Nos. 25-5185, 25-5189

———————————————

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————————

ARIZONA MINING REFORM COALITION, et al.,
*Plaintiffs–Appellants,*

v.

UNITED STATES FOREST SERVICE, et al.,
*Defendants–Appellees,*

and

RESOLUTION COPPER MINING, LLC,
*Intervenor-Defendant–Appellee.*

———————————————

SAN CARLOS APACHE TRIBE, et al.,
*Plaintiffs–Appellants,*

v.

UNITED STATES FOREST SERVICE, et al.,
*Defendants–Appellees,*

and

RESOLUTION COPPER MINING, LLC,
*Intervenor-Defendant–Appellee.*

———————————————

Appeal from the United States District Court for the District of Arizona
Nos. 2:21-cv-68, 2:21-cv-122 (Hon. Dominic W. Lanza)

———————————————

**FEDERAL APPELLEES' OPPOSITION TO PLAINTIFFS'
EMERGENCY MOTION UNDER CIRCUIT RULE 27-3
FOR AN INJUNCTION PENDING APPEAL**

———————————————

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*

ERIKA NORMAN
ANGELA ELLIS
CYNTHIA TAUB
EZEKIEL A. PETERSON
*Attorneys*
Environment & Natural Resources Div.
U.S. Department of Justice
999 18th St, North Terrace, Suite 600
Denver, CO 80202
(202) 598-6399
ezekiel.a.peterson@usdoj.gov

Of Counsel:

NICHOLAS PINO
*Attorney*
Office of General Counsel
U.S. Department of Agriculture

# TABLE OF CONTENTS

INTRODUCTION ................................................................. 1

STATEMENT OF THE CASE ............................................... 1

 A. The Southeast Arizona Land Exchange and
   Conservation Act ................................................... 1

 B. Factual and procedural background ...................... 2

STANDARD OF REVIEW .................................................... 5

ARGUMENT ...................................................................... 6

I. Plaintiffs have not established a likelihood of success
 or raised serious questions on the merits. ...................... 6

 A. Plaintiffs' claims suffer from fatal threshold
   deficiencies. ......................................................... 6

   1. Plaintiffs lack standing to challenge the
     land exchange because their injury is not
     redressable. ................................................ 6

   2. Even if Plaintiffs had standing and could
     challenge the land exchange under the APA,
     NEPA does not apply to the
     nondiscretionary land exchange. ................ 11

   3. With respect to their NEPA claims,
     Plaintiffs have not identified a final agency
     action subject to judicial review.................. 12

 B. Plaintiffs' claims also fail on the merits. ............. 15

i

1.    The AMRC Plaintiffs lack prudential standing for its appraisal claim under the Land Exchange Act and the Forest Service complied with the Act. ................................ 15

      a.    The AMRC Plaintiffs lack an APA right of action for its Land Exchange Act claims. ........................................ 15

      b.    The Forest Service complied with the appraisal provisions of the Land Exchange Act ................................... 17

2.    The Forest Service complied with NEPA. ................... 23

      a.    AMRC's NEPA arguments are wrong. ............... 23

      b.    The Tribe's NEPA Arguments are wrong. ................................................ 29

3.    The Forest Service complied with the NHPA and met its consultation duties. ................................. 31

II.   The balance of equities and public interest weigh against an injunction. ................................................ 34

CONCLUSION ................................................ 36

CERTIFICATE OF COMPLIANCE ........................................ 38

# TABLE OF AUTHORITIES

## Cases

*Artichoke Joe's v. Norton,*
  216 F. Supp. 2d 1084 (E.D. Cal. 2002) ................................. 10

*ASARCO Inc. v. Kadish,*
  490 U.S. 605 (1989) ...................................................... 10

*Bank of Am. Corp. v. City of Miami,*
  581 U.S. 189 (2017) ...................................................... 16

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................ 12, 14, 17

*Dep't of Transp. v. Pub. Citizen,*
  541 U.S. 752 (2004) ...................................................... 11

*Desert Citizens Against Pollution v. Bisson,*
  231 F.3d 1172 (9th Cir. 2000) ......................................... 10

*Envt'l Def. Ctr. v. Bureau of Ocean Energy Mgmt.,*
  *36 F.*4th 850 (9th Cir. 2022) ......................................... 12

*Feldman v. Ariz. Sec'y of State's Off.,*
  843 F.3d 366 (9th Cir. 2016) ........................................... 5

*Fund for Animals, Inc. v. Lujan,*
  962 F.2d 1391 (9th Cir. 1992) .......................................... 8

*Leiva-Perez v. Holder,*
  640 F.3d 962 (9th Cir. 2011) ........................................ 5, 25

*Lopez v. Brewer,*
  680 F.3d 1068 (9th Cir. 2012) .......................................... 5

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ..................................................... 7, 8

*Lujan v. National Wildlife Fed'n,*
  497 U.S. 871 (1990) .................................................... 15

*M.S. v. Brown,*
  902 F.3d 1076 (9th Cir. 2018)......................................................7

*Massachusetts v. EPA,*
  549 U.S. 497 (2007)........................................................................8

*Nken v. Holder,*
  556 U.S. 418 (2009)......................................................................34

*Ocean Advocs. v. U.S. Army Corps of Eng'rs,*
  402 F.3d 846 (9th Cir. 2005)......................................................16

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v.
  U.S. Dept. of Agric.,*
  415 F.3d 1078 (9th Cir. 2005)....................................................16

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989)......................................................................23

*Salmon Spawning & Recovery Alliance v. Gutierrez,*
  545 F.3d 1220 (9th Cir. 2008)..................................................7, 9

*Seven Cty. Infrastructure Coalition v. Eagle Cty.,*
  145 S. Ct. 1497 ........................................... 12, 23, 25, 29, 30

*Sierra Club v. Babbitt,*
  65 F.3d 1502 (9th Cir. 1995)......................................................11

*Static Control Components, Inc.,*
  572 U.S. 118 (2014)......................................................................16

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009)........................................................................8

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021)........................................................................7

*United States v. Locke,*
  471 U.S. 84 (1985)........................................................................18

*United States v. Oakland Cannabis Buyers Co-op,*
  532 U.S. 483 (2001)......................................................................34

iv

*Wilbur v. United States ex rel. Krushnic,*
　　280 U.S. 306 (1930) ............................................................ 18

*Wild Fish Conservancy v. Jewell,*
　　730 F.3d 791 (9th Cir. 2013) ............................................ 16

*Winter v. NRDC,*
　　555 U.S. 7 (2008) ................................................................ 5

