No. 25-5185

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION
OF ARIZONA, INC.; CENTER FOR BIOLOGICAL DIVERSITY;
EARTHWORKS; THE ACCESS FUND; and SIERRA CLUB.

*Plaintiffs-Appellants*,

v.

BROOKE L. ROLLINS, U.S. SECRETARY OF AGRICULTURE; UNITED
STATES FOREST SERVICE; and NEIL BOSWORTH, SUPERVISOR OF THE
TONTO NATIONAL FOREST.

*Defendants-Appellees*,

and

RESOLUTION COPPER MINING, LLC.

*Intervenor-Defendant-Appellee.*

_____

On Appeal from the United States District
Court for the District of Arizona

Honorable District Judge Dominic W.
Lanza
(2:21-CV-00122-DWL)

_____

## PLAINTIFFS-APPELLANTS' REPLY IN SUPPORT OF
## EMERGENCY MOTION UNDER CIRCUIT RULE 27-3

_____

# **TABLE OF CONTENTS**

TABLE OF AUTORITIES .................................................................... iii

MOTION ............................................................................................... 1

I.    Defendants/Resolution Fail to Find Error with Judge Lanza's Procedural and Jurisdictional Rulings. ....................................................... 4

    A.    AMRC has standing to challenge the Appraisal and FEIS ..................... 4

    B.    NEPA applies to the Land Exchange ....................................... 6

    C.    The FEIS is a Final Agency Action under the NDAA for the Land Exchange .......................................................................... 7

    D.    This Court has Authority to Enjoin the Exchange .................................. 8

II.    The Appraisals Violate the Federal Standards. .............................................. 9

    A.    Minerals Must be Values as in a Private-Lands, Open Market, Transaction. ........................................................................ 9

    B.    The MCZ Must Be Appraised for the "Highest and Best Use" – Mining. 13

III.    The FEIS Fails to Meet the NEPA and Section 3003 Requirements ........... 14

IV.    Plaintiffs Satisfy the Remaining Injunction Factors. .............................. 16

CERTIFICATE OF COMPLIANCE ...................................................... 18

CERTIFICATE OF SERVICE ............................................................... 19

# <u>TABLE OF AUTORITIES</u>

## Cases

*Apache Stronghold v. U. S.*, 101 F.4th 1036 (9th Cir. 2024).............................. 1, 7, 9

*Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084 (E.D. Cal. 2002) ..........................5

*ASARCO Inc. v. Kadish*, 490 US 605 (1989)................................................5

*Bennett v. Spear*, 520 U.S. 154 (1997) ..................................................7, 8

*Chrisman v. Miller*, 197 U.S. 313 (1905) ..................................................10

*Ctr. for Biol. Div. v. U.S. Forest Serv.*, No. 23-cv-00928 (DLF), 2025 WL 947472 (D.D.C. Mar. 28, 2025)............................................................9

*Ctr. for Biol. Div. v. U.S. FWS*, 33 F.4th 1202 (9th Cir. 2022) ..............................11

*Desert Citizens v. Bisson*, 231 F.3d 1172 (9th Cir. 2000) ................................. 5, 13

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850 (9th Cir. 2022) ...7

*Great Basin Res. Watch v. BLM*, 844 F.3d 1095 (9th Cir. 2016)...........................16

*Ritidian v. U.S. Dep't of the Air Force*, 128 F.4th 1089 (9th Cir. 2025)...................7

*Salmon Spawning & Recovery Alliance v. Gutierrez*, 5545 F.3d (9th Cir. 2008).....6

*Seven County Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497 (2025) .14, 15

*Stronghold v. United States*, 2025 U.S. Dist. LEXIS 88735, 2025 WL 1360694 (D. Ariz. May 9, 2025)...........................................................17

*United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 487 (2001)............18

*W. Land Exch. Project v. U.S. BLM*, 315 F.Supp.2d 1068 (D. Nev. 2004) .............6