## Statutes

5 U.S.C. § 702 ............................................................................ 15

5 U.S.C. § 704 .................................................................... 12, 13

16 U.S.C. § 539p ...................................................................... 31

16 U.S.C. § 539p(a) .......................................................... 10, 35

16 U.S.C. § 539p(b)(2) ........................................................ 1, 2

16 U.S.C. § 539p(c)(4) ...................................................... 16, 17

16 U.S.C. § 539p(c)(4)-(5) .................................................... 17

16 U.S.C. § 539p(c)(9)(B) ............................... 11, 12, 14, 15

16 U.S.C. § 539p(c)(9)(C) .......................................... 31, 32, 33

16 U.S.C. § 539p(c)(10) ........................................................ 3, 4

16 U.S.C. § 539p(*i*)(1)(C) .................................................... 21

16 U.S.C. § 539p(*i*)(3) .......................................................... 35

30 U.S.C. § 26 .......................................................................... 18

30 U.S.C. § 612 ........................................................................ 18

42 U.S.C. § 4332(c) .................................................................. 2

54 U.S.C. § 306108 ................................................................ 31

Pub. L. No. 114-94 ................................................................ 35

## Regulations

36 C.F.R. §254.9(b)(1) ............................................................. 22

36 C.F.R. § 218.11(b) ............................................................. 13

36 C.F.R. § 254.9(b)(1)(iv) ................................................... 19

36 C.F.R. § 254.9(c)(4) ......................................................... 19

## Other Authorities

90 Fed. Reg. 26,287 ............................................................... 3

Exec. Order No. 14241 ......................................................... 35

## INTRODUCTION

Plaintiffs ask this Court to take the extraordinary step of enjoining a land exchange between the U.S. Forest Service and Resolution Copper Mining, LLC, that Congress mandated more than a decade ago. But Plaintiffs' claims suffer from numerous fatal threshold deficiencies, and a careful review of the record shows that the Forest Service complied with its statutory obligations in preparing for this nondiscretionary, congressionally mandated land exchange. Plaintiffs fail to show significant questions or a likelihood of success on the merits and have not shown that the balance of the equities tips sharply in their favor. Thus, Plaintiffs have not made the requisite clear showing that they are entitled an injunction pending appellate review—relief that the district court properly denied. This Court too should deny their motion.

## STATEMENT OF THE CASE

### A.    The Southeast Arizona Land Exchange and Conservation Act

In 2014, Congress passed the Southeast Arizona Land Exchange and Conservation Act (the Land Exchange Act), which decided that the United States would exchange a 2,422-acre parcel of National Forest System Land—including an Apache ceremonial ground known in English as "Oak Flat"—for 5,459 acres of conservation lands in Arizona. 16 U.S.C. § 539p(b)(2), (c)(6)(A)(i), (d)(1). The Act provides that the Forest Service "shall convey all right, title, and interest" in Oak Flat to

1

Intervenor-Defendant Resolution Copper within sixty days of
publishing a Final Environmental Impact Statement (FEIS), *id.*
§ 539p(c)(1), (10), which is a document prepared under the National
Environmental Policy Act (NEPA) by agencies to evaluate and disclose
the environmental impacts of their proposed actions, 42 U.S.C.
§ 4332(c). Thus, the Land Exchange Act imposes a nondiscretionary
duty to convey title to Resolution Copper within sixty days after it
publishes the FEIS.

While the core of the Act is a nondiscretionary command to
execute the land exchange, the Act also imposes numerous procedural
requirements on the Forest Service. For instance, the Act requires that
the Forest Service engage in consultation with affected Indian tribes,
*id.* § 529p(c)(3); obtain appraisals of the land to be exchanged, *id.*
§ 539p(c)(4); issue special use permits to Resolution Copper, *id.*
§ 539p(c)(6); and prepare an FEIS to inform future agency
decisionmaking associated with the exchange, *id.* § 539p(c)(9). The Act
contains no private right of action nor any provision regarding judicial
review.

### B.   Factual and procedural background

The Forest Service initiated scoping for the land exchange in
March 2016. SER-006. The Forest Service then held five public scoping
meetings between March and June 2016 and received 133,512 public
comments, which it summarized in a scoping report in March 2017.

FEIS at SER-007. The Forest Service also participated in numerous other meetings and engaged in consultation with key stakeholders, tribes, and cooperating agencies. *Id.* In August 2019, the Forest Service published a draft EIS for public review and comment. *Id.* The agency then conducted six meetings and received over 29,000 comments on the draft. *Id.* The Forest Service published an EIS on January 15, 2021, but withdrew it shortly thereafter to reinitiate consultation with affected tribes to further explore tribal concerns. *See generally* SER-328-50.

On April 17, 2025, the Forest Service indicated that it would publish a notice of availability of the FEIS in the Federal Register within 60 days. SER-387. The agency made the FEIS available on its website on June 16, 2025, and published a notice of availability in the Federal Register on June 20, 2025. 90 Fed. Reg. 26,287 (June 20, 2025). Thus, under the Land Exchange Act, the Forest Service must convey title to the federal lands to Resolution Copper no later than August 19, 2025. 16 U.S.C. § 539p(c)(10).

The FEIS consists of six volumes, including a nine-chapter, 1,000-page body and twenty-one appendices, which together span more than 2,500 pages. SER-008-12. The FEIS includes responses to the 29,000 comments that the agency received on the draft EIS. *See* SER 228-42.

At the same time it published the FEIS, the Forest Service published a draft Record of Decision (ROD), which addresses the agency's discretionary decisions related to the Resolution Copper

3

Project on National Forest System lands, including proposed special-use authorizations, Forest Plan Amendments, and required mitigation measures. SER-359. The draft ROD is not a final decision and is still subject to an administrative objection process, which includes a 45-day period for parties to file objections. SER-369. The Forest Service must then prepare written responses to administrative objections. *Id.*

The Plaintiffs here filed suit in January 2021 under the Administrative Procedure Act (APA). They assert numerous claims under NEPA, the Land Exchange Act, the National Historic Preservation Act (NHPA), and the National Forest Management Act (NFMA). Their cases were stayed until 2025, when the Forest Service provided the parties notice that it would publish the FEIS no earlier than June 16, 2025. The parties briefed preliminary injunctions, which the district court denied on June 6, 2025. The Court nevertheless entered an order enjoining the government, with its agreement, from conveying title to the federal lands until August 19, 2025, to allow for a second round of preliminary-injunction briefing after publication of the FEIS. After that briefing, the district court denied Plaintiffs' motion on August 15, 2025. Order 94. The court found that Plaintiffs were unlikely to succeed on the merits of their claims and that the balance of

the equities did not tip sharply in Plaintiffs' favor. The court also denied Plaintiffs' motions for an injunction pending appeal. Order 93-94.[1]

## STANDARD OF REVIEW

An injunction pending appeal is a drastic remedy that is only granted in extraordinary circumstances. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). A movant must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent injunctive relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *see also Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016) (explaining the standard for an injunction pending appeal).