*W. Watersheds Project v. Grimm*, 921 F.3d 1141 (9th Cir. 2019) ..........................6

## Statutes

16 U.S.C. §539p..........................................................................1

16 U.S.C. §539p(c) ...................................................................................18

16 U.S.C. §539p(c)(1) ................................................................................1

16 U.S.C. §539p(c)(4) ................................................................................1

16 U.S.C. §539p(c)(5) ................................................................................1

16 U.S.C. §539p(c)(5)(B) ...........................................................................5

16 U.S.C. §539p(c)(9) ................................................................................7

42 U.S.C.§4332(2)(C)(ii) ..........................................................................16

## Regulations

36 C.F.R. §254.9 ............................................................................ 11, 13

36 C.F.R. §254.9(b) ................................................................................12

Within a matter of hours, the federal government will hand over 2,422 acres of cherished public land to a multinational mining conglomerate, violating the strict pre-requisites and standards Congress mandated in §3003 of the National Defense Authorization Act ("NDAA"). 16 U.S.C. §539p. At that moment, Plaintiffs will be immediately and irreparably harmed. This will also result in an incredible windfall to Resolution Copper Mining ("RCM"), because the required appraisal eliminated the value of the mineral estate still owned by the government, and ignored the most obvious future use of the land—copper mining.

Defendants' and RCM's case boils down to their view that §3003 contains only one relevant sentence—that the agency "shall" exchange the lands within 60 days of issuance of the Final Environmental Impact Statement ("FEIS")—with no other requirements or duties. But the Exchange is "Subject to the provisions of this section," including appraisals meeting strict standards and equalization requirements. §539p(c)(1),(c)(4),(c)(5); *Apache Stronghold v. U.S.*, 101 F.4th 1036, 1047 (9th Cir. 2024)(en banc).

Defendants/RCM re-raise a number of procedural and jurisdictional challenges that Judge Lanza squarely rejected, barely mentioning his detailed findings, and failing to show any legal error in his conclusions.

Regarding the appraisals, Defendants/RCM make various novel and erroneous assertions. First, they argue that the Exchange is not dependent on the

1

appraisals at all, believing that because Congress mandated the Exchange, the appraisals are mere non-discretionary formalities immune from judicial review. But the agency contradicts its own recent statements to another federal court, that the appraisals were part of the agency's discretionary decision-making process to determine whether to "approve" the appraisals and thus the Exchange. This was specifically recognized by Judge Lanza. 1-ER-23.

Second, Defendants double-down on their assertion that the estimated billions of pounds of copper within the Mining Claim Zone ("MCZ") would be worthless in a future private-lands transaction, due to RCM's mining claims. Yet they cite no provision in the federal appraisal standards and regulations, whose compliance was required in §3003, that exempt mineral values on federal lands. The fact that there are mining claims on the MCZ parcel does not eliminate the mineral values—as §3003 and the mandated appraisal standards apply equally to all the currently-federal lands.

The standards and regulations require that the lands and minerals be appraised as if the parcel was already in private hands, i.e., the **post-Exchange** value that RCM would expect to get on the open market. But, in their view, a company proposing an exchange could simply file mining claims on the federal lands it wants and thus obtain an enormous windfall at the expense of the public

2

land values and uses that would be eliminated. That defies reality and the plain language of the standards and regulations.

Regarding NEPA, Defendants first argue that the FEIS is not a "final agency action" subject to review under the APA. But their entire line of caselaw is based on a situation that is inapplicable here. As Defendants repeatedly state, §3003 removes any subsequent steps and the FEIS is final as it concluded the government's responsibilities under NEPA for the Exchange.

The government next argues that it has absolutely no discretion over the Exchange, and thus the FEIS is immune from this Court's authority. Defendants conveniently ignore the agency's rescission of its 2021 FEIS—imposing a self-injunction against the Exchange for further NEPA review. The agency cannot now say it has no discretion when it blocked the Exchange for over 4 years.