This Court has alternatively stated that a movant may satisfy this standard by showing "serious legal questions" on the merits, but only when the movant has carried its burden on the other three elements and has shown that the balance of hardships "tips sharply" in its favor. *Leiva-Perez v. Holder*, 640 F.3d 962, 964 (9th Cir. 2011).

---

[1] Plaintiffs in a third case filed suit in the District for the District of Columbia on July 24, 2025. *Lopez v. United States*, D.D.C. No. 1:25-cv-02408. That court granted the government's motion to transfer venue to the District of Arizona on August 1, 2025. There is currently a pending motion for a preliminary injunction in that case. *See Lopez v. United States*, D. Ariz. No. 2:25-cv-2758.

# ARGUMENT

Plaintiffs have not met their burden to show that they are entitled to an injunction pending appeal. As the district court explained, Plaintiffs do not come close to establishing a likelihood of success on their claims under the APA. Nor do the equities tip sharply in their favor.

## I. Plaintiffs have not established a likelihood of success or raised serious questions on the merits.

This Court should deny Plaintiffs' motions for injunctions pending appeal because Plaintiffs' claims fail at the threshold and on the merits.

### A. Plaintiffs' claims suffer from fatal threshold deficiencies.

This Court lacks jurisdiction because (1) Plaintiffs lack standing for all of their claims; (2) Plaintiffs' NEPA claims fail insofar as they challenge the land exchange because that statute does not apply to nondiscretionary actions; and (3) Plaintiffs have not identified a reviewable final agency action under the APA for their NEPA claims.

#### 1. Plaintiffs lack standing to challenge the land exchange because their injury is not redressable.

Plaintiffs' claims fail insofar as they challenge the land exchange because their alleged injuries traceable to the land exchange are not redressable. This is because the Forest Service has a nondiscretionary, congressionally mandated obligation to transfer title, and no additional

analysis under NEPA, additional appraisal, or consultation can redress these injuries.

To have Article III standing, a plaintiff must (1) show a concrete and particularized injury that is (2) caused by the defendant and (3) that is likely to be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

To satisfy the redressability prong of the standing test, plaintiffs must show that the relief they seek is both (1) substantially likely to redress their injuries and (2) within the district court's power to award. *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018). In general, the redressability requirement is relaxed when plaintiffs allege procedural violations—plaintiffs need only show that, were an agency to have followed the correct procedure, the agency's ultimate decision might have been different. *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226–27 (9th Cir. 2008). Still, that requirement is not toothless. *Id.* A plaintiff does not satisfy the redressability requirement if a substantive agency outcome could not be influenced even if a court gave the plaintiff the procedural remedy it seeks. *Id.* at 1227. In other words, there must be "some possibility that the requested relief [would] prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."

7

*Massachusetts v. EPA*, 549 U.S. 497, 517–18, 525–26 (2007) (citing *Lujan*, 504 U.S. at 572 n.7).

Plaintiffs fail that standard here. AMRC alleges that their use of the area "will be immediately and irreparably diminished or eliminated altogether by the [land] Exchange and Project operations." SER-405. The Tribe alleges that they will be injured by "Oak Flat's physical destruction[, which] will be irreversibly set in motion by its transfer to Resolution." SER-409-10. Thus, Plaintiffs lack standing because their injuries flow from the land exchange and the land exchange is nondiscretionary and congressionally mandated—there is no possibility that more NEPA, consultation, or appraisal analysis would change the outcome, even if they succeeded on the merits of those claims.

Insofar as Plaintiffs allege bare procedural injury based the NEPA or NHPA process itself—as opposed to concrete injury from the substantive decision to transfer the land—that fails as well. *See* SER-409-10 (alleging that the Tribe did not receive an opportunity to review and comment on new issues presented in the FEIS). Bare procedural injuries alone cannot satisfy Article III standing requirements. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."); *see also Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992) ("Merely establishing

a procedural violation of NEPA does not compel the issuance of a
preliminary injunction."). Plaintiffs must also show that the alleged
procedural injuries harmed their concrete interests and that those
harms could be redressed by the court. But additional NEPA or NHPA
review cannot address the concrete harms that Plaintiffs allege will
flow from the land exchange because the land exchange is a
nondiscretionary action, mandated by Congress.

In that way, this case is analogous to *Salmon Spawning*. There,
plaintiffs alleged that federal agencies failed to follow proper procedures
in consulting under the Endangered Species Act and sought to
invalidate a Biological Opinion for a fishing treaty between the United
States and Canada. 545 F.3d at 1226-27. The Ninth Circuit held that
plaintiffs did not meet the redressability element of standing because
the court could not "undo the Treaty," and setting aside the Biological
Opinion would not "remedy the harm asserted." *Id*. at 1227. The court
rejected plaintiffs' arguments that the agencies might take
discretionary actions that would alleviate their injuries as "too
uncertain." *Id*. at 1228-29.

Like *Salmon Spawning*, any decision by this Court that the FEIS
or appraisal is inadequate would not remedy the harms alleged by
Plaintiffs from the privatization of the federal lands and their eventual
mining because, even if the Forest Service is required to conduct
additional analysis, it cannot refuse to transfer the federal lands to

9

Resolution Copper. In that way, this case is different from *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1178-79 (9th Cir. 2000). There, this Court found that a procedural injury with respect to a land exchange was redressable where the federal agency had discretion to disapprove or alter the land exchange after a proper valuation. *Id.* at 1178-79. But here, the Forest Service has no discretion to do so. Instead, Congress "authorize[d], direct[ed], facilitate[d], and expedite[d] the exchange." 16 U.S.C. § 539p(a); *accord id.* § 539p(c)(10). The Forest Service lacks discretion over whether to transfer title, and a judicial order compelling additional NEPA analysis cannot alter that fact. Plaintiffs accordingly lack standing to challenge the land exchange.