Regarding the actual contents of the FEIS, Defendants rely on the quantity of documents RCM largely produced. But it's the quality of the NEPA analysis that counts—not documents that largely predate the 2021 FEIS and ignore the current facts on the ground. This is especially important regarding the Project's massive groundwater depletions, where the FEIS ignored the reasonably foreseeable impacts from the dewatering when coupled with the ongoing and proposed groundwater uses in the same area.

Regarding the other injunction factors, Defendants/RCM assert that the

3

copper will support the nation's economic and security needs. But RCM has made no commitment to actually process, or sell, the copper in the United States. Any rhetoric about America's mineral needs rings hollow. Defendants/RCM ignore the basic fact that an injunction pending this Court's consideration of Plaintiffs' appeal will last a few months, as briefing will conclude in October. Future copper mining—if it ever occurs as the company has yet to decide if the Mine is viable— is at no risk from this Court's actions.

I. **Defendants/RCM Fail to Find Error with Judge Lanza's Procedural and Jurisdictional Rulings.**

    **A. AMRC has standing to challenge the Appraisal and FEIS**.

The Government argues that AMRC's claims are not redressable because there is no possibility the requested relief would redress any of their harm. Gov. at 6–8. Yet if the agency had properly valued the MCZ parcel, this would have significantly increased the value of the federal lands to be exchanged and significantly increased the amount land that RCM would have been required to provide as part of the Exchange, 16 U.S.C. §539p(c)(5)(B), which would have resulted in considerably more public lands within Arizona for AMRC's members to use and enjoy. Additionally, as Judge Lanza recognized, correcting the appraisal to properly value the MCZ parcel may cause Resolution to determine the price is

4

too steep and walk away, which would fully redress AMRC's harm. 1-ER-17.[1]

Defendants/RCM cannot escape Ninth Circuit precedent, holding that public land users "are certainly entitled under the APA to file suit to assure that no exchange takes place unless the governing federal statutes and regulations are followed, including the requirement that the land exchange is properly valued by the agency." *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1177 (9th Cir. 2000)(reversing district court dismissal on standing and entering injunction reversing the exchange). This also applies when Congress has ordered the exchange. *See W. Land Exch. Project v. U.S. BLM*, 315 F.Supp.2d 1068, 1099 (D. Nev. 2004).

Regarding NEPA, the government ignores its own prior actions which *stopped the Exchange for four years*. Just as the agency could halt the Exchange on its own to ensure NEPA compliance, so can this Court. Moreover, as Judge Lanza

---

[1] *ASARCO Inc. v. Kadish*, 490 US 605, 615 (1989), is fundamentally different. There, plaintiffs' claim of economic injury "depends on the unfettered choices made by individual actors not before the courts." *Id*. at 615. Here, by contrast, RCM is before the court, and proper valuation of the appraisals is an obvious fundamental factor that could affect the Exchange. Similarly, in *Artichoke Joe v. Norton*, 216 F. Supp. 2d 1084, 1104-05 (E.D. Cal. 2002), the court found that the responsibilities of the defendant state agency were "relatively minor," with the Tribal Gaming Agency having the "primary responsibility," whereas here the Forest Service is responsible for approving the appraisals and engaging in the Exchange.

recognized, an injunction of the Exchange pending the agency's compliance with NEPA would be sufficient to establish redressability, as it would redress at least some of AMRC's injuries. 1-ER-36.

Each day these lands remain public and not under the control of a mining company whose intent is to permanently destroy the site is another day they can be used and enjoyed by ARMC's members without fear of exclusion or destruction. *W. Watersheds Project v. Grimm*, 921 F.3d 1141, 1148 (9th Cir. 2019)(even if agency only ceased activities temporarily, it may redress some of plaintiffs' harm, which demonstrated redressability).