Finally, that an injunction would delay the exchange or could ultimately result in Resolution Copper walking away from the transaction does not establish redressability. *See Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084 (E.D. Cal. 2002) (finding no redressability where injunction would "do little to hamper" actions which plaintiffs ultimately took issue with); *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (the redressability prong of standing cannot be met when redress depends on "the unfettered choices made by independent actors"). Plaintiffs accordingly lack standing to challenge the land exchange

2. **Even if Plaintiffs had standing and could challenge the land exchange under the APA, NEPA does not apply to the nondiscretionary land exchange.**

Plaintiffs cannot challenge the land exchange under NEPA because that procedural statute does not apply in the absence of agency discretion. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 769 (2004) ("NEPA's 'rule of reason' [does not] require an agency to prepare a full EIS due to the environmental impact of an action it could not refuse to perform."); *Sierra Club v. Babbitt*, 65 F.3d 1502, 1512-13 (9th Cir. 1995) (NEPA did not apply where BLM lacked authority to modify a road project). The 2023 amendments to NEPA codified this rule by exempting "activities or decisions that are non-discretionary" from NEPA's definition of a "major federal action." 42 U.S.C. § 4336e(10)(B)(vii).

A mandatory transfer of title is not a major federal action subject to NEPA. To be sure, the Land Exchange Act requires the EIS to "assess the effects of the mining and related activities . . . on the cultural and archeological resources located on the Federal land," but the statute also makes clear that the EIS "shall be used as the basis for all decisions under Federal law." 16 U.S.C. § 539p(c)(9)(B), (C)). The fact that Congress required the Forest Service to prepare an EIS specifically to "be used as the basis for its" *discretionary* decisions does not create a

11

cognizable NEPA claim against the predicate nondiscretionary land exchange. *Id.* § 539p(c)(9)(B).

### 3.   With respect to their NEPA claims, Plaintiffs have not identified a final agency action subject to judicial review.

Even ignoring the standing problem, this Court lacks jurisdiction over Plaintiffs' NEPA claims challenging the FEIS and draft ROD because neither of those documents is a final agency action subject to judicial review under the APA. *See Envt'l Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 867 (9th Cir. 2022).  The APA authorizes judicial review only of "final agency action." 5 U.S.C. § 704. For an agency action to be "final", it must (1) "mark the 'consummation' of the agency's decisionmaking process" and (2) "be one by which 'rights or obligations have been determined', or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The FEIS, which was issued alongside a draft ROD that is still subject to an administrative objections process, does not meet the *Bennett* test with respect to Plaintiffs' NEPA claims.

An FEIS, standing alone, is typically not a final agency action reviewable under the APA. This is because an FEIS is a procedural document that informs an agency's decisionmaking; it is not the decision itself. *Seven Cty. Infrastructure Coalition v. Eagle Cty.*, 145 S. Ct. 1497, 1514 ("[Courts] must keep in mind that review of an agency's

EIS is not the same thing as review of the agency's final decision concerning the project."). This is not to say that an EIS is unreviewable. But the APA provides that "preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704. Thus, courts typically review an FEIS once an agency makes the final decision the FEIS was meant to inform. *See, e.g.*, *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 6235 F.3d 1092, 1118 (9th Cir. 2010) ("Once an EIS's analysis has been solidified in a ROD, an agency has taken final agency action, reviewable under [the APA].").

Here, the FEIS was published concurrently with a draft—not final—ROD. The draft ROD is subject to a 45-day predecisional objection process and, before issuing a final ROD, the Forest Service must consider and provide written responses to objections. SER-359; 36 C.F.R. § 218.11(b). The draft ROD also explains, "[t]he FEIS includes analysis of both the Resolution Copper Mine project, which is the development of a mine on the land, and the congressionally mandated land exchange," but the draft ROD "addresses decisions only related to the Resolution Copper Mine project." SER-359. That is because, while the Forest Service has discretion over the contours of any components of a future mining project on public land, the Forest Service has "no discretion or decision to be made with respect to the land exchange." *Id.*

13

So in this case, neither the FEIS nor the draft ROD is a reviewable final agency action under the APA. The Land Exchange Act makes clear that the FEIS is not a decision document for the land exchange itself, but instead must be used to inform "all future decisions under Federal law related to the proposed mine," such as "granting of any permits, rights-of-way, or approvals" for the mine.  16 U.S.C. § 539p(c)(9)(B). And the draft ROD is a predecisional draft of a decision that has not yet been finalized and is still subject to public comment. Neither of these documents are decisions that "mark the 'consummation' of the agency's decisionmaking process," and are thus not final agency actions. *Bennett*, 520 U.S. at 177-78. The process is ongoing and will not be complete until the final ROD is signed and the Forest Service has resolved public objections. At that point, assuming Plaintiffs can satisfy jurisdictional requirements, Plaintiffs can bring suit to challenge any final agency action. But before then, there is no final agency action subject to judicial review under the APA; there is only the nondiscretionary statutory obligation to exchange the land.

Some Plaintiffs argue that their NEPA claims nonetheless challenge a final agency action because they seek "APA review under the [Land Exchange Act] as opposed to APA review under NEPA." Tribe Mot. 9. As already explained, however, the Land Exchange Act's NEPA provision makes clear that the FEIS is to be used for "future decisions," which means the relevant final agency action is that future decision, not

14

the land exchange itself.  16 U.S.C. § 539p(c)(9)(B).  And for those "future decisions," there is still future decisionmaking to come.

### B.  Plaintiffs' claims also fail on the merits.

#### 1.  The AMRC Plaintiffs lack prudential standing for its appraisal claim under the Land Exchange Act and the Forest Service complied with the Act.

The AMRC Plaintiffs fail to demonstrate a likelihood of success for their claims challenging the appraisal of the land. They lack prudential standing to challenge the appraisal, and their appraisal claims are without merit because the appraisal of the parcel properly excluded the value of the minerals in which Resolution Copper has an exclusive possessory interest.

##### a.  The AMRC Plaintiffs lack an APA right of action for its Land Exchange Act claims.

The APA provides a cause of action to a person who is "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To "be adversely affected or aggrieved" "within the meaning of a statute, the plaintiff must establish that the injury he complains of (his aggrievement, or the adverse effect upon him) falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 883 (1990) (cleaned up); *see*

*also Lexmark Intern., Inc.. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014); *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 796-97 (9th Cir. 2013) (quoting 5 U.S.C. § 702); *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005). A statutory provision's zone of interests is determined using traditional tools of statutory interpretation. *See Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 197–200 (2017).