While the government relies on *Salmon Spawning & Recovery Alliance v. Gutierrez*, 5545 F.3d 1220 (9th Cir. 2008), (Gov. at 9), Judge Lanza explained that the "important difference" here is that the court has the authority to vacate the FEIS it if violates NEPA, "which would at least temporarily preclude the Exchange from going forward." 1-ER-37.

**B. NEPA applies to the Land Exchange.**

The government argues that NEPA does not apply to the Exchange even though the statute requires NEPA, and the FEIS explicitly addresses the impacts of the Exchange. Gov. at 11-12. Congress ordered that the Exchange is "subject to the provisions of the section," (§539p(c)(1)), which includes "environmental compliance," including an FEIS that complies with NEPA. §539p(c)(9). *See also*

*Apache Stronghold*, 101 F.4th at 1046-47 ("The land exchange is subject to certain conditions," including an FEIS prepared under NEPA). The "purpose and need" of the FEIS is "[t]o consider the effects of the exchange of lands between Resolution Copper and the United States." 2-ER-189.

### C. The FEIS is a Final Agency Action under the NDAA for the Land Exchange.

Two conditions must be met for action to be "final" under the APA. *Bennett v. Spear*, 520 U.S. 154 (1997). "First, the action must mark the consummation of the agency's decisionmaking process," and "it must not be of a merely tentative or interlocutory nature." *Id*. at 177-78. "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id*. at 178. This requirement "must be interpreted in a pragmatic and flexible manner," with a "focus on the practical and legal effects of the agency action." *Ritidian v. U.S. Dep't of the Air Force*, 128 F.4th 1089, 1108 (9th Cir. 2025).

The FEIS here is final as it concluded the agency's responsibilities under NEPA. As in *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 868 (9th Cir. 2022), "[t]here is nothing preliminary or tentative" about the FEIS. And while the agency has yet to issue a decision for future project operations on the remaining federal lands, that has no bearing on either the FEIS or the Exchange. Gov. at 13.

7

The FEIS is the final word before the Exchange is executed, and thus it also meets part two of the test, as the FEIS "alter[ed] the legal regime to which the action agency is subject." *Bennett*, 520 U.S. at 178. The NDAA requires the Exchange within 60-days of the FEIS, and thus "the land exchange is a 'legal consequence' that will 'flow' from the issuance of the FEIS." 1-ER-39. There can be no greater "legal consequences" to those who use and enjoy Oak Flat than to have it eliminated from public ownership.

### D. This Court has Authority to Enjoin the Exchange.

RMC argues that even if the Court agrees that the government violated the law in preparing the MCZ appraisal, it lacks the authority to enjoin the Exchange. RMC at 15. Again, as this Court has recognized, the Exchange is "subject to certain conditions," including that the lands must be appraised pursuant to the strict standards in the statute. *Apache Stronghold*, 101 F.4th at 1046. Congress clearly did not waive judicial review for the Exchange (*see* 1-ER-20, 1-ER-38), meaning that both the agency must comply with these requirements, and the Court can enjoin the Exchange if AMRC satisfies the *Winters* four-part test, which it has demonstrated. Moreover, as recognized by Judge Lanza, under *Desert Citizens*, a district court "may enjoin a land exchange based on appraisal-related errors." 1-ER-24.

## II.    The Appraisals Violate the Federal Standards.

Defendants/RCM argue that the Secretary of Agriculture's approval of the appraisals is immune from judicial review, as the agency had no discretion whatsoever regarding the appraisals and the appraisals have no bearing on whether the Exchange occurs. Judge Lanza rejected this and other attempts to avoid judicial review. 1-ER-14–24. Judge Lanza highlighted the agency's admission to another federal court, where the agency stressed the discretionary nature of the appraisal approval decisions under §3003, as they were "provided to the Secretary to give the Secretary the best information to work from while making his decision to accept the Appraisal and move forward with the land exchange." 2-ER-144. *See Ctr. for Biol. Div. v. U.S. Forest Serv.*, No. 23-cv-00928 (DLF), 2025 WL 947472 (D.D.C. Mar. 28, 2025).