The AMRC Plaintiffs' alleged injuries fall outside the zone of interests of the Land Exchange Act's appraisal provisions. 16 U.S.C. § 539p(c)(4), (5). Plaintiffs allege environmental, recreational, and aesthetic harms from the land exchange and future mining activities, as well as harm from the privatization of the federal lands. But the text of the appraisal provisions of the Land Exchange Act makes clear that they are solely designed to protect the economic interests of the parties to the exchange. *See id.* § 539p(c)(4)(B) (establishing appraisal standards), (5)(B) (setting forth a process if the initial exchange turns out to lack the requisite equal value). Indeed, this land exchange is exempted from the requirements of the Federal Land Policy and Management Act. 16 U.S.C. § 539p(c)(5)(B)(ii). The statute's appraisal provisions thus offer no relief for Plaintiffs' environmentally focused injuries. *Cf. Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dept. of Agric.*, 415 F.3d 1078, 1103 (9th

Cir. 2005) (plaintiffs could not bring a NEPA claim because their economic interests were outside of NEPA's zone of interests).

Plaintiffs have argued that their members include recreational, tribal, and other users of these specific public lands that would be exchanged. But these interests do not relate to the appraisal provisions of the Act, which constitute the relevant statute for the zone-of-interests test. *Bennett v. Spear,* 520 U.S. 154, 175-76 (1997). Because Plaintiffs argue that the Forest Service's appraisal failed to comply with the requirements of the appraisal provisions of the Act, 16 U.S.C. § 539p(c)(4), (5), those provisions define the relevant zone of interests. Any flaws in the appraisal process would impact only the value of the exchange to the United States and Resolution Copper, it would not affect Plaintiffs' uses of the lands, nor could it prevent the exchange from moving forward. Plaintiffs thus lack an APA right of action to challenge the appraisals under the Land Exchange Act.

> **b.** **The Forest Service complied with the appraisal provisions of the Land Exchange Act.**

In any event, the Forest Service complied with the Act's provisions governing appraisal and its own regulations. The Act requires appraisals of the federal and nonfederal land to be exchanged and requires the value of the nonfederal land to be at least as great as the value of the federal land. 16 U.S.C. § 539p(c)(4)-(5). Plaintiffs raise

17

three main arguments challenging the appraisal of the parcel. AMRC
Mot. 5-12. All of them fail for the fundamental reason that the United
States could not convey, by sale or otherwise, the mineral rights on the
parcel that already belonged to Resolution Copper. The district court
agreed. Order 20-27 (correctly observing "Resolution Copper already
effectively owns the exclusive right to mine the copper" and that
"AMRC never directly addresses the absurd consequences that would
flow from adopting its position").

*First*, the appraisal properly excluded the value of Resolution
Copper's unpatented mining claims. *Cf.* AMRC Mot. 6-10. Plaintiffs'
argument mischaracterizes the legal significance of Resolution Copper's
unpatented mining claims on the parcel. Under the General Mining
Law of 1872, a party that discovers a valuable mineral deposit on lands
open to mining obtains a property right to that mineral deposit, and to
reasonable use of the land to extract the mineral deposit, without
payment to the United States. 30 U.S.C. §§ 26, 612. Although an
individual may "patent" his mining claim by fulfilling certain statutory
conditions, "[p]atenting . . . is not required, and an unpatented mining
claim remains a fully recognized possessory interest." *United States v.
Locke,* 471 U.S. 84, 86 (1985); *see also Wilbur v. United States ex rel.
Krushnic*, 280 U.S. 306, 316-17 (1930) ("[W]hen the location of a mining
claim is perfected under the law it has the effect of a grant by the

18

United States of the right of present and exclusive possession [and] is property in the fullest sense of that term . . . .").

Thus, while the United States owns the parcel in fee simple, it is encumbered by Resolution Copper's unpatented mining claims and the United States can neither mine the minerals nor transfer the right to do so to anyone else. The value of Resolution Copper's mineral rights was therefore properly excluded from the United States' estate in the appraisal. This makes sense, because even if Congress had never enacted the Land Exchange Act, Resolution Copper would have retained the exclusive rights to exploit the locatable minerals, and those rights would remain an encumbrance on the federal land. As the appraisal summary explains, "the Federal Property is encumbered by mining claims held by a party other than the United States; said mining claims confer all rights to locatable minerals to that party in accordance with the Mining Law and are not part of the estate owned by the United States . . . ." SER-374. The appraisal thus properly excluded the value of those minerals from the United States' estate. 36 C.F.R. § 254.9(c)(4) (requiring statement of encumbrances for land appraisals).

More broadly, the appraisal fully complied with federal appraisal standards and regulations. Plaintiffs cite 36 C.F.R. § 254.9(b)(1)(iv), which requires the appraiser to consider "the contributory value of any interest in land such as water rights, minerals, or timber." However,

19

neither that section nor any other regulatory provision requires the appraiser to consider interests not belonging to the party whose property is being appraised. The Uniform Appraisal Standards for Federal Land Acquisitions (known as the "Yellow Book") provides special considerations for minerals properties, including alerting those appraising such properties that "[i]t is fundamental that the property rights and interests in minerals properties are identified as part of the problem identification process" and that "[a]ppraisers valuing mineral properties impacted by the 1872 Mining law are advised to coordinate with client agency staff to clarify the approaches to valuing those interests." Interagency Land Acquisition Conference, *Yellow Book* 45-46 (2016), https://www.justice.gov/d9/enrd/legacy/2015/04/13/uniform-appraisal-standards.pdf. That process was followed here when the Forest Service advised the appraiser that Resolution Copper possessed the exclusive right to mine the locatable minerals on the land. As the district court correctly noted, AMRC failed to identify any regulation or standard that "explain how to perform the valuation when, as here, the minerals are subject to unpatented mining claims." Order 23.

In arguing otherwise, Plaintiffs point to several general statements made during the Congressional debate over the Exchange Act and the Congressional Budget Office's short two-page analysis of the bill. AMRC Mot. 9-10. But none of these required the Forest Service to include the value of the mining claims in the appraisal. Indeed, there

20

was no discussion in the documents of Resolution Copper's unpatented mining claims, the legal effect of those claims, or how the appraisal should take them into account. For example, while the House Report recognizes that "Resolution Copper already has unpatented mining claims that cover about 75% of the parcel," SER-432, it reflects no Congressional intent that the Forest Service ignore those property rights in the appraisals. In fact, 16 U.S.C. § 539p(*i*)(1)(C) recognizes Resolution's unpatented mining claims and their "rights and ability to conduct activities on the Federal land under such unpatented mining claims." Accepting Plaintiffs' argument would mean that Resolution Copper would pay the United States for minerals it otherwise could have possessed for free under the Mining Law—a result that Congress surely did not intend.