1.    Minerals Must Be Valued as in a Private-Lands Transaction.

In admittedly failing to value the billions of pounds of minerals currently owned by the public (as the United States still owns the surface and subsurface), Defendants/RCM's sole argument is that RCM's mining claims eliminate any consideration of these mineral values. This contradicts §3003, the agency's statements to Congress, and ignores the federal appraisal standards and rules. They spend considerable space noting that under the 1872 Mining Law, Resolution's claims allow it the ability to propose mining. That is undisputed. But they then

assert that Resolution Copper has "discovered a valuable mineral deposit" on the MCZ parcel. Gov. at 18, RCM at 10-11. But, crucially, no evidence is provided to support that assertion of "rights" under the Mining Law, based simply on the claims.

Under the Mining Law, a claimant cannot simply assert that their claims contain significant mineral reserves and thus it has rights to mine and occupy the claims. To prove that it has made the "discovery of a valuable mineral deposit," the claimant must show that the mineral can be "extracted, removed and marketed at a profit." *United States v. Coleman*, 390 U.S. 599, 600 (1968). "[L]ocation [of claims] is the act or series of acts whereby the boundaries of the claim are marked, etc., but it confers no right in the absence of discovery, both being essential to a valid claim." *Cole v. Ralph*, 252 U.S. 286, 296 (1920).

Thus, the amount of the minerals, even the large quantities asserted by RCM, is just one part of the validity/profitability equation. Here, there has never been any analysis of the costs—or whether the company could make the required substantial profit required for any "rights to mine" to accrue. "[T]he question should not be left to the arbitrary will of the locator [claimant]," but subject to an objective economic test. *Chrisman v. Miller*, 197 U.S. 313, 322 (1905). Although Resolution has stated its intention to mine the MCZ parcel, it has yet to actually determine whether the mine is financially viable or provide evidence of the costs.

This was reiterated recently in *Ctr. for Biol. Div. v. U.S. FWS*, 33 F.4th 1202, 1209-10 (9th Cir. 2022). Contrary to Defendants/RCM, the fact that *Rosemont* dealt with mining claims away from the ore body is not determinative. The issue is whether the claimant has proven its claims are valid, regardless of where the claims are. *Id*. Absent that, RCM has no "rights" to the minerals.

But even if RCM could provide evidence that all of its mining claims, **that is irrelevant for the appraisals**. Under the appraisal standards and regulations, parcels (including minerals) must be appraised as private lands, post-Exchange. Defendants point to no provision in the federal appraisal standards or the agency's 36 C.F.R. §254.9 appraisal regulations that exempt the mineral value on federal lands to be exchanged simply because they are covered by mining claims.

Defendants cannot escape the UASFLA and §254.9 requirements that all values in the parcel be accounted for. They mandate that the appraisals treat the lands and minerals as a post-Exchange, private-lands transaction on the open market, not influenced by RCM's claims. "[T]he appraiser must avoid estimating a property-specific investment value to a particular owner instead of developing an opinion of the market value of the property if it were placed for sale on the open market." UASFLA, 5-ER-804. But that is what the MCZ appraisal did—relying on RCM's current and particular "investment value" to zero-out the mineral value.

11

Overall, the central question in the appraisal process is what the "open market" would value the post-Exchange parcel, not how the government or RCM might *currently* value the parcel. "The federal land is appraised as if in private ownership, to its highest and best use." 36 C.F.R. §254.9(b). "When appraising the federal land portion of the exchange, the regulations require that the appraiser 'estimate the value of the lands and interests as if in private ownership and available for sale in the open market.'" UASFLA at 53, 5-ER-810. "[T]he Subject [federal lands] is considered, *as though it is in private ownership*." 4-ER-597 (MWA appraisal, emph. in original).