*Second*, the appraisal correctly determined the highest and best use of the parcel was for "surface land use in support of a mining operation" given that the parcel is encumbered by Resolution Copper's unpatented mining claims. *Cf.* AMRC Mot. 10-11. When determining the highest and best use of that parcel, the appraiser analyzed the highest and best use for the estate of the United States, while considering Resolution Copper's existing possessory interest in the minerals. Because the United States does not possess the right to mine the copper on the parcel, the appraiser correctly determined that the highest and best use of the federal estate—i.e., the land without the

21

right to mine the copper—would be for support facilities for the development of a mine.

*Finally*, the appraisal properly treats the exchange as a private-lands transaction. *Cf.* AMRC Mot. 11-12. (citing 36 C.F.R. §254.9(b)(1)). The appraisal provides that the federal land was "appraised as though it is in private ownership." AMRC Motion, Ex. 11 at 3. The appraisal explains that "[t]his hypothetical condition does not alter the facts that" the property "is encumbered by mining claims held by a party other than the United States; said mining claims . . . are not part of the estate owned by the United States." *Id.* The appraisal thus properly treated the exchange as a private sale, but acknowledged reality by excluding the mineral rights that the United States did not own and could not convey in any transaction. On this point, the district court correctly observed that AMRC's arguments to the contrary "rely on the false premise that, [if the lands were private], Resolution Copper's exclusive right to mine the minerals would somehow cease to exist." Order 23.

In sum, the district court correctly found that Plaintiffs were unlikely to succeed on their appraisal claims because "Resolution Copper" already effectively owns the exclusive right to mine the copper" and so Plaintiffs' "criticisms all flow from a misunderstanding of how unpatented mining claims work." Order 21-22. That was correct.

## 2.    The Forest Service complied with NEPA.

Even if Plaintiffs had standing, and even if the nondiscretionary land exchange was final agency action under NEPA, Plaintiffs' NEPA claims would fail on the merits.  NEPA is a "procedural cross-check." *Seven Cty.*, 145 S. Ct. at 1507. It "does not mandate particular results but simply prescribes the necessary process" by which agencies must consider the environmental impacts of their actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

Plaintiffs contend (AMRC Mot. 13) that the "guiding principle for judicial review" under NEPA is "reasonableness."  To the contrary, as the Supreme Court recently stated: "The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Seven Cty.*, 145 S. Ct. at 1515.  In conducting its NEPA analysis, "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry"—choices that are afforded "substantial deference." *Id.* at 1513. Thus, the Court must defer to the Forest Service's judgment as to the scope and contents of the FEIS so long as the agency's choices were reasonable. *Id.* at 1507.

### a.    AMRC's NEPA arguments are wrong.

AMRC makes three arguments on their NEPA claims, none of which is correct. *First*, AMRC argues that the agency failed to properly analyze the groundwater impacts of the Project's pump station, the

Desert Wellfield, on the groundwater in the surrounding region. AMRC Mot. 13-15. But the Forest Service fully analyzed impacts associated with the Desert Wellfield, including hundreds of pages on impacts on groundwater. The Forest Service quantitatively modeled the physical impact (drawdown of groundwater levels) caused by the removal of 100% of the Desert Wellfield groundwater up to 240 years into the future, under each alternative. *See* SER-031, 038-39. The Forest Service also analyzed direct pumping impacts for each alternative, including (i) the maximum drawdown at the center of the wellfield, (ii) the drawdown at the north and south ends of the wellfield, (iii) the drawdown near the New Magma Irrigation and Drainage District, and (iv) the long-term drawdown after recovery. *See* SER-049-53.

Plaintiffs argue that the Forest Service should have done more to analyze the cumulative groundwater impacts of the mine along with a residential development in the region, the Superstition Vistas. But the agency considered some of the cumulative effects on groundwater from both the mine and the development and drew a reasonable line in analyzing reasonably foreseeable future activities. First, to determine whether it should include a different project in its cumulative impacts analysis, the agency conducted a screening process for spatial overlap, temporal overlap, and to determine whether there is sufficient information to analyze for impacts. Second, as appropriate, the agency performed cumulative effects analyses for different resources where the

24

project and the activity overlap. SER-027, 158, 232. While the Forest Service determined that the Superstition Vistas development as a whole did not pass the initial screening for cumulative effects, *id.* at 977, the agency nevertheless analyzes portions of the development quantitatively and, in response to concerns about cumulative impacts to regional water supplies, Chapter 4 of the FEIS contains a qualitative or holistic discussion of regional water impacts including from Superstition Vistas. *See* SER-159-71.

The Forest Service's analysis of Superstition Vistas satisfies NEPA. The agency quantitatively analyzed the portions of the project for which it had sufficient information—specifically, the portion that has a demonstrated source of water and that could accordingly be included in the regional cumulative effects groundwater model. SER-169. The other portions "without demonstrated water supplies" were too speculative to include in the quantitative modeling," *id.*, but the agency nevertheless analyzed those portions qualitatively in Chapter 4. *See* SER-159, 166, 169, 171. The Forest Service also addressed the direct and cumulative groundwater impacts in its response to comments. SER-236. The Forest Service's assessment of the cumulative effects of Superstition Vistas and the mine was more than reasonable, and this is precisely the sort of reasonable line-drawing to which courts must defer. *Seven Cty.* 145 S. Ct. at 1513.

25

Plaintiffs also argue that the Forest Service ignored the State of Arizona's concerns about the Superstition Vistas development and socioeconomic impacts from pumping. In fact, the Forest Service amended its analysis of regional water supplies in response to comments from the State and others about potential housing developments, including by adding the qualitative discussion described above. SER-166, 235, 236. The Forest Service concluded that "[g]roundwater modeling, using the best available estimates of all regional groundwater users over the next 100 years, indicates that regional groundwater supplies generally are sufficient to satisfy committed demands," SER-168, but that with "potential new future residential demand from Superstition Vistas the cumulative effects modeling suggests that regional water supplies would become more limited and would need to be carefully assessed for sufficiency based on actual development plans for the area," SER-169.

*Second*, Plaintiffs argue that the agency failed to meaningfully consider comments from other agencies, including BLM and the Arizona State Lands Department. AMRC Mot. 15-16. Plaintiffs lean heavily on a twenty-six-page BLM report to support its arguments that the FEIS's analysis of water impacts falls short. But the Forest Service reviewed the BLM report and made several revisions to the FEIS in response. The additional cumulative effects analysis in Chapter 4 covers the very issues Plaintiffs assert that BLM said was missing from the draft, such

26

as Colorado River Shortages, SER-162-63; the Drought Contingency Plan and Central Arizona Project, SER-160-62; and Assured Water Supplies, Future Development, and Competing Uses for Groundwater, SER-163-68. Other changes responsive to BLM's comments include additional analysis of Cutter Basin impacts, SER-044-48; additional analysis of impacts to private wells from Desert Wellfield pumping under each alternative, SER-049-53; additional documentation on brownfield tailings storage, SER-183-84; additional discussion of existing water laws and two new sections on the topic, SER-039-42; and sections on future meteorological trends, SER-172-76.