A fundamental factor that neither the Government nor Resolution have address is that once these lands are privatized, the federal mining laws no longer apply, meaning RCM's previous claims are gone and irrelevant, leaving the parcel free and clear of any alleged "encumbrances" and not "split." RCM would own the entirety in fee simple.

Additionally, Defendants/RCM cannot so easily ignore the sworn testimony of agency officials to Congress, as well as congressional statements that the minerals in both parcels must be appraised. EM at 9-10. As they admit, Congress knew that Resolution had filed claims on the MCZ parcel, Gov. at 21, but §3003 still required full compliance with the appraisal regulations and standards.

The only support Defendants provided for their new "zero value" position is a quote from the UASFLA that "'[a]ppraisers valuing mineral properties impacted by the 1872 Mining law are advised to coordinate with client agency staff to clarify the approaches to valuing those interests.'" Gov. at 20. But simply "coordinating" with agency staff does not mean that "those interests" (i.e., the mineral values) are *per se* eliminated from the appraisals as Defendants believe. Such a wholesale departure from the UASFLA and §254.9 cannot be based on such a slender reed.

2.    The MCZ Must Be Appraised for the "Highest and Best Use" – Mining.

Defendants also misapply the requirement that the MCZ appraisal be based on its future "highest and best use." They maintain the complete fallacy that mining is not a probable use of the MCZ, and that only low-value surface uses need be considered. But the future use of the MCZ is obviously for mining. The fact that the MCZ is currently "encumbered" by RCM's claims does not somehow mean that once the lands are privatized mining would not be the likely use. The MWA appraisal correctly found that the "highest and best use" of that parcel, post-Exchange, was for mining. But the appraisal of the adjacent MCZ incongruously and arbitrarily found the "highest best use" to be for simple "surface use," at a paltry $1,200/acre, resulting in the severe undervalue of this parcel. 4-ER-565.

Defendants/Resolution point to **no** case where an appraisal of federal lands to be exchanged is based on the current federal-lands situation. But that is what

13

happened here. Importantly, they do not respond to the leading Ninth Circuit case on post-Exchange "highest and best use" requirements. *Desert Citizens*, 231 F.3d 1172, 1180–84 (9th Cir. 200). The court invalidated the agency's failure to appraise the future land use for what it was proposed to be, a landfill. The fact that the current use was for mining was not a factor. There was no question in *Desert Citizens* that the value of the parcel **in the future**, post-Exchange, is what is to be appraised. The current value, including any current encumbrances, are not relevant.

Defendants/RCM are blind to the legal requirement that the appraisals, including the "highest and best use," be based on the future, post-Exchange private lands situation. It does not make sense that the standards and regulations require the appraisals be based on the **future** uses while at the same time value the minerals as zero based on the current federal-lands status.

At a minimum, this raises "serious questions" as to the applicability of the appraisal standards and regulations to federal lands – especially when the government contradicted controlling caselaw on how the future "highest and best use" is valued.

## III.   The FEIS Fails to Meet the NEPA and Section 3003 Requirements.

Defendants argue for extreme deference under *Seven County Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497 (2025), hiding behind the sheer number of documents contained in the FEIS. This fails to meet the required test for

14

reasonableness. Regarding the Desert Wellfield's massive groundwater depletions, Defendants insist the agency "considered **some** of the cumulative effects" of this pumping, Gov. at 24 (emph. added), but then admit that in fact, the agency quantitatively modeled only a small portion of the long planned and partially built development, *id*., citing a lack of "sufficient information." But the agency **did** have the information it needed—in granular detail—to easily take a hard look and model the full water footprint of the development. *See, e.g.,* 3-ER-409-547. It just chose to ignore this information. This violates NEPA and the NDAA and should not be given deference.