*Finally*, Plaintiffs argue that the Forest Service failed to fully analyze potential mitigation measures to address regional groundwater declines. AMRC Mot. 16-17. But the Forest Service fully considered mitigation measures for water resources and their effectiveness, proposed measures that it has the authority to implement, and disclosed other mitigation measures that will be implemented under contractual, financial, or other agreements. *See* SER-018-26 (providing overall framework for mitigation); SER-054-56, 74-77, 79-80 (assessing the effectiveness of mitigation measures); SER-043, 69, 78 (discussing applicant-committed environmental protection measures for water); *see also* SER-362 (setting forth proposed required mitigation measures related to water).

27

Appendix J to the FEIS addresses the mitigation and monitoring measures considered and the design features and applicant-committed mitigation measures to be implemented. SER-185-227. The Forest Service considered the mitigation and monitoring measures suggested by commenters, including those related to groundwater impacts. But as the agency explained in its response to comments, the Forest Service lacks authority to impose some commenter-suggested measures. SER-229-37; *see also* SER-187 (explaining the Forest Service's limitations on its authority). For example, the Forest Service lacks authority to require Resolution Copper to "work with any impacted stakeholder to mitigate effects of water level declines caused by the project[,]" because Resolution Copper's recovery wells will not be located on federal land and will be subject to the jurisdiction of the Arizona Department of Water Resources. SER-230. Furthermore, water impacts were analyzed extensively as part of the EIS and are addressed in other monitoring and mitigation plans. SER-196-200. Plaintiffs show no defect with this analysis. The Forest Service fully complied with NEPA and Plaintiffs arguments do not come close to overcoming the strong deference that courts must give agencies' NEPA analysis under *Seven County*.

### b. The Tribe's NEPA Arguments are wrong.

The Tribe takes issue with the Forest Service's discussion of the impacts of tailings storage facilities. Tribe Mot. 13-15. But the Forest Service looked at those issues in detail.

As to tailings, the FEIS analyzes in detail the risks associated with tailings storage facilities, dedicating over fifty pages to tailings and pipeline safety. SER-081-132. The FEIS incorporates a full Failures Modes and Effects Analysis, building on the analysis in the draft EIS. SER-085. The Forest Service considered a range of possible breach scenarios and used a worst-case assumption to analyze potential outcomes. *Id.* The FEIS also incorporated a breach analysis to "assess the potential downstream impacts of where the tailings would travel, how far, and how fast." *Id.*

The Tribe relies on a declaration that includes a list of fourteen purported deficiencies with the tailings analysis. But that list of criticisms invites precisely the kind of second-guessing about the Forest Service's scientific analysis that the Supreme Court specifically rejected in *Seven County*. *See* 145 S. Ct. at 1511. Indeed, most of the criticisms in the list merely disagree with the weight the Forest Service gave to various concerns or the modeling it chose to employ. Those criticisms ignore "[b]lack-letter administrative law" requiring courts to be at their "most deferential" when assessing an agency's "speculative assessments

29

or predictive or scientific judgments." *Seven Cty.*, 145 S. Ct. at 1512 (citation omitted). The Tribe's arguments fail under this deferential standard of review.

The Tribe also argues that the FEIS failed to consider certain factors or scenarios that the Forest Service did, in fact, expressly analyze. For example, the Tribe argues that the FEIS "erroneously assumed that oxygen would not be present in the mine's collapsed and mineralized zones," thus compromising the analysis of tailings storage facility safety. Tribe Mot. 14. In fact, the FEIS analyzed the likelihood that oxygen would penetrate the tailings, causing a risk of acid rock drainage, SER-064-65; disclosed uncertainties in the modeling related to this issue, e.g., SER-068; and assessed the reasonableness of various assumptions, *id*. The Forest Service therefore assessed acid rock drainage, and the Tribe fails to show that the analysis was arbitrary or capricious.

* * *

The Forest Service's analysis complied with NEPA. And importantly, *Seven County* instructs that, even if an agency's NEPA analysis falls short in some respects, that deficiency may not require vacatur of the agency's ultimate approval of a project, "at least absent reason to believe the agency might disapprove the project if it added more to the EIS." 145 S. Ct. at 1514. That is especially true here,

30

because the land exchange is mandated by Congress—the Forest Service has no authority to disapprove the exchange. 16 U.S.C. § 539p.

### 3. The Forest Service complied with the NHPA and met its consultation duties.

For nearly eight years, the Forest Service consulted with the Advisory Council on Historic Preservation ("ACHP"), the Arizona State Historic Preservation Officer, 15 tribes (including the Plaintiff Tribe), representatives of local governments, public utilities, and other federal and state agencies. Among other things, the consultation assessed the likely effects of the mine project on cultural and archeological resources and sought to identify mutually acceptable measures to the Forest Service and Resolution Copper to mitigate those effects. That extensive consultation complied with the NHPA, 54 U.S.C. § 306108, and the consultation provision of the Land Exchange Act, 16 U.S.C. § 539p(c)(9)(C). Like the NHPA's consultation requirements, that provision directs the Forest Service to "assess the effects of the mining and related activities . . . on the cultural and archeological resources that may be located on the Federal Land[,]" and to "identify measures that may be taken, to the extent practicable, to minimize potential adverse impacts on those resources[.]" 16 U.S.C. § 539p(c)(9)(C).

The Tribe seems to argue that it is likely to succeed on its claim that the Forest Service did not substantively consult with the Tribe. Tribe Mot. 15-17. But that is wrong. The Forest Service consulted with

the required parties and complied with both the NHPA and the Land Exchange Act. *See generally* SER-133-56, 177-79. The district court's order provides an extensive summary of all the consultation between the Tribes and the Forest Service, including those events in which the Tribal council or its Chairman were directly involved, negating the Tribe's argument that only consultations with the Tribal Council count towards adequate consultation. Order 67-71, 74-75. Consistent with Section 106 of the NHPA, the Forest Service initiated consultation with ACHP and other NHPA consulting parties in 2017. By January 2021, all parties to the agreement except for the ACHP had signed the programmatic agreement. In February 2021, the ACHP notified the Forest Service that it was terminating consultation because it "believe[d] that further consultation in this case would be unproductive." SER-134. Central to the ACHP's decision to terminate was its conclusion that the land exchange "would destroy significant historic properties, including the highly significant Oak Flat," and that the measures contemplated by the programmatic agreement were "not sufficient to adequately resolve those adverse effects." SER-389.