Also, *Seven County* cannot insulate the FEIS simply because Superstition Vistas is on private land. NEPA review is required for "other projects [that] may be interrelated and close in time and place to the project at hand." *Seven County,* 145 S. Ct. at 1517. Moreover, the pumping impacts of the Desert Wellfield are directly connected to pumping for Superstation Vistas and these related impacts cannot be ignored since they are "reasonably foreseeable adverse environmental effect which cannot be avoided should the proposal be implemented." 42 U.S.C.§4332(2)(C)(ii).

While Defendants insist that the agency considered the serious water related concerns raised by their cooperating agency, the BLM, in fact, the BLM hydrology report is neither cited nor acknowledged in the language of the FEIS, and much of the concerns BLM raised (which echo Plaintiffs) are brushed off or ignored

entirely in the FEIS. Defendants similarly ignore the socioeconomic concerns ASLD raised.

Finally, the agency failed to meaningfully analyze or require key mitigation measures under NEPA. For example, the FEIS admits Desert Wellfield pumping will substantially lower the regional groundwater table, harming numerous wells throughout the region, 2-ER-227, but the agency totally failed to analyze **any mitigation** measures for these impacts. The agency is not relieved of its obligation to analyze mitigation measures under NEPA/FLPMA for these impacts merely because pumping for the Desert Wellfield will be permitted by another agency. *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1107 (9th Cir. 2016).

## V.  <u>Plaintiffs Satisfy the Remaining Injunction Factors.</u>

The privatization of federal lands will immediately and irreparably harm Plaintiffs. *See also* EM at 3–4, 17–18. Yet, the proposed copper mining is at least five years away, **if** RCM determines it is financially feasible to undertake **and** it receives all of the additional federal and state permits. *See e.g.* 2-ER-230. A temporary injunction will not prevent Resolution from mining a *single* ounce of ore. Allegations of immediate "substantial and unrecoverable economic harm" are hyperbole. RMC at 27. Thus, contrary to the facts, the requested injunction will not have any "profound" impact to National Security interests, much less any immediate impact on copper production. Gov. at 35–36; RMC at 27.

Regarding Congress' balancing, the district court, and Defendants/RCM are silent on Congress' imposition that significant conditions *must occur prior* to the Exchange, including detailed appraisals subject to strict requirements, fair-market value of to-be-exchanged lands, that the Forest Service "shall carry out the land exchange in accordance with the requirements of [NEPA]," and must prepare a single EIS, all of which go directly to the heart of Plaintiffs claims. 16 U.S.C. §539p(c); EM at 19; *U.S. v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 487, 497 (2001).

As for alleged "unrecoverable costs" on existing infrastructure (purchased over a decade before §3003 was passed) and "in anticipation of a transfer" are "Resolution Copper's voluntary choice." *Apache Stronghold v. United States*, 2025 WL 1360694, *7 (D. Ariz. May 12, 2025). These are insufficient to tip the balance of equities, where Plaintiffs' access and use will be "dependent on the good grace of a private copper mining venture" and any and all federal public land protections will immediately evaporate. *Id*.; EM at 4, 17–20.

Respectfully submitted this August 18, 2025.

*/s/ Roger Flynn*
Roger Flynn (Pro Hac Vice)
Jeffrey C. Parsons (Pro Hac Vice)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2

Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink (Pro Hac Vice)
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
mfink@biologicaldiversity.org

Allison N. Henderson (Pro Hac Vice)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs*

*/s/ Susan Montgomery*
_____
Susan B. Montgomery (AZ Bar # 020595)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com

*Attorneys for the ITAA*


CERTIFICATE OF COMPLIANCE

1.     This response complies with the type-volume limitation of Ninth Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 4,174 words, excluding the parts exempted by those rules. Consistent with Rule 32-3, 4,174 words "divided by 280"

18

is 14.90 which "does not exceed the designated page limit" of 15 pages, pursuant to AMRC's just-filed unopposed motion to allow for 15 pages for this reply.

2.      This response also complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

 August 18, 2025              */s/ Roger Flynn*

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2025, I electronically filed the foregoing, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*s/ Roger Flynn*