In March 2021, the Forest Service withdrew the 2021 FEIS and reinitiated Tribal consultation. SER-178. As part of the reinitiated consultation, the Forest Service held tribal listening sessions, as well as formal and informal consultation meetings with tribes that could be impacted by the land exchange. *Id.*; *see also* SER-398. The Forest

Service held a listening session in October 2021 with eight tribes, including the Tribe. SER-399. Between 2021 and 2023, the Forest Service engaged directly with Plaintiff's Tribal Council. SER-398-400. That process continued through 2024, when the Forest Service conducted two more formal consultation meetings with the Tribe to discuss its concerns as well as efforts to develop a Memorandum of Understanding. SER-400-01. The extensive Tribal consultation undertaken by the Forest Service is detailed in more than 100 pages of the FEIS. *See* SER-244-353. The consultation was more than sufficient.

Ultimately, "all consulting parties" recognized there would be "adverse direct effects on historic properties" resulting from mining after the nondiscretionary land exchange occurred. SER-394, 396. And the extensive consultation process did "not uncover[] other potential mitigation or alternatives that would allow USDA to comply with [the Land Exchange Act] while avoiding adverse impacts to Tribal interests." SER-396. Plaintiffs contend that the Forest Service therefore failed to comply with 16 U.S.C. § 539p(c)(9)(C)'s directive that the Forest Service identify minimization measures. But that provision did not require imposition of impracticable mitigation measures or require the Forest Service to resolve all potential impacts. *Id.* And the inability of the consulting parties to identify minimization measures was not due to a lack of meaningful consultation, SER-177-79 (summarizing consultation); *id.* at SER-244-353 (consultation history), but rather to

an irreconcilable conflict between land uses. The Forest Service complied with its obligations to consult under the NHPA and additional consultation would not yield a different result.

## II. The balance of equities and public interest weigh against an injunction.

Because Plaintiffs fail to show they are likely to succeed on appeal or even raise serious questions going to the merits, the motion should be denied without further analysis. But if this Court considers the other factors, the motion may also be denied because the balance of equities and harms, as well as the public interest, weigh against an injunction. The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, the equities weigh against an injunction because, as the district court explained, Order 91-92, in the Land Exchange Act, Congress determined that facilitating copper mining in Arizona and expanding the National Forest System is in the public interest. When Congress has spoken directly on a matter, a court sitting in equity "cannot 'ignore the judgment of Congress, deliberately expressed in legislation.'" *United States v. Oakland Cannabis Buyers Co-op*, 532 U.S. 483, 497 (2001). "Courts in equity, cannot, in their discretion, reject the balance that Congress has struck in a statute." *Id.* Here, Congress struck a balance by determining the land exchange was in the public interest because it would facilitate copper mining and expand the

34

National Forest System. *See* 16 U.S.C. § 539p(a). This Court should not override Congress's judgment by enjoining the land exchange.[2]

The land exchange is also in the public interest because it will facilitate the domestic production of copper, a critical mineral. Order 92. On March 20, 2025, the President issued an Executive Order, Immediate Measures to Increase American Mineral Production, finding that the national and economic security of the country are threatened by the United States' reliance on foreign mineral production, and it is "imperative for our national security that the United States take immediate action to facilitate domestic mineral production to the maximum possible extent." Exec. Order No. 14241, § 1, 90 Fed. Reg. 13673 (Mar. 20, 2025). Under the Executive Order, the Resolution Copper Project was added as a "priority" mineral project on the Permitting Dashboard established under section 41003 of title 41 of the Fixing America's Surface Transportation (FAST) Act, Pub. L. No. 114-

---

[2] We also note that the Land Exchange Act includes a provision explicitly mandating that Resolution Copper maintain access to Oak Flat even after the land exchange occurs until it is no longer safe to do so. 16 U.S.C. § 539p(*i*)(3) ("As a condition of conveyance . . . Resolution Copper shall agree to provide access to the surface of the Oak Flat Campground to members of the public, including Indian tribes, to the maximum extent practicable . . . until such time as the operation of the mine precludes continued public access for safety reasons . . . ."). Thus, even after the land exchange occurs, public access to Oak Flat will not immediately change.

35

94, 129 Stat. 1312, 1748 (2015). *See FAST-41 Transparency Projects*, Permitting Council, https://www.permits.performance.gov/projects/transparency-projects (last visited July 25, 2025). For its part, the district court was persuaded that there are "weighty equities and public-interest considerations on the [Government's] side of the ledger" that would prevent the equities from tipping sharply in Plaintiffs' favor. Order 91-92.

Executing the land exchange is an action in the public interest as determined by Congress and supported by the President's recent actions to increase domestic production of critical minerals. This Court should deny Plaintiffs' motions for injunctions pending appeal.

## CONCLUSION

Plaintiffs' motions for injunctions pending appeal should be denied.

Respectfully submitted,

/s/ *Ezekiel A. Peterson*

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*

Of Counsel:

NICHOLAS PINO                           ERIKA NORMAN
*Attorney*                              ANGELA ELLIS
Office of General Counsel               CYNTHIA TAUB
U.S. Department of Agriculture          EZEKIEL A. PETERSON
                                        *Attorneys*
                                        Environment & Natural Resources Div.
                                        U.S. Department of Justice
August 17, 2024                         999 18th St., North Terrace, Suite 600
90-1-4-16263                            Denver, CO 80202
90-2-4-16252                            (202) 598-6399
                                        ezekiel.a.peterson@usdoj.gov

37

## CERTIFICATE OF COMPLIANCE

Ninth Circuit Rules 27-1 and 32-3, which together establish a word limit of 5,600 words. This response, which responds to two motions for injunctions pending appeal, contains 8,066 words, excluding the items exempted by Ninth Circuit Rule 27-1(1)(d). Federal Defendants have concurrently filed a motion for leave to file an oversized response. The type size and typeface comply with Federal Rule of Appellate Procedure 27(d)(1)(E) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

/s/ *Ezekiel A. Peterson*
EZEKIEL A. PETERSON
*Attorney*
Environment & Natural Resources Div.
U.S. Department of Justice
999 18th St., North Terrace, Suite 600
Denver, CO 80202
(202) 598-6399
ezekiel.a.peterson@usdoj.gov