No. 25-5185

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
_____

ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION OF ARIZONA, INC.; CENTER FOR BIOLOGICAL DIVERSITY; EARTHWORKS; THE ACCESS FUND; and SIERRA CLUB.

*Plaintiffs-Appellants*,

v.

BROOKE L. ROLLINS, U.S. SECRETARY OF AGRICULTURE; UNITED STATES FOREST SERVICE; and NEIL BOSWORTH, SUPERVISOR OF THE TONTO NATIONAL FOREST.

*Defendants-Appellees*,

and

RESOLUTION COPPER MINING LLC.

*Intervenor-Defendant-Appellee.*

_____

On Appeal from the United States District
Court for the District of Arizona

Honorable District Judge Dominic W. Lanza
(2:21-CV-00122-DWL)

_____

**PLAINTIFFS-APPELLANTS'
EMERGENCY MOTION UNDER CIRCUIT RULE 27-3**

*RELIEF REQUESTED BY AUGUST 18, 2025, AS THE LAND TITLE
TRANSFER WILL OCCUR ON AUGUST 19, 2025*

i

Pursuant to Circuit Rule 27-3, Plaintiffs-Appellants' undersigned counsel,

Roger Flynn, hereby certifies the following is true and correct:

## CONTACT INFORMATION OF ATTORNEYS FOR PARTIES

**Plaintiffs-Appellants' Counsel**

All Plaintiffs-Appellants are represented by:

Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
mfink@biologicaldiversity.org

Allison N. Henderson
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

Plaintiff-Appellant Inter Tribal Association of Arizona, Inc. is represented by:

Susan B. Montgomery
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com

**Defendants-Appellees' Counsel**

Defendants-Appellees Brooke L. Rollins, U.S. Forest Service, and Neil Bosworth are represented by:

Adam R.F. Gustafson
Acting Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

Ezekiel Peterson
Attorney, Appellate Section
U.S. Department of Justice,
Environment & Natural Resources Division
999 18th St, North Terrace, Suite 600
Denver, CO 80212
(303) 844-1348
ezekiel.a.peterson@usdoj.gov

Erika Norman
Angela Ellis
Trial Attorneys
Natural Resources Section
150 M St. NE, Third Floor
Washington, D.C. 20002
(202) 305-0475 (Norman)
Erika.Norman@usdoj.gov
Angela.Ellis@usdoj.gov

**Intervenor-Defendants-Appellees' Counsel:**

Intervenor-Defendant-Appellee Resolution Copper Mining Co. is represented by:

Christopher D. Thomas
Andrea J. Driggs
Janet M. Howe
Benjamin A. Longbottom
HOLLAND & HART LLP
3110 North Central Ave., Suite D-160
Phoenix, Arizona 85012
(602) 316-9334

CDThomas@hollandhart.com

Michael R. Huston
Diane M. Johnsen
Samantha J. Burke
Addison W. Bennett
PERKINS COIE LLP
2525 East Camelback Road, Suite 500
Phoenix, Arizona 85016
(602) 351-8000
MHuston@perkinscoie.com
DJohnsen@perkinscoie.com
SBurke@perkinscoie.com
ABennett@perkinscoie.com

## EXISTENCE AND NATURE OF EMERGENCY

Unless enjoined by this Court, on August 19, 2025, as early as 12:01 am eastern time, Defendants-Appellees U.S. Forest Service will transfer title and convey 2,422 acres of federal public land ("Federal Lands") to Resolution Copper Mining Co. ("Resolution") (a joint venture of two foreign mining companies). The district court's current injunction against the land transfer, still in place despite the court's denial of Plaintiffs' preliminary injunction motion, expires at the end of Monday, August 18. 1-ER-98, n. 30. The transfer is part of a land exchange ("Exchange") between the Forest Service and Resolution and would facilitate Resolution's proposal for one of the world's largest copper mines.

Plaintiffs-Appellants request that the federal government be immediately enjoined from conveying any right, title, or interest in the Federal Lands to Resolution.

iv

The Federal Lands to be immediately privatized are generally known as "Oak Flat." The Oak Flat area is a place of profound religious, cultural, and historic significance to the San Carlos Apache Tribe and other Indian tribes, nations, and communities in Arizona. Apache People call Oak Flat "Chich'il Bildagoteel," or "a Flat with Acorn Trees" and it lies at the heart of T'iis Tseban Country, which is associated with at least eight Apache clans, and two Western Apache bands, the Pinal Band and the Aravaipa Band.

Because of its importance to the Apache Tribe and other tribes, nations and communities, Oak Flat is included in the National Register of Historic Places as a "Traditional Cultural Property" under Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470 et seq., and it meets the criteria to be identified as a "sacred site" within the meaning of Executive Order 13007, Indian Sacred Sites, May 24, 1996, 61 Fed. Reg. 26771, the American Indian Religious Freedom Act, 42 U.S.C. § 1996, et. seq., and related laws, regulations and policies.

Oak Flat "is a site of great spiritual value" to Tribes in the region. *Apache Stronghold v. United States*, 101 F. 4th 1036, 1044 (9th Cir. 2024)(en banc). "Once the land is transferred, the Western Apaches will suffer immediate, irreparable harm." *Apache Stronghold v. United States*, No. 21-15295, 2021 WL 12295173, *5 (9th Cir. Mar. 5, 2021) (Bumatay, J., dissenting).[1]

_____

[1] In a related case, an organization of traditional Apaches, Apache Stronghold, sought to enjoin the government's transfer of Oak Flat, based on religious freedom grounds

Oak Flat is also recognized for its beauty and importance to outdoor enthusiasts, including members of Plaintiff groups who value it for outdoor recreation and as a place of unique biological diversity. Oak Flat attracts rock-climbers from around the country as it contains numerous large boulders and outcrops. Sitting at an approximate elevation of 4,200 to 4,600 feet above sea level, Oak Flat is a cool respite for the many travelers and visitors from Phoenix and elsewhere, who recreate at Oak Flat. Wildlife cameras have documented a wide variety of wildlife at Oak Flat, including mountain lion, bear, and coatimundi. Nearby lands provide important wildlife habitat for Federally listed endangered and threatened species such as the southwestern willow flycatcher, yellow billed-cuckoo, Gila chub, Arizona hedgehog cactus, and ocelot. Over 170 bird species have been documented at Oak Flat.

**The district court found that Plaintiffs would be immediately and irreparably harmed by the land transfer and privatization of these invaluable**

---

(those claims are not at issue in this case). The initial injunction was denied, with Judge Bumatay in dissent. This court agreed to hear the case en banc, and in a 6-5 decision, denied that injunction request on March 1, 2024 (as amended on May 14, 2024). *Apache Stronghold*, 101 F. 4th 1036. After that, Judge Logan of the Arizona district court in that case issued a preliminary injunction blocking the Exchange pending the Supreme Court's certiorari review. *Apache Stronghold v. United States*, CV-21-00050-PHX-SPL, 2025 WL 1360694 (May 9, 2025). In a split decision, the Supreme Court denied certiorari. 2025 WL 1496472 (May 27, 2025). Apache Stronghold has requested the Court to reconsider that denial. **Notably, none of the Judges or Justices in that case, have ever denied that irreparable harm would result from the privatization, or that the balance of hardship/public interest did not tip sharply in favor of the plaintiffs.** The sole debated issue in that case, to date, has been focused on the religious freedom claims, which are not at issue here.

**public lands**. 1-ER-93-95.  Although the court denied plaintiffs' motion on other grounds, as shown below, the court, and the underlying agency actions, committed serious legal and factual errors which warrant, at a minimum on an emergency basis, this Court's authority to enjoin the lands title transfer.

Unless this Court immediately enjoins the title transfer and Exchange, public access to Oak Flat will be eliminated, Resolution will obtain the 2,422 acres in fee simple, and would be free to exclude the public and conduct operations, exempt from federal public land and environmental laws—immediately and irreparably harming Plaintiffs and their members.

## WHY THE MOTION COULD NOT BE FILED EARLIER

Plaintiffs could not file this Motion sooner because the district court's decision denying Plaintiffs' motion for preliminary injunction was just issued in the mid-afternoon on August 15, 2025 (1-ER-6). As required by F.R.A.P. 8(a)(1), at the conclusion of the court's hearing on the motion on August 6, 2025, Plaintiffs informed the court that they would seek emergency relief at the Circuit court to block the Exchange, and requested that, if the court denied the motion, it issue an injunction pending appeal. 1-ER-98. The district court's August 15 order denied that request, thus necessitating this Emergency Motion. *Id*. Even though plaintiffs had not filed a written motion for stay pending appeal (because the decision had yet to be issued), the district court stated that "it would deny a request for an injunction pending appeal even if such a request were properly before it." *Id*.

## NOTIFICATION AND SERVICE OF COUNSEL FOR PARTIES

At the August 6, 2025 hearing, Plaintiffs informed the district court, and counsel for all parties, that Plaintiffs would file this Emergency Motion if the court denied their request for an injunction. In addition, upon review of the district court's decision, Plaintiffs notified, via email, counsel for the Federal Defendants and Resolution that it had appealed and intended to file this Emergency Motion.

Pursuant to Rule 27-3, immediately after their Notice of Appeal was docketed in this case, Plaintiffs contacted this Court's emergency motions unit via email (emergency@ca9.uscourts.gov) and telephone (415.355.8020), informing that office that this Emergency Motion would be filed as soon as possible—further stressing the fact that the government could effectuate the land title transfer and Exchange after August 18, 2025.

Plaintiffs will immediately send copies of this Motion by email to all parties after it is filed.

## THE DISTRICT COURT DENIED PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL

As required by F.R.A.P. 8(a)(1), at the conclusion of the court's hearing on the motion on August 6, 2025, Plaintiffs informed the court that they would seek emergency relief at the Circuit court to block the Exchange, and requested that, if the court denied the motion, it issue an injunction pending appeal. 1-ER-98. The district court's order denied that request, thus necessitating this Emergency Motion. *Id*. Even

though plaintiffs had not filed a written motion for stay pending appeal (because the decision had yet to be issued), the district court stated that "it would deny a request for an injunction pending appeal even if such a request were properly before it." *Id.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to F.R.A.P. 26.1, Plaintiffs-Appellants Arizona Mining Reform Coalition, Inter Tribal Association of Arizona, Inc., Center for Biological Diversity, Earthworks, the Access Fund, and the Sierra Club have no parent companies, no subsidiaries or subordinate companies, and no affiliate companies that have issued shares to the public.

# MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

TABLE OF ACRONYMS ............................................................................. vi

STANDARDS FOR PRELIMINARY RELIEF ............................................. 2

**I.     The Privatization of Public Lands Will Result in Irreparable Harm.** . 3

**II.    Plaintiffs Are Likely to Succeed on the Merits** ....................................... 4

**A.     The Appraisal Determinations and Approvals Violate the NDAA** ...... 4

1.     The Secretary of Agriculture's Approval of the Appraisals Violates §3003, Forest Service Appraisal Regulations, and Federal Appraisal Standards ................................................................... 5

    *a.     Resolution's mining claims do not render the federal minerals valueless.* ............................................................ 6

    *b.     The MCZ appraisal failed to include its mineral values, as the federal rules and standards required* ................................. 7

    *c.     The MCZ appraisal arbitrarily assumed that its "highest and best use" was **not** for mining, when that's exactly its intended use.* ............... 10

    *d.     The MCZ appraisal failed to treat the exchange of the lands and minerals as a private-lands transaction, as required by the appraisal standards.* ......................................................... 11

**B.     The FEIS Violates NEPA and the NDAA** ............................................. 12

1.     The FEIS Failed to Properly Analyze the Project's Impacts to Water ....... 13

2.     The Forest Service Failed to Meaningfully Consider Comments from Other Agencies ....................................................................... 15

3.   The Agency Failed to Consider, and Require, Sufficient
     Mitigation Measures ................................................................... 16

**III.   Balance of Hardships and Public Interest Tip Sharply in
         Plaintiffs' Favor** ............................................................ 17

**CONCLUSION** ................................................................................ 20

### Exhibit List for Emergency Motion

1.   Index Volume

2.   Excerpts of Record, Vol. 1.

3.   Excerpts of Record, Vol. 2.

4.   Excerpts of Record, Vol. 3.

5.   Excerpts of Record, Vol. 4.

6.   Excerpts of Record, Vol. 5

# TABLE OF AUTHORITIES

***Federal Caselaw***

*Apache Stronghold v. United States*,
145 S. Ct. 1480 (2025) ......................................................... 3

*Apache Stronghold v. United States,*
101 F. 4th 1036 (9th Cir. 2023) ................................................. 1, 5, 12

*Apache Stronghold v. United States,*
CV-21-0050-PHX-SPL, 2025 WL 1360694
(D. Az. May 9, 2025) ...................................................... 3, 4, 18, 19, 20

*Apache Stronghold v. United States*,
No. 21-15295, 2021 WL 12295173 (9th Cir. Mar. 5, 2021) ................... 3, 4, 18

*Ctr. for Biol. Div. v. U.S. FWS*,
33 F.4th 1202 (9th Cir. 2022) ................................................... 7

*Desert Citizens Against Pollution v. Bisson*,
231 F.3d 1172 (9th Cir. 2000) .................................................. 11

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) .................................................... 3

*Flathead-Lolo-Bitterroot Citizen Task Force v. Mont.*,
98 F.4th 1180 (9th Cir. 2024) .................................................. 3

*Great Basin Res. Watch v. BLM*,
844 F.3d 1095 (9th Cir. 2016) ......................................... 13, 15, 17, 18

*Great Basin Mine Watch v. Hankins*,
456 F.3d 955 (9th Cir. 2006) .................................................. 14

*Idaho v. Coeur D'Alene Tribe*,
794 F.3d 1039 (9th Cir. 2015) ................................................. 19

*Idaho Sporting Cong. V. Rittenhouse,*
305 F.3d 957 (9th Cir. 2002) .................................................. 12

*Kettle Range Consv. Group v. U.S. BLM,*
150 F.3d 1083 (9th Cir. 1998) .......................................................... 20

*League of Wilderness Defs. V. Connaughton,*
752 F.3d 755 (9th Cir. 2014) ............................................................. 18

*Nat'l Parks & Cons. Ass'n v. BLM,*
606 F.3d 1058 (9th Cir. 2010) .......................................................... 11

*Nken v. Holder,*
556 U.S. 418 (2009)............................................................................ 17

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.,*
668 F.3d 1067 (9th Cir. 2011) .......................................................... 12

*Restore the N. Woods v. U.S. Dep't of Agric.,*
968 F. Supp. 168 (D. Vt. 1997) .......................................................... 9

*Seven County Infrastructure Coalition v. Eagle County,*
145 S.Ct. 1497 (2025) ................................................................. 13, 14

*Shoshone-Bannock Tribes v. Daniel-Davis,*
CV-20-00553-BLW, WL 2744123
(D. Idaho March 31, 2023) ............................................................... 11

*Silva v. Lynn*,
482 F.2d 1282 (1st Cir. 1973) ........................................................... 16

*U.S. v. Locke*,
471 U.S. 84 (1985) .............................................................................. 7

*United States v. Oakland Cannabis Buyers' Co-op*.,
532 U.S. 487 (2001) .......................................................................... 20

*Winter v. Natural Resources Defense Council*,
555 U.S. 7 (2008) ................................................................................ 3

## *Federal Statutes*

16 U.S.C. §539p, Section 3003 of the National Defense Authorization
Act for Fiscal Year 2015 ("NDAA") ........................................... *passim*

1872 Mining Law,
30 U.S.C. §21-54 ............................................................................... 7

National Environmental Policy Act ("NEPA"),
42 U.S.C. §§ 4321 *et seq.* ........................................................ *passim*

*Federal Regulations*

36 C.F.R. Part 254 ........................................................... 5, 8, 9, 10, 11

*Other Authorities*

Oversight and Legislative Hearing Before the Subcommittee on Energy and Mineral Resources, Committee on Natural Resources, U.S. House of Representatives, 113th Congress, 1st Session, Serial No. 113-7 (March 21, 2013). ................................. 9

Congressional Budget Office Cost Estimate, H.R. 687 Southeast Arizona Land Exchange and Conservation Act of 2013 (*As ordered reported by the House Committee on Natural Resources on May 15, 2013*) (July 11, 2013). ............... 9

U.S. House of Representatives Report No. 113-167, Southeast Arizona Land Exchange and Conservation Act of 2013 (July 22, 2013)
................................................................................................................ 9

## TABLE OF ACRONYMS

| | |
|---|---|
| AF | Acre-foot (325,851 gallons of water) |
| AMRC | Arizona Mining Reform Coalition |
| ASLD | Arizona State Lands Department |
| BLM | Bureau of Land Management |
| FEIS | Final Environmental Impact Statement |
| GPO | General (Mining) Plan of Operations |
| ITAA | Inter Tribal Association of Arizona, Inc. |
| MCZ | Mining Claim Zone (appraised) |
| MWA | Mineral Withdrawal Area (appraised) |
| NDAA | Section 3003 of the National Defense Authorization Act for Fiscal Year 2015. 16 U.S.C. §539p |
| NEPA | National Environmental Policy Act, 42 U.S.C. §§4321 et seq. |
| UAS | Uniform Standards of Professional Appraisal Practice |
| UASFLA | Uniform Appraisal Standards for Federal Land Acquisitions |

Plaintiffs-Appellants, Arizona Mining Reform Coalition ("AMRC"), *et al.*, submit this Emergency Motion for Stay Pending Appeal to enjoin the title transfer and land exchange that would transfer 2,422 acres of federal public lands to Resolution Copper Mining ("Resolution") (a joint venture of two foreign mining companies), pursuant to Section 3003 of the National Defense Authorization Act for Fiscal Year 2015 ("NDAA"). 16 U.S.C. §539p (the "Exchange"). The government intends to effectuate the Exchange and transfer title as soon as 12:01 eastern time on August 19, 2025. On August 15, 2025, the district court denied AMRC's motion for preliminary injunction and for stay pending appeal. Order, 1-ER-6-99.

The Exchange would privatize Oak Flat and adjacent public lands and remove all federal protections for the public resources at the site, causing immediate and irreparable harm to Plaintiffs. Oak Flat "is a site of great spiritual value" to Tribes in the region. *Apache Stronghold v. U.S.*, 101 F. 4th 1036, 1044 (9th Cir. 2024) (en banc). The lands also contain important public water, wildlife, and recreational values. The Exchange's purpose is to facilitate Resolution's proposed Mine, which would pump and dewater massive amounts of groundwater, deplete surface waters, and completely obliterate sacred land, Oak Flat. *See generally id*. at 1047–48.

Plaintiffs are likely to prevail on the merits. While *Apache Stronghold* concerned religious freedom claims, Plaintiffs' claims here focus on the legal errors contained in the required appraisals and the Final Environmental Impact Statement ("FEIS"), pursuant to the NDAA, federal appraisal standards and regulations, the National Environmental Policy Act ("NEPA"), and Forest Service regulations. At the very least, Plaintiffs have raised serious questions on the merits, and the current injunction, which ends on August 19 (1-ER 98 n. 30), should remain in place to allow the Court to rule on the full case prior to the pending drastic change of the *status quo*.

Section 3003 of the NDAA requires the federal and non-federal lands to be independently appraised, "and the value of the exchanged land equalized as set forth in the statute." *Apache Stronghold*, 101 F. 4th at 1046. This "equal value" mandate

1

must be demonstrated by appraisals conducted pursuant to strict standards. 16 U.S.C. §539p(c)(4)(B). However, the appraisal for the 1,655-acre "Mining Claim Zone" ("MCZ") parcel, which overlies the vast majority of the copper ore body, arbitrarily **zeroed-out the mineral value.** Even though Resolution estimates there are 35 billion pounds of copper beneath this parcel, which it maintains is worth tens of billions of dollars, the appraisal erroneously values the mineral estate of this parcel as zero. The appraisal for the MCZ parcel violates the agency's own appraisal regulations, as well as the federal appraisal standards—all of which Congress specifically said must be met before the Exchange could proceed.

Plaintiffs are also likely to prevail on their NEPA claims. In the new FEIS (the agency rescinded the initial FEIS in 2021), despite the massive amount of water required by the Mine, the agency truncated its review of the serious adverse effects that the pumping and mine dewatering will have on already stressed aquifers and surface waters and failed to consider the full cumulative impacts of this pumping along with other projects within the same area, affecting the same aquifers. In doing so, the agency failed to respond to the substantial criticisms leveled at the FEIS by "cooperating agencies" including the Bureau of Land Management ("BLM"). Lastly, the agency failed to review and impose measures to mitigate the devastating impacts caused by the Exchange and Mine.

Lastly, although Judge Lanza found that the balance of hardships and public interest did not tip sharply towards Plaintiffs, this contradicts the findings of the other federal judges that have reviewed the Exchange, who found that any temporary delay would not meaningfully harm the company, while the privatization would severely harm the Plaintiffs and the public.

## STANDARDS FOR PRELIMINARY RELIEF

To obtain preliminary relief, a Plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction

is in the public interest." *Winter v. Nat. Res. Defense Council*, 555 U.S. 7, 20 (2008). A court evaluates these factors on a sliding scale, as a stronger showing of one element may offset a weaker showing of another. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (en banc). When the balance of equities tips sharply in the plaintiff's favor, a plaintiff must raise only "serious questions" on the merits, which is a lesser showing than likelihood of success. *Id.* "Serious questions" are ones that cannot be resolved at this stage because they require a more deliberative review. *Flathead-Lolo-Bitterroot Citizen Task Force v. Mont.*, 98 F.4th 1180, 1192 (9th Cir. 2024).

## I.    The Privatization of Public Lands Will Result in Irreparable Harm.

Barring an injunction, the Government will transfer the 2,422 acres of public land to Resolution on August 19, 2025, resulting in immediate, irreparable harm to Plaintiffs. 1-ER-94-95. Judge Lanza found—as did Judge Logan, Judge Bumatay, and Justice Gorsuch—that Plaintiffs "have sufficiently established the second preliminary-injunction factor (a likelihood of irreparably injury in the absence of injunctive relief)." 1-ER-11; *Apache Stronghold*, 2025 WL 1360694, at \*6; *Apache Stronghold v. United States*, No. 21-15295, 2021 WL 12295173, \*5 (9th Cir. Mar. 5, 2021) (Bumatay, J., dissenting); *Apache Stronghold v. United States*, 145 S. Ct. 1480, 1480–82 (2025). "[E]very day that Oak Flat remains intact is another day that members of the Tribe can use the land in its current, unspoiled form for religious purposes and ceremonies. Thus, even a temporary delay may, for example, allow another Sunrise Ceremony to take place."1-ER-36 (citing 145 S. Ct. at 1480–82). "[O]nce the transfer is complete, Oak Flat will become private property no longer subject to federal law or Forest Service management, which 'gives Resolution power to exclude Apache Stronghold's members from Oak Flat and to restrict the timing and location of religious ceremonies that regularly take place at Oak Flat ….'" *Apache Stronghold*, 2025 WL 1360694, at \*6.

Without an injunction, these long-cherished national forest lands will become the property of a mining company that seeks to construct a massive mine that "will permanently destroy the Apache's historical place of worship, preventing them from ever again engaging in religious exercise at Oak Flat." 1-ER-7. In addition to the profound immediate loss of access for cultural and spiritual purposes for members of Plaintiff Inter Tribal Association of Arizona ("ITAA"), the Exchange will also immediately and permanently eliminate the legal ability of other Plaintiff groups' members to continue accessing and using these lands for hiking, rock climbing, appreciating and viewing wildlife, plants, and waters on these lands, camping, and other recreational and aesthetic purposes. 1-ER-93; 3-ER-373–408 (Decls. of Dadgar, Featherstone, McSpadden, Murdock, and Bahr).

While Resolution may argue that it will allow, at its sole discretion, some access to the newly private lands, including the 50-acre Oak Flat campground, for some period of time, Judge Lanza joined Judge Logan, Judge Bumatay, and Justice Gorsuch again, recognizing that these arguments are unavailing. 1-ER-93–95; *Apache Stronghold*, 2025 WL 1360694, at *6; *Apache Stronghold*, 2021 WL 12295173, *5. As Judge Bumatay found, this leaves the Apaches "dependent on the good grace of a private copper-mining venture for any access to their sacred religious site" and "on closer scrutiny, this guarantee of access appears to be a hollow promise," *Apache Stronghold*, 2021 WL 12295173, *5. That "does not appear to be legally enforceable" and "is a small fraction of overall area to be exchanged." 1-ER-94.

To prevent the immediate and irreparable loss of public land uses and values, this Court should maintain the status quo by enjoining the imminent Exchange until Plaintiffs' appeal can be heard and resolved.

## II.   Plaintiffs Are Likely to Succeed on the Merits.

## A.   The Appraisal Determinations and Approvals Violate the NDAA.

The Exchange cannot occur without the agency's compliance with the strict appraisal, "equal value" and other standards regarding the value of the lands and

4

minerals to be traded. "The land exchange is subject to certain conditions," including appraisal and equalization requirements. *Apache Stronghold v. U.S.*, 101 F.4th at 1046. Section 3003 sets forth mandatory provisions governing the appraisals for the federal and non-federal lands to be exchanged. The Exchange can occur only after "the final appraised values of the Federal land and non-federal land are determined and approved by the Secretary." 16 U.S.C. §539p(c)(4)(B)(ii).

Section 3003 requires the appraisals to be conducted in compliance with the Forest Service's appraisal regulations, 36 C.F.R. §254.9. 16 U.S.C. §539p(c)(4)(A). The appraisals must also be conducted "in accordance with nationally recognized appraisal standards, including (I) the Uniform Appraisal Standards for Federal Land Acquisitions; and (II) the Uniform Standards of Professional Appraisal Practice." *Id*. §539p(c)(4)(B). The appraisals "shall include a detailed income capitalization approach analysis of the market value of the Federal land which may be utilized, as appropriate, to determine the value of the Federal land." *Id*. §539p(c)(4)(C).

"The value of the Federal land and non-Federal land to be exchanged under this section shall be equal or shall be equalized in accordance with this paragraph." *Id*. §539p(c)(5)(A). *See also* 16 U.S.C. §539p(c)(5)(B)(i) ("If the final appraised value of the Federal lands exceeds the value of the non-federal land, Resolution Copper shall – (I) convey additional non-Federal land in the State to the Secretary").

1.  <u>The Secretary of Agriculture's Approval of the Appraisals Violates §3003, Forest Service Appraisal Regulations, and Federal Appraisal Standards</u>.

Defendants failed to comply with the mandatory appraisal and equal value requirements in four ways. First, the appraisal of the MCZ parcel, which overlies the vast majority of the copper ore body, erroneously assumed that the value of the estimated 35 billion pounds of copper is zero, simply because Resolution has filed mining claims on these federal lands—misunderstanding federal mining, appraisal, and public land law. Second, the MCZ appraisal contradicts the Forest Service's appraisal regulations, which require that in calculating market value, all values of the

5

exchanged lands must be factored in, including minerals. In fact, that was exactly what the agency told Congress it must do. Third, the MCZ appraisal erroneously determined that the "highest and best use" of those lands (as required by the appraisal rules) was merely for "surface land use in support of a mining operation." This is despite the fact that the clear intended use of the MCZ is for extracting its copper and other minerals. Lastly, the MCZ appraisal violates the appraisal regulations and standards by failing to treat the Exchange as a private-lands transaction, and not as if the lands were still federal (and thus subject to Resolution's mining claims).

The Forest Service prepared two appraisals for the federal lands to be exchanged, one covering the 766-acre "Mineral Withdrawal Area" ("MWA") parcel, 4-ER-568, and the other covering the 1,655-acre MCZ parcel. 4-ER-553 (Agency Appraisal Summaries). While the appraisal for the MWA parcel included an estimated value of the 5.33 billion pounds of copper under the surface 4-ER-580, the appraisal for the MCZ parcel arbitrarily failed to include **any** value for the estimated 35 billion pounds of copper, valuing the entire 1,655-acre parcel at less than $2 million. 4-ER-565.

a.   *Resolution's mining claims do not render the federal minerals valueless.*

At the outset, the MCZ appraisal is based on the erroneous assumption that the value of the 35 billion pounds of copper on these federal lands is zero, simply because Resolution has filed unpatented mining claims on these lands. Because of these claims, the appraiser believed that the government did not own its own mineral estate: "the Federal Property is encumbered by mining claims held by a party other than the United States; said mining claims confer all rights to locatable minerals to that party in accordance with the Mining Law and **are not part of the estate owned by the United States**." 4-ER-556 (emph. added).

The appraiser's assumption contradicts longstanding Supreme Court precedent. Although Resolution has filed mining claims on these lands, the United States undisputedly still owns the mineral estate (as well as the surface estate). While

6

owners of unpatented mining claims hold possessory interests in their claims, these interests are a "unique form of property." *U.S. v. Locke*, 471 U.S. 84, 104 (1985). "The United States, as owner of the underlying fee title to the public domain, maintains broad powers over the terms and conditions upon which the public lands can be used, leased, and acquired." *Id*. Accordingly, as shown below, the mineral values should have been included in the MCZ appraisal.

b.  *The MCZ appraisal failed to include its mineral values, as the federal rules and standards required.*

In upholding the MCZ appraisal's refusal to account for the mineral values on public land, the district court's, and Defendants', sole argument is that Resolution's mining claims eliminate any consideration of these mineral values. 1-ER-25-31. This contradicts §3003, the agency's statements to Congress, and ignores the federal appraisal standards and rules. As the court noted, under the 1872 Mining Law (30 U.S.C. §§21-54), Resolution's claims allow it the ability to propose mining, subject to government regulation. That is undisputed. But the court and Defendants then go further, asserting that Resolution has discovered a "valuable mineral deposit" of copper on its claims, which if proven, creates rights to mine. ER 24. But no evidence is provided to support that assertion of "rights" under the Mining Law, based simply on the filing of claims and Resolution's assertions of value.

The court summarized caselaw holding that mining claims are a "unique form of property." But more recent, and controlling, Ninth Circuit precedent has confirmed that the mere filing of mining claims provides no right to mine, absent verified evidence that each claim satisfies the strict economic test for validity. "A 'valuable mineral deposit' is 'mineral that can be extracted, removed and marketed at a profit.' … In the absence of a discovery of a valuable mineral deposit, Section 22 [of the Mining Law] gives a miner no right to occupy the claim beyond the temporary occupancy necessary for exploration." *Ctr. for Biol. Div. v. U.S. FWS*, 33 F.4th 1202, 1209 (9th Cir. 2022) (citations omitted) ("*Rosemont*" mine decision). In that case, the

court rejected the Forest Service's approval of a large copper mine because neither the agency nor the claimant provided the necessary evidence that each claim was valid (i.e., the revenues expected from mining each claim must well-exceed the operational costs).

Plaintiffs do not dispute that Resolution could have gone forward with its mine plan on the still-federal MCZ parcel, and upon proving that its mining claims were valid, as it must under *Rosemont*, rely on its rights under the Mining Law. Yet it chose not to do that. Instead, it opted for the exchange route, which eliminates federal authority. This choice was advantageous to Resolution, as it eliminates federal public land and environmental laws—which place significant controls on mining proposals.

But the company cannot have it both ways—relying on its current federal lands mining claims to assert a "right to mine," yet also take advantage of its future ownership of the parcels as private fee simple, free from federal authority. As shown below, and under the mandated federal appraisal standards and regulations, for purposes of the appraisals the MCZ parcel is no longer treated as being on federal land (and subject to the mining claims), but rather as a private parcel, whose **future** "highest and best use" is what is appraised—not the current pre-Exchange situation. Thus, contrary to the district court, it is not "absurd" that the minerals on this future private land must be valued, 1-ER-28, for that is what the open market would require.

Thus, even if Resolution could show that all of its mining claims are valid, that does not mean that the appraisal can simply ignore the mineral values. Forest Service appraisal regulations require that in estimating market value, **all** values of the exchanged lands must be factored in, including minerals. 36 C.F.R. §254.9(b). Market value "means the most probable price in cash, or terms equivalent to cash, which lands **or interest in lands** should bring in a competitive and open market under all conditions requisite to a fair sale." 36 C.F.R. §254.2 (emph. added).

The appraiser must "consider the contributory value of any interest in land such as water rights, **minerals**, or timber, to the extent they are consistent with the highest

8

and best use of the property." 36 C.F.R. §254.9(b)(1)(iv) (emph. added). The current status of the federal lands (whether covered by mining claims or not) is not determinative, because the appraiser must calculate the value of the lands and interests "as if in private ownership and available for sale in the open market." 36 C.F.R. §254.9(b)(1)(ii). All interests and values must be ascertained. *Restore the North Woods v. U.S. Dept. of Agric.*, 968 F. Supp. 168, 174, n. 4 (D. Vt. 1997) ("appraisal must include 'historic, wildlife, recreation, wilderness, scenic, cultural, or other resource values or amenities as reflected in prices paid for similar properties in the competitive market.' 36 C.F.R. §254.9(b)(1)(iii).").

The district court brushed-off the numerous sworn statements from high-ranking agency officials and congressional findings, that the minerals on both federal parcels must be accounted for. 1-ER-29-34. In the congressional debate over what became §3003, the Forest Service testified that the appraisals of both the MWA and MCZ parcels *must* include the value of the minerals. "The Bill calls for an equal value exchange in section 4(e). If the value of Federal land (**including the ore body**) to be conveyed exceeds the value of the parcels to be acquired, the Bill would allow for a cash equalization payment by Resolution…." 4-ER-660 (Statement of Assoc. Chief U.S. Forest Serv. Wagner) (emph. added). *See also id.* 4-ER-672. The Congressional Budget Office ("CBO"), tasked with analyzing the financial aspects of the Exchange, agreed. "Those appraisals would determine the relative values of the properties affected by the exchange, **including the value of mineral deposits that underlie the federal land**." 4-ER-716-17 (emph. added).

The House Report on the bill that would become §3003, further stressed the need for the appraisals of the two federal parcels to calculate the mineral values. "The bill's effect on offsetting receipts would depend on the outcome of formal appraisals of the federal and private properties that would be conducted after enactment. Those appraisals would determine the relative values of the properties affected by the exchange, **including the value of mineral deposits that underlie the federal land**."

9

H.R. Rep No. 113-167 (2013), at 22 (emph. added), 4-ER-739.

This mandate also helps implement subsection (e), which requires that if the mine produces more mineral value than originally calculated in the appraisals "prepared under subsection (c)(4)(C), Resolution Copper shall pay to the United States … a value adjustment payment for the quantity of excess production at the same rate assumed for the income capitalization approach analysis prepared under subsection (c)(4)(C)." §539p(e)(2).

In other words, for the public to be adequately compensated for future mineral production, the mineral values must be appraised/calculated in the first place, in order to gauge whether there was a difference in values after the mine began operations. But under the district court's and Defendants' view, the mineral values in the MCZ need not be appraised at all—rendering congressional mandates in subsection (e) meaningless. Section 3003 directly ties together the future payments in subsection (e) to the mineral values in the initial appraisals: "The appraisal prepared under this paragraph … shall be the basis for calculation of any payment under subsection (e)." §539p(c)(4)(C).

c.   *The MCZ appraisal arbitrarily assumed that its "highest and best use" was **not** for mining, when that's exactly its intended use.*

The appraiser also failed to correctly determine the "highest and best use" of the MCZ parcel, which is defined as "the most probable and legal use of a property." 36 C.F.R. §254.9(b)(1)(i); *id.* §254.2. For the MWA parcel, the appraiser correctly determined that the highest and best use is the "exploration and development of a mineral resource as a portion of the Resolution Copper deposit." 4-ER-577. Yet for the adjacent MCZ parcel, even though it overlies the very same deposit and Resolution is acquiring it for the very same purpose, the appraiser arbitrarily determined that the "highest and best use" of this parcel is **not** to develop the mineral deposit, but rather merely for "surface land use in support of a mining operation." MCZ summary at 9, 4-ER-562. Resolution, however, has no intention of using these

10

lands for surface facilities, as these lands would be mined.

This Circuit has invalidated land exchanges that low-ball the appraised value by ignoring the likely future use. That was the case in *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1180–84 (9th Cir. 2000). More recently, in rejecting the agency's appraisal of federal land to be used for mining, the court held that "one private party's 'proposed use of a parcel of property is certainly relevant to showing a market demand for that use.'" *Shoshone-Bannock Tribes v. Daniel-Davis*, No. 4:20-cv-00553-BLW, 2023 WL 2744123, at *9 (D. Idaho Mar. 31, 2023) (stayed while on appeal, 2023 WL 5345102) *quoting Desert Citizens*. *See also Nat'l Parks & Cons. Ass'n v. BLM,* 606 F.3d 1058, 1069 (9th Cir. 2010) (agency failed to consider company's intended use of exchanged land as "highest and best use").

d.    *The MCZ appraisal failed to treat the exchange of the lands and minerals as a private-lands transaction, as required by the appraisal standards.*

The MCZ appraisal further violates the agency appraisal regulations at 36 C.F.R. §254.9 and "the Uniform Appraisal Standards for Federal Land Acquisitions ["UASFLA"]" as mandated by §539p(c)(4)(B). These rules require that the appraisals treat the lands and minerals as a private-lands transaction on the open market, not as if the lands were still federal or influenced by mining claims. "The federal land is appraised as if in private ownership, to its highest and best use." 36 C.F.R. §254.9(b). "When appraising the federal land portion of the exchange, the regulations require that the appraiser 'estimate the value of the lands and interests as if in private ownership and available for sale in the open market.'" UASFLA at 53 (citations omitted), 5-ER-810.

But the appraisal of the MCZ parcel was based on the pre-Exchange situation, ignoring the mineral values based on the mere fact that Resolution had filed mining claims. After the Exchange, Resolution will own the lands and minerals in fee simple, and the previous situation regarding mining claims will be irrelevant. The focus on the pre-Exchange status violated the federal standards, where "the appraiser must

11

avoid estimating a property-specific investment value to a particular owner instead of developing an opinion of the market value of the property if it were placed for sale on the open market." UASFLA at 47, 5-ER-804. But that is what the MCZ appraisal did—ignoring the fact that, if this was a private transaction between Resolution and another buyer, it would certainly include the mineral values.

The agency's full appraisal for the MWA parcel recognized that appraisals of the currently federal land must be calculated as if in private ownership, without consideration of its current status as federal land. "[F]or the purposes of this Report, the Subject [parcel] is considered fee simple ownership, as though it is in private ownership, is freely alienable, and zoned consistently with other similarly situated non-Federal properties." "Real Property Appraisal Report." 4-ER-597.

It defies logic to assume that if Resolution were to offer these same lands for sale on the open market after the Exchange, it would assert that the 35 billion pounds of copper are worthless. Thus, until the appraisals and agency decision-making satisfy the NDAA requirements, the Exchange cannot legally proceed.

## B. The FEIS Violates NEPA and the NDAA.

Congress conditioned the Exchange on the Forest Service's compliance with NEPA for both the review and approval of the Exchange, as well as for the Mine. "Except as otherwise provided in this section, the Secretary shall carry out the land exchange in accordance with the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.)." 16 U.S.C. §539p(c)(9)*; see also Apache Stronghold*, 101 F. 4th at 1131.

"NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011). NEPA requires agencies to take a "hard look" at the environmental consequences of proposed actions, including direct, indirect, and cumulative impacts to all potentially affected resources. *Idaho Sporting*

12

*Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002); 42 U.S.C. §4332(2)(C). NEPA also requires that the FEIS fully analyze mitigation measures as part of the NEPA process—not in some future decision shielded from public review. *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1107 (9th Cir. 2016). The guiding principle for judicial review "inherent in NEPA … is a 'rule of reason.'" *Seven County Infrastructure Coalition v. Eagle County*, 145 S.Ct. 1497, 1513 (2025) (citations omitted). The FEIS fails this "reasonableness" test on numerous grounds.

1.    The FEIS Failed to Properly Analyze the Project's Impacts to Water.

Once constructed, the Mine will pump massive amounts of groundwater from its "Desert Wellfield" that will fully deplete (use) at least 544,000 acre-feet ("AF") of "fresh groundwater" from the East Salt River Valley, just outside Phoenix. 2-ER-230. However, the Forest Service refused to analyze the Mine's cumulative pumping impacts along with the pumping impacts for the 275-square mile Superstition Vistas mega development that is also being built on Arizona State Trust Land in the same proximity as the Desert Wellfield and which will rely on the same limited groundwater resources as the Mine. 2-ER-223. Instead, the agency unreasonably limited its substantive analysis and modeling of the water related cumulative impacts of the development visa-a-vis the Mine to only a small portion of the development (the DH Horton subdivision, 2-ER-227-228).

Judge Lanza rejected Plaintiffs' arguments related to agency's failure to consider Superstition's cumulative impacts, concluding that it was sufficient under NEPA for the agency to analyze the future growth in the Superstition Vistas development "conceptually," 1-ER-50, and because the FEIS contained "extensive analysis regarding water-use issues" including, in the court's view, "water modeling related to the anticipated water use associated with Desert Wellfield and Superstition Vistas." *Id*. But the court afforded the agency unwarranted deference, as the agency's predictive judgments were not supported in the record. 1-ER-50-51 (citing *Seven County Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497, 1512-13

13

(2025). These conclusions were in error.

First, while the FEIS does consider water use issues related to the Superstition development generally, *see, e.g.*, 2-ER-223-228, the agency's water modeling did not include the full anticipated water uses or demands associated with Superstition Vistas. To the contrary, the agency admits that it did not model or perform any quantitative analysis of the water related cumulative impact of the Superstition development alongside Desert Wellfield pumping because the Forest Service rejected these water demands in its initial screening as "speculative." 2-ER-223.

Second, while deference to an agency may be appropriate when an agency makes various "scientific judgments," *Seven County*, 145 S. Ct. at 1512, deference is not appropriate here, where the agency wholly refused to include the potential water demands for all but a small portion of the Superstition development in its quantitative modeling of cumulative impacts because it erroneously concluded "the development plans are conceptual and lack adequate detail to allow substantial analysis of resource effects and thus normally would be considered speculative, not reasonably foreseeable." 2-ER-223. *See also* 2-ER-228.

Here, the Superstition development is in no way "conceptual" since homes have already been built and sold in portions of the development. More importantly, the technical water demands for the development have already been calculated – in great detail, 3-ER-409-547, and these calculations could have easily been used by the agency to model the water demands of the full Superstition development in the FEIS, meaning they were in no way "speculative." For example, Superstition's residential development is planned to use 185 gallons per capita [person] per day, for roughly 27,370 single-family residential units, and water demands are also calculated for the 2,394 acres of non-residential uses (e.g., commercial, other). 3-ER-448.

This Court has rejected EISs for mining projects that fail to provide a "quantified assessment of their [other projects] combined environmental impacts," and "objective quantification of the impacts" from other existing and proposed

14

operations in the region. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 972 (9th Cir. 2006); *see also Great Basin Resource Watch v. BLM*, 844 F.3d 1095, 1105 (9th Cir. 2016)(FEIS failed to "quantify or discuss in any detail the effects of other activities").

The impacts from the Desert Wellfield pumping are directly connected to and cumulative of the groundwater pumping needed for the Superstition Vistas project. Seven County did not eliminate the agency's duty to analyze "any reasonably foreseeable adverse environmental effect which cannot be avoided should the proposal be implemented." 42 U.S.C. §4332(2)(C)(ii). Thus, the court erred in concluding that the agency complied with NEPA by conducting a "qualitative" discussion of Superstition's impacts.

2.    <u>The Forest Service Failed to Meaningfully Consider Comments from Other Agencies</u>.

Judge Lanza also erroneously rejected Plaintiffs' contention that the agency failed to consider the full scope of criticisms of the FEIS submitted by the Bureau of Land Management ("BLM") and the Arizona State Land Department ("ASLD"), 1-ER-52-55, both of which are cooperating agencies. 2-ER-188. The BLM's detailed comments on the water and related hydrology aspects of the original 2021 FEIS, which were expressly requested by the Forest Service, go to the heart of the FEIS issues and almost entirely support the concerns raised by Plaintiffs throughout the NEPA process. (BLM Review of Hydrology Aspects of the Resolution Copper Project, June 13, 2022)("BLM Hydrology Review"), 2-ER-155-180.  Nevertheless, the language of the FEIS **fails to even acknowledge the existence of this critically important BLM Report** or to explain, in reference to the BLM, why it apparently determined to reject much of the analysis set forth in the report.

Judge Lanza dismissed Plaintiffs' concerns regarding the BLM, noting the 2025 FEIS "directly acknowledges and addresses many of those concerns, even if it does not specifically identify the BLM report as the source." 1-ER-52. Judge Lanza

15

also gives substantial deference to the agency under *Seven County*, observing that "in a project of this magnitude, it will always be possible to identify some argument, raised by some stakeholder, that could have been analyzed in more detail in the FEIS." 1-ER-53.  But here, the BLM is not merely a "stakeholder," it is a cooperating agency, whose Report, prepared by a team of BLM hydrologists, 2-ER-155, was requested by the agency itself. The agency's "hide the ball" response to the BLM—if it can be considered a response at all—cannot be considered "in good faith" or "reasoned analysis," *Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973), where the FEIS fails to acknowledge the existence of the Report or the criticisms set forth in the Report, leaving the Plaintiffs' and members of the public guessing on such substantive matters, like water impacts.[1] This violates the fundamental "hard look" requirements of NEPA.

With regard to the ASLD's comments, while the FEIS examined a number of concerns raised by the ASLD related to water, it wholly ignored the socioeconomic impacts, particularly regarding the impacts to revenue needed by the State Trust stemming from the Mine's pumping at Superstition Vistas: "…the extraction and transportation of groundwater out of the SVPA [Superstition Vistas Planning Area] greatly compromises the ability to develop these lands to their full planned potential, and as a result, reduces the income and value of the Trust." 2-ER-234. ASLD also warned that the water impacts limit the total developable lands at Superstition Vistas: "the loss of 3,440 acres of developable State Trust land represents a minimum potential loss to the Trust of at least $536,640,000 in revenue." 2-ER-233. These socio-economic concerns were completely ignored by the agency, violating NEPA.

3.     The Agency Failed to Consider, and Require, Sufficient Mitigation Measures.

The Forest Service also failed to fully analyze potential mitigation measures in

---

[1] Defendants have recently informed the court and the parties of a memorandum contained in the project record that purportedly addresses the BLM Report, 1-ER-52–53 n. 13, yet this memorandum has not been made publicly available, leaving Plaintiffs and the public unable to review its contents.

16

the FEIS, especially regarding the groundwater pumping and transport via the proposed pipelines. Pointing to the deference required by *Seven County*, Judge Lanza also erroneously rejected Plaintiffs' contention that the agency failed to disclose or analyze important mitigation measures in the FEIS related to Mine. 1-ER-55. But an FEIS must fully analyze mitigation measures as part of the NEPA process. *See, e.g., Great Basin Resource Watch v. BLM*, 844 F.3d 1095, 1107 (9th Cir. 2016)(FEIS must fully analyze mitigation measures as part of the NEPA and FLPMA process).

Here, for example, the agency acknowledges Desert Wellfield pumping will cause regional groundwater declines that will adversely impact individual wells throughout region, meaning "infrastructure costs would increase as wells and pumps need to be lowered or replaced." 2-ER-227. Further, "there likely would be certain areas that experience lack of well capacity and groundwater shortages, particularly around the edges of the basin." *Id*.

Yet, the FEIS failed to analyze or require any mitigation measures to compensate for these impacts, including wells that would need to be deepened or would go dry as a result of the pumping. The FEIS deferred this analysis to future state permitting. 2-ER-231, 2-ER-235. But under NEPA and FLPMA, the Forest Service cannot defer the analysis of impacts and mitigation measures to the future. *Great Basin Resource Watch*, 844 F.3d at 1103–04 (EIS could not rely on future state permitting as substitute for the environmental review requirements). This is especially true here, as a "single" EIS must analyze all impacts. 16 U.S.C. §539p(c)(9)(B). These failures in the FEIS are therefore not entitled to deference under *Seven County*, and the court erred in concluding otherwise.

## III. Balance of Hardships and Public Interest Tip Sharply in Plaintiffs' Favor.

The "balance of equities" and "public interest" factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). In consideration of these factors, Plaintiffs emphasize two initial points. First, there is no dispute the Exchange will result in immediate, irreparable harm to Plaintiffs, as

17

Judge Lanza recognized. Second, throughout the litigation over this Exchange, three separate judges have now considered the balance of harms and public interest, with two finding that the balance tips sharply in the Plaintiffs/Tribes' favor, and Judge Lanza now finding that the balance tips toward Defendants.

First, in addressing Apache Stronghold's similar emergency motion for an injunction pending appeal in 2021, only Judge Bumatay considered these two factors, and he found that "[t]he balance of the equities and the public interest 'tip sharply' in Apache Stronghold's favor." *Apache Stronghold v. United States*, 2021 WL 12295173, *18 (9th Cir., March 5, 2021) (Bumatay, J., dissenting) (citations omitted). Similarly, in addressing a subsequent motion for an injunction pending appeal in the district court, Judge Logan held that "[t]he obvious conclusion" was "that the balance of equities indeed 'tips sharply' in Plaintiff's favor." *Apache Stronghold v. United States*, 2025 WL 1360694, *8 (D. Ariz., May 9, 2025). This is unsurprising, as courts generally conclude that immediate, irreparable harm, such as what Plaintiffs will face, far outweighs the sort of temporary, economic harm an injunction pending appeal would cause to Defendants and Resolution. *See e.g., League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) ("the balance of equities tips toward the . . . plaintiffs, because the harms they face are permanent, while the intervenors face temporary delay.").

As explained above, the privatization of the 2,422 acres of currently federal public land at Oak Flat will immediately and irreparably harm Plaintiffs and their members. "There is no doubt that an array of equities and public-interest considerations favor Plaintiffs." 1-ER-96.

On the other hand, the Government will suffer little hardship if a stay is issued. *Apache Stronghold*, 2021 WL 12295173, *19 (Bumatay, J.). While the Government will likely emphasize the nation's need for copper, this interest would "not be lost because of an injunction, but merely delayed." *Apache Stronghold*, 2025 WL 1360694, *8. Indeed, with or without the requested injunction, the Mine remains

18

years away—if it occurs at all. Additionally, Resolution has made no commitment or assurance whatsoever that any copper from this Mine would be processed or remain in the United States.

Resolution, for its part, will focus on temporary economic harm, which is generally not considered irreparable. *Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015). As Judge Logan recognized, "while an injunction will likely prevent Resolution Copper from beginning its work for a limited time, as Plaintiff points out, it will ultimately "not stop Resolution from mining a single ounce of copper should the transfer ultimately be upheld." *Apache Stronghold*, 2025 WL 1360694 at *8 (citations omitted).

Although Judge Lanza focused on the "national security" implications of fostering copper production, any short delay while this appeal progresses has nothing to do with domestic copper production. 1-ER-96. Indeed, Resolution has no stated plans to actually process or sell the copper in this country, simply stating that smelting/processing will occur "off-site." FEIS at ES-7, 2-ER-190.

In finding that the balance does not tip sharply towards Plaintiffs, Judge Lanza weighed heavily that Congress directed this Exchange in 2014. 1-ER-96–97, citing *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 487, 497 (2001). But Congress did not simply order the Exchange in the NDAA. In consideration of the public interest, Congress imposed significant conditions that must occur *prior* to the Exchange, including Tribal consultation, detailed appraisals subject to strict standards, fair-market value of the lands to be exchanged, preparation of an FEIS and compliance with NEPA, and extra consideration of the impacts on cultural and archaeological resources. 16 U.S.C. § 539p(c). Thus, not only did Congress require these pre-requisites, which form the heart of Plaintiffs' claims, it explicitly required them as part of its balancing of interests.

As Judge Logan noted in *Apache Stronghold*, the court considers the potential "error costs on each side" in balancing the interests and public interest. *Apache*

19

*Stronghold*, 2025 WL 1360694 at *8. "In the most harmful scenario to Plaintiff, if this Court denies the injunction, . . . and Plaintiff ultimately wins on the merits, Plaintiff will have already suffered some or all of its enumerated immediate harms, even despite winning the day in this litigation." *Id*. "Yet in the riskiest scenario for Defendants, . . . the only harm will have been a delay of the land transfer for a number of months or (at most) a couple years." *Id*. Relatedly, if Plaintiffs' motion is denied, but Plaintiffs ultimately prevail, it will become difficult to later reverse the Exchange, as once the lands are transferred, and undergo modifications, "it might become impracticable to attempt to unscramble the eggs." *Kettle Range Consv. Group v. U.S. BLM,* 150 F.3d 1083, 1087 (9th Cir. 1998) (per curiam).

Lastly, this Court has set an expeditious briefing schedule on Plaintiffs appeal, concluding by the end of October. DktEntry 2.1. Thus, any potential hardship to Resolution pending review of this appeal is short-lived at best.

## CONCLUSION

Plaintiffs-Appellants are entitled to a preliminary injunction having satisfied the *Winters* test and ask that this Court enjoin the impending Exchange.

Respectfully submitted August 16, 2025.

*/s/ Roger Flynn*
Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539

mfink@biologicaldiversity.org

Allison N. Henderson
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs*

/s/ Susan Montgomery
Susan B. Montgomery (AZ Bar # 020595)
Robyn L. Interpreter (AZ Bar # 020864)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorneys for the ITAA*

## STATEMENT OF RELATED CASES

The San Carlos Apache Tribe has filed a related case challenging the government's actions here, the FEIS and proposed Exchange, and had similarly filed a motion for preliminary injunction. As with Plaintiffs-Appellants AMRC et al, the district court denied the Tribe's motion. *See San Carlos Apache Tribe v. U.S. Forest Service*, Civ. No. 21-cv-0068-PHX-DWL (D. Ariz.). The Tribe has also appealed the district court's denial of their injunction motion. Appeal # 25-5189.

Further, the case brought by Apache Stronghold, challenging the Exchange, is still before this Court. *See Apache Stronghold v. U.S.*, 101 F. 4th 1036 (9th Cir. 2024).

Date: August 16, 2025          *s/ Roger Flynn*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2025, I electronically filed the foregoing, along with the Excerpts of Record (ER) with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system. In addition, I emailed the foregoing, along with the ER, to opposing counsel of record.

*s/ Roger Flynn*

22

**No. 25-5185**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION OF ARIZONA, INC.; CENTER FOR BIOLOGICAL DIVERSITY; EARTHWORKS; THE ACCESS FUND; and SIERRA CLUB.

*Plaintiffs-Appellants*,

v.

BROOKE L. ROLLINS, U.S. SECRETARY OF AGRICULTURE; UNITED STATES FOREST SERVICE; and NEIL BOSWORTH, SUPERVISOR OF THE TONTO NATIONAL FOREST.

*Defendants-Appellees*,

and

RESOLUTION COPPER MINING, LLC

*Intervenor-Defendant-Appellee.*

---

On Appeal from the United States District
Court for the District of Arizona
(District Judge Dominic W. Lanza)

---

**PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD**
**INDEX VOLUME**
*In Support of*
***PLAINTIFFS-APPELLANTS' EMERGENCY MOTION UNDER***
***CIRCUIT RULE 27-3***
***RELIEF REQUESTED BY AUGUST 18, 2025, AS THE LAND TITLE***
***TRANSFER WILL OCCUR ON AUGUST 19, 2025***

Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
mfink@biologicaldiversity.org

Allison N. Henderson
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs-Appellants*

Susan B. Montgomery
Robyn L. Interpreter
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorneys for the Inter Tribal Association of Arizona, Inc.*

**INDEX**

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| **Volume 1 of 5 [99 pages]** | | | |
| Order (August 15, 2025) | 8/15/2025 | 99 | 6-99 |
| **Volume 2 of 5 [268 pages]** | | | |
| Federal Defendants' Memo in Support of Summary Judgment, *CBD v. USFS*, Case No. 23-cv-00928 (DLF) (D.D.C., August 22, 2024) | 8/4/2025 | 97-1 | 105-154 |
| BLM Review of Hydrology Aspects of the Resolution Copper Project | 7/14/2025 | 87-1 | 155-180 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, June 2025 | 7/14/2025 | 87-2 | 181-275 |
| Draft Record of Decision, June 2025 | 7/14/2025 | 87-3 | 276-367 |
| **Volume 3 of 5 [180 pages]** | | | |
| Declaration of Maria Dadgar | 7/14/2025 | 87-5 | 373-380 |
| Declaration of Roger Featherstone | 7/14/2025 | 87-6 | 381-387 |

| | | | |
|---|---|---|---|
| Declaration of Russ McSpadden | 7/14/2025 | 87-7 | 388-399 |
| Declaration of Erik Murdock | 7/14/2025 | 87-8 | 400-403 |
| Declaration of Sandra Bahr | 7/14/2025 | 87-9 | 404-408 |
| Master Water Plan for Superstition Vistas, Apache Junction, Arizona | 7/14/2025 | 87-10 | 409-547 |
| **Volume 4 of 5 [195 pages]** | | | |
| Appraisal Report Summary: Mining Claim Zone MCZ Parcel | 7/14/2025 | 87-11 | 553-567 |
| Appraisal Report Summary: Mineral Withdrawal Area (MWA) Parcel | 7/14/2025 | 87-12 | 568-595 |
| Technical Appraisal Review Report: MWA Parcel (excerpts) | 7/14/2025 | 87-13 | 596-598 |
| Oversight and Legislative Hearing Before the U.S. House of Representatives Subcommittee on Energy & Mineral Resources, March 2013 | 7/14/2025 | 87-14 | 599-715 |
| Congressional Budget Office Cost Estimate, July 2013 | 7/14/2025 | 87-15 | 716-717 |

| | | | |
|---|---|---|---|
| House Natural Resources Committee House Report No. 113-167, July 2013 | 7/14/2025 | 87-16 | 718-742 |
| **Volume 5 of 5 [296 pages]** | | | |
| Uniform Appraisal Standards for Federal Land Acquisitions | 7/14/2025 | 87-17 | 748-1009 |
| Excerpt from Resolution Copper Mining's General Plan of Operations, 2016 | 7/14/2025 | 87-18 | 1010 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, January 2021 (rescinded) | 7/14/2025 | 87-19 | 1011-1013 |
| USDA Memo for Withdrawal of Notice of Availability, Rescind Final Environmental Impact Statement and Draft Record of Decision | 3/2/2021 | 26-2 | 1014 |
| Notice of Appeal | 8/15/2025 | 100 | 1015-1020 |
| Civil Docket for Case No. 2:21-cv-00122-DWL – United States District Court, District of Arizona (Phoenix) – *Arizona Mining Reform Coalition, et al. v. United States Forest Service, et al.* | | | 1021-1038 |

**No. 25-5185**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION OF ARIZONA, INC.; CENTER FOR BIOLOGICAL DIVERSITY; EARTHWORKS; THE ACCESS FUND; and SIERRA CLUB.

*Plaintiffs-Appellants*,

v.

BROOKE L. ROLLINS, U.S. SECRETARY OF AGRICULTURE; UNITED STATES FOREST SERVICE; and NEIL BOSWORTH, SUPERVISOR OF THE TONTO NATIONAL FOREST.

*Defendants-Appellees*,

and

RESOLUTION COPPER MINING, LLC

*Intervenor-Defendant-Appellee.*

_____

On Appeal from the United States District
Court for the District of Arizona
(District Judge Dominic W. Lanza)

_____

**PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD
VOLUME 1 of 5**
*In Support of*
***PLAINTIFFS-APPELLANTS' EMERGENCY MOTION UNDER
CIRCUIT RULE 27-3
RELIEF REQUESTED BY AUGUST 18, 2025, AS THE LAND TITLE
TRANSFER WILL OCCUR ON AUGUST 19, 2025***

Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
mfink@biologicaldiversity.org

Allison N. Henderson
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs-Appellants*

Susan B. Montgomery
Robyn L. Interpreter
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorneys for the Inter Tribal Association of Arizona, Inc.*

## INDEX

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| **Volume 1 of 5 [99 pages]** | | | |
| Order (August 15, 2025) | 8/15/2025 | 99 | 6-99 |
| **Volume 2 of 5 [268 pages]** | | | |
| Federal Defendants' Memo in Support of Summary Judgment, *CBD v. USFS*, Case No. 23-cv-00928 (DLF) (D.D.C., August 22, 2024) | 8/4/2025 | 97-1 | 105-154 |
| BLM Review of Hydrology Aspects of the Resolution Copper Project | 7/14/2025 | 87-1 | 155-180 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, June 2025 | 7/14/2025 | 87-2 | 181-275 |
| Draft Record of Decision, June 2025 | 7/14/2025 | 87-3 | 276-367 |
| **Volume 3 of 5 [180 pages]** | | | |
| Declaration of Maria Dadgar | 7/14/2025 | 87-5 | 373-380 |
| Declaration of Roger Featherstone | 7/14/2025 | 87-6 | 381-387 |

| | | | |
|---|---|---|---|
| Declaration of Russ McSpadden | 7/14/2025 | 87-7 | 388-399 |
| Declaration of Erik Murdock | 7/14/2025 | 87-8 | 400-403 |
| Declaration of Sandra Bahr | 7/14/2025 | 87-9 | 404-408 |
| Master Water Plan for Superstition Vistas, Apache Junction, Arizona | 7/14/2025 | 87-10 | 409-547 |
| **Volume 4 of 5 [195 pages]** | | | |
| Appraisal Report Summary: Mining Claim Zone MCZ Parcel | 7/14/2025 | 87-11 | 553-567 |
| Appraisal Report Summary: Mineral Withdrawal Area (MWA) Parcel | 7/14/2025 | 87-12 | 568-595 |
| Technical Appraisal Review Report: MWA Parcel (excerpts) | 7/14/2025 | 87-13 | 596-598 |
| Oversight and Legislative Hearing Before the U.S. House of Representatives Subcommittee on Energy & Mineral Resources, March 2013 | 7/14/2025 | 87-14 | 599-715 |
| Congressional Budget Office Cost Estimate, July 2013 | 7/14/2025 | 87-15 | 716-717 |

| | | | |
|---|---|---|---|
| House Natural Resources Committee House Report No. 113-167, July 2013 | 7/14/2025 | 87-16 | 718-742 |
| **Volume 5 of 5 [296 pages]** | | | |
| Uniform Appraisal Standards for Federal Land Acquisitions | 7/14/2025 | 87-17 | 748-1009 |
| Excerpt from Resolution Copper Mining's General Plan of Operations, 2016 | 7/14/2025 | 87-18 | 1010 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, January 2021 (rescinded) | 7/14/2025 | 87-19 | 1011-1013 |
| USDA Memo for Withdrawal of Notice of Availability, Rescind Final Environmental Impact Statement and Draft Record of Decision | 3/2/2021 | 26-2 | 1014 |
| Notice of Appeal | 8/15/2025 | 100 | 1015-1020 |
| Civil Docket for Case No. 2:21-cv-00122-DWL – United States District Court, District of Arizona (Phoenix) – *Arizona Mining Reform Coalition, et al. v. United States Forest Service, et al.* | | | 1021-1038 |

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| San Carlos Apache Tribe, | No. CV-21-00068-PHX-DWL |
| Plaintiff, | |
| | **ORDER** |
| v. | |
| United States Forest Service, et al., | |
| Defendants. | |
| Arizona Mining Reform Coalition, et al., | No. CV-21-00122-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| United States Forest Service, et al., | |
| Defendants. | |

## INTRODUCTION

This order addresses the sometimes overlapping motions for preliminary injunction filed in two cases: (1) *San Carlos Apache Tribe v. United States Forest Service et al.*, No. 21-cv-68-PHX-DWL (hereinafter, "*San Carlos*"), and (2) *Arizona Mining Reform Coalition v. United States Forest Service et al.*, No. 21-cv-122-PHX-DWL (hereinafter, "*AMRC*"). Each motion seeks an injunction to block a land exchange, now scheduled to occur on August 19, 2025, that Congress authorized over a decade ago, as part of the National Defense Authorization Act for Fiscal Year 2015 ("NDAA").

More specifically, § 3003 of the NDAA, known as the Southeast Arizona Land

Exchange and Conservation Act ("SALECA"), authorizes the exchange of 2,422 acres of federal land in the Tonto National Forest for land held by a private company, Resolution Copper ("Resolution Copper"). *See also* 16 U.S.C. § 539p(a) ("The purpose of this section is to authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States."). The federal land to be transferred to Resolution Copper includes an Apache ceremonial ground called *Chí'chil Biłdagoteel*. That area, known in English as Oak Flat, "is a site of great spiritual value to the Western Apache Indians, who believe that it is indispensable to their religious worship," but "also sits atop the world's third-largest deposit of copper ore." *Apache Stronghold v. United States*, 101 F.4th 1036, 1044 (9th Cir. 2024) (en banc). Congress's intent in authorizing the land exchange was "[t]o take advantage of that deposit" by enabling Resolution Copper to "mine the ore." *Id.*

Congress weighed considerable tradeoffs when deciding whether to approve the land exchange. On the one hand, the contemplated mining activity is expected to produce significant economic benefits in Arizona, as "the mine is projected to directly employ 1,434 workers . . . [and] increase the average annual economic value added in Arizona by about $1.2 billion." (*San Carlos*, Doc. 105-9 at 31-32.) Additionally, and perhaps more important, the mine is also expected to promote America's national security interests, by ensuring domestic access to a mineral that is essential to energy distribution, generation, and storage.

On the other hand, it is difficult to overstate just how profoundly the land exchange will undermine the ability of members of the San Carlos Apache Tribe ("the Tribe") to practice their religion. Put simply, the mining techniques that will be used to extract the copper will "turn Oak Flat into a massive hole in the ground. . . . It is undisputed that the government's plan will permanently destroy the Apaches' historical place of worship, preventing them from ever again engaging in religious exercise at Oak Flat." *Apache Stronghold v. United States*, 145 S. Ct. 1480, 1480 (2025) (Gorsuch, J., dissenting from the denial of certiorari) (cleaned up). "[T]he government's plan will effectively end Apache religious existence as we know it. Even the government has acknowledged that the

destruction of Oak Flat will inflict indescribable hardship on the Apaches." *Id.* at 1488 (cleaned up).

The contemplated mining activity also has the potential to cause potentially devastating environmental effects.  For example, Resolution Copper's mining activity will generate massive quantities of toxic waste material, known as tailings, that will need to be pumped through miles of pipelines before reaching a tailings storage facility.  "There is public apprehension over the creation, and type, of a tailings embankment for the tailings storage facility.  The catastrophic collapse of [a] tailings dam in Brazil in January 2019, resulting in 259 confirmed fatalities with 11 people still missing, has heightened concerns." (*San Carlos*, Doc. 105-9 at 7.)  "The consequences of a catastrophic failure and the downstream flow of tailings would include possible loss of life and limb, destruction of property, displacement of large downstream populations, disruption of the Arizona economy, contamination of soils and water, and risk to water supplies and key water infrastructure like the CAP [Central Arizona Project] canal."  (*Id.* at 30.)

Additionally, the contemplated mining activity will require tremendous quantities of water, which is of particular concern in drought-stricken Arizona.  (*Id.* at 7 ["Water use is a major concern among the public, other government agencies, and interested parties."].) "Over the mine life, 87,000 acre-feet of water would be pumped from the mine, and between 180,000 and 590,000 acre-feet of makeup water would be pumped from the Desert Wellfield in the East Salt River valley. . . .  The wellfield pumping would incrementally contribute to the lowering of groundwater levels and cumulatively reduce overall groundwater availability in the area."  (*Id.* at 28.)  This water use may result in alarming long-term consequences.  (*AMRC*, Doc. 93-1 at 169 ["[U]ltimately, long-term use of groundwater may become unsustainable . . . ."].)

Given these stark tradeoffs, it should come as no surprise that the land exchange has been the subject of intense opposition and an array of legal challenges.  In 2019, several members of Congress attempted, unsuccessfully, to introduce legislation to overturn SALECA.  (*San Carlos*, Doc. 105-9 at 7.)  In 2021, when the land exchange appeared to

be imminent, three lawsuits (including these two lawsuits) were filed in the District of Arizona seeking to enjoin it. In the other lawsuit, a nonprofit organization alleged that the land exchange would violate tribal members' rights under the First Amendment's Free Exercise Clause, the Religious Freedom Restoration Act ("RFRA"), and an 1852 treaty between the United States and the Tribe. *Apache Stronghold v. United States et al.*, No. 21-cv-50-PHX-SPL (hereinafter, "*Apache Stronghold*"). The procedural history surrounding *Apache Stronghold* is summarized in more detail in a previous order in this case. (*San Carlos*, Doc. 99 at 3-6.) In a nutshell, the Ninth Circuit narrowly rejected the plaintiff's claims in a 6-5 *en banc* decision issued in March 2024 and the Supreme Court denied certiorari in May 2025, albeit only after relisting the matter for consideration more than a dozen times and over the dissent of Justices Gorsuch and Thomas.

In light of those developments, the plaintiffs in these two actions have not advanced any religion-based claims in their pending motions. Instead, the claims underlying those motions broadly fall into the following four categories:

1.  <u>Appraisal Claims</u>:  Under SALECA, the United States Forest Service ("Forest Service") must perform an appraisal to calculate the value of the federal and non-federal land to be exchanged.  16 U.S.C. § 539p(c)(4).  SALECA also creates an "equalization process" providing that if the federal land is more valuable than the non-federal land, Resolution Copper must make up the difference by conveying additional land and/or "mak[ing] a cash payment." *Id.* § 539p(c)(5)(B)(i).  According to AMRC, the Forest Service violated its appraisal-related duties under SALECA by failing to account for the value of the copper deposits underlying one of the federal parcels to be exchanged, known as the Mining Claim Zone ("MCZ") parcel—an omission that resulted in the Forest Service "low-ball[ing] the appraised value" of that parcel by potentially billions of dollars. (*AMRC*, Doc. 97 at 10.)

2.  <u>NEPA Claims</u>: SALECA provides that "[p]rior to conveying Federal land under this section, the Secretary [of Agriculture] shall prepare a single environmental impact statement under the National Environmental Policy Act of 1969 ['NEPA'], which

shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." 16 U.S.C. § 539p(c)(9)(B). On June 20, 2025, the Forest Service published its voluminous final environmental impact statement ("FEIS") related to the land exchange,[1] as well as its draft record of decision ("DROD"). In their motions, AMRC and the Tribe identify an array of perceived shortcomings and omissions in the FEIS, which they contend violate NEPA.

3.    Consultation Claims:  SALECA provides that "[t]he Secretary shall engage in government-to-government consultation with affected Indian tribes concerning issues of concern to the affected Indian tribes related to the land exchange." 16 U.S.C. § 539p(c)(3)(A). Additionally, under section 106 of the National Historic Preservation Act ("NHPA"), agencies "shall take into account the effect of an undertaking on any historic property" and afford the Advisory Council on Historic Preservation ("ACHP") "a reasonable opportunity to comment with regard to the undertaking." *Tohono O'odham Nation v. U.S. Dept. of the Interior*, 138 F.4th 1189, 1193 (9th Cir. 2025) (cleaned up). According to the Tribe, the Forest Service did not fulfill these consultation duties before publishing the FEIS.

4.    NFMA Claims:  The National Forest Management Act ("NFMA") includes a provision that requires the Forest Service to prepare a land and resource management plan for each national forest. 16 U.S.C. § 1604(a). Such a plan exists for the Tonto National Forest (the "Forest Plan") and was last amended in 2023. In the FEIS, the Forest Service acknowledges that some of the contemplated mining-related activities will occur within the Tonto National Forest and thus require an amendment of the Forest Plan (*San*

---

[1]    "The FEIS consists of six volumes. It includes a nine-chapter, 1,000-page body and twenty-one appendices, which together span more than 2,500 pages. Over the course of nearly 400 pages in Appendix R, the FEIS responds to the more than 29,000 comments the agency received on the Draft EIS." (*San Carlos*, Doc. 114 at 4.)

1    *Carlos*, Doc. 105-9 at 11, 54), and the DROD proposes 16 amendments to the Forest Plan

2    that would be required for approving Skunk Camp as the preferred tailings storage facility

3    alternative (*AMRC*, Doc. 87-3 at 19-25).  According to AMRC, this approach violates

4    NFMA's forest planning regulations, which appear at 36 C.F.R. Part 219, because those

5    regulations require a public notice-and-comment process "which did not occur here" before

6    any forest plan may be amended.  (*AMRC*, Doc. 87 at 28.)

7    On August 6, 2025, the Court held a lengthy hearing to hear oral argument from the

8    parties.  Having given careful consideration to the parties' arguments, the Court now

9    concludes that Plaintiffs have not established a likelihood of success on any of their claims.

10    In all cases, this determination is based on an evaluation of the merits.  Additionally, in

11    some cases, this determination is also based on various jurisdictional and other threshold

12    issues identified by the Federal Defendants and Resolution Copper.

13    Moreover, even if the merits of some of Plaintiffs' claims could be said to satisfy

14    the lesser "serious questions" standard, the Court would still decline to issue injunctive

15    relief.  Although Plaintiffs have sufficiently established the second preliminary-injunction

16    factor (a likelihood of irreparable injury in the absence of injunctive relief), the remaining

17    factors (balance of hardships and public interest) present a mixed picture and thus do not

18    tip sharply in Plaintiffs' favor.  It is evident that Plaintiffs and their supporters profoundly

19    disagree with Congress's decision to authorize the land exchange, which may generate

20    significant economic and national security benefits but will also "effectively end Apache

21    religious existence as we know it" and pose significant environmental threats.

22    Nevertheless, in our system of government, the political branches are responsible for

23    weighing these sorts of competing objectives and determining how to balance them.  Here,

24    Congress chose to pursue the land exchange despite the existence of many significant

25    tradeoffs and the President chose to ratify Congress's choice by signing the law into effect.

26    As a result, the Court must accept that this choice advances the public interest and operate

27    from that premise.  *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497

28    (2001) ("[A] court sitting in equity cannot ignore the judgment of Congress, deliberately

1  expressed in legislation. . . .  Courts of equity cannot, in their discretion, reject the balance
2  that Congress has struck in a statute.") (cleaned up).  A NEPA lawsuit is not the proper
3  forum for second-guessing the wisdom of Congress's decision to pursue the land exchange.
4  *Seven County Infrastructure Coalition v. Eagle County, Colo.*, 145 S. Ct. 1497, 1511
5  (2025) ("Plaintiffs' policy objections to this 88-mile Utah railroad may or may not be
6  persuasive.  But . . . [t]he political process, and not NEPA, provides the appropriate forum
7  in which to air policy disagreements.") (cleaned up).

8                                     **LEGAL STANDARD**

9        "A preliminary injunction is an extraordinary and drastic remedy, one that should
10  not be granted unless the movant, by a clear showing, carries the burden of persuasion."
11  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (cleaned up).  *See also Winter v.*
12  *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an
13  extraordinary remedy never awarded as of right.") (citation omitted); *Dymo Industries, Inc.*
14  *v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964) ("The grant of a preliminary
15  injunction is the exercise of a very far reaching power never to be indulged in except in a
16  case clearly warranting it.").

17        "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to
18  succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of
19  preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction
20  is in the public interest."  *Winter*, 555 U.S. at 20.  However, "if a plaintiff can only show
21  that there are serious questions going to the merits—a lesser showing than likelihood of
22  success on the merits—then a preliminary injunction may still issue if the balance of
23  hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are
24  satisfied."  *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)
25  (cleaned up).[2]  Additionally, when, as here, "a government agency is a party," "the final

26  ―――――――――――――――
   [2]        The existence of serious questions often turns on the presence of disputed factual
27  issues. *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024)
   ("[P]arties do not show serious questions when they raise a merely plausible claim, nor can
28  a district court forgo legal analysis just because it has not identified precedent that places
   the question beyond debate.  This less demanding merits standard requires serious factual
   questions that need to be resolved in the case.") (cleaned up); *Alliance for the Wild Rockies*

1   two injunction factors—the balance of equities and the public interest—merge."

2   *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024).

3       Regardless of which standard applies, the movant "carries the burden of proof on

4   each element of either test." *Env't. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016,

5   1027 (E.D. Cal. 2000).

6                                    **ANALYSIS**

7   I.   First *Winter* Factor

8       The analysis begins with the first *Winter* factor—whether Plaintiffs have shown a

9   likelihood of success on the merits. *Roe v. Critchfield*, 137 F.4th 912, 922 (9th Cir. 2025)

10  ("Likelihood of success on the merits is the most important *Winter* factor and is a threshold

11  inquiry.") (cleaned up).

12      As noted, the Federal Defendants and Resolution Copper have, in addition to

13  addressing Plaintiffs' arguments on the merits, identified various jurisdictional and other

14  threshold reasons why, in their view, Plaintiffs will not be able to succeed on their claims.

15  Those arguments also go to whether Plaintiffs have satisfied the first *Winter* factor. *See,*

16  *e.g.*, *LA Alliance for Human Rights v. Cnty. of Los Angeles*, 14 F.4th 947, 958 (9th Cir.

17  2021) (reversing preliminary injunction in part because "Plaintiffs have not made the

18  required 'clear showing' that any individual Plaintiff has standing to bring the . . . claim");

19  *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020) ("At this preliminary injunction stage,

20  _____

21  *v. Petrick*, 68 F.4th 475, 497 (9th Cir. 2023) ("[L]ike many legal questions, the meaning of
    HFRA's unambiguous provisions would not become clearer with at least some discovery

22  or a further hearing on the merits. There is no need for more deliberative investigation or
    development of the record to resolve the plain meaning of HFRA.") (cleaned up).
    However, the Ninth Circuit has indicated that unsettled and debatable legal issues may also

23  qualify as serious questions. *See, e.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180,
    1184, 1195 (9th Cir. 2022) (identifying unresolved issue of statutory interpretation over

24  the meaning of the term "without authorization" before concluding that "[a]t the very least,
    . . . hiQ has raised a serious question as to this issue" and also noting that, during an earlier

25  stage in the case, "we focused on whether hiQ had raised serious questions on the merits
    of the factual *and legal* issues presented to us") (emphasis added); *City of Tenakee Springs*

26  *v. Clough*, 915 F.2d 1308, 1311 (9th Cir. 1990) (reversing denial of preliminary injunction
    in part because the movants' "interpretation of the language of the contract [was] not

27  reasonable" and "at least a serious question as to its proper interpretation"); *Adultworld Bookstore v. City of Fresno*, 758 F.2d 1348, 1351-52 (9th Cir. 1985) (reversing

28  denial of preliminary injunction because "the question of the constitutionality of the Fresno
    ordinance presents a fair ground for litigation" and "at least a serious litigation question").

1   Yazzie must make a clear showing of each element of standing . . . .") (cleaned up);

2   *Mitchell v. City of Cincinnati*, 2022 WL 4546852, *4 (6th Cir. 2022) ("[W]hether plaintiffs

3   had standing . . . is a component of the likelihood of success on the merits.").

4           A.   **Appraisal Claims**

5                1.   Threshold Issues

6                     a.   **Standing/Redressability**

7           "[S]tanding is an essential and unchanging part of the case-or-controversy

8   requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

9   "[T]he irreducible constitutional minimum of standing contains three elements.  First, the

10  plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest

11  which is (a) concrete and particularized and (b) actual or imminent, not conjectural or

12  hypothetical.  Second, there must be a causal connection between the injury and the

13  conduct complained of—the injury has to be fairly traceable to the challenged action of the

14  defendant, and not the result of the independent action of some third party not before the

15  court.  Third, it must be likely, as opposed to merely speculative, that the injury will be

16  redressed by a favorable decision." *Id.* at 560-61 (cleaned up).

17          Focusing on the redressability element, Resolution Copper argues that Plaintiffs

18  lack Article III standing to pursue all of their claims because any asserted "injuries flowing

19  from conveyance of title . . . are not redressable through their claims here. . . .  Nothing in

20  [SALECA] grants the Forest Service the power to refuse to make the exchange based on

21  court challenges to the FEIS, the appraisals, or the consultations.  Even if Plaintiffs could

22  convince this Court that flaws in the FEIS, appraisals, or the consultations require

23  additional study or correction, Plaintiffs cannot show that the Forest Service 'could be

24  influenced' ultimately to do anything other than comply with its duty under the Act to

25  proceed with the land exchange." (*AMRC*, Doc. 94 at 14.)  Meanwhile, although it is not

26  clear whether the Federal Defendants also challenge AMRC's Article III standing with

27  respect to the appraisal claims,[3] the Federal Defendants argue that, at a minimum, "AMRC

28  ─────────────────
    [3]      Although the Federal Defendants raise redressability arguments that are similar to
    the redressability arguments raised by Resolution Copper, their brief suggests they only

1    lacks prudential standing to challenge the appraisal at all, because its alleged injuries
2    caused by the privatization of and eventual impacts to the federal lands fall outside the zone
3    of interests protected by [SALECA's] appraisal provisions."  (*AMRC*, Doc. 93 at 34.)

4          Even though, as explained in later portions of this order, Defendants' redressability
5    arguments present a closer call when applied to some of Plaintiffs' other claims, they are
6    unpersuasive in relation to AMRC's appraisal-related claims.  *Davis v. Fed. Election
7    Comm'n*, 554 U.S. 724, 734 (2008) ("Standing is not dispensed in gross.  Rather, a plaintiff
8    must demonstrate standing for each claim he seeks to press and for each form of relief that
9    is sought.") (cleaned up).  The starting point for the analysis is the Ninth Circuit's decision
10   in *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000).  There, "three
11   environmental organizations" sought to challenge a decision by the Bureau of Land
12   Management ("BLM") to enter into a land exchange, arguing that BLM relied "on an
13   outdated appraisal that undervalued the federal lands."  *Id.* at 1174.  The district court
14   denied the plaintiffs' request for a preliminary injunction on the ground that they lacked
15   standing but the Ninth Circuit "reversed . . . [and] remanded for entry of a preliminary
16   injunction setting aside this land exchange pending further proceedings in accordance with
17   this opinion."  *Id.* at 1188.

18         As an initial matter, the Ninth Circuit rejected the district court's determination that
19   the plaintiffs' appraisal-related arguments "only constituted an attack on the way federal
20   money is spent, making [their] injury indistinguishable from that of other taxpayers and
21   therefore insufficiently particularized to confer standing," concluding that "the present
22   challenge . . . is not merely a generalized allegation of federal revenue loss at taxpayers'
23   expense.  Rather, it is an effort by land users to ensure appropriate federal guardianship of
24   the public lands which they frequent.  If, by exchange, public lands are lost to those who
25   use and enjoy the land, they are certainly entitled under the APA to file suit to assure that

26

27   _____
     view those redressability arguments as applying to Plaintiffs' NEPA and NHPA claims.
28   (*AMRC*, Doc. 93 at 13 ["Plaintiffs' NEPA and NHPA claims also fail for want of standing
     because the injury that Plaintiffs trace to the land exchange is not redressable; the Forest
     Service has a non-discretionary obligation to transfer title."].)

no exchange takes place unless the governing federal statutes and regulations are followed, including the requirement that the land exchanged is properly valued by the agency." *Id.* at 1176-77. Turning to the issue of redressability, the defendants argued—similar to Defendants here—that a ruling in the plaintiffs' favor would not redress their injuries because "even if [plaintiffs] succeeded on the merits and BLM relied on a new appraisal," the land exchange would still eventually go forward and "the public lands would nevertheless be traded away." *Id.* at 1178. The Ninth Circuit disagreed, holding that it would "place[] an unreasonable burden" on the plaintiffs to be required to conclusively establish "that no subsequent exchange would take place" following a reappraisal. *Id.* Instead, the court held, it was enough for redressability purposes that "the transfer based on the current appraisal would not have taken place and [plaintiffs] members could have continued to use and enjoy the selected federal lands." *Id.* Finally, the Ninth Circuit also held that the plaintiffs fell within the zone of interests protected by the statute giving rise to their appraisal-related claims—there, the Federal Land Policy and Management Act ("FLPMA")—and thus had prudential standing. *Id.* at 1179-80. Among other things, the court emphasized that FLPMA is intended to protect various environmental values, which "policy encompasses [plaintiffs'] interest in seeking to invalidate an allegedly unlawful transfer of federal land that will deprive its members of their aesthetic and recreational interest in the land," and that FLPMA contains provisions that encourage judicial review of public land adjudication decisions. *Id.*

For the same reasons that the environmental organizations in *Desert Citizens* had Article III standing to challenge the appraisal underlying the land exchange they sought to enjoin, AMRC likely has Article III standing to challenge the Forest Service's appraisal of the MCZ parcel. Defendants' primary basis for seeking to distinguish *Desert Citizens* is that the land exchange in that case "was a discretionary administrative land exchange—not one ordered by Congress" and thus "it was possible that, if the plaintiff prevailed, the agency might change its mind and the federal land might not 'be traded away,'" which is "not possible here" because "[e]ven if the . . . appraisals were found to need revision . . .

there is no possibility that the Forest Service may 'decide' not to make the land exchange." (*AMRC*, Doc. 94 at 15, emphases omitted.)  But this is a distinction without a difference. If, hypothetically, the Court were to agree with the merits of AMRC's appraisal-related arguments and enjoin the land exchange pending a reappraisal, and if the Forest Service were to conclude following the reappraisal that the MCZ parcel is actually worth billions of dollars (as AMRC contends it should be valued), these developments might very well derail the land exchange.  True, the Forest Service would still be required to *attempt* to convey title to Resolution Copper at the conclusion of the reappraisal process, but Resolution Copper might then decline to *accept* title because doing so would require it, pursuant to the equalization process set forth in § 539p(c)(5), to write a multi-billion dollar check to the federal government to make up the difference in value between the federal and non-federal parcels.[4]  The bottom line is that correcting the alleged statutory violation (*i.e.*, the flawed appraisal) will create some possibility that the alleged injury-causing event (*i.e.*, the land exchange) will not occur.  *Save Bull Trout v. Williams*, 51 F.4th 1101, 1106-07 (9th Cir. 2022) (explaining that the "relaxed" requirement of redressability in a case involving an alleged procedural injury requires there to be "'some possibility' that the requested relief . . . will redress their alleged harms").

Turning to prudential standing, SALECA itself, which provides the basis for AMRC's appraisal-related claims, does not create a private right of action.  *Concerned Citizens & Retired Miners Coalition v. U.S. Forest Serv.*, 279 F. Supp. 3d 898, 942-43 (D. Ariz. 2017) (rejecting tribal plaintiff's claim "that the Forest Service violated § 3003 of the NDAA" in part because "the Tribe has not shown that this statute provides a cause of action for it").  Thus, AMRC must assert those claims via the Administrative Procedure Act ("APA").  "[A] person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be arguably within the

---

[4]     The FEIS acknowledges this point.  (*San Carlos*, Doc. 105-9 at 137 [FEIS page 92: "[E]ven though directed by Congress, the land exchange remains a discretionary decision on the part of Resolution Copper, which may or may not choose to undertake the exchange after receipt of the appraised value."].)

zone of interests to be protected or regulated by the statute that he says was violated." *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1166 (9th Cir. 2018) (citation omitted). "The purpose of this prudential standing requirement is to exclude those plaintiffs whose suits are more likely to frustrate rather than to further statutory objectives.  The test is not meant to be especially demanding.  The benefit of any doubt goes to the plaintiff.  Still, the 'zone of interests' standard forecloses suit when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 797 (9th Cir. 2013) (cleaned up).  *See also Bennett v. Spear*, 520 U.S. 154, 163 (1997) (characterizing the zone of interests in APA cases as "generous").

On the one hand, although AMRC unsurprisingly views *Desert Citizens* as establishing the existence of prudential standing here, there are differences between the underlying statutes in that case and in this one.  There, the plaintiffs relied on FLPMA, which includes provisions that expressly call for the protection of scenic and environmental interests and expressly encourage judicial review.  *Desert Citizens*, 231 F.3d at 1179.  The Ninth Circuit concluded those provisions created a zone of interests that was capacious enough to encompass the environmental organizations' "interest in seeking to invalidate an allegedly unlawful transfer of federal land that will deprive its members of their aesthetic and recreational interest in the land."  *Id.*  SALECA, in contrast, has one and only one stated purpose, which is to facilitate the land exchange.[5]  Additionally, although the Court disagrees with Defendants' contention (addressed in more detail in later portions of this order) that SALECA should be construed as evincing an intent to implicitly preclude any form of judicial review related to the land exchange, it does not explicitly encourage judicial review in the same manner as FLPMA.

On the other hand, one of the plaintiffs in *AMRC* is the Inter Tribal Association of Arizona, Inc. and SALECA has provisions that evince an intent to protect the interests of

---

[5]    16 U.S.C. § 539p(a) ("The purpose of this section is to authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States.").

1  affected Indian tribes.[6]  Although those provisions do not specifically state that affected

2  Indian tribes have a protected interest in the appraisal and equalization portions of the

3  statute, that was also the situation in *Desert Citizens*—the Ninth Circuit concluded the

4  environmental organizations fell within the zone of interests created by FLPMA's

5  equalization provisions by looking to other portions of the statute that were not expressly

6  related to the equalization process.  Nor is *Desert Citizens* the only Ninth Circuit decision

7  to conclude that environmental groups had prudential standing to challenge agency

8  financial determinations.  *Nat'l Wildlife Fed. v. Burford*, 871 F.2d 849, 852-55 (9th Cir.

9  1989) (plaintiffs fell within the zone of interests of the Coal Leasing Act, and thus could

10  challenge whether agency leases were made at fair market value, even though the

11  challenged determination was purely economic).  More broadly, the zone-of-interests test

12  is "generous," *Bennett*, 520 U.S. at 163, and "not . . . especially demanding."  *Wild Fish*

13  *Conservancy*, 730 F.3d at 797.  *See also Lexmark Int'l, Inc. v. Static Control Components,*

14  *Inc.*, 572 U.S. 118, 130 (2014) ("[W]e have often conspicuously included the word

15  'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff . . . .")

16  (cleaned up).  Given those principles, AMRC likely possesses prudential standing to pursue

17  its appraisal-related claims, even if the case for prudential standing is not a slam dunk.

18        **b.**    **Implicit Preclusion Of Judicial Review**

19        Defendants contend that SALECA should be construed as barring judicial review

20  of the type of challenges Plaintiffs seek to advance here.  Resolution Copper emphasizes

21  that (1) the text of SALECA only identifies four enumerated conditions to the land

22  exchange and "the issues that Plaintiffs seek to litigate here are not among them"; (2) "the

23  unambiguous statutory obligation to transfer title within 60 days of FEIS publication is

24  irreconcilable with Plaintiffs' contention that conveyance of title must wait for judicial

25  review of [their] various claims"; and (3) the only purpose of the FEIS, as explained in

26

27  ───────────────

[6]  *See, e.g.*, 16 U.S.C. § 539p(c)(3)(A)-(B) (requiring "government-to-government consultation with affected Indian tribes concerning issues of concern to the affected Indian

28  tribes related to the land exchange" and corresponding efforts to "address the concerns of the affected Indian tribes").

§ 539(c)(9), is to guide future agency discretionary decisions related to the contemplated mining activity after the land exchange.  (*AMRC*, Doc. 94 at 9-14.)  Similarly, the Federal Defendants argue: "The practical effect of [the 60 day] statutory deadline is that title will necessarily be transferred before any judicial challenge to the FEIS could be resolved, or for that matter, before any Final ROD could issue.  Congress would have understood this when it enacted the Land Exchange Act. . . .  Aware that NEPA challenges are not resolved in a mere sixty days, Congress sought to ensure that the land exchange proceeded expeditiously.  Read together, subsections (c)(9) and (c)(10) evince Congress' intent to expedite the land exchange and to prevent an endless series of environmental reviews— and attendant judicial reviews—from frustrating that intent."  (*AMRC*, Doc. 93 at 19-20.)

These arguments lack merit.  Congress could have expressly precluded judicial review of claims related to the land exchange but declined to do so.  Defendants are thus left to argue that such intent should be inferred from various features of SALECA's text.  But such intent is not to be inferred lightly: "A strong presumption exists that the actions of federal agencies are reviewable in federal court."  *KOLA, Inc. v. United States*, 882 F.2d 361, 363 (9th Cir. 1989).  As the Supreme Court has explained:

> We begin with the strong presumption that Congress intends judicial review of administrative action.  From the beginning our cases have established that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress. . . .  Congress ordinarily intends that there be judicial review, and . . . only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review.  This standard has been invoked time and again when considering whether the Secretary has discharged the heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review of his decision.

*Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670-72 (1986) (cleaned up).

The features of SALECA emphasized by Defendants are too ambiguous to overcome this strong presumption.  Although the compressed 60-day transfer deadline has certainly complicated the task of providing judicial review of Plaintiffs' challenges, it has

1    not rendered judicial review impossible.  As the Tribe persuasively argues in its reply:

2    "Congress certainly knew that NEPA and APA challenges are common and often lengthy.

3    If it wanted to eliminate any such challenges, Congress could have excluded the Project

4    from NEPA entirely.  Congress did the opposite by requiring an EIS consistent with NEPA

5    but subject to additional requirements.  In this context, a preferable interpretation of the

6    sixty-day timeframe is that it permits sufficient time for aggrieved parties to seek

7    preliminary relief . . . ."  (*San Carlos*, Doc. 119 at 10.)

8                                    c.    **Final Agency Action**

9         The Federal Defendants contend that "[t]he Court lacks jurisdiction over Plaintiffs'

10   claims because neither the FEIS nor the Draft ROD is a final agency action."  (*AMRC*, Doc.

11   93 at 7, capitalization omitted.)  Likewise, Resolution Copper argues that "[o]nly agency

12   actions that are both discretionary and final are subject to APA review" and that "final

13   agency action . . . is absent here."  (*AMRC*, Doc. 94 at 6, 48, emphasis omitted.)

14        Although Defendants' "final agency action" arguments have more force when

15   applied to some of Plaintiffs' other claims, they are unpersuasive in relation to AMRC's

16   appraisal-related claims.  As background, under the APA, "the person claiming a right to

17   sue must identify some 'agency action' that affects him in the specified fashion" and "the

18   'agency action' in question must be 'final agency action.'"  *Lujan v. National Wildlife*

19   *Federation*, 497 U.S. 871, 882 (1990).  "The APA defines 'agency action' broadly to

20   include the whole or a part of an agency rule, order, license, sanction, relief, or the

21   equivalent or denial thereof, or failure to act.  This definition is meant to cover

22   comprehensively every manner in which an agency may exercise its power."  *Francisco*

23   *Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 575-76 (9th Cir. 2019) (cleaned up).

24   For purposes of AMRC's appraisal-related claims, the challenged conduct is the Forest

25   Service's appraisal of the MCZ parcel.  The Court has little trouble concluding that this

26   appraisal qualifies as "agency action."

27        To determine whether agency action is "final," courts in the Ninth Circuit apply the

28   two-part test from *Bennett v. Spear*, 520 U.S. 154 (1997): *first*, the action must "mark the

1    consummation of the agency's decision-making process"; and *second*, the action must

2    "determine rights or obligations or be one from which legal consequences will flow."

3    *Env't Defense Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 867-68 (9th Cir. 2022)

4    (cleaned up). "The law surrounding the APA's finality requirement is hardly crisp and our

5    precedent lacks many self-implementing, bright-line rules, given the pragmatic and flexible

6    nature of the inquiry as a whole." *MediNatura, Inc. v. Food & Drug Administration*, 998

7    F.3d 931, 938 (D.C. Cir. 2021) (cleaned up). "The core question is whether the agency has

8    completed its decisionmaking process, and whether the result of that process is one that

9    will directly affect the parties. The court focuses on the practical and legal effects of the

10   agency action: the finality element must be interpreted in a pragmatic and flexible manner."

11   *Tohono O'odham Nation*, 138 F.4th at 1200 (cleaned up).

12       The finality analysis is straightforward as applied to AMRC's appraisal-related

13   claims. As for the first finality element, the appraisal process has now been completed—

14   and, thus, there has been a "consummation of the agency's decision-making process" with

15   regard to the challenged appraisal decision. In this way, that decision differs from the

16   discretionary permitting and land-use determinations discussed in the FEIS and DROD,

17   which remain subject to change pending public comment and objection. As for the second

18   finality element, the appraisal decision will certainly "determine rights or obligations," as

19   it will provide part of the basis under the equalization process set forth in § 539p(c)(5) for

20   determining whether Resolution Copper has to write a check to the federal government—

21   a check that, at least theoretically, could be for billions of dollars—to complete the land

22   exchange.

23       Defendants' arguments to the contrary are unavailing. Although Resolution Copper

24   contends that SALECA "establishes its own remedy for any purported defect in the

25   appraisal: a make-whole payment, not an injunction against conveyance" (*AMRC*, Doc. 94

26   at 35-36), this ignores that the make-whole process only addresses what happens if the

27   appraised value of the federal land exceeds the appraised value of the non-federal land. It

28   doesn't create a process for questioning the accuracy of the appraisal itself. Again, as to

1    that issue, final agency action has already occurred.

2              d.    **No Agency Discretion**

3         Defendants also raise an array of arguments that hinge, in one way or another, on
4    the concept of agency discretion.  For example, the Federal Defendants argue that because
5    "Congress required the Forest Service to carry out the land exchange," it follows that "the
6    Forest Service lacks discretion with respect to that statutory mandate" and thus "Plaintiffs
7    cannot state a cognizable APA challenge to the land exchange."  (*AMRC*, Doc. 93 at 17.)
8    The Federal Defendants also contend that because "NEPA does not apply in the absence
9    of agency discretion" and non-discretionary actions are exempted "from NEPA's definition
10   of a 'major federal action,'" "[t]he mandatory transfer of title is not a major federal action
11   subject to NEPA."  (*Id.* at 22-23.)  Likewise, Resolution Copper argues that "the [APA] is
12   no help to Plaintiffs here, because what they seek to enjoin—conveyance of the federal
13   land—is not an agency decision subject to any discretion."  (*AMRC*, Doc. 94 at 2.)

14        These "no agency discretion" arguments lack merit in relation to AMRC's
15   appraisal-related claims.  Again, the challenged conduct here is the appraisal of the MCZ
16   parcel, and SALECA expressly vests the Secretary of the Forest Service with discretion
17   regarding that appraisal.  *See* 16 U.S.C. § 539p(c)(4)(B)(ii) ("After the final appraised
18   values of the Federal land and non-Federal land are determined and approved by the
19   Secretary . . . .").  *See also Ctr. for Biological Diversity v. U.S. Forest Serv.*, 2025 WL
20   947472, *2 (D.D.C. 2025) ("To comply with [SALECA's] equalization requirement,
21   Congress mandated that the land parcels be independently appraised.  The Forest Service
22   contracted with Barry Weissborn to serve as lead appraiser.  Within the Forest Service,
23   Gerald Sanchez was designated to assess the appraiser's work. . . .  On January 20, 2023,
24   the appraisal was completed, and on January 22, 2023, the appraisal was 'provided' to the
25   Forest Service, meaning that Sanchez was granted authorization to view it. . . .  On January
26   25, 2023, Sanchez completed the technical review of the results of the appraisal and issued
27   a report.  Sanchez's technical report assessed the completeness and accuracy of the
28   appraisal to ensure that it used appropriate methods and techniques, and that its

1    conclusions, analyses, and opinions were reasonably supported with market data.  Sanchez

2    also prepared an appraisal summary.  Both documents were prepared to *assist the Secretary*

3    *when deciding whether to accept the appraisal . . . .*") (citations omitted) (emphasis added).

4                    e.    **Vacatur As A Remedy**

5                    Defendants' final threshold argument turns on the issue of the appropriate remedy

6    in a NEPA action.   According to Defendants, the usual remedy for a flaw in an

7    environmental impact statement is not to order vacatur of the statement but simply to

8    remand to the agency for additional analysis or consultation.   (*AMRC*, Doc. 93 at 50

9    ["Vacatur is generally not appropriate in NEPA cases . . . ."]; *AMRC*, Doc. 94 at 19

10   ["Plaintiffs' motions also rest on a mistaken premise about the appropriate remedy for a

11   NEPA violation—even assuming they could establish one.   Plaintiffs assert without

12   analysis that this Court should vacate the FEIS and enjoin conveyance if it finds the FEIS

13   somehow flawed.  But . . . even if Plaintiffs were right that the FEIS is flawed, this Court

14   at most might remand the FEIS without vacatur for further analysis or consultation."].)

15   According to Defendants, this principle is significant here because, absent vacatur, the land

16   exchange must go forward on August 19, 2025 pursuant to SALECA's statutory directive

17   that the land exchange occur within 60 days of publication of the FEIS.  (*Id.*)

18                   This argument does not undermine AMRC's likelihood of success in relation to the

19   appraisal claims.   As discussed, *Desert Citizens* holds that a district court may enjoin a land

20   exchange based on appraisal-related errors.   Indeed, in *Desert Citizens*, the Ninth Circuit

21   remanded to the district court with directions to issue a preliminary injunction that would

22   retroactively unwind a land exchange that had already occurred.   *Desert Citizens*, 231 F.3d

23   at 1188 ("The district court's dismissal and its denial of a preliminary injunction are

24   reversed, and the case is remanded for entry of a preliminary injunction setting aside this

25   land exchange pending further proceedings in accordance with this opinion.").   Even

26   though, as Defendants emphasize, the land exchange in *Desert Citizens* was not

27   congressionally mandated, the Court still construes *Desert Citizens* (rather than the NEPA

28   decisions cited by Defendants) as supplying the relevant authority in evaluating whether

1  an available remedy exists in the appraisal context that would redress AMRC's asserted

2  injuries.

3          2.   <u>Merits</u>

4        Even though AMRC will likely to be able to survive the various jurisdictional and

5  threshold issued raised by Defendants in relation to its appraisal-related challenges, that is

6  only half the battle—AMRC must also establish that it is likely to prevail on those

7  challenges (or at least demonstrate the existence of serious questions going to the merits).

8        AMRC has failed to make that showing.  As background, the challenged appraisal

9  concerns the MCZ parcel, which comprises "1,655.53 acres of vacant land east of Superior

10  and just south of U.S. 60. . . .  Much of the property is within the site of the proposed

11  Resolution Copper underground copper mine." (*AMRC*, Doc. 93-3 at 7.)  In the appraisal

12  report, the Forest Service acknowledged that "[i]t is understood that a significant porphyry

13  copper deposit exists beneath the Subject Property." (*Id.* at 9.)  Nevertheless, the Forest

14  Service declined to consider the value of that copper when appraising the value of the MCZ

15  parcel because that copper is "subject . . . to 148 unpatented mining claims held by

16  Resolution Copper." (*Id.*)  The Forest Service explained: "An unpatented mining claim is

17  a conditional, possessory, interest in real property ownership of a mineral estate in

18  accordance with the Mining Law . . . .  Since the Subject Property is encumbered by mining

19  claims held by a party other than the United States; said mining claims confer all rights to

20  locatable minerals to that party in accordance with the Mining Law and are not part of the

21  estate owned by the United States." (*Id.* at 10, citations omitted.)  The Forest Service

22  concluded: "The Subject Property was regarded as a split estate since the unpatented

23  mining claims confer all rights to locatable minerals. . . .  Therefore, the total purchase

24  price is allocated to the surface interest, with no adjustments applied." (*Id.* at 12.)

25        AMRC raises an array of challenges to this appraisal, all of which hinge, one way

26  or another, on the appraiser's failure to include the value of the copper underlying the MCZ

27  parcel in the value of the parcel.  (*See, e.g.*, *AMRC*, Doc. 87 at 8 ["[T]he appraisal for the

28  MCZ parcel arbitrarily failed to include *any* value for the tens of billions of dollars worth

of copper, valuing the entire 1,655-acre parcel at less than $2 million."]; *id.* ["[T]he MCZ appraisal is based on the erroneous assumption that the value of the 35 billion pounds of copper on these federal lands is zero, simply because Resolution has filed mining claims on these lands."]; *id.* at 12 ["There is simply no rational, economic comparison between the types of nondescript surface lands that the appraiser considered as comparable sales and the invaluable MCZ parcel, which sits atop nearly 90 percent of the world's third-largest known copper deposit (35 of the estimated 40 billion pounds)."].)

In the Court's view, the appraiser's approach was correct and AMRC's criticisms all flow from a misunderstanding of how unpatented mining claims work. In *United States v. Shumway*, 199 F.3d 1093 (9th Cir. 1999), the Ninth Circuit provided an overview of this "relatively arcane area of law." *Id.* at 1097. The court explained that under "the Mining Law of 1872"—which, despite being the subject of "much contemporary hostility," "remains the law"—"the finder of valuable minerals on government land is entitled to exclusive possession of the land for purposes of mining and to all the minerals he extracts." *Id.* at 1098-99. The court further explained that although "[t]he phrase 'mining claim' . . . probably connotes to most laymen an unsupported assertion or demand from which no legal rights can be inferred," "that is emphatically not so" under the Mining Law of 1872 because "the word 'claim' in connection with the phrase 'mining claim' represents a federally recognized right in real property." *Id.* at 1099-1100. The court continued:

> The Supreme Court has established that a mining "claim" is not a claim in the ordinary sense of the word—a mere assertion of a right—but rather is a property interest, which is itself real property in every sense, and not merely an assertion of a right to property. . . . In *United States v. North American Transportation & Trading Co.*, the Army had been sent to Nome to bring order during its gold rush, and the president established a federal reservation for the Army base. The Court, in an opinion by Justice Brandeis, held that a company holding a mining claim at the site was entitled to compensation for the taking, with interest from the date of the reservation. This case establishes that the government cannot reserve its own land from an unpatented mining claim without paying the owner the value of the claim, because an unpatented mining claim is property.

1   *Id.* at 1100 (citations omitted).

2          Recently, in *Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 33 F.4th

3   1202 (9th Cir. 2022), the Ninth Circuit further addressed these concepts.  There, the court

4   explained that "[t]he Mining Law of 1872 . . . gives to United States citizens free of charge,

5   except for small filing and other fees, mining rights upon discovery of 'valuable minerals'

6   on federal land." *Id.* at 1208.  "[T]he Mining Law remains in effect for much federal land

7   and for many minerals, including copper.  Within the scope of its operation, the Mining

8   Law continues to be a source of wealth—sometimes great wealth—for those who discover

9   valuable minerals on federal land." *Id.* at 1209.  "A miner who finds valuable minerals

10  may 'locate' (or 'stake') a claim and thereby obtain an 'unpatented mining claim.'  A valid

11  unpatented claim gives the miner the right to 'occupy' the claim and to mine the minerals

12  free of charge." *Id.* (citations omitted).

13         In light of these principles, it is difficult for the Court to find any fault in the Forest

14  Service's appraisal.  Resolution Copper already effectively owns the exclusive right to

15  mine the copper underlying the MCZ parcel.  *See, e.g.*, *Ickes v. Virginia-Colorado*

16  *Development Corp.*, 295 U.S. 639, 644 (1935) (explaining that an unpatented mining claim

17  "is property in the fullest sense of that term" and "is alienable, inheritable, and taxable");

18  *Ctr. for Biological Diversity*, 33 F.4th at 1209 ("A valid unpatented claim gives the miner

19  the right to 'occupy' the claim and to mine the minerals free of charge."); *Shumway*, 199

20  F.3d at 1100 ("[T]he government cannot reserve its own land from an unpatented mining

21  claim without paying the owner the value of the claim, because an unpatented mining claim

22  is property.").  *See also Ctr. for Biological Diversity v. U.S. Dept. of Interior*, 623 F.3d

23  633, 643 (9th Cir. 2010) ("Asarco has a right to engage in mining on the selected lands

24  under the Mining Law even if the exchange does not proceed, based on its 747 unpatented

25  mining and mill site claims."); *Kunkes v. United States*, 32 Fed. Cl. 249, 252 (1994), *aff'd*,

26  78 F.3d 1549 (Fed. Cir. 1996) ("Although legal title to the land remains in the United

27  States, the claimant enjoys a valid, equitable title in the claim, possessing all of the

28  incidents of real property.").  It would be odd if the value of that copper were nevertheless

1   included in the value of the federal government's interest in the parcel.  Following that

2   approach would force Resolution Copper, as part of the land exchange, to pay the federal

3   government for the copper it effectively already owns the exclusive right to mine.  The

4   Court thus agrees with Resolution Copper that "AMRC's real complaint is not with the

5   MCZ appraisal but with the General Mining Law of 1872" and that adopting AMRC's

6   argument "that Resolution should pay the United States for rights it already owns in the

7   MCZ would nullify the 1872 Law and 150 years of Supreme Court precedent, as well as

8   take Resolution's property." (*AMRC*, Doc. 94 at 37-38.)  As the Federal Defendants

9   correctly note in their response: "[E]ven if Congress had never enacted [SALECA],

10  Resolution Copper would retain the exclusive rights to exploit the locatable minerals

11  (assuming it paid the annual claim maintenance fee), and those rights would remain an

12  encumbrance on the land owned by the United States." (*AMRC*, Doc. 93 at 39.)

13       In its motion papers, AMRC never directly addresses the absurd consequences that

14  would flow from adopting its position.  Nor do AMRC's more granular arguments change

15  the analysis.  For example, although the federal government may still technically "own[]

16  the mineral estate" underlying the MCZ parcel (*AMRC*, Doc. 87 at 8), that interest does not

17  include the right to *mine* the minerals, which belongs to Resolution Copper.  *Ctr. for*

18  *Biological Diversity*, 33 F.4th at 1209.  AMRC also identifies various regulations and

19  standards that call for appraisers to include the value of "minerals" in any appraisal (*AMRC*,

20  Doc. 87 at 9-10; *AMRC*, Doc. 97 at 7-11), but those general statements do not explain how

21  to perform the valuation when, as here, the minerals are subject to unpatented mining

22  claims.[7]  Finally, AMRC's "highest and best use" and "must be appraised as private lands"

23  arguments (*AMRC*, Doc. 87 at 11-13) rely on the false premise that, in those scenarios,

24  Resolution Copper's exclusive right to mine the minerals would somehow cease to exist.[8]

25      [7]    Indeed, the appraisal guidelines appear to recognize that valuing "mineral
26  properties" can be complicated by the existence of mining claims. (*AMRC*, Doc. 87-17 at
57 ["Appraisers valuing mineral properties impacted by the 1872 Mining Law are advised
27  to coordinate with client agency staff to clarify the approaches to valuing those interests."].)

28  [8]    AMRC also raises, in its reply brief, what the Court perceives to be a new argument
not properly raised in AMRC's motion—that the appraiser should have disregarded
Resolution Copper's unpatented mining claims to the copper underlying the MCZ parcel

AMRC also places heavy emphasis on certain statements that were made during the legislative process surrounding SALECA's enactment. (*AMRC*, Doc. 87 at 9-10 [discussing congressional testimony by a Forest Service representative, a report by the Congressional Budget Office, and a House report].)  As an initial matter, although those statements reflect a belief that the value of "mineral deposits" or "ore deposits" would be included in the appraised value of the federal land, that belief is not necessarily inconsistent with the approach the Forest Service took in this case.  Although AMRC confines its objections to the appraisal related to the MCZ parcel, the Forest Service also completed an appraisal of a different parcel of federal land to be included in the land exchange, called the Mineral Withdrawal Area (or "MWA") parcel. (*AMRC*, Doc. 87-12.)  The MWA parcel also sits atop large and valuable copper deposits, but those deposits—unlike the deposits underlying the MCZ parcel—are not the subject of unpatented mining claims held by

---

because Resolution Copper has never "actually determine[d] whether the mine is financially viable." (*AMRC*, Doc. 97 at 7-8.)  First, "[t]he district court need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).  Second, at any rate, it was logical—and certainly not arbitrary and capricious—for the appraiser to operate from the premise that the copper deposits underlying the MCZ parcel are valuable enough to validate Resolution Copper's mining claims.  Indeed, AMRC itself asserts in its motion that the MCZ parcel includes "tens of billions of dollars worth of copper," is "invaluable," and "sits atop nearly 90 percent of the world's third-largest known copper deposit (35 of the estimated 40 billion pounds)." (*AMRC*, Doc. 87 at 8, 12.)  Furthermore, SALECA can be reasonably interpreted as reflecting a congressional determination that Resolution Copper's mining claims are valid and that the contemplated mine will be financially viable.  16 U.S.C. § 539p(i)(C) ("Nothing in this section shall interfere with, limit, or otherwise impair, the unpatented mining claims . . . currently held by Resolution Copper on the Federal land, nor in any way change, diminish, qualify, or otherwise impact Resolution Copper's rights and ability to conduct activities on the Federal land under such unpatented mining claims and the general mining laws of the United States.").  *Center for Biological Diversity* is not to the contrary, as the disputed issue in that case was not whether the mining company had valid mining claims to the land containing the copper deposits but rather whether the company's mining claims to the adjacent land (where the mining waste would be dumped) were valid.  *Ctr. for Biological Diversity*, 33 F.4th at 1212 ("Rosemont proposes to dump 1.9 billion tons of waste rock onto 2,447 acres of nearby National Forest land on which it has mining claims, to an average depth of 700 feet.  Undisputed evidence in the administrative record shows that no valuable minerals have been found on the mining claims that Rosemont proposes to occupy with its waste rock."); *id.* at 1217 ("Rosemont owns valid mining rights on the National Forest land where it would dig its proposed pit mine.  Mining rights on that land were given by the federal government under the Mining Law, essentially free of charge.  Rosemont has now asked the Forest Service to authorize it to permanently occupy with its waste rock 2,447 acres of additional National Forest land on which it does not have valid mining rights, also essentially free of charge.").

Resolution Copper.  As a result, the Forest Service included the value of those copper deposits when appraising the value of the MWA parcel.  (*Id.* at 12 ["The property rights for the subject includes the surface and sub-surface mineral interests."].)  In other words, the Forest Service *did* include the value of at least some of the relevant mineral deposits in its appraisals, which is broadly consistent with the expectations reflected in the cited legislative history materials.[9]

More important, the isolated statements that AMRC has been able to pull from the extensive legislative record surrounding SALECA's enactment shed little light on how to construe the statutory text that Congress ultimately chose to adopt.  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) ("[L]egislative history is not the law.  It is the business of Congress to sum up its own debates in its legislation, and once it enacts a statute we do not inquire what the legislature meant; we ask only what the statute means.") (cleaned up).  To that point, SALECA contains a clear textual indication that Congress was aware of Resolution Copper's unpatented mining claims and intended to preserve them: "Nothing in this section shall interfere with, limit, or otherwise impair, the unpatented mining claims . . . currently held by Resolution Copper on the Federal land, nor in any way change, diminish, qualify, or otherwise impact Resolution Copper's rights and ability to conduct activities on the Federal land under such unpatented mining claims and the general mining laws of the United States."  16 U.S.C. § 539p(i)(C).

One final point bears emphasizing.  Because SALECA does not create a private right of action, AMRC must assert its appraisal-related challenges via the APA.  Under the APA, final agency action can only be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision."  *Northwest Ecosystem Alliance*

---

[9]     To the extent AMRC argues the cited legislative history materials reflect a belief "that the appraisals of both the MWA and MCZ parcels must include the value of the minerals" (*AMRC*, Doc. 87 at 9, emphasis omitted), the Court disagrees—the cited passages are ambiguous as to which minerals and ore would be included in the valuation and do not specifically state that the minerals underlying both parcels would be included.

1    *v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007).  "This rule ensures that

2    the reviewing court affords sufficient deference to the agency's action.  The APA gives an

3    agency substantial discretion to rely on the reasonable opinions of its own qualified experts

4    even if, as an original matter, a court might find contrary views more persuasive."  *San*

5    *Luis & Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014)

6    (cleaned up).  "A court simply ensures that the agency has acted within a zone of

7    reasonableness and, in particular, has reasonably considered the relevant issues and

8    reasonably explained the decision."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423

9    (2021).

10         These principles are relevant here because AMRC has failed to identify any

11    appraisal standard that specifically requires the value of minerals that are the subject of

12    unpatented mining claims to be included when calculating the federal government's

13    interest in the parcel of land that contains those minerals; failed to identify any prior

14    appraisal adopting that approach; and failed to identify any judicial decision suggesting

15    that approach is permissible (let alone required).  Given this backdrop, it is difficult to see

16    how the challenged appraisal decision—which followed the recommendations of an expert

17    whose credentials AMRC has not challenged—could be deemed not just wrong, but so

18    wrong as to qualify as arbitrary and capricious.  *Cf. Greer Coalition, Inc. v. U.S. Forest*

19    *Serv.*, 2011 WL 671750, *9-16 (D. Ariz. 2011) (rejecting various objections to appraisal,

20    noting that "courts should not overturn agency decisions when the agency has considered

21    relevant factors and reached a rational conclusion," and emphasizing that "[t]his is

22    particularly true where, as in the case of these appraisals, the agency chooses to rely on the

23    opinions of qualified experts").  Put another way, even if the appraisal decision was

24    wrong—and the Court is skeptical it was—it at least fell within the "zone of

25    reasonableness," *Prometheus Radio Project*, 592 U.S. at 423, given the absence of contrary

26    authority and the presence of a reasoned explanation for the decision.

27              3.    Conclusion As To Appraisal Claims

28         Although AMRC will likely be able to overcome the jurisdictional and other

- 26 -

1    threshold challenges that Defendants have raised to its appraisal-related claims, AMRC has

2    not shown a likelihood of success on the merits of those claims or even serious questions

3    going to the merits of those claims.

4            B.     **NEPA Claims**

5                  1.    <u>Threshold Issues</u>

6          Defendants' jurisdictional and other threshold challenges to Plaintiffs' NEPA

7    claims raise unsettled, complicated questions.  To understand why, it is necessary to take a

8    step back and consider how SALECA's statutorily-mandated process for performing an

9    environmental impact analysis differs from the typical process for performing such an

10   analysis.

11         Ordinarily, "[t]he NEPA review process concludes in one of two ways: (1) the

12   agency determines through an EA [environmental assessment] that a proposed action will

13   not have a significant impact on the environment and issues a FONSI [finding of no

14   significant impact], or (2) the agency determines that the action will have a significant

15   impact and issues an EIS *and* record of decision."  *Envt'l Defense Ctr.*, 36 F.4th at 868

16   (emphasis added).  As the italicized text indicates, the issuance of the FEIS is typically not

17   the final step in the agency's analysis in a case where a FEIS is required—instead, the final

18   step is the issuance of the final record of decision ("ROD").  *See, e.g.*, *Seven County*

19   *Infrastructure Coalition*, 145 S. Ct. at 1511 ("Because an EIS is only one input into an

20   agency's decision and does not itself require any particular substantive outcome, the

21   adequacy of an EIS is relevant only to the question of whether an agency's final decision

22   . . . was reasonably explained."); *Oregon Natural Resources Council v. Harrell*, 52 F.3d

23   1499, 1508 (9th Cir. 1995) ("A record of decision comes at the end of the pre-decision,

24   environmental review process and is intended to make public the agency's decision, to

25   identify the alternatives considered and which are environmentally preferable, to state

26   whether all practicable means to avoid or minimize environmental harm have been

27   adopted, and to summarize the monitoring and enforcement program that has been

28   adopted.").  For these reasons, the usual rule is that "[o]nce an EIS's analysis has been

1    solidified in a ROD, an agency has taken final agency action." *Oregon Natural Desert*

2    *Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1118 (9th Cir. 2010).

3        The environmental review process mandated by SALECA differs in some ways.  As

4    noted, SALECA provides that "[p]rior to conveying Federal land under this section, the

5    Secretary shall prepare a single environmental impact statement under [NEPA], which

6    shall be used as the basis for all decisions under Federal law related to the proposed mine

7    and the Resolution mine plan of operations and any related major Federal actions

8    significantly affecting the quality of the human environment, including the granting of any

9    permits, rights-of-way, or approvals for the construction of associated power, water,

10   transportation, processing, tailings, waste disposal, or other ancillary facilities." 16 U.S.C.

11   § 539p(c)(9)(B).  In isolation, this provision is consistent with the typical NEPA review

12   process in that it contemplates the issuance of a FEIS followed by the subsequent issuance

13   of a ROD setting forth the agency's final decisions regarding various discretionary matters.

14   However, SALECA also contains the following additional provision: "Not later than 60

15   days after the date of publication of the [FEIS], the Secretary shall convey all right, title,

16   and interest of the United States in and to the Federal land to Resolution Copper." *Id.*

17   § 539p(c)(10).  In other words, SALECA tethers a non-discretionary act—the conveyance

18   of title necessary to complete the land exchange—to the issuance of the FEIS.  SALECA

19   also effectively requires this non-discretionary act to occur before the issuance of the ROD,

20   because "[t]he Final ROD will not be signed until after the conclusion of the objection

21   process" and "this process is unlikely to conclude before the end of 2025."  (*San Carlos*,

22   Doc. 114 at 4.)

23        These unique features of SALECA—the parties have not identified any similar

24   statute—make it particularly challenging to apply the relevant Ninth Circuit and Supreme

25   Court authorities addressing the concepts of redressability, final agency action, and

26   discretionary agency action in NEPA cases.  From the Court's perspective, attempting to

27   applying those precedents has sometimes been akin to attempting to pound a round peg

28   into a square hole—the principles and standards set forth in other APA and NEPA cases

1    don't map neatly onto how SALECA operates.

2    The unique features of SALECA also create other complications.  One purpose of
3    the environmental review process under NEPA is to require an agency to provide a
4    reasoned comparison of the projected benefits and environmental consequences of a
5    proposed course of action.  *Baltimore Gas & Elec. Co. v. Natural Resources Defense*
6    *Council*, 462 U.S. 87, 97-98 (1983) ("NEPA has twin aims.  First, it places upon an agency
7    the obligation to consider every significant aspect of the environmental impact of a
8    proposed action.  Second, it ensures that the agency will inform the public that it has indeed
9    considered environmental concerns in its decisionmaking process.  Congress in enacting
10   NEPA, however, did not require agencies to elevate environmental concerns over other
11   appropriate considerations.  Rather, it required only that the agency take a 'hard look' at
12   the environmental consequences before taking a major action.  The role of the courts is
13   simply to ensure that the agency has adequately considered and disclosed the
14   environmental impact of its actions and that its decision is not arbitrary or capricious.")
15   (cleaned up).  Thus, "[i]n addition to the proposed agency action, every EIS must rigorously
16   explore and objectively evaluate all reasonable alternatives to that action. . . .  A no action
17   alternative in an EIS allows policymakers and the public to compare the environmental
18   consequences of the status quo to the consequences of the proposed action."  *Ctr. for*
19   *Biological Diversity*, 623 F.3d at 642 (cleaned up).

20   Nevertheless, SALECA contemplates that the land exchange will occur within 60
21   days of, *and regardless of the analysis set forth in*, the FEIS.  This has the feel of a "ready,
22   fire, aim" approach because it suggests, as Resolution Copper's counsel acknowledged
23   during oral argument, that the land exchange must go forward even if the Forest Service
24   determines it will result in catastrophic environmental consequences.  Again, this is not
25   how the environmental review process usually works under NEPA, which complicates the
26   task of applying existing NEPA precedents.

27   …

28   …

- 29 -

a.    **Standing/Redressability**

The Federal Defendants contend that Plaintiffs cannot establish redressability in relation to their NEPA claims "because there is no chance that additional environmental review could prompt the Forest Service to decide not to complete the land exchange to which Plaintiffs trace their injury.  The decision to transfer Oak Flat to Resolution Copper was made by Congress, and the Forest Service does not have discretion to take another course." (*AMRC*, Doc. 93 at 14.)  Similarly, Resolution Copper argues: "Even if Plaintiffs could convince this Court that flaws in the FEIS . . . require additional study or correction, Plaintiffs cannot show that the Forest Service 'could be influenced' ultimately to do anything other than comply with its duty under the Act to proceed with the land exchange." (*AMRC*, Doc. 94 at 14.)

Although this argument has some force, the Court perceives two related weaknesses in it.  First, it seems to presuppose that the Court lacks authority to order vacatur of the FEIS as a remedy even if the FEIS is deemed deficient under NEPA.  The question of vacatur is addressed in later portions of this order, but assuming for now that vacatur is an option, that remedy would, at least temporarily, prevent the land exchange from occurring (because the exchange can only occur, per § 539p(c)(1), "after" the date of publication of the FEIS).

Second, Defendants' argument also overstates the sort of relief that is required to establish redressability for a procedural injury.  In *W. Watersheds Project v. Grimm*, 921 F.3d 1141 (9th Cir. 2019), environmental organizations brought an "action to enjoin the federal government's participation in the killing of gray wolves in Idaho pending additional analysis under" NEPA.  *Id.* at 1143.  The district court concluded the plaintiffs lacked standing because the challenged activity would likely continue to occur regardless of the injunction, and thus the plaintiffs could not establish redressability, but the Ninth Circuit reversed, explaining that "[i]f Wildlife Services were to cease its activities—even temporarily—it is possible that fewer wolves would be killed, particularly in the short term." *Id.* at 1148.

Similarly, in *Center for Biological Diversity v. Mattis*, 868 F.3d 803 (9th Cir. 2017), after the Department of Defense ("DOD") approved the location, construction, and specifications for a military base in Okinawa, Japan, an environmental organization sought "to protect a local animal population and cultural property from the base's alleged adverse effects by bringing claims for declaratory and injunctive relief based on the Government's alleged violations of [NHPA]." *Id.* at 808. The DOD's decision to construct the military base arose from a bilateral executive agreement between the United States and Japan, *id.* at 811, and the Ninth Circuit noted that the plaintiff lacked standing to challenge the executive agreement itself or the DOD's decision to construct the base, *id.* at 819. Nevertheless, even though the construction of the base would eventually go forward, the Ninth Circuit concluded the plaintiff had standing to seek an injunction to prevent "any activities in furtherance of the [base construction], including granting permits . . . until [the DOD] complies with section 402 of the NHPA." *Id.* at 826 (cleaned up).

Here, too, if the land exchange were enjoined "temporarily" and "in the short term," *W. Watersheds Project*, 921 F.3d at 1148, that would redress at least some of Plaintiffs' injuries. *See also Ctr. for Biological Diversity v. Export-Import Bank of the U.S.*, 894 F.3d 1005, 1013 (9th Cir. 2018) (explaining that, in a prior case, the Ninth Circuit applied "the relaxed standard for procedural-injury" to hold "that a change in agency decisionmaking (from granting the permits to denying the permits, *even temporarily*)" was sufficient to establish redressability) (emphasis added). As Plaintiffs' counsel explained during oral argument, every day that Oak Flat remains intact is another day that members of the Tribe can use the land in its current, unspoiled form for religious purposes and ceremonies. Thus, even a temporary delay may, for example, allow another Sunrise Ceremony to take place. *See generally Apache Stronghold*, 145 S. Ct. at 1480-82 ("[T]ribal members have worshipped at Oak Flat for centuries, conducting there a number of religious ceremonies that cannot take place anywhere else. One example, the 'Sunrise Ceremony,' is a multiday coming-of-age ceremony for young women. . . . Tribal members believe the destruction of Oak Flat will close off a portal to the Creator forever and will completely devastate the

Western Apaches' spiritual lifeblood.  For the women who came of age at Oak Flat in particular, that means their ties to *Chí'chil Biłdagoteel*, and to all of the girls past, present, who have had their Sunrise Ceremony there, will be severed.") (Gorsuch, J., dissenting from the denial of certiorari) (cleaned up).  This will make all the difference in the world to the young women who are allowed to participate in that ceremony, even if it does not ensure that future ceremonies will take place that would benefit additional young women.

*Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220 (9th Cir. 2008), which Defendants view as conclusively foreclosing any claim of redressability, is distinguishable.  There, three environmental plaintiffs challenged the validity of a 1999 biological opinion ("BiOp") that the National Marine Fisheries Service ("NMFS") prepared to advise the United States on the implementation of a treaty with Canada and "evaluate the effects of . . . the Treaty on the recovery and survival of listed salmon." *Id.* at 1222-23.  The BiOp concluded that "Canadian take under the Treaty was not likely to jeopardize the continued existence of threatened or endangered salmon stocks." *Id.* at 1224.  The Ninth Circuit rejected the plaintiffs' challenge to the validity of the BiOp for lack of standing, explaining that even though the "defective BiOp could theoretically be set aside," the court lacked the power to require the State Department to withdraw from the treaty—the ultimate basis for the plaintiffs' injury—and thus that injury was beyond redress. *Id.* at 1226.

Although *Salmon Spawning* has some parallels to this case, an important difference is that the Court may have the power (subject to the additional vacatur discussion *infra*) to order the Forest Service to vacate the FEIS.  That remedy would at least temporarily preclude the land exchange from going forward, because SALECA identifies the issuance of the FEIS as a condition precedent to the land exchange.  In contrast, there was no step the court in *Salmon Spawning* could take that would undo, even temporarily, the treaty between the United States and Canada.[10]  *See also Ctr. for Biological Diversity*, 868 F.3d

---

[10]    Additionally, the plaintiffs in *Salmon Spawning* asserted a separate claim for relief based on the theory that "the State Department and NMFS were obligated by [the Endangered Species Act] and its implementing regulations to reinitiate consultation on the 1999 BiOp" following the discovery of new methods and criteria for evaluating the impact

at 818-19 (distinguishing *Salmon Spawning*).

For these reasons, Plaintiffs have established a likelihood (albeit not a certainty) that they will be able to satisfy the "relaxed" requirement of redressability in a case involving an alleged procedural injury, as "there is 'some possibility' that the requested relief . . . will redress their alleged harms." *Save Bull Trout*, 51 F.4th at 1106-07. *See also Salmon Spawning*, 545 F.3d at 1226 ("Plaintiffs alleging procedural injury can often establish redressibility [sic] with little difficulty . . . .").

### b.    **Implicit Preclusion Of Judicial Review**

Defendants' "implicit preclusion" argument fares no better in relation to Plaintiffs' NEPA claims than it did in relation to AMRC's appraisal claims. SALECA does not expressly preclude judicial review and a strong presumption exists in favor of judicial review. *Bowen*, 476 U.S. at 670-72; *KOLA, Inc*, 882 F.2d at 363. The statutory features that Defendants emphasize are too ambiguous to overcome this presumption. Indeed, SALECA provides that "[e]xcept as otherwise provided in this section, the Secretary shall carry out the land exchange in accordance with the requirements of the National Environmental Policy Act of 1969." 16 U.S.C. § 539p(A)(9). The natural reading of this provision is that judicial review under NEPA (via the APA) is available. True, the initial prefatory phrase "[e]xcept as otherwise provided in this section" suggests there may be some deviation from the norm in how that NEPA review is conducted, but that is not the same thing as a clear, unambiguous expression of congressional intent to preclude any judicial review of NEPA claims related to the land exchange.

### c.    **Final Agency Action**

Because Plaintiffs must "proceed under the APA in order to challenge claimed violations of NEPA," they also must comply with the APA's "series of procedural

---

of commercial fishing on wild salmon. *Salmon Spawning*, 545 F.3d at 1229. Although the Ninth Circuit expressed doubt about "whether reinitiation will ultimately benefit the [plaintiffs]," it declined to dismiss that claim for lack of standing because the redressability requirement is diminished for procedural injuries and "[u]nlike the other claims, this claim is a forward-looking allegation whose remedy rests in the hands of federal officials and does not hinge on upsetting the Treaty." *Id.*

requirements [that] litigants must fulfill before bringing suit in federal court," including that "the challenged agency action must be final." *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1093, 1096-97 (9th Cir. 2005). As noted, the following two-part test governs whether agency action is considered final: *first*, the action must mark the consummation of the agency's decision-making process; and *second*, the action must determine rights or obligations or be one from which legal consequences will flow. *Envt'l Defense Ctr.*, 36 F.4th at 867-68.

The second element of the finality test is likely satisfied in relation to Plaintiffs' NEPA claims. SALECA provides that "[n]ot later than 60 days" after the FEIS is published, the Forest Service "shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper." 16 U.S.C. § 539p(c)(10). This suggests the land exchange is a "legal consequence" that will "flow" from the issuance of the FEIS. Although Plaintiffs have not identified any prior case concluding that a land exchange may qualify as a "legal consequence" for purposes of this test, this absence of authority is unsurprising given SALECA's uniqueness and is not an obstacle to relief, given that the finality inquiry is meant to be "pragmatic and flexible" and "focus[] on the practical and legal effects of the agency action." *Tohono O'odham Nation*, 138 F.4th at 1200 (cleaned up).

The first element of the finality test—whether there has been a "consummation of the agency's decision-making process"—presents a more complicated question. As noted, in an ordinary NEPA process, the issuance of the FEIS does not mark the completion of the agency's decision-making process—instead, that process only reaches completion after the agency issues its final ROD (which has not yet occurred here). For this reason, the Federal Defendants argue that "[a]s to the discretionary decisions that are before the Forest Service, neither the FEIS nor the Draft ROD represent the consummation of that process. The Forest Service's decision-making process is ongoing and will not be complete until the Final ROD is signed. Any contrary interpretation would render the entire objection process meaningless." (*AMRC*, Doc. 93 at 9.) Meanwhile, Plaintiffs accuse Defendants of

focusing on the wrong decision-making process and argue that the relevant process here was simply the decision to issue the FEIS, which has now been completed.  (*AMRC*, Doc. 97 at 12 ["The FEIS here is final as it concluded the agency's responsibilities under NEPA. . . .  Under § 3003, the FEIS is the Forest Service's final word before the Exchange is executed and title is conveyed to RCM."]; *San Carlos*, Doc. 119 at 5 ["[B]ecause SALECA requires no further decisions—other than the decision to publish—before Oak Flat is transferred, the 2025 FEIS necessarily consummates Federal Defendant's environmental review and decision-making processes under SALECA, NEPA, and NHPA."].)[11]

Defendants likely have the better of this argument.  As an initial matter, although Plaintiffs identify several passages and parentheticals from Ninth Circuit decisions that can be construed, at least in isolation, as suggesting that the issuance of a FEIS may alone qualify as final agency action for purposes of a NEPA claim,[12] Defendants persuasively explain why the better reading of those cases is that final agency action only occurs when the FEIS *and* the ROD have been published. (*AMRC*, Doc. 93 at 9-10; *AMRC*, Doc. 94 at

---

[11]    Plaintiffs also cite cases recognizing that an agency's choice to embark on a particular course of conduct without preparing an EIS may constitute final agency action in the NEPA context. *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1099-1100 (9th Cir. 2025) (final agency action existed where one agency (the Air Force) applied to a different agency (the Guam EPA) for the renewal of a waste disposal permit without "tak[ing] the requisite 'hard look' at the environmental impacts . . . and appropriately engag[ing] the public before committing to its plan for disposal"); *Rattlesnake Coalition v. U.S. E.P.A.*, 509 F.3d 1095, 1104 (9th Cir. 2007) ("[A]n agency's decision not to issue an EIS concludes the agency's procedural inquiry into the environmental impact of a proposed project and therefore constitutes a final agency action, regardless of whether the agency has decided to fund the project.").  However, as noted, the "NEPA review process concludes in one of two ways: (1) the agency determines through an EA that a proposed action will not have a significant impact on the environment and issues a FONSI, or (2) the agency determines that the action will have a significant impact and issues an EIS and record of decision." *Envt'l Defense Ctr.*, 36 F.4th at 868.  Plaintiffs' cited cases are thus unhelpful because they address situations where the agency neglected environmental review altogether or achieved final agency action through an EA/FONSI.  Neither case addresses the FEIS/ROD option (which is the option the Forest Service pursued here).

[12]    *Envt'l Defense Ctr.*, 36 F.4th at 868 ("We have repeatedly held that final NEPA documents are final agency actions."); *Oregon Natural Desert Ass'n*, 625 F.3d at 1118 (parenthetical stating that, according to the Eighth Circuit, the Supreme Court "has strongly signaled that an agency's decision to issue . . . an environmental impact statement is a 'final agency action' permitting immediate judicial review under NEPA") (citation omitted).  In the order addressing Plaintiffs' earlier round of preliminary injunction motions, the Court simply noted that these cases might support Plaintiffs' position before clarifying that it was not yet deciding the issue.  (*AMRC*, Doc. 81 at 11 & n.3.)

1   17-18.)  Indeed, one of Plaintiffs' cited cases makes that exact point: "*Once an EIS's*
2   *analysis has been solidified in a ROD*, an agency has taken final agency action, reviewable
3   under § 706(2)(A)."  *Oregon Natural Desert Ass'n*, 625 F.3d at 1118 (emphasis added).
4   So do other cases from within the Ninth Circuit.  *See, e.g.*, *Oregon Natural Resources*
5   *Council*, 52 F.3d at 1508 ("A [ROD] comes at the end of the pre-decision, environmental
6   review process . . . .");  *Oregon Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 830 (D.
7   Or. 2022) ("NEPA review does not dictate a final agency decision until the agency adopts
8   the proposed alternative with a ROD.").  The Supreme Court also recently emphasized this
9   point: "Because an EIS is only one input into an agency's decision and does not itself
10  require any particular substantive outcome, the adequacy of an EIS is relevant only to the
11  question of whether an agency's final decision . . . was reasonably explained."  *Seven*
12  *County Infrastructure Coalition*, 145 S. Ct. at 1511.  "[R]eview of an agency's EIS is not
13  the same thing as review of the agency's final decision concerning the project."  *Id.* at 1514.
14          Moreover, even if it might be theoretically possible for an EIS alone to qualify as
15  final agency action in some other context, the analysis here must be "pragmatic and
16  flexible" and take account of SALECA's specific features.  SALECA provides that the
17  "[e]nvironmental analysis" set forth in the FEIS is to "be *used as the basis for all decisions*
18  *under Federal law* related to the proposed mine and the Resolution mine plan of operations
19  and any related major Federal actions significantly affecting the quality of the human
20  environment, including the granting of any permits, rights-of-way, or approvals for the
21  construction of associated power, water, transportation, processing, tailings, waste
22  disposal, or other ancillary facilities."  16 U.S.C. § 539p(c)(9)(B) (emphasis added).  This
23  is a strong indication that the environmental analysis set forth in the FEIS was not intended
24  to serve as a "decision" in and of itself—instead, it was simply intended to help inform the
25  Forest Service's separate discretionary "decisions under Federal law" regarding pipelines,
26  permits, and the like that have not yet been made with finality (and will eventually be set
27  forth in the ROD).
28          This conclusion is also consistent with the line of Ninth Circuit cases stating that

1    courts should "look to see whether the agency has rendered its last word on the matter"

2    when evaluating the first element of *Bennett*'s finality test.  *Oregon Nat. Desert Ass'n v.*

3    *U.S. Forest Serv.*, 465 F.3d 977, 984 (9th Cir. 2006).  *See also Whitman v. Am. Trucking*

4    *Associations*, 531 U.S. 457, 478 (2001) ("Only if the EPA has rendered its last word on the

5    matter in question, is its action final and thus reviewable.").  The Forest Service hasn't

6    "rendered its last word" on any of the discretionary decisions it will be making in relation

7    to the land exchange because it still has not issued the ROD.  The *proposed* decisions

8    addressed in the DROD are still subject to public review and revision.

9            With all of that said, it is a challenge to apply the Ninth Circuit's "final agency

10   action" precedents here because SALECA contemplates a unique environmental review

11   process that deviates from how that process usually operates.  Congress's choice to make

12   the issuance of the FEIS, rather than the issuance of the ROD, the triggering event for the

13   land exchange makes it at least possible to conceptualize the FEIS as the agency's "final

14   word" on the matter of the land exchange, even though the FEIS does not inform the

15   decision to transfer the land.  This uncertainty raises serious questions about how to

16   characterize the issuance of the FEIS under the first step of *Bennett*'s "pragmatic and

17   flexible" finality test.

18           d.    **No Agency Discretion**

19           The Court is unpersuaded by Defendants' "no agency discretion" arguments as

20   applied to Plaintiffs' NEPA claims.  In advancing those arguments, Defendants rely on

21   cases explaining that the question of *whether NEPA applies* ordinarily turns on whether an

22   agency has discretion in relation to the underlying project that would be the subject of the

23   environmental impact analysis.  *See, e.g.*, *Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th

24   Cir. 1995) (explaining that NEPA's "procedural requirements are triggered by a

25   discretionary federal action"); *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267

26   F.3d 1144, 1151 (D.C. Cir. 2001) ("The touchstone of whether NEPA applies is discretion

27   . . . .  If, however, the agency does not have sufficient discretion to affect the outcome of

28   its actions, and its role is merely ministerial, the information that NEPA provides can have

1  no affect on the agency's actions, and therefore NEPA is inapplicable."). Here, Congress

2  has already specified that NEPA applies—the Forest Service "shall carry out the land

3  exchange in accordance with the requirements of [NEPA]" and "shall prepare a single

4  environmental impact statement under [NEPA]." 16 U.S.C. § 539p(c)(9)(A)-(B).

5       Additionally, the Forest Service possesses discretion with respect to many issues

6  related to the land exchange, "including the granting of any permits, rights-of-way, or

7  approvals for the construction of associated power, water, transportation, processing,

8  tailings, waste disposal, or other ancillary facilities." *Id.* § 539(c)(9)(B). It is permissible,

9  under NEPA, for Plaintiffs to challenge the adequacy of the Forest Service's analysis of

10 the environmental impact of those decisions. That challenge may be premature, due to the

11 likely absence of "final agency action," but it does not fail for want of agency discretion.

12 In arguing otherwise, Defendants conflate the substance of Plaintiffs' NEPA challenge

13 with the remedy they seek. (*San Carlos*, Doc. 105 at 14 ["In an effort to defeat standing

14 and avoid judicial review, Federal Defendants and Resolution reduce the Tribe's

15 challenges to one contesting Oak Flat's transfer, which they assert is not a 'decision' within

16 the meaning of the APA because Congress gave them no discretion. The Tribe, however,

17 does not challenge the decision to convey Oak Flat as arbitrary and capricious. Instead,

18 the Tribe asserts that the Forest Service's decision to publish the 2025 FEIS, as well as the

19 decisions in it related to various action alternatives are arbitrary and capricious."].)

20              e.    **Vacatur As A Remedy**

21       As noted, Defendants argue that because the usual remedy under the APA and

22 NEPA for a flaw in an environmental impact statement is not to order vacatur of the

23 statement but simply to remand to the agency for additional analysis or consultation, and

24 because the land exchange must go forward on August 19, 2025 in the absence of vacatur,

25 Plaintiffs are effectively without a meaningful remedy with respect to their NEPA claims.

26 (*AMRC*, Doc. 93 at 50; *AMRC*, Doc. 94 at 19.)

27       On the one hand, Defendants are correct that vacatur is not always the remedy in an

28 APA action—sometimes, it is enough to remand for further consideration without formally

vacating the agency decision that was found to be flawed.  *See, e.g.*, *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 141 F.4th 976, 1015-16 (9th Cir. 2025) ("Having weighed the equities, vacatur is unwarranted because the procedural error is minor and the on-the-ground consequences of vacatur would be severe.  Still, we expect and urge BLM to move promptly in rectifying the ROD's deficiencies on remand.   But because we have been given no reason to believe that the agency would be unable to cure those deficiencies, we remand without vacating BLM's 2023 approval of the Project.") (cleaned up); *Cal. Communities Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012) ("That brings us to whether we must vacate the EPA's final rule.  A flawed rule need not be vacated. Indeed, when equity demands, the regulation can be left in place while the agency follows the necessary procedures to correct its action. . . .  Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed.") (cleaned up).  *See also Seven County Infrastructure Coalition*, 145 S. Ct. at 1514 ("Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS.").

On the other hand, Defendants' cited cases do not foreclose the availability of vacatur as a remedy.  Indeed, the Ninth Circuit has stated that "[w]e order remand without vacatur only in limited circumstances."  *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015).  Further, Defendants' cited cases emphasize that vacatur should be avoided when actions have already been undertaken in reliance on the agency's final decision and the "on-the-ground" consequences of halting those actions would be "severe" and "disruptive."  But that is not the situation here—Plaintiffs seek to enjoin the land exchange before it occurs.  Nor has the Forest Service yet made any final discretionary decisions related to the land exchange—those will only come when the ROD is issued.

This marks another instance where, due to the unique nature of SALECA, the applicable precedents do not provide an obvious answer.  The Court thus concludes that

1  Plaintiffs have, at a minimum, established serious questions going to the availability of

2  vacatur as a remedy (which, in turn, informs the redressability analysis).

3        2.    Merits

4        Before turning to the merits of Plaintiffs' NEPA claims, it is helpful to begin with

5  some first principles. Earlier this year, the Supreme Court announced "[a] course

6  correction of sorts . . . to bring judicial review under NEPA back in line with the statutory

7  text and common sense." *Seven County Infrastructure Coalition*, 145 S. Ct. at 1514. The

8  Court continued: "In light of the continuing confusion and disagreement in the Courts of

9  Appeals over how to handle NEPA cases, we think it important to reiterate and clarify the

10  fundamental principles of judicial review applicable in those cases." *Id.* at 1511.

11        Throughout the opinion, the Court emphasized that the "central principle of judicial

12  review in NEPA cases is deference." *Id*. *See also id.* at 1515 ("The bedrock principle of

13  judicial review in NEPA cases can be stated in a word: Deference."). The Court also

14  clarified that "[w]hen a party argues that an agency action was arbitrary and capricious due

15  to a deficiency in an EIS, the reviewing court must account for the fact that NEPA is a

16  purely procedural statute. Under NEPA, an agency's only obligation is to prepare an

17  adequate report. . . . Unlike a plethora of other federal environmental statutes (such as the

18  Clean Air Act, the Clean Water Act, etc.), NEPA imposes no substantive constraints on the

19  agency's ultimate decision to build, fund, or approve a proposed project. So when

20  reviewing an agency's EIS, the only role for a court is to confirm that the agency has

21  addressed environmental consequences and feasible alternatives as to the relevant project."

22  *Id.* at 1511 (cleaned up). "In short, when determining whether an agency's EIS complied

23  with NEPA, a court should afford substantial deference to the agency." *Id.* at 1511-12.

24        The Court also provided concrete examples of the forms this deference should take.

25  For instance, "the question of whether a particular report is detailed enough in a particular

26  case itself requires the exercise of agency discretion—which should not be excessively

27  second-guessed by a court." *Id.* at 1512. Additionally, "[a]n agency must make predictive

28  and scientific judgments in assessing the relevant impacts . . . and alternatives . . . . Black-

letter administrative law instructs that when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its 'most deferential.'" *Id.* "To tie all of this together: When assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS. Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 1513.

The Court concluded that "the proper judicial approach for NEPA cases is straightforward: Courts should review an agency's EIS to check that it addresses the environmental effects of the project at hand. . . . In conducting that review, courts should afford substantial deference to the agency as to the scope and contents of the EIS." *Id.* at 1518. The Court also emphasized that "Congress did not design NEPA for *judges* to hamstring new infrastructure and construction projects." *Id.* at 1514.

### a.    Statement Of "Purpose And Need" And Range Of Alternatives

AMRC's first NEPA argument is that the Forest Service "reviewed the project under an incorrect legal regime, resulting in an improper statement of the 'purpose and need' and range of reasonable alternatives." (*AMRC*, Doc. 87 at 18-20.) The thrust of this argument is that the Forest Service operated under the "mistaken belief" that "it had no authority to deny the proposed pipelines, transmission lines, roads, and other facilities" that would be located on federal land following the land exchange. (*Id.*) According to AMRC, the Forest Service thus mistakenly applied "the agency's mining regulations at 36 C.F.R. Part 228A" when reviewing those proposals, rather than applying "the totally-discretionary FLPMA special use permitting rules at 36 C.F.R. Parts 251 and 261." (*Id.*) In its reply, AMRC reiterates this criticism—"The agency believes that because it would not have authority over the underground mine (after the Exchange), it also does not have discretionary

authority over the infrastructure permits on the remaining public lands"—and argues, in a related vein, that the Forest Service mistakenly "failed to consider the alternative that, after the Exchange, the mine could not proceed if the agency denies the special use permits for the pipelines and other infrastructure." (*AMRC*, Doc. 97 at 15-16.)

AMRC is unlikely to succeed on these arguments.  It is simply not true that the Forest Service mistakenly believed it was required to automatically approve all of the pipelines and other mine-related infrastructure that, under the proposed mine plan of operations, would be located on federal land following the land exchange.  Although page 92 of the FEIS states that "the Forest Service is unable to refuse approval of the GPO within their regulations and guidance" (*AMRC*, Doc. 93-1 at 15), that statement, when viewed in proper context, only refers to Resolution Copper's planned use of *non*-federal land following the land exchange.  The executive summary of the FEIS states in plain terms that "[t]he purpose and need of this project is twofold," one of which is "[t]o *consider* approval of a proposed GPO governing surface disturbance on NFS lands—*outside the exchange parcels*—from mining operations that are reasonably incident to extraction, transportation, and processing of copper and molybdenum." (*San Carlos*, Doc. 105-9 at 9, emphasis added [FEIS page ES-6].)  Other portions of the record likewise make clear that the Forest Service understood that it had discretion over proposals related to the post-exchange use of federal land and that its evaluation of those proposals was governed by the special use permitting rules appearing at 36 C.F.R. Part 251:

> The Forest Service is making a decision regarding *whether* and how to authorize the use and occupancy of NFS land for mine-related pipeline and power line infrastructure crossing NFS lands, along with maintenance, reconstruction, and use of NFS roads.  *Any associated uses of NFS land for pipelines and utilities are special uses and are regulated under 36 CFR § 251.50 . . . [and] requires submittal of a special use application (SF-299).* This application process is designed to ensure that authorizations to use and occupy NFS lands are in the public interest. . . .  In processing the application, the Forest Service must consider the potential environmental effects of authorizing the proposed uses of NFS land in accordance with the National Environmental Policy Act (NEPA), and the Forest Supervisor must proceed to either approve or deny the authorization.  The special use authorization

(SUA) must include terms and conditions, including minimizing damage to the environment, protecting the public interest, and requiring compliance with water and air quality standards.

(*AMRC*, Doc. 87-3 at 16, emphasis added.)

Indeed, throughout the FEIS, the Forest Service explicitly stated that it was aware of, and applying, both sets of regulations. (*AMRC*, Doc. 93-1 at 16 [FEIS page 135: "The role of the Forest Service under its primary authorities in the Organic Administration Act, Locatable Regulations (36 CFR 228 Subpart A), and Multiple-Use Mining Act is to ensure that mining activities minimize adverse environmental effects on NFS surface resources. The role of the Forest Service under special use authorizations (36 CFR 251 Subpart B) would include terms and conditions to minimize damage to the environment, protect the public interest, and require compliance with water and air quality standards."]; *id.* at 13, emphasis added [FEIS page 21: "If the land exchange occurs, then the mine, all processing facilities, and the tailings storage facility would be located off of NFS lands. The remaining portions of the project on NFS land would be roads, pipelines, and utilities. *Any associated uses of NFS land such as roads, pipelines, and utilities are considered special uses and regulated under 36 CFR 251.50.*"].)

Finally, to the extent AMRC contends these perceived flaws also tainted the Forest Service's identification of the no-action alternative, this argument fails not only because it rests on a faulty premise but also because agencies are entitled to substantial deference when assessing "feasible alternatives" and making "fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry." *Seven County Infrastructure Coalition*, 145 S. Ct. at 1513. Given Congress's policy judgment, expressed in SALECA, that the land exchange should go forward so Resolution Copper can engage in copper mining, it was logical—and, at a minimum, fell within the "broad zone of reasonableness" described in *Seven County Infrastructure Coalition*—for the Forest Service to reject the no-action alternatives posited by AMRC. *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174, 1180 (9th Cir. 1990) ("[NEPA] does not

1    require the consideration of alternatives whose effect cannot be reasonably ascertained, and

2    whose implementation is deemed remote and speculative.  Nor must an agency consider

3    alternatives which are infeasible, ineffective, or inconsistent with the basic policy

4    objectives for the management of the area.") (cleaned up).

5                    b.    **Direct, Indirect, And Cumulative Impacts**

6        AMRC's second NEPA argument is that the Forest Service "failed to properly

7    analyze the project's direct, indirect, and cumulative impacts." (*AMRC*, Doc. 87 at 20-22.)

8    More specifically, AMRC argues that (1) despite the massive amount of water the mine

9    will require, the FEIS did not meaningfully disclose and analyze the direct and indirect

10   effects of the planned Desert Wellfield; and (2) the FEIS did not consider other reasonably

11   foreseeable activities that will cumulatively impact the available water in the East Salt

12   River Valley—most notably, by arbitrarily deeming it "speculative" that the Superstition

13   Vistas development would continue growing even though over 900,000 people are

14   expected to live there.  (*Id.*)

15       AMRC is unlikely to succeed on these arguments.  As an initial matter, some of

16   AMRC's arguments regarding Superstition Vistas are factually inaccurate.  True, the FEIS

17   contains passages characterizing the further development of this project as "speculative,"

18   but ARMC ignores that the Forest Service proceeded to analyze the expected water use

19   associated with this development despite that characterization:

20          We considered a number of specific projects or actions related to water
21          supplies during the cumulative effects analysis process, including the . . .
           Future Superstition Vistas Development Area on Arizona State Trust Land.
22          *Some of these normally would not be analyzed as cumulative effects because*
23          *they do not meet the appropriate screening criteria* to be considered
            reasonably foreseeable future actions.  For example, . . . [t]he Superstition
24          Vistas development area . . . development plans are conceptual and lack
            adequate detail to allow substantial analysis of resource effects and thus
25          normally would be considered speculative, not reasonably foreseeable.
26          *Regardless of the screening outcomes, due to the great interest expressed by*
            *the public and cooperating agencies in water-related issues, we have added*
27          *this section to the cumulative effects analysis to discuss these regional water*
            *supply issues in the context of the Resolution Copper Project's use of water.*
28

(*AMRC*, Doc. 93-1 at 157, emphases added [FEIS page 977].)  Elsewhere, the FEIS elaborates: "While the lack of detailed water use plans prevents specific analysis of most of the Superstition Vistas development, some estimates indicate that a population of 900,000 could live in this area. Throughout the Resolution Copper Project NEPA process, the ASLD has raised concerns about the potential future water supply to support the Superstition Vistas development.  The cumulative effects modeling described below was undertaken in part to investigate the potential impacts to the Superstition Vistas water supply."  (*Id.* at 164 [FEIS page 165].)  Finally, in Appendix R, the Forest Service explained that although "Superstition Vistas was not analyzed as a standalone RFFA" for various reasons, including that "[it] is considered too speculative to estimate if, when, or to what extent development may occur in these areas," "*we still incorporated the future growth in the Superstition Vistas planning area conceptually*. . . .  Note that we expanded the FEIS cumulative effects analysis (chapter 4) to quantify the cumulative effects of competing water uses in the region and the ramifications of ongoing drought or future meteorological trends.  This includes the Superstition Vistas development."  (*Id.* at 234, emphasis added [FEIS page R-340].)

AMRC also contends, seemingly in the alternative, that even if the Forest Service made some effort to consider the anticipated water use associated with Superstition Vistas, it used flawed modeling techniques by only considering "holistic" or "qualitative" impacts and not performing an "objective," "quantified assessment."  (*AMRC*, Doc. 97 at 17.)  AMRC raises similar criticisms regarding the Forest Service's techniques for analyzing Desert Wellfield's anticipated water use.  But as recently emphasized by the Supreme Court, "when an agency makes those kinds of speculative assessments or predictive or scientific judgments, . . . a reviewing court must be at its 'most deferential.'"  *Seven County Infrastructure Coalition*, 145 S. Ct. at 1512.  The bottom line is that the FEIS contains extensive analysis regarding water-use issues, including various forms of modeling related to the anticipated water use associated with Desert Wellfield and Superstition Vistas.  Chapter 3.7 of the FEIS, entitled "Water Resources," itself spans over 200 pages.  (*San*

1  *Carlos*, Doc. 106-3 at 4 [FEIS table of contents: showing that Chapter 3.7 spans pages 381-

2  599].)  "This section analyzes how the Resolution Copper Project could affect water

3  availability and quality in three key areas: groundwater quantity and groundwater-

4  dependent ecosystems (GDEs), groundwater and surface water quality, and surface water

5  quantity." (*San Carlos*, Doc. 105-9 at 28 [FEIS page ES-25: executive summary of Chapter

6  3.7].)  The FEIS also repeatedly acknowledges that the anticipated water use by the mine

7  will be substantial and may result, directly and indirectly, in alarming environmental

8  consequences.  (*See, e.g.*, *AMRC*, Doc. 93-1 at 169 [FEIS page 989: "[U]ltimately, long-

9  term use of groundwater may become unsustainable, even without considering the growth

10  of the Superstition Vistas development."]; *San Carlos*, Doc. 105-9 at 6-7 [FEIS pages ES-

11  3-4: noting that "[t]he estimated total quantity of external water needed for the life of the

12  mine . . . is substantial" and that "[w]ater use is a major concern among the public, other

13  government agencies, and interested parties"].)

14       It is thus evident that the Forest Service took the requisite "hard look" at water-use

15  issues that is required by NEPA.  *Cf. Audubon Society of Portland v. Haaland*, 240 F.4th

16  967, 984 (9th Cir. 2022) ("We next consider whether, under NEPA, [the agency] took a

17  sufficiently thorough 'hard look' at the environmental effects of pesticides on the Refuges

18  in concluding that pesticides could continue to be used with minimal environmental

19  consequences.  In performing this review, we do not fly-speck [the agency's] analysis and

20  . . . employ a rule of reason to determine whether it contains a reasonably thorough

21  discussion of the significant aspects of the probable environmental consequences.  Under

22  NEPA, we refrain from acting as a type of omnipotent scientist and must defer to an

23  agency's decision that is fully informed and well-considered.") (cleaned up).  Even if the

24  Forest Service could have used different technical water-use modeling techniques in some

25  instances, such "fact-dependent, context-specific, and policy-laden choices" are entitled to

26  "substantial deference" and "should not [be] micromanage[d]" so long "as they fall within

27  a broad zone of reasonableness."  *Seven County Infrastructure Coalition*, 145 S. Ct. at

28  1513.  Such is the case here.

1          c.    **Comments From Other Agencies**

2          AMRC's third NEPA argument is that "[t]he Forest Service failed to meaningfully

3   consider comments from other agencies."  (*AMRC*, Doc. 87 at 22-25.)  More specifically,

4   AMRC contends the Forest Service ignored the "significant criticisms" raised by the

5   Bureau of Land Management ("BLM") and the Arizona State Lands Department

6   ("ASLD"), both of whom are "cooperating agencies" on the FEIS.  (*Id.* at 22.)  Relying on

7   cases from outside the Ninth Circuit, AMRC contends that NEPA creates a duty to provide

8   a reasoned response to any criticisms raised by cooperating agencies.  (*Id.* at 23.)

9          Even assuming the Ninth Circuit follows such a rule, AMRC is unlikely to succeed

10  on this argument because it rests on an inaccurate factual premise—although the Forest

11  Service may not have *adopted* the views of BLM and ASLD on certain disputed issues, it

12  did not *ignore* those agencies' views.  For example, BLM issued a 26-page, singled-spaced

13  report in June 2022 that raised an array of concerns with, *inter alia*, how the 2021 version

14  of the EIS addressed hydrology and water-use issues.  (*AMRC*, Doc. 87-1.)  Those concerns

15  were often extremely technical in nature and involved, for example, contentions that the

16  2021 version of the EIS improperly "include[d] dewatering in the analysis of the No Action

17  alternative" (*id.* at 14); failed to consider "indirect effects of mining impacting groundwater

18  resources in the Cutter Basin" (*id.*); failed to properly address "[t]he Drought Contingency

19  Plan" (*id.* at 15); and failed to consider the cumulative impact of the planned mining

20  activities on private well owners (*id.* at 20 ["The BLM reviewers wondered if the

21  dewatering of the shallow aquifer will forever prevent any future landowner or

22  development from using the shallow Apache Leap tuff aquifer as a water source, which

23  would force any development or landowner to either drill a more expensive well to a deeper

24  water source, or force them to obtain water from another basin?"]).  The 2025 FEIS, in

25  turn, directly acknowledges and addresses many of those concerns, even if it does not

26  specifically identify the BLM report as their source:[13]

27  _____
    [13]       In addition to arguing that the FEIS functionally addressed the criticisms in the BLM
28  report without "[m]entioning the BLM report by name," the Federal Defendants contend
    that the Forest Service separately issued "[a] detailed memorandum on the BLM report,"
    which "is part of the administrative record for the project."  (*AMRC*, Doc. 93 at 27 n.13.)

We received many comments expressing concern with regional water supplies, current and future stresses on water supplies from drought and future meteorological trends, and the ramifications of Resolution Copper's use of water in the face of competing water uses. We considered a number of specific projects or actions related to water supplies during the cumulative effects analysis process, including the following: Arizona's Drought Contingency Plan; Resolution Copper's Potential Allocation of CAP Water; Town of Florence Development Projects; Population Change; Recent Modeling Reports Projecting Water Shortages in Pinal County; Assured Water Supplies in the East Salt River Valley; Future Superstition Vistas Development Area on Arizona State Trust Land. . . . Regardless of the screening outcomes, due to the great interest expressed by the public *and cooperating agencies* in water-related issues, we have added this section to the cumulative effects analysis to discuss these regional water supply issues in the context of the Resolution Copper Project's use of water.

(*AMRC*, Doc. 93-1 at 157, emphasis added [FEIS page 977]. *See also id.* at 42-46 [FEIS pages 437-41: providing an extensive new discussion of "indirect impacts to Tribal water resources in the Cutter Basin" in response to "concerns [that] were raised" regarding the 2021 EIS's analysis of that topic].)

Perhaps the Forest Service could have done even more to specifically address each and every one of the many detailed, technical criticisms set forth in BLM's June 2022 report, but NEPA does not require that level of detail. As the Federal Defendants note without contradiction in their brief, "[t]he water analysis alone included 38 participants representing the Forest Service and contractors, six cooperating agencies or stakeholders (including Dr. Wells on behalf of the San Carlos Apache Tribe), and Resolution Copper and contractors." (*AMRC*, Doc. 93 at 28 n.14.) Particularly in a project of this magnitude, it will always be possible to identify some argument, raised by some stakeholder, that could have been analyzed in more detail in the FEIS. Nevertheless, "the question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency

---

AMRC, in turn, contends the Court may not consider this memorandum because it was not included in the FEIS or published on the Forest Service's website at the time of the FEIS's publication. (*AMRC*, Doc. 97 at 18 & n.4.) The Court finds it unnecessary to resolve this argument because, as discussed above, AMRC's NEPA challenge fails even if the analysis is confined to the FEIS.

discretion—which should not be excessively second-guessed by a court." *Seven County Infrastructure Coalition*, 145 S. Ct. at 1512. *See also id.* at 1518 ("Courts should review an agency's EIS to check that it addresses the environmental effects of the project at hand. . . . In conducting that review, courts should afford substantial deference to the agency as to the scope and contents of the EIS."). With recognition that the "central principle of judicial review in NEPA cases is deference," *id.* at 1511, the Court concludes that AMRC is unlikely to succeed on its contention that the Forest Service arbitrarily and capriciously ignored BLM's criticisms.

The analysis is even more straightforward with respect to ASLD. AMRC contends that ASLD raised various concerns regarding Superstition Vistas and that those "concerns were largely ignored, as the Forest Service erroneously concluded that most of the Superstition Vistas is 'speculative.'" (*AMRC*, Doc. 87 at 25.) But as discussed in the preceding section of this order, the Forest Service proceeded to analyze the expected water use associated with the Superstition Vistas development despite the purportedly speculative nature of that development. Furthermore, the Forest Service specifically indicated, in various portions of the FEIS, that it had revised its analysis in response to concerns identified by ASLD. (*See, e.g.*, *San Carlos*, Doc. 109-2 at 50-51 [FEIS pages R-43-44: photocopy of November 7, 2019 letter from ASLD with superimposed comment boxes indicating where the Forest Service's responsive comments may be located in the FEIS]; *id.* at 81 [FEIS page R-74: table identifying ASLD's comment and indicating where the Forest Service's responsive comments may be located in the FEIS]; *AMRC*, Doc. 93-1 at 233 [FEIS page R-287: "These comments concern the potential impact to Arizona State Trust land, specifically the future Superstition Vistas development area in the East Salt River valley. Many public comments raised the issue of competing water uses, water scarcity, and regional water supplies. We added discussion of this topic to the FEIS. This includes the Superstitions Vistas development."]; *id.* at 234 [FEIS page R-340: "These comments specifically mention the planned Superstitions Vistas development area in the East Salt River valley. . . .  Note that we expanded the FEIS cumulative effects analysis

1    (chapter 4) to quantify the cumulative effects of competing water uses in the region and

2    the ramifications of ongoing drought or future meteorological trends.  This includes the

3    Superstition Vistas development."].)  Again, even if the Forest Service could have done

4    more to specifically address ASLD's criticisms, the Court must give deference to the Forest

5    Service's determination as to just how detailed the FEIS needed to be.  *Seven County*

6    *Infrastructure Coalition*, 145 S. Ct. at 1512, 1518.  Particularly in light of that deference,

7    the Forest Service's choice likely fell within the "broad zone of reasonableness," which

8    means that AMRC is unlikely to succeed on its NEPA challenge.

9                        d.    **Mitigation Measures**

10          AMRC's fourth NEPA argument is that the Forest Service "failed to consider, and

11   require, sufficient mitigation measures," "especially regarding the groundwater pumping

12   and transport via the proposed pipelines."  (*AMRC*, Doc. 87 at 25-27.)

13          These criticisms require little additional discussion in light of the analysis in the

14   preceding sections of this order.  The FEIS includes hundreds of pages of detailed analysis

15   regarding water usage, including analysis regarding mitigation measures: "We developed

16   a robust monitoring and mitigation strategy to avoid, minimize, rectify, reduce, or

17   compensate for resource impacts that have been identified during the process of preparing

18   this EIS.  Appendix J contains descriptions of mitigation measures that are being required

19   by the Forest Service and mitigation measures voluntarily brought forward and committed

20   to by Resolution Copper.  Appendix J also contains descriptions of monitoring that would

21   be needed to identify potential impacts and mitigation effectiveness."  (*AMRC*, Doc. 93-1

22   at 72 [FEIS page 562].  *See also id.* at 16-24 [FEIS pages 135-43: overall framework for

23   mitigation].)    AMRC's criticisms of the scope and substance of that analysis are

24   insufficient to overcome the deference required by *Seven County Infrastructure*

25   *Coalition*.[14]

26   _____

27   [14]      In a related vein, to the extent AMRC argues the Forest Service should have made
     "Measure PF-WR-03" mandatory (*AMRC*, Doc. 87 at 26), the Court agrees with the
     Federal Defendants that Forest Service did not act arbitrarily and capriciously in

28   concluding it lacked regulatory authority as to this specific issue because Resolution
     Copper's recovery wells will not be located on federal land.  (*AMRC*, Doc. 93-1 at 228

e.   **Tailings Storage Facility Alternatives And Pipelines**

The Tribe's first NEPA argument is that the "FEIS is woefully inadequate in how it addresses issues related to the tailings storage facility alternatives and both the failings and concentrate pipelines." (*San Carlos*, Doc. 105 at 19-22.)  In support, the Tribe proffers a declaration from Dr. Steven Emerman, which identifies 14 asserted deficiencies in the FEIS's analysis.  (*San Carlos*, Doc. 109-6 at 3-6.)  Enclosed as an attachment to the declaration is a 67-page report from Dr. Emerman, which describes the asserted deficiencies in more detail.  (*Id.* at 7-73.)  The Federal Defendants, in turn, have moved to strike Dr. Emerman's declaration because it "offer[s] improper expert opinions that were not before agency decision-makers from the United States Forest Service in this matter." (*San Carlos*, Doc. 115 at 1.)  In response, the Tribe identifies various reasons why Dr. Emerman's declaration may be considered despite the usual rule barring the consideration of extra-record evidence in an APA action.  (*San Carlos*, Doc. 120.)

The Court agrees with the Tribe that at least some aspects of Dr. Emerman's declaration may be considered—and, thus, the declaration need not be stricken.  Of course, "[w]hen reviewing an agency decision, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.  Parties may not use post-decision information as a new rationalization either for sustaining or attacking the Agency's decision." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006) (cleaned up).  The Ninth Circuit has "recognized four exceptions to this rule, allowing extra-record materials (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith." *Id.* (cleaned up).  "These exceptions are narrowly construed and applied," *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2004), and the party seeking to invoke an exception bears a

───────────────

[FEIS page R-235].)

"heavy burden," *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010).

If Dr. Emerman had simply been retained by the Tribe, following the conclusion of the Forest Service's environmental impact analysis, to attempt to poke holes in that analysis, there is a strong argument his declaration would be impermissible. Although the Tribe asserts that Dr. Emerman's declaration "do[es] not ask the district court to second guess the Forest Service's scientific judgments or conclusions" and is simply being provided to identify the relevant factors the Forest Service should have considered (*i.e.*, the first *Lands Council* exception) and/or to provide background information regarding technical terms (*i.e.*, the third *Lands Council* exception) (*San Carlos*, Doc. 120 at 5-6), this is obviously untrue—the main point of Dr. Emerman's declaration is to criticize the substance of the Forest Service's conclusions. (*See, e.g.*, *San Carlos*, Doc. 109-6 ¶ 4 ["As more fully stated in the memorandum that I authored, attached as Exhibit A, the 2025 FEIS fails to adequately address fourteen substantive areas related to tailings storage facilities and both tailings pipelines and concentrate pipelines."]; *id.* ¶ 8 ["As such, the 2025 FEIS fails to address and analyze the risks and potential environmental impacts presented by the Application to the degree required under NEPA . . . ."].) Courts should not allow litigants in an APA action to sneak in after-the-fact substantive criticisms of the agency's analysis under the guise of providing background details. *See, e.g.*, *Asarco, Inc. v. U.S. Envt'l Protection Agency*, 616 F.2d 1153, 1160-61 (9th Cir. 1980) ("[W]e think that the district court went too far in its consideration of evidence outside the administrative record. . . . Most of the expert testimony . . . should not have been admitted or at least not have been considered for the purpose of judging the wisdom of the EPA's stack-testing requirement. This technical testimony was plainly elicited for the purpose of determining the scientific merit of the EPA's decision."); *Bartell Ranch LLC v. McCullough*, 2021 WL 6118738, *5 (D. Nev. 2021) (denying supplementation request where "the Court is left with the impression . . . that Lithium Nevada seeks to use the Monitoring Plan," "not to explain technical subject matter," but "to impermissibly support the 'correctness or wisdom of the

1    agency's decision'") (citation omitted); *Alsea Valley Alliance v. Evans*, 143 F. Supp. 2d

2    1214, 1216 (D. Or. 2001) ("[A] party may not circumvent the general rule, that judicial

3    review is limited to the administrative record, by simply labeling a declaration as 'assisting

4    the court.'") (citation omitted).

5          With that said, Dr. Emerman is not attempting to raise entirely *new* arguments and

6    criticisms that were not previously presented to the Forest Service.  The FEIS reflects that

7    Dr. Emerman raised many of the criticisms set forth in his declaration as objections to the

8    draft EIS and that the Forest Service specifically considered and addressed those criticisms

9    in the appendix to the FEIS.  (*See, e.g.*, *San Carlos*, Doc. 109-2 at 220 [FEIS page R-213:

10   "Comment response" regarding "Volcanism and seismic data sources," explaining that

11   "additional investigation and updated data sources have been received since the DEIS . . .

12   including a report by Dr. S. Emerman (Appendix B-5 to the letter)"]; *id.* at 311 [FEIS page

13   R-304: "Comment response" regarding "FMEA, breach analysis, seismic analysis,

14   planning," which was "Responsive to these comments: . . . 30145-5 (Emerman4), 30145-

15   6 (Emerman4), 30145-7 (Emerman4), 30145-8 (Emerman4)."]; *id.* at 340 [FEIS page R-

16   333: "Comment response" regarding "Disclosed water use is incorrect and unrealistic,"

17   addressing various criticisms raised by Dr. Emerman].)  Under these circumstances, at least

18   some portions of Dr. Emerman's declaration may be considered.  *Cf. Asarco*, 616 F.2d at

19   1156, 1160-61 (concluding that the testimony from Cahill describing "the history of

20   Asarco's communications with the EPA concerning compliance with its testing

21   requirements" "could be considered under the standards we have set forth," even though

22   much of the other testimony was impermissible, where Cahill "sent a letter to the EPA

23   discussing the possibility that chemical reactions might occur in the stack and restating

24   Asarco's position that accurate tests could be conducted at the existing sampling sites" and

25   the EPA then issued the challenged decision but "made no response to Cahill's letter" in

26   its decision).

27         Nevertheless, on the merits, Dr. Emerman's declaration does not establish a

28   likelihood that the Forest Service acted arbitrarily and capriciously.  Resolution Copper's

brief succinctly identifies the various flaws in the Tribe's arguments regarding Dr. Emerman's opinions and the Court agrees with that analysis. For example, "[t]he FEIS exhaustively analyzed various alternatives for the tailings facility. The FEIS and the draft ROD explain why the Forest Service selected Skunk Camp, located off Forest Service Land: it is 'the most remote location' and 'offers the best ability to control seepage and protect water quality, has the least visibility, and is located in an area with little recreation use.' . . . The FEIS [also] devotes an entire 51-page section to tailings and pipeline safety that addresses all of Dr. Emerman's concerns. The agency undertook an exhaustive and collaborative process to assess the inherent risks in the tailings designs and a range of breach scenarios." (*San Carlos*, Doc. 116 at 32.) Furthermore, although "Dr. Emerman states that he would have relied more heavily on a different analytical method that estimated the pipeline failure risk to be higher, 0.62 incidents per 1,000 miles," this merely reflects that "one engineer disagreed with other engineers about the best way to evaluate the risk of pipeline failures" and "[b]oth *Seven County* and long-time NEPA precedents unambiguously teach that this Court should decline to interject itself into disputes about technical details—reached after a painstaking process fully described in the FEIS—and should instead defer to the agency's well-reasoned analysis." (*Id.* at 33.) And again, although Dr. Emerman raises criticisms regarding "the Forest Service's methodology for modeling the risk of tailings dam failure, its selection of tailings dam engineering criteria, and its alleged failure to consider international standards for tailings dam locations," "[t]he Forest Service addressed these engineering minutiae in detail in the FEIS and its supporting analyses, explaining how the agency exercised its judgment and referencing a massive library of technical documents supporting that judgment. Among these are a comprehensive breach (*i.e.*, total failure) analysis for each of the Project alternatives. These are again simply instances of one engineer disagreeing with others. They supply no basis to find the FEIS arbitrary and capricious . . . ." (*Id.*)

In reaching this conclusion, the Court does not mean to diminish the gravity of the concerns raised by Dr. Emerman. Among other things, Dr. Emerman contends that the

1    actual failure rate for tailings pipelines "is 21 times the annual failure rate estimated in the

2    FEIS" (*San Carlos*, Doc. 109-6 at 10); that, as a result, "tailings pipeline failure should be

3    regarded as an expected outcome for the Resolution Copper project" (*id.* at 12); that "a

4    great deal of toxic tailings and water could be released before the pipeline is shut down

5    upon detecting that a leak has occurred" (*id.* at 14); that "the failure of a concentrate

6    pipeline is an expected outcome of the Resolution Copper project" (*id.* at 16); that the cost

7    of performing Dr. Emerman's preferred form of dam breach analysis would have been

8    quite low, ranging from $10,000 to $35,000 (*id.* at 18, 23); that "the Skunk Camp site might

9    not even be suitable for a tailings storage facility" due to flaws in the Forest Service's

10   analysis of its foundation (*id.* at 26-27); and that "the tailings dam (outer embankment) of

11   the tailings storage facility at the Skunk Camp site (Alternative 6) will be a source of

12   uncontrolled acid mine drainage into the underlying aquifer and downstream waterways"

13   (*id.* at 36). It is difficult to read Dr. Emerman's report without developing a sense of

14   unease. Even so, the Forest Service was aware of his criticisms and provided extensive,

15   reasoned analysis to justify its conclusions. "Black-letter administrative law instructs that

16   when an agency makes those kinds of speculative assessments or predictive or scientific

17   judgments, and decides what qualifies as significant or feasible or the like, a reviewing

18   court must be at its 'most deferential.'" *Seven County Infrastructure Coalition*, 145 S. Ct.

19   at 1512. "Courts should afford substantial deference and should not micromanage those

20   agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 1513.

21   Courts must resist the urge to "fly-speck" the agency's analysis and "act[] as a type of

22   omnipotent scientist." *Audubon Society of Portland*, 240 F.4th at 984.

<center>f.    **Lack Of Supplemental EIS**</center>

23

24         The Tribe's second NEPA argument is that because the FEIS included new

25   "substantive" modeling and analysis that did not appear in the 2021 version of the EIS,

26   "the Forest Service was required to issue a supplemental DEIS for public comment." (*San

27   Carlos*, Doc. 105 at 22.) In support, the Tribe proffers a declaration from Dr. James Wells.

28   (*San Carlos*, Doc. 109-7 at 2-6.) Among other things, Dr. Wells asserts that "[t]he new

information that should have been published for public comment in a supplemental DEIS includes nine reports totaling thousands of pages on issues related to the Skunk Camp tailings storage facility ('TSF') site, stability analyses, aquifer testing, seismic hazard analyses, water quality and level analyses, TSF seepage analyses, groundwater flow models, site investigation summaries, and conceptual hydrogeological models." (*Id.* at 4 ¶ 5.)  Enclosed as an attachment to Dr. Wells's declaration is a 24-page report from Dr. Wells.  (*Id.* at 7-30.)  In that report, Dr. Wells opines that the NEPA implementing regulations at 40 C.F.R. § 1502.9 provide the foundation for his "professional opinion that [the Forest Service] had no discretion under NEPA regulations and should have published a Supplemental Draft EIS because there were significant new circumstances or information relevant to environmental concerns bearing on the proposed action." (*Id.* at 11-12.)

As a threshold matter, Dr. Wells is not qualified to opine on legal issues, such as when NEPA's implementing regulations require the issuance of a draft EIS.  As a further threshold matter, Dr. Wells fails to acknowledge that the regulation on which he bases his impermissible legal opinion was rescinded in February 2025, several months before the FEIS's publication.  (*San Carlos*, Doc. 105-9 at 54 [FEIS page 9: "In January 2025, Executive Order 14154 was issued, directing the CEQ to propose rescinding CEQ's NEPA regulations found at 40 CFR 1500 et. seq.  In February 2025, CEQ published an interim final rule removing CEQ regulations from the Code of Federal Regulations."].)

Yet even assuming the rescinded regulation still applied at the time of the FEIS's publication,[15] the Tribe has not established a likelihood of success on this claim.  "[T]he standard that governs an agency's decision whether to prepare a supplemental EIS . . . [is] that an agency should apply a 'rule of reason' . . . .  [A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized.  To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."

---

[15]    The Tribe argues in its reply that the rescinded regulation remained applicable based on a memo issued by the President's chief of staff.  (*San Carlos*, Doc. 119 at 16 n.7.)  For the reasons outlined above, it is unnecessary to resolve this issue.

*Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 373 (1980). "If an agency had to file a supplemental draft EA and repeat the public comment process every time it makes any . . . modifications, the NEPA review process would never end . . . ." *Earth Island Inst. V. U.S. Forest Serv.*, 87 F.4th 1054, 1067 (9th Cir. 2023).

The now-rescinded 40 C.F.R. § 1502.9(d) provided that an agency "shall prepare supplements to either draft or final environmental impact statements if a major Federal action is incomplete or ongoing, and . . . [t]here are substantial new circumstances or information about the significance of adverse effects that bear on the analysis." *Id.* "The "supplement requirement is triggered by 'new circumstances' when the underlying *project* significantly changes." *Greer Coal., Inc. v. U.S. Forest Serv.*, 470 F. App'x 630, 633 (9th Cir. 2012). And "[w]hether new information is sufficiently significant to necessitate an SEIS turns on the value of the new information to the still pending decisionmaking process." *Protect Our Cmtys. Found. v. Lacounte*, 939 F.3d 1029, 1040 (9th Cir. 2019) (cleaned up). By the Tribe's own account, that standard was not satisfied here—the Tribe contends the "added content" was merely included in an "attempt[] to shore up glaring deficiencies in the now-withdrawn EIS that the Forest Service published in 2021." (*San Carlos*, Doc. 105 at 3.) Particularly in light of the deferential standard that applies in this context—"Courts must uphold an agency determination that a supplemental EIS is not required if that determination is not arbitrary and capricious," *Or. Natural Res. Council v. Lyng*, 882 F.2d 1417, 1422 (9th Cir. 1989)—the Tribe is unlikely to succeed on this claim. *Cf. Protect Our Cmtys. Found.*, 939 F.3d at 1040-41 ("We agree with the district court that the new information is not significant because it merely confirmed concerns that the 2011 EIS already articulated and considered.") (cleaned up).

### g.    **Acid Rock Drainage And Associated Errors**

The Tribe's third NEPA argument is that "the FEIS erroneously concludes there would be no acid rock drainage during mine operation" and also "underestimates groundwater impacts downstream of the tailings storage facility," which errors render the "selection of the Skunk Camp action alternative . . . arbitrary and capricious." (*San Carlos*,

1    Doc. 105 at 22-23.)  In support, the Tribe once again relies on the declaration of Dr. Wells.

2    (*Id.*)  The Federal Defendants move to strike Dr. Wells's declaration and the Tribe defends

3    it.  (*San Carlos*, Docs. 115, 120.)

4           The threshold analysis regarding the admissibility of Dr. Wells's declaration mirrors

5    the analysis regarding Dr. Emerman's declaration.  Although one of the obvious purposes

6    of Dr. Wells's declaration is to substantively attack the Forest Service's conclusions, Dr.

7    Wells was personally involved in Forest Service's analytical process.  (*San Carlos*, Doc.

8    114 at 28 n.14 [Federal Defendants' acknowledgement that "Dr. Wells on behalf of the San

9    Carlos Apache Tribe" was one of the "38 participants" who formed the "workgroups" that

10    contributed to the Forest Service's "water analysis"]; *San Carlos*, Doc. 116 at 25

11    [Resolution Copper's acknowledgement that "[t]he FEIS process also included two

12    working groups formed to evaluate water concerns" and "[t]ribal consultant James Wells

13    participated extensively in both"].)  Thus, at least some aspects of Dr. Wells's declaration

14    can be viewed as being offered for the permissible purpose of identifying the opinions and

15    information that were before the Forest Service at the time it made the challenged decision

16    (which may be helpful in determining whether the agency failed to consider the relevant

17    factors and properly explained its decision).

18           Nevertheless, on the merits, Dr. Wells's declaration does not establish a likelihood

19    that the Forest Service acted arbitrarily and capriciously.  The Federal Defendants' brief

20    persuasively explains why, and the Court agrees with that analysis: "Dr. Wells's criticism

21    of the Forest Service's conclusions related to the risks of acid rock drainage . . . second-

22    guesses the Forest Service's scientific and technical analysis to which this Court must

23    defer.  The FEIS analyzed the likelihood that oxygen would penetrate the tailings, causing

24    a risk of acid rock drainage, disclosed uncertainties in the modeling related to this issue,

25    and assessed the reasonableness of various assumptions.  The Forest Service therefore gave

26    a hard look to the likely effects . . . ."  (*San Carlos*, Doc. 114 at 32-33, citations omitted.)

27           Just as with Dr. Emerman, the Court does not mean to diminish the seriousness of

28    the concerns raised by Dr. Wells.  Among other things, Dr. Wells contends that "it is highly

irregular (from a policy as well as scientific perspective) that water quality impacts from the various alternatives would be addressed using different methodologies" (*San Carlos*, Doc. 109-7 at 13); that the Forest Service "ask[ed] too much of a single groundwater model" and although "it is a great technical challenge to construct a groundwater model of this size and complexity, . . . 'best we can do' is not an adequate answer if the calibration issues render the model unreliable for its intended purpose" (*id.* at 15-16); that the Forest Service "is giving the public a false sense that it understands the future groundwater impacts from this project . . . when, in reality, the uncertainties in the groundwater modeling are often too large for the modeling results to be considered reliable at that scale" (*id.* at 17); and that "the FEIS fails to take a hard look at one of the most important environmental issues facing virtually any hard-rock mine: acid rock drainage," as its "conclusions on this issue are illogical and unsupported by reliable scientific analysis" (*id.* at 18). Again, these are alarming criticisms, but "when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its 'most deferential.'" *Seven County Infrastructure Coalition*, 145 S. Ct. at 1512. Courts must resist the urge to "fly-speck" the agency's analysis and "act[] as a type of omnipotent scientist." *Audubon Society of Portland*, 240 F.4th at 984.

### h.    **Failure To Address The Tribe's Hydrological Concerns**

The Tribe's fourth NEPA argument is that the FEIS "fails to address the hydrological impacts that the Tribe raised in its comment of December 23, 2019, related to the regional subsidence that would result from groundwater depletion and the effects on the precipitation and groundwater flows that would follow." (*San Carlos*, Doc. 105 at 23.)

The Tribe is unlikely to succeed on this claim because it is belied by the record. The FEIS expressly acknowledges and addresses the hydrology concerns that were raised by the Tribe. (*San Carlos*, Doc. 114-1 at 42 [FEIS page 437: "During the re-initiation of Tribal consultation in 2021–2022, concerns were raised by the San Carlos Apache Tribe about indirect impacts to Tribal water resources in the Cutter Basin caused by Resolution

Copper dewatering around the East Plant Site, as well as long-term changes in regional groundwater from block-caving.  The concern raised was not that drawdown from the Resolution Copper Project would directly impact the Cutter Basin, but that drawdown from the Resolution Copper Project would impact regional water supplies, which might then result in water users replacing lost water resources with additional pumping in the Cutter Basin.  In response to these comments, the Forest Service conducted an analysis of these potential indirect effects (Garrett 2023b), summarized below."]; *id.* at 237 [FEIS page R-356: "Comment response: WT30, Hydrologic connection to San Carlos Apache Reservation. . . .  After the January 2021 publication of the Rescinded FEIS, we received further insights into the concerns raised by the San Carlos Apache Tribe with respect to water impacts.  We understand that the concern is not of direct drawdown impacts but of the potential for cascading regional effects to cause greater groundwater use near Tribal lands.  An analysis of this potential has now been added to section 3.7.1 of the FEIS."].)

### 3.    Summary As To NEPA Claims

It is unlikely that Plaintiffs will be able to survive all of the jurisdictional and threshold challenges that Defendants have raised to their NEPA claims.  Plaintiffs are also unlikely to prevail on the merits of their NEPA claims.

### C.    **Consultation Claims**

#### 1.    Threshold Issues

##### a.    **Standing/Redressability**

The Tribe will likely be able establish standing/redressability in relation to his consultation claims.  An order vacating the FEIS pending additional consultation would, at a minimum, postpone the land exchange and thus create more time for members of the Tribe to continue using Oak Flat in is current, unspoiled form for religious purposes and ceremonies.  As discussed in relation to Plaintiffs' NEPA claims, the Ninth Circuit has indicated that the temporary cessation of a planned development so an agency can comply with its procedural obligations, which will in turn lead to the temporary cessation of the challenger's asserted injuries arising from the planned development, may be enough to

1    establish the relaxed showing of redressability that is required in the APA context. *W.*

2    *Watersheds Project*, 921 F.3d at 1148. The Ninth Circuit has also indicated that

3    establishing redressability is not an onerous task in the context of consultation claims under

4    NHPA seeking injunctive relief. *Ctr. for Biological Diversity*, 868 F.3d at 826

5    ("Redressability . . . is a more relevant difference when comparing declaratory and

6    injunctive relief because redressability depends on the relief envisioned. Here, CBD seeks

7    injunctive relief via an order that the Government not undertake any activities in

8    furtherance of the FRF project . . . [and] rescind any such permits or approvals already

9    granted, until it complies with section 402 of the NHPA. The grant of injunctive relief in

10   this case will result in (1) an adequate NHPA Section 402 process with (2) some likelihood

11   of protecting CBD's interests. Courts often exercise power under the APA to grant

12   injunctive relief analogous to the halt that CBD requests. Accordingly, CBD has satisfied

13   the requirement of redressability.") (cleaned up).

### b.    Implicit Preclusion Of Judicial Review

14

15   Defendants' "implicit preclusion" argument fails in relation to the Tribe's

16   consultation claims. SALECA does not expressly preclude judicial review and a strong

17   presumption exists in favor of judicial review. *Bowen*, 476 U.S. at 670-72; *KOLA, Inc*,

18   882 F.2d at 363. The statutory features that Defendants emphasize are too ambiguous to

19   overcome this presumption, particularly given SALECA's express requirement that the

20   Forest Service "engage in government-to-government consultation with affected Indian

21   tribes concerning issues of concern to the affected Indian tribes related to the land

22   exchange" and then "consult with Resolution Copper" to "seek to find mutually acceptable

23   measures to . . . address the concerns of the affected Indian tribes; and . . . minimize the

24   adverse effects on the affected Indian tribes resulting from mining and related activities on

25   the Federal land conveyed to Resolution Copper under this section." 16 U.S.C.

26   § 539p(c)(3). Additionally, SALECA does not even mention NHPA, an omission that is

27   difficult to reconcile with the idea that Congress clearly and unambiguously intended to

28   preclude judicial review of NHPA claims related to the land exchange.

1
c.    **Final Agency Action**

2    The Tribe's consultation claims are based on alleged violations of the consultation

3    obligations set forth in SALECA and NHPA, but neither statute has a private right of

4    action.  *San Carlos Apache Tribe*, 417 F.3d at 1093 (no private right of action under

5    NHPA); *Concerned Citizens*, 279 F. Supp. 3d at 942-43 (no private right of action under

6    SALECA).   Thus, the Tribe must once again assert those claims via the APA, which

7    requires a showing of final agency action.  *Tohono O'odham Nation*, 138 F.4th at 1200

8    ("Plaintiffs bring their NHPA challenge under the APA.  The APA allows judicial review

9    only of a 'final agency action.'").  As noted, the following two-part test governs whether

10   agency action is considered final: *first*, the action must mark the consummation of the

11   agency's decision-making process; and *second*, the action must determine rights or

12   obligations or be one from which legal consequences will flow.  *Envt'l Defense Ctr.*, 36

13   F.4th at 867-68.

14   The starting point for the finality analysis regarding the Tribe's consultation claims

15   is the Ninth Circuit's recent decision in *Tohono O'odham Nation*.   There, a private

16   company filed an application with BLM in 2008 for permission to build a 515-mile

17   transmission line through New Mexico and Arizona.  *Tohono O'odham Nation*, 138 F.4th

18   at 1194-95.  "A portion of the Route runs through the San Pedro Valley, northeast of

19   Tucson.  The Valley is of great historic and cultural importance to several Native American

20   Tribes, including the Tohono O'odham Nation, the San Carlos Apache Tribe, the Hopi

21   Tribe, and the Zuni Pueblo."  *Id.* a 1195.  BLM then conducted an environmental review

22   of the proposal under NEPA; issued a FEIS in June 2013; issued a final programmatic

23   agreement ("PA") in December 2014 that addressed its consultation obligations under

24   NHPA; and issued a ROD in January 2015 that granted the right-of-way application.  *Id.*

25   However, the ROD clarified that that the company could not actually begin construction

26   until it received a subsequent "limited notice to proceed" ("LNTP") and specified that that

27   an LNTP could not be issued until the BLM's consultation obligations set forth in the PA

28   were fulfilled.  *Id.*  Years later, in September and November 2023, BLM issued two LNTPs

to the company, which prompted the company to begin construction activities. *Id.* at 1197-98. In response, various tribal and environmental organizations filed a lawsuit and sought a preliminary injunction, claiming among other things "that the Department violated the NHPA by authorizing Project construction to begin in the San Pedro Valley before completing its NHPA obligations." *Id.* at 1198. The district court denied the request for injunctive relief and dismissed the lawsuit but the Ninth Circuit reversed the dismissal order. The court identified one of the "key issue[s]" as "whether the LNTPs constitute final agency actions." *Id.* at 1200. As for the first element of *Bennett*'s finality test, the court concluded that "the LNTPs mark the consummation of the agency's decisionmaking process about whether there are historic properties present in the San Pedro Valley" and "also represent the agency's final determination that construction will not restrict subsequent mitigation measures to protect historic properties, as such a determination was a prerequisite to authorizing construction under the PA." *Id.* at 1201 (cleaned up). As for the second element of *Bennett*'s finality test, the court concluded that "[t]he LNTPs also determine 'rights'" because, "[m]ost importantly, they expressly grant SunZia the right to begin construction in the San Pedro Valley." *Id.* Finally, the court rejected the defendants' argument "that the ROD is the only final agency action relevant here," explaining that "the ROD could not have marked the consummation of the Department's NHPA process under the PA; that process was incomplete when the ROD was issued." *Id.* "In sum, we hold that the LNTPs constitute final agency actions because they represent the Department's final decision that the PA requirements had been satisfied, and that [the company] could therefore begin construction in the San Pedro Valley." *Id.* at 1201-02.

Although the parallels between the two cases are not exact, *Tohono O'odham Nation* makes it likely the Tribe will be able to establish the finality element of its consultation claims. The analysis as to the second finality element is straightforward—just as the LNTPs in *Tohono O'odham Nation* determined rights because they served as the prerequisite for construction of the transmission line to begin, the FEIS determines rights and causes legal consequences to flow because it serves as the triggering event for the land

1    exchange.

2    The more complicated question is whether the FEIS marks the consummation of the

3    Forest Service's consultation obligations under SALECA and NHPA in the same way that

4    the LNTPs in *Tohono O'odham Nation* marked the consummation of BLM's consultation

5    obligations. According to the Federal Defendants, the answer is no: "[T]hose limited

6    notices to proceed are not analogous to the FEIS and Draft ROD here. The limited notices

7    to proceed 'expressly' authorized construction to commence. Here, the FEIS describes and

8    analyzes the consultation that occurred, and the Draft ROD identifies the decisions that the

9    Forest Service will make—*but has not yet made*—with respect to mitigation measures.

10   Thus, neither document is a final agency action with respect to the NHPA." (*San Carlos*,

11   Doc. 93 at 13.)

12   As explained in earlier portions of this order, the Court agrees with Defendants that

13   in the *NEPA* context, the Forest Service has likely not yet made any final discretionary

14   decisions and won't do so until it issues the ROD. But for *consultation* purposes, the

15   analysis is somewhat different. Although it's possible that comments and objections to the

16   DROD will prompt the Forest Service to revisit its proposed determinations and, perhaps,

17   engage in additional consultation, it's also possible that no further consultation will occur.

18   It can't be overlooked that the government's stated reason for rescinding the previous EIS

19   in March 2021 was that it had "concluded that additional time is necessary to fully

20   understand concerns raised by Tribes and the public and the project's impacts to these

21   important resources and ensures the agency's compliance with federal law," and thus "it

22   directed the Forest Service to take appropriate steps to re-initiate consultation." (*San

23   Carlos*, Doc. 36-1 ¶ 6, cleaned up.) The reissuance of the FEIS in June 2025 is a sign that

24   the government believes it has now satisfied those obligations. To that end, the FEIS

25   expressly states that the consultation process under § 106 of NHPA has now been

26   completed. (*San Carlos*, Doc. 106-3 at 171 [FEIS page 1000: "In accordance with 36 CFR

27   800.7(c)(4), the Secretary of Agriculture delivered a written response to the ACHP on April

28   17, 2025, and that response concluded the Section 106 process for this undertaking."]. *See*

*also San Carlos*, Doc. 82-15 [Secretary of Agriculture's letter to ACHP].)

Given this backdrop, and acknowledging that the issue is not free from doubt, the Court concludes that the Tribe will likely be able to establish the "final agency action" element of its consultation claims.

### d.  **No Agency Discretion**

The Court is unpersuaded by Defendants' "no agency discretion" arguments as applied to the Tribe's consultation claims.  The Forest Service possesses discretion regarding its consultation obligations, both with respect to how to fulfill them and in determining when they have been satisfied.  Additionally, as noted in relation to Plaintiffs' NEPA claims, Defendants' counterarguments conflate the substance of the Tribe's consultation claims with the remedy the Tribe seeks.

### e.  **Vacatur As A Remedy**

Earlier portions of this order explain why Defendants' arguments regarding the permissibility of vacatur as a remedy do not stand as an obstacle to preliminary injunctive relief on Plaintiffs' appraisal and NEPA claims.  The same is true with respect to the Tribe's consultation claims.  Even assuming that Defendants' cited NEPA cases apply in this context, they counsel against vacatur where, unlike here, the underlying project has already begun and actions have already been undertaken in reliance on the agency's challenged decision.

### 2.  <u>Merits</u>

### a.  **Tribal Consultation**

"The NHPA involves a series of measures designed to encourage preservation of sites and structures of historic, architectural, or cultural significance." *San Carlos Apache Tribe*, 417 F.3d at 1093-94 (cleaned up).  For instance, "[s]ection 106 [of NHPA] requires that federal agencies take into account the effect of their undertakings on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." *Id.* at 1094 (cleaned up).  "If a proposed undertaking will have an effect on historic properties to which Indian tribes attach religious and cultural significance, [NHPA]

requires the federal agency to consult with the affected tribes before proceeding." *Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1059 (9th Cir. 2007), *overruled on other grounds*, 535 F.3d 1058 (9th Cir. 2008). *See also* 36 C.F.R. § 800.2(c)(2)(ii) ("[T]he agency official [must] consult with any Indian tribe . . . that attaches religious and cultural significance to historic properties that may be affected by an undertaking."). Under the relevant regulations, "[c]onsultation means the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process." 36 C.F.R. § 800.16(f). "The agency official shall ensure that consultation . . . provides the Indian tribe . . . a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." 36 C.F.R. § 800(c)(2)(A).

SALECA also requires "government-to-government consultation with affected Indian tribes concerning issues of concern to the affected Indian tribes related to the land exchange." 16 U.S.C. § 539p(c)(3)(A). It further requires the government to "consult with Resolution Copper and seek to find mutually acceptable measures to . . . address the concerns of the affected Indian tribes" and "minimize the adverse effects on the affected Indian tribes resulting from mining and related activities" on federal land included in the exchange. *Id.* § 539p(c)(3)(B). This "government-to-government consultation" and "minimize adverse effects" language mirrors the governing NHPA regulations. 36 C.F.R. § 800.2(c)(ii)(C) ("Consultation with an Indian tribe must recognize the government-to-government relationship between the Federal Government and Indian tribes."); *id.* § 800.6(a) ("The agency official shall consult with . . . other consulting parties, including Indian tribes . . . to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize or mitigate adverse effects on historic properties.") In light of this parallel language, and because the Tribe has not argued that SALECA's requirements

are materially different from NHPA's requirements,[16] the Court will assume without deciding that these requirements are the same.

i.      Relevant Facts

Appendix S of the FEIS suggests that discussions between the federal government and members of the Tribe regarding the land exchange began in 2003. (*San Carlos*, Doc. 109-2 at 405.) That year, Forest Service staff members met with members of the Western Apache Coalition, including the Tribe, to "discuss[] proposed land exchange and request[] Apache assistance in reviewing a CR survey." (*Id.*) In the two decades that followed, Resolution Copper asserts, without contradiction, that "the Forest Service conducted . . . 434 documented consultations with the San Carlos Apache Tribe." (*San Carlos*, Doc. 116 at 41.)[17] The following non-exhaustive list of tribal contacts is instructive:

Between 2003 and 2008, the Forest Service sent several official letters to the San Carlos Apache "Tribal Chair[]" and cultural staff; hosted a "formal" meeting[18] with "San Carlos Cultural Staff"; and hosted an "[i]nformal meeting with the Western Apache coalition." (*San Carlos*, Doc. 109-2 at 405-07.)

Between 2008 and 2015, the Forest Service continued communications with the Tribe through various emails and letters, as well as through formal and informal meetings. (*Id.* at 406-21.) Some of the topics discussed during this period included the possibility of a "pre-feasibility" or "baseline" study regarding the proposed mine (*id.* at 406-07, 415) and the possibility of an "[e]thnographic" study of the region (*id.* at 413). Following these discussions, the Tribe executed a Memorandum of Understanding ("MOU") with the Forest Service outlining "[p]rotocols for San Carlos participation in Ethnohistoric/Ethnographic Study." (*Id.* at 414.)

---

[16]     One possible exception is that SALECA explicitly requires the FEIS to incorporate discussion of adverse effects on cultural resources and possible mitigation measures. 16 U.S.C. § 539p(c)(9)(C).

[17]     The Tribe does not dispute this number. Instead, as discussed in more detail below, the Tribe disputes whether certain consultations qualify as meaningful and/or "government-to-government" consultations.

[18]     Appendix S notes that meetings are designated as "formal" when a "Forest Service line officer [is] present." (*See, e.g.*, *San Carlos*, Doc. 109-2 at 406.)

1    In 2015, the "Ethnographic and Ethnohistoric Study" was completed (*id.* at 416),

2    including a literature review of "archival and existing literature" as well as "oral interviews

3    and field visits with Tribal members to collect oral history and knowledge" (*San Carlos*,

4    Doc. 106-3 at 44).    Members of the Tribe (as well as members of other tribes)

5    "accompanied research staff to important places throughout the study area and shared

6    information about those places."    (*Id.*)    As a result of that study and "Tribal Monitor

7    surveys," the Forest Service recorded "594 special interest areas," including various

8    "cultural resources" and "natural resources."  (*Id.* at 50.)  In addition, "the ethnographic

9    study identified seven places of traditional and cultural importance within the direct

10   analysis area." (*Id.* at 51.)

11   Between 2015 and 2016, the Forest Service continued communications with the

12   Tribe concerning the proposed "Baseline" project for "Hydrologic and Geotechnical Data

13   Gathering Activities" and an accompanying environmental assessment of that proposed

14   plan ("EA").  (*San Carlos*, Doc. 109-2 at 415, 417-25.)  Following publication of the EA,

15   the Tribe brought a lawsuit that challenged, *inter alia*, the sufficiency of the tribal

16   consultations.  *Concerned Citizens*, 279 F. Supp. 3d at 939-42.  Judge Campbell rejected

17   that challenge, explaining:

> Consultation is a two-way street.  The administrative record makes clear that
> the Forest Service made numerous and substantial efforts to consult, while
> the Tribe made no meaningful effort to engage with the Forest Service.  Were
> the Court to find that an agency had not satisfied the NHPA's consultation
> requirements simply because no actual consultation occurred, a tribe could
> block any undertaking by refusing to cooperate.  The NHPA does not
> guarantee actual meaningful consultation, only that the tribe will have a
> reasonable opportunity for such consultation.  The Tribe had such an
> opportunity here.

*Id.* at 942.

In August 2015, following the passage of SALECA, the Forest Service sent an

"[o]fficial letter" to the Tribe's "[l]eaders and cultural staff" inviting them "to consult about

the NDAA Land exchange."  (*San Carlos*, Doc. 109-2 at 419.)

From 2015 to 2021, the Forest Service communicated regularly with tribal members through emails and letters.  (*See generally id.* at 418-87.)  The Forest service also hosted formal and informal meetings with "[t]ribal leaders and staff."  (*See, e.g.*, *id.* at 427.)  The topics discussed during this period included: the possibility of a MOU between the Tribe and the Forest Service (*id.* at 423); the forthcoming EIS (*id.* at 427); the proposed "mining technique[] and water analyses" (*id.* at 443); and the development of a proposed Programmatic Agreement ("PA") to guide further consultations (*id.* at 435).

In November 2018, the Forest Service made a "Field Trip" in the "Camp Verde area" along with members of the Tribe and other tribes to examine "potential groves."  (*Id.* at 438.)  And in May 2019, tribal monitors led a tour of the proposed Skunk Camp tailings storage alternative, which tour included members of the Tribe.  (*Id.* at 442.)

Between 2018 and 2021, the Forest Service began including the Tribe in the development of a PA (*id.* at 434-82) with the aim of guiding future tribal consultations and outlining various mitigation measures concerning the land exchange and mine.  (*San Carlos*, Doc. 109-5 at 4-5 [ACHP comments: "Consultation has included the . . . San Carlos Apache Tribe . . . and resulted in the development of a draft PA that would provide a mechanism for further identification and evaluation of historic properties . . . as well as a broad array of measures to attempt to resolve identified adverse effects."].)  This process involved at least eight different versions of the PA, with the Forest Service soliciting comments and input from the Tribe (both in-person and via letter) concerning the successive drafts.  (*See, e.g.*, *San Carlos*, Doc. 109-2 at 475 ["San Carlos Apache Tribe . . . Provided comments on PA version 8."]; *id.* at 479 ["Reply to San Carlos . . . comments on PA version 8."].)

On November 22, 2019, the Forest Service met with the San Carlos Apache Tribal Council "during a special Tribal Council meeting."  (*San Carlos*, Doc. 116-2 at 42.)  At the meeting, the Forest Service solicited comments on the Draft EIS (*id.*), and the parties discussed the "[u]pdated status of EIS process, answered questions" and heard a "presentation by San Carlos water consultant."  (*San Carlos*, Doc. 109-2 at 455.  *See also*

1    *San Carlos*, Doc. 106-3 at 169 ["A seventh meeting, with the San Carlos Apache Tribe,

2    took place on November 22, 2019."].)

3        Between 2019 and 2021, the parties continued exchanging emails and letters and

4    participating in meetings concerning many of the same topics outlined above. (*San Carlos*,

5    Doc. 109-2 at 456-88.)  During this period, the Tribe also began expressing concerns about

6    the need for a supplemental EIS.  (*Id.* at 481.)

7        On March 1, 2021, the Secretary of Agriculture directed the Forest Service to

8    "rescind the FEIS and ROD" because "additional time [was] necessary to fully understand

9    concerns raised by Tribes and the public and the project's impacts to these important

10   resources and ensure the agency's compliance with federal law."  (Doc. 36 at 2.)

11       In September 2021, the Forest Service sent an email inviting the Tribe to participate

12   in an October 2021 listening session to "re-initiate consultations." (*San Carlos*, Doc. 109-

13   2 at 488, 491.)  On October 19, 2021, the listening session took place.  (*Id.* at 491.)

14       Between 2021 and 2025, the Forest Service continued sending emails and letters to

15   the Tribe, attempting to arrange meetings (*id.* at 488-510), and providing updates on topics

16   such as "water quality documents" and continued "review of hydrology aspects of the RCM

17   EIS" (*see, e.g.*, *id.* at 494, 500).  The Forest Service also continued its consultation efforts

18   with the various other tribal parties.  (*Id.* at 488-510.)

19       In November 2021, the Tribe's Chairman ("Chairman Rambler") "authorized his

20   admin to set a telephone meeting with [Associate Deputy Chief] Gyant."  (*Id.* at 492.)

21       In December 2021, the Forest Service sent an email "[a]sk[ing] San Carlos Tribe to

22   select date and time for meeting and provide topics they would like to discuss."  (*Id.* at

23   493.)

24       On February 10, 2022, the Forest Service met with Chairman Rambler, as well as

25   with the Tribe's attorney general ("San Carlos AG"), at Oak Flat in a meeting marked in

26   the FEIS as "CONFIDENTIAL."  (*Id.* at 495.)  The next day, another meeting was held in

27   Peridot, Arizona, to discuss "San Carlos' concerns about the project and the FEIS" and

28   other confidential topics.  (*Id.*)

In March 2023, the "USDA Under Secretary Wilkes" and other Forest Service staff attended a tour of Oak Flat along with "[p]resentations by proponents for saving Oak Flat." (*Id.* at 503.)

In April 2023, the Forest Service held another tribal listening session with multiple tribal members present, including members of the Tribe, and "[d]iscussed issues identified by Tribes and the status of the EIS." (*Id.* at 504.)

In August 2023, Chairman Rambler sent a letter to the Forest Service "propos[ing] a MOU, a working group, and 6 topics to be discussed by the working group." (*Id.* at 505.)

On May 15, 2024, after exchanging drafts of the MOU, the Forest Service met with the San Carlos Tribal Council in San Carlos, Arizona, to "[d]iscuss[] EIS and proposed consultation MOU." (*Id.* at 507.)

On June 7, 2024, the Forest Service met virtually with the San Carlos AG and other tribal staff to continue discussions of the proposed MOU. (*Id.* at 509. *See also San Carlos*, Doc. 119-2 [meeting agenda and transcript].) From the Tribe's perspective, the meeting was insulting. (*San Carlos*, Doc. 119 at 18 ["[A] 'transcript' of that June 7, 2024, meeting . . . [demonstrates] that the Forest Service resisted even the most basic acknowledgements, including whether Oak Flat was part of the Tribe's ancestral territory."].)

In April 2025, the Secretary of Agriculture sent a letter to the Tribe "[c]onvey[ing] USDA decision to publish the FEIS and draft Record of Decision, and conclude NHPA Section 106 process." (*San Carlos*, Doc. 109-2 at 510.)

<div align="center">

ii.    Sufficiency Of Consultation

</div>

Two baseline principles guide the analysis of the Tribe's challenge to the Forest Service's compliance with its tribal consultation obligations under NHPA and SALECA. First, the obligation to engage in consultation is not the same thing as an obligation to reach an outcome that is acceptable from the perspective of the party being consulted. Section 106 of NHPA is simply "a 'stop, look, and listen' provision." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999). It is "chiefly procedural in nature." *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 859 (9th Cir. 1982). Second, as

<div align="center">

- 71 -

</div>

1    discussed, because NHPA and SALECA do not create a private right of action, the Tribe's

2    challenge to the Forest Service's compliance with the consultation obligations created by

3    those statutes arises under the APA. *Tohono O'odham Nation*, 138 F.4th at 1200

4    ("Plaintiffs bring their NHPA challenge under the APA."); *San Carlos*, 417 F.3d at 1093.

5    The APA's arbitrary-and-capricious standard thus applies. *See, e.g.*, *Morongo Band of

6    Mission Indians v. F.A.A.*, 161 F.3d 569, 573 (9th Cir. 1998) ("Decisions regarding NHPA

7    . . . [are] reviewed under the arbitrary and capricious standard."); *Western Watersheds

8    Project v. McCullough*, 2023 WL 4557742, *2 (9th Cir. 2023) ("The BLM's identification

9    of tribes for consultation was not arbitrary or capricious and did not violate NHPA . . . .").

10   Under that "deferential" standard, the question is whether the Forest Service's consultation

11   efforts fell "within a zone of reasonableness." *Prometheus Radio Project*, 592 U.S. at 423.

12          Applying those standards, the Tribe is unlikely to prevail on its tribal consultation

13   challenges. As noted, the governing regulations only require the Forest Service to "seek[],

14   discuss[], and consider[] the views" of the Tribe and "*where feasible*, seek[] agreement."

15   36 C.F.R. § 800.16(f) (emphasis added). This requires the Forest Service to provide the

16   Tribe "a *reasonable opportunity* to identify its concerns" and "articulate its views on the

17   undertaking's effects on [affected] properties, and participate in the resolution of adverse

18   effects." 36 C.F.R. § 800(c)(2)(iii) (emphasis added). The voluminous letters, emails, and

19   meetings documented in the FEIS demonstrate that the Forest Service consistently sought

20   the Tribe's input regarding the project over a period of more than two decades and provided

21   many, many opportunities for the Tribe to participate in the decision-making process. Nor

22   can it be ignored that the Tribe brought a previous challenge regarding the adequacy of the

23   Forest Service's consultation efforts related to the land exchange, only for Judge Campbell

24   to determine that those consultation efforts were sufficient, in part because the Tribe

25   refused to engage in good faith. *Concerned Citizens*, 279 F. Supp. 3d at 941-42. Although

26   the Tribe is dissatisfied with the outcome that ultimately resulted from the tribal

27   consultation process, such dissatisfaction does not show the process itself was insufficient.

28   *See, e.g.*, *Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dept. of Interior*, 608 F.3d

592, 610 (9th Cir. 2010) ("In sum and as reflected in the record, the BLM has consulted with the Tribe regarding PCRIs within the project area for many years. In addition, the Tribe has made no showing that it would have provided new information had it been consulted again earlier in the Amendment's approval process. We therefore conclude that the BLM did not violate its obligation to consult with the Tribe and thus did not violate the NHPA."); *Navajo Nation*, 479 F.3d at 1060 ("[B]ecause of the extensive record of consultation undertaken by the Forest Service in this case, we agree with the district court that although the consultation process did not end with a decision the tribal leaders supported, this does not mean that the Forest Service's consultation process was substantively and procedurally inadequate.") (cleaned up).

The Tribe's more specific objections do nothing to change this conclusion. First, the Tribe appears to argue that any tribal consultations that took place before the March 2021 withdrawal of the initial EIS are irrelevant. (*San Carlos*, Doc. 105 at 23-24.) But the Ninth Circuit has rejected variants of this argument. *See, e.g.*, *Te-Moak*, 608 F.3d at 608-10 (rejecting NHPA-based tribal consultation challenge in part due to "BLM's previous consultation with the Tribe for the original HC/CUEP and other projects in the area" and emphasizing that those earlier consultation efforts took place "for many years"); *Summit Lake Paiute Tribe of Nev. v. U.S. Bureau of Land Mgmt.*, 496 F. App'x 712, 714-15 (9th Cir. 2012) ("The Tribe argues that BLM did not adequately consult with it regarding the proposed re-route, depriving it of its right to participate in the resolution of adverse effects as required by the regulations. *In addressing the adequacy of consultation, we consider both the consultation on the re-routing and the consultation that was conducted in connection with the initial approval of the project*. Indeed, it was BLM's consultation with the Tribe, which started at least as early as January 2009, that led it to propose the re-route in the first place, and BLM conducted four site visits with the Tribe to try to ascertain the boundaries of the traditional cultural property. We hold that this process, taken as a whole, fulfilled BLM's consultation obligation.") (emphasis added) (cleaned up). As noted, Judge Campbell previously rejected a challenge to the adequacy of one component of those earlier

consultation efforts. *Concerned Citizens*, 279 F. Supp. 3d at 941-42.

Second, the Tribe argues for the first time in its reply brief that only consultations with the San Carlos Apache *Tribal Council* qualify as "government-to-government consultation." (*San Carlos*, Doc. 119 at 17.)[19]  The Tribe thus argues that many of the letters, phone calls, "listening sessions," and other meetings identified in the FEIS, which involved communications with other San Carlos officials (including the San Carlos AG), do not count. (*Id.*)  As an initial matter, this argument is likely forfeited because it was raised for the first time in a reply brief, *Zamani*, 491 F.3d at 997, and the Tribe did not cite any supporting authority in its reply.  Moreover, given the interconnected nature of the voluminous tribal contacts described in the FEIS, which suggests the Tribal Council was kept apprised of the Forest Service's consultation efforts with other tribal officials and representatives, it would be surprising if those consultation efforts were *irrelevant* for purposes of evaluating the adequacy of the Forest Service's consultation efforts.[20]

In any case, the record establishes that the Forest Service's 400+ consultations and communications with tribal representatives included two formal meetings, in November 2019 and May 2024, with the Tribal Council (*San Carlos*, Doc. 109-2 at 258, 455, 507); additional formal meetings with individual members of the Tribal Council, such as the Vice-Chair (*id.* at 417); and a variety of efforts to schedule even more formal meetings with the Tribal Council (*see, e.g.*, *id.* at 430) and/or meetings and phone calls with Chairman Rambler, the chairman of the Tribal Council (*see, e.g.*, *id.* at 492, 503).  It is difficult to see how such consultation efforts could be deemed inadequate under the

---

[19]    The portion of the Tribe's motion raising consultation-related challenges says nothing about the consultations being directed toward the wrong tribal representatives. (*San Carlos*, Doc. 105 at 23-24.)

[20]    With that said, the Court has identified authority from outside the Ninth Circuit that may provide support for the Tribe's position regarding which representatives matter for purposes of "government-to-government" consultation duties. *City of Phoenix, Ariz. v. Huerta*, 869 F.3d 963, 971 (D.C. Cir. 2017) ("[T]he FAA failed to fulfill these obligations because it consulted only low-level employees in the City's Aviation Department, whom the City had never designated as its representatives.  True, the City never informed the FAA that low-level Aviation Department employees were inadequate points of contact, but that is irrelevant.  Neither statute nor regulation imposes a duty on local governments to affirmatively inform the agency of their chosen representatives.  Just the opposite: the agency must ask local governments who their authorized representatives are.").

relevant Ninth Circuit precedents.  *Te-Moak*, 608 F.3d at 609 (9th Cir. 2010) (rejecting tribal consultation claim where "as reflected in the record, the BLM has consulted with the Tribe regarding PCRIs within the project area for many years"); *Navajo Nation*, 479 F.3d at 1060 (rejecting tribal consultation claim in light "of the extensive record of consultation undertaken by the Forest Service in this case").  *See also Concerned Citizens*, 279 F. Supp. 3d at 942 ("The administrative record makes clear that the Forest Service made numerous and substantial efforts to consult . . . .").

Third, the Tribe contends the formal May 2024 meeting between the Forest Service and the Tribal Council was not meaningful because "[a]t most, the Forest Service consulted with the San Carlos Council about the terms of a [MOU] to guide consultation that was never executed." (*San Carlos*, Doc. 119 at 17.)  But Chairman Rambler's declaration does not support the assertion that the parties only discussed the MOU at the May 2024 meeting. (*San Carlos*, Doc. 89-5.)   In that declaration, Chairman Rambler lists various "concerns that the Tribe expressed at the meeting," which included, among other things, (1) concerns that the "EIS is deeply flawed," (2) concerns about "[w]hether the Forest Service would fully assess the water needs and assess the viability of potential water sources," and (3) concerns about "[w]hether the Forest Service would provide thorough written responses to BLM's concerns."  (*Id.* ¶ 7.)

Fourth, to the extent the Tribe contends that various features of the parties' consultations (such as the fact that no MOU was ever finalized) show that the Forest Service acted in bad faith when carrying out its consultation duties, this claim is not supported by the law, *see Navajo Nation*, 479 F.3d at 1060 ("[a]lthough the consultation process did not end with a decision the tribal leaders supported, this does not mean that the Forest Service's consultation process was substantively and procedurally inadequate"), or by the record.  For example, the Tribe argues that "the Forest Service resisted even the most basic acknowledgements, including whether Oak Flat was part of the Tribe's ancestral territory." (*San Carlos*, Doc. 119 at 18.)  To support this argument, the Tribe cites the June 7, 2024 transcript of a virtual meeting between the Forest Service and certain tribal

representatives, including the San Carlos AG.  (*San Carlos*, Doc. 119-2.)  In that meeting, the Forest Service representative explained the decision to strike certain land acknowledgements from the proposed MOU: "[T]he concern of the Forest Service here was that . . . enumerating these facts might implicate some of the facts in the ongoing litigation regarding the land exchange." (*Id.* at 27.)  The Forest Service then asked if these acknowledgments could be characterized as "[t]he San Carlos's perspective on these facts" and the tribal representatives pushed back, explaining that these acknowledgments were important for "establishing trust with the Council and the tribe." (*Id.* at 27-28.)  As a possible compromise, the Tribe proposed "putting a 408 label"[21] on the proposed acknowledgments and the Forest Service asked if the Tribe would be "willing to draft up some of that . . . 408 language." (*Id.* at 28.)  Rather than evincing bad faith, this exchange demonstrates—at least to the Court's eye—the enormous difficulties the parties faced in finding common ground given the specter of ongoing litigation and the Tribe's vehement opposition to the land exchange.

Fifth, the Tribe argues the Forest Service's consultation efforts were insufficient because they were not "responsive to the issues raised by the Tribe" and therefore not "meaningful." (*San Carlos*, Doc. 119 at 17-18.)  However, the record demonstrates that the Forest Service responded to many of the Tribe's concerns.  For example, during the early phases of tribal consultation, the Tribe participated extensively in the development of a PA to identify possible mitigation measures concerning the land exchange.  Although "the PA was never executed," some of the "mitigation measures identified in the PA . . . will now be implemented through the final ROD and special use permit for use of Forest Service lands." (*San Carlos*, Doc. 106-3 at 171 [FEIS page 1000].)  Among the mitigation measures addressed in the original PA and incorporated into the DROD are "preparation of an archeological [historic properties treatment plan]"; an "archeological research design" that will be "completed prior to the proposed ground-disturbing activities in the GPO project areas"; a plan to mitigate adverse "visual, atmospheric, auditory, and

---

[21]     Presumably this refers to Federal Rule of Evidence 408.

cumulative effects"; and an "archeological database fund"[22] "[i]n recognition of the substantial loss of cultural resources and historic properties on State Trust Lands." (*San Carlos*, Doc. 116-2 at 49-50 [DROD pages 38-39].)

In addition, following the May 2024 meeting between the Forest Service and the Tribal Council, a Forest Service representative, Troy Heithecker, sent a letter to Chairman Rambler assuring him that "issues raised through consultation have been considered and carefully analyzed." (*San Carlos*, Doc. 85-8 at 2.)  Heithecker went on to address some of the concerns raised in the May 2024 meeting, explaining that "[b]ased on the information obtained through our consultation efforts and reviews of the withdrawn FEIS, the Forest Service is not aware of any information that would require a complete reinitiation of the [FEIS] process." (*Id.* at 3.)  Heithecker also explained that, in response to tribal concerns about the mine's impact on water, the Forest Service conducted "additional analysis of potential indirect impacts to groundwater in the area known as the Cutter Basin" and "engaged a Bureau of Land Management (BLM) hydrological review team to review the water analysis section of the FEIS." (*Id.*)  Heithecker concluded: "While we have determined that further discussion on some issues is complete, we recognize that compliance with Congress's mandate to complete the SALECA land exchange cannot be reconciled with Tribal concerns and understand there are still issues that allow for further engagement.  I am committed to continued collaborative dialogue.  Therefore, I am inviting you to reach out directly to me to engage on this proposed project in formal consultation at a time and place convenient for you and your leadership." (*Id.* at 4.)

More substantively, it appears the Forest Service incorporated a more thorough response to the Tribe's concerns regarding water at page 437 of the FEIS:

> During the re-initiation of Tribal consultation in 2021-2022, concerns were raised by the San Carlos Apache Tribe about indirect impacts to Tribal water resources in the Cutter Basin caused by Resolution Copper dewatering around the East Plant Site, as well as long-term changes in regional

---

[22]    The Forest Service Acknowledges that it "no longer has the authority to require this measure" but that the measure is enforceable through "Letter Agreements" with Resolution "dated January 12, 2021." (*San Carlos*, Doc. 116-2 at 50.)

groundwater from block-caving. . . .    In response to these comments, the Forest Service Conducted an analysis of these potential indirect effects . . . .

(*San Carlos*, Doc. 106-2 at 68. *See also AMRC*, Doc. 93-1 at 235 [FEIS page R-356: "After the January 2021 publication of the Rescinded FEIS, we received further insights into the concerns raised by the San Carlos Apache Tribe with respect to water impacts.  We understand that the concern is not of direct drawdown impacts but of the potential for cascading regional effects to cause greater groundwater use near Tribal lands.  An analysis of this potential has now been added to section 3.7.1 of the FEIS."].)

### b.    **ACHP Consultation**

In addition to challenging the sufficiency of the Forest Service's tribal consultation efforts, the Tribe also argues that the Forest Service failed to adequately consult ACHP.  As part of the NHPA consultation process, the Forest Service must "afford [ACHP] a reasonable opportunity to comment with regard to the undertaking."  *Tohono O'odham Nation*, 138 F.4th at 1193 (quoting 54 U.S.C. § 306108) (cleaned up).  After identifying potential adverse effects on a historic property, "[t]he agency official shall notify [ACHP][23] of the adverse effect" and "invite [ACHP] to participate in the consultation" "to seek ways to avoid, minimize or mitigate the adverse effects."  36 C.F.R. § 800.6(a)(1), (b)(2).[24]  For "certain complex project situations or multiple undertakings," ACHP "and the agency official may negotiate a programmatic agreement to govern the implementation of a particular program or the resolution of adverse effects."  *Id.* § 800.14(b).

"After consulting . . . the agency official, the [State Historic Preservation Officer/Tribal Historic Preservation Officer], or [ACHP] may determine that further consultation will not be productive and terminate consultation.  Any party that terminates consultation shall notify the other consulting parties and provide them the reasons for

---

[23]    The regulations refer to ACHP as the "Council."  36 C.F.R. § 800.16(g) ("*Council* means the Advisory Council on Historic Preservation or a Council member or employee designated to act for the Council.").

[24]    Alternatively, ACHP has the option to enter "into the section 106 process . . . [w]hen the Council determines that its involvement is necessary."  36 C.F.R. § 800.2(b).

1    terminating in writing." *Id.* § 807(a). "If [ACHP] terminates consultation, the [ACHP]

2    shall notify the agency official . . . of the termination" and "transmit its comments within

3    45 days." *Id.* § 800.7(a)(4), (c)(2). The head of the agency, in turn, "shall take into account

4    [ACHP's] comments in reaching a final decision on the undertaking," including

5    "[p]reparing a summary of the decision that contains the rationale for the decision and

6    evidence of consideration of [ACHP's] comments" and "providing [the summary] to

7    [ACHP] prior to approval of the undertaking." *Id.* § 800.7(c)(4).

8                        i.    <u>ACHP Consultations Generally</u>

9            The evidence bearing on the issue of ACHP consultations is as follows. "On

10   December 7, 2017, the [Forest Service] notified the ACHP of its finding of adverse effect"

11   regarding the proposed mine and the land exchange, "and on December 21, 2017, the

12   ACHP informed the [Forest Service] that it would participate in the consultation." (*San

13   Carlos*, Doc. 109-5 at 4.) Over the next four years, ACHP "participated in the Section 106

14   consultation to seek ways to avoid, minimize, or mitigate adverse effects to historic

15   properties that would result from this undertaking." (*San Carlos* 109-3 at 2.) ACHP also

16   assisted in coordinating consultations with interested parties and "the development of a

17   draft PA that would provide a mechanism of further identification and evaluation of historic

18   properties." (*San Carlos*, Doc. 109-5 at 4-5.) As discussed in the preceding section, the

19   PA went through numerous iterations. Except for ACHP, all of the other required

20   signatories signed the PA. (*San Carlos*, Doc. 82-15 at 1.)

21           On February 11, 2021, ACHP notified the Forest Service that "further consultation

22   in this case would be unproductive and therefore, we are hereby terminating consultations

23   pursuant to 36 CFR § 800.7(a)(4)." (*San Carlos*, Doc. 109-3 at 2.) ACHP reached this

24   decision because "it [was] clear that the proposed undertaking would destroy significant

25   historic properties, including the highly significant Oak Flat, and the measures in the PA

26   [were] not sufficient to adequately resolve those adverse effects." (*Id.*)

27           On March 29, 2021, 45 days later, ACHP transmitted its comments to the Secretary

28   of Agriculture. (*San Carlos*, Doc. 109-5.)

1    On April 17, 2025, the Secretary of Agriculture responded to those comments in a

2  five-page letter.  (*San Carlos*, Doc. 82-15.)  The Secretary addressed each of ACHP's

3  comments individually and explained how those comments informed the ultimate decision

4  to publish the FEIS and the DROD.  (*Id.*)  More specifically, in response to ACHP's

5  comment that the Secretary "should work with the Administration and Congress to . . .

6  amend or repeal [SALECA]," the Secretary explained that the USDA is prohibited by

7  statute from engaging in lobbying activities.  (*Id.* at 3.)  As for ACHP's recommendation

8  to "use further discussions with Tribes and other stakeholders to develop and evaluate

9  alternatives and further modifications to the undertaking," the Secretary summarized the

10  additional consultation efforts that took place following ACHP's comments in 2021 and

11  explained that the USDA hadn't been able to identify better alternatives or permissible

12  modifications under SALECA.  (*Id.* at 3-4.)  As for ACHP's recommendation to "commit

13  to carrying out mitigation measures in the proposed PA" even though the PA was never

14  fully executed, the Secretary responded that the USDA "remained committed" to carrying

15  out those mitigation measures that remained in its power.  (*Id.* at 4.)  The remaining three

16  comments from ACHP concerned systematic changes the USDA should implement in

17  future consultation efforts not involving Oak Flat.  (*Id.* at 4-6.)  The Secretary explained,

18  in response, how the USDA would address those concerns moving forward.  (*Id.*)

19    The Tribe argues these consultation efforts were inadequate because "[t]he Forest

20  Service has not substantively addressed the comments ACHP offered when it terminated

21  consultation or that it presented by letter on March 29, 2021."  (*San Carlos*, Doc. 105 at

22  23.)  The Tribe also faults the Secretary for "defend[ing] the 2021 FEIS, a position contrary

23  to the Forest Service's statements when it withdrew the 2021 FEIS."  (*Id.* at 24.)

24    There is little caselaw on this subject.  What appears to be the most on-point case

25  comes from the Third Circuit in *Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686 (3d

26  Cir. 1999).  There, the plaintiff challenged a decision by the Federal Highway

27  Administration ("FHWA") to place a new bridge in a location that would send traffic

28  through a nearby historic district.  *Id.* at 690.  As part of the challenge, the plaintiff argued

that FHWA failed to adequately defer to the ACHP's preferred alternative route.  *Id.* at 695-97.  The court rejected this argument, concluding that FHWA adequately considered ACHP's input because (1) ACHP was heavily involved in the planning process, (2) FHWA hired a consultant recommended by ACHP, and (3) FHWA's disagreement with ACHP was adequately justified and not arbitrary and capricious.  *Id.*  In short, the agency "demonstrate[d] that it ha[d] read and considered" ACHP's comments and "gave the ACHP's conclusion genuine attention." *Id.* at 696.  Here, too, the Secretary acknowledged ACHP's concerns and recommendations and provided detailed, reasoned responses to them.  ACHP was involved in the Forest Service's consultation efforts early on, and the Secretary provided adequate justifications for its decision to publish the FEIS, notwithstanding ACHP's comments.

As for the Tribe's assertion that the Secretary's response to ACHP's comments was inadequate because the Secretary "defended the 2021 FEIS"—it's not entirely clear what the Tribe is referring to.  It seems this argument concerns the Secretary's response to ACHP's second comment that "USDA should use further discussions with Tribes and other stakeholders to develop and evaluate alternatives and further modifications to the undertaking . . . ." (*San Carlos*, Doc. 82-15 at 3.)  In response, the Secretary stated that "USDA worked extensively with Tribes and other stakeholders to identify potential modifications and mitigations that might avoid adverse effects." (*Id.*)  The Secretary then stated that "[n]evertheless, in 2021, the Secretary of Agriculture ordered the re-initiation of consultation with Tribal nations after the [FEIS] was rescinded to redouble the agency's efforts . . . .  To date, additional consultations with the Tribes has not uncovered other potential mitigation or alternatives that would allow USDA to comply with the SALECA while avoiding adverse impacts to Tribal interests." (*Id.*)  Nothing in this passage is arbitrary or capricious—as discussed elsewhere in this order, the tribal consultation process was quite complicated due to the Tribe's vehement, if understandable, opposition to the very concept of the land exchange.

…

1          ii.    Programmatic Agreement

2          The Tribe also contends the Forest Service's consultation efforts with ACHP were

3    inadequate because "[t]he Forest Service did not complete a Programmatic Agreement for

4    treatment of historic and cultural properties in 2021 and still has not done so." (*San Carlos*,

5    Doc. 105 at 23.)  But this argument misunderstands the nature of the PA.  The regulations

6    provide that "the Advisory Council and the agency *may* negotiate a programmatic

7    agreement." *Tohono O'odham Nation*, 138 F.4th at 1194 (cleaned up).  Although violating

8    a *fully executed* PA might violate NHPA, *id.* at 1202-04, the PA in this case was never fully

9    executed.  As explained above, if ACHP and the agency are unable to reach an agreement

10   on the PA, ACHP can terminate consultations and transmit its comments to the agency

11   within 45 days.  So long as the agency responds to those comments and takes them into

12   account when making a final decision—which occurred here—nothing in NHPA or its

13   governing regulations prevents the project from moving forward.

14          3.    Summary As To Consultation Claims

15          Although the Tribe will likely be able to overcome the jurisdictional and other

16   threshold challenges that Defendants have raised to its consultation claims, the Tribe has

17   not shown a likelihood of success on the merits of those claims or even serious questions

18   going to the merits of those claims.

19      D.    **NFMA Claims**

20          1.    Threshold Issues

21          The parties' briefing regarding the jurisdictional and threshold issues raised by

22   Defendants focuses almost exclusively on how those arguments apply to Plaintiffs'

23   appraisal, NEPA, and consultation claims.  The one specific argument that Resolution

24   Copper raises in relation to AMRC's NFMA claims is that they are "premature because the

25   draft ROD is not a final agency action."  (*AMRC*, Doc. 94 at 45-46.)

26          The Court agrees and thus finds it unnecessary to address how the remaining

27   jurisdictional and threshold issues apply in this context.  As with all of the other claims at

28   issue here, "agency decision-making under NFMA is governed by the judicial review

1    provisions of the APA because NFMA does not contain an express provision for judicial

2    review." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir.

3    2005). As a result, the "final agency action" requirement again applies.

4        AMRC's essential argument is that the Forest Service violated NFMA's

5    implementing regulations, which require any change to a forest plan to be preceded by a

6    formal notice-and-comment process, by including changes to the Forest Plan in the FEIS

7    and DROD without following such a process. But as discussed in relation to Plaintiffs'

8    NEPA claims, the proposed changes to the Forest Plan discussed in the FEID and DROD

9    are just that—proposed changes. No final decisions or changes have been made yet. It

10   follows that there has been no consummation of the agency's decision-making process, as

11   required to satisfy the first element of *Bennett*'s finality test.

12                           2.    Merits

13       Although the analysis could end there, the Court will also address the merits.

14   According to AMRC, 36 C.F.R. Part 219 provides that any proposed amendment to a forest

15   plan must be preceded by a period of public review, comment, and notice. (*AMRC*, Doc.

16   87 at 27-29.) AMRC further contends that the FEIS "included, for the first time, a new

17   proposal to substantially amend the Tonto National Forest Plan." (*Id.*) It follows,

18   according to AMRC, that "the agency's decision to bypass public review and amend the

19   Forest Plan . . . violates the substantive and procedural requirements of the NFMA." (*Id.*)[25]

20       AMRC is unlikely to succeed on this claim. As background, NFMA provides the

21   statutory framework for management of National Forest lands. Under NFMA, the Forest

22   Service and Secretary of Agriculture must develop and maintain a forest plan for each unit

23   of the National Forest System. 16 U.S.C. § 1604(a). "[T]he Forest Service implements

24   each forest plan by approving or disapproving site-specific actions." *N. Cascades

25   Conservation Council v. United States Forest Serv.*, 2021 WL 8344155, *5 (W.D. Wash.

26   _____

27   [25]    AMRC also makes a passing assertion that the Forest Service's challenged conduct
     violates FLPMA and NEPA (*AMRC*, Doc. 87 at 29), but AMRC does not develop this
28   assertion in any depth or elaborate on this assertion in its reply brief. *Martinez-Serrano v.
     INS*, 94 F.3d 1256, 1259 (9th Cir. 1996) ("Issues raised in a brief that are not supported by
     argument are deemed abandoned.").

1    2021), *report and recommendation adopted*, 2022 WL 1043930 (W.D. Wash. 2022).  *See*

2    *also* 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments

3    for the use and occupancy of National Forest System lands shall be consistent with the land

4    management plans.").

5         The Secretary of Agriculture is also required to "promulgate regulations . . . that set

6    out the process for the development and revision of the land management plans." 16 U.S.C.

7    § 1604(g).  The regulations create at least two possibilities for amending a forest plan.

8    Under the first option, "the responsible official shall . . . [p]rovide opportunities for public

9    participation as required in § 219.4 and public notification as required in § 219.16." 36

10   C.F.R. § 219.13(b)(2).  Part 219.4, in turn, requires "[t]he responsible official" to "provide

11   opportunities to the public for participating in the assessment process; developing a plan

12   proposal; . . . [and] commenting on the proposal." 36 C.F.R. § 219.4(a).  Part 219.16

13   requires "formal public notification" to "be provided . . . [t]o invite comments on a

14   proposed plan, plan amendment, or plan revision, and associated environmental analysis"

15   with the comment period lasting "at least 90 days" for a plan requiring a draft EIS.  36

16   C.F.R. § 219.16(a)(2).

17        Meanwhile, the second option applies "when a plan amendment is approved in a

18   decision document approving a project or activity and the amendment applies only to the

19   project or activity," in which case "the notification requirements of 36 CFR part 215 or

20   part 218, subpart A, appl[y] instead." 36 C.F.R. § 219.16(b).  *See also* 36 C.F.R.

21   § 219.59(b) ("When a plan amendment is approved in a decision document approving a

22   project or activity and the amendment applies only to the project or activity, the

23   administrative review process of 36 CFR part 215 or part 218, subpart A, applies instead

24   of the objection process established in this subpart.").  Part 218 creates a modified

25   "objection" process where public participation takes place contemporaneously with

26   publication of a final EIS: "[T]he responsible official must promptly make available the

27   final EIS . . . and a [DROD] to those who have requested the documents or are eligible to

28   file an objection" and publish "legal notice of the opportunity to object" "in the applicable

1    newspaper of record."  36 C.F.R. § 218.7(b)-(c).  "Written objections, including any

2    attachments, must be filed with the reviewing officer within 45 days following the

3    publication date of the legal notice."  36 C.F.R. § 218.26(a).  "The responsible official may

4    not sign a ROD . . . until the reviewing officer has responded in writing to all pending

5    objections."  36 C.F.R. § 218.12(a).

6        Here, it fell within the "broad zone of reasonableness," *Seven County Infrastructure*

7    *Coalition*, 145 S. Ct. at 1513, for the Forest Service to conclude that the proposed

8    amendments to the Forest Plan set forth in the FEIS are project-specific—indeed, all of

9    those changes will flow from the land exchange and Resolution Copper's plan to begin

10   mining for copper.  And if the proposed changes are project-specific, this means that "the

11   notification requirements of 36 CFR part 215 or part 218, subpart A, appl[y] instead" of

12   the more formal requirements described elsewhere in Part 219.  36 C.F.R. § 219.16(b).

13   Consistent with the requirements set forth in Part 218,[26] the Forest Service published the

14   requisite legal notice in the *Arizona Capitol Times* on June 20, 2025.  *Copper Project &*

15   *Land Exchange and Project–Specific Forest Plan Amendment, Legal Notice*, Ariz. Capitol

16   Times, (June 20, 2025), https://www.resolutionmineeis.us/sites/default/files/feis/arizona-

17   capitol-times-resolution-feis-drod-20250620.pdf.   The *Arizona Capitol Times* is the

18   applicable "newspaper of record" as defined in 36 C.F.R. § 218.2.  *Newspapers Used for*

19   *Publication of Legal Notices in the Southwestern Region, Which Includes Arizona, New*

20   *Mexico, and Parts of Oklahoma and Texas*, 89 Fed. Reg. 92,888, 92,889 (Nov. 25, 2024)

21   ("Notices for Availability for Comments, Decisions, and Objections by Forest Supervisor,

22   Cave Creek Ranger District, and Mesa Ranger District are published in:—'Arizona Capitol

23   Times', in Phoenix, Arizona.").  Following this publication, the 45-day "objection" period

24   began, and there is no suggestion—let alone evidence—that concerned parties who met the

25   requirements of 36 C.F.R. § 218.5 were denied an opportunity to participate in that

26

27   ───────────────────
     [26]    In 2014, the Forest Service repealed 36 C.F.R. Part 215.  *Notice, Comment, and*
28   *Appeal Procedures for National Forest System Projects and Activities and Project-Level*
     *Predecisional Administrative Review Process*, 79 Fed. Reg. 44,291 (July 31, 2014).

1    process.[27]

2           AMRC also contends that the FEIS and proposed Forest Plan amendments fail to

3    "explain the agency's dramatic departure from its policies and regulation from 2021 to

4    2025." (*AMRC*, Doc. 87 at 38.)  Charitably construed, this argument invokes the so-called

5    "change-in-position doctrine." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,

6    145 S. Ct. 898, 918 (2025).  This doctrine "asks two questions": *first*, "whether an agency

7    changed existing policy"; and *second*, whether "the agency display[ed] awareness that it is

8    changing position and offer[ed] good reasons for the new policy." *Id.* (internal quotation

9    marks omitted).  There is "no basis in the [APA] or in our opinions for a requirement that

10   all agency change be subjected to more searching review." *FCC v. Fox Television Stations*,

11   556 U.S. 502, 514 (2009).  Instead, the ordinary arbitrary-and-capricious standard applies,

12   so long as the agency accounts for "factual findings that contradict those which underlay

13   its prior policy" or "serious reliance interests" that "its prior policy has engendered." *Id.*

14   at 515.

15          AMRC's argument appears twofold.   First, AMRC argues that proposing

16   "numerous Plan Amendments" was "a complete reversal from the 2021 DROD, which

17   specifically stated that: 'I find that the authorized uses do not require an amendment to the

18   forest plan.'" (*AMRC*, Doc. 87 at 28.)  Second, AMRC appears to argue that the proposed

19   amendments themselves are a "dramatic departure" from pre-existing agency policy

20   because "the eliminated Plan requirements were enacted to protect valuable resources such

21   as the recognized Traditional Cultural Property of Ga'an Canyon . . . as well as wildlife

22   migration routes." (*Id.* at 28-29.)  This second argument is premature because the proposed

23   Forest Plan amendments have not yet been adopted.  As for the first argument, it's unclear

24   that the Forest Service was required to give any justification for its change in position

25   because neither the 2021 FEIS nor the 2021 DROD represented official agency policy.

26   *Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219, 1226 (9th Cir. 2015) ("Admittedly,

27

28   _____

     [27]     In fact, counsel for AMRC represented at oral argument that AMRC filed objections
     to the proposed Forest Plan amendments on Monday, August 4, 2025.

the BLM initially indicated that consultation might be required for the Wind Project. However, the BLM's evolving analysis was not a change in a published regulation or official policy.").[28]    Further, it's unclear that the proposal to amend the Forest Plan represents a true change in position.  As the Forest Service points out, "[a]s early as March 2016 the Forest Service informed the public that a Forest Plan amendment could be needed."  U.S. Dep't of Agric., *Request for Comments and Notice of Public Scoping on Resolution Copper Project and Land Exchange EIS* (Mar. 2016), https://www.resolutionmineeis.us/documents/usfs-tonto-legal-notice-scoping-schedule-201603 ("The Tonto National Forest (TNF) is preparing an environmental impact statement (EIS) to evaluate and disclose the potential environmental effects from: . . . amendments to the Tonto National Forest Land and Resource Management Plan.").  The 2021 EIS also reiterated that:

> An initial review of the consistency of the proposed GPO with the forest plan indicates that approval of the proposed GPO would result in conditions that are inconsistent with the forest plan for some alternatives.  If needed, an amendment to the forest plan would address the necessary changes to relevant standards and guidelines for managing visual quality and recreation opportunities, as determined by the project's record of decision.

(*AMRC*, Doc. 9-1 at 9.)  In this way, the proposal in the FEIS to amend the Forest Plan appears consistent with the agency's pre-existing position that such amendments might be needed.

Regardless, the Forest Service demonstrated awareness that it was changing position by noting that "[t]he [Forest Plan] was revised and implemented in December 2023" (*AMRC*, Doc. 87-2 at 59) and including an additional 36 pages of analysis in the FEIS specifically devoted to discussion of the new proposed amendments (*id.* at 59-95).  *See*

---

[28]    The Supreme Court has likewise expressed doubt that the "change-in-position" doctrine applies to informal and non-binding agency action, although it declined to decide the issue definitively.  *Food & Drug Admin.*, 145 S. Ct. at 918 n.5 ("We have traditionally applied the change-in-position doctrine when an agency shifts from a position expressed in a more formal setting.  True, we have on at least one occasion applied the doctrine when an agency altered a position first stated in a policy statement.  But as we explained in that case, the policy statement instituted 'a standardized review process' that 'effectively' resembled adjudication.").

*also Sierra Club*, 786 F.3d at 1226 ("[T]he BLM's change of view regarding the need for consultation was adequately justified after further investigation demonstrated the feasibility of private access.  Thus, the BLM did not act arbitrarily or capriciously when it changed its unofficial position regarding consultation.") (citation omitted).

### 3. Summary As To NFMA Claims

It is unlikely that AMRC will be able to establish final agency action in relation to its NFMA claims.  Furthermore, AMRC is unlikely to prevail on the merits.

## II. The Second *Winter* Factor

The second *Winter* factor asks whether the movant is "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  The Tribe contends it will suffer several "textbook examples of irreparable harm" once the land exchange occurs, including that "the Tribe and its members would lose access to all but 50 of Oak Flat's 2,422 acres, and even the limited access that remains would be temporary and subject to Resolution's unilateral choice." (*San Carlos*, Doc. 105 at 24-25.)  AMRC reiterates these arguments, emphasizing that "the immediate loss of access for cultural and spiritual purposes for [tribal members] is profound," and contends that "the Exchange will also immediately and permanently [sic] eliminate the legal ability of members of the other Plaintiff groups to access and use these lands for hiking, rock climbing, appreciating and viewing of wildlife, plants, and waters on these lands, camping, and other recreational and aesthetic purposes." (*AMRC*, Doc. 87 at 5.)

The Federal Defendants disagree, arguing that Plaintiffs cannot make the required showing because the exchange will not "cut off access to *all* the exchanged lands." (*AMRC*, Doc. 93 at 48, emphasis added.)  The Federal Defendants emphasize that, under SALECA, Resolution Copper is require to "provide access to the surface of the Oak Flat Campground to members of the public, including Indian tribes, to the maximum extent practicable, consistent with health and safety requirements, until such time as the operation of the mine precludes continued public access for safety reasons, as determined by Resolution Copper."  (*San Carlos*, Doc. 114 at 48, quoting 16 U.S.C. § 539p(i)(3).)

1    Meanwhile, Resolution Copper argues that Plaintiffs will still have access to all of the
2    federal land being exchanged following the transfer, because Resolution Copper has
3    "committed to maintaining current recreational access to the federal land for at least the
4    next ten years"; that "there will be no impact at all to the surface of the federal land being
5    conveyed to Resolution in the exchange until 2026"; and that any future "changes in the
6    land's status are the ultimate result mandated by Congress." (*AMRC*, Doc. 94 at 47-49.)

7         Plaintiffs have the better of these arguments.   SALECA itself only guarantees
8    access—and even then, only temporary access that may be rescinded "for safety reasons,
9    as determined by Resolution Copper," 16 U.S.C. § 539p(i)(3)—to the Oak Flat
10   *Campground*, which is a small fraction of overall area to be exchanged.  As for Resolution
11   Copper's contention that it will provide recreational access to all of exchanged land for at
12   least 10 years, although the Court accepts and has no reason to question the sincerity of
13   this contention, it does not appear to be legally enforceable.  (*San Carlos*, Doc. 116-9
14   ¶¶ 13-14 [declaration from Victoria Peacey, Resolution Copper's president and general
15   manager: "[S]ubsidence of the ground surface is anticipated to occur beginning
16   approximately 6 years after initiation of mining—or approximately 16 years.  Access to
17   Oak Flat will remain largely unchanged for this period of 16 years. . . .  Until that time,
18   existing access to the entire Oak Flat Parcel will remain largely unchanged.  The Oak Flat
19   campground will remain open to the public and available for tribal events and
20   ceremonies."].)    Thus, it appears that nothing would stop Resolution Copper from
21   reconsidering this proposed grant of access following the land exchange. *See also Apache*
22   *Stronghold v. United States*, 2025 WL 1360694, *6 (D. Ariz. 2025) ("Nothing about
23   Resolution Copper's broad 'commitment' to public access is legally binding; furthermore,
24   even their statutorily mandated duty to maintain access to the Oak Flat Campground is (1)
25   contingent on their *discretionary* determination that access is 'practicable' and 'consistent
26   with health and safety requirements,' and (2) fails to account for the fact that the Oak Flat
27   Campground represents only a tiny portion of Oak Flat itself.") (citations omitted).

28        More important, it is undisputed that once the land exchange is completed,

- 89 -

1   Resolution Copper will begin changing Oak Flat in irreversible ways.  Resolution Copper
2   plans to begin "construction of initial data-gathering tunnels through the resource and
3   beneath Oak Flat" following the land exchange.  (*San Carlos*, Doc. 116-9 ¶ 13.)  Although
4   this activity may not immediately cause any perceptible change to the surface of the land,
5   it is still an irreversible change.  Furthermore, Resolution Copper will begin engaging in
6   surface disturbances of Oak Flat in 2026.  (*San Carlos*, Doc. 116-9 ¶ 15 ["It will be
7   months—that is, not until 2026—before Resolution creates new surface disturbance of the
8   Oak Flat parcel. . . .  This will be for the purpose of creation of four new drill pads (soil
9   clearings), two access roads (soil/gravel), equipment storage (soil clearing), and a medical
10  evacuation area (soil clearing)."].)  Although Resolution Copper contends these activities
11  will only affect a small fraction of Oak Flat, they are still surface disturbances, and they
12  will begin before the case would otherwise reach a conclusion—there is no way this
13  complicated case, in which the administrative record is not yet even filed, would proceed
14  past summary judgment by the start of 2026.

15          It follows that absent injunctive relief, tribal members are at most guaranteed to
16  have access to some portion of Oak Flat for some period of time following the land
17  exchange.  That access, moreover, will be to land that will immediately start being laced
18  with subterranean data-gathering tunnels and then, beginning in 2026, will start undergoing
19  surface disturbances.  Continued access to such land is not meaningless, but to a tribal
20  member who sincerely "believe[s] the destruction of Oak Flat will close off a portal to the
21  Creator forever and will completely devastate the Western Apaches' spiritual lifeblood,"
22  *Apache Stronghold*, 145 S. Ct. at 1480-82 (Gorsuch, J., dissenting from the denial of
23  certiorari), it is easy to see why being given limited access to the post-land exchange
24  version of Oak Flat is no substitute for, and thus does not remediate the irreparable injury
25  flowing the lack of  unlimited access to, Oak Flat in its current form.

26  III.    The Third And Fourth *Winter* Factors

27          When, as here, "a government agency is a party," "the final two injunction factors—
28  the balance of equities and the public interest—merge."  *Assurance Wireless*, 100 F.4th at

1031.

There is no doubt that an array of equities and public-interest considerations favor Plaintiffs, for the reasons discussed above in relation to the second *Winter* factor and for the additional reasons that various judges have observed during the course of the *Apache Stronghold* proceedings. *Apache Stronghold v. United States*, 2021 WL 12295173, *7 (9th Cir. 2021) ("[A]ll citizens have a stake in upholding the Constitution. This is particularly so where religious rights are at issue, because protecting religious liberty and conscience is obviously in the public interest.") (Bumatay, J., dissenting) (cleaned up); *Apache Stronghold v. United States*, 2025 WL 1360694, *5-9 (D. Ariz. 2025) (Logan, J., granting stay pending resolution of Apache Stronghold's petition for certiorari).

However, there are also weighty equities and public-interest considerations on the other side of the ledger. As discussed at the outset of this order, SALECA represents a considered choice by the political branches to prioritize the significant potential benefits that Resolution Copper's mining activity is expected to generate—not only boosting Arizona's economy to the tune of over $1 billion per year but also promoting critical national security interests—at the expense of potential devastation to the religious beliefs and practices of the Tribe and to the environment. These are profound tradeoffs, and the litigation in this case has made clear that many affected parties strongly disagree with the choice that Congress made. Even so, the presence of a preliminary injunction request does not give the Court license, under the guise of the evaluating the third and fourth *Winter* factors, to second-guess the political branches' wisdom in deciding how to balance those considerations. *Oakland Cannabis Buyers' Co-op.*, 532 U.S. at 497 ("[A] court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation. . . . Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute.") (cleaned up).[29] It follows that there is a public interest in allowing the land

---

[29] In a related vein, the Court is unpersuaded by Plaintiffs' attempts to downplay the national security ramifications of securing a domestic supply of copper. (*San Carlos*, Doc. 119 at 20; *AMRC*, Doc. 97 at 20.) Regardless of the location of the smelting facilities, the political branches have determined that it is "imperative for our national security that the United States take immediate action to facilitate domestic mineral production to the maximum possible extent." Exec. Order No. 14241, § 1, 90 Fed. Reg. 13,673 (Mar. 20,

1 exchange to occur *even when* all of its profound tradeoffs, and the corresponding equities

2 and public-interest considerations that favor Plaintiffs, are factored into the calculus.

3       AMRC also contends the third and fourth *Winter* factors cut in Plaintiffs' favor

4 because they will suffer immediate, irreparable harm if the land exchange is not enjoined,

5 whereas "a temporary injunction would not stop Resolution from mining a single ounce of

6 copper should the transfer be upheld." (*AMRC*, Doc. 97 at 20, cleaned up.)  Although this

7 line of reasoning might have more force in a different case, *see, e.g.*, *League of Wilderness*

8 *Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th

9 Cir. 2014) ("[T]he balance of equities tips toward the LOWD plaintiffs, because the harms

10 they face are permanent, while the intervenors face temporary delay."), it ignores the

11 unique features of SALECA.  First, as noted, Congress specified that it wished for the land

12 exchange to occur within 60 days of the issuance of the FEIS and clarified that "[t]he

13 purpose of this section is to authorize, direct, facilitate, *and expedite* the exchange of land

14 between Resolution Copper and the United States."  16 U.S.C. § 539p(a) (emphasis added).

15 It follows that there is a public interest in allowing the land exchange to proceed on the

16 expedited timetable Congress contemplated, as opposed to delaying it for years pending

17 the resolution of these lawsuits.  Second, given the indications by the political branches

18 that securing access to a domestic supply of copper has significant national security

19 ramifications—a determination this Court possesses neither the competence nor

20 prerogative to second-guess—the Court is unwilling to conclude that a multi-year delay in

21 pursuing that objective can be disregarded as insignificant.

22       Given these considerations, the third and fourth *Winter* factors do not tip sharply in

23 Plaintiffs' favor.

24 IV.   <u>Conclusion As To The *Winter* Factors</u>

25       Because Plaintiffs have not established a likelihood of success or even serious

26 questions going to the merits of any of their claims, their requests for a preliminary

27 injunction must be denied.  *Critchfield*, 137 F.4th at 922 ("In the absence of serious

28 _____

2025).

questions going to the merits, the court need not consider the other factors.") (cleaned up).

Moreover, even if Plaintiffs had established serious questions going to the merits, a preliminary injunction could only "issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Shell Offshore, Inc.*, 709 F.3d at 1291. As discussed in Part III above, those requirements are not satisfied here.

V.    Request For Injunction Pending Appeal

During oral argument, Plaintiffs asked the Court to issue an injunction pending appeal if it denied their preliminary injunction requests.

It is understandable why Plaintiffs made this request. Plaintiffs intend to seek emergency injunctive relief from the Ninth Circuit should their motions be denied, and under Rule 8(a)(1)(C) of the Federal Rules of Appellate Procedure, "[a] party must ordinarily move first in the district court for . . . an order suspending, modifying, restoring, or granting an injunction while an appeal is pending." *Id.* Rule 62(d) of the Federal Rules of Civil Procedure, in turn, provides "*[w]hile an appeal is pending* from an interlocutory order or final judgment that . . . refuses . . . an injunction, the court may . . . grant an injunction on terms for bond or other terms that secure the opposing party's rights." *Id.* (emphasis added). As things currently stand, no "appeal is pending," so Plaintiffs' request appears to be premature.

Nevertheless, in an abundance of caution, the Court clarifies that it would deny a request for an injunction pending appeal even if such a request were properly before it.[30] Although "Rule 62(d) contemplates that there will be situations where district courts can grant injunctions pending appeal even after denying a preliminary injunction," "the fact that a court previously found that a preliminary injunction was not warranted should carry significant weight, so the circumstances must be of unusual magnitude to justify a district

---

[30]    With that said, the Court notes that it previously issued an order—which remains in effect—that "[t]he federal defendants are enjoined from conveying the federal land described in § 3003 of NDAA until August 19, 2025." (*San Carlos*, Doc. 99 at 20.) Thus, as a practical matter, Plaintiffs will have a period of time following the issuance of this order to attempt to obtain emergency injunctive relief from the Ninth Circuit. The Court endeavored to finalize and issue this order by August 15, 2025, which was no small task, so that Plaintiffs would have that period of time.

1  court granting an injunction pending appeal after denying a preliminary injunction.  Only

2  when the legal question raised is particularly important and serious questions going to the

3  merits have been raised should a district court consider such a course of action." *NetChoice*

4  *v. Bonta*, 761 F. Supp. 3d 1232, 1235-36 (N.D. Cal. 2025) (cleaned up).  "This can occur

5  when the trial court is charting a new and unexplored ground by ruling on an admittedly

6  difficult legal question, and when the equities of the case suggest that the status quo should

7  be maintained."  *Id.* (cleaned up).

8        Although these cases are undoubtedly important, of an unusual magnitude, and raise

9  an array of difficult and unsettled legal questions, those difficult and unsettled legal

10  questions relate to the jurisdictional and threshold issues raised by Defendants.  In contrast,

11  the *merits* of Plaintiffs' claims do not, in the Court's view, present close or serious

12  questions, especially in light of *Seven County Infrastructure Coalition*.   The Court

13  therefore cannot find, in good conscience, that the Rule 62(d) standard is satisfied.

14        This conclusion is also informed by two other considerations.  First, it is notable

15  that the Supreme Court recently denied certiorari in *Apache Stronghold* despite the

16  presence of claims that, in the Court's view, present much closer and more serious merits

17  questions than the substantive claims at issue here.  Second, as discussed in Part III above,

18  SALECA evinces a public interest in expediting the land exchange and allowing it to occur

19  on the timetable that Congress contemplated.

20        Accordingly,

21        **IT IS ORDERED** that:

22        1.     San Carlos's motion for preliminary injunction (*San Carlos*, Doc. 105) is

23  **denied**.

24        2.     AMRC's motion for preliminary injunction (*AMRC*, Doc. 87) is **denied**.

25        3.     Federal Defendants' motion to strike (*San Carlos*, Doc. 115) is **denied**.

26        Dated this 15th day of August, 2025.

27

28

Dominic W. Lanza
United States District Judge

No. 25-5185

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION
OF ARIZONA, INC.; CENTER FOR BIOLOGICAL DIVERSITY;
EARTHWORKS; THE ACCESS FUND; and SIERRA CLUB.

*Plaintiffs-Appellants*,

v.

BROOKE L. ROLLINS, U.S. SECRETARY OF AGRICULTURE; UNITED
STATES FOREST SERVICE; and NEIL BOSWORTH, SUPERVISOR OF THE
TONTO NATIONAL FOREST.

*Defendants-Appellees*,

and

RESOLUTION COPPER MINING, LLC

*Intervenor-Defendant-Appellee.*

_____

On Appeal from the United States District
Court for the District of Arizona
(District Judge Dominic W. Lanza)

_____

**PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD
VOLUME 2 of 5**
*In Support of*
***PLAINTIFFS-APPELLANTS' EMERGENCY MOTION UNDER
CIRCUIT RULE 27-3
RELIEF REQUESTED BY AUGUST 18, 2025, AS THE LAND TITLE
TRANSFER WILL OCCUR ON AUGUST 19, 2025***

Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
mfink@biologicaldiversity.org

Allison N. Henderson
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs-Appellants*

Susan B. Montgomery
Robyn L. Interpreter
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorneys for the Inter Tribal Association of Arizona, Inc.*

**INDEX**

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| **Volume 1 of 5 [99 pages]** | | | |
| Order (August 15, 2025) | 8/15/2025 | 99 | 6-99 |
| **Volume 2 of 5 [268 pages]** | | | |
| Federal Defendants' Memo in Support of Summary Judgment, *CBD v. USFS*, Case No. 23-cv-00928 (DLF) (D.D.C., August 22, 2024) | 8/4/2025 | 97-1 | 105-154 |
| BLM Review of Hydrology Aspects of the Resolution Copper Project | 7/14/2025 | 87-1 | 155-180 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, June 2025 | 7/14/2025 | 87-2 | 181-275 |
| Draft Record of Decision, June 2025 | 7/14/2025 | 87-3 | 276-367 |
| **Volume 3 of 5 [180 pages]** | | | |
| Declaration of Maria Dadgar | 7/14/2025 | 87-5 | 373-380 |
| Declaration of Roger Featherstone | 7/14/2025 | 87-6 | 381-387 |

| Declaration of Russ McSpadden | 7/14/2025 | 87-7 | 388-399 |
|---|---|---|---|
| Declaration of Erik Murdock | 7/14/2025 | 87-8 | 400-403 |
| Declaration of Sandra Bahr | 7/14/2025 | 87-9 | 404-408 |
| Master Water Plan for Superstition Vistas, Apache Junction, Arizona | 7/14/2025 | 87-10 | 409-547 |
| **Volume 4 of 5 [195 pages]** | | | |
| Appraisal Report Summary: Mining Claim Zone MCZ Parcel | 7/14/2025 | 87-11 | 553-567 |
| Appraisal Report Summary: Mineral Withdrawal Area (MWA) Parcel | 7/14/2025 | 87-12 | 568-595 |
| Technical Appraisal Review Report: MWA Parcel (excerpts) | 7/14/2025 | 87-13 | 596-598 |
| Oversight and Legislative Hearing Before the U.S. House of Representatives Subcommittee on Energy & Mineral Resources, March 2013 | 7/14/2025 | 87-14 | 599-715 |
| Congressional Budget Office Cost Estimate, July 2013 | 7/14/2025 | 87-15 | 716-717 |

| | | | |
|---|---|---|---|
| House Natural Resources Committee House Report No. 113-167, July 2013 | 7/14/2025 | 87-16 | 718-742 |
| **Volume 5 of 5 [296 pages]** | | | |
| Uniform Appraisal Standards for Federal Land Acquisitions | 7/14/2025 | 87-17 | 748-1009 |
| Excerpt from Resolution Copper Mining's General Plan of Operations, 2016 | 7/14/2025 | 87-18 | 1010 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, January 2021 (rescinded) | 7/14/2025 | 87-19 | 1011-1013 |
| USDA Memo for Withdrawal of Notice of Availability, Rescind Final Environmental Impact Statement and Draft Record of Decision | 3/2/2021 | 26-2 | 1014 |
| Notice of Appeal | 8/15/2025 | 100 | 1015-1020 |
| Civil Docket for Case No. 2:21-cv-00122-DWL – United States District Court, District of Arizona (Phoenix) – *Arizona Mining Reform Coalition, et al. v. United States Forest Service, et al.* | | | 1021-1038 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | |
| Plaintiff, | |
| v. | |
| UNITED STATES FOREST SERVICE, | Civil Action No. 23-0928 (DLF) |
| Defendant, | |
| RESOLUTION COPPER MINING, LLC, | |
| Intervenor. | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

## TABLE OF CONTENTS

Table of Contents ........................................................................................................ i

Table of Authorities ................................................................................................ iii

Background ................................................................................................................ 1

    I.      The Southeast Arizona Land Exchange and Conservation Act of 2013 ................ 1

    II.    The Forest Service's Contracted Appraisal and Role in the Approval Process ...... 3

    III.   Plaintiff's FOIA Request and FOIA Complaint. .................................................. 6

Legal Standards ........................................................................................................ 7

Argument ................................................................................................................ 10

    I.      The Forest Service Performed A Reasonable Search ........................................ 10

    II.    Neither the Appraisal nor the Data Upon Which the Appraisal is Based are Agency Records ............................................................................................... 14

    III.   The Forest Service Properly Withheld Information Under FOIA Exemption 4 ... 17

          A.     All of the Withheld Information at Issue Here is "Commercial Information." ....................................................................................... 17

          B.     All Information Withheld Under Exemption 4 Was Obtained from a "Person." .................................................................................................. 20

          C.     All Information Withheld Under Exemption 4 Is Customarily and Actually Treated as Confidential. ............................................................ 21

          D.     The Agency Need Not Demonstrate that the Withheld Information Was Provided Under an Assurance of Privacy ................................................. 25

          E.     Disclosure of Confidential Commercial Information Would Lead to Foreseeable Harm. ..................................................................................... 26

    IV.   The Forest Service Properly Withheld Information Under FOIA Exemption 5 ... 30

          A.     The Withheld Information Is Inter-Agency Communication Protected by FOIA Exemption 5 ................................................................................ 31

          B.     The Withheld Information Is Covered by the Deliberative Process Privilege as Predecisional ......................................................................... 32

C.      The Withheld Information Is Covered by the Deliberative Process
        Privilege as Deliberative ........................................................ 35

D.      The Forest Service Has Established that Disclosure of the Withheld
        Records Will Cause Foreseeable Harm. ...................................... 37

V.      The Forest Service Produced All Segregable Information .................................. 40

Conclusion ........................................................................................................... 42

# TABLE OF AUTHORITIES

Cases ................................................................................................................ Page(s)

*100Reporters LLC v. Dep't of Just.*,
 248 F. Supp. 3d 115 (D.D.C. 2017) ................................................... 27

*Access Reps. v. Dep't of Just.*,
 926 F.2d 1192 (D.C. Cir. 1991) ........................................................ 33

*Agrama v. IRS*,
 282 F. Supp. 3d 264 (D.D.C. 2017) ................................................... 40

*Allnet Commc'n Servs., Inc. v. FCC*,
 800 F. Supp. 984 (D.D.C. 1992) ........................................................ 20

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) ........................................................................... 7

*Animals v. Nat'l Insts. of Health*,
 543 F. Supp. 2d 83 (D.D.C. 2008) ..................................................... 21

*Apache Stronghold v. United States*,
 101 F.4th 1036 (9th Cir. 2014) ............................................................ 2

*Baker & Hostetler LLP v. Dep't of*,
 *Com.*, 473 F.3d 312 (D.C. Cir. 2006) ............................................... 18

*Bd. of Trade of City of Chi. v. Commodity Futures Trading Comm'n*,
 627 F.2d 392 (D.C. Cir. 1980) .................................................... 17, 20

*Boyd v. Crim. Div.*,
 475 F.3d 381 (D.C. Cir. 2007) ......................................................... 41

*Brayton v. Off. of U.S. Trade*,
 *Rep.*, 641 F.3d 521 (D.C. Cir. 2011) .................................................. 8

*Burka v. Department of Health & Human Services*,
 87 F.3d 508 (D.C. Cir. 1996) ........................................................... 14

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986) ........................................................................... 7

*Citizens for Resp. & Ethics in Wash. ("Crew") v. Dep't of Labor*,
 478 F. Supp. 2d 77 (D.D.C. 2007) .................................................. 8, 9

*Clemente v. FBI*,
 867 F.3d 111 (D.C. Cir. 2017) ......................................................... 10

*Coastal States Gas Corp. v. Dep't of Energy*,
 617 F.2d 854 (D.C. Cir. 1980) ............................................. 33, 36, 38

*Comm. for Freedom of the Press v. FBI*,
 3 F.4th 350 (2021) .............................................................. 35, 37, 38

*Consumer Fed'n of Am. v. Dep't of Agric.*,
 455 F.3d 283 (D.C. Cir. 2006) ......................................................... 14

*Ctr. for Auto Safety v. Dep't of Treasury*,
 133 F. Supp. 3d 109 (D.D.C. 2015) ................................................... 20

*Ctr. for Investigative Rep. v. U.S. Customs & Border Prot.*,
 436 F. Supp. 3d 90 (D.D.C. 2019) ..................................................... 26

*Defenders of Wildlife v. Dep't of Interior*,
 314 F. Supp. 2d 1 (D.D.C. 2004) ....................................................... 11

*Defenders of Wildlife v. U.S. Border Patrol,*
  623 F. Supp. 2d 83 (D.D.C. 2009) ................................................ 8, 11

*Dep't of Health & Hum. Servs.,*
  975 F. Supp. 2d 81 (D.D.C. 2013) .................................................... 19

*Dep't of Interior v. Klamath Water Users Protective Ass'n,*
  532 U.S. 1 (2001) ............................................................... 30, 31, 32

*Dep't of Just. v. Julian,*
  486 U.S. 1 n.1 (1988) ....................................................................... 31

*Dep't of Just. v. Tax Analysts,*
  492 U.S. 136 (1989) ...................................................................... 9, 14

*Donatos Sarras v. Dep't of Just.,*
  Civ. A. No. 19-0861 (CRC), 2021 WL 9909763 (D.D.C. Aug. 5, 2021) ............... 39, 40

*EPA v. Mink,*
  410 U.S. 73 (1973) ........................................................................ 31, 39

*Fish & Wildlife Serv. v. Sierra Club, Inc.,*
  592 U.S. 261 (2021) ................................................................... passim

*Food Marketing Institute v. Argus Leader Media,*
  588 U.S. 427 (2019) .............................................. 21, 22, 25, 26

*Forest Cnty. Potawatomi Cmty. v. Zinke,*
  278 F. Supp. 3d 181 (D.C. Cir. 2017) ........................................ 14, 16

*Frontier Found. v. Dep't of Just.,*
  739 F.3d 1 (D.C. Cir. 2014) ........................................................... 33

*Gallant v. Nat'l Lab. Rels. Bd.,*
  26 F.3d 168 (D.C. Cir. 1994) ............................................................ 9

*Greenberg v. Dep't of Treasury,*
  10 F. Supp. 2d 3 (D.D.C. 1998) ..................................................... 10

*Greenspan v. Bd. of Governors of Fed. Reserve Sys.,*
  643 F. Supp. 3d 176 (D.D.C. 2022) ............................................. 30

*Ground Saucer Watch, Inc. v. CIA,*
  692 F.2d 770 (D.C. Cir. 1981) .......................................................... 8

*Gulf & W. Indus. v. United States,*
  615 F.2d 527 (D.C. Cir. 1979) ................................................... 20, 21

*Info. Corp. v. Dep't of Interior,*
  976 F.2d 1429 (D.C. Cir. 1992) ................................................. 32, 38

*Info. Ctr. v. Dep't of Just.,*
  320 F. Supp. 3d 110 (D.D.C. 2018) ............................................. 36

*Jones & Co., Inc. v. Gen. Servs. Admin.,*
  714 F. Supp. 35 (D.D.C. 1989) ..................................................... 15

*Jud. Watch, Inc. v. Dep't of,*
  *Def.*, 847 F.3d 735 (D.C. Cir. 2017) ........................................... 34

*Jud. Watch, Inc. v. Dep't of State,*
  306 F. Supp. 3d 97 (D.D.C. 2018) ............................................... 30

*Jud. Watch, Inc. v. Rossotti,*
  285 F. Supp. 2d 17 (D.D.C. 2003) ............................................... 10

*Jud. Watch, Inc. v. U.S. Dep't of Hous. & Urb. Dev.,*
  20 F. Supp. 3d 247 (D.D.C. 2014) .................................................. 8

*Judicial Watch, Inc. v. Department of Justice*,
 20 F.4th 49 (D.C. Cir. 2021) ................................................................. 35

*Kahn v. Fed. Motor Carrier Safety Admin.*,
 648 F. Supp. 2d 31 (D.D.C. 2009) ......................................................... 18

*Kowalczyk v. Dep't of Just.*,
 73 F.3d 386 (D.C. Cir. 1996) ................................................................. 11

*Larson v. Dep't of State*,
 565 F.3d 857 (D.C. Cir. 2009) ............................................................... 8

*Leopold v. Dep't of Just.*,
 Civ. A. No. 19-3192 (RC), 2021 WL 124489 (D.D.C. Jan. 13, 2021) ............... 27, 28

*Machado Amadis v. Dep't of State*,
 971 F.3d 364 (D.C. Cir. 2020) ..................................................... 31, 32, 35

*Marks v. Dep't of Just.*,
 578 F.2d 261 (9th Cir. 1978) ................................................................. 11

*McGehee v. CIA*,
 697 F.2d 1095 (D.C. Cir. 1983) .............................................................. 8

*Mead Data Cent., Inc. v. Dep't of Air Force*,
 566 F.2d 242 (D.C. Cir. 1977) ........................................................... 9, 40

*Media Rsch. Ctr. v. Dep't of Just.*,
 818 F. Supp. 2d 131 (D.D.C. 2011) ......................................................... 8

*Military Audit Project v. Casey*,
 656 F.2d 724 (D.C. Cir. 1981) ............................................................. 8, 9

*Nat'l Ass'n of Home Builders v. Norton*,
 309 F.3d 26 (D.C. Cir. 2002) ................................................................. 19

*Nat'l Lab. Rels. Bd. v. Sears, Roebuck & Co.*,
 421 U.S. 132 (1975) ................................................................. 30, 32, 33

*Nat'l Parks & Conservation Ass'n v. Morton*,
 498 F.2d 765 (D.C. Cir. 1974) ............................................................... 26

*Nat. Res. Def. Council, Inc. v. Nuclear Regul. Comm'n*,
 216 F.3d 1180 (D.C. Cir. 2000) .............................................................. 9

*Nat'l Treasury Emps. Union v. U.S. Customs Serv.*,
 802 F.2d 525 (D.C. Cir. 1986) ............................................................... 9

*Nat'l Wildlife Fed. v. U.S. Forest Serv.*,
 861 F.2d 1114 (9th Cir. 1988) ............................................................... 36

*Oglesby v. Dep't of Army*,
 920 F.2d 57 (D.C. Cir. 1990) ........................................................... 10, 11

*People for the Ethical Treatment of Animals ("PETA") v. Dep't of Health & Hum. Serv.*,
 901 F.3d 343 (D.C. Cir. 2018) ............................................................... 28

*Perrin v. United States*,
 444 U.S. 37 (1979) ........................................................................... 22

*Perry v. Block*,
 684 F.2d 121 (D.C. Cir. 1982) ............................................................... 10

*Pub. Citizen Health Rsch. Grp. v. FDA*,
 704 F.2d 1280 (D.C. Cir. 1983) ..................................................... 17, 18, 20

*Pub. Emps. for Env't Resp. v. Dep't of Homeland Sec.*,
 575 F. Supp. 3d 34 (D.D.C. 2021) .......................................................... 38

*Renegotiation Bd. v. Grumman Aircraft*,
    421 U.S. 168 (1975) ................................................................................ 32, 35
*Renewable Fuels Assoc. v. EPA*,
    Civ. A. No. 18-2031 (JEB), 2021 WL 602913 (D.D.C. Feb. 16, 2021) ............................ 25, 26
*Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*,
    878 F.3d 1258 (10th Cir. 2018) ..................................................................... 17
*S. All. for Clean Energy v. Dep't of Energy*,
    853 F. Supp. 2d 60 (D.D.C. 2012) ................................................................. 21
*SafeCard Servs., Inc. v. SEC*,
    926 F.2d 1197 (D.C. Cir. 1991) ................................................................. 8, 10
*Schlefer v. United States*,
    702 F.2d 233 (D.C. Cir. 1983) ..................................................................... 37
*Senate of the Commonwealth of P.R. v. Dep't of Just.*,
    823 F.2d 574 (D.C. Cir. 1987) ..................................................................... 37
*Spirko v. U.S. Postal Serv.*,
    147 F.3d 992 (D.C. Cir. 1998) ...................................................................... 9
*Summers v. Dep't of Just.*,
    140 F.3d 1077 (D.C. Cir. 1998) .................................................................... 41
*Tax Analysts v. IRS*,
    152 F. Supp. 2d 1 (D.D.C. 2001) .................................................................. 33
*Truitt v. Dep't of State*,
    897 F.2d 540 (D.C. Cir. 1990) ..................................................................... 10
*United States v. Torres*,
    115 F.3d 1033 (D.C. Cir. 1997) .................................................................... 26
*Valencia-Lucena v. U.S. Coast Guard*,
    180 F.3d 321 (D.C. Cir. 1999) ..................................................................... 10
*Vaughn v. Rosen*,
    484 F.2d 820 (D.C. Cir. 1973) ...................................................................... 9
*Vaughn v. Rosen*,
    523 F.2d 1136 (D.C. Cir. 1975) .................................................................... 35
Wash. Post Co. v. Dep't of Health & Human Servs.,
    690 F.2d 252 (D.C. Cir. 1982) ..................................................................... 17
*Wilson v. FCC*,
    Civ. A. No. 21-0895 (RMM), 2022 WL 4245485 (D.D.C. Sept. 15, 2022) .......................... 20
*Wolfe v. Dep't of Health & Hum. Servs.*,
    839 F.2d 768 (D.C. Cir. 1988) ..................................................................... 36
*Worthington Compressors, Inc. v. Costle*,
    662 F.2d 45 (D.C. Cir. 1981) ...................................................................... 27
*WP Co. LLC v. Small Bus. Admin.*,
    Civ. A. No. 20-1240 (JEB), 2020 WL 6504534 (D.D.C. Nov. 5, 2020) ............................. 17

Statutes

5 U.S.C. § 552(a)(4)(B) ............................................................................. 9, 14
5 U.S.C. § 552(a)(8)(A) ................................................................................ 26
5 U.S.C. § 552(a)(8)(A)(i) ............................................................................. 37
5 U.S.C. § 552(b) .................................................................................... 9, 40

5 U.S.C. § 552(b)(4) ........................................................................ 17

5 U.S.C. § 552(b)(5) .................................................................. 30, 31

5 U.S.C. § 551(1) ............................................................................ 31

16 U.S.C. § 539p(a) .......................................................................... 2

16 U.S.C. § 539p(c)(3)(A) ................................................................ 3

16 U.S.C. § 539p(c)(3)(B) ................................................................ 3

16 U.S.C. § 539p(c)(4)................................................................... 3, 4

16 U.S.C. § 539p(c)(9)(B) ................................................................ 3

42 U.S.C. § 4321 .............................................................................. 3

Pub. L. No. 113-291 .......................................................................... 1

Rules

Fed. R. Civ. P. 56(a) ......................................................................... 7

Regulations

36 C.F.R. § 254.4 .......................................................................... 5, 6

In this Freedom of Information Act ("FOIA") case, Plaintiff requests records related to the appraisal of land to be exchanged by statute between the federal government and a private mining company, Resolution Copper, LLC ("Resolution Copper"). Specifically, Plaintiff submitted two FOIA requests to Defendant, the United States Forest Service ("Forest Service" or "Agency") on November 22, 2022 and March 29, 2023, seeking records that (1) the contracted appraiser submitted to the Forest Service on which its final report will be based and (2) documenting the contracted appraiser's completed work provided to the Forest Service for the Oak Flat appraisal, respectively.

As demonstrated below, the Forest Service has fully and properly responded to Plaintiff's FOIA requests pursuant to its obligations under FOIA. The Forest Service completed an adequate search and gathered all responsive records within its control and, after review, released all reasonably segregable, non-exempt records to Plaintiff. The Forest Service withheld only information the release of which would trigger foreseeable harm to the interests protected under FOIA Exemptions 4, 5, and 6.[1] Thus, the Forest Service is entitled to summary judgment.

## BACKGROUND

### I. The Southeast Arizona Land Exchange and Conservation Act of 2013.

In 2014, Congress passed, and the President signed federal land exchange legislation that directs the exchange of land between the United States and Resolution Copper, LLC ("Resolution Copper"), a private mining company. *See* Pub. L. No. 113-291, 128 Stat. 3292 (2014); Declaration of Margret Scofield ("Scofield Decl.") ¶ 4; Def.'s Stmt. of Undisputed Material Facts ("Def.'s Stmt.") ¶ 1. Specifically, the land exchange statute provides that "if Resolution Copper offers to

---

[1] Plaintiff does not challenge the Agency's application of Exemption 6 withholdings in this case. *See* Apr. 19, 2024, Jt. Status Rep., ECF No. 3.

convey to the United States, all right, title, and interest of Resolution Copper" in certain "non-Federal land," then "the Secretary [of Agriculture ("Secreatary")] is authorized and directed to convey to Resolution Copper, all right, title, and interest of the United States in and to the Federal land." 16 U.S.C. § 539p(a).

The "Federal land," described in the statute comprises of approximately 2,422 acres of federally owned land in Pinal County, Arizona, and includes most notably a sacred site for the San Carlos Apache Tribe, commonly known as "Oak Flat," located within the Tonto National Forest. *See Apache Stronghold v. United States*, 101 F.4th 1036, 1044–46 (9th Cir. 2014); Scofield Decl. ¶ 4; Def.'s Stmt. ¶¶ 2–3. Underneath the surface of this sacred land and at near what is known as the "Copper Triangle," sits the third-largest known copper deposit in the world—two billion tons of "copper resource." *Apache Stronghold*, 101 F.4th at 1044–46; Scofield Decl. ¶ 4; Def.'s Stmt. ¶ 3.

The legislation describes "non-Federal land" to include land "necessary to equalize the land exchange." *Id.* § 539p(b). But the two parcels of land need to be of equal value. Under the statute, "[i]f the final appraised value of the Federal land exceeds the value of the non-Federal land," the exchange could be equalized by other means, including cash payment, conveyance of additional non-Federal land, or a combination of the two." *Id.* § 539p(c)(5)(B); *see* Scofield Decl. ¶ 9. And, to further help facilitate the land exchange, Congress waived the Federal Land Policy and Management Act of 1976's cash equalization limit of twenty-five percent to allow for more cash supplementation should the parcels of land be found to not be equal in value. *See* 16 U.S.C. § 539p(c)(5)(B)(ii); Scofield Decl. ¶ 9.

Recognizing the sanctity of the land involved in the land exchange to the San Carlos Apache Tribe, Congress included a provision under the law that directs the Secretary to "engage

in government-to-government consultation with affected Indian tribes" to address concerns "related to the land exchange." 16 U.S.C. § 539p(c)(3)(A); Scofield Decl. ¶ 5. The statute also requires the Secretary of Agriculture to work with Resolution Copper to address the Western Apache Indian Tribe's concerns and to mitigate any possible "adverse effects on the affected Indian tribes." 16 U.S.C. § 539p(c)(3)(B); Scofield Decl. ¶ 5. Moreover, Congress has also required that the land exchange be governed by the National Environmental Policy Act ("Policy Act"), 42 U.S.C. § 4321 *et seq.*, which requires that an environmental impact statement be prepared before the Secretary can execute the land exchange. 16 U.S.C. § 539p(c)(9)(B); Scofield Decl. ¶ 5. Once a Final Environment Impact Statement ("Final Statement") is prepared according to the Policy Act review process, the Secretary has no more than sixty days to "convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper." *Id.* § 539p(c)(10); Scofield Decl. ¶ 5. A Final Statement, however, will not be completed until the Tribal consultation process is complete. *See* Scofield Decl. ¶ 5; Def.'s Stmt. ¶ 24.

## II.    **The Forest Service's Contracted Appraisal and Role in the Approval Process.**

As directed by Congress, to equalize the value of the land exchange, Congress required the parcels of land subject to the land exchange to be independently appraised. *See* 16 U.S.C. § 539p(c)(4); Scofield Decl. ¶ 6; Def.'s Stmt. ¶ 5. To obtain an independent appraisal, the Forest Service and specifically its Southwest Regional Office, which manages in part the federal land being exchanged, entered Contract No. 12837120C0041 for Appraisals Services supporting the land exchange (the "Contract") with Weissenborn Appraisal LLC ("Appraiser") on May 26, 2020. *See id.* The Forest Service refers to the land exchange and its work on that exchange as the Resolution Copper Project and Land Exchange ("Resolution Copper Project"). *See* Def.'s Stmt. ¶ 4. The lead contracted appraiser ("Lead Appraiser") is Barry Weissenborn. *See* Scofield Decl.

¶ 6; Def.'s Stmt.¶ 6.  The Review Appraiser for the Forest Service, also referred to as "Chief Appraiser," is Gerald Sanchez.  *See id.*

To date, Sanchez is the only Forest Service employee who has been authorized to view the final report of the appraisal (the "Appraisal") and the underlying data and information supporting it.  *See* Def.'s Stmt. ¶ 7.  He is also one of only three Forest Service employees who are contractually permitted to receive information about the assignment, appraisal results, or portions thereof.  *See id.* ¶ 8.  Contractually, the Appraisal may be released to Resolution Copper and the Forest Service after the Appraisal is reviewed and approved by the Secretary.  *See id.* ¶ 10.  But the unauthorized release of the Appraisal prior to the completion of this review will invalidate its use—to provide the basis of value for the legislated land exchange.  *See id.*

After being granted permission to view the underlying data and information on which the Appraisal was based, Sanchez began to prepare a technical review of the results of the Appraisal as required by Forest Service Policy and the Uniform Appraisal Standards for Federal Land Acquisition.  *See id.* ¶ 11.  Sanchez viewed the underlying data and information on which the Appraisal was based, via a virtual electronic vault paid for by the Appraiser.  *See id.* ¶¶ 51–52.  The Appraiser could track what Sanchez was viewing and for how long.  *See id.* ¶ 52.  Most importantly, Sanchez could not electronically copy any information he viewed in the vault.  *See id.* ¶ 53.  And when required to discuss this information with the Appraiser, all communications took place via Microsoft Teams call and were not recorded.  *See id.* ¶ 53.

Eventually, on January 20, 2023, the Appraiser completed the Appraisal and, on January 22, 2023, "provided" it to the Forest Service, meaning that Sanchez was granted authorization to view it.  *See id.* ¶ 12.  On January 25, 2023, Sanchez completed the technical review of the results of the Appraisal and issued a Technical Appraisal Review Report.  *See id.* ¶ 13.

The Technical Appraisal Review Report is a comprehensive assessment of the completeness and accuracy of the Appraisal, which also ensures that the Appraisal used appropriate appraisal methods and techniques, and that the Appraisal's conclusions, analyses, and opinions are reasonably supported with market data. *See id.* ¶ 14. In addition, Sanchez also prepared an Appraisal Report Summary, summarizing the appraisal concerning the value of land to be exchanged, and to meet the statutory requirement that the Secretary share either the approved Appraisal or a summary thereof before the land exchange is consummated. *See id.* ¶ 15. Both documents were prepared to assist the Secretary when making his decision to accept the Appraisal and move forward with the land exchange. *See id.* ¶ 20.

To date, however, no one other than Sanchez, and those needed to prepare the two reports to respond to Plaintiff's FOIA requests, have viewed the full Technical Appraisal Review Report and the Appraisal Report Summary. *See id.* ¶ 21. Eventually, both documents will be submitted up the chain of review to the Secretary. *See id.* ¶¶ 25, 27. At present, however, the review process of the Appraisal has not begun and, thus, the Secretary has not yet received a copy of the Appraisal, a summary thereof, or a copy of the Technical Appraisal Review Report. *See id.* ¶¶ 25–27. The reason for this is twofold.

First, approving the Appraisal too early may result in the unnecessary delay of having to update the Appraisal or complete an entirely new Appraisal before the land exchange is complete. *See id.* ¶ 27. Under the statute, the Secretary must conduct a new appraisal or update current one three years after the Appraisal is approved, unless the Forest Service and Resolution Copper reach an exchange agreement—a non-binding document that outlines the responsibilities of both parties to a land exchange, *see* 36 C.F.R. § 254.4—before then. *See* 16 U.S.C. §539p(c)(4)(B)(ii); Def.'s Stmt. ¶ 28. Because information gathered from the Tribal consultation process, however, is often

part of the considerations included in the exchange agreement between parties, such agreement is unlikely to be entered into until that Tribal consultation process is complete. *See* Def.'s Stmt. ¶ 29. Thus, to avoid any delay necessitated by the need to complete a new or updated appraisal if an exchange agreement is not reached within three years of the Appraisal's approval, the Secretary will not begin this approval process until at least the Tribal consultation process is complete. *See* Scofield Decl. ¶ 12.

Second, the Secretary has not begun the review process to approve the Appraisal, as updates to the Appraisal, along with the Technical Appraisal Review Report and Appraisal Report Summary, may still need to be made after the Tribal consultation process is completed and the Final Statement is issued. *See* Def.'s Stmt. ¶ 30. This is because if the consultation process or the Final Statement results in a mutual agreement to reconfigure the parcels of land to be exchanged, then an updated Appraisal may need to be completed to account for that reconfiguration. *See id.* For this reason, again, the Secretary will not begin the review process for approving the Appraisal until after the Tribal consultation process and Final Statement is complete. *See id.*

### III.    **Plaintiff's FOIA Requests and FOIA Complaint.**

On November 22, 2022, Plaintiff submitted a FOIA request to the Forest Service seeking the following records:

> [T]he records that document the information submitted to the Forest Service by the aforementioned contracted appraiser(s). This refers to the information or data from your contractor upon which your final report will be based.

*Id.* ¶ 31. Although the request was received by the Southwest Region al FOIA Service Center, it was forwarded first to Washington D.C. Office for processing before returned to the Southwest Regional Office. *See id.* ¶¶ 32–36. In the meantime, on March 29, 2023, Plaintiff submitted a second FOIA request seeking:

The records documenting the completed work the appraiser provided to the Forest Service for the Oak Flat appraisal.

*Id.* ¶ 37.

After completing a search for all responsive records, on April 17, 2024, the Forest Service produced to Plaintiff a copy of the Technical Appraisal Review Report and Appraisal Report Summary with partial redactions to protect material exempt pursuant to FOIA Exemptions 4, 5, and 6. *See id.* ¶¶ 38–39.

Meanwhile, Plaintiff filed its initial complaint in this case on April 5, 2023, and later amended it on June 29, 2023. *See* Compl., ECF No. 1; Am. Compl., ECF No. 13. On April 19, 2024, the parties represented that Plaintiff does not contest the Forest Service's withholdings of Exemption 6 material but challenges the Forest Service's search for responsive records and application of Exemptions 4, and 5. *See* Apr. 19, 2024, Jt. Status Rep., ECF No. 31. Accordingly, the current motion will only focus on defending the Forest Service's invocation of FOIA Exemptions 4 and 5 to protect the withheld information.

## LEGAL STANDARDS

Summary judgment is appropriate when the pleadings and evidence "show[] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). It is up to the party moving for summary judgment to demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. A genuine issue is one that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.*

"[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011); *see also Media Rsch. Ctr. v. Dep't of Just.*, 818 F. Supp. 2d 131, 136 (D.D.C. 2011) ("FOIA cases typically and appropriately are decided on motions for summary judgment.") (quoting *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)). A government agency may obtain summary judgment in a FOIA case by relying on "relatively detailed" and "nonconclusory" declarations. *McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983). "[T]he Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Labor*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)). "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Media Rsch.*, 818 F. Supp. 2d at 137 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). Courts give agency declarations "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)).

An agency is entitled to summary judgment if it shows that "it has fully discharged its obligations under . . . FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." *Jud. Watch, Inc. v. U.S. Dep't of Hous. & Urb. Dev*, 20 F. Supp. 3d 247, 253 (D.D.C. 2014). FOIA requires that an agency

release responsive information unless it is protected from disclosure by one or more of the Act's

nine exemptions.  *See* 5 U.S.C. § 552(b); *Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 150–51

(1989).  The agency bears the burden of demonstrating that any withheld information falls into

one or more of those exemptions.  5 U.S.C. § 552(a)(4)(B); *Nat. Res. Def. Council, Inc. v. Nuclear

Regul. Comm'n*, 216 F.3d 1180, 1190 (D.C. Cir. 2000).   An agency may meet its burden to

establish the applicability of an exemption by providing a *Vaughn* index or declaration that

"permit[s] adequate adversary testing of the agency's claimed right to an exemption."  *Nat'l

Treasury Emps. Union v. U.S. Customs Serv.*, 802 F.2d 525, 527 (D.C. Cir. 1986) (citing *Mead

Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977), and *Vaughn v. Rosen*,

484 F.2d 820, 828 (D.C. Cir. 1973)). The supporting documentation must contain "an adequate

description of the records" and "a plain statement of the exemptions relied upon to withhold each

record."  *Nat'l Treasury Emps.*, 802 F.2d at 527 n.9.

Although a *Vaughn* index is a common device used by agencies to meet their burden of

proof, "the Court may award summary judgment solely on the basis of information provided by

the department or agency in declarations when the declarations describe 'the documents and the

justifications for nondisclosure with reasonably specific detail, demonstrate that the information

withheld logically falls within the claimed exemption, and are not controverted by either contrary

evidence in the record nor by evidence of agency bad faith.'"  *CREW*, 478 F. Supp. 2d at 80

(quoting *Military Audit Project*, 656 F.2d at 738); *see Spirko v. U.S. Postal Serv.*, 147 F.3d 992,

998 n.4 (D.C. Cir. 1998) ("The form of the *Vaughn* index is unimportant and affidavits providing

similar information can suffice.") (citing *Gallant v. Nat'l Lab. Rels. Bd.*, 26 F.3d 168, 172-73 (D.C.

Cir. 1994)).

Once the court determines that an agency has released all non-exempt material, it has no

further judicial function to perform under FOIA and the FOIA claim is moot. *See Perry v. Block*,

684 F.2d 121, 125 (D.C. Cir. 1982).

## ARGUMENT

The parties have conferred, and Plaintiff has agreed not to challenge any of the invocations

of Exemption 6 to protect personally identifying information. Plaintiff therefore challenges the

Agency's search for responsive records and its withholdings of certain information contained the

Technical Appraisal Review Report and Appraisal Report Summary. Each challenge is discussed

below.

## I.     The Forest Service Performed A Reasonable Search

An agency is entitled to summary judgement in a FOIA case with respect to the adequacy

of its search if it shows "'that it made a good faith effort to conduct a search for the requested

records, using methods which can be reasonably expected to produce information requested.'"

*Clemente v. FBI*, 867 F.3d 111, 117 (D.C. Cir. 2017) (quoting *Oglesby v. Dep't of Army*, 920 F.2d

57, 68 (D.C. Cir. 1990)). "An agency fulfills its obligations under FOIA if it can demonstrate

beyond material doubt that its search was 'reasonably calculated to uncover all relevant

documents.'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting

*Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)).

A search is not inadequate merely because it failed to "uncover[] every document extant."

*SafeCard Servs.*, 926 F.2d at 1201; *see Jud. Watch, Inc. v. Rossotti*, 285 F. Supp. 2d 17, 26 (D.D.C.

2003) ("Perfection is not the standard by which the reasonableness of a FOIA search is measured").

It is appropriate for an agency to search for responsive records in accordance with the manner in

which its records systems are indexed. *Greenberg v. Dep't of Treasury*, 10 F. Supp. 2d 3, 13

(D.D.C. 1998). FOIA does not require that an agency search every division or field office on its

own initiative in response to a FOIA request if responsive records are likely to be located in a particular place. *Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 388 (D.C. Cir. 1996); *Marks v. Dep't of Just.*, 578 F.2d 261, 263 (9th Cir. 1978). Nor does FOIA require that an agency search every record system. *Oglesby*, 920 F.2d at 68.

Where an agency affidavit attests that a reasonable search was conducted, the agency is entitled to a presumption of good faith. *Defenders of Wildlife v. Dep't of Interior*, 314 F. Supp. 2d 1, 8 (D.D.C. 2004). "To meet its burden, the agency may submit affidavits or declarations that explain in reasonable detail the scope and method of the agency's search." *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 91 (D.D.C. 2009). Applying these principles, the Forest Service is entitled to summary judgment with respect to the adequacy of its search.

Here, there is no material doubt that the Forest Service performed an adequate and reasonable search in response to Plaintiff's two FOIA requests because its search was reasonably calculated to uncover all relevant documents. As the Scofiled declaration explained in detail, the Agency searched all locations reasonably believed to contain responsive records. In response to Plaitniff's first request—which seeks "the records that document the information submitted to the Forest Service by the aforementioend contracted appraiser(s)," including "the information or data from your contracor upon which your final report will be based"—the Forest Service assigned it to Sanchez, the Chief Appraiser for the Resolution Copper Project, the only custodian reasonably believed to have responsive records. Scofield Decl. ¶ 18; Def.'s Stmt. ¶¶ 31, 35, 41. Indeed, Sanchez is the only Forest Service employee who has seen a copy of the Appraisal and has access to view the underlying data and information on which it is based. *See* Def.'s Stmt. ¶ 7. However, when Mr. Sanchez received the request in January 2023, Mr. Sanchez replied that while he had access to the Appraisal and the undelrying supporting data and information, he had no records

responsive to Plaintiff's first FOIA request. *See* Scofield Decl. ¶ 19–21; Def.'s Stmt. ¶ 34–36, 42. According to both Sanchez and the Director of Lands and Minerals for the Southwest Region of the Forest Service ("Regional Land Director"), the Agency does not have possession of the Appraisal or any data submitted to form the basis for the Appraisal because those documents are in the Appraiser's possession. *See* Scofield Decl. ¶¶ 18, 32; Def.'s Stmt. ¶ 38, 43. Sanchez further suggested that the request should remain with the Southwest Regional Office of the Forest Service, as it was the official record holder for the Resolution Copper Project. *See* Scofield Decl. ¶¶ 21–22; Def.'s Stmt. ¶ 36. In March 2023, Plaintiff's November 2022 request was then transferred back to the Southwest Regional Office for procesisng. *See* Def.'s Stmt. ¶ 36.

Meanwhile, Plaintiff submitted a second FOIA request for the "records documenting the completed work the appraiser provided to the Forest Service for the Oak Flat appraisal." *See id.* ¶ 37. The Southwest Regional Office searched all locations at the Southwest Regional Office reasonably believed to contain responsive records to both of Plaitniff's FOIA requests. *See* Scofield Decl. ¶¶ 26–29; Def.'s Stmt. ¶ 38, 44. Specifically, the Director of Lands and Minerals for the Southwest Region, Tracy Parker, searched his emails using the search terms, "Resolution Copper" and "Oak Flats Appraisal," but found no responsive documents. *See* Scofield Decl. ¶ 27; Def.'s Stmt. ¶ 45. This finding, however, is entirely consistent with the fact that Sanchez is the only Forest Service Employee who has been authorized to view the Appraisal and the supporting data and information, and any conversations about the Appraisal and the data used in the Appraisal were done via Microsoft Teams Phone calls, not via email, and the calls which were not recorded by the Forest Service. *See* Def.'s Stmt. ¶¶ 7–10, 43, 52–56.

Parker then searched the only other location reasonably believed to contain documents responsive to Plaintiff's two FOIA requests—a restricted Pinyon (Box) folder for the Resolution

Copper Project, accessible only by Parker and Sanchez.  *See* Scofield Decl. ¶ 28; Def.'s Stmt. ¶ 46.  Per standard practice, this electronic folder is the official repository of any documents that the Forest Service created or retained for the Resolution Copper Project.  *See* Scofield Decl. ¶ 28; Def.'s Stmt. ¶ 47.  From there, Parker recovered two records responsive to Plaintiff's request: the Technical Appraisal Review Report and the Appraisal Report Summary.  *See* Scofield Decl. ¶ 28; Def.'s Stmt. ¶ 48.  Again, this result is consistent with the fact that while Sanchez had been approved to view the Appraisal and its supporting data and information, all of those records are maintained in the Appraiser's custody only, pursuant to the Appraiser's contract with the Forest Service.  *See* Def.'s Stmt. ¶¶ 9–10, 43, 51–54.

Notably, no other custodians were asked to search for responsive records because there not a need to do so.  *See* Scofield Decl. ¶ 29; Def.'s Stmt. ¶ 49.  According to Parker, he and Sanchez were the only two Forest Service employees involved in the land exchange during the timeframe that the Appraisal was being completed and up to the time of the search for responsive records. *See id.*  Although one other Regional Appraiser for the Forest Service was previously involved in the land exchange and authorized to receive information about the Appraisal from the Appraiser, Parker confirmed that the former Regional Appraiser would not have had any responsive records as he no longer worked for the Forest Service at the time the Appraisal was completed and because none of the information or data from the Appraiser underlying the Appraisal was conveyed to the Forest Service other than through unrecorded Microsoft Teams calls.  *See* Scofield Decl. ¶ 50; Def.s Stmt. ¶ 50.

Thus, these facts show  the Forest Service searched all locations reasonably believed to have responsive records. The Court should enter judgment the Forest Service's favor on the adequacy of the search issue.

## II. Neither the Appraisal nor the Data Upon Which the Appraisal is Based are Agency Records

FOIA applies only to "agency records[.]" 5 U.S.C. § 552(a)(4)(B). FOIA but does not define the term "agency record" in either its text or in its legislative history, *see Tax Analysts*, 492 U.S. at 142. The Supreme Court has held that documents constitute "agency records" subject to FOIA if they are (1) created or obtained by an agency, and (2) in the agency's control. *Id.* at 144-46. Thus, to be considered an "agency record," a document must have been both created or obtained by an agency and in the agency's control.

Whether an agency controlled the record at the time of a FOIA request, depends on the "'totality of the circumstances test' to determine whether documents are 'agency records.'" *Forest Cnty. Potawatomi Cmty. v. Zinke*, 278 F. Supp. 3d 181 (D.C. Cir. 2017) (quoting *Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006)). In *Burka v. Department of Health & Human Services*, 87 F.3d 508, 515 (D.C. Cir. 1996), the court examined four factors in determining whether an agency controls a record or document: (1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record or system of files. *Burka*, 87 F.3d at 515. As shown below, the Forest Service does not "control" the Appraisal or it supporting data because the Appraiser has retained complete control over those records, the Agency cannot use and dispose of the records as it sees fit. Moreover, the extent to which Agency personnel have read or relied on the records is extremely limited, and the records are not integrated the data into the Forest Service's files.

First, in storing the Appraisal and its supporting data in its virtual vault, called Digify, for which the Appraiser pays to keep records securely stored, and limits who has access to view those

records, the Appraiser has indicated his intention to retain exclusive control over the records and underlying information. *See* Def.'s Stmt. ¶ 7, 51; *Jones & Co., Inc. v. Gen. Servs. Admin.*, 714 F. Supp. 35, 38, 39 (D.D.C. 1989) ("[M]aintenance of the list in a locked safe and his granting of very limited access are indicative of his intention to retain close personal control over the list at all times."). Here, Sanchez was the only person from the Forest Service who was given access to view the Appraisal and its data. *See* Def.'s Smt. ¶ 7. To view these records, Sanchez was given his own password, by which the Appraiser could use to track what Sanchez was viewing in the vault and for how long. *See id.* ¶ 52. This shows that the Appraiser maintains complete control of the Appraisal and the data, even though it gives Sanchez periodic access to the information.

Second, because of the Appraiser maintains the Appraisal and its data upon in such a secure vault, the Agency cannot use and dispose of the records as it sees fit. Although permitted to view the Appraisal when necessary, Sanchez was unable to print it, screenshot it, forward it, or take any sort of action where he could remove the actual document or the information contained in the document from the virtual vault. *See id.* ¶ 53. Likewise, all communications between Sanchez and the Appraiser regarding the Appraisal and its data was conducted via Microsoft Teams calls only, and not by any other media (such as messages) that could be saved and disposed of at the will by the Forest Service. *See id.* ¶ 55. Indeed, until the Appraisal is approved, the Contract prohibits the Appraiser from releasing it to the Forest Service. *See id.* ¶ 10.

Third, consistent with the Appraiser's contractual requirements, the Appraiser further limits the extent to which Forest Service personnel have access to read or rely upon the document. *See id.* ¶ 9. Under the contract, "information about the assignment, appraisal results, or portions thereof" can be conveyed "only to the Contracting Officer, Forest Service Review Appraiser, or Chief Appraiser." *See id.* And here, only Sanchez, who was named as both the Forest Service

Review Appraiser and Chief Appraiser in the contract, had permission to review the Appraisal for Agency use. *See id.* ¶¶ 7–8. Because Sanchez' access to read and rely upon the Appraisal was so restricted, it took the majority of 2022 for Sanchez to draft the Technical Appraisal Review Report and the subsequent Summary Review Appraisal—the two documents upon which the Secretary will rely to assist with his decision on whether to approve the Appraisal. *See id.* ¶¶ 11, 15, 20, 56. And until the Final Statement and Tribal Consultation process is complete, these documents will not be shared with anyone else. *See id.* ¶ 23.

Fourth, neither the Appraisal nor any of the underlying data or information was imported into the Forest Service's Pinyon folder for the Resolution Copper Project—the official repository in which any documents that the Forest Service created or retained for the Resolution Copper Project is stored. *See* Scofield Decl. ¶30; Def.'s Stmt. ¶¶ 46–47, 54.

Given that none of the *Burka* factors evidencing agency control are present here, the Court should find that the Appraisal and its supporting data are not agency records over which the Forest Service had control at the time it completed its search. *See Zinke*, 278 F. Supp. 3d at 195-96 (finding third party contractor records not agency records despite fact that that agency created or obtained records where it exercised supervision and control over collection and analysis of data because control factors did not demonstrate that defendant controlled records).

As a final matter, to the extent Plaintiff may argue that, at some point in the future, the Forest Service may have access to the Appraisal and its underlying, this argument is irrelevant. As the Tenth Circuit has aptly pointed out, "it does not matter that the Forest Service could possess the documents by requesting them from [the contractor]: a federal right of access does not render a private organization's data 'agency records' subject to FOIA, because 'FOIA applies to records

which have been in fact obtained, and not to records which merely could have been obtained.'"

*See Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, 878 F.3d 1258, 1263 (10th Cir. 2018).

**III.    The Forest Service Properly Withheld Information Under FOIA Exemption 4**

Exemption 4 protects from disclosure "trade secrets and commercial or financial information obtained from a person and privilege or confidential." 5 U.S.C. § 552(b)(4). As Congress explained, this exemption is meant to protect information "which would customarily not be released to the public by the person from whom it was obtained" such as "business sales statistics" and "customer lists." *See* S. Rep. No. 813, 89th Cong., 1st Sess., 9 (1965).  Courts in this Circuit have distilled Exemption 4 into a three-part test where information is protected from disclosure if it is "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential." *WP Co. LLC v. Small Bus. Admin.*, Civ. A. No. 20-1240 (JEB), 2020 WL 6504534, at *5 (D.D.C. Nov. 5, 2020) (quoting *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)).  As demonstrated below, the Forest Service properly applied this exemption to withhold certain information contained in the Technical Appraisal Review Report and the Appraisal Report Summary which contain submitters' confidential commercial information. Such information, moreover, was obtained from a person and is customarily and actually treated as confidential.  Likewise, its disclosure would cause foreseeable harm to the submitters' interests protected by Exemption 4.

**A.    All of the Withheld Information at Issue Here is "Commercial Information."**

The courts in this Circuit have long held that "commercial or financial information" are broad terms to be given their "ordinary meanings." *Pub. Citizen*, 704 F.2d at 1290 (citing Wash. Post Co. v. Dep't of Health & Human Servs., 690 F.2d 252, 266 (D.C. Cir. 1982), and *Bd. of Trade of City of Chi. v. Commodity Futures Trading Comm'n*, 627 F.2d 392, 403 (D.C. Cir. 1980)).  "[R]ecords that actually reveal basic commercial operations, such as sales statistics, profits and

losses, and inventories, or relate to the income-producing aspects of a business" contain "commercial" information. *Pub. Citizen*, 704 F.2d at 1290. However, "Exemption 4 is not confined only to records that 'reveal basic commercial operations . . . or relate to the income producing aspects of a business.'" *Baker & Hostetler LLP v. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006) (emphasis is original). Indeed, "the question of whether information is 'commercial' boils down to a commonsense inquiry into whether the proponent has a business interest in that information." *Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36 (D.D.C. 2009) (citing *Pub. Citizen*, 704 F.2d at 1290 (describing manufacturers' interest in the documentation of the health and safety experience of their products as a clear "commercial interest")).

Here, the Forest Service has identified that the information withheld in its Technical Appraisal Review Report and the Appraisal Report Summary under Exemption 4 was obtained from three different sources, each of which have a business interest in the protected information. *See* Def.'s Decl. ¶¶ 57–59. These sources include (1) experts in the minerals field and providers of reports sold only to those in the mining and appraisal industries, (2) Resolution Copper, and (3) the Appraiser. *See id.* ¶ 59.

First, the information provided by mineral experts and providers of mining reports are commercial in nature because they contain assessments of the strength of various mineral deposits and their effects on the real estate market for parcels of land containing those deposits. *See* Scofield Decl. ¶ 48; Def.'s Stmt. ¶ 64. This information procured from mineral experts and mining reports include: the names of providers, such as consulting geologist, and their summaries of confidential and propriety technical reports and data; the number of international projects analyzed; the geographic locations, descriptions, metal content, property rights, and financing

terms of selected comparable sales; direct sales comparison sales summary table; the results of independent studies; concentrate transport costs; metal recovery information; treatment and refining cost information; metal pricing information; royalty (net smelter return) information and royalty calculation table information; and discount rate information. *See id.* ¶ 65. The real estate market is "by its nature," a "commercial enterprise." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 39 (D.C. Cir. 2002). Moreover, information relating to the effects on the real estate market is commercial "in its function," as the mineral experts and providers of mining reports sell their work product for profit. *See id.*

Second, the information provided by Resolution Copper is also commercial because it comprises the Appraiser's descriptions of and inferences from information about how Resolution Copper operates its business, such as how it uses its land, the intricacies of its smelting processes, project timelines, transportation costs, and cash flows. *See* Scofield Decl. ¶ 51; Def.'s Stmt. ¶ 69; *Pub. Citizen Health Rsch. Grp. v. Dep't of Health & Hum. Servs.*, 975 F. Supp. 2d 81, 105 (D.D.C. 2013) (finding information related to business-related processes, decisions, and conduct to be "sufficiently commercial" to benefit from Exemption 4). Specifically, this includes the information in the Technical Appraisal Review Report and the Appraisal Report Summary described as: "resource classification; deposit size and estimated billions of pounds; zoning use; orebody specific parameters; and project delay information." Def.'s Stmt. ¶ 70.

The remaining information that the Forest Service withheld under Exemption 4 derived from the Appraiser includes (1) the Appraiser's own opinions regarding the market value of the parcels of land subject to appraisal and (2) the Appraiser's forecast on the project stages about prefeasibility and feasibility and exploration and stages of selected comparable sales. *See* Scofield Decl. ¶ 52; Def.'s Stmt. ¶¶ 75. Both categories of withheld information are commercial in nature

as they relate, again, to the market and commercial value of the parcels of land subject to appraisal and comparable sales. *See* Def.'s Stmt. ¶ 76; *Wilson v. FCC*, Civ. A. No. 21-0895 (RMM), 2022 WL 4245485, at *7 (D.D.C. Sept. 15, 2022) (finding that withheld documents concerning "the market value and proposed sale prices for various broadcast stations, negotiations and possible structures for divestiture deals, and discussions surrounding the planned Sinclair-Tribune transaction" fit "snugly within the 'ordinary meanings' of the terms 'commercial' and 'financial'") (citing *Pub. Citizen*, 704 F.2d at 1290). Accordingly, the Forest Service properly determined that the withheld information constitutes "commercial information" under FOIA Exemption 4.

### B.     All Information Withheld Under Exemption 4 Was Obtained from a "Person."

Exemption 4 also requires that the information be obtained from a "person," which covers "a wide range of entities including corporations, associations and public or private organizations other than agencies." *Allnet Commc'n Servs., Inc. v. FCC*, 800 F. Supp. 984, 988 (D.D.C. 1992). In determining whether information is "obtained from a person," the D.C. Circuit has taken a plain language approach that focuses on whether the information at issue originated outside the federal agency. *See Bd. of Trade*, 627 F.2d at 404 (finding that information is considered "obtained from a person" if the information originated from an individual, corporation, or other entity, and so long as the information did not originate within the federal government). Similarly, information that was supplied to the government by a "person" outside of government is considered "obtained from a person" for purposes of Exemption 4, even when that information appears in Department generated documents. *See Gulf & W. Indus. v. United States*, 615 F.2d 527, 529–30 (D.C. Cir. 1979) (finding that information submitted to the government and then incorporated into Agency documents was "obtained from a person" for purposes of Exemption 4); *Ctr. for Auto Safety v. Dep't of Treasury*, 133 F. Supp. 3d 109, 123 (D.D.C. 2015) (holding that "[i]nformation originally

obtained from an outside source, but later included in Agency documents, may be considered 'obtained from a person'" and qualify for Exemption 4 protection). The key inquiry is who "the source of the information [was] in the first instance," and not who created the document. *Def. of Animals v. Nat'l Insts. of Health*, 543 F. Supp. 2d 83, 103 (D.D.C. 2008)

Here, the information withheld pursuant to Exemption 4 meets the "obtained from a person" criteria as it was gathered and developed from "persons" outside of government. Specifically, as just described, the withheld information was gathered by the Appraiser from three difference sources outside the government, including (1) mineral experts and providers of mining reports, (2) Resolution Copper, and (3) the Appraiser. *See* Def.'s Stmt. ¶ 59. That the Appraiser included this information gathered from non-government sources, "in the first instance," in the Appraisal and then Sanchez included it in the Technical Appraisal Review Report and Appraisal Summary Report, thereafter, does not change the fact that the information satisfies the criterion of being obtained from a person. *See* Scofield Decl. ¶ 55; Def.'s Stmt. ¶¶ 17–18; 57–58; *Def. of Animals*, 543 F. Supp. 2d at 103; *S. All. for Clean Energy v. Dep't of Energy*, 853 F. Supp. 2d 60, 68 (D.D.C. 2012) (holding that even "information in an agency-generated [document] is still 'obtained from a person' if such information was supplied to the agency by a person or could allow others to 'extrapolate' such information." (citing *Gulf & W. Indus.*, 615 F.2d at 529–30 (protecting contractor information contained in agency audit report))). Accordingly, Exemption 4 clearly covers information obtained (1) mineral experts and providers of mining reports, (2) Resolution Copper, and (3) the Appraiser because they are "persons" for purposes of Exemption 4.

### C.   All Information Withheld Under Exemption 4 Is Customarily and Actually Treated as Confidential.

The key consideration in evaluating the application of Exemption 4 is "confidential[ity]." In *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427 (2019), the Supreme Court held

that the term "confidential," as it is used in Exemption 4, must be given its "ordinary, contemporary, common meaning" at the time the statute was enacted in 1966 and that "[t]he term 'confidential' meant then, as it does now, 'private' or 'secret.'" 588 U.S. at 433 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). The Court observed that "FOIA expressly recognizes that 'important interests [are] served by [its] exemptions,' . . . and '[t]hose exemptions are as much part of [FOIA's] purpose[s and policies] as the [statute's disclosure] requirements.'. . . So just as we cannot properly expand Exemption 4 beyond what its terms permit, we cannot arbitrarily constrict it either by adding limitations found nowhere in its terms." *Argus Leader*, 588 U.S. at 439 (citations omitted, alterations and emphasis in original). In *Argus Leader*, the Supreme Court held that, to qualify as "confidential," the information must be customarily and actually kept private, or at least closely held. *See id.* at 434. As the Court explained, it would be "hard to see how information could be deemed confidential if its owner shares it freely." *Id.*; *see also Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992) (holding "commercial information provided to the Government on a voluntary basis is 'confidential' for the purpose of Exemption 4 if it is of a kind that would customarily not be released to the public by the person [or entity] from whom it was obtained.").

Here, all information withheld under Exemption 4 is confidential information because it is customarily and actually kept closely held. First, regarding information gathered from mineral expert assessments and providers mining reports, to protect its commercial value, this information is not available publicly. *See* Scofield Decl. ¶ 49; Def.'s Stmt. ¶ 66. Indeed, these assessments from mineral experts and providers of mining reports are the very business from which these sources make their profit and cannot be publicly released without undermining the providers' own business viability. *See* Scofield Decl. ¶ 49; Def.'s Stmt. 67. Thus, this information can and is

obtained for payment by appraisers, but not without customary assurances that the information purchased will be protected under confidentiality agreements and not made publicly available. *See* Scofield Decl. ¶ 49; Def.'s stmt. ¶ 66.

Likewise, when the Appraiser purchased information from mineral experts and mining reports, he did so only after providing assurances that the assessments from mineral experts and mining reports would be kept confidential by both the Appraiser, and the intended users of the Appraisal to the full extent possible under law. *See* Def.'s Smt. ¶ 59–61, 66. To that end, the Appraiser, as described above, has kept the Appraisal and all underlying data and information supporting it, very tightly secured in an electronic vault to which only one employee at the Forest Service has access. *See id.* ¶¶ 7, 51. As contractually required, moreover, the Appraiser has labeled confidential and closely held information from providers in the Appraisal, so that they may be protected to the full extent under law. *See* Scofield Decl. ¶ 47, 7; Def.'s Stmt. ¶ 62. Not only is the entire Appraisal as confidential, but at multiple points, the Appraisal includes the statement:

> This is a CONFIDENTIAL REPORT, possession of this report, or a copy thereof, does not carry with it the right of publication. It may not be used for any purpose by any person other than the party to whom it is addressed without prior written consent of the appraiser[.]

Def.'s Stmt. ¶ 62.

Similarly, to protect this same provider information from the Appraisal in the Summary Review Appraisal and the Technical Appraisal Review Report, the unredacted versions of two documents are secured in a password protected Pinyon box with the Forest Service, accessible by only Sanchez and Parker until the appropriate time the documents will be shared with the Secretary to assist with his decision to approve the Appraisal. *See* Def.'s Stmt. ¶¶ 46, 48. And before releasing the redacted versions in this case, the Forest Service conferred with the Appraisal to

ensure that all such confidential provider information was properly redacted as such. *See id.* ¶¶ 57–58.

Similarly, regarding information gathered from Resolution Copper, the Appraiser confirmed that such information gleaned from Resolution Copper is not part of current public disclosure made by Resolution Copper. *See id.* ¶ 72. It is also actually kept confidential as the Appraiser was not able to obtain this information without providing assurances of confidentiality to Resolution Copper. *See* Scofield Decl. ¶ 51; Def.'s Stmt. ¶¶ 60–61. And as described above, to keep this information confidential, the Appraiser has kept the Appraisal and all underlying data and information tightly secured in an electronic vault with notice on the Appraisal that the report and specific parts thereof are confidential. *See id.* ¶¶ 51, 62. The Forest Service, in turn, has protected the unredacted versions of the Technical Appraisal Review Report and Summary Review Appraisal in a password protected Pinyon box, and before releasing redacted versions of the same, conferred with the Appraisal to determine which part of those documents reflect the information derived from Resolution Copper that was included first in the Appraisal and is confidential. *See id.* ¶¶ 46–48, 57–58.

In addition, the Appraiser's (1) own opinions regarding the market value of the parcels of land subject to appraisal and (2) forecast on the project stages about prefeasibility and feasibility and exploration and stages of selected comparable sales are kept confidential. Indeed, it is very clear that none of the Appraiser's opinions regarding the market value of the parcels of land in the exchange has been made public, yet, given that this appraisal value has not yet even been approved by the Secretary. *See id.* ¶¶ 10, 26, 78. And as indicated, the Appraiser and Forest Service are taking every precaution to ensure that such information is kept confidential pending approval of the Appraisal by the Secretary. *See id.* ¶¶ 9–10, 46, 48; *see also* Scofield Decl. ¶¶ 10, 53. Likewise,

the Appraiser's own assessment of comparable sales is also kept confidential because this information, like information from mineral experts and mining reports, is the result of the Appraiser's own professional knowledge, and thus the Appraiser's developed forecast model can be used in products sold to other clients. *See* Scofield Decl. ¶ 54. This information is thus not made readily available to the public but can be purchased by clients under assurances of confidentiality. *See id.*; Def.'s Stmt. ¶¶ 66, 81. Therefore, when identifying that this information is confidential in the Appraisal, the Appraiser noted that any re-articulation of the same information in the Technological Appraisal Review Report and the Summary Review Report should be kept protected as well. *See* Def.'s Stmt. ¶ 82.

**D.    The Agency Need Not Demonstrate that the Withheld Information Was Provided Under an Assurance of Privacy**

The Court in *Argus Leader* questioned whether, in some instances, it might be possible for "privately held information [to] *lose* its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private[.]" 588 U.S. at 434–435 (emphasis in original). The Supreme Court had no need to resolve that question, however, because it was clear in *Argus Leader* that such assurances had been made. *Id.* In the cases that have been decided since, none have held that the absence of an assurance of privacy is, in and of itself, sufficient to defeat an Exemption 4 assertion. *Renewable Fuels Assoc. v. EPA*, Civ. A. No. 18-2031 (JEB), 2021 WL 602913, at *7 (D.D.C. Feb. 16, 2021) ("[N]o court has yet held that 'privately held information lose[s] its confidential character for purposes of Exemption 4 if it's communicated to the government without' privacy assurances." (quoting *Argus Leader*, 588 U.S. at 434)).

"The current law of the D.C. Circuit, which remains binding authority, is that information is confidential under Exemption 4 'if it is of a kind that would customarily not be released to the

public by the person [or entity] from whom it was obtained.'" *Renewable Fuels*, 2021 WL 602913, at *7 (quoting *Critical Mass*, 975 F.2d at 879); *see also Ctr. for Investigative Rep. v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 109 (D.D.C. 2019) ("*Critical Mass* and its progeny . . . supply the framework."). "Were this Court to hold that the information is not confidential because a second necessary condition exists that is not met here, it would essentially be overruling [*Critical Mass*] or at least declining to faithfully apply it." *Renewable Fuels*, 2021 WL 602913, at *7. "Absent a Supreme Court holding squarely abrogating Circuit precedent—which [*Argus Leader*] clearly is not—this Court has no power to depart from the result mandated by that precedent." *Id.* (citing *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997)). Thus, under the controlling authority in this Circuit, to establish confidentiality, the Agency need only demonstrate that the information was customarily and actually treated as private—as it has already shown above.

### E. Disclosure of Confidential Commercial Information Would Lead to Foreseeable Harm.

Under the FOIA Improvement Act, an agency is permitted to withhold information if "(I) the agency reasonably foresees that disclosure would harm an interest protected by [a FOIA] exemption; or (II) disclosure is prohibited by law[.]"  5 U.S.C. § 552(a)(8)(A).  "To meet this requirement, the defendants must explain how disclosing, in whole or in part, the specific information withheld under Exemption 4 would harm an interest protected by this exemption, such as by causing 'genuine harm to [the submitter's] economic or business interest.'" *Ctr. for Investigative Rep.*, 436 F. Supp. 3d at 113 (quoting *Argus Leader*, 588 U.S. at 443, and citing *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 768 (D.C. Cir. 1974)).  "The FOIA Improvement Act's 'foreseeable harm' requirement replaces to some extent the 'substantial competitive harm' test that the Supreme Court overruled in [*Argus Leader*]." *Id.*  Caselaw that addresses the "substantial competitive harm" test prior to *Argus Leader*, may therefore be

instructive.  At that time, the D.C. Circuit followed the general principle that "'competition in business turns on the relative costs and opportunities faced by members of the same industry,' and thus, 'there is a potential windfall for competitors to whom valuable information is released under FOIA.'"  *100Reporters LLC v. Dep't of Just.*, 248 F. Supp. 3d 115, 140 (D.D.C. 2017) (citing *Worthington Compressors, Inc. v. Costle*, 662 F.2d 45, 51 (D.C. Cir. 1981)).

Here, release of the information that Plaintiff seeks would cause serious financial and competitive harm for multiple sources whose confidential commercial information was included in the Appraisal, and now in the Technical Appraisal Review Report and the Appraisal Report Summary.  As for information from mineral experts and mining reports, the Appraiser confirmed that the public release of this information would foreseeably undermine its commercial value and affect the ability of mineral experts and providers of mining reports to make a profit form that information in the future, which in turn affects its business viability.  *See* Scofield Decl. ¶ 49. Specifically, the information, if released, could be used by competitors wishing to capitalize on a similar product to sell to clients of the providers who submitted this information, and at a lower cost that is not economically profitable for the providers who spent resources to develop those assessments in the first instance.  *See id.*; Def.'s Stmt. ¶ 67; *Leopold v. Dep't of Just.*, Civ. A. No. 19-3192 (RC), 2021 WL 124489, * 7 (D.D.C. Jan. 13, 2021) (finding that defendant met the standard of showing foreseeable harm when "[t]he release of [withheld] information could disadvantage [the submitter] and provide an unfair advantage to its competitors.").  That the Summary Review Appraisal may be released in full at some time before the land exchange is consummated, does not negate the foreseeable immediate harm on the profitability of the information currently protected as the business viability of the providers depends on this singular window of time to profit from their assessments.  *See* Scofield Decl. ¶ 50; Def.'s Stmt. ¶ 68.

Next, releasing the Appraiser's descriptions and inferences from information about how Resolution Copper operates its business could harm Resolution Copper competitively and financially. *See* Scofield Decl. ¶ 51. These descriptions and inferences, even filtered through the Appraiser, about Resolution Copper's mining operations, would build a mosaic of information regarding protected business information that is not part of current public disclosures made by Resolution Copper. *See id.* For example, even the commercial values of the proposed parcels of land may reflect commercial information about specific mining operations relative to the effectiveness of those mining operations. *See id.* Thus, disclosure of this information, to the extent it may disclose proprietary commercial information about specific mining operations may, immediately run the risk of absorption and use by competitors to Resolution Copper. *See* Def.'s Stmt. ¶ 72. These competitors, in turn, may seek to replicate Resolution Copper's operations in their own to try to see an end product at the lowest possible cost, undermining Resolution Copper's profits, which for business viability purposes, must account for resource and development expenditures of those operations that competitors now need not expend. *See id.*; *People for the Ethical Treatment of Animals ("PETA") v. Dep't of Health & Hum. Serv.*, 901 F.3d 343, 354 (D.C. Cir. 2018) (agreeing with the agency that disclosing the airline carriers and transport routes used by private importers would provide an unfair "windfall" to competitors who could thereby "enter the market without the startup costs associated with researching successful importation means and practices"). Likewise, earlier disclosure of this information prior to the Appraisal's approval by the Secretary may run the risk of public misperception or misunderstanding as to the value of the Resolution Copper's business to the company's detriment, including possibly financially. *See* Def.'s Stmt. ¶ 74.

There is another foreseeable harm at issue should confidential commercial information provided to the Appraisal from mining experts, providers of mining reports, and Resolution Copper be released.  Indeed, the Appraiser gathered this information under assurances of confidentiality to the providers who rely on the Appraiser's assurances and discretion.  *See id.* ¶ 60.  If the protected information is released, the Appraiser's own business would suffer, as providers and similar providers may decline to allow the Appraiser to avail itself of their information in the future, which would affect the Appraiser's competitive business operations and ability to provide competitive work for clients. *See id.* ¶ 63.

In addition, the Appraiser's (1) own opinions regarding the market value of the parcels of land subject to appraisal and (2) forecast on the project stages about prefeasibility and feasibility and exploration and stages of selected comparable sales, if released, would cause foreseeable financial harm to the Appraiser.  First, the Appraiser's opinions as to the market value of the parcels of land subject to appraisal, if released is, at bottom, the essence of the Appraisal itself.  *See* Def.'s Stmt. ¶ 79.  It is this value of land which the Secretary must review and approve before the land exchange is completed.  *See id.* ¶ 16.  Contractually, the early release of this information, may very well invalidate its use in supporting the Agency Action.  *See id.* ¶ 10.  In which case, this would compromise any remaining business interest that the Appraiser may still have under the Contract with the Forest Service.  *See* ¶ 79.  Second, regarding the Appraiser's own assessment of comparable sales, this information, like information from mineral experts and mining reports, can be sold to other clients.  *See id.* ¶ 80.  But if it is released publicly, the commercial value of this information decreases, undermining the Appraiser's ability to make a profit from the information, thus harming the Appraiser's business and financial interest as explained similarly above.  *See id.* ¶ 81

Because each of these concretely explain harms are "textbook articulations of foreseeable harm" for which Exemption 4 protects and the Scofield declaration articulates a "link between the specified harm and the specific information contained in the material withheld," withholding the information provided by mineral experts, providers of mining reports, Resolution Copper, and the Appraiser, under Exemption 4 was proper. *Greenspan v. Bd. of Governors of Fed. Reserve Sys.*, 643 F. Supp. 3d 176, 189 (D.D.C. 2022).

## IV.  The Forest Service Properly Withheld Information Under FOIA Exemption 5

Exemption 5 allows agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).  As a general matter, intra-agency communications are those between employees within a single executive branch agency, and inter-agency communications are between employees of different agencies or departments. *Jud. Watch, Inc. v. Dep't of State*, 306 F. Supp. 3d 97, 109 (D.D.C. 2018) (also discussing intra-agency consultant corollary).  One well-recognized civil discovery privilege that permits agencies to withhold records under Exemption 5 is the deliberative process privilege.  *Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 263 (2021).

The deliberative process privilege shields from disclosure "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Nat'l Lab. Rels. Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975).  The object of the privilege is to enhance the "quality of agency decisions" by "protecting open and frank discussion among those who make [decisions] within Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001) (quoting *Sears*, 421 U.S. at 151).  This privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front

page news." *Klamath*, 532 U.S. at 9; *Sierra Club*, 592 U.S. at 267 (noting the privilege encourages

candor among agency officials and "blunts the chilling effect that accompanies the prospect of

disclosure."); *EPA v. Mink*, 410 U.S. 73, 87 (1973) (explaining that Government decision making

would be greatly hampered if agencies were "prematurely forced to 'operate in a fishbowl.'")

(referencing S. Rep. No. 813, at 9 (1965)).

To properly assert the deliberative process privilege under Exemption 5, the Agency must

show that the contested intra or inter-agency records are both "'predecisional' and 'deliberative.'"

*Machado Amadis v. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020). Here, the Agency has

shown both.

### A. The Withheld Information Is Inter-Agency Communication Protected by FOIA Exemption 5.

FOIA Exemption 5 permits agencies to withhold "inter-agency or intra-agency

memorandums or letters that would not be available by law to a party other than an agency in

litigation with the agency." 5 U.S.C. § 552(b)(5). The FOIA statute defines "agency" as "an

authority of the Government of the United States" including "any executive department,"

"establishment in the executive branch of the Government," or "independent regulatory agency."

5 U.S.C. §§ 551(1), 552(f). "Intra-agency" memorandum generally refers to those documents

"addressed both to and from employees of a single agency." *Klamath*, 532 U.S. at 9-10 (quoting

*Dep't of Just. v. Julian*, 486 U.S. 1, at 18 n.1 (1988) (Scalia, J. dissenting)).

Here, the Agency withheld parts of two documents—the Technical Review Appraisal

Report and the Summary Review Appraisal. *See* Def.'s Stmt. ¶¶ 39–40. The withheld information

is covered under Exemption 5 as inter-agency communications because both documents were

created by Sanchez for the Forest Service. *See id.* ¶ 11, 13–15, 19–20, 22, 25. Except for purposes

of responding to the FOIA request at issue in this case, these documents have not been released to

anyone outside the Forest Service. *See id.* ¶¶ 21–22. Eventually, the Technical Review Appraisal Report will be shared with the Forest Supervisor and the Regional Director of Lands to decide whether to recommend to the Secretary to move forward with the land exchange. *See id.* ¶ 25. Likewise, the Appraisal Report Summary will be provided to the Secretary to give the Secretary the best information to work from while making his decision to accept the Appraisal and move forward with the land exchange. *See id.* ¶¶ 18–19, 25. Until then, both documents are maintained in the Forest Service's official repository for all Agency records created or retained by the Forest Service for the Resolution Copper Project and Land Exchange files. *See id.* ¶¶ 46–48.

### B.   The Withheld Information Is Covered by the Deliberative Process Privilege as Predecisional

To qualify for protection under Exemption 5, the United States Supreme Court has held that "a document must thus satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Klamath*, 532 U.S. at 8. Interpreting the second condition, the Supreme Court stated that Exemption 5 covers civil discovery privileges, including the deliberative process privilege, a form of executive privilege. *Id.* The deliberative process privilege permits the agency to withhold "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Sears*, 421 U.S. at 150. To be covered by this privilege, the agency must show that the withheld documents are both predecisional and deliberative. *Machado, 971 F.3d at 370.*

"A document is predecisional if it was 'prepared in order to assist an agency decision maker in arriving at his decision,' rather than to support a decision already made." *Petrol. Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting *Renegotiation Bd. v. Grumman*

*Aircraft*, 421 U.S. 168, 184 (1975)). The agency's categorization of a document as predecisional is not dispositive: courts should undertake a functional analysis of "whether the agency treats the document as its final view on the matter." *Sierra Club*, 592 U.S. at 268. Predecisional documents can lose that status if adopted as the agency's final position on the matter, but the privilege still protects information that was part of the agency's "group thinking in the process of working out its policy." *Elec. Frontier Found. v. Dep't of Just.*, 739 F.3d 1, 8 (D.C. Cir. 2014); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). To show that a document is predecisional, the agency does not need to identify a specific final decision on the subject, if one exists at all, but should explain the role the contested document played in the deliberative process. *Access Reps. v. Dep't of Just.*, 926 F.2d 1192, 1196 (D.C. Cir. 1991); *see Sears*, 421 U.S. at 151 n.18 (noting that not all recommendations will ripen into agency decisions).

The same information that the Forest Service withheld under Exemption 4, it also withheld under Exemption 5, because the information, at bottom, reflects either the express proposed opinion of value placed on the parcels of land being exchanged, or at a minimum, information which can be compiled to discern an opinion of value on the parcels of land being exchanged, which is still being deliberated and has not yet been reviewed and approved by the Secretary. *See id.* ¶ 83. The purpose of this withheld information is to assist the Secretary make that very determine whether to approve the appraised value of the parcels of land being exchanged. *See id.* ¶ 84; *see e.g. Tax Analysts v. IRS*, 152 F. Supp. 2d 1, 24-25 (D.D.C. 2001) (protecting memoranda "written by a component office without decisionmaking authority to a different component office" that had such authority), *aff'd in part, rev'd in part on other grounds & remanded*, 294 F.3d 71 (D.C. Cir. 2002). Specifically, Sanchez authored the Technical Appraisal Review Report to provide to the Secretary the with a comprehensive assessment of the completeness and accuracy

of the Appraisal, so that the Secretary could ensure that the Appraisal used appropriate appraisal methods and techniques, and that the Appraisal's conclusions, analyses, and opinions are reasonably supported with market data as required under Forest Service Policy and the Uniform Appraisal Standards for Federal Land Acquisitions.  *See* Scofield Decl. ¶ 40; Def.'s Stmt. ¶ 14, 25. Likewise, Sanchez authored the Appraisal Report Summary to provide the Secretary with the best information to work from while making his decision to accept the Appraisal and move forward with the land exchange.  *See* Def.'s Stmt. ¶ 18.  Likewise, because the Secretary is required, under statute, to publish a copy of either the Appraisal or a summary thereof before the land exchange is consummated, the Appraisal Report Summary will be provided to the Secretary so that he can have all the information necessary to decide whether to release the Appraisal or the summary thereof, as already drafted and for his review.  *See id.* ¶ 19.  Thus, the reason the Forest Service created the withheld material is consistent with it being predecisional, particularly when the Secretary has not made a decision on the Appraisal or approved the land exchange.

In addition, nothing in the record, moreover, suggests that the information withheld under Exemption 5 has lost its status as predecisional by being formally and explicitly adopted as the Agency's final decision on the matter.  *Sierra Club*, 592 U.S. at 268 (finding the rationale behind the deliberative process privilege "does not apply, of course, to documents that embody a final decision, because once a decision has been made, the deliberations are done."); *Jud. Watch, Inc. v. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017) (explaining predecisional materials can lose status as such in certain cases where there is an express adoption).  As Ms. Socfield explained, the Secretary has not approved the Appraisal, nor has he even received the Technical Appraisal Review Report or the Appraisal Report Summary to assist with this decision as both documents are still subject to revision.  *See* Scofield Decl. ¶ 58.

**C.**     **The Withheld Information Is Covered by the Deliberative Process Privilege as Deliberative**

Deliberative records are those "prepared to help the agency formulate its position," *Sierra Club,* 592 U.S. at 268, by implicating the "consultative process" including communications which reflect the "type of back-and-forth exchange of ideas, constructive feedback, and internal debate over how best to promote and to preserve" the agency's proposed policies. *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 364 (2021). In short, the "key to whether a document is deliberative is whether it is part of the 'give-and-take' of the 'consultative process.'" *Id.* (quoting *Machado*, 971 F.3d at 370); *see Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975) (stating that documents part of the deliberative process make recommendations or express opinions on legal or policy matters).

In order to assist court's in evaluating whether disputed records are deliberative, the D.C. Circuit in *Judicial Watch, Inc. v. Department of Justice*, 20 F.4th 49, 55 (D.C. Cir. 2021), advised agencies to explain four factors: (1) what deliberative process is involved; (2) the role played by the disputed documents in the course of that process; (3) the nature of the decision making authority vested in the person issuing the disputed document; and (4) the relative position in the agency's chain of command of the persons authoring and receiving the document.

Here, the Agency's explanation shows that the material it has withheld under Exemption 5 is deliberative. First, the deliberative process involved is the Secretary's ultimate decision whether to approve the Appraisal for the parcels of land subject to the pending land exchange. *See* Def.'s Stmt. ¶ 85. This process is plainly consistent with the Supreme Court's definition of "deliberative" communications as those "prepared to help the agency formulate its position." *Sierra Club*, 141 S. Ct. at 786; *Grumman Aircraft*, 421 U.S. at 184 (noting materials protected by the privilege are

"predecisional memoranda prepared in order to assist an agency decisionmaker in arriving at his decision[.]").

Next, the Technical Review Appraisal Report and the Review Summary Appraisal are the two most significant documents assisting the Secretary make that ultimate decision. *See id.* ¶ 85. The information, specifically withheld under Exemption 5 goes to the heart of the Secretary's decision, as it reflects either express proposed opinions on the values of the parcels of land being exchanged or the most relevant information from which those proposed values can be discerned. *See id.* ¶ 83. Indeed, when determining whether information protected under Exemption 5 is deliberative, the D.C. Circuit has declared that redacted information should be examined "in the light of the policies and goals that underlie" the privilege and in the "context in which the materials are used," *Wolfe v. Dep't of Health & Hum. Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988), and here, the "ultimate objective" of Exemption 5 is to safeguard agencies' deliberative process, *Nat'l Wildlife Fed. v. U.S. Forest Serv.*, 861 F.2d 1114, 1119 (9th Cir. 1988); *see also Elec. Priv. Info. Ctr. v. Dep't of Just.*, 320 F. Supp. 3d 110, 119 (D.D.C. 2018) (noting that "the selection or organization of facts can be part of an agency's deliberative process and so exempt from FOIA"). Thus, the role played by the information protected plainly falls within the course of the Forest Service's deliberative process to determine whether to approve the Appraisal of land values subject to a legislative land exchange.

In addition, the direction by which the protected pre-decisional information flows is precisely the direction that expected for protection warranted under Exemption 5. *Coastal States*, 617 F.2d at 868 ("[A] document from a subordinate to a superior official is more likely to be predecisional."). Here, Sanchez, who created the Technical Review Appraisal Report, and the Review Summary Appraisal is an employee of the Forest Service who was approved to review the

Appraisal and create these two documents to assist the Secretary, and other decisionmakers, assess the Appraisal's opinions regarding the value of the lands being exchanged. *See id.* ¶ 11, 13–15, 25. Eventually both the Technical Review Appraisal Report and the Review Summary Appraisal will be submitted up the decisional chain to the Forest Supervisor and the Regional Director of Lands to decide whether to recommend to the Secretary to move forward with the land exchange. *See id.* ¶ 25. Thus, the third and fourth factors that assist Courts with determining whether information is deliberative, clearly reflect the deliberative nature of the information being withheld as they show to the extent deliberative information is being considered from "subordinate" to "superior." *Senate of the Commonwealth of P.R. v. Dep.'t of Just.*, 823 F.2d 574, 586 (D.C. Cir. 1987) (referencing *Schlefer v. United States*, 702 F.2d 233, 238 (D.C. Cir. 1983)).

> **D.** **The Forest Service Has Established that Disclosure of the Withheld Records Will Cause Foreseeable Harm.**

In addition to showing that specific documents qualify for protection under a named Exemption, the FOIA Improvement Act of 2016 further requires that an agency show that it (i) "reasonably foresees that disclosure would harm an interest protected by an exemption" to FOIA or (ii) "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). "The foreseeable harm requirement imposes an independent and meaningful burden on agencies." *Reps. Comm.*, 3 F.4th at 369. To carry this burden, an agency withholding documents under the deliberative process privilege must provide "a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Id.* at 370. Agencies must explain the "particular sensitivity of the types of information at issue or the role that they play in the relevant agency decisional processes[,]" and must "articulate the link between the specified harm and specific

information contained in the material withheld." *Id.* at 369, 372 (referencing H.R. Rep. No. 391, at 9 (2016)).

Here, disclosure of the withheld materials will cause foreseeable harm to at least two interest protected by the deliberative process privilege: (1) public confusion of the Agency's position on controversial issues and (2) ensuring that Agency employees are able to engage in full and frank discussion. *See* Def.'s Stmt. ¶ 86; *Coastal States*, 617 F.2d at 866 (describing the purpose of the deliberative process privilege to preserve frank discussions between government officials, protect against the premature disclosure of proposed policies, and avoid public confusion from releasing inaccurate information.); *see also Pub. Emps. for Env't Resp. v. Dep't of Homeland Sec.*, 575 F. Supp. 3d 34, 51–52 (D.D.C. 2021) ("[T]he D.C. Circuit has long recognized that the risk of public confusion "has a special force with respect to disclosures of agency positions or reasoning concerning proposed policies." (citing *Petrol. Info.*, 976 F.2d at 1436 n.10)).

Here, the Secretary must approve the Appraisal and thus the value of the appraised parcels of land subject to the land exchange before any land or cash can be conveyed. *See* Def.'s Stmt. ¶ 16. And because various considerations weigh on the timing of this approval, the Secretary is not expected to begin this approval process until at least Tribal consultations and the Final Statement are completed. *See id.* ¶¶ 27–30. Thus, if the information withheld under Exemption 5 and reflecting the actual or discernible proposed value of the parcels of land being exchanged is released, this will sow confusion publicly as to whether (1) the Tribal consultation and Final Statement are completed, which they are not and (2) that proposed value is the actual approved value for the parcels of land being exchanged. *See id.* ¶ 87. The value of the land being exchange is an extremely sensitive and controversial issue. *See* Scofield Decl. ¶¶ 4–5, 10, 67, 70. As previously mentioned, the San Carlos Apache Tribe views the land being exchanged known as

Oak Flat as sacred and thus, Congress has specifically required the Forest Service to address and mitigate with Resolution Copper issues surrounding the land exchange raised by local Indian Tribes.  *See id.*  Thus, there is substantial potential for the public to construe the release of this information as an inaccurate representation of the Secretary's decision regarding the value of the sensitive parcels of land being exchanged.

More importantly, however, the release of information withheld under Exemption 5 in all responsive records would foreseeably harm the Forest Service's ability to complete its frank and candid consultation process with local Tribes.  *See* Def.'s Stmt. ¶ 88; *Mink*, 410 U.S. at 87 (explaining that the objective of the deliberative process privilege is to protect the candor of agency decision-making which would be harmed if employees were forced to "operate in a fishbowl"); *Donatos Sarras v. Dep't of Just.*, Civ. A. No. 19-0861 (CRC), 2021 WL 9909763, at *8 (D.D.C. Aug. 5, 2021) (recognizing candor as an interest protected by Exemption 5).  Currently, the Forest Service is still engaged in government-to-government discussions with local Indian Tribes regarding the land exchange.  *See* Def.'s Stmt. ¶ 89.  The premature release of the proposed value or discernible value of the parcels of land being exchanged may not be reflective of current government-to-government discussions regarding the intrinsic value placed on the land by these tribes.  *See id.*  While these considerations by Tribal members could be addressed through other terms of exchange mutually agreed upon with Resolution Copper at the time when Tribal consultations and a Final Statement is complete, the current Appraisal of the parcels of land subject to exchange by statue will not reflect those considerations.  *See id.*  As a result, frank and open discussions in the Tribal consultation process will be tempered or derailed until any misconceptions surrounding the premature release of the proposed value or discernible value of the parcels of land being exchanged dissipates.  *See id.*  This in turn will chill these discussions

and cause further delay to the completion of the land exchange. *See id.* Indeed, until these consultations are complete, neither the Final Statement, nor the Secretary's final decision to review and approve the Appraisal will be completed, and the triggering events necessary for completing the land exchange will be delayed or possibly stalled indefinitely. *See id.* ¶¶ 27–30; Scofield Decl. ¶ 14, 68.

Likewise, the Agency continues to engage in government-to-government consultation with local tribes in a variety of other matters. *See* Scofield Decl. ¶ 69–70; Def.'s Stmt. ¶ 90. Any potential negative effect on the current consultation process with the Resolution Copper Project and Land Exchange will, in turn, negatively affect the consultation process in these other matters as well, to the extent that any premature disclosure of Exemption 5 information sows discord that goes beyond the current project and leads to distrust and erosion in the Agency's government-to-government relationship with San Carlos and other tribes in the region. *See id.*

At bottom, the evidence in the record clearly shows that the foreseeable harm caused by releasing the disputed information withheld from disclosure includes the very interests protected by the deliberative process privilege of Exemption 5. The material withheld under Exemption 5 is therefore proper.

## V.     The Forest Service Produced All Segregable Information

While an agency may properly withhold records or parts of records under one or more FOIA exemptions, it "must release 'any reasonably segregable portions' of responsive records that do not contain exempt information.'" *Agrama v. IRS*, 282 F. Supp. 3d 264, 275 (D.D.C. 2017); *see* 5 U.S.C. § 552(b) (requiring "any reasonably segregable portion of a record shall be provided to [the requester] after deletion of the portions which are exempt"). Non-exempt portions of a document "must be disclosed unless they are inextricably intertwined with exempt portions." *Mead Data*, 566 F.2d at 260. Before approving the application of a FOIA exemption, district courts

must make specific findings of segregability regarding the material to be withheld. *Summers v. Dep't of Just.*, 140 F.3d 1077, 1081 (D.C. Cir. 1998). Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material. *Boyd v. Crim. Div.*, 475 F.3d 381, 391 (D.C. Cir. 2007).

As explained in the Scofield Declaration, the Forest Service undertook a careful page-by-page, and line-by-line analysis of the two documents produced in response to Plaintiff's FOIA request, and concluded they had released all reasonably segregable, non-exempt material. *See* Scofield Decl. ¶¶ 71–74; Def.'s Stmt. ¶ 91–92. The Forest Service further concluded that all information withheld from disclosure under Exemptions 4, 5, and 6 could not be further segregated of meaningful information in the page or portion of the pages withheld without disclosing information that warrants protection under those same three exemptions. *See id.* Moreover, all information not exempted from disclosure under the cited exemptions was correctly segregated and released. *See id.* Thus, the Forest Service has provided all non-exempt records responsive to Plaintiff's request.

*         *         *

**CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court grant summary

judgment in its favor.

Dated: August 22, 2024               Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division


By: _____ */s/ Anna D. Walker* _____
ANNA D. WALKER
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-2544

*Attorneys for the United States of America*

**Bureau of Land Management Review of Hydrology Aspects of the Resolution Copper Project**

**Lisa Dubas[1], James Johnsen[2], Steve Rice[3]**

**June 13, 2022**

At the request of the Department of Agriculture – U.S. Forest Service (USFS), the Bureau of Land Management (BLM) provided a targeted technical review of the 2021 Final Environmental Impact Statement for the Resolution Copper (RC) Project and Land Exchange (FEIS) and supporting documents.

For this review, a team of Bureau of Land Management hydrology specialists (BLM reviewers) reviewed the hydrology and water resources aspects of the project and assessed whether the FEIS adequately addressed comments received during the FEIS development.  The team focused on comments and questions raised by the Salt River Pima-Maricopa Indian Community (SRPMIC), other Tribes, and governments.  All but the targeted list of SRPMIC concerns were in Volume 6 of the FEIS.  Due to the substantial number of supplemental studies and amount of analysis conducted to develop the multi-volume FEIS, and the relatively short time in which to evaluate, the BLM reviewers consider this document to be a high-level review which focuses on broader topics that we believe may be deficient, under-developed, or improperly analyzed rather than a point-by-point list of technical comments.

The BLM reviewers would like to acknowledge the extensive amount of time and effort that has gone into developing this FEIS and for the obvious high level of staff and time commitment by the Tonto National Forest on the National Environmental Policy Act (NEPA) process.  The NEPA process and the resulting documents in the hydrology focus area were considered sufficient except where highlighted in this summary document.

While not unexpected, the FEIS struggles under the extensive scope of the proposed project and the scale of the studies needed to inform it.  Several perceived deficiencies in data analysis and interpretation or in adequacy of describing cumulative effects were later rationalized by searching the enormous number of supplementary reports, studies, and memos to file.  By not adequately incorporating this information into the FEIS, the final document often reads as incomplete and subjective in its preferred approaches. As difficult as it is for seasoned technical reviewers to follow the analyses, discussion, and reasoning for the assumptions and conclusions made in this FEIS, it must pose significant difficulty for a lay audience to process the scope and scale of the impacts predicted by this project, and whether they were predicted in an adequate and reasonable way.  It is understood that the magnitude of a project such as this is difficult to convey in a single document, even an expansive multi-volume one, but the reviewers felt that excessive time was spent tracking down the source material and studies necessary to understand the information and conclusions that are presented in the FEIS.

This document is structured to provide a general assessment of the FEIS and supporting documentation, followed by more specific topic area discussion containing comments and findings the BLM reviewers felt

---

[1] Hydrogeologist, Arizona State Office
[2] Hydrologist, Upper Snake Field Office, Idaho
[3] Hydrogeologist, BLM National Operations Center, Colorado

1

did not meet the analysis standards of NEPA, or suffered from insufficient evaluation or unsupported conclusions.

**Table of Contents**

**Executive Summary** .................................................................................................................. 3
**General comments on the FEIS** ............................................................................................... 6
    Summarize Additional Studies within FEIS ........................................................................... 6
    Additional Figures Would Benefit the Readers .................................................................... 6
    Arizona Water Law ............................................................................................................... 7
    Review Applicability of New CEQ Regulations ..................................................................... 8
    General Comments About Report Organization (not related to submitted comments) ......... 9
**Technical Comments** ............................................................................................................... 9
    Introduction .......................................................................................................................... 9
    Detailed Technical Comments .............................................................................................. 13
        Baseline Conditions ......................................................................................................... 13
        Concerns about Native Waters / Tribal Water Supplies .................................................... 13
        Impacts of Climate Change .............................................................................................. 14
            Alternatives Analysis and Climate Change ................................................................... 14
            Groundwater Model and Climate Change ...................................................................... 15
        Suggestions for Analysis of Alternatives .......................................................................... 16
        Characterization of Preferred Alternative Skunk Camp TSF .............................................. 17
        Impacts to Water Sources (springs, seeps, aquifer) ......................................................... 18
        Mitigation (water) ........................................................................................................... 20
        Limitations of Modeling Effort ......................................................................................... 22
            Skunk Camp Model .................................................................................................... 22
            The Mine Model ......................................................................................................... 22
            The East Salt River Valley Project Model ...................................................................... 25

**Executive Summary**

The BLM reviewers believe that all additional studies referenced in the FEIS should be summarized in the FEIS to promote accessibility. These additions would ultimately benefit the FEIS and the public's understanding of the action. These summaries should be sufficiently technical (as to provide the needed information) and approachable (for less technical readers to grasp the concepts). Where feasible, selected public comments could also be referenced in the FEIS in their respective sections, especially when the comment led to additional studies being performed.

The BLM reviewers identified the need for figures, coupled with a short discussion of terminology, to explain how the effects of this project are limited spatially and temporally. An example would be a figure of the geographic limitations on surface and groundwater flow.

The BLM reviewers found a few references to Arizona water law throughout the documents they reviewed but believe there is a need for a consolidated section within the FEIS that gives a brief overview of Arizona water rights related to this project.

The BLM reviewers note that the Council on Environmental Quality (CEQ) Executive Office of the President recently issued new regulations concerning NEPA.[4] Our understanding of the regulations is that the USFS *may* (but is not required to) apply the new regulations to this FEIS since the NEPA process started before September 14, 2020.[5] However, we suggest that the USFS consult with their Solicitor's Office or USFS implementation guidance (if available) about the implications of the new regulations.

With literature suggesting a higher likelihood for severe storm events in the future, the BLM reviewers believe alternatives lack sufficient discussion on climate change and the potential for catastrophic events. Climate change predictions should be discussed, and potential impacts of floods greater than the 200-year event should be incorporated into the FEIS analysis and discussion.

The FEIS groundwater model scenarios used to predict water resources impacts into the future did not incorporate any changes over time for precipitation and recharge in transient simulations. The FEIS docket contains a "Climate Change" scenario run that does not appear to be discussed in the FEIS. That scenario indicated that when reductions in recharge were simulated (which is common during drought), there were higher rates of drawdown at wells and springs compared to the static recharge scenarios presented in the FEIS, particularly to the north and east of the model area. The BLM reviewers believe the "Climate Change" scenario model run and the results from the model run should be discussed in the FEIS.

The BLM reviewers believe the potential to store some or all tailings in existing open pits in the area was dismissed too quickly and that this option should be given more than passing consideration and rise to the level of "detailed analysis". To minimize impacts, it may be feasible to place a portion of the tailings in existing pits in the area. If these existing pits cannot accommodate all the tailings from the proposed

---

[4] Effective May 20, 2022. See https://ceq.doe.gov/docs/laws-regulations/NEPA-Implementing-Regulations-Desk-Reference-2022.pdf
[5] See § 1506.13 Effective date.

3

action, a smaller tailings storage facility (TSF) alternative than that which was analyzed could be proposed for the remaining tailings.

The BLM reviewers note that the Global Tailings Review published new guidelines and industry standards for tailings management in August 2020.[6] If practicable, the FEIS would benefit from TSF breach analysis consistent with the Global Tailings Review guidelines and standards for all alternatives. If breach analysis for all alternative TSF's is impactable, a breach analysis for the preferred alternative is recommended. Based on the changing industry standards for TSFs, it may be feasible to reconsider all alternatives, including those alternatives that were originally dismissed from the analysis.

The BLM reviewers suggest looking at alternate Pyrite Cell locations within the Skunk Camp TSF layout to potentially negate exposure of the highest concentration tailings to stormwater runoff greater than the 200-year flood event. Alternatively, analysis is recommended for the permanent rerouting of Stone Cabin and Skunk Camp Washes to the west of the Skunk Camp TSF. The BLM reviewers believe a more thorough surface water hydrology characterization, as it concerns to climate change, needs to be completed for the Skunk Camp TSF.

Additional geologic cross sections should be developed, expanding beyond the eastern bounds of the groundwater model area to the Cutter Basin to highlight both the distance and the controls to groundwater flow between these two areas. The potential for the Cutter Basin to be viewed as a potential alternate water supply in the future is a plausible indirect effect of the proposed mine.

The BLM reviewers found no mention of a date for steady state in the Skunk Camp groundwater model, other than a statement that average values were used. The reviewers also found no mention within the Skunk Camp model of flood events being incorporated into the groundwater model. It is unclear whether 100, 200, and 500-year flood events factored into the projection runs.

While dewatering of the Resolution graben has been occurring since 2009, the baseline condition for analysis would be set to the start of mining. The BLM reviewers note that baseline monitoring occurred from 2003 to 2017, but dewatering started in 2009. Please explain whether the short time-period between the start of dewatering and the end of monitoring is cause for concern. For example, did the short time-period account for a delay in response between deep dewatering and a near-surface expression of the dewatering?

The BLM reviewers strongly recommend: implementing an adaptive monitoring and mitigation plan until the effects of mining have stabilized; using site photographs, vegetation monitoring, and water levels at the associated primary monitoring well (PMW) where direct measurements of spring discharge are not feasible; obtaining mitigation make up water from outside the project area; and using a threshold for potential effects to springs and GDEs that is more stringent (expanded area of impact) than the threshold used for wells. In addition, the BLM reviewers recommend that control sites be proactively implemented for data collection, a one-mile buffer be added around the modeled extent of mining impacts to the Apache Leap tuff aquifer, and that the wells, springs, and GDEs between the 10-foot

---

[6] See "Global Industry Standard on Tailings Management," available at https://globaltailingsreview.org/global-industry-standard/ (accessed May 10, 2022). The Global Tailings Review was convened by the International Council on Mining and Metals, the United Nations Environment Programme, and the Principles for Responsible Investment. The stated goal is to "establish an international standard for the safer management of tailings storage facilities."

contour and the 1-mile buffer be part of the monitoring and mitigation plan. Finally, the BLM reviewers suggest some of the 'potential future measures' like PF-WR-03 become a required measure.

BLM reviewers do not believe the north, south and east groundwater boundaries of the mine model are sufficient because the boundaries were not extended beyond the area of potential impact. Mineral Creek is defined as a boundary in the mine model, but the Apache Leap tuff aquifer extends past this creek and literature states that Mineral Creek is fed by the Apache Leap tuff aquifer. Additionally, the BLM reviewers suggest a figure be added that shows the spatial distribution of error between measured and simulated water levels of the mine model. How many wells will be impacted by the proposed mining and what could be the potential impacts?

The BLM reviewers note that several comments were directed at the surface water and the potential for contamination. The reviewers believe that the predicted outcome of impacts at 200 years is insufficient to address the true cumulative hydrological impacts of the action. The reviewers believe the surface water time scale should match the groundwater predictions (noting that the groundwater model was run out 1,000 years). Further, with literature pointing to less frequent but larger storms in the future because of climate change, the 1000-year flood event calculated today has the potential to be recalculated soon with a higher possibility of recurrence. A longer view of the impacts would help the public understand what impact a 1000-year stormwater event would have on the preferred alternative TSF and what the final condition of the aquifers in the mine model would be once they have adjusted to the new equilibrium. The BLM reviewers suggest additional cross-sections showing the north, south, and east mine model boundaries with justification for why the model boundaries were chosen.

Other comments from the BLM reviewers address the groundwater models for Skunk Camp and the East Salt River Valley Project.

**General comments on the FEIS**

**Summarize Additional Studies within FEIS**

Several perceived deficiencies in data analysis and interpretation or inadequacy of describing cumulative effects were later rationalized by searching the enormous number of supplementary reports, studies, and memos to file.  By not adequately incorporating this information into the FEIS, the final document often reads as incomplete and subjective in its preferred approaches. The BLM reviewers believe all additional studies referred to in the FEIS should be summarized in the FEIS to promote accessibility. These comments should be sufficiently technical as to provide the needed information, but also approachable for less technical readers to grasp the concepts. Where feasible, selected comments could also be referenced in the FEIS in their respective sections, especially when the comment led to additional studies being performed.

For example, the BLM reviewers believe the mining methods section does not sufficiently present or discuss why other known mining methods were not appropriate for the project location.  In Appendix F of the FEIS under *Post-DEIS Analysis of Alternative Mining Techniques*, where M3 Engineering and Technology Corporation is listed as a source for in-situ mining, the USFS could simply add the following paragraph, which was in the referenced July 13, 2020 M3 report, *Viability of In-Situ Leaching of the Resolution Copper Deposit*: "Expected copper recovery would be approximately 15%, as the Resolution Copper deposit is mostly comprised of chalcopyrite and bornite ore and not copper oxide ore, which is readily leachable."  Instead, the FEIS just states it was reviewed but found not appropriate, with the M3 report listed as a source of that statement.  The Reviewers believe that short statements like these, added to the FEIS for all the considered mining methods, would satisfy the comments concerned about why other mining methods were not discussed.

In another example, a comment questioned whether riparian habitats was adequately addressed in the DEIS. The response in Volume 6 of the FEIS was that the commenter was "unaware of the substantial background information, either in the project record or cited as DEIS references, that contributed to the analysis statements contained in the DEIS."  The BLM reviewers believe this comment would likely have not been submitted if previous studies had been summarized within the FEIS,.

**Additional Figures Would Benefit the Readers**

The BLM reviewers understand hydrologic concepts like model boundaries, boundary conditions and what they represent, cumulative impacts on surface and subsurface waters from stormwater runoff with dilution, and deposition of contaminated sediments later mobilized and transported further downstream, etc.  However, some of the comments indicate there are others who do not have this knowledge but are attempting to understand the effects of the proposed project.

The following comments by the BLM reviewers relate to the need for figures, coupled with a short discussion of terminology, to explain how the effects of this project are limited spatially and temporally because of geographic limitations on surface and groundwater flow.  The BLM reviewers believe that the FEIS would benefit from at least one figure that shows the various basins/subbasins in the area, with a discussion about what basins/subbasins are and how they contribute to the flow of surface water and groundwater.

6

For example, one of the comments received by the USFS included a figure that connected the contour lines provided in the East Salt River Valley (ESRV) groundwater model report with the contour lines provided in the mine groundwater model report, and then stated there would be cumulative effects within the mine area from pumping being done in the ESRV area. The aquifer in the ESRV is not connected to the Apache Leap tuff aquifer, which could have been more apparent to the readers if a figure of basins/subbasins had been included in the FEIS and/or the geologic controls delineating these basin boundaries was shown.

The BLM reviewers also noted comments submitted that referenced shortages of water in the Pinal Active Management Area (AMA), with reference to the ESRV model domain and the area of the mine project. ADWR's Pinal AMA groundwater model covers the Maricopa-Stanfield subbasins only, and the estimates provided on depletions within the aquifer are limited to those two subbasins and do not cross into the ESRV area adjacent to the wellfield, or the area of the proposed mining activity. The BLM reviewers believe the above-mentioned figure of basins/subbasins with supporting text could have helped someone who was speculating that the depletion estimates from the Pinal AMA groundwater model could be applied to this study area. A figure of basins/subbasins would have showed that these areas are not connected, and that any reference to a depleted aquifer in the Pinal AMA should not be used to prove depletions today or in the future for the areas referenced in the FEIS.

The BLM reviewers believe there should be a map (or several maps) that show the six alternative locations plus the HUC 12 or HUC 10 outlines from USGS (depending on the circumstances) that show each alternative and how it relates to places like "Cutter Basin", Maricopa-Stanfield, the ESRV area, the Gila River, and Top of the World. The BLM reviewers would also like to see such a map under the discussions for each alternative.


**Arizona Water Law**

A general discussion of water law in Arizona could be warranted – for example surface water rights not being adjudicated yet and no groundwater water rights in Arizona. Additional topics that could be addressed in this discussion are if there are any Federal or State regulations that prevent destruction of springs, if anything in the basin has been assigned a water right by the Arizona Adjudication Court, if the wells take groundwater out of the Phoenix AMA and if so, what does the law state on taking water out of an AMA? The BLM reviewers found a few references to Arizona water law throughout the documents they reviewed but believe there needs to be a consolidated section within the FEIS that gives a brief overview of Arizona water rights related to this project.

The BLM reviewers believe there needs to be a discussion about the potential for a subflow zone to be established in the project area, and if the project could potentially remove water from any proposed subflow zone. Even though a subflow zone has not been established within the project area, past precedence tells us any future subflow zone will be defined using floodplain alluvial sediments, but not bedrock or older consolidated sediments. This suggestion is not implying that the USFS needs to show where that subflow zone would be drawn, just an acknowledgement that one will be defined and if the project would impact it. The FEIS also needs a discussion about only major rivers and potentially mountain front streams being involved in Arizona Adjudication proceedings, and if there is a potential to impact these rivers. The BLM reviewers would also like to see a list of the Statement of Claimants (39s)

in the study area that would likely lose their ability to claim a water right when the Adjudication Court reaches the area as part of the Adjudication proceedings.

RC is currently dewatering the aquifer and some of the comments that were expressed denote confusion about the purpose and reasoning for the pumping.  The BLM reviewers suggest a paragraph be added to the FEIS to tell readers what a mineral extraction withdrawal permit is, what the purpose of such withdrawals are, and how long RC can withdrawal under that permit, even without the new project.  This paragraph should also state that permits must be renewed through the State of Arizona and state how often the permits need to be renewed.

Does the General Mining Law of 1872 have a higher priority than state and federal water rights?  If the General Mining Law of 1872 is a dominant factor in the water rights at stake in the project area, the BLM reviewers want to see a paragraph stating as such in the FEIS.  If the law of 1872 is not a dominant factor, the BLM reviewers want to see a discussion about other Federal rights already given and any state-based water right claims that would have an earlier priority date than RC.

A GIS layer of NHD points obtained by the BLM reviewers shows a lot more springs in the area of interest than are shown in the FEIS.  Are the rest of these springs/seeps already dry?  Why are they not mentioned?  If they are mentioned in other literature available through the FEIS web page the BLM reviewers believe there needs to be a summary in the FEIS where the groundwater dependent ecosystem (GDEs)/springs are discussed.  Would it help to tally up the number of springs that would not be impacted by the project versus how many would be impacted? Do they have 39s filed on them?

The BLM reviewers noted the mention of Superstition Vistas within Chapter 4, with the statement that the project is speculative and therefore not included in the analysis.  We think it is important to provide more information related to what Superstition Vistas has managed to procure with regards to Assured and Adequate Water Supply permits and what is currently considered speculative.  Superstition Vistas has obtained the rights to pump in that area, but only for a fraction of their conceptual project area.

The 39s filed with ADWR as part of the Gila River Adjudication are not mentioned in the FEIS.  There are several comments that were submitted about how this project will affect water rights, but only Federal water rights would have been decided to date.  Have any Federal water rights been approved within the project area?  How many state-based claims have been filed with ADWR within the project area?  Are there any surface water claims filed with ADWR in the area?  How many parties will not be able to get a state-based water right because the water source no longer exists due to the dewatering of the Apache Leap tuff aquifer?  The BLM reviewers found information within the FEIS lacking about water rights in Arizona, but we acknowledge the information could have potentially been included in another report related to the FEIS that was not reviewed by the BLM reviewers.  There should also be a paragraph added that state-based rights in the area have not yet gone through the adjudication court.

**Review Applicability of New CEQ Regulations**

As stated in the Executive Summary, the CEQ issued new regulations concerning NEPA.  The BLM reviewers believe that the USFS *may* (but is not required to) apply the new regulations to this FEIS since the NEPA process started before September 14, 2020.  This understanding is based on § 1506.13 Effective Date which reads "the regulations in this subchapter apply to any NEPA process begun after

8

September 14, 2020. An agency may apply the regulations in this subchapter to ongoing activities and environmental documents begun before September 14, 2020."

We understand that the USFS (or the U.S. Department of Agriculture) may have implementation guidance on how to interpret or comply with the CEQ regulations with respect to the FEIS. Therefore, we suggest that the USFS consult with their Solicitor's Office or USFS implementation guidance (if available) about the implications of the new regulations.

The BLM reviewers note that if the USFS applies the new CEQ regulations to the FEIS, it could require the addition of information to the FEIS. For example, information might be required related to the proposed or potential smelting operations. Page 58 of the FEIS states the final smelter destination for copper concentrate has not been determined. Though this has not been determined, it will occur somewhere, and smelting is known to have potentially significant effects on the local air and water quality at which it occurs. If the smelter location is beyond the extent of cumulative effects analysis, it still should be acknowledged as an associated environmental consequence of the action. Not currently knowing the location does not preclude a discussion of potential effects.

**General Comments About Report Organization (not related to submitted comments)**

Volume 1 p. 87 of the FEIS states "This alternative is required by regulation 40 CFR 1502.14(d)." The placement of this statement makes it appear that the mine is required to do these activities because of this regulation. The BLM reviewers looked up this regulation and it stipulates that when a study with alternatives is completed, then a no-action alternative must be considered. The statement in the text is misleading.

If discussions about the alternatives were decided based on information presented in other sections within the FEIS, the BLM reviewers believe those sections should be called out in the FEIS text along with the decision. For example, "For a discussion of the potential impacts to water rights from this alternative see Chapter #, Section #".

Add the water use number to the summary table given in each alternative. For example, the text earlier in the section says 590,000 acre-feet (AF) so add a line to the table that says 590,000 AF of water will be used for that alternative. Land acreage could also be added to the table as well (private, FS, BLM, State, etc.).

**Technical Comments**

**Introduction**

Adequate understanding of the surface water hydrology and hydrogeology of the mine area and proposed TSFs are key to accurately assessing the effects of mining, recovery, and for long-term stability. This includes baseline conditions, dewatering needs, drawdown in the Apache Leap tuff aquifer, impacts to groundwater dependent ecosystems and stream baseflow, seepage and transport of contaminants from the mine workings and tailings facilities, and effects of climate change, among others.

Considering the complex geology and mining-specific changes with time and the spatial and temporal scope of evaluation, all modeling and assumptions resulting from it need to be tempered with the appropriate level of acknowledgement of its limitations and uncertainty. It will be imperative that adequate monitoring be conducted and that observations are fed back into the model on a regular basis to increase the predictive capacity of the models as tools to estimate impacts. The presented extents of modeled impacts provide best estimates with reasonable degrees of certainty, but these extents should not be construed as evidence that impacts are not occurring beyond the boundaries of the presented extents. It will be imperative that adequate monitoring be conducted and that observations are fed back into the model on a regular basis to increase the predictive of the models as tools to estimate impacts.

The RC project has the potential to generate significant tonnage of important ore materials, but as a result will have a significant lasting impact on the landscape that will not be repaired with any level of mitigation. Even after mining and dewatering ceases, and water levels begin to recover, hydrologic features and processes in the project area will be altered forever and, in many cases, destroyed in perpetuity.

Future precipitation and recharge conditions must be adequately addressed to evaluate the cumulative effects of mine dewatering on the impacts and recovery of water levels in wells, spring discharge, and baseflow to streams.  Climate predictions of an increase in the severity of convective storm events must be adequately incorporated into assessments of future event magnitude and severity of storms related to the proposed tailings facility at Skunk Camp.

When it comes to surface features and mine waste it is important to ensure that impacts are disclosed well past the life of the mine.  This involves identification of potential failure modes and more robust facilities design as these features continue in perpetuity.  Because of the episodic nature of stresses like climate, earthquakes, wildfire, and stormwater events, catastrophic failure and rare natural events were not often seen as driving factors in alternative selection or mitigation planning. However, in the last few decades, with increasing news reports of tailings facility failures occurring, the potential impacts of these rare natural events appear to be increasing in importance.

According to Table R-2 in Appendix R of the FEIS, 472 comments were received with the general category of "Water resources" and comments that could touch on water related issues could also be within the general categories of "Alternative-related comments" and "Mitigation-related comments". The number of comments received on water and water resources alone, speaks to the importance of this issue to the submitters of comments.  Table 1 summarizes the topics of interest found within these comments in Volume 6 Appendix R, and those topics of interest served as a guide through the review process and for writing this report.

**Table 1.** Comments to the DEIS Which Guided the BLM Reviewers Strategy During Their Review

| Sub-Topic | Comment/Response Number | Number of Comments |
|---|---|---|
| **Characterization of Skunk Camp Alternative** | 30078-34 (WT7), 30078-35 (WT7), 463-3 (MIT3), 28824-1 (MIT1), 314-1 (MIT1), 524-15 (MIT17) lack of 200-yr, 524-18 (WT92), 524-21 (ALT1), | 8 |
| **Impacts of Climate Change** | 30078-18 (WT4), 30075-9 (AQ11), 28449-54 (WT4) | 3 |
| **Environmental Impacts** | 463-2 (CR12), 8030-12 (ALT22), 30078-1 (NS1), 261-10 (MIT1), 30075-3 (WT8), 30075-4 (DOC1), 30075-6 (DOC1), 30075-29 (WT17), 524-9 (WT76) only median flow used, 28449-54 (WT4) | 10 |
| **Impacts to Water Sources (springs, seeps, aquifer)** | 235-2 (CR4), 235-18 (WT30), 235-20 (CR21), 235-23 (WT50), 8030-9 (ALT22), 30078-3 (CR4), 30078-13 (WT4_A), 30078-14 (WT42), 30078-15 (WT4), 30078-24 (WT69), 30078-25 (NS2),   30078-26 (WT19), 30078-29 (MIT3), 30078-30 (MIT1), 30078-31 (MIT1), 30078-32 (MIT1), 30078-36 (WT4), 30078-37 (DOC1), 30078-44 (NEPA-44), 30078-45 (WT54), 30078-51 (WT10), 30079-3 (WT4), 30079-4 (WT4), 322-5 (MIT1), 261-3 (MIT1), 30075-21 (MIT3), 30075-30 (MIT30), 30075-44 (WI3), 30075-46 (MIT1), 562-2 (NS1)?, 562-4 (WT4_G), 562-7 (MIT1), F1 (ALT22, ALT5, NEPA2, NS1, TS2, WT1), F2 (ALT22, ALT5, NEPA2, NS1, TS2, WT1), F3 (NS1), F4 (ALT22, ALT5, NEPA2, NS1, TS2, WT1), F6 (ALT22, NEPA2, NEPA33, NS1, TS2, WT1, WT8), 29449-56 (NEPA54), 28449-55 (WT33), F10 (ALT22, NS1, WT4, WT6) | 40 |
| **Mitigation** | 30075-96 (MIT38), 30075-108 (MIT3), 30075-133 (MIT1), 30075-117 (MIT1), 30075-123 (MIT1), 524-6 (MIT27), 524-7 (MIT1) | 7 |
| **Concerns About Native Waters** | 30078-17 (WT4), 30079-5 (CR4), | 2 |
| **Arizona Water Law** | 30078-19 (WT4_H), 30078-42 (NEPA14), 30078-43 (NEPA14), 30078-44 (NEPA14), 30078-46 (WT21_C), 30078-48 (WT19), 562-6 (NEPA20) jurisdictional waters, 524-2 (MIT27) jurisdictional waters, 524-3 (MIT27), 524-5 (MIT27) jurisdictional waters | 10 |
| **Baseline Conditions** | 30078-20 (NEPA19), 30078-21 (NEPA19), 524-1 (ALT22) | 3 |
| **Basin/Sub-Basin Concerns** | 30078-23 (WT71), 30078-40 (WT30), 30078-41 (WT30) | 3 |
| **Alternative Mining Methods** | 30078-28 (AMT1_B), 30078-38 (AMT1), F5 (AMT1), F6 (ALT22, NEPA2, NEPA33, NS1, TS2, WT1, WT8) | 4 |
| **Limitations of Modeling Effort** | 30078-27 (WT61),30078-33 (WT49), 30075-18 (WT79), 30075-20 (WT79), 30075-22 (WT79), 30075-1 (WT82), | 14 |

11

| Sub-Topic | Comment/Response Number | Number of Comments |
|---|---|---|
| | 30075-23 (WT79), 30075-25 (WT8), 30075-24 (WT62), 30075-2 (WT16), 30075-26 (WT61), 30075-34 (DOC1), 28449-155 (WT81), 28449-52 (WT7) | |
| **Impacts to Water Sources** | 235-2 (CR4), 235-18 (WT30), 235-20 (CR21)?, 235-23 (WT50), 8030-9 (ALT22), 30078-3 (CR4), 30078-13 (WT4_A), 30078-14 (WT42), 30078-15 (WT4), 30078-24 (WT69), 30078-25 (NS2),   30078-26 (WT19), 30078-29 (MIT3), 30078-30 (MIT1), 30078-31 (MIT1), 30078-32 (MIT1), 30078-36 (WT4), 30078-37 (DOC1), 30078-44 (NEPA-44), 30078-45 (WT54), 30078-51 (WT10), 30079-3 (WT4), 30079-4 (WT4), 322-5 (MIT1), 261-3 (MIT1), 30075-21 (MIT3), 30075-30 (MIT30), 30075-44 (WI3), 30075-46 (MIT1), 562-2 (NS1)?, 562-4 (WT4_G), 562-7 (MIT1), F1 (ALT22, ALT5, NEPA2, NS1, TS2, WT1), F2 (ALT22, ALT5, NEPA2, NS1, TS2, WT1), F3 (NS1), F4 (ALT22, ALT5, NEPA2, NS1, TS2, WT1), F6 (ALT22, NEPA2, NEPA33, NS1, TS2, WT1, WT8), 29449-56 (NEPA54), 28449-55 (WT33), F10 (ALT22, NS1, WT4, WT6) | 40 |
| **Contamination/Water Quality** | 30078-33 (WT49), 30078-52 (TS24), 30078-53 (TS24), 30078-54 (TS24), 30075-31 (WT49), 30075-32 (WT44), 30075-33 (WT48), 30075-35 (WT44), 30075-36 (WT49), 30075-37 (DOC1), 30075-38 (WT44), 30075-42 (WT44), 30075-43 (WT44), 30075-33 (WT48), 30075-41 (WT7), 30075-45 (WT57), 30075-130 (DOC1) is only asking for something to be added to a table, 30075-131 (DOC1) correction to table, 30075-132 (DOC1), correction to table, 28449-5 (DOC1) asks for an add to a sentence, 28449-49 (WT32), 28449-89 (DOC1), 524-1 (ALT22), 524-4 (WT7), 524-8 (WT37), 524-10 (WT84), 524-11 (WT32), 524-12 (WT78), 524-13 (WT47), 524-14 (WT46), 524-16 (WI26), 28449-53 (DOC1), | 32 |

**Detailed Technical Comments**

**Baseline Conditions**

In reference to comment response WT31 and WT45, many comments centered on when the baseline condition started, on which impacts due to mining will be compared. The Groundwater Modeling Workgroup also discussed the issue, but no consensus was ever reached on which baseline condition would be most appropriate for groundwater modeling and the NEPA analysis. Concern was expressed in the comments that while dewatering of the Resolution graben has been occurring since 2009, the baseline condition for analysis would be set to the start of mining. The BLM reviewers share this concern because baseline monitoring occurred from 2003 to 2017, but dewatering started in 2009. The short time-period between the start of dewatering and the end of monitoring did not take into consideration a delay in response between deep dewatering and a near-surface expression of the dewatering. The BLM reviewers believe it may be more appropriate to analyze available groundwater level information from wells, between where dewatering is occurring and the four springs in Devils Canyon and the 14 sites on Oak Flat. A study of historical groundwater level information could identify if pre-mining dewatering appears to be expanding towards the locations being monitored, or if impacts are already being realized.

CEQ regulations define cumulative effect as one that "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable actions, regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time" (40 CFR 1508.7) p. 911. By not adequately addressing the importance of regional pre-mining groundwater conditions and the effects of early dewatering associated with the Magma mine, and by including continued dewatering in the analysis of the No Action alternative, the approach to assessing cumulative impacts does not meet the requirements of the above definition.

**Concerns about Native Waters / Tribal Water Supplies**

The San Carlos Sub-Basin of the Safford Groundwater Basin, otherwise known as the Cutter Basin, is located east of the predicted extent of mining influence but remains a concern to tribal entities who obtain groundwater there. Modeling results and geologic controls, mainly the basement rock complex of the Pinal Mountains, indicate that the likelihood of mining impacts propagating to the Cutter Basin is low. To better address the concerns regarding the Cutter Basin, an additional geologic cross section should be developed, expanding beyond the eastern bounds of the model area to the Cutter Basin, highlighting both the distance and the controls to groundwater flow between these two areas. Comment response WT30 addresses the structural and distance controls between the modeled extent of impact and the Cutter Basin, but the text of the FEIS does not appear to.

However, the BLM reviewers believe that geologic isolation does not preclude indirect effects of mining impacting groundwater resources in the Cutter Basin. Should the effects of mining degrade water availability or water quality in the Superior Basin, the Top-of-the-World area, or potential new areas of population development, especially beyond the boundaries of model-predicted effects that may not be subject to mitigation/compensation for loss, water users may have to go elsewhere for water supply. As

13

an adjacent basin, the Cutter Basin may be viewed as a potential alternative supply, which could lead to an indirect effect of mining on the water resources within the Cutter Basin.

**Impacts of Climate Change**

*Alternatives Analysis and Climate Change*

All alternatives for the tailing facilities have advantages and disadvantages in their location, construction, drainage management, breach control, and other factors. With literature in the last decade pointing to a higher likelihood for severe storm events in the future, the BLM reviewers believe there could be an increase in their recurrence.  Examples include:

- o "Average air temperatures are rising, and it is likely that continued warming will accentuate the temperature difference between the Southwest and the tropical Pacific Ocean, enhancing the strength of the southwesterly winds that carry moist air from the tropics into the Southwest during the monsoon. This scenario may increase the monsoon's intensity, or its duration, or both, in which case floods will occur with greater frequency. Hurricanes and other tropical cyclones are projected to become more intense in the future. Since Arizona and New Mexico typically receive 10 percent or more of their annual precipitation from tropical storms, it is likely that this change will also increase flooding." https://climas.arizona.edu/blog/climate-and-floods-southwest

- o "We find that floods generated by convective storms have become more common and more extreme. On the other hand, rain-on-snow floods have become rarer and less extreme." https://doi.org/10.1029/2021GL097022

- o "A growing body of work suggests that the extreme weather events that drive inland flooding are likely to increase in frequency and magnitude in a warming climate, thus potentially increasing flood damages in the future." https://doi.org/10.5194/nhess-17-2199-2017

The BLM reviewers located only brief references to the analysis of flood events at each of the alternative TSF. In addition, discrepancies were noted in discussions of 100-year vs 200-year flood events. Furthermore, no discussion was found of flood events greater than 200 years. We believe each alternative lacks sufficient discussion on climate change and the potential for catastrophic events.

Please incorporate climate change predictions into the stormwater event discussion and analyze the impacts of larger floods (1,000-year flood event has been suggested by the review team) into the analysis of all alternatives. In addition, please provide a summary for each alternative that states the predicted 1,000-year event entering and exiting the TSFs. Please provide the expected spill threshold for all alternatives. This could include buffering and storage based on the TSF pond depth. Also, please provide the expected contaminants and concentrations and their change as the contact water moves downstream and additional waters dilute. Finally, please provide the required mitigation measures if such an event takes place and provide impacts analysis and extent of the contaminants. Results should

be reported in acre feet per day and ft$^3$/s. Results should also be added to the text of the FEIS and provided in simple visual figures and tables for reference.

*Groundwater Model and Climate Change*

Regarding comment response WT4 on water scarcity and competing water uses, the USFS response states "cumulative effects analysis has been expanded in chapter 4 of the FEIS to quantify the cumulative effects of competing water uses in the region and the ramifications of ongoing drought or climate change" The section in chapter 4 recognizes that temperatures continue to rise and that there is a general agreement that timing and intensity of precipitation events would change, however, the groundwater model scenarios used to predict water resources impacts in the future did not incorporate any changes over time for precipitation and recharge in transient simulations. The BLM reviewers believe this results in an under-representation of the extent and magnitude of drawdown induced by mine operation (recharge was increased during simulations for the subsidence zone), which is supported by the "Climate Change" scenario that was requested to be conducted by the Groundwater Modeling Workgroup. The "Climate Change" scenario run indicated that when reductions in recharge (which is common during drought) were simulated, there were higher rates of drawdown at wells and springs compared to the static recharge scenarios presented in the FEIS, particularly to the north and east of the model area. Examples include a nearly 150-foot increase in projected drawdown between the proposed action scenario and the climate change scenario at well HRES-06 near Top-of-the-World, and significant (greater than 10 feet) additional increases in drawdown at locations such as McGinnel Spring, Rock Horizontal Spring, Queen Creek 17.39, DHRES-16, Devils Canyon 6.1E, 6.6W, and 8.8C, and Mineral Creek 6.9. The examples given are in different areas within the model, and in a variety of lithologies. The BLM reviewers could not find any discussion of the "Climate Change Scenario" within the FEIS and believe the model run and the results from the model run should be discussed within the FEIS.

According to the Arizona State Climate Office, in May 2022 Arizona is in the 27th year of a long-term drought. Data shown on the website *azclimate.asu.edu/drought* shows drought has affected Arizona many times throughout recorded history. The BLM reviewers are concerned that the FEIS does not adequately account for permitting processes for water use, CAP water availability, partially planned developments, and decreased precipitation (and therefore changes in recharge). The Drought Contingency Plan is mentioned, but with a short comment that the drought contingency plan is ending in 2026 and therefore will not affect the project. The BLM reviewers believe the FEIS treats other water uses as "speculative," even though there is a high probability that some of these actions will either affect the amount of water available to RC, or the amount of water withdrawn by RC will affect other planned developments. There are many assumptions in the FEIS regarding availability of water to RC, but few assumptions on the availability of water due to an extended drought or other planned projects.

Impacts from climate change will have significant ramifications on hydrologic conditions in the project area during both mine operation and the extended recovery period. Increases in temperature leading to more ET losses to aquifer systems, a reduction in recharge-inducing snowfall, increase in the severity and occurrence interval of convective storm events, and basin-scale drought (reducing not only local water supplies but regional ones including where the Desert Wellfield is proposed), are all factors that influence the cumulative impact of the mining operation and tailings storage on the landscape. The BLM reviewers do not believe factors known to be associated with climate change, such as higher average temperatures, decreased precipitation, higher evapotranspiration, more frequent and potentially more

15

severe flooding, increase in forest fires due to dry vegetation, increased groundwater pumping due to the reduction of surface flows, and salinity, were thoroughly addressed within the FEIS.

**Suggestions for Analysis of Alternatives**

Tailings storage facilities continue in perpetuity after mine closure. The potential energy of upper drainage TSFs like Skunk Camp increases the likelihood of TSF failure and increases the potential spatial extent of impacts. Because of the episodic nature of stresses like earthquakes and stormwater events, the chance for catastrophic tailings storage failure during the life of the mine is low. However, for the communities and environment they depend on for resources like water, the chance for catastrophic failure and the associated impacts is an important consideration.

In August of 2020, in response to the increasing number of TSF failures around the world, the Global Industry Standard on Tailings Management was published with the goal "of zero harm to people and the environment with zero tolerance for human fatality. It requires Operators to take responsibility and prioritize the safety of tailings facilities, through all phases of a facility's lifecycle, including closure and post-closure. It also requires the disclosure of relevant information to support public accountability."

The BLM reviewers believe TSF breach analysis should be conducted for the preferred alternative following the guidelines and standards put forth by the Global Industry Standard on Tailings Management. Study results should be disclosed in the FEIS to inform alternative selection and support public accountability. This analysis is typically conducted by a qualified third party, and like other external studies, the findings should be summarized in the FEIS and should include maps for the extent of impacts and modeling outputs to inform the public. If practicable, breach analysis or some variance thereof for all alternatives should be included in the alternatives analysis to inform the decision-making process. Results from additional breach analysis will inform other permitting data needs and emergency planning and response.

With the potential for extreme stormwater events on the rise and flows that would be catastrophic to downstream resources if the proposed Skunk Camp impoundment failed, what would be the extent of the damage? Has this potential stress on the TSF been considered in the design and placement of materials? What would the extent of the damage be for all the alternatives (not just Skunk Camp)? The BLM reviewers recommend a detailed analysis of the potential extent and impacts associated with each of the alternative tailing facility locations if a catastrophic failure occurred due to the Global Industry Standard 10,000-year stormwater runoff event.

Owing to the changing standards for TSFs, it may be feasible to reopen alternatives that were originally dismissed from the analysis. An alternative that was discussed in Appendix F (Alternatives considered but dismissed from detailed analysis) was the potential to store tailings in existing open pits in the area. While many of them have legitimate rationale for dismissal, the prospect of splitting the PAG tailings into multiple sites such as Casa Grande, Copperstone, and Tohono Cyprus appears viable. It is unclear how much analysis went into the feasibility of a multi-site disposal plan, but it seems that this option should be given more than passing consideration and rise to the level of "detailed analysis" even if it were ultimately dismissed. Even if a combination of available sites still are not sufficient in storing the PAG tailings, the remainder could potentially be stored in a scaled-down version of one of the other

16

alternatives that was analyzed. The BLM reviewers believe this should be explored more as continued evaluation of the preferred alternative approach could potentially reveal an increasing number of concerns about its long-term reliability.

The Reviewers found no evidence within the FEIS or supporting materials that forest fires were considered in the analysis for the alternatives presented for the TSF. Due to the decades long drought Arizona is currently experiencing there is a greater chance for wildfires in the state, and the Skunk Camp location is adjacent to several mountain ranges. If a wildfire were to occur upgradient of the tailings pile, the lack of vegetation caused by the fire could have a profound effect on the local hydrology and the BLM reviewers believe this scenario needs to be addressed as an environmental impact, or as part of a climate change discussion.

It is possible the following information has been presented in other documents that were provided as reference, but the BLM reviewers believe the FEIS should state that contamination of the aquifer and rivers/streams is possible during stormwater events. Please indicate in the FEIS under what scenarios this will happen and identify the extent of contamination for each scenario. The BLM reviewers noted 10 comments expressing concern about the environmental impacts of the TSF and 40 comments about impacts to water quality. The BLM Reviewers believe there needs to be a more thorough discussion in the FEIS about this topic.

Water quality modeling results are based on the seepage collection efficiency for each alternative. However, there is little documentation on what the confidence levels are on seepage efficiency of theoretical tailings facilities. If the values presented are average or expected values, but may vary plus/minus 5% for example, how much variability does that introduce into the modeled water quality results? The reviewers believe this deserves further explanation.

**Characterization of Preferred Alternative Skunk Camp TSF**

BLM reviewers recognize that the alternatives presented in the FEIS are not fully developed and that the purpose of the alternatives analysis is to consider a reasonable range of alternatives that can accomplish the purpose and need of the proposed action. With that in mind the following comments are concerns about the preferred alternative. The layout and positioning of the facilities for the Skunk Camp TSF illustrated in Appendix F of the FEIS shows Pyrite Cell 1 is planned in the path of the two largest drainages entering the Skunk Camp TSF (Stone Cabin and Skunk Camp Wash). The USGS StreamStats calculated 500-year event for the Skunk Camp Wash entering the TSF is 4750 ft3/s (PII 2430 and PIu 9270 ft3/s) while the Stone Cabin Wash for the same recurrence interval is 3760 ft3/s (PII 1910 and PIu 7390 ft3/s) (StreamStats (usgs.gov) accessed on 05/03/2022).

The BLM reviewers suggest looking at alternate Pyrite Cell locations within the Skunk Camp TSF layout to potentially negate exposure of the highest concentration tailings to stormwater runoff greater than the 200-year event. Alternatively, please analyze the feasibility of permanently rerouting Stone Cabin and Skunk Camp Washes around the Skunk Camp TSF to the west. The USGS StreamStats calculated 500-year event for the Skunk Camp Wash at the downstream extent of the TSF is 13,100 ft3/s (PII 5900 and PIu 29,100 ft3/s) (StreamStats (usgs.gov) accessed on 05/03/2022). Diverting all the upstream inflow to the TSF from Skunk Camp and Stone Cabin Washes would reduce the 500-year flood event volume of

17

water coming into contact with tailings in the Skunk Camp TSF by more than 50%. This has the long-term benefit of rerouting potential peak flows around the tailings facility and potentially generating more robust excavated material for tailings impoundment structures. The new alignment appears to be a paleo alignment of those washes prior to the washes eroding through the bed rock.

Permanent diversion dams for the Stone Wash and Skunk Camp Washes potentially entering the TSF should be of significant size and construction to prevent the suggested 1,000-year stormwater event from gaining contact with the TSF. As mentioned above, the probability of a 1,000-year stormwater event occurring during mining operations is low, but viewed at a longer temporal scale, it is an important consideration.

The BLM reviewers believe a more thorough surface water hydrology characterization as it concerns to climate change needs to be completed for the Skunk Camp TSF.  This location has the largest 100-year floodplain footprint when compared to other drainages in the area and BLM reviewers are concerned that more frequent and more severe flood events that could result from climate change have not been addressed.  The more severe flood events could cause erosion and breach of the tailings pile, which would lead to contamination and impact the Gila River.  This location is mostly surrounded by mountains, and with wildfires more likely due to a drier climate, the risk of flood flows caused by fires in the mountains is also a concern for the reviewers.

The BLM reviewers found no mention of a date for steady state in the Skunk Camp groundwater model, other than a statement that average values were used.  Does that mean all historical water levels were averaged and that the data used was not representative of a single moment in time?  There needs to be more of a discussion in the FEIS about the steady state heads used in the groundwater model.

The Reviewers found no mention within the Skunk Camp model of flood events being incorporated into the groundwater model.  Were 100, 200, 500, etc. flood events factored into the projection runs?  The groundwater model seemed to mainly be a tracer type study to show how far contaminants would travel if they got into the aquifer or streambed.


**Impacts to Water Sources (springs, seeps, aquifer)**

After significant study of the FEIS and supplemental studies the BLM reviewers believe the characterization of GDEs is inadequate.  On the United States Department of Agriculture RC Project and Land Exchange Environmental Impact Statement web page under "Baseline Reports" there are inventories of springs, but only a few of those springs were included in the FEIS.  The BLM reviewers did not see a discussion in the FEIS about why only a few of these GDEs were included within the study.

One of the questions sent to the USFS was a concern that there could be an impact to the subflow zone along the Salt River, due to pumping associated with the project.  Since the project is nowhere near the Salt River, the BLM reviewers wonder if this comment is concerned about pumping near the Gila River. If that is the case, a cross-section showing the general geology from the East Valley wellfield to the Gila River could be used to show that pumping for this project can not impact the Gila River.

The BLM reviewers believe the FEIS does not provide enough information to satisfy the concern that the damage to the aquifer from future subsidence at Oak Flat will impact the water in Mineral Creek.  If that

information is available within a supplemental source, a summary of the study should be provided in the FEIS.

In Comment Response WT19, which concerns mitigating lost flows to Queen Creek, the response states that through mitigation (measure FS-WR-04) lost flows would be replaced by direct input of water from existing wells.  Since the loss of flows due to subsidence are a permanent feature of the post-mining landscape, are mitigation flows to Queen Creek planned to be permanent, or will this mitigation be like the mitigation planned for springs and GDEs, where after 10 years past active dewatering the mitigation could potentially cease.  The BLM reviewers believe the response as written requires additional clarification to be adequate.

The area encompassed by the RC project, within any scenario, consists of lands managed by the USFS, State Land, and BLM, as well as interspersed private ownership.  The BLM reviewers wondered if the dewatering of the shallow aquifer will forever prevent any future landowner or development from using the shallow Apache Leap tuff aquifer as a water source, which would force any development or landowner to either drill a more expensive well to a deeper water source, or force them to obtain water from another basin?

In the water budget information presented in Volume 4 Appendix H of the FEIS, there are three periods discussed which include construction, operation, and rampdown, but there is no indication that any water budget analysis was done for the period following year 45 (end of rampdown).  Water budget values should be presented for out-years (perhaps 200 years to match the groundwater model) to compare the budget to pre-mining conditions.

The water balance information shown in Volume 4 Appendix H of the FEIS has exact numbers given to represent water use for each aspect of the project and is meant to convey water use between mine years 6-12, mine years 13-36, and mine years 37-46.  The BLM reviewers wonder how such specific values can be calculated before the project has even begun.  As part of any groundwater modeling process the initial step of creating a water budget always involves coming up with ranges based on available literature.  The exact numbers presented in this report could likely change as mining progresses, and therefore should be represented as a range of values instead of exact values.  The BLM reviewers would also like to see, built into the FEIS, mitigation efforts by RC if water use ends up higher than the new range of values.

The BLM reviewers believe the cumulative impact to groundwater users in the affected area are not well quantified, which should include costs to deepen or relocate wells and added costs to draw groundwater from deeper depths or treat for degraded quality prior to use.  Effects more difficult to directly quantify are the long-term impacts related to loss of basin storage due to irreversible subsidence.

In Volume 2 of the FEIS on page 384 Figure 3.7.1-6 depicts "Apache Leap tuff aquifer water-level elevations and general flow directions".  The BLM reviewers think there should be a similar figure which shows the predicted water level once the upper and lower aquifers become connected through subsidence and new steady state conditions are created.

**Mitigation (water)**

The BLM reviewers did not find any references within the FEIS to monitoring data being added back into the mine groundwater model to determine if initial predictions were accurate or if more mitigation measures needed to be considered to get the results intended under the mitigation plan. The reviewers also wondered if the data obtained through the mitigation efforts were to be entered back into the model and the results showed mitigation efforts were not moving in the direction intended, what would RC do with the result to ensure mitigation efforts stay on track?

The BLM reviewers do not believe the FEIS does enough to acknowledge that although subsidence will be monitored, there is not much that can be done to mitigate once block caving has started. The BLM reviewers believe there needs to be a discussion within the FEIS about the limitations of mitigating the effects of subsidence and an acknowledgement that subsidence could occur in a way that has not been predicted by the modeling efforts.

According to the FEIS, the groundwater model was based on a 200-year timeframe and effects of the mining project could go on for much longer than 200 years. However, the monitoring plan (2020 Monitoring and Mitigation Plan for Groundwater Ecosystems and Water Wells by Montgomery and Associates) states monitoring will only be done for 10 years after dewatering has ceased. The BLM reviewers believe 10 years is not adequate, considering the effects will be felt for hundreds of years, and that the monitoring and mitigation action should be in place until the effects of mining on those sources have been mitigated from the effects of the mining project.

As stated in Volume 4 of the FEIS on page J-2, "The role of the Tonto National Forest under its primary authorities in the Organic Administration Act, Locatable Regulations (36 Code of Federal Regulations (CFR) 228 Subpart A), and Multiple-Use Mining Act is to ensure that mining activities minimize adverse environmental effects on National Forest System (NFS) surface resources." The BLM reviewers want to know if the contents of this statement inhibit the agency's ability to mitigate impacts to groundwater resources (the Apache Leap tuff aquifer) that provide water to surface resources, like springs fed by water from the Apache Leap tuff aquifer?

In Table 2 of the monitoring plan, the measurement type at the springs is listed as "visual estimate" of flow. The BLM reviewers believe "visual estimate" of flow is a qualitative, subjective, and un-repeatable approach that should not be used in the statistical analysis of discharge trends over time. If spring flow cannot be measured directly (volumetric, weir, etc.) it should not be recorded, and site photographs, vegetation monitoring, and water levels at the associated primary monitoring well (PMW) should be used instead.

Contingent monitoring wells (CMWs) are planned at some of the GDE sites, but the CMWs are only planned to be constructed and monitored once trigger levels are met at a nearby PMW. The BLM reviewers believe, when the compartmentalization by faults and the heterogeneity of the fractured Apache Leap tuff are taken into consideration, it seems plausible that impacts will be realized at some GDE sites without a nearby PMW having reached the threshold necessary to move forward with a site-specific CMW.

Installation of wells, or systems to harvest precipitation or surface water flows to mitigate for spring flow loss is a flawed approach which follows the 'rob Peter to pay Paul' logic (FEIS p.421) and would

more accurately be called 'passing the buck' or 'kicking the can' than 'mitigation'. The water captured by a well in the discharging aquifer system of the spring, or capturing rainfall or flow is simply taking water that would have provided another resource further downgradient. From a water budgeting perspective, the only true means of compensating for loss of spring flow is to make up for the loss of system water by augmenting with water from outside that system. Otherwise, it should be acknowledged that the mitigations as proposed have the potential for future negative impacts on other undetermined downgradient resources. The only in-basin alternative that would not impair the collective water resources of the area would be after subsidence connects the Apache Leap aquifer with the deeper aquifer; water could be collected via wells prior to being lost to the lower aquifer and redistributed back on the landscape.

The monitoring plan shows many springs having been historically impounded, diverted, or otherwise influenced. Restoration of these sites may offset the impacts of potential reductions in flow or add habitat to compensate for other areas that may experience significant reductions or total loss of discharge. The reviewers propose that a mitigation for springs and GDEs could be to remove the development structures which inhibit full ecological utilization of the groundwater discharge. However, this is the opposite of what is proposed in the plan, where impacts to flow would trigger more construction of spring boxes. If the springs in question are within a 10-foot drawdown area, only substantial site work could create a spring box that would continue to supply groundwater to the surface.

The potential for a 10-foot water level decline in a well could result in an inconvenience or could make a well non-viable for water production. By contrast, a 1-foot decline in the water table from an aquifer that supplies water to a spring could prevent discharge from occurring at the spring entirely. The BLM reviewers believe the threshold for potential effects to springs and GDEs should be more stringent (expanded area of impact) than the threshold used for wells.

A 10-foot contour line, as stated within the FEIS and provided literature, was the highest accuracy decided upon to represent the effects to the Apache Leap tuff aquifer due to mining activity, and nothing less than 10-feet of drawdown was presented. The 10-foot contour line represents the drawdown limit after 200 years, but it has been acknowledged that drawdown will still be occurring after 200 years. The BLM reviewers suggest a one-mile buffer be added around the modeled extent of mining impacts to the Apache Leap tuff aquifer, and that the wells, springs, and GDEs between the 10-foot contour and the 1-mile buffer be part of the monitoring and mitigation plan.

The BLM reviewers believe the monitoring plan should have control sites outside of the mine project area to study non-mine related impacts such as precipitation patterns, temperature, non-mine pumping, wildfire potential, etc. Control sites were mentioned as a potential in Level 2 trigger, but these control sites should be proactively implemented for data collection, rather than implemented as a reaction to decreasing flows or water levels. The use of control sites would also improve the confidence in the analysis results.

Measure PF-WR-03 is another 'potential future measure' that should become a required measure. The EIS states that quality impacts and water level declines are not anticipated due to operation of the Desert Wellfield, it should not be a voluntary potential future mitigation. If no effects are observed, there will be no action necessary, however, the BLM reviewers believe it should be a mandatory

21

mitigation if in fact negative impacts are observed. The uncertainty in occurrence should not preclude the requirement for action should it occur; as such, this should be a required measure.

**Limitations of Modeling Effort**

*Skunk Camp Model*

See earlier discussion of the Skunk Camp model in the "Suggestions for Analysis of Alternatives" section.

*The Mine Model*

The BLM reviewers do not believe the north, south, and east boundaries of the mine model extend far enough, and that the reasoning given (that only one of the sensitivity runs showed depletion at the boundaries of the model domain and therefore the boundaries are sufficient) is not an adequate justification as the impacts are based on extent of an arbitrarily selected impact threshold, and not the extent of potentially measurable impact.

Model boundaries should extend beyond areas that could potentially be impacted by the project, and since the project will impact the Apache Leap tuff aquifer, and has the potential to impact Mineral Creek, the BLM reviewers believe the FEIS did not adequately explain why Mineral Creek was chosen as a general head boundary (GHB) in the mine model, while a map of the Apache Leap tuff reviewed by the BLM reviewers shows the unit extending beyond Mineral Creek.  There is also reference in the literature that states Mineral Creek is fed in places by the Apache Leap tuff aquifer, yet Mineral Creek was chosen as the boundary for the groundwater model.

The BLM reviewers noted that no pumping other than mine related pumping was added to the mine groundwater model, or at least we did not see any evidence that current stresses outside those caused by the RC mine were incorporated into the model.  The BLM reviewers believe model boundaries far away from stresses to the aquifer cannot be accurately chosen unless all pumping within the Apache Leap tuff and deeper aquifer are included within the groundwater model.

Many WT comment responses provide the estimated water budget values for varying components of the mine operations, stating that while this is "complex", values are presented to the single acre-foot. By contrast, model estimates of mine impact are not presented past 10 feet of drawdown because of uncertainty.  The BLM reviewers wondered if the values used to calculate the water budget (fracture flow drainage, ore moisture, tailings facility seepage control efficiency, etc.) are so well constrained that this level of precision is justified? A review of Appendix H (Mine water balance and use) does not indicate that the presented values are an average, median, or range of potential values, they are presented as one static value for each component of the overall balance.

Comment response WT36 the states "In the DEIS we compared the elevations of the subsidence crater and modeled elevations of groundwater during recovery and found that even after a period of 1,000 years they did not intersect."  The BLM reviewers noted up to a 500 ft error in the water levels for the deeper aquifer in the hydrographs.  Did the USFS choose water levels from hydrographs that had a lower error rate?  Or did the USFS use water level elevations presented as part of the final scenario run?  We are concerned that error prone water levels were used to make this assumption.

A secondary purpose of the mine model is to evaluate the effects of dewatering on the Apache Leap tuff aquifer. The BLM reviewers wondered if the collapse of Oak Flat causes the Apache Leap tuff aquifer to dewater, does the GHB used in the mine model at Mineral Creek permit the stream to dewater if the effects of the dewatering extend to Mineral Creek?

The BLM reviewers suggest a figure that shows the spatial distribution of error between measured and simulated water levels for the Apache Leap tuff aquifer and the deep aquifer are needed with any discussion of model related error in the FEIS. For example, The ADWR Salt River Valley 2009 model report has such a figure (https://new.azwater.gov/sites/default/files/SRV8306_Model_Report_1.pdf) which makes it easy to determine where the groundwater model was under and over simulating water levels in the chosen calibration run of the model.

The BLM reviewers looked at the hydrographs within the February 2019 RC Groundwater Flow Model Report in Appendix C and it appears that the Apache Leap tuff aquifer heads were simulated adequately, but that the deeper aquifer heads had errors up to several hundred feet. Is this an accurate interpretation of the hydrographs? If this is an accurate interpretation, does this error reflect the collapse of the mine over time? If that is the case, then the report needs further explanation so the reader can make the connection. If not, then there needs to be some explanation as to why the error is acceptable for the deep aquifer.

In Section 1.1 of the SWCA Environmental Consultants *Review of Numerical Groundwater Model Construction and Approach (Mining and Subsidence Area) Final* report, the modeling work group stated "Number of known private and public water supply wells within the geographic extent of the water-level impact, and assessment of impact to these water supplies". The BLM reviewers wonder if this was ever completed. If as part of the groundwater model discussion the results are to be presented using a representative well, so that a real well owned by a private entity is not used in the analysis, the BLM reviewers understand that decision. But the USFS needs to also state how many wells are registered with ADWR that could potentially be impacted given the extent of impact shown in the groundwater model. Exact locations and registry numbers are not required.

On page 410 and 411 of the FEIS the comment about well impacts is misleading. The model presented impacts at a well that was created only to symbolize pumping in a specific area (Top of the World, Superior, Boyce Thompson Arboretum). But as stated in a comment submitted to the draft EIS, all wells produce differently based on varying hydraulic conductivity and depths. The BLM reviewers believe Table 3.7.1-4 is misleading because one well is used to represent Superior, Boyce Thompson Arboretum, and Top-of-the-World. If other wells in those areas have different hydraulic conductivities or are screened in slightly different locations, the drawdown in those wells could be different from the well chosen to represent the area. Table 3.7.1-4 at least needs a statement that these wells were chosen to represent each area and a similar analysis at other wells within the same generalized area could produce different results.

Previous reviewers point to lack of adequate scientific data within the groundwater model (Comment ID 30078-27,30075-26, 28449-62, 28449-155, BGC Engineering USA Inc, 2020) which made the model a generic representation of the system versus a complex representation of the system. When beginning a groundwater model of this scale, the best approach is to build a model based on a very generic system, get it calibrated, then add complexity as the model progresses. In response to the concerns expressed by past reviewers, a generalized USFS response was given that adding additional complexity could

produce more model uncertainty by requiring additional parameters to be estimated in the absence of value data (SWCA memo 2020). The BLM reviewers looked to ADWR's approach with the complex regional groundwater models that they have built. These models are used by countless entities in support of assured and adequate water supply designations in the State of Arizona. The ADWR models follow proven groundwater methodology, and they take time to calibrate and refine their modeling approach to incorporate more complex data. Examples of data that would improve the mine model are variations of recharge, variations to evapotranspiration rates, and stresses on the aquifer not limited to RC pumping.

Comprehensive reviews of the model had been conducted prior to the release of the FEIS in 2021 by various parties. The BLM reviewers evaluated the model report, and the description of predicted impacts, prior to evaluating past assessments of the model, as well as the Water Resources Workgroup responses and modifications based on these evaluations. Remarkably, many of the same concerns expressed in past assessments of the model were identified by the BLM reviewers, indicating the concerns had never been incorporated into the groundwater model by the time the FEIS was released. According to the October 2020 SWCA report *Evaluation and Response to Public Comments on Groundwater Modeling Analysis*, prepared for the USFS, the various reasons behind not addressing these concerns were listed under "General categories of comments received" which included four categories of comments and an accompanying table (Table 1). The "General categories of comments received" section, and the accompanying table, did not address that there were definite concerns with the mine model. The section only lists reasons why the legitimate concerns should not be addressed.

The FEIS states that the model was run to 1,000 years, as this was likely necessary to bring the model to a point when effects of mine dewatering were no longer expanding, and that water levels at the edges of mine influence begin to recover. Model scenarios indicate that impacts beyond 200 years are predicted in the areas of natural discharge in Queen Creek, Telegraph Canyon, and Arnett Creek, and in water supply wells in Superior and Top of the World for many hundreds of years up to roughly 900 years. (FEIS p.411). The BLM reviewers believe it should be recognized and highlighted within the FEIS that the information presented in the FEIS does not represent the bounds of predicted impacts, merely those which can be reasonably predicted at an arbitrarily determined time step. We also believe that analyzing only three predicted outcomes, no action (with continued dewatering), life of mine, and impacts at 200 years, is insufficient to address the true cumulative effects of the action.

As addressed in comment response WT16, long term trends shown by the groundwater model have been limited to 200 years. While this time period was agreed upon by the Groundwater Modeling Group, there appears to be no reasoning provided as to why it is anything other than an arbitrary value. The BLM reviewers wondered if there were indications that there is an inflection point in predictive capability at 200 years and beyond this point certainty drops off? Without explanations as to why this alternative was chosen, one could assume that a reason 200 years was chosen was because if the spatial extent of the model was beyond this time period (say 300 or 400 years) the groundwater model results would show that mining impacts extend a significant distance past the model boundary, which would warrant an expansion of the model domain and re-analysis. The comment on the use of the 200-year time period has been mentioned multiple times in past reviews, but the response from the USFS has simply been that 200 years was the agreed-on time frame. The use of drawdown at 200 years and 10 feet was not universally agreed upon by the internal Groundwater Modeling Workgroup.

24

Regarding the potential formation of a pit lake, comment response WT36 states that comments on water levels rebounding and forming a pit lake are inaccurate, because "changes wrought to the aquifer by the block caving fundamentally change the hydrologic and geologic framework of the system. A return to pre-mining conditions is not anticipated, and a return to pre-mining groundwater levels is not inevitable." Model results have been provided to 200 years and have been qualitatively described as continuing to expand for many hundreds of years, even more than 1,000 years, but there is little description or presentation of what will be the new groundwater condition in this area long into the future.  This project is not one where after time, even a very long time, conditions return to an approximate pre-mining condition.  The BLM reviewers believe a description of what the new system will look like and how it will behave is warranted. Uncertainty may be high in this assessment, but it should not be avoided.

The WSP (2018) block cave report states that once subsidence connects the Apache Leap aquifer with the lower system (mine year 16), the Apache Leap will be draining nearly 1,600 gallons per minute (gpm) out of the upper aquifer system into the lower workings.  This rate will decrease over time, but at mine year 50 it will still be draining nearly 380 gpm (600 acre-feet per year) as the Apache Leap tuff continues to move towards a new equilibrium condition.  While these flows will be removed from the lower aquifer via the mine drains during mine operation, once mining is completed these flows will continue to drain from the upper aquifer until another equilibrium condition is reached, either by filling the extent of the workings and subsidence area or draining the Apache Leap aquifer. This drainage likely accounts for the single largest output of groundwater from the Apache Leap aquifer, so what does this do to new equilibrium groundwater flow directions and gradients compared to the pre-mining condition?  Will existing drain points for this aquifer ever recover to pre-mining conditions or will the generation of this new base level permanently alter this system, and what is the ultimate drain point for the lower aquifer?

Figure 2.1, Surface Geology Map, within the WSP February 2019 RC Groundwater Flow Model Report, shows the locations of cross-section A-A' and B-B' which are centered on the Oak Flat area of the project.  The BLM reviewers noted that neither cross-section can be used to help orient readers as to why the north, south and east groundwater model boundaries were chosen.  We would like to see either new cross-sections added to the FEIS, or modifications to these cross-sections, that would help explain to reviewers of the EIS as to why WSP chose those boundary locations for the groundwater model.  The BLM reviewers also believe such cross-sections would help to explain the science between basins/sub-basins and surface water/groundwater flow.


*The East Salt River Valley Project Model*

The BLM reviewers did not see any reference within the FEIS or provided documents to indicate site geology was used to update the 2009 ADWR Salt River Valley groundwater model.  A study was published in 2017 by the Arizona Geological Survey, with funding provided by RC, of the Superstition Vistas Planning Area, within the area shown in the FEIS and accompanying documents that would be used by RC for their East Salt River Valley pumping wells.  The BLM reviewers did not read this report, but the publication stated, "Depth to bedrock, and saturated thickness, were significantly increased throughout SVPA, especially along bedrock piedmonts adjacent to the Superstition Mountains and Mineral Mountains."  The increased depth to bedrock has not yet been included in a published ADWR

groundwater model of the East Salt River Valley, but the BLM reviewers believe this information should be reviewed and incorporated into the groundwater model that evaluates the pumping wells for the RC project.

The BLM reviewers want more of an explanation into how dry cells were modified within the East Salt River Valley Project Model when cells went dry. The literature stated cells that went dry were modified, but the BLM reviewers did not find anything cited within the literature to indicate what scientific data was used to give the cells a greater depth to bedrock.

The BLM reviewers found, related to the FEIS, that the pumping model within the East Salt River Valley states the groundwater model takes into consideration past stored water credits that RC has in the East Valley. Within a few years other entities that have stored water within the East Salt River Valley will also be removing their stored water credits. BLM reviewers would like to know if the pumping model factors in other entities removing stored credits.

The BLM reviewers noted the location of the modeled 25-foot drawdown contour but found no mention of other water users within that 25-foot drawdown zone. Are there current water users within that 25 ft drawdown zone, and are there any future projects already approved by ADWR within that area?

The BLM reviewers believe change maps should be included in the ESRV model report, in addition to the contour maps provided in the groundwater model report. For example, illustrating how much has depth to water changed between the no-action alternative and the other alternatives.

### Forest Service
U.S. DEPARTMENT OF AGRICULTURE

Tonto National Forest         MB-R3-12-10         June 2025

# **FINAL** Environmental Impact Statement
## Resolution Copper Project and Land Exchange
Coconino, Gila, Maricopa, Pinal, Santa Cruz, and Yavapai Counties, Arizona



**Forest Service**
U.S. DEPARTMENT OF AGRICULTURE

---

Tonto National Forest                    MB-R3-12-10                    June 2025

# **FINAL** Environmental Impact Statement
## Resolution Copper Project and Land Exchange
Coconino, Gila, Maricopa, Pinal, Santa Cruz, and Yavapai Counties, Arizona



In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

**Front Cover photo captions:**

*Top:* Map of the Preferred Alternative Project location and the Tonto National Forest

*Bottom Left:* Oak Flat Federal Parcel

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 225 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 5 of 96

Final Environmental Impact Statement

# Executive Summary

## ES-1. Introduction

This executive summary provides an overview of the final environmental impact statement (FEIS) for the proposed Resolution Copper Project and Land Exchange (herein called the project). The FEIS describes the process undertaken by the U.S. Forest Service (Forest Service), a land management agency under the U.S. Department of Agriculture (USDA), to evaluate the predicted effects of and issues related to the submittal of a mining General Plan of Operations (GPO) by Resolution Copper Mining LLC (Resolution Copper), along with a connected, legislatively mandated land exchange of Federal and private parcels in southeastern Arizona (figure ES-1).

This Executive Summary does not provide all the details contained in the FEIS. Please refer to the FEIS, its appendices, or referenced reports for more information. The FEIS and supporting documents are available on the project website at https://www.ResolutionMineEIS.us/.

## ES-1.1 Background

Resolution Copper proposes to develop an underground copper mine on unpatented mining claims on National Forest System (NFS) land near the town of Superior in Pinal County, Arizona, approximately 60 miles east of Phoenix. Resolution Copper is a limited liability company that is owned by Rio Tinto (55 percent) and BHP Copper, Inc. (45 percent). Rio Tinto is the managing member.

Resolution Copper has ties to the century-old Magma Mine, located in Superior, Arizona. The Magma Mine began production in 1910. In addition to constructing substantial surface facilities in Superior, the Magma Mine created approximately 42 miles of underground workings.

In 1995, the Magma Copper Company discovered a copper deposit about 1.2 miles south of the Magma Mine through exploration of those underground workings. The ore deposit lies between 4,500 and 7,000 feet below the surface.

In 1996, BHP Copper, Inc., acquired the Magma Copper Company, along with the Resolution Copper Mine deposit. Later that year, BHP closed operations at the Magma Mine, but exploration of the copper deposit continued.

In 2001, Kennecott Exploration, a subsidiary of Rio Tinto, signed an earn-in agreement with BHP and initiated a drilling program to further explore the deposit. Based on drilling data, officials believe the Resolution Copper Mine deposit to be one of the largest undeveloped copper deposits in the world, with an estimated copper resource of 1,970 billion metric tonnes at an average grade of 1.54 percent copper.

The portion of the Resolution Copper Mine deposit explored to date is located primarily on the Tonto National Forest and open to mineral entry under the General Mining Law of 1872. The copper deposit likely extends underneath an adjacent 760-acre section of NFS land known as the "Oak Flat Withdrawal Area." The 760-acre Oak Flat Withdrawal Area was withdrawn from mineral entry in 1955 by Public Land Order 1229, which prevented Resolution Copper from conducting mineral exploration or other mining-related activities. Resolution Copper pursued a land exchange for more than 10 years to acquire lands northeast of the copper deposit.

Resolution Copper Project and Land Exchange



**Figure ES-1. Resolution Copper Project vicinity map**

ES-2

In December 2014, Congress authorized a land exchange pending completion of the environmental impact statement (EIS), as outlined in Section 3003 of the Carl Levin and Howard P. 'Buck' McKeon National Defense Authorization Act for Fiscal Year 2015 (which is referred to as Public Law (PL) 113-291). The exchange parcel to be conveyed to Resolution Copper includes not only the Oak Flat Withdrawal Area but also the NFS lands above the location of the copper deposit. This collective 2,422-acre tract of land is known as the "Oak Flat Federal Parcel."

The draft EIS (DEIS) was published for public review and comment in August 2019.

The FEIS was completed and originally published on January 15, 2021. On March 1, 2021, the USDA directed the Forest Service to withdraw the Notice of Availability and rescind the FEIS and draft record of decision. The USDA took this step to provide an opportunity for the agency to conduct a thorough review; to ensure regulatory compliance of environmental, cultural, and archaeological analyses; and to provide time for the Forest Service to fully understand concerns raised by Tribes and the public and the project's impact to these important resources.

The FEIS is being republished at this time. The FEIS contains corrections, modifications, and additional analysis in direct response to public comments submitted on the DEIS. Appendix R of the FEIS contains written responses to all public comments received. In addition, revisions have been made since the original publication in January 2021 in response to events and changes since that time.

## ES-1.2    Project Overview

Resolution Copper is proposing to develop an underground copper mine at a site in Pinal County, about 60 miles east of Phoenix near Superior, Arizona. Project components include the mine site, associated infrastructure, a transportation corridor, and a tailings storage facility.

The project would progress through three distinct phases: construction (mine years 1 to 9), operations, also referred to as the production phase (mine years 6 to 46), and reclamation (mine years 46 to 51–56). At the end of operations, facilities would be closed and reclaimed in compliance with permit conditions.

Operational projections anticipate removal of 1.4 billion tons of ore and production of 40 billion pounds of copper using a mining technique known as panel caving. Using this process, a network of shafts and tunnels is constructed below the ore body. Access to the infrastructure associated with the panel caving would be from vertical shafts in an area known as the East Plant Site, which would be developed adjacent to the Oak Flat Federal Parcel. This area would include mine shafts and a variety of surface facilities to support mining operations. This area currently contains two operating mine shafts, a mine administration building, and other mining infrastructure. Portions of the East Plant Site would be located on NFS lands and would be subject to Forest Service regulatory jurisdiction. Ore processing would take place at the old Magma Mine site in Superior.

A tailings storage facility would be constructed to house the waste material that remains after processing. The facility disturbance footprint would occupy between 2,300 and 5,900 acres, depending on the location and embankment design. Pipelines would be constructed to transport the tailings waste from the ore processing facility to the tailings storage facility.

The estimated total quantity of external water needed for the life of the mine (construction through closure and reclamation) is substantial and varies by alternative (180,000 to 590,000 acre-feet). Resolution Copper proposes to use water either directly from the Central Arizona Project (CAP) canal and/or groundwater pumped from the East Salt River valley. Over the past decade, Resolution Copper has obtained banked water credits for recharging aquifers in central Arizona; the groundwater pumped would

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 228 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 8 of 96

Resolution Copper Project and Land Exchange

be through recovery of those banked water credits, or groundwater use authorized by the State of Arizona under a mineral extraction withdrawal permit.

While all mining would be conducted underground, removing the ore would cause the ground surface to collapse, creating a subsidence area at the Oak Flat Federal Parcel. The crater would start to appear in year 6 of active mining. The crater ultimately would be between 800 and 1,115 feet deep and roughly 1.8 miles across. The Forest Service assessed alternative mining techniques in an effort to prevent subsidence, but alternative methods were considered unreasonable.

The workforce during construction/ramp-up is expected to peak at 1,600 personnel in Pinal County and another 1,600 in other areas. During operations, the project would employ an average of approximately 2,100 people annually in Pinal County and another 1,700 in other areas. During the reclamation phase, employment is projected to be 600 in Pinal County and 600 in other areas.

# ES-1.3    Areas of Controversy

The Resolution Copper Project and Land Exchange is controversial for several reasons.

Foremost among them are the expected significant environmental impacts and loss of the Oak Flat area, historically used by Native Americans, who hold the land as sacred and use the area for spiritual and traditional uses. Additionally, in March 2016, the Oak Flat area was listed in the National Register of Historic Places (NRHP) as a traditional cultural place (TCP).

Measures to resolve adverse effects on known historic properties, including but not limited to data recovery, have been developed through consultation with the State Historic Preservation Office, Tribes, and others. However, there is the potential for some portion of existing yet currently unidentified prehistoric and historic artifacts and resources to be disturbed or destroyed, especially within the Oak Flat subsidence area and the footprint of the tailings storage area. These losses could include human burials within these areas.

Water use is a major concern among the public, other government agencies, and interested parties. Recycling and reuse would happen extensively throughout the mine operations, but as previously mentioned, additional external water is needed for processing.

There are concerns regarding how public safety may be affected by the project. This includes the physical safety of persons in areas of subsidence and adjacent communities, as well as increased traffic and effects on air and water quality.

There is public apprehension over the creation, and type, of a tailings embankment for the tailings storage facility. The catastrophic collapse of the Brumadinho tailings dam in Brazil in January 2019, resulting in 259 confirmed fatalities with 11 people still missing (Nogueira and Plumb 2020), has heightened concerns.

In January 2019, Representative Raul Grijalva, a Democrat who serves as the U.S. Representative for Arizona's 3rd congressional district (which includes the western third of Tucson), and Senator Bernie Sanders, an Independent from Vermont, introduced legislation that would overturn the land exchange described in Section 3003 of PL 113-291. Congressman Grijalva cited the need to protect Oak Flat and restore some balance to the country's natural resource policies. In November 2020, Congressman Grijalva released an opinion article admonishing Rio Tinto for its role in destroying a centuries-old Aboriginal heritage site in Australia and subsequently tying the global mining company's trustworthiness to the Resolution Copper Project.

In January 2021, three lawsuits were filed seeking to halt the land exchange. The consolidated cases were stayed in May 2021 due to the rescinding of the January 2021 FEIS by the Forest Service. The District Court ruling in one of those cases (Apache Stronghold v. U.S.) denied an injunction. That District Court ruling was appealed to the Ninth Circuit, and the District Court ruling was upheld. The Apache Stronghold case is based on arguments involving religious freedom and treaty obligations. In November 2022, the Ninth Circuit vacated that ruling and ordered the appeal to be heard en banc. The en banc hearing occurred in March 2023, and a ruling was issued in May 2024 in which the en banc court affirmed the District Court ruling denying an injunction.

# ES-1.4    Lead and Cooperating Agency Roles

In compliance with the National Environmental Policy Act (NEPA), the Forest Service is the lead agency preparing this FEIS. The Forest Supervisor, Tonto National Forest, is the primary deciding official for the proposed GPO submitted by Resolution Copper.

The Forest Service's role as lead agency includes the following:

- Analyzing and disclosing environmental effects of the proposed mine and the land exchange on private, State, and NFS lands or other Federal lands

- Conducting government-to-government consultations with potentially affected Tribes

- Developing mitigations to protect surface resources of the Tonto National Forest and recommending mitigations for lands not under Forest Service jurisdiction

Authorization of more than 25 permits and plans from various jurisdictions are required for this mine project. Representatives from Federal, State of Arizona, and county governments are serving as cooperating agencies with the Forest Service in developing this EIS. Cooperating agencies have jurisdiction over some part of the project by law or have special expertise in the environmental effects that are addressed in the EIS. Monthly calls and meetings between the lead and cooperating agencies have occurred since November 2017. The nine cooperating agencies are as follows:

- U.S. Army Corps of Engineers (USACE)

- U.S. Department of the Interior Bureau of Land Management (BLM)

- U.S. Environmental Protection Agency

- Arizona State Land Department

- Arizona Department of Environmental Quality

- Arizona Department of Water Resources

- Arizona Game and Fish Department

- Arizona State Mine Inspector

- Pinal County Air Quality Control District

Pursuant to Section 404 of the Clean Water Act, Resolution Copper has asked for authorization to discharge fill material into waters of the U.S. for the construction of a tailings storage facility at certain proposed locations. Because Congress directed that a single EIS is to support all Federal decisions related to the proposed mine, the USACE is relying on this EIS to support a decision for issuance of a Section 404 permit.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 230 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 10 of 96

Resolution Copper Project and Land Exchange

The 404 permitting process includes Resolution Copper's submittal of a document called a "404(b)1 alternatives analysis" to USACE. The purpose of the 404(b)1 alternatives analysis is to identify the least environmentally damaging practicable alternative. Part of USACE's permitting responsibility is to identify the least environmentally damaging practicable alternative, as well as to require adequate mitigation to compensate for impacts to waters of the U.S.

While most of the impacts considered under the USACE process are identical to those considered in this EIS, some impacts considered under the USACE process are specific only to that permitting process, which may have a different scope of analysis than the EIS. Because of these differences, the 404(b)1 alternatives analysis is a document strongly related to the EIS, but also separate. Accordingly, the 404(b)1 alternatives analysis is attached to the FEIS as appendix C.

## ES-1.5    Purpose and Need

The purpose of and need for this project is twofold:

1.  To consider approval of a proposed GPO governing surface disturbance on NFS lands—outside the exchange parcels—from mining operations that are reasonably incident to extraction, transportation, and processing of copper and molybdenum.

2.  To consider the effects of the exchange of lands between Resolution Copper and the United States as directed by Section 3003 of PL 113-291.

The role of the Forest Service under its primary authorities in the Organic Administration Act, Locatable Minerals Regulations (36 Code of Federal Regulations (CFR) 228 Subpart A), and the Multiple-Use Mining Act is to ensure that mining activities minimize adverse environmental effects on NFS surface resources and comply with all applicable environmental laws. The Forest Service may impose reasonable conditions to protect surface resources.

Through the Mining and Mineral Policy Act, Congress has stated that it is the continuing policy of the Federal Government, on behalf of national interests, to foster and encourage private enterprise in

•   development of economically sound and stable domestic mining, minerals, and metal and mineral reclamation industries; and

•   orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help ensure satisfaction of industrial, security, and environmental needs.

Secretary of Agriculture regulations that govern the use of surface resources in conjunction with mining operations on NFS lands are set forth under 36 CFR 228 Subpart A. These regulations require that the Forest Service respond to parties who submit proposed plans to conduct mining operations on or otherwise use NFS lands in conjunction with mining for part or all of their planned actions.

Compliance with other laws and regulations, such as State of Arizona water and air regulations, the Endangered Species Act, the Clean Water Act, and the National Historic Preservation Act, also frames the proposed mining activities.

The EIS also serves to support other Federal decisions, including those of the USACE and the BLM. These agencies only have decisions to be supported under certain alternatives.

## ES-1.6    Proposed Action

The proposed action consists of (1) approval of a proposed GPO for operations on NFS lands associated with a proposed large-scale mine, which would be on private land after the land exchange, (2) a land

exchange between Resolution Copper and the United States directed by PL 113-291, (3) amendments to the "Tonto National Forest Land Management Plan" (forest plan) if needed, and (4) mitigations to offset impacts from the proposed project. The next two sections summarize the proposed GPO and land exchange actions.

## ES-1.6.1    General Plan of Operations

A detailed description of the GPO can be found in section 2.2.2.2. The complete GPO is available on the project website, www.ResolutionMineEIS.us.

The type of copper deposit that would be mined at the East Plant Site is a porphyry deposit, a lower grade deposit that requires higher mine production rates to be economically viable. The copper deposit that Resolution Copper proposes to mine averages 1.54 percent copper (i.e., every ton of ore would on average contain 31 pounds of copper).

Mined ore would be crushed underground and then transported underground approximately 2.5 miles west to an area known as the West Plant Site, where ore would be processed to produce copper and molybdenum concentrates. Portions of the West Plant Site would be located on NFS lands and would be subject to Forest Service regulatory jurisdiction.

Once processed, the copper concentrate would be pumped as a slurry through a 22-mile pipeline to a filter plant and loadout facility located near Florence Junction, Arizona, where copper concentrate would be filtered and then sent to off-site smelters via rail cars or trucks. The molybdenum concentrate would be filtered, dried, and sent to market via truck directly from the West Plant Site.

The copper concentrate slurry pipeline corridor would be located along an existing, previously disturbed right-of-way known as the Magma Arizona Railroad Company (MARRCO) corridor. The MARRCO corridor would also host other mine infrastructure, including water pipelines, power lines, pump stations, and groundwater wells. A portion of the MARRCO corridor is located on NFS lands and would be subject to Forest Service regulatory jurisdiction.

Tailings produced at the West Plant Site would be pumped as a slurry through several pipelines for 5.3 miles to a tailings storage facility. The tailings storage area would gradually expand over time, eventually reaching about 3,300 acres in size. A fence constructed around the tailings to prevent public access would enclose about 4,900 acres. The proposed tailings storage facility would be located on NFS lands and would be subject to Forest Service regulatory jurisdiction.

All power to the mine would be supplied by the Salt River Project. Portions of the proposed electrical infrastructure would be located on NFS land and would be subject to Forest Service regulatory jurisdiction. A Forest Service special use permit would be required to approve construction and operation of new power lines on NFS lands by the Salt River Project.

Access to the mine facilities at the East Plant Site would be provided by existing roads. The Magma Mine Road would eventually be relocated as a result of expected subsidence.

Water for the process would come from a variety of sources. Filtrate from the filter plant, recycled water from the tailings storage facility, and recovered water from the concentrator complex would be recycled back into the mining process. Additional water would be obtained from dewatering of the mine workings, pumping from a well field along the MARRCO corridor, or potentially direct delivery of CAP water.

Reclamation would be conducted to achieve post-closure land use objectives. This would include closing and sealing the mine shafts, removing surface facilities and infrastructure, and establishing self-sustaining

vegetative communities using local species. The proposed tailings storage facility would be reclaimed in place, providing for permanent storage of mine tailings.

An initial review of the consistency of the proposed GPO with the forest plan indicates that approval of the proposed GPO would result in conditions that are inconsistent with the forest plan for some alternatives. If needed, an amendment to the forest plan would address the necessary changes to relevant standards and guidelines for managing visual quality and recreation opportunities, as determined by the project's record of decision.

## ES-1.6.2    Land Exchange

Section 3003 of PL 113-291 directs the conveyance of specified Federal lands to Resolution Copper if Resolution Copper offers to convey the specified non-Federal land to the United States. Section (i)(2) of Section 3003 of PL 113-291 allows for modifications to the acreages from those disclosed in the Act due to minor errors, conflict, and mutual agreement. The acreages shown here are the current acres agreed to by all parties and supported by cadastral surveys. For further information on acreage changes between PL 113-291 and publication of this FEIS, see appendix B. Summaries of the appraisals for each parcel were publicly released by the Forest Service on April 22, 2025. The following summarizes the land parcels that would be exchanged.

- The United States would transfer the 2,422-acre **Oak Flat Federal Parcel** to Resolution Copper

- Resolution Copper would offer to transfer the following parcels to the U.S. Department of Agriculture:

  o 140 acres near Superior in Pinal County, Arizona, known as the **Apache Leap South End Parcel**, to be administered by the Tonto National Forest

  o 148 acres in Yavapai County, Arizona, known as the **Tangle Creek Parcel**, to be administered by the Tonto National Forest

  o 147 acres in Gila County, Arizona, known as the **Turkey Creek Parcel**, to be administered by the Tonto National Forest

  o 149 acres near Cave Creek in Maricopa County, Arizona, known as the **Cave Creek Parcel**, to be administered by the Tonto National Forest

  o 640 acres north of Payson in Coconino County, Arizona, known as the **East Clear Creek Parcel**, to be administered by the Coconino National Forest

- Resolution Copper would offer to transfer the following parcels to the U.S. Department of the Interior:

  o 3,120 acres near Mammoth in Pinal County, Arizona, known as the **Lower San Pedro River Parcel**, to be administered by the BLM as part of the San Pedro Riparian National Conservation Area

  o 956 acres south of Elgin in Santa Cruz County, Arizona, known as the **Appleton Ranch Parcel**, to be administered by the BLM as part of the Las Cienegas National Conservation Area

  o 160 acres near Kearny in Gila and Pinal Counties, Arizona, known as the **Dripping Springs Parcel**, to be administered by the BLM

- An additional PL 113-291 requirement calls for the United States to convey upon payment the following land to Superior, Arizona, if the Town of Superior requests it:

  o 30 acres associated with the Fairview Cemetery

  o 250 acres associated with parcels contiguous to the Superior Airport

  o 265 acres of Federal reversionary interest associated with the Superior Airport

In October 2021, the Town of Superior requested the land transfer.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 233 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 13 of 96

Final Environmental Impact Statement

## ES-1.7    Nature of Lead Agency Decision

With regard to the proposed GPO, the Forest Supervisor, Tonto National Forest, would make the following decisions using the analysis in the EIS and supporting documentation:

- Decide whether to approve the proposed GPO submitted by Resolution Copper or require changes or additions to the proposed GPO to meet the requirements for environmental protection and reclamation set forth in 36 CFR 228 Subpart A before approving a final GPO. The Forest Service decision may be to authorize use of the surface of NFS lands in connection with mining operations under the GPO such that the authorized use is composed of elements from one or more of the alternatives considered.

- Decide which alternative to select for approval in the final GPO, which must minimize adverse impacts on NFS surface resources to the extent feasible and must comply with all Federal and State laws and regulations

- Decide whether to approve amendments to the forest plan, which would be required to approve the final GPO

- Decide whether to approve a special use permit for the Salt River Project to authorize construction and operation of power lines on NFS lands

- Decide whether to approve a special use permit for Resolution Copper to authorize construction and operation of pipelines on NFS lands. This decision is applicable to Alternatives 5 and 6. For both of these alternatives, the tailings storage facility is located off NFS lands, with only the pipeline/power line corridor crossing NFS lands. Hence, the NFS authorization would no longer occur under 36 CFR 228 Subpart A (mineral regulations), but rather under 36 CFR 251.50 (special uses).

With regard to the land exchange, Section 3003 of PL 113-291 directs the Secretary of Agriculture to convey to Resolution Copper all right, title, and interest of the United States in and to identified Federal land if Resolution Copper offers to convey to the United States all right, title, and interest of Resolution Copper in and to identified non-Federal lands. Note that the acreages shown in this section are those offered by Resolution Copper to the Federal Government, after completion of cadastral surveys, map revisions, and at the time of publication of this FEIS. Ultimately, the Federal Government may not accept all portions of these lands. The exact parcels and acreage have been assessed through the land appraisal process; summaries of the appraisals for each parcel were publicly released by the Forest Service on April 22, 2025. The Forest Supervisor, Tonto National Forest, has limited discretion to (1) address concerns of affected Tribes; (2) ensure that title to the non-Federal lands offered in the exchange is acceptable; (3) accept additional non-Federal land or a cash payment from Resolution Copper to the United States in the event that the final appraised value of the Federal land exceeds the value of the non-Federal land; or (4) address other matters related to the land exchange that are consistent with Section 3003 of PL 113-291.

## ES-1.8    Public Participation

The Forest Service sought public input during several phases of the environmental review process prior to publication of the FEIS.

The public scoping period began on March 18, 2016, with the Forest Service publication of a notice of intent to prepare an EIS in the Federal Register. Scoping is the first step in the NEPA process and seeks input from within the agency, from the public, and from other government agencies in order to define the scope of issues to be addressed in depth in the EIS.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 234 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 14 of 96

Resolution Copper Project and Land Exchange

The Forest Service planned for a 60-day public scoping period from March 18, 2016, to May 17, 2016.

Numerous individuals and several organizations requested an extension of the public scoping period, as well as additional public scoping meetings. The Forest Supervisor, Tonto National Forest, accommodated these requests by extending the public scoping period through July 18, 2016, resulting in a total overall scoping period of 120 days.

Between March and June 2016, the Forest Service held five EIS public scoping meetings.

A scoping report summarizing 133,512 public comments was completed and made available online on the project website on March 9, 2017 (U.S. Forest Service 2017i).

The Forest Service conducted two public workshops to collect information on public opinion regarding where to site a mine tailings storage facility.

Internal scoping efforts included several meetings and field trips with the NEPA interdisciplinary (ID) team. ID team members include Forest Service resource specialists and planners representing anticipated topics of analysis in the NEPA process, managers, and Tonto National Forest line officers.

Cooperating agency scoping was conducted through a kick-off meeting and through comments submitted by cooperating agencies and Tribes during the public scoping comment period.

Between May 2017 and October 2020, the Forest Service participated in numerous informal meetings (one or more per month) with key stakeholders, Tribes, and cooperating agencies regarding technical feasibility of the project and alternatives, differing environmental impacts and tradeoffs among the alternatives, and mitigations for reducing expected impacts of the proposed GPO and land exchange.

Additional details about scoping conducted during Tribal consultation can be found in section 1.6.5, chapter 5, and appendix S of the FEIS.

The Tonto National Forest released the DEIS on August 9, 2019. A notice of availability was published alongside the DEIS in the Federal Register. This began a 90-day public comment period that ended on November 7, 2019.

The Forest Service conducted six public meetings to present information, answer questions, and receive public comments. Over 29,000 comment submittals were received and responded to as recorded in appendix R. Tribes requested an extended comment period and meeting, which were granted by the Forest Service. Tribes were given a 45-day extension to submit comments; the extension concluded on December 23, 2019.

## ES-1.9    Issues Selected for Analysis

Issues help set the scope of the actions, alternatives, and effects to consider in the Forest Service's analysis (Forest Service Handbook 1909.15.12.4).

Comments submitted during the 2016 scoping period were used to formulate issues concerning the proposed action. An issue is a point of dispute or disagreement with the proposed action based on some anticipated environmental effect. The DEIS disclosed known information and impacts on these issues.

Below are the social, physical, and biological resources or other concerns that the Forest Service selected for analysis, based on scoping comments.

**Issues carried forward for analysis**

| Social and Cultural Issues | Physical and Biological Issues |
|---|---|
| • Cultural Resources | • Air Quality |
| • Environmental Justice | • Geology, Minerals, and Subsidence |
| • Public Health and Safety | • Livestock and Grazing |
| • Recreation | • Noise and Vibration |
| • Socioeconomics | • Scenic Resources |
| • Transportation and Access | • Soils and Vegetation |
| • Tribal Values and Concerns | • Water Resources |
| | • Wildlife and Special Status Species |

Section 1.7, Issues, in chapter 1 of the FEIS provides a snapshot of these issues. Detailed information about these issues appears in chapter 3 of the FEIS.

# ES-2.   Alternatives

NEPA requires consideration of a reasonable range of alternatives that can accomplish the purpose of and need for the proposed action. The Forest Service studied a range of alternatives to the Resolution Copper GPO, each of which

- responds to key issues raised during public scoping; project purpose and need; and applicable Federal and State laws and regulations;

- considers input from resource specialists, mining experts (project team), cooperating agency representatives, Tribes, and stakeholders; and

- is technically feasible to implement—but with differing environmental impacts and tradeoffs.

The alternatives include five action alternatives (out of 30+ considered) at four separate locations, including one location not on Federal land.

In addition, the Forest Service did the following:

- Assessed alternative mining techniques in an effort to prevent subsidence. No alternative methods were considered reasonable.

- Assessed tailings disposal in brownfield sites (old mine pits). No reasonable brownfield locations were found.

- Identified three separate methods of depositing tailings, including using filtered (dry-stack) tailings.

Environmental impacts and tradeoffs among the five action alternatives vary due to the differences in the tailings embankment design, the tailings deposition method, or the geographic location and affected surroundings of the proposed tailings storage facility (figure ES-2). Ore extraction and processing activities as proposed in the GPO remain similar between all action alternatives.

Additional alternatives were considered but dismissed from detailed analysis for various reasons. See appendix F of the FEIS for discussion of the other alternatives considered and the rationale for their dismissal.



**Figure ES-2. Overview of project alternative locations**

ES-12

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 237 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 17 of 96

Final Environmental Impact Statement

## ES-2.1    No Action Alternative

The no action alternative provides a basis for comparison in the EIS. Under this alternative, the Forest Service would not approve the GPO, none of the activities in the final GPO would be implemented on NFS lands, and the mineral deposit would not be developed. Additionally, the land exchange would not take place.

The no action alternative serves as a point of comparison for the proposed action and action alternatives.

## ES-2.2    Alternative 2 – Near West Proposed Action

This alternative is a variation of the proposed action described in the May 9, 2016, version of the Resolution Copper GPO. In early 2018, Resolution Copper changed its original plan for an "upstream" embankment design to a "modified-centerline" configuration for a tailings storage facility.

Alternative 2 would include a split-stream tailings processing method with two tailings types:

- Non-potentially acid generating (NPAG) tailings
- Potentially acid generating (PAG) tailings

PAG tailings have a greater potential to oxidize and generate acidic seepage to groundwater or surface waters. To minimize this potential, PAG tailings would be deposited centrally in the tailings storage facility and surrounded by NPAG tailings. A 5- to 10-foot-deep water cap would keep PAG tailings saturated to reduce exposure to oxygen during tailings storage facility development.

Additionally, the larger NPAG deposit would act as a buffer between the PAG tailings and areas outside the tailings storage facility. Water spigots would keep the NPAG tailings "beach" area wet, ensuring effective dust management during operations.

The modified centerline embankment construction would consist of earthfill and cyclone sand from the NPAG tailings stream. This sand results from tailings processed through one or more dedicated centrifuges to separate larger tailings particles from the finer particles.

A suite of engineered seepage controls, including engineered low-permeability liners, compacted fine tailings, and/or a "grouting" process to seal ground fractures, would limit and contain seepage. Uncontained seepage would be collected in downstream ponds and pumped back to the tailings storage facility. Figure ES-3 provides an overview of Alternative 2.

**Alternative 2 Facility Details**

| Ownership | Tonto National Forest |
|---|---|
| Tailings facility footprint | 3,309 acres |
| Area excluded from public access during operations | 4,903 acres |
| Embankment height | 520 feet |
| Embankment length | 10 miles |
| Tailings type | Slurry |

Resolution Copper Project and Land Exchange



ES-14

**Figure ES-3. Alternative 2 – Near West Proposed Action**

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 239 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 19 of 96

Final Environmental Impact Statement

# ES-2.3    Alternative 3 – Near West – Ultrathickened

## ES-2.3.1    Similarities with Alternative 2

This alternative represents a variation of the proposed action described in the May 2016 GPO. It includes a change in embankment design for a tailings storage facility to a "modified-centerline" configuration consisting of earthfill and cycloned sand.

Alternative 3 has a split-stream tailings processing method with two tailings types:

- NPAG tailings
- PAG tailings

A suite of engineered seepage controls, including engineered low-permeability liners, compacted fine tailings, and/or a "grouting" process to seal ground fractures, would limit and contain seepage, along with downstream seepage collection ponds.

The location on the Tonto National Forest would be identical. Figure ES-4 provides an overview of Alternative 3.

## ES-2.3.2    Differences from Alternative 2

This alternative would use physical barriers to segregate PAG tailings in a separate cell from NPAG tailings. Cycloned sand would be used to build low-permeability "splitter berms" between the two tailings storage areas.

This alternative has a proposal to reduce initial amounts of water retained in NPAG tailings and encourage rapid evaporation, as well as reduce seepage potential, through

- additional on-site thickening of NPAG tailings, which would increase the thickness by 5 percent, reducing the overall amount of water in the facility; and
- possible use of "thin-lift" (also known as thin layer) deposition, to enhance evaporation and further reduce the amount of water in the facility.

Alternative 3 would require less time to close the recycled water pond, compared with Alternative 2. By using ultrathickening methods that reduce water entering the tailings, officials estimate closure in 5 years, compared with 25 years estimated for Alternative 2.

**Alternative 3 Facility Details**

| Ownership | Tonto National Forest |
|---|---|
| Tailings facility footprint | 3,309 acres |
| Area excluded from public access during operations | 4,903 acres |
| Embankment height | 510 feet |
| Embankment length | 10 miles |
| Tailings type | Thickened slurry |





**Figure ES-4. Alternative 3 – Near West – Ultrathickened**

ES-16

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 241 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 21 of 96

Final Environmental Impact Statement

# ES-2.4    Alternative 4 – Silver King

This is the lone alternative proposing to use filtered tailings—instead of slurry tailings—at the tailings storage facility.

As with other alternatives, Alternative 4 would include a split-stream tailings processing method with two tailings types:

- NPAG tailings
- PAG tailings

From the West Plant Site, pipelines would transport the two tailings slurry streams to filter plants at the Silver King location north of the West Plant Site and the town of Superior. Pressure filters would extract about 85 percent of the water from the tailings, resulting in a more solid product and a decrease in water pumped for operations. The water would be recycled in the process water at the West Plant Site.

Conveyors and mobile equipment would mechanically deposit NPAG and PAG tailings in two separate, adjacent tailings storage facilities. Figure ES-5 provides an overview of Alternative 4.

To limit exposure of tailings to water, all runoff would be directed to perimeter ditches, sumps, and/or underdrains. Water coming into contact with exposed tailings would be collected in large ponds located in natural valleys downstream of the tailings storage facility. Large diversions also would be needed to keep upstream stormwater from reaching the tailings storage facility.

Unlike for the proposed action and other alternatives, the filter plant and loadout facilities would be constructed at the West Plant Site, and copper ore would be transported by rail car to the railhead by Magma Junction along the MARRCO corridor.

## ES-2.4.1    Arizona National Scenic Trail

The tailings storage facility and associated auxiliary facilities would impact approximately 5.5 miles of the Arizona National Scenic Trail, resulting in the rerouting of that portion of the trail.

**Alternative 4 Facility Details**

| | |
|---|---|
| **Ownership** | Tonto National Forest |
| **Tailings facility footprint** | 2,266 acres |
| **Area excluded from public access during operations** | 5,660 acres |
| **Embankment height** | Filtered tailings do not use an embankment to contain tailings. However, for comparison with the other alternatives, the overall height of the facility would be approximately 1,000 feet. |
| **Embankment length** | Not applicable |
| **Tailings type** | Filtered |

Resolution Copper Project and Land Exchange



ES-18

**Figure ES-5. Alternative 4 – Silver King**

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 243 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 23 of 96

Final Environmental Impact Statement

# ES-2.5    Alternative 5 – Peg Leg

This alternative allows for an evaluation of a tailings site that is more isolated from existing communities while remaining adjacent to areas of active mining on the landscape.

Alternative 5 also provides for a comparison of the impacts of slurry tailings if placed on a flatter, alluvial landscape instead of an upland wash or canyon.

As with other alternatives, Alternative 5 would include a split-stream tailings processing method with two tailings types:

- NPAG tailings
- PAG tailings

The tailings slurry streams would be transported via 23 miles of pipeline to the Peg Leg tailings storage facility. Two separate storage facilities for NPAG and PAG tailings would exist throughout the life of the mine.

The PAG facility would consist of four separate cells. This would reduce the pond size required for operations and allow for progressive reclamation. Only one cell would be operational at a time. A downstream embankment consisting of earthfill and cycloned sand is proposed for the PAG cells.

NPAG tailings would be located primarily on an alluvial soil foundation to the west and slightly downslope of the PAG site. A centerline embankment, also consisting of earthfill and cycloned sand, is proposed for NPAG tailings. Figure ES-6 provides an overview of Alternative 5.

Officials project higher seepage because of the alluvial foundation. A suite of engineered seepage controls, including low-permeability layers at the PAG facility and low-permeability barriers (liners or fine-grained tailings) for the NPAG tailings, would limit and control seepage. A downstream well field would capture seepage and return it to the tailings storage facility.

**Alternative 5 Facility Details**

| | |
|---|---|
| **Ownership** | BLM; Arizona State Land Department |
| **Tailings facility footprint** | 5,889 acres |
| **Area excluded from public access during operations** | 10,781 acres |
| **Embankment height** | 310 feet |
| **Embankment length** | 7 miles |
| **Tailings type** | Slurry |



**Figure ES-6. Alternative 5 – Peg Leg**

ES-20

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 245 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 25 of 96

Final Environmental Impact Statement

# ES-2.6    Alternative 6 – Skunk Camp

> ## Preferred Alternative
>
> The Forest Service has identified Alternative 6 (Skunk Camp) as the Lead Agency's preferred alternative.

This alternative was developed with consideration for its geospatial features:

- Its location is largely isolated from human residences and other infrastructure.

- It is adjacent to an existing mine (Ray Mine).

- Its location enables use of cross-valley embankments, requiring less fill to retain tailings, compared with a ring-like impoundment. This, in turn, simplifies construction and operations.

As with other alternatives, Alternative 6 would include a split-stream tailings processing method with two tailings types:

- NPAG tailings

- PAG tailings

The tailings slurry streams would be transported via 20 miles of pipeline to the Skunk Camp tailings storage facility. NPAG tailings would be cycloned to produce embankment fill with cycloned overflow—the finer particles—thickened at the tailings storage facility before discharge into the impoundment. PAG tailings would be deposited in two separate cells, behind a separate cycloned sand downstream-type embankment, to the north (upstream) end of the facility. Only one cell would be operational at a time, providing for early reclamation of the first cell. The much larger volume of NPAG tailings would be behind its own embankment of compacted cycloned sand and deposited immediately south of (downstream) and adjacent to the PAG tailings.

A suite of engineered seepage controls, including engineered low-permeability liners, compacted fine tailings, and/or a "grouting" process to seal ground fractures, would provide a low-permeability layer to limit and control seepage. A seepage collection pond also would be placed downstream. Figure ES-7 provides an overview of Alternative 6.

**Alternative 6 Facility Details**

| | |
|---|---|
| **Ownership** | Private land; Arizona State Land Department |
| **Tailings facility footprint** | 4,002 acres |
| **Area excluded from public access during operations** | 9,218 acres |
| **Embankment height** | 490 feet |
| **Embankment length** | 3 miles |
| **Tailings type** | Slurry |

Resolution Copper Project and Land Exchange



**Figure ES-7. Alternative 6 – Skunk Camp (preferred alternative)**

ES-22

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 247 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 27 of 96

Final Environmental Impact Statement

# ES-3.    Summary of Impacts

## ES-3.1    Introduction

Information in chapter 3 of the FEIS describes the natural and human environment that may be affected by the proposed action and its alternatives and discloses the direct, indirect, and cumulative impacts that could occur as a result of implementation of the proposed action or alternatives. The effects of the legislated land exchange are also disclosed in the FEIS. Once the land exchange is completed, Forest Service management regulations would no longer apply on 2,422 acres of the Oak Flat Federal Parcel transferred to Resolution Copper, and 5,460 acres scattered across southeast Arizona would transfer from private ownership into Federal ownership and regulation.

## ES-3.2    Geology, Minerals, and Subsidence

This section describes known geological characteristics at each of the major facilities of the proposed mine—including alternative tailings storage locations—and how the development of the project may impact existing cave and karst features, paleontological resources, area seismicity, and unpatented mining claims. It also outlines subsidence impacts that would result from Resolution Copper's plans to extract the ore from below the deposit using a mining technique known as "block caving" or "panel caving." The analysis concludes the following:

- The subsidence zone at the Oak Flat Federal Parcel would break through to the surface at mine year 6, would be between 800 and 1,115 feet deep, and would be about 1.8 miles in diameter.

- No damage is expected to Apache Leap, Devil's Canyon, or U.S. Route 60 as a result of the subsidence. The mine is also unlikely to induce seismic activity that would cause damage.

- Some unpatented mining claims not belonging to Resolution Copper are located within the project footprint, and access to these claims may be inhibited.

## ES-3.3    Soils and Vegetation

This section explains how the proposed mine would disturb large areas of ground and potentially destroy native vegetation, including species given special status by the Forest Service, and encourage noxious or invasive weeds. The analysis concludes the following:

- Between 9,900 and 17,000 acres of soil and vegetation would be disturbed by the project.

- Revegetation success in these desert ecosystems is demonstrated. However, impacts to soil health and productivity may last centuries to millennia, and the ecosystem may not meet desired future conditions. The habitat may be suitable for generalist wildlife and plant species, but rare plants and wildlife with specific habitat requirements are unlikely to return.

- Arizona hedgehog cactus (endangered) may be impacted during operations at the East Plant Site, by ground subsidence, and by the pipeline/power line corridor for Alternative 6. The pipeline corridor associated with Alternative 5 would impact critical habitat for acuña cactus (endangered).

- Reclamation of disturbed areas would decrease but not eliminate the likelihood of noxious weeds' becoming established or spreading.

## ES-3.4    Noise and Vibration

This section provides a detailed analysis of estimated impacts from noise and vibration under the proposed GPO and each of the alternatives. The analysis concludes the following:

- Noise impacts were modeled for 15 sensitive receptors representing residential, recreation, and conservation land uses. Under most conditions, predicted noise and vibration during construction and operations, for blasting and non-blasting activities, at sensitive receptors are below thresholds of concern. Rural character would not change due to noise.

- One exception is that noise along Dripping Springs Road (Alternative 6) is above thresholds of concern. However, no residual impacts would occur once mitigation is implemented. After mitigation, no unavoidable adverse impacts are anticipated from noise or vibration from any alternative.

## ES-3.5    Transportation and Access

This section discusses how the proposed Resolution Copper Mine would increase traffic on local roads and highways and likely alter local and regional traffic patterns and levels of service. This section also examines NFS road closures, along with accelerated deterioration of local roadways as a result of increased use. The analysis concludes the following:

- Approximately 8.0 miles of NFS roads are expected to be decommissioned or lost from the East Plant Site, West Plant Site, or subsidence area.

- An additional 21.7 miles of NFS roads would be lost as a result of the Alternative 2 and 3 tailings storage facility. Another 17.7 miles of NFS roads would be lost as a result of the Alternative 4 tailings storage facility. Approximately 29 miles of BLM inventoried roads would be lost as a result of the Alternative 5 tailings storage facility. The Alternative 6 tailings storage facility would impact 5.7 miles of private roads.

- NFS roads lost to the subsidence area provide access to areas that include Apache Leap and Devil's Canyon. Access to these areas still would be available but would require using routes that are not as direct or convenient. Alternative 4 would also change access to the highlands north of Superior, as well as to private inholdings in the Tonto National Forest.

## ES-3.6    Air Quality

This section analyzes potential impacts from an increase in dust, wind-borne particulates, and transportation-related emissions as a result of construction, mining, and reclamation activities at the mine and along transportation and utility corridors. The analysis concludes the following:

- Neither daily nor annual maximum impacts for fugitive dust (particulate matter 2.5 ($PM_{2.5}$) and particulate matter 10 ($PM_{10}$)) would exceed established air quality thresholds.

- None of the predicted results are anticipated to exceed the National Ambient Air Quality Standards at the project fence line (where public access is excluded).

- Impacts on air quality related values (deposition and visibility) at Class 1 and other sensitive areas would be within acceptable levels.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 249 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 29 of 96

Final Environmental Impact Statement

# ES-3.7    Water Resources

This section analyzes how the Resolution Copper Project could affect water availability and quality in three key areas: groundwater quantity and groundwater-dependent ecosystems (GDEs), groundwater and surface water quality, and surface water quantity. The analysis concludes the following:

- Impacts to between 18 and 20 GDEs are anticipated. Six of these are springs that are anticipated to be impacted by groundwater drawdown under the no action alternative as a result of ongoing dewatering by Resolution Copper. When block caving occurs, groundwater impacts would expand to overlying aquifers, and two more springs would be impacted. Direct disturbance within the project footprint would impact another six to nine springs or ponds. Depending on the alternative, GDEs associated with Queen Creek, Devil's Canyon, and the Gila River would be impacted as a result of reductions in surface runoff. The loss of water would be mitigated for some GDEs, but impacts to the natural setting would remain.

- Groundwater supplies in Superior and Top-of-the-World could be impacted by groundwater drawdown but would be replaced through mitigation.

- Over the mine life, 87,000 acre-feet of water would be pumped from the mine, and between 180,000 and 590,000 acre-feet of makeup water would be pumped from the Desert Wellfield in the East Salt River valley. Alternative 4, which uses filtered (dry-stack) tailings, requires the least amount of makeup water. The wellfield pumping would incrementally contribute to the lowering of groundwater levels and cumulatively reduce overall groundwater availability in the area.

- After closure, the reflooded block-cave zone could have poor water quality. However, a lake in the subsidence zone is not anticipated, and no other exposure pathways exist for this water.

- Stormwater runoff could have poor water quality, but under normal conditions no stormwater contacting tailings or facilities would be released during operations or post-closure until reclamation is successful. For some combination of extreme storms (300-year return period or greater) and operational upset conditions, stormwater could be released over the spillway of the seepage pond.

- All of the tailings facilities would lose seepage with poor water quality to the environment, and all are dependent on a suite of engineered seepage controls to reduce this lost seepage. Modeling indicates that seepage from Alternatives 2 and 4 would result in water quality problems in Queen Creek; Alternative 3 would not, but requires highly efficient seepage control to achieve this (99.5 percent capture). Seepage from Alternatives 5 and 6 would not result in any anticipated water quality problems. These two alternatives also have substantial opportunity for additional seepage controls if needed.

- There would be a reduction in average annual runoff as a result of the capturing of precipitation by the subsidence zone and tailings facilities, varying by alternative: 3.5 percent at the mouth of Devil's Canyon, between 6.5 and 8.9 percent in Queen Creek at Whitlow Ranch Dam, and between 0.2 and 0.5 percent in the Gila River. Alternative 4 also would result in an almost 20 percent loss of flow in Queen Creek at Boyce Thompson Arboretum.

- Under the Clean Water Act, Alternatives 2, 3, and 4 would impact zero acres of jurisdictional waters, based on a decision by the USACE that no such waters exist above Whitlow Ranch Dam. Alternative 5 directly would impact about 180 acres, and Alternative 6 would directly impact about 130 acres of potentially jurisdictional waters.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 250 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 30 of 96

Resolution Copper Project and Land Exchange

# ES-3.8    Wildlife and Special Status Wildlife Species

This section describes how impacts to wildlife can occur from habitat loss and fragmentation, as well as from artificial lighting, noise, vibration, traffic, loss of water sources, or changes in air or water quality. The analysis concludes the following:

- Habitat would be impacted in the analysis area for about 50 special status wildlife species. General impacts include a high probability of mortality or injury with vehicles or from grading; increased stress due to noise, vibration, and artificial light; and changes in cover. Changes in behavior include changes in foraging efficiency and success, changes in reproductive success, changes in growth rates of young, changes in predator–prey relationships, increased movement, and increased roadkill.

- There would be loss and fragmentation of movement and dispersal habitats from the subsidence area and tailings storage facility. Ground-clearing and consequent fragmentation of habitat blocks for other mine-related facilities would also inhibit wildlife movement and increase edge effects.

- For Tonto National Forest and BLM sensitive wildlife species, the proposed project may adversely impact individuals but is not likely to result in a loss of viability in the analysis area, nor is it likely to cause a trend toward Federal listing of these species as threatened or endangered.

- The general removal of vegetation, increased activity, and potential changes in streamflow and associated riparian vegetation along Devil's Canyon could impact the yellow-billed cuckoo (threatened); during consultation under Section 7 of the Endangered Species Act, U.S. Fish and Wildlife Service concurred that the project may affect, but is not likely to adversely affect, the yellow-billed cuckoo and designated critical habitat.

- The pipeline crossings of the Gila River under Alternative 5, including removal of vegetation and increased activity, could impact southwestern willow flycatcher (endangered).

- Critical habitat for Gila chub (endangered) occurs in Mineral Creek above Devil's Canyon. No individuals have been identified here during surveys, and this area is not anticipated to be impacted by groundwater drawdown. During consultation under Section 7 of the Endangered Species Act, U.S. Fish and Wildlife Service concurred that the project may affect, but is not likely to adversely affect, the Gila chub and designated critical habitat.

# ES-3.9    Recreation

This section quantifies, when possible, anticipated changes to some of the area's natural features and recreational opportunities as a result of infrastructure development related to the project. The analysis concludes the following:

- Public access (Tonto National Forest, Arizona State Land Department, and BLM lands) would be eliminated on 8,400 to 15,200 acres. Alternatives 2, 3, and 4 would result in 7,200 to 7,900 acres of access lost on Tonto National Forest land. Alternative 5 would primarily impact access to 2,600 acres of Tonto National Forest land and 7,000 acres of BLM land, as well as 4,600 acres of Arizona State land, and Alternative 6 would primarily impact access to 11,600 acres, of which 8,200 acres is Arizona State land.

- There would be changes to the recreation opportunity spectrum acres within the Globe Ranger District, with losses of 18 to 166 acres of semi-primitive non-motorized areas.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 251 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 31 of 96

Final Environmental Impact Statement

- Visitors to the Superstition Wilderness, Picketpost Mountain, and Apache Leap would have foreground and background views of the tailings facilities from trails and overlooks, and the recreation setting from certain site-specific views could change. Three miles of the Arizona National Scenic Trail would be impacted by Alternative 4 and require rerouting, whereas pipeline corridor crossings for Alternatives 2 and 5 would impact the trail.

- The exchange of the Oak Flat Federal Parcel would remove world-recognized rock climbing areas from public access, as well as Oak Flat campground. Both of these would be partially mitigated by replacement areas.

- The number of Arizona hunting permits that are issued in individual Game Management Units would not change as a result of implementation of any of the action alternatives.

## ES-3.10   Public Health and Safety

This section addresses three areas of interest: tailings embankment safety, fire risks, and the potential for releases or public exposure to hazardous materials. The analysis concludes the following:

- The risk of embankment failure for all alternatives would be minimized by required adherence to Federal and Arizona design standards and by applicant-committed environmental protection measures.

- The consequences of a catastrophic failure and the downstream flow of tailings would include possible loss of life and limb, destruction of property, displacement of large downstream populations, disruption of the Arizona economy, contamination of soils and water, and risk to water supplies and key water infrastructure like the CAP canal. The highest population is located downstream of Alternative 2.

- All alternative designs are built to the same safety standards, but they have inherent differences in their resilience when unexpected events or upsets happen. Alternatives 2 and 3 are the least resilient because they use modified-centerline embankments, have long (10-mile) freestanding embankments, and do not use separately contained PAG storage cells. Alternative 6 is the most resilient of the slurry tailings alternatives because it uses a centerline embankment that is only 3 miles long and anchored on each side and has separate PAG storage cells that use downstream embankments.

- Alternative 4, using filtered (dry-stack) tailings, is more resilient than slurry tailings alternatives and would have the fewest consequences if a failure occurred, collapsing as a slump or landslide, and impacting the local vicinity only.

- With respect to other public safety risks, the risk of inadvertent ignition and resulting wildland fire is considered quite low. However, Alternative 4 includes areas classified with shrub fuels that burn with high intensity in the event of ignition. As the Mine Safety and Health Administration and other regulations and standards govern the transport and storage of explosives and hazardous chemicals, risks of spills or releases are therefore considered possible, but unlikely, with appropriate response plans in place.

## ES-3.11   Scenic Resources

This section addresses the existing conditions of scenic resources (including dark skies) in the area of the proposed action and alternatives. It also addresses the potential changes to those conditions from construction and operation of the proposed project. The analysis concludes the following:

- All tailings facilities would be visible from long distances, and the change in contrast caused by land disturbance and vegetation removal, dust, and equipment would strongly impact viewers, including recreationists on scenic highways.

- Alternatives 2 and 3 would impact Arizona National Scenic Trail users and off-highway vehicle users, as would Alternative 4. Alternative 4 would be the tallest facility when viewed (1,000 feet high). It would dominate the scene and be viewable from sensitive locations (like Picketpost Mountain). Alternative 5 would also be highly visible and would impact Arizona National Scenic Trail and off-highway vehicle users. Alternative 6 would be visible from within the valley of Dripping Spring Wash but otherwise would not be as visible on the landscape as the other alternatives.

# ES-3.12  Cultural Resources

This section analyzes potential impacts on all known cultural resources within the project area. The analysis concludes the following:

- The NRHP-listed *Chí'chil Biłdagoteel* Historic District TCP would be directly and permanently damaged by the subsidence area at the Oak Flat Federal Parcel.

- A Programmatic Agreement (PA) was pursued and drafted during the Section 106 consultation process. The Rescinded FEIS included that PA (appendix O). All signatories, other than the Advisory Council on Historic Preservation (ACHP), had signed the PA as of January 15, 2021. On February 11, 2021, ACHP notified the Forest Service that "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture delivered a written response to the ACHP on April 17, 2025, and that response concluded the Section 106 process for this undertaking. Since ACHP did not sign the PA, the PA was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final record of decision and special use permit for use of NFS lands, through enforcement by other State and federal agencies, and through third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

- All alternative area surveys anticipated are complete at this time. Any remaining acreage slated for ground disturbance or land sale would be inventoried and cultural sites identified and addressed in accordance with several agreements that are detailed in appendix J. From surveyed areas, the number of NRHP-eligible sites are as follows:

    o  Alternatives 2 and 3: 120 NRHP-eligible sites and 18 sites of undetermined eligibility would be directly affected, and 59 sites would be indirectly affected;

    o  Alternative 4: 145 NRHP-eligible sites and 2 sites of undetermined eligibility would be directly affected, and 55 sites would be indirectly affected;

    o  Alternative 5: 154 NRHP-eligible sites and 3 sites of undetermined eligibility would be directly affected, and 77 sites would be indirectly affected; and

    o  Alternative 6: 377 NRHP-eligible sites and 3 sites of undetermined eligibility would be directly affected, and 55 sites would be indirectly affected.

# ES-3.13  Socioeconomics

This section examines the social and economic impacts on the quality of life for neighboring communities near the proposed mine. The analysis concludes the following:

- On average, the mine is projected to directly employ 1,434 workers, pay about $149 million per year in total employee compensation, and purchase about $490 million per year in goods and

services. Including direct and multiplier effects, the proposed mine is projected to increase the average annual economic value added in Arizona by about $1.2 billion.

- The proposed mine is projected to generate an average of between $80 and $120 million per year in State and local tax revenues and would also produce substantial revenues for the Federal Government, estimated at more than $200 million per year. There would be a loss of hunting revenue as a result of the tailings storage facilities. With Alternatives 2, 3, and 4, the loss would be highest in the Superior area.

- Construction and operations of the proposed mine could affect costs for both the Town of Superior and Pinal County to maintain street and road networks and could strain public services. A number of agreements between Resolution Copper and the Town of Superior would offset impacts to quality of life, education, and emergency services.

- Property values are expected to decline in close proximity to the tailings storage facilities.

## ES-3.14    Tribal Values and Concerns

This section discusses the potential for the proposed mine to directly, adversely, and permanently affect numerous cultural artifacts, sacred seeps and springs, traditional ceremonial areas, resource gathering localities, burial locations, and other places and experiences of high spiritual and other value to Tribal members.

Under all action alternatives, the Oak Flat Federal Parcel will be adversely impacted by the proposed mining operation. Extraction of the ore via block caving will eventually lead to the subsidence of the parcel; access to Oak Flat and the subsidence zone will be curtailed once it is no longer safe for visitors. Several springs located on the Oak Flat Federal Parcel will be lost due to the development of the subsidence area. The subsidence has a high potential to directly and permanently adversely affect numerous cultural resources sites, including the following: archaeological resources; areas with sacred values such as springs, seeps, and prayer locations; resource gathering sites; ancestor burial sites; traditional ceremonial and dance locations; and other places of spiritual and cultural significance to members of federally recognized Tribes.

## ES-3.15    Environmental Justice

This section has been removed in compliance with Executive Orders 14148 and 14173.

## ES-3.16    Livestock and Grazing

This section discloses the impacts to currently authorized livestock grazing on lands managed by the Forest Service, BLM, or Arizona State Land Department that are located within the project area. The analysis concludes the following:

- There would be a reduction in available allotment acreage (BLM, Forest Service, and Arizona State land) ranging from around 8,600 to 15,700 acres and a proportional reduction in livestock capacity from around 700 to 2,800 animal-unit months. The water sources and grazing infrastructure associated with these allotment areas would also be lost.

## ES-3.17    Impact Avoidance, Minimization, and Mitigation

The FEIS serves in part to inform the public and review agencies of design features, best management practices, and mitigation measures that are included with the project to reduce or avoid impacts. The Forest Service views these elements as part of the project and considers Resolution Copper's

proposed mitigation measures, described in appendix J of the FEIS, as inherent to the proposed alternative, as well as other action alternatives' applicable components.

To the extent possible, these measures, including any potential impacts associated with these measures, were considered when assessing the impacts of the project on the resources. Where there is insufficient detail to determine whether an impact can be avoided or minimized, the measure cannot be incorporated into the impact analysis but serves to inform the public of Resolution Copper's plans.

Additional mitigation measures identified or recommended to date during the NEPA process have been compiled and will be considered by the Forest Service and cooperating agencies as part of their permit decisions to further minimize project impacts. This list will be further updated upon completion of the Forest Service administrative review process (objection process), as needed, to provide a comprehensive list of all measures identified during the NEPA process.

All measures will be assessed with the goal of disclosing the likelihood that the measures would be adopted by the applicant or implemented as a condition in a State, Federal, or local permit by the responsible agencies as part of their permit decisions following completion of the NEPA process. Specific mitigation conditions would be determined following completion of the environmental review and would be included in the record of decision for any permit that may be issued.

Compensatory mitigation for unavoidable impacts to aquatic resources may be required to ensure that activities requiring a permit comply with 404(b)(1) guidelines. Compensatory mitigation is the restoration (reestablishment or rehabilitation), establishment (creation), enhancement, and/or in certain circumstances preservation of aquatic resources to offset unavoidable adverse impacts.

Resolution Copper has developed a draft conceptual compensatory mitigation plan outlining its proposed approach for compensatory mitigation. The draft conceptual compensatory mitigation plan would be amended in the future to include proposed mitigation plans. In addition, Resolution Copper proposes to use monitoring measures through construction, operation, and closure of the project to assess predicted project impacts and the effectiveness of mitigation measures.

The draft conceptual compensatory mitigation plan submitted to the USACE by Resolution Copper is included in the EIS as appendix D.

# ES-4.    FEIS Appendices

The final section of the FEIS provides detailed information on 21 subjects. These appendices are as follows:

- Appendix A: Section 3003 of PL 113-291

- Appendix B: Existing Conditions of Offered Lands

- Appendix C: Clean Water Act 404(B)(1) Alternatives Analysis – Resolution Copper

- Appendix D: Clean Water Act Section 404 Conceptual Mitigation Plan – Resolution Copper Project

- Appendix E: Alternatives Impact Summary

- Appendix F: Alternatives Considered but Dismissed from Detailed Analysis

- Appendix G: Further Details of East Plant Site, West Plant Site, MARRCO Corridor, and Filter Plant and Loadout Facility Infrastructure

- Appendix H: Further Details of Mine Water Balance and Use

- Appendix I: Summary of Effects of the Land Exchange

- Appendix J: Mitigation and Monitoring Strategy

- Appendix K: Summary of Content of Resource Analysis Process Memoranda

- Appendix L: Detailed Hydrographs Describing Impacts on Groundwater-Dependent Ecosystems

- Appendix M: Water Quality Modeling Results for Constituents of Concern

- Appendix N: Summary of Existing Groundwater and Surface Water Quality

- Appendix O: *This appendix has been removed from the FEIS*

- Appendix P: Final Biological Opinion Completing Consultation under Section 7 of the Endangered Species Act

- Appendix Q: Special Use Permit Applications

- Appendix R: Response to Comments Received on the DEIS

- Appendix S: Consultation History

- Appendix T: Proposed Forest Plan Amendment and NFMA Compliance Determination for Preferred Alternative

- Appendix U: Supplemental Information for Section 3.14, Tribal Values and Concerns

*This page intentionally left blank.*

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 257 of 2158
Case 2:21-cv-00122-DWL   Document 87-2   Filed 07/14/25   Page 37 of 96

Resolution Copper Project and Land Exchange

- The land exchange would not take place;

- Certain ongoing activities on Resolution Copper private land, such as reclamation of the historic Magma Mine, exploration, monitoring of historic mining facilities such as tailings under existing State programs and permits, maintenance of existing shaft infrastructure, including dewatering, and water treatment and piping of treated water along the MARRCO corridor to farmers for beneficial use, would continue regardless of GPO approval;

- Ongoing trends not related to the proposed project would continue, such as population growth, ongoing impacts on air quality from fugitive dust and vehicle emissions, human-caused fires, ranching, and a corresponding increase in use of public lands; and

- A project-specific forest plan amendment would not be needed for compliance with the forest plan.

### 2.2.3.1    Need for Inclusion of Land Exchange in Document

PL 113-291 directs the Forest Service to prepare a single EIS prior to the final execution of the land exchange to serve as the basis for all Federal decisions related to the proposed mine. The proposed action and action alternatives analyzed in detail in chapter 3 therefore assume that the land exchange would occur as directed by Congress; for this reason, it is included as a component common to all action alternatives (see section 2.2.2.1).

However, even though directed by Congress, the land exchange remains a discretionary decision on the part of Resolution Copper, which may or may not choose to undertake the exchange after receipt of the appraised value. It is possible that mining under the proposed action or action alternatives could also take place without the land exchange occurring. If the land exchange did not occur, the 760-acre Oak Flat Withdrawal Area would remain closed to mineral entry. While under the proposed action no mining panels are located below the Oak Flat Withdrawal Area, the proposed action might require modification to limit subsidence into that area. Regardless, mining without a land exchange would be a possibility. The single EIS must therefore allow for a comparison of potential impacts of mining that occurs on land remaining in Federal ownership with potential impacts that would occur following the land exchange. Whether the land exchange occurs or not, the mine would be developed in accordance with the Federal, State, and local laws governing mining operations. However, these laws could differ, depending on whether or not a land exchange occurred.

The no action alternative provides one baseline against which the proposed action and action alternatives may be compared. The no action alternative assumes no land exchange and no Forest Service approval of a GPO. This baseline allows a direct comparison of the effects of most of the mining impacts that would occur from the proposed action and action alternatives. However, the no action alternative is not sufficient to fully analyze the effects of the exchange of the selected lands.

Two other combinations of no action were considered during analysis:

- A fully executed land exchange, but no approval of the GPO; and

- The land exchange would not occur, Oak Flat would stay in Federal management, and the GPO would be approved with the mining taking place on public land.

The first combination was not carried forward as the Forest Service is unable to refuse approval of the GPO within their regulations and guidance. The second combination was considered because the land exchange is a discretionary action on the part of Resolution Copper. Therefore, an analysis was completed that compared the regulatory framework of mining activity on lands remaining in Federal ownership with the regulatory framework on lands being transferred to private ownership (appendix I). This provides the

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 258 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 38 of 96

Final Environmental Impact Statement

## 3.5.4    Environmental Consequences of Implementation of the Proposed Mine Plan and Alternatives

### 3.5.4.1    Alternative 1 – No Action

**Traffic Volume/Level of Service**

Under the no action alternative, no mine expansion would occur and the existing transportation patterns and existing infrastructure in the analysis area would continue (Southwest Traffic Engineering LLC 2017, 2020b).

While normal background growth and area development will increase traffic, intersections in the analysis area generally are expected to operate within an acceptable LOS in years 2022 and 2027 (see table 3.5.4-3 later in this section). The exception would be the Combs Road/Schnepf Road intersection, which is expected to operate with a side street LOS E/F by year 2022 through 2027. A traffic signal may be required at this intersection, along with exclusive turn lanes for all approaches, to alleviate delays expected to occur with or without the project.

**Transportation Routes**

Under the no action alternative, existing transportation routes would not change. There would be no direct, indirect, or cumulative effects on the transportation routes as a result.

**Changes in Access**

Public access to NFS land and transportation infrastructure would not be impacted under the no action alternative because there would be no new roads, updates to existing roads, or closures of existing roads under this alternative. There would be no direct, indirect, or cumulative effects on changes in access as a result.

### 3.5.4.2    Impacts Common to All Action Alternatives

**Effects of the Land Exchange**

The land exchange would have significant effects on transportation and access. The Oak Flat Federal Parcel would leave Forest Service jurisdiction, and with it public access would be lost to the parcel itself, as well as passage through the parcel to other destinations, including Apache Leap and Devil's Canyon. These locations have other means of access, but those routes may not be as direct or convenient. Resolution Copper may keep portions of the property open for public access, as feasible.

The offered land parcels would enter either Forest Service or BLM jurisdiction. The eight parcels would have beneficial effects; they would become accessible by the public and be managed by the Federal Government for multiple uses. Roads and access would be managed in accordance with the appropriate management plans and agency direction.

**Effects of Forest Plan Amendment**

No components of the 2023 forest plan directly relate to transportation and access that require amendment.



### Forest Service
U.S. DEPARTMENT OF AGRICULTURE

**Tonto National Forest**        **MB-R3-12-10**        June 2025

# **FINAL** Environmental Impact Statement
## Resolution Copper Project and Land Exchange
Coconino, Gila, Maricopa, Pinal, Santa Cruz, and Yavapai Counties, Arizona

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 260 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 40 of 96

Final Environmental Impact Statement

**Mineral Creek**

Mineral Creek is similar in nature to lower Devil's Canyon. While flows are supported in part by near-surface storage of seasonal precipitation, the available evidence indicates that these waters arise partially from the Apache Leap Tuff aquifer and other regional sources. For the purposes of analysis, Mineral Creek is considered to be connected with regional aquifers, which could potentially be impacted by groundwater drawdown caused by the block-cave mining and dewatering; whether this impact is predicted to occur or not is determined using the results of the groundwater modeling.

Approximately the lower 4 miles of Mineral Creek exhibits perennial flow that supports riparian galleries and aquatic habitat. Three perennial springs also contribute to Mineral Creek (Government Springs, MC-8.4C, and MC-3.4W or Wet Leg Spring). Government Springs is the farthest upstream, roughly 5.4 miles above the confluence with Devil's Canyon (Garrett 2018e).

Mineral Creek is designated as critical habitat for Gila chub. The AGFD has conducted fish surveys on Mineral Creek periodically since 2000 and has not identified Gila chub in Mineral Creek since 2000. While the presence of amphibians suggested acceptable water quality in this reach, until 2006 no fish populations were observed despite acceptable habitat. AGFD stocked native longfin dace in Mineral Creek downstream of Government Springs in 2006, and as of 2017, these fish were still present in the stream, though Gila chub have not been seen (Crowder et al. 2014; WestLand Resources Inc. 2018a).

**Arnett Creek**

Fairly strong and consistent evidence indicates that several reaches of Arnett Creek likely receive some contribution from groundwater that looks similar to the Apache Leap Tuff aquifer, though these units are not present in this area. This includes Blue Spring (located in the channel of Arnett Creek above Telegraph Canyon) and in the downstream portions of Arnett Creek immediately downstream of Telegraph Canyon. Arnett Creek is considered to be connected with regional aquifers, which could potentially be impacted by groundwater drawdown caused by the block-cave mining and dewatering; whether this impact is predicted to occur or not is determined using the results of the groundwater modeling.

**Telegraph Canyon**

Telegraph Canyon is a tributary to Arnett Creek. Unlike Arnett Creek, there was insufficient evidence to determine whether or not these waters were tied to the regional aquifers. In such cases, the Forest Service policy is to assume that a connection exists; therefore, Telegraph Canyon is also considered to be connected with the regional aquifers, which could potentially be impacted by groundwater drawdown caused by the block-cave mining and dewatering; whether this impact is predicted to occur or not is determined using the results of the groundwater modeling.

**Tributaries to Queen Creek and Devil's Canyon**

A number of tributaries were evaluated originating in the Oak Flat area and feeding either Queen Creek or Devil's Canyon. These include Number 9 Wash and Oak Flat Wash (Queen Creek drainage) and Iron Canyon, Hackberry Canyon, and Rancho Rio Canyon (Devil's Canyon drainage). Sufficient evidence existed for all of these tributaries to demonstrate that they most likely have local water sources that are not connected to the regional Apache Leap Tuff aquifer (Garrett 2018e).

WATER SUPPLY WELLS

GDEs represent natural systems that could be impacted by the project, but human communities also rely on groundwater sources in the area. In lieu of analyzing individual wells, typical wells in key

communities were analyzed using the groundwater flow model (Newell and Garrett 2018d). These areas include the following:

- **Top-of-the-World**. Many wells in this location are relatively shallow and rely on near-surface fracture systems and shallow perched alluvial deposits (see attachment 7 in Garrett (2018e)); these wells would not be impacted by changes in the regional aquifers. However, other wells in this area could be completed deeper into the Apache Leap Tuff aquifer. Impacts on well HRES-06 is used as a proxy for potential impacts on water supplies and individual wells in this area.

- **Superior**. The Arizona Water Company serves the Town of Superior; the water comes from the East Salt River valley. Even so, there are assumed to be still be individual wells within the town that use local groundwater (stock wells, domestic wells, commercial wells). As with Top-of-the-World, some of these wells may rely on near-surface groundwater and would not be impacted by changes in the regional aquifers. Other wells could be completed in geological units in hydraulic connection to the deep groundwater system. Well DHRES-16_743 is used as a proxy for potential impacts on water supplies and individual wells in this area.

- **Boyce Thompson Arboretum**. The Gallery Well is used as a proxy for impacts on water supplies associated with Boyce Thompson Arboretum. This well likely uses groundwater from local sources, but for the purposes of analysis it is assumed to be connected to regional aquifers.

Public comments suggested that focusing on proxies instead of specific individual wells was an inappropriate approach. The rationale for using proxies was provided in DEIS references (Newell and Garrett 2018c), but bears repeating here.

In order to evaluate the effects of groundwater drawdown on an individual well, a number of details need to be known about the well construction and operation. These include depth to water, depth of well, location of perforated intervals, and the type and depth of pump equipment in the well. In general, individual water supply wells vary so much a hypothetical 10-foot drop in the water table could leave a shallow well completely dry (requiring it to be redrilled), could cause a different well to lower a pump but otherwise remain unaffected, or could have no noticeable effect at all for deeper wells. Most of these key details are unknown through existing data sources, and unable to be collected without disrupting water service.

The proxy wells described above provide a reasonable estimate of impacts that any individual well owner could apply to their own well if located in the same area. If an individual well owner is not located near these areas, drawdown can be spatially seen in figures 3.7.1-2 (for drawdown near the Desert Wellfield) and 3.7.1-3 (for drawdown near the mine site). Drawdown also is detailed for any of the GDE locations (see hydrographs in appendix L, with the specific location shown on figure 3.7.1-9). If proxy wells are insufficient for a given individual well owner, all of these sources also are indicative of drawdown in the regional aquifer that could impact individual wells.

The Forest Service received comments suggesting an expansion of the analysis of individual wells. Specifically, even if the impact to individual wells cannot be undertaken with any certainty, the total number of wells potentially impacted could be disclosed. This analysis has been undertaken and added to the FEIS (Garrett 2023a).

We also received cautions about the ability to apply the proxy wells to all wells in the geographic area. We recognize this limitation. The proxy well locations are meant to reflect the drawdown that can be expected in a specific location, at a specific time, in a specific hydrogeologic unit. Other wells in the area could experience no impact at all (if drawing water from shallow alluvium or fractures) or different impacts (if completed in some other hydrogeologic units). The proxy wells are meant to reflect the most likely impacts in those areas: for Top-of-the-World drawdown in the Apache Leap Tuff, for Superior

## SUMMARY OF APPLICANT-COMMITTED ENVIRONMENTAL PROTECTION MEASURES

A number of environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on groundwater quantity and GDEs. These are non-discretionary measures and their effects are accounted for in the analysis of environmental consequences.

From the GPO (2016c), Resolution Copper has committed to various measures to reduce impacts on groundwater quantity and GDEs:

- Groundwater levels will be monitored at designated compliance monitoring wells located downstream of the tailings storage facility seepage recovery embankments in accordance with the requirements of the APP program;

- All potentially impacted water will be contained on-site during operations and will be put to beneficial use, thereby reducing the need to import makeup water;

- Approximately 60 percent of Resolution Copper's water needs will be sourced from long-term storage credits (surface stored underground[69]). In addition, in September 2021, the allocation of a Non-Indian Agriculture CAP allotment was finalized. In 2022, this water was delivered to NMIDD and may be used similarly in the future for continued aquifer recharge;

- As much water as possible will be recycled for reuse; and

- The water supply will also include the beneficial reuse of existing low-quality water sources such as impacted underground mine dewatering water.

## HYDROLOGIC CHANGES ANTICIPATED FROM MINING ACTIVITIES

The block caving conducted to remove the ore body would unavoidably result in fracturing and subsidence of overlying rocks. These effects would propagate upward until reaching the ground surface approximately 6 years after block caving begins (Garza-Cruz and Pierce 2017). It is estimated that the subsidence area that would develop at the surface would be approximately 800 to 1,100 feet deep (see Section 3.2, Geology, Minerals, and Subsidence).

Fracturing and subsidence of rock units would extend from the ore body to the surface. This includes fracturing of the Whitetail Conglomerate that forms a barrier between the deep groundwater system and the Apache Leap Tuff aquifer. When the Whitetail Conglomerate fractures and subsides, a hydraulic connection is created between all aquifers. Effects of dewatering from the deep groundwater system would extend to the Apache Leap Tuff aquifer at this time.

## CHANGES IN BASIN WATER BALANCE – MINE DEWATERING

Mine dewatering is estimated to remove approximately 87,000 acre-feet of water from the combined deep groundwater system and Apache Leap Tuff aquifer over the life of the mine, or about 1,700 acre-feet per year (Meza-Cuadra et al. 2018a).

## ANTICIPATED IMPACTS FOR GROUNDWATER-DEPENDENT ECOSYSTEMS (UP TO 200 YEARS AFTER START OF MINING)

As assessed in this EIS, GDEs can be impacted in several ways:

- Ongoing dewatering (described in the no action alternative section)

---

[69] More discussion about Resolution Copper's accumulation of long-term storage credits, or agreements for obtaining long-term storage credits, is included in Chapter 4, Cumulative Effects.

### Forest Service
#### U.S. DEPARTMENT OF AGRICULTURE

**Tonto National Forest**                    **MB-R3-12-10**                    June 2025

# **FINAL** Environmental Impact Statement
## Resolution Copper Project and Land Exchange
Coconino, Gila, Maricopa, Pinal, Santa Cruz, and Yavapai Counties, Arizona



Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 264 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 44 of 96

Final Environmental Impact Statement

A specific loss of water sources for specific grazing allotments is not known for any of the RFFAs.

## 4.3.4    Further Discussion of Key Topics

The following discussions concern several topics that have cumulative impacts that are not adequately captured in the cumulative effects analysis undertaken in sections 4.3.1 through 4.3.3. In some cases this is because many of the reasonably foreseeable actions have been screened out for lack of sufficient detail, but are still likely to happen in some unspecified fashion, such as increasing competition for water supplies. In other cases, such as future meteorological trends, the effects are not tied to a single reasonably foreseeable future action but have ramifications on many aspects of the analysis.

### 4.3.4.1    Cumulative Effects on Regional Water Supplies

We received many comments expressing concern with regional water supplies, current and future stresses on water supplies from drought and future meteorological trends, and the ramifications of Resolution Copper's use of water in the face of competing water uses.

We considered a number of specific projects or actions related to water supplies during the cumulative effects analysis process, including the following:

- Arizona's Drought Contingency Plan

- Resolution Copper's Potential Allocation of CAP Water

- Town of Florence Development Projects

- Population Change

- Recent Modeling Reports Projecting Water Shortages in Pinal County

- Assured Water Supplies in the East Salt River Valley

- Future Superstition Vistas Development Area on Arizona State Trust Land

Some of these normally would not be analyzed as cumulative effects because they do not meet the appropriate screening criteria to be considered reasonably foreseeable future actions (Debauche 2023; Newell et al. 2020; SWCA Environmental Consultants 2020b). For example, the provisions of the drought contingency plan expire in 2026 and would not overlap in time with the Resolution Copper Project's operational pumping. Similarly, water shortages in Pinal County are outside the spatial area impacted by Resolution Copper Project's pumping, and the effects of groundwater drawdown would not overlap. The Superstition Vistas development area would likely overlap in both space and time with the Resolution Copper Project's operational pumping. However, the development plans are conceptual and lack adequate detail to allow substantial analysis of resource effects and thus normally would be considered speculative, not reasonably foreseeable.

Regardless of the screening outcomes, due to the great interest expressed by the public and cooperating agencies in water-related issues, we have added this section to the cumulative effects analysis to discuss these regional water supply issues in the context of the Resolution Copper Project's use of water.

### Regulatory Framework and Appropriateness of Resolution Copper's Water Use

Many comments express a value judgment that use of water for the Resolution Copper Project is an inappropriate use of Arizona's limited water resources, especially in the context of current drought and future meteorological trends.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 265 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 45 of 96

Resolution Copper Project and Land Exchange

Tribes that receive water from the Non-Indian Agricultural (NIA) pool (Person 2021; Whitehill 2019). Though internal to Arizona, the drought contingency plan also provides for mitigation measures (including wet water replacement and financial compensation) that are meant to reduce impacts on end users.

One provision of the drought contingency plan is to allow irrigation districts in central Arizona to pump an additional 70,000 acre-feet of groundwater per year, which would only replace part of the Colorado River water that Pinal County farmers will have to relinquish under Tier 2 restrictions (James 2020). Some amount of CAP water has also been banked annually for future use as groundwater since 1996, but between 1996 and 2016, only 9 million total acre-feet of water was banked. This is the equivalent of about 1 year of total water usage for the state, or 9 years of total water usage for the Phoenix and Tucson AMAs (Hirt et al. 2017). With Tier 2 restrictions (as occurred in 2023), banking of CAP water for future use is likely to be further reduced, increasing the net reduction in available groundwater. There already is a demand/supply gap with respect to groundwater in Arizona, resulting in long-term depletion of aquifers (Eden et al. 2015). If water use restrictions continue or increase and the amount of groundwater recharge continues to decrease, this would only increase the rate at which groundwater supplies are depleting.

### Ramifications of Future Colorado River Shortages on the Resolution Copper Project

In June 2020, the U.S. Department of the Interior published a proposed decision for the reallocation of NIA priority CAP water (U.S. Department of the Interior 2020). The reallocation decision originated with the 2004 Arizona Water Settlements Act, which led to an ADWR recommendation in January 2014 to reallocate a pool of CAP water to a number of entities, including Resolution Copper. ADWR recommended that Resolution Copper receive 2,238 acre-feet of CAP water annually. The Bureau of Reclamation undertook a NEPA analysis for the potential reallocation, which culminated in the completion of a Final Environmental Assessment and Finding of No Significant Impact in November 2019. On September 20, 2021, Resolution Copper entered into a subcontract with the United States and the Central Arizona Water Conservation District for the approved annual allocation of 2,238 acre-feet of NIA CAP water (Antone 2022b). In 2022, Resolution's NIA CAP allocation was delivered to New Magma Irrigation and Drainage District's Groundwater Savings Facility. Availability of the Resolution Copper NIA CAP water in future years will be subject to both physical availability and the terms of the drought contingency plan.

The DEIS disclosed the potential for Resolution Copper to use CAP water directly as one possible water source, along with pumping groundwater from the Desert Wellfield. However, because Resolution Copper did not have an approved CAP allotment, for the purposes of impact analysis, all makeup water for the mine was assumed to be physically pumped from the Desert Wellfield. This choice was made to ensure that impacts caused by groundwater drawdown in the East Salt River valley are not underestimated. The FEIS continues to assume that all makeup water for the mine is physically pumped from the Desert Wellfield.

Now that Resolution Copper has received the CAP allocation, it could potentially be used to offset about 100,000 acre-feet of groundwater pumping over the operational life of the mine. This could be accomplished by direct use of CAP water but more likely would be accomplished by using the allotment to acquire additional long-term storage credits, as was done in 2022. If this occurs, the impacts to regional groundwater would be less than those disclosed in section 3.7.1 of the January 2021 Rescinded FEIS.

Under Tier 1 and 2 shortages on the Colorado River, or similar shortages required by future iterations of management plans once the drought contingency plan expires, Resolution Copper's CAP allocation may not be fully available. In this case, the disclosures of impacts to regional groundwater in the FEIS would remain appropriate.

agreements, Resolution Copper would have roughly 318,000 acre-feet of long-term storage credits, which accounts for roughly 60 percent of the water needs for the preferred alternative.

It is foreseeable that ADWR would make the remainder of the necessary groundwater available to Resolution Copper. Resolution Copper would likely receive a Permit to Withdraw Groundwater for Mineral Extraction and Metallurgical Processing. Under State law, this is a non-discretionary permit, provided that certain conditions are met (ARS 45-514).

OTHER FUTURE WATER USERS IN THE EAST SALT RIVER VALLEY

One of the primary mechanisms by which groundwater is managed in the AMAs is the Assured Water Supply program. Under this program, the act of subdividing land for development requires proof that enough water is physically and legally available to supply those homes for 100 years. As the intent of this program is to foster use of renewable sources of water, there are restrictions on how much groundwater can be used to make this demonstration. There is a total of roughly 24,000 acre-feet of annual future committed demand through approved Assured Water Supplies in the East Salt River valley (Barter et al. 2020). This is above and beyond the amount of agricultural, industrial, and municipal pumping already taking place in this part of the basin.

Superstition Vistas is a 275-square mile area of Arizona State Trust land in the East Salt River valley. Conceptually, this area has been identified for residential and commercial development, with a number of different scenarios considered (Morrison Institute for Public Policy 2006); however, at the time of the January 2021 Rescinded FEIS, the ASLD had taken no concrete steps for auction of this land. This has since changed, but only for a small portion of the Superstition Vistas area, described in the "Analysis of Cumulative Effects in the East Salt River Valley" section below. While the lack of detailed water use plans prevents specific analysis of most of the Superstition Vistas development, some estimates indicate that a population of 900,000 could live in this area. Throughout the Resolution Copper Project NEPA process, the ASLD has raised concerns about the potential future water supply to support the Superstition Vistas development. The cumulative effects modeling described below was undertaken in part to investigate the potential impacts to the Superstition Vistas water supply.

LONG-TERM STORAGE CREDITS IN EAST SALT RIVER VALLEY

Aside from the long-term storage credit portfolio acquired by Resolution Copper, a substantial amount of groundwater in the East Salt River valley is already "spoken for" because it represents banked water or long-term storage credits acquired through physical recharge of water to the aquifer or "in-lieu" recharge of water to the aquifer (foregoing otherwise legal groundwater pumping by providing alternative water supplies, like excess CAP water). The amount of stored water is substantial. Approximately 7 million acre-feet of long-term storage credits were stored in the entire Phoenix AMA at the end of 2017 (Barter et al. 2020).

ANALYSIS OF CUMULATIVE EFFECTS IN THE EAST SALT RIVER VALLEY

The analysis of impacts to the East Salt River valley aquifer as a result of the Desert Wellfield pumping was conducted for the EIS using a groundwater flow model. This groundwater flow model was built from an existing, calibrated, regulatory model prepared by ADWR. In some form, this model has been used widely for basin-wide planning purposes since the 1990s, as well as to estimate project-specific water supply impact. The appropriateness of using this model to predict impacts from the Desert Wellfield was further assessed by the NEPA team and found to be reasonable (Walser 2020a).

An additional set of model runs was conducted through the year 2118 to simulate cumulative effects from the water users described above: existing pumping, permitted Assured Water Supplies, recovery of long-term storage credits, and pumping from the Desert Wellfield (Barter et al. 2020). The following represent

the approximate stresses applied in the model (for the entire Phoenix AMA, not just the East Salt River valley):

- Non-recovery agricultural pumping: 530,000 acre-feet/year

- Non-recovery non-agricultural pumping: 200,000 acre-feet/year

- Recovery of storage credits accrued through 2017 (including Resolution Copper credits): 112,000 acre-feet/year

- Recovery of additional storage credits accrued after 2017: 14,300 acre-feet/year

- Permitted Assured Water Supply groundwater demands: 105,000 acre-feet/year

- Non-recovery Desert Wellfield pumping: 6,700 acre-feet per year

Results indicate that by 2118, groundwater levels in the East Salt River valley would experience drawdown up to roughly 450 feet below current water levels, with or without Desert Wellfield pumping. As shown in figure 4.3.4-1, Resolution Copper's pumping increases drawdown as would be anticipated, primarily in the immediate vicinity of the Desert Wellfield.



**Figure 4.3.4-1. Projected drawdown in the East Salt River valley in 2118 caused by cumulative water use, with (right) and without (left) Resolution Copper pumping**

In the center of the Desert Wellfield, without Resolution Copper pumping, water levels would decline roughly 75 feet from current levels by 2118. With Resolution Copper pumping, water levels would decline roughly 100 feet by 2118. Note that operational pumping has ceased, and groundwater levels have

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 268 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 48 of 96

Resolution Copper Project and Land Exchange

partially recovered by 2118. Maximum drawdown in the center of the Desert Wellfield of just over 200 feet would occur at the peak of operational pumping (around 2060).

A depth-to-water of 1,000 feet below land surface is often used as a limit of physically available groundwater in the Phoenix AMA. Maximum depth-to-water in 2118 with all cumulative groundwaters uses ranges up to 850 feet as shown in figure 4.3.4-2, with a large cone of depression forming near Apache Junction. In addition, some model cells near Apache Junction and at the periphery of the basin show drying by 2118, indicating that groundwater would not be available in these areas. The depth-to-water in the center of the Desert Wellfield in 2118 is 550 feet below ground surface without Resolution Copper pumping, and 575 feet below ground surface with Resolution Copper pumping.



**Figure 4.3.4-2. Projected depth-to-water in the East Salt River valley in 2118 caused by cumulative water use, with (right) and without (left) Resolution Copper pumping**

### Sufficiency of Regional Water Supplies

Groundwater modeling, using the best available estimates of all regional groundwater users over the next 100 years, indicates that regional groundwater supplies generally are sufficient to satisfy committed demands. Full drying of the aquifer is limited to peripheral areas, and depth-to-groundwater generally does not exceed limits of physical availability (1,000 feet). However, there likely would be certain areas that experience lack of well capacity and groundwater shortages, particularly around the edges of the basin.

Further, the cost and energy required for pumping increases as groundwater deepens, and infrastructure costs would increase as wells and pumps need to be lowered or replaced. According to one estimate, an additional 1.02 to 2.56 kilowatt-hours of energy, depending on pump efficiency, are required to lift an

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 269 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 49 of 96

Final Environmental Impact Statement

acre-foot of water an additional foot (Peacock n.d. [1996]). The above quantitative modeling analysis includes known population increases through the incorporation of permitted Assured Water Supplies. At the time of the January 2021 FEIS, no portion of Superstition Vistas had been concretely planned for development. This has now changed. The first Superstition Vistas parcels (2,783 acres) were auctioned by the ASLD in 2020, purchased by DR Horton. Prior to subdivision, this parcel will require demonstration of a 100-year water supply under the Assured Water Supply program. There are generally two ways a developer can demonstrate this 100-year water supply: either by obtaining a separate, independent Assured Water Supply for the parcel from the ADWR, or relying on a designation of Assured Water Supply already obtained by a water provider from the ADWR. In this case, the auctioned Superstition Vista parcels are relying on previous designation obtained by the Apache Junction Water Department. Sufficient water has not been demonstrated to develop the entire Superstition Vistas area, but Apache Junction Water Department has demonstrated enough water rights to begin development on the auctioned properties (Hilgartwilson LLC 2021). Importantly, those committed Assured Water Supplies were included in the Desert Wellfield modeling report described above (Barter et al. 2020).

In summary, the portion of Superstition Vistas that has a demonstrated source of water has been quantified and included in the regional cumulative effects groundwater model. Other portions of Superstition Vistas without demonstrated water supplies are speculative and not explicitly modeled.

Resolution Copper and ASLD have discussed potential wellfield layouts for Superstition Vistas, informed by these modeling results, but no firm water supply planning has been undertaken. Conceptual water use estimates for the entirety of Superstition Vistas range anywhere from 100,000 to 190,000 acre-feet/year, depending on the progressiveness of water conservation (Morrison Institute for Public Policy 2006).

While adequate groundwater exists for committed regional demands, including Resolution Copper's Desert Wellfield, as demonstrated by the cumulative effects model presented above, those demands are met in part by mining of non-renewable groundwater and result in an overall lowering of groundwater levels over the next 100 years. While the next 100 years are demonstrated through this modeling to be manageable without exhausting groundwater supplies in the East Salt River valley, ultimately, the long-term use of groundwater may become unsustainable, even without considering Superstition Vistas' growth. The potential new future residential demand from Superstition Vistas represents between seven and 13 times the annual groundwater pumping by Resolution Copper over the operational life of the mine. More importantly, these residential water demands are in perpetuity, rather than for a limited time frame (four decades in the case of Resolution Copper). While the cumulative effects modeling does not preclude the future Superstitions Vistas' development and the population growth it portends, the cumulative effects modeling suggests that regional water supplies would become more limited and would need to be carefully assessed for sufficiency based on actual development plans for the area. This assessment would take place at a basin-wide planning level by ASLD before auctioning of the land, as well as through the existing regulatory framework, which requires Assured Water Supply permitting before approving each subdivided parcel.

In its comments on the DEIS, ASLD indicated that the water use of the Desert Wellfield would preclude the development of 3,440 acres of otherwise developable State Trust land and calculated a potential loss in revenue. This comment fundamentally suggests that the Desert Wellfield and full and complete development of Superstition Vistas are mutually exclusive, based on the assumption that groundwater supplies would not be sufficient for all development. The cumulative effects modeling cannot fully answer this question. The recent auctioned land described above is an example of some Superstition Vistas parcels whose water use is already effectively included in the cumulative effects modeling. The outcome of the cumulative effects modeling indicates there is still groundwater available for use after 100 years, even after all committed demands are accounted for. Whether these water supplies would be sufficient for full development of Superstition Vistas depends on the details of that development, which

**Forest Service**
U.S. DEPARTMENT OF AGRICULTURE

Tonto National Forest                    MB-R3-12-10                    June 2025

# **FINAL** Environmental Impact Statement
## Resolution Copper Project and Land Exchange
Coconino, Gila, Maricopa, Pinal, Santa Cruz, and Yavapai Counties, Arizona



Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 271 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 51 of 96

Appendix H

| | | Operations Rampup (Mine Years 6–12) | Peak Operations (Mine Years 13–36) | Operations Rampdown to Closure (Mine Years 37–46) | Total Water Use All Phases |
|---|---|---|---|---|---|
| Desert Wellfield pumping (AF/year) | Alternative 5 | 7,416 | 17,244 | 7,901 | |
| Total AF per Phase | Alternative 5 | 51,912 | 413,856 | 79,010 | 544,778 |
| Desert Wellfield pumping (AF/year) | Alternative 6 | 5,578 | 17,948 | 7,506 | |
| Total AF per Phase | Alternative 6 | 39,046 | 430,752 | 75,060 | 544,858 |

# Post-Closure Water Budget

The post-closure water budget is substantially different from the operational water budget described in this appendix. With respect to water sources:

- No further pumping from the Desert Wellfield occurs,

- No further capture and recycling of stormwater occurs, and

- No further removal of water from the block-cave area occurs.

With respect to water losses:

- Water is no longer lost due to tailings entrainment,

- Water is no longer lost due to concentrate entrainment,

- Water is no longer consumed for refrigeration/ventilation, and

- Water is no longer lost to evaporation from tailings ponds (the water lost to evaporation post-closure from the store-and-release closure cover on the tailings storage facility derives from precipitation).

The sole water component remaining after closure is seepage from the tailings storage facility. The continuation of seepage is discussed under each alternative (see "Ramifications for Long-Term Closure" in section 3.7.2).

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 272 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 52 of 96

Appendix J

| | |
|---|---|
| **Resource affected/impacts being mitigated:** | |
| Livestock grazing and socioeconomics | |
| **Applicable alternatives:** | |
| All | |
| **Authority to require:** | |
| As an applicant-proposed mitigation measure, implementation is not assured. However, all grazing leases within the footprint are under Resolution Copper management and require implementation of management practices covering maintenance, including fencing, and stock ponds. | |
| **Funded by:** | |
| Resolution Copper | |
| **Additional ground disturbance:** | |
| None. | |

# Mitigation and Monitoring that Could Be Required by Other Regulatory and Permitting Agencies

Potential mitigation and monitoring measures associated with the permits listed below are within the authority of other regulatory permitting agencies and could be required, including ADEQ and Arizona Department of Water Resources. These measures were not considered in the chapter 3 impacts analysis. The Forest Service has no authority, obligation, or expertise to determine or enforce compliance for the measures associated with the permits listed in this section, as they have not yet been required by other agencies, nor have they been agreed to by Resolution Copper. The mitigation and monitoring measures in this section include permit requirements and stipulations from legally binding permits and authorizations such as the air quality permit, APP, and groundwater withdrawal permit.

Many of these permits have not yet been issued but are anticipated to be issued prior to approval of the final mining plan of operations or special use permit. Those permits received prior to the issuance of the final ROD may need to be modified to reflect the alternative selected by the deciding official. These regulatory and permitting agencies would share monitoring results and any instances of noncompliance with the Forest Service. The Forest Service would use the information provided by the regulatory and permitting agencies to determine compliance with the decision that would be documented in the ROD and compliance with the final mining plan of operations or special use permit. Some of the other permits, licenses, and authorizations (see FEIS table 1.5.4-1 in chapter 1) that are anticipated to be required for the mine to be operational (and may involve additional mitigations beyond those noted here) include the following:

- Aquifer Protection Permit (APP)

- Arizona Pollutant Discharge Elimination System (AZPDES) Permit

- Clean Water Act Section 401 Certification

- Special Use Permits

- Project-Specific Section 404 Clean Water Act Permit

- Air Quality Control Permit

## Forest Service
### U.S. DEPARTMENT OF AGRICULTURE

| | | |
|---|---|---|
| **Tonto National Forest** | **MB-R3-12-10** | **June 2025** |

# **FINAL** Environmental Impact Statement
## Resolution Copper Project and Land Exchange

Coconino, Gila, Maricopa, Pinal, Santa Cruz, and Yavapai Counties, Arizona





Douglas A. Ducey
Governor

Lisa A. Atkins
Commissioner

Arizona State Land Department
1616 West Adams, Phoenix, AZ 85007
(602) 542-4631

November 7, 2019

Mr. Neil Bosworth
District Supervisor
Tonto National Forest
PO Box 34468
Phoenix, AZ 85067-4468

RE: Resolution Copper Draft Environmental Impact Statement Comments

Dear Supervisor Bosworth,

As a cooperating agency, the Arizona State Land Department (ASLD) appreciates the opportunity to submit comments for the record on the Resolution Copper Draft Environmental Impact Statement (DEIS).

The ASLD manages a perpetual land Trust consisting of approximately 9.2 million acres located throughout the State, including subsurface mineral estate. Our comments reflect ASLD's responsibility to ensure that the land is best managed on behalf of the Trust's beneficiaries and therefore, ASLD must evaluate the potential risks and contributions for all projects on land and resources within the Trust.

ASLD recognizes and appreciates the mineral development, financial, technological, and career opportunities that Resolution Copper brings to the State, and ASLD supports the advancement of the project. However, ASLD does have concerns regarding the selected preferred alternative tailing facility site within the Skunk Camp/Dripping Springs Valley. The location is predominately State Trust land, and it is highly likely that this location will adversely impact the Trust.

*Comment ID: S62-1  Response: NS1*
*Comment ID: S62-2  Response: NS1*

This comment letter constitutes the official response of ASLD and has been organized into the following sections: 1) general comments (including the location of the preferred alternative tailing location at Skunk Camp), 2) DEIS comments from internal ASLD subject matter experts, and 3) concluding remarks.

## GENERAL COMMENTS:
### SKUNK CAMP TAILING FACILITY – PREFERRED ALTERNATIVE

ASLD acknowledges that the Skunk Camp tailing facility location has been identified as the preferred alternative in the DEIS prepared by the Tonto National Forest (TNF). ASLD prefers Silver King as the location for the tailings site, as it is located on federally managed land and requires significantly less water over the life-of-mine (LOM). In contrast, the Skunk Camp alternative location is comprised of over 65 percent State Trust land and requires much higher volumes of water to support the tailing slurry pipeline.

*Comment ID: S62-3  Response: ALT30*

### SLURRY PIPELINE ON STATE TRUST LAND

In order to minimize the amount of water necessary to supply the Skunk Camp alternative location's slurry pipeline, the tailings should be dewatered to the maximum extent possible with the most current technology. The recovered slurry water should then be recycled (in addition to any contaminated groundwater pumped from beneath the tailing facility) and reused within the system.

*Comment ID: S62-8  Response: WT23*

Skunk Camp's proposed slurry pipeline would be constructed over eight miles of State Trust land in the Dripping Springs Valley. In order to minimize the potential environmental risk, ASLD requests that all components of the pipeline be engineered and constructed pursuant to best management practices to reduce the possibility of a breach or spill occurring on State Trust land. These design methods may include using thick single-walled or double-walled pipe sections lined with high-density polyethylene, installing a comprehensive pipeline monitoring network, and peer-review of the construction and design.

*Comment ID: S62-9  Response: MIT1*

ASLD also requests that TNF provide written confirmation acknowledging approval of the pipeline corridor that crosses land under its jurisdiction. Receipt of this document is necessary for ASLD to begin issuing Rights-of-Way for the selected pipeline alignment.

*Comment ID: S62-10  Response: NEPA42*

### CULTURAL RESOURCES OF SKUNK CAMP

The results of cultural resources inventories for all alternatives have not yet been fully reported or evaluated. The DEIS provides some preliminary numbers for the significant cultural resources that will be directly impacted based on the different alternatives. These are the cultural resources that have been recommended as eligible for listing on the Arizona and National Registers of Historic Places (A/NRHP) and those that need testing to determine their register eligibility. Final determinations of eligibility and effect have not been completed, but the preliminary numbers indicate that the Skunk Camp alternative will directly impact significantly more cultural resources than any of the other alternatives (Table 1; Figure 1). Skunk Camp with the North Pipeline alternative will impact 2.8 to 4.3 times more cultural resources than the other alternatives, while the South Pipeline alternative will impact 3.3 to 5.4 times more.

*Comment ID: S62-11  Response: CR5*

Table 1. Cultural resources directly impacted by the different alternatives

| Tailing Storage Alternatives | Cultural Resources Directly Impacted |
| --- | --- |
| Skunk Camp (South Pipeline Alternative) | 501 |
| Skunk Camp (North Pipeline Alternative) | 253 |
| Peg Leg (West Pipeline Alternative) | 75 |
| Peg Leg (East Pipeline Alternative) | 90 |
| Silver King | 60 |
| Near West (both Alternatives 2 and 3) | 56 |

Continued

2

---

The greatest potential adverse impact to the Trust will be the water (usage of approximately 600,000 acre-feet (AF) over the LOM) that will be extracted from the aquifer beneath the Superstition Vistas Planning Area (SVPA). This level of water consumption is partially a result of the potential need to transport a projected 1.7 million tons of waste material to the Skunk Camp location. Based upon the anticipated groundwater requirements contained in the DEIS, the negative impact of the proposed water consumption sourced from the Superstition Vistas Planning Area (SVPA) far outweighs the estimated financial benefits to the Trust resulting from other aspects of the project by a factor of 20:1 (based on current growth projections for the Pinal County portion of the East Salt River Valley developed by the Maricopa Association of Governments).

*Comment ID: S62-4  Response: WT4_G*

ASLD is also concerned that a potential sale of the State Trust land directly at or near the Skunk Camp property would not adequately recognize the future value of the Skunk Camp property and fails to consider the inherent decrease in surrounding property values once the facility is established. As this area is immediately adjacent to the SVPA, it has future value as recreational, development, or open space property that supports the anticipated growth in the SVPA. By encumbering a large area with mine tailing storage, the surrounding State Trust land will be depreciated to the detriment of the Trust.

*Comment ID: S62-5  Response: SO18*

The Skunk Camp location would require a US Army Corps Jurisdictional Determination (JD) for the Dripping Springs Wash. If this watershed were determined to be a Jurisdictional Water(s) of the U.S., this decision could greatly complicate ASLD's ability to realize the highest value for those State Trust lands located downstream. As upstream determinations set precedence, this JD has the potential to expose these lands to additional Federal regulation that they would not have been absent such a determination.

*Comment ID: S62-6  Response: NEPA20*

## SUBJECT-SPECIFIC DEIS COMMENTS:
### WATER IMPACTS

Resolution's proposed withdrawal of water for mining operations from wells to be drilled along the MARRCO (Magma Arizona Railroad Company) rail corridor is estimated to range from 180,000 AF to as much as 600,000 AF over the LOM. Resolution has stored and/or obtained Long-Term Storage Credits (LTSCs) for approximately 313,000 AF of Central Arizona Project (CAP) water, of which approximately 256,000 AF are located within the Phoenix Active Management Area (AMA). However, the location along the rail corridor where Resolution proposes to withdraw the water from the area of hydrologic impact (AOI) where the water storage occurred. Therefore, the local aquifer in the central portion of the SVPA, and not the one(s) where the storage occurred, will be the aquifer impacted by Resolution's proposed withdrawals. In terms of a 100-year Assured Water Supply (AWS), the water represents the equivalent of an annual buildout demand of up to 6,000 AF per year (AFY).

*Comment ID: S62-7  Response: MIT1*

Resolution could partially mitigate this impact by withdrawing its 256,000 AF of Phoenix AMA LTSCs from within the AOI of storage. This would have the effect of reducing the local area impacts in the central SVPA to around 3,440 AFY. Even with this mitigation, at a density of three units per acre, assuming three persons per household, and using a water demand of one AFY per acre (Source: Arizona Department of Water Resources' Fourth Management Plan models for new single-family residential development), Resolution's withdrawals, if mitigated by recovering the LTSCs from within the AOI of storage, would still potentially result in the loss of the development of at least 3,440 acres of State Trust lands. State Trust land has recently been auctioned for residential development in the area near the SVPA for approximately $156,000 per acre. Therefore, even with partial mitigation, the loss of 3,440 acres of developable State Trust land represents a minimum potential loss to the Trust of at least $536,640,000 in revenue.

← Continued

## Figure 1: Cultural Resources Directly Impacted



Regardless of the pipeline corridor selected, the Skunk Camp alternative will directly impact significantly more cultural resources, most of which are on State Trust lands. While the reporting of the Skunk Camp inventories has not been completed, the preliminary results given to the ASLD Cultural Resources Section indicate that almost all the cultural resources in the Skunk Camp alternative consist of Classic period Salado sites. Previous research in the region has revealed that habitation sites from this time period have the potential for large numbers of human burials (for example, partial excavation of Togetzoge Pueblo near Top-of-the World resulted in the recovery of 70 burials), and the numbers of sites in the Skunk Camp alternative suggests that several hundred burials could be impacted.

ASLD will assure that the requirements of the Arizona Antiquities Act and the State Historic Preservation Act are fulfilled for those cultural resources on State Trust lands, but the identified preferred alternative (Skunk Camp) has the most significant impact to cultural resources and will require the most mitigation of the adverse impacts.

### LESSEE IMPACTS OF SKUNK CAMP

The Skunk Camp tailing facility greatly impacts several long-term ASLD grazing lessees and compromises future revenue generation for the Trust. A total of three grazing leases are likely to be impacted with an estimated minimum loss of 113 animal units. Over the approximately 40-year LOM, the Trust will recognize an estimated grazing revenue loss of $800,000 at the Skunk Camp location.

*Comment ID: S62-12  Response: LG3*

Additional impacts to grazing lessees downstream from the mine may include the potential loss of surface water for which claims have been filed in the General Stream Adjudication. Loss of surface water may require lessees downstream of the mine to install wells to provide stockwatering.

### CONCLUDING REMARKS:

ASLD appreciates the time and efforts of the collaborative TNF and SWCA teams in producing the multi-year DEIS project, and for ASLD's ability to participate as a cooperating agency on behalf of the State Land Trust and its Beneficiaries.

4

The Resolution Copper project has the potential to positively and negatively affect future development within the region. As the mine expands, available housing will be in short supply in the East Valley and this may act as a catalyst for the development of land within the SVPA. As demand for housing increases, the corresponding land values will increase. The Trust has the opportunity to recognize significant future revenue from these land sales. Conversely, the extraction and transportation of groundwater out of the SVPA greatly compromises the ability to develop these lands to their full planned potential, and as a result reduces the income and value of the Trust.

*Comment ID: 562-13*
*Response: SO18*

ASLD requests continued involvement in the completion of the final Environmental Impact Statement (EIS) as a cooperating agency stakeholder. ASLD asks that the TNF's project team continue to work with ASLD's Mineral, Cultural Resources, and Water Rights sections throughout all remaining stages of the EIS process. ASLD points of contact for this project include Aaron Magezi (amagezi@azland.gov) regarding minerals and rights-of-way, Pam Muse (pmuse@azland.gov) regarding water rights and Michael O'Hara (mohara@azland.gov) regarding cultural resources.

Sincerely,



Lisa A. Atkins
Commissioner
Arizona State Land Department

---

LORENZO SIERRA
1700 WEST WASHINGTON, SUITE H
PHOENIX, ARIZONA 85007-2844
CAPITOL PHONE: (602) 926-3211
TOLL FREE: 1-800-352-8404
lsierra@azleg.gov

DISTRICT 19

COMMITTEES:
GOVERNMENT
WAYS & MEANS

October 14, 2019

Tonto National Forest
Resolution EIS Comments
PO Box 34468
Phoenix AZ 85067-4468

Re: Resolution Copper DEIS comment

To whom it may concern:

As a longtime Arizonan, former city council member and legislator, I understand the importance of copper to the state. I have taken the time to learn about the Resolution Copper project in Superior, and I believe it offers immense value to Arizona.

As a mining region with a legacy of tailings, I am encouraged to learn about the reclamation work that has already been done in Superior, and the fact that progressive reclamation will occur as the project moves forward.

The economic benefit to the state will be a tremendous asset for decades to come. In a traditional mining region that has faced recent economic hardships, the numerous jobs this project will create will play a role in strengthening the economy in Superior and beyond. It is my understanding many of them will be high-tech STEM jobs, which is important to the United States and Arizona's future economic growth.

I commend the U.S. Forest Service for the thorough process it has conducted on this process, and I urge you to complete it in a timely matter. Please don't hesitate to reach out anytime if you have any thoughts or questions.

*Comment ID: 282-1*
*Response: NS1*

Sincerely,



Lorenzo Sierra

---

ROBERT MEZA
1700 WEST WASHINGTON, SUITE H
PHOENIX, ARIZONA 85007-2844
CAPITOL PHONE: (602) 926-3425
TOLL FREE: 1-800-352-8404
rmeza@azleg.gov

DISTRICT 30

COMMITTEES:
COMMERCE
FEDERALISM
FFPP&R (RANKING)

### Arizona House of Representatives
Phoenix, Arizona 85007

October 29, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth,

First, I congratulate the United State Forest Service for completion of the Draft Environmental Impact Statement for this project, which I support, as quickly as possible.

Second, I understand this project has gone above and beyond the norm of a typical NEPA as it relates to tribal/public engagement and I encourage the project and USFS to continue this practice. Specifically, I am extremely supportive of the Tribal Monitoring Program and Community Working Group which the USFS and Resolution Copper have established to not only engage with stakeholders but also participate in development of the project.

*Comment ID: 285-1*
*Response: NS1*

Finally, as the USFS has identified the Skunk Camp Alternative as its preferred TSF location can the USFS further analyze the workforce development, job training, and local economic impacts to the communities of Winkelman, Kearny, and Hayden? It is vital that these communities receive benefits that are equal to the footprint impact to their region should the TSF be constructed at Skunk Camp.

*Comment ID: 285-2*
*Response: SO10*

Thank you for your consideration of these comments during the development of the Final Environmental Impact Statement.

Respectfully,

Robert Meza
House of Representatives
Legislative District 30

---

LEO BIASIUCCI
1700 WEST WASHINGTON, SUITE H
PHOENIX, ARIZONA 85007-2844
CAPITOL PHONE: (602) 926-3018
TOLL FREE: 1-800-352-8404
lbiasiucci@azleg.gov

DISTRICT 5

COMMITTEES:
TRANSPORTATION
Vice Chairman
COMMERCE
EDUCATION
TECHNOLOGY

### Arizona House of Representatives
Phoenix, Arizona 85007

October 10, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth,

Thank you for the opportunity to comment during development of the Final Environmental Impact Statement for the Resolution Copper Project. I hope the United State Forest Service has the resources to quickly complete the Environmental Impact Statement for this project, which I support.

*Comment ID: 296-1*
*Response: NS1*

As an elected official to rural an Arizona community, I am was pleased to see the economic impacts the project will have on the east valley when reviewing the DEIS. This project is vital to our national security and specifically the defense industry which operates in my community. As I think about our state's economic stability, projects like the Resolution Copper project will be vital to a healthy stable economy in Arizona going forward.

I understand Resolution will create several thousand construction jobs and more than 1,500 permanent jobs created by the project's development. It is important to create as many jobs in rural AZ, and I am grateful that the Resolution Copper project will do that.

Thank you for your consideration of these comments and questions.

Sincerely,

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 276 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 56 of 96

Appendix R

| **Comment response**: MIT29 | |
| Seepage controls for Skunk Camp | Page 1 of 1 |

| **Responsive to these comments**: |
| 555-14, 8032-34 |

These comments express concerns with the seepage controls associated with the Skunk Camp alternative location, particularly the potential impacts on Arizona Water Company water supplies. We have refined the analysis of seepage controls and potential water quality impacts for Alternative 6 in section 3.7.2 of the FEIS. The refined analysis indicates that no exceedances of numeric aquifer water quality standards or surface water quality standards are anticipated at the point Dripping Spring Wash enters the Gila River.

Comments also express the need for more monitoring. New monitoring wells were installed along Dripping Spring Wash by Resolution Copper and will continue to be part of the monitoring network for water quality impacts (see FEIS appendix J, mitigation measure RC-WR-03).

| **Comment response**: MIT30 | |
| Water monitoring and mitigation | Page 1 of 1 |

| **Responsive to these comments**: |
| 1361-6, 30075-10, 43-3, 8031-65 |

This comment indicates that inadequate monitoring and mitigation were included in the DEIS with respect to water quantity impacts.

There are two major areas where drawdown associated with project groundwater pumping would occur and have the potential to impact natural systems of water supplies: near the mine site, and near the Desert Wellfield in the East Salt River valley.

The DEIS included monitoring and mitigation for groundwater impacts near the mine site, including impacts to groundwater-dependent ecosystems (GDEs), natural systems, and water supplies. These are included in mitigation measure RC-211 (DEIS, appendix J, p. J-9), with full details contained in Montgomery and Associates (Montgomery and Associates Inc. 2019b). This mitigation measure will "ensure that groundwater supported flow that is lost due to mining activity is replaced and continues to be available to the ecosystem." Effectiveness of this mitigation measure is assessed in section 3.7.1 (DEIS, pp. 343–344). This same measure (with modifications) has been carried forward into the FEIS (appendix J, mitigation measure FS-WR-01).

The comment is correct that no specific monitoring or mitigation measures are included in the DEIS specific to the Desert Wellfield in the East Salt River valley. This groundwater pumping is subject to permitting by the ADWR. Monitoring requirements may be established during this permitting process but are not under the jurisdiction of the Forest Service and are not incorporated into either the DEIS or the FEIS. See response MIT8 for more discussion of the role of State permits in mitigation.

Note that additional water monitoring and mitigation measures were brought forward between DEIS and FEIS. These are included in appendix J and assessed in section 3.7.1.

| **Comment response**: MIT33 | |
| Reclamation and revegetation | Page 1 of 1 |

| **Responsive to these comments**: |
| 30075-57, 541-2, 8032-235 |

We have added further discussion concerning reclamation and closure plans, revegetation techniques, and revegetation potential to section 3.3 of the FEIS.

# Appendix T. Proposed Forest Plan Amendment and NFMA Compliance Determination for Preferred Alternative

# Introduction

## *Tonto National Forest Land Management Plan*

The "Tonto National Forest Land Management Plan" (forest plan) was revised and implemented in December 2023 (U.S. Forest Service 2023d) under the 2012 Planning Rule (36 Code of Federal Regulations (CFR) § 219). The forest plan contains over 600 plan components consisting of desired conditions, guidelines, standards, and objectives.

Forest-wide plan direction is broken into 23 major categories, with further sub-categories in some instances (e.g., recreation is a major category that also includes forest-wide direction for developed recreation, dispersed recreation, motorized recreation, non-motorized recreation, water-based recreation, recreational shooting, and wildlife related recreation). The forest plan also includes Management Area Plan Direction for 12 discrete management areas.

The Resolution Copper Project preferred alternative (Alternative 6 – Skunk Camp) proposes a multi-component forest plan amendment that would except the Resolution Copper Project from nine guidelines and seven desired conditions. No standards or objectives would be excepted. Other than the proposed exceptions, no other changes to the forest plan would occur with the proposed amendment.

While the 2025 Resolution Copper Project final environmental impact statement (FEIS) addresses forest plan compliance for all six action alternatives, this appendix (appendix T) focuses only on the preferred alternative.

In appendix (appendix T), the Resolution Copper Project FEIS is cited as follows: citations listed as 2021 Resolution Copper Project FEIS refer to language or sections from the initial FEIS issued in January 2021; citations listed as 2025 Resolution Copper Project FEIS refer to language or sections from the FEIS issued in 2025 of which this appendix (appendix T) is a part; and citations listed as Resolution Copper Project FEIS refer to sections or language that are consistent in both versions of the FEIS (2021 and 2025).

## *Forest Plan Amendment Process and Compliance with 2012 Planning Rule*

This provides an overview of the process used to amend a forest plan for a specific project. It includes a section discussing how the proposed amendment meets the 2012 Planning Rule requirements.

The Forest and Rangeland Renewable Resources Planning Act of 1974, as amended by the National Forest Management Act of 1976 (NFMA), requires national forests to be managed under the land and resource management plan (land management plan or forest plan). The NFMA requires proposed projects, such as the Resolution Copper Project, to be consistent with a land management plan of the national forest where the project occurs (Forest Service Handbook (FSH) 1909.12 (U.S. Forest Service 2015b:chapter 20, section 21.33)). When a proposed project is not consistent with applicable plan components contained within the land management plan,[182] the U.S. Forest Service (Forest Service) has the following options: (1) modify the proposed project to make it consistent with the applicable plan; (2) reject the proposal; (3) amend the plan so that the project would be consistent with the plan as amended; or (4) amend the plan contemporaneously with the approval of the project so the project would be consistent with the plan, as amended. The fourth option may be limited to only the project.

---

[182] Title 36 Code of Federal Regulations (CFR) 219.15(c) (U.S. Forest Service 2023d:22).

A review of the Resolution Copper Project FEIS in relation to the December 2023 "Tonto National Forest Land Management Plan" indicated that the preferred alternative, as proposed, cannot adhere to nine forest plan guidelines and seven forest plan desired conditions that are intended to protect soil productivity, scenic resources, national scenic trails, recreation resources, wildlife habitat, and cultural resources.

This appendix (appendix T) describes how the Forest Service proposes to implement the fourth option described above and amend the forest plan contemporaneously with the approval of the project so that the project would be consistent with the plan as amended." The proposed amendment would be limited to apply only to this project.

Land management plans are like municipal zoning plans, which take a geographic area, for example a city or county, and partition it into zones to promote various objectives such as economic development, traffic flow, etc. To achieve those objectives, the zoning plan provides codes that limit or promote certain activities within a zone. In a municipal zoning plan, alterations to zoning codes, often called variances or modifications, are allowed to provide exceptions to a code restriction for a developer or property owner.

Similar to partitioning a city under a municipal zoning plan, a land management plan partitions a national forest into areas called management areas or where specific forest plan components apply. A land management plan defines the intentions through forest-wide guidelines, objectives, standards, and desired conditions. Each resource area or management area has an emphasis that is articulated in desired conditions and objectives, which are achieved through limiting or promoting certain activities through standards and guidelines. The 2012 Planning Rule (36 CFR Part 219) requires the following plan components: desired conditions, objectives, standards, guidelines, and suitability of lands. Like a municipal zoning plan, a land management plan allows for variances or modifications through the plan amendment process. "Project specific amendments give a way to deal with exceptions. An exception is similar to a variance to a county zoning ordinance" (77 Federal Register (FR) 21239).

Land management plan revisions are comprehensive changes to a plan, whereas plan amendments are more limited changes to a plan to accommodate specific projects and/or activities, or to adapt to changing conditions. In December 2016, the U.S. Department of Agriculture issued a final rule that amended the 2012 Planning Rule and clarified the U.S. Department of Agriculture's direction for amending land management plans. The 2016 final rule stated, "No individual amendment is required to do the work of a revision" (81 FR 90725). "The process requirements for plan amendments . . . are simpler than those for new plan development or plan revisions in order to . . . keep plans current and adapt to new information or changed conditions" (77 FR 21237).

A plan amendment is the adding, removing, or modification of one or more plan components or the changing of how or where one or more plan components apply to the plan area (36 CFR § 219.12(a)). As stated above, plan components include desired conditions, objectives, standards, guidelines, and suitability of uses. There are two types of plan amendments: programmatic amendments and project-specific amendments. Programmatic amendments are performed independently of any specific project or activity, although they may have been prompted by a specific proposal that is not consistent with a land management plan. Programmatic amendments result in a permanent change to the land management plan and apply to all future projects. On the other hand, project-specific amendments are applicable to only a single project, amending the land management plan solely for the life of the project or activity. A project-specific amendment is crafted in conjunction with a project proposal and is approved within a project's decision document.

"The point of a project-specific amendment is to allow a project that would otherwise not be consistent with the plan to be authorized" (77 FR 21239). The Forest Service is proposing a project-specific amendment with multiple components for the Resolution Copper Project.

Plan amendments are guided by Federal regulations at 36 CFR § 219 (NFMA implementing regulations, 2012 Planning Rule, or Planning Rule). The plan amendment process consists of three primary steps:

- Determine which plan components must be modified to allow the project to be consistent with the amended plan (36 CFR § 219.13(a)).

- Determine which of the substantive requirement(s) within §§ 219.8 through 219.11 are directly related to the proposed amendment based on the purpose for and the effects of the amendment (36 CFR § 219.13(b)(5)).

- Apply[183] those directly related substantive requirements to the amended plan within the scope and scale of the proposed amendment (36 CFR § 219.13(b)(5)).

### *Scope and Scale of the Amendment*

The 2012 Planning Rule gives the responsible official the discretion, within the framework of the rule's requirements, to tailor the scope and scale of an amendment to reflect the need to change the plan (81 FR 90725). The 2012 Planning Rule, at 36 CFR § 219.13(a), states, "A plan may be amended at any time. Plan amendments may be broad or narrow, depending on the need for change, and should be used to keep plans current and help units adapt to new information or changing conditions. The responsible official has the discretion to determine whether and how to amend the plan and to determine the scope and scale of any amendment. Except as provided by paragraph (c) of this section, a plan amendment is required to add, modify, or remove one or more plan components, or to change how or where one or more plan components apply to all or part of the plan area (including management areas or geographic areas)." Title 36 CFR § 219.13(b)(1) states, "When a plan amendment is made together with, and only applies to, a project or activity decision, the analysis prepared for the project or activity may serve as the documentation for the preliminary identification of the need to change the plan."

Title 36 CFR § 219.13(b)(5) states:

> [d]etermine which specific substantive requirement(s) within §219.8 through §219.11 are directly related to the plan direction being added, modified, or removed by the amendment and apply such requirement(s) within the scope and scale of the amendment.

> (ii) When basing the determination on adverse effects:

>> (A) The responsible official must determine that a specific substantive requirement is directly related to the amendment when scoping or NEPA effects analysis for the proposed amendment reveals substantial adverse effects associated with that requirement, or when the proposed amendment would substantially lessen protections for a specific resource or use.

The scope of an amendment is generally considered to be the extent of the changes to the land management plan. The scope of this proposed project-specific amendment is the exception of nine forest plan guidelines and seven forest plan desired conditions for the Resolution Copper Project for the duration of the project.

The scale of a project-specific amendment is generally considered to be the extent of the direct impacts to a resource related to a substantive requirement and varies for each resource. For example, for the Resolution Copper Project preferred alternative, the scope of the amendment differs by resource, but at its greatest extent represents about 2,500 acres of National Forest System (NFS) land on the Tonto National Forest that will be disturbed by the preferred alternative. This is composed of 2,458 acres of mine

---

[183] The 2012 Planning Rule regulations do not explicitly state what is intended by "apply." The FR notice from December 16, 2016, demonstrates that "apply" can mean determine that the plan needs additional components in order to provide for the identified directly related substantive requirement.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 282 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 62 of 96

Appendix T

infrastructure and 44 acres of NFS land where recreation mitigation is required, for a total of 2,502 acres. This area is referred to as the "preferred alternative area of disturbance." This is the area in which construction of electrical transmission lines, pipelines, and associated infrastructure would be located.

## Applying the Directly Related Substantive Requirements

In December 2016, the U.S. Department of Agriculture issued a final rule that amended the 2012 Planning Rule (81 FR 90723) clarifying that the responsible official is not required to apply every substantive requirement (36 CFR §§ 219.8 through 219.11) to every acre of land within the planning unit. The December 2016 final rule amending the 2012 Planning Rule clarifies that any evaluation of effects of amending the plan needs to remain focused on the amendment itself—its purpose, scope, and scale. "No individual amendment is required to do the work of a revision. While the 2012 rule sets forth a series of substantive requirements for land management plans within §§219.8 through 219.11, not every section or requirement within those sections will be directly related to the scope and scale of a given amendment. Although the Department recognizes that resources and uses are connected, the Department does not expect an individual plan amendment to do the work of a revision to bring an underlying plan into compliance with all the substantive requirements identified in §§219.8 through 219.11" (81 FR 90725).

Appropriate application of the directly related substantive requirements, within the scope and scale of the amendment, makes certain that the amended land management plan has the components necessary to ensure that meeting those requirements within the plan area will not be compromised by any single project. If a directly related substantive requirement is not meeting the Planning Rule intent through existing land management plan direction due to the amendment, then additional plan components need to be included as part of the amendment in order to satisfy the substantive requirement in question.

This understanding further supports that the purpose of the amendment is not to ensure compliance of the entire land management plan with all the substantive requirements of the 2012 Planning Rule, but rather to apply only those substantive requirements that are directly related to the amendment and the area affected by the amendment.

## Purpose of the Amendment

The NFMA requires proposed projects, including proposals from non-Federal entities subject to permits, to be consistent with the applicable forest plan (16 United States Code § 1604(i)). The December 2023 "Tonto National Forest Revised Land Management Plan" (forest plan) states on page 22, "All projects and activities authorized by the Forest Service must be consistent with the land management plan (16 USC 1604(i) and 36 CFR 219.15(b-c))."

As mentioned, the Resolution Copper Project preferred alternative, as proposed, cannot adhere to nine forest plan guidelines and seven forest plan desired conditions. Therefore, the purpose of the proposed amendment is to except specific plan desired conditions and guidelines to allow the project to be consistent with the forest plan. All other desired conditions, objectives, standards, and guidelines would remain unexcepted and applicable to all other activities across the planning unit (Tonto National Forest), including the preferred alternative. The Resolution Copper Project preferred alternative would be excepted from the desired conditions and guidelines, but they would continue to apply to the remainder of the planning unit.

# Step 1: Determine the Plan Components to Be Excepted

After reviewing the forest plan, the responsible official determined the Resolution Copper Project preferred alternative, as proposed, would be inconsistent with nine guidelines and seven desired conditions in the forest plan. The Forest Service proposes a project-specific amendment to except the

Resolution Copper Project from the nine guidelines and seven desired conditions to meet the requirement that the Resolution Copper Project be consistent with the forest plan. The proposed amendment would except the Resolution Copper Project from complying with the nine guidelines and seven desired conditions, which would apply to 2,502 acres of NFS land that would be disturbed by the preferred alternative (preferred alternative area of disturbance).

The following desired conditions and guidelines are proposed to be excepted. They are presented in the order in which they appear in the 2023 forest plan. The Resolution Copper Project preferred alternative would be excepted from each of these desired conditions and guidelines.

- **Recreation Guideline 10 (REC-G-10) - All project-level decisions, implementation activities, and management activities should be consistent with or move the area toward the appropriate recreation opportunity spectrum (ROS), or current protocol over the long term (forest plan, p. 31).** The pipeline, electrical transmission line, and associated infrastructure that would be authorized with the preferred alternative would not meet current ROS criteria.

- **Wildlife Related Recreation Guideline 03 (REC-WR-G-03) - Wildlife connectivity for economically important and other species should be maintained and/or enhanced (forest plan, p. 44).** The analysis of wildlife connectivity concludes there would be a loss of long-term movement habitat along pipeline corridors with the preferred alternative, therefore wildlife connectivity would not be maintained or enhanced.

- **Cultural and Historic Resources Desired Condition 01 (CUH-DC-01) - Historic properties, including traditional cultural properties, retain all of the characteristics that qualify the property for listing in the National Register of Historic Places and convey its historical significance, including any aspects of the property's integrity (e.g., location, design, setting, materials, workmanship, feeling, or association) that have been identified as supporting its eligibility (forest plan p. 55).** Although the preferred alternative includes mitigation measures designed to avoid, minimize, rectify, reduce, or compensate for resource impacts, impacts to historic properties cannot be avoided or fully mitigated. It is not feasible to retain all characteristics that qualify impacted properties for listing.

- **Cultural and Historic Resources Desired Condition 02 (CUH-DC-02) - Historic properties are not threatened by human disturbances (forest plan, p. 55).** The pipeline, electrical transmission, lines and associated infrastructure constructed and operated with the preferred alternative would impact historic properties.

- **Cultural and Historic Resources Desired Condition 07 (CUH-DC-07) - Cultural resources (including artifacts) are preserved in place (forest plan, p. 55).** The preferred alternative would disturb cultural resources, including artifacts, and data recovery and curation would be conducted on these sites.

- **Scenery Desired Condition 03 (SC-DC-03) - High quality scenery dominates the landscape in areas valued by the public (e.g., state designated scenic routes, major roads, developed recreation sites, wilderness, national scenic trails, and wild and scenic rivers) (forest plan, p. 67).** Infrastructure constructed with the preferred alternative would not meet criteria for existing Scenic Integrity Objectives (SIOs) and would degrade views from U.S. Route (U.S.) 60, a State designated scenic route.

- **Scenery Guideline 01 (SC-G-01) - Management activities and newly constructed features (e.g., facilities and infrastructure) should minimize visual disturbances and be consistent with or move the area towards achieving scenic integrity objectives (as defined in the Scenery Management System, or similar protocol) (forest plan, p. 67).** Infrastructure

constructed with the preferred alternative, including transmission lines and pipelines, would not be consistent with or move the area toward achieving SIOs.

- **Scenery Guideline 03 (SC-G-03) - Management activities that result in short-term impacts inconsistent with the scenic integrity objectives, as defined in the scenery management system or similar protocol, should achieve, or move the project towards, the scenic integrity objectives over the long-term (forest plan, p. 67).** It is not currently known whether the electrical transmission line constructed with the preferred alternative would remain in place after reclamation has occurred. Therefore, the preferred alternative may not achieve or move toward achieving SIOs in the long term.

- **Fish, Wildlife and Plants Guideline 06 (WFP-G-06) - Landscape and vegetation alterations that significantly contribute to uncharacteristic habitat fragmentation should be avoided. Project design should provide for movement and dispersal of species between treated and untreated areas (forest plan, p. 142).** The analysis of wildlife connectivity concludes that there would be a loss of long-term movement habitat along pipeline corridors by the preferred alternative; therefore, dispersal and movement of species would be adversely affected.

- **Fish, Wildlife and Plants Guideline 07 (WFP-G-07) - New infrastructure or constructed features (e.g., fences, roads, recreation sites, facilities, drinkers, and culverts) should be designed and maintained to minimize negative impacts to the movement and dispersal of wildlife, fish, and rare plants. Infrastructure and constructed features already present that negatively impact movement and dispersal should be modified or removed when no longer in use in order to improve connectivity. Barriers may be used to protect native species or prevent movement of nonnative species (forest plan, p. 142).** The analysis of wildlife connectivity concludes that there would be a loss of long-term movement habitat along pipeline corridors with the preferred alternative; therefore, dispersal and movement of wildlife would be adversely affected.

- **Soils Guideline 02 (SL-G-02) - Where biological soil crusts exist, ground disturbing activities should identify areas for protection and minimize disturbance (forest plan, p. 147).** The preferred alternative would disturb and impact soils on NFS land. Biological crust soils (referred to as biotic soils and desert pavement in the FEIS) are present in some of these areas and cannot be completely avoided.

- **National Trails Management Area Desired Condition 03 (NTMA-DC-03) - Visitor access, use, and management activities are consistent with the recreational, scenic, ecological, cultural, traditional, wildlife resources, and the nature and purpose for which the trail is designated (forest plan, p. 182).** New pipelines constructed within the Magma Arizona Railroad Company (MARRCO) corridor[184] would cross the Arizona National Scenic Trail. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purpose of the Arizona National Scenic Trail.

- **National Trails Management Area Desired Condition 06 (NTMA-DC-06) - The Arizona National Scenic Trail and corridor are well-defined and provide high-quality, primitive hiking, mountain biking, equestrian opportunities, and other compatible nonmotorized trail activities. The significant scenic, natural, historic, and cultural resources within the trail's corridor are conserved. The trail provides visitors with expansive views of the natural-appearing landscapes (forest plan, p. 182).** New pipelines constructed within the MARRCO corridor would cross the Arizona National Scenic Trail. The preferred alternative would not meet

---

[184] The MARRCO corridor is an existing utility corridor containing Arizona Water Company facilities, water lines, a Qwest fiber-optic line, an El Paso Natural Gas pipeline, a power line, and a telephone line in its right-of-way. The preferred alternative would construct additional pipelines and an access road within this existing corridor.

the criteria to provide visitors with expansive views of a naturally appearing landscape along all segments of the Arizona National Scenic Trail, or conserve scenic resources within the Trail corridor.

- **National Trails Management Area Desired Condition 07 (NTMA-DC-07) - Scenery viewed from the Arizona National Scenic Trail is consistent with high or very high scenic integrity objectives. The foreground of the trail is natural-appearing (forest plan, p. 182).** New pipelines constructed within the MARRCO corridor would cross the Arizona National Scenic Trail. The preferred alternative would not be consistent with or move the area toward high or very high SIOs.

- **National Trails Management Area Guideline 01 (NTMA-G-01) - National trails should be consistent with management direction in the trail establishment reports as well as the maintenance standards for trail class and use (forest plan, p. 182).** New pipelines and access road constructed within the MARRCO corridor would cross the Arizona National Scenic Trail. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purposes of the Arizona National Scenic Trail.

- **National Trails Management Area Guideline 08 (NTMA-G-08) - If management activities result in short-term impacts to the scenic character of the Arizona National Scenic Trail, design elements should be included (e.g., screening, feathering, and other scenery management techniques) at the project level (forest plan, p. 183).** The preferred alternative would result in impacts to the scenic character of the Arizona National Scenic Trail that cannot be fully mitigated through design elements.

# Step 2: Determine Directly Related Substantive Requirements

The purpose of Step 2 is to identify which 2012 Planning Rule substantive requirement(s) within 36 CFR §§ 219.8 through 219.11 are directly related to the amendment. Whether a substantive requirement is directly related to an amendment is determined by either the purpose or effects—beneficial or adverse— of the amendment (36 CFR § 219.13(b)(5)(i)). When basing the determination on adverse effects, a substantive requirement is directly related if the adverse effects are substantial or when the amendment would substantially lessen plan protections of a specific resource (36 CFR § 219.13(b)(5)(ii)(A)). Therefore, a substantive requirement is directly related to an amendment through one of the following: the amendment, or a substantial lessening of plan protections by the amendment (36 CFR § 219.13(b)(5)).

The scope of this proposed project-specific amendment is defined as the nine guidelines and seven desired conditions that would not be met if the Resolution Copper Project preferred alternative were implemented and the exception of the Resolution Copper Project from of those nine guidelines and seven desired conditions. The scale for the proposed project-specific amendment varies by resource as described in Step 3.

The determination of the directly related substantive requirements is organized by resource group.

## *Soil Productivity*

One forest plan guideline associated with soil productivity is proposed to be excepted in this amendment (SL-G-02). This one guideline cannot be met using standard industry construction methods like those proposed with the Resolution Copper Project.

- SL-G-02 requires that areas of biological crust soil be protected and disturbance minimized. Biological crust soils exist within the 2,502 acres of disturbance that will occur with this project, and disturbance cannot be fully avoided.

It is not practical to modify the Resolution Copper Project construction methods in a manner that would achieve consistency with this one guideline. Therefore, the Forest Service proposes to except this one guideline for the Resolution Copper Project.

**Purpose** - The purpose of excepting guideline SL-G-02 is to allow the Resolution Copper Project to exceed one of 12 forest-wide guidelines for soil protection.[185] The exception of this guideline is directly related to § 219.8(a)(2)(ii) – soils and soil productivity.

**Effects** - The effect of the exception of the one guideline includes minor adverse effects of vegetation removal, erosion and sedimentation, soil compaction, runoff potential, soil fertility, revegetation potential, and soil carbon budget (2021 Resolution Copper FEIS,[186] p. 238). The reduction of soil protection measures constitutes an adverse impact, but effects are not expected to be substantial. The greatest impact to soils would be during the construction period.

Guideline SL-G-02 is focused on maintaining soil productivity. The FEIS analysis of impacts on soil productivity concludes that the preferred alternative would impact soils through compaction, erosion, excavation, etc. However, the analysis of impacts along the pipeline and power line corridor, where all activities authorized by this alternative would occur, states, "Soil loss from construction and operations in the pipeline and power line corridor is expected to be minimal after compliance with applicant-committed environmental protection measures (SWPPPs and erosion and sediment controls), and post-closure after reclamation when the surface has stabilized from revegetation" (FEIS, section 3.3.4.7).

The effects noted would occur on 2,500 acres or less of NFS land (less than 0.09 percent of the total NFS land on the Tonto National Forest[187]); therefore, the one guideline would not hinder the Forest Service's ability to implement the forest plan to maintain or restore soils.

Required mitigation measures designed to minimize soil effects include (2021 Resolution Copper Project FEIS, section 3.3.4.9):

- **Revised reclamation and closure plans (FS-SV-03).** Implementing the reclamation and closure plans ensures that the post-closure landscape is successfully revegetated to the extent practicable and that the landforms are stable and safe. This measure is effective at partially replacing habitat and vegetation over the long term, reducing long-term effects on surface water quality from erosion.

- **Design feature:** Two different tailings corridor options were considered for the preferred alternative (north and south). The south corridor was eliminated from consideration due to impacts along Arnett Creek that otherwise would remain undisturbed and had greater surface disturbance. The north pipeline corridor was further revised to include the co-location of the

---

[185] The 2023 forest plan components associated with soil protection consist of the following: Desired Conditions – REC-DIS-DC-04, REC-DIS-MO-DC-03, GRZ-DC-03, FP-DC-05, RD-DC-04, FC-DC-02, ERU-DC-13, ERU-DES-DC-05, ERU-DES-DC-09, ERU-IC-DC-07, ERU-PPE-PG-DC-08, ERU-PPE-SS-DC-04, ERU-PPF-DC-05, ERU-MCD-DC-05, ERU-MCW-DC-06, ERU-MCW-DC-14, RERU-DC-06, RERU-DC-07, RERU-DC-11, RERU-DC-14, ERU-MEWMPO-DC-05, WAT-DC-04, WAT-DC-05, WAT-DC-07, RMZ-DC-02, RMZ-DC-05, SL-DC-01, SL-DC-02, SL-DC-03, SL-DC-04, SL-DC-05, SL-DC-06, RNBAMA-DC-03, SWBMA-DC-02, SRHMA-DC-03; Guidelines - REC-G-03, REC-DIS-G-02, ERU-G-02, ERU-G-04, ERU-SDG-G-01, RMZ-G-03, INS-G-07, SL-G-01, SL-G-02, SL-G-03, SL-G-04, LRMA-G-04; Standards – FP-S-01, FP-S-06, WAT-S-01; and Objectives – WAT-O-03.

[186] The Resolution Copper Project FEIS is cited as follows: citations listed as 2021 Resolution Copper Project FEIS refer to language or sections from the initial FEIS issued in January 2021; citations listed as 2025 Resolution Copper Project FEIS refer to language or sections from the FEIS issued in 2025 of which this appendix (appendix T) is a part; and citations listed as Resolution Copper Project FEIS refer to sections or language that are consistent in both versions of the FEIS (2021 and 2025).

[187] The Tonto National Forest totals 2,965,716 acres (U.S. Forest Service 2023b:1).

power line and pipeline within the same corridors. In addition, several aspects were changed to reduce impacts to sensitive drainages, including a span over Devil's Canyon and Queen Creek Canyon and directional drilling to avoid trenching through Mineral Creek. Overall, this reroute measurably reduced surface disturbance.

Environmental protection measures that are incorporated into the design of the project would act to reduce potential impacts on soils. The non-discretionary applicant-committed environmental protection measures related to soils include the following (Resolution Copper FEIS, section 3.3.4.2):

- Road embankment slopes will be graded and stabilized with vegetation or rock as practicable to prevent erosion;

- During construction and operations, diversions will be constructed around the affected areas to minimize erosion. A number of best management practices, including check dams, dispersion terraces, and filter fences, also will be used during construction and operations;

- Off-road vehicle travel across Tonto National Forest will generally be avoided;

- Newly reclaimed areas on Tonto National Forest will be monitored for weeds and invasive plants for the first 5 years after reclamation. Infestations of invasive species will be treated as soon as they are identified, or as soon as weather conditions are appropriate for treatment; and

- On NFS lands, seed mixes used in reclamation will be certified free of seeds listed on the Forest Service's noxious weed list and will contain only species native to the project area. Seed mixes will be developed from a native species seed list approved by the Forest Service.

Most impacts would occur during the construction phase of project, which would be considered minor and temporary adverse effects when considered on a forest-wide basis. Although impacts on soils and vegetation could take hundreds of years to fully recover, these impacts would affect less than 0.09 percent of the plan area (Tonto National Forest).

Because there would be no substantial environmental effects from the proposed exception of the one guideline, the proposed amendment is not directly related to any substantive requirements based on adverse or beneficial effects.

Guideline SL-G-02 would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative. The one excepted guideline would only apply to the 2,502 acres of NFS land where construction of electric transmission lines, pipelines, and associated infrastructure would disturb soils and vegetation, which would not constitute a substantial lessening of plan protections. Therefore, the proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

The 2023 forest plan contains the following soil protection components: 35 desired conditions, 12 guidelines, three standards, and one objective. This amendment would except the Resolution Copper Project from one guideline. The remaining 35 desired conditions, 11 guidelines, three standards, and one objective would remain applicable to the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. The one excepted guideline would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

In conclusion, the proposed exception of the one guideline related to soils (SL-G-02) is directly related to substantive requirement and § 219.8(a)(2)(ii) – soils and soil productivity. These two substantive requirements are directly related to the proposed amendment through the purpose of the amendment. None of the substantive requirements are directly related through beneficial effects, substantial adverse effects, or substantial lessening of plan protections.

## *Scenic Resources—Scenic Integrity Objectives*

A number of forest plan desired conditions and guidelines require all new projects to meet or move toward meeting specific scenery conditions. Three forest plan desired conditions and three forest plan guidelines associated with scenic resources are proposed to be excepted in this amendment (SC-DC-03, SC-G-01, SC-G-03, NTMA-DC-06, NTMA-DC-07, and NTMA-G-08).

- SC-DC-03 requires that high quality scenery dominates the landscape in areas valued by the public, including state designated scenic routes and national scenic trails. The facilities constructed under the Resolution Copper Project preferred alternative would be visible from U.S. 60, a State designated scenic route. SIOs would also be reduced along segments of the Arizona National Scenic Trail.

- SC-G-01 requires that management activities and newly constructed features minimize visual disturbance and be consistent with or move the area toward achieving SIOs. Under the Resolution Copper Project preferred alternative, electric transmission lines, pipelines, and associated infrastructure would be constructed that would not be consistent with or move the area toward achieving SIOs.

- SC-G-03 requires that management activities that result in short-term impacts inconsistent with the SIOs achieve, or move the project toward, the SIOs over the long term. It is not currently known whether the electrical transmission line constructed with the preferred alternative would remain in place after reclamation has occurred. Therefore, the preferred alternative may not achieve or move toward achieving SIOs in the long-term.

- NTMA-DC-06 requires that the Arizona National Scenic Trail provide visitors with expansive views of the natural appearing landscape. Under the Resolution Copper Project preferred alternative, electric transmission lines, pipelines, and associated infrastructure would be constructed that would be visible from some trail segments and would not be compatible with a natural appearing landscape.

- NTMA-DC-07 requires that scenery viewed from the Arizona National Scenic Trail be consistent with high or very high SIOs and that the foreground of the trail be natural appearing. The preferred alternative would lower existing SIOs, and segments of the trail would not be consistent with high or very high SIOs. Pipelines and associated infrastructure would also cross the Arizona National Scenic Trail in the MARRCO corridor, and the foreground of the trail would not be natural appearing.

- NTMA-G-08 requires that management activities that result in short-term impacts to scenic conditions include design elements to mitigate the impacts. As stated above, feasible measures to mitigate adverse impacts on scenic conditions have not been identified.

The Resolution Copper Project preferred alternative would occur in areas with high and moderate existing SIOs. Scenery analysis in the Resolution Copper Project FEIS concludes that the facilities constructed under the preferred alternative would not meet high and moderate SIOs. High SIO areas should appear unaltered to the casual observer, whereas moderate SIO areas may appear slightly altered but should borrow from elements of form, line, color, texture, and scale found in the characteristic landscape. The clearing of the transmission/pipeline corridor would highlight the linear nature of the pipelines and electric transmission lines and would not be consistent with the natural form, lines, and scales in the adjacent landscape. This alteration of the landscape would be obvious to the casual observer. It is not practical to modify the Resolution Copper Project construction methods and achieve consistency with high and moderate SIOs due to the linear nature of pipelines and the need to remove the vegetation along the corridor, which creates an unnatural form on the landscape. Therefore, the Forest Service proposes to

except the Resolution Copper Project from SC-DC-03, SC-G-01, SC-G-03, NTMA-DC-06, NTMA-DC-07, and NTMA-G-08.

**Purpose** - The purpose of excepting desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, and NTMA-G-08 is to allow the Resolution Copper Project to exceed three of the 12 forest-wide desired conditions for scenery; and three of the 17 forest-wide guidelines for scenery.[188] Therefore, due to the purpose of the amendment, the exception of these desired conditions and guidelines is directly related to § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character.

**Effects** - The effect of the exception of desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, and NTMA-G-08 would be a reduction in SIOs inconsistent with these forest plan components. Although this is an adverse impact to scenery, it is not a substantial adverse impact due to the limited extent to the scenery resource of the project on the Tonto National Forest and the implementation of mitigation measures.

Implementation of the Resolution Copper Project preferred alternative would reduce 516 acres of high SIO to the low category; and reduce 345 acres of moderate SIO to the low category (2025 Resolution Copper Project FEIS, table 3.11.4-2). These numbers include impacts to scenic resources in the Arizona National Scenic Trail corridor, which would reduce 20 acres of high SIO to low SIO (2025 Resolution Copper Project FEIS, table 3.11.4-3). There is a total of 1,706,521 acres of high SIO on the Tonto National Forest (see table 64, Alternative B, in the FEIS for the 2023 forest plan (U.S. Forest Service 2023b)). A reduction of 516 acres constitutes a change to 0.03 percent of the amount of high SIO across the forest. There is a total of 597,020 acres of moderate SIO on the Tonto National Forest (see table 64, Alternative B, in the FEIS for the 2023 forest plan (U.S. Forest Service 2023b)). A reduction of 345 acres constitutes a change to 0.06 percent of the amount of moderate SIO across the forest.

Required mitigation measures to reduce impacts on scenic resources include the following (Resolution Copper Project FEIS, section 3.11.4.9):

- **Revised reclamation and closure plans (FS-SV-03).** This measure would have long-term beneficial effects on scenic resources, reducing the contrast with the natural landscape.

- **GDEs and water well mitigation (FS-WR-01).** This measure would be effective at preserving riparian vegetation and aquatic habitats, which are of scenic value.

- **Clean Water Act Section 404 compensatory mitigation plan (FS-WR-02).** This measure would be effective at replacing xeroriparian habitat lost within the project footprint. Overall, these would be beneficial to scenic resources, though not necessarily in the vicinity of the impact area.

- **Replacement of water in Queen Creek (FS-WR-04).** This measure would be effective at minimizing impacts to scenic resources along this riparian corridor.

- **Minimize visual impacts from transmission lines (FS-SR-01).** Resolution Copper would use best management practices or other guidelines (when on NFS lands) that would minimize visual impacts from transmission lines. Measures could include using non-specular transmission lines, transformers, and towers; avoiding use of monopole transmission structures; avoiding "skylining"

---

[188] December 2023 forest plan components associated with scenic resources consist of the following: Desired Conditions – REC-DEV-DC-05, SC-DC-01, SC-DC-02, SC-DC-03, SC-DC-04, SC-DC-05, MMAM-DC-01, IRAMA-DC-04, NTMA-DC-03, NTMA-DC-06, NTMA-DC-07, NTMA-DC-10; Guidelines – REC-G-02, REC-G-03, REC-DIS-NMO-G-04, SU-G-07, EG-G-02, EG-G-06, TRB-G-04, SC-G-01, SC-G-02, SC-G-03, FC-G-04, RWMA-G-10, IRAMA-G-02, NTMA-G-02, NTMA-G-06, NTMA-G-08, NTMA-G-012; and Standards – FP-S-07.

transmission and communication towers and other structures (i.e., considering topography when siting transmission structures to avoid "skylining" structures on high ridges in the landscape); and using air transport capability to mobilize equipment and materials for clearing, grading, and erecting transmission towers in areas with the highest visual sensitivity with difficult access. These measures would be effective at reducing and minimize the scenery impacts and project contrast of mining operations in the surrounding landscape and impacts on sensitive viewers.

Environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on scenic resources. The non-discretionary applicant-committed environmental protection measures related to scenic resources include the following (Resolution Copper FEIS, section 3.11.4.2):

- Implement an outdoor lighting plan that would reduce potential impacts from artificial night lighting;

- Reduce illumination levels where appropriate while still providing safe working conditions;

- Adhere to the Pinal County Outdoor Lighting Code;

- Use control systems that can turn off lights at particular times of night or that are activated by detecting motion while still providing safe working conditions;

- Use non-reflective earth-tone paints on buildings and structures to the extent practicable;

- Bury pipelines to the extent practicable;

- Build rust-colored towers or use wooden poles on transmission lines;

- Use a reclamation seed mix of weed-free native species consistent with surrounding vegetation; and

- Use colors that blend in with the desert environment.

Excepting desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, and NTMA-G-08 through the proposed amendment would not cause a substantial lessening of plan protections.

These excepted desired conditions and guidelines would continue to apply across the forest. The Resolution Copper Project preferred alternative would affect only 516 acres of 1,706,521 acres of high SIO forest-wide and 345 acres 597,020 of moderate SIO forest-wide. Because excepting the Resolution Copper Project from desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, and NTMA-G-08 would not constitute a substantial lessening of plan protections, in part due to the implementation of required mitigation, the proposed excepted desired conditions and guidelines are not directly related to any substantive requirements based on substantial lessening of plan protections.

The 2023 forest plan contains the following scenery protection components: 12 desired conditions, 17 guidelines, and one standard. This amendment would except three desired conditions and three guidelines. The remaining nine desired conditions, 14 guidelines, and one standard would remain applicable to the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. The three excepted desired conditions and three excepted guidelines would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

In conclusion, the proposed exception of desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, and NTMA-G-08 is directly related to substantive requirement

§ 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character. This substantive requirement is only directly related to the proposed amendment through the purpose of the amendment. None of the substantive requirements are directly related through beneficial effects, substantial adverse effects, or substantial lessening of plan protections.

## National Scenic Trails

The direction in the forest plan considered here applies to the National Scenic Trails Management Area and not to the entire forest. Specifically, the area addressed here is the Arizona National Scenic Trail corridor on the Tonto National Forest.[189]

The 2023 forest plan contains a number of desired conditions and guidelines that focus on protection of user experience on the Arizona National Scenic Trail. Several of those desired conditions and guidelines are addressed under the Scenic Resources—Scenic Integrity Objectives section earlier in this document. The Resolution Copper Project preferred alternative would not be consistent with two other Arizona National Scenic Trail components: desired condition NTMA-DC-03 and guideline NTMA-G-01.

- NTMA-DC-03 requires visitor access, use, and management activities to be consistent with the recreational, scenic, ecological, traditional, and wildlife resources and the nature of and purpose for which the trail is designated. The preferred alternative would construct pipelines and an access road across the Arizona National Scenic Trail within the MARRCO corridor. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purpose of the Arizona National Scenic Trail (2021 Resolution Copper Project FEIS, p. 626).

- NTMA-G-01 requires national trails to be consistent with management direction in the trail establishment report. As previously stated, the preferred alternative would construct pipelines and an access road across the Arizona National Scenic Trail within the MARRCO corridor. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purpose of the Arizona National Scenic Trail (2021 Resolution Copper Project FEIS, p. 626).

The proposed amendment of desired condition NTMA-DC-03 and guideline NTMA-G-01 would allow for pipelines and an access road to cross the Arizona National Scenic Trail within the MARRCO corridor, a location where other major effects already exist.

**Purpose** - The purpose of excepting desired condition NTMA-DC-03 and guideline NTMA-G-01 is to allow the Resolution Copper Project to exceed one out of 10 forest plan desired conditions for the Arizona National Scenic Trail corridor and exceed one out of 13 forest plan guidelines for the Arizona National Scenic Trail corridor. Therefore, the exception of desired condition NTMA-DC-03 and guideline NTMA-G-01 is directly related by the purpose of the amendment to § 219.10(a)(3) – appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors, and to § 219.10(b)(1)(i) – sustainable recreation.

**Effects** - The effect of the exception of the desired condition NTMA-DC-03 and guideline NTMA-G-01 would be the allowance of a new pipeline and access road to cross the Arizona National Scenic Trail at a location where major effects already exist. As disclosed in the following paragraph, although this is an adverse impact to Arizona National Scenic Trail, it is not a substantial adverse impact because effects would primarily be limited to the construction period.

---

[189] The Arizona National Scenic Trail corridor is defined as approximately 0.5 mile from the centerline of the trail (U.S. Forest Service 2023d:181).

The Resolution Copper Project preferred alternative would construct pipelines and an associated access road within the MARRCO corridor. The pipelines would move concentrate to the filter plant near the train and move recovered water and newly pumped water from the Desert Wellfield back to the West Plant Site. The pipelines and access road would cross Passage 18 of the Arizona National Scenic Trail in the MARRCO corridor. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purpose of the Arizona National Scenic Trail. There would be short-term impacts on trail users during construction activities when disturbance precludes use for safety reasons (e.g., active grading, transport of heavy equipment, active construction).

The scale of the Arizona National Scenic Trail component of the project-specific amendment encompasses the immediate location in the MARRCO Corridor where the pipeline and access road cross the Arizona National Scenic Trail. New pipelines constructed within the MARRCO corridor would cross Passage 18 of the Arizona National Scenic Trail (2021 Resolution Copper Project FEIS, p. 626.). In the Passage 18 segment, 0.07 mile of the proposed tailings pipeline corridor would intersect the Arizona National Scenic Trail. The Arizona National Scenic Trail corridor extends 0.5 mile on either side of the Arizona National Scenic Trail; the proposed tailings pipeline corridor would affect approximately 45 acres of the Arizona National Scenic Trail corridor (2021 Resolution Copper Project FEIS, p. 630).

As stated above, the Arizona National Scenic Trail corridor is defined as approximately 0.5 mile from the centerline of the trail. The Tonto National Forest manages about 200 miles of the Arizona National Scenic Trail (forest plan, p. 181). The Arizona National Scenic Trail corridor totals about 128,000 acres,[190] and the area impacted by the Resolution Copper Project preferred alternative would be less than 0.04 percent of the Arizona National Scenic Trail corridor. The area impacted by Resolution Copper Project is a minor portion of the Arizona National Scenic Trail on the Tonto National Forest.

Disruption to Arizona National Scenic Trail users would occur during the activity, and when conditions are safe for hikers, cyclists, and equestrian users, the disruption would cease. Contractors would provide necessary detours or signage for Arizona National Scenic Trail user awareness during these activities. Existing disturbances in this area include a railroad corridor, trailhead parking, and Hewitt Station Road.

Required mitigation measures to reduce impacts on the Arizona National Scenic Trail include the following (Resolution Copper Project FEIS, section 3.11.4.9):

- **New mitigation aspects of revised road use plan (FS-TA-01).** Implementing the revised road use plan would help reduce the conflicts with existing traffic and recreational road users that would occur during construction and operations. New mitigation measures incorporated in response to disclosed impacts include additional mitigation that would be effective at reducing the impacts of road and pipeline crossings, especially with the Arizona National Scenic Trail.

Environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on the Arizona National Scenic Trail. The non-discretionary applicant-committed environmental protection measures related to national scenic trails include the following (Resolution Copper FEIS, section 3.9.4.2):

- Developing a concentrate pipeline corridor management plan to reestablish crossing on the Arizona National Scenic Trail after construction.

As stated above, the area of impact is a small fraction of the Arizona National Scenic Trail on the Tonto National Forest. Mitigation measures would further reduce impacts. Therefore, no substantive requirements are directly related due to beneficial effects or substantial adverse effects.

---

[190] 200 miles long × 1 mile wide = 200 square miles × 640 acres per square mile.

Excepting desired condition NTMA-DC-03 and guideline NTMA-G-01 would not cause a substantial lessening of plan protections. Desired condition NTMA-DC-03 and guideline NTMA-G-01 would continue to apply to the remaining 199+ miles of the Arizona National Scenic Trail corridor on the Tonto National Forest, and nine other desired conditions and 12 other guidelines focused on protecting user experience on the Arizona National Scenic Trail would be unaffected by the proposed amendment. Because allowing the pipeline to go over the Arizona National Scenic Trail would not constitute a substantial lessening of plan protections, the proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

The forest plan contains the following National Scenic Trail protection components: 10 desired conditions, 13 guidelines, and three standards. This amendment would except one desired condition and one guideline. The remaining nine desired conditions, 12 guidelines, and three standards would remain applicable to the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. The one excepted desired condition and one excepted guideline would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

In conclusion, the proposed exception of desired condition NTMA-DC-03 and guideline NTMA-G-01 is directly related to substantive requirements § 219.10(a)(3) – appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors, and to § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character. These two substantive requirements are only directly related to the proposed amendment through the purpose of the amendment. None of the substantive requirements are directly related through beneficial effects, substantial adverse effects, or substantial lessening of plan protections.

## Recreation Resources—Recreation Opportunity Spectrum

The Resolution Copper Project preferred alternative would not be consistent with one guideline related to the ROS: REC-G-10.

- REC-G-10 requires all decisions and activities to be consistent with or move the area toward the appropriate ROS. The preferred alternative would reduce nonmotorized ROS to motorized ROS in some areas; therefore, it is not consistent with this guideline.

**Purpose** - The purpose of excepting guideline REC-G-10 is to allow the Resolution Copper Project to exceed one out of 52 forest plan guidelines for recreation.[191] The exception of guideline REC-G-10 is

---

[191] December 2023 forest plan components associated with recreation and ROS consist of the following: Desired Conditions – PV-DC-01, PV-DC-02, REC-DC-01, REC-DC-02, REC-DC-03, REC-DC-04, REC-DC-05, REC-DC-06, REC-DC-07, REC-DC-08, REC-DC-09, REC-DC-10, REC-DEV-DC-01, REC-DEV-DC-02, REC-DEV-DC-03, REC-DEV-DC-04, REC-DEV-DC-05, REC-DIS-DC-01, REC-DIS-DC-02, REC-DIS-DC-03, REC-DIS-DC-04, REC-DIS-DC-05, REC-DIS-DC-06, REC-DIS-MO-DC-01, REC-DIS-MO-DC-02, REC-DIS-MO-DC-03, REC-DIS-MO-DC-04, REC-DIS-MO-DC-05, REC-DIS-NMO-DC-01, REC-DIS-NMO-DC-02, REC-DIS-NMO-DC-03, REC-DIS-NMO-DC-04, REC-DIS-WB-DC-01, REC-DIS-WB-DC-02, REC-DIS-WB-DC-03, REC-DIS-WB-DC-04, REC-DIS-RS-DC-01, REC-DIS-RS-DC-02, REC-DIS-RS-DC-03, REC-DIS-RS-DC-04, REC-DIS-RS-DC-05, REC-WR-DC-01, REC-WR-DC-02, REC-WR-DC-03, SC-DC-03, SC-DC-04, RD-DC-03, FC-DC-07, FC-DC-08, LA-DC-02, FF-DC-01, WAT-DC-01, WAT-DC-08, AQ-DC-01, DWMA-DC-01, DWMA-DC-02, DWMA-DC-03, DWMA-DC-04, DWMA-DC-05, DWMA-DC-06, DWMA-DC-07, DWMA-DC-08, DWMA-DC-09, DWMA-DC-10, DWMA-DC-11, RWMA-DC-02, RWMA-DC-03, RWMA-DC-05, RWMA-DC-06, RWMA-DC-07, IRAMA-DC-04, NTMA-DC-01, NTMA-DC-02, NTMA-DC-03, NTMA-DC-06, NTMA-DC-10, LRMA-DC-01, LRMA-DC-02, LRMA-DC-04, LRMA-DC-05; Guidelines - REC-G-01, REC-G-02, REC-G-03, REC-G-04, REC-G-05, REC-G-06, REC-G-07, REC-G-08, REC-G-09, REC-G-10, REC-DEV-G-01, REC-DIS-G-01, REC-DIS-G-02, REC-DIS-G-03, REC-DIS-G-04, REC-DIS-MO-G-01, REC-DIS-MO-G-02, REC-DIS-MO-G-03, REC-DIS-MO-G-04, REC-DIS-NMO-G-01, REC-DIS-NMO-G-02, REC-DIS-NMO-G-03, REC-DIS-NMO-G-04, REC-DIS-NMO-G-05, REC-DIS-NMO-G-06, REC-DIS-WB-G-01, REC-DIS-RS-G-01, REC-DIS-RS-G-02, REC-WR-G-01, REC-WR-G-02, REC-WR-G-03, RD-G-01, RD-G-02, INS-G-05, AQ-G-01, DWMA-G-10, RWMA-G-09, EWSRMA-G-03, IRAMA-G-01, NTMA-G-01, NTMA-G-02, NTMA-G-03, NTMA-G-04, NTMA-G-05, NTMA-G-06, NTMA-G-07, NTMA-G-08, NTMA-G-10, NTMA-G-11, NTMA-G-13, LRMA-G-03, ALSMA-G-02; Standards – REC-S-01, REC-DEV-S-01, REC-DEV-S-02, REC-DIS-S-01, REC-DIS-MO-S-01, REC-DIS-MO-S-02, REC-DIS-MO-S-03, REC-DIS-RS-S-01, FP-S-01, FP-S-06, DWMA-S-01, DWMA-S-02, NTMA-S-01, NTMA-S-02, NTMA-S-03; and Objectives – REC-O-01, REC-O-02, REC-O-03, REC-O-04, REC-O-05, REC-O-06, REC-DEV-O-01, REC-DIS-RS-O-01, WAT-O-05.

directly related by the purpose of the amendment to § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character.

**Effects** - The effect of the exception of the guideline REC-G-10 would be to allow construction, operation, and maintenance of new pipelines, electrical transmission lines, and associated infrastructure that would result in a reduction of 166 acres from semiprimitive nonmotorized ROS to semiprimitive motorized ROS (2025 Resolution Copper Project FEIS, table 3.9.4-2). Implementation of the Resolution Copper Project preferred alternative would reduce the amount of semiprimitive nonmotorized ROS on the forest from 715,024[192] acres to 714,858 acres, a reduction of 0.02 percent forest-wide. Semiprimitive motorized recreation would increase from 1,072,671 acres to 1,072,837 acres, an increase of less than 0.02 percent forest-wide. Although this has an adverse impact on nonmotorized recreation, it is not a substantial adverse impact due to the relatively small amount of effects across the Tonto National Forest.

Required mitigation measures to reduce impacts on recreation resources include the following (Resolution Copper Project FEIS, section 3.9.4.9):

- **Revised reclamation and closure plans (FS-SV-03).** Implementing reclamation and closure plans ensures that the post-closure landscape is successfully revegetated to the extent practicable. Eventually these areas could be reopened to recreational activities.

- **New mitigation aspects of revised road use plan (FS-TA-01).** Implementing the revised road use plan would help reduce the conflicts with existing traffic and recreational road users that would occur during construction and operations. This mitigation would be effective at reducing impacts of road and pipeline crossings.

- **GDEs and water well mitigation (FS-WR-01).** This measure would be effective at preserving riparian vegetation and aquatic habitats, which are of importance to recreational users of the Tonto National Forest.

- **Clean Water Act Section 404 compensatory mitigation plan (FS-WR-02).** The Queen Creek parcel would likely be effective at improving recreational opportunities in the immediate vicinity of Superior, when considered in combination with implementing the Tonto National Forest multi-use trail plan (FS-RC-03) and replacement of water in Queen Creek (FS-WR-04).

- **Replacement of water in Queen Creek (FS-WR-04).** This measure would be effective at minimizing impacts to recreational users and birdwatchers drawn to riparian habitat in this area.

- **Access to Oak Flat campground (FS-RC-02).** Maintaining access to Oak Flat campground, to the extent practicable with respect to safety, would be effective at reducing impacts caused by the loss of the Oak Flat area to subsidence.

- **Mitigation for adverse impacts to recreational trails (forest multi-use trail plan) (FS-RC-03).** This plan would replace over 20 miles of motorized routes and nonmotorized trail on the Tonto National Forest around Superior. It would be effective at expanding the motorized and nonmotorized travel routes and recreational opportunities.

Environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on recreation. The non-discretionary applicant-committed environmental protection measures related to recreation include the following (Resolution Copper FEIS, section 3.9.4.2):

- Developing traditional and sport climbing open to the public on Resolution Copper property outside the mining footprint through agreement with Queen Creek Coalition.

---

[192] See table 15 in the FEIS for the 2023 forest plan (U.S. Forest Service 2023b) for total acres by ROS on the forest.

The amount of reduction in semiprimitive ROS is a small fraction of the available semiprimitive ROS on the Tonto National Forest (0.02 percent). Mitigation measures and design features would further reduce impacts to recreation. Therefore, no substantive requirements are directly related due to beneficial effects or substantial adverse effects.

Excepting guideline REC-G-10 would not cause a substantial lessening of plan protections. Guideline REC-G-10 would continue to apply to the remaining 714,858 acres of semiprimitive nonmotorized ROS and 1,072,837 acres of semiprimitive motorized ROS on the Tonto National Forest.

The minor scale of the change in ROS would not constitute a substantial lessening of plan protections. The proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

The 2023 forest plan contains the following components focused on managing and providing recreation opportunities: 80 desired conditions; 52 guidelines; 15 standards; and nine objectives. This amendment would except one guideline. The remaining 51 guidelines, 80 desired conditions, 15 standards, and nine objectives would remain applicable to the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. The one excepted guideline would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

In conclusion, the proposed exception of guideline REC-G-10 is directly related to substantive requirements § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character. This substantive requirement is only directly related to the proposed amendment through the purpose of the amendment. None of the substantive requirements are directly related through beneficial effects, substantial adverse effects, or substantial lessening of plan protections.

## *Wildlife Habitat—Connectivity and Movement*

The forest plan contains guidelines that focus on maintenance of habitat connectivity and wildlife movement. The Resolution Copper Project preferred alternative would not be consistent with three habitat connectivity and wildlife movement guidelines: REC-WR-G-03, WFP-G-06, and WFP-G-07.

- REC-WR-G-03 requires that wildlife connectivity for economically important and other species be maintained or enhanced. The reduction in movement habitat with the preferred alternative would not maintain or enhance wildlife connectivity.

- WFP-G-06 requires that landscape and vegetation alterations that significantly contribute to uncharacteristic habitat fragmentation be avoided and that project design provide for movement and dispersal of species. The preferred alternative would not provide for movement and dispersal of species.

- WFP-G-07 requires that new infrastructure or constructed features be designed and maintained to minimize negative impacts to movement and dispersal of wildlife. Impacts to wildlife movement and dispersal would not be maintained or minimized with the preferred alternative.

**Purpose** - The purpose of excepting guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07 is to allow Resolution Copper Project to exceed three out of seven forest plan guidelines related to wildlife movement and habitat connectivity.[193] Therefore, the exception of guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07 is directly related by the purpose of the amendment to §219.8(a)(1)(i) – ecosystem

---

[193] December 2023 forest plan components associated with wildlife habitat—connectivity and movement consist of the following: Desired Conditions – FP-DC-01, FP-DC-05, MMAM-DC-01, LA-DC-01, DWMA-DC-02, RWMA-DC-02, SRHMA-DC-03, WAT-DC-08, RMZ-DC-07, ERU-DC-11 and WFP-DC-05; Guidelines – MMAM-G-06, LA-G-01(c), REC-WR-G-03, RD-G-04, WFP-G-06, WFP-G-07, and REC-WR-G-03; and Standard – FP-S-07.

integrity, interdependence of terrestrial and aquatic ecosystems in the plan area; and to §219.9(a)(2)(i) – ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types.

**Effects** - The effect of excepting guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07 would be to allow construction, operation, and maintenance of new pipelines, electrical transmission lines, and associated infrastructure that would result in 1,417 acres of habitat disturbance in the tailings corridor, transmission line corridor, and access roads (2025 Resolution Copper Project FEIS, table 3.8.4-1). This would result in a loss of long-term movement habitat along pipeline corridors since vegetation would be expected to eventually reestablish in the disturbed areas but would be unlikely to return to preconstruction conditions (2021 Resolution Copper Project FEIS, p. 581). The total acres of intact habitat connectivity on the Tonto National Forest is not known. However, the 1,417 acres of habitat connectivity that would be affected by the Resolution Copper Project preferred alternative is a minor component of the habitat available across the 2,965,716 acres of the Tonto National Forest. Potential impacts to biodiversity would likely be limited to impacts at the local level for most species and would not be significant at the population level (2021 Resolution Copper Project FEIS, p. 581).

Excepting guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07 would not cause a substantial lessening of plan protections. Guideline REC-WR-G-03, WFP-G-06, and WFP-G-07 would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

Required mitigation measures to reduce impacts on wildlife habitat include the following (Resolution Copper Project FEIS, section 3.8.4.4):

- **Revised reclamation and closure plans (FS-SV-03).** This measure would be effective at partially replacing habitat and vegetation for wildlife over the long term.

- **GDEs and water well mitigation (FS-WR-01).** This measure would be effective at preserving riparian vegetation and aquatic habitats available for wildlife.

- **Replacement of water in Queen Creek (FS-WR-04).** This measure would be highly effective at minimizing impacts to surface water quantity and riparian habitat, which would prevent impacts to wildlife using this habitat.

- **New mitigation aspects of revised wildlife management plan (FS-WI-01).** Adherence to the revised wildlife management plan would reduce effects on habitat and to individuals of species.

- **Maintain or replace access to stock tanks and AGFD wildlife waters (FS-WI-04).** This measure would ensure that these water sources are available for wildlife, preventing additional impacts to species from disruption of available water.

Environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on wildlife habitat. The non-discretionary applicant-committed environmental protection measures related to wildlife habitat include the following (Resolution Copper FEIS, section 3.8.4.2):

- In order to minimize the potential risk for bird collisions with transmission lines, the lines and structures would be designed in accordance with "Reducing Avian Collision with Power Lines" (Avian Power Line Interaction Committee 2012).

- Resolution Copper prepared a noxious weed and invasive species management plan for NFS lands (Resolution Copper 2019). Resolution Copper further agreed to prepare reports 2 years after construction begins and every 5 years during operations.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 297 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 77 of 96

Appendix T

- Developing a site-specific wildlife mitigation plan in coordination with the AGFD, FWS, and Forest Service biologists to address construction-related actions. Intent is to avoid, minimize, and mitigate impacts on special status species.

- Ensuring that all ground-disturbing activities associated with pipeline and power line work near Mineral Creek and Gila chub designated critical habitat are performed outside the ordinary high-water mark and designated critical habitat.

- Using trenchless/non-surface impact methods (such as horizontal drilling or micro-tunneling) in areas where project facilities intersect Mineral Creek to avoid surface disturbance within the ordinary high-water mark and designated critical habitat.

- Clearly defining the perimeter of the construction footprint with flagging or other appropriate markers to restrict heavy equipment use and other surface-disturbing activities to areas within the construction footprint. The biological monitor will be present at all times during construction and will help ensure that construction activities and equipment remain within designated limits.

- Conducting annual yellow-billed cuckoo surveys in Devil's Canyon and Mineral Creek immediately upstream and downstream of disturbance areas and crossings. Annual surveys will begin 2 years prior to surface-disturbing activities. Surveys will continue until pipeline construction has been completed, including reclamation of temporary construction disturbance.

- In areas where surveys have detected the presence of yellow-billed cuckoo, avoiding vegetation clearing and ground-disturbing activities associated with pipeline construction within 500 feet of the ordinary high-water mark of Mineral Creek from May 1 through September 30, to remain outside the breeding season.

- Avoiding when possible large trees (greater than 12 inches in diameter), including Fremont cottonwood (*Populus fremontii*) and willow species (*Salix* spp.), as well as dense stands of vegetation.

- Cutting riparian trees to ground level when they are removed. When possible, root masses will be left intact to help stabilize soils and provide opportunities for regrowth through adventitious shoots (e.g., in the case of willows).

The minor scale of the change in wildlife habitat connectivity would not constitute a substantial lessening of plan protections. The proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

The forest plan contains the following habitat connectivity wildlife movement protection components: 11 desired conditions, seven guidelines, and one standard. This amendment would except three guidelines. The remaining 11 desired conditions, four guidelines, and one standard would remain applicable to the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. The three excepted guidelines would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

In conclusion, the proposed exception of guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07 is directly related to substantive requirements §219.8(a)(1)(i) – ecosystem integrity, interdependence of terrestrial and aquatic ecosystems in the plan area; and to §219.9(a)(2)(i) – ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types. These substantive requirements are only directly related to the proposed amendment through the purpose of the amendment. None of the substantive requirements are directly related through beneficial effects, substantial adverse effects, or substantial lessening of plan protections.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 298 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 78 of 96

Appendix T

## *Cultural Resources*

Three forest plan desired conditions associated with protection of cultural resources are proposed to be excepted in this amendment: CUH-DC-01, CUH-DC-02, and CUH-DC-07. These three desired conditions cannot be met using standard industry construction methods like those proposed with the Resolution Copper Project.

- CUH-DC-01 requires that historic properties retain all of the characteristics that qualify the property for listing in the National Register of Historic Places (NRHP). Impacts to historic properties cannot be avoided or fully mitigated, and it is not feasible to retain all the characteristics that qualify impacted properties for listing.

- CUH-DC-02 requires that historic properties not be threatened by human disturbance. As previously stated, it is not feasible to avoid all impacts to historic properties.

- CUH-DC-07 requires that cultural resources, including artifacts, be preserved in place. Ground disturbance associated with the Resolution Copper Project preferred alternative would disturb hundreds of archaeological sites. Mitigation would include data recovery and curation of artifacts.

It is not practical to modify the Resolution Copper Project location or construction methods in a manner that would achieve consistency with these three desired conditions. Therefore, the Forest Service proposes to except the Resolution Copper Project from these three desired conditions.

**Purpose** - The purpose of excepting desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07 is to allow the Resolution Copper Project to exceed three of the 18 forest-wide desired conditions for cultural resource protection.[194] The modification of these desired conditions are directly related to § 219.8(a)(b) – social and economic sustainability – cultural and historic resources and uses; to § 219.10(a)(1) – integrated resource management for multiple use – cultural and heritage resources; and to § 219.10(b)(1)(ii) – protection of cultural and historic resources.

**Effects** - The effect of the exception of desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07 includes minor adverse effects on historic and archaeological resources. The reduction in cultural resource protection measures constitutes an adverse impact, but effects are not expected to be substantial. The greatest impacts to cultural resources would be during the construction period.

The cultural resources analysis in the Resolution Copper Project FEIS lists hundreds of historic and archaeological sites likely to be directly by the preferred alternative (2021 Resolution Copper Project FEIS, pp. 785-786). However, that analysis includes areas where the forest plan does not apply, such as private land and land administered by the State of Arizona and Bureau of Land Management. The Forest Service decision to implement the Resolution Copper Project preferred alternative would not authorize any activities on land that are not administered by the Forest Service. A review of impacted sites by landownership concludes that eight of these sites are located on NFS land associated with the preferred alternative area of disturbance (Newell 2018a). While it is not possible to know the total number of cultural resource sites on the Tonto National Forest, eight cultural sites represents a small amount of the number of sites on the forest.

---

[194] December 2023 forest plan components associated with cultural resources consist of the following: Desired Conditions – CUH-DC-01, CUH-DC-02, CUH-DC-03, CUH-DC-04, CUH-DC-05, CUH-DC-06, CUH-DC-07, CUH-DC-08, TRB-DC-01, TRB-DC-02, TRB-DC-03, TRB-DC-04, TRB-DC-05, LA-DC-01, REC-DIS-RS-DC-04, NTMA-DC-06, ALSMA-DC-01, CVK-DC-01; Guidelines – SU-G-04, EG-G-04, EG-G-06(b), CUH-G-01, CUH-G-02, CUH-G-03, CUH-G-04, CUH-G-05, TRB-G-01, TRB-G-02, TRB-G-03, TRB-G-04, TRB-G-05, MMAM-G-06, LA-G-01(c), FF-G-03, FF-G-04, CVK-G-03, ALSMA-G-01; and Standards – CUH-S-01, CUH-S-02, TRB-S-01, TRB-S-02, TRB-S-03, TRB-S-04, FF-S-04, SU-S-01.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 299 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 79 of 96

Appendix T

Any direct ground disturbance runs the risk of disturbing cultural resources. Implementation of the Resolution Copper Project preferred alternative would result in construction, use, and maintenance of electrical transmission lines, pipelines, and associated infrastructure that would disturb 2,502 acres of NFS lands and not affect that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative. This is a minor amount of impact when considered on a forest-wide basis.

The direct effects noted would occur on 2,502 acres or less of NFS land (less than 0.09 percent of the total NFS land on the Tonto National Forest); the three excepted desired conditions would not hinder the Forest Service's ability to implement the forest plan to protect cultural resources across that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

Required mitigation measures designed to minimize impacts on cultural resources include the following (Resolution Copper Project FEIS, section 3.12.4.9):

- **Implementation of Oak Flat HPTP (FS-CR-01).** The Oak Flat historic properties treatment plan (HPTP) sets out a plan for treatments to resolve the adverse effects on 42 historic properties that have been identified within the Oak Flat Federal Parcel.

- **GPO research design (FS-CR-02).** The GPO research design and data recovery plans will detail treatments to resolve adverse effects on historic properties within the GPO project area, with the exception of those in the Oak Flat Federal Parcel. Data recovery would be conducted on archaeological sites eligible for the NRHP under Criterion D within the GPO project area. Project materials and archaeological collections would be curated in accordance with 36 CFR 79 (Curation of Federally-Owned and Administered Archaeological Collections) with the Gila River Indian Community, Salt River Pima-Maricopa Indian Community, and Arizona State Museum.

- **Visual, atmospheric, auditory, socioeconomic, and cumulative effects mitigation plan (FS-CR 03).** The Forest Service will ensure that additional mitigation plan(s) are prepared after the publication of the FEIS that describe mitigation measures to address effects on historic properties.

- **Design criteria:** Two different tailings corridor options were considered for the preferred alternative (north and south), and the south corridor was eliminated from consideration due to impacts along Arnett Creek that otherwise would remain undisturbed and had greater surface disturbance. The north pipeline corridor was further revised based in part on public comments. Key changes include the co-location of the power line and pipeline within the same corridors, moving the corridor away from paralleling perennial reaches of lower Mineral Creek, and relocating it around Government Springs Ranch.

Environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on cultural resources. Specifically, Resolution Copper has committed to following the Section 106 process for the resolution of adverse effects on historic properties and will design the footprint of the project to avoid resources to the maximum extent possible (Resolution Copper FEIS, section 3.12.4.2).

Most impacts would occur during the construction phase of project, which would be considered minor adverse effects when considered on a forest-wide basis. These impacts would affect only eight cultural resource sites located on less than 0.09 percent of the forest plan area (Tonto National Forest).

Because there would be no substantial environmental effects from the proposed exception of these desired conditions and guidelines, the proposed amendment is not directly related to any substantive requirements based on adverse or beneficial effects.

Desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07 would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative. The

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 300 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 80 of 96

Appendix T

excepted three desired conditions would only apply to the 2,502 acres of NFS land where construction of electric transmission lines, pipelines, and associated infrastructure would occur and would not constitute a substantial lessening of plan protections. Therefore, the proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

The forest plan contains the following cultural resource protection components: 18 desired conditions, 19 guidelines, and eight standards. This amendment would except three desired conditions. The remaining 15 desired conditions, 19 guidelines, and eight standards would remain applicable to the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. The three excepted desired conditions would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

In conclusion, the proposed exception of the three desired conditions related to cultural resource areas (CUH-DC-01, CUH-DC-02, and CUH-DC-07) are directly related to substantive requirements § 219.8(a)(b) – social and economic sustainability – cultural and historic resources and uses; § 219.10(a)(1) – integrated resource management for multiple use – cultural and heritage resources; and § 219.10(b)(1)(ii) – protection of cultural and historic resources. These substantive requirements are directly related to the proposed amendment through the purpose of the amendment. None of the substantive requirements are directly related through beneficial effects, substantial adverse effects, or substantial lessening of plan protections.

## *Directly Related Substantive Requirements*

Based on the criteria and analyses described above, the substantive requirements that are directly related include:

- § 219.8(a)(2)(ii) – Soils and soil productivity due to the exception of guideline SL-G-02.

- § 219.10(b)(1)(i) – Sustainable recreation due to the exception of desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, NTMA-G-01, and NTMA-G-08 (Scenic Integrity Objectives); desired condition NTMA-DC-03 and guideline NTMA-G-01 (Arizona National Scenic Trail); and guideline REC-G-10 (Recreational Opportunity Spectrum).

- § 219.8(a)(1)(i) – Ecosystem integrity, interdependence of terrestrial and aquatic ecosystems in the plan area due to exception of guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07.

- § 219.9(a)(2)(i) – ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types due to the exception of guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07.

- § 219.8(a)(b) – social and economic sustainability – cultural and historic resources and uses due to the exception of desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07.

- § 219.10(a)(1) – Integrated resource management for multiple use – cultural and heritage resources due to the exception of desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07.

- § 219.10(a)(3) – Appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors, due to the exception of desired conditions and guidelines NTMA-DC-03 and NTMA-G-01.

- § 219.10(b)(1)(ii) – protection of cultural and historic resources due to the exception of desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07.

# Step 3: Apply the Directly Related Substantive Requirement

The purpose of Step 3 is to take the directly related substantive requirements (identified above in Step 2) and apply them within the scope and scale of the proposed amendment. In applying those requirements, the Forest Service must ensure that the forest plan, as amended, contains plan components that meet the 2012 Planning Rule substantive requirements across the planning unit within the scope and scale of the proposed amendment. A plan amendment is not expected to bear the burden of a plan revision and bring the entire plan into consistency with the 2012 Planning Rule. Rather, the plan amendment shall only apply the directly related substantive requirements and only in a manner commensurate with the scope and scale of the amendment.

In applying the directly related substantive requirements to those components related through "purpose" or "beneficial effect," the responsible official may determine that additional plan components are necessary to ensure compliance with the 2012 Planning Rule.[195] When a directly related substantive requirement is determined to be related by "adverse effect" in Step 2, the responsible official is required to either modify the proposal or review the amended plan to determine the need or benefit of additional plan components.

Based on the Step 2 analysis, the forest plan, as amended, must contain plan components that maintain or restore[196] ecosystem integrity and diversity of plant and animal communities (36 CFR §§ 219.8 and 219.9) and provide for multiple uses (36 CFR § 219.10). Each of these substantive requirements contains direction regarding their application to the plan. For some substantive requirements like ecosystem integrity and diversity (36 CFR §§ 219.8 and 219.9), the plan's components must strive to "maintain or restore."

When applying directly related substantive requirements, the scope of the proposed project-specific forest plan amendment is the exception of the following out of more than 600 forest plan components (see the Introduction section above):

- One of 35 forest-wide desired conditions for soil protection.

- Three of 12 forest-wide desired conditions and three of 17 forest-wide guidelines for scenery.

- One of 10 forest-wide desired conditions and one of 13 forest-wide guidelines for the Arizona National Scenic Trail corridor.

- One of 52 forest-wide guidelines for recreation.

- Three of seven forest-wide guidelines related to wildlife movement and habitat connectivity.

- Three of 18 forest-wide desired conditions for cultural resource protection.

Therefore, the proposed amendment leaves the following forest plan components related to the proposed amendment <u>unchanged</u>:

- Soil Productivity – 34 desired conditions, 12 guidelines, three standards, and one objective;

---

[195] When a directly related substantive requirement is determined to be related by "substantial adverse effect" in Step 2, the responsible official is required to either modify the proposal to avoid the "substantial adverse effect determination" or verify whether the existing plan provides sufficient plan components for the directly related substantive requirement. If the plan does not, the responsible official must add additional plan components to make certain the Planning Rule requirements are met.

[196] The Planning Rule defines restore as "[t]o renew by the process of restoration (see restoration)." It defines restoration as "[t]he process of assisting the recovery of an ecosystem that has been degraded, damaged, or destroyed. Ecological restoration focuses on reestablishing the composition, structure, pattern, and ecological processes necessary to facilitate terrestrial and aquatic ecosystem sustainability, resilience, and health under current and future conditions" (36 CFR § 219.19).

- Scenic Resources (SIO) – nine desired conditions, 14 guidelines, and one standard;

- National Scenic Trails – nine desired conditions, 12 guidelines, and three standards;

- Recreation Resources (ROS) – 80 desired conditions, 51 guidelines, 15 standards, and nine objectives;

- Wildlife Habitat (Connectivity and Movement) – 11 desired conditions, four guidelines, and one standard; and

- Cultural Resources – 15 desired conditions, 19 guidelines, and eight standards.

Through actions that require adherence to State standards and practices, actions that avoid or mitigate erosion, and practices that require restoration, these unexcepted desired conditions, guidelines, objectives, and standards would continue to maintain or restore terrestrial ecological integrity, soils and soil productivity, scenery, riparian areas, recreation, wildlife habitat, cultural resources, and ecosystem diversity.

The following analysis of the application of the directly related substantive requirements considers the extent of the proposed amendment (scope) and area of the forest affected by the proposed amendment (scale), evaluates the desired future conditions contained in the forest plan, and uses best available science data such as monitoring reports and other scientific information. The direction required by each substantive requirement is included in the analysis below.

## Section 219.8(a)(2)(ii) – Soils and Soil Productivity

Substantive requirement § 219.8(a)(2)(ii) – soils and soil productivity is directly related to the proposed amendment through the purpose of excepting guideline SL-G-02. The overarching goal of the substantive requirements found in § 219.8 is for the plan to provide for social, economic, and ecological sustainability within Forest Service authority and the inherent capability of the plan area. The substantive requirement specific to soils and soil productivity is to include plan components to maintain or restore soils and soil productivity, including guidance to reduce soil erosion and sedimentation. To "maintain" a resource is defined by the Planning Rule as "to keep in existence or continuance of the desired ecological condition in terms of desired composition, structure, and processes" (36 CFR § 219.19) and to "restore" means bring back to a baseline condition. This does not infer that there must be *no net loss* to the resource in question across the plan area. However, it does mean that over time, the trend for the resource in question should be moving toward the desired condition or is constant (sideways trend). Like any trend line, there can be peaks and troughs within the trendline; as long as over time the primary trend is toward the desired condition or is constant, then maintenance of the resource is being achieved.

### Scope

The scope of this component of the project-specific amendment is the exception of one out of 12 soil productivity guidelines as they are applied to the 2,502 acres of NFS land where construction of electric transmission lines, pipelines, and associated infrastructure would occur with the Resolution Copper Project preferred alternative (area of disturbance). The proposed amendment would only apply to the Resolution Copper Project and not except any other projects.

### Scale

The scale of the project-specific amendment for this resource is the preferred alternative area of disturbance (2,502 acres), which is less than 0.09 percent of the 2,965,716-acre Tonto National Forest. The project-specific amendment would be limited to the area of disturbance for the life of the pipelines and electrical transmission lines.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 303 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 83 of 96

Appendix T

**Application**

Excepting the Resolution Copper Project from adhering to this soil productivity guideline would have an adverse impact on the soil resource within the 2,502-acre preferred alternative area of disturbance. However, as discussed below, excepting the Resolution Copper Project from the soil productivity guideline would not detract from the Forest Service's ability to implement the forest plan to provide for the ecological integrity of the forest-wide soil resource, and the mandates of the 2012 Planning Rule would be met. As previously described, implementation of the preferred alternative would include mandatory measures to minimize impacts to soil and soil productivity from the Resolution Copper Project and thus would minimize impacts to ecosystem integrity as it relates to soil resources.

Soil loss from construction and operations in the pipeline and power line corridor (preferred alternative area of disturbance) is expected to be minimal after compliance with applicant-committed environmental protection measures (stormwater pollutant prevention plans and erosion and sediment controls) and after reclamation when the surface has stabilized from revegetation (2021 Resolution Copper Project FEIS, p. 255). Over the long term, with implementation of reclamation measures and mitigation, soil productivity would improve in the preferred alternative area of disturbance (2021 Resolution Copper Project FEIS, pp. 247–248).

Multiple unexcepted forest-wide plan components to maintain or restore soils and soil productivity would remain in place throughout the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. These include 35 unexcepted desired conditions, 11 unexcepted guidelines, three unexcepted standards, and one unexcepted objective that would remain in place throughout that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative. In addition, the original requirements of guideline SL-G-02 continue to apply to 99.9 percent of the Tonto National Forest. As such, the scope and scale of the proposed amendment is negligible in context of the forest-wide soil resource. Considering the scale of the plan amendment, the unaffected plan components maintain or restore soil resources, and the measures imposed on the Resolution Copper Project for construction and the forest plan direction for the Tonto National Forest, including the project-specific amendment, are sufficient to maintain the soil resource.

In conclusion, the substantive requirement § 219.8(a)(2)(ii) – soils and soil productivity would be sufficiently applied within the scope and scale of the project-specific amendment to maintain or restore soils/soil productivity across the planning unit (i.e., the plan area) because of

- the limited scale of the proposed exception to the soil productivity guideline;
- the limited soil loss and displacement from the construction, operation, and maintenance of the pipeline due to implementation of the design criteria and mitigation measures;
- the limited scope of the proposed amendment to soil guideline (one of 12 forest-wide soil productivity guidelines) and continued application of the unexcepted desired conditions, guidelines, standards, and objectives across the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance.

## Section 219.10(b)(1)(i) – Sustainable Recreation, Including Recreation Setting, Opportunities, Access; and Scenic Character

Substantive requirement § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character is directly related to the proposed amendment through the purpose of excepting the following: desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, NTMA-G-01, and NTMA-G-08 (Scenic Integrity Objectives); desired condition NTMA-DC-03 and guideline NTMA-G-01 (Arizona National Scenic Trail); and guideline

REC-G-10 (Recreational Opportunity Spectrum). The overarching goal of the substantive requirements found in § 219.10 is to provide for ecosystem services and multiple uses within Forest Service authority and the inherent capability of the plan area. The substantive requirement specific to recreation settings, opportunities, access; and scenic character is to include plan components to provide for sustainable conditions for these resources.

This section is organized based on major resource categories pertinent to this substantive requirement.

## SCENIC RESOURCES—SCENIC INTEGRITY OBJECTIVES

**Scope**

The scope of this component of the project-specific amendment is the exception of the following: desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, and NTMA-G-08 as they are applied to the Resolution Copper Project preferred alternative area of disturbance. The proposed amendment would only apply to the Resolution Copper Project and not except any other projects.

**Scale**

The scale of the scenic component of the project-specific amendment encompasses areas of high SIO (516 acres), moderate SIO (345 acres), and low SIO, representing approximately 0.03 percent of the amount of high SIO across the forest and 0.06 percent of the amount of moderate SIO across the forest.

**Application**

Excepting Resolution Copper Project from adhering to these three desired conditions and three guidelines would have an adverse impact on the scenery resource. However, as discussed below, excepting Resolution Copper Project from these desired conditions and guidelines would not detract from the Forest Service's ability to implement the forest plan to provide for sustainable scenery resources, and the mandates of the 2012 Planning Rule would be met.

Resolution Copper would use best management practices or other guidelines (when on NFS lands) that would minimize visual impacts from transmission lines. Other required mitigation measures to reduce impacts on scenic resources include measures to reduce the contrast with the natural landscape; preserve riparian vegetation and aquatic habitats, which are of scenic value; replace xeroriparian habitat, which would be beneficial to scenic resources; and replace water in Queen Creek, which would minimize impacts to scenic resources along this riparian corridor. These measures would be effective at reducing and minimizing the scenery impacts and the project contrast of mining operations in the surrounding landscape and impacts upon sensitive viewers.

Users of the Arizona National Scenic Trail would encounter the pipeline at the location where the pipeline crosses the trail and in an area where there are already pipelines and utilities crossing the trail (MARRCO Corridor). There is a total of 55 miles of the Arizona National Scenic Trail in the scenery analysis area (2025 Resolution Copper Project FEIS, section 3.11.3-2). Within the trail corridor, there is currently a total of 42,209 acres of high SIO. Implementation of the Resolution Copper Project preferred alternative would impact 20 acres of high SIO, which would then meet the criteria for low SIO (2025 Resolution Copper Project FEIS, table 3.11.4-3). Less than 0.05 percent of the high SIO in the analysis area would be affected by the Resolution Copper Project preferred alternative.

The forest plan includes numerous forest-wide desired conditions, guidelines, standards, and objectives for scenery that would not be subject to exception from this proposed amendment, including nine desired conditions, 14 guidelines, and one standard. The three excepted desired conditions and three excepted

guidelines would continue to apply to 99.9 percent of the Tonto National Forest. The amended forest plan direction would provide for sustainable scenic character for the Tonto National Forest.

As stated previously, only 516 acres of high SIO and 345 acres of moderate SIO would not meet the assigned SIO. This would be minor in the context of scenic conditions across the plan unit. Forest-wide the Tonto National Forest would remain predominantly natural appearing and natural evolving. In addition, the main plan component for managing for sustainable scenic character, the assigned SIO map for the Tonto National Forest, would remain in place and unaffected by the proposed amendment.

The substantive requirement § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character would be sufficiently applied within the scope and scale of the project-specific amendment, and the mitigation measures would provide for sustainable scenic character because

- required mitigation would reduce scenic impacts;

- the limited scope of this component of the proposed amendment and the fact that the proposed exceptions would only apply to three out of 12 forest-wide scenery desired conditions and three of 17 forest-wide guidelines in the forest plan;

- forest-wide, the scenery resources would continue toward meeting the desired conditions;

- the limited area the proposed exceptions to scenic desired conditions and guideline would be applied to: 516 acres of high SIO and 345 acres of moderate SIO; and

- the application of scenery desired conditions and guidelines would continue across the remaining plan area.

## NATIONAL SCENIC TRAILS[197]

### Scope

The scope of this component of the project-specific amendment is the exception of desired condition NTMA-DC-03 and guideline NTMA-G-01 as they are applied to the Resolution Copper Project preferred alternative. The proposed amendment would only apply to the Resolution Copper project and not except any other projects.

### Scale

The scale of the national scenic trails component of the project-specific amendment encompasses the immediate location in the MARRCO Corridor where new pipelines and an access road would cross the Arizona National Scenic Trail. New pipelines constructed within the MARRCO corridor would cross Passage 18 of the Arizona National Scenic Trail (2021 Resolution Copper Project FEIS, p. 626.). In the Passage 18 segment, 0.07 mile of the proposed tailings pipeline corridor would intersect the Arizona National Scenic Trail. The Arizona National Scenic Trail management corridor extends 0.5 mile on either side of the Arizona National Scenic Trail; the proposed tailings pipeline corridor would affect approximately 45 acres of the Arizona National Scenic Trail corridor (2021 Resolution Copper Project FEIS. p. 630). The Tonto National Forest manages about 200 miles of the Arizona National Scenic Trail (forest plan, p. 181). The Arizona National Scenic Trail corridor totals about 128,000 acres, and the area

---

[197] The forest plan contains a number of desired conditions and guidelines that focus on protection of visitor experience on the Arizona National Scenic Trail. Several of those desired conditions and guidelines for scenic conditions are addressed under scenic resources earlier in this document.

impacted by the Resolution Copper Project preferred alternative would be less than 0.04 percent of the Arizona National Scenic Trail corridor.

**Application**

Excepting Resolution Copper Project from adhering to this one desired condition and one guideline would have an adverse impact on the Arizona National Scenic Trail. However, as discussed previously, excepting the Resolution Copper Project from these desired conditions and guidelines would not detract from the Forest Service's ability to implement the forest plan to provide for sustainable scenery resources, and the mandates of the 2012 Planning Rule would be met.

There would be short-term impacts on trail users during construction of pipelines and an access road when disturbance precludes use for safety reasons (e.g., active grading, transport of heavy equipment, active construction). These impacts would occur during construction, and when conditions are safe for hikers, cyclists, and equestrian users, the impact would cease. Contractors would provide necessary detours or signage for Arizona National Scenic Trail user awareness during these activities. Existing disturbances in this area include a railroad corridor, trailhead parking, and Hewitt Station Road.

As mentioned, the area impacted by Resolution Copper Project is a minor portion of the Arizona National Scenic Trail on the Tonto National Forest, affecting only 45 acres of the 128,000-acre Arizona National Scenic Trail corridor on the Tonto National Forest.

Required mitigation to reduce impacts on the Arizona National Scenic Trail include a measure that would reduce impacts of road and pipeline crossings, especially with the Arizona National Scenic Trail.

As stated, the area of impact is a small fraction of the Arizona National Scenic Trail on the Tonto National Forest. Mitigation measures and design features would further reduce impacts. Therefore, no substantive requirements are directly related due to beneficial effects or substantial adverse effects.

Excepting desired condition NTMA-DC-03 and guideline NTMA-G-01 would not cause a substantial lessening of plan protections. Desired condition NTMA-DC-03 and guideline NTMA-G-01 would continue to apply to the remaining 199+ miles of the Arizona National Scenic Trail corridor on the Tonto National Forest, and nine other desired conditions, 12 other guidelines, and three standards focused on protecting user experience on the Arizona National Scenic Trail would be unaffected by the proposed amendment. Because allowing the pipelines to go over the Arizona National Scenic Trail would not constitute a substantial lessening of plan protections, the proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

The substantive requirement § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character would be sufficiently applied within the scope and scale of the project-specific amendment, and mitigation measures would provide for sustainable scenic character because

- required mitigation would limit impacts to Arizona National Scenic Trail users to brief periods only during construction activities;

- the limited scope of this component of the proposed amendment and the fact that the proposed exceptions would only apply to one of 10 forest-wide scenery desired conditions and one of 13 forest-wide guidelines in the forest plan;

- forest-wide, management of the Arizona National Scenic Trail would continue toward meeting desired conditions;

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 307 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 87 of 96

Appendix T

- the limited area to which the proposed exceptions to scenic desired conditions and guideline would be applied: 45 acres of the 128,000-acre Arizona National Scenic Trail corridor on the Tonto National Forest; and

- the application of scenery desired conditions, guidelines, and standard would continue across the remaining plan area.

## RECREATION RESOURCES—RECREATION OPPORTUNITY SPECTRUM

**Scope**

The scope of this component of the project-specific amendment is the exception of guideline REC-G-10 as it applies to the Resolution Copper Project preferred alternative area of disturbance. The proposed amendment would only apply to the Resolution Copper Project and not except any other projects.

**Scale**

The scale of the recreational opportunity spectrum component of the project-specific amendment encompasses the area of the Resolution Copper Project preferred alternative 2,502-acre area of disturbance, where construction of electrical transmission lines, pipelines, and associated infrastructure would impact existing ROS designations.

**Application**

Excepting Resolution Copper Project from adhering to this one guideline would have an adverse impact on the existing ROS designation in the preferred alternative area of disturbance. However, as discussed previously, excepting Resolution Copper Project from this guideline would not detract from the Forest Service's ability to implement the forest plan to provide for sustainable scenery resources, and the mandates of the 2012 Planning Rule would be met.

There would be short-term impacts on trail users during construction of pipelines and an access road; and during construction, operation, and maintenance of new pipelines, electrical transmission lines, and associated infrastructure that would result in a reduction of 166 acres from semiprimitive nonmotorized ROS to semiprimitive motorized ROS (2025 Resolution Copper Project FEIS, table 3.9.4-2). Implementation of the Resolution Copper Project preferred alternative would reduce the amount of semiprimitive nonmotorized ROS on the forest from 715,024[198] acres to 714,858 acres, a reduction of 0.02 percent forest-wide. Semiprimitive motorized recreation would increase from 1,072,671 acres to 1,072,837 acres, an increase of less than 0.02 percent forest-wide. Although this has an adverse impact on nonmotorized recreation, it is not a substantial adverse impact due to the relatively small amount of effects across the Tonto National Forest.

Excepting guideline REC-G-10 would not cause a substantial lessening of plan protections. Guideline REC-G-10 would continue to apply to the remaining 714,858 acres of semiprimitive nonmotorized ROS, and 1,072,837 acres of semiprimitive motorized ROS on the Tonto National Forest and 51 other recreation-focused guidelines on the Tonto National Forest would be unaffected by the proposed amendment.

The minor scale of the change in ROS would not constitute a substantial lessening of plan protections. The proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

---

[198] See table 15 in the FEIS for the 2023 forest plan (U.S. Forest Service 2023b) for total acres by ROS on the forest.

The application of the proposed Resolution Copper Project–specific amendment demonstrates that the amendment is consistent with the 2012 Planning Rule and that no additional provisions are needed to ensure the forest plan's consistency with the 2012 Planning Rule. Furthermore, the remainder of the forest plan is unaffected by the Resolution Copper Project–specific amendment and is adequately protecting and maintaining recreation and scenic resources. The substantive requirement § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character would be sufficiently applied within the scope and scale of the project-specific amendment because

- required mitigation and design features would reduce impacts to scenic resources and the Arizona National Scenic Trail;

- the limited scope of this component of the proposed amendment and the fact that the proposed exceptions would only apply to one of 52 forest-wide recreation guidelines;

- forest-wide, scenery resources management of the Arizona National Scenic Trail and recreation opportunity spectrum would continue toward meeting the desired conditions;

- the limited area of the proposed exceptions to scenic resources, the Arizona National Scenic Trail corridor, and recreation opportunity spectrum in the plan area; and

- the application of scenery, Arizona National Scenic Trail, and recreation opportunity spectrum desired conditions and guidelines would continue across the remaining plan area.

### Section 219.8(a)(1)(i) – Ecosystem Integrity, Interdependence of Terrestrial and Aquatic Ecosystems in the Plan Area; and Section 219.9(a)(2)(i) – Ecosystem Diversity, Key Characteristics Associated with Terrestrial and Aquatic Ecosystem Types

Substantive requirements §219.8(a)(1)(i) – ecosystem integrity, interdependence of terrestrial and aquatic ecosystems in the plan area; and § 219.9(a)(2)(i) – ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types are directly related to the proposed amendment through the purpose of excepting guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07. The overarching goal of the substantive requirements found in § 219.8 is to provide for social, economic, and ecological sustainability within Forest Service authority and the inherent capability of the plan area. The substantive requirement for ecosystem integrity is to include plan components to maintain or restore the ecological integrity of terrestrial and aquatic ecosystems and watersheds in the plan area. The substantive requirement specific to riparian areas is to include plan components to maintain or restore the ecological integrity of riparian areas in the plan area. To "maintain" a resource is defined by the Planning Rule as "to keep in existence or continuance of the desired ecological condition in terms of desired composition, structure, and processes" (36 CFR § 219.19), and to "restore" means bring back to a baseline condition. This does not infer that there must be *no net loss* to the resource in question across the plan area. However, it does mean that over time, the trend for the resource in question should be moving toward the desired condition or is constant (sideways trend). Like any trend line, there can be peaks and troughs within the trendline. As long as over time the primary trend is toward the desired condition or is constant, then maintenance of the resource is being achieved.

**Scope**

The scope of this component of the project-specific amendment is the exception of the following: three out of seven forest plan guidelines—REC-WR-G-03, WFP-G-06 and WFP-G-07—related to wildlife movement and habitat connectivity, as it applies to the Resolution Copper Project preferred alternative area of disturbance. The proposed amendment would only apply to the Resolution Copper Project and not except any other projects.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 309 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 89 of 96

Appendix T

**Scale**

The scale of the amendment in the context of the substantive requirements § 219.8(a)(1) – ecosystem integrity and § 219.9(a)(2)(i) – ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types is 1,417 acres of habitat disturbance in the tailings corridor, transmission line corridor, and access roads (FEIS, table 3.8.4-1) out of the 2,965,716 acres of the Tonto National Forest, or less than 0.05 percent of the Tonto National Forest.

**Application**

Excepting the Resolution Copper Project from adhering to the three guidelines would have an adverse impact to wildlife movement habitat in the preferred alternative area of disturbance. However, as discussed previously, excepting Resolution Copper Project from these desired conditions and guidelines would not detract from the Forest Service's ability to implement the forest plan to provide for the ecological integrity of terrestrial and aquatic ecosystems, and the mandates of the 2012 Planning Rule would be met.

The Resolution Copper Project preferred alternative includes measures to minimize impacts to wildlife movement habitat from the Resolution Copper Project and thus would minimize impacts to ecosystem integrity as it relates to wildlife habitat. These include measures that would improve wildlife connectivity by protecting habitat blocks, partially replace habitat and vegetation for wildlife over the long term, preserve riparian vegetation and aquatic habitats available for wildlife, prevent impacts to wildlife using habitat along Queen Creek, and reduce effects on habitat and on individuals of species.

There are 11 area desired conditions, four guidelines, and one standard to protect habitat connectivity and wildlife movement in the forest plan that are not subject to exception as part of this proposed amendment; those forest plan components continue to apply throughout the Tonto National Forest, including in the project area. The total acreage of intact habitat connectivity on the Tonto National Forest is unknown. However, the 1,417 acres of habitat connectivity that would be impacted by the Resolution Copper Project preferred alternative is a minor component of the habitat available across the 2,965,716 acres of the Tonto National Forest. Potential impacts to biodiversity would likely be limited to impacts at the local level for most species and would not be significant at the population level (2021 Resolution Copper Project FEIS, p. 581).

The proposed amendment would not affect the vast majority of wildlife habitat connectivity across the forest. Although there would be an adverse impact through removal of wildlife movement habitat, it would be limited to 1,417 acres and would not be significant enough to affect forest-wide trends toward desired conditions. This would not impede the Forest Service's ability to implement the forest plan to move toward the desired condition over the majority of the forest.

The remainder of the forest plan is unaffected by the project-specific amendment. The substantive requirements § 219.8(a)(1) – ecosystem integrity and § 219.9(a)(2)(i) – ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types would be sufficiently applied within the scope and scale of the project-specific amendment that ecological integrity of wildlife connectivity across the plan area would be maintained or restored because

- required mitigation and design features would reduce impacts to habitat connectivity and wildlife movement habitat;

- the limited scope of this component of the proposed amendment and the fact that the proposed exceptions would only apply to three of seven forest-wide guidelines;

- forest-wide, habitat connectivity and wildlife movement habitat would continue toward meeting the desired conditions;

- the limited area of the proposed exception to habitat connectivity and wildlife movement habitat in the plan area; and

- the application of habitat connectivity and wildlife movement habitat desired conditions and guidelines would continue across the remaining plan area.

### Section 219.8(a)(b) – Social and Economic Sustainability – Cultural and Historic Resources and Uses, Section 219.10(a)(1) – Integrated Resource Management for Multiple Use – Cultural and Heritage Resources, and Section 219.10(b)(1)(ii) – Protection of Cultural and Historic Resources

Substantive requirements § 219.8(a)(b) – Social and economic sustainability – cultural and historic resources and uses, § 219.10(a)(1) – Integrated resource management for multiple use – cultural and heritage resources, and § 219.10(b)(1)(ii) – Protection of cultural and historic resources are directly related to the proposed amendment based on the purpose of excepting desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07 as they apply to the Resolution Copper Project preferred alternative area of disturbance. The proposed amendment would only apply to the Resolution Copper Project and would not except any other future projects.

**Scope**

The scope of this component of the project-specific amendment is the exception of three forest plan components—desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07—as they apply to the Resolution Copper Project preferred alternative area of disturbance. The proposed amendment would only apply to the Resolution Copper Project and would not except any other projects.

**Scale**

The scale of the amendment in the context of the substantive requirements § 219.8(a)(b) – Social and economic sustainability – cultural and historic resources and uses, § 219.10(a)(1) – Integrated resource management for multiple use – cultural and heritage resources, and § 219.10(b)(1)(ii) – Protection of cultural and historic resources is disturbance of 2,502 acres of NFS lands out of the 2,965,716 acres of the Tonto National Forest, or less than 0.09 percent of the Tonto National Forest.

**Application**

Excepting the Resolution Copper Project from adhering to the three desired conditions would have an adverse impact on cultural resources in the preferred alternative area of disturbance. However, as discussed previously, excepting the Resolution Copper Project from these desired conditions would not detract from the Forest Service's ability to implement the forest plan to provide for the protection of cultural and historic resources, and the mandates of the 2012 Planning Rule would be met.

The Resolution Copper Project preferred alternative includes measures to minimize impacts to cultural resources from the Resolution Copper Project, although it is recognized that mitigation is primarily effective off-site and of benefit from a forest-wide perspective. These include measures that would require mitigating the loss of Oak Flat campground (which has cultural significance), resolving adverse effects on 41 historic properties that have been identified within the Oak Flat Federal Parcel, conducting data recovery on archaeological sites eligible for the NRHP with curated project materials and

archaeological collections, and preparing additional mitigation plan(s) that describe mitigation measures to address effects on historic properties. A design feature to select a tailings corridor location with fewer impacts is built into the preferred alternative.

There are 15 desired conditions, 19 guidelines, and eight standards to protect cultural resources in the forest plan that are not subject to exception as part of this proposed amendment; those forest plan components continue to apply throughout the Tonto National Forest, including in the project area.

The implementation of the Resolution Copper Project preferred alternative would result in construction, use, and maintenance of electrical transmission lines, pipelines, and associated infrastructure that would disturb 2,502 acres of NFS lands and not affect that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative. This is less than 0.09 percent of the Tonto National Forest, which is a minor amount of impact when considered on a forest-wide basis.

The proposed amendment would not affect the majority of cultural resources across the forest. Although there would be an adverse impact through direct impacts to eight cultural sites (Newell 2018a), within the 2,502-acre preferred alternative area of disturbance of NFS lands, it would be limited and would not be significant enough to affect forest-wide trends toward desired conditions. This would not impede the forest plan's movement toward the desired condition over the majority of the forest.

The remainder of the forest plan is unaffected by the project-specific amendment. The substantive requirements § 219.8(a)(b) – Social and economic sustainability – cultural and historic resources and uses, § 219.10(a)(1) – Integrated resource management for multiple use – cultural and heritage resources, and § 219.10(b)(1)(ii) – Protection of cultural and historic resources would be sufficiently applied within the scope and scale of the project-specific amendment that ecological integrity of wildlife connectivity across the plan area are maintained or restored because

- required mitigation and design features would compensate for impacts to cultural resources in the preferred alternative area of disturbance;

- the limited scope of this component of the proposed amendment and the fact that the proposed exceptions would only apply to three out of 18 forest-wide desired conditions;

- forest-wide, cultural resource management would continue toward meeting the desired conditions;

- the limited area of the proposed exception to cultural resources in the plan area; and

- the application of cultural resource desired conditions and guidelines would continue across the remaining plan area.

### Section 219.10(a)(3) – Appropriate Placement and Sustainable Management of Infrastructure, such as Recreational Facilities and Transportation and Utility Corridors

Substantive requirement § 219.10(a)(3) – Appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors, is directly related to the proposed amendment through the purpose of excepting desired condition NTMA-DC-03 and guideline NTMA-G-01. The overarching goal of the substantive requirements found in § 219.10 is to provide for ecosystem services and multiple uses within Forest Service authority and the inherent capability of the plan area. The substantive requirement specific to utility corridors is consideration of appropriate placement and sustainable management of infrastructure, including utility corridors.

**Scope**

The scope of this component of the project-specific amendment is the exception of desired condition NTMA-DC-03 and guideline NTMA-G-01 as they apply to the Resolution Copper Project preferred alternative area of disturbance. The proposed amendment would only apply to the Resolution Copper Project and not except any other projects.

**Scale**

The scale of the amendment is the 2,502 acres of land in the Resolution Copper Project preferred alternative area of disturbance. These acreages correlate to less than 0.09 percent of the total Tonto National Forest.

**Application**

The forest plan includes forest-wide desired conditions, guidelines, standards, and objectives for lands, special uses, and energy production and distribution, which include utility corridors, electrical transmission lines, and pipelines. The forest plan also includes forest-wide desired conditions, guidelines, standards, and objectives for recreational facilities, including recreation, developed recreation, facilities, cultural resources, and roads. The amended forest plan direction provides sufficient direction for future placement of infrastructure, including utility corridors, as well as recreational facilities.

The application of the proposed Resolution Copper Project–specific amendment demonstrates that the amendment is consistent with the 2012 Planning Rule. Furthermore, the remainder of the forest plan is unaffected by the Resolution Copper Project–specific amendment and is adequately protecting and maintaining the riparian resources. The substantive requirement § 219.10(a)(3) – Appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors, would be sufficiently applied within the scope and scale of the project-specific amendment, and no additional plan components are needed to ensure appropriate placement and sustainable management of infrastructure, including utility corridors and recreational facilities because

- the limited footprint of the impact to the Arizona National Scenic Trail from the Resolution Copper Project preferred alternative would be 45 acres of the 128,000 acres of Arizona National Scenic Trail corridor on the Tonto National Forest; and

- forest plan direction for recreational facilities and transportation and utility corridors would continue to apply across the forest, along with other forest plan direction, which does not foreclose future placement of infrastructure.

# Compliance with the Planning Rule Regulations

This section provides the agency's view of why the updated proposed amendment is consistent with the 2012 Planning Rule, specifically 36 CFR § 219.13, the section outlining the requirements for forest plan amendments.

The NFMA regulation at **36 CFR § 219.13(a)** states:

> A plan may be amended at any time. Plan amendments may be broad or narrow, depending on the need for change, and should be used to keep plans current and help units adapt to new information or changing conditions. The responsible official has the discretion to determine whether and how to amend the plan and to determine the scope and scale of any amendment. Except as provided by paragraph (c) of this section, a plan amendment is required to add, modify, or remove one or more plan components, or to change how or where one or more plan

components apply to all or part of the plan area (including management areas or geographic areas).

The responsible official used his discretion to propose an amendment to allow the Resolution Copper Project to move forward. The proposed amendment is narrow and is limited to the Resolution Copper Project. The amendment excepts the Resolution Copper Project from nine guidelines and seven desired conditions. The exception only applies to the Resolution Copper Project preferred alternative. The preferred alternative would issue a special use authorization to construct, operate, and maintain electrical transmission lines, pipelines, and associated infrastructure. The FEIS analysis indicates that 2,502 acres of land would be disturbed. The proposed amendment is consistent with the direction at 36 CFR § 219.13(a).

The NFMA regulation at **36 CFR § 219.13(b)(1)** states:

> Base an amendment on a preliminary identification of the need to change the plan. The preliminary identification of the need to change the plan may be based on a new assessment; a monitoring report; or other documentation of new information, changed conditions, or changed circumstances. When a plan amendment is made together with, and only applies to, a project or activity decision, the analysis prepared for the Project or activity may serve as the documentation for the preliminary identification of the need to change the plan.

The proposed amendment is a project-specific amendment, and the 2025 Resolution Copper Project FEIS serves as the documentation for the need to change the plan. This is consistent with the direction at 36 CFR § 219.13(b)(1).

The NFMA regulation at **36 CFR § 219.13(b)(2)** states:

> Provide opportunities for public participation as required in § 219.4 and public notification as required in § 219.16. The responsible official may combine processes and associated public notifications where appropriate, considering the scope and scale of the need to change the plan. The responsible official must include information in the initial notice for the amendment (§ 219.16(a)(1)) about which substantive requirements of §§ 219.8 through 219.11 are likely to be directly related to the amendment (§ 219.13(b)(5)).

Opportunities for public participation have been extensive for this project. The 2021 Resolution Copper Project FEIS section 1.6 (pp. 34 to 39) describes the public involvement process used to develop the 2021 Resolution Copper Project FEIS. The 2025 Resolution Copper Project FEIS section 1.6 describes the public involvement process used to develop the 2025 Resolution Copper Project FEIS and resulting 2025 Forest Service draft record of decision. The Forest Service used a wide variety of tools to engage the public, including mailings, public meetings, legal notices in local newspapers and the Federal Register, distribution of information on the Internet, and intake of comments electronically and in writing. Federal agencies have conducted outreach to affected landowners, public and private organizations, individuals, State and local governments, and Tribes. The Forest Service consulted on a government-to-government basis with federally recognized Native American Tribes having traditional interests in and/or ties to the lands potentially affected by a proposed action and alternatives. The public participation process, which began in March 2016 and continues today, is consistent with 36 CFR § 219.4.

This proposed amendment is a project-specific amendment; therefore, the notification requirements of 36 CFR Part 218 were followed, in accordance with direction at 36 CFR § 219.16(b). The notice of availability for this FEIS serves as the required Federal Register notice for inviting comments on the proposed amendment (36 CFR § 219.16(c)(3)). The public notification process is consistent with 36 CFR § 219.16.

The initial notice for this proposed amendment was the notice of intent for this FEIS, and it included information on which substantive requirements are likely to be directly related to the amendment. The

public participation effort undertaken for this proposed amendment is consistent with 36 CFR § 219.13(b)(2).

The NFMA regulation at **36 CFR § 219.13(b)(3)** states:

> Amend the plan consistent with Forest Service NEPA procedures. The appropriate NEPA documentation for an amendment may be an environmental impact statement, an environmental assessment, or a categorical exclusion, depending upon the scope and scale of the amendment and its likely effects. Except for an amendment that applies only to one project or activity, a proposed amendment that may create a significant environmental effect and thus requires preparation of an environmental impact statement is considered a significant change in the plan for the purposes of the NFMA and therefore requires a 90-day comment period for the proposed plan and draft environmental impact statement (§ 219.16(a)(2)), in addition to meeting the requirements of this section.

This amendment applies only to the Resolution Copper Project; therefore, the amendment is not considered a significant change in the plan for the purposes of the NFMA. A 90-day comment period is not required. This comment period for this proposed amendment is consistent with 36 CFR § 219.13(b)(3).

The NFMA regulation at **36 CFR § 219.13(b)(4)** states:

> Follow the applicable format for plan components set out at § 219.7(e) for the plan direction added or modified by the amendment, except that where an amendment to a plan developed or revised under a prior planning regulation would simply modify the area to which existing direction applies, the responsible official may retain the existing formatting for that direction.

This proposed amendment excepts nine guidelines and seven desired conditions by describing where the desired conditions and guidelines would not apply, which is consistent with 36 CFR § 219.7(e). The Resolution Copper Project–specific amendment is only applicable to the Resolution Copper Project, which is consistent with 36 CFR § 219.7(e). Therefore, the proposed amendment is consistent with 36 CFR § 219.13(b)(4).

The NFMA regulation at **36 CFR § 219.13(b)(5)** states:

> Determine which specific substantive requirement(s) within §§ 219.8 through 219.11 are directly related to the plan direction being added, modified, or removed by the amendment and apply such requirement(s) within the scope and scale of the amendment. The responsible official is not required to apply any substantive requirements within §§ 219.8 through 219.11 that are not directly related to the amendment.

The "Step 2" section in this document describes which specific substantive requirements are directly related to the proposed amendment. Each desired condition and guideline proposed to be excepted were reviewed for purpose and effect of the amendment. Excepted desired conditions and guidelines that would result in an adverse effect require further review to determine whether the adverse effects were substantial, would substantially lessen plan protections, or would be beneficial. Ten substantive requirements were found to be directly related due to purpose of the amendment. No substantive requirements were found to be directly related due to adverse effects, and no substantive requirements were found to be directly related due to beneficial effects. The determination of directly related substantive requirements is consistent with 36 CFR § 219.13(b)(5).

The "Step 3" section in this document applies to the directly related substantive requirements. The Forest Service must ensure that the forest plan will contain components that meet the directly related substantive requirements even after the Resolution Copper Project–specific amendment takes effect. Specifically, the

amended plan must contain plan components that maintain or restore[199] ecosystem integrity and diversity (36 CFR § 219.8 and 219.9), guide the plan area's contribution to social and economic sustainability (36 CFR § 219.10), and guide timber management within the plan area (36 CFR § 219.11). To "maintain" a resource is defined by the rule as "to keep in existence or continuance of the desired ecological condition in terms of desired composition, structure, and processes" (36 CFR § 219.19). This does not infer that there must be *no net loss* to the resource in question across the plan area.

---

[199] The process of assisting the recovery of an ecosystem that has been degraded, damaged, or destroyed. Ecological restoration focuses on reestablishing the composition, structure, pattern, and ecological processes necessary to facilitate terrestrial and aquatic ecosystem sustainability, resilience, and health under current and future conditions (36 CFR § 219.19).

*This page intentionally left blank.*

**Forest Service**
U.S. DEPARTMENT OF AGRICULTURE

# **DRAFT** Record of Decision

# Authorization of Special Use Permits, Road Use Permits, and Plan Amendment, Resolution Copper Project

Gila and Pinal Counties, Arizona

ABSTRACT

The final environmental impact statement (FEIS) for the Resolution Copper and Land Exchange Project analyzes the potential environmental effects from the disposition of National Forest System (NFS) land and development of the proposed Resolution Copper Mine near Superior, Arizona. Under the Southeast Arizona Land Exchange and Conservation Act (16 U.S.C. § 539p) Congress mandated that the U.S. Forest Service dispose of certain NFS land by exchange. Congress further specifies that proposed mining operations on land to be conveyed in the exchange are not to be regulated by the Forest Service.

The Forest Service does regulate uses of NFS land outside of the exchange area that will be required to conduct mining operations. This draft record of decision (ROD) documents the Forest Service's decision to authorize uses of NFS land by issuing special use authorizations for pipeline and powerline corridors, road use permits, and a project-specific Forest Plan Amendment associated with the Resolution Copper Project.

*In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.*

*Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.*

*To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.*

*USDA is an equal opportunity provider, employer, and lender.*

# Draft Record of Decision

# Authorization of Special Uses and Road Use Resolution Copper Project

LEAD AGENCY:

U.S. Department of Agriculture

Tonto National Forest

2324 East McDowell Road

Phoenix, Arizona 85006

(602) 225-5200

DATE DECISION SIGNED: _____

COOPERATING AGENCIES:

U.S. Army Corps of Engineers

U.S. Department of the Interior Bureau of Land Management

U.S. Environmental Protection Agency

Arizona State Land Department

Arizona Department of Environmental Quality

Arizona Department of Water Resources

Arizona Game and Fish Department

Arizona State Mine Inspector

Pinal County Air Quality Control District

# Table of Contents

Part 1 Introduction ........................................................................................................................ 1
   1.1    About This Document .......................................................................................................... 1
   1.2    Proposed Resolution Copper Mine Project ....................................................................... 2
       1.2.1   Project Overview (as originally proposed) .............................................................. 2
       1.2.2   Changes to the Proposed Action during the NEPA Process ..................................... 3

Part 2 Decision ............................................................................................................................. 5
   2.1    Introduction and Decision Authority ................................................................................. 5
       2.1.1   Authorization of Special Use for Salt River Project Power Lines ............................ 6
       2.1.2   Authorization of Special Use for Resolution Copper Pipelines ............................... 7
       2.1.3   Road Use Permit ...................................................................................................... 7
       2.1.4   Approval of Project-Specific Land Management Plan Amendment ............................ 8

Part 3 Principal Reasons for the Decision .................................................................................. 15
   3.1    Water Quality ..................................................................................................................... 15
   3.2    Groundwater-Dependent Ecosystems ................................................................................ 16
   3.3    Recreation and Scenic Resources ...................................................................................... 16
   3.4    Public Safety and Long-Term Management ....................................................................... 17
   3.5    Socioeconomics .................................................................................................................. 17
   3.6    Tribal Values ...................................................................................................................... 18
   3.7    Meeting Project's Purpose and Need ................................................................................. 18

Part 4 Applicant-Committed Environmental Protection Measures, Monitoring, And Mitigation ............. 19
   4.1    General ............................................................................................................................... 20
   4.2    Geology and Subsidence .................................................................................................... 20
   4.3    Soils, Vegetation, and Reclamation .................................................................................. 21
   4.4    Transportation and Access ................................................................................................. 22
   4.5    Air Quality ......................................................................................................................... 23
   4.6    Water Resources ................................................................................................................ 23
   4.7    Wildlife .............................................................................................................................. 24
   4.8    Recreation .......................................................................................................................... 26
   4.9    Public Health and Safety ................................................................................................... 26
       4.9.1   Tailings and Pipeline Safety ................................................................................... 26
       4.9.2   Fire Safety .............................................................................................................. 27
       4.9.3   Hazardous Materials ............................................................................................... 28
   4.10  Scenic Resources ............................................................................................................... 28
   4.11  Cultural Resources ............................................................................................................. 29

Part 5 Public Involvement and Issues ......................................................................................... 30
   5.1    Public Involvement Process ............................................................................................... 30
       5.1.1   Scoping ................................................................................................................... 30
       5.1.2   Project Update and Alternatives Development Workshop ....................................... 31
       5.1.3   Public Comments on the Draft Environmental Impact Statement ............................ 31
   5.2    Consultation with Other Agencies .................................................................................... 31
   5.3    Summary of Public Comment on Draft Environmental Impact Statement ......................... 32
       5.3.1   NEPA, Regulatory, or Procedural Comments ........................................................ 32
       5.3.2   Water-Related Comments ....................................................................................... 32
       5.3.3   Mitigation-Related Comments ................................................................................ 32

5.3.4   Other Issues ................................................................................................. 33

Part 6 Alternatives Considered ................................................................................................. 34
6.1   Alternatives Considered in Detail in the Final Environmental Impact Statement .............. 34
6.2   Environmentally Preferred Alternative ........................................................................ 35
6.3   Alternatives Eliminated from Detailed Analysis ........................................................... 35

Part 7 Legally Required Findings .............................................................................................. 37
7.1   Tribal Consultation and Coordination (Executive Order 13175) and Consultation with
      Tribes on Indian Sacred Sites (Executive Order 13007) ................................................ 37
      7.1.1   Tribal Consultation ......................................................................................... 37
      7.1.2   Development of Programmatic Agreement ......................................................... 38
      7.1.3   American Indian Religious Freedom Act of 1978 and Religious Freedom
              Restoration Act of 1993 .................................................................................. 41
      7.1.4   Summary of Compliance with Executive Orders 13175 and 13007, and with
              Section 3003 of PL 113-291 ............................................................................ 41
7.2   National Forest Management Act of 1976 and the Tonto National Forest Revised Forest
      Plan ....................................................................................................................... 42
7.3   National Environmental Policy Act .............................................................................. 42
7.4   Organic Administration Act of 1897 ............................................................................ 43
7.5   Endangered Species Act ............................................................................................ 43
7.6   National Historic Preservation Act ............................................................................... 43
7.7   Migratory Birds ....................................................................................................... 44
7.8   Water Pollution Control Act of 1972 (Clean Water Act) ................................................ 45
7.9   Federal Noxious Weed Act of 1974 and Invasive Species (Executive Order 13112) ........... 45
7.10  Wetlands (Executive Order 11990) and Floodplains (Executive Order 11988) .................. 46
7.11  Clean Air Act of 1963 .............................................................................................. 46
7.12  Special Uses ........................................................................................................... 47
7.13  Resource Conservation and Recovery Act .................................................................... 47

Part 8 Administrative Review Opportunities ............................................................................... 48
8.1   Implementation Timeline ........................................................................................... 48
8.2   Contact Person ........................................................................................................ 49

References ............................................................................................................................. 50

## APPENDICES

Appendix A.   Summary of Applicant-Committed Environmental Protection Measures, Monitoring,
              and Mitigation Not Included as Terms and Conditions for Authorized Use of NFS Lands

Appendix B.   Maps of Pipeline/Power Line Routes for Authorization

## Acronyms and Abbreviations

| ACRONYM / ABBREVIATION | DEFINITION |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| ADEQ | Arizona Department of Environmental Quality |
| AGFD | Arizona Game and Fish Department |
| ASLD | Arizona State Land Department |
| AZPDES | Arizona Pollutant Discharge Elimination System |
| BLM | Bureau of Land Management |
| CAA | Clean Air Act |
| CFR | Code of Federal Regulations |
| CWA | Clean Water Act |
| DEIS | draft environmental impact statement |
| EIS | environmental impact statement |
| FEIS | final environmental impact statement |
| forest plan | Tonto National Forest Land Management Plan |
| Forest Service | U.S. Department of Agriculture Forest Service |
| FWS | U.S. Department of the Interior Fish and Wildlife Service |
| GDE | groundwater-dependent ecosystem |
| GPO | General Plan of Operations |
| HPTP | historic properties treatment plan |
| kV | kilovolt |
| MARRCO | Magma Arizona Railroad Company |
| MOU | memorandum of understanding |
| MSHA | Mine Safety and Health Administration |
| NEPA | National Environmental Policy Act |
| NFS | National Forest System |
| NHPA | National Historic Preservation Act |
| NPAG | non-potentially acid generating |
| PA | Programmatic Agreement |
| PAG | potentially acid generating |
| PL | Public Law |
| project | Resolution Copper Project and Land Exchange |

| ACRONYM / ABBREVIATION | DEFINITION |
| --- | --- |
| Resolution Copper | Resolution Copper Mining LLC |
| ROD | record of decision |
| ROS | recreation opportunity spectrum |
| SHPO | State Historic Preservation Office |
| SRP | Salt River Project |
| SUA | special use authorization |
| USACE | U.S. Army Corps of Engineers |
| U.S.C. | United States Code |
| USDA | U.S. Department of Agriculture |
| VQO | Visual Quality Objective |

# Preface

In December 2014, the Tonto National Forest accepted a proposed General Plan of Operations (GPO) submitted to the Tonto National Forest by Resolution Copper Mining LLC (Resolution Copper). Resolution Copper is proposing to develop an underground copper mine currently on National Forest System (NFS) land that is to be conveyed to Resolution Copper near the town of Superior in Pinal County, Arizona, approximately 60 miles east of Phoenix, Arizona, where Resolution Copper currently holds unpatented mining claims. Resolution Copper is a limited liability company that is owned by Rio Tinto (55 percent) and BHP (45 percent). Rio Tinto is the managing member. The portion of the Resolution Copper Mine deposit explored to date is located primarily on NFS land that is open to mineral entry under the General Mining Law of 1872. The land exchange, and the proposed mine, will also include land within the Oak Flat Withdrawal Area that has been withdrawn from entry under the Mining Laws.

In December 2014, Congress mandated a land exchange pending completion of the environmental impact statement (EIS), as outlined in the Southeast Arizona Land and Conservation Act, 16 United States Code (U.S.C.) § 539p (which is referred to in this document as Public Law (PL) 113-219). The NFS land to be conveyed to Resolution Copper encompasses the copper deposit. PL 113-291 further specified the following:

> Prior to conveying Federal land under this section, the Secretary shall prepare a single environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities.

The EIS therefore considered the environmental impacts not only of the mining proposal and all connected actions, but also of the land exchange itself. However, the decisions to be made by the Forest Service are limited to authorization of the proposed uses of NFS land outside of the land to be exchanged, since PL 113-291 mandates the land exchange if certain requirements are met, and specifies that mining operations to be conducted on the NFS land to be conveyed are to be regulated under State and local laws that pertain to mining operations on private land (16 U.S.C. § 539p(c)(8)). Accordingly, mining operations within the area to be conveyed by the Forest Service in the exchange will not be subject to regulation by the Forest Service, since Forest Service regulation of mining operations pertains only to mining operations conducted on NFS land under the jurisdiction of the Secretary of Agriculture (36 Code of Federal Regulations (CFR) § 228.2). Further, PL 113-291 requires that the EIS consider impacts to cultural and archaeological resources that may be located on Federal land, and identify measures that may be taken to minimize potential impacts to those resources (16 U.S.C. § 639p(9)(C)). Based on this analysis, and consultation with Indian Tribes, the Forest Service is required to consult with Resolution Copper to find mutually acceptable measures to address concerns of the Indian Tribes and minimize adverse effects on the affected Indian Tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper (16 U.S.C. § 539p(c)(3)).

PL 113-291 directs, "Not later than 60 days after the date of publication of the final environmental impact statement, the Secretary shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper" (16 U.S.C. § 539p(c)(3)).

This draft record of decision (Draft ROD) is being published in conjunction with the final environmental impact statement (FEIS) for the Resolution Copper Project and Land Exchange.[1] The Final ROD will not be signed until after conclusion of the pre-decisional objection process, as required under 36 CFR § 218 Subparts A and B. As a result of this timing, it is likely that the decision described in this Draft ROD document will be made after transfer of the Oak Flat Federal Parcel to Resolution Copper.

Following the land exchange, all mineral extraction operations will take place on private land. In addition, Resolution Copper has indicated that it intends to place the tailings storage facility on private lands or Arizona State Trust lands. As a result, the only decision to be made by the Forest Service concerns the proposed use of NFS roads, and the use of NFS land for a tailings pipeline corridor and power line corridors across NFS lands. The authorization for uses of NFS lands and roads associated with the Resolution Copper Project would be implemented by issuance of authorizations under 36 CFR § 251 Subpart B and 36 CFR § 212 Subpart A, since they will be associated with mining operations that take place exclusively on private land, and not on Federal land under the Mining Laws.

This document has been written to reflect the conditions at the point in time the Final ROD will be published, not the conditions at the time the Draft ROD was published.

This Draft ROD is being shared with those on the project mailing list, as well as the general public via the Internet. Questions regarding this Forest Service draft decision document can be directed to Michelle Tom, Engineering and Minerals Staff Officer, Tonto National Forest, Phoenix, Arizona, and emailed to comments-southwestern-tonto@usda.gov.

---

[1] The titles of the FEIS and Draft ROD intentionally differ. The FEIS includes analysis of both the Resolution Copper Mine project, and the congressionally mandated land exchange. This Draft ROD addresses decisions only related to the Resolution Copper Mine project, as there is no discretion or decision to be made with respect to the land exchange.

# PART 1 INTRODUCTION

## 1.1   About This Document

The U.S. Forest Service (Forest Service), in cooperation with the U.S. Army Corps of Engineers (USACE), U.S. Department of the Interior Bureau of Land Management (BLM), U.S. Environmental Protection Agency, Arizona State Land Department (ASLD), Arizona Department of Environmental Quality (ADEQ), Arizona Department of Water Resources, Arizona Game and Fish Department (AGFD), Arizona State Mine Inspector, and Pinal County Air Quality Control District, prepared an environmental impact statement (EIS) to review the potential environmental impacts of the Resolution Copper Project and Land Exchange (herein called the project).

In addition to the proposed action, four action alternatives were considered, along with the no action alternative. Public scoping for this project began in 2016 and resulted in the identification of the issues described in part 5.3 of this draft record of decision (Draft ROD). The Final EIS (FEIS) (U.S. Forest Service 2021) was released to the public in January 2021, along with this Draft ROD. However, on March 1, 2021, the U.S. Department of Agriculture (USDA) directed the Forest Service to withdraw the notice of availability and rescind the FEIS and Draft ROD. The USDA took this step to provide an opportunity for the agency to conduct a thorough review, to ensure regulatory compliance of environmental, cultural, and archaeological analyses, and to provide time for the Forest Service to fully understand concerns raised by Tribes and the public and the project's impact to these important resources.

The notice of availability of the republished FEIS (U.S. Forest Service 2025) was released to the public in the Federal Register in June 2025, along with the notification of the opportunity to object on the republished Draft ROD in the "Arizona Capitol Times" (paper of record). This Forest Service Draft ROD is specific to the authorization of special uses on National Forest System (NFS) lands.

This ROD is organized into eight parts:

- *Part 1 – Introduction* provides background information about the proposed Resolution Copper Mine from Resolution Copper Mining LLC (Resolution Copper), which has mineral claims for the Oak Flat area.

- *Part 2 – Decision* explains the authorities of the Forest Service to regulate use and occupancy of NFS lands for special use permit activities associated with development of the Resolution Copper Project.

- *Part 3 – Principal Reasons for the Decision* explains the circumstances and rationale behind the Forest Service decisions.

- *Part 4 – Applicant-Committed Environmental Protection Measures, Monitoring, and Mitigation* specifies the requirements necessary for implementation of special use permit activities.

- *Part 5 – Public Involvement and Issues* describes the public involvement process, a summary of public comments, a description of government consultation, and a summary of the issues.

- *Part 6 – Alternatives Considered* briefly summarizes the no action alternative and the action alternatives that were considered in detail, the environmentally preferred alternative, and alternatives that were eliminated from detailed analysis.

- *Part 7 – Legally Required Findings* lists the laws and regulations that were considered during the decision-making process.

- *Part 8 – Administrative Review Opportunities* describes the opportunity provided for pre-decisional administrative review under 36 Code of Federal Regulations (CFR) § 218 Subparts A and B, identifies the contact person for the project, and documents the signature authorizing this decision.

## 1.2    Proposed Resolution Copper Mine Project

### 1.2.1  Project Overview (as originally proposed)

In November 2013, Resolution Copper submitted a General Plan of Operations (GPO) to the Tonto National Forest for development and operation of a large-scale mine near Superior, Arizona. The proposed GPO sought authorization for surface disturbance on NFS lands for mining operations and processing of copper and molybdenum. The proposed mine would be located in the Tonto National Forest Globe and Mesa Ranger Districts. The Forest Service determined that the proposed GPO was complete in December 2014. The GPO describes the full breadth of activities that would take place for construction, operation, closure, and reclamation of the mine project. These activities are also described in detail in chapter 2 of the FEIS. They are briefly summarized below to provide context to the decisions considered in this Draft ROD.

The project will progress through three distinct phases: construction (years 1 to 9), operations (years 6 to 46), and closure and reclamation (years 46 and beyond). The type of copper deposit that would be mined at the East Plant Site is a porphyry deposit, a lower-grade deposit that requires higher mine production rates to be economically viable. The copper deposit that Resolution Copper proposes to mine averages 1.54 percent copper (i.e., every ton of ore would on average contain 31 pounds of copper). Operational projections are removal of 1.4 billion tons of ore and production of 40 billion pounds of copper using a mining technique known as panel caving. Using this process, a network of shafts and tunnels is constructed below the ore body. Access to the infrastructure associated with the panel caving would be from vertical shafts in an area known as the East Plant Site, located on an area known as Oak Flat. This area would include mine shafts and a variety of surface facilities to support mining operations. As originally proposed in 2013, portions of the East Plant Site were located on NFS lands and would have been subject to Forest Service regulation; however, these operations will now be occurring on private lands following the land exchange and will be subject to regulations outside the Forest Service.

While all mining will be conducted underground, removing the ore would cause the ground surface to collapse, creating a subsidence area at Oak Flat. The crater will start to appear in year 6 of active mining. The subsidence area ultimately will be between 800 and 1,115 feet deep and roughly 1.8 miles across. The EIS evaluated alternative mining techniques that could avoid subsidence, and explains why the Forest Service determined that those mining techniques were not reasonable alternatives to consider in detail. As the mine will be on private land, the Forest Service will not be approving any mining method.

Under Resolution Copper's proposed plan, mined ore will be crushed underground and then transported underground approximately 2.5 miles west to an area known as the West Plant Site (the location of the old Magma Mine in Superior, Arizona), where ore will be processed to produce copper and molybdenum concentrates. As originally proposed, a portion of the West Plant Site would have been located on NFS lands, which would have been subject to Forest Service regulatory jurisdiction. Resolution Copper later modified this portion of the West Plant Site to avoid use of NFS land (see "Changes to the Proposed Action during the NEPA Process" below).

Once processed, the copper concentrate will be pumped as a slurry through a 22-mile pipeline to a filter plant and loadout facility located near Florence Junction, Arizona, where copper concentrate will be filtered and then sent to off-site smelters via rail cars or trucks. The molybdenum concentrate will be filtered, dried, and sent to market via truck directly from the West Plant Site.

The copper concentrate slurry pipeline corridor will be located along an existing, previously disturbed right-of-way known as the Magma Arizona Railroad Company (MARRCO) corridor. The MARRCO corridor will also host other infrastructure for the mine, including water pipelines, power lines, pump

stations, and groundwater wells. Resolution Copper holds an existing right-of-way for those portions of the MARRCO corridor that cross NFS lands.

Tailings produced at the West Plant Site will be pumped as a slurry through several pipelines to a tailings storage facility. The tailings storage area will gradually expand over time. As originally proposed, the tailings storage facility was to have been located on NFS lands, which would have been subject to Forest Service regulatory jurisdiction. Resolution Copper later modified that part of the proposed mine plan to avoid use of NFS land (see "Changes to the Proposed Action during the NEPA Process" below).

All power to the mine will be supplied by the Salt River Project (SRP). Portions of the proposed electrical infrastructure will be located on NFS land and will require Forest Service authorization.

Water for the process will come from a variety of sources. Filtrate from the filter plant, recycled water from the tailings storage facility, and recovered water from the concentrator complex will be recycled for use in the mining process. Additional water will be obtained from dewatering of the mine workings, potential direct delivery of Central Arizona Project water, and pumping from a well field along the MARRCO corridor.

Reclamation will be conducted to achieve post-closure land use objectives, including closing and sealing the mine shafts, removing surface facilities and infrastructure, and establishing self-sustaining vegetative communities using local species. The proposed tailings storage facility will be reclaimed in place, providing for permanent storage of mine tailings.

### 1.2.2 Changes to the Proposed Action during the NEPA Process

In March 2016, the Tonto National Forest undertook preparation of an EIS in order to (1) consider the effects of anticipated mining operations that would be reasonably incident to extraction, transportation, and processing of copper and molybdenum, and (2) consider the effects of the exchange of lands between Resolution Copper and the United States as directed by the Southeast Arizona Land and Conservation Act, 16 United States Code (U.S.C.) § 539p (which is referred to in this document as Public Law (PL) 113-219).

During this process, a number of alternatives to the proposed action were considered for purposes of the environmental analysis. These include the following:

- Facilities near the West Plant Site on NFS lands were redesigned to avoid the need to use NFS lands.

- A number of tailings storage facility alternatives were considered, including the location evaluated in Alternative 6 – Skunk Camp, under which the tailings storage facility will be located off of Federal lands, on private and Arizona State Trust lands (which Resolution Copper will need to acquire). Alternative 6 – Skunk Camp became the preferred alternative in the FEIS.

As a result of these changes and the congressionally mandated land exchange, the elements of the mine project to be located on NFS land, and thus subject to Forest Service regulations, have changed since initial submittal of the GPO. The activities or surface disturbance associated with the East Plant Site, subsidence area, West Plant Site, and tailings storage facility will no longer take place on NFS lands. These components of the project therefore will require no decision or authorization by the Forest Service.

The sole remaining uses of NFS lands associated with the Resolution Copper Project are as follows:

- several new or upgraded power lines;

- a pipeline corridor to convey tailings slurry from the West Plant Site to the tailings storage facility; and

- the upgrade, maintenance, construction, and use of NFS roads.

The decisions in the Draft ROD apply only to these project components as analyzed in the FEIS.

# PART 2  DECISION

## 2.1    Introduction and Decision Authority

In December 2014, Congress mandated a land exchange pending completion of the EIS, as outlined in the Southeast Arizona Land and Conservation Act, 16 U.S.C. § 539p (which is referred to in this document as PL 113-219). The NFS land to be conveyed to Resolution Copper encompasses the copper deposit. PL 113-291 specified,

> Prior to conveying Federal land under this section, the Secretary shall prepare a single environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities.

The EIS therefore considered the environmental impacts not only of the mining proposal and all connected actions, but also of the land exchange itself. PL 113-291 further directed, "Not later than 60 days after the date of publication of the final environmental impact statement, the Secretary shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper" (16 U.S.C. 539p(c)(3)).

Mining operations within the area conveyed by the Forest Service in the exchange are not subject to regulation by the Forest Service, since Forest Service regulation of mining operations pertains only to mining operations conducted on NFS land under the jurisdiction of the Secretary of Agriculture (36 CFR § 228.2). The decisions to be made by the Forest Service are limited to authorization of the proposed uses of NFS land outside the exchanged land.

The Forest Service and USACE are making separate but coordinated decisions related to the proposed Resolution Copper Project. These decisions are based on the FEIS and applicable laws, regulations, and policies. The Forest Service is making a decision regarding whether and how to authorize the use and occupancy of NFS land for mine-related pipeline and power line infrastructure crossing NFS lands, along with maintenance, reconstruction, and use of NFS roads.

Any associated uses of NFS land for pipelines and utilities are special uses and are regulated under 36 CFR § 251.50 because they are associated with mining on private property and therefore do not involve operations conducted under the U.S. mining laws. Authorization for a special use or occupancy of NFS lands requires submittal of a special use application (SF-299). This application process is designed to ensure that authorizations to use and occupy NFS lands are in the public interest (36 CFR § 251, Subpart B). Once submitted, this application is subject to initial screening (36 CFR § 251.54(e)(1)). After completion of the initial screening, a secondary screening is undertaken (36 CFR § 251.54(e)(5)). After consideration of the screening criteria, the Forest Service may decide to accept an application for processing (36 CFR § 251.54(g)). In processing the application, the Forest Service must consider the potential environmental effects of authorizing the proposed uses of NFS land in accordance with the National Environmental Policy Act (NEPA), and the Forest Supervisor must proceed to either approve or deny the authorization. The special use authorization (SUA) must include terms and conditions (36 CFR § 251.56), including minimizing damage to the environment, protecting the public interest, and requiring compliance with water and air quality standards.

The following applications have been submitted to the Tonto National Forest:

- SRP would be the owner and operator of the power line to the tailings storage facility, largely co-located with the tailings slurry pipeline. SRP would be responsible for construction, operation, and maintenance of the power line and would hold the special use permit. SRP submitted an SF-299 Special Use Permit application on November 11, 2020. Tonto National Forest staff carried out initial and secondary screenings and accepted the application on November 18, 2020. These documents are found in appendix Q of the FEIS.

- Resolution Copper submitted an SF-299 Special Use Permit application on September 7, 2020. Tonto National Forest staff carried out initial and secondary screenings and accepted the application on September 28, 2020. These documents are found in appendix Q of the FEIS.

The Tonto National Forest implemented a new "Tonto National Forest Land Management Plan" (forest plan) in December 2023 (U.S. Forest Service 2023). The Resolution FEIS and project record contain an analysis of the project's compliance with the new forest plan, which determined that the selection of Alternative 6 – Skunk Camp would require a multi-component amendment to the forest plan. The forest plan would be amended as part of the action to approve the project. The proposed amendment would be limited to apply only to this project. Only the selected Federal action detailed in this Draft ROD would be excepted from the specific current plan desired conditions and guidelines included in the amendment. This project complies with all other desired conditions, objectives, standards, and guidelines applicable to the actions of this project. Refer to appendix T of the republished FEIS for more detailed information on the specific proposed amendment for the selected Federal action, as well as assessment of the consistency of the forest plan amendment with the National Forest Management Act.

It is expected that the USACE will issue an individual permit under Section 404 of the Clean Water Act (CWA) for dredge and fill of waters of the U.S. associated with the tailings storage facility and the tailings pipeline corridor. Because of separate agency authorities, the Forest Service and USACE each prepare a separate ROD for their respective decision. The decision of each agency is developed in close coordination with the other because operations are interconnected and the FEIS was required to support both decisions. This Forest Service decision presumes that the USACE will select the preferred alternative (Alternative 6 – Skunk Camp) identified in the FEIS, as opposed to the no action alternative.

### 2.1.1 Authorization of Special Use for Salt River Project Power Lines

My decision approves the issuance of an SUA in order to allow the construction, operation, maintenance, and reclamation of transmission lines by SRP across NFS lands. These include the following:

- A new 3.6-mile, 230-kilovolt (kV) power line from the Silver King substation to Oak Flat substation, to serve the East Plant Site.

- A new 16.9-mile power line from the existing Silver King substation to the Skunk Camp tailings storage facility. Preliminary assessment of line voltage options show that either a 69-kV or 115-kV voltage level would be adequate to supply power to the tailings storage facility; the design is for a 115-kV line. The power line would almost entirely follow the same corridor as the tailings pipelines, except for a section between the Silver King substation and the tailings pipeline corridor where the 115-kV line parallels the existing 230-kV power line. Approximately 298 acres of NFS lands would be included in the power line corridor, which is collocated with the pipeline corridor described below. An additional 28 acres of NFS lands would be required outside the collocated corridor for power poles and access roads or trails.[2]

---

[2] These acreages reflect the conditions after the land exchange has occurred.

- Maps of the SUA routes are included as appendix A. It should be noted that SRP must obtain a Certificate of Environmental Compatibility from the Arizona Corporation Commission, following what is known as the "line siting" process. The SUA would not be issued to SRP until this process is complete.

### 2.1.2 Authorization of Special Use for Resolution Copper Pipelines

My decision approves the issuance of an SUA in order to allow the construction, operation, maintenance, and reclamation of tailings and water pipelines by Resolution Copper across NFS lands, including the following:

- A 19.6-mile pipeline corridor from the West Plant Site to the Skunk Camp tailings storage facility. Approximately 593 acres of NFS lands would be part of the pipeline corridor.

- Maps of the SUA routes are included as appendix A.

### 2.1.3 Road Use Permit

My decision approves the commercial use of NFS roads in accordance with 36 CFR § 212, Subpart A, which will include the construction, reconstruction, use, and maintenance of NFS roads in the vicinity of the West Plant Site and the MARRCO corridor. Resolution Copper has submitted a revised road use plan describing the planned uses (Resolution Copper 2020b).[3] The road use plan as submitted includes the following components (a final road use plan will be included with the appropriate request for authorization):

- There are 17 proposed access points from NFS roads along the MARRCO corridor for use for both construction and operation/maintenance purposes.

- Several NFS roads intersect the MARRCO corridor. The sections of NFS roads that cross the pipeline will be temporarily closed in coordination with the Forest Service and/or other relevant land management agencies (e.g., ASLD), and then reestablished to their existing maintenance level after construction.

- The tailings storage facility will not impact NFS roads. However, the tailings pipeline and the various power line corridors will cross NFS roads. The pipeline infrastructure will be buried via trench installation during construction (except for tunnel and bridge span sections). The sections of NFS roads that cross the pipeline will be temporarily closed in coordination with Forest Service and ASLD as needed, and then reestablished to their existing maintenance level after construction in coordination with Forest Service, ASLD, and Pinal County as needed. Two new road segments (PNR-1 and PNR-2) would need to be constructed on Tonto National Forest land for access to the tailings pipeline and power line corridor.

- Approximately 20 NFS roads will be maintained by Resolution Copper at a range of maintenance levels.

- Resolution Copper has also proposed an alternative routing of Silver King Mine Road (NFS Road 229), which would be used to transport mine personnel, equipment, supplies, and molybdenum and other mine products, to and/or from the West Plant Site, as described in section 2.2.9.2 of the FEIS.

---

[3] Any existing routes will be maintained in compliance with the Final ROD for Travel Management on the Tonto National Forest, which is anticipated to be signed before the Resolution Copper Final ROD, and in compliance with the published Motor Vehicle Use Map, which is produced yearly by the Tonto National Forest. The revised road use plan is available as a reference to the FEIS and includes a detailed list of the specific roads to be used.

As the Forest Service responsible official, I have decided to issue SUAs to permit these activities associated with the Resolution Copper Project under regulations codified at 36 CFR § 251 Subpart B, and permission for road use under regulations codified at 36 CFR § 212 Subpart A, and to determine the terms and conditions of such authorizations.

### 2.1.4  Approval of Project-Specific Land Management Plan Amendment

Additionally, my decision approves the multi-component project-specific plan amendment to the 2023 "Tonto National Forest Land Management Plan" (U.S. Forest Service 2023).

## Details of Amendment

The full context of 2023 forest plan desired conditions,  objectives, standards, and guidelines (plan components) were taken into consideration in making this decision, as detailed in the forest plan consistency review (SWCA Environmental Consultants 2025). Under the National Forest Management Act and its implementing regulations at 36 CFR § 219 (2012 Planning Rule), a plan may be amended at any time. Plan amendments may be broad or narrow, depending on the need for the change. The responsible official has the discretion to determine whether and how to amend the forest plan and to determine the scope and scale of any amendment.

The selected Federal action would not comply with all forest plan components without an amendment. The purpose of this amendment is to except the selected Federal action from complying with specific forest plan desired conditions and guidelines, which would allow this project to be consistent with the forest plan. This multi-component, project-specific forest plan amendment  includes nine guidelines and seven desired conditions. The amendment of the forest plan components would except the activities approved as part of the selected Federal action, including the powerline, pipeline, and road uses from complying with the specified plan components. Other than the proposed exceptions, no other changes to the  forest plan would occur with the proposed amendment. The effects of the project-specific plan amendment is documented in chapter 3 of the FEIS following Forest Service NEPA procedures at 36 CFR § 220 and are summarized below in table 1. Because the amendment applies to only this project, and because potential adverse effects from project implementation will be addressed through environmental protection measures and mitigation, they are not considered a significant change to the forest plan for the purposes of the National Forest Management Act (36 CFR § 219.13(b)(5)).

The date of the Final ROD for the Resolution Copper Project marks the date when the amendments are effective. Since the plan amendments apply to only one specific project, they are effective on the date on which the project is implemented in accordance with administrative review regulations at 36 CFR § 218, Subpart A (36 CFR § 219.17(a)(3)). The objection process under 36 CFR § 218 was used for both the project activities and the project-specific amendments (36 CFR § 219.59(b)).

**Table 1. Multiple-component, project-specific amendment to the forest plan for the Resolution Copper Project**

| Forest Plan Component | Reason for Amendment |
|---|---|
| Recreation Guideline 10 (REC-G-10) (forest plan, p. 31) | The pipeline, electrical transmission line, and associated infrastructure that would be authorized with the selected Federal action would not meet current recreation opportunity spectrum (ROS) criteria. |
| Wildlife Related Recreation Guideline 03 (REC-WR-G-03) (forest plan, p. 44) | The analysis of wildlife connectivity concludes there would be a loss of long-term movement habitat along pipeline corridors with the selected Federal action; therefore, wildlife connectivity would not be maintained or enhanced. |

| Forest Plan Component | Reason for Amendment |
|---|---|
| Cultural and Historic Resources Desired Condition 01 (CUH-DC-01) (forest plan, p. 55) | While the selected Federal action includes mitigation measures designed to avoid, minimize, rectify, reduce, or compensate for resource impacts, impacts to historic properties cannot be avoided or fully mitigated. It is not feasible to retain all characteristics that qualify impacted properties for listing. |
| Cultural and Historic Resources Desired Condition 02 (CUH-DC-02) (forest plan, p. 55) | The pipeline, electrical transmission lines and associated infrastructure constructed and operated with the selected Federal action would impact historic properties. |
| Cultural and Historic Resources Desired Condition 07 (CUH-DC-07) (forest plan, p. 55) | The selected Federal action would disturb cultural resources, including artifacts, and data recovery and curation would be conducted on these sites. |
| Scenery Desired Condition 03 (SC-DC-03) (forest plan, p. 67) | Infrastructure constructed with the selected Federal action would not meet criteria for existing Scenic Integrity Objectives (SIOs) and would degrade views from U.S. Route 60, a state designated scenic route. |
| Scenery Guideline 01 (SC-G-01) (forest plan, p. 67) | Infrastructure constructed with the selected Federal action, including transmission lines and pipelines, would not be consistent with or move the area toward achieving SIOs. |
| Scenery Guideline 03 (SC-G-03) (forest plan, p. 67) | It is not currently known whether the electrical transmission line constructed with the selected Federal action would remain in place after reclamation has occurred. Therefore, the selected Federal action may not achieve or move toward achieving SIOs in the long term. |
| Wildlife, Fish, and Plants Guideline 06 (WFP-G-06) (forest plan, p. 142) | The analysis of wildlife connectivity concludes that there would be a loss of long-term movement habitat along pipeline corridors with the selected Federal action; therefore, dispersal and movement of species would be adversely affected. |
| Wildlife, Fish, and Plants Guideline 07 (WFP-G-07) (forest plan, p. 142) | The analysis of wildlife connectivity concludes that there would be a loss of long-term movement habitat along pipeline corridors with the selected Federal action; therefore, dispersal and movement of wildlife would be adversely affected. |
| Soils Guideline 02 (SL-G-02) (forest plan, p. 147) | The selected Federal action would disturb and impact soils on NFS land. Biological crust soils (referred to as biotic soils and desert pavement in the FEIS) are present in some of these areas and cannot be completely avoided. |
| National Trails Management Area Desired Condition 03 (NTMA-DC-03) (forest plan, p. 182) | New pipelines constructed within the MARRCO corridor[4] would cross the Arizona National Scenic Trail. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purposes of the Arizona National Scenic Trail. |

---

[4] The MARRCO corridor is an existing utility corridor containing Arizona Water Company facilities, water lines, a Qwest fiber-optic line, an El Paso Natural Gas pipeline, a power line, and a telephone line in its right-of-way. The selected alternative would construct additional pipelines and an access road within this existing corridor.

| Forest Plan Component | Reason for Amendment |
|---|---|
| National Trails Management Area Desired Condition 06 (NTMA-DC-06) (forest plan, p. 182) | New pipelines constructed within the MARRCO corridor would cross the Arizona National Scenic Trail. The selected Federal action would not meet the criteria to provide visitors with expansive views of a natural-appearing landscape along all segments of the Arizona National Scenic Trail, or conserve scenic resources within the trail corridor. |
| National Trails Management Area Desired Condition 07 (NTMA-DC-07) (forest plan, p. 182) | New pipelines constructed within the MARRCO corridor would cross the Arizona National Scenic Trail. The selected Federal action would not be consistent with or move the area toward high or very high SIOs. |
| National Trails Management Area Guideline 01 (NTMA-G-01) (forest plan, p. 182) | New pipelines and access road constructed within the MARRCO corridor would cross the Arizona National Scenic Trail. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purposes of the Arizona National Scenic Trail. |
| National Trails Management Area Guideline 08 (NTMA-G-08) (forest plan, p. 183) | The selected Federal action would result in impacts to the scenic character of the Arizona National Scenic Trail that cannot be fully mitigated through design elements. |

## Substantive Provisions for Project-Specific Amendments

The specific substantive rule provisions within 36 CFR § 219.8 through 36 CFR § 219.11 that are directly related and therefore applicable to the amendment are described in appendix T of the FEIS and summarized below. As described below, the project-specific amendment complies with the procedural provisions of the 2012 Planning Rule (36 CFR § 219.13(b)). The amendment is based on a review of relevant scientific information, consideration of responsible opposing views, and the acknowledgment of any incomplete or unavailable information, scientific uncertainty, and risk. The specific substantive provisions evaluated relative to the project-specific amendments are as follows:

- § 219.8(a)(2)(ii) – Soils and soil productivity due to the exception of guideline SL-G-02 [forest plan, p. 147].

- § 219.10(b)(1)(i) – Sustainable recreation due to the exception of desired conditions SC-DC-03 [forest plan, p. 67], NTMA-DC-06 [forest plan, p. 182], and NTMA-DC-07 [forest plan, p. 182]; and guidelines SC-G-01 [forest plan, p. 67], SC-G-03 [forest plan, p. 67], NTMA-G-01 [forest plan, p. 182], and NTMA-G-08 [forest plan, p. 183] (SIO); desired condition NTMA-DC-03 [forest plan, p. 182] and guideline NTMA-G-01 [forest plan, p. 182] (Arizona National Scenic Trail); and guideline REC-G-10 [forest plan, p. 31] (ROS).

- § 219.8(a)(1)(i) – Ecosystem integrity, interdependence of terrestrial and aquatic ecosystems in the plan area due to exception of guidelines REC-WR-G-03 [forest plan, p. 44], WFP-G-06 [forest plan, p. 142] and WFP-G-07 [forest plan, p. 142].

- § 219.9(a)(2)(i) – Ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types due to the exception of REC-WR-G-03 [forest plan, p. 44], WFP-G-06 [forest plan, p. 142] and WFP-G-07 [forest plan, p. 142].

- § 219.8(a)(b) – Social and economic sustainability – cultural and historic resources and uses due to the exception of desired conditions CUH-DC-01 [forest plan, p. 55], CUH-DC-02 [forest plan, p. 55], and CUH-DC-07 [forest plan, p. 55].

- § 219.10(a)(1) – Integrated resource management for multiple use – cultural and heritage resources due to the exception of desired conditions CUH-DC-01 [forest plan, p. 55], CUH-DC-02 [forest plan, p. 55], and CUH-DC-07 [forest plan, p. 44].

- § 219.10(a)(3) – Appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors due to the exception of desired conditions and guidelines NTMA-DC-03 [forest plan, p. 182] and NTMA-G-01 [forest plan, p. 182].

- § 219.10(b)(1)(ii) – protection of cultural and historic resources due to the exception of desired conditions CUH-DC-01 [forest plan, p. 55], CUH-DC-02 [forest plan, p. 55], and CUH-DC-07 [forest plan, p. 55].

## Rationale for Exception from Land Management Plan Desired Conditions and Guidelines

The project was reviewed for consistency with the 2023 forest plan. The consistency evaluation (SWCA Environmental Consultants 2025) demonstrated the need for exception from nine guidelines and seven desired conditions from the forest plan. The rationale for exception is detailed in appendix T of the FEIS and summarized in table 2.

**Table 2. Rationale for exception from forest plan for the Resolution Copper Project**

| Forest Plan Component | Rationale for Exception |
|---|---|
| Recreation Guideline 10 (REC-G-10) (forest plan, p. 31) | Construction, operation, and maintenance of new pipelines, electrical transmission lines and associated infrastructure would result in a reduction of 166 acres from semiprimitive nonmotorized ROS to semiprimitive motorized ROS). Implementation of the Resolution Copper Project selected Federal action would reduce the amount of semiprimitive nonmotorized ROS on the Forest from 715,024 acres to 714,858 acres, a reduction of 0.02 percent forest-wide. Semiprimitive motorized recreation would increase from 1,072,671 acres to 1,072,837 acres, an increase of less than 0.02 percent forest-wide. Although this has an adverse impact on nonmotorized recreation, it is not a substantial adverse impact due to the relatively small amount of effects across the Tonto National Forest. |
| | Non-discretionary environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on recreation. |
| | The remaining 51 guidelines, 80 desired conditions, 15 standards, and nine objectives would remain applicable to the entire Tonto National Forest, including the selected Federal action area of disturbance. The one excepted guideline would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the selected Federal action. |

| Forest Plan Component | Rationale for Exception |
|---|---|
| Wildlife Related Recreation Guideline 03 (REC-WR-G-03) (forest plan, p. 44)<br><br>Wildlife, Fish, and Plants Guideline 06 (WFP-G-06) (forest plan, p. 142)<br><br>Wildlife, Fish, and Plants Guideline 07 (WFP-G-07) (forest plan, p. 142) | Construction, operation and maintenance of new pipelines, electrical transmission lines and associated infrastructure would result in 1,417 acres of habitat disturbance in the tailings corridor, transmission line corridor, and access roads. This would result in a loss of long-term movement habitat along pipeline corridors since vegetation would be expected to eventually reestablish in the disturbed areas but would be unlikely to return to preconstruction conditions. The total acres of intact habitat connectivity on the Tonto National Forest is not known. However, the 1,417 acres of habitat connectivity that would be affected by the selected Federal action is a minor component of the habitat available across the 2,965,716 acres of the Tonto National Forest. Potential impacts to biodiversity would likely be limited to impacts at the local level for most species and would not be significant at the population level.<br><br>Non-discretionary environmental protection measures and mitigation measures are incorporated into the design of the project that would act to reduce potential impacts on wildlife connectivity.<br><br>The remaining 11 desired conditions, four guidelines, and one standard related to wildlife connectivity would remain applicable to the entire Tonto National Forest, including the selected Federal action area of disturbance. The one excepted desired condition and three excepted guidelines would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the selected Federal action. |
| Scenery Desired Condition 03 (SC-DC-03) (forest plan, p. 67)<br><br>Scenery Guideline 01 (SC-G-01) (forest plan, p. 67)<br><br>Scenery Guideline 03 (SC-G-03) (forest plan, p. 67)<br><br>National Trails Management Area Desired Condition 06 (NTMA-DC-06) (forest plan, p. 182)<br><br>National Trails Management Area Desired Condition 07 (NTMA-DC-07) (forest plan, p. 182)<br><br>National Trails Management Area Goal 08 (NTMA-G-08) (forest plan, p. 183) | Construction, operation, and maintenance of new pipelines, electrical transmission lines, and associated infrastructure would reduce 516 acres of high SIO to the low category and reduce 345 acres of moderate SIO to the low category. There are 1,706,521 acres of high SIO on the Tonto National Forest. A reduction of 516 acres constitutes a change to 0.03 percent of the amount of high SIO across the forest. These numbers include impacts to scenic resources in the Arizona National Scenic Trail corridor, which would reduce 20 acres of high SIO to the low category. There are 597,020 acres of moderate SIO on the Tonto National Forest. A reduction of 345 acres constitutes a change to 0.06 percent of the amount of moderate SIO across the forest. Although this is an adverse impact to scenery, it is not a substantial adverse impact due to the limited extent to the scenery resource of the project on the Tonto National Forest and the implementation of mitigation measures.<br><br>Non-discretionary environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on scenery.<br><br>The remaining nine desired conditions, 14 guidelines, and one standard related to scenery would remain applicable to the entire Tonto National Forest, including the selected Federal action area of disturbance.<br><br>The three excepted desired conditions and three excepted guidelines would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the selected Federal action. |

| Forest Plan Component | Rationale for Exception |
|---|---|
| Cultural and Historic Resources Desired Condition 01 (CUH-DC-01) (forest plan, p. 55) <br><br> Cultural and Historic Resources Desired Condition 02 (CUH-DC-02) (forest plan, p. 55) <br><br> Cultural and Historic Resources Desired Condition 07 (CUH-DC-07) (forest plan, p. 55) | The reduction of cultural resource protection measures constitutes an adverse impact, but effects are not expected to be substantial. The greatest impacts to cultural resources would be during the construction period. The cultural resources analysis in the Resolution Copper Project FEIS lists hundreds of historic and archaeological sites likely to be directly impacted by the selected Federal action. However, that analysis includes areas where the forest plan does not apply, such as private land and land administered by the State of Arizona and BLM. The Forest Service decision to implement the selected Federal action would not authorize any activities on land that are not administered by the Forest Service. A review of impacted sites by land ownership concludes that eight of these sites are located on NFS land associated with the selected Federal action area of disturbance. While it is not possible to know the total number of cultural resource sites on the Tonto National Forest, eight cultural sites is a small amount of the number of sites on the Forest. <br><br> Any direct ground disturbance runs the risk of disturbing cultural resources. Implementation of the selected Federal action would result in construction, use, and maintenance of electrical transmission lines, pipelines, and associated infrastructure that would disturb 2,502 acres of NFS lands and not affect that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the selected Federal action. This is a minor amount of impact when considered on a forest-wide basis. <br><br> Non-discretionary environmental protection measures and mitigation measures are incorporated into the design of the project that would act to reduce potential impacts on cultural resources. <br><br> The remaining 13 desired conditions, 19 guidelines, and eight standards would remain applicable to the entire Tonto National Forest, including the selected Federal action area of disturbance. The three excepted desired conditions would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the selected Federal action. |
| Soils Guideline 02 (SL-G-02) (forest plan, p. 147) | Soil loss from construction and operations in the pipeline and power line corridor is expected to be minimal after compliance with applicant-committed environmental protection measures (stormwater pollution prevention plan and erosion and sediment controls) and post-closure after reclamation when the surface has stabilized from revegetation. <br><br> The effects noted would occur on 2,502 acres or less of NFS land (less than 0.09 percent of the total NFS land on the Tonto National Forest); therefore, the one guideline would not hinder the forest plan's ability to maintain or restore soils. <br><br> Non-discretionary environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on soils. <br><br> The remaining 35 desired conditions, 11 guidelines, three standards, and one objective related to soils would remain applicable to the entire Tonto National Forest, including the selected Federal action area of disturbance. The one excepted guideline would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the selected Federal action. |

| Forest Plan Component | Rationale for Exception |
|---|---|
| National Trails Management Area Desired Condition 03 (NTMA-DC-03) (forest plan, p. 182)<br><br>National Trails Management Area Goal 01 (NTMA-G-01) (forest plan, p. 182) | A new pipeline and access road to cross the Arizona National Scenic Trail at a location where major effects already exist. Although this is an adverse impact to the Arizona National Scenic Trail, it is not a substantial adverse impact because effects would primarily be limited to the construction period. Disruption to trail users would occur during the activity, and when conditions are safe for hikers, cyclists, and equestrian users, the disruption would cease. Contractors would provide necessary detours or signage for Arizona National Scenic Trail user awareness during these activities.<br><br>The scale of the Arizona National Scenic Trail component of the project-specific amendment encompasses the immediate location in the MARRCO Corridor where the pipeline and access road cross the trail. New pipelines constructed within the MARRCO corridor would cross Passage 18 of the Arizona National Scenic Trail. In the Passage 18 segment, 0.07 mile of the proposed tailings pipeline corridor would intersect the Arizona National Scenic Trail. The Tonto National Forest manages about 200 miles of the Arizona National Scenic Trail. The selected Federal action would be less than 0.04 percent of the trail corridor. The area impacted by the selected Federal action is a minor portion of the Arizona National Scenic Trail on the Tonto National Forest.<br><br>Non-discretionary environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on the trail.<br><br>The remaining nine desired conditions, 12 guidelines, and three standards related to the trail remain applicable to the entire Tonto National Forest, including the selected Federal action area of disturbance. The one excepted desired condition and one excepted guideline would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the selected Federal action. |

# PART 3 PRINCIPAL REASONS FOR THE DECISION

My decision is based on review of the FEIS and project record, which shows a thorough examination of relevant and best available scientific information, consideration of reasonable opposing views, and the acknowledgment of incomplete or unavailable information, scientific uncertainty, and risk. My decision is also informed by the legislative direction provided in PL 113-291 to "facilitate and expedite" the land exchange between Resolution Copper and the United States.

I have taken into consideration the degree to which the applicant-committed environmental protection measures,[5] monitoring, and mitigation measures will reasonably reduce potential impacts to the environment, and the predicted effects of the action alternatives on resources, including soils, vegetation, wildlife, including special status species, noise, transportation and access, air quality, the quantity and quality of surface water and groundwater, cultural resources, tribal values and concerns, socioeconomics, scenery, recreation, and public safety. All practicable means to avoid or reduce environmental harm have been adopted. I have ensured that a thorough evaluation of the potential environmental impacts in the FEIS was accomplished through coordination with other ongoing and planned studies by State and Federal agencies in cooperation with Resolution Copper.

My decision to authorize pipelines and power lines across NFS lands is based on a review not only of the impacts of these structures, but of the entire mining operation as proposed by Resolution Copper. The decision to authorize these linear features on NFS lands is predicated on Resolution Copper's decision to use Alternative 6 – Skunk Camp for tailings disposal.

I recognize that each of the action alternatives would result in significant environmental and social impacts and that the no action alternative is the environmentally preferable alternative (see part 6.2 of this document for further detail). My rationale for selecting Alternative 6 – Skunk Camp for the authorization of proposed uses of NFS lands and roads includes the commitments in part 4 of this document and is detailed below.

## 3.1   Water Quality

1.  Alternative 6 – Skunk Camp will provide a greater protection of water quality than any other action alternative. The tailings storage facility presents the greatest risk of impacts to water quality through the release of tailings seepage (which contains elevated levels of dissolved metals and other contaminants) into the environment, not just during operations but for many decades after closure. All action alternatives would result in tailings seepage entering the environment, and all action alternatives would require seepage capture systems located downgradient from the tailing storage facility. Capture of seepage at the Skunk Camp location is simpler than other alternatives, and therefore more effective with less risk of impact to water quality downstream from the tailings storage facility. The geography of the Dripping Spring Wash basin requires a single seepage collection pond, compared with multiple ponds (up to nine) for other action alternatives.

2.  Any tailings storage facility will require appropriate water quality permits from ADEQ prior to operation, to ensure compliance with State water quality standards. This includes permits for stormwater discharges under the Arizona Pollutant Discharge Elimination System (AZPDES) program and permits under the Aquifer Protection Permit program. Resolution Copper will be responsible for obtaining these permits.

---

[5] See part 4 of this Draft ROD for a description of what constitutes an "applicant-committed environmental protection measure."

While no Forest Service authorizations or actions are required for activities that will not occur on NFS land, the FEIS analyzes potential effects of the proposed mining operation and alternatives as a whole.

The analysis showed that Alternatives 2, 3, and 4 either could not demonstrate concentrations of dissolved metals and other contaminants below numeric water quality standards, or would require extremely high seepage collection efficiencies to maintain concentrations of dissolved metals and other contaminants below these thresholds. Further, due to the proximity to Queen Creek, there are limitations to the ability to install additional seepage controls for these alternatives. The analysis showed that both Alternatives 5 and 6 not only can meet these acceptable thresholds, but also allow substantial flexibility for installing additional seepage controls, as needed, if indicated by monitoring during operations.

Alternative 6 – Skunk Camp ultimately demonstrated the best ability to control seepage of any action alternative. Two separate water quality analyses for Alternative 6 – Skunk Camp were conducted. The analysis of anticipated effects on water quality in the Draft EIS (DEIS) was based on a mixing-cell model. The analysis of anticipated effects on water quality in the FEIS supplemented the DEIS analysis with a numerical groundwater flow model that incorporated additional site-specific information collected at the Skunk Camp location, including aquifer tests, boreholes, water level measurements, and water quality sampling. Both models demonstrate the ability to keep concentrations of dissolved metals and other contaminants below numeric water quality standards under normal conditions. The FEIS water quality model additionally demonstrates that even under low-flow conditions, concentrations of dissolved metals and other contaminants in downstream surface waters would remain below numeric water quality standards.

3. Alternative 6 – Skunk Camp also allows the greatest margin for error and opportunity for any additional needed mitigation in the event that modeling estimates are incorrect. The nearest surface water (the Gila River) is located approximately 12 miles downstream. This is the longest distance to perennial surface waters of any action alternative. This means that there is substantial space and opportunity to install additional seepage controls—such as pumpback systems—in the event that predictions turn out to be inaccurate and that monitoring identifies unanticipated degradation of water quality.

## 3.2    Groundwater-Dependent Ecosystems

1. The Alternative 6 – Skunk Camp tailings storage facility and pipeline corridor do not directly impact any groundwater-dependent ecosystems (GDEs), which include springs and perennial streams, or special aquatic sites like wetlands. Alternatives 2, 3, and 4 all would physically disturb springs.

2. The Alternative 6 – Skunk Camp location results in less reduction in runoff to support downstream perennial waters. Alternatives 2, 3, and 4 would reduce average annual flow in Queen Creek at Whitlow Ranch Dam from 6.5 to 9 percent (of which 3.5 percent is caused by the subsidence area, not the tailings storage facility). By contrast, Alternative 6 – Skunk Camp would reduce average annual flow in the Gila River by 0.5 percent below Dripping Spring Wash.

## 3.3    Recreation and Scenic Resources

1. All alternatives would impact scenic resources. However, the Skunk Camp location is relatively remote, and the impact is more confined than the other action alternatives. Alternatives 2, 3, and 4 would be seen from most locations in the Superior basin, as well as from key sensitive areas such as the Superstition Wilderness, Picketpost Mountain, Boyce Thompson Arboretum, and Apache Leap. Alternative 5 would be seen from Florence and elsewhere in the East Salt River valley, and

from the White Canyon Wilderness. The Alternative 6 – Skunk Camp location generally can only be seen within the Dripping Spring Wash valley, and from locations to the north in the Pinal Mountains.

3. The Skunk Camp location in Dripping Spring Wash is less used for recreation than locations identified in the other alternatives. Alternatives 2, 3, and 4 would occupy highly used recreation lands in and around the town of Superior, and Alternative 5 would prohibit recreational use of some of the BLM lands nearest to the East Salt River valley. Additionally, because the Alternative 6 – Skunk Camp tailings storage facility occupies the upper end of the Dripping Spring Wash valley, there is less restriction of through-access to other recreation areas.

4. Alternative 6 – Skunk Camp is the only alternative that does not substantially impact the Arizona National Scenic Trail, either with trail crossings by tailings pipelines or proximity of the tailings storage facility to trail users.

5. The Alternative 6 – Skunk Camp location consolidates large-scale mining activity on the larger landscape of central Arizona. Alternatives 2, 3, and 4 are largely surrounded by Forest Service lands that have not been disturbed by mining. The Skunk Camp location is in close proximity to the ASARCO Ray Mine open pit; the ASARCO land exchange parcels, which are expected to be mined in the future; the Christmas mine; and the recently permitted Ripsey Wash tailings facility.

## 3.4   Public Safety and Long-Term Management

1. The analysis included an evaluation for the safety of the tailings storage facilities and the potential for catastrophic failure. All alternatives are built to the same design standards and safety factors, and therefore no alternative is inherently safer than another. However, certain designs are more resilient and more able to withstand unexpected events or accumulated errors. The Skunk Camp location allows for a less complicated cross-valley embankment, with a single face, tied into bedrock on both sides, whereas Alternatives 2, 3, and 5 would require free-standing embankments with three sides. The approximate crest length of the Alternative 6 – Skunk Camp embankment is 3 miles, which is substantially less than Alternatives 2 and 3 (10 miles) and Alternative 5 (7 miles of non-potentially acid generating (NPAG) embankment and 4 miles of potentially acid generating (PAG) embankment).

2. The locations of Alternative 5 and 6 allow for the construction of a true centerline-type embankment, in contrast to the modified-centerline embankment that must be used at the Alternative 2 or 3 location due to space concerns. As noted, all embankments are built to the same design standards and safety factors; however, centerline construction is more robust and resilient than modified-centerline construction when unplanned circumstances are encountered.

3. After purchase of Arizona State Trust lands, the Alternative 6 – Skunk Camp tailings storage facility would be located entirely on private lands. Public lands would not be encumbered in perpetuity with a reclaimed mine structure, and neither the Forest Service nor the BLM would have to devote resources to managing a reclaimed facility in perpetuity.

## 3.5   Socioeconomics

The socioeconomic analysis identified both positive and negative impacts. The positive impacts are largely independent of alternative. On average, the mine is projected to employ over 1,400 workers, pay about $149 million per year in total employee compensation, and purchase about $490 million per year in goods and services. Including direct and multiplier effects, the proposed mine is projected to increase average annual economic value in Arizona by about $1.2 billion. The mine is also projected to generate an average of $80 million to $120 million per year in State and local tax revenues, as well as more than $200 million per year for the Federal government. Negative impacts include a loss of hunting revenue,

strain on street and road networks and other public services, and decreases in property values near the tailings storage facility. Based on the socioeconomics study, reductions in property values are predicted in the immediate vicinity of the tailings facility, and property values could be further exacerbated by impacts to private water supplies. While private property would still be impacted by Alternative 6 – Skunk Camp, the overall impact would be less than other alternatives, which have more private lots in close proximity.

## 3.6   Tribal Values

None of the action alternatives are acceptable to the consulting Tribes, as all would impact Tribal values and cultural heritage. Specific concerns have been consistently expressed by the Tribes throughout the process about the impacts of the required land exchange, the impacts from the mining operations, and the proposed tailings storage facility in the vicinity of sacred sites, including Apache Leap, Picketpost Mountain, and the Superstition Wilderness. In general, each of the consulted Tribes considers the impacts from the land exchange and related mining activities to their Tribal values as a loss that cannot be mitigated. However, given the land exchange requirements put forth in PL 113-291, I have limited discretion to completely eliminate impacts to expressed Tribal values.

I find that Alternative 6 – Skunk Camp, along with the commitments described in part 7.1 of the Draft ROD, while not alleviating overall impacts to Tribal values and still having impacts to cultural resources, is preferable as the activities there will have lesser impact to these specific sacred areas than the other action alternatives considered and will better address the impacts that represent risks to social sustainability.[6]

## 3.7   Meeting Project's Purpose and Need

The purpose of and need for the project that formed the foundation for the NEPA process was (1) to consider the effects of anticipated mining operations that would be reasonably incident to extraction, transportation, and processing of copper and molybdenum; and (2) to consider the effects of the exchange of lands between Resolution Copper and the United States.

The decision to authorize pipeline and power line features on NFS lands is predicated on Resolution Copper's decision to use Alternative 6 – Skunk Camp for tailings disposal. For the collective reasons stated above, this alternative best meets the purpose of and need for the project, as stated in chapter 1 of the FEIS. Authorizing pipeline and power line features across NFS land to the Alternative 6 – Skunk Camp tailings storage location results in reduced impacts with respect to water quality, water resources, public safety, recreation and scenic values, and Tribal values.

---

[6] For more detailed information, see section 7.2 of this Draft ROD.

# PART 4 APPLICANT-COMMITTED ENVIRONMENTAL PROTECTION MEASURES, MONITORING, AND MITIGATION

Applicant-committed environmental protection measures are features incorporated into the design of the project by Resolution Copper to reduce potential impacts on resources. The effects of these measures are accounted for in the analysis of environmental consequences disclosed in the FEIS.

However, not all applicant-committed environmental protection measures detailed in the FEIS are applicable to the decision by the Forest Service on special use and road authorizations. Measures applicable to uses on NFS land will be included as terms and conditions in the Forest Service authorizations. These measures are described in this section. The remainder of the applicant-committed environmental protection measures are listed in appendix B. Many of these measures would be required under other binding agreements or by other State or Federal agencies. Any such mechanisms that would make these measures binding also are described in appendix B.

After analyzing project impacts, the FEIS identified a substantial mitigation and monitoring strategy for the Resolution Copper Project to avoid, minimize, rectify, reduce, or compensate for resource impacts. These mitigation and monitoring measures are detailed in appendix J of the FEIS, and Resolution Copper has committed to implementing these measures both on and off of NFS land. Further, they may be required by other State and Federal agencies through their permits. Mitigation and monitoring measures applicable to uses on NFS land will be included as terms and conditions in the Forest Service authorizations; these measures are described in this section. The remainder of the mitigation and monitoring measures are listed in appendix B. As with applicant-committed environmental protection measures, many of the mitigation and monitoring measures would be required under other binding agreements or by other State or Federal agencies. Any such mechanisms that would make these measures binding also are described in appendix B.

Three regulatory processes that were conducted in parallel with the FEIS process are considered:

1. The Forest Service expects that required mitigation and monitoring will include compensatory mitigation requirements approved by the USACE as part of issuing an individual permit under Section 404 of the CWA. This mitigation will not be a term and condition of the Forest Service authorizations for use of NFS land, and therefore it appears only in appendix B.

2. A Programmatic Agreement (PA) was developed under Section 106 of the National Historic Preservation Act (NHPA) and in compliance with PL 113-291. All signatories, other than the Advisory Council on Historic Preservation (ACHP), had signed the PA as of January 15, 2021 (date of publication of the rescinded FEIS). On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR § 800.7(c)(4), the Secretary of Agriculture delivered a written response to the ACHP on April 17, 2025, and that response concluded the Section 106 process for this undertaking. Since ACHP did not sign the PA, it was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through other authorities. Changes in enforcement of the measures described in the draft PA are further described in appendix J of the FEIS and part 7.1 of this Draft ROD.

3. The Biological Opinion issued by the U.S. Department of the Interior Fish and Wildlife Service (FWS) after consultation under Section 7 of the Endangered Species Act (included as appendix P of the FEIS) contains a number of conservation measures. Many of these conservation measures are applicable to the pipeline and power line corridors that require authorization for use of NFS land. Those measures will be included as terms and conditions of the Forest Service authorizations for use of NFS land and therefore are included in this section. Other conservation

measures contained in the Biological Opinion not related to use of NFS land appear only in appendix B.

## 4.1    General

The special use and road use authorizations will contain general conditions of approval, to allow proper administration of uses of NFS lands. As authorized under 36 CFR § 251.56, these conditions are allowable for the following reasons:

- carry out the purpose of the applicable statutes and rules;

- minimize damage to scenic and esthetic values, and fish and wildlife habitat, and otherwise protect the environment;

- comply with applicable air and water quality standards under Federal or State law;

- comply with State standards for public health and safety, environmental protection, and siting, construction, operations, and maintenance;

- protect Federal property and economic interests;

- manage efficiently the lands subject to the use;

- protect other lawful users of the lands adjacent to or occupied by the use;

- protect lives and property;

- protect the interests of individuals living in the general area who rely on resources for subsistence;

- require siting to cause the least damage to the environment, taking into consideration feasibility; or

- otherwise protect the public interest.

## 4.2    Geology and Subsidence

In the GPO (Resolution Copper 2016a), Resolution Copper committed to various measures to reduce impacts from subsidence. Additional subsidence monitoring and mitigation measures by Resolution Copper are identified in a revised subsidence monitoring plan (Davies 2020) developed by Resolution Copper as part of the NEPA process. The monitoring and mitigation actions in the revised subsidence monitoring will reduce impacts from subsidence to Apache Leap, Queen Creek Canyon, or Devil's Canyon, including potential impacts to the pipeline and power line corridors on NFS land.

The Forest Service also has required several additional conditions for the subsidence monitoring, developed in response to comments received on the DEIS. These are described as mitigation measure "FS-GS-01:[7] New stipulations on subsidence monitoring plan" in appendix J of the FEIS.

The subsidence monitoring as proposed by Resolution Copper as an applicant-committed environmental protection measure, in addition to the additional stipulations required by the Forest Service as a mitigation measure, will be included as terms and conditions for authorizing use of NFS lands.

---

[7] The designations for each mitigation and monitoring measure, such as "FS-GS-01," are unique identifiers used in appendix J of the FEIS.

## 4.3   Soils, Vegetation, and Reclamation

In the GPO (Resolution Copper 2016b), Section 4.5, Water Resources, Resolution Copper outlined a variety of measures to reduce impacts on soils by uses on NFS lands:

- Road embankment slopes will be graded and stabilized with vegetation or rock as practicable to prevent erosion.

- During construction and operations, diversions will be constructed around the affected areas to minimize erosion. A number of best management practices, including check dams, dispersion terraces, and filter fences, also will be used during construction and operations.

- Off-road vehicle travel across Tonto National Forest will generally be avoided.

Resolution Copper also developed a noxious weed plan (Resolution Copper 2019) during the NEPA process to reduce impacts on vegetation by uses on NFS lands:

- Newly reclaimed areas on Tonto National Forest will be monitored for weeds and invasive plants for the first 5 years after reclamation. Infestations of invasive species would be treated as soon as they are identified, or as soon as weather conditions are appropriate for treatment.

- Additionally, elsewhere Resolution Copper stipulated that on NFS lands, seed mixes used in reclamation will be certified free of seeds listed on the Forest Service's noxious weed list and contain only species native to the project area. Seed mixes will be developed from a native species seed list approved by the Forest Service.

Additional conservation measures specific to Arizona hedgehog cactus were developed as part of consultation with the FWS and are included in the final Biological Opinion (see FEIS appendix P). These measures apply to uses on NFS lands, including pipeline construction and maintenance and power line construction and maintenance, which includes vegetation management for fire safety purposes. These conservation measures state the following:

- Prior to any ground-disturbing activities, suitable habitat within the project area will be surveyed for Arizona hedgehog cactus.

- Before construction begins within the Arizona hedgehog cactus known range, a biological monitor—a Forest Service–approved entity—will establish and clearly flag Arizona hedgehog cactus avoidance areas where individual cacti will be left in place based on preconstruction surveys.

- Prior to any ground-disturbing activities, a biological monitor will salvage Arizona hedgehog cacti that are inside the construction footprint in areas where ground disturbance will occur.

- Healthy salvaged Arizona hedgehog cacti that occur in areas that will be disturbed will be replanted outside the construction footprint but within the action area on Federal lands.

- Prior to relocation and salvage efforts, Resolution Copper will work with the FWS and the Forest Service to develop an Arizona hedgehog cactus relocation, salvage, and monitoring plan. The plan will provide criteria for determining which cacti are suitable for immediate relocation as well as measures to collect seed or to salvage healthy stems from individuals that otherwise cannot be salvaged.

- A mechanical mower for routine vegetation maintenance will not be used within Arizona hedgehog cactus occupied habitat.

- For vegetation maintenance and line maintenance work, vehicles will drive only on existing roads and utility access routes to access the right-of-way. Vehicles will not be driven off-road within the right-of-way.

- During vegetation management work, crews will check for Arizona hedgehog cactus under target plants prior to treatment. If crews find a cactus, they will implement appropriate conservation measures to avoid the cactus.

- During manual vegetation maintenance work, if an Arizona hedgehog cactus occurs underneath and is shaded by a shrub to be cut, the target shrub will be left untreated. In very rare circumstances, the nurse plant may be selectively trimmed in a manner to maintain the same shading protection for the Arizona hedgehog cactus. No more than 30 percent of the nurse plant may be trimmed.

The project reclamation and closure plan (Tetra Tech Inc. 2020) and the tailings storage facility reclamation and closure plan (KCB Consultants Ltd. 2020) expand on environmental protection measures that would be part of reclamation of project facilities, including those on NFS lands. The Forest Service has required implementation of these reclamation and closure plans in mitigation measure "FS-SV-03: Revised reclamation and closure plans" in appendix J of the FEIS.

The Forest Service also is requiring that resource salvage take place, including for the pipeline and power line corridors on NFS lands. This is detailed in mitigation measure "FS-SV-01: Resource salvage" in appendix J of the FEIS.

The activities proposed by Resolution Copper as applicant-committed environmental protection measures, including those developed during Section 7 consultation, as well as the Forest Service mitigation requirements to allow resource salvage and implement reclamation plans, will be included as terms and conditions for authorizing use of NFS lands.

## 4.4    Transportation and Access

The GPO (Resolution Copper 2016b) outlines applicant-committed environmental protection measures by Resolution Copper in Appendix K, Road Use Plan. This plan was subsequently updated (Resolution Copper 2020b) to include measures developed during the NEPA process. The Forest Service has required implementation of these new measures, as detailed in "FS-TA-01: New mitigation aspects of revised road use plan" in appendix J of the FEIS. The following applicant-committed measures are related to transportation and access, including use of NFS roads:

- Public access to the lands in the vicinity of the East Plant Site will be maintained via State Route 177 and NFS Road 315 as well as U.S. Route 60 and NFS Road 469 (until access is no longer possible).

- A number of best management practices for road construction and maintenance were identified in the GPO:
  - To the extent practicable, vegetation will not be removed except from those areas to be directly affected by road reconstruction activities.
  - Cut-and-fill slopes for road reconstruction will be designed to prevent soil erosion.
  - Drainage ditches with cross drains will be constructed where necessary. Disturbed slopes will be revegetated, mulched, or otherwise stabilized to minimize erosion as soon as practicable following construction.
  - Road embankment slopes will be graded and stabilized with vegetation approved by the Forest Service or rock as practicable to prevent erosion.

- o Runoff from roads will be handled through best management practices, including sediment traps, settling ponds, berms, sediment filter fabric, wattles, etc. Design of these features will be based on an analysis of local hydrologic conditions.
- o Off-road vehicle travel will generally be avoided.
- o During construction and operations, diversions will be constructed around affected areas to minimize erosion. A number of best management practices, including check dams, dispersion terraces, and filter fences, also will be used during construction and operations.

The activities proposed by Resolution Copper as applicant-committed environmental protection measures will be included as terms and conditions for authorizing use of NFS lands.

## 4.5   Air Quality

In the GPO (Resolution Copper 2016b), Resolution Copper has committed to a variety of measures to reduce potential impacts on air quality, including measures involving NFS roads:

- Dust control on roads, including regular watering, road base maintenance and dust suppression, and setting reasonable speed limits on access roads within the operational footprint.

The activities proposed by Resolution Copper as applicant-committed environmental protection measures will be included as terms and conditions for authorizing use of NFS lands.

## 4.6   Water Resources

In the GPO (Resolution Copper 2016b), Resolution Copper has committed to various measures to reduce impacts on surface water quantity or quality, including by uses on NFS lands:

- To the extent practicable, stormwater flows upgradient of the facilities will be diverted around the disturbed areas and returned to the natural drainage system.

- Runoff from roads, buildings, and other structures will be handled through best management practices, including sediment traps, settling ponds, berms, sediment filter fabric, wattles, etc.

The Forest Service also is requiring monitoring and mitigation for GDEs that occur on NFS lands. This is described in mitigation measure "FS-WR-01: GDEs and water well mitigation" in appendix J of the FEIS. The "Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells" (Montgomery and Associates Inc. 2020a) developed by Resolution Copper during the NEPA process outlines a monitoring plan to assess potential impacts on each GDE, identifies triggers and associated actions to be taken by Resolution Copper to ensure that GDEs are preserved, and identifies mitigation measures for each GDE if it is impacted by future mine dewatering. The stated goal of the plan is "to ensure that groundwater supported flow that is lost due to mining activity is replaced and continues to be available to the ecosystem."

The Forest Service also is requiring mitigation for surface water losses that occur on NFS lands. This is described in mitigation measure "FS-WR-04: Replacement of water in Queen Creek" in appendix J of the FEIS. This measure requires that water be discharged to Queen Creek to offset losses in average annual runoff caused by the capture of precipitation within the subsidence area.

The activities proposed by Resolution Copper as applicant-committed environmental protection measures, as well as the Forest Service mitigation requirements to mitigate impacts to GDEs and Queen Creek, will be included as terms and conditions for authorizing use of NFS lands.

## 4.7    Wildlife

In the GPO (Resolution Copper 2016b) and in the Biological Opinion (included as appendix P of the FEIS), Resolution Copper has committed to a variety of measures to reduce potential impacts on wildlife, including by uses on NFS lands:

- Designing lines and structures in accordance with "Reducing Avian Collision with Power Lines" (Avian Power Line Interaction Committee 2012), in order to minimize the potential risk for bird collisions with transmission lines. Line marking devices, i.e., flight diverters, will be placed at the proposed crossings of Queen Creek, Devil's Canyon, and Mineral Creek, especially in areas where there is suitable habitat for the yellow-billed cuckoo.

- Managing noxious and invasive weeds. Resolution Copper prepared a "Noxious Weed and Invasive Species Management Plan on National Forest System Lands" (Resolution Copper 2019). Resolution Copper will also prepare reports 2 years after construction begins and every 5 years during operations. These reports will update the Tonto National Forest and FWS on surveys, control, and activities related to noxious and invasive weed management.

- Conducting preconstruction surveys for Sonoran desert tortoise and Gila monster before surface ground-disturbing activities start. A biological monitor will monitor for Sonoran desert tortoise and Gila monster during construction activities. The monitor will flag Sonoran desert tortoise and Gila monster shelter sites/burrows. These flagged areas will be inspected, and any Gila monsters or tortoises discovered will be relocated outside project activity areas.

- Informing project crews of the potential to encounter Sonoran desert tortoise and Gila monster within the surface project area. Work crews will be instructed to check below equipment prior to moving and to cover and/or backfill holes that can potentially entrap these species. If these species are observed, work crews will stop work until the biological monitor has relocated these species out of harm's way.

- Establishing tortoise crossings, as needed and applicable within areas containing suitable habitat.

- Ensuring that all ground-disturbing activity associated with the tailings pipeline and power line work near Mineral Creek and Gila chub designated critical habitat occurs outside the ordinary high-water mark and designated critical habitat.

- Using trenchless/non-surface impact methods (such as horizontal drilling or micro-tunneling) in areas where project facilities intersect Mineral Creek, to avoid surface disturbance within the ordinary high-water mark and designated critical habitat.

- Clearly defining the perimeter of the construction footprint with flagging or other appropriate markers to restrict heavy equipment use and other surface-disturbing activities to areas within the construction footprint. The biological monitor will be present at all times during construction and will help ensure that construction activities and equipment remain within designated limits and outside the ordinary high-water mark and designated critical habitat.

- Developing a stormwater pollution prevention plan to reduce potential project-related increases in sedimentation to Mineral Creek.

- Ensuring that a qualified biological monitor is present in work areas that contain suitable habitat for the southwestern willow flycatcher and yellow-billed cuckoo along Mineral Creek during all surface-disturbing activities between May and September each year.

- Conducting annual yellow-billed cuckoo surveys in Devil's Canyon and Mineral Creek immediately upstream and downstream of disturbance areas and crossings. Annual surveys will

begin 2 years prior to surface-disturbing activities. Surveys will continue until pipeline construction has been completed, including reclamation of temporary construction disturbance.

- Avoiding vegetation clearing and ground-disturbing activities associated with pipeline construction, as well as reclamation and closure activities, within 500 feet of the ordinary high-water mark of Mineral Creek in areas where surveys have detected the presence of yellow-billed cuckoo, from May 1 through September 30 each year, to remain outside the breeding season for yellow-billed cuckoo and to prevent direct effects on the species (injuries or fatalities to adults, eggs, or young).

- Avoiding when possible large trees (greater than 12 inches in diameter), including Fremont cottonwood and willow species, as well as dense stands of vegetation.

- Cutting riparian trees to ground level when they are removed. When possible, root masses will be left intact to help stabilize soils and provide opportunities for regrowth through adventitious shoots (e.g., in the case of willows).

- Conducting yellow-billed cuckoo surveys every 5 years during mine operations in Devil's Canyon and Mineral Creek in potentially suitable habitats immediately upstream and downstream of project areas (crossings) to monitor cuckoo presence in the area and prevent/minimize direct effects on cuckoos.

- Avoiding large-scale, major noise-producing activities within 500 feet of the ordinary high-water mark of Mineral Creek in areas where surveys show the presence of possible, probable, or confirmed breeding of yellow-billed cuckoos, to the extent possible (e.g., maintenance activities associated with pipeline replacement and cleaning that may affect cuckoo habitat during the breeding season (May 1 to September 30, annually)).

Resolution Copper included a wildlife management plan as an appendix to its original GPO. After publication of the DEIS, Resolution Copper consulted with the AGFD in response to comments submitted by AGFD on the DEIS. The revised wildlife management plan (Resolution Copper 2020c) includes a number of these new measures. The Forest Service is requiring that the revised plan be implemented. This is detailed in mitigation measure "FS-WI-01: Revised wildlife management plan" in appendix J of the FEIS.

Resolution Copper also committed to the following:

- implementing conservation actions for reptiles and Sonoran desert tortoise, as detailed in measure "FS-WI-02: Reptile and Sonoran desert tortoise (ESA-CCA) plan" in appendix J of the FEIS;

- mitigating loss of habitat for bats, as detailed in measure "FS-WI-03: Mitigation of loss of abandoned mine or cave habitat for bats" in appendix J of the FEIS; and

- maintaining or replacing access to wildlife waters, as detailed in measure "FS-WI-04: Maintain or replace access to stock tanks and Arizona Game and Fish Department wildlife waters" in appendix J of the FEIS.

The Forest Service is requiring that these three measures be implemented.

The activities proposed by Resolution Copper as applicant-committed environmental protection measures, as well as the Forest Service mitigation requirements to implement the revised wildlife plan, implement reptile and Sonoran desert tortoise conservation measures, mitigate bat habitat, and maintain access to wildlife waters, will be included as terms and conditions for authorizing use of NFS lands.

## 4.8    Recreation

Applicant-committed environmental protection measures by Resolution Copper include the following to protect recreation resources from uses of NFS lands:

- To prevent exposure of the public to geological hazards, Resolution Copper will use fencing, berms, locking gates, signage, natural barriers/steep terrain (25 to 30 percent or greater), and site security measures to limit access roads and other locations near areas of heavy recreational use.

The Tonto National Forest has developed a recommended multi-use trail plan to mitigate recreational impacts. The recommendations include 9.3 miles of motorized trail and 11.5 miles of non-motorized trail that will be located on and managed by Tonto National Forest. Resolution Copper has committed to funding the construction and maintenance of the new multi-use trail network on the Tonto National Forest, with the further intent that investment funding can be supported by additional grants and funds from recreational groups and other organizations to further expand recreational opportunities. The Forest Service is requiring that the multi-use trail plan be implemented, as detailed in "FS-RC-03: Mitigation for adverse impacts to recreational trails (Tonto National Forest multi-use trail plan)" in appendix J of the FEIS.

PL 113-291 also requires Resolution Copper to ensure access to the Oak Flat campground to members of the public and Tribes as long as safety allows, as detailed in "FS-RC-02: Access to Oak Flat campground" in appendix J of the FEIS.

The activities proposed by Resolution Copper as applicant-committed environmental protection measures, as well as the Forest Service mitigation requirements to implement the multi-use trail plan and access to Oak Flat campground, will be included as terms and conditions for authorizing use of NFS lands.

## 4.9    Public Health and Safety

### 4.9.1    Tailings and Pipeline Safety

Applicant-committed environmental protection measures for tailings and pipeline safety include those outlined in the tailings design documents (Klohn Crippen Berger Ltd. 2018), a pipeline protection and integrity plan specific to the Skunk Camp location (Golder Associates Inc. 2020), and the GPO (Resolution Copper 2016b). The Forest Service is requiring that the pipeline integrity plan be implemented, as detailed in measure "FS-PH-03: Skunk Camp pipeline protection and integrity plan" in appendix J of the FEIS. As part of preparing these plans, Resolution Copper completed a failure modes analysis for the tailings pipelines. The analysis informed the following design measures for the tailings pipelines, which enhance the safety of the pipelines on NFS lands:

- Install pipe bridges for concentrate pipeline over Queen Creek outside the ordinary high-water mark of that drainage.

- Where the tailings pipeline crosses Devil's Canyon and Mineral Creek, the pipeline corridor will pass overhead or beneath the streams, with no disturbance to riparian habitat or waters within the ordinary high-water mark.

- Fabricate and test all tailings pipelines in accordance with the requirements of American Society of Mechanical Engineers (ASME) standards or equivalent for quality assurance and quality control purposes. A quality assurance/quality control system will be in place during construction (required by code and standards). A post-construction hydrostatic test will be conducted to prove the integrity of the newly installed pipeline.

- Locate pressure indicators on non-buried pipelines intermittently along water and tailings pipelines. Flow indicators will be placed near the tailings pumps and at the end of the line. A leak detection system will connect via fiber-optic cable to the control room at the West Plant Site and the control room at the tailings facility if a separate facility exists.

- Bury pipelines where feasible, given the geological setting, and buried pipelines will be appropriately wrapped. Field assessments will confirm the characterization of the pipeline route, including site-specific geophysical survey to approximate the extent of any suspected subsurface voids, and routing adjustments within the approved corridor will avoid unstable slopes or areas.

- Install sacrificial anodes at determined intervals on select sections of tailings pipelines to mitigate corrosion of pipeline sections. Installation of sacrificial anodes will follow appropriate best practices for proper placement in order to minimize the potential for migration of metals resulting from dissolved or decayed metallic anodes.

- Locate shut-off valves at booster pump stations.

- Tailings pipelines will be sleeved under major crossings. Expansion loops will be incorporated along the pipeline corridor.

- Maintain a minimum of 3.3 feet of horizontal and vertical separation between pipelines and existing utilities or infrastructure.

- The tailings pipeline will likely be carbon steel and pressurized.

- Contain aboveground tailings pipelines in a secondary containment ditch where possible and paint them with an epoxy coating to prevent degradation.

In addition, a number of operational or management control measures for pipelines have been identified:

- A tailings pipeline operations manual will be developed to summarize inspection and maintenance protocols (Operations, Maintenance, and Surveillance manual).

- Resolution Copper will have equipment available and/or contractors readily available on-site for pipeline repair. The pipeline access road will provide access to the full length of the line.

- There will be regular periodic patrols along the pipelines to look for leaks; containment spills, sediment build-up, and breaches; drainage sediment build-up, blockages, and wash-outs; access road erosion and damage; pipe bridges and over/underpass damage; landslides; third-party interference; and other potential hazards.

- The Operations, Maintenance, and Surveillance manual will be followed for immediately investigating, reporting, and implementing a response plan for suspected leaks from the tailings pipeline. Aberrations in flow rate, pump operation, and pressures will trigger investigations and emergency response if needed, as well as coordination with any agencies with surface management responsibility, such as the Forest Service.

- A tailings pipeline spill prevention and response plan (pipeline management plan) will be prepared as part of the comprehensive pipeline integrity program. The program will include maintenance of records, regular review of leak monitor data, regular corridor inspections, regular internal inspections using "smart-pigs," development of spill response plans, and having pre-positioned equipment and teams trained to respond to spills.

### 4.9.2   Fire Safety

In appendix M of the GPO (Resolution Copper 2016b), Resolution Copper has committed to various measures to reduce impacts on fuels and fire management:

- Any vegetation cleared from the site will be temporarily stored on-site at a location with minimal fire risk, well within a cleared area away from ignition sources. Handheld and large equipment (e.g., saws, tractors) used for vegetation clearing will be equipped with working spark arresters. Resolution Copper will take additional precautions if work is to be conducted during the critical dry season, which may include larger amounts of extinguishing agents, shovels, and possibly a fire watch.

- Parking will be prohibited on vegetated areas and proper disposal of smoking materials will be required. All surface mine vehicles will be equipped with, at a minimum, fire extinguishers and first aid kits.

- Resolution Copper will establish an emergency service or maintain contracts and agreements with outside emergency response contractors for emergency response support services to surface facilities on a 24/7 on-call basis. Fire emergency and response procedures specific to underground operations will be prepared and implemented.

### 4.9.3  Hazardous Materials

Applicable emergency response protection plans include the following:

- Spill Prevention Control and Countermeasures Plan (appendix O of the GPO)

- Emergency Response and Contingency Plan (appendix L of the GPO)

- Stormwater Pollution Prevention Plan (appendix W of the GPO)

- Fire Prevention and Response Plan (appendix M of the GPO)

- Environmental Materials Management Plan (appendix V of the GPO)

- Explosives Management Plan (appendix P of the GPO)

- Hydrocarbon Management Plan (appendix U of the GPO)

The activities related to pipeline safety, fire safety, and hazardous materials proposed by Resolution Copper as applicant-committed environmental protection measures, as well as the Forest Service mitigation requirements to implement the tailings pipeline protection and integrity plan, will be included as terms and conditions for authorizing use of NFS lands.

## 4.10  Scenic Resources

Applicant-committed environmental protection measures by Resolution Copper with respect to impacts to scenic resources from use of NFS lands include the following:

- Use non-reflective earth-tone paints on buildings and structures to the extent practicable.

- Build rust colored towers or use wooden poles on transmission lines.

- Bury tailings and other pipelines to the extent practicable.

- Use a reclamation seed mix of weed-free native species consistent with surrounding vegetation.

- Use colors that blend in with the desert environment.

Resolution Copper also has committed to minimizing visual impacts from transmission lines by using best management practices or other guidelines on NFS lands, as detailed in measure "FS-SR-01: Minimize visual impacts from transmission lines" in appendix J of the FEIS.

The activities proposed by Resolution Copper as applicant-committed environmental protection measures, as well as the Forest Service mitigation requirement to implement visual impact mitigations, will be included as terms and conditions for authorizing use of NFS lands.

## 4.11  Cultural Resources

A number of measures related to cultural resources were developed as part of the Programmatic Agreement (PA) and are described in more detail in part 7.1 of this Draft ROD, "Tribal Consultation and Coordination (Executive Order 13175) and Consultation with Tribes on Indian Sacred Sites (Executive Order 13007)." As noted in the introduction to part 4 of this document, since that ACHP terminated consultation and did not sign the PA, the PA was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through other authorities. Changes in enforcement of the measures described in the draft PA are further described in appendix J. All measures identified in the PA are still intended to be implemented; however, of the 12 measures originally required, only nine remain under Forest Service authority to require. The remaining three measures have been redesignated as "Resolution committed" measures. While Resolution Copper has committed to these measures in contractual, financial, or other agreements with non-Forest entities, the Tonto National Forest cannot ensure the implementation of these measures, and they cannot be included as conditions of the special use permits. See section 7.1.2 below for identification and description of these measures.

# PART 5 PUBLIC INVOLVEMENT AND ISSUES

## 5.1 Public Involvement Process

The public had multiple opportunities to provide input and comment on the Resolution Copper Project and the NEPA process undertaken by the Forest Service.

### 5.1.1 Scoping

The purpose of the scoping process is to obtain input from agencies and members of the public on the extent of the proposed project, the range of alternatives, and the content of the issue analysis in the EIS. The scoping process is described fully in section 1.6.1 of the FEIS.

The public scoping period commenced on March 18, 2016, with the Forest Service publication of the notice of intent to prepare an EIS in the Federal Register. The Forest Service planned for a 60-day public scoping period from March 18, 2016, to May 17, 2016. Numerous individuals and several organizations requested an extension of the public scoping period, as well as additional public scoping meetings. The Tonto National Forest Supervisor accommodated these requests by extending the public scoping period through July 18, 2016, resulting in a total overall scoping period of 120 days.

Tonto National Forest staff held five scoping meetings in the project area that provided the public with an opportunity to ask questions, learn about the proposed project, and provide comments on issues and concerns that should be addressed in the EIS and alternatives that should be evaluated. Internal scoping efforts included several meetings and field trips with the NEPA interdisciplinary team, cooperating agencies, and Tribes.

In total, 133,653 submittals were collected during public scoping. Scoping comments were analyzed and categorized and resulted in the identification of 13 issues, divided into 28 sub-issues, to be evaluated during the NEPA process. These issues are as follows:

- Tribal values and concerns
- Socioeconomics
- Cultural resources
- Public health and safety, including tailings and pipeline safety, wildfires, and hazardous materials
- Water resources, including groundwater drawdown from mine dewatering; potential impacts to springs, streams, and other GDEs; potential impacts to water supplies and wells; potential impacts to groundwater and surface water quality; and potential impacts to surface water runoff amounts
- Biological resources, including threatened, endangered, and other special-status species
- Air quality
- Long-term land suitability
- Recreation
- Scenic resources, including dark sky impacts
- Transportation and access
- Noise and vibration
- Land ownership and boundary management

### 5.1.2  Project Update and Alternatives Development Workshop

As part of the NEPA process, the Forest Service is required to investigate alternatives to various aspects of the proposed action. During the alternatives development process, in March 2017, the Forest Service hosted two in-person public workshops and one online workshop to (1) update the public on the status of the EIS process, (2) describe the alternatives development process, and (3) solicit input on the criteria being used to evaluate alternative tailings storage facility locations. The public responses showed that the tailings storage location was their primary concern, with protection of streams and springs having the highest concern. The Forest Service used the information gathered to inform the evaluation and comparison of alternative tailings storage facility locations during the alternative development process.

### 5.1.3  Public Comments on the Draft Environmental Impact Statement

The DEIS public comment period disclosed analyses and anticipated impacts from the proposed project and alternatives considered. The August 9, 2019, publication of the notice of availability for the DEIS in the Federal Register initiated the comment period. In addition to the Federal Register notice, the Forest Service used other outreach and means of notification, including more than 15,200 postal mailings and more than 23,000 emails to the project mailing list, social media posts, news releases, website announcements, 16 newspaper notices (in English and Spanish), and posters physically displayed at 37 various local bulletin boards and areas in the project vicinity. The Forest Service held six public meetings in local communities in the vicinity of the project during the 90-day public comment period, which ended on November 7, 2019.

The locations of these meetings were chosen because they mirrored locations used during the scoping period. Meetings were held mid-week during the evening hours in Superior, San Tan Valley, Kearny, Globe, Queen Valley, and Tempe, Arizona. The Forest Service added the Tempe meeting as a result of public requests for a meeting closer to central Phoenix. The Forest Service conducted a seventh meeting with the San Carlos Apache Tribe during a special Tribal Council meeting on November 22, 2019. This occurred within an extended 135-day comment period for Tribes, which ended on December 22, 2019.

Tonto National Forest received, analyzed, and responded to over 29,000 submittals on the DEIS. Comments were reviewed and categorized based on topic. Over 5,200 individual comments extracted from the submittals were assessed. Responses to these comments are included in appendix R of the FEIS, and the FEIS was revised based on comments received.

## 5.2   Consultation with Other Agencies

Forest Service NEPA regulations require identification of lead, joint lead, or cooperating agencies (36 CFR § 220.5(b)(3)). A cooperating agency is any Federal agency (other than the lead agency) and any State or local agency or Indian Tribe with jurisdictional authority or special expertise with respect to any environmental impact involved in a proposal. Nine cooperating agencies with jurisdictional authority and/or applicable special expertise cooperated in the development of this EIS. These are as follows:

- Arizona Department of Environmental Quality

- Arizona Department of Water Resources

- Arizona Game and Fish Department

- Arizona State Land Department

- Arizona State Mine Inspector

- Bureau of Land Management

- Pinal County Air Quality Control District
- U.S. Army Corps of Engineers
- U.S. Environmental Protection Agency

Arizona State Parks (Arizona State Historic Preservation Office (SHPO)) declined status as a cooperating agency; however, the agency has a consulting role under Section 106 of the NHPA.

The cooperating agencies assisted with EIS preparation in a number of ways, including providing research and baseline data information, reviewing scientific reports, identifying issues, assisting with the formulation of alternatives, and reviewing preliminary DEIS content and other EIS materials. Of particular importance was the participation of cooperating agencies in the Groundwater Modeling Workgroup and Water Resources Workgroup, both before and after the publication of the DEIS. In these workgroups, cooperating agencies assisted the Tonto National Forest by providing their professional viewpoints on a wide variety of water-related topics, including groundwater modeling, mitigation and monitoring, and water quality impacts.

Government-to-government tribal consultation is described in detail in part 7.1 of the Draft ROD.

## 5.3    Summary of Public Comment on Draft Environmental Impact Statement

Comments are summarized in appendix R of the FEIS, along with the responses to those comments. The Tonto National Forest received public comments on the DEIS on virtually every issue raised during scoping. Of the 5,209 individual comments coded, 51 percent generally expressed opposition or support for the project but contained no specific written comments. From the remaining comments, several issues stood out as receiving the most comments, and in general, the most complex and detailed comments.

### 5.3.1  NEPA, Regulatory, or Procedural Comments

These comments generally focused on whether the DEIS is sufficient with respect to the requirements of NEPA, focused on whether the comment periods provided by the Forest Service were adequate, or expressed concerns over the land exchange and the appraisal process. These comments represented roughly 10 percent of the individual comments that were coded.

### 5.3.2  Water-Related Comments

These comments focused largely on the scarcity of water in Arizona and the appropriateness of the project's water use in the face of future meteorological trends, Colorado River shortages, and drought. Many comments questioned whether the project's water use was accurately portrayed in the DEIS. These comments also included several detailed expert reports commenting on the groundwater modeling and water quality analyses in the DEIS. These comments represented roughly 9 percent of the individual comments that were coded.

### 5.3.3  Mitigation-Related Comments

One primary goal of the Tonto National Forest in publishing the DEIS was to identify mitigation suggestions for the impacts disclosed for the project, so that these mitigation concepts could be explored and potentially incorporated into the FEIS. The process the Tonto National Forest undertook to explore these mitigation concepts is described in section 2.3.1.2 of the FEIS, and the final outcomes (required or

voluntary measures) are described in appendix J of the FEIS. These comments represented roughly 7 percent of the individual comments that were coded.

### 5.3.4  Other Issues

Other issues with relatively high numbers of comments include alternatives-related comments (5 percent), Tribal values (3 percent), and socioeconomics (3 percent). Many comments were received directly from Tribal members about the sacredness and importance of Oak Flat to them, their lives, their culture, and their children. Many expressed their sadness and anger that their sacred place would be destroyed and that they would lose access to their oak groves and ceremonial grounds.

Based on these comments, it was determined that the DEIS discussion of Tribal impacts (section 3.14) failed to capture the true magnitude and nature of the impacts, as being shared with the Tonto National Forest during scoping comments, DEIS comments, and Tribal consultation. In response, the Tonto National Forest added information on the history of Oak Flat and its significance to the Tribes; expanded the plant resources list with information gathered by the Tribal Monitors; included Tribal Monitor survey results conducted since the DEIS for special interest areas; and disclosed information from the ethnographic report while respecting the sensitive nature of that data. More importantly, in order to demonstrate in their own words the Tribal members' heartbreak and pain caused by this project, the Tonto National Forest also included excerpts from the congressional testimony of Wendsler Nosie Sr., Chairman Terry Rambler, and Naelyn Pike, as well as personal perspectives and comments from Tribal members collected during the DEIS comment period.

# PART 6 ALTERNATIVES CONSIDERED

## 6.1 Alternatives Considered in Detail in the Final Environmental Impact Statement

NEPA requires consideration of a range of reasonable alternatives that can accomplish the purpose of and need for the proposed action. The Forest Service evaluated a range of alternatives to the Resolution Copper GPO, each of which does the following:

- responds to key issues raised during public scoping; project purpose and need; and applicable Federal and State laws and regulations;

- considers input from resource specialists, mining experts (project team), cooperating agency representatives, Tribes, and stakeholders; and

- is technically feasible to implement—but with differing environmental impacts and tradeoffs.

The proposed action and alternatives, including the preferred alternative (Alternative 6 – Skunk Camp), are described in detail in chapter 2 of the FEIS. The alternatives include the no action alternative and five action alternatives (out of more than 30 considered) at four separate locations, including one location not on Federal land.

Given that the location of the mine must remain where the ore body is, and the processing facilities are located on previously disturbed private land, much of the alternatives development process focused on the tailings storage facilities. One consistent public concern raised during scoping was the location of the tailings storage facility proposed in the Resolution Copper GPO. Concerns identified with the original location (known as the Near West site) included impacts to recreational use; impacts to the viewshed from the town of Superior and surrounding lands; and safety, air quality, and water quality concerns because of the proximity to Queen Valley. Scoping meetings and Tribal consultation also made clear that this location was in close proximity to a number of sites of cultural importance to Tribes. In addition to the *Chí'chil Biłdagoteel* Historic District (Oak Flat), a tailings storage facility at the Near West location would impact Apache Leap and the Apache Leap Special Management Area, the Superstition Mountains, and Picketpost Mountain. As a result of these impacts, the alternatives development process considered locations for tailings storage facilities away from the Superior area, even though these would require pumping of tailings over longer distances. Ultimately, this led to the tailings locations for Alternatives 5 and 6. Alternative 6 – Skunk Camp is identified as the preferred alternative in the FEIS, in part because it is relatively remote and not in proximity to the culturally important features identified around Superior.

Ore extraction and processing activities as proposed in the GPO remain similar between all action alternatives, but the environmental impacts and tradeoffs among the five action alternatives vary due to the differences summarized below:

- Tailings embankment design. Alternatives 2 and 3 would use a modified-centerline embankment, Alternative 4 (as dry-stack tailings) would not require an embankment, and Alternatives 5 and 6 would use centerline embankments, with downstream embankments for the separate PAG tailings cells. In addition, Alternative 6 – Skunk Camp is constructed as a single-face, cross-valley embankment, compared with Alternatives 2, 3, and 5, which all would be free-standing (not tied into bedrock) with multiple faces.

- Tailings deposition method. All of the alternatives would transport the tailings to the tailings storage facility in pipelines as a slurry. The alternatives then differ on the treatment of the tailings prior to deposition. Alternatives 2, 5, and 6 would all use thickened slurry tailings (50 to 70 percent solids). Alternative 3 would use ultrathickened tailings with even less water content

(70 percent solids). Alternative 4 would use filtered tailings (over 85 percent solids), which are no longer considered a slurry, but instead are handled and stacked as solids using conveyors and mechanical equipment.

- Geographic location and affected surroundings of the proposed tailings storage facility. Tailings for Alternatives 2 and 3 are placed at the location proposed by Resolution Copper in the GPO, on Tonto National Forest lands, west of the town of Superior. This area has high recreation use and high visibility. The proximity to Queen Creek also makes control of seepage from the tailings storage facility difficult to control. Alternative 4 (a dry-stack facility) is located on Tonto National Forest lands adjacent to the West Plant Site. This area is also highly visible, the terrain is steep and challenging, and control of seepage is also a concern. Alternative 5 is located on BLM-managed and Arizona State Trust lands east of the town of Florence, almost 30 miles from the mine. This area is more remote than the other locations, but still in relatively close proximity to the town of Florence and a highly used recreation area. Seepage losses are greater at this location because the foundation is porous alluvial material, but the distance downstream to the Gila River is great enough that there is adequate opportunity to capture and control seepage. Alternative 6 – Skunk Camp (the preferred alternative) is the most remote location, roughly adjacent to the Ray Mine, in Dripping Spring Wash, on private and Arizona State Trust lands. Alternative 6 – Skunk Camp offers the best ability to control seepage and protect water quality, has the least visibility, and is located in an area with relatively little recreation use.

## 6.2  Environmentally Preferred Alternative

Forest Service NEPA regulations define the "environmentally preferable alternative" (36 CFR 220.3), but there is no requirement that the environmentally preferable alternative be selected. The environmentally preferable alternative is the alternative that will promote the national environmental policy, as expressed in NEPA Section 101, and that will cause the least damage to the biological and physical environment and best protect, preserve, and enhance historic, cultural, and natural resources. As described in part 3 of the Draft ROD, of the action alternatives the Alternative 6 – Skunk Camp tailings storage location results in reduced impacts with respect to water quality, water resources, public safety, recreation and scenic values, and Tribal values.

The no action alternative analyzed in the FEIS would have the least environmental impact of all the analyzed alternatives and is the environmentally preferred alternative. Under the no action alternative, the proposed Resolution Copper Project would not be approved for mining or any associated development. This would eliminate the risk of local environmental impacts from mining, including preventing a subsidence area, eliminating the water use required for the mine, and eliminating the need for a tailings storage facility.

The no action alternative cannot be selected in this Draft ROD because the land exchange was mandated by Congress, and the Forest Service does not regulate mining operations on private land. The FEIS necessarily analyzed the possibility that the land exchange would not occur, and under this scenario the Forest Service would regulate mining operations in the area to be mined on Oak Flat. The land exchange is not discretionary since it was mandated by Congress (16 U.S.C. § 539p). In accordance with the land exchange, Oak Flat will be private property; and as recognized by PL 113-291, the Forest Service does not regulate mining operations on private property.

## 6.3  Alternatives Eliminated from Detailed Analysis

The Forest Service analyzed other potential alternatives as well, seeking to minimize project impacts, but ultimately these alternatives were eliminated from detailed analysis. These are detailed in appendix F of the FEIS and included the following:

- Assessment of alternative mining techniques, other than the proposed block caving method. Using other underground techniques potentially had great benefits, potentially preventing a subsidence crater from developing and allowing for backfill of tailings underground. Ultimately, however, no alternative mining methods were considered reasonable.

- Assessment of placement of tailings in brownfield sites, particularly old mine pits in central and southern Arizona. No reasonable brownfield locations were found during this assessment.

- Assessment of over a dozen other locations for the tailings storage facility, including areas in the Superior Basin, in the East Salt River valley, south of the Gila River (where Alternative 5 is located), and east of the proposed mine (where Alternative 6 – Skunk Camp is located).

# PART 7 LEGALLY REQUIRED FINDINGS

My decision is specific to authorization of road use, power lines, and pipelines of the project. However, the following subparts demonstrate the legal, regulatory, and procedural compliance of the project in its entirety.[8]

## 7.1 Tribal Consultation and Coordination (Executive Order 13175) and Consultation with Tribes on Indian Sacred Sites (Executive Order 13007)

### 7.1.1 Tribal Consultation

Federal agencies are required to consult with American Indian Tribes as part of the ACHP regulations, Protection of Historic Properties (36 CFR § 800), implementing Section 106 of the NHPA. Accordingly, the NHPA outlines when Federal agencies must consult with Tribes and the issues and other factors this consultation must address. Pursuant to Executive Order 13175, executive departments and agencies are charged with engaging in regular and meaningful consultation and collaboration with Tribal officials in the development of Federal policies that have Tribal implications and are responsible for strengthening the government-to-government relationship between the United States and Indian Tribes.

Executive Order 13007 requires Federal agencies, to the extent practicable, to accommodate access to and use of sacred sites by Indian religious practitioners and to avoid adversely affecting the physical integrity of such sacred sites.

Additionally, PL 113-291 mandates that the Forest Service engage in government-to-government consultation with affected Indian Tribes concerning issues of concern related to the land exchange. Subsequent to this Tribal consultation, the Forest Service was mandated to consult with Resolution Copper and "seek to find mutually acceptable measures to address tribal concerns and minimize the adverse effects to affected Tribes resulting from mining and related activities on the Federal land conveyed to RCM" (PL 113-299). Surface disturbance will result in significant and irreversible impacts to *Chí'chil Bildagoteel* Historic District (Oak Flat), a traditional cultural place listed in the National Register of Historic Places.

The Tonto National Forest has been conducting Tribal consultation related to various Resolution Copper projects, the land exchange, and the Apache Leap Special Management Area environmental assessment. This consultation has included formal and informal meetings, correspondence, information sharing, site visits, and documentation of Tribal comments and concerns by the Forest Service. Opportunity for consultations is ongoing and will continue through the end of the project. A full list of consultation efforts is contained in appendix S of the FEIS. The following affected Tribes are involved in the consultation process:

- Fort McDowell Yavapai Nation
- Gila River Indian Community
- Hopi Tribe
- Mescalero Apache Tribe
- Pueblo of Zuni

---

[8] This list is not exhaustive. For a complete list of all applicable laws, regulations, and agency policies for this project, see chapters 1 and 3 of the FEIS, and the project record.

- Salt River Pima-Maricopa Indian Community
- San Carlos Apache Tribe
- Tonto Apache Tribe
- White Mountain Apache Tribe
- Yavapai-Apache Nation
- Yavapai-Prescott Indian Tribe

Additional Tribes were included in consultation with the introduction of the Peg Leg alternative location. These Tribes, included at the BLM's request, are as follows:

- Ak-Chin Indian Community
- Fort Sill Apache Tribe
- Pascua Yaqui Tribe
- Tohono O'odham Nation

One reason for the March 2021 withdrawal of the notice of availability and rescinding of the January 2021 FEIS was to allow the Forest Service to re-engage with consulting Tribes to fully understand their concerns. On September 20, 2021, the Forest Service notified Tribes that the Forest Service would reinitiate Tribal consultation. This was followed by a Tribal listening session on October 19, 2021, and subsequent consultation and staff meetings thereafter. The reinitiated Tribal consultation has informed the republished FEIS and this decision.

### 7.1.2  Development of Programmatic Agreement

As noted in part 7.6, throughout the process the Forest Service complied with Section 106 of the NHPA through the development of a PA in consultation with the SHPO, ACHP, USACE, BLM, Tribes, and other consulting parties. The final version of the PA circulated for signature was included as appendix O of the January 2021 Rescinded FEIS.

The PA outlined the roles and responsibilities of parties, the procedure for identification and evaluation of historic properties, assessment for effects, and each party's responsibilities for resolving adverse effects from the project. The execution of the agreement evidences the agency official's compliance with Section 106. The agency official then must ensure that the undertaking is carried out in accordance with the agreement.

All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)."

Since ACHP did not sign the PA, it was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the Final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J of the FEIS and are summarized below.

Section 3003 of PL 113-291 required Resolution Copper and the Forest Service to develop mutually acceptable measures to address Tribal concerns and minimize the adverse effects on affected Tribes. During government-to-government consultation, the affected Tribes provided the Forest Service with

numerous suggestions on ways to help minimize the adverse effects of the proposed project on areas and resources of Tribal interest. The mitigation measures that the Forest Service developed in response to Tribal input are contained in the former PA.

Several components of the former PA directly addressed the treatment of historic properties:

1. **Oak Flat Historic Properties Treatment Plan (HPTP):** The Forest Service has completed preparation of an archaeological HPTP for the Oak Flat Federal Parcel to resolve adverse effects on historic properties eligible for the National Register of Historic Places under Criterion D. The implementation of the Oak Flat HPTP will begin prior to the land transfer, but the work is not likely to be completed prior to the land transfer. However, the transfer will not disrupt the completion of the measures listed in the HPTP. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. See "FS-CR-01: Implementation of Oak Flat HPTP," in appendix J of the FEIS.

2. **GPO Research Design and Treatment Plans:** The Forest Service has prepared an archaeological research design (GPO Research Design) in consultation with the SHPO, Tribes, and appropriate managing agencies to guide the development of treatment plans to address adverse effects on historic properties within the other Resolution Copper GPO project areas, and the Section 404 permit compensatory mitigation parcels (i.e., West Plant Site, MARRCO corridor, tailings facility, etc.), depending on the final alternative that is selected. The Forest Service determined, in consultation with the signatories and consulting parties, that the multiple treatment plans approach, rather than a single GPO HPTP, is needed because the GPO covers several large areas, each with its own cultural background and topography. The individual treatment plans will be tiered to the GPO Research Design, and tailored to fit the mitigation needs of each GPO project area. The work identified in the treatment plans will be completed prior to the proposed ground-disturbing activities in the GPO project areas. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. See "FS-CR-02: GPO research design," in appendix J of the FEIS.

3. **Visual, Atmospheric, Auditory, Socioeconomic, and Cumulative Effects Mitigation Plan(s)**: Within 9 months of the issuance of the Final ROD, the Forest Service will prepare, in consultation with SHPO and the other consulting parties, a draft plan or plans outlining a process to mitigate visual, atmospheric, auditory, and cumulative effects (indirect or direct) identified within the visual/auditory/atmospheric/socioeconomic area of potential effects. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. Note that this measure has already been completed. See "FS-CR-03: Visual, atmospheric, auditory, socioeconomic, and cumulative effects mitigation plan" in appendix J of the FEIS.

4. **Archaeological Database Funds:** In recognition of the substantial loss of cultural resources and historic properties on State Trust lands, Resolution Copper will fund the creation and/or enhancement of existing electronic archaeological databases to assist the State of Arizona with management of these assets. The Forest Service no longer has the authority to require this measure. This measure has been changed to a Resolution Copper–committed measure that is enforceable through Letter Agreements dated January 12, 2021, and March 10, 2025, with the SHPO. See "RC-CR-07: Archaeological database funds" in appendix J of the FEIS.

Resolution Copper has committed to create three compensatory mitigation funds for five Tribal programs that will be available to the 11 consulting Tribes. The administration and management of the three funds will be the responsibility of a to-be-determined 501(c)(3) organization(s). The National Forest Foundation is a candidate for the administration of those programs and funds, which require coordination with the Forest Service, although the final selection is yet to be made. Funding for the programs is timed to

specific milestones/actions and will be memorialized in a separate agreement between the Forest Service and Resolution Copper. The five programs are as follows:

5. **The Emory Oak Collaborative Tribal Restoration Initiative**: Funds the implementation of the treatments for the Emory Oak Collaborative Tribal Restoration Initiative, a multi-year restorative fieldwork program for Emory oak groves located in the Tonto and Coconino National Forests. Developed through consultation with the Forest Service and Tribes, the program is designed to restore and protect Emory oak groves that are accessed by Apache communities for traditional subsistence gathering and ensure their sustainability for future generations. The program funds the long-term restorative treatment, maintenance, and monitoring for the Emory oak, and includes research, cultural activities, and educational activities. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. See "FS-CR-05: Emory Oak Collaborative Tribal Restoration Initiative" in appendix J of the FEIS.

6. **Tribal Monitor Program**: Funds the long-term continuation of the existing Tribal Monitor Program and administration, program development, training, and funding for Tribal Monitors working on NHPA Section 106 and 110 projects on public lands. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. See "FS-SO-02: Establish foundations for long-term funding, including the Tribal Monitor Program" in appendix J of the FEIS.

7. **Tribal Youth Program**: Funds the development of a Tribal Youth Program in partnership with the Forest Service and consulting Tribes to provide cultural and educational opportunities to Tribal Youth on NFS lands. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. See "FS-SO-02: Establish foundations for long-term funding, including the Tribal Monitor Program" in appendix J of the FEIS.

8. **Tribal Cultural Fund**: Funds to address unique and specific Tribal proposals brought forth by Tribes during government-to-government consultation. The fund will provide a mechanism to fulfill Tribal requests that do not fit under the other funding programs, such as direct funding to assist Tribal projects, programs, and infrastructure. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. See "FS-CR-06: Tribal Cultural Heritage Fund" in appendix J of the FEIS.

9. **Tribal Education Fund**: Funds scholarships for 2-year and 4-year programs of study for members of the consulting Tribes. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. See "FS-CR-08: Tribal Education Fund" in appendix J of the FEIS.

Several other non-financial measures were included in the former PA as well, to address the concerns of the affected Tribes and minimize the adverse effects from mining and related activities on the conveyed lands. These include the following:

10. **Resource Salvage**. The Forest Service is facilitating the salvage of resources (e.g., culturally important plants and mineral resources) to address the loss of access to traditional collection areas and a loss of access to the *Chí'chil Biłdagoteel* Historic District within the Oak Flat Federal Parcel (selected lands). To the extent practicable and in collaboration and partnership with Tribes, an inventory will be conducted to identify the natural resources within the Oak Flat Federal Parcel area, pipeline corridor, and tailings storage facility footprint. When the inventory is complete, the resources will be "salvaged" (collected) and the material gathered will be distributed amongst the Tribes for traditional and cultural use. This measure remains a Forest Service–required measure; however, this authority only exists for NFS lands. Other

implementation, including on Oak Flat, would remain a commitment in Resolution Copper Cultural Heritage Management Plan and co-management of heritage on private lands developed in consultation and coordination with consulting Tribes. See "FS-SV-01: Resource salvage" in appendix J of the FEIS.

11. **Access to Oak Flat:** Resolution Copper will provide access to the surface of the Oak Flat campground to members of the public and Tribes, to the maximum extent practicable and consistent with health and safety requirements, until the operation of the mine precludes public access for safety reasons. An Oak Flat campground and access management plan is complete and follows the current management practices of the Tonto National Forest for the site (Resolution Copper 2020a). The plan ensures access to Oak Flat campground to the public and Tribal members and provides stipulations for closing the campground to accommodate Tribal ceremonies and other activities. Resolution Copper will allow access to and use of the Oak Flat campground until such time as mining activities make further use unsafe. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. See "FS-RC-02: Access to Oak Flat campground" in appendix J of the FEIS.

### 7.1.3 American Indian Religious Freedom Act of 1978 and Religious Freedom Restoration Act of 1993

The American Indian Religious Freedom Act states that no Federal lands may be managed in a manner that undermines and frustrates a traditional Native American religion or religious practice, except management decisions for those lands where it is necessary to a compelling government interest. The law states, "In making such a management decision, the Federal agency shall attempt to accommodate the various competing interests and shall, to the greatest extent feasible, select the course of action that is least intrusive on traditional Native religions or religious practices."

The Religious Freedom Restoration Act states that the government shall not substantially burden a person's exercise of religion, with the following exception. A government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. The Act allows for judicial relief for a person whose religious exercise has been burdened in violation of this Act.

The Forest Service has a responsibility to ensure that decisions affecting NFS lands do not substantially burden the rights of Native Americans and others to practice their religion.

The exchange of lands with Resolution Copper is congressionally mandated and is not part of this Draft ROD. The decisions to authorize special uses on NFS land for the pipelines, power lines, and use of roads do not substantially burden the rights of Native Americans and others to practice their religion. Therefore, I find that the selected Federal action complies with the American Indian Religious Freedom Act and the Religious Freedom Restoration Act.

### 7.1.4 Summary of Compliance with Executive Orders 13175 and 13007, and with Section 3003 of PL 113-291

In addition to binding requirements for treatment of historic properties and for implementing measures to address impacts to resources of Tribal interest, the former PA also served to clearly acknowledge the continued Tribal opposition to the project. As articulated in the final version of the PA circulated for signature included with the January 2021 Rescinded FEIS (appendix O), representatives of the Hopi

Tribe, Mescalero Apache Tribe, Pueblo of Zuni, San Carlos Apache Tribe, Tonto Apache Tribe, and White Mountain Apache Tribe have crafted the following statement:

> The Tribes have had the opportunity to be active in the consultation, review, and comment processes of the project and it has been made clear to the Forest Service that no Tribe supports the desecration/destruction of ancestral places where ancestors have lived, as these are considered alive and sacred. It is a tribal cultural imperative that these places should not be disturbed for any reason. For tribal members, continued access to the land and all its resources is necessary for their culture and they have expressed that access should be accommodated for present and future generations. Tribal members have communicated that participation in the design of this destructive activity has caused considerable emotional stress and brings direct harm to the traditional way of life to Tribes; however, it is still deemed necessary to ensure ancestral homes and ancestors receive the most thoughtful and respectful treatment possible.

While the PA is no longer in effect, I acknowledge the opposition to the Resolution Copper Project by the consulted Tribes. Through the development of alternatives, I have sought to place the tailings storage facility away from sensitive cultural places, including Apache Leap, Picketpost Mountain, and the Superstition Mountains. Through consultation I have sought with Tribal input to identify and require mutually acceptable measures to address the concerns of the affected Tribes and minimize the adverse effects from mining and related activities on the conveyed lands. These measures are incorporated into and required by this decision.

I find that the selected Federal action complies with Executive Orders 13175 and 13007, and with Section 3003 of PL 113-291.

## 7.2    National Forest Management Act of 1976 and the Tonto National Forest Revised Forest Plan

The National Forest Management Act of 1976 requires that all development, maintenance, permits, contracts, and other instruments for the use and occupancy of NFS land be consistent with Forest Service land management plans.

A review of all components (over 600) of the 2023 forest plan was conducted to identify the need for amendment due to the effects of the project, including both the land exchange and the proposed mine plan of operations. The Tonto National Forest then analyzed the effects of any forest plan amendment in the FEIS.

As described in detail in part 2 of this document, I find that the selected Federal action requires a multi-component, project-specific amendment that includes nine guidelines and seven desired conditions of the 2023 forest plan.

The forest plan amendment is consistent with the National Forest Management Act and its implementing regulations at 36 CFR § 219 (known as the 2012 Planning Rule), focusing on "management of NFS lands so that they are ecologically sustainable and contribute to social and economic sustainability" 36 CFR § 219.1(c). Specific assessment of compliance with the 2012 Planning Rule is assessed in appendix T of the FEIS.

## 7.3    National Environmental Policy Act

The Resolution Copper Project has the potential to result in significant effects on the environment. Therefore, in accordance with the provisions of NEPA, this decision considers alternatives and mitigation developed to minimize degradation to the environment. In addition, Congress required in PL 113-291 that

the Tonto National Forest prepare a single EIS "which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities."

My conclusions are based on a review of the project record that shows a thorough review of relevant scientific information, a consideration of responsible opposing views, and the acknowledgement of incomplete or unavailable information, scientific uncertainty, and risk. Chapter 7 of the FEIS contains a list of published scientific documents referenced in preparation of the EIS. Specifically, with respect to water resources, including analysis of impacts from groundwater modeling and water quality, and subsidence-related impacts, the Forest Service undertook substantial multidisciplinary investigation. The Tonto National Forest formed multiple workgroups with qualified professionals from multiple agencies and interested parties to ensure that the full range of professional opinions was considered and disclosed.

The FEIS discloses potential project impacts and makes environmental information available to agency decision makers, other agencies, Tribes, and the public. Therefore, I find that the selected Federal action complies with the National Environmental Policy Act, as amended.

## 7.4    Organic Administration Act of 1897

The Organic Administration Act, as amended, authorizes the Forest Service to regulate use and occupancy on NFS lands. The Forest Service's special use regulations are promulgated at 36 CFR § 251, Subpart B (see part 2 above in this document). The selected Federal action includes feasible and practicable measures to minimize adverse environmental impacts to NFS surface resources (see FEIS appendix J and part 4 above in this document) to ensure compliance with applicable environmental laws and regulations. Therefore, I find that the selected Federal action complies with the 1897 Organic Administration Act, as amended.

## 7.5    Endangered Species Act

Under Section 7 of the Endangered Species Act, the Forest Service must consult with the FWS to ensure that its actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species" that the Secretary of the Interior determines to be critical (16 U.S.C. § 1536).

A Biological Assessment was prepared for the Resolution Copper Project to identify endangered or threatened species likely to be affected by this decision. The Biological Assessment states that implementation of this decision "may affect and is likely to adversely affect" endangered Arizona hedgehog cactus and "may affect but is not likely to adversely affect" Gila chub, Gila chub designated critical habitat, northern Mexican gartersnake, southwestern willow flycatcher, yellow-billed cuckoo, and yellow-billed cuckoo proposed critical habitat. The FWS issued a Biological Opinion in December 2020 containing concurrence with these effects determinations. Therefore, I find that the selected Federal action complies with the Endangered Species Act.

## 7.6    National Historic Preservation Act

Section 106 of the NHPA requires Federal agencies to identify historic properties, assess effects of their undertakings on historic properties, and afford the ACHP an opportunity to comment on such undertakings. The SHPO administers the national historic preservation program at the State level.

The Section 106 process seeks to accommodate historic preservation concerns with Federal undertakings through consultation among the agency officials and other parties with an interest in the effects of the undertaking on historic properties.

The Forest Service initiated consultation with the SHPO on March 31, 2017; with the ACHP on December 7, 2017; and with 11 Tribes on the prefeasibility exploration plan for the Resolution Copper Project via a letter dated June 6, 2008, for the land exchange via a letter dated August 4, 2015, and with four additional Tribes on December 3, 2018.

The Forest Service determined that due to the complexity of the project, a PA would be needed to modify the Section 106 processing moving forward. The Forest Service has developed a PA in consultation with the SHPO, ACHP, Tribes, and other consulting parties. The PA outlined the roles and responsibilities of parties, the procedure for identification and evaluation of historic properties, assessment for effects, and each party's responsibilities under the Section 106 process. The January 2021 Rescinded FEIS included that PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, ACHP notified the Forest Service that "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." Since ACHP did not sign the PA, the PA was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the Final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

In accordance with 36 CFR § 800.7(c)(4), the Secretary of Agriculture delivered a written response to the ACHP on April 17, 2025, and that response concluded the Section 106 process for this undertaking. Therefore, while the PA is no longer in effect, I find that the Forest Service has complied with its Federal responsibilities under the National Historic Preservation Act.

## 7.7   Migratory Birds

The Migratory Bird Treaty Act of 1918, as amended, makes it illegal for anyone to take, possess, import, export, transport, sell, purchase, barter, or offer for sale, purchase, or barter, any migratory bird, or the parts, nests, or eggs of such a bird except under the terms of a valid permit issued pursuant to Federal regulations. In January 2001, President Clinton signed Executive Order 13186 requiring Federal agencies (specifically, those taking actions that may negatively impact migratory birds) to develop a memorandum of understanding (MOU) with the FWS to promote the recommendations of various migratory bird programs and conservation considerations. The Forest Service developed an MOU with the FWS in 2008. The needs of migratory birds have been incorporated into the Tonto National Forest planning process, and specific mitigation measures are required in this decision.

Potential impacts to migratory birds are described in section 3.8.4.2 of the FEIS. Unintentional take will likely impact individual birds and local migratory bird populations, varying by species due to life history traits and habitat use. Potential population-level impacts will likely be greater for species that breed in the analysis area and less for species that use the area only during migration or as wintering habitat. However, impacts on regional and overall migratory bird populations will likely be negligible. Appropriate measures to minimize those impacts, such as ground clearing new mining areas outside nesting seasons, are described in part 4 of this document.

A State law related to migratory birds is Arizona Revised Statutes 17-236. This law indicates, "It is unlawful to take or injure any bird or harass any bird upon its nest, or remove the nests or eggs of any bird, except as may occur in normal horticultural and agricultural practices and except as authorized by commission order." Mitigation measures to prevent this occurrence are discussed in measure FS-WI-01

and in the wildlife management plan. These measures were developed by Resolution Copper in collaboration with the AGFD and provided to the Forest Service in October 2020. In the wildlife management plan, all birds are treated as if they are migratory and protected under the Migratory Bird Treaty Act: "For practical purposes, virtually any bird that could be encountered within the GPA should be considered a migratory species (in addition to any special status species noted above)." Measure FS-WI-01 in appendix J of the FEIS clarifies the requirement that meets Arizona Revised Statutes 17-236 and the Migratory Bird Treaty Act: "Preconstruction surveys and nest location for golden eagles, peregrine falcon, and migratory or breeding birds, with mitigation if occurrences are found."

While the selected Federal action could result in unintentional take of migratory bird species, approval of these special use authorizations considers these impacts and includes measures to minimize impacts. Therefore, I find the selected Federal action complies with the Migratory Bird Treaty Act, as amended, the Bald and Golden Eagle Protection Act, as amended, and Arizona Revised Statutes 17-236.

## 7.8    Water Pollution Control Act of 1972 (Clean Water Act)

The Federal Water Pollution Control Act of 1972 (PL 92-500), as amended in 1977 (PL 95-217) and 1987 (PL 100-4), is also known as the Clean Water Act (CWA). The CWA establishes a non-degradation policy for all federally proposed projects to be accomplished through planning, application, and monitoring of best management practices. Identification of best management practices is mandated by Section 319 of the Water Quality Act of 1987, which states, "It is national policy that programs for the control of non-point sources of pollution be developed and implemented." Sediment control best management practices are required for road construction and maintenance. The stormwater permit(s), if needed, will also require best management practices for operational control of runoff and sediment.

The Forest Service is responsible for ensuring that operations on NFS lands obtain the proper permits and certifications to demonstrate they comply with applicable Federal and State water quality standards, including regulations issued pursuant to the CWA. My decision to approve these special uses requires that in accordance with

- Section 401 of the CWA, the proponent obtain a water quality certification from the ADEQ, unless the ADEQ waives its issuance;[9] and

- Section 402 of the CWA, the proponent obtain any appropriate 402 stormwater or surface water discharge permits from the ADEQ, if determined by that agency to be required. ADEQ has primacy for implementing this provision of the CWA; and

- Section 404 of the CWA, if the USACE has determined that a permit for any dredge or fill activities to waters of the U.S. is required, as is currently understood, the proponent must obtain the Section 404 permit to be in compliance with the CWA.

The issuance of these permits, along with the USACE's permit decision and conditions on the 404 permit, constitute compliance with CWA requirements. Therefore, with these conditions in place, I find that the selected Federal action complies with the Clean Water Act.

## 7.9    Federal Noxious Weed Act of 1974 and Invasive Species (Executive Order 13112)

The Noxious Weed Act was established for the control and eradication of noxious weeds, and the regulation of the movement in interstate or foreign commerce of noxious weeds and potential carriers thereof, and for other purposes. Similarly, Executive Order 13112 directs Federal agencies (in part) to

---

[9] The ADEQ issued the Section 401 water quality certification for the Resolution Copper Project on December 22, 2020.

prevent the introduction of invasive species; provide for their control; and minimize the economic, ecological, and human health impacts that invasive species cause.

Resolution Copper and SRP are required as a condition of the special use authorizations to update their invasive species management plan in coordination with the Tonto National Forest. The invasive species management plan will address the treatment and control of noxious weeds throughout all pipeline and power line corridors. Preparation and implementation of this plan will meet the requirements of the Noxious Weed Act. Therefore, with these conditions, I find that the selected Federal action complies with Executive Order 13112 and the Noxious Weed Act.

## 7.10  Wetlands (Executive Order 11990) and Floodplains (Executive Order 11988)

Executive Order 11990 requires Federal agencies to avoid, to the extent possible, the long- and short-term adverse effects associated with the destruction or modification of wetlands. Federal agencies must find that there is no practicable alternative to new construction located in wetlands, and that the selected Federal action includes all practicable measures to minimize harm to wetlands. Agencies may take into account economic, environmental, and other pertinent factors in making this finding.

Section 404 of the CWA authorizes the USACE to issue permits for activities that will result in the placement of dredged or fill material in waters of the U.S., which include special aquatic sites like wetlands. Before a permit can be issued, Section 404(b)(1) guidelines require that projects avoid impacts to the extent possible, minimize impacts that cannot be avoided, and provide compensatory mitigation for impacts that occur. The estimated total impacts to waters of the U.S. from the tailings storage facility footprint, pipeline corridor, and associated facilities is 188.3 acres. Resolution Copper will be required by conditions in the special use authorization to obtain Section 404 approval from the USACE prior to impacting potentially jurisdictional waters of the U.S., if the USACE determines that a permit is required. The issuance of the Section 404 permit will affirm my finding that the selected Federal action complies with Executive Order 11990.

Executive Order 11988, as amended by Executive Order 13690, requires Federal agencies to avoid, to the extent possible, the long- and short-term adverse impacts associated with the occupancy and modification of floodplains and to avoid direct and indirect support of floodplain development wherever there is a practicable alternative. Federal agencies must take floodplain management into account, consistent with the Federal Flood Risk Management Standard, when formulating or evaluating water and land use plans and require land and water resources use appropriate to the degree of flood hazard involved.

Operations under these special uses will have limited impacts on floodplains. The pipeline corridor crosses Queen Creek, Devil's Canyon, and Mineral Creek, but does not impact mapped floodplains. Instead, the corridor spans Queen Creek and Devil's Canyon, and uses a trenchless crossing for Mineral Creek. Due to the limited area of impacted floodplains, I find that approval of these special uses complies with Executive Order 11988.

## 7.11  Clean Air Act of 1963

The Clean Air Act (CAA), as amended, is designed to control air pollution on a national level by establishing a Federal program for monitoring and controlling air pollution by regulating air emissions from stationary and mobile sources. The Forest Service is responsible for ensuring that uses on NFS lands comply with applicable Federal and State air quality standards, including the CAA requirements. Consequently, Resolution Copper will be required to obtain a State of Arizona or Pinal County air quality permit if applicable for its activities on NFS land. Whichever agency has primacy over implementation of

CAA regulations—the ADEQ or the Pinal County Air Quality Control District—would determine the necessity of such permitting.

The issuance of an air quality permit, if required, constitutes compliance with CAA requirements. Therefore, with these permits in place, I find that the selected Federal action complies with the Clean Air Act, as amended.

## 7.12  Special Uses

The "Tonto National Forest Land Management Plan" allows special uses that serve the public, promote public health and safety, protect the environment, are legally mandated, and are compatible with other resources. This may include special uses for linear corridors for pipelines and power lines. The portions of the project that are authorized in this Draft ROD meet the special uses screening criteria and considerations put forth at 36 CFR § 251 Subpart B.

## 7.13  Resource Conservation and Recovery Act

Hazardous waste is regulated under the Federal Resource Conservation and Recovery Act regulations (40 CFR § 260 et seq.). Generators of hazardous waste must follow strict rules regarding the generation, storage, handling, and disposal of their wastes. Resolution Copper would comply with applicable State and Federal hazardous waste regulations. There is an exclusion for "solid waste from the extraction, beneficiation, and processing of ores and minerals;" therefore, the tailings transported by the pipelines are not considered hazardous waste (40 CFR § 261.4(b)(7)). No hazardous waste would be generated, stored, handled, or disposed of on NFS lands. Therefore, I find that the selected Federal action complies with the Resource Conservation and Recovery Act.

# PART 8 ADMINISTRATIVE REVIEW OPPORTUNITIES

This proposed decision to authorize the use of NFS land and roads is subject to predecisional objection pursuant to 36 CFR § 218, Subparts A and B. Objections to the Resolution Copper Project will only be accepted from those who have previously submitted timely comments regarding this project proposal during a designated opportunity for public comment, unless based on information not available during an earlier designated opportunity for public comment (i.e., new information).

Objections on the Resolution Copper Project must be submitted within 45 calendar days following the publication of the legal notice in the "Arizona Capitol Times." The date the legal notice is published in the "Arizona Capitol Times" is the exclusive means for calculating the time to file an objection. A copy of this legal notice will be posted on the website (link provided above) once published.

Those wishing to object should not rely upon dates or timeframe information provided by any other source. A timely submission will be determined by USPS postmark; the agency's electronically generated posted date and time for electronic submission; or shipping date for delivery by private carrier. It is the objector's responsibility to ensure timely filing of a written objection with the reviewing officer pursuant to § 218.9. All objections are available for public inspection during and after the objection process.

Electronic objections may be submitted using the Public Comment Form at https://cara.fs2c.usda.gov/Public/CommentInput?Project=48956. Electronic submissions, including attachments, must be submitted in a format (Microsoft Word, portable document format (PDF), or rich text format (RTF)) that is readable and searchable. Written objections may be submitted by mail to: Reviewing Official, Regional Forester, filed via mail or express delivery to 333 Broadway Boulevard SE, Albuquerque, New Mexico 87102.

At a minimum, an objection must include the following: (1) The objector's name and address, along with a telephone number or email address if available; (2) Signature or other verification of authorship upon request (a scanned signature for electronic mail may be filed with the objection); and (3) Identification of the lead objector, when multiple names are listed on an objection, and verification of the identity of the lead objector, if requested. Individual members of an entity must have submitted their own individual comments in order to have eligibility to object as an individual. Additional requirements are included below.

The reviewing officer must set aside and not review an objection when one or more of the following applies: (1) it is not filed in a timely manner; (2) the proposed project or forest plan amendment is not subject to the objection procedures; (3) the individual or entity did not submit timely and specific written comments or substantive formal comments during opportunities for public comment; (4) except for issues that arose after the opportunities for comment, none of the issues included in the objection are based on previously submitted written comments and the objector has not provided a statement demonstrating a connection between the comments and the objection issue; (5) the objection does not provide sufficient information as required; (6) the objector withdraws the objection; (7) an objector's identify is not provided or cannot be determined from the signature, and a reasonable means of contact is not provided; or (8) the objection is illegible for any reason, including submissions in an electronic format different from that specified in the legal notice, and (9) the responsible official cancels the objection process underway to reinitiate the objection procedures at a later date or withdraw the proposed project or activity.

## 8.1   Implementation Timeline

When no objection is filed within the objection filing period (in accordance with 36 CFR §§ 218.26 and 218.32), the reviewing officer must notify the responsible official. Approval of the proposed project or

activity documented in the Final ROD may occur on, but not before, the fifth business day following the end of the objection filing period (36 CFR § 218.12(c)(1 and 2)).

When an objection is filed, the responsible official may not sign the Final ROD subject to the provisions of 36 CFR § 218.12 until the reviewing officer has responded in writing to all pending objections (see 36 CFR § 218.11(b)(1)). Additionally, the responsible official may not sign the Final ROD subject to the provisions of 36 CFR § 218 until all concerns and instructions identified by the reviewing officer in the objection response have been addressed (36 CFR § 218.12(b)). Once the responsible official has complied with any instructions from the reviewing officer, the ROD can be signed, and implementation can take place immediately.

## 8.2   Contact Person

For additional information concerning this decision or the Forest Service administrative review process, contact Michelle Tom, Engineering and Minerals Staff Officer, Tonto National Forest Supervisor's Office, located at 2324 East McDowell Road, Phoenix, Arizona 85006, or emailed to comments-southwestern-tonto@usda.gov.

## Signature and Date

As the Forest Service responsible official, I certify that this agency decision was informed by all of the alternatives, information, analyses, and objections submitted by Tribal, State, and local governments and public commenters for consideration by the lead and cooperating agencies in developing the environmental impact statement.


_____          _____

Forest Supervisor                                          Date
Tonto National Forest

# REFERENCES

Air Sciences Inc. 2018. *Final Air Quality Impacts Analysis Modeling Plan, Resolution Copper Project, AZ*. Project No. 262. Golden, Colorado: Air Sciences Inc. March.

Avian Power Line Interaction Committee. 2012. *Reducing Avian Collisions with Power Lines: The State of the Art in 2012*. Washington, D.C.: Edison Electric Institute and Avian Power Line Interaction Committee. October.

Dark Sky Partners LLC. 2018. *Impact Assessment of the Proposed Resolution Copper Mine on Night Sky Brightness: Final Report*. Prepared for Resolution Copper. Tucson, Arizona: Dark Sky Partners LLC. February.

Davies, A. 2020. *Subsidence Monitoring and Management Plan - August*. Superior, Arizona: Resolution Copper.

Golder Associates Inc. 2020. *Resolution Copper Skunk Camp Pipelines: Pipeline Protection and Integrity Plan*. CCC.03-81900-EP-REP-00007_Rev0. Walnut Creek, California: Golder Associates Inc. May 15.

International Council on Mining and Metals, United Nations Environment Programme, and Principles for Responsible Investment. 2020. Global Industry Standard on Tailings Management. August. Available at: https://globaltailingsreview.org/wp-content/uploads/2020/08/global-industry-standard_EN.pdf. Accessed October 30, 2020.

KCB Consultants Ltd. 2020. *Resolution Copper Project: Skunk Camp TSF Reclamation Plan*. Doc. # CCC.03-81600-EX-REP-00023 - Rev. 0. Phoenix, Arizona: KCB Consultants Ltd. June 10.

Klohn Crippen Berger Ltd. 2018. *Resolution Copper Project: DEIS Design for Alternative 6 - Skunk Camp*. Doc. # CCC.03-81600-EX-REP-00006 - Rev.1. Vancouver, Canada: Klohn Crippen Berger Ltd. August 8.

———. 2019. *Resolution Copper Project DEIS Alternatives Failure Modes*. Doc. # CCC.03-81600-EX-REP-00011 - Rev.0. Vancouver, Canada: Klohn Crippen Berger Ltd. January.

M3 Engineering and Technology Corporation. 2019. *Resolution Copper Project: Concentrate Pipeline Corridor Management Plan, Superior, Arizona*. Revision 4. Project No. M3-PN140023.603. Chandler, Arizona: M3 Engineering and Technology Corporation. May 2.

Montgomery and Associates Inc. 2020a. *Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells*. Prepared for Resolution Copper. Tucson, Arizona: Montgomery and Associates. September 1.

———. 2020b. *Skunk Camp Water Quality Monitoring Program, Pinal and Gila Counties, Arizona*. Prepared for Resolution Copper. Tucson, Arizona: Montgomery and Associates Inc. August 28.

Oliver, D. 2020. *Queen Creek Climbing Mitigation and Access Plan*. F102201102-TE-MEM-01. Greenwood, Colorado: FloSolutions USA, Ltd. September 10.

Pilz, J. 2019. *Alternative 5 - Impacts to Public Safety*. Project No. 1788500.002 TM01 Rev0. Technical memorandum. Salt Lake City, Utah: Golder Associates Inc. January 11.

Resolution Copper. 2016a. Appendix E: Subsidence Management Plan. In *General Plan of Operations, Resolution Copper Mining*. Superior, Arizona. May 9.

———. 2016b. *General Plan of Operations Resolution Copper Mining*. Superior, Arizona. May 9.

———. 2019. *Resolution Copper Project, Noxious Weed and Invasive Species Management Plan on National Forest System Lands*. Prepared for Tonto National Forest. Superior, Arizona: Resolution Copper. May.

———. 2020a. *Access and Management Plan: Oak Flat Campground*. Superior, Arizona: Resolution Copper. November 13.

———. 2020b. *General Plan of Operations: Road Use Plan*. Superior, Arizona: Resolution Copper. August.

———. 2020c. *Wildlife Management Plan*. Superior, Arizona: Resolution Copper. October.

SWCA Environmental Consultants. 2025. *Resolution Copper Project Consistency with the Tonto National Forest Plan*. Process memorandum to file. Phoenix, Arizona: SWCA Environmental Consultants. January.

Tetra Tech Inc. 2020. *Draft Reclamation Plan: Preferred Alternative*. #114-570991. Prepared for Resolution Copper. Missoula, Montana: Tetra Tech Inc. June.

U.S. Forest Service. 2021. *Final Environmental Impact Statement: Resolution Copper Project and Land Exchange - Rescinded*. MB-R3-10. Phoenix, Arizona: U.S. Forest Service. January.

———. 2023. *Tonto National Forest Land Management Plan.* Coconino, Gila, Maricopa, Pinal, and Yavapai Counties, Arizona. MB-R3-12-13. U.S. Forest Service, Southwestern Region. December.

———. 2025. *Final Environmental Impact Statement: Resolution Copper Project and Land Exchange*. Coconino, Gila, Maricopa, Pinal, Santa Cruz, and Yavapai Counties, Arizona. MB-R3-12-10. Phoenix, Arizona: U.S. Forest Service. June.

*This page intentionally left blank.*

**APPENDIX A**

**SUMMARY OF APPLICANT-COMMITTED ENVIRONMENTAL PROTECTION MEASURES, MONITORING, AND MITIGATION NOT INCLUDED AS TERMS AND CONDITIONS FOR AUTHORIZED USE OF NATIONAL FOREST SYSTEM LANDS**

This appendix describes applicant-committed environmental protection measures, mitigation, and monitoring measures that are not related to uses of NFS land and are therefore not being required as terms and conditions of authorizing uses of NFS land. Many of the measures listed in this appendix will be required under other legally binding agreements or by other State or Federal agencies, and this is noted for each measure when applicable. Other measures listed in this appendix remain solely voluntary on the part of Resolution Copper, though Resolution Copper has publicly committed to implementing them and future binding agreements could incorporate them.

## Soils, Vegetation, and Reclamation

### Arizona State Land Department Right-of-way Permits

The applicant-committed environmental protection measures related to soils, vegetation, and reclamation that were described in part 4 of the Draft ROD may also be included as conditions in right-of-way permits or other authorizations for the portions of the tailings pipeline and power line corridors that cross Arizona State Trust land.

### Arizona State Mine Inspector

As noted in part 4 of the Draft ROD, the Forest Service is requiring implementation of reclamation plans for uses on NFS land. The reclamation activities applicable to NFS land are part of a larger reclamation plan for the entire Resolution Copper facility, including the East Plant Site, West Plant Site, filter plant and loadout facility, and tailings storage facility.

The Arizona State Mine Inspector regulates mining activities on private land in Arizona, and the primary action required is the implementation of reclamation activities at the site, including requirements for certification, plan updates, annual reporting, and financial assurance. Resolution Copper currently holds a plan authorizing the reclamation of surface disturbances at the East Plant Site and West Plant Site.

Implementation of reclamation plans for all mine activities, not just those on NFS land, will be required by the Arizona State Mine Inspector, who will determine what reclamation is appropriate under pertinent regulations.

### Biological Opinion

The many applicant-committed environmental protection measures related to soils, vegetation, and reclamation that were described in part 4 of the Draft ROD are also included as conservation measures in the Biological Opinion signed by the FWS on December 31, 2020 (appendix P of the FEIS). The analysis of impacts to threatened and endangered species contained in the Biological Opinion, and notably impacts to the endangered Arizona hedgehog cactus, accepts that the conservation measures will occur as described as a foundation for the analysis of impacts.

One specific conservation measure included in the Biological Opinion was developed during Section 7 consultation. Resolution Copper committed to recording a conservation easement on portions of the JI Ranch. The conservation easement's purpose shall be for the protection of the Arizona hedgehog cactus and will be at least 100 acres, comprising one or multiple parcels excluding roads and trails, for the life of the project. The Forest Service included this as measure "FS-SV-02: JI Ranch" in appendix J of the FEIS.

The Biological Opinion includes a reinitiation clause. Reinitiation considerations include new information that reveals effects of the agency action (authorizing use of NFS land) that may affect listed species or critical habitat in a manner or to an extent not considered in the Biological Opinion, or if the action is subsequently modified in a manner that causes an effect on the listed species or critical habitat not

considered in the Biological Opinion. If Resolution Copper does not implement these conservation measures as assumed in the Biological Opinion, reinitiation of consultation under Section 7 of the Endangered Species Act may be warranted.

### Programmatic Agreement

As noted in part 4 of the Draft ROD, the Forest Service is requiring resource salvage on NFS lands. This measure remains a Forest Service–required measure; however, this authority only exists for NFS lands. Other implementation, including on Oak Flat, would remain a commitment in the Resolution Copper cultural heritage management plan and co-management of heritage on private lands developed in consultation and coordination with consulting Tribes.

### Voluntary Measures and Other Future Agreements

As a voluntary measure, Resolution Copper has agreed to continue cooperative management of the 7B Ranch until BLM management can be implemented. This would involve private arrangements with The Nature Conservancy, which has not yet been undertaken and may or may not occur as planned. This is detailed as measure "RC-SV-04: Voluntary cooperative management of 7B Ranch" in appendix J of the FEIS.

## Noise and Vibration

### Voluntary Measures and Other Future Agreements

The GPO (Resolution Copper 2016b) outlines applicant-committed environmental protection measures by Resolution Copper in the "Environmental Protection Elements" section, including these measures pertinent to noise and vibration:

- Mining activities, primary crushing and conveying, will take place underground, and exhaust fans will be equipped with silencers for noise reduction. Milling will take place within a fully enclosed building.

Resolution Copper has also committed to addressing noise and vibration near the tailings facility specific to the presence of residential areas in Section 29, Township 3 South, Range 15 East, including the following measures prior to ground-disturbing activities: paving Dripping Springs Road, setting the speed limit to 15 miles per hour, and requiring the deliveries of equipment and materials to occur during the daytime. Resolution Copper has also already purchased properties in the footprint and vicinity of the tailings storage facility. This is detailed as measure "RV-NV-01: Dripping Springs Road mitigations" in appendix J of the FEIS.

At this time, these measures remain solely as voluntary measures, unrelated to use on NFS land. These measures may or may not occur as planned. Gila County has the legal authority to maintain Dripping Springs Road. As such, Resolution Copper will need to work with Gila County to implement the measures, including reduced speeds and selective paving.

## Air Quality

### Air Quality Permits from Pinal County and ADEQ

The various dust control measures identified in part 4 of the Draft ROD are likely to be required not only for uses on NFS land, but also as part of air quality permits. Resolution Copper currently holds an air quality control permit that pertains to the historical mining (reclamation) and development and

exploratory mining exploration facilities operated by Resolution Copper. A similar air quality permit will be required for the full operations.

The tailings facility lies within Gila County. Gila County relies on ADEQ to issue air permits within the county. At this time, it is anticipated that air permits would be obtained from the Pinal County Air Quality Control District for operations solely within Pinal County (East Plant Site, West Plant Site, filter plant and loadout facility), and from ADEQ for the tailings storage facility. Pinal County may also issue dust permits for construction, earthwork, and land development. Additional measures that Resolution Copper has committed to that may be required by the air quality permits include the following:

- Dust control on roads, including regular watering, road base maintenance and dust suppression, paving select access roads to the East Plant Site and West Plant Site with asphalt, and setting reasonable speed limits on access roads within the operational footprint.

- Dust control at the tailings storage facility, including delivering tailings to the storage facility via distribution pipelines and continuously wetting the tailings during active deposition. During non-active periods, dust emissions would be managed by establishing a temporary vegetative cover on construction areas that would be inactive and exposed for longer than 12 months, wetting inactive beaches and embankment surfaces with irrigation from sprinkler systems, and treating with chemical or polymer dust suppressants, if necessary.

- Dust control at East Plant Site, including periodic water and/or chemical dust suppressant, normal mining controls such as wet drilling and the wetting of broken rock, application of water suppression spray to control dust ore conveyance, dedicated exhaust ventilation systems and/or enclosures for crushers and transfer points underground, performing of primary crushing and conveying underground, and saturation of underground exhaust ventilation.

- Dust control at West Plant Site, including housing main active ore stockpiles in fully covered buildings, applying water suppression spray to control dust ore conveyance, processing ore in a new enclosed building, and enclosing conveyor transfer points within the concentrator building. Once arriving at the concentrator complex, the ore would either be processed immediately or stockpiled in an enclosed structure for future processing.

- Dust control during shipping, including bagging molybdenum concentrate at the concentrator facility before shipping and enclosing loadout building and storage shed.

Other applicant-committed environmental protection measures committed to by Resolution Copper include those outlined in the "Final Air Quality Impacts Analysis Modeling Plan" (Air Sciences Inc. 2018) and Resolution Copper's current air quality permit. Measures that may be required by the air quality permits include the following:

- use of low-sulfur diesel in mobile and stationary equipment;

- use of a scrubber to control sulfur dioxide emissions from the drying of molybdenum concentrate at the West Plant Site;

- use of Tier 4 diesel engines (or greater); and

- use of fencing, berms, locking gates, signage, natural barriers/steep terrain (25 to 30 percent or greater), and site security measures to limit access roads and other locations near areas of heavy recreational use. These same methods would be required to limit public access within the mine site (i.e., the air modeling boundary) to prevent public exposure to mine emissions.

### Solar Participation Agreement

In November 2019, Resolution Copper entered into a Solar Participation Agreement with the Salt River Project Agricultural Improvement and Power District to obtain solar power from a 100-megawatt solar photovoltaic generating facility. In furthering its commitment to increase its reliance on renewable energy, Resolution Copper subscribed to 4.6 percent of the generating facility's solar power. Accordingly, by entering into the agreement, Resolution Copper has sourced renewable energy credits constituting approximately 25 percent of Resolution Copper's estimated baseload in 2022. Resolution Copper will continue to explore other opportunities to obtain renewable energy credits as the project moves forward. This is detailed as measure "RC-AQ-01: Salt River Project solar participation agreement" in appendix J of the FEIS.

## Water Resources

### Arizona Department of Environmental Quality Water Permits

In the GPO and subsequent design documents, Resolution Copper has committed to various measures to reduce impacts on water quality:

- groundwater levels will be monitored at designated compliance monitoring wells located downstream of the tailings storage facility seepage recovery embankments in accordance with the requirements of the Aquifer Protection Permit program;
- all potentially impacted water will be contained on-site during operations and will be put to beneficial use, thereby reducing the need to import makeup water;
- stormwater controls (described in detail in section 3.7.2 of the FEIS);
- engineered seepage controls (described in detail in section 3.7.2 of the FEIS);
- to the extent practicable, stormwater flows upgradient of the facilities will be diverted around the disturbed areas and returned to the natural drainage system;
- permanent diversion channels will be designed for operations and closure; and
- runoff from roads, buildings, and other structures will be handled through best management practices, including sediment traps, settling ponds, berms, sediment filter fabric, wattles, etc.

Resolution Copper will be required to obtain two permits from ADEQ: an Aquifer Protection Permit for discharges to groundwater, and a stormwater permit under the Arizona Pollutant Discharge Elimination System, which would include both operational and construction stormwater discharges. The measures described above will likely be required as part of these two permits.

Resolution Copper has also developed a water quality monitoring plan for surface water and groundwater resources located in Dripping Spring Wash downgradient of the tailings storage facility (Montgomery and Associates Inc. 2020b). The Skunk Camp water quality monitoring plan includes monitoring of numerous wells and springs along or adjacent to Dripping Spring Wash and in the Gila River just downstream of its confluence of Dripping Spring Wash. While portions of this plan overlap permitting requirements, this monitoring plan exceeds the likely monitoring requirements to be implemented under the two ADEQ water quality permits. The monitoring above and beyond the ADEQ permits reflects a voluntary measure, unrelated to use on NFS land. These measures may or may not occur as planned.

### Compensatory Mitigation under Section 404 Individual Permit

Resolution Copper has proposed a package of compensatory mitigation as part of the CWA Section 404 permitting process. This compensatory mitigation is detailed in measure "FS-WR-02: 404 compensatory mitigation plan" in appendix J of the FEIS. This package has been approved by the USACE and is included in appendix D of the FEIS. The three compensatory mitigation parcels approved under the Section 404 permitting process are the MAR-5 Wetland/Olberg Road site, the Queen Creek site, and the H&E Farm site.

### Voluntary Measures and Other Future Agreements

Resolution Copper also has committed to various measures to reduce the amount of water used by the project, including the following:

- recycling as much water as possible for reuse;

- sourcing approximately one-half of Resolution Copper's water needs from long-term storage credits (surface water stored underground); and

- including the beneficial reuse of existing low-quality water sources, such as impacted underground mine dewatering water, in the project water supply.

The primary water supply for the Resolution Copper Project is obtained from the Desert Wellfield, located in the East Salt River valley, which is within the Phoenix Active Management Area. Under Arizona water law, all groundwater pumped within an Active Management Area must obtain a groundwater right from the Arizona Department of Water Resources. While Resolution Copper has obtained long-term storage credits to offset groundwater use, this is not required under water use regulations.

Resolution Copper has provided a robust water quality monitoring program around the proposed tailings storage facility (Montgomery and Associates Inc. 2020b) that exceeds the likely monitoring requirements to be implemented under the Arizona Protection Permit or AZPDES permits. The Skunk Camp Water Quality Monitoring Plan includes monitoring of numerous wells and springs along or adjacent to Dripping Spring Wash, and in the Gila River just downstream of its confluence of Dripping Spring Wash. Authority for these measures will ultimately reside with ADEQ under the Arizona Protection Permit and AZPDES programs; however, it is anticipated that much of the sampling detailed in the plan will remain voluntary by Resolution Copper, as detailed in "RC-WR-03: Skunk Camp water quality monitoring plan" in appendix J of the FEIS.

At this time, these measures remain solely as voluntary measures, unrelated to use on NFS land. These measures may or may not occur as planned.

## Wildlife

### Arizona State Land Department Right-of-Way Permits

The applicant-committed environmental protection measures related to wildlife that were described in part 4 of the Draft ROD may also be included as conditions in right-of-way permits or other authorizations for the portions of the tailings pipeline and power line corridors that cross Arizona State Trust land.

### Biological Opinion

The many applicant-committed environmental protection measures related to wildlife that were described in part 4 of the Draft ROD are also included as conservation measures in the Biological Opinion signed by the FWS on December 31, 2020 (appendix P of the FEIS). The analysis of impacts to threatened and endangered species contained in the Biological Opinion, and notably impacts to the endangered Arizona hedgehog cactus, accepts that the conservation measures will occur as described as a foundation for the analysis of impacts.

As described earlier in this appendix, if Resolution Copper does not implement these conservation measures as assumed in the Biological Opinion, reinitiation of consultation under Section 7 of the Endangered Species Act may be warranted.

### Voluntary Measures and Other Future Agreements

In the GPO and in the Biological Opinion, Resolution Copper has committed to a variety of measures to reduce potential impacts on wildlife not related to uses on NFS land, including those outlined in appendix P of the FEIS.

- Some additional non-lethal harassment and scare devices to deter and disperse wildlife from the PAG tailings, non-contact and contact stormwater catchment basins, and process water ponds may also be considered and could include the following:
  - Plastic ball covers, vehicle lights and horns, motion-sensor lights, flags, perch deterrents, shell crackers, bird bangers, screamers, distress cries/electronic noise systems, bird scare balloons, propane cannons, and mylar scare tape.
  - A bird hazing protocol would be developed for Resolution Copper employees and would include a combination of harassment techniques. Additional hazing techniques may be adjusted or added as necessary based on field observations and ongoing research efforts. The protocol would include an inspection schedule, acceptable harassment techniques, a field log procedure, and incident reporting procedures. Resolution Copper staff responsible for implementing the bird hazing program would be trained on the protocol prior to its initiation.
- Vegetation growth within the contact and non-contact stormwater catchment basins and process water ponds would be monitored and periodically removed as often as necessary to further discourage the presence of wading birds.

At this time, these measures remain solely as voluntary measures, unrelated to use on NFS land. These measures may or may not occur as planned.

## Recreation

### Programmatic Agreement

One recreational measure unrelated to uses on NFS land was required under the former PA. Resolution Copper also was to establish an alternative campground site, known as Castleberry, to mitigate the loss of Oak Flat campground, which is a historic property. The Forest Service has no authority over management of lands that will be private after the land exchange. As the PA is no longer valid, this measure has been changed to a Resolution Copper–committed measure, enforceable under third-party agreements dated January 14, 2021, between Resolution Copper and the Town of Superior. This is detailed in measure "RC-RC-04: Establish an alternative campground site (Castleberry) to mitigate the loss of Oak Flat Campground" in appendix J of the FEIS.

### *Voluntary Measures and Other Future Agreements*

Applicant-committed environmental protection measures by Resolution Copper include the following:

- Developing plans to reestablish a crossing on the Arizona National Scenic Trail after construction of the concentrate pipeline (along the MARRCO corridor). Further detail can be found in the Concentrate Pipeline Corridor Management Plan (M3 Engineering and Technology Corporation 2019).

Resolution Copper has committed to mitigating impacts to climbing resources, as described in the "Queen Creek Climbing and Mitigation Access Plan" (Oliver 2020), including new access to bouldering and climbing resources known as "The Inconceivables and Chill Hill Boulders." Additionally, Resolution Copper has agreed to mitigation efforts in the combined "Queen Creek Climbing Area," which includes 10 discrete climbing areas: The Pond, Atlantis, Oak Flat, Euro Dog Valley, The Mine Area, Apache Leap, Northern Devil's Canyon, Upper Devil's Canyon, and Lower Devil's Canyon, and Hackberry Creek/The Refuge. Some of these areas will be impacted, and Resolution Copper has proposed the following mitigation:

- Oak Creek and Euro Dog Valley: May eventually be impacted by subsidence. Funds for a new access road (crossing NFS lands) to the Inconceivables and Chill Hill Boulders.

- The Mine Area: Mining impacts will likely include closure of the current access route via Magma Mine Road and closure of some of the climbing area. Resolution Copper will work with local climbing groups and climbers to evaluate the feasibility of an alternate access route (trail) on private lands.

- Apache Leap: Access via Magma Mine Road and NFS Road 315 will be closed due to mining impacts. Resolution Copper will work with local climbing groups and climbers to evaluate the feasibility of an alternate access route (trail) across private lands. Although access from NFS Road 2440 via the Cross Canyon Road would not be impacted by mining activities, there may be possible restrictions for climbing as a result of the climbing management plan for Apache Leap Special Management Area.

- Upper Devil's Canyon: Access from NFS Road 2438 and/or 2439 via NFS Road 469 (Magma Mine Road) will most likely remain. However, in the event that parts of NFS Road 2438 are closed due to subsidence, Resolution Copper will work with local climbing groups and climbers to evaluate the feasibility of an alternate access route.

- Lower Devil's Canyon, Hackberry Creek/The Refuge: Access will remain from the south from NFS Road 315 via State Route 177, but access from Magma Mine Road will be closed.

These activities are detailed in measure "RC-RC-05: Mitigation for impacts on climbing resources" in appendix J of the FEIS.

Resolution Copper also has agreed to open Signal Mountain Road on the JI Ranch for public access to the Tonto National Forest for wildlife-related recreation through an agreement with the AGFD. This is detailed in measure "RV-RC-06: Mitigation for public access to JI Ranch through AGFD cooperative agreement" in appendix J of the FEIS. These actions are currently agreed to in concept but may eventually be executed in a road agreement with AGFD.

At this time, these measures remain solely as voluntary measures, unrelated to use on NFS land. These measures may or may not occur as planned.

# Public Health and Safety

## *Arizona Department of Environmental Quality Water Permits*

Applicant-committed environmental protection measures for tailings and pipeline safety include those outlined in the tailings design documents (Klohn Crippen Berger Ltd. 2018), a pipeline protection and integrity plan specific to the Skunk Camp location (Golder Associates Inc. 2020); the concentrate pipeline corridor management plan (M3 Engineering and Technology Corporation 2019), and the GPO (Resolution Copper 2016b).

The following measures that enhance the safety of the tailings storage facility have been incorporated into the tailings design for Alternative 6 – Skunk Camp:

- Use a centerline embankment for NPAG tailings

- Use full downstream embankment for PAG tailings

- Perform thickening of both PAG, NPAG, and NPAG overflow tailings

- Segregate PAG tailings into smaller separate cells.

A failure modes analysis has already been completed to identify all potential failure modes and to align them with design measures appropriate to address those modes (Klohn Crippen Berger Ltd. 2019; Pilz 2019). The design measures are aligned with international best practice and Federal and State regulations. Resolution Copper has identified preventive measures to minimize the potential for failure, as well as reactive measures if problems develop. These are considered applicant-committed environmental protection measures and are summarized in table 3.10.1-5 in the FEIS.

Given the location of the tailings storage facility off of Federal land, many of the design and operational features developed to reduce the risk of failure of the tailings storage facility or pipelines are dictated solely by industry best practice. However, the Aquifer Protection Permit that Resolution Copper is required to obtain for the tailings storage facility includes design criteria to which Resolution Copper must adhere. The standards under the Aquifer Protection Permit are described in detail in section 3.10.1 of the FEIS.

## *Global Tailings Standard*

As described in section 3.10.1 of the FEIS, in August 2020, the Global Industry Standard on Tailings Management was launched (International Council on Mining and Metals et al. 2020). The preamble to the new Global Industry Standard states:

> *The Global Industry Standard on Tailings Management (herein 'the Standard') strives to achieve the ultimate goal of zero harm to people and the environment with zero tolerance for human fatality. It requires Operators to take responsibility and prioritise the safety of tailings facilities, through all phases of a facility's lifecycle, including closure and post-closure. It also requires the disclosure of relevant information to support public accountability.*

International Council on Mining and Metals (ICMM) member companies will implement the Global Industry Standard as a commitment of membership. Both Rio Tinto and BHP, partners in Resolution Copper, are members of ICMM. Adherence to this standard is detailed in measure "RC-PH-05: Adhere to Global Tailings Standard" in appendix J of the FEIS.

### *Voluntary Measures and Other Future Agreements*

Resolution Copper has committed to maintaining the existing hotline set up for community complaints via email and telephone, described on the Resolution Copper website. This hotline is meant to provide immediate feedback on any tailings, pipeline, transportation, hazardous material, air quality, or other adverse issues observed by the public. This is detailed in measure "RV-PH-04: Maintain the existing hotline for community complaints" in appendix J of the FEIS.

At this time, this measure remains solely as a voluntary measure, unrelated to use on NFS land. This measure may or may not occur as planned.

## Scenic Resources

### *Voluntary Measures and Other Future Agreements*

Applicant-committed environmental protection measures by Resolution Copper include those outlined in the dark skies analysis (Dark Sky Partners LLC 2018):

- Implement an outdoor lighting plan that would reduce potential impacts from artificial night lighting.

- Reduce illumination levels where appropriate while still meeting Mine Safety and Health Administration (MSHA) requirements for lighting sufficient to provide safe working conditions.

- Adhere to the Pinal County Outdoor Lighting Code.

- Use control systems that can turn off lights at particular times of night or are activated by detecting motion while still meeting MSHA requirements for lighting sufficient to provide safe working conditions.

At this time, these dark sky measures remain solely as voluntary measures, unrelated to use on NFS land. These measures may or may not occur as planned.

## Cultural Resources

### *Programmatic Agreement*

As detailed in part 7.1 of the Draft ROD, a number of agreements related to cultural resources were required in the PA, and are now either required under other authorities or have become voluntary measures. These include the following:

- Oak Flat HPTP: The Forest Service has completed preparation of an archaeological HPTP for the Oak Flat Federal Parcel to resolve adverse effects on historic properties eligible for the National Register of Historic Places under Criterion D. The implementation of the Oak Flat HPTP will begin prior to the land transfer, but the work is not likely to be completed prior to the land transfer. However, the transfer will not disrupt the completion of the measures listed in the HPTP. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. These actions are detailed in measure "FS-CR-01: Implementation of Oak Flat HPTP" in appendix J of the FEIS.

- GPO Research Design and Treatment Plans: The Forest Service has prepared an archaeological research design (GPO research design) in consultation with the SHPO, Tribes, and appropriate managing agencies to guide the development of treatment plans to address adverse effects on historic properties within the other Resolution Copper GPO project areas, and the Section 404

permit compensatory mitigation parcels (i.e., West Plant Site, MARRCO corridor, tailings facility, etc.), depending on the final alternative that is selected. The Forest Service determined, in consultation with the consulting parties, that the multiple treatment plans approach, rather than a single GPO HPTP, is needed because the GPO covers several large areas, each with its own cultural background and topography. The individual treatment plans will be tiered to the GPO research design, and tailored to fit the mitigation needs of each GPO project area. The work identified in the treatment plans will be completed prior to the proposed ground-disturbing activities in the GPO project areas. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. These actions are detailed in measure "FS-CR-02: GPO research design" in appendix J of the FEIS.

- Visual, Atmospheric, Auditory, Socioeconomic, and Cumulative Effects Mitigation Plan(s): Within 9 months of the issuance of the Final ROD, the Forest Service will prepare, in consultation with SHPO and the other consulting parties, a draft plan or plans outlining a process to mitigate visual, atmospheric, auditory, and cumulative effects (indirect or direct) identified within the visual/auditory/atmospheric/socioeconomic area of potential effects. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. Note that this measure has already been completed. These actions are detailed in measure "FS-CR-03: Visual, atmospheric, auditory, socioeconomic, and cumulative effects mitigation plan" in appendix J of the FEIS.

- Archaeological Database Funds: In recognition of the substantial loss of cultural resources and historic properties on State Trust lands, Resolution Copper will fund the creation and/or enhancement of existing electronic archaeological databases to assist the State of Arizona with management of these assets. This measure is no longer Forest-required, but is enforceable through Letter Agreements dated January 12, 2021, and March 10, 2025, with the SHPO. This is detailed in measure "RC-CR-07: Archaeological database funds" in appendix J of the FEIS.

The PA is a binding agreement executed between Resolution Copper, the Forest Service, the USACE, the BLM, the ASLD, the Arizona State Museum, the Arizona SHPO, SRP, and the ACHP.

# Socioeconomics

## *Programmatic Agreement*

Under the PA, Resolution Copper was to establish a fund to be focused on the built environment located within cultural resources area of potential effects. The primary purpose of the fund was to address effects from the project on historic properties and other community infrastructure within the communities of Superior, Miami, Globe, Kearny, Hayden, and Winkelman. All funded projects must comply with the Secretary of the Interior's Standards for the Treatment of Historic Properties, and compliance with these Standards was to be determined by SHPO. Specific parameters for the Community Development Fund were to be defined through consultation between Resolution Copper, the applicable administering organization, and SHPO, and must include the following:

- availability to municipalities, counties, non-profits, private citizens, and private organizations;

- preference for projects participating in other historic preservation incentive programs;

- preference for projects agreeing to repay funds within 5 years of award, with extensions possible.

Purchase or rehabilitation of the Harding building in Superior (a specific suggestion made in public comments) is a project that may be covered by this fund.

This Forest Service no longer has the authority to require this measure. This measure has been changed to a Resolution Copper–committed measure that is enforceable under several third-party agreements between Resolution Copper and the Town of Superior, and through Letter Agreements dated January 12, 2021, and March 10, 2025 with the SHPO. These actions are detailed in measure "RC-SO-01: Community Development Fund" in appendix J of the FEIS.

### Town of Superior Agreements

The following applicant-committed environmental protection measures have been committed to by Resolution Copper:

- In February 2019, Resolution Copper entered into an Entrepreneurship and Innovation Center Gift Agreement with the Town of Superior, to fund a number of programs meant to diversify the economic base of the community.

- In February 2019, Resolution Copper entered into a Multigenerational Center Development Gift Agreement with the Town of Superior, to help fund the final studies, design, and construction of a multigenerational center. The goal of the center is to improve the overall quality of life for Superior residents, local employers, and their employees, expand the quality of life amenities and services that are essential to retraining and attracting residents and employers, allow for consolidation of Town services and decrease the overall administrative burden of the Town, and further develop public, private, civic, and educational sectors of the community.

- In February 2019, Resolution Copper entered into an Education Funding Agreement with the Superior Unified School District, dedicating funding to a number of classroom enhancements and educational programs over the next 4 years.

- In February 2019, Resolution Copper entered into a Park Improvement Agreement with the Town of Superior, to fund improvements to the U.S. 60 Caboose Park.

- In March 2016, Resolution Copper entered into an Emergency Response Services agreement with the Town of Superior, to fund the provision of fire and other emergency services to the mine facilities by the Town.

A projected increase in tax revenue is a factor of Resolution Copper's business impacts on the Town of Superior, driven mainly through increased sales taxes from Resolution Copper employees and contractors within the town, and to a lesser extent property and sales tax increases benefiting the Town through Pinal County and State apportionments. Resolution Copper has historically paid the Town for more public safety coverage than a standard level of service requires at a mine site. Resolution Copper is committed to public safety and will continue to work with the Town to agree annually on projected net direct costs that will be Resolution Copper's responsibility. This commitment is detailed in measure "RC-SO-06: Agreement with Town of Superior to cover direct costs" in appendix J of the FEIS.

At this time, these socioeconomic remain solely as voluntary measures, unrelated to use on NFS land. These measures may or may not occur as planned.

### Voluntary Measures and Other Future Agreements

Through investment of an initial endowment, Resolution Copper will develop a sustainable regional economic development entity (or entities) to provide programming and investment in the Copper Triangle communities (Superior, Hayden, Winkelman, and Kearney). This new community-based entity will partner with external organizations, local municipalities, and stakeholders. Specifically, partnerships will be sought with organizations having certain expertise and tools to support and enhance the quality of life in the region, such as strategic planning for economic reinvestment and workforce development. These

activities are detailed in measure "RC-SO-03: Establish a regional economic development entity for Copper Triangle communities" in appendix J of the FEIS.

The Resolution Copper social investment program and corporate giving program have been established to support economic development and enhance quality of life. This includes programs that help create a diverse local business community and programs that help build a healthier and safer community, including parks/pool facilities and schools. Through these programs Resolution Copper has worked with cities, towns, governments, and school districts to fund existing projects, including pool repair and upgrades as well as school programs. These requests are defined and based on the needs of those local municipalities and school districts. These activities are detailed in measure "RV-SO-04: Resolution Copper social investment program" in appendix J of the FEIS.

Based on regular project budgeting, Resolution Copper plans to continue funding the Community Working Group. This is detailed in measure "RC-SO-05: Continue funding Community Working Group" in appendix J of the FEIS.

In May 2024, Resolution Copper entered into a Good Neighbor Agreement with a number of entities, including: Town of Superior, Arizona Trail Association, Boyce Thompson Arboretum, Cobre Valley Medical Center, Copper Community Alliance, Queen Valley, Queen Valley Fire Department, Queen Valley Golf Association, Queen Valley Historic Society, Rebuild Superior, Inc., Superior Chamber of Commerce, Superior Optimist Club, Superior Unified School District, Top of the World, Town of Miami, Town of Kearney, Town of Winkelman, Gila County, Pinal County, and the City of Globe. The Good Neighbor Agreement provides for the continued funding of the Community Working Group. Working with the Community Working Group, and combined with Rio Tinto corporate requirements for health, safety, and environmental protection, Resolution Copper will ensure all possible measures are taken to identify and mitigate public health, safety, and environmental issues before they occur, with transparency with local communities. Additionally, Resolution Copper will comply with the Rio Tinto Community and Social Performance Standard, which requires comprehensive engagement throughout the life of the project. The standard specifically requires effective engagements with communities on social, environmental, and other issues, disclosure of project-related information, and consultation with communities on matters that directly affect them, throughout the life of the project. This involvement includes continuing the Community Monitoring Program.

Resolution Copper has also committed at a corporate level to hiring qualified candidates locally, with the intention to track employee proximity to the mine, and to using local suppliers and services wherever possible.

At this time these remain solely as voluntary measures, unrelated to use on NFS land. These measures may or may not occur as planned.

## Tribal Values

### *Programmatic Agreement*

As detailed in part 7.1 of this Draft ROD, several agreements related impacts to resources of Tribal interest were required in the former PA. These include the following:

- The Emory Oak Collaborative Tribal Restoration Initiative: Funds the implementation of the treatments for the Emory Oak Collaborative Tribal Restoration Initiative, a multi-year restorative fieldwork program for Emory oak groves located in the Tonto and Coconino National Forests. Developed through consultation with the Forest Service and Tribes, the program is designed to restore and protect Emory oak groves that are accessed by Apache communities for traditional

subsistence gathering and ensure their sustainability for future generations. The program funds the long-term restorative treatment, maintenance, and monitoring for the Emory oak, and includes research, cultural activities, and educational activities. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. These activities are detailed in measure "FS-CR-05: Emory Oak Collaborative Tribal Restoration Initiative" in appendix J of the FEIS.

- Tribal Monitoring Program: Funds the long-term continuation of the existing Tribal Monitor Program and administration, program development, training, and funding for monitors working on public projects. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. This program is detailed in measure "FS-SO-02: Establish foundations for long-term funding, including the Tribal Monitor Program" in appendix J of the FEIS.

- Tribal Youth Program: Funds the development of a Tribal Youth Program in partnership with the Tonto National Forest and consulting Tribes to provide cultural and education opportunities to Tribal youth on NFS lands. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291.  This program is detailed in measure "FS-SO-02: Establish foundations for long-term funding, including the Tribal Monitor Program" in appendix J of the FEIS.

- Tribal Cultural Fund: Funds to address unique and specific Tribal proposals brought forth by Tribes during government-to-government consultation. The fund will provide a mechanism to fulfill Tribal requests that do not fit under the other funding programs such as direct funding to assist Tribal projects, programs, and infrastructure. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. This program is detailed in measure "FS-CR-06: Tribal Cultural Heritage Fund" in appendix J of the FEIS.

- Tribal Education Fund: Funds scholarships for 2-year and 4-year programs of study for members of the consulting Tribes. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. This program is detailed in measure "FS-CR-08: Tribal Education Fund" in appendix J of the FEIS.

### *Voluntary Measures and Other Future Agreements*

Resolution Copper will donate 32 acres of privately owned land within the Apache Leap South End Parcel, in addition to 807 acres of land required by Section 3003 of PL 113-291. With this additional land, the Apache Leap Special Management Area (SMA), a sacred landscape for the Apache and Yavapai, will be 839 acres. The Apache Leap SMA is named after its signature feature, an escarpment of sheer cliff faces and hoodoos, and preserves the natural character of Apache Leap, allows for traditional uses of the area by Native Americans, and protects and conserves the cultural and archaeological resources of the area. This action is detailed in measure "RC-CR-04: Increase size of Apache Leap Special Management Area" in appendix J of the FEIS.

At this time, this remains solely as a voluntary measure, unrelated to use on NFS land. This measure may or may not occur as planned.

# Livestock and Grazing

## *Voluntary Measures and Other Future Agreements*

Resolution Copper will continue to work collaboratively with ranchers who hold private property and/or grazing leases/rights within the vicinity of the proposed project footprint. To minimize ranching impacts, the corridor pipeline/power line has been designed consistent with feedback from ranchers to have minimal impact on ranching land uses and day-to-day activities. In the event that other ranching and range improvements may be impacted in the future, Resolution Copper would replace those improvements as a result of the construction of the pipeline corridor. Range fencing will be opened during pipeline construction with temporary fencing installed at the end of each work day to prevent livestock migration. Permanent repairs will be made to the fencing including a gate to permit right-of-way access for inspection and maintenance activities along the pipeline corridor. These actions are detailed in measure "RV-LG-01: Mitigation for impacts to ranching and grazing leases" in appendix J of the FEIS.

At this time this remains solely as a voluntary measure, unrelated to use on NFS land. This measure may or may not occur as planned.

**APPENDIX B**

**MAPS OF PIPELINE/POWER LINE ROUTES FOR AUTHORIZATION**



ARIZONA

PROJECT VICINITY

Approximate Scale 1 Inch = 10 Miles

**Legend**

- Streams (ALRIS)
- Tunnel, Spans and Trenchless Crossings
- North Pipeline Route
- 500 ft Corridor
- Skunk Camp TSF (SWCA DEIS)

**Post Land Exchange Surface Management**
- Bureau of Land Management (BLM)
- Private Land (No Color)
- State Trust Land
- US Forest Service (USFS)

T1S, R12-13E; T2S, R13-14E,
Gila and Pinal Counties, Arizona,
Mesa and Globe 1:100,000 USGS Quadrangles.
Data Sources: SWCA DEIS 2018; Golder Associates, Pipeline Data, May 2020;
BLM Post Land Exchange Surface Management, WRI Modified 2017
Image Source: ArcGIS Online World Street Map

**RESOLUTION COPPER**
USFS Special Use Permit
Proposed North Pipeline Corridor

VICINITY MAP
Figure 1


WestLand Resources

N

0   1.5   3 Miles
0   2.5   5 Kilometers



2-ER-358



**RESOLUTION COPPER**
Skunk Camp Comparison Memo

USFWS CRITICAL HABITAT
AND MINERAL CREEK CROSSING
Figure 2



## Legend

Pinal and Gila Counties, Arizona
Globe and Mesa 1:100,000 USGS Quadrangles
Data Sources: Post Land Exchange Surface Management,
BLM, WRI Modified 2017, SWCA DEIS 8-20-2018,
SRP Powerline Data, 5-2020, and
Golder Associates, 5-2020

**Existing Powerlines**
- - - Existing Powerlines

**Skunk Camp Tunnel, Spans and Trenchless Crossings**
--- 230 kV Powerline
North Pipeline Route
500 ft Corridor
Skunk Camp Pipeline-Powerline Corridors (DEIS)

**Post Land Exchange Surface Management**
AHC Predicted Habitat (Baker 2013)
Private Land (No Color)
State Trust Land (ASLD)
US Forest Service (USFS)

Note: Within the 500 Foot Corridor for the North Pipeline Route, only 200 feet will actually be disturbed.

WestLand Resources

**RESOLUTION COPPER**
Skunk Camp Comparison Memo

ARIZONA HEDGEHOG CACTUS PREDICTED HABITAT
Figure 3

Co-located 230 kV and 115 kV Powerlines

Trenchless Crossing at US 60

Span Across Devil's Canyon

Co-located 500 Foot Pipeline Corridor and 115 kV Powerline

Silver King Substation

Span Across Queen Creek

Tunnel

230 kV Powerline

East Plant Site

Existing Powerlines

West Plant Site



**Legend**

- ● MARRCO Corridor Access Point (MCA)
- Existing Forest Road - Public Access To Be Maintained
- Proposed Drainage Trail
- TNF Ranger District Boundary
- TNF Roads
- Preferred Alternative
- Post Land Exchange Surface Management
- Bureau of Land Management (BLM)
- Private Land (No Color)
- State Trust Land
- National Forest System

Data Sources:
Pinal County Open Space and Trails Master Plan 2007
USDA Forest Service, Tonto National Forest Roads 6-9-2014
SWCA DEIS
8-20-2018
Post Land Exchange Surface Management,
BLM, WRI Modified 2017
Image Source: Florence Junction & Picketpost Mountain USGS 7.5 Minute Quadrangles

N

0    900    1,800
Feet

**RESOLUTION COPPER**
General Plan of Operations

MARRCO
Figure 2

2-ER-362

**Legend**

- MARRCO Corridor Access Point (MCA)
- Arboretum
- Trailhead
- Existing Forest Road – Public Access To Be Maintained
- TNF Roads
- Lost Trail
- Proposed Drainage Trail
- Arizona National Scenic Trail Polyline
- TNF Ranger District Boundary
- Preferred Alternative
- Post Land Exchange Surface Management
- Private Land (No Color)
- State Trust Land
- National Forest System

Data Sources:
Pinal County Open Space and Trails Master Plan 2007
USFS Forest Maps and AZ Recreation Map
Arizona Trail Provided by Arizona Trail Association
aztrail@aztrail.org
USDA Forest Service, Tonto National Forest Roads
6-9-2014
SWCA DEIS
8-20-2018
Post Land Exchange Surface Management
BLM, WRI Modified 2017
Image Source: Pickethpost Mountain
USGS 7.5 Minute Quadrangles

RESOLUTION COPPER
General Plan of Operations
MARRCO TO WEST PLANT SITE
Figure 3

2-ER-363

**Legend**

- ⦿ Gate
- ● MARRCO Corridor Access Point
- ▲ Campground
- Private Road
- Proposed New Road
- Existing Road To Be Decommissioned-Restricted from Public Access
- Existing Forest Road - Public Access To Be Maintained
- Lost Trail
- Arizona National Scenic Trail Polyline
- TNF Ranger District Boundary
- TNF Roads
- Subsidence Zone
- Fracture Zone
- Skunk Camp Tunnel, Spans Where Tunnel Underground
- Preferred Alternative
- Post Land Exchange Surface Management
- Private Land (No Color)
- State Trust Land
- National Forest System

Note: Project area around disturbance area as defined by modeled zone of continuous subsidence.

Data Sources:
Pinal County Open Space and Trails Master Plan, 2007
ALRIS AZ Roads, TIGER 2011
USFS Forest Maps and AZ Recreation Map
Arizona Trail Provided by Arizona Trail Association
aztrail.org
SWCA DEIS 8-20-2018
Subsidence and Fracture Zone 2017
West Plant Facilities
Provided by M3 Engineering, July 6, 2020
USDA Forest Service, Tonto National Forest Roads
6-9-2014
Post Land Exchange Surface Management,
BLM, WRI Modified 2017,
SRP Powerline Data, 6-2020, and
Golder Associates, 5-2020
Image Source: Picketpost Mountain & Superior
USGS 7.5 Minute Quadrangles

**RESOLUTION COPPER**
General Plan of Operations
WEST AND EAST PLANT SITES
Figure 4

0   1,500   3,000 Feet

2-ER-364



**Legend**

- Gate
- Mine
- Proposed New Road
- Existing State Land Road - Public Access To Be Maintained
- Existing County Road - Public Access To Be Maintained
- Existing Forest Road - Public Access To Be Maintained
- TNF Roads
- Skunk Camp Tunnel, Spans and Trenchless Crossings
- TNF Ranger District Boundary
- Preferred Alternative
- Post Land Exchange Surface Management
- Bureau of Land Management (BLM)
- Private Land (No Color)
- State Trust Land
- National Forest System

Data Sources:
ALRIS AZ Roads, TIGER 2011
USDA Forest Service, Tonto National Forest Roads
6-9-2014
Post Land Exchange Surface Management,
BLM, WRI Modified 2017,
SRP Powerline Data, 6-2020, and
Golder Associates, 5-2020
Image Source: Superior and Pinal Ranch
USGS 7.5 Minute Quadrangles

N

0    1,400    2,800    Feet

**RESOLUTION COPPER**
General Plan of Operations

UTILITY CORRIDOR
Figure 5

Path: M:\idex\800\807.1\RVEN\Roads\asPlanned\Fig5_North_9Camp_UtlCor_7_10_2020.mxd

2-ER-365



2-ER-366



2-ER-367

**Legend**

- Gate
- Proposed New Road
- Existing Road To Be Decommissioned - Restricted from Public Access
- Existing County Road - Public Access To Be Maintained
- Skunk Camp TSF
- Skunk Camp Diversion Dikes and Seepage Dams
- TSF Borrow Areas
- Preferred Alternative

**Post Land Exchange Surface Management**

- Bureau of Land Management (BLM)
- Private Land (No Color)
- State Trust Land

Data Sources:
ALRIS AZ Roads, TIGER 2011
Post Land Exchange Surface Management,
BLM, VRM Modified 2017,
SWCA DEIS 8-20-2018,
SRP Powerline Data, 6-2020, and
Golder Associates, 5-2020
Image Source: Hot Tamale Peak and El Capitan
Mountain USGS 7.5 Minute Quadrangles

**RESOLUTION COPPER**
General Plan of Operations

SKUNK CAMP TSF
Figure 7

0   1,400   2,800   Feet

No. 25-5185

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION
OF ARIZONA, INC.; CENTER FOR BIOLOGICAL DIVERSITY;
EARTHWORKS; THE ACCESS FUND; and SIERRA CLUB.

*Plaintiffs-Appellants*,

v.

BROOKE L. ROLLINS, U.S. SECRETARY OF AGRICULTURE; UNITED
STATES FOREST SERVICE; and NEIL BOSWORTH, SUPERVISOR OF THE
TONTO NATIONAL FOREST.

*Defendants-Appellees*,

and

RESOLUTION COPPER MINING, LLC

*Intervenor-Defendant-Appellee.*

_____

On Appeal from the United States District
Court for the District of Arizona
(District Judge Dominic W. Lanza)

_____

**PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD
VOLUME 3 of 5**
*In Support of*
**PLAINTIFFS-APPELLANTS' EMERGENCY MOTION UNDER
CIRCUIT RULE 27-3
RELIEF REQUESTED BY AUGUST 18, 2025, AS THE LAND TITLE
TRANSFER WILL OCCUR ON AUGUST 19, 2025**

Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
mfink@biologicaldiversity.org

Allison N. Henderson
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs-Appellants*

Susan B. Montgomery
Robyn L. Interpreter
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorneys for the Inter Tribal Association of Arizona, Inc.*

**INDEX**

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| **Volume 1 of 5 [99 pages]** | | | |
| Order (August 15, 2025) | 8/15/2025 | 99 | 6-99 |
| **Volume 2 of 5 [268 pages]** | | | |
| Federal Defendants' Memo in Support of Summary Judgment, *CBD v. USFS*, Case No. 23-cv-00928 (DLF) (D.D.C., August 22, 2024) | 8/4/2025 | 97-1 | 105-154 |
| BLM Review of Hydrology Aspects of the Resolution Copper Project | 7/14/2025 | 87-1 | 155-180 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, June 2025 | 7/14/2025 | 87-2 | 181-275 |
| Draft Record of Decision, June 2025 | 7/14/2025 | 87-3 | 276-367 |
| **Volume 3 of 5 [180 pages]** | | | |
| Declaration of Maria Dadgar | 7/14/2025 | 87-5 | 373-380 |
| Declaration of Roger Featherstone | 7/14/2025 | 87-6 | 381-387 |

| | | | |
|---|---|---|---|
| Declaration of Russ McSpadden | 7/14/2025 | 87-7 | 388-399 |
| Declaration of Erik Murdock | 7/14/2025 | 87-8 | 400-403 |
| Declaration of Sandra Bahr | 7/14/2025 | 87-9 | 404-408 |
| Master Water Plan for Superstition Vistas, Apache Junction, Arizona | 7/14/2025 | 87-10 | 409-547 |
| **Volume 4 of 5 [195 pages]** | | | |
| Appraisal Report Summary: Mining Claim Zone MCZ Parcel | 7/14/2025 | 87-11 | 553-567 |
| Appraisal Report Summary: Mineral Withdrawal Area (MWA) Parcel | 7/14/2025 | 87-12 | 568-595 |
| Technical Appraisal Review Report: MWA Parcel (excerpts) | 7/14/2025 | 87-13 | 596-598 |
| Oversight and Legislative Hearing Before the U.S. House of Representatives Subcommittee on Energy & Mineral Resources, March 2013 | 7/14/2025 | 87-14 | 599-715 |
| Congressional Budget Office Cost Estimate, July 2013 | 7/14/2025 | 87-15 | 716-717 |

| | | | |
|---|---|---|---|
| House Natural Resources Committee House Report No. 113-167, July 2013 | 7/14/2025 | 87-16 | 718-742 |
| **Volume 5 of 5 [296 pages]** | | | |
| Uniform Appraisal Standards for Federal Land Acquisitions | 7/14/2025 | 87-17 | 748-1009 |
| Excerpt from Resolution Copper Mining's General Plan of Operations, 2016 | 7/14/2025 | 87-18 | 1010 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, January 2021 (rescinded) | 7/14/2025 | 87-19 | 1011-1013 |
| USDA Memo for Withdrawal of Notice of Availability, Rescind Final Environmental Impact Statement and Draft Record of Decision | 3/2/2021 | 26-2 | 1014 |
| Notice of Appeal | 8/15/2025 | 100 | 1015-1020 |
| Civil Docket for Case No. 2:21-cv-00122-DWL – United States District Court, District of Arizona (Phoenix) – *Arizona Mining Reform Coalition, et al. v. United States Forest Service, et al.* | | | 1021-1038 |

Roger Flynn (CO Bar # 21078) (*pro hac vice*)
Jeffrey C. Parsons (CO Bar #30210) (*pro hac vice*)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738; wmap@igc.org

Susan B. Montgomery (AZ Bar # 020595)
Robyn L. Interpreter (AZ BAR # 020864)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825; smontgomery@milawaz.com
*Counsel for Inter Tribal Association of Arizona*

Marc D. Fink (MN Bar #343407) (*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
(218) 464-0539; mfink@biologicaldiversity.org

Allison N. Henderson (CO Bar #45088) (*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008; AHenderson@biologicaldiversity.org
*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| Arizona Mining Reform Coalition, *et al.,* | Case No. 2:21-cv-00122-DWL |
| Plaintiffs | |
| vs. | **DECLARATION OF** |
| United States Forest Service, *et al.,* | **MARIA DADGAR** |
| Defendants, | |
| and | |
| Resolution Copper Mining, | |
| Defendant-Intervenor. | |

1

I, Maria Dadgar, pursuant to 28 U.S.C. § 1746, declare as follows:

1. The facts set forth in this declaration are based on my personal and professional knowledge and understanding. If called as a witness, I could and would competently testify thereto under oath.

2. I am the Executive Director of the Inter Tribal Association of Arizona, Inc. ("ITAA") and have served in this role since 2014.

3. I am an enrolled tribal member of the Piscataway Tribe of Maryland.

4. The ITAA is an intertribal, 501(c)(4) nonprofit organization composed of 21 federally recognized Indian Tribes with lands located primarily in Arizona, as well as in California, New Mexico, and Nevada.

5. As Executive Director of ITAA I am responsible for managing ITAA's operations in achieving its advocacy mission, goals, and objectives for our Member Tribes.

6. ITAA's Member Tribes are the Ak-Chin Indian Community, the Cocopah Tribe, the Colorado River Indian Tribes, the Fort McDowell Yavapai Nation, the Fort Mojave Indian Tribe, the Gila River Indian Community, the Havasupai Tribe, the Hopi Tribe, the Hualapai Indian Tribe, the Kaibab Band of Paiute Indians, the Pascua Yaqui Tribe, the Quechan Tribe, the Salt River Salt River Pima-Maricopa Indian Community, the San Carlos Apache Tribe, the San Juan Southern Paiute Tribe, the Tohono O'odham Nation, the Tonto Apache Tribe, the White Mountain Apache Tribe, the Yavapai-Apache Nation, the Yavapai-Prescott Indian Tribe, and the Zuni Tribe.

7. The representatives of ITAA are the highest elected tribal officials from each of the Member Tribes, including tribal chairpersons, presidents, and governors.

8. ITAA's Member Tribes have worked together since 1952 to provide a united voice for Tribes on matters of common concern for their respective Tribes and tribal members. To this end, ITAA Member Tribes have firmly stood shoulder-to-shoulder for nearly 20 years in united opposition to the transfer of the public lands at Oak Flat for the development of the Resolution Copper Mine.

2

9. ITAA's President and individual Tribal Leaders from many of our Member Tribes have testified before Congress against the Resolution Copper Mine and Land Exchange numerous times. We have also written countless letters and comments, passed Resolutions in opposition to the exchange and mine both through ITAA and through the Tribal Councils of our individual Member Tribes, and we have taken other measures towards the shared goal of protecting the approximately 2,400 acres of Tribal ancestral lands, located within the Tonto National Forest in Arizona, known as "Oak Flat" or, for the Western Apache, "Chi'chil Biłdagoteel."

10. Since time immemorial, Oak Flat has been a place of profound religious, cultural, and historical significance for certain of ITAA's Member Tribes, including the San Carlos Apache Tribe, the Fort McDowell Yavapai Nation, and others.

11. I have personally visited Oak Flat to spend time in nature with friends and their family and to stand with our Member Tribes and their tribal members in support of protecting Oak Flat from future harms, including the irreparable harms presented by its potential exchange to private interests for mining purposes.

12. Many of the ancestors of our tribal members of at least one or more of our member tribes have used Oak Flat for religious, traditional or cultural practices since time immemorial. To the best of my knowledge and understanding, many current tribal members of at least one or more of our member tribes have continued to use Oak Flat for religious, traditional, or cultural practices on a regular basis and fully intend to continue doing so.

13. To this end, I fully anticipate that numerous individual tribal members from our Member Tribes will use Oak Flat for cultural, traditional, spiritual or other important purposes in the coming months and years.

14. The importance of Oak Flat is not based on a mere vestige of the past. Oak Flat remains a place that many tribal members of our Member Tribes visit to this day, in order to gather important plants for medicine and ceremony, to harvest vitamin rich foods like acorns and lemon berries, and to gather, pray, and perform tribal ceremonies. The continued existence of Oak Flat as a natural place has such a critical role in the religious practices of

3

many tribal members – practices that will be irreparably harmed if Oak Flat is conveyed to Resolution Copper for mining purposes.

15.    Under Section 3003 of the National Defense Authorization Act for Fiscal Year 2015 for fiscal year 2015. Pub. L. 113-291 ("NDAA" or "Section 3003") it is my understanding that the United States intends to transfer the sacred site of Oak Flat to the multinational mining conglomerate, London-based Rio Tinto Corp. ("Rio Tinto," "Resolution," or "Resolution Copper") no later than March 16, 2021, resulting in the loss of these sacred public lands forever.

16.    The Resolution Copper Mine will collapse the very heart of Oak Flat into a massive subsidence crater, rendering Oak Flat forever inaccessible to current and future generations of the public and those tribal members of ITAA's Member Tribes who need to access this place to support their religious, traditional, and cultural practices.

17.    Standing up for the protection of Oak Flat and the protection of the religious, traditional, and cultural practices of our Member Tribes is the type of issue of common interest and concern that goes to the core mission of ITAA. This is why ITAA is a plaintiff in this case.

18.    ITAA has been harmed by the Forest Service's failure to adequately consider the impacts related to the Land Exchange as well as the proposed mine, and the Forest Service's failure to adequately involve the public in its decision-making process.

19.    The new Final EIS and Draft ROD have numerous revisions from the prior versions. Yet since the 2021 versions were rescinded until now, the agencies have not engaged in any public review. The new Draft ROD also contains 16 brand-new proposed amendments to the Tonto National Forest Plan which the agency says are needed to approve the pipelines, transmission lines, and other infrastructure. These Forest Plan amendments, on which there has been no public review and comment, will eliminate existing protections for the wildlife and cultural resources in the Oak Flat area which are valuable to the public as well as tribal members of ITAA's Member Tribes.

4

20.     In December 2020 and again in April 2025, ITAA provided supplemental materials to the agencies containing new significant information on new environmental conditions, new activities in the area, and other new information since the prior 2021 FEIS was rescinded. The April 2025 supplement contained dozens of new documents on these topics. The agencies have not acknowledge receipt or responded to the April 2025 supplement.

**Irreparable Harm from the Land Exchange**

21.     Immediately upon the exchange of these 2,400 acres of Forest Service lands, all Federal laws and regulations governing access and use of Oak Flat will cease to be applicable, along with the United States' trust responsibility to our Member Tribes, which presently extends to the U.S. Forest Service's management of this culturally important place. Instead, the future management of this sacred place and the terms upon which access may be conditioned for our Member Tribes and their tribal members, will transfer into the sole discretion of Resolution Copper as the private landowner. This will occur on the day of the land exchange.

22.     While I understand that under the NDAA Resolution Copper may agree to provide limited (but temporary) access to the tribal members of ITAA's Member Tribes "to the maximum extent practicable, consistent with health and safety requirements" to a very small 50 acre portion of land referred to as the Oak Flat campground in Section 3003(i)(3) of the NDAA (a much-smaller piece of the original 760-acre Oak Flat Campground withdrawn from mining in 1955), the terms of this "access" will be in the sole discretion of Resolution Copper and Resolution Copper alone. Moreover, there is nothing in the NDAA that suggests any obligation on the part of Resolution Copper to provide access to the remaining approximately 2,350 acres of the wider Oak Flat area with any of its significant features and resources that are integral to the vitality of this place as a sacred site. Resolution Copper appears to have the unlimited right to exclude access to virtually all of the Oak Flat area immediately upon taking ownership.

5

23. The very act of seeking permission from a foreign mining interest to access a limited corner of this sacred site will visit trauma on the tribal members of our Member Tribes. Further, if Oak Flat is taken away, the security of those who have long accessed this site will be shattered, since agents, representatives, employees, or other personnel of Resolution Copper may require formal permission to access the small 50-acre portion of this sacred site and may demand proof of such permission at any time, disrupting the religious, traditional, cultural, or other practices or activities carried out by tribal members of our Member Tribes at this small portion of the Oak Flat area. Permission to access even the small 50-acre Oak Flat campground could be severely restricted or denied altogether.

24. In my experience as a tribal member and as the Executive Director of ITAA, this constant and real threat of disturbance would have a chilling and disturbing effect on tribal members attempting to engage in traditional, cultural, and religious practices at Oak Flat – which can and often are of a deeply personal and private nature.

25. Moreover, even while access to the small 50 acre Oak Flat campground at Oak Flat may be permitted for a period of time after the lands are exchanged into private ownership (and before the eventual destruction and inaccessibility of the area from mining activity), various noisy, disruptive and possibly even dangerous pre-mine construction activities will be occurring at the site. Not only would this be a major source of distraction, anger, and anxiety for tribal members engaged in cultural and religious practices, it will be a glaring reminder of the impending destruction of the area.

26. In addition, if Oak Flat is taken away and becomes the private property of a mining company that, by its very nature, plans to engage in activities resulting in the physical desecration and destruction of Oak Flat, tribal members will no doubt be aware that each visit to this sacred place to gather plants, perform religious ceremonies or to pray – practices that have been performed since time immemorial – could be their last. The emotional trauma and harm for our Member Tribes, their tribal members, and to ITAA's mission caused by the exchange will be immediate and irreparable.

6

27. Overall, in my experience as a tribal person and as the Executive Director of ITAA, the act of the exchange itself – that is the transfer of this sacred site to private interests for commercial profit – will permanently disrupt the religious and cultural foundation of certain of our Member Tribes, creating a dark cloud that will continue for future generations.

28. Tribal loss of place, displacement, forced removals, and cultural and religious disruption and genocide permeate American and Arizona history. The shadows of this grim history exist to this day and are keenly felt by current generations of tribal people.

29. Involuntary loss of land is a particularly prevalent source of historical trauma that has led to numerous social ills and other challenges for our Member Tribes.

30. The exchange of this deeply significant Oak Flat area into private ownership for destructive purposes would be a painful and very real reminder to ITAA Member Tribes and their tribal members that injuries like these are not wrongs relegated to the past, but rather, are wrongs that can and will continue to be perpetuated on tribal people today and in the future.

31. Even now, the scheduled loss and destruction of Oak Flat under the land exchange and mining plan is a source of great anxiety for tribal members of certain of ITAA's Member Tribes, but this anxiety would transform into deep grief if these lands are transferred to Resolution Copper resulting in an immeasurable and permanent loss of cultural heritage and religious identity for tribal people.

**Irreparable Harm from the Resolution Copper Mine Project**

32. The Resolution Copper Mine project would involve the extraction of 1.4 billion tons of ore from deep underneath Oak Flat, collapsing the land surface into a 2-mile wide, 1,000 foot deep crater.

33. Once the land surfaces begin to collapse, access to the Oak Flat area will become dangerous, physically impossible, and/or limited or curtailed entirely Resolution Copper.

34. The Oak Flat area is within the Chi'chil Biłdagoteel Historic District, a Traditional Cultural Property on the National Register of Historic Places, recognized by the

federal government for its enduring and vast archaeological, cultural, and historic resources and its deep significance to many of ITAA's Member Tribes. The integrity of Chi'chil Biłdagoteel as a Traditional Cultural Property would be permanently and irreversibly destroyed by the land subsidence and other activities from this mine project.

35.    The development of the mine at Oak Flat would also have irreparable and wide-reaching harmful impacts to the natural systems at Oak Flat, including its many plants and animals, and the water sources that have supported the health and vitality of Oak Flat since time immemorial.

36.    The mine project would also deposit 1.37 billion tons of mine tailings (much of them toxic) on nearby lands only a short distance from the Gila River, forever a physical reminder of the irreparable loss of Oak Flat to our Member Tribes and their tribal members. This massive mine tailings site will also provide a perpetual threat of contamination, which would loom over Arizona's waters for many centuries to come, if not forever, including waters used and relied upon by our Member Tribes for survival.

37.    I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this 12th day of July, 2025 in Phoenix, Arizona.


_____
Maria Dadgar, Executive Director
Inter Tribal Association of Arizona, Inc.

8

Roger Flynn (CO Bar #21078) (pro hac vice)
Jeffrey C. Parsons (CO Bar #30210) (pro hac vice)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738; wmap@igc.org

Marc D. Fink (MN Bar #343407) (pro hac vice)
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
(218) 464-0539; mfink@biologicaldiversity.org

Allison N. Henderson (CO Bar #45088) (pro hac vice)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008; ahenderson@biologicaldiversity.org
*Counsel for Plaintiffs*

Susan B. Montgomery (AZ Bar #020595)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825; smontgomery@milawaz.com
*Counsel for Inter Tribal Association of Arizona*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| Arizona Mining Reform Coalition, *et al.*, ) | Case No.  CV-21-00122-PHX-DWL |
| Plaintiffs, ) | |
| vs. ) | **DECLARATION OF** |
| United States Forest Service, *et al.*, ) | **ROGER FEATHERSTONE** |
| Defendants, ) | |
| and ) | |
| Resolution Copper Mining, ) | |
| Defendant-Intervenor. ) | |

1

I, Roger Featherstone, declare as follows:

1.      The facts set forth in this declaration are based on my personal knowledge. If called as a witness, I could and would testify competently to these facts. As to those matters which reflect an opinion, they reflect my personal opinion and judgment on the matter.

2.      I reside in Tucson, Arizona, where I have lived since 2005.

3.      I am a member of the Arizona Mining Reform Coalition (AMRC), one of the Plaintiffs in this case.  I am the former Director of AMRC, a position I held for many years until earlier this year.  I am currently the Board Secretary of AMRC.  I am also a member of Earthworks, also a Plaintiff in this case.

4.      AMRC is comprised of Arizona groups and individuals that work to ensure that responsible mining contributes to healthy communities, a healthy environment, and, when all costs are factored in, is a net benefit to Arizona.  AMRC expects the mining industry to clean up after itself, comply fully with the spirit of safeguards in place to protect Arizona, and to interact in a transparent and open manner with Arizona citizens.

5.      AMRC works to protect Arizona's environmental and community values from the adverse impacts of industrial mine development – to protect these values for both the current generation as well as future generations.  I have worked for decades in Arizona, as a member of AMRC and other conservation organizations, to protect these values – values that will be irrevocably destroyed by the land exchange and then the Resolution Project.

6.      Earthworks is a nonprofit organization dedicated to protecting communities and the environment from the adverse impacts of mineral and energy development while promoting sustainable solutions.  Earthworks stands for clean air, water and land, healthy communities, and corporate accountability.  Earthworks supports solutions that protect both the Earth's resources and our communities.  Along with the other Plaintiff groups, Earthworks submitted detailed comments to the Forest Service regarding the agency's review of the proposed Land Exchange and Mine.

2

7.      I first went to Oak Flat in 2004 and have visited there frequently ever since.  On average, I have visited Oak Flat on average about 4 times a year and over certain periods, especially since 2011, much more frequently.  From my many trips to Oak Flat, I know the area intimately.

8.      My last visit to Oak Flat was in the late Fall of 2024, and I intend to return regularly.  Over the next year, I anticipate that I will visit Oak Flat at least a few times.

9.      While visiting Oak Flat, I enjoy viewing wildlife, visiting and communing with my favorite plants, visiting and communing with my favorite places within Oak Flat, drinking the water (with filter, of course), photography, hiking, camping, scientific research (our camera project), communing with nature, and recharging my spiritual batteries, in these trying times especially.  I believe that Oak Flat is critical for my mental, emotional and spiritual health.

10.     If the land exchange is executed, I would no longer have the ability to visit Oak Flat with the knowledge that it is public land, and partially belonging to me as a United States citizen and taxpayer.  Instead, I would know during my visits that Oak Flat is in the ownership and control of foreign mining companies that would be able to condition my future visitation and use of Oak Flat for any reason, which would be devastating to my mental, emotional, and spiritual health.  The specter of Resolution Copper owning Oak Flat and the mining company's prominent presence on the land would loom over my psyche and irreparably taint my experience to the point that I would no longer be able to enjoy my time at Oak Flat.  In short, having to ask the permission of a mining company to visit would ruin the experience.

11.     Additionally, if the land exchange is executed, I would no longer be able to conduct my scientific research in this area, which is important to me, and AMRC, and for the public because our camera project is the longest running and most rigorous wildlife camera trap study in the area.  If these lands are privatized, there would also no longer be public notice of proposed projects and activities that may adversely impact Oak Flat and the surrounding



areas, and I would no longer be able to be involved in the development, analysis, and oversight of those projects and activities.

12.     Previously, the company had stated that it would allow after the land transfer, at its discretion, the use of roughly 50 acres of land at the current Oak Flat Campground. As I have stated, this is unacceptable and does not alleviate the immediate and irreparable harm to my uses and enjoyment. In addition, this hollow gesture does not apply to the other lands with the 700+ acre Withdrawn Area, let alone the over 1,600 acres of current national forest land adjacent to the Withdrawn Area that I use and enjoy as noted above.

13.     The privatization of these lands will also prevent my access to other public lands, such as the state trust lands south of Oak Flat, that I use and enjoy for recreational, aesthetic, and scientific purposes (similar to my uses of the lands to be exchanged-away).



4

Photo taken by Roger Featherstone on December 13, 2019, on Arizona State Trust land south of the Oak Flat Campground parcel. Access to this location is via roads that would be privatized if the land exchange is consummated.

14.     The knowledge that Oak Flat is currently protected from mining, no matter how imperfect that protection may be, is comforting to me during my visits to Oak Flat. If the land exchange is executed, I fear that this loss of comfort would be too high a burden for me to bear.

15.     If after the land exchange the proposed copper mine at Oak Flat is allowed to proceed, all of my concerns and injuries would be greatly magnified by the physical destruction of Oak Flat, the transformation of Oak Flat into an industrial wasteland, and the knowledge that the adverse effects of a mine would go far beyond Oak Flat. The loss of water would damage the livelihood of many people in the East Valley and even in the Phoenix area, some of which are our members.

16.     I have regularly contacted the management of Rio Tinto/Resolution Copper regarding the severe and irreparable impacts to public values and resources at Oak Flat that will be destroyed by the Project, as well as the Forest Service's truncated and limited public review of the Exchange. In response to my letter, the CEO of Rio Tinto reiterated that the Exchange could not be authorized/approved unless the FEIS was fully compliant with NEPA:

> The Resolution land exchange, in contrast to other land exchanges mandated by Congress, is subject to completion of an environmental impact assessment under the National Environmental Policy Act (NEPA) by the US Forest Service. Other land exchanges mandated by Congress occur 60 days after passage without a review under NEPA. Making the Resolution land exchange contingent on a full NEPA review was one of the requirements that bipartisan leaders included in the legislation prior to its passage in 2014.

Email response from Jakob Stausholm, CEO of Rio Tinto, to Roger Featherstone (a true and correct copy was attached to my previous Declaration, ECF No. 9-3, Feb. 19, 2021).

17.     In addition to these imminent, substantive, and irreparable harms to the environment and my uses of the affected lands, the Forest Service's failure to comply with the

5

1   requirements of the National Environmental Policy Act and other federal laws for the Land

2   Exchange and Resolution Copper Project has significantly harmed my ability, and the

3   ability of other members of AMRC and the public, to fully and adequately participate in the

4   required public participation process for this proposal.

5   18.    For example, on April 11, 2025, AMRC and the other plaintiffs submitted over 40

6   relevant documents, containing significant information regarding the new environmental

7   conditions, other new activities in the area, and other information that had arisen since the

8   rescission of the 2021 FEIS and DROD, requesting that the agency consider the new

9   information in the new FEIS (which had yet to be noticed). (April 11, 2025 letter attached to

10  this Declaration). The agency refused, as there is no reference, let alone analysis, of these

11  changed conditions and new information.

12  19.    In fact, the Forest Service did not allow, let alone consider, any public review or

13  comment on its decision-making between 2019 (issuance of Draft EIS) and its issuance of

14  the new FEIS and DROD in 2025. This is despite the many changes that the agency made to

15  the EIS after 2019, up to 2025.

16  20.    To make matters worse, the agency, for the first time in June 2025, included a whole

17  new Appendix T to the FEIS, proposing to make significant amendments to the Tonto

18  Forest Plan – amendments the agency says are needed for it to approve the mine's

19  infrastructure.  The public was not aware of this, and the agency never solicited public

20  comments, with is required by NEPA, FLPMA, and other federal laws.  Indeed, in the 2021

21  DROD, the Forest Supervisor said that amendments to the Forest Plan were not needed to

22  approve the Project.

23  21.    AMRC has been diligently monitoring actions of the Tonto National Forest regarding

24  the Exchange and mine, and certainly would have submitted comments detailing the many

25  legal and factual errors in Appendix T and the new section of the DROD (2.1.4).

26

27  I declare under penalty of perjury that the foregoing is true and correct.

28                                                                            6

1

2    Executed July  7, 2025, in Tucson, Arizona.

3

4

5

6    Roger Featherstone

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

Roger Flynn (CO Bar #21078) (pro hac vice)
Jeffrey C. Parsons (CO Bar #30210) (pro hac vice)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738; wmap@igc.org

Marc D. Fink (MN Bar #343407) (pro hac vice)
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
(218) 464-0539; mfink@biologicaldiversity.org

Allison N. Henderson (CO Bar #45088) (pro hac vice)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008; ahenderson@biologicaldiversity.org
*Counsel for Plaintiffs*

Susan B. Montgomery (AZ Bar #020595)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825; smontgomery@milawaz.com
*Counsel for Inter Tribal Association of Arizona*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| Arizona Mining Reform Coalition, *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> United States Forest Service, *et al.*, <br><br> Defendants, <br> and <br><br> Resolution Copper Mining, <br><br> Defendant-Intervenor. | No. CV-21-00122-PHX-DWL <br><br> **DECLARATION OF RUSSELL McSPADDEN** |

1

I, Russell McSpadden, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury:

1.    The facts set forth in this declaration are based on my personal knowledge. If called as a witness, I could and would testify competently to these facts. As to those matters which reflect an opinion, they reflect my personal opinion and judgment.

2.    I reside in Tucson, Arizona where I have lived since 2012. I have a master's degree in history, with a focus on environmental history, from Florida Atlantic University.

3.    I am a member of the Center for Biological Diversity ("the Center"), a national nonprofit organization headquartered in Tucson, Arizona, that works to protect imperiled species and wild places. I have been a member and have worked at the Center since 2012 and in that time have actively engaged in advocacy and public education around threats to Arizona's public lands and biodiversity, including the proposed Resolution Copper Mine and Land Exchange.

4.    The Resolution Copper Mine and Land Exchange is proposed for an area known as Oak Flat, which is within the Tonto National Forest in eastern Arizona. The Center has long been involved in protecting Oak Flat and opposing the proposed Resolution Copper Mine and Land Exchange. The Center has submitted extensive comments on the Draft and Final Environmental Impact Statements, filed Freedom of Information Act requests, coordinated media coverage, and engaged in coalition work with Indigenous and environmental partners. The Center has a strong institutional interest in protecting Oak Flat for its ecological,

2

recreational, and cultural values and to protect biodiversity and prevent the extinction of species that rely on the area's fragile ecosystems.

5.      Personally, I have visited Oak Flat regularly for the past 10 years. My connection to the area is grounded in both my conservation work and in my personal, meaningful time spent there. I have camped, hiked, birdwatched, and explored the area's canyons, seeps, springs, and ephemeral waterfalls. I have participated in ceremonies and events including multi-day campouts, marches, and meetings with Tribal leaders and elected officials at Oak Flat.

6.      My first visit to Oak Flat occurred from February 6 through February 8, 2015, during the First All Nations Spiritual Gathering held at the Oak Flat campground in the Tonto National Forest. This event would become known as the first annual march and spiritual gathering to oppose the potential loss of the sacred site of Oak Flat to the Resolution Copper Mine and Land Exchange. There have now been 11 annual marches and gatherings. I took my son, who at the time was 2 years old and we camped beside a running stream at the campground. We participated in the events of the gathering and spent time exploring the surrounding Emory oaks, played in the streams, and took small hikes through the beautiful diversity of agaves and rock formations nearby. There were a great many children from the nearby San Carlos Reservation, as well as from other Tribal lands and from communities across Arizona.

7.      At the gathering I listened to many speakers, including Terry Rambler, chairman of the San Carlos Apache Tribe; Dennis Welch, treasurer of the National Congress of American Indians; and Kieran Suckling, executive director of the Center for Biological

3

Diversity. Each speaker outlined the historical, spiritual and ecological values of Oak Flat and the surrounding Tonto National Forest. Part of my professional work includes videography and I recorded these speeches and edited a video that was published on the Center for Biological Diversity's YouTube channel.

8.      From February 26-27 of 2016, I also attended what was called the Second March to Freedom, which was the second annual march and gathering at Oak Flat to oppose the destruction of the area by Resolution Copper Company. On February 26, I visited a site at the San Carlos Apache Reservation and met with representatives of Apache Stronghold and there was a ceremony and prayer at sunset. I visited a series of intriguing statues that evening, which depicted Apache figures on horseback and on foot. One statue depicted an Apache man on a horse with his arms raised to the sky. I read inscriptions on the statues that depicted quotes about the imprisonment of the Apache at San Carlos. The location of the statues was beautiful, tucked in a wild, open space with a large wetland, beautiful cactus and sweeping views of mountains. Part of my work is as a photographer, and I took photographs of the landscapes and statues.

4



Photograph I took of statue during the second annual March and Gathering for Oak Flat in February 2016

9. On February 27, 2016, I attended a ceremony and prayer at sunrise and then helped support marchers walking from San Carlos to Oak Flat. I had a truck full of water and snacks and provided those items during the march. I also picked up marchers and runners and drove them to various locations because the march had a relay style process for those that were not intending to do the entire march from San Carlos to Oak Flat.

10. Over the years, starting in 2016, I've been a part of a wildlife monitoring project using numerous trail cameras in and around Oak Flat and several of the nearby canyons, including Ga'an Canyon, also known as Devil's Canyon. In partnership with the Arizona Mining Reform Coalition, I have helped check these remote cameras. This work is ongoing. Detections include mountain lions, black bears, coati, deer, and other species. We have used these trail camera photos and videos to help tell the story of the wildlife of Oak Flat in social

5

media and through traditional media outlets. I use wildlife cameras as part of my profession. I've personally reviewed this footage and consider this work important for documenting species that may be impacted by mining and land transfer activities. I will continue to check trail cameras in and around Oak Flat several times a year, including later this year in May and October.



Trail camera video still of mountain lion and her two cubs in a canyon very near the Oak Flat campground.

11.      From February 17-20, 2022, in coordination with the 8th Annual Oak Flat March/Run, I joined Indigenous youth from the Brophy Native American Club, affiliated with Brophy College Preparatory in Phoenix, Arizona, on a 227-mile prayer run from Flagstaff to Oak Flat. I both documented the event on video and participated in parts of the relay run. Together with the students I spent several nights out under the stars and days running from the snowy elevations near Flagstaff, across the Verde River, and all the way to Oak Flat. The run was an act of activism and spiritual journey for the students who often remarked that they,

6



like myself, consider Oak Flat an irreplaceable refuge for reflection, connection to nature, and community. My participation in this journey changed my life in ways that are not easy to explain. The connection and inspiration I felt with the student runners continues today. Their devotion to wildlife protection, Native American religious liberty and the environment invigorates my life professionally, personally and spiritually. I created a video that was used broadly in traditional and social media to tell the story of the student's journey.



7

Photographs that I took during the 227-mile run to Oak Flat, February 2022

12.    I have made several trips to Oak Flat to photograph and video the landscapes including in 2016, 2017, 2019, 2022, and 2024 and 2025. I like to make images of the canyons and flora and fauna of the region. I have visited known occurrences of the endangered Arizona hedgehog cactus and believe the site offers potential habitat for ocelots, a species I care deeply about and which I have documented and written about in other Sky Island ecosystems. The creation of these images are both personal and professional. Many of the images (photographs and videos) have been used by the Center for Biological Diversity and other groups and organizations, including media outlets, for educational and advocacy uses.



Image of Arizona hedgehog cactus I took in August 2022.

13.    On January 19, 2024, I was invited by the San Carlos Apache Tribal Council to present at the Tribal Council chambers to the Tribe and to Governor Katie Hobbs about the

8

ecological and wildlife impacts that could result from Resolution Copper's proposed mine at Oak Flat. I then attended a lunch at Oak Flat with Governor Hobbs, her staff, and members of the San Carlos Apache Tribal Council and community members where we ate acorn stew from local Emory Oaks.

14.    On June 7, 2025, I visited Oak Flat following my presence the day before at a court hearing in Phoenix about the Oak Flat Land Exchange. It felt important to me to visit the landscape. I wandered the Emory oak groves of the campground, and wandered beyond the campground to explore the geology and plant life of the surrounding Tonto National Forest land. I hiked a few miles beyond the campground. I sat in the shade of oaks and manzanita trees and contemplated the natural world around me and what could be lost. There was new growth and a delicate vibrancy from recent precipitation in early June and the I watched the beautiful golden hour. Those things gave me hope.

15.    I plan to continue visiting Oak Flat in the future. I have already scheduled a camping, wildlife photography and trail camera trip in the fall of 2025 and plan to return again in the spring of 2026 to check on trail cameras and visit seeps, springs and wildlife corridors. I also expect to join annual events organized by Indigenous-led organizations and conservation groups, including educational hikes and overnight visits focused on biocultural stewardship. My continued use and enjoyment of Oak Flat is ongoing, regular, and essential to my physical, emotional, and professional well-being.

16.    If the land exchange authorized by the 2015 National Defense Authorization Act is executed and Oak Flat is transferred to Resolution Copper Company, my ability to visit and use the site as I have in the past would be severely and irreparably impaired. Oak Flat

9

would be transferred from public national forests lands that I can visit freely and enjoy at any time, to the private mining company. Losing access to the public lands to be transferred, including lands outside the immediate 50-acre Oak Flat Campground, would immediately prevent me from visiting these lands and would eliminate my uses described above. I assume that I would also immediately no longer be able to continue my wildlife monitoring project using trail cameras once these lands are privatized. These irreparable harms will occur immediately, long before the mine would begin, and would be in addition to the harms caused by the mine itself.

17.    The mine project would destroy key surface features, including springs, riparian areas, cliffs, boulder formations, and cultural landmarks, making the area inaccessible, unsafe, or spiritually defiled. The proposed block cave mining would result in a massive subsidence crater, eliminating many of the places I have come to know intimately through years of visits.

18.    The mine and associated infrastructure would fundamentally alter the natural soundscape and night skies that define the Oak Flat experience. The quiet and darkness that make it possible to hear owls, observe bat activity, or photograph stars would be lost to light pollution, noise, and industrial activity. The wildlife that I monitor and photograph would either be displaced or perish as the habitat is fragmented or destroyed. If the land becomes private property controlled by a multinational mining company, I would no longer feel safe camping or exploring there, especially given the history of harassment and violence near extractive sites, which is particularly concerning to many of us in the conservation community.

10

19.     Once the public lands are transferred, and then also if Oak Flat is mined, I will no longer be able to experience this landscape in the ways I have come to rely on. My plans to return, my enjoyment of the area, and my ability to support ecological monitoring would be irreparably harmed. The loss of Oak Flat would not just be a personal loss, but also a blow to the broader public interest in preserving public lands for future generations and protecting biodiversity in Arizona's Sky Islands.

20.     In my role as Southwest Conservation Advocate for the Center, and as a member of the Center, I have been, and continue to be, harmed by the Forest Service's failures to adequately consider all of the impacts related to the Exchange and proposed mine, as well as its failure to adequately involve the public in the decision-making process.

21.     As just two examples: (1) the new Final EIS and Draft Record of Decision (DROD) contain numerous revisions from the 2021 versions. Yet despite over 4 years of review (after the 2021 FEIS and DROD were rescinded), the agency did not solicit any public review; (2) in addition, the new DROD contains, for the first time, 16 proposed amendments to the Tonto National Forest Plan, which the agency says are needed in order for it to approve the pipelines, transmission lines, roads, and other infrastructure. These amendments would eliminate existing protections for the wildlife and cultural resources that I value and have enjoyed for years, as detailed above.

22.     If the agency had allowed for public comment on these new changes, I and the Center would have been able to inform the agency of the need to keep the Forest Plan protections, as well as informing them of the various changed conditions in the region (such as water development) that should have undergone public review and agency considerations.

11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

23.    I respectfully request that the Court grant the relief sought in this case and halt the land exchange and Resolution Copper Project so that Oak Flat, including the over 2,300 acres of current public lands to be transferred, remains protected public land available for my cultural, spiritual, recreational, and ecological use.

Executed this 8th day of July, 2025.



_____
Russell McSpadden

12

1  Roger Flynn (CO Bar #21078) (pro hac vice)
   Jeffrey C. Parsons (CO Bar #30210) (pro hac vice)
2  WESTERN MINING ACTION PROJECT
   P.O. Box 349; 440 Main Street, #2
3  Lyons, CO 80540
4  (303) 823-5738; wmap@igc.org

5  Marc D. Fink (MN Bar #343407) (pro hac vice)
   CENTER FOR BIOLOGICAL DIVERSITY
6  209 East 7th Street
7  Duluth, Minnesota 55805
   (218) 464-0539; mfink@biologicaldiversity.org
8
9  Allison N. Henderson (CO Bar #45088) (pro hac vice)
   CENTER FOR BIOLOGICAL DIVERSITY
10 P.O. Box 3024
   Crested Butte, CO 81224
11 (970) 309-2008; ahenderson@biologicaldiversity.org
12 *Counsel for Plaintiffs*

13 Susan B. Montgomery (AZ Bar #020595)
14 MONTGOMERY & INTERPRETER, PLC
   3301 E. Thunderbird Rd.
15 Phoenix, AZ 85032
   (480) 513-6825; smontgomery@milawaz.com
16 *Counsel for Inter Tribal Association of Arizona*
17
                IN THE UNITED STATES DISTRICT COURT
18                 FOR THE DISTRICT OF ARIZONA
19                       PHOENIX DIVISION

20 Arizona Mining Reform Coalition, *et al.*,      )
                                                   )   Case No. CV-21-00122-PHX-
21                    Plaintiffs,                  )   DWL
                                                   )
22       vs.                                       )
                                                   )   **DECLARATION OF**
23 United States Forest Service, *et al.*,         )   **ERIK MURDOCK**
                                                   )
24                    Defendants,                  )
           and                                     )
25                                                 )
   Resolution Copper Mining,                       )
26                                                 )
                      Defendant-Intervenor.        )
27 ─────────────────────────────────────────

28
                                                                          1

I, Erik Murdock, declare as follows:

1. I am the Deputy Director of Programs, Policy and Government Affairs for the Access Fund, and also a member of the Access Fund, a Plaintiff in this case.  The Access Fund represents millions of climbers nationwide in all forms of climbing: rock climbing, ice climbing, mountaineering, and bouldering.  At the Access Fund, our mission is to keep climbing areas open and conserve the climbing environment.  The Access Fund not only protects access to climbing landscapes and experiences, but also protects the integrity of these valuable landscapes.

2. I lived in Tempe and Tucson, Arizona from 1994 to 2017, and currently reside in Estes Park, Colorado.

3. I have been going out to Oak Flat with my friends and family since 1994 to hike and rock climb.  Oak Flat is a unique and irreplaceable climbing and bouldering area, having a prominent place in the history of climbing in Arizona.  Oak Flat was the site of the world's largest climbing competition from 1989 through 2004.  I volunteered at the competition from 1995-1997.

4. I visit Oak Flat frequently, along with other members of the Access Fund.  While studying at Arizona State University from 1995 to 1998, I lived in Tempe, AZ and visited Oak Flat several times per week.  After I moved to Tucson, AZ in 1998, I would visit Oak Flat several times per year to rock climb and explore the desert. Just being outdoors there and climbing is rejuvenating.  The climbing at Oak Flat is quite varied—and that is unusual for most climbing areas.  Most areas are known primarily as bouldering areas, sport climbing areas, or traditional (trad) climbing areas—while Oak Flat has an abundance of all three.

5. I have been to Oak Flat as recently as March, 2023.  I bouldered at Oak Flat West and sport climbed at the Magma Mine area. Prior to this visit, I would make annual trips to Oak

2

Flat to climb at Lower Devils Canyon, Upper Devils Canyon, Euro Dog Valley, Magma Mine, and Oak Flat East and West bouldering areas.

6. I plan to continue visiting Oak Flat, including within the coming year. My daughter is a fourteen year old competitive climber who will join me for the climbing trips. It would be harmful to me if my daughter could not experience the climbing at Oak Flat as I have for the past thirty years. Oak Flat is a pivotal climbing area for my lifelong climbing career and I look forward to sharing the experience with my child.

7. If the Forest Service approves and executes the Oak Flat land exchange with Resolution Copper, this would take Oak Flat out of public ownership and preclude my rights to use public lands at the site. Additionally, once this land is no longer US Forest Service land (after the land exchange) Resolution Copper can do whatever it wants to with the land, even if it turns out to be impractical to build the mine. Even if the mine is never built, the area could be lost to recreation forever, if (for instance) Resolution decides to let a real estate developer build a housing community there.

8. If the proposed copper mine and related infrastructure at Oak Flat is approved and proceeds, there would be a complete and permanent loss of Oak Flat to climbers. The loss of Oak Flat would be immeasurable to all climbers who currently use and enjoy Oak Flat, including myself, as well as future generations that would be harmed by the loss of access to Oak Flat.

9. In addition to the loss of access to longstanding climbing areas on US Forest Service lands, if the US Forest Service executes the land transfer to Resolution Copper, access to world-class climbing on Arizona State Trust land, such as Lower Devils Canyon, will also be diminished or lost.

10. Oak Flat is only 60 miles from central Phoenix, Arizona, and there is no other similar climbing area (in terms of size, proximity, convenience) available to climbers in the area who would be displaced from Oak Flat.

3

11. If Plaintiffs succeed in this lawsuit, and the Final Environmental Impact Statement and Record of Decision are vacated and remanded to the Forest Service, and the lands stay in public ownership, I would retain my rights and ability to regularly visit Oak Flat, and I, alongside my daughter, would continue to regularly enjoy the area for climbing and other recreation.

12. In addition, the failure of the Forest Service to provide for public review and comment, since the Draft EIS in 2019, harms the ability of me, as well as the Access Fund, to participate in the required public and agency reviews under NEPA, the NDAA, and FLPMA. The Access Fund, along with other plaintiffs submitted a letter on April 11, 2025, enclosing dozens of documents showing the new and significant changed circumstances that have arisen since 2019.  The Forest Service failed to respond or otherwise include the new information in the new FEIS and DROD.

13. This is in addition to the agency's failure to have public comment or notice, whatsoever, regarding the newly-proposed 16 amendments to the Tonto Forest Plan.  The failure of the agency to provide any notice or comment opportunities violates my, and the Access Fund's, rights under NEPA, the NDAA, and FLPMA.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of July, 2025, in Estes Park, Colorado.

_Erik Murdock_

_____

Erik Murdock

Roger Flynn (CO Bar #21078) (pro hac vice)
Jeffrey C. Parsons (CO Bar #30210) (pro hac vice)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738; wmap@igc.org

Marc D. Fink (MN Bar #343407) (pro hac vice)
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
(218) 464-0539; mfink@biologicaldiversity.org

Allison N. Henderson (CO Bar #45088) (pro hac vice)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008; ahenderson@biologicaldiversity.org
*Counsel for Plaintiffs*

Susan B. Montgomery (AZ Bar #020595)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825; smontgomery@milawaz.com
*Counsel for Inter Tribal Association of Arizona*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

Arizona Mining Reform Coalition, *et al.*,

      Plaintiffs,

    vs.

United States Forest Service, *et al.*,

      Defendants,

    and

Resolution Copper Mining,

      Defendant-Intervenor.

Case No. CV-21-00122-PHX-DWL

**DECLARATION OF SANDRA BAHR**

1

1   I, Sandra Bahr, hereby declare:

2   1. I am over eighteen years old and am competent to give this declaration. The information

3   in this declaration is true and correct to the best of my knowledge, information, and belief

4   and is based on my personal experience, unless otherwise indicated.

5   2. I live in Phoenix, Arizona.

6   3. I have been a life member of Sierra Club since 1994.

7   4. I am the Chapter Director of Sierra Club's Arizona chapter, the Grand Canyon Chapter. I

8   have held this position for 27 years, since 1998.

9   5. My work as Chapter Director involves conservation outreach and organizing, advocacy at

10  the state legislature, and state and federal agencies, public education on conservation

11  priorities, and supervising staff and volunteers, among other activities.

12  6. According to Sierra Club's membership database, as of May 2025, Sierra Club has over

13  620,000 members nationally, including over 12,000 members in Arizona.

14  7. The Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to

15  practice and promote the responsible use of the Earth's resources and ecosystems; and to

16  educate and enlist humanity to protect and restore the quality of the natural and human

17  environment.

18  8. Preserving and protecting public lands, including our national forests, are key priorities

19  for Sierra Club, including for the Grand Canyon Chapter. Sierra Club members enjoy

20  national forests for their scenic views, recreational opportunities, wildlife viewing, and

21  ecological value.

22  9. I use and enjoy the public lands in the proposed Resolution Copper Mine project area and

23  specifically the lands at Oak Flat proposed to be exchanged to Resolution Copper Company,

24  including the lands at and adjacent to the Oak Flat Campground. My first experience with

25  Oak Flat was visiting there not long after I moved to Arizona in 1987. I drove out to

26  Superior and then on to Globe with my partner and we stopped at the Oak Flat

27  Campground, observing what a nice campground it is and enjoying the shade of the large

28

2

1   old oak trees. Later, I visited Oak Flat periodically with my family, some of whom were

2   climbing in the area. I would read, hike, and enjoy the area, including the shade of the oak

3   trees, while they climbed. I have a favorite memory of visiting there with my nephew when

4   he was about seven years old.

5   10. I have visited the lands at and immediately adjacent to the Resolution Copper Mine

6   project site many times in the last few years. During these visits, I hike, camp, sightsee,

7   watch wildlife, view historic and archeological sites, enjoy the solitude and views, and

8   otherwise use and enjoy the public lands in these areas. I especially love the large old

9   Emory oaks in the Oak Flat area and the shade and habitat for birds they provide. I most

10   recently visited Oak Flat on April 26, 2025 and spent the entire day there along with dozens

11   of other individuals. We had a potluck, listened to speakers, and generally enjoyed the

12   beauty and wonder of the place, worrying that it might be our last opportunity to enjoy it as

13   we were aware of and discussed the impending threats.

14   11. I have been very involved in opposing the Oak Flat land exchange since its inception. I

15   have provided and assisted with public comments, provided oral testimony and filed written

16   testimony against it with Congress, participated in and helped organize protests, reviewed

17   hundreds of pages of documents, spoke at public meetings and forums, advocated against

18   bills intended to facilitate the exchange by providing special consideration for Resolution

19   Copper at the Arizona Legislature, among other activities.

20   12. My use of the area and that of other Sierra Club members will be immediately and

21   irreparably harmed if the land exchange occurs, depriving me of my uses of the privatized

22   lands. This is in addition to the irreparable harm that will occur if the mine occurs. The

23   land exchange and mining project will cause significant impacts to the environment,

24   solitude, and unspoiled resources of the Oak Flat area that I use and value and will preclude

25   my access to the area.

26   13. The Oak Flat area has been valued by Sierra Club members, including me, for many

27   years. It contains world-class recreational values and is a refuge for people who come to

28

3

1    experience the unique scenery, wildlife, solitude, history, and other irreplaceable values. All

2    of these values are at risk from this land exchange and mining project and will be severely

3    and irreparably harmed if the project is allowed to begin operations.

4    14. The land exchange will facilitate the Resolution Copper Mine's mining, construction,

5    road construction/reconstruction, noise and light pollution, truck traffic, the privatization of

6    the campground and limits on access, plus removal of the old oak trees, and other activities,

7    and represent a severe intrusion into the unspoiled resources of the Oak Flat area that I use

8    and value.  These activities are totally incompatible with my uses of these public lands and

9    will severely and irreparably damage, if not eliminate, my ability to use these public lands

10   for aesthetic and emotional enjoyment, peace and solitude, hiking, camping, viewing

11   wildlife and scenery, and appreciating the Oak Flat area's invaluable environmental,

12   historical, and cultural treasures.

13   15. I intend to continue to visit and use Oak Flat, and those adjacent public lands that will

14   also be immediately and irreparably harmed by the exchange and the mine, to continue my

15   above noted uses. If the lands remain public, I intend to visit these Oak Flat lands at least

16   once, if not more, in the coming year.

17   16. The only way to protect my interests and uses of Oak Flat and other public lands and

18   waters affected by the land exchange and the mine, and the similar interests and uses of

19   members of the Sierra Club, from irreparable injury is for the Forest Service to reconsider

20   its analysis and decision, and that this land exchange and proposed mine would not proceed,

21   and Oak Flat and the surrounding areas would remain public lands, so I could continue my

22   regular use and enjoyment of the area.

23   17.    In addition to the immediate and irreparable harm caused by the Exchange (and later

24   mine), the Forest Service has injured my, and the Sierra Club's, rights to an adequate

25   agency review under NEPA, the NDAA, and other federal laws – including the agency's

26   failure to provide for public review after the Draft EIS was issued in 2019.  This is despite

27

28                                                                                                    4

1  all of the new information and changed circumstances that have arisen over the last 5+

2  years.

3  18.    This includes the new FEIS and DROD's inclusion, for the first time, a proposal to

4  enact 16 amendments to the Tonto National Forest Plan – stripping away current protections

5  for wildlife, cultural resources, recreation, and other public values. Myself, and the Sierra

6  Club, have for decades participated in the agency's Forest Planning process, through the

7  required public review process under the National Forest Management Act (NFMA) and

8  NEPA. For the agency to now amend the Tonto Plan without any public review represents a

9  significant departure from the NFMA and NEPA requirements, to the detriment of my and

10  the Sierra Club's rights under these laws.

11

12

13  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

14  and correct.

15  Executed this 2nd day of July, 2025, in Phoenix, Arizona.

16

17  _____

18  Sandra Bahr

19

20

21

22

23

24

25

26

27

28

5



# MASTER WATER PLAN

## FOR

## *SUPERSTITION VISTAS*

### APACHE JUNCTION, ARIZONA

Prepared For:
**DR Horton**
20410 N 19th Avenue, Suite 100
Phoenix, AZ 85027



&

**Brookfield Properties**
14646 N Kierland Boulevard, Suite 165
Scottsdale, AZ 85254

**Brookfield**
Residential

Prepared By:
**HILGARTWILSON, LLC**
2141 E. Highland Avenue, Suite 250
Phoenix, AZ 85016
Phone: (602) 490-0535



September 2021
HW Project No. 1635



**MASTER WATER PLAN**
**FOR**
*SUPERSTITION VISTAS*

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| 1.0 | EXECUTIVE SUMMARY | 1 |
| 2.0 | INTRODUCTION | 2 |
| 2.1 | Background and Project Location | 2 |
| 2.2 | General Description | 2 |
| 2.3 | Purpose of Report | 2 |
| 2.4 | Existing Conditions | 3 |
| 2.5 | Previous Studies | 3 |
| 3.0 | DESIGN CRITERIA | 4 |
| 3.1 | Water System Design Criteria | 4 |
| 4.0 | WATER DEMANDS | 6 |
| 4.1 | Land Use | 6 |
| 4.2 | Water Demand Calculations | 6 |
| 5.0 | WATER SYSTEM INFRASTRUCTURE | 9 |
| 5.1 | Existing Water System | 9 |
| 5.2 | Proposed Water System Improvements | 9 |
| 5.3 | Water Supply - Wells | 11 |
| 5.4 | Treatment & Transmission Main | 12 |
| 5.5 | Storage | 13 |
| 5.6 | Booster Pumps | 14 |
| 5.7 | Water Improvements Phasing | 14 |
| 5.8 | Assured Water Supply & Water Rights | 16 |
| 5.9 | Wet Water Availability | 17 |
| 6.0 | ADDITIONAL GROUNDWATER SUPPLY | 17 |
| 6.1 | Groundwater Wells | 17 |
| 7.0 | ONE WATER & SUSTAINABILITY GOALS | 18 |
| 7.1 | Direct & Indirect Potable Reuse | 18 |
| 8.0 | HYDRAULIC MODEL AND RESULTS | 18 |
| 8.1 | Design Methodology | 18 |
| 8.2 | Auction Property Model | 19 |
| 8.3 | Site Model | 20 |
| 9.0 | CONCLUSIONS | 21 |
| 10.0 | REFERENCES | 23 |



**APPENDICES**

A.    Figures
B.    Superstition Vistas Water System Calculations and Tables
C.    Superstition Vistas Hydraulic Modeling Results
D.    Designation of Assured Water Supply
E.    Carollo Water Study – Distribution & Transmission Main Exhibits

**FIGURES**

1.    Superstition Vistas Vicinity Map ............................................................. Appendix A
2.    Superstition Vistas Development Unit Exhibit ......................................... Appendix A
3.    Superstition Vistas Water System Improvements (Auction Property)..................... Appendix A
4.    Superstition Vistas Water System Improvements (Site)........................................ Appendix A

**TABLES**

1.    Water System Design Criteria.................................................................................... 5
2.    Land Use Summary.................................................................................................... 6
3.    Water Demand Calculations Summary (Including Irrigation)..................................... 7
4.    Water Demand Calculations Summary (Offset Irrigation) ........................................ 8
5.    Storage Capacity Summary..................................................................................... 14
6.    Booster Pump Summary.......................................................................................... 14
7.    Auction Property Development Schedule................................................................. 15
8.    AJWD 2019 Paper Water Portfolio Summary ......................................................... 16
9.    AJWD Water Use & Water Ordered......................................................................... 16
10.   Hydraulic Model Results Summary – Auction Property........................................... 20
11.   Hydraulic Model Results Summary – Site............................................................... 21
B.1.1  Superstition Vistas Water Demand Calculations................................... Appendix B
B.1.2  Superstition Vistas Water Demand Calculations (Offset Irrigation)....................... Appendix B
B.2    Superstition Vistas Transmission Main Sizing Calculations.................................. Appendix B
B.3    Superstition Vistas Storage Requirements Calculations ....................................... Appendix B
B.4    Superstition Vistas Booster Pump Calculations .................................................... Appendix B
B.5    Overall Property Density Allocation ...................................................................... Appendix B
B.6    AJWD Water System Design Criteria..................................................................... Appendix B
B.7    Well Capacity Calculations .................................................................................... Appendix B
B.8.1  Auction Property Development Schedule (No Irrigation) ...................................... Appendix B
B.8.2  Auction Property Development Schedule (Including Irrigation)............................. Appendix B



## 1.0   EXECUTIVE SUMMARY

Superstition Vistas is a proposed 8,090-acre planned development (Site) located west of the Central Arizona Project (CAP) canal, east of Meridian Road, north of the Frye Road alignment (future SR-24 alignment) and south of Baseline Road in Pinal County, Arizona. It is comprised of eight (8) Development Units and will consist of various uses ranging from residential to industrial development. Of this overall assemblage, Development Units 1 & 2 (Auction Property, or "Property") is a proposed 2,783 acre master planned community located west of the Idaho Road alignment, east of Meridian Road, north of the Ray Road alignment, and south of the Elliot Road alignment. The Auction Property will consist of approximately 10,940 residential units. The Auction Property will also contain approximately 466 acres of non-residential use, comprised of commercial properties, neighborhood open space, and community open space.

The scope of this Master Water Plan will detail the water infrastructure needed to serve the Auction Property and will provide a regional framework for the anticipated infrastructure needed for the surrounding area around Development Units 1 & 2 totaling approximately 5,307 acres (Retained Property). The Retained Property is located within Pinal County and will be annexed into the City of Apache Junction.

Given the timing and scale of the development for the overall project, this Master Water Plan is organized into evaluations specific to the Auction Property and Site. Since the timing of the Auction Property is immediate, the level of analysis for the Auction Property is specific with corresponding recommendations for improvements. For the Retained Property, the evaluation is focused on establishing the primary water infrastructure network for future development. For both scenarios, water demands for Superstition Vistas have been estimated based on the proposed land uses established by the Client and design criteria as approved by the Apache Junction Water District (AJWD, or "District"). The scope of this plan also includes evaluation of water supply, transmission main facilities, treatment, storage, pumping and distribution facilities.

The intent of this Master Plan is to be used as the basis for final design as each Development Unit proceeds to development. The size and scale of both the Auction Property and Site are such that individual unit or parcel water reports are to be prepared to confirm the intensity and land use as the basis for final water demands, and substantiate the scope of water infrastructure needed. There may be instances where this Master Plan may need to be amended to update the various elements contained in this Plan. These amendments may range from updating the demand factors that reflect actual rates to revised locations of primary water infrastructure to corroborate with the most current District Water Master Plan at that respective time.



## 2.0   INTRODUCTION

### 2.1   Background and Project Location

Superstition Vistas is a proposed 8,090-acre planned development (Site) located west of the Central Arizona Project (CAP) canal, east of Meridian Road, north of the Frye Road alignment (future SR-24 alignment) and south of Baseline Road in Pinal County, Arizona. Superstition Vistas will be annexed into the City of Apache Junction. It is comprised of eight (8) Development Units (DU) and will consist of various uses ranging from residential to industrial development.   Of this overall assemblage, Development Units 1 & 2 (Auction Property, or "Property") is a proposed 2,783 acre master planned community located west of the Idaho Road alignment, east of Meridian Road, north of the Ray Road alignment, and south of the Elliot Road alignment, in Sections 17, 18, 19, 20, and a portion of 30 of Township 1 South, Range 8 East of the Gila and Salt River Meridian.

The portion of Superstition Vistas outside Development Units 1 & 2 (Retained Property) totals approximately 5,307 acres and is currently located within Pinal County. The entire Site will be annexed into the City of Apache Junction, Arizona. The Retained Property includes Sections 7, 28, 29, and portions of Sections 6, 8, 16, 21, 27, 30, 31, 32, 33, and 34 of Township 1 South, Range 8 East of the Gila and Salt River Meridian.

Figure 1 in Appendix A provides a vicinity map for the Project.

### 2.2   General Description

Superstition Vistas Development Units 1 & 2 will consist of approximately 10,940 residential units, as well as approximately 466 acres of non-residential use, including commercial use, neighborhood open space, and community open space. Based on proposed land uses within the Auction Property and preliminary land uses within the Retained Property area, the Site is planned to have a total of approximately 27,370 single-family residential units at build-out, as well as 2,394 acres of non-residential use, comprised of commercial properties, neighborhood open space, community open space, schools, business parks, and industrial properties.

Development Units 1 & 2 are located within the Apache Junction Water District (AJWD) service area and are situated within a single pressure zone. The majority of the Retained Property is also within the same pressure zone within the AJWD service area.  However, portions of DU 7 & 8 (within Sections 6 and 7 bounded by Meridian Road, Baseline Road, the Ironwood Road alignment, and the Elliot Road alignment) are within Arizona Water Company's service area.

### 2.3   Purpose of Report

The purpose of this Master Water Plan is to detail the water infrastructure needed to serve the Auction Property and provide a regional framework for the anticipated infrastructure needed for the remainder of the Site.  This Master Plan identifies and evaluates the proposed water infrastructure and distribution system required to serve the Auction Property based on the current land use plan and the design criteria as approved by the AJWD.  In addition, the water infrastructure needed to serve the



Retained Property is identified on a conceptual level. A Development Unit exhibit is provided in Figure 2 in Appendix A.

This Master Plan identifies the projected water demands for the Auction Property and Site for average day, maximum day, peak hour, and maximum day plus fire flow conditions. It also discusses the water supply, storage, booster pumping station, and treatment facilities required to serve both the Auction Property and the Retained Property, and presents results from hydraulic models of the proposed water infrastructure. The demand calculations presented in this Master Plan are based on the current land uses planned for the Auction Property and the preliminary conceptual land uses identified for the Retained Property. In addition, after connection of the 500th equivalent dwelling unit ("EDU") constructed, the District shall analyze the average flows for one year to determine the actual flows used per EDU, and shall use such actual flows (plus or minus 20%, depending on environmental conditions) to calculate future capacity and infrastructure required. The water analysis presented in this Master Plan is based on the City of Apache Junction *Engineering Design Guidelines and Policies* (City of Apache Junction) and general design criteria as agreed upon by the AJWD.

The intent of this Master Plan is to be used as the basis for final design as each Development Unit proceeds to development. The size and scale of both the Auction Property and Retained Property are such that individual unit or parcel water reports are to be prepared to confirm the intensity and land use as the basis for final water demands, and substantiate the scope of water infrastructure needed. There may be instances where this Master Plan needs to be amended to update the various elements contained in this Plan. These amendments may range from updating the demand factors that reflect actual rates to revised locations of primary water infrastructure to corroborate with the most current City General Plan and Water Master Plan at that respective time. At no point should the demands go below 360 gallons per day per EDU.

## 2.4 Existing Conditions

The Auction Property and Retained Property sites generally consist of undeveloped desert land that generally slopes toward the southwest at a rate of approximately 0.5%. The CAP canal borders the Retained Property to the east. In addition, there is existing residential development bordering the Project to the west and north. There are also multiple existing utility easements that intersect the Property and Retained Property areas. An existing drainage easement for the Powerline Channel extends from the CAP canal, just north of the northeast corner of Development Unit 2, to the southwest, crossing Meridian Road between Warner Road and Ray Road. In addition, an existing electrical transmission easement extends to the southeast near the southwest corner of Development Unit 1. A separate electrical transmission easement extends east-west through the Retained Property in Development Unit 7. See Figure 1 in Appendix A for the Vicinity Map and Figure 2 in Appendix A for the Development Unit Exhibit, which shows the easements crossing the Auction Property and Retained Property areas.

## 2.5 Previous Studies

In November 2019, Kimley-Horn & Associates, Inc. (KHA) prepared the *Infrastructure*



*Assessment Study ASLD 8500*. The KHA study identified preliminary design standards and preliminary concepts for extending water, wastewater, roadway, and drainage infrastructure to serve Superstition Vistas at buildout. Elements of this study served as the basis of this Plan, however, it should be noted that the demands identified in the KHA study are different from what is established in this Plan due to revised demand criteria and land use designations.

In addition to the KHA efforts, Carollo has been recently engaged by AJWD to develop the AJWD Master Plan for the area south of Baseline Road. The purpose of the AJWD Master Plan is to provide information to developers to help them understand the master plan for AJWD and how AJWD operates and plans. The first part of this work resulted in concepts for potential distribution and transmission main networks for a large portion of the AJWD service area, including the Auction Property and Retained Property areas, as well as other future development west of the CAP canal. This initial Carollo effort was reviewed by HILGARTWILSON and was used to help coordinate and corroborate HILGARTWILSON's efforts. Exhibits showing Carollo's conceptual distribution and transmission main networks are included in Appendix E of this Master Plan for reference.

This Master Plan provides an updated analysis for water infrastructure needed to serve the Superstition Vistas development with design/demand factors as approved by the AJWD.

## 3.0   DESIGN CRITERIA

### 3.1   Water System Design Criteria

The proposed water system infrastructure for the Auction Property and the regional framework for the infrastructure to serve the Retained Property have been prepared and evaluated consistent with the design criteria as approved by the AJWD. The criteria are summarized below in Table 1 and supplement the City's other design criteria as identified in the City's *Engineering Design Guidelines and Policies* (City of Apache Junction). In developing this Master Plan, HILGARTWILSON worked with AJWD staff to develop the criteria identified in Table 1, which is to be used for sizing of master-planned water infrastructure for the Property and Retained Property areas. In addition, the demand criteria will be used to help procure and establish both rights and physical water availability to the Auction Property and Retained Property. Since these latter elements (water rights and physical availability) are interrelated to AJWD's overall water portfolio, which is inclusive of, but not limited to, effluent recharge credits, implementation of reuse of effluent to offset demands, actual customer demands, it is expected that the scale and intensity of these demand factors may be reevaluated and amended from time to time during the development of both Projects.

A full summary of AJWD water system design criteria identified for the Superstition Vistas development is shown in Table B.6 in Appendix B. Table B.6 also notes relative design requirements of other municipalities and water providers for reference.



| Table 1: Water System Design Criteria | | |
|---|---|---|
| **Land Use** | **Value** | **Unit** |
| **Average Day Demands** | | |
| Single Family Low Density Residential (1-2 DU/ac) | 592 | gpd/DU |
| Single Family Med Density Residential (2-10 DU/ac) | 555 | gpd/DU |
| Single Family High Density Residential (10+ DU/ac) | 370 | gpd/DU |
| Multi-Family Residential | 315 | gpd/DU |
| Commercial | 2,000 | gpad |
| Office / Business Park | 2,000 | gpad |
| School | 5,000 | gpad |
| Malls/Retail | 0.5 | gpd/sq. ft. |
| Industrial | 2,000 | gpad |
| Hotel/Motel | 150 | gpd/room |
| Turf/Irrigation | 4,400 | gpad |
| Xeriscape/Low Water Use Irrigation | 1,000 | gpad |
| **Peaking Factors** | | |
| Maximum Day Demand = 2.0 x Average Day Demand | | |
| Peak Hour Demand = 1.7 x Maximum Day Demand | | |
| **Fire Flow[2]** | | |
| Residential | 1,500 | gpm for 2 hours |
| Commercial | 4,000 | gpm for 4 hours |
| Industrial | 4,000 | gpm for 4 hours |
| School | 4,000 | gpm for 4 hours |
| Office/Business | 4,000 | gpm for 4 hours |
| **Minimum Pipe Sizes** | | |
| Looped Water Main | 8 | inch |
| Water Main in Collector Streets | 12 | inch |
| Water Main in Arterial Streets | 16 | inch |
| **System Hydraulics** | | |
| Minimum Pressure - Average Day, Max Day, Peak Hour | 50 | psi |
| Minimum Pressure - Maximum Day plus Fire Flow | 20 | psi |
| Maximum Velocity (Peak Hour Demand) | 5 | fps |
| Maximum Velocity (Max Day + Fire Flow) | 10 | fps |
| Maximum Head Loss (Peak Hour) | 10 | ft/1,000 ft |
| Hazen Williams 'C' Factor | 120 | |

Notes:
1. Design criteria are based on factors agreed upon by the AJWD for the master planning of the Auction Property and Retained Property.
2. Fire flows shown are for planning purposes. All parcel phases will be required to meet the International Fire Code (IFC) 2015 Appendix B fire flow requirements.
3. A full summary of AJWD water system design criteria is provided in Table B.6 in Appendix B.



## 4.0  WATER DEMANDS

### 4.1  Land Use

Superstition Vistas Development Units 1 & 2 will consist of approximately 10,940 single-family residential units, as well as approximately 466 acres of non-residential use, comprised of commercial development, neighborhood open space, and community open space. Preliminary conceptual land uses have also been identified for the Retained Property area (Development Units 3-8). Table 2 below summarizes the current projected land uses that have been identified for master planning purposes. Table B.5 in Appendix B shows more detail for the land uses allocated for each Development Unit within Superstition Vistas, and the allocations that were used in developing this Master Plan.  For reference, Figure 2 in Appendix A shows the anticipated boundaries for each of the Development Units.

| Table 2: Land Use Summary | | | | | | | |
|---|---|---|---|---|---|---|---|
| Dev. Unit | Gross Area (ac) | Neighborhood Open Space (ac) | Industrial (ac) | Commercial (ac) | School | Community Open Space (ac) | SFR (Med Density) (DU) |
| 1 | 1,375 | 138 | 0 | 20 | 0 | 83 | 5,470 |
| 2 | 1,408 | 135 | 0 | 20 | 0 | 70 | 5,470 |
| 3 | 1,355 | 136 | 0 | 0 | 60 | 81 | 6,400 |
| 4 | 638 | 64 | 0 | 240 | 0 | 38 | 2,730 |
| 5 | 1,169 | 117 | 0 | 20 | 60 | 70 | 3,790 |
| 6 | 714 | 71 | 0 | 0 | 0 | 43 | 2,170 |
| 7 | 899 | 90 | 100 | 110 | 0 | 54 | 1,340 |
| 8 | 532 | 53 | 400 | 90 | 0 | 32 | 0 |
| Total: | 8,090 | 803 | 500 | 500 | 120 | 406 | 27,370 |

Notes:
1. Residential, Industrial, Commercial, and School land uses are derived from the latest density and intensity projections for Development Units 1-8. There are currently not any site plans for Sections 17, 18, and 20. Projections for Development Units 3-8 are assumed for master planning purposes.
2. Based on information from the Developer, DU 2 is anticipated to contain 135 acres of Neighborhood Open Space and 70 acres of Community Open Space.
3. For all Development Units (not including DU 2), 10% of gross area is assumed to be Neighborhood Open Space and 6% of gross area is assumed to be Community Open Space.
4. See Table B.5 (Overall Property Density Allocation) in Appendix B for detailed land use summary.

### 4.2  Water Demand Calculations

Anticipated water demands for the Auction Property and Retained Property have been calculated in accordance with the design criteria listed in Table 1.  The projected water demands are summarized in Table 3 below and detailed water demand calculations are provided in Table B.1.1 in Appendix B. The Project area and the majority of the Retained Property area are within the AJWD service area, with exception of approximately 1,076 acres within Development Units 7 and 8 that are located within AZWC's service area.  Table 3 includes a breakdown of water demands by water service provider. This table represents a conservative scenario that assumes that all irrigation demands for DUs 1-8 will be supplied by the proposed potable water system. These demands were utilized for infrastructure sizing to help establish this scenario.



| Table 3: Water Demand Calculations Summary (Including Irrigation) – Superstition Vistas | | | | |
|---|---|---|---|---|
| Development Unit | Xeriscape / Turf Irrigation Demand (gpm)[5] | Average Day Demand (gpm) | Maximum Day Demand (gpm) | Peak Hour Demand (gpm) |
| Apache Junction Water District Service Area | | | | |
| 1 | 419 | 2,555 | 4,691 | 7,681 |
| 2 | 386 | 2,522 | 4,658 | 7,648 |
| Erie Lift Station | 0 | 1.4 | 1.4 | 1.4 |
| Subtotal – Dev. Units 1 & 2 (Incl. Irrigation) | 805 | 5,078 | 9,350 | 15,331 |
| 3 | 413 | 3,088 | 5,763 | 9,508 |
| 4 | 194 | 1,580 | 2,965 | 4,905 |
| 5 | 356 | 2,053 | 3,750 | 6,125 |
| 6 | 218 | 1,054 | 1,890 | 3,061 |
| 7 (334 acres) | 102 | 402 | 702 | 1,123 |
| 8 (21 acres) | 6 | 34 | 62 | 101 |
| Subtotal - AJWD Service Area (Incl. Irrigation) | 2,094 | 13,289 | 24,483 | 40,154 |
| Arizona Water Company Service Area | | | | |
| 7 (565 acres) | 172 | 680 | 1,188 | 1,899 |
| 8 (511 acres) | 156 | 808 | 1,461 | 2,375 |
| Subtotal - AZWC Service Area (Incl. Irrigation) | 328 | 1,489 | 2,649 | 4,274 |
| GRAND TOTAL (Incl. Irrigation) | 2,422 | 14,778 | 27,132 | 44,428 |

Notes:
1. Residential, Industrial, Commercial, and School demands are calculated using land uses derived from the latest density and intensity projections for Development Units 1-8.
2. The demands shown in Table 3 represent a conceptual demand for the future development.
3. Irrigation demands are not peaked, as these are anticipated to remain constant. Community Open Space is assumed to be 70% Turf and 30% Xeriscape. Neighborhood Open Space is assumed to be 40% Turf and 60% Xeriscape. See Table B.1.1 in Appendix B for detailed demand calculations.
4. A commercial demand for 1 acre of 2,000 gpd (1.4 gpm) will be needed to serve the proposed Erie Lift Station (ELS), located at the southeast corner of Meridian Road and Erie Street. This demand is not peaked.
5. Table 3 above assumes that all irrigation demands will be supplied by the potable water system. It is anticipated that a non-potable water system will offset irrigation demands within DU 2, 3, 5, 6, and a portion of DU 1 (north of Warner Road). Therefore, potable water demand shown in Table 3 may be reduced. See Table 4 for reduced water demands offset by the proposed non-potable water system in DUs 1, 2, 3, 5, and 6.

In contrast to the above table, Table 4 assumes that irrigation demands throughout the Site will be supplemented by the proposed non-potable water system. More specifically, irrigation demands in DUs 2, 3, 5, 6, and a portion of DU 1 (north of Warner Road) are anticipated to be supplied by a separate proposed non-potable water system, as referenced in the *Master Non-Potable Water Plan for Superstition Vistas* (Wood, Patel & Associates, Inc., 2021). To illustrate how the non-potable water system could offset irrigation demands from the proposed potable water system, revised demands are provided in Table 4. Both demand scenarios are provided to



outline the potential minimum and maximum demands anticipated to be supplied by the proposed potable water system. This table shows demands for the development with the assumption that irrigation demands in DUs 2, 3, 5, 6, and a portion of 1 (north of Warner Road) are offset by a separate non-potable water system. Detailed calculations for this demand scenario are provided in Table B.1.2 in Appendix B.

| Table 4: Water Demand Calculations Summary (Offset Irrigation) – Superstition Vistas | | | | |
|---|---|---|---|---|
| Development Unit | Xeriscape / Turf Irrigation Demand (gpm)[5] | Average Day Demand (gpm) | Maximum Day Demand (gpm) | Peak Hour Demand (gpm) |
| Apache Junction Water District Service Area | | | | |
| 1 | 246 | 2,382 | 4,518 | 7,509 |
| 2 | 0 | 2,136 | 4,272 | 7,262 |
| Erie Lift Station | 0 | 1.4 | 1.4 | 1.4 |
| *Subtotal – Dev. Units 1 & 2 (Incl. Irrigation)* | *246* | *4,520* | *8,792* | *14,773* |
| 3 | 0 | 2,675 | 5,350 | 9,095 |
| 4 | 194 | 1,580 | 2,965 | 4,905 |
| 5 | 0 | 1,697 | 3,394 | 5,769 |
| 6 | 0 | 836 | 1,673 | 2,844 |
| 7 (334 acres) | 102 | 402 | 702 | 1,123 |
| 8 (21 acres) | 6 | 34 | 62 | 101 |
| *Subtotal - AJWD Service Area (Incl. Irrigation)* | *549* | *11,744* | *23,938* | *38,609* |
| Arizona Water Company Service Area | | | | |
| 7 (565 acres) | 172 | 680 | 1,188 | 1,899 |
| 8 (511 acres) | 156 | 808 | 1,461 | 2,375 |
| *Subtotal - AZWC Service Area (Incl. Irrigation)* | *328* | *1,489* | *2,649* | *4,274* |
| **GRAND TOTAL (Incl. Irrigation)** | **877** | **13,233** | **25,587** | **42,883** |

Notes:
1. Residential, Industrial, Commercial, and School demands are calculated using land uses derived from the latest density and intensity projections for Development Units 1-8.
2. The demands shown in Table 3 represent a conceptual demand for the future development.
3. Irrigation demands are not peaked, as these are anticipated to remain constant. Community Open Space is assumed to be 70% Turf and 30% Xeriscape. Neighborhood Open Space is assumed to be 40% Turf and 60% Xeriscape. See Table B.1.2 in Appendix B for detailed demand calculations.
4. A commercial demand for 1 acre of 2,000 gpd (1.4 gpm) will be needed to serve the proposed Erie Lift Station (ELS), located at the southeast corner of Meridian Road and Erie Street. This demand is not peaked.
5. This table assumes that irrigation demands in DU 4, 7, 8, and a portion of DU 1 (south of Warner Road) will be supplied by the potable water system. This table assumes that a non-potable water system will fully offset irrigation demands within DU 2, 3, 5, 6, and a portion of DU 1 (north of Warner Road). For calculation purposes, approximately 41% of DU 1's irrigation demand is assumed to be offset by the non-potable system.



## 5.0    WATER SYSTEM INFRASTRUCTURE

### 5.1    Existing Water System

The AJWD owns and operates an existing surface water treatment facility, the Superstition Area Water Plant (SAWP), which is located north of the CAP canal and west of Ironwood Road. The SAWP has a current surface water treatment capacity of 2.0 million gallons per day (MGD), with a planned build-out capacity of 10.0 MGD. The plant is currently operating at approximately 1.5 MGD. AJWD staff have indicated that 6.0 MGD of the plant's build-out capacity is allocated to the Auction Property and Retained Property, and that the remaining 2.0 MGD of treatment capacity is being reserved for future development within the City and may or may not be available for use by the Auction Property.  Additional water demands beyond the 6.0 MGD currently reserved for the Auction Property and any portion of the remaining 2.0 MGD capacity that the City decides to allocate to the Project from the SAWP, will need to be sourced from a separate interim source and future distribution facility (herein referred to as Water Treatment Facility 2 and conceptually located along the CAP canal). The source of additional water supply may be from a future water treatment facility; direct potable reuse at the existing SAWP; and/or from groundwater wells on an interim basis. It is anticipated that the Water Treatment Facility 2 will be developed after the Auction Property as a part of the Retained Property. The AJWD currently has two wells, Well 5 and Well 6, which each have a capacity of 0.7 MGD, but per AJWD staff are currently reserved for back-up purposes. Well 5 is located near the intersection of 16th Avenue and Delaware Drive and Well 6 is located near Baseline Road and Winchester Road. These groundwater wells are used during annual CAP canal maintenance and for emergencies as they arise.

Figure 4 in Appendix A shows a conceptual layout and sizing for infrastructure needed to serve the Site at full buildout. As there is not currently any existing water infrastructure in place to serve the Auction Property or Retained Property areas, additional surface water treatment facilities and/or wells, along with transmission mains, storage facilities, booster pump stations, and distribution water mains will be required to extend water service to the development.

### 5.2    Proposed Water System Improvements

As noted previously, the purpose of this Master Water Plan is to detail the water infrastructure needed to serve the Auction Property and provide a regional framework for the anticipated infrastructure needed for the Retained Property. The proposed water system infrastructure for serving the Auction Property is shown in Figure 3 in Appendix A. The proposed water system has been designed to function as a stand-alone system for serving the Auction Property, as well as an integrated part of the build-out water system to serve both the Auction Property and Retained Property once the area is fully developed. The conceptual water system infrastructure that will be required to serve the Retained Property at full build-out is shown in Figure 4 in Appendix A. Based on existing topography across the Site, the entire portion of the development within the AJWD service area will be served by a single pressure zone.

As shown in Figure 3 in Appendix A, the proposed water system for serving the Project is comprised of 12-inch, 16-inch, and 24-inch water distribution mains located within the arterial streets, 12-inch mains within the collector streets, and



looped 8-inch mains within the local streets within the individual parcels.

Water supply for the first phases of the Auction Property will be provided by a proposed 30-inch transmission main that will convey treated water from the AJWD SAWP facility, located north of the CAP canal and west of Ironwood Road, south to a proposed water storage and booster pumping facility (referred to herein as Water Campus 1), which is conceptually located west of Ironwood Road, between Elliot Road and Warner Road. The SAWP has a current treatment capacity of 2.0 MGD and can adequately meet current demands in the system but will need to be expanded to serve the Auction Property. This expansion will consist of the addition of treatment trains and pumping capacity at the plant to increase the plant's current capacity, with each new treatment train sized to provide an additional 2.0 MGD of treatment capacity.

Once the treatment capacity that has been allocated to the Auction Property and Retained Property from the SAWP has been reached, another source of supply will need to be developed. If limited to the current allocation of 6.0 MGD from the SAWP and none of the excess 2.0 MGD capacity is made available for use by the Auction Property, an additional supply of approximately 7.46 MGD will be required to meet the projected maximum day demand of 13.46 MGD for Development Units 1 & 2. Initially, as an interim solution, groundwater wells will be developed to supply any remaining demands needed for the Auction Property. Groundwater wells will be used on an interim basis until a future second water treatment facility (Water Treatment Facility 2) is constructed. This second facility, anticipated to be located along Ray Road, just west of the CAP canal, will supplement the SAWP and Water Campus 1 for sourcing, storing, and conveying water to the Auction Property and Retained Property and will be developed when the property along Ray Road becomes available.

AJWD is currently independent of groundwater sources and has stated an ultimate goal of continuing to use renewable resources to serve future customers. Of AJWD's total current water rights portfolio, approximately one-third of their available rights are from a groundwater allocation. Given the scale of the overall Auction Property, the development of new groundwater production wells is anticipated to be needed as an interim condition source. The approach will allow an immediate path to augment current water production to enable development of the Auction Property and to utilize the current allocation of groundwater rights. In the long term, wells may be used as an emergency potable water source to recover groundwater recharge credits. The development of a well (or series of wells, as may be needed depending on actual production) will enable water system planning to continue to plan for and site a second surface water treatment plant, which is planned to be developed once the Retained Property is developed. Additional detail and discussion are provided in Section 6.0.

The anticipated location of a future second water treatment plant is along the Ray Road alignment, near the CAP canal. This alignment is a logical location, effectively bridging the Auction Property boundary to the southern development areas of the Retained Property along the proposed regional transportation corridor. It is anticipated that Water Treatment Facility 2 will provide for supply, storage, and pumping capacities that will benefit both the Auction Property and Retained Property. Proposed infrastructure and distribution mains are identified in Figures 3-6 in Appendix A.



To meet additional future demands within the southern areas of the Retained Property area as it builds out, a third water storage/distribution facility (Water Campus 3) will be constructed. Conceptually, Water Campus 3 will be located near the intersection of the Williams Field Road and Ironwood Road alignments. Final locations and sizing for Water Treatment Facility 2 and Water Campus 3 will be determined at the time of final design.

The following sections discuss the water supply, treatment, storage, and booster pumping requirements for serving the Auction Property and Retained Property at buildout. These improvements may be phased with the phasing of development within the community to ensure each phase has adequate water service without having to construct the entire water system at the time the first parcels are developed. Pipe sizes identified in this Master Plan have been determined using demand factors that have been agreed upon by the AJWD. These factors are used for sizing infrastructure on a master-planning level. As the Site is built out, water campus, treatment, transmission main sizing, and distribution main sizing may be refined based on actual water usage.

### 5.3    Water Supply - Wells

While water supply for Superstition Vistas will primarily be provided by treated CAP surface water, AJWD staff has indicated that the existing wells are to provide supply redundancy for the AJWD system. Furthermore, additional water supply may be needed beyond the reserved capacity at the SAWP facility to meet the demands of the Auction Property at buildout, which will be initially provided by groundwater wells if additional surface water treatment is unavailable. Wells may be used as an interim source until the construction of Water Treatment Facility 2 is completed with the Retained Property. In the long term, these interim wells are to be used during emergency scenarios or while the CAP canal undergoes maintenance, which results in dry-ups every 2 to 3 years. These dry-ups can typically range from at least one week to a month in duration. A hydrogeological analysis has not yet been completed for the Site to determine preferred well locations, flow rates, and water quality, but is proposed to identify potential well locations. Once a hydrogeologic study is completed, an anticipated well capacity can be determined. If one or more wells are constructed within the Auction Property, transmission mains will also be installed to convey water from the wells to Water Campus 1, where the raw water will be treated, stored, and pumped out to distribution. The specific treatment required for the groundwater will depend on the contaminant levels identified during groundwater sampling as the wells are developed. The final locations and number of future wells will be determined as the Auction Property is built-out. It is anticipated that a future well site will be proposed near a future irrigation lake in DU 2 to fill the lake during interim conditions.

As discussed in Section 5.2, additional water supply from groundwater wells may be required to meet the maximum day demands of the Auction Property at buildout until the future Water Treatment Facility 2 is developed. The Auction Property will require up to 7.46 MGD (5,183 gpm if pumping 24 hours per day) to meet the Auction Property's maximum day demand at buildout. If used, groundwater wells may be proposed at Water Campus 1, Water Treatment Facility 2, and potentially at the proposed lake site within Development Unit 2, as well as at other locations within the



Project as identified by a well siting study. Water from the wells would be routed to Water Campus 1 for treatment, storage, and pumping to distribution. The demand used to determine required well capacity assumes that all irrigation demands will be provided by the potable water system. Demand and required well capacity may be reduced if the non-potable water system offsets irrigation demands in DU 2, 3, 5, 6, and 1 (north of Warner Road).

### 5.4    Treatment & Transmission Main

The initial water supply for the Auction Property will be from the AJWD SAWP facility, located west of Ironwood Road on the north side of the CAP canal. The existing facility has a constructed capacity of 2.0 MGD, with potential to expand in 2.0 MGD increments up to a total capacity of 10.0 MGD at buildout.  To meet demands as the Auction Property area develops, the SAWP facility will need to be expanded.  Once the Retained Property develops, Water Treatment Facility 2 will be constructed along the CAP canal near Ray Road (for surface water supply and treatment)). If groundwater wells are used to supplement the surface water supply or to provide system redundancy, groundwater treatment will be needed. The type of treatment needed will depend on final water quality results as the wells are drilled and tested. It is anticipated that Water Campus 1 will contain groundwater treatment.

To provide the initial supply for the Auction Property, a 30-inch transmission main will be constructed along Ironwood Road and will convey treated surface water from the SAWP facility south to Water Campus 1 located along Ironwood Road between Elliot Road and Warner Road. This 30-inch transmission main is anticipated to convey 6.0 MGD at a velocity of 1.89 fps.  The main is also sufficiently sized to convey 8.0 MGD if available from the SAWP facility, for a velocity of 2.52 fps. Transmission main calculations are provided in Table B.2 in Appendix B. The 30-inch transmission main within Ironwood Road will extend to the south to the intersection of Ray Road and Ironwood Road.

As the Retained Property develops, the capacity at Water Treatment Facility 2 will increase and ultimately, a future transmission main will be constructed to convey water to the proposed Water Campus 3 to serve the southern portion of the Retained Property at buildout. Based on preliminary sizing, it is anticipated that a 36-inch transmission main will be developed to convey a flow of approximately 15.36 MGD of treated water from Water Treatment Facility 2 to the intersection of Ray Road and Ironwood Road at build-out. Conceptually, this 36-inch transmission main will extend from Water Treatment Facility 2 west along Ray Road, then south as a 30-inch transmission main along Ironwood Road to the proposed Water Campus 3 site. The final alignment and sizing for this future transmission main will depend on the location of Water Campus 3 and other factors.  In addition, demand calculations used to size this transmission main assume that irrigation demands for all DUs will be supplied by the proposed potable water system. Demand and transmission main sizing may be reduced if the non-potable water system offsets irrigation demands in DUs 2, 3, 5, 6, and a portion of 1. Preliminary sizing calculations for this future transmission main are included in Table B.2 in Appendix B and may be refined as the Retained Property area develops.

Rights-of-way are available for the offsite transmission main alignment along Ironwood Road. Additional rights-of-way may be required in areas so that all utilities



can fit. If additional easements or rights-of-way are required, they will need to be acquired from State Land for the offsite transmission mains and for Water Treatment Facility 2, should those facilities be located outside the Auction Property area. An easement will be required along Ironwood Road north of the Auction Property to allow for the installation of the 30-inch transmission main between the SAWP and the Project. Other required easements or rights-of-way may include those for future water campus locations and distribution/transmission main alignments.

The proposed distribution and transmission mains will be located in standard alignments throughout the overall Site. Where reasonable, water and sewer mains will be installed on opposite sides of the roadway, and will consider other wet and dry utilities. There may be instances where non-standard alignments may be needed to reflect development timing and sequencing. The exact locations and alignments of water and sewer infrastructure within each alignment will be determined during future reports.

### 5.5    Storage

The criteria agreed upon by the AJWD requires sufficient storage to be provided to meet 40 percent of the maximum day demand plus fire flow.  Table 5 below summarizes the storage capacity needed to serve Superstition Vistas at various phases of development.  It is anticipated that this total storage requirement for the Auction Property at build-out will be provided at Water Campus 1 (6.4 MG). Water Campus 1 will need to be sized to potentially contain all 6.4 MG of storage needed to serve the Auction Property. If the area of Retained Property for Water Treatment Facility 2 is acquired, then storage can be installed at Water Treatment Facility 2 to serve the Auction Property. However, Water Campus 1 will still be required to be sized for all 6.4 MG of storage.

At full build-out, the Auction Property and Retained Property will require a total of 17.0 MG of storage capacity for the portions of the community in the AJWD service area. Conceptual sizing to meet this build-out storage capacity is shown in Table B.3 in Appendix B and includes 6.4 MG of storage at Water Campus 1, 4.7 MG of storage at Water Treatment Facility 2, and 5.9 MG of storage at Water Campus 3. As each phase of the Site is developed, actual water usage should be monitored and the storage requirement be refined based on actual water usage to minimize the potential for oversized water facilities. These storage requirements assume that irrigation demands will be supplied by the proposed potable water system. It is anticipated that a non-potable water system will supply irrigation demands for DUs 2, 3, 5, 6, and a portion of 1. Therefore, storage requirements for the Auction Property may be reduced. Storage capacity calculations for Superstition Vistas are provided in Table B.3 in Appendix B and required storage at buildout is summarized in Table 5 below.



| Table 5: Storage Capacity Summary | | |
|---|---|---|
| Total Required Storage at Build-Out (gpm) | | |
| Auction Property (Build-Out) | AJWD Service Area (Auction Property & Retained Property) | Entire Site[1] |
| 6.4 MG | 17.0 MG | 18.6 MG |
| Notes:<br>1. Entire Site includes AJWD service area and current Arizona Water Company service area. | | |

### 5.6    Booster Pumps

The design criteria agreed upon by the AJWD indicate that sufficient booster pumping capacity shall be provided to meet the greater of the maximum day demand plus fire flow demand or the peak hour demand with the largest pump out of service. A booster pump station is proposed at Water Campus 1 to meet the Auction Property's booster pumping requirement of 15,331 gpm. Table 6 below shows the total pumping capacity required for the Auction Property at buildout, and for the Auction Property and Retained Property areas within AJWD's service area at buildout. Detailed pump capacity calculations are provided in Table B.4 in Appendix B. As the Project is built out, it is anticipated that the buildout pumping capacity requirement will be met by the combined capacities of pumps at Water Campus 1. At buildout of the Auction Property and Retained Property, the pumping capacity will be provided by a combination of pumping capacities at Water Campus 1, Water Treatment Facility 2, and Water Campus 3. These booster pumping requirements assume that irrigation demands will be supplied by the proposed potable water system. It is anticipated that a non-potable water system will supply irrigation demands for DUs 2, 3, 5, 6, and a portion of 1. Therefore, booster pumping requirements for the Auction Property may be reduced.

| Table 6: Booster Pump Summary | | |
|---|---|---|
| Required Pumping Capacity (gpm) | | |
| Auction Property (Build-Out)[1] | AJWD Service Area (Auction Property & Retained Property)[1] | All of Site[1, 2] |
| 15,331 | 40,154 | 44,428 |
| Notes:<br>1. Peak hour demand is controlling scenario.<br>2. Total area includes AJWD service area and current Arizona Water Company service area within the Site. | | |

### 5.7    Water Improvements Phasing

It is anticipated that Auction Property and Retained Property will be developed in several phases, with the initial phase anticipated to be within Development Unit 1 & Development Unit 2. The water mains, wells, treatment, storage, and pumping facilities required to serve each phase will similarly be constructed in phases as required to serve each phase of development. For any given phase, the offsite water infrastructure required to serve that phase will be constructed at the same time the phase is developed. Furthermore, the water mains that are installed will be sized for build-out conditions and will meet the required fire flows for the area that is



developed.

The size and scale of the Auction Property and Retained Property are such that individual unit or parcel reports will be prepared as each unit or parcel is developed to confirm the intensity and land use as the basis for final water demands, and to substantiate the scope of water infrastructure needed for the given unit or parcel. Infrastructure sizing will be phased and expanded over time to meet the demands within the Site area as it develops. It is also anticipated that storage and pumping capacity at Water Campus 1 will be expanded in phases as the SAWP capacity increases. Phasing will similarly apply to storage, treatment, and pumping facilities.

Residential dwelling units within the Auction Property are anticipated to be developed in phases, with an estimated combined 2,350 homes to be constructed in Development Units 1 & 2 by the end of 2023. Table 7 below summarizes an anticipated development schedule for the Auction Property. Table 7 assumes that irrigation demands within the Auction Property are fully offset by a non-potable water system. Detailed development schedules for the Auction Parcel are also provided in Tables B.8.1 and B.8.2 in Appendix B. Table B.8.1 summarizes a development schedule with the assumption that irrigation demands are offset by the non-potable water system and Table B.8.2 summarizes a development schedule with the assumption that irrigation demands within the Auction Property are to be supplied by the potable water system.

| Table 7: Auction Property Development Schedule | | |
|---|---|---|
| Year | Construction Activity | Source |
| 2021 | Begin grading / infrastructure improvements | SAWP |
| 2022 | Infrastructure construction / begin home construction | SAWP |
| 2023 | 2,350 homes | SAWP (2.6 MGD Max Day) |
| 2024 | 3,805 homes | SAWP (4.2 MGD Max Day) |
| 2025 | 5,165 homes | SAWP (5.7 MGD Max Day) |
| 2026 | 6,880 homes, 20.5 AC commercial | SAWP (6.0 MGD Max Day), Well(s) (1.7 MGD Max Day) |
| 2027 | 8,450 homes, 20.5 AC commercial | SAWP (6.0 MGD Max Day), Well(s) (3.5 MGD Max Day) |
| 2028 | 9,580 homes, 30 AC commercial | SAWP (6.0 MGD Max Day), Well(s) (4.8 MGD Max Day) |
| 2029 | 10,080 homes, 30 AC commercial | SAWP (6.0 MGD Max Day), Well(s) (5.3 MGD Max Day) |
| 2030 | 10,545 homes, 35 AC commercial | SAWP (6.0 MGD Max Day), Well(s) (5.8 MGD Max Day) |
| 2031 | 10,940 homes, 40 AC commercial | SAWP (6.0 MGD Max Day), Well(s) (6.3 MGD Max Day) |
| Notes: 1. This table does not include irrigation demands for the Auction Property. 2. Construction Activity totals are cumulative. 3. Detailed calculations and development schedule assumptions are provided in Tables B.8.1 and B.8.2 in Appendix B. | | |

3-ER-426



**5.8    Assured Water Supply & Water Rights**

The AJWD ("Apache Junction Water Company", DWR 86-002025.0001) is included in the Arizona Department of Water Resources (ADWR) *List of Municipal Water Providers Designated as having an Assured or Adequate Water Supply as of February, 19, 2020*. The current designation of assured water supply from ADWR and a summary of water rights is included in Appendix D for reference. Although the AJWD is included on the current list of designated providers, additional water supply and water rights will be required to serve the Auction Property and Retained Property at build-out.

The AJWD 2019 paper water portfolio includes a variety of sources that equate to approximately 7,393 acre-ft/year. These sources and their associated volumes are summarized in Table 8 below and were provided by AJWD staff.

| Table 8: AJWD 2019 Paper Water Portfolio Summary | |
|---|---|
| **AJWD Paper Water Rights** | |
| **Source** | **Value (acre-ft/year)** |
| CAP | 2,919 |
| Gila River Indian Community (GRIC) Lease | 1,000 |
| Non-Indian Agriculture (NIA) | 817 |
| Groundwater | 2,372 |
| Long-Term Storage Credits (LTSC) | 285 |
| **Total:** | **7,393** |

Per discussions with AJWD staff, the AJWD currently has 1,919 acre-ft/year of committed water and 2,893 acre-ft/year of water rights reserved for existing and future customers within the AJWD service area. Additionally, the AJWD has issued Commitment to Serve letters for three other individual communities within AJWD's service area, with a commitment of 350 acre-ft/year to serve 564 lots. As of mid-2020, the existing customers in the AJWD use 2,400 acre-ft/year. AJWD has indicated that they are currently working on acquiring additional water rights to meet the demands of the Auction Property and Retained Property. AJWD currently has enough paper water rights to get the Auction Property started, however, it is anticipated that additional water rights will be acquired in the future. Table 9 below summarizes the AJWD 2020 water use and the volume of water ordered for 2021.

| Table 9: AJWD Water Use & Water Ordered | | |
|---|---|---|
| **Source** | **2020 Water Use (acre-ft/year)** | **2021 Water Ordered (acre-ft/year)** |
| SAWP | 1,485 | 1,545 |
| Mesa Water Interconnect | 15 | 24 |
| Groundwater Storage Facility (GSF) | 900 | 1,000 |
| **Total:** | **2,400** | **2,569** |



The demand criteria utilized in this master plan incorporate components needed to account for potable water consumption for both domestic and fire protection needs and infrastructure sizing.  While this is typical for municipal providers, it should be noted that the criteria utilized herein is more conservative than other more established municipal providers.  An important distinction is that these demand criteria do not necessarily correlate to actual water rights needed to continue to support the District designation boundary.  As the Site develops, actual demands should be monitored in concert with annual reporting requirements, and amended as needed.  This should be done to appropriately size the needed infrastructure and establish additional water rights as needed for the District.

### 5.9 Wet Water Availability

The SAWP currently operates at approximately 1.5 MGD and has a current capacity of 2.0 MGD.  The plant has a planned future buildout capacity of 10.0 MGD.  Based on initial discussions with AJWD, a total of 6.0 MGD of the buildout capacity is allocated for the Auction Property and Retained Property, and an additional 2.0 MGD of capacity at buildout is available for general development in the City.  Once the Auction Property's demands reach the allocated capacity at the SAWP (6.0 MGD plus any portion of the 2.0 MGD of excess capacity that the City allocates to the Auction Property in the future), additional wet water supply will need to be developed to meet the projected demands of the Auction Property and the Retained Property.  However, it may be possible for additional water to be supplied by the SAWP, based on timing of development and availability. To minimize the volume of treated water needed to serve the Auction Property and Retained Property, the projected irrigation demands in DU 2, 3, 5, 6, and a portion of 1 may be served by reclaimed water from the Guadalupe Wastewater Treatment facility that is operated by the Superstition Mountains Community Facilities District No. 1 (SMCFD).

## 6.0  ADDITIONAL GROUNDWATER SUPPLY

### 6.1 Groundwater Wells

As discussed earlier in this Master Plan, once the Auction Property's maximum day demand reaches the allocated supply available from the SAWP, additional water supply and treatment facilities will need to be developed.  A future second surface water sourcing facility and water campus (Water Treatment Facility 2) are preliminarily planned along the Ray Road alignment near the CAP canal as a part of the Retained Area development.  However, water supply may be provided in the interim by drilling and equipping one or more wells within the Auction Property area.  Wells would be located as identified in a future well siting study and would convey water through transmission mains to Water Campus 1 for treatment, storage, and distribution.  Treatment requirements for the groundwater will be determined once the wells are drilled and tested.

Assuming 6.0 MGD would be distributed by Water Campus 1, the wells would need to supply the Auction Property's remaining buildout maximum day demand of 7.46 MGD (5,183 gpm). Well capacity calculations to meet this demand are provided in Table B.7 in Appendix B. As shown, when pumping 24 hours per day, the wells would need a capacity of 5,183 gpm.  When pumping 18 hours per day, the wells would need a



capacity of 6,911 gpm.  As the area develops and actual demands are known, the required well capacity may be revisited and updated to better reflect the actual maximum day demand.

## 7.0    ONE WATER & SUSTAINABILITY GOALS

As the Auction Property and Retained Property areas develop, the One Water and/or other sustainability goals of the City, the AJWD, the SMCFD, and other Project stakeholders will be considered in an effort to effectively manage the available water resources for the community and surrounding areas. Opportunities to offset potable water use may include an integrated approach to water supply by using one or more sources such as potable water, non-potable reuse, potable reuse, wastewater, stormwater, and others. AJWD is currently under contract with a consultant to further develop One Water goals. Further discussions will be held with the Project stakeholders as the Auction Property and Retained Property areas develop to optimize water management considerations and solutions.

### 7.1    Direct & Indirect Potable Reuse

It is a goal of AJWD to implement direct and indirect potable water reuse (DPR & IPR) into its water system capabilities to conserve water and support One Water goals. As the Superstition Vistas development progresses, this system will be evaluated further to determine the feasibility of DPR & IPR capabilities.

## 8.0    HYDRAULIC MODEL AND RESULTS

### 8.1    Design Methodology

The proposed conceptual water system for Superstition Vistas was modeled using WaterCAD Connect Edition by Bentley Systems, Inc.  Two models were prepared for this evaluation.  The first represents the Auction Property at buildout (see Figure 3 in Appendix A).  The second model represents the Site (i.e., both the Auction Property and Retained Property) at buildout (see Figure 4 in Appendix A).  Both models include Water Campus 1.  The model for the Site at buildout also includes Water Treatment Facility 2 and Water Campus 3 for improved distribution within the Retained Property area.  The Arizona Water Company (AWC) service area in Sections 6 and 7 of the Retained Property are also modeled in the second model with a separate reservoir and distribution piping from that used for the AJWD service area. The model results for the AWC service area are included only for reference. Model scenarios utilized demands with the assumption that irrigation demands would be supplied by the potable water system, as shown in Table 3 and Table B.1.1 in Appendix B, to simulate conservative demand factors.

Each model includes five scenarios: average day, maximum day, peak hour, residual fire flow during maximum day conditions, and available fire flow during maximum day conditions.  A residual fire flow analysis applies the applicable fire flow to each corresponding junction in the system to confirm the system's ability to meet the minimum pressure and maximum velocity requirements while providing the required



fire flow during maximum day conditions. The available fire flow analysis estimates the maximum flow available at each junction while maintaining the minimum allowable residual pressure throughout the proposed system during maximum day conditions.

## 8.2  Auction Property Model

The proposed conceptual water system layout for the Auction Property at buildout is shown in Figure 3 of Appendix A. The hydraulic model uses one reservoir, R-1, to represent Water Campus 1. The static head reservoir for R-1 is set to a hydraulic grade line (HGL) of 1,710-feet to provide the appropriate minimum pressure as required by the AJWD (50 psi) during peak hour conditions.

Junctions are distributed along arterial and collector streets throughout the Auction Property based on conceptual land use plans and the demands for Development Units 1 & 2 were distributed to provide an accurate representation of anticipated pressures and flows throughout the modeled system. Irrigation demands were distributed evenly among the 12-inch mains in the collectors. Residential and irrigation demands were also applied to junctions J-39, J-46, and J-53. A fire flow requirement of 4,000 gpm is applied to junctions within arterial streets. Generally, water mains within proposed arterial streets are at least 16 inches in diameter and water mains within collector streets are generally 12 inches in diameter. However, a 12-inch main is proposed along Meridian Road along the western Auction Property boundary since no development is planned to be served by AJWD west of Meridian Road. As shown in Figure 3, a few arterial streets will have 24-inch mains to keep velocities generally below 5 fps. If the non-potable water system offsets irrigation demands within the Auction Property, it is not anticipated that any 24-inch mains would be able to be reduced to 16-inch mains within the Auction Property. Internal local streets and some collectors will have 8-inch looped water mains. It is anticipated that additional 8-inch loops will be developed along the other local streets within the community as it develops. A 12-inch main extends to the south along Meridian Road from the southwest corner of the Auction Property to serve the proposed Erie Lift Station, located near the intersection of Erie Street and Meridian Road. A residential fire flow is applied to J-205 and J-ELS, since there is not anticipated to be any additional development served by this extended 12-inch main during the Auction Property's development.

Detailed hydraulic model results for the proposed water system for the Auction Property at buildout are provided in Appendix C. Table 10 below summarizes the results. As shown in Table 10, all pressures remain between 61.3 psi and 108.8 psi for the average day, maximum day, and peak hour scenarios. Velocities and head losses for all pipes generally remain below their respective maximum allowable limits (5 fps and 10 ft/1,000 ft, respectively). Two pipes have velocities that slightly exceed 5 fps during peak hour conditions. However, it is anticipated that actual demands for the system will be lower than those identified in Table B.1.1, resulting in lower velocities than are shown in the model. The fire flow analysis results show that the proposed system can adequately provide the required 1,500 gpm of fire flow to residential areas and 4,000 gpm of fire flow to commercial/industrial/school areas during maximum day conditions, while maintaining a residual pressure of at least 20 psi and a maximum velocity of less than 10 feet per second.



**Table 10: Hydraulic Model Results Summary – Auction Property**

| | Average Day | | Maximum Day | | Peak Hour | |
|---|---|---|---|---|---|---|
| | Value | Location | Value | Location | Value | Location |
| Minimum Pressure (psi) | 66.3 | J-15 | 64.7 | J-15 | 61.3 | J-15 |
| Maximum Pressure (psi) | 108.8 | J-ELS | 106.5 | J-ELS | 101.5 | J-ELS |
| Maximum Velocity (fps)[2] | 1.92 | P-133 | 3.53 | P-133 | 5.79 | P-133 |
| Maximum Headloss (ft/1,000 ft of pipe) | 0.921 | P-27 | 2.840 | P-27 | 7.080 | P-27 |

| Residual Fire Flow Analysis (at Maximum Day) | | | |
|---|---|---|---|
| | Value | Location | Fire Flow Location and Flow |
| Minimum Residual Pressure (psi) | 58.4 | J-15 | J-15 @ 4,000 gpm |
| Maximum Velocity (fps) | 7.10 | P-34 | J-39 @ 1,500 gpm |

| Available Fire Flow Analysis (at Maximum Day) | | |
|---|---|---|
| | Value | Location |
| Minimum Available Fire Flow – Residential (gpm) | 2,207 | J-39 |
| Minimum Available Fire Flow – Commercial/Industrial/School  (gpm) | 7,088 | J-41 |

Notes:
1. Full hydraulic model results can be seen in Appendix C.
2. Pipe velocity only exceeds 5 fps in two pipes during peak hour conditions. It is anticipated that actual demands will be lower and system velocities will not exceed 5 fps.
3. Any structure experiencing pressures greater than 80 psi shall have an individual PRV.

### 8.3    Site Model

The proposed conceptual water system layout for the Site, including both the Auction Property and Retained Property areas, at buildout is shown in Figure 4 in Appendix A. The primary purpose of this model is to demonstrate that the infrastructure improvements proposed for the Auction Property can support the conceptual future infrastructure within the Retained Property area and to establish the primary water infrastructure network for future development in the Retained Property area.  The model includes three static head reservoirs (R-1, R-2, and R-3) placed at the proposed water campus locations. These reservoirs represent Water Campus 1, Water Treatment Facility 2, and Water Campus 3, respectively. The water main alignments and sizing for the Auction Property area remain the same as shown in the Site model.  In the Retained Property area, infrastructure is placed along arterial and collector streets to provide a conceptual representation of the future system at buildout.

A site plan has not yet been developed for the Retained Property area.  Therefore, the demands identified for each individual Development Unit in the Retained Property area are split evenly among junctions within the given Development Unit. Commercial and industrial demands for the Retained Property are distributed along adjacent arterial streets for Development Units 3 through 8 and the static head reservoirs are set to an HGL of 1,710-feet.  Flow control valves are set at reservoirs R-2 and R-3 to limit flows to the peak hour pumping capacities of Water Treatment Facility 2 and Water Campus 3; 10,410 gpm and 14,413 MGD, respectively. These flows are representative of the conceptual pumping capacities that will be at Water Treatment Facility 2 and Water Campus 3.  A fourth reservoir is placed near the intersection of



Baseline Road and Meridian Road to simulate a separate water source for the AWC service area. This reservoir is set to an HGL of 1,720-feet to produce sufficient pressures for the AWC service area.

As shown in Table 11, all pressures throughout the modeled area remain between 57.4 psi and 110.5 psi for the average day, maximum day, and peak hour scenarios. Velocities and head losses for all pipes generally remain below their respective maximum allowable limits, with only one pipe having a velocity that slightly exceeds 5 fps during peak hour conditions. However, it is anticipated that actual demands for the system will be lower than those identified in Table B.1.1, resulting in lower velocities than are shown in the model. In addition, if the non-potable system offsets irrigation demands within the Retained Property, it is anticipated that some downsizing of certain 24-inch mains may be possible within the arterial streets of the Retained Property. The fire flow analysis results show that the proposed system can adequately provide the required 1,500 gpm of fire flow to residential areas and 4,000 gpm of fire flow to commercial/industrial areas during maximum day conditions, while maintaining a residual pressure of at least 20 psi and a maximum velocity of less than 10 feet per second.

| Table 11: Hydraulic Model Results Summary– Site | | | | | | |
|---|---|---|---|---|---|---|
| | Average Day | | Maximum Day | | Peak Hour | |
| | Value | Location | Value | Location | Value | Location |
| Minimum Pressure (psi) | 63.0 | J-223 | 62.2 | J-223 | 57.4 | J-223 |
| Maximum Pressure (psi) | 110.5 | J-204 | 109.4 | J-204 | 103.5 | J-204 |
| Maximum Velocity (fps) | 1.40 | P-134 | 2.56 | P-134 | 5.24 | P-133 |
| Maximum Headloss (ft/1,000 ft of pipe) | 0.720 | P-27 | 2.222 | P-27 | 6.545 | P-27 |
| Residual Fire Flow Analysis (at Maximum Day) | | | | | | |
| | Value | | Location | | Fire Flow Location and Flow | |
| Minimum Residual Pressure (psi) | 40.0 | | J-232 | | J-232 @ 4,000 gpm | |
| Maximum Velocity (fps) | 7.58 | | P-240 | | J-219 @ 4,000 gpm | |
| Available Fire Flow Analysis (at Maximum Day) | | | | | | |
| | Value | | | | Location | |
| Minimum Available Fire Flow – Residential (gpm) | 2,145 | | | | J-39 | |
| Minimum Available Fire Flow – Commercial/Industrial/School (gpm) | 5,458 | | | | J-219 | |

Notes:
1. Model results summary in Table 11 does not include results from the Arizona Water Company service area.
2. Pipe velocity only exceeds 5 fps during peak hour conditions. It is anticipated that actual demands will be lower and actual system velocities will not exceed 5 fps.
3. Any structure experiencing pressures greater than 80 psi shall have an individual PRV.
4. Full hydraulic model results can be seen in Appendix C.

## 9.0   CONCLUSIONS

The proposed water system discussed in this Master Water Plan will adequately serve the Superstition Vistas development. This report has determined that:

- Based on the approved AJWD demand factors, preliminary land uses, the average



day, maximum day and peak hour demands for the Auction Property are 7,312,250 gpd (5,078 gpm), 13,463,950 gpd (9,350 gpm) and 22,076,330 gpd (15,331 gpm), respectively. These demand factors assume that all irrigation demands will be supplied by the potable water system. Anticipated potable water demands may be reduced if the proposed non-potable water system offsets irrigation demands within DU 2 and a portion of DU 1.

- Based on the approved AJWD demand factors, preliminary land uses, the average day, maximum day and peak hour demands for the portions of the Site (Auction Property and Retained Property) within the AJWD service area are 19,136,153 gpd (13,289 gpm), 35,255,193 gpd (24,483 gpm) and 57,821,849 gpd (40,154 gpm), respectively. These demand factors assume that all irrigation demands will be supplied by the potable water system. Anticipated potable water demands may be reduced if the proposed non-potable water system offsets irrigation demands within DU 2, 3, 5, 6, and a portion of DU 1.

- The demands identified within this Water Master Plan are used primarily for infrastructure and facility sizing. These demands are not intended to outline the amount of legal water rights and/or resources that will need to be obtained as the Auction Property develops into the future. It is anticipated that actual system demands will be lower than those identified within this Water Master Plan and a separate water resources analysis should be completed to determine actual water rights to be acquired for the Auction Property as the Property develops.

- The hydraulic model shows the Auction Property can be adequately served by the proposed system of 8-inch to 24-inch looped water mains. In addition, model results show that the distribution system infrastructure proposed for the Auction Property integrates well into the future system development in the Retained Property at full buildout.

- Water for the Auction Property will initially be supplied by the AJWD SAWP through a 30-inch transmission main along Ironwood Road. A future second water treatment facility is proposed as part of the Retained Property development. In the interim, groundwater wells will be used to supply the remaining demands for the Auction Property until Water Treatment Facility 2 is active. A third water campus is proposed to meet the full buildout demands within the Retained Property area.

- Superstition Vistas Retained Property is situated within a single pressure zone of Apache Junction Water District's water system. Sections 6 and 7 within the Retained Property are within the AWC service area.

- The proposed water system for Superstition Vistas is anticipated to consist of transmission mains, treatment facilities, storage facilities, booster pumping facilities, and water distribution mains.

- The proposed system can provide the required fire flow (1,500 gpm for residential areas and 4,000 for commercial/industrial/school/office areas) during maximum day conditions while maintaining a residual pressure of at least 20 psi, as required by the AJWD.

- It is anticipated that procurement of additional paper and wet water supply will be needed as the Auction Property and Retained Property develop. Potential options for obtaining additional water may include groundwater, surface water, DPR and IPR, and others.



- Groundwater wells used to supply water for the Auction Property in the interim will be used as emergency and backup water sources in the long-term.

- The intent of this Master Plan was to establish the basis for future final design as each Development Unit proceeds to development. The size and scale of both the Auction Property and Retained Property are such that individual unit or parcel water reports are to be prepared to confirm the intensity and land use as the basis for final water demands, and substantiate the scope of water infrastructure needed.

- This Master Plan may need to be amended in the future to update the various elements contained in this Plan. These amendments may range from updating the demand factors that reflect actual rates to revised locations of primary water infrastructure to corroborate with the most current District Water Master Plan at that respective time.

## 10.0  REFERENCES

Arizona Department of Water Resources (2020).  *List of Municipal Water Providers Designated as Having an Assured or Adequate Water Supply as of February 19, 2020.* February 2020, Phoenix, AZ.

Kimley-Horn & Associates, Inc. (2019).  *Infrastructure Assessment Study ASLD 8500.* November 2019, Mesa, AZ.

Wood, Patel & Associates, Inc. (2021).  *Master Non-Potable Water Plan for Superstition Vistas.* April 2021, Phoenix, AZ.



# APPENDIX A
## FIGURES

### 1. SUPERSTITION VISTAS VICINITY MAP
### 2. SUPERSTITION VISTAS DEVELOPMENT UNIT EXHIBIT
### 3. SUPERSTITION VISTAS WATER SYSTEM IMPROVEMENTS (AUCTION PROPERTY)
### 4. SUPERSTITION VISTAS WATER SYSTEM IMPROVEMENTS (SITE)

HILGARTWILSON, LLC









SUPERSTITION VISTAS
ELLIOT ROAD & MERIDIAN ROAD
PINAL COUNTY, ARIZONA

FIG 4: WATER SYSTEM IMPROVEMENTS - SITE



## APPENDIX B
## SUPERSTITION VISTAS WATER SYSTEM CALCULATIONS & TABLES

**TABLE B.1.1: SUPERSTITION VISTAS WATER DEMAND CALCULATIONS**
**TABLE B.1.2: SUPERSTITION VISTAS WATER DEMAND CALCULATIONS (OFFSET IRRIGATION)**
**TABLE B.2: SUPERSTITION VISTAS TRANSMISSION MAIN SIZING CALCULATIONS**
**TABLE B.3: SUPERSTITION VISTAS STORAGE REQUIREMENT CALCULATIONS**
**TABLE B.4: SUPERSTITION VISTAS BOOSTER PUMP CALCULATIONS**
**TABLE B.5: SUPERSTITION VISTAS OVERALL PROPERTY DENSITY ALLOCATION**
**TABLE B.6: AJWD WATER SYSTEM DESIGN CRITERIA**
**TABLE B.7: WELL CAPACITY CALCULATIONS**
**TABLE B.8.1: AUCTION PROPERTY DEVELOPMENT SCHEDULE (NO IRRIGATION)**
**TABLE B.8.2: AUCTION PROPERTY DEVELOPMENT SCHEDULE (INCLUDING IRRIGATION)**

HILGARTWILSON, LLC

## Table B.1.1 - Water Demand Calculations
Superstition Vistas
Pinal County, Arizona
April 2024

| Development Unit | Gross Area (ac) | Neighborhood Open Space (ac) | Commercial Area (ac) | Industrial Area (ac) | School (ac) | Community Open Space (ac) | IVR (Medium Density) (DU) | (gpd) | Turf Demand (gpm) | Average Day Demand (gpd) | (gpm) | Maximum Day Demand (gpd) | (gpm) | Peak Hour Demand (gpd) | (gpm) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Apache Junction Water District Service Area** | | | | | | | | | | | | | | | |
| **Development Units 1 & 2 Buildout:** | | | | | | | | | | | | | | | |
| 1 | 1,375 | 138 | 20 | 0 | 0 | 20 | 5,470 | 603,350 | 419 | 3,879,200 | 2,695 | 6,758,000 | 4,691 | 11,061,243 | 7,681 |
| 2 | 1,408 | 135 | 20 | - | - | 70 | 5,470 | 555,000 | 386 | 3,631,000 | 2,522 | 6,706,800 | 4,658 | 11,013,000 | 7,646 |
| Elm Lift Station | - | - | - | - | - | - | - | - | - | 2,000 | 1.4 | 2,000 | 1.4 | 2,000 | 1.4 |
| **Development Unit 1 & 2 Buildout** | 2,783 | 273 | 40 | 0 | 0 | 183 | 10,940 | 1,158,350 | 805 | 7,512,200 | 8,078 | 13,466,800 | 9,360 | 22,076,330 | 15,331 |
| 3 | 1,365 | 136 | 0 | 0 | 60 | 81 | 6,400 | 594,574 | 413 | 4,446,574 | 3,088 | 8,298,514 | 5,763 | 13,991,274 | 9,502 |
| 4 | 638 | 64 | 240 | 0 | 0 | 38 | 2,730 | 279,964 | 194 | 2,275,104 | 1,580 | 4,270,264 | 2,965 | 7,053,464 | 4,906 |
| 5 | 1,169 | 117 | 20 | 0 | 60 | 70 | 3,700 | 512,957 | 356 | 2,956,407 | 2,053 | 5,299,807 | 3,790 | 8,820,687 | 6,125 |
| 6 | 714 | 71 | 0 | 0 | 0 | 43 | 2,170 | 313,303 | 218 | 1,817,653 | 1,062 | 2,722,553 | 1,890 | 4,406,093 | 3,061 |
| 7 / 338A | 334 | 33 | 41 | 37 | 0 | 20 | 498 | 146,950 | 102 | 578,949 | 402 | 1,011,309 | 702 | 1,616,683 | 1,123 |
| 8 (21 acres) | 21 | 2 | 4 | 16 | 0 | 1 | 0 | 9,215 | 6 | 49,215 | 34 | 88,215 | 62 | 146,215 | 101 |
| Retained Property (AJWD Subtotal) | 4,251 | 423 | 305 | 63 | 120 | 264 | 15,898 | 1,856,863 | 1,289 | 11,923,903 | 8,211 | 21,791,343 | 15,139 | 35,745,619 | 24,823 |
| **AJWD SERVICE AREA TOTAL:** | 7,014 | 696 | 345 | 63 | 120 | 408 | 26,338 | 3,015,113 | 2,094 | 19,138,163 | 13,299 | 35,805,583 | 24,883 | 57,821,649 | 40,154 |
| **Arizona Water Company Service Area** | | | | | | | | | | | | | | | |
| 7 (663 acres) | 555 | 57 | 69 | 63 | 0 | 34 | 942 | 224,227 | 172 | 979,332 | 680 | 1,735,842 | 1,188 | 2,734,376 | 1,899 |
| 8 (611 acres) | 511 | 51 | 86 | 384 | 0 | 31 | 0 | 225,227 | 156 | 1,164,527 | 808 | 2,154,227 | 1,461 | 3,420,227 | 2,375 |
| **AWC SERVICE AREA TOTAL:** | 1,078 | 108 | 156 | 447 | 0 | 65 | 942 | 472,549 | 328 | 2,143,469 | 1,489 | 3,854,769 | 2,649 | 6,154,603 | 4,274 |
| **SITE GRAND TOTAL:** | 8,060 | 803 | 500 | 600 | 120 | 472 | 27,870 | 3,467,262 | 2,422 | 21,279,612 | 14,778 | 39,098,662 | 27,132 | 63,978,452 | 44,439 |

**Notes:**

Demand Factors based on AJWD Tenants:

Single-Family (Low Density, 1-2 DU/Acre) — 502 gpd/DU
Single-Family (Medium Density, 2-10 DU/Acre) — 666 gpd/DU
Single-Family (High Density, 10+ DU/Acre) — 370 gpd/DU
Multi-Family Residential: — 385.0 gpd/DU

School: — 5,000 gpsd
Commercial: — 2,000 gpsd
Industrial: — 2,000 gpsd
Meta/Retail: — 0.5 gpd/sq ft
Office/Business: — 2,000 gpsd
Hotel/Motel: — 180 gpd/room

Turf/Irrigation: — 4,400 gpsd
Xeriscape/Low Water Use Irrigation: — 1,000 gpsd

Peaking Factors:
Maximum Day — Average Day x 2.0
Peak Hour — Maximum Day x 1.7

Fire Flow:
Residential: — 1,500 gpm
Commercial: — 4,000 gpm
Industrial: — 4,000 gpm

**Notes:**

1. DU 2 is anticipated contains 180 acres of Neighborhood Open Space and 70 acres of Community Open Space, according to the Developer.
2. For all Development Units (not including DU 2), 10% of gross area is assumed to be Neighborhood Open Space and 6% of gross area is assumed to be Community Open Space.
3. Area to Community Open Space is assumed to be 70% Turf and 30% Xeriscape.
4. Neighborhood Open Space is assumed to be 40% Turf and 60% Xeriscape.
5. Unit demands are based on factors as agreed upon by Apache Junction Water District and are used for infrastructure sizing.
6. A nominal demand for 1 acre of 2,000 gpd/1.4 gpm is assumed to be needed to serve the proposed Elm Lift Station (ELS), located at the southeast corner of Meridian Road and Elm Street. A peaking factor is not applied to this demand.
7. The demand scale assumes that all irrigation demands will be supplied by the potable water system, so it is anticipated that a non-potable water system will not ... irrigation demands within DU 2, 3, 5, 6, and a portion of DU 1 (north of Warner Road). Therefore, potable water demand shown in this table above may be reduced.

HILGART WILSON

**Table B.1.2 - Water Demand Calculations (Offset Irrigation).**
Superstition Vistas
Pinal County, Arizona
April 2021

HILGARTWILSON

| Development Unit | Gross Area (ac) | Neighborhood Open Space (ac) | Commercial Area (ac) | Industrial Area (ac) | School (ac) | Community Open Space (ac) | SFR (Medium Density) (DU) | Xeriscape/Turf Demand (gpd) | (gpm) | Average Day Demand (gpd) | (gpm) | Maximum Day Demand (gpd) | (gpm) | Peak Hour Demand (gpd) | (gpm) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Apache Junction Water District Service Area | | | | | | | | |
| 1 | 1,375 | 138 | 20 | - | - | 83 | 5,470 | 354,912 | 246 | 3,630,762 | 2,382 | 6,506,612 | 4,518 | 10,812,802 | 7,509 |
| 2 | 1,408 | 135 | 20 | - | - | 70 | 5,470 | 0 | - | 3,075,850 | 2,136 | 6,151,700 | 4,272 | 10,467,890 | 7,282 |
| Era LR Station | - | - | - | - | - | - | - | 2,090 | 1.4 | 2,090 | 1.4 | 2,090 | 1.4 | 2,090 | 1.4 |
| Development Unit 1 & 2 (Subtotal) | 2,783 | 273 | 40 | 0 | 0 | 183 | 10,940 | 354,912 | 246 | 6,906,612 | 4,920 | 12,660,312 | 8,792 | 21,272,882 | 14,773 |
| 3 | 1,365 | 136 | 0 | 0 | 60 | 81 | 6,400 | 0 | - | 3,852,000 | 2,675 | 7,704,000 | 5,350 | 13,096,800 | 9,095 |
| 4 | 688 | 64 | 260 | 0 | 0 | 38 | 2,730 | 279,964 | 194 | 2,275,104 | 1,580 | 4,270,264 | 2,965 | 7,063,464 | 4,906 |
| 5 | 1,169 | 117 | 20 | 0 | 60 | 70 | 3,780 | 0 | - | 2,443,460 | 1,697 | 4,886,900 | 3,394 | 8,307,730 | 5,769 |
| 6 | 714 | 71 | 0 | 0 | 0 | 43 | 2,170 | 0 | - | 1,204,560 | 838 | 2,434,700 | 1,673 | 4,054,790 | 2,844 |
| 7 (534 acres) | 384 | 33 | 41 | 87 | 0 | 20 | 498 | 146,869 | 102 | 578,949 | 402 | 1,011,339 | 702 | 1,616,685 | 1,123 |
| 8 (21 acres) | 21 | 2 | 4 | 16 | 0 | 1 | 63 | 9,215 | 6 | 49,215 | 34 | 88,215 | 60 | 145,215 | 101 |
| Related Property (AWD) Subtotal | 4,331 | 423 | 306 | 103 | 120 | 254 | 15,688 | 435,728 | 303 | 10,408,068 | 7,224 | 20,370,408 | 14,146 | 34,924,684 | 23,837 |
| AWD SERVICE AREA TOTAL: | 7,014 | 696 | 346 | 103 | 120 | 408 | 26,628 | 790,640 | 549 | 16,611,680 | 11,744 | 33,030,720 | 22,938 | 56,597,578 | 38,609 |
| | | | | | | | Arizona Water Company Service Area | | | | | | | | |
| 7 (566 acres) | 565 | 57 | 69 | 63 | 0 | 54 | 842 | 247,922 | 172 | 979,232 | 680 | 1,710,942 | 1,188 | 2,734,376 | 1,899 |
| AZWD SERVICE AREA TOTAL: | 5,079 | 108 | 155 | 447 | 0 | 66 | 842 | 234,277 | 166 | 1,164,227 | 808 | 2,104,227 | 1,461 | 3,420,227 | 2,375 |
| SITE GRAND TOTAL: | 8,080 | 803 | 500 | 500 | 120 | 471 | 27,370 | 472,149 | 328 | 19,006,139 | 13,333 | 36,645,489 | 26,587 | 61,765,979 | 42,683 |

**Notes:**

**Demand Factors (based on AWD Values):**

| | |
|---|---|
| Single-Family (Low Density, 1-2 DU/acre) | 592 gpd/DU |
| Single-Family (Medium Density, 2-10 DU/acre) | 956 gpd/DU |
| Single-Family (High Density, 10+ DU/acre) | 370 gpd/DU |
| Multi-Family Residential: | 335.0 gpd/DU |
| School: | 5,000 gpsd |
| Commercial: | 2,000 gpsd |
| Industrial: | 2,000 gpsd |
| Meta/Retail: | 0.6 gpd/sq. Ft. |
| Office/Business: | 2,000 gpsd |
| Hotel/Motel: | 150 gpd/room |
| Turf/Irrigation: | 4,400 gpsd |
| Xeriscape/Low Water Use Irrigation: | 1,000 gpsd |

**Peaking Factor:**
Average Day x: 2.0
Maximum Day x: 1.7

**Fire Flow:**
Residential: 1,500 gpm
Commercial: 4,000 gpm
Industrial: 4,000 gpm

**Notes:**
1. DU 2 is anticipated contain 136 acres of Neighborhood Open Space and 70 acres of Community Open Space, according to the Developer.
2. For all Development Units (not including DU 2), 30% of gross area is assumed to be Neighborhood Open Space.
3. Area for Community Open Space is assumed to be 70% Turf and 30% Xeriscape.
4. Neighborhood Open Space is assumed to be 40% Turf and 60% Xeriscape.
5. Unit demands are based on factors as agreed upon by Apache Junction Water District and are used for infrastructure sizing.
6. Era is demonstrated elements for 1 acre of 2,090 gpd is assumed to be needed to serve the proposed Era LR Station (Era LR), located at the southeast corner of Meridian Road and Elliot Street. A peaking factor is not applied to this demand.
7. The demand table assumes that all irrigation demands in DU 4, 7, 8, and a portion of DU 1 (south of Warner Road). For calculation purposes, approximately 41% of DU 1's irrigation demand is assumed to be offset by the non-potable system. This table assumes that a non-potable water system will fully offset irrigation demands.

# Table B.2 - Transmission Main Sizing Calculations

**Superstition Vistas**
Pinal County, Arizona
July 2021


HILGARTWILSON
ENGINEER | PLAN | SURVEY | MANAGE

| AIWD SAWP Facility to Water Campus 1 (2 MGD) | |
| --- | --- |
| Diameter | 30 in |
| Flowrate | 1,389 gpd (2 MGD) |
| Velocity | 0.63 fps |
| Headloss | 0.062 ft/1,000 ft |

| AIWD SAWP Facility to Water Campus 1 (4 MGD) | |
| --- | --- |
| Diameter | 30 in |
| Flowrate | 2,778 gpm (4 MGD) |
| Velocity | 1.26 fps |
| Headloss | 0.225 ft/1000 ft |

| AIWD SAWP Facility to Water Campus 1 (6 MGD) | |
| --- | --- |
| Diameter | 30 in |
| Flowrate | 4,167 gpm (6 MGD) |
| Velocity | 1.89 fps |
| Headloss | 0.477 ft/1000 ft |

| Water Treatment Facility 2 to Ironwood Road & Ray Road (15.36 MGD) | |
| --- | --- |
| Diameter | 36 in |
| Flowrate | 10,669 gpm (15.36 MGD) |
| Velocity | 3.36 fps |
| Headloss | 1.119 ft/1000 ft |

| AIWD SAWP Facility to Water Campus 1 (8 MGD) | |
| --- | --- |
| Diameter | 30 in |
| Flowrate | 5,556 gpm (8 MGD) |
| Velocity | 2.52 fps |
| Headloss | 0.812 ft/1000 ft |

| Ironwood Road & Ray Road to Water Campus 3 (15.36 MGD) | |
| --- | --- |
| Diameter | 30 in |
| Flowrate | 10,669 gpm (15.36 MGD) |
| Velocity | 4.84 fps |
| Headloss | 2,718 ft/1000 ft |

Note:
1) Conceptual transmission pipeline sizes are based on maintaining velocities below 5 fps and headloss below 10 feet per 1,000 feet.
2) 30" transmission main sized to convey 2 MGD, 4 MGD, 6 MGD, and 8 MGD as pumping capacity increases at the existing AIWD CAP facility.
3) Water Treatment Facility 2 to Ironwood Road & Ray Road, to Water Campus 3 transmission mains sized to convey maximum day demand output from Water Campus 3 for Site Build-Out conditions.
4) Demand calculations used for sizing assume that irrigation demands for DUs 2, 3, 5, 6, and a portion of DU 1 (north of Warner Road) will be supplied by the proposed potable water system.
It is anticipated that a non-potable water system will offset irrigation demands within DU 2, 3, 5, 6, and a portion of DU 1. Therefore, demand and transmission main size from Water Campus
2 to Water Campus 3 shown in table above may be reduced.

U:\16900\16935\16935.02 DR Horton\REPORTS\WATER\Master\Tables\21-0712_UD_Transmission Calcs.xlsx

# Table B.3 - Storage Requirement Calculations

## Superstition Vistas

Pinal County, Arizona

July 2021

**HILGARTWILSON**

Calculated By: AP

Checked By: MI

| | | STORAGE CAPACITY | | |
|---|---|---|---|---|
| | Phase(s): | Auction Property (Build-Out) | AJWD Service Area (Auction Property & Retained Property) | All of Site [8] |
| **Storage Requirements [1]:** | | | | |
| Storage shall be sized by using the following criteria: | | | | |
| 1) 40% of Maximum Day demand + Fire Flow | | | | |
| **Requirement 1:** | Maximum Day Demand (gallons): | 13,463,950 | 35,255,193 | 39,069,962 |
| | 40% of Maximum Day Demand (gallons): | 5,385,580 | 14,102,077 | 15,627,985 |
| | Commercial/Industrial Fire Flow (4,000 gpm for 4 hrs, gallons) [2]: | 960,000 | 2,880,000 | 2,880,000 |
| | **Total Storage (gallons):** | **6,345,580** | **16,982,077** | **18,507,985** |
| **Total Storage Required:** | **Storage Required:** | **6,345,580** | **16,982,077** | **18,507,985** |
| | **Storage to be Provided:** | **6,400,000** | **17,000,000** | **18,800,000** |
| **Storage by Water Campus:** | Phase(s): | Auction Property (Build-Out) | AJWD Service Area (Auction Property & Retained Property) | |
| **Water Campus 1:** | | 6,400,000 | 6,400,000 | |
| **Water Treatment Facility 2:** | | - | 4,700,000 | |
| **Water Campus 3:** | | - | 5,900,000 | |
| | **Total Storage:** | **6,400,000** | **17,000,000** | |

**Notes:**

1) Storage requirements based on design criteria as agreed upon by the Apache Junction Water District.

2) A commercial/industrial fire flow storage of 960,000 MG will be required at all water campuses. It is anticipated that within the AJWD service area, Water Campus 1, Water Treatment Facility 2, and Water Campus 3 will contain a combined fire flow storage of 2,880,000 gal.

3) It is anticipated that the storage at proposed Water Campus 1 will meet the minimum storage required for all of Development Unit 1 & 2. Water Campus 1 will be required to space plan for at least 6.4 MG of available storage.

4) It is anticipated that the storage at proposed Water Campus 1, Water Treatment Facility 2, and Water Campus 3 will combine to meet the minimum storage required for all of AJWD's service area (Auction Property and Retained Property). The calculations shown above assume that Water Treatment Facility 2 will account for storage needed to serve the approximate areas of DU 5 & 6 and portions of DU 7 & 8 in AJWD's service area. Water Campus 3 will account for the storage needed to serve the approximate areas of DU 3 & 4.

5) Storage to be provided is rounded up to 100,000 gallons.

6) Total Site area includes AJWD service area and current Arizona Water Company service area.

7) Storage calculations shown in table above assume that all irrigation demands will be provided by the potable water system. It is anticipated that a non-potable water system will offset irrigation demands within DU 2, 3, 5, 6, and a portion of DU 1 (north of Warner Road). Therefore demand and required storage capacity shown in table above may be reduced.

U:\1400\1635\1635.02 DR Horton\REPORTS\WATER\Master\Tables\Latest Master Plan Tables\21-0709_StoragePumpWell Calcs for LD.xlsx

7/15/2021

# Table B.4 - Booster Pump Calculations

**Superstition Vistas**
Pinal County, Arizona
July 2021

HILGARTWILSON
Calculated By: AP
Checked By: MI

| | Phase(s): | Auction Property (Build-Out) | AWD Service Area (Auction Property & Retained Property) | All of Site[1] |
|---|---|---|---|---|
| **PUMPING CAPACITY** | | | | |
| **Booster Pump Requirements:** | | | | |
| *Shall meet or exceed the greater of:* | | | | |
| *Peak Hour Demand OR* | | | | |
| *Maximum Day Demand + Fire Flow* | | | | |
| Peak Hour Demand: | | | | |
|   Peak Hour Demand (gpm): | | 15,331 | 40,154 | 44,428 |
|   Firm Pumping Capacity (gpm): | | 15,331 | 40,154 | 44,428 |
| Maximum Day Demand + Fire Flow: | | | | |
|   Maximum Day Demand (gpm): | | 9,350 | 24,483 | 27,132 |
|   Fire Flow (gpm): | | 4,000 | 4,000 | 4,000 |
|   Firm Pumping Capacity (gpm): | | 13,350 | 28,483 | 31,132 |
| **Firm Pumping Capacity:** | | **15,331** | **40,154** | **44,428** |
| Pumping Capacity by Water Campus: | Phase(s): | Auction Property (Build-Out) | AWD Service Area (Auction Property & Retained Property) | All of Site[1] |
| | Water Campus 1: | 15,331 | 15,331 | |
| | Water Treatment Facility 2: | - | 10,410 | |
| | Water Campus 3: | - | 14,413 | |
| **Total Firm Pumping Capacity:** | | **15,331** | **40,154** | **44,428** |

**Notes:**

1) Total Site area includes AWD service area and current Arizona Water Company service area.

2) Booster pump calculations shown in table above assume that all irrigation demands will be provided by the potable water system. It is anticipated that a non-potable water system will offset irrigation demands within DU 2, 3, 5, 6, and a portion of DU 1 (north of Warner Road). Therefore demand and required booster pump capacity shown in table above may be reduced.

U:\16001165S\1635.02 DR Horton\REPORTS\WATER\Master\Tables\21-0709_StoragePumpWell Calcs for LD.xlsx

7/12/2021



## TABLE B.5: OVERALL PROPERTY DENSITY ALLOCATION



| Description | Gross Acreage | Acres (AC.) | Units (D.U.) | Density (D.U./AC.) | Maximum Density Transfer In (D.U.) | Units with Maximum Transfer In (D.U.) | Maximum Density Transfer Out (D.U.) | Units with Maximum Transfer Out (D.U.) | Floor Area (S.F.) | Maximum Floor Area Transfer In (S.F.) | Floor Area With Maximum Transfer In (S.F.) | Maximum Floor Area Transfer Out (S.F.) | Floor Area With Maximum Transfer Out (S.F.) | F.A.R. | Commercial/ Retail/Restaurant/ Office (AC.) | Industrial (AC.) | Civic/ School (AC.) | Regional Open Space | Power Line Corridor Easement (AC.) | Power line Floodway Channel (AC.) | Total Area Non-reside ntial (AC.) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Development Unit 1 | 1375 | 1,335 | 5,670 | 4.20 | 1640 | 7,110 | 1640 | 3,830 | 221,700 | 66,500 | 288,200 | 66,500 | 155,200 | 0.25 | 20 | | | | 3 | 17 | 40 |
| Development Unit 2 | 1408 | 1,775 | 5,670 | 4.29 | 1640 | 7,110 | 1640 | 3,830 | 221,700 | 66,500 | 288,200 | 66,500 | 155,200 | 0.25 | 20 | | | 36 | | 77 | 133 |
| Development Unit 3 | 1355 | 1,280 | 6,400 | 5.00 | 1920 | 8,320 | 1920 | 4,480 | | | | | | | | 60 | | | 15 | | 75 |
| Development Unit 4 | 638 | 390 | 2,730 | 7.00 | 820 | 3,550 | 820 | 1,910 | 2,733,600 | 790,100 | 2,523,700 | 790,100 | 1,943,500 | 0.26 | 240 | | | | | 8 | 248 |
| Development Unit 5 | 1169 | 1,010 | 3,780 | 3.75 | 1140 | 4,930 | 1140 | 2,650 | 185,300 | 58,600 | 233,900 | 58,600 | 135,700 | 0.22 | 20 | | 60 | 52 | 27 | | 159 |
| Development Unit 6 | 714 | 668 | 2,170 | 3.25 | 650 | 2,820 | 650 | 1,520 | | | | | | 0.00 | | | | | 33 | 13 | 46 |
| Development Unit 7 | 899 | 520 | 1,340 | 2.58 | 400 | 1,740 | 400 | 940 | 2,235,600 | 688,700 | 2,884,300 | 688,700 | 1,606,000 | 0.35 | 130 | 100 | | 53 | 79 | 37 | 379 |
| Development Unit 8 | 532 | | | | 810 | 810 | | | 4,532,100 | 1,299,600 | 5,831,700 | 1,299,600 | 3,032,500 | 0.20 | 90 | 400 | | 42 | | | 532 |
| Total | 8,090 | 6,478 | 27,570 | 4.28 | 9,020 | 36,290 | 8,210 | 19,160 | 10,000,000 | 2,970,000 | 12,970,000 | 2,970,000 | 7,033,000 | | 500 | 500 | 120 | 183 | 165 | 144 | 1612 |

SUPERSTITION VISTAS

OVERALL PROPERTY DENSITY ALLOCATION

WOOD PATEL

NOT FOR CONSTRUCTION OR RECORDING

3-ER-447

| DATE | 02-26-2021 | SCALE | 1" = 3000' | SHEET | 1 OF 1 |
| JOB NO. | 205166 | DESIGN | DM | DRAWN | LL |

Z:\2020\205166\Dwg\Exhibit\Overall Property Density Allocation.dwg

0   3000   6000
Horz. 1 in. = 3000 ft.

**Table 8.6 - AUWD Water System Design Criteria**
Superstition Vistas
Pinal County, Arizona
March 2011

HILGART WILSON

| Offsite Category | | Units | Eastmark | Verrado | Mesa* | Phoenix* | Gilbert* | Buckeye* | Queen Creek* | Apache Junction* | HILGARTWILSON / AUWD Recommended Population Value | HILGARTWILSON / AUWD Recommended Values |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **RESIDENTIAL WATER DEMANDS** | | | | | | | | | | | | |
| Single Family (Low Density, 2-3 DU/Ac'.wt) | Commercial | gpd/DU | 470-490 | 470-490 | 360 | 360 | 362 | | 362 | 360 gpd | 3.2 Persons/DU | 145 gpd per DU (Low Density) |
| Single Family (Medium Density, 3-8 DU/Ac'.wt) | | gpd/DU | 254-420 | 254-420 | 360 | 360 | 362 | | 362 | 168 gpd | 2.9 Persons/DU | 169 gpd (319 gpd/DU) |
| Single Family (High Density, >8 DU/Ac'.wt) | | gpd/DU | 184-194 | 184-194 | 360 | 360 | 360 | | 360 | 168 gpd | 2.2 Persons/DU | 169 gpd (319 gpd/DU) |
| Multi-Family (Residential) | | gpd/DU | | | | | | | | 190 gpd (2.2 Persons/DU) | 1.7 Persons/DU | 169 gpd (319 gpd/DU) |
| **NON-RESIDENTIAL WATER DEMANDS** | | | | | | | | | | | | |
| Commercial | | Varies | 80 gpd/person | | 0.2 gpd/sq. ft (retail) | 0.125 gpd/sq. ft. | 1,400 gpd/acre | 1,375 gpd (regional) | | 246 gpd | 30 Persons/Acre | 2,600 gpd |
| Office | | Varies | 80 gpd/person | | 0.3 gpd/sq. ft, (high rise) | | 2,000 gpd/acre | 1,000 gpd (master planned) | | 145 gpd | 30 Persons/Acre | 2,600 gpd |
| Industrial | | Varies | | | 13,175 gpd/Ac. ft | 660 gpd/Ac.ft | 690 gpd | 2,000 gpd (master planned) | | 145 gpd | 30 Persons/Acre | 2,600 gpd |
| School | | Varies | 40 gpd/person | 40 gpd/person | 25 gpd/student | 829-5,340 gpd | | 346 gpd (specific use) | | 75 gpd/student (inch/kitchen), 125 gpd/student (with lunch/shower), 5,000 gpd (elementary) | 296 Students & Staff/Acre (Elementary Schools), 100 Students & Staff/Acre (Middle/High Schools) | 5,000 gpd |
| Parks/School | | Varies | 80 gpd/person | | 0.15 gpd/sq. ft. | 0.135 gpd/sq. ft. | | 0.5 gpd/sq. ft. | | 75 gpd/student (inch/kitchen), 125 gpd/student (with lunch/shower) | 0.5 gpd/Sq. ft. | 0.5 gpd/Sq. ft. |
| Turf/Landscaping/Open Space | | gpd | 800 gpd (low water use landscaping) | 4,496 gpd | | 4,374 gpd (general landscaping), 1,539 gpd (public right-of-way) | 0 gpd | | | 4,374 gpd (turf), 1,782 gpd (developed open space) | 4,600 gpd (turf), 1,000 gpd (developed open space) | 4,600 gpd (turf), 1,000 gpd (developed open space) |
| Hotel/Motel | | gpd/room | 150 gpd/room | | 150 gpd/room | 245 gpd/room (no restaurant), 200 gpd/room (restaurant) | | | | 203 gpd/room | 2.5 Persons/room | 150 gpd/room |
| Tech Industrial | | | | | | | | | | 200 gpd/room | | |
| **PEAKING FACTORS** | | | | | | | | | | | | |
| Peak Day | | Max. Day Demand | 2.0 | 2.0 | 2.0 | | 1.8 | 1.8 | | 1.8 | | 1.8 Average Day Demand |
| Peak Hour | | Avg. Day Demand | 3.0 | 3.0 | | | 3.0 | | | 3.0 | | 3.7 Maximum Day Demand |
| **MODELS/FIRE HYDRANT FLOW (RESIDENTIAL)** | | | | | | | | | | | | |
| Residential | | gpm | 1,500 | 1,500 (City of Mesa Fire Code) | | 1,000 | | 1,500 | | | | 1,500 |
| Commercial | | gpm | 4,000 | | | 3,000 | | 4,000 | | | | 4,000 (minimal) 4,000 |
| **ON-SITE HYDRAULICS** | | | | | | | | | | | | |
| Minimum Residual Pressure (Peak Hour) | Peak Hour | psi | 40 | 40 | 40 | 40 | | | 40 | | | Larger of the following: maximum day demand plus fire flow, or peak hour demand |
| Minimum Residual Pressure (Max Day + Fire Flow) | | psi | 20 | 20 | 25 | 20 | | | 20 | | | |
| Maximum Velocity (Peak Hour Demand) | | fps | 5 | 5 | 5 | 5 (maximum 6 pk./peak hour) | | | 5 | | | 5 |
| Maximum Velocity (Max Day + FF) | | fps | 10 | 10 | 10 | 10 | | | 10 | | | 10 |
| Maximum Head loss | | ft/1,000 ft | 10 | | | 6.31 ft/2+ pipe, 6.60 (6+ pipe) | | | | | | 10 |
| Minimum Size of 2" Line Diameter | | In | 8 | 8 | 6 | 6.17 (12+ pipe) | | | 8 | | | 8 |
| Hazen Williams "C" Factor | | | 120 | 120 | 130 | | | Class 150 PVC | | | | 150 |
| Minimum Storage Requirement | | | - | - | 130 | 130 (double tank, 189 PVC) | 150 | | | | | 130 |
| Minimum Pumping Requirement | | | - | - | - | | - | | - | - | | 40% of maximum day demand plus fire peak hour demand |

Sources:

In developing the Master Water Plan for Superstition Vistas, HILGARTWILSON worked with AUWD to develop highlighted water criteria for the sizing of master-planned water infrastructure.

[1] City of Mesa Engineering & Design Standards (2009)
[2] City of Phoenix Design Standards Manual for Water and Wastewater Systems (2007)
[3] Town of Gilbert Public Works & Engineering Standards (2010)
[4] City of Avondale Engineering Design Standards (2008)
[5] Design and Construction Standards Manual for Water, Wastewater, and Irrigation Systems for Town of Queen Creek, Arizona (2010)
[6] Apache Junction Engineering Design Guidelines and Policies

Limitations:
A) Demands for high and low density single-family residential units are not provided in the Design and Construction Standards Manual for Water, Wastewater, and Irrigation Systems for Town of Queen Creek, Arizona (2010).
B) The population density for the Mesa 5 DU/acre is 3.2 persons/DU, and 2.2 persons/DU for population densities of 8 DU/acre or more.
C) Population densities of 200 persons/acre and 100 persons/acre are assumed for elementary schools and middle schools, respectively.

Abbreviations:
gpd = gallons per day
gpm = gallons per minute
DU = dwelling unit
ft = feet
fps = feet per second
gpd/DU = gallons per acre per day
gpm/acre = gallons per capita per day

in = inch
ft = feet
FF = fire flow
ft = feet
sq. ft = square feet

# Table B.7 - Well Capacity Calculations

## Superstition Vistas

Pinal County, Arizona

July 2021

**HILGARTWILSON**

Calculated By: AP
Checked By: MI

| | WELL CAPACITY |
|---|---|
| Maximum Day Demand for Auction Property: | 9,350 gpm |
| | 13,463,950 gpd |

**Well Requirements:**

*Wells shall be sized to provide capacity for the following:*

*1) Maximum Day Demand and;*

*2) Redundancy to meet Maximum Day Demand with largest well out of service.*

Requirement:

| | Phase(s): | Auction Property |
|---|---|---|
| Maximum Day Demand (gpm): | | 9,350 |
| 6 MGD Demand Supplied By SAWP (gpm): | | 4,167 |
| Remaining Maximum Day Demand (gpm, not including 6 MGD from SAWP): | | 5,183 |
| 24 Hour Firm Well Capacity Required (gpm): | | 5,183 |
| **18 Hour Firm Well Capacity Required (gpm):** | | **6,911** |

**Notes:**

1) Wells are anticipated to run for 18 hours a day and, therefore, must provide the equivalent of a 24-hour period.

2) Well capacity shown in table above only includes maximum day demand for Auction Property, assuming that 6 MGD is already supplied by SAWP.

3) Calculations for demand shown in table above assume that all irrigation demands will be provided by the potable water system. It is anticipated that a non-potable water system will offset irrigation demands within DU 2, 3, 5, 6, and a portion of DU 1 (north of Warner Road). Therefore demand and required well capacity shown in table above may be reduced.

U:\16001\16351\635.02 DR Horton\REPORTS\WATER\Master\Tables\21-0709_StoragePumpWell Calcs for LD.xlsx

7/12/2021

## Table B.8.1 - Auction Property Development Schedule (No Irrigation)
### Superstition Vistas
Pinal County, Arizona
July 2021

| Year | Construction Activity | Source | Storage Requirement MG | Irrigated Areas (ac)² Neighborhood Open Space | Community Open Space | Xeriscape/Turf Demand (gpd) | (gpm) | Average Day Demand (gpd) | (gpm) | Maximum Day Demand (gpd) | (gpm) | Peak Hour Demand (gpd) | (gpm) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021 | Begin grading / Infrastructure improvements | SWMP | - | - | - | - | - | - | - | - | - | - | - |
| 2022 | Infrastructure construction / begin home construction | SWMP | - | - | - | - | - | - | - | - | - | - | - |
| 2023 | 2,350 homes | SWMP (2.6 MGD Max Day) | 1.2 | 59 | 33 | 0 | 0 | 1,304,250 | 905.7 | 2,606,500 | 1,811.5 | 4,434,450 | 3,079.5 |
| 2024 | 3,805 homes | SWMP (4.2 MGD Max Day) | 1.9 | 95 | 53 | 0 | 0 | 2,111,775 | 1,466.5 | 4,223,550 | 2,933.0 | 7,180,035 | 4,986.1 |
| 2025 | 5,185 homes | SWMP (5.7 MGD Max Day) | 2.5 | 129 | 72 | 0 | 0 | 2,866,575 | 1,990.7 | 5,733,150 | 3,981.4 | 9,746,355 | 6,768.3 |
| 2026 | 6,880 homes, 20.5 AC commercial | SWMP (6.0 MGD Max Day), Wells (1.2 MGD Max Day) | 4.0 | 171 | 96 | 0 | 0 | 3,859,400 | 2,680.1 | 7,718,800 | 5,360.3 | 13,121,960 | 9,112.5 |
| 2027 | 8,450 homes, 20.5 AC commercial | SWMP (6.0 MGD Max Day), Wells (3.5 MGD Max Day) | 4.7 | 210 | 118 | 0 | 0 | 4,730,750 | 3,285.2 | 9,461,500 | 6,570.5 | 16,084,550 | 11,169.8 |
| 2028 | 9,580 homes, 30 AC commercial | SWMP (6.0 MGD Max Day), Wells (4.8 MGD Max Day) | 5.3 | 239 | 134 | 0 | 0 | 5,376,900 | 3,734.0 | 10,753,800 | 7,467.9 | 18,281,460 | 12,695.5 |
| 2029 | 10,080 homes, 30 AC commercial | SWMP (6.0 MGD Max Day), Wells (5.3 MGD Max Day) | 5.5 | 251 | 141 | 0 | 0 | 5,654,400 | 3,926.7 | 11,308,800 | 7,853.3 | 19,224,960 | 13,350.7 |
| 2030 | 10,545 homes, 35 AC commercial | SWMP (6.0 MGD Max Day), Wells (5.8 MGD Max Day) | 5.7 | 263 | 147 | 0 | 0 | 5,922,475 | 4,112.8 | 11,844,950 | 8,225.7 | 20,136,415 | 13,983.6 |
| 2031 | 10,940 homes, 40 AC commercial | SWMP (6.0 MGD Max Day), Wells (6.3 MGD Max Day) | 5.9 | 273 | 153 | 0 | 0 | 6,151,700 | 4,272.0 | 12,303,400 | 8,544.0 | 20,915,780 | 14,524.8 |

Notes:
1) Unit demands are based on factors as agreed upon by Apache Junction Water District and are used for infrastructure sizing.
2) Neighborhood Open Space and Community Open Space scaled by number of residential units.
3) Neighborhood Open Space is assumed to be 40% Turf and 60% Xeriscape.
4) Community Open Space is assumed to be 70% Turf and 30% Xeriscape.
5) Average Day, Maximum Day, and Peak Hour demands shown in table above do not include Irrigation demands.
6) Total demands listed in table above do not include 2,000 gpd demand for Eriá Lift Station.
7) The table above assumes that irrigation demands within the Auction Property will be supplied by the non-potable water system.
8) The table above assumes that 6.0 MGD would be available for the Auction Property from the SWMP. Additional water supply from the SWMP may be available for the Auction Property.
9) Construction Activity totals are cumulative.

Demand Factors:
Single-Family (Medium Density) Residential: 555 gpd/DU
Commercial: 2,000 gpad
Turf/Irrigation: 4,400 gpad
Xeriscape/Low Water Use Irrigation: 1,000 gpad

Peaking Factors:
Maximum Day Demand: 2 x Average Day Demand
Peak Hour Demand: 1.7 x Maximum Day Demand

Abbreviations:
SWMP: Superstition Area Water Plant

## Table B.8.2 - Auction Property Development Schedule (Including Irrigation)

Superstition Vistas
Pinal County, Arizona
July 2021

| Year | Construction Activity | Source | Storage Requirement MG | Irrigated Areas (sf) Neighborhood Open Space | Community Open Space | Xeriscape/Turf Demand (gpd) | (gpm) | Average Day Demand (gpd) | (gpm) | Maximum Day Demand (gpd) | (gpm) | Peak Hour Demand (gpd) | (gpm) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021 | Begin grading / infrastructure improvements | SAWP | - | - | - | - | - | - | - | - | - | - | - |
| 2022 | Infrastructure construction / begin home construction | SAWP | - | - | - | - | - | - | - | - | - | - | - |
| 2023 | 2,350 homes | SAWP (2.9 MGD Max Day) | 1.3 | 59 | 33 | 248,866 | 173 | 1,553,116 | 1,078.6 | 2,857,366 | 1,984.3 | 4,683,316 | 3,252.3 |
| 2024 | 3,805 homes | SAWP (4.8 MGD Max Day) | 2.0 | 95 | 53 | 402,951 | 280 | 2,514,726 | 1,746.3 | 4,626,501 | 3,212.8 | 7,582,986 | 5,266.0 |
| 2025 | 5,165 homes | SAWP (6.0 MGD Max Day), Wells (0.3 MGD Max Day) | 2.7 | 129 | 72 | 946,975 | 380 | 3,413,550 | 2,370.5 | 6,280,125 | 4,361.2 | 10,299,330 | 7,148.1 |
| 2026 | 6,880 homes, 20.5 AC commercial | SAWP (6.0 MGD Max Day), Wells (2.4 MGD Max Day) | 4.3 | 171 | 96 | 728,595 | 506 | 4,587,995 | 3,186.1 | 8,447,395 | 5,866.2 | 13,850,555 | 9,618.4 |
| 2027 | 8,450 homes, 20.5 AC commercial | SAWP (6.0 MGD Max Day), Wells (4.4 MGD Max Day) | 5.1 | 210 | 118 | 894,858 | 621 | 5,626,608 | 3,906.7 | 10,356,558 | 7,191.9 | 16,979,408 | 11,791.3 |
| 2028 | 9,580 homes, 30 AC commercial | SAWP (6.0 MGD Max Day), Wells (5.8 MGD Max Day) | 5.7 | 239 | 134 | 1,014,526 | 705 | 6,391,426 | 4,438.5 | 11,768,226 | 8,172.4 | 19,295,986 | 13,400.0 |
| 2029 | 10,080 homes, 30 AC commercial | SAWP (6.0 MGD Max Day), Wells (6.4 MGD Max Day) | 5.9 | 251 | 141 | 1,067,476 | 741 | 6,721,876 | 4,668.0 | 12,376,276 | 8,594.6 | 20,292,436 | 14,092.0 |
| 2030 | 10,045 homes, 35 AC commercial | SAWP (6.0 MGD Max Day), Wells (7.2 MGD Max Day) | 6.1 | 263 | 147 | 1,116,717 | 775 | 7,039,194 | 4,888.3 | 12,961,689 | 9,001.2 | 21,253,134 | 14,759.1 |
| 2031 | 10,040 homes, 40 AC commercial | SAWP (6.0 MGD Max Day), Wells (7.5 MGD Max Day) | 6.4 | 273 | 153 | 1,158,050 | 805 | 7,310,250 | 5,076.6 | 13,461,950 | 9,348.6 | 22,074,330 | 15,329.4 |

Notes:
1) Unit demands are based on factors as agreed upon by Apache Junction Water District and are used for infrastructure sizing.
2) Neighborhood Open Space and Community Open Space scaled by number of residential units. This assumes that DU 1 and 2 are fully irrigated by the potable water system.
3) Neighborhood Open Space is assumed to be 40% Turf and 60% Xeriscape.
4) Community Open Space is assumed to be 70% Turf and 30% Xeriscape.
5) Average Day, Maximum Day, and Peak Hour demands shown in table above include irrigation demands.
6) Total demands listed in table above do not include 2,000 gpd demand for Erie Lift Station.
7) The table above assumes that irrigation demands within the Auction Property will be supplied by the potable water system.
8) The table above assumes that 6.0 MGD would be available for the Auction Property from the SAWP. Additional water supply from the SAWP may be available for the Auction Property.
9) Construction Activity totals are cumulative.

Demand Factors:
Single-Family (Medium Density) Residential:    555 gpd/DU
Commercial:    2,000 gpad
Turf/Irrigation:    4,400 gpad
Xeriscape/Low Water Use Irrigation:    1,000 gpad

Peaking Factors:
Maximum Day Demand:    2 x Average Day Demand
Peak Hour Demand:    1.7 x Maximum Day Demand

Abbreviations:
SAWP: Superstition Area Water Plant

HILGARTWILSON



**APPENDIX C**
**SUPERSTITION VISTAS WATER HYDRAULIC MODELING RESULTS**
**(AUCTION PROPERTY AND SITE MODELS)**


**AVERAGE DAY DEMAND RESULTS**
**MAXIMUM DAY DEMAND RESULTS**
**PEAK HOUR DEMAND RESULTS**
**MAXIMUM DAY + FIRE FLOW RESULTS (AVAILABLE)**
**MAXIMUM DAY + FIRE FLOW RESULTS (RESIDUAL)**

HILGARTWILSON, LLC



**AUCTION PROPERTY
HYDRAULIC MODELING RESULTS**



**AUCTION PROPERTY**
**AVERAGE DAY DEMAND RESULTS**

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario: Average Day - Auction
Property

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|---|---|---|---|---|
| J-1 | 1,518.46 | 0 | 1,708.47 | 82.2 |
| J-2 | 1,524.42 | 0 | 1,709.16 | 79.9 |
| J-3 | 1,534.31 | 0 | 1,709.55 | 75.8 |
| J-4 | 1,536.36 | 14 | 1,709.36 | 74.8 |
| J-5 | 1,511.94 | 0 | 1,708.41 | 85.0 |
| J-6 | 1,496.19 | 0 | 1,708.27 | 91.8 |
| J-7 | 1,487.97 | 0 | 1,707.79 | 95.1 |
| J-8 | 1,482.10 | 0 | 1,707.65 | 97.6 |
| J-9 | 1,489.31 | 0 | 1,707.66 | 94.5 |
| J-10 | 1,498.18 | 0 | 1,707.71 | 90.7 |
| J-11 | 1,505.45 | 0 | 1,707.95 | 87.6 |
| J-12 | 1,528.22 | 0 | 1,708.17 | 77.9 |
| J-13 | 1,541.89 | 0 | 1,708.04 | 71.9 |
| J-14 | 1,551.18 | 0 | 1,708.22 | 67.9 |
| J-15 | 1,555.10 | 192 | 1,708.30 | 66.3 |
| J-16 | 1,547.57 | 0 | 1,708.64 | 69.7 |
| J-17 | 1,539.63 | 0 | 1,708.96 | 73.3 |
| J-18 | 1,536.04 | 0 | 1,707.86 | 74.3 |
| J-19 | 1,531.88 | 0 | 1,707.86 | 76.1 |
| J-20 | 1,525.85 | 0 | 1,707.85 | 78.7 |
| J-21 | 1,509.31 | 0 | 1,707.85 | 85.9 |
| J-22 | 1,500.29 | 14 | 1,707.87 | 89.8 |
| J-23 | 1,507.70 | 0 | 1,708.01 | 86.7 |
| J-24 | 1,478.32 | 0 | 1,707.52 | 99.2 |
| J-25 | 1,468.56 | 0 | 1,707.49 | 103.4 |
| J-26 | 1,470.59 | 0 | 1,707.41 | 102.5 |
| J-27 | 1,491.65 | 149 | 1,707.66 | 93.5 |
| J-28 | 1,494.43 | 149 | 1,707.73 | 92.3 |
| J-29 | 1,504.84 | 0 | 1,708.07 | 87.9 |
| J-30 | 1,509.95 | 149 | 1,708.16 | 85.8 |
| J-31 | 1,506.31 | 149 | 1,707.80 | 87.2 |
| J-32 | 1,510.99 | 149 | 1,708.04 | 85.3 |
| J-33 | 1,517.93 | 149 | 1,708.35 | 82.4 |
| J-34 | 1,523.42 | 149 | 1,708.73 | 80.2 |
| J-35 | 1,500.26 | 0 | 1,708.10 | 89.9 |
| J-36 | 1,519.89 | 0 | 1,708.43 | 81.6 |
| J-37 | 1,497.84 | 0 | 1,707.71 | 90.8 |
| J-38 | 1,508.75 | 0 | 1,707.77 | 86.1 |
| J-39 | 1,509.06 | 192 | 1,707.89 | 86.0 |
| J-40 | 1,519.34 | 0 | 1,708.69 | 81.9 |
| J-41 | 1,493.31 | 0 | 1,708.11 | 92.9 |
| J-42 | 1,520.78 | 0 | 1,708.71 | 81.3 |
| J-43 | 1,528.04 | 192 | 1,708.20 | 77.9 |
| J-44 | 1,539.15 | 192 | 1,708.49 | 73.3 |
| J-45 | 1,525.42 | 0 | 1,708.63 | 79.3 |
| J-46 | 1,536.25 | 192 | 1,708.89 | 74.7 |
| J-47 | 1,523.18 | 0 | 1,708.44 | 80.2 |
| J-48 | 1,543.23 | 0 | 1,708.18 | 71.4 |
| J-49 | 1,544.66 | 192 | 1,708.23 | 70.8 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 2

3-ER-455

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario: Average Day - Auction
Property

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|----------------|--------------|----------------------|----------------|
| J-50 | 1,550.01 | 0 | 1,708.26 | 68.5 |
| J-51 | 1,551.30 | 0 | 1,708.18 | 67.9 |
| J-52 | 1,541.61 | 0 | 1,708.12 | 72.0 |
| J-53 | 1,482.08 | 149 | 1,707.45 | 97.5 |
| J-54 | 1,476.49 | 0 | 1,707.54 | 100.0 |
| J-55 | 1,480.56 | 0 | 1,707.34 | 98.1 |
| J-56 | 1,481.69 | 149 | 1,707.24 | 97.6 |
| J-57 | 1,483.32 | 0 | 1,707.36 | 96.9 |
| J-58 | 1,478.32 | 0 | 1,707.39 | 99.1 |
| J-59 | 1,473.68 | 0 | 1,707.44 | 101.1 |
| J-60 | 1,475.18 | 0 | 1,707.29 | 100.4 |
| J-61 | 1,474.72 | 149 | 1,707.26 | 100.6 |
| J-62 | 1,493.15 | 149 | 1,707.25 | 92.6 |
| J-63 | 1,494.82 | 149 | 1,707.39 | 92.0 |
| J-64 | 1,489.78 | 0 | 1,707.37 | 94.1 |
| J-65 | 1,486.52 | 149 | 1,707.33 | 95.5 |
| J-66 | 1,484.90 | 0 | 1,707.56 | 96.3 |
| J-67 | 1,492.33 | 0 | 1,707.38 | 93.0 |
| J-68 | 1,498.85 | 149 | 1,707.46 | 90.3 |
| J-69 | 1,504.49 | 0 | 1,707.57 | 87.9 |
| J-70 | 1,496.77 | 149 | 1,707.25 | 91.1 |
| J-71 | 1,492.39 | 149 | 1,707.24 | 93.0 |
| J-72 | 1,489.15 | 149 | 1,707.24 | 94.4 |
| J-73 | 1,526.88 | 0 | 1,707.72 | 78.2 |
| J-74 | 1,522.81 | 192 | 1,707.59 | 79.9 |
| J-75 | 1,517.39 | 192 | 1,707.59 | 82.3 |
| J-76 | 1,513.14 | 192 | 1,707.63 | 84.1 |
| J-77 | 1,518.58 | 192 | 1,707.57 | 81.8 |
| J-78 | 1,525.14 | 192 | 1,707.71 | 79.0 |
| J-79 | 1,521.50 | 0 | 1,707.82 | 80.6 |
| J-80 | 1,521.52 | 0 | 1,708.26 | 80.8 |
| J-81 | 1,507.88 | 0 | 1,707.73 | 86.5 |
| J-82 | 1,511.68 | 192 | 1,707.69 | 84.8 |
| J-83 | 1,530.12 | 192 | 1,707.68 | 76.8 |
| J-84 | 1,534.97 | 0 | 1,707.77 | 74.8 |
| J-85 | 1,520.43 | 0 | 1,707.67 | 81.0 |
| J-86 | 1,512.42 | 0 | 1,707.81 | 84.5 |
| J-87 | 1,519.02 | 0 | 1,707.87 | 81.7 |
| J-90 | 1,553.44 | 0 | 1,708.26 | 67.0 |
| J-91 | 1,501.89 | 0 | 1,707.86 | 89.1 |
| J-92 | 1,529.36 | 0 | 1,710.00 | 78.2 |
| J-93 | 1,513.70 | 0 | 1,707.85 | 84.0 |
| J-94 | 1,544.69 | 28 | 1,708.11 | 70.7 |
| J-95 | 1,552.90 | 0 | 1,708.50 | 67.3 |
| J-205 | 1,458.56 | 0 | 1,707.49 | 107.7 |
| J-ELS | 1,456.01 | 1 | 1,707.49 | 108.8 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 2

3-ER-456

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario:  Average Day - Auction
Property

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-1 | 1,337 | 24.0 | 120 | J-1 | J-2 | 2,420 | 1.72 | 0.516 |
| P-2 | 1,236 | 24.0 | 120 | J-3 | J-4 | 1,258 | 0.89 | 0.154 |
| P-3 | 2,654 | 16.0 | 120 | J-5 | J-6 | 237 | 0.38 | 0.050 |
| P-4 | 2,643 | 12.0 | 120 | J-7 | J-8 | 113 | 0.32 | 0.052 |
| P-5 | 1,373 | 16.0 | 120 | J-8 | J-9 | 73 | 0.12 | 0.006 |
| P-6 | 1,371 | 16.0 | 120 | J-10 | J-11 | 472 | 0.75 | 0.181 |
| P-7 | 1,867 | 16.0 | 120 | J-9 | J-10 | 154 | 0.25 | 0.023 |
| P-7 | 1,712 | 16.0 | 120 | J-11 | J-1 | 625 | 1.00 | 0.303 |
| P-8 | 1,252 | 16.0 | 120 | J-16 | J-17 | 568 | 0.91 | 0.254 |
| P-9 | 1,335 | 16.0 | 120 | J-17 | J-4 | 618 | 0.99 | 0.297 |
| P-10 | 1,872 | 16.0 | 120 | J-13 | J-18 | 331 | 0.53 | 0.094 |
| P-11 | 817 | 16.0 | 120 | J-18 | J-19 | 101 | 0.16 | 0.010 |
| P-12 | 2,582 | 16.0 | 120 | J-19 | J-20 | 36 | 0.06 | 0.002 |
| P-13 | 2,636 | 24.0 | 120 | J-22 | J-23 | 699 | 0.50 | 0.052 |
| P-14 | 2,640 | 24.0 | 120 | J-23 | J-1 | 1,355 | 0.96 | 0.176 |
| P-15 | 2,850 | 16.0 | 120 | J-24 | J-25 | 105 | 0.17 | 0.011 |
| P-16 | 1,880 | 12.0 | 120 | J-25 | J-26 | 103 | 0.29 | 0.044 |
| P-17 | 1,357 | 12.0 | 120 | J-9 | J-27 | 6 | 0.02 | 0.000 |
| P-18 | 1,167 | 12.0 | 120 | J-27 | J-28 | 122 | 0.35 | 0.060 |
| P-19 | 1,813 | 8.0 | 120 | J-28 | J-29 | 78 | 0.50 | 0.187 |
| P-20 | 781 | 8.0 | 120 | J-29 | J-30 | 58 | 0.37 | 0.109 |
| P-21 | 997 | 12.0 | 120 | J-30 | J-5 | 265 | 0.75 | 0.251 |
| P-22 | 1,324 | 12.0 | 120 | J-7 | J-28 | 104 | 0.30 | 0.044 |
| P-23 | 2,040 | 12.0 | 120 | J-28 | J-31 | 89 | 0.25 | 0.033 |
| P-24 | 935 | 12.0 | 120 | J-31 | J-32 | 270 | 0.77 | 0.261 |
| P-25 | 1,071 | 12.0 | 120 | J-32 | J-33 | 284 | 0.81 | 0.285 |
| P-26 | 757 | 12.0 | 120 | J-33 | J-34 | 386 | 1.09 | 0.504 |
| P-27 | 888 | 12.0 | 120 | J-34 | J-3 | 534 | 1.52 | 0.921 |
| P-28 | 1,587 | 8.0 | 120 | J-29 | J-35 | 20 | 0.13 | 0.015 |
| P-29 | 1,506 | 8.0 | 120 | J-30 | J-36 | 77 | 0.49 | 0.184 |
| P-30 | 1,149 | 8.0 | 120 | J-36 | J-33 | 47 | 0.30 | 0.073 |
| P-31 | 1,110 | 8.0 | 120 | J-27 | J-37 | 33 | 0.21 | 0.038 |
| P-32 | 1,560 | 8.0 | 120 | J-37 | J-38 | 33 | 0.21 | 0.039 |
| P-33 | 895 | 8.0 | 120 | J-38 | J-31 | 33 | 0.21 | 0.038 |
| P-34 | 783 | 8.0 | 120 | J-11 | J-39 | 47 | 0.30 | 0.074 |
| P-35 | 1,356 | 8.0 | 120 | J-39 | J-40 | 145 | 0.92 | 0.590 |
| P-36 | 792 | 8.0 | 120 | J-40 | J-2 | 145 | 0.92 | 0.590 |
| P-37 | 807 | 12.0 | 120 | J-6 | J-41 | 237 | 0.67 | 0.204 |
| P-38 | 1,833 | 12.0 | 120 | J-41 | J-7 | 217 | 0.62 | 0.173 |
| P-39 | 949 | 8.0 | 120 | J-35 | J-41 | 20 | 0.13 | 0.015 |
| P-40 | 2,155 | 16.0 | 120 | J-4 | J-42 | 625 | 1.00 | 0.303 |
| P-41 | 1,477 | 16.0 | 120 | J-42 | J-5 | 502 | 0.80 | 0.202 |
| P-42 | 614 | 8.0 | 120 | J-36 | J-42 | 124 | 0.79 | 0.442 |
| P-43 | 1,556 | 12.0 | 120 | J-32 | J-30 | 135 | 0.38 | 0.072 |
| P-44 | 689 | 12.0 | 120 | J-12 | J-43 | 90 | 0.25 | 0.034 |
| P-45 | 1,946 | 12.0 | 120 | J-43 | J-44 | 202 | 0.57 | 0.153 |
| P-46 | 2,073 | 8.0 | 120 | J-44 | J-45 | 45 | 0.29 | 0.068 |
| P-47 | 969 | 8.0 | 120 | J-45 | J-2 | 139 | 0.88 | 0.546 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 3

3-ER-457

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Average Day - Auction
Property

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-48 | 1,168 | 8.0 | 120 | J-3 | J-46 | 142 | 0.90 | 0.567 |
| P-49 | 911 | 8.0 | 120 | J-46 | J-17 | 50 | 0.32 | 0.083 |
| P-50 | 742 | 8.0 | 120 | J-45 | J-47 | 94 | 0.60 | 0.263 |
| P-51 | 921 | 8.0 | 120 | J-47 | J-43 | 94 | 0.60 | 0.263 |
| P-52 | 2,082 | 8.0 | 120 | J-43 | J-48 | 15 | 0.09 | 0.009 |
| P-53 | 1,325 | 8.0 | 120 | J-48 | J-49 | 34 | 0.22 | 0.040 |
| P-54 | 1,465 | 12.0 | 120 | J-49 | J-44 | 220 | 0.62 | 0.178 |
| P-55 | 1,495 | 12.0 | 120 | J-49 | J-14 | 28 | 0.08 | 0.004 |
| P-56 | 743 | 8.0 | 120 | J-49 | J-50 | 34 | 0.21 | 0.040 |
| P-57 | 1,129 | 8.0 | 120 | J-50 | J-15 | 34 | 0.21 | 0.040 |
| P-58 | 931 | 16.0 | 120 | J-51 | J-14 | 242 | 0.39 | 0.052 |
| P-59 | 1,264 | 8.0 | 120 | J-48 | J-51 | 5 | 0.03 | 0.001 |
| P-60 | 2,202 | 16.0 | 120 | J-12 | J-52 | 151 | 0.24 | 0.022 |
| P-61 | 885 | 16.0 | 120 | J-52 | J-94 | 112 | 0.18 | 0.012 |
| P-62 | 840 | 8.0 | 120 | J-48 | J-52 | 44 | 0.28 | 0.064 |
| P-63 | 906 | 8.0 | 120 | J-9 | J-53 | 88 | 0.56 | 0.234 |
| P-64 | 910 | 12.0 | 120 | J-54 | J-8 | 186 | 0.53 | 0.130 |
| P-65 | 721 | 8.0 | 120 | J-53 | J-54 | 61 | 0.39 | 0.119 |
| P-66 | 983 | 8.0 | 120 | J-24 | J-55 | 79 | 0.50 | 0.190 |
| P-67 | 1,333 | 8.0 | 120 | J-55 | J-56 | 46 | 0.30 | 0.071 |
| P-68 | 1,116 | 8.0 | 120 | J-56 | J-57 | 57 | 0.36 | 0.104 |
| P-69 | 729 | 8.0 | 120 | J-57 | J-58 | 37 | 0.24 | 0.048 |
| P-70 | 857 | 12.0 | 120 | J-26 | J-59 | 88 | 0.25 | 0.032 |
| P-71 | 1,622 | 12.0 | 120 | J-59 | J-54 | 125 | 0.35 | 0.062 |
| P-72 | 936 | 8.0 | 120 | J-58 | J-59 | 37 | 0.24 | 0.048 |
| P-73 | 1,459 | 8.0 | 120 | J-55 | J-60 | 28 | 0.18 | 0.028 |
| P-74 | 1,114 | 8.0 | 120 | J-60 | J-61 | 28 | 0.18 | 0.028 |
| P-75 | 1,054 | 12.0 | 120 | J-61 | J-26 | 191 | 0.54 | 0.137 |
| P-76 | 1,140 | 12.0 | 120 | J-61 | J-56 | 70 | 0.20 | 0.021 |
| P-77 | 855 | 12.0 | 120 | J-62 | J-63 | 206 | 0.58 | 0.157 |
| P-78 | 905 | 12.0 | 120 | J-63 | J-10 | 318 | 0.90 | 0.353 |
| P-79 | 831 | 8.0 | 120 | J-63 | J-64 | 20 | 0.13 | 0.015 |
| P-80 | 1,177 | 8.0 | 120 | J-64 | J-57 | 20 | 0.13 | 0.015 |
| P-81 | 1,245 | 8.0 | 120 | J-55 | J-65 | 5 | 0.03 | 0.001 |
| P-82 | 2,151 | 16.0 | 120 | J-22 | J-66 | 419 | 0.67 | 0.144 |
| P-83 | 1,176 | 16.0 | 120 | J-66 | J-24 | 183 | 0.29 | 0.031 |
| P-84 | 1,113 | 12.0 | 120 | J-65 | J-66 | 236 | 0.67 | 0.202 |
| P-85 | 1,034 | 8.0 | 120 | J-65 | J-67 | 37 | 0.23 | 0.046 |
| P-86 | 1,662 | 8.0 | 120 | J-67 | J-68 | 37 | 0.23 | 0.046 |
| P-87 | 1,161 | 12.0 | 120 | J-68 | J-23 | 372 | 1.06 | 0.471 |
| P-88 | 1,359 | 8.0 | 120 | J-68 | J-69 | 50 | 0.32 | 0.082 |
| P-89 | 1,832 | 8.0 | 120 | J-69 | J-63 | 56 | 0.35 | 0.100 |
| P-90 | 1,005 | 12.0 | 120 | J-68 | J-70 | 237 | 0.67 | 0.204 |
| P-91 | 573 | 12.0 | 120 | J-70 | J-62 | 27 | 0.08 | 0.004 |
| P-92 | 1,409 | 12.0 | 120 | J-65 | J-71 | 128 | 0.36 | 0.065 |
| P-93 | 1,201 | 12.0 | 120 | J-56 | J-72 | 24 | 0.07 | 0.003 |
| P-94 | 503 | 12.0 | 120 | J-72 | J-62 | 84 | 0.24 | 0.030 |
| P-95 | 736 | 12.0 | 120 | J-71 | J-72 | 40 | 0.11 | 0.008 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 3

3-ER-458

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Average Day - Auction
Property

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-96 | 718 | 12.0 | 120 | J-71 | J-70 | 61 | 0.17 | 0.016 |
| P-97 | 1,047 | 8.0 | 120 | J-19 | J-73 | 65 | 0.41 | 0.133 |
| P-98 | 1,393 | 12.0 | 120 | J-83 | J-74 | 128 | 0.36 | 0.066 |
| P-99 | 903 | 12.0 | 120 | J-74 | J-75 | 29 | 0.08 | 0.004 |
| P-100 | 1,063 | 12.0 | 120 | J-21 | J-76 | 238 | 0.67 | 0.205 |
| P-101 | 1,185 | 12.0 | 120 | J-76 | J-77 | 116 | 0.33 | 0.054 |
| P-102 | 939 | 12.0 | 120 | J-77 | J-74 | 76 | 0.22 | 0.025 |
| P-103 | 1,124 | 12.0 | 120 | J-74 | J-78 | 169 | 0.48 | 0.109 |
| P-104 | 1,019 | 8.0 | 120 | J-78 | J-79 | 56 | 0.36 | 0.103 |
| P-105 | 1,354 | 16.0 | 120 | J-1 | J-80 | 440 | 0.70 | 0.158 |
| P-106 | 894 | 16.0 | 120 | J-80 | J-12 | 335 | 0.53 | 0.096 |
| P-107 | 1,486 | 8.0 | 120 | J-76 | J-81 | 43 | 0.27 | 0.062 |
| P-108 | 1,004 | 12.0 | 120 | J-75 | J-82 | 163 | 0.46 | 0.102 |
| P-109 | 1,106 | 12.0 | 120 | J-82 | J-23 | 284 | 0.80 | 0.285 |
| P-110 | 1,868 | 8.0 | 120 | J-81 | J-82 | 22 | 0.14 | 0.019 |
| P-111 | 1,711 | 12.0 | 120 | J-78 | J-12 | 274 | 0.78 | 0.267 |
| P-112 | 675 | 8.0 | 120 | J-73 | J-83 | 38 | 0.24 | 0.049 |
| P-113 | 1,008 | 8.0 | 120 | J-83 | J-84 | 52 | 0.33 | 0.089 |
| P-114 | 1,673 | 8.0 | 120 | J-84 | J-52 | 83 | 0.53 | 0.209 |
| P-115 | 1,776 | 8.0 | 120 | J-78 | J-84 | 31 | 0.19 | 0.033 |
| P-116 | 1,656 | 8.0 | 120 | J-73 | J-85 | 27 | 0.17 | 0.026 |
| P-117 | 1,568 | 8.0 | 120 | J-85 | J-76 | 27 | 0.17 | 0.026 |
| P-118 | 1,542 | 8.0 | 120 | J-82 | J-86 | 49 | 0.31 | 0.078 |
| P-119 | 532 | 8.0 | 120 | J-79 | J-87 | 56 | 0.36 | 0.103 |
| P-120 | 1,177 | 8.0 | 120 | J-87 | J-80 | 105 | 0.67 | 0.325 |
| P-121 | 801 | 8.0 | 120 | J-86 | J-87 | 49 | 0.31 | 0.078 |
| P-122 | 931 | 12.0 | 120 | J-83 | J-18 | 230 | 0.65 | 0.194 |
| P-125 | 839 | 16.0 | 120 | J-14 | J-90 | 214 | 0.34 | 0.042 |
| P-126 | 1,077 | 16.0 | 120 | J-90 | J-15 | 214 | 0.34 | 0.042 |
| P-128 | 1,309 | 24.0 | 120 | J-21 | J-91 | 201 | 0.14 | 0.005 |
| P-129 | 1,332 | 24.0 | 120 | J-91 | J-22 | 267 | 0.19 | 0.009 |
| P-130 | 974 | 8.0 | 120 | J-81 | J-91 | 65 | 0.42 | 0.136 |
| P-133 | 1,322 | 24.0 | 120 | J-2 | J-92 | 2,703 | 1.92 | 0.634 |
| P-134 | 1,322 | 24.0 | 120 | J-92 | J-3 | 1,934 | 1.37 | 0.341 |
| P-135 | 1,774 | 24.0 | 120 | J-20 | J-93 | 36 | 0.03 | 0.000 |
| P-136 | 778 | 24.0 | 120 | J-93 | J-21 | 36 | 0.03 | 0.000 |
| P-137 | 786 | 16.0 | 120 | J-13 | J-94 | 331 | 0.53 | 0.094 |
| P-138 | 1,159 | 16.0 | 120 | J-94 | J-51 | 247 | 0.39 | 0.054 |
| P-139 | 2,314 | 12.0 | 120 | J-44 | J-16 | 128 | 0.36 | Headloss |
| P-140 | 1,166 | 8.0 | 120 | J-11 | J-69 | 105 | 0.67 | 0.328 |
| P-141 | 890 | 16.0 | 120 | J-95 | J-16 | 440 | 0.70 | 0.158 |
| P-142 | 1,256 | 16.0 | 120 | J-15 | J-95 | 440 | 0.70 | 0.158 |
| P-143 | 2,336 | 12.0 | 120 | J-44 | J-92 | 441 | 1.25 | 0.645 |
| P-204 | 2,317 | 12.0 | 120 | J-205 | J-25 | 1 | 0.00 | 0.000 |
| P-259 | 1,600 | 12.0 | 120 | J-ELS | J-205 | 1 | 0.00 | 0.000 |
| P-500 | 679 | 48.0 | 120 | R-1 | J-92 | 5,078 | 0.90 | 0.071 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 3

3-ER-459

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Reservoir Table

Active Scenario:  Average Day - Auction Property

| Label | Elevation (ft) | Flow (Out net) (gpm) | Hydraulic Grade (ft) |
|-------|----------------|----------------------|----------------------|
| R-1 | 1,710.00 | 5,078 | 1,710.00 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 1

3-ER-460



# AUCTION PROPERTY
# MAXIMUM DAY DEMAND RESULTS

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario: Max Day - Auction
Property

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|---|---|---|---|---|
| J-1 | 1,518.46 | 0 | 1,705.27 | 80.8 |
| J-2 | 1,524.42 | 0 | 1,707.40 | 79.2 |
| J-3 | 1,534.31 | 0 | 1,708.60 | 75.4 |
| J-4 | 1,536.36 | 28 | 1,708.02 | 74.3 |
| J-5 | 1,511.94 | 0 | 1,705.08 | 83.6 |
| J-6 | 1,496.19 | 0 | 1,704.67 | 90.2 |
| J-7 | 1,487.97 | 0 | 1,703.18 | 93.1 |
| J-8 | 1,482.10 | 0 | 1,702.75 | 95.5 |
| J-9 | 1,489.31 | 0 | 1,702.78 | 92.4 |
| J-10 | 1,498.18 | 0 | 1,702.91 | 88.6 |
| J-11 | 1,505.45 | 0 | 1,703.67 | 85.8 |
| J-12 | 1,528.22 | 0 | 1,704.33 | 76.2 |
| J-13 | 1,541.89 | 0 | 1,703.92 | 70.1 |
| J-14 | 1,551.18 | 0 | 1,704.49 | 66.3 |
| J-15 | 1,555.10 | 354 | 1,704.74 | 64.7 |
| J-16 | 1,547.57 | 0 | 1,705.79 | 68.5 |
| J-17 | 1,539.63 | 0 | 1,706.78 | 72.3 |
| J-18 | 1,536.04 | 0 | 1,703.38 | 72.4 |
| J-19 | 1,531.88 | 0 | 1,703.35 | 74.2 |
| J-20 | 1,525.85 | 0 | 1,703.34 | 76.8 |
| J-21 | 1,509.31 | 0 | 1,703.34 | 83.9 |
| J-22 | 1,500.29 | 28 | 1,703.40 | 87.9 |
| J-23 | 1,507.70 | 0 | 1,703.82 | 84.9 |
| J-24 | 1,478.32 | 0 | 1,702.34 | 96.9 |
| J-25 | 1,468.56 | 0 | 1,702.24 | 101.1 |
| J-26 | 1,470.59 | 0 | 1,701.99 | 100.1 |
| J-27 | 1,491.65 | 273 | 1,702.78 | 91.3 |
| J-28 | 1,494.43 | 273 | 1,703.00 | 90.2 |
| J-29 | 1,504.84 | 0 | 1,704.05 | 86.2 |
| J-30 | 1,509.95 | 273 | 1,704.31 | 84.1 |
| J-31 | 1,506.31 | 273 | 1,703.21 | 85.2 |
| J-32 | 1,510.99 | 273 | 1,703.96 | 83.5 |
| J-33 | 1,517.93 | 273 | 1,704.91 | 80.9 |
| J-34 | 1,523.42 | 273 | 1,706.08 | 79.0 |
| J-35 | 1,500.26 | 0 | 1,704.12 | 88.2 |
| J-36 | 1,519.89 | 0 | 1,705.16 | 80.2 |
| J-37 | 1,497.84 | 0 | 1,702.91 | 88.7 |
| J-38 | 1,508.75 | 0 | 1,703.10 | 84.1 |
| J-39 | 1,509.06 | 354 | 1,703.48 | 84.1 |
| J-40 | 1,519.34 | 0 | 1,705.96 | 80.7 |
| J-41 | 1,493.31 | 0 | 1,704.16 | 91.2 |
| J-42 | 1,520.78 | 0 | 1,706.00 | 80.1 |
| J-43 | 1,528.04 | 354 | 1,704.40 | 76.3 |
| J-44 | 1,539.15 | 354 | 1,705.32 | 71.9 |
| J-45 | 1,525.42 | 0 | 1,705.76 | 78.0 |
| J-46 | 1,536.25 | 354 | 1,706.55 | 73.7 |
| J-47 | 1,523.18 | 0 | 1,705.15 | 78.7 |
| J-48 | 1,543.23 | 0 | 1,704.35 | 69.7 |
| J-49 | 1,544.66 | 354 | 1,704.51 | 69.2 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 2

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario: Max Day - Auction
Property

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|----------------|--------------|----------------------|----------------|
| J-50  | 1,550.01 | 0   | 1,704.60 | 66.9 |
| J-51  | 1,551.30 | 0   | 1,704.34 | 66.2 |
| J-52  | 1,541.61 | 0   | 1,704.18 | 70.3 |
| J-53  | 1,482.08 | 273 | 1,702.13 | 95.2 |
| J-54  | 1,476.49 | 0   | 1,702.39 | 97.7 |
| J-55  | 1,480.56 | 0   | 1,701.76 | 95.7 |
| J-56  | 1,481.69 | 273 | 1,701.47 | 95.1 |
| J-57  | 1,483.32 | 0   | 1,701.83 | 94.5 |
| J-58  | 1,478.32 | 0   | 1,701.94 | 96.8 |
| J-59  | 1,473.68 | 0   | 1,702.08 | 98.8 |
| J-60  | 1,475.18 | 0   | 1,701.64 | 98.0 |
| J-61  | 1,474.72 | 273 | 1,701.55 | 98.1 |
| J-62  | 1,493.15 | 273 | 1,701.51 | 90.1 |
| J-63  | 1,494.82 | 273 | 1,701.92 | 89.6 |
| J-64  | 1,489.78 | 0   | 1,701.89 | 91.8 |
| J-65  | 1,486.52 | 273 | 1,701.76 | 93.1 |
| J-66  | 1,484.90 | 0   | 1,702.45 | 94.1 |
| J-67  | 1,492.33 | 0   | 1,701.91 | 90.7 |
| J-68  | 1,498.85 | 273 | 1,702.14 | 88.0 |
| J-69  | 1,504.49 | 0   | 1,702.49 | 85.7 |
| J-70  | 1,496.77 | 273 | 1,701.51 | 88.6 |
| J-71  | 1,492.39 | 273 | 1,701.48 | 90.5 |
| J-72  | 1,489.15 | 273 | 1,701.46 | 91.9 |
| J-73  | 1,526.88 | 0   | 1,702.92 | 76.2 |
| J-74  | 1,522.81 | 354 | 1,702.53 | 77.8 |
| J-75  | 1,517.39 | 354 | 1,702.52 | 80.1 |
| J-76  | 1,513.14 | 354 | 1,702.66 | 82.0 |
| J-77  | 1,518.58 | 354 | 1,702.46 | 79.6 |
| J-78  | 1,525.14 | 354 | 1,702.91 | 76.9 |
| J-79  | 1,521.50 | 0   | 1,703.24 | 78.6 |
| J-80  | 1,521.52 | 0   | 1,704.60 | 79.2 |
| J-81  | 1,507.88 | 0   | 1,702.95 | 84.4 |
| J-82  | 1,511.68 | 354 | 1,702.84 | 82.7 |
| J-83  | 1,530.12 | 354 | 1,702.82 | 74.7 |
| J-84  | 1,534.97 | 0   | 1,703.10 | 72.7 |
| J-85  | 1,520.43 | 0   | 1,702.79 | 78.9 |
| J-86  | 1,512.42 | 0   | 1,703.21 | 82.5 |
| J-87  | 1,519.02 | 0   | 1,703.41 | 79.8 |
| J-90  | 1,553.44 | 0   | 1,704.60 | 65.4 |
| J-91  | 1,501.89 | 0   | 1,703.36 | 87.2 |
| J-92  | 1,529.36 | 0   | 1,710.00 | 78.2 |
| J-93  | 1,513.70 | 0   | 1,703.34 | 82.1 |
| J-94  | 1,544.69 | 56  | 1,704.14 | 69.0 |
| J-95  | 1,552.90 | 0   | 1,705.36 | 66.0 |
| J-205 | 1,458.56 | 0   | 1,702.24 | 105.4 |
| J-ELS | 1,456.01 | 1   | 1,702.24 | 106.5 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 2

3-ER-463

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Max Day - Auction
Property

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-1 | 1,337 | 24.0 | 120 | J-1 | J-2 | 4,456 | 3.16 | 1.599 |
| P-2 | 1,236 | 24.0 | 120 | J-3 | J-4 | 2,317 | 1.64 | 0.476 |
| P-3 | 2,654 | 16.0 | 120 | J-5 | J-6 | 435 | 0.69 | 0.155 |
| P-4 | 2,643 | 12.0 | 120 | J-7 | J-8 | 208 | 0.59 | 0.160 |
| P-5 | 1,373 | 16.0 | 120 | J-8 | J-9 | 133 | 0.21 | 0.017 |
| P-6 | 1,371 | 16.0 | 120 | J-10 | J-11 | 866 | 1.38 | 0.554 |
| P-7 | 1,867 | 16.0 | 120 | J-9 | J-10 | 281 | 0.45 | 0.069 |
| P-7 | 1,712 | 16.0 | 120 | J-11 | J-1 | 1,147 | 1.83 | 0.933 |
| P-8 | 1,252 | 16.0 | 120 | J-16 | J-17 | 1,048 | 1.67 | 0.789 |
| P-9 | 1,335 | 16.0 | 120 | J-17 | J-4 | 1,141 | 1.82 | 0.924 |
| P-10 | 1,872 | 16.0 | 120 | J-13 | J-18 | 608 | 0.97 | 0.288 |
| P-11 | 817 | 16.0 | 120 | J-18 | J-19 | 183 | 0.29 | 0.031 |
| P-12 | 2,582 | 16.0 | 120 | J-19 | J-20 | 64 | 0.10 | 0.004 |
| P-13 | 2,636 | 24.0 | 120 | J-22 | J-23 | 1,289 | 0.91 | 0.161 |
| P-14 | 2,640 | 24.0 | 120 | J-23 | J-1 | 2,495 | 1.77 | 0.546 |
| P-15 | 2,850 | 16.0 | 120 | J-24 | J-25 | 190 | 0.30 | 0.033 |
| P-16 | 1,880 | 12.0 | 120 | J-25 | J-26 | 189 | 0.54 | 0.134 |
| P-17 | 1,357 | 12.0 | 120 | J-9 | J-27 | 14 | 0.04 | 0.001 |
| P-18 | 1,167 | 12.0 | 120 | J-27 | J-28 | 225 | 0.64 | 0.186 |
| P-19 | 1,813 | 8.0 | 120 | J-28 | J-29 | 143 | 0.91 | 0.578 |
| P-20 | 781 | 8.0 | 120 | J-29 | J-30 | 107 | 0.68 | 0.337 |
| P-21 | 997 | 12.0 | 120 | J-30 | J-5 | 486 | 1.38 | 0.774 |
| P-22 | 1,324 | 12.0 | 120 | J-7 | J-28 | 191 | 0.54 | 0.137 |
| P-23 | 2,040 | 12.0 | 120 | J-28 | J-31 | 164 | 0.46 | 0.103 |
| P-24 | 935 | 12.0 | 120 | J-31 | J-32 | 498 | 1.41 | 0.807 |
| P-25 | 1,071 | 12.0 | 120 | J-32 | J-33 | 522 | 1.48 | 0.881 |
| P-26 | 757 | 12.0 | 120 | J-33 | J-34 | 709 | 2.01 | 1.554 |
| P-27 | 888 | 12.0 | 120 | J-34 | J-3 | 981 | 2.78 | 2.840 |
| P-28 | 1,587 | 8.0 | 120 | J-29 | J-35 | 36 | 0.23 | 0.045 |
| P-29 | 1,506 | 8.0 | 120 | J-30 | J-36 | 142 | 0.90 | 0.567 |
| P-30 | 1,149 | 8.0 | 120 | J-36 | J-33 | 86 | 0.55 | 0.224 |
| P-31 | 1,110 | 8.0 | 120 | J-27 | J-37 | 61 | 0.39 | 0.120 |
| P-32 | 1,560 | 8.0 | 120 | J-37 | J-38 | 61 | 0.39 | 0.120 |
| P-33 | 895 | 8.0 | 120 | J-38 | J-31 | 61 | 0.39 | 0.120 |
| P-34 | 783 | 8.0 | 120 | J-11 | J-39 | 88 | 0.56 | 0.235 |
| P-35 | 1,356 | 8.0 | 120 | J-39 | J-40 | 266 | 1.70 | 1.825 |
| P-36 | 792 | 8.0 | 120 | J-40 | J-2 | 266 | 1.70 | 1.825 |
| P-37 | 807 | 12.0 | 120 | J-6 | J-41 | 435 | 1.23 | 0.629 |
| P-38 | 1,833 | 12.0 | 120 | J-41 | J-7 | 399 | 1.13 | 0.536 |
| P-39 | 949 | 8.0 | 120 | J-35 | J-41 | 36 | 0.23 | 0.045 |
| P-40 | 2,155 | 16.0 | 120 | J-4 | J-42 | 1,149 | 1.83 | 0.936 |
| P-41 | 1,477 | 16.0 | 120 | J-42 | J-5 | 921 | 1.47 | 0.622 |
| P-42 | 614 | 8.0 | 120 | J-36 | J-42 | 227 | 1.45 | 1.362 |
| P-43 | 1,556 | 12.0 | 120 | J-32 | J-30 | 248 | 0.70 | 0.223 |
| P-44 | 689 | 12.0 | 120 | J-12 | J-43 | 164 | 0.47 | 0.103 |
| P-45 | 1,946 | 12.0 | 120 | J-43 | J-44 | 373 | 1.06 | 0.473 |
| P-46 | 2,073 | 8.0 | 120 | J-44 | J-45 | 83 | 0.53 | 0.212 |
| P-47 | 969 | 8.0 | 120 | J-45 | J-2 | 256 | 1.63 | 1.695 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 3

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Max Day - Auction
Property

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-48 | 1,168 | 8.0 | 120 | J-3 | J-46 | 261 | 1.67 | 1.762 |
| P-49 | 911 | 8.0 | 120 | J-46 | J-17 | 93 | 0.59 | 0.260 |
| P-50 | 742 | 8.0 | 120 | J-45 | J-47 | 173 | 1.10 | 0.818 |
| P-51 | 921 | 8.0 | 120 | J-47 | J-43 | 173 | 1.10 | 0.818 |
| P-52 | 2,082 | 8.0 | 120 | J-43 | J-48 | 27 | 0.17 | 0.027 |
| P-53 | 1,325 | 8.0 | 120 | J-48 | J-49 | 62 | 0.40 | 0.124 |
| P-54 | 1,465 | 12.0 | 120 | J-49 | J-44 | 406 | 1.15 | 0.554 |
| P-55 | 1,495 | 12.0 | 120 | J-49 | J-14 | 52 | 0.15 | 0.012 |
| P-56 | 743 | 8.0 | 120 | J-49 | J-50 | 62 | 0.40 | 0.123 |
| P-57 | 1,129 | 8.0 | 120 | J-50 | J-15 | 62 | 0.40 | 0.123 |
| P-58 | 931 | 16.0 | 120 | J-51 | J-14 | 446 | 0.71 | 0.163 |
| P-59 | 1,264 | 8.0 | 120 | J-48 | J-51 | 10 | 0.06 | 0.004 |
| P-60 | 2,202 | 16.0 | 120 | J-12 | J-52 | 280 | 0.45 | 0.068 |
| P-61 | 885 | 16.0 | 120 | J-52 | J-94 | 207 | 0.33 | 0.039 |
| P-62 | 840 | 8.0 | 120 | J-48 | J-52 | 80 | 0.51 | 0.198 |
| P-63 | 906 | 8.0 | 120 | J-9 | J-53 | 161 | 1.03 | 0.720 |
| P-64 | 910 | 12.0 | 120 | J-54 | J-8 | 341 | 0.97 | 0.401 |
| P-65 | 721 | 8.0 | 120 | J-53 | J-54 | 112 | 0.71 | 0.365 |
| P-66 | 983 | 8.0 | 120 | J-24 | J-55 | 144 | 0.92 | 0.584 |
| P-67 | 1,333 | 8.0 | 120 | J-55 | J-56 | 85 | 0.54 | 0.219 |
| P-68 | 1,116 | 8.0 | 120 | J-56 | J-57 | 104 | 0.67 | 0.322 |
| P-69 | 729 | 8.0 | 120 | J-57 | J-58 | 68 | 0.44 | 0.147 |
| P-70 | 857 | 12.0 | 120 | J-26 | J-59 | 161 | 0.46 | 0.100 |
| P-71 | 1,622 | 12.0 | 120 | J-59 | J-54 | 230 | 0.65 | 0.193 |
| P-72 | 936 | 8.0 | 120 | J-58 | J-59 | 68 | 0.44 | 0.147 |
| P-73 | 1,459 | 8.0 | 120 | J-55 | J-60 | 51 | 0.32 | 0.084 |
| P-74 | 1,114 | 8.0 | 120 | J-60 | J-61 | 51 | 0.32 | 0.085 |
| P-75 | 1,054 | 12.0 | 120 | J-61 | J-26 | 350 | 0.99 | 0.421 |
| P-76 | 1,140 | 12.0 | 120 | J-61 | J-56 | 128 | 0.36 | 0.065 |
| P-77 | 855 | 12.0 | 120 | J-62 | J-63 | 378 | 1.07 | 0.485 |
| P-78 | 905 | 12.0 | 120 | J-63 | J-10 | 585 | 1.66 | 1.088 |
| P-79 | 831 | 8.0 | 120 | J-63 | J-64 | 36 | 0.23 | 0.045 |
| P-80 | 1,177 | 8.0 | 120 | J-64 | J-57 | 36 | 0.23 | 0.045 |
| P-81 | 1,245 | 8.0 | 120 | J-55 | J-65 | 9 | 0.05 | 0.003 |
| P-82 | 2,151 | 16.0 | 120 | J-22 | J-66 | 765 | 1.22 | 0.441 |
| P-83 | 1,176 | 16.0 | 120 | J-66 | J-24 | 334 | 0.53 | 0.095 |
| P-84 | 1,113 | 12.0 | 120 | J-65 | J-66 | 431 | 1.22 | 0.620 |
| P-85 | 1,034 | 8.0 | 120 | J-65 | J-67 | 67 | 0.43 | 0.142 |
| P-86 | 1,662 | 8.0 | 120 | J-67 | J-68 | 67 | 0.43 | 0.142 |
| P-87 | 1,161 | 12.0 | 120 | J-68 | J-23 | 682 | 1.93 | 1.447 |
| P-88 | 1,359 | 8.0 | 120 | J-68 | J-69 | 92 | 0.58 | 0.253 |
| P-89 | 1,832 | 8.0 | 120 | J-69 | J-63 | 102 | 0.65 | 0.308 |
| P-90 | 1,005 | 12.0 | 120 | J-68 | J-70 | 434 | 1.23 | 0.626 |
| P-91 | 573 | 12.0 | 120 | J-70 | J-62 | 50 | 0.14 | 0.011 |
| P-92 | 1,409 | 12.0 | 120 | J-65 | J-71 | 234 | 0.66 | 0.200 |
| P-93 | 1,201 | 12.0 | 120 | J-56 | J-72 | 45 | 0.13 | 0.009 |
| P-94 | 503 | 12.0 | 120 | J-72 | J-62 | 155 | 0.44 | 0.093 |
| P-95 | 736 | 12.0 | 120 | J-71 | J-72 | 73 | 0.21 | 0.023 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 3

3-ER-465

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Max Day - Auction
Property

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|-------|------|------|-----|------|------|-------|------|-------|
| P-96 | 718 | 12.0 | 120 | J-71 | J-70 | 111 | 0.32 | 0.050 |
| P-97 | 1,047 | 8.0 | 120 | J-19 | J-73 | 119 | 0.76 | 0.413 |
| P-98 | 1,393 | 12.0 | 120 | J-83 | J-74 | 237 | 0.67 | 0.204 |
| P-99 | 903 | 12.0 | 120 | J-74 | J-75 | 53 | 0.15 | 0.013 |
| P-100 | 1,063 | 12.0 | 120 | J-21 | J-76 | 439 | 1.24 | 0.639 |
| P-101 | 1,185 | 12.0 | 120 | J-76 | J-77 | 214 | 0.61 | 0.169 |
| P-102 | 939 | 12.0 | 120 | J-77 | J-74 | 140 | 0.40 | 0.077 |
| P-103 | 1,124 | 12.0 | 120 | J-74 | J-78 | 311 | 0.88 | 0.338 |
| P-104 | 1,019 | 8.0 | 120 | J-78 | J-79 | 104 | 0.66 | 0.319 |
| P-105 | 1,354 | 16.0 | 120 | J-1 | J-80 | 813 | 1.30 | 0.494 |
| P-106 | 894 | 16.0 | 120 | J-80 | J-12 | 620 | 0.99 | 0.299 |
| P-107 | 1,486 | 8.0 | 120 | J-76 | J-81 | 79 | 0.51 | 0.194 |
| P-108 | 1,004 | 12.0 | 120 | J-75 | J-82 | 301 | 0.85 | 0.318 |
| P-109 | 1,106 | 12.0 | 120 | J-82 | J-23 | 524 | 1.49 | 0.888 |
| P-110 | 1,868 | 8.0 | 120 | J-81 | J-82 | 41 | 0.26 | 0.058 |
| P-111 | 1,711 | 12.0 | 120 | J-78 | J-12 | 505 | 1.43 | 0.828 |
| P-112 | 675 | 8.0 | 120 | J-73 | J-83 | 70 | 0.45 | 0.153 |
| P-113 | 1,008 | 8.0 | 120 | J-83 | J-84 | 96 | 0.61 | 0.275 |
| P-114 | 1,673 | 8.0 | 120 | J-84 | J-52 | 152 | 0.97 | 0.648 |
| P-115 | 1,776 | 8.0 | 120 | J-78 | J-84 | 56 | 0.36 | 0.103 |
| P-116 | 1,656 | 8.0 | 120 | J-73 | J-85 | 49 | 0.32 | 0.081 |
| P-117 | 1,568 | 8.0 | 120 | J-85 | J-76 | 49 | 0.32 | 0.081 |
| P-118 | 1,542 | 8.0 | 120 | J-82 | J-86 | 89 | 0.57 | 0.242 |
| P-119 | 532 | 8.0 | 120 | J-79 | J-87 | 104 | 0.66 | 0.320 |
| P-120 | 1,177 | 8.0 | 120 | J-87 | J-80 | 193 | 1.23 | 1.009 |
| P-121 | 801 | 8.0 | 120 | J-86 | J-87 | 89 | 0.57 | 0.242 |
| P-122 | 931 | 12.0 | 120 | J-83 | J-18 | 425 | 1.21 | 0.603 |
| P-125 | 839 | 16.0 | 120 | J-14 | J-90 | 395 | 0.63 | 0.129 |
| P-126 | 1,077 | 16.0 | 120 | J-90 | J-15 | 395 | 0.63 | 0.130 |
| P-128 | 1,309 | 24.0 | 120 | J-21 | J-91 | 375 | 0.27 | 0.016 |
| P-129 | 1,332 | 24.0 | 120 | J-91 | J-22 | 496 | 0.35 | 0.027 |
| P-130 | 974 | 8.0 | 120 | J-81 | J-91 | 121 | 0.77 | 0.423 |
| P-133 | 1,322 | 24.0 | 120 | J-2 | J-92 | 4,978 | 3.53 | 1.963 |
| P-134 | 1,322 | 24.0 | 120 | J-92 | J-3 | 3,560 | 2.52 | 1.055 |
| P-135 | 1,774 | 24.0 | 120 | J-20 | J-93 | 64 | 0.05 | 0.001 |
| P-136 | 778 | 24.0 | 120 | J-93 | J-21 | 64 | 0.05 | 0.001 |
| P-137 | 786 | 16.0 | 120 | J-13 | J-94 | 608 | 0.97 | 0.288 |
| P-138 | 1,159 | 16.0 | 120 | J-94 | J-51 | 456 | 0.73 | 0.169 |
| P-139 | 2,314 | 12.0 | 120 | J-44 | J-16 | 237 | 0.67 | 0.204 |
| P-140 | 1,166 | 8.0 | 120 | J-11 | J-69 | 194 | 1.24 | 1.012 |
| P-141 | 890 | 16.0 | 120 | J-95 | J-16 | 811 | 1.29 | 0.491 |
| P-142 | 1,256 | 16.0 | 120 | J-15 | J-95 | 811 | 1.29 | 0.491 |
| P-143 | 2,336 | 12.0 | 120 | J-44 | J-92 | 813 | 2.31 | 2.002 |
| P-204 | 2,317 | 12.0 | 120 | J-205 | J-25 | 1 | 0.00 | 0.000 |
| P-259 | 1,600 | 12.0 | 120 | J-ELS | J-205 | 1 | 0.00 | 0.000 |
| P-500 | 679 | 48.0 | 120 | R-1 | J-92 | 9,350 | 1.66 | 0.214 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 3

3-ER-466

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Reservoir Table

Active Scenario:  Max Day - Auction
Property

| Label | Elevation (ft) | Flow (Out net) (gpm) | Hydraulic Grade (ft) |
|-------|----------------|----------------------|----------------------|
| R-1   | 1,710.00       | 9,350                | 1,710.00             |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 1

3-ER-467



**AUCTION PROPERTY**
**PEAK HOUR DEMAND RESULTS**

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario: Peak Hour - Auction
Property

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|---------------|--------------|---------------------|----------------|
| J-1   | 1,518.46 | 0   | 1,698.17 | 77.8 |
| J-2   | 1,524.42 | 0   | 1,703.51 | 77.5 |
| J-3   | 1,534.31 | 0   | 1,706.51 | 74.5 |
| J-4   | 1,536.36 | 47  | 1,705.04 | 73.0 |
| J-5   | 1,511.94 | 0   | 1,697.72 | 80.4 |
| J-6   | 1,496.19 | 0   | 1,696.69 | 86.7 |
| J-7   | 1,487.97 | 0   | 1,692.98 | 88.7 |
| J-8   | 1,482.10 | 0   | 1,691.92 | 90.8 |
| J-9   | 1,489.31 | 0   | 1,691.98 | 87.7 |
| J-10  | 1,498.18 | 0   | 1,692.30 | 84.0 |
| J-11  | 1,505.45 | 0   | 1,694.19 | 81.7 |
| J-12  | 1,528.22 | 0   | 1,695.82 | 72.5 |
| J-13  | 1,541.89 | 0   | 1,694.79 | 66.2 |
| J-14  | 1,551.18 | 0   | 1,696.23 | 62.8 |
| J-15  | 1,555.10 | 581 | 1,696.85 | 61.3 |
| J-16  | 1,547.57 | 0   | 1,699.48 | 65.7 |
| J-17  | 1,539.63 | 0   | 1,701.95 | 70.2 |
| J-18  | 1,536.04 | 0   | 1,693.45 | 68.1 |
| J-19  | 1,531.88 | 0   | 1,693.39 | 69.9 |
| J-20  | 1,525.85 | 0   | 1,693.36 | 72.5 |
| J-21  | 1,509.31 | 0   | 1,693.36 | 79.6 |
| J-22  | 1,500.29 | 47  | 1,693.50 | 83.6 |
| J-23  | 1,507.70 | 0   | 1,694.57 | 80.8 |
| J-24  | 1,478.32 | 0   | 1,690.87 | 92.0 |
| J-25  | 1,468.56 | 0   | 1,690.64 | 96.1 |
| J-26  | 1,470.59 | 0   | 1,690.01 | 94.9 |
| J-27  | 1,491.65 | 446 | 1,691.98 | 86.7 |
| J-28  | 1,494.43 | 446 | 1,692.52 | 85.7 |
| J-29  | 1,504.84 | 0   | 1,695.14 | 82.3 |
| J-30  | 1,509.95 | 446 | 1,695.80 | 80.4 |
| J-31  | 1,506.31 | 446 | 1,693.05 | 80.8 |
| J-32  | 1,510.99 | 446 | 1,694.93 | 79.6 |
| J-33  | 1,517.93 | 446 | 1,697.29 | 77.6 |
| J-34  | 1,523.42 | 446 | 1,700.22 | 76.5 |
| J-35  | 1,500.26 | 0   | 1,695.32 | 84.4 |
| J-36  | 1,519.89 | 0   | 1,697.93 | 77.0 |
| J-37  | 1,497.84 | 0   | 1,692.31 | 84.1 |
| J-38  | 1,508.75 | 0   | 1,692.78 | 79.6 |
| J-39  | 1,509.06 | 581 | 1,693.72 | 79.9 |
| J-40  | 1,519.34 | 0   | 1,699.91 | 78.1 |
| J-41  | 1,493.31 | 0   | 1,695.43 | 87.4 |
| J-42  | 1,520.78 | 0   | 1,700.01 | 77.5 |
| J-43  | 1,528.04 | 581 | 1,696.00 | 72.7 |
| J-44  | 1,539.15 | 581 | 1,698.30 | 68.9 |
| J-45  | 1,525.42 | 0   | 1,699.40 | 75.3 |
| J-46  | 1,536.25 | 581 | 1,701.36 | 71.4 |
| J-47  | 1,523.18 | 0   | 1,697.88 | 75.6 |
| J-48  | 1,543.23 | 0   | 1,695.86 | 66.0 |
| J-49  | 1,544.66 | 581 | 1,696.27 | 65.6 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 2

3-ER-469

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario: Peak Hour - Auction
Property

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|----------------|--------------|----------------------|----------------|
| J-50 | 1,550.01 | 0 | 1,696.50 | 63.4 |
| J-51 | 1,551.30 | 0 | 1,695.85 | 62.5 |
| J-52 | 1,541.61 | 0 | 1,695.45 | 66.6 |
| J-53 | 1,482.08 | 446 | 1,690.35 | 90.1 |
| J-54 | 1,476.49 | 0 | 1,691.01 | 92.8 |
| J-55 | 1,480.56 | 0 | 1,689.44 | 90.4 |
| J-56 | 1,481.69 | 446 | 1,688.72 | 89.6 |
| J-57 | 1,483.32 | 0 | 1,689.61 | 89.3 |
| J-58 | 1,478.32 | 0 | 1,689.88 | 91.5 |
| J-59 | 1,473.68 | 0 | 1,690.22 | 93.7 |
| J-60 | 1,475.18 | 0 | 1,689.14 | 92.6 |
| J-61 | 1,474.72 | 446 | 1,688.90 | 92.7 |
| J-62 | 1,493.15 | 446 | 1,688.81 | 84.7 |
| J-63 | 1,494.82 | 446 | 1,689.84 | 84.4 |
| J-64 | 1,489.78 | 0 | 1,689.75 | 86.5 |
| J-65 | 1,486.52 | 446 | 1,689.43 | 87.8 |
| J-66 | 1,484.90 | 0 | 1,691.15 | 89.2 |
| J-67 | 1,492.33 | 0 | 1,689.80 | 85.4 |
| J-68 | 1,498.85 | 446 | 1,690.39 | 82.9 |
| J-69 | 1,504.49 | 0 | 1,691.25 | 80.8 |
| J-70 | 1,496.77 | 446 | 1,688.82 | 83.1 |
| J-71 | 1,492.39 | 446 | 1,688.73 | 84.9 |
| J-72 | 1,489.15 | 446 | 1,688.69 | 86.3 |
| J-73 | 1,526.88 | 0 | 1,692.31 | 71.6 |
| J-74 | 1,522.81 | 581 | 1,691.33 | 72.9 |
| J-75 | 1,517.39 | 581 | 1,691.31 | 75.2 |
| J-76 | 1,513.14 | 581 | 1,691.65 | 77.2 |
| J-77 | 1,518.58 | 581 | 1,691.15 | 74.7 |
| J-78 | 1,525.14 | 581 | 1,692.28 | 72.3 |
| J-79 | 1,521.50 | 0 | 1,693.10 | 74.2 |
| J-80 | 1,521.52 | 0 | 1,696.49 | 75.7 |
| J-81 | 1,507.88 | 0 | 1,692.38 | 79.8 |
| J-82 | 1,511.68 | 581 | 1,692.11 | 78.1 |
| J-83 | 1,530.12 | 581 | 1,692.05 | 70.1 |
| J-84 | 1,534.97 | 0 | 1,692.74 | 68.3 |
| J-85 | 1,520.43 | 0 | 1,691.97 | 74.2 |
| J-86 | 1,512.42 | 0 | 1,693.04 | 78.1 |
| J-87 | 1,519.02 | 0 | 1,693.52 | 75.5 |
| J-90 | 1,553.44 | 0 | 1,696.50 | 61.9 |
| J-91 | 1,501.89 | 0 | 1,693.41 | 82.9 |
| J-92 | 1,529.36 | 0 | 1,710.00 | 78.2 |
| J-93 | 1,513.70 | 0 | 1,693.36 | 77.7 |
| J-94 | 1,544.69 | 94 | 1,695.36 | 65.2 |
| J-95 | 1,552.90 | 0 | 1,698.39 | 62.9 |
| J-205 | 1,458.56 | 0 | 1,690.64 | 100.4 |
| J-ELS | 1,456.01 | 1 | 1,690.64 | 101.5 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 2

3-ER-470

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Peak Hour - Auction
Property

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-1 | 1,337 | 24.0 | 120 | J-1 | J-2 | 7,306 | 5.18 | 3.995 |
| P-2 | 1,236 | 24.0 | 120 | J-3 | J-4 | 3,800 | 2.69 | 1.191 |
| P-3 | 2,654 | 16.0 | 120 | J-5 | J-6 | 713 | 1.14 | 0.387 |
| P-4 | 2,643 | 12.0 | 120 | J-7 | J-8 | 341 | 0.97 | 0.400 |
| P-5 | 1,373 | 16.0 | 120 | J-8 | J-9 | 219 | 0.35 | 0.043 |
| P-6 | 1,371 | 16.0 | 120 | J-10 | J-11 | 1,416 | 2.26 | 1.379 |
| P-7 | 1,867 | 16.0 | 120 | J-9 | J-10 | 458 | 0.73 | 0.171 |
| P-7 | 1,712 | 16.0 | 120 | J-11 | J-1 | 1,878 | 3.00 | 2.326 |
| P-8 | 1,252 | 16.0 | 120 | J-16 | J-17 | 1,719 | 2.74 | 1.975 |
| P-9 | 1,335 | 16.0 | 120 | J-17 | J-4 | 1,872 | 2.99 | 2.311 |
| P-10 | 1,872 | 16.0 | 120 | J-13 | J-18 | 995 | 1.59 | 0.717 |
| P-11 | 817 | 16.0 | 120 | J-18 | J-19 | 297 | 0.47 | 0.077 |
| P-12 | 2,582 | 16.0 | 120 | J-19 | J-20 | 101 | 0.16 | 0.010 |
| P-13 | 2,636 | 24.0 | 120 | J-22 | J-23 | 2,116 | 1.50 | 0.403 |
| P-14 | 2,640 | 24.0 | 120 | J-23 | J-1 | 4,092 | 2.90 | 1.365 |
| P-15 | 2,850 | 16.0 | 120 | J-24 | J-25 | 310 | 0.49 | 0.083 |
| P-16 | 1,880 | 12.0 | 120 | J-25 | J-26 | 308 | 0.88 | 0.333 |
| P-17 | 1,357 | 12.0 | 120 | J-9 | J-27 | 24 | 0.07 | 0.003 |
| P-18 | 1,167 | 12.0 | 120 | J-27 | J-28 | 369 | 1.05 | 0.465 |
| P-19 | 1,813 | 8.0 | 120 | J-28 | J-29 | 234 | 1.50 | 1.443 |
| P-20 | 781 | 8.0 | 120 | J-29 | J-30 | 175 | 1.12 | 0.842 |
| P-21 | 997 | 12.0 | 120 | J-30 | J-5 | 796 | 2.26 | 1.929 |
| P-22 | 1,324 | 12.0 | 120 | J-7 | J-28 | 313 | 0.89 | 0.342 |
| P-23 | 2,040 | 12.0 | 120 | J-28 | J-31 | 269 | 0.76 | 0.257 |
| P-24 | 935 | 12.0 | 120 | J-31 | J-32 | 816 | 2.31 | 2.015 |
| P-25 | 1,071 | 12.0 | 120 | J-32 | J-33 | 855 | 2.43 | 2.199 |
| P-26 | 757 | 12.0 | 120 | J-33 | J-34 | 1,161 | 3.29 | 3.877 |
| P-27 | 888 | 12.0 | 120 | J-34 | J-3 | 1,607 | 4.56 | 7.080 |
| P-28 | 1,587 | 8.0 | 120 | J-29 | J-35 | 59 | 0.38 | 0.113 |
| P-29 | 1,506 | 8.0 | 120 | J-30 | J-36 | 232 | 1.48 | 1.414 |
| P-30 | 1,149 | 8.0 | 120 | J-36 | J-33 | 140 | 0.89 | 0.556 |
| P-31 | 1,110 | 8.0 | 120 | J-27 | J-37 | 101 | 0.64 | 0.299 |
| P-32 | 1,560 | 8.0 | 120 | J-37 | J-38 | 101 | 0.64 | 0.299 |
| P-33 | 895 | 8.0 | 120 | J-38 | J-31 | 101 | 0.64 | 0.299 |
| P-34 | 783 | 8.0 | 120 | J-11 | J-39 | 145 | 0.92 | 0.592 |
| P-35 | 1,356 | 8.0 | 120 | J-39 | J-40 | 436 | 2.78 | 4.556 |
| P-36 | 792 | 8.0 | 120 | J-40 | J-2 | 436 | 2.78 | 4.556 |
| P-37 | 807 | 12.0 | 120 | J-6 | J-41 | 713 | 2.02 | 1.570 |
| P-38 | 1,833 | 12.0 | 120 | J-41 | J-7 | 654 | 1.85 | 1.337 |
| P-39 | 949 | 8.0 | 120 | J-35 | J-41 | 59 | 0.38 | 0.113 |
| P-40 | 2,155 | 16.0 | 120 | J-4 | J-42 | 1,881 | 3.00 | 2.333 |
| P-41 | 1,477 | 16.0 | 120 | J-42 | J-5 | 1,509 | 2.41 | 1.552 |
| P-42 | 614 | 8.0 | 120 | J-36 | J-42 | 372 | 2.37 | 3.393 |
| P-43 | 1,556 | 12.0 | 120 | J-32 | J-30 | 407 | 1.15 | 0.556 |
| P-44 | 689 | 12.0 | 120 | J-12 | J-43 | 268 | 0.76 | 0.257 |
| P-45 | 1,946 | 12.0 | 120 | J-43 | J-44 | 611 | 1.73 | 1.182 |
| P-46 | 2,073 | 8.0 | 120 | J-44 | J-45 | 137 | 0.87 | 0.531 |
| P-47 | 969 | 8.0 | 120 | J-45 | J-2 | 420 | 2.68 | 4.242 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 3

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Peak Hour - Auction
Property

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|-------|------|------|------|------|------|------|------|------|
| P-48 | 1,168 | 8.0 | 120 | J-3 | J-46 | 428 | 2.73 | 4.410 |
| P-49 | 911 | 8.0 | 120 | J-46 | J-17 | 153 | 0.97 | 0.651 |
| P-50 | 742 | 8.0 | 120 | J-45 | J-47 | 283 | 1.81 | 2.045 |
| P-51 | 921 | 8.0 | 120 | J-47 | J-43 | 283 | 1.81 | 2.045 |
| P-52 | 2,082 | 8.0 | 120 | J-43 | J-48 | 45 | 0.29 | 0.068 |
| P-53 | 1,325 | 8.0 | 120 | J-48 | J-49 | 102 | 0.65 | 0.310 |
| P-54 | 1,465 | 12.0 | 120 | J-49 | J-44 | 666 | 1.89 | 1.385 |
| P-55 | 1,495 | 12.0 | 120 | J-49 | J-14 | 84 | 0.24 | 0.030 |
| P-56 | 743 | 8.0 | 120 | J-49 | J-50 | 102 | 0.65 | 0.307 |
| P-57 | 1,129 | 8.0 | 120 | J-50 | J-15 | 102 | 0.65 | 0.307 |
| P-58 | 931 | 16.0 | 120 | J-51 | J-14 | 732 | 1.17 | 0.406 |
| P-59 | 1,264 | 8.0 | 120 | J-48 | J-51 | 16 | 0.10 | 0.010 |
| P-60 | 2,202 | 16.0 | 120 | J-12 | J-52 | 460 | 0.73 | 0.172 |
| P-61 | 885 | 16.0 | 120 | J-52 | J-94 | 342 | 0.55 | 0.099 |
| P-62 | 840 | 8.0 | 120 | J-48 | J-52 | 131 | 0.84 | 0.493 |
| P-63 | 906 | 8.0 | 120 | J-9 | J-53 | 264 | 1.68 | 1.795 |
| P-64 | 910 | 12.0 | 120 | J-54 | J-8 | 559 | 1.59 | 1.002 |
| P-65 | 721 | 8.0 | 120 | J-53 | J-54 | 183 | 1.17 | 0.908 |
| P-66 | 983 | 8.0 | 120 | J-24 | J-55 | 235 | 1.50 | 1.453 |
| P-67 | 1,333 | 8.0 | 120 | J-55 | J-56 | 139 | 0.88 | 0.544 |
| P-68 | 1,116 | 8.0 | 120 | J-56 | J-57 | 171 | 1.09 | 0.804 |
| P-69 | 729 | 8.0 | 120 | J-57 | J-58 | 112 | 0.71 | 0.366 |
| P-70 | 857 | 12.0 | 120 | J-26 | J-59 | 265 | 0.75 | 0.251 |
| P-71 | 1,622 | 12.0 | 120 | J-59 | J-54 | 377 | 1.07 | 0.482 |
| P-72 | 936 | 8.0 | 120 | J-58 | J-59 | 112 | 0.71 | 0.366 |
| P-73 | 1,459 | 8.0 | 120 | J-55 | J-60 | 83 | 0.53 | 0.210 |
| P-74 | 1,114 | 8.0 | 120 | J-60 | J-61 | 83 | 0.53 | 0.210 |
| P-75 | 1,054 | 12.0 | 120 | J-61 | J-26 | 573 | 1.63 | 1.050 |
| P-76 | 1,140 | 12.0 | 120 | J-61 | J-56 | 210 | 0.60 | 0.163 |
| P-77 | 855 | 12.0 | 120 | J-62 | J-63 | 619 | 1.76 | 1.210 |
| P-78 | 905 | 12.0 | 120 | J-63 | J-10 | 958 | 2.72 | 2.714 |
| P-79 | 831 | 8.0 | 120 | J-63 | J-64 | 59 | 0.38 | 0.112 |
| P-80 | 1,177 | 8.0 | 120 | J-64 | J-57 | 59 | 0.38 | 0.113 |
| P-81 | 1,245 | 8.0 | 120 | J-55 | J-65 | 14 | 0.09 | 0.008 |
| P-82 | 2,151 | 16.0 | 120 | J-22 | J-66 | 1,251 | 2.00 | 1.096 |
| P-83 | 1,176 | 16.0 | 120 | J-66 | J-24 | 545 | 0.87 | 0.235 |
| P-84 | 1,113 | 12.0 | 120 | J-65 | J-66 | 706 | 2.00 | 1.541 |
| P-85 | 1,034 | 8.0 | 120 | J-65 | J-67 | 110 | 0.70 | 0.354 |
| P-86 | 1,662 | 8.0 | 120 | J-67 | J-68 | 110 | 0.70 | 0.354 |
| P-87 | 1,161 | 12.0 | 120 | J-68 | J-23 | 1,116 | 3.16 | 3.600 |
| P-88 | 1,359 | 8.0 | 120 | J-68 | J-69 | 150 | 0.96 | 0.632 |
| P-89 | 1,832 | 8.0 | 120 | J-69 | J-63 | 167 | 1.06 | 0.768 |
| P-90 | 1,005 | 12.0 | 120 | J-68 | J-70 | 710 | 2.01 | 1.557 |
| P-91 | 573 | 12.0 | 120 | J-70 | J-62 | 81 | 0.23 | 0.028 |
| P-92 | 1,409 | 12.0 | 120 | J-65 | J-71 | 383 | 1.09 | 0.498 |
| P-93 | 1,201 | 12.0 | 120 | J-56 | J-72 | 73 | 0.21 | 0.023 |
| P-94 | 503 | 12.0 | 120 | J-71 | J-62 | 254 | 0.72 | 0.232 |
| P-95 | 736 | 12.0 | 120 | J-71 | J-72 | 119 | 0.34 | 0.057 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 3

3-ER-472

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Peak Hour – Auction
Property

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-96 | 718 | 12.0 | 120 | J-71 | J-70 | 182 | 0.52 | 0.126 |
| P-97 | 1,047 | 8.0 | 120 | J-19 | J-73 | 196 | 1.25 | 1.035 |
| P-98 | 1,393 | 12.0 | 120 | J-83 | J-74 | 389 | 1.10 | 0.511 |
| P-99 | 903 | 12.0 | 120 | J-74 | J-75 | 87 | 0.25 | 0.032 |
| P-100 | 1,063 | 12.0 | 120 | J-21 | J-76 | 721 | 2.04 | 1.602 |
| P-101 | 1,185 | 12.0 | 120 | J-76 | J-77 | 351 | 1.00 | 0.423 |
| P-102 | 939 | 12.0 | 120 | J-77 | J-74 | 230 | 0.65 | 0.193 |
| P-103 | 1,124 | 12.0 | 120 | J-74 | J-78 | 509 | 1.45 | 0.843 |
| P-104 | 1,019 | 8.0 | 120 | J-78 | J-79 | 170 | 1.09 | 0.800 |
| P-105 | 1,354 | 16.0 | 120 | J-1 | J-80 | 1,336 | 2.13 | 1.238 |
| P-106 | 894 | 16.0 | 120 | J-80 | J-12 | 1,019 | 1.63 | 0.749 |
| P-107 | 1,486 | 8.0 | 120 | J-76 | J-81 | 130 | 0.83 | 0.487 |
| P-108 | 1,004 | 12.0 | 120 | J-75 | J-82 | 494 | 1.40 | 0.796 |
| P-109 | 1,106 | 12.0 | 120 | J-82 | J-23 | 860 | 2.44 | 2.225 |
| P-110 | 1,868 | 8.0 | 120 | J-81 | J-82 | 68 | 0.43 | 0.146 |
| P-111 | 1,711 | 12.0 | 120 | J-78 | J-12 | 828 | 2.35 | 2.071 |
| P-112 | 675 | 8.0 | 120 | J-73 | J-83 | 115 | 0.73 | 0.385 |
| P-113 | 1,008 | 8.0 | 120 | J-83 | J-84 | 157 | 1.00 | 0.687 |
| P-114 | 1,673 | 8.0 | 120 | J-84 | J-52 | 249 | 1.59 | 1.618 |
| P-115 | 1,776 | 8.0 | 120 | J-78 | J-84 | 92 | 0.59 | 0.257 |
| P-116 | 1,656 | 8.0 | 120 | J-73 | J-85 | 81 | 0.52 | 0.202 |
| P-117 | 1,568 | 8.0 | 120 | J-85 | J-76 | 81 | 0.52 | 0.202 |
| P-118 | 1,542 | 8.0 | 120 | J-82 | J-86 | 147 | 0.94 | 0.605 |
| P-119 | 532 | 8.0 | 120 | J-79 | J-87 | 170 | 1.09 | 0.800 |
| P-120 | 1,177 | 8.0 | 120 | J-87 | J-80 | 317 | 2.02 | 2.524 |
| P-121 | 801 | 8.0 | 120 | J-86 | J-87 | 147 | 0.94 | 0.605 |
| P-122 | 931 | 12.0 | 120 | J-83 | J-18 | 698 | 1.98 | 1.509 |
| P-125 | 839 | 16.0 | 120 | J-14 | J-90 | 648 | 1.03 | 0.324 |
| P-126 | 1,077 | 16.0 | 120 | J-90 | J-15 | 648 | 1.03 | 0.324 |
| P-128 | 1,309 | 24.0 | 120 | J-21 | J-91 | 619 | 0.44 | 0.041 |
| P-129 | 1,332 | 24.0 | 120 | J-91 | J-22 | 818 | 0.58 | 0.069 |
| P-130 | 974 | 8.0 | 120 | J-81 | J-91 | 199 | 1.27 | 1.061 |
| P-133 | 1,322 | 24.0 | 120 | J-2 | J-92 | 8,162 | 5.79 | 4.904 |
| P-134 | 1,322 | 24.0 | 120 | J-92 | J-3 | 5,836 | 4.14 | 2.635 |
| P-135 | 1,774 | 24.0 | 120 | J-20 | J-93 | 101 | 0.07 | 0.001 |
| P-136 | 778 | 24.0 | 120 | J-93 | J-21 | 101 | 0.07 | 0.001 |
| P-137 | 786 | 16.0 | 120 | J-13 | J-94 | 995 | 1.59 | 0.717 |
| P-138 | 1,159 | 16.0 | 120 | J-94 | J-51 | 748 | 1.19 | 0.423 |
| P-139 | 2,314 | 12.0 | 120 | J-44 | J-16 | 389 | 1.10 | 0.511 |
| P-140 | 1,166 | 8.0 | 120 | J-11 | J-69 | 317 | 2.02 | 2.522 |
| P-141 | 890 | 16.0 | 120 | J-95 | J-16 | 1,330 | 2.12 | 1.228 |
| P-142 | 1,256 | 16.0 | 120 | J-15 | J-95 | 1,330 | 2.12 | 1.228 |
| P-143 | 2,336 | 12.0 | 120 | J-44 | J-92 | 1,333 | 3.78 | 5.006 |
| P-204 | 2,317 | 12.0 | 120 | J-205 | J-25 | 1 | 0.00 | 0.000 |
| P-259 | 1,600 | 12.0 | 120 | J-ELS | J-205 | 1 | 0.00 | 0.000 |
| P-500 | 679 | 48.0 | 120 | R-1 | J-92 | 15,331 | 2.72 | 0.547 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 3

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Reservoir Table

Active Scenario: Peak Hour - Auction
Property

| Label | Elevation (ft) | Flow (Out net) (gpm) | Hydraulic Grade (ft) |
|-------|---------------|----------------------|----------------------|
| R-1 | 1,710.00 | 15,331 | 1,710.00 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 1

3-ER-474



**AUCTION PROPERTY**
**MAXIMUM DAY + FIRE FLOW RESULTS (RESIDUAL)**
**MAXIMUM DAY + FIRE FLOW RESULTS (AVAILABLE)**

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Residual - Auction Property

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated @ Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-1 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 78.1 | 63.0 | J-15 | 78.1 | 63.0 | P-133 | 5.51 | True |
| J-2 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 77.4 | 63.7 | J-15 | 77.4 | 63.7 | P-133 | 5.83 | True |
| J-3 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 73.9 | 64.0 | J-15 | 73.9 | 64.0 | P-134 | 4.91 | True |
| J-4 | 28 | 4,000 | 4,028 | 4,000 | 4,028 | 72.1 | 63.6 | J-15 | 72.1 | 63.6 | P-134 | 4.68 | True |
| J-5 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 76.1 | 63.5 | J-15 | 76.1 | 63.5 | P-27 | 4.94 | True |
| J-6 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 78.9 | 63.5 | J-15 | 78.9 | 63.5 | P-27 | 4.94 | True |
| J-7 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 82.4 | 63.4 | J-15 | 82.4 | 63.4 | P-133 | 4.84 | True |
| J-8 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 86.8 | 63.2 | J-15 | 86.8 | 63.2 | P-133 | 5.06 | True |
| J-9 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 84.8 | 63.2 | J-15 | 84.8 | 63.2 | P-133 | 5.09 | True |
| J-10 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 82.3 | 63.1 | J-15 | 82.3 | 63.1 | P-133 | 5.21 | True |
| J-11 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 80.2 | 63.1 | J-15 | 80.2 | 63.1 | P-133 | 5.30 | True |
| J-12 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 71.6 | 61.9 | J-15 | 71.6 | 61.9 | P-133 | 5.23 | True |
| J-13 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 64.1 | 61.6 | J-15 | 64.1 | 61.6 | P-133 | 5.20 | True |
| J-14 | 354 | 4,000 | 4,354 | 4,000 | 4,354 | 60.5 | 60.1 | J-90 | 60.5 | 60.1 | P-133 | 5.02 | True |
| J-15 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 58.4 | 60.0 | J-15 | 58.4 | 60.0 | P-133 | 4.92 | True |
| J-16 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 63.7 | 62.5 | J-15 | 63.7 | 62.5 | P-133 | 4.75 | True |
| J-17 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 68.3 | 61.9 | J-15 | 68.3 | 61.9 | P-9 | 4.80 | True |
| J-18 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 66.2 | 62.1 | J-15 | 66.2 | 62.1 | P-133 | 5.28 | True |
| J-19 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 67.6 | 62.3 | J-15 | 67.6 | 62.3 | P-133 | 5.30 | True |
| J-20 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 71.0 | 62.5 | J-15 | 71.0 | 62.5 | P-133 | 5.34 | True |
| J-21 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 78.8 | 62.6 | J-15 | 78.8 | 62.6 | P-133 | 5.35 | True |
| J-22 | 28 | 4,000 | 4,028 | 4,000 | 4,028 | 83.3 | 62.7 | J-15 | 83.3 | 62.7 | P-133 | 5.37 | True |
| J-23 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 80.8 | 62.8 | J-15 | 80.8 | 62.8 | P-133 | 5.41 | True |
| J-24 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 87.5 | 62.9 | J-15 | 87.5 | 62.9 | P-133 | 5.31 | True |
| J-25 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 87.8 | 62.9 | J-15 | 87.8 | 62.9 | P-133 | 5.29 | True |
| J-26 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 88.4 | 63.0 | J-15 | 88.4 | 63.0 | P-133 | 5.26 | True |
| J-27 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 88.3 | 64.2 | J-15 | 88.3 | 64.2 | P-133 | 4.06 | True |
| J-28 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 87.5 | 64.3 | J-15 | 87.5 | 64.3 | P-133 | 4.04 | True |
| J-29 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 80.5 | 64.3 | J-15 | 80.5 | 64.3 | P-20 | 4.52 | True |
| J-30 | 273 | 4,000 | 4,273 | 4,000 | 4,273 | 74.2 | 63.5 | J-15 | 74.2 | 63.5 | P-21 | 5.47 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 4

3-ER-476

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Residual - Auction Property

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Residual @ Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-31 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 82.1 | 64.3 | J-15 | 82.1 | 64.3 | P-133 | 3.99 | True |
| J-32 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 80.8 | 64.3 | J-15 | 80.8 | 64.3 | P-133 | 3.94 | True |
| J-33 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 78.3 | 64.4 | J-15 | 78.3 | 64.4 | P-27 | 4.29 | True |
| J-34 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 76.5 | 64.4 | J-15 | 76.5 | 64.4 | P-27 | 4.99 | True |
| J-35 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 79.0 | 64.3 | J-15 | 79.0 | 64.3 | P-39 | 5.60 | True |
| J-36 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 76.0 | 64.3 | J-15 | 76.0 | 64.3 | P-42 | 4.60 | True |
| J-37 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 77.7 | 64.3 | J-15 | 77.7 | 64.3 | P-31 | 5.74 | True |
| J-38 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 73.9 | 64.3 | J-15 | 73.9 | 64.3 | P-33 | 6.14 | True |
| J-39 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 74.0 | 64.3 | J-15 | 74.0 | 64.3 | P-34 | 7.10 | True |
| J-40 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 72.2 | 64.3 | J-15 | 72.2 | 64.3 | P-36 | 7.03 | True |
| J-41 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 78.7 | 63.5 | J-15 | 78.7 | 63.5 | P-37 | 5.80 | True |
| J-42 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 74.0 | 63.5 | J-15 | 74.0 | 63.5 | P-40 | 4.98 | True |
| J-43 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 74.5 | 63.7 | J-15 | 74.5 | 63.7 | P-133 | 4.13 | True |
| J-44 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 70.3 | 63.7 | J-15 | 70.3 | 63.7 | P-133 | 4.04 | True |
| J-45 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 73.6 | 63.9 | J-15 | 73.6 | 63.9 | P-47 | 4.56 | True |
| J-46 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 65.3 | 64.2 | J-15 | 65.3 | 64.2 | P-49 | 6.05 | True |
| J-47 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 72.3 | 63.8 | J-15 | 72.3 | 63.8 | P-50 | 4.90 | True |
| J-48 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 66.5 | 63.5 | J-15 | 66.5 | 63.5 | P-133 | 4.12 | True |
| J-49 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 67.0 | 63.4 | J-15 | 67.0 | 63.4 | P-133 | 4.07 | True |
| J-50 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 60.4 | 63.2 | J-15 | 60.4 | 63.2 | P-56 | 5.25 | True |
| J-51 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 60.5 | 63.2 | J-15 | 60.5 | 63.2 | P-133 | 5.07 | True |
| J-52 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 60.7 | 60.7 | J-15 | 60.7 | 60.7 | P-133 | 5.18 | True |
| J-53 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 61.5 | 61.5 | J-15 | 61.5 | 61.5 | P-65 | 5.88 | True |
| J-54 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 87.3 | 64.2 | J-15 | 87.3 | 64.2 | P-64 | 6.16 | True |
| J-55 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 86.0 | 63.2 | J-15 | 86.0 | 63.2 | P-133 | 5.18 | True |
| J-56 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 91.4 | 64.1 | J-15 | 91.4 | 64.1 | P-133 | 4.19 | True |
| J-57 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 91.9 | 64.1 | J-15 | 91.9 | 64.1 | P-133 | 4.18 | True |
| J-58 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 88.4 | 64.1 | J-15 | 88.4 | 64.1 | P-72 | 5.00 | True |
| J-59 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 88.8 | 64.1 | J-15 | 88.8 | 63.0 | P-133 | 5.23 | True |
| J-60 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 86.2 | 64.1 | J-15 | 86.2 | 64.1 | P-74 | 5.14 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node Flex Table: Fire Flow Report

Active Scenario: Max Day + FF Residual - Auction Property

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Residual @ Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-61 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 94.7 | 64.1 | J-15 | 94.7 | 64.1 | P-133 | 4.18 | True |
| J-62 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 87.4 | 64.1 | J-15 | 87.4 | 64.1 | P-133 | 4.19 | True |
| J-63 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 87.0 | 64.2 | J-15 | 87.0 | 64.2 | P-133 | 4.18 | True |
| J-64 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 83.6 | 64.2 | J-15 | 83.6 | 64.2 | P-79 | 5.56 | True |
| J-65 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 90.3 | 64.1 | J-15 | 90.3 | 64.1 | P-133 | 4.19 | True |
| J-66 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 86.5 | 62.9 | J-15 | 86.5 | 62.9 | P-133 | 5.32 | True |
| J-67 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 81.5 | 64.1 | J-15 | 81.5 | 64.1 | P-85 | 5.33 | True |
| J-68 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 85.4 | 64.1 | J-15 | 85.4 | 64.1 | P-133 | 4.20 | True |
| J-69 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 80.4 | 64.2 | J-15 | 80.4 | 64.2 | P-133 | 4.19 | True |
| J-70 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 85.9 | 64.1 | J-15 | 85.9 | 64.1 | P-133 | 4.19 | True |
| J-71 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 87.6 | 64.1 | J-15 | 87.6 | 64.1 | P-133 | 4.19 | True |
| J-72 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 89.0 | 64.1 | J-15 | 89.0 | 64.1 | P-133 | 4.19 | True |
| J-73 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 71.5 | 63.9 | J-15 | 71.5 | 63.9 | P-133 | 4.20 | True |
| J-74 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 75.4 | 63.9 | J-15 | 75.4 | 63.9 | P-133 | 4.20 | True |
| J-75 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 77.1 | 64.0 | J-15 | 77.1 | 64.0 | P-133 | 4.21 | True |
| J-76 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 79.3 | 64.0 | J-15 | 79.3 | 64.0 | P-133 | 4.21 | True |
| J-77 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 76.4 | 64.0 | J-15 | 76.4 | 64.0 | P-133 | 4.21 | True |
| J-78 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 74.5 | 63.9 | J-15 | 74.5 | 63.9 | P-133 | 4.20 | True |
| J-79 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 71.7 | 63.9 | J-15 | 71.7 | 63.9 | P-119 | 5.07 | True |
| J-80 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 74.7 | 62.2 | J-15 | 74.7 | 62.2 | P-133 | 5.30 | True |
| J-81 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 79.3 | 64.0 | J-15 | 79.3 | 64.0 | P-133 | 4.21 | True |
| J-82 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 80.2 | 64.0 | J-15 | 80.2 | 64.0 | P-133 | 4.21 | True |
| J-83 | 354 | 4,000 | 4,354 | 4,000 | 4,354 | 66.1 | 62.3 | J-15 | 66.1 | 62.3 | P-122 | 5.51 | True |
| J-84 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 67.6 | 63.9 | J-15 | 67.6 | 63.9 | P-133 | 4.19 | True |
| J-85 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 67.8 | 64.0 | J-15 | 67.8 | 64.0 | P-117 | 4.94 | True |
| J-86 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 73.8 | 64.0 | J-15 | 73.8 | 64.0 | P-121 | 5.30 | True |
| J-87 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 74.3 | 63.9 | J-15 | 74.3 | 63.9 | P-133 | 4.20 | True |
| J-90 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 59.0 | 59.4 | J-15 | 59.0 | 59.4 | P-133 | 4.97 | True |
| J-91 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 82.3 | 62.6 | J-15 | 82.3 | 62.6 | P-133 | 5.36 | True |
| J-92 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 78.2 | 64.7 | J-15 | 78.2 | 64.7 | P-133 | 3.53 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Padora
Page 3 of 4

3-ER-478

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Residual - Auction Property

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-93 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 76.7 | 62.6 | J-15 | 76.7 | 62.6 | P-133 | 5.35 | True |
| J-94 | 56 | 4,000 | 4,056 | 4,000 | 4,056 | 63.8 | 61.4 | J-15 | 63.8 | 61.4 | P-133 | 5.16 | True |
| J-95 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 60.2 | 59.7 | J-15 | 60.2 | 59.7 | P-133 | 4.84 | True |
| J-205 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 96.0 | 64.1 | J-15 | 96.0 | 64.1 | P-204 | 4.26 | True |
| J-ELS | 1 | 1,500 | 1,501 | 1,500 | 1,501 | 92.8 | 64.1 | J-15 | 92.8 | 64.1 | P-259 | 4.26 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 4 of 4

3-ER-479

**21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg**
Fire Flow Node Flex Table: Fire Flow Report

Active Scenario: Max Day + FF Available - Auction Property

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Pipe Maximum (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-1 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 78.1 | 63.0 | J-15 | 72.3 | 59.4 | P-133 | 8.40 | True |
| J-2 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 77.4 | 63.7 | J-15 | 73.8 | 61.4 | P-133 | 9.11 | True |
| J-3 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 77.9 | 64.0 | J-15 | 70.8 | 62.0 | P-134 | 8.05 | True |
| J-4 | 28 | 4,000 | 4,028 | 10,000 | 10,028 | 73.9 | 64.0 | J-15 | 67.6 | 60.5 | P-134 | 7.45 | True |
| J-5 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 72.1 | 63.6 | J-15 | 51.8 | 59.0 | P-41 | 9.12 | True |
| J-6 | 0 | 4,000 | 4,000 | 9,617 | 9,617 | 76.1 | 63.5 | J-15 | 41.8 | 53.6 | P-37 | 10.00 | True |
| J-7 | 0 | 4,000 | 4,000 | 9,514 | 9,514 | 78.9 | 63.5 | J-15 | 48.8 | 61.0 | P-22 | 10.00 | True |
| J-8 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 82.4 | 63.4 | J-15 | 59.8 | 60.2 | P-5 | 8.49 | True |
| J-9 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 86.8 | 63.2 | J-15 | 62.9 | 60.2 | P-7 | 8.00 | True |
| J-10 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 84.8 | 63.2 | J-15 | 64.9 | 59.9 | P-6 | 7.98 | True |
| J-11 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 82.3 | 63.1 | J-15 | 65.3 | 59.7 | P-6 | 9.28 | True |
| J-12 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 80.2 | 63.1 | J-15 | 59.5 | 55.4 | P-133 | 7.79 | True |
| J-13 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 71.6 | 61.9 | J-15 | 51.6 | 51.6 | P-137 | 9.82 | True |
| J-14 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 64.1 | 61.6 | J-15 | 45.7 | 44.2 | P-58 | 7.23 | True |
| J-15 | 354 | 4,000 | 4,354 | 10,354 | 10,354 | 58.4 | 60.1 | J-90 | 42.5 | 43.9 | P-141 | 8.27 | True |
| J-16 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 63.7 | 60.0 | J-15 | 38.0 | 48.4 | P-8 | 8.62 | True |
| J-17 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 60.8 | 61.9 | J-15 | 48.9 | 54.7 | P-9 | 9.80 | True |
| J-18 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 66.2 | 62.1 | J-15 | 56.2 | 52.7 | P-133 | 7.86 | True |
| J-19 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 67.6 | 62.3 | J-15 | 48.0 | 51.4 | P-11 | 8.18 | True |
| J-20 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 71.0 | 62.5 | J-15 | 47.9 | 57.8 | P-133 | 8.08 | True |
| J-21 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 78.8 | 62.6 | J-15 | 55.3 | 58.1 | P-133 | 8.11 | True |
| J-22 | 28 | 4,000 | 4,028 | 10,000 | 10,028 | 83.3 | 62.7 | J-15 | 65.8 | 58.6 | P-133 | 8.15 | True |
| J-23 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 80.8 | 62.8 | J-15 | 72.5 | 58.9 | P-133 | 8.20 | True |
| J-24 | 0 | 4,000 | 4,000 | 9,427 | 9,427 | 87.5 | 62.9 | J-15 | 61.4 | 59.6 | P-83 | 10.00 | True |
| J-25 | 0 | 4,000 | 4,000 | 9,365 | 9,365 | 87.8 | 62.9 | J-15 | 48.1 | 52.4 | P-16 | 10.00 | True |
| J-26 | 0 | 4,000 | 4,000 | 9,387 | 9,387 | 88.4 | 63.0 | J-15 | 54.5 | 59.9 | P-70 | 10.00 | True |
| J-27 | 273 | 1,500 | 1,773 | 7,162 | 7,434 | 88.3 | 64.2 | J-15 | 59.8 | 62.0 | P-17 | 10.00 | True |
| J-28 | 273 | 1,500 | 1,773 | 10,273 | 10,273 | 87.5 | 64.3 | J-15 | 45.1 | 53.1 | P-22 | 9.79 | True |
| J-29 | 0 | 1,500 | 1,500 | 3,389 | 3,389 | 80.5 | 64.3 | J-15 | 64.3 | 63.7 | P-20 | 10.00 | True |
| J-30 | 273 | 4,000 | 4,273 | 7,788 | 8,060 | 74.2 | 63.5 | J-15 | 55.7 | 62.1 | P-21 | 10.00 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 4

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wcg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Available - Auction Property

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Residual @ Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-31 | 273 | 1,500 | 1,773 | 6,355 | 6,627 | 82.1 | 64.3 | J-15 | 57.3 | 59.9 | P-24 | 10.00 | True |
| J-32 | 273 | 1,500 | 1,773 | 8,616 | 8,889 | 80.8 | 64.3 | J-15 | 49.1 | 57.2 | P-25 | 10.00 | True |
| J-33 | 273 | 1,500 | 1,773 | 6,301 | 6,574 | 78.3 | 64.4 | J-15 | 60.7 | 62.9 | P-27 | 10.00 | True |
| J-34 | 273 | 1,500 | 1,773 | 4,841 | 5,114 | 76.5 | 64.4 | J-15 | 60.4 | 62.9 | P-27 | 10.00 | True |
| J-35 | 0 | 1,500 | 1,500 | 2,676 | 2,676 | 79.0 | 64.3 | J-15 | 67.0 | 63.5 | P-39 | 10.00 | True |
| J-36 | 0 | 1,500 | 1,500 | 3,533 | 3,533 | 76.0 | 64.3 | J-15 | 63.3 | 63.9 | P-39 | 10.00 | True |
| J-37 | 0 | 1,500 | 1,500 | 2,607 | 2,607 | 77.7 | 64.3 | J-15 | 63.4 | 63.7 | P-42 | 10.00 | True |
| J-38 | 0 | 1,500 | 1,500 | 2,450 | 2,450 | 73.9 | 64.3 | J-15 | 60.0 | 63.9 | P-31 | 10.00 | True |
| J-39 | 354 | 1,500 | 1,854 | 2,207 | 2,561 | 74.0 | 64.3 | J-15 | 60.2 | 64.0 | P-33 | 10.00 | True |
| J-40 | 0 | 1,500 | 1,500 | 2,265 | 2,265 | 74.0 | 64.3 | J-15 | 65.6 | 64.1 | P-34 | 10.00 | True |
| J-41 | 0 | 4,000 | 4,000 | 9,680 | 9,680 | 78.7 | 63.5 | J-15 | 63.9 | 59.0 | P-36 | 10.00 | True |
| J-42 | 0 | 4,000 | 4,000 | 6,767 | 7,121 | 74.0 | 63.5 | J-15 | 56.1 | 60.9 | P-37 | 10.00 | True |
| J-43 | 354 | 1,500 | 1,854 | 10,000 | 10,354 | 74.5 | 63.7 | J-15 | 59.9 | 59.0 | P-40 | 10.00 | True |
| J-44 | 354 | 1,500 | 1,854 | 3,606 | 3,606 | 70.3 | 63.7 | J-15 | 49.7 | 54.4 | P-143 | 8.80 | True |
| J-45 | 0 | 1,500 | 1,500 | 3,077 | 3,003 | 73.6 | 63.9 | J-15 | 52.9 | 62.6 | P-47 | 10.00 | True |
| J-46 | 354 | 1,500 | 1,854 | 2,649 | 3,077 | 65.3 | 64.2 | J-15 | 62.6 | 63.7 | P-49 | 10.00 | True |
| J-47 | 0 | 1,500 | 1,500 | 3,077 | 3,077 | 72.3 | 63.8 | J-15 | 55.8 | 62.8 | P-51 | 10.00 | True |
| J-48 | 0 | 1,500 | 1,500 | 5,032 | 5,032 | 66.5 | 63.5 | J-15 | 46.3 | 59.9 | P-62 | 10.00 | True |
| J-49 | 354 | 1,500 | 1,854 | 8,577 | 8,931 | 67.0 | 63.4 | J-15 | 40.2 | 44.7 | P-54 | 10.00 | True |
| J-50 | 0 | 1,500 | 1,500 | 2,850 | 2,850 | 60.4 | 63.2 | J-15 | 47.4 | 61.6 | P-56 | 10.00 | True |
| J-51 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 60.5 | 60.7 | J-15 | 42.9 | 47.3 | P-138 | 7.82 | True |
| J-52 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 64.9 | 61.5 | J-15 | 49.2 | 51.7 | P-133 | 7.60 | True |
| J-53 | 273 | 1,500 | 1,773 | 2,728 | 3,001 | 87.3 | 64.2 | J-15 | 75.1 | 63.7 | P-65 | 10.00 | True |
| J-54 | 0 | 1,500 | 1,500 | 6,700 | 6,700 | 94.9 | 64.2 | J-15 | 71.2 | 61.9 | P-64 | 10.00 | True |
| J-55 | 273 | 1,500 | 1,773 | 5,074 | 5,074 | 91.4 | 64.1 | J-15 | 65.5 | 62.4 | P-66 | 10.00 | True |
| J-56 | 0 | 1,500 | 1,500 | 8,165 | 8,438 | 91.9 | 64.1 | J-15 | 58.2 | 60.7 | P-93 | 10.00 | True |
| J-57 | 273 | 1,500 | 1,773 | 4,043 | 4,043 | 88.4 | 64.1 | J-15 | 62.4 | 63.0 | P-68 | 10.00 | True |
| J-58 | 0 | 1,500 | 1,500 | 3,014 | 3,014 | 88.8 | 64.1 | J-15 | 70.9 | 63.5 | P-72 | 10.00 | True |
| J-59 | 0 | 4,000 | 4,000 | 7,636 | 7,636 | 86.2 | 63.0 | J-15 | 63.1 | 61.1 | P-70 | 10.00 | True |
| J-60 | 0 | 1,500 | 1,500 | 2,904 | 2,904 | 88.2 | 64.1 | J-15 | 67.7 | 63.5 | P-74 | 10.00 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wcg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 4

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node Flex Table: Fire Flow Report

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Active Scenario: Max Day + FF Available - Auction Property

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-61 | 273 | 1,500 | 1,773 | 7,365 | 7,638 | 94.7 | 64.1 | J-15 | 61.6 | 61.2 | P-75 | 10.00 | True |
| J-62 | 273 | 1,500 | 1,773 | 9,236 | 9,508 | 87.4 | 64.1 | J-15 | 57.0 | 60.0 | P-77 | 10.00 | True |
| J-63 | 273 | 1,500 | 1,773 | 7,149 | 7,421 | 87.0 | 64.2 | J-15 | 67.6 | 61.4 | P-78 | 10.00 | True |
| J-64 | 0 | 1,500 | 1,500 | 2,695 | 2,695 | 83.6 | 64.2 | J-15 | 69.7 | 63.6 | P-79 | 10.00 | True |
| J-65 | 273 | 1,500 | 1,773 | 7,284 | 8,057 | 90.3 | 64.1 | J-15 | 63.0 | 60.8 | P-84 | 10.00 | True |
| J-66 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 86.5 | 62.9 | J-15 | 64.3 | 59.2 | P-82 | 9.40 | True |
| J-67 | 0 | 1,500 | 1,500 | 2,799 | 2,799 | 81.5 | 64.1 | J-15 | 63.8 | 63.5 | P-85 | 10.00 | True |
| J-68 | 273 | 1,500 | 1,773 | 7,010 | 7,282 | 85.4 | 64.1 | J-15 | 66.7 | 61.3 | P-87 | 10.00 | True |
| J-69 | 0 | 1,500 | 1,500 | 4,102 | 4,102 | 80.4 | 64.2 | J-15 | 57.2 | 63.0 | P-140 | 10.00 | True |
| J-70 | 273 | 1,500 | 1,773 | 9,338 | 9,611 | 85.9 | 64.1 | J-15 | 54.1 | 59.9 | P-90 | 10.00 | True |
| J-71 | 273 | 1,500 | 1,773 | 9,543 | 9,816 | 87.6 | 64.1 | J-15 | 52.2 | 59.7 | P-96 | 10.00 | True |
| J-72 | 273 | 1,500 | 1,773 | 8,513 | 8,786 | 89.0 | 63.9 | J-15 | 60.5 | 60.4 | P-94 | 10.00 | True |
| J-73 | 0 | 1,500 | 1,500 | 3,545 | 3,545 | 71.5 | 63.9 | J-15 | 56.6 | 62.6 | P-112 | 10.00 | True |
| J-74 | 354 | 1,500 | 1,854 | 10,000 | 10,354 | 75.4 | 63.9 | J-15 | 46.3 | 53.0 | P-103 | 8.48 | True |
| J-75 | 354 | 1,500 | 1,854 | 6,302 | 6,656 | 77.1 | 64.0 | J-15 | 56.1 | 60.9 | P-99 | 10.00 | True |
| J-76 | 354 | 1,500 | 1,854 | 6,737 | 7,091 | 79.3 | 64.0 | J-15 | 59.8 | 60.6 | P-100 | 10.00 | True |
| J-77 | 354 | 1,500 | 1,854 | 6,078 | 6,432 | 76.4 | 64.0 | J-15 | 55.5 | 61.0 | P-102 | 10.00 | True |
| J-78 | 354 | 1,500 | 1,854 | 8,732 | 9,086 | 74.5 | 63.9 | J-15 | 45.4 | 57.5 | P-111 | 10.00 | True |
| J-79 | 0 | 1,500 | 1,500 | 3,027 | 3,027 | 71.7 | 63.9 | J-15 | 55.4 | 63.0 | P-119 | 10.00 | True |
| J-80 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 74.7 | 62.2 | J-15 | 62.4 | 56.8 | P-105 | 8.69 | True |
| J-81 | 0 | 1,500 | 1,500 | 3,830 | 3,830 | 79.3 | 64.0 | J-15 | 60.0 | 62.7 | P-130 | 10.00 | True |
| J-82 | 354 | 1,500 | 1,854 | 6,706 | 7,060 | 80.2 | 64.0 | J-15 | 61.8 | 60.8 | P-109 | 10.00 | True |
| J-83 | 354 | 4,000 | 4,354 | 7,903 | 8,257 | 66.1 | 62.3 | J-15 | 50.4 | 58.1 | P-122 | 10.00 | True |
| J-84 | 0 | 1,500 | 1,500 | 3,989 | 3,989 | 67.6 | 63.9 | J-15 | 45.8 | 62.1 | P-113 | 10.00 | True |
| J-85 | 0 | 1,500 | 1,500 | 3,015 | 3,015 | 67.8 | 64.0 | J-15 | 41.0 | 63.1 | P-117 | 10.00 | True |
| J-86 | 0 | 1,500 | 1,500 | 2,874 | 2,874 | 73.8 | 64.0 | J-15 | 55.2 | 63.1 | P-121 | 10.00 | True |
| J-87 | 0 | 1,500 | 1,500 | 3,871 | 3,871 | 74.3 | 63.9 | J-15 | 52.1 | 58.8 | P-120 | 10.00 | True |
| J-90 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 59.0 | 59.4 | J-15 | 38.6 | 43.4 | P-125 | 8.72 | True |
| J-91 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 82.3 | 62.6 | J-15 | 70.3 | 58.3 | P-133 | 8.13 | True |
| J-92 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 78.2 | 64.7 | J-15 | 78.2 | 64.7 | P-133 | 3.53 | True |

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 4

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Available - Auction Property

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-93 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 76.7 | 62.6 | J-15 | 62.8 | 57.9 | P-133 | 8.10 | True |
| J-94 | 56 | 4,000 | 4,056 | 10,000 | 10,056 | 63.8 | 61.4 | J-15 | 49.0 | 49.7 | P-133 | 7.52 | True |
| J-95 | 0 | 4,000 | 4,000 | 9,916 | 9,916 | 60.2 | 59.7 | J-15 | 41.8 | 45.2 | P-141 | 10.00 | True |
| J-205 | 0 | 1,500 | 1,500 | 3,524 | 3,524 | 96.0 | 64.1 | J-15 | 64.1 | 63.2 | P-204 | 10.00 | True |
| J-ELS | 1 | 1,500 | 1,501 | 3,524 | 3,525 | 92.8 | 64.1 | J-15 | 44.3 | 63.2 | P-259 | 10.00 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 4 of 4

3-ER-483



# SITE
# HYDRAULIC MODELING RESULTS



# SITE
# AVERAGE DAY DEMAND RESULTS

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg                                   Active Scenario: Average Day - Site
FlexTable: Junction Table

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|---------------|--------------|---------------------|----------------|
| AZWC-J-1 | 1,565.65 | 96 | 1,717.17 | 65.6 |
| AZWC-J-2 | 1,566.00 | 0 | 1,718.48 | 66.0 |
| AZWC-J-3 | 1,562.39 | 96 | 1,719.53 | 68.0 |
| AZWC-J-4 | 1,549.27 | 192 | 1,717.00 | 72.6 |
| AZWC-J-5 | 1,549.29 | 14 | 1,717.15 | 72.6 |
| AZWC-J-6 | 1,550.00 | 14 | 1,718.56 | 72.9 |
| AZWC-J-7 | 1,540.00 | 14 | 1,717.14 | 76.6 |
| AZWC-J-8 | 1,540.19 | 96 | 1,720.00 | 77.8 |
| AZWC-J-9 | 1,532.76 | 74 | 1,716.86 | 79.7 |
| AZWC-J-10 | 1,532.13 | 96 | 1,716.88 | 79.9 |
| AZWC-J-11 | 1,530.66 | 192 | 1,717.00 | 80.6 |
| AZWC-J-12 | 1,530.39 | 96 | 1,718.65 | 81.5 |
| AZWC-J-13 | 1,516.54 | 55 | 1,716.89 | 86.7 |
| AZWC-J-14 | 1,511.49 | 55 | 1,716.86 | 88.9 |
| AZWC-J-15 | 1,510.00 | 192 | 1,717.09 | 89.6 |
| AZWC-J-16 | 1,510.00 | 96 | 1,717.38 | 89.7 |
| AZWC-J-17 | 1,498.95 | 55 | 1,716.90 | 94.3 |
| AZWC-J-18 | 1,496.42 | 55 | 1,716.87 | 95.4 |
| J-1 | 1,518.46 | 0 | 1,709.23 | 82.5 |
| J-2 | 1,524.42 | 0 | 1,709.57 | 80.1 |
| J-3 | 1,534.31 | 0 | 1,709.53 | 75.8 |
| J-4 | 1,536.36 | 28 | 1,709.31 | 74.8 |
| J-5 | 1,511.94 | 0 | 1,708.70 | 85.1 |
| J-6 | 1,496.19 | 0 | 1,708.63 | 91.9 |
| J-7 | 1,487.97 | 0 | 1,708.40 | 95.4 |
| J-8 | 1,482.10 | 0 | 1,708.39 | 97.9 |
| J-9 | 1,489.31 | 0 | 1,708.40 | 94.8 |
| J-10 | 1,498.18 | 0 | 1,708.49 | 91.0 |
| J-11 | 1,505.45 | 0 | 1,708.73 | 87.9 |
| J-12 | 1,528.22 | 0 | 1,708.84 | 78.1 |
| J-13 | 1,541.89 | 0 | 1,708.75 | 72.2 |
| J-14 | 1,551.18 | 0 | 1,708.75 | 68.2 |
| J-15 | 1,555.10 | 192 | 1,708.77 | 66.5 |
| J-16 | 1,547.57 | 14 | 1,708.94 | 69.8 |
| J-17 | 1,539.63 | 0 | 1,709.09 | 73.3 |
| J-18 | 1,536.04 | 0 | 1,708.77 | 74.7 |
| J-19 | 1,531.88 | 0 | 1,708.85 | 76.6 |
| J-20 | 1,525.85 | 0 | 1,709.19 | 79.3 |
| J-21 | 1,509.31 | 0 | 1,709.16 | 86.5 |
| J-22 | 1,500.29 | 14 | 1,709.17 | 90.4 |
| J-23 | 1,507.70 | 0 | 1,709.15 | 87.2 |
| J-24 | 1,478.32 | 0 | 1,708.73 | 99.7 |
| J-25 | 1,468.56 | 0 | 1,708.66 | 103.9 |
| J-26 | 1,470.59 | 0 | 1,708.37 | 102.9 |
| J-27 | 1,491.65 | 149 | 1,708.33 | 93.7 |
| J-28 | 1,494.43 | 149 | 1,708.34 | 92.5 |
| J-29 | 1,504.84 | 0 | 1,708.49 | 88.1 |
| J-30 | 1,509.95 | 149 | 1,708.52 | 85.9 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario: Average Day - Site

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|---|---|---|---|---|
| J-31 | 1,506.31 | 149 | 1,708.34 | 87.4 |
| J-32 | 1,510.99 | 149 | 1,708.44 | 85.4 |
| J-33 | 1,517.93 | 149 | 1,708.62 | 82.5 |
| J-34 | 1,523.42 | 149 | 1,708.89 | 80.2 |
| J-35 | 1,500.26 | 0 | 1,708.53 | 90.1 |
| J-36 | 1,519.89 | 0 | 1,708.69 | 81.7 |
| J-37 | 1,497.84 | 0 | 1,708.33 | 91.1 |
| J-38 | 1,508.75 | 0 | 1,708.34 | 86.4 |
| J-39 | 1,509.06 | 192 | 1,708.62 | 86.3 |
| J-40 | 1,519.34 | 0 | 1,709.22 | 82.2 |
| J-41 | 1,493.31 | 0 | 1,708.55 | 93.1 |
| J-42 | 1,520.78 | 0 | 1,708.89 | 81.4 |
| J-43 | 1,528.04 | 192 | 1,708.83 | 78.2 |
| J-44 | 1,539.15 | 192 | 1,708.92 | 73.5 |
| J-45 | 1,525.42 | 0 | 1,709.11 | 79.5 |
| J-46 | 1,536.25 | 192 | 1,708.98 | 74.7 |
| J-47 | 1,523.18 | 0 | 1,708.99 | 80.4 |
| J-48 | 1,543.23 | 0 | 1,708.76 | 71.6 |
| J-49 | 1,544.66 | 192 | 1,708.75 | 71.0 |
| J-50 | 1,550.01 | 0 | 1,708.76 | 68.7 |
| J-51 | 1,551.30 | 0 | 1,708.75 | 68.1 |
| J-52 | 1,541.61 | 0 | 1,708.76 | 72.3 |
| J-53 | 1,482.08 | 149 | 1,708.24 | 97.8 |
| J-54 | 1,476.49 | 0 | 1,708.37 | 100.3 |
| J-55 | 1,480.56 | 0 | 1,708.41 | 98.6 |
| J-56 | 1,481.69 | 149 | 1,708.23 | 98.0 |
| J-57 | 1,483.32 | 0 | 1,708.30 | 97.3 |
| J-58 | 1,478.32 | 0 | 1,708.33 | 99.5 |
| J-59 | 1,473.68 | 0 | 1,708.37 | 101.5 |
| J-60 | 1,475.18 | 0 | 1,708.32 | 100.9 |
| J-61 | 1,474.72 | 149 | 1,708.25 | 101.0 |
| J-62 | 1,493.15 | 149 | 1,708.24 | 93.1 |
| J-63 | 1,494.82 | 149 | 1,708.30 | 92.4 |
| J-64 | 1,489.78 | 0 | 1,708.30 | 94.5 |
| J-65 | 1,486.52 | 149 | 1,708.41 | 96.0 |
| J-66 | 1,484.90 | 0 | 1,708.77 | 96.9 |
| J-67 | 1,492.33 | 0 | 1,708.44 | 93.5 |
| J-68 | 1,498.85 | 149 | 1,708.49 | 90.7 |
| J-69 | 1,504.49 | 0 | 1,708.51 | 88.3 |
| J-70 | 1,496.77 | 149 | 1,708.25 | 91.5 |
| J-71 | 1,492.39 | 149 | 1,708.24 | 93.4 |
| J-72 | 1,489.15 | 149 | 1,708.23 | 94.8 |
| J-73 | 1,526.88 | 0 | 1,708.73 | 78.7 |
| J-74 | 1,522.81 | 192 | 1,708.57 | 80.4 |
| J-75 | 1,517.39 | 192 | 1,708.57 | 82.7 |
| J-76 | 1,513.14 | 192 | 1,708.74 | 84.6 |
| J-77 | 1,518.58 | 192 | 1,708.57 | 82.2 |
| J-78 | 1,525.14 | 192 | 1,708.60 | 79.4 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 4

3-ER-487

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario: Average Day - Site

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|---|---|---|---|---|
| J-79 | 1,521.50 | 0 | 1,708.71 | 81.0 |
| J-80 | 1,521.52 | 0 | 1,708.97 | 81.1 |
| J-81 | 1,507.88 | 0 | 1,708.87 | 87.0 |
| J-82 | 1,511.68 | 192 | 1,708.73 | 85.3 |
| J-83 | 1,530.12 | 192 | 1,708.63 | 77.2 |
| J-84 | 1,534.97 | 0 | 1,708.65 | 75.1 |
| J-85 | 1,520.43 | 0 | 1,708.73 | 81.5 |
| J-86 | 1,512.42 | 0 | 1,708.75 | 84.9 |
| J-87 | 1,519.02 | 0 | 1,708.76 | 82.1 |
| J-88 | 1,543.79 | 211 | 1,709.44 | 71.7 |
| J-89 | 1,561.51 | 211 | 1,710.00 | 64.2 |
| J-90 | 1,553.44 | 0 | 1,708.76 | 67.2 |
| J-91 | 1,501.89 | 0 | 1,709.16 | 89.7 |
| J-92 | 1,529.36 | 0 | 1,710.00 | 78.2 |
| J-93 | 1,513.70 | 0 | 1,709.17 | 84.6 |
| J-94 | 1,544.69 | 28 | 1,708.75 | 71.0 |
| J-95 | 1,552.90 | 0 | 1,708.89 | 67.5 |
| J-200 | 1,496.00 | 309 | 1,709.37 | 92.3 |
| J-201 | 1,488.00 | 489 | 1,710.00 | 96.0 |
| J-202 | 1,470.66 | 489 | 1,709.47 | 103.3 |
| J-203 | 1,458.00 | 489 | 1,708.73 | 108.5 |
| J-204 | 1,453.24 | 0 | 1,708.72 | 110.5 |
| J-205 | 1,458.56 | 0 | 1,708.68 | 108.2 |
| J-206 | 1,496.31 | 489 | 1,709.32 | 92.2 |
| J-207 | 1,517.23 | 496 | 1,709.09 | 83.0 |
| J-208 | 1,519.99 | 316 | 1,709.09 | 81.8 |
| J-209 | 1,504.30 | 309 | 1,709.12 | 88.6 |
| J-210 | 1,475.66 | 309 | 1,708.81 | 100.9 |
| J-211 | 1,463.36 | 309 | 1,708.56 | 106.1 |
| J-212 | 1,454.56 | 125 | 1,708.82 | 110.0 |
| J-213 | 1,466.18 | 125 | 1,709.25 | 105.2 |
| J-214 | 1,480.99 | 125 | 1,709.56 | 98.9 |
| J-215 | 1,494.36 | 125 | 1,709.24 | 93.0 |
| J-216 | 1,510.97 | 180 | 1,709.01 | 85.7 |
| J-217 | 1,559.60 | 253 | 1,709.43 | 64.8 |
| J-218 | 1,554.84 | 253 | 1,709.08 | 66.7 |
| J-219 | 1,549.95 | 253 | 1,708.67 | 68.7 |
| J-220 | 1,529.45 | 253 | 1,708.77 | 77.6 |
| J-221 | 1,536.00 | 253 | 1,709.11 | 74.9 |
| J-222 | 1,536.00 | 260 | 1,709.07 | 74.9 |
| J-223 | 1,563.53 | 260 | 1,709.10 | 63.0 |
| J-224 | 1,560.58 | 253 | 1,708.79 | 64.1 |
| J-225 | 1,550.03 | 211 | 1,708.69 | 68.6 |
| J-226 | 1,551.62 | 211 | 1,708.66 | 67.9 |
| J-227 | 1,546.70 | 211 | 1,708.75 | 70.1 |
| J-228 | 1,534.99 | 113 | 1,709.02 | 75.3 |
| J-229 | 1,550.60 | 73 | 1,708.92 | 68.5 |
| J-230 | 1,544.78 | 113 | 1,708.98 | 71.0 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 4

3-ER-488

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg                                    Active Scenario: Average Day - Site
FlexTable: Junction Table

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|----------------|--------------|----------------------|----------------|
| J-231 | 1,539.83 | 73 | 1,708.98 | 73.2 |
| J-232 | 1,550.00 | 34 | 1,708.98 | 68.8 |
| J-233 | 1,547.13 | 0 | 1,708.98 | 70.0 |
| J-ELS | 1,456.01 | 1 | 1,708.70 | 109.3 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Average Day - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| AZWC-P-1 | 1,622 | 12.0 | 120 | AZWC-J-18 | AZWC-J-17 | 70 | 0.20 | 0.022 |
| AZWC-P-2 | 2,123 | 12.0 | 120 | AZWC-J-17 | AZWC-J-15 | 152 | 0.43 | 0.090 |
| AZWC-P-3 | 3,095 | 16.0 | 120 | AZWC-J-4 | AZWC-J-11 | 34 | 0.05 | 0.001 |
| AZWC-P-4 | 2,970 | 16.0 | 120 | AZWC-J-11 | AZWC-J-15 | 179 | 0.29 | 0.030 |
| AZWC-P-5 | 2,054 | 12.0 | 120 | AZWC-J-13 | AZWC-J-11 | 116 | 0.33 | 0.054 |
| AZWC-P-6 | 2,990 | 12.0 | 120 | AZWC-J-17 | AZWC-J-13 | 27 | 0.08 | 0.004 |
| AZWC-P-7 | 1,705 | 12.0 | 120 | AZWC-J-14 | AZWC-J-13 | 60 | 0.17 | 0.016 |
| AZWC-P-8 | 2,436 | 16.0 | 120 | AZWC-J-4 | AZWC-J-1 | 282 | 0.45 | 0.069 |
| AZWC-P-9 | 3,055 | 16.0 | 120 | AZWC-J-8 | AZWC-J-3 | 434 | 0.69 | 0.155 |
| AZWC-P-10 | 1,316 | 16.0 | 120 | AZWC-J-15 | AZWC-J-16 | 523 | 0.84 | 0.218 |
| AZWC-P-11 | 2,912 | 16.0 | 120 | AZWC-J-16 | AZWC-J-12 | 762 | 1.22 | 0.438 |
| AZWC-P-12 | 2,013 | 16.0 | 120 | AZWC-J-12 | AZWC-J-8 | 958 | 1.53 | 0.669 |
| AZWC-P-13 | 2,178 | 12.0 | 120 | AZWC-J-1 | AZWC-J-2 | 425 | 1.21 | 0.603 |
| AZWC-P-14 | 2,649 | 12.0 | 120 | AZWC-J-2 | AZWC-J-3 | 339 | 0.96 | 0.396 |
| AZWC-P-15 | 1,502 | 12.0 | 120 | AZWC-J-5 | AZWC-J-7 | 33 | 0.09 | 0.005 |
| AZWC-P-16 | 2,991 | 12.0 | 120 | AZWC-J-16 | AZWC-J-7 | 143 | 0.41 | 0.080 |
| AZWC-P-17 | 1,931 | 12.0 | 120 | AZWC-J-5 | AZWC-J-1 | 47 | 0.13 | 0.010 |
| AZWC-P-18 | 2,422 | 12.0 | 120 | AZWC-J-6 | AZWC-J-2 | 86 | 0.24 | 0.031 |
| AZWC-P-19 | 2,346 | 12.0 | 120 | AZWC-J-6 | AZWC-J-12 | 100 | 0.28 | 0.042 |
| AZWC-P-20 | 1,354 | 12.0 | 120 | AZWC-J-11 | AZWC-J-7 | 162 | 0.46 | 0.101 |
| AZWC-P-21 | 2,644 | 12.0 | 120 | AZWC-J-18 | AZWC-J-14 | 15 | 0.04 | 0.001 |
| AZWC-P-22 | 3,404 | 12.0 | 120 | AZWC-J-14 | AZWC-J-9 | 20 | 0.06 | 0.002 |
| AZWC-P-23 | 1,779 | 12.0 | 120 | AZWC-J-9 | AZWC-J-10 | 54 | 0.15 | 0.013 |
| AZWC-P-24 | 3,067 | 12.0 | 120 | AZWC-J-10 | AZWC-J-13 | 27 | 0.08 | 0.004 |
| AZWC-P-25 | 1,946 | 12.0 | 120 | AZWC-J-10 | AZWC-J-4 | 123 | 0.35 | 0.061 |
| P-1 | 1,337 | 24.0 | 120 | J-1 | J-2 | 1,639 | 1.16 | 0.251 |
| P-2 | 1,236 | 24.0 | 120 | J-3 | J-4 | 1,378 | 0.98 | 0.182 |
| P-3 | 2,654 | 16.0 | 120 | J-5 | J-6 | 165 | 0.26 | 0.026 |
| P-4 | 2,643 | 12.0 | 120 | J-7 | J-8 | 29 | 0.08 | 0.004 |
| P-5 | 1,373 | 16.0 | 120 | J-8 | J-9 | 49 | 0.08 | 0.003 |
| P-6 | 1,371 | 16.0 | 120 | J-10 | J-11 | 468 | 0.75 | 0.177 |
| P-7 | 1,867 | 16.0 | 120 | J-9 | J-10 | 232 | 0.37 | 0.049 |
| P-7 | 1,712 | 16.0 | 120 | J-11 | J-1 | 614 | 0.98 | 0.294 |
| P-8 | 1,252 | 16.0 | 120 | J-16 | J-17 | 379 | 0.60 | 0.120 |
| P-9 | 1,335 | 16.0 | 120 | J-17 | J-4 | 442 | 0.71 | 0.160 |
| P-10 | 1,872 | 16.0 | 120 | J-13 | J-18 | 92 | 0.15 | 0.009 |
| P-11 | 817 | 16.0 | 120 | J-18 | J-19 | 341 | 0.54 | 0.098 |
| P-12 | 2,582 | 16.0 | 120 | J-19 | J-20 | 401 | 0.64 | 0.133 |
| P-13 | 2,636 | 24.0 | 120 | J-22 | J-23 | 215 | 0.15 | 0.006 |
| P-14 | 2,640 | 24.0 | 120 | J-23 | J-1 | 529 | 0.38 | 0.031 |
| P-15 | 2,850 | 16.0 | 120 | J-24 | J-25 | 163 | 0.26 | 0.025 |
| P-16 | 1,880 | 12.0 | 120 | J-25 | J-26 | 202 | 0.57 | 0.152 |
| P-17 | 1,357 | 12.0 | 120 | J-9 | J-27 | 110 | 0.31 | 0.049 |
| P-18 | 1,167 | 12.0 | 120 | J-27 | J-28 | 32 | 0.09 | 0.005 |
| P-19 | 1,813 | 8.0 | 120 | J-28 | J-29 | 52 | 0.33 | 0.088 |
| P-20 | 781 | 8.0 | 120 | J-29 | J-30 | 28 | 0.18 | 0.028 |
| P-21 | 997 | 12.0 | 120 | J-30 | J-5 | 224 | 0.64 | 0.184 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 5

3-ER-490

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Average Day - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-22 | 1,324 | 12.0 | 120 | J-7 | J-28 | 113 | 0.32 | 0.051 |
| P-23 | 2,040 | 12.0 | 120 | J-28 | J-31 | 16 | 0.05 | 0.001 |
| P-24 | 935 | 12.0 | 120 | J-31 | J-32 | 172 | 0.49 | 0.113 |
| P-25 | 1,071 | 12.0 | 120 | J-32 | J-33 | 213 | 0.60 | 0.168 |
| P-26 | 757 | 12.0 | 120 | J-33 | J-34 | 319 | 0.91 | 0.355 |
| P-27 | 888 | 12.0 | 120 | J-34 | J-3 | 468 | 1.33 | 0.720 |
| P-28 | 1,587 | 8.0 | 120 | J-29 | J-35 | 24 | 0.15 | 0.021 |
| P-29 | 1,506 | 8.0 | 120 | J-30 | J-36 | 60 | 0.39 | 0.117 |
| P-30 | 1,149 | 8.0 | 120 | J-36 | J-33 | 43 | 0.27 | 0.061 |
| P-31 | 1,110 | 8.0 | 120 | J-27 | J-37 | 7 | 0.05 | 0.002 |
| P-32 | 1,560 | 8.0 | 120 | J-37 | J-38 | 7 | 0.05 | 0.002 |
| P-33 | 895 | 8.0 | 120 | J-38 | J-31 | 7 | 0.05 | 0.002 |
| P-34 | 783 | 8.0 | 120 | J-11 | J-39 | 68 | 0.43 | 0.146 |
| P-35 | 1,356 | 8.0 | 120 | J-39 | J-40 | 124 | 0.79 | 0.443 |
| P-36 | 792 | 8.0 | 120 | J-40 | J-2 | 124 | 0.79 | 0.443 |
| P-37 | 807 | 12.0 | 120 | J-6 | J-41 | 165 | 0.47 | 0.105 |
| P-38 | 1,833 | 12.0 | 120 | J-41 | J-7 | 142 | 0.40 | 0.079 |
| P-39 | 949 | 8.0 | 120 | J-35 | J-41 | 24 | 0.15 | 0.021 |
| P-40 | 2,155 | 16.0 | 120 | J-4 | J-42 | 492 | 0.79 | 0.195 |
| P-41 | 1,477 | 16.0 | 120 | J-42 | J-5 | 389 | 0.62 | 0.126 |
| P-42 | 614 | 8.0 | 120 | J-36 | J-42 | 103 | 0.66 | 0.314 |
| P-43 | 1,556 | 12.0 | 120 | J-32 | J-30 | 108 | 0.31 | 0.047 |
| P-44 | 689 | 12.0 | 120 | J-12 | J-43 | 43 | 0.12 | 0.008 |
| P-45 | 1,946 | 12.0 | 120 | J-43 | J-44 | 105 | 0.30 | 0.045 |
| P-46 | 2,073 | 8.0 | 120 | J-44 | J-45 | 54 | 0.34 | 0.094 |
| P-47 | 969 | 8.0 | 120 | J-45 | J-2 | 128 | 0.82 | 0.469 |
| P-48 | 1,168 | 8.0 | 120 | J-3 | J-46 | 129 | 0.82 | 0.475 |
| P-49 | 911 | 8.0 | 120 | J-46 | J-17 | 63 | 0.40 | 0.128 |
| P-50 | 742 | 8.0 | 120 | J-45 | J-47 | 74 | 0.47 | 0.171 |
| P-51 | 921 | 8.0 | 120 | J-47 | J-43 | 74 | 0.47 | 0.171 |
| P-52 | 2,082 | 8.0 | 120 | J-43 | J-48 | 30 | 0.19 | 0.032 |
| P-53 | 1,325 | 8.0 | 120 | J-48 | J-49 | 16 | 0.10 | 0.010 |
| P-54 | 1,465 | 12.0 | 120 | J-49 | J-44 | 173 | 0.49 | 0.114 |
| P-55 | 1,495 | 12.0 | 120 | J-49 | J-14 | 15 | 0.04 | 0.001 |
| P-56 | 743 | 8.0 | 120 | J-49 | J-50 | 18 | 0.11 | 0.012 |
| P-57 | 1,129 | 8.0 | 120 | J-50 | J-15 | 18 | 0.11 | 0.012 |
| P-58 | 931 | 16.0 | 120 | J-51 | J-14 | 14 | 0.02 | 0.000 |
| P-59 | 1,264 | 8.0 | 120 | J-48 | J-51 | 17 | 0.11 | 0.012 |
| P-60 | 2,202 | 16.0 | 120 | J-12 | J-52 | 188 | 0.30 | 0.033 |
| P-61 | 885 | 16.0 | 120 | J-52 | J-94 | 139 | 0.22 | 0.019 |
| P-62 | 840 | 8.0 | 120 | J-48 | J-52 | 3 | 0.02 | 0.000 |
| P-63 | 906 | 8.0 | 120 | J-9 | J-53 | 74 | 0.47 | 0.169 |
| P-64 | 910 | 12.0 | 120 | J-54 | J-8 | 78 | 0.22 | 0.026 |
| P-65 | 721 | 8.0 | 120 | J-53 | J-54 | 75 | 0.48 | 0.175 |
| P-66 | 983 | 8.0 | 120 | J-24 | J-55 | 105 | 0.67 | 0.324 |
| P-67 | 1,333 | 8.0 | 120 | J-55 | J-56 | 65 | 0.41 | 0.134 |
| P-68 | 1,116 | 8.0 | 120 | J-56 | J-57 | 42 | 0.26 | 0.058 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 5

3-ER-491

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Average Day - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-69 | 729 | 8.0 | 120 | J-57 | J-58 | 35 | 0.22 | 0.042 |
| P-70 | 857 | 12.0 | 120 | J-26 | J-59 | 31 | 0.09 | 0.005 |
| P-71 | 1,622 | 12.0 | 120 | J-59 | J-54 | 3 | 0.01 | 0.000 |
| P-72 | 936 | 8.0 | 120 | J-58 | J-59 | 35 | 0.22 | 0.042 |
| P-73 | 1,459 | 8.0 | 120 | J-55 | J-60 | 43 | 0.27 | 0.061 |
| P-74 | 1,114 | 8.0 | 120 | J-60 | J-61 | 43 | 0.27 | 0.061 |
| P-75 | 1,054 | 12.0 | 120 | J-61 | J-26 | 171 | 0.48 | 0.112 |
| P-76 | 1,140 | 12.0 | 120 | J-61 | J-56 | 65 | 0.18 | 0.019 |
| P-77 | 855 | 12.0 | 120 | J-62 | J-63 | 139 | 0.39 | 0.076 |
| P-78 | 905 | 12.0 | 120 | J-63 | J-10 | 236 | 0.67 | 0.202 |
| P-79 | 831 | 8.0 | 120 | J-63 | J-64 | 7 | 0.04 | 0.002 |
| P-80 | 1,177 | 8.0 | 120 | J-64 | J-57 | 7 | 0.04 | 0.002 |
| P-81 | 1,245 | 8.0 | 120 | J-65 | J-55 | 3 | 0.02 | 0.000 |
| P-82 | 2,151 | 16.0 | 120 | J-22 | J-66 | 480 | 0.77 | 0.186 |
| P-83 | 1,176 | 16.0 | 120 | J-66 | J-24 | 179 | 0.29 | 0.030 |
| P-84 | 1,113 | 12.0 | 120 | J-65 | J-66 | 301 | 0.85 | 0.318 |
| P-85 | 1,034 | 8.0 | 120 | J-65 | J-67 | 28 | 0.18 | 0.028 |
| P-86 | 1,662 | 8.0 | 120 | J-67 | J-68 | 28 | 0.18 | 0.028 |
| P-87 | 1,161 | 12.0 | 120 | J-68 | J-23 | 413 | 1.17 | 0.571 |
| P-88 | 1,359 | 8.0 | 120 | J-68 | J-69 | 20 | 0.13 | 0.015 |
| P-89 | 1,832 | 8.0 | 120 | J-69 | J-63 | 59 | 0.38 | 0.112 |
| P-90 | 1,005 | 12.0 | 120 | J-68 | J-70 | 256 | 0.73 | 0.236 |
| P-91 | 573 | 12.0 | 120 | J-70 | J-62 | 69 | 0.20 | 0.021 |
| P-92 | 1,409 | 12.0 | 120 | J-65 | J-71 | 177 | 0.50 | 0.119 |
| P-93 | 1,201 | 12.0 | 120 | J-56 | J-72 | 23 | 0.06 | 0.003 |
| P-94 | 503 | 12.0 | 120 | J-72 | J-62 | 59 | 0.17 | 0.016 |
| P-95 | 736 | 12.0 | 120 | J-71 | J-72 | 67 | 0.19 | 0.020 |
| P-96 | 718 | 12.0 | 120 | J-71 | J-70 | 39 | 0.11 | 0.007 |
| P-97 | 1,047 | 8.0 | 120 | J-19 | J-73 | 60 | 0.38 | 0.117 |
| P-98 | 1,393 | 12.0 | 120 | J-83 | J-74 | 99 | 0.28 | 0.040 |
| P-99 | 903 | 12.0 | 120 | J-74 | J-75 | 13 | 0.04 | 0.001 |
| P-100 | 1,063 | 12.0 | 120 | J-21 | J-76 | 340 | 0.96 | 0.398 |
| P-101 | 1,185 | 12.0 | 120 | J-76 | J-77 | 192 | 0.55 | 0.139 |
| P-102 | 939 | 12.0 | 120 | J-77 | J-74 | 0 | 0.00 | 0.000 |
| P-103 | 1,124 | 12.0 | 120 | J-74 | J-78 | 80 | 0.23 | 0.027 |
| P-104 | 1,019 | 8.0 | 120 | J-78 | J-79 | 56 | 0.36 | 0.102 |
| P-105 | 1,354 | 16.0 | 120 | J-1 | J-80 | 495 | 0.79 | 0.197 |
| P-106 | 894 | 16.0 | 120 | J-80 | J-12 | 421 | 0.67 | 0.145 |
| P-107 | 1,486 | 8.0 | 120 | J-76 | J-81 | 52 | 0.33 | 0.157 |
| P-108 | 1,004 | 12.0 | 120 | J-75 | J-82 | 205 | 0.58 | 0.157 |
| P-109 | 1,106 | 12.0 | 120 | J-82 | J-23 | 331 | 0.94 | 0.379 |
| P-110 | 1,868 | 8.0 | 120 | J-81 | J-82 | 48 | 0.30 | 0.075 |
| P-111 | 1,711 | 12.0 | 120 | J-78 | J-12 | 190 | 0.54 | 0.136 |
| P-112 | 675 | 8.0 | 120 | J-73 | J-83 | 68 | 0.44 | 0.147 |
| P-113 | 1,008 | 8.0 | 120 | J-83 | J-84 | 21 | 0.13 | 0.016 |
| P-114 | 1,673 | 8.0 | 120 | J-84 | J-52 | 46 | 0.29 | 0.071 |
| P-115 | 1,776 | 8.0 | 120 | J-78 | J-84 | 25 | 0.16 | 0.024 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 5

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Average Day - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|-------|------|------|-----|------|------|------|------|------|
| P-116 | 1,656 | 8.0 | 120 | J-73 | J-85 | 8 | 0.05 | 0.003 |
| P-117 | 1,568 | 8.0 | 120 | J-85 | J-76 | 8 | 0.05 | 0.003 |
| P-118 | 1,542 | 8.0 | 120 | J-82 | J-86 | 19 | 0.12 | 0.013 |
| P-119 | 532 | 8.0 | 120 | J-79 | J-87 | 56 | 0.36 | 0.102 |
| P-120 | 1,177 | 8.0 | 120 | J-87 | J-80 | 75 | 0.48 | 0.173 |
| P-121 | 801 | 8.0 | 120 | J-86 | J-87 | 19 | 0.12 | 0.013 |
| P-122 | 931 | 12.0 | 120 | J-83 | J-18 | 201 | 0.57 | 0.151 |
| P-123 | 2,664 | 24.0 | 120 | J-20 | J-88 | 946 | 0.67 | 0.091 |
| P-124 | 2,422 | 24.0 | 120 | J-88 | J-89 | 1,574 | 1.12 | 0.233 |
| P-125 | 839 | 16.0 | 120 | J-14 | J-90 | 115 | 0.18 | 0.013 |
| P-126 | 1,077 | 16.0 | 120 | J-90 | J-15 | 115 | 0.18 | 0.013 |
| P-128 | 1,309 | 24.0 | 120 | J-21 | J-91 | 64 | 0.05 | 0.001 |
| P-129 | 1,332 | 24.0 | 120 | J-22 | J-91 | 164 | 0.12 | 0.003 |
| P-130 | 974 | 8.0 | 120 | J-81 | J-91 | 100 | 0.64 | 0.298 |
| P-133 | 1,322 | 24.0 | 120 | J-2 | J-92 | 1,891 | 1.34 | 0.327 |
| P-134 | 1,322 | 24.0 | 120 | J-92 | J-3 | 1,974 | 1.40 | 0.354 |
| P-135 | 1,774 | 24.0 | 120 | J-20 | J-93 | 336 | 0.24 | 0.013 |
| P-136 | 778 | 24.0 | 120 | J-93 | J-21 | 336 | 0.24 | 0.013 |
| P-137 | 786 | 16.0 | 120 | J-13 | J-94 | 92 | 0.15 | 0.009 |
| P-138 | 1,159 | 16.0 | 120 | J-94 | J-51 | 31 | 0.05 | 0.001 |
| P-139 | 2,314 | 12.0 | 120 | J-44 | J-16 | 48 | 0.14 | 0.011 |
| P-140 | 1,166 | 8.0 | 120 | J-11 | J-69 | 79 | 0.50 | 0.190 |
| P-141 | 890 | 16.0 | 120 | J-16 | J-95 | 268 | 0.43 | 0.063 |
| P-142 | 1,256 | 16.0 | 120 | J-15 | J-95 | 324 | 0.52 | 0.090 |
| P-143 | 2,336 | 12.0 | 120 | J-44 | J-92 | 369 | 1.05 | 0.463 |
| P-200 | 2,335 | 24.0 | 120 | J-201 | J-202 | 1,550 | 1.10 | 0.226 |
| P-201 | 2,336 | 16.0 | 120 | J-202 | J-203 | 641 | 1.02 | 0.318 |
| P-202 | 1,418 | 16.0 | 120 | J-203 | J-204 | 64 | 0.10 | 0.004 |
| P-204 | 2,317 | 12.0 | 120 | J-205 | J-25 | 39 | 0.11 | 0.007 |
| P-205 | 2,640 | 24.0 | 120 | J-201 | J-206 | 1,657 | 1.18 | 0.256 |
| P-206 | 2,639 | 24.0 | 120 | J-206 | J-207 | 934 | 0.66 | 0.088 |
| P-207 | 2,567 | 12.0 | 120 | J-208 | J-209 | 49 | 0.14 | 0.011 |
| P-208 | 2,713 | 12.0 | 120 | J-209 | J-200 | 157 | 0.44 | 0.095 |
| P-209 | 2,452 | 12.0 | 120 | J-24 | J-210 | 88 | 0.25 | 0.033 |
| P-210 | 2,672 | 24.0 | 120 | J-22 | J-200 | 873 | 0.62 | 0.078 |
| P-211 | 2,633 | 12.0 | 120 | J-209 | J-21 | 61 | 0.17 | 0.016 |
| P-212 | 2,662 | 16.0 | 120 | J-208 | J-20 | 208 | 0.33 | 0.040 |
| P-213 | 2,706 | 12.0 | 120 | J-202 | J-210 | 261 | 0.74 | 0.244 |
| P-214 | 1,265 | 12.0 | 120 | J-203 | J-211 | 186 | 0.53 | 0.131 |
| P-215 | 1,876 | 12.0 | 120 | J-211 | J-205 | 122 | 0.35 | 0.060 |
| P-216 | 2,801 | 12.0 | 120 | J-200 | J-210 | 235 | 0.67 | 0.201 |
| P-217 | 2,687 | 24.0 | 120 | J-200 | J-201 | 1,573 | 1.12 | 0.232 |
| P-218 | 2,651 | 12.0 | 120 | J-206 | J-209 | 141 | 0.40 | 0.078 |
| P-219 | 2,641 | 16.0 | 120 | J-207 | J-208 | 16 | 0.03 | 0.000 |
| P-220 | 2,285 | 12.0 | 120 | J-203 | J-212 | 99 | 0.28 | 0.040 |
| P-221 | 2,358 | 12.0 | 120 | J-212 | J-213 | 223 | 0.63 | 0.183 |
| P-222 | 2,276 | 12.0 | 120 | J-213 | J-214 | 189 | 0.54 | 0.135 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 4 of 5

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario:  Average Day - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|-------|------|------|-----|-------|-------|-------|------|-------|
| P-223 | 2,646 | 12.0 | 120 | J-214 | J-215 | 178 | 0.51 | 0.120 |
| P-224 | 2,674 | 12.0 | 120 | J-215 | J-216 | 147 | 0.42 | 0.084 |
| P-225 | 2,288 | 16.0 | 120 | J-216 | J-207 | 188 | 0.30 | 0.033 |
| P-226 | 2,254 | 12.0 | 120 | J-213 | J-202 | 159 | 0.45 | 0.097 |
| P-227 | 2,266 | 16.0 | 120 | J-201 | J-201 | 492 | 0.78 | 0.195 |
| P-228 | 2,289 | 12.0 | 120 | J-206 | J-215 | 93 | 0.27 | 0.036 |
| P-229 | 2,627 | 24.0 | 120 | J-222 | J-207 | 233 | 0.17 | 0.007 |
| P-230 | 2,665 | 12.0 | 120 | J-219 | J-220 | 92 | 0.26 | 0.035 |
| P-231 | 2,652 | 12.0 | 120 | J-220 | J-216 | 155 | 0.44 | 0.093 |
| P-232 | 2,707 | 12.0 | 120 | J-221 | J-222 | 56 | 0.16 | 0.014 |
| P-233 | 2,657 | 24.0 | 120 | J-218 | J-222 | 161 | 0.11 | 0.003 |
| P-234 | 2,252 | 12.0 | 120 | J-220 | J-222 | 190 | 0.54 | 0.135 |
| P-235 | 2,583 | 12.0 | 120 | J-221 | J-88 | 183 | 0.52 | 0.126 |
| P-236 | 2,638 | 24.0 | 120 | J-89 | J-217 | 1,510 | 1.07 | 0.216 |
| P-237 | 2,620 | 12.0 | 120 | J-208 | J-221 | 42 | 0.12 | 0.008 |
| P-238 | 2,942 | 12.0 | 120 | J-221 | J-217 | 169 | 0.48 | 0.109 |
| P-239 | 2,825 | 24.0 | 120 | J-217 | J-223 | 1,088 | 0.77 | 0.118 |
| P-240 | 1,107 | 12.0 | 120 | J-224 | J-219 | 162 | 0.46 | 0.101 |
| P-241 | 903 | 24.0 | 120 | J-223 | J-218 | 414 | 0.29 | 0.020 |
| P-242 | 2,212 | 16.0 | 120 | J-223 | J-224 | 415 | 0.66 | 0.142 |
| P-243 | 1,160 | 16.0 | 120 | J-225 | J-94 | 234 | 0.37 | 0.049 |
| P-244 | 3,411 | 12.0 | 120 | J-88 | J-227 | 235 | 0.67 | 0.201 |
| P-245 | 2,726 | 12.0 | 120 | J-227 | J-225 | 72 | 0.20 | 0.022 |
| P-246 | 855 | 12.0 | 120 | J-225 | J-226 | 95 | 0.27 | 0.038 |
| P-247 | 1,678 | 12.0 | 120 | J-226 | J-14 | 116 | 0.33 | 0.054 |
| P-248 | 1,900 | 12.0 | 120 | J-18 | J-227 | 47 | 0.13 | 0.010 |
| P-249 | 2,011 | 16.0 | 120 | J-4 | J-228 | 415 | 0.66 | 0.142 |
| P-250 | 1,945 | 12.0 | 120 | J-16 | J-229 | 49 | 0.14 | 0.011 |
| P-251 | 1,597 | 16.0 | 120 | J-228 | J-230 | 157 | 0.25 | 0.024 |
| P-253 | 1,930 | 12.0 | 120 | J-229 | J-231 | 81 | 0.23 | 0.028 |
| P-254 | 558 | 12.0 | 120 | J-231 | J-228 | 144 | 0.41 | 0.082 |
| P-255 | 842 | 16.0 | 120 | J-230 | J-232 | 37 | 0.06 | 0.002 |
| P-256 | 552 | 8.0 | 120 | J-230 | J-233 | 7 | 0.05 | 0.003 |
| P-257 | 1,595 | 8.0 | 120 | J-233 | J-231 | 10 | 0.06 | 0.004 |
| P-258 | 330 | 12.0 | 120 | J-232 | J-233 | 2 | 0.01 | 0.000 |
| P-259 | 1,600 | 12.0 | 120 | J-ELS | J-205 | 63 | 0.18 | 0.017 |
| P-260 | 1,038 | 12.0 | 120 | J-204 | J-ELS | 64 | 0.18 | 0.018 |
| P-261 | 3,327 | 12.0 | 120 | J-210 | J-205 | 99 | 0.28 | 0.041 |
| P-262 | 2,378 | 12.0 | 120 | J-95 | J-229 | 57 | 0.16 | 0.014 |
| P-500 | 679 | 48.0 | 120 | R-1 | J-92 | 4,234 | 0.75 | 0.048 |
| P-501 | 600 | 48.0 | 120 | R-2 | FCV-2 | 3,295 | 0.58 | 0.024 |
| P-502 | 566 | 48.0 | 120 | FCV-2 | J-89 | 3,295 | 0.58 | 0.049 |
| P-503 | 604 | 48.0 | 120 | R-3 | FCV-3 | 5,760 | 1.02 | 0.098 |
| P-504 | 604 | 48.0 | 120 | FCV-3 | J-201 | 5,760 | 1.02 | 0.073 |
| P-505 | 861 | 48.0 | 120 | R-AZWC | AZWC-J-8 | 1,489 | 0.26 | 0.012 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 5 of 5

3-ER-494

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg                                                Active Scenario:  Average Day - Site
FlexTable: FCV Table

| Label | Elevation (ft) | Diameter (Valve) (in) | Flow Setting (Initial) (gpm) | Minor Loss Coefficient (Local) | Flow (gpm) | Hydraulic Grade (From) (ft) | Hydraulic Grade (To) (ft) | Headloss (ft) |
|---|---|---|---|---|---|---|---|---|
| FCV-2 | 1,561.51 | 48.0 | 10,410 | 0.0000000 | 3,295 | 1,710.00 | 1,710.00 | 0.00 |
| FCV-3 | 1,488.00 | 48.0 | 14,413 | 0.0000000 | 5,760 | 1,710.00 | 1,710.00 | 0.00 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Reservoir Table

Active Scenario: Average Day - Site

| Label | Elevation (ft) | Flow (Out net) (gpm) | Hydraulic Grade (ft) |
|-------|---------------|----------------------|----------------------|
| R-1 | 1,710.00 | 4,234 | 1,710.00 |
| R-2 | 1,710.00 | 3,295 | 1,710.00 |
| R-3 | 1,710.00 | 5,760 | 1,710.00 |
| R-AZWC | 1,720.00 | 1,489 | 1,720.00 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 1

3-ER-496



# SITE
# MAXIMUM DAY DEMAND RESULTS

HILGARTWILSON, LLC

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario:  Max Day - Site

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|---|---|---|---|---|
| AZWC-J-1 | 1,565.65 | 177 | 1,711.85 | 63.3 |
| AZWC-J-2 | 1,566.00 | 0 | 1,715.63 | 64.7 |
| AZWC-J-3 | 1,562.39 | 177 | 1,718.62 | 67.6 |
| AZWC-J-4 | 1,549.27 | 351 | 1,711.35 | 70.1 |
| AZWC-J-5 | 1,549.29 | 14 | 1,711.80 | 70.3 |
| AZWC-J-6 | 1,550.00 | 14 | 1,715.86 | 71.8 |
| AZWC-J-7 | 1,540.00 | 14 | 1,711.78 | 74.3 |
| AZWC-J-8 | 1,540.19 | 177 | 1,720.00 | 77.8 |
| AZWC-J-9 | 1,532.76 | 130 | 1,710.97 | 77.1 |
| AZWC-J-10 | 1,532.13 | 173 | 1,711.03 | 77.4 |
| AZWC-J-11 | 1,530.66 | 351 | 1,711.37 | 78.2 |
| AZWC-J-12 | 1,530.39 | 177 | 1,716.12 | 80.4 |
| AZWC-J-13 | 1,516.54 | 91 | 1,711.07 | 84.2 |
| AZWC-J-14 | 1,511.49 | 91 | 1,711.00 | 86.3 |
| AZWC-J-15 | 1,510.00 | 351 | 1,711.62 | 87.2 |
| AZWC-J-16 | 1,510.00 | 177 | 1,712.44 | 87.6 |
| AZWC-J-17 | 1,498.95 | 91 | 1,711.10 | 91.8 |
| AZWC-J-18 | 1,496.42 | 91 | 1,711.01 | 92.8 |
| J-1 | 1,518.46 | 0 | 1,707.63 | 81.8 |
| J-2 | 1,524.42 | 0 | 1,708.66 | 79.7 |
| J-3 | 1,534.31 | 0 | 1,708.57 | 75.4 |
| J-4 | 1,536.36 | 56 | 1,707.88 | 74.2 |
| J-5 | 1,511.94 | 0 | 1,706.00 | 84.0 |
| J-6 | 1,496.19 | 0 | 1,705.79 | 90.7 |
| J-7 | 1,487.97 | 0 | 1,705.07 | 93.9 |
| J-8 | 1,482.10 | 0 | 1,705.03 | 96.5 |
| J-9 | 1,489.31 | 0 | 1,705.05 | 93.3 |
| J-10 | 1,498.18 | 0 | 1,705.32 | 89.6 |
| J-11 | 1,505.45 | 0 | 1,706.07 | 86.8 |
| J-12 | 1,528.22 | 0 | 1,706.42 | 77.1 |
| J-13 | 1,541.89 | 0 | 1,706.18 | 71.1 |
| J-14 | 1,551.18 | 0 | 1,706.16 | 67.1 |
| J-15 | 1,555.10 | 354 | 1,706.24 | 65.4 |
| J-16 | 1,547.57 | 28 | 1,706.77 | 68.9 |
| J-17 | 1,539.63 | 0 | 1,707.23 | 72.5 |
| J-18 | 1,536.04 | 0 | 1,706.22 | 73.6 |
| J-19 | 1,531.88 | 0 | 1,706.46 | 75.5 |
| J-20 | 1,525.85 | 0 | 1,707.51 | 78.6 |
| J-21 | 1,509.31 | 0 | 1,707.40 | 85.7 |
| J-22 | 1,500.29 | 28 | 1,707.42 | 89.6 |
| J-23 | 1,507.70 | 0 | 1,707.37 | 86.4 |
| J-24 | 1,478.32 | 0 | 1,706.05 | 98.5 |
| J-25 | 1,468.56 | 0 | 1,705.82 | 102.7 |
| J-26 | 1,470.59 | 0 | 1,704.97 | 101.4 |
| J-27 | 1,491.65 | 273 | 1,704.85 | 92.2 |
| J-28 | 1,494.43 | 273 | 1,704.86 | 91.0 |
| J-29 | 1,504.84 | 0 | 1,705.36 | 86.8 |
| J-30 | 1,509.95 | 273 | 1,705.43 | 84.6 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 4

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario: Max Day - Site

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|---|---|---|---|---|
| J-31 | 1,506.31 | 273 | 1,704.87 | 85.9 |
| J-32 | 1,510.99 | 273 | 1,705.20 | 84.0 |
| J-33 | 1,517.93 | 273 | 1,705.76 | 81.3 |
| J-34 | 1,523.42 | 273 | 1,706.59 | 79.2 |
| J-35 | 1,500.26 | 0 | 1,705.46 | 88.8 |
| J-36 | 1,519.89 | 0 | 1,705.98 | 80.5 |
| J-37 | 1,497.84 | 0 | 1,704.85 | 89.6 |
| J-38 | 1,508.75 | 0 | 1,704.87 | 84.8 |
| J-39 | 1,509.06 | 354 | 1,705.72 | 85.1 |
| J-40 | 1,519.34 | 0 | 1,707.58 | 81.4 |
| J-41 | 1,493.31 | 0 | 1,705.52 | 91.8 |
| J-42 | 1,520.78 | 0 | 1,706.58 | 80.4 |
| J-43 | 1,528.04 | 354 | 1,706.40 | 77.2 |
| J-44 | 1,539.15 | 354 | 1,706.68 | 72.5 |
| J-45 | 1,525.42 | 0 | 1,707.27 | 78.7 |
| J-46 | 1,536.25 | 354 | 1,706.86 | 73.8 |
| J-47 | 1,523.18 | 0 | 1,706.89 | 79.5 |
| J-48 | 1,543.23 | 0 | 1,706.20 | 70.5 |
| J-49 | 1,544.66 | 354 | 1,706.17 | 69.9 |
| J-50 | 1,550.01 | 0 | 1,706.20 | 67.6 |
| J-51 | 1,551.30 | 0 | 1,706.16 | 67.0 |
| J-52 | 1,541.61 | 0 | 1,706.20 | 71.2 |
| J-53 | 1,482.08 | 273 | 1,704.57 | 96.3 |
| J-54 | 1,476.49 | 0 | 1,704.96 | 98.8 |
| J-55 | 1,480.56 | 0 | 1,705.08 | 97.1 |
| J-56 | 1,481.69 | 273 | 1,704.54 | 96.4 |
| J-57 | 1,483.32 | 0 | 1,704.74 | 95.8 |
| J-58 | 1,478.32 | 0 | 1,704.84 | 98.0 |
| J-59 | 1,473.68 | 0 | 1,704.96 | 100.1 |
| J-60 | 1,475.18 | 0 | 1,704.81 | 99.4 |
| J-61 | 1,474.72 | 273 | 1,704.60 | 99.5 |
| J-62 | 1,493.15 | 273 | 1,704.56 | 91.5 |
| J-63 | 1,494.82 | 273 | 1,704.76 | 90.8 |
| J-64 | 1,489.78 | 0 | 1,704.75 | 93.0 |
| J-65 | 1,486.52 | 273 | 1,705.09 | 94.6 |
| J-66 | 1,484.90 | 0 | 1,706.17 | 95.7 |
| J-67 | 1,492.33 | 0 | 1,705.18 | 92.1 |
| J-68 | 1,498.85 | 273 | 1,705.32 | 89.3 |
| J-69 | 1,504.49 | 0 | 1,705.39 | 86.9 |
| J-70 | 1,496.77 | 273 | 1,704.59 | 89.9 |
| J-71 | 1,492.39 | 273 | 1,704.58 | 91.8 |
| J-72 | 1,489.15 | 273 | 1,704.53 | 93.2 |
| J-73 | 1,526.88 | 0 | 1,706.08 | 77.5 |
| J-74 | 1,522.81 | 354 | 1,705.59 | 79.1 |
| J-75 | 1,517.39 | 354 | 1,705.60 | 81.4 |
| J-76 | 1,513.14 | 354 | 1,706.10 | 83.5 |
| J-77 | 1,518.58 | 354 | 1,705.59 | 80.9 |
| J-78 | 1,525.14 | 354 | 1,705.69 | 78.1 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 4

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg                                    Active Scenario:  Max Day - Site
FlexTable: Junction Table

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|------|------|------|------|
| J-79  | 1,521.50 | 0   | 1,706.01 | 79.8 |
| J-80  | 1,521.52 | 0   | 1,706.81 | 80.2 |
| J-81  | 1,507.88 | 0   | 1,706.51 | 85.9 |
| J-82  | 1,511.68 | 354 | 1,706.08 | 84.1 |
| J-83  | 1,530.12 | 354 | 1,705.77 | 76.0 |
| J-84  | 1,534.97 | 0   | 1,705.83 | 73.9 |
| J-85  | 1,520.43 | 0   | 1,706.09 | 80.3 |
| J-86  | 1,512.42 | 0   | 1,706.14 | 83.8 |
| J-87  | 1,519.02 | 0   | 1,706.18 | 81.0 |
| J-88  | 1,543.79 | 378 | 1,708.26 | 71.2 |
| J-89  | 1,561.51 | 378 | 1,710.00 | 64.2 |
| J-90  | 1,553.44 | 0   | 1,706.20 | 66.1 |
| J-91  | 1,501.89 | 0   | 1,707.40 | 88.9 |
| J-92  | 1,529.36 | 0   | 1,710.00 | 78.2 |
| J-93  | 1,513.70 | 0   | 1,707.43 | 83.8 |
| J-94  | 1,544.69 | 56  | 1,706.16 | 69.9 |
| J-95  | 1,552.90 | 0   | 1,706.60 | 66.5 |
| J-200 | 1,496.00 | 576 | 1,708.06 | 91.7 |
| J-201 | 1,488.00 | 917 | 1,710.00 | 96.0 |
| J-202 | 1,470.66 | 917 | 1,708.34 | 102.8 |
| J-203 | 1,458.00 | 917 | 1,706.01 | 107.3 |
| J-204 | 1,453.24 | 0   | 1,705.99 | 109.4 |
| J-205 | 1,458.56 | 0   | 1,705.86 | 107.0 |
| J-206 | 1,496.31 | 917 | 1,707.89 | 91.5 |
| J-207 | 1,517.23 | 931 | 1,707.17 | 82.2 |
| J-208 | 1,519.99 | 590 | 1,707.17 | 81.0 |
| J-209 | 1,504.30 | 576 | 1,707.25 | 87.8 |
| J-210 | 1,475.66 | 576 | 1,706.29 | 99.8 |
| J-211 | 1,463.36 | 576 | 1,705.49 | 104.8 |
| J-212 | 1,454.56 | 230 | 1,706.30 | 108.9 |
| J-213 | 1,466.18 | 230 | 1,707.66 | 104.5 |
| J-214 | 1,480.99 | 230 | 1,708.62 | 98.5 |
| J-215 | 1,494.36 | 230 | 1,707.63 | 92.3 |
| J-216 | 1,510.97 | 341 | 1,706.93 | 84.8 |
| J-217 | 1,559.60 | 462 | 1,708.24 | 64.3 |
| J-218 | 1,554.84 | 462 | 1,707.15 | 65.9 |
| J-219 | 1,549.95 | 462 | 1,705.91 | 67.5 |
| J-220 | 1,529.45 | 462 | 1,706.19 | 76.5 |
| J-221 | 1,536.00 | 462 | 1,707.24 | 74.1 |
| J-222 | 1,536.00 | 476 | 1,707.12 | 74.0 |
| J-223 | 1,563.53 | 476 | 1,707.21 | 62.2 |
| J-224 | 1,560.58 | 462 | 1,706.25 | 63.0 |
| J-225 | 1,550.03 | 378 | 1,705.99 | 67.5 |
| J-226 | 1,551.62 | 378 | 1,705.89 | 66.7 |
| J-227 | 1,546.70 | 378 | 1,706.17 | 69.0 |
| J-228 | 1,534.99 | 201 | 1,707.04 | 74.4 |
| J-229 | 1,550.60 | 121 | 1,706.72 | 67.5 |
| J-230 | 1,544.78 | 201 | 1,706.93 | 70.2 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario:  Max Day - Site

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|---|---|---|---|---|
| J-231 | 1,539.83 | 121 | 1,706.91 | 72.3 |
| J-232 | 1,550.00 | 62 | 1,706.93 | 67.9 |
| J-233 | 1,547.13 | 0 | 1,706.93 | 69.1 |
| J-ELS | 1,456.01 | 1 | 1,705.94 | 108.1 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 4 of 4

3-ER-501

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Max Day - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| AZWC-P-1 | 1,622 | 12.0 | 120 | AZWC-J-18 | AZWC-J-17 | 120 | 0.34 | 0.058 |
| AZWC-P-2 | 2,123 | 12.0 | 120 | AZWC-J-17 | AZWC-J-15 | 260 | 0.74 | 0.243 |
| AZWC-P-3 | 3,095 | 16.0 | 120 | AZWC-J-4 | AZWC-J-11 | 60 | 0.10 | 0.004 |
| AZWC-P-4 | 2,970 | 16.0 | 120 | AZWC-J-11 | AZWC-J-15 | 314 | 0.50 | 0.085 |
| AZWC-P-5 | 2,054 | 12.0 | 120 | AZWC-J-13 | AZWC-J-11 | 196 | 0.56 | 0.144 |
| AZWC-P-6 | 2,990 | 12.0 | 120 | AZWC-J-17 | AZWC-J-13 | 49 | 0.14 | 0.011 |
| AZWC-P-7 | 1,705 | 12.0 | 120 | AZWC-J-14 | AZWC-J-13 | 102 | 0.29 | 0.043 |
| AZWC-P-8 | 2,436 | 16.0 | 120 | AZWC-J-4 | AZWC-J-1 | 502 | 0.80 | 0.202 |
| AZWC-P-9 | 3,055 | 16.0 | 120 | AZWC-J-8 | AZWC-J-3 | 774 | 1.24 | 0.451 |
| AZWC-P-10 | 1,316 | 16.0 | 120 | AZWC-J-16 | AZWC-J-16 | 925 | 1.48 | 0.626 |
| AZWC-P-11 | 2,912 | 16.0 | 120 | AZWC-J-16 | AZWC-J-12 | 1,350 | 2.15 | 1.262 |
| AZWC-P-12 | 2,013 | 16.0 | 120 | AZWC-J-12 | AZWC-J-8 | 1,698 | 2.71 | 1.929 |
| AZWC-P-13 | 2,178 | 12.0 | 120 | AZWC-J-1 | AZWC-J-2 | 753 | 2.14 | 1.737 |
| AZWC-P-14 | 2,649 | 12.0 | 120 | AZWC-J-2 | AZWC-J-3 | 597 | 1.69 | 1.130 |
| AZWC-P-15 | 1,502 | 12.0 | 120 | AZWC-J-5 | AZWC-J-7 | 59 | 0.17 | 0.016 |
| AZWC-P-16 | 2,991 | 12.0 | 120 | AZWC-J-16 | AZWC-J-7 | 248 | 0.70 | 0.222 |
| AZWC-P-17 | 1,931 | 12.0 | 120 | AZWC-J-5 | AZWC-J-1 | 74 | 0.21 | 0.023 |
| AZWC-P-18 | 2,422 | 12.0 | 120 | AZWC-J-6 | AZWC-J-2 | 156 | 0.44 | 0.094 |
| AZWC-P-19 | 2,346 | 12.0 | 120 | AZWC-J-6 | AZWC-J-12 | 170 | 0.48 | 0.111 |
| AZWC-P-20 | 1,354 | 12.0 | 120 | AZWC-J-11 | AZWC-J-7 | 293 | 0.83 | 0.303 |
| AZWC-P-21 | 2,644 | 12.0 | 120 | AZWC-J-18 | AZWC-J-14 | 29 | 0.08 | 0.004 |
| AZWC-P-22 | 3,404 | 12.0 | 120 | AZWC-J-14 | AZWC-J-9 | 40 | 0.11 | 0.007 |
| AZWC-P-23 | 1,779 | 12.0 | 120 | AZWC-J-9 | AZWC-J-10 | 90 | 0.26 | 0.034 |
| AZWC-P-24 | 3,067 | 12.0 | 120 | AZWC-J-10 | AZWC-J-13 | 52 | 0.15 | 0.012 |
| AZWC-P-25 | 1,946 | 12.0 | 120 | AZWC-J-10 | AZWC-J-4 | 211 | 0.60 | 0.165 |
| P-1 | 1,337 | 24.0 | 120 | J-1 | J-2 | 3,015 | 2.14 | 0.776 |
| P-2 | 1,236 | 24.0 | 120 | J-3 | J-4 | 2,516 | 1.78 | 0.555 |
| P-3 | 2,654 | 16.0 | 120 | J-5 | J-6 | 305 | 0.49 | 0.080 |
| P-4 | 2,643 | 16.0 | 120 | J-7 | J-8 | 57 | 0.16 | 0.014 |
| P-5 | 1,373 | 16.0 | 120 | J-8 | J-9 | 91 | 0.15 | 0.009 |
| P-6 | 1,371 | 16.0 | 120 | J-10 | J-11 | 859 | 1.37 | 0.547 |
| P-7 | 1,867 | 16.0 | 120 | J-9 | J-10 | 426 | 0.68 | 0.149 |
| P-7 | 1,712 | 16.0 | 120 | J-11 | J-1 | 1,130 | 1.80 | 0.907 |
| P-8 | 1,252 | 16.0 | 120 | J-16 | J-17 | 691 | 1.10 | 0.365 |
| P-9 | 1,335 | 16.0 | 120 | J-17 | J-4 | 809 | 1.29 | 0.489 |
| P-10 | 1,872 | 16.0 | 120 | J-18 | J-13 | 162 | 0.26 | 0.025 |
| P-11 | 817 | 16.0 | 120 | J-18 | J-19 | 618 | 0.99 | 0.297 |
| P-12 | 2,582 | 16.0 | 120 | J-19 | J-20 | 730 | 1.16 | 0.404 |
| P-13 | 2,636 | 24.0 | 120 | J-22 | J-23 | 386 | 0.27 | 0.017 |
| P-14 | 2,640 | 24.0 | 120 | J-23 | J-1 | 981 | 0.70 | 0.097 |
| P-15 | 2,850 | 16.0 | 120 | J-24 | J-25 | 305 | 0.49 | 0.080 |
| P-16 | 1,880 | 12.0 | 120 | J-25 | J-26 | 366 | 1.04 | 0.456 |
| P-17 | 1,357 | 12.0 | 120 | J-9 | J-27 | 199 | 0.56 | 0.147 |
| P-18 | 1,167 | 12.0 | 120 | J-27 | J-28 | 60 | 0.17 | 0.016 |
| P-19 | 1,813 | 8.0 | 120 | J-28 | J-29 | 96 | 0.61 | 0.275 |
| P-20 | 781 | 8.0 | 120 | J-29 | J-30 | 52 | 0.33 | 0.090 |
| P-21 | 997 | 12.0 | 120 | J-30 | J-5 | 412 | 1.17 | 0.569 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 5

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg                                              Active Scenario: Max Day - Site
FlexTable: Pipe Table

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|-------|------|------|------|------|------|------|------|------|
| P-22 | 1,324 | 12.0 | 120 | J-7 | J-28 | 205 | 0.58 | 0.157 |
| P-23 | 2,040 | 12.0 | 120 | J-28 | J-31 | 31 | 0.09 | 0.005 |
| P-24 | 935 | 12.0 | 120 | J-31 | J-32 | 318 | 0.90 | 0.353 |
| P-25 | 1,071 | 12.0 | 120 | J-32 | J-33 | 393 | 1.11 | 0.521 |
| P-26 | 757 | 12.0 | 120 | J-33 | J-34 | 587 | 1.67 | 1.096 |
| P-27 | 888 | 12.0 | 120 | J-34 | J-3 | 860 | 2.44 | 2.222 |
| P-28 | 1,587 | 8.0 | 120 | J-29 | J-35 | 43 | 0.28 | 0.063 |
| P-29 | 1,506 | 8.0 | 120 | J-30 | J-36 | 111 | 0.71 | 0.363 |
| P-30 | 1,149 | 8.0 | 120 | J-36 | J-33 | 78 | 0.50 | 0.189 |
| P-31 | 1,110 | 8.0 | 120 | J-27 | J-37 | 14 | 0.09 | 0.008 |
| P-32 | 1,560 | 8.0 | 120 | J-37 | J-38 | 14 | 0.09 | 0.008 |
| P-33 | 895 | 8.0 | 120 | J-38 | J-31 | 14 | 0.09 | 0.008 |
| P-34 | 783 | 8.0 | 120 | J-39 | J-11 | 126 | 0.80 | 0.456 |
| P-35 | 1,356 | 8.0 | 120 | J-39 | J-40 | 228 | 1.46 | 1.372 |
| P-36 | 792 | 8.0 | 120 | J-40 | J-2 | 228 | 1.46 | 1.372 |
| P-37 | 807 | 12.0 | 120 | J-6 | J-41 | 305 | 0.87 | 0.327 |
| P-38 | 1,833 | 12.0 | 120 | J-41 | J-7 | 262 | 0.74 | 0.246 |
| P-39 | 949 | 8.0 | 120 | J-35 | J-41 | 43 | 0.28 | 0.063 |
| P-40 | 2,155 | 16.0 | 120 | J-4 | J-42 | 907 | 1.45 | 0.604 |
| P-41 | 1,477 | 16.0 | 120 | J-42 | J-5 | 717 | 1.14 | 0.391 |
| P-42 | 614 | 8.0 | 120 | J-36 | J-42 | 190 | 1.21 | 0.974 |
| P-43 | 1,556 | 12.0 | 120 | J-32 | J-30 | 198 | 0.56 | 0.147 |
| P-44 | 689 | 12.0 | 120 | J-12 | J-43 | 76 | 0.21 | 0.025 |
| P-45 | 1,946 | 12.0 | 120 | J-43 | J-44 | 196 | 0.56 | 0.144 |
| P-46 | 2,073 | 8.0 | 120 | J-44 | J-45 | 98 | 0.62 | 0.286 |
| P-47 | 969 | 8.0 | 120 | J-45 | J-2 | 234 | 1.49 | 1.434 |
| P-48 | 1,168 | 8.0 | 120 | J-3 | J-46 | 236 | 1.51 | 1.461 |
| P-49 | 911 | 8.0 | 120 | J-46 | J-17 | 118 | 0.75 | 0.404 |
| P-50 | 742 | 8.0 | 120 | J-45 | J-47 | 136 | 0.87 | 0.525 |
| P-51 | 921 | 8.0 | 120 | J-47 | J-43 | 136 | 0.87 | 0.525 |
| P-52 | 2,082 | 8.0 | 120 | J-43 | J-48 | 54 | 0.34 | 0.095 |
| P-53 | 1,325 | 8.0 | 120 | J-48 | J-49 | 28 | 0.18 | 0.028 |
| P-54 | 1,465 | 12.0 | 120 | J-49 | J-44 | 318 | 0.90 | 0.352 |
| P-55 | 1,495 | 12.0 | 120 | J-49 | J-14 | 27 | 0.08 | 0.003 |
| P-56 | 743 | 8.0 | 120 | J-49 | J-50 | 35 | 0.22 | 0.040 |
| P-57 | 1,129 | 8.0 | 120 | J-50 | J-15 | 35 | 0.22 | 0.040 |
| P-58 | 931 | 16.0 | 120 | J-51 | J-14 | 33 | 0.05 | 0.001 |
| P-59 | 1,264 | 8.0 | 120 | J-48 | J-51 | 31 | 0.20 | 0.034 |
| P-60 | 2,202 | 16.0 | 120 | J-12 | J-52 | 339 | 0.54 | 0.097 |
| P-61 | 885 | 16.0 | 120 | J-52 | J-94 | 248 | 0.40 | 0.055 |
| P-62 | 840 | 8.0 | 120 | J-48 | J-52 | 4 | 0.03 | 0.001 |
| P-63 | 906 | 8.0 | 120 | J-9 | J-53 | 136 | 0.87 | 0.524 |
| P-64 | 910 | 12.0 | 120 | J-54 | J-8 | 148 | 0.42 | 0.085 |
| P-65 | 721 | 8.0 | 120 | J-53 | J-54 | 137 | 0.87 | 0.534 |
| P-66 | 983 | 8.0 | 120 | J-24 | J-55 | 191 | 1.22 | 0.984 |
| P-67 | 1,333 | 8.0 | 120 | J-55 | J-56 | 119 | 0.76 | 0.409 |
| P-68 | 1,116 | 8.0 | 120 | J-56 | J-57 | 76 | 0.49 | 0.181 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario:  Max Day - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-69 | 729 | 8.0 | 120 | J-57 | J-58 | 63 | 0.40 | 0.128 |
| P-70 | 857 | 12.0 | 120 | J-26 | J-59 | 52 | 0.15 | 0.012 |
| P-71 | 1,622 | 12.0 | 120 | J-59 | J-54 | 11 | 0.03 | 0.001 |
| P-72 | 936 | 8.0 | 120 | J-58 | J-59 | 63 | 0.40 | 0.127 |
| P-73 | 1,459 | 8.0 | 120 | J-60 | J-55 | 78 | 0.50 | 0.187 |
| P-74 | 1,114 | 8.0 | 120 | J-60 | J-61 | 78 | 0.50 | 0.187 |
| P-75 | 1,054 | 12.0 | 120 | J-61 | J-26 | 313 | 0.89 | 0.343 |
| P-76 | 1,140 | 12.0 | 120 | J-61 | J-56 | 118 | 0.34 | 0.056 |
| P-77 | 855 | 12.0 | 120 | J-62 | J-63 | 256 | 0.73 | 0.236 |
| P-78 | 905 | 12.0 | 120 | J-63 | J-10 | 434 | 1.23 | 0.626 |
| P-79 | 831 | 8.0 | 120 | J-63 | J-64 | 13 | 0.08 | 0.007 |
| P-80 | 1,177 | 8.0 | 120 | J-64 | J-57 | 13 | 0.08 | 0.007 |
| P-81 | 1,245 | 8.0 | 120 | J-65 | J-55 | 6 | 0.04 | 0.001 |
| P-82 | 2,151 | 16.0 | 120 | J-22 | J-66 | 888 | 1.42 | 0.581 |
| P-83 | 1,176 | 16.0 | 120 | J-66 | J-24 | 338 | 0.54 | 0.097 |
| P-84 | 1,113 | 12.0 | 120 | J-65 | J-66 | 550 | 1.56 | 0.970 |
| P-85 | 1,034 | 8.0 | 120 | J-65 | J-67 | 52 | 0.33 | 0.088 |
| P-86 | 1,662 | 8.0 | 120 | J-67 | J-68 | 52 | 0.33 | 0.088 |
| P-87 | 1,161 | 12.0 | 120 | J-68 | J-23 | 759 | 2.15 | 1.763 |
| P-88 | 1,359 | 8.0 | 120 | J-68 | J-69 | 36 | 0.23 | 0.046 |
| P-89 | 1,832 | 8.0 | 120 | J-69 | J-63 | 108 | 0.69 | 0.344 |
| P-90 | 1,005 | 12.0 | 120 | J-68 | J-70 | 471 | 1.34 | 0.728 |
| P-91 | 573 | 12.0 | 120 | J-70 | J-62 | 126 | 0.36 | 0.063 |
| P-92 | 1,409 | 12.0 | 120 | J-65 | J-71 | 323 | 0.92 | 0.363 |
| P-93 | 1,201 | 12.0 | 120 | J-56 | J-72 | 41 | 0.12 | 0.008 |
| P-94 | 503 | 12.0 | 120 | J-72 | J-62 | 109 | 0.31 | 0.049 |
| P-95 | 736 | 12.0 | 120 | J-71 | J-72 | 123 | 0.35 | 0.061 |
| P-96 | 718 | 12.0 | 120 | J-71 | J-70 | 72 | 0.21 | 0.023 |
| P-97 | 1,047 | 8.0 | 120 | J-19 | J-73 | 112 | 0.72 | 0.369 |
| P-98 | 1,393 | 12.0 | 120 | J-83 | J-74 | 185 | 0.53 | 0.129 |
| P-99 | 903 | 12.0 | 120 | J-74 | J-75 | 22 | 0.06 | 0.002 |
| P-100 | 1,063 | 12.0 | 120 | J-21 | J-76 | 623 | 1.77 | 1.223 |
| P-101 | 1,185 | 12.0 | 120 | J-76 | J-77 | 352 | 1.00 | 0.426 |
| P-102 | 939 | 12.0 | 120 | J-77 | J-74 | 2 | 0.00 | 0.000 |
| P-103 | 1,124 | 12.0 | 120 | J-74 | J-78 | 149 | 0.42 | 0.086 |
| P-104 | 1,019 | 8.0 | 120 | J-78 | J-79 | 103 | 0.66 | 0.314 |
| P-105 | 1,354 | 16.0 | 120 | J-1 | J-80 | 904 | 1.44 | 0.601 |
| P-106 | 894 | 16.0 | 120 | J-80 | J-12 | 766 | 1.22 | 0.442 |
| P-107 | 1,486 | 8.0 | 120 | J-76 | J-81 | 96 | 0.61 | 0.277 |
| P-108 | 1,004 | 12.0 | 120 | J-75 | J-82 | 376 | 1.07 | 0.480 |
| P-109 | 1,106 | 12.0 | 120 | J-82 | J-23 | 608 | 1.72 | 1.169 |
| P-110 | 1,868 | 8.0 | 120 | J-81 | J-82 | 87 | 0.56 | 0.231 |
| P-111 | 1,711 | 12.0 | 120 | J-78 | J-12 | 352 | 1.00 | 0.425 |
| P-112 | 675 | 8.0 | 120 | J-73 | J-83 | 125 | 0.80 | 0.450 |
| P-113 | 1,008 | 8.0 | 120 | J-83 | J-84 | 38 | 0.25 | 0.051 |
| P-114 | 1,673 | 8.0 | 120 | J-84 | J-52 | 86 | 0.55 | 0.226 |
| P-115 | 1,776 | 8.0 | 120 | J-78 | J-84 | 48 | 0.30 | 0.076 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 5

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Max Day - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-116 | 1,656 | 8.0 | 120 | J-73 | J-85 | 13 | 0.08 | 0.006 |
| P-117 | 1,568 | 8.0 | 120 | J-85 | J-76 | 13 | 0.08 | 0.006 |
| P-118 | 1,542 | 8.0 | 120 | J-82 | J-86 | 35 | 0.22 | 0.043 |
| P-119 | 532 | 8.0 | 120 | J-79 | J-87 | 103 | 0.66 | 0.314 |
| P-120 | 1,177 | 8.0 | 120 | J-87 | J-80 | 138 | 0.88 | 0.540 |
| P-121 | 801 | 8.0 | 120 | J-86 | J-87 | 35 | 0.22 | 0.043 |
| P-122 | 931 | 12.0 | 120 | J-83 | J-18 | 376 | 1.07 | 0.480 |
| P-123 | 2,664 | 24.0 | 120 | J-88 | J-20 | 1,748 | 1.24 | 0.282 |
| P-124 | 2,422 | 24.0 | 120 | J-88 | J-89 | 2,892 | 2.05 | 0.718 |
| P-125 | 839 | 16.0 | 120 | J-90 | J-90 | 214 | 0.34 | 0.042 |
| P-126 | 1,077 | 16.0 | 120 | J-90 | J-15 | 214 | 0.34 | 0.041 |
| P-128 | 1,309 | 24.0 | 120 | J-21 | J-91 | 114 | 0.08 | 0.002 |
| P-129 | 1,332 | 24.0 | 120 | J-22 | J-91 | 298 | 0.21 | 0.011 |
| P-130 | 974 | 8.0 | 120 | J-81 | J-91 | 183 | 1.17 | 0.915 |
| P-133 | 1,322 | 24.0 | 120 | J-2 | J-92 | 3,477 | 2.47 | 1.010 |
| P-134 | 1,322 | 24.0 | 120 | J-92 | J-3 | 3,611 | 2.56 | 1.083 |
| P-135 | 1,774 | 24.0 | 120 | J-20 | J-93 | 626 | 0.44 | 0.042 |
| P-136 | 778 | 24.0 | 120 | J-93 | J-21 | 626 | 0.44 | 0.042 |
| P-137 | 786 | 16.0 | 120 | J-13 | J-94 | 162 | 0.26 | 0.025 |
| P-138 | 1,159 | 16.0 | 120 | J-94 | J-51 | 64 | 0.10 | 0.004 |
| P-139 | 2,314 | 12.0 | 120 | J-44 | J-16 | 95 | 0.27 | 0.038 |
| P-140 | 1,166 | 8.0 | 120 | J-11 | J-69 | 144 | 0.92 | 0.589 |
| P-141 | 890 | 16.0 | 120 | J-95 | J-16 | 490 | 0.78 | 0.193 |
| P-142 | 1,256 | 16.0 | 120 | J-15 | J-95 | 603 | 0.96 | 0.284 |
| P-143 | 2,336 | 12.0 | 120 | J-44 | J-92 | 675 | 1.91 | 1.420 |
| P-200 | 2,335 | 24.0 | 120 | J-201 | J-202 | 2,878 | 2.04 | 0.712 |
| P-201 | 2,336 | 16.0 | 120 | J-202 | J-203 | 1,188 | 1.90 | 0.996 |
| P-202 | 1,418 | 16.0 | 120 | J-203 | J-204 | 111 | 0.18 | 0.012 |
| P-204 | 2,317 | 12.0 | 120 | J-205 | J-25 | 61 | 0.17 | 0.016 |
| P-205 | 2,640 | 24.0 | 120 | J-201 | J-206 | 3,063 | 2.17 | 0.798 |
| P-206 | 2,639 | 24.0 | 120 | J-206 | J-207 | 1,715 | 1.22 | 0.273 |
| P-207 | 2,567 | 12.0 | 120 | J-208 | J-209 | 89 | 0.25 | 0.033 |
| P-208 | 2,713 | 12.0 | 120 | J-209 | J-200 | 290 | 0.82 | 0.296 |
| P-209 | 2,452 | 12.0 | 120 | J-24 | J-210 | 157 | 0.45 | 0.095 |
| P-210 | 2,672 | 24.0 | 120 | J-22 | J-200 | 1,599 | 1.13 | 0.240 |
| P-211 | 2,633 | 12.0 | 120 | J-209 | J-21 | 118 | 0.33 | 0.056 |
| P-212 | 2,662 | 16.0 | 120 | J-208 | J-20 | 392 | 0.63 | 0.128 |
| P-213 | 2,706 | 12.0 | 120 | J-202 | J-210 | 481 | 1.36 | 0.757 |
| P-214 | 1,265 | 12.0 | 120 | J-203 | J-211 | 344 | 0.98 | 0.408 |
| P-215 | 1,876 | 12.0 | 120 | J-211 | J-205 | 232 | 0.66 | 0.197 |
| P-216 | 2,801 | 12.0 | 120 | J-200 | J-210 | 436 | 1.24 | 0.632 |
| P-217 | 2,687 | 24.0 | 120 | J-200 | J-201 | 2,901 | 2.06 | 0.722 |
| P-218 | 2,651 | 12.0 | 120 | J-206 | J-209 | 259 | 0.73 | 0.240 |
| P-219 | 2,641 | 16.0 | 120 | J-207 | J-208 | 27 | 0.04 | 0.001 |
| P-220 | 2,285 | 12.0 | 120 | J-203 | J-212 | 184 | 0.52 | 0.128 |
| P-221 | 2,358 | 12.0 | 120 | J-212 | J-213 | 414 | 1.17 | 0.574 |
| P-222 | 2,276 | 12.0 | 120 | J-213 | J-214 | 351 | 1.00 | 0.424 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 4 of 5

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Max Day - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-223 | 2,646 | 12.0 | 120 | J-214 | J-215 | 328 | 0.93 | 0.374 |
| P-224 | 2,674 | 12.0 | 120 | J-215 | J-216 | 271 | 0.77 | 0.262 |
| P-225 | 2,288 | 16.0 | 120 | J-216 | J-207 | 351 | 0.56 | 0.104 |
| P-226 | 2,254 | 12.0 | 120 | J-213 | J-202 | 292 | 0.83 | 0.302 |
| P-227 | 2,266 | 16.0 | 120 | J-214 | J-201 | 910 | 1.45 | 0.608 |
| P-228 | 2,289 | 12.0 | 120 | J-206 | J-215 | 172 | 0.49 | 0.113 |
| P-229 | 2,627 | 24.0 | 120 | J-222 | J-207 | 406 | 0.29 | 0.019 |
| P-230 | 2,665 | 12.0 | 120 | J-219 | J-220 | 166 | 0.47 | 0.105 |
| P-231 | 2,652 | 12.0 | 120 | J-220 | J-216 | 281 | 0.80 | 0.280 |
| P-232 | 2,707 | 12.0 | 120 | J-221 | J-222 | 105 | 0.30 | 0.045 |
| P-233 | 2,657 | 24.0 | 120 | J-218 | J-222 | 312 | 0.22 | 0.012 |
| P-234 | 2,252 | 12.0 | 120 | J-220 | J-222 | 347 | 0.98 | 0.413 |
| P-235 | 2,583 | 12.0 | 120 | J-221 | J-88 | 338 | 0.96 | 0.394 |
| P-236 | 2,638 | 24.0 | 120 | J-89 | J-217 | 2,780 | 1.97 | 0.667 |
| P-237 | 2,620 | 12.0 | 120 | J-208 | J-221 | 82 | 0.23 | 0.029 |
| P-238 | 2,942 | 12.0 | 120 | J-221 | J-217 | 311 | 0.88 | 0.339 |
| P-239 | 2,825 | 24.0 | 120 | J-217 | J-223 | 2,007 | 1.42 | 0.365 |
| P-240 | 1,107 | 12.0 | 120 | J-224 | J-219 | 296 | 0.84 | 0.308 |
| P-241 | 903 | 24.0 | 120 | J-223 | J-218 | 774 | 0.55 | 0.062 |
| P-242 | 2,212 | 16.0 | 120 | J-223 | J-224 | 758 | 1.21 | 0.433 |
| P-243 | 1,160 | 16.0 | 120 | J-225 | J-94 | 419 | 0.67 | 0.144 |
| P-244 | 3,411 | 12.0 | 120 | J-88 | J-227 | 429 | 1.22 | 0.612 |
| P-245 | 2,726 | 12.0 | 120 | J-227 | J-225 | 130 | 0.37 | 0.067 |
| P-246 | 855 | 12.0 | 120 | J-225 | J-226 | 170 | 0.48 | 0.111 |
| P-247 | 1,678 | 12.0 | 120 | J-226 | J-14 | 208 | 0.59 | 0.160 |
| P-248 | 1,900 | 12.0 | 120 | J-18 | J-227 | 79 | 0.22 | 0.027 |
| P-249 | 2,011 | 16.0 | 120 | J-4 | J-228 | 743 | 1.19 | 0.418 |
| P-250 | 1,945 | 12.0 | 120 | J-16 | J-229 | 77 | 0.22 | 0.025 |
| P-251 | 1,597 | 16.0 | 120 | J-228 | J-230 | 282 | 0.45 | 0.069 |
| P-253 | 1,930 | 12.0 | 120 | J-229 | J-231 | 157 | 0.45 | 0.096 |
| P-254 | 558 | 12.0 | 120 | J-231 | J-228 | 260 | 0.74 | 0.243 |
| P-255 | 842 | 16.0 | 120 | J-230 | J-232 | 67 | 0.11 | 0.005 |
| P-256 | 552 | 8.0 | 120 | J-230 | J-233 | 14 | 0.09 | 0.008 |
| P-257 | 1,595 | 8.0 | 120 | J-233 | J-231 | 19 | 0.12 | 0.013 |
| P-258 | 330 | 12.0 | 120 | J-232 | J-233 | 5 | 0.01 | 0.000 |
| P-259 | 1,600 | 12.0 | 120 | J-ELS | J-205 | 109 | 0.31 | 0.049 |
| P-260 | 1,038 | 12.0 | 120 | J-204 | J-ELS | 111 | 0.31 | 0.050 |
| P-261 | 3,327 | 12.0 | 120 | J-210 | J-205 | 184 | 0.52 | 0.127 |
| P-262 | 2,378 | 12.0 | 120 | J-95 | J-229 | 113 | 0.32 | 0.052 |
| P-500 | 679 | 48.0 | 120 | R-1 | J-92 | 7,763 | 1.38 | 0.143 |
| P-501 | 600 | 48.0 | 120 | R-2 | FCV-2 | 6,050 | 1.07 | 0.098 |
| P-502 | 566 | 48.0 | 120 | FCV-2 | J-89 | 6,050 | 1.07 | 0.098 |
| P-503 | 604 | 48.0 | 120 | R-3 | FCV-3 | 10,669 | 1.89 | 0.269 |
| P-504 | 604 | 48.0 | 120 | FCV-3 | J-201 | 10,669 | 1.89 | 0.293 |
| P-505 | 861 | 48.0 | 120 | R-AZWC | AZWC-J-8 | 2,649 | 0.47 | 0.024 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 5 of 5

3-ER-506

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: FCV Table

Active Scenario: Max Day - Site

| Label | Elevation (ft) | Diameter (Valve) (in) | Flow Setting (Initial) (gpm) | Minor Loss Coefficient (Local) | Flow (gpm) | Hydraulic Grade (From) (ft) | Hydraulic Grade (To) (ft) | Headloss (ft) |
|---|---|---|---|---|---|---|---|---|
| FCV-2 | 1,561.51 | 48.0 | 10,410 | 0.0000000 | 6,050 | 1,710.00 | 1,710.00 | 0.00 |
| FCV-3 | 1,488.00 | 48.0 | 14,413 | 0.0000000 | 10,669 | 1,710.00 | 1,710.00 | 0.00 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 1

3-ER-507

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Reservoir Table

Active Scenario:  Max Day - Site

| Label | Elevation (ft) | Flow (Out net) (gpm) | Hydraulic Grade (ft) |
|-------|---------------|----------------------|----------------------|
| R-1 | 1,710.00 | 7,763 | 1,710.00 |
| R-2 | 1,710.00 | 6,050 | 1,710.00 |
| R-3 | 1,710.00 | 10,669 | 1,710.00 |
| R-AZWC | 1,720.00 | 2,649 | 1,720.00 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 1

3-ER-508



# SITE
# PEAK HOUR DEMAND RESULTS

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario: Peak Hour - Site

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|---|---|---|---|---|
| AZWC-J-1 | 1,565.65 | 292 | 1,700.32 | 58.3 |
| AZWC-J-2 | 1,566.00 | 0 | 1,709.46 | 62.1 |
| AZWC-J-3 | 1,562.39 | 292 | 1,716.66 | 66.7 |
| AZWC-J-4 | 1,549.27 | 573 | 1,699.13 | 64.8 |
| AZWC-J-5 | 1,549.29 | 14 | 1,700.23 | 65.3 |
| AZWC-J-6 | 1,550.00 | 14 | 1,710.02 | 69.2 |
| AZWC-J-7 | 1,540.00 | 14 | 1,700.17 | 69.3 |
| AZWC-J-8 | 1,540.19 | 292 | 1,720.00 | 77.8 |
| AZWC-J-9 | 1,532.76 | 207 | 1,698.24 | 71.6 |
| AZWC-J-10 | 1,532.13 | 281 | 1,698.38 | 71.9 |
| AZWC-J-11 | 1,530.66 | 573 | 1,699.16 | 72.9 |
| AZWC-J-12 | 1,530.39 | 292 | 1,710.62 | 78.0 |
| AZWC-J-13 | 1,516.54 | 142 | 1,698.48 | 78.7 |
| AZWC-J-14 | 1,511.49 | 142 | 1,698.31 | 80.8 |
| AZWC-J-15 | 1,510.00 | 573 | 1,699.76 | 82.1 |
| AZWC-J-16 | 1,510.00 | 292 | 1,701.75 | 83.0 |
| AZWC-J-17 | 1,498.95 | 142 | 1,698.56 | 86.4 |
| AZWC-J-18 | 1,496.42 | 142 | 1,698.34 | 87.4 |
| J-1 | 1,518.46 | 0 | 1,700.26 | 78.7 |
| J-2 | 1,524.42 | 0 | 1,704.61 | 78.0 |
| J-3 | 1,534.31 | 0 | 1,705.57 | 74.1 |
| J-4 | 1,536.36 | 96 | 1,703.40 | 72.3 |
| J-5 | 1,511.94 | 0 | 1,697.50 | 80.3 |
| J-6 | 1,496.19 | 0 | 1,696.73 | 86.8 |
| J-7 | 1,487.97 | 0 | 1,693.99 | 89.1 |
| J-8 | 1,482.10 | 0 | 1,693.41 | 91.4 |
| J-9 | 1,489.31 | 0 | 1,693.47 | 88.3 |
| J-10 | 1,498.18 | 0 | 1,694.04 | 84.7 |
| J-11 | 1,505.45 | 0 | 1,696.08 | 82.5 |
| J-12 | 1,528.22 | 0 | 1,697.27 | 73.1 |
| J-13 | 1,541.89 | 0 | 1,696.38 | 66.8 |
| J-14 | 1,551.18 | 0 | 1,696.69 | 63.0 |
| J-15 | 1,555.10 | 581 | 1,697.28 | 61.5 |
| J-16 | 1,547.57 | 48 | 1,699.44 | 65.7 |
| J-17 | 1,539.63 | 0 | 1,701.16 | 69.9 |
| J-18 | 1,536.04 | 0 | 1,696.33 | 69.4 |
| J-19 | 1,531.88 | 0 | 1,696.61 | 71.3 |
| J-20 | 1,525.85 | 0 | 1,698.06 | 74.5 |
| J-21 | 1,509.31 | 0 | 1,697.77 | 81.5 |
| J-22 | 1,500.29 | 47 | 1,697.81 | 85.5 |
| J-23 | 1,507.70 | 0 | 1,698.07 | 82.4 |
| J-24 | 1,478.32 | 0 | 1,693.74 | 93.2 |
| J-25 | 1,468.56 | 0 | 1,693.01 | 97.1 |
| J-26 | 1,470.59 | 0 | 1,692.24 | 95.9 |
| J-27 | 1,491.65 | 446 | 1,693.35 | 87.3 |
| J-28 | 1,494.43 | 446 | 1,693.57 | 86.2 |
| J-29 | 1,504.84 | 0 | 1,695.46 | 82.5 |
| J-30 | 1,509.95 | 446 | 1,695.86 | 80.4 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 4

3-ER-510

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg                                    Active Scenario: Peak Hour - Site
FlexTable: Junction Table

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|------|------|------|------|
| J-31 | 1,506.31 | 446 | 1,693.81 | 81.1 |
| J-32 | 1,510.99 | 446 | 1,695.17 | 79.7 |
| J-33 | 1,517.93 | 446 | 1,697.12 | 77.5 |
| J-34 | 1,523.42 | 446 | 1,699.75 | 76.3 |
| J-35 | 1,500.26 | 0 | 1,695.65 | 84.5 |
| J-36 | 1,519.89 | 0 | 1,697.63 | 76.9 |
| J-37 | 1,497.84 | 0 | 1,693.49 | 84.7 |
| J-38 | 1,508.75 | 0 | 1,693.69 | 80.0 |
| J-39 | 1,509.06 | 581 | 1,695.51 | 80.7 |
| J-40 | 1,519.34 | 0 | 1,701.25 | 78.7 |
| J-41 | 1,493.31 | 0 | 1,695.77 | 87.6 |
| J-42 | 1,520.78 | 0 | 1,699.34 | 77.3 |
| J-43 | 1,528.04 | 581 | 1,697.29 | 73.2 |
| J-44 | 1,539.15 | 581 | 1,698.82 | 69.1 |
| J-45 | 1,525.42 | 0 | 1,700.33 | 75.7 |
| J-46 | 1,536.25 | 581 | 1,700.53 | 71.1 |
| J-47 | 1,523.18 | 0 | 1,698.97 | 76.1 |
| J-48 | 1,543.23 | 0 | 1,696.73 | 66.4 |
| J-49 | 1,544.66 | 581 | 1,696.80 | 65.8 |
| J-50 | 1,550.01 | 0 | 1,696.99 | 63.6 |
| J-51 | 1,551.30 | 0 | 1,696.58 | 62.9 |
| J-52 | 1,541.61 | 0 | 1,696.60 | 67.1 |
| J-53 | 1,482.08 | 446 | 1,692.01 | 90.8 |
| J-54 | 1,476.49 | 0 | 1,692.76 | 93.6 |
| J-55 | 1,480.56 | 0 | 1,692.14 | 91.5 |
| J-56 | 1,481.69 | 446 | 1,691.18 | 90.6 |
| J-57 | 1,483.32 | 0 | 1,691.87 | 90.2 |
| J-58 | 1,478.32 | 0 | 1,692.07 | 92.5 |
| J-59 | 1,473.68 | 0 | 1,692.34 | 94.6 |
| J-60 | 1,475.18 | 0 | 1,691.67 | 93.7 |
| J-61 | 1,474.72 | 446 | 1,691.31 | 93.7 |
| J-62 | 1,493.15 | 446 | 1,691.27 | 85.7 |
| J-63 | 1,494.82 | 446 | 1,692.05 | 85.3 |
| J-64 | 1,489.78 | 0 | 1,691.98 | 87.5 |
| J-65 | 1,486.52 | 446 | 1,692.15 | 89.0 |
| J-66 | 1,484.90 | 0 | 1,694.26 | 90.6 |
| J-67 | 1,492.33 | 0 | 1,692.53 | 86.6 |
| J-68 | 1,498.85 | 446 | 1,693.15 | 84.1 |
| J-69 | 1,504.49 | 0 | 1,693.63 | 81.8 |
| J-70 | 1,496.77 | 446 | 1,691.32 | 84.2 |
| J-71 | 1,492.39 | 446 | 1,691.24 | 86.0 |
| J-72 | 1,489.15 | 446 | 1,691.17 | 87.4 |
| J-73 | 1,526.88 | 0 | 1,695.45 | 72.9 |
| J-74 | 1,522.81 | 581 | 1,694.36 | 74.2 |
| J-75 | 1,517.39 | 581 | 1,694.36 | 76.6 |
| J-76 | 1,513.14 | 581 | 1,695.26 | 78.8 |
| J-77 | 1,518.58 | 581 | 1,694.33 | 76.0 |
| J-78 | 1,525.14 | 581 | 1,694.83 | 73.4 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg                 Superstition Vistas          A. Paciora
7/12/2021                              HILGARTWILSON, LLC            Page 2 of 4

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg                                          Active Scenario: Peak Hour - Site
FlexTable: Junction Table

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|------|------|------|------|
| J-79  | 1,521.50 | 0     | 1,695.62 | 75.3  |
| J-80  | 1,521.52 | 0     | 1,698.21 | 76.4  |
| J-81  | 1,507.88 | 0     | 1,696.09 | 81.4  |
| J-82  | 1,511.68 | 581   | 1,695.33 | 79.5  |
| J-83  | 1,530.12 | 581   | 1,694.97 | 71.3  |
| J-84  | 1,534.97 | 0     | 1,695.21 | 69.3  |
| J-85  | 1,520.43 | 0     | 1,695.35 | 75.7  |
| J-86  | 1,512.42 | 0     | 1,695.79 | 79.3  |
| J-87  | 1,519.02 | 0     | 1,696.03 | 76.6  |
| J-88  | 1,543.79 | 612   | 1,700.05 | 67.6  |
| J-89  | 1,561.51 | 612   | 1,704.55 | 61.9  |
| J-90  | 1,553.44 | 0     | 1,696.95 | 62.1  |
| J-91  | 1,501.89 | 0     | 1,697.78 | 84.8  |
| J-92  | 1,529.36 | 0     | 1,710.00 | 78.2  |
| J-93  | 1,513.70 | 0     | 1,697.86 | 79.7  |
| J-94  | 1,544.69 | 94    | 1,696.40 | 65.6  |
| J-95  | 1,552.90 | 0     | 1,698.76 | 63.1  |
| J-200 | 1,496.00 | 951   | 1,698.12 | 87.4  |
| J-201 | 1,488.00 | 1,517 | 1,700.44 | 91.9  |
| J-202 | 1,470.66 | 1,517 | 1,696.99 | 97.9  |
| J-203 | 1,458.00 | 1,517 | 1,692.45 | 101.4 |
| J-204 | 1,453.24 | 0     | 1,692.47 | 103.5 |
| J-205 | 1,458.56 | 0     | 1,692.59 | 101.3 |
| J-206 | 1,496.31 | 1,517 | 1,696.83 | 86.8  |
| J-207 | 1,517.23 | 1,540 | 1,695.83 | 77.3  |
| J-208 | 1,519.99 | 974   | 1,696.12 | 76.2  |
| J-209 | 1,504.30 | 951   | 1,696.31 | 83.1  |
| J-210 | 1,475.66 | 951   | 1,693.77 | 94.4  |
| J-211 | 1,463.36 | 951   | 1,691.38 | 98.7  |
| J-212 | 1,454.56 | 377   | 1,692.87 | 103.1 |
| J-213 | 1,466.18 | 377   | 1,695.55 | 99.2  |
| J-214 | 1,480.99 | 377   | 1,697.66 | 93.7  |
| J-215 | 1,494.36 | 377   | 1,696.12 | 87.3  |
| J-216 | 1,510.97 | 566   | 1,695.07 | 79.7  |
| J-217 | 1,559.60 | 754   | 1,699.39 | 60.5  |
| J-218 | 1,554.84 | 754   | 1,696.02 | 61.1  |
| J-219 | 1,549.95 | 754   | 1,692.86 | 61.8  |
| J-220 | 1,529.45 | 754   | 1,693.45 | 71.0  |
| J-221 | 1,536.00 | 754   | 1,696.50 | 69.4  |
| J-222 | 1,536.00 | 777   | 1,695.82 | 69.1  |
| J-223 | 1,563.53 | 777   | 1,696.25 | 57.4  |
| J-224 | 1,560.58 | 754   | 1,693.79 | 57.6  |
| J-225 | 1,550.03 | 612   | 1,695.97 | 63.1  |
| J-226 | 1,551.62 | 612   | 1,695.82 | 62.4  |
| J-227 | 1,546.70 | 612   | 1,696.17 | 64.7  |
| J-228 | 1,534.99 | 324   | 1,700.92 | 71.8  |
| J-229 | 1,550.60 | 189   | 1,699.40 | 64.4  |
| J-230 | 1,544.78 | 324   | 1,700.62 | 67.4  |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg                  Superstition Vistas                         A. Paciora
7/12/2021                               HILGARTWILSON, LLC                          Page 3 of 4

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg                                              Active Scenario: Peak Hour - Site
FlexTable: Junction Table

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|---------------|--------------|----------------------|----------------|
| J-231 | 1,539.83 | 189 | 1,700.42 | 69.5 |
| J-232 | 1,550.00 | 101 | 1,700.60 | 65.2 |
| J-233 | 1,547.13 | 0 | 1,700.60 | 66.4 |
| J-ELS | 1,456.01 | 1 | 1,692.51 | 102.3 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Peak Hour - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| AZWC-P-1 | 1,622 | 12.0 | 120 | AZWC-J-18 | AZWC-J-17 | 190 | 0.54 | 0.136 |
| AZWC-P-2 | 2,123 | 12.0 | 120 | AZWC-J-17 | AZWC-J-15 | 412 | 1.17 | 0.568 |
| AZWC-P-3 | 3,095 | 16.0 | 120 | AZWC-J-4 | AZWC-J-11 | 98 | 0.16 | 0.010 |
| AZWC-P-4 | 2,970 | 16.0 | 120 | AZWC-J-11 | AZWC-J-15 | 502 | 0.80 | 0.202 |
| AZWC-P-5 | 2,054 | 12.0 | 120 | AZWC-J-13 | AZWC-J-11 | 309 | 0.88 | 0.334 |
| AZWC-P-6 | 2,990 | 12.0 | 120 | AZWC-J-17 | AZWC-J-13 | 80 | 0.23 | 0.027 |
| AZWC-P-7 | 1,705 | 12.0 | 120 | AZWC-J-14 | AZWC-J-13 | 160 | 0.45 | 0.099 |
| AZWC-P-8 | 2,436 | 16.0 | 120 | AZWC-J-4 | AZWC-J-1 | 810 | 1.29 | 0.490 |
| AZWC-P-9 | 3,055 | 16.0 | 120 | AZWC-J-8 | AZWC-J-3 | 1,250 | 1.99 | 1.094 |
| AZWC-P-10 | 1,316 | 16.0 | 120 | AZWC-J-15 | AZWC-J-16 | 1,487 | 2.37 | 1.509 |
| AZWC-P-11 | 2,912 | 16.0 | 120 | AZWC-J-16 | AZWC-J-12 | 2,173 | 3.47 | 3.048 |
| AZWC-P-12 | 2,013 | 16.0 | 120 | AZWC-J-12 | AZWC-J-8 | 2,733 | 4.36 | 4.659 |
| AZWC-P-13 | 2,178 | 12.0 | 120 | AZWC-J-1 | AZWC-J-2 | 1,212 | 3.44 | 4.195 |
| AZWC-P-14 | 2,649 | 12.0 | 120 | AZWC-J-2 | AZWC-J-3 | 958 | 2.72 | 2.716 |
| AZWC-P-15 | 1,502 | 12.0 | 120 | AZWC-J-5 | AZWC-J-7 | 96 | 0.27 | 0.038 |
| AZWC-P-16 | 2,991 | 12.0 | 120 | AZWC-J-16 | AZWC-J-7 | 395 | 1.12 | 0.527 |
| AZWC-P-17 | 1,931 | 12.0 | 120 | AZWC-J-5 | AZWC-J-1 | 110 | 0.31 | 0.049 |
| AZWC-P-18 | 2,422 | 12.0 | 120 | AZWC-J-6 | AZWC-J-2 | 254 | 0.72 | 0.231 |
| AZWC-P-19 | 2,346 | 12.0 | 120 | AZWC-J-6 | AZWC-J-12 | 268 | 0.76 | 0.256 |
| AZWC-P-20 | 1,354 | 12.0 | 120 | AZWC-J-11 | AZWC-J-7 | 477 | 1.35 | 0.746 |
| AZWC-P-21 | 2,644 | 12.0 | 120 | AZWC-J-18 | AZWC-J-14 | 48 | 0.14 | 0.011 |
| AZWC-P-22 | 3,404 | 12.0 | 120 | AZWC-J-14 | AZWC-J-9 | 67 | 0.19 | 0.020 |
| AZWC-P-23 | 1,779 | 12.0 | 120 | AZWC-J-9 | AZWC-J-10 | 140 | 0.40 | 0.077 |
| AZWC-P-24 | 3,067 | 12.0 | 120 | AZWC-J-10 | AZWC-J-13 | 87 | 0.25 | 0.032 |
| AZWC-P-25 | 1,946 | 12.0 | 120 | AZWC-J-10 | AZWC-J-4 | 335 | 0.95 | 0.387 |
| P-1 | 1,337 | 24.0 | 120 | J-1 | J-2 | 6,539 | 4.64 | 3.253 |
| P-2 | 1,236 | 24.0 | 120 | J-3 | J-4 | 4,680 | 3.32 | 1.751 |
| P-3 | 2,654 | 16.0 | 120 | J-5 | J-6 | 612 | 0.98 | 0.291 |
| P-4 | 2,643 | 12.0 | 120 | J-7 | J-8 | 247 | 0.70 | 0.220 |
| P-5 | 1,373 | 16.0 | 120 | J-8 | J-9 | 220 | 0.35 | 0.044 |
| P-6 | 1,371 | 16.0 | 120 | J-10 | J-11 | 1,477 | 2.36 | 1.492 |
| P-7 | 1,867 | 16.0 | 120 | J-9 | J-10 | 624 | 1.00 | 0.302 |
| P-7 | 1,712 | 16.0 | 120 | J-11 | J-1 | 1,927 | 3.07 | 2.439 |
| P-8 | 1,252 | 16.0 | 120 | J-16 | J-17 | 1,416 | 2.26 | 1.379 |
| P-9 | 1,335 | 16.0 | 120 | J-17 | J-4 | 1,574 | 2.51 | 1.677 |
| P-10 | 1,872 | 16.0 | 120 | J-18 | J-13 | 167 | 0.27 | 0.026 |
| P-11 | 817 | 16.0 | 120 | J-18 | J-19 | 668 | 1.07 | 0.343 |
| P-12 | 2,582 | 16.0 | 120 | J-19 | J-20 | 871 | 1.39 | 0.561 |
| P-13 | 2,636 | 24.0 | 120 | J-22 | J-23 | 992 | 0.70 | 0.099 |
| P-14 | 2,640 | 24.0 | 120 | J-23 | J-1 | 3,123 | 2.22 | 0.828 |
| P-15 | 2,850 | 16.0 | 120 | J-24 | J-25 | 570 | 0.91 | 0.256 |
| P-16 | 1,880 | 12.0 | 120 | J-25 | J-26 | 346 | 0.98 | 0.412 |
| P-17 | 1,357 | 12.0 | 120 | J-9 | J-27 | 154 | 0.44 | 0.092 |
| P-18 | 1,167 | 12.0 | 120 | J-27 | J-28 | 228 | 0.65 | 0.191 |
| P-19 | 1,813 | 8.0 | 120 | J-28 | J-29 | 197 | 1.26 | 1.042 |
| P-20 | 781 | 8.0 | 120 | J-29 | J-30 | 135 | 0.86 | 0.516 |
| P-21 | 997 | 12.0 | 120 | J-30 | J-5 | 730 | 2.07 | 1.643 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 5

3-ER-514

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Peak Hour - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|-------|------|------|------|------|------|------|------|------|
| P-22 | 1,324 | 12.0 | 120 | J-7 | J-28 | 303 | 0.86 | 0.321 |
| P-23 | 2,040 | 12.0 | 120 | J-28 | J-31 | 175 | 0.50 | 0.117 |
| P-24 | 935 | 12.0 | 120 | J-31 | J-32 | 685 | 1.94 | 1.460 |
| P-25 | 1,071 | 12.0 | 120 | J-32 | J-33 | 772 | 2.19 | 1.821 |
| P-26 | 757 | 12.0 | 120 | J-33 | J-34 | 1,094 | 3.10 | 3.474 |
| P-27 | 888 | 12.0 | 120 | J-34 | J-3 | 1,541 | 4.37 | 6.545 |
| P-28 | 1,587 | 8.0 | 120 | J-29 | J-35 | 62 | 0.40 | 0.123 |
| P-29 | 1,506 | 8.0 | 120 | J-30 | J-36 | 210 | 1.34 | 1.177 |
| P-30 | 1,149 | 8.0 | 120 | J-36 | J-33 | 124 | 0.79 | 0.444 |
| P-31 | 1,110 | 8.0 | 120 | J-27 | J-37 | 64 | 0.41 | 0.129 |
| P-32 | 1,560 | 8.0 | 120 | J-37 | J-38 | 64 | 0.41 | 0.129 |
| P-33 | 895 | 8.0 | 120 | J-38 | J-31 | 64 | 0.41 | 0.129 |
| P-34 | 783 | 8.0 | 120 | J-11 | J-39 | 162 | 1.03 | 0.727 |
| P-35 | 1,356 | 8.0 | 120 | J-39 | J-40 | 419 | 2.68 | 4.233 |
| P-36 | 792 | 8.0 | 120 | J-40 | J-2 | 419 | 2.68 | 4.233 |
| P-37 | 807 | 12.0 | 120 | J-6 | J-41 | 612 | 1.73 | 1.183 |
| P-38 | 1,833 | 12.0 | 120 | J-41 | J-7 | 549 | 1.56 | 0.970 |
| P-39 | 949 | 8.0 | 120 | J-35 | J-41 | 62 | 0.40 | 0.123 |
| P-40 | 2,155 | 16.0 | 120 | J-4 | J-42 | 1,676 | 2.67 | 1.884 |
| P-41 | 1,477 | 16.0 | 120 | J-42 | J-5 | 1,342 | 2.14 | 1.248 |
| P-42 | 614 | 8.0 | 120 | J-36 | J-42 | 334 | 2.13 | 2.781 |
| P-43 | 1,556 | 12.0 | 120 | J-32 | J-30 | 360 | 1.02 | 0.442 |
| P-44 | 689 | 12.0 | 120 | J-12 | J-43 | 82 | 0.23 | 0.029 |
| P-45 | 1,946 | 12.0 | 120 | J-43 | J-44 | 491 | 1.39 | 0.787 |
| P-46 | 2,073 | 8.0 | 120 | J-44 | J-45 | 162 | 1.03 | 0.729 |
| P-47 | 969 | 8.0 | 120 | J-45 | J-2 | 429 | 2.74 | 4.411 |
| P-48 | 1,168 | 8.0 | 120 | J-3 | J-46 | 423 | 2.70 | 4.310 |
| P-49 | 911 | 8.0 | 120 | J-46 | J-17 | 158 | 1.01 | 0.693 |
| P-50 | 742 | 8.0 | 120 | J-45 | J-47 | 267 | 1.70 | 1.830 |
| P-51 | 921 | 8.0 | 120 | J-47 | J-43 | 267 | 1.70 | 1.830 |
| P-52 | 2,082 | 8.0 | 120 | J-43 | J-48 | 94 | 0.60 | 0.267 |
| P-53 | 1,325 | 8.0 | 120 | J-48 | J-49 | 39 | 0.25 | 0.051 |
| P-54 | 1,465 | 12.0 | 120 | J-49 | J-44 | 664 | 1.88 | 1.378 |
| P-55 | 1,495 | 12.0 | 120 | J-49 | J-14 | 137 | 0.39 | 0.073 |
| P-56 | 743 | 8.0 | 120 | J-49 | J-50 | 92 | 0.59 | 0.255 |
| P-57 | 1,129 | 8.0 | 120 | J-50 | J-15 | 92 | 0.59 | 0.255 |
| P-58 | 931 | 16.0 | 120 | J-51 | J-14 | 373 | 0.60 | 0.117 |
| P-59 | 1,264 | 8.0 | 120 | J-48 | J-51 | 61 | 0.39 | 0.119 |
| P-60 | 2,202 | 16.0 | 120 | J-12 | J-52 | 627 | 1.00 | 0.305 |
| P-61 | 885 | 16.0 | 120 | J-52 | J-94 | 525 | 0.84 | 0.219 |
| P-62 | 840 | 8.0 | 120 | J-48 | J-52 | 72 | 0.46 | 0.161 |
| P-63 | 906 | 8.0 | 120 | J-9 | J-53 | 249 | 1.59 | 1.619 |
| P-64 | 910 | 12.0 | 120 | J-54 | J-8 | 467 | 1.33 | 0.718 |
| P-65 | 721 | 8.0 | 120 | J-53 | J-54 | 197 | 1.26 | 1.044 |
| P-66 | 983 | 8.0 | 120 | J-24 | J-55 | 250 | 1.60 | 1.629 |
| P-67 | 1,333 | 8.0 | 120 | J-55 | J-56 | 161 | 1.03 | 0.723 |
| P-68 | 1,116 | 8.0 | 120 | J-56 | J-57 | 149 | 0.95 | 0.622 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 5

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Peak Hour - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-69 | 729 | 8.0 | 120 | J-57 | J-58 | 96 | 0.62 | 0.279 |
| P-70 | 857 | 12.0 | 120 | J-26 | J-59 | 174 | 0.49 | 0.115 |
| P-71 | 1,622 | 12.0 | 120 | J-59 | J-54 | 270 | 0.77 | 0.261 |
| P-72 | 936 | 8.0 | 120 | J-58 | J-59 | 96 | 0.62 | 0.279 |
| P-73 | 1,459 | 8.0 | 120 | J-55 | J-60 | 104 | 0.66 | 0.321 |
| P-74 | 1,114 | 8.0 | 120 | J-60 | J-61 | 104 | 0.66 | 0.321 |
| P-75 | 1,054 | 12.0 | 120 | J-61 | J-26 | 520 | 1.48 | 0.876 |
| P-76 | 1,140 | 12.0 | 120 | J-61 | J-56 | 178 | 0.50 | 0.120 |
| P-77 | 855 | 12.0 | 120 | J-62 | J-63 | 532 | 1.51 | 0.914 |
| P-78 | 905 | 12.0 | 120 | J-63 | J-10 | 853 | 2.42 | 2.192 |
| P-79 | 831 | 8.0 | 120 | J-63 | J-64 | 52 | 0.33 | 0.090 |
| P-80 | 1,177 | 8.0 | 120 | J-64 | J-57 | 52 | 0.33 | 0.090 |
| P-81 | 1,245 | 8.0 | 120 | J-65 | J-55 | 15 | 0.10 | 0.009 |
| P-82 | 2,151 | 16.0 | 120 | J-22 | J-66 | 1,559 | 2.49 | 1.648 |
| P-83 | 1,176 | 16.0 | 120 | J-66 | J-24 | 769 | 1.23 | 0.445 |
| P-84 | 1,113 | 12.0 | 120 | J-65 | J-66 | 790 | 2.24 | 1.900 |
| P-85 | 1,034 | 8.0 | 120 | J-65 | J-67 | 112 | 0.72 | 0.369 |
| P-86 | 1,662 | 8.0 | 120 | J-67 | J-68 | 112 | 0.72 | 0.369 |
| P-87 | 1,161 | 12.0 | 120 | J-68 | J-23 | 1,219 | 3.46 | 4.242 |
| P-88 | 1,359 | 8.0 | 120 | J-68 | J-69 | 110 | 0.70 | 0.355 |
| P-89 | 1,832 | 8.0 | 120 | J-69 | J-63 | 177 | 1.13 | 0.861 |
| P-90 | 1,005 | 12.0 | 120 | J-68 | J-70 | 770 | 2.19 | 1.814 |
| P-91 | 573 | 12.0 | 120 | J-70 | J-62 | 153 | 0.44 | 0.091 |
| P-92 | 1,409 | 12.0 | 120 | J-65 | J-71 | 441 | 1.25 | 0.644 |
| P-93 | 1,201 | 12.0 | 120 | J-56 | J-72 | 42 | 0.12 | 0.008 |
| P-94 | 503 | 12.0 | 120 | J-72 | J-62 | 239 | 0.68 | 0.208 |
| P-95 | 736 | 12.0 | 120 | J-71 | J-72 | 165 | 0.47 | 0.105 |
| P-96 | 718 | 12.0 | 120 | J-70 | J-71 | 171 | 0.48 | 0.111 |
| P-97 | 1,047 | 8.0 | 120 | J-19 | J-73 | 203 | 1.30 | 1.108 |
| P-98 | 1,393 | 12.0 | 120 | J-83 | J-74 | 356 | 1.01 | 0.435 |
| P-99 | 903 | 12.0 | 120 | J-74 | J-75 | 32 | 0.09 | 0.005 |
| P-100 | 1,063 | 12.0 | 120 | J-21 | J-76 | 888 | 2.52 | 2.360 |
| P-101 | 1,185 | 12.0 | 120 | J-76 | J-77 | 490 | 1.39 | 0.784 |
| P-102 | 939 | 12.0 | 120 | J-77 | J-74 | 91 | 0.26 | 0.035 |
| P-103 | 1,124 | 12.0 | 120 | J-74 | J-78 | 348 | 0.99 | 0.415 |
| P-104 | 1,019 | 8.0 | 120 | J-78 | J-79 | 168 | 1.07 | 0.775 |
| P-105 | 1,354 | 16.0 | 120 | J-1 | J-80 | 1,489 | 2.38 | 1.513 |
| P-106 | 894 | 16.0 | 120 | J-80 | J-12 | 1,221 | 1.95 | 1.048 |
| P-107 | 1,486 | 8.0 | 120 | J-76 | J-81 | 140 | 0.90 | 0.559 |
| P-108 | 1,004 | 12.0 | 120 | J-75 | J-82 | 549 | 1.56 | 0.969 |
| P-109 | 1,106 | 12.0 | 120 | J-82 | J-23 | 912 | 2.59 | 2.478 |
| P-110 | 1,868 | 8.0 | 120 | J-81 | J-82 | 118 | 0.75 | 0.406 |
| P-111 | 1,711 | 12.0 | 120 | J-78 | J-12 | 677 | 1.92 | 1.427 |
| P-112 | 675 | 8.0 | 120 | J-73 | J-83 | 161 | 1.03 | 0.719 |
| P-113 | 1,008 | 8.0 | 120 | J-83 | J-84 | 90 | 0.57 | 0.243 |
| P-114 | 1,673 | 8.0 | 120 | J-84 | J-52 | 174 | 1.11 | 0.828 |
| P-115 | 1,776 | 8.0 | 120 | J-78 | J-84 | 84 | 0.54 | 0.216 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 5

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Peak Hour - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-116 | 1,656 | 8.0 | 120 | J-73 | J-85 | 42 | 0.27 | 0.061 |
| P-117 | 1,568 | 8.0 | 120 | J-85 | J-76 | 42 | 0.27 | 0.061 |
| P-118 | 1,542 | 8.0 | 120 | J-82 | J-86 | 100 | 0.64 | 0.299 |
| P-119 | 532 | 8.0 | 120 | J-79 | J-87 | 168 | 1.07 | 0.775 |
| P-120 | 1,177 | 8.0 | 120 | J-87 | J-80 | 268 | 1.71 | 1.847 |
| P-121 | 801 | 8.0 | 120 | J-86 | J-87 | 100 | 0.64 | 0.299 |
| P-122 | 931 | 12.0 | 120 | J-83 | J-18 | 687 | 1.95 | 1.466 |
| P-123 | 2,664 | 24.0 | 120 | J-88 | J-20 | 2,954 | 2.10 | 0.747 |
| P-124 | 2,422 | 24.0 | 120 | J-88 | J-89 | 4,829 | 3.42 | 1.856 |
| P-125 | 839 | 16.0 | 120 | J-90 | J-14 | 629 | 1.00 | 0.306 |
| P-126 | 1,077 | 16.0 | 120 | J-90 | J-15 | 629 | 1.00 | 0.306 |
| P-128 | 1,309 | 24.0 | 120 | J-21 | J-91 | 215 | 0.15 | 0.006 |
| P-129 | 1,332 | 24.0 | 120 | J-22 | J-91 | 473 | 0.34 | 0.025 |
| P-130 | 974 | 8.0 | 120 | J-81 | J-91 | 259 | 1.65 | 1.731 |
| P-133 | 1,322 | 24.0 | 120 | J-2 | J-92 | 7,387 | 5.24 | 4.077 |
| P-134 | 1,322 | 24.0 | 120 | J-92 | J-3 | 6,644 | 4.71 | 3.350 |
| P-135 | 1,774 | 24.0 | 120 | J-20 | J-93 | 1,079 | 0.77 | 0.116 |
| P-136 | 778 | 24.0 | 120 | J-93 | J-21 | 1,079 | 0.77 | 0.116 |
| P-137 | 786 | 16.0 | 120 | J-13 | J-94 | 167 | 0.27 | 0.026 |
| P-138 | 1,159 | 16.0 | 120 | J-94 | J-51 | 434 | 0.69 | 0.154 |
| P-139 | 2,314 | 12.0 | 120 | J-44 | J-16 | 273 | 0.78 | 0.266 |
| P-140 | 1,166 | 8.0 | 120 | J-11 | J-69 | 287 | 1.83 | 2.103 |
| P-141 | 890 | 16.0 | 120 | J-95 | J-16 | 1,027 | 1.64 | 0.761 |
| P-142 | 1,256 | 16.0 | 120 | J-15 | J-95 | 1,302 | 2.08 | 1.180 |
| P-143 | 2,336 | 12.0 | 120 | J-44 | J-92 | 1,301 | 3.69 | 4.783 |
| P-200 | 2,335 | 24.0 | 120 | J-201 | J-202 | 4,273 | 3.03 | 1.479 |
| P-201 | 2,336 | 16.0 | 120 | J-202 | J-203 | 1,703 | 2.72 | 1.942 |
| P-202 | 1,418 | 16.0 | 120 | J-203 | J-204 | 103 | 0.16 | 0.011 |
| P-204 | 2,317 | 12.0 | 120 | J-205 | J-25 | 224 | 0.64 | 0.184 |
| P-205 | 2,640 | 24.0 | 120 | J-201 | J-206 | 4,096 | 2.91 | 1.368 |
| P-206 | 2,639 | 24.0 | 120 | J-206 | J-207 | 2,050 | 1.45 | 0.380 |
| P-207 | 2,567 | 12.0 | 120 | J-208 | J-209 | 136 | 0.39 | 0.073 |
| P-208 | 2,713 | 12.0 | 120 | J-209 | J-200 | 449 | 1.27 | 0.668 |
| P-209 | 2,452 | 12.0 | 120 | J-210 | J-24 | 51 | 0.15 | 0.012 |
| P-210 | 2,672 | 24.0 | 120 | J-22 | J-200 | 1,087 | 0.77 | 0.117 |
| P-211 | 2,633 | 12.0 | 120 | J-209 | J-21 | 406 | 1.15 | 0.553 |
| P-212 | 2,662 | 16.0 | 120 | J-208 | J-20 | 1,004 | 1.60 | 0.729 |
| P-213 | 2,706 | 12.0 | 120 | J-202 | J-210 | 614 | 1.74 | 1.189 |
| P-214 | 1,265 | 12.0 | 120 | J-203 | J-211 | 511 | 1.45 | 0.848 |
| P-215 | 1,876 | 12.0 | 120 | J-211 | J-205 | 440 | 1.25 | 0.642 |
| P-216 | 2,801 | 12.0 | 120 | J-200 | J-210 | 709 | 2.01 | 1.553 |
| P-217 | 2,687 | 24.0 | 120 | J-200 | J-201 | 3,196 | 2.27 | 0.864 |
| P-218 | 2,651 | 12.0 | 120 | J-206 | J-209 | 232 | 0.66 | 0.197 |
| P-219 | 2,641 | 16.0 | 120 | J-207 | J-208 | 362 | 0.58 | 0.110 |
| P-220 | 2,285 | 12.0 | 120 | J-203 | J-212 | 222 | 0.63 | 0.180 |
| P-221 | 2,358 | 12.0 | 120 | J-212 | J-213 | 599 | 1.70 | 1.137 |
| P-222 | 2,276 | 12.0 | 120 | J-213 | J-214 | 537 | 1.52 | 0.928 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 4 of 5

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Peak Hour - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-223 | 2,646 | 12.0 | 120 | J-214 | J-215 | 417 | 1.18 | 0.582 |
| P-224 | 2,674 | 12.0 | 120 | J-215 | J-216 | 337 | 0.96 | 0.392 |
| P-225 | 2,288 | 16.0 | 120 | J-216 | J-207 | 657 | 1.05 | 0.332 |
| P-226 | 2,254 | 12.0 | 120 | J-213 | J-202 | 439 | 1.25 | 0.641 |
| P-227 | 2,266 | 16.0 | 120 | J-201 | J-214 | 1,331 | 2.12 | 1.229 |
| P-228 | 2,289 | 12.0 | 120 | J-206 | J-215 | 297 | 0.84 | 0.311 |
| P-229 | 2,627 | 24.0 | 120 | J-222 | J-207 | 215 | 0.15 | 0.006 |
| P-230 | 2,665 | 12.0 | 120 | J-219 | J-220 | 247 | 0.70 | 0.221 |
| P-231 | 2,652 | 12.0 | 120 | J-220 | J-216 | 428 | 1.21 | 0.610 |
| P-232 | 2,707 | 12.0 | 120 | J-221 | J-222 | 266 | 0.75 | 0.253 |
| P-233 | 2,657 | 24.0 | 120 | J-218 | J-222 | 870 | 0.62 | 0.078 |
| P-234 | 2,252 | 12.0 | 120 | J-220 | J-222 | 573 | 1.63 | 1.049 |
| P-235 | 2,583 | 12.0 | 120 | J-221 | J-88 | 664 | 1.88 | 1.375 |
| P-236 | 2,638 | 24.0 | 120 | J-89 | J-217 | 4,969 | 3.52 | 1.956 |
| P-237 | 2,620 | 12.0 | 120 | J-208 | J-221 | 197 | 0.56 | 0.144 |
| P-238 | 2,942 | 12.0 | 120 | J-221 | J-217 | 553 | 1.57 | 0.981 |
| P-239 | 2,825 | 24.0 | 120 | J-217 | J-223 | 3,662 | 2.60 | 1.112 |
| P-240 | 1,107 | 12.0 | 120 | J-219 | J-224 | 507 | 1.44 | 0.834 |
| P-241 | 903 | 24.0 | 120 | J-223 | J-218 | 1,624 | 1.15 | 0.247 |
| P-242 | 2,212 | 16.0 | 120 | J-223 | J-224 | 1,260 | 2.01 | 1.111 |
| P-243 | 1,160 | 16.0 | 120 | J-225 | J-94 | 697 | 1.11 | 0.371 |
| P-244 | 3,411 | 12.0 | 120 | J-88 | J-227 | 599 | 1.70 | 1.138 |
| P-245 | 2,726 | 12.0 | 120 | J-227 | J-225 | 135 | 0.38 | 0.072 |
| P-246 | 855 | 12.0 | 120 | J-225 | J-226 | 220 | 0.62 | 0.178 |
| P-247 | 1,678 | 12.0 | 120 | J-226 | J-14 | 392 | 1.11 | 0.519 |
| P-248 | 1,900 | 12.0 | 120 | J-18 | J-227 | 148 | 0.42 | 0.086 |
| P-249 | 2,011 | 16.0 | 120 | J-4 | J-228 | 1,334 | 2.13 | 1.235 |
| P-250 | 1,945 | 12.0 | 120 | J-16 | J-229 | 67 | 0.19 | 0.020 |
| P-251 | 1,597 | 16.0 | 120 | J-228 | J-230 | 485 | 0.77 | 0.189 |
| P-253 | 1,930 | 12.0 | 120 | J-229 | J-231 | 396 | 1.12 | 0.529 |
| P-254 | 558 | 12.0 | 120 | J-231 | J-228 | 525 | 1.49 | 0.893 |
| P-255 | 842 | 16.0 | 120 | J-230 | J-232 | 132 | 0.21 | 0.017 |
| P-256 | 552 | 8.0 | 120 | J-230 | J-233 | 28 | 0.18 | 0.029 |
| P-257 | 1,595 | 8.0 | 120 | J-233 | J-231 | 59 | 0.38 | 0.113 |
| P-258 | 330 | 12.0 | 120 | J-232 | J-233 | 31 | 0.09 | 0.005 |
| P-259 | 1,600 | 12.0 | 120 | J-ELS | J-205 | 104 | 0.30 | 0.045 |
| P-260 | 1,038 | 12.0 | 120 | J-204 | J-ELS | 103 | 0.29 | 0.043 |
| P-261 | 3,327 | 12.0 | 120 | J-210 | J-205 | 320 | 0.91 | 0.356 |
| P-262 | 2,378 | 12.0 | 120 | J-95 | J-229 | 275 | 0.78 | 0.268 |
| P-500 | 679 | 48.0 | 120 | R-1 | J-92 | 15,331 | 2.72 | 0.547 |
| P-501 | 600 | 48.0 | 120 | R-2 | FCV-2 | 10,410 | 1.85 | 0.269 |
| P-502 | 566 | 48.0 | 120 | FCV-2 | J-89 | 10,410 | 1.85 | 0.269 |
| P-503 | 604 | 48.0 | 120 | R-3 | FCV-3 | 14,413 | 2.56 | 0.488 |
| P-504 | 604 | 48.0 | 120 | FCV-3 | J-201 | 14,413 | 2.56 | 0.488 |
| P-505 | 861 | 48.0 | 120 | R-AZWC | AZWC-J-8 | 4,274 | 0.76 | 0.049 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 5 of 5

3-ER-518

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: FCV Table

Active Scenario: Peak Hour - Site

| Label | Elevation (ft) | Diameter (Valve) (in) | Flow Setting (Initial) (gpm) | Minor Loss Coefficient (Local) | Flow (gpm) | Hydraulic Grade (From) (ft) | Hydraulic Grade (To) (ft) | Headloss (ft) |
|---|---|---|---|---|---|---|---|---|
| FCV-2 | 1,561.51 | 48.0 | 10,410 | 0.0000000 | 10,410 | 1,710.00 | 1,704.55 | 5.45 |
| FCV-3 | 1,488.00 | 48.0 | 14,413 | 0.0000000 | 14,413 | 1,710.00 | 1,700.45 | 9.55 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 1

3-ER-519

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Reservoir Table

Active Scenario: Peak Hour - Site

| Label | Elevation (ft) | Flow (Out net) (gpm) | Hydraulic Grade (ft) |
|-------|----------------|----------------------|----------------------|
| R-1 | 1,710.00 | 15,331 | 1,710.00 |
| R-2 | 1,710.00 | 10,410 | 1,710.00 |
| R-3 | 1,710.00 | 14,413 | 1,710.00 |
| R-AZWC | 1,720.00 | 4,274 | 1,720.00 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 1



**SITE**
**MAXIMUM DAY + FIRE FLOW RESULTS (RESIDUAL)**
**MAXIMUM DAY + FIRE FLOW RESULTS (AVAILABLE)**

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Residual - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated) Residual @ Total Flow Needed (psi) | Pressure (Calculated) Zone Lower Limit @ Total Flow Needed (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated) Residual (psi) | Pressure (Calculated) System Lower Limit (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AZWC-J-1 | 177 | 4,000 | 4,177 | 4,000 | 4,177 | 39.9 | 47.9 | AZWC-J-4 | 39.9 | 47.9 | AZWC-P-12 | 7.23 | True |
| AZWC-J-2 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 48.3 | 49.5 | AZWC-J-1 | 48.3 | 49.5 | AZWC-P-12 | 6.63 | True |
| AZWC-J-3 | 177 | 4,000 | 4,177 | 4,000 | 4,177 | 58.2 | 58.0 | AZWC-J-2 | 58.2 | 58.0 | AZWC-P-9 | 5.67 | True |
| AZWC-J-4 | 351 | 4,000 | 4,351 | 4,000 | 4,351 | 45.5 | 41.7 | AZWC-J-1 | 45.5 | 41.7 | AZWC-P-12 | 7.28 | True |
| AZWC-J-5 | 14 | 4,000 | 4,014 | 4,000 | 4,014 | 40.0 | 41.4 | AZWC-J-1 | 40.0 | 41.4 | AZWC-P-12 | 7.28 | True |
| AZWC-J-6 | 14 | 4,000 | 4,014 | 4,000 | 4,014 | 50.3 | 52.3 | AZWC-J-2 | 50.3 | 52.3 | AZWC-P-12 | 7.06 | True |
| AZWC-J-7 | 14 | 4,000 | 4,014 | 4,000 | 4,014 | 48.7 | 42.4 | AZWC-J-1 | 48.7 | 42.4 | AZWC-P-12 | 7.31 | True |
| AZWC-J-8 | 177 | 4,000 | 4,177 | 4,000 | 4,177 | 77.8 | 62.2 | J-223 | 77.8 | 62.2 | AZWC-P-12 | 2.71 | True |
| AZWC-J-9 | 130 | 4,000 | 4,130 | 4,000 | 4,130 | 35.7 | 42.7 | AZWC-J-1 | 35.7 | 42.7 | AZWC-P-12 | 7.31 | True |
| AZWC-J-10 | 173 | 4,000 | 4,173 | 4,000 | 4,173 | 44.9 | 42.5 | AZWC-J-1 | 44.9 | 42.5 | AZWC-P-12 | 7.31 | True |
| AZWC-J-11 | 351 | 4,000 | 4,351 | 4,000 | 4,351 | 54.6 | 42.5 | AZWC-J-1 | 54.6 | 42.5 | AZWC-P-12 | 7.31 | True |
| AZWC-J-12 | 177 | 4,000 | 4,177 | 4,000 | 4,177 | 70.6 | 54.3 | AZWC-J-1 | 70.6 | 54.3 | AZWC-P-12 | 7.64 | True |
| AZWC-J-13 | 91 | 4,000 | 4,091 | 4,000 | 4,091 | 54.6 | 42.7 | AZWC-J-1 | 54.6 | 42.7 | AZWC-P-12 | 7.32 | True |
| AZWC-J-14 | 91 | 4,000 | 4,091 | 4,000 | 4,091 | 51.2 | 42.8 | AZWC-J-1 | 51.2 | 42.8 | AZWC-P-12 | 7.32 | True |
| AZWC-J-15 | 351 | 4,000 | 4,351 | 4,000 | 4,351 | 64.8 | 43.7 | AZWC-J-1 | 64.8 | 43.7 | AZWC-P-12 | 7.35 | True |
| AZWC-J-16 | 177 | 4,000 | 4,177 | 4,000 | 4,177 | 67.6 | 45.2 | AZWC-J-1 | 67.6 | 45.2 | AZWC-P-12 | 7.39 | True |
| AZWC-J-17 | 91 | 4,000 | 4,091 | 4,000 | 4,091 | 59.9 | 43.1 | AZWC-J-1 | 59.9 | 43.1 | AZWC-P-12 | 7.33 | True |
| AZWC-J-18 | 91 | 4,000 | 4,091 | 4,000 | 4,091 | 53.4 | 42.9 | AZWC-J-1 | 53.4 | 42.9 | AZWC-P-12 | 7.32 | True |
| J-1 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 80.7 | 62.0 | J-223 | 80.7 | 62.0 | P-133 | 3.60 | True |
| J-2 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 78.7 | 62.0 | J-223 | 78.7 | 62.0 | P-133 | 4.20 | True |
| J-3 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 74.1 | 62.1 | J-223 | 74.1 | 62.1 | P-134 | 4.68 | True |
| J-4 | 56 | 4,000 | 4,056 | 4,000 | 4,056 | 72.5 | 62.1 | J-223 | 72.5 | 62.1 | P-134 | 4.32 | True |
| J-5 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 77.1 | 62.1 | J-223 | 77.1 | 62.1 | P-27 | 4.57 | True |
| J-6 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 80.1 | 62.1 | J-223 | 80.1 | 62.1 | P-27 | 4.61 | True |
| J-7 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 84.1 | 62.0 | J-223 | 84.1 | 62.0 | P-27 | 4.31 | True |
| J-8 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 89.3 | 62.0 | J-223 | 89.3 | 62.0 | P-27 | 3.80 | True |
| J-9 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 87.4 | 62.0 | J-223 | 87.4 | 62.0 | P-27 | 3.76 | True |
| J-10 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 85.2 | 62.0 | J-223 | 85.2 | 62.0 | P-7 | 3.84 | True |
| J-11 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 83.0 | 62.0 | J-223 | 83.0 | 62.0 | P-7 | 4.52 | True |
| J-12 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 74.3 | 62.0 | J-223 | 74.3 | 62.0 | P-105 | 3.35 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 5

3-ER-522

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Residual - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-13 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 67.1 | 62.0 | J-223 | 67.1 | 62.0 | P-137 | 3.58 | True |
| J-14 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 63.1 | 62.0 | J-223 | 63.1 | 62.0 | P-134 | 3.31 | True |
| J-15 | 354 | 4,000 | 4,354 | 4,000 | 4,354 | 60.7 | 62.0 | J-223 | 60.7 | 62.0 | P-142 | 3.68 | True |
| J-16 | 28 | 4,000 | 4,028 | 4,000 | 4,028 | 65.5 | 62.0 | J-223 | 65.5 | 62.0 | P-134 | 3.71 | True |
| J-17 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 69.3 | 62.1 | J-223 | 69.3 | 62.1 | P-9 | 3.99 | True |
| J-18 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 70.4 | 61.9 | J-223 | 70.4 | 61.9 | P-133 | 3.08 | True |
| J-19 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 72.1 | 61.9 | J-223 | 72.1 | 61.9 | P-12 | 3.36 | True |
| J-20 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 77.5 | 61.8 | J-223 | 77.5 | 61.8 | P-133 | 2.96 | True |
| J-21 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 84.5 | 61.8 | J-223 | 84.5 | 61.8 | P-133 | 3.05 | True |
| J-22 | 28 | 4,000 | 4,028 | 4,000 | 4,028 | 88.6 | 61.9 | J-223 | 88.6 | 61.9 | P-133 | 3.14 | True |
| J-23 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 85.0 | 62.0 | J-223 | 85.0 | 62.0 | P-133 | 3.35 | True |
| J-24 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 94.4 | 62.0 | J-223 | 94.4 | 62.0 | P-82 | 3.52 | True |
| J-25 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 96.6 | 62.0 | J-223 | 96.6 | 62.0 | P-87 | 3.33 | True |
| J-26 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 93.3 | 62.0 | J-223 | 93.3 | 62.0 | P-16 | 4.50 | True |
| J-27 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 89.5 | 62.1 | J-223 | 89.5 | 62.1 | P-27 | 3.09 | True |
| J-28 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 88.7 | 62.1 | J-223 | 88.7 | 62.1 | P-27 | 3.16 | True |
| J-29 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 81.4 | 62.1 | J-223 | 81.4 | 62.1 | P-20 | 4.42 | True |
| J-30 | 273 | 4,000 | 4,273 | 4,000 | 4,273 | 75.3 | 62.1 | J-223 | 75.3 | 62.1 | P-21 | 5.46 | True |
| J-31 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 83.0 | 62.1 | J-223 | 83.0 | 62.1 | P-27 | 3.35 | True |
| J-32 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 81.7 | 62.1 | J-223 | 81.7 | 62.1 | P-27 | 3.51 | True |
| J-33 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 79.0 | 62.1 | J-223 | 79.0 | 62.1 | P-27 | 3.93 | True |
| J-34 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 77.1 | 62.1 | J-223 | 77.1 | 62.1 | P-27 | 4.51 | True |
| J-35 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 79.9 | 62.1 | J-223 | 79.9 | 62.1 | P-39 | 5.62 | True |
| J-36 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 76.6 | 62.1 | J-223 | 76.6 | 62.1 | P-42 | 4.48 | True |
| J-37 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 78.9 | 62.1 | J-223 | 78.9 | 62.1 | P-31 | 5.76 | True |
| J-38 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 74.9 | 62.1 | J-223 | 74.9 | 62.1 | P-33 | 6.10 | True |
| J-39 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 75.3 | 62.1 | J-223 | 75.3 | 62.1 | P-34 | 7.22 | True |
| J-40 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 73.3 | 62.1 | J-223 | 73.3 | 62.1 | P-36 | 6.91 | True |
| J-41 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 80.0 | 62.0 | J-223 | 80.0 | 62.0 | P-37 | 5.64 | True |
| J-42 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 74.8 | 62.1 | J-223 | 74.8 | 62.1 | P-40 | 4.67 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 5

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Residual - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-43 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 75.8 | 62.1 | J-223 | 75.8 | 62.1 | P-134 | 2.79 | True |
| J-44 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 71.4 | 62.1 | J-223 | 71.4 | 62.1 | P-134 | 2.83 | True |
| J-45 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 74.6 | 62.1 | J-223 | 74.6 | 62.1 | P-47 | 4.45 | True |
| J-46 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 65.5 | 62.1 | J-223 | 65.5 | 62.1 | P-49 | 6.14 | True |
| J-47 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 73.4 | 62.1 | J-223 | 73.4 | 62.1 | P-50 | 4.81 | True |
| J-48 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 67.8 | 62.1 | J-223 | 67.8 | 62.1 | P-62 | 2.99 | True |
| J-49 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 68.2 | 62.1 | J-223 | 68.2 | 62.1 | P-134 | 2.84 | True |
| J-50 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 61.6 | 62.1 | J-223 | 61.6 | 62.1 | P-56 | 5.24 | True |
| J-51 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 62.9 | 62.0 | J-223 | 62.9 | 62.1 | P-134 | 3.26 | True |
| J-52 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 67.6 | 62.0 | J-223 | 67.6 | 62.1 | P-134 | 3.18 | True |
| J-53 | 273 | 4,000 | 4,000 | 4,000 | 4,000 | 88.9 | 62.1 | J-223 | 88.9 | 62.1 | P-65 | 5.93 | True |
| J-54 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 89.0 | 62.0 | J-223 | 89.0 | 62.1 | P-64 | 5.85 | True |
| J-55 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 93.9 | 62.1 | J-223 | 93.9 | 62.1 | P-66 | 3.46 | True |
| J-56 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 94.2 | 62.1 | J-223 | 94.2 | 62.1 | P-87 | 2.95 | True |
| J-57 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 90.5 | 62.1 | J-223 | 90.5 | 62.1 | P-68 | 3.66 | True |
| J-58 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 91.0 | 62.1 | J-223 | 91.0 | 62.1 | P-72 | 5.00 | True |
| J-59 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 90.3 | 62.0 | J-223 | 90.3 | 62.1 | P-70 | 5.63 | True |
| J-60 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 90.6 | 62.1 | J-223 | 90.6 | 62.1 | P-74 | 5.11 | True |
| J-61 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 97.0 | 62.1 | J-223 | 97.0 | 62.1 | P-87 | 2.87 | True |
| J-62 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 89.6 | 62.1 | J-223 | 89.6 | 62.1 | P-87 | 3.09 | True |
| J-63 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 89.0 | 62.1 | J-223 | 89.0 | 62.1 | P-87 | 3.09 | True |
| J-64 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 85.6 | 62.1 | J-223 | 85.6 | 62.1 | P-79 | 2.99 | True |
| J-65 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 92.7 | 62.1 | J-223 | 92.7 | 62.1 | P-84 | 5.54 | True |
| J-66 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 92.1 | 62.0 | J-223 | 92.1 | 62.0 | P-82 | 3.01 | True |
| J-67 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 83.8 | 62.1 | J-223 | 83.8 | 62.1 | P-85 | 3.91 | True |
| J-68 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 87.6 | 62.1 | J-223 | 87.6 | 62.1 | P-87 | 5.35 | True |
| J-69 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 82.3 | 62.1 | J-223 | 82.3 | 62.1 | P-140 | 3.61 | True |
| J-70 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 88.0 | 62.1 | J-223 | 88.0 | 62.1 | P-87 | 3.79 | True |
| J-71 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 89.8 | 62.1 | J-223 | 89.8 | 62.1 | P-87 | 3.16 | True |
| J-72 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 91.2 | 62.1 | J-223 | 91.2 | 62.1 | P-87 | 3.08 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 5

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Residual - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-73 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 73.7 | 62.1 | J-223 | 73.7 | 62.1 | P-112 | 4.08 | True |
| J-74 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 77.6 | 62.1 | J-223 | 77.6 | 62.1 | P-133 | 2.73 | True |
| J-75 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 79.3 | 62.1 | J-223 | 79.3 | 62.1 | P-109 | 2.92 | True |
| J-76 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 81.8 | 62.1 | J-223 | 81.8 | 62.1 | P-100 | 3.46 | True |
| J-77 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 78.7 | 62.1 | J-223 | 78.7 | 62.1 | P-100 | 2.92 | True |
| J-78 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 76.4 | 62.1 | J-223 | 76.4 | 62.1 | P-134 | 2.73 | True |
| J-79 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 73.6 | 62.1 | J-223 | 73.6 | 62.1 | P-119 | 5.03 | True |
| J-80 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 77.4 | 62.0 | J-223 | 77.4 | 62.0 | P-105 | 4.05 | True |
| J-81 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 81.9 | 62.1 | J-223 | 81.9 | 62.1 | P-130 | 4.23 | True |
| J-82 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 82.4 | 62.1 | J-223 | 82.4 | 62.1 | P-109 | 3.39 | True |
| J-83 | 354 | 4,000 | 4,354 | 4,000 | 4,354 | 70.0 | 61.9 | J-223 | 70.0 | 61.9 | P-122 | 5.56 | True |
| J-84 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 69.5 | 62.1 | J-223 | 69.5 | 62.1 | P-113 | 3.73 | True |
| J-85 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 70.1 | 62.1 | J-223 | 70.1 | 62.1 | P-117 | 4.97 | True |
| J-86 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 75.7 | 62.1 | J-223 | 75.7 | 62.1 | P-121 | 5.23 | True |
| J-87 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 76.2 | 62.1 | J-223 | 76.2 | 62.1 | P-120 | 3.98 | True |
| J-88 | 378 | 4,000 | 4,378 | 4,000 | 4,378 | 70.2 | 61.8 | J-223 | 70.2 | 61.8 | P-124 | 3.24 | True |
| J-89 | 378 | 4,000 | 4,378 | 4,000 | 4,378 | 64.2 | 62.2 | J-223 | 64.2 | 62.2 | AZWC-P-12 | 2.71 | True |
| J-90 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 61.5 | 61.7 | J-15 | 61.5 | 61.7 | P-125 | 3.55 | True |
| J-91 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 87.7 | 61.9 | J-223 | 87.7 | 61.9 | P-133 | 3.09 | True |
| J-92 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 78.2 | 62.2 | J-223 | 78.2 | 62.2 | P-120 | 2.71 | True |
| J-93 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 82.6 | 62.2 | J-223 | 82.6 | 62.2 | AZWC-P-12 | 3.02 | True |
| J-94 | 56 | 4,000 | 4,056 | 4,000 | 4,056 | 66.6 | 61.8 | J-223 | 66.6 | 61.8 | P-133 | 3.20 | True |
| J-95 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 62.5 | 62.0 | J-223 | 62.5 | 62.0 | P-134 | 3.61 | True |
| J-200 | 576 | 4,000 | 4,576 | 4,000 | 4,576 | 90.8 | 61.9 | J-223 | 90.8 | 61.9 | P-217 | 3.14 | True |
| J-201 | 917 | 4,000 | 4,917 | 4,000 | 4,917 | 95.9 | 62.1 | J-223 | 95.9 | 62.1 | AZWC-P-12 | 2.71 | True |
| J-202 | 917 | 4,000 | 4,917 | 4,000 | 4,917 | 101.0 | 62.1 | J-223 | 101.0 | 62.1 | P-125 | 4.02 | True |
| J-203 | 917 | 4,000 | 4,917 | 4,000 | 4,917 | 101.2 | 62.1 | J-223 | 101.2 | 62.1 | P-201 | 4.89 | True |
| J-204 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 100.6 | 62.1 | J-223 | 100.6 | 62.1 | P-201 | 4.70 | True |
| J-205 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 99.8 | 62.1 | J-223 | 99.8 | 62.1 | P-201 | 3.94 | True |
| J-206 | 917 | 4,000 | 4,917 | 4,000 | 4,917 | 90.3 | 61.4 | J-223 | 90.3 | 61.4 | P-205 | 3.48 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 4 of 5

3-ER-525

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Residual - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-207 | 931 | 4,000 | 4,931 | 4,000 | 4,931 | 80.6 | 60.9 | J-223 | 80.6 | 60.9 | P-205 | 3.15 | True |
| J-208 | 590 | 4,000 | 4,590 | 4,000 | 4,590 | 78.3 | 61.4 | J-223 | 78.3 | 61.4 | P-205 | 2.87 | True |
| J-209 | 576 | 4,000 | 4,576 | 4,000 | 4,576 | 83.0 | 61.7 | J-223 | 83.0 | 61.7 | P-208 | 3.33 | True |
| J-210 | 576 | 4,000 | 4,576 | 4,000 | 4,576 | 94.1 | 62.0 | J-223 | 94.1 | 62.0 | P-213 | 3.78 | True |
| J-211 | 576 | 4,000 | 4,576 | 4,000 | 4,576 | 90.9 | 62.0 | J-223 | 90.9 | 62.0 | P-214 | 7.19 | True |
| J-212 | 230 | 1,500 | 1,730 | 1,500 | 1,730 | 105.7 | 62.1 | J-223 | 105.7 | 62.1 | AZWC-P-12 | 2.71 | True |
| J-213 | 230 | 1,500 | 1,730 | 1,500 | 1,730 | 102.5 | 62.1 | J-223 | 102.5 | 62.1 | AZWC-P-12 | 2.71 | True |
| J-214 | 230 | 1,500 | 1,730 | 1,500 | 1,730 | 97.4 | 62.1 | J-223 | 97.4 | 62.1 | AZWC-P-12 | 2.71 | True |
| J-215 | 230 | 1,500 | 1,730 | 1,500 | 1,730 | 90.7 | 61.9 | J-223 | 90.7 | 61.9 | AZWC-P-12 | 2.71 | True |
| J-216 | 341 | 4,000 | 4,341 | 4,000 | 4,341 | 79.5 | 61.0 | J-223 | 79.5 | 61.0 | P-225 | 4.07 | True |
| J-217 | 462 | 4,000 | 4,462 | 4,000 | 4,462 | 62.8 | 61.0 | J-223 | 62.8 | 61.0 | P-236 | 3.56 | True |
| J-218 | 462 | 4,000 | 4,462 | 4,000 | 4,462 | 63.8 | 60.2 | J-223 | 63.8 | 60.2 | P-236 | 3.12 | True |
| J-219 | 462 | 4,000 | 4,462 | 4,000 | 4,462 | 52.1 | 56.1 | J-224 | 52.1 | 56.1 | P-240 | 7.51 | True |
| J-220 | 462 | 4,000 | 4,462 | 4,000 | 4,462 | 66.5 | 59.5 | J-224 | 66.5 | 59.5 | P-234 | 5.22 | True |
| J-221 | 462 | 4,000 | 4,462 | 4,000 | 4,462 | 69.2 | 61.2 | J-223 | 69.2 | 61.2 | P-235 | 3.50 | True |
| J-222 | 476 | 4,000 | 4,476 | 4,000 | 4,476 | 72.1 | 60.6 | J-223 | 72.1 | 60.6 | P-205 | 3.03 | True |
| J-223 | 476 | 4,000 | 4,476 | 4,000 | 4,476 | 60.1 | 61.1 | J-224 | 60.1 | 61.1 | P-236 | 3.17 | True |
| J-224 | 462 | 4,000 | 4,462 | 4,000 | 4,462 | 53.8 | 59.2 | J-223 | 53.8 | 59.2 | P-242 | 5.91 | True |
| J-225 | 378 | 1,500 | 1,878 | 1,500 | 1,878 | 66.1 | 62.1 | J-223 | 66.1 | 62.1 | P-134 | 2.80 | True |
| J-226 | 378 | 1,500 | 1,878 | 1,500 | 1,878 | 64.4 | 62.1 | J-223 | 64.4 | 62.1 | P-246 | 2.94 | True |
| J-227 | 378 | 1,500 | 1,878 | 1,500 | 1,878 | 67.2 | 62.1 | J-223 | 67.2 | 62.1 | P-134 | 2.76 | True |
| J-228 | 201 | 4,000 | 4,201 | 4,000 | 4,201 | 67.3 | 60.8 | J-232 | 67.3 | 60.8 | P-249 | 5.37 | True |
| J-229 | 121 | 4,000 | 4,121 | 4,000 | 4,121 | 59.8 | 62.0 | J-223 | 59.8 | 62.0 | P-250 | 4.24 | True |
| J-230 | 201 | 4,000 | 4,201 | 4,000 | 4,201 | 57.6 | 55.4 | J-232 | 57.6 | 55.4 | P-251 | 5.85 | True |
| J-231 | 121 | 1,500 | 1,621 | 1,500 | 1,621 | 70.3 | 62.1 | J-223 | 70.3 | 62.1 | P-134 | 3.12 | True |
| J-232 | 62 | 4,000 | 4,062 | 4,000 | 4,062 | 53.7 | 55.4 | J-233 | 53.7 | 55.4 | P-251 | 5.74 | True |
| J-233 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 66.0 | 62.1 | J-223 | 66.0 | 62.1 | P-134 | 3.15 | True |
| J-ELS | 1 | 4,000 | 4,001 | 4,000 | 4,001 | 96.1 | 62.0 | J-223 | 96.1 | 62.0 | P-260 | 5.97 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Padora
Page 5 of 5

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wig
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Available - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AZWC-J-1 | 177 | 4,000 | 4,177 | 6,061 | 6,238 | 39.9 | 47.9 | AZWC-J-4 | 20.0 | 29.6 | AZWC-P-12 | 9.54 | True |
| AZWC-J-2 | 0 | 4,000 | 4,000 | 7,475 | 7,475 | 48.3 | 49.5 | AZWC-J-1 | 21.6 | 29.8 | AZWC-P-12 | 10.00 | True |
| AZWC-J-3 | 177 | 4,000 | 4,177 | 7,936 | 8,113 | 58.2 | 58.0 | AZWC-J-2 | 39.5 | 48.5 | AZWC-P-9 | 10.00 | True |
| AZWC-J-4 | 351 | 4,000 | 4,351 | 6,378 | 6,729 | 45.5 | 41.7 | AZWC-J-1 | 20.8 | 20.6 | AZWC-P-12 | 10.00 | True |
| AZWC-J-5 | 14 | 4,000 | 4,014 | 5,530 | 5,544 | 40.0 | 23.0 | AZWC-J-1 | 23.0 | 28.6 | AZWC-P-12 | 9.00 | True |
| AZWC-J-6 | 14 | 4,000 | 4,014 | 6,487 | 6,501 | 50.3 | 52.3 | AZWC-J-2 | 24.3 | 40.6 | AZWC-P-12 | 9.03 | True |
| AZWC-J-7 | 14 | 4,000 | 4,014 | 6,340 | 6,354 | 48.7 | 42.4 | AZWC-J-1 | 22.6 | 22.7 | AZWC-P-19 | 10.00 | True |
| AZWC-J-8 | 177 | 4,000 | 4,177 | 10,000 | 10,177 | 77.8 | 62.2 | AZWC-J-1 | 77.8 | 62.2 | AZWC-P-12 | 2.71 | True |
| AZWC-J-9 | 130 | 4,000 | 4,130 | 5,790 | 5,963 | 35.7 | 42.7 | AZWC-J-1 | 20.0 | 35.8 | AZWC-P-23 | 8.35 | True |
| AZWC-J-10 | 173 | 4,000 | 4,173 | 4,899 | 5,029 | 44.9 | 42.5 | AZWC-J-1 | 20.0 | 22.9 | AZWC-P-12 | 9.37 | True |
| AZWC-J-11 | 351 | 4,000 | 4,351 | 6,340 | 6,690 | 54.6 | 42.5 | AZWC-J-1 | 31.8 | 22.8 | AZWC-P-12 | 10.00 | True |
| AZWC-J-12 | 177 | 4,000 | 4,177 | 5,919 | 6,096 | 70.6 | 54.3 | AZWC-J-1 | 63.2 | 47.5 | AZWC-P-12 | 10.00 | True |
| AZWC-J-13 | 91 | 4,000 | 4,091 | 6,329 | 6,420 | 54.6 | 42.7 | AZWC-J-1 | 24.6 | 22.3 | AZWC-P-12 | 9.63 | True |
| AZWC-J-14 | 91 | 4,000 | 4,091 | 6,009 | 6,100 | 51.2 | 42.8 | AZWC-J-1 | 20.0 | 20.4 | AZWC-P-12 | 10.00 | True |
| AZWC-J-15 | 351 | 4,000 | 4,351 | 6,286 | 6,637 | 64.8 | 43.7 | AZWC-J-1 | 43.7 | 25.9 | AZWC-P-12 | 10.00 | True |
| AZWC-J-16 | 177 | 4,000 | 4,177 | 6,236 | 6,413 | 67.6 | 45.2 | AZWC-J-1 | 49.6 | 28.9 | AZWC-P-12 | 10.00 | True |
| AZWC-J-17 | 91 | 4,000 | 4,091 | 6,315 | 6,406 | 59.9 | 43.1 | AZWC-J-1 | 27.2 | 24.2 | AZWC-P-12 | 10.00 | True |
| AZWC-J-18 | 91 | 4,000 | 4,091 | 5,879 | 5,970 | 53.4 | 42.9 | AZWC-J-1 | 27.3 | 27.3 | AZWC-P-1 | 9.76 | True |
| J-1 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 80.7 | 62.0 | J-223 | 78.4 | 61.7 | P-133 | 5.28 | True |
| J-2 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 78.7 | 62.0 | J-223 | 77.0 | 61.8 | P-133 | 6.35 | True |
| J-3 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 74.1 | 62.1 | J-223 | 71.4 | 62.0 | P-134 | 7.58 | True |
| J-4 | 56 | 4,000 | 4,056 | 10,000 | 10,056 | 72.5 | 62.1 | J-223 | 68.4 | 62.0 | P-134 | 6.98 | True |
| J-5 | 0 | 4,000 | 4,000 | 9,545 | 9,545 | 77.1 | 62.1 | J-223 | 53.9 | 61.3 | P-41 | 6.63 | True |
| J-6 | 0 | 4,000 | 4,000 | 9,506 | 9,506 | 80.1 | 62.1 | J-223 | 45.0 | 56.8 | P-37 | 8.97 | True |
| J-7 | 0 | 4,000 | 4,000 | 9,506 | 9,506 | 84.1 | 62.0 | J-223 | 52.0 | 45.0 | P-22 | 10.00 | True |
| J-8 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 89.3 | 62.0 | J-223 | 65.5 | 61.9 | P-5 | 10.00 | True |
| J-9 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 87.4 | 62.0 | J-223 | 68.6 | 61.8 | P-7 | 8.49 | True |
| J-10 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 85.2 | 62.0 | J-223 | 71.5 | 61.8 | P-7 | 8.29 | True |
| J-11 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 83.0 | 62.0 | J-223 | 71.6 | 61.8 | P-6 | 7.87 | True |
| J-12 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 74.3 | 62.0 | J-223 | 65.7 | 60.7 | P-106 | 6.84 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wig
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Pacora
Page 1 of 5

3-ER-527

**21-0708_1635 LD Water Model(AJWD_3CAMPUS).wig**
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Available - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-13 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 67.1 | 62.0 | J-223 | 54.1 | 56.8 | P-137 | 9.24 | True |
| J-14 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 63.1 | 62.0 | J-223 | 50.8 | 52.0 | P-58 | 6.11 | True |
| J-15 | 354 | 4,000 | 4,354 | 10,354 | 10,354 | 60.7 | 62.0 | J-223 | 45.2 | 51.2 | P-142 | 8.24 | True |
| J-16 | 28 | 4,000 | 4,028 | 10,028 | 10,028 | 65.5 | 62.0 | J-223 | 54.7 | 54.5 | P-8 | 6.91 | True |
| J-17 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 69.3 | 62.0 | J-223 | 58.6 | 58.8 | P-9 | 8.82 | True |
| J-18 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 70.4 | 61.9 | J-223 | 59.6 | 59.6 | P-11 | 6.18 | True |
| J-19 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 72.1 | 61.9 | J-223 | 60.7 | 60.8 | P-11 | 7.56 | True |
| J-20 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 77.5 | 61.9 | J-223 | 74.9 | 61.3 | P-124 | 4.04 | True |
| J-21 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 84.5 | 61.8 | J-223 | 81.5 | 61.4 | P-133 | 3.93 | True |
| J-22 | 28 | 4,000 | 4,028 | 10,028 | 10,028 | 88.6 | 61.9 | J-223 | 86.1 | 61.7 | P-133 | 4.22 | True |
| J-23 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 85.0 | 62.0 | J-223 | 82.1 | 61.7 | P-133 | 4.66 | True |
| J-24 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 94.4 | 62.0 | J-223 | 80.8 | 61.4 | P-83 | 7.60 | True |
| J-25 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 96.6 | 62.0 | J-223 | 74.8 | 61.3 | P-15 | 7.60 | True |
| J-26 | 0 | 4,000 | 4,000 | 9,698 | 9,698 | 93.3 | 62.0 | J-223 | 66.2 | 61.7 | P-16 | 10.00 | True |
| J-27 | 273 | 1,500 | 1,773 | 6,987 | 7,260 | 89.5 | 62.1 | J-223 | 64.1 | 61.7 | P-17 | 10.00 | True |
| J-28 | 273 | 1,500 | 1,773 | 10,000 | 10,273 | 88.7 | 62.1 | J-223 | 48.5 | 56.3 | P-22 | 9.83 | True |
| J-29 | 0 | 1,500 | 1,500 | 3,411 | 3,411 | 81.4 | 62.1 | J-223 | 65.2 | 62.1 | P-20 | 10.00 | True |
| J-30 | 273 | 4,000 | 4,273 | 7,800 | 8,073 | 75.3 | 62.1 | J-223 | 57.5 | 61.9 | P-21 | 10.00 | True |
| J-31 | 273 | 1,500 | 1,773 | 6,471 | 6,744 | 83.0 | 62.1 | J-223 | 58.2 | 61.2 | P-24 | 10.00 | True |
| J-32 | 273 | 1,500 | 1,773 | 8,790 | 9,063 | 81.7 | 62.1 | J-223 | 49.9 | 58.6 | P-25 | 10.00 | True |
| J-33 | 273 | 1,500 | 1,773 | 6,462 | 6,735 | 79.0 | 62.1 | J-223 | 60.7 | 62.0 | P-27 | 10.00 | True |
| J-34 | 273 | 1,500 | 1,773 | 4,977 | 5,249 | 79.9 | 62.1 | J-223 | 67.2 | 62.1 | P-27 | 10.00 | True |
| J-35 | 273 | 1,500 | 1,773 | 2,675 | 2,675 | 77.1 | 62.1 | J-223 | 60.7 | 62.1 | P-39 | 10.00 | True |
| J-36 | 273 | 1,500 | 1,773 | 3,545 | 3,545 | 76.6 | 62.1 | J-223 | 64.3 | 62.1 | P-42 | 10.00 | True |
| J-37 | 0 | 1,500 | 1,500 | 2,460 | 2,600 | 74.9 | 62.1 | J-223 | 64.2 | 62.1 | P-31 | 10.00 | True |
| J-38 | 0 | 1,500 | 1,500 | 2,460 | 2,460 | 78.9 | 62.1 | J-223 | 61.5 | 62.1 | P-33 | 10.00 | True |
| J-39 | 354 | 1,500 | 1,854 | 2,182 | 2,536 | 75.3 | 62.1 | J-223 | 61.3 | 62.1 | P-34 | 10.00 | True |
| J-40 | 0 | 1,500 | 1,500 | 2,289 | 2,289 | 73.3 | 62.1 | J-223 | 64.8 | 62.1 | P-36 | 10.00 | True |
| J-41 | 0 | 4,000 | 4,000 | 7,189 | 7,189 | 80.0 | 62.0 | J-223 | 60.2 | 62.0 | P-37 | 10.00 | True |
| J-42 | 0 | 4,000 | 4,000 | 9,906 | 9,906 | 74.8 | 62.1 | J-223 | 57.0 | 61.9 | P-40 | 10.00 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wig
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 5

3-ER-528

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Available - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated) Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-43 | 354 | 1,500 | 1,854 | 6,572 | 6,926 | 75.8 | 62.1 | J-223 | 64.0 | 61.9 | P-44 | 10.00 | True |
| J-44 | 354 | 1,500 | 1,854 | 10,000 | 10,354 | 71.4 | 62.1 | J-223 | 53.4 | 58.9 | P-143 | 8.06 | True |
| J-45 | 0 | 1,500 | 1,500 | 3,640 | 3,640 | 74.6 | 62.1 | J-223 | 58.4 | 62.0 | P-47 | 10.00 | True |
| J-46 | 354 | 1,500 | 1,854 | 2,625 | 2,979 | 65.5 | 62.1 | J-223 | 53.6 | 62.1 | P-49 | 10.00 | True |
| J-47 | 0 | 1,500 | 1,500 | 3,058 | 3,058 | 73.4 | 62.1 | J-223 | 57.6 | 62.0 | P-51 | 10.00 | True |
| J-48 | 0 | 1,500 | 1,500 | 4,999 | 4,999 | 67.8 | 62.1 | J-223 | 49.4 | 61.9 | P-62 | 10.00 | True |
| J-49 | 354 | 1,500 | 1,854 | 8,844 | 9,198 | 68.2 | 62.1 | J-223 | 43.4 | 48.5 | P-54 | 10.00 | True |
| J-50 | 0 | 1,500 | 1,500 | 2,852 | 2,852 | 61.6 | 62.1 | J-223 | 43.1 | 62.0 | P-56 | 10.00 | True |
| J-51 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 62.9 | 62.0 | J-223 | 49.1 | 54.3 | P-138 | 7.63 | True |
| J-52 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 67.6 | 62.0 | J-223 | 49.7 | 49.7 | P-61 | 7.51 | True |
| J-53 | 273 | 1,500 | 1,773 | 2,716 | 2,989 | 88.9 | 62.1 | J-223 | 77.4 | 57.4 | P-65 | 10.00 | True |
| J-54 | 0 | 1,500 | 1,500 | 6,935 | 6,935 | 96.6 | 62.1 | J-223 | 74.6 | 62.1 | P-64 | 10.00 | True |
| J-55 | 0 | 1,500 | 1,500 | 4,911 | 4,911 | 93.9 | 62.1 | J-223 | 73.4 | 61.9 | P-63 | 10.00 | True |
| J-56 | 273 | 1,500 | 1,773 | 8,395 | 8,667 | 94.2 | 62.1 | J-223 | 66.1 | 62.0 | P-93 | 10.00 | True |
| J-57 | 0 | 1,500 | 1,500 | 4,027 | 4,027 | 90.5 | 62.1 | J-223 | 66.7 | 61.8 | P-68 | 10.00 | True |
| J-58 | 0 | 1,500 | 1,500 | 3,015 | 3,015 | 91.0 | 62.1 | J-223 | 74.2 | 62.0 | P-72 | 10.00 | True |
| J-59 | 0 | 1,500 | 1,500 | 7,149 | 7,149 | 90.3 | 62.1 | J-223 | 74.3 | 61.9 | P-70 | 10.00 | True |
| J-60 | 0 | 1,500 | 1,500 | 2,912 | 2,912 | 90.6 | 62.1 | J-223 | 71.2 | 61.9 | P-74 | 10.00 | True |
| J-61 | 273 | 1,500 | 1,773 | 7,245 | 7,517 | 97.0 | 62.1 | J-223 | 71.4 | 62.0 | P-75 | 10.00 | True |
| J-62 | 273 | 1,500 | 1,773 | 9,754 | 10,027 | 89.6 | 62.1 | J-223 | 63.7 | 61.8 | P-77 | 10.00 | True |
| J-63 | 273 | 1,500 | 1,773 | 7,534 | 7,807 | 89.0 | 62.1 | J-223 | 71.8 | 61.9 | P-78 | 10.00 | True |
| J-64 | 0 | 1,500 | 1,500 | 2,702 | 2,702 | 85.6 | 62.1 | J-223 | 72.4 | 61.9 | P-79 | 10.00 | True |
| J-65 | 273 | 1,500 | 1,773 | 7,353 | 7,626 | 92.7 | 62.1 | J-223 | 74.8 | 61.8 | P-84 | 10.00 | True |
| J-66 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 92.1 | 62.0 | J-223 | 80.6 | 61.8 | P-82 | 8.02 | True |
| J-67 | 0 | 1,500 | 1,500 | 2,790 | 2,790 | 83.8 | 62.1 | J-223 | 67.2 | 61.4 | P-85 | 10.00 | True |
| J-68 | 273 | 1,500 | 1,773 | 6,987 | 7,259 | 87.6 | 62.1 | J-223 | 73.4 | 62.0 | P-87 | 10.00 | True |
| J-69 | 0 | 1,500 | 1,500 | 4,150 | 4,150 | 82.3 | 62.1 | J-223 | 60.0 | 61.8 | P-140 | 10.00 | True |
| J-70 | 273 | 1,500 | 1,773 | 9,365 | 9,638 | 88.0 | 62.1 | J-223 | 63.4 | 61.8 | P-90 | 10.00 | True |
| J-71 | 273 | 1,500 | 1,773 | 9,811 | 10,083 | 89.8 | 62.1 | J-223 | 61.0 | 61.7 | P-96 | 10.00 | True |
| J-72 | 273 | 1,500 | 1,773 | 8,756 | 9,028 | 91.2 | 62.1 | J-223 | 68.1 | 61.8 | P-94 | 10.00 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 5

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Available - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-73 | 0 | 1,500 | 1,500 | 3,562 | 3,562 | 73.7 | 62.1 | J-223 | 60.3 | 61.9 | P-112 | 10.00 | True |
| J-74 | 354 | 1,500 | 1,854 | 10,000 | 10,354 | 77.6 | 62.1 | J-223 | 55.8 | 61.6 | P-98 | 8.15 | True |
| J-75 | 354 | 1,500 | 1,854 | 6,344 | 6,698 | 79.3 | 62.1 | J-223 | 61.8 | 61.8 | P-99 | 10.00 | True |
| J-76 | 354 | 1,500 | 1,854 | 6,453 | 6,807 | 81.8 | 62.1 | J-223 | 68.6 | 61.7 | P-100 | 10.00 | True |
| J-77 | 354 | 1,500 | 1,854 | 6,224 | 6,578 | 78.7 | 62.1 | J-223 | 61.0 | 61.8 | P-102 | 10.00 | True |
| J-78 | 354 | 1,500 | 1,854 | 8,598 | 8,952 | 76.4 | 62.1 | J-223 | 53.0 | 61.7 | P-103 | 10.00 | True |
| J-79 | 0 | 1,500 | 1,500 | 3,035 | 3,035 | 73.6 | 62.1 | J-223 | 58.0 | 62.0 | P-119 | 10.00 | True |
| J-80 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 77.4 | 62.0 | J-223 | 68.6 | 61.7 | P-105 | 8.65 | True |
| J-81 | 0 | 1,500 | 1,500 | 3,781 | 3,781 | 81.9 | 62.0 | J-223 | 61.7 | 61.7 | P-130 | 10.00 | True |
| J-82 | 354 | 1,500 | 1,854 | 6,622 | 6,976 | 82.4 | 62.1 | J-223 | 65.0 | 61.9 | P-109 | 10.00 | True |
| J-83 | 354 | 4,000 | 4,354 | 7,744 | 8,098 | 70.0 | 62.1 | J-223 | 68.6 | 61.9 | P-122 | 10.00 | True |
| J-84 | 0 | 1,500 | 1,500 | 3,961 | 3,961 | 69.5 | 62.1 | J-223 | 49.4 | 61.9 | P-113 | 10.00 | True |
| J-85 | 0 | 1,500 | 1,500 | 3,006 | 3,006 | 70.1 | 62.1 | J-223 | 44.7 | 62.0 | P-117 | 10.00 | True |
| J-86 | 0 | 1,500 | 1,500 | 2,890 | 2,890 | 75.7 | 62.1 | J-223 | 57.7 | 62.0 | P-121 | 10.00 | True |
| J-87 | 0 | 1,500 | 1,500 | 3,915 | 3,915 | 76.2 | 62.1 | J-223 | 54.7 | 61.6 | P-120 | 10.00 | True |
| J-88 | 378 | 4,000 | 4,378 | 10,000 | 10,378 | 70.2 | 61.8 | J-223 | 67.5 | 60.9 | P-124 | 4.76 | True |
| J-89 | 378 | 4,000 | 4,378 | 10,000 | 10,378 | 64.2 | 62.2 | J-223 | 60.7 | 59.7 | P-205 | 3.42 | True |
| J-90 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 61.5 | 61.9 | J-15 | 46.1 | 50.5 | P-125 | 9.03 | True |
| J-91 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 87.7 | 61.9 | J-223 | 84.7 | 61.4 | P-133 | 4.07 | True |
| J-92 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 78.2 | 62.2 | J-223 | 78.2 | 62.2 | P-500 | 3.15 | True |
| J-93 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 82.6 | 61.8 | J-223 | 79.5 | 61.4 | P-133 | 3.86 | True |
| J-94 | 0 | 4,000 | 4,056 | 10,000 | 10,056 | 66.6 | 62.0 | J-223 | 57.1 | 61.4 | P-61 | 5.51 | True |
| J-95 | 56 | 4,000 | 4,000 | 10,000 | 10,000 | 62.5 | 62.0 | J-223 | 49.3 | 55.1 | P-141 | 8.20 | True |
| J-200 | 576 | 4,000 | 4,576 | 10,000 | 10,576 | 90.8 | 61.9 | J-223 | 87.5 | 52.3 | P-217 | 4.42 | True |
| J-201 | 917 | 4,000 | 4,917 | 10,000 | 10,917 | 95.9 | 62.1 | J-223 | 92.6 | 61.0 | P-133 | 3.78 | True |
| J-202 | 917 | 4,000 | 4,917 | 10,000 | 10,917 | 101.0 | 62.1 | J-223 | 94.0 | 60.4 | P-200 | 6.71 | True |
| J-203 | 917 | 4,000 | 4,917 | 10,000 | 10,917 | 101.2 | 62.1 | J-223 | 80.3 | 60.5 | P-201 | 9.79 | True |
| J-204 | 0 | 4,000 | 4,000 | 8,668 | 8,668 | 100.6 | 62.1 | J-223 | 76.7 | 60.7 | P-202 | 10.00 | True |
| J-205 | 0 | 1,500 | 1,500 | 10,000 | 10,000 | 105.2 | 62.1 | J-223 | 73.2 | 61.1 | P-204 | 8.77 | True |
| J-206 | 917 | 4,000 | 4,917 | 10,000 | 10,917 | 90.3 | 61.4 | J-223 | 86.0 | 58.9 | P-205 | 5.12 | True |

7/12/2021

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 4 of 5

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Available - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-207 | 931 | 4,000 | 4,931 | 10,000 | 10,931 | 80.6 | 60.9 | J-223 | 75.7 | 57.6 | P-205 | 4.51 | True |
| J-208 | 590 | 4,000 | 4,590 | 10,000 | 10,590 | 78.3 | 61.4 | J-223 | 69.4 | 59.7 | P-212 | 6.08 | True |
| J-209 | 576 | 4,000 | 4,576 | 10,000 | 10,576 | 83.0 | 61.7 | J-223 | 65.1 | 60.4 | P-211 | 7.57 | True |
| J-210 | 576 | 4,000 | 4,576 | 10,000 | 10,576 | 94.1 | 62.0 | J-223 | 72.8 | 61.0 | P-216 | 8.18 | True |
| J-211 | 576 | 4,000 | 4,576 | 5,790 | 6,366 | 90.9 | 62.0 | J-223 | 79.4 | 61.9 | P-214 | 10.00 | True |
| J-212 | 230 | 1,500 | 1,730 | 6,647 | 6,877 | 105.7 | 62.1 | J-223 | 70.5 | 61.5 | P-220 | 10.00 | True |
| J-213 | 230 | 1,500 | 1,730 | 8,830 | 9,060 | 102.5 | 62.1 | J-223 | 70.3 | 60.8 | P-226 | 9.53 | True |
| J-214 | 230 | 1,500 | 1,730 | 10,000 | 10,230 | 97.4 | 62.1 | J-223 | 76.6 | 60.1 | P-227 | 10.00 | True |
| J-215 | 230 | 1,500 | 1,730 | 9,431 | 9,661 | 90.7 | 61.9 | J-223 | 58.8 | 59.4 | P-228 | 10.00 | True |
| J-216 | 341 | 4,000 | 4,341 | 10,000 | 10,341 | 79.5 | 61.0 | J-223 | 60.3 | 56.8 | P-225 | 9.46 | True |
| J-217 | 462 | 4,000 | 4,462 | 10,000 | 10,462 | 62.8 | 61.0 | J-223 | 57.5 | 56.2 | P-236 | 5.61 | True |
| J-218 | 462 | 4,000 | 4,462 | 10,000 | 10,462 | 63.8 | 60.2 | J-223 | 57.0 | 54.1 | P-236 | 4.83 | True |
| J-219 | 462 | 4,000 | 4,462 | 5,481 | 5,942 | 52.1 | 56.1 | J-224 | 54.1 | 51.9 | P-240 | 10.00 | True |
| J-220 | 462 | 4,000 | 4,462 | 8,362 | 8,824 | 66.5 | 59.5 | J-224 | 51.9 | 49.4 | P-225 | 10.00 | True |
| J-221 | 462 | 4,000 | 4,462 | 10,000 | 10,462 | 69.2 | 61.2 | J-223 | 49.4 | 58.6 | P-235 | 7.91 | True |
| J-222 | 476 | 4,000 | 4,476 | 10,000 | 10,476 | 72.1 | 60.6 | J-223 | 50.7 | 55.9 | P-236 | 4.53 | True |
| J-223 | 476 | 4,000 | 4,476 | 10,000 | 10,476 | 60.6 | 61.1 | J-224 | 43.3 | 54.7 | P-236 | 4.94 | True |
| J-224 | 462 | 4,000 | 4,462 | 7,427 | 7,889 | 60.1 | 61.1 | J-224 | 66.1 | 46.5 | P-234 | 10.00 | True |
| J-225 | 378 | 1,500 | 1,878 | 9,625 | 10,003 | 53.8 | 59.2 | J-219 | 53.5 | 48.7 | P-243 | 10.00 | True |
| J-226 | 378 | 1,500 | 1,878 | 5,865 | 6,243 | 66.1 | 62.1 | J-223 | 38.5 | 60.1 | P-242 | 10.00 | True |
| J-227 | 378 | 1,500 | 1,878 | 8,787 | 9,165 | 64.4 | 62.1 | J-223 | 46.4 | 59.6 | P-250 | 10.00 | True |
| J-228 | 201 | 4,000 | 4,201 | 8,041 | 8,243 | 67.2 | 62.1 | J-232 | 48.2 | 59.6 | P-248 | 10.00 | True |
| J-229 | 121 | 4,000 | 4,121 | 9,663 | 9,785 | 67.3 | 60.8 | J-223 | 38.2 | 56.9 | P-249 | 10.00 | True |
| J-230 | 201 | 4,000 | 4,201 | 7,027 | 7,229 | 59.8 | 62.0 | J-223 | 32.6 | 35.6 | P-251 | 10.00 | True |
| J-231 | 121 | 1,500 | 1,621 | 6,508 | 6,629 | 57.6 | 62.1 | J-232 | 37.7 | 54.2 | P-254 | 10.00 | True |
| J-232 | 62 | 4,000 | 4,062 | 6,629 | 7,235 | 70.3 | 62.1 | J-223 | 51.8 | 32.1 | P-251 | 10.00 | True |
| J-233 | 0 | 1,500 | 1,500 | 7,173 | 7,235 | 53.7 | 55.4 | J-233 | 29.3 | 42.5 | P-258 | 10.00 | True |
| J-ELS | 1 | 1,500 | 1,501 | 5,823 | 6,723 | 105.6 | 62.1 | J-223 | 78.6 | 61.7 | P-260 | 10.00 | True |

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 5 of 5



# APPENDIX D
# DESIGNATION OF ASSURED WATER SUPPLY

**JANICE K. BREWER**

Governor



**HERBERT R. GUENTHER**

Director

## ARIZONA DEPARTMENT OF WATER RESOURCES

3550 North Central Avenue, Second Floor
PHOENIX, ARIZONA 85012-2105
(602) 771-8500

September 29, 2010

**Via Certified Mail**
7004 2510 0000 8660 1031

Water Utilities Community Facility District
George Hoffman
District Manager
PO Box 4768
Apache Junction, AZ 85278-4768

**Re: Designation of Assured Water Supply (DWR No. 86-002025.0001)**
**Water Utilities Community Facility District**

Dear Mr. Hoffman:

I am pleased to inform you that the Arizona Department of Water Resources has approved the Modification of the Water Utilities Community Facilities District's ("WUCFD") Designation of Assured Water Supply. We have enclosed the formal Decision and Order. The Decision and Order includes an itemization of the WUCFD's responsibilities in maintaining the Designation.

WUCFD's status as a designated water provider demonstrates that the WUCFD is taking a long-term perspective in managing water resources. The WUCFD's commitment to sound water management represents a major contribution to the State's water management goal of achieving safe-yield in the Phoenix Active Management Area.

If you have any questions regarding these documents, please contact Scott Miller at (602) 771-8604.

Sincerely,

Sandra Fabritz Whitney
Assistant Director

cc:     Via electronic mail:
        Frank Blanco, WUCFD
        Robin King, Arizona Department of Real Estate
        J. Scott Miller, Manager, Groundwater Permitting and Wells

1

2

3

# DEPARTMENT OF WATER RESOURCES

## BEFORE THE DIRECTOR

4     IN THE MATTER OF THE APPLICATION OF          )

5     APACHE JUNCTION WATER UTILITIES              )    AWS No. 2010-014
      COMMUNITY FACILITIES DISTRICT FOR A          )
      DESIGNATION AS HAVING AN ASSURED WATER       )    DECISION AND ORDER

6     SUPPLY                                        )
                                                    )    No. 86-002025.0001

7                                                   )

8

9

## I.     INTRODUCTION

10

11          On September 29, 2008 the Department of Water Resources ("Department") received

12    an application from Apache Junction Water Utilities Community Facilities District

13    ("WUCFD") requesting that the Department modify WUCFD's designation of assured water

14    supply pursuant to A.R.S. § 45-576 *et seq*. and A.A.C. R12-15-701 *et seq*.  On July 15, 2010

      and July 22, 2010, the Department gave public notice of the application pursuant to A.R.S. §

15    45-578. One objection to the application was filed with the Department.

16          After receiving WUCFD's application to modify its designation of assured water

17    supply, the Department reviewed relevant information regarding the modification request,

18    including: 1) hydrologic information and other information on file with the Department for the

      proposed groundwater supply, 2) information regarding WUCFD's consistency with the

19    management plan and the management goal of the Phoenix Active Management Area

20    ("Phoenix AMA"); 3) information regarding WUCFD's financial capability to construct the

21    necessary delivery system, treatment works and storage facilities; and 4) the issues raised by

      the objection to the application.  Based on that information, the Department makes the

22    following Findings of Fact, Conclusions of Law and Order of Designation and Conditions of

23    Designation:

24

25

26

1

## II.  FINDINGS OF FACT

### A.  General

1. WUCFD is a community facilities district established under A.R.S. § 48-701 *et.seq.*

2. WUCFD has the legal authority to deliver water to its customers located within its service area.

3. WUCFD currently serves water through its municipal distribution system to its customers.

4. On February 1, 2005 WUCFD was designated as having an assured water supply in Decision and Order AWS 2005-003, No. 26-400989.0000.

### B.  Water Demands

5. WUCFD's current demand as of calendar year 2008 is 1,843.29 acre-feet per year ("current demand").

6. WUCFD's committed demand as of calendar year 2008 is 43.04 acre-feet per year ("committed demand").

7. WUCFD's projected demand in 2025 is 1,675.71 acre-feet per year ("2025 projected demand"). The 2025 projected demand does not include the current demand or the committed demand, but does include the demand at build-out of plats reasonably projected to be approved through calendar year 2025.

8. WUCFD's annual estimated water demand in 2025, which is the sum of its current demand, committed demand, and 2025 projected demand, is 3,562.04 acre-feet per year ("2025 annual estimated water demand").

### C.  Physical Availability of Groundwater and Stored Water Recovered Outside the Area of Impact

9. WUCFD has demonstrated that after withdrawing 276,900 acre-feet, or an average of 2,769 acre-feet per year over 100 years, of groundwater and stored water recovered outside the area of impact (*see* Finding of Fact No. 28), the depth-to-static water level within WUCFD's service area is not expected to exceed 1,000 feet below land surface. For purposes of this Decision and Order, that volume includes the following:

2

a.    39,126.18 acre-feet, or an average of 391.26 acre-feet per year over 100 years, of future and existing long-term storage credits to be recovered outside the area of impact. See Finding of Fact No. 28.

b.    584 acre-feet, or an average of 5.84 acre-feet per year over 100 years, of groundwater that WUCFD may use to supplement its CAP water supplies, pursuant to A.A.C. R12-15-717(D)(2). See Finding of Fact No. 30.

c.    237,190 acre-feet, or an average of 2,371.9 acre-feet per year over 100 years, of groundwater to meet annual demands. See Finding of Fact No. 20.

### D.    Groundwater

10.    WUCFD has demonstrated that it has wells of sufficient capacity to withdraw at least 2,899.75 acre-feet per year of groundwater for 100 years.

11.    WUCFD has the right to withdraw and deliver groundwater to its customers pursuant to service area right No. 56-002025.

12.    As of the date of this Decision and Order, WUCFD's current groundwater allowance is 463.02 acre-feet, or an average of 4.63 acre-feet per year over 100 years, pursuant to A.A.C. R12-15-724(A)(2).

13.    Pursuant to A.A.C. R12-15-724(A)(4), the Director shall add a volume for incidental recharge to WUCFD's groundwater allowance for each calendar year, based upon its total water use from any source in the previous calendar year.

14.    Based on its reported water use within its service area for calendar year 2008, WUCFD's incidental recharge volume for calendar year 2009 is 80.54 acre-feet.

15.    If WUCFD delivers 3,383 acre-feet per year of water for use within its service area in calendar year 2024, its incidental recharge volume for calendar year 2025 will be 135.32 acre-feet ("2025 incidental recharge volume").

16.    The sum of WUCFD's current groundwater allowance and 2025 incidental recharge volume is 139.95 acre-feet per year.  This volume of groundwater will be consistent with the management goal each year for 100 years.

17.    WUCFD is a member service area of the Central Arizona Groundwater Replenishment District (CAGRD). The Member Service Area Agreement between WUCFD and the CAGRD (Agreement) does not limit the volume of excess groundwater, as defined in the

3

Agreement.

18. The Director has made a determination, which has not expired, that the most recent CAGRD Plan of Operation is consistent with the management goal of the Phoenix AMA.

19. As of the date of this decision and order, the CAGRD is in compliance with its groundwater replenishment obligation for the Phoenix AMA.

20. WUCFD has demonstrated that an average of 2,371.9 acre-feet per year of groundwater to meet annual demands will be physically, continuously and legally available for 100 years and consistent with the management goal of the Phoenix AMA.

21. In addition to the groundwater supplies described in Finding of Fact No. 20, WUCFD has demonstrated that 584 acre-feet, or an average of 5.84 acre-feet per year over 100 years, of groundwater will be physically, continuously and legally available to supplement its CAP water supplies, pursuant to A.A.C. R12-15-717(D)(2). See Finding of Fact No. 30.

**E.    Storage and Recovery**

22. WUCFD holds Water Storage Permit No. 73-545695.7000, which allows storage of a maximum volume of 20,000 acre-feet per year of CAP water at the RWCD Groundwater Savings Facility.

23. WUCFD holds Recovery Well Permit No. 74-576703.0001, which allow recovery of a total of 2,899.75 acre-feet per year outside the area of impact of storage.

**F.    Long-Term Storage Credits**

24. As of December 31, 2008, WUCFD holds 24,286.18 acre-feet of long-term storage credits.

25. On January 17, 2006, WUCFD and the Superstition Mountains Community Facilities District ("SMCFD") entered into an intergovernmental agreement ("IGA") for the sale and purchase of long term storage credits to be earned by SMCFD at Underground Storage Facility No. 71-584469.0000.

26. The term of the agreement expires on December 31, 2015.

4

27. Pursuant to the IGA, WUCFD may purchase 14,840 acre-feet of long-term storage credits during the term of the IGA.

28. WUCFD has demonstrated that up to 39,126.18 acre-feet, or an average of 391.26 of long-term storage credits to be recovered outside the area of impact will be physically, continuously and legally available for 100 years, for purposes of this Decision and Order.

### G.   CAP Water:  Physical, Continuous and Legal Availability

#### i.   WUCFD M&I CAP Water Allocation

29. WUCFD holds a long-term, non-declining municipal and industrial ("M&I") subcontract for CAP water with the Central Arizona Water Conservation District for 2,919 acre-feet per year.

#### ii.   Continuous Availability of CAP Water

30. The volume of groundwater and stored water to be recovered outside the area of impact of storage described in Finding of Fact No. 9 includes 584 acre-feet, or an average of 5.84 acre-feet per year over 100 years, of groundwater that WUCFD may use to supplement its CAP water supplies, pursuant to A.A.C. R12-15-717(D)(2).

#### iii.   Treatment Facilities

31. Pursuant to an agreement between WUCFD and the City of Mesa ("Mesa") dated March 17, 2006, WUCFD has treatment capacity to treat up to a total of 2,919 acre-feet per year of CAP water at Mesa's Brown Road CAP Water Treatment Plant until March 17, 2016.

32. According to WUCFD's 5 year (2010 – 2014) Water System Capital Improvements Plan, a Water Treatment Plant with a treatment capacity of approximately 1,232 acre feet per year will be built to treat WUCFD's CAP allocation.

#### iv.   Summary

33. The total volume of CAP Water is 2,919 which includes WUCFD's CAP M&I allocation.  WUCFD has demonstrated that 1,232 acre-feet per year of CAP water to be treated and delivered without storage is physically, continuously and legally available for 100 years.

5

### H.    Consistency with the Management Plan

34.    WUCFD is currently regulated as a large municipal provider under the Municipal Conservation Program in the Third Management Plan for the Phoenix AMA ("Management Plan"). As of the date the application was filed, WUCFD has not been found to be out of compliance with the Management Plan.

### I.    Water Quality

35.    WUCFD is regulated by the Arizona Department of Environmental Quality as a public water system pursuant to A.R.S. § 49-351, *et seq.*

### J.    Financial Capability

36.    WUCFD's five-year capital improvement plan provides for the creation of a water treatment facility to treat 1,232 acre-feet per year of CAP water

37.    WUCFD has constructed the remaining delivery system and storage facilities necessary to satisfy its 2025 annual estimated water demand.

### III.    CONCLUSIONS OF LAW

Having reviewed the Findings of Fact, the Department makes the following Conclusions of Law:

1.    For purposes of this Decision and Order, WUCFD has demonstrated that 2,371.9 acre-feet per year of groundwater, 391.26 acre-feet per year of long-term storage credits to be recovered outside the area of impact, and 1,232 acre-feet per year of CAP water to be treated and delivered without storage, will be physically, continuously and legally available for at least 100 years and will be consistent with the management goal. A.A.C. R12-15-716, R12-15-717, R12-15-718, R12-15-722. The sum of these volumes, 3,995.16 acre-feet per year, exceeds the 2025 annual estimated water demand of 3,562.04 acre-feet per year. *See* Attachment A to this Decision and Order.

2.    WUCFD has also demonstrated that 584 acre-feet, or an average of 5.84 acre-feet per year over 100 years, of groundwater will be physically, continuously and legally available to supplement its CAP water supplies. A.A.C. R12-15-717(D)(2). *See*

6

Attachment A to this Decision and Order.

3. For purposes of A.A.C. R12-15-716(B)(3)(c)(ii), the volume of WUCFD's 2025 annual estimated water demand that will be met with groundwater and stored water recovered outside the area of impact is 276,900 acre-feet, or an average of 2,769 acre-feet per year over 100 years. See Attachment A to this Decision and Order.

4. In accordance with A.A.C. R12-15-722, WUCFD has demonstrated that its projected use of groundwater is consistent with the management goal of the Phoenix AMA.

5. The water supply served by WUCFD will be of adequate quality pursuant to A.A.C. R12-15-719.

6. In accordance with A.A.C. R12-15-721, WUCFD meets the standard established for determining consistency with the Management Plan for the Phoenix AMA.

7. WUCFD has satisfied the financial capability criteria prescribed in A.A.C. R12-15-720.

8. WUCFD has satisfied all the requirements for a designation of an assured water supply.

## IV.    ORDER OF DESIGNATION AND CONDITIONS OF DESIGNATION

Having reviewed the Findings of Fact and Conclusions of Law, the Department hereby issues this Decision and Order designating WUCFD as having an assured water supply, subject to the following conditions:

1. The Director's determination that an assured water supply exists for WUCFD is based on its analysis of the water supplies pledged by WUCFD. Nothing in this Decision and Order limits or reduces WUCFD's legal authority to use any water supply in any year.

2. The Director reserves the right under A.A.C. R12-15-711(C) to periodically review and modify the designation for good cause as conditions warrant.

3. Pursuant to A.A.C. R12-15-711(F), the Director may, at any time revoke this designation if the findings of fact or the conclusions of law upon which the designation is based change or are invalid, or if an assured water supply no longer exists.

4. WUCFD shall submit an application to modify this decision and order designating WUCFD as having an assured water supply to increase the term of the designation when the sum of WUCFD current demand, committed demand and two years of

7

projected demand exceeds 3,562.04 acre-feet per year, or by December 31, 2023, whichever is earlier.

5.   Pursuant to A.A.C. R12-15-719, WUCFD shall satisfy any state water quality requirements established for its proposed use after the date of this designation.

6.   WUCFD shall annually provide to the Department the following information for the previous calendar year in the manner prescribed in A.A.C. R12-15-711(A):

a.   An estimate of the demand of platted, undeveloped lots located in WUCFD's service area.

b.   An estimate of the projected demand at build-out for customers with which WUCFD has entered into a notice of intent to serve agreement in the preceding calendar year.

c.   A report regarding WUCFD's compliance with water quality requirements.

d.   The depth-to-static water level of all wells from which WUCFD withdrew water during the previous calendar year.

e.   Any other information requested by the Director to determine whether WUCFD continues to meet all the requirements necessary to maintain this designation of assured water supply.

**IT IS HEREBY ORDERED THAT WUCFD BE DESIGNATED AS HAVING AN ASSURED WATER SUPPLY UNTIL DECEMBER 31, 2025.**

DATED this 29th day of September, 2010.

Herbert R. Guenther
Director
Arizona Department of Water Resources

8

A copy of the foregoing **Decision and Order** mailed by certified mail this _29th_ day of _SEPTEMBER_, 2010, to:

WUCFD
George Hoffman
District Manager
PO Box 4768
Apache Junction, AZ 85278-4768

Certified Mail No.:

_7004 2510 0000 8660 1031_

Sent by: _MICHELLE MORENO_

A copy of the foregoing sent by electronic mail this _29th_ day of _SEPTEMBER_, 2010, to:

WUCFD
Frank Blanco
PO Box 4768
Apache Junction, AZ 85278-4768

Cliff Neal
CAGRD
23636 N 7th St
Phoenix, AZ 85024

Robin King
Arizona Department of Real Estate
2910 N. 44th Street
WUCFD, AZ 85018

J. Scott Miller
ADWR
3550 North Central Avenue
WUCFD, AZ 85012

9

Decision and Order No. 86-002025.0001 (WUCFD Designation as Having an Assured Water Supply): Attachment A

| Source | Approved (af/yr) | Capacity | Legal Authority | Comments |
|---|---|---|---|---|
| **Total Groundwater to Meet Annual Demands** | 2,371.9 | Physical availability of groundwater and stored water recovered outside the area of impact (AOI) = 2,769 af/yr<br><br>Groundwater Well Capacity = 2,899.75 af/yr | Service Area Right No. 56-002520.0000<br><br>Groundwater allowance: A.A.C. R12-15-724(A)(2): 2009 Groundwater Allowance 4.63 af/yr<br><br>Incidental Recharge: A.A.C. R12-15-724(A)(4): 2019 water use times IR factor of 4.00% (3,383 x 0.04 = 135.32)<br><br>Total Groundwater Allowance for 2020: 139.95 af/yr | Total Groundwater to meet annual demands include:<br>2,769 physically available<br>• minus 391.26 af/yr of long-term storage credits to be recovered outside the area of impact ("AOI")<br>• minus 5.84 af/yr of groundwater to supplement CAP water supplies<br>=2,371.9 af/yr. |
| **Total Existing Long Term Storage Credits** | 391.26 | Recovery Well Permit No: 74-576703.0001<br><br>Recovery Well Capacity =2,899.75 af/yr<br><br>Recharge Storage Permit Capacity = 20,000 af/yr<br><br>Physical availability of groundwater + stored water recovered outside AOI = 2,769 af/yr | Long Term Storage Account No: 70- 441152<br><br>Water Storage Permit No: 73-545695.7000 | 2008 balance of 39,126.18 af divided by 100 years. |

Decision and Order No. 86-002025.0001 (WUCFD Designation as Having an Assured Water Supply): Attachment A

| Source | Approved (af/yr) | Capacity | Legal Authority | Comments |
|---|---|---|---|---|
| Total CAP water – M&I subcontract | 1,232 | Treatment capacity pursuant to CIP = 1,232 af/yr | M&I Subcontract No: 07-XX-30-W0494 | M&I Subcontract is 2,919 af/yr |
| Total 2025 Supplies | 3,995.16 | | | |
| Total 2025 Demand | 3,562.04 | | | |

* Note: Abbreviations are consistent with those identified in Decision and Order No. 86-002025.0001



# APPENDIX E
# CAROLLO WATER STUDY – DISTRIBUTION & TRANSMISSION MAIN EXHIBITS





Figure 2 State Lands Area Water Treatment and Transmission System

No. 25-5185

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION
OF ARIZONA, INC.; CENTER FOR BIOLOGICAL DIVERSITY;
EARTHWORKS; THE ACCESS FUND; and SIERRA CLUB.

*Plaintiffs-Appellants*,

v.

BROOKE L. ROLLINS, U.S. SECRETARY OF AGRICULTURE; UNITED
STATES FOREST SERVICE; and NEIL BOSWORTH, SUPERVISOR OF THE
TONTO NATIONAL FOREST.

*Defendants-Appellees*,

and

RESOLUTION COPPER MINING, LLC

*Intervenor-Defendant-Appellee.*

_____

On Appeal from the United States District
Court for the District of Arizona
(District Judge Dominic W. Lanza)

_____

**PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD**
**VOLUME 4 of 5**
*In Support of*
**PLAINTIFFS-APPELLANTS' EMERGENCY MOTION UNDER**
**CIRCUIT RULE 27-3**
**RELIEF REQUESTED BY AUGUST 18, 2025, AS THE LAND TITLE**
**TRANSFER WILL OCCUR ON AUGUST 19, 2025**

Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
mfink@biologicaldiversity.org

Allison N. Henderson
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs-Appellants*

Susan B. Montgomery
Robyn L. Interpreter
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorneys for the Inter Tribal Association of Arizona, Inc.*

**INDEX**

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| **Volume 1 of 5 [99 pages]** | | | |
| Order (August 15, 2025) | 8/15/2025 | 99 | 6-99 |
| **Volume 2 of 5 [268 pages]** | | | |
| Federal Defendants' Memo in Support of Summary Judgment, *CBD v. USFS*, Case No. 23-cv-00928 (DLF) (D.D.C., August 22, 2024) | 8/4/2025 | 97-1 | 105-154 |
| BLM Review of Hydrology Aspects of the Resolution Copper Project | 7/14/2025 | 87-1 | 155-180 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, June 2025 | 7/14/2025 | 87-2 | 181-275 |
| Draft Record of Decision, June 2025 | 7/14/2025 | 87-3 | 276-367 |
| **Volume 3 of 5 [180 pages]** | | | |
| Declaration of Maria Dadgar | 7/14/2025 | 87-5 | 373-380 |
| Declaration of Roger Featherstone | 7/14/2025 | 87-6 | 381-387 |

| | | | |
|---|---|---|---|
| Declaration of Russ McSpadden | 7/14/2025 | 87-7 | 388-399 |
| Declaration of Erik Murdock | 7/14/2025 | 87-8 | 400-403 |
| Declaration of Sandra Bahr | 7/14/2025 | 87-9 | 404-408 |
| Master Water Plan for Superstition Vistas, Apache Junction, Arizona | 7/14/2025 | 87-10 | 409-547 |
| **Volume 4 of 5 [195 pages]** | | | |
| Appraisal Report Summary: Mining Claim Zone MCZ Parcel | 7/14/2025 | 87-11 | 553-567 |
| Appraisal Report Summary: Mineral Withdrawal Area (MWA) Parcel | 7/14/2025 | 87-12 | 568-595 |
| Technical Appraisal Review Report: MWA Parcel (excerpts) | 7/14/2025 | 87-13 | 596-598 |
| Oversight and Legislative Hearing Before the U.S. House of Representatives Subcommittee on Energy & Mineral Resources, March 2013 | 7/14/2025 | 87-14 | 599-715 |
| Congressional Budget Office Cost Estimate, July 2013 | 7/14/2025 | 87-15 | 716-717 |

| | | | |
|---|---|---|---|
| House Natural Resources Committee House Report No. 113-167, July 2013 | 7/14/2025 | 87-16 | 718-742 |
| **Volume 5 of 5 [296 pages]** | | | |
| Uniform Appraisal Standards for Federal Land Acquisitions | 7/14/2025 | 87-17 | 748-1009 |
| Excerpt from Resolution Copper Mining's General Plan of Operations, 2016 | 7/14/2025 | 87-18 | 1010 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, January 2021 (rescinded) | 7/14/2025 | 87-19 | 1011-1013 |
| USDA Memo for Withdrawal of Notice of Availability, Rescind Final Environmental Impact Statement and Draft Record of Decision | 3/2/2021 | 26-2 | 1014 |
| Notice of Appeal | 8/15/2025 | 100 | 1015-1020 |
| Civil Docket for Case No. 2:21-cv-00122-DWL – United States District Court, District of Arizona (Phoenix) – *Arizona Mining Reform Coalition, et al. v. United States Forest Service, et al.* | | | 1021-1038 |

| Forest Service | Washington Office | 1400 Independence Avenue, SW Washington, DC 20250 |
|---|---|---|

# Appraisal Report Summary

**Mining Claim Zone MCZ Parcel  (Federal)**
**Pinal County, Arizona**

**Resolution Copper Legislated Land Exchange**
**(Southeast Arizona Land Exchange and Conservation Act, 16 U.S.C. §539p)**



**Date of Appraisal Report**
December 30, 2022
(Provided to US Forest Service on January 6, 2023)

**Date of Appraisal Review**
January 24, 2023

**Appraisal Report Prepared By**
Marc P. Springer, SFMC Mining Geologist/Mineral Appraiser
Spanish Flat Mining Company (sub-contractor to Weissenborn Appraisal, LLC)
7024 Snapdragon Drive
Carlsbad, CA 92011



**America's Working Forests – Caring Every Day in Every Way**   Printed on Recycled Paper 

MCZ Parcel (Federal)                                                                                                Page 1 of 14
Pinal County, Arizona

# Appraisal Summary

## Appraisal Report under Review

### Appraiser
Marc P. Springer, SFMC Mining Geologist/Mineral Appraiser
Arizona Certified General Real Estate Appraiser #1036208 (Expires 02/29/2024)
California Certified General Real Estate Appraiser # AG044432 (Expires 09/20/2023)
International Institute of Mineral Appraisers, #2006-4
CA State Registered Professional Geologist PG# 7831
BLM Certified Mineral Examiner CME #0139
Spanish Flat Mining Company (sub-contractor to Weissenborn Appraisal, LLC)
7024 Snapdragon Drive
Carlsbad, CA 92011

*(Note: Per USDA Forest Service Contract No. 12837120C0041, Weissenborn Appraisal LLC commissioned Spanish Flat Mining Company who has extensive experience, professional knowledge, and expertise in the valuation of mineralized and mine-related properties).*

### Date of Inspection
The Subject Property was inspected on April 12, 2022 which is the effective date of the appraisal. Prior to this inspection, the mineral appraiser, Mr. Halmbacher (deceased) inspected the property on May 08, 2019. Between these dates, the Telegraph Fire started on June 4, 2021 and burned portions of the Subject. The appraisal notes burned areas were still apparent during the property inspection. The property owner(s) were provided the opportunity to accompany the appraiser on the property inspection.

### Date of Report
December 30, 2022 (Provided to US Forest Service on January 6, 2023)

### Owner
The United States of America

### Client
As part of USDA Forest Service Contract No. 12837120C0041, Weissenborn Appraisal LLC commissioned Spanish Flat Mining Company who has extensive experience, professional knowledge, and expertise in the valuation of mineralized and mine-related properties. Weissenborn Appraisal, LLC is the primary appraisal contractor for the USFS, relative to the Federal and non-Federal parcels of the Southeast Arizona Land Exchange and Conservation Act. Weissenborn Appraisal LLC commissioned Spanish Flat Mining Company to complete appraisals on the Federal real property (selected lands) portion of the land exchange; the appraisal will be used by the USFS to facilitate the land exchange. Although the appraisal completed for Weissenborn Appraisal LLC by Spanish Flat Mining Company as a sub-contractor states the Client is Weissenborn Appraisal LLC, the letter of transmittal from Weissenborn Appraisal LLC to the USDA Forest Service states that the Client in the assignment is the USDA Forest Service specifically the USDA Forest Service, Director of Lands and Minerals, Southwestern Region.



**Intended Use**

To provide a basis of value for the legislated land exchange between the United States of America and Resolution Copper Mining, LLC pursuant to 16 U.S.C. §539p.

**Intended User(s)**

In the original appraisal contract, the intended users were broadly defined. It shall be noted that the intended users of the appraisal report are specifically identified as the USDA Forest Service, Director of Lands and Minerals, Southwestern Region, USDA Office of General Counsel, and Resolution Copper Mining, LLC.

**Professional Standards**

The appraisal standards required for this assignment were the *Uniform Appraisal Standards for Federal Land Acquisitions* and *Uniform Standards of Professional Appraisal Practice*.

**Estate Appraised**

Fee Simple Interest, subject to valid and existing rights including all unpatented mining claims held by Resolution Copper as listed in Section G of the Federal Status Report dated September 28, 2017.

### Outstanding Rights

The appraisal adequately considered the following outstanding rights and reservations on the Subject Property:

Unpatented Mining Claims: All unpatented mining claims as listed in Section G of the Federal Status Report dated September 28, 2017. These unpatented mining claims confer all right to locatable minerals on the Subject Property, and the right to use the surface for mining purposes, including destructive use of the surface reasonably incident to mining, to a third party, and which rights are therefore no longer held by the United States.

Existing Easements: Highway Easement Deed granted to State of Arizona, recorded on 3/18/91 in the records of Pinal County, Arizona. Federal parcel will be conveyed subject to the easement. GLO101208 ADOT US60 EASEMENT. United States Department of Interior Easement for Right-of-Way for Electric Transmission Line granted to Arizona Public Service Company, dated 12/22/75. Federal parcel will be conveyed subject to the easement GLO401905 APS 500KV POWERLINE.

Permits and Temporary Easements to convert to Easements in perpetuity: Permit to Salt River Project Agricultural Improvement and Power District for an overhead transmission line Amendment dated 7/8/85. At closing, Resolution Copper Mining shall grant a replacement authorization to Salt River Project Agricultural Improvement and Power District for those sections involved in the conveyance It shall contain terms at least equivalent to those in the permit. Forest Service shall amend the permit to reflect those deletions. GLO401137 OAK FLAT 115KV PERMIT

Permit to Quest/Century Link for a telephone line dated 7/2/73. At closing, Resolution Copper Mining shall grant a replacement easement to Salt River Project Agricultural Improvement and Power District for those sections involved in the conveyance It shall contain terms at least equivalent to those in the permit. MASTER SPECIAL USE PERMIT FO209



In the context and scope of this appraisal GLO101208 ADOT US60 EASEMENT, GLO401905 APS 500KV POWERLINE, GLO401137 OAK FLAT 115KV PERMIT, MASTER SPECIAL USE PERMIT FO209, have no effect on the value of the Subject.

**Definition of Value**
Market Value means the most probable price in cash, or terms equivalent to cash, which lands or interest in lands should bring in a competitive and open market under all conditions requisite to a fair sale, where the buyer and seller each acts prudently and knowledgeable, and the price is not affected by undue influence (36 CFR 254.2).

**Extraordinary Assumptions**
The appraisal is not based upon any Extraordinary Assumptions.

**Hypothetical Conditions**
The appraisal was prepared subject to the following FS instructed Hypothetical Condition: The Federal Property shall be appraised as though it is in private ownership, is freely alienable, and zoned consistently with other similarly situated non-Federal properties within the jurisdiction of the zoning authority. Federal law provides that, upon conveyance, "[t]he Federal Property shall be available to Resolution Copper for mining and related activities subject to and in accordance with applicable Federal, State, and local laws pertaining to mining and related activities on land in private ownership." 16 U.S.C. §539p(c)(8). This hypothetical condition does not alter the facts that: the Federal Property is encumbered by mining claims held by a party other than the United States; said mining claims confer all rights to locatable minerals to that party in accordance with the Mining Law and are not part of the estate owned by the United States, 30 U.S.C. §§26, 181, 611; that the United States currently holds the rights to reasonably regulate surface use of the Federal land for mining purposes under 36 C.F.R. 228 Subpart A, 16 U.S.C. § 551; or that the United States may not prohibit the use of the surface of NFS land for mining purposes, nor may it materially interfere with such uses. 30 U.S.C. § 612.

***Rationale for the Hypothetical Condition:*** The hypothetical condition is based upon direction and guidance from 36 CFR 254.9(b)(ii), FSH 5409.12_65.11(5) which was updated in 2021 to FSH 5409.12_45.1a, FSM 5454, and 16 U.S.C. §539p(c)(8). Federal land is generally not freely alienable, local government entities do not have the authority to zone land owned by the United States, and mining operations on National Forest System land are subject to federal laws and regulations applicable to the administration of the National Forest System and are often exempt from State and local laws. For the purposes of appraisal, the appraiser shall determine and support a conclusion of zoning based on similarly situated private property within the jurisdiction of the zoning authority. This hypothetical condition does not alter or affect the rights of Resolution Copper to the unpatented mining claims and locatable minerals on the Federal land pursuant to the United States Mining Law, or the estate to be appraised in consideration of the existence of the mining claims. The hypothetical condition shall be prominently reported on the transmittal letter, summary page, conclusion page, and certification.

**Jurisdictional Exception**
The appraisal has been prepared in conformance with UASFLA, which requires that the opinion of value not be linked to a specific exposure time as required by USPAP SR 1-2(c) & UASFLA 1.2.4 & 4.2.1.2.



MCZ Parcel (Federal)
Pinal County, Arizona
Page 4 of 14

**Legal Description**
**Gila and Salt River Meridian, Arizona:**
T. 1 S., R. 13 E., partly surveyed, Tracts 49 (864.79 ac)
T. 2 S., R. 12 E., Tract 37 (385.9ac)
T. 2 S., R. 13 E., partly surveyed Sec. 6 (404.84 ac)
Total acreage: 1,655.53

The following maps are for illustration purposes:

### Topographic View of Subject MCZ Property



MCZ Parcel (Federal)                                                    Page 5 of 14
Pinal County, Arizona

### Aerial View of Subject MCZ Property



**Property Description -** The Subject Property is 1,655.53 acres of vacant land east of Superior and just south of U.S. 60. It is adjacent to the Magna No. 9 headframe. Much of the property is within the site of the proposed Resolution Copper underground copper mine. The project is to include mining of portions of this property, referred to as the Mining Claim Zone.

> **Location:** The Subject Property is located about 1.5 miles east of the town of Superior and the northwest corner of the parent parcel adjoins Resolution patented lands at the Magma Mine No. 9 Shaft location. The property is bounded on the north by U.S. 60 and the Oak Flat Mineral Withdrawal Area at the northeast corner. The property adjoins additional Tonto National Forest lands to the south and southwest and Arizona State Trust land to the southeast. The subject neighborhood is the area in and adjacent to the Arizona Copper Triangle which extends from west of Superior to Globe/Miami, and southerly to Winkleman. The area is generally rural where mining and ranching occur. However, active mining, including processing and exploration operations, are common.

The following map illustrates the Arizona Copper Triangle:

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 600 of 2158
Case 2:21-cv-00122-DWL    Document 87-11    Filed 07/14/25    Page 6 of 14

MCZ Parcel (Federal)
Pinal County, Arizona

**Subject MCZ located within Arizona Copper Triangle**



**Configuration:** The larger parcel is a single irregular parcel with a 40-acre private inholding that is owned by Resolution Copper at the west side of the tract just south of the patents around the #9 shaft.

**Size:** The Subject Property is 1,655.53 acres.

**Topography:** From U.S. 60 south to the south edge of Section 33, the terrain is gentle at around the 4,200-foot elevation. Terrain becomes increasingly rough and rocky moving westward. The eastern portion is generally dissected rolling hills with low to moderate sloping topography which becomes more irregular and steeper as you move west towards the Apache Leap escarpment.

**Soil Types:** The Phase 1 ESA reports that most of the soils on the subject are unmapped on the Web Soil Survey. The property previously mapped on the ALRIS General soil map with more than half showing as Mined Land and Rock Outcrop-Woodcutter complex, tuff. Significant areas were unmapped on the ALRIS map as well. The ESA, however, did not agree with this assessment and concluded that the soils were primarily rock outcrop with loamy and gravelly slope alluvium.



**Water :** Three surface water rights belonging to the Tonto National Forest are noted on the Subject Property. All are filled by unnamed washes. These are:

38-23975 Apache Leap Tank – Stock/Wildlife Tank - 0.26 - acre feet

38-65060 Oak Flat Tank – Stock/Wildlife Tank - 3.26-acre feet

33-77040 Rim Pond - Stock/Wildlife Tank – 0.77-acre feet

There is a total of 51 wells on the Subject Property. Many are co-located and for those wells there is a total of 151 registrations.

S 1 T.2S. R.12E. 1 well 2 registry numbers
S 6 T.2S R.13E. 18 wells 27 registry numbers
S 28, 29, 32, 33 T.1S. R.13E. 32 wells 52 registrations

Resolution Copper Mining LLC is the named owner of most of these wells with co-located owners including BHP Copper, Rio Tinto, the University of Arizona, and the Tonto National Forest. Nearly all the wells are of the type "Other" and are actually exploratory bore holes. A few are identified in ADWR records as Monitor wells. Reported depths range from around 150 feet to 7,977 feet. Many are cased with casing typically ranging from 5 to 10 inches in diameter. Where reported, water levels range widely from a couple hundred feet to over 4,600 feet. The wells were drilled from the early 1980s through early 2020.

**Flood Zone:** The Phase I Environmental Site Assessment (ESA) indicates there are no identified flood hazard areas on the Subject Property. The area has been mapped by the Federal Emergency Management Agency (FEMA) map panels showing that the entirety of the Property is designated as flood Zone D, which is the designation for areas where FEMA has not conducted a flood hazard analysis and the potential flood hazard has not been determined. There are no FEMA-designated floodplains identified within the Property and none were observed during previous site visits (WestLand 2004a, 2015).

**Utilities:** Electricity is served to the No. 9 Shaft site at the northwest corner of the Subject Property. In addition, Qwest/Century Link has a permit for a telephone line which shows up on the topo map running across the northwest corner of the subject. No water or sewer systems on or near the Subject Property .

**Access:** Access to the property is available from U.S. 60 which runs along the north boundary of the Subject parcel. The Subject parcel is about 60 miles east of Phoenix and about 5 miles east of Superior. Internal access is available from FR 469 which travels from U.S. 60, southerly to FR 2432 which goes to the south and then northwesterly to the No. 9 Shaft parcel. FR 315 (a 4WD road) connects to FR 2432 and travels to the south, leaving the subject near the southeast corner.

**Timber:** N/A

**Minerals:** The estate appraised is the fee simple interest, subject, in part, to 148 unpatented mining claims held by Resolution Copper. It is understood that a significant porphyry copper deposit exists beneath the Subject Property but the right to mine the deposit is not a property



right included with the Subject Property. An unpatented mining claim is a conditional, possessory, interest in real property ownership of a mineral estate in accordance with the Mining Law (30 U.S.C) and is subject to a discovery of a valuable mineral deposit within the bounds of the location, and completion of annual assessment work/filing, or payment of an annual maintenance fee, within the regulatory timeframe. Since the Subject Property is encumbered by mining claims held by a party other than the United States; said mining claims confer all rights to locatable minerals to that party in accordance with the Mining Law and are not part of the estate owned by the United States, 30 U.S.C. §§26, 181, 611.

**Environmental Hazards:** The Phase I ESA concluded that there are no Recognized Environmental Conditions (REC) on the Subject Property but noted that surface water quality in the Devils Canyon Watershed and the Queen Creek Watershed is in overall compliance with applicable surface water standards with the following exceptions: arsenic, copper, dissolved oxygen, E. coli bacteria, iron, lead, pH, and selenium (Resolution 2016). Water quality in regional groundwater basins meets EPA and State of Arizona overall drinking water standards, with a few exceptions. Several samples fell below the federal secondary standard for pH and slightly above the federal secondary standards for iron and manganese. In addition, several samples did not meet federal secondary standards for total dissolved solids and sulfate, and one sample also exceeded federal and state primary standards for nitrate (Resolution 2016). It is not known if these conditions are naturally occurring and/or the result of anthropogenic activity. Approximately six small spills of petroleum products (less than 100 gallons) have occurred at the drilling sites and immediately off-site between 2015 and 2020. Information provided from Resolution indicates that these spills were cleaned up and reported to the USFS pursuant to the requirements of the SPCC plan. WestLand did not observe any visible evidence of product spills on the Property. Due to the small quantity and number of spills, this is considered a de minimis condition. Known regional exceedances do not necessarily indicate contamination at the Property that would be considered environmental liabilities associated with the Property. Given the Highest and Best Use of the property is surface land use in support of a mining operation, it is unlikely that these environmental conditions would affect the overall value of the property.

## Improvements
None

## Use, Rent and Sale History
The subject is and has been the site of mineral exploration activity pursuant to the mining claims held by Resolution Copper. The property has never been sold or rented and is not currently listed for sale.

## Zoning and Land Use Restrictions
The following is a requirement regarding disclosure and analysis of property zoning:

"Determine "consistent" zoning (and other land use restrictions) of Federal land by research and analysis, not by making an assumption. As instructed, the appraisal considered the hypothetical condition that the Federal land be appraised as though in private ownership and zoned consistent with other non-Federal lands. In determining consistent zoning for the Federal land, the appraisal should not consider entitlements such as master planning that are not in place as of the date of value."

The appraisal concluded that the Subject Property is zoned Pinal County GR – General Rural Zone. This is the predominant rural classification throughout the county and permitted uses include single family



Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 603 of 2158

MCZ Parcel (Federal)    Case 2:21-cv-00122-DWL    Document 87-11    Filed 07/14/25    Page 11 of 16    Page 9 of 14
Pinal County, Arizona

dwellings, various agricultural uses and quasi-public uses such as parks and schools. The minimum lot size is 1.25 acres. This classification does not specifically allow or prohibit mining but according to the Arizona Revised Statutes:

11-812. Restriction on regulation; exceptions; aggregate mining regulation; definitions

A. Nothing contained in any ordinance authorized by this chapter shall:

2. Prevent, restrict or otherwise regulate the use or occupation of land or improvements for railroad, mining, metallurgical, grazing or general agricultural purposes, if the tract concerned is five or more contiguous commercial acres.  For the purposes of this paragraph:

(b) "Mining" has the same meaning prescribed in section 27-301…

10. "Mining" means those activities conducted to develop or extract materials from a mine including on-site transportation, concentrating, milling, leaching, smelting or other processing of ores or other materials. Mining includes mined land reclamation activities regulated pursuant to chapter 5 or 6 of this title.

Pinal County Code affirms the state statutes at 2.05-050 – Statutory Exemptions:
    As specified in A.R.S. title 11, Ch. 6 (A.R.S. § 11-801 et seq.), the provisions of this title shall not prevent, restrict, or otherwise regulate in any zoning district the use or occupation of land or improvements for railroad, mining, metallurgical, grazing or general agriculture purposes, as defined herein, provided the tract or premises so used is five or more contiguous commercial acres.

The county zoning map for the Ray Mine and surrounding area was also reviewed. All land in that area, including the mine, is zoned GR as well.

**Highest and Best Use**
It is reported that the uses that meet the tests of legally permissible, physically possible, and financially feasible resulting in the highest value is of surface land use in support of a mining operation.

**Larger Parcel Determination**
The report indicates the subject property is contiguous, in the same ownership, and has a single, unified highest and best use.  The appraisal report concludes that the subject parcel is considered the larger parcel.

**Selection of Approaches to Value**
The appraisal included a **sales comparison approach** using sales of similar properties which are competitive in the marketplace having the same or similar highest and best use as the Subject.

The **income capitalization approach** was used in the appraisal to fulfill the requirement of the legislation which requires the use of a detailed income capitalization approach analysis of the federal land.  It is noted in the appraisal that the Income Approach is not typically considered by buyers of mine support lands similar to the Subject Property but was included to comply with the legislation.

The **cost approach** is based upon the principal of substitution that a prudent buyer would not pay more for a property than the cost to acquire a similar site and construct improvements of a similar utility



without undue delay. The cost approach was not included in the appraisal and is not applicable as the property is vacant land.

## Sales Comparison Approach

The appraisal considered 7 comparable sales for analysis. Of these 7 comparable sales, the appraiser selected 5 primary sales to compare to the subject. One of these sales was dismissed (See Conditions of Sale below) leaving 4 primary sales for direct comparison to the subject, presented in a narrative format, and included a summary adjustment grid listing the comparable sales and their comparison to the subject property. The sales bracket the subject property in a number of elements that include size, location, and zoning.

The **unit of comparison** selected for the analysis is price per acre. The market area and timeframe analyzed for the comparable sales was from September 2018 to March 2020 and all were within close proximity to the Subject Property.

The appraisal analysis continued with the analysis of the characteristics of each individual sale to the subject property in both narrative format and on the adjustment grid for each sale. Quantitative and/or qualitative adjustments were made for the various elements cited as affecting overall value.

## Property Rights

The property rights for the comparable sales ranged from fee simple to split estate. The Subject Property was regarded as a split estate since the unpatented mining claims confer all rights to locatable minerals. The appraisal report indicated that buyers' motivation for land purchases were for the surface estate to support mining operations with mineral rights not considered important or necessary. Therefore, the total purchase price is allocated to the surface interest, with no adjustments applied.

## Financing Terms

Financing terms for all the sales were reported as being cash or cash equivalent, with no adjustments required.

## Conditions of Sale

The appraisal report indicated that buyer's motivation was a long-term use of the land to support a mine/processing operation with the seller motivated by the highest price offered for the land. Adjustments for conditions of sale usually reflect the motivations of the buyer and seller. Most mining operations require substantial land holdings for mine infrastructure, material/equipment storage, fluids management, office/dry room/warehouse buildings, processing facilities, ore/waste stockpiles, tailings management and storage, waste water ponds, equipment and supply storage, employee parking and other mine infrastructure requirements.

One of the five comparable sales mentioned above was not originally listed for sale and the owners were not motivated to sell (willing buyer, unwilling seller). The buyer needed a ROW across the private land, and after several failed negotiations to acquire the ROW, the buyer ultimately purchased the entire ranch including the deeded land, the Forest grazing allotment, the State grazing lease, as well as the ranch improvements which included the main house (approximately 1,400 SF), bunk house (approximately 530 SF with 154 SF porch), storage room/studio (approximately 840 sf), and barn/tack room/corral for an "exceptional price" that far exceeded market value for this type of property.

The appraisal notes that non-mineral surface land transactions supporting mine/processing operations



Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 605 of 2158
Case 2:21-cv-00122-DWL    Document 87-11    Filed 07/14/25    Page 13 of 16

MCZ Parcel (Federal)                                                    Page 11 of 14
Pinal County, Arizona

are specifically driven by the needs of the mining companies. The primary use of four of the five sales was for tailings management, treatment, and storage. The transaction for the ROW does not meet the market value standard since the sale price was unduly influenced by the seller and the buyer was leveraged into acquiring the entire ranch. The appraisal dismissed this comparable sale from further analysis since the transaction did not represent an arm's length transaction.

## Market Conditions
The comparable sales dates ranged from September 2018 to March 2020.  The appraisal took into consideration the effective date of value of April 12, 2022. The appraisal anecdotally states there is a linkage to commodity prices and a demand for mining related transactions. As commodity prices increased, there is a corresponding increase in mining related transactions. Although the appraisal states the recent uptick in copper mining is due to increased copper demand and price increases since mid-2020 and is a key market condition factor considered for adjustment, no adjustment was made to the comparable sales for market conditions.

## Property Adjustments

### Location
The location of suitable mine support properties for mining/mineral processing operations is of primary importance for mining operations.  The Subject Property's surface lands overlie the unpatented mining claims held by Resolution Copper and are likely to directly support the mining operation. The appraisal evaluated five land sales purchased by Resolution Copper or their subsidiary along US Highway 60 corridor for their location influence on value. After discussion with respect to the sales comparability with respect to proximity to associated mining/mineral processing operations, access and environmental considerations, the appraisal concluded that no adjustment for location could be derived.  No adjustments were applied.

### Physical Characteristics
The Subject Property has gentle terrain along the east side and becomes increasingly rough and rocky moving westward. The eastern portion is generally dissected rolling hills with low to moderate sloping topography which becomes more irregular and steeper as you move west towards the Apache Leap escarpment.  The comparable sales are typically high desert terrain with desert washes similar to the Subject, therefore the appraisal did not make an adjustment for physical characteristics.

### Size
The Subject Property is 1,655.53 acres.  The sales ranged in size from 400 acres to 7,391 acres. The sales were arrayed which indicated that the unit rates trended lower as the size increased.  To illustrate this relationship and develop a basis for quantitative adjustments, a linear regression analysis was utilized.  Results of the analysis indicated upward adjustments to Sales 1 and 3 which were larger than the subject, and downward adjustments for Sales 2 and 4 which were smaller than the subject.

### Zoning/Land Use
The Subject Property and all of the comparable sales had the same General Rural/Vacant Ranch Land zoning. No adjustments were required as reflected on the grid.


The unadjusted and adjusted sale prices are reflected below.



MCZ Parcel (Federal)
Pinal County, Arizona

**Direct Sales Comparison Sales Summary**

| SALE | DATE | ACRES | UNADJUSTED $/AC | ADJUSTED $/AC |
|------|------|-------|-----------------|---------------|
| 1 | Feb-2019 | 2,191 | $994 | $1,036 |
| 2 | Mar-2020 | 1,299 | $1,106 | $1,078 |
| 3 | Sep-2018 | 7,391 | $789 | $1,242 |
| 4 | Jan-2019 | 400 | $1,498 | $1,399 |
| | | | | |
| Low | 2018 | 400 | $789 | $1,036 |
| High | 2020 | 7,391 | $1,498 | $1,399 |

**Reconciliation**

The appraisal report addresses the overall comparability of the sales as required by UASFLA. The appraisal stated that the land sales, before adjustments, show a range of indicated values from a low of $789 per acre to a high of $1,498 per acre with the mid-range at $1,100 per acre. The comparable sales after adjustments ranged from $1,036 per acre to $1,399 per acre with a mid-range at $1,200 per acre. Based on the limited quantity of comparable sales similar to the subject, Seller motivation, and the size difference between the subject and comparable sales, the appraisal concluded at $1,200 per acre.

The opinion of value conclusion is $1,200 per acre for the subject's 1,655.53 acres, equivalent to $1,990,000 rounded.

<div align="center">1,655.53 acres x $1,200 per acre = $1,990,000 ROUNDED</div>

MCZ Parcel (Federal)                                                                 Page 13 of 14
Pinal County, Arizona

**Income Capitalization Approach**

This approach was presented in the appraisal because the Southeast Arizona Land Exchange and
Conservation Act – 303, Sec. 4(C) required the use of a detailed Income Capitalization Approach of the
federal land.

The appraisal states the Income Approach is not typically considered by buyers of mine support lands
that are similar to the Subject Property. It is uncommon for mining companies to lease surface mine
support land from property owners due to the high risk of potential environment issues, costly cleanup,
and liabilities associated with mining. Market dynamics for these types of properties demonstrates that
mining companies prefer to purchase rather than lease surface mine support lands.

Although private land leases for mine support land were not available in the market, the appraisal
presented land lease transactions between mining companies and the Arizona State Lands Department
(ASLD). These leases are negotiated in an open auction setting which are advertised and exposed to the
market.  Mineral royalties paid by the mining company are excluded from the land use rental payment.
The basis for the land use rental fees are land values for **non-mining purposes** which is a different
highest and best use of the Subject Property.

The appraisal presented the following leases for analysis:

| ASLD Lease | County | Acres | Market Value | Rent $/year | Rent $/AC/Year | Effective Date | Cap Rate (Ro) |
|---|---|---|---|---|---|---|---|
| 11-98925 | Pima (Cu) | 574.79 | $1,380,000 | $47,644 | $ 83 | Dec 2010 | 3.5% |
| 11-26500 | Pinal (Cu) | 160.00 | $1,760,000 | $60,500 | $378 | Jul 2014 | 3.4% |
| 11-118141 | Yavapai (Au) | 120.00 | $  228,000 | $10,640 | $ 89 | Sep 2015 | 4.7% |

Based on this information and recognition of location, highest and best use and property size
differentials, the appraisal estimated the rent for the Subject Property at $78/acre to derive the annual
income:

<div align="center">1,655.53 acres x $78/acre = $129,131 annual income.</div>

The appraisal estimated the Subject Ro from the above rental data and determined that a mid-range of
4.0% would be applied to the subject:

<div align="center">$129,131 ÷ 4.0% = <b>$3,230,000 ROUNDED</b></div>



MCZ Parcel (Federal)                                                    Page 14 of 14
Pinal County, Arizona

**Reconciliation and Final Value Opinion**
The Sales Comparison Approach provides an opinion of value of $1,990,000. The Income Approach
provides an opinion of value of $3,230,000. The appraisal placed equal weight on both opinions of value
and concluded an opinion of value at the mid-range of $2,610,000.

The opinion of value conclusion is $2,610,000 for the subject's 1,655.53 acres, equivalent to $1,577 per
acre (Rounded).

<div align="center">

**Value Indications**

</div>

| | |
|---|---|
| Cost Approach | $0 |
| Sale Comparison Approach | $1,990,000 |
| Income Capitalization Approach | $3,230,000 |
| **Conclusion** | **$2,610,000** |

**Transaction Scale Analysis**
As a final step in the valuation of each larger parcel, in accordance with the SOW requirement, the appraisal
analyzed the parcels comprising each side of the exchange as a whole in the context of the market and
report if there is an additional increment of value or discount attributable to portfolio enhancement
or the bulk nature of the transaction. Any value enhancement or diminution under this provision
shall be recognized in the concluded values for each of the larger parcels as noted in the SOW.

As stated in the report, the Subject MCZ parcel is one of two federal parcels included in the Southeast
Arizona Land Exchange and Conservation Act. Although they are contiguous parcels, they are two
different properties with different highest and best uses subject to two separate and distinct market
forces and dynamics. The appraisal concluded that the properties would not compete against each other
due to the different highest and best uses, and there would be no enhancement or diminution of value to
either parcel. Further, the appraisal concluded there is no market data that would suggest an increment
in value, or a discount attributable to the bulk nature of the legislated transaction.

| | | |
|---|---|---|
| **Forest**<br>**Service** | **Washington**<br>**Office** | **1400 Independence Avenue, SW**<br>**Washington, DC 20250** |

# Appraisal Report Summary

### Mineral Withdrawal Area MWA (Federal)
### Pinal County, Arizona

### Resolution Copper Legislated Land Exchange
### (Southeast Arizona Land Exchange and Conservation Act, 16 U.S.C. §539p)



**Date of Appraisal Report**
January 20, 2023
(Provided to US Forest Service on January 22, 2023)

**Date of Appraisal Review**
January 25, 2023

**Appraisers**
Marc P. Springer, SFMC Mining Geologist/Mineral Appraiser
Spanish Flat Mining Company (sub-contractor to Weissenborn Appraisal, LLC)
7024 Snapdragon Drive
Carlsbad, CA 92011

Evan Mudd, PE, CG, MBA, PMP, QP, CMA
Mining Engineer, Mineral Appraiser
Arizona Certified General Real Estate Appraiser #1037748 (Expires
03/31/2024) Rock Associates, Ltd
Overland Park, KS 66214



**America's Working Forests – Caring Every Day in Every Way**    Printed on Recycled Paper



# Appraisal Summary

## Appraisal Report under Review
### Appraisers
Marc P. Springer, SFMC Mining Geologist/Mineral Appraiser
Arizona Certified General Real Estate Appraiser #1036208 (Expires 02/29/2024)
California Certified General Real Estate Appraiser # AG044432 (Expires 09/20/2023)
International Institute of Mineral Appraisers, 2006-4
CA State Registered Professional Geologist PG# 7831
BLM Certified Mineral Examiner CME #0139
Spanish Flat Mining Company (sub-contractor to Weissenborn Appraisal, LLC)
7024 Snapdragon Drive
Carlsbad, CA 92011

Evan Mudd, PE, CG, MBA, PMP, QP, CMA
Mining Engineer, Mineral Appraiser
Arizona Certified General Real Estate Appraiser #1037748 (Expires 03/31/2024)
Rock Associates, Ltd
Overland Park, KS 66214

*(Note: Per USDA Forest Service Contract No. 12837120C0041, Weissenborn Appraisal LLC commissioned Spanish Flat Mining Company who has extensive experience, professional knowledge, and expertise in the valuation of mineralized and mine-related properties).*

### Date of Inspection
The Subject Property was inspected on April 12, 2022 which is the effective date of the appraisal. Prior to this inspection, the mineral appraiser, Mr. Halmbacher (deceased) inspected the property on May 08, 2019. Between these dates, the Telegraph Fire started on June 4, 2021 and burned portions of the Subject. The appraisal notes burned areas were still apparent during the property inspection. The property owner(s) were provided the opportunity to accompany the appraiser on the property inspection.

### Date of Report
January 20, 2023

### Owner
The United States of America

### Client
As part of USDA Forest Service Contract No. 12837120C0041, Weissenborn Appraisal LLC commissioned Spanish Flat Mining Company who has extensive experience, professional knowledge, and expertise in the valuation of mineralized and mine-related properties. Weissenborn Appraisal, LLC is the primary appraisal contractor for the USFS, relative to the Federal and non-Federal parcels of the Southeast Arizona Land Exchange and Conservation Act. Weissenborn Appraisal LLC commissioned Spanish Flat Mining Company to complete appraisals on the Federal real property (selected lands) portion of the land exchange; the appraisal will be used by the USFS to facilitate the land exchange.



Although the appraisal completed for Weissenborn Appraisal LLC by Spanish Flat Mining Company as a sub-contractor states the Client is Weissenborn Appraisal LLC, the letter of transmittal from Weissenborn Appraisal LLC to the USDA Forest Service states that the Client in the assignment is the USDA Forest Service specifically the USDA Forest Service, Director of Lands and Minerals, Southwestern Region.

**Intended Use**
To provide a basis of value for the legislated land exchange between the United States of America and Resolution Copper Mining, LLC pursuant to 16 U.S.C. §539p.

**Intended User(s)**
In the original appraisal contract, the intended users were broadly defined. It shall be noted that the intended users of the appraisal report are specifically identified as the USDA Forest Service, Director of Lands and Minerals, Southwestern Region, USDA Office of General Counsel, and Resolution Copper Mining, LLC.

**Professional Standards**
The appraisal standards required for this assignment were the *Uniform Appraisal Standards for Federal Land Acquisitions* and *Uniform Standards of Professional Appraisal Practice.*

**Estate Appraised**

The property rights reported and appraised includes the fee simple interest subject to valid and existing rights encompassing 766.58 acres.

**Outstanding Rights**

The appraisal adequately considered the following outstanding rights and reservations on the Subject Property: <u>Existing Easements</u>: United States Department of Interior Easement for Right-of-Way for Electric Transmission Line granted to Arizona Public Service Company, dated 12/22/75. Federal parcel will be conveyed subject to easement GLO401905 APS 500KV POWERLINE.

<u>Permits and Temporary Easements to convert to Easements in perpetuity:</u> Permit to Salt River Project Agricultural Improvement and Power District for an overhead transmission line Amendment dated 5/21/74. At closing, Resolution Copper Mining shall grant a replacement authorization to Salt River Project Agricultural Improvement and Power District for those sections involved in the conveyance. It shall contain terms at least equivalent to those in permit GLO4011143 SRP PERMIT.

In the context and scope of the appraisal, GLO401905 APS 500KV POWERLINE and GLO4011143 SRP PERMIT have no effect on the value of the subject MWA parcel.

**Definition of Value**
Market Value means the most probable price in cash, or terms equivalent to cash, which lands or interest in lands should bring in a competitive and open market under all conditions requisite to a fair sale, where the buyer and seller each acts prudently and knowledgeable, and the price is not affected by undue influence (36 CFR 254.2).



**Extraordinary Assumptions**
The appraisal is not based upon any Extraordinary Assumptions.

**Hypothetical Conditions**
The appraisal was prepared subject to the following FS instructed Hypothetical Condition: The Federal Property shall be appraised as though it is in private ownership, is freely alienable, and zoned consistently with other similarly situated non-Federal properties within the jurisdiction of the zoning authority. Federal law provides that, upon conveyance, "[t]he Federal Property shall be available to Resolution Copper for mining and related activities subject to and in accordance with applicable Federal, State, and local laws pertaining to mining and related activities on land in private ownership." 16 U.S.C. §539p(c)(8). This hypothetical condition does not alter the facts that: the Federal Property is encumbered by mining claims held by a party other than the United States; said mining claims confer all rights to locatable minerals to that party in accordance with the Mining Law and are not part of the estate owned by the United States, 30 U.S.C. §§26, 181, 611; that the United States currently holds the rights to reasonably regulate surface use of the Federal land for mining purposes under 36 C.F.R. 228 Subpart A, 16 U.S.C. § 551; or that the United States may not prohibit the use of the surface of NFS land for mining purposes, nor may it materially interfere with such uses. 30 U.S.C. § 612.

***Rationale for the Hypothetical Condition:*** The hypothetical condition is based upon direction and guidance from 36 CFR 254.9(b)(ii), FSH 5409.12_65.11(5) which was updated in 2021 to FSH 5409.12_45.1a, FSM 5454, and 16 U.S.C. §539p(c)(8). Federal land is generally not freely alienable, local government entities do not have the authority to zone land owned by the United States, and mining operations on National Forest System land are subject to federal laws and regulations applicable to the administration of the National Forest System and are often exempt from State and local laws. For the purposes of appraisal, the appraiser shall determine and support a conclusion of zoning based on similarly situated private property within the jurisdiction of the zoning authority. This hypothetical condition does not alter or affect the rights of Resolution Copper to the unpatented mining claims and locatable minerals on the Federal land pursuant to the United States Mining Law, or the estate to be appraised in consideration of the existence of the mining claims. The hypothetical condition shall be prominently reported on the transmittal letter, summary page, conclusion page, and certification.

**Jurisdictional Exception**
The appraisal has been prepared in conformance with UASFLA, which requires that the opinion of value not be linked to a specific exposure time as required by USPAP SR 1-2(c) & UASFLA 1.2.4 & 4.2.1.2.

**Legal Description**
Lands comprising the Oak Flat Withdrawal Area; Tract 50; partially surveyed, T.1S., R.13E., for 766.58 acres.

The following maps are for illustration purposes:

MWA Parcel (Federal)
Pinal County, Arizona

### Topographic View of Subject MWA Property



1:40,000

### Aerial View of Subject MWA Property



**Property Description -** The Subject Property is 766.58 acres located east of Superior and just south of U.S. 60.

> **Location:** The Subject Property is located about two miles east-northeast of the town of Superior at the Oak Flat Campground on the Tonto National Forest. The subject neighborhood is the area in and adjacent to the Arizona Copper Triangle which extends from west of Superior to Globe/Miami, and southerly to Winkleman. The area is generally rural where mining and ranching occur. However, active mining, including processing and exploration operations, are common.

The following map illustrates the Arizona Copper Triangle:

**Subject MCZ located within Arizona Copper Triangle**



**Configuration:** The Subject MWA Property is generally equidimensional, contiguous with, and bounded on three sides by the Mining Claim Zone (MCZ) federal property.

**Size:** The Subject Property is 766.58 acres.

**Topography:** The landscape is southcentral Arizona high desert terrain with elevations around 4,200 feet. The land is generally flat with moderate vegetation in the northern portion with moderately rolling hill, sparser vegetation and prominent volcanic rock outcrop in the southern portion. The Subject is in the Lower Mogollon Transition Zone Ecoregion.

**Soil Types:** The Phase 1 ESA reports that most of the soils on the subject are unmapped on the Web Soil Survey. The property previously mapped on the ALRIS General soil map with more than half showing as Mined Land and Rock Outcrop-Woodcutter complex, tuff. Significant areas were unmapped on the ALRIS map as well. The ESA, however, did not agree with this assessment and concluded that the soils were primarily rock outcrop with loamy and gravelly slope alluvium.

**Water :** There are two surface water rights belonging to the Tonto National Forest on or adjacent to the Subject Property. The water sources are filled by unnamed washes. These are:

- 38-65060 Oak Flat Tank – Stock/Wildlife Tank - 3.26-acre feet

- 33-77040 Rim Pond - Stock/Wildlife Tank – 0.77-acre feet

**Flood Zone:** The Phase I Environmental Site Assessment (ESA) indicates there are no identified flood hazard areas on the Subject Property. The area has been mapped by the Federal Emergency Management Agency (FEMA) map panels showing that the entirety of the Property is designated as flood Zone D, which is the designation for areas where FEMA has not conducted a flood hazard analysis and the potential flood hazard has not been determined. There are no FEMA-designated floodplains identified within the Property and none were observed during previous site visits (WestLand 2004a, 2015).

**Utilities:** There are no electrical, telephone, natural gas, water or sewer systems apparent on the Subject Property.

**Access:** Access to the property is available from U.S. 60. The Subject Property is about 60 miles east of Phoenix and about 2 miles east of Superior. Internal access is available from FR 469 which travels from U.S. 60, southerly to FR 2432 (Magma Mine Road) which goes to the south and then northwesterly towards the No. 9 Shaft parcel. A portion of the northwest corner of the Subject Property can be accessed by heading west on FR 2432. The northeast corner is traversed by E Oak Flat Road and FR 2438 which runs easterly from FR 469 through the Oak Flat area. E Oak Flat Road turns north and return to U.S. 60.

**Timber:** N/A

**Minerals:** The mineral rights have been withdrawn from mineral entry since September 27, 1955 and are owned by the United States.

**Environmental Hazards:** The Phase I ESA concluded that there are no Recognized Environmental Conditions (REC) on the Subject Property but noted that surface water quality in the Devils Canyon Watershed and the Queen Creek Watershed is in overall compliance with applicable surface water standards with the following exceptions: arsenic, copper, dissolved oxygen, E. coli bacteria, iron, lead, pH, and selenium (Resolution 2016). Water quality in regional groundwater basins meets EPA and State of Arizona overall drinking water standards, with a few exceptions. Several samples fell below the federal secondary standard for pH and slightly above the federal secondary standards for iron and manganese. In addition, several samples did not meet federal secondary standards for total dissolved solids and sulfate, and one sample also exceeded federal and state primary standards for nitrate (Resolution 2016). It is not known if these conditions are naturally occurring and/or the result of anthropogenic activity. Approximately six small spills of petroleum products (less than 100 gallons) have occurred at the drilling sites and immediately off-site between 2015 and 2020. Information provided from Resolution indicates that these spills were cleaned up and reported to the USFS pursuant to the requirements of the SPCC plan. WestLand did not observe any visible evidence of product spills on the Property. Due to the small quantity and number of spills, this is considered a de minimis condition. Known regional exceedances do not necessarily indicate contamination at the Property



that would be considered environmental liabilities associated with the Property. Given the Highest and Best Use of the property, it is unlikely that these environmental conditions would affect the overall value of the property.

**Improvements**
USA-owned improvements located on the Subject Property are limited to two (2) vault toilets within the Oak Flat Campground. The appraisal states that since the highest and best use of the subject is exploration and development of the Subject MWA mineral resource as a portion of the Resolution Copper Deposit and the focus of the valuation is on the subsurface interest, surface improvements do not contribute value to the subsurface interest and suggests the UASFLA unit rule precludes adding the value of various interests, different physical elements, or components of a tract of land are not to be separately valued and added together.

Since the appraisal did not provide information on the vault toilets, the following discussion is provided for information purposes. The vault toilets were installed in 1994 (28 years ago) and have a 30-year economic life. The replacement costs range from $60,000 to $90,000. Applying a 93% depreciation rate (28/30), provides a range of $4,200 - $6,300 which suggests a nominal stand-alone value as they are almost fully depreciated and likely eligible for replacement if the exchange did not occur.

**Use, Rent and Sale History**
The primary use for the Subject Property is public recreation and has never been sold or rented.

**Zoning and Land Use Restrictions**
The following is a requirement regarding disclosure and analysis of property zoning:

"Determine "consistent" zoning (and other land use restrictions) of Federal land by research and analysis, not by making an assumption. As instructed, the appraisal considered the hypothetical condition that the Federal land be appraised as though in private ownership and zoned consistent with other non-Federal lands. In determining consistent zoning for the Federal land, the appraisal should not consider entitlements such as master planning that are not in place as of the date of value."

The appraisal concluded that the Subject Property is zoned Pinal County GR – General Rural Zone. This is the predominant rural classification throughout the county and permitted uses include single family dwellings, various agricultural uses and quasi-public uses such as parks and schools. The minimum lot size is 1.25 acres. This classification does not specifically allow or prohibit mining but according to the Arizona Revised Statutes:

11-812. Restriction on regulation; exceptions; aggregate mining regulation; definitions

A. Nothing contained in any ordinance authorized by this chapter shall:

2. Prevent, restrict or otherwise regulate the use or occupation of land or improvements for railroad, mining, metallurgical, grazing or general agricultural purposes, if the tract concerned is five or more contiguous commercial acres. For the purposes of this paragraph:

(b) "Mining" has the same meaning prescribed in section 27-301…

10. "Mining" means those activities conducted to develop or extract materials from a mine including



on-site transportation, concentrating, milling, leaching, smelting or other processing of ores or other materials. Mining includes mined land reclamation activities regulated pursuant to chapter 5 or 6 of this title.

Pinal County Code affirms the state statutes at 2.05-050 – Statutory Exemptions:
  As specified in A.R.S. title 11, Ch. 6 (A.R.S. § 11-801 et seq.), the provisions of this title shall not prevent, restrict, or otherwise regulate in any zoning district the use or occupation of land or improvements for railroad, mining, metallurgical, grazing or general agriculture purposes, as defined herein, provided the tract or premises so used is five or more contiguous commercial acres.

The county zoning map for the Ray Mine and surrounding area was also reviewed. All land in that area, including the mine, is zoned GR as well.

## Highest and Best Use
The Highest and Best use was determined to be exploration and development of a mineral resource as a portion of the Resolution Copper deposit.

## Larger Parcel Determination
The report indicates the subject property is contiguous, in the same ownership, and has a single, unified highest and best use.  The appraisal report concludes that the subject parcel is considered the larger parcel.

## Selection of Approaches to Value
The appraisal included a **sales comparison approach** using sales of similar properties which are competitive in the marketplace having the same or similar highest and best use as the Subject.

The **income capitalization approach** was used in the appraisal to fulfill the requirement of the legislation which requires the use of a detailed income capitalization approach analysis of the federal land.  It is noted in the appraisal that the Income Approach is not typically considered by buyers of mine support lands similar to the Subject Property but was included to comply with the legislation.

The **cost approach** is based upon the principal of substitution that a prudent buyer would not pay more for a property than the cost to acquire a similar site and construct improvements of a similar utility without undue delay.  The cost approach was not included in the appraisal.

## Sales Comparison Approach
The appraisal gathered and analyzed 68 international copper projects from the USA, Pakistan, Peru, Ecuador, Chile, Indonesia, Philippines, Argentina, Mexico, Fiji, Democratic Republic of the Congo, Canada, Papua New Guinea, Mongolia, Kazakhstan, Nambia, Sweden, and Colombia.  The copper projects were examined using the following criteria; **deposit setting**, **transaction date**, **transaction framework, deposit type** and **metal content**.  The first set of criteria regarded deposit setting and mining methods. The Subject is proposed as an underground block-cave mine at a depth of 7,000 feet. The infrastructure required to support an underground mine is more extensive than surface mine requirements. As such,  projects that utilized surface mining methods were removed from the data set. The remaining 13 comparable sales that had a combination of surface and underground mining were retained for further analysis.  The next set of criteria regarded the transaction date. Those comparable sales older than five years were removed from the list. This narrowed the list to four comparable sales. The criteria for deposit type and metal content was examined on the remaining four comparable sales.



MWA Parcel (Federal)
Pinal County, Arizona

Since the MWA copper deposit consists of approximately 94% copper, comparable sales with similar metal content were selected. One of the sales (Cascabel Project in Ecuador) had significant gold and silver content and was excluded from the list. The remaining three sales were used for direct comparison to the Subject Property. Two of these sales were from the USA, and one was from Peru. They occurred from 2017-2022 and had a metal content ranging from 86%-100% copper.

The **unit of comparison** used within the appraisal report is US price per pound ($/lb). This unit of comparison is also reflected in the comparable sales and provides for an analysis that is consistent with industry standards.

The appraisal analysis continued with the analysis of the characteristics of each individual sale to the subject property in both narrative format and on the adjustment grid for each sale. Quantitative and/or qualitative adjustments were made for the various elements cited as affecting overall value.

**Property Rights**
The property rights for the subject includes the surface and sub-surface mineral interests. It does not include any business, marketing, or other values associated with mineral exploration. Sale 1 included both an operation firm and the mineral deposit and was considered superior to the subject due to these additional components of value and a downward adjustment was applied to the sale. Sale 2 included an interest holding real estate interests in the project and also actively participating in development which was regarded as superior to the subject and was adjusted downward. Sale 3 was a private equity placement that procured three stakes in the transaction. This form of ownership includes company attributes in addition to the mineral deposit, which is considered a superior form of ownership. However the sale include the acquisition of a partial interest, which is less than the fee simple estate as compared to the subject. The appraisal concluded the form of ownership, and the partial interest were offset, with no adjustment applied.

**Financing Terms**
Financing terms that involve non-market terms require adjustments for cash equivalency. Sale 1 was an all-stock transaction where stockholders of the acquired company were compensated with 0.929 shares of stock for each share in the previously held company. This is considered to be slightly inferior to a cash payment since stock equity has a degree of market risk, thus an upward adjustment was applied to Sale 1. Sales 2 and 3 were cash transactions with no adjustment applied.

**Conditions of Sale**
The appraisal report indicated that Sales 1 and 3 reflected typical sale conditions, no adjustment applied. Sale 2 involved a sale to a related firm that had controlling interest in the property. During the exploration state, an Australian firm owned 100% of the property. The initial exploration reported a reserve that was downgraded as a result of additional exploration. The company sold 51% ownership in 2016 which required the buyer to carry all project costs leading to a completed feasibility study. In 2017 the buyer purchased the remaining 49% interest for what was considered a significant discount from the previous sale. Company news releases at the time of sale indicated the seller desired to exit the project for strategic reasons and re-deploy capital on an alternate project. The conditions of this sale are inferior to the subject and an upward adjustment was made to this sale.

**Market Conditions**
The comparable sales dates ranged from June 2017 to April 2022. The appraisal anecdotally states there is a linkage to commodity prices and a demand for mining related transactions. The appraisal further states that market elements such as inflation, deflation, competitive landscape changes, commodity price

fluctuations, and other factors may influence the sale price. The appraisal maintains that since the comparable sales include exploration and development projects, they are influenced by the commodity price. Therefore 2 of the 3 comparable sales were adjusted upward for metal pricing based on commodity prices at the time of sale as compared to commodity prices as of the effective date of value.

### Property and Physical Adjustments

**Geographic Location**
Sales 1 and 3 are in the Copper Triangle Region of Arizona which is similar to the subject. No adjustment applied to these sales. Sale 2 is located in a high-altitude mountainous region of Peru that has a complexity of political, social, labor, infrastructure, and jurisdictional risk challenges and is considered inferior to the subject with an upward adjustment applied.

**Mining Method**
Two of the three sales had a combination surface/underground mining operation, and one sale is a block cave mining operation. The appraisal states that surface mining operations are generally less costly to operate on a per-ton basis than underground operations. Surface mining generally uses large excavating/hauling equipment with lower unit cost methods. The surface mines are able to mine lower grade ore since they are well suited for low to moderate grade porphyry copper deposits and able to afford moderate dilution. Deep sulfide mineralization like the Subject is generally mined by underground methods. Underground mining requires costly development of an underground infrastructure capable of operating within the constraints of an underground environment. They are also subject to a variety of infrastructure requirements such as hoisting, pumping, and ventilation. Since Sales 1 and 3 were a combination open pit/underground mine, a downward adjustment was applied.

**Project Stage**
The Subject Property is considered to be in the Prefeasibility/Feasibility stage. It has not been explored, but all metal grade and rock mechanics data are inferred from exploration on adjacent properties. As noted in the appraisal, the Subject is in an advanced Exploration/Prefeasibility Stage with a conceptual mine plan and project economics being studied. Sale 1 is in the Exploration Stage and has established mineral resources with infill drilling planned but a mine plan or prefeasibility/feasibility economics has not been established and considered inferior to the subject with an upward adjustment applied. Sale 2 is in the Exploration/Prefeasibility Stage, it has an established mineral resource that had a feasibility study in process at the time of sale. Since this is similar to the Subject, no adjustment was made. Sale 3 had an established mineral resource and at the time of sale updated the mineral resource estimate and was updating the Preliminary Economic Assessment (PEA). Since the mineral resource estimate was completed and is in the Prefeasibility Stage it was considered superior to the Subject with a downward adjustment applied.

**Resource Classification**
The Subject is considered an Inferred Resource since it has not been explored and the quantity, grade, and quality of the deposit is based on limited geological evidence and sampling. An Inferred Resource has the lowest level of confidence of all resource classes. Indicated and Measured Resource classes have higher levels of confidence and are generally reported separately and in a combination which provides a benchmark to gauge the quantity of resources that fall within the higher confidence classes. The appraisal compared the combinations of Indicated and Measured resource classes to the Subject. All three sales had a combination of Indicated and Measured classes and were considered superior to the Subject with downward adjustments applied to all three sales.



**Deposit Size**
The deposit size is directly related to mine capital and operating costs. Larger operations are typically able to extract and process material at a lower unit cost ($/ton) relative to small operations. In general, deposits operating at a larger scale can extract and process generally lower grades with better economies of scale than smaller scale deposits. The appraisal states the Subject deposit is estimated at approximately 5.33 billion lbs., plus other base metals Cu equivalent of 0.28 billion lbs., plus precious metal Cu equivalent of 0.07 billion lbs., for an estimated total Cu and equivalent deposit of 5.68 billion lbs.  Sale 1 was similar in size, so no adjustment was made. Sales 2 and 3 were smaller in size and considered inferior to the Subject with an upward adjustment applied to both sales.

**Zoning/Land Use**
Although the appraisal did not include Zoning/Land Use in the sales comparison grid, it did discuss Zoning and Land Use throughout the report. Sale 1 and Sale 3 had the same General Rural/Vacant Ranch Land zoning that allowed mining and Sale 2 is located in a mining district. No adjustment applied.

The unadjusted and adjusted sale prices are reflected below.

**Direct Sales Comparison Sales Summary**

| Sale | Date | Billion lbs. | Unadjusted $/lb | Adjusted $/lb |
|------|------|------|------|------|
| 1 | June-2018 | 4.65 | $0.0022 | $0.0026 |
| 2 | June-2017 | 3.29 | $0.0015 | $0.0034 |
| 3 | April-2022 | 3.59 | $0.0077 | $0.0045 |
| | | | | |
| Low | 2017 | 3.29 | $0.0015 | $0.0026 |
| High | 2022 | 4.65 | $0.0077 | $0.0045 |

**Reconciliation**
The appraisal report addressed the overall comparability of the sales as required by UASFLA. The appraisal stated that the comparable sales, after adjustments, shows a range of indicated values from a low of $0.0026 per pound to a high of $0.0045 per pound. The appraisal placed equal weight on all the comparable sales and concluded an opinion of value of $0.0037 per pound.

The opinion of value conclusion is $0.0037 per pound.

5.68 Billion lbs. X $0.0037 per pound = $21,000,000 (ROUNDED)



**Income Capitalization Approach**

In developing an opinion of value using the income approach for a mineral property, it is generally recognized that the most appropriate method of capitalization is yield capitalization most notably the discounted cash flow (DCF) analysis (UASFLA). The income that is evaluated is the royalty income as opposed to the income or profit generated by the business of mining and selling the mineral. The income approach utilized to value mineral properties is commonly referred to as the royalty income approach by the Uniform Appraisal Standards for Federal Land Acquisitions (UASFLA). The royalty income paid to the landowner over the life of the mine is capitalized to a net present value (NPV) using a discounted cash flow (DCF) analysis. The DCF analysis can be highly complex as a detailed mining plan for the property is often required.

Besides the mining plan, essential components include:
- the royalty rate,
- the unit sale price of the mineral to which the royalty rate is applied,
- the projected annual amount of mineral production,
- projected number of years of production,
- bonus payments prior to production,
- the year production will begin,
- transportation and smelter/refinery costs,
- metal recovery rates,
- NPV discount rate

**MWA Mineral Resources**

For purposes of this appraisal, independent studies were completed by Dassault Systemes, an international mine modeling firm often utilized by mining companies worldwide who seek solutions to mine productivity, and Dr. David Wahl, Jr., PHD, Consulting Geologist. The results of these confidential and proprietary studies were used in the MWA appraisal. Dassault Systemes is home to world-renowned and award-winning mining solutions utilized by industry thought leaders who are pushing the boundaries of what's possible in mining, through the GEOVIA brand. The largest global supplier of mining software, GEOVIA delivers comprehensive solutions in all major mining centers in more than 130 countries at over 4,000 sites. Although these are confidential and proprietary reports, the Review Appraiser had controlled access to these reports during the course of the review. In May of 2019 the caving specialists of Dassault Systemes, owners of PCBC (Personal Computer Block Caving) Software and PCBC's Footprint Finder Application, were requested by the Forest Service to complete an evaluation of the annual mine production of the MWA block cave deposit. PCBC software is considered the standard software package for block cave mines across the globe and is used virtually by every mining company involved in block caving to improve profits through better mine plans, schedules and production management. The focus of the study was to independently determine the schedules with annual tons and grade, inside and outside of the MWA. Orebody specific parameters provided by Resolution Copper that included geologic and geotechnical data gathered from 15 years of exploratory drilling and subsequent analysis, testing, modeling and third-party validation were benchmarked against similar block cave operations worldwide. Ore body parameters for cave design and scheduling specific to the deposit included; density of caved material, drawpoint spacing and design, drawcone diameter, caveability and hydraulic radius, geotechnical domains and fines assumptions, inter-panel pillars, mixing and slicefile parameters, recompaction rule and panel sequencing, stress, and undercutting orientation.



Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 623 of 2158
Case 2:21-cv-00122-DWL    Document 87-12    Filed 07/14/25    Page 16 of 29

MWA Parcel (Federal)                                                                    Page 14 of 28
Pinal County, Arizona

Dassault utilized their proprietary software to independently develop a mine plan for the subject MWA property and Dr. Wahl, PHD independently evaluated the Dassault results and produced a consulting report that analyzed generalized geological mining scenarios, net smelter returns and discounted cash flow rates. The input variables of Dr Wahl's report were independently reviewed by a Forest Service Certified Mineral Examiner/Geologist and concluded the information presented in the report was supported with market/consensus/benchmarking data.

The results from the independent studies of the MWA deposit and Dassault Mine Plan are as follows:
- Block cave underground mine design with 10-year pre-production construction timeframe
- Mine life of 31 years
- Mining activities reach 2,175 feet below sea level (Approximately 6,400 feet below surface)
- 141,874,468 tons of inferred mineral resource grading 1.88% copper
- 5.33 billion pounds of copper within MWA minable ore
- 90% recovery of copper from ore body
- Maximum production of approximately 58,000 tons/day (reached in year 11)
- Overall metal content is 94% copper and 6% molybdenum and silver equivalents
- Molybdenum and silver production to occur concurrently with copper production
- In-place molybdenum resources at 81.23 million pounds
- In-place silver resources at 17.98 million ounces

## Net Smelter Return (NSR)
The royalty rate for the subject MWA property was determined using the Net Smelter Return (NSR) rate. The Net Smelter Return (NSR) is what a landowner is paid after the metals have been smelted and refined at a toll-based treatment facility. There are fees for these processes that take into account metal recovery and small metal deductions as part of the toll smelting/refining agreement. Once the ore is extracted, it is converted into a concentrated form that is shipped to a smelting facility. The cost to transport concentrates to the toll-based treatment facility and the metal treatment charged are deducted from the NSR that is paid to the landowner. To illustrate this, if a mine operator receives $1,000 from a toll-based treatment facility as payment for the ore concentrates and say the cost of concentrate transport and processing was $300, the final royalty payment to the landowner with a 3% NSR would be: $1,000 - $300 = $700 x .03 (NSR) = $210.

## Concentrate Transport Costs
The appraisal evaluated the transport costs based on Dr. Wahl's research which concluded that the most likely copper smelting location for the copper concentrate is southeast Asia. Transportation costs for copper is based on freight to Wilmington Port, California then shipped to southeast Asia. Molybdenum processing is likely to occur in Mexico and Belgium. The appraisal cross-checked Dr. Wahl's transportation cost estimates against freight cost and ocean carrier estimates using the Mine Cost Service and affirmed the estimates. The appraisal estimated transport costs that include mine to port, ocean transport, and destination port to smelter and concluded a transport cost of approximately $80-$90 per ton which is similar to Dr. Wahl's estimate. The transport costs used in the appraisal are $88.57 per concentrate ton.

## Metal Recovery
The estimate of metal recovery from concentrating and smelting the mined ore was based on the independent research conducted by Dassault and Dr. Wahl. The subject MWA recovery of copper, molybdenum, and silver metals include 90% for copper and 75% for molybdenum. After concentrate transport; smelter and roast recoveries are estimated to include a 96.6% smelter recovery for copper and



Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 624 of 2158

MWA Parcel (Federal)                                    Case 2:21-cv-00122-DWL   Document 87-12   Filed 07/14/25   Page 17 of 29                    Page 15 of 28
Pinal County, Arizona

a 99% roasting recover for molybdenum. Silver is a minor byproduct of the MWA. Overall, 70% of the
silver is projected to be recovered through both the concentrator and smelting processes.

**Treatment and Refining Cost**
After transporting metal concentrates to the smelter, Treatment and Refinement costs are charged to
refine concentrate into the finished metal. At the smelter, high temperatures are used to further purify
the ore through smelting and electrolytic metal recovery. Based on research by Dr. Wahl, these costs are
estimated to fall near $84.82 per concentrate ton. Similar to the transportation cost estimates, the
appraisers cross-checked Dr Wahl's estimates with publications from Mining Cost Service (Smelting
and Refining, 2018) and found them to be reasonable by comparison to the Mine Cost Service industry
survey.

**Metal Pricing**
Commodity prices were determined by using consensus pricing from international investment banks,
advisory firms, and data from the Arizona Department of Revenue. Long-term copper pricing was
estimated at $3.4514 per lb. The long-term pricing for molybdenum was estimated at $10.6505 per lb,
and the long-term silver pricing was estimated at $20.80 per lb. The appraisal validated these forecasts
against long-term projections by the Commodity Research Bureau (accessed via market data firm
Barchart) and found them to be in alignment with industry-standard projections.

**Royalty (Net Smelter Return)**
There are numerous factors that influence the NSR rate. Factors like, how promising does the project
appear, how advanced is the project and how much has the NSR recipient done to advance the project?
Dr. Wahl conducted a study of 13 NSR private, porphyry-type mining NSR royalty agreements in the
Southwest United States with 11 in Arizona. The results show that 9 of the royalty agreements had a 2%
NSR and four had a 2.5% NSR. A NSR between 2% and 2.5% would appear to be the only obligation
the mining company would once it goes into production. It should be noted that private party options
commonly have significant "up-front" payments due long before production begins. Typically payments
are required to exercise an option, and yearly payments plus work commitments follow that. Also, as
progress is made and certain milestones are reached, benchmark payments may be required. Initial
resource estimates, pre-feasibility studies and feasibility studies are accomplishments that may initiate
benchmark payments. So, by the time a mine goes into production, the "up-front" payments received by
the royalty holders have significantly augmented the actual NSR payments due at production.

The appraisal reviewed the royalty agreements and cross-checked them with sources to verify their
validity and applicability. The subject MWA is most similar to six specific agreements that call for
varying degrees of "up-front" payments, milestone payments, advanced minimum royalties, and NSR
payments. Most weight was given to royalty agreements that occurred within the past five years, were
similar to the subject and did not involve complex stock transfers, "work-in" components, or
connections with other related deal transactions. The appraisal concluded that a royalty structure with
slightly lower "up-front" payments and higher NSR would be applied in the valuation of the subject
MWA. Based on the body of work reviewed, the appraisal concluded a NSR of 2.5% be applied to the
subject MWA parcel.



MWA Parcel (Federal)                                                 Page 16 of 28
Pinal County, Arizona

**Royalty Calculations**

Utilizing the subject MWA parcel's metal pricing, concentrator recovery, smelting metal recovery, transportation costs, refining cost, and net smelter return, the royalty calculation is summarized as follows:

**Copper Royalty Summary**

| Description | Amount |
|---|---|
| Potential Gross Revenue ($/lb) | $3.45 |
| Payable Metal Recovery (%) | 96.60% |
| Estimated Gross Revenue$/lb) | $3.33 |
| | |
| Transportation Cost ($/lb) | -$0.15 |
| Treatment Cost ($/lb) | -$0.14 |
| Refining Cost ($/lb) | -$0.09 |
| Net Smelter Return ($/lb) | $2.95 |
| | |
| 2.5% Royalty | 2.5% |
| **Royalty ($/lb)** | **$0.074** |

**Molybdenum Royalty Summary**

| Description | Amount |
|---|---|
| Potential Gross Revenue ($/lb) | $10.65 |
| Payable Metal Recovery (%) | 99.0% |
| Estimated Gross Revenue$/lb) | $10.54 |
| | |
| Transportation Cost ($/lb) | -$0.40 |
| Roasting Cost ($/lb) | -$0.98 |
| Net Smelter Return ($/lb) | $9.16 |
| | |
| 2.5% Royalty | 2.5% |
| **Royalty ($/lb)** | **$0.229** |

**Silver Royalty Summary**

| Description | Amount |
|---|---|
| Potential Gross Revenue ($/oz) | $20.80 |
| 2.5% Royalty | 2.5% |
| **Royalty ($/lb)** | **$0.520** |

The Dassault Mine model estimates that over the life of the mine, the MWA portion will be paid for:

- 4,634,308,108 lbs. of copper
- 60,316,000 lbs. of molybdenum
- 12,582,647 oz. of silver.

If the MWA produces in excess of these amounts, a royalty will be paid to the United States as production continues as directed by the Southeast Arizona Land Exchange and Conservation Act.

### Discount Rate

The discount rate reflects the degree of risk associated with the property appraised.  It is the rate that discounts all future benefits to an estimated present value. The appraisal analyzed the independent research conducted by Dr. Wahl regarding discount rates for mineral properties at various project stages ranging from early exploration, pre-feasibility, feasibility, initial production, and mid-life production. Mineral properties that are in the early exploration phase have higher discount rates, around 20% while those in the production phase have lower discount rates at 5% or less. The higher the risk, the higher the discount rate.  Although block cave mining is the most efficient mining method for the MWA parcel, it also requires extensive pre-production development costs prior to generating any cash flows from mining. For the subject MWA parcel, it is conceivable that mine production would not begin until ten years after all permits and agreements are in place. Upfront payments for metal recovery values that are expected to come out of the ground at least ten to 41 years after the payment date are discounted to account for the time value of money over a long period of time.

The risks associated with mining the MWA parcel correlates to the confidence of the mineral deposit, tonnage and grade, political stability and social/environmental issues, commodity prices, and demand. The undrilled nature of the MWA poses a risk in the grade and tonnage of the ore that will be mined. Mining at great depths in unknown conditions coupled with social, political and environmental issues also contribute to the risk associated with the subject MWA parcel.

Since the MWA has not been drilled, it could be considered being in the early exploration phase. However, since there is known mineralization and significant development work on the adjacent property, the subject MWA is considered to be at an advanced level beyond the early exploration stage.

The appraisal opined that the subject MWA is between the late pre-feasibility to early feasibility stage.

Figure 1 below illustrates different discount rates for various project stages and suggests a range of 10% to 15% for the subject MWA:





**Figure 1 -** *Components of real discount rates at different stages of project development. Revenue factors include metal price, grade, recovery, and throughput, 100% equity (Smith 2003b)*

The following Table provided by the Wahl report illustrates discount rates for each project stage. The data is a culmination of the average discount rates from various sources for base metals projects:

| PROJECT STAGE | DISCOUNT RATE |
| --- | --- |
| Exploration/Scoping | 14% to 20% |
| Pre-feasibility | 12% to 15% |
| Feasibility | 10% to 12.5% |
| Operational | 8% to 8.5% |

Since the appraisal opined that the subject MWA parcel was between Pre-Feasibility and Feasibility stages the table suggests a discount rate between 10% to 15%.

In developing the discount rate for the subject MWA parcel, the appraisal utilized a variety of resources including market-based information and industry studies conducted pertaining to discount rates for properties with similar mineral resources as the subject.

The findings from Dr. Wahl's report were augmented with other market-based discount rate information of copper properties that also produced molybdenum and silver.

The Arizona Department of Revenue publishes an annual study on discount rates for mining properties. A base capitalization rate for discounting cash flows is determined annually by reviewing current industry practice. During the year, numerous transactions related to the metals industry is collected from merger and acquisition developments, technical project reports, annual financial reports, press releases, professional journals, and other publications. Based on this information, the range of discount rates for copper properties that includes a mix of pre-tax and post-tax rates ranges from 5% to 15%. Since all but one of these properties were surface mines, the appraisal conducted additional research and analysis to develop a discount rate using the Arizona Discount Rate Dataset Average for copper, molybdenum, and silver, while also addressing the after-tax premium, geologic certainty premium, project stage premium, and project specific premium to derive a discount rate of 14.25%.

The appraisal also utilized a Weighted Average Cost of Capital (WACC) approach that was derived by using five base metal mining companies for the past 5 years. All 5 of the companies have significant involvement in copper projects but also allocate financial resources to other commodities such as precious metals. The appraisal developed the WACC for copper, molybdenum, and silver and also accounted for after-tax premium, capital constraints, project risk, and capital appreciation to conclude a discount rate of 15.25%.

The state of Utah publishes an annual discount rate study.  It derives discount rates from publicly traded equities of mining companies in coal, precious metals, non-precious metal, non-metals, and other types of mining. Using the equity yield rate for non-precious metals, adjusted for inflation, project-specific risks, and capital constraints, a discount rate of at least 15% was derived.

The appraisal took into consideration the following information to conclude a discount rate for the subject MWA parcel:
- Dr. Wahl's report – 10% -15%
- Metal mining project discount rate studies by Lawrence Smith  – 14%
- Arizona DOR transaction surveys – 14.25%
- Arizona Valuation guidelines – Discount Rate dataset for CU, Mo, AG – 14%
- Weighted Average Cost of Capital (WACC) – 15.25%
- Utah State Tax Commission non-precious metal equity rate – 15%

The appraisal states the weighted average cost of capital indication is believed to be less reliable and was not given any weight. The Arizona DOR survey is considered a strong indicator because it is based on actual transactions involving copper, molybdenum, and silver properties.  After taking into consideration the body of work analyzed, the appraisal concluded a discount rate of **14.25%** for the subject MWA parcel.

**Project Delay**
The appraisal indicated that it is likely that production would not occur until year 14 from the effective date of value. The first 13 years will provide for non-production payments as identified by the Dassault Mine Model.



MWA Parcel (Federal)                                                                                     Page 20 of 28
Pinal County, Arizona

**Royalty Income Capitalization Approach Determination/Conclusion –** <u>Adequate</u>
The royalty income capitalization approach provides for 13 years of non-production payments, 31 years of production payments for Copper, Molybdenum, and Silver using a discount rate of 14.25%.  The commodity production and recoverable metals was based on Dassault Systemes Mine Model.

The following table compares the DCF results between the appraisal and the FS review:

| Summary of MWA Royalty | | |
|---|---|---|
| **Present Value 14.25%** | **Appraisal Results** | **FS Review Calc** |
| Non-Production | $        3,693,465 | $        3,693,465 |
| Copper Royalty | $      17,584,784 | $      17,615,854 |
| Molybdenum Royalty | $           647,547 | $           647,270 |
| Silver Royalty | $           297,191 | $           297,864 |
| Total Royalty | $      22,222,986 | $      22,254,453 |
| Deduct Feasibility Milestones (-$500K per year, Yrs 14-18) | $         (301,939) | $         (301,939) |
| **Grand Total $** | **$      21,921,047** | **$      21,952,514** |
| *FS - Apppraisal Difference* | *$            31,467* | *0.1435%* |

A difference of $31,467 (which falls within the range of tolerance) is likely attributed to the difference in the number of decimal places used in the calculations.

Based on the Royalty income approach, the appraisal concluded an opinion of value for the Subject MWA parcel of $22,000,000 (Rounded)

**Final Reconciliation –** <u>Adequate</u>
The appraisal has completed a sales comparison and income capitalization analysis to provide a final opinion of value for the subject MWA parcel. The appraisal placed more weight on the income approach to value and states the sales comparison approach is used as a test of reasonableness regarding the magnitude and conclusion of the income approach.

<u>**VALUE INDICATIONS**</u>

Cost Approach: N/A

Sales Comparison Approach: $21,000,000

Income Approach: $22,000,000

**Conclusion: $22,000,000**

MWA Parcel (Federal)                                                    Page 21 of 28
Pinal County, Arizona

**Transaction Scale Analysis**

As a final step in the valuation of each larger parcel, in accordance with the SOW requirement, the appraisal analyzed the parcels comprising each side of the exchange as a whole in the context of the market and report if there is an additional increment of value or discount attributable to portfolio enhancement or the bulk nature of the transaction. Any value enhancement or diminution under this provision shall be recognized in the concluded values for each of the larger parcels as noted in the SOW.

As stated in the report, the Subject MWA parcel is one of two federal parcels included in the Southeast Arizona Land Exchange and Conservation Act. Although they are contiguous parcels, they are two different properties with different highest and best uses subject to two separate and distinct market forces and dynamics. The appraisal concluded that the properties would not compete against each other due to the different highest and best uses, and there would be no enhancement or diminution of value to either parcel. Further, the appraisal concluded there is no market data that would suggest an increment in value, or a discount attributable to the bulk nature of the legislated transaction.

MWA Parcel (Federal)
Pinal County, Arizona

Page 22 of 28

## MWA CASH FLOWS – Non-Production Payments

| Non-Production Payment Calculation | | 14.25% | | FS Calc | Appraisal Calc | | FS Calc | Appraisal Calc |
|---|---|---|---|---|---|---|---|---|
| Period/Year | Option/Bonus $ | Advanced $ | Milestone $ | Non-Prod TTL Pmts $ | Non-Prod TTL Pmts APR | PV Factor @14.25% | PV of Cash Flow $ | PV CF $ Appraisal |
| 1.0 | $ 1,000,000 | $ 200,000 | $ – | $ 1,200,000 | $ 1,200,000 | 0.87527 | $ 1,050,328 | $ 1,050,328 |
| 2.0 | $ – | $ 200,000 | $ – | $ 200,000 | $ 200,000 | 0.76610 | $ 153,221 | $ 153,221 |
| 3.0 | $ – | $ 200,000 | $ – | $ 200,000 | $ 200,000 | 0.67055 | $ 134,110 | $ 134,110 |
| 4.0 | $ – | $ 200,000 | $ 500,000 | $ 700,000 | $ 700,000 | 0.58691 | $ 410,840 | $ 410,840 |
| 5.0 | $ – | $ 200,000 | $ – | $ 200,000 | $ 200,000 | 0.51371 | $ 102,742 | $ 102,742 |
| 6.0 | $ – | $ 200,000 | $ 1,000,000 | $ 1,200,000 | $ 1,200,000 | 0.44964 | $ 539,565 | $ 539,565 |
| 7.0 | $ – | $ 200,000 | $ – | $ 200,000 | $ 200,000 | 0.39356 | $ 78,711 | $ 78,711 |
| 8.0 | $ – | $ 200,000 | $ 2,500,000 | $ 2,700,000 | $ 2,700,000 | 0.34447 | $ 930,067 | $ 930,067 |
| 9.0 | $ – | $ 250,000 | $ – | $ 250,000 | $ 250,000 | 0.30150 | $ 75,376 | $ 75,376 |
| 10.0 | $ – | $ 250,000 | $ – | $ 250,000 | $ 250,000 | 0.26390 | $ 65,975 | $ 65,975 |
| 11.0 | $ – | $ 250,000 | $ – | $ 250,000 | $ 250,000 | 0.23098 | $ 57,746 | $ 57,746 |
| 12.0 | $ – | $ 250,000 | $ – | $ 250,000 | $ 250,000 | 0.20217 | $ 50,544 | $ 50,544 |
| 13.0 | $ – | $ 250,000 | $ – | $ 250,000 | $ 250,000 | 0.17696 | $ 44,239 | $ 44,239 |
| 14.0 | $ – | $ – | $ – | $ – | $ – | 0.15489 | $ – | $ – |
| 15.0 | $ – | $ – | $ – | $ – | $ – | 0.13557 | $ – | $ – |
| 16.0 | $ – | $ – | $ – | $ – | $ – | 0.11866 | $ – | $ – |
| 17.0 | $ – | $ – | $ – | $ – | $ – | 0.10386 | $ – | $ – |
| 18.0 | $ – | $ – | $ – | $ – | $ – | 0.09091 | $ – | $ – |
| 19.0 | $ – | $ – | $ – | $ – | $ – | 0.07957 | $ – | $ – |
| 20.0 | $ – | $ – | $ – | $ – | $ – | 0.06964 | $ – | $ – |
| 21.0 | $ – | $ – | $ – | $ – | $ – | 0.06096 | $ – | $ – |
| 22.0 | $ – | $ – | $ – | $ – | $ – | 0.05335 | $ – | $ – |
| 23.0 | $ – | $ – | $ – | $ – | $ – | 0.04670 | $ – | $ – |
| 24.0 | $ – | $ – | $ – | $ – | $ – | 0.04087 | $ – | $ – |
| 25.0 | $ – | $ – | $ – | $ – | $ – | 0.03578 | $ – | $ – |
| 26.0 | $ – | $ – | $ – | $ – | $ – | 0.03131 | $ – | $ – |
| 27.0 | $ – | $ – | $ – | $ – | $ – | 0.02741 | $ – | $ – |
| 28.0 | $ – | $ – | $ – | $ – | $ – | 0.02399 | $ – | $ – |
| 29.0 | $ – | $ – | $ – | $ – | $ – | 0.02100 | $ – | $ – |
| 30.0 | $ – | $ – | $ – | $ – | $ – | 0.01838 | $ – | $ – |
| 31.0 | $ – | $ – | $ – | $ – | $ – | 0.01609 | $ – | $ – |
| 32.0 | $ – | $ – | $ – | $ – | $ – | 0.01408 | $ – | $ – |
| 33.0 | $ – | $ – | $ – | $ – | $ – | 0.01232 | $ – | $ – |
| 34.0 | $ – | $ – | $ – | $ – | $ – | 0.01079 | $ – | $ – |
| 35.0 | $ – | $ – | $ – | $ – | $ – | 0.00944 | $ – | $ – |
| 36.0 | $ – | $ – | $ – | $ – | $ – | 0.00826 | $ – | $ – |
| 37.0 | $ – | $ – | $ – | $ – | $ – | 0.00723 | $ – | $ – |
| 38.0 | $ – | $ – | $ – | $ – | $ – | 0.00633 | $ – | $ – |
| 39.0 | $ – | $ – | $ – | $ – | $ – | 0.00554 | $ – | $ – |
| 40.0 | $ – | $ – | $ – | $ – | $ – | 0.00485 | $ – | $ – |
| 41.0 | $ – | $ – | $ – | $ – | $ – | 0.00425 | $ – | $ – |
| 42.0 | $ – | $ – | $ – | $ – | $ – | 0.00372 | $ – | $ – |
| 43.0 | $ – | $ – | $ – | $ – | $ – | 0.00325 | $ – | $ – |
| 44.0 | $ – | $ – | $ – | $ – | $ – | 0.00285 | $ – | $ – |
| TOTAL | $ 1,000,000 | $ 2,850,000 | $ 4,000,000 | $ 7,850,000 | $ 7,850,000 | | $ 3,693,465 | $ 3,693,465 |

Summary:

| | |
|---|---|
| Total PMTS | $7,850,000 |
| PV @ 14.25% | |
| FS calc | $3,693,465 |
| Appraisal calc | $3,693,465 |
| Diff | $0 |

4-ER-590

MWA Parcel (Federal)
Pinal County, Arizona

## MWA CASH FLOWS – COPPER

| Copper Production | | | 14.25% | | | 1,000,000.00 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Period/Year | Prod (Mlbs) | Short Tons (2K) | Recovery (Mlbs) | Recovery rate calc | Royalty $/lb | Royalty $ FS calc | Appraisal $calc | PV Factor @14.25% | PV of Cash Flow $ FS calc | Appraisal $calc | FS – Apprsl Diff |
| 1.0 | 0.00 | | 0.00 | | $0.000 | $  – | $  – | 0.87527 | $  – | $  – | $  – |
| 2.0 | 0.00 | | 0.00 | | $0.000 | $  – | $  – | 0.76610 | $  – | $  – | $  – |
| 3.0 | 0.00 | | 0.00 | | $0.000 | $  – | $  – | 0.67055 | $  – | $  – | $  – |
| 4.0 | 0.00 | | 0.00 | | $0.000 | $  – | $  – | 0.53691 | $  – | $  – | $  – |
| 5.0 | 0.00 | | 0.00 | | $0.000 | $  – | $  – | 0.51371 | $  – | $  – | $  – |
| 6.0 | 0.00 | | 0.00 | | $0.000 | $  – | $  – | 0.44964 | $  – | $  – | $  – |
| 7.0 | 0.00 | | 0.00 | | $0.000 | $  – | $  – | 0.39356 | $  – | $  – | $  – |
| 8.0 | 0.00 | | 0.00 | | $0.000 | $  – | $  – | 0.34447 | $  – | $  – | $  – |
| 9.0 | 0.00 | | 0.00 | | $0.000 | $  – | $  – | 0.30150 | $  – | $  – | $  – |
| 10.0 | 0.00 | | 0.00 | | $0.000 | $  – | $  – | 0.26390 | $  – | $  – | $  – |
| 11.0 | 0.00 | | 0.00 | | $0.000 | $  – | $  – | 0.23098 | $  – | $  – | $  – |
| 12.0 | 0.00 | | 0.00 | | $0.000 | $  – | $  – | 0.20217 | $  – | $  – | $  – |
| 13.0 | 0.00 | | 0.00 | | $0.000 | $  – | $  – | 0.17696 | $  – | $  – | $  – |
| 14.0 | 8.03 | 4,015.00 | 7.22 | 89.913% | $0.074 | $ 534,280 | $ 533,556 | 0.15489 | $ 82,753 | $ 82,641 | $ 112 |
| 15.0 | 80.11 | 40,055.00 | 72.09 | 89.989% | $0.074 | $ 5,334,660 | $ 5,325,562 | 0.13557 | $ 723,209 | $ 721,975 | $ 1,233 |
| 16.0 | 159.95 | 79,975.00 | 143.95 | 89.997% | $0.074 | $ 10,652,300 | $ 10,633,552 | 0.11866 | $ 1,263,991 | $ 1,261,767 | $ 2,225 |
| 17.0 | 242.56 | 121,280.00 | 218.30 | 89.996% | $0.074 | $ 16,154,200 | $ 16,125,587 | 0.10356 | $ 1,677,760 | $ 1,674,789 | $ 2,972 |
| 18.0 | 254.86 | 127,430.00 | 229.40 | 90.010% | $0.074 | $ 16,975,690 | $ 16,945,843 | 0.09091 | $ 1,543,169 | $ 1,540,464 | $ 2,705 |
| 19.0 | 136.18 | 68,090.00 | 122.56 | 89.999% | $0.074 | $ 9,069,440 | $ 9,053,214 | 0.07957 | $ 721,627 | $ 720,336 | $ 1,291 |
| 20.0 | 141.30 | 70,650.00 | 127.17 | 90.000% | $0.074 | $ 9,410,580 | $ 9,394,211 | 0.06964 | $ 655,379 | $ 654,239 | $ 1,140 |
| 21.0 | 329.47 | 164,735.00 | 296.52 | 89.999% | $0.074 | $ 21,942,480 | $ 21,903,549 | 0.06096 | $ 1,337,536 | $ 1,335,162 | $ 2,373 |
| 22.0 | 668.34 | 334,170.00 | 601.50 | 89.999% | $0.074 | $ 44,511,000 | $ 44,432,377 | 0.05335 | $ 2,374,620 | $ 2,370,626 | $ 4,195 |
| 23.0 | 928.33 | 464,165.00 | 835.50 | 90.000% | $0.074 | $ 61,827,000 | $ 61,717,271 | 0.04670 | $ 2,887,257 | $ 2,882,132 | $ 5,124 |
| 24.0 | 805.57 | 402,785.00 | 725.01 | 90.000% | $0.074 | $ 53,650,740 | $ 53,355,628 | 0.04067 | $ 2,182,940 | $ 2,189,052 | $ 3,888 |
| 25.0 | 383.53 | 191,765.00 | 345.17 | 89.980% | $0.074 | $ 25,542,580 | $ 25,497,626 | 0.03578 | $ 913,818 | $ 912,209 | $ 1,608 |
| 26.0 | 78.14 | 39,070.00 | 70.32 | 89.992% | $0.074 | $ 5,203,680 | $ 5,194,704 | 0.03131 | $ 162,948 | $ 162,667 | $ 281 |
| 27.0 | 1.46 | 730.00 | 1.32 | 90.411% | $0.074 | $ 97,680 | $ 97,341 | 0.02741 | $ 2,677 | $ 2,668 | $ 9 |
| 28.0 | 0.92 | 460.00 | 0.83 | 90.217% | $0.074 | $ 61,420 | $ 61,268 | 0.02399 | $ 1,473 | $ 1,470 | $ 4 |
| 29.0 | 113.51 | 56,755.00 | 102.16 | 90.001% | $0.074 | $ 7,559,840 | $ 7,546,087 | 0.02100 | $ 158,739 | $ 158,450 | $ 289 |
| 30.0 | 195.39 | 97,695.00 | 175.85 | 89.999% | $0.074 | $ 13,012,900 | $ 12,990,026 | 0.01838 | $ 239,160 | $ 238,739 | $ 420 |
| 31.0 | 203.43 | 101,715.00 | 183.09 | 90.001% | $0.074 | $ 13,548,640 | $ 13,524,575 | 0.01609 | $ 217,948 | $ 217,561 | $ 387 |
| 32.0 | 173.02 | 89,010.00 | 160.22 | 90.001% | $0.074 | $ 11,856,280 | $ 11,835,542 | 0.01408 | $ 166,936 | $ 166,641 | $ 295 |
| 33.0 | 157.74 | 78,870.00 | 141.96 | 89.996% | $0.074 | $ 10,505,040 | $ 10,486,518 | 0.01232 | $ 129,462 | $ 129,234 | $ 228 |
| 34.0 | 113.33 | 56,665.00 | 102.00 | 90.003% | $0.074 | $ 7,548,000 | $ 7,534,564 | 0.01079 | $ 81,418 | $ 81,273 | $ 145 |
| 35.0 | 79.73 | 39,865.00 | 71.76 | 90.004% | $0.074 | $ 5,310,240 | $ 5,300,563 | 0.00944 | $ 50,136 | $ 50,044 | $ 91 |
| 36.0 | 28.27 | 14,135.00 | 25.44 | 89.989% | $0.074 | $ 1,882,560 | $ 1,879,247 | 0.00826 | $ 15,557 | $ 15,530 | $ 27 |
| 37.0 | 2.34 | 1,170.00 | 2.11 | 90.171% | $0.074 | $ 156,140 | $ 155,810 | 0.00723 | $ 1,129 | $ 1,127 | $ 2 |
| 38.0 | 10.11 | 5,055.00 | 9.10 | 90.010% | $0.074 | $ 673,400 | $ 672,420 | 0.00633 | $ 4,263 | $ 4,257 | $ 6 |
| 39.0 | 11.98 | 5,990.00 | 10.78 | 89.983% | $0.074 | $ 797,720 | $ 796,580 | 0.00554 | $ 6,420 | $ 4,416 | $ 6 |
| 40.0 | 10.36 | 5,180.00 | 9.33 | 90.058% | $0.074 | $ 690,420 | $ 688,835 | 0.00485 | $ 3,349 | $ 3,341 | $ 8 |
| 41.0 | 4.73 | 2,365.00 | 4.26 | 90.063% | $0.074 | $ 315,240 | $ 314,330 | 0.00420 | $ 1,338 | $ 1,334 | $ 4 |
| 42.0 | 1.70 | 850.00 | 1.53 | 90.000% | $0.074 | $ 113,220 | $ 113,024 | 0.00372 | $ 421 | $ 420 | $ 1 |
| 43.0 | 0.93 | 465.00 | 0.83 | 89.247% | $0.074 | $ 61,420 | $ 61,602 | 0.00325 | $ 200 | $ 200 | $ (1) |
| 44.0 | 0.12 | 60.00 | 0.11 | 91.667% | $0.074 | $ 8,140 | $ 8,012 | 0.00285 | $ 23 | $ 23 | $ 0 |
| TOTAL | 5,330.44 | 2,665,220.00 | 4,797.39 | 90.000% | $0.074 | $ 355,006,860 | $ 354,378,874 | | $ 17,615,854 | $ 17,584,784 | $ 31,070 |

Summary:
Total PMTS                $555,006,860

PV @ 14.25% FS calc       $17,615,854
Appraisal calc            $17,584,784

Diff                      $31,070

MWA Parcel (Federal)
Pinal County, Arizona

## MWA CASH FLOWS – MOLYBDENUM

| Molybdenum Production | 14.25% | | | | 1,000,000.00 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Period/Year | Prod (Mlbs) | Recovery (Mlbs) | Recovery rate calc | Royalty $/lb | Royalty $ FS calc | Appraisal Scalc | PV Factor @14.25% | PV of Cash Flow $ FS calc | Appraisal Scalc | FS - Apprsl Diff |
| 1.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.87527 | $ - | $ - | $ - |
| 2.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.76610 | $ - | $ - | $ - |
| 3.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.67055 | $ - | $ - | $ - |
| 4.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.58691 | $ - | $ - | $ - |
| 5.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.51371 | $ - | $ - | $ - |
| 6.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.44964 | $ - | $ - | $ - |
| 7.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.39356 | $ - | $ - | $ - |
| 8.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.34447 | $ - | $ - | $ - |
| 9.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.30150 | $ - | $ - | $ - |
| 10.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.26390 | $ - | $ - | $ - |
| 11.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.23098 | $ - | $ - | $ - |
| 12.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.20217 | $ - | $ - | $ - |
| 13.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.17696 | $ - | $ - | $ - |
| 14.0 | 0.20 | 0.15 | 75.000% | $0.229 | $ - | $ - | 0.15489 | $ - | $ - | $ - |
| 15.0 | 1.71 | 1.28 | 74.854% | $0.229 | 293,120 | 293,542 | 0.13557 | 39,738 | 39,795 | (57) |
| 16.0 | 2.46 | 1.84 | 74.797% | $0.229 | 421,360 | 422,187 | 0.11866 | 49,998 | 50,096 | (98) |
| 17.0 | 2.23 | 1.68 | 75.336% | $0.229 | 384,720 | 384,075 | 0.10386 | 39,957 | 39,890 | 67 |
| 18.0 | 1.73 | 1.29 | 74.566% | $0.229 | 295,410 | 296,511 | 0.09091 | 26,854 | 26,954 | (100) |
| 19.0 | 1.18 | 0.89 | 75.424% | $0.229 | 203,810 | 203,646 | 0.07957 | 16,217 | 16,203 | 13 |
| 20.0 | 3.59 | 2.70 | 75.209% | $0.229 | 618,300 | 617,680 | 0.06964 | 43,060 | 43,017 | 43 |
| 21.0 | 8.45 | 6.34 | 75.030% | $0.229 | 1,451,860 | 1,452,318 | 0.06096 | 88,500 | 88,526 | (28) |
| 22.0 | 11.73 | 8.80 | 75.021% | $0.229 | 2,015,200 | 2,016,282 | 0.05335 | 107,518 | 107,576 | (58) |
| 23.0 | 11.43 | 8.58 | 75.066% | $0.229 | 1,964,820 | 1,965,228 | 0.04670 | 91,755 | 91,774 | (19) |
| 24.0 | 7.69 | 5.77 | 75.033% | $0.229 | 1,321,330 | 1,321,759 | 0.04087 | 54,009 | 54,026 | (18) |
| 25.0 | 3.37 | 2.53 | 75.074% | $0.229 | 579,370 | 579,059 | 0.03578 | 20,728 | 20,717 | 11 |
| 26.0 | 0.72 | 0.54 | 75.000% | $0.229 | 123,660 | 124,447 | 0.03131 | 3,872 | 3,897 | (25) |
| 27.0 | 0.02 | 0.01 | 50.000% | $0.229 | 2,290 | 2,741 | 0.02741 | 63 | 75 | (12) |
| 28.0 | 0.03 | 0.03 | 100.000% | $0.229 | 6,870 | 5,786 | 0.02399 | 165 | 139 | 26 |
| 29.0 | 3.48 | 2.61 | 75.000% | $0.229 | 597,690 | 597,371 | 0.02100 | 12,550 | 12,543 | 7 |
| 30.0 | 5.50 | 4.12 | 74.909% | $0.229 | 943,480 | 944,969 | 0.01838 | 17,340 | 17,367 | (27) |
| 31.0 | 4.84 | 3.63 | 75.000% | $0.229 | 831,270 | 831,125 | 0.01609 | 13,372 | 13,370 | 2 |
| 32.0 | 3.54 | 2.65 | 74.859% | $0.229 | 606,850 | 608,012 | 0.01408 | 8,544 | 8,561 | (16) |
| 33.0 | 2.92 | 2.19 | 75.000% | $0.229 | 501,510 | 501,343 | 0.01232 | 6,181 | 6,178 | 2 |
| 34.0 | 1.97 | 1.48 | 75.127% | $0.229 | 338,920 | 338,630 | 0.01079 | 3,656 | 3,653 | 3 |
| 35.0 | 1.11 | 0.83 | 74.775% | $0.229 | 190,070 | 190,229 | 0.00944 | 1,795 | 1,796 | (1) |
| 36.0 | 0.31 | 0.23 | 74.194% | $0.229 | 52,670 | 53,747 | 0.00826 | 435 | 444 | (9) |
| 37.0 | 0.05 | 0.04 | 80.000% | $0.229 | 9,160 | 8,154 | 0.00723 | 66 | 59 | 7 |
| 38.0 | 0.24 | 0.18 | 75.000% | $0.229 | 41,220 | 40,862 | 0.00633 | 261 | 259 | 2 |
| 39.0 | 0.29 | 0.23 | 77.586% | $0.229 | 51,525 | 50,202 | 0.00554 | 286 | 278 | 7 |
| 40.0 | 0.27 | 0.20 | 74.074% | $0.229 | 45,800 | 45,964 | 0.00485 | 222 | 223 | (1) |
| 41.0 | 0.14 | 0.10 | 71.429% | $0.229 | 22,900 | 23,728 | 0.00425 | 97 | 101 | (4) |
| 42.0 | 0.03 | 0.03 | 100.000% | $0.229 | 6,870 | 5,919 | 0.00372 | 26 | 22 | 4 |
| 43.0 | 0.01 | 0.01 | 100.000% | $0.229 | 2,290 | 1,545 | 0.00325 | 7 | 5 | 1 |
| 44.0 | 0.00 | 0.00 | 0.000% | $0.229 | $ - | 146 | 0.00285 | $ - | 0 | (0) |
| TOTAL | 81.24 | 60.96 | | | $ 13,924,345 | 13,927,207 | | $ 647,270 | 647,547 | $ (276) |

Summary:
Total PMTS        $13,924,345.00
PV @ 14.25%
FS calc           $647,270
Appraisal calc    $   647,547

Diff              -$276.13

MWA Parcel (Federal)
Pinal County, Arizona

## MWA CASH FLOWS – SILVER

| Silver Calc | | 14.25% | | | 1,000,000.00 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Period/Year | Prod (Moz) | Recovery (Moz) | Recovery rate calc | Royalty $/lb | Royalty $ FS calc | Appraisal Scalc | PV Factor @14.25% | PV of Cash Flow $ FS calc | Appraisal Scalc | FS - Apprsl Diff |
| 1.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.87527 | $ - | $ - | $ - |
| 2.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.76610 | $ - | $ - | $ - |
| 3.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.67055 | $ - | $ - | $ - |
| 4.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.58691 | $ - | $ - | $ - |
| 5.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.51371 | $ - | $ - | $ - |
| 6.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.44964 | $ - | $ - | $ - |
| 7.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.39356 | $ - | $ - | $ - |
| 8.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.34447 | $ - | $ - | $ - |
| 9.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.30150 | $ - | $ - | $ - |
| 10.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.26390 | $ - | $ - | $ - |
| 11.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.23098 | $ - | $ - | $ - |
| 12.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.20217 | $ - | $ - | $ - |
| 13.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.17696 | $ - | $ - | $ - |
| 14.0 | 0.02 | 0.02 | 100.000% | $0.520 | $ 10,400 | $ 8,256 | 0.15489 | $ 1,611 | $ 1,279 | 332 |
| 15.0 | 0.20 | 0.14 | 70.000% | $0.520 | $ 72,800 | $ 73,218 | 0.13557 | $ 9,869 | $ 9,926 | (57) |
| 16.0 | 0.35 | 0.25 | 38.462% | $0.520 | $ 130,000 | $ 129,175 | 0.11866 | $ 15,426 | $ 15,328 | 98 |
| 17.0 | 0.46 | 0.33 | 44.000% | $0.520 | $ 171,600 | $ 169,140 | 0.10386 | $ 17,822 | $ 17,567 | 255 |
| 18.0 | 0.49 | 0.34 | 29.825% | $0.520 | $ 176,800 | $ 178,387 | 0.09091 | $ 16,072 | $ 16,216 | (144) |
| 19.0 | 0.65 | 0.46 | 23.232% | $0.520 | $ 239,200 | $ 237,236 | 0.07957 | $ 19,032 | $ 18,876 | 156 |
| 20.0 | 0.75 | 0.52 | 23.529% | $0.520 | $ 270,400 | $ 272,303 | 0.06964 | $ 18,831 | $ 18,964 | (133) |
| 21.0 | 1.14 | 0.80 | 33.058% | $0.520 | $ 416,000 | $ 416,469 | 0.06096 | $ 25,358 | $ 25,386 | (29) |
| 22.0 | 1.98 | 1.38 | 64.486% | $0.520 | $ 717,600 | $ 718,967 | 0.05335 | $ 38,287 | $ 38,359 | (73) |
| 23.0 | 2.21 | 1.55 | 131.356% | $0.520 | $ 806,000 | $ 805,327 | 0.04670 | $ 37,639 | $ 37,608 | 31 |
| 24.0 | 2.42 | 1.70 | 3400.000% | $0.520 | $ 884,000 | $ 882,355 | 0.04087 | $ 36,133 | $ 36,066 | 67 |
| 25.0 | 2.14 | 1.50 | 70.093% | $0.520 | $ 780,000 | $ 778,549 | 0.03578 | $ 27,905 | $ 27,854 | 52 |
| 26.0 | 1.18 | 0.83 | 70.339% | $0.520 | $ 431,600 | $ 429,005 | 0.03131 | $ 13,515 | $ 13,434 | 81 |
| 27.0 | 0.05 | 0.04 | 80.000% | $0.520 | $ 20,800 | $ 19,826 | 0.02741 | $ 570 | $ 543 | 27 |
| 28.0 | 0.00 | 0.00 | #DIV/0! | $0.520 | $ - | $ 831 | 0.02399 | $ - | $ 20 | (20) |
| 29.0 | 0.34 | 0.24 | 70.588% | $0.520 | $ 124,800 | $ 125,017 | 0.02100 | $ 2,621 | $ 2,625 | (5) |
| 30.0 | 0.63 | 0.44 | 69.841% | $0.520 | $ 228,800 | $ 228,708 | 0.01838 | $ 4,205 | $ 4,203 | 2 |
| 31.0 | 0.64 | 0.45 | 70.313% | $0.520 | $ 234,000 | $ 233,653 | 0.01609 | $ 3,764 | $ 3,759 | 6 |
| 32.0 | 0.54 | 0.38 | 70.370% | $0.520 | $ 197,600 | $ 195,001 | 0.01408 | $ 2,782 | $ 2,746 | 37 |
| 33.0 | 0.50 | 0.35 | 70.000% | $0.520 | $ 182,000 | $ 181,313 | 0.01232 | $ 2,243 | $ 2,234 | 8 |
| 34.0 | 0.43 | 0.30 | 69.767% | $0.520 | $ 156,000 | $ 157,804 | 0.01079 | $ 1,683 | $ 1,702 | (19) |
| 35.0 | 0.43 | 0.30 | 69.767% | $0.520 | $ 156,000 | $ 154,774 | 0.00944 | $ 1,473 | $ 1,461 | 12 |
| 36.0 | 0.25 | 0.17 | 68.000% | $0.520 | $ 88,400 | $ 89,530 | 0.00826 | $ 731 | $ 740 | (9) |
| 37.0 | 0.01 | 0.00 | 0.000% | $0.520 | $ - | $ 2,435 | 0.00723 | $ - | $ 18 | (18) |
| 38.0 | 0.03 | 0.02 | 66.667% | $0.520 | $ 10,400 | $ 9,320 | 0.00633 | $ 66 | $ 59 | 7 |
| 39.0 | 0.04 | 0.03 | 75.000% | $0.520 | $ 15,600 | $ 13,009 | 0.00554 | $ 86 | $ 72 | 14 |
| 40.0 | 0.04 | 0.03 | 75.000% | $0.520 | $ 15,600 | $ 15,501 | 0.00485 | $ 76 | $ 75 | 0 |
| 41.0 | 0.03 | 0.02 | 66.667% | $0.520 | $ 10,400 | $ 10,428 | 0.00425 | $ 44 | $ 44 | (0) |
| 42.0 | 0.01 | 0.01 | 100.000% | $0.520 | $ 5,200 | $ 4,430 | 0.00372 | $ 19 | $ 16 | 3 |
| 43.0 | 0.01 | 0.00 | 0.000% | $0.520 | $ - | $ 2,587 | 0.00325 | $ - | $ 8 | (8) |
| 44.0 | 0.00 | 0.00 | 0.000% | $0.520 | $ - | $ 423 | 0.00285 | $ - | $ 1 | (1) |
| TOTAL | 17.97 | | | $0.520 | $ 6,552,000 | $ 6,542,977 | | $ 297,864 | $ 297,191 | 673 |

Summary:
| | | |
|---|---|---|
| Total PMTS | $ | 6,552,000 |
| PV @ 14.25% | | |
| FS calc | $ | 297,864 |
| Appraisal calc | $ | 297,191 |
| Diff | $ | 673 |

# MWA CASH FLOWS – TOTAL CASH FLOWS

| Period/Year | Copper $Appraisal | Copper $ FS calc | Molydenum $Appraisal | Molydenum $ FS calc | Silver $Appraisal | Silver $ FS calc | Non-Production Cash Flows | Deduct Feasibility Milestone (-500k/yr) | TOTAL PMTS $ Appraisal | Total PMTS $ FS calc | PV Factor @14.25% | PV Cash Flow $ FS calc | PV Cash Flow $ Appraisal | FS - Appraisal Difference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.0 | | | | | | | $ 1,200,000 | | $ 1,200,000 | $ 1,200,000 | 0.875274 | $ 1,050,328 | $ 1,050,328 | $ - |
| 2.0 | | | | | | | $ 200,000 | | $ 200,000 | $ 200,000 | 0.766104 | $ 153,221 | $ 153,221 | $ - |
| 3.0 | | | | | | | $ 200,000 | | $ 200,000 | $ 200,000 | 0.670550 | $ 134,110 | $ 134,110 | $ - |
| 4.0 | | | | | | | $ 700,000 | | $ 700,000 | $ 700,000 | 0.586915 | $ 410,840 | $ 410,840 | $ - |
| 5.0 | | | | | | | $ 200,000 | | $ 200,000 | $ 200,000 | 0.513711 | $ 102,742 | $ 102,742 | $ - |
| 6.0 | | | | | | | $ 1,200,000 | | $ 1,200,000 | $ 1,200,000 | 0.449638 | $ 539,565 | $ 539,565 | $ - |
| 7.0 | | | | | | | $ 200,000 | | $ 200,000 | $ 200,000 | 0.393556 | $ 78,711 | $ 78,711 | $ - |
| 8.0 | | | | | | | $ 2,700,000 | | $ 2,700,000 | $ 2,700,000 | 0.344469 | $ 930,067 | $ 930,067 | $ - |
| 9.0 | | | | | | | $ 250,000 | | $ 250,000 | $ 250,000 | 0.301505 | $ 75,376 | $ 75,376 | $ - |
| 10.0 | | | | | | | $ 250,000 | | $ 250,000 | $ 250,000 | 0.263899 | $ 65,975 | $ 65,975 | $ - |
| 11.0 | | | | | | | $ 250,000 | | $ 250,000 | $ 250,000 | 0.230984 | $ 57,746 | $ 57,746 | $ - |
| 12.0 | | | | | | | $ 250,000 | | $ 250,000 | $ 250,000 | 0.202174 | $ 50,544 | $ 50,544 | $ - |
| 13.0 | | | | | | | $ 250,000 | | $ 250,000 | $ 250,000 | 0.176958 | $ 44,239 | $ 44,239 | $ - |
| 14.0 | $ 533,556.00 | $ 534,280.00 | $ - | $ - | $ 8,256 | $ 10,400 | $ - | $ (500,000) | $ 41,812 | $ 44,680 | 0.154886 | $ 6,920 | $ 6,478 | $ 444 |
| 15.0 | $ 5,525,962.00 | $ 5,334,660.00 | $ 293,542.00 | $ 293,120 | $ 73,218 | $ 72,800 | $ - | $ (500,000) | $ 5,392,322 | $ 5,200,580 | 0.135540 | $ 705,032 | $ 703,912 | $ 1,120 |
| 16.0 | $ 10,633,552.00 | $ 10,852,300.00 | $ 422,187.00 | $ 421,980 | $ 129,175 | $ 130,000 | $ - | $ (500,000) | $ 10,684,914 | $ 10,703,660 | 0.118859 | $ 1,270,086 | $ 1,267,861 | $ 2,224 |
| 17.0 | $ 16,125,587.00 | $ 16,154,200.00 | $ 384,075.00 | $ 384,720 | $ 169,140 | $ 171,600 | $ - | $ (500,000) | $ 16,178,802 | $ 16,210,520 | 0.103859 | $ 1,683,610 | $ 1,680,315 | $ 3,294 |
| 18.0 | $ 16,945,843.00 | $ 16,975,600.00 | $ 296,511.00 | $ 295,410 | $ 178,587 | $ 176,800 | $ - | $ (500,000) | $ 16,920,741 | $ 16,947,810 | 0.090905 | $ 1,540,642 | $ 1,538,182 | $ 2,461 |
| 19.0 | $ 9,053,214.00 | $ 9,069,440.00 | $ 203,646.00 | $ 205,810 | $ 237,236 | $ 239,200 | $ - | $ - | $ 9,494,096 | $ 9,512,450 | 0.079567 | $ 756,875 | $ 755,415 | $ 1,460 |
| 20.0 | $ 9,394,211.00 | $ 9,410,500.00 | $ 617,680.00 | $ 618,300 | $ 272,303 | $ 270,400 | $ - | $ - | $ 10,284,194 | $ 10,299,280 | 0.069643 | $ 717,270 | $ 716,239 | $ 1,051 |
| 21.0 | $ 21,903,549.00 | $ 21,942,680.00 | $ 1,452,318.00 | $ 1,451,880 | $ 416,469 | $ 416,000 | $ - | $ - | $ 23,772,336 | $ 23,810,540 | 0.060956 | $ 1,451,394 | $ 1,449,077 | $ 2,317 |
| 22.0 | $ 44,432,377.00 | $ 44,531,000.00 | $ 2,016,282.00 | $ 2,015,200 | $ 718,967 | $ 717,600 | $ - | $ - | $ 47,167,626 | $ 47,263,800 | 0.053354 | $ 2,520,625 | $ 2,516,561 | $ 4,064 |
| 23.0 | $ 61,717,271.00 | $ 61,827,000.00 | $ 1,965,228.00 | $ 1,964,820 | $ 805,327 | $ 806,000 | $ - | $ - | $ 64,487,826 | $ 64,597,820 | 0.046699 | $ 3,016,651 | $ 3,011,514 | $ 5,137 |
| 24.0 | $ 53,555,628.00 | $ 53,650,740.00 | $ 1,321,759.00 | $ 1,321,350 | $ 882,355 | $ 884,000 | $ - | $ - | $ 55,759,742 | $ 55,856,070 | 0.040874 | $ 2,283,681 | $ 2,279,144 | $ 5,937 |
| 25.0 | $ 25,497,626.00 | $ 25,542,500.00 | $ 579,059.00 | $ 579,370 | $ 778,549 | $ 780,000 | $ - | $ - | $ 26,855,234 | $ 26,901,950 | 0.035776 | $ 962,451 | $ 960,779 | $ 1,671 |
| 26.0 | $ 5,194,704.00 | $ 5,203,660.00 | $ 124,447.00 | $ 123,660 | $ 429,005 | $ 431,600 | $ - | $ - | $ 5,748,156 | $ 5,758,940 | 0.031314 | $ 180,335 | $ 179,998 | $ 338 |
| 27.0 | $ 97,541.00 | $ 97,680.00 | $ 2,741.00 | $ 2,290 | $ 19,026 | $ 20,000 | $ - | $ - | $ 119,308 | $ 119,970 | 0.027408 | $ 3,310 | $ 3,286 | $ 24 |
| 28.0 | $ 61,268.00 | $ 61,420.00 | $ 5,786.00 | $ 6,870 | $ 331 | $ - | $ - | $ - | $ 67,385 | $ 68,290 | 0.023990 | $ 1,638 | $ 1,629 | $ 10 |
| 29.0 | $ 7,546,087.00 | $ 7,559,640.00 | $ 597,571.00 | $ 597,690 | $ 125,017 | $ 124,800 | $ - | $ - | $ 8,268,475 | $ 8,282,130 | 0.020998 | $ 173,908 | $ 173,618 | $ 291 |
| 30.0 | $ 12,990,026.00 | $ 13,012,900.00 | $ 943,969.00 | $ 943,480 | $ 228,706 | $ 228,300 | $ - | $ - | $ 14,163,703 | $ 14,185,180 | 0.018379 | $ 260,705 | $ 260,310 | $ 395 |
| 31.0 | $ 13,524,575.00 | $ 13,548,660.00 | $ 831,125.00 | $ 831,270 | $ 233,653 | $ 234,000 | $ - | $ - | $ 14,589,353 | $ 14,613,930 | 0.016086 | $ 235,085 | $ 234,689 | $ 395 |
| 32.0 | $ 11,835,542.00 | $ 11,856,280.00 | $ 608,012.00 | $ 606,350 | $ 195,001 | $ 197,600 | $ - | $ - | $ 12,638,555 | $ 12,660,730 | 0.014080 | $ 178,263 | $ 177,947 | $ 315 |
| 33.0 | $ 10,486,518.00 | $ 10,505,040.00 | $ 501,943.00 | $ 501,510 | $ 181,313 | $ 182,000 | $ - | $ - | $ 11,169,774 | $ 11,188,550 | 0.012324 | $ 137,886 | $ 137,647 | $ 239 |
| 34.0 | $ 7,534,584.00 | $ 7,548,000.00 | $ 338,630.00 | $ 338,920 | $ 157,804 | $ 156,000 | $ - | $ - | $ 8,031,018 | $ 8,042,920 | 0.010787 | $ 86,757 | $ 86,628 | $ 128 |
| 35.0 | $ 5,300,533.00 | $ 5,310,240.00 | $ 190,229.00 | $ 180,070 | $ 154,774 | $ 156,000 | $ - | $ - | $ 5,645,536 | $ 5,656,510 | 0.009441 | $ 53,403 | $ 53,502 | $ 101 |
| 36.0 | $ 1,879,247.00 | $ 1,882,560.00 | $ 53,747.00 | $ 52,670 | $ 89,530 | $ 88,400 | $ - | $ - | $ 2,022,524 | $ 2,023,650 | 0.008254 | $ 16,723 | $ 16,714 | $ 8 |
| 37.0 | $ 159,810.00 | $ 156,140.00 | $ 8,154.00 | $ 9,160 | $ 2,435 | $ - | $ - | $ - | $ 166,399 | $ 165,300 | 0.007233 | $ 1,196 | $ 1,204 | $ (8) |
| 38.0 | $ 672,420.00 | $ 673,400.00 | $ 40,862.00 | $ 43,220 | $ 9,320 | $ 10,400 | $ - | $ - | $ 722,602 | $ 725,020 | 0.006331 | $ 4,590 | $ 4,575 | $ 15 |
| 39.0 | $ 796,580.00 | $ 797,720.00 | $ 50,202.00 | $ 51,525 | $ 13,009 | $ 15,600 | $ - | $ - | $ 859,791 | $ 864,845 | 0.005541 | $ 4,792 | $ 4,764 | $ 28 |
| 40.0 | $ 688,835.00 | $ 690,420.00 | $ 45,964.00 | $ 45,800 | $ 15,501 | $ 15,600 | $ - | $ - | $ 750,300 | $ 751,820 | 0.004850 | $ 3,646 | $ 3,639 | $ 7 |
| 41.0 | $ 314,930.00 | $ 315,240.00 | $ 23,728.00 | $ 22,900 | $ 10,428 | $ 10,400 | $ - | $ - | $ 349,086 | $ 348,540 | 0.004245 | $ 1,480 | $ 1,479 | $ 0 |
| 42.0 | $ 113,024.00 | $ 113,220.00 | $ 5,819.00 | $ 6,870 | $ 4,430 | $ 5,200 | $ - | $ - | $ 123,273 | $ 125,290 | 0.003716 | $ 466 | $ 458 | $ 7 |
| 43.0 | $ 61,602.00 | $ 61,420.00 | $ 1,545.00 | $ 2,290 | $ 2,587 | $ - | $ - | $ - | $ 65,734 | $ 63,710 | 0.003252 | $ 207 | $ 214 | $ (7) |
| 44.0 | $ 8,012.00 | $ 8,140.00 | $ 146.00 | $ - | $ 423 | $ - | $ - | $ - | $ 8,591 | $ 8,140 | 0.002847 | $ 23 | $ 24 | $ (1) |
| **TOTAL** | $ 354,378,874.00 | $ 355,006,860.00 | $ 13,927,207.00 | $ 13,924,345.00 | $ 6,542,977 | $ 6,552,000 | $ 7,850,000 | $ (2,500,000) | $ 380,199,058 | $ 380,833,205 | | $ 21,952,514 | $ 21,921,047 | $ 31,467 |

Summary:

| | |
|---|---|
| Total PMTS | $ 380,833,205 |
| PV @ 14.25% FS calc | $ 21,952,514 |
| Appraisal calc | $ 21,921,047 |
| **Diff** | $ 31,487 |

## MWA CASH FLOWS – SUMMARY AND MILESTONE DEDUCTIONS

| Summary of MWA Royalty | | | |
|---|---|---|---|
| **Present Value 14.25%** | **Appraisal Results** | **FS Review Calc** | |
| Non-Production | $ 3,693,465 | $ 3,693,465 | |
| Copper Royalty | $ 17,584,784 | $ 17,615,854 | |
| Molybdenum Royalty | $ 647,547 | $ 647,270 | |
| Silver Royalty | $ 297,191 | $ 297,864 | |
| Total Royalty | $ 22,222,986 | $ 22,254,453 | |
| Deduct Feasibility Milestones (-$500K per year, Yrs 14-18) | $ (301,939) | $ (301,939) | |
| **Grand Total $** | **$ 21,921,047** | **$ 21,952,514** | |
| *FS - Apppraisal Difference* | *$ 31,467* | *0.1435%* | |
| | | | |
| | | | |
| | | | |
| **Feasibility Milestone Deductions PV @ 14.25%** | | | **PV - Feasibility Milestones** |
| Yr 14 | $ (500,000) | 0.154886326 | $ (77,443) |
| Yr 15 | $ (500,000) | 0.1355679 | $ (67,784) |
| Yr 16 | $ (500,000) | 0.118658993 | $ (59,329) |
| Yr 17 | $ (500,000) | 0.103859075 | $ (51,930) |
| Yr 18 | $ (500,000) | 0.090905099 | $ (45,453) |
| | | | $ (301,939) |



January 22, 2023

Gerald Sanchez, RPRA, Chief Appraiser
USDA Forest Service, Washington Office Lands & Realty
333 Broadway SE, Room 333
Albuquerque, New Mexico 87102

RE:     Real Property Appraisal Report
        Southeast Arizona Land Exchange and Conservation Act
        Selected Federal Land – Mineral Withdrawal Area (MWA)
        Pinal County, Arizona

Greetings Jerry:

Per USDA Forest Service Contract No. 12837120C0041, I have commissioned an appraisal and submit herewith the report relating the findings thereof for the Mineral Withdrawal Area portion of the Selected Federal Lands included in the Southeast Arizona Land Exchange and Conservation Act. The 766.58-acre subject property, referred to in the report as the Mineral Withdrawal Area, or MWA, is located just east of the historic Magma Mine, near Superior, Arizona. It includes the fee simple interest in the surface and underlying mineral estate.

**This is a CONFIDENTIAL REPORT. Possession of this report, or a copy thereof, does not carry with it the right of publication. It may not be used for any purpose by any person other than the party to whom it is addressed without the prior written consent of the appraiser, and in any event only with properly written qualifications and only in its entirety.**

The client in this appraisal assignment is the USDA Forest Service.

Weissenborn Appraisal, LLC is the contractor under the above referenced contract and is providing appraisals of the Offered Non-federal Land component of the Southeast Arizona Land Exchange and Conservation Act. But Weissenborn Appraisal lacks the professional background and expertise necessary to provide credible valuations of the Selected Federal Land component of the exchange. Accordingly, Weissenborn Appraisal commissioned Spanish Flat Mining Company, which has extensive experience in the valuation of mineralized and mine-related properties and possesses the professional expertise necessary to complete this leg of the assignment.

The accompanying report correctly identifies Weissenborn Appraisal, LLC as the client of Spanish Flat Mining Company, but it was, and still is, recognized that the report was prepared for submittal to the Forest Service under Contract No.12837120C0041.

The intended users of the appraisal report are the USDA Forest Service, the USDA Office of General Counsel and Resolution Copper Mining, LLC. The appraisal and report are not intended for any other user.

---

contiguous commercial acres.  Mining is considered a legally permissible use by Pinal County; the permitting authority for mining related activities is under state and county jurisdictions.

The Pinal County Comprehensive Plan (PCCP), updated January 2021, states …*all private and public entities share the responsibilities of ...encourage retention of existing and creation of new (and diverse) employment opportunities, including mining*… Pinal County claims 1,757 mining industry jobs county wide, which accounts for 3.2% of its total jobs.

The PCCP, in its Commerce-Related Land Uses section specific to Mining/Extraction,

> *Identifies those areas where mineral resources have been identified or are likely to be identified in the future. The intent of this designation is to protect the mineral resources by minimizing conflicts with surrounding land uses. This designation recognizes the rights of exploration, mining, and processing of mineral resources. Copper mining is currently occurring around Superior and Kearny. All mining operations conducted by whatever techniques and technologies employed are required to comply with all applicable federal, state, and local laws providing for the protection of environmental resources.*

## Regulatory & Permitting Structure

National Forest System surface resources are managed by the USFS; the subsurface (mineral interest) is managed by the BLM. The Subject is in the Tonto National Forest, Globe Ranger District jurisdiction; however, for the purpose of this Report, the Subject is considered fee simple ownership, *as though it is in private ownership, is freely alienable, and zoned consistently with other similarly situated non-Federal properties within the jurisdiction of the zoning authority*.

RCM submitted an updated General Plan of Operations (POO, aka GPO) to the USFS in August 2016 to evaluate environmental baseline data for proposed surface disturbances and resource impacts, as required by the Southeast Arizona Land Exchange and Conservation Act (the Act):

> *The Act requires that the land exchange and the GPO be considered and evaluated by the Forest Service in a single EIS. In order to support the environmental evaluation of both the GPO and the land exchange, this GPO identifies where mine development would occur on or under public lands included in the exchange.*

The USFS is charged with processing POOs, as well as bonding, monitoring, reclamation, final mine closure, and compliance issues; compliance with NEPA, via the Council on Environmental Quality, is also a regulatory requirement.  However, because the Subject is considered, *as though it is in private ownership*, RCM's proposed POO will be processed as if under state jurisdiction

and the USFS surface management authorities/responsibilities are not a component of the estate to be appraised.

The privately owned land surrounding the National Forest System lands, including the Subject, are zoned GR under Pinal County jurisdiction, which allows mining related activities as a legally permissible use. The Arizona State Mine Inspector (ASMI) must be notified prior to starting, moving or stopping a mining operation. The Arizona Department of Mines & Mineral Resources (ADMMR) is the principal authority for mine permitting and reclamation, which is regulated by the ASMI. ADMMR requires the mine operator to submit a Mined Land Reclamation Plan and financial assurance (reclamation bond), for all metalliferous mining units and exploration operations with surface disturbances on private lands greater than five acres. Mine operators are responsible for obtaining all necessary environmental, planning, building, and operational permits; operators are referred to the Arizona Mining Permitting Guide, 2nd Edition, published by the US Department of the Interior, and compiled/edited by the ADMMR, for permitting assistance.

The statutory laws of Arizona are referred to as the Arizona Revised Statutes (ARS), organized by subject area into Titles, Chapters, Articles and Sections ( https://www.azleg.gov/arstitle/); there are currently 49 titles, although three have been repealed.  ARS Titles include ARS Title 1- General Provisions through ARS Title 49- The Environment; a few citations in this report are from Minerals, Oil and Gas (ARS Title 27).

The Pinal County Comprehensive Plan (updated January 2021) is a broad policy statement, which addresses most of the County's future planning objectives and provides guidelines for sustainable growth.   Pinal County Planning & Development Department provides information, regulatory requirements, and permitting guidelines for specific: multi-family dwelling units, such as planned unit developments (PUDs); large commercial and industrial developments and special land uses; and institutional developments, such as schools, libraries and churches.

Pinal County Building Safety Department (PCBSD) requires building permits and inspections, via their building code ordinance, as amended (2018); PCBSD provides inspection, plan review and investigative services to the unincorporated areas of the county.

Mine safety and health compliance is regulated and inspected by state and federal authorities. ASMI is the state agency charged with safety and health regulatory compliance for mining operations.  Mine Safety and Health Administration (MSHA) is the federal authority for training, regulatory compliance and inspecting active mining operations.  No permitting structure exists for mine safety/health programs, but notification, prior to initiating mining operations, and regulatory compliance is required by both ASMI and MSHA.

OVERSIGHT HEARING TITLED "AMERICA'S MINERAL RESOURCES: CREATING MINING AND MANUFACTURING JOBS AND SECURING AMERICA"; AND LEGISLATIVE HEARING ON H.R. 1063, H.R. 687, H.R. 697, H.R. 761, H.R. 767, H.R. 957, AND H.R. 981

# OVERSIGHT AND LEGISLATIVE HEARING

BEFORE THE

## SUBCOMMITTEE ON ENERGY AND MINERAL RESOURCES

OF THE

## COMMITTEE ON NATURAL RESOURCES U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED THIRTEENTH CONGRESS

FIRST SESSION

Thursday, March 21, 2013

**Serial No. 113–7**

Printed for the use of the Committee on Natural Resources



Available via the World Wide Web: http://www.fdsys.gov
or
Committee address: http://naturalresources.house.gov

U.S. GOVERNMENT PRINTING OFFICE

80–077 PDF     WASHINGTON : 2014

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

COMMITTEE ON NATURAL RESOURCES

DOC HASTINGS, WA, *Chairman*
EDWARD J. MARKEY, MA, *Ranking Democratic Member*

Don Young, AK
Louie Gohmert, TX
Rob Bishop, UT
Doug Lamborn, CO
Robert J. Wittman, VA
Paul C. Broun, GA
John Fleming, LA
Tom McClintock, CA
Glenn Thompson, PA
Cynthia M. Lummis, WY
Dan Benishek, MI
Jeff Duncan, SC
Scott R. Tipton, CO
Paul A. Gosar, AZ
Raúl R. Labrador, ID
Steve Southerland, II, FL
Bill Flores, TX
Jon Runyan, NJ
Mark E. Amodei, NV
Markwayne Mullin, OK
Chris Stewart, UT
Steve Daines, MT
Kevin Cramer, ND
Doug LaMalfa, CA
*Vacancy*

Peter A. DeFazio, OR
Eni F. H. Faleomavaega, AS
Frank Pallone, Jr., NJ
Grace F. Napolitano, CA
Rush Holt, NJ
Raúl M. Grijalva, AZ
Madeleine Z. Bordallo, GU
Jim Costa, CA
Gregorio Kilili Camacho Sablan, CNMI
Niki Tsongas, MA
Pedro R. Pierluisi, PR
Colleen W. Hanabusa, HI
Tony Cárdenas, CA
Steven A. Horsford, NV
Jared Huffman, CA
Raul Ruiz, CA
Carol Shea-Porter, NH
Alan S. Lowenthal, CA
Joe Garcia, FL
Matt Cartwright, PA

Todd Young, *Chief of Staff*
Lisa Pittman, *Chief Legislative Counsel*
Jeffrey Duncan, *Democratic Staff Director*
David Watkins, *Democratic Chief Counsel*

———

SUBCOMMITTEE ON ENERGY AND MINERAL RESOURCES

DOUG LAMBORN, CO, *Chairman*
RUSH HOLT, NJ, *Ranking Democratic Member*

Louie Gohmert, TX
Rob Bishop, UT
Robert J. Wittman, VA
Paul C. Broun, GA
John Fleming, LA
Glenn Thompson, PA
Cynthia M. Lummis, WY
Dan Benishek, MI
Jeff Duncan, SC
Paul A. Gosar, AZ
Bill Flores, TX
Mark E. Amodei, NV
Steve Daines, MT
Kevin Cramer, ND
Doc Hastings, WA, *ex officio*

Steven A. Horsford, NV
Matt Cartwright, PA
Jim Costa, CA
Niki Tsongas, MA
Jared Huffman, CA
Alan S. Lowenthal, CA
Peter A. DeFazio, OR
Tony Cárdenas, CA
Raúl M. Grijalva, AZ
Colleen W. Hanabusa, HI
Joe Garcia, FL
*Vacancy*
*Vacancy*
Edward J. Markey, MA, *ex officio*

———

(II)

# CONTENTS

|  | Page |
|---|---|
| Hearing held on Thursday, March 21, 2013 | 1 |
| **Statement of Members:** | |
| Holt, Hon. Rush, a Representative in Congress from the State of New Jersey | 5 |
| Prepared statement of | 6 |
| Lamborn, Hon. Doug, a Representative in Congress from the State of Colorado | 2 |
| Prepared statement of | 4 |
| **Statement of Witnesses:** | |
| Batulis, Ruthe, President, Dakota County Regional Chamber of Commerce, and President, Minnesota Conference of Chamber Executives | 23 |
| Prepared statement on the Oversight Hearing | 24 |
| Connell, Jamie E., Acting Deputy Director, Bureau of Land Management, U.S. Department of the Interior | 46 |
| Prepared statement: | |
| on H.R. 687 | 49 |
| on H.R. 697 | 51 |
| on H.R. 761 and H.R. 1063 | 48 |
| on H.R. 767 | 52 |
| on H.R. 957 | 54 |
| on H.R. 981 | 55 |
| Questions submitted for the record | 56 |
| Gosar, Hon. Paul A., a Representative in Congress from the State of Arizona | 7 |
| Prepared statement on H.R. 687 | 9 |
| Grijalva, Hon. Raúl M., a Representative in Congress from the State of Arizona, Oral statement on H.R. 687 | 10 |
| Heck, Hon. Joseph J., a Representative in Congress from the State of Nevada | 14 |
| Prepared statement on H.R. 697 | 15 |
| Hohn, Mike, General Manager, Soda Ash Business OCI Chemical Corporation | 83 |
| Prepared statement on H.R. 957 | 85 |
| Iwanicki, James M., P.E., Engineer Manager, Marquette County Road Commission | 18 |
| Prepared statement on the Oversight Hearing | 20 |
| Johnson, Hon. Henry C. "Hank," Jr., a Representative in Congress from the State of Georgia, Oral statement on H.R. 981 | 17 |
| Kirkpatrick, Hon. Ann, a Representative in Congress from the State of Arizona | 12 |
| Prepared statement on H.R. 687 | 13 |
| Krill, Jennifer, Executive Director, Earthworks | 28 |
| Prepared statement on the Oversight Hearing, H.R. 687, H.R. 697, H.R. 761, and H.R. 957 | 29 |
| McGroarty, Daniel, President, American Resources Policy Network | 80 |
| Prepared statement on H.R. 1063 | 81 |
| Melander, Harry, President, Minnesota Building and Construction Trades Council | 25 |
| Prepared statement on the Oversight Hearing | 26 |
| Miller, Stephen Q., Chairman, Board of Supervisors, Pinal County District 3, Casa Grande, Arizona | 72 |
| Prepared statement on H.R. 687 | 74 |

(III)

IV

| | Page |
|---|---|
| Statement of Witnesses—Continued | |
| Miller, Stephen Q., Chairman, Board of Supervisors, Pinal County District 3, Casa Grande, Arizona—Continued | |
| Question submitted for the record .......................................................... | 75 |
| Neatby, Pierre, Vice President, Sales & Marketing, Avalon Rare Metals ... | 87 |
| Prepared statement on H.R. 1063, H.R. 761, and H.R. 981 .................. | 88 |
| Peralta, Soyla "Kiki," Council Member, Superior Town Council, Superior, Arizona ............................................................................................................. | 102 |
| Prepared statement on H.R. 687 ............................................................ | 103 |
| Quinn, Hal, President and CEO, National Mining Association ................... | 76 |
| Prepared statement on H.R. 761 ............................................................ | 77 |
| Rambler, Terry, Chairman, San Carlos Apache Tribe ............................... | 91 |
| Prepared statement on H.R. 687 ............................................................ | 92 |
| Questions submitted for the record ....................................................... | 101 |
| Wagner, Mary, Associate Chief, U.S. Forest Service, U.S. Department of Agriculture ................................................................................................... | 57 |
| Prepared statement on H.R. 687 ............................................................ | 58 |
| Additional materials submitted for the record: | |
| List of documents retained in the Committee's official files ........................ | 112 |

OVERSIGHT HEARING ON "AMERICA'S MINERAL RESOURCES: CREATING MINING AND MANUFACTURING JOBS AND SECURING AMERICA"; AND A LEGISLATIVE HEARING ON H.R. 1063, "NATIONAL STRATEGIC AND CRITICAL MINERALS POLICY ACT OF 2013"; H.R. 687, "SOUTHEAST ARIZONA LAND EXCHANGE AND CONSERVATION ACT OF 2013"; H.R. 697, "THREE KIDS MINE REMEDIATION AND RECLAMATION ACT"; H.R. 761, "NATIONAL STRATEGIC AND CRITICAL MINERALS PRODUCTION ACT OF 2013"; H.R. 767, TO AMEND THE ENERGY POLICY ACT OF 2005 TO MODIFY THE PILOT PROJECT OFFICES OF THE FEDERAL PERMIT STREAMLINING PILOT PROJECT; H.R. 957, "AMERICAN SODA ASH COMPETITIVENESS ACT"; AND H.R. 981, "RESOURCE ASSESSMENT OF RARE EARTHS ACT OF 2013."

---

**Thursday, March 21, 2013**
**U.S. House of Representatives**
**Subcommittee on Energy and Mineral Resources**
**Committee on Natural Resources**
**Washington, D.C.**

---

The Subcommittee met, pursuant to notice, at 10:07 a.m., in room 1334, Longworth House Office Building, Hon. Doug Lamborn [Chairman of the Subcommittee] presiding.

Present: Representatives Lamborn, Broun, Lummis, Benishek, Duncan, Gosar, Daines, Cramer, Holt, Horsford, Huffman, Lowenthal, DeFazio, Grijalva, Hanabusa, and Garcia.

Also Present: Representatives Heck, Napolitano, Johnson of Georgia, and Kirkpatrick.

Mr. LAMBORN. The Committee will come to order. We are going to go ahead and get an expedited start here. As the Ranking Member comes in he will make his opening statement at an opportune time. But with votes pending, and then with people wanting to catch planes later in the day, we thought we should go ahead and get started.

The Chairman notes the presence of a quorum, which, under Committee Rule 3(e), is 2 Members. The Subcommittee on Energy

(1)

2

and Mineral Resources hearing today is to hear testimony on an oversight hearing on, America's Mineral Resources: Creating Mining and Manufacturing Jobs and Securing America, and we are going to have a legislative hearing on H.R. 1063, I introduced it, it is National, Strategic, and Critical Minerals Policy Act of 2013; H.R. 687 by Representatives Gosar and Kirkpatrick on Southeast Arizona Land Exchange and Conservation Act of 2013; H.R. 697 by Representative Heck, Three Kids Mine Remediation and Reclamation Act; H.R. 761, by Representative Amodei, National Strategic and Critical Minerals Production Act of 2013; H.R. 767 by Representative Cramer to amend the Energy Policy Act of 2005 to modify the Pilot Project offices of the Federal Permit Streamlining Pilot Project; H.R. 957 by Representative Lummis, America Soda Ash Competitiveness Act; and H.R. 981 by Representative Johnson of Georgia and Markey, Resource Assessment of Rare Earths Act of 2013.

Under Committee Rule 4(f), opening statements are limited to the Chairman and Ranking Member. However, I ask unanimous consent to include any other Members' opening statements in the hearing record if submitted to the clerk by close of business today.

[No response.]

Mr. LAMBORN. Hearing no objection, so ordered.

I also ask unanimous consent that the following Members be allowed to participate in today's hearing: the gentlelady from California, Mrs. Napolitano; the gentlelady from Arizona, Mrs. Kirkpatrick, the gentleman from Nevada, Mr. Heck, and the gentleman from Georgia, Mr. Johnson.

[No response.]

Mr. LAMBORN. Hearing no objection, so ordered.

## STATEMENT OF THE HON. DOUG LAMBORN, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF COLORADO

Mr. LAMBORN. I would like to welcome everybody to the hearing today, and who are listening via our webcast, to the Subcommittee on Energy and Mineral Resources oversight, and the legislative hearing focusing on assessing the Nation's solid mineral resources, and examining our national strategic and critical minerals policy.

As I have stated before, our national minerals policy has been neglected for far too long. And as evidenced by the bipartisan nature of the legislation we will be considering today, there is a clear recognition that, as a Nation, we can no longer afford to have our domestic mineral needs or policy put on the back burner.

Strategic and critical minerals are essential to our economy, livelihoods and national security, as well. Renewable energy, national defense equipment, agriculture, health care, and everyday items such as televisions, telephones, computers, light bulbs, and so on, are all dependent on minerals. Currently, the United States relies on foreign sources for a majority of our non-fuel mineral materials. And, according to the USGS, we are 100 percent dependent on foreign sources for rare earth minerals.

Mining creates tangible value, introducing new money into the Nation's economic system. Additional tangible value is added to the raw mined production through manufacturing, construction, and other uses. Harvesting domestic mineral resources contributes to

3

local economies, and it also contributes to the Nation's overall economic security from the most basic level up.

Mining and the associated businesses and industry have been one of the few growth areas during our country's prolonged recession, and has provided employment opportunities for skilled labor, scientists, engineers, and others. These are not your everyday, run-of-the-mill jobs, but high-paying, family wage jobs with generous benefits. A recent CRS analysis shows the non-supervisory positions in the energy and mineral sectors pays $1,200 to $1,500 per week, respectively.

I would like to point out that domestic mining isn't just about jobs in the mines. It is thousands of geologists, biologists, and environmental engineers. It is about the tens of thousands of jobs in the industries that support our miners, from the Caterpillar factories in Illinois to Redwing Boots in Minnesota, from St. Pierre chains in Worcester, Massachusetts to AirFlow Catalyst Systems in Rochester, New York.

As an added benefit, the Nation will become more self-reliant on the raw, mined materials our society depends on, as well as increasing opportunities for growth in our domestic manufacturing sector. We will also have improved economic and national security. The end result is Americans everywhere benefit from more domestic mining.

Now, we have an interesting and exciting hearing before us today. We will start with a bipartisan panel of our colleagues on both sides of the legislation before us. We will have an oversight panel following that will provide testimony on America's mineral resources creating mining and manufacturing jobs and securing America.

Domestic mining faces many challenges in the U.S., permitting and access being only a sliver of the numerous challenges facing mine development. However, it holds great promise. So we will hear from folks who see a bright future and opportunity. Just as the United States has experienced significant growth in oil and natural gas reserves and resources, mainly from private and State mineral-rich lands, there is an opportunity for significant growth in domestic, non-fuel, strategic, and critical minerals production, as well.

Now, this oversight hearing will be followed by an administration panel that will provide testimony on the legislation under consideration today.

And finally, we will hear from our legislative panel. We are getting a lot of things done today. With the exception of my colleague Kevin Cramer's bill to amend the Energy Policy Act of 2005 to modify the Pilot Project offices that were referred to earlier, the other pieces of legislation have passed out of the House Committee on Natural Resources and, in some cases, the Floor of the House during the last Congress, unfortunately only to languish in the Senate.

Here I would like to make a pitch for my legislation, H.R. 1063, the National Strategic and Critical Minerals Policy Act of 2013, which I strongly believe will provide the agencies with the information they need to make better decisions for the country when it comes to the development of our non-fuel solid mineral resources.

4

Other important bipartisan pieces of legislation under consideration today that will not be considered by the Members panel, so I should give them a little emphasis right here, H.R. 761, the National Strategic and Critical Minerals Production Act of 2013, which uses the President's Executive order requiring coordination between agencies when permitting infrastructure projects in order to expedite construction and job creation; and H.R. 957, the American Soda Ash Competitiveness Act, which sets the Federal royalty rate for soda ash at 2 percent, allowing the domestic soda ash industry to remain competitive with international producers.

I look forward to hearing from our witnesses today, and I would like to recognize the Ranking Member, from New Jersey, Representative Holt.

[The prepared statement of Mr. Lamborn follows:]

PREPARED STATEMENT OF THE HONORABLE DOUG LAMBORN, CHAIRMAN, SUBCOMMITTEE ON ENERGY AND MINERAL RESOURCES

I would like to welcome everyone in the room here today and listening via our webcast to the Subcommittee on Energy and Mineral Resources oversight and legislative hearing focusing on accessing the Nation's solid mineral resources and examining our national Strategic and Critical Minerals Policy. As I've stated before—our national minerals policy has been neglected for far too long. And as evidenced by the bipartisan nature of the legislation we will be considering today there is a clear recognition that as a Nation we can no longer afford to leave our domestic mineral needs or policy on the back burner.

Strategic and critical minerals are essential to our economy, livelihood and national security. Renewable energy, national defense equipment, agriculture, healthcare and everyday items such as televisions, telephones, computers and light bulbs are all dependent on minerals. Currently the United States relies on foreign sources for a majority of our non-fuel mineral materials and, according to the USGS, is 100 percent dependent on foreign sources for rare earth minerals.

Mining creates tangible value, introducing new money into the Nation's economic system. Additional tangible value is added to the raw mined product through manufacturing, construction, and other uses. Harvesting domestic mineral resources contributes to local economies, and to the nation's overall economic security from the most basic level up.

Mining and the associated businesses and industry have been one of the few growth areas during the country's prolonged recession providing employment opportunities for skilled labor, scientist, engineers and others.

These are not your everyday run of the mill jobs but high-paying-family wage jobs with generous benefits. A recent CRS analysis shows the non- supervisory positions in the energy and minerals sector pay $1,535 and $1,220 per week respectively.

I'd like to point out that domestic mining isn't just about jobs in the mines, its thousands of geologists, biologists, and environmental engineers, it is about the tens of thousands of jobs in the industries that support our miners. From the Caterpillar factories in Illinois to Red Wing Boots in Minnesota, from St. Pierre Chains in Wooster, MA to Airflow Catalyst Systems in Rochester, NY.

As an added benefit—the Nation will become more self-reliant on the raw mined materials our society depends on as well as increasing opportunities for growth in our domestic manufacturing sector, and improving the Nation's economic and national security. The end result is Americans everywhere benefit from more domestic mining.

**Members Panel**

We have an exciting hearing before us today; we will start with a bipartisan panel of our colleagues, on both sides of the legislation before us.

**Oversight Panel**

The Members panel will be followed by our oversight panel that will provide testimony on *"America's Mineral Resources: Creating Mining and Manufacturing Jobs and Securing America."* Domestic mining faces many challenges in the U.S., permitting and access being only a sliver of the numerous challenges facing mine development. However, it also holds great promise as we will hear from folks who see a bright future and opportunity.

5

Just as the U.S. has experienced significant growth in Oil and Natural Gas reserves and resources—mainly from private and state mineral rich lands—there is an opportunity for significant growth in domestic non-fuel strategic and critical minerals production as well.

**ADMINISTRTION PANEL**

The Oversight panel will be followed by the Administration Panel that will provide testimony on the Legislation under consideration today.

**Legislative Panel**

Finally, we will hear from our legislative panel. With the Exception of my colleague Kevin Cramer's bill to amend the Energy Policy Act of 2005 to modify the Pilot Project offices of the Federal Permit Streamlining Pilot Project to include Montana and South Dakota, the other pieces of legislation have passed out of the House Committee on Natural Resources and in some cases the floor of the House during the last Congress only to languish in the Senate.

Here I'd like to make a pitch for my legislation H.R. 1063 the *"National Strategic and Critical Minerals Policy Act of 2013,"* which I strongly believe will provide the agencies with the information they need to make better decisions for the country when it comes to the development of our non-fuel solid mineral resources.

Other important bipartisan pieces of legislation under consideration today that will not be discussed by the Members panel are:

- H.R. 761 the *"National Strategic and Critical Minerals Production Act of 2013"* which uses the President's Executive Order requiring coordination between agencies when permitting infrastructure projects in order to expedite construction and JOB creation as a template for permitting reform for advanced mineral exploration and mine development projects—the foundation of other more familiar Infrastructure projects such as roads and bridges—leading to JOB creation and economic and national security; and

- H.R. 957 the *"American Soda Ash Competitiveness Act"* sets the Federal royalty rate for soda ash at 2 percent allowing the domestic soda ash industry to remain competitive with international producers—namely China—and protects domestic JOBS in the mining, transportation and shipping sectors.

I look forward to hearing from our witnesses today.

––––––––

**STATEMENT OF THE HON. RUSH HOLT, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NEW JERSEY**

Dr. HOLT. Thank you, Mr. Chairman. Let me see if I can keep my remarks to a minute or two. The bells have sounded. We have Members waiting, and we clearly won't be able to get through everything.

But I am pleased we are examining rare earth and critical minerals. I am pleased that H.R. 1063, introduced by Chairman Lamborn, includes compromised language agreed to in the last Congress.

I would point out that, despite being entitled, "National Strategic and Critical Minerals Production Act of 2013," H.R. 761 has nothing to do with developing these minerals. In fact, it is about gutting environmental safeguards and proper review of large mining projects.

Another bill today, H.R. 687 that looks at exchanging land at the Tonto National Forest with regard to copper mining, raises numerous concerns about the impacts on the environment. And I will be interested to hear more about that.

H.R. 957 would impose reduced royalty rate for soda ash produced on Federal lands. We can and should debate the impact of such a reduction. But the ability of the soda ash industry to increase production should be part of that conversation.

And, overall, we have to understand that all of this debate is done in the context of the archaic Mining Law of 1872. Ranking

6

Member Markey and Representative Grijalva and I will be introducing legislation that would ensure that large companies extracting minerals belonging to the taxpayer from public lands pay for the privilege of doing so, as they do for oil and gas. More about that later.

But to save time, let me end my remarks and come back to them in the course of the questioning. Thank you.

[The prepared statement of Dr. Holt follows:]

PREPARED STATEMENT OF THE HONORABLE RUSH HOLT, RANKING MEMBER, SUBCOMMITTEE ON ENERGY AND MINERAL RESOURCES

Thank you.

I am pleased that we are examining rare earth and other critical and strategic minerals that are indispensable in the manufacture of high-tech goods. Everything from solar panels and iPhones, to missile guidance systems and MRI machines requires one or several of the world's 17 minerals collectively known as rare earths. H.R. 981, the RARE Act, tasks the U.S. Geological Society with conducting a global assessment of rare earth mineral resources and potential supply sources. And I am pleased that H.R. 1063, introduced by Chairman Lamborn, also includes compromise language agreed to in the last Congress that would accomplish the same goals of improving our understanding of these important rare earth minerals.

Unfortunately, while these two bills will improve our understanding of critical and strategic minerals, other pieces of legislation that we are considering today represent nothing more than huge giveaways to the mining industry and rollbacks of environmental protections for our public lands. Many of these measures passed the House in the last Congress but were too extreme to pass the Senate. Yet, today we are considering these same extreme bills with few or no changes.

For instance, despite being entitled the "National Strategic and Critical Minerals Production Act of 2013," H.R. 761 has absolutely NOTHING to do with developing these minerals. In fact, this bill is all about gutting the environmental safeguards and the proper review of large mining projects on public lands for virtually all minerals. The bill would really waive proper environmental review and public input for large mining operations on public lands for abundant minerals like gold, silver or copper.

Another bill we are considering today, H.R. 687, would transfer approximately 2,400 acres of land in the Tonto National Forest, including 760 acres that were withdrawn from mining operations by President Eisenhower in 1955, to a subsidiary of two foreign mining companies—Rio Tinto and BHP Billiton. This bill raises numerous concerns about the impacts on the environment, surrounding communities and Native American sacred sites.

Allowing copper mining in this area could have significant impacts on the quality and quantity of drinking water for thousands of people in this already drought prone area. This proposal could decimate the economic benefits of recreation. It could devastate an area sacred to Native People. And this legislation would hand over billions of dollars worth of mineral resources to foreign mining companies without receiving a fair return. All while waiving proper review under the National Environmental Policy Act. In addition, support for this mining proposal has been eroding. The town of Superior, Arizona—the town that would be most directly impacted—recently adopted a resolution opposing the deal.

H.R. 957 would re-impose a reduced royalty rate for soda ash produced from Federal lands. We can and should debate the impact of such a reduction but the ability of the soda ash industry to increase production, exports, and employment last year following the expiration of the reduced royalty rate should be part of that conversation.

And while many of the bills we are considering today provide new giveaways to large, multinational mining companies, they do nothing to update the Mining Law of 1872, which allows mining companies to pull taxpayer-owned hardrock minerals out of our public lands virtually for free. In fact, under this 140-year old law, mining companies can extract gold, silver, uranium, copper and other hardrock minerals without paying taxpayers a dime in royalties for those minerals. This law isn't just outdated, it's outrageous. That is why I will be introducing legislation with Ranking Member Markey, and Representative Grijalva that would ensure that large companies extracting these minerals on public lands pay taxpayers for the privilege of doing so, just as oil, gas and coal companies do now. As we are looking at ways to

7

reduce our deficit, updating this law should be a common sense reform. But instead, the Majority continues to focus on heaping new giveaways on this industry.

————

Mr. LAMBORN. OK, certainly. And thank you, Representative Holt. We now have five Members who have come forward for our first panel. We have about 8 minutes or so before we have to scurry over there to catch the first vote, because the 15-minute period is running. Hopefully we can get through the testimony. If not, we will just reconvene after votes. But we will be in recess in about 8 minutes or so.

Let's start now with Representative Paul Gosar of Arizona.

**STATEMENT OF THE HON. PAUL A. GOSAR, A REPRESENTA-TIVE IN CONGRESS FROM THE STATE OF ARIZONA**

Dr. GOSAR. Thank you, Chairman Lamborn, and thanks for scheduling today's legislative hearing on the Southeast Arizona Land Exchange and Conservation Act. When I was first elected to Congress a little over 2 years ago, one of the first initiatives the people of Arizona brought to my attention was this land exchange.

H.R. 687 facilitates a land exchange that will bring into Federal stewardship 5,500 acres of high-priority conservation lands that contain endangered species, sensitive ecosystems, recreational sites, and historical landmarks, in exchange for 2,600 acres of Federal land in Pinal County, Arizona, containing one of the largest undeveloped copper resources in the world. It is a critical first step in the development of the largest producing mine in North America.

The potential economic benefits of this legislation are staggering. Upon passage of the bill, Resolution Copper estimates that it will be able to employ nearly 3,000 workers during a 6-year construction period, and that is just the start. The mine, assuming the company's mine plan of operation, complies with all environmental laws. Let me repeat. It is a requirement explicitly by my bill that they comply with all environmental bills.

When they go into full production, they will directly employ another 1,400 people. These are high-paying jobs, ranging from $40,000 to $120,000 salaries per year in a region that is struggling, economically. As many people familiar with mining communities know, an influx of over 1,000 mining jobs will spur economic development growth in the community. These mine workers need restaurants to eat at, convenience stores to shop at, and homes to live in. A recent economic study estimates an additional 2,300 jobs could be created due to these demands. That brings the estimated total number of jobs resulting from this legislation to 3,700.

Overall, independent analysis estimates the total economic impact of the project will be over $61 billion. That is over $1 billion per year over the life of the mine, which equates to over $19 billion to Federal, State, county, and local tax revenues—$19 billion in tax revenues. In these tough fiscal times, I think we could all agree our local governments, and certainly the U.S. Treasury, could use those funds.

This legislation has national security implications. The U.S. currently imports 30 percent of our copper demands, and the demand is skyrocketing. This critical mineral is used in virtually all mod-

8

ern-day technology, ranging from renewable energy and hybrid cars to everyday electronics like cell phones and iPads. Our country must use domestic resources to meet this growing demand, and this project could yield enough copper to meet 25 percent of our current needs.

This legislation is not only a jobs bill, it is a conservation bill. The lands that the Federal Government acquires in the exchange are highly coveted recreational and conservation areas. It protects one of the few remaining undammed rivers in Arizona, the San Pedro River. The Dripping Springs property is a superb hiking and climbing location. The Cave Creek property will protect a riparian corridor, as well as numerous archeological sites, and nearly 100 acres of private land adjacent to culturally important Apache Leap is placed into the Federal stewardship.

A few of the witnesses today are going to testify that Congress is rushing consideration of the land project exchange, and that there are many unanswered questions surrounding the project. That could not be further from the truth. Over the past 8 years, this exchange and the potential mine have been subject to intensive review, public consideration, and modification. Today will be the fifth legislative hearing in either the House or the Senate held to examine the specifics of this legislation. This exact language passed the U.S. House with bipartisan support, and was almost signed into law last year.

Many of the issues that the detractors of this project will bring up in today's hearing have been addressed in the Congressional Record at some point. Congresswoman Kirkpatrick and I are committed to addressing the few concerns that have not as we move forward in this legislative process, in particular the concerns about the land that will be conveyed to the Town of Superior.

But don't be fooled. This land exchange has strong bipartisan support across the State of Arizona. I would like to submit letters of support from the State Government delegation of the affected region: Governor Jan Brewer, Democrat State Senator Barb McGuire, Republican State Representatives Frank Pratt and T.J. Shope, and Brenda Barton. I would like to submit these for the record.

Mr. LAMBORN. With no objection, so ordered.

Dr. GOSAR. Also for the record, a resolution unanimously passed by the bipartisan Pinal County Board of Supervisors and letters of support from the entire bipartisan Gila County Board of Supervisors.

Mr. LAMBORN. With no objection, so ordered.

Dr. GOSAR. These two counties encompass the area's most affected by the exchange.

And finally, I have letters from the Town of Payson; the Mayor of Globe, Terry Wheeler; a Superior Councilman, John Tameron; and a resolution of support from the Town of Kearny.

Mr. LAMBORN. Seeing no objection, so ordered.

[The information submitted for the record by Dr. Gosar has been retained in the Committee's official files:]

Dr. GOSAR. Each of these officials was elected to their position in some part because of their support for this land exchange. Their constituents—our constituents—want Congress to approve this land exchange.

9

Thank you for the opportunity to testify. I urge my colleagues to support the legislation because I know it will lead to a better future for my constituents and this country. Thank you, sir.

[The prepared statement of Dr. Gosar follows:]

PREPARED STATEMENT OF PAUL A. GOSAR, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF ARIZONA, ON H.R. 687

First, I would like to thank Chairman Lamborn for scheduling today's legislative hearing on the Southeast Arizona Land Exchange and Conservation Act. When I was first elected to Congress a little over 2 years ago, one of the first initiatives the people of Arizona brought to my attention was this land exchange.

H.R. 687 facilitates a land exchange that will bring into Federal stewardship 5,500 acres of high-priority conservation lands that contain endangered species, sensitive ecosystems, recreational sites, and historic landmarks, in exchange for 2,600 acres of Federal land in Pinal County, Arizona containing one of the largest undeveloped copper resources in the world. It is the critical first step to the development of the largest producing mine in North America.

The potential economic benefits of this legislation are staggering. Upon passage of the bill, Resolution Copper estimates it will be able to employ nearly 3,000 workers during a 6-year construction period—and that is just the start. The mine, assuming the company's mine plan of operation complies with all environmental laws, which let me repeat—is required explicitly by my bill before the company can begin production, will directly employ around 1,400 people. These are high-paying jobs, ranging from $40,000 to $120,000 salaries per year, in a region that is struggling economically.

As many people familiar with mining communities know, an influx of over 1,000 mining jobs will spur additional economic growth in a community. Those mine workers need restaurants to eat at, convenience stores to shop at, and homes to live. A recent economic study estimates an additional 2,300 jobs could be created due to these demands. That brings the estimated total number of jobs resulting from this legislation to 3,700.

Overall, independent analysis estimates the total economic impact of the project will be over $61 billion. That is over $1 billion per year over the life of the mine, which equates to over $19 billion in Federal, State, county, and local tax revenue. Nineteen billion dollars in tax revenue—in these tough fiscal times I think we can all agree our local governments and certainly the U.S. Treasury could use those funds.

This legislation also has national security implications. The United States currently imports 30 percent of our copper and demand is skyrocketing. This critical mineral is used in virtually all modern day technology ranging from renewable energy and hybrid cars, to your everyday electronics like cell phones and iPods. Our country must use domestic resources to meet this growing demand; this project could yield enough copper to meet 25 percent of our current needs.

This legislation is not only a jobs bill, it's a conservation bill. The lands the Federal Government acquires in the exchange are highly-coveted recreational and conservation areas. It protects one of the few remaining undammed rivers in Arizona, the San Pedro River. The Dripping Springs property is a superb hiking and climbing location. The Cave Creek property will protect a riparian corridor as well as numerous archaeological sites. And nearly 100 acres of private land adjacent to the culturally important Apache Leap is being placed into Federal stewardship.

A few of the witnesses today are going to testify that Congress is rushing consideration of the land exchange and that there are many unanswered questions surrounding the project. That could not be further from the truth. Over the past 8 years, this exchange and the potential mine has been subject to intensive review, public consideration, and modification. Today will be the sixth legislative hearing, in either the House or the Senate, held to examine the specifics of this legislation. This exact language passed the U.S. House with bipartisan support and was almost signed into law last year.

Many of the issues that the detractors of this project will bring up in today's hearing have been addressed in the Congressional record at some point. Congresswoman Kirkpatrick and I are committed to addressing the few concerns that have not as we move forward in the legislative process, in particular concerns about the land that will be conveyed to the Town of Superior.

But don't be fooled—this land exchange has strong bipartisan support across the State of Arizona.

10

I would like to submit letters of support from the State government delegation of the affected region—Democrat State Senator Barb McGuire, and Republican State Representatives Frank Pratt, T.J. Shope, and Brenda Barton.

Also for the record—a resolution unanimously passed by the bipartisan Pinal County Board of Supervisors and letters of support from the entire bipartisan Gila County Board of Supervisors. These two counties encompass the areas most affected by the exchange.

Finally, I have letters from the Town of Payson, the Mayor of Globe Terry Wheeler, Superior Councilman John Tameron, and a resolution of support from the Town of Kearney.

Each of these officials was elected to their positions in some part because of their support for this land exchange. Their constituents . . . OUR constituents, want Congress to approve this land exchange.

Thank you for the opportunity to testify. I urge my colleagues to support the legislation because I know it will lead to a better future for my constituents and this country.

————

Mr. LAMBORN. OK, thank you.

We will now hear from Representative Grijalva.

## STATEMENT OF THE HON. RAÚL M. GRIJALVA, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF ARIZONA

Mr. GRIJALVA. Thank you, Mr. Chairman. I appreciate the time. And I think, as President Reagan said famously in a debate once, "Here we go again." And as my friend, Mr. Gosar, said, this is about the fifth, sixth version of this piece of legislation.

And before I make any comments on this legislation, I want to advise the Chairman and the Ranking Member that I made a request to Chairman Hastings and Ranking Member Markey to delay this hearing until there is meaningful government-to-government consultation between the Federal Government and tribal Nations affected by this legislation. And that is consistent with the Federal agency and tribal memorandum of understanding that is in place right now. And I would again urge that consideration.

I am also asking that we ask the State Department to verify that this particular decision on H.R. 687 does not violate any resolution that this Congress has passed with regards to sanctions, economic sanctions in Iran, or any company or entity that does business with them. It is our understanding that Rio Tinto, the parent company of subsidiary Resolution Copper, jointly operates a uranium mine, of all things, in Namibia.

And I would suggest that before you take my word for it or take the denials as truth, that a formal request from the Chair and the Ranking Member to the State Department to validate and verify that. We have all passed resolutions and the urgency of those resolutions has come for the protection of Israel. I would suggest that that is one. The last time we had a motion to recommit on the same subject, we split entirely along party lines. Democrats supported the motion to recommit, and every Republican opposed to it. Before we cross that bridge again I would suggest we get information.

This legislation, quite frankly, Mr. Chairman, is a deception. Even today we have no one from Rio Tinto or its subsidiary, Resolution, as a witness available to answer questions, questions dealing with transparency, the due diligence, and what is the return for the taxpayer. There is a tattered history to this legislation and

this deal. But the fundamental and consistent reasons for opposition remain the same.

Pre or post-NEPA, the company says, "We are going to obey everything," but once it is in their hands and it is privatized, the Federal land, no matter what is found in NEPA, no matter what is found in the environmental impact statement, there is nothing the Government can do to assure compliance. So when we say we are OK with NEPA, after the fact, the law is moot after the fact.

Native Americans, and you are going to hear from them today, we have the Chairman and the President of the Hopi and Navajo Nation, as well as the Chairman of the All-Indian Pueblo Council, representing 20 pueblos in New Mexico and Texas that are here, not only in support of their colleagues, San Carlos Apaches, but also in opposition to this bill.

And the opposition continues the same. What is the value of the resource? $60 billion? $100 billion? What is under that land? And is the trade that we are talking about, is that a fair return for the taxpayer? I understand the value is proprietary to the company, but I think some due diligence on the part of this Committee to understand value and what we are giving back to the taxpayer is an important issue.

I mentioned the issue of sanctions. I think all the legitimate opposition and concerns that we have are always met with, "You are anti-jobs, you are anti-mining." Well, I think there is a rush for this legislation because there is an erosion of local support. There is unanimous opposition among Native Americans, not only in Arizona but across the country. And there is a track record for Rio Tinto with regards to labor violations, environmental violations, and failure to do reclamation.

So, why the rush? Perhaps there is a feeling there is a much more accommodating presence at the Senate that would allow this bill to go as is. Perhaps it is that there is hemorrhaging local support in the region for the mine, and let's do it now before that support eradicates entirely.

Mr. Chairman, I hope that we do our due diligence and be true stewards of our public lands and the responsibility we own. We are not Wal-Mart greeters for Rio Tinto or its subsidiary. We are not facilitators or brokers. This cozy deal before us today in the form of H.R. 687 is the same deal we saw before, and before, and before. We are doing it again, and the opposition to the points remain the same. Thank you, Mr. Chairman.

Mr. LAMBORN. OK, thank you for your testimony. I apologize that we couldn't finish the remainder of the panel. We will go into recess now to vote. I am going to let the audience know I am estimating about 45 minutes or so before we come back. But at that point we will reconvene, hear from the rest of the panel, and then go into our other panels.

We will be in recess.

[Recess.]

Mr. LAMBORN. The Subcommittee will come back to order. We have a couple Members who are on their way from the voting that just concluded, but one Member is here and I see another Member coming in. Excellent. So we will go ahead and, since Mrs. Kirk-

12

patrick is here and we are still on the subject of H.R. 687, we will hear her testimony and then go to Mr. Heck of Nevada.

Mrs. Kirkpatrick, the floor is yours.

## STATEMENT OF THE HON. ANN KIRKPATRICK, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF ARIZONA

Mrs. KIRKPATRICK. Thank you, Mr. Chairman and Ranking Member Holt. I am proud to represent Arizona's first district. It covers 60,000 square miles, 80 rural communities, including the Town of Superior, whose leaders are here today. And it has 12 Native American Tribes, including the San Carlos Apache Tribe, whose leaders are here today.

I am here today testifying in support of H.R. 687, the Southeastern Arizona Land Exchange, of which I am an original cosponsor. I would like to start by first recognizing there are pros and cons to this legislation and to the land exchange. My testimony will touch on both aspects of this project. However, it is my belief that there is a way to work together and use the legislative process to develop a piece of legislation that brings a diversified and stable economy to this region. But not without first addressing the project's impact on our environment, water, and lands.

My district includes Arizona's Copper Corridor, which has more than a century's legacy of copper mining. It includes communities like Superior, Globe, Miami, Hayden, Winkelman, and Kearny. Copper is part of Arizona's heritage. It is one of the four C's represented in our State Seal.

The Copper Corridor has played a major role in our State's early growth and economic development. Folks here have remained in these towns for generations, and have expressed strong support over the years for the Superior mine. They have raised their families here, worked the mines, run their own businesses. But small towns in Arizona have been hit hard by the Great Recession. They have been set back by changing economic realities. The median household income in my district is just over $30,000. These are working families; they struggle. But they love their communities and they want to stay if there is a way.

Across the globe there is a great need, an economic demand for the high-grade copper these communities can produce. I know this, and so does my colleague, Congressman Gosar. That is why each of us tried in previous Congresses to make this project a reality. And that is why, in this Congress, we have joined together to try again in hopes that a bipartisan approach could make the difference.

My district is also home to the San Carlos Apache Tribe. The testimony of Chairman Rambler must also be taken into account as we move through the legislative process. The Tribe's concerns about the impact this project will have on sacred sites and land are valid concerns. The Tribe's concerns about the impact of the project on our environment, water, and public health are also valid concerns. I am committed to using the legislative process to represent their concerns. This process must be transparent. It must reflect our shared interest in the public good. And that means recognizing that these communities cannot have long-term economic stability without clean water, air, and land.

13

The voices of tribal and environmental groups should be heard and respected, and that is where the legislative process comes in. I support requiring government-to-government tribal consultations prior to the land exchange. We also need to include environmental protections for the water and land in and around the Copper Corridor very likely prior to the land exchange.

If people are going to live, work, and raise their families in these areas, these factors must be addressed. I will be working toward including responsible provisions like these in a final version of this legislation. I believe that if these provisions are included, it will help ensure that Superior Mine can finally move forward.

I offer my sincere thanks to all of those who came here today to testify about this legislation and make your voices heard.

And I want to especially thank Congressman Gosar and his staff for working together with us on this important effort. Thank you very much.

[The prepared statement of Mrs. Kirkpatrick follows:]

PREPARED STATEMENT OF THE HONORABLE ANN KIRKPATRICK, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF ARIZONA, ON H.R. 687

I am proud to represent Arizona's first district, which covers 60,000 square miles, 80 rural communities, including the town of Superior whose leaders are here today, and 12 Native American tribes—including the San Carlos Apache Tribe, whose leaders are here today.

I stand here today testifying in support of H.R. 687—the Southeastern Arizona Land Exchange, of which I am an original co-sponsor.

I would like to start by recognizing there are pros and cons to this legislation and to the land exchange. My testimony will touch on both aspects of this project.

However, it is my belief that there is a way to work together, and use the legislative process to develop a piece of legislation that brings a diversified and stable economy to the region—but not without first addressing the project's impact on our environment, water and lands.

My district includes Arizona's Copper Corridor, which has more than a century's legacy of copper mining.

It includes communities like Superior. Globe. Miami. Hayden. Winkelman and Kearny.

Copper is part of Arizona's heritage—it's one of the five C's represented in our State seal.

The Copper Corridor has played a major role in our State's early growth and economic development.

Folks here have remained in these towns for generations and have expressed strong support over the years for the Superior mine.

They've raised their families here. Worked the mines. Run their own businesses.

But small towns in Arizona have been hit hard by the great recession.

They've been set back by changing economic realities.

The median income in my district is just over $30,000 a year.

These are working families. They struggle.

But they love their communities and they want to stay—if there's a way.

Across the globe, there is a great need—an economic demand—for the high-grade copper these communities can produce.

I know this, and so does my colleague, Congressman Gosar.

That's why each of us tried in previous Congresses to make this project a reality.

And that's why in this Congress, we have joined together to try again, in hopes that a bipartisan approach could make the difference.

Now, my district is also home to the San Carlos Apache Tribe. The testimony of Chairman Rambler must also be taken into account as we move through the legislative process.

The tribe's concerns about the impact this project will have on sacred sites and land are valid concerns.

The tribe's concerns about the impact of the project on our environment, water and public health are also valid concerns.

I am committed to using the legislative process to represent their concerns.

14

This process must be transparent. It must reflect our shared interest in the public good.

And that means recognizing that these communities cannot have long-term economic stability without clean water, air and land.

The voices of tribal and environmental groups should be heard and respected.

And that's where the legislative process comes in:

I support requiring government-to-government tribal consultations prior to the land exchange.

We also need to include environmental protections for the water and land in and around the Copper Corridor—very likely, prior to the land exchange.

If people are going to live, work and raise their families in these areas, these factors must be addressed.

I will be working toward including responsible provisions like these in a final version of this legislation.

I believe that if these provisions are included, it will help ensure the Superior mine can finally move forward.

I offer my sincere thanks to all those who came here today to testify about this legislation and make your voices heard.

And I want to thank Congressman Gosar and his staff for working together with us on this important effort.

Thank you.

————

Mr. LAMBORN. Thank you, Representative. And as each Member provides their testimony, feel free to be excused. I know there are other Committees going on and other pressing matters. Thank you.

Mrs. KIRKPATRICK. Mr. Chairman, may I be excused?

Mr. LAMBORN. Please, yes.

Mrs. KIRKPATRICK. Thank you.

Mr. LAMBORN. Thank you for being here. And now we will hear from Representative Heck of Nevada on his bill.

**STATEMENT OF THE HON. JOSEPH J. HECK, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NEVADA**

Mr. HECK. Chairman Lamborn, thank you for inviting me back to testify before the Subcommittee on an innovative solution for restoring the environment, improving safety, and creating jobs in my district in Southern Nevada.

As you know, I originally introduced the Three Kids Mine Remediation and Reclamation Act in the previous Congress. This legislation was passed successfully through the Natural Resources Committee and passed the House by a voice vote, but unfortunately, did not receive consideration in the Senate before the 112th Congress adjourned. I have since re-introduced the legislation as H.R. 697.

Mr. LAMBORN. Representative, is your microphone on?

Mr. HECK. Yes, it is.

Mr. LAMBORN. OK, excellent. Maybe pull it a little closer.

Mr. HECK. And I appreciate the opportunity to come back and testify before the Subcommittee to talk about a serious environmental public safety and abandoned mine reclamation issue in the city of Henderson, Nevada. In the interest of time, I am going to abbreviate my remarks, but request that my full statement be entered into the record.

Mr. LAMBORN. No objection, so ordered.

Mr. HECK. And I also request that a written statement of The Honorable Andy Hafen, Mayor, City of Henderson, Nevada, be entered into the record.

Mr. LAMBORN. Without objection, so ordered.

15

[The information submitted for the record by Mr. Heck has been retained in the Committee's official files:]

Mr. HECK. The Three Kids Mine is an abandoned manganese mine and mill site consisting of approximately 1,262 acres of Federal and private lands which lies within the Henderson City limits, and is literally across from Lake Mead Parkway, from an increasing number of homes and businesses. The Three Kids Mine was owned and operated by various parties, including the United States, from approximately 1917 through 1961, and used as a storage area for Federal manganese ore reserves from the late 1950s through 2003.

The project site contains numerous large, unstable, sheer cliff open pits as deep as 400 feet, and huge volumes of mine overburden and tailings, mill facility remnants, and waste disposal areas.

To give a sense of scale, the mine overburden is 10 stories high in some areas. Abandoned waste ponds are up to 60 feet deep and filled with over 1 million cubic yards of gelatinous tailings containing high concentrations of arsenic, lead, and petroleum compounds. Reclaiming the project site will require the excavation and management of at least 12 million cubic yards of material, enough to fill a modern sports stadium 6 times. The presumptive remedy for the project site is to use the existing mine pits as permanent repositories for the mine residue in an appropriately engineered manner.

The legislation I have introduced with the support of the entire Nevada Delegation is the result of over 5 years of work among the City of Henderson Redevelopment Agency, the Department of the Interior, the State of Nevada, and private entities to develop a program to finally clean up the Three Kids Mine site.

Boiled down to its simplest form, the Secretary of the Interior will convey the Federal lands at the project site, approximately 948 acres, at fair market value, taking into account the cost of investigating and remediating the entire site, which includes an additional 314 acres of now private lands that were used historically in mine operations. The Federal Government will receive a release of liability for clean-up of both the Federal lands and the private lands.

This is a unique and complex public-private partnership proposal. It will finally lead to the clean-up of the Three Kids Mine site at no cost to the Federal Government.

In closing, I want to once again thank Chairman Lamborn and Ranking Member Holt, as well as the other members of the Subcommittee for holding a hearing on this serious problem of abandoned mine lands and innovative solutions for addressing the problem. And I would be happy to answer any questions the Subcommittee might have.

[The prepared statement of Mr. Heck follows:]

PREPARED STATEMENT OF THE HONORABLE JOSEPH J. HECK, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NEVADA, ON H.R. 697

Chairman Lamborn and Ranking Member Holt, thank you for inviting me back testify before the Subcommittee on an innovative solution for restoring the environment, improving safety, and creating jobs in my District in southern Nevada. As you know, I originally introduced the Three Kids Mine Remediation and Reclamation Act in the previous Congress. This legislation was passed successfully through the

16

Natural Resources Committee and the House, but unfortunately, did not receive consideration in the Senate before the 112th Congress adjourned. I have since re-introduced this legislation as H.R. 697, and I appreciate the opportunity to come back and testify before the Subcommittee to talk about a serious environmental, public safety, and abandoned mine reclamation issue in the City of Henderson, Nevada.

* * *

The Three Kids Mine is an abandoned manganese mine and mill site consisting of approximately 1,262 acres of Federal and private lands which lies within the Henderson City limits and is literally across Lake Mead Parkway from an increasing number of homes and businesses. The Three Kids Mine was owned and operated by various parties, including the United States, from approximately 1917 through 1961, and used as a storage area for Federal manganese ore reserves from the late 1950s through 2003. The project site contains numerous large unstable sheer-cliff open pits as deep as 400 feet, huge volumes of mine overburden/tailings, mill facility remnants and waste disposal areas. To give a sense of scale, mine overburden is ten stories high in some areas; abandoned waste "ponds" are up to 60 feet deep and filled with over 1 million cubic yards of gelatinous tailings containing high concentrations of arsenic, lead and petroleum compounds. Reclaiming the Project Site will require the excavation and management of at least 12 million cubic yards of material (enough to fill a modern sports stadium six times). The "Presumptive Remedy" for the Project Site is to use the existing mine pits as permanent repositories for the mine residue, in an appropriately engineered manner.

* * *

The Nevada Division of Environmental Protection has identified the Three Kids Mine as a high priority for the implementation of a comprehensive environmental investigation, remediation, and reclamation program. Numerous unsuccessful proposals to clean up and redevelop the Project Site have been advanced over the years. All were ultimately abandoned due to unrealistic estimates of the scale of required remediation, as well as the complexities posed by the mix of private and Federal ownership at the Project Site. Something must be done to address this serious blight on the Henderson community.

* * *

The legislation I have introduced, with the support of the entire Nevada Delegation, is the result of over 5 years of work among the City of Henderson Redevelopment Agency, the Department of the Interior, the State of Nevada, and private entities to develop a program to finally clean up the Three Kids Mine site. Boiled down to its simplest form, the Secretary of the Interior will convey the Federal lands at the project site—approximately 948 acres—at fair market value taking into account the costs of investigating and remediating the entire site, which includes an additional 314 acres of now-private lands that were used historically in mine operations. The Federal Government will receive a release of liability for cleanup of both the Federal lands and the private lands. Under the legislation, before the Federal lands are conveyed, the State must enter into a binding consent agreement under which the cleanup of the entire Project Site will occur. The consent agreement must include financial assurances to ensure the completion of the remediation and reclamation of the Site. The cleanup will be financed with private capital and Nevada tax increment financing at no cost to the Federal Government.

In more detail, the legislation would direct the Secretary to convey the 948 Federal acres of the Three Kids Mine project site to the Henderson Redevelopment Agency for fair market value, discounted to reflect the costs of cleanup of the entire Project Site. According to preliminary estimates, the cleanup costs for the Project Site range from a low of $300 million to a high of nearly $1 billion. The BLM's preliminary estimate of the value of the lands to be conveyed as if they were "clean" ranges from $95 million to $190 million. The value and costs will be determined by the Secretary under the legislation using established national appraisal methods, environmental assessment standards, and cost estimating procedures. We fully expect the cleanup costs to substantially exceed the value of the lands to be conveyed. Moreover, given the mix of private and Federal lands at the project site and the substantial cleanup costs involved, there is no viable solution to remediate and reclaim the Federal lands without the private lands.

Before any conveyance of Federal land, the legislation requires an executed Mine Remediation and Reclamation Agreement between a responsible party and the State of Nevada that would govern the "CERCLA-protective" cleanup program for the entire Project Site (Federal and private lands) and ensure that the program is fully funded. Finally, in exchange for the conveyance, the Federal Government's responsi-

17

bility for the cleanup of this site will be assumed and paid for by a responsible third party and the Secretary's land will also be cleaned up at no cost to the Federal Government.

* * *

Fundamental to the economic viability of the entire project is the availability of "tax increment financing" under the Nevada Community Redevelopment Law. The Nevada Redevelopment Law allows the Redevelopment Agency to fund the cleanup of blighted conditions such as an abandoned mine and environmental contamination through use of an "increment" of property taxes collected within a designated redevelopment area over a 30-year "capture period." The "increment" is a portion of the assessed value of the property which predictably increases in value following cleanup and as the subsequent commercial and residential redevelopment build-out occurs. To advance this important project, the City of Henderson completed annexation of the Three Kids site in January 2009, and the Lakemoor Canyon Redevelopment Area was established in February 2009.

* * *

This is a unique and complex "public/private partnership" proposal. It will finally lead to the cleanup of the Three Kids Mine site at no cost to the Federal Government. Millions of dollars have been spent on this effort to date on environmental assessment work at the Project Site and to advance discussions and negotiations among project stakeholders. I believe that this initiative offers a viable solution for the cleanup and reclamation of the Three Kids Mine and could serve as a model for other similar sites across the country. I would respectfully request that the Subcommittee grant expeditious consideration of the Three Kids Mine Remediation and Reclamation Act.

In closing, I want to once again thank Chairman Lamborn and Ranking Member Holt, as well as the other members of the Subcommittee, for holding a hearing on the serious problem of abandoned mined lands, and innovative solutions for addressing the problem. I would be happy to answer any questions the Subcommittee might have.

————

Mr. LAMBORN. OK, thank you for your testimony. Feel free to be excused. I know there are other pressing issues and Committee hearings. Thank you for being here.

We will now hear from Senator—excuse me, Representative Johnson—there is an interesting Senate race going on in Georgia, but I should say Representative Johnson of Georgia.

## STATEMENT OF THE HON. HENRY C. "HANK," JOHNSON, JR., A REPRESENTATIVE IN CONGRESS FROM THE STATE OF GEORGIA

Mr. JOHNSON OF GEORGIA. Well, I tell you, I am going to stay right where I am and stay out of that big fight.

[Laughter.]

Mr. JOHNSON OF GEORGIA. But thanks for the elevation, anyway.

Mr. LAMBORN. We just made some news today here.

Mr. JOHNSON OF GEORGIA. Thanks, Mr. Chairman. I want to thank you, Chairman Lamborn. Also, Ranking Member Horsford, for allowing me to join you today.

Mr. Chairman, it is a testament to the statesmanship of the Chairman and Ranking Members that you have placed a bill offered by a Democrat on the table for discussion today. That bipartisan approach will be necessary if we are going to rise to the challenges of our time.

I also must thank Ranking Member Markey for his and his staff's hard work in developing H.R. 981, the Resource Assessment of Rare Earths Act of 2013, or the RARE Act, which we jointly introduced this year.

18

Ranking Member Holt I also want to thank for his support for this legislation.

This hearing on creating mining and manufacturing jobs here in America, and the securing of our access to necessary minerals is critically important. The RARE Act will help ensure that our Nation is able to assess rare earth elements, which are necessary components of numerous products, from wind turbines to solar panels to energy-efficient light bulbs and a number of Department of Defense applications, as well.

The bill is simple and I would also argue that it is also non-partisan. It directs the U.S. Geological Survey to lead a global, multilateral assessment of rare earth element deposits to develop a comprehensive understanding of their distribution around the world.

We need this bill because China now accounts for upwards of 90 percent of U.S. rare earth element supply. This Chinese monopoly is a potentially ruinous economic and geopolitical vulnerability for the United States. In recent years, China has shown a willingness to exploit its monopoly by restricting rare earth elements exports, undermining U.S. national security and competitiveness in defense and clean energy. A better understanding of where these critical elements are will enable us to adjust to supply disruptions from any particular region.

As I said, this is a non-partisan issue, and that is why I am happy to see Chairman Lamborn's bill, H.R. 1063, which is under consideration today, and which includes language that mirrors the rare earth assessments called for in my bill.

Thank you, Mr. Chairman, for holding this hearing today. I look forward to the comments from the witnesses which I will take in via webcast. And thank you, members of the Committee.

Mr. LAMBORN. OK, thank you, Representative Johnson, for being here today and providing your testimony.

That concludes our first panel. We will now move to the second panel of witnesses for oversight. And I invite forward Mr. James Iwanicki, Engineer Manager for the Marquette County Road Commission; Ms. Ruthe Batulis, President of the Dakota County Regional Chamber of Commerce, and President of the Minnesota Conference of Chamber Executives; Mr. Harry Melander, President of the Minnesota Building and Construction Trades Council; and Ms. Jennifer Krill, Executive Director of Earthworks.

Like all our witnesses, your written testimony will appear in full in the record. So I ask that you keep your oral statements to 5 minutes, as outlined in our invitation letter and our Committee rules.

Our microphones are not automatic, so you have to push a button to be heard. And the way the timing works is that when you press the button a green light comes on, and the 5-minute timer starts counting down. After 4 minutes, the yellow light comes on, and then the red light at 5 minutes.

So, we will start in with our testimony. Mr. Iwanicki, you may begin.

### STATEMENT OF JAMES M. IWANICKI, P.E., ENGINEER MANAGER, MARQUETTE COUNTY ROAD COMMISSION

Mr. IWANICKI. Hi. I am James M. Iwanicki, Engineer and Manager of the Marquette County Road Commission. Thank you, Mr.

19

Chairman and members of the Committee. Thank you for asking me here to testify about our experiences with trying to create a new county road, County Road 595, to improve the quality of life, the health, safety, and welfare of our citizens. County Road 595 would have had a positive impact on the mining, logging, recreation, and tourist industries.

Rio Tinto was willing to fund an $83 million, 21-mile public road project to access a remote but key area of the county. The road would have had a major positive economic and public safety impact for the area and region. The road is located in a working woods. It would have replaced a system of two track roads that are currently used to access the area.

As a local government official, it was very frustrating in dealing with the EPA throughout this project. If I operated the Marquette County Road Commission the way the EPA handled this permit, I would not be sitting here today. It is even more surprising, when you consider the list of support that we had. County Road 595 was supported by all local units of government in Marquette County and where County Road 595 would either go, or where the existing road to the mine goes through. This includes three cities, Marquette, Ishpeming, and Negaunee; eight townships; the Marquette County Board; two Michigan State House of Representative Members, one Democrat, one Republican; the Michigan State Senator of the area, a Republican; 63 of the 110 Members of the 96th Michigan State House; 28 of the 38 Senators from the 96th Michigan State Senate; the Governor of the State of Michigan; the Michigan Department of Transportation; the Michigan Department of Environmental Quality; the Michigan Department of Natural Resources; the Michigan State Police; Republican Dan Benishek of the U.S. House; and both Democratic U.S. Senators, Carl Levin and Debbie Stabenow.

EPA over-reached their authority on this project in at least five different ways to kill County Road 595. EPA did not allow Marquette County Road Commission to use any creation of wetlands for mitigation, forested wetlands in particular, as allowed by 40 CFR Part 230.92 and 230.92a2. The preservation ratios EPA required were beyond that which were reasonable, and not compliant with 40 CFR Part 230. Michigan Department of Environmental Quality rules allowed a maximum ratio of 12-to-1 for wetland preservation.

EPA imposed requirements that required mineral rights to be obtained for wetland preservation areas. Federal rules only required that site protection should include measures to protect sites to the extent appropriate and practical in regard to mineral extraction and other threats.

EPA continually changed the rules in regards to what was required for mitigation on the project. EPA suggested that wetland preservation be at 20-to-1 replacement ratio in June 2012 to cover indirect and secondary impacts. But in December 2012 it required additional mitigation to address secondary impacts and gave Marquette County Road Commission less than 30 days, including Christmas and New Year's holidays, to come up with such measures. The EPA public hearing in this process was held over 3 months prior to the December 4, 2012 EPA letter, and the timing

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 663 of 2158
Case 2:21-cv-00122-DWL    Document 87-14    Filed 07/14/25    Page 25 of 118

20

of the letter did not allow sufficient time for the Marquette County Road Commission and MDEQ to respond to the requirements of EPA's letter, due to the holidays.

EPA would not allow the Marquette County Road Commission, Marquette County, or Michigamme Township, all legal governmental entities in the State of Michigan, to be the land stewards for the proposed wetland mitigation area, as allowed in 230.97(a).

Because of the EPA decision, we have gone from having a common-sense practical solution to solve public safety issues and improve the economics of the region to the use of the existing road system which will not be as safe as the proposed solution, cause more air pollution, and stagnate the economic development of the area.

In conclusion, it is hard for the people in the area to understand how a Federal agency that does not live and work in our community can make such an important decision for us, 350 miles away in Chicago.

Thank you for your time. I would be happy to answer any questions the Committee may have.

[The prepared statement of Mr. Iwanicki follows:]

Prepared Statement of James M. Iwanicki, P.E., Engineer Manager, Marquette County Road Commission

Mr. Chairperson and Members of the Committee:

Thank you for asking me here today to testify about our experiences with trying to create a new county road, CR 595, to improve the quality of life, the health, the safety, and the welfare of our citizens. CR 595 would have had a positive economic impact on the Mining, Logging, Recreation, and Tourism Industries.

**Background Information**

In January of 2012 Marquette County Road Commission (MCRC) submitted a Section 404 permit application to fill approximately 26 acres of wetland to construct 21 miles of road at a cost of $83 million. CR 595 was going to be funded by Rio Tinto through a public-private partnership. In addition Rio Tinto spent over $20 million to permit CR 595.

Rio Tinto was interested in funding the project because they were constructing a new nickel and copper underground mine called the Eagle Mine. The company is also refurbishing the old Humboldt Mill to process the ore. The mine and the mill will create about 300 direct new jobs. (See Figure 2) The distance between the mine and the mill as the crow flies is about 19 miles. Using the existing road system to go from the mine to the mill would be approximately 60 miles one way. CR 595 would reduce travel time by an hour. The construction of CR 595 would have lasted 2 years and employed over 100 people during that timeframe.

CR 595 would have been built in a working woods not in pristine wilderness. The road alignment is based on existing public and private roads. (See Figures 4 and 6–9.).

CR 595 was the common sense solution to Marquette County's transportation needs.

If you cannot build CR 595 then you can never build any new road in Marquette County or the Upper Peninsula of Michigan.

**EPA**

- In April of 2012 EPA objected to MCRC's project purpose.
- EPA held a public hearing on CR 595 in August of 2012.
- EPA lifted their objection to the project purpose on December 4, 2012 but had other objections which needed to be satisfied by January 3, 2013 (within 30 days) or jurisdiction would revert to the Army Corps of Engineers.
- Rio Tinto needed certainty in their transportation route by January of 2013. Failure to have a permit for CR 595 in January 2013 would cause Rio Tinto to pull their $83 million funding commitment for CR 595 and they would use the existing road system to truck the ore.
- EPA did not like how we proposed to mitigate the impacts of CR 595. Our proposed mitigation plan involved preserving over 1,576 Acres of land (2.5 square

21

miles) adjacent to McCormick Tract in the Ottawa National Forrest. The area included approximately 647 acres of high quality wetland (25 to 1 ratio) including an additional 929 acres of uplands (60 to 1, total acreage). (See Figure 5)

- EPA was very aloof doing the whole permit process. They would not tell us what would be acceptable. In fact durring the last month of the project they would not even tell us who the decision maker was going to be. They were unwilling to negotiate resolutions openly by telling us directly what would satisfy their issues.
- EPA wanted additional wildlife protection and they proposed creating wildlife crossings (tunnels or bridges) large enough to accommodate moose, bear, and cougar and to place fencing to guide wildlife to the crossing. But they would not tell us where these crossings needed to go.
- EPA wanted to limit secondary road connections to CR 595 by placing deed restrictions on CR 595 so adjacent land owners could not connect to the road.

**EPA's Overreach of Their Authority**

The Marquette County Road Commission (MCRC) believes the EPA overstepped its authority in the following areas:

1. EPA would not allow MCRC to use any creation ("establishment") of wetlands for mitigation, forested wetlands in particular, as allowed by 40 CFR part 230.92 and 230.93(a)(2).

2. The preservation ratios EPA required (i.e. 20:1) were beyond what was reasonable and not compliant with 40 CFR part 230. Michigan Department of Environmental Quality (MDEQ) rules allow a maximum replacement ratio of 12:1 for wetland preservation.

3. EPA imposed requirements that required mineral rights to be obtained for the wetland preservation areas. Federal rules only require that site protection should include measures to protect sites *"to the extent appropriate and practicable"* (230.97(a)(2)) in regard to mineral extraction and other threats.

4. EPA continually changed the "rules" in regards to what was required for mitigation on the project. EPA suggested that wetland preservation be at a 20:1 replacement ratio in June 2012 to cover indirect and secondary impacts but in December 2012 it required additional mitigation measures to address secondary impacts and gave MCRC less than 30 days (including Christmas and New Year holidays) to come up with such measures. The EPA public hearing in this process was held over three months prior to the December 4, 2012 EPA letter and the timing of the letter did not allow sufficient time for MDEQ or MCRC to respond to the requirements of EPA's letter due in substantial part to the holidays.

5. EPA would not allow the Marquette County Road Commission, Marquette County, or Michigamme Township (all legal governmental entities in the State of Michigan) to be the land steward of the proposed wetland preservation area, as allowed in 230.97(a).

**Political Support for CR595**

CR 595 is supported by all local units of government in Marquette County where CR 595 would either go through or where the existing road to the mine goes through. This includes 3 cities, (Marquette, Ishpeming, Negaunee) 8 townships, the Marquette County Board, the two Michigan State House of Representatives members that represent Marquette County, the Michigan State Senate senator who represents Marquette County, 63 of the 110 members of the 96th Michigan State House, and 28 of 38 senators from the 96th Michigan State Senate, the Governor of the State of Michigan, Michigan Department of Transportation, Michigan Department of Environmental Quality, Michigan Department of Natural Resources, the Michigan State Police, Dan Benishek (R) U.S. House of Representative, and both U.S. Senators Carl Levin (D), and Debbie Stabenow (D).

**Result of EPA's Overreach**

- Heavy truck traffic will now be routed through the populated areas of Marquette County.
- Local Units of government are trying to address the safety issues created by EPA's lack of regards for people and local units of government.
- The following are excerpts from The Mining Journal, the local newspaper:

**Headline: CR 595 project killed**
Date: January 4, 2013
Online location: http://www.miningjournal.net/page/content.detail/id/583130/CR-595-project-killed.html
Author: John Pepin, Staff Writer

22

Quotes:

- Road Commission Engineer-Manager Jim Iwanicki said the U.S. Environmental Protection Agency's refusal to remove objections to the project prevented the DEQ from issuing a permit that had the required Federal backing.

  "It's a shame that the EPA has killed a good project," Iwanicki said. "The EPA's action is going to affect a lot of lives in Marquette County and the road commission believes it will affect them negatively."

- Iwanicki said the EPA "stonewalled" road commission efforts to comply with the agency's request in several phone conversations held with the road commission, EPA and DEQ in December.

  "The EPA moved the bar every time we got close," Iwanicki said. "Throughout the whole process, it's been an ever-changing target."

  The road commission responded on Dec. 27 to the EPA's requirements for removing its remaining objections, but Iwanicki said it became clear before Christmas; the Federal agency would not be satisfied.

- Iwanicki said the agency never liked the project from the start and for months worked to change expectations and requirements. He said Thursday's official finality to the project was expected and was "just the bow on the package."

  "They played a good game of bureaucratic nonsense," Iwanicki said of the EPA.

**Headline: City wants joint meeting on truck traffic**
Date: March 12, 2013
Online location: http://www.miningjournal.net/page/content.detail/id/585271/City-wants-joint-meeting-on-truck-traffic.html
Author: Kyle Whiney—Journal Staff Writer

Quotes:

- In the wake of the Michigan Department of Environmental Quality's decision to not permit the proposed Marquette County Road 595, local groups have been working to determine the route mining company Rio Tinto will use to transport ore from its Eagle Mine to the Humboldt Mill.

- The city commission also charged its special legal counsel with determining how best to communicate with the U.S. Environmental Protection Agency concerning Rio Tinto traffic on city streets.

  In an August letter to the EPA, the city voiced concerns related to the prospect of mine trucks traveling through Marquette.

  At that time, according to the letter, the city had no plans "for expanding local infrastructure to support increased heavy truck traffic." The alternate route would "create substantial negative social impacts, as well as drastically undermine decades of transitional economic development and tens of millions of dollars of investment supporting Marquette's current economy."

**Editorial: Finding new truck route worth the effort**
Date: March 14, 2013
Online location: http://www.miningjournal.net/page/content.detail/id/585322/Finding-new-truck-route-worth-the-effort.html
Author: Mining Journal Editorial

Quotes:

- Concerns over the increase in truck traffic from the mine, which is expected to begin production in 2014, became more significant when a plan to construct a new north-south haul road—Marquette County Road 595—through the woods from the mine to the mill was scrapped.

  Rio Tinto now plans to use its originally intended route, which involves trucking the ore from Eagle Mine on County Road AAA to CR 510, then on CR 510 to CR 550, south on CR 550 to the City of Marquette, then on Wright Street to U.S. 41 and finally west on U.S. 41 to the mill. While we maintain our stance that the CR 595 option was by far the best route, particularly for public safety reasons, it's a good idea to have the county, city and township seriously explore an alternative to driving the trucks through residential areas and on busy roads.

23

Mr. LAMBORN. Mr. Iwanicki, thank you for your testimony.
We will now hear from Ms. Batulis.

**STATEMENT OF RUTHE BATULIS, PRESIDENT, DAKOTA COUNTY REGIONAL CHAMBER OF COMMERCE, PRESIDENT, MINNESOTA CONFERENCE OF CHAMBER EXECUTIVES**

Ms. BATULIS. Mr. Chair and Members, thank you for having us here today. I want to bring greetings from Minnesota, where yesterday it was minus 7 degrees. So we are glad to be here. My name is Ruthe Batulis. I represent a statewide association of chamber of commerce executives, and I am President of Dakota County Regional Chamber of Commerce.

As you know, business and labor do not always agree. But when it comes to job creation, and specifically the jobs that come from the mining of strategic metals, we could not agree more. You will hear from my friend, Harry Melander next to me, from the Building and Trades Association in a minute. We are tremendously excited about the Jobs for Minnesotans Coalition, and what strategic metal mining can do for the entire State of Minnesota and our country.

You have heard previous testimony about the jobs that are created, ancillary jobs that are created from the strategic metal mining and the production of materials and entrepreneurs that can really drive creation of jobs throughout the State. These strategic metals such as nickel and copper are used in the green economy in electric cars, wind turbines, and, of course smart phones and other high-tech equipment.

Imagine Minnesota's high-tech manufacturing industry, where contractors and suppliers have the opportunity to creatively utilize those strategic metals mined right in Minnesota. That is on the horizon.

In Minnesota, we have some of the best schools in the country. We know that providing for a good education and a good investment isn't cheap. Resources for our schools are constantly an issue of public debate and discussion. Our schools will gain tremendously from an emerging strategic metals industry in Minnesota because royalties generated from the projects directly benefit our schools. In Minnesota, these royalties from mining go directly into what our lawmakers call the School Trust Fund. At this time about $5 million a year goes into the Trust Fund. That is $26 for every student. Imagine the impact of $2.5 billion going into the school district.

The addition of strategic metal mining in Minnesota will add to this existing fund. Businesses and construction unions alike need skilled workers. And, as such, the education and workforce development issues are paramount. The prospect of this kind of investment is thrilling.

Our members are always seeking ways to make their processes more efficient and effective to serve their customers. In fact, you are all working together to make the permitting process more efficient and effective, and it is a great sign for all of us, this renewed commitment and job creation.

We are blessed in Minnesota that any large-scale projects and the jobs that follow come with the equivalent of the Good Housekeeping Seal of Approval. Our environmental laws are among the

24

most stringent in the world, ensuring that our precious waters are protected from the outset through our permitting processes. Our citizens can always rest assured that permitting projects have undergone responsible and extensive scrutiny by the Department of Natural Resources, the Minnesota Pollution Control Agency and other State agencies.

Minnesotans have just recently worked across party lines to ensure responsible scrutiny is done in an effective manner that allows permit seekers to have certainty and investors to continue to seek opportunities in Minnesota and the United States.

I applaud you for all that you do here in Washington, and appreciate what you are about to accomplish to foster job creation in Minnesota and the United States.

Thank you for hearing us here today, and I can answer any questions that you might have.

[The prepared statement of Ms. Batulis follows:]

PREPARED STATEMENT OF RUTHE BATULIS, PRESIDENT OF THE MINNESOTA
CONFERENCE OF CHAMBER EXECUTIVES

Mr. Chairman, Members of the Committee, good morning, my name is Ruthe Batulis and I am the President of the Dakota County Regional Chamber of Commerce, also in Minnesota. We are a regional chamber of commerce in the southeast suburbs of the Twin Cities. We proudly serve the cities of Eagan, Farmington, Lilydale, Mendota Heights, Mendota, Rosemount, Sunfish Lake, and West St. Paul. And we're proud to contribute to the outstanding quality of life our businesses enjoy every day. I also currently serve as President of the Minnesota Conference of Chamber Executives—the professional association for chamber leaders across our State.

We are also tremendously excited about the Jobs for Minnesotans Coalition, and what strategic metals mining means for the *entire* State of Minnesota and the country.

As you know—business and labor don't always agree, but when it comes to job creation, and specifically the jobs that will come with the mining of strategic metals in Northern Minnesota, we couldn't agree more.

Minnesota is fortunate to have an abundance of natural resources. We are literally "by nature" an agricultural state, a timber State and a mining State.

What people don't necessarily think of when it comes to our natural resources—and for us what is very exciting—is that thousands of associated and spinoff jobs are created as a result of our natural resources industry. When the strategic metals mines start producing materials, entrepreneurs and workers across Minnesota and throughout the Twin Cities will have new opportunities in all kinds of industries. These strategic metals are used in electric car batteries, smart phones, wind turbines and other high tech equipment. The sky is the limit.

Imagine Minnesota's medical device manufacturing industry, or Minnesota's many national defense contractors and suppliers with the opportunity to creatively utilize strategic metals mined right here in Minnesota. That is on the horizon.

Furthermore, Minnesota (especially Dakota County) has some of the best schools in the country. Providing for schools is a good investment, but it isn't cheap! Resources for our schools are constantly an issue of public discussion and debate. Our schools will gain tremendously from an emerging strategic metals industry in Minnesota, because of the royalties generated from the projects that directly benefit our schools. In Minnesota, royalties from mining go directly into what our law makers call our "school trust fund." The addition of Strategic Metals Mining in Minnesota will add to this existing fund. Businesses and construction unions alike need skilled workers for the future, and as such, education and workforce development issues are paramount. The prospect of this kind of new investment is thrilling.

My members are always seeking ways to make their processes more efficient and effective to serve their customers. The fact that you are all working together to make the permitting process more efficient and effective is a wonderful sign to us of a renewed commitment to my members and businesses in general.

We are blessed in Minnesota that any large-scale projects and the jobs that follow come with the equivalent of "Good Housekeeping Seal of Approval." Our environmental laws are among the most stringent in the world, ensuring that our precious waters are protected from the outset through our thorough permitting process. Our

25

citizens can always rest assured that permitted projects have undergone responsible and extensive scrutiny by the Department of Natural Resources, the Minnesota Pollution Control Agency and other State agencies.

As my friend Harry said during his testimony, Minnesotans just recently worked across party lines to ensure this responsible scrutiny is done in an efficient manner so that permit seekers have certainty and investors will continue to seek opportunities in Minnesota and the United States.

I applaud you all for working to do the same here in Washington, and appreciate what you are about to accomplish to help foster job creation in Minnesota and across the country.

I am happy to answer any questions you may have.

———

Mr. LAMBORN. Thank you for your testimony and for being here. And we will now hear from Mr. Melander.

## STATEMENT OF HARRY MELANDER, PRESIDENT, MINNESOTA BUILDING AND CONSTRUCTION TRADES COUNCIL

Mr. MELANDER. Chair, Committee members, my name is Harry Melander, and I work as the President of the Minnesota Building and Construction Trades Council, an organization that represents over 50,000 unionized workers throughout the State of Minnesota, and also the Co-Chair of Jobs for Minnesota, with David Olson, the President of the Minnesota Chamber of Commerce, and working very closely with Ruthe on this issue.

David, Ruthe, and I, along with other business, labor, local bodies of government, professional associations, and the heart and backbone of our State, small businesses, and its employers, form this diverse group of Minnesotans to focus on jobs, jobs that will be created in the development of strategic metals in our State.

Minnesota has a long history of iron ore mining for well over 100 years, and is on the verge of its next generation of mining metals. These metals, copper, nickel, and others, are used in the production, as indicated earlier, in smart and green products that we all use today. These metals will also be used in products yet to be designed that will save lives and also create new jobs for Northeastern Minnesota that will last for generations, revitalizing an industry and its region.

Minnesota has one of the largest untapped sources of these metals in the world. If allowed to move permitting forward, we will have the second-largest deposit of nickel, globally. We think that is important for our Nation's independence and its security.

Jobs for Minnesota is here today encouraging you and others to use what we call "The Minnesota Model." As indicated in our written comments, 2 years ago, with a Republican-led House and Senate and a Democratic Governor, we were able to create a law that limited the time applicants have to get permits. In the report submitted to you today, that good work by different interests has benefited Minnesota, limiting the time it takes to issue permits in our State.

What you are doing here today will have a positive effect on the permitting process on a national level. Members, we can no longer look to others for materials that are already limited, globally. We believe what Minnesota has done is only a start. The work you do today in efficient permitting will make our country prosperous and allow us to continue to grow technology with an abundant source of metals used in advancing technologies around the world.

26

You have an opportunity to create and expedite always safe means of permitting on our limited resources. Please do not lose sight of this opportunity. If we can do it in Minnesota, others can do that. Thousands of Minnesotans and others in our country are waiting for jobs.

Thank you. And if there is any questions, I would be more than happy to answer those.

[The prepared statement of Mr. Melander follows:]

PREPARED STATEMENT OF HARRY MELANDER, PRESIDENT, MINNESOTA BUILDING AND CONSTRUCTION TRADES COUNCIL

Mr. Chairman, Members of the Committee, good morning, my name is Harry Melander and I am the President of the Minnesota Building and Construction Trades Council. We are the advocate and voice for unionized construction workers in Minnesota. Fifty thousand members strong, we have provided leadership and advocacy for construction workers in Minnesota for 60 years.

On behalf of my members, I have recently teamed up with David Olson, the President of the Minnesota Chamber of Commerce, to form the Jobs for Minnesotans Coalition.

Jobs for Minnesotans is a growing coalition of labor organizations, businesses and business associations, middle class workers, local governments, educators and other supporters of job creation in the State of Minnesota. The initial focus of this diverse coalition is to champion the development of critical and strategic metals (copper, nickel, platinum, palladium and gold) mining in Minnesota and provide information about the direct and ancillary job creation that strategic metals mining will produce for the state, once permitted to begin operations.

Why this Coalition?

Minnesota is on the verge of becoming one of the most significant producers of strategic metals in the world. Right now, the United States has no domestic source of nickel, a key element in many products used for our national security. If those seeking permits in Minnesota are able to proceed, Minnesota will become the 2nd largest producer of nickel globally. This is critically important.

For my members, a recent University of Minnesota Duluth study shows that strategic metals projects could mean the potential for 1,300 jobs in Minnesota. A job surge of this magnitude in Minnesota's Iron Range would have a significant, lasting impact on our State's, and the region's economy. By moving forward to safely extract these minerals from one of the world's largest known, untapped deposits in what is known as Minnesota's "Duluth Complex" means jobs for generations for hard working Minnesotans.

The Minnesota Department of Natural Resources is charged with issuing the permits to mine. Just 2 years ago, labor and business, our Democratic governor and Republican legislature stood together to pass landmark permit efficiency legislation, much like that which you are considering here at a Federal level. There was no discussion of who was going to get a political win. It was about getting Minnesotans back to work; together—and doing it in an environmentally sensitive way.

In fact, during the last Legislature, streamlining permits in Minnesota was House File 1. And Governor Dayton, early in that session, issued similar executive orders while the legislature passed this landmark legislation which the he then signed into law.

Both branches of government are actively working together again this legislative session to shorten the permitting time. In fact it was a key policy point made by Governor Dayton's Chief of Staff at the Minnesota Chamber of Commerce's legislative banquet earlier this year.

My point here is that an efficient permitting process can be something that policymakers of all political stripes can and should stand together to support. I am enclosing for the record the recent February 2013 report by the Minnesota Pollution Control Agency which outlines the successes of efficient environmental permitting in Minnesota today, due to the laws we passed.

What you are working on here is a natural extension of what we did, working together in Minnesota. On behalf of the 50,000 men and women I represent through the Building and Construction Trades Council, and the growing coalition I am leading with my State chamber counterpart, I'd ask that you too stand together for jobs and pass significant permitting efficiency legislation here in Washington.

I am happy to answer any questions you may have.

27

**Note:** The report entitled, "Environmental Permitting: MPCA's Semiannual Permitting Efficiency Report" Minnesota Pollution Control Agency, (February 1, 2013) (*http://www.pca.state.mn.us/index.php/view-document.html?gid=18982*) has been retained in the Committee's official files. Minnesota Pollution Control Agency, 520 Lafayette Road North, Saint Paul, Minnesota 55155–4194. This report is available in alternative formats upon request, and online at *www.pca.state.mn.us*. Document number: lrp–gen–10sy13.

_____

JOBS FOR MINNESOTANS

MINNESOTA—PERMITTING EFFICIENCY LAW

During the 2011–2012 biennium, Democratic Governor Mark Dayton and the Republican-controlled Legislature worked on a bi-partisan basis to enact the permitting efficiency law. The bills were in response to concerns expressed about the overall length and uncertainty associated with regulatory processes, including both environmental review and permitting.

Minnesota House File 1/Senate File 42 (2011)
Minnesota House File 2095/Senate File 1567 (2012)

- Established a 150-day goal for the Minnesota Pollution Control Agency (MPCA) and Minnesota Department of Natural Resources (DNR) to issue permits and requires a report on applications not meeting that goal.
- Allows a project proposer the option to prepare the draft Environmental Impact Statement (EIS), rather than a regulated government unit such as a State agency or local government.
- Requires that final decisions on permits be made within 30 days—rather than 90 days—of the final approval of an EIS.
- Eliminated district court review of environmental review decisions and sends all appeals directly to the Court of Appeals.
- Requires that when the MPCA adopts standards that exceed federal standards, the MPCA must document that federal standards are not protective enough.
- Allows a permit applicant to begin new construction or an extension before a national pollutant discharge elimination system (NPDES) or State disposal system (SDS) permit is issued by the MPCA, unless Federal law prohibits the action.
- Established a permits coordinator required to assist permit applicants.
- Allowed DNR permit holders who have a permit or have applied for a permit to continue to operate during a suspension of government services as long as they abide by all rules and regulations in the permit.

On February 1, 2013 the MPCA released its semiannual report to the Legislature. In its findings, the MPCA acknowledged that full implementation would take additional time but that they are pleased with the overall results. Most notably the MPCA continues issuing more than 90 percent of priority (construction) permits within the 150-day goal while ensuring the protection of human health and the environment.

Since the enactment of the Permitting Efficiency Law, the MPCA has initiated a number of improvement endeavors:

- Improving communication around permitting metrics through the Agency electronic dashboard.
- Standardizing permitting processes across media and programs to minimize business and technology system duplication and establish a unified agency-approach, where possible, to permit delivery.
- Developing new technology tools to improve data integration and utilization of data, and system efficiency.

*The MPCA Report can be accessed here: *http://www.pca.state.mn.us/index.php/view-document.html?gid=18982*.

_____

Mr. LAMBORN. Thank you for your testimony.
We will now hear from Ms. Krill.

28

## STATEMENT OF JENNIFER KRILL, EXECUTIVE DIRECTOR, EARTHWORKS

Ms. KRILL. Thank you. Mr. Chairman, Ranking Member Holt, and members of the Subcommittee, for giving me the opportunity to testify here today. My name is Jennifer Krill, and I am the Executive Director of Earthworks. We are a nonprofit organization dedicated to protecting communities and the environment from the destructive impacts of mineral and energy development.

Earthworks opposes H.R. 761, the National Strategic and Critical Minerals Production Act of 2013. The authors and advocates of this legislation, the mining industry lobby and its champions, would have you believe that mining companies in the United States are stifled by the current regulatory system. The truth is the mining lobby's vision of a mining-hostile United States is, in our view, pure fantasy. Our stable democracy, our courts that enforce contracts, and an orderly and reliable process for public input in permitting decisions make this country one of the best places for mining investment.

Hard-rock mining companies in the United States also enjoy a myriad of subsidies and loopholes that create an extremely friendly regulatory environment.

First, they have the 1872 Mining Law, which was mentioned earlier today, a law that allows mining companies, foreign and domestic, to take gold, copper, silver, uranium, and any other mineral from public lands for free. The Forest Service has repeatedly said that because of this antiquated law, they cannot deny mine proposals on our National Forests. While operating under this 140-year-old law, mining companies are also given free reign to pollute our water, thanks to two Clean Water Act loopholes that allow mining waste to be dumped directly into streams, rivers, lakes, and wetlands. The metals mining industry is the single largest source of toxic pollution in this country.

An extremely favorable tax code rounds out the fantastic regulatory environment for hard-rock mining. The percentage depletion allowance allows a company to deduct a fixed percentage from their gross income, which costs taxpayers over $500 million per year.

In the case of minerals mined on public lands, mining companies, because of the percentage depletion allowance, sometimes get paid by the government to mine minerals that the public gave them for free.

According to the Frasier Institute, a center-right Canadian think tank which annually surveys mining companies around the world, three U.S. States, Nevada, Utah, and Wyoming, are ranked in the top 10 highest jurisdiction for investment, according to the opinions of mining company managers and executives from around the world.

Environmental review does not discourage mining investment in the United States. We know this because the Frasier survey asked that question of these global companies, and the answer was no.

This is not an issue of too many lawyers or regulators. It is an economics issue. Mining occurs where minerals are, and where the target mineral price makes the process economically viable. H.R. 761 is a bill written for a problem that does not exist. This legislation would negatively impact the environment and our public lands

29

and the communities surrounding them, while doing little to give mining companies the social license to operate that they often claim that they desire.

By seriously impairing the public's ability to review and provide input on the uses of its lands, this legislation simply adds another special favor to an overly blessed industry. What we believe is really needed is a concerted mining industry effort to work with communities to build more responsible mines, to reform outdated policies, and to play by the rules with which other industries already profitably comply.

I would like to take my last minute and turn to H.R. 687, the Southeast Arizona Land Exchange and Conservation Act of 2013. This is a bill that is also opposed by Earthworks. A foreign-owned mining company is planning a massive mine in southeast Arizona. Because the area is partially protected and would be destroyed by the mining process, this company would like to privatize 2,600 acres of public lands.

As you will hear from the Chairman of the San Carlos Apache Tribe later today, the Oak Flat Campground, which has been protected since 1955 under the Eisenhower Administration, is a sacred area to Tribes and is used often for religious purposes. In addition to the destruction of this sacred site, this land exchange would end public access to some of the most spectacular outdoor recreation and wildlife viewing areas in Arizona.

This bill would sacrifice the interests of Arizonans and all Americans in order to enrich foreign shareholders. We strongly urge you to protect these public lands for future use. Thank you.

[The prepared statement of Ms. Krill follows:]

PREPARED STATEMENT OF JENNIFER KRILL, EXECUTIVE DIRECTOR, EARTHWORKS

**H.R. 761—*"National Strategic and Critical Minerals Production Act of 2013"***

Thank you Mr. Chairman for the opportunity to testify before your Committee in opposition to H.R. 761, the National Strategic and Critical Minerals Production Act of 2013. My name is Jennifer Krill, and I am the Executive Director of Earthworks. We are a non-profit organization dedicated to protecting communities and the environment from the destructive impacts of mineral and energy development. We work closely with a broad coalition of local governments, Native Americans, citizen groups and other conservation organizations to improve the policies governing hardrock mining and oil and gas development.

The authors and advocates of H.R. 761—the mining industry lobby and its champions—would have you believe that mining companies in the United States are stifled by the current regulatory system. They describe a country where mineral development is stymied by Federal rules that divert companies to spend their mineral investment dollars elsewhere. But the mining lobby's vision of a mining-hostile United States is pure fantasy.

In reality, hardrock mining companies in the United States enjoy subsidies and loopholes that create an extremely friendly regulatory environment for them.

It starts with the 1872 Mining Law—a law that allows mining companies, foreign and domestic, to take gold, copper, silver, uranium and any critical or strategic minerals from public lands for free, without paying a royalty to the taxpayer. Years of case law define hardrock mining as the highest and best use of public lands; Federal land managers now give hardrock mineral extraction precedence over hunting, fishing, sacred sites and all other uses of public lands. The Forest Service has repeatedly said that because of this antiquated law, they cannot deny mine proposals on our national forests.

In addition to royalty-free mining, the 1872 Mining Law collects no reclamation fee from the industry. The EPA estimates that the clean up cost of these hardrock abandoned mine sites is $50 billion—all of which is currently being paid for by the taxpayer.

30

While operating under this 140-year-old law, mining companies are also given free rein to pollute our waters thanks to two Clean Water Act loopholes that allow mining waste to be dumped directly into streams, rivers, lakes and wetlands. The metals mining industry is the single largest source of toxic waste and one of the most environmentally destructive industries in the country. In fact, the Environmental Protection Agency estimates hardrock mining pollutes 40 percent of the headwaters of watersheds in the western United States.

An extremely favorable tax code rounds out the regulatory fantasy for hardrock mining companies in the United States. The Percentage Depletion Allowance (PDA) permits a company to deduct a fixed percentage from their gross income according to the mineral extracted, ranging from 22 percent for uranium to 15 percent for silver and other hardrock minerals. In some cases this deduction actually exceeds costs. The result is a situation where mining companies not only pay virtually nothing for the deposit royalty for the public's minerals, but also get paid by the government to mine public minerals they were freely given under the PDA. This subsidy costs taxpayers over $500 million every year.

This trifecta of an outdated mining law, the ability to dump mine waste directly into fresh water and enormous tax breaks for the industry makes hardrock mining unique in this country, and renders H.R. 761 unnecessary and absurd.

The United States of America is one of the world's best places for mining investment. We have stable Democratic institutions, courts that enforce contracts, favorable tax and environmental policy, and an orderly and reliable process for public input in permitting decisions.

Just ask the mining companies. According to the Fraser Institute—a center-right Canadian think tank who annually survey approximately 700 mining, exploration, development companies around the world—Nevada, Utah, and Wyoming, rank in the top 10 most attractive jurisdictions for mineral exploration investment, according to mining company managers and executives surveyed.

THE NEVADA EXAMPLE

According to the University of Nevada Reno, more than 80 percent of Nevada's surface area is public land managed by the Federal Government in trust for all Americans by the Bureau of Land Management and the U.S. Forest Service. Consequently, Federal law—and NEPA in particular—applies to the vast majority of Nevada.

As a result, if permitting delays imposed on public lands were so burdensome, one would expect that Nevada would be unattractive relative to other potential mineral investment destinations.

The opposite is true.

Consider again the Fraser Institute survey and its most important criteria included in the composition its "Policy Potential Index" (i.e. policy attractiveness):

"The Policy Potential Index is a composite index that measures the effects on exploration of government policies including uncertainty concerning the administration, interpretation, and enforcement of existing regulations; environmental regulations; regulatory duplication and inconsistencies; taxation; uncertainty concerning native land claims and protected areas; infrastructure; socioeconomic agreements; political stability; labor issues; geological database; and security."

Note what is absent from that ranking: mineral potential. The ranking is based on policies, and things that result from policies, alone.

In the most recent survey (2012–2013 edition), Nevada—in terms of the aggregate effect of the various policies that apply to mining within the State—is the 7th most attractive mineral investment destination in the world. Wyoming, another State known for its abundance of public lands, ranks 5th. Utah, another public lands State, follows close behind.

The aforementioned Policy Potential Index includes areas in which Nevada would score well but is conceivably not directly attributable to regulation (e.g. infrastructure). Do environmental regulation and permitting drag down mineral investment in Nevada and the rest of public lands in the United States?

The answer is "no". In fact, the Fraser Survey also includes a ranking of the relative attractiveness of regions' "current mineral potential with no regulations in place and assuming [only] industry best practices".

If the claim that existing regulations actually restrict mineral investment in Nevada and Federal public lands around the nation were true—then one would expect

31

survey participants to find the absence of regulations to increase Nevada's mineral investment appeal.

Instead, the opposite is true. According to the Fraser Survey, when mining industry insiders were asked to assume no government regulations in a jurisdiction, Nevada's mineral investment attractiveness ranking in the 2012–13 survey remains unchanged. In past years, it actually dropped.

Furthermore, the 2012–13 Fraser Survey directly asks survey respondents whether a jurisdiction's environmental regulations deter investment, encourage investment, or have no effect. 69 percent of respondents said environmental rules in Nevada—80 percent of whose area is subject to Federal oversight—either encourage mineral investment or do not deter it.

Taken as a whole, the Fraser Survey is a direct refutation for the need for this bill. In fact, the only evidence found in the survey suggest that existing oversight—including Federal policies like NEPA—is a relative competitive advantage, not disadvantage.

DEFINITION OF STRATEGIC MINERALS

The bill broadly defines critical and strategic minerals as those that "support domestic manufacturing, agriculture, housing, telecommunications, healthcare, and transportation infrastructure." In other words, all minerals including gold, the most valuable mineral mined in Nevada.

Gold is particularly inappropriate for designation as a critical or strategic mineral for the simple reason that the majority of it in the United States—54 percent in 2011 according to the USGS—is used in jewelry fabrication. 54 percent is actually quite low in terms of jewelry's historic percentage of U.S. gold demand. As recently as 2008, it was 84 percent.

Since jewelry fabrication is neither a critical nor strategic use for gold, then no critical or strategic purpose is served by exempting its mining from our most basic environmental protections like NEPA review.

THE IMPORTANCE OF PUBLIC PARTICIPATION, PUBLIC LANDS, AND ENVIRONMENTAL PROTECTION

When the National Environmental Policy Act (NEPA) was enacted in 1969 by an overwhelming bi-partisan majority and signed by President Richard Nixon, the goal of the legislation was to create a process by which the environmental impacts of large industrial projects could be explored, weighed and eventually mitigated.

NEPA makes sure that in addition to government and industry input, everyday citizens can take part in the development and oversight of projects that affect our social, economic, and environmental health. The NEPA process provides citizens an opportunity to learn about proposed Federal actions and offers agencies an opportunity to receive valuable input from the public.

The average time it takes BLM to permit a large mine is 4 years—not 10, not even 7. When a particular permit takes longer, the reason either has to do with State processes or, more likely, delays created by the mining company themselves—sometime for perfectly legitimate reasons like changes in market conditions.

Under current law, agencies must fully evaluate the environmental impacts of actions that may significantly affect the environment. Though, it is important to point out that the law does not require that the decision-making agency choose the most environmentally-friendly option, it only requires that they weigh all options.

Furthermore, the NEPA process is the public's window on how a mining operator plans to comply with environmental law. Without NEPA, the public is forced to rely on the mining company, and the permitting agency, to verify that mining operator's plan of operations can realistically do so.

While such faith is touching, the facts indicate it is sadly unfounded.

In a unprecedented 2008 research paper commissioned by Earthworks, conducted by a member of the National Academies of Science Earth Science Board, and reviewed by regulators and industry, mining industry promises of environmental compliance for "major" mines undergoing full NEPA review were compared against what actually happened at the mines. The most disappointing finding: 100 percent of mines in the study predicted environmental compliance; 75 percent of them did not.

The only reason we know of industry (and permitting agencies') failure to adequately govern mining operations: NEPA review. If not for NEPA, citizens would not know how badly the mining industry performs, nor be able to use this information to pressure permitting agencies to improve its behavior.

32

This legislation would run roughshod over the values of transparency and public participation that are at the heart of NEPA—essentially taking public review out of potential uses of our public lands.

While mining on public lands helps stimulate economic activity, protection of those lands is also vital to the western economy. Last year, over 100 economists including 3 Nobel laureates, sent a letter to President Obama stressing the importance of the protection of our public lands to our national economy. They said:

"The rivers, lakes, canyons, and mountains found on public lands serve as a unique and compelling backdrop that has helped to transform the western economy from a dependence on resource extractive industries to growth from in-migration, tourism, and modern economy sectors such as finance, engineering, software development, insurance, and health care."

They also note, "increasingly, entrepreneurs are basing their business location decisions on the quality of life in an area. Businesses are recruiting talented employees by promoting access to beautiful, nearby public lands . . . Together with investment in education and access to markets, studies have repeatedly shown that protected public lands are significant contributors to economic growth."

Section 103 reprioritizes the entire field of public land and environmental law regarding mineral operations, making "development of the mineral resource" the "priority of the lead agency."

Under current law, the Federal land agencies are subject to a variety of congressional mandates that attempt to balance mineral production with the protection of human health, water and air quality, wildlife, etc. For example, if a mining project may adversely affect a threatened or endangered species, then as the Supreme Court has held pursuant to the Endangered Species Act, "Congress intended endangered species to be afforded the highest of priorities." *TVA* v. *Hill*, 437 U.S. 153 (1978). If the ESA is not applicable, then other congressional policies apply, such as the prevention of "unnecessary or undue degradation" to public land under the Federal Land Policy and Management Act of 1976, 43 U.S.C. 1732(b). See *Mineral Policy Center* v. *Norton*, 292 F.Supp.2d 30, 33 (D.D.C. 2003) (discussing competing congressional mandates for mining operations on Interior Department lands).

H.R. 761 essentially eliminates these long-standing congressional mandates, and subjects the BLM and Forest Service to a new "maximize mineral development" standard. Although Section 103 states that the agency must "mitigate environmental impacts," that vague language does little to protect environmental values in light of the new overarching development standard. For example, under current environmental law, "mitigation" can mean simply "minimizing impacts" or "reducing the impact over time." 40 CFR 1508.20. Coupled with the "maximize development" priority, as well as the requirement that the agencies ensure that "more of the mineral resource can be brought to the market place," an agency's "mitigation" authority is thus severely curtailed.

EQUAL ACCESS TO JUSTICE ACT

H.R. 761 also allows regulators to exempt mining projects from the Equal Access to Justice Act (EAJA). In many cases, affected communities cannot afford to hire a lawyer, much less the litany of scientific and technical experts needed to mount a serious challenge to a major multinational mining corporation. The practical effect of this provision would leave many communities unable to sue for the contamination of their lands and waters.

CONCLUSION

In sum, environmental reviews and legal challenges do not substantially affect mining investment, employment, or the reserves of certain critical minerals. The market has long ago priced in these costs and the result is that many of our Western States are among the best places for mineral investment and have substantially lower unemployment rates than surrounding communities. This is not an issue of too many lawyers or regulators; it's an economics issue. Mining occurs where the target mineral price makes the process economically viable.

NEPA has been in place for more than 40 years. Federal Government agencies and the mining companies they regulate understand the process well and value the market certainty NEPA creates and investors crave. Dismantling this well-established process could undermine the purported purpose of this bill of encouraging investment and securing more critical mineral resources.

The consequences of H.R. 761 would negatively impact the environment of publicly owned lands within mining States, and the communities surrounding them, while doing little to give mining companies the social license to operate that they

33

often claim they desire. By seriously impairing the public's ability to review and provide input on the uses of its lands, this legislation simply adds another special favor to an already overly blessed industry.

H.R. 761 is a bill in search of a problem that does not exist. What is really needed is a concerted mining industry effort to work with communities to build more responsible mines, to reform the outdated policies that haunt them, and to play by the rules with which other industries profitably, comply.

**H.R. 687—"Southeast Arizona Land Exchange and Conservation Act of 2013"**

On behalf of Earthworks and the thousands of members we represent in Arizona and nationwide, we also urge you to oppose H.R. 687 the Southeastern Arizona Land Exchange and Conservation Act of 2013 (the "land exchange bill") that would, in part, revoke a mining prohibition on 760 acres of public lands in the Tonto National Forest in the area of the Oak Flat Campground 60 miles east of Phoenix.

Resolution Copper Company (RCC), a foreign-owned mining company, is planning a massive block-cave mine and seeks to acquire Oak Flat Campground and the surrounding public lands through this land exchange bill. If they succeed, the campground and an additional 2,300 acres of the Tonto National Forest will become private property, forever off limits to many recreationists and other users. Privatization of this land would end public access to some of the most spectacular outdoor recreation and wildlife viewing areas in Arizona. And massive surface subsidence will leave a permanent scar on the landscape, eliminating the possibility of a diversified economy for the region.

The Eisenhower Administration recognized the Oak Flat Campground as an important recreational resource in 1955, specifically placing it off limits to future mining activity. Oak Flat should remain under Federal jurisdiction for its continued protection. With tens-of-thousands of visitors each year, Oak Flat contains a world-class natural resource for birding, bouldering, camping, hiking, hunting, picnicking, rock climbing and other recreational uses. On the eastern border lies Gaan Canyon, one of the crown jewels of Arizona's State trust lands with some of the finest remaining riparian habitat in the State.

Oak Flat Campground and the surrounding area has long been an important cultural site for Western Apaches. The Tonto National Forest recognized at least a dozen archeological sites in and around Oak Flat and traditional Apache continue to use the Campground area for performing religious and cultural rites. Privatizing Oak Flat and destroying its surface would forever eliminate Apache traditional practices in the area, since they would be unable to access the land.

Transfer of part of our national forests to a multinational copper mining company will almost certainly deplete and contaminate water resources and nearby watersheds. Surface water, tributary water, and aquifers are located where the copper ore body resides. Excavating this ore risks contamination. Many billions of gallons of water are necessary to carry migrating slurry to and from the ore body over the decades long life of the mine. Altering the surface and subsurface geological structure of this area via the impending subsidence will forever change the natural state of aquifers and drainage of watersheds through out the region.

Section 4(j) of H.R. 687 provides sham compliance with the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321). This is because the environmental impact statement (EIS) occurs only after privatizing the land. By that point, the Government loses the opportunity to act on reasonable alternatives, and the mine becomes a forgone conclusion regardless of the potential impacts the EIS finds.

In addition, as soon as this bill becomes law, the land becomes available for mining activities. Section 4(h) mandates that only laws pertaining to mining on private land will apply. The Secretary will also issue a special use permit for exploration of Oak Flat within 30 days of Resolution Copper's request (Section 4(f)). Only after Resolution Copper has built mine shafts, adits, tunnels, and tailings deposition areas will the Secretary then receive a mine plan of operations.

Finally, this land exchange bill would set a chilling precedent allowing for the revocation of similar land withdrawals such as parks, recreation areas, and wildlife refuges. Public lands such as Oak Flat that are set aside for recreation should remain protected for future generations. This land exchange bill would sacrifice the interests of Arizonans, and all Americans, to enrich foreign shareholders. It would destroy sacred sites for short terms gains. Thirty years from now—when the mining jobs once again leave—the region will be much worse off because the landscape will be ruined. We strongly urge you to protect these public lands for the public's future use and preserve the unique opportunities for Arizonans that the Oak Flat area provides.

34

**H.R. 957—*American Soda Ash Competitiveness Act***

Earthworks also respectfully opposes H.R. 957, The American Soda Ash Competitiveness Act. The experience gained from the last time Congress lowered the royalty on soda ash and related sodium minerals teaches us that this industry remains competitive regardless of the royalty rate. The U.S. Department of Interior's Report to Congress on the Soda Ash Royalty Reduction Act of 2006 makes this clear.

Despite cutting the royalty from a weighted average of 5.6 percent to 2 percent, the soda ash industry experienced almost no change in the volume of production, leases, or sales. Overall capital investment since FY 2006 has fallen. Domestic employment in the soda ash industry has similarly dropped since FY 2006. While industry revenues increased significantly, the Department of the Interior attributes this to a spike in prices coupled with a sharp decline in production costs—due to historically low prices of the natural gas used to power these operations.

Instead, this bill amounts to an unnecessary extension of a taxpayer giveaway first granted in 2006. Without the royalty reduction, DOI estimates States alone would have received $62.1 million more from FY 2007–2010. They estimate total lost royalty revenues between FY 2007–2011 at more than $150 million. Additionally, BLM regulation (43 CFR 3513) provides an administrative process through which Federal sodium lessees may individually seek royalty rate reductions. Creating an industry wide reduction only encourages a trend toward shifting soda ash extraction from State and private lands to Federal lands just to take advantage of the lower royalty. The end result is simply lower government revenues, without the benefits of more jobs or greater global competitiveness.

————

Mr. LAMBORN. Thank you. And thank you all for being here and providing testimony. We will now have a round of questions for the witnesses from the members of the Committee. And I will start by asking a question of Mr. Iwanicki.

Later today on another panel we are going to hear from BLM and others that requiring agencies, including the EPA, to better coordinate on NEPA documents and mine permits is unnecessary and will somehow hinder their ability to follow their multiple-use mandate. How would you respond to that?

Mr. IWANICKI. I am not quite sure of that question. I know for us, with our project with County Road 595, we had all private funds that were being used to build this county road. And, therefore, we did not have to go through the Federal process. And we did follow a lot of those guidelines in doing our permit process with our Department of Environmental Quality and with the EPA, but we did not follow all the rules of the NEPA process through our project.

Mr. LAMBORN. OK, thank you. And I am going to ask a question now of Ms. Batulis and Mr. Melander. What advice do you have for us in Washington to try and streamline the permitting and NEPA processes so it doesn't take 7 to 10 years, or even more, to permit a project?

Mr. MELANDER. Want to go? Me?

Ms. BATULIS. You go.

Mr. MELANDER. Chair, Committee members, a response to that question is that I think looking at what the State of Minnesota, as indicated in my comments, what we call "The Minnesota Model" is something to look at. We have a State that is beautiful, other than being cold, as Ruthe had indicated, and we love our State. But we have opportunities here that we need to take advantage of in a safe way. But using the model that Minnesota has developed, I think, is a good start.

Mr. LAMBORN. Ms. Batulis?

35

Ms. BATULIS. I would agree with Harry. What really happened in Minnesota was both sides of the aisle worked together to find a common ground that would work for everyone. And it was about streamlining the process so that we can create jobs. It is all about jobs now. And we really saw some extraordinary work done across the aisle that we are all very proud of. So that would be our suggestion.

Mr. LAMBORN. OK. Thank you. And I would like to note at this time that both Michigan and Minnesota—Michigan is represented very well by Representative Benishek, who is here on the Committee—are home to, in the case of Minnesota, the 3rd largest producer of non-fuel minerals, and Michigan, the 10th largest producer of non-fuel minerals in the country. So, there are significant deposits of strategic and critical minerals.

Ms. Krill, I would like to ask you a question real quick here. Is there any new proposed mine in the United States that your organization does approve of?

Ms. KRILL. Our organization approves of mines—I am sorry, am I on? Yes.

Mr. LAMBORN. I can hear you.

Ms. KRILL. Our organization would approve of mining that has attained the free, prior, and informed consent of indigenous communities, that does not pollute waterways or allow the dumping of tailings or mine waste into waterways, rivers, lakes, streams, and wetlands, that enjoy the community support of the local community, that do not impact areas of high biodiversity, and follow international labor organizational standards for labor organizing.

At this time, there are some mines that follow some of these principles, and others that we would support. We haven't found a mine in the United States that follows all of these principles that we would support. And we encourage industry and are working actively with industry in dialog to identify a way that we can move forward.

Mr. LAMBORN. Well, it sounds to me that if there is no new mine in this country that you support, that you could be accused of opposing for the sake of opposing, that you will always find some reason to oppose.

Ms. KRILL. We don't oppose mines, either. In fact, many mines we don't take a position on. There are some areas where we feel like mining is not an appropriate activity. And in those instances we do take a position of opposition.

Mr. LAMBORN. OK. At this point I am going to turn to Representative Holt for his questions.

Dr. HOLT. Thank you. Let me begin with just a comment following from that last exchange. I would say that the standards that Ms. Krill, that you laid out are attainable and desirable. And I would hope that all operations, mining and otherwise, would work to achieve those.

Ms. Krill, the Interior Department has stated that H.R. 761 is, "drafted in such," and this is a quotation, "drafted in such a manner as to cover virtually all hard-rock mining on Federal lands." Do you believe that a bill that is intended to deal with strategic minerals should also be broad enough to cover clay, coal, crushed stone, sand, gravel, scrap iron?

36

Ms. KRILL. No, we do not. We oppose H.R. 761 because, in large part, because of how broad it really is. As I said earlier, mining companies mine where minerals are. The economics of mining in the United States favor the ability of mining companies to mine in the United States.

Dr. HOLT. Ms. Batulis, simple question. Could you define for us a critical and strategic mineral?

Ms. BATULIS. Copper, nickel.

Dr. HOLT. OK.

Ms. BATULIS. And I think the——

Dr. HOLT. And would you include crushed stone, granite, gravel, clay?

Ms. BATULIS. Mr. Chair, Committee members, no.

Dr. HOLT. No? Yes. Mr. Melander?

Mr. MELANDER. The same question, sir?

Dr. HOLT. Yes, please.

Mr. MELANDER. As indicated by Ruthe, those precious metals. And regarding sand and gravel, I would not consider those precious metals.

Dr. HOLT. Yes. I think we might have some redrafting to do, or some amending here, then.

Do you include gold and silver in that?

Mr. MELANDER. Gold, correct.

Dr. HOLT. OK. Ms. Krill, in a later panel, we will hear testimony that the United States is putting itself at a competitive disadvantage with other countries, because of permitting time. And yet, in your testimony you say that the United States is one of the best places in the world for mining investment. Which is it?

Ms. KRILL. Well, if Mr. Holt, if you listen——

Dr. HOLT. Would you care to elaborate on the statement that you made in your testimony?

Ms. KRILL. Absolutely. If you listen to the opinions of mining managers from a global perspective, they do indeed favor the United States as a place for mining investment. The BLM says that the average time for permitting in the United States is 4 years. With various other regulatory conditions, the United States is, indeed, considered a favorable place by mining investment, worldwide, to mine.

Dr. HOLT. Ms. Krill, in light of the conditions under which the Mining Act of 1872 was passed—we were trying to build a Nation and expand to fill the western territories—would you say that this bill is up to date? In particular, do you think at a time that there is so much talk about reducing the deficit we should be asking mining companies to pay a royalty rate for extracting these minerals?

Ms. KRILL. I——

Dr. HOLT. And should it be comparable to what is done for, say, oil and gas?

Ms. KRILL. I absolutely agree that mining companies should be paying a royalty rate. Mining companies shouldn't be granted access to public lands and public minerals for free. And if there is an interest in reforming how mining is done in this country, I would suggest we start with reforming the Mining Law of 1872.

Dr. HOLT. Yes. The name itself suggests some dated characteristic of it.

37

[Laughter.]

Dr. HOLT. Just in the few seconds that remain, Ms. Krill, do you know whether Western States charge a royalty rate for extraction of minerals, different from the Mining Act of 1872, different from the Federal——

Ms. KRILL. There are Western States that charge a royalty rate for mining. federally, on a national level, we do not.

Dr. HOLT. Well, I think my time has expired. I thank the witnesses and I thank the Chair.

Mr. LAMBORN. Thank you. And I would point out to the Ranking Member that the Mining Law of 1872 has been amended many times over the years. So let's keep up on the amendments.

And, Ms. Krill, I would like to point out to you that when you say that minerals are extracted for free, you are neglecting State severance taxes, you are neglecting the taxes that are paid by mining companies on a corporate income, taxes paid by their employees on personal income, sales tax, property tax, and on and on and on.

OK. We are going to go to our next witness—excuse me, next Committee member. I would like to point out that we are missing Representative Amodei. Unfortunately, his mother passed away earlier this week, so our thoughts and prayers are with him. But we will go instead next to Representative Gosar.

Dr. GOSAR. Thank you. I want the record very, very clear. Ms. Krill, have you ever endorsed or supported—careful wording here—any mining operation in the United States, your organization?

Ms. KRILL. Have we ever endorsed——

Dr. GOSAR. Or supported a mining operation in the United States.

Ms. KRILL. A single operation.

Dr. GOSAR. Absolutely.

Ms. KRILL. No. We have endorsed and supported principles for——

Dr. GOSAR. I am getting at that point. It seems like, I am going back with the Chairman's connotation, that no is an answer. No is not an answer any more in America. It is how do we accomplish this under the protocols.

Let me ask you the next question. In regards to the United States, isn't it a lot about our mineral composition, that we are rich with minerals in the United States that so many foreign and national mining companies really would like to work here, because it is a concentration and plethora of minerals that we actually have here? Is that not true, compared to about any other continent?

Ms. KRILL. Mining companies do mine where the minerals are.

Dr. GOSAR. So we are very rich, and that is why. So I mean we want to make sure we are careful about how we look at those things.

Chairman, for the record, what I would also like to do is, put in the record a letter from the Nature Conservancy and this is an op ed from the Arizona Republic, as well as a climbing recreational group from Queen Creek for the record that support this mine.

Mr. LAMBORN. Seeing no objection, so ordered.

[The information that Dr. Gosar submitted for the record has been retained in the Committee's official files:]

38

Dr. GOSAR. Let me ask you one more question, Ms. Krill. You know, has your organization ever been out to the mine?

Ms. KRILL. I am sorry, which mine?

Dr. GOSAR. Resolution Copper in Southeast Arizona.

Ms. KRILL. Yes.

Dr. GOSAR. You have actually toured the mine?

Ms. KRILL. I have not personally, no.

Dr. GOSAR. No, I don't think anybody has toured the mine, frankly. I just checked with the company. You have not toured the mine, as far as I can understand.

Let me ask you another question.

Ms. KRILL. I thought you were referring to Oak Flat Campground.

Dr. GOSAR. That is the campgrounds.

Ms. KRILL. The site.

Dr. GOSAR. I am looking at the mining site.

Ms. KRILL. OK.

Dr. GOSAR. You know, hands-on are a lot of different things. There is being able to see, to dialog about the facts. You know, facts are kind of an interesting thing. It is hard to argue around facts, because the facts set you free. I know that there was an invitation, was there not, from the company to come out and review the mine?

Ms. KRILL. I have not received a invitation, but I would be happy——

Dr. GOSAR. I think you need to go back in your records to do your due diligence to find out that they actually extended that, and they were turned away. So I would hope that you would go back into your records.

And I would invite you, like I would invite the Member from Arizona who has not been in his tenure, out to the mine. Because I think those are the things that answer questions. You know, facts set you free. And I think Arizona has been stalwart in that aspect in regards to doing this, with all the magical features that we have been able to do and to build Arizona.

And I think that I would leave my questions at that. Thank you. I yield back, Mr.——

Mr. LAMBORN. All right, thank you. We will now go to Representative Grijalva.

Mr. GRIJALVA. Thank you very much. Ms. Krill, a couple of quick questions. In reference to the first part of your testimony, there was a time prior to President Nixon signing the NEPA Act where there was no NEPA, that we can talk—it is not about "what if," there was none.

Consequences of that lack of oversight, transparency, public participation, what drove that Congress, that President to enact the NEPA Act? What was the situation in terms of not just the environment, but communities as well?

Ms. KRILL. That is a very good question, Representative Grijalva. I think that the critical thing that NEPA provides to communities and to the public is an opportunity to participate in a clear and transparent and consistent process. The minerals, for example, in mining, which we are discussing, the minerals are minerals that belong to the public. And it is very important, in our democratic

39

society, that the public has this opportunity to comment on and to participate in a process about what we do with public minerals.

Mr. GRIJALVA. And you mentioned the H.R. 687. H.R. 761 is kind of the same process as H.R. 687, only taken to steroid quality, in the sense that we would do away with all regulatory controls, to do it after the fact, when there is nothing to bind, an action or a remedy. Fair or unfair comparison between the two bills?

Ms. KRILL. I think that is a fair comparison.

Mr. GRIJALVA. I was going to ask Mr. Melander, on all these issues, and I think my friend from Arizona has mentioned that this is about how you say yes, not just no. And I couldn't agree more. But the point is that everything, and you said it is about the jobs and it is about creating that kind of a sustainability in Minnesota, and everybody is at the table at that effort.

Verification of the job numbers, do you verify them yourself? Or, let's say, for instance, we are working off in Resolution Copper, the job analysis by the company, themselves, and it is a movable target. And so, how do you validate that you are making a commitment, whether it is regulatory, whether it is government assistance, based on a sole source, proprietary source of analysis by the company on job production, or do you seek an independent source to verify that that is indeed what is going to be there at the end of the day, in terms of number of jobs?

Mr. MELANDER. Chair, Representative—and that, too, is a good question. And one can get in trouble indicating the amount of jobs.

The first part of your question, when we make reference to our specific State in regards to the opportunity in generational employment, it is done working with our partners in trying to get a realistic expectation.

What we like to do, and we do this consistently, is we talk about work hours that will be generated. I mean it is really hard to describe, I mean, to really be clear. But when we, whether it is, and this has nothing to do with it, but whether we are building stadiums or projects, we base it off of work hours, because it is a better way to describe the opportunities for individuals, at least within our industry.

Mr. GRIJALVA. OK. As you generate precious metals, copper, gold, and I think, I don't know who stated that those are for use and for the industries as they grow here in that country, what is a ratio of export versus keeping the product domestic? What is the emphasis? For instance, the other legislation, the CEO, that said the Resolution Copper mine will help meet this need, and the need is that China will build three more cities larger than Sydney every year until 2030, and that the major stockholder in Rio Tinto, the parent company, is, indeed, China.

And so, we take out our domestic taxpayer resource and ship it overseas, no royalties, no payback, no infrastructure, no sustainability in that community. Is there a ratio that you think is appropriate? Anybody can answer it.

Mr. MELANDER. Chair, Representative, by no means were we prepared to start to give a statistical or analytical information in regards to export and import of these precious metals, strategic metals.

Mr. GRIJALVA. I appreciate——

40

Mr. MELANDER. We were here today to talk about the opportunities that we believe are——

Mr. GRIJALVA. You are absolutely right, and it is probably an unfair question. If Resolution or Rio Tinto were sitting in your seat, they might have an answer. Thank you.

Dr. GOSAR [presiding]. Thank you very much. I would like to yield to the gentleman from Michigan, Dr. Benishek.

Dr. BENISHEK. Thank you, Mr. Chairman. I want to thank the Chairman for holding this important hearing today, and I want to also thank Mr. Jim Iwanicki from my district in Northern Michigan for coming to Washington to tell us about the tremendous obstacles he had in simply building a county road through a working forest in the Upper Peninsula, and the difficulties he has had with the EPA.

Mr. Iwanicki, can you tell me some of the most frustrating part of dealing with the EPA? And I heard in your testimony about the changing goal post, how to deal with them, and they seem to change the rules halfway through the process. Can you elaborate on that a little bit more?

Mr. IWANICKI. Well, the EPA was kind of cold to the idea of building a county road in this working woods area from the start. And it took great effort on our part locally and with your help and the help of our Democratic Senators to at least get them to listen and evaluate the permit, which we thought was a huge deal. And any time we seemed to come to a conclusion and thought we had solved their issue, they would come back and say, "Well, that is not really what we meant, we were looking for something more like this," and that was very evident when you took a look a the wetland mitigation process and the process that went through the wetland mitigation.

We first proposed doing some creation of forested wetlands, and the EPA said, "No, we don't like the creation aspect; we would like more preservation." We then turned around and came up with a preservation plan for them, and then they started with the issues of, "Well, we don't like who the land stewards are going to be, we don't like the way you have the mineral rights in protecting that preservation area and the lack of mineral rights for it." So again, it was very frustrating.

Dr. BENISHEK. Let me ask you a question. How many acres of wetlands would need to be mitigated by the construction of the road?

Mr. IWANICKI. It was 25 acres of wetland that needed to be mitigated, and we proposed giving them 2.5 square miles of land. The wetland being protected was about 25-to-1, I believe, in that 2.5 square miles, and that was next to a National Forest. And again, so it was very frustrating that they wouldn't——

Dr. BENISHEK. Now, as I understand it, not only did you have to give—was it 2.5 square miles for the 25 acres?

Mr. IWANICKI. Correct.

Dr. BENISHEK. But you also had to have an environmental steward of that land in perpetuity. Is that correct?

Mr. IWANICKI. That is correct. And again, none of the local agencies were considered a viable steward for that land.

41

Dr. BENISHEK. This is the Michigan Department of Environmental Quality, is that correct?

Mr. IWANICKI. Well, again, we worked with the Michigan Department of Environmental Quality and the State DNR. And the State DNR in December agreed that they would be the stewards of the land. And when we said that to the EPA, the EPA was not sure that the State DNR was an acceptable agency to be the steward of this land, and the State DNR addresses all the public lands and takes care of all the public lands the State owns in the State.

Dr. BENISHEK. They are the stewards of all the public lands within the State.

Mr. IWANICKI. Right.

Dr. BENISHEK. The State-owned public lands, is that correct?

Mr. IWANICKI. Correct.

Dr. BENISHEK. And they have been doing that for hundreds of years, is that right?

Let me ask you another question about this road, because this is dear to me. In other words, now I know that this road is a 22-mile road which will take the place of a 66-mile road going through downtown Marquette that the ore trucks will now have to drive through. Can you explain to me, how is that better for our local environment, going through the 66 miles?

Mr. IWANICKI. Again, it isn't. And again, the EPA put the animals and the environment in front of all the concerns of public safety and safety of our community, in front of all those. So, again, it was very frustrating. And you can see from all of our public support that we had on the political end of things that it was something that the people wanted and something that we wanted, as a community.

Dr. BENISHEK. Do you think there has ever been the kind of requirements of any other county road in the country that you are aware of to deal with the requirements this road needed?

Mr. IWANICKI. I am unaware of any. And again, if these requirements are out there for all new road projects, it is a good thing our grandfathers and great-grandfathers built a lot of the infrastructure here in the United States.

Dr. BENISHEK. I think my time has expired. Thank you very much, sir.

Dr. GOSAR. I thank the gentleman. Now I would like to go to Mr. Lowenthal from California.

Dr. LOWENTHAL. Pass.

Dr. GOSAR. You are going to pass? That would be, then, Ms. Hanabusa from Hawaii.

Ms. HANABUSA. Thank you very much, Mr. Chair. My questions are directed to Ms. Krill. Ms. Krill, I am talking here about H.R. 687. And I just want to know if you are reading the bill very similarly to the way I am.

My first question is really beginning on page 12, and that is the environmental compliance section, which if you just read it sort of quickly, it seems like NEPA applies. However, if you read it, I think carefully, it doesn't kick in until after the transfer is made to Resolution Copper. And it is prior to the commencing of any production in commercial quantities of any valuable minerals. And

42

then it gives 3 years for the Secretary to then actually complete a review under Section 102 of NEPA. Am I reading that correctly?

Ms. KRILL. I believe you are reading that correctly.

Ms. HANABUSA. So, as opposed to a situation where before the Secretary would even consider doing this transfer, which clearly has a lot of environmental implications, and what I am concerned about are the cultural aspects of it, as well, the EIS is not, and there is no requirement for any review. That is correct.

Ms. KRILL. That is my understanding, yes.

Ms. HANABUSA. OK. Now, the other part of this that I am concerned about in reading is the references, of course, to the Oak Flat withdrawal area, and Apache Leap. Apache Leap, as I understand it, is not directly covered by this potential transfer.

Notwithstanding, the Secretary is told in this bill that they can give special use permits to Resolution Copper to actually tunnel under the surface of Apache Leap. It says you are not supposed to mine under Apache Leap, but you have the right to tunnel under Apache Leap. But Apache Leap is outside of the area of the transfer. Is that correct?

Ms. KRILL. I believe so, although I would defer to the gentleman who will be testifying later from the San Carlos Apache Tribe.

Ms. HANABUSA. I understand that. I just want to know if you are reading this bill very similarly to how I am.

I am also curious about—and the same thing applies, by the way, to the Oak Flat area, which is supposed to be withdrawn, but you can still tunnel under it, or you can give a permit for tunneling under that.

You do reference in here in your testimony the fact that there is a way of the extraction. And I think it is some kind of a—let's see, block cave mine.

Ms. KRILL. Yes.

Ms. HANABUSA. Are you familiar with this methodology enough to explain it to me? What does it mean to be a block cave mining whatever? Massive block cave mine is what you are saying they are intending to do. Can you explain to me what you mean by block cave mine, and how you developed that understanding that Resolution Copper is going to do this?

Ms. KRILL. I will do my best to explain it in layman's terms. I am not a mining engineer, and I have never performed block cave mining. What block cave mining is, in my understanding, is creating a very large, open space, a cave, to extract the ore body with some supports, and then letting the supports go, so you have significant surface subsidence into the area. It is essentially creating an open pit, and turning the surface area into rubble above it.

Ms. HANABUSA. So it is like extracting whatever minerals or whatever that they want underneath, and then, after that, letting nature take its course. In other words, you don't fill it back up. Is that what you are saying?

Ms. KRILL. Yes.

Ms. HANABUSA. And evidence of this used in other areas have resulted with the ground settling and leaving pits in various locations?

Ms. KRILL. Yes. The technique causes severe impacts on the surface. It also causes severe impacts to the water table below the

43

mine. And this is a area where we are very concerned about water, as well.

Ms. HANABUSA. So though they do not permit this block cave mining, it appears, under Apache Leap, which has very major cultural significance, as well as Oak Flat, what they are permitting, however, is for Resolution Copper to get a permit to tunnel under that. We have no idea what it means to tunnel under those specific areas.

Ms. KRILL. That is correct. And we are very concerned for that reason about the impacts on those areas.

Ms. HANABUSA. Thank you. I yield back, Mr. Chair.

Mr. LAMBORN [presiding]. OK, thank you. We will now have questions from Representative Daines.

Mr. DAINES. Thank you, Mr. Chairman. I am going to yield my time to the gentleman from Arizona.

Dr. GOSAR. Thank you very, very much. First of all, I would like to address Ms. Hanabusa, just to make sure we understand this. In this language, that is why my bill will protect Apache Leap beyond the current land management situation. It places nearly 100 acres of Apache Leap currently owned by the mining company into Federal stewardship. Additionally, as a condition of the land exchange, Resolution Copper will surrender its right to commercially extract any minerals under Apache Leap.

Finally, I would like to point out that the company will have over a billion dollars of infrastructure located between the underground mine and Apache Leap. And, in other words, the company would have to destroy a billion—with a B—dollars before Apache Leap's structural integrity could be jeopardized. Without a doubt, Apache Leap would be protected, more so than the current situation, if this legislation is signed into law. So, I wanted to make sure we are clear on that.

Ms. Krill, what size of parcel of land would be too small to have a NEPA done? What kind of acreage would we have to do a NEPA on?

Ms. KRILL. I am not sure of the answer to that question, but I can get back to you.

Dr. GOSAR. Let me ask you a question, then. Let me ask you a question. So you are a homeowner, and what you do is you go buy a piece of property. Would that homeowner have to have a pre-NEPA?

Ms. KRILL. No.

Dr. GOSAR. Why not?

Ms. KRILL. Because I know that is too small.

Dr. GOSAR. Oh. Interesting. So, I mean, it is part of a plan.

Let me ask you the next question. In regards to the mining operation, is anything—let me rephrase that—is anything in the NEPA process short-cutted with this process?

Ms. KRILL. I am sorry, which process?

Dr. GOSAR. In the process I outline in this bill. They cannot go forward, they cannot do anything, without a full NEPA going through. Is that true?

Ms. KRILL. My understanding is that is after the land transfers.

Dr. GOSAR. Well, I am making a correlation here, yes. But the NEPA, I mean, they can't do anything to the land. They are just

44

getting a transfer. So they can't do anything on the land until the NEPA process goes through. Is that true? There are no shortcuts?

Ms. KRILL. [No response.]

Dr. GOSAR. Let me answer it for you. There are no shortcuts. There are absolutely no shortcuts. And our next witness will validate that, as well.

This comes back to the facts. We have to deal in facts, because the facts set you free. Not scaring people, not fear-mongering. We have to deal in the facts.

Let me ask you another question. You know how Arizona was founded? Do you know the five areas in which Arizona was founded? Its principle—what made Arizona special? It is called the five C's: cattle, citrus, climate, cotton, and what would be the fifth one?

Ms. KRILL. I believe that would be copper.

Dr. GOSAR. I thank you very, very much. It is called gold-leaf copper, or leaf copper here. It forms naturally.

You also made another comment in regards to that mining has been the source of the largest pollution in this country. I would like to see your facts on that. Because I would like to show you a case in point of Rio Tinto and stewardship. This is in Wisconsin, very close to Congressman Obey's congressional district. This is an open pit mine. I just want to make sure we get this straight, too. This is an open pit mine, where we actually open a big, large top—OK? It is much more conventional in copper. And this is exactly how it was mitigated, OK?

In block mining, what we do is we have a small opening where we go down. OK? So you are going deep in the ground. And that is where robotics come in, where we hear this problem with robotics. Because we want miners' safe, do we not? I would really be concerned about mining safety. And so, the robots actually go down into the ground and mines this ore and brings it back up. Right? Am I right so far?

Ms. KRILL. I am not familiar with that particular mine.

Dr. GOSAR. Well, cave mining, you made a comment here, cave mining and open pit mining, very different. And once again, you need to make sure you are solidly on the facts, OK? But this shows mitigation. And it is wonderful. I mean this is an extraction. I think Congressman Obey would tell you this is incredible. This is a great company, OK?

And are you familiar with all their investments and good stewardship in Superior?

Ms. KRILL. Am I familiar with Rio Tinto's investments?

Dr. GOSAR. Yes.

Ms. KRILL. No, but I would like to answer your earlier——

Dr. GOSAR. No? Would you also like to know that what they did is they actually came in and helped mitigate problems from previous mining claims? Now they have been a very good steward with us, the City of Superior. They have helped out all over.

And so, I think, and this is getting back to what the Ranking Member and I were talking about back there, that is why I asked you the question, "Have you ever supported a mine claim," because it is not good enough just to say we take no action, it is that you have to start rewarding good behavior and proper behavior that you illicitly want to see done.

45

Ms. KRILL. The source for the statistic about the toxic releases of the mining industry is the Toxic Release Inventory, which is released annually. The mining industry tops the list of industries, as far as toxic releases in the United States.

Dr. GOSAR. I would challenge that, in regards to the waste that comes out of urban areas. And so I think what we ought to do is go back to the facts and look carefully at what that is in mitigation. So I would like to see that answer.

So, without further ado, I am out of time.

Mr. LAMBORN. OK, thank you. Representative Lowenthal.

Dr. LOWENTHAL. Thank you, Mr. Chair. I would like to yield my time to Mr. Grijalva.

Mr. GRIJALVA. Thank you. Mr. Chairman. One of the things that Rio Tinto touts, Ms. Krill, part of the panel was about employment, so I won't go back and ask any questions there, they tout the fact that they are an automated mine. They are the mine of the future. And you get mixed messages.

You get the message where we did our job and we are going to have 1,500 people, and they are going to get paid from $40,000 to $100,000, and it will be the greatest boon that ever happened to Arizona. But in other statements that the executives and CEOs of Rio Tinto make talking about Resolution Copper, that it is the mine of the future, and that they will be able to reduce employment because of automation, and there will be a central place where there will be a minimum amount of maintenance work required there. So it kind of runs counter to the proposal that this is all about jobs.

I preface that because I think there is an important point. I understand that we have to deal in facts, and I wouldn't like anything better than for us to be able to factually deal with this question of Resolution Copper. But since all we have is the legislation to go by as fact, while I am a trusting person, I also like to verify. And part of the verification process has to be some independent look at what this mine is going to be.

Let me ask you one question. Ms. Krill, the Forest Service in its testimony said that, "An environmental review document after the exchange would" and this is talking about Resolution "would preclude the U.S. Forest Service from developing a reasonable range of alternatives to the proposal and providing the public and local and tribal governments with opportunities to comment on the proposal." As a result, wouldn't the bill, as drafted, prevent the Forest Service from properly identifying or considering any mitigation measures that may be necessary, including the tunnels under Apache Leap and Oak Flat?

Ms. KRILL. Yes, it would. Once the land is in private hands, then the Forest Service would not have the ability to develop alternatives, as they would if it continued to be on public lands.

Mr. GRIJALVA. Thank you. And as my State that I love very much evolves, I try to add an additional C to the five C's, conscientious compassion. I hope we get compassion as one of the C's down the road.

Anyway, I yield back, Mr. Chair.

Mr. LAMBORN. OK, thank you. That concludes our questions for this panel. I know that those of you from Michigan and Minnesota

46

didn't know as much about Arizona issues, but I appreciate the testimony that you gave today, all four of you, so thank you for your testimony.

Mr. MELANDER. Thank you.

Mr. IWANICKI. Thank you.

Ms. BATULIS. Thank you.

Ms. KRILL. Thank you.

Mr. LAMBORN. We will now go to our third panel, and I would like to invite forward Ms. Jamie Connell, BLM Acting Deputy Director in the U.S. Department of the Interior, accompanied by Larry Meinert, Mineral Resources Program Coordinator for the U.S. Geological Survey; and Ms. Mary Wagner, Associate Chief of the U.S. Forest Service within the Department of Agriculture.

Like all of our witnesses, your written testimony will appear in full in the hearing record, so I ask that you keep your oral statements to 5 minutes, as outlined in our invitation letter.

You have to press the button on the microphone to be heard in this room. The timing lights, as I said earlier, start at 5 minutes, runs down to turn yellow at one minute, and then runs out and turns red at 5 minutes.

Thank you all for being here. And Deputy Director Connell, you may begin.

## STATEMENT OF JAMIE E. CONNELL, ACTING DEPUTY DIRECTOR, BUREAU OF LAND MANAGEMENT, U.S. DEPARTMENT OF THE INTERIOR

Ms. CONNELL. Mr. Chairman, Members of the Subcommittee——

Mr. LAMBORN. Pull it a little closer, please. Thank you.

Ms. CONNELL. Is that better?

Mr. LAMBORN. Yes.

Ms. CONNELL. Mr. Chairman, members of the Subcommittee, thank you for the opportunity to present testimony today on a number of bills on behalf of the Bureau of Land Management. My permanent job is as the BLM's Montana-Dakota State Director, but I am currently acting in the position of Deputy Director for the BLM here in Washington.

I am accompanied today by Larry Meinert with the USGS. He is a Mineral Resource Program Coordinator. He is available to answer questions on H.R. 981, the Resource Assessment of Rare Earths Act, and USGS-related questions on H.R. 1063, the National Strategic and Critical Minerals Policy Act.

I have submitted testimony for the record on each of the bills being presented. I will briefly summarize the Administration's position on each of these, and ask that my entire statements be made a part of the official record.

The Administration has several concerns with the complex land exchange proposed in H.R. 687, the Southeastern Arizona Land Exchange and Conservation Act. Two of the Administration's principal concerns with the legislation pertain to the timing of NEPA analysis and tribal consultation. In general, the Department of the Interior defers to the Forest Service on H.R. 687, as it relates primarily to Forest Service-managed lands and associated valuation issues.

47

H.R. 697, the Three Kids Mine Remediation and Reclamation Act, provides legislative solutions to the issues surrounding the abandoned Three Kids Mine in Henderson, Nevada, and clears the way for the area's development. The BLM supports innovative proposals to address the clean-up of the Three Kids Mine, and we support this proposal to transfer 948 acres of public land to the Henderson Redevelopment Agency at fair market value, subject to valid existing rights.

The Department shares the Committee's interest in developing rare earth elements and other critical mineral resources on our Nation's public lands, consistent with environmental protection and public involvement in agency decisionmaking. H.R. 761 expedites critical mineral exploration and mine permitting on public lands managed by the Departments of the Interior and Agriculture. The bill would limit public involvement in review of mining proposals and the formulation of alternatives, which are vital components of the BLM's multiple-use management of the Nation's public lands. As such, the Department opposes H.R. 761.

H.R. 767 expands the scope of the Federal permit streamlining project to include all of the field offices within the jurisdiction of BLM's Montana-Dakota State office. The BLM supports the goal of the bill to better conform the pilot office authority to current permitting demands. This flexibility would be especially useful for the BLM's North Dakota field office in Dickinson, North Dakota, where permitting demand has increased substantially in recent years.

In addition, the BLM would like to work with the sponsor and the Committee in clarifying amendments as well as language that would provide additional flexibilities nationwide. There are many BLM field offices that are not part of the Pilot Project, but are receiving hundreds of drilling applications per year.

H.R. 957, the American Soda Ash Competitiveness Act, would reinstate for 5 years the royalty rate reduction provided under the Soda Ash Royalty Rate Reduction Act of 2006, which expired in October of 2011. Because the bill would waive the fair market value requirements of the Federal Land Policy and Management Act, and the terms of any applicable leases, and for the reasons outlined in the Department's 2011 report to Congress, the BLM cannot support H.R. 957.

H.R. 1063 requires the Secretary of the Interior, through the BLM and the USGS, to assess the capability of the United States to meet the demands for minerals essential to manufacturing and competitiveness and economic and national security. The Department supports the goals of H.R. 1063. We would like to work with the Committee and other affected departments to further these goals, while taking into account time and resource considerations.

Finally, H.R. 981 directs the Secretary of the Interior, acting through the Director of the USGS, to conduct a global assessment of rare earth elements. The Department supports the goals of this bill, although we note that the activities called for in H.R. 981 are within the scope of the existing Department of the Interior authorities.

Mr. Chairman, thank you for the opportunity to testify today, and I would be happy to take any questions.

[The prepared statement of Ms. Connell follows:]

48

PREPARED STATEMENT OF JAMIE E. CONNELL, ACTING DEPUTY DIRECTOR, BUREAU OF
LAND MANAGEMENT, U.S. DEPARTMENT OF THE INTERIOR

H.R. 761—NATIONAL STRATEGIC AND CRITICAL MINERALS PRODUCTION ACT AND
H.R. 1063—NATIONAL STRATEGIC AND CRITICAL MINERALS POLICY ACT

**Introduction**

Thank you for the opportunity to testify for the Department of the Interior on two bills pertaining to the development of strategic and critical mineral resources on our Nation's public lands: H.R. 761, the National Strategic and Critical Minerals Production Act, and H.R. 1063, National Strategic and Critical Minerals Policy Act. These bills seek to expedite the development of strategic, critical and rare earth minerals on public lands managed by the Departments of the Interior and of Agriculture. This statement addresses the provisions relevant to the Department of the Interior.

The Department shares the Committee's interest in identifying opportunities for increasing efficiencies in the development of rare earth elements and other critical mineral resources on our Nation's public lands consistent with environmental protection and public involvement in agency decision-making. We also encourage finding ways to make permitting less complex, costly, and time-consuming. The Bureau of Land Management (BLM) would like to work with the Committee to further these shared goals.

The Department has concerns with these two bills. Public involvement in review of mining proposals and the formulation of alternatives—critical components of BLM's multiple-use management of public lands—would be constrained under H.R. 761, and therefore, the Department opposes H.R. 761. While the Department supports the goals of H.R. 1063, we have concerns and would like to work with the Committee to address them. The Department looks forward to continuing a dialogue with the Congress on these important matters.

**Background**

The BLM administers over 245 million surface acres of public land located in the 12 Western States, including Alaska, as well as 700 million acres of sub-surface mineral estate throughout the Nation. The public lands not only produce commodities, but also offer hunting, angling, and other recreational opportunities that help provide economic stability and growth for local and regional communities. Under its multiple-use mandate, BLM is working with local communities, tribes, State regulators, industry, and other Federal agencies to promote environmentally responsible development of mineral resources on Federal and Indian lands with a fair return to the American people.

The BLM manages mineral development under a number of different authorities, including the Federal Land Policy and Management Act, the Mineral Leasing Act of 1920, the Materials Act of 1947, and the Mining Law of 1872. Each of these authorities, along with BLM regulations and guidance, provides a legal framework for the development of minerals.

Global manufacturing demand for critical mineral commodities, including rare earth elements (REE), is on the rise, with increasing applications in consumer products such as renewable energy technology, computers, automobiles, aircraft, and other advanced technology products. While no REE are being mined on public lands at this time, some portions of the Federal mineral estate hold potential for REE development and deposits are being evaluated in three areas: the Bear Lodge Project in northeast Wyoming; the Bokan Mountain/Dotson Zone in southeastern Alaska; and potential expansion onto public lands of Molycorp's Mountain Pass exploration operations in California.

**H.R. 761—National Strategic and Critical Minerals Production Act**

The stated purpose of H.R. 761, the National Strategic and Critical Minerals Production Act of 2013, is to increase the flow of critical and strategic minerals to the U.S. manufacturing sector by expediting the critical mineral exploration and mine permitting process on public lands managed by the Departments of the Interior and Agriculture. However, H.R. 761 is drafted in such a manner as to cover virtually all hard rock mining on Federal lands. H.R. 761 includes numerous provisions that circumvent sound Federal decision-making and existing law calling for the multiple uses of public lands, including public involvement, the application of the National Environmental Policy Act (NEPA), the management of permit applications, the review of *Federal Register* notices for such projects, and the handling by the courts of civil actions arising from disputes over mine proposals. The bill's provisions also could apply retroactively to an application for a mineral exploration or mine permit that is pending at the time of the bill's enactment, upon the request of the applicant

49

to the lead agency. The legislation defines critical and strategic mineral mines as "infrastructure projects" so that they will fall under the March 22, 2012, Executive order "Improving Performance of Federal Permitting and Review of Infrastructure Projects."

While the Department strongly supports the development of rare earth elements and other critical minerals, it strongly opposes H.R. 761. This legislation would remove many of the environmental safeguards for almost all types of hardrock mines on public lands, bypass evaluation of potential impacts under NEPA, and limit public involvement in agency decision-making.

Additionally, H.R. 761 lacks clarity on a number of issues, including how the rights of surface owners in split estate situations might be affected in an expedited review process. It is also unclear how Section 103, which requires maximizing recoverable resources while mitigating environmental impacts, would affect the Department's authority under the Federal Land Policy and Management Act to prevent "undue and unnecessary degradation of the public lands." H.R. 761 also does not discuss the consequences of missing the 30-month deadline on permitting decisions and how State permitting authorities relate to this timeline. The provision allowing for retroactive application of the bill to permit applications could have the effect of requiring the BLM or another agency to abandon in-progress environmental reviews of proposed actions.

Some of the bill's provisions also duplicate actions the BLM has already implemented, including the formulation of memoranda of understanding among agencies and proponents, the concurrent gathering and review of data, and the appointment of project leads who are assigned to a project through completion.

Finally, the Department of the Interior defers to the Department of Justice regarding the provisions of H.R. 761 (Title II) pertaining to judicial review procedures.

### H.R. 1063—National Strategic and Critical Minerals Policy Act

H.R. 1063 requires the Secretary of the Interior—through the BLM and the U.S. Geological Survey—to assess the capability of the United States to meet the demands for minerals essential to manufacturing competitiveness and economic and national security. It requires the Secretary, in consultation with the Secretary of Agriculture, to produce a report to Congress within 180 days of enactment that includes an inventory of the non-fossil-fuel mineral potential of lands under the jurisdiction of the BLM and the U.S. Forest Service. The report must identify anticipated mineral requirements for the U.S. manufacturing sector, current sources of these minerals, implications of shortages, timelines for mineral development projects on public lands, and the cost of litigation. In addition, the report must include an assessment of the Federal workforce and its ability to meet the challenges of the critical minerals issue. The report must also include an inventory of rare earth element potential on Federal lands, impediments and restrictions to exploration or development, and recommendations to reduce such impediments. Finally, the bill directs the USGS to conduct national and global assessments of critical mineral resources.

H.R. 1063 requires far-reaching analysis of vast amounts of data spanning the jurisdictions of the Departments of the Interior, Agriculture, Defense, Commerce, and Justice, as well as the Office of Personnel Management. While we share the goals of H.R. 1063, it would entail much more than producing a report, likely requiring the development and implementation of data tracking systems and an ongoing commitment of staff resources to gather, input, analyze, and update the data. The administrative time and cost of this work would exceed the 180 days and $1 million authorized by the legislation. Regarding the national and global assessments of critical minerals, we note that these activities are already authorized by existing USGS authorities. These studies would require substantial resources and, absent authorized appropriations, would significantly impact other program mission activities.

We would like to work with the Committee and the other affected Departments to further the goals of the bill taking into account time and resource considerations. We would also like to work with the Committee to provide clarification on some provisions of the bills, such as the minerals under consideration and the designation of impediments and restrictions.

Thank you for the opportunity to testify on H.R. 761 and H.R. 1063. I will be glad to respond to questions.

H.R. 687—SOUTHEAST ARIZONA LAND EXCHANGE AND CONSERVATION ACT

Thank you for the opportunity to present testimony on H.R. 687, the Southeast Arizona Land Exchange and Conservation Act. The legislation provides for the exchange of a 2,422-acre parcel of U.S. Forest Service-managed land to a private company in exchange for a number of parcels within the State of Arizona for management by the U.S. Forest Service (FS) and the Bureau of Land Management (BLM).

50

Three of the private parcels are identified for transfer to the Secretary of the Interior.

In general, the Department of the Interior (DOI) defers to the FS on the issues directly related to FS-managed lands and associated valuation issues. We believe that the intent of the legislation is to facilitate an exchange of land with Resolution Copper Mining, LLC. Resolution Copper has indicated its intention to develop a copper mine near Superior, Arizona, and wishes to acquire the 2,422-acre FS parcel overlying the copper deposit as well as the Federal subsurface rights.

**Conveyance of Parcels to the Bureau of Land Management**

H.R. 687 provides for the conveyance of three parcels to the Secretary of the Interior to be managed by the BLM. The parcels identified are located in Gila, Pinal, and Santa Cruz Counties and include:

- 3,050 acres along the lower San Pedro River near Mammoth, Arizona;
- 160 acres within the Dripping Springs area near Kearny, Arizona; and
- the 940-acre Appleton Ranch parcel adjacent to the Las Cienegas National Conservation Area near Sonoita, Arizona.

We would note that the maps for these three parcels are inaccurately described in the legislation and we would like to work with the sponsor and the Committee to correct those descriptions.

The lower San Pedro parcel is east of the town of Mammoth, Arizona, and straddles the San Pedro River. The acquisition of these lands would enhance key migratory bird habitat along the San Pedro River. H.R. 687 provides for the lower San Pedro parcel to be managed as part of the BLM's existing San Pedro Riparian National Conservation Area (NCA) designated by Public Law 100–696. The lower San Pedro parcel lies along the same riparian corridor as the NCA, but it is at least 60 miles downstream (north) of the existing NCA and has substantially different resource issues and needs. If this parcel is conveyed to the Secretary of the Interior and incorporated into the NCA, the Department recommends that the existing 80 acres of adjacent BLM-managed public land likewise be included within the NCA to facilitate the efficient and effective management of this important riparian corridor.

The legislation also proposes to transfer 160 acres in the Dripping Springs area near Kearny, Arizona, to the Secretary of the Interior. This private parcel is an inholding within a larger block of public lands and has important resource values, including sensitive Desert Tortoise habitat.

Finally, the bill provides for the transfer of the 940-acre Appleton Ranch parcel to the Secretary of the Interior. This parcel is located on the southern end of the BLM's Las Cienegas NCA. These lands lie within the "Sonoita Valley Acquisition Planning District" established by Public Law 106–538, which designated the Las Cienegas NCA. That law directs the Department to acquire lands from willing sellers within the planning district for inclusion in the NCA to further protect the important resource values for which the Las Cienegas NCA was designated. These lands are part of a significant wildlife corridor. The acquisition of these lands advances important conservation goals associated with this unique and special natural resource.

**General Concerns**

The Administration has several concerns with the Southeast Arizona Land Exchange and Conservation Act and cannot support H.R. 687 as written. Two of the Administration's principal concerns with the legislation pertain to the timing of NEPA analysis and tribal consultation.

H.R. 687 requires the Forest Service to prepare an environmental review document under the National Environmental Policy Act (NEPA) *after* the land exchange is completed rather than in advance of the exchange. It is this Administration's policy that NEPA be fully complied with to address all Federal agency actions and decisions, including those necessary to implement congressional direction.

In addition, increasing and improving tribal consultation with Indian tribes by all Federal agencies is a key accomplishment of this Administration, and concerns have been raised by Indian tribes nationwide that the legislation is contrary to laws and policies and Executive orders that direct Federal land management agencies to engage in meaningful government-to-government consultation with interested Indian tribes, and to protect and preserve sites sacred to Native Americans. This consultation framework includes, including the recent Memorandum of Understanding among the Departments of Defense, Interior, Agriculture, Energy and the Advisory Council of Historic Preservation Regarding Interagency Coordination and Collabora-

51

tion for the Protection of Indian Sacred Sites, which was signed on December 4, 2012.

Many of the lands to be exchanged in this legislation hold significant cultural value to Indian tribes. In particular, the Apache Leap area, the Oak Flat Campground, and Devil's Canyon are culturally significant to the San Carlos Apache Tribe and the Fort McDowell Yavapai Nation. For the San Carlos Apache, and the Yavapai, this area is a place of ancient settlements and burial sites. Tribal members still go to these areas to pray, conduct ceremonies, and gather medicines and ceremonial items.

The Administration is concerned that any consultations under H.R. 687 would not be meaningful under Executive Order 13175, "Consultation and Coordination with Indian Tribal Governments," because the legislation limits the Secretary of Agriculture's discretion regarding the land exchange. Engaging in government-to-government consultation prior to the Secretary of Agriculture's public interest determination would better allow for meaningful consultation and coordination with interested tribes.

Section 4(i) of H.R. 687 expresses the intent of Congress that the exchange be completed within 1 year. Based on our experience with exchanges, we believe the amount of time provided in H.R. 687 is insufficient to review and finalize the necessary environmental documents, mineral report, and appraisals, as well as to conduct the final verification and prepare title documents. We are also concerned that 1 year may not be sufficient to complete analysis of any historic and sacred sites in the exchange area as required by the Native American Graves Protection Act and the National Historic Preservation Act.

Preparation of a mineral report is a crucial first step toward an appraisal of the Federal parcel because the report provides important information about the Federal mineral deposit. The bill does not address access to confidential exploration and development data and company analyses on the mineral deposits underlying the Federal land in order to ensure a timely and accurate appraisal. Such information is essential for the mineral report, particularly in the context of this exchange, because of the size of the proposed mining operation and the proposed mining technique.

Section 6 of H.R. 687 provides for an annual value adjustment payment to the United States if the cumulative production of locatable minerals exceeds the projected production used in the appraisal required by section 4. This provision recognizes that an accurate projection of future production as part of the appraisal process will be difficult to develop, and provides a mechanism for additional payments to the United States if the actual production exceeds the projected production. The Department generally defers to the FS on the specific provisions of section 6 of the bill. However, we note that this section creates a new fund in the U.S. Treasury for the deposit of these value adjustment payments. The Department believes that these funds should be dedicated to Federal land acquisition in the same manner as the initial land equalization payments provided for in section 4(e)(2)(C) of the bill. Because these funds are to compensate for a possible initial inadvertent under-appraisal of land values, it is appropriate that the value when captured be used in the same manner as if it had been included in the initial appraisal.

Finally, there are a number of issues of a more technical nature, including appropriate map references, which we would welcome the opportunity to discuss as this legislation moves forward.

**Conclusion**

Thank you for the opportunity to testify. The exchange proposed in H.R. 687 is complex. The Departments of Agriculture and of the Interior seek to assure that the Federal Government's interest is appropriately protected in any final legislation and tribal interests are considered.

H.R. 697—THREE KIDS MINE REMEDIATION AND RECLAMATION ACT

**Introduction**

Thank you for the opportunity to testify on H.R. 697, the Three Kids Mine Remediation and Reclamation Act. During the past 5 years, the Bureau of Land Management (BLM) has worked with Nevada governmental entities in search of administrative remedies to the problems posed by the abandoned Three Kids Mine, in Henderson, Nevada. The BLM supports H.R. 697, which provides legislative solutions to the issues surrounding the Three Kids Mine area and clears the way for its eventual development.

**Background**

The Three Kids Mine is an abandoned manganese mine and mill site located along the south side of Lake Mead Drive, across the highway from Lake Las Vegas,

52

in Henderson, Nevada. The mine and mill operated from 1917 through 1961 on 314 acres of private land, in part providing steel-strengthening manganese to the defense industry and contributing to the United States' efforts in World War I and II. Federal manganese reserves were stored in the area from the late 1950s through 2003.

H.R. 697 would direct that 948 acres of the public lands adjacent to the private site be conveyed to the Henderson Redevelopment Agency, bringing the total size of the project area to 1,262 acres. Of the 948 acres of public lands, 146 acres are contaminated and will require mine reclamation and environmental remediation. The most severe contamination appears to be on the 314 private acres where the mine and mill were located. No viable former operator or responsible party has been identified to remediate and reclaim the abandoned mine and mill site. Today, the site's deep open pits, large volumes of mine overburden and tailings, mill facility ruins, and solid waste disposal areas pose significant risks to public health, safety and the environment. The Nevada Division of Environmental Protection (NDEP) identified the Three Kids Mine site as a high priority for the implementation of a comprehensive environmental investigation, remediation, and reclamation program.

Representatives of the BLM, the Bureau of Reclamation, and the Department of the Interior Solicitor's Office have worked with the City of Henderson and representatives of developer Lakemoor Canyon, LLC, to find solutions to the complex challenges this site presents. Discussions have focused on overlapping Federal agency jurisdictions, land management designations and other resource issues, Resource Management Plan amendments, future liability, and an important utility corridor that traverses the site.

**H.R. 697**

H.R. 697 would designate the combined 314 acres of private land and 948 acres of public land as the 1,262-acre "Three Kids Mine Project Site" and provide for the conveyance of the public lands to the Henderson Redevelopment Agency. The legislation also provides that fair market value for the Federal lands to be conveyed should be determined through standard appraisal practices, and that, subsequent to that determination, the Secretary should determine the "reasonable approximate estimation of the costs to assess, remediate, and reclaim the Three Kids Mine Project Site." That cost would then be deducted from the fair market value of the public land to be conveyed. The Henderson Redevelopment Agency would pay the adjusted fair market value of the conveyed land, if any, and the Federal Government would be released from "any and all liabilities or claims of any kind arising from the presence, release, or threat of release of any hazardous substance, pollutant, contaminant, petroleum product (or derivative of a petroleum product of any kind), solid waste, mine materials or mining related features" at the site in existence on or before the date of the conveyance.

While the BLM has not established a range for the cost of cleanup, a proponent of the transaction, Lakemoor Canyon, LLC, estimates the cost of remediating the public and private lands at between $300 million and $1.3 billion. While it is possible that the cost of remediating and reclaiming the entire project area might exceed the fair market value of the Federal land to be conveyed, the cost of the transaction will only be known after the Secretary completes the appraisal and remediation cost estimate process as outlined in the legislation.

The BLM supports innovative proposals to address the cleanup of the Three Kids Mine, and we support this proposal to transfer the entire 948 acres of public land to the Henderson Redevelopment Agency at fair market value, subject to valid existing rights. However, the BLM recognizes that the transfer would include a small portion of the River Mountains ACEC, and we would like to discuss with the committee opportunities to mitigate that loss.

**Conclusion**

Thank you for inviting the Administration to testify on H.R. 697. The Three Kids Mine problem needs to be resolved, and we look forward to working toward a solution that protects the environment and serves the public interest. I would be happy to answer your questions.

H.R. 767—OIL AND GAS PILOT PROJECT OFFICES

**Introduction**

Thank you for the opportunity to testify on H.R. 767, which would amend the Energy Policy Act of 2005 to modify the Federal Permit Streamlining Pilot Project. The bill would expand the Federal Permit Streamlining Pilot Project to include all of the field offices within the jurisdiction of the BLM's Montana/Dakotas State Office. The BLM supports the goal of H.R. 767 to better conform the pilot office authority to

53

current permitting demands. However, the BLM would like to work with the sponsor and the Committee on clarifying amendments as well as language that would provide additional flexibilities nationwide to utilize the pilot office authority to respond as permitting demands shift over time.

**Background**

Section 365 of the Energy Policy Act of 2005 established the Federal Permit Streamlining Pilot Project with the intent to improve the efficiency of processing oil and gas use authorizations and environmental stewardship on Federal lands. It designated seven pilot project offices: Miles City, Montana; Buffalo and Rawlins, Wyoming; Vernal, Utah; Grand Junction/Glenwood Springs, Colorado; and Farmington and Carlsbad, New Mexico.

Section 365 also established the Permit Processing Improvement Fund, an account of approximately $18 million annually, to support the pilot project for 10 years. Specifically, it directed 50 percent of the income derived from Federal onshore oil and gas lease rental payments outside of Alaska to the Fund. For FY 2006 through FY 2015, the section made the Fund available to the Secretary of the Interior for expenditure without further appropriation to enhance coordination and processing of oil and gas use authorizations on Federal land under the jurisdiction of the designated pilot project offices.

In addition to the BLM, Section 365 authorized the Secretary to transfer monies from the Permit Processing Improvement Fund as necessary to the Fish and Wildlife Service, the Bureau of Indian Affairs, the Forest Service, the Environmental Protection Agency, the Army Corps of Engineers, and the States of Wyoming, Montana, Colorado, Utah, and New Mexico. It also prohibited the BLM from establishing cost recovery fees for processing applications for oil and gas permits to drill. The President's 2013 budget proposed to repeal this fee prohibition. In lieu of the budget proposal, we note that the Congress has implemented permit fees through appropriations language for the last several years.

The agencies involved in the pilot project have made significant progress in a number of areas. Additional resources, such as personnel devoted to processing oil and gas use authorizations, have enabled the various bureaus and agencies to increase the pace of permitting and completing environmental reviews, particularly given the complex resource issues we face. The time taken for interagency consultations has been reduced due to improved communication and through programmatic streamlining efforts, which have been used in multiple projects and permits.

Also, the BLM has increased inspection and enforcement capability as a result of the hiring of additional skilled specialists in the pilot project offices. The increase in inspections has led to better compliance by the industry and a reduction in major violations due to the increased number of inspectors in the field. Increasing the number of inspectors has allowed the BLM to identify issues early; intervene in nascent violation situations; and improve interim reclamation work on lands disturbed by oil and gas operations. The pilot project offices are also better staffed to help new industry permitting specialists understand the BLM's requirements for obtaining an oil and gas use authorization.

**H.R. 767**

H.R. 767 would substitute the BLM's Montana/Dakotas State Office for the current pilot project office in Miles City, Montana, with the goal of broadening the geographic scope of the pilot project authority. This broadened geographic scope would allow BLM to better allocate some resources based on current permitting demands and new exploration and development of oil and gas fields and plays. For example, this flexibility would be especially useful for processing permits received in the North Dakota Field Office in Dickinson, North Dakota, which received 701 applications for permits to drill (APDs) in FY 2012, compared to 147 APDs received in FY 2009.

In addition, the BLM would like to work with the sponsor and the Committee on language that would allow greater flexibilities nationwide to adjust permitting resources based on demand. There are many BLM field offices that are not part of the pilot project, but are receiving hundreds of APDs per year. Of the 10 field offices that received the most APDs during FY 2012, only 5 are currently designated as pilot project offices. For example, in FY 2012, the Pinedale Field Office in Pinedale, Wyoming, received 325 APDs; the Bakersfield Field Office in Bakersfield, California, received 286 APDs; and the Oklahoma Field Office in Tulsa, Oklahoma, received 157 APDs. Although these offices have received high volumes of APDs, none are currently designated as pilot project offices, and none would be designated as such under the bill. At the same time, some of the currently designated pilot project of-

54

fices have received relatively few APDs in recent years; for example, the Grand Junction Field Office received only 47 APDs in FY 2012.

## Conclusion

Thank you for the opportunity to provide testimony on H.R. 767. I would be happy to answer any questions you may have.

### H.R. 957—AMERICAN SODA ASH COMPETITIVENESS ACT

## Introduction

Thank you for the opportunity to testify on H.R. 957, the American Soda Ash Competitiveness Act. This bill would reinstate for five years the royalty rate reduction provided for under the Soda Ash Royalty Rate Reduction Act of 2006, which expired in October 2011. The BLM cannot support H.R. 957.

## Background

Soda ash is one of several products derived from sodium minerals mined on public lands and is used in many common products, including glass, pulp, detergents, and baking soda. The mineral trona is a naturally occurring mixture of sodium carbonate, sodium bicarbonate, and water. Soda ash may be either natural or synthetic. It can be extracted from mined natural trona deposits, or it can be manufactured synthetically. Synthetic soda ash production began in this country in the 1880s and increased as the demand for soda ash increased. In the early 1950s, the modern natural soda ash industry began in the Green River Basin of Wyoming, home of the world's largest known natural deposit of trona, where soda ash, or "sodium carbonate," is refined from trona mined at depths of between 800 and 1,600 feet below the surface.

In 2012, the U.S. soda ash industry consisted of five companies that mine and mill soda ash, four of which operate five plants in Wyoming. One company in California produces soda ash from sodium-carbonate rich brines. At the end of FY 2012, there were 86 Federal sodium leases covering 111,185 acres in Wyoming, California, Colorado, Arizona, and New Mexico. Sixty-three of these Federal sodium leases were located in Wyoming. The soda ash industry is a substantial contributor to the gross domestic product of the United States, with the total value of domestic soda ash produced in 2012 being about $1.6 billion and the industry supplying over 2,200 direct jobs. Soda ash is also a key ingredient in many diversified products, including flat glass used by the automobile and construction industries.

## Soda Ash Royalty Rate Reduction Act

In 2006, Congress passed the Soda Ash Royalty Rate Reduction Act (2006 Act), which reduced the Federal royalty rate for soda ash to 2 percent. Before the 2006 Act went into effect, the BLM was charging royalty rates of 6 and 8 percent. The BLM established these rates based on a 1996 study to examine the fair market value in the sodium industry in Wyoming. The study reviewed many comparable State and private leases and found that fair market value in Wyoming appeared to be somewhat higher than the 5 percent being charged by the BLM previously. As a result of the study, the BLM determined that the royalty rate for all then-existing leases would be increased from 5 to 6 percent at the lease renewal date. The BLM, based on the study, also determined that the royalty rate on all new leases would be 8 percent. In the Green River Basin at that time, the royalty rate on most private land was 8 percent and 5 percent on State lands.

## Report to Congress

As mandated by the 2006 Act, the BLM reported to Congress in the fall of 2011 on the impact of the reduction over the previous 5 years, in the "U.S. Department of the Interior Report to Congress: The Soda Ash Royalty Reduction Act of 2006." The report found that the 2006 Act resulted in a substantial loss of royalty revenues to the Federal Government and the States which exceeded congressional estimates at the time of enactment. It also stated that the royalty rate reduction did not appear to have contributed in a significant way to the creation of new jobs within the industry, to increased exports, or to a notable increase in capital expenditures to enhance production. Furthermore, the report found that the royalty rate reduction appeared to have influenced a shift of production away from State leases and private lands and onto Federal leases, and that, with regard to global competitiveness, U.S. production remained stable.

## H.R. 957

H.R. 957 would reinstate for 5 years the 2 percent royalty rate for soda ash which expired in October 2011. Specifically, the bill would apply an across-the-board reduc-

55

tion in the royalty rate on soda ash leases from an average of 5.6 percent to 2 percent. In FY 2012, the soda ash industry paid over $47 million in royalty for production from Federal lands. If the royalty rate had been reduced to 2 percent during FY 2012, the royalty revenue for that year would have been approximately $17 million, a reduction of about $30 million. Furthermore, the bill could be subject to the Statutory Pay-As-You-Go Act of 2010.

H.R. 957 would waive the requirements of section 102(a)(9) of the Federal Land Policy Management Act of 1976 (FLPMA) and the terms of any applicable leases. Section 102(a)(9) of FLPMA states that it is the policy of the United States to receive fair market value for the use of public lands and their resources unless otherwise provided by statute. For these reasons and for the reasons outlined in the Department's 2011 report, the BLM cannot support H.R. 957.

**Conclusion**

Thank you for the opportunity to provide testimony on H.R. 957. I would be happy to answer any questions you may have.

H.R. 981—RESOURCE ASSESSMENT OF RARE EARTHS ACT OF 2013

Thank you for the opportunity to present the Department of the Interior's views on H.R. 981, directing the Secretary of the Interior, acting through the Director of the U.S. Geological Survey (USGS), to conduct a global assessment of rare earth element resources. The Department supports the goals of this bill, although we note that the activities called for in H.R. 981 are within the scope of existing Department of the Interior authorities.

The USGS is responsible for conducting research and collecting data on a wide variety of fuel and nonfuel mineral resources, including rare earth elements (REE). For nonfuel minerals, research is conducted to understand the geologic processes of concentrated known mineral resources at specific localities in the Earth's crust and to estimate (or assess) quantities, qualities, and areas of undiscovered mineral resources, or potential future supply. USGS scientists also conduct research on the interactions of mineral resources with the environment, both natural and as a result of resource extraction, to better predict the degree of impact that resource development may have on human and ecosystem health. USGS mineral commodity specialists collect, analyze, and disseminate data and information that document current production and consumption for about 100 mineral commodities, both domestically and internationally for 180 countries. This full spectrum of mineral resource science allows for a comprehensive understanding of the complete life cycle of mineral resources and materials—resource formation, discovery, production, consumption, use, recycling, and reuse—and allows for an understanding of environmental issues of concern throughout the life cycle.

Global demand for critical mineral commodities is on the rise with increasing applications in consumer products, computers, automobiles, aircraft, and other advanced technology products. Much of this demand growth is driven by new technologies that increase energy efficiency and decrease reliance on fossil fuels. In 2010, the USGS completed an inventory of known domestic rare-earth reserves and resources (Long and others, 2010). The report documents 28 deposits and includes information on the location, exploration status, past production, and estimated resources. The report also includes an overview of known global rare-earth resources and discusses the reliability of alternative foreign sources of rare earths. Known U.S. deposits of REE comprise about 13 percent of the global reserve of REE and are located on a mix of public (BLM and USFS) and private lands in 14 States. The primary U.S. source for REE is the Mountain Pass mine in California, operated by Molycorp Minerals, a Colorado-based company. Advanced exploration projects for new REE deposits are underway at Bokan Mountain, AK and Bear Lodge, WY. In 2011, USGS released two additional REE reports, "China's Rare-Earth Industry" (Tse, 2011) and "Rare Earth Elements—End Use and Recyclability" (Goonan, 2011).

The logical next steps are to (1) update a global inventory of rare earth resources published by the USGS in 2002 (Orris and Grauch, 2002), (2) review principal REE deposits outside of China and evaluate their geologic, economic, and development potential, and (3) conduct a comprehensive assessment of undiscovered REE resources. H.R. 981, the RARE Act of 2013, outlines a reasonable approach to properly assess the global endowment of REE resources, to identify potential future supplies of REE resources, and to better understand future potential sources of REE needed for United States industry.

The USGS maintains a workforce of geoscientists (geologists, geochemist, geophysicists, and resource specialists) with expertise in critical minerals and materials, including REE. The USGS continuously collects, analyzes, and disseminates data and information on domestic and global REE reserves and resources, produc-

56

tion, consumption, and use. This information is published annually in the USGS Mineral Commodity Summaries (USGS, 2013) and includes a description of current events, trends, and issues related to REE supply and demand.

The USGS stands ready to fulfill its role as the sole Federal provider of unbiased mineral resource research on known REE resources, assessment of undiscovered REE resources, and information on domestic and global production and consumption of REE resources for use in global REE supply chain analysis. We note, however, that the activities called for in H.R. 981 are already authorized by existing authorities. Any study conducted to fulfill the objectives of the bill will require substantial resources that, without additional support, would significantly impact other program mission activities.

Thank you for the opportunity to present the views of the Department on H.R. 981.

References Cited

Goonan, T.G., 2011, Rare earth elements—End use and recyclability: U.S. Geological Survey Scientific Investigations Report 2011–5094, 15 p., available only at *http://pubs.usgs.gov/sir/2011/5094/*.

Long, K.R., Van Gosen, B.S., Foley, N.K., and Cordier, Daniel, 2010, The principal rare earth elements deposits of the United States—A summary of domestic deposits and a global perspective: U.S. Geological Survey Scientific Investigations Report 2010–5220, 96 p. Available at *http://pubs.usgs.gov/sir/2010/5220/*.

Orris, G.J., and Rauch, R.I., 2002, Rare earth element mines, deposits, and occurrences: U.S. Geological Survey Open-File Report 2002–0189, 174 p. Available at *http://pubs.usgs.gov/of/2002/of02-189/*.

Tse, Pui-Kwan. (2011) *China's Rare-Earth Industry.* U.S. Geological Survey Open-File Report 2011–2042.

USGS, 2013, Mineral Commodity Summaries 2013, p. 128–129

––––––

QUESTIONS SUBMITTED FOR THE RECORD TO JAMIE E. CONNELL

QUESTIONS SUBMITTED FOR THE RECORD BY THE HONORABLE GRACE F. NAPOLITANO

*Question.* Can you clarify how many acre-feet of water will be utilized in the mining process to cool the drill? It is my understanding it would be about 40,000 acre-feet. of water. My concern is the current drought condition of the City of Superior and surrounding area.

Answer. The Department of the Interior does not have this information.

*Question.* Are there current environmental studies in process or have any been completed on the examination of the land prior to the exchange into private ownership?

Answer. The Department of the Interior defers to the Forest Service on issues directly related to the transfer of Forest Service-managed lands and associated valuation issues.

*Question.* Wouldn't the normal process of requesting an environmental study be the first step? H.R. 687 waives compliance with NEPA prior to the exchange, meaning that the Forest Service or the public will *never* have access to information documenting the potential environmental impacts of a large copper mining operation in the area.

Answer. It is the Administration's policy that NEPA be fully complied with to address all Federal actions and decisions prior to the exchange.

––––––

QUESTION SUBMITTED FOR THE RECORD BY THE HONORABLE KEVIN CRAMER, A REPRESENTATIVE IN CONGRESS FOR THE STATE OF NORTH DAKOTA

*Question.* Ms. Connell, on page 2, 2nd paragraph of your March 21, 2013, pre-filed testimony, you stated:

"The agencies involved in the pilot project have made significant progress in a number of areas. Additional resources, such as personnel devoted to processing oil and gas use authorizations, have enabled the various bureaus and agencies to increase the pace of permitting and completing environmental reviews, particularly given the complex resource issues we face. The time taken for interagency consultations has been reduced due to improved communication and through programmatic streamlining efforts, which have been used in multiple projects and permits."

57

Do you have specific results to show that this Pilot Project has improved the Federal permit process? (i.e. A backlog of X amount of Applications for Permit to Drill (APDs) has been reduced to X amount, reduced average time to process an APD from X to X, X amount of inspections before compared to X amount of inspections now.)

Answer. The pilot office authority has allowed the BLM and other pilot office agencies to better coordinate permitting and related environmental reviews, which along with additional funding has allowed us to increase the pace of permitting. The pilot project offices approved approximately 54 percent of all APDs received from FY 2006 to FY 2012. From FY 2006 to FY 2012, the amount of time it took for all BLM field offices to process and approve complete APDs fell from 127 to 77 days. The number of complete APDs pending more than 90 days (the "backlog") at all BLM offices declined from 1,486 to 551 from FY 2006 to FY 2012. (Note: only after an applicant has submitted all the required components of an APD package is the BLM able to complete its review and make a decision on an APD.) The number of inspections completed by all BLM offices rose 73 percent from FY 2006 to FY 2012, from 19,974 to 34,571.

————

Mr. LAMBORN. OK, thank you for being here and for your testimony.

We will now hear from Ms. Wagner.

### STATEMENT OF MARY WAGNER, ASSOCIATE CHIEF, U.S. FOREST SERVICE, U.S. DEPARTMENT OF AGRICULTURE

Ms. WAGNER. Good morning, Mr. Chairman and members of the Committee. Thanks for the opportunity to provide the Department of Agriculture's views on H.R. 687, the Southeast Arizona Land Exchange and Conservation Act of 2013.

We have had the opportunity to share our perspective on previous versions of this bill, and we have not changed our position since our last testimony. I know you have had an opportunity to review the detailed written testimony. I am going to focus on a few key points in my oral remarks.

We support environmentally sound mineral development. We also recognize the benefit of copper mine development to economic and employment conditions in the State of Arizona and the Nation. We acknowledge the environmental benefits and qualities of the non-Federal land parcels considered in this exchange, and we appreciate the efforts to resolve land use issues for the Town of Superior. Last, we appreciate the recognition and protection of important values of Apache Leap.

While the Department understands and appreciates the potential economic benefits and value of the lands to be acquired by the American public, the Department cannot support the bill as written, but is looking forward to working with sponsors and the Committee to resolve concerns. The two principal concerns with the bill are that it would require the Agency to prepare an environmental review document under NEPA after the land exchange is completed, and the land exchange and subsequent mining activities have the potential to impact a landscape considered sacred to a number of federally recognized Tribes, without environmental review or consultation with the Tribes.

The Department believes that adhering to the Federal Land Policy Management Act and other laws that guide administrative land exchanges ensures a sound process for determining the public interest and disclosing environmental impacts. It requires that before making a discretionary decision, the Federal agency considers the

58

environmental impacts of a proposed major Federal action, and alternatives of such an action.

It is this Administration's policy that NEPA be fully complied with to address all Federal actions and decisions, including those necessary to implement congressional direction. NEPA conducted in advance of the exchange would create an opportunity for meaningful tribal consultation, as envisioned by numerous laws that acknowledge that consultation with tribal governments is legally mandated and integral to the Federal Government's trust responsibility to Tribes. Consultation becomes the vehicle where tribal concerns and interests are identified, addressed, and potentially mitigated.

We have a number of technical concerns with the bill, including the timeframe to complete the land exchange, appraisal provisions, value adjustment provisions, and the purpose of funds from value adjustment payments. And we would like to work with the Committee to resolve those issues.

This concludes my statement. I am happy to answer any questions you might have.

[The prepared statement of Ms. Wagner follows:]

PREPARED STATEMENT OF MARY WAGNER, ASSOCIATE CHIEF, U.S. FOREST SERVICE, U.S. DEPARTMENT OF AGRICULTURE, ON H.R. 687

Mr. Chairman and members of the Committee, thank you for the opportunity to appear before you today to provide the Department of Agriculture's views on H.R. 687, the "Southeast Arizona Land Exchange and Conservation Act of 2013". I am Mary Wagner, Associate Chief of the U.S. Forest Service. H.R. 687 would direct the Secretary of Agriculture to convey Federal land for use as an underground copper mine in exchange for environmentally sensitive non-Federal land in Arizona. We defer to the Department of the Interior on provisions relating to lands to be managed by the Bureau of Land Management (BLM).

H.R. 687 would direct the Secretary of Agriculture to convey to Resolution Copper Mining, LLC (Resolution Copper), a 2,422 acre parcel of land on the Tonto National Forest. The Federal land to be conveyed, known as Oak Flat, contains a potentially sizeable copper ore body and adjoins an existing copper mine on private land owned by Resolution Copper. In exchange, Resolution Copper would convey five parcels of land to the Forest Service and three parcels of land to BLM. The total non-Federal acreage that would be conveyed by Resolution Copper is 5,344 acres, all of which are in Arizona.

The Bill calls for an equal value exchange in section 4(e). If the value of the Federal land (including the ore body) to be conveyed exceeds the value of the parcels to be acquired, the Bill would allow for a cash equalization payment by Resolution Copper in excess of 25 percent. Under current law, cash equalization payments may not exceed 25 percent (section 206(b) of Federal Land Policy and Management Act of 1976 (43 U.S.C. 1716(b)). A cash equalization payment resulting from the exchange would be deposited in the Sisk Act account to be used, upon appropriation by Congress, for acquisition of land for addition to the National Forest System within the State of Arizona.

Section 6(b) of the Bill would require Resolution Copper to make value adjustment payments if, as the mine is developed, production of the mine exceeds expectations documented in the appraisal. Those funds would be deposited in a special account in the Treasury to be used, upon appropriation by Congress, for maintenance, repair, and rehabilitation projects on BLM and National Forest System lands. The Department's position is that any value adjustment payments should be used for land acquisition.

The Bill also would provide for the sale of: a 30 acre parcel of land currently being used as a cemetery; a reversionary interest and reserved mineral rights in a 265 acre parcel; and 250 acres near the Superior Airport at market value to the Town of Superior. Sale proceeds would be deposited in the Sisk Act account to be used, upon appropriation by Congress, for acquisition of land to the National Forest System in Arizona.

59

H.R. 687 would require Resolution Copper to pay all costs associated with the exchange, including any environmental review document. The Bill provides that it is the intent of Congress that the exchange be completed not later than 1 year after the date of enactment.

At the request of Resolution Copper, the Bill would require the Secretary, within 30 days of such request, to issue a special use permit to Resolution Copper to carry out mineral exploration activities under the Oak Flat Withdrawal Area, from existing drill pads located outside the area, if such activities would not disturb the surface of the Area. At the request of Resolution Copper, within 90 days, the Bill would require the Secretary to issue a special use permit to Resolution Copper to carry out mineral exploration activities under the Oak Flat Withdrawal Area (but not within the Oak Flat Campground), if the activities are conducted from a single exploratory drill pad which is located to reasonably minimize visual and noise impacts to the Campground.

H.R. 687 would require the Secretary of Agriculture to complete an environmental review document after the exchange, and after the above-noted activities were permitted to take place, but before Resolution Copper's commencement of commercial mineral production on the land it would acquire in the exchange. Specifically, once the land exchange is consummated, and these lands are in the private ownership of Resolution Copper, Resolution Copper is authorized to submit a mine plan of operation to the Secretary. Thereafter, the Secretary must complete an environmental review document within 3 years that is limited to section 102(2) of the National Environmental Policy Act of 1969 (NEPA). The environmental document would be used as the basis for any Federal action or authorization related to the proposed mine and mine plan of operations of Resolution Copper, including the construction of associated power, water, transportation, processing, tailings, waste dump, and other ancillary facilities. After the exchange, Resolution Copper may need to use the adjoining National Forest System land for ancillary activities related to the mining development, such as rights-of-way for electric lines, pipelines, or roads.

The Bill would add five parcels of land totaling almost 1,200 acres to the National Forest System. Most of these parcels include riparian areas which are somewhat rare in Arizona. One of the parcels that would be acquired adjoins the Apache Leap area on the Tonto National Forest. Additionally, as a condition of the land exchange, Resolution Copper would surrender its rights to commercially extract minerals under Apache Leap.

While the Department understands and appreciates the potential economic benefits and the value of the lands to be acquired by the American public, the Department cannot support the Bill as written but is looking forward to working with the Sponsor and the Committee. The principal concern is that the Bill would require the agency to prepare an environmental review document under NEPA *after* the land exchange is completed. Also of concern is the fact the Bill would immediately authorize mining exploration activities under an area that is considered sacred to a number of federally recognized Indian tribes (the Western Apache, including the San Carlos Tribe and of the Fort McDowell Yavapai Nation, and certain other tribes in Arizona and New Mexico) without a review or study or consultation with Tribes.

NEPA is a forward looking statute setting out procedural obligations to be carried out before a Federal action is taken. It requires that, before taking a discretionary decision, the Federal agency consider the environmental impacts of a proposed major Federal action and alternatives of such action. It is this Administration's policy that NEPA be fully complied with to address all Federal agency actions and decisions, including those necessary to implement congressional direction.

The purpose of the requirement in the bill that the agency prepare a limited NEPA review *after* the exchange, when the land is in private ownership, is unclear because the bill provides the agency limited discretion to exercise. An environmental review document after the exchange would preclude the U.S. Forest Service from developing a reasonable range of alternatives to the proposal and providing the public and local and tribal governments with opportunities to comment on the proposal. In addition, the U.S. Forest Service does not have an understanding of the impacts the proposed mine will have on local or regional water supplies, water quality, or possible dewatering of the area. No studies or assessments of the water supplies have been conducted. That is information which could and should be obtained by the Forest Service with NEPA analysis *before* the exchange. A NEPA analysis after the exchange would not allow the Forest Service to recommend alternatives since the exchanged parcel would already be in private ownership.

The Bill should be amended to require the preparation of an environmental analysis *before* the land exchange is completed. The purpose of preparing an environmental analysis before consummating the land exchange would be to analyze the effects of the transfer of the Federal land to Resolution Copper, any activities that

60

are reasonably foreseeable to occur on the transferred land (including mineral development), and the acquisition of the non-Federal land resulting from the exchange. The agency would use the environmental analysis to make a decision on whether and how to proceed with the exchange and what mitigation conditions would be required to mitigate the identified impacts.

The legislation states that it is Congressional intent that the exchange be completed within 1 year. Based on our experience with complex land exchanges, this is clearly an insufficient amount of time to complete the exchange. Given the requirement of mineral reports, appraisals, title documents, environmental analysis and government to government consultation with local Indian Tribes, a 2 to 3-year timeframe is much more realistic.

The agency also understands that a number of federally recognized Indian tribes and regional and national tribal organizations are concerned that the H.R. 687 circumvents various laws, policies, and Executive order that directs the Federal land managing agencies to engage in formal consultation with the interested Indian tribes. Indian tribes have also raised important concerns that the Bill is designed to various policies and Executive Orders that Federal land managing agencies protect and preserve sites that are sacred to Native Americans. The Forest Service understands that the land is considered sacred by the tribe and holds significant traditional and historic value. Because of these expressed concerns and because this specific site has been the focus of historic Government protection it is important that this Bill provide for the process of formal tribal consultation to ensure both tribal participation in cultural impact analysis and protection of this site.

We hold in public trust a great diversity landscapes and sites held sacred by Indian tribes. Last year, the Department and the Forest Service issued the "Indian Sacred Sites Policy Review and Recommendations". The Report acknowledges that consultation "with Tribal governments is legally mandated and integral to the agency's trust responsibility to tribes. Among the laws that specifically require consultation are the Archeological Resources Protection Act (ARPA), Native American Graves Protection and Repatriation Act (NAGPRA), and the National Historic Preservation Act (NHPA)." On December 5, 2012, the Departments of Defense, Interior, Agriculture, and Energy, and the Advisory Council on Historic Preservation entered into a Memorandum of Understanding (MOU) Regarding Interagency Coordination and Collaboration for the Protection of Indian Sacred Sites to improve the protection of and tribal access to Indian sacred sites through enhanced and improved interdepartmental coordination and collaboration. The MOU is based on the requirements of Executive Order 13007, Indian Sacred Sites, and provisions of the National Historic Preservation Act.

The Bill would require the Secretary to prepare a management plan for Apache Leap. Further, the Federal lands to be exchanged (Oak Flat) hold significant cultural values to Indian Tribes. Although the Bill would require government-to-government consultation, any consultation would not be considered meaningful under Executive Order 13175, "Consultation and Coordination with Indian Tribal Governments", because the bill as introduced, limits the Secretary's discretion regarding the land exchange. The focus of the consultations would likely be the management of those areas over which the agency would have discretion, namely, the Federal land adjacent to the mine and Apache Leap.

For example, the Secretary would not have discretion over the conveyance or on-site management of the Oak Flat site, which under the legislation would be conveyed to Resolution Copper. The San Carlos Apache Tribe considers the Oak Flat area to be a sacred site. They have expressed concerns that block cave mining would cause subsidence that would impact the fundamental religious nature of the site. They have also expressed concerns regarding potential impacts on water quality. They have detailed in correspondence to Secretary Vilsack, the importance of traditional acorn gathering and religious ceremonies which still occur on this site. The Department has a responsibility to consider the Tribes' concerns and these can only be adequately addressed if a pre-exchange environmental analysis is the first step.

There is no doubt that the lands that would be acquired and managed by the U.S. Forest Service under H.R. 687 have important resource values that should be protected. It is also clear that the economic benefits from the production of copper could be significant in creating family wage jobs in tough economic times. However, it is important to more fully understand the scope of the project before proceeding and address potentially significant environmental concerns and sites of high importance to local Tribes. In addition to the concerns expressed in testimony, the Department would like to work with the Committee on a number of significant technical concerns.

This concludes my statement and I would be happy to answer any questions you may have.

61

Mr. LAMBORN. OK, thank you for your testimony and all three of you for being here. We will now have questions from the Committee. And I will start, and I will ask the first one to Ms. Connell.

Can you tell me how many acres are currently being explored, developed, or mined on BLM lands under a notice of intent or plan of operation?

Ms. CONNELL. We have plans of operations on more than 260,000 acres of public lands in the United States.

Mr. LAMBORN. OK. Thank you. That is exactly what I have. In fact, I have, when you combine those two categories together, approximately 260,000 acres. So our numbers correlate exactly.

Now, out of the 247 million acres of land that BLM manages, 260,000 is about $\frac{1}{10}$ of 1 percent, when you do the math. So, $\frac{1}{10}$ of 1 percent of the lands you actually manage are authorized for disturbance and it is not all disturbed today, it is just theoretically could go up to that amount for mineral exploration, development, or mining. I don't see a problem, when the mission of BLM is to allow for multiple uses of public lands, recreation, hunting, fishing, hiking, et cetera, et cetera, why $\frac{1}{10}$ of 1 percent for mining is overdoing it in any way, and is a cause for huge concern. Could you respond to that?

Ms. CONNELL. Certainly the Department of the Interior, the Bureau of Land Management has a multiple-use mission that includes mining. And we very much support mining development on public lands in the United States, subject to the public involvement requirements, the environmental protection requirements. It is definitely a part of our mission, and we look forward to working with the Committee on any issues related to that.

Mr. LAMBORN. So, what objection is there, for instance, in working more with other agencies, State and Federal agencies, as some of these bills call for?

Ms. CONNELL. We work very——

Mr. LAMBORN. And is your microphone on?

Ms. CONNELL. It is. You want me to—I will try and speak up.

Mr. LAMBORN. Sure, thank you.

Ms. CONNELL. We do not have a concern with working closely with other agencies. In fact, I have been a field manager in the BLM for more than 20 years before I became a State director. And some of our most successful efforts have occurred in working at the local level with local managers from other agencies. And I have seen that at the regional level, as well.

And so, the concerns that we have are not with the requirements for our organizations to work closely together.

Mr. LAMBORN. OK, thank you. I have a question now for Ms. Wagner. And Mr. Meinert, if you want to chime in at any point, feel free to do so.

Do you believe that understanding the mineral resource needs of the Nation and knowing where they are located should have an equal priority to things that are already in the budget for BLM for things like figuring out what surface changes might occur if climate gets warmer or colder?

Ms. WAGNER. I will defer to the Department of the Interior for that.

Mr. LAMBORN. Excuse me?

62

Ms. WAGNER. I would like to defer to the—excuse me. I would like to defer to the Department of the Interior for that question.

Mr. LAMBORN. Oh, I am sorry. I should have redirected that. Thank you for the clarification. Yes.

Ms. CONNELL. The question is regarding whether or not we should place priority on identifying where our particular minerals are. And certainly the Department of the Interior is interested very much in understanding the resources that we hold in trust for the American public. And I think that any way that we can gain better information to make better decisions is a good thing.

I would ask if my colleague from the USGS has comments on the ability to collect that information and the cost that might be associated.

Mr. MEINERT. The gist of your question is really a policy question about relative priorities, which, for the United States Geological Survey, I can't really get into, because we are a science agency.

But for the part of the question concerning the knowledge about mineral resources, that is a central part of our mission. It goes all the way back to the founding Organic Act that says that it is part of our job description to understand about the mineral resources of the United States. And we have a very high level of scientific expertise to bring to bear on those subjects, and that is something that we do on a continuing basis.

Mr. LAMBORN. Well, thank you. I like that answer, because this does get back to the original mission. And unfortunately, my figures show that zero dollars are being spent now in locating rare earth and critical mineral and strategic mineral resources, and what the obstacles are to using those, that is getting zero dollars. And yet there is $25 million going to climate change centers.

So, even though you say there is the mission to know where our resources are located, as two of these bills call for, you are allocating zero dollars to do that. Yet there is $25 million going for climate change centers. So I think that that first category, knowing where our resources are, is just as important. So I think——

Mr. MEINERT. I couldn't agree more.

Mr. LAMBORN [continuing]. We shouldn't have—excuse me?

Mr. MEINERT. About the importance of mineral resources. And we have many ongoing programs looking exactly at that question. So I don't think it would be true to say that there are zero resources being allocated to this. We, in fact, have many ongoing programs looking at mineral resources.

Mr. LAMBORN. Well, I am glad to hear that. But I am perplexed by the opposition to the legislation.

OK. I am at this point going to recognize Representative Holt for questions.

Dr. HOLT. Thank you, Mr. Chairman. I thank the witnesses. It is good to see you here. I appreciate your good work.

Ms. Connell, you indicated that public involvement in the review of mining proposals would be constrained under H.R. 761. You also testified that "public lands not only produce commodities, but also offer hunting, angling, and other recreational opportunities."

I am trying to understand. Do you think that H.R. 761 would adversely affect other uses of public lands, such as hunting, fishing, recreational shooting, and so forth?

63

Ms. CONNELL. Based on our review of the language of this bill, our concerns lie more with the language in the bill. Our concerns lie with our ability to conduct a timely version of the environmental review and public involvement. And so, we certainly support the development of rare earth elements and any critical minerals that exist on the public lands in the United States——

Dr. HOLT. Yes, we are talking—I am sorry, we are talking about H.R. 761.

Ms. CONNELL. H.R. 761, which is the Critical Minerals Production Act.

Dr. HOLT. Yes.

Ms. CONNELL. Right.

Dr. HOLT. OK, OK, I am sorry.

Ms. CONNELL. So that is what I was answering.

Dr. HOLT. I beg your pardon. OK.

Ms. CONNELL. OK.

Dr. HOLT. Please go ahead, then. Thank you.

Ms. CONNELL. But that is a concern that we have with this bill, is the way that the language isn't clear to us that it provides as much of an opportunity for public involvement as we would have liked to have seen.

Dr. HOLT. OK. Now, further on H.R. 761, do you agree that this bill has little to do with critical and strategic minerals, and would cover lots of other things? Perhaps even coal mining?

Ms. CONNELL. The language, when we reviewed it, it was unclear as to the definition of what "strategic" or "critical minerals" might be, and it could actually incorporate a large number of the mineral activities.

Dr. HOLT. OK.

Ms. CONNELL. And it was uncertain to us as to whether that was the intent of the bill or not.

Dr. HOLT. And probably would include gold and silver, as written?

Ms. CONNELL. All of the basic——

Dr. HOLT. OK.

Ms. CONNELL [continuing]. Basic minerals that were mined under the 1872 Mining Law, as amended.

Dr. HOLT. Let me turn to H.R. 957, Ms. Connell. The 2011 report by the Department said that royalty reduction for soda ash mining meant a loss of some hundreds of millions of dollars of revenue to the Government, which is five times the amount anticipated by Congress. The industry, those who use the soda ash, disputes these findings and the conclusion of the report.

So, I wanted to ask if you have met with the industry on this, if the Bureau or the Department has met with the industry, and if you can help me understand what the disagreement is, and how that would be resolved.

Ms. CONNELL. Well, certainly——

Dr. HOLT. Do you still stand by the report, for example?

Ms. CONNELL. The report that you are speaking of is the 2011 Report to Congress——

Dr. HOLT. Yes.

Ms. CONNELL [continuing]. That BLM was required to submit. Correct?

64

Dr. HOLT. Yes.

Ms. CONNELL. And that is accurate, that the numbers that were concluded in that report by the Department of the Interior and its partners were basically the data, when we compared that data with the information that came out from the industry's report, the data was very, very similar. It was the conclusions or the interpretations of that data where we found differences.

And, I apologize, I am not familiar with any meetings that have occurred between the BLM and industry, but we could certainly get that information to you on the record, if you would like us to do that.

Dr. HOLT. I would appreciate it if you would provide that to us.

And, well, in the three-quarters of a minute remaining, let me ask what might be a quick question, Ms. Wagner, on H.R. 687. What can you say in general terms about the impact on water for local communities in the area from these activities that would take place there?

Ms. WAGNER. For the mining operation, the question is still a bit outstanding. The company has not submitted a mine plan of operations, and with this proposed bill would not be required to do so until 3 years after the land exchange was codified. The lands would be in private ownership at that point in time, and be governed by the State of Arizona's provisions for private land——

Dr. HOLT. So we would not know in advance of voting on this bill, and maybe we should, do you think?

Ms. WAGNER. The absence of a provision for NEPA to explore the issues surrounding the land exchange, some of which might be impacts to the highest and best use of that land, in this case, perhaps mineral development, would not be known prior to the land exchange.

Dr. HOLT. Thank you.

Mr. LAMBORN. OK, thank you. Representative Gosar?

Dr. GOSAR. Thank you. Thank you, Ms. Wagner, and thank you for being so quick with your comments. That is a long day. I have a quick question for you, not just on the Administration, but a question came up in testimony last year that I want to clarify.

When the United States Forest Service does an appraisal, they use what they call the DOJ Yellow Book, or the DOJ's guidelines for appraisals, is that not correct?

Ms. WAGNER. We use the uniform appraisals standard guidebook.

Dr. GOSAR. So more specifically, the appraisal must comply with Section 254.9 of Title 36, Code of Federal Regulations and Nationally Recognized Appraisal Standards, which include the uniform appraisal standards for the Federal land acquisitions and the uniform standards of professional appraisal practice. Right?

Ms. WAGNER. Correct.

Dr. GOSAR. OK. Now, the Department of Justice guidelines for appraisals has been very carefully drafted, revised, and updated over many decades. It requires the appraiser to look at the actual facts that apply to a particular property, including associated mineral values.

Last year, some in the minority tried to make the case that my legislation requires some unusual appraisal process. I would like to point out that Section 4 of H.R. 687 specifically requires the same

65

appraisal standards that the agencies are required to use to determine fair market value. There is nothing unusual about it; it is a standard procedure.

When Resolution files its Mine Plan of Operation, then it will go through the NEPA process, and the public will have ample opportunity to provide comments, as guaranteed under the law. Is that not true?

Ms. WAGNER. The Mine Plan of Operations, as I understand the bill, Mr. Gosar, would be looking at the ancillary activities to the plan of operations outside of the private land. So, if the mine needed utility corridors, power corridors, roads, tailing, waste dump, ancillary facilities, that would be what the question on the Federal lands would be about.

Dr. GOSAR. I think that what you have is a full NEPA disclosure. There would be no shortcuts for the NEPA process in regards to the way this language is written.

Ms. WAGNER. On the private land, would they not be governed by the laws of Arizona for private land mineral development?

Dr. GOSAR. I mean, in fact, in some cases, Arizona is more stringent than the U.S. Code. Is it not?

Ms. WAGNER. So, to your point, what would govern the private land, should the land exchange go forward, would be the laws governing private lands in the State of Arizona.

Dr. GOSAR. And the full NEPA process is not subjugated or shortchanged.

Ms. WAGNER. If that is what is required in the State of Arizona.

Dr. GOSAR. That is exactly what is required here. So I wanted to make sure, because we had a witness prior that could not answer that question appropriately.

Ms. Connell, in your testimony you mention my bill doesn't touch on the disclosure of mineral reports. In Section 4(d)1 on page 6, language was inserted to ensure that the appraisal must comply with the requirements of Section 254.9 of Title 36, Code of Federal Regulations. Section 254.9 of Title 36, Code of Federal Regulations states, "Appraisals prepared for exchange purposes must contain the following minimum information: 11, copies of relevant written reports, studies, or summaries, conclusions prepared by others in association with the appraisal assignment, which were relied upon by the appraisal to estimate value, which may include, but is not limited to, current title reports, mineral reports, or timber crews, as prepared for qualified specialists."

Can you clarify why you don't believe we don't touch on mineral reports? Because our intention is full disclosure, and I believe the code we cite in the bill requires our full disclosure.

Ms. WAGNER. I am not an expert appraiser, obviously, but my understanding of the concern was that some of the information that might be needed to develop an appraisal would be not accessible to the Federal Government unless it were made available by a private entity.

Dr. GOSAR. And what part would that be?

Ms. WAGNER. The mineral quantities from the samples——

Dr. GOSAR. Now let me ask you a question. Isn't that part of the State jurisdiction and oversight? You don't trust the State?

Ms. WAGNER. I can't answer that question for you.

66

Dr. GOSAR. I mean we have kind of a funny thing about facts here, is that the State is very, very articulate about this. And once again, some of the State laws are much more onerous than the Federal laws.

What about Section 6 that specifies the Resolution Copper must report annually to the Federal Government and the State of Arizona if the total mine production ever exceeds appraisal production, estimates Resolution Copper must make an annual royalty-like adjustment payment to the United States on all excess productions? Would that also require mineral reports? Correct?

Ms. WAGNER. That is correct.

Dr. GOSAR. Yes. That is what I thought. So I have further questions, but we will start that under somebody else. Thank you.

Mr. LAMBORN. OK, thank you. We will now hear questions from Representative Grijalva.

Is your microphone on?

Mr. GRIJALVA. Sorry. The public interest requires a complete and full informed appraisal, equalization of values be performed prior to a congressional passage of this bill, not after. Do you see that as a public interest requirement or a requirement in the appraisal process as you see it, that the appraisal process be done prior to, rather than after the passage of the bill?

Ms. WAGNER. Is that question to me, Mr. Grijalva?

Mr. GRIJALVA. Yes.

Ms. WAGNER. The public interest determination that is usually done when a land exchange is considered is actually pre-NEPA. It actually looks at the qualities of the non-Federal parcels, the issues of the Federal parcels. It is not predicated on a appraisal of the lands, a complete appraisal of the lands. An estimate of values is done to determine a public interest.

Mr. GRIJALVA. And that is for both witnesses. Throughout his Administration, President Obama has been committed to enhancing the partnership with Native Nations and the Federal Government, very vocal about his support for a real consultation process, and a government-to-government relationship that has formality and process.

If this bill were to become law, will the Federal Government be able to meet its commitment, whether it is a memorandum of understanding your agency might have, or the initiative of the President, would you be able to meet that commitment to a meaningful consultation with Native Nations affected by this legislation?

Ms. WAGNER. The Department of Agriculture doesn't believe that meaningful consultation can occur without the NEPA process preceding the land exchange decision.

Mr. GRIJALVA. Resolution Copper's mining operation is going to require 20,000 acre-feet per year. That is their number. Apparently, the company says that it has been banking water, and has indicated it will use excess CAP water to support its mine operations.

Just so that I am clear, has Resolution Copper provided any analysis about any potential impact or any mitigation plan in place to protect the resource? The resource being ground water in the area, the resource being acid mine drainage into the ground water. And an analysis, is this 20,000 feet per year enough to support the

67

mining activities for the life of the mine? Have any of those been provided to you, the agency, or any that you know of?

Ms. WAGNER. The NEPA that has been conducted with the Forest Service and Resolution Copper has been on pre-feasibility exploration by the company on parcels adjacent——

Mr. GRIJALVA. NEPA question. And correct me. I just want to be clear, we keep going over this. NEPA is triggered if a Federal action is likely to have significant impact on human development. While numerical values of proposed action are relevant, the number of acres or megawatts, or whatever, there is no numerical cap or limit on NEPA application. The point is to determine environmental impacts and things like the number of acres involved cannot always answer the question.

This bill, I think, plainly waives NEPA with regard to the land exchange. The decision to trade Federal land, forest land, particularly land that was set aside during the Eisenhower Administration, and withdraw it from mining—to a mining company, a foreign-owned mining company, is likely to impact the human environment. NEPA would be required prior to the exchange, if this bill did not specifically waive that application. Right or wrong?

Ms. WAGNER. That is correct.

Mr. GRIJALVA. And just, I think, for the record, because we were talking about $1/10$ of 1 percent, Mr. Chairman, I am happy to announce that the Federal judge in Arizona threw out the case, the withdrawal of the 1 million acres around the Grand Canyon. And we can rest assured for a little while that beautiful icon will continue to be a beautiful icon. I yield back.

Mr. LAMBORN. We will now hear from Representative Cramer.

Mr. CRAMER. Thank you, Mr. Chairman and Ranking Member, and thank you to the witnesses. My, of course, interest is on my bill, H.R. 767, and all my questions will be for answering by Ms. Connell.

And, first of all, let me say, publicly thank you for your service and for being here. Having been an energy and environmental regulator for nearly 10 years in North Dakota, I always found the relationship between the State and your agency to be very professional and productive, and I appreciate that, which is why I think this makes so much sense, what we are talking about today.

You know, H.R. 676 simply just adds the word "Dakota," basically, to the Montana-Dakota State office, since that is our State office, and it wasn't originally part of the original bill in 2005, the Act in 2005. But this Pilot Project probably, in 2005, wasn't even envisioned to be as active as it is today. And so we want to include North Dakota as part of the streamlining Pilot Project.

Could you in the first few seconds or minute, describe what that Pilot Project is, exactly? What specifically helps streamline the permitting process? And is there any environmental compromising as a result of it?

Ms. CONNELL. The Energy Policy Act of 2005 identified 7 offices managed by the Bureau of Land Management that would receive funding which is acquired from rentals for public land leases across the Nation. And, as a result of that additional source of income, we were able to establish some teams that would be set aside in each of those various offices to focus on developing the oil and gas re-

68

sources in that area. At the time, the price of natural gas was very high, and so many of those offices are areas where we have natural gas activity.

North Dakota has boomed, the Bakken play there is a world-class, amazing oil resource for this country. And the Dickenson field office for the BLM has very much been trying to keep up with the activity. Should the Dickenson office be made a part of this pilot effort, we would be able to take advantage of utilizing extra resources from across the county in our ability to bring the oil reserves from the Bakken from the Federal lands and from Indian Trust estate to the surface and make it part of the oil resources available to the American public.

Mr. CRAMER. Exactly how does that happen? In other words, how is the streamlining—how does that happen? What do you do to streamline, if you——

Ms. CONNELL. Well, we streamline in some ways by bringing everyone close together: representatives who work for the Bureau of Indian Affairs, for the BLM, for the Fish and Wildlife Service. We are located very close together, and we have streamlined some of the processes at the local level, depending on what the issues are. We have actually been able to streamline some of the work that is done out in the field.

The number of environmental inspections has more than doubled, as well as the drilling and production inspections. And we also in the pilot office have been able to process more drilling permits with an equal amount of environmental oversight that we were before the implementation of the law.

Mr. CRAMER. Thank you. Now I want to get to your testimony where you have some suggestions for us. And I have been sort of thinking about it all morning. Realizing that this pilot project is due to expire at the end of 2015, so we are about 7.5 years into it, as I understand, and your suggestion is that perhaps we could, by giving BLM more flexibility, utilize the resources in places other than those original 7-plus North Dakota offices.

Do you have any concern that would dilute the intent of the pilot, or would we be better off, and I am really asking, I really don't know, or would we be better off sticking sort of to this mission, seeing how it goes, realizing you now have a world-class play right in the middle, surrounded by public and State activity, that we could do a real experiment, if you will, and gather real information, and then perhaps look at doing something larger down the road? And I am just honestly asking.

Ms. CONNELL. I think that broadening the effort across the Nation would help in a few other places that are having similar struggles to the Bakken area. I think you would still continue to see the focus of the pilot efforts in the highest density of drilling areas, North Dakota would and Eastern Montana would likely remain in the eye of that development activity for the foreseeable future.

Mr. CRAMER. All right. Thanks for the clarity. And again, thanks for the great job you do in protecting our resources. And I just look forward to continuing that same level of protection, while also providing opportunity for economic growth.

Thank you, Mr. Chairman.

69

Mr. LAMBORN. You are welcome. We will now hear questions from Representative DeFazio.

Mr. DEFAZIO. Thank you, Mr. Chairman. Mr. Chairman, I do have questions about H.R. 687 that I hope to get to. But I do, given the opportunity of having Deputy Chief Wagner here, there is something of immediate concern, which is I disagree strongly with the Office of Management and Budget that the safe and secure county rural schools funds are subject to sequestration, particularly since these were funds for Fiscal Year 2012, when sequestration did not exist.

We seem somehow to have lost that battle. We have been sequestered on the BLM funds. And now we are being told you are going to sequester the funds from the Forest Service. So my question is, since the money has been dispersed to the States and spent or programmed for education and public works roads purposes, where are you going to get that money? How are we going to do it? The only thing I can see that you might be able to do is to cut out Title 2 funds. And Title 2, of course, actually benefits the Forest Service, in terms of projects on Forest Lands, and employs people.

So, is that where we are headed? We are about to do this sequestration to the detriment of activities on the Forest Service lands and loss of jobs? Is that where we are headed?

Ms. WAGNER. We had the secure rural schools funding distributed as quickly as we could because it works for schools, for roads——

Mr. DEFAZIO. Right, right.

Ms. WAGNER [continuing]. For emergency protection and services. And last, Title 2 funds are investments in conservation projects.

It is unfortunate, but we find ourselves in a situation of having to have notified the States of the impacts of sequester, and that we are going to have to ask for a return of 5.5 percent of those funds back to Treasury. We have done that, and the only option as we see right now, because, as you said, those funds have been programmed to important investments at the county level, would be to consider using the Title 2 as offsets to return the 5.5 percent to treasury.

Mr. DEFAZIO. But what happens, not everybody gets a Title 2.

Ms. WAGNER. Exactly.

Mr. DEFAZIO. So you are going to take sort of doubly out of the States where they get Title 2 money, will be penalized more?

Ms. WAGNER. It is unfortunate we have to ask for that money back, but that is where we find ourselves.

Mr. DEFAZIO. This is extraordinary, and I just find this very, very hard to believe.

Back to a more general question about H.R. 687, for many years I have been involved in the fight over mining reform, and I did the royalty amendment back in 1994, when we passed a bill on mining reform. This seems to me a very unusual process by which we would, the taxpayers would, realize value from this unbelievably valuable asset. And I don't understand why we wouldn't just want to assess a straight-up royalty, which would be predictable both to the producer, and it would be predictable to or more predictable, to the government and benefit the taxpayers.

70

Have you reviewed this proposal on how we would get future revenues from the production of this asset, either—yes, OK.

Ms. WAGNER. Yes, Mr. DeFazio. The company would be, should the estimate of mineral value or quantity differ from what was assumed in the appraisal process, if the company actually produced more than what was estimated, there is a provision in this bill for an income capitalization approach to the taxpayers receiving some——

Mr. DEFAZIO. Is this something routinely used, income capitalization for this sort of an asset?

Ms. WAGNER. I am not aware of other——

Mr. DEFAZIO. So this would be a first impression. They get to deduct——

Ms. WAGNER. I am not aware of other——

Mr. DEFAZIO [continuing]. All of their estimated construction, operating, maintenance costs on an annual basis, from their production, and then that would come up with this theoretical appraised or annual value.

Ms. WAGNER. The appraisal actually would be done by somebody who has expertise in appraising properties that have mineral value. And they would use a cost sale comparison methodology. They might use the income capitalization approach. It is a multi-faceted approach to get——

Mr. DEFAZIO. Right. But why would we create a new and novel process for such an incredibly valuable asset? Why wouldn't we just say we want a royalty?

Ms. WAGNER. My understanding is that it is the vehicle to protect the interests of the public if the appraisal estimate of material removed from the mine didn't match up with the actual production of the mine.

Mr. DEFAZIO. Yes, but if we are doing a royalty on growth, that is very predictable, and there is no way to harm the public there.

Ms. WAGNER. We would be happy to work with the Committee on language that would work to achieve the public interest that I think that provision was intended to achieve.

Mr. DEFAZIO. I am not following that at all. Thank you, Mr. Chairman.

Mr. LAMBORN. OK, thank you. Representative Lummis.

Mrs. LUMMIS. Thank you, Mr. Chairman. I am going to concentrate my time on the soda ash bill. I appreciate Ms. Connell's remarks about how the data was very similar between the BLM and the industry, and the fact that it is how you interpret it that makes the difference.

And there is a reason that the interpretations that were drawn by the employer and employee groups that support this bill convinced both the gentleman from New Jersey and the gentleman from Oregon here present to support this bill in the last Congress. And the reason is that both the employer and employee organizations, industry and labor unions, are supporting this bill because they recognize what China is doing.

Soda ash is a natural product. And it is produced in the United States and shipped overseas, a large part of it. It is used to make glass and soda, baking soda, and laundry detergent, and things like that. It is a hard rock. China produces synthetic soda ash in great

71

quantities, and subsidizes it to the tune of $30 million annually. So, if we increase the royalty, which we have now allowed to occur on naturally occurring soda ash in the United States, we are charging $25 million more annually for soda ash, while the Chinese are subsidizing theirs to the tune of $30 million. And that just creates a lopsided competitive disadvantage for U.S. soda ash that costs jobs and costs production, costs our competitive edge around the globe. So, that is why this bill enjoys the support of both labor unions and industry.

Congress set a 2 percent royalty rate back in 2006. And during those following 5 years of the 2-percent royalty rate, U.S. soda ash manufacturers increased employment, increased production and exports, and increased the royalties paid to the Federal and State coffers, as compared to the previous 5 years. Now, that royalty rate of 2 percent was allowed to expire. It has gone up to 6 percent. And that is why labor unions and industry have joined forces on this bill to allow for more royalty dollars to be paid to the U.S. Government and the taxpayers of this country, by allowing our product to remain competitive globally against this Chinese synthetic product that is subsidized.

So, Mr. Chairman, I want to point that out and maybe conclude with this question for Ms. Connell. Isn't it true that during the years 2006 to 2011 the United States suffered a recession and unemployment levels were at double digits? But at the same time, when we had a lower royalty rate on soda ash, its employment base increased, the production increased, exports increased, and we actually collected more than the previous 5 years under a 6 percent royalty?

Ms. CONNELL. During the year that you are asking about would have been during the 5 years while the royalty rate was lower. Correct?

Mrs. LUMMIS. While the royalty rate was at 2 percent we enjoyed an increase in production and an increase in employment in the soda ash industry because our product was more competitive overseas, as compared to the Chinese synthetic product.

Ms. CONNELL. Certainly the soda ash industry in the United States has remained very competitive, worldwide. And from the information that I have been provided, it has remained competitive through 2012, despite the fact that we have had economic difficulties, as well as the increase in the royalty rate.

Mrs. LUMMIS. Well, it is not easy, once employment and contracts have been established globally under a 2-percent royalty rate, to immediately change those contracts. And isn't that the case? I mean some contracts to provide soda ash would run beyond the expiration of the 2-percent royalty rate, simply because the contract term runs beyond the expiration of the 2-percent royalty rate. Isn't that possible?

Ms. CONNELL. That could definitely be true.

Mrs. LUMMIS. Thank you, Mr. Chairman. My time is up and I yield back.

Mr. LAMBORN. Thank you. I want to thank the panel for being here today. Let me ask a couple of clarifications.

72

Mr. Meinert, you referred earlier to the fact that USGS was working on some projects to both search for and list critical and strategic minerals today. Could you supply me with that list?

Mr. MEINERT. To clarify, I stated that we have many projects researching mineral resources, including strategic minerals. And we would be happy, for the record, to provide you with further information about those projects.

Mr. LAMBORN. Please do so. Thank you for that offer. And to clarify something you said, Ms. Wagner, during your testimony, is it your position that NEPA should be complied with before land exchanges and conveyances take place?

Ms. WAGNER. That is the position of the Administration, yes.

Mr. LAMBORN. OK. I thought you would be interested to know that we passed a bill yesterday in this Committee, Full Committee, and it also passed the last Congress by unanimous consent. It is a bill by Representative Grijalva, H.R. 507, to convey land into a trust involving a golf course without NEPA being complied with.

Ms. WAGNER. It is certainly true that Congress has the authority to waive provisions of NEPA.

Mr. LAMBORN. OK. Thank you for that clarification, and thank you for being here. Members of the Committee may have questions for you to follow up, and we would ask that you respond to those questions, if they are submitted to you in writing. Thank you.

We will now go to our fourth and final panel. And I would like to invite forward the witnesses for this panel: Mr. Stephen Miller, Chairman of the Board of Supervisors of Pinal County District 3; Mr. Hal Quinn, President and CEO of the National Mining Association; Mr. Dan McGroarty, Principal and Director of American Resources Policy Network; Mr. Mike Hohn, General Manager of the Soda Ash Business of OCI Chemical Corporation; Mr. Terry Rambler, Chairman of San Carlos Apache Tribe; Mr. Pierre Neatby, Vice President of Sales and Marketing for Avalon Rare Metals; and Ms. Soyla Peralta, Council Member of the Superior Town Council.

Like all of our witnesses, your written testimony will appear in full in the hearing record, so I would ask that you keep your oral statements to 5 minutes. You have to turn on the microphone to be heard. The countdown begins at 5 minutes with a green light, turns to yellow after 4 minutes, and then turns red after 5 minutes.

Thank you all for being here. We look forward to your testimony, and we will start with Mr. Miller. Thank you for being here.

### STATEMENT OF STEPHEN Q. MILLER, CHAIRMAN OF THE BOARD OF SUPERVISORS, PINAL COUNTY DISTRICT 3

Mr. MILLER. Mr. Chairman and members of the Subcommittee, my name is Steve Miller, I serve as Chairman of the Pinal County Board of Supervisors. I appreciate the opportunity to testify before you——

Mr. LAMBORN. Are you speaking into the microphone?

Mr. MILLER. I believe I am. Is that better?

Mr. LAMBORN. OK. Make it a little closer. Yes, thank you.

Mr. MILLER. OK. I appreciate the opportunity to testify before you today and would like to personally thank Congressman Paul Gosar and Congresswoman Ann Kirkpatrick for working together

73

in a bipartisan manner to advance legislation which is important to the people of Arizona.

I must acknowledge my colleagues in the Pinal County Board of Supervisors, and especially Supervisor Pete Rios, who hoped to testify here today, but was not able to make it. I know that my complete testimony will appear in the record, so let me be brief and summarize my remarks. Then I will be pleased to answer any questions.

First, support for this bill is bipartisan and very strong. Support for this bill from a bipartisan Board of Supervisors is unanimous, and the vast majority of residents of Pinal County and all Arizona supports this mine.

Nowhere is the support stronger than the citizens of Superior. Fourth generation resident Mila Besich Lira spoke at the Board of Supervisors meeting and said, "Resolution Copper has been very generous and transparent with the people of Superior and the entire mining triangle." She credited Resolution for the exponential rise in the elementary school math scores and the success of the local schools in the competition with the schools throughout the Southwest.

Second, the bill and the proposed mine will be a net positive environment. The mine's operation being proposed by the Resolution Copper looks very different than the standard open pit mine. Based upon the county's long-standing working relationship with Resolution Copper, we believe this project is going to be one of the most environmentally-sensitive mines in the Nation, even the world. They have taken it upon themselves to reclaim an old mine in Superior decades before they were required to do so at the cost of $50 million.

One parcel in Pinal County that the Federal Government will receive is the 7B Ranch, 3,050 acres of ranch land, covers 7 miles of both sides of the San Pedro River. Resolution Copper has already put it under the management of Nature Conservancy. And in addition, stepped up to the plate, and at their own expense, have addressed the huge problem of illegal dumping on an otherwise pristine piece of property. Actions speak louder than words.

Third, this mine is just the kind of economic stimulus our county, our State and our Nation needs. The citizens of Pinal County need more high-quality paying jobs. Our unemployment rate is about 8 percent. The unemployment rate on the Indian Reservation is more than triple that number. The Resolution Copper project will put over 1,400 people in excellent jobs, direct jobs, as a result of passage of this legislation. It will create thousands more indirect jobs, combine these jobs, have the potential of creating more than $60 billion of economic benefit over the life of the mine.

This project also benefits the public sector beyond the lands the U.S. Government will receive. The mine will yield more than $16 billion in new revenues to the Federal Government. Last I checked, you could use a few billion here.

Back in Arizona, in the State, county, and local governments, they will receive another $2 billion in revenue. Every day that passes without this legislation, we lose out on all these economic benefits. As an elected official, my responsibility is to improve the quality of life for the constituents. I came here today to urge you

74

to join me and the citizens of Pinal County to support the land exchange. I ask that you pass H.R. 687 immediately. The residents of Pinal County and the State of Arizona are looking to you for action.

Mr. Chairman, thank you for the honor of appearing here today, and I look forward to answering any questions.

[The prepared statement of Mr. Miller follows:]

PREPARED STATEMENT OF CHAIRMAN STEPHEN Q. MILLER, PINAL COUNTY
BOARD OF SUPERVISORS, DISTRICT 3, ON H.R. 687

Mr. Chairman and Members of the Subcommittee:

My name is Steve Miller. I serve as the Chairman of the Pinal County Board of Supervisors. I appreciate the opportunity to testify before you today, and would like to personally thank Congressman Paul Gosar for inviting me to testify. I would also like to thank Congresswoman Ann Kirkpatrick for her leadership on the issue before us today.

I was born in Arizona and have lived in Pinal County for almost 42 years. During that time, I've been through a lot of ups and downs in our community. As a husband, father, and grandfather, economic and community issues drove me to get involved in public and community service. Sure, I had my livelihood as a builder and truss manufacturer to consider, but I have always known people are what matter and few issues today are as important to the people of this County as this legislation and the jobs that will be created by the development of the Resolution Copper Mine.

I am fortunate to serve with some great leaders and I must acknowledge my colleagues on the Pinal County Board of Supervisors, especially Supervisor Pete Rios. Pete also hoped to testify here today, but could not be here. He has been an ardent supporter of the Resolution Copper Mining project from the days when he served in the Arizona State Senate to now.

The Pinal County Board of Supervisors, made up of Republicans and Democrats, just unanimously passed a resolution supporting H.R. 687. The vast majority of residents of Pinal County support this land exchange and this mine. Nowhere is support stronger than with the citizens of Superior, Arizona where polling shows support of the mine exceeds 80 percent. Strong words of support were spoken at our Board meeting by Superiorites like fourth generation resident Mila Besich Lira who stated that Resolution Copper has been very generous and transparent with people in Superior and the entire mining triangle. She credited Resolution's support of local schools for the exponential rise in elementary school math scores and the success local Superior schools have had in competitions with schools throughout the Southwest.

Let me tell you a little about Pinal County. We are right in the middle of the State between Arizona's two largest counties—Maricopa to the north and Pima to the south. Like many of the counties in Arizona, we have a large geographic footprint—just a little larger than Connecticut. Our population has exploded from 60,000 in 1965 to more than 375,000. We need high quality, good paying jobs for our citizens today and into the future. Passage of this bill will help create those jobs.

Pinal County is not only large, but also diverse. The western part of the County, which I represent, is mostly low desert where irrigated farming has dominated over the years. The eastern part of the County is mountainous with elevations as high as 6,000 feet. It is home to what we've called the "copper triangle"—an area known for its long history as a copper mining region.

While I may be new to the Board of Supervisors, I'm not new to Pinal County and I'm very familiar with this legislation and the proposed mine. Mr. Chairman and Members, you need to understand the mining operation being proposed by Resolution Copper looks very different than the standard open pit mine. Based upon the County's long-standing working relationship with Resolution Copper, we believe this project is going to be one of the most environmentally-sensitive mines in the Nation . . . even the world. On behalf of our citizens, the Board will hold Resolution to the highest standard of environmental stewardship; and based on their actions so far, it is clear to me they intend to hold themselves to the same standard.

Let me explain what I see as evidence of Resolution Copper's commitment to the environment. First, the legislation being considered today is the result of extensive consultation between Resolution Copper, Federal agencies, and various non-governmental organizations like The Nature Conservancy and the Audubon Society to find

75

the best lands to exchange for the Oak Flat Campground. The Federal Government is the overwhelming beneficiary of this lands package. For example, one parcel in Pinal County the Federal Government would receive through passage of this bill is known as the 7B Ranch—3,050 acres of ranch land that covers 7 miles on both sides of the San Pedro River. Resolution Copper has already put it under the management of the Nature Conservancy, and has additionally stepped up to the plate and, at its own expense, addressed the huge problem of illegal dumping on this otherwise pristine piece of property. Actions speak louder than words. Resolution Copper set a high standard for others to follow.

Resolution Copper's actions also speak loudly in Superior, Arizona. It took over the nearly century-old Magma Mine site in Superior, which required an extensive environmental cleanup. Resolution Copper was not obligated to complete cleanup for decades, but decided to begin the $50 million reclamation. Today, that cleanup is over 70 percent complete. These actions will ensure a safer, cleaner and healthier environment for the residents of Superior. Resolution Copper knows what it takes to be a good corporate citizen and a good community partner. They are helping improve Superior schools, send high school graduates to college, make it possible for younger kids to play little league on a field with grass, provide funding for community programs such as Superior's signature event, Apache Leap Mining Festival, and provide much needed support for the fire and police departments. They understand that Superior is their home and the home to many of their current and future employees.

Let me say something more about economic growth. The citizens of Pinal County need more high-quality, good paying jobs. Our unemployment rate is about 8 percent. The unemployment rate on our Indian reservations is more than triple that number. The Resolution Copper project will put over 1,400 people into excellent jobs—direct jobs as a result of the passage of this legislation. It will create thousands more indirect jobs. Combined, these jobs have the potential to create more than $60 billion in economic benefit over the life of the mine.

This project also benefits the public sector beyond the lands the U.S. Government will receive. The mine will yield more than $16 billion in new revenue to the Federal Government. Last I checked, you could use a few billion dollars. Back in Arizona, the State, county and local governments stand to receive another $2 billion in revenues. It has been said by many others, far better than I can say it, but this bill is a true stimulus bill that doesn't cost taxpayers one dime. By the way, dimes are currently made with 91 percent copper.

As an elected official, my responsibility is to improve the quality of life for my constituents. I came here today to urge you to join me, and the citizens of Pinal County, in support of this land exchange. I ask you to pass H.R. 687 immediately. The residents of Pinal County and the State of Arizona are looking to you for action.

Mr. Chairman, thank you for the honor of appearing before your subcommittee. I look forward to answering any questions the Subcommittee may have.

QUESTION SUBMITTED FOR THE RECORD TO STEPHEN Q. MILLER

QUESTION SUBMITTED FOR THE RECORD BY THE HONORABLE. GRACE F. NAPOLITANO

*Question.* Is it the normal process for the county to give the mining business to companies outside the United States, in this case to the UK and Australia? Why not seek U.S. owned companies to build U.S. investments in our companies?

Answer. Pinal County is a firm believer in the free-enterprise system, a system that today thrives within a global economy. As such, the county does not dictate company ownership or where a mining company may choose to stake claims and invest its capital to develop a mine. The practice of isolationism in this country in the past was not found to be practical or profitable for the nation.

Pinal County did not choose the mining company and direct them to make an investment here. Resolution Copper, a subsidiary of Rio Tinto, explored this site and has determined that the ore body in Superior, Arizona is one of the *10 largest ore bodies in the world.* The company has made multimillion dollar investments in exploring high-tech ways to extract the ore that sends the fewest number of miners underground. The company will be able to mine this ore through the extensive use of robotics and skilled workers.

The jobs created at the mine will be American jobs, pulling a global commodity from American soil to make the sorts of products that power this Nation—from motors to cell phones, to the piping that runs through our homes.

Pinal County seeks to provide opportunity for any company that wants to make investments in our county which will generate wealth and provide economic growth

76

and opportunity for our citizens. Pinal County enjoys the presence of a number of foreign companies which have created a tremendous number of jobs.

Some of those companies are:

| | | |
|---|---|---|
| Hexcel Composites | Abbott Nutrition | Phoenix Mart |
| ACO Polymers | ASARCO Groupo | Bright International |

It strikes me that this project presents the single biggest opportunity for Congress to show America that it is serious about creating jobs, spurring a healthy economy, producing a commodity that is in global demand and reducing our dependence on foreign sources of raw materials.

———

Dr. GOSAR [presiding]. Thank you, Mr. Miller.

Now I would like to have Mr. Quinn for 5 minutes.

## STATEMENT OF HAL QUINN, PRESIDENT AND CEO, NATIONAL MINING ASSOCIATION

Mr. QUINN. Thank you, Mr. Chairman, members of the Committee. I appreciate the invitation to testify today on H.R. 761. And I also want to thank you all for your continued efforts in trying to find and advance enabling public policies that will positively affect our mineral supply chain here in the United States.

Let me begin maybe with a little global context to frame out not only H.R. 761, but also a number of the other pieces of legislation on minerals that you are considering today. Today about three-quarters of all the economic growth globally comes from emerging economies. And some estimate at this rate, by 2050, 80 percent of the entire global GDP will be allocated to what is today the emerging nations and economies.

Now, these trends are often compared to the Industrial Revolution, but their pace and scope today are simply unprecedented. Consider that in the space of 25 years the GDP of China grew by a factor of 10, took the better part of 70 years for Britain's GDP to grow by a factor of 4 after 1830. And while the Industrial Revolution was a story of about perhaps 100 million people, the story unfolding before us today that we are witnessing really involves billions of people and for the foreseeable future.

And I say the foreseeable future, because the developing nations have per capita consumption rates of energy and commodities that are still just a fraction of the developed world.

So resource competition will be fierce over the next 20 years. Demand for minerals will soar, and stable and reliable supplies will become increasingly difficult to sustain. Here in the United States, our share of global exploration investments is less than half the levels attracted 20 years ago. At the same time, our dependence upon foreign sources of key minerals has doubled. Today domestic minerals supply less than half the needs of all U.S. manufacturing.

Now, these trends are not due to the lack of mineral resources. In fact, in the United States we are blessed with a world-class mineral resource base. Unfortunately, we are cursed with a third-world permitting system, one that is cumbersome, duplicative, and unpredictable. Now, finding minerals in developing mines requires substantial investments, hundreds of millions and even billions of dollars. As a consequence, regulatory certainty is a highly valued commodity. Lengthy delays and permit reviews compromise the commercial viability of projects by increasing costs, reducing the net

77

present value of those projects, and impairing financing arrangements.

So, the efficiency and predictability of the permitting process matters in decisions where to invest. The choice can be very stark. Invest in countries that provide a predictable pathway for receiving permits within 2 to 3 years, or here in the United States, where it may take three to five times longer.

Now, let me be clear. Valid concerns about environmental protection should be fully considered and addressed. At the same time, they should not serve as an excuse to trap mining projects in a limbo of duplicative, unpredictable, and endless review without a decision point. We should not confuse the length of the process with the rigor of the review. Countries like Canada and Australia, which share our same core principles of responsible resource development, have demonstrated that permit views and decisions can be both thorough and timely. They understand that we are in a global competition for mining investment, and that an effective and efficient permitting process provides a competitive advantage.

H.R. 761 provides a big step for the United States to catch up in this race for investments in minerals. The bill reflects best practices for coordination among State and Federal agencies, clarifies responsibilities, minimizes duplication, sets goals and timeframes, and, frankly, brings just more accountability to the process.

H.R. 761 provides the opportunity to establish a permitting system that prepares us for the challenges of the new global reality, one that will allow our manufacturing, technology, and other industries to compete with the world's fastest-growing economies.

Thank you very much for the opportunity to testify today.

[The prepared statement of Mr. Quinn follows:]

PREPARED STATEMENT OF HAL QUINN, PRESIDENT AND CEO, NATIONAL MINING ASSOCIATION, ON H.R. 761

Good morning. I am Hal Quinn, President and Chief Executive Officer of the National Mining Association (NMA). NMA is the national trade association representing the producers of most of the Nation's coal, metals, industrial and agricultural minerals; manufacturers of mining and mineral processing machinery, equipment and supplies; and engineering and consulting firms, financial institutions and other firms serving U.S. mining.

Today I am testifying in support of H.R. 761, the National Strategic and Critical Minerals Production Act of 2013. I want to thank Representative Amodei for reintroducing this very important legislation. It enjoys bi-partisan support and addresses a key issue for the country's future economic growth and manufacturing revival: the painfully slow permitting process for the mines that supply metals and minerals essential for our basic industries, our national defense and the consumer products we use. I also want to thank the subcommittee, especially Congressman Lamborn, for the leadership and persistence in raising the visibility of a growing problem—the availability and security of mineral supplies critical to innovation, manufacturing, national security and our economic growth.

**U.S. Mining's Contribution to Society**

Mining's contributions to our economy and society are significant. The value added by major industries that consume the $77 billion of minerals produced in the United States was an estimated $2.4 trillion in 2012, or 15 percent of our GDP. Mining's direct and indirect economic contribution includes nearly 2 million jobs with wage and benefits well above the State average for the industrial sector. In addition, domestic mining generated $50 billion in tax payments to Federal, State and local governments.

In addition to these economic contributions, U.S. metals mining's commitment to employee safety and health has led to continuing improvements in our performance and includes the introduction of our CORESafety® initiative last year, which relies

78

on a systems approach to eliminate fatalities and reduce the injury rate at U.S. mines by 50 percent within 5 years. We also developed last year a systems approach to environmental management at hardrock mines with a special emphasis on practices to assist smaller operations with improvements in environmental outcomes.

**U.S. Mining's Potential**

Mining's potential is even greater than its current performance. The United States has an immense and enviable mineral endowment waiting to be tapped. For example, Resolution Copper's world class copper deposit represents one of the largest undeveloped copper resources in the world and is anticipated to have a 50 year mine life that will support over 3,700 jobs annually.

Overall, when viewed through the lens of resource potential, the United States is underperforming, a fact that will have increasing consequences as global demand for minerals becomes more competitive due to the demands of developing economies, where millions are being propelled into a rising global middle class. Last week, the United Nations Development Program released a report that examines the profound shift in global dynamics driven by the fast-rising new powers of the developing world.

The report, *The Rise of the South: Human Progress in a Diverse World,* includes in its classification of "the South" nations in the Southern Hemisphere as well as China and India. The report emphasizes the shift is occurring not just in large middle-income developing nations such as Brazil, Argentina, India and China, but also in more than 40 other up-and-coming countries that in recent decades have made astonishing gains in what's called human development. As one of the report's authors noted, "The Industrial Revolution was a story of perhaps a hundred million people, but this is a story about billions of people."

Clearly demand for minerals will continue to grow, fueled by these fast growing economies. Growing demand presents opportunities and challenges for both U.S. mining and the Nation. These trends point to enormous growth and job-creation opportunities if U.S. mining is allowed to perform to its potential. If we do not and become increasingly marginalized, the consequences are severe for our Nation's global competitiveness, forcing us to become more reliant upon extended and unstable supply chains for what we can produce here.

**Permitting Poses a Major Obstacle**

So while the United States has one of the world's greatest mineral repositories, our ability to get these minerals into the supply chain to help meet more of America's needs is threatened. A major obstacle to the U.S.' reaching its potential is the length of time consumed in obtaining permits to mine in the United States. Authorities ranging from the National Academy of Sciences to the Departments of Energy and Defense to international mining consulting firms have identified permitting delays as among the most significant risks and impediments to mining projects in the United States.[1]

The United States has one of the longest permitting processes in the world for mining projects. In fact, the length, complexity and uncertainty of the permitting process are the primary reasons investors give for not investing is U.S. minerals mining. In the United States, necessary government authorizations now take approximately 7 to 10 years to secure, placing the United States at a competitive disadvantage and forcing our economy to become increasingly reliant on foreign producers for minerals we can produce domestically. Our dependence on foreign minerals has doubled in the past 20 years.

Despite the Nation's rich mineral endowment, our flawed permitting system significantly impedes the ability to attract investment to our shores. In 1993, the United States attracted 20 percent of worldwide exploration investment dollars. Today, our share has eroded to just 8 percent. The percentage of global exploration spending the United States attracts is critically important since exploration spending is a leading indicator of where future development capital will be deployed.

**The Permitting Scheme Harms U.S. Manufacturing**

More than the future of domestic mining is at risk from our cumbersome and inefficient permitting scheme. Today, less than half of the mineral needs of U.S. manufacturing are met from domestically mined minerals, a trend that has been building for nearly 30 years and will only worsen unless we reform the permitting process

---

[1] *See* National Resources Council, *Hardrock Mining on Federal Lands,* National Academy Press (1999); U.S. Department of Energy, *Critical Materials Strategy* (Dec. 2010); U.S. Geological Survey USGS, *the Principal Rare Earth Elements Deposits of the United States—A Summary of Domestic Deposits and a Global Perspective,* (2010); Behre Dolbear, *Where Not to Invest* (2012).

79

responsible for it. Our broken permitting process also slows creation of high-wage jobs supported by mineral mining.

As the recent Rand Corporation study, *Critical Materials: Present Danger to U.S. Manufacturing,* warns:

> While the United States has extensive mineral resources and is a leading materials producer, a high percentage of many materials critical to U.S. manufacturing are imported, sometimes from a country that has the dominant share of a material's global production and export. In this situation, U.S. manufacturers are vulnerable to export restrictions that limit their access to these materials and that can result in two-tier pricing, under which domestic manufacturers in the producing country have access to materials at lower prices than those charged for exports, thereby hindering the international competitiveness of U.S. manufacturers and creating pressure to move manufacturing away from the United States and into the producing country. (p. ix)

The Rand Study also notes a potential ripple effect on U.S. innovation:

> The U.S. science and technology base that support manufactured products was built on and depends upon the presence of U.S. manufacturers producing these products from raw and semi-finished materials. Prolonged disruption in the supply of raw and semi-finished materials required by these manufacturers could put the science and technology base in jeopardy, which would further reduce U.S. innovation capability and competiveness in the development of new, higher-performance products. (p.1)

To ease mineral supply constraints on U.S. manufacturers, the study indicates the most effective action that can be taken would be to encourage diversified production, i.e., the operation of mines in several different countries. This diversification should include the United States and would be accomplished by encouraging domestic production of the resources needed for the manufacturing supply chain through modernization of our permitting structure.

**The Solution is a Modern Permitting Process**

Similar to the bill passed overwhelmingly by the U.S. House of Representatives in the 112th Congress, H.R. 761 carefully addresses the deficiencies of our outdated and underperforming permitting system. Without changing environmental and other protections afforded by current laws and regulations, it provides for efficient, timely and thorough permit reviews and incorporates best practices for coordination between State and Federal agencies.

As an example, Canada is a global mining leader that continues to take advantage of its efficient permitting system, large pool of junior explorers and exploration-focused tax incentives to attract 16 percent of all global exploration dollars in 2012. Canada maintains an expedient, approximately 2-year, permitting timeline by implementing a flexible system that seeks to minimize duplication, uncertainty and delays. Canada recognizes mining is a key economic driver. A recent Conference Board of Canada report, *The Future of Mining in Canada's North,* anticipates the country's overall metal and non-metallic mineral production will grow by 91 percent from 2011 to 2020. Canada recognizes long-term global demand for commodities is increasing and is positioning itself to take advantage of this opportunity and provide minerals for both domestic and global use.

Further, many of the approaches contained in H.R. 761 are comparable to those recently praised by the Government Accountability Office as significantly improving the permitting process for wind and solar renewable energy projects on Federal lands. The GAO report, *Renewable Energy: Agencies Have Taken Steps Aimed at Improving the Permitting Process for Development on Federal Lands,* found that wind and solar permitting times at the Bureau of Land Management were reduced from 4 years for applications filed in 2006 to 1.5 years for applications filed in 2009. Ironically, the same agency that permits these alternative energy projects cannot streamline the permitting process for mining projects that supply minerals essential for building renewable energy infrastructure and technology.

**Conclusion**

Using our country's minerals responsibly and efficiently must be a bi-partisan priority for strengthening our manufacturing base and the jobs it provides. NMA urges Congress to pass H.R. 761 to provide a more predictable regulatory environment, one that will attract additional investments and allow U.S. mining to build on our positive contribution to the U.S. economy and host communities. The legislation will bring the United States in line with our competitors for minerals exploration and

80

development investments—countries such as Australia and Canada that have already modernized their permitting regime. The permitting efficiencies set forth in H.R. 761 will allow the United States to unlock its full potential. Thank you for the opportunity to testify today.

———

Dr. GOSAR. Thank you, Mr. Quinn. Mr. McGroarty—hopefully I said that right.

Mr. MCGROARTY. You did, thank you. Am I being heard? All right.

### STATEMENT OF DAN MCGROARTY, PRINCIPAL AND DIRECTOR, AMERICAN RESOURCES POLICY NETWORK

Mr. MCGROARTY. Thanks to the Committee for the opportunity to testify today. I am Dan McGroarty, President of American Resources Policy Network, a nonprofit think tank and experts organization dedicated to informing the public and the ongoing policy debate on the importance of developing U.S. minerals and metals resources, and reducing America's dangerous dependency on foreign sources of supply. I am also an officer and director of U.S. Rare Earths, developing rare earths properties in three States, with the aim of adding to domestic supply of these metals that are so critical to our high-tech and green-tech sectors, as well as our advanced military weapons systems.

The subject before the Subcommittee this morning is key to so many of the pressing policy issues before the Congress today, whether it is restoring America's manufacturing prowess or supporting our high-tech sector and our green-tech transition. And, of course, as the last portion of the title today suggests, securing America.

As a significant first step toward aligning our public policy with the goals of strengthening our resource sector, I want to focus on one of the bills before this Committee and this Congress, H.R. 1063, the National Strategic and Critical Minerals Policy Act of 2013, introduced by Chairman Lamborn. As the bill notes—and I quote—"The United States has vast mineral resources, but is becoming increasingly dependent on foreign sources." The bill buttresses this statement. With data on the degree to which the United States is 100 percent foreign-dependent on certain metals and minerals, 18 at present, triple the number 25 years ago.

Last year, when my organization did a risk screen for metals used in defense applications, we derived a risk pyramid with 46 metals on it, China being the single largest provider. But when we looked at known resources in the United States, we found that the U.S. is home to 40 of the 46 metals and minerals on our risk pyramid. In other words, if we are foreign-dependent for a wide range of hard rock resources, it is a dependency that is largely self-inflicted.

The Lamborn bill takes three steps that would help the United States formulate a targeted policy to reduce and, in the case of many metals, eventually eliminate our foreign dependence.

First, via Section 4, the bill strengthens our assessment capability. We can't begin to reduce our resource dependence if we lack current and comprehensive data on the depth of that dependence. Because in a world of resource nationalism, foreign dependence for

81

critical metals can be used as leverage, commercial, but also strategic, that can induce economic shock to the American system.

The second key section in the Lamborn legislation is eliminating needless duplication in the mine permitting process, a process that today, in the leading independent study, earns the United States the worst in the world ranking, tied for last with Papua New Guinea, with an average mine permitting process in the United States taking 7 to 10 years. And this metric is getting worse, not better.

Just 4 years ago in 2009, the same study found the U.S. process took an average of 5 to 7 years. Little wonder why. One day the DOD releases a study showing 23 metals and minerals in potential shortfall, and the DOE declares a dozen minerals critical to green-tech and clean energy transition, but at the very same time the U.S. EPA moves to stop a proposed American copper mine, a metal whose short supply DOD tells us has already caused a significant weapons system delay, before the permitting process has even begun.

With so many mixed signals coming from the Federal Government, let's ask ourselves if you were an American manufacturer, dependent on metals and minerals engineered into your products, could you risk waiting for a reliable source of American supply? Or would you build your new facility where the metals are? In China perhaps, exporting jobs and intellectual property, sacrificing GDP, and feeding a negative balance of trade as we buy back products that could have been, that should have been, made here in America? We need to recognize that Made in America often begins with Mined in America. And the Lamborn bill puts us back on that track.

The final feature in H.R. 1063 that I would like to focus on today is the call for a national mineral assessment updated at 2-year intervals. Critical metals are technology-dependent. As technology evolves over time, so too will our tool kit of critical metals. In Roman times sodium chloride, salt, was a critical mineral essential to preserving food for armies on the march. In our Moore's Law world, as technology cycles are measured in months, not years, we must constantly update our understanding of what metals and minerals deserve to be called critical.

The Lamborn bill is a solid test of our seriousness on this issue. If enacted, it would provide the fact base for a data-driven assessment of the obstacles that stand between us and a greater degree of resource independence. Thank you.

[The prepared statement of Mr. McGroarty follows:]

PREPARED STATEMENT OF DANIEL MCGROARTY, PRESIDENT, AMERICAN RESOURCES POLICY NETWORK, ON H.R. 1063

Chairman Lamborn, my thanks to you and your colleagues on the House Subcommittee on Energy and Mineral Resources for the opportunity to testify today. I am Daniel McGroarty, President of the American Resource Policy Network, a non-profit think tank and experts organization dedicated to informing the public—and the ongoing policy debate—on the importance of developing U.S. mineral and metals resources—and reducing America's dangerous dependency on foreign sources of supply.

I am also an officer and director of U.S. Rare Earths, a publicly-held company currently developing Rare Earths properties in three States, with the aim of adding to the domestic supply of metals critical to our high-tech and green-tech sectors, as well as the U.S. military's advanced defense systems. The subject before this subcommittee this morning—America's Mineral Resources: Creating Mining & Manu-

82

facturing Jobs and Securing America—is critical to so many of the pressing policy issues before the Congress today, whether it's the restoration of American manufacturing prowess, or restoring our economy to sustainable growth, or supporting our high-tech sector and our green-tech transition—and of course, as the last portion of our title today suggests: "Securing America."

As a significant first step toward aligning our public policy with the goal of strengthening our resource sector, I want to focus on one of the bills before this Committee and this Congress: H.R. 1063, the "National Strategic and Critical Minerals Policy Act of 2013," introduced by Chairman Lamborn.

As the bill notes—and I quote—"the United States has vast mineral resources but is becoming increasingly dependent on foreign sources." The bill buttresses this statement with data on the degree to which the United States is 100 percent foreign-dependent on certain metals and minerals—18 at present—up from 6—25 years ago. Last year, when my organization, American Resources, did a risk screen for metals and minerals used in defense applications, we derived a "risk pyramid," with 46 metals on it—with China being the single largest supplier. But as we looked further at known resources located in the United States, we found that the United States is home to resources for 40 of the 46 metals and minerals on our risk pyramid.



In other words, if we are foreign-dependent for a wide range of hard rock resources, it is a dependency that is largely self-inflicted.

As I see it, the Lamborn bill takes three steps that would help the United States formulate a targeted policy to reduce—and in the case of many metals, eventually eliminate—our foreign dependence.

First—via Section 4—the bill strengthens our assessment capability. We can't begin to systematically address our resource dependence if we lack current, comprehensive data on the depth of that dependence. And that assessment, in turn, requires solid data on the extent to which potential resources might be found on Federal lands—including lands withdrawn from mineral exploration and development—as well as the uses to which various metals are put across our economy and in our defense sector—and finally, a review of our current foreign suppliers, with an assessment of the likelihood of shortfalls or supply disruptions. Because in a world of resource nationalism, foreign dependence for critical metals can be used as leverage—commercial, but also military—that can induce economic shock to the American system.

And yet even before the U.S. Government begins collecting data, the agencies involved must begin by sorting through a half-dozen conflicting definitions of critical

83

and strategic metals—one so tight that it produced a single strategic metal to the exclusion of all others—and some so vague that the entire Periodic Table might be eligible for inclusion.

The second key section in the Lamborn legislation concerns eliminating needless duplication in the mine permitting process—a process that today, in the leading independent study, earns the United States worst-in-the-world ranking, tied for last with Papua New Guinea, with the average mine permitting process in the United States taking 7–10 years. And this metric is getting worse, not better: Just 4 years ago, in 2009, the same study found the U.S. process took an average of 5 to 7 years.

And little wonder why. One day, the DOD releases a study showing 23 metals and minerals in potential shortfall, while the DOE declares a dozen minerals critical to the green-tech and clean-energy transition. But at the very same time the U.S. EPA moves to stop a proposed American copper mine—a metal whose short supply, DOD tells us, has already caused "a significant weapon system production delay"—before the permitting process has even begun.

So with so many mixed signals coming from the Federal Government, let's ask ourselves: If you were an American manufacturer, dependent on metals and minerals engineered into your products, could you risk waiting for a reliable source of American supply? Or would you build your new facility where the metals are—in China, perhaps—exporting jobs and Intellectual Property, sacrificing GDP and feeding a negative balance of trade as we buy back products that could have been, should have been, made here in America?

Mr. Chairman, we need to recognize that Made in America often begins with Mined in America. The Lamborn bill puts us back on that track.

The third feature in H.R. 1063 that I want to mention today is the requirement for a National Mineral Assessment, updated at 2-year intervals. Critical metals are technology-dependent; and as technology evolves over time, so too will our tool-kit of critical metals. In Roman times, sodium chloride—salt—was a critical mineral, essential to preserving food for armies on the move. In Adam Smith's time, he classed gunpowder and sailcloth as critical materials, and the father of free-market theory warned Britain against being dependent on foreign sources of supply. In our Moore's Law world, as technology cycles are measured in months, not years, we will need to constantly update our understanding of what metals and minerals deserve to be called critical.

The Lamborn bill is a solid test of our seriousness on this issue. If enacted, it would provide the fact-base for a data-driven assessment of our domestic resource potential, our vulnerability to foreign supply, and the obstacles that stand between us and a greater degree of resource independence.

I commend the Chairman for his leadership on the critical issue of critical metals, and for the Committee's focus today on the various bills that are the focus of this hearing. America has the good fortune to be a resource-rich nation. Sound policy can help ensure that our resources will be used to support our economic strength and our national security—and reduce the dangers of resource dependence in our uncertain world.

Thank you.

———

Mr. LAMBORN [presiding]. Well, thank you for your excellent, excellent testimony.

[Laughter.]

Mr. LAMBORN. I would like to now hear from Mr. Hohn, please.

## STATEMENT OF MIKE HOHN, GENERAL MANAGER, SODA ASH BUSINESS OCI CHEMICAL CORPORATION

Mr. HOHN. Chairman Lamborn and members of the Committee, my name is Mike Hohn, and I am the General Manager of Soda Ash Business for OCI Chemical Corporation. I am here today on behalf of the U.S. Soda Ash industry, and I thank you for the opportunity to testify on this vital legislation for our industry.

The U.S. soda ash industry contributes some $1 billion net positive to the U.S. balance of trade annually, and is the single largest inorganic chemical export from the United States. Soda ash is produced by one of two methods: the natural method used in the

84

United States; and through synthetic processes elsewhere in the world, and primarily in China.

The cleaner, natural method only accounts for 25 percent of the global soda ash production. The American Soda Ash Competitiveness Act will lead to the growth of jobs at U.S. soda ash facilities, the growth of jobs in the transportation sector that supports the U.S. industry, and the growth of jobs at the ports that support growing exports, including the ports in Portland, Oregon; Long Beach, California; and Port Arthur, Texas.

During the recent economic downturn, when a similar royalty reduction was in place, the U.S. soda ash facilities experienced the addition of about 100 jobs in the United States. Now, while that may not seems significant, it certainly beats the 1,000-plus jobs that the industry lost in the period from 1996 to 2006, when the royalty rate was 6 percent, which is the current Federal royalty rate.

It should be noted that these are high-paying jobs in a very rural community, with an average wage roughly six times higher than the U.S. minimum wage. We have already witnessed significant market downturn over the last year that is similar to what the industry was facing in the late 1990s, and we do not want to risk a full-blown return to those conditions.

OCI is one of 4 companies that produce about 90 percent of the world's natural soda ash in Sweetwater County, Wyoming. The remainder is produced in Trona, California. U.S. soda ash producers, on average, emit about three times less greenhouse gas emissions and three times less energy consumed than the synthetic soda ash plants in the rest of the world. Export growth is essential to job growth in the U.S. soda ash industry. One of every two jobs in the U.S. soda ash is directly attributable to exports.

Therefore, policies which help to grow exports will mean a growth in U.S. jobs. We believe the Soda Ash Competitiveness Act will accelerate this job growth. Exports increased by some 11.7 percent in the period during which the 2 percent royalty was in effect, 2006 to 2011. U.S. soda ash exports also rose by more than 1 million tons in the same period. Thus, the 2 percent rate resulted in the sort of jobs and export growth consistent with the President's national export initiative.

Now, during that period, the U.S. soda ash industry increased investment in the local community and U.S. soda ash facilities through increased capital investments, which led to increased economic activity in the communities in which we operate.

In our current environment, we believe that U.S. soda ash jobs are at risk to Chinese expansion, export, and pricing practices. Chinese soda ash production is now the largest in the world, and they are currently engaged in a price war for valuable export business in Asia, Africa, and South America. In the decade of the 1990s, China went from importing over 1 million tons of soda ash per year to becoming a 1 million-ton net exporter. By 2000, China had become the world's largest producer of soda ash, though not the most efficient. Maintaining our competitiveness is important, as we compete with state-owned Chinese producers.

Mr. Chairman, we hear a lot of discussion about how Congress can help U.S. manufacturing to restore jobs and economic growth,

85

i.e. to recapture our economic swagger. As an industry, we were encouraged by the President's State of the Union Address when he referenced climate change and the need to do something. He also indicated he wants to increase job growth through exports. The U.S. soda ash industry provides a unique opportunity to accomplish both of these goals. Our industry has proven that it will increase jobs by increasing exports.

And by increasing the U.S. industry's market share, we will also be reducing greenhouse gases. Because the U.S. soda ash industry uses a natural method of producing soda ash, the U.S. industry uses roughly, again, three times less energy and emits three times less greenhouse gases than our Chinese competitors relying on synthetic method for production.

Make no mistake. Throughout history, soda ash is required to produce glass, for autos, homes, and bottles, containers, as well as detergents and chemicals that are demanded by an emerging middle class. The demand for soda ash will be met in some way. This Committee has the opportunity to reduce global greenhouse gases and increase jobs by investing in the U.S. soda ash industry.

We would suggest the bill before you has already proved successful in doing so for one important sector of our economy. We believe the 2 percent rate should be reinstated.

Thank you for your consideration of our views. I would be pleased to take any questions from the Committee.

[The prepared statement of Mr. Hohn follows:]

PREPARED STATEMENT OF MIKE HOHN, GENERAL MANAGER, SODA ASH BUSINESS
OCI CHEMICAL CORPORATION, ON H.R. 957

Chairman Lamborn and Ranking Member Holt, I would like to thank you for the opportunity to testify on H.R. 957, the "American Soda Ash Competitiveness Act." I am the General Manager, Soda Ash Business for OCI Chemical Corporation, and I am here today on behalf of the U.S. Soda Ash industry. I am pleased to report that the soda ash mined and processed on Federal lands contributes nearly $1 billion annually to our balance of trade, $20 million in Federal royalties, and some 3,000 direct jobs.

Up until October of 2011 when the BLM raised our royalty from 2 percent to 6 percent, our industry was experiencing job growth, and there were plans for expansion, despite the economy still suffering from the worst recession in decades. Enactment of H.R. 957 is important to insuring that we remain a strong American employer and exporter in the years ahead. It means the industry will continue to pay our fair share for the privilege of mining on Federal lands, while creating the conditions for positive economic growth that are in all of our best interests.

From the recent experience of the 2006 Soda Ash Royalty Reduction Act, we know that a 2 percent, as opposed to 6 percent Federal royalty rate, can have positive impacts:

- First, it will lead to robust export growth consistent with the President's National Export Initiative (NEI).
- Second, it will lead to expanded domestic manufacturing capacity and jobs growth; and
- Third, it will result in an increase, rather than a decrease, in Federal royalty revenues by spurring development of the resource.

Mr. Chairman, the 2006 act was enacted by Congress out of a recognition that global economic conditions, specifically the emergence of stiff Chinese competition, was eroding America's natural soda ash advantage. We need to continue the positive trajectory that Act created for this important domestic manufacturing sector by enacting H.R. 957.

Indeed, our continued competitiveness in world markets is far from certain, in fact over the last year since the royalty increase has been in effect, the industry has seen a steady decline in our total exports. This reality was well recognized by Congress in 2006, when it enacted the Soda Ash Royalty Relief Act, which reestablished

86

a 2 percent royalty on every ton of soda ash produced. In October 2011, the BLM saw fit to raise the rate to 6 percent. We believe this rate increase is not only counterproductive to increasing Federal revenues from soda ash production, but threatens our industry's exports and jobs growth.

Let me briefly revisit the global conditions that caused Congress to set the rate at 2 percent in 2006. In the 15 years between 1982 and 1997, our domestic soda ash industry enjoyed a steady and significant growth in exports. But after 1997, our export growth slowed dramatically. By 2003, our U.S. exports were only 4 percent above their 1997 levels. This rapid decline in export growth resulted from a sudden and dramatic change in global competition. In the brief span of the decade of the 1990s, China went from importing over 1 million tons of soda ash per year to becoming a 2 million ton net exporter. By 2000, China had become the world's largest producer of soda ash, though hardly the most efficient. A growing number of state owned Chinese producers making soda ash from a more energy intensive and more greenhouse gas generating synthetic process flooded international markets with lower priced material aided by an export VAT rebate incentive. Not only were these exports responsible for a greater carbon footprint, they were also hurting our cleaner, more efficient American natural soda ash producers in growing markets, particularly those in Asia and South America.

Faced with this state owned competition, we identified innovative ways to reduce spiraling structural costs, and the increasing prices we paid for energy and transportation. However, as our export growth slowed in the early part of the last decade we also had to reduce employment. To remain globally competitive, we regrettably shed almost 1,000 jobs as an industry. Mr. Chairman, this was not a preferred option. It was in this context that we decided to ask the Congress to consider that the royalty we pay on each ton of soda ash be assessed at 2 percent as called for originally in the underlying Minerals Leasing Act.

Mr. Chairman, in 2006, just as today, our low cost natural soda ash production process when allowed to compete fairly on a level playing field can beat any other producer in the world. In sum, then as now, if conditions are equal, we know we can compete with any other global producer. We can mine the vast underground trona ore reserves in Wyoming or in lakebeds in California, and bring this raw material to be processed into soda ash. We can then ship it by rail to Long Beach, California, Portland Oregon, or Port Arthur, Texas, and deliver it to any Asian or South American port and effectively compete for our fair share of global business against the Chinese.

Mr. Chairman, as a result of the action Congress took in 2006, our industry came out of its downward spiral and experienced sustained growth driven by our ability to again grow exports. Despite a global recession and a continuing slow recovery, the American Natural Soda Ash industry did not lose jobs during the recent recession, and in fact added almost 100 new jobs in 2010. To put this in perspective, one out of every two jobs in our U.S. soda ash industry is now the direct result of exports. U.S. soda ash exports had risen by more than 1 million tons since enactment of the soda ash royalty legislation. As Mr. Robert Abbey, former Director Bureau of Land Management, stated in his Senate testimony on August 3, 2011, exports increased by some 11.7 percent in the 5-year period during which the 2006 Act was in place. It thus puzzled us as to why the BLM saw fit to immediately reinstate the 6 percent rate when the 2006 Act expired in October.

Very simply, the 2006 Act allowed us to grow exports in large part because we could reinvest in our business at higher rates. During the 5 years this Act was in effect, we reinvested in our businesses at rates well above those before its passage. In 2005, the year before the royalty was enacted; the U.S. soda ash industry spent some $88 million in capital improvements. In 2006, the year after passage, and with the predictability of a stable 2 percent royalty, the U.S. soda ash industry nearly doubled its rate of investment in our future, spending over $158 million dollars to expand capacity and make needed improvements.

However, Mr. Chairman since the BLM reinstated the 6 percent royalty, the industry is headed towards a bleaker future similar to the circumstances in place in the early 2000s. Across the industry, jobs are going unfilled, planned expansions are being put on hold, and our exports have fallen off significantly. While the BLM had indicated that they would entertain individual lease-by-lease application for waivers of their 6 percent royalty, nothing in their 100-page guidance document addresses export growth. When we attempted as an industry last year to submit a streamlined application for relief that was based upon maximization of production on Federal lands, we were denied. We would be pleased to make our application available to the Committee for its review.

Thus, Mr. Chairman, we again turn to Congress to restore the 2 percent royalty rate by enacting H.R. 957. In sum, soda ash production represents hardcore U.S.

87

manufacturing at its best. We hear every day how American manufacturing jobs are disappearing and we have a shrinking middle class. The production of soda ash from U.S. natural resources in Wyoming and California is done by skilled workers with an average salary of about $85,000 per year in very small, rural communities. Growing U.S. soda ash exports will increase the number of those jobs. Moreover, it will help grow revenues at Treasury. When the Congressional Budget Office (CBO) produced cost estimates for legislation implementing the 2006 royalty reduction, it concluded that the Government would lose $15 million in direct spending and $15 million in payments to States in which the royalties were generated. In actuality, over the 5-year period, royalties tallied over $85 million because of the increased production the royalty reduction helped to generate.

Mr. Chairman, we hear a lot of discussion about how Congress can help U.S. manufacturing to restore jobs and economic growth; i.e., to recapture our economic swagger. As an industry, we were encouraged by the President's State of the Union address when he referenced climate change and the need to do something. He also indicated he wants to increase job growth through exports. The U.S. Soda Ash industry provides a unique opportunity to accomplish both of these goals. Our industry has proven that it will increase jobs by increasing exports, and by increasing the U.S. industry's market share we will also be reducing greenhouse gases. Because the U.S. soda ash industry uses a natural method of producing soda ash, the U.S. industry uses roughly three times less energy and emits three times less greenhouse gases than our Chinese competitors relying on the synthetic method for production. Make no mistake, throughout history; soda ash has been produced to supply the glass (glass for autos, homes and bottles) as well as detergents and chemicals that are required by emerging markets to grow. The demand for soda ash will be met in some way. This Committee has the opportunity to reduce global greenhouse gases and increase jobs by supporting the U.S. Soda Ash industry. We would suggest the bill before you has already proved successful in doing so for one important sector of our economy. We believe the 2 percent rate should be reinstated. Thank you for your consideration of our views. I would be pleased to take any questions from the Committee.

———

Dr. GOSAR [presiding]. Thank you very, very much.

Now, Mr. Neatby.

## STATEMENT OF PIERRE NEATBY, VICE PRESIDENT, SALES AND MARKETING, AVALON RARE METALS

Mr. NEATBY. Thank you very much, Mr. Chairman. My name is Pierre Neatby, and I am Vice President of Sales and Marketing for Avalon Rare Metals, Inc. I will briefly describe Avalon and then provide some comments in support of bill H.R. 981.

Avalon Rare Metals is a Canadian-headquartered mineral development company publicly traded in New York and Toronto. Our flagship project is the Nechalacho Rare Earth Deposit at Thor Lake, Northwest Territories, Canada, that contains 25 percent heavy rare earths, which are the truly rare rare earths, and our project plan is to mine and do initial processing in the Northwest Territories and further refine the rare earths in Geismar, Louisiana, in the United States.

H.R. 981 proposes to fund a study of current and future rare earth deposits and an analysis of the rare earth supply chain. I believe the focus of the bill should be on the analysis of the supply chain. There are hundreds of deposits that have been identified around the world. But the biggest issue facing our industry is the processing of rare earths and the production of downstream products that can be used as inputs into final products.

Why are rare earths important? They are important for jobs and economic growth. They play a vital role in a multitude of applications, many in the clean energy sector. These includes motors for electric and hybrid vehicles, generators for wind turbines, solar

88

panel systems, and phosphors for energy-efficient lighting. We believe the next few years will be critical for the development of the clean energy sector.

I have highlighted clean energy applications of rare earth, but other very significant end-use applications include smart phones, oil refining catalysts, MRI machines, and various military uses that are also growing.

Rare earth demand is expected to grow at a rate of 7 to 12 percent per year to the year 2020. This demand needs a secure supply chain outside China, if the demand is going to grow outside China, and specifically to determine if the new jobs stemming from this growth are going to be here in the United States and other western countries, or in China.

So, China produces over 95 percent of the world's rare earth elements, and China has recently been implementing a range of policies to control its domestic rare earth industry: consolidation of ownership, restriction of foreign ownership, export taxes, export quotas, environmental regulations, limiting illegal mining, and price controls. The outcome of these policies has been the ability to restrict exports and increase prices outside China. China limited exports in 2010, and this caused prices to increase dramatically in 2011. China is in a better position today to restrict exports and manipulate prices outside China than it was in 2010.

The supply chain includes mining, processing, separation, metal and alloy production, and manufacturing of products sold to end users. We would like to add recycling and the human resource aspect to the supply chain. Recycling makes the supply chain more efficient and less costly to the end user. This is important for competitiveness. Human resources are the people that bring know-how to the supply chain: geologists, engineers, technicians, operators, and researchers.

Growth can't take place if there is no expertise in the processing and use of rare earths. This is where universities, colleges, and government can take a key role in our industry, possibly in conjunction with an industry association, such as the new Rare Earth Technology Alliance, right here in Washington. China has hundreds and hundreds of scientists dedicated to rare earths, and have rare earth courses in universities. If North America is going to develop its rare earth infrastructure, it needs educated people specializing in rare earths.

In conclusion, many growth industries depend on rare earths, and China will continue to be the dominant supplier, not only in mining, but also in processing and manufacturing of final products. China wants the downstream for manufacturing, because that is where the jobs are. We need action now to stem the flow of jobs going to China. Thank you very much.

[The prepared statement of Mr. Neatby follows:]

PREPARED STATEMENT OF PIERRE NEATBY, VICE PRESIDENT FOR SALES AND MARKETING, AVALON RARE METALS INC., ON H.R. 1063, H.R. 761, AND H.R. 981

Avalon Rare Metals Inc. is Canadian headquartered mineral development company, publicly traded in Toronto and New York, with a primary focus on the rare metals and minerals in North America. Americans comprise a high proportion of our current shareholders.

89

Our flagship project, the 100-percent-owned Nechalacho Rare Earth Element Deposit, Thor Lake, Northwest Territories, Canada is one of the largest undeveloped rare earth elements resources in the world. Its exceptional enrichment in the more valuable Heavy Rare Earth Elements (HREEs) is key to enabling advances in clean energy technologies, national defense and other growing high-tech applications. Nechalacho is one of the few potential sources of these critical elements outside of China, currently the source of over 95 percent of the world supply.

Avalon is well funded to complete its Feasibility Study (expected in Q2 2013) and has no debt. Our project includes a mine and processing facility in the Northwest Territories of Canada and plans for a refinery in Geismar, Louisiana. This project will cost over $1.2 billion to build. It is one of very few projects outside China to be at the final Feasibility stage, the last stage before full project financing is secured and construction begins.

Avalon also explores for and owns other rare metals and minerals project in Canada and the United States, of which two are at advanced stages of development: Separation Rapids (lithium) in Ontario, and East Kemptville, Nova Scotia, a tin-indium-gallium-germanium project where large inferred resources have been identified requiring further drilling to bring the project to the pre-feasibility stage.

Avalon is proud to be a charter member of the Rare Earths Technology Alliance (RETA), a Washington, DC-based international industry association (non-lobbyist) whose membership includes producers and users of rare earths and also includes academic institutions engaged in rare earths research and development. RETA's primary goal is to promote the development of the rare earth industry through education, market development and dealing with common issues facing the industry. It is in that spirit of education and insight into this emerging industry, in recognition of the U.S.-Canada trade relationship, and in support of clean technologies and their contribution to future growth economies that we appear before the committee today to support the RARE Act of 2013.

**Rare Earths—Jobs and Economic Growth**

According to the Industrial Minerals Corporation of Australia (IMCOA), an Australian-based authority on the rare earth market, rare earth demand is expected to grow at a rate of 7–12 percent per year to 2020. Rare earths are used in a multitude of applications, many in the clean energy sector. These include electric and hybrid vehicles, wind turbines, solar panels, and energy-efficient lighting. The next few years will be crucial to the clean energy sector as it develops. Rare earth magnets and phosphors are key building blocks for companies developing these technologies and they need access to a competitive and secure rare earth supply chain to prosper.

Other end use applications include smart phones, oil refining catalysts, MRI machines, other medical diagnostics and treatments, and various military applications. Demand outside China is expected to grow from 35,000 tonnes in 2012 to 55,000 tonnes in 2016. This increase in demand assumes that export quotas from China will remain around 30,000 tonnes and that no new export restrictions on rare earths are imposed so that rare earth consuming industries outside China will be allowed to grow.

**China's Dominance—Threat to Jobs in the U.S. and North America.**

Today, China produces over 95 percent of the world's rare earth elements, even as new sources are being developed in other countries, including the United States, Canada, and Australia. However, China has been implementing a range of policies to control its domestic rare earth industry: reducing the number of companies involved in the extraction and processing of rare earths, imposing limits on foreign ownership in the rare earth sector, imposing export taxes, export quotas, curbing illegal mining, implementing and enforcing strict environmental regulations, and attempting to set prices. The outcome of these policies is reduced availability of rare earths outside China, higher prices and potentially greater price volatility outside China and the threat of further export restrictions, which ultimately create the potential for severe supply shortages. While we currently see relatively low rare earth prices, our interest is that when they spike again, the United States and North America should not be impacted as much as we have been. Industry experts believe export restrictions, specifically on the scarce heavy rare earths, are likely in the coming years. Western companies are essentially being forced to set up manufacturing inside China, which puts at risk their intellectual property and eliminates jobs in countries like the United States. This is troublesome not only for Avalon, but other companies along the supply chain and should remain a major security concern for western governments.

90

## The Importance of the Secure Supply Chain

Avalon is pleased to see the introduction of the RARE Act of 2013 with its focus on conducting global census of the identity and availability of rare earths elements and an analysis of the supply chain. We believe that the results of this proposed undertaking will better inform industry participants and end-users on how all parties can work collaboratively to offset actions by a single monopolistic supplier (i.e., China) that can disrupt pricing, availability, and security of supply. Given the wide variety of applications of rare earths in many critical sectors such as clean energy, defense and national security, we believe this type of assessment and analysis is more important than ever before.

I believe that the U.S. Geological Service (USGS) and U.S.-based experts like Technology Metal Research (TMR), have endeavored to identify the hundreds of potential rare earth deposits outside China. (For example TMR currently tracks the development of over 440 projects in 37 countries and closely follows some 46 projects it defines as 'advanced' in 14 countries). These projects will generally only produce mixed concentrates or possibly separated rare earth oxides, with very few projects pursuing the further value-added processing of such into phosphors, metals, alloys, magnets or motors which are essentially the products that consumers need. China's strategy has been to fulfill the needs of the full downstream processing supply chain and end products, generating more profits and, more importantly, creating more high skilled labor and greater job opportunities in China.

One suggested addition to H.R. 981 is to include recycling and human resources to the discussion about fulfilling the rare earth supply chain. Recycling is the key to an efficient use of resources in the rare earth supply chain to achieve low cost manufacturing. A diverse range of people (e.g. geologists; metallurgical, chemical, process engineers and technicians; business people, operators, researchers) are required to establish, maintain and improve a supply chain outside China.

It is not enough to establish mines and processing plants outside China. End consumers want reliable, long term, price competitive supply chains. Currently, some companies are specifying inferior solutions for certain applications due to fears of high prices or fear of lack of availability of neodymium and dysprosium (e.g. substituting ferrite and other magnets where rare earth magnets increase performance). This strategy is highly detrimental to longer term business and domestic economic development. Using less efficient inputs (such as ferrite magnets rather than rare earth magnets) in certain applications could lead to loss of competitiveness and replacement by most probably foreign-based suppliers, that can build more efficient products using superior raw materials.

The supply chain analysis that H.R. 981 would provide will help government and industry determine where the most sensitive and cost effective investment should take place and highlight the importance of investment at all levels of the supply chain to be able to effectively offer a secure alternative to China.

## Corporate Social Responsibility

Social responsibility and environmental stewardship are corporate cornerstones for Avalon. Avalon believes that environmental, economic and social responsibility are integral to the upstream and downstream activities used to create these critical materials; from exploration and development to production. In 2010, Avalon was recognized by the Prospectors and Developers Association of Canada with its award for Environmental & Social Responsibility. Avalon is also one of only a very few junior resource companies in the world to have published a comprehensive Sustainability Report, prepared to the Global Reporting Initiative standard, in which Avalon fully discloses its policies and practices on social and environmental responsibility, including its performance against specific targets.

## Permitting

The permitting and environmental assessment process is different across the world, and is dependent upon the national and local jurisdictions in which the deposit and or operating facilities are to be established. Avalon's Nechalacho deposit is located in the Northwest Territories and is regulated under the Mackenzie Valley Resource Management Act. Avalon is nearing completion of the Environmental Assessment for the project, a critical step in the permitting process, and has already established strong community relationships with local Aboriginal groups where Avalon is considered an industry leader in best practice. In Geismar, Louisiana Avalon has an option on a property where permitting for a separation plant was initiated in December 2012 and is expected to be completed by the end of 2013.

———

Dr. GOSAR. Thank you very much.

91

Our next witness is Chairman Terry Rambler.

### STATEMENT OF TERRY RAMBLER, CHAIRMAN, SAN CARLOS APACHE TRIBE

Mr. RAMBLER. Can you hear me? OK. Good morning, Chairman Lamborn, Ranking Member Holt, and members of the Subcommittee. My name is Terry Rambler, I am the Chairman of the San Carlos Apache Tribe, and President of the Inter-Tribal Council of Arizona. On behalf of my Tribe and ITCA, thank you for this opportunity to testify.

Joining me today are San Carlos Apache Councilman Windsor Nosy, Sr., tribal leaders, local elected officials from communities directly impacted by this bill, and representatives from different organizations throughout the country. I would like for all of them to stand. Thank you. This group is diverse and growing. And it also includes Tribes and tribal organizations nationwide. We bring our united front in strong opposition to H.R. 687.

We strongly oppose this bill and the land transfer it mandates for three reasons: one, it will destroy our sacred areas; two, it will deplete and contaminate the region's already overdrawn water supply; and three, it is a bad deal for the American taxpayer. H.R. 687 would transfer 2,422 acres of our sacred land, known as Oak Flat in the Tonto National Forest, to Resolution Copper to develop a massive copper mine. Oak Flat is one of our holy places, where spiritual deities reside. Just as a church is a place of worship to Christians and the Vatican is a holy place to Catholics, Oak Flat is the equivalent for Apaches, Yavapais, and others. My people have always gone to Oak Flat to pray, to gather ceremonial items, to seek peace, and to conduct ceremonial dances of our ancestors, such as the sunrise dance that celebrates a young woman coming of age. You can see some of those.

I have a map here that shows the Oak Flat in relation to our Reservation. As you can see, the forest borders our Reservation, and Oak Flat is just 15 miles away. These lands are our aboriginal homelands. I have a second map here that shows Oak Flat and the forest outlined in red. The black outline shows land withdrawn from mining by President Eisenhower's public land order, which protected this area. Federal laws and policies require meaningful consultation with Tribes before Federal action. However, once Oak Flat is held in private ownership, as this bill directs, these Federal protections will disappear and the sacred area will be destroyed without our input.

Resolution Copper plans to use the block cave method to extract the copper ore body underneath Oak Flat because it is far cheaper than other methods. However, the process is also more destructive to the land. The diagram here depicts the block cave mining process. The company would dig a tunnel 7,000 feet down and then dig a horizontal tunnel to extract 1 cubic mile of ore. It will take 1,400 Cowboy Stadiums to hold 1 cubic mile of ore. The next diagram shows what happens next. The surface will eventually collapse, and the area will become an open pit about 2 miles in diameter. Like a crater, the pit will be visible from outer space.

Our second major concern is the loss of water in the region, and our water rights. One of the primary purposes for establishing the

92

Tonto National Forest in 1905 was to protect the watersheds and the quality of the water. H.R. 687 undermines these purposes because this project will require at least 20,000 acre-feet of water annually to keep the mine from flooding. To put that in perspective, that amounts to the annual life water supply for 180,000 Arizona citizens. According to a recent study, this massive groundwater pumping would be unsustainable, harmful to the region's water supply, and threatens surface water resources and riparian habitats.

Here is a picture of a perennial spring at Oak Flat. Mining here will contaminate and dry up this spring and other water resources at Oak Flat. Here is another picture of the Oak Flat area, an ancient oak tree that has nourished us for centuries with its acorns. It takes a century to produce the first acorn from these trees. These trees will be destroyed when the land collapses.

My final point is that at a time when all Americans are being asked to tighten our belts, this bill will result in a giveaway of American wealth to a foreign-owned mining company. The appraisal requirements included in H.R. 687 do not insure that the public will receive fair value. As a result, the American taxpayer stands to receive only a small fraction of what the Federal minerals are worth.

In closing, the Federal Government should continue to be stewards of this land to sustain the well-being of my people. Our people dance and pray at Oak Flat, just as our ancestors did. I ask for your help to ensure that our children and theirs will be able to do the same, well into the future.

Again, thank you for this opportunity. [Speaks in Apache.] What I said to you was, "May God watch over you and give you guidance." Thank you.

[The prepared statement of Mr. Rambler follows:]

PREPARED STATEMENT OF TERRY RAMBLER, CHAIRMAN, SAN CARLOS APACHE TRIBE, ON H.R. 687

My name is Terry Rambler. I am the Chairman of the San Carlos Apache Tribe ("Tribe"), representing 15,000 tribal members. The San Carlos Apache Reservation ("Reservation") is located within part of our aboriginal territory, and spans 1.8 million acres in southeastern Arizona. I am also President of the Inter Tribal Council of Arizona ("ITCA"), a non-profit organization representing 20 federally recognized Indian tribes. Thank you for the opportunity to testify about our views on H.R. 687, the Southeast Arizona Land Exchange and Conservation Act of 2013. On behalf of the San Carlos Apache Tribe and ITCA, we strongly oppose H.R. 687 and respectfully urge Members of the Subcommittee to oppose this bill for the reasons set forth below.

### Summary of Objections to H.R. 687

H.R. 687 would direct the Secretary of Agriculture to convey 2,422 acres of U.S. Forest Service lands in an area called Oak Flat and the copper ore body underneath it into the private ownership of Resolution Copper Mining, LLC ("Resolution Copper" or "Resolution")—a subsidiary of foreign mining giants Rio Tinto (United Kingdom) and BHP Billiton, Ltd. (Australia) for block cave mining. The bill would require this transfer of the Oak Flat area to Resolution Copper within *1* year of enactment.

In the decade since this project has been in development, Resolution Copper has consistently refused to provide details regarding the environmental and economic impacts of the project to the local community and region. H.R. 687 would give the Oak Flat area to Resolution Copper for a bare fraction of its actual value. Once the land is privatized under H.R. 687, Federal laws and policies that currently protect the area and tribal rights would no longer apply.

93

As details about the impacts of H.R. 687 have emerged, public opposition has grown and is diverse. Joining us today are local officials representing the Town of Superior and the Queen Valley Homeowner's Association. In addition, the City of Globe recently tabled its support for this project. These communities located near the Oak Flat area have either expressed opposition to H.R. 687 or serious concerns about it. Further, many tribes and tribal organizations nationwide oppose the bill because it would transfer Federal land encompassing a known tribal sacred area to a mining company whose mining activities will ultimately destroy the area and circumvent government-to-government consultation requirements with Indian tribes. Tribal organizations opposing this bill include the National Congress of American Indians, the Inter Tribal Council of Nevada, the United South and Eastern Tribes, Midwest Alliance of Sovereign Tribes, the Great Plains Tribal Chairman's Association, the Affiliated Tribes of Northwest Indians, the Eight Northern Pueblos Council, the All Indian Pueblo Council, and many other tribes and tribal organizations. Other groups that oppose this bill include the Association of Retired Miners, the Arizona Mining Reform Coalition, the Sierra Club, the Audubon Society, and others.

Our opposition to H.R. 687 is based upon the following points: (1) the bill would desecrate and destroy an area of religious and sacred significance to the Apache and Yavapai people, which conflicts with Federal laws and policies governing meaningful consultation with Indian tribes and protection and preservation of sacred sites; (2) the bill mandates, in direct violation of NEPA, the transfer of the Oak Flat area to Resolution Copper without first informing the public about the adverse impacts on the quality and quantity of the region's precious water supply, the environment, and the potential health and safety risks to the public; and (3) the bill constitutes a multi-billion dollar giveaway to a foreign-owned mining company that is partnering with the country of Iran on a uranium mine in Namibia. Simply put, the American public cannot afford this deal.

**H.R. 687 Would Result in Desecration and Destruction of a Native American Religious and Sacred Site**

The 2,422 acres of lands to be conveyed pursuant to H.R. 687 are located in the Tonto National Forest and include the 740 acres of the Oak Flat Withdrawal where the Oak Flat Campground is located and the surrounding area (collectively referred to as the "Oak Flat area"). The San Carlos Apache Reservation is bordered on the west by the Tonto National Forest. The Oak Flat area is 15 miles from our Reservation. The Forest and the Oak Flat area are part of our and other Western Apaches' aboriginal lands and it has always played an essential role in the Apache religion, traditions, and culture. In the late 1800s, the U.S. Army forcibly removed Apaches from our lands, including the Oak Flat area, to the San Carlos Apache Reservation. We were made prisoners of war there until the early 1900s. Our people lived, prayed, and died in the Oak Flat area. At least eight Apache Clans and two Western Apache Bands document their history in the area. Since time immemorial, Apache religious ceremonies and traditional practices have been held at Oak Flat. Article 11 of the Apache Treaty of 1852, requires the United States to "so legislate and act to secure the permanent prosperity and happiness" of the Apache people. Clearly, H.R. 687 fails to live up to this promise. The Oak Flat area, as well as other nearby locations, are eligible for inclusion in, and protection under, the National Historic Preservation Act of 1966, as well as many other laws, Executive orders and policies.

Today, the Oak Flat area continues to play a vital role in Apache ceremonies, religion, tradition, and culture. In Apache, the Oak Flat area is *Chich'il Bildagoteel* (a "Flat with Acorn Trees"). The Oak Flat area is a place filled with power—a place where Apaches today go for prayer, to conduct ceremonial dances such as the sunrise dance that celebrates a young woman's coming of age, to gather medicines and ceremonial items, and to seek and obtain peace and personal cleansing. The Oak Flat area and everything in it belongs to powerful *Diyin,* or Medicine Men, and is the home of a particular kind of *Gaan,* which are mighty Mountain Spirits and Holy Beings on whom we Apaches depend for our well-being.

Apache Elders tell us that mining on the Oak Flat area will adversely impact the integrity of the area as a holy and religious place. Mining the Oak Flat area will desecrate the *Gaan's* home and would diminish the power of the place. Without the power of *Gaan,* the Apache people cannot conduct our ceremonies. We become vulnerable to a variety of illnesses and our spiritual existence is threatened. There are no human actions or steps that could make this place whole again or restore it once lost.

The unique nature of the Oak Flat area has long been recognized and not just by the Apache. The Oak Flat Withdrawal was set aside from appropriation under

94

the mining laws by President Eisenhower and reaffirmed by President Nixon.[1] U.S. Department of Agriculture (USDA) Secretary Tom Vilsack has acknowledged the Oak Flat area as a "special place" that should be protected from harm "for future generations." Protecting the Oak Flat area as a sacred site is consistent with the articles of the United Nations Declaration on the Rights of Indigenous Peoples, which was adopted by the U.N. General Assembly in September of 2007, and for which President Obama announced U.S. support in December of 2012.[2] The Obama Administration tied its support of the Declaration to the current Federal policies of government-to-government consultations with Indian tribes and maintaining cultures and traditions of Native Peoples.[3]

The mining project proposed by Resolution Copper will destroy the Oak Flat area. The block cave mining technique will permanently ruin the surface of the area. As explained below, the water required for the project will forever alter the medicinal plants and trees in the area upon which our people rely for healing and prayer. The ore body that Resolution seeks lies 4,500 to 7,000 feet beneath the Oak Flat area. Resolution admits that the ore body is "technologically difficult" to mine, that it may take up to a decade to develop this technology, and that temperatures as high as 175 degrees Fahrenheit will be encountered.[4] It also acknowledges that the land above the ore body, the Oak Flat Campground, will subside and cave in.[5] The mine will destroy the nature of the land, its ecology, and its sacred powers forever. For my constituents, this reason alone is enough to oppose H.R. 687.

**H.R. 687 Circumvents Federal Laws and Policies Designed To Protect Native American Religious and Sacred Sites**

Indian tribes, including the San Carlos Apache Tribe, ceded and had taken from us hundreds of millions of acres of tribal homelands to help build this great Nation. The United States has acknowledged that, despite the transfer in title of these lands to the United States, it retained an obligation to accommodate access to and ceremonial use of religious and sacred sites by Native Americans. This solemn obligation is codified in a number of Federal laws, regulations, and policies.[6] A core aspect of each of these Federal enactments is the requirement that the United States must conduct *meaningful* government-to-government consultation with affected Indian tribes *prior* to making a decision that will impact a Native sacred area.

Executive Order 13175 on tribal consultation requires Federal agencies to conduct consultations with tribes when proposed legislation has substantial direct effects on one or more Indian tribes.[7] USDA Secretary Vilsack acknowledged "it is important that [the Southeast Arizona Land Exchange] engage in a process of formal tribal consultation to ensure both tribal participation and the protection of this site."[8] President Obama stated in his 2009 Memorandum affirming and requiring agency implementation of E.O. 13175, that "[h]istory has shown that failure to include the voices of tribal officials in formulating policy affecting their tribal communities has all too often led to undesirable and, at times, devastating and tragic results."[9]

To strengthen Federal polices pertaining to Indian tribes, the Obama Administration recently acted to improve protections of Native religions and sacred areas. In December of 2012, the USDA released a report titled, "USDA and Forest Service: Sacred Sites Policy Review and Recommendations," which provides a framework for how and why the United States, and specifically USDA and the Forest Service, is legally obligated to protect and preserve sacred sacred areas located on Federal lands. The Report acknowledges, "Like almost all public and private lands in the United States, all or part of every national forest is carved out of the ancestral lands of American Indian and Alaska Native people." It affirms and lists the Administration's Federal

---

[1] Public Land Orders 1229 (1955) and 5132 (1971).

[2] See *http://www.ohchr.org/english/issues/indigenous/declaration.htm.*

[3] Available at *http://www.state.gov/s/tribalconsultation/deeis/index.htm.*

[4] *See* S. Hrg. 110–572, p. 44 (July 9, 2008) (Hearing before the Subcommittee on Public Lands and Forests of the Committee on Energy and Natural Resources, United States Senate, S. 3157 110th Cong.).

[5] *See* Resolution Copper website available at *http://www.resolutioncopper.com/sdr/2011/environment.*

[6] *See* Executive Order 13007: Indian Sacred Sites (May 24, 1996); the Native American Graves Protection and Repatriation Act, 25 U.S.C. 3001 et seq.; the American Indian Religious Freedom Act, 42 U.S.C. 1996; the National Historic Preservation Act, 16 U.S.C. 470 et seq.; the Religious Freedom Restoration Act, 42 U.S.C. 2000bb et seq.; and Executive Order 13175: Consultation with Indian Tribal Governments (Nov. 6, 2000).

[7] 59 Fed. Reg. 22951 (April 29, 1994).

[8] *See* Letter from USDA Secretary Vilsack to Chairman of the Senate Energy and Natural Resources Committee, Subcommittee on Public Lands and Forests (July 13, 2009).

[9] 74 Fed. Reg. 57881 (Nov. 5, 2009).

95

legal obligations to protect and provide access to Indian sacred sites and to consult with tribes on any Federal actions that will impact sacred sites.

On December 5, 2012, five Federal agencies, including USDA, the Departments of the Interior, Defense, Energy, and the Advisory Council on Historic Preservation entered into a MOU to develop guidance for the management and treatment of Native sacred areas, to develop a public outreach plan to acknowledge the importance of maintaining the integrity of Native sacred areas and to protect and preserve such sites, and to establish practices to foster the collaborative stewardship of sacred sites, among other goals. On March 5, 2013, these Federal agencies adopted an action plan to implement the MOU, which entails working to "improve the protection of and tribal access to Indian sacred sites, in accordance with Executive Order 13007 [on Indian Sacred Sites] and the MOU, through enhanced and improved interdepartmental coordination and collaboration and through consultation with Indian tribes."

H.R. 687 will make an end run around these legal and policy obligations by transferring the Oak Flat area to Resolution Copper in private ownership. Once the lands are in private hands, the obligations to protect the Tribe's religious and sacred areas and accommodate tribal access will have no force of law. Section 4(c) of the bill requires tribal consultation, but earlier provisions of the bill mandate that the land be transferred regardless of the outcome of that consultation, rendering the act of consultation a mere formality with no meaningful effect.

**H.R. 687 Authorizes the Project To Move Forward Without Informing the Public of the Adverse Impacts to the Region's Water, Environment, and Health and Human Safety**

### Bill Circumvents NEPA and Public Interest Requirements

H.R. 687 undermines the National Environmental Policy Act (NEPA), which requires an analysis of potential impacts, including providing public notice and an opportunity to comment, *before* Federal actions are taken. The bill fails to require an environmental review, including consideration of mitigation measures, of the mining project before the land exchange is completed. The bill mandates that USDA convey the lands to Resolution Copper within 1 year of enactment.[10] Once the lands are transferred to Resolution Copper, NEPA review will not have any real impact because the land would already be in private ownership. Because the bill is a mandatory transfer, the Secretary of Agriculture has no discretionary authority to determine under the Federal Land Policy Management Act (FLPMA) or other laws whether the exchange is a bad deal for the American taxpayer, the local residents, and the local economy, which would be the case if an administrative transfer were required.

In May 2007, the Forest Service published its "Technical Guide to Managing Groundwater Resources." The Technical Guide examined the Forest Service's compliance with FLPMA and NEPA.[11] The Guide references the Service's experience with the Carlota Mine also located in the Tonto National Forest. It was determined through the evaluative procedures of FLPMA and NEPA that Carlota Mine's groundwater pumping would impact the Tonto Forest's surface waters and the Service's appropriated water rights. The Carlota Mine was required to mitigate the impacts of its groundwater demands for the mining operation before the mine was permitted. The Carlota project illustrates the importance of NEPA review *before* this land exchange is completed. The surface waters and aquifers that were affected by the Carlota Mine are the same surface waters and aquifers that will be impacted by Resolution Copper's mine. Under H.R. 687, Resolution Copper will be able to evade this type of analysis and can ignore mitigation conditions.

Resolution Copper has no intention of sharing any relevant information with the public prior to taking the lands in private ownership. Resolution's Jon Cherry told the Senate Environment and Natural Resources Committee in February of 2012 that Resolution Copper "will be in a position to file our Mine Plan of Operations (MPO) which will begin the NEPA EIS process over the entire project area including the area of the subject exchange" by the "second quarter of 2012."[12] To our knowledge, Resolution Copper has not fulfilled this promise.

Section 4(j)(1) of H.R. 687 requires only that Resolution Copper submit a MPO to the Secretary prior to commencing production in commercial quantities. There are

---

[10] Section 4(i) of the bill states, "the land exchange directed by this Act *shall be* consummated not later than 1 year after the date of enactment of this Act." (Emphasis added).

[11] *See* Technical Guide to Managing Groundwater Resources, U.S. Forest Service, FS–88, pp. 20–22 (May 2007).

[12] *See* S. Hrg. 112–486, pp. 28, 29 (Feb. 9, 2012) (Hearing Before the Committee on Energy and Natural Resources, United States Senate, 112th Congress).

96

no requirements to guarantee that the MPO will contain a complete description of mining activities and measures Resolution Copper will take to protect environmental and cultural resources, which are normally required by law. Under Resolution Copper's proposed timeline, the MPO could take close to a decade. Regarding actual environmental review, Section 4(j)(2) of the bill requires only that the Secretary, within 3 years of receiving Resolution Copper's MPO, prepare an environmental review that must be conducted under the framework of subparagraph 4322(2) of NEPA. Again, this review will be conducted long *after* the lands are exchanged and in private ownership.

Section 4(h) of the bill makes clear that Federal laws will not limit Resolution Copper's activities on the land after the mandated exchange. It provides that the lands conveyed "shall be available to Resolution Copper for mining and related activities subject to and in accordance with applicable Federal, State, and local laws pertaining to mining and related activities on land in private ownership." As a result, the Secretary will have no discretion to exercise meaningful authority over the MPO or mining activities on private land after the exchange absent a Federal nexus. There is no requirement in the bill for the Secretary to examine the direct, indirect and cumulative impacts of exploratory activities, pre-feasibility, feasibility operations, or mine facility construction that will be conducted after the exchange.

Further, upon enactment of H.R. 687, Resolution Copper will almost immediately begin activities that will harm our sacred area and the region's water supply, again without any public disclosures of information. Section 4(f) mandates that the Secretary "shall" provide Resolution with a special use permit within 30 days of enactment to engage in mineral exploration activities at Oak Flat Withdrawal and, within 90 days, the Secretary is required to allow mineral exploration. The integrity of Oak Flat could be substantially harmed by exploratory activities *before* the limited environmental review requirements in Sec. 4(j)(2) are triggered. The limited environmental review of the MPO will have little or no benefit. The Secretary lacks any authority to propose alternatives to interim activities that might be necessary to protect water resources, landscape, plants, ecosystems or the integrity of Oak Flat as a traditional cultural property and sacred site. The immediate exploration of Oak Flat contemplated by Section 4(j) constitutes an "irretrievable commitment of resources" in contravention of NEPA.

Joel Holtrop, Deputy Chief of the National Forest Service, stated that a MPO containing subsurface information is "essential in order to assess environmental impacts, including hydrological conditions, subsidence, and other related issues."[13] Similar concerns were expressed by the Forest Service Associate Chief Mary Wagner who noted that the Service could not support the bill given that it "limited the discretion" of the Service to develop a reasonable range of alternatives and lacked the opportunity for public comment on the proposal.[14] Likewise, USDA Secretary Vilsack stated:

> The purpose of a requirement that the agency prepare the EIS after the exchange, when the land is in private ownership, is unclear because *the bill provides the agency with no discretion to exercise after completing the EIS.* If the objective of the environmental analysis is to ascertain the impacts of the potential commercial mineral production on the parcel to be exchanged, then the analysis should be prepared before an exchange, not afterwards, and only if the agency retains the discretion to apply what it learns in the EIS to its decision about the exchange. *It seems completion of the exchange prior to the EIS would negate the utility of the EIS.*[15]

Further, H.R. 687 does not allow for a supplemental EIS document if additional review is needed to examine the direct, indirect and cumulative impacts of mining activities by Resolution. Sec. 4(j)(2) makes clear that the Secretary may only use the *single environmental review document* prepared within 3 years of the submission of a MPO as the basis for *all* "decisions under applicable Federal laws, rules and regulations regarding any Federal actions or authorizations related to the proposed mine or plan of operations." (Emphasis added).

---

[13] *See* S. HRG. 111–65 (June 17, 2009) p. 41, Hearing before the Subcommittee on Public Lands and Forests of the Committee on Energy and Natural Resources, United States Senate (S. 409 111th Cong.).
[14] *See* S. HRG. 112–486 (June 14, 2011) p. 16, Hearing before the Committee on Energy and Natural Resources, United States Senate (H.R. 1904 and S. 409 112th Cong.).
[15] *See* Letter from USDA Secretary Vilsack to Chairman of the Senate Energy and Natural Resources Committee, Subcommittee on Public Lands and Forests (July 13, 2009) (emphasis added).

97

Again, the bill conflicts with the purposes of NEPA and the bill fails to vest any real discretion in the Secretary to address the many concerns presented by the mining operation proposed for Oak Flat. It simply does not make sense for this bill to limit the Secretary's discretion, undermine the NEPA process, and ignore the environmental and tribal concerns related to the mining project.

Moreover, the potential for negative economic impacts to the local economy through a loss of recreation and tourism could be substantial. In 2009, detailed direct travel impact estimated for Pinal County totaled $421 million dollars, with over $16 million spent by those visiting the nearby campground areas.[16] Many of these dollars were spent in and around the area of this proposed mine.

If enacted, H.R. 687 will result in disastrous consequences, which Resolution seeks to downplay and conceal given that the bill requires no cost-benefit analysis of the potential environmental impacts. Resolution would be able to mine copper without environmental permitting, cultural protections or financial assurances necessary for responsible stewardship. As a limited liability corporation, the Company could simply walk away from potentially billions of dollars of environmental and infrastructure damages to this sacred area.

**Southeast Arizona's Water Supply Cannot Sustain This Project**

Resolution Copper has not been transparent with the public or its neighbors in the Oak Flat area. In 2009, Resolution explained that it was purchasing water and reclaiming contaminated waters in order "to build the needed water supplies for mining activities that are a full decade or more away." Resolution claimed to be "managing water by taking into account the needs of both current and future users of this precious resource."[17] Resolution claimed that it had purchased and "banked" over 120,000 acre feet of Central Arizona Project ("CAP") water from 2006 through 2008 with Irrigation Districts near Phoenix, enough to operate the mine for 6 years at a projected use of 20,000 acre feet per year.[18] Resolution further reported in 2008 that it "installed several hydrology wells to assist in developing models that will determine if mining may affect the regional aquifers, and . . . what mitigation options are viable."[19]

H.R. 687 does not require Resolution Copper to perform or disclose its studies of the impacts on the regional water supply and hydrology. Repeated requests for an independent agency, such as the U.S. Geological Survey ("USGS"), to conduct studies have been ignored or opposed. Resolution Copper's failure to disclose critical information about the impacts on the region's water has united a diverse group that opposes H.R. 687.

Our neighbors to the West in Queen Valley have already felt Resolution's insatiable thirst for water. Since 2008, Resolution has been pumping groundwater to dewater parts of the decommissioned Magma Mine. Water levels in the Magma shaft have declined nearly 2,000 feet and water levels in the surrounding aquifer will inevitably decline as well. The Queen Valley Homeowners Association reported that since Resolution began pumping 900,000 gallons of water a day, the community's water supply fell to a historic low requiring water rationing for the community golf course. The Association passed a resolution opposing the mine.

According to USGS records, since 2008, the average streamflow in Queen Creek (downstream from the mine site) has been less than half the average streamflow for 2001–2007 before Resolution began dewatering at Magma Mine. Resolution's dewatering efforts removes far less water than the mine sought, though H.R. 687 will require (approximately 920 acre feet per year compared to the mine's eventual need for 20,000 acre feet per year). The simple act of dewatering will have negative effects on regional water supplies. If Resolution depends on even more groundwater for its mining operations, the negative impacts will grow.

In 2009, Senator Bingaman questioned the Forest Service about the impacts of the mine on the local water supplies and quality. Deputy Chief Holtrop responded:

> At this time the U.S. Forest Service does not have an understanding of the impacts of the proposed mine will have on local or regional water supplies, water quality, or possible dewatering of the area. No studies or assessments of the water supplies have been conducted. That is information which could be obtained by the Forest Service with NEPA analysis *before* the exchange.

---

[16] *See Arizona Travel Impacts 1998–2009p, July 2010 Report*, Arizona Office of Tourism, Phoenix, Arizona.
[17] Previously on Resolution Copper webpage, now missing file: *http://www.resolutioncopper.com/res/environment/ddnav.css*
[18] *Id.*
[19] *See* Resolution Copper webpage.

98

A NEPA analysis after the exchange would not allow the Forest Service to recommend alternatives since the exchanged parcel would already be in private ownership. Data and analyses in the possession of Resolution Copper Mining would be of assistance to the Forest Service in evaluating the impacts of the proposed mine on local and regional water supplies and quality.[20]

In order to better inform the public of the potential impacts, L. Everett & Associates (LEA), an internationally recognized environmental consulting firm made up of hydrogeologists, engineers, and geologists, conducted a review recently of potential environmental impacts to the region that would be caused by H.R. 687. The following excerpts from the review clearly rebuff Resolution Copper's water claims:

"[I]t is highly speculative that CAP water will be a reliable source for Resolution over the decades-long lifetime of the mine. In fact, Resolution correctly admitted that 'excess CAP water will not always be available for purchase and other sources will be needed.' It seems apparent that Resolution will need to rely on local groundwater resources to provide a significant percentage of Resolution's water supply if it is to be a viable project.

"It is virtually impossible for Resolution to meet even a fraction of its water needs from local groundwater in a sustainable manner: the amount of water needed is just too vast for the natural processes that recharge the aquifer in this arid region of Arizona to replenish the needed withdrawals.

"Because groundwater and surface water systems are intimately interrelated, pumping too much groundwater will have a negative impact on nearby surface water resources because lowering the water table can starve the local streams of recharge from the aquifer. This is a serious issue that is very difficult if not impossible to mitigate. For example, the nearby Carlota Mine uses much less water than the proposed Resolution Mine (approximately 1,000 acre feet per year). In a 25-day pump test at the Carlota Mine, stream flow in Haunted Canyon (2,300 feet from the nearest well) declined from 45 gallons per minute to 5 gallons per minute, thus threatening the sensitive riparian habitat."[21]

Following its assessment of the dewatering process that will be required to operate Resolution's mine, LEA added, "Given the depth of the ore body and the need to dewater the mine workings that are deep below the water table, Resolution will have to aggressively pump groundwater from the aquifer. The effect of this pumping will be felt far beyond the boundaries of the mine."

Throughout the mining process, water will migrate to the vacant ore body and mining tunnels. For example, Resolution estimates that inflows to the existing workings at Magma Mine are 300 million gallons per year. If mining production on this new project is authorized, the mine dewatering will deplete many billions of gallons of water from surface waters and groundwater throughout the region, resulting in the loss of important seeps, springs, and streams and depleting the perennial pools in *Gaan* (Devil's) Canyon and streamflows in Queen Creek and other surface waters.

The alteration of subsurface and surface geological structures because of block caving and the admitted collapse of the land surface will alter the natural state of the aquifers and surface drainage of the watersheds forever. Resolution has refused to publish the potential impacts on the water supplies of the region despite the fact that this legislation has been introduced in the Congress over the past 8 years. Instead, Resolution has simply claimed that it is urgent for Congress to pass this land exchange.

### Additional Damage to the Southeast Arizona Environment

While water is a paramount concern for the opponents of H.R. 687, it is not the only concern. Resolution Copper has failed to provide data pertaining to its mining and post-mining subsidence analysis, water quality contamination analysis (including acid mine drainage and subsequent pollution), air quality compliance, tailings and overburden storage and placement.

---

[20] *See* S. Hrg. 111–65, p. 42 (June 17, 2009) (Hearing before the Subcommittee on Public Lands and Forests of the Committee on Energy and Natural Resources, United States Senate, S. 409 111th Cong.) (emphasis original).

[21] Letter from LEA Principal Geologist, James T. Wells, PhD, PG, to San Carlos Apache Tribe, Chairman Terry Rambler (March 18, 2013) (Attached to this testimony) (hereinafter "LEA Analysis").

99

On March 15, 2013, the local Town of Superior adopted a resolution opposing H.R. 687. The nearby City of Globe has tabled a proposed resolution to support the bill until its questions about the bill have been satisfactorily answered about the impacts of this mine. This bill touts jobs for the local economy. But local community leaders rightfully ask: "What good are jobs if our communities are environmental disaster areas lacking water to support our citizens?"

It is common knowledge that acid mine drainage leaking into groundwater and surface water is a widespread consequence of copper mining. Acid-generating mines pollute surface water and groundwater requiring expensive reclamation and long-term water treatment. The water Resolution is pumping from the Magma Mine shaft is contaminated with heavy metals. That water is being treated at Resolution's water treatment facility. In order for that treated water to be reclaimed and re-used, it has to be diluted with clean CAP before being transported for use on crops to the Irrigation Districts.

Instead, Resolution and its foreign corporate parents avoid the true costs of environmental compliance through this land exchange. Once these public lands are conveyed, under the permissive mining and reclamation laws of the State of Arizona, Resolution will probably not be required to post a cash bond to underwrite either the cost of remediation during its mining operations or for clean-up upon mine closure. Typically, only self-bonding or *corporate guarantees* are all that is required. This is woefully insufficient to protect the public from bearing the potentially astronomic costs of clean-up resulting from a limited liability company's massive mining operations. As stated earlier, Resolution can simply walk away from damage to the Oak Flat area. As a result, American taxpayers would be left without any revenue and will be on the hook for the future cost of any environmental remediation.

There are too many environmental questions that Resolution Copper has failed to answer. This land exchange allows Resolution to avoid responding to these questions that Federal law otherwise requires every other company in America to answer. The Subcommittee should ask why Resolution deserves special treatment?

**H.R. 687 is a Massive Giveaway of Taxpayer Resources to Foreign, Special Interests**

At a time when all Americans are being asked to tighten our belts, H.R. 687 will result in a giveaway of American wealth to a foreign-owned mining company. The appraisal requirements of H.R. 687 are unique to this land transfer and do not adequately ensure that the public will receive fair value. Since the bill does not afford the Federal agencies the opportunity to perform a substantive economic evaluation of the lands along with the copper and other minerals to be exchanged to Resolution, it is impossible for the Congressional Budget Office and/or Office of Management and Budget to effectively evaluate H.R. 687. The public interest requires that a complete and fully informed appraisal and equalization of values be performed *prior to* Congressional passage of H.R. 687, *not after*. Resolution Copper has variously estimated the mineral wealth in the lands ranging from $100 to $200 billion. Resolution's *self evaluation* of the ore body underlying Oak Flat is orders of magnitude greater in value than that of the non-Federal parcels offered in exchange to the public.

A significant amount of information is required for a meaningful and accurate appraisal. Under the Uniform Appraisal Standards for Federal Land Acquisition (UASFLA) requirements, a detailed mining plan is necessary to properly assess the value of the exchanged land. UASFLA requires that production level estimates should be supported by documentation regarding production levels achieved in similar operations. However, it is unknown at this time what Resolution Copper's production estimates are since mining plan data has not been forthcoming.

UASFLA royalty income approach also requires several economic predictions including a cash-flow projection of incomes and expenses over the life-span of the project and a determination of the Net Present Value (NPV), including the NPV of the profit stream, based on a discount factor.

Deputy Chief Holtrop and BLM Deputy Director Luke Johnson informed the Subcommittee on National Parks, Forests and Public Lands on an earlier version of this bill that the completion of the exchange within 1 year (as required by H.R. 687 Section 4(i)) was insufficient time to complete the required appraisals.[22] Specifically, Mr. Johnson stated:

---

[22] *See* S.110-52 (Nov. 1, 2007), pp. 4, 5, 8 (Legislative Hearing before the Subcommittee on National Parks, Forests and Public Lands of the Committee on Natural Resources U.S. House Of Representatives, 112th Congress).

100

Based on our experience with exchanges, we do not believe that this is sufficient time for the completion and review of a mineral report, completion and review of the appraisals, and final verification and preparation of title documents. Preparation of a mineral report is a crucial first step toward an appraisal of the Federal parcel because the report provides the foundation for an appraisal where the land is underlain by a mineral deposit. Accordingly, adequate information for the mineral report is essential.

Given the evaluation standards prescribed by the UASFLA, coupled with the lack of factual data from Resolution, the American taxpayer will once again be short-changed.

**Resolution Copper's Corporate Parents Partner With Iran and China**

Resolution is not deserving of the special treatment given it under H.R. 687. The Company is a subsidiary of Rio Tinto (55 percent majority owner) (UK headquarter/ Australian offices) and BHP Billiton (45 percent shareholder) (Australia headquarter/UK offices). Rio Tinto is a partner with Iran in the Rössing *uranium* mine in Namibia.

Rio Tinto currently owns a majority stake in the Rössing mine; while, the Iran Foreign Investment Company (IFIC) owns a 15 percent stake in the same mine. The IFIC is wholly owned by the Iranian government. United Against Nuclear Iran (UANI) raised concerns about Rio Tinto partnership and called on Rio Tinto and Rössing to sever ties with the Iranian government. In a letter to the Chairman of Rio Tinto, UANI President, Ambassador Mark D. Wallace, wrote:

Thank you for the letter of November 8, 2010 from the Rio Tinto Group. While your letter attempts to address some of the concerns . . . the largest issue—the current Iranian government's 15 percent stake—remains outstanding and is of serious concern to UANI and many within the international community . . .. You dismiss the concerns raised by UANI because the government of Iran initially acquired its share in the Rössing mine in 1975 . . .. This fact is not relevant in 2011 when the government that has been profiting from the mine for over three decades is one that is pursuing an illegal nuclear weapons program, [and] sponsoring terrorism in the region . . .."

Letter from Former U.S. Ambassador and UANI CEO Mark Wallace to Rio Tinto Group Chairman Jan du Plessis (Jan. 13, 2011).

In addition, there are no guarantees that the copper mined pursuant to H.R. 687 will even be processed or used in the U.S. Chinalco, owned by the Chinese government, holds a 9 percent stake in the Rio Tinto Group. Nothing in the bill requires Resolution Copper, Rio Tinto's subsidiary, to process or sell the copper to U.S. companies or even use U.S. resources to mine the copper.

Based upon the history of parent company Rio Tinto's business relations with Iran and China and in light of the U.S. and international sanctions against Iran, it is not in America's interests to trade valuable Federal land to this foreign-owned mining company.

**Speculative Economic Benefits**

Without substantiation, Resolution has touted local job creation as the primary justification for this land exchange. Resolution's jobs claims have varied widely over the years that this project has been proposed. Because Resolution is not required to publicly disclose a MPO before the land transfer, Resolution's jobs claims are speculative at best. Resolution takes pride in the fact that they are building the mine of the future. Resolution's Vice President stated, "Our grandfathers wouldn't recognize the mines of today." The proposed mine, under H.R. 687, will be highly automated and the likely actual jobs produced will come in far below the speculative figures promised. In addition, Resolution has opposed all efforts to amend the bill to require that: (1) the project headquarters to be located in Southeast Arizona; (2) local Arizonans be considered first for any job opportunities that may result from the project; and (3) the ore is processed and used in the United States—and not in China or another foreign nation. Further, Resolution has admitted that it will take at least 10 years to develop technology to access the ore body given that it is 1-mile beneath the surface of the earth where it is a temperature of 175 degrees.

**Conclusion**

In 1871, the U.S. established our Reservation. Since then, the United States diminished our Reservation several times due to the discovery of silver, copper, coal, water and other minerals and natural resources. Our burial sites, living areas, and

101

farmlands on our Reservation were flooded for a Federal dam for the benefit of others. Based upon this history and for the reasons stated above, the Tribe strongly opposes H.R. 687 or any other conveyance of our tribal ancestral lands in the Oak Flat area to Resolution Copper for mining that would permanently destroy this sacred site. Once done, this action cannot be undone.

[Note.—The material attached to Mr. Rambler's Prepared Statement and the letter referred to in footnote 21 have been retained in the Committee's official files.]

QUESTIONS SUBMITTED FOR THE RECORD TO TERRY RAMBLER

QUESTIONS SUBMITTED FOR THE RECORD BY THE HONORABLE GRACE F. NAPOLITANO

*Question.* Where are tribal sacred sites located?

Answer. Apache culture, heritage and religion do not focus upon a specific site or place as sacred, in the traditional convention of Anglo-European site location. Instead, an area or region is deemed by the Apache People to have cultural, sacred and religious significance.

The Apache lands which are impacted by the land exchange with Resolution Copper Mining cover a wide area and include lands known in Apache as *Chi'chil bigagoteel*. *Chi'chil bigagoteel* encompasses the Oak Flat campground. Nearby is *Dibecho Nadil* (Bighorn Sheep Are Put There), the geological feature known as Apache Leap. *Chi'chil Bigagoteel* is bounded by *Gan Bikoh* (Crowndancers Canyon), also known as Devil's Canyon. To the north it is bounded by *Ga'an Daszin* (Mountain Spirits Standing), also called Queen Creek Canyon.

This area is documented as the ancestral home of the Pinal and Aravaipa Apache Bands of the Western Apache, San Carlos Apache Group. It was also known to have significance to the Western Apache, Tonto Apache Group.

Apache spiritual beings, *Ga'an,* live and exist within the sacred sites of Oak Flat, *Ga'an* Canyon (Devil's Canyon) and Apache Leap. The *Ga'an* are spirit entities made for the Apache People by *Yusn,* Life Giver, and are responsible for teaching the Apache People the proper way of living. *Chi'chil bigagoteel* is recognized as home of the *Ga'an.*

Oak Flat has, for generations, played a crucial role in the exercise of the religious, traditional and cultural practices of the Western Apache. These practices continue to this day. Oak Flat and the surrounding area have long been used—and are used today—for religious ceremonies, sweat lodge ceremonies, and Sunrise Dances (puberty ceremonies). *Chi'chil bigagoteel* provides plants and other natural resources for spiritual, ceremonial and medicinal uses. It has been said by San Carlos Apache Tribal Cultural Officer, Vernelda Grant, that the uniqueness of the ecosystem of this area adds to significance and sacredness of the area to the Apache People.

Losing access to these ecosystems, both by their closure [to Apache People] or their destruction profoundly weakens the strength to both Apache and Indigenous peoples' prayer and ceremony, and severely limits the abilities of Apaches and Indigenous peoples to effectively practice their religion, ultimately resulting in physical and spiritual harm to Apaches and Indigenous peoples and neighboring communities.

*Question.* Are sacred sites in jeopardy?

Answer. There is no question that Apache sacred areas are in jeopardy as a consequence of the *Southeast Arizona Land Exchange and Conservation Act of 2013.*

The ore body which Resolution Copper Mining (RCM) seeks to exploit lies directly under Oak Flat, *Chi'chil bigagoteel.* As pointed out in my testimony on March 21, 2013, the surface lands of Oak Flat will collapse as a result of the mining method, block caving, RCM will employ to extract the ore body. RCM's own website admits to such subsidence. The exhibits which were presented with my testimony exemplify how the block cave mining method works and the land subsidence which inescapably follows. Virtually the entirety of *Chi'chil bigagoteel* will be destroyed by RCM's mining operation.

RCM's mining operation will also require enormous quantities of water estimated at 20,000 acre feet per annum, or 600,000 acre feet over the life span of the mine. Groundwater pumping will inevitably be a large source for that water. Seeps, springs and streams well beyond the physical boundaries of Oak Flat will be affected by this pumping. Furthermore, in order to operate the mine at depths of 4,500 to 7,000 feet below the surface of the earth, RCM will be required to pump groundwater to keep its mine from flooding further depleting water resources throughout the area. RCM's groundwater pumping activities will destroy the medicines and plants that we gather, which will effectively suffocate the practice of our religion.

102

Certainly, the land subsidence and groundwater pumping will destroy Apache sacred areas. Without belaboring the point, other aspects of the mining operation, such as toxic water pollution associated with copper mining and tailings waste sites, will further contribute to the destruction of areas sacred to the Apache and other Indigenous people.

*Question.* Does H.R. 687 provide adequate protections to avoid the land from collapsing?

Answer. H.R. 687 provides no protections to avoid the land from collapsing. Indeed, the protections which are usually afforded the public under various Federal laws, such as National Environmental Policy Act (NEPA), to assess potential harms and suggest possible alternatives are circumvented by H.R. 687. Once the land is in the private ownership of Resolution Copper and its parent corporations Rio Tinto and BHP Billiton, NEPA and other protections will be lost. H.R. 687 virtually eliminates the Secretary of Agriculture's discretionary authority to determine under the Federal Land Policy Management Act (FLPMA) or other laws the best interests of the public and the American taxpayer. Please see my written testimony at pages four to seven.

———

Dr. GOSAR. Thank you, Chairman Rambler.

Our next guest is Ms. Soyla Peralta, otherwise known as Kiki.

## STATEMENT OF SOYLA "KIKI" PERALTA, COUNCIL MEMBER, SUPERIOR TOWN COUNCIL

Ms. PERALTA. Good morning, members of the Subcommittee. My name is Kiki Peralta, and I am councilwoman for the Town of Superior. The project mandated by H.R. 687 will have the most direct and greatest impact on our town. This project will be in our back yard. And we can't let that happen, because this is our town. We were born and raised in Superior. I was married in Superior, and I raised my children in Superior.

Unfortunately, we are here because we want our voices heard. Our county and Arizona Delegation is not listening.

I support the mining industry. The Town of Superior supports the mining industry and recognizes the role that copper mining has played in Superior's history and economy. My father, brother, husband were all miners. As a matter of fact, I was the first female hired by Magna-Copper Company in 1975 as a laborer.

I have to let you know up front that in the past this Council has supported this project. However, for the following reasons, the Town of Superior now opposes the Southeast Arizona Land Exchange. Information has been difficult to come by. But with the little information that we have, we have learned the true impacts of this project. This has forced me and our Town Council to rethink our position.

Our opposition to this project is based on three major points: number one, the lack of a NEPA study to show what impacts we will be facing; number two, the impact of our water and/or hydrology studies; and three, the impacts of block cave mining on our environment, and the lack of jobs that it will produce.

First, on the NEPA and Mining Plan of Operation. We strongly oppose this land exchange moving forward without first performing the NEPA studies and informing our town about the negative impacts of this project. Section 4(h) of the bill provides that if this bill is passed, the lands will be treated as if they are in private ownership. As a result, no tribal consultation or no NEPA studies will be required.

103

A Mining Plan of Operation will also help inform our community. Where will the tailings and waste products be dumped? What impacts will they have on our town and surrounding communities? My question is, once again, why must this project move forward before informing our community what we can expect? This is like playing Russian Roulette with our community.

Next, the water. It is often said that whiskey is for drinking and water is for fighting. Water in Southeast Arizona is more precious than gold, and it is surely worth more than copper. Where will this water come from? And what effects will such large water consumption have on the regional water balance? Again, where are the hydrology studies? Again, I ask, how can this project move forward before a question as vital to our lives as water is answered?

Finally, we have serious concerns with the block cave method of mining. Block cave mining historically has not been used in Superior. We know mining, and this method is proven to be destructive and harmful to the environment. My other concern with block cave mining is the jobs. Resolution promises jobs for our community. But in reality, with the use of block cave mining, most of it will be mechanized and employ only a small workforce.

I wish that Resolution Copper would answer these questions today, and I wish that the Arizona Delegation and Congress would demand these answers. But the bottom line is that today I am here to represent my community and to protect the long-term interest of my town.

It was great to hear Pinal County Chairman Miller speak today. Unfortunately, this is the first time I have seen him. Neither him nor Congressman Gosar or Kirkpatrick have met with us on this issue. Yet again, our town will suffer the most direct impacts of this project. Our water, our environment, our air will all be harmed. Yet no one has come to me with our Council. Unfortunately, our county and congressional delegation are not listening. I wish that my Congresswoman, Ann Kirkpatrick, could have stayed to listen.

With that said, I am here to fight for my community and I am glad that you are here to listen. I urge you to oppose this bill. The Town of Superior can't afford this deal. I again want to thank you for this opportunity.

[The prepared statement of Ms. Peralta follows:]

PREPARED STATEMENT OF SOYLA "KIKI" PERALTA, COUNCIL MEMBER, SUPERIOR TOWN COUNCIL, ON H.R. 687

The Town Council of the Town of Superior, Arizona realizes that Superior, Arizona, was born as a mining community and has lived through the mining booms and busts of the Silver King Mine, the Queen Mine, the Belmont Mine, the Magma Mine and the Broken Hill Proprietary Mine over the history of our 100 plus years. Because we recognize that mining is a large part of our history and will potentially be a larger part of our future, we are not opposed to mining. In fact, we strongly support responsible mining policies, and practices in and around our community. However, we believe that H.R. 687 is unacceptable as it presents serious negative impacts to us and our surrounding community as it seeks to circumvent the important National Environmental Policy Act (NEPA) review and analysis process. This is public land, and the public must be heard openly and fairly under the NEPA process. A decision regarding these public lands should be made with the utmost knowledge and care. Once these lands are lost to the public, they can never be regained.

104

We appreciate and thank you for the opportunity to express our views and voice our concerns about H.R. 687, the Southeast Arizona Land Exchange and Conservation Act of 2013 that will profoundly affect our Town and Region.

### Oak Flat Land Exchange and Loss of Important Public Campground and Recreational Areas

Resolution Copper Mining, LLC, owned by Rio Tinto based in the United Kingdom, and BHP-Billiton based in Australia, is planning a massive block-cave mine and seeks to acquire Oak Flat Campground and the surrounding public lands for its use through this land exchange bill. If they succeed, the campground and an additional 2,406 acres of the Tonto National Forest will become private property and forever off limits to recreationists and other users. Privatizing this land would end public access to some of the most spectacular outdoor recreation and wildlife viewing areas in Arizona. It would deprive the Town of Superior, currently land-locked at only 4 square miles, from economic diversification in and around our community. It would also deprive the San Carlos Apache Tribe of their religious and cultural attachments to the area.

Located just 5 miles east of Superior, Oak Flat and Devil's Canyon are recognized as some of the most unique, scenic, popular and unspoiled areas in the State of Arizona; and they are an important part of our history and our economic diversification. It has long been prized for its recreational variety. This area is exquisite and easily accessible to millions of visitors from the Phoenix and Tucson metropolitan areas, as well as the outlying areas of Gold Canyon, Queen Valley, Florence, Kearny, Winkelman, Hayden, Globe, Miami, Top of the World and Superior. It is significant to our citizens, our neighbors, and the Apache people, for their cultural values and religious heritage.

The Oak Flat Campground, Apache Leap, and the surrounding area are important to the Apaches who gather acorns and pine nuts that are used both traditionally and ceremonially. Apache Leap is an historical land known as the Apache's Masada. It is there that many Apaches leaped to their deaths rather than be captured by the U.S. Army approximately 125 years ago. One of our local historians, Christine Marin, Ph.D., Archivist and Historian for Arizona State University and who is a former resident of Globe, Arizona, and still has family in Superior, Arizona, published an article in the *Copper Country News* dated June 11, 2008. In her article entitled, "Apache Leap Legend: Now We Have 'The Rest of the Story'," Dr. Marin indicated that the story of the Apache warriors is verified by two historical publications. We believe that these lands have significant import to the Apaches and that their wishes should be carefully considered and respected. It is because of this that our Resolution No. 451 (attached) includes this reference.

You, our Federal legislators, are being asked to give up these publicly owned lands that have been in trust for the American and Native peoples since 1955, when President Eisenhower signed BLM Public Land Order 1229. This Order specifically put Oak Flat *off-limits to all future mining activity.* In 1971, President Nixon issued BLM Public Land Order 5132 to modify PLO 1229 and allow "all forms of appropriation under the public land laws applicable to national forest lands—*except under the U.S. mining laws.*" These two executive orders from two different Republican administrations both mandated that these lands were to be preserved in perpetuity with special emphasis on prohibiting mining activities on Oak Flat. There is no compelling reason for these Orders to be overturned.

We are particularly concerned that this legislated land exchange of the Oak Flat Campground and surrounding area would bypass critical environmental impact studies. We fear that natural and cultural resources will not be protected. We know, without a doubt, that subsidence will occur and that it will adversely affect our community. We don't have any information regarding RCC's proposed disposition of the massive amounts of tailings that will be produced and where they will reside. We are terrified that downstream pollution will affect the Town of Superior and everyone who depends upon the nearby aquifers for drinking water. Our local water supplier recently imposed an additional "arsenic surcharge." While The Magma Mine was operational, local residents were told that there was no pollution or effects on the water supply. Now, 20 plus years later, we find that there was—and continues to be—a price to pay for giving a foreign-owned mining company carte blanche because we trusted the mine explicitly. We are also worried that a mine would dry up not only the Town of Superior's water supply, but a portion of the water supply for the Phoenix metropolitan area. We also have good reason to believe that mining at Oak Flat will destroy the riparian habitat not only at Oak Flat, but the nearby Devil's Canyon which is one of Arizona's great undiscovered riparian treasures. It is for these reasons and many more that we oppose the enactment of the Southeast Arizona Land Exchange and Conservation Act prior to proper NEPA reviews.

105

## Water, the Environment, and Destruction of Land Surface

The Town believes it is critical that Hydrology Surveys, Environmental Impact Studies, Subsidence Analyses and Transportation and Circulation Plans be conducted **PRIOR** to discussion of **any** land exchange and/or different use.

Resolution Copper Company's Environmental Impact Assessment Manager, Bruce Marsh, has indicated that the new mine would utilize 40,000 acre feet of water per year. He further indicated that they would be buying excess water from the tribes and other sources, however, they are merely banking those water rights and the sources are not secured. This is a concern because: (1) Arizona is still in the grip of a decades long drought with dwindling Central Arizona Project supplies, and we do not have any assurances that water will still be available when Resolution Copper Company begins mining in the next 10 years; (2) Superior is located in the Maricopa AMA rather than the Pinal AMA, and Phoenix metropolitan area water supplies depend upon the Queen Creek aquifers; (3) The close proximity of the Queen Creek aquifer to such a massive mining operation will negatively disrupt the underground water flow and negatively impact hundreds of thousands of residents; and (4) Neither the State of Arizona nor the local residents should have to bear the burden of restoring clean and sustainable water utilized by mining.

RCC has already begun to dewater shafts to prepare for additional exploration of the ore deposit. We fear that in removing the more than 2 billion gallons of water that have accumulated in the mine since it was last shut down in 1996 will upset the water balance of the Oak Flat, Apache Leap, and Devil's Canyon riparian areas. In 1946, Queen Creek was called a perennial flowing stream. Our Town elders tell us that when the Magma Mine was in full production during the 60s and 70s, riparian areas at Oak Flat and in the Town of Superior dried up. An independent analysis of the impact of a potential mine at Oak Flat to the water balance of the entire region should be conducted before this bill should even be considered by Congress.

The Town is alarmed about the issue of subsidence from Resolution Copper Company's proposed block-cave mining method and its effect on Oak Flat Campground, Apache Leap escarpment, US Highway 60, and the Town of Superior. Resolution Copper Company has admitted to only "minimal subsidence." However, they admittedly chose this method of mining as it is the least expensive and quickest method to approach this massive ore body. However, experts have demonstrated that there will be irreparable destruction of unknown extent to the surface utilizing the block-cave method of mining. This is absolutely unacceptable. Does block cave mining eventually lead to open pit?

Resolution Copper Company has not yet determined the manner in which the tailings will be accumulated. Since there will be a considerable volume of tailings that will be created by this method of mining, The Town is concerned about the contamination associated with this activity. We are also concerned regarding reclamation of these tailings upon mine closure.

H.R. 687 mentions the National Environmental Policy Act (NEPA) but the bill does not provide for even the most basic study and analysis of these issues and concerns **prior to** obtaining the land exchange. Furthermore, if the land exchange is granted, the "NEPA" language in the bill is so vague that the company could easily avoid doing any "NEPA" analysis. Even if a "NEPA" study were to be conducted after the land exchange went into effect, the results would be meaningless as the outcome of the study would already be mandated by law.

The Town believes that Resolution Copper Company should not be exempt from the required national permitting studies and analyses that have been required of the other mines in the area by virtue of a land exchange. **No other mining corporation in this area has been allowed to bypass the Federal permitting and NEPA process.**

If the start-up timeframe proposed by Resolution Copper Company is correct, then there is plenty of time to conduct the full public review process. Additionally, if Resolution Copper Company is as "transparent" as they profess, they should welcome this endeavor to put all the "cards on the table" and hear everyone's input.

We also believe that details of the project and potential impacts (Mining Plan of Operation) should be made available to our residents and to the general public up front. We continually hear that Resolution Copper Company will make this plan available later—after the land exchange. We feel that if the land exchange is of utmost importance, Resolution Copper Company should accelerate production of their plan NOW—before the land exchange.

## Threat to the Town of Superior's Economic Diversification and Sustainability

Many citizens of the Town have lived through the boom and bust cycle of mining. After closure of the Magma/BHP mine in the 1990s, many people fled the commu-

106

nity in search of jobs, medical treatment facilities and amenities that were not available in Superior. Voters taxed the political body to create a more diversified and sustainable economic base for its residents. The Town received grants to develop an Industrial Park, a low-income housing subdivision, a new swimming pool, second fire station, airport, rest stop and numerous parks and trails. These projects were initiated to create jobs for our local residents, to increase State-shared revenue and local taxes and to encourage eco-tourism.

The Town believes that in order to sustain growth and development, *we cannot rely on any one industry to support us.* Mining has an allure and historical ties in our community. However, just as in the past, mining has a short life. We cannot base our future on one single industry or employer. Additionally, the process of mining in the 21st century is very technologically advanced and requires specialized training. Resolution Copper Company has not indicated that they will hire untrained, local labor. In fact, today's activity on the project reflects an influx of mining technicians from outside the community. We routinely see vehicles with license plates from Utah, Colorado and Mexico. We are seeing more and more articles regarding the development of robotic workers for future mining activities. These robotic systems are being tested today in South American and Australian mining operations. It would be no surprise if many of the technical jobs that are available will be held by highly trained individuals sitting at a computer in another state—or even another country—controlling our robotic work-force remotely. The loss of this natural resource and already protected public lands compromises the potential for our community to foster and promote a more diversified economy based upon tourism and outdoor activity. At a minimum, the Boyce Thompson State Park to the west and the Oak Flat Campground to the east create a natural flow of traffic to and through the Town. Tourists, Boy Scout troops and other individuals and groups routinely pass through to camp overnight at the Oak Flat Campground. They stop for gas, sundries and refreshments at local establishments in far greater numbers than local workers. Superior is a natural "pit stop" for eco-tourism and this is the type of activity that sustains our economy.

While Resolution Copper Company has promised great hope for another "boom," they do not willingly embrace annexation into our town limits, they have purposely depreciated their land values in anticipation of the land exchange and they have strong-armed our local government into accepting less than adequate compensation for future use of the Town's services and support.

**Summary**

Resolution Copper Company has divided this community by demanding that the Town Council speak for the residents of Superior in unwavering and unqualified support of a land exchange that is not necessary in order for Resolution Copper Company to mine. Behind the scenes, their representatives have attempted to force the firing of individuals opposing the Land Exchange. Those individuals who question Resolution Copper Company in any fashion are deemed to be "anti-mine." Businesses deemed "anti-mine" are not supported by Resolution Copper Company, their employees or agents—in fact RCC employees are urged to boycott! These strong-arm tactics should not be allowed to pervade a community already distraught from previous "boom and bust" mining cycles.

H.R. 687 does not represent a land exchange that is in the broader public interest. It is clear to the Town that Presidents Eisenhower and Nixon believed that they were protecting Oak Flat from big business interests in acquiring public lands for development, mining and transportation. Oak Flat has been important enough to protect from mining and other elements for over 50 years, and it should not be so easily conveyed to a foreign-owned mining interest. This land exchange would set a terrible precedent.

The Town urges this Committee to ensure that **the concerns of all public interests** are addressed prior to consideration of any Federal land exchange. We believe you should protect these public lands for the public's future use and preserve the unique opportunities for Arizonans—and especially Superiorites—that the Oak Flat area provides.

For these and many other reasons, we oppose H.R. 687, the Southeast Arizona Land Exchange and Conservation Act of 2013 and feel that it should be rejected, until such time as our concerns are at least addressed through proper NEPA studies.

Thank you for your time and consideration.

———

Dr. GOSAR. Thank you very, very much. There are two things now—if we can have the screens cleared, please? Thank you.

107

The Chairman would like, by unanimous consent, to have two things, the "Pentagon Warns of Mineral Shortfalls," and a Congressional Research memorandum to be included in the record. So ordered?

[No response.]

Dr. GOSAR. No objections, so ordered.

[The information submitted for the record by Dr. Gosar has been retained in the Committee's official files:]

Dr. GOSAR. I would like to acknowledge myself for the first aspects of questioning.

Ms. Peralta, thank you for coming here today. I noticed in your testimony that you made the following statement, "This is public land, and the public must be heard openly and fairly under the NEPA process." You are aware that when Resolution files its Mining Plan of Operations, that it will go through the environmental review process, and that the public will have opportunity to provide comments, as guaranteed in the law. Are you familiar with that?

Ms. PERALTA. Yes, I am.

Dr. GOSAR. Thank you. Sections 4(i) and 4(j) address explicitly and implicitly compliance with the Federal environmental laws and regulations pertaining to conveyances of Federal land and approval of Mining Plan of Operations. My bill is clear that the mine can only move forward following preparation of a full environmental impact study that is in accordance with NEPA and all other applicable Federal laws and regulations. That includes national historic preservation acts, endangered species acts, Executive orders pertaining to wetlands and floodlands, and hazardous material surveys.

Additional environmental compliance requirements will also have to be addressed at the State and local levels in order for this mine to be developed. As you know, and should know, many of Arizona's environmental compliance laws are even stronger than those of the Federal laws. This legislation promotes economic development in an environmentally responsible way.

Now, I agree that the public should be heard, and that is why we invited you here today. Why do you feel it is so important for the public to be heard in the NEPA process, while you and your colleagues silenced the voices of almost 200 citizens last week at your Council meeting when you adopted your resolution to oppose this bill? You stated that you had made up your mind, no executive session was necessary, no public input would be taken, and that if anyone acted up, they would be escorted out by the police. Is that fair, Ms. Peralta?

Ms. PERALTA. Once again——

Dr. GOSAR. Is it fair, ma'am?

Ms. PERALTA. Yes, it is. According to the open meeting law, I had those rights. I was the Chair of the meeting.

Dr. GOSAR. Thank you very much. For the record, even my chief of staff went to the meeting at my request, tried to meet with members of the Council prior to the meeting, and was not given the opportunity to address the Council. In fact, everyone in the town that attended your 4-minute meeting—4 minutes, 4-minute meeting—was threatened with police removal if they spoke. It doesn't really sound like you or your town manager want to engage at all.

108

I have been humbled by the outpouring of support of your community that was given to Congressman Kirkpatrick and myself in our efforts to take action. I have been submitted, in regards to the record, over 400 letters and petition signatures opposing the town's actions and supporting our bill collected over the span of just 3 days. The Town of Superior has little over 2,500 residents. This is pretty incredible.

Ms. Peralta, is it true that petitions have been taken out to recall you from your seat on the Council?

Ms. PERALTA. Yes, it is.

Dr. GOSAR. Yes, it is. They were actually filed this morning.

Ms. PERALTA. But—yes, they were.

Dr. GOSAR. Yes, thank you.

Ms. PERALTA. And I think they have been taken out before——

Dr. GOSAR. The Town of Superior held local elections just a week ago, after the current Council broke its Mutual Benefits Agreement off with Resolution Copper. The two top vote-getters in the pick-three election were the only two candidates in the race to express vocal opposition to the current Council's actions. Two of the current Council members who were part of this action were the bottom two vote-getters.

I would like to submit for the record the results of the March 12th election and the statements of the opposition to the current Council's actions.

I would also like to submit the local media accounts of the report: the Superior Sun: "Business Owners, Townspeople React to Superior's Council Decision;" "Thank You, Town Council, for Losing Superior's Jobs with Resolution Copper," right here on the front page. "The Copper New Superior Council Meeting Stirs Anger."

Ms. Peralta, it appears the only person dividing your Council is you and the three Council members that have spearheaded this effort. I encourage you to read these letters, these petitions, and hear from your citizens and what they are telling you. I am hard-pressed to believe that you would be here today with your position if you had listened to your community.

Ms. Peralta, what is the current financial situation and status of the town?

Ms. PERALTA. We are broke.

Dr. GOSAR. Yes. My understanding is the community is in dire financial conditions. Four months ago you could not even meet payroll or pay for garbage collection. Is it true that Resolution advanced monies due in 2013 under your Mutual Benefits Agreement to cover these bills?

Ms. PERALTA. Yes, it is.

Dr. GOSAR. Hardly sounds like a bad partner. Supervisor Miller, why do you think the Town Council has taken such a radical reversal in position?

Mr. MILLER. Congressman Gosar, I don't know what the total motivation was. I thought it was interesting that, at my board of supervisors meeting, we had 12 residents from Superior in support of the resolution that we passed, and 2 against it, one of which was the new town manager, who stood up and advised us that they were broke, that they couldn't even put two police cars back into duty. I thought that was awfully telling as to their status.

109

Dr. GOSAR. Supervisor Miller, just one last question. In my tenure in representing District 1, have you seen my presence in and around Superior in regards to being accessible and answering questions? Because the witness prior said that I was not accessible and never had been consulted about this mine.

Mr. MILLER. Congressman Gosar, you have been one of the most accessible legislators I have ever seen. And if there was an issue and we called you, you made yourself available at any time.

Dr. GOSAR. For the record, without objection, I would like to highlight those things that I highlighted. And one last exception is a letter in regards to Chairman Rambler dated April 15, 2011 in regards to my office in regards to the issues with tribal consultation and tribal issue in regards to this mine that was prepared by my staff and experts in Native American law that I would like submitted for the record.

[No response.]

Dr. GOSAR. No objection, so done.

[The information submitted for the record by Dr. Gosar has been retained in the Committee's official files:]

Dr. GOSAR. I would like to now turn it over to the Ranking Member, Raúl Grijalva.

Mr. GRIJALVA. Thank you very much, Mr. Chairman. Ms. Peralta, welcome and thank you for taking the time. Can you tell us about the City Council? There is a number of your colleagues that can't vote on this issue. Is that correct?

Ms. PERALTA. That is correct. We——

Mr. GRIJALVA. How many?

Ms. PERALTA. We have our Mayor and our Vice Mayor, John Tameron, who are in conflict.

Mr. GRIJALVA. Conflict because of what?

Ms. PERALTA. Our Vice Mayor's son is employed by Resolution.

Mr. GRIJALVA. It is because of employment?

Ms. PERALTA. And then our Mayor's daughter is married to him, so that puts him in conflict, also. And our Councilman John Tameron has a contract with Resolution for cleaning services he provides.

Mr. GRIJALVA. It is my understanding that one of the councilmen, I don't know how recently, left the Council after some adjudication?

Ms. PERALTA. Yes, which is why we had to—which is why the mutual benefits agreement is null and void. Councilman Hank Gutierrez was indicted for conflict of interest.

Mr. GRIJALVA. And he works where?

Ms. PERALTA. He has a contract with Resolution.

Mr. GRIJALVA. Thank you, Ms. Peralta. I also wanted to ask you. There was a, you know, we get into the discussion, and I appreciate the Supervisor's point that Resolution has not only raised the reading scores in the area but is prepared to spend $16 billion of revenue. At some point we will follow up with the Supervisor and get some information and some facts. It is nice to put a little facts, figures around, but you know, at some point you have to substantiate them. And we will be following up with questions.

Chairman Rambler, and thank you very much for being here, as well. Oak Flats' significance; you hear that we are going to leave

110

the surface alone, so what is the problem? Proponents of the legis-
lation say, "We are going to leave the surface alone, so what is the
problem?" And would you please tell them what the problem is
going to be down the road, not only in terms of a sacred site, but
in terms of the excavation that could potentially occur underneath?

Mr. RAMBLER. Yes, thank you. I know in reading some parts of
the bill itself, the proposed bill, it talks about surface, but it doesn't
talk about subsurface. So, on the surface, for example, Oak Flat
and Apache Leap itself, even though in this particular case the bill
itself may say Apache Leap will not be disturbed and a fence may
be put around it to not disturb it further, but there is nothing there
that prevents it from being disturbed underneath.

So, when we look at it, we look at it in total, the sacredness of
the whole area in total. And so, when underground it is going to
be disturbed, when there is going to be a big hole left under there,
and we don't know what the potential impact is to the water re-
sources, but we know from history that when there is a big hole
and it rains and it snows and water comes running down, where
is that water going to go, it is going to go to that big hole, and so
we don't know what the impacts are, and that is how we believe
that what is going to happen under ground is going to affect what-
ever is going to be on the surface.

Mr. GRIJALVA. Thank you. And there has been discussion saying
that this bill does not weaken the NEPA process, and so people are
convinced that the State of Arizona permitting process for mines
and private lands is the same as NEPA. Even if we side-step NEPA
on this one, that is absolutely not true. The State is far weaker.
The public comment period is short. There is no quick turnaround
in the submission of critical documents. There is no pre-scoping,
and the process does not require bonding to guarantee a clean-up
and reclamation after the fact. And that is just the environmental
side of it. On the consultation, that is a whole other story that
doesn't exist.

And so, there is no substitute for, one, skipping over NEPA and
doing it after the fact where there is no enforceability, and saying,
well, the State can take care of it. The State can't take care of it.
The State won't take care of it. This NEPA process guarantees not
only the people of Superior and the surrounding community, but
the viability and the intended or unintended consequences of this
mine everybody is going to know up front.

And I, for the life of me, you know, many of the critics of this
process could have, would have been shut up a long time ago, 5
years ago. But for some reason there is a drive to get it done with-
out NEPA, do it after the fact. If there would have been agreement,
"Let's do NEPA now," we would be waiting and resolving and de-
bating what the remediation would have had to be. The consulta-
tion government-to-government, we would have dealt with those
consequences, and maybe they wouldn't have been good.

One suspects, and it is only a suspicion, that a full-blown NEPA
process with public comment is going to disclose and make trans-
parent some consequences that not only the Tribes and the Council
lady from Superior are going to be opposed to, they are going to
have some consequences that the whole region will be very, very

111

concerned, particularly around water and sacred sites. Thank you very much, Mr. Chairman.

Dr. GOSAR. Thank you. I would like to acknowledge the gentle-woman from Wyoming, Ms. Lummis.

Mrs. LUMMIS. Thank you, Mr. Chairman. And I would like to slip back in to the much more mundane topic of soda ash in Trona.

[Laughter.]

Mrs. LUMMIS. Mr. Hohn, give everybody just a little break, could you explain a little bit about China and its trade practices that are distorting the markets for soda ash, globally?

Mr. HOHN. Absolutely. You know, the facts are China's capacity to produce synthetic soda ash is growing. Another fact is that China's exports of soda ash are growing. Another known fact is that China has incentives such as the VAT that enables China to sell soda ash below their cash costs. These are all facts that we are dealing with within the global soda ash markets.

Mrs. LUMMIS. I have another quick question, and it relates to the checkerboard. I think a lot of people don't understand that the Union Pacific Railroad, when it was given its right-of-way across the Untied States, was given every other section, and that this area where the Trona resource lies is within that checkerboard.

So, the surface, and, therefore, the subsurface mineral interests under it—lie 640 acres of private land, and next to that, 640 acres of public land, and that the mining technology is such that when you are mining a long wall, those things are enormously expensive to move. Almost indescribably expensive to move, a long wall, once you set it up and start along its mining course of action.

Is it possible to just lift those up, or lift your mining up and go where the royalty is the lowest?

Mr. HOHN. It is very, very, very difficult. It requires years of advanced mine planning as we look at how we mine the checkerboard, as you just described. I can assure you with confidence that, prior to my current role as General Manager of the Soda Ash Business for OCI Chemical Corporation I was the Site Manger out in our facility out in Green River, Wyoming. And while we employ a bit of a different mining technique, it is a continuous miner operation with room and pillar advancement—it is impossible to pick up and just change a mine plan very, very rapidly. And while I don't have the long wall mining experience, I can assure you also that from my education, that also requires many years of advanced mine planning.

Mrs. LUMMIS. Thank you. And, Mr. Chairman, I will save the rest of my time and yield back to you to use for whatever purpose you wish to use it for.

Dr. GOSAR. I thank the gentlelady. Before her time runs out I would like to address some issues laid out in the Administration's testimony regarding tribal consultation and the protection of historical significant sites.

As someone who has lived among Native Americans my entire life, first in Wyoming, then in Creighton University in Omaha, Nebraska, and finally in Northern Arizona, tribal consultation and Congress's trust responsibility to Tribes is very important to me. In fact, I have been very outspoken in favor of the policies that benefit Tribes in my short time in Congress. That is why, in crafting this

112

legislation, I have taken specific measures to protect those inter-
ests.

However, regarding Oak Flat Campground, I wanted to correct
some of the misinformation that has been thrown around here.
When the Oak Flat Picnic and Campground was withdrawn in
1955 by a Public Order, PLO1229, in the text it read, "Reserving
lands within National Forests for use of the Forest Service as
campgrounds, recreation areas, and for other public purposes." The
withdrawal was done to protect the Federal Government's interest
in the capital improvement of the campground. It made no mention
of tribal sacred sites. In fact, members of communities that sur-
round the area have given firsthand accounts that the San Carlos
did not utilize the area for ceremonies until this project was an-
nounced about a decade ago. I will submit a variety of accounts
longtime residents of the area have provided for the record.

I would also like to point out on September 20, 1971 the Oak
Flat Picnic and Campground withdrawal area was modified by
Public Land Order 5132 by Assistant Secretary of the Interior Har-
rison Loche. Since then, the 760 acres, known as Oak Flat Picnic
and Campground Area, has been eligible for disposal by land ex-
change and other disposal authorities of the Forest Service.

Once again, I would like to keep the discussion about facts, be-
cause the facts set you free.

The Ranking Member has two articles that he would like to be
included?

Mr. GRIJALVA. Thank you, Mr. Chairman. And an inventory and
a list of all the Native Nations and tribal governments that are in
opposition of the legislation. Also we will be submitting for Chair-
man Lamborn a kind of an explanation between fee simple and
trust land that is for the purpose and use by Native Tribes under
law.

And, Mr. Rambler, thank you. I like the NEPA process, I like
consultation, government-to-government, because I don't try to tell
you what to do and what you need.

Dr. GOSAR. Without objection, so ordered.

[The information submitted for the record by Mr. Grijalva has
been retained in the Committee's official files:]

Dr. GOSAR. As of this, with no further objections—oh, no, I am
sorry. Mr. Cramer?

Mr. CRAMER. I have nothing, Mr. Chairman, but would yield my
time to the Chair, if he needs it.

Dr. GOSAR. Well, thank you very, very much. Without further
ado, I know a number of you have to catch your planes. So thank
you very, very much for the testimony, and as of now—thank you—
we stand adjourned.

[Whereupon, at 2:05 p.m., the Subcommittee was adjourned.]

## [Additional Materials Submitted for the Record]

The documents listed below have been retained in the Commit-
tee's official files.
Submitted for the record by Representative Paul A. Gosar on
H.R. 687:

113

- Letters of support from the State government delegation of the affected region: Governor Jan Brewer, State Senator Barb McQuire, State Representatives Frank Pratt, T.J. Shope, and Brenda Barton
- A resolution unanimously passed by the bipartisan Pinal County Board of Supervisors and letters of support from the entire bipartisan Gila County Board of Supervisors. These two counties encompass the areas most affected by the exchange.

Additional material submitted for the record by Representative Paul A. Gosar:
- Article: Hope for Resolution Copper mine is bipartisanship, By Editorial board, The Republic/azcentral.com, 2/19/13
- E&E Article—Pentagon Warns of Mineral Shortfalls, 3/20/13
- Letter of support from Senate President Biggs
- Letter from the Queen Creek Coalition (rock climbing group)
- Superior Town Council election results with quotes from two candidates and links to news articles where they were quoted
- News Articles: Superior Sun and the Cooper Country News
- CRS Report on Earnings of Mining and Tourism Industries
- Letter from Representative Paul A. Gosar to Chairman Rambler dated April 15, 2011
- Petition and letters of support for H.R. 687, 400 signatures
- Letter of support from The Nature Conservancy
- Letter of support from the Sonoran Institute

Additional material submitted for the record on H.R. 687:
- Access Fund Executive Director Brady Robinson
- Affiliated Tribes of NW Indians
- Colorado River Indian Tribes
- Fort McDowell Yavapai Nation
- Inter Tribal Council of AZ Tribes
- National Center for Policy Analysis Finding Sources of Rare Earths beyond China
- Ramona Band of Cahuilla Indians
- Letters from the Mayor of the Town of Payson, the Mayor of Globe, Terry Wheeler, Superior Councilman John Tameron, and a resolution of support from the Town of Kearney

Submitted for the record by Representative Raúl M. Grijalva:
- Written Testimony of Roger Featherstone, Director, Arizona Mining Reform Coalition, Testimony on H.R. 687

Submitted for the record in response to James M. Iwanicki's testimony:
- Keweenaw Bay Indian Community
- Upper Peninsula Environmental Coalition

Submitted for the record by Representative Joseph J. Heck on H.R. 697:
- Historic Defense Plant Corporation areas
- Three Kids Mine and Mill Site Layout
- Three Kids Mine Project Site Map Final
- Statement of the Honorable Andy Hafen, Mayor, City of Henderson, Nevada, on H.R. 697

○



# CONGRESSIONAL BUDGET OFFICE
# COST ESTIMATE

July 11, 2013

---

## H.R. 687
### Southeast Arizona Land Exchange and Conservation Act of 2013

*As ordered reported by the House Committee on Natural Resources on May 15, 2013*

---

H.R. 687 would authorize a land exchange in Arizona between the federal government and a mining company. Based on information provided by the affected agencies, CBO estimates that implementing the bill would cost less than $500,000 annually, assuming the availability of appropriated funds. Those costs would include preparing management plans and administering private lands received in exchange for federal land.

Enacting the legislation could increase offsetting receipts, which are treated as reductions in direct spending; however, CBO has insufficient information to estimate whether any receipts would be collected under the bill. Because enacting the bill could affect direct spending, pay-as-you-go procedures apply.

Under H.R. 687, the Forest Service would convey about 2,400 acres of land in southeast Arizona to Resolution Copper Mining LLC in exchange for about 5,400 acres of company-owned land. Of the company land, about 1,200 acres would become part of the National Forest System, and about 4,200 acres would be administered as conservation areas by the Bureau of Land Management.

If the property sought by Resolution Copper is appraised at more than the appraised value of the property that the company offers for exchange, the company could donate additional land or make a cash payment to the United States to make the final exchange of equal value. If the company's property is appraised for more than the federal acreage, the difference in the value would be considered a donation to the federal government. Any cash payment received by the Forest Service would be deposited in the U.S. Treasury as an offsetting receipt. In addition, after completion of the exchange, Resolution Copper would have to pay the federal government a portion of any future income earned on the former federal property if the company determines that the actual cumulative production of minerals located on that property exceeds the value of the estimated production used in the original appraisal process.

The bill's effect on offsetting receipts would depend on the outcome of formal appraisals of the federal and private properties that would be conducted after enactment. Those appraisals would determine the relative values of the properties affected by the exchange,

including the value of mineral deposits that underlie the federal land. If the value of the federal land were to exceed the value of the company land, Resolution Copper could pay the government a lump sum equal to the difference in property values in the year or two following enactment. That payment might be significant; however, because there are no publicly available estimates regarding the quantity of copper underlying the federal land, CBO has no basis for estimating the value of that land relative to the value of the company land. Therefore, we cannot determine whether the company would make a payment or estimate the size of any such payment.

In addition, if the company extracts more mineral resources than assumed in the original appraisal, Resolution Copper would make annual payments to the federal government. Such payments might be significant; however, based on information provided by Resolution Copper, CBO expects that those lands would not be mined within 10 years of the enactment of H.R. 687. Therefore, no payments would be made over the next 10 years.

The bill contains no intergovernmental or private-sector mandates as defined in the Unfunded Mandates Reform Act and would impose no costs on state, local, or tribal governments.

The CBO staff contact for this estimate is Jeff LaFave. The estimate was approved by Theresa Gullo, Deputy Assistant Director for Budget Analysis.

| 113TH CONGRESS<br>*1st Session* | HOUSE OF REPRESENTATIVES | REPORT<br>113–167 |
|---|---|---|

# SOUTHEAST ARIZONA LAND EXCHANGE AND CONSERVATION ACT OF 2013

JULY 22, 2013.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. HASTINGS of Washington, from the Committee on Natural Resources, submitted the following

# R E P O R T

together with

## DISSENTING VIEWS

[To accompany H.R. 687]

[Including cost estimate of the Congressional Budget Office]

The Committee on Natural Resources, to whom was referred the bill (H.R. 687) to facilitate the efficient extraction of mineral resources in southeast Arizona by authorizing and directing an exchange of Federal and non-Federal land, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike all after the enacting clause and insert the following:

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Southeast Arizona Land Exchange and Conservation Act of 2013".

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Findings and purpose.
Sec. 3. Definitions.
Sec. 4. Land exchange.
Sec. 5. Conveyance and management of non-Federal land.
Sec. 6. Value adjustment payment to United States.
Sec. 7. Withdrawal.
Sec. 8. Apache leap.
Sec. 9. Miscellaneous provisions.

**SEC. 2. FINDINGS AND PURPOSE.**

(a) FINDINGS.—Congress finds that—

29–006

2

(1) the land exchange furthers public objectives referenced in section 206 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1716) including—

(A) promoting significant job and other economic opportunities in a part of the State of Arizona that has a long history of mining, but is currently experiencing high unemployment rates and economic difficulties;

(B) facilitating the development of a world-class domestic copper deposit capable of meeting a significant portion of the annual United States demand for this strategic and important mineral, in an area which has already been subject to mining operations;

(C) significantly enhancing Federal, State, and local revenue collections in a time of severe governmental budget shortfalls;

(D) securing Federal ownership and protection of land with significant fish and wildlife, recreational, scenic, water, riparian, cultural, and other public values;

(E) assisting more efficient Federal land management via Federal acquisition of land for addition to the Las Cienegas and San Pedro National Conservation Areas, and to the Tonto and Coconino National Forests;

(F) providing opportunity for community expansion and economic diversification adjacent to the towns of Superior, Miami, and Globe, Arizona; and

(G) protecting the cultural resources and other values of the Apache Leap escarpment located near Superior, Arizona; and

(2) the land exchange is, therefore, in the public interest.

(b) PURPOSE.—It is the purpose of this Act to authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States.

**SEC. 3. DEFINITIONS.**

In this Act:

(1) APACHE LEAP.—The term "Apache Leap" means the approximately 807 acres of land depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Apache Leap" and dated February 2013.

(2) FEDERAL LAND.—The term "Federal land" means the approximately 2,422 acres of land located in Pinal County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Federal Parcel–Oak Flat" and dated February 2013.

(3) INDIAN TRIBE.—The term "Indian tribe" has the meaning given the term in section 4 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450b).

(4) NON-FEDERAL LAND.—The term "non-Federal land" means the parcels of land owned by Resolution Copper that are described in section 5(a) and, if necessary to equalize the land exchange under section 4, section 4(e)(2)(A)(i).

(5) OAK FLAT CAMPGROUND.—The term "Oak Flat Campground" means the approximately 50 acres of land comprising approximately 16 developed campsites depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Oak Flat Campground" and dated February 2013.

(6) OAK FLAT WITHDRAWAL AREA.—The term "Oak Flat Withdrawal Area" means the approximately 760 acres of land depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Oak Flat Withdrawal Area" and dated February 2013.

(7) RESOLUTION COPPER.—The term "Resolution Copper" means Resolution Copper Mining, LLC, a Delaware limited liability company, including any successor, assign, affiliate, member, or joint venturer of Resolution Copper Mining, LLC.

(8) SECRETARY.—The term "Secretary" means the Secretary of Agriculture.

(9) STATE.—The term "State" means the State of Arizona.

(10) TOWN.—The term "Town" means the incorporated town of Superior, Arizona.

**SEC. 4. LAND EXCHANGE.**

(a) IN GENERAL.—Subject to the provisions of this Act, if Resolution Copper offers to convey to the United States all right, title, and interest of Resolution Copper in and to the non-Federal land, the Secretary is authorized and directed to convey to Resolution Copper, all right, title, and interest of the United States in and to the Federal land.

(b) CONDITIONS ON ACCEPTANCE.—Title to any non-Federal land conveyed by Resolution Copper to the United States under this Act shall be in a form that—

(1) is acceptable to the Secretary, for land to be administered by the Forest Service and the Secretary of the Interior, for land to be administered by the Bureau of Land Management; and

3

(2) conforms to the title approval standards of the Attorney General of the United States applicable to land acquisitions by the Federal Government.

(c) CONSULTATION WITH INDIAN TRIBES.—If not undertaken prior to enactment of this Act, within 30 days of the date of enactment of this Act, the Secretary shall engage in government-to-government consultation with affected Indian tribes concerning issues related to the land exchange, in accordance with applicable laws (including regulations).

(d) APPRAISALS.—

(1) IN GENERAL.—As soon as practicable after the date of enactment of this Act, the Secretary and Resolution Copper shall select an appraiser to conduct appraisals of the Federal land and non-Federal land in compliance with the requirements of section 254.9 of title 36, Code of Federal Regulations.

(2) REQUIREMENTS.—

(A) IN GENERAL.—Except as provided in subparagraph (B), an appraisal prepared under this subsection shall be conducted in accordance with nationally recognized appraisal standards, including—

(i) the Uniform Appraisal Standards for Federal Land Acquisitions; and

(ii) the Uniform Standards of Professional Appraisal Practice.

(B) FINAL APPRAISED VALUE.—After the final appraised values of the Federal land and non-Federal land are determined and approved by the Secretary, the Secretary shall not be required to reappraise or update the final appraised value—

(i) for a period of 3 years beginning on the date of the approval by the Secretary of the final appraised value; or

(ii) at all, in accordance with section 254.14 of title 36, Code of Federal Regulations (or a successor regulation), after an exchange agreement is entered into by Resolution Copper and the Secretary.

(C) IMPROVEMENTS.—Any improvements made by Resolution Copper prior to entering into an exchange agreement shall not be included in the appraised value of the Federal land.

(D) PUBLIC REVIEW.—Before consummating the land exchange under this Act, the Secretary shall make the appraisals of the land to be exchanged (or a summary thereof) available for public review.

(3) APPRAISAL INFORMATION.—The appraisal prepared under this subsection shall include a detailed income capitalization approach analysis of the market value of the Federal land which may be utilized, as appropriate, to determine the value of the Federal land, and shall be the basis for calculation of any payment under section 6.

(e) EQUAL VALUE LAND EXCHANGE.—

(1) IN GENERAL.—The value of the Federal land and non-Federal land to be exchanged under this Act shall be equal or shall be equalized in accordance with this subsection.

(2) SURPLUS OF FEDERAL LAND VALUE.—

(A) IN GENERAL.—If the final appraised value of the Federal land exceeds the value of the non-Federal land, Resolution Copper shall—

(i) convey additional non-Federal land in the State to the Secretary or the Secretary of the Interior, consistent with the requirements of this Act and subject to the approval of the applicable Secretary;

(ii) make a cash payment to the United States; or

(iii) use a combination of the methods described in clauses (i) and (ii), as agreed to by Resolution Copper, the Secretary, and the Secretary of the Interior.

(B) AMOUNT OF PAYMENT.—The Secretary may accept a payment in excess of 25 percent of the total value of the land or interests conveyed, notwithstanding section 206(b) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1716(b)).

(C) DISPOSITION AND USE OF PROCEEDS.—Any amounts received by the United States under this subparagraph shall be deposited in the fund established under Public Law 90–171 (commonly known as the "Sisk Act"; 16 U.S.C. 484a) and shall be made available, in such amounts as are provided in advance in appropriation Acts, to the Secretary for the acquisition of land for addition to the National Forest System.

(3) SURPLUS OF NON-FEDERAL LAND.—If the final appraised value of the non-Federal land exceeds the value of the Federal land—

(A) the United States shall not make a payment to Resolution Copper to equalize the value; and

(B) the surplus value of the non-Federal land shall be considered to be a donation by Resolution Copper to the United States.

4

(f) OAK FLAT WITHDRAWAL AREA.—

(1) PERMITS.—Subject to the provisions of this subsection and notwithstanding any withdrawal of the Oak Flat Withdrawal Area from the mining, mineral leasing, or public land laws, the Secretary, upon enactment of this Act, shall issue to Resolution Copper—

(A) if so requested by Resolution Copper, within 30 days of such request, a special use permit to carry out mineral exploration activities under the Oak Flat Withdrawal Area from existing drill pads located outside the Area, if the activities would not disturb the surface of the Area; and

(B) if so requested by Resolution Copper, within 90 days of such request, a special use permit to carry out mineral exploration activities within the Oak Flat Withdrawal Area (but not within the Oak Flat Campground), if the activities are conducted from a single exploratory drill pad which is located to reasonably minimize visual and noise impacts on the Campground.

(2) CONDITIONS.—Any activities undertaken in accordance with this subsection shall be subject to such reasonable terms and conditions as the Secretary may require.

(3) TERMINATION.—The authorization for Resolution Copper to undertake mineral exploration activities under this subsection shall remain in effect until the Oak Flat Withdrawal Area land is conveyed to Resolution Copper in accordance with this Act.

(g) COSTS.—As a condition of the land exchange under this Act, Resolution Copper shall agree to pay, without compensation, all costs that are—

(1) associated with the land exchange and any environmental review document under subsection (j); and

(2) agreed to by the Secretary.

(h) USE OF FEDERAL LAND.—The Federal land to be conveyed to Resolution Copper under this Act shall be available to Resolution Copper for mining and related activities subject to and in accordance with applicable Federal, State, and local laws pertaining to mining and related activities on land in private ownership.

(i) INTENT OF CONGRESS.—It is the intent of Congress that the land exchange directed by this Act shall be consummated not later than one year after the date of enactment of this Act.

(j) ENVIRONMENTAL COMPLIANCE.—Compliance with the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) under this Act shall be as follows:

(1) Prior to commencing production in commercial quantities of any valuable mineral from the Federal land conveyed to Resolution Copper under this Act (except for any production from exploration and mine development shafts, adits, and tunnels needed to determine feasibility and pilot plant testing of commercial production or to access the ore body and tailing deposition areas), Resolution Copper shall submit to the Secretary a proposed mine plan of operations.

(2) The Secretary shall, within 3 years of such submission, complete preparation of an environmental review document in accordance with section 102(2) of the National Environmental Policy Act of 1969 (42 U.S.C. 4322(2)) which shall be used as the basis for all decisions under applicable Federal laws, rules and regulations regarding any Federal actions or authorizations related to the proposed mine and mine plan of operations of Resolution Copper, including the construction of associated power, water, transportation, processing, tailings, waste dump, and other ancillary facilities.

SEC. 5. CONVEYANCE AND MANAGEMENT OF NON-FEDERAL LAND.

(a) CONVEYANCE.—On receipt of title to the Federal land, Resolution Copper shall simultaneously convey—

(1) to the Secretary, all right, title, and interest that the Secretary determines to be acceptable in and to—

(A) the approximately 147 acres of land located in Gila County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Non-Federal Parcel–Turkey Creek" and dated February 2013;

(B) the approximately 148 acres of land located in Yavapai County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Non-Federal Parcel–Tangle Creek" and dated February 2013;

(C) the approximately 149 acres of land located in Maricopa County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Non-Federal Parcel–Cave Creek" and dated February 2013;

5

(D) the approximately 640 acres of land located in Coconino County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Non-Federal Parcel–East Clear Creek" and dated February 2013; and

(E) the approximately 110 acres of land located in Pinal County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Apache Leap South End" and dated February 2013; and

(2) to the Secretary of the Interior, all right, title, and interest that the Secretary of the Interior determines to be acceptable in and to—

(A) the approximately 3,050 acres of land located in Pinal County, Arizona, identified as "Lands to DOI" as generally depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Non-Federal Parcel–Lower San Pedro River" and dated February 2013;

(B) the approximately 160 acres of land located in Gila and Pinal Counties, Arizona, identified as "Lands to DOI" as generally depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Non-Federal Parcel–Dripping Springs" and dated February 2013; and

(C) the approximately 940 acres of land located in Santa Cruz County, Arizona, identified as "Lands to DOI" as generally depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Non-Federal Parcel–Appleton Ranch" and dated February 2013.

(b) Management of Acquired Land.—

(1) Land acquired by the secretary.—

(A) In general.—Land acquired by the Secretary under this Act shall—

(i) become part of the national forest in which the land is located; and

(ii) be administered in accordance with the laws applicable to the National Forest System.

(B) Boundary revision.—On the acquisition of land by the Secretary under this Act, the boundaries of the national forest shall be modified to reflect the inclusion of the acquired land.

(C) Land and water conservation fund.—For purposes of section 7 of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 4601–9), the boundaries of a national forest in which land acquired by the Secretary is located shall be deemed to be the boundaries of that forest as in existence on January 1, 1965.

(2) Land acquired by the secretary of the interior.—

(A) San pedro national conservation area.—

(i) In general.—The land acquired by the Secretary of the Interior under subsection (a)(2)(A) shall be added to, and administered as part of, the San Pedro National Conservation Area in accordance with the laws (including regulations) applicable to the Conservation Area.

(ii) Management plan.—Not later than 2 years after the date on which the land is acquired, the Secretary of the Interior shall update the management plan for the San Pedro National Conservation Area to reflect the management requirements of the acquired land.

(B) Dripping springs.—Land acquired by the Secretary of the Interior under subsection (a)(2)(B) shall be managed in accordance with the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.) and applicable land use plans.

(C) Las cienegas national conservation area.—Land acquired by the Secretary of the Interior under subsection (a)(2)(C) shall be added to, and administered as part of, the Las Cienegas National Conservation Area in accordance with the laws (including regulations) applicable to the Conservation Area.

(c) Surrender of Rights.—In addition to the conveyance of the non-Federal land to the United States under this Act, and as a condition of the land exchange, Resolution Copper shall surrender to the United States, without compensation, the rights held by Resolution Copper under the mining laws and other laws of the United States to commercially extract minerals under Apache Leap.

**SEC. 6. VALUE ADJUSTMENT PAYMENT TO UNITED STATES.**

(a) Annual Production Reporting.—

(1) Report required.—As a condition of the land exchange under this Act, Resolution Copper shall submit to the Secretary of the Interior an annual report indicating the quantity of locatable minerals produced during the preceding calendar year in commercial quantities from the Federal land conveyed to Resolution Copper under section 4. The first report is required to be submitted not later than February 15 of the first calendar year beginning after the date of

6

commencement of production of valuable locatable minerals in commercial quantities from such Federal land. The reports shall be submitted February 15 of each calendar year thereafter.

(2) SHARING REPORTS WITH STATE.—The Secretary shall make each report received under paragraph (1) available to the State.

(3) REPORT CONTENTS.—The reports under paragraph (1) shall comply with any recordkeeping and reporting requirements prescribed by the Secretary or required by applicable Federal laws in effect at the time of production.

(b) PAYMENT ON PRODUCTION.—If the cumulative production of valuable locatable minerals produced in commercial quantities from the Federal land conveyed to Resolution Copper under section 4 exceeds the quantity of production of locatable minerals from the Federal land used in the income capitalization approach analysis prepared under section 4(d), Resolution Copper shall pay to the United States, by not later than March 15 of each applicable calendar year, a value adjustment payment for the quantity of excess production at the same rate assumed for the income capitalization approach analysis prepared under section 4(d).

(c) STATE LAW UNAFFECTED.—Nothing in this section modifies, expands, diminishes, amends, or otherwise affects any State law relating to the imposition, application, timing, or collection of a State excise or severance tax.

(d) USE OF FUNDS.—

(1) SEPARATE FUND.—All funds paid to the United States under this section shall be deposited in a special fund established in the Treasury and shall be available, in such amounts as are provided in advance in appropriation Acts, to the Secretary and the Secretary of the Interior only for the purposes authorized by paragraph (2).

(2) AUTHORIZED USE.—Amounts in the special fund established pursuant to paragraph (1) shall be used for maintenance, repair, and rehabilitation projects for Forest Service and Bureau of Land Management assets.

**SEC. 7. WITHDRAWAL.**

Subject to valid existing rights, Apache Leap and any land acquired by the United States under this Act are withdrawn from all forms of—

(1) entry, appropriation, or disposal under the public land laws;

(2) location, entry, and patent under the mining laws; and

(3) disposition under the mineral leasing, mineral materials, and geothermal leasing laws.

**SEC. 8. APACHE LEAP.**

(a) MANAGEMENT.—

(1) IN GENERAL.—The Secretary shall manage Apache Leap to preserve the natural character of Apache Leap and to protect archeological and cultural resources located on Apache Leap.

(2) SPECIAL USE PERMITS.—The Secretary may issue to Resolution Copper special use permits allowing Resolution Copper to carry out underground activities (other than the commercial extraction of minerals) under the surface of Apache Leap that the Secretary determines would not disturb the surface of the land, subject to any terms and conditions that the Secretary may require.

(3) FENCES; SIGNAGE.—The Secretary may allow use of the surface of Apache Leap for installation of fences, signs, monitoring devices, or other measures necessary to protect the health and safety of the public, protect resources located on Apache Leap, or to ensure that activities conducted under paragraph (2) do not affect the surface of Apache Leap.

(b) PLAN.—

(1) IN GENERAL.—Not later than 3 years after the date of enactment of this Act, the Secretary, in consultation with affected Indian tribes, the Town, Resolution Copper, and other interested members of the public, shall prepare a management plan for Apache Leap.

(2) CONSIDERATIONS.—In preparing the plan under paragraph (1), the Secretary shall consider whether additional measures are necessary to—

(A) protect the cultural, archaeological, or historical resources of Apache Leap, including permanent or seasonal closures of all or a portion of Apache Leap; and

(B) provide access for recreation.

(c) MINING ACTIVITIES.—The provisions of this section shall not impose additional restrictions on mining activities carried out by Resolution Copper adjacent to, or outside of, the Apache Leap area beyond those otherwise applicable to mining activities on privately owned land under Federal, State, and local laws, rules and regulations.

7

**SEC. 9. MISCELLANEOUS PROVISIONS.—**

(a) REVOCATION OF ORDERS; WITHDRAWAL.—

(1) REVOCATION OF ORDERS.—Any public land order that withdraws the Federal land from appropriation or disposal under a public land law shall be revoked to the extent necessary to permit disposal of the land.

(2) WITHDRAWAL.—On the date of enactment of this Act, if the Federal land or any Federal interest in the non-Federal land to be exchanged under section 4 is not withdrawn or segregated from entry and appropriation under a public land law (including mining and mineral leasing laws and the Geothermal Steam Act of 1970 (30 U.S.C. 1001 et seq.)), the land or interest shall be withdrawn, without further action required by the Secretary concerned, from entry and appropriation. The withdrawal shall be terminated—

(A) on the date of consummation of the land exchange; or

(B) if Resolution Copper notifies the Secretary in writing that it has elected to withdraw from the land exchange pursuant to section 206(d) of the Federal Land Policy and Management Act of 1976, as amended (43 U.S.C. 1716(d)).

(3) RIGHTS OF RESOLUTION COPPER.—Nothing in this Act shall interfere with, limit, or otherwise impair, the unpatented mining claims or rights currently held by Resolution Copper on the Federal land, nor in any way change, diminish, qualify, or otherwise impact Resolution Copper's rights and ability to conduct activities on the Federal land under such unpatented mining claims and the general mining laws of the United States, including the permitting or authorization of such activities.

(b) MAPS, ESTIMATES, AND DESCRIPTIONS.—

(1) MINOR ERRORS.—The Secretary concerned and Resolution Copper may correct, by mutual agreement, any minor errors in any map, acreage estimate, or description of any land conveyed or exchanged under this Act.

(2) CONFLICT.—If there is a conflict between a map, an acreage estimate, or a description of land in this Act, the map shall control unless the Secretary concerned and Resolution Copper mutually agree otherwise.

(3) AVAILABILITY.—On the date of enactment of this Act, the Secretary shall file and make available for public inspection in the Office of the Supervisor, Tonto National Forest, each map referred to in this Act.

PURPOSE OF THE BILL

The purpose of H.R. 687 is to facilitate the efficient extraction of mineral resources in southeast Arizona by authorizing and directing an exchange of Federal and non-Federal land.

BACKGROUND AND NEED FOR LEGISLATION

Resolution Copper Mining LLC (Resolution Copper) owns land and holds mining claims near the Town of Superior, in southeastern Arizona. In the late 1990s, Resolution Copper's exploratory activities revealed the existence of a very large copper deposit on its claims, located between 4,500 to 7,000 feet below the surface. Resolution Copper is interested in developing a large underground mine where the ore would be extracted and removed.

The Oak Flat Campground, part of the Tonto National Forest, is located in the center of Resolution Copper's land holdings and mining claims. Approximately 760 acres of National Forest lands in and around the Oak Flat Campground were withdrawn from entry under the mining laws in 1955 along with numerous other tracks of land for the purpose of establishing several campgrounds on the public lands. See Public Land Order 1229 (Sept. 27, 1955); 20 Fed. Reg. 7336–37 (Oct. 1, 1955).

Members of the Arizona Delegation have proposed a land exchange allowing Resolution Copper to acquire the campground and adjacent withdrawn National Forest lands so the company can proceed with development of the mine. The Secretary of Agriculture would convey to Resolution Copper certain lands and interests in

8

the Tonto National Forest, Arizona, in exchange for private lands of environmental and archeological significance in the State of Arizona for management by the U.S. Forest Service and the Bureau of Land Management (BLM). Legislation is required for the proposed land exchange because it includes National Forest System lands.

The three-part land exchange would occur under H.R. 687, as follows:

U.S. Forest Service acquisition of land from Resolution Copper: The Forest Service would acquire a total of 1,194 acres from five different locations. These include Resolution Copper lands located within Coconino (640 acres), Gila (147 acres), Maricopa (149 acres), Pinal (110 acres) and Yavapai (148 acres) Counties. These lands contain riparian habitats and sensitive cultural areas, in addition to the several hundred acres that contain habitat for endangered species, and archeological sites.

BLM acquisition of land from Resolution Copper: BLM would acquire a total of 4,150 acres from three separate locations. Three thousand fifty acres would be acquired from the lower San Pedro River area, which includes one of the largest mesquite bosques (dense forest) left in Arizona, critical habitat for several endangered species, and critical bird habitat. This would be an important addition to the San Pedro Conservation Area. BLM would also acquire 160 acres in Gila County and 940 acres in Santa Cruz County.

Resolution Copper acquisition of land from Forest Service: Resolution Copper will acquire the 2,422 acre "Oak Flat" parcel, which is checker-boarded within Resolution Copper's lands. Resolution Copper already has unpatented mining claims that cover about 75% of the parcel, including the culturally sensitive Apache Leap area. This exchange will provide more protection for Apache Leap since the conveyance will prohibit any type of extraction activity and transfer this land to the federal government indefinitely. If the land received by Resolution Copper exceeds the value of the lands received by the federal government, Resolution Copper may provide additional lands to equal the exchange or provide a monetary payment. Any cash payment will be deposited in a fund established under the Sisk Act and the proceeds used to buy additional forest land for the National Forest System nationally and maintain existing federal facilities.

Enactment of this land exchange would allow for development of the mine while adding other important lands for Federal management. The mine could provide up to one-quarter of the nation's estimated annual copper needs. Resolution Copper estimates that the total economic impact of the mine will exceed $60 billion and support 3,700 jobs annually.

COMMITTEE ACTION

H.R. 687 was introduced on February 14, 2013, by Congressman Paul Gosar (R–AZ). The bill was referred to the Committee on Natural Resources, and within the Committee to the Subcommittees on Energy and Mineral Resources and Public Lands and Environmental Regulation. On March 21, 2013, the Subcommittee on Energy and Mineral Resources held a hearing on the bill. On May 15, 2013, the Full Natural Resources Committee met to consider the

9

bill. The Subcommittees on Energy and Mineral Resources and Public Lands and Environmental Regulation were discharged by unanimous consent. Congressman Gosar offered an amendment designated #1 to the bill; the amendment was adopted by voice vote. Congressman Peter DeFazio (D–OR) offered an amendment designated .001 to the bill; the amendment was not adopted by a bipartisan roll call vote of 16 to 24, as follows:

10

**Committee on Natural Resources**
U.S. House of Representatives
113th Congress

Date:   May 15, 2013                                           Recorded Vote #:  4

Meeting on / Amendment on: **H.R. 687 - DeFazio.001**, Not agreed to by vote of 16 yeas and 24 nays

| MEMBERS | Yea | Nay | Pres | MEMBERS | Yea | Nay | Pres |
|---|---|---|---|---|---|---|---|
| **Mr. Hastings, WA, Chairman** | | X | | **Mr. Duncan, SC** | | X | |
| *Mr. Markey, MA, Ranking* | | | | *Ms. Hanabusa, HI* | X | | |
| **Mr. Young, AK** | | X | | **Mr. Tipton, CO** | | X | |
| *Mr. Defazio, OR* | X | | | *Mr. Cardenas, CA* | X | | |
| **Mr. Gohmert, TX** | | | | **Mr. Gosar, AZ** | | X | |
| *Mr. Faleomavaega, AS* | | | | *Mr. Horsford, NV* | | X | |
| **Mr. Bishop, UT** | | X | | **Mr. Labrador, ID** | | X | |
| *Mr. Pallone, NJ* | X | | | *Mr. Huffman, CA* | X | | |
| **Mr. Lamborn, CO** | | X | | **Mr. Southerland, FL** | | X | |
| *Mrs. Napolitano, CA* | X | | | *Mr. Ruiz, CA* | X | | |
| **Mr. Wittman, VA** | | X | | **Mr. Flores, TX** | | X | |
| *Mr. Holt, NJ* | X | | | *Ms. Shea-Porter, NH* | X | | |
| **Mr. Broun, GA** | | | | **Mr. Runyan, NJ** | | X | |
| *Mr. Grijalva, AZ* | X | | | *Mr. Lowenthal, CA* | X | | |
| **Mr. Fleming, LA** | | X | | **Mr. Amodei, NV** | | X | |
| *Ms. Bordallo, GU* | X | | | *Mr. Garcia, FL* | X | | |
| **Mr. McClintock, CA** | | X | | **Mr. Mullin, OK** | | X | |
| *Mr. Costa, CA* | | | | *Mr. Cartwright, PA* | X | | |
| **Mr. Thompson, PA** | | X | | **Mr. Stewart, UT** | | X | |
| *Mr. Sablan, CNMI* | X | | | **Mr. Daines, MT** | | X | |
| **Ms. Lummis, WY** | | | | **Mr. Cramer, ND** | | X | |
| *Ms. Tsongas, MA* | X | | | **Mr. LaMalfa, CA** | | X | |
| **Mr. Benishek, MI** | | X | | | | | |
| *Mr. Pierluisi, PR* | | | | | | | |
| | | | | | | | |
| | | | | **TOTALS** | 16 | 24 | |

11

Congressman Tony Cárdenas (D–CA) offered an amendment designated .003 to the bill; the amendment was not adopted by a roll call vote of 18 to 22, as follows:

12

**Committee on Natural Resources**
U.S. House of Representatives
113th Congress

Date:   May 15, 2013                                          Recorded Vote #:  5

Meeting on / Amendment on: **H.R. 687 - Cardenas.003**, Not agreed to by vote of 18 yeas and 22 nays

| MEMBERS | Yea | Nay | Pres | MEMBERS | Yea | Nay | Pres |
|---|---|---|---|---|---|---|---|
| **Mr. Hastings, WA, Chairman** | | X | | **Mr. Duncan, SC** | | X | |
| *Mr. Markey, MA, Ranking* | | | | *Ms. Hanabusa, HI* | X | | |
| **Mr. Young, AK** | | X | | **Mr. Tipton, CO** | | X | |
| *Mr. Defazio, OR* | X | | | *Mr. Cardenas, CA* | X | | |
| **Mr. Gohmert, TX** | | | | **Mr. Gosar, AZ** | | X | |
| *Mr. Faleomavaega, AS* | | | | *Mr. Horsford, NV* | X | | |
| **Mr. Bishop, UT** | | X | | **Mr. Labrador, ID** | | X | |
| *Mr. Pallone, NJ* | X | | | *Mr. Huffman, CA* | X | | |
| **Mr. Lamborn, CO** | | X | | **Mr. Southerland, FL** | | X | |
| *Mrs. Napolitano, CA* | X | | | *Mr. Ruiz, CA* | X | | |
| **Mr. Wittman, VA** | | X | | **Mr. Flores, TX** | | X | |
| *Mr. Holt, NJ* | X | | | *Ms. Shea-Porter, NH* | X | | |
| **Mr. Broun, GA** | | | | **Mr. Runyan, NJ** | | X | |
| *Mr. Grijalva, AZ* | X | | | *Mr. Lowenthal, CA* | X | | |
| **Mr. Fleming, LA** | | X | | **Mr. Amodei, NV** | | X | |
| *Ms. Bordallo, GU* | X | | | *Mr. Garcia, FL* | X | | |
| **Mr. McClintock, CA** | | X | | **Mr. Mullin, OK** | X | | |
| *Mr. Costa, CA* | | | | *Mr. Cartwright, PA* | X | | |
| **Mr. Thompson, PA** | | X | | **Mr. Stewart, UT** | | X | |
| *Mr. Sablan, CNMI* | X | | | **Mr. Daines, MT** | | X | |
| **Ms. Lummis, WY** | | X | | **Mr. Cramer, ND** | | X | |
| *Ms. Tsongas, MA* | X | | | **Mr. LaMalfa, CA** | | X | |
| **Mr. Benishek, MI** | | X | | | | | |
| *Mr. Pierluisi, PR* | | | | | | | |
| | | | | | | | |
| | | | | **TOTALS** | 18 | 22 | |

13

Congressman Rául Grijalva (D–AZ) offered an amendment designated .036 to the bill; the amendment was not adopted by a roll call vote of 18 to 22, as follows:

14

**Committee on Natural Resources**
U.S. House of Representatives
113th Congress

Date:   May 15, 2013                                      Recorded Vote #:  6

Meeting on / Amendment on: **H.R. 687 - Grijalva.036**, Not agreed to by vote of 18 yeas and 22 nays

| MEMBERS | Yea | Nay | Pres | MEMBERS | Yea | Nay | Pres |
|---|---|---|---|---|---|---|---|
| **Mr. Hastings, WA, Chairman** | | X | | **Mr. Duncan, SC** | | X | |
| *Mr. Markey, MA, Ranking* | | | | *Ms. Hanabusa, HI* | X | | |
| **Mr. Young, AK** | | X | | **Mr. Tipton, CO** | | X | |
| *Mr. Defazio, OR* | X | | | *Mr. Cardenas, CA* | X | | |
| **Mr. Gohmert, TX** | | | | **Mr. Gosar, AZ** | | X | |
| *Mr. Faleomavaega, AS* | | | | *Mr. Horsford, NV* | X | | |
| **Mr. Bishop, UT** | | X | | **Mr. Labrador, ID** | | X | |
| *Mr. Pallone, NJ* | X | | | *Mr. Huffman, CA* | X | | |
| **Mr. Lamborn, CO** | | X | | **Mr. Southerland, FL** | | X | |
| *Mrs. Napolitano, CA* | X | | | *Mr. Ruiz, CA* | X | | |
| **Mr. Wittman, VA** | | X | | **Mr. Flores, TX** | | X | |
| *Mr. Holt, NJ* | X | | | *Ms. Shea-Porter, NH* | X | | |
| **Mr. Broun, GA** | | | | **Mr. Runyan, NJ** | | X | |
| *Mr. Grijalva, AZ* | X | | | *Mr. Lowenthal, CA* | X | | |
| **Mr. Fleming, LA** | | X | | **Mr. Amodei, NV** | | X | |
| *Ms. Bordallo, GU* | X | | | *Mr. Garcia, FL* | X | | |
| **Mr. McClintock, CA** | | X | | **Mr. Mullin, OK** | X | | |
| *Mr. Costa, CA* | | | | *Mr. Cartwright, PA* | X | | |
| **Mr. Thompson, PA** | | X | | **Mr. Stewart, UT** | | X | |
| *Mr. Sablan, CNMI* | X | | | **Mr. Daines, MT** | | X | |
| **Ms. Lummis, WY** | | X | | **Mr. Cramer, ND** | | X | |
| *Ms. Tsongas, MA* | X | | | **Mr. LaMalfa, CA** | | X | |
| **Mr. Benishek, MI** | | X | | | | | |
| *Mr. Pierluisi, PR* | | | | | | | |
| | | | | | | | |
| | | | | **TOTALS** | 18 | 22 | |

15

Congressman Rául Grijalva (D–AZ) offered an amendment designated .037 to the bill; the amendment was not adopted by voice vote. Congressman Rául Grijalva (D–AZ) offered an amendment designated .040 to the bill; the amendment was not adopted by a roll call vote of 17 to 23, as follows:

16

**Committee on Natural Resources**
U.S. House of Representatives
113th Congress

Date:   May 15, 2013                                    Recorded Vote #:  7

Meeting on / Amendment on: **H.R. 687 - Grijalva.040**, Not agreed to by vote of 17 yeas and 23 nays

| MEMBERS | Yea | Nay | Pres | MEMBERS | Yea | Nay | Pres |
|---|---|---|---|---|---|---|---|
| **Mr. Hastings, WA, Chairman** | | X | | **Mr. Duncan, SC** | | X | |
| *Mr. Markey, MA, Ranking* | | | | *Ms. Hanabusa, HI* | X | | |
| **Mr. Young, AK** | | X | | **Mr. Tipton, CO** | | X | |
| *Mr. Defazio, OR* | X | | | *Mr. Cardenas, CA* | X | | |
| **Mr. Gohmert, TX** | | | | **Mr. Gosar, AZ** | | X | |
| *Mr. Faleomavaega, AS* | | | | *Mr. Horsford, NV* | X | | |
| **Mr. Bishop, UT** | | X | | **Mr. Labrador, ID** | | X | |
| *Mr. Pallone, NJ* | X | | | *Mr. Huffman, CA* | X | | |
| **Mr. Lamborn, CO** | | X | | **Mr. Southerland, FL** | | X | |
| *Mrs. Napolitano, CA* | X | | | *Mr. Ruiz, CA* | X | | |
| **Mr. Wittman, VA** | | X | | **Mr. Flores, TX** | | X | |
| *Mr. Holt, NJ* | X | | | *Ms. Shea-Porter, NH* | X | | |
| **Mr. Broun, GA** | | | | **Mr. Runyan, NJ** | | X | |
| *Mr. Grijalva, AZ* | X | | | *Mr. Lowenthal, CA* | X | | |
| **Mr. Fleming, LA** | | X | | **Mr. Amodei, NV** | | X | |
| *Ms. Bordallo, GU* | X | | | *Mr. Garcia, FL* | X | | |
| **Mr. McClintock, CA** | | X | | **Mr. Mullin, OK** | | X | |
| *Mr. Costa, CA* | | | | *Mr. Cartwright, PA* | X | | |
| **Mr. Thompson, PA** | | X | | **Mr. Stewart, UT** | | X | |
| *Mr. Sablan, CNMI* | X | | | **Mr. Daines, MT** | | X | |
| **Ms. Lummis, WY** | | X | | **Mr. Cramer, ND** | | X | |
| *Ms. Tsongas, MA* | X | | | **Mr. LaMalfa, CA** | | X | |
| **Mr. Benishek, MI** | | X | | | | | |
| *Mr. Pierluisi, PR* | | | | | | | |
| | | | | | | | |
| | | | | **TOTALS** | 17 | 23 | |

17

Congresswoman Grace Napolitano (D–CA) offered an amendment designated .002 to the bill; the amendment was not adopted by a roll call vote of 18 to 23, as follows:

18

**Committee on Natural Resources**
U.S. House of Representatives
113th Congress

Date:   May 15, 2013                                        Recorded Vote #:  8

Meeting on / Amendment on: **H.R. 687 - Napolitano.002**, Not agreed to by vote of 18 yeas and 23 nays

| MEMBERS | Yea | Nay | Pres | MEMBERS | Yea | Nay | Pres |
|---|---|---|---|---|---|---|---|
| **Mr. Hastings, WA, Chairman** | | X | | **Mr. Duncan, SC** | | X | |
| *Mr. Markey, MA, Ranking* | | | | *Ms. Hanabusa, HI* | X | | |
| **Mr. Young, AK** | | X | | **Mr. Tipton, CO** | | X | |
| *Mr. Defazio, OR* | X | | | *Mr. Cardenas, CA* | X | | |
| **Mr. Gohmert, TX** | | | | **Mr. Gosar, AZ** | | X | |
| *Mr. Faleomavaega, AS* | | | | *Mr. Horsford, NV* | X | | |
| **Mr. Bishop, UT** | | X | | **Mr. Labrador, ID** | | X | |
| *Mr. Pallone, NJ* | X | | | *Mr. Huffman, CA* | X | | |
| **Mr. Lamborn, CO** | | X | | **Mr. Southerland, FL** | | X | |
| *Mrs. Napolitano, CA* | X | | | *Mr. Ruiz, CA* | X | | |
| **Mr. Wittman, VA** | | X | | **Mr. Flores, TX** | | X | |
| *Mr. Holt, NJ* | X | | | *Ms. Shea-Porter, NH* | X | | |
| **Mr. Broun, GA** | | | | **Mr. Runyan, NJ** | | X | |
| *Mr. Grijalva, AZ* | X | | | *Mr. Lowenthal, CA* | X | | |
| **Mr. Fleming, LA** | | X | | **Mr. Amodei, NV** | | X | |
| *Ms. Bordallo, GU* | X | | | *Mr. Garcia, FL* | X | | |
| **Mr. McClintock, CA** | | X | | **Mr. Mullin, OK** | | X | |
| *Mr. Costa, CA* | | | | *Mr. Cartwright, PA* | X | | |
| **Mr. Thompson, PA** | | X | | **Mr. Stewart, UT** | | X | |
| *Mr. Sablan, CNMI* | X | | | **Mr. Daines, MT** | | X | |
| **Ms. Lummis, WY** | | X | | **Mr. Cramer, ND** | | X | |
| *Ms. Tsongas, MA* | X | | | **Mr. LaMalfa, CA** | | X | |
| **Mr. Benishek, MI** | | X | | | | | |
| *Mr. Pierluisi, PR* | X | | | | | | |
| | | | | | | | |
| | | | | **TOTALS** | 18 | 23 | |

19

No further amendments were offered and the bill, as amended, was then adopted and ordered favorably reported to the House of Representatives by a bipartisan roll call vote of 23 to 19, as follows:

20

**Committee on Natural Resources**

U.S. House of Representatives

113th Congress

Date:   May 15, 2013                                   Recorded Vote #: 9

Meeting on / Amendment on: **H.R. 687 -** To adopt and favorably report the bill to the House, as amended, agreed to by a vote of 23 yeas to 19 nays

| MEMBERS | Yea | Nay | Pres | MEMBERS | Yea | Nay | Pres |
|---|---|---|---|---|---|---|---|
| **Mr. Hastings, WA, Chairman** | X | | | **Mr. Duncan, SC** | X | | |
| *Mr. Markey, MA, Ranking* | | | | *Ms. Hanabusa, HI* | | X | |
| **Mr. Young, AK** | X | | | **Mr. Tipton, CO** | X | | |
| *Mr. Defazio, OR* | | X | | *Mr. Cardenas, CA* | | X | |
| **Mr. Gohmert, TX** | | | | **Mr. Gosar, AZ** | X | | |
| *Mr. Faleomavaega, AS* | | | | *Mr. Horsford, NV* | X | | |
| **Mr. Bishop, UT** | X | | | **Mr. Labrador, ID** | X | | |
| *Mr. Pallone, NJ* | | X | | *Mr. Huffman, CA* | | X | |
| **Mr. Lamborn, CO** | X | | | **Mr. Southerland, FL** | X | | |
| *Mrs. Napolitano, CA* | | X | | *Mr. Ruiz, CA* | | X | |
| **Mr. Wittman, VA** | X | | | **Mr. Flores, TX** | X | | |
| *Mr. Holt, NJ* | | X | | *Ms. Shea-Porter, NH* | | X | |
| **Mr. Broun, GA** | | | | **Mr. Runyan, NJ** | X | | |
| *Mr. Grijalva, AZ* | | X | | *Mr. Lowenthal, CA* | | X | |
| **Mr. Fleming, LA** | X | | | **Mr. Amodei, NV** | X | | |
| *Ms. Bordallo, GU* | | X | | *Mr. Garcia, FL* | | X | |
| **Mr. McClintock, CA** | X | | | **Mr. Mullin, OK** | | X | |
| *Mr. Costa, CA* | | X | | *Mr. Cartwright, PA* | | X | |
| **Mr. Thompson, PA** | X | | | **Mr. Stewart, UT** | X | | |
| *Mr. Sablan, CNMI* | | X | | **Mr. Daines, MT** | X | | |
| **Ms. Lummis, WY** | X | | | **Mr. Cramer, ND** | X | | |
| *Ms. Tsongas, MA* | | X | | **Mr. LaMalfa, CA** | X | | |
| **Mr. Benishek, MI** | X | | | | | | |
| *Mr. Pierluisi, PR* | | X | | | | | |
| | | | | | | | |
| | | | | **TOTALS** | 23 | 19 | |

21

COMMITTEE OVERSIGHT FINDINGS AND RECOMMENDATIONS

Regarding clause 2(b)(1) of rule X and clause 3(c)(1) of rule XIII of the Rules of the House of Representatives, the Committee on Natural Resources' oversight findings and recommendations are reflected in the body of this report.

COMPLIANCE WITH HOUSE RULE XIII

1. Cost of Legislation. Clause 3(d)(1) of rule XIII of the Rules of the House of Representatives requires an estimate and a comparison by the Committee of the costs which would be incurred in carrying out this bill. However, clause 3(d)(2)(B) of that rule provides that this requirement does not apply when the Committee has included in its report a timely submitted cost estimate of the bill prepared by the Director of the Congressional Budget Office under section 402 of the Congressional Budget Act of 1974. Under clause 3(c)(3) of rule XIII of the Rules of the House of Representatives and section 403 of the Congressional Budget Act of 1974, the Committee has received the following cost estimate for this bill from the Director of the Congressional Budget Office:

*H.R. 687—Southeast Arizona Land Exchange and Conservation Act of 2013*

H.R. 687 would authorize a land exchange in Arizona between the federal government and a mining company. Based on information provided by the affected agencies, CBO estimates that implementing the bill would cost less than $500,000 annually, assuming the availability of appropriated funds. Those costs would include preparing management plans and administering private lands received in exchange for federal land.

Enacting the legislation could increase offsetting receipts, which are treated as reductions in direct spending; however, CBO has insufficient information to estimate whether any receipts would be collected under the bill. Because enacting the bill could affect direct spending, pay-as-you-go procedures apply.

Under H.R. 687, the Forest Service would convey about 2,400 acres of land in southeast Arizona to Resolution Copper Mining LLC in exchange for about 5,400 acres of company-owned land. Of the company land, about 1,200 acres would become part of the National Forest System, and about 4,200 acres would be administered as conservation areas by the Bureau of Land Management.

If the property sought by Resolution Copper is appraised at more than the appraised value of the property that the company offers for exchange, the company could donate additional land or make a cash payment to the United States to make the final exchange of equal value. If the company's property is appraised for more than the federal acreage, the difference in the value would be considered a donation to the federal government. Any cash payment received by the Forest Service would be deposited in the U.S. Treasury as an offsetting receipt. In addition, after completion of the exchange, Resolution Copper would have to pay the federal government a portion of any future income earned on the former federal property if the company determines that the actual cumulative production of minerals located on that property exceeds the value of the estimated production used in the original appraisal process.

22

The bill's effect on offsetting receipts would depend on the outcome of formal appraisals of the federal and private properties that would be conducted after enactment. Those appraisals would determine the relative values of the properties affected by the exchange, including the value of mineral deposits that underlie the federal land. If the value of the federal land were to exceed the value of the company land, Resolution Copper could pay the government a lump sum equal to the difference in property values in the year or two following enactment. That payment might be significant; however, because there are no publicly available estimates regarding the quantity of copper underlying the federal land, CBO has no basis for estimating the value of that land relative to the value of the company land. Therefore, we cannot determine whether the company would make a payment or estimate the size of any such payment.

In addition, if the company extracts more mineral resources than assumed in the original appraisal, Resolution Copper would make annual payments to the federal government. Such payments might be significant; however, based on information provided by Resolution Copper, CBO expects that those lands would not be mined within 10 years of the enactment of H.R. 687. Therefore, no payments would be made over the next 10 years.

The bill contains no intergovernmental or private-sector mandates as defined in the Unfunded Mandates Reform Act and would impose no costs on state, local, or tribal governments.

The CBO staff contact for this estimate is Jeff LaFave. The estimate was approved by Theresa Gullo, Deputy Assistant Director for Budget Analysis.

2. Section 308(a) of Congressional Budget Act. As required by clause 3(c)(2) of rule XIII of the Rules of the House of Representatives and section 308(a) of the Congressional Budget Act of 1974, this bill does not contain any new budget authority, spending authority, credit authority, or an increase or decrease in revenues or tax expenditures. Based on information provided by the affected agencies, CBO estimates that implementing the bill would cost less than $500,000 annually, assuming the availability of appropriated funds.

3. General Performance Goals and Objectives. As required by clause 3(c)(4) of rule XIII, the general performance goal or objective of this bill is to facilitate the efficient extraction of mineral resources in southeast Arizona by authorizing and directing an exchange of Federal and non-Federal land.

EARMARK STATEMENT

This bill does not contain any Congressional earmarks, limited tax benefits, or limited tariff benefits as defined under clause 9(e), 9(f), and 9(g) of rule XXI of the Rules of the House of Representatives.

COMPLIANCE WITH PUBLIC LAW 104–4

This bill contains no unfunded mandates.

23

COMPLIANCE WITH H. RES. 5

Directed Rule Making. The Chairman does not believe that this bill directs any executive branch official to conduct any specific rule-making proceedings.

Duplication of Existing Programs. This bill does not establish or reauthorize a program of the federal government known to be duplicative of another program. Such program was not included in any report from the Government Accountability Office to Congress pursuant to section 21 of Public Law 111–139 or identified in the most recent Catalog of Federal Domestic Assistance published pursuant to the Federal Program Information Act (Public Law 95–220, as amended by Public Law 98–169) as relating to other programs.

PREEMPTION OF STATE, LOCAL OR TRIBAL LAW

This bill is not intended to preempt any State, local or tribal law.

CHANGES IN EXISTING LAW

If enacted, this bill would make no changes in existing law.

## DISSENTING VIEWS

H.R. 687 will rob Native People of their heritage, local people of their water and the American people of valuable natural resources, all to benefit two large, foreign-owned mining corporations. This legislation is an abdication of our responsibilities as stewards of the public lands and the public trust and it should be rejected by the House.

Resolution Copper Mining, LLC (Resolution Copper) is a subsidiary of Rio Tinto and BHP-Billiton. Resolution Copper owns land and holds mining claims on the Tonto National Forest in Southeastern Arizona. The company believes the area is home to a significant copper deposit and is seeking to develop a lucrative copper mining operation. However, approximately 760 acres of national forest land in the area was withdrawn from mining by President Eisenhower in 1955. Resolution Copper is seeking H.R. 687 to require the federal government to exchange the withdrawn forest land for land owned by the Company so that the mining operation can proceed.

Evaluating the merits of land exchanges is difficult under the best of circumstances; H.R. 687 would require this land exchange to proceed under the worst of circumstances. By waiving timely Tribal consultation, standard appraisal requirements and meaningful compliance with the National Environmental Policy Act (NEPA) (42 U.S.C. §4321 et seq.), H.R. 687 would require that the exchange go forward without mitigation or even analysis of its potentially devastating impacts.

Testimony received by the Committee indicates that the mining operation planned by Resolution Copper would require 40,000 acre-feet of water per year; roughly the amount used by the city of Tempe (population 160,000). The company has been less than transparent regarding where they would find this massive quantity of water in Southeastern Arizona. Past practice for mining companies has been to simply sink deeper wells and take the water they need, leaving their neighbors literally high and dry.

Securing a fair return to taxpayers on this exchange is difficult given that the most valuable aspect of the exchange by far is the copper, the value of which is speculative but estimated to be worth billions of dollars. Rather than clarifying the valuation issue, H.R. 687 further muddies the waters by requiring highly unusual appraisal procedures which fail to guarantee that Resolution Copper will pay a fair price for the copper it stands to receive from the American people.

The principal justification for this land exchange is the creation of jobs in Southeastern Arizona. These claims are highly suspect, however, given that Rio Tinto and BHP-Billiton are pioneers in the automation and remote control of mining operations.

(24)

25

Finally, H.R. 687 trades away several sites that are sacred to Native People. The hearing record includes desperate pleas from the San Carlos Apache Tribe, White Mountain Apache Tribe, Yavapai-Apache Nation, Tonto Apache Tribe, Fort McDowell Yavapai Nation, Hualapai Tribe, Jicarilla Apache Nation, Mescalero Apache Tribe, the Pueblo of Zuni and other Native Nations to respect their religious and cultural traditions.

Instead, the bill waives compliance with NEPA, the Native American Graves Protection Act, and all other statutes that might give Tribes a voice. The final insult comes when the bill requires consultation with Native People—*after* the land exchange has occurred.

The majority rejected an amendment from Representative DeFazio (D–OR) that would have imposed a royalty rate of 12.5 percent on minerals produced from the conveyed federal land, required Resolution Copper to annually report to the Secretary of the Interior the amount of minerals produced from the conveyed federal land, and required that the funds received from the royalty payments be used for abandoned hardrock mine lands reclamation.

The Majority also rejected an amendment from Water and Power Subcommittee Ranking Member Napolitano (D–CA) that would have prevented adverse impacts on water quantity and quality in the development of this project.

The Majority rejected three amendments from Public Lands and Environmental Regulation Subcommittee Ranking Member Grijalva (D–AZ). The first would have excluded any Native American sacred or cultural sites, including Apache Leap, from the federal land conveyance.

The second Grijalva amendment would have required the mining plan for the conveyed federal land to support the local workforce, while the third would have made the conveyance of federal land contingent on the Secretary of the Interior completing an environmental review document regarding the land exchange, proposed mine, and mine plan of operations in accordance with NEPA.

In one fell swoop, H.R. 687 would gather up hundreds of acres of sacred land, thousands of acre-feet of precious water, and millions of tons of valuable copper, and hand it all over to Resolution Copper and its owners, Rio Tinto and BHP-Billiton. Such a move would be a disservice to local residents, Tribes and taxpayers. The House should reject this irresponsible and unwise proposal.

PETER DEFAZIO.
GRACE F. NAPOLITANO.
RUSH HOLT.
RAÚL M. GRIJALVA.

○

**No. 25-5185**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION
OF ARIZONA, INC.; CENTER FOR BIOLOGICAL DIVERSITY;
EARTHWORKS; THE ACCESS FUND; and SIERRA CLUB.

*Plaintiffs-Appellants*,

v.

BROOKE L. ROLLINS, U.S. SECRETARY OF AGRICULTURE; UNITED
STATES FOREST SERVICE; and NEIL BOSWORTH, SUPERVISOR OF THE
TONTO NATIONAL FOREST.

*Defendants-Appellees*,

and

RESOLUTION COPPER MINING, LLC

*Intervenor-Defendant-Appellee.*

_____

On Appeal from the United States District
Court for the District of Arizona
(District Judge Dominic W. Lanza)

_____

**PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD
VOLUME 5 of 5**
*In Support of*
***PLAINTIFFS-APPELLANTS' EMERGENCY MOTION UNDER
CIRCUIT RULE 27-3
RELIEF REQUESTED BY AUGUST 18, 2025, AS THE LAND TITLE
TRANSFER WILL OCCUR ON AUGUST 19, 2025***

Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
mfink@biologicaldiversity.org

Allison N. Henderson
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs-Appellants*

Susan B. Montgomery
Robyn L. Interpreter
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorneys for the Inter Tribal Association of Arizona, Inc.*

**INDEX**

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| **Volume 1 of 5 [99 pages]** | | | |
| Order (August 15, 2025) | 8/15/2025 | 99 | 6-99 |
| **Volume 2 of 5 [268 pages]** | | | |
| Federal Defendants' Memo in Support of Summary Judgment, *CBD v. USFS*, Case No. 23-cv-00928 (DLF) (D.D.C., August 22, 2024) | 8/4/2025 | 97-1 | 105-154 |
| BLM Review of Hydrology Aspects of the Resolution Copper Project | 7/14/2025 | 87-1 | 155-180 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, June 2025 | 7/14/2025 | 87-2 | 181-275 |
| Draft Record of Decision, June 2025 | 7/14/2025 | 87-3 | 276-367 |
| **Volume 3 of 5 [180 pages]** | | | |
| Declaration of Maria Dadgar | 7/14/2025 | 87-5 | 373-380 |
| Declaration of Roger Featherstone | 7/14/2025 | 87-6 | 381-387 |

| | | | |
|---|---|---|---|
| Declaration of Russ McSpadden | 7/14/2025 | 87-7 | 388-399 |
| Declaration of Erik Murdock | 7/14/2025 | 87-8 | 400-403 |
| Declaration of Sandra Bahr | 7/14/2025 | 87-9 | 404-408 |
| Master Water Plan for Superstition Vistas, Apache Junction, Arizona | 7/14/2025 | 87-10 | 409-547 |
| **Volume 4 of 5 [195 pages]** | | | |
| Appraisal Report Summary: Mining Claim Zone MCZ Parcel | 7/14/2025 | 87-11 | 553-567 |
| Appraisal Report Summary: Mineral Withdrawal Area (MWA) Parcel | 7/14/2025 | 87-12 | 568-595 |
| Technical Appraisal Review Report: MWA Parcel (excerpts) | 7/14/2025 | 87-13 | 596-598 |
| Oversight and Legislative Hearing Before the U.S. House of Representatives Subcommittee on Energy & Mineral Resources, March 2013 | 7/14/2025 | 87-14 | 599-715 |
| Congressional Budget Office Cost Estimate, July 2013 | 7/14/2025 | 87-15 | 716-717 |

| | | | |
|---|---|---|---|
| House Natural Resources Committee House Report No. 113-167, July 2013 | 7/14/2025 | 87-16 | 718-742 |
| **Volume 5 of 5 [296 pages]** | | | |
| Uniform Appraisal Standards for Federal Land Acquisitions | 7/14/2025 | 87-17 | 748-1009 |
| Excerpt from Resolution Copper Mining's General Plan of Operations, 2016 | 7/14/2025 | 87-18 | 1010 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, January 2021 (rescinded) | 7/14/2025 | 87-19 | 1011-1013 |
| USDA Memo for Withdrawal of Notice of Availability, Rescind Final Environmental Impact Statement and Draft Record of Decision | 3/2/2021 | 26-2 | 1014 |
| Notice of Appeal | 8/15/2025 | 100 | 1015-1020 |
| Civil Docket for Case No. 2:21-cv-00122-DWL – United States District Court, District of Arizona (Phoenix) – *Arizona Mining Reform Coalition, et al. v. United States Forest Service, et al.* | | | 1021-1038 |

*Interagency Land Acquisition Conference*

# UNIFORM APPRAISAL STANDARDS FOR FEDERAL LAND ACQUISITIONS

## 2016



The Yellow Book is available in an enhanced electronic version and in print from The Appraisal Foundation. Please visit these links to purchase your copy today!

**Yellow Book Electronic PDF Edition**
**Yellow Book in Print** (available mid-February 2017)

The Uniform Appraisal Standards for Federal Land Acquisitions have been developed, revised, approved, adopted and promulgated on behalf of the Interagency Land Acquisition Conference. The Conference is solely and exclusively responsible for the content of the Standards. The Appraisal Foundation provided editing and technical assistance to the Standards, but neither undertakes nor assumes any responsibility whatsoever for the content of the Standards. The Appraisal Foundation has published the Uniform Appraisal Standards for Federal Land Acquisitions on behalf of the Conference and in cooperation with the United States Department of Justice.

**Printed in the United States of America**

**ISBN:** 978-0-09892208-8-0



THE APPRAISAL FOUNDATION
*Authorized by Congress as the Source of Appraisal Standards and Appraiser Qualifications*

The Appraisal Foundation is the nation's foremost authority on the valuation profession. The organization sets the Congressionally authorized standards and qualifications for real estate appraisers, and provides voluntary guidance on recognized valuation methods and techniques for all valuation professionals. This work advances the profession by ensuring that appraisals are independent, consistent, and objective.

# TABLE OF CONTENTS

**FOREWORD** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**ACKNOWLEDGEMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**0. INTRODUCTORY MATERIAL** . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

    0.1. Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    0.2. Governing Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    0.3. Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    0.4. About the Sixth Edition to the "Yellow Book." . . . . . . . . . . . . . . 6

    0.5. Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**1. APPRAISAL DEVELOPMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

    1.1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    1.2. Problem Identification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

        1.2.1. Client . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        1.2.2. Intended Users . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        1.2.3. Intended Use. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

        1.2.4. Type of Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

        1.2.5. Effective Date.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

        1.2.6. Relevant Characteristics of the Subject Property. . . . . . . . . . . .11

            1.2.6.1. Property Interest(s) to be Appraised . . . . . . . . . . . . . . 11

            1.2.6.2.Legal Description . . . . . . . . . . . . . . . . . . . . . . . . 11

            1.2.6.3. Property Inspections . . . . . . . . . . . . . . . . . . . . . 12

            1.2.6.4. Contacting Landowners . . . . . . . . . . . . . . . . . . . . 12

        1.2.7. Assignment Conditions . . . . . . . . . . . . . . . . . . . . . . . . 12

            1.2.7.1. Instructions, Hypothetical Conditions, Extraordinary Assumptions. . . . . . . . 13

            1.2.7.2. Jurisdictional Exceptions . . . . . . . . . . . . . . . . . . . .14

            1.2.7.3. Special Rules and Methods . . . . . . . . . . . . . . . . . . 15

                1.2.7.3.1. Larger Parcel . . . . . . . . . . . . . . . . . . . . .16

                1.2.7.3.2. Unit Rule . . . . . . . . . . . . . . . . . . . . . . . 16

                1.2.7.3.3. Government Project Influence and the "Scope of the Project" Rule  16

                1.2.7.3.4. Before and After Rule . . . . . . . . . . . . . . . . . .17

                1.2.7.3.5. Damages. . . . . . . . . . . . . . . . . . . . . . . . .17

                1.2.7.3.6. Benefits . . . . . . . . . . . . . . . . . . . . . . . . .18

        1.2.8. Scope of Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    1.3. Data Collection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        1.3.1. Property Data.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            1.3.1.1. Land . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            1.3.1.2. Improvements . . . . . . . . . . . . . . . . . . . . . . . . 18

            1.3.1.3. Zoning and Land Use Controls . . . . . . . . . . . . . . . . 19

1.3.1.4. Use History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20
1.3.1.5. Sales History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21
1.3.1.6. Rental History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21
1.3.1.7. Assessed Value and Annual Tax Load . . . . . . . . . . . . . . .21
1.4. Data Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21
1.4.1. Area and Neighborhood Analysis . . . . . . . . . . . . . . . . . . . . . .22
1.4.2. Marketability Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
1.4.3. Highest and Best Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
1.4.4. Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
1.4.5. Four Tests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
1.4.5.1. Economic Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
1.4.6. Larger Parcel Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . .23
1.4.7. Highest and Best Use Conclusion . . . . . . . . . . . . . . . . . . . . . .24
1.5. Application of Approaches to Value . . . . . . . . . . . . . . . . . . . . . . . 25
1.5.1. Land Valuation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
1.5.1.1. Sales Comparison Approach . . . . . . . . . . . . . . . . . . . .25
1.5.1.2. Subdivision Development Method . . . . . . . . . . . . . . . . . 25
1.5.1.3. Ground Leases . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
1.5.2. Sales Comparison Approach . . . . . . . . . . . . . . . . . . . . . . . . .26
1.5.2.1. Prior Sales of Subject Property . . . . . . . . . . . . . . . . . .26
1.5.2.2. Selection and Verification of Sales . . . . . . . . . . . . . . . . .26
1.5.2.3. Adjustment Process . . . . . . . . . . . . . . . . . . . . . . . . .27
1.5.2.4. Sales Requiring Extraordinary Verification . . . . . . . . . . . .28
1.5.3. Cost Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
1.5.3.1. Critical Elements . . . . . . . . . . . . . . . . . . . . . . . . . .34
1.5.3.1.1. Reproduction and Replacement Costs . . . . . . . . . . . . . . .34
1.5.3.1.2. Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . .34
1.5.3.1.3. Entrepreneurial Profit . . . . . . . . . . . . . . . . . . . . . . .35
1.5.3.1.4. Unit Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
1.5.4. Income Capitalization Approach . . . . . . . . . . . . . . . . . . . . . . .35
1.5.4.1. Market Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
1.5.4.2. Comparable Leases . . . . . . . . . . . . . . . . . . . . . . . . .35
1.5.4.3. Expense Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . 35
1.5.4.4. Direct Capitalization . . . . . . . . . . . . . . . . . . . . . . . . 36
1.5.4.5. Yield Capitalization (Discounted Cash-Flow [DCF] Analysis) . . . . . . . . .36
1.6. The Reconciliation Process and Final Opinion of Value . . . . . . . . . . . . 36
1.7. Partial Acquisitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37
1.7.1. Before and After Rule (Federal Rule) . . . . . . . . . . . . . . . . . . . .37
1.7.1.1. Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
1.7.1.2. Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
1.7.1.3. Offsetting of Benefits . . . . . . . . . . . . . . . . . . . . . . . 39
1.7.1.4. Takings Plus Damages Procedure (State Rule) . . . . . . . . . . .39
1.8. Leasehold Acquisitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
1.8.1. Market Rent and Highest and Best Use . . . . . . . . . . . . . . . . . . .39

5-ER-751

1.8.2. Leasehold Estate Acquired . . . . . . . . . . . . . . . . . . . . . . . . . . .40

1.8.3. Larger Parcel Concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

1.9.   Temporary Acquisitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

1.9.1. Temporary Construction Easements (TCEs) . . . . . . . . . . . . . . . .42

1.9.2. Temporary Inverse Takings . . . . . . . . . . . . . . . . . . . . . . . . . . .43

1.10. Acquisitions Involving Natural Resources . . . . . . . . . . . . . . . . . . . .43

1.10.1.  The Unit Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44

1.10.2.  Highest and Best Use Considerations. . . . . . . . . . . . . . . . . . .44

1.10.3.  Special Considerations for Minerals Properties. . . . . . . . . . . .45

1.10.4.  Special Considerations for Forested Properties . . . . . . . . . . . . .48

1.10.5.  Water Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .49

1.11. Special Considerations in Appraisals for Inverse Condemnations . . . . . . . .49

1.12. Special Considerations in Appraisals for Federal Land Exchanges . . . . . . . . .50

1.13. Supporting Experts Opinions and Reports . . . . . . . . . . . . . . . . . . . . 53

1.14. Appraisers as Expert Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . 54

1.15. Confidentiality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**2.  APPRAISAL REPORTING** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **56**

2.1.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .56

2.2.   Appraisal Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .56

2.2.1. Oral Appraisal Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . .56

2.2.2. Restricted Appraisal Reports . . . . . . . . . . . . . . . . . . . . . . . . .56

2.2.3. Compliance with Rule 26 of the Federal Rules of Civil Procedure  . . . . . . . . . . .57

2.2.4. Electronic Transmission of Appraisal Reports . . . . . . . . . . . . . . .57

2.2.5. Draft Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .57

2.3.   Content of Appraisal Report . . . . . . . . . . . . . . . . . . . . . . . . . . . .57

2.3.1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .58

2.3.1.1. Title Page . . . . . . . . . . . . . . . . . . . . . . . . . . . . .58

2.3.1.2. Letter of Transmittal . . . . . . . . . . . . . . . . . . . . . . .58

2.3.1.3. Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . .58

2.3.1.4. Appraiser's Certification . . . . . . . . . . . . . . . . . . . . .58

2.3.1.5. Executive Summary. . . . . . . . . . . . . . . . . . . . . . . .59

2.3.1.6. Photographs . . . . . . . . . . . . . . . . . . . . . . . . . . . .59

2.3.1.7. Statement of Assumptions and Limiting Conditions  . . . . . . . . . . . .59

2.3.1.8. Description of Scope of Work . . . . . . . . . . . . . . . . . .60

2.3.2. Factual Data—Before Acquisition . . . . . . . . . . . . . . . . . . . . . .61

2.3.2.1. Legal Description. . . . . . . . . . . . . . . . . . . . . . . . . .61

2.3.2.2. Area, City, and Neighborhood Data . . . . . . . . . . . . . . .61

2.3.2.3. Property Data. . . . . . . . . . . . . . . . . . . . . . . . . . . .61

2.3.2.3.1. Site. . . . . . . . . . . . . . . . . . . . . . . . . . .61

2.3.2.3.2. Improvements . . . . . . . . . . . . . . . . . . . .62

2.3.2.3.3. Fixtures . . . . . . . . . . . . . . . . . . . . . . . .62

2.3.2.3.4. Use History . . . . . . . . . . . . . . . . . . . . . .62

2.3.2.3.5. Sales History. . . . . . . . . . . . . . . . . . . . . .62

2.3.2.2.3.6. Rental History . . . . . . . . . . . . . . . . . . . . . . . 63
2.3.2.3.7. Assessed Value and Annual Tax Load. . . . . . . . . . . . . . . . 63
2.3.2.3.8. Zoning and Other Land Use Regulations. . . . . . . . . . . . . . . 63
2.3.3. Data Analysis and Conclusions – Before Acquisition. . . . . . . . . . . . . . . . 63
2.3.3.1. Highest and Best Use. . . . . . . . . . . . . . . . . . . . . . . . . . . 63
2.3.3.1.1. Four Tests . . . . . . . . . . . . . . . . . . . . . . . . . 64
2.3.3.1.2. Larger Parcel . . . . . . . . . . . . . . . . . . . . . . . 65
2.3.3.2. Land Valuation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
2.3.3.2.1. Sales Comparison Approach . . . . . . . . . . . . . . . . . 65
2.3.3.2.2. Subdivision Development Method . . . . . . . . . . . . . . 65
2.3.3.3. Cost Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
2.3.3.4. Sales Comparison Approach. . . . . . . . . . . . . . . . . . . . . . . 66
2.3.3.5. Income Capitalization Approach . . . . . . . . . . . . . . . . . . . . . 67
2.3.3.6. Reconciliation and Final Opinion of Market Value . . . . . . . . . . . 68
2.3.4. Factual Data—After Acquisition (Partial Acquisitions Only). . . . . . . . . . . . 68
2.3.4.1. Legal Description. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
2.3.4.2. Neighborhood Factors . . . . . . . . . . . . . . . . . . . . . . . . . 68
2.3.4.3. Property Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
2.3.4.3.1. Site. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
2.3.4.3.2. Improvements . . . . . . . . . . . . . . . . . . . . . . . . 69
2.3.4.3.3. Fixtures . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
2.3.4.3.4. History. . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
2.3.4.3.5. Assessed Value and Tax Load . . . . . . . . . . . . . . . . 69
2.3.4.3.6. Zoning and Other Land Use Regulations . . . . . . . . . . . 69
2.3.5. Data Analysis and Conclusions—After Acquisition (Partial Acquisitions Only) . . . . . 69
2.3.5.1. Analysis of Highest and Best Use . . . . . . . . . . . . . . . . . . . . 70
2.3.5.2. Land Valuation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
2.3.5.3. Cost Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
2.3.5.4. Sales Comparison Approach. . . . . . . . . . . . . . . . . . . . . . . 70
2.3.5.5. Income Capitalization Approach . . . . . . . . . . . . . . . . . . . . . 70
2.3.5.6. Reconciliation and Final Opinion of Market Value . . . . . . . . . . . 70
2.3.6. Acquisition Analysis (Partial Acquisitions Only) . . . . . . . . . . . . . . . . . 70
2.3.6.1. Recapitulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
2.3.6.2. Allocation and Damages . . . . . . . . . . . . . . . . . . . . . . . . 71
2.3.6.3. Special Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
2.3.7. Exhibits and Addenda . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
2.4.    Reporting Requirements for Leasehold Acquisitions . . . . . . . . . . . . . . . . . . . 72
2.4.1. Property Rights Appraised . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
2.4.2. Improvements Description . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
2.4.3. Highest and Best Use and Larger Parcel . . . . . . . . . . . . . . . . . . . . . 72
2.5.    Project Appraisal Reports. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

5-ER-753

3.  **APPRAISAL REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **80**

   3.1.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .80

      3.1.1. Government Review Appraisers. . . . . . . . . . . . . . . . . . . . . . . .80

      3.1.2. Contract Review Appraisers . . . . . . . . . . . . . . . . . . . . . . . . .81

      3.1.3. Rebuttal Experts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .82

   3.2.  Types of Appraisal Reviews . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

   3.3.  Problem Identification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .83

      3.3.1. Client . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84

      3.3.2. Intended Users . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84

      3.3.3. Intended Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84

      3.3.4. Type of Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84

      3.3.5. Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84

      3.3.6. Subject of the Assignment . . . . . . . . . . . . . . . . . . . . . . . .84

      3.3.7. Assignment Conditions . . . . . . . . . . . . . . . . . . . . . . . . . .85

   3.4.  Responsibilities of the Review Appraiser . . . . . . . . . . . . . . . . . . . . .85

   3.5.  Review Appraiser Expressing an Opinion of Value . . . . . . . . . . . . . . . . 86

   3.6.  Review Appraiser's Use of Information Not Available to Appraiser . . . . . . . . . . . . . .86

   3.7.  Review Reporting Requirements . . . . . . . . . . . . . . . . . . . . . . . . . .87

   3.8.  Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .88

4.  **LEGAL FOUNDATIONS FOR APPRAISAL STANDARDS** . . . . . . . . . . . . . . . . . . **89**

   4.1.  Introduction to Legal Foundations . . . . . . . . . . . . . . . . . . . . . . . . 89

      4.1.1. Requirement of Just Compensation . . . . . . . . . . . . . . . . . . . . .89

      4.1.2. Market Value: The Measure of Just Compensation . . . . . . . . . . . . .90

      4.1.3. Federal Law Controls . . . . . . . . . . . . . . . . . . . . . . . . . . .90

      4.1.4. Defining Property Interests . . . . . . . . . . . . . . . . . . . . . . . .91

      4.1.5. About the Sixth Edition . . . . . . . . . . . . . . . . . . . . . . . . . .92

   4.2.  Market Value Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .92

      4.2.1. Market Value Definition . . . . . . . . . . . . . . . . . . . . . . . . . .93

         4.2.1.1. Date of Value. . . . . . . . . . . . . . . . . . . . . . . . . . .93

         4.2.1.2. Exposure on the Open, Competitive Market . . . . . . . . . . . . .95

         4.2.1.3. Willing and Reasonably Knowledgeable Buyers and Sellers. . . . . . . . . .95

         4.2.1.4. All Available Economic Uses . . . . . . . . . . . . . . . . . . . .96

      4.2.2. The Unit Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .97

         4.2.2.1. Ownership Interests (the Undivided Fee) . . . . . . . . . . . . . .97

         4.2.2.2. Physical Components . . . . . . . . . . . . . . . . . . . . . . . .97

            4.2.2.2.1. Existing Government Improvements . . . . . . . . . . . .98

         4.2.2.3. Allocations and Administrative Payments Under the Uniform Act . . . . . . .98

         4.2.2.4. Departure from the Unit Rule . . . . . . . . . . . . . . . . . . .99

      4.2.3. Objective Market Evidence; Conjectural and Speculative Evidence . . . . . . . . . .99

      4.2.4. Refinements of Market Value Standard . . . . . . . . . . . . . . . . . . 100

      4.2.5. Special Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

      4.2.6. Exceptions to Market Value Standard . . . . . . . . . . . . . . . . . . 101

4.3.  Highest and Best Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101
    4.3.1. Highest and Best Use Definition . . . . . . . . . . . . . . . . . . . . . 102
    4.3.2. Criteria for Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . 102
        4.3.2.1. All Possible Uses . . . . . . . . . . . . . . . . . . . . . . . 103
        4.3.2.2. Market Demand . . . . . . . . . . . . . . . . . . . . . . . . 104
        4.3.2.3. Economic Use . . . . . . . . . . . . . . . . . . . . . . . . . 105
        4.3.2.4. Zoning and Permits . . . . . . . . . . . . . . . . . . . . . . 107
            4.3.2.4.1. Exceptions . . . . . . . . . . . . . . . . . . . . . 109
    4.3.3. Larger Parcel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
    4.3.4. Criteria for Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . 111
        4.3.4.1. Unity of Use . . . . . . . . . . . . . . . . . . . . . . . . . 111
        4.3.4.2. Unity of Ownership (Title) . . . . . . . . . . . . . . . . . . 113
        4.3.4.3. Physical Unity (Contiguity or Proximity) . . . . . . . . . . . . 115
        4.3.4.4. Legal Instructions . . . . . . . . . . . . . . . . . . . . . . 116
        4.3.4.5. Special Considerations in Partial Acquisitions . . . . . . . . . 117
        4.3.4.6. Special Considerations in Riparian Land Acquisitions . . . . . 117
        4.3.4.7. Special Considerations in Land Exchanges . . . . . . . . . . . 117
        4.3.4.8. Special Considerations in Inverse Takings . . . . . . . . . . . 117
4.4.  Valuation Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
    4.4.1. The Three Approaches to Value . . . . . . . . . . . . . . . . . . . . . 118
    4.4.2. Sales Comparison Approach. Under federal law . . . . . . . . . . . . . . 119
        4.4.2.1. Comparability . . . . . . . . . . . . . . . . . . . . . . . . 120
        4.4.2.2. Adjustments . . . . . . . . . . . . . . . . . . . . . . . . . 121
        4.4.2.3. Sales Verification . . . . . . . . . . . . . . . . . . . . . . . 122
        4.4.2.4. Transactions Requiring Extraordinary Care . . . . . . . . . . . 122
            4.4.2.4.1. Prior Sales of the Same Property . . . . . . . . . . 123
            4.4.2.4.2. Transactions with Potential Nonmarket Motivations . . 124
            4.4.2.4.3. Exchanges of Property . . . . . . . . . . . . . . . 128
            4.4.2.4.4. Sales that Include Personal Property . . . . . . . . . 128
            4.4.2.4.5. Contingency Sales . . . . . . . . . . . . . . . . . 129
            4.4.2.4.6. Offers, Listings, Contracts, and Options . . . . . . . 129
            4.4.2.4.7. Sales After the Date of Valuation . . . . . . . . . . 130
    4.4.3. Cost Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131
        4.4.3.1. Foundations of the Cost Approach . . . . . . . . . . . . . . . 132
        4.4.3.2. Value of the Land (Site) as if Vacant . . . . . . . . . . . . . . 134
        4.4.3.3. Reproduction Cost and Replacement Cost . . . . . . . . . . . . 134
        4.4.3.4. Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . 135
        4.4.3.5. Entrepreneurial Incentive and Entrepreneurial Profit . . . . . . . 135
        4.4.3.6. Unit Rule and the Cost Approach . . . . . . . . . . . . . . . 136
    4.4.4. Income Capitalization Approach . . . . . . . . . . . . . . . . . . . . . 136
        4.4.4.1. Applications . . . . . . . . . . . . . . . . . . . . . . . . . 137
        4.4.4.2. Income to Be Considered . . . . . . . . . . . . . . . . . . . 140
        4.4.4.3. Capitalization Rate or Discount Rate . . . . . . . . . . . . . . 140
        4.4.4.4. Unit Rule Implications . . . . . . . . . . . . . . . . . . . . 141
        4.4.4.5. Further Guidance . . . . . . . . . . . . . . . . . . . . . . . 142

4.4.5. Subdivision Valuation and the Development Method . . . . . . . . . . . . . . . . . 142

    4.4.5.1. Reasonable Probability of Development . . . . . . . . . . . . . . . . . . . 143

    4.4.5.2. Application to Undeveloped Land . . . . . . . . . . . . . . . . . . . . . 144

    4.4.5.3. Credible Cost Estimate . . . . . . . . . . . . . . . . . . . . . . . . . 144

    4.4.5.4. Availability of Comparable Sales . . . . . . . . . . . . . . . . . . . 145

4.5. Project Influence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

    4.5.1. The Scope of the Project Test . . . . . . . . . . . . . . . . . . . . . . . 146

    4.5.2. Application of the Scope of the Project Rule . . . . . . . . . . . . . . . . 149

    4.5.3. Legal Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

    4.5.4. Impact on Market Value . . . . . . . . . . . . . . . . . . . . . . . . . 149

    4.5.5. Limits of the Scope of the Project Rule . . . . . . . . . . . . . . . . . . 150

    4.5.6. Further Guidance . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

4.6. Partial Acquisitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

    4.6.1. The Federal Rule: Before and After Methodology . . . . . . . . . . . . . . 152

        4.6.1.1. Larger Parcel Determination . . . . . . . . . . . . . . . . . . . 153

    4.6.2. Damage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

        4.6.2.1. Compensable (Severance) Damages . . . . . . . . . . . . . . . . . 155

        4.6.2.2. Necessary Support . . . . . . . . . . . . . . . . . . . . . . . . 156

        4.6.2.3. Non-Compensable (Consequential) Damages . . . . . . . . . . . . . 159

    4.6.3. Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

    4.6.4. Exceptions to the Federal Rule . . . . . . . . . . . . . . . . . . . . . . 165

        4.6.4.1. Taking Plus Damages (the "State Rule") . . . . . . . . . . . . . . 166

    4.6.5. Easement Valuation Issues. In general terms . . . . . . . . . . . . . . . . 168

        4.6.5.1. Dominant Easement Interests . . . . . . . . . . . . . . . . . . . 169

            4.6.5.1.1. "Going Rates" and Nonmarket Considerations . . . . . . . . . . 171

            4.6.5.1.2. Temporary Easements . . . . . . . . . . . . . . . . . . . . 171

            4.6.5.1.3. Sale or Disposal of Easements . . . . . . . . . . . . . . . 171

        4.6.5.2. Lands Encumbered by Easements . . . . . . . . . . . . . . . . . . 172

        4.6.5.3. Appurtenant Easements to the Servient Estate . . . . . . . . . . . 172

4.7. Leaseholds and Other Temporary Acquisitions . . . . . . . . . . . . . . . . . . . . 174

    4.7.1. Leaseholds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

    4.7.2. Temporary Inverse Takings . . . . . . . . . . . . . . . . . . . . . . . . 177

4.8. Natural Resources Acquisitions . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

    4.8.1. Unit Rule and Natural Resources . . . . . . . . . . . . . . . . . . . . . 178

    4.8.2. Highest and Best Use and Natural Resources . . . . . . . . . . . . . . . . 179

    4.8.3. Valuation Approaches for Mineral Resources . . . . . . . . . . . . . . . . 180

    4.8.4. Timber . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

    4.8.5. Water Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

4.9. Inverse Takings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

4.10. Land Exchanges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

4.11. Special Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

    4.11.1. Riparian Lands and the Federal Navigational Servitude . . . . . . . . . . 187

    4.11.2. Federal Grazing Permits . . . . . . . . . . . . . . . . . . . . . . . . 195

    4.11.3. Streets, Rail Corridors, Infrastructure, and Public Facilities . . . . . . . . 195

4.11.3.1. Streets, Highways, Roads, and Alleys . . . . . . . . . . . . . . . . . . . . 196

4.11.3.2. Corridors and Rights of Way . . . . . . . . . . . . . . . . . 198

4.11.3.3. Substitute-Facility Compensation . . . . . . . . . . . . . . . . 199

4.12. Appraisers' Use of Supporting Experts' Opinions . . . . . . . . . . . . . . . . . . 201

4.13. Common Purpose (Roles and Responsibilities) . . . . . . . . . . . . . . . . . . . 203

4.13.1. Appraisers and Other Experts . . . . . . . . . . . . . . . . . . . 203

4.13.2. Government Agency Staff . . . . . . . . . . . . . . . . . . . . . . . 205

4.13.3. Landowners . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

4.13.4. Attorneys . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

**APPENDIX** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **207**

A.    Appraisal Report Documentation Checklist. . . . . . . . . . . . . . . . . 208

B.    Recommended Appraisal Report Format for Total Acquisition . . . . . . . . . . . . . 212

C.    Recommended Appraisal Report Format for Partial Acquisitions . . . . . . . . . . . 214

D.    Recommended Project Appraisal Report Format . . . . . . . . . . . . . . . . 216

E.    Extraordinary Verification of Sales . . . . . . . . . . . . . . . . . . . 218

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **220**

**INDEX** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **245**

5-ER-757

# FOREWORD

This is the sixth edition of the Uniform Appraisal Standards for Federal Land Acquisitions, known to many as the Yellow Book. The valuation of real estate in federal acquisitions—serving public purposes that range from national parks and public buildings to infrastructure and national security needs—must satisfy not only appraisal industry standards authorized by Congress, but also the command of the Fifth Amendment to the U.S. Constitution: that no property shall "be taken for public use, without just compensation." Sound appraisals are vital to ensure that government acquisitions do justice to both the individual whose property is taken and the public which must pay for it. These federal Standards, frequently cited in legislation and court rulings, have guided the appraisal process in the valuation of real estate in federal acquisitions since their original publication by the Interagency Land Acquisition Conference in 1971.

The Attorney General formed the Interagency Land Acquisition Conference in 1968. Since its inception, the Conference has been "fueled by the common purpose and dedication" of its participants—any and all federal agencies that acquire property for public uses. Their shared objectives are to promulgate uniform, fair, and efficient appraisal standards for federal acquisitions; to identify and find the best solutions to the problems incident to acquiring land for public purposes; and to consider all acquisition-related matters with the twin aims of protecting the public interest and ensuring fair and equitable treatment of landowners whose property is affected by public projects.

The Conference is chaired by the Assistant Attorney General for the Environment and Natural Resources Division, Department of Justice, and Andrew M. Goldfrank, Chief of the Division's Land Acquisition Section, serves as Conference Executive.

In updating the Standards for the first time in 16 years, we incorporated relevant new appraisal methodology and theory, integrated new case law, and ensured appropriate consistency with professional appraisal standards. The content is also restructured and revised for clarity and readability, resulting in practical and understandable guidance for appraisers, attorneys, and the general public. The final text reflects the contributions of the Conference agencies' representatives, who shared valuable insights and suggestions on the previous Standards and commented on drafts of the sixth edition.

The Appraisal Foundation provided technical assistance in preparing these Standards for publication. To ensure the Yellow Book is easily available to all interested users, The Appraisal Foundation is publishing this 2016 edition in both print and electronic forms under a cooperative agreement with the Department of Justice. A free electronic version is also available on the Department of Justice website.

I commend the sixth edition of the Yellow Book to all readers as the foremost authority on real estate valuation in federal eminent domain, and an indispensable resource for the appraisal of property for all types of federal acquisitions. And, I would like to single out for special recognition appraisal unit chief Brian Holly, MAI, and trial attorney Georgia Garthwaite, of the Department of Justice, who led the effort that resulted in this sixth edition of the Uniform Appraisal Standards for Federal Land Acquisitions, with the assistance of Mr. Goldfrank.

John C. Cruden, Chair
Interagency Land Acquisition Conference
December 6, 2016

# ACKNOWLEDGEMENTS

The Interagency Land Acquisition Conference gratefully acknowledges the important contributions of the following individuals.

**United States Department of Justice**
Jennifer Campbell, Supervisory Paralegal
Eric Chiapponi, Review Appraiser
Hannah Flesch, Paralegal
Kristine Hartley, Review Appraiser
Jacqueline Hyatt, Law Clerk
Daniel Kastner, Trial Attorney
Kristin Muenzen, Trial Attorney
Erica Pencak, Trial Attorney
Wade Schroeder, Review Appraiser
Michelle Sellers, Paralegal
Lucy Shepherd, Staff Assistant
Moriah Sulc, Paralegal
Reade Wilson, Trial Attorney

**General Services Administration**
Nicholas Hufford, Chief Appraiser

**United States Army Corps of Engineers**
Mary Arndt, Chief Appraiser

**United States Forest Service**
Jerry Sanchez, Chief Appraiser

**United States Department of the Interior**
Timothy Hansen, Chief Appraiser

**United States Department of the Navy**
Mark Worthen, Chief Appraiser

**The Appraisal Foundation**
Magdalene Vasquez, Editor

# 0.  INTRODUCTORY MATERIAL

**0.1.**   **Purpose.** The purpose of the *Uniform Appraisal Standards for Federal Land Acquisitions* (Standards) is to promote fairness, uniformity, and efficiency in the appraisal of real property in federal acquisitions. Just compensation must be paid for property acquired for public purposes, whether by voluntary purchase, land exchange, or the power of eminent domain. Landowners should be treated equitably no matter which agency is acquiring their land. The use of public funds compels efficient, cost-effective practices.

The same goals of uniformity, efficiency, and fair treatment of those affected by public projects underlie the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (hereinafter Uniform Act).[1] The Uniform Act applies to federal acquisitions as well as many state and local government acquisitions involving federal funds.

In federal acquisitions, the purpose of an appraisal—whether prepared for the government or a landowner—is to develop an opinion of market value that can be used to determine just compensation under federal law. As a result, appraisals in federal acquisitions face different—and often more rigorous—valuation problems and standards than those typically encountered in appraisals for other purposes, such as private sales, tax, mortgage, rate-making, or insurance. These Standards set forth the guiding principles, legal requirements, and practical implications for the appraisal of property in all types of federal acquisitions.

These Standards may need to be modified to meet specific requirements of agency programs, special legislation, or negotiated agreements between agencies and landowners.[2] Any such modifications to these Standards require specific written instructions from the acquiring agency, as do modifications to comply with court rulings or stipulations between parties in litigation.

Legal questions often arise when applying these Standards to the facts of a specific appraisal assignment, requiring appropriate written legal instructions. Appraisers and agency counsel should work closely to ensure legal instructions not only are legally correct, but also adequately address the valuation problem to be solved. Federal agencies are also encouraged to consult with the U.S. Department of Justice on challenging legal and valuation issues, regardless of whether condemnation is anticipated. Appropriate legal instructions can resolve doubt about the proper method of valuation or the application of particular rules to specific factual situations. If these Standards are properly applied, under sound legal instructions,

---

[1]   The Uniform Act, also called the URA, is discussed throughout these Standards. The Uniform Act addresses two principal areas:

- *Real Property Acquisition* policies set out agency appraisal criteria and negotiation obligations in order to encourage acquisitions by agreement, avoid litigation, ensure consistent treatment for landowners across federal programs, and promote public confidence in federal property acquisition practices.

- *Relocation Assistance* policies are designed to ensure uniform, fair, and equitable treatment of those who are displaced by government programs and projects, and to minimize the hardships displaced persons may face as a result of programs and projects intended to benefit the public as a whole.

Federal regulations direct agencies to implement the Uniform Act in an efficient, cost-effective manner, and specifically reference these appraisal Standards at 49 C.F.R. § 24.103. In turn, these appraisal Standards presume full compliance with all applicable provisions of the Uniform Act and related regulations. The full Uniform Act is codified at 42 U.S.C. §§ 4601 to 4655, and enforced by federal regulations at 49 C.F.R. Part 24.

[2]   Some federal agencies have adopted appraisal and/or appraisal review handbooks or manuals that may modify these Standards to meet other criteria for specific acquisition programs.

the resulting appraisal will be a credible, reliable, and accurate opinion of market value that can be used for purposes of just compensation.

**0.2.**   **Governing Principles.** Federal acquisitions entail different appraisal standards than other types of property transactions because they involve payment of just compensation. As the measure of just compensation is a question of substantive right "grounded upon the Constitution of the United States," just compensation must be determined under federal common law—that is, case law.[3] Federal case law holds that just compensation must reflect basic principles of fairness and justice for both the individual whose property is taken and the public which must pay for it. To achieve this, an objective and practical standard was required, and the Supreme Court has long adopted the concept of market value to measure just compensation. As a result, just compensation is measured by the market value of the property taken. "To award [a landowner] less would be unjust to him; to award him more would be unjust to the public."[4]

> ". . . nor shall private property be taken for public use, without just compensation."
>
> — U.S. Constitution, amendment v

Most of the case law on just compensation stems from the federal exercise of eminent domain, but the resulting practical, objective rules for determining market value have been adopted in numerous federal statutes, rules and regulations, and programs and agency policies. As a result, the federal eminent domain-based valuation requirements reflected in these Standards apply to all types of federal acquisitions.[5] And because these Standards require appraisers to provide an opinion of market value and not just compensation, they also apply to the appraisal of property for many types of government transactions that require a reliable determination of market value without reference to just compensation, such as land exchanges under the Federal Land Policy and Management Act (FLPMA).[6]

Certain types of transactions may require exceptions to specific valuation rules contained in these Standards—for example, to comply with special legislation—but the underlying principles of just compensation remain in force. In addition, while just compensation does not exceed market value fairly determined, Congress has the power to allow or require the United States to pay more than the just compensation required under the Fifth Amendment. For example, under the Uniform Act, people and businesses displaced by public projects receive moving and relocation expenses in addition to the market-value-based just compensation received for the acquisition.

Just compensation is determined under federal rather than state law. Appraisers must apply federal law throughout the process of opining on market value, recognizing that federal and state laws differ in important respects. Most appraisals for federal acquisitions involve straightforward application of established law to the facts. But some valuation problems require nuanced legal instructions to address complicated or undecided questions of law. These Standards address both routine and complex legal issues that arise in federal acquisitions.

---

3   *United States v. Miller*, 317 U.S. 369, 380 (1943); *see Marbury v. Madison*, 5 U.S. 137 (1803).
4   *Bauman v. Ross*, 167 U.S. 548, 574 (1897).
5   Similarly, the appraisal requirements set forth in the Uniform Act regulations "are necessarily designed to comply with . . . Federal eminent domain based appraisal requirements." 49 C.F.R. app. A § 24.103(a).
6   See Sections 1.12 and 4.10 for a discussion of special considerations arising in the appraisal of property for federal land exchanges under FLPMA, 43 U.S.C. § 1716, and other statutes.

Where just compensation is concerned, a reliable process is necessary to ensure a just result. For federal acquisition purposes, the appraisal process must result in opinions of market value that are credible, reliable, and accurate. These federal Standards governing the appraisal process protect against allowing "mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth."[7]

**"[O]ur cases have set forth a clear and administrable rule for just compensation: 'The Court has repeatedly held that just compensation normally is to be measured by 'the market value of the property at the time of the taking.''"**

**— *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2432 (2015) (quoting *United States v. 50 Acres of Land* (*Duncanville*), 469 U.S. 24, 29 (1984))**

**0.3.   Scope.** These Standards cover the following areas:
(1)   Appraisal Development
(2)   Appraisal Reporting
(3)   Appraisal Review
(4)   Legal Foundations

Section 1: Appraisal Development sets forth the standards that must be followed in developing an appraisal for federal acquisition purposes to ensure a credible, reliable, and accurate valuation that reflects just compensation mandated by the United States Constitution. Section 1 derives from generally accepted professional appraisal standards and federal law. Competent development of an appraisal under these Standards requires an understanding of applicable law, described in Section 4: Legal Foundations and Guidance.

Section 2: Appraisal Reporting presents the content and documentation required for appraisals developed in compliance with these Standards and applicable law. Section 2 also includes a recommended appraisal report format. Agencies may modify these documentation and formatting requirements in certain circumstances to ensure appropriate flexibility to accomplish agency program goals.

Section 3: Appraisal Review addresses technical and administrative reviews of appraisals by appraisers and non-appraisers, and is derived from generally accepted appraisal review standards and federal law and regulations. The purpose of Section 3 is to ensure that appraisals used by the government in its land acquisitions are credible, reliable and accurate and have been conducted in an unbiased, objective, and thorough manner, in accordance with applicable law.

Section 4: Legal Foundations explains the federal law that dictates these appraisal Standards, which apply to appraisals for all federal acquisitions involving the measure of just compensation. Federal case law, cited throughout the section, has long held that market value is normally the measure of just compensation; the rare departures from the *market value* standard are also discussed. Appraisers who make market value appraisals for federal acquisitions must understand and apply federal law in the development, reporting, and review of appraisals in federal acquisitions. Section 4 also includes a discussion of the legal standards that apply to many recurring valuation problems, as well as guidance on specialized appraisal issues that are unique to federal acquisitions.

---

7   *Olson v. United States*, 292 U.S. 246, 257 (1934).

As a whole, these Standards aim to encourage uniform, reliable, and fair approaches to appraisal problems, and to ensure consistent, effective practices for evaluating appraisal reports for federal acquisition purposes. Nothing in these Standards is intended to limit the scope of appraisal investigations or to undermine the independence and objectivity of appraisers engaged in providing opinions of market value for just compensation purposes.

With appropriate modifications, these Standards—or rather, portions of these Standards—may be applied to valuations for non-acquisition purposes, such as appraisals for conveyance, sale, or other disposals of federal property. Some rules that must be followed in valuing real property for federal acquisition purposes are inapt or impossible to apply to federal disposals. As discussed in Section 1.2.8, these Standards do not prohibit adapting these valuation rules to address the distinct challenges of appraising federal property for disposal purposes.

**0.4.**    **About the Sixth Edition to the "Yellow Book."** In this sixth edition, the *Uniform Appraisal Standards for Federal Land Acquisitions* have been updated to reflect developments in appraisal methodology and theory, case law, and other federal requirements since the fifth edition was published in 2000. These Standards have also been restructured for clarity, convenience, and consistency with professional appraisal standards, as appropriate.

The four-part structure is designed to follow the appraisal process, from development, to reporting, to review, while the final section explains the legal foundations for the appraisal development, reporting, and review requirements, and provides practical examples of how the underlying law applies to actual valuation problems in federal acquisitions. This sixth edition is also broadly consistent with the structure of the current Uniform Standards of Professional Appraisal Practice (USPAP) and federal regulations implementing the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Uniform Act or URA).

The sixth edition's structure reflects the evolution of USPAP (which did not exist in early editions of these Standards) as the congressionally authorized minimum standards for the appraisal profession. It also continues the fifth edition's focus on the practical effects of federal valuation requirements on appraisals in federal acquisitions.[8] Broadly speaking, this sixth edition incorporates previous editions as follows:

Section 1: Appraisal Development addresses the appraisal process and the scope of work appropriate for appraisals in federal acquisitions, integrating appraisal development topics from the fifth edition's Parts A, B, C, and D with USPAP's Scope of Work Rule (created since the fifth edition);

Section 2: Appraisal Reporting incorporates the contents of the fifth edition's Part A, Data Documentation and Appraisal Reporting Standards;

---

[8]    Recognizing that the vast majority of federal acquisitions are accomplished by voluntary means, the fifth edition placed technical appraisal requirements up front. Previous editions led off with discussion of federal law on valuation issues, primarily focusing on eminent domain litigation. To reduce confusion, topics in this sixth edition are organized by number, unlike the lettered subparts in earlier editions. A detailed cross-reference table is included in the Appendix.

Section 3: Appraisal Review incorporates the contents of the fifth edition's Part C, Standards for the Review of Appraisals; and

Section 4: Legal Foundations integrates and updates the topics in the fifth edition's Part B, Legal Basis for Appraisal Standards for Federal Land Acquisitions, and several legal topics previously in Part D as miscellaneous. Of particular note, the fifth edition's lengthy Part D-9, Comparable Sales Requiring Extraordinary Verification and Treatment, is now addressed in Section 1.5.2.4, and the legal foundations for these heightened requirements are explained in Section 4.4.2.4. A verification checklist is also included in the Appendix.

**0.5.** **Policy.** In acquiring real property, or any interest in real property, the United States will impartially protect the interests of the public and ensure the fair and equitable treatment of those whose property is needed for public purposes. As a general policy, the United States bases its property acquisitions on appraisals of market value, the standard adopted by the courts as the practical, objective measure of just compensation.

> **"[I]t is the duty of the state, in the conduct of the inquest by which the compensation is ascertained, to see that it is just, not merely to the individual whose property is taken but to the public which is to pay for it."**
>
> **— *Bauman v. Ross*, 167 U.S. 548, 574 (1897)**

# 1. APPRAISAL DEVELOPMENT

1.1.    **Introduction.** These Standards reflect the application of the appraisal process to valuation assignments for federal property acquisitions. The goal of every appraisal prepared under these Standards is a well-supported opinion of market value that is credible, reliable, and accurate. These requirements and rules are set forth to ensure that the appraiser's opinion of market value can be used for purposes of just compensation under the United States Constitution. The appraisal process provides a logical framework for the identification and proper solution of an appraisal problem. The general steps of the appraisal process are:

- Problem identification
- Scope of work
- Data collection
- Data analysis
- Application of approaches to value
- Reconciliation and final opinion of market value
- Report of opinion of market value

The first step in the appraisal process is to *identify the appraisal problem* to be solved. To do so, the appraiser and the client[9] must address seven critical assignment elements presented in Section 1.2. This discussion summarizes each of the seven elements and in particular addresses the assignment conditions associated with appraisals prepared for federal property acquisitions. The special legal rules and methods required under these Standards are identified and briefly addressed. This section is intended to assist appraisers and agencies in determining the appropriate scope of work for each appraisal assignment.

Section 1 also addresses the next four steps in the appraisal process. Section 1.3 addresses <u>data collection</u> concerning the subject property and the market, respectively. Section 1.4 addresses <u>data analysis</u>, including highest and best use, and larger parcel and market analysis. Section 1.5 addresses the application of the <u>approaches to value</u> including land valuation, the sales comparison approach, the income capitalization approach, and the cost approach. Section 1.6 addresses the <u>reconciliation process</u> and the <u>final opinion of market value</u>. Section 1 also contains appraisal development requirements specific to certain types of federal acquisitions including partial acquisitions, leasehold acquisitions, temporary acquisitions, natural resources acquisitions, inverse takings, and federal land exchanges. Finally, Section 1 provides guidance concerning the use of reports by other experts and the appraiser's responsibilities in litigation.

Section 1 is generally consistent with Standard 1 of USPAP, but provides more in-depth discussion of each topic to address the heightened requirements for appraisals prepared for just compensation purposes. These Standards do not cover all of the valuation problems that

---

9    See Section 1.2.1 for discussion concerning the client.

might be encountered in the appraisal of real property for government acquisitions. Instead, the Standards address the fundamental scope of work issues associated with preparing sound appraisals for federal agencies. Proper application of the scope of work will ensure that federal agencies obtain appraisals that are credible, reliable, and accurate and result in uniform, fair treatment of property owners during the acquisition process.

The acquisition of private property by government agencies can create difficult and complex valuation problems, the solutions to which must be developed with great care. It is critical that in those instances when proposed acquisitions are complex, high value, sensitive, or controversial or when the matter must be referred to the Department of Justice for litigation, the full scope of work described in these Standards must be applied. In other assignments, it is appropriate to modify the scope of work when the acquisition is noncomplex and/or to ensure the cost of the appraisal is consistent with the requirements of the client agency. Under no circumstances may the scope of work result in an appraisal that does not meet the minimum requirements under the Uniform Act.

**1.2.**  **Problem Identification.** The problem identification process ensures that the appraiser identifies and understands the critical assignment elements associated with developing an appraisal for federal acquisition purposes under these Standards. Federal appraisal requirements are often different than those of private clients, and the appraiser must fully understand and comply with these requirements.

The scope of work[10] must address seven critical assignment elements for each appraisal assignment:

- Client
- Intended users
- Intended use
- Type and definition of value
- Effective date
- Relevant characteristics about the subject property
- Assignment conditions

**1.2.1.**  **Client.** The client is the party or parties engaging an appraiser in an assignment. The client is the appraiser's primary contact and provides all of the information about the assignment. Most importantly, the client is the entity to whom the appraiser owes confidentiality. The client must be established before the appraiser begins the assignment. Under these Standards, the client is the federal agency that is requesting the appraisal.

**1.2.2.**  **Intended Users.** All intended users of an appraisal must be identified at the outset of the assignment. Intended users often include not only the client agency but also other federal, state, or local agencies. In appraisals for land exchanges, discussed in more detail in Section 1.12, intended users may include landowners. In appraisals for acquisitions referred to the Department of Justice for condemnation litigation purposes, the intended users may include

---

10  THE APPRAISAL FOUNDATION, UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE (USPAP) 17-18 (2016-2017) [hereinafter USPAP]. See Scope of Work Rule and Standards Rule 1-2.

the federal court, landowners, and their counsel. The appraiser must fully identify and understand who the intended users are before initiating the appraisal assignment.

**1.2.3.**   **Intended Use.** The intended use of the appraisal is one of the most important elements of the problem identification process. In most assignments, the intended use of the appraisal is to assist the client agency in its determination of the amount to be paid as just compensation for the property rights acquired or conveyed. In those cases that have been referred to the Department of Justice for litigation, the intended use will be to assist government's trial counsel and the court in determining market value for the purpose of just compensation.

**1.2.4.**   **Type of Opinion.** In all assignments for federal acquisitions under these Standards, the type of opinion to be developed is market value. It is imperative that the appraiser utilize the correct definition of market value. In all federal acquisitions except leasehold acquisitions, appraisers must use the following federal definition of market value:[11]

> **Definition of Market Value**
> Market value is the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would have sold on the effective date of value, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither acting under any compulsion to buy or sell, giving due consideration to all available economic uses of the property.

Appraisers should not *link* opinions of value under these Standards to a specific opinion of exposure time, unlike appraisal assignments for other purposes under USPAP Standards Rule 1-2(c). This requires a jurisdictional exception to USPAP because, as discussed in Section 4.2.1.2, the federal definition of market value already presumes that the property was exposed on the open market for a *reasonable* length of time, given the character of the property and its market.

Similarly, estimates of marketing time are not appropriate for just compensation purposes, and must not be included in appraisal reports prepared under these Standards.[12] While estimates of marketing time may be appropriate in other contexts and are often required by relocation companies, mortgage lenders, and other users, "provid[ing] a reasonable marketing time opinion exceeds the normal information required for the conduct of the appraisal process"[13] and is beyond the scope of the appraisal assignment under these Standards.

**1.2.5.**   **Effective Date.**  The effective date of value for the assignment is dependent on the intended use, which depends on the legal nature of the acquisition and is further discussed in Section 4.2.1.1.  In most direct acquisitions (such as voluntary purchases), the effective date of value will be as near as possible to the date of the acquisition—typically the date of final inspection. In "quick-take" condemnations under the Declaration of Taking Act, the date of value is the earlier of (1) the date the United States files a declaration of taking and deposits estimated compensation with the court, or (2) the date the government enters into possession of the property. In "complaint-only" straight condemnations under the General Condemnation

---

11   See Section 4.2.1 for the legal basis for this definition.
12   Marketing time refers to the period of time it would take to sell the appraised property, after the effective date of value, at its appraised value.
13   USPAP, Advisory Opinion 7, *Marketing Time Opinions*.

5-ER-767

Act in which no declaration of taking is filed, there may be two valuation dates: the first date will likely be the date of final inspection; the second date is when the appraiser is asked to form a new opinion of value (a new appraisal assignment) effective as of the date of trial. In <u>inverse takings</u>, the date of value is the date of taking, typically established by the court. When necessary, the client must provide the appraiser with a **legal instruction** regarding the appropriate effective date of value and the legal basis for the date to be used in the assignment. For assignments in which the effective date of value is prior to the date of the report, the appraiser should consult USPAP guidance regarding retrospective value opinions.[14] The identification of the effective date of value does not preclude consideration of market data after that date. Comparable sales and rentals occurring after the effective date of value may be considered (see Section 4.4.2.4.7). Market data after the effective date of value that confirms market trends identified as of the effective date of value may also be considered.

**1.2.6.** **Relevant Characteristics of the Subject Property.** The subject property is the property that is being appraised.[15] In the context of these Standards the term may refer to the property that is the larger parcel. In developing an appraisal under these Standards the appraiser must complete a comprehensive study of the physical, legal, and economic characteristics of the subject property as well as the neighborhood and market in which it is located.

**1.2.6.1.** **Property Interest(s) to be Appraised.** It is the responsibility of the acquiring agency to provide the appraiser with an accurate description of the property interest(s) to be appraised in each assignment.

Often, the property interest being acquired and appraised is the fee simple estate. This is so even when the real estate has been divided into multiple estates with different owners. This is an application of the unit rule, which will be discussed in greater detail in Section 1.2.7.3.2 and 4.2.2. Federal agencies can also acquire something less than the fee simple interest in property, for example by excluding easements for roads and utilities, mineral rights, water rights, or mineral leases. Agencies can also acquire partial interests such as permanent and temporary easements, rights of entry, and leaseholds. The appraiser must fully understand the nature of the estate(s) to be acquired, and request **legal instructions** if clarification is needed, for each assignment.

**1.2.6.2.** **Legal Description.** It is the responsibility of the agency to provide the appraiser with an accurate legal description of the subject property prior to initiating the assignment. If the assignment is a partial acquisition, the appraiser should receive both a legal description of the larger parcel and a legal description of the remainder property, or alternatively, a legal description of the area to be acquired and/or encumbered. Since the larger parcel is determined by the appraiser as part of the highest and best use analysis, it is possible that a legal description for the larger parcel must be developed at that point in the appraisal development process.

The appraiser should verify the legal description (1) on the ground during a physical inspection of the property; (2) with the owner of the property (if possible); (3) by comparing it with aerial or other maps available in city, county, or other governmental offices; and (4) by comparing it

---

14   USPAP, Advisory Opinion 34, *Retrospective and Prospective Value Opinions*.
15   *Subject Property*, THE DICTIONARY OF REAL ESTATE APPRAISAL (6th ed. 2015).

with public records in the recorder's, auditor's, assessor's, tax collector's, or other appropriate city or county offices. If the appraiser discovers a significant error or inconsistency, the appraiser should consult the client for clarification before proceeding with the appraisal.

**1.2.6.3.** **Property Inspections.** The appraiser must personally inspect the subject property in every assignment. Appraisers should recognize that they may have only one opportunity to physically inspect the property and should ensure that they have collected all information required to identify all property characteristics (land and improvements) that influence value.

In partial acquisitions in which the appraiser's inspection precedes the acquisition, the appraiser should request that the agency stake the portion(s) of the property to be acquired before the inspection so that the impact of the acquisition on the remainder can be visualized. If the appraiser's inspection occurs after construction of the government's project begins (most commonly in Declaration of Taking cases), the appraiser must learn about the property as it existed before the taking to ensure that the property characteristics influencing value before the taking are properly accounted for.[16] In acquisitions of such large or inaccessible properties that a physical on-the-ground inspection may be impossible or not useful, the client may modify the scope of work to allow for an aerial inspection of the property.

In most assignments, the appraiser should also conduct a physical inspection of all properties used as sales or rental comparables. The level of detail of these inspections is dependent on the complexity of the appraisal problem to be solved. Physical inspection of all properties used as sales or rental comparables is required for any appraisal being prepared for the U.S. Department of Justice for litigation purposes.

**1.2.6.4.** **Contacting Landowners.** During the course of inspecting the subject property, the appraiser is expected to meet with the property owner or, in the owner's absence, the owner's agent or representative. If a property owner is represented by legal counsel, all owner contact and property inspections must be arranged through the owner's attorney, unless the attorney specifically authorizes the appraiser to make direct contact with the owner. Owners are generally a prime source of detailed information concerning the history, management, and operation of the property.

Under the Uniform Act, the owner or the owner's designated representative must be given an opportunity to accompany the acquiring agency's appraiser during the appraiser's inspection of the property.[17]

**1.2.7.** **Assignment Conditions.** In developing an appraisal under these Standards, appraisers must understand the special assignment conditions associated with the valuation of property being acquired by federal agencies. These special assignment conditions include the use of instructions, hypothetical conditions, extraordinary assumptions, and jurisdictional exceptions from USPAP as well as the special rules and methods required in these appraisals.

---

16   J.D. Eaton, Real Estate Valuation in Litigation 272-73 (2d ed. 1995) [hereinafter Eaton].
17   42 U.S.C. § 4651(2).

5-ER-769

**1.2.7.1.**    **Instructions, Hypothetical Conditions, Extraordinary Assumptions.** Application of these Standards may require instructions from the acquiring agency. For example, agency instructions can provide clarification about the legal description of the property to be appraised and/or the property rights being acquired. Agency instructions that result in assumptions, hypothetical conditions, or extraordinary assumptions that impact the appraisal process or the appraisal results should be carefully considered before being issued. An appraiser cannot make an assumption or accept an instruction that is unreasonable or misleading, nor can an appraiser make an assumption that corrupts the credibility of the opinion of market value[18] or alters the scope of work required by the appraiser's contract. For example, it is improper (unless specifically instructed otherwise) for an appraiser to make an assumption that the property being appraised is free of contamination when there is evidence from the property inspection or the past use of the property that contamination may exist. Instructions should always be in writing, retained in the appraiser's workfile, and included in the addenda of the report.

**Hypothetical Conditions.** "A hypothetical condition[19] may be used in an assignment only if:

- use of the hypothetical condition is clearly required for legal purposes, for purposes of reasonable analysis, or for purposes of comparison;
- use of the hypothetical condition results in a credible analysis; and
- the appraiser complies with the disclosure requirements set forth in USPAP for hypothetical conditions."[20]

The appraiser must always consult with the client and/or counsel before employing a hypothetical condition. If utilization of a hypothetical condition is required by the facts or nature of the acquisition, then written **legal instructions** must be provided to the appraiser and included within the appraisal report. The appraiser must also comply with USPAP requirements regarding disclosure and impact on the value conclusion.[21]

**Extraordinary Assumptions.** "An extraordinary assumption[22] may be used in an assignment only if:

- it is required to properly develop credible opinions and conclusions;
- the appraiser has a reasonable basis for the extraordinary assumption;
- use of the extraordinary assumption results in a credible analysis; and
- the appraiser complies with the disclosure requirements set forth in USPAP for extraordinary assumptions."[23]

---

18    *See* Section 4.4 (Valuation Process).
19    "Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis." USPAP, Definitions, 3.
20    USPAP, <u>Comment</u> to Standards Rule 1-2(g), 19.
21    USPAP, Standards Rule 2-2(a)(xi), (b)(xi), 25, 27.
22    "Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis." USPAP, <u>Comment</u> to Extraordinary Assumption, 3.
23    USPAP, <u>Comment</u> to Standards Rule 1-2(f), 19.

---

It is improper for an appraiser to classify conclusions reached after investigation and analysis as assumptions. For example, after proper investigation and analysis, an appraiser can *conclude* that a probability of rezoning for the subject property exists, but it would be improper to *assume* such a probability. The appraiser must also comply with USPAP requirements regarding disclosure and impact on the value conclusion.

Circumstances arise in which a **<u>legal instruction</u>** is necessary to properly complete the appraisal assignment. Examples of situations in which a **<u>legal instruction</u>** may be required include: unity of title questions in a larger parcel analysis, scope of the government's project questions, compensability of damages questions, special benefits questions, and effective date of value questions. Resolving questions such as these is a proper role for agency counsel (and Department of Justice trial attorneys) and appraisers must follow their guidance. In situations where the legal outcome is uncertain, counsel may direct the appraiser to develop a dual premise appraisal.

**1.2.7.2.    Jurisdictional Exceptions.** While these Standards generally conform to USPAP,[24] in certain instances it is necessary to invoke USPAP's Jurisdictional Exception Rule to comply with federal law relating to the valuation of real estate for just compensation purposes. Areas of these Standards that preclude compliance with USPAP and therefore require invoking the Jurisdictional Exception Rule are briefly discussed here.

USPAP's Jurisdictional Exception Rule simply provides that "[i]f any applicable law or regulation precludes compliance with any part of USPAP, only that part of USPAP becomes void for that assignment." Further, a <u>Comment</u> in the Jurisdictional Exception Rule states, in part, "When an appraiser properly follows this Rule in disregarding a part of USPAP, there is no violation of USPAP."[25]

As made clear below, the conflicts between these Standards and USPAP that require invocation of USPAP's Jurisdictional Exception Rule are limited and supported by clearly established federal law, which is further discussed in Section 4. The Jurisdictional Exception Rule should never be invoked lightly or without reference to the overriding federal law, rule, or regulation that requires it. USPAP and these Standards require full and prominent disclosure to avoid misleading intended users (or even casual readers) of the appraisal report.

While these Standards are not *law* in and of themselves, they are based on, and describe, federal law (including case law, legislation, administrative rules, and regulations). These Standards have also been specifically incorporated by reference into a number of statutes and regulations, including the regulations that implement the Uniform Act.[26] It is clear that the deviations between the requirements of these Standards and USPAP noted below fall under

---

24    For purposes of this discussion, the 2016-2017 edition of USPAP has been used. Appraisers are cautioned that USPAP changes frequently and, thus, additional jurisdictional exceptions to USPAP may be required.

25    USPAP, Jurisdictional Exception Rule, 16.

26    49 C.F.R. § 24.103; *see, e.g.*, 113 Stat. 1693 § 4(b), (Pub. L. No. 106-138); 112 Stat. 879 § 1(c), (Pub. L. No. 105-208); 112 Stat. 2681 §357(1), § 605(a)(3), (Pub. L. No. 105-277); 110 Stat. 4093 § 304(c)(4)(A) (Pub. L. No. 104-333); 106 Stat. 2112 § 7(b) (Pub. L. No. 102-415); 106 Stat. 2258 § 2(d)(2)(A) (Pub. L. No. 102-484); 105 Stat. 1150 § 8126(a) (Pub. L. No. 102-172); 102 Stat. 1086 § 3(a) (Pub. L. No. 100-409), amending 43 U.S.C. § 1716; 100 Stat. 4274 § 8(o) (Pub. L. No. 99-663); 36 C.F.R. § 254.9; 43 C.F.R. § 2201.3.

USPAP's Jurisdictional Exception Rule; the legal authority justifying these exceptions consists of these Standards and the federal case law, legislation, and federal regulations upon which these Standards are based.

**Linking Estimate of Value to Specific Exposure Time.** Section 1.2.4 provides that the appraiser shall not *link* an opinion of market value for federal acquisition purposes to a specific exposure time. The legal basis for this jurisdictional exception to USPAP Standards Rule 1-2(c) and may be found in Section 4.2 of these Standards.

**Consideration of Land Use Regulations and Anticipated Public Projects.** Section 1.2.7.3.3 of these Standards provides that the appraiser disregard any changes in a property's neighborhood brought about by the government's project. Section 1.4.3 further instructs appraisers to disregard recent rezoning (or the probability of rezoning) of the subject property if such action was the result of the government's project. Section 4.3.2.4.1 (Exceptions, under Zoning and Permits) explains the legal basis for these instructions. These instructions are contrary to USPAP Standards Rule 1-3(a), which requires appraisers to identify and analyze the effect on use and value of existing land use regulations and probable modifications thereof, and to USPAP Standards Rule 1-4(f), which requires appraisers to analyze the effect on value of anticipated public improvements located on or off site. Therefore, the instructions to appraisers in these Standards in this regard are considered jurisdictional exceptions.

**Specific Legislation and Regulations.** Each land acquisition agency has its own rules and regulations relating to its land acquisition activities. While all of these rules and regulations work from a base of the Uniform Act and its implementing regulations, specific agency program activities sometimes make it necessary to adopt rules and regulations that are, or may be construed to be, contrary to USPAP.

Also, it is not uncommon for Congress to enact specific legislation relating to the acquisition of a specific property or properties to be acquired for a specific public project. In some instances, adherence to the provisions of that specific legislation may require the appraiser to invoke USPAP's Jurisdictional Exception Rule and/or prepare an appraisal under a hypothetical condition or extraordinary assumption. In such instances, it is the agency's responsibility to advise the appraiser of the special conditions under which the appraisal is to be conducted, of the specific law requiring the invocation of USPAP's Jurisdictional Exception Rule, and, if applicable, of the hypothetical condition or extraordinary assumption.

Any time appraisers confront a potential conflict between USPAP and these Standards or the client's instructions, they should always analyze the apparent conflict and avoid invocation of USPAP's Jurisdictional Exception Rule whenever possible. Often, these Standards and the agency's special appraisal instructions do not require a jurisdictional exception, but rather merely that the appraiser conduct an appraisal under a hypothetical condition or by adopting an extraordinary assumption.

**1.2.7.3.    Special Rules and Methods.** An important aspect of assignment conditions under these Standards is compliance with the special rules and methods that apply to the development of

appraisals of market value for federal acquisition purposes. These special rules and methods are summarized briefly below, and explained in greater detail throughout these Standards. The legal foundations for these rules are found in the appropriate sections of Section 4 (Legal Foundations).

**1.2.7.3.1. Larger Parcel.** Essential to the appraiser's conclusion of highest and best use is the determination of the <u>larger parcel</u>.[27] The appraiser must make a larger parcel determination in every appraisal conducted under these Standards, even in minor partial acquisitions in which the appraiser is instructed not to do a complete before and after appraisal.

**1.2.7.3.2. Unit Rule.** There are several aspects of the unit rule that are important for appraisers to understand in developing appraisals under these Standards. The unit rule requires valuing property as a whole rather than by the sum of the values of the various interests into which it has been carved—such as lessor and lessee, or life tenant and the holder of the remainder. This requirement holds true in circumstances where the physical components of the property are held under different ownership such as the surface estate, mineral rights, water rights, or timber. Even when the physical components of a property are under the same ownership, it is improper to separately value the various components (improvements, minerals, standing timber, crops, and land) and then add them up. This procedure results in an improper <u>summation</u> or <u>cumulative appraisal</u>, which is inconsistent with both federal appraisal standards and USPAP.[28]

**1.2.7.3.3. Government Project Influence and the "Scope of the Project" Rule.** Any increase or decrease in the market value of real property prior to the date of valuation caused by the government project for which the property is being acquired must be disregarded in developing the appraisal. Under federal law, valuations for just compensation purposes must disregard any government <u>project influence</u> on a property's market value once it is within the scope of the government's project. The resulting <u>scope of the project rule</u>, when properly applied, ensures fair results for both landowners and the public, as discussed in Section 4.5.

> **Proper application of the <u>scope of the project rule</u> is complex, and virtually always requires a <u>legal instruction</u>.**
>
> **Simply directing appraisers to follow these Standards is not a sufficient legal instruction for purposes of the scope of the project rule. *See* Section 4.5.**

The scope of the project rule applies only to changes in value *attributable to the government's project*; it does not allow an appraiser to disregard changes in value attributable to other factors. For this reason, changes in value prior to the date of valuation due to physical deterioration within the landowner's reasonable control must be considered.

In partial acquisitions, the scope of the project rule typically excludes consideration of government project influence on the value of the larger parcel before the acquisition, and includes consideration of government project influence on the value of the remainder after the acquisition.[29]

---

27   As discussed in Section 4.3.3, the <u>larger parcel</u>, for purposes of these Standards, is defined as that tract or those tracts of land that possess a unity of ownership and have the same, or an integrated, highest and best use. Elements of consideration by the appraiser in making a determination in this regard are contiguity, or proximity, as it bears on the highest and best use of the property, unity of ownership, and unity of highest and best use.

28   USPAP, Standards Rule 1-4(e).

29   *See* Sections 4.5 and 4.6 (especially 4.6.1, 4.6.2, and 4.6.3).

5-ER-773

Because the scope of the project rule involves interrelated factual and legal questions, the appraiser must request appropriate **legal instruction** if there is evidence the government's project affected the market value of the property being appraised.[30] The appraiser may be asked to gather and/or analyze data to inform the legal analysis. Counsel (or the Court) will instruct the appraiser as to (1) *whether* the scope of the project rule applies; (2) *how* the rule must be applied to the specific property under appraisal; and, if applicable (3) *when* the scope of the project rule applies, i.e., the date as of which the rule is triggered. As discussed in Section 4.5, these legal instructions are the criteria the appraiser must follow in determining the fair market value of the property. As with other complex legal questions, counsel may direct the appraiser to perform a dual-premise appraisal if the legal outcome is uncertain.[31]

**1.2.7.3.4.  Before and After Rule.** In partial acquisitions, these Standards require application of the before and after rule, also known as the federal rule, in which the appraiser estimates both the market value of the larger parcel before the government's acquisition and the market value of the remainder property after the government's acquisition.[32] Requiring this method of valuation allows acquiring agencies, the Department of Justice, and the courts to calculate a reasonable measure of compensation by deducting the appraiser's estimated remainder or after value from the appraiser's estimate of the larger parcel's before value. The result of this procedure is a figure that includes the value of the property acquired as well as any compensable damages and/or special benefits to the remainder property.

Appraisers should note that these are two separate appraisals within the same assignment and require the appraiser to perform a new analysis and valuation of the remainder after the acquisition.

**1.2.7.3.5.  Damages.** Because damage to the remainder is automatically included in the before and after valuation, damages are not separately appraised in federal acquisitions. However, to properly estimate the value of the remainder after the acquisition, appraisers must understand the concept of damages for federal acquisition purposes.  The legal terminology associated with damages is confusing, perhaps because the same terms have been applied to different concepts under federal and state laws. Under federal law, damage to a property's market value is either compensable and must be considered, or non-compensable and must be disregarded.[33] The term *severance damages* has been used to describe those damages for which the United States must pay compensation. The term *consequential damages* has been used to describe damages for which the United States is not obligated to pay compensation.  For the purposes of these Standards and to reduce confusion, appraisers should use the term compensable rather than severance and non-compensable instead of consequential. Further discussion regarding the proper development of appraisals concerning partial acquisitions is found in Section 1.7.

---

30  *See* Section 4.5. If there is no evidence the government's project affected the market value, the scope of the project rule does not apply. *See id.*
31  *See* Section 1.2.7.
32  *See* Section 4.6.1.
33  As discussed in Section 4.6.2, the United States reimburses landowners for many types of non-compensable damage through administrative payments under the Uniform Act. These statutory benefits to persons and businesses affected by federal acquisitions are separate from, and in addition to, just compensation paid for the property acquired.

**1.2.7.3.6. Benefits.** Broadly, benefits are positive effects on market value that result from the public project for which the property was acquired. There are two categories of benefits for federal acquisition purposes: direct (special) benefits, which must be offset against total compensation, and general (indirect) benefits, which must be ignored. As with damages, whether a benefit is general or direct is a mixed fact/law question that requires a **legal instruction**.

**1.2.8.     Scope of Work.** A full understanding of the critical assignment elements discussed above is essential to a proper scope of work that will enable appraisers to solve the appraisal problem they have been hired to solve. It is ultimately the appraisers' responsibility to discuss these critical elements with the client at the time they are engaged to perform the assignment to ensure the resulting appraisal is credible, reliable, and accurate. The scope of work should reflect the complexity of the property and the market. The intended use and intended users are also critical factors that will impact scope of work decisions.

It is recognized that federal agencies may use (or are directed by statute or other authority to use) these Standards outside the realm of acquisitions/exchanges (for sales or conveyances of federal land, leases, and fee determinations). In these situations, the scope of work may be modified. For example, some of the special rules and methods, including the larger parcel analysis and the before and after methodology, may not apply in these appraisal assignments. Additional hypothetical conditions related to highest and best use and ownership may be required as well. The protection of the public trust remains paramount and must be the foundation that appraisers and client agencies operate from when making these determinations.

**1.3.     Data Collection.** As discussed in Section 1.2 (Problem Identification), the starting point for developing an appraisal under these Standards is the legal description of the property to be acquired and the property rights to be appraised. All of the information concerning the characteristics of the land and improvements that influence the value of the subject property must be collected by the appraiser during the process of property inspection and market research.

**1.3.1.     Property Data.**

**1.3.1.1.     Land.** In the development of the appraisal, the appraiser must collect and properly analyze data about the subject property. The appraiser must identify all characteristics that impact value, which may include access and road frontage, topography, soils, vegetation (including timber and crops), views, land area and shape, utilities, mineral deposits, water rights, and easements or other encumbrances. The presence of hazardous substances should be considered by appraisers in accordance with the assignment conditions.

**1.3.1.2.     Improvements.** The appraiser must collect and properly analyze data about all improvements located on the subject property. This includes building dimensions; square foot measurements; chronological and effective ages; type and quality of construction; present use and occupancy; interior finishes; type and condition of the roof; type and condition of mechanical, electrical, and plumbing systems; and dates of any significant remodeling or renovations. The appraiser must identify and properly calculate the appropriate method of

measurement used in determining rentable areas. In addition, the appraiser must identify the type, quality, and condition of all site improvements, including fencing, landscaping, paving (both roadways and parking areas), irrigation systems, and domestic and private water systems.

Questions regarding whether an item is a fixture (real estate) or equipment (personal property) must be referred to legal counsel for clarification. In making this referral, appraisers should bear in mind that the determination of whether an item is a fixture or equipment, for federal acquisition purposes, may not always be consistent with laws of the state in which the property is located.[34] In those instances where specialty fixtures are encountered or when the fixtures will represent a substantial portion of the property's value, consideration should be given to the retention of a fixture valuation specialist.[35]

**1.3.1.3.** **Zoning and Land Use Controls.** Zoning is a factor to be considered in evaluating property. Accordingly, if the property to be appraised is subject to zoning, the appraiser must identify the applicable restrictions and interpret the impact of such restrictions on the utility and value of the subject property. If zoning is uncertain, **legal instruction** may be required. In selecting comparable sales for use in the appraisal, the appraiser should select those sales that have the same or similar zoning as the property being appraised.[36]

The appraiser must consider not only the use restrictions of the zoning ordinance, but also other provisions of the zoning ordinance that may affect value. Examples include lot area requirements, building setback requirements, floor/area ratios, lot coverage ratios, off-street parking, landscaping requirements, height limitations, treatment of preexisting nonconforming uses, and treatment of uses that became nonconforming after adoption of the zoning ordinance. If the appraisal involves a partial acquisition, the appraiser must consider the effect of the zoning provisions on both the larger parcel and the remainder property.

Special care must be taken to determine the effect of a zoning ordinance on a remainder property that has been converted to a nonconforming use by the government's partial acquisition. Some ordinances have specific provisions to reclassify or "grandfather in" properties that have become nonconforming by reason of a partial acquisition by a governmental agency. Other ordinances contain no mechanism for converting a property that has become nonconforming after adoption of the zoning ordinance into a conforming property or classifying it as a preexisting nonconforming use. Penalties for nonconformity can be severe under such circumstances.

The appraiser must consider not only the effect of existing land use regulations, but also the effect of reasonably probable modifications of such land use regulations,[37] such as what impact on value any probability of a rezoning of the subject property might have. Although an appraiser might conclude that a property could be put to a more profitable highest and best use if it were zoned differently, this does not in itself suggest that a probability of rezoning exists.

---

34   *See* Section 4.1.
35   *See* Section 1.13.
36   *See* Sections 4.3.2.4 (Zoning and Permits), 4.4.2.1 (Comparability), and 4.4.2.4.5 (Contingency Sales).
37   *See* Section 4.3.2.4; *see also* USPAP, Standards Rule 1-3(a).

An investigation of the probability of rezoning should include:

- interviews of zoning administrators and members of the legislative body that make final zoning determinations;
- reviews of all rezoning activity of nearby property (both approvals and denials), land use patterns in the neighborhood (and any recent changes), physical characteristics of the subject and nearby properties, neighborhood growth patterns, and land use planning document provisions;
- investigation of neighborhood attitudes concerning rezones;
- determination of the age of the zoning ordinance; and
- analysis of sales of similar property to determine whether the sale prices reflect anticipated rezoning.

If the probability of a rezoning is impacted, either positively or negatively, by the government project for which the subject property is being acquired, such impact must be disregarded under the scope of the project rule.[38] In partial acquisitions, the probability of rezoning must be separately analyzed in regard to the larger parcel before acquisition, and the remainder property after acquisition. If the remainder property has a greater probability of rezoning, there may be a direct benefit to the property that must be offset against the total;[39] if such probability has been diminished, a compensable damage may have occurred.[40]

In addition to zoning, the appraiser must consider the impact of other land use regulations on the utility and value of the subject property. These land use regulations may be of local, state, regional, or national origin. Many common land use regulations that may have an impact on property value are listed in the sidebar. The client agency should advise the appraiser of any special or unique land use regulations it has identified that may affect the value of the property.

**Common land use regulations that can affect market value:**

- building codes
- health code regulations
- subdivision regulations
- development moratoria
- other development restrictions
- environmental impact statements
- shorelines management requirements
- coastal zone management
- flood plain management regulations
- comprehensive land use plans
- mining regulations
- timber harvesting regulations
- wetland regulations
- open space requirements
- endangered species protections
- noise, air, or water pollution controls
- hazardous or toxic waste controls

**1.3.1.4.    Use History.** In developing the appraisal, the appraiser must identify the purpose for which the improvements were designed and the dates of original construction and major renovations, additions, and/or conversions. This is particularly important for properties located in transitional areas (such as a residential neighborhood being converted to higher density residential and commercial uses) or special-use properties (such as church buildings converted to a commercial or residential use). The appraiser should identify a 10-year history of the use and occupancy of the property, if available. Past uses of the property may suggest historical contamination by hazardous substances.

---

38   *See* Section 4.5.
39   *See* Section 4.3.3.
40   *See* Section 4.3.4.

**1.3.1.5.** **Sales History.** Since any recent, unforced sale of the subject property can be the best evidence of its value, it is important to collect data on all sales of the property for the 10 years prior to the effective date of value.[41] Any offers to buy or sell the subject property should also be identified and evaluated if available. If no sale of the property has occurred in the past 10 years, the appraiser shall identify the most recent sale of the property, whenever it occurred.

> **These Standards require a *10-year sales history*— longer than that required in appraisals for many other purposes—for the reasons discussed in Section 4.4.2.**

Information to be identified and reported under Section 2 shall include name of the seller, name of the buyer, date of sale, price, terms, and conditions of sale.[42] As part of this process, the appraiser should verify the information with a party to the transaction and determine whether the transaction met the conditions required for a comparable sale under Section 1.5.2.1.

**1.3.1.6.** **Rental History.** The appraiser must collect historical rental or lease history of the property for at least the past three years, if this information can be ascertained. All current leases should be identified and information collected, including: the date of the lease, name of the tenant, rental amount, term of the lease, parties responsible for property expenses, and other lease provisions that impact whether the lease reflects market rent.

**1.3.1.7.** **Assessed Value and Annual Tax Load.** The appraiser must collect all information related to the current assessment and dollar amount of real estate taxes. If assessed value is statutorily a percentage of market value, determine the percentage. If the property is not assessed or taxed, the appraiser should collect all necessary information to support an estimate of the assessment and the tax rate to support an estimate of the dollar amount of tax. In some jurisdictions, certain types of property may be assessed based on *current use* rather than *highest and best use*. These programs often relate to farmlands, timberlands, and open space; to be eligible, owners may have to agree to leave the property in its existing use for a certain period of time.[43] In such situations, the appraiser should collect the data necessary to support both the current assessed value and taxes for the property's existing use and the estimated assessed value and tax load for the property at its highest and best use.

**1.4.** **Data Analysis.** A well-supported market analysis is a critical element in every appraisal prepared under these Standards. The data and analysis developed in this process are fundamental to the highest and best use and the larger parcel analyses that follow. The area and neighborhood analysis leads directly to a more detailed marketability study focused on the market characteristics of the subject property.

> ***Market*** **decides the *use*. *Use* determines *value*.**

---

41  In comparison, USPAP requires a three-year sales history, while the Uniform Act requires at least a five-year sales history.
42  Terms and conditions of sale cannot, of course, conclusively be determined from the public record. Therefore, appraisers should confirm the sales of the subject property with one of the parties to the transaction.
43  Many of these programs require owners to pay back taxes and a substantial penalty if land is converted from its existing use before the agreed time period. These back taxes and penalties become an encumbrance on the land when it is converted to an alternate use. However, since appraisers should estimate the market value of property as if free and clear, the indebtedness, or potential indebtedness, imposed under these programs is not to be considered by the appraiser in estimating the property's market value.

1.4.1.  **Area and Neighborhood Analysis.** In developing an area and neighborhood analysis, the appraiser must identify the characteristics of the area or neighborhood that directly influence the subject property. These data (demographic and economic) should include only the information that directly affects the appraised property, together with the appraiser's conclusions as to significant trends. The use of "boilerplate" or general demographic and economic data is unnecessary and should not be included unless the specific data directly impacts the current market value of the subject property. As discussed in Section 4.6 and Section 1.2.7.3.3, the appraiser must disregard changes in the neighborhood brought about by the government's project for which the subject property is being acquired. This specific standard regarding government *project influence* requires a <u>jurisdictional exception</u> to USPAP Standards Rule 1-4(f).

1.4.2.  **Marketability Studies.** In complex or unusual appraisal problems, a marketability study may be required as part of the scope of work. Marketability studies are often required for appraisals of properties located in transitional areas, properties that contain special-use improvements, or properties for which the highest and best use is unclear without in-depth study. In acquisitions referred to the U.S. Department of Justice, a marketability study will be required.

A marketability study should include a detailed analysis of the subject property and its economic environment. This should include an analysis of the potential physically possible and legally permissible uses of the subject property and its competitive position within the market. A detailed supply and demand analysis should be developed for the various uses possible for the subject property. In appraisals of properties with income producing improvements, the marketability study should identify the quality class of the improvements and the existing and future competitive supply of similar improvements. Vacancy levels in the market, rental rates, and operating expenses should also be addressed.

1.4.3.  **Highest and Best Use.** The appraiser's determination of highest and best use is one of the most important elements of the entire appraisal process.[44] Therefore, appraisers must apply their skill with great care and provide market support for the highest and best use conclusion(s) developed in the appraisal.

1.4.4.  **Definition.** For just compensation purposes, market value must be determined with reference to the property's <u>highest and best use</u>, that is,[45]

> The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.

1.4.5.  **Four Tests.** First, the appraiser should form an opinion of the highest and best use of the land, as if vacant. If the land is improved, the appraiser forms an opinion of the highest and best use of the property, as improved. The highest and best use of some property cannot be reliably estimated without extensive marketability and/or feasibility studies, which may

---

44   *See* Section 4.3.
45   See Section 4.3 for the legal basis for this definition.

require the assistance of special consultants in particularly complex assignments.[46] To be a property's highest and best use, the use must be (1) physically possible; (2) legally permissible; (3) financially feasible; and (4) must result in the highest value. Each of these four tests must be fully analyzed in the appraisal development process. A property's highest and best use will ordinarily be its existing use, as an owner will normally put property to its maximum (highest-value) use. A determination that the property has a different highest and best use than its existing use requires evidence that the property is physically and legally adaptable for that use and there is market demand for that use in the reasonably near future.

In assignments involving improved properties, it is important to fully develop both analyses of highest and best use (as if vacant and as improved). Land can be influenced by the size, shape, function, and remaining life of the improvements. For example, there may be surplus or excess land when considered in light of the existing pattern of development. For this reason, all four tests of highest and best use must be addressed in the analysis of highest and best use as improved.

For any highest and best use that will require a property to be rezoned, the probability of that rezoning must be thoroughly investigated and analyzed. Likewise, the probability of obtaining any other forms of government approvals necessary for a proposed highest and best use must be investigated and analyzed. The extent of the investigation and analysis required to meet this requirement can be found in Section 1.3.1.3.

Generally, the government's intended use of the property after acquisition is an improper highest and best use and cannot be considered. It is the property's *market value* that is to be estimated, not the property's value to the government. If it is solely the government's need that creates a market for the property, this special need must be excluded from consideration by the appraiser. The government's intended use of the property can only be considered as a potential highest and best use if there is *competitive demand for that use in the private market*, separate and apart from the government project for which the property is being acquired. Section 4.3 discusses the legal bases for these requirements.

**1.4.5.1.    Economic Use.** For purposes of just compensation, opinions of market value must be based on an <u>economic</u> highest and best use. Therefore, appraisals in federal acquisitions cannot be based on noneconomic or nonmarket uses. To be an economic use, the use must contribute to the property's actual market value, and there must be competitive supply and demand for that use in the private market. Whether or not a particular use is economic and therefore appropriate to consider depends on the relevant market, not the use itself. This topic is discussed in depth in Section 4.3.2.3.

**1.4.6.    Larger Parcel Analysis.** Essential to the appraiser's analysis of highest and best use is the determination of the <u>larger parcel</u>. These Standards define the larger parcel as that tract, or those tracts, of land that possess a unity of ownership and have the same, or an integrated, highest and best use.

> **The <u>larger parcel</u> is that tract of land which possesses a unity of *ownership* and has the same, or an integrated, *highest and best use*.**
>
> **Determining unity of ownership may require <u>legal instruction</u>.**

---

46    *See* Section 1.13.

Elements to be considered in determining the larger parcel are contiguity (or proximity) as it bears on the highest and best use of the property, unity of ownership, and unity of highest and best use.

The appraiser must make a larger parcel determination in every appraisal developed under these Standards.[47] It is not uncommon for an appraiser's conclusion regarding the larger parcel to be different from the specific parcel the client agency identified to be appraised, as the appraiser cannot determine highest and best use without considerable investigation and analysis. In such instances, the appraiser shall inform the client agency of the determination of the larger parcel and the agency shall amend the appraisal assignment accordingly.

The appraiser must make a larger parcel determination regardless of whether the agency designated an acquisition as a total acquisition or a partial acquisition. This is so because whether an acquisition is a total or partial acquisition cannot be determined until the appraiser has determined the highest and best use and the larger parcel. Under the rules for larger parcel determination, as described in Section 4.3.4, two physically separate tracts may constitute a single larger parcel, or a single contiguous physical tract may constitute multiple larger parcels. This can be important not only in consideration of damages and benefits, but also in the selection and analysis of comparable sales.[48]

In light of the discussion in Section 4.3.4 regarding the larger parcel, it is recommended that the appraiser begin an analysis of the unity of ownership test with the premise that, in making a larger parcel determination, it is allowable to consider all lands that are under the beneficial control of a single individual or entity even though title is not identical in all areas of the tract(s). If the appraiser then concludes that the larger parcel constitutes lands that are under the beneficial control of a single entity (but title is not identical), the appraiser's larger parcel determination, together with the facts upon which it is based, should be submitted to the client agency's legal counsel for review before the appraiser proceeds. Based on applicable case law and the facts of the case, legal counsel can then determine whether, as a matter of law, the unity of ownership test of the larger parcel is present, and provide written **legal instructions** to the appraiser accordingly.

Larger parcel determinations in appraisals for federal land exchanges, or in connection with inverse condemnation claims, may require different considerations than those described above. For a discussion of those potential differences, appraisers should refer to Section 1.12 regarding federal land exchange appraisals and to Section 1.11 regarding inverse condemnation appraisals.

**1.4.7.**    **Highest and Best Use Conclusion.** In reaching a conclusion regarding a property's highest and best use and regarding the larger parcel, the appraiser must identify the *most probable buyer* and/or the *most probable user* of the subject property under that highest and best use. The appraiser must also reach a conclusion concerning the *timing* of any highest and best use that is different than the current use.

---

47    The appraiser must make a larger parcel determination even for minor partial acquisitions in which the appraiser is instructed not to perform a complete before and after appraisal. *See* Section 4.6.4.1.

48    For instance, if an appraiser determined that the larger parcel was a 10-acre tract out of a total ownership of 200 acres, the unit (e.g., per square foot or per acre) value may well be different for the smaller tract and the appraiser would utilize comparable sales similar in size to the 10-acre larger parcel rather than sales similar in size to the entire 200-acre ownership.

1.5.     **Application of Approaches to Value.** The following sections outline the standards for the application of the three approaches to value. The approaches to be used to value land as if vacant are presented first. The application of the <u>sales comparison approach</u>, the <u>income capitalization approach</u>, and the <u>cost approach</u> for the valuation of the property as improved follows.

1.5.1.   **Land Valuation.** When the subject property is unimproved or the cost approach is being used, the primary method of land valuation is the sales comparison approach as described below. The subdivision development method and the capitalization of ground leases are to be used only in rare cases when the property has a highest and best use for subdivision development or the property is subject to a long-term ground lease. Even when those situations exist, the latter two methods are better used as additional support for the sales comparison approach.

1.5.1.1.  **Sales Comparison Approach.** The appraiser shall develop an opinion of the value of the land for its highest and best use, as if vacant and available for such use. In doing so, the appraiser's opinion of value shall be supported by confirmed sales of comparable or nearly comparable lands[49] having like optimum uses. Differences shall be weighed and considered to determine how they indicate the value of the subject land. Items of comparison shall include property rights conveyed, financing terms, conditions of sale, market conditions, location, and physical characteristics. The appraiser shall obtain adequate information concerning each comparable sale used and perform a comparative analysis to form a supported opinion of the market value of the subject property as if vacant. See Section 1.5.2 for a full discussion of the Sales Comparison Approach.

1.5.1.2.  **Subdivision Development Method.** When the highest and best use of a property is for subdivision purposes and comparable sales do not exist, resorting to the <u>subdivision development method</u>[50] to land value may be appropriate if adequate market and/or technical data are available to reliably estimate the property value. This method of estimating land value can also be used to test the appraiser's highest and best use conclusion and to check against the indicated value of the land developed by the use of comparable sales when the sales data is limited. However, this approach to value is complex, often requires the assistance of other experts,[51] and always requires substantial amounts of research, analysis, and supporting documentation.

In applying this technique, appraisers must bear in mind that a property must be valued in its *as-is* condition. Therefore, consideration must be given to the time lag that is typically necessary between the date of value and the projected date when developed lots would become marketable. This time lag must provide for the time necessary to procure all land use permits and approvals, as well as the time necessary for the physical construction of the infrastructure that will be required to convert the land into marketable lots. One of the most critical factors in the application of this technique is, of course, selection of the appropriate discount rate to be applied to the income streams generated by the development. This discount rate should be derived from and supported by direct market data whenever possible.

---

49   For a discussion of what legally constitutes a comparable sale and the admissibility of comparable sales information, see Section 4.4.2.
50   For a discussion of the courts' view of this valuation technique, see Section 4.4.5.
51   Such as marketing and feasibility consultants, land use planners, civil engineers, and contractors. *See* Section 4.12 (Appraisers' Use of Supporting Experts' Opinions); USPAP Competency Rule (acquiring competency).

**1.5.1.3.**  **Ground Leases.** In those rare circumstances when the property being appraised is under a long-term ground lease, the appraiser must analyze the lease and determine whether it is appropriate to use a direct capitalization of the ground lease to develop an opinion of the market value of the land. The appraiser must be able to identify comparable properties in the area that are subject to similar ground leases in order to ensure that the ground lease is a market rent, as well as adequate market data to support the selection of a capitalization rate. This procedure should be used to support a conclusion of land value developed by the sales comparison approach rather than as the only method used to develop an opinion of market value.

**1.5.2.**  **Sales Comparison Approach.** The sales comparison approach is normally the preferred method of valuation for property being acquired under these Standards. The sales comparison approach is a systematic procedure in which appraisers study the market for sales of properties with the same highest and best use as the subject property that are as close in proximity and time as possible.  Each sale is verified with parties to the transaction to ensure that information is accurate and the sale is a market transaction. Each sale is adjusted for elements that are different from the subject property and the resulting array of sales data is reconciled to a final opinion of market value.  Analysis of sales shall be made using a market derived unit of comparison such as price per acre, price per square foot, or animal unit month.  In some markets, more than one unit of comparison may be used by market participants and care should be used to maintain consistency.

**1.5.2.1.**  **Prior Sales of Subject Property.** Since any recent and unforced sale of the subject property can be the best evidence of its value,[52] any such sale is treated as a <u>comparable sale</u> in this approach to value. It must be analyzed like any other comparable sale and given appropriate weight by the appraiser in forming a final opinion of the market value of the subject property. As noted in Section 1.3.1.5, the appraiser must verify the most recent sale of the subject property with the parties to the transaction to ensure that the sale provides an indication of market value.

**1.5.2.2.**  **Selection and Verification of Sales.** In selecting the comparable sales to be used in valuing a given property, it is fundamental that all sales have the same economic highest and best use as the subject property and that the greatest weight be given to the properties most comparable to the subject property. In this regard, appraisers must recognize that when valuing a property with a highest and best use that will require rezoning or extensive permitting, sales of similar properties may require extensive analysis and adjustment before they can be deemed economically comparable. The analysis and adjustment of such sales is discussed below.

All comparable sales used must be confirmed by the buyer, seller, broker, or other person having knowledge of the price, terms, and conditions of sale.[53] When a comparable sale is of questionable nature and/or admissibility (e.g., sales to a government entity), special care must be

---

52   *See* Section 4.4.2.4.1.
53   These Standards require that sales verification be conducted by competent and reliable personnel, and if the case goes into condemnation, the sale must be personally verified by the appraiser who will testify. However, appraisers should recognize that some agencies may require in their appraisal contracts that initial verification be made by the appraiser who will sign the appraisal report.

taken in the verification of the circumstances of the sale.[54] The appraiser must collect adequate information about each sales transaction to support a detailed analysis in the adjustment process. In most cases this would include a physical inspection of each property selected as a comparable sale. If the appraisal is being prepared for the Department of Justice, a physical inspection of each sale selected as a comparable is required.

The appraiser should collect and analyze the recent sales history of properties selected as comparable sales. This information can be useful in analyzing trends in the market and evaluating the impact of the government project on market value after acquisition.

**1.5.2.3.    Adjustment Process.** Comparison of sales transactions to the subject property is the essence of the sales comparison approach to value. The basic elements of comparison to be considered are recognized as:

- Property rights conveyed
- Financing terms
- Conditions of sale
- Expenditures made immediately after purchase
- Market conditions (historically referred to as a *time* or *date of sale* adjustment)
- Location
- Physical characteristics
- Economic characteristics
- Legal characteristics (land use, zoning)
- Non-realty components of value included in the sale property[55]

The comparable sales should be adjusted through quantitative and/or qualitative analysis, depending on the market data available, to derive an indication of the market value of the subject property.[56] Quantitative adjustments should be made whenever adequate market data exist to support dollar or percentage amount adjustments. Qualitative adjustments (i.e., inferior, superior) can be made when market data is not sufficient to support reliable quantitative adjustments.[57] Quantitative and qualitative adjustments are not mutually exclusive methodologies: because one factor of adjustment cannot be quantified by market data does not mean that all adjustments to a sale property must be qualitative. All factors that can be reliably quantified should be adjusted accordingly. When using quantitative adjustments, appraisers must recognize that not all factors are suitable for percentage adjustments. Percentage and dollar adjustments may, and often should, be combined.[58] Each item of adjustment must be carefully analyzed to determine

---

54  For a description of the verification process required by these Standards for such sales, see Section 1.5.2.4. See Section 4.4.2.4 for the legal bases for these requirements.

55  *See generally* APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 403-37 (14th ed. 2013) (discussing elements of comparison).

56  *See* Section 4.4.2.2.

57  Both quantitative and qualitative adjustments have strengths and weaknesses—and both can be misleading and unreliable without careful support. Without adequate market data, the apparent precision of quantitative adjustments can convey a false sense of accuracy. Similarly, without careful explanation of each element of comparison for each sale, qualitative adjustments can improperly obscure key aspects of the appraiser's analysis.

58  For instance, a percentage adjustment for market conditions (time) may be appropriate, but an adjustment for the fact that the property under appraisal is 300 feet from a sewer connection and all of the comparable sales are connected to sewer should often be made in a lump sum dollar amount to reflect the cost to cure the subject property's comparative deficiency. If a percentage adjustment were applied to the price per unit (e.g., per acre, per square foot) of each comparable, the adjustment to each of the comparables would vary, depending on the price per unit of the comparable, and might have no relationship to the cost to cure the subject property's deficiency.

whether a percentage or dollar adjustment is appropriate. When both quantitative and qualitative adjustments are used, all quantitative adjustments should be made first.[59]

When appraisers must resort to qualitative adjustments, more extensive discussion of the appraiser's reasoning is generally required. This methodology may also require the presentation of a greater number of comparable sales to develop a reliable opinion of value. It is essential that the appraiser specifically state whether each comparable sale is generally either overall superior or inferior to the property under appraisal. The comparable sales utilized should include both sales that are overall superior and overall inferior to the property being appraised, rather than merely demonstrating the property is worth more (if all sales are inferior to the subject property) or less than a certain amount (if all sales are superior to the subject property).

The definition of market value used in these Standards requires that the opinion of value be made in terms of cash or its equivalent, as discussed in Section 4.2. Therefore, the appraiser must make a diligent investigation to determine the financial terms of each comparable sale. When comparing the sale to the property being appraised, the appraiser shall analyze and make appropriate adjustments to any comparable sale that included favorable or unfavorable financing terms as of the date of sale. Such adjustment must reflect the difference between what the comparable sold for with the favorable or unfavorable financing and the price at which it would have sold for cash or its equivalent.

While cash equivalency of favorable or unfavorable financing can be estimated by discounting the contractual terms at current market or yield rates for the same type of property and loan term over the expected holding period of the property, the preferred method of estimating a proper cash equivalency adjustment is by the analysis of actual market data, if such data is available.

In developing a final opinion of market value by the sales comparison approach, the appraiser shall consider the comparative weight given to each comparable sale, regardless of whether quantitative or qualitative adjustments or a combination thereof are used.

**1.5.2.4.    Sales Requiring Extraordinary Verification.** Certain types of sales can be used only under certain circumstances or for limited purposes in appraisals for federal acquisitions. As a result, these sales require <u>extraordinary verification</u> to ensure the appraiser's opinion does not reflect any legally improper considerations. Section 4.4.2.4 addresses several types of sales that require this extraordinary treatment and the legal reasons for this requirement. This Section explains the verification process required for sales to government entities, sales to environmental organizations, and contingency sales.[60]

---

[59]  THE APPRAISAL OF REAL ESTATE, *supra note* 55, at 433-36.

[60]  *See* Sections 4.4.2.4.2., Item (5) (Sales Involving the Government or Other Condemnation Authority), 4.4.2.4.2., Item (6) (Sales Involving Environmental or Other Public Interest Organizations), and 4.4.2.4.5 (Contingency Sales); *see generally* Section 4.4.2.4 (Transactions Requiring Extraordinary Care).

5-ER-785

**Sales to Government Entities.** Because sales to government entities routinely involve nonmarket considerations, sales to the government should be immediately viewed by appraisers as *suspect* in appraisals for federal acquisitions.[61] Sales to the government should not be used as comparable sales unless there is such a paucity of private market data as to make a reliable estimate of market value impossible without the use of government purchases. The types of transactions conducted and lands acquired by governments are often unique. For instance, lands acquired for conservation or preservation are often of extraordinary size, have little economic utility or value, and are located in remote areas with little market activity. To develop a reliable and supported estimate of market value in these situations, appraisers may be forced to consider sales to the government in the sales comparison approach to value.

If the appraiser determines, after careful analysis and verification required under these Standards, that a sale to the government was a true open-market transaction, the sale may be appropriate to consider as a potential comparable sale. There are certain steps that the appraiser must take before a sale to the government can be qualified as a valid comparable sale. Comprehensive and documented verification of government transactions is essential.

The type and amount of sales documentation and other information available to an appraiser about a sale to the government that is potentially comparable to the subject property will vary, depending on the land acquisition documentation requirements of the entity that acquired the potentially comparable property. Small governmental entities, such as local service districts, may acquire property without written appraisals, appraisal reviews, or written records of negotiations. On the other hand, state and federal government acquisitions are usually subject to the Uniform Act (or comparable state statutes) and require extensive documentation of land acquisitions, including formal documented appraisals, written appraisal reviews, and written records of the negotiating process.

First, the appraiser should review the legislation that authorized and/or mandated the government's acquisition of the potentially comparable property to determine whether the legislation provided that such property would be acquired at market value. Legislation that mandates acquisition at a price other than market value or provides for acquisition at a price unaffected by particular market forces (e.g., disregard of the influence of the Endangered Species Act) may not result in a valid comparable sale representative of market value. Likewise, legislation that allows the acquiring agency to deviate from the market value measure if it finds it in the public interest to do so will often not result in a price representative of market value.

**The availability of sales documentation for inspection and analysis may vary by agency.**

**The appraisal report must note any sales documentation that was not available for inspection, and explain the impact on the reliability of the transaction as a comparable sale.**

The appraiser should next contact the acquiring agency and ask to inspect the <u>appraisal</u> upon which the acquisition was based, the agency review of that appraisal, the negotiator's report (or file) in conjunction with the acquisition, and the agency's acquisition file.

---

61  *See* Section 4.4.2.4.2, Item (5) (Sales Involving the Government or Other Condemnation Authority).

Examination and analysis of the agency's appraisal should include:

- Determination of whether the sale was a <u>total acquisition</u> of the landowner's property indicating the value of the property acquired or a <u>partial acquisition</u> that reflects not only the value of the part acquired but also damage to the remainder.
- Determination of whether the sale was for the fee simple interest in the property or a total interest similar to the interest being appraised (e.g., leasehold of the entire property). Sales of something less than the fee simple interest in an entire property (e.g., easement acquisitions) may not be valid comparable sales.
- A review of the highest and best use determination. The highest and best use upon which the value opinion was based must be an *economic* use, and must be the *same* as, or *highly similar* to, the highest and best use of the property under appraisal before the transaction can be considered a reliable comparable sale. A highest and best use of *sale to the government*, conservation, or any use that contemplates noneconomic considerations is not a valid highest and best use upon which to estimate market value.
- A review of the appraiser's final opinion of value. Determine whether the price paid for the property was equivalent to its appraised value. If not, determine whether the price paid was within the range of values indicated by the appraiser's comparable sales in the sales comparison approach and/or by the different approaches to value developed by the appraiser.
- A review of the sales used by the appraiser in developing an opinion of value. If the sales relied on by the appraiser were influenced by nonmarket factors (e.g., political pressure), they would be invalid indicators of market value; thus, any value conclusion reached based on such sales may, likewise, be invalid.
- A review of any value allocation or breakdown included in the appraisal report, such as different unit values for different land types included in the sale property or the contributory value of improvements.

Next, the appraiser must examine the agency's <u>appraisal review</u>, and make particular note of any technical or factual errors reported by the review appraiser. The requirements for appraisal reviews for federal acquisition purposes can be found in Section 3.

The appraiser must also review the negotiator's report and the agency's acquisition file regarding the process of negotiation between the agency and the property owner. Any suggestion that the property would be condemned if agreement could not be reached should be noted. Likewise, any indication that the property owner accepted the price paid with the understanding that the agency would support (or not oppose) the property owner's attempt to take a tax write-off for a donation for some amount in excess of the actual price paid should be noted. Either of these circumstances may suggest a price below market value. Any suggestion that a property owner may have threatened to damage the property for the government's intended use (e.g., cutting the timber from land slated for acquisition as a park) if the owner's asking price was not paid can result in a price in excess of market value. Sales involving the exchange of property are generally unreliable for use as comparable sales.[62]

---

62   *See* Section 4.4.2.4.3.

A determination should be made whether the property owner or the owner's representative submitted an appraisal or any meaningful market data to the agency that may have supported a value higher than the government's appraisal and the agency's subsequent determination to pay more than its appraisal. If so, the submitted material should be analyzed.

The appraiser should read any correspondence from the property owner's political representatives, and the agency's response thereto, to determine whether there may have been nonmarket pressure to consummate a sale at something other than market value. The appraiser should also review any media coverage concerning the property and the government project to determine whether there was an undue amount of public pressure on the agency or the property owner to consummate a quick sale. Such public pressure can result in a price that is above or below the market value of the property.

Conveyance and closing documents will reveal the exact estate conveyed to the government. It should be confirmed that the estate that was conveyed is the same estate that was appraised. In negotiations, some agencies may allow the property owner to retain some rights in the property after acquisition not contemplated by the government's appraiser (for example, a life estate in the property or an estate for years, at zero or nominal rent, or the right to continue to grow crops on the land or use it for grazing or a physical reduction in the land area acquired).

If the estate acquired was only an easement, the sale is not a valid comparable either as an indication of fee simple value or of the value of the easement. If only an easement is being acquired from the subject property, the measure of value should not be based on the price paid for similar easements but rather upon the federal <u>before and after method</u>.[63]

There are a number of legitimate reasons why a government agency would pay a price in excess of its approved appraisal for a specific acquisition. A reading and analysis should be undertaken of any documents produced by the agency or others in an attempt to justify payment in excess of the approved appraisal. An agency's appraisal does not represent the only reasonable estimate of market value. But if the government paid more for the property than its approved appraisal, the appraiser must determine the government's justification for doing so and whether it was based on market considerations.

A price in excess of an agency's approved appraisal may still represent a *valid indication of market value* if:
• The appraisal is outdated in a rapidly appreciating market.
• The price remains within the range of values indicated by the comparable sales developed by the appraiser.
• The price remains within the range of values indicated by the different approaches to value developed by the appraiser.
• Factual information about the property, the appraisal, or the comparable sales used came to light after the appraisal and review that revealed errors in the appraisal that could be mechanically corrected.

---

63   *See* Section 4.6.1.

On the other hand, a price in excess of an agency's approved appraisal would *not* be a valid indication of market value, and therefore would not be a valid comparable sale (at least without adjustment) if:

- The price in excess of market value was warranted due to costs and risks inherent in a condemnation trial.
- The threat of imminent destruction of the property for the government's intended use existed.
- The cost of project delay caused by the failure to acquire the property offsets the price paid in excess of its market value.
- The administrator of the public agency found it to be in the public interest to pay in excess of market value.
- The tract acquired was a key tract, or the last tract to be acquired, for the government's project.
- The economy of land management of a consolidated ownership by the government outweighed the price in excess of market value paid for the tract.

Once the foregoing investigation and analysis have been completed, the appraiser should personally verify the sale with the purchaser *and* the seller or their representatives. In conducting this verification, the appraiser should clear up any questions that may have arisen as a result of earlier research.

**Sales to Environmental or Other Public Interest Organizations.** Sales to environmental or other public interest organizations are also prone to reflecting nonmarket considerations, as discussed in Section 4.4.2.4.2., Item (6). As a result, these transactions are subject to the same extraordinary verification measures as sales to government entities. When public interest organizations work closely with government agencies that administer conservation or similar projects, extensive sale documentation may be available. Before using such a transaction as a comparable sale, the appraiser must determine whether the sale was based on a competent appraisal of market value of the property for its *economic* highest and best use, whether any tax write-offs were taken, and whether the transaction was impacted by the pendency of the government's project.[64] If the purchase price was not based on the market value of the property for an economic highest and best use, the sale will normally have to be discarded as a comparable sale. The same is true if tax write-offs were involved or if project influence was present, although it is sometimes possible to make adjustments to the sale for these factors. If, subsequent to the sale, the property has been transferred by the environmental group to the government, the facts and circumstances of the transfer must be reported.

**Contingency Sales.** Potentially comparable sales for a property with a highest and best use that requires procurement of rezoning or a land use permit must also be verified and treated with great care. Sales of such property in the private market generally take the form of initial options or <u>contingency sales</u>, with the contingency being the purchaser's ability to procure the necessary rezoning or permitting to develop the property to its highest and best use. If the rezoning or

---

64    Such transactions may well reflect project influence, as discussed in Section 4.5.

permitting is denied, the contingency is not met and the sale does not close (or the option is not exercised). Therefore, when consummated, such sales reflect the price of property already rezoned or permitted for development to its highest and best use. All of the risks, time delays, and costs associated with a rezoning or permitting have been removed from the transaction.

Such sales are typically not comparable to the property being appraised for federal acquisition purposes. Generally, properties under appraisal for government acquisition purposes that have a highest and best use that requires a rezone and/or permits to be developed to their highest and best use do not have the zoning or permitting in place. Thus, on the theoretical date of the sale's closing (i.e., the effective date of valuation), the purchaser must assume the risks, time delay, and costs of procuring the rezone and/or permitting. Properties seldom sell in such a condition in the private market; thus, there are few truly comparable sales available for the appraiser's use in developing a value for the property under appraisal by the sales comparison approach.

Accordingly, appraisers must often resort to using sales that already have, on the date of consummation, their needed zoning/permitting in place. Under these circumstances, it is essential that the appraiser adjust the sales to reflect the differences in the regulatory environments of both the sales at the time of closing and the subject property as of the effective date of the appraisal. Such adjustments must account for the risks inherent in the procurement of a rezoning or permitting, including the possibility that the regulatory agency may deny such a request or place conditions on it.[65] The time delays encountered in procurement of the rezoning and/or permitting and the costs associated with their procurement must also be considered. In certain circumstances, a purchaser may require an entrepreneurial profit in addition to an adjustment for risk.

Appraisers cannot merely assume that such a rezoning/permit is in place for the subject property, or assume that such a rezone/permit will be granted. They must appraise the property only in light of the probability of obtaining the rezone/permit. If appraisers use sales of properties with zoning/permitting in place at the time of sale, they must clearly and specifically explain how they accounted for the regulatory environmental differences between these sales and the subject property and how they quantified the adjustment(s) for this factor, based on market evidence whenever possible.

### 1.5.3. Cost Approach.

**1.5.3.** **Cost Approach.** In the cost approach, the market value of the vacant land is added to the depreciated reproduction or replacement cost (contribution) of the improvements to arrive at an indication of the value of the property. The value of the land, vacant and subject to improvement, is generally developed by the sales comparison approach for land (see Section 1.5.1.1.). The estimate of the reproduction or replacement cost of the improvements is based on current local market cost of labor and materials for construction of improvements. All forms of depreciation are deducted from the cost new estimate, as discussed below. This approach to value is most useful in developing the value of a property in which the improvements are new (and actual costs are known) and there is no evidence of depreciation. The cost approach is also used

---

65    See Section 4.3.2.4 regarding the consideration of the possibility of rezoning or permitting.

as a check on the opinion of market value indicated by the sales comparison approach and for appraising highly improved properties with no known comparable sales.

In the case of special-purpose properties[66] that are not generally bought and sold, it is sometimes necessary to resort to reproduction cost new less depreciation for want of any more reliable method of determining market value. If it is necessary to resort to the cost approach, all forms of depreciation—physical deterioration, functional obsolescence, and external (or economic) obsolescence—must be accurately reflected and deducted from the reproduction or replacement cost before the value of the land and the contributory value of the improvements are added together to develop an indication of market value by the cost approach. Whenever the cost approach is utilized and it can be determined at what time and at what cost the improvements were erected, a trending up—or down, as appropriate—of such initial costs becomes an important part of the analysis.

**1.5.3.1.  Critical Elements.** In developing an opinion of market value by the cost approach, the appraiser must recognize the critical elements that must be well supported by market evidence: reproduction and replacement costs, depreciation, and entrepreneurial profit.

**1.5.3.1.1.  Reproduction and Replacement Costs.** The appraiser must recognize the distinction between reproduction cost and replacement cost.[67] Reproduction cost is the present cost of reproducing the improvement with an exact replica; replacement cost is the present cost of replacing the improvement with one having equal utility. If the cost approach is applicable, the appraiser may use either the reproduction or replacement cost method, but must account for all forms of depreciation appropriate under the particular method chosen. In developing the cost estimate, the appraiser must account for all *direct* and *indirect* costs associated with constructing the improvements. Direct (hard) costs include the labor and materials required to construct the improvements. Indirect (soft) costs include such items as architectural and engineering design fees, legal fees, costs of permits and other similar expenses associated with obtaining approvals, and designing and overseeing the construction of the improvements.

If a national cost-estimating service is used, the appraiser should ensure that the most similar improvement type is selected and that all adjustment factors such as locality adjustments developed for the service are properly accounted for. If the appraiser may place considerable weight on the cost approach to value in reaching a final opinion of value, a contractor or professional cost estimator should be retained to assist in developing the reproduction or replacement cost estimate.

**1.5.3.1.2.  Depreciation.** The depreciation from all causes—including physical deterioration, functional obsolescence, and economic or external obsolescence—must be properly identified and analyzed. The estimated dollar amounts associated with each form of depreciation must be supported by market data using the breakdown method or the market extraction method. Depreciation should not be estimated by the use of published tables or age-life computations.

---

66   Also referred to as special-use properties or limited-market properties.
67   *See* Section 4.4.3.3.

**1.5.3.1.3.  Entrepreneurial Profit.** The estimate of the contribution of entrepreneurial profit should be supported by market data developed from properties similar to the subject improvements.

**1.5.3.1.4.  Unit Rule.** In developing the cost approach, appraisers must distinguish between calculating an improvement's replacement cost and estimating market value.  It is the contribution of the improvements (and all of its components) to the market value of the whole that is being measured.[68]

**1.5.4.    Income Capitalization Approach.** In appraising property that generates income, it may be appropriate to develop an opinion of market value using the income capitalization approach. This approach should generally be used in addition to the sales comparison approach and can serve as additional support for the final opinion of market value.  In developing the income capitalization approach, it is critical that the appraiser have market support for every component such as income, expenses, capitalization, and/or discount rates.

**1.5.4.1.    Market Rent.** The income that is to be capitalized in the income approach is the market or economic rent for the subject property.  These Standards use the following definition of market rental value:[69]

> **Definition of Market Rental Value**
> Market rental value is the rental price in cash or its equivalent that the leasehold would have brought on the date of value on the open market, at or near the location of the property acquired, assuming reasonable time to find a tenant.

The appraiser should not consider the fact that a property may be under lease to a third party, except to the extent that the rent specified in the lease may be indicative of the property's market rental value.  The value to be appraised is the market value of the property as a whole, not the value of the various interests into which it may have been carved.[70]

**1.5.4.2.    Comparable Leases.** The opinion of market rent should be based on an analysis of comparable leases extracted from the market. As with the sales comparison approach, the comparable leases selected in this analysis should have the same or similar highest and best use as the subject property and reflect leases as close as possible to the effective date of value. The lease data shall be verified with a party to the transaction. It is important to identify the operating expenses paid by each party (landlord and tenant), the basis for the calculation of the leased area, and any concessions (free rent and/or tenant improvements) offered by the landlord. A physical inspection of each rent comparable is necessary to identify the quality of tenant finishes, overall building condition, and quality and location difference with the subject. As with the sales comparison approach, the appraiser must collect market data to support adjustments (quantitative and/or qualitative) to the comparable leases for differences between them and the subject property.

**1.5.4.3.    Expense Analysis.** In developing the estimate of net operating income that will be capitalized to develop an opinion of the market value of the subject property, the appraiser must collect market

---

68    *See* Section 4.4.3.1.
69    See Section 4.7 for the legal basis for this definition.
70    See Section 4.2.2 concerning the Unit Rule.

data to support the estimated vacancy and credit loss, as well as operating expenses and any set asides for reserves for replacement. If available, the operating history of the subject property provides an important basis for these estimates, but data collected from other similar competitive buildings in the market area is also important to provide market support for these determinations.

**1.5.4.4.**    **Direct Capitalization.** Capitalization of the net operating income shall be at a rate prevailing for the type of property and location. The preferred source of an applicable capitalization rate is from actual capitalization rates reflected by comparable sales. The selection of the capitalization rate is one of the most critical factors to be applied in the income capitalization approach to value. Accordingly, developing capitalization rates from the improved sales used in the sales comparison approach provides the best market support for the rate selected for the subject property. Capitalization rates identified in national publications can be used as support for the estimated capitalization rate selected for the subject but should not be the only source for this determination.

**1.5.4.5.**    **Yield Capitalization (Discounted Cash-Flow [DCF] Analysis).** A second method of valuation used in the income capitalization approach is known as the <u>yield capitalization</u> method. This method is also often referred to as the <u>discounted cash-flow (DCF)</u> analysis and has been an accepted valuation method within the appraisal profession for several decades. This method is often used in the valuation of investment grade properties such as multi-tenant office buildings, retail centers, apartment complexes, and industrial warehouse facilities and reflects the way sophisticated buyers and sellers consider the potential income generated by a property to arrive at a purchase or sale price.

The yield capitalization method has limited use in an eminent domain setting because it requires the appraiser to forecast a number of different factors into the future such as income change, holding period, property value at the end of the holding period, and the yield rate or discount rate to be applied to the future stream of income in order to arrive at the present value of the property. Because of this, valuations based on this method can be complicated, confusing, and speculative. If this method is to be used in developing an appraisal under these Standards, it is critical that the appraiser develop market support for each of the many factors that must be forecasted in order to show that the analysis reflects what buyers and sellers for that property type are considering on the effective date of value. If appraisers are considering the use of this method, they should discuss it with their client as part of the scope of work conversation.

The yield capitalization method can be a useful tool in testing feasibility in highest and best analysis and as support for the other approaches to value. This method can be very useful in appraisals of leasehold acquisition involving potential damages to a remainder after the taking. It is useful as a means of determining the value of the property before and after the leasehold taking in order to identify the difference.[71]

**1.6.**    **The Reconciliation Process and Final Opinion of Value.** A critical part of developing an appraisal under these Standards and forming a final opinion of market value is the reconciliation process. This process requires a careful examination of the factual data about the subject property

---

71    Eaton, *supra* note 16, at 414.

and the market. The highest and best use and larger parcel analyses are considered in light of the factual data to ensure consistency and accuracy. All of the supporting data for each of the approaches to value is examined for consistency and accuracy with the subject property and market data as well as the highest and best use and larger parcel analyses. For example, if both the sales comparison and income capitalization approaches were developed, the appraiser should examine the adjustment processes in both approaches to ensure that adjustments for location and other physical characteristics of the subject property were consistently applied in both.

Each of the approaches to value developed in the analysis are examined for the quality and extent of the supporting data. In the sales comparison approach, the appraiser should consider the proximity in time and location of the sales to the subject property. The level of market support for the adjustment process and the number and size of the adjustments should also be considered. A similar analysis should be followed in the income capitalization approach. The appraiser should also evaluate the market support for estimates of vacancy, credit loss, and expenses as well as capitalization and discount rates. If the cost approach has been developed, the appraiser should consider the level of support for all of the elements of cost new, depreciation, and entrepreneurial profit. Every calculation in each approach should be double-checked for accuracy.

The final opinion of market value should not be derived by applying a formulaic approach such as averaging the values from the various approaches developed in the appraisal. The goal is to provide the client agency and intended users with a clear, logical analysis of the results of each approach to value developed in the appraisal and the reasons for the weight given to each approach in forming a final opinion of market value.

**1.7.**    **Partial Acquisitions.** There are many situations in which a client agency is only acquiring a part of a larger parcel. This can occur when the client agency is acquiring an interest less than the fee simple, such as an easement, water rights, subsurface rights, or air rights. This can also occur when the agency is acquiring the fee interest in only a portion of a larger parcel. This section of the Standards addresses the appraisal requirements under these circumstances.

**1.7.1.**    **Before and After Rule (Federal Rule).** The federal rule—also known as the before and after rule—applies in all appraisals involving partial acquisitions. Under this procedure, the appraiser develops opinions of both the market value before the acquisition and the market value after the acquisition. Requiring this valuation procedure allows acquiring agencies, the Department of Justice, and the courts to calculate a reasonable measure of compensation by deducting the remainder or after value from the larger parcel's before value. The result is a figure that includes the value of the property acquired as well as any compensable damages and/or direct (special) benefits to the remainder property. It should be noted that these are two separate appraisals within the same assignment requiring the appraiser to perform a new analysis and valuation of the remainder after the taking. It should also be noted that it is improper for an appraiser to develop an opinion of the market value of the larger parcel in the before situation and then deduct the opinion of value of the property acquired together with separately calculated damages to arrive at the value of the remainder.

If the appraisal is prepared for the Department of Justice, the scope of work will typically not include allocation of the difference between the before and after values into the components of the contributory value of the property acquired and compensable damages to the remainder. However, in assignments for other client agencies the scope of work may include such an allocation in order to assist the agency in meeting their obligations under the Uniform Act.

**1.7.1.1.  Damages.** When considering damages to remainder properties, appraisers must understand that state and federal rules may differ on which items of damage may be compensable (severance) and which items may be non-compensable (consequential). It is recommended that appraisers seek guidance from agency legal counsel if there is any question about whether an element of damage is compensable.

The fundamental basis for a claim of compensable damages is a diminution in the market value of the remainder.  The extent to which the utility of a property has been impacted by the acquisition must be established by factual information and analysis and must never be assumed or based on speculation.  Evidence that the highest and best use of the remainder property has changed as a result of the taking provides support for the existence of damages.  Factual evidence of a change in the intensity of the highest and best use, such as from a balanced farm to an unbalanced farm, may also provide support for the conclusion.

In certain circumstances, damage to the remainder may be cured by remedial action.  This is generally called the cost to cure and is a proper measure of damage only when it is no greater in amount than the decrease in the market value of the remainder if left as it stood.  When the cost to cure is less than the compensable damages if the cure were undertaken, the cost to cure is the proper measure of damage and the United States is not obligated to pay in excess of that amount.  Developing the cost to cure requires that the appraiser develop a well-supported cost estimate in the same manner as described in Section 1.5.3, which describes the critical elements in developing a cost approach.

If a consultant's services are used to assist an appraiser in estimating a cost to cure damage amount in a partial acquisition, the appraiser must review and analyze the cost estimate with great care. Even though a cost to cure method of estimating the diminution of value may be appropriate, it must be remembered that the remainder property is still to be valued in its uncured condition. Therefore, it is important that any cost to cure estimate of damage include not only the direct costs of the cure, but also the indirect cost, any effects of delay, and if appropriate, an entrepreneurial profit factor.

**1.7.1.2.  Benefits.** As with damages, appraisers must be aware that the legal rules regarding what constitutes indirect (general) benefits and what constitutes direct (special) benefits may differ between state and federal rules. The extent of a benefit to a remainder parcel is a fact question that must be well supported by the appraiser. Whether the benefit is general or direct (special) is a mixed fact/law question and client agency counsel should be consulted to resolve any question about this classification.

**5-ER-795**

Appraisers should give the same consideration to benefits as they do to damages in developing an opinion of the market value of remainder properties. Benefits can take many forms, such as when the project has caused the remainder to have lake frontage, frontage on a better road, more convenient access, improved drainage, irrigated land, and an improved view. An upward shift in highest and best use of the remainder property is often an indication of direct (special) benefits, and direct benefits must be considered when appraisers develop an opinion of the value of remainder properties, even though other lands may have the same benefits from the project.

**1.7.1.3.**    **Offsetting of Benefits.** Direct (special) benefits may offset the contributory value of the part taken and any damages to the remainder caused by the government's project. To take into account any direct benefits from the project, appraisers must apply the before and after rule by forming an opinion of the market value of the larger parcel at the time of acquisition (excluding any enhancement or diminution resulting from the project) and deducting the market value of the remainder property (including any direct benefit or diminution from the project).

Appraisers should note that the federal rule in this regard may be different from state rules and they should consult client agency counsel if there is a question.

**1.7.1.4.**    **Takings Plus Damages Procedure (State Rule).** There may be rare circumstances in federal acquisitions when strict adherence to the before and after rule will create costly and/or difficult burdens on the appraiser. Examples of such situations are minor fee or easement acquisitions (for flowage, wetland or habitat protection, roads, pipelines) from large parcels, where the cost of performing a full before and after appraisal is unwarranted in view of the minor nature of the acquisition and there are clearly minor or no damages to the remainder. In those rare situations, the client agency may alter the scope of work to allow a <u>takings plus damages procedure</u>, sometimes called the state rule. Under this procedure, the appraiser must still determine the larger parcel and develop an opinion of the value of the part taken as it contributes to the larger parcel. Minor damages are added to the opinion of value of the part taken to provide an estimate of the compensation to be paid by the client agency.

**1.8.**    **Leasehold Acquisitions.** The government will sometimes acquire only a leasehold estate in all or a portion of a property, thus acquiring the right of use and occupancy of the property for an identified period of time. This section of the Standards will address the requirements for developing an appraisal for this purpose.

**1.8.1.**    **Market Rent and Highest and Best Use.** As discussed in the income capitalization approach section of these Standards, in developing an appraisal for a leasehold acquisition, the appraiser must use the definition of <u>market rental value</u> found in Section 1.5.4.1.

As part of the development of an appraisal for a leasehold acquisition, the appraiser must determine the highest and best use of the property (as improved) that is the subject of the leasehold. This requirement is critical to the selection of comparable rents used in the valuation process. Where necessary, the appraiser may need to perform a marketability study to aid in this analysis.

1.8.2.    **Leasehold Estate Acquired.** It is critical that the client agency provide the appraiser with a description of the leasehold estate it plans to acquire. In turn, the appraiser must fully understand the estate to be appraised and the impact on the market value of the property.

It is important for the appraiser to recognize the characteristics of the rental or income streams being evaluated. Most often rent is paid periodically (e.g., monthly) in advance. However, when the government acquires a leasehold interest or right of use and occupancy in a property, it will usually pay rent in a manner that is inconsistent with the market. If the leasehold interest is acquired by condemnation, all of the rent due for the entire term of its occupancy is usually paid in a lump sum at the beginning of the occupancy (or on the date of acquisition). Therefore, an appraiser must convert any opinion of periodic market rent into a single lump sum present value or payment to be paid in advance. If the leasehold is acquired by negotiation, the rent may be paid in arrears or at different frequencies than is typical in the market, and the appraiser must account for this difference.

If rent is paid by the government in a single lump sum, adjustment for this factor is typically accomplished by applying an ordinary annuity factor (present worth of 1 per period factor) to the periodic market rent (if the opinion of rent is projected to remain constant over the government's occupancy). If the appraiser concludes that the market rent will not be constant throughout the government's occupancy, the periodic rent is typically converted into a lump sum present worth by the use of present worth of 1 factors or by underlined discounted cash-flow (DCF) analysis.

The discount rate to be applied to the periodic rent should reflect the rates of return typical for the type of property involved. The selected discount rate should be supported by market data whenever possible.

Appraisers must bear in mind that the leasehold estate acquired by the government may vary substantially from the terms of a typical lease in the private market. For instance, the term of the lease may be longer or shorter than typical for the type of space under appraisal. Expenses paid by the government may differ from those paid by the typical lessee, and there may be no provisions for expense stops and rental escalations during the lease term. The parking ratio for the space occupied by the government may vary from the market standard and there will be no provisions for rent concessions or lessor buildout of the occupied space. The appraiser must consider all of these factors when estimating the market or economic rent for the acquired space, and comparable rentals must be adjusted to account for these differences. Table 1 summarizes the most commonly encountered differences between private and government leases which must be accounted for in the adjustment process.

**Table 1. Common Differences Between Private and Government Leases**

| Adjustment Factors | Private Leases | Federal Leases |
|---|---|---|
| **Measurements** | Typical for market—often BOMA based | Generally inconsistent with local market and/or standards such as BOMA or IPMS |
| **Term (duration)** | Typical for market (e.g., five years) | Shorter or longer terms—often unusual (e.g., 33 months) |
| **Base rent** | Dollar per square foot monthly in advance | Lump sum in advance, or monthly in arrears |
| **Rent adjustments** | Index leases, graduated leases, percentage leases | Level payment over term (no adjustments) or adjustments built into lump sum |
| **Expenses** | Full service, gross, modified gross, net | Expense stops not included. May include excess janitorial, security services |
| **Parking** | x spaces per x square feet | More or less spaces than market norm |
| **Tenant improvements (TIs)** | Landlord provides dollar amount for tenant improvements (TIs) | No tenant improvements (TIs) |
| **Rent concessions** | Landlord provides free rent dependent on size and length of lease | No rent concessions |
| **Renewal options** | Established in lease | May condemn another term if needed |
| **At lease end** | Lessor retains TIs | May allow the government to destructively remove specialized equipment |
| **At lease extension/ renewal** | Market rent for finished out space | Government won't pay twice for TIs already paid for |

1.8.3.    **Larger Parcel Concerns.** There are occasions when the government acquires the leasehold interest in only a portion of a larger property. In those instances, the appraiser must consider the possibility of damages to the remainder property (i.e., that portion not to be occupied by the government). In those instances where severance damages may be significant, appraisers should consult with their client agency and/or its legal counsel before proceeding with the appraisal assignment to ensure that the appraisal will be prepared in accordance with current applicable law.

1.9.    **Temporary Acquisitions.** In addition to leasehold acquisitions, there are generally two situations in which the acquisition by the government may be temporary: temporary construction easements (TCEs), and temporary acquisitions by inverse condemnations. TCEs and temporary inverse condemnation acquisitions will be discussed separately below because of their uniquely different characteristics.

**1.9.1.**    **Temporary Construction Easements (TCEs).** A temporary construction easement (TCE) is generally acquired in conjunction with a permanent acquisition and often abuts the boundaries of the permanent acquisition. The permanent acquisition area is used for permanent placement of the public improvement, whereas the TCE is used in addition to the permanent acquisition area for initial construction of the public improvement. After initial construction of the public improvement is completed, the construction easement expires and the unencumbered fee interest in the land reverts back to the owner. Similar to TCEs but shorter in nature is an easement for a right of entry onto the land for purposes of surveying, inspection, and/or testing for contamination. These rights of entry are generally very short term in nature and are treated in the same manner as TCEs.[72]

Damages that result from TCEs are usually based on the economic or market rent of the affected area for the term of the temporary easement. Usually, the land area affected is so small and the term of the easement so short that compensation for the TCE is nominal. As a result, many agencies and appraisers have adopted a shortcut for its estimation. A reasonable return rate, rather than the economic or market rent based on comparable rentals, is estimated and applied to the encumbered land's fee value for the term of the easement. The rent loss or appropriate return is often not converted to a present value through the application of a discount rate because of the short term of the easement and the nominal nature of the indicated rent loss.

Even though technically incorrect, as discussed below, this shortcut is generally acceptable to agencies because of the nominal nature of the TCE acquisition and the cost/time savings associated with the shortcut. However, appraisers must recognize that the shortcut methodology will be found unacceptable under these Standards if the indicated compensation is more than nominal. When the indicated compensation for the acquisition of a TCE is more than nominal, the appraiser must use proper appraisal methodology to develop the present value of the rent loss. This will entail the use and presentation of properly documented comparable rentals, and the discounting of the lost rental income stream into a present value.

The appraiser must also consider whether the existence of a TCE will restrict the property owner from using the unencumbered portion of the land for its highest and best use during the easement's term. Often an appropriate method to estimate the proper adjustment to reflect the diminution in the land's value by reason of the temporary easement is to apply the rent loss to all lands so affected. (If the property can be rented for a lesser use during the term of the TCE, the measure of damage is usually measured by the rent differential between the before and after situations.)

Appraisers must remember that the loss in value caused by a TCE acquisition is not an independent acquisition, and the compensation for it cannot be added to the indicated diminution in value by reason of the associated permanent acquisition. The rent loss associated with a TCE should be used as the basis for an adjustment to the remainder property's after value, not as something to be added to the difference between the before and after value of the property.

---

72   These rights of entry are often so short term in nature (sometimes as short as 24 hours) and their purpose so restricted that agencies do not have an appraisal conducted of such properties, but rather they make an administrative determination of a nominal compensation for the acquisition.

**1.9.2.**   **Temporary Inverse Takings.** Temporary acquisitions by inverse condemnation may be by either a physical invasion of the property by the government (or an agent of the government)[73] or by regulation.[74] The measure of value in a temporary inverse case is the same as in the acquisition of a TCE, that is, the rental value of the land taken for the term of the taking. The substitution of a return on the fee value of the land for an opinion of the rental value of the land is not generally an accepted alternative.[75]

What generally makes temporary acquisitions by inverse condemnation uniquely different from the acquisition of a TCE is the amount of indicated compensation. An inverse condemnation acquisition usually involves whole ownerships rather than a small geographical portion of the ownership, and the term of the alleged inverse taking is generally of a substantially longer period of time than the duration of a TCE. For that reason, greater care must be employed by the appraiser in developing an opinion of the value of such properties. Department of Justice legal counsel will generally provide the appraiser with the effective date of the appraisal and the duration and extent of the alleged taking.

In a regulatory taking situation, it is possible that the regulation temporarily precludes the use of the land for its highest and best use, but secondary uses of the property remain available to the property owner. In such a case, opinions of the before and after market rent are developed to determine the difference in the rent that could have been commanded by the property during the inverse taking period. The *before* rent is the market or economic rent of the property for its highest and best use for the duration of the taking, and the *after* rent is the market or economic rent of the property for its secondary, but allowable, use during the taking period. In estimating the potential use of the subject property during the taking period, appraisers must take into account the limited duration of the period of use.[76]

Because inverse condemnation cases (either permanent or temporary) are very fact-specific, it is essential that the appraiser work very closely with the Department of Justice attorney assigned to the case. Both appraiser and attorney must understand the precise question that must be addressed by the appraiser and the acceptable methodology to be used to answer it. This will often involve substantial legal research by the attorney, concluding with written **legal instructions** to the appraiser.[77]

**1.10.**   **Acquisitions Involving Natural Resources.** The appraisal of properties containing valuable natural resources such as minerals, timber, and water is a complex subject requiring specialized training and experience (see USPAP Competency Rule). A critical first step in developing an appraisal of properties containing resource assets is identifying the property

---

73   *See, e.g., 767 Third Ave. Assocs. v. United States,* 30 Fed. Cl. 216 (1993), *aff'd* 48 F. 3d 1575 (Fed. Cir. 1995).

74   *See, e.g.,* First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304 (1987).

75   *United States v. 883.89 Acres of Land in Sebastian Cty.,* 442 F.2d 262, 264, 265 (8th Cir. 1971), *aff'g* 314 F. Supp. 238 (W.D. Ark. 1970); *United States v. Michoud Indus. Facilities,* 322 F.2d 698, 707 (5th Cir. 1963); *United States v. 117,763 Acres of Land in Imperial Cty.,* 410 F. Supp. 628 (S.D. Cal. 1976), *aff'd sub nom. United States v. Shewfelt Inv. Co.,* 570 F.2d 290 (9th Cir. 1977).

76   For instance, if the denial of a permit for a period of three years precluded the use of a property for commercial purposes, a secondary use of industrial warehousing during the taking period would not be appropriate because the short-term life of the secondary use would not be economically feasible. However, a secondary use as an industrial equipment storage yard might be a suitable secondary use because such a use would not involve the construction of substantial improvements or a commitment to a long-term use.

77   See Section 1.9 for additional discussion of inverse condemnations.

rights to be acquired and the ownership interests into which they may be divided. The appraiser and the client agency must work together to obtain title information and legal descriptions to ensure that the appraisal properly addresses these components and their contribution to the value of the larger parcel.

While the valuation of these diverse resource assets requires different considerations, there are common elements that apply in all appraisals of these properties: the <u>unit rule</u>, <u>highest and best use</u>, and <u>larger parcel analyses</u>.

**1.10.1.**    **The Unit Rule.** In the development of an appraisal concerning properties containing resource assets, it is particularly important to understand the unit rule.[78] Property must be valued as a whole for federal acquisition purposes, with due consideration of all of the components that make up its value. Its constituent parts are considered only in light of how they enhance or diminish the value of the whole, with care being exercised to avoid so-called <u>cumulative</u> or <u>summation appraisals</u>.[79]

Accordingly, it is improper to estimate the value of the surface of the property, add to it a valuation of the minerals or other resource such as water or timber (as estimated by a separate expert), and thereby conclude an opinion of total market value for the property. Not only would this result in an improper summation appraisal, as a practical matter it would also mean that no one individual could testify to the market value of the property as a whole should the matter go to litigation. For these reasons, when consultants' reports are used in the valuation of mineral property, appraisers must strictly adhere to the requirements of Section 1.13 of these Standards relating to the use of consultants' reports.

**1.10.2.**    **Highest and Best Use Considerations.** Highest and best use analysis is a critical element in the development of a reliable appraisal of property containing valuable natural resources. As a first step, a market analysis should be performed to identify the market supply and demand for the resource located on the property. If no market exists for the resource, then the quantity and quality of the commodity need not be determined. The market analysis provides the foundation for the appraiser's conclusions regarding the marketability, price, and competition for the commodity found on the property.

If a market exists for a mineral or other resource, then a supported determination must be made concerning both the *legal permissibility* of extracting the mineral (or harvesting the timber) and the *physical characteristics* of the minerals or timber located on the property. These determinations often require special expertise, including:

- Interpretation of permitting and other environmental requirements that may necessitate the assistance of a consultant with specialized knowledge and experience in the relevant market.
- Studies regarding the physical characteristics of the minerals that are usually conducted by specialists (usually geologists and/or engineers) who make determinations concerning such

---

78    See Section 4.2.2 for a discussion of the legal basis for the unit rule.
79    *See* Section 4.2.2.

important factors as the location, quantity, quality of the mineral deposit, and any variations in the quality that might be found on the property.

- Additional determinations regarding such factors as accessibility (due to topographical constraints or distance to road or rail line, for example) and problems and costs of extraction or harvest.
- A cruise plan, timber cruise, and check cruise for land containing valuable timber.

This information provides the basis for developing an opinion of the value of the property using the sales comparison and income capitalization approaches to value. However, before the adoption of these interpretations, studies, or determinations, it is the professional responsibility[80] of the appraiser to thoroughly analyze and understand the reports prepared by other experts and adopt them only if the analysis and conclusions were prepared according to appropriate standards, are sound, and are adequately supported.

As with all other appraisals prepared under these Standards, the appraiser must identify the most likely purchaser and user of the subject property as well as the timing of the use (for example, mineral extraction or timber harvesting). In addition, a larger parcel analysis must be completed. For property containing valuable natural resources, this analysis may require an examination of minerals or timber holdings beyond the land being acquired by the government that meet the three tests of the larger parcel.[81]

### 1.10.3.   Special Considerations for Minerals Properties.

**Property Rights and Interests.** It is fundamental that the property rights and interests in minerals properties are identified as part of the problem identification process. The client agency must identify the property rights and interests that are to be acquired and valued. A comprehensive understanding of the rights and interests to be appraised is critical to the proper development of both the sales comparison and income capitalization approaches to value.

In the oil and gas industry there is a distinction between the working interest and the royalty interest. For example, in a federal lease sale the successful bidder acquires a working interest through payment of a bonus bid while the United States retains the royalty interest. In hard rock mining, these two interests are sometimes referred to as the contributing and noncontributing interests. The contributing interest is controlled by the mining company, which contributes the capital required for exploration, ore definition, and mining of a property. The noncontributing interest is a passive interest in the land and is essentially a nonparticipating royalty interest. Both contributing and noncontributing interests can be present in leased fee and fee simple estates. In the case of fee ownership, the contributing and noncontributing interests may be held by the same party.

The selection and evaluation of comparable sales in the sales comparison approach and the methodology selected for the income capitalization approach are both driven by the interests being acquired and valued. For example, when valuing a noncontributing interest, the sales selected for analysis should be transfers of property with the same interest. The income analyzed would be the present worth of the anticipated future royalty income.

---

80   See Section 1.13 for further discussion of an appraiser's reliance on the work of other experts.
81   See Section 4.3.3 for further discussion of the legal requirements for a larger parcel analysis.

Appraisers valuing mineral properties impacted by the 1872 Mining Law are advised to coordinate with client agency staff to clarify the approaches to valuing those interests.

**Sales Comparison Approach to Value.** Despite the common use of the income capitalization approach for industry purposes, in federal acquisitions the sales comparison approach is normally considered the most reliable approach for minerals as for other property types.[82] As a result, the appraiser cannot default to using an income approach or other valuation method that may be acceptable for typical industry or other purposes. It is unacceptable for an appraiser to simply state that there are no comparable sales transactions without providing adequate support for the conclusion.

To properly develop a sales comparison approach to value for a mineral-bearing property, the appraiser must understand the level of information available concerning the mineralization found on the subject property. It is then important to identify comparable sales that had similar levels of information about mineralization available at the time of sale. Significant variables typically include rights conveyed, conditions of sale, the presence of multiple ores on the same property, access for extraction purposes, topography and cover (stripping ratios), transportation availability and cost, and distance to smelters or refineries. All of these factors may require adjustment.[83]

In analyzing a sale of a mining property as a comparable sale, the sale may include the mine, mill, extraction plant, offices, and various other support facilities. These capital improvements are part of the real property and are also components of the business of mining and selling the mineral. The appraiser must understand the complex interplay of the real property components and identify where the real property ends and the business interests begin.

The verification of comparable sales data is a critical component of this analysis, and the assistance of experts in identifying all necessary areas of inquiry during the verification process may be required. The appraiser may need to consult geologists, engineers, and other experts for producing or nonproducing oil and gas, fissionable and hard rock, or other locatable minerals.

Also important in the sales comparison approach is the selection of the appropriate unit of comparison. Such selection should generally mirror that unit of comparison used by participants in the market and, as such, will generally result in the tightest bracket of value for the subject property.[84]

> **In valuing mineral properties using the income capitalization approach, "[g]reat care must be taken, or such valuations can reach wonderland proportions."**
>
> **— *United States v. 47.14 Acres of Land in Polk Cty.*, 674 F.2d 722, 726 (8th Cir. 1982).**

**Income Capitalization Approach to Value.** The income capitalization approach to value is also a valid means for developing an opinion of the market value of mineral properties, but should never be used exclusively if comparable sales are available for use in the sales comparison approach. The income capitalization approach can be especially applicable when the subject

---

[82]   *See* Section 4.8.
[83]   For a general discussion of the application of the sales comparison approach, see Sections 1.5.2 and 4.4.2.
[84]   *See* Section 4.8.

Uniform Appraisal Standards for Federal Land Acquisitions  /  Appraisal Development

property is already being mined, and thus the historical income stream from the property is available for analysis. In applying the income capitalization approach, appraisers must take care to consider only the income that the property itself will produce—not income produced from the business enterprise conducted on the property (i.e., the business of mining).[85] An appraiser who is not thoroughly experienced in the appraisal of mineral properties should not attempt to employ the income capitalization approach. Even when used by an appraiser experienced in this field, this appraisal approach can be highly speculative, and great care must be exercised in its use.

In developing an opinion of value by the income capitalization approach for a mineral property, it is generally recognized that the most appropriate method of capitalization is yield capitalization, most notably discounted cash flow (DCF) analysis. The income that may be capitalized is the royalty income, and not the income or profit generated by the business of mining and selling the mineral. For this reason, the income capitalization approach, when applied to mineral properties, is sometimes referred to as the royalty income approach.

In conducting a DCF analysis, the appraiser must avoid estimating a property-specific investment value to a particular owner instead of developing an opinion of the market value of the property if it were placed for sale on the open market. Like application of the subdivision development method to value, DCF analysis in the valuation of mineral properties can be highly complex.[86] Creation of a detailed mining plan for the property is often required. The essential components of this approach are: (1) the royalty rate; (2) the unit sale price of the mineral to which the royalty rate is applied (e.g., $20 per ton); (3) the projected annual amount of mineral production (e.g., 100,000 tons per year)—with the product of this ingredient and the prior two ingredients yielding the annual income; (4) the projected number of years of production and the year when the production will begin; and (5) the proper capitalization or discount rate.

In developing an estimated income stream, the proper royalty rate can be derived from comparable mineral lease transactions, and the mineral unit price to which the royalty rate is applied may be derived from appropriate market transactions. The annual amount of production and the number of years of production are more difficult (and speculative) to estimate, and at a minimum require not only physical tests of the property to determine the quantity and quality of the mineral present, but also market studies to determine the volume and duration of the demand for the mineral in the subject property. Production level estimates should be supported by documentation regarding production levels achieved in similar operations. Production levels should also be consistent with the mining plan's labor and equipment estimates. Numerous other factors may have to be considered, such as the amount of overburden, the method of mining (e.g., surface or deep mining), the requirements of permitting and applicable reclamation laws, the hauling distance to market, competition from other sites, the size and timing of the investment needed to construct any necessary access or processing plant, and so on.

When the interest to be acquired and appraised includes the working or contributing interest, the income analysis should also consider the size and timing of the investment needed. Capital costs will include expenditures for services, construction, and equipment related to mine development,

---

85    *See* Sections 4.4.4 and 4.8.
86    See Sections 1.5.1.2 for discussion of the subdivision development method.

preproduction, and production. Among the factors to be considered in this portion of the analysis are preliminary studies such as exploration and environmental and engineering studies required to define the location and nature of the resource sufficiently to support the mining plan and ensure compliance with all applicable governmental permitting and land use regulations. The engineering costs related to the mining operation design must include contractors' fees and management. Other elements to be considered include the costs of site preparation, facilities and improvements (including off-site improvements, such as rail or road facilities), mining equipment, and preproduction (including all of the costs required to bring the extraction process to full production, including the costs of time lag and permitting).[87]

Operating costs are the expenditures incurred during the ongoing extraction process. These cost elements include labor, materials, supplies, utility costs, payroll overhead, management, indirect costs, and contingencies. Also, appropriate deductions for all relevant taxes associated with the operation must be made. As in the subdivision development approach, the estimation of an appropriate level of entrepreneurial profit is a critical element in the DCF analysis of any mineral property and is a factor that should be supported by direct market data whenever possible.

One of the most critical factors in the application of DCF analysis is the selection of the discount rate. Attempts have been made to apply various statistical techniques (such as probability weighted scenarios, Monte Carlo analysis, marketing uncertainty analysis, and timing of development analysis) to mineral valuations to account for the extraordinary high risks associated with such operations. However, the application of various statistical techniques is not a substitute for discount rate selection derived from and supported by direct market data,[88] which is the preferred and most widely accepted approach.[89]

**1.10.4.  Special Considerations for Forested Properties.** In developing an appraisal of forested properties, the appraiser must determine whether any merchantable timber is located on the property and whether the tree products located on the property are marketable and saleable. There must be sufficient volumes for profitable harvesting under existing state forest practice rules (or other applicable jurisdiction if appropriate). Merchantable timber may contribute value to the property.  Pre-merchantable timber may or may not contribute value to the property and in some cases is included in the land value.

A critical part of the valuation of forested property is a timber cruise.  A cruise plan should be developed that establishes the cruise procedures to be used in accordance with current market practices for the area and type of timber.  The objective is to establish cruise standards and sampling errors based on private market expectations in the local market when timber is sold with the land.

---

87  This factor can have a significant impact on the value of mineral property because the time lag between the effective date of an appraisal and the projected date upon which all studies have been completed, all permits issued, all construction completed, and an actual income stream can be generated may be extended.

88  For a discussion of market extraction of discount rates, see the American Society of Farm Managers and Rural Appraisers' 2012 course, "Appraising Natural Resources," 18-19.

89  *See* Section 1.5.1.2.

The sales comparison and income capitalization approaches are both appropriate for use in valuing properties with a highest and best use for timber production. In developing the sales comparison approach, the selection of the unit of comparison should be based on common local market practices. In developing the income capitalization approach, the appraiser must consider all factors including lumber selling price and absorption period (based on supply and demand analysis in the market), all harvesting and transportation costs, costs of sales, and profit. The discount rate used to estimate present value must be market supported and should reflect timber investment rates and risk associated with the subject property.

1.10.5.   **Water Rights.** In appraising properties in which water rights contribute to the overall value of the property, the appraiser must recognize that water rights are established under state law. Appraisers should research sales in the same district or drainage basin and take into account water-rights seniority, past demand, drought, past depletion type of use, historic place of use, conversion, and statutory limitations on transferring place of use. There may be many other market factors that should be considered, such as costs of hydrologic and engineering studies as well as legal fees that must be addressed. The appraiser should consult with the client agency and agency counsel to ensure that the characteristics of the water rights that contribute value to the larger parcel are properly accounted for.

1.11.   **Special Considerations in Appraisals for Inverse Condemnations.** Unlike direct condemnations and other intentional acquisitions, inverse taking or inverse condemnation claims involve a threshold question of government liability. In filing a direct condemnation, the United States expressly acknowledges the actual or proposed acquisition and its obligation to pay compensation. In the inverse taking claim, on the other hand, the United States may contest the landowner's claim that a taking occurred for which just compensation must be paid under the Fifth Amendment. Accordingly, in an inverse taking claim, the court must first determine whether a taking of property occurred for which just compensation must be paid. Appraisers may be retained to develop opinions in connection with the liability phase, the compensation phase, or both. If the government's action resulted in the government's permanent physical occupation of the land in question, the liability issue is a rather straightforward one.[90] However, in the context of a taking by regulation, the federal courts have developed various *tests* to determine whether a taking has occurred: the character of the government action; the extent to which the regulation interferes with distinct, investment-backed expectations; and the economic impact of the regulation.[91]

The economic impact test above involves the valuation of the property in question before and after the government's action.[92] When conducting such an analysis, the appraiser's application of the larger parcel tests may vary from those applied in the direct acquisition or condemnation[93] because of the investment-backed expectations test noted above. Investment-backed expectations

---

90   "[A] permanent physical occupation is a government action of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 (1982).
91   *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).
92   Such action generally relates to the denial of a government permit, such as a permit to fill wetlands.
93   In the context of inverse condemnation cases the courts have sometimes referred to the larger parcel determination as the issue of the denominator. *See, e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987). For a discussion of the larger parcel tests in direct acquisitions, see Sections 1.2.7.3.1 and 4.3.

are typically considered as of the date upon which the owner acquired the property and in the regulatory environment that existed at that time. But, on the date of the alleged taking, the owner may have sold portions of the property previously acquired. For the court to accurately assess the *economic impact of the regulation*, it must know how the regulation impacted the owner's reasonable investment-backed expectations.[94] For that reason, it may be necessary for the appraiser to disregard the <u>unity of title</u> test of the larger parcel and to value the entirety of the tract that was originally acquired. Because the tests applied by the courts to determine the question of liability (i.e., whether a compensable taking has occurred) are quite complex, it is essential for the appraiser to confirm with legal counsel the appropriateness of the larger parcel determination before proceeding with the appraisal assignment.

In providing appraisal services to the government in connection with the liability phase of an inverse condemnation action, it is imperative for both the appraiser and the trial attorney to completely understand what the appraiser's valuations are intended to measure. For that reason, continual contact and conferencing between the appraiser and trial counsel throughout the development of the appraisal is essential. Government's trial counsel must determine *what* is to be measured, while the appraiser determines *how* to measure it.

If the court finds that a compensable taking has occurred, the appraiser's function generally is to develop an opinion of the market value of the affected property before and after the taking, as of the date of the taking, which should be provided to the appraiser by legal counsel. In this valuation phase of the inverse condemnation litigation, the appraiser will generally utilize the same larger parcel tests that are applied in direct acquisitions or condemnations. In other words, the larger parcel used in the liability phase of the trial may be different than the larger parcel used in the valuation phase of the trial. Inverse condemnation actions relating to temporary takings are discussed in Section 1.9.2.

**1.12.**     **Special Considerations in Appraisals for Federal Land Exchanges.** Federal land exchanges differ from other federal land acquisitions in that an exchange must always be voluntary and the parties must reach agreement on the value of the properties. In direct acquisitions, the government has the authority to force owners to transfer their land by the exercise of its power of eminent domain as long as the government's use of the land will be for a public purpose and the government pays the owner just compensation for the land. However, the government does not have the authority to force individuals to convey their lands and accept federal lands as compensation. Likewise, the government "is not required to exchange any Federal lands. Land exchanges are discretionary, voluntary real estate transactions between the Federal and non-Federal parties."[95] This does not mean that such transactions are exempt from litigation relating to the valuation of the property involved and/or the adequacy of the appraisal report upon which the transaction was based.[96]

---

94   For example, the owner may have acquired 100 acres, but as of the date of the alleged taking may have sold 75 acres of the tract, leaving an ownership on the date of valuation of only 25 acres.

95   36 C.F.R. § 254.3(a). *See also* 43 C.F.R. § 2200.0-6(a).

96   *See, e.g., Desert Citizens Against Pollution v. Bisson,* 231 F.3d 1172 (9th Cir. 2000).

Most federal land exchanges are accomplished pursuant to the Federal Land Policy and Management Act of 1976 (FLPMA), as amended (43 U.S.C. § 1701 *et seq.*). There are a number of specific statutes authorizing land trades that may not be entirely consistent with the provisions of FLPMA, as for example, certain National Wildlife Refuge System and National Park System exchange acts; the Alaska Native Claims Settlement Act, as amended (43 U.S.C. § 1621); and the Alaska National Interest Lands Conservation Act (16 U.S.C. 3192). Appraisers must therefore confer with the agency to ensure complete understanding of the appraisal development and appraisal report requirements applicable to the specific appraisal assignment.

The two agencies most actively involved in federal land exchanges are the U.S. Forest Service and the Bureau of Land Management (BLM). Both the Forest Service and BLM have adopted regulations that implement FLPMA and control their land exchange activities.[97] Forest Service and BLM regulations are similar and both require some modifications of these Standards. These regulations define appraisal, highest and best use, and market value,[98] and appraisers must use these definitions when conducting appraisals for federal land exchanges.

Exchanges can be proposed by the Forest Service, BLM, or any person, state, or local government. To assess the feasibility of an exchange proposal, the agency may complete a feasibility analysis of the lands involved in the proposal. Valuation input into the feasibility analysis may or may not include an appraisal, but shall always be prepared by a qualified agency appraiser in compliance with the requirements of USPAP.[99]

If the feasibility analysis does not provide an opinion of value, it may not fall under these Standards but would still be considered part of appraisal practice under USPAP.[100] The requirements for classification as a qualified appraiser under these exchange regulations are essentially the same as those for a contract appraiser under 49 C.F.R. § 24.103(d)(2) and these Standards.[101]

One of the initial steps in an exchange involving federal lands is the formulation of an Agreement to Initiate an Exchange (ATI).[102] This nonbinding agreement outlines the exchange process, identifies the proposed lands or interests in lands to exchange, and memorializes the responsibilities of each party (including the appraisal costs and other costs associated with processing the exchange). The ATI also documents whether the proposed land exchange will be processed as an assembled or non-assembled land exchange.

A qualified appraiser shall be an individual acceptable to all parties and approved by the authorized officer. The appraiser shall be competent, reputable, impartial, and have training and experience in appraising property similar to the property involved in the appraisal assignment pursuant to these Standards. The appraisal report must reference and be prepared according to the applicable regulations and, to the extent appropriate, these Standards.[103] All appraisal reports

---

97  Forest Service regulations may be found in 36 C.F.R. § 254 *et seq.*, and BLM regulations may be found in 43 C.F.R. § 2200 *et seq.*
98  36 C.F.R. § 254.2; 43 C.F.R. § 2200.0-5.
99  43 C.F.R. § 2201.1(b); *see also* 36 C.F.R. § 254.4(b).
100  If the feasibility analysis provides a value opinion, it would fall under these Standards and must comply with USPAP's Standard 1 and Standard 2.
101  *See* 36 C.F.R § 254.9(a)(2); 43 C.F.R. § 2201.3-1(b).
102  43 C.F.R. § 2201.1; 36 C.F.R. § 254.4.
103  36 C.F.R. § 254.9; 43 C.F.R. § 2201.3.

prepared for federal exchanges are subject to review by federal agency review appraisers.[104] Therefore, appraisers conducting appraisals for federal exchange purposes have a professional responsibility to recognize the federal agency as the client and the private landowners as *intended users* of the appraisal report and to identify them as such in the appraisal report.[105]

If any party issues an instruction to the appraiser to make an extraordinary assumption or to employ a hypothetical condition in the conduct of the appraisal that would conflict with the exchange regulations, the ATI, or these Standards, the appraiser must advise the client of the conflict. If the client provides written instructions to the appraiser to make the assumption or employ the condition in conducting the appraisal, the appraiser may make the appraisal but must clearly identify the assumption and/or condition in the appraisal report and also report that the opinion of value has not been prepared in accordance with the exchange regulations, the ATI, and/or these Standards, so as to ensure that the *intended users* of the report are not misled.

The major technical difference between appraisals prepared for federal land exchange purposes and those typically prepared under these Standards relates to the appraisal of multiple tracts and the appraiser's determination of the larger parcel.[106] For a non-assembled land exchange appraisal (similar to the typical acquisition appraisal, although the estate to be appraised has been identified in the ATI), the appraiser will apply the tests of unity of ownership, of unity of highest and best use, and of contiguity or proximity as it bears on unity of use in determining the larger parcel. However, for purposes of an assembled exchange appraisal, the tracts to be appraised are defined in the property description contained in the ATI. The nonfederal ownerships being assembled for exchange shall be appraised based on the sum of the value of the separate ownerships in the manner they were acquired and conveyed as individual transactions.

If an appraiser concludes that the property described in the ATI constitutes two or more separate larger parcels, the method of valuation is generally fact dependent and, in most cases, will be controlled by the provisions of the ATI. In some instances, the appraiser may be instructed to value the different larger parcels as separate entities, while under other circumstances the appraiser may be instructed to value the larger parcels only as they contribute to the whole, as if the property described in the ATI would be sold from one seller to one buyer in one transaction.[107] If appraiser instructions are contrary to the appraiser's highest and best use or larger parcel conclusion, the appraiser must advise the client that it may be necessary to identify the instruction as an extraordinary assumption or hypothetical condition under USPAP. It is important, however, for the appraiser to recognize that the same method of valuation must be utilized for both the federal and nonfederal lands.[108]

---

104  36 C.F.R. § 254.9(d); 43 C.F.R. § 2201.3-4.
105  USPAP, Standards Rule 2-2(a)(i) and 2-2(b)(i), 23, 25.
106  For discussion of the larger parcel, see Sections 1.4.6 and 4.3.3.
107  In other words, the value of the whole property cannot be estimated by simply adding together the independently appraised values of the larger parcels, unless market evidence demonstrates that the larger parcels would contribute their full value to the value of the whole property as defined in the ATI.
108  36 C.F.R. § 254.9(b)(v); 43 C.F.R. § 2201.3-2(a)(5).

The regulations provide for special treatment of the larger parcel issue in assembled land exchanges.[109] This term is defined differently in Forest Service and BLM regulations[110] and, for that reason, assembled land exchanges may be administered differently by these agencies. Again, depending on the provisions of the ATI, the value of the various parcels may be estimated as independent parcels, or as a single tract to be sold in a single transaction.

When appraising the federal land portion of the exchange, the regulations require that the appraiser "estimate the value of the lands and interests as if in private ownership and available for sale in the open market."[111] This is an assignment condition that requires a **legal instruction** and creates a hypothetical condition. Because the federal land is appraised as if in private ownership, to its highest and best use, any other surrounding federal land cannot be part of a larger parcel because (due to the hypothetical condition) it is under different ownership and has a different highest and best use.

Because of the complexity of appraising multiple tracts of land for exchange purposes and the fact that their treatment is often fact specific, it is essential that agencies provide clear written instructions to the appraiser in this regard and that the appraiser insist upon such instructions at the initiation of the appraisal assignment.

**1.13.**    **Supporting Experts Opinions and Reports.** Real estate appraisal is becoming increasingly sophisticated. Preparation of an adequately supported opinion of market value often requires the assistance of consultants with special expertise. Before issuing an appraisal assignment, agencies should attempt to identify the need for such special consultants and make arrangements for such services, either by contracting with the consultant directly or by providing for the appraiser's retention of the consultant in the appraisal contract. If an agency retains the consultant directly, it should select the consultant in cooperation with the appraiser, who will ultimately have to rely on the consultant's analysis and conclusions. The agency and the appraiser should jointly determine the scope of work and establish qualification criteria for any consultant retained. Regardless of whether the consultant is retained by the agency or the appraiser, selection of the consultant must be by concurrence of both the appraiser and the agency.

If the appraiser finds that an appraisal cannot be completed without a consultant's assistance, the appraiser should notify the agency involved immediately. The appraiser may not adopt unauthorized, unreasonable, or unsupported assumptions in making an appraisal in lieu of obtaining specialized consultant assistance.

Types of special consultants often needed include:

- Fixture appraisers
- Environmental engineers and auditors

---

109   36 C.F.R. § 254.5; 43 C.F.R. § 2201.1-1.
110   An "[a]ssembled land exchange means an exchange of Federal land for a package of multiple ownership parcels of non-Federal land consolidated for purposes of one land exchange transaction." 36 C.F.R. § 254.2; An "[a]ssembled land exchange means the consolidation of multiple parcels of Federal and/or non-Federal lands for purposes of one or more exchange transactions over a period of time." 43 C.F.R. § 2200.0-5(f).
111   43 C.F.R. § 2201.3-2(2); 36 C.F.R. § 254.9(b)(ii).

- Civil engineers
- Cost estimators and contractors
- Market experts
- Feasibility and planning experts
- Statisticians
- Geologists/mining engineers/mineral specialists
- Hydrologists
- Timber cruisers/foresters/forestry engineers
- Communications experts

In using these opinions and reports, the appraiser cannot merely accept such consultant reports as accurate, but rather must analyze such reports and adopt them only if reasonable and adequately documented and supported. The results of secondary valuation reports (minerals, fixtures, or timber valuations) cannot simply be added to the value of the land to arrive at a value of the property as a whole without proper analysis by the appraiser. To do so would violate the unit rule and professional standards. The appraiser must consider these components of the property in light of how they contribute to the market value of the property as a whole.

**1.14.**    **Appraisers as Expert Witnesses.** When contracting for appraisals, it is important to require the individual appraiser with whom the contract is made to actually prepare or be principally responsible for developing the appraisal and the appraisal report, and to be prepared to testify in court if it becomes necessary. There are additional reporting requirements for appraisals prepared for trial purposes (refer to Section 2.2.3 for additional requirements).

The appraiser's role as an expert witness in litigation carries with it a heavy responsibility that should not be taken lightly no matter how many times the appraiser has testified before. In addition, federal eminent domain cases are generally complex matters involving discovery, depositions, and testimony that require the appraiser to be well prepared and thorough. Unlike other forms of litigation such as bankruptcy cases, attorneys involved in eminent domain cases are often as knowledgeable about appraisal standards, methodology, and theory as the appraisers appearing as expert witnesses. Section 4.13.1 of these Standards is required reading for any appraiser who has been identified as an expert witness by the U.S. Department of Justice.

**1.15.**    **Confidentiality.** Appraisers' valuations and supporting appraisal reports are confidential information and appraisers shall strictly abide by the following confidentiality of USPAP's Ethics Rule:

(1) An appraiser must protect the confidential nature of the appraiser-client relationship.

(2) An appraiser must act in good faith with regard to the legitimate interests of the client in the use of confidential information and in the communication of assignment results.

(3) An appraiser must not disclose confidential information or assignment results prepared for a client to anyone other than: a) the client and persons specifically authorized by the client; b) state appraiser enforcement agencies and such third parties as may be authorized by due process of law; and c) a duly authorized professional peer review committee.

Under item (1) above, appraisers must obtain written authorization from the client agency (or the Department of Justice if a case has been filed) before disclosure. The passage of time in and of itself does not extinguish either the appraiser's responsibility for confidentiality or the appraiser/client relationship. The appraiser/client relationship is extinguished only upon written release from the client agency or upon the consummation of the government's acquisition of the property appraised. Even though the appraiser/client relationship may terminate, the appraiser remains subject to the confidentiality provisions of USPAP.

Appraisers have an extraordinary duty to maintain confidentiality when the acquisition of the property appraised may have to be accomplished by condemnation, and any appraisal report prepared for the purposes of government acquisition should be considered the subject of potential litigation until such time as the government has consummated its acquisition.

If an appraiser receives a request or order, under items (2) or (3) above, to provide confidential information relating to an appraisal conducted for the government to a state appraiser enforcement agency or professional peer review committee, the appraiser must provide the government with written notice of the request or order *prior* to providing the confidential information to the state appraiser enforcement agency or professional peer review committee. If litigation is pending, the Department of Justice may elect to intercede if it determines such intercession would be in the best interest of the government.

Appraisers must use extreme caution in choosing what information to cite in developing their opinions of value. While it is common practice for appraisers in non-litigation appraisals to report that they have relied upon confidential information (such as information learned in the conduct of other appraisals, or information provided to the appraiser by market participants on the condition that it not be disclosed) in addition to the supporting data reported, in developing their opinion of value such a reference in a litigation report may subject the information to discovery. Appraisers should not reference such information in litigation reports unless they are prepared to reveal the information, which occurs often by order of the court.

# 2.  APPRAISAL REPORTING

2.1.    **Introduction.** These Standards address the content and level of information and analysis required to communicate the results of an appraisal prepared for federal property acquisitions. These Standards are intended to establish requirements for appraisal report *content* and *documentation*. These Standards are not, however, intended to establish an absolute requirement for appraisal report *formatting*. The report formats described in Section 2.3, consisting of a four-part appraisal report for total acquisition appraisals and a seven-part appraisal report for partial acquisition appraisals, are recommended guides that agencies can modify as appropriate for agency needs. Appraisers are cautioned to closely examine their appraisal contract or assignment letter for report formatting requirements, as many agencies mandate report formatting in accordance with the recommendations herein. For ease of reference, the recommended formatting for appraisal reports is shown in the addenda of these Standards, marked as Appendix B and Appendix C.

These Standards also address the additional content and documentation requirements for appraisal reports to be used by appraisers who will testify as expert witnesses in federal court under Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. Finally, the reporting requirements for leasehold acquisitions and project appraisal reports are addressed under Sections 2.4 and 2.5 respectively.

2.2.    **Appraisal Reports.** There are two written reporting options established under USPAP: an *appraisal report* and a *restricted appraisal report*. In addition, USPAP permits an appraiser to provide an *oral report*.  For the reasons discussed under Sections 2.2.1 and 2.2.2 below, oral reports and restricted appraisal reports are not permitted under these Standards.  The reporting formats set forth under Sections 2.3, 2.4, and 2.5 below are consistent with and/or exceed the requirements for an appraisal report under Standard 2 of USPAP.

2.2.1.    **Oral Appraisal Reports.** Oral appraisal reports are not permitted under these Standards.  An oral report is inconsistent with the intended use and intended users of an appraisal prepared for federal acquisitions. Even with the appraiser's workfile available, an oral report does not satisfy agency record-keeping requirements, and cannot be reliably reviewed. The number of intended users of appraisals in federal acquisitions also makes such a practice impossible.

2.2.2.    **Restricted Appraisal Reports.** For most acquisitions and all litigation matters, restricted appraisal reports are not permitted.[112] These reports cannot be reviewed to the level of detail required for federal acquisition appraisals; the intended user of the report is restricted to the client only,[113] a condition that cannot be met for federal acquisition appraisals because it should

---

112    This does not prevent agencies from using restricted appraisal reports performed by internal agency appraisal staff for low value noncomplex acquisitions (in general accordance with the waiver valuation procedures established under the URA) or for internal portfolio valuation purposes.

113    USPAP, Standards Rule 2-2 and Advisory Opinion 12, *Use of the Appraisal Report Options of Standards Rules 2-2, 8-2*, and *10-2, 22* and *103*.

be anticipated that others such as landowners, legislators, or the courts will be asked to use and rely on the appraisal report.

2.2.3.    **Compliance with Rule 26 of the Federal Rules of Civil Procedure.** If an appraiser may testify as an expert witness in a federal trial or deposition, the appraiser's report must satisfy not only these appraisal Standards, but also the content requirements of Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

Rule 26(a)(2)(B) requires a written report, prepared and signed by the expert, that contains:

i.    a complete statement of all opinions the witness will express and the basis and reasons for them;
ii.    the facts or data considered by the witness in forming them;
iii.    any exhibits that will be used to summarize or support them;
iv.    the witness's qualifications, including a list of all publications authored in the previous 10 years;
v.    a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
vi.    a statement of the compensation to be paid for the study and testimony in the case.[114]

Appraisal reports prepared in accordance with these appraisal Standards will normally satisfy parts (i), (ii) and (iii) of Rule 26(a)(2)(B).[115] However, many appraisers' qualification resumes or curriculum vitae typically do not include the information required in parts (iv), (v), and (vi). Appraisers must therefore supplement their customary qualification resumes to list (iv) all publications authored in the previous 10 years; all trial or deposition testimony within the previous four years; and (vi) the appraiser's fees for the appraisal assignment and for potential testimony. The appraiser must comply with Rule 26 if an appraisal report may be used for litigation purposes. In addition, because litigation may arise even when testimony is not anticipated, appraisers may wish to include such information in any report being prepared for federal acquisition purposes.

2.2.4.    **Electronic Transmission of Appraisal Reports.** It is common for appraisers to deliver appraisal reports electronically.  The appraiser is responsible for the security of the report when it is submitted in this manner.

2.2.5.    **Draft Reports.** Agencies may request that the appraiser provide a draft of all or a portion of the appraisal report prior to delivery of a final report. This requirement should be addressed as part of the scope of work with the agency before initiating the assignment. A draft should <u>not</u> be signed and must be clearly marked as a draft or a work in progress.

2.3.    **Content of Appraisal Report.**

---

114    Fᴇᴅ. R. Cɪᴠ P. 26(a)(2)(B) (through amendments effective Dec. 1, 2015).
115    *See,* e.g., *United States v. 12.94 Acres of Land in Solano Cty.,* No. CIV. S-07-2172, 2009 WL 4828749, at *4, *7, 2009 U.S. Dist. LEXIS 114581, at *11, *20–*21 (E.D. Cal. Dec. 9, 2009).

**2.3.1.    Introduction.**

**2.3.1.1.    Title Page.** This should include (1) the name, street address, and agency assigned tract or parcel number (if any) of the property appraised; (2) the name and address of the individual(s) making the report; and (3) the effective date of the appraisal.

**2.3.1.2.    Letter of Transmittal.** This should include the date of the letter; identification of the property and property rights appraised; a reference that the letter is accompanied by an appraisal report; a statement of the effective date of the appraisal; identification of any hypothetical conditions, extraordinary assumptions, limiting conditions, or legal instructions; the value opinion (or, in a partial acquisition, opinions of the value of the larger parcel before the acquisition and the remainder property after the acquisition, the difference); and the appraiser's signature.

**2.3.1.3.    Table of Contents.** The major parts of the appraisal report and their subheadings should be listed. Items in the addenda of any report shall be listed individually in the table of contents.

**2.3.1.4.    Appraiser's Certification.** The appraisal report shall include an appraiser's signed certification statement that is consistent with the certification requirements of USPAP Standard 2. In addition, the following statements related to these Standards must be included:

- the appraisal was developed and the appraisal report was prepared in conformity with the *Uniform Appraisal Standards for Federal Land Acquisitions*;
- the appraisal was developed and the appraisal report prepared in conformance with the Appraisal Standards Board's *Uniform Standards of Professional Appraisal Practice* and complies with USPAP's Jurisdictional Exception Rule when invoked by Section 1.2.7.2 of the *Uniform Appraisal Standards for Federal Land Acquisitions*; and
- the appraiser has made a physical inspection of the property appraised and that the property owner, or [his][her] designated representative, was given the opportunity to accompany the appraiser on the property inspection.

The appraiser's certification shall also include the appraiser's opinion of the market value of the subject property as of the effective date of the appraisal. If the government's acquisition comprises only a portion of the whole property or property rights appraised, the certification shall include both the appraiser's opinion of the market value of the whole property as of the effective date of the appraisal and the appraiser's opinion of the remainder property's market value after the government's acquisition and the difference between them as of the effective date of the appraisal.

Appraisers may also add to their certifications certain items that may be required by law and the appraiser's professional organization(s). However, appraisers should avoid adding certifications that are not pertinent to the specific appraisal (e.g., that the report was prepared in accordance with the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 [FIRREA]) or that are beyond the scope of the appraisers' assignment (e.g., certifying an opinion of just compensation).

**2.3.1.5.** **Executive Summary.** The appraiser shall report the major facts and conclusions that led to the final opinions(s) of value. This summary should include an identification of the property appraised; the highest and best use of the property (both before and after the acquisition if a partial acquisition); brief description of improvements (both before and after the acquisition if a partial acquisition); the indicated value of the property by each approach to value employed (both before and after the acquisition if a partial acquisition); the final opinion of value (both before and after the acquisition if a partial acquisition); any hypothetical conditions, extraordinary assumptions, limiting conditions, or instructions; and the effective date of the appraisal.

**2.3.1.6.** **Photographs.** Photographs shall show the front elevation of the major improvements, any unusual features, views of the abutting properties on either side, views of the property directly opposite, and interior photographs of any unique features. When a large number of buildings are involved, including duplicates, one photograph may be used for each type. Except for an overall view, photographs may be incorporated in the body of the report as appropriate, or may be placed in the addenda of the report.

Each photograph should be numbered and show the identification of the property, the date taken, and the name of the person taking the photograph. The location from which each photograph was taken and the direction the camera lens was facing should be shown on the plot plan of the property in the report's addenda.

In selecting photographs for inclusion in their reports, appraisers should bear in mind that some government appraisal reviewers and other readers of the report may never have an opportunity to personally view the property. Therefore, they must rely on the photographs and the narrative description of the property provided by the appraiser to gain an adequate understanding of the physical characteristics of the property to judge the accuracy and reasonableness of the appraiser's analyses and value estimate(s). Thus, the appraiser may need to include aerial photographs in the report to ensure that readers can accurately visualize the property.

In taking photographs, appraisers should also be guided by the knowledge that the government may be unable to acquire the property voluntarily and may take possession of the property well before the question of value is settled; thus, the land may be substantially altered and improvements demolished prior to a final decision in a condemnation trial.

**2.3.1.7.** **Statement of Assumptions and Limiting Conditions.** Any assumptions and limiting conditions that are necessary to the background of the appraisal shall be stated. Any agency or special __legal instructions__ provided to the appraiser shall be referenced and a copy of such instructions shall be included in the addenda of the appraisal report.[116]

If the appraisal has been made subject to any encumbrances against the property, such as easements, these shall be stated. In this regard, it is unacceptable to state that the property has

---

[116] Appraisers must bear in mind that if a client or legal instruction has not been provided to them in writing, it is not considered a binding instruction. Therefore, if the appraiser accepts an oral instruction from the client or legal counsel, the appraiser becomes wholly responsible for it. Reference to a client or legal instruction, a copy of which is not in the addenda of the appraisal report, will not be acceptable justification for acceptance or adoption of the instruction and may result in disapproval of the appraisal report.

been appraised as if free and clear of all encumbrances, *except as stated in the body of the report*; the encumbrances *must* be identified in this portion of the report.

The appraiser must avoid including "boilerplate" assumptions and limiting conditions. For instance, an assumption that improvements are free from termite infestations is inappropriate in the appraisal of vacant land. Also, assumptions and limiting conditions cannot be used by an appraiser to alter an appraisal contract, assignment letter, or the appraiser's scope of work. Unauthorized hypothetical conditions, assumptions, or limiting conditions may result in disapproval of the appraisal report.

In a partial acquisition, the appraiser should identify those hypothetical conditions, assumptions, and limiting conditions that apply to both the before and after acquisition appraisals, those that apply only to the appraisal of the larger parcel before the acquisition, and those that apply only to the appraisal of the remainder. Appraiser assumptions and limiting conditions, as well as client and **legal instructions**, are discussed in greater detail in Section 1.2 of these Standards.

**2.3.1.8.    Description of Scope of Work.** The appraiser shall use this section of the report to identify the seven critical elements that defined the appraisal problem to be solved:

- Client
- Intended users
- Intended use
- Definition of market value
- Effective date
- Property characteristics
- Assignment conditions

This section shall include an explanation of the intended use for the appraisal, and a description of the property rights appraised, which should be provided to the appraiser by the client agency. In most instances the intended use of the appraisal will be to provide an opinion of the market value as of a specific date.[117] In an appraisal assignment involving a partial acquisition, the intended use of the appraisal will be to provide an opinion of the market value of the larger parcel before the acquisition and an opinion of the market value of the remaining property after the acquisition.

It is imperative that the appraiser utilize the correct definition of market value. For appraisals prepared under these Standards, appraisers shall use the definition of market value found in Section 1.2.4 of these Standards.

This definition must be placed in this portion of the appraisal report. No other definition of market value for purposes of appraisals made under these Standards is acceptable,[118] unless otherwise required by a specific and cited federal law or regulation.

---

117  For a discussion of the legal requirements regarding the effective date of value, see Section 4.2.1.1.
118  For a discussion of the legal basis for this definition of market value and this specific requirement, see Section 4.2.

5-ER-817

The appraiser should describe the investigation and analysis that was undertaken in developing the appraisal. The geographical area and time span searched for market data should be included, as should a description of the type of market data researched and the extent of market data confirmation. The appraiser should state the references and data sources relied upon in developing the appraisal.

The applicability of all approaches to value shall be discussed and the exclusion of any approach to value shall be explained.

The appraiser has the burden of clearly identifying and explaining the implications of any hypothetical condition or extraordinary assumption adopted. The required explanation and discussion of the implications of such hypothetical conditions or extraordinary assumptions must be included in this portion of the appraisal report. Each hypothetical condition and extraordinary assumption must be labeled as such and any legal instructions must be included in the addenda of the report.

### 2.3.2. Factual Data—Before Acquisition.[119]

**2.3.2.1. Legal Description.** This description must be sufficiently detailed to properly identify the property appraised. If lengthy, it should be referenced and included in the addenda of the report. If the client agency has assigned a parcel or tract number to the property, that information should also be referenced. A more detailed standard concerning the legal description of the property to be appraised appears in Section 1.1.1 of these Standards.

**2.3.2.2. Area, City, and Neighborhood Data.** This data (mostly demographic and economic) must be kept to an absolute minimum and should only include information that directly affects the subject property, together with the appraiser's conclusions as to significant trends. The use of "boilerplate" demographic and economic data is unnecessary and, unless the appraiser demonstrates that the specific data directly impacts the current market value of the subject property, it should be excluded.

Changes in the neighborhood brought about by the government's project for which the property under appraisal is being acquired shall be disregarded. This specific Standard is contrary to USPAP Standards Rule 1-4(f) and is considered a jurisdictional exception. See Section 4.5 (Project Influence) for a discussion of the legal basis for this specific Standard.

**2.3.2.3. Property Data.**

**2.3.2.3.1. Site.** Describe the present use, accessibility and road frontage, land contours and elevations, soils, vegetation (including timber), views, land area, land shape, utilities, mineral deposits, water rights associated with the property, and relevant easements, etc. A statement must be made concerning the existence or nonexistence of commercially valuable mineral deposits.

---

[119] If the government's acquisition is a partial acquisition, it is imperative that the sections of the appraisal report in Section 2.3.2 relate only to the before situation. The appraiser must not attempt to combine the discussion of the factual data after acquisition with the factual data relating to the before situation.

Also discuss the beneficial and detrimental factors inherent in the location of the property.[120] The presence of hazardous substances should be addressed in accordance with Sections 1.3.1.1 of these Standards. An affirmative statement is required if the property is located within a flood hazard area.[121]

**2.3.2.3.2.    Improvements.** Describe the following: all improvements including their dimensions; square foot measurements, chronological and effective age, and dates of any significant remodeling/renovation; condition; type and quality of construction; and present use and occupancy. This description may be in narrative or schedule form. Where appropriate, a statement of the method of measurement used in determining gross building area and net rentable areas should be included. All site improvements, including fencing, landscaping, paving, irrigation systems, and domestic and private water systems require description. The appraiser should coordinate such description with the photographs of the property included in the report and with the plot plan (and floor plan, if included).  If the appraiser will rely on the cost approach to value, or if the acquisition is a partial acquisition that will structurally impact the improvements, a more comprehensive improvement description is required. These items are described in more detail in Section 2.3.7.

**2.3.2.3.3.    Fixtures.** All fixtures are to be described in narrative or schedule report form with a statement of the type and purpose of each. The current physical condition, relative utility, and obsolescence should be stated for each item or group included in the appraisal, and whenever applicable the repair or replacement requirements to bring the fixture to a usable condition.[122]

**2.3.2.3.4.    Use History.** State briefly the history of the use of the property as vacant and as improved. If improved, state the purpose for which the improvements were designed and the dates of original construction and major renovations, additions, and/or conversions. Include a 10-year history of the use and occupancy of the property.[123] If any of the foregoing information is indeterminable, the appraiser must report that fact.

**2.3.2.3.5.    Sales History.** Include a 10-year record of all sales and, if the information is available, any offers to buy or sell the subject property. If no sale of the property has occurred in the past 10 years, the appraiser must report the last sale of the property, irrespective of date.

Information to be reported must include the name of the seller, name of the buyer, date of sale,[124] price, terms and conditions of sale,  and the appraiser's verification of the sale and whether the transaction met the conditions required for a comparable sale under Section 1.5.2.2.

---

120  Beneficial factors may include such items as desirable views, proximity to desirable public or cultural facilities, or proximity to dedicated open space or greenbelts. Detrimental factors may include such items as offensive odors, undesirable land uses, contamination, and noxious weeds. Farm properties can be especially impacted by environmental factors such as noxious weeds, frost, incidence of hail, floods and droughts, and variations in crop yields. Appraisers should list and describe those beneficial and detrimental factors that may impact the utility and value of the land.

121  For this purpose, appraisers should refer to Federal Emergency Management Agency (FEMA) flood hazard maps.

122  *See* Section 1.3.1.2.

123  Past uses of the property may suggest its historical contamination by hazardous substances.

124  Terms and conditions of sale cannot, of course, be conclusively determined from the public record. Therefore, appraisers should confirm the sales of the subject property with one of the parties to the transaction.

**2.3.2.3.6.  Rental History.** Report the historical rental or lease history of the property for at least the past three years, if this information can be ascertained. All current leases should be reported, including the date of the lease, name of the tenant, rental amount, term of the lease, parties responsible for property expenses, and other pertinent lease provisions. The appraiser must describe the verification process and whether the lease(s) meets the conditions required for a comparable lease.

**2.3.2.3.7.  Assessed Value and Annual Tax Load.** Include the current assessment and dollar amount of real estate taxes. If assessed value is statutorily a percentage of market value, state the percentage.

Some jurisdictions have developed programs wherein property will be assessed based on its current use rather than its highest and best use. These programs often relate to farmlands, timberlands, and open space; for purposes of eligibility, owners may have to agree to leave the property in its existing use for a certain period of time.[125] In such a case, the appraiser should report both the current assessed value and taxes for the property's existing use and the estimated assessed value and tax load for the property at its highest and best use.

**2.3.2.3.8.  Zoning and Other Land Use Regulations.** Identify the zoning for the subject property. This must be reported in descriptive terms (e.g., multifamily residential, 5000 sq. ft. of land per unit) rather than by zoning code (e.g., MF-2). Other local land use regulations that have an impact on the highest and best use and value of the property, including setback requirements, off-street parking requirements, and open space requirements must be reported. The appraiser should also note any master or comprehensive land use plan in existence that may affect the utility or value of the property.

If the property was recently rezoned, that must be reported. The appraiser must determine whether such rezoning was a result of the government's project for which the subject property is being acquired. If so, the appraiser must justify this conclusion and disregard the rezoning.[126] If the rezoning of the property is imminent or probable, discuss in detail the investigation and analysis that led to that conclusion under Section 2.3.3.1 (Highest and Best Use).[127] The mere assertion by an appraiser that a property could be rezoned is insufficient.[128] In addition to zoning, the appraiser must identify all other land use and environmental regulations that have an impact on the highest and best use and value of the property.[129] The impact of the regulations must also be discussed in the highest and best use analysis. The appraiser must also discuss the impact of any private restrictions on the property, such as deed and/or plat restrictions.

**2.3.3.  Data Analysis and Conclusions – Before Acquisition.**

**2.3.3.1.  Highest and Best Use.** The appraiser's determination of highest and best use is one of the most important elements of the entire appraisal process. Therefore, appraisers must apply their skill with great care and clearly support the highest and best use conclusion in the appraisal report.

---

125  *See* Section 1.3.1.7.
126  For the legal basis for this standard, see Section 4.5.3. Under USPAP, invocation of this standard would result in an appraisal prepared under a hypothetical condition.
127  For a discussion of the extent of the required investigation that must be taken by the appraiser in this regard, see Section 1.3.1.3.
128  *See* Section 1.3.1.3.
129  *See* Section 1.3.1.3.

The highest and best use of the land, as if vacant, is addressed first. If the land is improved, the highest and best use of the property, as improved, is then addressed. In some cases, the highest and best use of property cannot be reliably determined without extensive marketability and/or feasibility studies, which in complex cases may require the assistance of special consultants.

**2.3.3.1.1. Four Tests.** The four tests of highest and best use are physically possible, legally permissible, financially feasible, and highest value. Each of these four criteria must be addressed in the appraisal report. The level of supporting data and analysis presented in the report for each criteria will depend in part on the complexity of the appraisal problem.

In all assignments, the appraiser must describe the analysis developed under Section 1.4 concerning the highest and best use of the property as if vacant. The physical characteristics of the property that impact value must be addressed. Property size, shape, topography, access, road frontage, and utilities are all examples of physical characteristics of a property that may influence use and value and should be described in adequate detail for the client and intended users to understand how they may influence the determination of highest and best use.

The appraiser must describe the legal constraints on the property that were identified and analyzed under Sections 1.3.1.3 and 1.4.5. Zoning requirements, height restrictions, setback and open space requirements, and all other legal constraints on the property should be described and their impact discussed. If the appraiser concludes a highest and best use that will require rezoning of the property, the investigations and analyses developed under Section 1.3.1.3 concerning the probability of obtaining that zoning change should be reported here in sufficient detail for the client and intended users to understand the reasons for the conclusion. If the appraiser concludes that the highest and best use requires some other form of government approval, the investigations and analyses developed under Sections 1.3.1.3 and 1.4.5 concerning the probability of obtaining those approvals must be described in sufficient detail for the client and intended users to understand the reasons for the conclusion.

The financial feasibility of those uses, which are both physically possible and legally permitted, should be addressed. All feasibility or comparative studies developed under Section 1 should be described here, so the client and intended users can understand those uses that may have been eliminated in that analysis. Finally, the appraiser should discuss the use of the property as if vacant, which results in the highest value, and the analysis that supports that conclusion. The appraiser should identify the timing of the use and the likely purchaser and user.

If the property contains improvements, the appraiser must address the highest and best use as improved. The same process described above should be followed. This analysis is focused on the contribution of the improvements to the property overall, taking into account the highest and best use of the property as if vacant. After addressing each of the four tests and making a determination of the highest and best use as improved, the appraiser should identify the timing of the use and the likely purchaser and user.

**2.3.3.1.2.  Larger Parcel.** In every appraisal report prepared under these Standards, the appraiser must describe the factual basis and analysis underlying the conclusion of the larger parcel analysis. The three tests developed under the larger parcel analysis—unity of highest and best use, unity of title, and contiguity—should be addressed here.[130] Each of the three tests (with emphasis on the unity of highest and best use) must be reported in sufficient detail for the client and intended users to fully understand the factual and analytical basis for the conclusion.

**Application of the Approaches to Value**

**2.3.3.2.      Land Valuation.** The appraiser shall report the opinion of value of the land for its highest and best as if vacant and available for such use. See Sections 1.5.1 and 4.4.2 for a detailed discussion concerning the approaches to value and the legal foundation for these Standards. In all assignments, the sales comparison approach is the preferred valuation approach for forming an opinion of the market value of the land as if vacant. However, in some assignments the subdivision development method may be appropriate. The following sections describe the reporting requirements for the land valuation process.

**2.3.3.2.1.  Sales Comparison Approach.** In reporting the results of the sales comparison approach for land valuation, the appraiser shall provide detailed descriptions of confirmed sales of lands that have the same or similar highest and best use as the subject property. The description of each sale transaction used as a comparable sale should at a minimum include the date of the transaction, the price paid, the name of the seller, the name of the buyer, the size of the property, the location of the property, the zoning or other legal constraints on the property, and a description of the physical characteristics of the property.  The person with whom the transaction was verified should also be identified.

Differences between the comparable sales and the subject property shall be considered and adjustments made to the sales to address these differences. Items of comparison shall include property rights conveyed, financing terms, conditions of sale, market conditions, location, physical characteristics, economic characteristics, legal characteristics, and non-realty components of value.  The adjustments must be summarized in an adjustment grid and each adjustment (whether qualitative or quantitative) should be supported with market data.  The data and analysis must provide sufficient detail for the client and intended users to understand the data, the analysis, and the logic of the appraiser's opinion of market value for the subject land as if vacant.

**2.3.3.2.2.  Subdivision Development Method.** In those circumstances where the property has a highest and best use for subdivision purposes and the appraiser has developed the subdivision development method, the report must address all of the factors and assumptions used in sufficient detail for the client and intended users to understand the outcome of this method. The market support for each factor (lot sale price, absorption rate, development costs, expenses, time lag, and discount rate) used in this analysis must be clearly presented in the report. The discounted cash flow analysis prepared as part of this analysis must be included in the report.

---

130   See Sections 1.5.3, 4.3.3, and 4.3.4 for an in-depth discussion of the analysis required and the legal basis for the larger parcel analysis.

**2.3.3.3.    Cost Approach.** This portion of the report should be in the form of computational data, arranged in sequence, beginning with reproduction or replacement cost. The report should state the source (book and page—including last date of page revision—if a national service) of all figures used. Entrepreneur's profit, as an element of reproduction or replacement cost, must be considered and discussed and if applicable, should be derived from market data whenever possible. If the appraiser retained the services of a contractor or professional cost estimator to assist in developing the reproduction or replacement cost estimate, this data should be referenced and the estimator's report included in the addenda of the appraisal report.

The dollar amount of depreciation from all causes, including physical deterioration, functional obsolescence, and economic or external obsolescence shall be explained and deducted from reproduction or replacement cost. See Section 1.5.3 for a discussion concerning the preferred methods of estimating depreciation under these Standards.

**2.3.3.4.    Sales Comparison Approach.** Each appraisal report must contain a sufficient description of the comparable sales[131] used so that it is possible for the reader to understand the conclusions drawn by the appraiser from the comparable sales data. Photographs of the comparable sales are valuable visual aids that indicate the comparability of the property recently sold with the subject property. Such photographs must accompany each appraisal report not only to aid the review appraiser but also for the agency's records and for later use in possible condemnation litigation. In addition to the identification of the property, every photograph should show the date taken and the name of the person taking the photograph.

Documentation of each comparable sale shall include the name of the buyer and seller, date of sale, legal description,[132] type of sale instrument, document recording information, price, terms of sale, location, zoning, present use, highest and best use, and a brief physical description of the property. A plot plan or sketch of each comparable property should be included, not only to facilitate the reader's understanding of the relationship between the sale property and the subject property, but also to locate the sale property in the field. This information may be summarized for each sale on a <u>comparable sales form</u> and included in this section or in the addenda of the report. As noted, a photograph of each comparable sale shall also be included. A comparable sales map showing the relative location of the comparable sales to the subject property[133] shall be included, either in this section or in the addenda of the report. Inclusion of a copy of the transfer document (e.g., deed, contract) in the report is neither required nor desirable, unless there is something in the document that is unusual or particularly revealing.

As discussed in Section 1.5.2.3, the preferred method of adjusting comparable sales is through the use of quantitative adjustments (whenever adequate market data exists to support them). Only when adequate market data does not exist to support quantitative adjustments should the appraiser resort to qualitative adjustments (i.e., inferior, superior). Appraisers must bear in mind that quantitative and qualitative adjustments are not mutually exclusive methodologies. Because

---

131   See Section 1.5.2 for discussion of Selection and Verification of Comparable Sales, The Adjustment Process, and Sales Requiring Extraordinary Verification.

132   This may be abbreviated if lengthy, or reference may be made to a tax parcel number.

133   It is important that the locations of the comparable sales and the subject property are shown on the same map so that a reader of the report who may not be familiar with the area can understand the relative proximity of the properties and locate them in the field.

one factor of adjustment cannot be quantified by market data does not mean that all adjustments to a sale property must be qualitative. All factors that can be quantified should be adjusted accordingly. When quantitative and qualitative adjustments are both used in the adjustment process, all quantitative adjustments should be made first. When using quantitative adjustments, appraisers must recognize that not all factors are suitable for percentage adjustments. Percentage and dollar adjustments may and often should be combined.[134] Each item of adjustment must be carefully analyzed to determine whether a percentage or dollar adjustment is appropriate.

When appraisers must resort to qualitative adjustments, they must recognize that this form of comparative analysis will often require more extensive discussion of the appraiser's reasoning. This methodology may also require the presentation of a greater number of comparable sales. It is essential, of course, that the appraiser specifically state whether each comparable sale is generally either overall superior or inferior to the property under appraisal. To develop a valid indication of value of the property under appraisal by the use of qualitative analysis, it is essential that the comparable sales utilized include both sales that are overall superior and overall inferior to the subject property. If this is not done, the appraiser will have merely demonstrated that the property is worth more than a certain amount (if all of the sales are inferior to the subject property) or less than a certain amount (if all of the sales are superior to the subject property).

In developing a final opinion of value by the sales comparison approach, the appraiser shall explain the comparative weight given to each comparable sale, no matter whether quantitative or qualitative adjustments or a combination thereof are used. A comparative adjustment chart or graph is required and may assist appraisers in explaining their analysis in this regard.

**2.3.3.5.  Income Capitalization Approach.** The appraisal report shall include adequate factual data to support each figure and factor used and should be arranged in detailed form to show at least (1) estimated gross economic (or market) rent, or income; (2) allowance for vacancy and credit losses; (3) an itemized estimate of total expenses; and (4) an itemized estimate of the reserves for replacements, if applicable. Section 1.5.4 discusses the income capitalization approach in detail.

Capitalization of net income shall be at the rate prevailing for this type of property and location. The capitalization technique, method, and rate used should be explained in narrative form and supported by a statement of the sources of rates and factors. The preferred source of an applicable capitalization rate is from actual capitalization rates reflected by comparable sales.[135]

As with a recent and unforced sale of the subject property (see Section 2.3.3.4), if the property is actually rented, its current rent is often the best evidence of its economic (or market) rent and should be given appropriate consideration by the appraiser in developing an opinion of the gross economic rent of the property. Likewise, the appraiser should attempt to obtain at least the last three years' historical income and expense statements for the property. These

---

134   For instance, a percentage adjustment for market conditions (time) may be appropriate, but an adjustment for the fact that the subject property is 300 feet from a sewer connection and all of the comparable sales are connected to sewer should often be made in a lump sum dollar amount to reflect the cost to cure the subject property's comparative deficiency. If a percentage adjustment were applied to the price-per-unit (e.g., per acre, per square foot) of each comparable, the adjustment to each of the comparable sales would vary depending on the price-per-unit of the comparable and might have no relationship to the cost to cure the subject's deficiency.

135   *See* Section 4.4.4.

can generally be developed into a reliable reconstructed operating statement. If this historical income and expense information is available, it should be included in this portion of the appraisal report or in the addenda.

**2.3.3.6.**   **Reconciliation and Final Opinion of Market Value.** The appraiser must explain the reasoning applied to arrive at the final opinion of value and how the results of each approach to value were weighed in that opinion, and the reliability of each approach to value for solving the particular appraisal problem. See Section 1.6.

The appraiser shall also state the final opinion of value of all of the property under appraisal as a single amount, including the contributory value of fixtures, timber, minerals, and water rights, if any. The appraiser must avoid making a summation appraisal.[136] The appraiser is solely responsible for the final opinion of value. If that value opinion includes elements of value that were based on estimates developed by others (e.g., timber cruisers, mineral appraisers), the appraiser cannot merely assume their accuracy. The reasonableness of the subsidiary estimates must be confirmed in accordance with Section 1.13.

**2.3.4.**   **Factual Data—After Acquisition (Partial Acquisitions Only).**

**2.3.4.1.**   **Legal Description.** The legal description of the remainder property shall be included. If a legal description of the remainder property is not available, appraisers may develop their own by utilizing the before acquisition legal description and excluding from it the legal description of the real estate acquired by the government.

If the *estate acquired* is less than a fee interest (e.g., an easement), the legal description under Section 2.3.2.1 may be referenced and the legal description of the property encumbered by the estate acquired should be included. If lengthy, the legal description should be briefly referenced and the full legal description should be included in the report's addenda.

**2.3.4.2.**   **Neighborhood Factors.** The appraiser shall describe the government project for which the property is being acquired and its impact, if any, on the neighborhood and the remainder property. The degree of detail regarding the government's project included in this section should relate directly to the complexity of the government's project and its impact on the remainder property.[137] The aspects of the government's project that will result in damages to the remainder property should be described in specific detail.

---

136   *See* Section 4.2.2.

137   For example, in a fee acquisition of a portion of the property for inclusion in a wildlife refuge without any substantial construction, the description of the government's project could probably be brief. If, on the other hand, the government's acquisition was a permanent easement through the parcel for construction of a flood control levee with associated temporary construction easements, a detailed description of the government's project may be necessary. Such a description might include such things as height of the levee; width at the base and at the top of the levee; degree of side slopes of the levee; finish material (e.g., riprap, seeded soil) of the slopes; any provisions for access over the levee; any provisions for drainage; duration of temporary construction easements and the use to which the government will put the easement areas during construction; anticipated condition of the temporary construction easement areas at termination; and anticipated impact on future flooding, as compared to historical flooding.

---

5-ER-825

**2.3.4.3.   Property Data.**

**2.3.4.3.1.   Site.** The appraiser must describe the remainder site, paying particular attention to the shape, size, available utilities, and available access to the remainder site, addressing all requirements listed in Section 2.3.2.3.1.

**2.3.4.3.2.   Improvements.** The appraiser must describe those improvements remaining in whole or in part, addressing all requirements listed in Section 2.3.2.3.2.

**2.3.4.3.3.   Fixtures.** The appraiser must describe those fixtures remaining, addressing all requirements listed in Section 2.3.2.3.3.

**2.3.4.3.4.   History.** If the appraisal is prepared after the date of acquisition, the appraiser must report the utilization of the remainder property since the date of acquisition as well as any sales or rentals of the remainder property, addressing all requirements listed in Sections 2.3.2.3.4 (Use History), 2.3.2.3.5 (Sales History), and 2.3.2.3.6 (Rental History).

**2.3.4.3.5.   Assessed Value and Tax Load.** The appraiser must estimate what the assessed value and annual tax load will be on the remainder property. This estimate is particularly critical if the income capitalization approach is to be utilized in developing an opinion of the value of the remainder property. In this connection, discussions with local assessing authorities are often helpful in making these estimates. All requirements listed in Section 2.3.2.3.7 must be addressed.

**2.3.4.3.6.   Zoning and Other Land Use Regulations.** The appraiser must report the influence of zoning and other land use regulations on the remainder property.[138] Specific attention should be given to the probability of a rezone, either up or down, of the property caused by the government's project and the possibility that because of the acquisition, the remainder property has become nonconforming to land use regulations in areas such as lot area requirements, setbacks, and off-street parking. All requirements in Section 2.3.2.3.8 must be addressed.

**2.3.5.   Data Analysis and Conclusions—After Acquisition (Partial Acquisitions Only).**

**Introductory Note:** These analyses and valuation sections relating to the remainder property constitute a new appraisal. In cases of an insignificant taking, the remainder may be so similar to the larger parcel before the acquisition that the same highest and best use analysis and the same cost, market, and income data and analysis will remain applicable and can therefore be referenced and employed in reporting the opinion of the market value of the remainder property. However, a change in the basic physical or economic character of the remainder may result in a change in the remainder's highest and best use or the intensity of that use and may result in damages or benefits, which will require different market data and/or analysis than that which was used in the larger parcel valuation.[139]

---

138   *See* Sections 2.3.2.3.4 to 2.3.2.3.6 and Section 2.3.2.3.8.
139   *See* Section 4.3.4.5.

**2.3.5.1.    Analysis of Highest and Best Use.** The appraiser shall state and explain the highest and best use of both the remainder land (as if vacant) and the remainder property (as improved). Impacts of the acquisition on the property's highest and best use or the intensity of that use shall be specifically addressed and described. If restoration or rehabilitation of the remainder property will be required before it can be put to its highest and best use, the physical and economic feasibility of such restoration or rehabilitation shall be explained and justified. Major restoration or rehabilitation may require the services of an expert in the field, such as an architect, engineer, and/or contractor.[140] If the acquisition includes a temporary construction easement, or other temporary property interest, the effect of such temporary acquisition on the remainder property's highest and best use must be discussed.[141]

**2.3.5.2.    Land Valuation.** The appraiser will develop an opinion of the market value of the remainder land for its highest and best use as if vacant and available for such use.[142]

If the acquisition includes one or more temporary construction easements, the impact of those easements on the value of the remainder property must be accounted for in the valuation of the land after acquisition. Any diminution in the remainder land value by reason of the temporary easements must be measured in accordance with Section 1.9.1, and then be used as the basis for an adjustment to the remainder's land value in this section of the report. The diminution in the remainder's land value by reason of temporary easements should not be treated as an additive to be added to the difference between the before and after value of the property.

**2.3.5.3.    Cost Approach** – See Section 2.3.3.3.

**2.3.5.4.    Sales Comparison Approach** – See Section 2.3.3.4.

**2.3.5.5.    Income Capitalization Approach** – See Section 2.3.3.5.

**2.3.5.6.    Reconciliation and Final Opinion of Market Value.** The appraiser must describe the reasoning applied to arrive at the final opinion of value of the remainder property, addressing all the requirements in Section 2.3.3.6.

**2.3.6.    Acquisition Analysis (Partial Acquisitions Only).** This part of these Standards is applicable only in partial acquisition appraisals. The requirements in Sections 2.3.6.2 and 2.3.6.3 are identified to assist agencies in meeting their obligations under the Uniform Act. If the appraisal report is being prepared for condemnation trial purposes, trial counsel for the United States may instruct the appraiser to omit these sections.

**2.3.6.1.    Recapitulation.** The appraiser must report the difference between the value of the larger parcel and the value of the remainder by deducting the property's after value from its before value.

---

140  *See* Section 1.13.
141  *See* Section 1.9.1.
142  For requirements of land valuation, see Section 2.3.3.2.

**5-ER-827**

**2.3.6.2.** **Allocation and Damages.** Damages, as such, are not appraised. However, the appraiser shall briefly explain any damages to the remainder property and allocate the difference in the value of the property before and after the acquisition between the value of the acquisition and damages to the remainder. The appraiser should note that such allocation is an accounting tabulation and not necessarily indicative of the appraisal method employed.

If damages have been measured by a <u>cost to cure</u>, the appraiser must justify the cost to cure[143] and demonstrate that the cost to cure is less than the damage would be if the cure was not undertaken.

**2.3.6.3.** **Special Benefits.** The appraiser shall identify any special or direct benefits accruing to the remainder property and explain how and why those benefits have occurred.

**2.3.7.** **Exhibits and Addenda.**

**Legal Instructions.** Any legal instructions must be presented.

**Location Map.** This exhibit should display the location of the subject property within the city or area in which the property is located. All maps should include a north arrow and the identification of the subject property.

**Comparable Data Maps.** These maps might include, among other items, a comparable land sales map, a comparable improved sales map, and a comparable rentals map. The maps should include a north arrow and show the locations of both the comparable sales and/or rentals and the subject property. If this requires the use of a map that is not of a readable scale, secondary maps showing the specific location of each comparable should be included.

**Details of Comparable Sales and Rental Data.** This data may be included in the body of the report. Photographs of each comparable property must be included.

**Plot Plan.** A plot plan should help the reader to visualize the property and the scope of the appraisal considerations. The plot plan should depict the entire subject property, including dimensions and street frontages. Structural improvements should be shown in their approximate locations; significant on-site improvements and easements should also be shown. The dimensions of improvements should be noted. The plot plan should include a directional north arrow. The location from which each of the subject photographs was taken should be identified on the plot plan, as well as the photograph identification number and the direction in which the photo was taken.

In a partial acquisition, the plot plan should identify the remainder area and its dimensions. Any significant construction features of the government project for which the property is being acquired should be shown. If the subject property or area acquired is complex, a separate plot plan of the remainder property may be desirable.

---

143  This may require the services of a consultant. *See* Section 1.13.

**Floor Plan.** Floor plans are required only for reports related to leasehold acquisitions or when they are necessary to describe a unique property feature.

**Title Evidence Report.** If the agency provided a title evidence report to the appraiser it should be included, but if it is lengthy it may be referenced.

**Other Pertinent Reports and Exhibits.** These would include, for example, any written instructions given to the appraiser by the agency or its legal counsel, any specialist reports (such as timber appraisals, environmental studies, mineral or water-rights studies or appraisals, reproduction cost estimates, cost to cure estimates, fixture valuations), any pertinent title documents (such as leases or easements), and any charts or illustrations that may have been referenced in the body of the report.

**Qualifications of the Appraiser.** Include the qualifications of all appraisers or technicians who made significant contributions to the completion of the appraisal assignment. If appraisal reports are being prepared for trial purposes, appraisers must ensure that the content of their qualifications conform with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

**2.4.**      **Reporting Requirements for Leasehold Acquisitions.** The reporting Standards presented above provide the framework for reporting the results of an appraisal developed for a leasehold acquisition. The following are additional reporting requirements that apply to these special assignments.

**2.4.1.**      **Property Rights Appraised.** The terms of the leasehold estate acquired must be clearly discussed in the appraisal. Any differences between the government's lease and typical leases in the market must be described and analyzed. The analysis should address all of the differences identified in Section 1.8.

**2.4.2.**      **Improvements Description.** The description of the improvements must address all exterior and interior features of the building improvements in which the leasehold will be located. The physical location of the government's leasehold space within the building must be described in sufficient detail to allow the client and intended users to understand the impact (if any) of the government's leasehold on the rest of the building.

**2.4.3.**      **Highest and Best Use and Larger Parcel.** The appraiser must describe the factual basis and analysis concerning the highest and best use of the building in which the government's leasehold is located, including those situations in which the leasehold is the entire building. This analysis is critical in determining the position of the building within the market. This analysis is critical in situations where the property is located in a market in transition. The appraiser must also present the larger parcel analysis developed under Section 1.8. The result of this analysis will dictate whether a before and after valuation must be performed.

**2.5.**      **Project Appraisal Reports.** Some government projects require the acquisition of many parcels of real property, and individual appraisers are assigned to appraise a number of these

5-ER-829

properties at the same time. On occasion, it is logical to include the appraisal of more than one parcel in a single report. Such <u>project appraisal reports</u> (or <u>multiple-parcel appraisal reports</u>) are not appraisal shortcuts; they are clerical shortcuts. A separate opinion of market value must still be *developed* for each acquisition; but the results of each valuation can be *reported* in a more efficient form. Project appraisal reports that meet the criteria set forth here may be acceptable for agency negotiation purposes under the Uniform Act and for initial review purposes by the Department of Justice.

Project appraisal reports are rarely conducive to litigation purposes, as they typically contain opinions of value of properties owned by persons not parties to the lawsuit and introduce a myriad of collateral issues.[144] But they can be a useful tool to assist in fair and efficient acquisitions for agencies engaged in large projects in which the vast majority of acquisitions can be completed voluntarily without condemnation litigation.

**A project appraisal report may be appropriate if:**

(1)  All parcels are <u>total acquisitions</u> OR all are partial acquisitions of a nominal and/or consistent nature;

(2)  All parcels are <u>vacant</u> OR all have <u>similar improvements</u>;

(3)  All parcels are located within a geographic area with a relatively similar land use pattern;

(4)  All parcels have the same or similar <u>highest and best use</u>;

(5)  The most relevant approach to value is the same for all parcels; and

(6)  The <u>same array of market data</u> can be relied on in the valuation of each parcel.

The project appraisal report consists of three major parts: **<u>Part I</u>** contains an introduction, factual data, and analysis relating to all properties included in the report; **<u>Part II</u>** includes the individual parcel reports; and **<u>Part III</u>** provides addenda and exhibits relating to all properties included in the report.

### <u>Part I—Introduction, General Factual Data, and Analysis</u>

(1)  **Title Page.** This should include the government project title, the number of individual parcels included in the report, the name and address of the individual(s) making the report, and the date on which the appraisals were prepared.

(2)  **Letter of Transmittal.** This should include the date of the letter; identification of the government project; the number of parcels included in the appraisal report; statement of the range of effective dates of the appraisals; identification of any hypothetical conditions, extraordinary assumptions, limiting conditions or **<u>legal instructions</u>** relating to all parcels included in the report; and the appraiser's signature.

(3)  **Table of Contents.** The major parts of the appraisal report and their subheadings shall be listed. The location of each individual parcel report shall be specifically identified and items in the addenda of the report shall be individually listed in the table of contents.

(4)  **Executive Summary.** The appraiser should report the value findings for each parcel

---

144  For the same reasons, project appraisal reports generally should not be used for acquisitions in which an agency will need to release the underlying appraisals to comply with specific statutory or other requirements, unless the agency and the appraiser are prepared to significantly revise the appraisal scope of work. *See* Section 1.2.6.

appraised. These findings should include the agency-assigned parcel number, the owner of the property, the effective date of the value estimate(s), and the value conclusion(s). In partial acquisitions, the before value, after value, and difference should be shown. If the project appraisal encompasses a larger number of parcels, it is desirable to include a second summary listed alphabetically, by owners' names.

(5)  **Statement of Assumptions and Limiting Conditions.** The requirements of Section 2.3.1.7 must be addressed. All assumptions and limiting conditions that universally apply to the appraisal of all parcels in the project appraisal report must be listed. Assumptions and limiting conditions that are not applicable to all parcels included in the project appraisal report should not be included in this section, but rather should be noted in the individual parcel reports.

(6)  **Scope of Work.** The requirements of Section 2.3.1.8 must be addressed.

(7)  **Area, City, and Neighborhood Data.** The requirements of Section 2.3.2.3.2 must be addressed. In partial acquisitions, this discussion should be clearly broken down into two subsections: before the acquisitions and after the acquisitions.

(8)  **Zoning and Other Land Use Regulations.** Include a general discussion of the zoning and other land use regulations that affect all parcels in the report. General trends in land use regulations in the area and recent zoning activity should be discussed. In partial acquisitions, this discussion should be clearly broken down into two subsections: before the acquisitions and after the acquisitions.

(9)  **Analysis of Highest and Best Use.** The general content requirements of Section 2.3.3 must be addressed. Inasmuch as all parcels in the report will have the same or similar highest and best use, the appraiser should discuss and develop the highest and best use of the parcels in this section. If, after in-depth analysis an appraiser determines that the highest and best use of a parcel is not the same as or similar to that of the other parcels to be included in the report, the unique parcel should be excluded from the project report and a separate narrative appraisal report should be prepared for this unique parcel in accordance with Section 2.3 of these Standards. In partial acquisitions, this discussion should be clearly divided into two subsections: before the acquisitions and after the acquisitions.

(10)  **Discussion of Approaches to Value.** The appraiser should discuss the standard approaches to value and their applicability or non-applicability to the subject parcels in the project appraisal report. If any modification to the typical application of the approaches to value is required, such modification should be discussed. In partial acquisitions, this discussion should be clearly broken down into two subsections: before the acquisitions and after the acquisitions.

(11)  **Land Valuation.** The appraiser should identify, describe, and discuss all comparable land sales that will be used in the individual parcel reports. A discussion of how the

5-ER-831

comparable sales will be used in the individual reports can be included in this section of the report. Reference should be made to comparable sales data sheets, photos, and a comparable sales map, which shall be included in the addenda of the report.

Universal adjustments to the comparable sales should be discussed and developed in this section of the report. Adjustments classified as universal would include such adjustments as time (or market conditions), cash equivalency, and those adjustments that are not subject property dependent. Also, the general results of any study relating to land value (e.g., a size adjustment study) developed under item (15) (Special Studies) should be discussed. In partial acquisitions, this discussion should be clearly divided into two subsections: before the acquisitions and after the acquisitions.

If a parcel requires land valuation by means other than comparable sales, as a general rule that parcel is not appropriate for inclusion in a project report.

**(12) Cost Approach.** The appraiser should describe the methodology used to develop reproduction or replacement cost and depreciation estimates. If a national cost service has been used in estimating reproduction or replacement costs, that publication should be specifically identified. If entrepreneur's profit has been included in reproduction or replacement cost, its derivation should be explained.

If depreciation studies using the market extraction or sales comparison method have been developed, their content and development should be discussed and the general conclusions reached should be reported. Discussion of partial acquisitions should be clearly divided into two subsections: before the acquisitions and after the acquisitions.

**(13) Sales Comparison Approach.** The appraiser should identify, describe, and discuss all improved property comparable sales that will be used in the individual parcel reports. A discussion of how the comparable sales will be used in the individual reports can be included in this section of the report. Reference should be made to comparable sales data sheets, photos, and a comparable sales map, which shall be included in the addenda of the report. Universal adjustments to the comparable sales should be discussed and developed in this section of the report. Adjustments classified as universal would include time, market conditions, cash equivalency adjustments; i.e., those adjustments that are not subject property dependent. The discussion of partial acquisitions should be clearly divided into two subsections: before the acquisitions and after the acquisitions.

**(14) Income Capitalization Approach.** The appraiser should identify, describe, and discuss all comparable rental properties to be used in the individual parcel reports. A discussion of how the comparable rentals will be used in the individual reports can be included in this section of the report. Reference should be made to comparable rental data sheets, photos, and a comparable rentals map, which shall be included in the addenda of the report.

Because a high degree of similarity exists between all individual parcels included in the project report, capitalization rates applicable to each should be the same or fit into a relatively narrow bracket. Therefore, the development of applicable capitalization rates should be presented in this section of the report. Discussion of partial acquisitions should be clearly broken down into two subsections: before the acquisitions and after the acquisitions.

**(15)** **Special Studies.** Present any special studies that are appropriate and apply to all, or most, of the individual parcels included in the project appraisal report. Such studies might include easement studies (the impact of easements on encumbered areas and abutting unencumbered areas), size adjustment studies, proximity studies (impact on remainder property values due to proximity to various public improvements), land lock studies, special benefit studies, and project influence studies. These studies may relate to the before situation, the after situation, or both, and are in addition to the capitalization rate, time or market conditions, entrepreneurial profit, depreciation, and cash equivalency studies previously mentioned.

### Part II—Individual Parcel Report

Each individual parcel report should contain the following information. In partial acquisitions, item (26) through (34) should be repeated in the after situation, which is further discussed in Section 2.3.4.

**(16)** **Title Page.** See Section 2.3.1.1 for content requirements.

**(17)** **Table of Contents.** See Section 2.3.1.3 for content requirements.

**(18)** **Appraiser's Certification.** See Section 2.3.1.4 for content requirements.

**(19)** **Summary of Salient Facts and Conclusions.** See Section 2.3.1.7 for content requirements.

**(20)** **Photographs of Subject Property.** See Section 2.3.1.6 for content requirements.

**(21)** **Statement of Assumptions and Limiting Conditions.** The appraiser should state that the assumptions and limiting conditions stated in item (5) of Part I of the project report are applicable to this parcel. If any additions, modifications, or deletions to the general assumptions and limiting conditions are necessary, they shall be noted.

**(22)** **Scope of Work.** The appraiser should state that the scope of work for this appraisal stated in item (6) of Part I of the project report is applicable to this parcel. If any additions, modifications, or deletions to the general discussion are necessary, they shall be noted.

**(23)** **Executive Summary.** The appraiser should discuss any specific appraisal problem unique to the individual subject parcel and briefly describe its treatment.

**(24) Legal Description.** See Section 2.3.2.1 for content requirements.

**(25) Area, City, and Neighborhood Data.** The appraiser should reference the area, city, and neighborhood data in item (7) of Part I of the project report, discuss the parcel's location within the neighborhood, and note any specific neighborhood factors uniquely affecting the subject parcel.

**(26) Property Data.**

   a.  <u>Site</u>. See Sections 2.3.2.3.1 and 2.3.4.3.1 for content requirements.
   b.  <u>Improvements</u>. See Sections 2.3.2.3.2 and 2.3.4.3.2 for content requirements.
   c.  <u>Fixtures</u>. See Sections 2.3.2.3.3 and 2.3.4.3.3 for content requirements .
   d.  <u>Use History</u>. See Sections 2.3.2.3.4 and 2.3.4.3.4 for content requirements.
   e.  <u>Sales History</u>. See Sections 2.3.2.3.5 and 2.3.4.3.4 for content requirements.
   f.  <u>Rental History</u>. See Sections 2.3.2.3.6 and 2.3.4.3.4 for content requirements.
   g.  <u>Assessed Value and Annual Tax Load</u>. See Sections 2.3.2.3.7 and 2.3.4.3.5 for content requirements.
   h.  <u>Zoning and Other Land Use Regulations</u>. The appraiser should reference the discussion of zoning and other land use regulations in Part I, item (8) of the project report. If additions, modifications, or deletions from that general discussion are required as they relate to the specific parcel, this should be noted.

**(27) Analysis of Highest and Best Use.** The appraiser should reference the discussion of highest and best use in item (9) of Part I of the project appraisal report and relate that discussion specifically to the subject parcel. The appraiser shall specifically state the highest and best use of the property, both in the before and after situations if a partial acquisition, and thoroughly explain the reasoning that led to the conclusion.

**(28) Land Valuation.** For content requirements, see Section 2.3.3.2. The appraiser should reference the data and discussion of land sales in item (11) of Part I of the project appraisal report and shall specifically identify which of those sales are most comparable to the parcel under appraisal and have been relied upon in developing an opinion of the parcel's value. A comparative analysis between each of the selected comparable sales and the subject property shall be included.

If adjustments are based on universal adjustments and/or studies discussed and developed in Part I of the appraisal, the discussion or study should be specifically referenced and related to the subject property.

**(29) Value Indication by the Cost Approach.** For content requirements, see Section 2.3.3.3. The appraiser should reference the general discussion of the cost approach in item (12) of Part I of the project report. If computations or estimates are based on studies discussed and developed in Part I of the project appraisal report, the studies should be specifically referenced and related to the subject parcel.

**5-ER-834**

(30) **Value Indication by the Sales Comparison Approach.** For content requirements, see Section 2.3.3.4. The appraiser should reference the data and discussion of the whole property sales in item (13) of Part I of the project appraisal report and shall specifically identify which of these sales are most comparable to the subject parcel and have been relied upon in developing an opinion of the parcel's value. A comparative analysis between each of the selected comparable sales and the subject property shall be included.

If adjustments are based on universal adjustments and/or studies discussed and developed in Part I of the project appraisal report, the discussion or study should be specifically referenced and related to the subject property.

(31) **Value Indication by the Income Capitalization Approach.** For content requirements, see Section 2.3.3.5. The appraiser should reference the data and discussion of whole property rentals in item (14) of Part I of the project appraisal report and shall specifically identify which of those rentals are most comparable to the subject parcel and have been relied upon in developing an opinion of the parcel's economic (or market) rent. A comparative analysis between each of the selected comparable rentals and the subject property shall be included.

If the capitalization rate selected for the subject property is based on studies discussed and developed in Part I of the project appraisal report, the study should be specially referenced and related to the subject property.

(32) **Reconciliation and Final Opinion of Value.** For content requirements, see Section 2.3.3.6.

(33) **Acquisition Analysis.** In a partial acquisition, the appraisal report shall include an analysis of the government's acquisition in accordance with the requirements of Section 2.3.6 of these Standards.

(34) **Exhibits and Addenda.** For content requirements, see Section 2.3.7 of these Standards.

    a.  <u>Location Map</u>
    b.  <u>Comparable Data Maps</u>. If the comparable data maps included in Part III of the project report are not clear enough to ensure complete understanding of the relationship between the subject property and the comparable data relied on in the individual parcel report, comparable data maps should be included in the addenda of the individual parcel reports.
    c.  <u>Details of Comparable Sales and Rental Data.</u> Detailed comparable data sheets must be included in Part III of the project report. Those comparable data sheets relating to the specific comparable sales and/or rentals relied on in estimating the value of the individual parcel may also be included here for ease of reference.

    d.   Plot Plan
    e.   Floor Plan
    f.   Title Evidence Report
    g.   Other Pertinent Reports and Exhibits

### Part III—General Exhibits and Addenda

Exhibits and addenda items should relate to all or most of the parcels included in the project appraisal report. Exhibits and addenda items relating only to one or a small portion of the parcels appraised should be included in the addenda of the individual parcel reports.

**(35)** **Location Map.** (Within the city or area.) All maps should include a north arrow and the identification of the subject parcels.

**(36)** **Comparable Data Maps.** These maps might include, among others things, a comparable land sales map, a comparable improved sales map, and a comparable rentals map. The maps should include a north arrow that shows the locations of the comparable sales and/or rentals, and shows the parcels appraised. If this requires use of a map that is not of a readable scale, secondary maps showing the specific location of each comparable relied on in making the individual parcel appraisals should be included in the addenda of the individual parcel reports.

**(37)** **Detail of Comparable Sales and Rental Data.** See Section 2.3.7.

**(38)** **Other Pertinent Exhibits.** These would include, for example, any written instructions given the appraiser by the agency or its legal counsel relating to all parcels in the project report, such as environmental studies relating to all parcels; fixture, timber, and/or mineral appraisals relating to multiple parcels; and any charts or illustrations that may have been referenced in the body of the report and relate to all or most of the parcels in the project report.

**(39)** **Qualifications of Appraiser.**

# 3. APPRAISAL REVIEW

**3.1.** **Introduction.** The appraisal review process in federal acquisitions should be developed and reported in conformity with these Standards, which are compatible with standards and practices of the appraisal profession and with the current edition of USPAP. This Section of the Standards addresses the types of reviews completed by government appraisers (technical reviews and administrative reviews) as well scope of work considerations.

**3.1.1.** **Government Review Appraisers.** Government review appraisers are often assigned administrative duties in addition to the technical review of individual appraisal reports. Those administrative duties vary from agency to agency and may range from contract administration or counseling management for general valuation issues to assisting the agency to meet both its non-appraisal and appraisal obligations under the Uniform Act. Some of these duties may fall outside the scope of <u>valuation services</u> as defined in USPAP.[145] These administrative duties are also considered to fall outside the scope of these Standards and are therefore not covered in the following discussion.

The review of appraisal reports by a qualified reviewing appraiser is required. The federal regulations implementing the Uniform Act require agencies to have an <u>appraisal review process</u> that at a minimum requires the following:

(a)   A *qualified review appraiser* shall examine the presentation and analysis of market information in all appraisals to ensure that they meet all applicable appraisal requirements and support the appraiser's opinion of value. The level of review analysis depends on the complexity of the appraisal problem. As needed, the review appraiser shall, prior to acceptance, seek necessary corrections or revisions.

The review appraiser shall identify each appraisal report as *recommended* (as the basis for the establishment of the amount believed to be just compensation), *accepted* (meets all requirements, but not selected as recommended or approved), or *not accepted*.

If authorized by the agency to do so, the staff review appraiser shall also *approve* the appraisal (as the basis for the establishment of the amount believed to be just compensation), and if also authorized to do so, develop and report the amount believed to be just compensation.

(b)   If the review appraiser is unable to recommend (or approve) an appraisal as an adequate basis for the establishment of the offer of just compensation and it is determined by the acquiring agency that it is not practical to obtain an additional appraisal, the review appraiser may, as part of the review, present and analyze market information in conformance with § 24.103 to support a recommended (or approved) value.

---

145   USPAP, Definitions, 4.

(c)   The review appraiser shall prepare a written report that identifies the appraisal reports reviewed and documents the findings and conclusions arrived at during the review of the appraisal(s). Any damages or benefits to any remaining property shall be identified in the review appraiser's report. The review appraiser shall also prepare a signed certification that states the parameters of the review. The certification shall state the approved value, and if the review appraiser is authorized to do so, the amount believed to be just compensation for the acquisition.[146]

Federal agencies have adopted various policies and rules to implement these regulations.[147] Therefore, review appraisers should refer to the agency-specific review standards for a detailed discussion of appraisal review requirements. Agency appraisal review standards generally set appraisal review requirements from USPAP as minimum appraisal review standards.

In accordance with agency requirements, prior to approving an appraisal of property having more than nominal value, the review appraiser for each agency should prepare a written review report indicating the scope of work for the review and the reviewer's analysis and support for the action recommended. It is the review appraiser's responsibility to determine whether the appraisal is adequately supported, complies with recognized appraisal principles and practices, complies with the appraiser's contract (or assignment letter) and these Standards, and conforms to all governing legal premises prescribed by written **legal instruction**.

Appraisals provided by an agency to the U.S. Department of Justice in support of a request to initiate condemnation proceedings shall be reviewed by the Appraisal Unit of the Department. It is the responsibility of the Appraisal Unit to ensure that credible, reliable, and accurate appraisals are available for litigation purposes, including settlement negotiations and trial. In this regard, the Appraisal Unit shall confirm both technical conformance with these Standards and the reasonableness of the appraiser's opinion of value. In addition, the Appraisal Unit shall determine the suitability of the appraisal report for trial purposes: it will identify weaknesses and strengths of the report under review and recommend actions that the government's appraiser and/or trial counsel can take prior to trial to improve the appraisal report and provide better support for its conclusions. Appraisal reports may be found to be unsuitable for trial purposes even if they are in technical conformance with these Standards and the appraiser's opinion(s) of value are reasonable.[148] Due to the intended use and intended user of these appraisal reviews, review appraisers within the Appraisal Unit shall not develop their own independent opinions of value.

**3.1.2.**   **Contract Review Appraisers.** Some agencies may have the authority to engage a qualified non-agency review appraiser to review an appraisal report.  In most instances the contract review appraiser will be bound by the requirements discussed in Section 3.1.1 above and Section 3.2 below. But different requirements may apply in some instances (e.g., review

---

146  49 C.F.R. § 24.104(a)-(c); *see also* 49 C.F.R. § 24.103(d)(1) (requiring agencies to establish qualifications for review appraisers) and app. A, § 24.104 (review of appraisals).

147  *E.g.*, U.S. Dep't of Agric., Forest Service Manual FSM § 5400 (2005) and Forest Service Handbook FSH 5409.12 (2006); U.S. Army Corps of Eng'rs, Real Estate Engineer Regulations, EC 405-1-04 (2016).

148  For instance, a prior appraisal of the same property by the appraiser, which may have been provided to the property owner by the agency during the negotiating process or may be subject to discovery, may have contained inconsistent or erroneous conclusions and if brought to light during trial, could undermine the credibility of the appraiser and the ultimate opinion(s) of value and testimony.

appraisers engaged as rebuttal experts). Not all agencies have authority to engage non-agency review appraisers. Refer to specific agency regulations, guidelines, and authorities.

### 3.1.3.  Rebuttal Experts.

Contract review appraisers may be engaged as rebuttal experts in litigation. *Rebuttal* is a legal term meaning evidence introduced by a party to meet new facts brought out in the opponent's case in chief.[149] Its function is to "explain, repel, counteract or disprove evidence of the adverse party."[150]

> **In federal condemnation cases, proper rebuttal of an appraisal report typically addresses flaws in the appraiser's data and basic assumptions, but does not itself contain an independent opinion of value.** *E.g. United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1141 (9th Cir. 1999).

Rebuttal experts are typically engaged by the Department of Justice in condemnation trial proceedings to contradict or rebut the analysis and conclusions of another appraiser. As a rebuttal expert, a review appraiser may be asked to review an entire appraisal report or to focus on a specific element of an appraisal (for example, the quality and reasonableness of the highest and best use conclusion or a specific approach to value employed).

Review appraisers who prepare rebuttal reports for federal litigation purposes must comply with USPAP and the Federal Rules of Civil Procedure, particularly Rule 26(a)(2) regarding expert reports.[151] As with all assignments, review appraisers must never allow the assignment conditions or a client's objectives to cause the results of a rebuttal assignment to be biased or not credible.[152]

### 3.2.  Types of Appraisal Reviews.

Federal acquisitions generally involve two types of agency appraisal reviews: a technical review, which can only be developed and reported by an appraiser, and an administrative (or compliance) review, which may be performed by a non-appraiser.[153]

A <u>technical review</u> is developed and reported by an appraiser in accordance with these Standards, which require conformity with USPAP and with agency polices, rules, and regulations. In completing a technical review, the review appraiser renders opinions on the quality of an appraisal report and whether the opinion(s) of value are adequately supported and in compliance with all appropriate standards, laws, and regulations relating to the appraisal of property for federal acquisition purposes. In addition, as a part of a technical review, the review appraiser may reach a conclusion regarding whether to approve (or recommend approval of), modify, or not accept or modify the conclusions presented in the appraisal report under review. If appropriate to the assignment, the agency review appraiser performing a technical review may render a separate opinion of value. However, if the review appraiser renders a separate opinion of value, the value opinion must be developed and reported in accordance with the appraisal development and content requirements for these Standards. The development of such opinions and further review

---

149  *Morgan v. Commercial Union Assurance Cos.*, 606 F.2d 554, 555 (5th Cir. 1979).

150  *United States v. Finis P. Ernest, Inc.*, 509 F.2d 1256, 1263 (7th Cir. 1975), *cert. denied*, 423 U.S. 893.

151  *See Standard 2.2.3 for an explanation of the requirements under Rule 26 of the Federal Rules of Civil Procedure.*

152  USPAP, Scope of Work Rule, 14-15.

153  USPAP formerly included guidance discussing both types of review in Advisory Opinion 6 (AO-6), which was retired in 2004. While USPAP no longer addresses administrative reviews, they continue to be a useful tool for many agencies to ensure quality control and inform agency decisions, among other purposes.

of the initial reviewer's opinion of value and the support therefore may also be subject to the pertinent agency's policies, rules, and/or regulations.

An <u>administrative review</u> may be performed by an appraiser or a non-appraiser and is sometimes referred to as a compliance review. The content and scope of an administrative review will vary with the intended use and intended user of the administrative review. Some federal agencies have specific policies regarding the development and use of administrative reviews. An administrative review may include confirmation that the appraisal report conforms to contract/assignment letter requirements and to applicable federal law for federal land acquisition appraisals, and/or that the report includes a signed certification stating that the report has been prepared in compliance with these Standards. The administrative reviewer may also verify if the correct subject property has been appraised, if photographs of the subject property and comparable market data are included, if the analyses reflect the government's most recent project plans, and if the factual data and the mathematics presented in the appraisal report are correct. The administrative reviewer shall not, however, form an opinion regarding the quality of the analysis, judgment, or opinion(s) of value contained within the appraisal report under review.[154] As such, administrative reviews do not meet the requirements of 49 C.F.R. § 24.104. Administrative reviewers often use a checklist as a guide in making their determinations; a model checklist is provided in the Appendix of these Standards for convenience.[155]

### 3.3.    Problem Identification.

**Problem Identification.** The research and analyses necessary to develop credible assignment results will vary depending on the scope of work for an appraisal review assignment.  For example, technical reviews may be conducted as either desk reviews or field reviews. In addition to confirmation that the report was prepared in accordance with these Standards, a desk review involves a thorough review and analysis of the information and analysis contained in the appraisal report under review and a careful examination of the internal logic and consistency. In a desk review, the review appraiser limits the examination to the information and analysis presented within the appraisal report. The data contained within the appraisal report may or may not be confirmed and the review appraiser may or may not identify additional comparative market data.

The most significant difference between a desk review and a field review is the level of evaluation accorded the factual data presented in the appraisal report. A field review always requires at least an exterior field inspection of the subject property and often of the properties used as comparable data in the appraisal report. In addition, the data contained within the appraisal report is usually independently confirmed during the review process. A field review may be used to obtain additional market data beyond that provided by the appraiser or to resolve factual differences between two appraisals with divergent market value estimates. The field review represents the highest level of due diligence within the appraisal review practice.

---

154  If the administrative reviewer is an appraiser and forms an opinion regarding the analysis, judgment, or opinion(s) of value contained in the appraisal report, the review becomes a technical review and falls under the requirements of Standard 3 of USPAP. If appraisers complete a compliance review they must still comply with the portions of USPAP related to appraisal practice such as the Definitions, Preamble, Ethics Rule, Competency Rule, and Jurisdictional Exception Rule.

155  This checklist is not intended to be used as part of a technical appraisal review and is included merely for easy reference by appraisers and reviewers.

The appropriate scope of work to be performed within the review process may be based on the dollar value of the property and/or the complexity of the valuation problem, as dictated by the regulatory and policy requirements of the acquiring agency. The degree of controversy surrounding a particular acquisition (or the agency's project generally) may also play a role in determining the scope of work.

It is critical that the review appraiser clearly identify the precise scope of work and extent of the review process for each appraisal review assignment. Terms such as <u>administrative</u> or <u>technical review</u>, <u>desk review</u> and <u>field review</u> may not be understood by all users or readers of the review, and require precise definition if used. This can be done while disclosing the mandatory assignment elements for a scope of work[156] that are outlined in sections 3.3.1 through 3.3.7 below.

If an appraisal review results in a request for corrective action by the appraiser, the review appraiser should maintain a complete file memorandum of the results of the preliminary review and the requested corrective action. The practice of maintaining only the final corrected appraisal report and the final review thereof should be avoided.

**3.3.1.**   **Client.** The review appraiser must identify who engaged the review appraiser to perform the appraisal review assignment together with all relevant contact information for the client(s).

**3.3.2.**   **Intended Users.** The review appraiser must disclose the review appraiser's understanding of who intends to use the appraisal review assignment results.

**3.3.3.**   **Intended Use.** The review appraiser must disclose the review appraiser's understanding of the intended use of the appraisal review assignment results by both the client and intended users.

**3.3.4.**   **Type of Opinion.** The review appraiser must disclose the type of opinion being rendered, which in an appraisal review assignment is generally an opinion about the quality of the appraisal work under review. If applicable, the review appraiser should discuss the actions to be taken in accordance with the implementing regulations of the Uniform Act (e.g., accept, approve, or not accept the appraisal, etc.).

**3.3.5.**   **Effective Date.** The date of the review appraiser's report will normally reflect the effective date of the review appraiser's opinions and conclusions. The appraisal review report must clearly disclose the date of the report and the effective date of the appraisal under review.

**3.3.6.**   **Subject of the Assignment.** An appraisal review must identify what is being reviewed by the review appraiser. Typically, this will be an appraisal report so the review appraiser must provide identifying details relating to the report under review, its author(s), the subject of the report, etc. However, review appraisers should also recognize that a specific scope of work may call for a review to include the workfile for the appraisal assignment, just a portion of the appraisal report, or any combination of these items.

---

156   USPAP, Scope of Work Rule, <u>Problem Identification</u> section, 14.

5-ER-841

3.3.7.    **Assignment Conditions.** The type and extent of research and analyses undertaken as part of the appraisal review process must be clearly identified.  If the review appraiser required significant assistance in arriving at conclusions, then the extent of that assistance should be summarized in the scope of work together with the names of those providing assistance (which must also be stated in the certification).  Other assignment conditions to be discussed can include assumptions, extraordinary assumptions, hypothetical conditions, laws and regulations, or other conditions that affect the scope of work. Care should be taken to focus on assignment conditions applied to the appraisal review assignment itself and not just those adopted in the report that has been reviewed.

3.4.    **Responsibilities of the Review Appraiser.** Like the appraiser, review appraisers must remain objective in their appraisal review activities. They cannot let agency goals or adversarial pressure influence their opinions of an appraisal report's appropriateness or of the value opinion(s) it reports, nor can they let their personal opinions regarding an agency's proposed acquisition enter into the review process. Also, review appraisers should not attempt to substitute their judgment for that of the appraiser unless they are willing and able to develop their own opinions of value and become the appraiser of record.

Review appraisers must recognize that technical deficiencies can be found in nearly every appraisal report. However, minor technical nonconformance with these Standards or USPAP Standards should not be the reason to not accept an appraisal report, unless the deficiency affects the credibility of the opinion of value, or the opinion of value itself. Minor technical nonconformance with these Standards should never be used as an excuse to not accept a report if the underlying reason for not accepting it is the review appraiser's differing opinion of the market value of the property appraised.

In conducting an appraisal review the review appraiser must:

• Identify the scope of work performed in the review consistent with the seven elements described above under problem identification.

• Develop an opinion as to the completeness of the appraisal report under review within the scope of work applicable to the appraisal assignment, which shall include these Standards.

• Develop an opinion as to the adequacy and relevance of the data and the adequacy of market support for any adjustments to the data.

• Develop an opinion as to the appropriateness of the appraisal methods and techniques used and describe the reasons for any disagreements.

• Develop an opinion as to whether the analyses, opinions, and conclusions in the appraisal report under review are appropriate, reasonable, and adequately supported by market data and describe the reasons for any disagreement.

- Prepare an appraisal review report in compliance with agency policies, rules, and regulations and in accordance with these Standards, which include USPAP.

**3.5.**   **Review Appraiser Expressing an Opinion of Value.** If a review appraiser cannot accept or recommend approval of an appraisal report reviewed for Uniform Act purposes and it is determined that it is not practical to obtain an additional appraisal, the review appraiser may be authorized to develop an independent opinion of value.[157] Various federal agencies have adopted policies, rules, and procedures that regulate the circumstances in which a reviewing appraiser may develop an independent opinion of value and become the agency's appraiser of record.[158]

The review appraiser may recommend, accept, or not accept an appraisal report based upon compliance with these Standards and the appropriateness of the methods and analyses employed in the appraisal report. Such actions do not constitute an opinion of value on the part of the review appraiser, nor do they infer that the reviewing appraiser has taken ownership of, or is responsible for, the value opinion expressed in the appraisal report under review.

When it is appropriate for a review appraiser to develop an opinion of value and become the appraiser of record, that value opinion must be supported and documented in accordance with these Standards. This does not require the review appraiser to replicate the steps completed by the original appraiser. The data and analysis that the reviewer determined to be credible and in compliance with these Standards can be incorporated by reference into the review appraiser's review report using an extraordinary assumption.[159] Those portions of the appraiser's report that the reviewer determined not credible or inconsistent with these Standards must be replaced in the review report with additional data and analysis by the review appraiser.[160] The reviewer may use additional information that was not available to the original appraiser, but under such circumstances the effective date of the reviewer's opinion of value will generally be later in time than the effective date of the original appraiser's opinion of value. Therefore, in most cases, the original appraiser's opinion of value generally cannot be compared directly to the reviewer's later opinion of value for any legitimate purpose.

**3.6.**   **Review Appraiser's Use of Information Not Available to Appraiser.** The scope of work for an appraisal review assignment involving a federal acquisition typically exceeds that of the usual appraisal review because Uniform Act regulations require the reviewer to determine whether the appraisal report under review can be the basis for the establishment of an offer of just compensation.[161] In making that determination, the review appraiser may need to consider information that was not available to the appraiser who prepared the

---

157   Under 49 C.F.R. § 24.104, the independent opinion of value must be developed and reported in accordance with the appraisal criteria set forth in 49 C.F.R. § 24.103.

158   Some of those policies, rules, and procedures may require invocation of USPAP's Jurisdictional Exception Rule. If so, reviewers must specifically identify the jurisdictional exception and the section(s) of USPAP to which it applies and include that information in the appraisal review report.

159   The extraordinary assumption would be to assume that the facts relied upon and reported by the original appraiser that are incorporated into the reviewer's report are accurate.

160   While this procedure may produce a report suitable for the establishment of an offer of just compensation under 49 C.F.R. § 24.104, it would not, of course, produce a report suitable for litigation purposes.

161   *See* 49 C.F.R. § 24.104(a)-(c).

appraisal report under review.[162] In light of the intended use (i.e., establishing a basis for offer of just compensation) and intended user (i.e., agency management), the reviewer is required to consider all available information in making a recommendation. A recommendation based on outdated or incomplete information would fail to meet the agency's obligation to determine a *current* offer of just compensation, and would not conform to the intent of the Uniform Act and its implementing regulations.

Consideration of information not available to the original appraiser is also consistent with USPAP requirements.[163] The current USPAP document expressly contemplates that review appraisers may need to consider such information to produce credible assignment results:

> Information that should have been considered by the original appraiser can be used by the reviewer in developing an opinion as to the quality of the work under review.

> Information that was not available to the original appraiser in the normal course of business may also be used by the reviewer; however, the reviewer must not use such information in the reviewer's development of an opinion as to the quality of the work under review.[164]

Accordingly, a review appraiser's use of subsequent information necessary to produce credible assignment results for the scope of work does not require a jurisdictional exception to USPAP. Of course, an appraisal reviewer may find that an appraisal report under review was prepared in accordance with these Standards and that the opinion of value reported was reasonable and reliable as of the effective date of the appraisal, and yet still find that the opinion of value is unreliable as the basis for an offer to purchase by the government because of changed circumstances or new information that has become available. In such an instance, the review appraiser must clearly explain all pertinent findings in the review report to avoid any impression that the appraisal report under review was not accepted because of its quality or the reasonableness of the opinion of value as of the effective date of the appraisal. In these circumstances, some agency reviewers *accept* but do not *approve* the appraisal report.

3.7.     **Review Reporting Requirements.** Oral appraisal review reports are contrary to Uniform Act regulations and these Standards. Therefore, oral appraisal review reports as the end-result or final conclusion of an appraisal review assignment are not permitted. However, an oral appraisal review may be reported if the scope of work for an appraisal review assignment requires an oral review to be conducted in advance of a final written appraisal review report and there is adequate support for the oral review in the review appraiser's workfile for the assignment.

These Standards do not require a specific review report format or structure. A number of federal agencies have required or recommended formats for review reports to provide consistency and

---

162   Information not available until after completion of the original appraisal report might include additional market activity that occurred after the effective date of the appraisal, a change in the estate to be acquired by the government, information from other appraisals of different properties by different appraisers for the same project, or information that became available as a result of negotiations or though the discovery process in litigation.

163   Previously, USPAP was more restrictive of review appraisers' consideration of information not available to the appraiser. Compare USPAP Standards Rule 3-1(c) (2000 ed.) with USPAP Standards Rule 3-2(g) (2016-2017 ed.). But USPAP has since been updated to allow reviewers "broad flexibility and significant responsibility in determining the appropriate scope of work in an appraisal review assignment."

164   USPAP, Comment to Standards Rule 3-2(g), 31.

efficiency in the review reporting process. Review appraisers for these agencies should, of course, be familiar with and follow these agency-required or recommended formats. Irrespective of the review report format, all appraisal review reports must be in writing and contain, at a minimum, the following:

- Identification of the client and intended users of the review report, the intended use of the review, and the purpose of the review assignment;

- Identification of the appraisal report under review, the date of the review report, the property and ownership interest appraised in the report under review, the date of the report under review and the effective date of the value opinion(s) reported, and the names of the appraisers that completed the report under review; and

- Description of the scope of work performed in the review;

- Statement of opinions, reasons, and conclusions reached concerning the appraisal report under review; and

- Review appraiser's signed certification, in accordance with these Standards and USPAP.

The scope of work undertaken in the review assignment must be adequately described so that the intended user of the review report will understand the type and level of review completed.

**3.8.** **Certification.** The technical appraisal review report shall include the reviewing appraiser's signed certification statement consistent with the certification requirements in Standard 3 of the current edition of USPAP and the following statements related to these Standards:

- The appraisal review was developed and the review report prepared in conformity with the *Uniform Appraisal Standards for Federal Land Acquisitions*.

- My analyses, opinions, and conclusions were developed and this review report was prepared in conformity with the *Uniform Standards of Professional Appraisal Practice*, and complies with those areas of the *Uniform Appraisal Standards for Federal Land Acquisitions* that might require invocation of USPAP's Jurisdictional Exception Rule (see scope of work for details).

- Review appraisers should also include any additional certification statements required by professional organizations in which they are members.

# 4. LEGAL FOUNDATIONS FOR APPRAISAL STANDARDS

**4.1.** **Introduction to Legal Foundations.** This Section explains the legal foundations for Sections 1, 2, and 3. It is written for both lawyers and non-lawyers—including appraisers, who must correctly apply federal law in the development, reporting, and review of market value appraisals in federal acquisitions. This Section discusses the legal standards that govern many recurring valuation problems, and provides guidance on specialized appraisal issues that are unique to federal acquisitions. The legal foundations discussed here hold significance even for those who are not bound to follow these Standards but must adhere to the federal law these Standards summarize and explain.

**4.1.1.** **Requirement of Just Compensation.** Federal acquisitions entail different appraisal standards than other types of valuation problems because they involve payment of just compensation, and the meaning of just compensation is a question of substantive right "grounded upon the Constitution of the United States."[165] Because only the United States Supreme Court can make binding interpretations of the Constitution,[166] questions with respect to just compensation must be resolved under federal common law—that is, case law.[167] These questions most frequently arise in federal condemnation cases. As the Supreme Court observed: "Our jurisprudence involving condemnations…is as old as the Republic and, for the most part, involves the straightforward application of *per se* rules."[168] Those rules form the basis of these Standards. While most of the case law cited in these Standards stems from the federal exercise of eminent domain, just compensation must be paid in many other types of federal acquisitions, whether or not condemnation may be involved.[169]

> **". . . nor shall private property be taken for public use, without just compensation."**
>
> **– U.S. Constitution, amendment v**

These Standards explain the valuation requirements that apply to all federal acquisitions involving "the measure of compensation…grounded upon the Constitution of the United States."[170] The underlying principles of just compensation remain in force even if special legislation or other considerations may require exceptions to certain aspects of these Standards. Where just compensation is concerned, a reliable process is necessary to ensure a just result,[171] "and it is the duty of the state, in the conduct of the inquest by which the compensation is ascertained, to see

---

165  *United States v. Miller,* 317 U.S. 369, 380 (1943); U.S. CONST. amend. v.

166  *Marbury v. Madison,* 5 U.S. 137 (1803).

167  *Miller,* 317 U.S. at 380; *Norfolk Redev. & Hous. Auth. v. Chesapeake & Potomac Tel. Co.,* 464 U.S. 30, 36 (1983); *see United States v. New River Collieries Co.,* 262 U.S. 341, 343-44 (1923); *Kohl v. United States,* 91 U.S. 367, 376-77 (1875).

168  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 322 (2002); *cf.* 1 LEWIS ORGEL, VALUATION UNDER THE LAW OF EMINENT DOMAIN v (2d ed. 1953) [hereinafter ORGEL] ("eminent domain furnishes perhaps the richest case law on the valuation of real property[, giving the] subject a significance even for [those] who may never be faced with a condemnation case").

169  *See* ORGEL, *supra* note 191, at v; *see, e.g.,* Uniform Act, § 301, 42 U.S.C. § 4651.

170  *Miller,* 317 U.S. at 380.

171  *Rasmuson v. United States,* 807 F.3d 1343, 1346 (Fed. Cir. 2015) (vacating compensation award based on valuation that applied incorrect methodology under federal law).

---

that it is just, not merely to the individual whose property is taken, but to the public which is to pay for it."[172]

### 4.1.2. **Market Value: The Measure of Just Compensation.** To ensure a fair, objective and practical standard, federal courts have long held that market value is normally the measure of just compensation.[173] The market value measure "has an external validity which makes it a fair measure of public obligation to compensate the loss incurred by an owner as a result of the taking of his property for public use."[174] The "appraiser's function is to assist…in [the] determination of just compensation by furnishing an opinion of market value."[175] Opinions of market value for federal acquisition purposes must follow federal law to provide a fair measure of just compensation. Otherwise, "a finding on the value of a [property interest] that 'is derived from the application of an improper legal standard to the facts' must be remanded for new factual findings for application of the correct legal standard."[176]

### 4.1.3. **Federal Law Controls.** Just compensation is determined in accordance with federal rather than state law.[177] Both appraisers and attorneys must correctly apply federal law as it affects the appraisal process in the estimations of market value, recognizing that federal and state laws differ in important respects. Appraisals for federal acquisitions must follow the appropriate legal standards.[178] Most appraisals for federal acquisitions involve straightforward application of established legal standards to the facts.[179] But some valuation problems require nuanced **legal instructions** to address complicated or undecided questions of law.[180] If the correct legal standard is unclear, agencies may find it prudent to procure a dual-premise appraisal.[181]

Federal courts have jurisdiction to determine title (ownership) questions in federal condemnation proceedings, but sometimes refer to state law in resolving the nature of property rights acquired.[182] The United States Supreme Court has stated that "[t]hough the meaning of 'property'…in the Fifth Amendment is a federal question, it will normally obtain its content by

---

172 *Bauman v. Ross*, 167 U.S. 548, 574 (1897); *Searl v. Sch. Dist. in Lake Cty.*, 133 U.S. 553, 562 (1890); *cf. Kelo v. City of New London*, 545 U.S. 469, 489 n.21 (2005) (noting importance of "questions about the fairness of the measure of just compensation").

173 *E.g., Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2432 (2015); *United States v. 50 Acres of Land* (*Duncanville*), 469 U.S. 24, 29 (1984); *Miller*, 317 U.S. at 374; *Olson v. United States*, 292 U.S. 246, 255 (1934); *Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 407-08 (1878).

174 *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949).

175 EATON, *supra* note 16, at 19-22 ("[A]ppraisers are experts in estimating value, not just compensation.").

176 *Rasmuson*, 807 F.3d at 1345 (quoting *Walther v. Sec'y of Health & Human Servs.*, 485 F.3d 1146, 1152 (Fed. Cir. 2007)); *cf. Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 149-50 (1997) (Breyer, J., concurring) (observing that subjecting expert opinions to appropriate legal standards "will help secure the basic objectives of . . . the ascertainment of truth and the just determination of proceedings" (citing FED. R. EVID. 102)); *Olson*, 292 U.S. at 257 ("[T]o allow mere speculation and conjecture to become a guide for the ascertainment of value [is] a thing to be condemned in business transactions as well as in judicial ascertainment of truth.").

177 *United States v. Miller*, 317 U.S. 369, 379-80 (1943) ("We need not even determine what is the local law . . . [on] the measure of compensation,—grounded upon the Constitution of the United States.").

178 *Cf. Rasmuson*, 807 F.3d at 1345.

179 *Kimball Laundry*, 338 U.S. at 4; *cf. Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2432 (2015); *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002).

180 *See Kimball Laundry*, 338 U.S. at 4 ("novel and serious questions in determining what is 'just compensation' are not resolved by the familiar formulas available for the conventional situationswhich gave occasion for their adoption").

181 *See, e.g., United States v. Eastman* (*Eastman III*), 714 F.2d 76, 77 (9th Cir. 1983), *adopting* 528 F. Supp. 1177 (D. Or. 1981), and aff'g 528 F. Supp. 1184, 1184 (D. Or. 1981) ("dual set of findings" of market value so that "if the Court of Appeals reverses my preliminary [legal] ruling, it may then evaluate the correctness of the alternative finding"); *see United States v. Reynolds*, 397 U.S. 14, 15 (1970) ("There being a conflict between the circuits on this question, we granted certiorari to consider a recurring problem of importance in federal condemnation proceedings.").

182 *See United States v. Causby*, 328 U.S. 256, 266 (1946); *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 279 (1943); *United States v. 0.073 Acres of Land* (*Mariner's Cove*), 705 F.3d 540, 544 (5th Cir. 2013); *United States v. 79.31 Acres of Land*, 717 F.2d 646, 647-48 (1st Cir. 1983); *United States v. 1,629.6 Acres of Land in Sussex Cty.* (*Island Farm III*), 503 F.2d 764, 766-67 & n.3 (3d Cir. 1974).

reference to local law."[183] It is also established that the United States can acquire any property interest it deems necessary, whether or not the interest is recognized under state laws.[184] Federal law is "wholly applicable" to condemnations by federal agencies,[185] controlling procedural as well as substantive matters under Rule 71.1 of the Federal Rules of Civil Procedure.[186]

### 4.1.4.    Defining Property Interests.

An appraiser cannot develop an opinion of market value for just compensation purposes without knowing what, exactly, the United States will acquire.[187] A legal description identifies a property's precise physical or geographic location. The property interest or interests to be acquired must be described with equal precision. The nature and extent of any property interest being acquired is determined by the acquiring agency, as delegated by Congress—not the appraiser, the landowner, or the courts.[188] Under federal title regulations, the property interest must be sufficient for the government's purpose in acquiring it,[189] balanced against "the Government's natural desire and duty to deplete the public purse no further than necessary in carrying out its projects"[190] and other considerations that may be imposed by specific statutes and regulations. "Of course, payment need only be made for what is taken, but for all that the Government takes it must pay."[191] It is therefore critical for the agency to carefully and precisely define the property interest(s) being acquired and expressly state what interest(s), if any, will remain with the landowner.[192]

> **An interest is a legal share in property, such as a right to possess, use or convey it to another. An estate is the amount, degree, nature, and quality of a person's interest in property. The broadest possible estate is fee simple absolute (often shortened to fee simple or fee).**

Agencies are well advised to follow the maxim "measure twice, cut once" in defining the property interests to be acquired. An opinion of market value can only be used for just compensation

---

183 *Powelson*, 319 U.S. at 279; *cf. Rogers v. United States*, 814 F.3d 1299, 1307-08 (Fed. Cir. 2015) and *Rogers v. United States*, 184 So.3d 1087, 1090 (Fla. 2015) (Federal Circuit's certification of property law question to Florida Supreme Court). But this does not mean "that every local idiosyncrasy . . . will be accepted." *Nebraska v. United States*, 164 F.2d 866, 868 (8th Cir. 1947).

184 *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 604 (1973); *United States v. Certain Interests in Prop. in Champaign Cty.*, 271 F.2d 379, 384 (7th Cir. 1959); *see United States v. 32.42 Acres of Land in San Diego Cty.*, 683 F.3d 1030, 1039 (9th Cir. 2012) ("Having paid just compensation, the United States is entitled to the interest it sought.").

185 *United States v. 93.970 Acres of Land (Illinois Aircraft)*, 360 U.S. 328, 332-33 & n.7 (1959).

186 Rule 71.1 (formerly Rule 71A) ended the use of state procedures in federal condemnations in 1951, establishing "a uniform set of procedures governing federal condemnation actions." *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 3-4 & n.2 (1984) (discussing Rule 71A); FED. R. CIV. P. 71.1. However, condemnations by pipeline companies under the Natural Gas Act are governed by state law in some circuits. *E.g., Rockies Express Pipeline LLC v. 4.895 Acres of Land*, 734 F.3d 424, 429-30 (6th Cir. 2013); *but see, e.g., S. Nat. Gas Co. v. Land, Cullman Cty.*, 197 F.3d 1368 (11th Cir. 1999) (applying federal procedural law); *see also Portland Nat. Gas Transmission Sys. v. 19.2 Acres of Land*, 318 F.3d 279, 282 n.1 (1st Cir. 2003) ("Perhaps surprisingly, several circuits [apply] state substantive law as well as formal practice [in Natural Gas Act condemnations].”). Cases decided on state law grounds are not applicable to federal acquisitions, in which compensation must be determined under federal law. *United States v. Miller*, 317 U.S. 369, 379-80 (1943).

187 *See United States v. Causby*, 328 U.S. 256, 268 (1946) ("Since [the terms of the property interests acquired are] not clear…, it would be premature for us to consider whether the amount of the award…was proper."); *United States v. 21.54 Acres of Land in Marshall Cty.*, 491 F.2d 301, 305 (4th Cir. 1973) (discrepancies in legal description of easement boundaries required determination "whether the government has, in fact, accurately described the land in which it intends to take easements").

188 *See Berman v. Parker*, 348 U.S. 26, 35-36 (1954); *Shoemaker v. United States*, 147 U.S. 282, 298 (1893); *United States v. Gettysburg Elec. Ry. Co.*, 160 U.S. 668, 685 (1896); *United States v. 3,218.9 Acres of Land in Warren Cty.*, 619 F.2d 288, 291 (3d Cir. 1980); *cf. United States v. Meyer*, 113 F.2d 387, 392 (7th Cir. 1940) (citing cases); *United States ex rel. Tenn. Valley Auth. v. Russell*, 87 F. Supp. 386, 389 (E.D. Tenn. 1948) (citing cases).

189 Regulations of the Attorney General Governing the Review and Approval of Title for Federal Land Acquisitions (2016); *cf. United States v. City of Tacoma*, 330 F.2d 153, 155, n.6 (9th Cir. 1964) (noting Attorney General could not "render . . . a written opinion as to the validity of the Government's title, without noticing the very serious impediment on that title left undecided by the judgment" of the lower court).

190 *See United States v. 62.17 Acres of Land in Jasper Cty.*, 538 F.2d 670, 676 (5th Cir. 1976); *cf. United States ex rel. Tenn. Valley Auth. v. Welch*, 327 U.S. 546, 554 (1946) ("The cost of public projects is a relevant element in all of them, and the government, just like anyone else, is not required to proceed oblivious to elements of cost.").

191 *United States v. Dickinson*, 331 U.S. 745, 750 (1947).

192 *See Causby*, 328 U.S. at 268; *see also* Sections 4.6, 4.7, and 4.8.

purposes if it reflects the market value of the precise property interest being acquired.[193] If an appraiser is provided an incorrect or outdated property interest, the resulting opinion of market value—no matter how well supported—will be of little or no use for purposes of just compensation.[194] Moreover, in condemnation, agencies must stand by and pay compensation for the stated terms of the property interest taken.[195] If those terms are not carefully defined, a condemning authority may well "'discover[ ] that the judgment it won gave it more of a title than it wanted to pay for,' but it must pay for what it won nonetheless."[196]

**4.1.5.    About the Sixth Edition.** As noted, this is the sixth edition of the *Uniform Appraisal Standards for Federal Land Acquisitions*. With the passage of 16 years since publication of the previous edition, some topics of great importance in past decades have become less significant, and some issues that were controversial or unsettled have been resolved by the courts. Of course, some valuation problems remain as vital today as in years past. And while the underlying legal principles are unchanged, recent court rulings contain practical examples of how to apply the underlying law to actual valuation problems. Therefore, this Section includes case studies and citations to instructive court opinions. Most of these citations are eminent domain cases, which are often difficult to distinguish by case name.[197] To assist the reader, frequently cited cases include common names or reference a distinctive property location, landowner name, or public project for which property was acquired.[198] A table of all cases and other authorities cited in these Standards is included in the Appendix.

**4.2.    Market Value Standard.** Under established law, the measure of just compensation is the market value of the property acquired. As stated by the United States Supreme Court, just compensation "means in most cases the fair market value of the property on the date it is appropriated. Under this standard, the owner is entitled to receive what a willing buyer would pay in cash to a willing seller at the time of the taking."[199] The Supreme Court has often repeated this "clear and administrable rule for just compensation: 'The court has repeatedly

> ## Measure Twice, Cut Once
>
> An opinion of market value can be useful for just compensation purposes only if it reflects the market value of the precise property interest to be acquired.
>
> **Agencies** must carefully define the interest(s) to be acquired and expressly state what interests (if any) will remain with the landowner.
>
> **Appraisers** must ensure they understand the precise property interest(s) invloved and request **legal instruction** to clarify any uncertainty.

---

193  *See Causby*, 328 U.S. at 268; *Benecke v. United States*, 356 F.2d 439, 441 (5th Cir. 1966) (remanding for new trial where appraisal witnesses "valued somewhat less than the entire tract" actually taken).

194  As a result, in the appraisal review process under the Uniform Act, an appraisal may be *accepted* as meeting applicable standards but not *recommended* or *approved* as a basis for establishing just compensation, and the agency may need to obtain an additional appraisal. *See* Section 3.

195  *See, e.g., Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15, 19-21 (5th Cir. 1969) (proper to measure compensation based on actual easement language in pleadings, not condemnor's assertions that landowner would be allowed to make more extensive use of remainder).

196  *Vector Pipeline, L.P. v. 68.55 Acres of Land*, 157 F. Supp. 2d 949, 958 (N.D. Ill. 2001); *see United States v. Dickinson*, 331 U.S. 745, 750 (1947).

197  Federal condemnation cases are generally styled (named) as United States v. [#] Acres of Land, rather than United States v. [Landowner], because a condemnation proceeding is an action *in rem*, that is, a taking of a thing itself—the real property. In contrast, a legal proceeding against a person is an action *in personam*, taking the rights of persons in the thing. *See Dunnington*, 146 U.S. at 352-53; *In Personam* and *In Rem*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see also* FED. R. CIV. P. 71.1(c)(1) (requiring case caption to name "the property— designated generally by kind, quantity, and location—and at least one owner of some part of or interest in the property").

198  For example, the Supreme Court case *United States v. 50 Acres of Land* (*Duncanville*) concerned the United States' condemnation of 50 acres owned by the City of Duncanville, Texas. 469 U.S. 24 (1984).

199  *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 9-10 (1984) (internal quotations & citations omitted); *accord Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 407-08 (1878).

held that just compensation normally is to be measured by "the market value of the property taken at the time of the taking.""[200] As a result, these Standards require use of the following definition of market value in the appraisal of property for federal acquisitions:

### 4.2.1.    Market Value Definition.

#### Definition of Market Value

Market value is the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would have sold on the effective date of value, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither compelled to buy or sell, giving due consideration to all available economic uses of the property.

The federal definition of market value is based on Supreme Court cases that establish and explain the market value standard as the measure of just compensation.[201] It applies to all types of federal acquisitions that involve payment of just compensation, whether or not condemnation may be involved.[202] In most situations, the market value measure "achieves a fair 'balance between the public's need and the claimant's loss.'"[203] Thus, while the "Court has never attempted to prescribe a rigid rule for determining what is 'just compensation' under all circumstances and in all cases[,]  market value has normally been accepted as a just standard."[204] These Standards follow the practical, objective, clear, and administrable rule of market value as the measure of just compensation, established by the Supreme Court nearly 140 years ago.[205]

### 4.2.1.1.    Date of Value. The date of value is generally determined by law (or a **legal instruction**, for the appraiser's purposes) based on the nature of the acquisition.[206]

---

200  *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2432 (2015) (quoting *Duncanville*, 469 U.S. at 29, and *Olson v. United States*, 292 U.S. 246, 255 (1934)).

201  *E.g.*, *Kirby Forest Indus., Inc.*, 467 U.S. at 10; *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 471-72, 474 (1973); *United States v. Reynolds*, 397 U.S. 14, 17 (1970); *United States v. Miller*, 317 U.S. 369, 374 (1943); *McCoy v. Union Elevated R.R. Co.*, 247 U.S. 354, 359 (1918); *Kerr v. S. Park Comm'rs*, 117 U.S. 379, 386-87 (1886).

202  As discussed in Section 0.2.4, only the Supreme Court can define just compensation. *See Miller*, 317 U.S. at 380; *United States v. New River Collieries Co.*, 262 U.S. 341, 343-44 (1923); *Marbury v. Madison*, 5 U.S. 137 (1803).

203  *Duncanville*, 469 U.S. at 33. Other measures of just compensation "are employed only 'when market value [is] too difficult to find, or when its application would result in manifest injustice to owner or public.'" *Kirby Forest Indus., Inc.*, 467 U.S. at 10 n.14 (quoting *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950)).

204  *Commodities Trading*, 339 U.S. at 123; *see Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949) ("The value of property springs from subjective needs and attitudes, its value to the owner may therefore differ widely from its value to the taker. Most things, however, have a general demand which gives them a value transferable from one owner to another. As opposed to such personal and variant standards as value to the particular owner whose property has been taken, this transferable value has an external validity which makes it a fair measure of public obligation to compensate the loss incurred by an owner as a result of the taking of his property for public use.").

205  *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2432 (2015) ("clear and administrable rule for just compensation"); *United States v. 564.54 Acres of Land (Lutheran Synod)*, 441 U.S. 506, 511 (1979) ("relatively objective working rule . . . a useful . . . tool"); *Kimball Laundry*, 338 U.S. at 5 ("a fair measure of public obligation to compensate the loss incurred by an owner as a result of the taking of his property for public use"); *Miller*, 317 U.S. at 374 ("practical standard"); *Bauman v. Ross*, 167 U.S. 548, 574 (1897) ("The just compensation required by the constitution to be made to the owner is to be measured by the loss caused to him by the appropriation. He is entitled to receive the value of what he has been deprived of, and no more."); *Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 408 (1878) ("The inquiry in such cases must be what is the property worth in the market . . . from its availability for valuable uses.").

206  *See United States v. Dow*, 357 U.S. 17, 22 (1958) ("that event which gives rise to the claim for compensation and fixes the date as of which the land is to be valued").

- In most <u>direct acquisitions</u> (such as voluntary purchases), the date of value should be as near as possible to the date of the acquisition—typically the date of the appraiser's last property inspection.[207]

- In "quick-take" condemnations involving a <u>declaration of taking</u>, the date of value is the earlier of (1) the date the United States files a declaration of taking and deposits estimated compensation with the court, or (2) the date the government enters into possession of the property.[208]

- In "complaint-only" <u>straight condemnations</u> in which no declaration of taking is filed, the date of value is the date trial commences.[209]

- In <u>inverse takings</u>, the date of value is the date of taking, which should be provided by legal counsel.[210]

- For <u>property exchanges</u>, the date of value may be set by the parties or established by statute, and should be provided by legal counsel or the appraiser's client.[211]

In each type of acquisition, a property's market value is to be ascertained as of the appropriate date of value, considering the property as it existed on that date.[212] The appraiser must disregard physical changes (such as government construction) as well as changes in market value that occur after the date of value.[213] But this does not necessarily prohibit consideration of market data or events that occurred after the date of value: For example, market data after the date of value may be considered for the purpose of corroborating the market expectations or trends that existed on the date of value.[214] Sales that occurred after the date of value may be appropriate to consider, as discussed in Section 4.4.2.4.7. And in acquisitions under the

---

207  *Cf.* 49 C.F.R. § 24.102(g) (updating offer of just compensation under Uniform Act); *United States v. 790.71 Acres of Land in Cotton, Comanche & Stephens Ctys.*, 550 F. Supp. 690, 691 (W.D. Okla. 1981) (holding changes in appraisals of same property were due to later appraisal's inclusion of recently discovered comparable sales, not bad faith or unfair treatment).

208  *Dow*, 357 U.S. at 21-22; *see* Declaration of Taking Act, 40 U.S.C. § 3114 (corresponds to Act of February 26, 1931, 46 Stat. 1421, originally codified at 40 U.S.C. §§ 258a-258b).

209  *See Kirby Forest Indus., Inc.*, 467 U.S. at 16-17; General Condemnation Act, 40 U.S.C. § 3113 (corresponds to Act of August 1, 1888, 25 Stat. 357, originally codified at 40 U.S.C. § 257).

210  *See United States v. Clarke*, 445 U.S. 253, 258 (1980); *see generally* Section 4.9.

211  E.g., *Greer Coal., Inc. v. U.S. Forest Serv.*, 470 F. App'x 630, 636 (9th Cir. 2012) (unpubl.); *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1185-86 & nn.17-18 (9th Cir. 2000); *see generally* Section 4.10.

212  *Kerr v. S. Park Comm'rs*, 117 U.S. 379, 385-87 (1886); *accord United States v. Reynolds*, 397 U.S. 14, 16 (1970); *United States v. Miller*, 317 U.S. 369, 374 (1943); *see, e.g., United States v. 125.2 Acres of Land in Nantucket*, 732 F.2d 239, 244 (1st Cir. 1984) ("well-settled rule"); *United States v. 161.99 Acres of Land in Collins Cty.*, 512 F.2d 65, 66 (5th Cir. 1975); *see also Rasmuson v. United States*, 807 F.3d 1343, 1346 (Fed. Cir. 2015) ("A proper appraisal methodology has to account for those physical conditions [that existed on the date of value].").

213  *See Kirby Forest Indus., Inc.*, 467 U.S. at 16-18 & n.29; *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 76 (1913); *Searl v. Sch. Dist. in Lake Cty.*, 133 U.S. 553, 562-65 (1890); *United States v. Certain Land in Lincoln*, 343 F. Supp. 155 (D. Neb. 1972).

214  *Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 337 n.5 (Ct. Cl. 1980) (allowing post-taking data "for purposes of corroborating the reasonableness of the views of a . . . prospective purchaser and seller as to their anticipations" as of the date of taking); *e.g., United States v. Certain Lands in Wappinger*, 67 F. Supp. 905, 907-08, 909-11 (S.D.N.Y. 1946) (considering market trends); *see Hickey v. United States*, 208 F.2d 269, 277-78 (3d Cir. 1953) ("A witness may state that his conclusion on an initial examination was confirmed by later events, when additional information is available."); *United States v. 765.56 Acres of Land in Southampton (765.56 Acres I)*, 164 F. Supp. 942, 947 (E.D.N.Y. 1958), *aff'd sub nom. United States v. Glanat Realty Corp.*, 276 F.2d 264 (2d Cir. 1960) (noting "zoning regulations [that] had been under consideration . . . for some time" as of date of value "had become a fact" at time of trial); *see also* USPAP Advisory Opinion 34 ("Data subsequent to the effective date may be considered in developing a restrospective value as a confirmation of trends that would reasonably be considered by a buyer or seller as of that date."); *cf. Dugan v. Rank*, 372 U.S. 609, 624 (1963) (noting "[p]arenthetically" that federal dam project had indeed been operating in accordance with previously stated plans).

Uniform Act, the assignment may instruct the appraiser to consider changes in value due to physical deterioration within the owner's reasonable control.[215]

### 4.2.1.2. Exposure on the Open, Competitive Market.

The federal definition of market value presumes that the property, prior to the date of value, was on the open market for a reasonable length of time to find a buyer who was ready, willing, and able to consummate a purchase on the date of valuation.[216] Value is to be determined by what the property "would sell for in the market for cash in the due course of business . . . under ordinary circumstances . . . ."[217]

> **Appraisers should not link an opinion of market value made for federal acquisition purposes to a specific exposure time. This <u>jurisdictional exception</u> to USPAP is required for appraisals applying the federal definition of market value.**

In determining just compensation, federal courts have neither defined a "reasonable" length of time nor required that an estimate of market value be linked to a specified exposure time on the open market. For these reasons, appraisers should not link opinions of market value for federal acquisitions to a specific exposure time.[218] To do so in an appraisal for federal acquisition purposes would needlessly place a limiting condition on the opinion that is irrelevant and could undermine the reliability of the entire appraisal.[219]

### 4.2.1.3. Willing and Reasonably Knowledgeable Buyers and Sellers.

*Willing* and *reasonably knowledgeable* buyers and sellers are not defined as all-knowing, but rather as having the knowledge possessed by the "typical 'willing buyer-willing seller'" in the marketplace.[220] An arm's-length transaction cannot be disregarded solely because a buyer or seller lacked "perfect" knowledge.[221] For example, the Federal Circuit held that it was appropriate to consider "a relevant market made up of investors who are real but are speculating in whole or major part."[222] And as the same court held in a later appeal, "uncontroverted evidence of an active real estate market compels the conclusion that the typical 'willing buyer-willing seller'

---

215  *See* Uniform Act, § 301 (3), 42 U.S.C. § 4651(3). This is an express statutory exception to the rule that property must be valued as it existed on the date of value. *E.g., Rasmuson*, 807 F.3d at 1346 (noting that a calculation that does not consider existing conditions "will result in an artificially inflated value and yield a windfall"); *cf. 161.99 Acres in Collins*, 512 F.2d at 66 (holding compensation must be measured as of date of taking, regardless of subsequent changes in property's market value).

216  *See, e.g., Kimball Laundry Co. v. United States*, 338 U.S. 1, 6 (1949) ("the equivalent arrived at by the haggling of the market"); *McCoy v. Union Elevated R.R. Co.*, 247 U.S. 354, 359 (1918).

217  *McCoy*, 247 U.S. at 359; *see Kerr v. S. Park Comm'rs*, 117 U.S. 379, 386-87 (1886) ("what land would have sold for in cash, or on such time and terms as would be equivalent to cash").

218  This <u>jurisdictional exception</u> to USPAP Standards Rule 1-2(c) is required for appraisals for federal acquisitions—i.e., appraisals applying the federal definition of market value—to ensure the opinion of value can be used as a reliable measure of just compensation under the Fifth Amendment to the U.S. Constitution. *See* USPAP Advisory Opinion 35, *Reasonable Exposure Time in Real Property and Personal Property Opinions of Value*; USPAP Frequently Asked Question 108. Appraisers may be accustomed to linking opinions of value to specific exposure times in other types of assignments. *Cf. Robinson v. United States*, 305 F.3d 1330, 1332 (Fed. Cir. 2002) (distinguishing "quick sale value" as amount expected if property's market exposure was limited to specific term, and "liquidation value" as amount expected if property "is sold without reasonable market exposure"); *In re Dyevoich*, No. 11–2551 (MLC), 2012 WL 194677 (D.N.J. Jan. 23, 2012) (unpubl.) (distinguishing "reasonable market exposure time" from "restricted market exposure time").

219  *See* EATON, *supra* note 16, at 18-19.

220  *See Fla. Rock Indus., Inc. v. United States* (*Florida Rock III*), 18 F.3d 1560, 1567 (Fed. Cir. 1994).

221  *See id.* at 1566 n.12 ("The market from which a fair market value may be ascertained need not contain only legally trained (or advised) persons who fully investigate current land use regulations; ignorance of the law is every buyer's right."); id. at 1567 ("When the market provides a well-substantiated value for a property, a court may not substitute its own judgment as to what is a wise investment. . . . Should a landowner wish to pick and choose her buyers, that luxury is not chargeable to the federal fisc.").

222  *Fla. Rock Indus. v. United States* (*Florida Rock II*), 791 F.2d 893, 903 (Fed. Cir. 1986); *see United States v. 69.1 Acres of Land* (*Sand Mountain*), 942 F.2d 290, 294 (4th Cir. 1991) ("The buyers in the sand reserve market are limited to those with foresight and patience, but they are nonetheless real buyers in a real market.").

requirement of fair market value had been met . . . ."[223]
As a result, "[w]hile an [appraiser] might be justified in adjusting the fair market value figure by discarding aberrational values based upon sales between related entities or fraudulent sales . . . , an [appraiser] may not discard an entire market as aberrational."[224]

The hypothetical <u>buyer</u> and <u>seller</u> under the federal definition of market value are objective market participants, motivated by typical market considerations: "[T]he same considerations are to be regarded as in the sale of property between private parties[,]"[225]  having regard for "the existing business or wants of the community . . . ."[226] As the Supreme Court warned, "care must be taken to avoid . . . supposing the hypothetical purchaser to have either the same idiosyncrasies as the owner, or the same opportunities for use of the property as a taker armed with the power of eminent domain."[227]

> **"Speculation"**
>
> While *market participants* may speculate, *appraisers* cannot. The finder of fact "must not, itself, speculate, i.e., guess, about potential end uses or markets when the speculation is so remote or improbable that one would not invest his money in it." *Fla. Rock Indus., Inc. v. United States* (*Florida Rock II*), 791 F.2d 893, 903 (Fed. Cir. 1986); *see* Section 4.3.

### 4.2.1.4.  **All Available Economic Uses.** Compensation "is to be arrived at upon just consideration of all the uses for which [a property] is suitable."[228] As the Supreme Court stated in *Olson v. United States*, "[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered . . . ."[229] That use must be considered "to the full extent that the prospect of demand for such use affects the market value while the property is privately held."[230] As discussed in Section 4.3, in valuations for just compensation purposes, only profitable—i.e., economic—uses can be considered.[231] Nonmarket considerations such as *value to the public* "afford[ ] no just criterion for estimating what the owner should receive" and must be disregarded.[232]

---

223  *Florida Rock III*, 18 F.3d at 1567; *accord Sand Mountain*, 942 F.2d at 294 (4th Cir. 1991) ("The existence of six other recent sales of properties in the area to sand producers lends further support . . . that a market exists for minable reserves . . . .").

224  *Florida Rock III*, 18 F.3d at 1567; *cf. United States v. 381.76 Acres of Land* (*Montego Group*), No. 96-1813-CV, 2010 WL 3734003, at *7 (S.D. Fla. Aug. 3, 2010) (qualitative analysis of comparable sales was the "superior" approach "to determine the value of peculiar properties in a peculiar market while taking complex factors into account"), *adopted sub nom. United States v. 10.00 Acres of Land*, No. 99-0672-CIV, 2010 WL 3733994 (S.D. Fla. Sept. 22, 2010), *aff'd sub nom. United States v. Gonzalez*, 466 F. App'x 858 (11th Cir. 2012) (per curiam).

225  *Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 407-08 (1878); *see United States v. 6.24 Acres of Land* (*Weber*), 99 F.3d 1140, 1996 WL 607162, at *5 (6th Cir. 1996) (per curiam) (unpubl.) ("We assume that buyers and sellers of ordinary prudence are knowledgeable and that they are not motivated by speculation or conjecture."); *accord United States v. 760.807 Acres of Land in Honolulu*, 731 F.2d 1443, 1446 (9th Cir. 1984).

226  *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 77-78 (1913); *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5-6 (1949); *see Olson v. United States*, 292 U.S. 246, 257 (1934) (In estimating market value, "there should be taken into account all considerations that fairly might be brought forward and reasonably be given substantial weight" in "fair negotiations between an owner willing to sell and a purchaser desiring to buy.").

227  *Kimball Laundry*, 338 U.S. at 6 n.3; *Chandler-Dunbar*, 229 U.S. at 79-81; *see United States v. 564.54 Acres of Land* (*Lutheran Synod*), 441 U.S. 506, 514 (1979) ("[N]ontransferable values arising from the owner's unique need for the property are not compensable . . . ."); *see also Boom Co.*, 98 U.S. at 408 ("Others may be able to use [the property], and make it subserve the necessities or conveniences of life. Its capability of being made thus available gives it a market value which can be readily estimated."); *Florida Rock III*, 18 F.3d at 1567 ("Dollars are fungible . . . . Should a landowner wish to pick and choose her buyers, that luxury is not chargeable to the federal fisc.").

228  *Olson v. United States*, 292 U.S. 246, 255 (1934).

229  *Id.*; *see* Section 4.3 (Highest and Best Use).

230  *Olson*, 292 U.S. at 255.

231  *See id.*; *see also Monongahela Nav. Co v. United States*, 148 U.S. 312, 328 (1893).

232  *Chandler-Dunbar*, 229 U.S. at 80.

**4.2.2.**    **The Unit Rule.** The market value concept in federal acquisitions generally requires application of the so-called <u>unit rule</u>, a principle developed by the federal courts that dictates what is to be valued for just compensation purposes.[233] Under the unit rule, the property being appraised must be valued as a unitary whole and held in single ownership.[234] The value of the whole cannot be derived by adding together the separate values of various interests or components.[235] As a result, summation or cumulative appraisals are improper under federal law.[236] The unit rule relates to *ownership* interests (estates) in real estate—such as landlord and tenant, or mortgagor and mortgagee—and to various *physical* components of real estate—such as timber, mineral deposits, farmland, and buildings.[237] As discussed in Section 4.6, the unit rule can raise particularly challenging valuation issues in appraisals for partial acquisitions, especially if easements are involved.

**4.2.2.1.**    **Ownership Interests (the Undivided Fee).** A property with multiple ownership interests or estates—such as lessor and lessee, life tenant and the holder of the remainder, or mortgagor and mortgagee—must be valued as a whole, embracing all of the rights, estates, and interests of all who may claim, and as if in one ownership.[238] For example, in an acquisition of property in fee simple absolute, the property must be appraised as an <u>undivided fee</u>.[239] Similarly, in acquisitions of less-than-fee interests, the interests being appraised must be valued as if under single ownership.[240] The market value of the whole is later apportioned among "the respective interest holders . . . either by contract or judicial intervention."[241] This is because just compensation is for the property itself, not the various ownership interests; thus, "the appraised value of the property represents the whole fee."[242] This aspect of the unit rule ensures the public is not charged twice in federal acquisitions.[243]

**4.2.2.2.**    **Physical Components.** Buildings and improvements, timber, crops, sand, gravel, minerals, oil, and so forth, in or upon the property are to be considered *to the extent they contribute to the market value of the property as a whole.* "[I]t is firmly settled that one does not value the [ ]land as one factor and then value the improvements as another factor and then add the two values to determine market

---

233  *See United States v. 6.45 Acres of Land (Gettysburg Tower)*, 409 F.3d 139, 146 & n.13 (3d Cir. 2005) ("[W]e have applied the unit rule as the legal procedure by which just compensation is to be determined and apportioned."); *United States v. 1.377 Acres of Land (Hotel San Diego)*, 352 F.3d 1259, 1269 (9th Cir. 2003) (government provides just compensation, then respective interest holders apportion award).

234  *United States v. Dunnington*, 146 U.S. 338, 351 (1892); *United States v. 25.936 Acres of Land in Edgewater*, 153 F.2d 277, 279 (3d Cir. 1946).

235  *E.g., Dunnington*, 146 U.S. at 351; *Bogart v. United States*, 169 F.2d 210, 213 (10th Cir. 1948); *Nebraska v. United States*, 164 F.2d 866, 868 (8th Cir. 1947); *25.936 Acres in Edgewater*, 153 F.2d at 279; *Meadows v. United States*, 144 F.2d 751, 753 (4th Cir. 1944).

236  *See, e.g., United States v. Gonzalez*, 466 F. App'x 858 (11th Cir. 2012) (per curiam).

237  *United States v. 91.90 Acres of Land in Monroe Cty. (Cannon Dam)*, 586 F.2d 79, 87 (8th Cir. 1978).

238  *E.g., Dunnington*, 146 U.S. at 351; *Bogart*, 169 F.2d at 213; *Nebraska*, 164 F2d at 868; *25.936 Acres in Edgewater*, 153 F.2d at 279; *Meadows*, 144 F.2d at 753; *cf. United States v. 499.472 Acres of Land in Brazoria Cty.*, 701 F.2d 545, 552 (5th Cir. 1983) (emphasizing "importance of presenting in a single trial to a single jury all interests of all parties in the condemned property.").

239  *Gettysburg Tower*, 409 F.3d at 145-47 & nn.12-13; *United States v. 1.377 Acres of Land (Hotel San Diego)*, 352 F.3d 1259, 1269 (9th Cir. 2003); *Nebraska*, 164 F.2d at 868-69.

240  *E.g., United States v. 237,500 Acres of Land*, 236 F. Supp. 44, 55 (S.D. Cal. 1964) (valuing placer mining claims as a whole, then apportioning locators', lease and option interests). Applying the unit rule can be particularly complex in acquisitions of less-than-fee estates such as easement (Section 4.6.5) or leasehold (Section 4.7) interests, or in acquisitions involving minerals, timber or other natural resources (Section 4.8).

241  *Hotel San Diego*, 352 F.3d at 1269. This apportionment is generally beyond the scope of the appraiser's assignment.

242  *Dunnington*, 146 U.S. at 351; *see Gettysburg Tower*, 409 F.3d at 146.

243  *Dunnington*, 146 U.S. at 353-54.

value."[244] Rather, the measure of just compensation is the market value of the entire property—not the total of the money values of the separate items. As a result, in developing an opinion of value for federal acquisitions, the appraiser must consider all the elements that "contribute to make the property valuable, all . . . that detract from it, and finally, weighing all those elements, determine [the market value of] the single piece of property . . . ." acquired.[245]

The unit rule is often misapplied in valuations involving natural resources such as minerals, oil, and gas.[246] As with any other component, the possible or actual existence of such resources can only be considered to the extent it would contribute to the market value of the whole property. Section 4.8 discusses valuation issues that commonly arise in appraising natural resource properties.

**4.2.2.2.1. Existing Government Improvements.** The presence of *government-constructed* buildings and improvements on the property on the date of value may significantly affect the analysis of market value. Proper treatment of improvements often turns on the legal effects of a lease, if one exists, as "any valuation should take into account the lease terms covering improvements" of significance to a reasonable buyer.[247] But regardless of a contractual agreement, "the equitable principle which condemns unjust enrichment [may] prevent[ ] the value of [government-built] premises becoming a windfall to the owner of the land in the guise of fair compensation."[248] Depending on the facts of the acquisition, the appraiser may need to determine a buyer's cost to remove such improvements, estimate any contributory value, or exclude them from consideration entirely, among other courses.[249] Therefore, appraisers should request **legal instructions** on how to treat government-constructed improvements that predate the date of value.[250]

**4.2.2.3. Allocations and Administrative Payments Under the Uniform Act.** Valuations for federal acquisitions must follow the unit rule. But some appraisal assignments may require the appraiser to subsequently allocate the market value of the whole property, once properly determined under the unit rule, for administrative or other purposes. Thus, the appraiser may be directed to apportion the whole property's value among separate estates or interests

---

244  *United States v. 91.90 Acres of Land in Monroe Cty.* (*Cannon Dam*), 586 F.2d 79, 87 (8th Cir. 1978) ("[T]he value of the improved property may be greater than, equal to, or even less than the property in its unimproved state."); *accord United States v. 6.24 Acres of Land* (*Weber*), 99 F.3d 1140, 1996 WL 607162 (6th Cir. 1996) (per curiam) (unpubl.); *United States v. Lewis*, 308 F.2d 453, 457-59 (9th Cir. 1962); *United States v. 158.76 Acres of Land in Townshend*, 298 F.2d 559, 561 (2d Cir. 1962); *United States v. Certain Parcels of Land in Rapides Par.*, 149 F.2d 81, 82 (5th Cir. 1945); *United States v. Meyer*, 113 F.2d 387, 397 (7th Cir. 1940); *United States v. 33.92356 Acres of Land* (*Piza-Blondet Trial Op.*), No. 98-1664, 2008 WL 2550586, at *10-*11 (D.P.R. June 13, 2008), aff'd, 585 F.3d 1, 11 (1st Cir. 2009); *United States ex rel. Tenn. Valley Auth. v. Harralson*, 43 F.R.D. 318, 321 (W.D. Ky. 1966) (mem.); *see Morton Butler Timber Co. v. United States*, 91 F.2d 884, 888 (6th Cir. 1937); *United States v. Wise*, 131 F.2d 851, 852-53 (4th Cir. 1942); *cf. United States v. Sowards*, 370 F.2d 87, 90-91 (10th Cir. 1966) (improper to value property by multiplying amount of coal *in situ* by price per ton).

245  *Wise*, 131 F.2d at 852-53 ("[When a] shrewd, able purchaser who was interested in that property . . . finally came to determine what he would pay, it would be a single figure.").

246  *See, e.g, Cannon Dam*, 586 F.2d at 88-89 ("serious error" to permit aggregation of estimated surface value and estimated value of underlying clay).

247  *United States v. 32.42 Acres of Land* (*Fleet ASW*), No. 05cv1137 DMS, 2009 WL 2424303, at *6 (S.D. Cal. Aug. 6, 2009) (citing *Kimball Laundry Co. v. United States*, 338 U.S. 1, 16 (1949)); *United States v. Certain Space in Rand McNally Bldg.*, 295 F.2d 381, 383-84 (7th Cir. 1961).

248  *Bibb Cty. v. United States*, 249 F.2d 228, 230 (5th Cir. 1957); *see also Searl v. Sch. Dist. in Lake Cty.*, 133 U.S. 553, 562-65 (1890); *United States v. Del., Lackawana & W.R.R. Co.*, 264 F.2d 112, 116-17 (3d Cir. 1959).

249  *See Fleet ASW*, 2009 WL 2424303, at *6; *cf. United States v. City of Columbus*, 180 F. Supp. 775, 775 (S.D. Ohio 1959) (lease provision allowed tenant United States reasonable time to remove improvements); *San Nicolas v. United States*, 617 F.2d 246 (Ct. Cl. 1980) (lease provision obligated tenant United States to restore property to condition at lease onset).

250  *See, e.g., Old Dominion Land Co. v. United States*, 269 U.S. 55, 65 (1925); *Searl*, 133 U.S. at 562-65; *Wash. Metro. Area Transit Auth. v. One Parcel of Land*, 780 F.2d 467, 471 (4th Cir. 1986); *Del., Lackawana*, 264 F.2d at 116-17; *Bibb Cty.*, 249 F.2d at 230; but see *Rand McNally Bldg.*, 295 F.2d at 383-84.

for negotiating purposes and/or to comply with agency obligations under the Uniform Act. Such an allocation should be reported in a separate, supplemental report, rather than in the appraisal report of the market value of the whole property.[251] Similarly, some assignments may require a determination of the contributory value of buildings, structures, or other improvements that will be removed or adversely affected due to the government project.[252] If applicable, the appraiser should clearly state that any such allocations do not indicate the appraisal method(s) employed.[253]

**4.2.2.4.** **Departure from the Unit Rule.** Federal courts have repeatedly emphasized that the unit rule is "a 'carefully guarded' one and that only in rare and exceptional types of situations [should] departures from it be[ ] permitted."[254] Thus, while the courts recognize the unit rule "manifestly is not without hardships in practical operation,"[255] under federal law departure from the unit rule is permitted only in "extraordinary," "unique," "rare and compelling" circumstances.[256] Any departure from the unit rule requires a **legal instruction**, as "the determination as to [the unit rule's] applicability is one made by a court as a matter of law rather than by an appraiser."[257]

> Any departure from the unit rule requires a <u>legal instruction</u>, because the applicability of the rule is a matter of law that cannot be determined by an appraiser.

**4.2.3.** **Objective Market Evidence; Conjectural and Speculative Evidence.** For compensation to be "just, not merely to the individual whose property is taken, but to the public which is to pay for it[,]" its measure must be objective.[258] The determination of market value must therefore take into account all considerations that might fairly be brought forward

> "[I]t is the owner's loss, not the taker's gain, which is the measure of compensation . . . ."
>
> —*United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 281 (1943)

---

251 Unless specifically instructed, apportionment (allocation) of the market value of the whole property is generally beyond the scope of the appraiser's assignment. *See United States v. Dunnington*, 146 U.S. 338, 351 (1892); *United States v. 6.45 Acres of Land (Gettysburg Tower)*, 409 F.3d 139, 146-47 & n.13 (3d. Cir. 2005); *United States v. 1.377 Acres of Land (Hotel San Diego)*, 352 F.3d 1259, 1269 (9th Cir. 2003).

252 Section 302 of the Uniform Act directs agencies to acquire proportional interest in such structures. 42 U.S.C. § 4652; *see United States v. 158.00 Acres in Clay Cty.*, 562 F.2d 11, 13 (8th Cir. 1977) (noting "contributory value of improvements may be only a subsidiary fact supporting the ultimate finding of just compensation" but "has independent significance" under the Act). Administrative benefits under the Act or other statutes are separate from compensation under the Fifth Amendment. *See United States v. Gen. Motors*, 323 U.S. 373, 379-80 (1945); *United States v. Willow River Power Co.*, 324 U.S. 499, 510 (1945); *Ackerley Commc'ns of Fla. v. Henderson*, 881 F.2d 990, 992-93 & n.2 (11th Cir. 1989) ("[S]uch benefits should be viewed as administrative payments to displaced persons." (quoting H.R. REP. NO. 91-1656, at 5-6 (1970), as reprinted in 1970 U.S.C.C.A.N. 5854)).

For a thorough analysis of the legislative history and intent of the Uniform Act, *see Barnhart v. Brinegar*, 362 F. Supp. 464 (W.D. Mo. 1973) (adopted by *Ackerley Commc'ns*, 881 F.2d at 992); *United States v. 320 Acres of Land*, 605 F.2d 762, 823 (5th Cir. 1979); *Roth v. U.S. Dep't of Transp.*, 572 F.2d 183, 184 (8th Cir. 1978), *Rhodes v. City of Chi. for Use of Sch.*, 516 F.2d 1373, 1378 (7th Cir. 1975); *cf. Clear Sky Car Wash, LLC v. City of Chesapeake*, 910 F. Supp. 2d 861, 878 n.13 (E.D. Va. 2012).

253 *See United States v. 91.90 Acres of Land in Monroe Cty. (Cannon Dam)*, 586 F.2d 79, 87 (8th Cir. 1978) ("[I]t is firmly settled that one does not value the [l]and as one factor and then value the improvements as another factor and then add the two values to determine market value. That is true because the value of the improved property may be greater than, equal to, or even less than the property in its unimproved state.").

254 *United States v. 6.45 Acres of Land (Gettysburg Tower)*, 409 F.3d 139, 148 (3d Cir. 2005) (quoting *Nebraska v. United States*, 164 F.2d 866, 869 (8th Cir. 1947)).

255 *Nebraska*, 164 F.2d at 868.

256 *Gettysburg Tower*, 409 F.3d at 147-48 (citing, inter alia, *United States v. Welch*, 217 U.S. 333, 338 (1910); *Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910); *United States v. 499.472 Acres of Land in Brazoria Cty.*, 701 F.2d 545, 549 (5th Cir. 1983); *United States v. Corbin*, 423 F.2d 821, 828 (10th Cir. 1970)).

257 *Gettysburg Tower*, 409 F.3d at 142 n.5.

258 *Bauman v. Ross*, 167 U.S. 548, 574 (1897); *see United States v. 564.54 Acres of Land (Lutheran Synod)*, 441 U.S. 506, 511 (1979) ("we have recognized the need for a relatively objective working rule"); *United States v. Miller*, 317 U.S. 369, 375 (1943); *cf. City of New York v. Sage*, 239 U.S. 57, 61 (1915) ("[I]t is to be considered only so far as the public would have considered it if the land had been offered for sale . . . .").

and reasonably be given substantial weight in bargaining between buyer and seller.[259] But the appraiser must disregard any *special value to the owner* "who may not want to part with his land because of its special adaptability to his own use" as well as *any special value to the government* because of the government's needs or the property's "peculiar fitness" for the government's purposes.[260] Only "value transferable from one owner to another . . . has an external validity which makes it a fair measure of public obligation to compensate the loss incurred by an owner as a result of the taking of his property for public use."[261] As a result, "loss to the owner of nontransferable values deriving from his unique need for property or idiosyncratic attachment to it, like loss due to an exercise of the police power, is properly treated as part of the burden of common citizenship."[262] Similarly, "the Fifth Amendment allows the owner only the fair market value of his property; it does not guarantee him a return of his investment."[263]

Moreover, just compensation cannot be based on mere speculation or conjecture. As the Supreme Court stated in *Olson v. United States*:

> Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth.[264]

**4.2.4.    Refinements of Market Value Standard.** The Fifth Amendment requirement of just compensation "derives as much content from the basic equitable principles of fairness as it does from technical concepts of property law."[265] With this in mind, the Supreme Court has honed the basic foundation of market value "with certain refinements developed over the years in the interest of effectuating the constitutional guarantee" of just compensation.[266] Valuations for federal acquisitions must comply with these refinements, which reflect the Supreme Court's recognition that "strict adherence to the criterion of market value may involve . . . elements which, though they affect such value, must in fairness be eliminated."[267] These refinements reflect the practical applications of the principles of fairness underlying

> **Appraisers estimate market value, not just compensation. Departure from the market value standard is rarely justified in federal acquisitions, and inevitably requires appropriate <u>legal instruction</u>.**

259  *Olson v. United States*, 292 U.S. 246, 257 (1934); *Rasmuson v. United States*, 807 F.3d 1343, 1346 (Fed. Cir. 2015).

260  *Miller*, 317 U.S. at 375; *see* Section 4.4.2.4.2.5 (Sales to a Party with Condemnation Authority); *see also United States v. Fuller*, 409 U.S. 488, 491 (1973). In developing the market value standard as the measure of just compensation, the federal courts have used terms such as *value, market value, fair market value,* and *market value fairly determined* interchangeably without altering the meaning of *market value* for federal acquisition purposes. *See Miller*, 317 U.S. at 374 & nn.10-14 (citing cases).

261  *United States v. 50 Acres of Land* (<u>Duncanville</u>), 469 U.S. 24, 36 (1984) (quoting *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949)).

262  *Duncanville*, 469 U.S. at 36.

263  *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 285 (1943); *see Olson*, 292 U.S. at 255 ("The public may not by any means confiscate the benefits, or be required to bear the burden, of the owner's bargain."); *see, e.g., United States v. 15,478 Square Feet of Land* (<u>Balaji Sai</u>), No. 2:10-cv-00322, 2011 WL 2471586, at *6 (E.D. Va. June 20, 2011).

264  *Olson*, 292 U.S. at 257.

265  *Fuller*, 409 U.S. at 490.

266  *United States v. Reynolds*, 397 U.S. 14, 16 (1970).

267  *United States v. Miller*, 317 U.S. 369, 375 (1943); *see also Fuller*, 409 U.S. at 491. In developing the market value standard as the measure of just compensation, the federal courts have employed terms such as *value, market value, fair market value,* and *market value fairly determined* interchangeably; the adding of adjectives such as *fair* or *cash* to the term *market value* does not alter its meaning for federal acquisition purposes. *See Miller*, 317 U.S. at 374 & nn.10-14 (citing cases).

5-ER-857

the Fifth Amendment.[268] They include the analysis of highest and best use (Section 4.3) and determination of the larger parcel (Section 4.3.3); acceptable approaches to value (Section 4.4); the treatment of government project influence on market value (Section 4.5); partial acquisitions and the before and after valuation method (Section 4.6.1), compensable damages (4.6.2), offsetting benefits (4.6.3), and easement valuation issues (4.6.5); and the market rental value standard for leasehold and other temporary acquisitions (Section 4.7). These refinements can lead to particularly complex valuation problems in acquisitions involving natural resources (Section 4.8), inverse takings (Section 4.9), and land exchanges (Section 4.10).

**4.2.5.**    **Special Rules.** Certain types of federal acquisitions raise unique compensation questions that have led the courts to craft special valuation rules with limited applicability, which is discussed in Section 4.11. The general principle that just compensation does not include value created by the United States has specific implications in the appraisal of riparian lands involving the United States' navigational servitude (Section 4.11.1) and of ranch lands involving federal grazing permits (Section 4.11.2). Similarly, the valuation of public roads, infrastructure, and facilities sometimes requires special treatment to ensure that compensation will reflect the owner's loss, not the government's gain (Section 4.11.3).

**4.2.6.**    **Exceptions to Market Value Standard.** These Standards direct appraisers to estimate a property's market value—not the just compensation due for a government acquisition[269]—because appraisers do not have the authority to determine just compensation under the Fifth Amendment.[270] Rarely, deviation from market value as the measure of just compensation may be required in federal acquisitions, but "only 'when market value has been too difficult to find, or when its application would result in manifest injustice to owner or public.'"[271] Such situations are highly unusual,[272] and moreover, inevitably require appropriate **legal instruction**.[273] Whether departure from the established market value standard is appropriate in a given set of facts is a legal question beyond the scope of an appraiser to determine.[274]

**4.3.**    **Highest and Best Use.** Market value must be determined by considering a property's highest and best use, a term of art defined by the Supreme Court in 1934 as the "highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future."[275] The Court went on to explain that a property's highest and best use must be considered "not necessarily as the measure of value, but to the full extent

---

268    *See Powelson*, 319 U.S. at 285; *Bauman v. Ross*, 167 U.S. 548, 574 (1897); *Shoemaker v. United States*, 147 U.S. 282 (1893); *Kerr v. S. Park Comm'rs*, 117 U.S. 379 (1886).

269    *See United States v. New River Collieries Co.*, 262 U.S. 341, 343-44 (1923); *cf. United States v. 33.92356 Acres of Land* (*Piza-Blondet Trial Op.*), No. 98-1664, 2008 WL 2550586, at *1-*2, *6 (D.P.R. June 13, 2008) (distinguishing valuation evidence from determination of just compensation); *aff'd*, 585 F.3d 1 (1st Cir. 2009); *cf. United States v. Foster*, 131 F.2d 3, 6-7 (8th Cir. 1942).

270    *See Monongahela Nav. Co. v. United States*, 148 U.S. 312, 327-28 (1893).

271    *United States v. 50 Acres of Land* (*Duncanville*), 469 U.S. 24, 29 (1984) (quoting *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950), and *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 n.14 (1984)).

272    *See Duncanville*, 469 U.S. at 30 ("This case is not one in which an exception to the normal measure of just compensation is required because fair market value is not ascertainable. Such cases, for the most part, involve properties that are seldom, if ever, sold in the open market.").

273    *See Monongahela*, 148 U.S. at 327 ("what shall be the measure of compensation . . . . is a judicial . . . question"); *see Rasmuson v. United States*, 807 F.3d 1343, 1345 (Fed. Cir. 2015); *United States v. 4.105 Acres of Land in Pleasanton*, 68 F. Supp. 279, 292-93 (N.D. Cal. 1946).

274    *See Kimball Laundry Co. v. United States*, 338 U.S. 1, 4 (1949) (granting certiorari in case "rais[ing] novel and serious questions in determining what is 'just compensation' under the Fifth Amendment" that "are not resolved by the familiar formulas available for the conventional situations which gave occasion for their adoption").

275    *Olson v. United States*, 292 U.S. 246, 255 (1934); *see United States ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land*, 821 F.3d 742, 752 (6th Cir. 2016) ("a term of art" (citing *Olson*)).

---

that the prospect of demand for such use affects the market value while the property is privately held."[276]

### 4.3.1. Highest and Best Use Definition.

> **Definition of Highest and Best Use**
> The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.

A highest and best use must be reasonably probable. The determination of market value must take into account all considerations that might fairly be brought forward and reasonably be given substantial weight in bargaining between buyer and seller.[277] But the Supreme Court has stated: "Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration."[278]

A significant practical implication of this legal rule is that a specific highest and best use can only be considered "if the use is likely to be reasonably probable 'in the reasonably near future.'"[279] Accordingly, there must be proof of "present or future demand, the connecting link from adaptability to value."[280] Similarly, if a property could not legally be used for residential development without rezoning or some variance or permit, that use cannot be considered in determining value unless there is "a reasonable probability that the property would be rezoned or that a variance could have been obtained in the near future."[281] This requirement "ensures that the landowner is put in as good a position as he would have occupied if his property had not been taken, but that he does not profit" from a government acquisition for public purposes.[282]

> **Criteria for Analysis**
> Each potential highest and best use must be analyzed using four criteria as stated in Section 1.5.2:
>
> (1) Physical possibility,
> (2) Legal permissibility,
> (3) Financial feasibility, and
> (4) Degree of profitability.

The fact that a parcel's highest and most profitable use "can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value."[283] But "there must be a reasonable probability of the lands in question being combined with other tracts for that purpose in the reasonably near future."[284]

### 4.3.2. Criteria for Analysis. As discussed in Section 1.5.2, in determining a property's highest and best use, each potential use must be analyzed using four criteria: (1) physical possibility, (2) legal

---

276  *Olson*, 292 U.S. at 255; *cf. Kerr v. S. Park Comm'rs*, 117 U.S. 379, 386 (1886) ("What would any one needing lands for residence, business, or any other purpose have paid for them in cash?").

277  *Olson*, 292 U.S. at 257; *Rasmuson*, 807 F.3d at 1346.

278  *Olson*, 292 U.S. at 257; *see also United States v. 320 Acres of Land*, 605 F.2d 762, 814-20 (5th Cir. 1979).

279  *United States v. 33.92556 Acres of Land* (*Piza-Blondet*), 585 F.3d 1, 7-8 (1st Cir. 2009) (quoting *Olson*, 292 U.S. at 255-56); *accord TVA v. 1.72 Acres*, 821 F.3d at 752-53.

280  *St. Joe Paper Co. v. United States*, 155 F.2d 93, 97 (5th Cir. 1946); *accord TVA v. 1.72 Acres*, 821 F.3d at 755-56; *see* Section 4.3.2.2 (Market Demand).

281  *Piza-Blondet*, 585 F.3d at 7-8; *see* Section 4.3.2.4 (Zoning and Permits).

282  *TVA v. 1.72 Acres*, 821 F.3d at 752-53 (citing *Olson*, 292 U.S. at 255, 257).

283  *Olson*, 292 U.S. at 256.

284  *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 275-76 (1943) (citing *Olson*, 292 U.S. at 255).

permissibility, (3) financial feasibility and (4) degree of profitability. Because most property is adaptable to several uses, the highest and best use is the physically possible, legally permissible, and financially feasible use that results in the highest value. [285]

### 4.3.2.1.   All Possible Uses.

As "economic demands normally result in an owner's putting his land to the most advantageous use[,]"[286] a property's highest and best use is ordinarily its existing use on the date of value.[287] Many courts describe this precept as a *presumption* in favor of a property's existing use;[288] others simply regard an existing use as "compelling evidence" of highest and best use when a different proposed use is asserted.[289] Either rationale has the same result: to assert a highest and best use other than a property's existing use, there must be evidence "that this [different] use is 'reasonably probable' and that the probability has a real market value."[290] Similarly, in litigation (such as condemnation proceedings), the party claiming a property's highest and best use is not the existing use bears the burden of proof.[291]

Any presumption favoring the existing use does not preclude consideration of other uses in the highest and best use analysis. In fact, any reasonably probable use should be considered to the extent a property's potential for such use affects its market value.[292] As the Fifth Circuit stated:

> owners of property [may seek] to prove, if they can, that the actual use to which they are putting it is not the highest and best use for the property as viewed by a potential purchaser. [But where] there has been no such proof[, t]here is nothing more than speculation that…a purchaser could be interested in buying the land [for another use].[293]

Moreover, a potential future use, even if profitable, is not necessarily the measure of the property's value: "Instead, it is to be considered to the extent the prospect of demand for the use affects market value."[294]

---

285   *See United States v. 69.1 Acres of Land* (*Sand Mountain*), 942 F.2d 290, 292 (4th Cir. 1991); Section 1.6.

286   *United States v. Buhler*, 305 F.2d 319, 328 (5th Cir. 1962).

287   *United States v. L.E. Cooke Co.*, 991 F.2d 336, 341 (6th Cir. 1993); *United States v. 62.50 Acres of Land in Jefferson Par.*, 953 F.2d 886, 890 (5th Cir. 1992); *Sand Mountain*, 942 F.2d at 292.

288   *E.g., United States ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land,* 821 F.3d 742, 753 (6th Cir. 2016); *L.E. Cooke*, 991 F.2d at 341 ("In the absence of proof to the contrary, the current use is presumed to be the best use."); *62.50 Acres in Jefferson,* 953 F.2d at 890 ("A landowner can overcome this presumption only by showing a reasonable probability that the land is adaptable and needed for the potential use in the near future."); *Sand Mountain*, 942 F.2d at 292; *United States v. 158.24 Acres of Land in Bee Cty.*, 515 F.2d 230, 233 (5th Cir. 1975).

289   *E.g., Buhler*, 305 F.2d at 328-29; *see United States v. 25.202 Acres of Land* (*Amexx I*), 860 F. Supp. 2d 165, 177-79 (N.D.N.Y. 2010) ("A potential use should be considered only to the extent that the prospect of demand for such use would have affected the price that a willing buyer would have offered for the property just prior to the taking."), *aff'd*, 502 F. App'x 43, 45 (2d Cir. 2012).

290   *United States v. 1.604 Acres of Land* (*Granby I*), 844 F. Supp. 2d 668, 679-81 (E.D. Va. 2011); *accord 62.50 Acres in Jefferson*, 953 F.2d at 890; *United States v. 27.93 Acres of Land in Cumberland Cty.*, 924 F.2d 506, 512-14 (3d Cir. 1991).

291   *E.g., TVA v. 1.72 Acres*, 821 F.3d at 753-54, 756; *United States v. 100.00 Acres of Land in Livingston Cty.*, 369 F. Supp. 195, 200 (W.D. Ky. 1973); *United States v. 429.59 Acres of Land* (*Imperial Beach*), 612 F.2d 459, 460, 461-62 (9th Cir. 1980); *62.50 Acres in Jefferson*, 953 F.2d at 890; *see United States v. 33.92356 Acres of Land* (*Piza-Blondet*), 585 F.3d 1, 7-8 (1st Cir. 2009) ("If a claimed use is prohibited by zoning, the property owner must show that it is reasonably probable that the relevant restrictions will be removed in the reasonably near future."), *aff'g* 2008 WL 2550586, at *7 (D.P.R. June 13, 2008) ("[E]vidence of a proposed use must be excluded if the landowner fails to demonstrate reasonable probability that a permit would be issued for the proposed use.").

292   *Olson v. United States*, 292 U.S. 246, 255 (1934); *Sand Mountain*, 942 F.2d at 292; *United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 394 (5th Cir. 1982).

293   *Buhler*, 305 F.2d at 329; *see TVA v. 1.72 Acres*, 821 F.3d at 754 ("[T]here must be demonstrated an actual profitable use or a market demand for the prospective use.").

294   *62.50 Acres in Jefferson*, 953 F.2d at 890; *accord Olson*, 292 U.S. at 255.

4.3.2.2.  **Market Demand.** Any highest and best use requires a showing of <u>market demand</u>. As the Supreme Court observed, "most things…have a general demand which gives them a value transferable from one owner to another…[T]his transferable value has an external validity which makes it a fair measure" of just compensation.[295] Accordingly, "it is generally accepted that there must be demonstrated an actual profitable use or a market demand for the prospective use."[296] To meet this standard, "objective evidence substantiating [the appraiser's] market demand analysis" is required.[297] "Value implies demand and a buyer"—and each must be proven, never assumed.[298]

> **Government demand cannot support a highest and best use.**

Highest and best use cannot be predicated on demand created solely by the government project for which the property is acquired; as the Supreme Court held, "[i]t is not fair that the government be required to pay the enhanced price which its demand alone has created."[299] To illustrate, a property's highest and best use cannot be commercial rock quarrying if there is no likely market demand for gravel except in connection with the public highway project for which the property is acquired.[300]

Similarly, the government's intended use of the property—such as a military bombing range, national monument, or habitat conservation—cannot be considered unless there is competitive demand for that use in the private market.[301] As the Ninth Circuit reasoned:

> [V]alues resulting from the urgency or uniqueness of the government's need for the property or from the uniqueness of the use to which the property will be put do not reflect what a willing buyer would pay to a willing seller . . . . [G]overnment projects may render property valuable for a unique purpose. Value for such a purpose, if considered, would cause "the market to be an unfair indication of value," because there is no market apart from the government's demand.[302]

The Sixth Circuit recently explored what must be shown "to prove the existence of a market demand for something."[303] To show market demand for a proposed use of hotel development, examples of "objective evidence substantiating [a] market demand analysis" would include proof of preliminary discussions with a prospective hotel chain, market studies showing sufficient

---

295  *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949) (rejecting "such personal and variant standards as value to the particular owner whose property has been taken" or "gain to the taker [which] may be wholly unrelated to the deprivation imposed upon the owner").

296  *TVA v. 1.72 Acres*, 821 F.3d at 754 (quoting *United States ex rel. Tenn. Valley Auth. v. An Easement & Right-of-Way* (*Hadley*), 447 F.2d 1317, 1319 (6th Cir. 1971)).

297  *TVA v. 1.72 Acres*, 821 F.3d at 755; *accord United States v. 341.45 Acres of Land in St. Louis Cty.*, 633 F.2d 108, 113 (8th Cir. 1980).

298  *341.45 Acres in St. Louis*, 633 F.2d at 113 (quoted in *TVA v. 1.72 Acres*, 821 F.3d at 755); *see Olson*, 292 U.S. at 256 (highest and most profitable use is to be considered "to the full extent that the prospect of demand for such use affects the market value while the property is privately held").

299  *United States v. Cors*, 337 U.S. 325, 333 (1949); *accord United States v. 320 Acres of Land*, 605 F.2d 762, 811 n.107 (5th Cir. 1979); *United States v. 46,672.96 Acres of Land in Doña Ana Ctys.*, 521 F.2d 13, 15, 16 (10th Cir. 1975); *J.A. Tobin Constr. Co. v. United States*, 343 F.2d 422, 423 (10th Cir. 1965); *United States v. 158.76 Acres of Land in Townshend*, 298 F.2d 559, 560 (2d Cir. 1962).

300  *J.A. Tobin*, 343 F.2d 422.

301  *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 80-81 (1913); *320 Acres*, 605 F.2d at 783 n.26, 811 n.107; *46,672.96 Acres in Doña Ana*, 521 F.2d at 15-16; *United States v. 275.81 Acres of Land* (*Flight 93 Memorial*), No. 09-233, 2014 WL 1248205, at *4 (W.D. Pa. March 26, 2014) (compensation cannot reflect change in value due to United States' development of public Flight 93 National Memorial).

302  *United States v. Weyerhaeuser Co.*, 538 F.2d 1363, 1366, 1367 (9th Cir. 1976) (internal citations omitted); *accord 46,672.96 Acres in Doña Ana*, 521 F.2d at 15-17; *United States v. Whitehurst*, 337 F.2d 765 (4th Cir. 1964).

303  *TVA v. 1.72 Acres*, 821 F.3d at 755 (citing *341.45 Acres in St. Louis*, 633 F.2d 108).

---

5-ER-861

demand for a hotel, or market sales of land for hotel development purposes.[304] With no such evidence presented, hotel development was correctly excluded from consideration as the property's highest and best use.[305]

#### 4.3.2.3.  Economic Use.

For just compensation purposes, market value must be based on a property's highest and *most profitable use*—that is, an *economic* use.[306] The inquiry must be "what is the property worth in the market . . . from its availability for valuable uses."[307] And *valuable uses* are those which "the prospect of demand for such use affects the market value while the property is privately held."[308] Because "[c]onsiderations that may not reasonably be held to affect *market value* are excluded[,]"[309] *noneconomic* uses cannot be considered in determining market value for federal acquisitions.[310] Federal courts have also rejected valuations that improperly fail to consider an economic use.[311]

"The federal concept of market value is intimately related to selling price on the market" in federal case law.[312] Indeed, the Supreme Court has recognized that "the 'market price' becomes so important a standard of reference" because it reflects the value "arrived at by the haggling of the market . . . ."[313] Accordingly, in determining market value for just compensation purposes, a use cannot be considered unless there is competitive demand for that use in the private market.[314] This means that a use can be considered as a highest and best use only if that use contributes to the property's actual market value—that is, to the amount for

---

### Market Value and Economic Use

"Value is a word of many meanings"—but "the *value* compensable under the Fifth Amendment … is only that which is capable of transfer from owner to owner and thus of exchange for some equivalent." *Kimball Laundry Co. v. United States*, 338 U.S. 1, 4-5 (1949). Thus market value, as the measure of just compensation, cannot reflect nonmarket or noneconomic considerations.

The federal concept of market value is fundamentally different from the real estate appraisal concept of public interest value, which links highest and best use to noneconomic uses and public policy benefits rather than market considerations. Because noneconomic uses reflect something other than market value, **appraisals for federal acquisitions cannot consider public interest value or related concepts** (such as habitat value or preservation value).

---

304  *TVA v. 1.72 Acres*, 821 F.3d at 755.

305  *Id.* at 755-56.

306  *See Olson v. United States*, 292 U.S. 246, 255-56 (1934) ("highest and most profitable use"); *Monongahela Nav. Co v. United States*, 148 U.S. 312, 328 (1893) ("The value of property, generally speaking, is determined by its productiveness,—the profits which its use brings to the owner.").

307  *Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 407-08 (1878) ("[C]ompensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonable expected in the immediate future."); *see also Olson*, 292 U.S. at 255-57 ("The highest and most profitable use . . . is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held.").

308  *Olson*, 292 U.S. at 255 (citing *Boom Co.*, 98 U.S. at 408 ("In determining the value of land appropriated for public purposes, the same considerations are to be regarded as in a sale of property between private parties.")).

309  *Olson*, 292 U.S. at 256 (emphasis added), *quoted in United States v. 50 Acres of Land* (*Duncanville*), 469 U.S. 24, 29 (1984).

310  *See, e.g., United States v. 46,672.96 Acres of Land in Doña Ana Ctys.*, 521 F.2d 13, 17 (10th Cir. 1975); *United States v. 1.57 Acres of Land in San Diego Cty.*, No. 12cv3055, 2015 WL 5254558 (S.D. Cal. Sept. 9, 2015) (excluding from consideration all evidence not "relating to market value" in valuation of conservation easement); *see also United States v. 275.81 Acres of Land* (*Flight 93 Memorial*), No. 09-233, 2014 WL 1248205, at *4 (W.D. Pa. March 26, 2014); *United States v. 1.604 Acres of Land* (*Granby I*), 844 F. Supp. 2d 668, 679-81 (E.D. Va. 2011) (excluding all evidence of proposed highest and best use not shown to be financially feasible).

311  *See, e.g., Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1185 (9th Cir. 2000).

312  *United States v. Sowards*, 370 F.2d 87, 89 (10th Cir. 1966).

313  *Kimball Laundry Co. v. United States*, 338 U.S. 1, 6 (1949).

314  *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 80-81 (1913); *United States v. 320 Acres of Land*, 605 F.2d 762, 783 n.26, 811 n.107 (5th Cir. 1979); *United States v. Weyerhaeuser Co.*, 538 F.2d 1363, 1366, 1367 (9th Cir. 1976); *46,672.96 Acres in Doña Ana*, 521 F.2d at 15-16; *United States v. Whitehurst*, 337 F.2d 765 (4th Cir. 1964); *Flight 93 Memorial*, 2014 WL 1248205, at *4; see, e.g., *1.57 Acres in San Diego*, 2015 WL 5254558, at *3 (evidence unrelated to market value cannot be considered in determining whether conservation easement had "significant private market value").

which the property would sell in the open competitive market.[315] As to what constitutes an open competitive market, the Supreme Court held that where prices are "controlled by the supply and demand[, t]hese facts indicate a free market."[316]

Federal courts consistently reject alternative measures of compensation that reflect something other than market value based on an economic use indicated by supply and demand in the open, competitive market.[317] Uses based on *preservation*, *conservation* or *open space*, among other priorities, typically lack the competitive supply and demand necessary to indicate a free market and therefore cannot be considered in determining market value for federal acquisitions.[318] As the Supreme Court has held for over a century: "That [a] property may have to the public a greater value than its fair market value affords no just criterion for estimating what the owner should receive."[319]

The Supreme Court bluntly rejected the addition of nonmarket, noneconomic considerations to market value in *City of New York v. Sage*, in which land commissioners improperly awarded compensation "over and above the market value" of the property acquired due to "what they thought a fair proportion of the increase" for its availability and adaptability for a public reservoir. [320]

> Upon that point . . . they were wrong . . . . [W]hat the owner is entitled to is the value of the property taken, and that means what it fairly may be believed that a purchaser in fair market conditions would have given for it in fact,—not what a tribunal at a later date may think a purchaser would have been wise to give . . . . Any rise in value before the taking, not caused by the expectation of that event, is to be allowed, but we repeat, it must be a rise in what a purchaser might be expected to give.[321]

---

315  *See, e.g., 46,672.96 Acres in Doña Ana*, 521 F.2d at 17 ("[T]he land had little, if any, market value. . . . The fact that [the property] has very little value cannot justify . . . using an inapplicable measure, namely, its highest and best use being a missile range."). A related issue is that sales to government entities and certain other transactions frequently involve noneconomic or nonmarket considerations. As discussed in Section 4.4.2.4, such sales cannot be used without "great caution" because they are "an inaccurate indicator of market value." *Id*. at 17. *See* Section 1.5.2.4 and the appendix regarding the extraordinary verification and treatment necessary to rely on such sales.

316  *United States v. New River Collieries Co.*, 262 U.S. 341, 345 (1923); *see also L. Vogelstein & Co. v. United States*, 262 U.S. 337, 338 (1923) ("market price as fixed by supply and demand and other elements in normal trading") (decided the same day as *New River*); *Desert Citizens*, 231 F.3d at 1185 ("A regional market and the presence of competitors sponsoring similar projects made reasonably probable . . . that use of the lands for landfill purposes was financially feasible [and should have been considered as a potential highest and best use].").

317  *See, e.g., New River*, 262 U.S. at 345 (refusing to depart from market value standard where prices "were controlled by the supply and demand. These facts indicate a free market").

318  *Cf. United States v. 15.00 Acres of Land in Miss. Cty.*, 468 F. Supp. 310, 314-16 & n.9 (E.D. Ark. 1979) ("The court is not unmindful of the special significance of this land to the [landowners], their families, friends and associates. And, while the court is sympathetic to the unique problems posed by the increasing demand for the limited natural resources involved in this case, the court must resolve the issues herein on the same basis as a jury, without regard to sympathy or prejudice or like or dislike of any party to this suit. . . . [W]hile the value of the . . . tract for duck hunting purposes is conceded, it does not follow that the [landowners] are to be compensated on the basis of that particular value . . . ."); APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 331 (14th ed. 2013) ("[H]ighest and best use . . . is an economic concept"); id. 334 ("[C]onservation and preservation are not uses of land. Rather, they are the motivations of individuals or groups for acquiring certain properties.").

As discussed in Section 4.4.2.4, sales of properties for conservation or similar purposes may also reflect project influence from the government project, which must be disregarded. As a result, such sales cannot be relied on as comparable sales without great caution.

319  *Chandler-Dunbar*, 229 U.S. at 80.

320  239 U.S. 57, 61 (1915).

321  *Id*. at 61; *accord Five Tracts of Land in Cumberland Twp. v. United States*, 101 F. 661, 664-65 (3d Cir. 1900) ("There is no doubt that historic association may enter into the market value of the land, but you are not to give, as separate items- First, market value; and, second, historic value.").

---

Whether a specific use is economic and therefore appropriate to consider depends on the market, not the use itself.[322] For example, in a market in which real estate developers are required to acquire and set aside suitable land to mitigate the impacts of and obtain approvals for real estate development projects, competitive demand in the private market could make mitigation an economic use.[323] But in a market lacking private competitive demand—due to insufficient development activity, absence of mitigation requirements, excess supply of suitable mitigation land, or other reasons—mitigation would not be an economic use.[324] A recent example can be found in a condemnation involving an existing conservation easement.[325] Recognizing "private market value" as the measure of compensation for the easement, the district court excluded all evidence not "relating to market value" from consideration, as "[c]onsiderations that may not reasonably be held to affect market value are excluded."[326] Thus, under federal law, whether mitigation or a similar use is economic (and therefore appropriate to consider) in a given valuation assignment cannot be assumed, but rather must be demonstrated on the specific facts of the property being appraised and the relevant market.[327]

#### 4.3.2.4. Zoning and Permits.
A proposed highest and best use cannot be considered reasonably probable unless it is *legally permissible*.[328] Zoning regulations, permits, and other land use restrictions are therefore of critical importance in analyzing highest and best use because they restrict the uses to which property can lawfully be devoted.[329] Indeed, "regulatory restrictions may preclude an otherwise possible use even more decisively than the inherent physical characteristics of a property."[330] And "it is clear that just compensation must be determined in

---

322  *Compare United States v. Whitehurst*, 337 F.2d 765, 775 (4th Cir. 1964) (rejecting valuation based on use of gravel quarrying because "under the facts of this case, . . . extensive use to supply . . . sand and gravel demand is merely a figment of the imagination"), *with United States v. 237,500 Acres of Land*, 236 F. Supp. 44, 53 (S.D. Cal. 1964), *aff'd sub nom. United States v. Am. Pumice Co.*, 404 F.2d 336 (9th Cir. 1968) (allowing valuation based on use of pumice mining because "in this case, there was not only a prior market, but an existing and rising one on the date of taking, and the [landowners] were in active operation of the pumice mines").

323  *E.g.*, *Otay Mesa Property, L.P. v. United States*, 110 Fed. Cl. 732, 734 n.1 (2013) (*Otay Mesa II*), *aff'd in relevant part*, 779 F.3d 1315 (Fed. Cir. 2015) (*Otay Mesa III*); *see Olson v. United States*, 292 U.S. 246, 256 (1934) ("[P]ublic service corporations and others having that power [of eminent domain] frequently are actual or potential competitors [for property]. And, to the extent that probable demand by prospective purchasers or condemnors affects market value, it is to be taken into account."); *see also Sage*, 239 U.S. at 61 ("Any rise in value before the taking, not caused by the expectation of that event, is to be allowed, but we repeat, it must be a rise in what a purchaser might be expected to give.").

324  *See United States v. 15.00 Acres of Land in Miss. Cty.*, 468 F. Supp. 310, 315 n.9, 316 (E.D. Ark. 1979) (Despite "special significance of this land to the [landowners and others, and] increasing demand for the limited natural resources[, . . . ] it does not follow that the [landowners] are to be compensated on the basis of that particular value[;]" rather, "all factors should be considered which would influence a person of ordinary prudence desiring to purchase the property involved."); *see also United States v. 46,572.96 Acres of Land in Doña Ana Ctys.*, 521 F.2d 13, 16 (10th Cir. 1975) ("In our case there is absolutely no evidence that anyone other than the government could or would use the land for a missile range."); *Olson v. United States*, 67 F.2d 24, 30 (8th Cir. 1933), *aff'd*, 292 U.S. 246 (1934) ("In using this defined standard [of market value] no account is given to values or necessities peculiar to the seller, or the buyer, but only such matters as would affect the ordinary seller and buyer in negotiating a fair price."); *cf. Chandler-Dunbar*, 229 U.S. at 80 ("no just criterion for estimating what the owner should receive"); *Sage*, 239 U.S. at 62 (rejecting compensation award reflecting not only market value but also "additional value gained by the [government's] acquisition that a commission felt] should be taken into account and shared between the [government] and the owner of the land,—a proposition to which we cannot assent").

325  *United States v. 1.57 Acres of Land in San Diego Cty.*, No. 12-cv-3055, 2015 WL 5254558 (S.D. Cal. Sept. 9, 2015).

326  *Id.* at *2-3 (quoting *United States v. 50 Acres of Land* (*Duncanville*), 469 U.S. 24, 29 (1984). Similarly, in a condemnation of land being used as a park, the Eighth Circuit found no "justification for a departure from the concept of market value as the standard of just compensation" and ordered a new trial in which "market value is not [to be] abandoned as the ultimate test . . . ." *United States v. S.D. Game, Fish & Parks Dep't*, 329 F.2d 665, 666-69 (8th Cir. 1964) (citing, *inter alia*, *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949); *Olson*, 292 U.S. at 254; *Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 408 (1878); and *L. Vogelstein & Co. v. United States*, 262 U.S. 337, 340 (1923)).

327  *1.57 Acres in San Diego*, 2015 WL 5254558. Note that even if mitigation is an economic use appropriate for consideration in a given assignment, the *price of mitigation credits* does not equate to the value of property suitable for mitigation use.

328  *See United States v. 480.00 Acres of Land* (*Fornatora*), 557 F.3d 1297, 1312 (11th Cir. 2009); *United States v. 429.59 Acres of Land* (*Imperial Beach*), 612 F.2d 459, 462 (9th Cir. 1980); *United States v. 320 Acres of Land*, 605 F.2d 762, 818 & n.128 (5th Cir. 1979); *see also Olson*, 292 U.S. at 256-57 ("physical adaptability alone cannot be deemed to affect market value").

329  *See, e.g.*, *United States ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land*, 821 F.3d 742, 753-54 (6th Cir. 2016); *United States v. 33.92356 Acres of Land* (*Piza-Blondet*), 585 F.3d 1, 7-9 (1st Cir. 2009); *Fornatora*, 557 F.3d 1297, 1313; *Imperial Beach*, 612 F.2d at 462; *320 Acres*, 605 F.2d at 818.

330  *320 Acres*, 605 F.2d at 818.

---

light of such regulatory restrictions."[331] As a result, any zoning or other use restrictions that are applied to the property and its proposed use on the date of valuation must be considered.[332] Under federal law, a "use is not possible and probable if it is prohibited by a zoning regulation that is not likely to change."[333] For any use that requires a permit, license, or rezoning, "it must be shown that there is a reasonable probability that such permit or license will be issued or that a re-zoning will occur to make the use legal."[334]

Of course, zoning regulations may change, and prospective purchasers may well consider the potential for a zoning change or variance when determining the price they would pay for the property.[335] Thus, if there was "a reasonable probability that the property would be rezoned or that a variance could have been obtained in the near future[,]" this probability should be considered in arriving at the value estimate[336]—but only to the extent that this probability would have *affected the price* a willing buyer would have paid for the property at the time of the government's acquisition.[337] It is legally improper to assume that a permit, license, or rezoning would be obtained.[338] Rather, the appraiser's opinion as to whether there is a reasonable probability of a zoning change must have a factual foundation; an unsupported statement that a zoning change is reasonably probable is insufficient.[339] To demonstrate a reasonable probability of rezoning or obtaining a variance requires concrete factual support; examples of such support might include, as the First Circuit recently suggested, instances of similar properties receiving similar variances, permits being granted to develop the subject property for the proposed use (not merely pending applications), or actual development of the proposed use on similarly zoned properties.[340] The test is not the probability (or possibility) of rezoning in absolute terms, but rather the market value of the property "in the light of the chances as they would appear to the hypothetical willing buyer and seller."[341]

---

331   *Id.* at 818 & n.128 (citing *United States v. Commodities Trading Corp.*, 339 U.S. 121 (1950)); *United States v. 765.56 Acres of Land in Southampton* (*765.56 Acres I*), 164 F. Supp. 942, 947 (E.D.N.Y. 1958) ("of course it is necessary . . . to consider the possibility and probability of the future use of this land . . . and the appropriate zoning for such use"), *aff'd sub nom. United States v. Glanat Realty Corp.*, 276 F.2d 264 (2d Cir. 1960).

332   *TVA v. 1.72 Acres*, 821 F.3d at 753-54; *Piza-Blondet*, 585 F.3d at 7-9; *United States v. 27.93 Acres of Land in Cumberland Cty.*, 924 F.2d 506, 512-14 (3d Cir. 1991); *United States v. 174.12 Acres of Land in Pierce Cty.*, 671 F.2d 313, 315-16 (9th Cir. 1982); *320 Acres*, 605 F.2d 762, 818; *United States v. Eden Mem'l Park Ass'n*, 350 F.2d 933, 936 (9th Cir. 1965); *H & R Corp. v. District of Columbia*, 351 F.2d 740, 742-43 (D.C. Cir. 1965); *Rapid Transit Co. v. United States*, 295 F.2d 465, 466-67 (10th Cir. 1961); *United States v. Meadow Brook Club*, 259 F.2d 41, 45 (2d Cir. 1958); *see, e.g., Wash. Metro. Area Transit Auth. v. One Parcel of Land* (*Old Georgetown*), 691 F.2d 702, 703-04 (4th Cir. 1982).

333   *Fornatora*, 557 F.3d at 1312; *see Piza-Blondet*, 585 F.3d at 7-8 (use can only be considered if it is "likely to be reasonably probable 'in the reasonably near future,'" quoting *Olson*, 292 U.S. at 255-56)); *320 Acres*, 605 F.2d at 818 & n.129 ("if existing zoning restrictions preclude a more profitable use, ordinarily such use should not be considered in the evaluation"); *Meadow Brook*, 259 F.2d at 45.

334   *Fornatora*, 557 F.3d at 1300.

335   E.g., *320 Acres*, 605 F.2d at 818-19 & nn.128-29; *see Piza-Blondet*, 585 F.3d at 7-8.

336   *Piza-Blondet*, 585 F.3d at 7-8; *see 320 Acres*, 605 F.2d at 818-19.

337   *Olson*, 292 U.S. at 255, 256; *Virgin Islands v. 2.7420 Acres of Land*, 411 F.2d 785, 786 (3d Cir. 1969); *Wolff v. Puerto Rico*, 341 F.2d 945, 946 n.3 (1st Cir. 1965); *Meadow Brook*, 259 F.2d at 45; *H & R Corp.*, 351 F.2d at 743.

338   E.g., *United States ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land*, 821 F.3d 742, 753-54 (6th Cir. 2016); *Piza-Blondet*, 585 F.3d at 8; *see United States v. 62.50 Acres of Land in Jefferson Par.*, 953 F.2d 886, 888-93 (5th Cir. 1992); *see also H & R Corp.*, 351 F.2d at 742-43 ("[A] witness' bare assertion that zoning change was probable [does not allow the probability of a change in zoning to be considered]. His opinion must have some foundation in fact.").

339   *320 Acres*, 605 F.2d at 819 & n.130; H & R Corp., 351 F.2d at 742-43.

340   *See Piza-Blondet*, 585 F.3d at 8 (excluding appraiser's opinion that "failed to document a single instance in which the Board has ever, or is likely to, approve residential housing developments" on land with same zoning as the subject property); *accord United States ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land*, 821 F.3d 742, 754 (6th Cir. 2016).

341   *Wolff*, 341 F.2d at 946 n.3; *see United States v. 62.50 Acres of Land in Jefferson Par.*, 953 F.2d 886, 890 (5th Cir. 1992) ("If regulatory contingencies mean that a buyer would consider the use insignificant in deciding how much to pay for the property, the use does not contribute to the property's market value."); *United States v. 8,968.06 Acres of Land in Chambers & Liberty Ctys.*, 326 F. Supp. 546, 548 (S.D. Tex. 1971) (requiring proponent of prospective use requiring permit to "demonstrate that a willing buyer and seller would have regarded the issuance of the permit as reasonably probable").

These principles apply with equal force to regulations that preclude a particular use unless permits are issued by regulating authorities.[342] As held in a case recently affirmed by the Eleventh Circuit, the issue is whether there is a reasonable probability that permits for the proposed use would have been granted: if so, the market value "would be based on the property value as if it had obtained the necessary permits"—while if not, the value "would be based on conditions at the time" of the acquisition.[343] As with the possibility of rezoning, a reasonable possibility of obtaining necessary permits must be demonstrated with concrete factual support. The fact that the parcels under appraisal "are adjacent and proximate to established and permitted [uses] is not, without more, determinative."[344] Permitting issues often arise in connection with a proposed use of wetlands, which require permits to discharge dredged or fill material under the Clean Water Act as administered by the U.S. Army Corps of Engineers.[345] Such uses of wetlands may require not only federal but also state and/or municipal permits.[346] Other frequently encountered permits are discussed in Section 1.3.1.3.

**4.3.2.4.1.  Exceptions.** A narrow exception to the general rule that zoning and other land use regulations must be considered in determining a property's highest and best use may arise under the scope of the project rule.[347] As discussed in Section 4.5, the scope of the project rule ensures that compensation does not reflect changes in market value due to the influence of the government project prompting the acquisition. In most valuation assignments, zoning and other land use restrictions are not a form of *project influence*—they are simply "the legal framework of land use restrictions to which virtually all private real estate is subject," and so they must be considered regardless of whether the scope of the project rule applies.[348]

> Whether the scope of the project rule applies and if so, how to apply it, are complex questions that require legal instruction. See Section 4.5.

However, in limited circumstances—and only with appropriate **legal instructions**—application of the scope of the project rule may allow or require the appraiser to disregard the impact of a zoning restriction on a piece of property.[349] The Eleventh Circuit recently stated this narrow exception as follows:

> [I]n order to have a zoning restriction excluded from a calculation of a property's value, a landowner must show that the primary purpose of the regulation was to depress the property

---

342  *See, e.g., United States v. 381.76 Acres of Land (Montego Group)*, No. 96-1813-CV, 2010 WL 3734003, at *3-5 (S.D. Fla. Aug. 3, 2010), *adopted sub nom. United States v. 10.00 Acres of Land*, No. 99-0672-CIV, 2010 WL 3733994 (S.D. Fla. Sept. 22, 2010), *aff'd sub nom. United States v. Gonzalez*, 466 F. App'x 858 (11th Cir. 2012) (per curiam); *62.50 Acres in Jefferson*, 953 F.2d at 890-93; *8,968.06 Acres in Chambers*, 326 F. Supp. at 548.

343  *Montego Group*, 2010 WL 3734003, at *4.

344  *Id.; see also 320 Acres*, 605 F.2d at 819 n.130 ("[A] party obviously cannot . . . simply . . . assert[ ] that a particular use is reasonably practicable and reasonably probable, or that there is a reasonable possibility of obtaining a permit; . . . there must be some foundation in fact.").

345  Section 301(a) of the Clean Water Act prohibits the discharge of pollutants into the nation's water, except for discharges made in compliance with other sections of the Act, including Section 404. Pursuant to Section 404, the U.S. Army Corps of Engineers administers a permit program for the discharge of dredged or fill material ("pollutants" under the Act) into navigable waters, including wetlands. The Clean Water Act is codified at 33 U.S.C. § 1251 *et seq. See* 33 C.F.R. § 323.2 (implementing regulations).

346  *See generally Montego Group*, 2010 WL 3734003.

347  *United States v. 480.00 Acres of Land (Fornatora)*, 557 F.3d 1297, 1307 (11th Cir. 2009).

348  *320 Acres*, 605 F.2d at 818 ("[I]t is clear that just compensation must be determined in light of such regulatory restrictions."); *see id.* at 818 n.128 (citing cases, including *United States v. Commodities Trading Corp.*, 339 U.S. 121 (1950) (wartime price controls); *United States v. Eden Mem'l Park Ass'n*, 350 F.2d 933, 936 (9th Cir. 1965); *Fairfield Gardens, Inc. v. United States*, 306 F.2d 167, 170 (9th Cir. 1962); *United States v. Delano Park Homes, Inc.*, 146 F.2d 473, 474 (2d Cir. 1944)); *see also Fornatora*, 557 F.3d at 1311.

349  *Fornatora*, 557 F.3d at 1307; *320 Acres*, 605 F.2d at 820 n.131.

value of land or that the ordinance was enacted with the *specific intent* of depressing property value for the purpose of later condemnation.[350]

Federal case law makes clear that this narrow test is not satisfied simply because the government advocated for or against a local zoning decision. Thus, the Second Circuit held it was improper to consider an improbable prospective rezoning (and therefore a more profitable use) even though the government's opposition was the primary obstacle to rezoning: "Clearly the United States, like any adjoining landowner, was a proper party to resist zoning."[351] The Second Circuit's reasoning has been widely adopted by federal courts, most recently by the Eleventh Circuit.[352]

### 4.3.3. Larger Parcel.

**4.3.3.** **Larger Parcel.** In adopting "working rules in order to do substantial justice[,]" the Supreme Court established that "a parcel of land which has been used and treated as an entity shall be so considered in assessing compensation for the taking of part or all of it."[353] That "parcel of land," reflecting the whole property to be considered for compensation purposes, is called the <u>larger parcel</u>. It is the economic unit to be valued.[354] Under federal law, the larger parcel is the tract or tracts of land that possess a unity of ownership and have the same, or an integrated, highest and best use.[355]

> ### Definition of Larger Parcel
> The tract or tracts of land that possess a unity of ownership and have the same, or an integrated, highest and best use.

The larger parcel may or may not have the same boundaries as the government's acquisition.[356] As a result, the appraiser must determine the larger parcel in every appraisal for federal acquisition purposes. This determination will distinguish whether a total or partial acquisition is involved, and therefore will dictate the valuation method to be used.[357] In a total acquisition, the United States acquires an entire larger parcel, and compensation is measured by the market value of the

**A <u>total acquisition</u> is an acquisition of an entire larger parcel. A <u>partial acquisition</u> is an acquisition of only part of a larger parcel.**

---

350 *Fornatora*, 557 F.3d at 1311 (emphases added); *accord United States v. Land & Cris Realms Inc.*, 213 F.3d 830, 834-36 (5th Cir. 2000); *United States v. 27.93 Acres of Land in Cumberland Cty.*, 924 F.2d 506 (3d Cir. 1991); *United States v. Meadow Brook Club*, 259 F.2d 41 (2d Cir. 1958); *see also 320 Acres*, 605 F.2d at 820 n.131.

351 *Meadow Brook*, 259 F.2d at 45; *accord Fornatora*, 557 F.3d at 1311; *see also Cris Realms*, 213 F.3d at 836.

352 *See, e.g., Fornatora*, 557 F.3d at 1311; *Cris Realms*, 213 F.3d at 834-36; *27.93 Acres in Cumberland*, 924 F.2d at 511.

353 *United States v. Miller*, 317 U.S. 369, 375-76 (1943); *see Sharp v. United States*, 191 U.S. 341, 354-55 (1903), *aff'g Sharpe v. United States*, 112 F. 893 (3d Cir. 1902).

354 *See United States v. 6.45 Acres of Land* (<u>Gettysburg Tower</u>), 409 F.3d 139, 147-48 & n.15 (3d Cir. 2005); *United States v. 0.21 Acres of Land*, 803 F.2d 620, 623-24 (11th Cir. 1986); *United States v. 429.59 Acres of Land* (<u>Imperial Beach</u>), 612 F.2d 459, 461 (9th Cir. 1980); *United States v. Buhler*, 254 F.2d 876, 882 & n.10 (5th Cir. 1958); *United States v. Waymire*, 202 F.2d 550, 554-55 (10th Cir. 1953).

355 *See Miller*, 317 U.S. at 375-76; *Sharp*, 191 U.S. at 351-56; *United States v. 33.92356 Acres of Land* (<u>Piza-Blondet</u>), 585 F.3d 1, 10 (1st Cir. 2009); *United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 392-93 & n.6 (5th Cir. 1982); *Imperial Beach*, 612 F.2d at 464-65; *Bank of Edenton v. United States*, 152 F.2d 251, 253 (4th Cir. 1945); *United States v. 25.202 Acres of Land* (<u>Amexx I</u>), 860 F. Supp. 2d 165, 179-81 (N.D.N.Y. 2010), aff'd, 502 F. App'x 43, 45-46 (2d Cir. 2012); *cf. Gettysburg Tower*, 409 F.3d at 148 & n.15, *and on remand*, No. 1:CV-99-2128, 2006 WL 839375 (M.D. Pa. March 27, 2006).

356 *See United States v. Grizzard*, 219 U.S. 180, 181-85 (1911). As discussed in Section 1.4.6, if the appraiser determines the boundaries of the larger parcel are different than those of the specific parcel initially identified for appraisal, the appraisal assignment may need to be modified. *Cf.* EATON, *supra* note 16, at 89-90 ("Appraisers, whether they are retained by the condemnor or the condemnee, have a tendency to estimate the value of the parcel shown on the condemnor's right-of-way map, *often without adequately analyzing the larger parcel.*" (emphasis added)).

357 *See Miller*, 317 U.S. at 375-76; *Piza-Blondet*, 585 F.3d at 10; *see, e.g., Winn v. United States*, 272 F.2d 282 (9th Cir. 1959); *see generally* EATON, *supra* note 16, at 88-92 (stating "appraisers must make a determination of the larger parcel in all cases" and rejecting "myth that the larger parcel determination is only important in damage and/or benefit cases").

property acquired. In a partial acquisition, the United States acquires only part of a larger parcel, and compensation is measured by the difference between the market value of the larger parcel before the government's acquisition and the market value of the remainder after the government's acquisition.[358] A single acquisition for government purposes may involve more than one larger parcel (or parts of more than one larger parcel) for compensation and valuation purposes.[359]

The larger parcel determination is integral to the analysis of highest and best use.[360] It is fact-specific and rarely simple, but it is necessary for purposes of just compensation. As the Supreme Court explained:

> It is often difficult . . . to determine what is a distinct and independent tract; but the character of the holding, and the distinction between the residue of a tract whose integrity is destroyed by the taking, and what are merely other parcels or holdings of the same owner, must be kept in mind in the practical application of the requirement to render just compensation for property taken for public uses. How it is applied must largely depend upon the facts of the particular case . . . .[361]

**4.3.4.    Criteria for Analysis.** In determining the larger parcel, federal courts consider unity of use, unity of ownership (title), and physical unity (proximity or contiguity) as it relates to highest and best use—factors historically called the three unities.[362] Because this analysis typically involves questions of law as well as fact, appropriate **legal instructions** are often required.[363]

**4.3.4.1.    Unity of Use.** The key question in determining the larger parcel is whether parcels have an integrated use.[364] To meet the unity of use test in federal acquisitions, the lands in question must have the same or an integrated highest and best use.[365] Lands with dissimilar uses are not part of the same larger parcel, and must be considered as separate and distinct tracts for compensation and valuation purposes.[366]

> **Determination of the larger parcel is necessary in both total and partial acquisitions.**
>
> **Partial acquisitions (Section 4.6) require two larger parcel determinations. The larger parcel *before* acquisition is also called the parent tract, and the larger parcel *after* acquisition is the remainder.**

---

358  The before and after method of valuation and other issues specific to partial acquisitions are discussed in depth in Section 4.6.

359  *See, e.g., Gettysburg Tower*, 409 F.3d at 148 & n.15; *United States v. 6.24 Acres of Land* (*Weber*), 99 F.3d 1140, 1996 WL 607162 (6th Cir. 1996) (*per curiam*) (unpubl.). The unit rule (Section 4.2.2) would not prohibit a well-supported determination that an acquisition encompasses more than one larger parcel. As reasoned in *Weber*, considering a property's distinct features and then arriving at a value for the land as a whole does "not violate the spirit nor the application of the unit rule as employed by the courts." *Weber*, 1996 WL 607162 at *4.

360  *See, e.g., Piza-Blondet*, 585 F.3d at 3-4, 10; *8.41 Acres in Orange*, 680 F.2d at 390-91 & n.1 ("[Y]ou must first determine the fair cash market value, immediately before the taking, of the entire tract of land of which the portion taken was a part, in the light of the highest and best use at the time of the entire tract as a single unit. You must next determine the fair cash market value, immediately after the taking, of the remainder of the tract not taken, bearing in mind that the highest and best use of the remainder after the taking may not be the same as the highest and best use of the entire tract before the taking.").

361  *Sharp v. United States*, 191 U.S. 341, 354 (1903) (quoting and affirming *Sharpe v. United States*, 112 F. 893, 896 (1902)).

362  *See, e.g., 8.41 Acres in Orange*, 680 F.2d at 390-91, 394-95.

363  *See, e.g., Sharp*, 191 U.S. at 354; *Gettysburg Tower*, 409 F.3d at 148 & n.15; *United States v. 429.59 Acres of Land* (*Imperial Beach*), 612 F.2d 459, 463-64 (9th Cir. 1980) (approving instruction "to value the property as a unit" because "it was 'reasonably probable that the properties would be used in combination'"); *8.41 Acres in Orange*, 680 F.2d at 393.

364  *Piza-Blondet*, 585 F.3d at 10 (quoting *Baetjer v. United States*, 143 F.2d 391, 394-95 (1st Cir. 1944)); *8.41 Acres in Orange*, 680 F.2d at 393; *United States v. 25.202 Acres of Land* (*Amexx I*), 860 F. Supp. 2d 165, 179 (N.D.N.Y. 2010), *aff'd*, 502 F. App'x 43, 45 (2d Cir. 2012); *see Wash. Metro. Area Transit Auth. v. One Parcel of Land* (*Old Georgetown*), 691 F.2d 702, 704-05 (4th Cir. 1982); *Imperial Beach*, 612 F.2d at 463-64; *cf. United States v. 105.40 Acres of Land in Porter Cty.*, 471 F.2d 207, 211-12 (7th Cir. 1972); *United States v. Evans*, 380 F.2d 761, 763-64 (10th Cir. 1967).

365  *Old Georgetown*, 691 F.2d 702, 704-05 (4th Cir. 1982); *United States v. 158.24 Acres of Land in Bee Cty.*, 515 F.2d 230, 232 (5th Cir. 1975); *United States v. Wateree Power Co.*, 220 F.2d 226, 231-32 (4th Cir. 1955); *Baetjer*, 143 F.2d 391.

366  *See, e.g., Piza-Blondet*, 585 F.3d at 4-5, 9-10; *Winn v. United States*, 272 F.2d 282, 286-87 (9th Cir. 1959).

As with any other aspect of the highest and best use analysis, actual use is compelling evidence of highest and best use.[367] An integrated use that is merely planned or hoped for is not sufficient to meet the unity of use test.[368] In determining the larger parcel, a potential use "may be weighed only if there is a 'reasonable probability' the lands in question will be put to that use in the reasonably near future."[369] Even then, "potential use is only one factor to consider in determination of the 'unity' issue, along with unity of ownership, contiguity, and existing use."[370]

The federal unity of use test turns on an integrated highest and best use. But some courts have invoked a different unity of use test (rarely applicable in federal acquisitions) to determine whether to allow separate valuations of property taken and of damage to property not taken[371]—loosely, and misleadingly, called <u>severance damage</u>.[372] This taking plus damages compensation formula, also known as the State Rule, is generally improper in federal acquisitions regardless of unity of use.[373] Still, based on the State Rule measure of compensation, courts have required proof of *actual unitary use* with the part taken to allow consideration of separately calculated severance damage to a landowner's other property.[374] The actual unitary use test reflects the requirement that compensation cannot be charged for damage to separate and independent parcels belonging to the same owner as the property taken.[375] Under the Federal Rule, compensation in partial acquisitions is measured by the difference in the market value of the landowner's property *before* and *after* the government's acquisition, as discussed in Section 4.6. Using this federal measure, "there is no occasion for the making of any special award or determination of 'severance damage,' because the matter is included in the finding of what the remainder of the land was worth immediately after the taking."[376] For this reason, severance damage "concepts have no application" to acquisitions

---

367  *See, e.g., United States v. 50.50 Acres of Land*, 931 F.2d 1349, 1359 (9th Cir. 1991); *United States v. 33.92356 Acres (Piza-Blondet Trial Op.)*, No. 98-1664, 2008 WL 2550586 (D.P.R. June 13, 2008), *aff'd, Piza-Blondet*, 585 F.3d 1.

368  *8.41 Acres in Orange*, 680 F.2d at 394 n.8 (citing *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266 (1943)); *United States v. Mattox*, 375 F.2d 461, 463-64 (4th Cir. 1967) ("there must exist a reasonable probability that the separate tracts would have been combined for such integrated use"); *Cole Inv. Co. v. United States*, 258 F.2d 203, 205 (9th Cir. 1958) (finding no unity of use where evidence "would only show a planned unity of use"); *cf. Powelson*, 319 U.S. at 284 ("the possibility or probability of [a future] action, so far as it affects present values, is a proper subject for consideration in valuing property for purposes of a condemnation award" (emphasis added)).

369  *E.g., Piza-Blondet Trial Op.*, 2008 WL 2550586; *8.41 Acres in Orange*, 680 F.2d at 394 n.8 (citing *Powelson*, 319 U.S. 266); *Imperial Beach*, 612 F.2d at 463-64.

370  *8.41 Acres in Orange*, 680 F.2d at 394 n.8.

371  *United States v. Certain Land Situated in Detroit (DIBCO I (for Detroit Int'l Bridge Co.))*, 188 F. Supp. 2d 747, 755 (E.D. Mich. 2002), *aff'd*, 450 F.3d 205 (6th Cir. 2006); *United States v. Honolulu Plantation Co.*, 182 F.2d 172, 179 (9th Cir. 1950); *see United States v. 10.0 Acres of Land*, 533 F.2d 1092, 1095 n.1 (9th Cir. 1976).

372  *United States v. Miller*, 317 U.S. 369, 376 (1943) ("loosely"); *United States v. 9.20 Acres of Land in Polk Cty.*, 638 F.2d 1123, 1125 n.2 & 1127 (8th Cir. 1981) (discussing "misleading" nature of term and concept of 'severance damages'); *United States v. 91.90 Acres of Land in Monroe Cty. (Cannon Dam)*, 586 F.2d 79, 86 (8th Cir. 1978) ("[W]hile the solution to the problem [of measuring compensation in partial takings] is simple, it seems to be frequently missed. And, the difficulty seems to arise out of the concept of 'severance damage.'"); *Honolulu Plantation*, 182 F.2d at 175 n.1 ("The use of this term is to be criticized because it is apt to lead to loose thinking.").

373  As discussed in Section 4.6.4.1, the *taking plus damages* or State Rule formula not only is more complicated than the *before and after* or Federal Rule, but also frequently results in something other than just compensation under the Fifth Amendment.

374  *See DIBCO I*, 188 F. Supp. 2d at 749-55 (rejecting "severance damages" for owner's other property not in actual unitary use with part taken, and rejecting before and after valuation because there was no reasonable probability that owner's other property would be used in conjunction with part taken in reasonably near future).

375  *See Miller*, 317 U.S. at 376; *8.41 Acres in Orange*, 680 F.2d at 393 & n.6; *Cole Inv. Co. v. United States*, 258 F.2d 203, 205 (9th Cir. 1958) ("The test in severance damage cases [is] that market value is the criterion for severance damages and that 'strict proof of the loss in market value to the remaining parcel is obligatory.'" (quoting *Honolulu Plantation*, 182 F.2d at 179)); *United States v. Certain Parcel of Land in Jackson Cty.*, 322 F. Supp. 841, 850 (W.D. Mo. 1971) ("'Adaptability to a common use, or an intention on the part of the owner to put the property to a common use, is not enough to admit their being treated as a separate subject of damages.'" (quoting 6 A.L.R. 2d 1197, 1202)); see also *United States v. Mattox*, 375 F.2d 461, 463 (4th Cir. 1967) ("[I]t does not follow that the mere proximity or possibility of the integrated use will confer upon the owner a right to severance damages.").

376  *United States v. 403.14 Acres of Land in St. Clair Cty.*, 553 F.2d 565, 567 n.2 (8th Cir. 1977); *accord United States v. 6.24 Acres of Land (Weber)*, 99 F.3d 1140, 1996 WL 607162, at *4 (6th Cir. 1996) (per curiam) (unpubl.); *United States v. 2.33 Acres of Land in Wake Cty.*, 704 F.2d 728, 730 (4th Cir. 1983); *see United States v. 33.92356 Acres of Land (Piza-Blondet)*, 585 F.3d 1, 9 (1st Cir. 2009) ("The before and after method is particularly advantageous where either it is difficult to value fairly the condemned tract as a separate parcel or one of the parties contends that the remainder was harmed or benefitted by the condemnation.").

that are subject to "a before-and-after valuation . . . ."[377] With no separate calculation of severance damage under the Federal Rule, actual unitary use is not determinative, but merely a factor to be considered in determining the larger parcel in federal acquisitions.[378] For a full discussion of the Federal Rule, the State Rule, appropriate treatment of damages and benefits, and other issues arising in partial acquisitions, see Section 4.6.

In federal acquisitions, whether under the Federal Rule or (with appropriate **legal instructions**) the State Rule, the ultimate goal is to fairly measure the owner's actual compensable loss.[379] As a result, "strict proof of the loss in market value to the remaining parcel is obligatory."[380] Similarly, the availability of replacement property for the part acquired must be considered, as reasonable buyers and sellers would do.[381]

### 4.3.4.2.  Unity of Ownership (Title).

The larger parcel must also have *unity of ownership*—that is, there must be uniform control over the ownership and future of all property making up the larger parcel.[382] Principles of fairness underlie the unity of ownership concept and form the basis of the Supreme Court's reasoning in *Campbell v. United States*:

> [I]f the land taken from plaintiff had belonged to another, or if it had not been deemed part and parcel of this estate, he would not have been entitled to anything on account of the diminution in value of his estate. It is only because of the taking of a part of his land that he became entitled to any damages resulting to the rest.[383]

Thus, to allow landowners to receive compensation not only for their property but for diminution in value to land owned by another would be a windfall and an unfair enrichment rather than just compensation.[384]

Historically, unity of ownership (or unity of title) was held to require all property comprising a single larger parcel to be owned to precisely the same extent (e.g., in fee simple) by precisely the

---

377  *United States v. 10.0 Acres*, 533 F.2d 1092, 1095 n.1 (9th Cir. 1976) (noting "severance-damage cases . . . are not in point" regarding "a before-and-after valuation"); *accord Cannon Dam*, 586 F.2d at 86; *United States v. 765.56 Acres of Land in Southampton* (*765.56 Acres II*), 174 F. Supp. 1, 13-14 (E.D.N.Y. 1959), *aff'd sub nom. United States v. Glanat Realty Corp.*, 276 F.2d 264 (2d Cir. 1960).

378  *See 8.41 Acres in Orange*, 680 F.2d at 393-94 & n.8; *United States v. 105.40 Acres of Land in Porter Cty.*, 471 F.2d 207, 210-12 (7th Cir. 1972); *Baetjer v. United States*, 143 F.2d 391, 394 (1st Cir. 1944); *see 403.14 Acres in St. Clair*, 553 F.2d at 567 n.2; *see also United States v. 429.59 Acres of Land* (*Imperial Beach*), 612 F.2d 459, 463 (9th Cir. 1980) (affirming valuation of properties as a unit because it was "reasonably probable that the properties would be used in combination"); *cf. United States v. Grizzard*, 219 U.S. 180, 185-86 (1911) ("The determining factor was that the value of that part of the Grizzard farm not taken was $1,500, when the value of the entire place before the taking was $3,000.").

379  *See, e.g., Bauman v. Ross*, 167 U.S. 548, 574 (1897) ("The just compensation required by the constitution to be made to the owner is to be measured by the loss caused to him by the appropriation. He is entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public.").

380  *Cole Inv.*, 258 F.2d at 205 (quoting *Honolulu Plantation*, 182 F.2d at 179)).

381  *See* Section 4.6 and cases cited therein. This federal requirement may differ from state law.

382  *Imperial Beach*, 612 F.2d at 463-64; *United States v. 17.69 Acres of Land in San Diego* (*Nat'l Enterprises*), No. 99cv1248 DMS (JMA), slip op. at 8 (S.D. Cal. Aug. 30, 2004) ECF No. 272; *United States v. 14.36 Acres of Land in McMullen Cty.*, 252 F. Supp. 2d 361, 363 (S.D. Tex. 2002).

383  *Campbell v. United States*, 266 U.S. 368, 371 (1924); *see Sharp v. United States*, 191 U.S. 341, 355 (1903) ("'It is solely by virtue of his ownership of the tract invaded that the owner is entitled to . . . damages.'").

384  *See Campbell*, 266 U.S. at 371; *United States v. Grizzard*, 219 U.S. 180, 184 (1911) ("The 'just compensation' thus guaranteed obviously requires that the recompense *to the owner for the loss caused to him* by the taking of a part of a parcel, or single tract of land, shall be measured by the *loss resulting to him* from the appropriation." (emphases added)); *Sharp*, 191 U.S. at 354; *see also United States ex rel. Tenn. Valley Auth. v. Stewart*, 429 F. Supp. 658, 659-61 (E.D. Tenn. 1976) ("it would be wholly inequitable to allow other parties owning . . . different tracts . . . [to] secure damages to which they are not entitled").

same owner.[385] But modern case law has recognized that at times, the strict traditional rule may ignore market realities that should in fairness be considered.[386] As a result, the unity of ownership inquiry focuses on whether a *single decision maker* has *actual legal control* of all property at issue.[387] Ultimately, unity of ownership turns on what "is more consistent with the goal of just compensation . . . ."[388] Because unity of ownership raises not only factual but legal questions, appraisers must obtain **legal instructions** if they conclude that a single larger parcel exists when the ownership interests in all parts of the whole are not identical.[389] This is one of many issues on which federal and state law may differ.[390]

Federal courts have held that fairness compels consideration of market realities in determining unity of ownership. Accordingly, the Ninth Circuit found unity of title was satisfied for properties owned by three corporations because a single person served as the president, chairman of the board, and chief executive officer for all three entities.[391] As one district court recently reasoned, a person with personal control of Parcel A and actual control of Parcel B as the sole owner of a corporation "would never negotiate against or attempt to undermine himself in a transaction. The relevant 'economic realities of the marketplace simply do not produce those kind of results.'"[392] Moreover, as another district court observed, "the buyer in the marketplace could readily acquire both parcels from the same operative vendors, exercising the same business judgment in the transaction."[393]

But "a group of individuals is significantly different than a single decision maker operating through a variety of corporate forms."[394] Fairness and market realities therefore dictate that unity of ownership does not exist when *multiple* decision makers are involved—that is, as one district court recently stated, "when the wishes of different individuals, and not a single individual wearing multiple hats, must be spanned to achieve unity of title."[395] As a result, unity of ownership has been ruled lacking when one tract was owned by one person and a second tract by a spouse,[396] sibling,[397] or adult child.[398] Similarly, the existence of common or overlapping owners among multiple decision makers is not sufficient for unity of ownership. Thus, a court found unity of ownership was lacking among three tracts: one owned by one person, the second owned by the same person and a sibling, and the third owned by the same person and his spouse.[399]

---

385 *United States v. 87.30 Acres of Land*, 430 F.2d 1130, 1133 (9th Cir. 1970); *Stewart*, 429 F. Supp. at 660-61; *United States v. Certain Parcel of Land in Jackson Cty.*, 322 F. Supp. 841, 848-49 (W.D. Mo. 1971).

386 *See Imperial Beach*, 612 F.2d at 464; *14.36 Acres in McMullen*, 252 F. Supp. 2d at 363-64.

387 *E.g., So. Supply Header, LLC v. 110 Acres in Covington Cty.* (*SESH*), No. 2:07-CV-291 KS-MTP, 2008 WL 127490, at *2 (S.D. Miss. Jan. 10, 2008); *Nat'l Enterprises*, slip op. at 4-8, ECF No. 272; *14.36 Acres in McMullen*, 252 F. Supp. 2d at 363-64; *see Imperial Beach*, 612 F.2d at 463-64.

388 *14.36 Acres in McMullen*, 252 F. Supp. 2d at 364; *accord United States v. Miller*, 317 U.S. 369, 375-76 (1943) (larger parcel requirement and subsidiary rules developed "in order to do substantial justice").

389 *See 14.36 Acres in McMullen*, 252 F. Supp. 2d at 364; *see also Miller*, 317 U.S. at 375-76; *Sharp*, 191 U.S. at 354.

390 *See 14.36 Acres in McMullen*, 252 F. Supp. 2d at 363 (disregarding state law on unity of use because federal law controls in federal condemnation cases); *see also Oncor Elec. Delivery Co. v. Brown*, 451 S.W.3d 128, 132 (Tex. Ct. App. 2014) (citing *14.36 Acres* and noting differences in federal and state law).

391 *Imperial Beach*, 612 F.2d at 463-64.

392 *SESH*, 2008 WL 127490, at *2 (quoting *14.36 Acres in McMullen*, 252 F. Supp. 2d at 364).

393 *14.36 Acres in McMullen*, 252 F. Supp. 2d at 363-64 (quoting Julius L. Sackman et al., Nichols On Eminent Domain § 1202[1] (rev. 3d ed. 2001)).

394 *SESH*, 2008 WL 127490, at *2.

395 *Id.*

396 *United States ex rel. Tenn. Valley Auth. v. Stewart*, 429 F. Supp. 658, 660-61 (E.D. Tenn. 1976).

397 *Id.*

398 *United States v. 87.30 Acres of Land in Whitman & Garfield Ctys.*, 430 F.2d 1130, 1133 (9th Cir. 1970) (cited with approval in *United States v. 50.50 Acres of Land*, 931 F.2d 1349, 1350 (9th Cir. 1991)); *SESH*, 2008 WL 127490, at *2-3; *see Stewart*, 429 F. Supp. at 660 n.3 ("familial relationship to the other owners [is] a consideration not relevant to this analysis" (citing *87.30 Acres in Whitman, supra*)).

399 *Stewart*, 429 F. Supp. at 660-61 ("For whatever reason, they have treated the three tracts as independent with regard to the ownership interests held therein."); *accord SESH*, 2008 WL 127490, at *1-3 (no unity of ownership among two adjacent tracts, one owned in fee by one person and the second owned by the same person and his parents).

---

5-ER-871

Tracts that lack unity of ownership cannot be treated as a single larger parcel for just compensation purposes, regardless of whether they share an integrated or actual use. Accordingly, a district court recently found no unity of ownership among one tract owned by one person in fee, and a second tract owned by the same person and his parents, observing that "[d]espite the present harmony of the . . . family, either [the son] or his parents could prevent a transaction to acquire a present possessory interest in the [combined tracts]."[400] The court ultimately concluded:

> Although both parents and son benefit from the uninterrupted use of the whole, the division of ownership between the . . . parents and their son has legal consequences in an eminent domain proceeding. The potentially conflicting interests between the parents' use of their life estates and the son's vested remainder make it impossible . . . to recognize a unity of title consistent with available case law.[401]

### 4.3.4.3.   Physical Unity (Contiguity or Proximity). Under federal law, physical unity is considered within the context of integrated use rather than as a stand-alone test. As the First Circuit emphasized:

> Physical contiguity is important, however, in that it frequently has great bearing on the question of unity of use. Tracts physically separated from one another frequently, but we cannot say always, are not and cannot be operated as a unit, and the greater the distance between them the less is the possibility of unitary operation . . . .[402]

Accordingly, the physical unity (proximity) or separation of a tract is an important consideration, but not necessarily determinative of the ultimate question of what constitutes a single tract.[403]

The availability of replacement property for the part acquired must always be considered (as noted above) and can be particularly important in partial acquisitions involving noncontiguous parcels devoted to a unitary use, such as a livestock ranch or a timber and milling operation.[404] The effect of the existence (or absence) of replacement property on the market value of the remainder property must be shown, as it will vary depending on the property, its use, and the relevant market. For example, in *International Paper Co. v. United States*, the Fifth Circuit found no unitary use between woodland acres and the same landowner's paper mill in another state, as neither the existing operation nor any reasonable expectation in the foreseeable future showed any difference between the owner's small woodland tracts and "the tracts of small owners whose products would be available on a competitive basis."[405] Moreover, the landowner could "turn right around and

---

400   *SESH*, 2008 WL 127490, at *2.

401   *Id.* at *3.

402   *Baetjer v. United States*, 143 F.2d 391, 395 (1st Cir. 1944); *cf. Sharpe v. United States*, 112 F. 893, 895-96 (3d Cir. 1902), *aff'd sub nom. Sharp v. United States*, 191 U.S. 341 (1903) (discussing "22 acres of meadow . . . not adjoining or a part of [the farm tract with which it had been purchased], nor was it used in connection therewith, but was such a considerable distance away, and of so little value, that no attention was paid to it by either [party], either as to value or damages").

403   *Baetjer*, 143 F.2d at 395.

404   *See, e.g., United States v. Evans*, 380 F.2d 761, 764 (10th Cir. 1967) (livestock ranch); *Int'l Paper Co. v. United States*, 227 F.2d 201, 206-07 (5th Cir. 1955) (paper mill operation); *Baetjer*, 143 F.2d at 396-97 (sugar cane production); *Ga.-Pac. Corp. v. United States*, 640 F.2d 328 (Ct. Cl. 1980) (per curiam) (burden to show that "replacement old-growth timber was not available, or if available, at least, the burden to show persuasively that under existing circumstances it would be economically unfeasible to obtain available replacement timber"); *cf. United States v. 711.57 Acres of Land in Alameda Cty.*, 51 F. Supp. 30, 33 (N.D. Cal. 1943) (awarding compensation reflecting availability of alternative access to severed tract).

405   *Int'l Paper*, 227 F.2d at 206. The Fifth Circuit went on to state that regardless of whether a unitary tract existed (which it called "quite doubtful"), there was "no doubt whatever about the correctness" of the finding that the taking of woodland acreage did not diminish the value of the remainder property (the paper mill). *Id.* at 206-07.

make its acreage whole by buying [similarly located timber property to replace that taken] with the proceeds of the condemnation award."[406] Meanwhile in *United States v. Evans*, different facts led the Tenth Circuit to uphold a finding that pastureland was part of a single economic unit with noncontiguous but "integrated" and "interdependent" croplands, feeding yards, and ranch headquarters with silage land within economical hauling distance.[407]    In *Evans*, there was evidence that such physical separation of integrated tracts was not only common for ranching in the area but considered desirable to take advantage of variations in rainfall, soil types, and other factors, and that "pasture land sold separately would bring a lower price than if sold as part of a ranch—a balanced unit."[408] Even so, the Tenth Circuit cautioned, the *Evans* case "must be considered to be an extreme one, as to the noncontiguous tract problem; however, the record shows unusually clear evidence on the point. The damages have been well limited to the integrated lands."[409] Critically, both *Evans* and *International Paper* "restricted damages to the realities of the situation . . . ."[410] Of course, depending on "the realities of the situation," even a demonstrated lack of available replacement property may not diminish the value of remainder property.[411]

### 4.3.4.4.  Legal Instructions.

While the larger parcel must ultimately be determined by the appraiser, **legal instructions** are often required to address questions of law that arise within the appraiser's analysis. For example, whether unity of ownership exists based on the quality of the property interests held in different tracts raises not only factual but legal questions.[412] Thus, an appraiser must obtain **legal instructions** if the ownership interests in all parts of the whole are not identical in a potential larger parcel. Similarly, whether there is sufficient evidence to support a finding of an integrated use involves legal as well as factual analysis.[413] In addition, in federal condemnation litigation, the appraiser's larger parcel analysis and conclusions will be evaluated by the court and/or the finder of fact (jury, land commission, or judge).[414]

### 4.3.4.5.  Special Considerations in Partial Acquisitions.

In partial acquisitions, the appraiser must make two separate determinations of highest and best use: once for the larger parcel

---

406  *Id.* at 207 (noting that the landowner in fact "actually purchased [such replacement property] subsequent to the taking here involved").

407  *Evans*, 380 F.2d at 764.

408  *Id.* at 764; *cf.* Appraisal Inst. & Am. Soc'y of Farm Managers, The Appraisal Of Rural Property 343, 323-60 (2d ed. 2000) ("[T]he highest and best use of a ranch property is directly related to ranch balance." (Chapter 19: The Valuation of Livestock Ranches)).

409  *Evans*, 380 F.2d at 764.

410  *Id.* (analyzing Int'l Paper, 227 F.2d 201).

411  *Id.*; e.g., *Baetjer*, 143 F.2d at 396, and on remand, *United States v. 7936.6 Acres of Land*, 69 F. Supp. 328, 332 (D.P.R. 1947) ("[W]hile there has been a severance in the legal sense such severance has caused no compensable damage to the market value of the properties not taken."); *see also Int'l Paper*, 227 F.2d at 207 n.7 (discussing *Baetjer* and result on remand).

412  *See, e.g., United States v. 429.59 Acres of Land (Imperial Beach)*, 612 F.2d 459, 463-64 (9th Cir. 1980); *United States v. 14.26 Acres of Land in McMullen Cty.*, 252 F. Supp. 2d 361, 363-64 (S.D. Tex. 2002); *United States v. 17.69 Acres of Land in San Diego (Nat'l Enterprises)*, No. 99cv1248 DMS (JMA) (S.D. Cal. Aug. 30, 2004), ECF No. 272; *Se. Supply Header, LLC v. 110 Acres in Covington Cty. (SESH)*, No. 2:07-CV-291 KS-MTP, 2008 WL 127490, at *2 (S.D. Miss. Jan. 10, 2008).

413  *See, e.g., United States v. 33.92356 Acres of Land (Piza-Blondet)*, 585 F.3d 1, 10 (1st Cir. 2009); *United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 393 (5th Cir. 1982); *United States v. 25.202 Acres of Land (Amexx I)*, 860 F. Supp. 2d 165, 179-81 (N.D.N.Y. 2010), aff'd, 502 F. App'x 43, 45-46 (2d Cir. 2012); *SESH*, 2008 WL 127490, at *3; *United States v. Certain Land Situated in Detroit (DIBCO I (for Detroit Int'l Bridge Co.))*, 188 F. Supp. 2d 747, 755 (E.D. Mich. 2002), aff'd, 450 F.3d 205 (6th Cir. 2006).

414  There is a split of authority among federal courts on this issue, although it does not affect the appraiser's role of determining the larger parcel in keeping with appropriate legal instructions. The Supreme Court has held that in a federal condemnation case, "except for the single issue of just compensation, the trial judge is to decide all issues, legal and factual, that may be represented." *United States v. Reynolds*, 397 U.S. 14, 19 (1970); *see* Fed. R. Civ. P. 71.1(h). Many federal circuits hold based on *Reynolds* that "[u]nity of use is an issue for the court to decide." *Amexx I*, 860 F. Supp. 2d at 179; *accord DIBCO*, 450 F.3d at 208-11; *Imperial Beach*, 612 F.2d at 463-64; *United States v. 105.40 Acres of Land in Porter Cty.*, 471 F.2d 207, 212 (7th Cir. 1972); *see Piza-Blondet*, 585 F.3d at 10 ("While unity of use is an issue for the court to decide, unless some party objects, there is no ground for overturning a decision by the trial judge to submit the question to the jury in an advisory capacity."). But some federal courts hold that "the issue of unity or separateness of tracts is a question of fact to be presented to the trier of fact." *8.41 Acres in Orange*, 680 F.2d at 393; *see also Nat'l Enterprises*, slip op. at 2 n.1 (S.D. Cal. Aug. 30, 2004), ECF No. 271 ("The Court also questions Defendants' assertion that the issue of unity or separateness of tracts is a matter of law to be decided by the Court."). Even under the latter rule, however, the court will reject the fact-finder's identification of the unitary parcel if it is unsupported, speculative, or otherwise legally erroneous. *E.g., 8.41 Acres in Orange*, 680 F.2d at 393-94 & n.8 (rejecting commission's "clearly erroneous . . . finding that the strips of condemned land were 'severed' from their parent tracts").

before acquisition, and once for the remainder after acquisition. As J.D. Eaton cautioned: "If the appraiser does not estimate the property's highest and best use correctly in both the before and after situations, it will be impossible to estimate the property's value correctly."[415]

The existence and extent of any change in highest and best use due to the government's acquisition requires careful analysis.[416] The highest and best use of the remainder may reflect a complete change, a change in intensity, or no change from the highest and best use of the larger parcel before acquisition.[417] A change in a property's highest and best use may have a positive, negative, or negligible impact on its market value. For example, if what was farmland before acquisition becomes lakefront property with a highest and best use for recreational home sites, offsetting special or direct benefits may apply, as discussed in Section 4.5.5.[418] On the other hand, if a remainder property has a less valuable highest and best use after acquisition, the difference in the values before and after acquisition will reflect any compensable diminution in the value of the remainder resulting from acquisition, as discussed in in Section 4.5.2.

**4.3.4.6.    Special Considerations in Riparian Land Acquisitions.** When developing an opinion of the highest and best use of land riparian to navigable water, there are special considerations that must be taken into account, as discussed in Section 4.11.1.

**4.3.4.7.    Special Considerations in Land Exchanges.** Different considerations may be required in determining the larger parcel in appraisals for federal land exchanges (see Section 1.12). In such situations, **legal instructions** for the appraiser to assume a specific larger parcel determination may be necessary to comply with statutes or other federal requirements, as discussed in Section 4.10.

> **Determining the larger parcel in inverse takings claims raises complex legal issues. Close consultation between appraisers and legal counsel is essential.**

**4.3.4.8.    Special Considerations in Inverse Takings.** Determining the larger parcel in connection with inverse taking claims for liability purposes requires different considerations than in eminent domain-based valuations because of the distinct—and complex—legal issues involved.[419] As the Ninth Circuit explained, in eminent domain cases the issue is *how much* is due the landowner as just compensation: "[But i]n inverse condemnation the issue is liability: Has the government's action effected a taking of the landowner's property? [T]he boundaries of the property allegedly taken must be determined by taking jurisprudence rather than the laws of eminent domain."[420]

---

415    Eaton, *supra* note 16, at 104; see *Olson v. United States*, 292 U.S. 246, 255 (1934).

416    *See, e.g., Rousseaux v. United States*, 394 F.2d 123, 124 (5th Cir. 1968) (per curiam) ("The parties did not dispute that the highest and best use of the land after the easement was imposed was for growing timber. However, the highest and best use of the land before the taking was sharply contested, as was the issue of value.").

417    *E.g., E. Tenn. Nat. Gas Co. v. 7.74 Acres of Land*, 228 F. App'x 323 (4th Cir. 2007) (unpubl.) (highest and best use changed from commercial development before taking to agricultural or residential use after taking); *Wash. Metro. Area Transit Auth. v. One Parcel of Land (Old Georgetown)*, 691 F.2d 702, 703 (4th Cir. 1982) (change in intensity from low-density to high-density residential development in new mass-transit "impact zone"); *United States v. Werner*, 36 F.3d 1095 (4th Cir. 1994) (no change in highest and best use of large-lot residential development); *8.41 Acres in Orange*, 680 F.2d at 394-95 (no change in highest and best use for industrial plant sites).

418    *E.g., United States v. Trout*, 386 F.2d 216 (5th Cir. 1967).

419    *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002) ("Our regulatory takings jurisprudence . . . is characterized by 'essentially ad hoc, factual inquiries,' designed to allow 'careful examination and weighing of all relevant circumstances.'" (quoting *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978), and *Palazzolo v. Rhode Island*, 533 U.S. 606, 636 (2001) (O'Connor, J., concurring))).

420    *Am. Savings & Loan Ass'n v. County of Marin*, 653 F.2d 364, 369 (9th Cir. 1981).

In the context of regulatory inverse takings claims, the larger parcel is commonly referred to as the <u>parcel as a whole</u> or the <u>denominator</u>.[421] It is the relevant parcel against which to measure the economic impact of the regulation being challenged.[422] As a result, determination of the parcel as a whole plays a critical role in regulatory takings cases in determining liability—i.e., whether a compensable taking occurred.[423] This complex legal determination requires careful consideration of all relevant facts, making close consultation between the appraiser and legal counsel essential.[424]

The typical starting point is "the metes and bounds that describe [the] geographic dimensions" of contiguous acres held under common ownership,[425] with a focus on the property owned by the plaintiff at the time of the government action giving rise to the taking. As a result, the unity-of-ownership test may need to be disregarded, or applied on an earlier date, so that the parcel as a whole will include properties originally (but no longer) held in common ownership on the date of valuation.[426] The owner's actual and projected use of the property must also be considered. Other relevant factors include the timing of an owner's acquisition of property interests, the timing of the imposition of the regulations being challenged, the owner's demonstrated expectations for the property, whether the extent to which property is linked through a common development scheme, and the extent to which regulated portions are integrated with and enhance the value of unregulated portions of the property.

The Supreme Court has consistently rejected the "circular" approach of "defining the [relevant parcel] in terms of the very regulation being challenged."[427] But lower federal courts' rulings weighing the various factors listed above have resulted in contradictory opinions, with some facing Supreme Court review as these Standards went to publication.[428]

## 4.4.    Valuation Process.

**4.4.1.    The Three Approaches to Value.** For purposes of just compensation, market value must be determined "with an approach which seeks with the aid of all relevant data to find an amount representing value to any normally situated owner or purchaser of the interests taken . . . ."[429] Three approaches to value are recognized in federal acquisitions: (1) the <u>sales comparison approach</u>, (2) the <u>cost approach</u>, and (3) the <u>income capitalization approach</u>.[430]

---

421  *E.g., Palazzolo*, 533 U.S. at 631 ("the difficult, persisting question of what is the proper denominator in the takings fraction"); *Penn Cent.*, 438 U.S. at 130-31 ("In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole . . . .").

422  *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987) ("Because our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction.'").

423  *See, e.g., Tahoe-Sierra*, 535 U.S. at 330-31; *Penn Cent.*, 438 U.S. at 130-31.

424  *Cf. Tahoe-Sierra*, 535 U.S. at 322; *Palazzolo*, 533 U.S. at 636 (O'Connor, J., concurring); *Penn Cent.*, 438 U.S. at 124.

425  *See Tahoe-Sierra*, 535 U.S. at 331.

426  *E.g., Norman v. United States*, 429 F.3d 1081, 1087, 1091 (Fed. Cir. 2005) (including previously sold property in parcel as a whole).

427  *Tahoe-Sierra*, 535 U.S. at 331.

428  *See, e.g., Lost Tree Village Corp. v. United States*, 787 F.3d 1111 (Fed. Cir. 2015), *petition for cert. docketed*, No. 15-1192 (March 23, 2016); *Murr v. Wisconsin*, 359 Wis. 2d 675 (Wis. Ct. App. 2014), *review denied*, 366 Wis. 2d 59 (2015), *cert. granted*, 136 S. Ct. 890 (2016).

429  *Kimball Laundry v. United States*, 338 U.S. 1, 20 (1949).

430  *See generally United States v. 25.202 Acres of Land* (<u>Amexx I</u>), 860 F. Supp. 2d 165, 174-75 (N.D.N.Y. 2009), *adopted by* 860 F. Supp. 2d 165 (N.D.N.Y. 2010), *aff'd*, 502 F. App'x 43, 45 (2d Cir. 2012). As discussed in Section 4.4.5, it may be appropriate to incorporate aspects of all three approaches to value in the *development method*, a technique for appraising undeveloped acreage with a highest and best use for subdivision into lots. *E.g., United States v. 99.66 Acres of Land* (<u>Sunburst Invs.</u>), 970 F.2d 651, 655-56 (9th Cir. 1992).

Because the "federal conception of market value . . . is intimately related to selling prices in the market,"[431] the sales comparison approach is normally preferred as the best evidence of market value in federal acquisitions, but not to the exclusion of other relevant evidence of value based on market data.[432] One or more approaches to value may be appropriate—even necessary—to derive a reliable estimate of market value in a given appraisal problem.[433] As the Supreme Court recognized:

> Valuation is not a matter of mathematics . . . . Rather, the calculation of true market value is an applied science, even a craft. Most appraisers estimate market value by employing not one methodology but a combination. These various methods generate a range of possible market values which the appraiser uses to derive what he considers to be an accurate estimate of market value, based on careful scrutiny of all the data available.[434]

Of course, not every approach to value is appropriate for every valuation assignment: in determining market value in federal acquisitions, appraisers must not use an approach that "though perhaps making it easier to reach some solution, only ma[kes] the proper solution more difficult."[435] Federal courts have repeatedly prohibited the use of an approach to value that is unreliable in light of the facts and circumstances of a given valuation problem.[436] Where just compensation is concerned, a reliable valuation process is necessary to ensure a just result, "and it is the duty of the state, *in the conduct of the inquest by which the compensation is ascertained*, to see that it is just, not merely to the individual whose property is taken, but to the public which is to pay for it."[437]

**4.4.2.**   **Sales Comparison Approach.** Under federal law, unforced, arm's-length transactions of properties in the vicinity of and comparable to the property being appraised, reasonably near the

---

431  *United States v. 60.14 Acres of Land*, 362 F.2d 660, 665 (3d Cir. 1966).

432  *See United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 402-404 (1949); *United States v. Miller*, 317 U.S. 369, 374-75 (1943); *United States v. 320 Acres of Land*, 605 F.2d 762, 798-99 & n. 61 (5th Cir. 1979) (citing cases).

433  *Toronto, Hamilton*, 338 U.S. at 402-405 ("Were market conditions normal, we could hardly call an award 'just compensation' unless relevant . . . sales, in available markets, were considered....The question is of course one of degree, and we do not mean to foreclose the consideration of each case upon its facts."); *see CSX Transp., Inc. v. Ga. State Bd. of Equalization*, 552 U.S. 9, 17 (2007) ("Appraisers typically employ a combination of methods because no one approach is entirely accurate, at least in the absence of an established market for the type of property evaluated."); *Seravalli v. United States*, 845 F.2d 1571, 1575 (Fed. Cir. 1988) ("The method of valuation that is most appropriate in the light of the facts of the particular case . . . . may be a single method or some combination of different methods."); *Sill Corp. v. United States*, 343 F.2d 411, 416 (10th Cir. 1965).

434  *CSX Transp.*, 552 U.S. at 16-17.

435  *United States v. Benning Hous. Corp.*, 276 F.2d 248, 253 (5th Cir. 1960); *cf. CSX Transp.*, 552 U.S. at 18 (rejecting contention that it is "as likely to get an accurate result by [one valuation method] as it is by employing another method altogether" because "some approximations [a]re better than others").

436  *See, e.g.*, *United States v. 25.202 Acres of Land (Amexx I)*, 860 F. Supp. 2d 165, 174-179 (N.D.N.Y. 2009), *adopted by* 860 F. Supp. 2d 165 (N.D.N.Y. 2010), *aff'd*, 502 F. App'x 43, 45 (2d Cir. 2012); *United States v. 33.92356 Acres of Land (Piza-Blondet)*, 585 F.3d 1, 7-8 (1st Cir. 2009); *see United States v. Wise*, 131 F.2d 851, 851-52 (4th Cir. 1942); *cf. Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146-47 (1997) (expert opinions are to be rejected when "there is simply too great an analytical gap between the data and the opinion proffered"); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) (expert opinions must be "not only relevant, but reliable").

437  *Bauman v. Ross*, 167 U.S. 548, 574 (1897) (emphasis added) quoting *Searl v. Sch. Dist. in Lake City*, 133 U.S. 553, 562 (1890); *cf. Gen. Elec.*, 522 U.S. at 149-50 (Breyer, J., concurring) (observing that subjecting expert opinions to appropriate legal standards "will help secure the basic objectives of . . . the ascertainment of truth and the just determination of proceedings" and citing FED. R. EVID. 102); *Olson v. United States*, 292 U.S. 246, 257 (1934) ("to allow mere speculation and conjecture to become a guide for the ascertainment of value [is] a thing to be condemned in business transactions as well as in judicial ascertainment of truth").

time of acquisition, are normally the best evidence of market value.[438] The process of forming an opinion of a property's market value through comparison with such <u>comparable sales</u> is known as the <u>sales comparison approach to value</u>.[439] The sales comparison approach is normally preferred in federal acquisitions as the best evidence of value, but not to the exclusion of other relevant evidence of value based on market data.[440] The essence of the sales comparison approach to value is the comparison of sales transactions to the property being appraised.[441] "Generally, the more comparable a sale is, the more probative it will be of the fair market value" of the property being appraised.[442] The converse is also true, as one court observed:

> Significant differences as to location, size, topography, market area, and recreational potential existed between most comparable sales and the subject property. This makes comparison extremely shaky because of the necessity of substantial adjustments required between the comparable and the subject.[443]

As a result, the most recent sale of the property being appraised may well be the most comparable of all the comparable sales, as discussed further in Section 4.4.2.4.1.[444]

**4.4.2.1.    Comparability.** A sale's comparability "is largely a function of three variables: characteristics of the properties, their geographic proximity to one another, and the time differential."[445] The significance of different elements of comparison will vary with the type of property being appraised and the relevant market. For example, as the Sixth Circuit explained:

---

438    *E.g., El Paso Nat. Gas Co. v. Fed. Energy Regulatory Comm'n,* 96 F.3d 1460, 1464 (D.C. Cir. 1996); *United States v. 819.98 Acres of Land,* 78 F.3d 1468, 1471 (10th Cir. 1996); *United States v. 24.48 Acres of Land,* 812 F.2d 216, 218 (5th Cir. 1987); *United States v. 47.14 Acres of Land in Polk Cty.,* 674 F.2d 722, 725 (8th Cir. 1982); *United States v. 103.38 Acres of Land in Morgan Cty.* (*Oldfield*), 660 F.2d 208, 211 (6th Cir. 1981); *United States v. 320 Acres of Land,* 605 F.2d 762, 798 & n.61 (5th Cir. 1979) (citing cases); *United States v. 100 Acres of Land,* 468 F.2d 1261, 1265 (9th Cir. 1972); *United States v. Upper Potomac Props. Corp.,* 448 F.2d 913, 918 (4th Cir. 1971); *United States v. 344.85 Acres of Land,* 384 F.2d 789, 791-92 (7th Cir. 1967); *United States v. 60.14 Acres of Land,* 362 F.2d 660, 665 (3d Cir. 1966).

439    The sales comparison approach was formerly called the market data approach, a problematic term because "[i]n essence, all approaches to value (particularly when the purpose of the appraisal is to establish market value) are market data approaches since the data inputs are presumably market derived." BYRL N. BOYCE, REAL ESTATE APPRAISAL TERMINOLOGY 136 (1st ed. 1975) (defining "market data approach"); *compare* THE APPRAISAL OF REAL ESTATE 273-314 (7th ed. 2d prtg. 1979) ("market data approach") *and* THE APPRAISAL OF REAL ESTATE 8th ed.) 1983) 309-31 ("sales comparison approach") *and Amex I,* 860 F. Supp. 2d at 174 ("market approach (also known as the sales comparison approach)").

440    *El Paso Nat. Gas,* 96 F.3d at 1464; *819.98 Acres of Land,* 78 F.3d at 1471; *Seravalli v. United States,* 845 F.2d 1571, 1575 (Fed. Cir. 1988); *United States v. 421.89 Acres of Land,* 465 F.2d 336, 338-39 (8th Cir. 1972); *Upper Potomac,* 448 F.2d at 917; *344.85 Acres,* 384 F.2d at 792.

441    *Cf. United States v. New River Collieries Co.,* 262 U.S. 341, 344 (1923) ("Where private property is taken for public use, and there is a market price prevailing at the time and place of the taking, that price is just compensation.").

442    *320 Acres,* 605 F.2d at 798.

443    *United States v. Eastman* (*Eastman II*), 528 F. Supp. 1184, 1186 (D. Or. 1981), *aff'd,* 714 F. 2d 76, 77 (9th Cir. 1983).

444    *Cf. Hickey v. United States,* 208 F.2d 269, 273 (3d Cir. 1953).

445    *320 Acres,* 605 F.2d at 798 & n.61 (citing cases). In appraisal terminology, typical elements of comparison include property rights conveyed, financing terms, conditions of sale (i.e., buyer and seller motivations), expenditures made immediately after purchase, market conditions (i.e., time- or date-of-sale adjustment), location, physical characteristics, economic characteristics, legal characteristics (i.e., zoning and permits) and non-realty components of value included in sale. *See* Section 1.5.2.3; APPRAISAL INST., THE APPRAISAL OF REAL ESTATE 390-92, 404-25 (14th ed. 2013); *see, e.g., United States v. 480.00 Acres of Land* (*Fornatora*), 557 F.3d 1297, 1304-05, 1312 (11th Cir. 2009) (applicable zoning restrictions, buyer motivations, conditions of sale); *United States v. 124.84 Acres of Land in Warrick Cty.,* 387 F.2d 912, 915 (7th Cir. 1968) (physical characteristics including soil type and susceptibility to flooding); *Knollman v. United States,* 214 F.2d 106 (6th Cir. 1954) (character and location); *United States v. 68.94 Acres of Land in Kent Cty.,* 736 F. Supp. 541, 549-550 (D. Del. 1990) (time, size, tillable soil percentage, effects of easements on property rights conveyed, buyer motivations); *Eastman II,* 528 F. Supp. at 1185-86 (time, size, location, topography); *cf. BFP v. Resolution Trust Corp.,* 511 U.S. 531, 537-40 (1994) (noting "'fair market value' presumes market conditions that, by definition, simply do not obtain in the context of a forced sale"); *United States v. 564.54 Acres of Land* (*Lutheran Synod*), 441 U.S. 506, 513-14 (1979) (noting new facilities would bear financial burdens imposed by regulations that did not apply to comparable existing facilities).

On the point of similarity in character and locality, obviously if part of an allotment is condemned, sales, in order to be evidence of market value, should be of lots either within the immediate vicinity or very close. But when large areas of open country are involved, similarity of character and locality depends not upon mere propinquity. The character of such land situated several miles from land condemned may well be more comparable than that within a few hundred feet.[446]

**4.4.2.2.    Adjustments.** Depending on the property involved and the relevant market, the appraiser may need to adjust each comparable sale through quantitative and/or qualitative analysis to derive an indication of the market value of the subject property. Adjustments are made "up or down, depending upon such factors as time of sale, size of parcel, location, topography, and other such variables."[447] Quantitative adjustment, qualitative analysis, or both may be appropriate depending on the specific facts of the valuation problem.[448]

Quantitative adjustment is appropriate when there are adequate market data to reliably quantify the effect of a sale characteristic in terms of a percentage or dollar amount:

For example, if the comparable sale occurred one year before the taking of the subject property and during a period of rising prices, the appraiser will adjust upward, that is, he will derive a value (either on a per-acre or per-parcel basis) for the comparable. This will be adjusted in accord with the percent by which sales of that kind of property increased over the period of time between the two relevant dates.[449]

Some characteristics may require quantitative rather than qualitative adjustment, such as market conditions (time) as described above, or expenditures made immediately after purchase.[450] But quantitative adjustment is not appropriate for characteristics for which reliable numerical adjustments cannot be derived from market data.[451] Indeed, without adequate market support, the apparent precision of quantitative adjustments would convey a false sense of accuracy.[452]

Qualitative adjustment may also be appropriate—and necessary—where market data does not support a quantitative adjustment. As another court recognized:

[The appraiser's] decision to make qualitative rather than quantitative adjustments to his identified comparable sales . . . is reasonable in light of the multiple factors involved in each of the sales and the complex market in which the subject tracts are located. Further, . . . [the

---

446  *Knollman v. United States*, 214 F.2d 106, 109 (6th Cir. 1954) (citation omitted).

447  *Eastman II*, 528 F. Supp. at 1186.

448  E.g., *Childers v. United States*, 116 Fed. Cl. 486, 498-99 (Fed. Cl. 2013); *United States v. 381.76 Acres of Land* (*Montego Group*), No. 96-1813-CV, 2010 WL 3734003, at *7 (S.D. Fla. Aug. 3, 2010), *adopted sub nom. United States v. 10.00 Acres of Land*, No. 99-0672-CIV, 2010 WL 3733994 (S.D. Fla. Sept. 22, 2010), *aff'd sub nom. United States v. Gonzalez*, 466 F. App'x 858 (11th Cir. 2012) (per curiam).

449  *Eastman II*, 528 F. Supp. at 1186; *see also McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608, 619-22 (Fed. Cl. 2013).

450  *See Eastman II*, 528 F. Supp. at 1186; Section 1.5.2.3; Section 4.4.2.1.

451  *McCann Holdings*, 111 Fed. Cl. at 622-23 ("This Court is not persuaded that [the appraiser's] numbers were derived from sufficient market data. While [the] expert applied various percentage-based adjustments, it is not clear what market data supported a particular adjustment or why a given numerical adjustment was chosen.").

452  *Cf. Borman v. Raymark Indus., Inc.*, 960 F.2d 327, 334 n.12 (3d Cir. 1992) ("Requiring the experts to speak in terms of numerical percentages introduces a false precision into the evidence. . . . Honest, but more flexible, words such as 'substantial factor,' 'major contribution' or 'significant cause' are more suitable to the . . . function of justly and fairly resolving uncertainties."; *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 596 (S.D.N.Y. 1992).

appraiser] initially attempted to use a quantitative approach to appraise one of the [tracts] but found that method to be problematic . . . . While [qualitative analysis] is not without flaws, it appears to this Court that it is the superior approach, especially considering the . . . market and . . . the parcels at issue.[453]

Qualitative analysis can be particularly useful in evaluating considerations such as development restrictions, particular land use restrictions, allowable density, the presence of environmental lands, and the impact of easements or encumbrances.[454]

### 4.4.2.3.  Sales Verification.

In developing an opinion of market value for the purpose of determining just compensation, the appraiser must verify sales amounts and ascertain whether terms and conditions of a sale were conventional and under open competitive market conditions.[455] Verification typically requires interviews and discussions with the seller, the buyer, the closing agency, and/or the broker handling the transaction in addition to confirming recordation.[456] As federal courts recognize, prices reported in public records may not tell the whole story:

> [C]ertainly most transactions are likely to be influenced by the motives of the parties thereto, such as the special needs or the strong desires of the buyer, the financial or other exigencies of the seller, and the whims, follies, fancies or ignorance of local values on the part of one or both of them . . . . [T]hese are all matters of which persons . . . such as a party to the sale itself or the broker or agent who affected it, can be expected to know at least something . . . . More often than not the true consideration paid is not stated in a deed . . . . And . . . accurate knowledge of the price paid cannot be calculated from revenue stamps without accurate knowledge of liens and encumbrances on the land at the time of the sale which might or might not appear in the records . . . .[457]

Verification must be accomplished by competent and reliable personnel, and if the case goes into condemnation, the appraiser who will testify must personally verify the sale. As the Third Circuit explained, the appraiser's function is "to express his opinion of the value of real estate which he has personally examined and studied . . . ."[458] A real estate appraiser, "no matter how well qualified he may be in general, . . . is not an expert on the value of property which is unknown to him or is situated in an area which is unfamiliar to him."[459]

### 4.4.2.4.  Transactions Requiring Extraordinary Care.

Not all property transactions can be used as potential comparable sales in valuations for federal acquisitions. While few types of

---

453  *Montego Group*, 2010 WL 3734003, at *7 (citations omitted) (accepting valuation opinions derived from qualitative analysis as "honest attempts to determine the value of peculiar properties in a peculiar market while taking complex factors into account").

454  *Childers*, 116 Fed. Cl. at 498-99.

455  *Accord United States v. 5,139.5 Acres of Land*, 200 F.2d 659, 662 (4th Cir. 1952); *see United States v. 429.59 Acres of Land (Imperial Beach)*, 612 F.2d 459, 462 (9th Cir. 1980) ("[T]he proper inquiry is whether the expert has made careful inquiry into the facts of the other sales, and whether his opinion is founded upon such careful inquiry.").

456  *See United States v. Katz*, 213 F.2d 799, 800 (1st Cir. 1954).

457  *Id.*

458  *United States v. 60.14 Acres of Land*, 362 F.2d 660, 668 (3d Cir. 1966).

459  *Id.* ("Instead the essential elements of the real estate expert's competency include his knowledge of the property and of the real estate market in which it is situated, as well as his evaluating skill and experience as an appraiser.").

transactions are categorically excluded from consideration under modern jurisprudence,[460] as a matter of law several types of sales can be considered only under certain circumstances or for limited purposes. Accordingly, careful verification and analysis of each sale is required to ensure the appraiser's opinion of value does not reflect any legally improper considerations.[461] Of course, extraordinary verification alone would not allow an appraiser to rely on a sale that cannot be considered for other reasons, such as a sale involving a different property interest than the property under appraisal,[462] or a sale excluded from consideration under a **legal instruction** applying the scope of the project rule.[463]

> **Some transactions require special attention, verification, and analysis, including:**
>
> - **Prior sales of the same property**
> - **Transactions with potential nonmarket motivations**
> - **Exchanges of property**
> - **Sales that include personal property**
> - **Contingency sales**
> - **Offers, listings, contracts, and options**
> - **Sales after the date of valuation**

**4.4.2.4.1. Prior Sales of the Same Property.** Prior sales of the same property, if unforced, arm's-length, for cash or its equivalent, and reasonably recent to the date of valuation, are extremely probative evidence of market value.[464] Accordingly, the appraiser must determine what the owner paid for the property being appraised.[465] In analyzing prior sales, adjustments may be necessary to account for changes in market conditions, transaction conditions, or other factors.[466] Prior sales of the same property are not categorically entitled to more weight than sales of other comparable properties: the relative importance of each must be analyzed under the particular facts of the appraisal assignment.[467]

Each appraisal report must state and support the consideration accorded to the immediate past sale of the property under appraisal, even if the appraiser concludes the circumstances of the prior sale may have rendered it irrelevant to the determination of the market value as of the date of valuation.[468] An unsupported statement that the sale did not represent market value, or was not an arm's-length transaction is not sufficient: as the Eighth Circuit admonished, disregarding

---

460  *United States v. 320 Acres of Land*, 605 F.2d 762, 798-99 & nn.65-66 (5th Cir. 1979) (citing cases); *see, e.g., United States v. 4.85 Acres of Land in Lincoln Cty.*, 546 F.3d 613, 618-19 (9th Cir. 2008) (post-acquisition sales) (citing cases).

461  *See Olson v. United States*, 292 U.S. 246, 256 (1934) ("Considerations that may not reasonably be held to affect market value are excluded."); *see, e.g., 4.85 Acres*, 546 F.3d at 619 (requiring ". . . separate findings of the comparability of each of the proffered comparable properties to the [subject] property . . . ." (quoting *United States v. 68.94 Acres of Land*, 918 F.2d 389, 399 (3d Cir. 1990))).

462  *United States v. 46,672.96 Acres of Land in Doña Ana Ctys.*, 521 F.2d 13, 17 (10th Cir. 1975).

463  *See* Section 4.5; *see generally 320 Acres*, 605 F.2d at 798-803 & nn.61-81.

464  *United States v. 100.01 Acres of Land*, 102 F. App'x 295, 298 (4th Cir. 2004) (unpubl.); *United States v. 428.02 Acres of Land*, 687 F.2d 266, 271 (8th Cir. 1982); *Surfside of Brevard, Inc. v. United States*, 414 F.2d 915, 917 (5th Cir. 1969); *United States v. Leavell & Ponder, Inc.*, 286 F.2d 398, 403-04 (5th Cir. 1961); *Simmonds v. United States*, 199 F.2d 305, 307-08 (9th Cir. 1952); *Baetjer v. United States*, 143 F.2d 391, 397 (1st Cir. 1944); *United States ex rel. Tenn. Valley Auth. v. Harralson*, 43 F.R.D. 318, 323-24 (W.D. Ky. 1966) (mem.).

465  During litigation, the appraiser should consult with the attorney on how to obtain this information, as communications with landowners may need to go through counsel.

466  *See, e.g., United States v. 633.07 Acres of Land*, 362 F. Supp. 451, 453 (M.D. Pa. 1973) (upholding admission of prior sale, reflecting payment of preexisting debt, because it was a "bona fide and voluntary transaction" and circumstances were fully explained and went to weight, not admissibility; court warned that if the prior sale had been admitted "without explanation as to the circumstances surrounding the transaction, . . . reversible error would have been committed"); *cf. United States v. Certain Land Situated in Detroit (DIBCO III* (for *Detroit Int'l Bridge Co.)*), 600 F. Supp. 2d 880, 897 (E.D. Mich. 2009), *aff'd*, 633 F.3d 418 (6th Cir. 2011) (reasonable for appraiser to discount prior sale of property "due to evidence that it was not an arms length transaction").

467  *Hickey v. United States*, 208 F.2d 269, 273 (3d Cir. 1953) ("While it is true that prior sales of the condemned property eliminate any question as to whether another sale was of a comparable piece of property, nevertheless the comparison of sales of other properties have their advantages too. For example, the sale of another property may be closer in time to the date of the taking, and therefore would reflect more accurately the condition of the market at the time of the taking.").

468  *See* Section 1.3.1.5. Appraisals subject to the Uniform Act must include "at least a 5-year sales history of the property." 49 C.F.R. § 24.103(a)(2)(i).

a prior transaction without first contacting the participants "to ascertain their motives" would be based on "nothing but speculation[.]"[469]

These requirements reflect the federal courts' recognition that considering a property's sale and use history is simply good practice in "forming an intelligent opinion" of its value.[470] Because a prior sale of the property being acquired is extremely pertinent, such evidence has been allowed even when a considerable period of time has elapsed between the sale and the date of valuation.[471] The sales history should also include prior transactions involving a portion of the property under appraisal, such as sales of individual parcels that were subsequently assembled to form the single property under appraisal.[472]

> **Under these Standards, appraisal reports must include:**
>
> - a *10-year sales history* of the subject property (including the whole property or portions);
> - the *most recent sale* of the subject property (regardless of when it occurred); and
> - an *analysis of the most recent sale's relevance* (or lack of relevance) to the property's market value on the date of valuation.

### 4.4.2.4.2. Transactions with Potential Nonmarket Motivations.

Not all property transactions can be used as potential comparable sales in valuations for federal acquisitions. While few types of transactions are categorically excluded from consideration under modern jurisprudence,[473] as a matter of law several types of sales can be considered only under certain circumstances or for limited purposes. Accordingly, careful verification and analysis of each sale is required to ensure the appraiser's opinion of value does not reflect any legally improper considerations.[474] Transactions that involve potential nonmarket motivations include: (1) forced sales, (2) distress sales, (3) settlement negotiations, (4) sales between related parties or entities, (5) sales to government or other entities with condemnation authority, (6) sales to environmental or other public interest organizations, and (7) project-influenced sales.

**(1) Forced Sales.** Forced sales are transactions that occur under a form of legal compulsion such as foreclosure or condemnation, are nonmarket transactions as a matter of law, and therefore cannot be considered as comparable sales.[475] Forced sales include sales "at foreclosure, under deed of trust securing indebtedness, at execution of attachment, at auction, under the pressure of the exercise of the power of eminent domain, or other coercion *sui generis*—types of legal

---

469  *428.02 Acres*, 687 F.2d at 270-72, 271 n.5; *see Olson v. United States*, 292 U.S. 246, 257 (1934) (prohibiting "mere speculation and conjecture" as basis for determining value).

470  *See Int'l Paper Co. v. United States*, 227 F.2d 201, 208 (5th Cir. 1955).

471  *E.g. Carlstrom v. United States*, 275 F.2d 802, 809 (9th Cir. 1960) (sale six or seven years prior to valuation date); *Dickinson v. United States*, 154 F.2d 642,43 (4th Cir. 1946) (six years); *United States v. Becktold Co.*, 129 F.2d 473, 479 (8th Cir. 1942) (passage of 14 years "went to the weight of the evidence, rather than to its admissibility.").

472  *See United States v. 1.604 Acres of Land (Granby III)*, 844 F. Supp. 2d 685, 688-89 (E.D. Va. 2011) (finding more facts were needed to determine admissibility of prior sales of individual parcels in valuation of ensuing assembled property; prior sales of parcels were ultimately admitted for purpose of comparison with concurrent comparable sales, but not as evidence of value of the property as assembled).

473  *United States v. 320 Acres of Land*, 605 F.2d 762, 798-99 & nn.65-66 (5th Cir. 1979) (citing cases); *see, e.g.*, *United States v. 4.85 Acres of Land in Lincoln Cty.*, 546 F.3d 613, 618-19 (9th Cir. 2008) (refusing to categorically exclude post-acquisition sales) (citing cases).

474  *See Olson*, 292 U.S. at 256 ("Considerations that may not reasonably be held to affect market value are excluded."); *see, e.g.*, *4.85 Acres*, 546 F.3d at 619 (requiring "'separate findings of the comparability of each of the proffered comparable properties to the [subject] property'"), quoting *United States v. 68.94 Acres of Land*, 918 F.2d 389, 399 (3d Cir. 1990).

475  *United States v. Certain Land in Fort Worth*, 414 F.2d 1029, 1031-32 (5th Cir. 1969); *D.C. Redev. Land Agency v. 61 Parcels of Land*, 235 F.2d 864, 865-66 (D.C. Cir. 1956); *Hickey v. United States*, 208 F.2d 269, 275 (3d Cir.1953) ("A forced sale is one which has no probative value whatever and therefore must be excluded from evidence."); *United States v. 5139.5 Acres of Land*, 200 F.2d 659, 661 (4th Cir. 1952); *Baetjer v. United States*, 143 F.2d 391, 397 (1st Cir. 1944); *see United States v. 79.95 Acres of Land*, 459 F.2d 185, 187 (10th Cir. 1972); *cf. BFP v. Resolution Trust Corp.*, 511 U.S. 531, 538 (1994) ("'[F]air market value' presumes market conditions that, by definition, simply do not obtain in the context of a forced sale.").

compulsion generally disclosed by public records."[476] Appraisers must carefully investigate the circumstances of a potential forced sale to ensure they do not consider a transaction in which "elements of compulsion so affected the seller that the sale could not be said to be fairly representative of market value at the time made."[477]

**(2) Distress Sales.** Similarly, distress sales and sales with atypical financing terms are questionable indicators of value and can be used only with great care.[478] If limited market data necessitates reference to such a sale or sales, the appraiser must carefully analyze the circumstances of each transaction[479] and make proper adjustments to account for any nonmarket motivations.[480]

**(3) Settlement Negotiations.** It is generally recognized that offers of settlement are not reliable indicators of market value because such offers are often in the nature of compromise to avoid the expense and uncertainty of litigation.[481] As a result, appraisers cannot rely on settlement negotiations or completed settlements as evidence of market value. As early as its October 1876 term, the Supreme Court noted that well-recognized principles made an offer of compromise inadmissible.[482] The prohibition against the admissibility of offers to compromise and completed compromises is also codified in Rule 408 of the Federal Rules of Evidence.[483] As with any sale, the appraiser should not simply assume that a transaction was a settlement to avoid or resolve litigation, but rather should contact the participants to ascertain their motives.[484]

**(4) Sales Between Related Parties or Entities.** Sales between members of a family or closely related business entities are not arm's-length transactions, and since they may involve other factors than market value considerations, such sales generally cannot be considered.[485]

**(5) Sales Involving the Government or Other Condemnation Authority.** Sales to government entities are inherently problematic for federal appraisal purposes because they routinely

---

476  *Fort Worth*, 414 F.2d at 1031-32 (quoting *61 Parcels*, 235 F.2d at 865-66); *see 79.95 Acres*, 459 F.2d at 187 ("[A] foreclosure sale is not an arms length transaction involving a willing buyer and a willing seller. The amount of money one has 'invested', i.e., paid, in the acquisition of property by foreclosure is not relevant . . . . It is not evidence of fair market value."); *cf. BFP*, 511 U.S. at 537 ("Market value . . . is the very antithesis of forced-sale value.").

477  *Hickey*, 208 F.2d at 275; *Baetjer*, 143 F.2d at 397 ("Only sales on foreclosure and similar forced transactions not on the open market are without probative force as a matter of law. The motivation behind other transactions can be shown . . . ."); *accord 5139.5 Acres*, 200 F.2d at 661.

478  *United States v. 480.00 Acres of Land* (*Fornatora*), 557 F.3d 1297, 1305 (11th Cir. 2009) ("distress sales . . . offer[] little insight"); Hickey, 208 F.2d at 275 ("[C]ompulsion may also be that created by business circumstances. For example, a property taken in discharge of a debt may be considered a forced sale, where the creditor had little choice in the matter."); *cf. United States v. Deist*, 442 F.2d 1325, 1327 (9th Cir. 1971) ("a 'forced' or 'distress' sale wherein the seller was shown to have been in financial difficulty and in need of making a sale").

479  *See, e.g., Hickey*, 208 F.2d at 275-76.

480  *See, e.g., Fornatora*, 557 F.3d at 1305; *Deist*, 442 F.2d at 1327 (finders of fact "recognized the [forced or distress] sales for what they were and gave little weight to either").

481  *United States v. 10.48 Acres of Land*, 621 F.2d 338, 339-40 (9th Cir. 1980); *Slattery Co. v. United States*, 231 F.2d 37, 41 (5th Cir. 1956); *United States v. 46,672.96 Acres of Land in Doña Ana Ctys.*, 521 F.2d 13 (10th Cir. 1975); *Evans v. United States*, 326 F.2d 827 (8th Cir. 1964); *United States v. Foster*, 131 F.2d 3 (8th Cir. 1942).

482  *Home Ins. Co. v. Balt. Warehouse Co.*, 93 U.S. 527, 548 (1876); *United States v. Playa De Flor Land & Improvement Co.*, 160 F.2d 131, 136 (5th Cir. 1947); *cf. Barnes v. S.C. Pub. Serv. Auth.*, 120 F.2d 439, 440 (4th Cir. 1941).

483  Rule 408 is designed "to encourage settlements which would be discouraged if such evidence were admissible." FED. R. EVID. 408, notes of Committee on the Judiciary, Senate Report No. 93-1277.

484  *See United States v. 428.02 Acres of Land*, 687 F.2d 266, 270-72, 272 n.5 (8th Cir. 1982).

485  *See Deist*, 442 F.2d at 1327 ("purported sale was shown to have been an 'intra-family' transaction"); *see United States v. 47.14 Acres of Land*, 674 F.2d 722, 726 (8th Cir. 1982) ("[C]omparable sales are the best evidence of the value . . . , which sales on the whole reflect the principle of a willing seller and a willing buyer concluding arms-length negotiations."); *Welch v. Tenn. Valley Auth.*, 108 F.2d 95, 101 (6th Cir. 1939) ("Sales at arms length of similar property are the best evidence of market value."); *cf. United States v. Leavell & Ponder, Inc.*, 286 F.2d 398, 405-06 (5th Cir. 1961) (describing transaction in which the parties " 'reach(ed) up in mid-air and pull(ed) down a figure—any figure they wanted to,' and that is what they reported for income tax purposes").

involve nonmarket considerations, making them inaccurate indicators of market value and therefore improper to consider as comparable sales.[486] For example, as recognized by the federal courts, such transactions tend to reflect payments "in the nature of compromise to avoid the expense and uncertainty of litigation and are not fair indications of market value."[487] Courts also exclude such evidence in litigation because it "complicates the record, confuses the issue, is misleading, and especially in condemnation cases, raises collateral issues as to the conditions under which such sales were made . . . ."[488]

> **Sales to government entities are inherently suspect and cannot be relied on as comparable sales without a determination that they are true open-market transactions.**

Sales to government entities must therefore be viewed as *suspect* from the outset, but they cannot, and should not, be rejected by appraisers as categorically invalid comparable sales.[489] If the appraiser determines, after careful analysis and verification, that a sale to a government entity was a true open-market transaction, the sale may be appropriate to consider,[490] particularly if there is a paucity of private sales available for use in the sales comparison approach to value.[491] But such a determination requires extraordinary verification due to the nonmarket considerations inherent in most government acquisitions.[492] Mere conclusory statements that a transaction was voluntary or did not involve the threat of condemnation are not sufficient.[493] For example, the Tenth Circuit barred consideration of the government transactions at issue despite one witness's testimony that the transactions were "voluntary," pointing out that the same witness "also admitted that the government was eager to obtain the [properties] without using the condemnation process."[494]

While some cases allude to a split of legal authority on the admissibility of prices paid by entities with the power of eminent domain,[495] the federal courts uniformly hold that such sales *cannot*

---

486  *See United States v. 0.59 Acres of Land*, 109 F.3d 1493, 1498 (9th Cir. 1997); *10.48 Acres*, 621 F.2d at 339; *United States v. 25.02 Acres of Land*, 495 F.2d 1398, 1403 (10th Cir. 1974); *Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15, 17-18 (5th Cir. 1969); *Evans*, 326 F.2d at 831; *Slattery*, 231 F.2d at 40-41.

487  *10.48 Acres*, 621 F.2d at 339 (quoting *Slattery*, 231 F.2d at 41).

488  *United States ex rel. Tenn. Valley Auth. v. Bailey*, 115 F.2d 433, 434 (5th Cir. 1940); *see also Duk Hea Oh v. Nat'l Capital Revitalization Corp.*, 7 A.3d 997, 1010-11 (D.C. 2010) (barring evidence of other government acquisitions that would "bias the [government] by requiring it to explain its compromise decision and 'what's going on with the government' and would occasion a 'frolic and detour' that would 'bias' the [government]").

489  *See 10.48 Acres*, 621 F.2d at 339-40; *cf. Olson v. United States*, 292 U.S. 246, 256 (1934) ("[T]o the extent that probable demand by prospective purchasers or condemnors affects market value, it is to be taken into account. But . . . . [v]alue to the taker of a piece of land combined with other parcels for public use is not the measure of or a guide to the compensation to which the owner is entitled.") (citation omitted).

490  *Transwestern*, 418 F.2d at 18 (Sales to condemnors can be considered "only when it is certain that those sales truly represent the market value of the land in question."); *25.02 Acres*, 495 F.2d at 1403 (Such sales "often involve compulsion, coercion or compromise . . . . [A] condemning party might be willing to give more than the property is worth, and the owner might be willing to take less than it is worth rather than undergo a lawsuit.").

491  *E.g., United States v. 264.80 Acres of Land in Ramsey Cty.*, 360 F. Supp. 1381, 1383 (D. N.D. 1973) ("[T]his purchase of land in the area by [a government agency] was not an isolated transaction. The [agency] had made several other purchases in the area, and . . . taken together, all of these purchases had a significant impact on the general market value of land in that community."); *see Olson*, 292 U.S. at 257.

492  *E.g., United States v. 46,672.96 Acres in Doña Ana Ctys.*, 521 F.2d 13, 17 (10th Cir. 1975) ("[G]reat caution should be used . . . since [the price paid by a condemnor] is an inaccurate indicator of market value."); *see also United States v. 2.739 Acres of Land in Santa Cruz Cty.*, 609 F. App'x 436, 437-38 (9th Cir. 2015) (unpubl.) (upholding use of sale to government entity given "evidence that the sale had been voluntary"); *cf. Olson*, 292 U.S. at 256 ("Considerations that may not reasonably be held to affect market value are excluded. Value to the taker of a piece of land combined with other parcels for public use is not the measure of or a guide to . . . compensation . . . .").

493  *Transwestern*, 418 F.2d at 19; *see, e.g., 264.80 Acres in Ramsey*, 360 F. Supp. at 1383.

494  *46,672.96 Acres in Doña Ana*, 521 F.2d at 17.

495  *See Duk Hea Oh v. Nat'l Capital Revitalization Corp.*, 7 A.3d 997, 1010-11 (D.C. Cir. 2010) (noting D.C. Circuit's conflicting holdings in *Nash*, 395 F.2d at 573, 575-76, and *Hannan v. United States*, 131 F.2d 441, 442-43 (D.C. Cir. 1942)). Compare *Transwestern*, 418 F.2d at 18-19 ("generally prevailing rule" excludes sales to buyers with the power of eminent domain, subject to "sensible exception" if party "show[s] that the sales in question were made willingly, without coercion, compulsion, or compromise") *with Nash v. D.C. Redev. Land Agency*, 395 F.2d 571, 575 (D.C. Cir. 1967) (McGowan, J., explaining why petition for rehearing en banc should be denied) ("minority rule . . . [admits] such evidence . . . provided the purchase by the condemnor was made without compulsion").

be considered if they are compelled by nonmarket considerations, but *may* be considered if they are *true open-market transactions free of compulsion*.[496] Indeed, the federal courts have recognized a multitude of motivations that may compel a government entity (or other entity with the power of eminent domain[497]) to acquire lands at a price other than market value. For example, "the necessity of the purchaser, the disposition of the vendor, and peculiar circumstances and conditions may be such as to oblige a purchaser to submit to severe exactions in order to consummate a purchase without delay."[498] Or, "in an accumulation for a project such as a large airplane plant, the last parcels are undoubtedly more difficult to obtain, at their fair value, since the purpose of the acquisition is then usually known[,]" and due to "the exigencies which necessitated speed[, the] . . . parcels were urgently wanted and they were bought without regard to the real value . . . ."[499] Moreover, "a condemning party might be willing to give more than the property is worth, and the owner might be willing to take less than it is worth rather than undergo a lawsuit."[500] Because of the likelihood of such nonmarket motivations, appraisers can consider sales to buyers with the power of eminent domain as "evidence of market value only when it is certain that those sales *truly* represent the market value of the land in question."[501]

To ensure compliance with federal case law, the appraiser must identify, analyze, and rule out or appropriately adjust for all potential nonmarket motivations before relying on a sale to a government entity as a comparable sale.[502] Appraisers must carefully verify the circumstances surrounding a sale to a government entity to ensure that it meets the criteria of market value or can be accurately adjusted to reflect market value.[503] See Section 1.5.2.4 and Appendix E.

**(6) Sales Involving Environmental or Other Public Interest Organizations.** Sales to environmental or other public interest organizations may be similarly suspect. For example, acquisitions may be authorized for a government conservation or preservation project before adequate funds are appropriated to acquire the entire project area.[504] Conservation or other environmental organizations may then voluntarily acquire lands within the project area for the sole purpose of transferring them to the government once funding becomes available.[505] Sales made

---

496  *United States v. 0.59 Acres of Land*, 109 F.3d 1493, 1498 (9th Cir. 1997); *46,672.96 Acres in Doña Ana*, 521 F.2d at 17; *Transwestern*, 418 F.2d at 18-19; *Evans v. United States*, 326 F.2d 827, 831 (8th Cir. 1964); *Slattery Co. v. United States*, 231 F.2d 37, 40-41 (5th Cir. 1956).

497  For example, Congress can delegate a limited right of eminent domain to private entities "to be exercised by them in the execution of works in which the public is interested." *Miss. & Rum R. Boom Co. v. Patterson*, 98 U.S. 403, 406 (1878); *e.g.*, Natural Gas Act, 15 U.S.C. § 717f(h) (giving gas companies power of eminent domain for construction of natural gas pipelines).

498  *United States v. Freeman*, 113 F. 370, 371 (D. Wash. 1902) (excluding "the price of adjoining lands, which was fixed by agreement, and was paid by the government" from consideration); *see Justice v. United States*, 145 F.2d 110, 111 (9th Cir. 1944) (rejecting consideration of "the sum paid by the Government for comparable lands" (citing *Freeman*, 113 F. at 371)).

499  *Phillips v. United States*, 148 F.2d 714, 716 (2d Cir. 1945); *see Olson*, 292 U.S. at 257.

500  *25.02 Acres*, 495 F.2d at 1403; *see 46,672.96 Acres in Doña Ana*, 521 F.2d at 17.

501  *Transwestern*, 418 F.2d at 19.

502  As J.D. Eaton observed, "unlike most private purchases, a government purchase and the decision-making process that led to it are usually well documented. The appraiser can take advantage of that documentation in the sales verification process. In fact, the appraiser *must* take advantage of it." EATON, *supra* note 16, at 222.

503  Sales to a *buyer* with condemnation authority are inherently suspect, and cannot be relied on as comparable sales without a determination that they are true open-market transactions. But sales involving a *seller* with condemnation authority are a different matter.

504  For example, Congress authorized an expansion of the boundaries of Everglades National Park in 1989, but did not provide funding for the private land acquisition necessary for expansion until 1992, and the expansion was not fully funded until 1999. *See* 16 U.S.C. §§ 410r-5 *et seq.*; *United States v. 480.00 Acres of Land* (*Fornatora*), 557 F.3d 1297, 1300 (11th Cir. 2009) (discussing East Everglades Acquisition Project); *see also* Section 4.5 (Project Influence).

505  *See, e.g.*, 16 U.S.C. § 410r-9(2)(B) (authorizing acquisition "from willing sellers by donation, purchase with donated or appropriated funds, or exchange" of property interests "within the area . . . to be added to Everglades National Park").

---

under such circumstances may well reflect project influence, which cannot be considered.[506] And of course, where "a market for a particular use is created solely as a result of the project for which the land is condemned, value based on that use must be excluded."[507] Moreover, such sales, like direct sales to the government, typically involve nonmarket motivations and considerations beyond the property's market value for its "highest and most profitable use…."[508] But "[c]onsiderations that may not reasonably be held to affect market value are excluded."[509] Thus, as with sales to government entities, sales to public interest organizations cannot be used as comparable sales without careful analysis to identify and rule out or adjust for potential nonmarket motivations.[510]

(7) **Project-Influenced Sales.** As discussed in depth in Section 4.5, valuations must disregard any value attributable to the government project prompting the acquisition.[511] Consideration of <u>project influence</u> on market value is prohibited under the <u>scope of the project rule</u>. Whether the rule applies and how to apply it in a particular valuation assignment will require **legal instructions**.

### 4.4.2.4.3.  Exchanges of Property.
Sales involving an exchange of property generally introduce too many collateral issues to be reliable indicators of market value. As the Fifth Circuit explained, if evidence of an exchange "is to be considered as proof of present valuation, the values of such exchanged lands obviously must be proved by the same standards as attends proof of value of the property being condemned."[512]

### 4.4.2.4.4.  Sales that Include Personal Property.
Sales that include personal property cannot be considered unless they can be adjusted to reliably reflect only the real property transaction.[513] For example, in considering the sale of a farm in which the price included personal property, the Second Circuit held it was legal error to exclude reliable evidence of "the actual consideration received for [the] realty."[514] In the sale of a farm, the purchase price often includes equipment, livestock, and other items of consideration.[515]

---

506  *See* Section 4.5; *cf. United States v. Miller*, 317 U.S. 369, 376-77 (1943) ("If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.").

507  *United States v. 46,672.96 Acres of Land in Doña Ana Ctys.*, 521 F.2d 13, 15-16 (10th Cir. 1975); *cf. Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 410 (1878) ("[T]he proper inquiry was, 'What is the value of the property for the most advantageous uses to which it may be applied?'" (quoting *In re Furman Street*, 17 Wend. 649 (N.Y. Sup. Ct. 1836)).

508  *Olson v. United States*, 292 U.S. 246, 255 (1934); *see* Section 4.3. This may be true of not only the buyer's but also the seller's motivations (e.g., sellers may claim such sales as a tax write-off). *Cf. United States v. Leavell & Ponder, Inc.*, 286 F.2d 398, 405-06 (5th Cir. 1961).

509  *Olson*, 292 U.S. at 256; *cf. Boom Co.*, 98 U.S. at 407-08 ("In determining the value of land appropriated for public purposes, the same considerations are to be regarded as in a sale of property between private parties. . . . [The amount] is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community . . . .").

510  Where public interest organizations work closely with the government agency administering conservation or similar projects, extensive sale documentation may be available. In such sales, the government agency commonly approves an organization's selection of appraisers, provides or assists in the development of appraiser instructions, and reviews the appraisal before the organization makes an offer to purchase the property. *See* note 528, *supra*, quoting EATON, *supra* note 16, at 221-23.

511  *United States v. Reynolds*, 397 U.S. 14, 16-17 (1970); *Miller*, 317 U.S. at 376-77; *United States v. 320 Acres of Land*, 605 F.2d 762, 781-90 (5th Cir. 1979).

512  *Leavell & Ponder*, 286 F.2d at 406.

513  *Cf. Stephenson Brick Co. v. United States ex rel. Tenn. Valley Auth.*, 110 F.2d 360, 361 (5th Cir. 1940) ("the fair value . . . , excluding personal property, ought to be ascertained").

514  *United States v. 18.46 Acres of Land in Swanton*, 312 F.2d 287, 289 (2d Cir. 1963).

515  *See* APPRAISAL INST. & AM. SOC'Y OF FARM MANAGERS, THE APPRAISAL OF RURAL PROPERTY 234-35 (2d ed. 2000).

**4.4.2.4.5. Contingency Sales.** Sales of property with a highest and best use for some form of development that requires rezoning or land use permits generally take the form of *contingency sales* or initial options.[516] Such sales are *contingent* on the would-be purchaser's ability to procure the rezoning or permitting necessary to develop the property to its highest and best use; if the rezoning or permitting is denied, the contingency is not met and the sale does not close (or the option is not exercised). Therefore, when such sales are actually consummated, they reflect the price of property *already rezoned or permitted for development to its highest and best use*. If, on the date of value, the property being appraised would require rezoning or permits to be developed to its highest and best use, completed contingency sales cannot be considered as comparable sales without appropriate adjustments to account for the risks, time delays, and costs associated with rezoning or permitting.[517] As discussed in Section 4.3.2.4, appraisers cannot merely assume that such a rezoning/permit is in place for the property under appraisal or assume that such a rezoning/permit will be granted.[518]

**4.4.2.4.6. Offers, Listings, Contracts, and Options.** Unconsummated transactions are generally not reliable indicators of value and therefore cannot be used as comparable sales. Appraisers should still carefully analyze such data, which may be appropriate to consider for certain limited purposes.[519] "An opinion, however, largely based on owners' asking prices ought to be rejected, for the courts have decided that even offers by buyers are too unreliable to be considered."[520]

A *binding and unconditional* contract of sale can generally be considered as evidence of value, even if title has yet to be conveyed.[521] By contrast, mere nonbinding offers or unexercised options are not permissible evidence of value, and therefore the appraiser should give little or no weight to such options except to the extent that they may set limits of value.[522]

<u>Listings</u> and other <u>nonbinding offers</u> to buy or sell real estate generally cannot be relied on as comparable sales.[523] As the Supreme Court explained:

> It is frequently very difficult to show precisely the situation under which these offers were

---

[516]  *See, e.g., United States v. 429.59 Acres of Land (Imperial Beach)*, 612 F.2d 459 (9th Cir. 1980); *United States v. Meadow Brook Club*, 259 F.2d 41, 46 (2d Cir. 1958), *aff'g United States v. 50.8 Acres of Land in Hempstead*, 149 F. Supp. 749 (E.D.N.Y. 1957).

[517]  *Meadow Brook Club*, 259 F.2d at 46; *see Imperial Beach*, 612 F.2d at 462-63; *Foster v. United States*, 2 Cl. Ct. 426, 447-48 & n.19 (1983) (Sale was "of questionable comparability" because "it was unlikely that a conditional use permit could be obtained.").

[518]  *See Olson v. United States*, 292 U.S. 246, 257 (1934); *United States v. 33.92356 Acres of Land (Piza-Blondet)*, 585 F.3d 1, 4-5, 7-9 (2009); *United States v. 320 Acres of Land*, 605 F.2d 762, 818 & n.128 (5th Cir. 1979) (citing cases); *Meadow Brook Club*, 259 F.2d at 45.

[519]  *See* note 498, *infra; cf.* USPAP, Standards Rule 1-5 (appraisers must analyze "all agreements of sale, options, and listings of the subject property current as of the effective date of the appraisal" in developing opinion of market value).

[520]  *United States v. Dillman*, 146 F.2d 572, 575 (5th Cir. 1944) (quoting *Atlantic Coast Line R. Co. v. United States*, 132 F.2d 959, 963 (5th Cir. 1943)); *United States v. 0.59 Acres of Land in Pima Cty.*, 109 F.3d 1493, 1496 (9th Cir. 1997) ("[a] letter containing a mere offer to buy 'comparable' property [was] plainly inadmissible."); *accord United States v. 10,031.98 Acres of Land*, 850 F.2d 634, 637 (10th Cir. 1988) (Where witness "used the offering price of replacement property as the basis for figuring the value of his own property . . . , his opinion of the value . . . cannot be separated from the basis on which he arrived at that opinion even though [he] factored in the difference" between the subject property and those on which the offers were received.).

[521]  *United States v. 312.50 Acres of Land*, 812 F.2d 156, 157 (4th Cir. 1987); *United States v. 428.02 Acres of Land*, 687 F.2d 266, 270-71 (8th Cir. 1982); *United States v. 114.64 Acres of Land*, 504 F.2d 1098, 1100 (9th Cir. 1974); *United States v. Smith*, 355 F.2d 807, 811-12 (5th Cir. 1966).

[522]  *0.59 Acres in Pima*, 109 F.3d at 1495-96; *10,031.98 Acres*, 850 F.2d at 637; *United States v. 158.24 Acres of Land*, 696 F.2d 559, 565 (8th Cir. 1982); *United States v. Certain Land in Fort Worth*, 414 F.2d 1029, 1032 (5th Cir. 1969).

[523]  *10,031.98 Acres*, 850 F.2d at 637 ("It has long been held in condemnation suits that the offering price of replacement properties cannot be used to show the fair market value of the condemned land."); *158.24 Acres*, 696 F.2d at 565 (landowner demand/offer to sell); *Smith*, 355 F.2d at 811-13 ("transactions which were in fact mere offers and not sales and which were, therefore, of no probative value on the question of market value"); *Bank of Edenton v. United States*, 152 F.2d 251, 253 (4th Cir. 1945).

made. In our judgment they do not tend to show value, and they are unsatisfactory, easy of fabrication and even dangerous in their character as evidence upon this subject.[524]

These risks are still greater "when the offers are proved only by the party to whom they are alleged to have been made, and not by the party making them."[525]

An <u>option to purchase</u> is a form of an offer; it is an offer that is irrevocable for the period stipulated. <u>Unexercised options</u> "represent only what a willing seller would take for his land but not, unless and until exercised by the holder of the option, what a willing buyer would give for it."[526] As a result, even if consideration has been paid for it, an unexercised option—like an unaccepted offer—is inadmissible to establish market value. As the Fifth Circuit reasoned:

> We cannot agree that paying a consideration for the granting of an option to purchase property at a stipulated price changes its basic character or increases its reliability as an indicia of value. The payment of consideration makes the landowner's offer irrevocable for the period of time stipulated in the option, . . . and thus assures the holder that amount of time in which to consider all the facts which he deems relevant and to decide at his leisure whether or not to buy. The payment thus merely binds the landowner and indicates the bona fides of his asking price. It does not in any way bind the holder to buy at that price or indicate that he regards that price as a fair one from a purchaser's standpoint. An option, even though paid for, may well have been acquired for purely speculative reasons.[527]

<u>Exercised options</u>, on the other hand, "when they result in a binding agreement between buyer and seller, do not differ, from a probative standpoint, from completed transactions."[528]

### 4.4.2.4.7. Sales After the Date of Valuation. 

Sales that occurred after the date of valuation may be considered if they are not otherwise incompetent as evidence of value.[529] In the words of the Eleventh Circuit: "While post-taking sales are not automatically appropriate evidence of comparable value, neither are they automatically inappropriate."[530] But post-acquisition sales may be tainted by government project influence and reflect elements of value that cannot be considered under the scope of the project

**Sales after the date of valuation may be considered if they are reliable indicators of value. Post-acquisition sales may be particularly useful in valuing the remainder property in partial acquisitions.**

---

524  *Sharp v. United States*, 191 U.S. 341, 349 (1903).

525  *Id.* In condemnation proceedings, evidence of owners' offers to sell their own property may be permitted as admissions of value. *Albert Hanson Lumber Co. v. United States*, 261 U.S. 581, 589 (1923) ("the specified price was fixed with perfect freedom; they show a completed agreement of purchase and sale; and there is no reason why they should not be considered as the owner's admission of the then value of the property"); *cf. United States v. Hart*, 312 F.2d 127, 130 (6th Cir. 1963) ("The testimony was that of the offerors themselves under oath, and not that of the offerees. [It] was not tendered primarily for valuation purposes, negativing any apparent motive for fabrication." citing *Erceg v. Fairbanks Expl. Co.*, 95 F.2d 850, 853-54 (9th Cir. 1938)).

526  *Smith*, 355 F.2d at 811.

527  *Id.* at 812 (quoting *Sharp*, 191 U.S. at 348 "Pure speculation may have induced it . . . .")).

528  *Smith*, 355 F.2d at 812 (citing, *inter alia, United States v. Certain Parcels of Land in Phila.*, 144 F.2d 626, 629-30 (3d Cir. 1944)).

529  *United States v. 4.85 Acres of Land in Lincoln Cty.*, 546 F.3d 613, 618-19 (9th Cir. 2008); *United States v. 68.94 Acres of Land in Kent Cty.*, 918 F.2d 389, 398-99 & n.6 (3d Cir. 1990); *United States v. 0.161 Acres of Land in Birmingham*, 837 F.2d 1036, 1044 (11th Cir. 1988); *United States v. 312.50 Acres of Land in Prince William Cty.*, 812 F.2d 156, 157 n.3 (4th Cir. 1987); *United States v. 428.02 Acres of Land in Newton & Searcy Ctys.*, 687 F.2d 266, 270 (8th Cir. 1982); *United States v. 320 Acres of Land*, 605 F.2d 762, 799-803 (5th Cir. 1979); *United States v. 691.81 Acres of Land in Clark Cty.*, 443 F.2d 461, 462 (6th Cir. 1971); *United States v. 63.04 Acres of Land at Lido Beach*, 245 F.2d 140, 144 (2d Cir. 1957).

530  *0.161 Acres in Birmingham*, 837 F.2d at 1044.

---

5-ER-887

rule.[531] As a result, before considering such sales, the appraiser must analyze "whether the sales are tainted and how much the taint distorts true market value . . . ."[532]

In partial acquisitions, post-acquisition sales that reflect the influence of the government project can be highly comparable in valuing the remainder property after acquisition.[533] For example, "[s]uch sales should be particularly useful when the measure of [compensation] … is the difference between the market value before and after imposition of an easement."[534]

### 4.4.3. Cost Approach.

Where appropriate, appraisers can employ the <u>cost approach</u> in valuing property with existing physical improvements.[535] In this approach, the <u>reproduction</u> or <u>replacement cost</u> of the improvements, less appropriate <u>depreciation</u>, is added to the estimated market value of the *land as if vacant* to derive an indication of the market value of the property as a whole.[536] It bears noting that the cost approach can yield *an indication* of market value, but "cost is not synonymous with market value. *A fortiori*, cost of land and cost of improvements taken separately and added are not to be equalized with fair market value."[537] Rather, the elements are considered under the cost approach in developing an opinion of the market value of the property as a whole.[538]

Cost of improvements (incl. entrepreneurial profit)

- depreciation

+ land value

= indication of market value of whole property

While not inherently flawed, the cost approach has often been misused, leading a number of courts to identify the cost approach as "one of the least reliable indicia of market value" for the purpose of measuring just compensation.[539] Indeed, as the Fifth Circuit observed, when improperly applied, "reproduction cost evidence, though perhaps making it easier to reach some solution, only ma[kes] the proper solution more difficult."[540] As a result, the cost approach is rarely

---

531  *See 4.85 Acres in Lincoln*, 546 F.3d at 618; *68.94 Acres in Kent*, 918 F.2d at 398-99; *320 Acres*, 605 F.2d at 799; Section 4.5.

532  *320 Acres*, 605 F.2d at 802. In some cases, post-acquisition sales may be so distorted by project influence that they must be categorically excluded, particularly if sufficient untainted sales are available for a fair comparison – but this would be a legal determination beyond the scope of the appraiser. *See id.* at 802-03; *68.94 Acres in Kent*, 918 F.2d at 398-99; *see also United States v. Reynolds*, 397 U.S. 14, 20-21 (1970); *4.85 Acres in Lincoln*, 546 F.3d at 618-19 (noting "necessity of a case-by-case approach"); *Lido Beach*, 245 F.2d at 144 ("In every case it is a question of judgment . . . .").

533  Project influence on market value normally must be disregarded, as discussed in Section 4.5. But partial acquisitions present a special situation, as explained in Section 4.6: the measure of compensation for a partial acquisition is the difference in the market value of the landowner's property before and after the government's acquisition. As a result, the impact of the government project would normally be disregarded for the "before" value but considered for the "after" value.

534  *United States v. 1129.75 Acres of Land in Cross & Pointsett Ctys.*, 473 F.2d 996, 999 (8th Cir. 1973).

535  *Compare United States v. 1.604 Acres of Land* (*Granby I*), 844 F. Supp. 2d 668, 682 (E.D.Va. 2011) (allowing cost approach in valuation of partially improved property), *with United States v. 15,478 Square Feet of Land* (*Balaji Sai*), No. 2:10-cv-00322, 2011 WL 2471586 at *5 (E.D.Va. June 20, 2011) (rejecting cost approach in valuation of vacant property).

536  *Granby I*, 844 F. Supp. 2d at 682; see *United States v. 100 Acres of Land*, 468 F.2d 1261, 1265 (9th Cir. 1972) (citing *United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 402, 403 (1949)). While replacement cost and reproduction cost are distinct appraisal concepts as discussed below, the terms sometimes appear interchangeably in case law.

537  *Kinter v. United States*, 156 F.2d 5, 7 (3d Cir. 1946).

538  *See, e.g., United States v. Becktold Co.*, 129 F.2d 473, 478-79 (8th Cir. 1942) (question is "the value of the land as enhanced by the buildings thereon" (citations omitted)); *United States v. Wise*, 131 F.2d 851, 853 (4th Cir. 1942) (whether existence of improvements "contributes anything to the fair market value of the whole").

539  *United States v. Certain Interests in Prop. in Champaign Cty.*, 271 F.2d 379, 382 (7th Cir. 1959); *accord United States v. 55.22 Acres of Land in Yakima Cty.*, 411 F.2d 432, 435 (9th Cir. 1969); *United States v. 49,375 Square Feet of Land in Manhattan* (*252 Seventh Ave.*), 92 F. Supp. 384, 387-88 (S.D.N.Y. 1950), *aff'd sub nom. United States v. Tishman Realty & Constr. Co.*, 193 F.2d 180 (2d Cir. 1952) (per curiam) (affirming on opinion of trial court) ("[The cost approach] is in itself absurd in the ordinary case, because even in ordinary times it is ridiculous to suppose that anyone would think of reproducing this or any like property, and that same thing would be true in the vast majority of cases, I should think."); *see* EATON, *supra* note 16, at 159 (noting "flagrant misuse of the approach by appraisers [who err] from lack of knowledge [or] use the cost approach to intentionally exaggerate the market value of property").

540  *United States v. Benning Hous. Corp.*, 276 F.2d 248, 253 (5th Cir. 1960).

acceptable as a stand-alone indication of value for federal acquisitions;[541] instead, it is typically employed either to test the financial feasibility of a potential highest and best use[542] or to "check" or test the reasonableness of estimates of value indicated by other approaches.[543] Use of the cost approach may be appropriate in the valuation of properties with highly specialized improvements that have no known comparable sales in the area.[544] Proper application of the cost approach for any purpose under these Standards requires an understanding of its underlying foundations in the context of determining just compensation, as well as the specific elements involved.[545]

### 4.4.3.1. Foundations of the Cost Approach.

Like the sales comparison and income capitalization approaches to value, the cost approach is based on the principle of substitution: a prudent buyer will pay no more for one property than for a similarly desirable property.[546] Likewise, when several similar properties are available, the one with the lowest price will attract the greatest demand.[547] The cost approach specifically "reflects the notion that one will not pay more for an existing property than it would cost to construct one's own replacement for the property."[548] But as the Supreme Court recognized, "the value of property may be greater or less than its cost . . . . It is the property and not the cost of it that is protected by the Fifth Amendment."[549] Thus, the cost approach as a means of measuring value "may have relevance—but only, of course, as bearing on what a prospective purchaser would have paid."[550] Its relevance to market value therefore cannot be merely assumed in federal acquisitions; rather, the appraiser must demonstrate that application of the cost approach to a specific property would be relevant to market participants.[551] The Ninth Circuit suggested possible ways to make the necessary showing in *United States v. 55.22 Acres of Land*, such

---

541  *E.g., 55.22 Acres in Yakima*, 411 F.2d at 435 & n.2 (rejecting reproduction cost as direct evidence of value (citing *Toronto, Hamilton*, 338 U.S. at 403)).

542  *See also United States v. 0.59 Acres*, 109 F.3d 1493, 1497 (9th Cir. 1997) (holding it is improper to "artificially increase or decrease the value of the condemnees' land by ignoring a condition that the Government did not create"); *cf. 252 Seventh Ave.*, 92 F. Supp. at 389 ("it is obvious that to make [the building] suitable for the particular industry would mean . . . a very large expense and a considerable diminution of income . . . ."). Of course, "the determination of a highest and best use does not obviate the need to determine the fair market value in light of the physical condition of the property." *Rasmuson v. United States*, 807 F.3d 1343, 1346 n.1 (Fed. Cir. 2015) (citing *Olson*, 292 U.S. at 255).

543  *See United States v. Certain Interests in Prop. in Brooklyn*, 326 F.2d 109, 114-15 (2d Cir. 1964); *Fairfield Gardens, Inc. v. United States*, 306 F.2d 167, 173-74 (9th Cir. 1962); *cf. 252 Seventh Ave.*, 92 F. Supp. at 396 (award of compensation "is not based upon any one abstraction or method of valuation, nor on any one isolated circumstance or even set of circumstances[;]" rather it "take[s] into consideration the physical characteristics of the property, the peculiarities of the area in which it is located, the teachings of the history of property in that area and adjacent areas, [an] inspection of the building and of comparable properties, sales which were brought forward on the theory that they involved equivalent buildings, and every bit of information that seemed relevant"). See generally USPAP Standards Rule 1-4(b) (specifying appraisers' professional obligations "[w]hen a cost approach is necessary for credible assignment results"), Section 1.6 (The Approaches to Value); Section 1.6.5 (Reconciliation Process and Final Opinion of Value).

544  *E.g., United States v. Becktold Co.*, 129 F.2d 473 (8th Cir. 1942) (allowing cost approach in valuation of book bindery plant with large, heavy machinery bolted in place, where no bindery sales had occurred in 20 years and no other sales upon which to base valuation had occurred in vicinity, and under state law, machinery was part of realty (see Section 4.1.3)); *see 55.22 Acres in Yakima*, 411 F.2d at 435-36 (prohibiting cost approach as direct evidence of value where improvements were not "of an unusual nature, such as a church, for which comparable sales or other indicia of market value would probably be unavailable").

545  *Cf. Standard Oil Co. of N.J. v. S. Pac. Co.*, 268 U.S. 146, 155-56 (1925) ("It is to be borne in mind that value is the thing to be found and that neither cost of reproduction new, nor that less depreciation, is the measure or sole guide." (citing *Minnesota Rate Cases*, 230 U.S. 352, 434 (1913)).

546  *See United States v. 1.604 Acres of Land (Granby I)*, 844 F. Supp. 2d 668, 682 (E.D.Va. 2011); *cf. Int'l Paper Co. v. United States*, 227 F.2d 201, 207 (5th Cir. 1955).

547  *Cf. United States v. 25.202 Acres of Land (Amexx I)*, 860 F. Supp. 2d 165, 178 (N.D.N.Y. 2009), *adopted by* 860 F. Supp. 2d 165 (N.D.N.Y. 2010), *aff'd*, 502 F. App'x 43 (2d Cir. 2012).

548  *Granby I*, 844 F. Supp. 2d at 682.

549  *Brooks-Scanlon Corp. v. United States*, 265 U.S. 106, 123 (1924).

550  *United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 402-03 (1949) (naming reproduction cost a "'false standard of the past' . . . when no one would think of reproducing the property").

551  *United States v. 55.22 Acres of Land in Yakima Cty.*, 411 F.2d 432, 435-36 (9th Cir. 1969); *United States v. Certain Interests in Prop. in Cumberland Cty.*, 296 F.2d 264, 269-70 (4th Cir. 1961) ("It seems plain that a showing . . . that a reasonable investor would reproduce the project for the amount given as reproduction or replacement cost would be required before a willing vendee would consider such a figure relevant in his negotiations with a willing vendor."); *see Toronto, Hamilton*, 338 U.S. at 402-03.

---

as with evidence that "a prudent investor would reproduce the improvements at the reproduction cost figure [stated]," or that "willing vendees and vendors would deem reproduction cost less depreciation relevant in negotiating a purchase and sale of the property."[552] The court further suggested that limited use of the cost approach as but "one guide" considered by the appraiser in arriving at a fair market value might have been acceptable.[553]

Federal courts agree that reliance on the cost approach is improper "when no one would think of reproducing the property," or when no prudent investor would reproduce it for the figure or amount estimated as replacement or reproduction cost.[554] Thus courts reject the cost approach without "unequivocal evidence that the [improvements] involved would be reproduced by private investors at the risk of private capital."[555]

> **The cost approach is generally inapplicable to vacant land, as any value contributed by bringing a property to its vacant state are reflected in the comparison of the parcel to the prices paid on the market for other vacant parcels.**

Because the cost approach is designed to inform the valuation of properties with existing physical improvements, it is generally inapplicable to vacant lands, regardless of costs the landowner may have incurred to remove prior improvements. As a district court recently explained in rejecting any use of the cost approach to value a vacant site:

> Efforts and expenditures made by the landowner to bring the property to its present, vacant state, and to maintain it as such, are reflected in the comparison of the parcel to the prices paid on the market for other vacant parcels. Costs to demolish buildings extant on the property and the associated site work, and property maintenance costs such as real estate taxes capitalized, do not inure to the benefit of a prospective buyer over and above any increase in value from the property's status as vacant land.[556]

Moreover, the mere existence of improvements does not automatically justify application of the cost approach; its use is inappropriate where the improvements would be of no value to a prudent buyer due to the nature or condition of the improvements or of the market or other factors,[557] or simply because "the original builder guessed wrong."[558] Again, "cost is not synonymous with market value."[559] Thus the Fourth Circuit emphasized the distinction

---

552  *55.22 Acres in Yakima*, 411 F.2d at 435-36 (citations omitted).

553  *Id.* at 435-36; *see* 2 ORGEL, *supra* note 191, at 57 ("The really important problem is that of the use to be made of the evidence [of value derived from the cost approach] rather than the technical question as to its admissibility.").

554  *Toronto, Hamilton*, 338 U.S. at 403; *55.22 Acres in Yakima*, 411 F.2d at 435-36; *Interests in Cumberland*, 296 F.2d at 269-70; *United States v. Benning Hous. Corp.*, 276 F.2d 248, 253 (5th Cir. 1960); *Buena Vista Homes, Inc. v. United States*, 281 F.2d 476, 478 (10th Cir. 1960).

555  *Benning Hous. Corp.*, 276 F.2d at 253.

556  *United States v. 15,478 Square Feet of Land* (*Balaji Sai*), No. 2:10-CV-00322, 2011 WL 2471586, at *6 (E.D. Va. June 20, 2011) (citing *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 285 (1943)).

557  *E.g.*, *United States v. 25.202 Acres of Land* (*Amexx I*), 860 F. Supp. 2d 165, 178 (N.D.N.Y. 2009), *adopted by* 860 F. Supp. 2d 165 (N.D.N.Y. 2010), *aff'd*, 502 F. App'x 43 (2d Cir. 2012) (cost approach did not apply in acquisition where "only structure was an old building that had not been used in years and whose demolition was necessary in any event"); *55.22 Acres in Yakima*, 411 F.2d at 436 ("No doubt, having regard for [the landowner's] personal circumstances, these improvements were satisfactory for his purposes, but they were not shown to be of such a character that, if not on the land, one purchasing the acreage would have wished to construct generally similar improvements.").

558  *United States v. 49,375 Square Feet of Land in Manhattan* (*252 Seventh Ave.*), 92 F. Supp. 384, 387-88 (S.D.N.Y. 1950), *aff'd sub nom. United States v. Tishman Realty & Constr. Co.*, 193 F.2d 180 (2d Cir. 1952) (per curiam) (affirming on opinion of trial court); *Balaji Sai*, 2011 WL 2471586, at *6 ("To the extent the inclusion of [demolition and other] costs in the valuation is an attempt to collect reimbursement for [the landowner's] prior investment in the property, the costs are impermissible, as the Fifth Amendment does not guarantee the landowner a return on his investment." (citing *Powelson*, 319 U.S. at 285)).

559  *Kinter v. United States*, 156 F.2d 5, 7 (3d Cir. 1946).

between merely calculating a building's replacement cost and actually determining a property's market value:

> [T]he purpose behind determining replacement cost, or original cost, or any of those things[,] is to aid you in determining whether or not the existence of those buildings on the land contributes anything to the fair market value of the whole, and, if it does contribute to it, how much does it contribute? That applies to each and every structure that was on or in the property.[560]

To ensure a reliable indication of market value, every element of the cost approach methodology and its underlying assumptions must be carefully scrutinized, supported by market research, and directly linked to the property's highest and best use.[561]

**4.4.3.2.    Value of the Land (Site) as if Vacant.** The value of the site as if vacant and available for its highest and best use is generally estimated by analysis of comparable sales (i.e., by application of the sales comparison approach).[562] Of course, this does not allow an appraiser to disregard actual physical conditions that a reasonably prudent buyer would consider: "A proper appraisal methodology has to account for those physical conditions."[563]

**4.4.3.3.    Reproduction Cost and Replacement Cost.** The appraiser must distinguish between reproduction cost and replacement cost, despite the fact that many courts have used the terms interchangeably.[564] Reproduction cost is the present cost of reproducing the improvement with an exact replica using the same physical materials; replacement cost is the present cost of replacing the improvement with one of equal utility.[565] The appraiser may typically use either measure, but must demonstrate the relevance of the selected measure to the market value of the specific property being appraised and account for all forms of depreciation appropriate to the selected method.[566]

The estimate of the reproduction or replacement cost of the improvements must be based on current local market cost of labor and materials for construction of improvements; to be considered, such improvements and any associated cost data must be relevant to the property's highest and best use.[567]

---

560   *United States v. Wise*, 131 F.2d 851, 853 (4th Cir. 1942) (quoting trial court's instructions to jury); *see 55.22 Acres in Yakima*, 411 F.2d at 435-36 (accepting valuation of improved property derived from analysis of comparable sales and incremental value of improvements).

561   *See United States v. 1.604 Acres of Land (Granby I)*, 844 F. Supp. 2d 668, 683-84 (E.D. Va. 2011); USPAP SR 1-4(b) ("When a cost approach is necessary for credible assignment results, an appraiser must: (i) develop an opinion of site value by an appropriate appraisal method or technique; (ii) analyze such comparable cost data as are available to estimate the cost new of the improvements (if any); and (iii) analyze such comparable data as are available to estimate the difference between the cost new and the present worth of the improvements (accrued depreciation)."); *see also Olson v. United States*, 292 U.S. 246, 257 (1934) ("Elements affecting value that depend upon events or combinations of occurrences which . . . are not fairly shown to be reasonably probable should be excluded from consideration . . . .").

562   *E.g., 55.22 Acres in Yakima*, 411 F.2d at 436; *cf. Morris v. Comm'r,* 761 F.2d 1195, 1196 (6th Cir. 1985) (tax case).

563   *Rasmuson v. United States*, 807 F.3d 1343, 1346 (Fed. Cir. 2015) (holding valuation of agricultural property that "does not take into account the costs of removing [existing] physical remnants of [a] railway will result in an artificially inflated value and grant a windfall to the landowner").

564   *E.g., Winston v. United States*, 342 F.2d 715, 724 (9th Cir. 1965). In particular, the phrases "reproduction cost new less depreciation" and "replacement cost new less depreciation" often appear with little precision or explanation. Nonetheless, "[i]n appraisal the distinction between reproduction cost and replacement cost is quite clear." EATON, *supra* note 16, at 161.

565   EATON, *supra* note 16, at 161.

566   *See In re U.S. Comm'n to Appraise Wash. Mkt. Co. Prop.*, 295 F.950, 957-58 (D.C. Cir. 1924) (discussing forms of depreciation to be considered in reproduction cost method);

567   *United States v. 1.604 Acres (Granby I)*, 844 F. Supp. 2d 668, 684 (E.D. Va. 2011); *see United States v. Wise*, 131 F.2d 851, 853 (4th Cir. 1942); *see also Olson v. United States*, 292 U.S. 246, 255 (1934).

**4.4.3.4.    Depreciation.** All appropriate forms of depreciation, including <u>physical deterioration</u>, <u>functional obsolescence</u>, and <u>economic obsolescence</u>, must be derived from market data and deducted from the estimated reproduction or replacement cost.[568] Depreciation may vary depending on the locality, purpose, and type of improvements, among other factors.[569] "The sales comparison or abstraction method of estimating depreciation is particularly reliable."[570]

**4.4.3.5.    Entrepreneurial Incentive and Entrepreneurial Profit.** Current appraisal methodology recognizes <u>entrepreneurial incentive</u>—the amount an entrepreneur expects to receive from developing a real estate project—as an element of the cost approach to valuation.[571] Similarly, <u>entrepreneurial profit</u> (also <u>developer's profit</u>) is the amount actually received, reflecting the difference between the total cost of development and its market value after completion.[572] Of course, not all developments live up to expectations: "It must be remembered that an entrepreneur is not guaranteed a profit."[573]

The Supreme Court has yet to address the propriety of entrepreneurial incentive or entrepreneurial profit in the cost approach to valuation in federal acquisitions.[574] Still, rulings from one of the only federal courts to consider this issue are instructive:

> Because the [amount] due an entrepreneur or developer for assuming the risk of a development project and coordinating and managing the development is a real cost to constructing a replacement for the existing property, inclusion of entrepreneurial incentive may be necessary to ensure the accuracy of the cost approach valuation methodology. The goal of the cost approach is to estimate the market value of the property. Thus, consideration of entrepreneurial incentive comports with current law. [575]

If considered as a potential element of reproduction or replacement cost, entrepreneurial profit or entrepreneurial incentive must be "based on market research and data" and reflect the subject property's highest and best use,[576] and will "be scrutinized to ensure that [estimates] do not take

---

568  *Wash. Mkt. Co. Prop.*, 295 F.at 957-58; *see United States v. Certain Interests in Prop. in Cumberland Cty.*, 296 F.2d 264, 266 n.1 (4th Cir. 1961) ("replacement cost, or reproduction costs, may be considered only when proper deductions are made for physical and economic depreciation and obsolescence"); *cf. United States v. 3,727.91 Acres of Land in Pike Cty.* (<u>Elsberry Drainage Dist.</u>), 563 F.2d 357, 360 n.4 (8th Cir. 1977) (noting challenged finding on depreciation was "supported by substantial evidence").

569  *See, e.g., United States v. Becktold Co.*, 129 F.2d 473, 479 (8th Cir. 1942).

570  EATON, *supra* note 16, at 169; *cf. Becktold*, 129 F.2d at 479-80.

571  *United States v. 15,478 Square Feet of Land* (<u>Balaji Sai</u>), No. 2:10-cv-00322, 2011 WL 2471586, at *6 (E.D. Va. June 20, 2011); *see United States v. 1.604 Acres of Land* (<u>Granby I</u>), 844 F. Supp. 2d 668, 682-84 (E.D. Va. 2011); EATON, *supra* note 16, at 168-170.

572  *See Entrepreneurial Profit*, THE DICTIONARY OF REAL ESTATE APPRAISAL (6th ed. 2015).

573  EATON, *supra* note 16, at 168; *cf. United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 285 (1943) ("[T]he Fifth Amendment allows the owner only the fair market value of this property; it does not guarantee him a return of his investment.").

574  *Granby I*, 844 F. Supp. 2d at 683; *see United States v. 8.34 Acres of Land in Ascension Par.*, No. 04-5-D-MI, 2006 WL 6860387, at *5 (M.D. La. June 12, 2006) (describing "'entrepreneur's profit" as "a controversial legal-economic issue"); EATON, *supra* note 16, at 168 ("Entrepreneurial profit is a relatively new concept, at least as a separate item of cost in the cost approach."); *cf.* 2 ORGEL, *supra* note 191, at 57 ("The failure of the courts to keep abreast of current appraisal theory is not to be explained entirely on the ground that the law lags behind the times. It is partly due to the peculiar problem of finding satisfactory judicial proof.").

575  *Granby I*, 844 F. Supp. 2d at 683; *see United States v. 1.604 Acres of Land* (<u>Granby III</u>), 844 F. Supp. 2d 685, 690 (E.D. Va. 2011); *Balaji Sai*, 2011 WL 2471586, at *4-7; *see also United States v. 1.604 Acres of Land* (<u>Granby II</u>), No. 2:10-cv-00320, 2011 WL 1810594, at *3 (E.D. Va. May 11, 2011). The *Granby* and *Balaji* cases, involving concurrent acquisitions of adjacent properties, were decided by the same district judge.

576  *Granby I*, 844 F. Supp. 2d at 683-84; *see Granby III*, 844 F. Supp. 2d at 690; *Granby II*, 2011 WL 1810594, at *1, *3 (barring consideration of costs premised on unsupported highest and best use); *see also Olson*, 292 U.S. at 255.

---

into account any improper considerations."[577] It is impermissible to calculate entrepreneurial incentive (in whole or in part) as a percentage of land value or land cost because "the fair market value of the land already encapsulates the incentive necessary to entice an entrepreneur or developer to [acquire] the property."[578]

#### 4.4.3.6. Unit Rule and the Cost Approach. 
Valuations derived from the cost approach and any other approach to value must follow the <u>unit rule</u>, which requires property to be valued as a whole, as discussed in Section 4.2.2. Indeed, "it is firmly settled that one does not value the [ ] land as one factor and then value the improvements as another factor and then add the two values to determine market value."[579] In using the cost approach, it is therefore critical to distinguish between calculating the cost of improvements and estimating the market value of the property as a whole, considering the contributory value of improvements.[580]

As discussed in Section 4.2.2.3, some assignments may require separate allocation of the contributory value of improvements that will be removed or adversely affected due to the government project (if applicable, the appraiser should clearly state that any such allocations do not indicate the appraisal method(s) employed).[581]

#### 4.4.4. Income Capitalization Approach. 
The third recognized approach to value in federal acquisitions is the income capitalization approach, which involves capitalizing[582] a property's anticipated net income to derive an indication of its present market value.[583] When properly applied, the income approach can indicate what a buyer would pay at the present time for the anticipated future benefits, discounted for risk and other variables, of owning a property.[584] The income capitalization approach is relevant only in certain circumstances—namely, in the

---

577  *Granby I*, 844 F. Supp. 2d at 683-84; *cf. Kimball Laundry Co. v. United States*, 338 U.S. 1, 5-6 (1949) ("The value compensable under the Fifth Amendment, therefore, is only that value which is capable of transfer from owner to owner and thus of exchange for some equivalent."); *Olson*, 292 U.S. at 257 ("Elements affecting value that . . . are not fairly shown to be reasonably probable, should be excluded from consideration . . . .").

578  *Granby III*, 844 F. Supp. 2d at 690; *see Powelson*, 319 U.S. at 285 ("[T]he Fifth Amendment . . . does not guarantee [a landowner] a return of his investment."); *Olson*, 292 U.S. at 255 ("It is the property and not the cost of it that is safeguarded by [the Fifth Amendment]."); *Granby I*, 844 F. Supp. 2d at 684; *cf. United States v. Gen. Motors Corp.*, 323 U.S. 373, 379 (1945) ("compensation . . . does not include future loss of profits").

579  *United States v. 91.90 Acres of Land in Monroe Cty. (Cannon Dam)*, 586 F.2d 79, 87 (8th Cir. 1978); *accord Kinter v. United States*, 156 F.2d 5, 7 (3d Cir. 1946) ("[C]ost of land and cost of improvements taken separately and added are not to be equalized with fair market value.").

580  *See United States v. Wise*, 131 F.2d 851, 853 (4th Cir. 1942); *United States v. Bechtold Co.*, 129 F.2d 473, 478 (8th Cir. 1942) (noting it may be proper to consider evidence "'as to the value of the building separate from the land, and all the land separate from the building, where from such evidence the [factfinder] can reach . . . the market value of the land including the building'" (quoting *Devou v. City of Cincinnati*, 162 F. 633, 636 (6th Cir. 1908))); *cf. United States v. 158.00 Acres of Land in Clay Cty.*, 562 F.2d 11, 13 (8th Cir. 1977) ("As just compensation is determined by valuing a parcel as a whole, not mechanically adding together its separate components, the contributory value of improvements may be only a subsidiary fact supporting the ultimate finding of just compensation.").

581  *See 158.00 Acres in Clay*, 562 F.2d at 13 ("the contributory value of the [improvements] has independent significance in the comprehensive statutory scheme [of the Uniform Act]").

582  Capitalization is the conversion of income into value. *Capitalization*, THE DICTIONARY OF REAL ESTATE APPRAISAL (6th ed. 2015).

583  *United States v. 25.202 Acres of Land (Amexx I)*, 860 F. Supp. 2d 165, 174-75 (N.D.N.Y. 2009), *adopted by* 860 F. Supp. 2d 165 (N.D.N.Y. 2010), *aff'd* 502 F. App'x 43 (2d Cir. 2012); *United States v. 6.45 Acres of Land (Gettysburg Tower)*, 409 F.3d 139, 143 n.6 (3d Cir. 2005); *Foster v. United States*, 2 Cl. Ct. 426, 447 (1983), *aff'd*, 746 F.2d 1491 (Fed. Cir. 1984); EATON, *supra* note 16, 173-96; *see United States v. 47.14 Acres of Land in Polk Cty.*, 674 F.2d 722, 725-26 (8th Cir. 1982); *Income Capitalization Approach*, THE DICTIONARY OF REAL ESTATE APPRAISAL (5th ed. 2010); *cf.* APPRAISAL INST. & AM. SOC'Y OF FARM MANAGERS, THE APPRAISAL OF RURAL PROPERTY 506-11 (2d ed. 2000).

584  *See United States v. 25.202 Acres of Land (Amexx II)*, No. 5:06-CV-428, 2011 WL 4595009, at *2 n.4 (N.D.N.Y. Sept. 30, 2011), *aff'd*, 502 F. App'x 43 (2d Cir. 2012) ("evidence of income-producing potential of the property is relevant only to the extent that it would affect how much a willing buyer would be willing to pay."); *see Gettysburg Tower*, 409 F.3d at 143 n.6.

valuation of income-producing property with no available comparable sales.[585] Even then, "[g]reat care must be taken, or such valuations can reach wonderland proportions."[586]

For this reason, federal courts have often found iterations of the income capitalization approach to value "ill-suited to the purposes" of just compensation.[587]

> These valuations almost always achieve chimerical magnitude, because, in the mythical business world of income capitalization, nothing ever goes wrong. There is always a demand; prices always go up; no competing material displaces the market.[588]

As the Fourth Circuit warned, "to allow value to be proved in such a suspect manner, impeccably objective and convincing evidence is required."[589] Accordingly, every factor to be considered in the income capitalization approach in federal acquisitions must be properly supported.[590] In valuations for just compensation purposes, the goal is "to duplicate marketplace calculations to the greatest possible extent."[591] Courts have therefore rejected income capitalization without evidence that "rates are in fact fixed in the marketplace by a process which parallels [the expert's] calculations."[592]

Proper application of the income capitalization approach requires a distinction between income generated by *the property itself* (such as rental or royalty income), which can be considered, and income generated by *a business conducted on the property*, which must be disregarded.[593]

### 4.4.4.1. Applications. While federal courts recognize the income capitalization may be a valid and reliable approach to value in certain cases, they uniformly hold that it should be used only

---

585  *Amexx I*, 860 F. Supp. 2d at 176-77; *United States v. 33.92356 Acres of Land* (*Piza-Blondet Trial Op.*), No. 98-1664, 2008 WL 2550586, at *11-12 (D.P.R. June 13, 2008), *aff'd*, 585 F.3d 1, 11 (1st Cir. 2009); *United States v. 100.80 Acres of Land* (*Parrish*), 657 F. Supp. 269, 274 (M.D.N.C. 1987); see *United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 403 (1949) ("past earnings are significant only when they tend to reflect future returns").

586  *47.14 Acres in Polk*, 674 F.2d at 726; *see United States v. 69.1 Acres of Land* (*Sand Mountain*), 942 F.2d 290, 293-94 (4th Cir. 1991) ("These valuations almost always achieve chimerical magnitude, because, in the mythical business world of income capitalization, nothing ever goes wrong."); *cf. United States v. Whitehurst*, 337 F.2d 765, 772 (4th Cir. 1964) ("[A] change of even a fraction of one per cent will produce a surprisingly material change in the result."); EATON, *supra* note 16, at 174 ("To address the increasing complexity of real estate investment and financing, and the inflationary and recessionary trends of the 1970s and 1980s, more sophisticated investment analysis was developed. New techniques of analysis probably contributed in some degree to the financial woes of the banking industry, not because these techniques are flawed, but because they can easily be misused and manipulated.").

587  *United States v. 103.38 Acres of Land in Morgan Cty.* (*Oldfield*), 660 F.2d 208, 214 (6th Cir. 1981); *accord Sand Mountain*, 942 F.2d at 294 ("As the seminal case on the subject stated, 'it would require the enumeration of every cause of business disaster to point out the fallacy of using this method of arriving at just compensation.'" (quoting *United States ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*, 40 F. Supp. 811, 822 (E.D. Tenn. 1941))); *see Parrish*, 657 F. Supp. at 274 ("[D] angers present in the discounted royalty method [include] the dangers of speculation about future market demand and the vagaries of operating a business.").

588  *Sand Mountain*, 942 F.2d at 293.

589  *Id.* at 294; *see, e.g., Oldfield*, 660 F.2d at 214-15 (requiring strict evidence of basis in market for use of income capitalization approach); *Parrish*, 657 F. Supp. at 275 (accepting well-supported income capitalization approach that is "substantial, rational, nonspeculative, credible, and based upon the realities of the market place").

590  *47.14 Acres in Polk*, 674 F.2d at 726; *Oldfield*, 660 F.2d at 214-15 (requiring "evidence derived from or demonstrably related to the actual market" as "essential characteristics"); *Whitehurst*, 337 F.2d at 771-74; *United States v. 158.76 Acres of Land in Townshend*, 298 F.2d 559, 561 (2d Cir. 1962); *Parrish*, 657 F. Supp. at 275-77 (approving analysis that "relied on market and economic realities"); *see, e.g., Amexx I*, 860 F. Supp. 2d at 176-78, aff'd, 502 F. App'x at 45 (noting lower court's "thorough report exposing the unreliability of the expert's methods"); *see also United States v. Sowards*, 370 F.2d 87, 90-92 (10th Cir. 1966); *Likins-Foster Monterey Corp. v. United States*, 308 F.2d 595, 597-99 (9th Cir. 1962), *aff'g United States v. Certain Interests in Prop. in Monterey Cty.*, 186 F. Supp. 167 (N.D. Cal. 1960); *United States v. Leavell & Ponder, Inc.*, 286 F.2d 398, 406-08 (5th Cir. 1961).

591  *Oldfield*, 660 F.2d at 212; *see Cementerio Buxeda, Inc. v. Puerto Rico*, 196 F.2d 177, 181 (1st Cir. 1952) (allowing consideration of income and expense figures that "are factors which would be considered by a prospective buyer").

592  *Oldfield*, 660 F.2d at 214 ("The fatal flaw in the owners' . . . method is its lack of demonstrable relationship with this 'real' market . . . ."); *see Parrish*, 657 F. Supp. 275-77 (accepting analysis of expert who "relied on market and economic realities to derive his opinion on a royalty").

593  *Parrish*, 657 F. Supp. at 274, 277; *see United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 403 n.6 (1949) (citing *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949)); *Cementerio Buxeda*, 196 F.2d at 180-81; Section 4.6.2.

"when there are *no* comparable sales and market value must be estimated."[594] Accordingly, the fact that a property produces (or could potentially produce) income will not, on its own, justify use of the income capitalization approach. Rather, its relevance to what a willing buyer would pay to a willing seller must be demonstrated.[595]

The income capitalization approach may refer to either <u>direct capitalization</u> or <u>yield capitalization</u> techniques:

- Direct capitalization techniques are used to derive an indication of the market value of a stabilized income-producing property by applying an overall capitalization rate to a property's single-year net income.[596]

- Yield capitalization techniques are used to derive an indication of the market value of an income-producing property with varying forecasted income or expenses, typically using discounted cash-flow (DCF) analysis. Forecasts of net income, expenses, cash flow and other factors over a holding or projection period are required.[597]

Due to the relatively recent development of these techniques in the appraisal of real estate, some specific iterations have faced little or no scrutiny in federal courts.[598] But existing case law makes clear that regardless of the technique used, there must be sufficient market data to ensure a reliable indication of value for the specific property being appraised.[599]

Use of the income capitalization approach is improper when the future use or demand for that use is speculative.[600] As stated in an opinion affirmed by the Second Circuit:

---

594  *United States v. 25.202 Acres of Land (Amexx I)*, 860 F. Supp. 2d 165, 176-77 (N.D.N.Y. 2009), *adopted by* 860 F. Supp. 2d 165 (N.D.N.Y. 2010), *aff'd*, 502 F. App'x 43 (2d Cir. 2012); *accord Oldfield*, 660 F.2d at 211-13; *Sowards*, 370 F.2d at 89; *United States v. 33.92356 Acres of Land (Piza-Blondet Trial Op.)*, No. 98-1664, 2008 WL 2550586 (D.P.R. June 13, 2008), *aff'd*, 585 F.3d 1, 11 (1st Cir. 2009); *Parrish*, 657 F. Supp. at 274; *see United States v. Whitehurst*, 337 F.2d 765, 775 (4th Cir. 1964).

595  *Oldfield*, 660 F.2d at 212-15 ("[T]o validate [this] appraisal in our eyes, the owners would have to establish that royalty rates are in fact fixed in the marketplace by a process which parallels [the expert's] calculations."); *see Foster v. United States*, 2 Cl. Ct. 426, 448 (1983), *aff'd*, 746 F.2d 1491 (Fed. Cir. 1984) ("situations where income producing potential is a key element for both buyer and seller . . . in arriving at a fair price"); *Whitehurst*, 337 F.2d at 775; *Cementerio Buxeda*, 196 F.2d at 180; *see also Sowards*, 370 F.2d at 90 ("whatever method is employed, the evidence offered must have a bearing upon what a willing buyer would pay a willing seller for the property on the date of the taking"); *cf. Kimball Laundry*, 338 U.S. at 5-6.

596  *See Amexx I*, 860 F. Supp. 2d at 174-75; *United States v. 15.00 Acres of Land in Miss. Cty.*, 468 F. Supp. 310, 315 (E.D. Ark. 1979) (discussing direct capitalization); *Direct Capitalization*, THE DICTIONARY OF REAL ESTATE APPRAISAL (6th ed. 2015).

597  *See Amexx I*, 860 F. Supp. 2d at 174-75; *Yield Capitalization*, THE DICTIONARY OF REAL ESTATE APPRAISAL (6th ed. 2015); *cf. United States v. 6.45 Acres of Land (Gettysburg Tower)*, 409 F.3d 139 (3d Cir. 2005), *and on remand*, No. 1:CV-99-2128, 2006 WL 839375 (M.D. Pa. March 27, 2006) (yield capitalization technique).

598  *See* EATON, supra note 16, at 173 ("In the past 25 years, the income capitalization approach has been modified and expanded more dramatically than any other procedure in real estate appraisal.").

599  *See Whitehurst*, 337 F.2d at 776 ("[I]f all of the factors which must necessarily be taken into account are established by proper evidence, there would appear to be no valid reason to judicially condemn, prohibit or outlaw the use of [the income capitalization approach].We do hold, however, in the instant case that the determination of the several elements or factors which were here relied upon was based upon pure speculation and was without objective evidential support."); *accord United States v. 69.1 Acres of Land (Sand Mountain)*, 942 F.2d 290, 293-94 (4th Cir. 1991) (discussing *Whitehurst*, 337 F.2d at 771); *United States v. 47.14 Acres of Land in Polk Cty.*, 674 F.2d 722, 726 (8th Cir. 1982) ("[W]here such method is used all of the factors that must necessarily be taken into account should be established by proper evidence. . . . [W]ithout objective evidential support, that method is faulty and can obviously lead to unfounded and enhanced valuations."); *Oldfield*, 660 F.2d at 214-15 (holding royalties in cash flow analysis must be "derived from or demonstrably related to the actual market in mineral royalties"); *Sowards*, 370 F.2d at 90-92 ("[T]o have probative value, that opinion or estimate [of value] must be founded upon substantial data, not mere conjecture, speculation or unwarranted assumption. It must have a rational foundation."); *Parrish*, 657 F. Supp. at 274-75.

600  *Amexx I*, 860 F. Supp. 2d at 176-77; *accord United States v. 75.13 Acres in Polk Cty.*, 693 F.2d 813, 816 (8th Cir. 1982).

---

The mere physical adaptability to a given use is insufficient to invoke the capitalization method, and the landowner must show that "an income producing market existed at the date of the taking or will exist in the reasonably near future."[601]

Of course, the highest and best use of a property may increase the value of vacant land because a buyer may pay more for property that is capable of being developed into a profitable operation.[602] But "if there is no currently operating business, it would be 'improper to value the property as if it were *actually being used* for the more valuable purpose.'"[603]

Direct capitalization techniques cannot be used to value property that is not generating income as of the date of value:

[D]irect capitalization of net income is an appropriate method of valuation only when the landowner can establish actual income, application of the capitalization approach is thus necessarily limited to those situations where eminent domain proceedings impinge an established, on-going business' opportunity for *continued* as opposed to *prospective* profit. There can be no capitalization of income unless the fact of income is itself first established. Any other rule would permit a valuation, speculative *ab initio*, to be seriously compounded.[604]

Yield capitalization techniques may be appropriate to value property with a highest and best use of development into a profitable operation that is not yet generating income on the date of value.[605] But such property "may not be valued on the basis of conjectural future demand for [the proposed use]. There must be some objective support for the future demand, including volume and duration."[606] Accordingly, the Sixth Circuit rejected a valuation based on costs fixed on the date of value because it did not reflect the fact that the property interest being valued—the right to remove sand—"extended over a period of years: the value of the deposit might be affected by prospects of future increase or decrease in the cost of similar sand."[607]

Well-documented market support is critical because "[t]his method is highly susceptible to overvaluation, because of the tendency to overestimate the [annual income] and the tendency to employ a capitalization rate that is too low to reflect the hazards of the industry."[608] Market support for yield capitalization techniques should include investigation and analysis of potentially relevant sales. Even if there are insufficient sales to support a reliable sales comparison approach,

---

601  *Amexx I*, 860 F. Supp. 2d at 176-77 (quoting *75.13 Acres in Polk*, 693 F.2d at 816); *accord United States v. 1,291.83 Acres of Land in Adair & Taylor Ctys.*, 411 F.2d 1081, 1084-85 (6th Cir. 1969); *see also Hembree v. United States*, 347 F.2d 109, 111-14 (8th Cir. 1965).

602  *See Olson v. United States*, 292 U.S. 246, 255 (1934); *Amexx I*, 860 F. Supp. 2d at 176-77.

603  *Amexx I*, 860 F. Supp. 2d at 177 (quoting *United States v. Meadow Brook Club*, 259 F.2d 41, 45 (2d Cir. 1958), and *Olson*, 292 U.S. at 255); *see 1,291.83 Acres*, 411 F.2d at 1084-85.

604  *United States v. 15.00 Acres of Land in Miss. Cty.*, 468 F. Supp. 310, 315 (D. Ark. 1979); (citation omitted]; *accord Amexx I*, 860 F. Supp. 2d at 175-81 & n.20; *Foster v. United States*, 2 Cl. Ct. 426, 448 (1983), *aff'd*, 746 F.2d 1491 (Fed. Cir. 1984) ("Direct capitalization of net income is an appropriate method only when actual income from the property can be established in a continuing ongoing business.").

605  *See Olson*, 292 U.S. at 255; *Amexx I*, 860 F. Supp. 2d at 176-77.

606  *United States v. Whitehurst*, 337 F.2d 765, 771-72 (4th Cir. 1964); *accord Mills v. United States*, 363 F.2d 78, 81 (8th Cir. 1966); *see United States v. 237,500 Acres of Land*, 236 F. Supp. 44, 49-51 (S.D. Cal.1964), *aff'd with qualifications sub nom. United States v. Am. Pumice Co.*, 404 F.2d 336 (9th Cir. 1968).

607  *United States v. Pa.-Dixie Cement Corp.*, 178 F.2d 195, 200 (6th Cir. 1949).

608  *Whitehurst*, 337 F.2d at 773; *United States v. 69.1 Acres of Land* (*Sand Mountain*), 942 F.2d 290, 293-94 (4th Cir. 1991) ("[I]n the mythical business world of income capitalization, nothing ever goes wrong. There is always a demand; prices always go up; no competing material displaces the market.").

"that does not put out of hand the bearing which the scattered sales may have on what an ordinary purchaser would have paid for the claimant's property."[609] This holds true for all types of properties, including mineral properties: "There may be cases where quite distant properties can be shown to be comparable in an economic or market sense, due allowance being made for variables" such as (for a mineral property) "quantity, quality, mining costs and access to market . . . ."[610] And sales prices may support a "bonus value" due to a property's potential for development[611]—or "demonstrate[ ] that there [i]s no such enhanced value in the market."[612]

**4.4.4.2.**    **Income to Be Considered.** The Supreme Court has instructed that "separation…must be made, in any case, between the value of the property and the value of the claimant's own business skill . . . ."[613] As a result, in determining the market value of the property, only income generated by the *real estate* itself—typically rental or royalty income—can be considered and capitalized.[614] In contrast, income generated by a *business* conducted on the property (such as a farming operation) is not considered.[615] As the First Circuit stated: "It is the value of the real estate, not the business that we are concerned with in this case. To allow evidence of past and future business profits would only confuse the value of the business with the value of the real estate."[616] The Supreme Court has recognized a single exception to this rule, allowing consideration of *business* income, rather than *real estate* income, only in those rare instances where the United States has condemned a business or franchise itself, and not merely a property on which business is conducted.[617]

**4.4.4.3.**    **Capitalization Rate or Discount Rate.** Determination of the capitalization or discount rate in an income capitalization approach is critical. This rate "reflects the degree of risk in the undertaking involved. It is an extremely important figure in the computation because a change of even a fraction of one percent will produce a surprisingly material change in the result."[618] As a result, federal courts have rejected use of the income capitalization approach if the discount rate is not supported by appropriate market evidence.[619]

---

609  *United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 402 (1949); *Mills*, 363 F.2d at 80-81; *Whitehurst*, 337 F.2d at 775.

610  *Am. Pumice Co.*, 404 F.2d at 336-37.

611  *Mills*, 363 F.2d at 80-81.

612  *Whitehurst*, 337 F.2d at 775.

613  *Toronto, Hamilton*, 338 U.S. at 403 n. 6 (citing *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949)); *Cementerio Buxeda, Inc. v. Puerto Rico*, 196 F.2d 177, 180-81 (1st Cir. 1952).

614  *See Toronto, Hamilton*, 338 U.S. at 403 & n.6 (citing *Kimball Laundry*, 338 U.S. 1); *A.G. Davis Ice Co. v. United States*, 362 F.2d 934, 936-37 (1st Cir. 1966); *United States v. 100.80 Acres of Land* (*Parrish*), 657 F. Supp. 269, 274 (M.D.N.C. 1987).

615  *United States v. 33.92356 Acres of Land* (*Piza-Blondet Trial Op.*), No. 98-1664, 2008 WL 2550586, at *11-12 (D.P.R. June 13, 2008), aff'd, 585 F.3d 1, 11 (1st Cir. 2009); *Stipe v. United States*, 337 F.2d 818, 820-21 & nn.3-4 (10th Cir. 1964); *see also In re Cool*, 81 B.R. 614, 616 (D. Mont. 1987) (discussing "the failings made by appraisers in cases where the appraiser attempts to capitalize the profits of the particular farm operation as opposed to fixing the intrinsic value of the land based on production or reasonable rental value").

616  *A.G. Davis Ice*, 362 F.2d at 936-37; *see, e.g., Parrish*, 657 F. Supp. at 274 (accepting opinion of value by expert who "was careful to rely on the income generable by the mineral itself (a royalty)—which is correctly attributable to the value of the land—and did not rely on an estimate of an operator's profit—which would not be attributable to the land").

617  *See Kimball Laundry*, 338 U.S. at 15 ("It is a difference in degree wide enough to require a difference in result."); *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 281-85 (1943); *Monongahela Nav. Co. v. United States*, 148 U.S. 312, 326-29, 343-44 (1893); *Stipe*, 337 F.2d 818  (rejecting valuation based on business income where owner's loss was "due to the destruction or frustration of his business, and not the taking of the property" because "[s]uch losses are not compensable").

618  *United States v. Whitehurst*, 337 F.2d 765, 771-72 (4th Cir. 1964).

619  *E.g., Whitehurst*, 337 F.2d at 771-72; *United States v. 158.76 Acres of Land in Townshend*, 298 F.2d 559, 561 (2d Cir. 1962); *United States v. Leavell & Ponder, Inc.*, 286 F.2d 398, 407 (5th Cir. 1961); *see Parrish*, 657 F. Supp. at 274 (noting discount rate was "supported" unlike in *Whitehurst, supra*).

The capitalization or discount rate must be derived from actual market data, through comparison if possible:

> [A] capitalization rate…should be ascertained by reference to the best evidence—the most similar property—as well as dissimilar investments if that proves necessary. "The selection of a capitalization rate by comparison is perhaps the most widely accepted approach. It recognizes the behavioristic nature of economics, because by comparison one gets the reaction of people in the market place."[620]

#### 4.4.4.4. Unit Rule Implications.

The underlined *unit rule*, discussed in Section 4.2.2, applies in valuations using the income capitalization approach as in all other approaches to value.[621] "The subsidiary interests in a fee cannot add to its market value and compensation for these interests must be paid out of the amount awarded for the whole."[622] Accordingly, in federal acquisitions, if using the income capitalization approach to value, appraisers must value the property being acquired as if in single ownership—not by "computing separately the value of the various constituent legal interests" (such as lessor/lessee or operator/owner) in the property.[623]

For example, in *United States v. 6.45 Acres of Land* (*Gettysburg Tower*), the United States acquired two adjacent tracts in fee simple: Tract 4-203, owned in fee by landowner Enggren and under a 99-year lease to landowner Overview, and Tract 4-204, owned in fee by landowner Overview.[624] On the date of value, Overview had built an observation tower on Tract 4-203 overlooking the Gettysburg Battlefield and was operating the tower as a tourist attraction and making payments to Enggren under the lease; Overview also owned and operated a gift shop, restaurant, and parking lot on Tract 4-204. The Third Circuit determined the following appraisal methodology correctly followed the unit rule for this property:

> [The appraiser] explained that because he was valuing the *fee* as a whole, lease payments were not considered an expense but merely a transfer of funds between interest holders that would cancel out under a unit valuation. Because [the appraiser's] task was neither to appraise Overview's interest nor the Enggrens' interest, but rather the composite value of all interests, he did not count as an expense what was simply a transfer of value between interest holders that had no bearing on the land's inherent capacity to generate income.[625]

---

620 *United States v. Certain Interests in Prop. in Monterey Cty.*, 186 F. Supp. 167, 170 (N.D. Cal. 1960), *aff'd sub nom. Likins-Foster Monterey Corp. v. United States*, 308 F.2d 595 (9th Cir. 1962); *see 158.76 Acres in Townshend*, 298 F.2d at 561 ("Capitalization of income comprehends the use of a rate of return in comparable investments."); *Leavell & Ponder*, 286 F.2d at 407.

621 *See, e.g., United States v. 6.45 Acres of Land* (*Gettysburg Tower*), 409 F.3d 139 (3d Cir. 2005).

622 *A.G. Davis Co. v. United States*, 362 F.2d 934,  936-37 (1st Cir. 1966); *see Eagle Lake Improvement Co. v. United States* (*Eagle Lake II*), 160 F.2d 182, 184 n.1 (5th Cir. 1947) ("For example, . . . the owner of the surface . . . claimed a value of $350 to $400 per acre on the theory that the best use of the tract was for subdivision purposes. The owners of the mineral interests on that same parcel claimed values of $350 to $700 per acre for the leasehold and $175 to $300 per acre for the royalty interest. Certainly, the surface could not be used for a residential subdivision if oil wells were drilled and producing. These are inconsistent uses.").

623 *Gettysburg Tower*, 409 F.3d at 148.

624 *Id.* at 148. The acquisition also included easements and other interests and other tracts not relevant to this issue. *See id.* at 142-43.

625 *Id.* at 149. The court noted that it also would be acceptable under the unit rule to value Tracts 4-203 and 4-204 separately—i.e., valuing each unit (each tract) as if it was held in fee simple ownership. *Id.* at 148 n.15. "What the [fact-finder] could not do, consistent with the unit rule, was… [to] comput[e] separately the value of the various constituent legal interests in the Condemned Properties." *Id.* at 148.

The Third Circuit therefore reversed the district court's ruling, which had improperly added to the valuation just described above a separate valuation of the Enggrens' interest in the lease payments—thereby "double-count[ing] the substantial value of the lease."[626]

As discussed in Section 4.8.1, the unit rule is frequently misapplied in valuations of properties containing minerals or other natural resources.

**4.4.4.5.   Further Guidance.** The income capitalization approach to value in the appraisal of real estate generally—not only in the context of federal acquisitions—has evolved significantly in recent decades.[627] The basic parameters for its use for just compensation purposes can be found in Supreme Court cases such as *United States v. Toronto, Hamilton & Buffalo Navigation Co.*,[628] and several recent circuit court cases cited in this Section provide more concrete analysis.[629] The district court rulings affirmed by or on remand from three recent circuit court opinions are also instructive—see the *Gettysburg Tower* litigation in the Third Circuit, the *Amexx* litigation in the Second Circuit, and the *Piza-Blondet* litigation in the First Circuit.[630] The *Parrish* case, an older district court ruling from the Middle District of North Carolina, provides a sound analysis of the appropriate determination and use of royalty rates in estimating market value.[631] Also informative are *In re Cool*, a bankruptcy case discussing the income approach based on legal principles derived from eminent domain case law,[632] and *Denver v. Quick*, a state law case—cited with approval by a number of federal circuit courts—analyzing the consideration of income derived from the land itself.[633]

**4.4.5.   Subdivision Valuation and the Development Method.** When appropriate, aspects of the sales comparison, income capitalization, and cost approaches to valuation can be incorporated into a technique for appraising undeveloped acreage having a highest and best use for subdivision into lots. A federal court recently explained this <u>development method</u>[634] as follows:

---

626   *Id.* at 150 & n.17 (aggregated award "includes '$2.7 million worth of prejudice'").

627   *See* Eaton, *supra* note 16, at 173-75.

628   *Toronto, Hamilton*, 338 U.S. 396, 403 & n.6 (1949) ("[P]ast earnings are significant only when they tend to reflect future returns. We see no relevance in the [property's] earnings between 1916 and 1932 on the issue of capacity to earn after 1942 . . . . On this record they are entirely too remote to bear on [its] value when taken."); *see Mitchell v. United States*, 267 U.S. 341 (1925); *Joslin Co. v. Providence*, 262 U.S. 668, 675 (1923) ("Injury to a business carried on upon lands taken for public use, it is generally held, does not constitute an element of just compensation, in the absence of a statute expressly allowing it.") (citations omitted) (applying state law).

629   *E.g., United States v. 6.45 Acres of Land* (*Gettysburg Tower*), 409 F.3d 139 (3d Cir. 2005); *United States v. 25.202 Acres of Land* (*Amexx I*), 860 F. Supp. 2d 165 (N.D.N.Y. 2009), adopted by 860 F. Supp. 2d 165 (N.D.N.Y. 2010), *aff'd*, 502 F. App'x 43 (2d Cir. 2012) (affirming in all respects, "[l]argely for the reasons that the district court articulated in its memorandum-decision and order").

630   *United States v. 6.45 Acres of Land*, No. 1:CV-99-2128, 2006 WL 839375 (M.D. Pa. Mar. 27, 2006) (on remand from *Gettysburg Tower*, 409 F.3d 139); *United States v. 25.202 Acres of Land* (*Amexx I*), 860 F. Supp. 2d 165 (N.D.N.Y. 2009), *new trial denied*, No. 5:06-CV-428, 2011 WL 4595009 (N.D.N.Y. Sept. 30, 2011), *aff'd*, 502 F. App'x 43 (2d Cir. 2012); *United States v. 33.92356 Acres of Land* (*Piza-Blondet Trial Op.*), No. 98-1664, 2008 WL 2550586 (D.P.R. June 13, 2008), *aff'd*,  585 F.3d 1, 11 (1st Cir. 2009).

631   *United States v. 100.80 Acres of Land* (*Parrish*), 657 F. Supp. 269, 272-80 (M.D.N.C. 1987). Modern technology allows for more sensitive formula to determine the present value of royalty income than the "Morkill formula" adopted by the court in 1987. *See id.* at 278 & n. 15. But the court's analysis of the concepts underlying proper discounting of future income to value as of the date of taking, the considerations that must be taken into account and those that must be disregarded, the market support necessary for elements of the income capitalization approach, and the flaws in the formula applied by the fact-finder, remains sound. *See id.* at 273-79.

632   *In re Cool*, 81 B.R. 614, 616-18 (D. Mont. 1987).

633   *Denver v. Quick*, 108 Colo. 111 (1941) (cited in *Hicks v. United States ex rel. Tenn. Valley Auth.*, 266 F.2d 515, 519 (6th Cir. 1959); *Cementerio Buxeda, Inc. v. Puerto Rico*, 196 F.2d 177, 180-81 (1st Cir. 1952); *Chapman v. United States*, 169 F.2d 641, 644 (10th Cir. 1948); and *In re Cool*, 81 B.R. at 618).

634   The development method is not an approach to value; it is a valuation method or technique. The development method is also referred to as the *lot method, land residual approach, developer's residual approach, anticipated use method, or subdivision development method.*

---

[O]ne first determines or projects both how the land would be subdivided and the prices at which those lots would sell. The projected gross sale proceeds for all lots in the tract are then aggregated and a deduction is made for all projected direct and indirect costs of maintenance and sale, including development [i.e., the developer's anticipated profit] and marketing. Finally, the net amount is discounted to present value to reflect that the lots would be sold over time, i.e., an absorption period, considering projected market demand.[635]

The remaining sum (the *residual*) is said to represent the market value of the raw land on the date of value. This highly sensitive and complex method of valuation "relies upon layers of hypothetical assumptions regarding the prospects, costs, and timing of subdivision, development, and sales of multiple lots in an uncertain future."[636] As a result, under federal law it can be used only in limited circumstances, and then only with rigorous evidentiary support.[637]

**4.4.5.1.    Reasonable Probability of Development.** Under federal law, the development method cannot be used unless the property was "'needed or likely to be needed in the reasonably near future' for residential subdivision."[638] And showing "that a few new homes had been built in the area around the time" of valuation is insufficient: There must be "evidence 'of…current demand or potential for subdivisions in the neighborhood[.]'"[639] To credibly establish demand for such lots, "there must be some evidence that others have developed and sold such lots, so as to establish a trend, at least, toward that type of development of [similar] property."[640]

Use of the development method requires evidence that on the date of value, there was a reasonable probability that the property could be developed as a residential subdivision and that its lots would be sold within a reasonable time.[641] It cannot be used "if the subdivision is improbable or unrealistic or merely theoretical or speculative or capable of realization only in the remote future . . . ."[642]

As practical guidance, consider these district court instructions in one case regarding the evidence necessary to support the use of the development method:

[I]f you conclude that this property by map was subdivided into individual lots; that the property was adaptable for residential subdivision purposes; that physical changes were made on the land, such as the digging of a well with a sufficient water supply for development

---

635  *United States ex rel. Tenn. Valley Auth. v. An Easement & Right-of-Way over 6.09 Acres of Land* (*TVA v. 6.09 Acres*), 140 F. Supp. 3d 1218, 1247-48 (N.D. Ala. 2015); *see generally id.* at 1247-56; *see also United States v. 99.66 Acres of Land* (*Sunburst Invs.*), 970 F.2d 651, 655-56 (9th Cir. 1992); *United States v. 47.3096 Acres of Land*, 583 F.2d 270, 271-72 (6th Cir. 1978).

636  *TVA v. 6.09 Acres*, 140 F. Supp. 3d at 1251; *see generally* Eaton, *supra* note 16, at 245-70.

637  *See TVA v. 6.09 Acres*, 140 F. Supp. 3d at 1247-56; *Sunburst Invs.*, 970 F.2d at 655-56; Eaton, *supra* note 16, at 246 ("[I]n many cases the development approach has been applied under the wrong circumstances or in the wrong way. If all of the land that has been appraised by the development approach were actually subdivided, there would be enough subdivision lots on the market to last hundreds of years and little, if any, farmland left in the United States.").

638  *47.3096 Acres*, 583 F.2d at 272 (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)); *Sunburst Invs.*, 970 F.2d at 655-56; *United States v. 341.45 Acres of Land*, 633 F.2d 108, 112 (8th Cir. 1980); *United States v. 147.47 Acres of Land* (*Delagap*), 352 F. Supp. 1055, 1061-62 & n.7 (M.D. Pa. 1972).

639  *47.3096 Acres*, 583 F.2d at 272 (quoting *United States v. 478.34 Acres*, 578 F.2d 156, 159 (6th Cir. 1978)); *341.45 Acres*, 633 F.2d at 112 ("more than a few sporadic sales of such lots are necessary"); *see Olson*, 292 U.S. at 255.

640  *341.45 Acres*, 633 F.2d 108, 112 (8th Cir. 1980). In fact, "if there is an actual demand for [such] lots we believe the landowners will be able to show such demand." *Id.*

641  *Delagap*, 352 F. Supp. at 1061-62 & n.7.

642  *Id.*; *see Olson*, 292 U.S. at 255-56.

purposes; constructing a lake; road grading and other physical changes in the condition of the land; that some lot sales had actually taken place; that there was a reasonable probability that this property could be developed as a residential subdivision; that the anticipated expenses of development would be as [estimated]; that there would be a market for the sale of these lots and that these lots would be sold within a reasonable time…then you may accept the opinion based upon [this method].[643]

### 4.4.5.2. Application to Undeveloped Land.

It is rarely appropriate to apply the development method to undeveloped land.[644] As a district court recently explained, the development method

> effectively values a parcel of land, even if undivided and unimproved, virtually as if it has *already* been subdivided and sold. Such a valuation calculation…requires more than just that a hypothetical purchaser at the time of the taking would consider development potential; it generally requires that landowner demonstrate that subdivision of the unimproved land was reasonably certain in the near future at the time of the taking.[645]

Use of the development method cannot be justified based on a landowner's "inchoate plans, intention, or profit expectations" for a property as assumptions underlying the development method are too speculative when a landowner has "not actually subdivided, improved, or sold any of the land .…"[646] As the Supreme Court admonished in *Olson v. United States*, "allow[ing] mere speculation and conjecture to become a guide for the ascertainment of value [is] a thing to be condemned in business transactions as well as in judicial ascertainment of truth."[647] As a result, "even though the highest and best use of a property is for a residential subdivision, if no meaningful steps have been taken in that direction, viz., construction expenses and actual lot sales, then a '[development] method' appraisal…would be inappropriate."[648] Rather, in such cases, "the appropriate market [is] for the entire tract as investment property for future subdivision development."[649]

### 4.4.5.3. Credible Cost Estimate.

Even if subdivision was a demonstrably reasonable certainty, federal law requires credible evidence of projected subdivision costs: "In the absence of credible cost evidence, [one should] exclude[ ] the [development] method valuation altogether."[650] Mere unsupported assertions are insufficient.[651] Costs that must be reliably estimated and considered

---

643  *Delagap*, 352 F. Supp. at 1061-62 & n.7.

644  *See United States ex rel. Tenn. Valley Auth. v. An Easement & Right-of-Way over 6.09 Acres of Land* (*TVA v. 6.09 Acres*), 140 F. Supp. 3d 1218, 1250-51 (N.D. Ala. 2015) (citing cases); *compare United States v. 99.66 Acres of Land* (*Sunburst Invs.*), 970 F.2d 651, 655-56 (9th Cir. 1992) (affirming exclusion of method for valuation of "paper subdivision and nothing more") *and United States v. 100 Acres of Land*, 468 F.2d 1261, 1266-67 (9th Cir. 1972) (permitting method for valuation of property which was part of a subdivision that was partially under development on date of value).

645  *TVA v. 6.09 Acres*, 140 F. Supp. 3d at 1255; *see generally id.* at 1247-56. Courts express similar concerns outside federal condemnation. *E.g., United States v. Hickey*, 360 F.2d 127, 137 (7th Cir. 1966) ("Whatever its merit to builders and developers might be, the speculative and unrealistic character of 'lot-method' appraisals in assessing the value of vacant land as security for mortgage loans is apparent. 'Lot-method' appraisal is a reflection of a value which may be achieved at some time in the future when the land is subdivided, improved, and ready to be sold in individual residential lots. It does not reflect the present fair market value of the vacant land . . . .").

646  *TVA v. 6.09 Acres*, 140 F. Supp. 3d at 1252-53.

647  *Olson*, 292 U.S. at 257.

648  *Delagap*, 352 F. Supp. at 1060.

649  *Sunburst Invs.*, 970 F.2d at 655-56; *see* Section 4.2.2 (Unit Rule).

650  *United States v. 47.3096 Acres of Land*, 583 F.2d 270, 272 (6th Cir. 1978).

651  *Id.*; *see Sunburst Invs.*, 970 F.2d at 655-56; *United States v. 341.45 Acres of Land*, 633 F.2d 108, 112-13 (8th Cir. 1980).

include direct costs of development (such as surveying, design, engineering, permitting, grading, clearing, sewers, street paving, curbs and gutters, water lines, and other utilities); indirect costs (including financing, insurance, real property taxes, sales, advertising, accounting, legal and closing costs, project overhead, and supervision); and the developer's expected profit.[652]

### 4.4.5.4. Availability of Comparable Sales.

When a property's market value can be reliably estimated using comparable sales, the development approach should not be relied upon as a primary indicator of value, as its underlying assumptions are "largely speculative" and "subjective elements…enhance the risk of error[.]"[653] However, the development method can be utilized in such situations to *test* a highest and best use conclusion[654] or to support a value indicated by the sales comparison approach.[655] It also bears noting that "[w]hile a lack of sales and/or development activity may indicate an insufficient supply of land suitable for such use, it can also indicate a lack of demand."[656] And without "credible evidence that there is an actual demand for [subdivision development] or that such demand will occur in the reasonably near future[,]" subdivision cannot be considered as a highest and best use.[657]

### 4.5. Project Influence.

At times, the market value of the property being acquired may be affected, positively or negatively, by the very project prompting the government's acquisition. This underlined project influence on value is potentially problematic in federal acquisitions because "to permit compensation to be either reduced or increased because of an alteration in market value attributable to the project itself would not lead to the 'just compensation' that the Constitution requires."[658] The Supreme Court has ruled that in fairness, the United States cannot be charged for value it created in constructing the government project for which the property is being acquired. Similarly, an owner cannot be penalized for any diminution in value due to that very government project.[659] Accordingly, in valuations for just compensation purposes, once a property is "within the scope" of the government project, all project influence on the property's market value must be disregarded.[660]

> **Change in market value due to the government project—project influence—must be disregarded under the scope of the project rule.**

---

652  See *TVA v. 6.09 Acres*, 140 F. Supp. 3d at 1247-48 ("all projected direct and indirect costs of maintenance and sale, including development and marketing"); *47.3096 Acres*, 583 F.2d at 272  ("expense of clearing and improving the land, surveying and dividing it into lots, advertising and selling, holding it, and paying taxes and interest until all lots are sold"); *United States v. 100 Acres of Land*, 468 F.2d 1261, 1266 (9th Cir. 1972) ("selling and advertising expenses, engineering and development costs, overhead costs, taxes, buyers' anticipated profits, and for acreage loss for streets, etc."); Section 4.4.3.5 (Entrepreneurial Incentive and Entrepreneurial Profit).

653  See *TVA v. 6.09 Acres*, 140 F. Supp. 3d at 1250-52 (quoting *United States v. 50 Acres of Land (Duncanville)*, 469 U.S. 24, 36 & n.23 (1984)); *see also Norman v. United States*, 63 Fed. Cl. 231, 271 (Ct. Cl. 2004) ("approach 'is highly speculative [and] prone to error'"), *aff'd*, 429 F.3d 1081 (Fed. Cir. 2005); *cf. Olson v. United States*, 292 U.S. 246, 257 (1934). Courts have also found the development method unreliable in other contexts. E.g., *Rockies Express Pipeline LLC v. Hopkins*, 131.495 Acres, No. 1:08-cv-00751-RLY-DML, 2012 WL 1622532, at *4 (S.D. Ind. May 9, 2012) (noting "susceptibility to misuse" and "speculative nature" in valuation under state law).

654  See, e.g., *United States v. 125.07 Acres of Land (Pond Road I)*, F.2d 243, 246 (1st Cir. 1981); *United States v. 1,291.83 Acres of Land in Adair & Taylor Ctys.*, 411 F.2d 1081, 1087 (6th Cir. 1969).

655  EATON, *supra* note 16, at 247, 268; *see, e.g.*, *United States v. 3.544 Acres of Land*, 147 F.2d 596 (3d Cir. 1945); *United States v. 147.47 Acres of Land (Delagap)*, 352 F. Supp. 1055, 1059 (M.D. Pa. 1972) (using lot values as market data in addition to comparable sales).

656  EATON, *supra* note 16, at 248; *e.g.*, *United States v. 341.45 Acres of Land in St. Louis Cty.*, 633 F.2d 108, 112-13 (8th Cir. 1980) ("[T]here must be some evidence that others have developed and sold such lots . . . . [I]f there is an actual demand for [such] lots we believe the landowners will be able to show such demand."); *cf. Delagap*, 352 F. Supp. at 1058 n.4, 1057-61.

657  *341.45 Acres in St. Louis Cty.*, 633 F.2d at 112-14; *see Olson*, 292 U.S. at 255.

658  *United States v. Reynolds*, 397 U.S. 14, 16 (1970)

659  *Shoemaker v. United States*, 147 U.S. 282, 303-05 (1893); *United States v. Miller*, 317 U.S. 369, 376-79 (1943); *United States v. Va. Elec. & Power Co.*, 365 U.S. at 636; *Reynolds*, 397 U.S. at 16-18; *see United States v. 320 Acres*, 605 F.2d 762, 781-82 (5th Cir. 1979).

660  *Reynolds*, 397 U.S. at 16-18; *Miller*, 317 U.S. at 376-77; *320 Acres*, 605 F.2d at 781-84 & nn.24-27; *United States v. Crance*, 341 F.2d 161, 165 (8th Cir. 1965) ("[A] landowner cannot claim a benefit from a proximate improvement when inclusion of his land in the improvement from the outset renders impossible enjoyment of the claimed benefit."). As discussed below, whether a particular property was within the scope of a particular government project on a particular date is one of several legal questions that must be determined by the court (or a legal instruction), not by the appraiser.

The <u>scope of the project rule</u> excluding project influence is "one of the secondary rules refining the concept of market value as the basic measurement of compensation so that injustice does not result . . . ."[661] The rule functions to adjust, limit, or exclude certain evidence from consideration to ensure the appraisal does not unfairly reflect any change in market value caused by the government project for which the property is acquired, or by the likelihood the property would be acquired for such public project.[662] Proper application of the scope of the project rule requires careful legal and factual analysis of the government project and its influence on market value.[663] **<u>Legal instruction</u>** is required, as the scope of the project rule raises questions of law "which limit[ ] the factors necessary to the determination of 'just compensation'"[664] and go beyond the appraiser's function of assessing the government project's influence, if any, on market value.[665]

The mere existence of a government project does not automatically invoke the scope of the project rule; it merely marks the beginning of a complex legal and factual inquiry to determine whether the evidence warrants application of the rule.[666] In a scope of the project rule inquiry, legal determinations will be required regarding: (1) the date as of which the property was probably within the scope of the project;[667] (2) whether application of the scope of the project rule is warranted;[668] and (3) if so, how to apply the scope of the project rule to ensure a just result.[669]

4.5.1.    **The Scope of the Project Test.** To fairly apply the principle excluding *project influence*, the Supreme Court created the <u>scope of the project</u> test in *United States v. Miller*: "[I]f the 'lands were probably within the scope of the project from the time the Government was committed to it,' no [change] in value attributable to the project is to be considered in awarding compensation."[670] Accordingly, if the scope of the project rule applies, project influence on market value must be disregarded.[671] Conversely, if properties *not* originally within the scope of the project are later acquired by the government, the United States "must pay their market value as enhanced [or diminished] by this factor of proximity" to the project—so any project influence on value, positive or negative, must in fairness be considered.[672]

---

661  *320 Acres*, 605 F.2d at 782; *United States v. 428.02 Acres of Land*, 687 F.2d 266, 269 (8th Cir. 1982); *see Cors*, 337 U.S. at 332 ("Any increase in value due to [the government's planned project] in fairness should be excluded from the determination of what compensation would be just."); *cf. United States v. 480.00 Acres of Land* (<u>Fornatora</u>), 557 F.3d 1297, 1311 (11th Cir. 2009) ("Courts have only applied exceptions to a general takings doctrine when it is necessary to do so in order to protect the rights of both the taking body and the landowner.").

662  *E.g.*, *320 Acres*, 605 F.2d at 800 (discussing application of rule by exclusion of "evidence of sales possibly tainted by the Government's condemnation activities"), 798-803 & nn.61-80 (citing cases applying rule); *Kerr v. S. Park Comm'rs*, 117 U.S. 379, 386 (1886) (sales affected by government project were properly excluded); *cf. Fornatora*, 557 F.3d at 1313 (valuation must consider preexisting zoning regulations because regulations' impact was not "project influence").

663  *See generally 320 Acres*, 605 F.2d 762 (comprehensive analysis of scope of the project rule); *see also Reynolds*, 397 U.S. 14; *Miller*, 317 U.S. 369; *Fornatora*, 557 F.3d at 1311-13.

664  *Reynolds*, 397 U.S. at 20 & n.14 (quoting and adopting *Wardy v. United States*, 402 F.2d 762, 763 (5th Cir. 1968)).

665  *E.g.*, *Fornatora*, 557 F.3d at 1312; *United States v. Eastman* (<u>Eastman I</u>), 528 F. Supp. 1177, 1178 & n.1 (D. Or. 1981), *aff'd*, 714 F.2d 76 (9th Cir. 1983); *see Reynolds*, 397 U.S. at 21.

666  *See United States v. 1.604 Acres of Land* (<u>Granby I</u>), 844 F. Supp. 2d 674, 675-76 (E.D. Va. 2011).

667  *Reynolds*, 397 U.S. at 20-21; *Miller*, 317 U.S. at 377.

668  *Fornatora*, 557 F.3d at 1313; *see Cors*, 337 U.S. at 332-34 ("a value which the government itself created and hence in fairness should not be required to pay"); *Wardy*, 402 F.2d at 763 (scope of the project is "equitable" rule), *adopted by Reynolds*, 397 U.S. at 20.

669  *See 320 Acres*, 605 F.2d at 796 ("But what is the 'just' application of the rule with respect to [these properties]? . . . [T]he rule is not to be divorced from its objective – compensation awards that are just to both the public and the dispossessed landowner.").

670  *Reynolds*, 397 U.S. at 21 (quoting *Miller*, 317 U.S. at 377).

671  As the Old Fifth Circuit noted in *320 Acres*, the scope of the project rule "is primarily concerned with awards that are unjust from the perspective of the public footing the bill" – i.e., enhancements in value due to the project. 605 F.2d at 782. But "the scope-of-the-project rule is also applicable to 'depreciations in value . . . attributable to the Government project for which property is taken.'" *United States v. Land & Cris Realms Inc.*, 213 F.3d 830, 834 (5th Cir. 2000) (alteration in original) (quoting *320 Acres*, 605 F.2d at 787 n.32).

672  *Miller*, 317 U.S. at 376. The scope of the project rule applies to both positive and negative effects on market value. See supra note 694.

The *Miller* test concerns "whether the . . . lands were probably within the scope of the project from the time the Government was committed to it."[673] This determination can be particularly complex in connection with acquisitions in later stages of large government projects that span several years or require boundary adjustments, such as flood control and reservoir projects.[674] In making this determination, courts typically consider the government's representations to the landowner or the public regarding the property and/or the project boundaries;[675] how foreseeable it was at the outset of the project that the property would be needed for it;[676] and the length of time between the original and subsequent acquisitions, if applicable.[677] The rule does not require that the land ultimately acquired was actually specified in the original project plans. It need only be shown that during the course of the planning or original construction it became evident that land so situated would probably be needed for the public project.[678]

Some courts have framed this inquiry in terms of reasonable expectations, i.e., whether, after announcement of the government project, a reasonable buyer could reasonably anticipate being able to devote the subject property to its highest and best use without serious apprehension that it would soon be condemned for the government project.[679] For example, the Tenth Circuit held that landowners could not have reasonably believed that their property had been removed from the scope of a reservoir project despite mistakenly being left off some project maps: the property not only was clearly covered by the government's statements of intent, but also had been partly "covered with water nearly all of the time since the lake filled . . . ; obviously the government intended this property to be part of the project."[680] But both frameworks reflect a common aim:

> Regardless of how the inquiry is framed, however—whether in terms of the *Miller* test or in terms of reasonable expectations—the object is the same: to distinguish value attributable to Government demand from true fair market value of Government-conferred benefits, and to ensure that the landowner is not awarded a premium for the former but, at the same time, is justly compensated for the latter.[681]

The *date* on which the government's project commences also requires legal determination. In making this determination, courts typically consider three legal requirements of a "project": a *public purpose* for which property is to be acquired, *identification of the particular properties* to be acquired for that public purpose, and imminent acquisition that is *evident to the public.*[682] As the former Fifth

---

673  *Miller*, 317 U.S. at 377; *Reynolds*, 397 U.S. at 21.

674  *E.g.*, *Miller*, 317 U.S. at 370-73; *United States v. Eastman* (*Eastman III*), 714 F.2d 76 (9th Cir. 1983); *United States v. 49.01 Acres of Land in Osage Cty.*, 669 F.2d 1364, 1366-69 (10th Cir. 1982); *United States v. 62.17 Acres of Land in Jasper Cty.*, 538 F.2d 670, 678 (5th Cir. 1976) ("We cannot straitjacket the government in defining scope of the project, but on the other hand, we cannot permit global meanderings to enclave areas not reasonably to have been conceived as included at its inception."); *United States v. 172.80 Acres of Land in Mercer Cty.*, 350 F.2d 957 (3d Cir. 1965); *United States v. Crance*, 341 F.2d 161 (8th Cir. 1965).

675  *62.17 Acres in Jasper*, 538 F.2d at 680-681.

676  *United States v. Eastman* (*Eastman I*), 528 F. Supp. 1177, 1182-83 (D. Or. 1981), *aff'd*, *Eastman III*, 714 F.2d at 77; *62.17 Acres in Jasper*, 538 F.2d at 680-81.

677  *62.17 Acres in Jasper*, 538 F.2d at 681("time can be a factor in removing the mote of potential acquisition from the eyes of area landowners"); *Eastman I*, 528 F. Supp. at 1183.

678  *Reynolds*, 397 U.S. at 21.

679  *See 320 Acres*, 605 F.2d at 792-93 & nn.44-46; *Eastman III*, 714 F.2d at 77; *49.01 Acres in Osage*, 669 F.2d at 1367-69; *62.17 Acres in Jasper*, 538 F.2d at 678-81.

680  *49.01 Acres in Osage*, 669 F.2d at 1369.

681  *320 Acres*, 605 F.2d at 793 (quoted in *Eastman I*, 528 F. Supp. at 1182).

682  *United States v. 1.604 Acres of Land* (*Granby I*), 844 F. Supp. 2d 674, 674-75 (E.D. Va. 2011); *see United States v. Miller*, 317 U.S. 369, 376, 377 (1943); *Reynolds*, 397 U.S. 14, 21 (1970); *320 Acres*, 605 F.2d at 808.

Circuit reasoned:

> It is the date as of which the landowners or prospective purchasers no longer could reasonably anticipate being able to devote these properties to their highest and best use in the context of the surrounding governmental project, without serious apprehension that the properties would soon be condemned. In other words, it is the date as of which the prospect of imminent condemnation becomes sufficiently definite that it would be a major factor in the decision of any reasonable person to buy or develop the property.[683]

Once that date has been legally determined, the appraiser "*must* disregard any . . . alterations in value [due to the project] which it finds to have occurred thereafter."[684]

The nature of the government project and its alleged influence on value may also require legal analysis. For example, in *United States v. 480.00 Acres of Land* (*Fornatora*), the Eleventh Circuit determined that the scope of the project rule did not allow appraisers to disregard preexisting zoning restrictions that affected the market value of property being acquired for the East Everglades expansion of Everglades National Park.[685] There, county regulations had restricted development of the properties being acquired since 1981, well before the properties were acquired by condemnation starting in 2000.[686] The landowners argued the county regulations should be disregarded under the scope of the project rule, claiming they reflected the influence of the federal government in an attempt to depress market value in anticipation of future federal acquisitions. To determine this legal question, the lower court correctly conducted an extensive review of evidence surrounding the county's passage of the 1981 zoning ordinance, ultimately finding that the evidence failed to show that "the primary purpose of the regulation was to depress the property value of land or that the ordinance was enacted with the specific intent of depressing property value for the purpose of later condemnation."[687] As a result, the 1981 county ordinance "was not within 'the scope' of [the federal government's] decision seven years later to expand Everglades National Park or its decision nineteen years later to begin condemning properties."[688] The Eleventh Circuit affirmed, holding that the district court "acted correctly in ruling on [the landowners] objection regarding the zoning restrictions as a matter of law and in then excluding evidence regarding this objection from the fact-finding Commission."[689]

---

683    *320 Acres*, 605 F.2d at 807; *cf. Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions rendered by the former Fifth Circuit prior to October 1, 1981); Fifth Circuit Court of Appeals Reorganization Act of 1980, Pub. L. No. 96-452, 94 Stat. 1994 (1980) (codified as amended in scattered sections of 28 U.S.C.).

684    *Id.* at 807 n.90 (emphasis added).

685    *United States v. 480.00 Acres* (*Fornatora*), 557 F.3d 1297 (11th Cir. 2009); *see* 16 U.S.C. §§ 410r-5 *et seq.* (authorizing expansion).

686    *Fornatora*, 557 F.3d at 1300; *see id.* (discussing Dade County's 1981 East Everglades Zoning Overlay restricting development to one dwelling per 40 acres with no agricultural use allowed); *cf.* Code of Miami-Dade Cty., Fla., Municipal Code §1-4.2 (renaming Dade County).

687    *Fornatora*, 557 F.3d at 1299; *see id.* at 1304 ("The evidence instead shows that the purpose and intent of the regulations was for the ecological reasons set out in the Ordinance . . . . Additionally, . . . there is clearly insufficient evidence to show that the United States acted in concert or agreement to depress the property values. All the evidence . . . shows is that the federal government shared the concerns expressed by the state and local governments in ensuring the continued vitality of the natural resources of South Florida." (quoting magistrate judge's findings adopted by district court)).

688    *Id.* at 1313. Congress authorized the East Everglades expansion project in 1989, but did not provide any funding for acquisitions until 1992, and the expansion was not fully funded until 1999. Once "[a]rmed with sufficient funding," the United States began acquiring properties by condemnation in 2000. *Id.* at 1300.

689    *Id.* at 1313.

**4.5.2.** **Application of the Scope of the Project Rule.** Application of the scope of the project test to any set of facts "requires discriminating judgment."[690] Thus, even if a property is unquestionably within the scope of the government project, a "mechanical application of the . . . rule" is insufficient.[691] Rather, "the rule is not to be divorced from its objective—compensation awards that are just to both the public and the dispossessed landowner."[692] A nuanced factual and legal inquiry is necessary to determine what must be considered and what must be disregarded to ensure the appraiser's opinion of market value does not unfairly reflect project influence. Depending on the specific facts of each acquisition, it may be appropriate or necessary to carefully scrutinize, adjust, or even entirely disregard potentially comparable sales that may have been tainted by the government's acquisition activities, as indicated by date, location, applicable zoning or other factors.[693]

**4.5.3.** **Legal Instructions.** Because the scope of the project rule involves interrelated factual and legal questions, the appraiser must request appropriate **legal instruction** if there is evidence the government's project affected the market value of the property being appraised.[694] The appraiser may be asked to gather and/or analyze data to inform the legal analysis. Counsel (or the Court) will instruct the appraiser as to (1) whether the scope of the project rule applies, and, if so, (2) how the rule must be applied to the specific property under appraisal, and, if applicable (3) when the scope of the project rule applies, (i.e., the date as of which the rule is triggered).[695] These legal instructions are "the criteria [the appraiser] must follow in determining" the fair market value of the property.[696] As with other complex legal questions, counsel may direct the appraiser to perform a dual-premise appraisal if the legal outcome is uncertain.[697]

> **Proper application of the scope of the project rule requires careful legal and factual analysis. The appraiser should request legal instructions from counsel.**
>
> **If the legal outcome is uncertain, the agency/client may find it prudent to direct the appraiser to perform a dual-premise appraisal.**

**4.5.4.** **Impact on Market Value.** The scope of the project rule only arises if there is evidence the government's project affected the market value of the property being appraised. If there is no evidence the government project influenced the property's market value, no determination of the scope of the project is required because there is no project influence to disregard.[698] And while possible project influence on market value can prompt an analysis of the scope of

---

690  *United States v. Reynolds*, 397 U.S. 14, 21 (1970).

691  *United States v. 320 Acres*, 605 F.2d 762, 796, 782 (5th Cir. 1979); *see also United States v. 49.01 Acres of Land in Osage Cty.*, 669 F.2d 1364, 1369 (10th Cir. 1982) (refusing to apply scope of the project rule where landowners could not have reasonably believed their submerged property was no longer within the scope of a government reservoir project).

692  *320 Acres*, 605 F.2d at 796.

693  *See, e.g., Kerr v. S. Park Comm'ns*, 117 U.S. 379, 386 (1886); *Fornatora*, 557 F.3d at 1311-13; *see generally 320 Acres*, 605 F.2d at 798-803 & nn.61-80 (citing cases).

694  *See 320 Acres*, 605 F.2d at 789-90; *Reynolds*, 397 U.S. at 21 ("application to any particular set of facts requires discriminating judgment"); *United States v. 1.604 Acres of Land* (*Granby I*), 844 F. Supp. 2d 668, 674 (E.D. Va. 2011). If there is no evidence the government's project affected the market value, the scope of the project rule does not apply. *Granby I*, 844 F. Supp. 2d at 675.

695  *See 320 Acres*, 605 F.2d at 806 & nn.87-88, 808-09.

696  *Reynolds*, 397 U.S. at 20; *accord 320 Acres*, 605 F.2d at 809; *Granby I*, 844 F. Supp. 2d at 674.

697  Note that simply directing an appraiser to follow these Standards is not a sufficient legal instruction for purposes of the scope of the project rule.

698  *Granby I*, 844 F. Supp. 2d at 675-76 ("[The Court] need not resolve whether imminent acquisition of the property was evident to the public [before the date of valuation] because there is scant evidence that the government's actions actually affected the market value of the property.").

the project, project influence on a property's *marketability* cannot: Even a substantial decrease in marketability, decreasing the number of potential buyers, must be disregarded if the *price* at which the property would be sold is not affected.[699] This is because the federal definition of market value assumes the property has already had reasonable exposure time on the open market on the effective date of value.[700] Similarly, a substantial decrease in the *number of market sales* within an announced project boundary would not be considered unless the project has affected the price at which the property could be sold.

**4.5.5.** **Limits of the Scope of the Project Rule.** The scope of the project rule "is designed to ensure that the landowner is neither hurt nor helped in a takings valuation by any action done by the Government within the scope of the project leading to the taking."[701] The scope of the project rule applies only to changes in value attributable to the government's project: the rule does not allow an appraiser to disregard changes in value attributable to other factors.[702] For this reason, changes in value prior to the date of valuation due to physical deterioration within the landowner's reasonable control must be considered.[703] Similarly, the scope of the project rule does not permit the appraiser to ignore market realities beyond the government project.[704] It also bears noting that the requirement to consider the government project's *direct and special benefits* to remainder property in partial acquisitions (discussed in Section 4.6) does not conflict with the scope of the project rule.[705] Rather, as the Fifth Circuit explored at length in *320 Acres*, these requirements stem from the same underlying principles.[706]

**4.5.6.** **Further Guidance.** As often observed, the scope of the project rule may "be stated easily enough" but "is not so easily understood or applied."[707] For further guidance, the two major Supreme Court decisions on the scope of the project rule are *United States v. Miller* and *United States v. Reynolds*.[708] The Fifth Circuit's influential opinion in *United States v. 320 Acres* analyzes

---

699  *See Marketability*, THE DICTIONARY OF REAL ESTATE APPRAISAL (6th ed. 2015) ("The relative desirability of a property (for sale or lease) in comparison with similar or competing properties in the area."); *United States v. 881.39 Acres of Land*, 254 F. Supp. 294, 297 (E.D. Okla. 1966) (discussing marketability); *United States v. 48.10 Acres of Land in New Windsor*, 144 F. Supp. 258, 264-265 (S.D.N.Y. 1956) (allowing compensation for taking of easements where not only marketability, but market value was affected); *see also United States v. 58.1 Acres of Land in Hempstead*, 151 F. Supp. 631, 634 (E.D.N.Y. 1957) (discussing market value impacts in *48.10 Acres of Land in New Windsor*); Section 1.4.2 (marketability studies); *cf. United States v. 6.24 Acres of Land* (*Weber*), 99 F.3d 1140, 1996 WL 607162, at *6 (6th Cir. 1996) (per curiam) (unpubl.) ("diminution in value caused by fear may be recoverable when such fear affects the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller"); *accord United States v. 760.807 Acres of Land*, 731 F.2d 1443, 1446-1447 (9th Cir. 1984).

700  *See* Section 4.2.1.2.

701  *United States v. 480.00 Acres* (*Fornatora*), 557 F.3d 1297, 1312 (11th Cir. 2009).

702  *320 Acres*, 605 F.2d at 803 ("The [scope of the project] rule refines the concept of fair market value only with respect to alterations in value attributable to the [specific government project at issue]. It has no bearing whatsoever upon alterations in value attributable to other events or market forces."); *Granby I*, 844 F. Supp. 2d at 674, 675-79 (finding scope of the project rule did not apply, "given the multitude of other plausible—and more likely—explanations for the financial difficulties" of landowner's proposed development besides alleged project influence); *see City of New York v. Sage*, 239 U.S. 57, 60-62 (1915) ("The [government] is not to be made to pay for any part of what it has added to the land by thus uniting it with other lots, if that union would not have been practicable or have been attempted except by the intervention of eminent domain. Any rise in value before the taking, not caused by the expectation of that event, is to be allowed, but we repeat, it must be a rise in what a purchaser might be expected to give.").

703  Uniform Act, § 301(3), 42 U.S.C. § 4651(3) (2012); *Granby I*, 844 F. Supp. 2d at 674; *cf. Rasmuson v. United States*, 807 F.3d 1343, 1346 (Fed. Cir. 2015) ("proper appraisal methodology must account for those physical conditions . . . a reasonably prudent buyer would consider . . . when formulating an offer").

704  *320 Acres*, 605 F.2d at 803; *Granby I*, 844 F. Supp. 2d at 674, 675-79.

705  *See United States v. Fuller*, 409 U.S. 488, 492 (1973)

706  *320 Acres*, 605 F.2d at 781-89.

707  *Id.* at 781-82; *see United States v. Reynolds*, 397 U.S. 14, 21 (1970) ("application to any particular set of facts requires discriminating judgment"); *United States v. Eastman* (*Eastman I*), 528 F. Supp. 1177, 1179 n.2 (D. Or. 1981), *aff'd*, 528 F. Supp. 1177 (9th Cir. 1983).

708  *United States v. Miller*, 317 U.S. 369 (1943); *Reynolds*, 397 U.S. 14 (1970).

applications of the rule as well as its historical and legal origins.[709] Two more recent cases on the applicability of the scope of the project rule are also instructive: *United States v. 480.00 Acres* (*Fornatora*), from the Eleventh Circuit, and *United States v. 1.604 Acres* (*Granby I*), from the Eastern District of Virginia.[710]

**4.6.    Partial Acquisitions.** Just compensation must put a landowner "in the same position monetarily as he would have occupied if his property had not been taken."[711] The landowner "must be made whole but is not entitled to more."[712] Under this principle, compensation for a <u>partial acquisition</u>—when the United States acquires only part of a unitary holding—must reflect not only the property interest acquired, but also any change in the value of the remainder directly caused by the government's acquisition or planned use of the part acquired.[713] As a result, the federal measure of compensation in partial acquisitions is the difference between the value of the landowner's property before and after the government's acquisition.[714] Accordingly, appraisers must apply the *before and after* method of valuation in partial acquisitions under federal law, developing opinions of both (1) the market value of the whole property before the acquisition, and (2) the market value of the remainder property after the acquisition.[715] Valuations must analyze and reflect all <u>compensable damages</u> and <u>direct (special) benefits</u> to the value of the remainder property due to the government's acquisition and disregard all <u>non-compensable damages</u> and <u>indirect (general) benefits</u>.[716]

> **In <u>partial acquisitions</u> the measure of compensation is the difference between the market value of the landowner's property before and after the government's acquisition.**

There are important differences between federal and many state laws governing the valuation of partial acquisitions for just compensation purposes.[717] Valuations in federal acquisitions must apply the correct valuation method, analyze and consider compensable damages and benefits, and disregard non-compensable damages and benefits in accordance with federal law.[718] As discussed below, these critical distinctions are often complex and always require careful analysis. Of course, the overarching goal is to ensure that compensation reflects "the value of what [the landowner] has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public."[719]

---

709   *320 Acres*, 605 F.2d 762 (5th Cir. 1979); *see generally id.* at 781-85 (historical and legal foundations of rule), 785-90 (applicability of rule), 798-803 (implementation of rule) & 803-811 (case-specific analysis). The opinion is widely cited across the federal courts. *See, e.g., United States v. 480.00 Acres* (*Fornatora*), 557 F.3d 1297, 1306-07, 1311-13 (11th Cir. 2009); *Eastman I*, 528 F. Supp. at 1179 n.2; *United States v. 428.02 Acres of Land*, 687 F.2d 266, 270 (8th Cir. 1982); *United States v. 49.01 Acres of Land in Osage Cty.*, 669 F.2d 1364 (10th Cir. 1982); *United States v. 125.07 Acres of Land* (*Pond Road I*), 667 F.2d 243, 248-49 (1st Cir. 1981); *Granby I*, 844 F. Supp. 2d at 674-75.

710   *Fornatora*, 557 F.3d at 1307, 1311; *Granby I*, 844 F. Supp. 2d at 674-75.

711   *United States v. Reynolds*, 397 U.S. 14, 16 (1970); *accord United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 633 (1961); *Olson v. United States*, 292 U.S. 246, 255 (1934); *United States v. New River Collieries Co.*, 262 U.S. 341, 343 (1923); *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 304 (1923).

712   *Va. Elec.*, 365 U.S. at 633 (quoting *Olson*, 292 U.S. at 255).

713   *United States v. Miller*, 317 U.S. 369, 376 (1943); *United States v. Grizzard*, 219 U.S. 180, 183 (1911); *Bauman v. Ross*, 167 U.S. 548, 574-75 (1897).

714   *Va. Elec.*, 365 U.S. at 632; *United States v. 68.94 Acres of Land*, 918 F.2d 389, 393 n.3 (3d Cir. 1990); *United States v. 91.90 Acres of Land in Monroe Cty.* (*Cannon Dam*), 586 F.2d 79, 86 (8th Cir. 1978); *Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 336 (Ct. Cl. 1980) (per curiam).

715   *Va. Elec.*, 365 U.S. at 632. *Partial* acquisitions are distinct from *temporary* acquisitions. *See United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 374, 378 (4th Cir. 1995); Section 4.7.

716   *See Bauman*, 167 U.S. at 574.

717   *See Mitchell v. United States*, 267 U.S. 341, 345-46 & n.1 (1925); *Ga.-Pac.*, 640 F.2d at 361 & n.43.

718   *See Miller*, 317 U.S. at 376 & nn.20-21.

719   *Bauman*, 167 U.S. at 574.

While outside the appraiser's assignment, it bears noting that landowners are reimbursed for many types of non-compensable damage—such as moving expenses and relocation costs—through the Uniform Act or other federal statutes.[720] As the Supreme Court explained, "[s]uch losses may be compensated by legislative authority, not by force of the Constitution alone."[721] These administrative payments for *people or businesses* affected by federal acquisitions are separate from, and in addition to, just compensation for the *property* acquired.[722] Accordingly, an appraisal that improperly includes non-compensable elements not only would be legally incorrect for just compensation purposes, but also could result in double payment.[723]

### 4.6.1. The Federal Rule: Before and After Methodology.

The before and after method of valuation for partial acquisitions is accepted in all federal courts.[724] It is often called the <u>federal rule</u>, although it also applies in many (but not all) state jurisdictions.[725] A before and after valuation requires careful determination of the larger parcel (or parent tract) at issue—which may differ before and after the acquisition—and proper consideration of damages and benefits to the remainder property due to the government acquisition. Each of these issues will be addressed below, along with limited exceptions to the before and after method.

The before and after method is "particularly advantageous" where the remainder may have been damaged and/or benefitted by the government's acquisition.[726] As recognized by the federal courts, proper application of the before and after method will result in a figure that reflects the value of the land actually acquired as well as any compensable damages and direct and special benefits to the remainder property.[727] "All of the elements of value entering into just compensation"—i.e., the part acquired, compensable damage to the remainder and compensable

> **In partial acquisitions, <u>compensable damages</u> and <u>direct (special) benefits</u> to the remainder must be reflected.**
>
> **<u>Non-compensable damages</u> and <u>indirect (general) benefits</u> must be disregarded.**
>
> **These federal rules may differ from state law or local practice.**

---

720  State laws governing relocation benefits vary. *See generally* Nicole Stelle Garnett, *The Neglected Political Economy of Eminent Domain*, 105 MICH. L. REV. 101, 121-26 & nn.111-53 (2006) (discussing federal and state relocation benefits and empirical studies of same).

721  *United States v. Willow River Power Co.*, 324 U.S. 499, 510 (1945); *see also United States v. Gen. Motors Corp.*, 323 U.S. 373, 382 (1945).

722  *See United States v. 3.66 Acres of Land in S.F.*, 426 F. Supp. 533, 537 (N.D. Cal. 1977) ("While Congress has recognized that landowners sometimes deserve more compensation than the fair market value alone would provide, it did not intend such compensation to be recovered . . . in a condemnation action."). The Uniform Act expressly states that it does not "creat[e] . . . any element of value or of damage" in eminent domain proceedings to determine just compensation. 42 U.S.C. § 4602(b); *see generally* note 1, *supra*.

723  *Cf. Gen. Motors*, 323 U.S. at 379-80, 382.

724  *E.g.*, *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 632 (1961); *Rasmuson v. United States*, 807 F.3d 1343, 1345 (Fed. Cir. 2015); *United States v. 33.92356 Acres of Land* (*Piza-Blondet*), 585 F.3d 1, 9 (1st Cir. 2009); *United States v. 4.27 Acres of Land*, 271 F. App'x 424, 425 (5th Cir. 2008) (per curiam) (unpubl.); *United States v. 6.24 Acres of Land* (*Weber*), 99 F.3d 1140, 1996 WL 607162 (6th Cir. 1996) (per curiam) (unpubl.); *United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 374, 376 (4th Cir. 1995); *United States v. 760.807 Acres of Land in Honolulu*, 731 F.2d 1443, 1445-46 (9th Cir. 1984); *United States v. 68.94 Acres of Land in Kent Cty.*, 918 F.2d 389, 393, n.3 (3d Cir. 1990); *United States v. 91.90 Acres of Land in Monroe Cty.* (*Cannon Dam*), 586 F.2d 79, 86 (8th Cir. 1978); *United States v. 105.40 Acres of Land in Porter Cty.*, 471 F. 2d 207, 210 (7th Cir. 1972); *United States v. 901.89 Acres of Land in Davidson & Rutherford Ctys.* (*Davenport*), 436 F.2d 395 (6th Cir. 1970); *Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15, 21 (5th Cir. 1969); *United States v. Evans*, 380 F.2d 761, 765 (10th Cir. 1967); *United States v. Glanat Realty Corp.*, 276 F.2d 264, 265 (2d Cir. 1960), *aff'g United States v. 765.56 Acres of Land in Southampton* (*765.56 Acres II*), 174 F. Supp. 1 (E.D.N.Y. 1959), and *United States v. 765.56 Acres of Land in Southampton* (*765.56 Acres I*), 164 F. Supp. 942 (E.D.N.Y. 1958). The before and after method is the only method of valuation allowed for partial acquisitions in the Fifth Circuit. *United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 392, n.5 (5th Cir. 1982).

725  *See generally* EATON, *supra* note 16, at 23-43; 4A-14 NICHOLS ON EMINENT DOMAIN § 14.02 (Just Compensation for Partial Takings).

726  *Piza-Blondet*, 585 F.3d at 9-10 & n.6 (citing *United States v. Miller*, 317 U.S. 369, 375-76 (1943)).

727  *Piza-Blondet*, 585 F.3d at 9-10 & n.6 (citing *Miller*, 317 U.S. at 375-76).

benefit to the remainder—"are contained in the federal formula."[728]

## 4.6.1.1. Larger Parcel Determination.

By definition, a partial acquisition involves property that is some part of a unitary holding (the "whole"),[729] commonly called the underlined larger parcel or parent tract.[730] In a partial acquisition, "[i]t is often difficult . . . to determine what is a distinct and independent tract"—the whole property, comprising the part acquired and the remainder.[731] But this determination of the larger parcel is critical for proper consideration of compensable damages and offsetting benefits.[732] As discussed in Section 4.3.3, the key factors in determining the larger parcel are (1) unity of use (i.e., highest and best use), (2) unity of ownership, and (3) physical unity (proximity or contiguity).

Certain aspects of the larger parcel determination merit particular emphasis in partial acquisitions. Appraisers must bear in mind "the distinction between a residue of a tract whose integrity is destroyed [or impaired] by the [acquisition] and what are merely other parcels or holdings of the same owner" that are not part of the remainder for compensation or valuation purposes.[733] Also, the availability of replacement property for the parcel acquired must be considered—as reasonable buyers

### Availability of Replacement Property

In *Baetjer v. United States*, the United States acquired more than 7,900 acres of land from a large, integrated sugar cane operation spanning 30,000 acres in Puerto Rico and the neighboring island of Vieques. 143 F.2d 391 (1st Cir. 1944). The landowners claimed the sugar cane capacity of the condemned land could not be economically replaced. The court found that a compensable loss could result—*if* a lack of available replacement property would affect market value for a hypothetical willing buyer. The court therefore remanded the case to determine whether the sugar mills had an uneconomic over-capacity so that they could not be operated by anyone as profitably after the taking, such that market value would be affected. *Id.* at 396.

In contrast, take the case of *International Paper Co. v. United States*, a condemnation of over 9,500 acres of timber property, which the landowner claimed shared an integrated use with a paper mill under the same ownership. 227 F.2d 201 (5th Cir. 1955). Citing an industry "rule of thumb" that a paper mill should have one acre of woodland for every ton of paper it produced annually, the landowner claimed that falling below this acreage threshold because of the taking had significantly decreased the value of its paper mill. The court rejected this claim because the landowners' experts failed to consider the availability of replacement property that would in all respects make up the deficiency in acreage due to the taking. Without proof that similar land was unavailable, the court held, damage to the paper mill could not be considered, as the landowner could simply buy replacement acreage to effectively restore the value of the paper mill. *Id.* at 207.

---

728  *United States ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*, 40 F. Supp. 811, 820 (E.D. Tenn. 1941), cited with approval by *City of Van Buren v. United States*, 697 F.2d 1058, 1062 (Fed. Cir. 1983), and *United States v. 2,847.58 Acres of Land in Bath Ctys.*, 529 F.2d 682, 686 (6th Cir. 1976); see *United States v. 760.807 Acres of Land in Honolulu*, 731 F.2d 1443, 1445 (9th Cir. 1984) ("Using [the before and after] method, any diminution in value of the remainder resulting from the taking and use of part of the original parcel, sometimes termed 'severance damages,' would be included in the award.").

729  *See Sharp v. United States*, 191 U.S. 341, 353-55 (1903), *aff'g Sharpe v. United States*, 112 F.893, 896 (3d Cir. 1902).

730  *See United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996). Otherwise, the property under appraisal would be a total acquisition, leaving no remainder.

731  *Sharpe*, 112 F. at 896.

732  *See id.*

733  *See id.*; *see also United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 393 (5th Cir. 1982).

and sellers would do.[734] This may be contrary to some state law and practice.[735] But in federal acquisitions, failing to consider the availability of replacement property may result, in the words of the Fifth Circuit, in a valuation that "offends any rules relating to the awarding of just compensation for property taken for public use."[736]

> **The availability of replacement property to restore the usability of the remainder must be considered in federal partial acquisitions.**

**4.6.2.    Damage.** Just compensation is measured by the owner's loss, not the government's gain.[737] In partial acquisitions when only part of a larger parcel is acquired, the value of the part acquired is not the sole measure of compensation; the "injury or benefit to the part not taken is also to be considered."[738] If the part not acquired, the landowner's *remainder*, is "left in such shape or condition as to be in itself of less value than before, the owner is entitled to additional damages on that account."[739] In legal terms, decreases in the market value of the remainder property for which compensation must be paid are <u>compensable damage</u> and must be considered in valuations for federal acquisitions. Compensable diminution in value is also loosely, and misleadingly, referred to as <u>severance damages</u>.[740] Compensable damages are not a distinct item to be added to compensation; rather, they are already reflected and automatically included in a before and after method of valuation.[741]

But "not all losses suffered by the owner are compensable under the Fifth Amendment."[742] <u>Non-compensable damages</u> cannot be considered in valuations for federal just compensation purposes.[743] The distinction between compensable and non-compensable losses is rooted in the market value standard as the measure of just compensation: under the Fifth Amendment, the Supreme Court held, just compensation does not include "indirect or remote injuries" beyond market value "which would ensue the sale of the property to someone other than the sovereign."[744] Such losses are not compensable because they fluctuate with the

> **<u>Damage</u> to a property's market value is <u>compensable</u> or <u>non-compensable</u> for federal acquisition purposes.**
>
> **The confusing terms *severance damage* and *consequential damage* can generally be avoided.**

---

734   *Baetjer v. United States*, 143 F.2d 391 at 396-97 (1st Cir. 1944); *accord Int'l Paper Co. v. United States*, 227 F.2d 201 (5th Cir. 1955); *Porrata v. United States*, 158 F.2d 788, 790 (1st Cir. 1947) ("Certainly one of the elements which would be considered by the mythical 'willing buyer' of the [remainder property] would be the availability of a suitable substitute . . . to take the place of the one formerly on [the part taken]."); *see Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 359 (Ct. Cl. 1980) (per curiam) (burden to show that "replacement old-growth timber was not available, or if available, at least, the burden to show persuasively that under existing circumstances it would be economically unfeasible to obtain available replacement timber"); *see also United States v. 711.57 Acres of Land in Alameda Cty.*, 51 F. Supp. 30, 33 (N.D. Cal. 1943) (awarding compensation reflecting availability of alternative access to severed tract).

735   *See Miller v. United States*, 620 F.2d 812, 831-32 & n.17 (1980). (noting that while some state law cases hold otherwise, "the better rule" applied in federal court holds that "the future availability of other land should be considered as the hypothetical 'willing buyer' of the [remainder] would consider such a factor") (citing *Porrata*, 158 F.2d 788).

736   *Int'l Paper*, 227 F.2d at 207 (case study).

737   *Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910); *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 281 (1943).

738   *Bauman v. Ross*, 167 U.S. 548, 574 (1897).

739   *Id.*

740   *See, e.g.*, *United States v. Miller*, 317 U.S. 369, 376 (1943) ("loosely"); *United States v. 9.20 Acres of Land in Polk Cty.*, 638 F. 2d 1123, 1127 (8th Cir. 1981) (discussing "misleading nature of the term 'severance damages' as used in partial taking cases"); *see United States v. Honolulu Plantation Co.*, 182 F.2d 172, 175 & n.1 (9th Cir. 1950) ("The use of this term is to be criticized because it is apt to lead to loose thinking." (citing *Miller*, 317 U.S. at 376)); *United States v. 760.807 Acres of Land in Honolulu*, 731 F.2d 1443, 1448 (9th Cir. 1984).

741   *United States v. 33.92356 Acres of Land (Piza-Blondet)*, 585 F.3d 1, 9 & n.6 (1st Cir. 2009); *United States v. 91.90 Acres of Land in Monroe Cty. (Cannon Dam)*, 586 F.2d 79, 86 (8th Cir. 1978); *United States v. 711.57 Acres of Land in Alameda Cty.*, 51 F. Supp. 30, 33 (N.D. Cal. 1943) ("Such . . . damage is a part of the whole damage suffered by the owner upon the taking."); see *Miller*, 317 U.S. at 375-76.

742   *Powelson*, 319 U.S. at 281.

743   *United States v. Westinghouse Elec. & Mfg. Co.*, 339 U.S. 261, 264 (1950).

744   *United States v. Gen. Motors Corp.*, 323 U.S. 373, 382, 379 (1945).

needs of the owner, not the market; they are "apart from the value of the thing taken."[745] Non-compensable damages have often been called <u>consequential damages</u>, but this term has caused confusion in both valuation and legal analyses.[746]

Federal law prohibits consideration of non-compensable damages that may be compensable under many state laws and therefore considered in other contexts.[747] Under federal law, some types of damage may be compensable if proved. Some other types of damage—such as lost profits—are never compensable, even if proved, because "not all losses are compensable."[748] And some types of damage may be compensable (if proved) in specific types of acquisitions, but are never compensable in other types of acquisitions.

### 4.6.2.1. Compensable (Severance) Damages.

In the context of the Fifth Amendment, *damage* is simply "the equivalent for the injury done," just as *compensation*, "standing by itself, carries the idea of an equivalent."[749] Yet the concept of compensable damage is often misunderstood, as the Eighth Circuit explained:

> It is incorrect to think of "severance damages" as a separate and distinct item of just compensation apart from the difference between the market value of the entire tract immediately before the taking and the market value of the remainder immediately after the taking. In the case of a partial taking, if the "before and after" measure of compensation is properly [applied], there is no occasion . . . to talk about "severance damages" as such, and indeed it may be confusing to do so. The matter is taken care of automatically in the "before and after" submission.[750]

> **It is incorrect to think of severance damages as a separate item apart from the difference in the property's market value before and after the government's acquisition.**

---

745  *United States v. Petty Motor Co.*, 327 U.S. 372, 377-78 (1946); *United States v. 50 Acres of Land (Duncanville)*, 469 U.S. 24, 33 (1984); *see also United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 76 (1913) ("These additional values represent, therefore, no actual loss, and there would be no justice in paying for a loss suffered by no one in fact.").

746  *See Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 361 n.44 (Ct. Cl. 1980) (per curiam) ("The concept of consequential damages, however, is sometimes troublesome and confusing in severance damage situations."); *see also* EATON, *supra* note 16, at 289-90 ("[T]he term consequential damages introduces nothing but confusion to what, from a valuation standpoint, would merely appear [to] be a question of compensability.").

747  *See Mitchell v. United States*, 267 U.S. 341, 345-46 (1925); *Batten v. United States*, 306 F.2d 580, 583-84 (10th Cir. 1962) (citing *Richards v. Wash. Terminal Co.*, 233 U.S. 546, 554 (1914)); *cf. Bauman v. Ross*, 167 U.S. 548, 575-84 (1897) (quoting state constitutional provisions regarding just compensation).

748  *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 281 (1943); *cf. United States v. 101.88 Acres of Land in St. Mary Par. (Avoca Island)*, 616 F.2d 762, 770 (5th Cir. 1980) (noting case law draws "distinction between damages allowable in the condemnation proceeding, and claims for damages that are not allowable . . . in a condemnation proceeding").

749  *Monongahela Nav. Co. v. United States*, 148 U.S. 312, 326 (1893) (distinguishing "damages by way of compensation . . . from punitive or exemplary damages").

750  *United States v. 9.20 Acres of Land in Polk Cty.*, 638 F.2d 1123, 1127 (8th Cir. 1981) (quoting *United States v. 91.90 Acres of Land in Monroe Cty. (Cannon Dam)*, 586 F.2d 79, 86 (8th Cir. 1978)); *accord United States v. 25.202 Acres of Land (Amexx I)*, 860 F. Supp. 2d 165 (N.D.N.Y. 2010), *aff'd*, 502 F. App'x 43, 45 (2d Cir. 2012) (unpubl.); *United States v. 6.24 Acres of Land (Weber)*, 99 F.3d 1140, 1996 WL 607162 (6th Cir. 1996) (per curiam) (unpubl.); *United States v. Werner*, 36 F.3d 1095, 1994 WL 507461, *6 (4th Cir. 1994) (per curiam) (unpubl.); *United States v. 50.50 Acres of Land*, 931 F.2d 1349, 1358 (9th Cir. 1991); *United States v. 2,560.00 Acres of Land in Wash. Cty.*, 836 F.2d 498, 502 (10th Cir. 1988); *United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 390-92 & n.1 (5th Cir. 1982); *see also United States v. 33.92356 Acres of Land (Piza-Blondet)*, 585 F.3d 1, 8-10 & n.6 (1st Cir. 2009); *Baetjer v. United States*, 143 F.2d 391, 395-96 (1st Cir. 1944).

Compensable damages may reflect a decrease in the market value of the remainder arising from (1) the government's planned use of the part acquired, and/or (2) the relation of the part acquired to the larger parcel.[751]

**4.6.2.2.    Necessary Support.** Of course, the mere fact of a partial acquisition will not necessarily entitle a landowner to damages.[752] It may well be "that while there has been a severance in the legal sense such severance has caused no compensable damage to the market value of the properties not taken."[753]

And legally compensable damages can only be considered if proved: as with any element affecting value, damage to the remainder (i.e., diminution in value) can never be assumed but must always be fully supported by the facts of each situation.[754] Damage that is "vague and speculative in character" or premised on "possibilities more or less remote" cannot be considered.[755] As a result, it is improper to use damage as a catchall, simply stating an amount without specifying the basis for the opinion. One court criticized parties who failed to furnish factual data to support claimed diminution in value to the remainder as follows: "Not only were the opinions of their experts based largely on speculation and conjecture, but these witnesses totally disregarded available evidence of comparable sales before and after the taking of the easement."[756] In short, damage is "compensable only if the landowner incurs a direct loss reflected in the market place that results from the [acquisition]."[757] Moreover, not merely damage, but *causation* must be proved: for compensation to reflect diminution in value to the remainder, the "landowner must demonstrate that the taking caused the . . . damage[ ]."[758]

**Conjecture and Speculation.** Of course, even potentially compensable damages must be disregarded if based on mere speculation and conjecture.[759] Thus, the federal courts have barred

---

751  *Baetjer*, 143 F.2d at 392 n.2; *see, e.g.*, *Sharpe v. United States*, 112 F. 893, 896 (3d Cir. 1902), *aff'd sub nom. Sharp v. United States*, 191 U.S. 341 (1903) ("proper to include the damages in the shape of deterioration in value which will result to the residue of the tract from the occupation of the part so taken"); *United States v. Miller*, 317 U.S. 369, 376 (1943) ("compensation . . . includes any element of value arising out of the relation of the part taken to the entire tract"); *cf. United States v. 105.40 Acres of Land in Porter Cty.*, 471 F.2d 207, 211 n.8 (7th Cir. 1972) ("It might be argued that recovery of damages arising from a) the relation of the 'remainder tract' to the whole, and b) the relation of the 'condemned tract' to the whole, have both been 'loosely spoken of' and treated as severance damages." (quoting *Miller*, 317 U.S. at 376)); *Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 336 (Ct. Cl. 1980) (per curiam).

752  *United States v. Mattox*, 375 F.2d 461, 463-64 (4th Cir. 1967); *Baetjer*, 143 F.2d at 395-96.

753  *United States v. 7,936.6 Acres of Land*, 69 F. Supp. 328, 332 (D.P.R. 1947), *on remand from Baetjer*, 143 F.2d at 395-96.

754  *Olson v. United States*, 292 U.S. 246, 257 (1934); *Baetjer*, 143 F.2d at 395-96 (remanding for evidence on "whether or not the [landowners] have suffered a compensable loss, and if they have, its extent"); *Sharpe*, 112 F. at 897.

755  *Sharpe*, 112 F. at 897.

756  *United States v. 26.07 Acres of Land in Nassau Cty.*, 126 F. Supp. 374, 377 (E.D.N.Y. 1954). In contrast, "the Government's expert made a detailed survey of sales of residential and industrial parcels in the immediate vicinity of the defendants' properties, before and after the appropriation of the easement, which plainly indicated that there was no appreciable depreciation in the market value of similar parcels as a result of the imposition of the easement." *Id.*

757  *United States v. 760.807 Acres of Land in Honolulu*, 731 F.2d 1443, 1448 (9th Cir. 1984); *United States v. 6.24 Acres of Land (Weber)*, 99 F.3d 1140, 1996 WL 607162, at *5 (6th Cir. 1996) (per curiam) (unpubl.).

758  *760.807 Acres in Honolulu*, 731 F.2d at 1448; *Hendler v. United States*, 175 F.3d 1374, 1384-85 (Fed. Cir. 1999) (affirming finding that diminution in market value of contaminated property was due to preexisting contamination caused by third parties, not government's subsequent remediation activities). Proof of causation is also required to consider the effects of the government project in total acquisitions. *See, e.g.*, *United States v. 1.604 Acres of Land (Granby I)*, 844 F. Supp. 2d 668, 675-76 (E.D. Va. 2011) ("[The court] need not resolve [project influence issues] because there is scant evidence that the government's actions actually affected the market value of the property.").

759  *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 275-76 (1943); *Olson v. United States*, 292 U.S. 246, 257 (1934).

consideration of damages that are not supported by actual market evidence.[760] These items must be disregarded in determining market value for federal acquisitions because consideration of such elements would "add to just compensation something that the law does not allow."[761] Elements that have been excluded from consideration because they were not shown to be reasonably probable run the gamut from an assertion that "buyers would suddenly become fearful of explosive hazards" due to a safety buffer zone "created to ease public fear of explosive hazards"[762] to claimed damage due to the threat that "marauding bears" would "specifically foray from [a] newly created park" to attack young-growth trees on remainder property.[763]

**Anticipated Physical Invasion of the Remainder.** Damage due to anticipated physical invasion of the remainder resulting from the intended use of the land acquired is not compensable in federal acquisitions.[764] For example, in the federal acquisition of a flowage easement for construction of a reservoir, an opinion of market value must disregard any damage to the remainder from anticipated wave action above the line of the acquisition during periods of high winds.[765] To do otherwise would in essence expand the government's acquisition, which neither appraisers nor landowners—nor the courts—have the power to do.[766]

**Use of Others' Lands.** Similarly, diminution in value of a landowner's remainder caused by the United States' use of *other* lands is not compensable and cannot be considered in valuations for just compensation purposes.[767] The Supreme Court created this rule in *Campbell v. United States*, reasoning:

> If the former private owners [of adjacent property] had devoted their lands to the identical uses for which they were acquired by the United States . . . , they would not have become liable for the resulting diminution in value of [the remainder] property. The liability of the United States is not greater than would be that of the private users.[768]

---

760  *E.g.*, *United States v. Honolulu Plantation Co.*, 182 F.2d 172, 179 (9th Cir. 1950) ("[S]trict proof of the loss in market value to the remaining parcel is obligatory."); *26.07 Acres in Nassau*, 126 F. Supp. at 377; *see 760.807 Acres in Honolulu*, 731 F.2d at 1448 (finding appraiser's determination was "insufficient" without "market surveys or other data" that showed damages actually recognized in the market); *United States v. 122.63 Acres of Land in Norfolk Cty.*, 526 F. Supp. 539 (D. Mass. 1981) (declining to award damages for taking of easement where there was no proof of such damage); *see also Weber*, 99 F.3d 1140, 1996 WL 607162, at *4-6 (rejecting one appraiser's finding of stigma damage where record was "devoid of evidence" showing such damage, and accepting another appraiser's finding that no stigma damage existed based on comparison of similar properties and interviews of market participants involved with the purchase of similar property); *Sharpe*, 112 F. at 897.

761  *Intertype Corp. v. Clark-Congress Corp.*, 240 F.2d 375, 380 (7th Cir. 1957).

762  *760.807 Acres in Honolulu*, 731 F.2d at 1448-49 (noting government's acquisition of safety buffer zone "could very well have *increased* the value of the remainder" due to public confidence that remainder was safe from explosive hazards).

763  *Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 362-63 & n.47 (Ct. Cl. 1980) (per curiam) (finding "no reasonable probability supportive of such a belief in this record" (citing *Olson*, 292 U.S. at 257) and noting it "is questionable, in any event, if such intrusions provide a basis for recovery of severance damages" (citing *United States v. Pope & Talbot, Inc.*, 293 F.2d 822, 826 (9th Cir. 1961))).

764  Such damage may be compensable in a separate acquisition or inverse taking claim (Section 4.9). *United States v. 38.60 Acres of Land in Henry Cty.*, 625 F.2d 196, 199-200 (8th Cir. 1980); *United States v. 101.88 Acres of Land in St. Mary Par.* (*Avoca Island*), 616 F.2d 762, 768 (5th Cir. 1980).

765  *E.g.*, *38.60 Acres in Henry*, 625 F.2d at 199-200; *see also Avoca Island*, 616 F.2d at 768 (improper to value as if United States would deposit dredging spoil on remainder land); *United States v. 3,317.39 Acres of Land in Jefferson Cty.*, 443 F.2d 104 (8th Cir. 1971) (error to consider damage for possible flooding of remainder property); *United States v. Brendum*, 272 F.2d 642 (5th Cir. 1959) (error to value taking of easement to cut trees and remove obstructions as if it also included avigation rights to fly aircraft over area).

766  *38.60 Acres in Henry*, 625 F.2d at 199-200; *Avoca Island*, 616 F.2d at 768; *United States v. 3,317.39 Acres of Land in Jefferson Cty.*, 443 F.2d 104, 105-06 (8th Cir. 1971); *see Berman v. Parker*, 348 U.S. 26, 35-36 (1954); *United States v. 3,218.9 Acres of Land in Warren Cty.*, 619 F.2d 288, 290-93 (3d Cir. 1980); *United States v. 40.60 Acres of Land in Contra Costa Cty.*, 483 F.2d 927, 928 (9th Cir. 1973); *see also United States v. 21.54 Acres of Land in Marshall Cty.*, 491 F.2d 301, 304-06 (4th Cir. 1973).

767  *Campbell v. United States*, 266 U.S. 368, 371-72 (1924); *760.807 Acres in Honolulu*, 731 F.2d at 1447; *Avoca Island*, 616 F.2d at 769; *United States v. Kooperman*, 263 F.2d 331, 332 (2d Cir. 1959); *Winn v. United States*, 272 F.2d 282, 286-87 (9th Cir. 1959); *Boyd v. United States*, 222 F.2d 493, 494 (8th Cir. 1955).

768  *Campbell*, 266 U.S. at 371-72 (noting a landowner "ha[d] no right to prevent the taking and use of the lands of others"); *accord United States v. 15.65 Acres of Land in Marin Cty.* (*Marin Ridgeland Co.*), 689 F.2d 1329, 1331-32 (9th Cir. 1982).

The Ninth Circuit created a narrow exception to the *Campbell* rule in *United States v. Pope & Talbot, Inc.* to allow compensation for damage resulting from the use of another's property in limited circumstances.[769] Thus, in the Ninth Circuit, damage to the remainder resulting from the use of others' property may be considered if (1) the part acquired is *indispensable* to the government project; (2) the part acquired contributes *substantially* (not inconsequentially) to the project and the resulting damage; and (3) damage to the remainder due to the use of the part acquired is *inseparable* from damage to the remainder due to the government's use of its adjoining land in the project.[770] For example, consider a partial taking of a tract for construction of a contaminated soils depository, which would be constructed partly on the property taken and partly on property acquired from others: it might not be practical to separate the diminution in value of the remainder caused by the use of *the property acquired* from that caused by the use of *lands acquired from others*. In such situations, the appraiser should seek **legal guidance**. The Ninth Circuit's exception to the *Campbell* rule has not been adopted by other federal courts,[771] and even in the Ninth Circuit is rarely invoked.[772] And as the Ninth Circuit made clear in subsequent rulings, regardless of the *Pope & Talbot* exception, damage is "compensable only if the landowner incurs a direct loss reflected in the market place that results from the [acquisition]."[773] Moreover, causation must be proved: a "landowner must demonstrate that the taking caused the . . . damage[ ]."[774]

**Stigma, Fear, and Contamination.** If stigma or fear of a "hazard would affect the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller, diminution in value caused by that fear may be recoverable as part of just compensation."[775] The threshold question is not whether the fear or stigma is rational or well-founded, but rather whether and to what extent it affects the market.[776] There must be evidence "connecting the safety issue to the real estate market."[777] Moreover, it is improper to simply assume that a hazard, or the fear of a hazard, has an effect on market value. As the Ninth Circuit explained in a condemnation for construction of high-voltage transmission lines and potential fears of electromagnetic fields (EMFs):

> In the absence of relevant and probative evidence, a [fact-finder] could only speculate concerning the effect of a particular measurement on public perception. Perhaps the general public, unschooled in the significance of the milligauss, is afraid of actual EMFs in any quantity, so long as they come from a big power line. Or perhaps the levels of EMFs that exist on [the subject property] would even *ease* public fears in the marketplace. There is simply no way for a [fact-finder] to tell. Without any evidence . . . that higher levels of EMF generate higher levels of buyer aversion and lower sale prices, [evidence] about specific EMF levels has little to no probative value.[778]

---

769  *United States v. Pope & Talbot, Inc.*, 293 F.2d 822 (9th Cir. 1961).

770  *Marin Ridgeland Co.*, 689 F.2d at 1332; *Pope & Talbot*, 293 F.2d at 825.

771  *See E. Tenn. Nat. Gas Co. v. 2.93 Acres of Land*, No. 4:02CV00179, 2007 WL 2688414, *2 (W.D. Va. Sept. 13, 2007) (citing cases); *cf. Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 363 (Ct. Cl. 1980) (per curiam) (citing but not applying *Pope & Talbot* analysis).

772  *See, e.g.*, *760.807 Acres in Honolulu*, 731 F.2d at 1447-48 (finding *Pope & Talbot* exception did not apply where "alleged severance damage, if resulting from any use, could not be caused by any use of the condemned property"); *St. Regis Paper Co. v. United States*, 313 F.2d 45 (9th Cir. 1962) (finding reduced access to remainder was due to use to which adjoining land owned by others was put, and therefore not compensable under *Campbell*, and *Pope & Talbot* did not apply).

773  *760.807 Acres in Honolulu*, 731 F.2d at 1448.

774  *Id.*

775  *Id.* at 1447.

776  *United States v. 87.98 Acres of Land in Merced Cty.*, 530 F.3d 899, 904-05 (9th Cir. 2008); *Basset, New Mexico LLC v. United States*, 55 Fed. Cl. 63, 75 (2002).

777  *87.98 Acres in Merced*, 530 F.3d at 905 (analyzing *760.807 Acres in Honolulu*, 731 F.2d at 1449).

778  *87.98 Acres in Merced*, 530 F.3d at 905-06 (internal citations omitted).

Further, fear or stigma associated with anticipated damage may also be recoverable if it would affect the market price a knowledgeable and prudent buyer would pay for the property on the date of value.[779] Causation between the stigma or fear and the government's acquisition must be shown.[780] And diminution in value resulting from fear or stigma due to the actions of a third party or to pre-existing conditions cannot be considered.[781] For these reasons, appraisers must obtain clear written instructions regarding appropriate consideration of environmental contamination or other hazards, as discussed in Section 1.2.7.1.[782]

**4.6.2.3.    Non-Compensable (Consequential) Damages.** Because the compensability of a particular aspect of damage stems from its treatment in the open market between willing buyers and sellers, losses that are not reflected in sales prices in the private market cannot be considered in federal acquisitions. Applying this principle, federal courts have determined that the following losses are not compensable under the Fifth Amendment: loss of business value or going concern value;[783] loss of or damage to goodwill;[784] future loss of profits;[785] frustration of plans;[786] frustration of contract or contractual expectations;[787] loss of opportunity or business prospect;[788] frustration of an enterprise;[789] loss of customers;[790] expenses of moving removable fixtures and personal property;[791] depreciation in value of furniture and removable equipment;[792] increased production or management costs;[793] damage to inventory or equipment;[794] expense of adjusting or restructuring manufacturing operations;[795] incurrence of removal or relocation costs;[796] loss or cancellation of revocable permits or licenses;[797] loss of ability to collect assessments;[798] uncertainty premium due to tenant's status as a government entity;[799] and interference with development

---

779  *United States v. 33.5 Acres of Land*, 789 F.2d 1396, 1398 (9th Cir. 1986).

780  *760.807 Acres in Honolulu*, 731 F.2d at 1447.

781  *Hendler v. United States*, 175 F.3d 1374, 1384-85 (Fed. Cir. 1999); *760.807 Acres in Honolulu*, 731 F.2d at 1448.

782  *See, e.g., Hendler*, 175 F.3d at 1384-85; *760.807 Acres in Honolulu*, 731 F.2d at 1448.

783  *Mitchell v. United States*, 267 U.S. 341, 345 (1925); *United States v. 1735 N. Lynn St.*, 676 F. Supp. 693, 697-98 (E.D. Va. 1987).

784  *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945).

785  *Id.*; *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 283 (1943); *Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577, 1581-82 (Fed. Cir. 1990); *Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 360-61 (Ct. Cl. 1980) (per curiam).

786  *1735 N. Lynn St.*, 676 F. Supp. at 701 (citing *Powelson*, 319 U.S. at 281-82 & n.12, and *Omnia Commercial Co. v. United States*, 261 U.S. 502, 513 (1923)).

787  *Omnia*, 261 U.S. at 513; *United States v. 57.09 Acres of Land in Skamania Cty.* (*Peterson II*), 757 F.2d 1025, 1027 (9th Cir. 1985); *United States v. 677.50 Acres of Land*, 420 F.2d 1136, 1138-39 (10th Cir. 1970); *Hooten v. United States*, 405 F.2d 1167, 1168 (5th Cir. 1969); *United States v. 1.604 Acres of Land* (*Granby I*), 844 F. Supp. 2d 668, 681-82 (E.D. Va. 2011); *United States v. Gossler*, 60 F. Supp. 971, 976-77 (D. Or. 1945).

788  *Omnia*, 261 U.S. at 513; *United States v. Grand River Dam Auth.*, 363 U.S. 229, 236 (1960); *Powelson*, 319 U.S. at 283.

789  *Omnia*, 261 U.S. at 513; *Grand River*, 363 U.S. at 236.

790  *S. Ctys. Gas Co. of Cal. v. United States*, 157 F. Supp. 934, 935-36 (Ct. Cl. 1958), *cert. denied*, 358 U.S. 815 (1958); *R.J. Widen Co. v. United States*, 357 F.2d 988, 990, 993-94 (Ct. Cl. 1966); *see Stipe v. United States*, 337 F.2d 818, 819-21 & n.3 (10th Cir. 1964).

791  *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945).

792  *Certain Land in City of Washington v. United States*, 355 F.2d 825, 826 (D.C. Cir. 1965); *see County of Ontonagon v. Land in Dickinson Cty.*, 902 F.2d 1568, 1990 WL 66813, *3-*4 (6th Cir. 1990) (unpubl.).

793  *PVM Redwood Co. v. United States*, 686 F.2d 1327, 1328-29 (9th Cir. 1982); *Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 360 n.44, 363-65 (Ct. Cl. 1980) (per curiam).

794  *Klein v. United States*, 375 F.2d 825, 829 (Ct. Cl. 1967).

795  *United States v. 91.90 Acres of Land in Monroe Cty.* (*Cannon Dam*), 586 F.2d 79, 87-88 (8th Cir. 1978); *Klein*, 375 F.2d 825 at 829.

796  *United States v. Westinghouse Elec. & Mfg. Co.*, 339 U.S. 261, 264 (1950); *United States v. Petty Motor Co.*, 327 U.S. 372, 377-78 (1946); *Intertype Corp. v. Clark-Congress Corp.*, 240 F.2d 375 (7th Cir. 1957); *Ga.-Pac.*, 640 F.2d at 361 n.44. But see exception discussed below regarding temporary acquisitions that interrupt but do not terminate a longer term.

797  *Acton v. United States*, 401 F.2d 896, 897-900 (9th Cir. 1968); *United States v. Cox*, 190 F.2d 293, 295-96 (10th Cir. 1951); *see also* Section 4.11.2 (Federal Grazing Permits).

798  *United States v. 0.073 Acres of Land* (*Mariner's Cove*), 705 F.3d 540, 546-49 (5th Cir. 2013); *but see Adaman Mut. Water Co. v. United States*, 278 F.2d 842 (9th Cir. 1960) (regarding restrictive covenants for collection of assessments for water extracted from burdened properties).

799  *United States v. 131,675 Rentable Square Feet of Space* (*GSA-VA St. Louis I*), No. 4:14-cv-1077 (CEJ), 2015 WL 4430134, *4 (E.D. Mo. July 20, 2015); *see United States v. Gen. Motors Corp.*, 323 U.S. 373, 379-80 (1945); *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 276 (1943).

agreements,[800] among others. [801] Such losses must be disregarded—even if proved—because by law, they are not compensable under the Fifth Amendment.

**Acquisitions of Fee or Other Full-Term Interests.** Under federal law, compensation for a fee acquisition does not include "future loss of profits, the expense of moving removable fixtures and personal property from the premises, the loss of good-will which inheres in the location of the land, or other like consequential losses which would ensue the sale of the property to someone other than the sovereign."[802] The Supreme Court explained the reasons for this rule as follows:

> Whatever of property the citizen has the government may take. When it takes the property, that is, the fee, the lease, whatever he may own, terminating altogether his interest, under the established law it must pay him for what is taken, not more; and he must stand whatever indirect or remote injuries are properly comprehended within the meaning of "consequential damage" as that conception has been defined in such cases. Even so the consequences often are harsh. For these whatever remedy may exist lies with Congress.[803]

While beyond the scope of the appraiser's assignment, Congress has enacted remedies: people and businesses affected by federal acquisitions receive replacement housing, moving expenses, and relocation services under the Uniform Act.[804] Similarly, Congress authorized administrative payments for losses due to the cancellation of federal grazing permits for war purposes.[805] Administrative benefits under the Uniform Act or other statutes are separate from compensation under the Fifth Amendment (and again, beyond the scope of the appraiser's assignment to develop an opinion of market value for a federal acquisition).[806]

**Temporary Acquisitions.** The rules above apply with equal force to temporary acquisitions (Section 4.7) that acquire or terminate the full remaining term, because in such situations a "lessee would have to move at the end of his term unless the lease was renewed" regardless of the federal acquisition.[807] "The compensation for the value of his leasehold covers the loss from the premature termination . . . ."[808] As a result, the Supreme Court held, when there is an acquisition of an entire property interest, "whether that property represents the interest in a leasehold or a fee, the expenses of removal or of relocation are not to be included in valuing what is taken."[809]

**Temporary Acquisitions Interrupting a Longer Term.** The valuation of a temporary acquisition that interrupts but does not terminate a longer interest—such as a sublet for less than the outstanding term of an existing leasehold—may involve a nuanced refinement of the

---

800  *United States v. 1.604 Acres of Land (Granby I)*, 844 F. Supp. 2d 668, 681-82 (E.D. Va. 2011); *Kaiser Dev. Co. v. Honolulu*, 649 F. Supp. 926, 936-37 (D. Haw. 1986), *aff'd for reasons stated by district court*, 898 F. 2d 112 (9th Cir. 1990) (mem.).

801  As observed in a leading appraisal text, "[i]t is simply impossible to develop an all-inclusive list of the potential damages that could accrue to property in a partial taking case." Eaton, *supra* note 16, at 309.

802  *Gen. Motors*, 323 U.S. at 379-80 (footnotes omitted).

803  *Id.* at 382.

804  *See* note 1, *supra*; 49 C.F.R. §§ 24.1 to 24.603 (implementing regulations).

805  43 U.S.C. § 315q; *see United States v. Cox*, 190 F.2d 293, 296 (10th Cir. 1951); Section 4.11.2 (Federal Grazing Permits).

806  *See Gen. Motors*, 323 U.S. at 379-80; *United States v. Willow River Power Co.*, 324 U.S. 499, 510 (1945); *Cox*, 190 F.2d at 296.

807  *United States v. Petty Motor Co.*, 327 U.S. 372, 378-79 (1946); *Intertype Corp. v. Clark-Congress Corp.*, 240 F.2d 375 (7th Cir. 1957).

808  *Petty Motor*, 327 U.S. at 379; *Intertype Corp.*, 240 F.2d 375.

809  *United States v. Westinghouse Elec. & Mfg. Co.*, 339 U.S. 261, 264 (1950) (citing *Gen. Motors*, 323 U.S. at 379); *Intertype Corp.*, 240 F.2d at 380-81 ("the measure of its damages would have been . . . just compensation—which does not include . . . the cost of removal and other such consequential items").

rule stated above.[810] As a result, the market value of this type of temporary interest may need to reflect reasonable costs for tenant relocation, preparing the space for the new occupant, and storage of goods pending the displaced tenant's return.[811] Such items may be considered "not as independent items of damage but to aid in the determination of what would be the usual—the market—price which would be asked and paid for such temporary occupancy of the building then in use under a long term lease."[812]

The Supreme Court has emphasized that consideration of reasonable relocation costs in temporary interrupting acquisitions does not "depart from the settled rule against allowance for 'consequential losses' in federal condemnation proceedings."[813] Rather, relocation costs may be relevant to the market value of a temporary interrupting acquisition of less than the outstanding term—such as a sublet of an occupied building—and therefore compensable and appropriate to consider in such acquisitions. But relocation costs are merely incidental to the value of an acquisition of the *entire* interest (whether temporary or permanent) and therefore must be disregarded in acquisitions of the entire interest.[814] In short, as the Seventh Circuit stated, "if the Government takes over only a portion of a lease, then the cost of removal may be considered in determination of just compensation" but if it acquires "the entire lease, such consequential losses are not to be considered."[815] The reasons for this distinction can be found in *United States v. Petty Motor Co.*:

> There is a fundamental difference between the taking of a part of a lease and the taking of the whole lease. That difference is that the lessee must return to the leasehold at the end of the Government's use or at least the responsibility for the period of the lease, which is not taken, rests upon the lessee. . . . Because of that continuing obligation in all takings of temporary occupancy of leaseholds, the value of the rights of the lessees, which are taken, may be affected by evidence of the cost of temporary removal.[816]

**Exceptions.** Federal courts have recognized rare exceptions to the foregoing rules, allowing normally non-compensable damage to be reflected in unusual circumstances, such as the temporary acquisition of a business property or a partial acquisition with the effect of a total taking.[817] Such exceptions always require **legal instruction**.

---

810  *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949); *Gen. Motors*, 323 U.S. 373. These temporary interrupting acquisitions have chiefly occurred in "'response to the uncertainties of the Government's needs in wartime.'" *Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 519 (2012) (quoting *Westinghouse*, 339 U.S. at 267); *see United States v. 1735 N. Lynn St.*, 676 F. Supp. 693, 696 (E.D. Va. 1987) ("Exigencies of [World War II] moved the government to adopt a policy of acquiring properties for short periods with options to renew.").

811  *Gen. Motors*, 323 U.S. at 383. Unlike benefits under the Uniform Act (see note 828, *supra*), consideration of relocation costs in this specific circumstance would be within the scope of the appraiser's assignment because they bear on market value and just compensation. *See Westinghouse*, 339 U.S. at 263-64 & n.2 ("This holding in the *General Motors* case was the Court's determination, without any congressional action, of what constituted 'just compensation' under the Fifth Amendment."); *see also United States v. Willow River Power Co.*, 324 U.S. 499, 510 (1945) ("Such losses may be compensated by legislative authority, not by force of the Constitution alone.").

812  *Gen. Motors*, 323 U.S. at 383; *see United States v. 131,675 Rentable Square Feet of Space (GSA-VA St. Louis I)*, No. 4:14-cv-1077 (CEJ), 2015 WL 4430134, *4 (E.D. Mo. July 20, 2015); *see also 1735 N. Lynn St.*, 676 F. Supp. at 696-99.

813  *Westinghouse*, 339 U.S. at 264; *accord Gen. Motors*, 323 U.S. at 383.

814  *United States v. Petty Motor Co.*, 327 U.S. 372, 379-80 (1946); *see Kimball Laundry*, 338 U.S. at 15 ("The temporary interruption as opposed to the final severance of occupancy so greatly narrows the range of alternatives open to the condemnee that it substantially increases the condemnor's obligation to him. It is a difference in degree wide enough to require a difference in result.").

815  *Intertype Corp. v. Clark-Congress Corp.*, 240 F.2d 375, 380 (7th Cir. 1957).

816  *Petty Motor*, 327 U.S. at 379-80.

817  *Kimball Laundry*, 338 U.S. 1 (allowing compensation for going concern value where government temporarily took business); *United States v. 58,994 Net Usable Square Feet at 910 S. Mich. Ave.*, No. 87 C 8569, 1989 WL 51395 (N.D. Ill. May 11, 1989) (government's holdover and subsequent condemnation of a lease interest in part of an otherwise vacant office building slated for demolition and renovation was effectively temporary taking of entire building; court directed compensation to be measured as difference between property before and after government announced holdover, including in "after" valuation costs buyer would consider such as anticipated carrying costs, etc.).

**4.6.3.    Benefits.** Federal acquisitions and the projects they serve can also enhance properties' market value, often raising complicated valuation questions.[818] Under federal law, compensation for a partial acquisition must reflect any <u>direct and special benefits</u> to the remainder due to the government project.[819] <u>Indirect and general benefits</u>, on the other hand, are not considered because they are enjoyed by the public as a whole rather than arising from an acquisition's particular impact on a specific property.[820] Distinctions between these types of benefits are discussed in more detail below.

The same principles guide the analysis of benefits and damages in valuations for federal acquisitions.[821] Just compensation turns on the question, "What has the owner lost? not, What has the taker gained?"[822] In legal terms, direct and special benefits are a form of just compensation, no different than a monetary award or payment.[823] As a result, any direct and special benefits must be *set off* against the total compensation because when a landowner's remainder property "is specially and directly increased in value by the public improvement, the damages to the whole parcel by the appropriation of part of it are lessened."[824] One federal court explained the fairness of this principle as follows:

> **Distinguishing special and direct benefits from general and indirect benefits can raise complicated factual and legal questions, and virtually always requires a <u>legal instruction</u>.**

> It is not in contemplation of law . . . that after the sovereign has taken from a citizen and paid him for that which it has taken, that the citizen can on the same market sell his residue for an amount which, added to the compensation he has received, aggregates more than the value of the whole from which the part was taken. That cannot be just compensation . . . .[825]

Direct and special benefits commonly include "new access to a waterway or highway, or filling in of swampland."[826] An upward shift in the remainder property's highest and best use is often an indication of special and direct benefits. For example, a partial acquisition for the extension of a mass transit system had a special and direct benefit on remainder property that was eligible for special zoning that would allow higher-density residential development due to its location within

---

818  *See Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2432 (2015).

819  *See Bauman v. Ross*, 167 U.S. 548, 574 (1897).

820  *Id.* at 581-82.

821  *See id.* at 574-75 ("injury or benefit to the part not taken is also to be considered").

822  *Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910) (quoted in *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 236 (2003)); *see Bauman*, 167 U.S. at 574; *Olson v. United States*, 292 U.S. 246, 255 (1934); *see also United States v. Sponenbarger*, 308 U.S. 256, 266-67 (1939).

823  *McCoy v. Union Elevated R.R. Co.*, 247 U.S. 354, 366 (1918) ("[I]n arriving at the amount of damage to property not taken allowance should be made for peculiar and individual benefits conferred upon it; compensation to the owner in that form is permissible."); *United States ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*, 40 F. Supp. 811, 819 (E.D. Tenn. 1941) ("compensation shall be paid, whether in cash or in benefits incident to the use to which the property taken is put by the condemnor"); *see Bauman*, 167 U.S. at 581; *Sponenbarger*, 308 U.S. at 265-70 (finding taking without compensation had not occurred as "lands were not damaged, but actually benefited"); *United States v. 901.89 Acres of Land (Davenport)*, 436 F.2d 395, 397-98 (6th Cir. 1970) (discussing historical consideration of benefits in assessing compensation); *cf. Horne*, 135 S. Ct. at 2432 (reiterating that special benefits are deducted from compensation in partial takings while rejecting contention that general regulatory activity can constitute just compensation for a specific physical taking).

824  *Bauman*, 167 U.S. at 574; *see Indian Creek Marble Co.*, 40 F. Supp. at 818 ("compensation is simply that amount of money required to leave the owner with property, including his compensation, of the same market value as that which he had prior to the taking").

825  *Indian Creek Marble Co.*, 40 F. Supp. at 818; *accord Bauman*, 167 U.S. at 581-82 (quoting Justice Brewer's analysis in *Pottawatomie Cty. Comm'rs v. O'Sullivan*, 17 Kan. 58, 59-60 (1876)); *Sponenbarger*, 308 U.S. at 266-67 ("[I]f governmental activities inflict slight damage upon land in one respect and actually confer great benefits when measured in the whole, to compensate the landowner further would be to grant him a special bounty.")

826  *Horne*, 135 S. Ct. at 2432; *see, e.g.*, *Davenport*, 436 F.2d 395 (proximity to and view of lake created by reservoir project was a special and direct benefit). Special valuation rules apply to partial acquisitions affected by the federal navigational servitude. *See* Section 4.11.1.

---

5-ER-919

a certain distance of a new mass transit station.[827] Comparable sales typically provide the best evidence of special and direct benefits.[828] The existence or absence of special and direct benefits turns not on the specifications of the government project, but on its impact in the market. For instance, in a partial acquisition for reservoir purposes: "The question is whether the market value of the remainder was increased by its prospective frontage on the [new reservoir created by the government project, which spurred demand for lakeside subdivision]. Market value 'is . . . a reflection of the state of mind of the public with respect to the property.'"[829]

General and indirect benefits, in contrast, are those "which result to the public as a whole, and therefore to the individual as one of the public; for he pays in taxation for his share of such general benefits."[830] Thus, compensation would not be offset by the benefit of a "general increase in the value of property in the neighborhood" caused by a government project.[831] In modern federal acquisitions, appraisers are rarely—if ever—asked to analyze and estimate general and indirect benefits, which relate to taxation, not just compensation.[832] But this makes the distinction between the types of benefits no less critical.[833]

The *extent* of a special and direct benefit is a fact question to be determined by the appraiser.[834] But correctly distinguishing special and direct benefits (to be considered) from general and indirect benefits (to be ignored) "can raise complicated questions" in practice,[835] and virtually always requires a **legal instruction**.[836] The distinction stems from principles of fairness:

> [I]f the proposed road or other improvement inure to the *direct and special benefit* of the individual out of whose property a part is taken, he receives something which none else of the public receive, and it is just that this should be taken into account in determining what is compensation. Otherwise, he is favored above the rest, and,

**Benefits: *Bauman v. Ross***

*Bauman v. Ross*, 167 U.S. 548 (1897), illustrates the distinction between benefit types: in 1893, Congress authorized an expansion of the highway grid system in Washington, D.C., to be funded by an assessment (tax) against area landowners *generally benefited* by the expansion. The expansion also conferred *special benefits* on some remainder properties after partial takings for the project.

As a result, the fact-finder had to (1) determine just compensation for the property taken, offsetting any *special and direct benefits* to the remainder, and (2) quantify the *general* and *indirect benefits* to all area landowners for assessment purposes to fund the project.

In contemporary federal acquisitions, appraisers are rarely asked to quantify *indirect* and *general benefits* in making valuations for just compensation purposes.

---

827  *See, e.g.*, *Wash. Metro. Area Transit Auth. v. One Parcel of Land (Old Georgetown)*, 691 F.2d 702 (4th Cir. 1982).

828  *United States v. Trout*, 386 F.2d 216, 222-24 (5th Cir. 1967) ("If the best evidence of market value, i.e., evidence of comparable sales, indicates that there were special benefits to the remainder, it cannot be rejected . . . without an adequate explanation.").

829  *Id.* at 223 & n.9, 224 (noting that "in demanding evidence pertaining to the structure of the reservoir, the commission misconceived the issue of special benefits").

830  *Bauman*, 167 U.S. at 581.

831  *Id.* at 580; *United States v. River Rouge Improvement Co.*, 269 U.S. 411 (1926); *Davenport*, 436 F.2d at 397-99; *6,816.5 Acres of Land v. United States*, 411 F.2d 834, 837 (10th Cir. 1969); *United States v. 2,477.79 Acres of Land in Bell Cty.*, 259 F.2d 23, 28-29 (5th Cir. 1958).

832  *See Bauman*, 167 U.S. at 574-75, 587-88 (discussed in sidebar); *cf. Trout*, 386 F.2d at 220 (same amount before and after taking attributed to general benefits of increased property values over county resulting from contemplated government project).

833  *See, e.g.*, *Hendler v. United States*, 175 F.3d 1374 (Fed. Cir. 1999); *Davenport*, 436 F.2d at 397-99.

834  *2,477.79 Acres in Bell*, 259 F.2d at 28.

835  *See Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2432 (2015).

836  *See, e.g.*, *Davenport*, 436 F.2d at 400-01 (valuation by appraiser who was correctly "instructed to appraise the 'after' value of the subject property considering the reservoir enhancement," as a direct and special benefit of the government's acquisition, was "the only [opinion] which has probative value and discloses the proper compensation"); *see also Hendler*, 175 F.3d 1374.

instead of simply being made whole, he profits by the appropriation, and the taxes of the others must be increased for his special advantage.[837]

Applying these principles, "any special and direct benefits [that are] capable of present estimate and reasonable computation" must be deducted for purposes of just compensation.[838]

Special and direct benefits can accrue to more than one property, such as a new or widened street benefiting multiple abutting properties. "The benefit is not the less direct and special to the [property at issue], because other estates upon the same street are benefited in a similar manner."[839] The Supreme Court reasoned:

> [t]he advantages of more convenient access to a particular lot of land in question, and of having a front upon a more desirable avenue, are direct benefits to that lot, giving it increased value in itself. It may be the same, in greater or less degree, with each and every lot of land upon the same street. But such advantages are direct and special to each lot.[840]

On the other hand, "sharing in the common advantage and convenience of increased public facilities, and the general advance in value of real estate in the vicinity by reason thereof" would be indirect and general benefits.[841]

To take into account any special benefits from the project, appraisers apply the before and after rule of valuation, developing opinions of the market value of the larger parcel (the entire tract) *before* acquisition *excluding* any enhancement or diminution from the project, and the market value of the remainder *after* acquisition *including* any special benefit or diminution due to the government project. In a practical example, the Sixth Circuit described the valuation of a partial acquisition for construction of a dam and lake:

> An appraiser . . . valued [the landowner's entire tract before acquisition] at $80,000, or about $365 per acre, as of the day of the taking. That was its market value without any enhancement because of its proximity to the already projected development of the [dam and lake]. The [appraiser] buttressed his valuation by referring to comparable sales.

> He then valued the [remainder property], title to which would remain in [the landowner after acquisition], at $30,000 or about $404 an acre. In valuing this remainder, he gave consideration to the enhancement that would accrue to it from its proximity to the lake and the advantage of an unobstructed view thereof.

---

837  *Bauman*, 167 U.S. at 581-82 (quoting Justice Brewer's analysis in *Pottawatomie Cty. Comm'rs v. O'Sullivan*, 17 Kan. 58, 59-60 (1876) (emphasis added)).
838  *Id.* at 584. In a regulatory inverse taking case, the Supreme Court recently rejected the contention that the effects of general regulatory activity—such as higher consumer demand due to government enforcement of quality standards and promotional activities—can offset the total just compensation due for a specific physical taking. *Horne*, 135 S. Ct. at 2432. The Court expressly clarified that this ruling, concerning certain regulatory benefits, does not affect the deduction of special benefits from the amount of compensation paid in partial takings. *Id.* (discussing concerns raised in dissent); *see id.* at 2435-36 (Breyer, J., concurring in part and dissenting in part) ("it is unclear to me what distinguishes this case from . . . other types of partial takings").
839  *United States v. River Rouge Improvement Co.*, 269 U.S. 411, 416 (1926).
840  *Id.*
841  *Id.*

Deducting this $30,000 from the $80,000 value placed on the entire tract, he came up with a figure of $50,000 representing the fair compensation that should be paid . . . . This appraiser's method was correct.[842]

In this way, the value of any special or direct benefits is offset against the total value.[843]

Consideration and offset of the government project's direct and special benefits to remainder property does not violate the <u>scope of the project rule</u>, discussed in Section 4.5. Rather, the general principle, as the Supreme Court expressly stated in *United States v. Fuller*, is that the United States "may not be required to compensate a [landowner] for elements of value that the Government has created . . . ."[844] And this general principle does not prevent application of the scope of the project rule to exclude increments in value due to the government's project when necessary "to do substantial justice."[845] Application of the scope of the project rule turns on the question: "Should the owner have the benefit of any increment of value added to the property taken by the action of the public authority[?]"[846] As discussed in Section 4.5, the answer to this question depends on the precise facts of each acquisition, and "requires discriminating judgment" and **legal instructions**.[847]

### 4.6.4.   Exceptions to the Federal Rule.

**Exceptions to the Federal Rule.** The federal courts' universal preference for the before and after method makes clear that departures may be appropriate, if at all, only in "very unique and complex" circumstances.[848] "[A]ny other method of arriving at compensation could conceivably arrive at something else, either more or less, than compensation."[849] Nevertheless, some federal courts have accepted valuation methods other than the before and after rule in partial acquisitions where necessary to reach a fair and practical result.[850] But in those unusual circumstances, as the Court of Claims warned, "[t]he particular evaluation approach utilized by a party in severance damage situations can sometimes serve to increase the burden it must

---

842  *United States v. 901.89 Acres of Land* (*Davenport*), 436 F.2d 395, 396 (6th Cir. 1970).

843  Agencies may need to instruct the appraiser to allocate the result of a before and after valuation between the value of the property being acquired, and damages (and/or benefits) to the remainder – for example, for negotiating purposes and/or to comply with agency obligations under the Uniform Act. *See* 42 U.S.C. § 4561(3). Such an allocation should be reported in a separate, supplemental report, rather than in the appraisal report of the market value of the property as a whole. *Cf. United States v. Grizzard*, 219 U.S. 180, 185-86 (1911) ("That the [fact-finder allocated] the damages for the land and for the easement of access separately is not controlling. The determining factor was that the value of that part of the Grizzard farm not taken was $1,500, when the value of the entire place before the taking was $3,000. . . . Judgment [of $1,500] affirmed.").

844  *United States v. Fuller*, 409 U.S. 488, 492 (1973).

845  *Id.* (quoting *United States v. Miller*, 317 U.S. 369, 374, 375 (1943); *see also United States v. 320 Acres of Land*, 605 F.2d 762, 781-89 (5th Cir. 1979) (exploring history and underlying principles of scope of the project rule and treatment of benefits due to government project).

846  *Miller*, 317 U.S. at 375.

847  *United States v. Reynolds*, 397 U.S. 14, 21 (1970); *320 Acres*, 605 F.2d at 796; *see generally* Section 4.5.

848  *See Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 336-37 (1980) (per curiam); *cf. United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 632 (1961) (before and after method is "an acceptable method of appraisal, indeed the conventional method"). As noted, the Fifth Circuit "requires the exclusive use of the before-and-after method of valuation." *United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 392, n.5 (5th Cir. 1982); *see United States v. 4.27 Acres*, 271 F. App'x 424, 425 (5th Cir. 2008).

849  *United States ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*, 40 F. Supp. 811, 818 (E.D. Tenn. 1941), *cited with approval in United States v. 2,847.58 Acres of Land in Bath Ctys.*, 529 F.2d 682, 686 (6th Cir. 1976).

850  *See, e.g., Ga.-Pac.*, 640 F.2d at 336-37 ("The approaches to severance damages herein represent practical efforts by the parties to reach valuation determinations in a very unique and complex set of circumstances."); *but see United States v. 33.92356 Acres of Land* (*Piza-Blondet*), 585 F.3d 1, 9 (1st Cir. 2009) (refusing alternative valuation method when there was "no persuasive reason why the before and after method would be unfair in assessing the value" in a partial taking).

carry in persuading that speculation and conjecture are not the essence of its presentation."[851]

### 4.6.4.1.    Taking Plus Damages (the "State Rule").

Many appraisers may be familiar with an alternative *taking plus damages* (or *taking + damages*) method for valuing partial acquisitions, also referred to as the state rule. Because the taking plus damages method is apt to "arrive at something else, either more or less, than compensation" under the Fifth Amendment,[852] it is generally improper in valuations for federal acquisition purposes, and cannot be used without **legal instruction** from the acquiring agency or the U.S. Department of Justice.[853]

The taking plus damages method lacks the "effectiveness of the before and after method in clearly and simply dealing with . . . damages" and benefits in partial acquisitions.[854] Moreover, as recognized by the federal courts, the taking plus damages method is subject to error and apt to result in improper duplication or *double damage*.[855] As a result, the taking plus damages method is generally improper in valuations for federal acquisitions: "It is not compensation but more than compensation to twice give the owner severance damage."[856] For example, the Fourth Circuit[857] was forced to vacate a compensation award based on a taking plus damages calculation that was nearly four times greater than

> Some assignments may require *allocation* of the difference in the property's value before and after acquisition, between (1) the part acquired and (2) damage to the remainder, to meet agency obligations under the Uniform Act, 42 U.S.C. § 4561(3).
>
> This accounting exercise is not an exception to the federal rule that partial acquisitions must be valued using the before and after method.
>
> Any allocations must be clearly labeled as <u>accounting tabulations</u> that do not indicate the appraisal method(s) employed.

---

851  *Ga.-Pac.*, 640 F.2d at 337; *see United States ex rel. Tenn. Valley Auth. v. Robertson*, 354 F.2d 877, 880-81 (5th Cir. 1966) ("[Elements] which make the property less desirable and thus diminish the market value of the property are proper to be considered, though as a separate item of damage might be too speculative and conjectural to be submitted . . . ."); *see also United States v. Honolulu Plantation Co.*, 182 F.2d 172, 179 (9th Cir. 1950) ("[S]trict proof of the loss in market value to the remaining parcel is obligatory.").

852  *Indian Creek Marble Co.*, 40 F. Supp. at 818.

853  *See Piza-Blondet*, 585 F.3d at 9 (refusing alternative valuation method when there was "no persuasive reason why the before and after method would be unfair in assessing the value"); *United States v. 12.94 Acres of Land in Solano Cty.*, No. CIV. S-07-2172, 2009 WL 4828749, at *5-*6, 2009 U.S. Dist LEXIS 114581, at *15-*21 (E.D. Cal. Dec. 9, 2009) (error to analyze value of the part taken separately from the total); *cf. United States v. Miller*, 317 U.S. 369, 375-76 (1943) (discussing "working rules" that have been "adopt[ed] in order to do substantial justice" in partial takings).

854  *Piza-Blondet*, 585 F.3d at 9 n.6 (citing 4A NICHOLS, THE LAW OF EMINENT DOMAIN § 14.02[4] (rev. 3d ed. 1981)); *United States v. 760.807 Acres of Land in Honolulu*, 731 F.2d 1443, 1445 (9th Cir. 1984) ("Using [the before and after] method, any diminution in value of the remainder resulting from the taking and use of part of the original parcel, sometimes termed 'severance damages,' would be included in the award."); *cf. United States v. 901.89 Acres of Land in Davidson & Rutherford Ctys. (Davenport)*, 436 F.2d 395, 399 (6th Cir. 1970) (reversing lower court's rejection of before and after valuation that reflected direct and special benefits to remainder after taking); *United States v. Werner*, 36 F.3d 1095, 1994 WL 507461, at *5 (4th Cir. 1994) (unpubl.) ("'[T]he taking may not affect the value of the remainder in any way [or] it may either damage or benefit the remainder. . . . In any such situation the measure of just compensation is the same, that is, the difference between the fair and reasonable market value of the land immediately before the taking and the fair and reasonable market value of the portion that remains after the taking.'" (alterations in original)).

855  *Indian Creek Marble Co.*, 40 F. Supp. at 818-19 ("the inevitable result would be that the land owner would twice receive incidental damages, either in cash compensation or partly in cash and partly in incidental benefits"); *see, e.g.*, EATON, *supra* note 16 at 32-33 (noting a "chronic and dangerous problem—double damage, i.e., the duplication of just compensation" and illustrating "how easy it is to double damage using the taking plus damages (state) rule").

856  *Indian Creek Marble Co.*, 40 F. Supp. at 818.

857  While the Fourth Circuit previously broke from other federal courts in adopting the taking plus damages method, it subsequently embraced the federal before and after rule, observing "it is well settled that in the event of a 'partial taking' . . . the measure of just compensation is the difference between the fair and reasonable market value of the land immediately before the taking and the fair and reasonable market value of the portion that remains after the taking." *United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 374, 378 (4th Cir. 1995); *cf. United States v. 97.19 Acres of Land*, 582 F.2d 878, 881 (4th Cir. 1978) ("this circuit measures damages as the fair market value of the parcel actually taken plus the severance damages, if any, to the portion of the tract retained by the landowner", *abrogated by Banisadr*, 65 F.3d at 378, *and United States v. 2.33 Acres of Land in Wake Cty.*, 704 F.2d 728, 730 (4th Cir. 1983), *as recognized in United States v. 0.39 Acres of Land*, No. 2:11-0259, 2013 WL 3874472, at *4 (S.D.W. Va. July 25, 2013).

the landowners' actual loss revealed by applying the before and after method to the same facts.[858] The court remanded for new proceedings "to the end that duplications in just compensation are eliminated."[859]

The taking plus damages method may be appropriate or even mandated in nonfederal acquisitions, as certain *state* laws offset benefits against "severance damage" to the remainder but not against the value of the part acquired, necessitating separate findings of "severance damage" and the value of the part acquired.[860] But federal law makes no such distinction,[861] recognizing that under the U.S. Constitution, just compensation turns on the question, "What has the owner lost? not, What has the taker gained?"[862] Based on this principle, under federal law, compensation must reflect "the effect of the appropriation of a part of a single parcel upon the remaining interest of the owner, by taking into account both the benefits which accrue and the depreciation which results to the remainder in its use and value."[863] The taking plus damages method was developed to measure a different question, and thus generally has no place in valuations for federal acquisition purposes.[864]

Still, there may be "persuasive reason[s] why the before and after method would be unfair in assessing the value" of a specific partial acquisition.[865] Whether the taking plus damages method can be relied on for federal just compensation purposes in a specific valuation assignment is a **legal determination**, not one that can be made by an appraiser.[866] For example, partial acquisitions affected by the federal navigational servitude may require use of a taking plus damages method due to the unique constitutional and statutory requirements governing compensation for such acquisitions.[867] The taking plus damages method may also be appropriate in certain minor partial acquisitions, such as acquisitions of easements or other minor interests for flowage or road purposes from large ranches or industrial complexes.[868] Whether a partial acquisition is sufficiently "minor" to make the taking plus damages method a fair and practical alternative to the before and after rule depends on the acquisition's impact *on the*

> **Whether the *taking plus damages* method can be used in a specific valuation assignment is a <u>legal determination</u> that cannot be made by an appraiser.**

---

858  *2.33 Acres*, 704 F.2d at 729-31. The vacated award valued the larger parcel before the taking at $296,870 and the remainder after the taking at $240,663, a difference of approximately $56,000, yet would have awarded total compensation in excess of $200,000. *See id.*

859  *Id.* at 731 ("Again the conclusion that the landowner was overcompensated . . . ineluctably follows."); *see also Indian Creek Marble Co.*, 40 F. Supp. at 818-19.

860  *See McCoy v. Union Elevated R.R. Co.*, 247 U.S. 354, 365 (1918); *Harris v. United States*, 205 F.2d 765, 767 (10th Cir. 1953) (distinguishing between federal and state constitutional provisions for just compensation); *cf.* Eaton, *supra* note 16, at 41-42 & nn.26-31 ("most authorities argue that the complexity of the state rule and its potential for double damages are so great that the before and after rule should be adopted").

861  Under federal law, "if the taking has in fact benefitted the remainder, the benefit may be set off against the value of the land taken." *United States v. Miller*, 317 U.S. 369, 376 (1943); *Bauman v. Ross*, 167 U.S. 548, 584 (1897).

862  *Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910), quoted in *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 236 (2003); *Bauman*, 167 U.S. at 574.

863  *United States v. Grizzard*, 219 U.S. 180, 184-85 (1911).

864  *See Indian Creek Marble Co.*, 40 F. Supp. at 819 (state rule method of determining "so-called compensation is and must be grounded upon . . . an artificial measure based upon neither justice nor the settled conception of the meaning of the word 'compensation'"); *cf.* Eaton, *supra* note 16, at 40-43 ("The state rule is generally used in jurisdictions that do not allow benefits to be set off against the value of the part taken and/or damages.").

865  *See United States v. 33.92356 Acres of Land (Piza-Blondet)*, 585 F.3d 1, 9-10 (1st Cir. 2009); *cf. Miller*, 317 U.S. at 375-76 (recognizing need to "adopt working rules in order to do substantial justice" in measuring compensation for partial takings).

866  *Piza-Blondet*, 585 F.3d at 9 (refusing alternative valuation method when there was "no persuasive reason why the before and after method would be unfair in assessing the value"); *Ga.-Pac. Corp. v. United States*, 226 Ct. Cl. 95, 107, 640 F.2d 328, 336-37 (1980) (per curiam); *United States v. 12.94 Acres of Land in Solano Cty.*, No. CIV. S-07-2172, 2009 WL 4828749, at *5-*6, 2009 U.S. Dist. LEXIS 114531, at *15-*17 (E.D. Cal. Dec. 9, 2009) (error to analyze value of the part taken separately from the total).

867  *See* Section 4.11.1.

868  *See, e.g., Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 336-37 (1980) (per curiam).

*owner's property.*[869] As a result, use of the taking plus damages method is generally limited to acquisitions that cause *no damage to the remainder*. If the "usefulness and value of the remainder" are or may be affected, however,

> [t]o say that such an owner would be compensated by paying him only for the narrow strip actually appropriated, and leaving out of consideration the depreciation to the remaining land by the manner in which the part was taken, and the use to which it was put, would be a travesty upon justice.[870]

**4.6.5.   Easement Valuation Issues.** In general terms, an <u>easement</u> is a limited right to use or control land owned by another for specified purposes.[871] An easement is a property interest less than the fee estate, with the owner of the underlying fee (the <u>servient estate</u>) retaining full dominion over the realty, subject only to the easement (the <u>dominant estate</u>); the fee owner may make any use of the realty that does not interfere with the easement holder's reasonable use of the easement and is not specifically excluded by the terms of the easement.

**In easement acquisitions, the agency must provide the appraiser with a written description of the precise estate(s) being acquired. There is no "generic" road easement, conservation easement, or any other type of easement.**

Easements are either appurtenant or in gross. An <u>appurtenant easement</u> benefits another tract of land, and typically is useful only in conjunction with other property but has no independent utility—for example, a highway access easement for adjacent land. An <u>easement in gross</u> benefits a person or entity, and typically has utility in and of itself or in conjunction with other easements—such as a continuous easement across multiple tracts of land, forming a right of way.

Federal acquisitions involve a wide variety of easements, including road, pipeline, transmission line, levee, flowage, clearance, avigation, scenic, conservation, tunnel, sewer line, construction, access, and safety zone easements, among others.[872] Easements may be permanent (perpetual) or temporary.[873]

Easement-related valuation problems typically arise in federal acquisitions in one of three scenarios: (1) direct acquisition of an easement—that is, a *dominant easement interest*—and its resulting impact on the value of the larger parcel; (2) acquisition of a *servient estate* encumbered by an existing (dominant) easement; or (3) acquisition that *affects or extinguishes an existing easement benefitting another*

**A <u>dual-premise appraisal</u> may be useful to evaluate how acquisitions of various partial interests affect market value.**

---

869   *See United States v. Grizzard*, 219 U.S. 180, 184 (1911) ("'just compensation' . . . obviously requires that the recompense to the owner for the loss caused to him by the taking of a part of a parcel, or single tract of land, shall be measured by the loss resulting to him from the appropriation"); *Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910) ("What has the owner lost? not, What has the taker gained?"); *cf. Miller*, 317 U.S. at 375 ("Since the owner is to receive no more than indemnity for his loss, his award cannot be enhanced by any gain to the taker.").

870   *Grizzard*, 219 U.S. at 184, 185-86.

871   Black's Law Dictionary defines an easement as "[a]n interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose . . . ." *Easement*, Black's Law Dictionary (10th ed. 2014).

872   Easements that affect or relate to riparian uses—such as flowage, levee or irrigation easements—may raise special valuation issues due to the United States' dominant navigational servitude. *See* Section 4.11.1; *cf. Weatherford v. United States*, 606 F.2d 851 (9th Cir. 1979).

873   *See* Section 4.7; *cf. Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 517-19 (2012).

*parcel* (the affected easement may be *appurtenant* or *in gross*). In each scenario addressed below, the effect of the easement must be analyzed to reach a supported opinion of value.

As discussed in Section 4.1.4, the nature and extent of the easement (or any other interest in property) being acquired will be determined by the agency, as delegated by Congress. In easement acquisitions, this means the agency must carefully and precisely define the property interest(s) being acquired and expressly state what interest(s), if any, will remain with the landowner.[874] As the Supreme Court held, if the terms of the easement being acquired are unclear, "it would be premature for us to consider whether the amount of the award . . . was proper."[875]

### 4.6.5.1.   Dominant Easement Interests.

Compensation for the acquisition of a dominant easement interest is measured by "the difference in the value of the servient land before and after the Government's easement was imposed."[876] Accordingly, federal acquisitions of dominant easement interests must be valued using a before and after methodology, reflecting compensable damage and special (direct) benefits to the remainder, as with all other partial acquisitions.[877]

If an acquisition imposes an easement upon an entire ownership, there is a remainder estate in the land within the easement.[878] If the easement is impressed upon less than the full area of the larger parcel, the remainder will also include the portion of the parcel outside the easement.[879] In either setting, it is well established that "[t]he valuation of an easement upon the basis of its destructive impact upon other uses of the servient fee is a universally accepted method of determining worth."[880] Accordingly, in a valuation involving acquisition of a dominant easement, the appraiser must clearly understand the specific terms of the easement involved to analyze the burden the easement imposes on the servient estate and the resulting impact on the value of the affected land.[881] As the Sixth Circuit observed, "for the commissioners to determine the 'before and after' value of the land, it was necessary that they clearly understood what rights the landowner would retain in the land subject to the easement."[882]

---

874  *Compare United States v. 3,218.9 Acres of Land in Warren Cty.*, 619 F.2d 288, 289-91 (3d Cir. 1980) (noting "explicit" description of "the nature of the estate to be taken" and "clear" language that "third party mineral rights are not intended to be affected"), *with United States v. City of Tacoma*, 330 F.2d 153, 155-56 (9th Cir. 1964) (reversing judgment of compensation that did not resolve "the nature of the easement taken," as leaving "this critical issue undecided" was detrimental to both the United States and the landowner).

875  *United States v. Causby*, 328 U.S. 256, 268 (1946); *see City of Tacoma*, 330 F.2d at 155-56.

876  *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 626 n.2, 632 (1961); *Dugan v. Rank*, 372 U.S. 609, 626 (1963).

877  *Va. Elec.*, 365 U.S. at 632; *Rasmuson v. United States*, 807 F.3d 1343, 1345 (Fed. Cir. 2015); *United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 392 (5th Cir. 1982); *United States v. 38.60 Acres of Land in Henry Cty.*, 625 F.2d 196, 198-99 (8th Cir. 1980); *Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15, 21 (5th Cir. 1969); *see United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 374 (4th Cir. 1995).

878  *E.g.*, *United States v. 68.94 Acres of Land in Kent Cty.*, 918 F.2d 389 (3d Cir. 1990).

879  *E.g.*, *United States v. 38.60 Acres of Land*, 625 F.2d 196 (8th Cir. 1980); *Transwestern Pipeline*, 418 F.2d 15.

880  *Va. Elec.*, 365 U.S. at 630; *see 68.94 Acres*, 918 F.2d at 393 n.3; *38.60 Acres*, 625 F.2d at 198 & n.1; *Transwestern Pipeline*, 418 F.2d at 21.

881  *United States v. Causby*, 328 U.S. 256, 268 (1946) ("Since . . . it is not clear whether the easement taken is a permanent or a temporary one, it would be premature for us to consider whether the amount of the award . . . was proper.").

882  *Evans v. Tenn. Valley Auth.*, 922 F.2d 841, 1991 WL 1113, at *2 (6th Cir. 1991) (unpubl.) (discussing *United States ex rel. Tenn. Valley Auth. v. An Easement & Right-of-Way*, 182 F. Supp. 899 (M.D. Tenn. 1960)); *cf. Monongahela Nav. Co. v. United States*, 148 U.S. 312, 344 (1893) ("doubtless the existence of [a] reserved right to take the property upon certain specified terms may often, and perhaps in the present case, materially affect the question of value").

For example, consider the acquisition of an easement with the right "to cut and remove any and all trees now or hereafter growing" alongside a right of way.[883] To develop an opinion of market value, the appraiser must understand whether or not the tree-cutting privilege is "coupled with liability for future cuttings" under the terms of the easement:[884]

> It is conceivable that the market value of [remainder] land would vary as between the alternatives. . . . What difference would the choice make to a prospective purchaser? What difference would it make in the market value of the land? . . . [S]peculative damages need not be considered, except as an estimate of them might affect market value.[885]

A district court explained these considerations as follows:

> The question is, how does the easement affect the market price of the property? Here again we have the willing and intelligent buyer and seller, neither acting under compulsion. They agree upon a price before the easement is imposed.

> But before the sale is closed the easement is imposed. They meet again, both willing to deal on the basis, of course, of the fair market value. But the situation is changed in one particular—the imposition of the easement or easements. The question is, how does the changed situation affect the market price?

> The willing prospective buyer examines the instrument creating the outstanding easement as to its terms, whether it is perpetual; to what extent does it limit the use of the servient estate, and what are the maximum uses granted by the instrument? All in all, how much less valuable do the outstanding easements make the whole property?[886]

Federal courts have rejected other methods for valuing dominant easement interests—even though those methods may be accepted in other settings—because they do not reflect just compensation under the Fifth Amendment.[887] Thus, where only an easement is acquired, the full fee value of the land within the easement is not a proper measure of damages since the rights remaining in the owners of the servient estate may be substantial.[888] Moreover, valuing only the area subject to the easement (i.e. "strip valuation") fails to "compar[e] the fair market value of the *entire* tract affected by the taking before and after the taking . . . [that is] the correct measure of value in federal court condemnation."[889]

---

883  Similar easements are acquired to remove "danger trees" near high-voltage transmission lines, where they can present potentially serious hazards. *See, e.g., Evans*, 1991 WL 1113, at *2 n.2.

884  *United States ex rel. Tenn. Valley Auth. v. Russell*, 87 F. Supp. 386, 389 (E.D. Tenn. 1948).

885  *Id.* (citing *Olson v. United States*, 292 U.S. 246 (1934)); *cf. Monongahela Nav.*, 148 U.S. at 344 (existence of a reserved right in property may often materially affect value).

886  *United States ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*, 40 F. Supp. 811, 821 (E.D. Tenn. 1941), *cited with approval in United States v. 2,847.58 Acres of Land*, 529 F.2d 682, 686 (6th Cir. 1976).

887  *E.g., Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15, 21 (5th Cir. 1969); *see United States v. 33.92356 Acres of Land (Piza-Blondet)*, 585 F.3d 1, 4, 9-10 (1st Cir. 2009); *Calvo v. United States*, 303 F.2d 902, 909 (9th Cir. 1962); *United States v. Glanat Realty Corp.*, 276 F.2d 264, 265 (2d Cir. 1960).

888  *E.g., United States v. An Easement & Right-of-Way Over Two Strips of Land*, 284 F. Supp. 71, 73 (W.D. Ky. 1968), citing *United States v. Cress*, 243 U.S. 316, 328-29 (1917) ("If any substantial enjoyment of the land still remains to the owner . . . . less than the whole has been taken and is to be paid for . . . ."), *discussed in Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 518-20 (2012); *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 633-35 (1961); *see United States v. Grizzard*, 219 U.S. 180, 185-86 (1911).

889  *Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15, 21 (5th Cir. 1969) (emphasis added); *Grizzard*, 219 U.S. at 185-86.

**4.6.5.1.1. "Going Rates" and Nonmarket Considerations.** For some types of easements, such as for electric, telephone, fiber optics, cable, transmission line, or pipeline purposes, there may be a customary "going rate" (per pole, per line-mile, or per rod, for example). But while customary rates may offer a convenient pricing system in other settings, going rates cannot be used as a proxy for market value in federal acquisitions requiring payment of just compensation.[890] Going rates tend to reflect non-compensable considerations above the market value of the property acquired, such as avoiding the cost of condemnation or other litigation, and economic pressures to complete construction and place the planned facility or infrastructure in operation. As the Fifth Circuit recognized, "consideration of the expense and lost motion involved in relocation, additional construction, pipe and material costs and delay—none of which relate to the fair market value—are inevitably involved."[891] Amid such nonmarket considerations, "[t]here is no basis for translating a dollar per rod settlement figure into a market value per acre figure."[892] Moreover, the use of a "going rate" improperly assumes the easement acquired is a separate economic unit to be valued based on the government's planned use of the property—assumptions the federal courts reject as improper.[893] For these reasons, appraisals of easements for federal acquisitions cannot be based upon going rates but rather must be based upon the accepted before and after appraisal method.[894]

**4.6.5.1.2. Temporary Easements.** For temporary easements, like other temporary acquisitions, compensation is measured by the <u>market rental value</u> for the term of the easement, adjusted as may be appropriate for the rights of use, if any, reserved to the owner.[895] Federal courts apply this measure even to acquisitions of temporary property interests that are "seldom exchanged."[896] "After all, what . . . is required . . . is to determine the figure which would compensate [the landowner] for the loss it suffered by being deprived of this property for this period of time."[897]

**4.6.5.1.3. Sale or Disposal of Easements.** Although the before and after method of valuation is required by these Standards when the government *acquires* easements,[898] use of the before and after method of valuation is not required when the government sells or otherwise *disposes* of an easement interest. In disposing of easement interests, agencies are therefore free to consider the value of the easement to the acquirer, customary "going rates" or other measures, as well as the diminution to the government's property by reason of the encumbrance.

---

890   *Cf. Olson v. United States*, 292 U.S. 246, 256-57 (1934); *Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 408-10 (1878). These Standards do not prohibit consideration of customary going rates in federal *disposals* of easement interests. *See* Section 4.6.5.1.3.

891   *Transwestern Pipeline*, 418 F.2d at 18; *see also United States v. 10.48 Acres of Land*, 621 F.2d 338, 339 (9th Cir. 1980) (prices paid by entity with condemnation authority to acquire easements "are in the nature of compromise to avoid the expense and uncertainty of litigation and are not fair indications of market value").

892   *Transwestern Pipeline*, 418 F.2d at 18.

893   *E.g., United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 392 (5th Cir. 1982); *see Etalook v. Exxon Pipeline Co.*, 831 F.2d 1440, 1447 n.4 (9th Cir. 1987) ("improperly attributes to the tract an increase in value caused by the very improvements for which condemnation was sought"), citing *United States v. 320 Acres of Land*, 605 F.2d 762, 811-20 (5th Cir. 1979); *cf. United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 633 (1961) ("no evidence of a market in flowage easements of the type here involved").

894   *8.41 Acres in Orange*, 680 F.2d at 392.

895   *See Kimball Laundry Co. v. United States*, 338 U.S. 1, 7 (1949) ("[T]he proper measure of compensation [in a temporary taking] is the rental that probably could have been obtained . . . ."); Section 4.7; *cf. United States v. 883.89 Acres of Land in Sebastian Cty.*, 442 F.2d 262, 265 (8th Cir. 1971), *aff'g* 314 F. Supp. 238 (W.D. Ark. 1970) ("The comparable sales of other leaseholds in the immediate area were adequate and substantial evidence of the market value of this leasehold.").

896   *E.g., Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577, 1582 (Fed. Cir. 1990).

897   *See United States v. Michoud Indus. Facilities*, 322 F.2d 698, 707 (5th Cir. 1963).

898   *See Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910) ("[T]he question is, What has the owner lost? not, What has the taker gained?").

**4.6.5.2.** **Lands Encumbered by Easements.** In federal acquisitions of property already encumbered by an easement, the appraiser must value the property in light of the preexisting easement—and not as an unencumbered fee.[899] As the Supreme Court held:

> [T]he Constitution does not require a disregard of the mode of ownership—of the state of the title. It does not require a parcel of land to be valued as an unencumbered whole when it is not held as an unencumbered whole. It merely requires that an owner of property taken should be paid for what is taken from him. It deals with persons, not with tracts of land. And the question is what has the owner lost,? not What has the taker gained?[900]

As a result, it is improper to disregard preexisting encumbrances and their impact on the property, as "there is 'no justice in (requiring the Government to pay) for a loss suffered by no one in fact.'"[901] In a <u>total acquisition</u> of property encumbered by a preexisting easement, the measure of compensation is the market value of the property as encumbered.[902] In a <u>partial acquisition</u> of property encumbered by a preexisting easement, the measure of compensation is the difference between the market value of the property as encumbered before the acquisition, and the market value of the remainder property—subject to the preexisting *and* newly acquired easements—after acquisition.[903] Regarding an appraiser who misunderstood the nature and extent of the interests being acquired and failed to consider preexisting encumbrances, one court held, "his appraisals and estimates of damage are largely, if not entirely, based upon unwarranted and unjustified theories of law and assumptions of fact and, as such, must be completely rejected . . . ."[904]

Appraisals must "take into account all encumbrances on the land" as the question is "the fair market [value] of what the [landowners] had left . . . ."[905] Depending on the nature of the preexisting and newly acquired easements, the difference in market value may be nominal.[906]

**4.6.5.3.** **Appurtenant Easements to the Servient Estate.** Slightly different valuation issues arise when the United States' acquisition of a servient estate also acquires or extinguishes a third party's appurtenant easement; for example, in a fee acquisition of Owner A's parcel through which Owner B has an access easement to connect B's other property to a highway. In such an acquisition, Owner A is entitled to compensation for "what the owner has lost"—i.e., the encumbered fee.[907] And Owner B, "the owner of a condemned access easement[,] is entitled to

> **Legal instruction is required for any departure from the unit rule, as the rule's application is a matter of law that cannot be determined by an appraiser.**

---

899  *United States v. 765.56 Acres of Land in Southampton* (<u>765.56 Acres I</u>), 164 F. Supp. 942, 946, 948 (E.D.N.Y. 1958), *aff'd sub nom. United States v. Glanat Realty Corp.*, 276 F.2d 264, 267 (2d Cir. 1960); *see also United States v. 765.56 Acres of Land in Southampton* (<u>765.56 Acres II</u>), 174 F. Supp. 1, 10 (E.D.N.Y. 1959), *aff'd sub nom. Glanat Realty*, 276 F.2d 264.
900  *Bos. Chamber of Commerce*, 217 U.S. at 195.
901  *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 642 (1961) (Whittaker, J., dissenting) (quoting *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 76 (1913)).
902  *Cf. Nebraska v. United States*, 164 F.2d 866, 869 (8th Cir. 1947), *cert. denied*, 334 U.S. 815 (1948) (no compensation for "a diminution in the market value of the [landowner's] rights through the creation of a leasehold, easement, or other interest in the land by the [landowner's] own acts" preceding United States' acquisition; *United States v. 32.42 Acres of Land*, No. 05cv1137 DMS, 2009 WL 2424303 (S.D. Cal. Aug. 6, 2009) (measure of compensation for acquisition of leased fee excluding existing leasehold is market value of lessor's reversionary leased-fee interest).
903  *See, e.g., United States v. 3.6 Acres of Land in Spokane Cty.*, 395 F. Supp. 2d 982 (E.D. Wash. 2004); *765.56 Acres I*, 164 F. Supp. at 945-47.
904  *765.56 Acres I*, 164 F. Supp. at 948.
905  *United States v. 79.20 Acres of Land in Stoddard Cty.*, 710 F.2d 1352, 1355 (8th Cir. 1983).
906  *E.g., 3.6 Acres*, 395 F. Supp. 2d at 992 (finding $1.00 was just compensation for acquisition of easement that did not exceed preexisting easement).
907  *Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910); *79.20 Acres in Stoddard*, 710 F.2d at 1354-55.

compensation for the diminution in value of the property which it serves.'"[908] In such instances, departure from the <u>unit rule</u> "may be necessary to avoid grossly unjust results[,]"[909] as the usual valuation of the property as an <u>undivided fee</u> would not result in just compensation.[910]

The federal courts' solution to this valuation challenge reflects "[t]he guiding principle of just compensation . . . that the *owner* of the condemned property 'must be made whole but is not entitled to more.'" [911] Acquisitions of this sort involve two larger parcels and require two appraisal assignments:

- <u>To measure compensation for Owner A</u>, one appraisal must develop an opinion of the value of the *encumbered fee* (discussed in Section 4.6.5.2), "tak[ing] into account all encumbrances on the land."[912] This is because "the Constitution does not require a disregard of the mode of ownership,—of the state of the title."[913] Just compensation will not result if a parcel of land is "valued as an unencumbered whole when it is not held as an unencumbered whole."[914] The appraisal of the encumbered fee may require a before and after valuation if the acquisition is only a portion of a *larger parcel*.[915]

- <u>To measure compensation for Owner B</u>, another appraisal must develop an opinion of the value of the *appurtenant easement* (discussed in Section 4.6.5.1), which "cannot be ascertained without reference to the dominant estate to which it was attached."[916] As a partial acquisition, the before and after rule applies, so the appraiser must develop an opinion of the value of the property served by the easement before (with the easement) and after (without the easement) the government's acquisition.[917] The difference between the before and after values is the measure of compensation.

In neither appraisal will the appraiser develop an opinion of the market value of the property as if unencumbered. The value of the undivided fee is simply not relevant to compensation for such peculiar acquisitions, as the Fourth Circuit reasoned:

908  *United States v. 57.09 Acres of Land in Skamania Cty.* (*Peterson I*), 706 F.2d 280, 281 (9th Cir. 1983), citing *United States v. Grizzard*, 219 U.S. 180 (1911), *and United States v. Welch*, 217 U.S. 333, 339 (1910) ("the value of the easement cannot be ascertained without reference to the dominant estate to which it was attached").

909  *United States v. 6.45 Acres of Land* (*Gettysburg Tower*), 409 F.3d 139, 148 (3d Cir. 2005); *cf. United States v. 499.472 Acres of Land in Brazoria Cty.*, 701 F.2d 545, 552 (5th Cir. 1983) (emphasizing that "limited" holding to permit separate valuations in particular condemnation did not "sanction any departure from valuation of condemned property as a unit" and "simply acknowledges that there are rare circumstances where separate trials are justified").

910  *See* Section 4.2.2 (The Unit Rule); *Grizzard*, 219 U.S. at 184-85 ("[J]ustice . . . required that regard be had to the effect of the appropriation of a part of a single parcel upon the remaining interest of the owner, by taking into account both the benefits which accrue and the depreciation which results to the remainder in its use and value."); *Bos. Chamber*, 217 U.S. at 194-95 (The government cannot "be made to pay for a loss of theoretical creation, suffered by no one in fact. . . . [The] Constitution does not require a disregard of the mode of ownership . . . ."); *see also Gettysburg Tower*, 409 F.3d at 145-48 & nn.11-15 (analyzing unit rule principle and rare exceptions and citing cases).

911  *United States v. 564.54 Acres of Land* (*Lutheran Synod*), 441 U.S. 506, 516 (1979) (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)); *see Gettysburg Tower*, 409 F.3d at 145-46 & nn.11-12.

912  *79.20 Acres in Stoddard*, 710 F.2d at 1355.

913  *Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910).

914  *Id.*

915  *See* Section 4.5.1; *see generally* Eaton, *supra* note 16, at 365-68.

916  *United States v. Welch*, 217 U.S. 333, 339 (1910).

917  *United States v. Grizzard*, 219 U.S. 180, 184-85 (1911); *United States v. 57.09 Acres of Land in Skamania Cty.* (*Peterson I*), 706 F.2d 280, 281 (9th Cir. 1983).

[W]ith property whose use is divided, . . . the compensation to be paid to any one whose interest is taken must be reckoned by the value of the use to which he is entitled and not by the value which the land, if unencumbered, would have.[918]

Moreover, as the Fourth Circuit recognized, while the "sum of these values may at times approximate the value of the unencumbered fee[,]" it may be "much less. Indeed, the sum of these values may be only nominal."[919]

### 4.7. Leaseholds and Other Temporary Acquisitions.

**4.7.** **Leaseholds and Other Temporary Acquisitions.** When the government acquires a leasehold or other temporary interest in property, the measure of compensation is the <u>market rental value</u> of the premises acquired for the term acquired.[920]

> ### Definition of Market Rental Value
> The rental price in cash or its equivalent that the leasehold would have brought on the date of value on the open competitive market, at or near the location of the property acquired, assuming reasonable time to find a tenant.

As with <u>market value</u>, the federal definition of *market rental value*[921] requires willing and reasonably knowledgeable market participants, not compelled to buy or sell, giving due consideration to all available economic uses of the property.[922] Temporary acquisitions also require a rigorous, well-supported analysis of highest and best use—as in permanent acquisitions.[923] As a district court recently held, "only direct evidence of market rental value, to the exclusion of remote, hypothetical conjecture, should be considered in ascertaining just compensation for a taking."[924] In keeping with the <u>unit rule</u> (Section 4.2.2), market rental value must be determined for the

---

918 *Mayor & City Council of Baltimore v. United States*, 147 F.2d 786, 789 (4th Cir. 1945).

919 *Id.*

920 *Kimball Laundry Co. v. United States*, 338 U.S. 1, 7 (1949); *United States v. Gen. Motors Corp.*, 323 U.S. 373, 382-83 (1945); *United States v. Petty Motor Co.*, 327 U.S. 372, 378-79 (1946); *United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 374, 378 (4th Cir. 1995); *Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577, 1580-81 (Fed. Cir. 1990).

921 *Kimball Laundry*, 338 U.S. at 7; *Gen. Motors*, 323 U.S. at 382-383; *Banisadr*, 65 F.3d at 378; *United States v. 46,672.96 Acres in Doña Ana Ctys.*, 521 F.2d 13, 17-18 (10th Cir. 1975); *United States v. 1735 N. Lynn St.*, 676 F. Supp. 693, 706 (E.D. Va. 1987); *see First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 319 (1987) ("[T]he Just Compensation Clause of the Fifth Amendment requires that the government pay the landowner for the value of the use of the land during this period."); *Carlock v. United States*, 60 App. D.C. 314, 315-16 (D.C. Cir. 1931) ("The present money value of a leasehold interest is the present market value of the residue of the term yet to run with reference to the most valuable use or uses to which the same may be lawfully put; that is, what would be its present money worth over and above the obligations of the lease, to an assignee or purchaser willing and able to assume and perform the obligation of the lease for the residue of the term after the return of the award."); *cf. 46,672.96 Acres in Doña Ana*, 521 F.2d 13, 17-18 (10th Cir. 1975) ("[T]he evidence offered must have a bearing upon what a willing buyer would pay a willing seller for the property on the date of the taking. . . . [W]e are here concerned with leasehold interests and . . . the amount of the award . . . must bear a realistic relationship to reasonable market value.").

922 *Kimball Laundry*, 338 U.S. at 7 ("[D]etermination of the value of temporary occupancy can be approached only on the supposition that free bargaining between petitioner and a hypothetical lessee of that temporary interest would have taken place in the usual framework of such negotiations."); *cf.* Section 4.2.1 (Market Value Definition).

923 *E.g.*, *Banisadr*, 65 F.3d at 378 (affirming finding that highest and best use of building was for regular office space at low-end rent based on detailed analysis of leases on several comparable buildings, rather than for specialized high-tech use, which lacked any supporting data).

924 *United States v. 131,675 Rentable Square Feet of Space (GSA-VA St. Louis I)*, No. 4:14-cv-1077, slip op. at *9, 2015 WL 4430134 (E.D. Mo. July 20, 2015) (citing *Olson v. United States*, 292 U.S. 246, 257 (1934)).

property as an unencumbered whole, regardless of any sub-leases or other subsidiary interests into which it may have been divided.[925]

The measure of compensation for temporary acquisitions rarely arose in federal jurisprudence until the World War II era, when war-time exigencies prompted condemnations of leaseholds and other temporary interests.[926] As Justice Reed observed in 1951, "[t]he relatively new technique of temporary taking . . . is a most useful administrative device[,]" allowing for properties to be occupied for public uses "for a short time to meet war or emergency needs," and then "returned to their owners."[927] But temporary acquisitions present "a host of difficult problems . . . in the fixing of just compensation."[928] Of these valuation problems, perhaps the most frequently encountered arise in the context of federal leasehold acquisitions—particularly leaseholds of office space.

### 4.7.1.    Leaseholds.

As in appraising a fee estate, the best evidence of the market rental value of a leasehold estate is comparable transactions—for leaseholds, comparable lease transactions.[929] As the Eighth Circuit stated, "comparable sales of other leaseholds in the immediate area [a]re adequate and substantial evidence of the market value of this leasehold."[930] Generally, "the more comparable a sale is, the more probative it will be" of the market value of the property being appraised.[931] Elements of comparability in leasehold valuations include the familiar elements of size, time, location, and so forth (discussed in Section 4.4.2),[932] as well as the period (term) of the lease (e.g., six months, one year, five years, etc.),[933] the number and terms

> A **lease** is a contract arrangement in which an owner (**landlord** or **lessor**) conveys to another (**tenant** or **lessee**) the rights to use and occupy property for a period of time in exchange for payment.
>
> During the lease, the tenant/lessee owns a possessory interest called the **leasehold estate,** and the landlord/lessor owns the remaining interest, called the **leased fee estate.**

---

925   *See Carlock*, 53 F.2d at 927; *A.G. Davis Ice Co. v. United States*, 362 F.2d 934, 937 (1st Cir. 1966); *see also Autozone Dev. Corp. v. District of Columbia*, 484 F. Supp. 2d 24, 31 (D.D.C. 2007) ("Put simply, when all of the interests in a land are condemned, the total amount paid by the condemning authority to everyone with an interest should not be more than the amount it would pay if only one person owned the land." (discussing *Carlock*).

If the government's acquisition will interrupt or extinguish an existing lease of the property, the lessee's compensation (if any) is a question of distribution, not of valuation, and therefore generally beyond the scope of the appraiser's assignment. Thus, under these Standards the appraiser should not separately value a third-party leasehold estate unless specifically instructed to do so—for example, if needed for negotiating purposes and/or to comply with agency obligations under the Uniform Act. Similarly, the appraiser should not apportion values of subsidiary interests unless instructed. *See* Section 4.2.2; *cf. United States v. Rodgers*, 461 U.S. 677, 704-05 & n.33 (1983) (noting challenges of apportioning compensation in eminent domain proceedings involving subsidiary homestead or life-estate interests, and citing cases); *Pa. Ave. Dev. Corp. v. One Parcel of Land in D.C.*, 670 F.2d 289, 292 (D.C. Cir. 1981) ("Under most leases, allocation of the award between lessor and lessee is not problematical because 'leases generally include a clause which makes them terminate in case of condemnation.'").

926   E.g., *United States v. Westinghouse Elec. & Mfg. Co.*, 339 U.S. 261 (1950); *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949); *United States v. Petty Motor Co.*, 327 U.S. 372 (1946); *United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945); *see* Ark. Game & Fish Comm'n v. United States, 133 S. Ct. 511, 519-520 (2012); *United States v. 1735 N. Lynn St.*, 676 F. Supp. 696-97 (E.D. Va. 1987); *United States v. Flood Bldg.*, 157 F. Supp. 438, 440-42 (N.D. Cal. 1957).

927   *United States v. Pewee Coal Co.*, 341 U.S. 114, 119 (1951) (Reed, J., concurring).

928   *Id.*

929   *United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 374, 378 (4th Cir. 1995); *United States v. 883.89 Acres of Land in Sebastian Cty.*, 442 F.2d 262, 265 (8th Cir. 1971), *aff'g* 314 F. Supp. 238 (W.D. Ark. 1970).

930   *883.89 Acres in Sebastian*, 442 F.2d at 265. Note that the term *sale* refers to a transaction involving the property interest at issue – here, a leasehold. *Id.*

931   *United States v. 320 Acres of Land*, 605 F.2d 762, 798 (5th Cir. 1979); *United States v. 46,672.96 Acres of Land in Doña Ana Ctys.*, 521 F.2d 13, 17 (10th Cir. 1975).

932   *See, e.g., 883.89 Acres in Sebastian*, 442 F.2d at 265.

933   *See United States v. Gen. Motors Corp.*, 323 U.S. 373, 382 (1945) (long-term rental value did not reflect market rental value of short-term occupancy of same space); *see also 46,672.96 Acres in Doña Ana*, 521 F.2d at 17 ("A further reason for rejecting the [proposed comparable] lease evidence is that these interests are dissimilar to the interest [being valued].").

of any option(s) to renew,[934] tenant build-out,[935] and the nature and extent of services provided by the lessor and/or the lessee.[936] Section 1.6 notes several terms and services in government leases that often differ from those typically encountered in the market and therefore require careful adjustment. All terms must be evaluated in regard to the market rental value of the space in the open, competitive market.[937] In no event can the market rental value reflect the government's special need for the property or the risk that the government may exercise the power of eminent domain at some future point.[938]

The period of the leasehold being acquired may require careful consideration. For example, as the Supreme Court recognized in *United States v. General Motors Corp.*, if a short-term occupancy is being acquired, its market rental value may not be accurately reflected by the long-term market rental value of the same space.[939] Rather, the market rental value of the short-term occupancy "is to be ascertained, not treating what is taken as an empty warehouse to be leased for the long term, but what would be the market rental value of such a building on a lease by the long-term tenant to the temporary occupier."[940]

It is improper to develop an opinion of the market rental value of a leasehold estate based on the value of the underlying fee—that is, a percentage-of-fee value method.[941] Among other problems, this method (1) does not reflect how rental rates are established in the market;[942] (2) assumes full utilization of—and payment for—all leasable space, regardless of existing supply and demand in the competitive market;[943] and (3) relies on a supposed return on value or a return on an owner's investment, rather than market value.[944] As a result, use of a percentage-of-fee-value method can lead to "gross over-valuation" of a leasehold interest.[945] Moreover, federal courts have rejected percentage-of-fee-value methods even if comparable lease transactions are not available.[946] In

---

934   *See United States v. 131,675 Rentable Square Feet of Space (GSA-VA St. Louis I)*, No. 4:14-cv-1077, slip op. at *10, 2015 WL 4430134 (E.D. Mo. July 20, 2015) (condemned leasehold interest contained no option to renew, holdover, or terminate early); *see also 883.89 Acres in Sebastian*, 442 F.2d at 265 (valuation properly reflected no value for renewal options because "[t]here was no evidence . . . that these options had any value"); *United States v. Right to Use & Occupy 3.38 Acres in Alexandria*, 484 F.2d 1140, 1145 (4th Cir. 1973) (no evidence of any difference in value whether renewal option required 30 or 90 days' notice to exercise).

935   *See United States v. Bedford Assocs.*, 548 F. Supp. 732, 743-45 (S.D.N.Y. 1982) (considering whether property should be valued in 'as is' condition or whether determination of market rental price should include renovations), modified in other respects, 713 F.2d 895 (2d Cir. 1983); *United States v. Flood Bldg.*, 157 F. Supp. 438, 442-44 (N.D. Cal. 1957) (tenant alterations "did not wreak havoc and destruction to the interior" but rather made space "suitable for occupation by commercial type tenants, and owing to the excellent location of the building . . . its continuing utility can readily be perceived").

936   *See Bedford Assocs.*, 548 F. Supp.at 743-45 (finding operating expenses borne by tenant must be deducted from expected rental income to lessor), modified in other respects, 713 F.2d 895 (2d Cir. 1983).

937   See, e.g., id.

938   *See, e.g., GSA-VA St. Louis I*, 2015 WL 4430134, at *10-*11 ("The market value of the property taken should be assessed uninfluenced by [the government's] right to exercise its power of eminent domain in the future. . . . In the event of a future taking, [a landowner] may be assured that the law would require [the government] to provide just compensation again [i.e., in a separate proceeding]."); *cf. United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 276 (1943).

939   *United States v. Gen. Motors Corp.*, 323 U.S. 373, 382 (1945).

940   *Id.* at 382; *United States v. 1735 N. Lynn St.*, 676 F. Supp. 693, 696-97 (E.D. Va. 1987).

941   *See United States v. 883.89 Acres of Land in Sebastian Cty.*, 314 F. Supp. 238, 240-42 (W.D. Ark. 1970), aff'd, 442 F.2d 262, 264-65 (8th Cir. 1971); *United States v. Michoud Indus. Facilities*, 322 F.2d 698, 707 (5th Cir. 1963); *United States v. 117,763 Acres of Land in Imperial Cty.*, 410 F. Supp. 628, 631 (S.D. Cal. 1976), aff'd sub nom. *United States v. Shewfelt Inv. Co.*, 570 F.2d 290, 291-92 (9th Cir. 1977).

942   *See 883.89 Acres in Sebastian*, 314 F. Supp. at 240-42; *Michoud*, 322 F.2d at 706-08.

943   *Michoud*, 322 F.2d at 706-08.

944   *Id.* at 707; *see United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 285 (1943) ("[T]he Fifth Amendment allows the owner only the fair market value of this property; it does not guarantee him a return of his investment."); *Olson v. United States*, 292 U.S. 246, 255 (1934) ("[T]he market value of the property at the time of the [acquisition] . . . may be more or less than the owner's investment. . . . The public may not by any means confiscate the benefits, or be required to bear the burden, of the owner's bargain.").

945   *Michoud*, 322 F.2d at 707; *cf. 117,763 Acres in Imperial*, 410 F. Supp. at 631 ("[T]here is no rule that, where what is taken has a minimal value, something more than that value must be allowed.").

946   *Shewfelt Inv.*, 570 F.2d at 291-92.

temporary acquisitions, as in permanent acquisitions, "lack of comparable [transactions] does not change the measure of compensation[.]"[947]

Temporary acquisitions may be partial or total. At times, the acquisition of a leasehold estate over only a portion of a larger property may cause the diminution in the market rental value of the area not leased by the government that must be considered.[948] For example, in an acquisition of a leasehold of a portion of a commercial office building, if the rental value of the remainder is diminished unless offered together with the space acquired by the government, then the diminution in rental value of the remainder would be compensable and must be considered.[949] However, appraisers must take care to disregard non-compensable damage such as frustration of plans or lost opportunities.[950] As discussed in Section 4.6, specific aspects of diminution in value may be legally compensable, and therefore must be considered in a *partial* leasehold acquisition—but are legally non-compensable, and therefore must be disregarded, in a *complete* leasehold acquisition.[951] "By the same token, a taking may conceivably enhance the value of a residue[,]" meaning such benefits must also be considered in the remainder's value after acquisition.[952] Valuation issues in partial acquisitions, including treatment of compensable damages and benefits, are addressed in Section 4.6.

**4.7.2.    Temporary Inverse Takings.** The measure of compensation for temporary inverse takings is the same as for other temporary acquisitions—that is, the market rental value of the property acquired for the term of the acquisition.[953] Temporary inverse takings may be *physical* or *regulatory* in nature.[954] And whether a compensable temporary inverse taking occurred will be determined by the court, using a "more complex balancing process" than in alleged permanent takings.[955]

> **Whether an inverse taking occurred, and if so whether it is *temporary* or *permanent*, are legal questions that require <u>legal instruction</u>.**

Similarly, whether an alleged inverse taking is *temporary* or *permanent* is a legal question requiring <u>legal instruction</u>. In deciding this issue, "[t]he essential element of a temporary taking is a finite start and end to the taking."[956] This determination can have a significant impact on the

947   *United States v. 46,672.96 Acres in Doña Ana Ctys.*, 521 F.2d 13, 18 (10th Cir. 1975) (quoting *United States v. Sowards*, 370 F.2d 87, 90 (10th Cir. 1966)); *see United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 402-03 (1949).

948   *United States v. 1735 N. Lynn St.*, 676 F. Supp. 693, 698-99 (E.D. Va. 1987).

949   *Id.*

950   *Id.* at 701; *United States v. 131,675 Rentable Square Feet of Space* (*GSA-VA St. Louis I*), No. 4:14-cv-1077, slip op. at *8-*11, 2015 WL 4430134 (E.D. Mo. July 20, 2015). Damages are discussed in Section 4.6.

951   *See United States v. Petty Motor Co.*, 327 U.S. 372, 379-80 (1946) (explaining "fundamental difference between the taking of a part of a lease and the taking of the whole lease"); *Intertype Corp. v. Clark-Cong. Corp.*, 240 F.2d 375, 380 (7th Cir. 1957) (analyzing *Petty Motor*, *supra*; *United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945); and *United States v. Westinghouse Elec. & Mfg. Co.*, 339 U.S. 261 (1950)).

952   *1735 N. Lynn St.*, 676 F. Supp. at 698-99 (citing *United States v. Miller*, 317 U.S. 369, 376 (1943)).

953   *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 318 (1987) (citing, *inter alia*, *United States v. Dow*, 357 U.S. 17 (1958); *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949); *United States v. Causby*, 328 U.S. 256 (1946); *Petty Motor*, 327 U.S. 372; and *Gen. Motors*, 323 U.S. 373); *Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577, 1580-81 (Fed. Cir. 1990).

954   *See, e.g.*, *767 Third Ave. Assocs. v. United States*, 48 F.3d 1575 (Fed. Cir. 1995) (affirming dismissal of alleged temporary physical and regulatory takings); *First English*, 482 U.S. 304 (alleged regulatory inverse taking).

955   *See Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 521 (2012) ("temporary limitations are subject to a more complex balancing process [than permanent occupations] to determine whether they are a taking" (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982)).

956   *Otay Mesa Property, L.P. v. United States* (*Otay Mesa I*), 670 F.3d 1358, 1365 n.5 (Fed. Cir. 2012) (quoting *Wyatt v. United States*, 271 F.3d 1090, 1097 n.6 (Fed. Cir. 2001)).

valuation, and therefore on the amount of compensation awarded.[957] Indeed, the Supreme Court has held that until it is determined a taking is permanent or temporary, "it would be premature . . . to consider whether the amount of the award . . . was proper."[958] Accordingly, the appraiser must receive appropriate **legal instructions** regarding the precise terms of the property interest(s) to be valued in an alleged inverse taking.

The Supreme Court recently held that recurrent floodings, even if of finite duration (i.e., temporary), are not categorically exempt from Takings Clause liability.[959] Alleged takings of this sort are therefore subject to the same liability and valuation inquiries as other types of inverse takings.[960]

**4.8.    Natural Resources Acquisitions.** Property acquisitions involving natural resources—such as minerals, timber, or water rights—are subject to the same valuation standards as any other type of property acquisition.[961] While such acquisitions may present particularly complex valuation problems for purposes of just compensation, "whatever the difficulties may be in making such appraisals with complete accuracy, it does not defeat the existence of a 'market value' . . . and it does not suffice as a reason to depart from the ordinary requirements that the law imposes on such transactions."[962] Moreover, "the degree of speculation can and should be minimized."[963] Specialized expertise is typically required, either by the appraiser or through appropriate subsidiary experts, subject to the requirements discussed in Sections 1.11 and 4.12.[964] Several frequently encountered (and often confused) valuation issues are discussed below.

**4.8.1.    Unit Rule and Natural Resources.** The underlined unit rule, discussed in Section 4.2.2, is often misapplied in the valuation of properties with possible or proven natural resources such as minerals, timber, or oil and gas. For just compensation purposes, property must be valued as a whole—not by summation of its constituent parts.[965] Thus, the possible or actual existence of a resource in a property can only be considered to the extent its possible or actual existence would contribute to the market value of the whole property.[966] For example,

---

957  *See, e.g., Otay Mesa I*, 670 F.3d 1358 (rejecting compensation award of approximately $3 million based on erroneous finding of temporary taking), *and on remand*, 110 Fed. Cl. 732 (2013) (*Otay Mesa II*) (awarding $455,520 based on finding of permanent taking), *aff'd*, 779 F.3d 1315 (Fed. Cir. 2015) (*Otay Mesa III*).

958  *Causby*, 328 U.S. at 268.

959  *Ark. Game*, 133 S. Ct. at 515.

960  *Id.* at 519-23.

961  *Mont. Ry. Co. v. Warren*, 137 U.S. 348, 352-53 (1890) (reiterated in *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 628 n.3 (1989)); *United States v. Consol. Mayflower Mines, Inc.*, 60 F.3d 1470, 1477 (10th Cir. 1995).

962  *ASARCO*, 490 U.S. at 628 n.3 (citing *Mont. Ry.*, 137 U.S. at 352-53); *accord. Mayflower Mines*, 60 F.3d at 1476; *see Eagle Lake Improvement Co. v. United States* (*Eagle Lake I*), 141 F.2d 562, 564 (5th Cir. 1944) ("[if] mineral interests . . . are bought and sold in arms-length transactions for a valuable consideration, they have a market price translative into a fair market value").

963  *United States v. 103.38 Acres in Morgan Cty.* (*Oldfield*), 660 F.2d 208, 212 (6th Cir. 1981).

964  *See, e.g., United States v. 100.80 Acres of Land* (*Parrish*), 657 F. Supp. 269, 276 (M.D.N.C. 1987) (rejecting valuation of real estate appraiser whose expertise did not extend to minerals); *see also* USPAP Competency Rule; *cf. United States v. Sowards*, 370 F.2d 87, 92 (10th Cir. 1966) ("owner's qualification to testify does not change the 'market value' concept and permit him . . . to establish a value based entirely upon speculation").

965  *E.g., United States v. 381.76 Acres of Land* (*Montego Group*), No. 96-1813-CV, 2010 WL 3734003 (S.D. Fla. Aug. 3, 2010), *aff'd*, Doc. No. 239 (S.D. Fla. Sept. 22, 2010), *aff'd sub nom. United States v. Gonzalez*, 466 F. App'x 858 (11th Cir. 2012) (unpubl.) (per curiam).

966  *United States v. 499.472 Acres in Brazoria Cty.*, 701 F.2d 545, 549 (5th Cir. 1983); *Oldfield*, 660 F.2d at 212; *United States v. 91.90 Acres of Land in Monroe Cty.* (*Cannon Dam*), 586 F.2d 79, 87 (8th Cir. 1978); *United States v. 158.76 Acres in Townshend*, 298 F.2d 559, 561 (2d Cir. 1962); *Ga. Kaolin Co. v. United States*, 214 F.2d 284, 286 (5th Cir. 1954); *United States v. Meyer*, 113 F.2d 387, 397 (7th Cir. 1940); *United States v. 33.92536 Acres of Land* (*Piza-Blondet Trial Op.*), No. 98-1664, 2008 WL 2550586, at *11 (D.P.R. June 13, 2008), *aff'd*, 585 F.3d 1 (1st Cir. 2009); *United States ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*, 40 F. Supp. 811, 817-18, 822 (E.D. Tenn. 1941); *see Sowards*, 370 F.2d at 91 ("The mere adaptability of the coal deposit to a use does not establish a market."); *accord United States v. Whitehurst*, 337 F.2d 765, 771-72 (4th Cir. 1964); *see also United States v. 22.80 Acres in San Benito Cty.*, 839 F.2d 1362, 1364 n.2 (9th Cir. 1988) (distinguishing taking of "land on which mineral resources are incidentally located" from taking of "the limestone and granite itself, not the overlying parcel of land").

---

> [for] land that is underlaid with marketable minerals, . . . the existence of those minerals is a factor of value to be considered in determining the market value of the property, but the landowner is not entitled to have the surface value of the land and the value of underlying minerals aggregated to determine market value.[967]

Indeed, in any given acquisition, it is possible that "the whole property is worth more than, the same as, or even less than the mineral [or other resource] it contains."[968]

**4.8.2.**     **Highest and Best Use and Natural Resources.** The mere presence of minerals or other resources in a property does not allow the appraiser to forego a careful analysis of highest and best use (discussed in Section 4.3).[969] "The mere adaptability of [a mineral] deposit to a use does not establish a market."[970] Federal courts require "a showing of some sort of sort of market, poor or good, great or small, for the commodity in question before the quantity and price of the commodity or substance may . . . be used as a factor in the expert's opinion . . . ."[971]

In valuing property with mineral or other subsurface resources, appraisers must carefully distinguish between a highest and best use of mineral *extraction*[972] and a highest and best use of mineral *exploration*.[973] "Where a proffered highest and best use is extraction of some sort of mineral, the landowner must show not only the presence of the mineral in commercially exploitable amounts, but also that a market exists for the mineral that would justify its extraction in the reasonably foreseeable future."[974] For example, a highest and best use of quarrying requires supporting evidence that is

> specific as to the suitability and availability of the property for a quarry, considering all factors, such as . . . plant expense, operation expense, transportation, and the presence or reasonable probability of a commercial market, . . . that would have affected the market price of the property on that date.[975]

On the other hand, a highest and best use of mineral exploration requires a reasonable probability that market participants would attempt to explore the property for such a use—and would pay more for property on the date of value with such a prospect than without.[976] That

---

967  *Cannon Dam*, 586 F.2d at 87.

968  *Oldfield*, 660 F.2d at 212; *see, e.g., Cameron Dev. Co. v. United States*, 145 F.2d 209, 210 (5th Cir. 1944) ("The mere physical adaptability of the property to use as a source of supply of shell marl, in the absence of a market for its commercial production, did not effect an increase in its market value.").

969  *Olson v. United States*, 292 U.S. 246, 255, 257 (1934); *see, e.g., United States v. Consol. Mayflower Mines, Inc.*, 60 F.3d 1470, 1476-77 (10th Cir. 1995) (rejecting contention that "the *Olson* standard for considering a use not yet undertaken must be relaxed where the use is the extraction of minerals").

970  *Sowards*, 370 F.2d at 89-90; *accord Whitehurst*, 337 F.2d at 771-72; *Cameron Dev.*, 145 F.2d at 210.

971  *United States v. Land in Dry Bed of Rosamond Lake*, 143 F. Supp. 314, 322 (S.D. Cal. 1956).

972  *E.g., Oldfield*, 660 F.2d 208; *United States v. 1,629.6 Acres in Sussex Cty.* (*Island Farm II*), 360 F. Supp. 147, 151-53 (D. Del. 1973), *aff'd*, 503 F.2d 764, 766 (3d Cir. 1974); *United States v. Upper Potomac Props. Corp.*, 448 F.2d 913, 914-15 (4th Cir. 1971).

973  *E.g., Mont. Ry. Co. v. Warren*, 137 U.S. 348 (1890); *Mayflower Mines*, 60 F.3d at 1477; *Phillips v. United States*, 243 F.2d 1 (9th Cir. 1957); *Eagle Lake I*, 141 F.2d at 564; *see also United States v. 69.1 Acres* (*Sand Mountain*), 942 F.2d 290, 292-94 (4th Cir. 1991) (highest and best use of holding sand reserves for future development based on "reasonable probability that the sand will be needed and wanted at a near enough point in the future to affect the current value of the property" (emphasis added)).

974  *Sand Mountain*, 942 F. 2d at 292.

975  *United States v. 599.86 Acres of Land in Johnson & Logan Ctys.*, 240 F. Supp. 563, 570 (W.D. Ark. 1965), *aff'd sub nom. Mills v. United States*, 363 F.2d 78 (8th Cir. 1966).

976  *Phillips v. United States*, 243 F.2d 1, 6 (9th Cir. 1957); *Eagle Lake I*, 141 F.2d at 564 ("[if] mineral interests . . . are bought and sold in arms-length transactions for a valuable consideration, they have a market price translative into a fair market value"); *see, e.g., Montana Ry.*, 137 U.S. at 352-53.

reasonable probability can be demonstrated "from the fact that such prospects are the constant subject of barter and sale."[977]

With a proposed highest and best use of holding for future mineral extraction, the *timing* of future use and its *relation to current market value* (i.e., as of the date of valuation) are critical.[978] Similarly, extraction of a mineral or other resource cannot be considered as a highest and best use absent "proof that it would be legally permissible to exploit that resource" in the reasonably near future.[979] Accordingly, the First Circuit recently held that sand extraction could not be considered as a highest and best use because there was no proof of "a reasonable probability that the property would be rezoned or that a variance could have been obtained in the near future" to make sand extraction legally permissible.[980]

Moreover, to prevent confusion, injustice, and improper duplication of value, market value cannot be premised on inconsistent or incompatible uses.[981] Of particular importance in properties with minerals or oil and gas resources, "[t]he fact that the minerals, if any, are located beneath the surface of the parcels condemned cannot be ignored."[982] Thus, while a parcel's surface might be suitable for subdivision purposes and the same parcel's subsurface oil and gas resources suitable for extraction, "[c]ertainly, the surface could not be used for a residential subdivision if oil wells were drilled and producing. These are inconsistent uses."[983] This would not prevent a well-supported determination that different parts of a property have different highest and best uses—as long as those uses are compatible and consistent (for example, residential or commercial use along highway frontage and agricultural use for the rear land).[984] To avoid improper duplication of value, a determination of multiple highest and best uses must not (1) attribute two highest and best uses to the same acres, or (2) accept conflicting and incompatible uses.[985]

> **Market value cannot be premised on inconsistent or incompatible uses. Disregarding this rule is a common error in mineral property valuations.**

**4.8.3.    Valuation Approaches for Mineral Resources.** Under federal law, the sales comparison approach is normally the most reliable approach to value for properties involving minerals.[986]

---

977  *Montana Ry.*, 137 U.S. at 352-53; *Phillips*, 243 F.2d at 6; *Eagle Lake I*, 141 F.2d at 564.

978  *Sand Mountain*, 942 F.2d at 292-94 & n.3; *United States v. 494.10 Acres in Cowley Cty.*, 592 F.2d 1130, 1131-32 (10th Cir. 1979).

979  *United States v. 33.92536 Acres of Land (Piza-Blondet Trial Op.)*, No. 98-1664, 2008 WL 2550586, at *9 (D.P.R. June 13, 2008), *aff'd*, 585 F.3d 1 (1st Cir. 2009).

980  *United States v. 33.92536 Acres (Piza-Blondet)*, 585 F.3d 1, 7-8 (1st Cir. 2009).

981  *United States v. 320 Acres of Land*, 605 F.2d 762, 817 n.124 (5th Cir. 1979) ("To the extent that potential uses are inconsistent or incompatible uses, whatever value the land possesses because of its suitability for each of these uses cannot be aggregated in determining fair market value and just compensation."); *United States v. Carroll*, 304 F.2d 300, 306 (4th Cir. 1962); *Eagle Lake Improvement Co. v. United States (Eagle Lake II)*, 160 F.2d 182, 184 & n.1 (5th Cir. 1947) ("It becomes manifest . . . that separate valuation [of surface rights and mineral rights] . . . would bring about confusion and injustice in condemnation cases. . . . [S]eparate awards . . . might include valuation based on inconsistent uses of the property, and consequent duplication of value."); *see, e.g., United States v. 15.00 Acres in Miss. Cty.*, 468 F. Supp. 310 (E.D. Ark. 1979).

982  *Eagle Lake II*, 160 F.2d at 184 n. 1.

983  *Id.*

984  *E.g., United States v. 179.26 Acres in Douglas Cty.*, 644 F.2d 367, 371 (10th Cir. 1981) (consistent uses of commercial rock quarry and improved livestock and grain farm); *United States v. 1,629.6 Acres in Sussex Cty. (Island Farm II)*, 360 F. Supp. 147, 152-53 (D. Del. 1973), *aff'd*, 503 F.2d 764, 766 (3d Cir. 1974) ("we affirm on the basis of the district court's fine opinions").

985  *Island Farm II*, 360 F. Supp. at 153.

986  *United States v. 24.48 Acres of Land*, 812 F.2d 216, 218 (5th Cir. 1987); *Cloverport Sand & Gravel Co. v. United States*, 6 Cl. Ct. 178, 189 (1984); *United States v. 103.38 Acres of Land in Morgan Cty. (Oldfield)*, 660 F.2d 208, 212 (6th Cir. 1981) ("the value of the coal in place would be fully reflected in the sale price of comparable properties"); *United States v. Upper Potomac Props. Corp.*, 448 F.2d 913, 916-18 (4th Cir. 1971); *see United States v. Sowards*, 370 F.2d 87, 89-90 (10th Cir. 1966); *United States v. Whitehurst*, 337 F.2d 765, 775-76 (4th Cir. 1964).

As a result, in federal acquisitions the appraiser cannot default to using an income approach or other valuation method that may be acceptable for typical industry purposes.[987] Indeed, both federal courts and industry professionals have criticized valuations of mineral property for just compensation purposes that improperly disregard the sales comparison approach.[988] An unsupported statement that comparable sales do not exist is insufficient.[989] Moreover, in appraising property involving minerals, "[e]lements of sales of quite distant properties, even those with different mineral content, may be comparable in an economic or market sense when due allowance is made for variables."[990] Significant variables or elements for mineral properties may include location (relative to market demand, processing facilities, transportation options, etc.), certainty (e.g., proven or unproven deposits), mineral content or type, mineral quality, mineral quantity, and zoning or permitting status.[991] The sales comparison approach and comparability generally are discussed in Section 4.4.2.

Use of the sales comparison approach requires the appraiser to determine the appropriate <u>unit of comparison</u> (per acre, per square foot, etc.). The unit of comparison should generally reflect that used by market participants. Regardless of what unit of comparison is selected, however, "arriving at a valuation by multiplying an assumed quantity of mineral reserves by a unit price is almost universally disapproved by the courts."[992]

Under certain circumstances, it may be appropriate to apply the income capitalization approach to value mineral properties. As discussed in Section 4.4.4, the income approach involves capitalizing a property's anticipated net income to derive an indication of its present market value. This approach cannot be used as a stand-alone approach to value if comparable sales are available.[993] Even if comparable sales are lacking, however, federal courts have repeatedly held that the income approach can be used only with great caution for purposes of just compensation. As the Eighth Circuit warned:

> **If comparable sales are not available, use of the <u>income capitalization approach</u> may be appropriate in valuing mineral property. When applying this approach to mineral properties, <u>yield capitalization</u> techniques (e.g. discounted cash-flow [DCF] analysis) are typically more appropriate than <u>direct capitalization</u> techniques.**

> Great care must be taken, or such valuations can reach wonderland proportions. It is necessary to take into consideration manifold and varied factors, like future supply and demand, economic conditions, estimates of mineral recoverability, the value of currency, changes in the

---

987  *Foster v. United States*, 2 Cl. Ct. 426, 448-455 (1983); *Upper Potomac*, 448 F.2d at 917.

988  *See, e.g., United States v. Am. Pumice Co.*, 404 F.2d 336, 336-37 (9th Cir. 1968) (rejecting assumption that mineral properties could rarely be comparable to one another unless nearly adjacent), *modifying in relevant part United States v. 237,500 Acres in Inyo & Kern Ctys.*, 236 F. Supp. 44, 51 (S.D. Cal. 1964); *Whitehurst*, 337 F.2d at 775 (finding valuation that ignored or rejected comparable sales evidence in valuing alleged mineral property was "grossly mistaken"); A.K. Stagg, P.G., A.I.M.A., *Federal Condemnation and Takings – A Journey Down the Yellow Book Road*, to Soc'y of Mining, Metallurgy, & Exploration, Inc. (Denver, Colo., March 1, 2011) (noting "predisposition on the part of many mineral appraisers to believe that the sales comparison approach simply cannot be used" and stating that sales comparison approach "can be used quite adequately in mineral appraisals, albeit, perhaps, with a little extra effort involved"); *see generally* Trevor R. Ellis, *Sales Comparison Valuation of Development and Operating Stage Mineral Properties*, MINING ENG'G 89 (April 2011).

989  *See, e.g., Whitehurst*, 337 F.2d at 770-72.

990  *Foster*, 2 Cl. Ct. at 448; *accord Am. Pumice*, 404 F.2d at 336-37.

991  *United States v. 100.80 Acres of Land (Parrish)*, 657 F. Supp. 269, 276 n.13 (M.D.N.C. 1987); *Am. Pumice*, 404 F.2d at 336-37; *Foster*, 2 Cl. Ct. at 448-55; *see United States v. 33.92356 Acres (Piza-Blondet)*, 585 F.3d 1 (1st Cir. 2009) (affirming exclusion of highest and best use of sand extraction without evidence of reasonable probability permit could be obtained).

992  *Cloverport*, 6 Cl. Ct. at 188.

993  *E.g., Whitehurst*, 337 F.3d at 770-72; *see United States v. 24.48 Acres of Land*, 812 F.2d 216, 218 (5th Cir. 1987).

marketplace, and technological advances. Many of these factors are impossible to predict with reasonable accuracy.[994]

Similarly, the Fourth Circuit observed, valuations of mineral property based on the income capitalization approach "almost always achieve chimerical magnitude, because, in the mythical business world of income capitalization, nothing ever goes wrong. There is always a demand; prices always go up; no competing material displaces the market."[995] As a result, the Fourth Circuit concluded, "to allow value to be proved in such a suspect manner, *impeccably objective and convincing evidence* is required."[996] Stated another way, "failure to anchor assumptions to information corroborated by demonstrable facts renders the computations mathematical exercises unrelated to reality."[997]

As discussed in Section 4.4.4, the income capitalization approach may include direct capitalization or yield capitalization techniques.[998] When applicable to mineral properties, yield capitalization is generally the more appropriate of these two techniques, and typically involves a discounted cash-flow (DCF) analysis.[999] The income capitalization approach requires a distinction between income generated by the property itself (the <u>royalty income</u> in producing mining properties), which can be considered, and income generated by a business conducted on the property (i.e., a mining enterprise), which must be disregarded.[1000] For this reason, the income capitalization approach is sometimes called the <u>royalty income approach</u> when applied to mineral properties.

Every factor considered in an income capitalization approach must be properly supported.[1001] In DCF analysis, one of the most critical factors is the selection of the <u>discount rate</u>, which should be derived from and supported by direct market data.[1002] Because the market value measure of just compensation is intended "to duplicate marketplace calculations to the greatest possible extent[,]"[1003] courts have rejected income capitalization without evidence that "rates are in fact fixed in the marketplace by a process which parallels [the expert's] calculations."[1004]

---

994 *United States v. 47.14 Acres of Land*, 674 F.2d 722, 726 (8th Cir. 1982).

995 *United States v. 69.1 Acres of Land* (<u>Sand Mountain</u>), 942 F.2d 290, 293-94 (4th Cir. 1991).

996 *Id.* at 294; *United States ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*, 40 F. Supp. 811, 822 (E.D. Tenn. 1941) ("It would require the enumeration of every cause of business disaster to point out the fallacy of using this method of arriving at just compensation.").

997 *Foster*, 2 Cl. Ct. at 451 ("Although the calculation may be internally consistent, the capitalization of income approach frequently does not produce reasonably persuasive evidence of value.").

998 *Direct capitalization* techniques apply an overall capitalization rate to a property's single-year net income. *Yield capitalization* techniques typically use a discounted cash-flow (DCF) analysis to evaluate varying forecasted income or expenses. *See* Section 4.4.4 (Income Capitalization Approach).

999 *Whitney Benefits v. United States*, 18 Cl. Ct. 394, 408 (1989); *Foster*, 2 Cl. Ct. at 448-49.

1000 *Cloverport*, 6 Cl. Ct. at 191; *see United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 403 n.6 (1949); *see generally* Section 4.4.4 (Income Capitalization Approach).

1001 *47.14 Acres*, 674 F.2d at 726; *United States v. 103.38 Acres of Land in Morgan Cty.* (<u>Oldfield</u>), 660 F.2d 208, 214-15 (6th Cir. 1981) (requiring "evidence derived from or demonstrably related to the actual market" as "essential characteristics"); *Whitehurst*, 337 F.2d at 771-74; *United States v. 158.76 Acres of Land in Townshend*, 298 F.2d 559, 561 (2d Cir. 1962); *see, e.g.*, *United States v. 25.202 Acres of Land* (<u>Amexx I</u>), 860 F. Supp. 2d 165, 176-78 (N.D.N.Y. 2010), *aff'd*, 502 F. App'x 43, 45 (2d Cir. 2012) (noting lower court's "thorough report exposing the unreliability of the expert's methods"); *see also United States v. Sowards*, 370 F.2d 87, 90-92 (10th Cir. 1966); *Likins-Foster Monterey Corp. v. United States*, 308 F.2d 595, 597-99 (9th Cir. 1962), *aff'g United States v. Certain Interests in Prop. in Monterey Cty.*, 186 F. Supp. 167 (N.D. Cal. 1960); *United States v. Leavell & Ponder, Inc.*, 286 F.2d 398, 406-08 (5th Cir. 1961).

1002 *Prop. in Monterey*, 186 F. Supp. at 170; *see also Leavell & Ponder*, 286 F.2d at 407; *158.76 Acres in Townshend*, 298 F.2d at 561.

1003 *Oldfield*, 660 F.2d at 212; *see Cementerio Buxeda, Inc. v. Puerto Rico*, 196 F.2d 177, 181 (1st Cir. 1952) (allowing consideration of income and expense figures that "are factors which would be considered by a prospective buyer").

1004 *Oldfield*, 660 F.2d at 214 ("The fatal flaw in the owners' . . . method is its lack of demonstrable relationship with this 'real' market . . . .").

**4.8.4.** **Timber.** The sales comparison approach is also typically the most reliable approach to value for properties involving timber.[1005] Appraising property with a potential highest and best use for timber production typically requires special expertise and analysis, including a *timber cruise* to inventory the timber involved, evaluation of logging conditions, and investigation of potential timber sales.[1006] Such information may be particularly useful as a "check" on the appraiser's estimate of contributory timber values gleaned from comparable sales and other market data.[1007] But it is never appropriate to simply add timber value to land value to determine the market value of the property as a whole.[1008]

Important considerations in valuing timber properties may include the quantity and quality of merchantable timber, topography, and feasible logging methods.[1009] In addition, applicable local, state, and federal laws may significantly affect the value of forested properties and must be considered in valuations for federal acquisitions. For example, the Ninth Circuit held that "in appraising privately owned forest land in California, . . . evaluation witnesses must determine the highest and best use of the land in a manner that is not violative of the Forest Practice Act of the State of California."[1010]

**4.8.5.** **Water Rights.** Water rights may have a substantial impact on the uses to which property can be put and, as a result, on market value.[1011] The laws governing water rights vary significantly by state, county, or other local jurisdiction. Water-rights law may also be an important consideration in determining liability in inverse takings.[1012] Applicable water laws must be taken into account in determining market value for purposes of just compensation,[1013] and appropriate **legal instructions** may be required.

State laws on surface water rights generally follow one of three systems. In most Eastern states, water law is based on the doctrine of <u>riparian rights</u>. Broadly, water rights are allocated to owners of <u>riparian</u> land—that is, land adjacent to a body of water. Various laws in riparian-doctrine states regulate *reasonable use* to protect other riparian owners. In most Western states, where the water supply is more limited, water law is based on a <u>prior appropriation</u> system. Under this "first in time, first in right" concept, water rights are allocated based on when a person puts a quantity of water to actual *beneficial use*, regardless of whether that person owns riparian land. Finally,

---

1005 *United States v. 2,175.86 Acres in Hardin & Jefferson Ctys.*, 687 F. Supp. 1079, 1085-86 (E.D. Tex. 1988), on remand from *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1 (1984).

1006 E.g., *United States v. 15.00 Acres of Land in Miss. Cty.*, 468 F. Supp. 310, 313 & n.6 (E.D. Ark. 1979); *2,175.86 Acres in Hardin & Jefferson*, 687 F. Supp. at 1085-86.

1007 E.g., *2,175.86 Acres in Hardin & Jefferson*, 687 F. Supp. at 1085-87.

1008 *Id.* at 1086-87; *see generally* Section 4.2.2.

1009 E.g., *Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 345-46 (Ct. Cl. 1980) (per curiam); *2,175.86 Acres in Hardin & Jefferson*, 687 F. Supp. at 1085-87.

1010 E.g., *Scott Lumber Co. v. United States*, 390 F.2d 388, 395-96 (9th Cir. 1968); *see also United States v. 320 Acres of Land*, 605 F.2d 762, 818-19 & n. 128 (5th Cir. 1979) (legal framework affecting uses of property must be taken into account).

1011 E.g., *Wilson v. United States*, 350 F.2d 901, 908 (10th Cir. 1965) (rejecting proposed use of hay production through projected irrigation installations because of "question[able] feasibility of the development of some of the lands for which water rights were pending") (citing *Olson v. United States*, 292 U.S. 246, 255 (1934)); *see United States v. 46,672.96 Acres in Doña Ana Ctys.*, 521 F.2d 13, 14-15 (10th Cir. 1975) (noting evidence that value of properties with potential uses of grazing purposes, rural homesites, recreational sites or roadside businesses "depend[ed] on availability of water and roads").

1012 *Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 522 (2012) (noting that bearing of Arkansas water-rights law on whether taking occurred should be addressed on remand).

1013 *See, e.g., United States v. 320 Acres of Land*, 605 F.2d 762, 818-19 & n.128 (5th Cir. 1979) (legal framework affecting uses of property must be taken into account). Note that this is not an exception to the rule that federal, not state, law controls. *Scott Lumber Co.*, 390 F.2d at 395-96 (rejecting valuation based on proposed highest and best use that violated state law); *see* Section 4.1.

several Western states (including California, Texas, and Oklahoma) originally recognized riparian rights but later incorporated an appropriation system, creating a <u>hybrid system</u> with both riparian and appropriation elements. Beyond these three surface-water-rights systems, unique variations apply in Hawaii and Louisiana, and pueblo water rights affect a few places in the Southwest. Groundwater rights in the United States are generally allocated based on ownership of overlying land, prior appropriation, or state management.[1014]



Special rules regarding riparian lands adjacent to navigable waters and the federal navigational servitude are discussed in Section 4.11.1.

**4.9.**   **Inverse Takings.** Most valuation assignments under these Standards involve intentional acquisitions, in which the United States purposely seeks to acquire property (by negotiated purchase, exchange, or eminent domain). But actions of the United States may also result in its taking property without intending to do so. In such a situation, called an <u>inverse taking</u> (or <u>inverse condemnation</u>), a landowner can sue the United States for compensation.[1015] Inverse takings claims involve important legal and practical differences from other types of federal acquisitions.[1016]

The most significant difference between an inverse taking claim and a direct condemnation or other affirmative acquisition is the threshold question of liability: In filing a direct condemnation, the United States expressly acknowledges the actual or proposed property acquisition and its obligation to pay compensation. In an inverse taking claim, on the other hand, the United States may contest the landowner's claim that a taking occurred for which just compensation must be paid under the Fifth Amendment.[1017] Accordingly, in an inverse taking claim, the court must

---

1014 *See generally United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 742-55 (1950) (exploring development of water law systems in the United States generally and California in particular); *cf.* David H. Getches et al., Water Law in a Nutshell (5th ed. 2015).

1015 The U.S. Court of Federal Claims has exclusive jurisdiction over inverse takings claims exceeding $10,000 under the Tucker Act. 28 U.S.C. § 1491. Federal district courts have concurrent jurisdiction for claims for $10,000 or less. 28 U.S.C. § 1346(a)(2) (the "Little Tucker Act"). These statutes waive sovereign immunity, allowing the United States to be sued, in recognition of the fact that unintended takings may occur despite federal agencies' efforts to avoid them. *Cf.* Uniform Act, 42 U.S.C. § 4651(8) ("No Federal agency head shall intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the taking of his real property."); 49 C.F.R. § 24.102(*l*) ("If the Agency intends to acquire any interest in real property by exercise of the power of eminent domain, it shall institute formal condemnation proceedings and not intentionally make it necessary for the owner to institute legal proceedings to prove the fact of the taking of the real property."); *see also Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 6 (1984) (noting Uniform Act "enjoins federal agencies . . . to attempt to acquire property by negotiation rather than condemnation, and whenever possible not to take land by physical appropriation").

1016 *See United States v. Clarke*, 445 U.S. 253, 255 (1980).

1017 The United States can also concede liability as appropriate. *E.g.*, *Otay Mesa Property, L.P. v. United States* (*Otay Mesa III*), 779 F.3d 1315 (Fed. Cir. 2015).

first determine whether a taking occurred for which just compensation must be paid. If so, the case can then proceed to the compensation phase to determine what amount of compensation is due. Appraisers may be retained to develop opinions in connection with the liability phase, the compensation phase, or both.

The liability inquiry will vary depending on the nature of the inverse taking claim. The issue is rather straightforward if the government's action resulted in the government's permanent physical occupation of the land in question.[1018] But "[i]n view of the nearly infinite variety of ways in which government actions or regulations can affect property interests, the Court has recognized few invariable rules in this area."[1019] In regulatory takings claims, the federal courts have developed various tests to determine whether a taking has occurred: the character of the government action; the extent to which the regulation interferes with distinct, investment-backed expectations; and the economic impact of the regulation.[1020] These distinct inquiries may alter the appropriate considerations (as well as the terminology) for determining the larger parcel for liability purposes in inverse takings claims, as discussed in Section 4.3.4.8.

If the court finds that a compensable taking occurred, litigation will proceed to the compensation phase, in which the standard valuation rules apply. Generally, the appraiser will be asked to develop opinions of the market value of the affected property before and after the taking. As discussed in Section 4.2.1.1, the date of value is typically the date of taking, which should be provided by legal counsel.

**4.10.**    **Land Exchanges.** Federal land exchanges are voluntary real estate transactions between the United States and a nonfederal landowner. The parties must agree on the market value of the properties being exchanged, and neither the United States nor a nonfederal landowner is required to participate in an exchange.[1021] Nevertheless, federal land exchanges may still result in litigation relating to the valuation of the property involved and/or the adequacy of the appraisal supporting the transaction.[1022] Most federal land exchanges are authorized under the Federal Land Policy and Management Act of 1976 (FLPMA).[1023] Exchanges can be initiated by any party. By law, for an exchange to occur the public interest must be well served, and the estimated value of the nonfederal land must be within 25 percent of the estimated value of the federal land, among other requirements.[1024] Some land exchanges are specifically legislated by Congress, sometimes with special provisions that differ from the usual federal exchange process.[1025]

---

1018 *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 (1982) ("[A] permanent physical occupation is a government action of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine.").

1019 *Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 518 (2012).

1020 *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

1021 In contrast, direct acquisitions, while often voluntary, may involve at least a possibility that the government can exercise the power of eminent domain to take property for a public purpose with payment of just compensation.

1022 *E.g.*, *Greer Coal., Inc. v. U.S. Forest Serv.*, 470 F. App'x 630 (9th Cir. 2012) (unpubl.); *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.* (*NPCA v. BLM*), 606 F.3d 1058 (9th Cir. 2010); *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000). Litigation also arises over the determination that an exchange is in the public interest, and agency environmental compliance. *E.g.*, *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633 (9th Cir. 2010); *Lodge Tower Condo. Ass'n v. Lodge Props., Inc.*, 85 F.3d 476 (10th Cir. 1996), *aff'g* 880 F. Supp. 1370 (D. Colo. 1995).

1023 43 U.S.C. §§ 1701-1785 (2012).

1024 43 U.S.C. § 1716.

1025 *See, e.g.*, Mt. St. Helens National Volcanic Monument Act, Pub. L. No. 97-243, 96 Stat. 301 (1982), 16 U.S.C. § 431 note (1982) (repealed 2014).

---

Federal land exchanges are subject to the same valuation requirements as other types of federal acquisitions. In fact, federal regulations specifically require appraisals in many federal land exchanges to comply with these Standards.[1026] But special **legal instructions** may be necessary due to statutory or regulatory requirements for land exchanges. Special rules commonly dictate the larger parcel determination, reflecting federal statutes and agency regulations.[1027] The appraiser must also obtain instructions regarding the appropriate date of valuation,[1028] which may be negotiated by the parties involved in the exchange in accordance with agency regulations[1029] or dictated by statute.[1030] For example, following the volcanic eruption at Mount St. Helens in 1980, Congress authorized the acquisition of lands by donation or exchange in what is now the Mount St. Helens National Volcanic Monument.[1031] Most of these acquisitions required appraisal of the properties' current market value, but the statute expressly provided for timber acquisitions to be valued as of July 1, 1982, in recognition of rapid deterioration of timber in the area.[1032]

As in other types of acquisitions, analysis of a property's highest and best use is critical in appraising property for federal land exchanges.[1033] As discussed in Section 4.3.2, a property's existing use is normally its highest and best use on the date of value because "economic demands normally result in an owner's putting his land to the most advantageous use."[1034] But federal lands typically involve other considerations: as the Supreme Court observed over a century ago, "property may have to the public a greater value than its fair market value . . . ."[1035] As a practical matter, then, the federal lands to be exchanged likely are not being put to their highest and best use on the date of value,[1036] while the nonfederal party's proposed use may well be a feasible highest and best use that must be considered.[1037] For this reason, a nonfederal party's proposed use, if reasonably probable, must be analyzed as a part of the highest and best use determination.[1038] As with any possible highest and best use, neither an existing federal use nor a nonfederal party's proposed use can be considered unless there is competitive demand for that use in the private market.[1039] And of course, any proposed use, no matter how probable or

---

1026 *See, e.g.*, *NPCA v. BLM*, 606 F.3d at 1066 (citing 43 C.F.R. § 2201.3).

1027 *See* Section 4.3.3.

1028 *See Greer Coal., Inc. v. U.S. Forest Serv.*, 470 F. App'x 630, 636 (9th Cir. 2012) (unpubl.) ("an exchange is concerned with the relative value of two sets of property rather than the absolute value of either"); *see generally* Section 4.2 (discussing date of valuation).

1029 *See, e.g.*, *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1185 (9th Cir. 2000); *cf.* 43 U.S.C. § 1716(d).

1030 *See Mt. St. Helens Mining & Recovery Ltd. P'ship v. United States*, 384 F.3d 721, 729 (9th Cir. 2004) (noting date of valuation for specific acquisitions set by statute).

1031 Mt. St. Helens National Volcanic Monument Act, Pub. L. No. 97-243, 96 Stat. 301 (1982), 16 U.S.C. § 431 note (1982) (repealed 2014).

1032 *Mt. St. Helens Mining*, 384 F.3d at 729; Pub. L. No. 97-243, § 3(b); 36 C.F.R. § 254.9(b) (2015).

1033 *See* Section 4.3.

1034 *United States v. Buhler*, 305 F.2d 319, 328 (5th Cir. 1962); *see* Section 4.3.2.1.

1035 *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 80 (1913).

1036 *See United States v. Weyerhaeuser Co.*, 538 F.2d 1363, 1366-67 (9th Cir. 1976) ("[G]overnment projects may render property valuable for a unique purpose."); *see, e.g.*, *United States v. 46,672.96 Acres of Land in Doña Ana Ctys.*, 521 F.2d 13, 15-16 (10th Cir. 1975) ("absolutely no evidence that anyone other than the government could or would use the land for a missile range"); *cf. United States v. 320 Acres of Land*, 605 F.2d 762, 783 n.26 (5th Cir. 1979) ("[T]he use which the Government proposes to devote the property to should not be considered unless private owners could also reasonably devote the property to that use.").

1037 *See, e.g.*, *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.* (*NPCA v. BLM*), 606 F.3d 1058, 1066-69 (9th Cir. 2010); *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1181-85 (9th Cir. 2000).

1038 *Desert Citizens*, 231 F.3d at 1181; *accord NPCA v. BLM*, 606 F.3d at 1067-68; *see* Section 4.3.

1039 *Chandler-Dunbar*, 229 U.S. at 80-81; *compare NPCA v. BLM*, 606 F.3d at 1067-68 (noting "obvious and well-known presence of competing . . . proposals" for nonfederal party's proposed use), *and Desert Citizens*, 231 F.3d at 1185 (noting "regional market and the presence of competitors" pursuing similar projects to nonfederal party's proposed use), *with Doña Ana*, 521 F.2d at 16 ("no basis whatsoever for considering that the highest and best use was for a missile range" without "evidence that anyone other than the government could or would use the land for [that purpose]"), *and J.A. Tobin Constr. Co. v. United States*, 343 F.2d 422, 425 (10th Cir. 1965) ("'there was no market for an ordinary commercial quarry in the area involved'"); *see 320 Acres*, 605 F.2d at 811 n.107 ("[T]he use must be one which a *private* owner might reasonably develop or enjoy." (emphasis added)).

profitable, is to be considered only "to the full extent that the prospect of demand for the use affects market value."[1040]

4.11.    **Special Rules.** Federal acquisitions of certain types of property involve special valuation rules to comply with constitutional or specific statutory provisions. The special valuation rules discussed in Section 4.11.1 (Riparian Lands [Navigation Servitude]) and Section 4.11.2 (Federal Grazing Permits) arise from the general principle that the United States is not compelled to compensate "for elements of value that the Government has created, or that it might have destroyed under the exercise of governmental authority other than the power of eminent domain."[1041] In the words of Justice Jackson: "Such losses may be compensated by legislative authority, not by force of the Constitution alone."[1042] Specifically, Section 4.11.1 addresses the valuation of property involving the federal navigation servitude over waters of the United States. This section also explains special valuation requirements for partial and total acquisitions under 33 U.S.C. § 595a, which authorizes compensation for certain elements beyond what the Fifth Amendment requires.[1043] Section 4.11.2 discusses the valuation of property involving federal grazing permits, which are administered primarily by the U.S. Forest Service and the Bureau of Land Management.[1044] Section 4.11.3, on the other hand, discusses the application of the standard valuation rules to special types of property, guided by the principles of fairness and indemnity underlying the Fifth Amendment.[1045] Valuation issues arising in inverse taking claims under the National Trails System Act and Amendments[1046] are also addressed, as well as the substitute-facility form of compensation.

4.11.1.    **Riparian Lands and the Federal Navigational Servitude.** Special valuation rules apply in acquisitions affected by the navigational servitude, a dominant federal easement over the nation's navigable waters.[1047] Arising under the U.S. Constitution, the federal navigation servitude is a preexisting limitation on the ownership of the flow of navigable waters and underlying streambeds.[1048] This has important ramifications for the compensation due not only for navigable waters, which encompass the entire streambed up to the high-water mark, but also for riparian fast lands (upland) lying above the high-water mark.[1049] In addition, by federal

---

[1040] *Olson v. United States*, 292 U.S. 246, 255 (1934).

[1041] *United States v. Fuller*, 409 U.S. 488, 492 (1973) (citing *United States v. Rands*, 389 U.S. 121 (1967), *United States v. Twin City Power Co.*, 350 U.S. 222 (1956), and *United States v. Commodore Park, Inc.*, 324 U.S. 386 (1945)).

[1042] *United States v. Willow River Power Co.*, 324 U.S. 499, 510 (1945); *accord Fuller*, 409 U.S. at 494 ("Congress may, of course, provide in connection with condemnation proceedings that particular elements of value or particular rights be paid for even though in the absence of such provision the Constitution would not require payment."); *cf. United States v. Bodcaw Co.*, 440 U.S. 202, 204 (1979) ("such compensation is a matter of legislative grace rather than constitutional command").

[1043] Rivers and Harbors Act of 1970 § 111, 33 U.S.C. § 595a (2012); *see United States v. 30.54 Acres of Land in Greene Cty.* (*Filiaggi*), 90 F.3d 790, 793-94, 794 n.3 (3d Cir. 1996).

[1044] Taylor Grazing Act of 1934, 43 U.S.C. § 315(b) (2012); Granger-Thye Act of 1950, 16 U.S.C. § 580*l* (2012).

[1045] *See United States v. 50 Acres of Land* (*Duncanville*), 469 U.S. 24, 30 (1984); *United States v. 564.54 Acres of Land* (*Lutheran Synod*), 441 U.S. 506, 517 (1979); *see also United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 281 (1943) ("it is the owner's loss, not the taker's gain, which is the measure of just compensation").

[1046] National Trails System Act, 16 U.S.C. §§ 1241-51 (2012); *see* 1983 Amendments, Pub. L. No. 98-11, 97 Stat. 48 (railbanking provisions).

[1047] *See United States v. Rands*, 389 U.S. 121, 122-23 (1967); *Gilman v. City of Philadelphia*, 70 U.S. 713, 724-25 (1865); *Gibbons v. Ogden*, 22 U.S. 1, 189-93 (1824); *United States v. 30.54 Acres of Land in Greene Cty.* (*Filiaggi*), 90 F.3d 790, 795 (3d Cir. 1996). A servitude is an easement or other legal right to limited use of property without possession of it. *See* Section 4.6.5 (Easement Valuation Issues).

[1048] *United States v. Twin City Power Co.*, 350 U.S. 222, 227 (1956); *see Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1028-29 (1992); *United States v. Cherokee Nation*, 480 U.S. 700, 707 (1987); *Rands*, 389 U.S. at 123; *United States v. Commodore Park Inc.*, 324 U.S. 386, 391 (1945); *United States v. Chi., M., St. P. & P. R. Co.*, 312 U.S. 592, 597 (1941); *Scranton v. Wheeler*, 179 U.S. 141, 163 (1900).

[1049] *Rands*, 389 U.S. at 122-26; *see United States v. Willow River Power Co.*, 324 U.S. 499, 509 (1945); *see also United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 628-29 (1961); *cf. Cherokee Nation*, 480 U.S. at 704; *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979) ("fast lands"); *Scranton*, 179 U.S. at 163 ("upland").

statute, Congress has increased compensation above what the Constitution requires in certain acquisitions of fast lands.[1050] These constitutional and statutory requirements establish when market value due to a property's access to or use of navigable waters can be considered, and when it must be disregarded, in appraisals for federal acquisitions relating to navigation.

**Origins of the Navigational Servitude.** Although the federal navigation servitude affects compensation under the Fifth Amendment, it arises from Congress' power to regulate commerce under Article I of the U.S. Constitution.[1051] "Commerce includes navigation"[1052]—and so the Commerce Clause "confers a unique position upon the Government in connection with navigable waters."[1053] As a result, the great inland waterways have long been deemed national assets rather than the private property of riparian owners: they are "the public property of the nation."[1054] And while lands adjacent to or beneath navigable waters may be owned by states or individuals, their ownership "is always subject to the servitude in respect of navigation created in favor of the federal government by the constitution."[1055]

The Commerce Clause "speaks in terms of power, not of property."[1056] The navigational servitude "encompasses the exercise of this federal power with respect to the stream itself and the lands beneath and within its high-water mark."[1057] Accordingly, when the United States properly exercises its navigational servitude, no property is taken within the meaning of the Fifth Amendment, and no compensation is due.[1058]

**Navigable Waters.** While the term navigable waters is significant in different areas of the law, only its meaning in the context of the navigational servitude is relevant here.[1059] The basic

---

1050 See 33 U.S.C. § 595a (codifying Section 111 of the Rivers and Harbors Act of 1970); see also United States v. Gerlach Live Stock Co., 339 U.S. 725, 739-42 (1950); cf. United States v. Fuller, 409 U.S. 488, 494 (1973) ("Congress may, of course, provide . . . that particular elements of value or particular rights be paid for even though in the absence of such provision the Constitution would not require payment.").

1051 U.S. Const. art. 1, § 8, cl. 3 ("Congress shall have power . . . [t]o regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes"); see Twin City Power, 350 U.S. at 224-25.

1052 Gilman, 70 U.S. at 724; accord Gibbons, 22 U.S. at 190 ("All America understands, and has uniformly understood, the word 'commerce,' to comprehend navigation. It was so understood, and must have been so understood, when the constitution was framed. The power over commerce, including navigation, was one of the primary objects for which the people of America adopted their government, and must have been contemplated in forming it."); see United States v. Appalachian Elec. Power Co., 311 U.S. 377, 426-27 (1940).

1053 Rands, 389 U.S. at 123; accord Cherokee Nation, 480 U.S. at 704.

1054 Gilman, 70 U.S. at 725 ("For [navigation] purposes, Congress possesses all the powers which existed in the States before the adoption of the national Constitution, and which have always existed in the Parliament in England."); see United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 69 (1913) ("that the running water in a great navigable stream is capable of private ownership is inconceivable").

1055 Gibson v. United States, 166 U.S. 269, 272 (1897); see Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1028-29 (1992) ("a pre-existing limitation upon the land owner's title"); Rands, 389 U.S. at 123 ("a power to which the interests of riparian owners have always been subject"); Scranton v. Wheeler, 179 U.S. 141, 163 (1900); see also Lambert Gravel Co. v. J.A. Jones Constr. Co., 835 F.2d 1105, 1112 (5th Cir. 1988); cf. Ronald C. Allen, Federal Evaluation of Riparian Property: Section 111 of the Rivers and Harbors Act of 1970, 24 ME. L. REV. 175, 197-98 (1972) ("[The] servitude exemplifies the only clear cut instance when we as a nation have maintained a common property right exclusively for common benefit when needed.").

1056 Twin City Power, 350 U.S. 222, 225 (1956); accord United States v. Certain Parcels in Valdez, 666 F.2d 1236, 1238 (9th Cir. 1982).

1057 United States v. Va. Elec. & Power Co., 365 U.S. 624, 628 (1961). Federal courts have used the terms high-water mark and ordinary high-water mark interchangeably in describing the boundary of the federal navigational servitude. Banks v. United States, 71 Fed. Cl. 501, 506 (2006) (noting both terms "refer to the same boundary" despite "any distinction in nomenclature" and citing cases).

1058 Cherokee Nation, 480 U.S. at 704; Rands, 389 U.S. at 123; United States v. Kan. City Life Ins. Co., 339 U.S. 799, 804 (1950); see Lucas, 505 U.S. at 1028-29; United States v. 30.54 Acres of Land in Greene Cty. (Filiaggi), 90 F.3d 790, 795 (3d Cir. 1996) ("Exercise of the servitude did nothing more than realize a limitation always inherent in the landowners' title. It was not a taking."); Pub. Util. Dist. No. 1 v. City of Seattle, 382 F.2d 666, 669 (9th Cir. 1967) ("[T]he navigational servitude, by its nature, does not destroy or exclude all property rights in the beds and banks of navigable streams. Such rights continue to exist but are held subject to the governmental power in the nature of an easement.").

1059 See Kaiser Aetna v. United States, 444 U.S. 164, 170-79 (1979); see also PPL Montana, LLC v. Montana 132 S. Ct. 1215, 1228-29 (2012); The Propeller Genesee Chief v. Fitzhugh, 12 How. 443, 454-57 (1851) (exploring inadequacy of English common-law concept of navigable waters, based on ebb and flow of tide, for American geography); Kaiser Aetna, 444 U.S. at 182-83 (Blackmun, J., dissenting) (discussing same); cf. Rapanos v. United States, 547 U.S. 715 (2006) (construing "navigable waters" and "waters of the United States" as used in Clean Water Act); Tundidor v. Miami-Dade Cty., 831 F.3d 1328, 1333 (11th Cir. 2016) (citing cases).

standard is <u>navigability in fact</u>.[1060] Waterways are "navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce."[1061] But this threshold question is not the end of the inquiry: for purposes of compensation under the Fifth Amendment, "the Supreme Court has rejected a mechanical test imposing the [navigational] servitude on all waters navigable in fact."[1062] Thus, whether the navigational servitude applies under federal law to a specific body of water that is navigable in fact must be determined on a case-by-case basis.[1063] Arising mainly (but not only) in inverse takings claims, this determination cannot be made by the appraiser; **legal instructions** are required.[1064]

**Scope of the Navigational Servitude.** The navigational servitude extends "to the entire bed of a stream, which includes the lands below ordinary high-water mark."[1065] It "applies to *all* holders of riparian and riverbed interests."[1066] Accordingly, property within the bed of a navigable stream is always subject to the potential exercise of the navigational servitude.[1067] And while the navigational servitude does not extend beyond the high-water mark, it does affect the compensation for fast lands acquired by the United States in connection with navigation.[1068]

Whether the federal project prompting an acquisition is related to navigation is determined by Congress or the agency officials to whom Congress has delegated this authority—primarily the U.S. Army Corps of Engineers.[1069] "If the interests of navigation are served, it is constitutionally irrelevant that other purposes may also be advanced."[1070] Accordingly, "[o]nce Congress determines that an action will improve or protect navigation, the Government may rely on the navigation servitude to accomplish that action."[1071] And federal courts have repeatedly held that proper exercise of the navigation servitude stems from the purposes of the federal project as a whole rather than the immediate facts of a specific acquisition.[1072] Indeed, the United States may "block navigation at one place to foster it at another."[1073]

Congress may also decide not to assert the navigational servitude in a specific acquisition or project—in other words, Congress may authorize payment of compensation above what the

---

1060  E.g., *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 406 & n.21 (1940); *see Kaiser Aetna*, 444 U.S. at 175.

1061  *The Daniel Ball*, 77 U.S. 557, 563 (1870); *see Arizona v. California*, 283 U.S. 423, 452 n.2 (1931) (citing cases).

1062  *Boone v. United States*, 944 F.2d 1489, 1495 n.12 (9th Cir. 1991) (citing *Kaiser Aetna*, 444 U.S. at 175).

1063  *See, e.g., United States v. 102.871 Acres of Land in Cameron Par.* (*La. Jetty*), No. 2:13 CV 2508, 2015 WL 5794073 (W.D. La. Oct. 2, 2015); *see also Banks v. United States*, 71 Fed. Cl. 501 (2006). In practice, "this important public interest has generally led to the conclusion that the navigational servitude will preclude the payment of compensation in cases involving waters navigable in interstate commerce . . . ." *Boone*, 944 F.2d at 1501.

1064  *See, e.g., Owen v. United States*, 851 F.2d 1404 (Fed. Cir. 1988); *Banks*, 71 Fed. Cl. 501; *Alameda Gateway, Ltd. v. United States*, 45 Fed. Cl. 757 (1999). The issue arises less frequently in other types of federal acquisitions. *See, e.g., La. Jetty*, 2015 WL 5794073; *see also United States v. 30.54 Acres of Land in Greene Cty.* (*Filiaggi*), 90 F.3d 790 (3d Cir. 1996).

1065  *United States v. Chi., M., St. P. & P. R. Co.*, 312 U.S. 592, 596-97 (1941); *accord United States v. Cherokee Nation*, 480 U.S. 700, 704 (1987); *United States v. Rands*, 389 U.S. 121, 123 (1967); *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 625 (1961).

1066  *Cherokee Nation*, 480 U.S. at 706; *see id.* at 706-07 (citing cases).

1067  *Rands*, 389 U.S. at 123; *Lewis Blue Point Oyster Cultivation Co. v. Briggs*, 229 U.S. 82, 88 (1913); *Alameda Gateway*, 45 Fed. Cl. at 763.

1068  *Va. Elec.*, 365 U.S. at 629; *accord Rands*, 389 U.S. at 123-24; *United States v. Twin City Power Co.*, 350 U.S. 222, 225 (1956); *see also Kaiser Aetna v. United States*, 444 U.S. 164, 175-77 (1979).

1069  *Twin City Power*, 350 U.S. at 224; *United States v. Commodore Park, Inc.*, 324 U.S. 386, 392 (1945); *see, e.g., United States v. Certain Parcels of Land in Valdez*, 666 F.2d 1236, 1239 (9th Cir. 1982) (discussing Ports and Waterways Safety Act of 1972, codified at 33 U.S.C. § 1221).

1070  *Twin City Power*, 350 U.S. at 224.

1071  *Valdez*, 666 F.2d at 1239 (citing *Chi., M., St. P. & P. R. Co.*, 312 U.S. at 597); *cf. United States v. Gerlach Live Stock Co.*, 339 U.S. 725 (1950) (finding Congress had not intended to exercise navigation servitude in acquisitions for specific dam project).

1072  *Commodore Park*, 324 U.S. at 392-93; *see, e.g., Weatherford v. United States*, 606 F.2d 851, 853 (9th Cir. 1979) (holding navigational servitude applied to acquisition for purpose of relocating highway that would be submerged by construction of dam in navigable stream).

1073  *Commodore Park*, 324 U.S. at 393.

Constitution requires.[1074] But "[s]uch a waiver of sovereign authority will not be implied . . . . [I]t must be 'surrendered in unmistakable terms.'"[1075]

### Elements of Value Under the Navigational Servitude.

Market value that is "attributable in the end to the flow of the stream—over which the Government has exclusive dominion"—is not compensable under the Fifth Amendment.[1076] Similarly, any market value that arises from access to or use of navigable waters is allocable to the public, not to private owners.[1077] Paying compensation for such values would permit private owners to receive windfalls to which they are not entitled under the Fifth Amendment.[1078] Accordingly, while access to navigable waters may enhance the market value of fast land, any such value must be disregarded in federal acquisitions pursuant to the navigational servitude, except as provided below.[1079] Under this established principle of law, "all value attributable to the riparian location of the land" is excluded from consideration under the Fifth Amendment.[1080] As a result, when the United States acquires riparian fast lands in an exercise of its power to control commerce, elements of value that are not compensable under the Fifth Amendment include: port site value;[1081] power site or power development value;[1082] value due to riparian rights of access to navigable waters;[1083] irrigation value;[1084] and recreational value for boating, fishing, and hunting.[1085] Any value arising from a property's access to or use of navigable

> **Values Due to Access to or Use of Navigable Water**
>
> In federal acquisitions related to navigation, the following elements are not compensable under the Fifth Amendment:
>
> - Port site value
> - Power site value
> - Riparian rights of access to navigable waters
> - Irrigation value
> - Recreational value for boating, fishing, and hunting
>
> These values must be disregarded in federal acquisitions of fast land, except as required by federal statute. *See* 33 U.S.C. § 595a.

---

1074 *Gerlach Live Stock*, 339 U.S. at 739; *Lambert Gravel Co. v. J.A. Jones Constr. Co.*, 835 F.2d 1105, 1110 (5th Cir. 1988); *cf. Turner v. Kings River Conservation Dist.*, 360 F.2d 184, 192-93 (9th Cir. 1966) (analyzing Flood Control Act of 1944 § 8, codified at 33 U.S.C. § 701-1(b) (1996).

1075 *United States v. Cherokee Nation*, 480 U.S. 700, 707 (1987) (quoting *Bowen v. Pub. Agencies Opposed to Soc. Security Entrapment*, 477 U.S. 41, 52 (1986)); *accord Lambert Gravel*, 835 F.2d at 1109-10.

1076 *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 629 (1961); *accord United States v. Twin City Power Co.*, 350 U.S. 222, 225-27 (1956) ("a value in the flow of the stream [is] a value that inheres in the Government's servitude and one that under our decisions the Government can grant or withhold as it chooses").

1077 *United States v. Rands*, 389 U.S. 121, 124-25 (1967); *accord United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 427 (1940) ("[T]here is no private property in the flow of the stream. This has no assessable value to the riparian owner.").

1078 *Rands*, 389 U.S. at 126; *see also United States v. 30.54 Acres of Land in Greene Cty. (Filiaggi)*, 90 F.3d 790, 795 (3d Cir. 1996).

1079 *Rands*, 389 U.S. at 126 ("[T]hese rights and values are not assertable against the superior rights of the United States, are not property within the meaning of the Fifth Amendment, and need not be paid for when appropriated by the United States."); *see Twin City Power*, 350 U.S. at 227 ("it is the water power that creates the special value, whether the lands are above or below ordinary high water").

1080 *Va. Elec.*, 365 U.S. at 631; *accord Twin City Power*, 350 U.S. at 225-26 ("It is no answer to say that payment is sought only for the location value of the fast lands. That special location value is due to the flow of the stream . . . .").

1081 *Rands*, 389 U.S. at 126; *see also Filiaggi*, 90 F.3d at 796; *United States v. 87.30 Acres of Land*, 430 F.2d 1130, 1133 (9th Cir. 1970).

1082 E.g., *Va. Elec.*, 365 U.S. at 629; *Twin City Power*, 350 U.S. at 228; *United States v. Willow River Power Co.*, 324 U.S. 499, 511 (1945); *see Appalachian Elec.*, 311 U.S. at 424 (describing federal "dominion over flowage and its product, energy").

1083 *United States v. Commodore Park, Inc.*, 324 U.S. 386, 390-91 (1945); *Scranton v. Wheeler*, 179 U.S. 141, 152-53 (1900); *Gibson v. United States*, 166 U.S. 269, 275-76 (1897); *see South Carolina v. Georgia*, 93 U.S. 4, 10-11 (1876) (no compensation for diverting channel).

1084 *Weatherford v. United States*, 606 F.2d 851, 853 (9th Cir. 1979) (Kennedy, Circuit J.); *United States v. Birnbach*, 400 F.2d 378, 381-82 (8th Cir. 1968) (before Blackmun, Circuit J.).

1085 *Commodore Park*, 324 U.S. at 391 ("no private riparian rights of access to the waters to do such things as 'fishing and boating and the like'"); *Birnbach*, 400 F.2d at 382 ("boating, fishing and hunting"); *see also Lewis Blue Point Oyster Cultivation Co. v. Briggs*, 229 U.S. 82, 88 (1913) (no compensation for right to use bed for oyster cultivation); *but see* 28 U.S.C. § 1497 (permitting oyster growers to seek damages for destruction of oyster beds cultivated on private lands).

Federal law limits the navigational use of waters in the western United States so as not to "conflict with any beneficial consumptive use, present or future, . . . of such waters for domestic, municipal, stock water, irrigation, mining, or industrial purposes." 33 U.S.C. § 701-1(b) (2012) (applicable to "waters arising in States lying wholly or partly west of the ninety-eighth meridian"); *see In re Operation of the Mo. River Sys. Litig.*, 363 F. Supp. 2d 1145, 1153-54 (D. Minn. 2004), *aff'd in part and vacated in part*, 421 F.3d 618 (8th Cir. 2005) (discussing statute); *Turner v. Kings River Conservation Dist.*, 360 F.2d 184, 190-98 (9th Cir. 1966) (same). Appraisers should obtain legal guidance on the applicability of this Act.

waters must therefore be disregarded in valuations for federal acquisitions relating to navigation—except as required by 33 U.S.C. § 595a, the federal statute discussed below.[1086]

**Statutory Modification.** Congress modified the compensation rule disregarding value due to water access or use from consideration in 1970, with the enactment of 33 U.S.C. § 595a.[1087] This statute specifically authorizes compensation for market value due to water uses—that is, for more than what the constitution requires—for lands *above the high-water mark* that are *actually acquired* by the United States.[1088] But the statute does not allow compensation for loss of water access from property not acquired by the United States (remainder property),[1089] nor for any property below the high-water mark.[1090] The statute also made "no change in existing law with respect to the offsetting of special [direct] benefits to remaining real property against the just compensation" to be paid.[1091] As a result, § 595a has different implications for total and partial acquisitions.[1092]

**Total Acquisitions Under 33 U.S.C. § 595a.** In total acquisitions, in which the United States acquires an entire larger parcel, 33 U.S.C. § 595a creates an exception to the rule to disregard market value due to water access or use for property above the high-water mark.[1093] The statute provides that in connection with any improvement of rivers, harbors, canals, or waterways of the United States:

> [T]he compensation to be paid for real property taken by the United States above the normal high water mark of navigable waters of the United States shall be the fair market value of such real property based upon all uses to which such real property may reasonably be put, including its highest and best use, any of which uses may be dependent upon access to or utilization of such navigable waters.[1094]

As a result, valuations of total acquisitions under § 595a are fairly straightforward: the appraiser must consider water-dependent uses in determining the highest and best use, and the market value of fast land actually acquired should include any value due to its riparian location.[1095]

---

1086 As the Supreme Court observed, since its decision in *Rands* (1967), *Va. Electric* (1961), and *Twin City Power* (1956), "the elements of compensation for which the Government must pay when it condemned fast lands riparian to a navigable stream have remained largely settled." *Kaiser Aetna v. United States*, 444 U.S. 164, 176-77 (1979) (citing *Rands*, 389 U.S. at 123; *Va. Elec.*, 365 U.S. at 628; and *Twin City Power*, 350 U.S. at 226).

1087 Rivers and Harbors Act of 1970, Pub. L. No. 91-611, § 111, 84 Stat. 1818, 1821 (codified at 33 U.S.C. § 595a (2012)). These Standards refer to this statute as § 595a, using the official U.S. Code citation. The same statute has been referred to as Section 111 (an abbreviation of the session laws citation) in prior editions of these Standards and a few early federal cases.

1088 33 U.S.C. § 595a; *United States v. 967,905 Acres of Land in Cook Cty.* (*Pete*), 447 F.2d 764, 770-72 (8th Cir. 1971); *United States v. 71.29 Acres of Land in Catahoula Par.*, 376 F. Supp. 1221, 1225-26 (W.D. La. 1974); *United States v. 8,968.06 Acres of Land in Chambers & Liberty Ctys.* (*Wallisville*), 326 F. Supp. 546, 547-48 (S.D. Tex. 1971).

1089 33 U.S.C. § 595a; *United States v. 13.20 Acres of Land in Lincoln Cty.*, 629 F. Supp. 242, 247 (E.D. Wash. 1986); *see United States v. 30.54 Acres of Land in Greene Cty.* (*Filiaggi*), 90 F.3d 790, 795-96 (3d Cir. 1996); *see also Weatherford*, 606 F.2d 851 (no compensation for loss of irrigation rights for remainder property).

1090 *See, e.g., United States v. Certain Parcels of Land in Valdez*, 666 F.2d 1236 (9th Cir. 1982) (no compensation for alteration of improvements located in navigable waters); *United States v. 422,978 Square Feet of Land in S.F.*, 445 F.2d 1180 (9th Cir. 1971) (no compensation for use of submerged land beneath navigable waters); *see also United States v. Cherokee Nation*, 480 U.S. 700, 701-05 (1987) (no compensable taking arises from "interference with in-stream interests result[ing] from an exercise of the Government's power to regulate navigational uses of 'the deep streams which penetrate our country in every direction'" (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 195 (1824))).

1091 H.R. REP. No. 91-1665, at 31 (1970) (quoted in *Filiaggi*, 90 F.3d at 794 n.3).

1092 *Filiaggi*, 90 F.3d at 794 & n.3; *13.20 Acres in Lincoln*, 629 F. Supp. at 247; *see Pete*, 447 F.2d at 771. As discussed in Section 4.3.3, the appraiser must determine the larger parcel to distinguish whether a total or partial acquisition is involved.

1093 *See Filiaggi*, 90 F.3d at 795-96 & nn.4-5 (noting § 595a's limited nature).

1094 33 U.S.C. § 595a.

1095 *Pete*, 447 F.2d at 771; *United States v. 8,968.06 Acres of Land in Chambers & Liberty Ctys.* (*Wallisville*), 326 F. Supp. 546, 547-48 (S.D. Tex. 1971); *see United States v. 71.29 Acres of Land in Catahoula Par.*, 376 F. Supp. 1221, 1225-26 (W.D. La. 1974).

Section 595a does not alter the rule that no compensation is due for lands *below* the high-water mark.[1096] Such lands include property located in the bed of a navigable stream[1097] or "spoil islands" and other infilled land created by the United States' dredging activity.[1098] And this rule does not change simply because the legal description of property being acquired may include or contain some land below the high-water mark—for example, if a deed is the source of a legal description, reflecting "a measure of convenience [rather] than a waiver of the navigational servitude."[1099] Note also that § 595a does not alter or replace the scope of the project rule, which bars consideration of changes in market value due to government project influence (see Section 4.5). As a result, application of the scope of the project rule and application of § 595a are separate inquiries.[1100]

**Partial Acquisitions Under 33 U.S.C. § 595a.** Partial acquisitions under 33 U.S.C. § 595a require a special valuation method because Congress expressly did not authorize compensation for diminution in value of landowners' remaining property because of lost or reduced access to navigable waters. The statute provides:

> In cases of partial takings of real property, no depreciation in the value of any remaining real property shall be recognized and no compensation shall be paid for any damages to such remaining real property which result from loss of or reduction of access from such remaining real property to such navigable waters because of the taking of real property or the purposes for which such real property is taken.[1101]

As a result, in partial acquisitions of riparian land under § 595a, access to or use of navigable waters must be considered in valuing the *part acquired*, but cannot be considered in evaluating any damage to the *remainder property*.[1102] Moreover, because § 595a does not alter "existing law with respect to the offsetting of special benefits to remaining real property,"[1103] any direct and special benefit to the remainder property—including benefits resulting from new or enhanced access to navigable waters due to the government's acquisition—must be considered.[1104]

---

1096 33 U.S.C. § 595a; *Filiaggi*, 90 F.3d at 795-96; *see United States v. 101.88 Acres of Land in St. Mary Par.* (*Avoca Island*), 616 F.2d 762, 768 (5th Cir. 1980) (noting government may use submerged lands subject to navigational servitude "for any purpose in aid of navigation without compensating the owner").

1097 *Greenleaf-Johnson Lumber Co. v. Garrison*, 237 U.S. 251 (1915) (wharf); *Lewis Blue Point Oyster Cultivation Co. v. Briggs*, 229 U.S. 82 (1913) (oyster cultivation); *W. Chi. St. R.R. v. Ill. ex rel. Chi.*, 201 U.S. 506 (1906) (tunnel); *Alameda Gateway, Ltd. v. United States*, 45 Fed. Cl. 757, 764 (1999) (pier).

1098 E.g., *United States v. 49.79 Acres of Land in New Castle Cty.* (*Cherry Island*), 582 F. Supp. 368, 374 (D. Del. 1983); *United States v. 102.871 Acres of Land in Cameron Par.* (*La. Jetty*), No. 2:13 CV 2508, 2015 WL 5794073, *7-*8 (W.D. La. Oct. 2, 2015) (holding servitude applied to spoil island created by dredge cast into navigable waters). Lands created by private dredging activity may require compensation, however. See *Kaiser Aetna v. United States*, 444 U.S. 164, 178-80 (1979).

1099 *See, e.g.*, *Lambert Gravel Co. v. J.A. Jones Constr. Co.*, 835 F.2d 1105, 1111 (5th Cir. 1988); *see also Avoca Island*, 616 F.2d at 764-69 (noting government's original legal description of property relied on disputed ordinary high-water mark, but after amendment to "describe the above water ridges in courses and distances, there was little question about the accuracy of the description").

1100 E.g., *United States v. 13.20 Acres of Land in Lincoln Cty.*, 629 F. Supp. 242, 243-47 (E.D. Wash. 1986). Similarly, application of the scope of the project rule is also distinct from application of the navigational servitude, regardless of whether § 595a applies. *See United States v. Birnbach*, 400 F.2d 378 (8th Cir. 1968).

1101 33 U.S.C. § 595a; *see* Section 4.6 (Partial Acquisitions); *see also Palm Beach Isles Assocs. v. United States*, 42 Fed. Cl. 340, 352 (Fed. Cl. 1998) (noting provision "does not abrogate the navigational servitude generally, . . . nor provide compensation for loss or reduction of access to navigable waters"), *vacated on other grounds*, 208 F.3d 1374 (Fed. Cir. 2000).

1102 *United States v. 13.20 Acres in Lincoln Cty.*, 629 F. Supp. 242, 247 (E.D. Wash. 1986); *see also Good v. United States*, 39 Fed. Cl. 81, 97 (1997), *aff'd*, 189 F.3d 1355 (Fed. Cir. 1999).

1103 *United States v. 30.54 Acres of Land in Greene Cty.* (*Filiaggi*), 90 F.3d 790, 794 n.3 (3d Cir. 1996) (quoting H.R. REP. No. 91-1665, at 31 (1970)); *see* Section 4.6.3 (Benefits).

1104 *See United States v. Rands*, 389 U.S. 121, 125-26 (1967); *Filiaggi*, 90 F.3d at 794 & nn.2-3; *Miller v. United States*, 550 F. Supp. 669, 674 n.3 (Cl. Ct. 1982), *aff'd*, 714 F.2d 160 (Fed. Cir. 1983) (mem.); *see also* 33 U.S.C. § 595 (2012) (codifying offset of "special and direct benefits to the remainder" for partial takings "in connection with any improvement of rivers, harbors, canals, or waterways of the United States"); *cf. Horne v. Dep't of Agric.*, 135 S.Ct. 2419, 2432 (2015) (noting regulatory taking ruling does not affect provisions for offset of "special benefits—such as new access to a waterway" in partial takings).

The portion of § 595a prohibiting consideration of damage for remainder property's loss of riparian access has been upheld as constitutional.[1105] But federal courts have not specifically addressed the appropriate valuation method to measure compensation in partial acquisitions under the statute.[1106] The usual before and after valuation method for partial acquisitions[1107] does not readily allow the different treatment of the part acquired and the remainder property that § 595a requires.[1108] As a result, valuing partial acquisitions under § 595a may require use of a taking plus damages method—but only with appropriate **legal instructions**.[1109]

As explained in Section 4.6.4.1, the taking plus damages method is subject to error and apt to result in improper duplication (double damage), and is therefore generally improper in valuations for federal acquisitions. Its use is recommended here solely to address the unique challenges of valuing partial acquisitions under 33 U.S.C. § 595a. As discussed above, valuations of partial acquisitions under this statute must incorporate the following:

Each of the steps in this rare application of the taking plus damages method requires great care to ensure its results can be used for purposes of just compensation. Note also that the portion being valued at each step must be valued as part of the appropriate larger parcel (Section 4.6.1.1).

- Estimate the market value of the part acquired, *including* value due to water access. The market value of the part acquired must be estimated as a part of the larger parcel. As a result, the appraiser must estimate the market value of the larger parcel based on its highest and best use, *including* uses that depend on access to or utilization of navigable waters, *before* acquisition; then allocate that value to determine the contributory value of the *part being acquired*.[1110]

---

1105 *13.20 Acres of Land in Lincoln*, 629 F. Supp. at 247 (citing *Rands*, 389 U.S. 121).

1106 *E.g.*, *13.20 Acres in Lincoln*, 629 F. Supp. at 247 ("[Section] 595a will apply to the valuation of the remaining parcels, and severance damages regarding those parcels will not include loss of access to Lake Roosevelt."). Indeed, the only other cases to directly address valuation issues under § 595a involved total, not partial, acquisitions. *Filiaggi*, 90 F.3d 790; *United States v. 967, 905 Acres of Land in Cook Cty.* (*Pete*), 447 F.2d 764, 771 (8th Cir. 1971); *United States v. 71.29 Acres of Land in Catahoula Par.*, 376 F. Supp. 1221, 1225-26 (W.D. La. 1974); *United States v. 8,968.06 Acres of Land in Chambers & Liberty Ctys.* (*Wallisville*), 326 F. Supp. 546, 547-50 (S.D. Tex. 1971), *vacating* 318 F. Supp. 698 (S.D. Tex. 1970) *in view of statute*. The legislative history of § 595a is similarly sparse. *See* Ronald C. Allen, *Federal Evaluation of Riparian Property: Section 111 of the Rivers and Harbors Act of 1970*, 24 ME. L. REV. 175 (1972); Kerry R. Brittain, Comment, *Navigation Servitude—The Shifting Rule of No Compensation*, 7 LAND & WATER L. REV. 501 (1972); Charles E. Corker, *Federal-State Relations in Water Rights Adjudication and Administration*, 17 ROCKY MTN. MIN. L. INST. 21 (1972); *see also* Alan T. Ackerman & Noah Eliezer Yanich, *Just and Unjust Compensation: The Future of the Navigational Servitude in Condemnation Cases*, 34 U. MICH. J.L. REFORM 573 (2001).

1107 In partial acquisitions (Section 4.6), the measure of compensation is normally the difference between the market value of the landowner's property before and after the government's acquisition. *E.g.*, *United States v. Birnbach*, 400 F.2d 378, 382 (8th Cir. 1968). Appraisers therefore apply the before and after valuation method (the Federal Rule), estimating the market value of the larger parcel *before* the acquisition, and subtracting the market value of the remainder property *after* acquisition, to determine the difference (diminution) in market value. *See* Section 4.6.1.

1108 *Cf. Birnbach*, 400 F.2d at 382-83 (holding that in determining damage to remainder property in partial taking affected by navigational servitude, an "important distinction must be made so that the enhancement in value 'flowing' from a riparian location may not be recognized when the riparian character of the [remainder] land is destroyed"). While *Birnbach* predated § 595a, the statute did not change the compensation for damage to remainder property. *See Pete*, 447 F.2d at 770-71 (discussing *Birnbach* and § 595a).

1109 As discussed in Section 4.6.4.1, the taking plus damages valuation method (the State Rule) is generally improper in valuations for federal acquisition purposes. It cannot be used in federal acquisitions (under § 595a or otherwise) without appropriate **legal instructions**. *See* EATON, *supra* note 16, at 30-40 (discussing taking plus damages valuation methods); *see also United States v. 97.19 Acres of Land*, 582 F.2d 878, 880-81 (4th Cir. 1978); *United States v. 344.85 Acres of Land*, 384 F.2d 789, 792 (7th Cir. 1967).

1110 *See* Section 4.3.3; *cf. Olson v. United States*, 292 U.S. 246, 256 (1934) (addressing uses made in combination with other lands); *United States v. 429.59 Acres of Land* (*Imperial Beach*), 612 F.2d 459, 463-64 (9th Cir. 1980) (approving instruction to "value the property as a unit" because "it was 'reasonably probable that the properties would be used in combination'").

- Estimate damage (diminution in value) to the remainder property resulting from the government's acquisition, *disregarding* any damage due to lost or impaired water access. That is, what is the difference in value of the *remainder property* before and after the acquisition, based on its highest and best use *excluding* uses that depend on access to or utilization of navigable waters? There may or may not be any diminution in value of the remainder resulting from the government's acquisition that is unrelated to water use or access.[1111]

- Estimate special and direct benefits to the remainder resulting from the government's project, *including* those due to new or enhanced riparian access.[1112] For example, such benefits include direct river access from the remainder property from which a landowner can build docks or piers (subject to applicable laws)[1113] or improved bank stabilization and flood control due to a revetment project that allows remainder property to be converted to a more valuable use.[1114] Any direct and special benefits resulting from the project must be offset against the total compensation to be paid.[1115]

Following these steps, the ultimate calculation will reflect the market value of the part acquired (including water access) plus damage to the remainder (disregarding lost water access), offset by direct and special benefits to the remainder (including new or improved water access).

**The Navigational Servitude and Inverse Taking Claims.** As the Supreme Court has observed, the navigational servitude does not create a blanket exception to the Takings Clause whenever Congress exercises its authority to promote navigation under the Commerce Clause.[1116] In inverse takings claims, courts must consider the factual circumstances of each case regarding the scope of the navigational servitude to determine whether a public action has effected a taking.[1117]

---

1111 *See United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 629-30 (1961) (remanding for determination of "depreciative impact of the [acquisition] upon the nonriparian uses of the property").

1112 *United States v. Rands*, 389 U.S. 121, 125-26 (1967); *United States v. River Rouge Improvement Co.*, 269 U.S. 411, 417-18 (1926); *see* 33 U.S.C. § 595 (2012) (mandating that in partial takings in connection with improvement of rivers, harbors, canals or waterways of the United States, award of just compensation "shall take into consideration by way of reducing the amount of compensation or damages any special and direct benefits to the remainder arising from the improvement"); *see also United States v. Eastman (Eastman I)*, 528 F. Supp. 1177, 1179 n.2 (D. Or. 1981), *adopted* 714 F.2d 76, 77 (9th Cir. 1983) (per curiam) ("Where only part of a tract of land is taken, the government is entitled to deduct from the condemnation award benefits which accrue to the landowner's remaining land in the same tract." (citing § 595)).

1113 *River Rouge*, 269 U.S. at 417-18. While the remainder property may be subject to the navigational servitude, it is "fundamental error" to "over-emphasi[ze] the contingent character of the rights of the riparian owners." *Id.* at 420-21.

1114 *E.g.*, *United States v. Fort Smith River Dev. Corp.*, 349 F.2d 522, 525-26 (8th Cir. 1965) (reversing award that failed to consider special benefits due to United States' revetment project that "manifestly" protected remainder land "from further reliction or erosion. That fact alone apparently places [the remainder] in a 'better position' because of the taking" and must be considered).

1115 H.R. Rep. No. 91-1665, at 31 (1970) (noting § 595a does not change federal law on offsetting special benefit to remainder "against the just compensation that would otherwise be paid for the real property taken and for damages to remaining real property"); *United States v. 30.54 Acres of Land in Greene Cty. (Filiaggi)*, 90 F.3d 790, 794 n.3 (3d Cir. 1996) (quoting H.R. Rep. No. 91-1665); *see Rands*, 389 U.S. at 125-26 ("compensation award for the part of the property taken by the Government was reduced by the value of the special and direct benefits to the remainder of the land" (describing *River Rouge*)); *see also Bauman v. Ross*, 167 U.S. 548 (1897); *Hendler v. United States*, 175 F.3d 1374, 1379-80 (Fed. Cir. 1999) (noting differences in federal and state laws regarding offset of benefits).

1116 *Kaiser-Aetna*, 444 U.S. 164, 172 (1979).

1117 *E.g.*, *Owen v. United States*, 851 F.2d 1404 (Fed. Cir. 1988); *Banks v. United States*, 71 Fed. Cl. 501 (2006); *Alameda Gateway, Ltd. v. United States*, 45 Fed. Cl. 757 (1999).

5-ER-951

**4.11.2.    Federal Grazing Permits.** In federal acquisitions involving ranch lands, appraisers must disregard any value added to those lands as a result of their actual or potential use in combination with adjacent federal lands under revocable grazing permits.[1118] Federal grazing permits are chiefly administered by the Bureau of Land Management (U.S. Department of Interior) under the Taylor Grazing Act [1119] and the Forest Service (U.S. Department of Agriculture) under the Granger-Thye Act.[1120] By law, these federal permits to use the public domain for grazing are revocable and create no property rights in the holder.[1121] Thus, while grazing permits typically remain with a privately owned base property for many years, permits revert to the federal agency when the base property is sold and may or may not be granted to the new owner.[1122] As a result, in federal acquisitions, privately owned lands cannot be aggregated with permitted public lands for valuation purposes, as "[t]o require the United States to pay for this . . . value would be to create private claims in the public domain."[1123] Appraisers must therefore disregard the use or potential use of the subject property in conjunction with federal grazing permit lands—even if "this element of value would be considered by a potential buyer in the open market"—because the government "need not compensate for value which it could remove by revocation of a permit for the use of lands that it owned outright."[1124]

Because Congress elected not to create compensable rights out of what are now licensees, landowners "have no compensable right in the land covered by their grazing permits or in the permits themselves."[1125] As a result, federal grazing permits cannot be considered in estimating market value.[1126]

> **Whether departure from the market value measure of just compensation is required, and if so, what alternative measure of compensation is appropriate, are legal determinations that cannot be made by the appraiser.**

**4.11.3.    Streets, Rail Corridors, Infrastructure, and Public Facilities.** Federal acquisitions may involve property already being used to benefit the public—such as a street, landfill, or other public facility—owned by public or private entities that may be obligated to replace the facility acquired by the United States. But the Supreme Court has unanimously held that none of these facts

---

1118 *United States v. Fuller*, 409 U.S. 488, 492-93 (1973); *see Bischoff v. Glickman*, 54 F. Supp. 2d 1226, 1230-31 (D. Wyo. 1999); *see also Estate of Hage v. United States*, 687 F.3d 1281, 1291-92 (Fed. Cir. 2012).

1119 Taylor Grazing Act of 1934, 43 U.S.C. § 315(b) (2012) (grazing permits on rangelands in the public domain administered by the Bureau of Land Management, U.S. Department of the Interior); *see generally Public Lands Council v. Babbitt*, 529 U.S. 728, 731-39 (2000) (purpose, history, and administration of Taylor Grazing Act).

1120 Granger-Thye Act of 1950, 16 U.S.C. § 580*l* (2012) (grazing permits on National Forest System lands, administered by the U.S. Forest Service).

1121 43 U.S.C. § 315b ("issuance of a permit pursuant to [this provision] shall not create any right, title, interest or estate in or to the lands"); *Fuller*, 409 U.S. at 492-93.

1122 APPRAISAL INSTITUTE & AM. SOC'Y OF FARM MANAGERS, THE APPRAISAL OF RURAL PROPERTY 325 (2d ed. 2000); *see generally id.* 324-27; *Public Lands Council*, 529 U.S. at 743 (noting "well-established [agency] powers to cancel, modify, or decline to renew individual permits" under Taylor Grazing Act).

1123 *Fuller*, 409 U.S. at 493 (citation omitted).

1124 *Id.* at 491-92; *see, e.g., Estate of Hage*, 687 F.3d at 1291-92.

1125 *Hage v. United States*, 51 Fed. Cl. 570, 587-88 (Fed. Cl. 2002); *see Estate of Hage*, 687 F.3d at 1291-92; *see also Monongahela Nav. Co. v. United States*, 148 U.S. 312, 327 (1893) ("The legislature may determine what . . . property is needed for public purposes[,]" but determining the measure of compensation "is a judicial, and not a legislative, question."); *Hage v. United States*, 35 Fed. Cl. 147, 170 (Fed. Cl. 1996) ("[B]ased upon the language and history of the Granger-Thye Act and the Taylor Grazing Act, . . . Congress had no legislative intention of creating a property interest in the permit just as Congress had no legislative intention of creating a property interest in the underlying federal lands.").

1126 *Fuller*, 409 U.S. at 491-92. Congress has provided for *administrative* payments for losses due to cancellation of Taylor grazing permits for war purposes. *See* 43 U.S.C. § 315q (2012); *United States v. Cox*, 190 F.2d 293, 296 (10th Cir. 1951). But these administrative benefits created by statute are separate from compensation under the Fifth Amendment, and beyond the scope of the appraiser's assignment to estimate market value. *See United States v. Westinghouse Elec. & Mfg. Co.*, 339 U.S. 261, 263-64, 264 n.2 (1950); *United States v. Gen. Motors Corp.*, 323 U.S. 373, 379-80 (1945); *United States v. Willow River Power Co.*, 324 U.S. 499, 510 (1945).

"require suspension of the normal rules for determining just compensation."[1127] Accordingly, compensation for streets, highways, roads, alleys, other infrastructure, or public facilities is measured by the same market value standard applied to other types of property, whether publicly or privately owned. "Deviation from this measure of just compensation [is] required only 'when market value [is] too difficult to find, or when its application would result in manifest injustice to owner or public.'"[1128] Appraisals for federal acquisitions of streets, infrastructure, or public facilities must therefore follow the same valuation standards as for any other property, whether privately or publicly owned.[1129]

### 4.11.3.1. Streets, Highways, Roads, and Alleys.

Under federal law, streets, roads, highways, and alleys typically have only nominal market value, and therefore only nominal compensation is due for their acquisition.[1130] This is because streets and similar property are normally long narrow strips of land that have been legally dedicated to use as streets or highways, depriving them of value except as thoroughfares.[1131] As discussed in more detail in Section 4.6.5 (Easement Valuation Issues), it is critical for the appraiser to understand the precise property interest(s) being acquired and the impact of any existing encumbrances.[1132] **Legal instructions** are typically required. The Ninth Circuit explained the process for determining just compensation for the taking of state-owned lands dedicated as public thoroughfares in *California v. United States* (*Naval Shipyard*):

> "Just compensation" is to be measured by what the State lost by the taking, and, [here], this is the value of the lands in question burdened as they were. The *legal effect of the dedication* under the law of the State must first be determined. That question of law resolved, the monetary *value, if any*, of the loss to the State *of the lands so burdened* must then be ascertained . . . .[1133]

Federal courts have repeatedly upheld the payment of only nominal compensation for streets and similar property with only nominal market value.[1134] If the owner of a street acquired by the United States is not required to replace it, the owner—typically a city or other municipal

---

[1127] *United States v. 564.54 Acres of Land* (*Lutheran Synod*), 441 U.S. 506, 516 (1979) (rejecting demand of owner, a private nonprofit organization, for compensation measured by cost of substitute facility rather than market value); *United States v. 50 Acres of Land* (*Duncanville*), 469 U.S. 24, 33-34 (1984) (rejecting municipal owner's demand for same).

[1128] *Duncanville*, 469 U.S. at 29 (quoting *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950)); *accord Lutheran Synod*, 441 U.S. at 512-13; *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 n.14 (1984); *see United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 402 (1949) ("[When there are insufficient comparable sales to determine market value, w]e then say that there is 'no market' for the property in question. . . . And it is here that other means of measuring [market] value may have relevance—but only, of course, as bearing on what a prospective purchaser would have paid.").

[1129] *See Duncanville*, 469 U.S. at 26 (holding public condemnees are not entitled to substitute-facilities compensation if market value can be ascertained); *Lutheran Synod*, 441 U.S. at 516-17 (holding private condemnees are not entitled to substitute-facilities compensation).

[1130] *United States v. Streets, Alleys & Pub. Ways in Vill. of Stoutsville*, 531 F.2d 882, 887 (8th Cir. 1976).

[1131] *E.g.*, *Mayor & City Council of Baltimore v. United States*, 147 F.2d 786, 788-89 (4th Cir. 1945) ("The fact is that the value of the land in the bed of the highway as land has been diminished by its devotion to a limited purpose."); *see United States v. 3,727.91 Acres of Land* (*Elsberry Drainage District*), 563 F.2d 357, 359-60 (8th Cir. 1977) ("[When] the public condemnee has held only a right of way easement in a public street or alley, and, upon condemnation, they retained no interest in the property[, . . . ] only nominal compensation is held to be proper."); *California v. United States* (*Naval Shipyard*), 395 F.2d 261, 266-68 (9th Cir. 1968) (discussing possible impacts of dedication on lands' use and market value).

[1132] Encumbrances affecting streets could include dedication to highway use, prohibitions on non-road use, or reversionary rights, for example. Such legal encumbrances are a type of easement, that is, a limited right to use or control land owned by another for specified purposes. Federal acquisitions of streets, roads, highways, and alleys may involve dominant easement interests (Section 4.6.5.1), lands encumbered by easements (Section 4.6.5.2), and/or appurtenant easements to the servient estate (Section 4.6.5.3). Section 4.6.5 addresses the valuation issues that commonly arise in acquisitions involving each type of easement.

[1133] *Naval Shipyard*, 395 F.2d at 266-67 (emphases added).

[1134] *See Caporal v. United States*, 577 F.2d 113, 117-18 (10th Cir. 1978); *Elsberry Drainage District*, 563 F.2d at 359-60; *Vill. of Stoutsville*, 531 F.2d at 887; *United States v. City of New York*, 168 F.2d 387, 389-90 (2d Cir. 1948); *Woodville v. United States*, 152 F.2d 735, 736-37 (10th Cir. 1946), *cert. denied*, 328 U.S. 842 (1946); *United States v. Des Moines Cty.*, 148 F.2d 448, 449 (8th Cir. 1945).

entity—suffers no *loss*, and therefore no compensation is due.[1135] Such federal acquisitions may even *benefit* the owner economically by relieving the owner of the cost of maintaining the land as a highway.[1136] Nominal compensation in such circumstances is therefore consistent with the basic Fifth Amendment principles of indemnity and fairness.[1137] Alternatively, as discussed below, it is constitutionally permissible for the United States to provide compensation in the form of a *substitute facility* instead of cash.[1138]

Even strips of land that may have been intended for use as a street, but are not legally encumbered (or "dedicated") to prohibit non-street use, typically have limited market value. Indeed, it is legally improper to simply assume such strips have the same market value as surrounding lands.[1139] As the Federal Circuit explained:

> The point is that the property at issue here consists of strips of land, rather than one large, easily developable tract. The question . . . is, what is the fair market value of such odd pieces of land, taking into account their potential uses, current condition and the improvements thereon, and considering the most profitable uses to which the pieces of land can probably be put in the reasonably near future.[1140]

Again, **legal instructions** are typically required regarding the precise property interest(s) to be appraised and the effects of any encumbrances. Existing legal encumbrances must be considered when developing opinions of market value.[1141]

Acquisitions of existing roads or rights of way may also involve land with physical impediments or conditions—such as embankments, underground utility lines, rail ties, or poor soil conditions.[1142] Preexisting physical conditions, like legal encumbrances, must be considered when developing opinions of market value.[1143] For example, in an inverse taking of a railway corridor with physical remnants of the abandoned railway that would require removal to put the property

---

1135 *Vill. of Stoutsville*, 531 F.2d at 886; *Naval Shipyard*, 395 F.2d at 266-67; *Washington v. United States* (*Hanford*), 214 F.2d 33, 39 (9th Cir. 1954); *see United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 281 (1943) ("it is the owner's loss, not the taker's gain, which is the measure of compensation for the property taken").

1136 *Jefferson Cty. v. Tenn. Valley Auth.*, 146 F.2d 564, 566 (6th Cir. 1945); *see Naval Shipyard*, 395 F.2d at 268 ("The State has lost the profit potential, if any, which these lands may have had as part of the 'channel.' On the other hand, the untaken lands have been relieved of the burdens of the dedication. These and other relevant factors must be considered . . . to determine whether the taking resulted in a decrease in the value of the untaken portion of the channel . . . .").

1137 *See United States v. 50 Acres of Land* (*Duncanville*), 469 U.S. 24, 30 (1984) ("basic principles of indemnity embodied in the Just Compensation Clause"); *United States v. 564.54 Acres of Land* (*Lutheran Synod*), 441 U.S. 506, 517 (1979) ("'basic equitable principles of fairness' underlying the Just Compensation Clause" (quoting *United States v. Fuller*, 409 U.S. 488, 490 (1973))); *cf. United States v. 46,672.96 Acres of Land in Doña Ana Ctys.*, 521 F.2d 13, 17 (10th Cir. 1975) ("The fact that [property] has very little value cannot justify . . . using an inapplicable measure . . . .").

1138 *See Duncanville*, 469 U.S. at 33 (discussing *Brown v. United States*, 263 U.S. 78 (1923)).

1139 *Bd. of Cty. Supervisors v. United States* (*Prince William Cty. II*), 116 F.3d 454, 458 (Fed. Cir. 1997) (holding lower court "erred as a matter of law in reading our decision as foreclosing an inquiry into whether the value of the [strips of land] was different from the value of the surrounding land").

1140 *Id.*; *see Naval Shipyard*, 395 F.2d at 266-68.

1141 *Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910); *see United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 76 (1913) ("[T]here would be no justice in paying for a loss suffered by no one in fact."); *cf. Nebraska v. United States*, 164 F.2d 866, 869 (8th Cir. 1947), *cert. denied*, 334 U.S. 815 (1948) (no compensation for "a diminution in the market value of the [landowner's] rights through the creation of a leasehold, easement, or other interest in the land by the [landowner's] own acts" preceding United States' acquisition).

1142 *See, e.g., Rasmuson v. United States*, 807 F.3d 1343, 1346 (Fed. Cir. 2015) (inverse taking of railway corridor converted to trail use). See Section 4.11.3.2 for discussion of inverse takings claims regarding *rails-to-trails* conversions under the 1983 Amendments to the National Trails System Act.

1143 *Rasmuson*, 807 F.3d at 1346; *United States v. 0.59 Acres of Land*, 109 F.3d 1493, 1497 (9th Cir. 1997) (holding "the condition of condemned land is relevant" and it would be improper to "ignor[e] a condition that the Government did not create" – namely, a preexisting power transmission line within abutting right of way); *United States v. 320 Acres of Land*, 605 F.2d 762, 818 (5th Cir. 1979) (noting "inherent physical characteristics of a property" may "decisively" preclude an otherwise possible use); *see Olson v. United States*, 292 U.S. 246, 256 (1934) ("highest and most profitable use for which the property is adaptable"); Section 4.3 (Highest and Best Use).

Uniform Appraisal Standards for Federal Land Acquisitions / Legal Foundations for Appraisal Standards      197

to its highest and best use, the Federal Circuit recently held that failing to consider the removal costs "will result in an artificially inflated value and yield a windfall to the landowner."[1144] Physical remnants of *improvements made by the United States* may require special treatment, and the appraiser must request appropriate **legal instruction**. This issue is discussed in Section 4.2.2.2.1 and the accompanying case study.

At times, streets or similar facilities may be "so infrequently traded" that their market value may be too difficult to ascertain, at least from comparable sales.[1145] But a market need not be "an extremely active one" to allow market value to be ascertained.[1146] And market value can generally be determined even when no comparable sales are available.[1147] Accordingly, it is legally improper to assume that market value cannot be ascertained, even if no comparable sales are available.[1148] Whatever valuation method is used, "the equitable principles underlying just compensation require that any profitable uses of the lands which are left open by the dedication must be considered in determining the fact of loss and in calculating its monetary equivalent."[1149]

**4.11.3.2.    Corridors and Rights of Way.** Acquisitions of strips, corridors, or rights of way via negotiated purchase or affirmative condemnation involve many similar valuation problems to those found in acquisitions of streets. Such acquisitions often involve preexisting encumbrances, such as easements for rail or transmission line use, that may deprive them of value for other uses.[1150] The appraiser must understand the precise property interest(s) being acquired and the impact of any existing encumbrances.[1151] Typically, **legal instructions** are required.[1152]

**Rails-to-Trails Claims.** These issues frequently arise in so-called *rails-to-trails* cases. The

---

1144 *Rasmuson*, 807 F.3d at 1346.

1145 *See United States v. 564.54 Acres of Land (Lutheran Synod)*, 441 U.S. 506, 513 (1979) ("This might be the case, for example, with respect to . . . roads or sewers."); *United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 402 (1949) ("At times, however, peculiar circumstances may make it impossible to determine a 'market value.' There may have been, for example, so few sales of similar property that we cannot predict with any assurance that the prices paid would have been repeated in the sale we postulate of the property taken. We then say that there is 'no market' for the property in question. But that does not put out of hand the bearing which the scattered sales may have on what an ordinary purchaser would have paid for the claimant's property. We simply must be wary that we give these sparse sales less weight than we accord 'market' price, and take into consideration those special circumstances in other sales which would not have affected our hypothetical buyer. And it is here that other means of measuring value may have relevance—but only, of course, as bearing on what a prospective purchaser would have paid.").

1146 *See Lutheran Synod*, 441 U.S. at 513.

1147 *Toronto, Hamilton*, 338 U.S. at 402; *see, e.g.*, *United States v. 3,727.91 Acres of Land (Elsberry Drainage District)*, 563 F.2d 357, 361-62 (8th Cir. 1977) (error to assume market value of levees and ditches could not be determined without comparable sales evidence and to disregard other evidence of market value).

1148 *Elsberry Drainage District*, 563 F.2d at 361-62; *California v. United States (Naval Shipyard)*, 395 F.2d 261, 264-67 (9th Cir. 1968); *see Toronto, Hamilton*, 338 U.S. at 402.

1149 *Naval Shipyard*, 395 F.2d at 267 (reversing lower court's failure to consider evidence of market value of lands dedicated as streets); *accord Elsberry Drainage District*, 563 F.2d at 362 (quoting *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473 (1973)) ("The district court ruled that without the comparable sale as evidence of value the appraisers did not have an adequate basis for their valuation . . . . [But i]n light of the underlying policy in condemnation proceedings of providing the 'full monetary equivalent of the property taken,' we think [the appraiser's] testimony [based on other evidence of market value] deserved to be given greater weight.").

1150 *See, e.g.*, Interstate Commerce Act, 49 U.S.C. § 10903 (2012) (generally requiring rail carrier to continue to offer service over its lines to shippers unless it first obtains authority to abandon or discontinue lines from Interstate Commerce Commission); *United States v. Chi., B. & Q. R. Co.*, 82 F.2d 131, 140 (8th Cir. 1936) (discussing similarities between public highways and railways).

1151 *See* Section 4.6.5; *cf. Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910).

1152 Whether or not a rail right of way had been legally abandoned or discontinued as of the date of value is often key. *See Preseault v. Interstate Commerce Comm'n (Preseault I)*, 494 U.S. 1, 5 n.3 (1990) (discussing important distinction between legal "abandonment" of a rail line and "discontinuance" of service under Interstate Commerce Act, 49 U.S.C. § 10903 (1982)); *see, e.g.*, *Terminal Coal Co. v. United States*, 172 F.2d 113, 114-16 (3d Cir. 1949) (finding railroad had not abandoned right of way that was actively used for railroad purposes until taking, therefore owner of reversionary interest in underlying land in event of abandonment was entitled to only nominal compensation); *Woodville v. United States*, 152 F.2d 735, 737-39 (10th Cir. 1946), *cert. denied*, 328 U.S. 842 (1946) (same result where owner of reversionary interest was municipality).

National Trails System Act Amendments of 1983[1153] has prompted numerous inverse takings claims regarding adjacent landowners' potential reversionary interests in rail corridor lands.[1154] As in any inverse taking claim, the court must first determine liability (i.e., whether a taking occurred for which just compensation must be paid) before the case can proceed to the compensation phase (i.e., what amount of compensation is due) in which appraisers are retained to develop opinions of market value.[1155] If a taking occurred and the United States is liable for compensation, the standard federal valuation rules apply in the compensation phase of a rails-to-trails case, as in other inverse takings.[1156] Rails-to-trails takings may be permanent or temporary in nature.[1157] Rail corridors frequently include preexisting improvements or physical remnants of rail use—such as embankments, rail ties, or poor soil conditions—which must be considered in developing an opinion of market value.[1158] As the Federal Circuit held, in a rails-to-trails case "the fair market value of the land includes the physical remnants of the railway that would have remained on the landowners' property" but for the conversion of the corridor to trail use.[1159] Accordingly, failing to consider the removal costs is an improper appraisal methodology that "will result in an artificially inflated value and yield a windfall to the landowner.'"[1160]

**4.11.3.3.  Substitute-Facility Compensation.** As noted above, it is constitutionally permissible for the United States to provide compensation in the form of a <u>substitute facility</u> instead of cash.[1161] This form of compensation may be the most practical and equitable means of compensating landowners in certain "peculiar" acquisitions.[1162] In such circumstances— typically acquisitions of properties that are owned by a public entity, dedicated to public use, and for which a functional substitute is required and payment of market value would deviate significantly from making the owner whole—"compensation by substitution would seem to be the best means of making the parties whole."[1163]

But while a substitute facility is a constitutionally acceptable *form* of just compensation instead of cash, the Supreme Court has repeatedly rejected attempts to *measure* just compensation by

---

1153 16 U.S.C. § 1241-51 (2012) (1983 Amendments, Pub. L. No. 98-11, 97 Stat. 42, 48, amended the National Trails System Act, Pub. L. No. 90-543, 82 Stat. 919 (1968)); *see generally Preseault I*, 494 U.S. at 5-8 (discussing Act and Amendments), 15-16 (distinguishing types of acquisitions).

1154 *See, e.g., Ladd v. United States*, 630 F.3d 1015 (Fed. Cir. 2010); *Ellamae Phillips Co. v. United States*, 564 F.3d 1367 (Fed. Cir. 2009); *Preseault v. United States (Preseault II)*, 100 F.3d 1525, 1533 (Fed. Cir. 1996).

1155 *See Preseault I*, 494 U.S. at 16 ("only some rail-to-trail conversions will amount to takings"); *cf. United States v. Clarke*, 445 U.S. 253, 255-58 (1980) (discussing "important legal and practical differences" between affirmative condemnation proceedings and inverse takings). See *generally* Section 4.9.

1156 *See, e.g., Rasmuson v. United States*, 807 F.3d 1343, 1345-46 (2015) (citing these Standards).

1157 *Ladd*, 630 F.3d at 1025; *Caldwell v. United States*, 391 F.3d 1226, 1234 (Fed. Cir. 2004).

1158 *See, e.g., Rasmuson*, 807 F.3d at 1345-46.

1159 *Id.* (noting railway companies were not obligated to remove physical railroad construction features and landowners would have regained possession of corridor land with physical structures still on it).

1160 *Id.* at 1346.

1161 *United States v. 50 Acres of Land (Duncanville)*, 469 U.S. 24, 33 (1984) (discussing *Brown v. United States*, 263 U.S. 78 (1923)).

1162 *E.g., Brown*, 263 U.S. at 81 (United States provided new town site and relocated buildings as compensation for flooding of three-quarters of town due to reservoir project); *United States v. Streets, Alleys & Pub. Ways in Vill. of Stoutsville*, 531 F.2d 882 (8th Cir. 1976) (affirming United States' plan to construct substitute road facilities to compensate Village in kind, rather than monetarily, for taking of gravel streets, public alleys and sidewalks); *United States v. 10.56 Acres of Land in Whatcom Cty. (Peace Arch II)*, No. C07-1261RAJ, 2010 WL 415244, at *2 (W.D. Wash. Jan. 27, 2010) (United States' condemnation of interstate highway conduit to construct elevated roadway and then convey new roadway to state).

1163 *Brown*, 263 U.S. at 81-83; *see Duncanville*, 469 U.S. at 30-34, 30 n.12; *United States v. 564.54 Acres of Land (Lutheran Synod)*, 441 U.S. 506, 513 (1979); *see also Duncanville*, 469 U.S. at 37 (O'Connor, J., concurring) ("When a local governmental entity can prove that the market value of its property deviates significantly from the make-whole remedy intended by the Just Compensation Clause and that a substitute facility must be acquired to continue to provide an essential service, limiting compensation to the fair market value in my view would be manifestly unjust.").

the cost of a substitute facility instead of the market value standard.[1164] The Court unanimously criticized the "substitute facility doctrine" as an unfair measure of compensation: among other flaws, it increases the risk of error, prejudice, and windfall awards; adds uncertainty and complexity to the valuation process without any necessary improvement; and departs from the established "principle that just compensation must be measured by an objective standard that disregards subjective values which are only of significance to an individual landowner."[1165]

If the United States provides compensation in the form of a substitute facility, "the market value of the . . . property is no longer relevant."[1166] As a result, appraisals of market value are generally inapplicable in such situations,[1167] although appraisers or other experts may be retained to estimate costs, perform traffic studies, or conduct other analyses in connection with compensation by substitution.[1168] But determining whether substitute-facility compensation would be appropriate for a given acquisition is beyond the scope of the appraiser's task of developing an opinion of market value.[1169]

Congress can specifically authorize substitute-facility compensation, regardless of whether the standard market value measure of just compensation would be adequate.[1170] Absent a congressional mandate to provide substitute-facility compensation, agencies are to be guided in this determination by the basic principles of just compensation: fairness to both landowners and the public, and making the landowner whole.[1171] With substitute-facilities compensation, as with monetary compensation, "the question is, What has the owner lost? not, What has the taker gained?"[1172] Accordingly, appropriate compensation will turn on the impact of the government's

---

1164 *Duncanville*, 469 U.S. at 32-33; *Lutheran Synod*, 441 U.S. at 513-17; *see Peace Arch II*, 2010 WL 415244, at *2 (noting "mistaken[ ] belie[f] that the substitute facilities doctrine deems the cost of a substitute facility to be 'the equivalent' of a property's market value[,]" as "the cost of a substitute facility is an alternate measure of just compensation, it is not the equivalent of fair market value").

1165 *Duncanville*, 469 U.S. at 33-35; *Lutheran Synod*, 441 U.S. at 511, 514-16; *see id.* at 517-19 (White, J., concurring) ("The substitute-facilities doctrine is unrelated to fair market value and . . . unabashedly demands additional compensation over and above market value in order to allow the replacement of the condemned facility . . . . It seems to me that the argument for enhanced compensation . . . is nothing more than a particularized submission that the award should exceed fair market value because of the unique uses to which the property has been put by the condemnee or because of the unique value the property has for it.").

1166 *Peace Arch II*, 2010 WL 415244, at *2; *accord Vill. of Stoutsville*, 531 F.2d at 885 (discussing substitute-facilities compensation "in place of the conventional fair market value concept of determining compensation"); *see also United States v. 10.56 Acres in Whatcom Cty.* (*Peace Arch I*), No. C07-1261RAJ, 2008 WL 3977614, at *2 (W.D. Wash. Aug. 22, 2008) (discussing substitute-facility compensation).

1167 *See* EATON, *supra* note 16, at 19-22 ("[A]ppraisers are experts in estimating value, not just compensation."); Section 4.1.2 (Market Value: The Measure of Just Compensation); Section 4.2.6 (Exceptions to Market Value Standard).

1168 *See, e.g.*, *Peace Arch II*, 2010 WL 415244, at *2 (dispute over maintenance and operating costs of substitute highway provided as compensation).

1169 *See Duncanville*, 469 U.S. at 32-33 (quoting *Brown v. United States*, 263 U.S. 78, 81 (1923)), 37 (O'Connor, J., concurring); *Lutheran Synod*, 441 U.S. at 513-17 ("we find no circumstances here that require suspension of the normal rules for determining just compensation"); *see also* EATON, *supra* note 16, at 234 ("The doctrine of substitute facilities is not a valuation or appraisal technique, but a concept that has evolved from court decisions.").

1170 *See, e.g.*, Tenn. Valley Auth. Act, 16 U.S.C. § 831q (2012) (authorizing condemnation of property for purpose of relocating railroad tracks, highways, and other properties, enterprises and projects whose removal may be necessary to carry out purposes of Act); *Berberich v. United States*, 5 Cl. Ct. 652, 655 (1984) (discussing statutory authorization for relocation of North Bonneville, Wash., in connection with construction of new powerhouse at Bonneville Dam); *Brown*, 263 U.S. at 80 (quoting statute authorizing and appropriating funds for condemnation of replacement town site as compensation for flooding of American Falls, Idaho); *see also Lutheran Synod*, 441 U.S. at 519 n.6 (White, J., concurring); *cf. Duncanville*, 469 U.S. at 33 (holding that while substitute-facility compensation may be constitutionally permissible, the United States has no duty to provide anything more than market value (discussing *Brown*, 263 U.S. 78)).

1171 *See Duncanville*, 469 U.S. at 30 ("basic principles of indemnity embodied in the Just Compensation Clause"); *Lutheran Synod*, 441 U.S. at 517 ("'basic equitable principles of fairness' underlying the Just Compensation Clause" (quoting *United States v. Fuller*, 409 U.S. 488, 490)); *see also Town of Clarksville v. United States*, 198 F.2d 238, 242-43 (4th Cir. 1952) ("Of course, the interests of the public, upon which the payment burden rests, are at stake, too, and the award must not be in excess of strict equivalence.").

1172 *Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910); *see Brown*, 263 U.S. at 83 ("A method of compensation by substitution would seem to be the best means of making the parties whole" in "peculiar" circumstances presented.); *see also Duncanville*, 469 U.S. at 37 (O'Connor, J., concurring) ("the make-whole remedy intended by the Just Compensation Clause"); *Lutheran Synod*, 441 U.S. at 511 ("compensation required to make the owner whole"), 516 ("The guiding principle of just compensation . . . is that the *owner* of the condemned property 'must be made whole but is not entitled to more.'" (quoting *Olson v. United States*, 292 U.S. 246, 255)).

---

acquisition, not the nature of the acquisition itself. Regardless of the form of compensation, the Fifth Amendment does not require any award for non-compensable (or "consequential") damages, further discussed in Section 4.6.[1173]

**Reliance on unsupported subsidiary expert opinions can undermine or even invalidate the appraiser's valuation analysis and conclusions.**

In practice, substitute-facility compensation is often extremely complex and arises only in "peculiar" situations.[1174] As for the specifics of this form of compensation for a given acquisition, the Fourth Circuit's discussion in *Town of Clarksville v. United States* is instructive:

> Of course, the interests of the public, upon which the payment burden rests, are at stake, too, and the award must not be in excess of strict equivalence. Yet we are not here dealing with a rigid, blind measure, that grants compensation only on a pound of flesh basis, but rather with an equitable concept of justice and fairness that accords with the Fifth Amendment's mandate. Accordingly, the equivalence requirement which must be met with respect to the substitute facility is more that of utility than of mere dollar and cents value.[1175]

As the Supreme Court held in rejecting a substitute-facilities measure of compensation for the taking of a municipal landfill in *Duncanville*, "[i]n this case, as in most, the market measure of compensation achieves a fair 'balance between the public's need and the claimant's loss.'"[1176] To be just, compensation—whether in the form of cash or substitute facility—must achieve that "fair balance."[1177]

4.12. **Appraisers' Use of Supporting Experts' Opinions.** Some appraisal assignments may require the appraiser to rely on other experts' opinions on technical or other specialized issues.[1178] "An expert cannot be an expert in all fields, and it is reasonable to expect that experts will rely on the opinion of experts in other fields as background material for arriving at an

---

1173 *See Duncanville*, 469 U.S. at 33. Congress can authorize compensation for otherwise non-compensable damage in connection with substitute-facility compensation. For example, in the relocation of the Town of Bonneville, Washington (population 650), in connection with the construction of a new powerhouse at Bonneville Dam, special legislation authorized the U.S. Army Corps of Engineers to provide not only substitute streets and utilities, but also city planning assistance, cooperation with nonfederal entities, and other elements above and beyond the constitutional requirements of just compensation. *See* Act of Mar. 7, 1974, Pub. L. No. 93-251, § 83, 88 Stat. 12, 35 (authorizing legislation); *cf. Berberich v. United States*, 5 Cl. Ct. 652, 655 (1984) (discussing specific statutory authorization for relocation of town). This endeavor generated years of litigation. *See Town of N. Bonneville v. Callaway*, 10 F.3d 1505 (9th Cir. 1993); *Town of N. Bonneville v. U.S. Dist. Court*, 732 F.2d 747 (9th Cir. 1984); *Town of N. Bonneville v. United States*, 833 F.2d 1024, 1987 WL 38842 (Fed. Cir. Oct. 28, 1987) (unpubl.); *Town of N. Bonneville v. United States*, 5 Cl. Ct. 312 (1984).

1174 *See, e.g., Brown*, 263 U.S. at 81-83 (providing new town site as compensation for flooding of three-quarters of existing town); *Washington v. United States* (*Hanford*), 214 F.2d 33, 38-39, 41-43 (9th Cir. 1954) (providing nominal compensation for taking of part of state highway where existing highways were adequate substitute, as rerouted traffic would "impose no appreciable burden" and state "has suffered no money loss and has been relieved of the burden of maintaining the road taken"); *see also United States v. 10.56 Acres in Whatcom Cty.* (*Peace Arch II*), No. C07-1261RAJ, 2010 WL 415244, at *2-*3 (W.D. Wash. Jan. 27, 2010) (providing new highway as compensation with consideration of costs saved by and imposed on state due to substitute; *see also California v. United States* (*Naval Shipyard*), 395 F.2d 261 (9th Cir. 1968) (compensation for state road measured by market value).

1175 *Clarksville*, 198 F.2d at 242-43.

1176 *Duncanville*, 469 U.S. at 33 (quoting *United States v. Toronto, Hamilton & Buffalo Navigation Co.*, 338 U.S. 396, 402 (1949)).

1177 *See id.; Bauman v. Ross*, 167 U.S. 548 (1897) (Compensation must be "just, not merely to the individual whose property is taken, but to the public which is to pay for it." (quoting *Searl v. Sch. Dist. in Lake Cty.*, 133 U.S. 553, 562 (1890)).

1178 *See* USPAP, Competency Rule: Acquiring Competency, comment ("Competency can be acquired in various ways, including, but not limited to, personal study by the appraiser . . . or retention of others who possess the necessary knowledge and/or experience."). For topics that often require additional expertise in appraisals for federal acquisitions, see Section 1.13.

opinion."[1179] But the appraiser cannot merely assume such supporting experts' reports are accurate and reliable. Rather, the appraiser must review all supporting opinions and can rely on or adopt them only if the appraiser determines, after review, that all supporting opinions are credible, reliable, and factually supported.[1180] As the Tenth Circuit succinctly stated: "[Any expert] opinion . . . must be founded upon substantial data, not mere conjecture, speculation or unwarranted assumption. It must have a rational foundation."[1181] An appraiser who fails to ensure the rational foundation of all supporting opinions and other underlying assumptions will be left with an "ultimate opinion of value [that] is virtually devoid of factual moorings, depriving it of virtually any evidentiary value."[1182]

The appraiser must carefully analyze subsidiary experts' reports to ensure a full understanding of the bases for their findings and the impact on the appraisal. The precise steps necessary to ensure the reliability of a particular subsidiary expert's opinion will of course depend on the subject matter. Broadly, however, important considerations for the appraiser include:

- Are subsidiary experts' opinions confirmed by market studies or other appropriate analyses?
- Did subsidiary experts credibly reconcile data or other facts that may contradict their conclusions?
- Did subsidiary experts gather relevant data in a methodical manner?
- Are the assumptions underlying subsidiary experts' opinions reasonable and appropriate?
- Are subsidiary experts' conclusions substantiated by other evidence?

Appraisers' reliance on subsidiary expert opinions that failed to adequately address these concerns has resulted in the rejection of all valuation evidence based on such unsupported opinions—including appraisers' conclusions of highest and best use, methodology, and ultimate opinions of value.[1183] However, with appropriate verification of reliability and support (as recognized in a case affirmed by the Eleventh Circuit), "relying on a sub-consultant's report is a common, respected, and approved occurrence in appraisal practice and[ ] 'to hold otherwise would effectively demand an inconceivably broad area of expertise from any appraiser.'"[1184]

**Unit Rule Considerations.** The results of subsidiary valuation reports, such as mineral, fixture, or timber valuations, cannot simply be added to the value of the land to arrive at a value of the property as a whole without proper analysis by the appraiser. To do so would

---

1179 *United States v. 1,014.16 Acres of Land in Vernon Cty.*, 558 F. Supp. 1238, 1242 (W.D. Mo. 1983), *aff'd*, 739 F.2d 1371, 1373 (8th Cir. 1984) ("The district court properly noted that in condemnation cases, federal procedural and evidentiary rules apply."); *see* Fed. R. Evid. 703 (bases of an expert opinion).

1180 *See, e.g., United States v. 1.604 Acres of Land* (*Granby I*), 844 F. Supp. 2d 668, 678 (E.D. Va. 2011); *United States v. 381.76 Acres of Land* (*Montego Group*), No. 96-1813-CV, 2010 WL 3734003, *7 (S.D. Fla. Aug. 3, 2010), *adopted sub nom. United States v. 10.00 Acres of Land*, No. 99-0672-CIV, 2010 WL 3733994 (S.D. Fla. Sept. 22, 2010), *aff'd sub nom. United States v. Gonzalez*, 466 F. App'x 858 (11th Cir. 2012) (per curiam) (unpubl.); *1,014.16 Acres in Vernon*, 558 F. Supp. at 1242.

1181 *United States v. Sowards*, 370 F.2d 87, 92 (10th Cir. 1966).

1182 *Brace v. United States*, 72 Fed. Cl. 337, 352-53 (2006) ("the *ipse dixit* of that reliance does not make those facts, data or opinions true"), *aff'd*, 250 F. App'x 359 (Fed. Cir. 2007) (per curiam) (unpubl.) ("affirmed based upon the well-reasoned opinion of the trial court"); *see, e.g., Granby I*, 844 F. Supp. 2d at 676-81 (excluding all valuation and other evidence based on highest and best use that was premised on unreliable, unsupported opinions of subsidiary experts).

1183 *Granby I*, 844 F. Supp. 2d at 676-81 (detailing failures of subsidiary experts' opinions, holding such opinions were "without support" and excluding from consideration all valuation and other evidence based on unsupported subsidiary opinions); *see also United States v. 1.604 Acres of Land* (*Granby III*), 844 F. Supp. 2d 685, 689 (E.D. Va. 2011) (excluding opinions of five experts based on *Granby I* ruling).

1184 *Montego Group*, 2010 WL 3734003, at *5; *accord 1,014.16 Acres in Vernon*, 558 F. Supp. at 1242.

violate the <u>unit rule</u> (discussed in Section 4.2.2) and professional appraisal standards.[1185] These components are to be considered, but only in light of how they contribute to the market value of the property as a whole.[1186]

**4.13.    Common Purpose (Roles and Responsibilities).** The importance of sound appraisals in federal acquisitions cannot be overstated. It is the United States' obligation to serve the general public and protect the common welfare by paying just compensation whenever property is needed for public purposes, and reliable, objective valuations are critical to achieving this end.[1187] Appraisers, landowners, attorneys, and government agency staff all play important roles in the federal acquisition process, whether or not litigation is anticipated.

**4.13.1.    Appraisers and Other Experts.** Appraisers assist in the determination of just compensation by developing an opinion of market value,[1188] often in consultation with experts in other fields.[1189] In fact, there is a long history in the United States of objective evaluators appraising property value to assist and inform the determination of just compensation—since well before a distinct real estate appraisal profession began to emerge in the early twentieth century.[1190]

Serving this important function requires expertise, diligence, sound judgment, and objectivity, whether appraisers or other experts are retained by the United States, landowners, or other parties.[1191] The appraiser must be diligent in data collection and competently apply the accepted methods and techniques of the appraisal profession as well as the special rules and requirements set forth in these Standards (e.g., larger parcel, unit rule, before and after method). The following describes an appraiser's job well done:

> A comprehensive investigation of [the] parcels was made . . . . [The appraiser] thoroughly surveyed each of the parcels and completely catalogued and examined all of the improvements on each parcel; in addition [the appraiser] investigated and checked all sales made in the immediate vicinity for several years prior to the [date of value] and interviewed a number of persons of long experience and familiarity with the property and its uses. Both [t]his investigation and appraisal appear to me to have been thoroughly and conscientiously conducted with a view to a just evaluation. [The appraiser's] conclusions were wholly impersonal and not actuated by any adversary concept.[1192]

---

1185 USPAP Standards Rule 1-4(e) ("An appraiser must refrain from valuing the whole solely by adding together the individual values of the various estates or component parts.").

1186 *See* Sections 4.8 and 4.8.1; *see also* Sections 4.8.3 and 4.8.4.

1187 *See, e.g., Hoover v. U.S. Dep't of Interior*, 611 F.2d 1132, 1138 (5th Cir. 1980).

1188 *See* EATON, *supra* note 16, at 19-22; Section 4.1.2.

1189 *See* Sections 1.11 and 4.12.

1190 For example, in 1878, the Supreme Court described a condemnation involving the "appointment of commissioners to . . . secure a fair appraisement of [a property's] value" followed by a court determination "as to the amount of compensation the owner of the land was entitled to receive[.]" *Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 404-405 (1878). Similarly, in 1893 the Court noted that "[v]iewers were appointed, who reported the value . . . . [and then] the matter was tried before the court . . . as to the question of amount of compensation." *Monongahela Nav. Co. v. United States*, 148 U.S. 312, 314 (1893); *cf.* James H. Boykin, *Real Property Appraisal in the American Colonial Era*, THE APPRAISAL J. 361, 366-367 (July 1976) (describing property valuation in legal disputes); Norman G. Miller, Jr. & Sergey Markosyan, *The Academic Roots and Evolution of Real Estate Appraisal*, THE APPRAISAL J. 172, 172 (April 2003) (appraisal as a distinct professional field began in about 1902).

1191 *See* USPAP Ethics Rule ("An appraiser must promote and preserve the public trust inherent in appraisal practice by observing the highest standards of professional ethics.").

1192 *United States v. 711.57 Acres in Alameda Cty.*, 51 F. Supp. 30, 32 (N.D. Cal. 1943); *see also* USPAP Ethics Rule – Conduct ("[Appraisers] must not advocate the cause or interest of any party or issue . . . .").

While this description arose from an appraiser's work as an expert witness in condemnation litigation, the same qualities are necessary for any appraisal for federal acquisition purposes. Appraisers must exercise sound judgment based on known pertinent facts and circumstances, and it is their responsibility to obtain knowledge of all pertinent facts and circumstances that can be acquired with diligent inquiry and search. They must then weigh and consider the relevant facts, exercise sound judgment, and develop an opinion that is completely unbiased by any consideration favoring either the landowner or the government. For this reason, it is inappropriate for an appraiser to "give the benefit of the doubt" to either a landowner or the United States.

> **It is inappropriate to "give the benefit of the doubt" to either a landowner or the United States.**

While the vast majority of federal acquisitions do not involve litigation, every appraisal and report should be prepared with recognition of the possibility that the question of value may be litigated, since it is not possible to predetermine which tracts will be acquired by voluntary means.[1193] The fact that a new appraisal and report may be required prior to trial (to bring the effective date of valuation into conformance with the legally required date of valuation[1194]) does not excuse an ill-prepared initial appraisal. *All* appraisal reports are often subject to discovery, and a poorly prepared initial appraisal may not only embarrass an appraiser, but also weaken a client's case.

**Appraisers Retained as Expert Witnesses by the U.S. Department of Justice.** Expert witnesses for litigation have additional obligations. It is the responsibility of the appraiser to spend adequate time and effort to thoroughly prepare to testify in depositions and at trial. Prior to undertaking this preparation and any necessary updating of the appraisal report, the appraiser will confer with the trial attorney.

Appraisers must conform their appraisal reports with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, as discussed in Section 2.2.3. In addition, the particular court in which a case will be tried may have local rules regarding expert reports. The United States' legal counsel should advise the appraiser of any such local rules. In preparing the initial appraisal report, the appraiser may have had comparable sales verified by personnel from his or her office. In litigation, however, the appraiser must personally verify all comparable sales prior to testifying in deposition or at trial.

The trial attorney will often provide the appraiser with observations and suggestions for strengthening the appraisal report. Both appraisers and attorneys should distinguish between a rigorous exploration of the appraiser's methodologies, analysis, and factual support—and improper pressure that undermines the objectivity and reliability of the appraiser's conclusions. Embracing the former with a clear eye on the appraiser's independence will strengthen the appraisal and reinforce the appraiser's credibility at trial. Any suggestion of the latter, on the other hand, should be immediately addressed and clarified to ensure appraisers' objectivity and the integrity of their opinions.

---

1193 Moreover, even voluntary acquisitions may generate litigation over valuation matters or the sufficiency of appraisals. *See, e.g.*, *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000).

1194 *E.g.*, *United States v. 8.34 Acres of Land in Ascension Par.*, No. 04-50D-MI, 2006 WL 6860387, at *4 (M.D. La. June 12, 2006); see *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 (1984).

In conferring with the attorney, the appraiser should advise the attorney of any information that would be helpful in strengthening the report that was not available to the appraiser.[1195] The attorney may be able to procure this information from the landowner's legal counsel or through the discovery process, if necessary. The appraiser and the attorney should also discuss the logistics of a site inspection and appropriate communication with the landowner (if the landowner is represented by an attorney, all communications must go through legal counsel).

In condemnation proceedings, appraisers' only function is to testify to their impartial opinion of market value. While it is important that appraisers testify with the conviction that their valuations are correct, appraisers are not advocates for their clients: that role is exclusively reserved to attorneys. Nor do appraisers determine what is *fair* or *just*: that is the responsibility of the fact-finder—a jury, land commission, or judge. The appraiser is employed to develop and express an objective opinion of market value, following federal law, that is supported by factual data to warrant being accorded weight.[1196]

### 4.13.2. Government Agency Staff.

**4.13.2.   Government Agency Staff.** Federal realty acquisitions require the contributions of a variety of government agency staff, including realty specialists, surveyors, engineers, title researchers, negotiators, project managers, contract procurement specialists, executives, appraisers, review appraisers, and attorneys. Critical to the valuation process, agency staff identify property for federal acquisition; work with government and outside appraisers to develop an appropriate scope of work for each valuation assignment; provide necessary information to appraisers, such as property descriptions, title information, maps, surveys and other data; and issue **legal instructions**. Agency staff are also tasked with explaining the United States' offer of just compensation and its basis, which often involves explaining the appraisal process, the data considered by the appraiser, and the reasons improper considerations are disregarded. Agency staff also rely on appraisals to determine just compensation for the purpose of making offers under the Uniform Act, estimate project acquisition costs, and make judicious use of public funds. Finally, while only a small fraction of federal acquisitions involve litigation, it is impossible to predict with certainty which acquisitions—even voluntary acquisitions—will result in litigation.[1197] Even if a new appraisal may be obtained for litigation (often required in condemnation to reflect the appropriate date of value),[1198] *every* appraisal should be well prepared, reflecting sound instructions and a scope of work appropriate for its purpose.

---

1195 Examples might include the property's historical income and expense information that a landowner had not previously provided to the appraiser, or verification of the price, terms, and conditions of a prior sale of the property being appraised.

1196 *See, e.g.*, *Washington v. United States* (*Hanford*), 214 F.2d 33, 43 (9th Cir. 1954) ("Opinion evidence is only as good as the facts upon which it is based. . . . Opinion evidence without any support in the demonstrated facts . . . can have no weight . . . .").

1197 *See, e.g.*, *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000).

1198 *See 8.34 Acres in Ascension*, 2006 WL 6860387, at *4; *cf. Kirby Forest Indus., Inc.*, 467 U.S. at 10.

**4.13.3.**    **Landowners.** Each and every federal acquisition involves a landowner—usually, but not always, as a willing participant. Landowners are entitled to just compensation if their property is acquired for public purposes, and to receive fair and equitable treatment no matter which agency is acquiring their land. During the appraisal process, landowners must be given an opportunity to accompany the United States' appraiser on the inspection of their property under the Uniform Act.[1199] The site visit is a chance for landowners to share information about their property that they believe should be considered in the valuation process (Section 1.2.6.4).

**4.13.4.**    **Attorneys.** Attorneys play a critical role in appraisals for federal acquisitions, whether or not litigation is involved. **<u>Legal instructions</u>** are necessary on a variety of valuation issues addressed throughout these Standards, such as ownership and title questions affecting the larger parcel determination (Section 4.3.3) or the proper application of the scope of the project rule to exclude government project influence on market value (Section 4.5). To do so, attorneys—whether agency counsel, Department of Justice attorneys, or landowners' counsel—must often engage in nuanced discussions with appraisers to determine what legal instructions are necessary and appropriate. Agency counsel should consult the U.S. Department of Justice for assistance on novel or complex issues.

---

[1199] 42 U.S.C. § 4651(2); *see* Section 1.2.6.4. Landowners can also designate a representative to attend the property inspection on their behalf.

# APPENDIX

# APPENDIX A

## Appraisal Report Documentation Checklist

**INTRODUCTION**

**Title Page**

|  | Agency name |  | Appraiser's name(s) |
|---|---|---|---|
|  | Agency tract no. |  | Appraiser's address |
|  | Property address |  | Effective date of value |

**Transmittal Letter**

|  | Date of letter |  | Client and legal instructions |
|---|---|---|---|
|  | Property identification |  | Opinion of value before acquisition |
|  | Property rights appraised |  | Opinion of value after acquisition |
|  | Effective date of value |  | Difference |
|  | Extraordinary assumptions |  | Appraiser signature |
|  | Table of Contents |  |  |

**Appraiser's Certification**

|  | Conforms to USPAP |  | Opinion of value after acquisition |
|---|---|---|---|
|  | Conforms to Federal Standards |  | Difference |
|  | Property inspection |  | Effective date of value |
|  | Offered owner accompaniment |  | Appraiser signature |
|  | Opinion of value before acquisition |  |  |

**Executive Summary**

|  | Property identification |  | Highest and best use – after acquisition |
|---|---|---|---|
|  | Effective date of value |  | Description before |
|  | Highest and best use – before acquisition |  | Description after |

| Value before |  | Value after |  |
|---|---|---|---|
|  | Cost approach |  | Cost approach |
|  | Sales comparison approach |  | Sales comparison approach |
|  | Income capitalization approach |  | Income capitalization approach |
|  | Final opinion of value |  | Final opinion of value |
|  | Photos of subject |  | Assumptions and limiting conditions |

5-ER-965

## Scope of Work Description

|  | Client |  | Property characteristics |
|---|---|---|---|
|  | Intended users |  | Assignment conditions |
|  | Intended use |  | Geographic area and timespan of market data research |
|  | Definition of market value |  | Type of market data researched |
|  | Definition of market rental value |  | Extent of market data confirmation |
|  | Effective date |  | Data sources |

## FACTUAL DATA AND ANALYSIS – BEFORE ACQUISITION

|  | Legal description |  | Area data |
|---|---|---|---|

## Site Data

|  | Existing use |  | Land Shape |
|---|---|---|---|
|  | Access |  | Utilities |
|  | Topography |  | Minerals |
|  | Soils |  | Easements |
|  | Vegetation |  | Hazards |
|  | Land Area |  |  |

## Improvement Data

|  | Type |  | Condition |
|---|---|---|---|
|  | Size |  | Quality |
|  | Actual age |  | Occupancy |
|  | Effective age |  | On-site improvements |
|  | Fixtures |  | Sales history |
|  | Use history |  | Rental history |

## Tax/Assessments

|  | Assessed value |  | Tax load |
|---|---|---|---|
|  | Zoning and land use regulations |  |  |

## Highest and Best Use

|  | As vacant |  | Financial feasibility |
|---|---|---|---|
|  | As improved |  | Degree of profitability |
|  | Physical possibility |  | Larger parcel |
|  | Legal permissibility |  |  |

## Land Valuation

|  | Describe comparables |  | Analysis of comparables |
|---|---|---|---|
|  | Photos of comparables |  | Final value analysis/opinion of value |

5-ER-966

**Cost Approach**

|  | Included *or* [ ] omission explained |  | Market support |
|---|---|---|---|
|  | Reproduction/replacement cost |  | Final value analysis/opinion of value |
|  | Depreciation |  |  |

**Sales Comparison Approach**

|  | Included |  | Analysis of comparables |
|---|---|---|---|
|  | Describe comparables |  | Final value analysis/opinion of value |
|  | Photos of comparables |  |  |

**Income Capitalization Approach**

|  | Included *or* [ ] omission explained |  | Operating expenses |
|---|---|---|---|
|  | Market rental comparables |  | Market support for capitalization rate |
|  | Gross income estimate |  | Explain selection of capitalization rate |
|  | Vacancy |  | Final value analysis/opinion of value |
|  | Fixed expenses |  |  |

**Reconciliation and Final Opinion of Value**

|  | Provided |  | Avoid summation appraisal |
|---|---|---|---|

## FACTUAL DATA AND ANALYSIS – AFTER ACQUISITION

**Legal Description/Description of Acquisition**

|  | Legal description of remainder *or* [ ] description of acquisition |
|---|---|

**Area Data**

|  | Describe government project |  | Address project impact |
|---|---|---|---|

**Site Data**

|  | Shape |  | Utilities |
|---|---|---|---|
|  | Size |  | Access |
|  | Easements |  | Relationship to project |

**Improvement Data**

|  | Describe improvements |  |  |
|---|---|---|---|
|  | Fixtures |  | Rental history after acquisition |
|  | Use after acquisition |  |  |

**Tax/Assessments**

|  | Est. assessed value |  | Est. tax load |
|---|---|---|---|

**Zoning and Land Use Regulations**

|  | Re-zone considered |  |  |
|---|---|---|---|

**Highest and Best Use**

|  | Change considered |  | Effects of TCEs *or* [ ] n/a |
|---|---|---|---|
|  | Intensity considered |  | Zoning non-conformance addressed |
|  | Restoration considered |  |  |

**Land Valuation**

|  | Same *or* different comparables |  | Analysis of comparables |
|---|---|---|---|
|  | Describe comparables |  | Final value analysis/opinion of value |
|  | Photos of comparables |  |  |

**Cost Approach**

|  | Included *or* [ ] omission explained |  | Market support |
|---|---|---|---|
|  | Reproduction cost |  | Final value analysis/opinion of value |
|  | Depreciation |  |  |

**Sales Comparison Approach**

|  | Included |  | Photos of comparables |
|---|---|---|---|
|  | Same *or* [ ] different comparables |  | Analysis of comparables |
|  | Describe comparables |  | Final value analysis/opinion of value |

**Income Capitalization Approach**

|  | Included *or* [ ] omission explained |  | Operating expenses |
|---|---|---|---|
|  | Gross income estimate |  | Market support for capitalization rate |
|  | Vacancy |  | Explain selection of capitalization rate |
|  | Fixed expenses |  | Final value analysis/opinion of value |

**Reconciliation and Final Opinion of Value**

|  | Provided |  | Avoided summation appraisal |
|---|---|---|---|

**Acquisition Analysis**

|  | Recapitulation |  | Proper format |
|---|---|---|---|

**Damage (if applicable)**

|  | Allocate part acquired vs. damage to remainder *or* [ ] n/a |  | Estimate cost to cure damage |
|---|---|---|---|
|  | Note allocation is accounting exercise |  |  |

**Benefits (if applicable)**

|  | Consider direct (special) benefits |  | Explain benefits analysis |
|---|---|---|---|
|  | Disregard indirect (general) benefits |  |  |

**ADDENDA AND EXHIBITS**

|  | Location map |  | Comparable sales data maps |
|---|---|---|---|

**Comparable Sales Data Sheets**

|  | Sales confirmed |  | Existing use |
|---|---|---|---|
|  | Terms reported |  | Highest and best use |
|  | Buyer and seller |  | Zoning |
|  | Date of sale |  | Legal |
|  | Recording information |  | Physical description |
|  | Location |  |  |

**Subject Property Plot Plan**

|  | Property boundaries shown |  | Street frontage after acquisition |
|---|---|---|---|
|  | Dimensions before acquisition |  | Photo locations |
|  | Dimensions after acquisition |  | Improvement locations |
|  | Street frontage before acquisition |  |  |
|  | Subject property floor plan |  | Other exhibits |
|  | Title report |  | Appraiser qualifications |

# APPENDIX B

**Recommended Appraisal Report Format for Total Acquisitions**

**2.3.1   Introduction**
    (2.3.1.1)    Title Page
    (2.3.1.2)    Transmittal Letter
    (2.3.1.3)    Table of Contents
    (2.3.1.4)    Appraiser's Certification
    (2.3.1.5)    Executive Summary
    (2.3.1.6)    Photographs
    (2.3.1.7)    Statement of Assumptions and Limiting Conditions
    (2.3.1.8)    Description of Scope of Work

**2.3.2   Factual Data**
    (2.3.2.1)    Legal Description
    (2.3.2.2)    Area, City, and Neighborhood Data
    (2.3.2.3)    Property Data
        (2.3.2.3.1)    Site
        (2.3.2.3.2)    Improvements
        (2.3.2.3.3)    Fixtures
        (2.3.2.3.4)    Use History
        (2.3.2.3.5)    Sales History
        (2.3.2.3.6)    Rental History
        (2.3.2.3.7)    Assessed Value and Annual Tax Load
        (2.3.2.3.8)    Zoning and Other Land Use Regulations

**2.3.3   Data Analysis and Conclusions**
    (2.3.3.1)    Highest and Best Use
        (2.3.3.1.1)    Four Tests
        (2.3.3.1.2)    Larger Parcel
    (2.3.3.2)    Land Valuation
        (2.3.3.2.1)    Sales Comparison Approach
        (2.3.3.2.2)    Subdivision Development Method
    (2.3.3.3)    Cost Approach
    (2.3.3.4)    Sales Comparison Approach
    (2.3.3.5)    Income Capitalization Approach
    (2.3.3.6)    Reconciliation and Final Opinion of Market Value

**2.3.7     Exhibits and Addenda**

Location Map

Comparable Data Maps

Detail of Comparable Sales and Rental Data

Plot Plan

Floor Plan

Title Evidence Report

Other Pertinent Exhibits

Qualifications of the Appraiser

# APPENDIX C

**Recommended Appraisal Report Format for Partial Acquisitions**

**2.3.1   Introduction**
        (2.3.1.1)      Title Page
        (2.3.1.2)      Transmittal Letter
        (2.3.1.3)      Table of Contents
        (2.3.1.4)      Appraiser's Certification
        (2.3.1.5)      Executive Summary
        (2.3.1.6)      Photographs
        (2.3.1.7)      Statement of Assumptions and Limiting Conditions
        (2.3.1.8)      Description of Scope of Work

**2.3.2   Factual Data – Before Acquisition**
        (2.3.2.1)      Legal Description
        (2.3.2.2)      Area, City, and Neighborhood Data
        (2.3.2.3)      Property Data
                (2.3.2.3.1)      Site
                (2.3.2.3.2)      Improvements
                (2.3.2.3.3)      Fixtures
                (2.3.2.3.4)      Use History
                (2.3.2.3.5)      Sales History
                (2.3.2.3.6)      Rental History
                (2.3.2.3.7)      Assessed Value and Annual Tax Load
                (2.3.2.3.8)      Zoning and Other Land Use Regulations

**2.3.3   Data Analysis and Conclusions – Before Acquisition**
        (2.3.3.1)      Highest and Best Use
                (2.3.3.1.1)      Four Tests
                (2.3.3.1.2)      Larger Parcel
        (2.3.3.2)      Land Valuation
                (2.3.3.2.1)      Sales Comparison Approach
                (2.3.3.2.2)      Subdivision Development Method
        (2.3.3.3)      Cost Approach
        (2.3.3.4)      Sales Comparison Approach
        (2.3.3.5)      Income Capitalization Approach
        (2.3.3.6)      Reconciliation and Final Opinion of Market Value – Before Acquisition

**2.3.4**      **Factual Data – After Acquisition**

    (2.3.4.1)      Legal Description

    (2.3.4.2)      Neighborhood Factors

    (2.3.4.3)      Property Data

          (2.3.4.3.1)        Site

          (2.3.4.3.2)        Improvements

          (2.3.4.3.3)        Fixtures

          (2.3.4.3.4)        History

          (2.3.4.3.5)        Assessed Value and Tax Load

          (2.3.4.3.6)        Zoning and Other Land Use Regulations

**2.3.5**      **Data Analysis and Conclusions – After Acquisition**

    (2.3.5.1)      Analysis of Highest and Best Use

    (2.3.5.2)      Land Valuation

    (2.3.5.3)      Cost Approach

    (2.3.5.4)      Sales Comparison Approach

    (2.3.5.5)      Income Capitalization Approach

    (2.3.5.6)      Reconciliation and Final Opinion of Value – After Acquisition

**2.3.6**      **Acquisition Analysis**

    (2.3.6.1)      Recapitulation

    (2.3.6.2)      Allocation and Damages

    (2.3.6.3)      Special Benefits

**2.3.7**      **Exhibits and Addenda**

Location Map

Comparable Data Maps

Details of Comparable Sales and Rental Data

Plot Plan

Floor Plan

Title Evidence Report

Other Pertinent Exhibits

Qualifications of the Appraiser

5-ER-973

# APPENDIX D

**(2.5)  Recommended Project Appraisal Report Format**

**Part I – Introduction, General Factual Data and Analysis**

<u>Introduction</u>
      (1)  Title Page
      (2)  Transmittal Letter
      (3)  Table of Contents
      (4)  Executive Summary
      (5)  Statement of Assumptions and Limiting Conditions
      (6)  Description of Scope of Work

<u>General Factual Data</u>
      (7)  Area, City, and Neighborhood Data
      (8)  Zoning and Other Land Use Regulations

<u>Analysis</u>
      (9)  Analysis of Highest and Best Use
     (10)  Discussion of Approaches to Value
     (11)  Land Valuation
     (12)  Cost Approach
     (13)  Sales Comparison Approach
     (14)  Income Capitalization Approach
     (15)  Special Studies

**Part II – Individual Parcel Report**

<u>Introduction</u>
     (16)  Title Page
     (17)  Table of Contents
     (18)  Appraiser's Certification
     (19)  Summary of Salient Facts and Conclusions
     (20)  Photographs of Subject Property
     (21)  Statement of Assumptions and Limiting Conditions
     (22)  Description of Scope of Work
     (23)  Executive Summary

<u>Factual Data</u> [total acquisitions] or <u>Factual Data – Before Acquisition</u> [partial acquisitions]
     (24)  Legal Description

    (25)  Area, City, and Neighborhood Data
    (26)  Property Data
        a.   Site
        b.   Improvements
        c.   Fixtures
        d.   Use History
        e.   Sales History
        f.   Rental History
        g.   Assessed Value and Annual Tax Load
        h.   Zoning and Other Land Use Regulations

<u>Data Analysis and Conclusions</u> [total acquisitions] or <u>Data Analysis and Conclusions</u> – After Acquisition [partial acquisitions]

    (27)  Analysis of Highest and Best Use
    (28)  Land Valuation
    (29)  Value Estimate by Cost Approach
    (30)  Value Estimate by Sales Comparison Approach
    (31)  Value Estimate by Income Capitalization Approach
    (32)  Reconciliation and Final Opinion of Value

<u>Factual Data – After Acquisition</u> [partial acquisitions only]

    Items (24) to (26) in after situation

<u>Data Analysis and Conclusions – After Acquisition</u> [partial acquisitions only]

    Items (27) to (32) in after situation

<u>Acquisition Analysis</u> [partial acquisitions only]

    (33)  Acquisition Analysis

<u>Exhibits and Addenda</u>

    (34)  Exhibits and Addenda
        a.   Neighborhood Map
        b.   Comparable Data Map
        c.   Detail of Comparative Data
        d.   Plot Plan
        e.   Floor Plan
        f.   Title Evidence Report
        g.   Other Pertinent Exhibits

**Part III – General Exhibits and Addenda**

    (35)  Location Map
    (36)  Comparable Data Maps
    (37)  Details of Comparative Data
    (38)  Other Pertinent Exhibits
    (39)  Qualifications of Appraiser

# APPENDIX E

**Extraordinary Verification of Sales - Section 1.5.2.4**

1.       **Examine Authorizing Legislation**
- Does the legislation require purchase based on market value?
- Does the legislation mandate purchase at other than market value?
- Does the legislation provide for acquisition based on non- market considerations (e.g., unaffected by Endangered Species Act even though an endangered species is found on the property)?

2.       **Contact Acquiring Agency**
- Examine the Appraisal
  - Was the appraisal based on a partial or total acquisition?
  - What property interest was valued?
  - Was the highest and best use an economic use?
  - Was the highest and best use the same or similar to the subject property?
  - Were the sales used in the appraisal influenced by non-market factors?
  - Was there an allocation of value in the appraisal addressing the contributions of different land types or improvements?
- Examine the Appraisal Review
  - Did the appraisal review identify any factual or technical errors in the appraisal report?
- Examine the Negotiators Report
  - Was there threat of condemnation if agreement could not be reached?
  - Was the price paid based on agency support for a tax write-off for the seller?
  - Did the owner threaten to damage property if the asking price was not paid?
  - Was the sale part of a land exchange?
  - Did the owner submit an appraisal or other market data to the agency during the negotiation?
- Examine the Correspondence File
  - Was there correspondence between the agency and the owner's political representatives?
  - Was there public pressure on the agency about the purchase?
  - Was there media coverage about the purchase?
- Examine the Conveyance and Closing Documents
  - Was the estate conveyed the same as the estate valued in the appraisal?
  - Was the estate conveyed an easement?
  - Was the price paid for the property equivalent to the appraiser's final opinion of value?
  - Was the price paid within the appraisal's range of value?
  - Did the conveyance allow the seller to remain on the property or continue to use the property for a period of time (e.g., life estate)?

3.       **Verify Sale with Buyer and Seller**

# TABLE OF AUTHORITIES

## Cases

*6,816.5 Acres of Land v. United States*, 411 F.2d 834 (10th Cir. 1969) . . . . . . . . . . . . . . . . . 163

*767 Third Ave. Assocs. v. United States*, 30 Fed. Cl. 216 (1993), *aff'd*, 48 F.3d 1575 (Fed. Cir. 1995) . . . . . . . . . . .43

*767 Third Ave. Assocs. v. United States*, 48 F.3d 1575 (Fed. Cir. 1995) . . . . . . . . . . . . . . . 177

*A.G. Davis Ice Co. v. United States*, 362 F.2d 934 (1st Cir. 1966) . . . . . . . . . . . . . . . 140-41, 175

*Ackerley Comm'ns of Fla., Inc. v. Henderson*, 881 F.2d 990 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . .99

*Acton v. United States*, 401 F.2d 896 (9th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . 159

*Adaman Mut. Water Co. v. United States*, 278 F.2d 842 (9th Cir. 1960) . . . . . . . . . . . . . . . . 159

*Alameda Gateway, Ltd. v. United States*, 45 Fed. Cl. 757 (1999) . . . . . . . . . . . . . . . 115, 154, 189, 192, 194, 203

*Albert Hanson Lumber Co. v. United States*, 261 U.S. 581 (1923) . . . . . . . . . . . . . . . . . . . . . 130

*Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470 (1973) . . . . . . . . . . . . . . . . 93, 198

*Am. Savings & Loan Ass'n v. County of Marin*, 653 F.2d 364 (9th Cir. 1981) . . . . . . . . . . . . . 117

*Arizona v. California*, 283 U.S. 423 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

*Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511 (2012) . . . . . . . . . . .161, 168, 170, 175, 177, 183, 185

*ASARCO, Inc. v. Kadish*, 490 U.S. 605 (1989) . . . . . . . . . . . . . . . . . . . . . . . 178

*Atlantic Coast Line R. Co. v. United States*, 132 F.2d 959 (5th Cir. 1943) . . . . . . . . . . . . . . . . . 129

*Autozone Dev. Corp. v. Dist. of Columbia*, 484 F. Supp. 2d 24 (D.D.C. 2007) . . . . . . . . . . . . . . . . 175

*Baetjer v. United States*, 143 F.2d 391 (1st Cir. 1944) . . . . . . . . . . . . . . . . . .111, 113, 115-16, 123-25, 153-56

*Bank of Edenton v. United States*, 152 F.2d 251 (4th Cir. 1945) . . . . . . . . . . . . . . . . . . . 110, 129

*Banks v. United States*, 71 Fed. Cl. 501 (2006) . . . . . . . . . . . . . . . . . . . . . 188-89, 194

*Barnes v. S.C. Pub. Serv. Auth.*, 120 F.2d 439 (4th Cir. 1941) . . . . . . . . . . . . . . . . . 125

*Barnhart v. Brinegar*, 362 F. Supp. 464 (W.D. Mo. 1973) . . . . . . . . . . . . . . . . . . . . . . .99

*Basset, New Mexico LLC v. United States*, 55 Fed. Cl. 63 (2002) . . . . . . . . . . . . . . . . . . . . 158

*Batten v. United States*, 306 F.2d 580 (10th Cir. 1962) . . . . . . . . . . . . . . . . . . . . 155

*Bauman v. Ross*, 167 U.S. 548 (1897) . . . . . . . . 4, 6, 90, 93, 99, 101, 113, 119, 151, 154-55, 162-63, 167, 194, 201

**5-ER-977**

*Bd. of Cty. Supervisors v. United States* (*Prince William Cty. II*), 116 F.3d 454 (Fed. Cir. 1997) . . . . . . . . . . . . . . . 197

*Benecke v. United States*, 356 F.2d 439 (5th Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . .92

*Berberich v. United States*, 5 Cl. Ct. 652 (1984) . . . . . . . . . . . . . . . . . . . . . . . . 200-01

*Berman v. Parker*, 348 U.S. 26 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91, 157

*BFP v. Resolution Tr. Corp.*, 511 U.S. 531 (1994) . . . . . . . . . . . . . . . . . . . . 120, 124-25

*Bibb Cty. v. United States*, 249 F.2d 228 (5th Cir. 1957) . . . . . . . . . . . . . . . . . . . . .98

*Bischoff v. Glickman*, 54 F. Supp. 2d 1226 (D. Wyo. 1999) . . . . . . . . . . . . . . . . . . 195

*Bogart v. United States*, 169 F.2d 210 (10th Cir. 1948) . . . . . . . . . . . . . . . . . . . . . .97

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) . . . . . . . . . . . . . . . . . . 148

*Boone v. United States*, 944 F.2d 1489 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . 189

*Borman v. Raymark Indus., Inc.*, 960 F.2d 327 (3d Cir. 1992) . . . . . . . . . . . . . . . . . 121

*Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189 (1910) . . . . . . . . . . . . . 99, 162, 172-73, 197-98, 200

*Bowen v. Pub. Agencies Opposed to Soc. Security Entrapment*, 477 U.S. 41 (1986) . . . . . . . . . . 190

*Boyd v. United States*, 222 F.2d 493 (8th Cir. 1955) . . . . . . . . . . . . . . . . . . . . . . 157

*Brace v. United States*, 72 Fed. Cl. 337 (2006), *aff'd*, 250 F. App'x 359 (Fed. Cir. 2007) (per curiam) (unpubl.) . . . . 202

*Brooks-Scanlon Corp. v. United States*, 265 U.S. 106 (1924) . . . . . . . . . . . . . . . . . . 132

*Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003) . . . . . . . . . . . . . . . . . . . . . 162

*Brown v. United States*, 263 U.S. 78 (1923) . . . . . . . . . . . . . . . . . . . . . 197, 199, 200-01

*Buena Vista Homes, Inc. v. United States*, 281 F.2d 476 (10th Cir. 1960) . . . . . . . . . . . . . . . . . . . . 133

*Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . 199

*California v. United States* (*Naval Shipyard*), 395 F.2d 261 (9th Cir. 1968) . . . . . . . . . . . .196, 198, 201

*Calvo v. United States*, 303 F.2d 902 (9th Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . 170

*Cameron Dev. Co. v. United States*, 145 F.2d 209 (5th Cir. 1944) . . . . . . . . . . . . . . . . 179

*Campbell v. United States*, 266 U.S. 368 (1924) . . . . . . . . . . . . . . . . . . . . . 113, 157-58

*Caporal v. United States*, 577 F.2d 113 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . . 196

*Carlock v. United States*, 60 App. D.C. 314 (D.C. Cir. 1931) . . . . . . . . . . . . . . . . . 174-75

*Carlstrom v. United States*, 275 F.2d 802 (9th Cir. 1960) . . . . . . . . . . . . . . . . . . . . 124

*Cementerio Buxeda, Inc. v. Puerto Rico*, 196 F.2d 177 (1st Cir. 1952) . . . . . . . . . 137-38, 140, 142, 182

*Certain Land in City of Washington v. United States*, 355 F.2d 825 (D.C. Cir. 1965) . . . . . . . . . . . . . . . 159

*Chapman v. United States*, 169 F.2d 641 (10th Cir. 1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

*Childers v. United States*, 116 Fed. Cl. 486 (Fed. Cl. 2013). . . . . . . . . . . . . . . . . . . . . . . . 121-22

*City of New York v. Sage*, 239 U.S. 57 (1915) . . . . . . . . . . . . . . . . . . . . . . 99, 106, 150

*City of Van Buren v. United States*, 697 F.2d 1058 (Fed. Cir. 1983). . . . . . . . . . . . . . . . . . . . 153

*Clear Sky Car Wash., LLC v. City of Chesapeake*, 910 F. Supp. 2d 861 (E.D. Va. 2012) . . . . . . . . . . . . . . . . .99

*Cloverport Sand & Gravel Co. v. United Sates*, 6 Cl. Ct. 178 (1984) . . . . . . . . . . . . . . 180-82

*Cole Inv. Co. v. United States*, 258 F.2d 203 (9th Cir. 1958) . . . . . . . . . . . . . . . . . . . 112

*County of Ontonagon v. Land in Dickinson Cty.*, 902 F.2d 1568, 1990 WL 66813 (6th Cir. 1990) (unpubl.) . . . . . . . 159

*CSX Transp., Inc. v. Ga. State Bd. of Equalization*, 552 U.S. 9 (2007). . . . . . . . . . . . . . . . . . . . 119

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . 185

*D.C. Redev. Land Agency v. 61 Parcels of Land*, 235 F.2d 864 (D.C. Cir. 1956) . . . . . . . . . . . . . . . . . . . 124

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . 119

*Denver v. Quick*, 108 Colo. 111 (1941) . . . . . . . . . . . . . . . . . . . . . . . . 142

*Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000). . . . . . . . . . 50, 94, 105-06, 185-86, 204-05

*Devou v. City of Cincinnati*, 162 F. 633 (6th Cir. 1908) . . . . . . . . . . . . . . . . . . . . . . 136

*Dickinson v. United States*, 154 F.2d 642 (4th Cir. 1946). . . . . . . . . . . . . . . . . . . . . . 124

*Dugan v. Rank*, 372 U.S. 609 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . 94, 169

*Duk Hea Oh v. Nat'l Capital Revitalization Corp.*, 7 A.3d 997 (D.C. 2010) . . . . . . . . . . . . . . . . . . . 126

*E. Tenn. Nat. Gas Co. v. 2.93 Acres of Land*, No. 4:02CV00179, 2007 WL 2688414 (W.D. Va. Sept. 13, 2007) . . . . 158

*E. Tenn. Nat. Gas Co. v. 7.74 Acres of Land*, 228 F. App'x 323 (4th Cir. 2007) (unpubl.) . . . . . . . . . . . . . . . . . 117

*Eagle Lake Improvement Co. v. United States (Eagle Lake I)*, 141 F.2d 562 (5th Cir. 1944) . . . . . . . . . . . . . . 178-80

*Eagle Lake Improvement Co. v. United States (Eagle Lake II)*, 160 F.2d 182 (5th Cir. 1947). . . . . . . . . . . . . . 141, 180

*El Paso Nat. Gas Co. v. Fed. Energy Regulatory Comm'n*, 96 F.3d 1460 (D.C. Cir. 1996) . . . . . . . . . . . . . . . 120

*Ellamae Phillips Co. v. United States*, 564 F.3d 1367 (Fed. Cir. 2009). . . . . . . . . . . . . . . . . . . 199

*Erceg v. Fairbanks Expl. Co.*, 95 F.2d 850 (9th Cir. 1938) . . . . . . . . . . . . . . . . . . . . . 130

*Estate of Hage v. United States*, 687 F.3d 1281 (Fed. Cir. 2012) . . . . . . . . . . . . . . . . . . . 195

*Etalook v. Exxon Pipeline Co.*, 831 F.2d 1440 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . 171

*Evans v. Tenn. Valley Auth.*, 922 F.2d 841, 1991 WL 1113 (6th Cir. 1991) (unpubl.) . . . . . . . . . . . . . . 169-70

*Evans v. United States*, 326 F.2d 827 (8th Cir. 1964). . . . . . . . . . . . . . . . . . . . . . . 125-27

*Fairfield Gardens, Inc. v. United States*, 306 F.2d 167 (9th Cir. 1962) . . . . . . . . . . . . . . . . . . . . . 109, 132

*First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304 (1987) . . . . . . . . . . . . 43, 174, 177

*Five Tracts of Land in Cumberland v. United States*, 101 F. 661 (3d Cir. 1900) . . . . . . . . . . . . . . . . . 106

*Fla. Rock Indus., Inc. v. United States (*Florida Rock II*)*, 791 F.2d 893 (Fed. Cir. 1986). . . . . . . . . . . . . .95, 96

*Fla. Rock Indus., Inc. v. United States (*Florida Rock III*)*, 18 F.3d 1560 (Fed. Cir. 1994) . . . . . . . . . . . . . .95, 96

*Foster v. United States*, 2 Cl. Ct. 426 (1983), *aff'd*, 746 F.2d 1491 (Fed. Cir. 1984) . . . . . . 129, 136, 138-39, 181-82

*Ga. Kaolin Co. v. United States*, 214 F.2d 284 (5th Cir. 1954) . . . . . . . . . . . . . . . . . . . . . . . . 178

*Ga.-Pac. Corp. v. United States*, 640 F.2d 328 (Ct. Cl. 1980) (per curiam) . . . . . . 94, 115, 151, 154-59, 165-67, 183

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90, 119

*Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824) . . . . . . . . . . . . . . . . . . . . . . . . . . . 187-88, 191

*Gibson v. United States*, 166 U.S. 269 (1897). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188, 190

*Gilman v. City of Philadelphia*, 70 U.S. 713 (1865) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187-88

*Good v. United States*, 39 Fed. Cl. 81 (1997), *aff'd*, 189 F.3d 1355 (Fed. Cir. 1999) . . . . . . . . . . . . . . 192

*Greenleaf Johnson Lumber Co. v. Garrison*, 237 U.S. 251 (1915) . . . . . . . . . . . . . . . . . . . . . . . 192

*Greer Coal., Inc. v. U.S. Forest Serv.*, 470 F. App'x 630 (9th Cir. 2012) (unpubl.). . . . . . . . . . . . . . . . . 94, 185-86

*H & R Corp. v. District of Columbia*, 351 F.2d 740 (D.C. Cir. 1965). . . . . . . . . . . . . . . . . . . . . . . 108

*Hage v. United States*, 35 Fed. Cl. 147 (Fed. Cl. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

*Hage v. United States*, 51 Fed. Cl. 570 (Fed. Cl. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

*Hannan v. United States*, 131 F.2d 441 (D.C. Cir. 1942). . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

*Harris v. United States*, 205 F.2d 765 (10th Cir. 1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Hembree v. United States*, 347 F.2d 109 (8th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

*Hendler v. United States*, 175 F.3d 1374 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 156, 159, 163, 194

*Hickey v. United States*, 208 F.2d 269 (3d Cir. 1953). . . . . . . . . . . . . . . . . . . . . . . . 94, 120, 123-25

*Hicks v. United States ex rel. Tenn. Valley Auth.*, 266 F.2d 515 (6th Cir. 1959). . . . . . . . . . . . . . . . . 142

*Home Ins. Co. v. Balt. Warehouse Co.*, 93 U.S. 527 (1876) . . . . . . . . . . . . . . . . . . . . . . . . . . 125

*Hooten v. United States*, 405 F.2d 1167 (5th Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*Hoover v. U.S. Dep't of Interior*, 611 F.2d 1132, 1138 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . 203

*Horne v. Dep't of Agric.*, 135 S. Ct. 2419 (2015). . . . . . . . . . . . . . . . . . . . . . . 5, 90, 93, 162-64, 192

*In re Cool*, 81 B.R. 614 (D. Mont. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140, 142

*In re Dyevoich*, No. 11-2551 (MLC), 2012 WL 194677 (D.N.J. Jan. 23, 2012) (unpubl.) . . . . . . . . . . . . . . . .95

*In re Furman Street*, 17 Wend. 649 (N.Y. Sup. Ct. 1836) . . . . . . . . . . . . . . . . . . . . . . 128

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . 121

*In re Operation of the Mo. River Sys. Litig.*, 363 F. Supp. 2d 1145 (D. Minn. 2004),
*aff'd in part and vacated in part*, 421 F.3d 618 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . 190

*In re U.S. Comm'n to Appraise Wash. Mkt. Co. Prop.*, 295 F. 950 (D.C. Cir. 1924) . . . . . . . . . . . . . . . . . . . 134

*Int'l Paper Co. v. United States*, 227 F.2d 201 (5th Cir. 1955) . . . . . . . . . . . . . . . 115-16, 124, 132, 153-54

*Intertype Corp. v. Clark-Congress Corp.*, 240 F.2d 375 (7th Cir. 1957) . . . . . . . . . . . . . . . .157, 159-61, 177

*J.A. Tobin Constr. Co. v. United States*, 343 F.2d 422 (10th Cir. 1965) . . . . . . . . . . . . . . . . 104, 186

*Jefferson Cty. v. Tenn. Valley Auth.*, 146 F.2d 564 (6th Cir. 1945) . . . . . . . . . . . . . . . . . . . . . . 197

*Joslin Co. v. Providence*, 262 U.S. 668 (1923) . . . . . . . . . . . . . . . . . . . . . . 142

*Justice v. United States*, 145 F.2d 110 (9th Cir. 1944) . . . . . . . . . . . . . . . . . . . . . . 127

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) . . . . . . . . . . . . . . . . . . 187-89, 191-92, 194

*Kaiser Dev. Co. v. Honolulu*, 649 F. Supp. 926 (D. Haw. 1986), *aff'd*, 898 F.2d 112 (9th Cir. 1990) (mem.) . . . . . . . 160

*Kelo v. City of New London*, 545 U.S. 469 (2005) . . . . . . . . . . . . . . . . . . . . . . .90

*Kerr v. S. Park Comm'rs*, 117 U.S. 379 (1886) . . . . . . . . . . . . . . . . .93, 94, 95, 101-02, 146, 149

*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987) . . . . . . . . . . . . . . . . . . . . . . 49, 118

*Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949) . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . .90, 93, 95-96, 98, 100-01, 104-05, 107, 118, 136-38, 140, 161, 171, 174-75, 177

*Kinter v. United States*, 156 F.2d 5 (3d Cir. 1946) . . . . . . . . . . . . . . . . . . . .131, 133, 136

*Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1 (1984) . . . . . . . . . . . . . . . 91-94, 101, 183-84, 196, 204-05

*Klein v. United States*, 375 F.2d 825 (Ct. Cl. 1967) . . . . . . . . . . . . . . . . . . . . . . 159

*Knollman v. United States*, 214 F.2d 106 (6th Cir. 1954) . . . . . . . . . . . . . . . . . . 120-21

*Kohl v. United States*, 91 U.S. 367 (1875) . . . . . . . . . . . . . . . . . . . . . . .89

*L. Vogelstein & Co. v. United States*, 262 U.S. 337 (1923) . . . . . . . . . . . . . . . . . . 106-07

*Ladd v. United States*, 630 F.3d 1015 (Fed. Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . 199

*Lambert Gravel Co. v. J.A. Jones Constr. Co.*, 835 F.2d 1105 (5th Cir. 1988). . . . . . . . . . . . . . . . .188, 190, 192

*Lewis Blue Point Oyster Cultivation Co. v. Briggs*, 229 U.S. 82 (1913) . . . . . . . . . . . . . . . 189-90, 192

*Likins-Foster Monterey Corp. v. United States*, 308 F.2d 595 (9th Cir. 1962) . . . . . . . . . . . . . . . .137, 141, 182

*Lodge Tower Condo. Ass'n v. Lodge Props., Inc.*, 85 F.3d 476 (10th Cir.1996) . . . . . . . . . . . . . . . . . . 185

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) . . . . . . . . . . . . . . . . . . 49, 177, 185

*Lost Tree Village Corp. v. United States*, 787 F.3d 1111 (Fed. Cir. 2015),
*petition for cert. docketed*, No. 15-1192 (U.S. March 23, 2016) . . . . . . . . . . . . . . . . . . . . . 118

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) . . . . . . . . . . . . . . . . . . . . . . . 187-88

*Marbury v. Madison*, 5 U.S. 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 89, 93

*Mayor & City Council of Baltimore v. United States*, 147 F.2d 786 (4th Cir. 1945) . . . . . . . . . . . . . 174, 196

*McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608 (Fed. Cl. 2013) . . . . . . . . . . . . . . . 121

*McCoy v. Union Elevated R.R. Co.*, 247 U.S. 354, 365 (1918) . . . . . . . . . . . . . . . . 93, 95, 162, 167

*Meadows v. United States*, 144 F.2d 751 (4th Cir. 1944) . . . . . . . . . . . . . . . . . . . . . . .97

*Miller v. United States*, 550 F. Supp. 669 (Cl. Ct. 1982), *aff'd*, 714 F.2d 160 (Fed. Cir. 1983) (mem.) . . . . . . . . . 192

*Miller v. United States*, 620 F.2d 812 (Ct. Cl. 1980) . . . . . . . . . . . . . . . . . . . . . . . 154

*Mills v. United States*, 363 F.2d 78 (8th Cir. 1966) . . . . . . . . . . . . . . . . . . . . .139-140, 179

*Minnesota Rate Cases*, 230 U.S. 352 (1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

*Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403 (1878) . . . . . . . . 90, 92-93, 96, 105, 107, 127-28, 171, 203

*Mitchell v. United States*, 267 U.S. 341 (1925) . . . . . . . . . . . . . . . . . . . . . 142, 151, 155, 159

*Monongahela Nav. Co. v. United States*, 148 U.S. 312 (1893) . . . . . . . 96, 101, 105, 140, 155, 169-70, 195, 203

*Mont. Ry. Co. v. Warren*, 137 U.S. 348 (1890) . . . . . . . . . . . . . . . . . . . . . . . . 178-79

*Morgan v. Commercial Union Assurance Cos.*, 606 F.2d 554 (5th Cir. 1979) . . . . . . . . . . . . . . . . .82

*Morris v. Comm'r*, 761 F.2d 1195 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 134

*Morton Butler Timber Co. v. United States*, 91 F.2d 884 (6th Cir. 1937) . . . . . . . . . . . . . . . . . .98

*Mt. St. Helens Mining & Recovery Ltd. P'ship v. United States*, 384 F.3d 721 (9th Cir. 2004) . . . . . . . . . . . . . . 186

*Murr v. Wisconsin*, 359 Wis. 2d 675 (Wis. Ct. App. 2014), *review denied*, 366 Wis. 2d 59 (2015),
*cert. granted*, 136 S. Ct. 890 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Nash v. D.C. Redev. Land Agency*, 395 F.2d 571 (D.C. Cir. 1967) . . . . . . . . . . . . . . . . . . . 126

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.* (*NPCA v. BLM*), 606 F.3d 1058 (9th Cir. 2010) . . . . . 185-86

*Nebraska v. United States*, 164 F.2d 866 (8th Cir. 1947) . . . . . . . . . . . . . . . . . 91, 97, 99, 172, 197

*Norfolk Redev. & Hous. Auth. v. Chesapeake & Potomac Tel. Co.*, 464 U.S. 30 (1983) . . . . . . . . . . . . . .89

*Norman v. United States*, 429 F.3d 1081 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 118

*Norman v. United States*, 63 Fed. Cl. 231 (Ct. Cl. 2004), *aff'd*, 429 F.3d 1081 (Fed. Cir. 2005) . . . . . . . . . . . 145

*Old Dominion Land Co. v. United States*, 269 U.S. 55 (1925) . . . . . . . . . . . . . . . . . . . . . .98

*Olson v. United States*, 292 U.S. 246 (1934) . . . 5, 90, 93, 96, 100-05, 107-08, 117, 119, 123-24, 126-29, 132, 134-36, . . . . . . . . . . . . . . . . . . . . . . . . . .139, 143-45, 151, 156-57, 162, 170-71, 173, 174, 176, 179, 183, 187, 193, 197, 200

*Olson v. United States*, 67 F.2d 24 (8th Cir. 1933), *aff'd*, 292 U.S. 246 (1934) . . . . . . . . . . . . . . . . . . . . . 107

*Omnia Commercial Co. v. United States*, 261 U.S. 502 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*Oncor Elec. Delivery Co. v. Brown*, 451 S.W.3d 128 (Tex. Ct. App. 2014) . . . . . . . . . . . . . . . . . . . . . 114

*Otay Mesa Prop., L.P. v. United States (Otay Mesa I)*, 670 F.3d 1358 (Fed. Cir. 2012) . . . . . . . . . . . . . 177-78

*Otay Mesa Prop., L.P. v. United States (Otay Mesa II)*, 110 Fed. Cl. 732 (Fed. Cl. 2013) . . . . . . . . . . . 107, 178

*Otay Mesa Prop., L.P. v. United States (Otay Mesa III)*, 779 F.3d 1315 (Fed. Cir. 2015) . . . . . . . . . . .107, 178, 184

*Owen v. United States*, 851 F.2d 1404 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189, 194

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117-18

*Palm Beach Isles Assocs. v. United States*, 42 Fed. Cl. 340 (Fed. Cl. 1998). . . . . . . . . . . . . . . . . . . . . 192

*Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978) . . . . . . . . . . . . . . . . . 49, 117-18, 185

*Pa. Ave. Dev. Corp. v. One Parcel of Land in D.C.*, 670 F.2d 289 (D.C. Cir. 1981). . . . . . . . . . . . . . . . . 175

*Phillips v. United States*, 148 F.2d 714 (2d Cir. 1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

*Phillips v. United States*, 243 F.2d 1 (9th Cir. 1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179-80

*Porrata v. United States*, 158 F.2d 788 (1st Cir. 1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

*Portland Nat. Gas Transmission Sys. v. 19.2 Acres of Land*, 318 F.3d 279 (1st Cir. 2003) . . . . . . . . . . . . .91

*Pottawatomie Cty. Comm'rs v. O'Sullivan*, 17 Kan. 58 (1876) . . . . . . . . . . . . . . . . . . . . . . . . 162, 164

*PPL Montana, LLC v Montana*, 132 S. Ct. 1215 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*Preseault v. Interstate Commerce Comm'n (Preseault I)*, 494 U.S. 1 (1990) . . . . . . . . . . . . . . . . . . . 198-99

*Preseault v. United States (Preseault II)*, 100 F.3d 1525 (Fed. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . 199

*Public Lands Council v. Babbitt*, 529 U.S. 728 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

*Pub. Util. Dist. No. 1 v. City of Seattle*, 382 F.2d 666, 669 (9th Cir. 1967) . . . . . . . . . . . . . . . . . . . . 188

*PVM Redwood Co. v. United States*, 686 F.2d 1327 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . 159

*R.J. Widen Co. v. United States*, 357 F.2d 988 (Ct. Cl. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*Rapanos v. United States*, 547 U.S. 715 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*Rapid Transit Co. v. United States*, 295 F.2d 465 (10th Cir. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Rasmuson v. United States*, 807 F.3d 1343 (Fed. Cir. 2015) . . . 89-90, 94-95, 100-02, 132, 134, 150, 152, 169, 197-99

*Rhodes v. City of Chi. for Use of Sch.*, 516 F.2d 1373 (7th Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . .99

5-ER-983

*Richards v. Wash. Terminal Co.*, 233 U.S. 546 (1914) . . . . . . . . . . . . . . . . . . . . . . 155

*Robinson v. United States*, 305 F.3d 1330 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . .95

*Rockies Exp. Pipeline LLC v. 4.895 Acres of Land*, 734 F.3d 424 (6th Cir. 2013) . . . . . . . . . . . . . . . . . . .91

*Rockies Exp. Pipeline LLC v. Hopkins, 131.495 Acres*, No. 1:08-cv-00751-RLY-DML, 2012 WL 1622532 (S.D. Ind. May 9, 2012) . . . . . . . . . . . . . . . . . . . . . . . 145

*Rogers v. United States*, 184 So.3d 1087 (Fla. 2015) . . . . . . . . . . . . . . . . . . . . . . .91

*Rogers v. United States*, 814 F.3d 1299 (Fed. Cir. 2015) . . . . . . . . . . . . . . . . . . . . .91

*Roth v. U.S. Dep't of Transp.*, 572 F.2d 183 (8th Cir. 1978) . . . . . . . . . . . . . . . . . .99

*Rousseaux v. United States*, 394 F.2d 123 (5th Cir. 1968) (per curiam) . . . . . . . . . . . . . . 117

*S. Ctys. Gas Co. of Cal. v. United States*, 157 F. Supp. 934 (Ct. Cl. 1958), *cert. denied*, 358 U.S. 815 (1958) . . . . . . 159

*S. Nat. Gas Co. v. Land, Cullman Cty.*, 197 F.3d 1368 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . .91

*San Nicolas v. United States*, 617 F.2d 246 (Ct. Cl. 1980) . . . . . . . . . . . . . . . . . . . . .98

*Scott Lumber Co. v. United States*, 390 F.2d 388 (9th Cir. 1968) . . . . . . . . . . . . . . . . . . 183

*Scranton v. Wheeler*, 179 U.S. 141 (1900) . . . . . . . . . . . . . . . . . . . . . . 187-88, 190

*Se. Supply Header, LLC v. 110 Acres in Covington Cty. (SESH)*, No. 2:07-CV-291 KS-MTP, 2008 WL 127490 (S.D. Miss. Jan. 10, 2008) . . . . . . . . . . 114, 116

*Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299 (1923) . . . . . . . . . . . . . . . . . . 151

*Searl v. School Dist.*, 133 U.S. 553 (1890) . . . . . . . . . . . . . . 90, 94, 98, 119, 201

*Seravalli v. United States*, 845 F.2d 1571 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . 119-20

*Sharp v. United States*, 191 U.S. 341 (1903) . . . . . . . . . . . . . . 110-14, 130, 153, 156

*Sharpe v. United States*, 112 F. 893 (3d Cir. 1902), *aff'd sub nom. Sharp v. United States*, 191 U.S. 341 (1903) . . . . . . . . . . . . . . . . . 110-11, 115, 153, 156

*Shoemaker v. United States*, 147 U.S. 282 (1893) . . . . . . . . . . . . . . . . . . . 91, 101, 145

*Sill Corp. v. United States*, 343 F.2d 411 (10th Cir. 1965) . . . . . . . . . . . . . . . . . . 119

*Simmonds v. United States*, 199 F.2d 305 (9th Cir. 1952) . . . . . . . . . . . . . . . . . . . . 123

*Slattery Co. v. United States*, 231 F.2d 37 (5th Cir. 1956) . . . . . . . . . . . . . . . . . 125-27

*South Carolina v. Georgia*, 93 U.S. 4 (1876) . . . . . . . . . . . . . . . . . . . . . . . 190

*St. Joe Paper Co. v. United States*, 155 F.2d 93 (5th Cir. 1946) . . . . . . . . . . . . . . . . . . 102

*St. Regis Paper Co. v. United States*, 313 F.2d 45 (9th Cir. 1962) . . . . . . . . . . . . . . . . . . 158

*Standard Oil Co. of N.J. v. S. Pac. Co.*, 268 U.S. 146 (1925) . . . . . . . . . . . . . . . . . . 132

5-ER-984

*Stephenson Brick Co. v. United States ex rel. Tenn. Valley Auth.*, 110 F.2d 360 (5th Cir. 1940) . . . . . . . . . . . . . . . 128

*Stipe v. United States*, 337 F.2d 818 (10th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . 140, 159

*Surfside of Brevard, Inc. v. United States*, 414 F.2d 915 (5th Cir. 1969) . . . . . . . . . . . . . . . . . . . . . 123

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002) . . . . . . . . . . . . 89-90, 117-18

*Terminal Coal Co. v. United States*, 172 F.2d 113 (3d Cir. 1949) . . . . . . . . . . . . . . . . . . . . . . 198

*The Daniel Ball*, 77 U.S. 557 (1870) . . . . . . . . . . . . . . . . . . . . . . . . 189

*The Propeller Genesee Chief v. Fitzhugh*, 12 How. 443 (1852) . . . . . . . . . . . . . . . . . . . . 188

*Town of Clarksville v. United States*, 198 F.2d 238 (4th Cir. 1952) . . . . . . . . . . . . . . . . . . . . . 200-01

*Town of N. Bonneville v. Callaway*, 10 F.3d 1505 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 201

*Town of N. Bonneville v. U.S. Dist. Court*, 732 F.2d 747 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . 201

*Town of N. Bonneville v. United States*, 5 Cl. Ct. 312 (1984) . . . . . . . . . . . . . . . . . . . . . . 201

*Town of N. Bonneville v. United States*, 833 F.2d 1024 (Fed. Cir. Oct. 28, 1987) (unpubl.) . . . . . . . . . . . . . . 201

*Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15 (5th Cir. 1969) . . . . . . . . . . . 92, 126-27, 152, 169-71

*Tundidor v. Miami-Dade Cty.*, 831 F.3d 1328 (11th Cir. 2016) . . . . . . . . . . . . . . . . . . 188

*Turner v. Kings River Conservation Dist.*, 360 F.2d 184 (9th Cir. 1966) . . . . . . . . . . . . . . . . . . . 190

*United States ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land*, 821 F.3d 742 (6th Cir. 2016) . . . . . . . . . 101-05, 107-08

*United States ex rel. Tenn. Valley Auth. v. An Easement & Right-of-Way*, 182 F. Supp. 899 (M.D. Tenn. 1960) . . . . . . 169

*United States ex rel. Tenn. Valley Auth. v. An Easement & Right-of-Way (Hadley)*, 447 F.2d 1317 (6th Cir. 1971) . . . . . . 104

*United States ex rel. Tenn. Valley Auth. v. An Easement & Right-of-Way over 6.09 Acres of Land (TVA v. 6.09 Acres)*,
140 F. Supp. 3d 1218 (N.D. Ala. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143-45

*United States ex rel. Tenn. Valley Auth. v. Bailey*, 115 F.2d 433 (5th Cir. 1940) . . . . . . . . . . . . . . . . . 126

*United States ex rel. Tenn. Valley Auth. v. Harralson*, 43 F.R.D. 318 (W.D. Ky. 1966) (mem.) . . . . . . . . . . . 98, 123

*United States ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*,
40 F. Supp. 811 (E.D. Tenn. 1941) . . . . . . . . . . . . . . . . . . 137, 153, 162, 165-66, 167, 170, 178, 182

*United States ex rel. Tenn. Valley Auth. v. Powelson*,
319 U.S. 266 (1943) . . . . . . . . . . . . . . . . 90, 91, 99-102, 112, 133, 135-36, 140, 154-56, 159, 176, 187, 197

*United States ex rel. Tenn. Valley Auth. v. Robertson*, 354 F.2d 877 (5th Cir. 1966) . . . . . . . . . . . . . . . . 166

*United States ex rel. Tenn. Valley Auth. v. Russell*, 87 F. Supp. 386 (E.D. Tenn. 1948) . . . . . . . . . . . . . . 91, 170

*United States ex rel. Tenn. Valley Auth. v. Stewart*, 429 F. Supp. 658 (E.D. Tenn. 1976) . . . . . . . . . . . . . . 113-14

*United States ex rel. Tenn. Valley Auth. v. Welch*, 327 U.S. 546, 554 (1946) . . . . . . . . . . . . . . . . . . . 91

*United States v. 0.073 Acres of Land (Mariner's Cove)*, 705 F.3d 540 (5th Cir. 2013) . . . . . . . . . . . . . . . . 90, 159

*United States v. 0.161 Acres of Land in Birmingham*, 837 F.2d 1036 (11th Cir. 1988) . . . . . . . . . . . . . . . 130

*United States v. 0.21 Acres of Land*, 803 F.2d 620 (11th Cir. 1986) . . . . . . . . . . . . . . . . . 110

*United States v. 0.39 Acres of Land*, No. 2:11-0259, 2013 WL 3874472 (S.D.W. Va. July 25, 2013) . . . . . . . . . 166

*United States v. 0.59 Acres of Land in Pima Cty.*, 109 F.3d 1493 (9th Cir. 1997) . . . . . . . . . . 126-27, 129, 132, 197

*United States v. 1,014.16 Acres of Land in Vernon Cty.*, 558 F. Supp. 1238 (W.D. Mo. 1983),
*aff'd*, 739 F.2d 1371 (8th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 202

*United States v. 1,291.83 Acres of Land in Adair & Taylor Ctys.*, 411 F.2d 1081 (6th Cir. 1969) . . . . . . . . . 139, 145

*United States v. 1,629.6 Acres of Land in Sussex Cty. (Island Farm II)*,
360 F. Supp. 147 (D. Del. 1973), *aff'd*, 503 F.2d 764 (3d Cir. 1974) . . . . . . . . . . . . . . . . . 179-80

*United States v. 1,629.6 Acres of Land in Sussex Cty. (Island Farm III)*, 503 F.2d 764 (3d Cir. 1974) . . . . . . . . . . . .90

*United States v. 1.377 Acres of Land (Hotel San Diego)*, 352 F.3d 1259 (9th Cir. 2003) . . . . . . . . . . . . . . .97, 99

*United States v. 1.57 Acres of Land in San Diego Cty.*, No. 12cv3055,
2015 WL 5254558 (S.D. Cal. Sept. 9, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . 105, 107

*United States v. 1.604 Acres of Land (Granby I)*,
844 F. Supp. 2d 668 (E.D. Va. 2011) . . . . . . . . . 103, 105, 131-32, 134-36, 146-47, 149-51, 156, 159, 160, 202

*United States v. 1.604 Acres of Land (Granby II)*, No. 2:10-cv-00320, 2011 WL 1810594 (E.D. Va. May 11, 2011) . . 135

*United States v. 1.604 Acres of Land (Granby III)*, 844 F. Supp. 2d 685 (E.D. Va. 2011) . . . . . . . . . .124, 135-36, 202

*United States v. 10,031.98 Acres of Land in Las Animas Cty.*, 850 F.2d 634 (10th Cir. 1988) . . . . . . . . . . . . . . 129

*United States v. 10.0 Acres of Land*, 533 F.2d 1092 (9th Cir. 1976) . . . . . . . . . . . . . . . . 112-13

*United States v. 10.00 Acres of Land*, No. 99-0672-CIV, 2010 WL 3733994 (S.D. Fla. Sept. 22, 2010),
*aff'd sub nom. United States v. Gonzalez*, 466 F. App'x 858 (11th Cir. 2012) (per curiam) . . . . . . . . 96, 109, 121, 202

*United States v. 10.48 Acres of Land*, 621 F.2d 338 (9th Cir. 1980) . . . . . . . . . . . . . . . . . 125-26, 171

*United States v. 10.56 Acres in Whatcom Cty. (Peace Arch I)*, No. C07-1261RAJ,
2008 WL 3977614 (W.D. Wash. Aug. 22, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 200

*United States v. 10.56 Acres in Whatcom Cty. (Peace Arch II)*, No. C07-1261RAJ,
2010 WL 415244 (W.D. Wash. Jan. 27, 2010) . . . . . . . . . . . . . . . . . . 199, 201

*United States v. 100 Acres of Land*, 468 F.2d 1261 (9th Cir. 1972) . . . . . . . . . . . . . . . . . . .120, 131, 144-45

*United States v. 100.00 Acres of Land in Livingston Cty.*, 369 F. Supp. 195 (W.D. Ky. 1973). . . . . . . . . . . . . . 103

*United States v. 100.01 Acres of Land in Buchanan Cty.*, 102 F. App'x 295 (4th Cir. 2004) (unpubl.) . . . . . . . . . . 123

*United States v. 100.80 Acres of Land (Parrish)*, 657 F. Supp. 269 (M.D.N.C. 1987) . . . . . . . 137, 140, 142, 178, 181

*United States v. 101.88 Acres of Land in St. Mary Par. (Avoca Island)*, 616 F.2d 762 (5th Cir. 1980) . . . . . .155, 157, 192

5-ER-986

*United States v. 102.871 Acres of Land in Cameron Par.* (*La. Jetty*), No. 2:13 CV 2508,
2015 WL 5794073 (W.D. La. Oct. 2, 2015) . . . . . . . . . . . . . . . . . . . . . . 189, 192

*United States v. 103.38 Acres of Land in Morgan Cty.* (*Oldfield*), 660 F.2d 208 (6th Cir. 1981). . . 120, 137-38, 178-80, 182

*United States v. 105.40 Acres of Land in Porter Cty.*, 471 F.2d 207 (7th Cir. 1972) . . . . . . . . 111, 113, 116, 152, 156

*United States v. 1129.75 Acres of Land in Cross & Pointsett Ctys.*, 473 F.2d 996 (8th Cir. 1973). . . . . . . . . . . .131

*United States v. 114.64 Acres of Land*, 504 F.2d 1098 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . 129

*United States v. 117,763 Acres of Land in Imperial Cty.*, 410 F. Supp. 628 (S.D. Cal. 1976),
*aff'd sub nom. United States v. Shewfelt Inv. Co.*, 570 F.2d 290 (9th Cir. 1977). . . . . . . . . . . . . . . . . . . . 43, 176

*United States v. 12.94 Acres of Land in Solano Cty.*, No. S-07-2172,
2009 WL 4828749, 2009 U.S. Dist. LEXIS 114581 (E.D. Cal. Dec. 9, 2009). . . . . . . . . . . . . . . . 57, 166-67

*United States v. 122.63 Acres of Land in Norfolk Cty.*, 526 F. Supp. 539 (D. Mass. 1981). . . . . . . . . . . . . . 157

*United States v. 124.84 Acres of Land in Warrick Cty.*, 387 F.2d 912 (7th Cir. 1968) . . . . . . . . . . . . . . 120

*United States v. 125.07 Acres of Land* (*Pond Road I*), 667 F.2d 243 (1st Cir. 1981) . . . . . . . . . . . . . 145, 151

*United States v. 125.2 Acres of Land in Nantucket*, 732 F.2d 239 (1st Cir. 1984). . . . . . . . . . . . . . . .94

*United States v. 13.20 Acres of Land in Lincoln Cty.*, 629 F. Supp. 242 (E.D. Wash. 1986) . . . . . . . . . . . . . 191-93

*United States v. 131,675 Rentable Square Feet of Space* (*GSA-VA St. Louis I*),
No. 4:14-cv-1077, 2015 WL 4430134 (E.D. Mo. July 20, 2015) . . . . . . . . . . . . 159, 161, 174, 176-77

*United States v. 14.36 Acres of Land in McMullen Cty.*, 252 F. Supp. 2d 361 (S.D. Tex. 2002) . . . . . . . . . . . 113-14

*United States v. 14.38 Acres of Land*, 80 F.3d 1074 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . 153

*United States v. 147.47 Acres of Land* (*Delagap*), 352 F. Supp. 1055 (M.D. Pa. 1972) . . . . . . . . . . . . 143, 145

*United States v. 15,478 Square Feet of Land* (*Balaji Sai*), No. 2:10-cv-00322,
2011 WL 2471586 (E.D. Va. June 20, 2011) . . . . . . . . . . . . . . . . . . . . . . .100, 131, 133, 135

*United States v. 15.00 Acres of Land in Miss. Cty.*, 468 F. Supp. 310 (E.D. Ark. 1979) . . . . . . 106-07, 138-39, 180, 183

*United States v. 15.65 Acres of Land in Marin Cty.* (*Marin Ridgeland Co.*), 689 F.2d 1329 (9th Cir. 1982) . . . . . . . 157-58

*United States v. 158.00 Acres of Land in Clay Cty.*, 562 F.2d 11 (8th Cir. 1977). . . . . . . . . . . . . . . . . 99, 136

*United States v. 158.24 Acres of Land in Bee Cty.*, 515 F.2d 230 (5th Cir. 1975) . . . . . . . . . . . . . 103, 111

*United States v. 158.24 Acres of Land*, 696 F.2d 559 (8th Cir. 1982) . . . . . . . . . . . . . . . . . 129

*United States v. 158.76 Acres of Land in Townshend*, 298 F.2d 559 (2d Cir. 1962) . . . . . 98, 104, 137, 140-41, 178, 182

*United States v. 161.99 Acres of Land in Collins Cty.*, 512 F.2d 65 (5th Cir. 1975) . . . . . . . . . . . . . .94-95

*United States v. 17.69 Acres of Land in San Diego* (*Nat'l Enterprises*),
No. 99cv1248 DMS (JMA) (S.D. Cal. Aug. 30, 2004) . . . . . . . . . . . . . . . . . . . 113, 116

5-ER-987

*United States v. 172.80 Acres of Land in Mercer Cty.*, 350 F.2d 957 (3d Cir. 1965) . . . . . . . . . . . . . . . . . . . 147

*United States v. 1735 N. Lynn St.*, 676 F. Supp. 693 (E.D. Va. 1987) . . . . . . . . . . . . . . . .159, 161, 174-77

*United States v. 174.12 Acres of Land in Pierce Cty.*, 671 F.2d 313 (9th Cir. 1982) . . . . . . . . . . . . . . . . 108

*United States v. 179.26 Acres of Land in Douglas Cty.*, 644 F.2d 367 (10th Cir. 1981) . . . . . . . . . . . . . . 180

*United States v. 18.46 Acres of Land in Swanton*, 312 F.2d 287 (2d Cir. 1963) . . . . . . . . . . . . . . . . . 128

*United States v. 2,175.86 Acres of Land in Hardin & Jefferson Ctys.*, 687 F. Supp. 1079 (E.D. Tex. 1988) . . . . . . . 183

*United States v. 2,477.79 Acres of Land in Bell Cty.*, 259 F.2d 23 (5th Cir. 1958) . . . . . . . . . . . . . . . . . 163

*United States v. 2,560.00 Acres of Land in Wash. Cty.*, 836 F.2d 498 (10th Cir. 1988) . . . . . . . . . . . . . . . 155

*United States v. 2,847.58 Acres of Land in Bath Ctys.*, 529 F.2d 682 (6th Cir. 1976) . . . . . . . . . . . .153, 165, 170

*United States v. 2.33 Acres of Land in Wake Cty.*, 704 F.2d 728 (4th Cir. 1983) . . . . . . . . . . . . . .112, 166, 167

*United States v. 2.739 Acres of Land in Santa Cruz Cty.*, 609 F. App'x 436 (9th Cir. 2015) (unpubl.) . . . . . . . . . . 126

*United States v. 21.54 Acres of Land in Marshall Cty.*, 491 F.2d 301 (4th Cir. 1973) . . . . . . . . . . . . . . 91, 157

*United States v. 22.80 Acres of Land in San Benito Cty.*, 839 F.2d 1362 (9th Cir. 1988) . . . . . . . . . . . . . . 178

*United States v. 237,500 Acres of Land*, 236 F. Supp. 44 (S.D. Cal. 1964),
*aff'd sub nom. United States v. Am. Pumice Co.*, 404 F.2d 336 (9th Cir. 1968) . . . . . . . . . . . . . 97, 107, 139, 181

*United States v. 24.48 Acres of Land*, 812 F.2d 216 (5th Cir. 1987) . . . . . . . . . . . . . . . . . 120, 180-81

*United States v. 25.02 Acres of Land*, 495 F.2d 1398 (10th Cir. 1974) . . . . . . . . . . . . . . . . . . 126-127

*United States v. 25.202 Acres of Land (Amexx I)*, 860 F. Supp. 2d 165 (N.D.N.Y. 2009),
*adopted* 860 F. Supp. 2d 165 (N.D.N.Y. 2010),
*aff'd*, 502 F. App'x 43 (2d Cir. 2012) . . . . . . . . . 103, 110-11, 116, 118-20, 132-33, 136-38, 142, 155, 182, 189

*United States v. 25.202 Acres of Land (Amexx II)*, No. 5:06-CV-428,
2011 WL 4595009 (N.D.N.Y. Sept. 30, 2011), *aff'd*, 502 F. App'x 43 (2d Cir. 2012) . . . . . . . . . . . . . . . 136

*United States v. 25.936 Acres of Land in Edgewater*, 153 F.2d 277 (3d Cir. 1946) . . . . . . . . . . . . . . . . . .97

*United States v. 26.07 Acres of Land in Nassau Cty.*, 126 F. Supp. 374 (E.D.N.Y. 1954) . . . . . . . . . . . . . .156-57

*United States v. 264.80 Acres of Land in Ramsey Cty.*, 360 F. Supp. 1381 (D.N.D. 1973) . . . . . . . . . . . . . . 126

*United States v. 27.93 Acres of Land in Cumberland Cty.*, 924 F.2d 506 (3d Cir. 1991) . . . . . . . . . . . .103, 108, 110

*United States v. 275.81 Acres of Land (Flight 93 Memorial)*,
No. 09-233, 2014 WL 1248205 (W.D. Pa. Mar. 26, 2014) . . . . . . . . . . . . . . . . . . . . . . . . 104-05

*United States v. 3,218.9 Acres of Land in Warren Cty.*, 619 F.2d 288 (3d Cir. 1980) . . . . . . . . . . . 91, 157, 169

*United States v. 3,317.39 Acres of Land in Jefferson Cty.*, 443 F.2d 104 (8th Cir. 1971) . . . . . . . . . . . . . . 157

*United States v. 3,727.91 Acres of Land (Elsberry Drainage District)*, 563 F.2d 357 (8th Cir. 1977) . . . . . . . .135, 196, 198

*United States v. 3.544 Acres of Land*, 147 F.2d 596 (3d Cir. 1945) . . . . . . . . . . . . . . . . . . . . . 145

*United States v. 3.6 Acres of Land in Spokane Cty.*, 395 F. Supp. 2d 982 (E.D. Wash. 2004) . . . . . . . . . . . . . . . 172

*United States v. 3.66 Acres of Land in S.F.*, 426 F. Supp. 533 (N.D. Cal. 1977). . . . . . . . . . . . . . . . . . . . 152

*United States v. 30.54 Acres of Land in Greene Cty. (Filiaggi)*, 90 F.3d 790 (3d Cir. 1996) . . . . . . . . . . . 187-92, 194

*United States v. 312.50 Acres of Land in Prince William Cty.*, 812 F.2d 156 (4th Cir. 1987) . . . . . . . . . . . . . 129-30

*United States v. 32.42 Acres of Land (Fleet ASW)*, No. 05cv1137 DMS, 2009 WL 2424303 (S.D. Cal. Aug. 6, 2009) . . . . . . . . . . . . . . . . . . 98, 172

*United States v. 32.42 Acres of Land in San Diego Cty.*, 683 F.3d 1030 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . .91

*United States v. 320 Acres of Land*, 605 F.2d 762 (5th Cir. 1979) . . . .  99, 102, 104-06, 107-10, 119-120, 123-24, 129-30, 145-50, 165, 171, 175, 180, 183, 186, 197

*United States v. 33.5 Acres of Land*, 789 F.2d 1396 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . 159

*United States v. 33.92356 Acres of Land (Piza-Blondet)*, 585 F.3d 1 (1st Cir. 2009) . . . . . . . . . 102-03, 107-08, 110-12, 116, 119, 129, 152, 154-55, 165-67, 170, 180-81

*United States v. 33.92356 Acres of Land (Piza-Blondet Trial Op.)*, Nos. 98-1664 & 98-2344, 2008 WL 2550586 (D.P.R. June 13, 2008), *aff'd*, 585 F.3d 1 (1st Cir. 2009). . . . . . . . . . . . . . . . . . . . 98, 101, 112, 137-38, 140, 142, 178, 180

*United States v. 341.45 Acres of Land in St. Louis Cty.*, 633 F.2d 108 (8th Cir. 1980) . . . . . . . . . . . 104, 143-45

*United States v. 344.85 Acres of Land*, 384 F.2d 789 (7th Cir. 1967). . . . . . . . . . . . . . . . . . . 120, 193

*United States v. 38,994 Net Usable Square Feet at 910 S. Mich. Ave.*, No. 87 C 8569, 1989 WL 51395 (N.D. Ill. May 11, 1989). . . . . . . . . . . . . . . . . . . . . . . . 161

*United States v. 38.60 Acres of Land in Henry Cty.*, 625 F.2d 196 (8th Cir. 1980) . . . . . . . . . . . . . . . . 157, 169

*United States v. 381.76 Acres of Land (Montego Group)*, No. 96-1813, 2010 WL 3734003 (S.D. Fla. Aug. 3, 2010), *adopted sub nom. United States v. 10.00 Acres of Land*, No. 99-0672-CIV, 2010 WL 3733994 (S.D. Fla. Sept. 22, 2010), *aff'd sub nom. United States v. Gonzalez*, 466 F. App'x 858 (11th Cir. 2012) (per curiam). . . . . . . . . . . . . . . . .96, 109, 121, 178, 202

*United States v. 4.0 Acres of Land*, 175 F.3d 1133 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . .81

*United States v. 4.105 Acres of Land in Pleasanton*, 68 F. Supp. 279 (N.D. Cal. 1946) . . . . . . . . . . . . . . . . 101

*United States v. 4.27 Acres of Land*, 271 F. App'x 424, 2008 WL 830711 (5th Cir. 2008) (per curiam) (unpubl.) . 152, 165

*United States v. 4.85 Acres of Land in Lincoln Cty.*, 546 F.3d 613 (9th Cir. 2008) . . . . . . . . . . . . . . . .123-24, 130-31

*United States v. 40.60 Acres of Land in Contra Costa Cty.*, 483 F.2d 927 (9th Cir. 1973). . . . . . . . . . . . 157

*United States v. 403.14 Acres of Land in St. Clair Cty.*, 553 F.2d 565 (8th Cir. 1977) . . . . . . . . . . . . . . 112-13

*United States v. 421.89 Acres of Land*, 465 F.2d 336 (8th Cir. 1972). . . . . . . . . . . . . . . . . . . . . . 120

*United States v. 422,978 Square Feet of Land in S.F.*, 445 F.2d 1180 (9th Cir. 1971) . . . . . . . . . . . . . 191

5-ER-989

*United States v. 428.02 Acres of Land in Newton & Searcy Ctys.*, 687 F.2d 266 (8th Cir. 1982) . . 123-25, 129-30, 146, 151

*United States v. 429.59 Acres of Land (Imperial Beach)*, 612 F.2d 459 (9th Cir. 1980) . 103, 107, 110-14, 116, 122, 129, 193

*United States v. 46,672.96 Acres of Land in Doña Ctys.*,
521 F.2d 13 (10th Cir. 1975) . . . . . . . . . . . . . . . . . 104-06, 123, 125, 126-28, 174, 175, 177, 183, 186, 197

*United States v. 47.14 Acres of Land in Polk Cty.*, 674 F.2d 722 (8th Cir. 1982) . . . . . 46, 120, 125, 136, 137, 138, 182

*United States v. 47.3096 Acres of Land*, 583 F.2d 270 (6th Cir. 1978) . . . . . . . . . . . . . . . . . . . 143-45

*United States v. 478.34 Acres of Land*, 578 F.2d 156 (6th Cir. 1978) . . . . . . . . . . . . . . . . . . . 143

*United States v. 48.10 Acres of Land in New Windsor*, 144 F. Supp. 258 (S.D.N.Y. 1956) . . . . . . . . . . . . . . . . . . 150

*United States v. 480.00 Acres of Land (Fornatora)*,
557 F.3d 1297 (11th Cir. 2009) . . . . . . . . . . . . . . . . . . 107, 109, 120, 125, 127, 146, 148, 150-51

*United States v. 49,375 Square Feet of Land in Manhattan (252 Seventh Ave.)*,
92 F. Supp. 384 (S.D.N.Y. 1950), *aff'd sub nom. United States v.*
*Tishman Realty & Constr. Co.*, 193 F.2d 180 (2d Cir. 1952) (per curiam) . . . . . . . . . . . . . . . . . . 131, 133

*United States v. 49.01 Acres of Land in Osage Cty.*, 669 F.2d 1364 (10th Cir. 1982) . . . . . . . . . . . . . .147, 149, 151

*United States v. 49.79 Acres of Land in New Castle Cty. (Cherry Island)*, 582 F. Supp. 368 (D. Del. 1983) . . . . . . . . 192

*United States v. 494.10 Acres of Land in Cowley Cty.*, 592 F.2d 1130 (10th Cir. 1979) . . . . . . . . . . . . . . . 180

*United States v. 499.472 Acres of Land in Brazoria Cty.*, 701 F.2d 545 (5th Cir. 1983) . . . . . . . . . . 97, 99, 173, 178

*United States v. 5,139.5 Acres of Land*, 200 F.2d 659 (4th Cir. 1952) . . . . . . . . . . . . . . . . . . . 122

*United States v. 50 Acres of Land (Duncanville)*,
469 U.S. 24 (1984) . . . . . . . . . . . . . . . .5, 90, 92-93, 100-01, 105, 107, 145, 155, 187, 196-97, 199, 200-01

*United States v. 50.50 Acres of Land*, 931 F.2d 1349 (9th Cir. 1991) . . . . . . . . . . . . . . . . . .112, 114, 155

*United States v. 55.22 Acres of Land in Yakima Cty.*, 411 F.2d 432 (9th Cir. 1969) . . . . . . . . . . . . . . . . 131-34

*United States v. 564.54 Acres of Land (Lutheran Synod)*, 441 U.S. 506 (1979) . . . . . . 93, 96, 99-120, 173, 187, 196-200

*United States v. 57.09 Acres of Land in Skamania Cty. (Peterson I)*, 706 F.2d 280 (9th Cir. 1983) . . . . . . . . . . . . . 173

*United States v. 57.09 Acres of Land in Skamania Cty. (Peterson II)*, 757 F.2d 1025 (9th Cir. 1985) . . . . . . . . . . . . . 159

*United States v. 58.1 Acres of Land in Hempstead*, 151 F. Supp. 631 (E.D.N.Y. 1957) . . . . . . . . . . . . . . . . . . 150

*United States v. 599.86 Acres in Johnson & Logan Ctys.*, 240 F. Supp. 563 (W.D. Ark. 1965),
*aff'd sub nom. Mills v. United States*, 363 F.2d 78 (8th Cir. 1966) . . . . . . . . . . . . . . . . . . . 179

*United States v. 6.24 Acres of Land (Weber)*, 99 F.3d 1140,
1996 WL 607162 (6th Cir. 1996) (per curiam) (unpubl.) . . . . . . . . . . . . . . . 96, 98, 111-12, 150, 152, 155-57

*United States v. 6.45 Acres of Land (Gettysburg Tower)*, 409 F.3d 139 (3d Cir. 2005) . 97, 99, 110-11, 136, 138, 141-42, 173

*United States v. 6.45 Acres of Land*, No. 1:CV-99-2128, 2006 WL 839375
(M.D. Pa. Mar. 27, 2006), *on remand from* 409 F.3d 139 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . 138, 142

*United States v. 60.14 Acres of Land*, 362 F.2d 660 (3d Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . .119, 120, 122

*United States v. 62.17 acres of Land in Jasper Cty.*, 538 F.2d 670 (5th Cir. 1976) . . . . . . . . . . . . . . . . . 91, 147

*United States v. 62.50 Acres of Land in Jefferson Par.*, 953 F.2d 886 (5th Cir. 1992) . . . . . . . . . . 103, 108-09

*United States v. 63.04 Acres of Land at Lido Beach*, 245 F.2d 140 (2d Cir. 1957) . . . . . . . . . . . . . . . . . 130

*United States v. 633.07 Acres of Land*, 362 F. Supp. 451 (M.D. Pa. 1973) . . . . . . . . . . . . . . . . . . . . . 123

*United States v. 677.50 Acres of Land*, 420 F.2d 1136 (10th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . 159

*United States v. 68.94 Acres of Land in Kent Cty.*, 918 F.2d 389 (3d Cir. 1990) . . . . . .120, 123-24, 130-31, 151-52, 169

*United States v. 69.1 Acres of Land* (*Sand Mountain*), 942 F.2d 290 (4th Cir. 1991) . . . .  95-96, 103, 137-39, 179-80, 182

*United States v. 691.81 Acres of Land in Clark Cty.*, 443 F.2d 461 (6th Cir. 1971) . . . . . . . . . . . . . . . . . 130

*United States v. 71.29 Acres in Catahoula Par.*, 376 F. Supp. 1221 (W.D. La. 1974). . . . . . . . . . . . . 191, 193

*United States v. 711.57 Acres of Land in Alameda Cty.*, 51 F. Supp. 30 (N.D. Cal. 1943) . . . . . . . . . . .115, 154, 203

*United States v. 75.13 Acres in Polk Cty.*, 693 F.2d 813 (8th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . 138-39

*United States v. 760.807 Acres of Land in Honolulu*, 731 F.2d 1443 (9th Cir. 1984) . . . . . .96, 150, 152-54, 156-59,166

*United States v. 765.56 Acres of Land in Southampton* (*765.56 Acres I*), 164 F. Supp. 942 (E.D.N.Y. 1958),
*aff'd sub nom. United States v. Glanat Realty Corp.*, 276 F.2d 264 (2d Cir. 1960). . . . . . . . . . . . . . 94, 108, 152, 172

*United States v. 765.56 Acres of Land in Southampton* (*765.56 Acres II*), 174 F. Supp. 1 (E.D.N.Y. 1959),
*aff'd sub nom. United States v. Glanat Realty Corp.*, 276 F.2d 264 (2d Cir. 1960). . . . . . . . . . . . . .113, 152, 172

*United States v. 79.20 Acres of Land in Stoddard Cty.*, 710 F.2d 1352 (8th Cir. 1983) . . . . . . . . . . . . . . . . 172-73

*United States v. 79.31 Acres of Land*, 717 F.2d 646 (1st Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . .90

*United States v. 79.95 Acres of Land*, 459 F.2d 185 (10th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . 124-25

*United States v. 790.71 Acres of Land in Cotton, Comanche & Stephens Ctys.*, 550 F. Supp. 690 (W.D. Okla. 1981) . . . . .94

*United States v. 7,936.6 Acres of Land*, 69 F. Supp. 328 (D.P.R. 1947) . . . . . . . . . . . . . . . . . . . . . 116

*United States v. 8,968.06 Acres in Chambers & Liberty Ctys.* (*Wallisville*), 326 F. Supp. 546 (S.D. Tex. 1971) . .108, 191, 193

*United States v. 8,968.06 Acres of Land in Chambers & Liberty Ctys.*, 318 F. Supp. 698 (S.D. Tex. 1970),
*vacated* 326 F. Supp. 546 (S.D. Tex. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

*United States v. 8.34 Acres of Land in Ascension Par.*, No. 04-5-D-MI,
2006 WL 6860387 (M.D. La. June 12, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135, 204-05

*United States v. 8.41 Acres of Land in Orange Cty.*,
680 F.2d 388 (5th Cir. 1982) . . . . . . . . . . . . . . . . . .103, 110-13, 116-17, 152-53, 155, 165, 169, 171

5-ER-991

*United States v. 819.98 Acres of Land*, 78 F.3d 1468 (10th Cir. 1996) . . . . . . . . . . . . . . . . 120

*United States v. 87.30 Acres of Land in Whitman & Garfield Ctys.*, 430 F.2d 1130 (9th Cir. 1970) . . . . . . . 113, 190

*United States v. 87.98 Acres of Land in Merced Cty.*, 530 F.3d 899 (9th Cir. 2008) . . . . . . . . . . . . . 158

*United States v. 881.39 Acres of Land*, 254 F. Supp. 294 (E.D. Okla. 1966) . . . . . . . . . . . . . . . . 150

*United States v. 883.89 Acres of Land in Sebastian Cty.*, 314 F. Supp. 238 (W.D. Ark. 1970),
*aff'd*, 442 F.2d 262 (8th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 171, 175

*United States v. 883.89 Acres of Land in Sebastian Cty.*, 442 F.2d 262 (8th Cir. 1971) . . . . . . . . . . . . 43, 171, 175-76

*United States v. 9.20 Acres of Land in Polk Cty.*, 638 F.2d 1123 (8th Cir. 1981) . . . . . . . . . . . 112, 154-55,

*United States v. 901.89 Acres of Land in Davidson & Rutherford Ctys. (Davenport)*,
436 F.2d 395 (6th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . .152, 162-63, 166

*United States v. 91.90 Acres of Land in Monroe Cty. (Cannon Dam)*,
586 F.2d 79 (8th Cir. 1978) . . . . . . . . . . . . . 97-99, 112-13, 136, 151-52, 154-55, 159, 178-79

*United States v. 93.970 Acres of Land (Illinois Aircraft)*, 360 U.S. 328 (1959) . . . . . . . . . . . . . .91

*United States v. 967,905 Acres of Land in Cook Cty. (Pete)*, 447 F.2d 764 (8th Cir. 1971) . . . . . . . . . . 191, 193

*United States v. 97.19 Acres of Land*, 582 F.2d 878 (4th Cir. 1978) . . . . . . . . . . . . . . . . . 166, 193

*United States v. 99.66 Acres of Land (Sunburst Invs.)*, 970 F.2d 651 (9th Cir. 1992) . . . . . . . . . 118, 143-44

*United States v. Am. Pumice Co.*, 404 F.2d 336 (9th Cir. 1968) . . . . . . . . . . . . . . . . . . 140, 181

*United States v. An Easement & Right-of-Way Over Two Strips of Land*, 284 F. Supp. 71 (W.D. Ky. 1968) . . . . . . . . 170

*United States v. Appalachian Elec. Power Co.*, 311 U.S. 377 (1940) . . . . . . . . . . . . . . . . . 188-90

*United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 374 (4th Cir. 1995) . . . . . . . . . . . 151-52, 166, 169, 174-75

*United States v. Becktold Co.*, 129 F.2d 473 (8th Cir. 1942) . . . . . . . . . . . . . . . . 124, 131-32, 135-36

*United States v. Bedford Assocs.*, 548 F. Supp. 732 (S.D.N.Y. 1982) . . . . . . . . . . . . . . . . . 176

*United States v. Benning Hous. Corp.*, 276 F.2d 248 (5th Cir. 1960) . . . . . . . . . . . . . . .119, 131, 133

*United States v. Birnbach*, 400 F.2d 378 (8th Cir. 1968) . . . . . . . . . . . . . . . . . . 190, 192-93

*United States v. Bodcaw Co.*, 440 U.S. 202 (1979) . . . . . . . . . . . . . . . . . . . . . . . 187

*United States v. Brondum*, 272 F.2d 642 (5th Cir. 1959) . . . . . . . . . . . . . . . . . . . . . 157

*United States v. Buhler (Buhler I)*, 254 F.2d 876 (5th Cir. 1958) . . . . . . . . . . . . . . . . . . 110

*United States v. Buhler (Buhler II)*, 305 F.2d 319 (5th Cir. 1962) . . . . . . . . . . . . . . . . 103, 186

*United States v. Carroll*, 304 F.2d 300 (4th Cir. 1962) . . . . . . . . . . . . . . . . . . . . . 180

*United States v. Causby*, 328 U.S. 256 (1946) . . . . . . . . . . . . . . . . . . . . .90-92, 169, 177-78

*United States v. Certain Interests in Prop. in Brooklyn*, 326 F.2d 109 (2d Cir. 1964) . . . . . . . . . . . . . . . . . . . . 132

*United States v. Certain Interests in Prop. in Champaign Cty.*, 271 F.2d 379 (7th Cir. 1959) . . . . . . . . . . . . . . . 91, 131

*United States v. Certain Interests in Prop. in Cumberland Cty.*, 296 F.2d 264 (4th Cir. 1961) . . . . . . . . . . .132, 133, 135

*United States v. Certain Interests in Prop. in Monterey Cty.*, 186 F. Supp. 167 (N.D. Cal. 1960),
*aff'd sub nom. Likins-Foster Monterey Corp. v. United States*, 308 F.2d 595 (9th Cir. 1962) . . . . . . . . . .137, 141, 182

*United States v. Certain Land in Fort Worth*, 414 F.2d 1029 (5th Cir. 1969) . . . . . . . . . . . . . . . . . . 124-25, 129

*United States v. Certain Land in Lincoln*, 343 F. Supp. 155 (D. Neb. 1972) . . . . . . . . . . . . . . . . . . . . . .94

*United States v. Certain Lands in Wappinger*, 67 F. Supp. 905 (S.D.N.Y. 1946) . . . . . . . . . . . . . . . . . . . .94

*United States v. Certain Land Situated in Detroit (DIBCO I)*, 188 F. Supp. 2d 747 (E.D. Mich. 2002),
*aff'd*, 450 F.3d 205 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112, 116

*United States v. Certain Land Situated in Detroit (DIBCO III)*, 600 F. Supp. 2d 880 (E.D. Mich. 2009),
*aff'd*, 633 F.3d 418 (6th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*United States v. Certain Parcel of Land in Jackson Cty.*, 322 F. Supp. 841 (W.D. Mo. 1971) . . . . . . . . . . . . 112, 114

*United States v. Certain Parcels of Land in Phila.*, 144 F.2d 626 (3d Cir. 1944) . . . . . . . . . . . . . . . . . . 130

*United States v. Certain Parcels of Land in Rapides Par.*, 149 F.2d 81 (5th Cir. 1945). . . . . . . . . . . . . . . . .98

*United States v. Certain Parcels of Land in Valdez*, 666 F.2d 1236 (9th Cir. 1982) . . . . . . . . . . . . 188-89, 191

*United States v. Certain Space in Rand McNally Bldg.*, 295 F.2d 381 (7th Cir. 1961). . . . . . . . . . . . . . . . . .98

*United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53 (1913) . . . . . . .94, 96, 104-07, 155, 172, 186, 188, 197

*United States v. Cherokee Nation*, 480 U.S. 700 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187-91

*United States v. Chi., B. & Q.R. Co.*, 82 F.2d 131 (8th Cir. 1936) . . . . . . . . . . . . . . . . . . . . . . . . . 198

*United States v. Chi., M., St. P. & P. R. Co.*, 312 U.S. 592 (1941). . . . . . . . . . . . . . . . . . . . . . . . 187-89

*United States v. City of Columbus*, 180 F. Supp. 775 (S.D. Ohio 1959). . . . . . . . . . . . . . . . . . . . . . . .98

*United States v. City of New York*, 168 F.2d 387 (2d Cir. 1948). . . . . . . . . . . . . . . . . . . . . . . . . . . 196

*United States v. City of Tacoma*, 330 F.2d 153 (9th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . 91, 169

*United States v. Clarke*, 445 U.S. 253 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94, 184, 199

*United States v. Commodities Trading Corp.*, 339 U.S. 121 (1950) . . . . . . . . . . . . . . . . . .93, 101, 108-09, 196

*United States v. Commodore Park, Inc.*, 324 U.S. 386 (1945). . . . . . . . . . . . . . . . . . . . . . . . 187, 189-90

*United States v. Consol. Mayflower Mines, Inc.*, 60 F.3d 1470 (10th Cir. 1995) . . . . . . . . . . . . . . . . . 178-79

*United States v. Corbin*, 423 F.2d 821 (10th Cir. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .99

*United States v. Cors*, 337 U.S. 325 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104, 146

5-ER-993

*United States v. Cox*, 190 F.2d 293 (10th Cir. 1951) . . . . . . . . . . . . . . . . . . . . . 159-160, 195

*United States v. Crance*, 341 F.2d 161 (8th Cir. 1965) . . . . . . . . . . . . . . . . . 145, 147

*United States v. Cress*, 243 U.S. 316 (1917) . . . . . . . . . . . . . . . . . . . . . . 170

*United States v. Deist*, 442 F.2d 1325 (9th Cir. 1971) . . . . . . . . . . . . . . . . . . 125

*United States v. Delano Park Homes, Inc.*, 146 F.2d 473 (2d Cir. 1944) . . . . . . . . . . . 109

*United States v. Del., Lackawana & W.R.R. Co.*, 264 F.2d 112 (3d Cir. 1959) . . . . . . . . 98

*United States v. Des Moines Cty.*, 148 F.2d 448 (8th Cir. 1945) . . . . . . . . . . . . . . 196

*United States v. Dickinson*, 331 U.S. 745 (1947) . . . . . . . . . . . . . . . . . . . 91-92

*United States v. Dillman*, 146 F.2d 572 (5th Cir. 1944) . . . . . . . . . . . . . . . . . 129

*United States v. Dow*, 357 U.S. 17 (1958) . . . . . . . . . . . . . . . . . . . . . . 93-94

*United States v. Dunnington*, 146 U.S. 338 (1892) . . . . . . . . . . . . . . . . . 92, 97, 99

*United States v. Eastman* (*Eastman I*), 528 F. Supp. 1177 (D. Or. 1981),
*adopted* 714 F.2d 76 (9th Cir. 1983) (per curiam) . . . . . . . . . . . 90, 146-47, 150, 194

*United States v. Eastman* (*Eastman II*), 528 F. Supp. 1184 (D. Or. 1981),
*aff'd*, 714 F.2d 76 (9th Cir. 1983) (per curiam) . . . . . . . . . . . . . . . . . 90, 120-21

*United States v. Eastman* (*Eastman III*), 714 F.2d 76 (9th Cir. 1983) . . . . . . . . 90, 147, 194

*United States v. Eden Mem'l Park Ass'n*, 350 F.2d 933 (9th Cir. 1965) . . . . . . . . 108-09, 120

*United States v. Evans*, 380 F.2d 761 (10th Cir. 1967) . . . . . . . . . . . . . . 111, 115-16, 152

*United States v. Finis P. Ernest, Inc.*, 509 F.2d 1256 (7th Cir. 1975), *cert. denied*, 423 U.S. 893 (1975) . . . . . . . . . 82

*United States v. Flood Bldg.*, 157 F. Supp. 438 (N.D. Cal. 1957) . . . . . . . . . . . . 175-76

*United States v. Fort Smith River Dev. Corp.*, 349 F.2d 522 (8th Cir. 1965) . . . . . . . . . . 194

*United States v. Foster*, 131 F.2d 3 (8th Cir. 1942) . . . . . . . . . . . . . . . . . 101, 125

*United States v. Freeman*, 113 F. 370 (D. Wash. 1902) . . . . . . . . . . . . . . . . . 127

*United States v. Fuller*, 409 U.S. 488 (1973) . . . . . . . . . . . . . 100, 150, 165, 187-88, 195, 197

*United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945) . . . . . . . . 99, 136, 152, 154, 159, 160-61, 174-77, 195

*United States v. Gerlach Live Stock Co.*, 339 U.S. 725 (1950) . . . . . . . . . . . 184, 188-190

*United States v. Gettysburg Elec. Ry. Co.*, 160 U.S. 668 (1896) . . . . . . . . . . . . . . 91

*United States v. Glanat Realty Corp.*, 276 F.2d 264 (2d Cir. 1960) . . . . . . . . . . . 152, 170

*United States v. Gonzalez*, 466 F. App'x 858 (11th Cir. 2012) (per curiam) . . . . . . . . . . 97

*United States v. Gossler*, 60 F. Supp. 971 (D. Or. 1945) . . . . . . . . . . . . . . . . . 159

*United States v. Grand River Dam Auth.*, 363 U.S. 229 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*United States v. Grizzard*, 219 U.S. 180 (1911). . . . . . . . . . . . . . . . . . . . . 110, 113, 151, 165, 167-68, 170, 173

*United States v. Hart*, 312 F.2d 127, 130 (6th Cir. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*United States v. Hickey*, 360 F.2d 127 (7th Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

*United States v. Honolulu Plantation Co.*, 182 F.2d 172 (9th Cir. 1950) . . . . . . . . . . . . . 112-13, 154, 157, 166

*United States v. Kan. City Life Ins. Co.*, 339 U.S. 799 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*United States v. Katz*, 213 F.2d 799 (1st Cir. 1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

*United States v. Kooperman*, 263 F.2d 331 (2d Cir. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

*United States v. L.E. Cooke Co.*, 991 F.2d 336 (6th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*United States v. Land & Cris Realms, Inc.*, 213 F.3d 830 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . 110, 146

*United States v. Land in Dry Bed of Rosamond Lake*, 143 F. Supp. 314 (S.D. Cal. 1956) . . . . . . . . . . . . 179

*United States v. Leavell & Ponder, Inc.*, 286 F.2d 398 (5th Cir. 1961) . . . . . . . . . . 123, 125, 128, 137, 140-41, 182

*United States v. Lewis*, 308 F.2d 453 (9th Cir. 1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .98

*United States v. Little Lake Misere Land Co.*, 412 U.S. 580 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .91

*United States v. Mattox*, 375 F.2d 461 (4th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112, 156

*United States v. Meadow Brook Club*, 259 F.2d 41 (2d Cir. 1958). . . . . . . . . . . . . . . . . . . . 108, 110, 129, 139

*United States v. Meyer*, 113 F.2d 387 (7th Cir. 1940). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91, 98, 178

*United States v. Michoud Indus. Facilities*, 322 F.2d 698 (5th Cir. 1963). . . . . . . . . . . . . . . . . . 43, 171, 176

*United States v. Miller*,
317 U.S. 369 (1943) . . 4, 89, 90-91, 93-94, 99, 100, 110, 112, 114, 119, 128, 145-47, 150-52, 154, 156, 165-68, 177

*United States v. New River Collieries Co.*, 262 U.S. 341 (1923) . . . . . . . . . . . . . . . . . . . 89, 93, 101, 106, 120, 151

*United States v. Pa.-Dixie Cement Corp.*, 178 F.2d 195 (6th Cir. 1949) . . . . . . . . . . . . . . . . . . . . . . . . . 139

*United States v. Petty Motor Co.*, 327 U.S. 372 (1946). . . . . . . . . . . . . . . . . . . 155, 159-61, 174-75, 177

*United States v. Pewee Coal Co.*, 341 U.S. 114 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

*United States v. Playa De Flor Land & Improvement Co.*, 160 F.2d 131 (5th Cir. 1947) . . . . . . . . . . . . . . . 125

*United States v. Pope & Talbot, Inc.*, 293 F.2d 822 (9th Cir. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . 157-58

*United States v. Rands*, 389 U.S. 121 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187-94

*United States v. Reynolds*, 397 U.S. 14 (1970) . . . . . . . . .90, 93-94, 100, 116, 128, 131, 145-47, 149, 150-51, 165

*United States v. Right to Use & Occupy 3.38 Acres in Alexandria*, 484 F.2d 1140 (4th Cir. 1973) . . . . . . . . . . . . . 176

5-ER-995

*United States v. River Rouge Improvement Co.*, 269 U.S. 411 (1926) . . . . . . . . . . . . . . . . . . . . 163-64, 194

*United States v. Rodgers*, 461 U.S. 677 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

*United States v. S.D. Game, Fish & Parks Dep't*, 329 F.2d 665 (8th Cir. 1964) . . . . . . . . . . . . . . 107

*United States v. Smith*, 355 F.2d 807 (5th Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . 129-30

*United States v. Sowards*, 370 F.2d 87 (10th Cir. 1966) . . . . . . . . . . . . . 98, 105, 137-38, 177-80, 182, 202

*United States v. Sponenbarger*, 308 U.S. 256 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . 162

*United States v. Streets, Alleys & Pub. Ways in Vill. of Stoutsville*, 531 F.2d 882 (8th Cir. 1976) . . . . . . 196-97, 199-200

*United States v. Tishman Realty & Constr. Co.*, 193 F.2d 180 (2d Cir. 1952) (per curiam) . . . . . . . . . . . . . . 131

*United States v. Toronto, Hamilton & Buffalo Nav. Co.*,
338 U.S. 396 (1949) . . . . . . . . . . . . . . . . . . . 119, 131-33, 137, 140, 142, 177, 182, 196, 198, 201

*United States v. Trout*, 386 F.2d 216 (5th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . 117, 163

*United States v. Twin City Power Co.*, 350 U.S. 222 (1956) . . . . . . . . . . . . . . . . . . . . . . 187-91

*United States v. Upper Potomac Props. Corp.*, 448 F.2d 913 (4th Cir. 1971) . . . . . . . . . . . . . . . . 120, 179-81

*United States v. Va. Elec. & Power Co.*, 365 U.S. 624 (1961) . . . . . . . . . . . 145, 151-52, 165, 169-172, 187-91, 194

*United States v. Wateree Power Co.*, 220 F.2d 226 (4th Cir. 1955) . . . . . . . . . . . . . . . . . . . . 111

*United States v. Waymire*, 202 F.2d 550 (10th Cir. 1953) . . . . . . . . . . . . . . . . . . . . . . . . 110

*United States v. Welch*, 217 U.S. 333 (1910) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99, 173

*United States v. Werner*, 36 F.3d 1095 (4th Cir. 1994) (unpubl.) . . . . . . . . . . . . . . . . . 117, 155, 166

*United States v. Westinghouse Elec. & Mfg.*, 339 U.S. 261 (1950) . . . . . . . . . . . . . 154, 159-61, 175, 177, 195

*United States v. Weyerhaeuser Co.*, 538 F.2d 1363 (9th Cir. 1976) . . . . . . . . . . . . . . . . . 104-05, 186

*United States v. Whitehurst*, 337 F.2d 765 (4th Cir. 1964) . . . . . . . . . . . . 104-05, 107, 137-40, 178-82

*United States v. Willow River Power Co.*, 324 U.S. 499 (1945) . . . . . . . . . . 99, 152, 160-61, 187, 190, 195

*United States v. Wise*, 131 F.2d 851 (4th Cir. 1942) . . . . . . . . . . . . . . . . 98, 119, 131, 134, 136

*Vector Pipeline, L.P. v. 68.55 Acres of Land*, 157 F. Supp. 2d 949 (N.D. Ill. 2001) . . . . . . . . . . . . . . . 92

*Virgin Islands v. 2.7420 Acres of Land*, 411 F.2d 785 (3d Cir. 1969) . . . . . . . . . . . . . . . . . . . . 108

*W. Chi. St. R.R. v. Ill. ex rel. Chi.*, 201 U.S. 506 (1906) . . . . . . . . . . . . . . . . . . . . . . . 192

*Walther v. Secretary of Health & Human Servs.*, 485 F.3d 1146 (Fed. Cir. 2007) . . . . . . . . . . . . . . . 90

*Wardy v. United States*, 402 F.2d 762 (5th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . 146

*Wash. Metro. Area Transit Auth. v. One Parcel of Land (Old Georgetown)*, 691 F.2d 702 (4th Cir. 1982) . . . 108, 111, 117, 163

*Wash. Metro. Area Transit Auth. v. One Parcel of Land*, 780 F.2d 467 (4th Cir. 1986) . . . . . . . . . . . . . . . . . . .98

*Washington v. United States* (*Hanford*), 214 F.2d 33 (9th Cir. 1954) . . . . . . . . . . . . . . . . . . .197, 201, 205

*Weatherford v. United States*, 606 F.2d 851 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . 168, 189-91

*Welch v. Tenn. Valley Auth.*, 108 F.2d 95 (6th Cir. 1939) . . . . . . . . . . . . . . . . . . . . . . . 125

*Whitney Benefits v. United States*, 18 Cl. Ct. 394 (1989) . . . . . . . . . . . . . . . . . . . . . 182

*Wilson v. United States*, 350 F.2d 901 (10th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . 183

*Winn v. United States*, 272 F.2d 282 (9th Cir. 1959) . . . . . . . . . . . . . . . . . . . . . . 110-11, 157

*Winston v. United States*, 342 F.2d 715 (9th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . 134

*Wolff v. Puerto Rico*, 341 F.2d 945 (1st Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . 108

*Woodville v. United States*, 152 F.2d 735 (10th Cir. 1946), *cert. denied*, 328 U.S. 842 (1946) . . . . . . . . . . 196, 198

*Wyatt v. United States*, 271 F.3d 1090 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 177

*Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577 (Fed. Cir. 1990) . . . . . . . . . . . . . . . 159, 171, 174, 177

**United States Constitution**

U.S. Const. amend. v . . . . . . . . . . . . . . . . . . .1, 4, 49, 89-90, 95, 99-101, 105-112, 132-33, 135-36, 154-55,
. . . . . . . . . . . . . . . . . . . . . . . . 159-61, 166, 170, 174, 176, 184, 187-190, 195, 197, 201

U.S. Const. art. 1, § 8, cl. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

**Statutes**

100 Stat. 4274 § 8(o) (Pub. L. No. 99-663) . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

102 Stat. 1086 § 3(a) (Pub. L. No. 100-409), amending 43 U.S.C. § 1716 . . . . . . . . . . . . . . . . 4, 14

105 Stat. 1150 § 8126(a) (Pub. L. No. 102-172) . . . . . . . . . . . . . . . . . . . . . . . . . .14

106 Stat. 2112 § 7(b) (Pub. L. No. 102-415) . . . . . . . . . . . . . . . . . . . . . . . . . . .14

106 Stat. 2258 § 2(d)(2)(A) (Pub. L. No. 102-453) . . . . . . . . . . . . . . . . . . . . . . . .14

110 Stat. 4093 § 304(c)(4)(A) (Pub. L. No. 104-333) . . . . . . . . . . . . . . . . . . . . . . .14

112 Stat. 879 § 1(c) (Pub. L. No. 105-208) . . . . . . . . . . . . . . . . . . . . . . . . . . .14

112 Stat. 2681 §357(1), § 605(a)(3) (Pub. L. No. 105-277) . . . . . . . . . . . . . . . . . . . .14

113 Stat. 1693 § 4(b) (Pub. L. No. 106-138) . . . . . . . . . . . . . . . . . . . . . . . . . . .14

Act of Mar. 7, 1974, Pub. L. No. 93-251, § 83, 88 Stat. 12 . . . . . . . . . . . . . . . . . . . . 201

Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3192 . . . . . . . . . . . . . . . . . . . . . . . . .51

Alaska Native Claims Setlement Act, as amended, 43 U.S.C. § 1621 . . . . . . . . . . . . . . . . . . . . . .51

Clean Water Act, 33 U.S.C. § 1251 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

Declaration of Taking Act, 40 U.S.C. § 3114 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . .10, 94

Everglades National Park Protection and Expansion Act of 1989, 16 U.S.C. § 410r-5 *et seq.* . . . . . . . . 127, 148

Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701-1785 . . . . . . . . 4, 14, 51, 185

Fifth Circuit Court of Appeals Reorganization Act of 1980, Pub. L. No. 96-452,
94 Stat. 1994 (1980) (codified as amended in scattered sections of 28 U.S.C.). . . . . . . . . . . . . . . . . . . . . 148

Flood Control Act of 1944 § 8, 33 U.S.C. § 701-1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

General Condemnation Act, 40 U.S.C. § 3113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .94

Granger-Thye Act of 1950, 16 U.S.C. § 580*l* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187, 195

Interstate Commerce Act, 49 U.S.C. § 10903 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

Little Tucker Act, 28 U.S.C. § 1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

Mount St. Helens National Volcanic Monument Act, Pub. L. No. 97-243,
96 Stat. 301 (1982), 16 U.S.C. § 431 note (1982) (repealed 2014) . . . . . . . . . . . . . . . . . . . . 185-86

National Trails System Act, as amended, 16 U.S.C. §§ 1241-51 (2012) . . . . . . . . . . . . . . . . . . 187, 199

Natural Gas Act, 15 U.S.C. § 717f(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Ports and Waterways Safety Act of 1972, 33 U.S.C. § 1221 . . . . . . . . . . . . . . . . . . . . . . . . . 189

Rivers and Harbors Act of 1970, § 111, 33 U.S.C. § 595a . . . . . . . . . . . . . . . . . . . . . . . . 187-93

Taylor Grazing Act of 1934, 43 U.S.C. § 315(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187, 195

Tennessee Valley Authority Act, 16 U.S.C. § 831q . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

Tucker Act, 28 U.S.C. § 1491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

Uniform Relocation Assistance & Real Property Acquisition Policies Act of 1970
(Uniform Act), 42 U.S.C. §§ 4601-4655 . . . . . .3, 6, 9, 12, 14-15, 17, 21, 29, 38, 70, 73, 80, 84, 86-87, 89, 92, 94-95,
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98-99, 123, 136, 150, 152, 160-61, 163, 165-66, 175, 184, 205-06

16 U.S.C. § 410r-9(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

43 U.S.C. § 315q . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160, 195

Code of Miami-Dade Cty., Fla., Municipal Code §1-4.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

**Legislative Materials**

H.R. Rep. No. 91-1656, 91st Cong., 2d Sess. (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .99

H.R. Rep. No. 91-1665, 91st Cong., 2d Sess. (1970) . . . . . . . . . . . . . . . . . . . . . . . . 191-92, 194

**Rules**

Federal Rules of Civil Procedure, Rule 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . .56-57, 72, 82

Federal Rules of Civil Procedure, Rule 71.1 (formerly Rule 71A) . . . . . . . . . . . . . . . . . 91-92, 116

Federal Rules of Evidence, Rule 102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90, 119

Federal Rules of Evidence, Rule 408 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

Federal Rules of Evidence, Rule 703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

**Regulations and Administrative Materials**

33 C.F.R. § 323.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

36 C.F.R. § 254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

36 C.F.R. § 254.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51, 53

36 C.F.R. § 254.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

36 C.F.R. § 254.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

36 C.F.R. § 254.4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

36 C.F.R. § 254.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53

36 C.F.R. § 254.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14, 51

36 C.F.R. § 254.9(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

36 C.F.R. § 254.9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

36 C.F.R. § 254.9(b)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53

36 C.F.R. § 254.9(b)(v) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

36 C.F.R. § 254.9(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

43 C.F.R. § 2200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

43 C.F.R. § 2200.0-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

43 C.F.R. § 2200.0-5(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53

43 C.F.R. § 2200.0-6(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

5-ER-999

43 C.F.R. § 2201.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

43 C.F.R. § 2201.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

43 C.F.R. § 2201.1-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53

43 C.F.R. § 2201.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 51, 186

43 C.F.R. § 2201.3-1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

43 C.F.R. § 2201.3-2(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53

43 C.F.R. § 2201.3-2(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

43 C.F.R. § 2201.3-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

49 C.F.R. pt. 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

49 C.F.R. § 24.102(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .94

49 C.F.R. § 24.102(*l*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

49 C.F.R. § 24.103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14, 86

49 C.F.R. § 24.103(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

49 C.F.R. § 24.103(a)(2)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

49 C.F.R. § 24.103(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .81

49 C.F.R. § 24.103(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

49 C.F.R. § 24.104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .83, 86

49 C.F.R. § 24.104(a)-(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .81, 86

Regulations of the Attorney General Governing the Review and Approval of Title
for Federal Land Acquisitions (<u>Attorney General's Title Regulations</u>) (2016) . . . . . . . . .91

U.S. Army Corps of Eng'rs, Real Estate Engineer Regulations, EC 405-1-04 (2016) . . . . . . . . . . . . .81

U.S. Dep't of Agric., Forest Service Manual FSM § 5400 (2005) . . . . . . . . . . . . . . . . .81

U.S. Dep't of Agric., Forest Service Handbook FSH 5409.12 (2006) . . . . . . . . . . . . . . . . . . .81

**Professional Standards**

The Appraisal Foundation, Uniform Standards of Professional Appraisal Practice (USPAP) (2016-17) . . . . .
. . . . . . . . . . 6, 8, 9-16, 19, 21, 22, 25, 43, 51, 52, 54-56, 58, 61, 63, 80-88, 94-95, 129, 132, 134, 178, 201, 203

## Books and Treatises

Appraisal Inst., The Dictionary of Real Estate Appraisal (6th ed. 2015) . . . . . . . . . . 11, 135-36, 138, 150
(5th ed. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

Appraisal Inst., The Appraisal of Real Estate (14th ed. 2013) . . . . . . . . . . . . . 27, 106, 120
(8th ed. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120
(7th ed. 2d prtg. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

Appraisal Inst. & Am. Soc'y of Farm Managers, The Appraisal of Rural Property
(2d ed. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116, 128, 136, 195

Black's Law Dictionary (10th ed. 2014) . . . . . . . . . . . . . . . . . . . . . . . . 92, 168

Byrl N. Boyce, Real Estate Appraisal Terminology (1st ed. 1975) . . . . . . . . . . . . . . 120

J.D. Eaton, Real Estate Valuation in Litigation (2d. ed. 1995) . . . . . . . . . . . . . . . . . .
. . . . . . . . 12, 36, 90, 95, 110, 117, 127-28, 131, 134-38, 142-43, 145, 152, 155, 160, 166-67, 173, 193, 200, 203

David H. Getches et al., Water Law in a Nutshell (5th ed. 2015) . . . . . . . . . . . . . . 184

Lewis Orgel, Valuation Under the Law of Eminent Domain (2d ed. 1953) . . . . . . . . 89, 133, 135

Julius L. Sackman, et al., Nichols on Eminent Domain (rev. 3d ed. 2001) . . . . . . . . . . 114, 152, 156

## Articles and Presentations

Alan T. Ackerman & Noah Eliezer Yanich, *Just and Unjust Compensation: The Future of the Navigational Servitude in
Condemnation Cases*, 34 U. Mich. J.L. Reform 573 (2001) . . . . . . . . . . . . . . . . . . . . 193

Ronald C. Allen, *Federal Evaluation of Riparian Property: Section 111 of the Rivers and Harbors Act of 1970*,
24 Me. L. Rev. 175 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188, 193

Am. Soc'y of Farm Managers & Rural Appraisers, 2012 course**,** *Appraising Natural Resources* (2012) . . . . . . .48

James H. Boykin, *Real Property Appraisal in the American Colonial Era*, The Appraisal J. (July 1976) . . . . . . . . . 203

Kerry R. Brittain, Comment, *Navigation Servitude—The Shifting Rule of No Compensation*,
7 Land & Water L. Rev. 501 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

Charles E. Corker, *Federal-State Relations in Water Rights Adjudication and Administration*,
17 Rocky Mtn. Min. L. Inst. 21 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

Trevor R. Ellis, *Sales Comparison Valuation of Development and Operating Stage Mineral Properties*,
Mining Engineering 89 (April 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

Nicole Stelle Garnett, *The Neglected Political Economy of Eminent Domain*, 105 Mich. L. Rev. 101 (2006) . . . . . . 152

Norman G. Miller, Jr. & Sergey Markosyan, *The Academic Roots and Evolution of Real Estate Appraisal*,
The Appraisal J. (April 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203

Alan K. Stagg, P.G., *Federal Condemnation and Takings–A Journey Down the Yellow Book Road*,
to Soc'y of Mining, Metallurgy, & Exploration, Inc. (Denver, Colo., March 1, 2011) . . . . . . . . . . . . . . 181

# INDEX

acquisition analysis, 70, 78

admissibility, 27, 125-26, 130

adjustment
  *sales adjustment grid*, 65
  *quantitative adjustment*, 27-28, 36, 37, 67, 121-22
  *qualitative adjustment*, 27-28, 36, 67, 121-22
  *in sales comparison approach*, 121-22

administrative review, 83

administrative benefits, 98-99, 152, 160; *see also*
  Uniform Act

after acquisition, 20, 23, 27, 31, 60-61, 68-70

alleys, 196-98

allocations, 38, 71, 98-99, 166; *see also* Uniform Act

appraisal
  *appraisal development*, 5-6, 8-55
  *appraisal report*, 56-79
  *appraisal review*, 80-88

appraiser's certification, 58, 81, 83, 85, 88

appraiser's responsibility, 85-86

approaches to value
  *generally*, 25-26
  *reconciliation*, 25, 37, 68, 70, 78
  *see also* sales comparison approach, cost approach,
    income capitalization approach

assessed value, 21, 63, 69

assumptions and limiting conditions, 12-14, 59-60; *see
  also* extraordinary assumptions

avigation easements, 157n765, 168

before acquisition, 61-63

before and after method (before and after rule)
  (Federal Rule), 17-18, 31, 37-39, 73, 152
  *larger parcel*, 71, 110, 152-54
  *parent tract*, 111, 152
  *remainder*, 17-19, 130-31, 150-52

benefits
  *direct (special) benefits*, 20, 39, 71, 161-65, 194
  *indirect (general) benefits*, 39, 151, 162-65
  *offset*, 18, 20, 39, 117, 153, 163, 165, 167, 191-92, 194
  *and navigational servitude*, 187-94
  *see also* partial acquisitions

buildings; *see* improvements

business
  *business income*, 47-48, 140,
  *business losses*, 154-55, 159-60
  *business value*, 159

capitalization
  *direct capitalization*, 36, 138-140, 181-82
  *income capitalization approach*, 25, 35-6, 47-49, 67-68, 70,
    76, 78, 119, 136-40
  *yield capitalization*, 36-37, 47, 138-40, 181-82

capitalization rate, 36, 67, 76-78, 138, 141

cash equivalency, 28, 75-76

certification; *see* appraiser's certification

choice of law, 4, 49, 90, 91n186, 114n390, 151-52,
  154-55, 167, 183

client, 9, 54-55, 59-61, 84, 88

client instructions, 72, 79

common law (case law), 4, 89

comparable sales
  *adjustments*, 121-22
  *approach to value*, 66-67, 119-20
  *comparability*, 66, 120-21
  *comparable lease transactions*, 35-36, 63, 175-76
  *comparable sales map*, 66, 75
  *sales requiring extraordinary verification and treatment*, 28-33
  *sales after date of value*, 123-24, 130-31
  *transactions with potential non-market considerations*, 124-28
  *see also* sales; sales comparison approach

compensable damage
  *compensable elements*, 38
  *generally*, 154-56
  *in temporary acquisitions*, 160

condemnation; *see* eminent domain; inverse takings
  (inverse condemnation)
  *direct (affirmative) condemnation*, 10-11, 40, 81, 184,
    198-99

confidentiality, 54-55

confirmation
  *of comparable sales*, 25-27, 65

5-ER-1002

*of sales with potential nonmarket considerations*, 96, 126-27, 171

*see also extraordinary verification*, 28-33, 123-26

conjectural evidence, 99-100

consequential damages; *see* non-compensable damages

conservation, 30, 32, 104, 106, 127

conservation easements, 107, 168

consultants, 48, 44, 53-54, 202

contamination, 13, 20, 71, 158-59

contract of sale, 129

contracting for services, 53-54

cost approach 25, 34-35, 66, 75, 78, 119, 131-36

cost to cure, 38-39, 71

costs, 32, 33-34, 38-39, 48-49, 133, 142, 144-45

Court of Federal Claims, 184n1044

crops, 16, 18, 31, 97

cumulative appraisal (cumulative valuation); *see* summation

customers, loss of, 159

damages, 41-42, 71, 104, 170

   *compensable damage*, 17, 20, 38, 151-56, 169

   *non-compensable damage*, 17, 38, 151-55, 159-61, 177, 201

   *consequential damage*, 17, 38, 151-55, 159-61, 177, 201

   *severance damages*, 17, 38, 41, 112, 154-56, 166-67

date

   *date of valuation*, 10-11, 16, 25, 33, 35, 60, 65, 93-95, 98, 107, 118, 123-24, 139, 143, 150, 174, 186, 204

   *date of sale*, 21, 28, 63, 65-66

   *effective date of appraisal*, 10-11, 16, 25, 33, 35, 43, 58-59, 60, 65, 84, 86-87, 93-95, 98, 107, 118, 143, 139, 143, 150, 174, 186, 204

   *instructions*, 11, 14, 93, 98, 186

   *sales after the date of valuation*, 123, 130

DCF; *see* discounted cash-flow analysis

declaration of taking, 10-11, 94

demand; *see* market demand

denominator, issue of, 118

Department of Justice, 3, 9-10, 14, 17, 22, 27, 38, 43, 54-55, 73, 81-82, 166, 204, 206

depreciation, 34-35, 37, 66, 75, 131, 134-35, 167-68

developer's residual approach; *see* development approach

development approach, 25-26, 48, 142n633,145

development method (lot method, subdivision method), 25-26, 47-48, 65, 142-45

direct acquisition, 10, 50, 94, 169

direct benefits (special benefits), 17-18, 38-39, 71, 150-52, 161-65, 194, 192-93

discount rate, 47

   *selection of*, 26, 40, 48, 141, 182

   *importance of*, 35-36, 47, 140, 182

   *support for*, 35, 37, 49, 66, 182

discounted cash-flow (DCF) analysis, 36, 40, 47-48, 66, 138, 181-82

discovery, 54-55, 204-05

disposals of property, 6, 171, 181

draft reports (draft appraisal reports), 57

dual-premise appraisal, 17, 90, 149, 168

easements, 11, 30-31, 41-42, 68, 70, 168-73, 187, 198

economic investment backed expectations, 40, 50, 198

economic use, 30, 106-07

   *and noneconomic use*, 23, 105

   *necessary proof*, 107

   *requirement of*, 10, 23, 96, 105, 174

eminent domain

   *as source of case law on just compensation*, 4, 54, 89, 117, 142, 187

   *case names*, 92

   *date of valuation in*, 36, 127, 139

   *in rem nature of proceedings*, 92n197

   *sales to entities with power of eminent domain*, 96, 124, 126-27

   *see also* inverse taking (inverse condemnation)

entrepreneurial incentive (entrepreneurial profit), 33-35, 48, 131, 135-36

equipment, 19, 48, 128, 159

estate, 11, 31, 39, 40, 91, 97, 113, 168-69, 172, 175-77

estate acquired, 11, 31, 39, 40, 68, 72, 168-69, 172, 177

exchanges of land, 4, 9, 50-53, 117, 128, 185-86

expenses, 4, 21-22, 34-36, 40-41, 67-68, 138, 152, 159-60, 179

expert, 25, 44-46, 53-54, 57, 70, 82, 178, 183, 201-04

exposure time, 10, 15, 93, 95, 150, 158-59

extraordinary assumption, 13, 15, 52, 61, 86

fair market value; *see* market value

federal law 3-5, 14

   *binding nature*, 89

   *differences from state law*, 4, 90-91, 151, 167

Federal Rules of Civil Procedure. 56-57, 72, 82, 91, 204

Federal Rules of Evidence, 125

financial feasibility, 64, 102-03, 132

FIRREA, 59

5-ER-1003

fixtures, 19, 62, 69, 77, 159-60

flood hazard, 62

floor plan, 62, 72, 79

forced sales, 124-25

general benefits; *see* benefits

goodwill, loss of or damage to, 159

government
    *sales to government entities*, 27, 29-32, 125-27
    *government project*, 27, 31, 73-74, 99, 162-65
    *government project influence*, 16-17, 22, 128, 130-31, 145-46, 149-50
    *demand due to government project*, 23, 104
    *non-federal governmental entities*, 50-53

grazing permits, 187, 195
    *and administrative payments*, 160

ground leases; *see* leases

highest and best use, 22
    *analysis*, 30-31, 44-45, 64, 70, 72-74, 77
    *and market value*, 40, 65, 104-05
    *definition*, 22-25, 64, 101-03
    *criteria*, 44-45, 96-97, 111-18

history; *see* rental history; sales history; use history

homeowner's association, 159

hypothetical condition, 13-14, 18, 53

impartiality, 51

improvements, 18-19, 23, 62, 69, 72, 98

*in rem* nature of condemnation proceeding, 92n197

income
    *business income*, 140
    *property income*, 139-40

income approach; *see* income capitalization approach

income capitalization approach, 35, 47-48, 67-68, 76, 136-42
    *approach to value*, 35, 67-68, 76, 136-42
    *direct capitalization*, 36, 138-39
    *yield capitalization*, 36-37, 138-39
    *for mineral property*, 45-46, 181-82

inconsistent uses, 180

indirect benefits (general benefits), 39, 151, 162-65

inspection
    *site inspection*, 205
    *property inspection*, 12-13, 58, 94
    *opportunity for landowner to attend*, 12
    *comparable sale inspection*, 12, 27, 35-36
    *intensity of use*, 38, 70, 117

interest
    *interest in property (ownership interest)*, 44-46, 97, 114

inverse taking (inverse condemnation)
    *date of valuation*, 94
    *generally*, 11, 49-50, 184-85, 194
    *larger parcel determination*, 117-18
    *Rails to Trails cases*, 199
    *temporary inverse takings*, 43, 177-78

investment-backed expectations, 49-50, 185

janitorial services, 41

jurisdictional exception
    *applicability in appraisal reviews*, 10, 15-16, 95
    *consideration of land use regulations and anticipated public projects*, 22
    *exposure time*, 10, 95
    *generally*, 14-15
    *see also* project influence; *specific legislation and regulations; appraiser certification*

just compensation, 4-7, 89-91, 100

land exchange, 50-53,

land residual approach, 25-26, 65-66, 142-45

land use regulations
    *zoning*, 19-20, 33, 63-64, 69, 74, 107-10, 129
    *permits*, 19-20, 33, 107-10
    *reasonable probability of re-zoning*, 29-20, 102, 108-09
    *contingency sales*, 33, 129

land valuation, 25, 65, 70, 75, 77-78

landlord; *see* lessor

landowner, right to accompany appraiser, 12

larger parcel, 16, 23-24, 41, 65, 72-73, 110-18, 153-54

lease, 21, 26, 35-36, 39-41, 63, 174-77

leased fee, 175

leasehold, 39-41, 72-73, 160-61, 174-178

leasehold valuation, 175-77

legal description, 11-12, 61, 68, 77

legal instruction
    *benefit setoff*, 162-65
    *compensability of damage*, 13-14
    *date of valuation and legal bases*, 11, 14, 93, 98, 186
    *departure from the unit rule*, 99, 172-73
    *deviation from market value standard*, 101
    *dual-premise appraisals*, 17, 90, 149
    *form*, 13, 24, 43
    *government-constructed improvements*, 93
    *hypothetical conditions*, 13, 53

*project influence (scope of the project rule)*, 16, 17, 109, 123, 128, 146, 149, 206

*unity of title (ownership) (larger parcel determination)*, 14, 23, 24, 111, 114, 116-17, 186, 206

*zoning and permitting issues*, 19, 109

legal permissibility, 44

lessee (tenant), 16, 21, 35-36, 40-41, 63, 97, 160-61, 175-76

lessor (landlord), 16, 41, 97, 175-76

letter of transmittal, 58, 73

limited appraisal, 146

limiting conditions, 59-60, 74, 76-77, 95

litigation, 9-10

*eminent domain*, 54, 103, 116

*in voluntary transactions*, 51, 125-26, 185

*inverse takings claims*, 50, 117, 184

*likelihood of*, 204-05

*role of agency in*, 81

*role of expert witness in*, 54-55, 57, 82, 185, 204

lost profits; *see* profits

lot method; *see* development method

market area, 36, 120

market demand, 22-23, 44, 47, 49, 96, 102-07, 139, 143, 145, 186

market evidence, 33, 34, 99

market price, 105

market rental value

*applicability*, 40, 171, 174, 177

*definition*, 35, 174

*legal foundations*, 174-75

market trends, 11

market value

*as measure of just compensation*, 3-5, 7-8, 10, 22-23, 90-93, 98, 100, 105, 110, 112, 118, 122, 131, 146, 154-57, 171-72, 182-83, 190-91, 195-96, 199, 203

*definition*, 10, 28, 51, 60, 93, 95-96, 150

marketability, 21-22, 40, 44, 64

mineral

*mineral rights*, 11, 16, 45

*mineral interests*, 11, 44-48, 140, 180-82

*mineral appraisal*, 72, 79

*mineral expert*, 45, 54, 68

*mineral valuation*, 44, 46-48, 97-98, 178-82, 202

*mineral resource(s)*, 18, 43, 44, 47, 62, 68, 97-98, 178, 180

*mineral property*, 44-48, 140, 180-82

mitigation, 107

modifications of Standards, 3, 6, 51

moving expenses, 152, 160

navigable waters, 187-94

navigational servitude, 101, 187-94

negotiations, 30-31, 40, 73, 124-45; *see also* offers

neighborhood data, 61, 74, 77

non-compensable damages (consequential damages)

*generally*, 17, 38, 151-55, 159-61, 177, 201

*exceptions*, 161

noneconomic use, 23, 105

offers

*to compromise*, 125-26

*as admissions*, 125-26

*to purchase*, 21, 62, 87, 129-30

*to sell*, 21, 62, 87, 129-30

office space, lease of, 175

offset; *see* benefits

option

*contingency*, 33, 123, 129

*to purchase*, 130

partial acquisition (partial taking), 12, 20, 30, 37, 71-78

*allocation*, 165n843

*determination of larger parcel*, 11, 16, 24, 50, 110-11, 117, 153

*valuation methods*, 16-17,60, 130-31, 151-52, 154, 162-168, 172-73, 192-93

*see also* before and after method

permits; *see* land use regulations

photographs, 59, 62, 66, 71-72

physical components, 16, 97

physical invasion, 43, 157

physical possibility, 102

plot plan, 59, 62, 66, 71-72

police power, 100

policy underlying Standards, 7

post-acquisition sales; *see* comparable sales (sales after date of value)

price

*paid by condemnor*, 125-28

principle of substitution, 132

profitability, degree of, 102-03

profits, loss of, 159-60, 155

project
  *government project*, 91, 104, 127-28, 131, 189, 194
  *project enhancement, see* 18, 39, 104, 146-48, 177, 162-65, 194; *see also project influence*
  *project influence*, 16-17, 22, 32, 99, 104, 109, 128, 130-31, 145-50, 162-65, 192, 194
  *scope of the project rule*, 16-17, 20, 109, 123, 128, 130, 145-51, 165, 192
project appraisal reports, 73-79
project influence, 16-17, 22, 32, 99, 104, 109, 128, 130-31, 145-50, 162-65, 192, 194
property data, 61-63, 77
property history, 12, 20-21, 36, 62-63, 69
property rights,
  *state law generally defines*, 90-91
public facilities, 164, 195-96
purpose of acquisition, 50, 91, 102, 127, 147, 189
purpose of appraisal, 60-61
purpose of Standards, 3
public infrastructure, 195-96
public interest value; *see* economic use
qualifications of appraiser, 53, 57, 72
qualitative adjustments, 27-28, 67, 121-22
quantitative adjustments, 27-28, 67, 121-22
Rails to Trails cases, 199
reasonability
  *reasonably knowledgeable buyers and sellers*, 10, 95, 134, 147-48, 174
  *reasonably near future*, 22-23, 95, 101-02, 112, 139, 143-45, 179-80, 197
  *reasonably probable use*, 22-23, 95, 101-03, 107-08, 112, 186, 191, 197
  *test of reasonableness*, 132
reasonable probability, 143-44, 179-80
rebuttal
  *experts*, 82
  *in litigation*, 81-82
reconciliation and final opinion of value, 8, 37, 68, 70, 78
relocation; *see* Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970
relocation expenses; *see* Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970
remainder, 152-58, 162-70, 172, 177, 191-94

rent
  *market rental value*, 35, 40, 171, 174-77
  *market rent*, 21, 26, 35, 40, 41-43
rentable area, determination of, 18, 62
rental history of property, 21, 63
replacement cost, 34-35, 66, 75, 131, 134-35
replacement property, 113, 115-16, 153-54
reproduction cost, 34-35, 131, 133-35
restoration, 70
review
  *administrative review*, 80, 83-84
  *appraisal review*, 5, 30, 52, 73, 80-88
  *review appraiser*, 30, 52, 80-88
  *technical review*, 81-84, 80-88
reviewer's certification, 81, 83, 88
rezoning; *see* land use regulations
riparian
  *doctrine*, 183
  *land*, 117, 183-84, 187, 192
  *owner*, 183, 188
  *rights*, 183-84, 189-90
Rivers and Harbors Act, 187-88, 191
royalty income capitalization, 47, 137, 140, 182
sales
  *adjustments*, 26-28, 32-37, 46, 65-67, 75-76, 121-23, 125, 129
  *after the date of value*, 94, 123, 130-31
  *arm's-length*, 95, 119-20, 123
  *between related persons or entities*, 96, 124-25
  *comparable sales*, 25-36, 45-47, 65-67, 71, 75-79, 120-134, 145, 163-64, 175, 181
  *contingency sales*, 33, 123, 129
  *contracts*, 123, 129
  *distress sales*, 125
  *elements of comparison*, 27, 120-21
  *extraordinary verification requirements*, 28, 32, 123, 126
  *forced sales*, 124-25
  *fraudulent sales*, 96
  *including exchange of property*, 128
  *including personal property*, 123-128
  *leasehold transactions*, 30, 175-77
  *listings*, 123, 129-30
  *non-market considerations*, 124-28
  *offers to sell*, 129-30
  *options*, 33, 123, 129-30
  *prior sales of the same property*, 123-24
  *project-influenced sales*, 128

*sales history,* 27, 62-63, 124
   *to environmental organizations,* 32-33, 127-28
   *to government entities,* 29-33, 125-28
   *to public interest organizations,* 32-33, 127-28
   *verification of,* 26-27, 29, 46, 63, 204
   *transactions,* 4, 26-27, 29, 46, 50-52, 119-20, 122-30, 175, 185
sales adjustment grid, 65
sales comparison approach (comparable sales approach), 25-30, 32-33, 45-49, 65-67, 75, 78-79, 119-121, 134, 145, 163-64, 175, 181
sales data sheets, 75
scope of appraisal, 6
scope of Standards, 5
scope of the project rule, 16-17, 20, 109, 123, 128, 130, 145-51, 165, 192; *see also* project influence
scope of work, 9, 18, 60-61, 74, 77
setoff; *see* benefits
settlement negotiations, 124-25
severance damage; *see* compensable damage
site data, 69, 77
site inspection, 205; *see* inspection
special benefits (direct benefits), *see* benefits
special-purpose properties, 34
speculation
   *as highest and best use,* 103
   *generally,* 96
speculative evidence, 99-100
state law, 4, 49, 90-91
state rule; *see* taking + damages valuation
streets, highways, roads, 196-98
strip valuation, 170
subdivision development method; *see* development method
substitute facilities
   *as form of compensation,* 199-201
   *rejection as measure of compensation,* 199-201
summary of appraisal problem, 9, 77, 83-84
summary of salient facts and conclusions, 59-60
summation approach (summation appraisal), 16, 44, 68, 97
taking + damages valuation (state rule), 39, 112-13, 166-68; *see also* partial acquisition
takings; *see* eminent domain; inverse takings

temporary acquisitions
   *leaseholds,* 39-41, 72-73, 160-61, 174-78
   *temporary construction easements,* 4
   *temporary inverse takings,* 43
   *temporary takings,* 175, 177-78
tenant (lessee), 16, 21, 35-36, 40-41, 63, 97, 160-61, 175-76
test of reasonableness, 132
timber, 16, 20, 43-45, 48-49, 54, 62, 97-98, 115-16, 153, 178, 183
title, 113-15
title evidence report, 72
trends; *see* market trends
Tucker Act, 184
undivided fee, 97, 173
uneconomic remnant; *see under* partial acquisition: allocation
Uniform Act; *see* Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970
Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Uniform Act), 3-4, 15, 71, 98-99
Uniform Standards of Professional Appraisal Practice (USPAP), 6, 10, 13-15, 56, 58-59
unit rule
   *and cost approach,* 35, 136
   *and existing government improvements,* 98
   *and less-than-fee acquisitions,* 97
   *and mineral properties,* 16, 44, 97, 178-79, 202-03
   *and natural resource properties,* 16, 44, 97, 178-79, 202-03
   *and ownership interests,* 16, 97,
   *and physical components,* 16, 97-98, 202-203
   *and Uniform Act requirements,* 98-99
   *exceptions,* 99
   *generally,* 16, 97
   *undivided fee rule,* 97, 173
unitary holding, 153
unity of ownership, 23-24, 110, 113-15
unity of use, 111-13, 115-16
URA; *see* Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970
use
   *current use,* 21, 63
   *existing use,* 21, 23, 63, 103, 186
   *government's planned use of part acquired,* 151, 156, 171

5-ER-1007

*highest and best use*, 22-25, 30-31, 44-45, 64, 70, 72-74, 77

*potential use*, 103

*prospective use*, 104

*speculative use*, 138

use history, 20, 62

USPAP; *see* Uniform Standards of Professional Appraisal Practice

vacant land, unimproved land, 134

vacant, land as if, 64-65, 134

valuation date, 10-11, 16, 25, 33, 35, 60, 65, 93-95, 98, 107, 118, 123-24, 139, 143, 150, 174, 186, 204

valuation methods

*before and after (federal rule)*, 17-18, 31, 37-39, 73, 152

*taking + damages (state rule)*, 39, 112-13, 166-68

value

*contributory value*, 34, 38, 39, 68, 98, 193-94

*interchangeable terms*, 100n260

*market value, cash value, fair market value*, 10, 20, 68, 70, 90, 92-101, 104-05, 118-19

*multiple meanings*, 105

*noneconomic values*, 23, 105-106

*use value*, 174

*value to government*, 23, 100

*value to owner*, 93, 100

*see also* market value

verification of sales, 26-27; *see also* extraordinary verification

voluntary acquisitions, 10, 50, 94, 185-87

water

*consideration of uses dependent on access to or utilization of navigable waters*, 193-94

*hybrid system*, 184

*navigable waters*, 117, 187-94

*navigational servitude*, 101, 187-94

*prior appropriation system*, 183-84

*riparian rights doctrine*, 183-84, 189-90

*water rights*, 49, 183-84

wetlands, 20, 109

willing buyer, 95-96, 104-05

willing seller, 95-96, 104-05

witness, appraiser as, 54, 57, 204-05

zoning; *see* land use regulations



**Figure 1. Overview of mining area**

United States Department of Agriculture

# **FINAL** Environmental Impact Statement
## Resolution Copper Project and Land Exchange





**Volume 4**

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1053 of 2158
Case 2:21-cv-00122-DWL    Document 87-19    Filed 07/14/25    Page 3 of 4

Appendix J

**Additional ground disturbance:**

No additional ground disturbance anticipated.

---

**PF-WR-02: Divert existing flows across the subsidence area to preserve downstream flows**

Other names: M-W26

**Description/overview:**

Public comments suggested that existing flows (surface runoff during storm events) be diverted across the subsidence area in order to preserve downstream flows, if possible. This concept was also raised by Forest Service specialists during the Groundwater Modeling Workgroup prior to publication of the DEIS.

Rationale for including as a potential future measure: Resolution Copper indicated in their responses to the Forest Service on mitigation suggestions raised in public comments, that to the extent practicable and before subsidence starts, Resolution Copper will evaluate the practicability of implementing diversion around the subsidence area. The majority of upgradient surface runoff that would flow towards the subsidence area would have to pass over the Resolution Copper East Plant Site infrastructure complex which sits between the source and the subsidence area. Minimizing that flow across infrastructure would be accomplished by diverting water around the facility and into Queen Creek and Devil's Canyon. This would also minimize the amount of flow lost to the subsidence area.

**Source of measure:**

Resolution Copper; public comments

**Resource affected/impacts being mitigated:**

Socioeconomic resources; water quality and water supply

**Applicable alternatives:**

All

**Authority to require:**

As an applicant-proposed mitigation measure, implementation is not assured; however, if included as a stipulation or requirement in a permit it may become required.

**Additional ground disturbance:**

None.

---

**PF-WR-03: Mitigation of effects of water level declines**

Other names: M-W32

**Description/overview:**

Arizona Water Company submitted comments on the DEIS requesting that appropriate funding or bonding be in place to ensure the project will not cause any significant water level declines or water quality impacts. While such mitigation is in place for water level declines caused by dewatering near the mine site (see measure FS-WR-01), no such protections are in place for the area near the Desert Wellfield in the East Salt River valley.

| |
|---|
| Rationale for including as a potential future measure: The EIS analysis discloses that water quality impacts and significant water level declines are not anticipated in any areas associated with Arizona Water Company water supply systems. However, Resolution Copper notes: "If there are unique situations where water users will be impacted because of well siting requirements, for example, Resolution will work with these impacted stakeholders to mitigate effects of a water level decline caused by the project." This mitigation measure is being included in the event remedies in the future could be warranted. |
| **Source of measure:** |
| Resolution Copper; public comments |
| **Resource affected/impacts being mitigated:** |
| Socioeconomic resources; water quality and water supply |
| **Applicable alternatives:** |
| All |
| **Authority to require:** |
| As an applicant-proposed mitigation measure, implementation is not assured; however, if included as a stipulation or requirement in a permit it may become required. |
| **Additional ground disturbance:** |
| None. |

## *Potential Future Measures for Wildlife (1 measure)*

| |
|---|
| **PF-WI-01: Voluntary achievement of "no net loss" of habitat** |
| Other names: M-WL47 |
| **Description/overview:** |
| Continue collaboration on a voluntary compensatory plan, beyond what is legally mandated, to achieve no net loss of habitat. |
| Rationale for including as a potential future measure: Many aspects of the project design and mitigation will already replace habitat impacted by the mine or will prevent impacts from occurring. This includes preventing riparian and aquatic impacts associated with springs and perennial streams through water replacement if needed, reestablishment of habitat through reclamation, new riparian habitat brought forward as part of the compensatory mitigation under the Section 404 permit, as well as the offered lands coming into Federal ownership that contain desirable habitat. Although there is no legal mandate or regulatory requirement, the goal expressed in the mitigation measure—no net loss of habitat—is an aspirational goal that would have long-term benefits to wildlife in the region. Future mitigations could be considered to bring the project closer to this goal. |
| **Source of measure:** |
| Public comments |
| **Resource affected/impacts being mitigated:** |
| Wildlife habitat |
| **Applicable alternatives:** |
| All |

**United States Department of Agriculture**
Office of the Under Secretary, Natural Resources and Environment
Washington, D.C. 20250

**TO**:  Victoria Christiansen, Chief, USDA Forest Service

**FROM:**  Chris French, Acting Deputy Under Secretary

CHRISTOPHER FRENCH
2021.03.01 14:04:10 -05'00'

**DATE:**  March 1, 2021

**SUBJECT:**  Withdrawal of Notice of Availability; Rescind Final Environmental Impact Statement and Draft Record of Decision for Resolution Copper

With this memorandum I am instructing the Forest Service to withdraw the Notice of Availability, and rescind the Final Environmental Impact Statement and draft Record of Decision released on January 15, 2021, for Resolution Copper project on the Tonto National Forest in Arizona and re-initiate tribal consultation.

The withdraw will terminate the pre-decisional objection period. The Resolution Copper project is proposed on Oak Flat, a site sacred to numerous Federally Recognized Tribes in the Southwest. The Department is taking this step to provide an opportunity for the agency to conduct a thorough review based on significant input received from collaborators, partners, and the public since these documents were released.

The recent Presidential Memorandum on tribal consultation and strengthening nation to nation relationships, counsels in favor of ensuring the Forest Service has complied with the environmental, cultural, and archaeological analyses required. USDA has concluded that additional time is necessary to fully understand concerns raised by Tribes and the public and the project's impacts to these important resources and ensures the agency's compliance with federal law. The agency should take appropriate steps to re-initiate consultation and undertake this review and keep USDA informed of progress.

Roger Flynn (CO Bar # 21078) (*pro hac vice*)
Jeffrey C. Parsons (CO Bar #30210) (*pro hac vice*)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738; wmap@igc.org

Marc D. Fink (MN Bar #343407) (*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
(218) 464-0539; mfink@biologicaldiversity.org

Allison N. Henderson (CO Bar #45088) (*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008; ahenderson@biologicaldiversity.org
*Counsel for Plaintiffs*

Susan B. Montgomery (AZ Bar # 020595)
Robyn L. Interpreter (AZ Bar # 020864)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825; smontgomery@milawaz.com
*Counsel for Inter Tribal Association of Arizona, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| Arizona Mining Reform Coalition, *et al.*, ) <br><br> Plaintiffs ) <br><br> vs. ) <br><br> United States Forest Service, *et al.*, ) <br><br> Defendants, ) <br><br> and ) <br><br> Resolution Copper Mining, ) <br><br> Defendant-Intervenor. ) | Case No. 2:21-CV-00122-DWL <br><br> **PLAINTIFFS' NOTICE OF APPEAL** <br><br> **PRELIMINARY INJUNCTION APPEAL** |

1  Notice is hereby given that Plaintiffs Arizona Mining Reform Coalition; Inter Tribal

2  Association of Arizona, Inc.; Earthworks; Center for Biological Diversity; Access Fund;

3  and Grand Canyon Chapter of the Sierra Club hereby appeal to the United States Court of

4
   Appeals for the Ninth Circuit the U.S. District Court's denial of Plaintiffs' motion for a
5
   preliminary injunction, which was issued on August 15, 2025. Doc. 99.
6

7  Pursuant to Ninth Circuit Rule 3-2, a Representation Statement is included below.

8  Respectfully submitted August 15, 2025.

9
   */s/ Marc D. Fink*
10  Marc D. Fink (Pro Hac Vice)
    CENTER FOR BIOLOGICAL DIVERSITY
11  209 East 7th Street
12  Duluth, MN 55805
    218-464-0539
13  mfink@biologicaldiversity.org

14
   Roger Flynn (Pro Hac Vice)
15  Jeffrey C. Parsons (Pro Hac Vice)
    WESTERN MINING ACTION PROJECT
16  P.O. Box 349; 440 Main St., #2
17  Lyons, CO 80540
    303-823-5738
18  wmap@igc.org

19
   Allison N. Henderson (Pro Hac Vice)
20  CENTER FOR BIOLOGICAL DIVERSITY
    P.O. Box 3024
21  Crested Butte, CO 81224
22  970-309-2008
    ahenderson@biologicaldiversity.org
23
   *Attorneys for All Plaintiffs*
24

25  Susan B. Montgomery (AZ Bar # 020595)
    Robyn L. Interpreter (AZ Bar # 020864)
26  MONTGOMERY & INTERPRETER, PLC
    3301 E. Thunderbird Rd.
27  Phoenix, AZ 85032
28  (480) 513-6825

smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorneys for the ITAA*

1

**REPRESENTATION STATEMENT**

2

**Appellants:**

3

Names of Parties:

4

Arizona Mining Reform Coalition; Inter Tribal Association of Arizona, Inc.; Earthworks; Center for Biological Diversity; Access Fund; and Grand Canyon Chapter of the Sierra Club

5

6

Names of Counsel:

7

Roger Flynn (CO Bar # 21078), *pro hac vice* (registered for Electronic Filing in 9th Cir.)
Jeffrey C. Parsons (CO Bar # 30210), *pro hac vice* (registered for Electronic Filing in 9th Cir.)

8

Western Mining Action Project

9

P.O. Box 349; 440 Main St., #2
Lyons, CO 80540

10

303-823-5738

11

wmap@igc.org

12

Marc D. Fink (MN Bar # 343407), *pro hac vice* (registered for Electronic Filing in 9th Cir.)

13

Center for Biological Diversity
209 East 7th Street
Duluth, MN 55805

14

218-464-0539

15

mfink@biologicaldiversity.org

16

Allison N. Henderson (CO Bar # 45088), *pro hac vice* (registered for Electronic Filing in 9th Cir.)

17

Center for Biological Diversity

18

P.O. Box 3024
Crested Butte, CO 81224

19

970-309-2008

20

ahenderson@biologicaldiversity.org

21

*Attorneys for All Plaintiffs*

22

Susan B. Montgomery (AZ Bar # 020595) (registered for Electronic Filing in 9th Cir.)

23

Montgomery & Interpreter, PLC
3301 E. Thunderbird Rd.

24

Phoenix, AZ 85032

25

(480) 513-6825
smontgomery@milawaz.com

26

rinterpreter@milawaz.com

27

*Attorney for the ITAA*

28

**Appellees:**

Name of Parties:
Brooke L. Rollins, United States Secretary of Agriculture; United States Forest Service, an agency in the U.S. Department of Agriculture; and Neil Bosworth, Supervisor of the Tonto National Forest.

Names of Counsel:

Adam R.F. Gustafson
Acting Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

Erika Norman (CA Bar 268425)
Angela Ellis (DC Bar 1670713)
Natural Resources Section
150 M St. NE, Third Floor
Washington, D.C. 20002
(202) 305-0475 (Norman)
Erika.Norman@usdoj.gov;
Angela.Ellis@usdoj.gov

Ezekiel Peterson
Attorney, Appellate Section
U.S. Department of Justice,
Environment & Natural Resources Division
999 18th St, North Terrace, Suite 600
Denver, CO 80212
(303) 844-1348
ezekiel.a.peterson@usdoj.gov

**Defendant-Intervenors:**

Name of Parties:
Resolution Copper Mining

Names of Counsel:
Christopher D. Thomas (#010482)
Andrea J. Driggs (#023633)
Janet M. Howe (#034615)
Benjamin A. Longbottom (#038602)
Holland & Hart LLP
3110 North Central Ave., Suite D-160
Phoenix, Arizona 85012
Telephone: +1.602.316.9334
CDThomas@hollandhart.com

1  Michael R. Huston (#038763)
   Diane M. Johnsen (#007634)
2  Samantha J. Burke (#036064)
   Addison W. Bennett (#039801)
3  Perkins Coie LLP
4  2525 East Camelback Road, Suite 500
   Phoenix, Arizona 85016
5  Telephone: +1.602.351.8000
6  MHuston@perkinscoie.com
   DJohnsen@perkinscoie.com
7  SBurke@perkinscoie.com
   ABennett@perkinscoie.com
8

9

10

11                    **CERTIFICATE OF SERVICE**

12         I hereby certify that on August 15, 2025, I filed the foregoing document

13
   electronically through the CM/ECF system, which caused all parties through counsel of
14
15 record to be served by electronic means, as reflected on the Notice of Electronic Filing.

16
                            */s/ Marc D. Fink*
17                          Marc D. Fink, *pro hac vice*
                            Center for Biological Diversity
18

19

20

21

22

23

24

25

26

27

28

APPEAL,STD

# U.S. District Court
## DISTRICT OF ARIZONA (Phoenix Division)
## CIVIL DOCKET FOR CASE #: 2:21-cv-00122-DWL

Arizona Mining Reform Coalition et al v. United States Forest
Service et al
Assigned to: Judge Dominic W Lanza
Related Case: 2:25-cv-02758-DWL
Cause: 42:4321 Review of Agency Action-Environment

Date Filed: 01/22/2021
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Arizona Mining Reform Coalition**          represented by  **Allison N Henderson**
Center for Biological Diversity - Crested
Butte, CO
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
Email: ahenderson@biologicaldiversity.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey C Parsons**
Western Mining Action Project
PO Box 349
P.O. Box 349
Lyons, CO 80540
303-823-5738
Email: jeff@wmaplaw.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marc D Fink**
Center for Biological Diversity
209 East 7th St
209 E 7th St
Duluth, MN 55805
218-464-0539
Email: mfink@biologicaldiversity.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Roger Flynn**
Western Mining Action Project
P.O. Box 349
Lyons, CO 80540
303-823-5738

5-ER-1021

Fax: 303-823-5732
Email: wmap@igc.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Susan B Montgomery**
Montgomery & Interpreter PLC
3301 E Thunderbird Rd.
Phoenix, AZ 85032
480-513-6825
Fax: 480-513-6948
Email: smontgomery@milawaz.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Inter Tribal Association of Arizona Incorporated** | represented by | **Allison N Henderson** |

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey C Parsons**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marc D Fink**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robyn Loretta Interpreter**
Montgomery & Interpreter PLC
3301 E Thunderbird Rd.
Phoenix, AZ 85032
480-513-6825
Fax: 480-513-6948
Email: rinterpreter@milawaz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roger Flynn**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Susan B Montgomery**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

5-ER-1022

**Plaintiff**

**Earthworks**                                    represented by  **Allison N Henderson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey C Parsons**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marc D Fink**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Roger Flynn**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Susan B Montgomery**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Center for Biological Diversity**               represented by  **Allison N Henderson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey C Parsons**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marc D Fink**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Roger Flynn**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

                                                                   **Susan B Montgomery**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Access Fund**                          represented by  **Allison N Henderson**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *PRO HAC VICE*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Jeffrey C Parsons**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *PRO HAC VICE*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Marc D Fink**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *PRO HAC VICE*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Roger Flynn**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *PRO HAC VICE*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Susan B Montgomery**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Grand Canyon Chapter of the Sierra      represented by  **Allison N Henderson**
Club**                                                             (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *PRO HAC VICE*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Jeffrey C Parsons**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *PRO HAC VICE*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Marc D Fink**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *PRO HAC VICE*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Roger Flynn**

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Susan B Montgomery**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**United States Forest Service**
*an agency in the U.S. Department of
Agriculture*

represented by **Angela Ellis**
US Dept of Justice - ENRD M Street
150 M St. NE
Washington, DC 20002
202-305-0466
Email: angela.ellis@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erika Danielle Norman**
US Dept of Justice - ENRD
4 Constitution Sq.
Washington, DC 20002
202-305-0475
Email: erika.norman@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tyler McVeigh Alexander**
US Dept of Justice
4 Constitution Sq,
150 M St. NE
Washington, DC 20002
202-305-0238
Fax: 202-305-0506
Email: talexander@bicklawllp.com
*TERMINATED: 04/03/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Neil Bosworth**
*Supervisor of the Tonto National Forest*

represented by **Angela Ellis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erika Danielle Norman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tyler McVeigh Alexander**
(See above for address)
*TERMINATED: 04/03/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tom Torres**                                    represented by    **Angela Ellis**
*Acting Supervisor, Tonto National Forest*                          (See above for address)
*TERMINATED: 07/14/2025*                                            *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Erika Danielle Norman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tyler McVeigh Alexander**
(See above for address)
*TERMINATED: 04/03/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Brooke L Rollins**                              represented by    **Angela Ellis**
*US Secretary of Agriculture*                                       (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**Resolution Copper Mining LLC**                  represented by    **Addison W Bennett**
                                                                    Perkins Coie LLP - Phoenix, AZ
                                                                    2525 E Camelback Rd., Ste. 500
                                                                    Phoenix, AZ 85016
                                                                    202-654-6278
                                                                    Email: abennett@perkinscoie.com
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Andrea J Driggs**
Holland & Hart LLP - Phoenix
3110 N Central Ave., Ste. D-160
Phoenix, AZ 85012
602-884-2003
Email: ajdriggs@hollandhart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Longbottom**
Holland & Hart LLP - Phoenix
3110 N Central Ave., Ste. D-160
Phoenix, AZ 85012

5-ER-1026

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1068 of 2158

602-884-2003
Email: balongbottom@hollandhart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher David Thomas**
Holland & Hart LLP - Phoenix
3110 N Central Ave., Ste. D-160
Phoenix, AZ 85012
602-884-2003
Email: cdthomas@hollandhart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Diane M Johnsen**
Perkins Coie LLP - Phoenix, AZ
2525 E Camelback Rd., Ste. 500
Phoenix, AZ 85016
602-351-8000
Email: djohnsen@perkinscoie.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Luis Rojas**
Perkins Coie LLP - Phoenix, AZ
2525 E Camelback Rd., Ste. 500
Phoenix, AZ 85016
602-351-8000
Fax: 602-648-7000
Email: mlrojas@perkinscoie.com
*TERMINATED: 05/04/2023*
*LEAD ATTORNEY*

**Michael R Huston**
Perkins Coie LLP - Phoenix, AZ
2525 E Camelback Rd., Ste. 500
Phoenix, AZ 85016
602-351-8062
Email: mhuston@perkinscoie.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Janet Marie Howe**
Holland & Hart LLP - Phoenix
3110 N Central Ave., Ste. D-160
Phoenix, AZ 85012
602-351-8187
Email: jmhowe@hollandhart.com
*ATTORNEY TO BE NOTICED*

**Samantha Jones Burke**
Perkins Coie LLP - Phoenix, AZ
2525 E Camelback Rd., Ste. 500
Phoenix, AZ 85016

602-351-8204
Fax: 602-648-7000
Email: sburke@perkinscoie.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/22/2021 | 1 | COMPLAINT. Filing fee received: $ 402.00, receipt number 0970-19087782 filed by Grand Canyon Chapter of the Sierra Club, Center for Biological Diversity, Arizona Mining Reform Coalition, Earthworks, Inter Tribal Association of Arizona Incorporated, Access Fund. (Flynn, Roger) (Attachments: # 1 Civil Cover Sheet)(JAM) (Entered: 01/25/2021) |
| 01/22/2021 | 2 | Corporate Disclosure Statement by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (JAM) (Entered: 01/25/2021) |
| 01/22/2021 | 3 | SUMMONS Submitted by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Flynn, Roger) (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons)(JAM) (Entered: 01/25/2021) |
| 01/22/2021 | 4 | Filing fee paid, receipt number 0970-19087782. This case has been assigned to the Honorable Douglas L Rayes. All future pleadings or documents should bear the correct case number: CV-21-122-PHX-DLR. Notice of Availability of Magistrate Judge to Exercise Jurisdiction form attached. (Flynn, Roger) (JAM) (Entered: 01/25/2021) |
| 01/25/2021 | 5 | Summons Issued as to All Defendants. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons)(JAM). *** IMPORTANT: When printing the summons, select "Document and stamps" or "Document and comments" for the seal to appear on the document. (Entered: 01/25/2021) |
| 01/25/2021 | 6 | NOTICE TO FILER OF DEFICIENCY re: 1 Complaint filed by Arizona Mining Reform Coalition, Access Fund, Inter Tribal Association of Arizona Incorporated, Center for Biological Diversity, Grand Canyon Chapter of the Sierra Club, Earthworks. Document not in compliance with LRCiv 7.1(a)(3) - Party names must be capitalized using proper upper and lower case type. *No further action is required*. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (JAM) (Entered: 01/25/2021) |
| 01/25/2021 | 7 | ORDER - The parties are advised, pursuant to LRCiv 12.1(c), that motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) and motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) are discouraged if the defect(s) in the complaint can be cured by a permissible amendment. Plaintiff shall serve a copy of this Order upon Defendant and file notice of service with the Court. See document for complete details. Signed by Judge Douglas L Rayes on 1/25/2021. (WLP) (Entered: 01/25/2021) |
| 01/25/2021 | | Remark: Pro hac vice motion(s) granted for Marc D Fink on behalf of Plaintiffs Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 01/25/2021) |
| 01/25/2021 | | Remark: Pro hac vice motion(s) granted for Allison N Melton on behalf of Plaintiffs Access Fund, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated, Defendant Neil Bosworth. |

5-ER-1028

| | | |
|---|---|---|
| | | This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 01/25/2021) |
| 01/29/2021 | | Remark: Pro hac vice motion(s) granted for Roger Flynn on behalf of Plaintiffs Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 01/29/2021) |
| 01/29/2021 | | Remark: Pro hac vice motion(s) granted for Jeffrey C Parsons on behalf of Plaintiffs Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 01/29/2021) |
| 02/18/2021 | 8 | MOTION to Consolidate Cases by Neil Bosworth, Tom Torres, United States Forest Service, Neil Bosworth, Tom Torres, Neil Bosworth, Vicki Christensen, Sonny Perdue, Tom Torres, United States of America. (Associated Cases: CV-21-00050-PHX-SPL, CV-21-00068-PHX-DWL, CV-00122-PHX-DLR) (Alexander, Tyler) (Entered: 02/18/2021) |
| 02/19/2021 | 9 | MOTION for Preliminary Injunction by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10)(Montgomery, Susan) (Entered: 02/19/2021) |
| 02/19/2021 | 10 | Additional Attachments to Main Document re: 9 MOTION for Preliminary Injunction by Plaintiffs Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Attachments: # 1 Exhibit 12, # 2 Exhibit 13, # 3 Exhibit 14, # 4 Exhibit 15, # 5 Exhibit 16, # 6 Exhibit 17, # 7 Exhibit 18, # 8 Exhibit 19)(Montgomery, Susan) (Entered: 02/19/2021) |
| 02/19/2021 | 11 | Additional Attachments to Main Document re: 9 MOTION for Preliminary Injunction by Plaintiffs Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Attachments: # 1 Exhibit 21, # 2 Text of Proposed Order) (Montgomery, Susan) (Entered: 02/19/2021) |
| 02/19/2021 | 12 | MOTION for Leave to File Excess Pages for Motion for Preliminary Injunction by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Attachments: # 1 Text of Proposed Order)(Montgomery, Susan) (Entered: 02/19/2021) |
| 02/19/2021 | 13 | MINUTE ORDER: Scheduling Conference re: 9 Plaintiff's Motion for Preliminary Injunction set for 2/23/2021 at 10:00 AM before Judge Douglas L Rayes. The parties are advised oral argument on the motion will not be heard at this hearing, only a briefing schedule on the motion will be established. The parties will be provided with call-in information via separate email. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MMO) (Entered: 02/19/2021) |
| 02/20/2021 | 14 | Additional Attachments to Main Document re: 9 MOTION for Preliminary Injunction by Plaintiffs Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Attachments: # 1 Exhibit 6)(Montgomery, Susan) (Entered: 02/20/2021) |

5-ER-1029

| 02/22/2021 | 15 | NOTICE OF ATTORNEY APPEARANCE: Erika Norman appearing for Neil Bosworth, Tom Torres, United States Forest Service. . (Norman, Erika) (Entered: 02/22/2021) |
|---|---|---|
| 02/22/2021 | 16 | ORDER: IT IS ORDERED granting 12 Unopposed Motion for Additional Pages for Motion for Preliminary Injunction. The Court accepts Plaintiffs' Motion for Preliminary Injunction (and included Memorandum in Support) up to 27 pages. Federal Defendants' response to the Motion for Preliminary Injunction shall be limited to 27 pages. Plaintiffs' reply brief shall be limited to 16 pages. Ordered by Judge Douglas L Rayes on 2/22/2021. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MMO) (Entered: 02/22/2021) |
| 02/22/2021 | 17 | Joinder re: (60 in 2:21-cv-00050-SPL) MOTION to Consolidate Cases . filed by Resolution Copper Mining LLC. (Associated Cases: 2:21-cv-00068-DWL, 2:21-cv-00050-SPL, 2:21-cv-00122-DLR) (Thomas, Christopher) (Entered: 02/22/2021) |
| 02/22/2021 | 18 | NOTICE of Appearance by Christopher David Thomas on behalf of Resolution Copper Mining LLC. (Thomas, Christopher) (Entered: 02/22/2021) |
| 02/22/2021 | 19 | Corporate Disclosure Statement by Resolution Copper Mining LLC identifying Corporate Parent Resolution Copper Company, Corporate Parent BHP Copper Incorporated for Resolution Copper Mining LLC. (Thomas, Christopher) (Entered: 02/22/2021) |
| 02/22/2021 | 20 | MOTION to Intervene *(Unopposed)* by Resolution Copper Mining LLC. (Attachments: # 1 Exhibit A Declaration of Andrew Lye, # 2 Exhibit B (Proposed) Answer, # 3 Text of Proposed Order)(Thomas, Christopher) (Entered: 02/22/2021) |
| 02/23/2021 | 21 | MINUTE ENTRY for proceedings held before Judge Douglas L Rayes: Telephonic Scheduling Conference held on 2/23/2021. Upon discussion with the parties, IT IS ORDERED setting the following schedule as to the 9 Motion for Preliminary Injunction: Response due by 3/2/2021. Reply due by noon on 3/4/2021. Telephonic Oral Argument set for 3/5/2021 at 01:30 PM. <br><br> APPEARANCES: Telephonic appearance by Roger Flynn, Marc Fink, and Susan Montgomery for Plaintiffs. Telephonic appearance by Erica Norman for Defendants. Telephonic appearance by Chris Thomas for Defendant-Intervenor Resolution Copper Mining LLC. (Court Reporter Jennifer Pancratz.) Hearing held 9:58 am to 10:12 am. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (RMV) (Entered: 02/23/2021) |
| 02/24/2021 | 22 | ORDER granting 20 Motion to Intervene. The Clerk shall file Resolution's proposed form of Answer, which was lodged with the Court, as Exhibit B of the Motion. Signed by Judge Douglas L Rayes on 2/23/21. (DXD) (Entered: 02/24/2021) |
| 02/24/2021 | 23 | ANSWER to 1 Complaint by Resolution Copper Mining LLC.(DXD) (Entered: 02/24/2021) |
| 02/26/2021 | 24 | SERVICE EXECUTED filed by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated: Proof of Service re: Complaint, Summons, Civil Cover Sheet, Corporate Disclosure Statement, Order, etc. upon Tonto National Forest Supervisor Neil Bosworth on 1/28/21; Tonto National Forest Acting Supervisor Tom Torres on 1/27/21; U.S. Attorney's Office District of Arizona on 1/28/21; Acting U.S. Attorney General Robert M. Wilkinson on 2/1/21; United States Department of Agriculture on 2/1/21; United States Forest Service on 2/1/21. (Montgomery, Susan) *Modified text on 3/1/2021 (DXD). (Entered: 02/26/2021) |
| 03/02/2021 | 25 | RESPONSE in Opposition re: 9 MOTION for Preliminary Injunction filed by Resolution Copper Mining LLC. (Attachments: # 1 Exhibit A - Order by Judge Logan, # 2 Exhibit B |

| | | - Declaration of Andrew Lye, # 3 Exhibit C - Declaration of Victoria Peacey, # 4 Exhibit D - Declaration of Sterling Hundley)(Thomas, Christopher) (Entered: 03/02/2021) |
|---|---|---|
| 03/02/2021 | 26 | RESPONSE in Opposition re: 9 MOTION for Preliminary Injunction *and Notice of Superseding Agency Action* filed by Neil Bosworth, Tom Torres, United States Forest Service. (Attachments: # 1 Exhibit Declaration of Tracy Parker, # 2 Exhibit Mem. from USDA to USFS, # 3 Exhibit USFS Ltr. to EPA)(Norman, Erika) (Entered: 03/02/2021) |
| 03/02/2021 | 27 | ORDER: In light of the 3/1/2021 USDA directive to rescind the FEIS and draft Record of Decision for the Resolution Copper Project, the Court believes that the 3/5/2021 oral argument should be vacated. However, the Court will provide the parties an opportunity to object. If the Court receives no objection by 3/3/2021 at 5:00 PM, the 3/5/2021 hearing will be vacated. Should neither side object to the vacating of the hearing, the parties shall file a joint status report no later than 3/10/2021 that explains the status of the case moving forward and that includes a proposed schedule. Ordered by Judge Douglas L Rayes on 3/2/2021. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MMO) (Entered: 03/02/2021) |
| 03/03/2021 | 28 | STIPULATION re: 9 MOTION for Preliminary Injunction , 27 Order, Set Deadlines *Joint Stipulation* by Arizona Mining Reform Coalition. (Flynn, Roger) (Entered: 03/03/2021) |
| 03/03/2021 | 29 | *WITHDRAWAL OF DOCUMENT re: 9 MOTION for Preliminary Injunction by Arizona Mining Reform Coalition. (Flynn, Roger) *Modified to correct event on 3/4/2021 (DXD). (Entered: 03/03/2021) |
| 03/03/2021 | 30 | MINUTE ORDER: Pursuant to 29 Plaintiff's Notice of Withdrawal of Plaintiff's Motion for Preliminary Injunction, oral argument set for 3/5/2021 at 1:30 PM is VACATED. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MMO) (Entered: 03/03/2021) |
| 03/04/2021 | 31 | **REFILED at Doc. 32 ** RESPONSE in Opposition re: 8 MOTION to Consolidate Cases filed by Arizona Mining Reform Coalition. (Flynn, Roger) *Modified to correct event. Redocketed by Clerk using correct event on 3/5/2021 (DXD). (Entered: 03/04/2021) |
| 03/04/2021 | 32 | RESPONSE to Motion re: (60 in 2:21-cv-00050-SPL) MOTION to Consolidate Cases *in Opposition* filed by Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Associated Cases: 2:21-cv-00050-SPL, 2:21-cv-00068-DWL, 2:21-cv-00122-DLR) (DXD) (Entered: 03/05/2021) |
| 03/10/2021 | 33 | STATUS REPORT *Joint Status Report* by Arizona Mining Reform Coalition. (Attachments: # 1 Text of Proposed Order)(Flynn, Roger) (Entered: 03/10/2021) |
| 03/11/2021 | 34 | REPLY to Response to Motion re: (60 in 2:21-cv-00050-SPL) MOTION to Consolidate Cases filed by Neil Bosworth, Tom Torres, United States Forest Service, Neil Bosworth, Vicki Christensen, Sonny Perdue, Tom Torres, United States of America, Neil Bosworth, Tom Torres. (Associated Cases: 2:21-cv-00122-DLR, 2:21-cv-00050-SPL, 2:21-cv-00068-DWL) (Norman, Erika) (Entered: 03/11/2021) |
| 03/16/2021 | 35 | ORDER - Pursuant to the parties' joint Status Report (Doc. 33 ), this case is stayed pending the Forest Service's publication of a future Final Environmental Impact Statement and Draft Record of Decision for the Resolution Copper Project and Land Exchange. The parties shall submit a status report to this Court 90 days after the date of this Order. See Order for further details. Signed by Judge Douglas L Rayes on 3/15/21. (DXD) (Entered: 03/16/2021) |

| 04/16/2021 | 36 | ORDER that Defendants' Motion to Consolidate (Doc. 60 ) is denied. Signed by Judge Steven P Logan on 4/15/2021. (Associated Cases: 2:21-cv-00050-SPL, 2:21-cv-00068-DWL, 2:21-cv-00122-DLR) (REK) (Entered: 04/16/2021) |
|---|---|---|
| 06/14/2021 | 37 | STATUS REPORT *(JOINT)* by Neil Bosworth, Tom Torres, United States Forest Service. (Norman, Erika) (Entered: 06/14/2021) |
| 09/13/2021 | 38 | STATUS REPORT *(Joint)* by Neil Bosworth, Tom Torres, United States Forest Service. (Norman, Erika) (Entered: 09/13/2021) |
| 12/10/2021 | 39 | STATUS REPORT *(Joint)* by Neil Bosworth, Tom Torres, United States Forest Service. (Norman, Erika) (Entered: 12/10/2021) |
| 03/10/2022 | 40 | STATUS REPORT *(Joint)* by Neil Bosworth, Tom Torres, United States Forest Service. (Norman, Erika) (Entered: 03/10/2022) |
| 06/10/2022 | 41 | STATUS REPORT by Neil Bosworth, Tom Torres, United States Forest Service. (Alexander, Tyler) (Entered: 06/10/2022) |
| 09/09/2022 | 42 | STATUS REPORT *Joint Status Report* by Neil Bosworth, Tom Torres, United States Forest Service. (Alexander, Tyler) (Entered: 09/09/2022) |
| 12/08/2022 | 43 | STATUS REPORT *(Joint)* by Neil Bosworth, Tom Torres, United States Forest Service. (Norman, Erika) (Entered: 12/08/2022) |
| 12/28/2022 | 44 | NOTICE re: Notice of Last Name and Email Address Change by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated . (Henderson, Allison) (Entered: 12/28/2022) |
| 03/08/2023 | 45 | STATUS REPORT *(Joint)* by Neil Bosworth, Tom Torres, United States Forest Service. (Norman, Erika) (Entered: 03/08/2023) |
| 05/04/2023 | 46 | NOTICE of Attorney Withdrawal *of Counsel Matthew Rojas Only* filed by Christopher David Thomas. (Thomas, Christopher) (Entered: 05/04/2023) |
| 06/06/2023 | 47 | STATUS REPORT *(Joint)* by Neil Bosworth, Tom Torres, United States Forest Service. (Norman, Erika) (Entered: 06/06/2023) |
| 09/05/2023 | 48 | STATUS REPORT *(Joint)* by Neil Bosworth, Tom Torres, United States Forest Service. (Norman, Erika) (Entered: 09/05/2023) |
| 12/04/2023 | 49 | STATUS REPORT *Joint* by Neil Bosworth, Tom Torres, United States Forest Service. (Alexander, Tyler) (Entered: 12/04/2023) |
| 03/04/2024 | 50 | STATUS REPORT *Joint* by Neil Bosworth, Tom Torres, United States Forest Service. (Alexander, Tyler) (Entered: 03/04/2024) |
| 03/18/2024 | 51 | NOTICE OF ATTORNEY'S CHANGE OF ADDRESS/FIRM NAME by Christopher David Thomas. (Thomas, Christopher) (Entered: 03/18/2024) |
| 06/05/2024 | 52 | STATUS REPORT *Joint* by Neil Bosworth, Tom Torres, United States Forest Service. (Alexander, Tyler) (Entered: 06/05/2024) |
| 09/06/2024 | 53 | STATUS REPORT *Joint* by Neil Bosworth, Tom Torres, United States Forest Service. (Alexander, Tyler) (Entered: 09/06/2024) |
| 11/27/2024 | 54 | JOINT STATUS REPORT by United States Forest Service, Neil Bosworth, Tom Torres. (Norman, Erika) (Entered: 11/27/2024) |

| | | |
|---|---|---|
| 02/27/2025 | 55 | JOINT STATUS REPORT by United States Forest Service, Neil Bosworth, Tom Torres. (Norman, Erika) (Entered: 02/27/2025) |
| 03/17/2025 | 56 | NOTICE OF ATTORNEY'S CHANGE OF ADDRESS/EMAIL/FIRM NAME by Andrea J Driggs. (Driggs, Andrea) (Entered: 03/17/2025) |
| 04/03/2025 | 57 | NOTICE of Attorney Termination/Withdrawal *Tyler McVeigh Alexander* filed by Tyler McVeigh Alexander. (Alexander, Tyler) (Entered: 04/03/2025) |
| 04/17/2025 | 58 | NOTICE of Appearance by Angela Ellis on behalf of Neil Bosworth, Tom Torres, United States Forest Service. (Ellis, Angela) (Entered: 04/17/2025) |
| 04/17/2025 | 59 | NOTICE re: 60-Day Notice of Publication of Final Environmental Impact Statement by Neil Bosworth, Tom Torres, United States Forest Service . (Ellis, Angela) (Entered: 04/17/2025) |
| 04/18/2025 | 60 | NOTICE of Appearance by Janet Marie Howe on behalf of Resolution Copper Mining LLC. (Howe, Janet) (Entered: 04/18/2025) |
| 04/28/2025 | 61 | JOINT STATUS REPORT by Neil Bosworth, Tom Torres, United States Forest Service. (Norman, Erika) (Entered: 04/28/2025) |
| 05/01/2025 | 62 | ORDER REASSIGNING CASE - Case reassigned to Judge Dominic W Lanza for all further proceedings. All future pleadings and papers submitted for filing shall bear the following complete case number: CV-21-00122-PHX-DWL. The Clerk shall provide a copy of this order to the District of Arizona Chief Judge. Signed by Senior Judge Douglas L Rayes on 5/1/25. (DXD) (Entered: 05/01/2025) |
| 05/01/2025 | 63 | ORDER - Pursuant to the Joint Status Report (Doc. 61 ), IT IS ORDERED setting Status Conference for **5/5/2025 at 01:00 PM** in Courtroom 601, 401 West Washington Street, Phoenix, AZ 85003 before Judge Dominic W Lanza. The hearing will be conducted in person and/or via Zoom. Counsel shall advise the Court via e-mail (lanza_chambers@azd.uscourts.gov) no later than 5/2/2025 at 3:00 PM as to whether they will appear via Zoom or in person. The Court's staff will provide counsel with the Zoom link for the hearing. Ordered by Judge Dominic W Lanza on 5/1/25. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (SLQ) *Modified text on 5/1/2025 (SLQ). (Entered: 05/01/2025) |
| 05/05/2025 | 64 | MINUTE ENTRY for proceedings held before Judge Dominic W Lanza: Status Conference held on 5/5/2025. Discussion held as to the Joint Status Report (Doc. 61 ). For the reasons stated on the record, the Court adopts, with modifications, the briefing schedule proposed in CV-21-00068-PHX-DWL. The motion for preliminary injunction is due 5/14/2025, the response is due 5/27/2025, and the reply is due 6/2/2025. Oral Argument is set for **6/6/2025 at 10:00 AM** in Courtroom 601, 401 West Washington Street, Phoenix, AZ 85003 before Judge Dominic W Lanza. The hearing will be conducted in person and/or via Zoom. Counsel shall advise the Court via e-mail (lanza_chambers@azd.uscourts.gov) no later than 6/3/2025 at 12:00 PM as to whether they will appear via Zoom or in person. Counsel shall utilize the same Zoom link used for today's proceeding. IT IS FURTHER ORDERED that the stay (Doc. 35 ) is lifted.<br><br>APPEARANCES: Marc Fink and Allison Henderson (via Zoom) and Susan Montgomery (in person) for Plaintiffs. Angela Ellis and Erika Norman (via Zoom) for Defendants. Christopher Thomas and Andrea Driggs (in person) for Intervenor Defendant. (Court Reporter Jennifer Pancratz.) Hearing held 1:05 PM to 1:45 PM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (SLQ) (Entered: 05/05/2025) |

| 05/13/2025 | 65 | TRANSCRIPT REQUEST by Resolution Copper Mining LLC for proceedings held on 05/05/2025, Judge Dominic W Lanza hearing judge(s). (Thomas, Christopher) (Entered: 05/13/2025) |
|---|---|---|
| 05/13/2025 | 66 | NOTICE TO FILER OF DEFICIENCY re: AO435 65 Transcript Request filed by Resolution Copper Mining LLC. Item 16 ORDER FOR - Applicable Box(es) Not Checked: NON-APPEAL. Item 17 - TRANSCRIPT REQUESTED: The left side is meant for a trial. No need to duplicate date. ***FOLLOW-UP ACTION REQUIRED:*** 1) Please refile with each box in Item 16 checked that applies. 2) Please refile with duplicated dates of proceedings on left side in Item 17 removed. Deficiency must be corrected within one business day of this notice. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (RAP) (Entered: 05/13/2025) |
| 05/14/2025 | 67 | AMENDED TRANSCRIPT REQUEST pursuant to 66 Notice of Deficiency by Resolution Copper Mining LLC for proceedings held on 05/05/2025, Judge Dominic W Lanza hearing judge(s). (Thomas, Christopher) (Entered: 05/14/2025) |
| 05/14/2025 | 68 | MOTION for Preliminary Injunction by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Attachments: # 1 Exhibit 1-2, # 2 Exhibit 3-7, # 3 Exhibit 8, # 4 Exhibit 9, # 5 Exhibit 10-13, # 6 Exhibit 14, # 7 Exhibit 15, # 8 Proposed Order)(Montgomery, Susan) (Entered: 05/14/2025) |
| 05/14/2025 | 69 | NOTICE OF FILING of OFFICIAL TRANSCRIPT of STATUS CONFERENCE proceedings held on 05/05/2025 before Judge DOMINIC W. LANZA. [Court Reporter: Jennifer A. Pancratz, RMR, CRR, FCRR, CRC, Telephone number (602) 322-7198]. The ordering party receives the transcript directly from the Court Reporter. Therefore, transcripts may not be viewed through Pacer. A non-ordering party may view a transcript at the court's public terminal or purchased through the Court Reporter/Transcriber by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through Pacer. Redaction Request due 6/4/2025. Redacted Transcript Deadline set for 6/16/2025. Release of Transcript Restriction set for 8/12/2025. (RAP) (Entered: 05/15/2025) |
| 05/27/2025 | 70 | NOTICE of Appearance by Samantha Jones Burke on behalf of Resolution Copper Mining LLC. (Burke, Samantha) (Entered: 05/27/2025) |
| 05/27/2025 | 71 | RESPONSE in Opposition re: 68 MOTION for Preliminary Injunction filed by Neil Bosworth, Tom Torres, United States Forest Service. (Attachments: # 1 Exhibit 1 (Appraisal Report Summary))(Norman, Erika) (Entered: 05/27/2025) |
| 05/27/2025 | 72 | RESPONSE in Opposition re: 68 MOTION for Preliminary Injunction filed by Resolution Copper Mining LLC. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2)(Burke, Samantha) (Entered: 05/27/2025) |
| 05/30/2025 | 73 | NOTICE re: Supplemental Authority by Resolution Copper Mining LLC . (Attachments: # 1 Exhibit Slip Opinion)(Huston, Michael) (Entered: 05/30/2025) |
| 06/02/2025 | 74 | REPLY to Response to Motion re: 68 MOTION for Preliminary Injunction filed by Inter Tribal Association of Arizona Incorporated. (Attachments: # 1 Exhibit 16, # 2 Exhibit 17, # 3 Exhibit 18, # 4 Exhibit 19)(Montgomery, Susan) (Entered: 06/02/2025) |
| 06/02/2025 | 75 | RESPONSE re: 73 Notice (Other) *Response to RCM's Notice of Supplemental Authority* by Plaintiff Arizona Mining Reform Coalition. (Montgomery, Susan) (Entered: 06/02/2025) |
| 06/05/2025 | 76 | NOTICE OF TENTATIVE RULING - In advance of the motion hearing on June 6, 2025, the Court wishes to provide the parties with its tentative ruling. The point of providing it |

5-ER-1034

| | | |
|---|---|---|
| | | beforehand is to streamline oral argument and enhance the parties' ability to address any perceived errors in the Court's tentative analysis. This is not an invitation to submit additional evidence or briefing. Signed by Judge Dominic W Lanza on 6/5/2025. (SLQ) (Entered: 06/05/2025) |
| 06/06/2025 | 77 | MINUTE ENTRY for proceedings held before Judge Dominic W. Lanza: Preliminary Injunction Hearing held on 6/6/2025. Oral argument held regarding Plaintiffs' 68 Motion for Preliminary Injunction. Defendants' exhibits 100, 101 and 101A are admitted. The motion is taken under advisement. APPEARANCES: Roger Flynn, Susan Montgomery, Marc Fink and Allison Henderson for Plaintiffs. Angela Ellis and Erika Norman for Defendants Michael Huston, Christopher Thomas, Addison Bennett and Samantha Burke for Intervenor Defendant. (Court Reporter Andrea Bluedorn) Hearing held 10:05 AM to 11:49 AM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (ESG) (Entered: 06/06/2025) |
| 06/06/2025 | 78 | Exhibit List re: Preliminary Injunction Hearing by Neil Bosworth, Tom Torres, United States Forest Service. (ESG) (Entered: 06/06/2025) |
| 06/06/2025 | 79 | MINUTE ORDER regarding exhibits: that the exhibits marked and/or admitted in the above-entitled case at the time of the trial/hearing are returned to respective counsel. Counsel/agents are directed to retain custody of the exhibits until the case has been completely terminated, including all appeals, pursuant to LRCiv 79.1. (ESG) (Entered: 06/06/2025) |
| 06/06/2025 | 80 | TRANSCRIPT REQUEST by Resolution Copper Mining LLC for proceedings held on 06/06/2025, Judge Dominic W Lanza hearing judge(s). (Thomas, Christopher) (Entered: 06/06/2025) |
| 06/09/2025 | 81 | ORDER - IT IS ORDERED that: 1. The motions for preliminary injunction (San Carlos Apache Tribe, Doc. 82; Arizona Mining Reform Coalition, Doc. 68 ) are denied. 2. The federal defendants are enjoined from conveying the federal land described in § 3003 of NDAA until August 19, 2025 (i.e., 60 days after the publication of the FEIS on June 20, 2025). 3. By July 14, 2025, the plaintiff in San Carlos Apache Tribe may file a Second Amended Complaint and the plaintiffs in Arizona Mining Reform Coalition may file a First Amended Complaint. Plaintiffs shall, consistent with LRCiv 15.1(b), attach a redlined version of the pleading as an exhibit. 4. By July 14, 2025, the plaintiff in San Carlos Apache Tribe and the plaintiffs in Arizona Mining Reform Coalition may each file a renewed motion for preliminary injunction. Each motion may not exceed 30 pages. 5. By July 28, 2025, the federal defendants and Resolution Copper shall each file a response to any such renewed motion for preliminary injunction. Each response may not exceed 30 pages. 6. By August 4, 2025, the plaintiff in San Carlos Apache Tribe and the plaintiffs in Arizona Mining Reform Coalition may each file a consolidated reply in support of their renewed motion for preliminary injunction. Each reply may not exceed 20 pages. 7. The Court will endeavor to hold a hearing on the motions and issue a decision before August 19, 2025. (See document for complete details). Signed by Judge Dominic W Lanza on 6/9/2025. (SLQ) (Entered: 06/09/2025) |
| 06/09/2025 | 82 | TRANSCRIPT REQUEST by Neil Bosworth, Tom Torres, United States Forest Service for proceedings held on 6/6/2025, Judge Dominic W Lanza hearing judge(s). (Norman, Erika) (Entered: 06/09/2025) |
| 06/10/2025 | 83 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of PRELIMINARY INJUNCTION Proceeding held on 6/6/2025 before Judge Dominic W. Lanza. Court Reporter: Andrea K. Bluedorn, RMR, CRR, Telephone number: (602)322-7245. The ordering party receives the transcript directly from the Court Reporter. Therefore, transcripts should not be |

| | | viewed through Pacer. A non-ordering party may view a transcript at the court's public terminal or purchased through the Court Reporter/Transcriber by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through Pacer. Redaction Request due 7/1/2025. Redacted Transcript Deadline set for 7/11/2025. Release of Transcript Restriction set for 9/8/2025. (SCH) (Entered: 06/10/2025) |
|---|---|---|
| 07/14/2025 | 84 | Joint MOTION for Extension of Time to File Answer re: 81 Order *(Unopposed)* by Neil Bosworth, Tom Torres, United States Forest Service. (Attachments: # 1 Proposed Order) (Norman, Erika) *Modified text on 7/15/2025 (DXD). (Entered: 07/14/2025) |
| 07/14/2025 | 85 | ORDER - IT IS ORDERED that the parties' joint motion (Doc. 84 ) is granted. Defendants' deadline to file an answer to the Second Amended Complaint in the San Carlos Apache Tribe Case and to the First Amended Complaint in the Arizona Mining Reform Coalition Case is extended to 30 days from the date on which the Court resolves the renewed preliminary injunction motions. Ordered by Judge Dominic W Lanza on 7/14/2025. (SLQ)(This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Entered: 07/14/2025) |
| 07/14/2025 | 86 | First AMENDED COMPLAINT *FOR VACATUR, DECLARATORY AND INJUNCTIVE RELIEF* against All Defendants filed by Grand Canyon Chapter of the Sierra Club, Earthworks, Inter Tribal Association of Arizona Incorporated, Arizona Mining Reform Coalition, Center for Biological Diversity, Access Fund. (Attachments: # 1 Redline to Plaintiffs' Original Complaint)(Montgomery, Susan) (Entered: 07/14/2025) |
| 07/14/2025 | 87 | MOTION for Preliminary Injunction by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Proposed Order on Plaintiffs' Motion for Preliminary Injunction) (Montgomery, Susan) (Entered: 07/14/2025) |
| 07/17/2025 | 88 | ORDER - IT IS ORDERED that a hearing on the renewed preliminary injunction motions is set for **8/6/2025 at 01:00 PM** in Courtroom 601, 401 West Washington Street, Phoenix, AZ 85003 before Judge Dominic W Lanza. The hearing will be conducted in person and/or via Zoom. Counsel shall advise the Court via e-mail (lanza_chambers@azd.uscourts.gov) no later than 7/31/2025 at 12:00 PM as to whether they will appear via Zoom or in person. The Court's staff will provide counsel with the Zoom link for the hearing. IT IS FURTHER ORDERED that the deadline for the exchange of witness and exhibit lists is **8/4/2025**. All exhibit lists, witness lists, and exhibits shall be provided to the Courtroom Deputy no later than **12:00 PM on 8/5/2025**. Ordered by Judge Dominic W Lanza on 7/17/25. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (SLQ) (Entered: 07/17/2025) |
| 07/17/2025 | 89 | Joint MOTION to Shorten and Consolidate Opposition Briefs re: 81 Order by Neil Bosworth, Brooke L Rollins, Tom Torres, United States Forest Service. (Attachments: # 1 Proposed Order)(Ellis, Angela) (Entered: 07/17/2025) |
| 07/18/2025 | 90 | RESPONSE in Opposition re: 89 Joint MOTION to Shorten and Consolidate Opposition Briefs re: 81 Order filed by Arizona Mining Reform Coalition. (Flynn, Roger) (Entered: 07/18/2025) |
| 07/21/2025 | 91 | ORDER - IT IS ORDERED that a telephonic status conference is set for **July 22, 2025 at 10:00 a.m.** The parties should be prepared to address issues related to the hearing schedule as well as Defendants' motion to modify the briefing schedule. Counsel shall |

| | | |
|---|---|---|
| | | connect to the hearing by dialing 855-244-8681 and using access code 2313-785-5764. **All parties must connect no later than five minutes prior to the hearing**. Ordered by Judge Dominic W Lanza on 7/21/25. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (SLQ) (Entered: 07/21/2025) |
| 07/22/2025 | 92 | MINUTE ENTRY for proceedings held before Judge Dominic W Lanza: Telephonic Status Conference held on 7/22/2025. Scheduling is discussed. The Court finds that no live testimony will be permitted at the Preliminary Injunction Hearing. The Court further finds good cause to reset the Preliminary Injunction Hearing in time only. The Preliminary Injunction Hearing is reset from 1:00 PM to 10:45 AM on 8/6/2025 in Courtroom 601. Counsel may utilize the same Zoom link previously provided. Argument is presented regarding Defendants' and Intervenor's Joint Motion to Shorten and Consolidate Opposition Briefs (Doc. 89 ). For the reasons stated on the record, IT IS ORDERED granting the motion in part. The Court will allow Defendants and Intervenor to submit 50-page consolidated briefs. Defendants' and Intervenor's consolidated briefs should make very clear which of their arguments apply to Plaintiffs' arguments.<br><br>TELEPHONIC APPEARANCES: Marc Fink, Roger Flynn, Allison Henderson, and Susan Montgomery for Plaintiffs. Angela Ellis and Erika Norman for Defendants. Christopher Thomas for Intervenor. Senior Corporate Counsel Karlene Martorana for Intervenor also present. (Court Reporter Jennifer Pancratz.) Hearing held 10:02 AM to 10:29 AM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (SLQ) (Entered: 07/22/2025) |
| 07/28/2025 | 93 | RESPONSE in Opposition re: 87 MOTION for Preliminary Injunction filed by Neil Bosworth, Brooke L Rollins, Tom Torres, United States Forest Service. (Attachments: # 1 Exhibit 1 (FEIS - Excerpt), # 2 Exhibit 2 (Draft ROD - Excerpt), # 3 Exhibit 3 (Appraisal Summary - MCZ Parcel))(Norman, Erika) (Entered: 07/28/2025) |
| 07/28/2025 | 94 | RESPONSE in Opposition re: 87 MOTION for Preliminary Injunction filed by Resolution Copper Mining LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Huston, Michael) (Entered: 07/28/2025) |
| 08/01/2025 | 95 | NOTICE re: Related Case by Neil Bosworth, Brooke L Rollins, Tom Torres, United States Forest Service . (Ellis, Angela) (Entered: 08/01/2025) |
| 08/01/2025 | 96 | *MOTION Status Conference by Defendants Neil Bosworth, Brooke L Rollins, Tom Torres, United States Forest Service. (Ellis, Angela) *Modified to correct event on 8/4/2025 (SLQ). (Entered: 08/01/2025) |
| 08/04/2025 | 97 | REPLY to Response to Motion re: 87 MOTION for Preliminary Injunction filed by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Attachments: # 1 Exhibit 20)(Montgomery, Susan) (Entered: 08/04/2025) |
| 08/06/2025 | 98 | MINUTE ENTRY for proceedings held before Judge Dominic W Lanza: Preliminary Injunction Hearing (Doc. 87 ) held on 8/6/2025. Argument is presented. IT IS ORDERED taking this matter under advisement. (Court Reporter Cathy Taylor.) Hearing held 10:50 AM to 4:55 PM.(SLQ) (Entered: 08/08/2025) |
| 08/15/2025 | 99 | ORDER - IT IS ORDERED that: 1. San Carlos's motion for preliminary injunction (San Carlos, Doc. 105 ) is denied. 2. AMRC's motion for preliminary injunction (AMRC, Doc. 87 ) is denied. 3. Federal Defendants' motion to strike (San Carlos, Doc. 115 ) is denied. (See document for complete details). Signed by Judge Dominic W Lanza on 8/15/25. (SLQ) (Entered: 08/15/2025) |

| 08/15/2025 | 100 | NOTICE OF INTERLOCUTORY APPEAL to 9th Circuit Court of Appeals re: 99 Order on Motion for Preliminary Injunction, by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. Filing fee received: $ 605.00, receipt number AAZDC-24625812. (Fink, Marc) (Entered: 08/15/2025) |
|---|---|---|

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 08/15/2025 15:09:25 | | | |
| PACER Login: | montinter123 | Client Code: | 0000 |
| Description: | Docket Report | Search Criteria: | 2:21-cv-00122-DWL |
| Billable Pages: | 16 | Cost: | 1.60 |

5-ER-1038

No. 25-5185

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION OF ARIZONA, INC.; CENTER FOR BIOLOGICAL DIVERSITY; EARTHWORKS; THE ACCESS FUND; and SIERRA CLUB.

*Plaintiffs-Appellants*,

v.

BROOKE L. ROLLINS, U.S. SECRETARY OF AGRICULTURE; UNITED STATES FOREST SERVICE; and NEIL BOSWORTH, SUPERVISOR OF THE TONTO NATIONAL FOREST.

*Defendants-Appellees*,

and

RESOLUTION COPPER MINING LLC.

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District
Court for the District of Arizona

Honorable District Judge Dominic W. Lanza
(2:21-CV-00122-DWL)

## PLAINTIFFS-APPELLANTS'
## EMERGENCY MOTION UNDER CIRCUIT RULE 27-3

*RELIEF REQUESTED BY AUGUST 18, 2025, AS THE LAND TITLE TRANSFER WILL OCCUR ON AUGUST 19, 2025*

i

Pursuant to Circuit Rule 27-3, Plaintiffs-Appellants' undersigned counsel,

Roger Flynn, hereby certifies the following is true and correct:

## <u>CONTACT INFORMATION OF ATTORNEYS FOR PARTIES</u>

**Plaintiffs-Appellants' Counsel**

All Plaintiffs-Appellants are represented by:

Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
mfink@biologicaldiversity.org

Allison N. Henderson
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

Plaintiff-Appellant Inter Tribal Association of Arizona, Inc. is represented by:

Susan B. Montgomery
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com

ii

**Defendants-Appellees' Counsel**

Defendants-Appellees Brooke L. Rollins, U.S. Forest Service, and Neil Bosworth are represented by:

Adam R.F. Gustafson
Acting Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

Ezekiel Peterson
Attorney, Appellate Section
U.S. Department of Justice,
Environment & Natural Resources Division
999 18th St, North Terrace, Suite 600
Denver, CO 80212
(303) 844-1348
ezekiel.a.peterson@usdoj.gov

Erika Norman
Angela Ellis
Trial Attorneys
Natural Resources Section
150 M St. NE, Third Floor
Washington, D.C. 20002
(202) 305-0475 (Norman)
Erika.Norman@usdoj.gov
Angela.Ellis@usdoj.gov

**Intervenor-Defendants-Appellees' Counsel:**

Intervenor-Defendant-Appellee Resolution Copper Mining Co. is represented by:

Christopher D. Thomas
Andrea J. Driggs
Janet M. Howe
Benjamin A. Longbottom
HOLLAND & HART LLP
3110 North Central Ave., Suite D-160
Phoenix, Arizona 85012
(602) 316-9334

iii

CDThomas@hollandhart.com

Michael R. Huston
Diane M. Johnsen
Samantha J. Burke
Addison W. Bennett
PERKINS COIE LLP
2525 East Camelback Road, Suite 500
Phoenix, Arizona 85016
(602) 351-8000
MHuston@perkinscoie.com
DJohnsen@perkinscoie.com
SBurke@perkinscoie.com
ABennett@perkinscoie.com

## EXISTENCE AND NATURE OF EMERGENCY

Unless enjoined by this Court, on August 19, 2025, as early as 12:01 am eastern time, Defendants-Appellees U.S. Forest Service will transfer title and convey 2,422 acres of federal public land ("Federal Lands") to Resolution Copper Mining Co. ("Resolution") (a joint venture of two foreign mining companies). The district court's current injunction against the land transfer, still in place despite the court's denial of Plaintiffs' preliminary injunction motion, expires at the end of Monday, August 18. 1-ER-98, n. 30. The transfer is part of a land exchange ("Exchange") between the Forest Service and Resolution and would facilitate Resolution's proposal for one of the world's largest copper mines.

Plaintiffs-Appellants request that the federal government be immediately enjoined from conveying any right, title, or interest in the Federal Lands to Resolution.

The Federal Lands to be immediately privatized are generally known as "Oak Flat." The Oak Flat area is a place of profound religious, cultural, and historic significance to the San Carlos Apache Tribe and other Indian tribes, nations, and communities in Arizona. Apache People call Oak Flat "Chich'il Bildagoteel," or "a Flat with Acorn Trees" and it lies at the heart of T'iis Tseban Country, which is associated with at least eight Apache clans, and two Western Apache bands, the Pinal Band and the Aravaipa Band.

Because of its importance to the Apache Tribe and other tribes, nations and communities, Oak Flat is included in the National Register of Historic Places as a "Traditional Cultural Property" under Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470 et seq., and it meets the criteria to be identified as a "sacred site" within the meaning of Executive Order 13007, Indian Sacred Sites, May 24, 1996, 61 Fed. Reg. 26771, the American Indian Religious Freedom Act, 42 U.S.C. § 1996, et. seq., and related laws, regulations and policies.

Oak Flat "is a site of great spiritual value" to Tribes in the region. *Apache Stronghold v. United States*, 101 F. 4th 1036, 1044 (9th Cir. 2024)(en banc). "Once the land is transferred, the Western Apaches will suffer immediate, irreparable harm." *Apache Stronghold v. United States*, No. 21-15295, 2021 WL 12295173, *5 (9th Cir. Mar. 5, 2021) (Bumatay, J., dissenting).[1]

---

[1] In a related case, an organization of traditional Apaches, Apache Stronghold, sought to enjoin the government's transfer of Oak Flat, based on religious freedom grounds

Oak Flat is also recognized for its beauty and importance to outdoor enthusiasts, including members of Plaintiff groups who value it for outdoor recreation and as a place of unique biological diversity. Oak Flat attracts rock-climbers from around the country as it contains numerous large boulders and outcrops. Sitting at an approximate elevation of 4,200 to 4,600 feet above sea level, Oak Flat is a cool respite for the many travelers and visitors from Phoenix and elsewhere, who recreate at Oak Flat. Wildlife cameras have documented a wide variety of wildlife at Oak Flat, including mountain lion, bear, and coatimundi. Nearby lands provide important wildlife habitat for Federally listed endangered and threatened species such as the southwestern willow flycatcher, yellow billed-cuckoo, Gila chub, Arizona hedgehog cactus, and ocelot. Over 170 bird species have been documented at Oak Flat.

**The district court found that Plaintiffs would be immediately and irreparably harmed by the land transfer and privatization of these invaluable**

---

(those claims are not at issue in this case). The initial injunction was denied, with Judge Bumatay in dissent. This court agreed to hear the case en banc, and in a 6-5 decision, denied that injunction request on March 1, 2024 (as amended on May 14, 2024). *Apache Stronghold*, 101 F. 4th 1036. After that, Judge Logan of the Arizona district court in that case issued a preliminary injunction blocking the Exchange pending the Supreme Court's certiorari review. *Apache Stronghold v. United States*, CV-21-00050-PHX-SPL, 2025 WL 1360694 (May 9, 2025). In a split decision, the Supreme Court denied certiorari. 2025 WL 1496472 (May 27, 2025). Apache Stronghold has requested the Court to reconsider that denial. **Notably, none of the Judges or Justices in that case, have ever denied that irreparable harm would result from the privatization, or that the balance of hardship/public interest did not tip sharply in favor of the plaintiffs.** The sole debated issue in that case, to date, has been focused on the religious freedom claims, which are not at issue here.

**public lands**. 1-ER-93-95. Although the court denied plaintiffs' motion on other grounds, as shown below, the court, and the underlying agency actions, committed serious legal and factual errors which warrant, at a minimum on an emergency basis, this Court's authority to enjoin the lands title transfer.

Unless this Court immediately enjoins the title transfer and Exchange, public access to Oak Flat will be eliminated, Resolution will obtain the 2,422 acres in fee simple, and would be free to exclude the public and conduct operations, exempt from federal public land and environmental laws—immediately and irreparably harming Plaintiffs and their members.

## WHY THE MOTION COULD NOT BE FILED EARLIER

Plaintiffs could not file this Motion sooner because the district court's decision denying Plaintiffs' motion for preliminary injunction was just issued in the mid-afternoon on August 15, 2025 (1-ER-6). As required by F.R.A.P. 8(a)(1), at the conclusion of the court's hearing on the motion on August 6, 2025, Plaintiffs informed the court that they would seek emergency relief at the Circuit court to block the Exchange, and requested that, if the court denied the motion, it issue an injunction pending appeal. 1-ER-98. The district court's August 15 order denied that request, thus necessitating this Emergency Motion. *Id*. Even though plaintiffs had not filed a written motion for stay pending appeal (because the decision had yet to be issued), the district court stated that "it would deny a request for an injunction pending appeal even if such a request were properly before it." *Id*.

## NOTIFICATION AND SERVICE OF COUNSEL FOR PARTIES

At the August 6, 2025 hearing, Plaintiffs informed the district court, and counsel for all parties, that Plaintiffs would file this Emergency Motion if the court denied their request for an injunction. In addition, upon review of the district court's decision, Plaintiffs notified, via email, counsel for the Federal Defendants and Resolution that it had appealed and intended to file this Emergency Motion.

Pursuant to Rule 27-3, immediately after their Notice of Appeal was docketed in this case, Plaintiffs contacted this Court's emergency motions unit via email (emergency@ca9.uscourts.gov) and telephone (415.355.8020), informing that office that this Emergency Motion would be filed as soon as possible—further stressing the fact that the government could effectuate the land title transfer and Exchange after August 18, 2025.

Plaintiffs will immediately send copies of this Motion by email to all parties after it is filed.

## THE DISTRICT COURT DENIED PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL

As required by F.R.A.P. 8(a)(1), at the conclusion of the court's hearing on the motion on August 6, 2025, Plaintiffs informed the court that they would seek emergency relief at the Circuit court to block the Exchange, and requested that, if the court denied the motion, it issue an injunction pending appeal. 1-ER-98. The district court's order denied that request, thus necessitating this Emergency Motion. *Id*. Even

though plaintiffs had not filed a written motion for stay pending appeal (because the decision had yet to be issued), the district court stated that "it would deny a request for an injunction pending appeal even if such a request were properly before it." *Id.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to F.R.A.P. 26.1, Plaintiffs-Appellants Arizona Mining Reform Coalition, Inter Tribal Association of Arizona, Inc., Center for Biological Diversity, Earthworks, the Access Fund, and the Sierra Club have no parent companies, no subsidiaries or subordinate companies, and no affiliate companies that have issued shares to the public.

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

TABLE OF ACRONYMS ........................................................................ vi

STANDARDS FOR PRELIMINARY RELIEF ............................................. 2

I.    **The Privatization of Public Lands Will Result in Irreparable Harm.** . 3

II.    **Plaintiffs Are Likely to Succeed on the Merits** ...................................... 4

A.    **The Appraisal Determinations and Approvals Violate the NDAA** ...... 4

1.    The Secretary of Agriculture's Approval of the Appraisals Violates §3003, Forest Service Appraisal Regulations, and Federal Appraisal Standards ................................................................. 5

    *a.*    *Resolution's mining claims do not render the federal minerals valueless.* ........................................................... 6

    *b.*    *The MCZ appraisal failed to include its mineral values, as the federal rules and standards required* .................................. 7

    *c.*    *The MCZ appraisal arbitrarily assumed that its "highest and best use" was **not** for mining, when that's exactly its intended use.* ............... 10

    *d.*    *The MCZ appraisal failed to treat the exchange of the lands and minerals as a private-lands transaction, as required by the appraisal standards.* ........................................................ 11

B.    **The FEIS Violates NEPA and the NDAA** ............................................. 12

1.    The FEIS Failed to Properly Analyze the Project's Impacts to Water ....... 13

2.    The Forest Service Failed to Meaningfully Consider Comments from Other Agencies ......................................................... 15

3.  The Agency Failed to Consider, and Require, Sufficient
    Mitigation Measures ................................................... 16

**III.   Balance of Hardships and Public Interest Tip Sharply in
         Plaintiffs' Favor** ............................................. 17

**CONCLUSION** ...................................................... 20

## Exhibit List for Emergency Motion

1.  Index Volume

2.  Excerpts of Record, Vol. 1.

3.  Excerpts of Record, Vol. 2.

4.  Excerpts of Record, Vol. 3.

5.  Excerpts of Record, Vol. 4.

6.  Excerpts of Record, Vol. 5

xi

# <u>TABLE OF AUTHORITIES</u>

### *Federal Caselaw*

*Apache Stronghold v. United States*,
145 S. Ct. 1480 (2025) .......................................................... 3

*Apache Stronghold v. United States,*
101 F. 4th 1036 (9th Cir. 2023) ............................................ 1, 5, 12

*Apache Stronghold v. United States,*
CV-21-0050-PHX-SPL, 2025 WL 1360694
(D. Az. May 9, 2025) ................................................... 3, 4, 18, 19, 20

*Apache Stronghold v. United States*,
No. 21-15295, 2021 WL 12295173 (9th Cir. Mar. 5, 2021) ................... 3, 4, 18

*Ctr. for Biol. Div. v. U.S. FWS*,
33 F.4th 1202 (9th Cir. 2022) ............................................. 7

*Desert Citizens Against Pollution v. Bisson*,
231 F.3d 1172 (9th Cir. 2000) ............................................ 11

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) ............................................. 3

*Flathead-Lolo-Bitterroot Citizen Task Force v. Mont.*,
98 F.4th 1180 (9th Cir. 2024) ............................................ 3

*Great Basin Res. Watch v. BLM*,
844 F.3d 1095 (9th Cir. 2016) .................................... 13, 15, 17, 18

*Great Basin Mine Watch v. Hankins*,
456 F.3d 955 (9th Cir. 2006) ............................................ 14

*Idaho v. Coeur D'Alene Tribe*,
794 F.3d 1039 (9th Cir. 2015) .......................................... 19

*Idaho Sporting Cong. V. Rittenhouse,*
305 F.3d 957 (9th Cir. 2002) ........................................... 12

*Kettle Range Consv. Group v. U.S. BLM,*
150 F.3d 1083 (9th Cir. 1998) ........................................................ 20

*League of Wilderness Defs. V. Connaughton,*
752 F.3d 755 (9th Cir. 2014) .......................................................... 18

*Nat'l Parks & Cons. Ass'n v. BLM,*
606 F.3d 1058 (9th Cir. 2010) ........................................................ 11

*Nken v. Holder,*
556 U.S. 418 (2009).......................................................................... 17

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.,*
668 F.3d 1067 (9th Cir. 2011) ........................................................ 12

*Restore the N. Woods v. U.S. Dep't of Agric.,*
968 F. Supp. 168 (D. Vt. 1997) ......................................................... 9

*Seven County Infrastructure Coalition v. Eagle County,*
145 S.Ct. 1497 (2025) ............................................................... 13, 14

*Shoshone-Bannock Tribes v. Daniel-Davis,*
CV-20-00553-BLW, WL 2744123
(D. Idaho March 31, 2023) ............................................................. 11

*Silva v. Lynn*,
482 F.2d 1282 (1st Cir. 1973) ........................................................ 16

*U.S. v. Locke*,
471 U.S. 84 (1985) ............................................................................. 7

*United States v. Oakland Cannabis Buyers' Co-op*.,
532 U.S. 487 (2001) ........................................................................ 20

*Winter v. Natural Resources Defense Council*,
555 U.S. 7 (2008) ............................................................................... 3

## Federal Statutes

16 U.S.C. §539p, Section 3003 of the National Defense Authorization
Act for Fiscal Year 2015 ("NDAA") ......................................... *passim*

1872 Mining Law,
30 U.S.C. §21-54 ............................................................................ 7

National Environmental Policy Act ("NEPA"),
42 U.S.C. §§ 4321 *et seq.* ......................................................... *passim*

### Federal Regulations

36 C.F.R. Part 254......................................................... 5, 8, 9, 10, 11

### Other Authorities

Oversight and Legislative Hearing Before the Subcommittee on Energy and Mineral Resources, Committee on Natural Resources, U.S. House of Representatives, 113th Congress, 1st Session, Serial No. 113-7 (March 21, 2013). ................................ 9

Congressional Budget Office Cost Estimate, H.R. 687 Southeast Arizona Land Exchange and Conservation Act of 2013 (*As ordered reported by the House Committee on Natural Resources on May 15, 2013*) (July 11, 2013). ............... 9

U.S. House of Representatives Report No. 113-167, Southeast Arizona Land Exchange and Conservation Act of 2013 (July 22, 2013)
................................................................................................. 9

## TABLE OF ACRONYMS

| | |
|---|---|
| AF | Acre-foot (325,851 gallons of water) |
| AMRC | Arizona Mining Reform Coalition |
| ASLD | Arizona State Lands Department |
| BLM | Bureau of Land Management |
| FEIS | Final Environmental Impact Statement |
| GPO | General (Mining) Plan of Operations |
| ITAA | Inter Tribal Association of Arizona, Inc. |
| MCZ | Mining Claim Zone (appraised) |
| MWA | Mineral Withdrawal Area (appraised) |
| NDAA | Section 3003 of the National Defense Authorization Act for Fiscal Year 2015. 16 U.S.C. §539p |
| NEPA | National Environmental Policy Act, 42 U.S.C. §§4321 et seq. |
| UAS | Uniform Standards of Professional Appraisal Practice |
| UASFLA | Uniform Appraisal Standards for Federal Land Acquisitions |

Plaintiffs-Appellants, Arizona Mining Reform Coalition ("AMRC"), *et al.*, submit this Emergency Motion for Stay Pending Appeal to enjoin the title transfer and land exchange that would transfer 2,422 acres of federal public lands to Resolution Copper Mining ("Resolution") (a joint venture of two foreign mining companies), pursuant to Section 3003 of the National Defense Authorization Act for Fiscal Year 2015 ("NDAA"). 16 U.S.C. §539p (the "Exchange"). The government intends to effectuate the Exchange and transfer title as soon as 12:01 eastern time on August 19, 2025. On August 15, 2025, the district court denied AMRC's motion for preliminary injunction and for stay pending appeal. Order, 1-ER-6-99.

The Exchange would privatize Oak Flat and adjacent public lands and remove all federal protections for the public resources at the site, causing immediate and irreparable harm to Plaintiffs. Oak Flat "is a site of great spiritual value" to Tribes in the region. *Apache Stronghold v. U.S.*, 101 F. 4th 1036, 1044 (9th Cir. 2024) (en banc). The lands also contain important public water, wildlife, and recreational values. The Exchange's purpose is to facilitate Resolution's proposed Mine, which would pump and dewater massive amounts of groundwater, deplete surface waters, and completely obliterate sacred land, Oak Flat. *See generally id*. at 1047–48.

Plaintiffs are likely to prevail on the merits. While *Apache Stronghold* concerned religious freedom claims, Plaintiffs' claims here focus on the legal errors contained in the required appraisals and the Final Environmental Impact Statement ("FEIS"), pursuant to the NDAA, federal appraisal standards and regulations, the National Environmental Policy Act ("NEPA"), and Forest Service regulations. At the very least, Plaintiffs have raised serious questions on the merits, and the current injunction, which ends on August 19 (1-ER 98 n. 30), should remain in place to allow the Court to rule on the full case prior to the pending drastic change of the *status quo*.

Section 3003 of the NDAA requires the federal and non-federal lands to be independently appraised, "and the value of the exchanged land equalized as set forth in the statute." *Apache Stronghold*, 101 F. 4th at 1046. This "equal value" mandate

1

must be demonstrated by appraisals conducted pursuant to strict standards. 16 U.S.C. §539p(c)(4)(B). However, the appraisal for the 1,655-acre "Mining Claim Zone" ("MCZ") parcel, which overlies the vast majority of the copper ore body, arbitrarily **zeroed-out the mineral value.** Even though Resolution estimates there are 35 billion pounds of copper beneath this parcel, which it maintains is worth tens of billions of dollars, the appraisal erroneously values the mineral estate of this parcel as zero. The appraisal for the MCZ parcel violates the agency's own appraisal regulations, as well as the federal appraisal standards—all of which Congress specifically said must be met before the Exchange could proceed.

Plaintiffs are also likely to prevail on their NEPA claims. In the new FEIS (the agency rescinded the initial FEIS in 2021), despite the massive amount of water required by the Mine, the agency truncated its review of the serious adverse effects that the pumping and mine dewatering will have on already stressed aquifers and surface waters and failed to consider the full cumulative impacts of this pumping along with other projects within the same area, affecting the same aquifers. In doing so, the agency failed to respond to the substantial criticisms leveled at the FEIS by "cooperating agencies" including the Bureau of Land Management ("BLM"). Lastly, the agency failed to review and impose measures to mitigate the devastating impacts caused by the Exchange and Mine.

Lastly, although Judge Lanza found that the balance of hardships and public interest did not tip sharply towards Plaintiffs, this contradicts the findings of the other federal judges that have reviewed the Exchange, who found that any temporary delay would not meaningfully harm the company, while the privatization would severely harm the Plaintiffs and the public.

## STANDARDS FOR PRELIMINARY RELIEF

To obtain preliminary relief, a Plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction

is in the public interest." *Winter v. Nat. Res. Defense Council*, 555 U.S. 7, 20 (2008). A court evaluates these factors on a sliding scale, as a stronger showing of one element may offset a weaker showing of another. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (en banc). When the balance of equities tips sharply in the plaintiff's favor, a plaintiff must raise only "serious questions" on the merits, which is a lesser showing than likelihood of success. *Id*. "Serious questions" are ones that cannot be resolved at this stage because they require a more deliberative review. *Flathead-Lolo-Bitterroot Citizen Task Force v. Mont.*, 98 F.4th 1180, 1192 (9th Cir. 2024).

## I.     <u>The Privatization of Public Lands Will Result in Irreparable Harm.</u>

Barring an injunction, the Government will transfer the 2,422 acres of public land to Resolution on August 19, 2025, resulting in immediate, irreparable harm to Plaintiffs. 1-ER-94-95. Judge Lanza found—as did Judge Logan, Judge Bumatay, and Justice Gorsuch—that Plaintiffs "have sufficiently established the second preliminary-injunction factor (a likelihood of irreparably injury in the absence of injunctive relief)." 1-ER-11; *Apache Stronghold*, 2025 WL 1360694, at *6; *Apache Stronghold v. United States*, No. 21-15295, 2021 WL 12295173, *5 (9th Cir. Mar. 5, 2021) (Bumatay, J., dissenting); *Apache Stronghold v. United States*, 145 S. Ct. 1480, 1480–82 (2025). "[E]very day that Oak Flat remains intact is another day that members of the Tribe can use the land in its current, unspoiled form for religious purposes and ceremonies. Thus, even a temporary delay may, for example, allow another Sunrise Ceremony to take place."1-ER-36 (citing 145 S. Ct. at 1480–82). "[O]nce the transfer is complete, Oak Flat will become private property no longer subject to federal law or Forest Service management, which 'gives Resolution power to exclude Apache Stronghold's members from Oak Flat and to restrict the timing and location of religious ceremonies that regularly take place at Oak Flat ….'" *Apache Stronghold*, 2025 WL 1360694, at *6.

Without an injunction, these long-cherished national forest lands will become the property of a mining company that seeks to construct a massive mine that "will permanently destroy the Apache's historical place of worship, preventing them from ever again engaging in religious exercise at Oak Flat." 1-ER-7. In addition to the profound immediate loss of access for cultural and spiritual purposes for members of Plaintiff Inter Tribal Association of Arizona ("ITAA"), the Exchange will also immediately and permanently eliminate the legal ability of other Plaintiff groups' members to continue accessing and using these lands for hiking, rock climbing, appreciating and viewing wildlife, plants, and waters on these lands, camping, and other recreational and aesthetic purposes. 1-ER-93; 3-ER-373–408 (Decls. of Dadgar, Featherstone, McSpadden, Murdock, and Bahr).

While Resolution may argue that it will allow, at its sole discretion, some access to the newly private lands, including the 50-acre Oak Flat campground, for some period of time, Judge Lanza joined Judge Logan, Judge Bumatay, and Justice Gorsuch again, recognizing that these arguments are unavailing. 1-ER-93–95; *Apache Stronghold*, 2025 WL 1360694, at *6; *Apache Stronghold*, 2021 WL 12295173, *5. As Judge Bumatay found, this leaves the Apaches "dependent on the good grace of a private copper-mining venture for any access to their sacred religious site" and "on closer scrutiny, this guarantee of access appears to be a hollow promise," *Apache Stronghold*, 2021 WL 12295173, *5. That "does not appear to be legally enforceable" and "is a small fraction of overall area to be exchanged." 1-ER-94.

To prevent the immediate and irreparable loss of public land uses and values, this Court should maintain the status quo by enjoining the imminent Exchange until Plaintiffs' appeal can be heard and resolved.

## II.     Plaintiffs Are Likely to Succeed on the Merits.

## A.     The Appraisal Determinations and Approvals Violate the NDAA.

The Exchange cannot occur without the agency's compliance with the strict appraisal, "equal value" and other standards regarding the value of the lands and

4

minerals to be traded. "The land exchange is subject to certain conditions," including appraisal and equalization requirements. *Apache Stronghold v. U.S.*, 101 F.4th at 1046. Section 3003 sets forth mandatory provisions governing the appraisals for the federal and non-federal lands to be exchanged. The Exchange can occur only after "the final appraised values of the Federal land and non-federal land are determined and approved by the Secretary." 16 U.S.C. §539p(c)(4)(B)(ii).

Section 3003 requires the appraisals to be conducted in compliance with the Forest Service's appraisal regulations, 36 C.F.R. §254.9. 16 U.S.C. §539p(c)(4)(A). The appraisals must also be conducted "in accordance with nationally recognized appraisal standards, including (I) the Uniform Appraisal Standards for Federal Land Acquisitions; and (II) the Uniform Standards of Professional Appraisal Practice." *Id*. §539p(c)(4)(B). The appraisals "shall include a detailed income capitalization approach analysis of the market value of the Federal land which may be utilized, as appropriate, to determine the value of the Federal land." *Id*. §539p(c)(4)(C).

"The value of the Federal land and non-Federal land to be exchanged under this section shall be equal or shall be equalized in accordance with this paragraph." *Id*. §539p(c)(5)(A). *See also* 16 U.S.C. §539p(c)(5)(B)(i) ("If the final appraised value of the Federal lands exceeds the value of the non-federal land, Resolution Copper shall – (I) convey additional non-Federal land in the State to the Secretary").

1.  The Secretary of Agriculture's Approval of the Appraisals Violates §3003, Forest Service Appraisal Regulations, and Federal Appraisal Standards.

Defendants failed to comply with the mandatory appraisal and equal value requirements in four ways. First, the appraisal of the MCZ parcel, which overlies the vast majority of the copper ore body, erroneously assumed that the value of the estimated 35 billion pounds of copper is zero, simply because Resolution has filed mining claims on these federal lands—misunderstanding federal mining, appraisal, and public land law. Second, the MCZ appraisal contradicts the Forest Service's appraisal regulations, which require that in calculating market value, all values of the

5

exchanged lands must be factored in, including minerals. In fact, that was exactly what the agency told Congress it must do. Third, the MCZ appraisal erroneously determined that the "highest and best use" of those lands (as required by the appraisal rules) was merely for "surface land use in support of a mining operation." This is despite the fact that the clear intended use of the MCZ is for extracting its copper and other minerals. Lastly, the MCZ appraisal violates the appraisal regulations and standards by failing to treat the Exchange as a private-lands transaction, and not as if the lands were still federal (and thus subject to Resolution's mining claims).

The Forest Service prepared two appraisals for the federal lands to be exchanged, one covering the 766-acre "Mineral Withdrawal Area" ("MWA") parcel, 4-ER-568, and the other covering the 1,655-acre MCZ parcel. 4-ER-553 (Agency Appraisal Summaries). While the appraisal for the MWA parcel included an estimated value of the 5.33 billion pounds of copper under the surface 4-ER-580, the appraisal for the MCZ parcel arbitrarily failed to include **any** value for the estimated 35 billion pounds of copper, valuing the entire 1,655-acre parcel at less than $2 million. 4-ER-565.

a.    *Resolution's mining claims do not render the federal minerals valueless.*

At the outset, the MCZ appraisal is based on the erroneous assumption that the value of the 35 billion pounds of copper on these federal lands is zero, simply because Resolution has filed unpatented mining claims on these lands. Because of these claims, the appraiser believed that the government did not own its own mineral estate: "the Federal Property is encumbered by mining claims held by a party other than the United States; said mining claims confer all rights to locatable minerals to that party in accordance with the Mining Law and **are not part of the estate owned by the United States**." 4-ER-556 (emph. added).

The appraiser's assumption contradicts longstanding Supreme Court precedent. Although Resolution has filed mining claims on these lands, the United States undisputedly still owns the mineral estate (as well as the surface estate). While

6

owners of unpatented mining claims hold possessory interests in their claims, these interests are a "unique form of property." *U.S. v. Locke*, 471 U.S. 84, 104 (1985). "The United States, as owner of the underlying fee title to the public domain, maintains broad powers over the terms and conditions upon which the public lands can be used, leased, and acquired." *Id*. Accordingly, as shown below, the mineral values should have been included in the MCZ appraisal.

b. *The MCZ appraisal failed to include its mineral values, as the federal rules and standards required.*

In upholding the MCZ appraisal's refusal to account for the mineral values on public land, the district court's, and Defendants', sole argument is that Resolution's mining claims eliminate any consideration of these mineral values. 1-ER-25-31. This contradicts §3003, the agency's statements to Congress, and ignores the federal appraisal standards and rules. As the court noted, under the 1872 Mining Law (30 U.S.C. §§21-54), Resolution's claims allow it the ability to propose mining, subject to government regulation. That is undisputed. But the court and Defendants then go further, asserting that Resolution has discovered a "valuable mineral deposit" of copper on its claims, which if proven, creates rights to mine. ER 24. But no evidence is provided to support that assertion of "rights" under the Mining Law, based simply on the filing of claims and Resolution's assertions of value.

The court summarized caselaw holding that mining claims are a "unique form of property." But more recent, and controlling, Ninth Circuit precedent has confirmed that the mere filing of mining claims provides no right to mine, absent verified evidence that each claim satisfies the strict economic test for validity. "A 'valuable mineral deposit' is 'mineral that can be extracted, removed and marketed at a profit.' … In the absence of a discovery of a valuable mineral deposit, Section 22 [of the Mining Law] gives a miner no right to occupy the claim beyond the temporary occupancy necessary for exploration." *Ctr. for Biol. Div. v. U.S. FWS*, 33 F.4th 1202, 1209 (9th Cir. 2022) (citations omitted) ("*Rosemont*" mine decision). In that case, the

7

court rejected the Forest Service's approval of a large copper mine because neither the agency nor the claimant provided the necessary evidence that each claim was valid (i.e., the revenues expected from mining each claim must well-exceed the operational costs).

Plaintiffs do not dispute that Resolution could have gone forward with its mine plan on the still-federal MCZ parcel, and upon proving that its mining claims were valid, as it must under *Rosemont*, rely on its rights under the Mining Law. Yet it chose not to do that. Instead, it opted for the exchange route, which eliminates federal authority. This choice was advantageous to Resolution, as it eliminates federal public land and environmental laws—which place significant controls on mining proposals.

But the company cannot have it both ways—relying on its current federal lands mining claims to assert a "right to mine," yet also take advantage of its future ownership of the parcels as private fee simple, free from federal authority. As shown below, and under the mandated federal appraisal standards and regulations, for purposes of the appraisals the MCZ parcel is no longer treated as being on federal land (and subject to the mining claims), but rather as a private parcel, whose **future** "highest and best use" is what is appraised—not the current pre-Exchange situation. Thus, contrary to the district court, it is not "absurd" that the minerals on this future private land must be valued, 1-ER-28, for that is what the open market would require.

Thus, even if Resolution could show that all of its mining claims are valid, that does not mean that the appraisal can simply ignore the mineral values. Forest Service appraisal regulations require that in estimating market value, **all** values of the exchanged lands must be factored in, including minerals. 36 C.F.R. §254.9(b). Market value "means the most probable price in cash, or terms equivalent to cash, which lands **or interest in lands** should bring in a competitive and open market under all conditions requisite to a fair sale." 36 C.F.R. §254.2 (emph. added).

The appraiser must "consider the contributory value of any interest in land such as water rights, **minerals**, or timber, to the extent they are consistent with the highest

8

and best use of the property." 36 C.F.R. §254.9(b)(1)(iv) (emph. added). The current status of the federal lands (whether covered by mining claims or not) is not determinative, because the appraiser must calculate the value of the lands and interests "as if in private ownership and available for sale in the open market." 36 C.F.R. §254.9(b)(1)(ii). All interests and values must be ascertained. *Restore the North Woods v. U.S. Dept. of Agric.*, 968 F. Supp. 168, 174, n. 4 (D. Vt. 1997) ("appraisal must include 'historic, wildlife, recreation, wilderness, scenic, cultural, or other resource values or amenities as reflected in prices paid for similar properties in the competitive market.' 36 C.F.R. §254.9(b)(1)(iii).").

The district court brushed-off the numerous sworn statements from high-ranking agency officials and congressional findings, that the minerals on both federal parcels must be accounted for. 1-ER-29-34. In the congressional debate over what became §3003, the Forest Service testified that the appraisals of both the MWA and MCZ parcels *must* include the value of the minerals. "The Bill calls for an equal value exchange in section 4(e). If the value of Federal land (**including the ore body**) to be conveyed exceeds the value of the parcels to be acquired, the Bill would allow for a cash equalization payment by Resolution…." 4-ER-660 (Statement of Assoc. Chief U.S. Forest Serv. Wagner) (emph. added). *See also id*. 4-ER-672. The Congressional Budget Office ("CBO"), tasked with analyzing the financial aspects of the Exchange, agreed. "Those appraisals would determine the relative values of the properties affected by the exchange, **including the value of mineral deposits that underlie the federal land**." 4-ER-716-17 (emph. added).

The House Report on the bill that would become §3003, further stressed the need for the appraisals of the two federal parcels to calculate the mineral values. "The bill's effect on offsetting receipts would depend on the outcome of formal appraisals of the federal and private properties that would be conducted after enactment. Those appraisals would determine the relative values of the properties affected by the exchange, **including the value of mineral deposits that underlie the federal land**."

9

H.R. Rep No. 113-167 (2013), at 22 (emph. added), 4-ER-739.

This mandate also helps implement subsection (e), which requires that if the mine produces more mineral value than originally calculated in the appraisals "prepared under subsection (c)(4)(C), Resolution Copper shall pay to the United States … a value adjustment payment for the quantity of excess production at the same rate assumed for the income capitalization approach analysis prepared under subsection (c)(4)(C)." §539p(e)(2).

In other words, for the public to be adequately compensated for future mineral production, the mineral values must be appraised/calculated in the first place, in order to gauge whether there was a difference in values after the mine began operations. But under the district court's and Defendants' view, the mineral values in the MCZ need not be appraised at all—rendering congressional mandates in subsection (e) meaningless. Section 3003 directly ties together the future payments in subsection (e) to the mineral values in the initial appraisals: "The appraisal prepared under this paragraph … shall be the basis for calculation of any payment under subsection (e)." §539p(c)(4)(C).

c.  *The MCZ appraisal arbitrarily assumed that its "highest and best use" was **not** for mining, when that's exactly its intended use.*

The appraiser also failed to correctly determine the "highest and best use" of the MCZ parcel, which is defined as "the most probable and legal use of a property." 36 C.F.R. §254.9(b)(1)(i); *id.* §254.2. For the MWA parcel, the appraiser correctly determined that the highest and best use is the "exploration and development of a mineral resource as a portion of the Resolution Copper deposit." 4-ER-577. Yet for the adjacent MCZ parcel, even though it overlies the very same deposit and Resolution is acquiring it for the very same purpose, the appraiser arbitrarily determined that the "highest and best use" of this parcel is **not** to develop the mineral deposit, but rather merely for "surface land use in support of a mining operation." MCZ summary at 9, 4-ER-562. Resolution, however, has no intention of using these

10

lands for surface facilities, as these lands would be mined.

This Circuit has invalidated land exchanges that low-ball the appraised value by ignoring the likely future use. That was the case in *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1180–84 (9th Cir. 2000). More recently, in rejecting the agency's appraisal of federal land to be used for mining, the court held that "one private party's 'proposed use of a parcel of property is certainly relevant to showing a market demand for that use.'" *Shoshone-Bannock Tribes v. Daniel-Davis*, No. 4:20-cv-00553-BLW, 2023 WL 2744123, at *9 (D. Idaho Mar. 31, 2023) (stayed while on appeal, 2023 WL 5345102) *quoting Desert Citizens*. *See also Nat'l Parks & Cons. Ass'n v. BLM,* 606 F.3d 1058, 1069 (9th Cir. 2010) (agency failed to consider company's intended use of exchanged land as "highest and best use").

d.     *The MCZ appraisal failed to treat the exchange of the lands and minerals as a private-lands transaction, as required by the appraisal standards.*

The MCZ appraisal further violates the agency appraisal regulations at 36 C.F.R. §254.9 and "the Uniform Appraisal Standards for Federal Land Acquisitions ["UASFLA"]" as mandated by §539p(c)(4)(B). These rules require that the appraisals treat the lands and minerals as a private-lands transaction on the open market, not as if the lands were still federal or influenced by mining claims. "The federal land is appraised as if in private ownership, to its highest and best use." 36 C.F.R. §254.9(b). "When appraising the federal land portion of the exchange, the regulations require that the appraiser 'estimate the value of the lands and interests as if in private ownership and available for sale in the open market.'" UASFLA at 53 (citations omitted), 5-ER-810.

But the appraisal of the MCZ parcel was based on the pre-Exchange situation, ignoring the mineral values based on the mere fact that Resolution had filed mining claims. After the Exchange, Resolution will own the lands and minerals in fee simple, and the previous situation regarding mining claims will be irrelevant. The focus on the pre-Exchange status violated the federal standards, where "the appraiser must

11

avoid estimating a property-specific investment value to a particular owner instead of developing an opinion of the market value of the property if it were placed for sale on the open market." UASFLA at 47, 5-ER-804. But that is what the MCZ appraisal did—ignoring the fact that, if this was a private transaction between Resolution and another buyer, it would certainly include the mineral values.

The agency's full appraisal for the MWA parcel recognized that appraisals of the currently federal land must be calculated as if in private ownership, without consideration of its current status as federal land. "[F]or the purposes of this Report, the Subject [parcel] is considered fee simple ownership, as though it is in private ownership, is freely alienable, and zoned consistently with other similarly situated non-Federal properties." "Real Property Appraisal Report." 4-ER-597.

It defies logic to assume that if Resolution were to offer these same lands for sale on the open market after the Exchange, it would assert that the 35 billion pounds of copper are worthless. Thus, until the appraisals and agency decision-making satisfy the NDAA requirements, the Exchange cannot legally proceed.

## B.    The FEIS Violates NEPA and the NDAA.

Congress conditioned the Exchange on the Forest Service's compliance with NEPA for both the review and approval of the Exchange, as well as for the Mine. "Except as otherwise provided in this section, the Secretary shall carry out the land exchange in accordance with the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.)." 16 U.S.C. §539p(c)(9); *see also Apache Stronghold*, 101 F. 4th at 1131.

"NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011). NEPA requires agencies to take a "hard look" at the environmental consequences of proposed actions, including direct, indirect, and cumulative impacts to all potentially affected resources. *Idaho Sporting*

*Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002); 42 U.S.C. §4332(2)(C). NEPA also requires that the FEIS fully analyze mitigation measures as part of the NEPA process—not in some future decision shielded from public review. *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1107 (9th Cir. 2016). The guiding principle for judicial review "inherent in NEPA … is a 'rule of reason.'" *Seven County Infrastructure Coalition v. Eagle County*, 145 S.Ct. 1497, 1513 (2025) (citations omitted). The FEIS fails this "reasonableness" test on numerous grounds.

1.    The FEIS Failed to Properly Analyze the Project's Impacts to Water.

Once constructed, the Mine will pump massive amounts of groundwater from its "Desert Wellfield" that will fully deplete (use) at least 544,000 acre-feet ("AF") of "fresh groundwater" from the East Salt River Valley, just outside Phoenix. 2-ER-230. However, the Forest Service refused to analyze the Mine's cumulative pumping impacts along with the pumping impacts for the 275-square mile Superstition Vistas mega development that is also being built on Arizona State Trust Land in the same proximity as the Desert Wellfield and which will rely on the same limited groundwater resources as the Mine. 2-ER-223. Instead, the agency unreasonably limited its substantive analysis and modeling of the water related cumulative impacts of the development visa-a-vis the Mine to only a small portion of the development (the DH Horton subdivision, 2-ER-227-228).

Judge Lanza rejected Plaintiffs' arguments related to agency's failure to consider Superstition's cumulative impacts, concluding that it was sufficient under NEPA for the agency to analyze the future growth in the Superstition Vistas development "conceptually," 1-ER-50, and because the FEIS contained "extensive analysis regarding water-use issues" including, in the court's view, "water modeling related to the anticipated water use associated with Desert Wellfield and Superstition Vistas." *Id*. But the court afforded the agency unwarranted deference, as the agency's predictive judgments were not supported in the record. 1-ER-50-51 (citing *Seven County Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497, 1512-13

13

(2025). These conclusions were in error.

First, while the FEIS does consider water use issues related to the Superstition development generally, *see, e.g.*, 2-ER-223-228, the agency's water modeling did not include the full anticipated water uses or demands associated with Superstition Vistas. To the contrary, the agency admits that it did not model or perform any quantitative analysis of the water related cumulative impact of the Superstition development alongside Desert Wellfield pumping because the Forest Service rejected these water demands in its initial screening as "speculative." 2-ER-223.

Second, while deference to an agency may be appropriate when an agency makes various "scientific judgments," *Seven County*, 145 S. Ct. at 1512, deference is not appropriate here, where the agency wholly refused to include the potential water demands for all but a small portion of the Superstition development in its quantitative modeling of cumulative impacts because it erroneously concluded "the development plans are conceptual and lack adequate detail to allow substantial analysis of resource effects and thus normally would be considered speculative, not reasonably foreseeable." 2-ER-223. *See also* 2-ER-228.

Here, the Superstition development is in no way "conceptual" since homes have already been built and sold in portions of the development. More importantly, the technical water demands for the development have already been calculated – in great detail, 3-ER-409-547, and these calculations could have easily been used by the agency to model the water demands of the full Superstition development in the FEIS, meaning they were in no way "speculative." For example, Superstition's residential development is planned to use 185 gallons per capita [person] per day, for roughly 27,370 single-family residential units, and water demands are also calculated for the 2,394 acres of non-residential uses (e.g., commercial, other). 3-ER-448.

This Court has rejected EISs for mining projects that fail to provide a "quantified assessment of their [other projects] combined environmental impacts," and "objective quantification of the impacts" from other existing and proposed

14

operations in the region. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 972 (9th Cir. 2006); *see also Great Basin Resource Watch v. BLM*, 844 F.3d 1095, 1105 (9th Cir. 2016)(FEIS failed to "quantify or discuss in any detail the effects of other activities").

The impacts from the Desert Wellfield pumping are directly connected to and cumulative of the groundwater pumping needed for the Superstition Vistas project. Seven County did not eliminate the agency's duty to analyze "any reasonably foreseeable adverse environmental effect which cannot be avoided should the proposal be implemented." 42 U.S.C. §4332(2)(C)(ii). Thus, the court erred in concluding that the agency complied with NEPA by conducting a "qualitative" discussion of Superstition's impacts.

2.    The Forest Service Failed to Meaningfully Consider Comments from Other Agencies.

Judge Lanza also erroneously rejected Plaintiffs' contention that the agency failed to consider the full scope of criticisms of the FEIS submitted by the Bureau of Land Management ("BLM") and the Arizona State Land Department ("ASLD"), 1-ER-52-55, both of which are cooperating agencies. 2-ER-188. The BLM's detailed comments on the water and related hydrology aspects of the original 2021 FEIS, which were expressly requested by the Forest Service, go to the heart of the FEIS issues and almost entirely support the concerns raised by Plaintiffs throughout the NEPA process. (BLM Review of Hydrology Aspects of the Resolution Copper Project, June 13, 2022)("BLM Hydrology Review"), 2-ER-155-180.  Nevertheless, the language of the FEIS **fails to even acknowledge the existence of this critically important BLM Report** or to explain, in reference to the BLM, why it apparently determined to reject much of the analysis set forth in the report.

Judge Lanza dismissed Plaintiffs' concerns regarding the BLM, noting the 2025 FEIS "directly acknowledges and addresses many of those concerns, even if it does not specifically identify the BLM report as the source." 1-ER-52. Judge Lanza

15

also gives substantial deference to the agency under *Seven County*, observing that "in a project of this magnitude, it will always be possible to identify some argument, raised by some stakeholder, that could have been analyzed in more detail in the FEIS." 1-ER-53. But here, the BLM is not merely a "stakeholder," it is a cooperating agency, whose Report, prepared by a team of BLM hydrologists, 2-ER-155, was requested by the agency itself. The agency's "hide the ball" response to the BLM—if it can be considered a response at all—cannot be considered "in good faith" or "reasoned analysis," *Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973), where the FEIS fails to acknowledge the existence of the Report or the criticisms set forth in the Report, leaving the Plaintiffs' and members of the public guessing on such substantive matters, like water impacts.[1] This violates the fundamental "hard look" requirements of NEPA.

With regard to the ASLD's comments, while the FEIS examined a number of concerns raised by the ASLD related to water, it wholly ignored the socioeconomic impacts, particularly regarding the impacts to revenue needed by the State Trust stemming from the Mine's pumping at Superstition Vistas: "…the extraction and transportation of groundwater out of the SVPA [Superstition Vistas Planning Area] greatly compromises the ability to develop these lands to their full planned potential, and as a result, reduces the income and value of the Trust." 2-ER-234. ASLD also warned that the water impacts limit the total developable lands at Superstition Vistas: "the loss of 3,440 acres of developable State Trust land represents a minimum potential loss to the Trust of at least $536,640,000 in revenue." 2-ER-233. These socio-economic concerns were completely ignored by the agency, violating NEPA.

3.  <u>The Agency Failed to Consider, and Require, Sufficient Mitigation Measures</u>.

The Forest Service also failed to fully analyze potential mitigation measures in

---

[1] Defendants have recently informed the court and the parties of a memorandum contained in the project record that purportedly addresses the BLM Report, 1-ER-52–53 n. 13, yet this memorandum has not been made publicly available, leaving Plaintiffs and the public unable to review its contents.

the FEIS, especially regarding the groundwater pumping and transport via the proposed pipelines. Pointing to the deference required by *Seven County*, Judge Lanza also erroneously rejected Plaintiffs' contention that the agency failed to disclose or analyze important mitigation measures in the FEIS related to Mine. 1-ER-55. But an FEIS must fully analyze mitigation measures as part of the NEPA process. *See, e.g., Great Basin Resource Watch v. BLM*, 844 F.3d 1095, 1107 (9th Cir. 2016)(FEIS must fully analyze mitigation measures as part of the NEPA and FLPMA process).

Here, for example, the agency acknowledges Desert Wellfield pumping will cause regional groundwater declines that will adversely impact individual wells throughout region, meaning "infrastructure costs would increase as wells and pumps need to be lowered or replaced." 2-ER-227. Further, "there likely would be certain areas that experience lack of well capacity and groundwater shortages, particularly around the edges of the basin." *Id*.

Yet, the FEIS failed to analyze or require any mitigation measures to compensate for these impacts, including wells that would need to be deepened or would go dry as a result of the pumping. The FEIS deferred this analysis to future state permitting. 2-ER-231, 2-ER-235. But under NEPA and FLPMA, the Forest Service cannot defer the analysis of impacts and mitigation measures to the future. *Great Basin Resource Watch*, 844 F.3d at 1103–04 (EIS could not rely on future state permitting as substitute for the environmental review requirements). This is especially true here, as a "single" EIS must analyze all impacts. 16 U.S.C. §539p(c)(9)(B). These failures in the FEIS are therefore not entitled to deference under *Seven County*, and the court erred in concluding otherwise.

## III.    Balance of Hardships and Public Interest Tip Sharply in Plaintiffs' Favor.

The "balance of equities" and "public interest" factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). In consideration of these factors, Plaintiffs emphasize two initial points. First, there is no dispute the Exchange will result in immediate, irreparable harm to Plaintiffs, as

Judge Lanza recognized. Second, throughout the litigation over this Exchange, three separate judges have now considered the balance of harms and public interest, with two finding that the balance tips sharply in the Plaintiffs/Tribes' favor, and Judge Lanza now finding that the balance tips toward Defendants.

First, in addressing Apache Stronghold's similar emergency motion for an injunction pending appeal in 2021, only Judge Bumatay considered these two factors, and he found that "[t]he balance of the equities and the public interest 'tip sharply' in Apache Stronghold's favor." *Apache Stronghold v. United States*, 2021 WL 12295173, *18 (9th Cir., March 5, 2021) (Bumatay, J., dissenting) (citations omitted). Similarly, in addressing a subsequent motion for an injunction pending appeal in the district court, Judge Logan held that "[t]he obvious conclusion" was "that the balance of equities indeed 'tips sharply' in Plaintiff's favor." *Apache Stronghold v. United States*, 2025 WL 1360694, *8 (D. Ariz., May 9, 2025). This is unsurprising, as courts generally conclude that immediate, irreparable harm, such as what Plaintiffs will face, far outweighs the sort of temporary, economic harm an injunction pending appeal would cause to Defendants and Resolution. *See e.g., League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) ("the balance of equities tips toward the . . . plaintiffs, because the harms they face are permanent, while the intervenors face temporary delay.").

As explained above, the privatization of the 2,422 acres of currently federal public land at Oak Flat will immediately and irreparably harm Plaintiffs and their members. "There is no doubt that an array of equities and public-interest considerations favor Plaintiffs." 1-ER-96.

On the other hand, the Government will suffer little hardship if a stay is issued. *Apache Stronghold*, 2021 WL 12295173, *19 (Bumatay, J.). While the Government will likely emphasize the nation's need for copper, this interest would "not be lost because of an injunction, but merely delayed." *Apache Stronghold*, 2025 WL 1360694, *8. Indeed, with or without the requested injunction, the Mine remains

18

years away—if it occurs at all. Additionally, Resolution has made no commitment or assurance whatsoever that any copper from this Mine would be processed or remain in the United States.

Resolution, for its part, will focus on temporary economic harm, which is generally not considered irreparable. *Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015). As Judge Logan recognized, "while an injunction will likely prevent Resolution Copper from beginning its work for a limited time, as Plaintiff points out, it will ultimately "not stop Resolution from mining a single ounce of copper should the transfer ultimately be upheld." *Apache Stronghold*, 2025 WL 1360694 at *8 (citations omitted).

Although Judge Lanza focused on the "national security" implications of fostering copper production, any short delay while this appeal progresses has nothing to do with domestic copper production. 1-ER-96. Indeed, Resolution has no stated plans to actually process or sell the copper in this country, simply stating that smelting/processing will occur "off-site." FEIS at ES-7, 2-ER-190.

In finding that the balance does not tip sharply towards Plaintiffs, Judge Lanza weighed heavily that Congress directed this Exchange in 2014. 1-ER-96–97, citing *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 487, 497 (2001). But Congress did not simply order the Exchange in the NDAA. In consideration of the public interest, Congress imposed significant conditions that must occur *prior* to the Exchange, including Tribal consultation, detailed appraisals subject to strict standards, fair-market value of the lands to be exchanged, preparation of an FEIS and compliance with NEPA, and extra consideration of the impacts on cultural and archaeological resources. 16 U.S.C. § 539p(c). Thus, not only did Congress require these pre-requisites, which form the heart of Plaintiffs' claims, it explicitly required them as part of its balancing of interests.

As Judge Logan noted in *Apache Stronghold*, the court considers the potential "error costs on each side" in balancing the interests and public interest. *Apache*

19

*Stronghold*, 2025 WL 1360694 at *8. "In the most harmful scenario to Plaintiff, if this Court denies the injunction, . . . and Plaintiff ultimately wins on the merits, Plaintiff will have already suffered some or all of its enumerated immediate harms, even despite winning the day in this litigation." *Id.* "Yet in the riskiest scenario for Defendants, . . . the only harm will have been a delay of the land transfer for a number of months or (at most) a couple years." *Id.* Relatedly, if Plaintiffs' motion is denied, but Plaintiffs ultimately prevail, it will become difficult to later reverse the Exchange, as once the lands are transferred, and undergo modifications, "it might become impracticable to attempt to unscramble the eggs." *Kettle Range Consv. Group v. U.S. BLM,* 150 F.3d 1083, 1087 (9th Cir. 1998) (per curiam).

Lastly, this Court has set an expeditious briefing schedule on Plaintiffs appeal, concluding by the end of October. DktEntry 2.1. Thus, any potential hardship to Resolution pending review of this appeal is short-lived at best.

## **CONCLUSION**

Plaintiffs-Appellants are entitled to a preliminary injunction having satisfied the *Winters* test and ask that this Court enjoin the impending Exchange.

Respectfully submitted August 16, 2025.

*/s/ Roger Flynn*
Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539

20

mfink@biologicaldiversity.org

Allison N. Henderson
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs*

/s/ Susan Montgomery
Susan B. Montgomery (AZ Bar # 020595)
Robyn L. Interpreter (AZ Bar # 020864)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorneys for the ITAA*

## STATEMENT OF RELATED CASES

The San Carlos Apache Tribe has filed a related case challenging the government's actions here, the FEIS and proposed Exchange, and had similarly filed a motion for preliminary injunction. As with Plaintiffs-Appellants AMRC et al, the district court denied the Tribe's motion. *See San Carlos Apache Tribe v. U.S. Forest Service*, Civ. No. 21-cv-0068-PHX-DWL (D. Ariz.). The Tribe has also appealed the district court's denial of their injunction motion. Appeal # 25-5189.

Further, the case brought by Apache Stronghold, challenging the Exchange, is still before this Court. *See Apache Stronghold v. U.S.*, 101 F. 4th 1036 (9th Cir. 2024).

Date: August 16, 2025            *s/ Roger Flynn*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2025, I electronically filed the foregoing, along with the Excerpts of Record (ER) with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system. In addition, I emailed the foregoing, along with the ER, to opposing counsel of record.

*s/ Roger Flynn*

No. 25-5185

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION
OF ARIZONA, INC.; CENTER FOR BIOLOGICAL DIVERSITY;
EARTHWORKS; THE ACCESS FUND; and SIERRA CLUB.

*Plaintiffs-Appellants*,

v.

BROOKE L. ROLLINS, U.S. SECRETARY OF AGRICULTURE; UNITED
STATES FOREST SERVICE; and NEIL BOSWORTH, SUPERVISOR OF THE
TONTO NATIONAL FOREST.

*Defendants-Appellees*,

and

RESOLUTION COPPER MINING, LLC

*Intervenor-Defendant-Appellee.*

_____

On Appeal from the United States District
Court for the District of Arizona
(District Judge Dominic W. Lanza)

_____

**PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD
INDEX VOLUME**
*In Support of*
***PLAINTIFFS-APPELLANTS' EMERGENCY MOTION UNDER
CIRCUIT RULE 27-3
RELIEF REQUESTED BY AUGUST 18, 2025, AS THE LAND TITLE
TRANSFER WILL OCCUR ON AUGUST 19, 2025***

Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
mfink@biologicaldiversity.org

Allison N. Henderson
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs-Appellants*

Susan B. Montgomery
Robyn L. Interpreter
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorneys for the Inter Tribal Association of Arizona, Inc.*

**INDEX**

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| **Volume 1 of 5 [99 pages]** | | | |
| Order (August 15, 2025) | 8/15/2025 | 99 | 6-99 |
| **Volume 2 of 5 [268 pages]** | | | |
| Federal Defendants' Memo in Support of Summary Judgment, *CBD v. USFS*, Case No. 23-cv-00928 (DLF) (D.D.C., August 22, 2024) | 8/4/2025 | 97-1 | 105-154 |
| BLM Review of Hydrology Aspects of the Resolution Copper Project | 7/14/2025 | 87-1 | 155-180 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, June 2025 | 7/14/2025 | 87-2 | 181-275 |
| Draft Record of Decision, June 2025 | 7/14/2025 | 87-3 | 276-367 |
| **Volume 3 of 5 [180 pages]** | | | |
| Declaration of Maria Dadgar | 7/14/2025 | 87-5 | 373-380 |
| Declaration of Roger Featherstone | 7/14/2025 | 87-6 | 381-387 |

| | | | |
|---|---|---|---|
| Declaration of Russ McSpadden | 7/14/2025 | 87-7 | 388-399 |
| Declaration of Erik Murdock | 7/14/2025 | 87-8 | 400-403 |
| Declaration of Sandra Bahr | 7/14/2025 | 87-9 | 404-408 |
| Master Water Plan for Superstition Vistas, Apache Junction, Arizona | 7/14/2025 | 87-10 | 409-547 |
| **Volume 4 of 5 [195 pages]** | | | |
| Appraisal Report Summary: Mining Claim Zone MCZ Parcel | 7/14/2025 | 87-11 | 553-567 |
| Appraisal Report Summary: Mineral Withdrawal Area (MWA) Parcel | 7/14/2025 | 87-12 | 568-595 |
| Technical Appraisal Review Report: MWA Parcel (excerpts) | 7/14/2025 | 87-13 | 596-598 |
| Oversight and Legislative Hearing Before the U.S. House of Representatives Subcommittee on Energy & Mineral Resources, March 2013 | 7/14/2025 | 87-14 | 599-715 |
| Congressional Budget Office Cost Estimate, July 2013 | 7/14/2025 | 87-15 | 716-717 |

| | | | |
|---|---|---|---|
| House Natural Resources Committee House Report No. 113-167, July 2013 | 7/14/2025 | 87-16 | 718-742 |
| **Volume 5 of 5 [296 pages]** | | | |
| Uniform Appraisal Standards for Federal Land Acquisitions | 7/14/2025 | 87-17 | 748-1009 |
| Excerpt from Resolution Copper Mining's General Plan of Operations, 2016 | 7/14/2025 | 87-18 | 1010 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, January 2021 (rescinded) | 7/14/2025 | 87-19 | 1011-1013 |
| USDA Memo for Withdrawal of Notice of Availability, Rescind Final Environmental Impact Statement and Draft Record of Decision | 3/2/2021 | 26-2 | 1014 |
| Notice of Appeal | 8/15/2025 | 100 | 1015-1020 |
| Civil Docket for Case No. 2:21-cv-00122-DWL – United States District Court, District of Arizona (Phoenix) – *Arizona Mining Reform Coalition, et al. v. United States Forest Service, et al.* | | | 1021-1038 |

No. 25-5185

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION
OF ARIZONA, INC.; CENTER FOR BIOLOGICAL DIVERSITY;
EARTHWORKS; THE ACCESS FUND; and SIERRA CLUB.

*Plaintiffs-Appellants*,

v.

BROOKE L. ROLLINS, U.S. SECRETARY OF AGRICULTURE; UNITED
STATES FOREST SERVICE; and NEIL BOSWORTH, SUPERVISOR OF THE
TONTO NATIONAL FOREST.

*Defendants-Appellees*,

and

RESOLUTION COPPER MINING, LLC

*Intervenor-Defendant-Appellee.*

_____

On Appeal from the United States District
Court for the District of Arizona
(District Judge Dominic W. Lanza)
_____

**PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD
VOLUME 1 of 5**
*In Support of*
**PLAINTIFFS-APPELLANTS' EMERGENCY MOTION UNDER
CIRCUIT RULE 27-3
RELIEF REQUESTED BY AUGUST 18, 2025, AS THE LAND TITLE
TRANSFER WILL OCCUR ON AUGUST 19, 2025**

Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
mfink@biologicaldiversity.org

Allison N. Henderson
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs-Appellants*

Susan B. Montgomery
Robyn L. Interpreter
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorneys for the Inter Tribal Association of Arizona, Inc.*

**INDEX**

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| **Volume 1 of 5 [99 pages]** | | | |
| Order (August 15, 2025) | 8/15/2025 | 99 | 6-99 |
| **Volume 2 of 5 [268 pages]** | | | |
| Federal Defendants' Memo in Support of Summary Judgment, *CBD v. USFS*, Case No. 23-cv-00928 (DLF) (D.D.C., August 22, 2024) | 8/4/2025 | 97-1 | 105-154 |
| BLM Review of Hydrology Aspects of the Resolution Copper Project | 7/14/2025 | 87-1 | 155-180 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, June 2025 | 7/14/2025 | 87-2 | 181-275 |
| Draft Record of Decision, June 2025 | 7/14/2025 | 87-3 | 276-367 |
| **Volume 3 of 5 [180 pages]** | | | |
| Declaration of Maria Dadgar | 7/14/2025 | 87-5 | 373-380 |
| Declaration of Roger Featherstone | 7/14/2025 | 87-6 | 381-387 |

| | | | |
|---|---|---|---|
| Declaration of Russ McSpadden | 7/14/2025 | 87-7 | 388-399 |
| Declaration of Erik Murdock | 7/14/2025 | 87-8 | 400-403 |
| Declaration of Sandra Bahr | 7/14/2025 | 87-9 | 404-408 |
| Master Water Plan for Superstition Vistas, Apache Junction, Arizona | 7/14/2025 | 87-10 | 409-547 |
| **Volume 4 of 5 [195 pages]** | | | |
| Appraisal Report Summary: Mining Claim Zone MCZ Parcel | 7/14/2025 | 87-11 | 553-567 |
| Appraisal Report Summary: Mineral Withdrawal Area (MWA) Parcel | 7/14/2025 | 87-12 | 568-595 |
| Technical Appraisal Review Report: MWA Parcel (excerpts) | 7/14/2025 | 87-13 | 596-598 |
| Oversight and Legislative Hearing Before the U.S. House of Representatives Subcommittee on Energy & Mineral Resources, March 2013 | 7/14/2025 | 87-14 | 599-715 |
| Congressional Budget Office Cost Estimate, July 2013 | 7/14/2025 | 87-15 | 716-717 |

| | | | |
|---|---|---|---|
| House Natural Resources Committee House Report No. 113-167, July 2013 | 7/14/2025 | 87-16 | 718-742 |
| **Volume 5 of 5 [296 pages]** | | | |
| Uniform Appraisal Standards for Federal Land Acquisitions | 7/14/2025 | 87-17 | 748-1009 |
| Excerpt from Resolution Copper Mining's General Plan of Operations, 2016 | 7/14/2025 | 87-18 | 1010 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, January 2021 (rescinded) | 7/14/2025 | 87-19 | 1011-1013 |
| USDA Memo for Withdrawal of Notice of Availability, Rescind Final Environmental Impact Statement and Draft Record of Decision | 3/2/2021 | 26-2 | 1014 |
| Notice of Appeal | 8/15/2025 | 100 | 1015-1020 |
| Civil Docket for Case No. 2:21-cv-00122-DWL – United States District Court, District of Arizona (Phoenix) – *Arizona Mining Reform Coalition, et al. v. United States Forest Service, et al.* | | | 1021-1038 |

1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    San Carlos Apache Tribe,                    No. CV-21-00068-PHX-DWL

10                Plaintiff,                       **ORDER**

11   v.

12   United States Forest Service, et al.,

13                Defendants.

14

15   Arizona Mining Reform Coalition, et al.,     No. CV-21-00122-PHX-DWL

16                Plaintiffs,                      **ORDER**

17   v.

18   United States Forest Service, et al.,

19                Defendants.

20

21                              **INTRODUCTION**

22           This order addresses the sometimes overlapping motions for preliminary injunction

23   filed in two cases: (1) *San Carlos Apache Tribe v. United States Forest Service et al.*, No.

24   21-cv-68-PHX-DWL (hereinafter, "*San Carlos*"), and (2) *Arizona Mining Reform*

25   *Coalition v. United States Forest Service et al.*, No. 21-cv-122-PHX-DWL (hereinafter,

26   "*AMRC*"). Each motion seeks an injunction to block a land exchange, now scheduled to

27   occur on August 19, 2025, that Congress authorized over a decade ago, as part of the

28   National Defense Authorization Act for Fiscal Year 2015 ("NDAA").

             More specifically, § 3003 of the NDAA, known as the Southeast Arizona Land

Exchange and Conservation Act ("SALECA"), authorizes the exchange of 2,422 acres of federal land in the Tonto National Forest for land held by a private company, Resolution Copper ("Resolution Copper"). *See also* 16 U.S.C. § 539p(a) ("The purpose of this section is to authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States."). The federal land to be transferred to Resolution Copper includes an Apache ceremonial ground called *Chí'chil Biłdagoteel*. That area, known in English as Oak Flat, "is a site of great spiritual value to the Western Apache Indians, who believe that it is indispensable to their religious worship," but "also sits atop the world's third-largest deposit of copper ore." *Apache Stronghold v. United States*, 101 F.4th 1036, 1044 (9th Cir. 2024) (en banc). Congress's intent in authorizing the land exchange was "[t]o take advantage of that deposit" by enabling Resolution Copper to "mine the ore." *Id.*

Congress weighed considerable tradeoffs when deciding whether to approve the land exchange. On the one hand, the contemplated mining activity is expected to produce significant economic benefits in Arizona, as "the mine is projected to directly employ 1,434 workers . . . [and] increase the average annual economic value added in Arizona by about $1.2 billion." (*San Carlos*, Doc. 105-9 at 31-32.) Additionally, and perhaps more important, the mine is also expected to promote America's national security interests, by ensuring domestic access to a mineral that is essential to energy distribution, generation, and storage.

On the other hand, it is difficult to overstate just how profoundly the land exchange will undermine the ability of members of the San Carlos Apache Tribe ("the Tribe") to practice their religion. Put simply, the mining techniques that will be used to extract the copper will "turn Oak Flat into a massive hole in the ground. . . . It is undisputed that the government's plan will permanently destroy the Apaches' historical place of worship, preventing them from ever again engaging in religious exercise at Oak Flat." *Apache Stronghold v. United States*, 145 S. Ct. 1480, 1480 (2025) (Gorsuch, J., dissenting from the denial of certiorari) (cleaned up). "[T]he government's plan will effectively end Apache religious existence as we know it. Even the government has acknowledged that the

destruction of Oak Flat will inflict indescribable hardship on the Apaches." *Id.* at 1488 (cleaned up).

The contemplated mining activity also has the potential to cause potentially devastating environmental effects. For example, Resolution Copper's mining activity will generate massive quantities of toxic waste material, known as tailings, that will need to be pumped through miles of pipelines before reaching a tailings storage facility. "There is public apprehension over the creation, and type, of a tailings embankment for the tailings storage facility. The catastrophic collapse of [a] tailings dam in Brazil in January 2019, resulting in 259 confirmed fatalities with 11 people still missing, has heightened concerns." (*San Carlos*, Doc. 105-9 at 7.) "The consequences of a catastrophic failure and the downstream flow of tailings would include possible loss of life and limb, destruction of property, displacement of large downstream populations, disruption of the Arizona economy, contamination of soils and water, and risk to water supplies and key water infrastructure like the CAP [Central Arizona Project] canal." (*Id.* at 30.)

Additionally, the contemplated mining activity will require tremendous quantities of water, which is of particular concern in drought-stricken Arizona. (*Id.* at 7 ["Water use is a major concern among the public, other government agencies, and interested parties."].) "Over the mine life, 87,000 acre-feet of water would be pumped from the mine, and between 180,000 and 590,000 acre-feet of makeup water would be pumped from the Desert Wellfield in the East Salt River valley. . . . The wellfield pumping would incrementally contribute to the lowering of groundwater levels and cumulatively reduce overall groundwater availability in the area." (*Id.* at 28.) This water use may result in alarming long-term consequences. (*AMRC*, Doc. 93-1 at 169 ["[U]ltimately, long-term use of groundwater may become unsustainable . . . ."].)

Given these stark tradeoffs, it should come as no surprise that the land exchange has been the subject of intense opposition and an array of legal challenges. In 2019, several members of Congress attempted, unsuccessfully, to introduce legislation to overturn SALECA. (*San Carlos*, Doc. 105-9 at 7.) In 2021, when the land exchange appeared to

1   be imminent, three lawsuits (including these two lawsuits) were filed in the District of

2   Arizona seeking to enjoin it.  In the other lawsuit, a nonprofit organization alleged that the

3   land exchange would violate tribal members' rights under the First Amendment's Free

4   Exercise Clause, the Religious Freedom Restoration Act ("RFRA"), and an 1852 treaty

5   between the United States and the Tribe.  *Apache Stronghold v. United States et al.*, No.

6   21-cv-50-PHX-SPL (hereinafter, "*Apache Stronghold*").  The procedural history

7   surrounding *Apache Stronghold* is summarized in more detail in a previous order in this

8   case.  (*San Carlos*, Doc. 99 at 3-6.)  In a nutshell, the Ninth Circuit narrowly rejected the

9   plaintiff's claims in a 6-5 *en banc* decision issued in March 2024 and the Supreme Court

10  denied certiorari in May 2025, albeit only after relisting the matter for consideration more

11  than a dozen times and over the dissent of Justices Gorsuch and Thomas.

12        In light of those developments, the plaintiffs in these two actions have not advanced

13  any religion-based claims in their pending motions.  Instead, the claims underlying those

14  motions broadly fall into the following four categories:

15        1.   Appraisal Claims:   Under SALECA, the United States Forest Service

16  ("Forest Service") must perform an appraisal to calculate the value of the federal and non-

17  federal land to be exchanged.   16 U.S.C. § 539p(c)(4).   SALECA also creates an

18  "equalization process" providing that if the federal land is more valuable than the non-

19  federal land, Resolution Copper must make up the difference by conveying additional land

20  and/or "mak[ing] a cash payment." *Id.* § 539p(c)(5)(B)(i).  According to AMRC, the Forest

21  Service violated its appraisal-related duties under SALECA by failing to account for the

22  value of the copper deposits underlying one of the federal parcels to be exchanged, known

23  as the Mining Claim Zone ("MCZ") parcel—an omission that resulted in the Forest Service

24  "low-ball[ing] the appraised value" of that parcel by potentially billions of dollars. (*AMRC*,

25  Doc. 97 at 10.)

26        2.   NEPA Claims: SALECA provides that "[p]rior to conveying Federal land

27  under this section, the Secretary [of Agriculture] shall prepare a single environmental

28  impact statement under the National Environmental Policy Act of 1969 ['NEPA'], which

shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." 16 U.S.C. § 539p(c)(9)(B). On June 20, 2025, the Forest Service published its voluminous final environmental impact statement ("FEIS") related to the land exchange,[1] as well as its draft record of decision ("DROD"). In their motions, AMRC and the Tribe identify an array of perceived shortcomings and omissions in the FEIS, which they contend violate NEPA.

3. <u>Consultation Claims</u>: SALECA provides that "[t]he Secretary shall engage in government-to-government consultation with affected Indian tribes concerning issues of concern to the affected Indian tribes related to the land exchange." 16 U.S.C. § 539p(c)(3)(A). Additionally, under section 106 of the National Historic Preservation Act ("NHPA"), agencies "shall take into account the effect of an undertaking on any historic property" and afford the Advisory Council on Historic Preservation ("ACHP") "a reasonable opportunity to comment with regard to the undertaking." *Tohono O'odham Nation v. U.S. Dept. of the Interior*, 138 F.4th 1189, 1193 (9th Cir. 2025) (cleaned up). According to the Tribe, the Forest Service did not fulfill these consultation duties before publishing the FEIS.

4. <u>NFMA Claims</u>: The National Forest Management Act ("NFMA") includes a provision that requires the Forest Service to prepare a land and resource management plan for each national forest. 16 U.S.C. § 1604(a). Such a plan exists for the Tonto National Forest (the "Forest Plan") and was last amended in 2023. In the FEIS, the Forest Service acknowledges that some of the contemplated mining-related activities will occur within the Tonto National Forest and thus require an amendment of the Forest Plan (*San*

---

[1] "The FEIS consists of six volumes. It includes a nine-chapter, 1,000-page body and twenty-one appendices, which together span more than 2,500 pages. Over the course of nearly 400 pages in Appendix R, the FEIS responds to the more than 29,000 comments the agency received on the Draft EIS." (*San Carlos*, Doc. 114 at 4.)

1   *Carlos*, Doc. 105-9 at 11, 54), and the DROD proposes 16 amendments to the Forest Plan

2   that would be required for approving Skunk Camp as the preferred tailings storage facility

3   alternative (*AMRC*, Doc. 87-3 at 19-25).  According to AMRC, this approach violates

4   NFMA's forest planning regulations, which appear at 36 C.F.R. Part 219, because those

5   regulations require a public notice-and-comment process "which did not occur here" before

6   any forest plan may be amended.  (*AMRC*, Doc. 87 at 28.)

7        On August 6, 2025, the Court held a lengthy hearing to hear oral argument from the

8   parties.  Having given careful consideration to the parties' arguments, the Court now

9   concludes that Plaintiffs have not established a likelihood of success on any of their claims.

10  In all cases, this determination is based on an evaluation of the merits.  Additionally, in

11  some cases, this determination is also based on various jurisdictional and other threshold

12  issues identified by the Federal Defendants and Resolution Copper.

13       Moreover, even if the merits of some of Plaintiffs' claims could be said to satisfy

14  the lesser "serious questions" standard, the Court would still decline to issue injunctive

15  relief.  Although Plaintiffs have sufficiently established the second preliminary-injunction

16  factor (a likelihood of irreparable injury in the absence of injunctive relief), the remaining

17  factors (balance of hardships and public interest) present a mixed picture and thus do not

18  tip sharply in Plaintiffs' favor.  It is evident that Plaintiffs and their supporters profoundly

19  disagree with Congress's decision to authorize the land exchange, which may generate

20  significant economic and national security benefits but will also "effectively end Apache

21  religious existence as we know it" and pose significant environmental threats.

22  Nevertheless, in our system of government, the political branches are responsible for

23  weighing these sorts of competing objectives and determining how to balance them.  Here,

24  Congress chose to pursue the land exchange despite the existence of many significant

25  tradeoffs and the President chose to ratify Congress's choice by signing the law into effect.

26  As a result, the Court must accept that this choice advances the public interest and operate

27  from that premise.  *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497

28  (2001) ("[A] court sitting in equity cannot ignore the judgment of Congress, deliberately

expressed in legislation. . . . Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute.") (cleaned up). A NEPA lawsuit is not the proper forum for second-guessing the wisdom of Congress's decision to pursue the land exchange. *Seven County Infrastructure Coalition v. Eagle County, Colo.*, 145 S. Ct. 1497, 1511 (2025) ("Plaintiffs' policy objections to this 88-mile Utah railroad may or may not be persuasive. But . . . [t]he political process, and not NEPA, provides the appropriate forum in which to air policy disagreements.") (cleaned up).

### LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (cleaned up). *See also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (citation omitted); *Dymo Industries, Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964) ("The grant of a preliminary injunction is the exercise of a very far reaching power never to be indulged in except in a case clearly warranting it.").

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. However, "if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (cleaned up).[2] Additionally, when, as here, "a government agency is a party," "the final

---

[2] The existence of serious questions often turns on the presence of disputed factual issues. *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024) ("[P]arties do not show serious questions when they raise a merely plausible claim, nor can a district court forgo legal analysis just because it has not identified precedent that places the question beyond debate. This less demanding merits standard requires serious factual questions that need to be resolved in the case.") (cleaned up); *Alliance for the Wild Rockies*

1   two injunction factors—the balance of equities and the public interest—merge.”

2   *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024).

3       Regardless of which standard applies, the movant “carries the burden of proof on

4   each element of either test.” *Env’t. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016,

5   1027 (E.D. Cal. 2000).

6                                              **ANALYSIS**

7   I.    First *Winter* Factor

8       The analysis begins with the first *Winter* factor—whether Plaintiffs have shown a

9   likelihood of success on the merits. *Roe v. Critchfield*, 137 F.4th 912, 922 (9th Cir. 2025)

10  (“Likelihood of success on the merits is the most important *Winter* factor and is a threshold

11  inquiry.”) (cleaned up).

12      As noted, the Federal Defendants and Resolution Copper have, in addition to

13  addressing Plaintiffs’ arguments on the merits, identified various jurisdictional and other

14  threshold reasons why, in their view, Plaintiffs will not be able to succeed on their claims.

15  Those arguments also go to whether Plaintiffs have satisfied the first *Winter* factor. *See,*

16  *e.g.*, *LA Alliance for Human Rights v. Cnty. of Los Angeles*, 14 F.4th 947, 958 (9th Cir.

17  2021) (reversing preliminary injunction in part because “Plaintiffs have not made the

18  required ‘clear showing’ that any individual Plaintiff has standing to bring the . . . claim”);

19  *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020) (“At this preliminary injunction stage,

20  ─────────────────────────────────

21  *v. Petrick*, 68 F.4th 475, 497 (9th Cir. 2023) (“[L]ike many legal questions, the meaning of
    HFRA’s unambiguous provisions would not become clearer with at least some discovery

22  or a further hearing on the merits. There is no need for more deliberative investigation or
    development of the record to resolve the plain meaning of HFRA.”) (cleaned up).

23  However, the Ninth Circuit has indicated that unsettled and debatable legal issues may also
    qualify as serious questions. *See, e.g., hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180,

24  1184, 1195 (9th Cir. 2022) (identifying unresolved issue of statutory interpretation over
    the meaning of the term “without authorization” before concluding that “[a]t the very least,

25  . . . hiQ has raised a serious question as to this issue” and also noting that, during an earlier
    stage in the case, “we focused on whether hiQ had raised serious questions on the merits

26  of the factual *and legal* issues presented to us”) (emphasis added); *City of Tenakee Springs
    v. Clough*, 915 F.2d 1308, 1311 (9th Cir. 1990) (reversing denial of preliminary injunction

27  in part because the movants’ “interpretation of the language of the contract [was] not
    reasonable” and raised “at least a serious question as to its proper interpretation”);

28  *Adultworld Bookstore v. City of Fresno*, 758 F.2d 1348, 1351-52 (9th Cir. 1985) (reversing
    denial of preliminary injunction because “the question of the constitutionality of the Fresno
    ordinance presents a fair ground for litigation” and “at least a serious litigation question”).

1   Yazzie must make a clear showing of each element of standing . . . .") (cleaned up);

2   *Mitchell v. City of Cincinnati*, 2022 WL 4546852, *4 (6th Cir. 2022) ("[W]hether plaintiffs

3   had standing . . . is a component of the likelihood of success on the merits.").

4       A.    **Appraisal Claims**

5           1.    Threshold Issues

6               a.    **Standing/Redressability**

7       "[S]tanding is an essential and unchanging part of the case-or-controversy

8   requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

9   "[T]he irreducible constitutional minimum of standing contains three elements.  First, the

10  plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest

11  which is (a) concrete and particularized and (b) actual or imminent, not conjectural or

12  hypothetical.   Second, there must be a causal connection between the injury and the

13  conduct complained of—the injury has to be fairly traceable to the challenged action of the

14  defendant, and not the result of the independent action of some third party not before the

15  court.   Third, it must be likely, as opposed to merely speculative, that the injury will be

16  redressed by a favorable decision." *Id.* at 560-61 (cleaned up).

17      Focusing on the redressability element, Resolution Copper argues that Plaintiffs

18  lack Article III standing to pursue all of their claims because any asserted "injuries flowing

19  from conveyance of title . . . are not redressable through their claims here. . . .   Nothing in

20  [SALECA] grants the Forest Service the power to refuse to make the exchange based on

21  court challenges to the FEIS, the appraisals, or the consultations.   Even if Plaintiffs could

22  convince this Court that flaws in the FEIS, appraisals, or the consultations require

23  additional study or correction, Plaintiffs cannot show that the Forest Service 'could be

24  influenced' ultimately to do anything other than comply with its duty under the Act to

25  proceed with the land exchange." (*AMRC*, Doc. 94 at 14.)  Meanwhile, although it is not

26  clear whether the Federal Defendants also challenge AMRC's Article III standing with

27  respect to the appraisal claims,[3] the Federal Defendants argue that, at a minimum, "AMRC

28  _____

[3]       Although the Federal Defendants raise redressability arguments that are similar to
the redressability arguments raised by Resolution Copper, their brief suggests they only

1    lacks prudential standing to challenge the appraisal at all, because its alleged injuries

2    caused by the privatization of and eventual impacts to the federal lands fall outside the zone

3    of interests protected by [SALECA's] appraisal provisions."  (*AMRC*, Doc. 93 at 34.)

4         Even though, as explained in later portions of this order, Defendants' redressability

5    arguments present a closer call when applied to some of Plaintiffs' other claims, they are

6    unpersuasive in relation to AMRC's appraisal-related claims.  *Davis v. Fed. Election*

7    *Comm'n*, 554 U.S. 724, 734 (2008) ("Standing is not dispensed in gross.  Rather, a plaintiff

8    must demonstrate standing for each claim he seeks to press and for each form of relief that

9    is sought.") (cleaned up).  The starting point for the analysis is the Ninth Circuit's decision

10   in *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000).  There, "three

11   environmental organizations" sought to challenge a decision by the Bureau of Land

12   Management ("BLM") to enter into a land exchange, arguing that BLM relied "on an

13   outdated appraisal that undervalued the federal lands."  *Id.* at 1174.  The district court

14   denied the plaintiffs' request for a preliminary injunction on the ground that they lacked

15   standing but the Ninth Circuit "reversed . . . [and] remanded for entry of a preliminary

16   injunction setting aside this land exchange pending further proceedings in accordance with

17   this opinion."  *Id.* at 1188.

18        As an initial matter, the Ninth Circuit rejected the district court's determination that

19   the plaintiffs' appraisal-related arguments "only constituted an attack on the way federal

20   money is spent, making [their] injury indistinguishable from that of other taxpayers and

21   therefore insufficiently particularized to confer standing," concluding that "the present

22   challenge . . . is not merely a generalized allegation of federal revenue loss at taxpayers'

23   expense.  Rather, it is an effort by land users to ensure appropriate federal guardianship of

24   the public lands which they frequent.  If, by exchange, public lands are lost to those who

25   use and enjoy the land, they are certainly entitled under the APA to file suit to assure that

26

27   _____

     view those redressability arguments as applying to Plaintiffs' NEPA and NHPA claims.
28   (*AMRC*, Doc. 93 at 13 ["Plaintiffs' NEPA and NHPA claims also fail for want of standing
     because the injury that Plaintiffs trace to the land exchange is not redressable; the Forest
     Service has a non-discretionary obligation to transfer title."].)

no exchange takes place unless the governing federal statutes and regulations are followed, including the requirement that the land exchanged is properly valued by the agency." *Id.* at 1176-77. Turning to the issue of redressability, the defendants argued—similar to Defendants here—that a ruling in the plaintiffs' favor would not redress their injuries because "even if [plaintiffs] succeeded on the merits and BLM relied on a new appraisal," the land exchange would still eventually go forward and "the public lands would nevertheless be traded away." *Id.* at 1178. The Ninth Circuit disagreed, holding that it would "place[] an unreasonable burden" on the plaintiffs to be required to conclusively establish "that no subsequent exchange would take place" following a reappraisal. *Id.* Instead, the court held, it was enough for redressability purposes that "the transfer based on the current appraisal would not have taken place and [plaintiffs] members could have continued to use and enjoy the selected federal lands." *Id.* Finally, the Ninth Circuit also held that the plaintiffs fell within the zone of interests protected by the statute giving rise to their appraisal-related claims—there, the Federal Land Policy and Management Act ("FLPMA")—and thus had prudential standing. *Id.* at 1179-80. Among other things, the court emphasized that FLPMA is intended to protect various environmental values, which "policy encompasses [plaintiffs'] interest in seeking to invalidate an allegedly unlawful transfer of federal land that will deprive its members of their aesthetic and recreational interest in the land," and that FLPMA contains provisions that encourage judicial review of public land adjudication decisions. *Id.*

For the same reasons that the environmental organizations in *Desert Citizens* had Article III standing to challenge the appraisal underlying the land exchange they sought to enjoin, AMRC likely has Article III standing to challenge the Forest Service's appraisal of the MCZ parcel. Defendants' primary basis for seeking to distinguish *Desert Citizens* is that the land exchange in that case "was a discretionary administrative land exchange—not one ordered by Congress" and thus "it was possible that, if the plaintiff prevailed, the agency might change its mind and the federal land might not 'be traded away,'" which is "not possible here" because "[e]ven if the . . . appraisals were found to need revision . . .

there is no possibility that the Forest Service may 'decide' not to make the land exchange." (*AMRC*, Doc. 94 at 15, emphases omitted.)  But this is a distinction without a difference. If, hypothetically, the Court were to agree with the merits of AMRC's appraisal-related arguments and enjoin the land exchange pending a reappraisal, and if the Forest Service were to conclude following the reappraisal that the MCZ parcel is actually worth billions of dollars (as AMRC contends it should be valued), these developments might very well derail the land exchange.  True, the Forest Service would still be required to *attempt* to convey title to Resolution Copper at the conclusion of the reappraisal process, but Resolution Copper might then decline to *accept* title because doing so would require it, pursuant to the equalization process set forth in § 539p(c)(5), to write a multi-billion dollar check to the federal government to make up the difference in value between the federal and non-federal parcels.[4]  The bottom line is that correcting the alleged statutory violation (*i.e.*, the flawed appraisal) will create some possibility that the alleged injury-causing event (*i.e.*, the land exchange) will not occur.  *Save Bull Trout v. Williams*, 51 F.4th 1101, 1106-07 (9th Cir. 2022) (explaining that the "relaxed" requirement of redressability in a case involving an alleged procedural injury requires there to be "'some possibility' that the requested relief . . . will redress their alleged harms").

Turning to prudential standing, SALECA itself, which provides the basis for AMRC's appraisal-related claims, does not create a private right of action.  *Concerned Citizens & Retired Miners Coalition v. U.S. Forest Serv.*, 279 F. Supp. 3d 898, 942-43 (D. Ariz. 2017) (rejecting tribal plaintiff's claim "that the Forest Service violated § 3003 of the NDAA" in part because "the Tribe has not shown that this statute provides a cause of action for it").  Thus, AMRC must assert those claims via the Administrative Procedure Act ("APA").  "[A] person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be arguably within the

---

[4]     The FEIS acknowledges this point.  (*San Carlos*, Doc. 105-9 at 137 [FEIS page 92: "[E]ven though directed by Congress, the land exchange remains a discretionary decision on the part of Resolution Copper, which may or may not choose to undertake the exchange after receipt of the appraised value."].)

zone of interests to be protected or regulated by the statute that he says was violated." *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1166 (9th Cir. 2018) (citation omitted). "The purpose of this prudential standing requirement is to exclude those plaintiffs whose suits are more likely to frustrate rather than to further statutory objectives. The test is not meant to be especially demanding. The benefit of any doubt goes to the plaintiff. Still, the 'zone of interests' standard forecloses suit when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 797 (9th Cir. 2013) (cleaned up). *See also Bennett v. Spear*, 520 U.S. 154, 163 (1997) (characterizing the zone of interests in APA cases as "generous").

On the one hand, although AMRC unsurprisingly views *Desert Citizens* as establishing the existence of prudential standing here, there are differences between the underlying statutes in that case and in this one. There, the plaintiffs relied on FLPMA, which includes provisions that expressly call for the protection of scenic and environmental interests and expressly encourage judicial review. *Desert Citizens*, 231 F.3d at 1179. The Ninth Circuit concluded those provisions created a zone of interests that was capacious enough to encompass the environmental organizations' "interest in seeking to invalidate an allegedly unlawful transfer of federal land that will deprive its members of their aesthetic and recreational interest in the land." *Id.* SALECA, in contrast, has one and only one stated purpose, which is to facilitate the land exchange.[5] Additionally, although the Court disagrees with Defendants' contention (addressed in more detail in later portions of this order) that SALECA should be construed as evincing an intent to implicitly preclude any form of judicial review related to the land exchange, it does not explicitly encourage judicial review in the same manner as FLPMA.

On the other hand, one of the plaintiffs in *AMRC* is the Inter Tribal Association of Arizona, Inc. and SALECA has provisions that evince an intent to protect the interests of

---

[5]     16 U.S.C. § 539p(a) ("The purpose of this section is to authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States.").

affected Indian tribes.[6]  Although those provisions do not specifically state that affected Indian tribes have a protected interest in the appraisal and equalization portions of the statute, that was also the situation in *Desert Citizens*—the Ninth Circuit concluded the environmental organizations fell within the zone of interests created by FLPMA's equalization provisions by looking to other portions of the statute that were not expressly related to the equalization process.  Nor is *Desert Citizens* the only Ninth Circuit decision to conclude that environmental groups had prudential standing to challenge agency financial determinations.  *Nat'l Wildlife Fed. v. Burford*, 871 F.2d 849, 852-55 (9th Cir. 1989) (plaintiffs fell within the zone of interests of the Coal Leasing Act, and thus could challenge whether agency leases were made at fair market value, even though the challenged determination was purely economic).  More broadly, the zone-of-interests test is "generous," *Bennett*, 520 U.S. at 163, and "not . . . especially demanding."  *Wild Fish Conservancy*, 730 F.3d at 797.  *See also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) ("[W]e have often conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff . . . .") (cleaned up).  Given those principles, AMRC likely possesses prudential standing to pursue its appraisal-related claims, even if the case for prudential standing is not a slam dunk.

### b.    **Implicit Preclusion Of Judicial Review**

Defendants contend that SALECA should be construed as barring judicial review of the type of challenges Plaintiffs seek to advance here.  Resolution Copper emphasizes that (1) the text of SALECA only identifies four enumerated conditions to the land exchange and "the issues that Plaintiffs seek to litigate here are not among them"; (2) "the unambiguous statutory obligation to transfer title within 60 days of FEIS publication is irreconcilable with Plaintiffs' contention that conveyance of title must wait for judicial review of [their] various claims"; and (3) the only purpose of the FEIS, as explained in

---

[6]    *See, e.g.*, 16 U.S.C. § 539p(c)(3)(A)-(B) (requiring "government-to-government consultation with affected Indian tribes concerning issues of concern to the affected Indian tribes related to the land exchange" and corresponding efforts to "address the concerns of the affected Indian tribes").

§ 539(c)(9), is to guide future agency discretionary decisions related to the contemplated mining activity after the land exchange.  (*AMRC*, Doc. 94 at 9-14.)  Similarly, the Federal Defendants argue: "The practical effect of [the 60 day] statutory deadline is that title will necessarily be transferred before any judicial challenge to the FEIS could be resolved, or for that matter, before any Final ROD could issue.  Congress would have understood this when it enacted the Land Exchange Act. . . .  Aware that NEPA challenges are not resolved in a mere sixty days, Congress sought to ensure that the land exchange proceeded expeditiously.  Read together, subsections (c)(9) and (c)(10) evince Congress' intent to expedite the land exchange and to prevent an endless series of environmental reviews— and attendant judicial reviews—from frustrating that intent."  (*AMRC*, Doc. 93 at 19-20.)

These arguments lack merit.  Congress could have expressly precluded judicial review of claims related to the land exchange but declined to do so.  Defendants are thus left to argue that such intent should be inferred from various features of SALECA's text. But such intent is not to be inferred lightly: "A strong presumption exists that the actions of federal agencies are reviewable in federal court."  *KOLA, Inc. v. United States*, 882 F.2d 361, 363 (9th Cir. 1989).  As the Supreme Court has explained:

> We begin with the strong presumption that Congress intends judicial review of administrative action.  From the beginning our cases have established that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress. . . .  Congress ordinarily intends that there be judicial review, and . . . only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review.  This standard has been invoked time and again when considering whether the Secretary has discharged the heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review of his decision.

*Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670-72 (1986) (cleaned up).

The features of SALECA emphasized by Defendants are too ambiguous to overcome this strong presumption.  Although the compressed 60-day transfer deadline has certainly complicated the task of providing judicial review of Plaintiffs' challenges, it has

1  not rendered judicial review impossible.  As the Tribe persuasively argues in its reply:

2  "Congress certainly knew that NEPA and APA challenges are common and often lengthy.

3  If it wanted to eliminate any such challenges, Congress could have excluded the Project

4  from NEPA entirely.  Congress did the opposite by requiring an EIS consistent with NEPA

5  but subject to additional requirements.  In this context, a preferable interpretation of the

6  sixty-day timeframe is that it permits sufficient time for aggrieved parties to seek

7  preliminary relief . . . ."  (*San Carlos*, Doc. 119 at 10.)

8  <div align="center">**c.   Final Agency Action**</div>

9       The Federal Defendants contend that "[t]he Court lacks jurisdiction over Plaintiffs'

10  claims because neither the FEIS nor the Draft ROD is a final agency action."  (*AMRC*, Doc.

11  93 at 7, capitalization omitted.)  Likewise, Resolution Copper argues that "[o]nly agency

12  actions that are both discretionary and final are subject to APA review" and that "final

13  agency action . . . is absent here."  (*AMRC*, Doc. 94 at 6, 48, emphasis omitted.)

14       Although Defendants' "final agency action" arguments have more force when

15  applied to some of Plaintiffs' other claims, they are unpersuasive in relation to AMRC's

16  appraisal-related claims.  As background, under the APA, "the person claiming a right to

17  sue must identify some 'agency action' that affects him in the specified fashion" and "the

18  'agency action' in question must be 'final agency action.'"  *Lujan v. National Wildlife*

19  *Federation*, 497 U.S. 871, 882 (1990).  "The APA defines 'agency action' broadly to

20  include the whole or a part of an agency rule, order, license, sanction, relief, or the

21  equivalent or denial thereof, or failure to act.  This definition is meant to cover

22  comprehensively every manner in which an agency may exercise its power."  *Francisco*

23  *Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 575-76 (9th Cir. 2019) (cleaned up).

24  For purposes of AMRC's appraisal-related claims, the challenged conduct is the Forest

25  Service's appraisal of the MCZ parcel.  The Court has little trouble concluding that this

26  appraisal qualifies as "agency action."

27       To determine whether agency action is "final," courts in the Ninth Circuit apply the

28  two-part test from *Bennett v. Spear*, 520 U.S. 154 (1997): *first*, the action must "mark the

<div align="center">- 16 -</div>

consummation of the agency's decision-making process"; and *second*, the action must "determine rights or obligations or be one from which legal consequences will flow." *Envt'l Defense Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 867-68 (9th Cir. 2022) (cleaned up). "The law surrounding the APA's finality requirement is hardly crisp and our precedent lacks many self-implementing, bright-line rules, given the pragmatic and flexible nature of the inquiry as a whole." *MediNatura, Inc. v. Food & Drug Administration*, 998 F.3d 931, 938 (D.C. Cir. 2021) (cleaned up). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties. The court focuses on the practical and legal effects of the agency action: the finality element must be interpreted in a pragmatic and flexible manner." *Tohono O'odham Nation*, 138 F.4th at 1200 (cleaned up).

The finality analysis is straightforward as applied to AMRC's appraisal-related claims. As for the first finality element, the appraisal process has now been completed—and, thus, there has been a "consummation of the agency's decision-making process" with regard to the challenged appraisal decision. In this way, that decision differs from the discretionary permitting and land-use determinations discussed in the FEIS and DROD, which remain subject to change pending public comment and objection. As for the second finality element, the appraisal decision will certainly "determine rights or obligations," as it will provide part of the basis under the equalization process set forth in § 539p(c)(5) for determining whether Resolution Copper has to write a check to the federal government— a check that, at least theoretically, could be for billions of dollars—to complete the land exchange.

Defendants' arguments to the contrary are unavailing. Although Resolution Copper contends that SALECA "establishes its own remedy for any purported defect in the appraisal: a make-whole payment, not an injunction against conveyance" (*AMRC*, Doc. 94 at 35-36), this ignores that the make-whole process only addresses what happens if the appraised value of the federal land exceeds the appraised value of the non-federal land. It doesn't create a process for questioning the accuracy of the appraisal itself. Again, as to

1    that issue, final agency action has already occurred.

2                    d.    **No Agency Discretion**

3           Defendants also raise an array of arguments that hinge, in one way or another, on

4    the concept of agency discretion.  For example, the Federal Defendants argue that because

5    "Congress required the Forest Service to carry out the land exchange," it follows that "the

6    Forest Service lacks discretion with respect to that statutory mandate" and thus "Plaintiffs

7    cannot state a cognizable APA challenge to the land exchange."  (*AMRC*, Doc. 93 at 17.)

8    The Federal Defendants also contend that because "NEPA does not apply in the absence

9    of agency discretion" and non-discretionary actions are exempted "from NEPA's definition

10   of a 'major federal action,'" "[t]he mandatory transfer of title is not a major federal action

11   subject to NEPA."  (*Id.* at 22-23.)  Likewise, Resolution Copper argues that "the [APA] is

12   no help to Plaintiffs here, because what they seek to enjoin—conveyance of the federal

13   land—is not an agency decision subject to any discretion."  (*AMRC*, Doc. 94 at 2.)

14          These "no agency discretion" arguments lack merit in relation to AMRC's

15   appraisal-related claims.  Again, the challenged conduct here is the appraisal of the MCZ

16   parcel, and SALECA expressly vests the Secretary of the Forest Service with discretion

17   regarding that appraisal.  *See* 16 U.S.C. § 539p(c)(4)(B)(ii) ("After the final appraised

18   values of the Federal land and non-Federal land are determined and approved by the

19   Secretary . . . .").  *See also Ctr. for Biological Diversity v. U.S. Forest Serv.*, 2025 WL

20   947472, *2 (D.D.C. 2025) ("To comply with [SALECA's] equalization requirement,

21   Congress mandated that the land parcels be independently appraised.  The Forest Service

22   contracted with Barry Weissborn to serve as lead appraiser.  Within the Forest Service,

23   Gerald Sanchez was designated to assess the appraiser's work. . . .  On January 20, 2023,

24   the appraisal was completed, and on January 22, 2023, the appraisal was 'provided' to the

25   Forest Service, meaning that Sanchez was granted authorization to view it. . . .  On January

26   25, 2023, Sanchez completed the technical review of the results of the appraisal and issued

27   a report.  Sanchez's technical report assessed the completeness and accuracy of the

28   appraisal to ensure that it used appropriate methods and techniques, and that its

1   conclusions, analyses, and opinions were reasonably supported with market data.  Sanchez

2   also prepared an appraisal summary.  Both documents were prepared to *assist the Secretary*

3   *when deciding whether to accept the appraisal . . . .*") (citations omitted) (emphasis added).

4                    e.       **Vacatur As A Remedy**

5            Defendants' final threshold argument turns on the issue of the appropriate remedy

6   in a NEPA action.   According to Defendants, the usual remedy for a flaw in an

7   environmental impact statement is not to order vacatur of the statement but simply to

8   remand to the agency for additional analysis or consultation.  (*AMRC*, Doc. 93 at 50

9   ["Vacatur is generally not appropriate in NEPA cases . . . ."]; *AMRC*, Doc. 94 at 19

10  ["Plaintiffs' motions also rest on a mistaken premise about the appropriate remedy for a

11  NEPA violation—even assuming they could establish one.   Plaintiffs assert without

12  analysis that this Court should vacate the FEIS and enjoin conveyance if it finds the FEIS

13  somehow flawed.  But . . . even if Plaintiffs were right that the FEIS is flawed, this Court

14  at most might remand the FEIS without vacatur for further analysis or consultation."].)

15  According to Defendants, this principle is significant here because, absent vacatur, the land

16  exchange must go forward on August 19, 2025 pursuant to SALECA's statutory directive

17  that the land exchange occur within 60 days of publication of the FEIS.  (*Id.*)

18          This argument does not undermine AMRC's likelihood of success in relation to the

19  appraisal claims.  As discussed, *Desert Citizens* holds that a district court may enjoin a land

20  exchange based on appraisal-related errors.  Indeed, in *Desert Citizens*, the Ninth Circuit

21  remanded to the district court with directions to issue a preliminary injunction that would

22  retroactively unwind a land exchange that had already occurred.  *Desert Citizens*, 231 F.3d

23  at 1188 ("The district court's dismissal and its denial of a preliminary injunction are

24  reversed, and the case is remanded for entry of a preliminary injunction setting aside this

25  land exchange pending further proceedings in accordance with this opinion.").   Even

26  though, as Defendants emphasize, the land exchange in *Desert Citizens* was not

27  congressionally mandated, the Court still construes *Desert Citizens* (rather than the NEPA

28  decisions cited by Defendants) as supplying the relevant authority in evaluating whether

1  an available remedy exists in the appraisal context that would redress AMRC's asserted

2  injuries.

3       2.   Merits

4       Even though AMRC will likely to be able to survive the various jurisdictional and

5  threshold issued raised by Defendants in relation to its appraisal-related challenges, that is

6  only half the battle—AMRC must also establish that it is likely to prevail on those

7  challenges (or at least demonstrate the existence of serious questions going to the merits).

8       AMRC has failed to make that showing.  As background, the challenged appraisal

9  concerns the MCZ parcel, which comprises "1,655.53 acres of vacant land east of Superior

10  and just south of U.S. 60. . . .  Much of the property is within the site of the proposed

11  Resolution Copper underground copper mine." (*AMRC*, Doc. 93-3 at 7.)  In the appraisal

12  report, the Forest Service acknowledged that "[i]t is understood that a significant porphyry

13  copper deposit exists beneath the Subject Property." (*Id.* at 9.)  Nevertheless, the Forest

14  Service declined to consider the value of that copper when appraising the value of the MCZ

15  parcel because that copper is "subject . . . to 148 unpatented mining claims held by

16  Resolution Copper." (*Id.*)  The Forest Service explained: "An unpatented mining claim is

17  a conditional, possessory, interest in real property ownership of a mineral estate in

18  accordance with the Mining Law . . . .  Since the Subject Property is encumbered by mining

19  claims held by a party other than the United States; said mining claims confer all rights to

20  locatable minerals to that party in accordance with the Mining Law and are not part of the

21  estate owned by the United States." (*Id.* at 10, citations omitted.)  The Forest Service

22  concluded: "The Subject Property was regarded as a split estate since the unpatented

23  mining claims confer all rights to locatable minerals. . . .  Therefore, the total purchase

24  price is allocated to the surface interest, with no adjustments applied." (*Id.* at 12.)

25       AMRC raises an array of challenges to this appraisal, all of which hinge, one way

26  or another, on the appraiser's failure to include the value of the copper underlying the MCZ

27  parcel in the value of the parcel.  (*See, e.g.*, *AMRC*, Doc. 87 at 8 ["[T]he appraisal for the

28  MCZ parcel arbitrarily failed to include *any* value for the tens of billions of dollars worth

of copper, valuing the entire 1,655-acre parcel at less than $2 million."]; *id.* ["[T]he MCZ appraisal is based on the erroneous assumption that the value of the 35 billion pounds of copper on these federal lands is zero, simply because Resolution has filed mining claims on these lands."]; *id.* at 12 ["There is simply no rational, economic comparison between the types of nondescript surface lands that the appraiser considered as comparable sales and the invaluable MCZ parcel, which sits atop nearly 90 percent of the world's third-largest known copper deposit (35 of the estimated 40 billion pounds)."].)

In the Court's view, the appraiser's approach was correct and AMRC's criticisms all flow from a misunderstanding of how unpatented mining claims work. In *United States v. Shumway*, 199 F.3d 1093 (9th Cir. 1999), the Ninth Circuit provided an overview of this "relatively arcane area of law." *Id.* at 1097. The court explained that under "the Mining Law of 1872"—which, despite being the subject of "much contemporary hostility," "remains the law"—"the finder of valuable minerals on government land is entitled to exclusive possession of the land for purposes of mining and to all the minerals he extracts." *Id.* at 1098-99. The court further explained that although "[t]he phrase 'mining claim' . . . probably connotes to most laymen an unsupported assertion or demand from which no legal rights can be inferred," "that is emphatically not so" under the Mining Law of 1872 because "the word 'claim' in connection with the phrase 'mining claim' represents a federally recognized right in real property." *Id.* at 1099-1100. The court continued:

> The Supreme Court has established that a mining "claim" is not a claim in the ordinary sense of the word—a mere assertion of a right—but rather is a property interest, which is itself real property in every sense, and not merely an assertion of a right to property. . . . In *United States v. North American Transportation & Trading Co.*, the Army had been sent to Nome to bring order during its gold rush, and the president established a federal reservation for the Army base. The Court, in an opinion by Justice Brandeis, held that a company holding a mining claim at the site was entitled to compensation for the taking, with interest from the date of the reservation. This case establishes that the government cannot reserve its own land from an unpatented mining claim without paying the owner the value of the claim, because an unpatented mining claim is property.

1    *Id.* at 1100 (citations omitted).

2    Recently, in *Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 33 F.4th

3    1202 (9th Cir. 2022), the Ninth Circuit further addressed these concepts.  There, the court

4    explained that "[t]he Mining Law of 1872 . . . gives to United States citizens free of charge,

5    except for small filing and other fees, mining rights upon discovery of 'valuable minerals'

6    on federal land."  *Id.* at 1208.  "[T]he Mining Law remains in effect for much federal land

7    and for many minerals, including copper.  Within the scope of its operation, the Mining

8    Law continues to be a source of wealth—sometimes great wealth—for those who discover

9    valuable minerals on federal land."  *Id.* at 1209.  "A miner who finds valuable minerals

10   may 'locate' (or 'stake') a claim and thereby obtain an 'unpatented mining claim.'  A valid

11   unpatented claim gives the miner the right to 'occupy' the claim and to mine the minerals

12   free of charge."  *Id.* (citations omitted).

13   In light of these principles, it is difficult for the Court to find any fault in the Forest

14   Service's appraisal.  Resolution Copper already effectively owns the exclusive right to

15   mine the copper underlying the MCZ parcel.  *See, e.g.*, *Ickes v. Virginia-Colorado

16   Development Corp.*, 295 U.S. 639, 644 (1935) (explaining that an unpatented mining claim

17   "is property in the fullest sense of that term" and "is alienable, inheritable, and taxable");

18   *Ctr. for Biological Diversity*, 33 F.4th at 1209 ("A valid unpatented claim gives the miner

19   the right to 'occupy' the claim and to mine the minerals free of charge."); *Shumway*, 199

20   F.3d at 1100 ("[T]he government cannot reserve its own land from an unpatented mining

21   claim without paying the owner the value of the claim, because an unpatented mining claim

22   is property.").  *See also Ctr. for Biological Diversity v. U.S. Dept. of Interior*, 623 F.3d

23   633, 643 (9th Cir. 2010) ("Asarco has a right to engage in mining on the selected lands

24   under the Mining Law even if the exchange does not proceed, based on its 747 unpatented

25   mining and mill site claims."); *Kunkes v. United States*, 32 Fed. Cl. 249, 252 (1994), *aff'd*,

26   78 F.3d 1549 (Fed. Cir. 1996) ("Although legal title to the land remains in the United

27   States, the claimant enjoys a valid, equitable title in the claim, possessing all of the

28   incidents of real property.").  It would be odd if the value of that copper were nevertheless

1   included in the value of the federal government's interest in the parcel.  Following that

2   approach would force Resolution Copper, as part of the land exchange, to pay the federal

3   government for the copper it effectively already owns the exclusive right to mine.  The

4   Court thus agrees with Resolution Copper that "AMRC's real complaint is not with the

5   MCZ appraisal but with the General Mining Law of 1872" and that adopting AMRC's

6   argument "that Resolution should pay the United States for rights it already owns in the

7   MCZ would nullify the 1872 Law and 150 years of Supreme Court precedent, as well as

8   take Resolution's property." (*AMRC*, Doc. 94 at 37-38.)  As the Federal Defendants

9   correctly note in their response: "[E]ven if Congress had never enacted [SALECA],

10  Resolution Copper would retain the exclusive rights to exploit the locatable minerals

11  (assuming it paid the annual claim maintenance fee), and those rights would remain an

12  encumbrance on the land owned by the United States." (*AMRC*, Doc. 93 at 39.)

13          In its motion papers, AMRC never directly addresses the absurd consequences that

14  would flow from adopting its position.  Nor do AMRC's more granular arguments change

15  the analysis.  For example, although the federal government may still technically "own[]

16  the mineral estate" underlying the MCZ parcel (*AMRC*, Doc. 87 at 8), that interest does not

17  include the right to *mine* the minerals, which belongs to Resolution Copper.  *Ctr. for*

18  *Biological Diversity*, 33 F.4th at 1209.  AMRC also identifies various regulations and

19  standards that call for appraisers to include the value of "minerals" in any appraisal (*AMRC*,

20  Doc. 87 at 9-10; *AMRC*, Doc. 97 at 7-11), but those general statements do not explain how

21  to perform the valuation when, as here, the minerals are subject to unpatented mining

22  claims.[7]  Finally, AMRC's "highest and best use" and "must be appraised as private lands"

23  arguments (*AMRC*, Doc. 87 at 11-13) rely on the false premise that, in those scenarios,

24  Resolution Copper's exclusive right to mine the minerals would somehow cease to exist.[8]

25  ───────────────────

26  [7]      Indeed, the appraisal guidelines appear to recognize that valuing "mineral
    properties" can be complicated by the existence of mining claims.  (*AMRC*, Doc. 87-17 at
    57 ["Appraisers valuing mineral properties impacted by the 1872 Mining Law are advised
27  to coordinate with client agency staff to clarify the approaches to valuing those interests."].)

28  [8]      AMRC also raises, in its reply brief, what the Court perceives to be a new argument
    not properly raised in AMRC's motion—that the appraiser should have disregarded
    Resolution Copper's unpatented mining claims to the copper underlying the MCZ parcel

1    AMRC also places heavy emphasis on certain statements that were made during the

2    legislative process surrounding SALECA's enactment. (*AMRC*, Doc. 87 at 9-10

3    [discussing congressional testimony by a Forest Service representative, a report by the

4    Congressional Budget Office, and a House report].)  As an initial matter, although those

5    statements reflect a belief that the value of "mineral deposits" or "ore deposits" would be

6    included in the appraised value of the federal land, that belief is not necessarily inconsistent

7    with the approach the Forest Service took in this case.  Although AMRC confines its

8    objections to the appraisal related to the MCZ parcel, the Forest Service also completed an

9    appraisal of a different parcel of federal land to be included in the land exchange, called

10   the Mineral Withdrawal Area (or "MWA") parcel. (*AMRC*, Doc. 87-12.)  The MWA parcel

11   also sits atop large and valuable copper deposits, but those deposits—unlike the deposits

12   underlying the MCZ parcel—are not the subject of unpatented mining claims held by

13

14   ──────────────
     because Resolution Copper has never "actually determine[d] whether the mine is
     financially viable." (*AMRC*, Doc. 97 at 7-8.)  First, "[t]he district court need not consider
     arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997

15   (9th Cir. 2007).  Second, at any rate, it was logical—and certainly not arbitrary and
     capricious—for the appraiser to operate from the premise that the copper deposits

16   underlying the MCZ parcel are valuable enough to validate Resolution Copper's mining
     claims.  Indeed, AMRC itself asserts in its motion that the MCZ parcel includes "tens of

17   billions of dollars worth of copper," is "invaluable," and "sits atop nearly 90 percent of the
     world's third-largest known copper deposit (35 of the estimated 40 billion pounds)."

18   (*AMRC*, Doc. 87 at 8, 12.)  Furthermore, SALECA can be reasonably interpreted as
     reflecting a congressional determination that Resolution Copper's mining claims are valid

19   and that the contemplated mine will be financially viable.  16 U.S.C. § 539p(i)(C)
     ("Nothing in this section shall interfere with, limit, or otherwise impair, the unpatented

20   mining claims . . . currently held by Resolution Copper on the Federal land, nor in any way
     change, diminish, qualify, or otherwise impact Resolution Copper's rights and ability to

21   conduct activities on the Federal land under such unpatented mining claims and the general
     mining laws of the United States.").  *Center for Biological Diversity* is not to the contrary,

22   as the disputed issue in that case was not whether the mining company had valid mining
     claims to the land containing the copper deposits but rather whether the company's mining

23   claims to the adjacent land (where the mining waste would be dumped) were valid.  *Ctr.
     for Biological Diversity*, 33 F.4th at 1212 ("Rosemont proposes to dump 1.9 billion tons of

24   waste rock onto 2,447 acres of nearby National Forest land on which it has mining claims,
     to an average depth of 700 feet.  Undisputed evidence in the administrative record shows

25   that no valuable minerals have been found on the mining claims that Rosemont proposes
     to occupy with its waste rock."); *id.* at 1217 ("Rosemont owns valid mining rights on the

26   National Forest land where it would dig its proposed pit mine.  Mining rights on that land
     were given by the federal government under the Mining Law, essentially free of charge.

27   Rosemont has now asked the Forest Service to authorize it to permanently occupy with its
     waste rock 2,447 acres of additional National Forest land on which it does not have valid

28   mining rights, also essentially free of charge.").

Resolution Copper.  As a result, the Forest Service included the value of those copper deposits when appraising the value of the MWA parcel.  (*Id.* at 12 ["The property rights for the subject includes the surface and sub-surface mineral interests."].)  In other words, the Forest Service *did* include the value of at least some of the relevant mineral deposits in its appraisals, which is broadly consistent with the expectations reflected in the cited legislative history materials.[9]

More important, the isolated statements that AMRC has been able to pull from the extensive legislative record surrounding SALECA's enactment shed little light on how to construe the statutory text that Congress ultimately chose to adopt.  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) ("[L]egislative history is not the law.  It is the business of Congress to sum up its own debates in its legislation, and once it enacts a statute we do not inquire what the legislature meant; we ask only what the statute means.") (cleaned up).  To that point, SALECA contains a clear textual indication that Congress was aware of Resolution Copper's unpatented mining claims and intended to preserve them: "Nothing in this section shall interfere with, limit, or otherwise impair, the unpatented mining claims . . . currently held by Resolution Copper on the Federal land, nor in any way change, diminish, qualify, or otherwise impact Resolution Copper's rights and ability to conduct activities on the Federal land under such unpatented mining claims and the general mining laws of the United States."  16 U.S.C. § 539p(i)(C).

One final point bears emphasizing.  Because SALECA does not create a private right of action, AMRC must assert its appraisal-related challenges via the APA.  Under the APA, final agency action can only be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision."  *Northwest Ecosystem Alliance*

---

[9]     To the extent AMRC argues the cited legislative history materials reflect a belief "that the appraisals of both the MWA and MCZ parcels must include the value of the minerals" (*AMRC*, Doc. 87 at 9, emphasis omitted), the Court disagrees—the cited passages are ambiguous as to which minerals and ore would be included in the valuation and do not specifically state that the minerals underlying both parcels would be included.

1  *v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007).  "This rule ensures that

2  the reviewing court affords sufficient deference to the agency's action.  The APA gives an

3  agency substantial discretion to rely on the reasonable opinions of its own qualified experts

4  even if, as an original matter, a court might find contrary views more persuasive."  *San*

5  *Luis & Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014)

6  (cleaned up).  "A court simply ensures that the agency has acted within a zone of

7  reasonableness and, in particular, has reasonably considered the relevant issues and

8  reasonably explained the decision."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423

9  (2021).

10      These principles are relevant here because AMRC has failed to identify any

11  appraisal standard that specifically requires the value of minerals that are the subject of

12  unpatented mining claims to be included when calculating the federal government's

13  interest in the parcel of land that contains those minerals; failed to identify any prior

14  appraisal adopting that approach; and failed to identify any judicial decision suggesting

15  that approach is permissible (let alone required).  Given this backdrop, it is difficult to see

16  how the challenged appraisal decision—which followed the recommendations of an expert

17  whose credentials AMRC has not challenged—could be deemed not just wrong, but so

18  wrong as to qualify as arbitrary and capricious.  *Cf. Greer Coalition, Inc. v. U.S. Forest*

19  *Serv.*, 2011 WL 671750, *9-16 (D. Ariz. 2011) (rejecting various objections to appraisal,

20  noting that "courts should not overturn agency decisions when the agency has considered

21  relevant factors and reached a rational conclusion," and emphasizing that "[t]his is

22  particularly true where, as in the case of these appraisals, the agency chooses to rely on the

23  opinions of qualified experts").  Put another way, even if the appraisal decision was

24  wrong—and the Court is skeptical it was—it at least fell within the "zone of

25  reasonableness," *Prometheus Radio Project*, 592 U.S. at 423, given the absence of contrary

26  authority and the presence of a reasoned explanation for the decision.

27          3.    Conclusion As To Appraisal Claims

28      Although AMRC will likely be able to overcome the jurisdictional and other

- 26 -

1    threshold challenges that Defendants have raised to its appraisal-related claims, AMRC has

2    not shown a likelihood of success on the merits of those claims or even serious questions

3    going to the merits of those claims.

4            B.    **NEPA Claims**

5                    1.    <u>Threshold Issues</u>

6            Defendants' jurisdictional and other threshold challenges to Plaintiffs' NEPA

7    claims raise unsettled, complicated questions.  To understand why, it is necessary to take a

8    step back and consider how SALECA's statutorily-mandated process for performing an

9    environmental impact analysis differs from the typical process for performing such an

10   analysis.

11           Ordinarily, "[t]he NEPA review process concludes in one of two ways: (1) the

12   agency determines through an EA [environmental assessment] that a proposed action will

13   not have a significant impact on the environment and issues a FONSI [finding of no

14   significant impact], or (2) the agency determines that the action will have a significant

15   impact and issues an EIS *and* record of decision."  *Envt'l Defense Ctr.*, 36 F.4th at 868

16   (emphasis added).  As the italicized text indicates, the issuance of the FEIS is typically not

17   the final step in the agency's analysis in a case where a FEIS is required—instead, the final

18   step is the issuance of the final record of decision ("ROD").  *See, e.g.*, *Seven County

19   Infrastructure Coalition*, 145 S. Ct. at 1511 ("Because an EIS is only one input into an

20   agency's decision and does not itself require any particular substantive outcome, the

21   adequacy of an EIS is relevant only to the question of whether an agency's final decision

22   . . . was reasonably explained."); *Oregon Natural Resources Council v. Harrell*, 52 F.3d

23   1499, 1508 (9th Cir. 1995) ("A record of decision comes at the end of the pre-decision,

24   environmental review process and is intended to make public the agency's decision, to

25   identify the alternatives considered and which are environmentally preferable, to state

26   whether all practicable means to avoid or minimize environmental harm have been

27   adopted, and to summarize the monitoring and enforcement program that has been

28   adopted.").  For these reasons, the usual rule is that "[o]nce an EIS's analysis has been

1    solidified in a ROD, an agency has taken final agency action." *Oregon Natural Desert*

2    *Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1118 (9th Cir. 2010).

3           The environmental review process mandated by SALECA differs in some ways.  As

4    noted, SALECA provides that "[p]rior to conveying Federal land under this section, the

5    Secretary shall prepare a single environmental impact statement under [NEPA], which

6    shall be used as the basis for all decisions under Federal law related to the proposed mine

7    and the Resolution mine plan of operations and any related major Federal actions

8    significantly affecting the quality of the human environment, including the granting of any

9    permits, rights-of-way, or approvals for the construction of associated power, water,

10   transportation, processing, tailings, waste disposal, or other ancillary facilities." 16 U.S.C.

11   § 539p(c)(9)(B).  In isolation, this provision is consistent with the typical NEPA review

12   process in that it contemplates the issuance of a FEIS followed by the subsequent issuance

13   of a ROD setting forth the agency's final decisions regarding various discretionary matters.

14   However, SALECA also contains the following additional provision: "Not later than 60

15   days after the date of publication of the [FEIS], the Secretary shall convey all right, title,

16   and interest of the United States in and to the Federal land to Resolution Copper." *Id.*

17   § 539p(c)(10).  In other words, SALECA tethers a non-discretionary act—the conveyance

18   of title necessary to complete the land exchange—to the issuance of the FEIS.  SALECA

19   also effectively requires this non-discretionary act to occur before the issuance of the ROD,

20   because "[t]he Final ROD will not be signed until after the conclusion of the objection

21   process" and "this process is unlikely to conclude before the end of 2025."  (*San Carlos*,

22   Doc. 114 at 4.)

23          These unique features of SALECA—the parties have not identified any similar

24   statute—make it particularly challenging to apply the relevant Ninth Circuit and Supreme

25   Court authorities addressing the concepts of redressability, final agency action, and

26   discretionary agency action in NEPA cases.  From the Court's perspective, attempting to

27   applying those precedents has sometimes been akin to attempting to pound a round peg

28   into a square hole—the principles and standards set forth in other APA and NEPA cases

don't map neatly onto how SALECA operates.

The unique features of SALECA also create other complications. One purpose of the environmental review process under NEPA is to require an agency to provide a reasoned comparison of the projected benefits and environmental consequences of a proposed course of action. *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 97-98 (1983) ("NEPA has twin aims. First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process. Congress in enacting NEPA, however, did not require agencies to elevate environmental concerns over other appropriate considerations. Rather, it required only that the agency take a 'hard look' at the environmental consequences before taking a major action. The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.") (cleaned up). Thus, "[i]n addition to the proposed agency action, every EIS must rigorously explore and objectively evaluate all reasonable alternatives to that action. . . . A no action alternative in an EIS allows policymakers and the public to compare the environmental consequences of the status quo to the consequences of the proposed action." *Ctr. for Biological Diversity*, 623 F.3d at 642 (cleaned up).

Nevertheless, SALECA contemplates that the land exchange will occur within 60 days of, *and regardless of the analysis set forth in*, the FEIS. This has the feel of a "ready, fire, aim" approach because it suggests, as Resolution Copper's counsel acknowledged during oral argument, that the land exchange must go forward even if the Forest Service determines it will result in catastrophic environmental consequences. Again, this is not how the environmental review process usually works under NEPA, which complicates the task of applying existing NEPA precedents.

…

…

1

a.      **Standing/Redressability**

2      The Federal Defendants contend that Plaintiffs cannot establish redressability in

3   relation to their NEPA claims "because there is no chance that additional environmental

4   review could prompt the Forest Service to decide not to complete the land exchange to

5   which Plaintiffs trace their injury.  The decision to transfer Oak Flat to Resolution Copper

6   was made by Congress, and the Forest Service does not have discretion to take another

7   course."  (*AMRC*, Doc. 93 at 14.)  Similarly, Resolution Copper argues: "Even if Plaintiffs

8   could convince this Court that flaws in the FEIS . . . require additional study or correction,

9   Plaintiffs cannot show that the Forest Service 'could be influenced' ultimately to do

10   anything other than comply with its duty under the Act to proceed with the land exchange."

11   (*AMRC*, Doc. 94 at 14.)

12      Although this argument has some force, the Court perceives two related weaknesses

13   in it.  First, it seems to presuppose that the Court lacks authority to order vacatur of the

14   FEIS as a remedy even if the FEIS is deemed deficient under NEPA.  The question of

15   vacatur is addressed in later portions of this order, but assuming for now that vacatur is an

16   option, that remedy would, at least temporarily, prevent the land exchange from occurring

17   (because the exchange can only occur, per § 539p(c)(1), "after" the date of publication of

18   the FEIS).

19      Second, Defendants' argument also overstates the sort of relief that is required to

20   establish redressability for a procedural injury.  In *W. Watersheds Project v. Grimm*, 921

21   F.3d 1141 (9th Cir. 2019), environmental organizations brought an "action to enjoin the

22   federal government's participation in the killing of gray wolves in Idaho pending additional

23   analysis under" NEPA.  *Id.* at 1143.  The district court concluded the plaintiffs lacked

24   standing because the challenged activity would likely continue to occur regardless of the

25   injunction, and thus the plaintiffs could not establish redressability, but the Ninth Circuit

26   reversed, explaining that "[i]f Wildlife Services were to cease its activities—even

27   temporarily—it is possible that fewer wolves would be killed, particularly in the short

28   term."  *Id.* at 1148.

Similarly, in *Center for Biological Diversity v. Mattis*, 868 F.3d 803 (9th Cir. 2017), after the Department of Defense ("DOD") approved the location, construction, and specifications for a military base in Okinawa, Japan, an environmental organization sought "to protect a local animal population and cultural property from the base's alleged adverse effects by bringing claims for declaratory and injunctive relief based on the Government's alleged violations of [NHPA]." *Id.* at 808. The DOD's decision to construct the military base arose from a bilateral executive agreement between the United States and Japan, *id.* at 811, and the Ninth Circuit noted that the plaintiff lacked standing to challenge the executive agreement itself or the DOD's decision to construct the base, *id.* at 819. Nevertheless, even though the construction of the base would eventually go forward, the Ninth Circuit concluded the plaintiff had standing to seek an injunction to prevent "any activities in furtherance of the [base construction], including granting permits . . . until [the DOD] complies with section 402 of the NHPA." *Id.* at 826 (cleaned up).

Here, too, if the land exchange were enjoined "temporarily" and "in the short term," *W. Watersheds Project*, 921 F.3d at 1148, that would redress at least some of Plaintiffs' injuries. *See also Ctr. for Biological Diversity v. Export-Import Bank of the U.S.*, 894 F.3d 1005, 1013 (9th Cir. 2018) (explaining that, in a prior case, the Ninth Circuit applied "the relaxed standard for procedural-injury" to hold "that a change in agency decisionmaking (from granting the permits to denying the permits, *even temporarily*)" was sufficient to establish redressability) (emphasis added). As Plaintiffs' counsel explained during oral argument, every day that Oak Flat remains intact is another day that members of the Tribe can use the land in its current, unspoiled form for religious purposes and ceremonies. Thus, even a temporary delay may, for example, allow another Sunrise Ceremony to take place. *See generally Apache Stronghold*, 145 S. Ct. at 1480-82 ("[T]ribal members have worshipped at Oak Flat for centuries, conducting there a number of religious ceremonies that cannot take place anywhere else. One example, the 'Sunrise Ceremony,' is a multiday coming-of-age ceremony for young women. . . . Tribal members believe the destruction of Oak Flat will close off a portal to the Creator forever and will completely devastate the

1    Western Apaches' spiritual lifeblood.  For the women who came of age at Oak Flat in

2    particular, that means their ties to *Chí'chil Bildagoteel*, and to all of the girls past, present,

3    who have had their Sunrise Ceremony there, will be severed.") (Gorsuch, J., dissenting

4    from the denial of certiorari) (cleaned up).  This will make all the difference in the world

5    to the young women who are allowed to participate in that ceremony, even if it does not

6    ensure that future ceremonies will take place that would benefit additional young women.

7        *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220 (9th Cir. 2008),

8    which Defendants view as conclusively foreclosing any claim of redressability, is

9    distinguishable.  There, three environmental plaintiffs challenged the validity of a 1999

10   biological opinion ("BiOp") that the National Marine Fisheries Service ("NMFS")

11   prepared to advise the United States on the implementation of a treaty with Canada and

12   "evaluate the effects of . . . the Treaty on the recovery and survival of listed salmon."  *Id.*

13   at 1222-23.  The BiOp concluded that "Canadian take under the Treaty was not likely to

14   jeopardize the continued existence of threatened or endangered salmon stocks."  *Id.* at

15   1224.  The Ninth Circuit rejected the plaintiffs' challenge to the validity of the BiOp for

16   lack of standing, explaining that even though the "defective BiOp could theoretically be

17   set aside," the court lacked the power to require the State Department to withdraw from the

18   treaty—the ultimate basis for the plaintiffs' injury—and thus that injury was beyond

19   redress.  *Id.* at 1226.

20       Although *Salmon Spawning* has some parallels to this case, an important difference

21   is that the Court may have the power (subject to the additional vacatur discussion *infra*) to

22   order the Forest Service to vacate the FEIS.  That remedy would at least temporarily

23   preclude the land exchange from going forward, because SALECA identifies the issuance

24   of the FEIS as a condition precedent to the land exchange.  In contrast, there was no step

25   the court in *Salmon Spawning* could take that would undo, even temporarily, the treaty

26   between the United States and Canada.[10]  *See also Ctr. for Biological Diversity*, 868 F.3d

27   _____

    [10]    Additionally, the plaintiffs in *Salmon Spawning* asserted a separate claim for relief
28   based on the theory that "the State Department and NMFS were obligated by [the
    Endangered Species Act] and its implementing regulations to reinitiate consultation on the
    1999 BiOp" following the discovery of new methods and criteria for evaluating the impact

at 818-19 (distinguishing *Salmon Spawning*).

For these reasons, Plaintiffs have established a likelihood (albeit not a certainty) that they will be able to satisfy the "relaxed" requirement of redressability in a case involving an alleged procedural injury, as "there is 'some possibility' that the requested relief . . . will redress their alleged harms." *Save Bull Trout*, 51 F.4th at 1106-07. *See also Salmon Spawning*, 545 F.3d at 1226 ("Plaintiffs alleging procedural injury can often establish redressibility [sic] with little difficulty . . . .").

### b.   **Implicit Preclusion Of Judicial Review**

Defendants' "implicit preclusion" argument fares no better in relation to Plaintiffs' NEPA claims than it did in relation to AMRC's appraisal claims. SALECA does not expressly preclude judicial review and a strong presumption exists in favor of judicial review. *Bowen*, 476 U.S. at 670-72; *KOLA, Inc*, 882 F.2d at 363. The statutory features that Defendants emphasize are too ambiguous to overcome this presumption. Indeed, SALECA provides that "[e]xcept as otherwise provided in this section, the Secretary shall carry out the land exchange in accordance with the requirements of the National Environmental Policy Act of 1969." 16 U.S.C. § 539p(A)(9). The natural reading of this provision is that judicial review under NEPA (via the APA) is available. True, the initial prefatory phrase "[e]xcept as otherwise provided in this section" suggests there may be some deviation from the norm in how that NEPA review is conducted, but that is not the same thing as a clear, unambiguous expression of congressional intent to preclude any judicial review of NEPA claims related to the land exchange.

### c.   **Final Agency Action**

Because Plaintiffs must "proceed under the APA in order to challenge claimed violations of NEPA," they also must comply with the APA's "series of procedural

---

of commercial fishing on wild salmon. *Salmon Spawning*, 545 F.3d at 1229. Although the Ninth Circuit expressed doubt about "whether reinitiation will ultimately benefit the [plaintiffs]," it declined to dismiss that claim for lack of standing because the redressability requirement is diminished for procedural injuries and "[u]nlike the other claims, this claim is a forward-looking allegation whose remedy rests in the hands of federal officials and does not hinge on upsetting the Treaty." *Id.*

1   requirements [that] litigants must fulfill before bringing suit in federal court," including

2   that "the challenged agency action must be final."  *San Carlos Apache Tribe v. United*

3   *States*, 417 F.3d 1091, 1093, 1096-97 (9th Cir. 2005).  As noted, the following two-part

4   test governs whether agency action is considered final: *first*, the action must mark the

5   consummation of the agency's decision-making process; and *second*, the action must

6   determine rights or obligations or be one from which legal consequences will flow.  *Envt'l*

7   *Defense Ctr.*, 36 F.4th at 867-68.

8          The second element of the finality test is likely satisfied in relation to Plaintiffs'

9   NEPA claims.  SALECA provides that "[n]ot later than 60 days" after the FEIS is

10  published, the Forest Service "shall convey all right, title, and interest of the United States

11  in and to the Federal land to Resolution Copper."  16 U.S.C. § 539p(c)(10).  This suggests

12  the land exchange is a "legal consequence" that will "flow" from the issuance of the FEIS.

13  Although Plaintiffs have not identified any prior case concluding that a land exchange may

14  qualify as a "legal consequence" for purposes of this test, this absence of authority is

15  unsurprising given SALECA's uniqueness and is not an obstacle to relief, given that the

16  finality inquiry is meant to be "pragmatic and flexible" and "focus[] on the practical and

17  legal effects of the agency action."  *Tohono O'odham Nation*, 138 F.4th at 1200 (cleaned

18  up).

19         The first element of the finality test—whether there has been a "consummation of

20  the agency's decision-making process"—presents a more complicated question.  As noted,

21  in an ordinary NEPA process, the issuance of the FEIS does not mark the completion of

22  the agency's decision-making process—instead, that process only reaches completion after

23  the agency issues its final ROD (which has not yet occurred here).  For this reason, the

24  Federal Defendants argue that "[a]s to the discretionary decisions that are before the Forest

25  Service, neither the FEIS nor the Draft ROD represent the consummation of that process.

26  The Forest Service's decision-making process is ongoing and will not be complete until

27  the Final ROD is signed.  Any contrary interpretation would render the entire objection

28  process meaningless." (*AMRC*, Doc. 93 at 9.)  Meanwhile, Plaintiffs accuse Defendants of

focusing on the wrong decision-making process and argue that the relevant process here was simply the decision to issue the FEIS, which has now been completed. (*AMRC*, Doc. 97 at 12 ["The FEIS here is final as it concluded the agency's responsibilities under NEPA. . . . Under § 3003, the FEIS is the Forest Service's final word before the Exchange is executed and title is conveyed to RCM."]; *San Carlos*, Doc. 119 at 5 ["[B]ecause SALECA requires no further decisions—other than the decision to publish—before Oak Flat is transferred, the 2025 FEIS necessarily consummates Federal Defendant's environmental review and decision-making processes under SALECA, NEPA, and NHPA."].)[11]

Defendants likely have the better of this argument. As an initial matter, although Plaintiffs identify several passages and parentheticals from Ninth Circuit decisions that can be construed, at least in isolation, as suggesting that the issuance of a FEIS may alone qualify as final agency action for purposes of a NEPA claim,[12] Defendants persuasively explain why the better reading of those cases is that final agency action only occurs when the FEIS *and* the ROD have been published. (*AMRC*, Doc. 93 at 9-10; *AMRC*, Doc. 94 at

[11] Plaintiffs also cite cases recognizing that an agency's choice to embark on a particular course of conduct without preparing an EIS may constitute final agency action in the NEPA context. *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1099-1100 (9th Cir. 2025) (final agency action existed where one agency (the Air Force) applied to a different agency (the Guam EPA) for the renewal of a waste disposal permit without "tak[ing] the requisite 'hard look' at the environmental impacts . . . and appropriately engag[ing] the public before committing to its plan for disposal"); *Rattlesnake Coalition v. U.S. E.P.A.*, 509 F.3d 1095, 1104 (9th Cir. 2007) ("[A]n agency's decision not to issue an EIS concludes the agency's procedural inquiry into the environmental impact of a proposed project and therefore constitutes a final agency action, regardless of whether the agency has decided to fund the project."). However, as noted, the "NEPA review process concludes in one of two ways: (1) the agency determines through an EA that a proposed action will not have a significant impact on the environment and issues a FONSI, or (2) the agency determines that the action will have a significant impact and issues an EIS and record of decision." *Envt'l Defense Ctr.*, 36 F.4th at 868. Plaintiffs' cited cases are thus unhelpful because they address situations where the agency neglected environmental review altogether or achieved final agency action through an EA/FONSI. Neither case addresses the FEIS/ROD option (which is the option the Forest Service pursued here).

[12] *Envt'l Defense Ctr.*, 36 F.4th at 868 ("We have repeatedly held that final NEPA documents are final agency actions."); *Oregon Natural Desert Ass'n*, 625 F.3d at 1118 (parenthetical stating that, according to the Eighth Circuit, the Supreme Court "has strongly signaled that an agency's decision to issue . . . an environmental impact statement is a 'final agency action' permitting immediate judicial review under NEPA") (citation omitted). In the order addressing Plaintiffs' earlier round of preliminary injunction motions, the Court simply noted that these cases might support Plaintiffs' position before clarifying that it was not yet deciding the issue. (*AMRC*, Doc. 81 at 11 & n.3.)

1    17-18.)  Indeed, one of Plaintiffs' cited cases makes that exact point: "*Once an EIS's*
2    *analysis has been solidified in a ROD*, an agency has taken final agency action, reviewable
3    under § 706(2)(A)."  *Oregon Natural Desert Ass'n*, 625 F.3d at 1118 (emphasis added).
4    So do other cases from within the Ninth Circuit.  *See, e.g.*, *Oregon Natural Resources*
5    *Council*, 52 F.3d at 1508 ("A [ROD] comes at the end of the pre-decision, environmental
6    review process . . . .");  *Oregon Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 830 (D.
7    Or. 2022) ("NEPA review does not dictate a final agency decision until the agency adopts
8    the proposed alternative with a ROD.").  The Supreme Court also recently emphasized this
9    point: "Because an EIS is only one input into an agency's decision and does not itself
10   require any particular substantive outcome, the adequacy of an EIS is relevant only to the
11   question of whether an agency's final decision . . . was reasonably explained."  *Seven*
12   *County Infrastructure Coalition*, 145 S. Ct. at 1511.  "[R]eview of an agency's EIS is not
13   the same thing as review of the agency's final decision concerning the project."  *Id.* at 1514.
14        Moreover, even if it might be theoretically possible for an EIS alone to qualify as
15   final agency action in some other context, the analysis here must be "pragmatic and
16   flexible" and take account of SALECA's specific features.  SALECA provides that the
17   "[e]nvironmental analysis" set forth in the FEIS is to "be *used as the basis for all decisions*
18   *under Federal law* related to the proposed mine and the Resolution mine plan of operations
19   and any related major Federal actions significantly affecting the quality of the human
20   environment, including the granting of any permits, rights-of-way, or approvals for the
21   construction of associated power, water, transportation, processing, tailings, waste
22   disposal, or other ancillary facilities."  16 U.S.C. § 539p(c)(9)(B) (emphasis added).  This
23   is a strong indication that the environmental analysis set forth in the FEIS was not intended
24   to serve as a "decision" in and of itself—instead, it was simply intended to help inform the
25   Forest Service's separate discretionary "decisions under Federal law" regarding pipelines,
26   permits, and the like that have not yet been made with finality (and will eventually be set
27   forth in the ROD).
28        This conclusion is also consistent with the line of Ninth Circuit cases stating that

- 36 -

1   courts should "look to see whether the agency has rendered its last word on the matter"

2   when evaluating the first element of *Bennett*'s finality test.  *Oregon Nat. Desert Ass'n v.*

3   *U.S. Forest Serv.*, 465 F.3d 977, 984 (9th Cir. 2006).  *See also Whitman v. Am. Trucking*

4   *Associations*, 531 U.S. 457, 478 (2001) ("Only if the EPA has rendered its last word on the

5   matter in question, is its action final and thus reviewable.").  The Forest Service hasn't

6   "rendered its last word" on any of the discretionary decisions it will be making in relation

7   to the land exchange because it still has not issued the ROD.  The *proposed* decisions

8   addressed in the DROD are still subject to public review and revision.

9       With all of that said, it is a challenge to apply the Ninth Circuit's "final agency

10  action" precedents here because SALECA contemplates a unique environmental review

11  process that deviates from how that process usually operates.  Congress's choice to make

12  the issuance of the FEIS, rather than the issuance of the ROD, the triggering event for the

13  land exchange makes it at least possible to conceptualize the FEIS as the agency's "final

14  word" on the matter of the land exchange, even though the FEIS does not inform the

15  decision to transfer the land.  This uncertainty raises serious questions about how to

16  characterize the issuance of the FEIS under the first step of *Bennett*'s "pragmatic and

17  flexible" finality test.

18          d.    **No Agency Discretion**

19      The Court is unpersuaded by Defendants' "no agency discretion" arguments as

20  applied to Plaintiffs' NEPA claims.  In advancing those arguments, Defendants rely on

21  cases explaining that the question of *whether NEPA applies* ordinarily turns on whether an

22  agency has discretion in relation to the underlying project that would be the subject of the

23  environmental impact analysis.  *See, e.g.*, *Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th

24  Cir. 1995) (explaining that NEPA's "procedural requirements are triggered by a

25  discretionary federal action"); *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267

26  F.3d 1144, 1151 (D.C. Cir. 2001) ("The touchstone of whether NEPA applies is discretion

27  . . . .  If, however, the agency does not have sufficient discretion to affect the outcome of

28  its actions, and its role is merely ministerial, the information that NEPA provides can have

no affect on the agency's actions, and therefore NEPA is inapplicable."). Here, Congress has already specified that NEPA applies—the Forest Service "shall carry out the land exchange in accordance with the requirements of [NEPA]" and "shall prepare a single environmental impact statement under [NEPA]." 16 U.S.C. § 539p(c)(9)(A)-(B).

Additionally, the Forest Service possesses discretion with respect to many issues related to the land exchange, "including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." *Id.* § 539(c)(9)(B). It is permissible, under NEPA, for Plaintiffs to challenge the adequacy of the Forest Service's analysis of the environmental impact of those decisions. That challenge may be premature, due to the likely absence of "final agency action," but it does not fail for want of agency discretion. In arguing otherwise, Defendants conflate the substance of Plaintiffs' NEPA challenge with the remedy they seek. (*San Carlos*, Doc. 105 at 14 ["In an effort to defeat standing and avoid judicial review, Federal Defendants and Resolution reduce the Tribe's challenges to one contesting Oak Flat's transfer, which they assert is not a 'decision' within the meaning of the APA because Congress gave them no discretion. The Tribe, however, does not challenge the decision to convey Oak Flat as arbitrary and capricious. Instead, the Tribe asserts that the Forest Service's decision to publish the 2025 FEIS, as well as the decisions in it related to various action alternatives are arbitrary and capricious."].)

### e.    **Vacatur As A Remedy**

As noted, Defendants argue that because the usual remedy under the APA and NEPA for a flaw in an environmental impact statement is not to order vacatur of the statement but simply to remand to the agency for additional analysis or consultation, and because the land exchange must go forward on August 19, 2025 in the absence of vacatur, Plaintiffs are effectively without a meaningful remedy with respect to their NEPA claims. (*AMRC*, Doc. 93 at 50; *AMRC*, Doc. 94 at 19.)

On the one hand, Defendants are correct that vacatur is not always the remedy in an APA action—sometimes, it is enough to remand for further consideration without formally

vacating the agency decision that was found to be flawed.  *See, e.g.*, *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 141 F.4th 976, 1015-16 (9th Cir. 2025) ("Having weighed the equities, vacatur is unwarranted because the procedural error is minor and the on-the-ground consequences of vacatur would be severe.  Still, we expect and urge BLM to move promptly in rectifying the ROD's deficiencies on remand.   But because we have been given no reason to believe that the agency would be unable to cure those deficiencies, we remand without vacating BLM's 2023 approval of the Project.") (cleaned up); *Cal. Communities Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012) ("That brings us to whether we must vacate the EPA's final rule.  A flawed rule need not be vacated.  Indeed, when equity demands, the regulation can be left in place while the agency follows the necessary procedures to correct its action. . . .  Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed.") (cleaned up).  *See also Seven County Infrastructure Coalition*, 145 S. Ct. at 1514 ("Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS.").

On the other hand, Defendants' cited cases do not foreclose the availability of vacatur as a remedy.  Indeed, the Ninth Circuit has stated that "[w]e order remand without vacatur only in limited circumstances."  *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015).  Further, Defendants' cited cases emphasize that vacatur should be avoided when actions have already been undertaken in reliance on the agency's final decision and the "on-the-ground" consequences of halting those actions would be "severe" and "disruptive."  But that is not the situation here—Plaintiffs seek to enjoin the land exchange before it occurs.  Nor has the Forest Service yet made any final discretionary decisions related to the land exchange—those will only come when the ROD is issued.

This marks another instance where, due to the unique nature of SALECA, the applicable precedents do not provide an obvious answer.  The Court thus concludes that

1    Plaintiffs have, at a minimum, established serious questions going to the availability of

2    vacatur as a remedy (which, in turn, informs the redressability analysis).

3                           2.    Merits

4           Before turning to the merits of Plaintiffs' NEPA claims, it is helpful to begin with

5    some first principles.    Earlier this year, the Supreme Court announced "[a] course

6    correction of sorts . . . to bring judicial review under NEPA back in line with the statutory

7    text and  common sense." *Seven County Infrastructure Coalition*, 145 S. Ct. at 1514.  The

8    Court continued: "In light of the continuing confusion and disagreement in the Courts of

9    Appeals over how to handle NEPA cases, we think it important to reiterate and clarify the

10   fundamental principles of judicial review applicable in those cases." *Id.* at 1511.

11          Throughout the opinion, the Court emphasized that the "central principle of judicial

12   review in NEPA cases is deference." *Id*.  *See also id.* at 1515 ("The bedrock principle of

13   judicial review in NEPA cases can be stated in a word: Deference.").   The Court also

14   clarified that "[w]hen a party argues that an agency action was arbitrary and capricious due

15   to a deficiency in an EIS, the reviewing court must account for the fact that NEPA is a

16   purely procedural statute.   Under NEPA, an agency's only obligation is to prepare an

17   adequate report. . . .   Unlike a plethora of other federal environmental statutes (such as the

18   Clean Air Act, the Clean Water Act, etc.), NEPA imposes no substantive constraints on the

19   agency's ultimate decision to build, fund, or approve a proposed project.   So when

20   reviewing an agency's EIS, the only role for a court is to confirm that the agency has

21   addressed environmental consequences and feasible alternatives as to the relevant project."

22   *Id.* at 1511 (cleaned up).  "In short, when determining whether an agency's EIS complied

23   with NEPA, a court should afford substantial deference to the agency." *Id.* at 1511-12.

24          The Court also provided concrete examples of the forms this deference should take.

25   For instance, "the question of whether a particular report is detailed enough in a particular

26   case itself requires the exercise of agency discretion—which should not be excessively

27   second-guessed by a court." *Id.* at 1512.  Additionally, "[a]n agency must make predictive

28   and scientific judgments in assessing the relevant impacts . . . and alternatives . . . .  Black-

1    letter administrative law instructs that when an agency makes those kinds of speculative
2    assessments or predictive or scientific judgments, and decides what qualifies as significant
3    or feasible or the like, a reviewing court must be at its 'most deferential.'" *Id.* "To tie all
4    of this together: When assessing significant environmental effects and feasible alternatives
5    for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-
6    specific, and policy-laden choices about the depth and breadth of its inquiry—and also
7    about the length, content, and level of detail of the resulting EIS. Courts should afford
8    substantial deference and should not micromanage those agency choices so long as they
9    fall within a broad zone of reasonableness." *Id.* at 1513.

10        The Court concluded that "the proper judicial approach for NEPA cases is
11   straightforward: Courts should review an agency's EIS to check that it addresses the
12   environmental effects of the project at hand. . . . In conducting that review, courts should
13   afford substantial deference to the agency as to the scope and contents of the EIS." *Id.* at
14   1518. The Court also emphasized that "Congress did not design NEPA for *judges* to
15   hamstring new infrastructure and construction projects." *Id.* at 1514.

16                       a.     **Statement Of "Purpose And Need" And Range Of**
17                              **Alternatives**

18        AMRC's first NEPA argument is that the Forest Service "reviewed the project under
19   an incorrect legal regime, resulting in an improper statement of the 'purpose and need' and
20   range of reasonable alternatives." (*AMRC*, Doc. 87 at 18-20.) The thrust of this argument
21   is that the Forest Service operated under the "mistaken belief" that "it had no authority to
22   deny the proposed pipelines, transmission lines, roads, and other facilities" that would be
23   located on federal land following the land exchange. (*Id.*) According to AMRC, the Forest
24   Service thus mistakenly applied "the agency's mining regulations at 36 C.F.R. Part 228A"
25   when reviewing those proposals, rather than applying "the totally-discretionary FLPMA
26   special use permitting rules at 36 C.F.R. Parts 251 and 261." (*Id.*) In its reply, AMRC
27   reiterates this criticism—"The agency believes that because it would not have authority
28   over the underground mine (after the Exchange), it also does not have discretionary

1    authority over the infrastructure permits on the remaining public lands"—and argues, in a

2    related vein, that the Forest Service mistakenly "failed to consider the alternative that, after

3    the Exchange, the mine could not proceed if the agency denies the special use permits for

4    the pipelines and other infrastructure." (*AMRC*, Doc. 97 at 15-16.)

5          AMRC is unlikely to succeed on these arguments. It is simply not true that the

6    Forest Service mistakenly believed it was required to automatically approve all of the

7    pipelines and other mine-related infrastructure that, under the proposed mine plan of

8    operations, would be located on federal land following the land exchange. Although page

9    92 of the FEIS states that "the Forest Service is unable to refuse approval of the GPO within

10   their regulations and guidance" (*AMRC*, Doc. 93-1 at 15), that statement, when viewed in

11   proper context, only refers to Resolution Copper's planned use of *non*-federal land

12   following the land exchange. The executive summary of the FEIS states in plain terms that

13   "[t]he purpose and need of this project is twofold," one of which is "[t]o *consider* approval

14   of a proposed GPO governing surface disturbance on NFS lands—*outside the exchange*

15   *parcels*—from mining operations that are reasonably incident to extraction, transportation,

16   and processing of copper and molybdenum." (*San Carlos*, Doc. 105-9 at 9, emphasis added

17   [FEIS page ES-6].) Other portions of the record likewise make clear that the Forest Service

18   understood that it had discretion over proposals related to the post-exchange use of federal

19   land and that its evaluation of those proposals was governed by the special use permitting

20   rules appearing at 36 C.F.R. Part 251:

21
22
23
24
25
26
27
28
      The Forest Service is making a decision regarding *whether* and how to authorize the use and occupancy of NFS land for mine-related pipeline and power line infrastructure crossing NFS lands, along with maintenance, reconstruction, and use of NFS roads. *Any associated uses of NFS land for pipelines and utilities are special uses and are regulated under 36 CFR § 251.50 . . . [and] requires submittal of a special use application (SF-299).* This application process is designed to ensure that authorizations to use and occupy NFS lands are in the public interest. . . . In processing the application, the Forest Service must consider the potential environmental effects of authorizing the proposed uses of NFS land in accordance with the National Environmental Policy Act (NEPA), and the Forest Supervisor must proceed to either approve or deny the authorization. The special use authorization

1
2
3
(SUA) must include terms and conditions, including minimizing damage to the environment, protecting the public interest, and requiring compliance with water and air quality standards.

4   (*AMRC*, Doc. 87-3 at 16, emphasis added.)

5           Indeed, throughout the FEIS, the Forest Service explicitly stated that it was aware

6   of, and applying, both sets of regulations. (*AMRC*, Doc. 93-1 at 16 [FEIS page 135: "The

7   role of the Forest Service under its primary authorities in the Organic Administration Act,

8   Locatable Regulations (36 CFR 228 Subpart A), and Multiple-Use Mining Act is to ensure

9   that mining activities minimize adverse environmental effects on NFS surface resources.

10  The role of the Forest Service under special use authorizations (36 CFR 251 Subpart B)

11  would include terms and conditions to minimize damage to the environment, protect the

12  public interest, and require compliance with water and air quality standards."]; *id.* at 13,

13  emphasis added [FEIS page 21: "If the land exchange occurs, then the mine, all processing

14  facilities, and the tailings storage facility would be located off of NFS lands. The remaining

15  portions of the project on NFS land would be roads, pipelines, and utilities. *Any associated*

16  *uses of NFS land such as roads, pipelines, and utilities are considered special uses and*

17  *regulated under 36 CFR 251.50*."].)

18          Finally, to the extent AMRC contends these perceived flaws also tainted the Forest

19  Service's identification of the no-action alternative, this argument fails not only because it

20  rests on a faulty premise but also because agencies are entitled to substantial deference

21  when assessing "feasible alternatives" and making "fact-dependent, context-specific, and

22  policy-laden choices about the depth and breadth of its inquiry." *Seven County*

23  *Infrastructure Coalition*, 145 S. Ct. at 1513. Given Congress's policy judgment, expressed

24  in SALECA, that the land exchange should go forward so Resolution Copper can engage

25  in copper mining, it was logical—and, at a minimum, fell within the "broad zone of

26  reasonableness" described in *Seven County Infrastructure Coalition*—for the Forest

27  Service to reject the no-action alternatives posited by AMRC. *Headwaters, Inc. v. Bureau*

28  *of Land Mgmt., Medford Dist.*, 914 F.2d 1174, 1180 (9th Cir. 1990) ("[NEPA] does not

1    require the consideration of alternatives whose effect cannot be reasonably ascertained, and

2    whose implementation is deemed remote and speculative.  Nor must an agency consider

3    alternatives which are infeasible, ineffective, or inconsistent with the basic policy

4    objectives for the management of the area.") (cleaned up).

5                    b.      **Direct, Indirect, And Cumulative Impacts**

6         AMRC's second NEPA argument is that the Forest Service "failed to properly

7    analyze the project's direct, indirect, and cumulative impacts." (*AMRC*, Doc. 87 at 20-22.)

8    More specifically, AMRC argues that (1) despite the massive amount of water the mine

9    will require, the FEIS did not meaningfully disclose and analyze the direct and indirect

10   effects of the planned Desert Wellfield; and (2) the FEIS did not consider other reasonably

11   foreseeable activities that will cumulatively impact the available water in the East Salt

12   River Valley—most notably, by arbitrarily deeming it "speculative" that the Superstition

13   Vistas development would continue growing even though over 900,000 people are

14   expected to live there.  (*Id.*)

15        AMRC is unlikely to succeed on these arguments.  As an initial matter, some of

16   AMRC's arguments regarding Superstition Vistas are factually inaccurate.  True, the FEIS

17   contains passages characterizing the further development of this project as "speculative,"

18   but ARMC ignores that the Forest Service proceeded to analyze the expected water use

19   associated with this development despite that characterization:

20        We considered a number of specific projects or actions related to water
21        supplies during the cumulative effects analysis process, including the . . .
          Future Superstition Vistas Development Area on Arizona State Trust Land.
22        *Some of these normally would not be analyzed as cumulative effects because*
23        *they do not meet the appropriate screening criteria* to be considered
          reasonably foreseeable future actions.  For example, . . . [t]he Superstition
24        Vistas development area . . . development plans are conceptual and lack
25        adequate detail to allow substantial analysis of resource effects and thus
          normally would be considered speculative, not reasonably foreseeable.
26        *Regardless of the screening outcomes, due to the great interest expressed by*
27        *the public and cooperating agencies in water-related issues, we have added*
          *this section to the cumulative effects analysis to discuss these regional water*
28        *supply issues in the context of the Resolution Copper Project's use of water.*

1    (*AMRC*, Doc. 93-1 at 157, emphases added [FEIS page 977].)  Elsewhere, the FEIS

2    elaborates: "While the lack of detailed water use plans prevents specific analysis of most

3    of the Superstition Vistas development, some estimates indicate that a population of

4    900,000 could live in this area. Throughout the Resolution Copper Project NEPA process,

5    the ASLD has raised concerns about the potential future water supply to support the

6    Superstition Vistas development.  The cumulative effects modeling described below was

7    undertaken in part to investigate the potential impacts to the Superstition Vistas water

8    supply."  (*Id.* at 164 [FEIS page 165].)  Finally, in Appendix R, the Forest Service

9    explained that although "Superstition Vistas was not analyzed as a standalone RFFA" for

10   various reasons, including that "[it] is considered too speculative to estimate if, when, or

11   to what extent development may occur in these areas," "*we still incorporated the future*

12   *growth in the Superstition Vistas planning area conceptually*. . . .  Note that we expanded

13   the FEIS cumulative effects analysis (chapter 4) to quantify the cumulative effects of

14   competing water uses in the region and the ramifications of ongoing drought or future

15   meteorological trends.  This includes the Superstition Vistas development."  (*Id.* at 234,

16   emphasis added [FEIS page R-340].)

17        AMRC also contends, seemingly in the alternative, that even if the Forest Service

18   made some effort to consider the anticipated water use associated with Superstition Vistas,

19   it used flawed modeling techniques by only considering "holistic" or "qualitative" impacts

20   and not performing an "objective," "quantified assessment."  (*AMRC*, Doc. 97 at 17.)

21   AMRC raises similar criticisms regarding the Forest Service's techniques for analyzing

22   Desert Wellfield's anticipated water use.  But as recently emphasized by the Supreme

23   Court, "when an agency makes those kinds of speculative assessments or predictive or

24   scientific judgments, . . . a reviewing court must be at its 'most deferential.'" *Seven County*

25   *Infrastructure Coalition*, 145 S. Ct. at 1512.  The bottom line is that the FEIS contains

26   extensive analysis regarding water-use issues, including various forms of modeling related

27   to the anticipated water use associated with Desert Wellfield and Superstition Vistas.

28   Chapter 3.7 of the FEIS, entitled "Water Resources," itself spans over 200 pages.  (*San*

1    *Carlos*, Doc. 106-3 at 4 [FEIS table of contents: showing that Chapter 3.7 spans pages 381-

2    599].)   "This section analyzes how the Resolution Copper Project could affect water

3    availability and quality in three key areas: groundwater quantity and groundwater-

4    dependent ecosystems (GDEs), groundwater and surface water quality, and surface water

5    quantity." (*San Carlos*, Doc. 105-9 at 28 [FEIS page ES-25: executive summary of Chapter

6    3.7].)   The FEIS also repeatedly acknowledges that the anticipated water use by the mine

7    will be substantial and may result, directly and indirectly, in alarming environmental

8    consequences.   (*See, e.g.*, *AMRC*, Doc. 93-1 at 169 [FEIS page 989: "[U]ltimately, long-

9    term use of groundwater may become unsustainable, even without considering the growth

10   of the Superstition Vistas development."]; *San Carlos*, Doc. 105-9 at 6-7 [FEIS pages ES-

11   3-4: noting that "[t]he estimated total quantity of external water needed for the life of the

12   mine . . . is substantial" and that "[w]ater use is a major concern among the public, other

13   government agencies, and interested parties"].)

14          It is thus evident that the Forest Service took the requisite "hard look" at water-use

15   issues that is required by NEPA.   *Cf. Audubon Society of Portland v. Haaland*, 240 F.4th

16   967, 984 (9th Cir. 2022) ("We next consider whether, under NEPA, [the agency] took a

17   sufficiently thorough 'hard look' at the environmental effects of pesticides on the Refuges

18   in concluding that pesticides could continue to be used with minimal environmental

19   consequences.   In performing this review, we do not fly-speck [the agency's] analysis and

20   . . . employ a rule of reason to determine whether it contains a reasonably thorough

21   discussion of the significant aspects of the probable environmental consequences.   Under

22   NEPA, we refrain from acting as a type of omnipotent scientist and must defer to an

23   agency's decision that is fully informed and well-considered.") (cleaned up).   Even if the

24   Forest Service could have used different technical water-use modeling techniques in some

25   instances, such "fact-dependent, context-specific, and policy-laden choices" are entitled to

26   "substantial deference" and "should not [be] micromanage[d]" so long "as they fall within

27   a broad zone of reasonableness."   *Seven County Infrastructure Coalition*, 145 S. Ct. at

28   1513.   Such is the case here.

c.    **Comments From Other Agencies**

AMRC's third NEPA argument is that "[t]he Forest Service failed to meaningfully consider comments from other agencies." (*AMRC*, Doc. 87 at 22-25.)  More specifically, AMRC contends the Forest Service ignored the "significant criticisms" raised by the Bureau of Land Management ("BLM") and the Arizona State Lands Department ("ASLD"), both of whom are "cooperating agencies" on the FEIS.  (*Id.* at 22.)  Relying on cases from outside the Ninth Circuit, AMRC contends that NEPA creates a duty to provide a reasoned response to any criticisms raised by cooperating agencies.  (*Id.* at 23.)

Even assuming the Ninth Circuit follows such a rule, AMRC is unlikely to succeed on this argument because it rests on an inaccurate factual premise—although the Forest Service may not have *adopted* the views of BLM and ASLD on certain disputed issues, it did not *ignore* those agencies' views.  For example, BLM issued a 26-page, singled-spaced report in June 2022 that raised an array of concerns with, *inter alia*, how the 2021 version of the EIS addressed hydrology and water-use issues.  (*AMRC*, Doc. 87-1.)  Those concerns were often extremely technical in nature and involved, for example, contentions that the 2021 version of the EIS improperly "include[d] dewatering in the analysis of the No Action alternative" (*id.* at 14); failed to consider "indirect effects of mining impacting groundwater resources in the Cutter Basin" (*id.*); failed to properly address "[t]he Drought Contingency Plan" (*id.* at 15); and failed to consider the cumulative impact of the planned mining activities on private well owners (*id.* at 20 ["The BLM reviewers wondered if the dewatering of the shallow aquifer will forever prevent any future landowner or development from using the shallow Apache Leap tuff aquifer as a water source, which would force any development or landowner to either drill a more expensive well to a deeper water source, or force them to obtain water from another basin?"]).  The 2025 FEIS, in turn, directly acknowledges and addresses many of those concerns, even if it does not specifically identify the BLM report as their source:[13]

---

[13]    In addition to arguing that the FEIS functionally addressed the criticisms in the BLM report without "[m]entioning the BLM report by name," the Federal Defendants contend that the Forest Service separately issued "[a] detailed memorandum on the BLM report," which "is part of the administrative record for the project."  (*AMRC*, Doc. 93 at 27 n.13.)

We received many comments expressing concern with regional water supplies, current and future stresses on water supplies from drought and future meteorological trends, and the ramifications of Resolution Copper's use of water in the face of competing water uses. We considered a number of specific projects or actions related to water supplies during the cumulative effects analysis process, including the following: Arizona's Drought Contingency Plan; Resolution Copper's Potential Allocation of CAP Water; Town of Florence Development Projects; Population Change; Recent Modeling Reports Projecting Water Shortages in Pinal County; Assured Water Supplies in the East Salt River Valley; Future Superstition Vistas Development Area on Arizona State Trust Land. . . . Regardless of the screening outcomes, due to the great interest expressed by the public *and cooperating agencies* in water-related issues, we have added this section to the cumulative effects analysis to discuss these regional water supply issues in the context of the Resolution Copper Project's use of water.

(*AMRC*, Doc. 93-1 at 157, emphasis added [FEIS page 977]. *See also id.* at 42-46 [FEIS pages 437-41: providing an extensive new discussion of "indirect impacts to Tribal water resources in the Cutter Basin" in response to "concerns [that] were raised" regarding the 2021 EIS's analysis of that topic].)

Perhaps the Forest Service could have done even more to specifically address each and every one of the many detailed, technical criticisms set forth in BLM's June 2022 report, but NEPA does not require that level of detail. As the Federal Defendants note without contradiction in their brief, "[t]he water analysis alone included 38 participants representing the Forest Service and contractors, six cooperating agencies or stakeholders (including Dr. Wells on behalf of the San Carlos Apache Tribe), and Resolution Copper and contractors." (*AMRC*, Doc. 93 at 28 n.14.) Particularly in a project of this magnitude, it will always be possible to identify some argument, raised by some stakeholder, that could have been analyzed in more detail in the FEIS. Nevertheless, "the question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency

_____

AMRC, in turn, contends the Court may not consider this memorandum because it was not included in the FEIS or published on the Forest Service's website at the time of the FEIS's publication. (*AMRC*, Doc. 97 at 18 & n.4.) The Court finds it unnecessary to resolve this argument because, as discussed above, AMRC's NEPA challenge fails even if the analysis is confined to the FEIS.

discretion—which should not be excessively second-guessed by a court." *Seven County Infrastructure Coalition*, 145 S. Ct. at 1512. *See also id.* at 1518 ("Courts should review an agency's EIS to check that it addresses the environmental effects of the project at hand. . . . In conducting that review, courts should afford substantial deference to the agency as to the scope and contents of the EIS."). With recognition that the "central principle of judicial review in NEPA cases is deference," *id.* at 1511, the Court concludes that AMRC is unlikely to succeed on its contention that the Forest Service arbitrarily and capriciously ignored BLM's criticisms.

The analysis is even more straightforward with respect to ASLD. AMRC contends that ASLD raised various concerns regarding Superstition Vistas and that those "concerns were largely ignored, as the Forest Service erroneously concluded that most of the Superstition Vistas is 'speculative.'" (*AMRC*, Doc. 87 at 25.) But as discussed in the preceding section of this order, the Forest Service proceeded to analyze the expected water use associated with the Superstition Vistas development despite the purportedly speculative nature of that development. Furthermore, the Forest Service specifically indicated, in various portions of the FEIS, that it had revised its analysis in response to concerns identified by ASLD. (*See, e.g.*, *San Carlos*, Doc. 109-2 at 50-51 [FEIS pages R-43-44: photocopy of November 7, 2019 letter from ASLD with superimposed comment boxes indicating where the Forest Service's responsive comments may be located in the FEIS]; *id.* at 81 [FEIS page R-74: table identifying ASLD's comment and indicating where the Forest Service's responsive comments may be located in the FEIS]; *AMRC*, Doc. 93-1 at 233 [FEIS page R-287: "These comments concern the potential impact to Arizona State Trust land, specifically the future Superstition Vistas development area in the East Salt River valley. Many public comments raised the issue of competing water uses, water scarcity, and regional water supplies. We added discussion of this topic to the FEIS. This includes the Superstitions Vistas development."]; *id.* at 234 [FEIS page R-340: "These comments specifically mention the planned Superstitions Vistas development area in the East Salt River valley. . . . Note that we expanded the FEIS cumulative effects analysis

1    (chapter 4) to quantify the cumulative effects of competing water uses in the region and

2    the ramifications of ongoing drought or future meteorological trends.  This includes the

3    Superstition Vistas development."].)  Again, even if the Forest Service could have done

4    more to specifically address ASLD's criticisms, the Court must give deference to the Forest

5    Service's determination as to just how detailed the FEIS needed to be.  *Seven County*

6    *Infrastructure Coalition*, 145 S. Ct. at 1512, 1518.  Particularly in light of that deference,

7    the Forest Service's choice likely fell within the "broad zone of reasonableness," which

8    means that AMRC is unlikely to succeed on its NEPA challenge.

9                        d.    **Mitigation Measures**

10        AMRC's fourth NEPA argument is that the Forest Service "failed to consider, and

11    require, sufficient mitigation measures," "especially regarding the groundwater pumping

12    and transport via the proposed pipelines."  (*AMRC*, Doc. 87 at 25-27.)

13        These criticisms require little additional discussion in light of the analysis in the

14    preceding sections of this order.  The FEIS includes hundreds of pages of detailed analysis

15    regarding water usage, including analysis regarding mitigation measures: "We developed

16    a robust monitoring and mitigation strategy to avoid, minimize, rectify, reduce, or

17    compensate for resource impacts that have been identified during the process of preparing

18    this EIS.  Appendix J contains descriptions of mitigation measures that are being required

19    by the Forest Service and mitigation measures voluntarily brought forward and committed

20    to by Resolution Copper.  Appendix J also contains descriptions of monitoring that would

21    be needed to identify potential impacts and mitigation effectiveness."  (*AMRC*, Doc. 93-1

22    at 72 [FEIS page 562].  *See also id.* at 16-24 [FEIS pages 135-43: overall framework for

23    mitigation].)  AMRC's criticisms of the scope and substance of that analysis are

24    insufficient to overcome the deference required by *Seven County Infrastructure*

25    *Coalition*.[14]

26

27    [14]    In a related vein, to the extent AMRC argues the Forest Service should have made "Measure PF-WR-03" mandatory (*AMRC*, Doc. 87 at 26), the Court agrees with the

28    Federal Defendants that Forest Service did not act arbitrarily and capriciously in concluding it lacked regulatory authority as to this specific issue because Resolution Copper's recovery wells will not be located on federal land.  (*AMRC*, Doc. 93-1 at 228

1          e.     **Tailings Storage Facility Alternatives And Pipelines**

2          The Tribe's first NEPA argument is that the "FEIS is woefully inadequate in how it

3   addresses issues related to the tailings storage facility alternatives and both the failings and

4   concentrate pipelines." (*San Carlos*, Doc. 105 at 19-22.)  In support, the Tribe proffers a

5   declaration from Dr. Steven Emerman, which identifies 14 asserted deficiencies in the

6   FEIS's analysis.  (*San Carlos*, Doc. 109-6 at 3-6.)  Enclosed as an attachment to the

7   declaration is a 67-page report from Dr. Emerman, which describes the asserted

8   deficiencies in more detail.  (*Id.* at 7-73.)  The Federal Defendants, in turn, have moved to

9   strike Dr. Emerman's declaration because it "offer[s] improper expert opinions that were

10  not before agency decision-makers from the United States Forest Service in this matter."

11  (*San Carlos*, Doc. 115 at 1.)  In response, the Tribe identifies various reasons why Dr.

12  Emerman's declaration may be considered despite the usual rule barring the consideration

13  of extra-record evidence in an APA action.  (*San Carlos*, Doc. 120.)

14         The Court agrees with the Tribe that at least some aspects of Dr. Emerman's

15  declaration may be considered—and, thus, the declaration need not be stricken.  Of course,

16  "[w]hen reviewing an agency decision, the focal point for judicial review should be the

17  administrative record already in existence, not some new record made initially in the

18  reviewing court.  Parties may not use post-decision information as a new rationalization

19  either for sustaining or attacking the Agency's decision." *Ctr. for Biological Diversity v.*

20  *U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006) (cleaned up).  The Ninth

21  Circuit has "recognized four exceptions to this rule, allowing extra-record materials (1) if

22  necessary to determine whether the agency has considered all relevant factors and has

23  explained its decision, (2) when the agency has relied on documents not in the record,

24  (3) when supplementing the record is necessary to explain technical terms or complex

25  subject matter, or (4) when plaintiffs make a showing of agency bad faith." *Id.* (cleaned

26  up).  "These exceptions are narrowly construed and applied," *Lands Council v. Powell*, 395

27  F.3d 1019, 1030 (9th Cir. 2004), and the party seeking to invoke an exception bears a

28  _____

[FEIS page R-235].)

"heavy burden," *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010).

If Dr. Emerman had simply been retained by the Tribe, following the conclusion of the Forest Service's environmental impact analysis, to attempt to poke holes in that analysis, there is a strong argument his declaration would be impermissible. Although the Tribe asserts that Dr. Emerman's declaration "do[es] not ask the district court to second guess the Forest Service's scientific judgments or conclusions" and is simply being provided to identify the relevant factors the Forest Service should have considered (*i.e.*, the first *Lands Council* exception) and/or to provide background information regarding technical terms (*i.e.*, the third *Lands Council* exception) (*San Carlos*, Doc. 120 at 5-6), this is obviously untrue—the main point of Dr. Emerman's declaration is to criticize the substance of the Forest Service's conclusions. (*See, e.g.*, *San Carlos*, Doc. 109-6 ¶ 4 ["As more fully stated in the memorandum that I authored, attached as Exhibit A, the 2025 FEIS fails to adequately address fourteen substantive areas related to tailings storage facilities and both tailings pipelines and concentrate pipelines."]; *id.* ¶ 8 ["As such, the 2025 FEIS fails to address and analyze the risks and potential environmental impacts presented by the Application to the degree required under NEPA . . . ."].) Courts should not allow litigants in an APA action to sneak in after-the-fact substantive criticisms of the agency's analysis under the guise of providing background details. *See, e.g.*, *Asarco, Inc. v. U.S. Envt'l Protection Agency*, 616 F.2d 1153, 1160-61 (9th Cir. 1980) ("[W]e think that the district court went too far in its consideration of evidence outside the administrative record. . . . Most of the expert testimony . . . should not have been admitted or at least not have been considered for the purpose of judging the wisdom of the EPA's stack-testing requirement. This technical testimony was plainly elicited for the purpose of determining the scientific merit of the EPA's decision."); *Bartell Ranch LLC v. McCullough*, 2021 WL 6118738, *5 (D. Nev. 2021) (denying supplementation request where "the Court is left with the impression . . . that Lithium Nevada seeks to use the Monitoring Plan," "not to explain technical subject matter," but "to impermissibly support the 'correctness or wisdom of the

1   agency's decision'") (citation omitted); *Alsea Valley Alliance v. Evans*, 143 F. Supp. 2d

2   1214, 1216 (D. Or. 2001) ("[A] party may not circumvent the general rule, that judicial

3   review is limited to the administrative record, by simply labeling a declaration as 'assisting

4   the court.'") (citation omitted).

5          With that said, Dr. Emerman is not attempting to raise entirely *new* arguments and

6   criticisms that were not previously presented to the Forest Service.  The FEIS reflects that

7   Dr. Emerman raised many of the criticisms set forth in his declaration as objections to the

8   draft EIS and that the Forest Service specifically considered and addressed those criticisms

9   in the appendix to the FEIS.  (*See, e.g.*, *San Carlos*, Doc. 109-2 at 220 [FEIS page R-213:

10  "Comment response" regarding "Volcanism and seismic data sources," explaining that

11  "additional investigation and updated data sources have been received since the DEIS . . .

12  including a report by Dr. S. Emerman (Appendix B-5 to the letter)"]; *id.* at 311 [FEIS page

13  R-304: "Comment response" regarding "FMEA, breach analysis, seismic analysis,

14  planning," which was "Responsive to these comments: . . . 30145-5 (Emerman4), 30145-

15  6 (Emerman4), 30145-7 (Emerman4), 30145-8 (Emerman4)."]; *id.* at 340 [FEIS page R-

16  333: "Comment response" regarding "Disclosed water use is incorrect and unrealistic,"

17  addressing various criticisms raised by Dr. Emerman].)  Under these circumstances, at least

18  some portions of Dr. Emerman's declaration may be considered.  *Cf. Asarco*, 616 F.2d at

19  1156, 1160-61 (concluding that the testimony from Cahill describing "the history of

20  Asarco's communications with the EPA concerning compliance with its testing

21  requirements" "could be considered under the standards we have set forth," even though

22  much of the other testimony was impermissible, where Cahill "sent a letter to the EPA

23  discussing the possibility that chemical reactions might occur in the stack and restating

24  Asarco's position that accurate tests could be conducted at the existing sampling sites" and

25  the EPA then issued the challenged decision but "made no response to Cahill's letter" in

26  its decision).

27         Nevertheless, on the merits, Dr. Emerman's declaration does not establish a

28  likelihood that the Forest Service acted arbitrarily and capriciously.  Resolution Copper's

1  brief succinctly identifies the various flaws in the Tribe's arguments regarding Dr.
2  Emerman's opinions and the Court agrees with that analysis.  For example, "[t]he FEIS
3  exhaustively analyzed various alternatives for the tailings facility.  The FEIS and the draft
4  ROD explain why the Forest Service selected Skunk Camp, located off Forest Service
5  Land: it is 'the most remote location' and 'offers the best ability to control seepage and
6  protect water quality, has the least visibility, and is located in an area with little recreation
7  use.' . . .  The FEIS [also] devotes an entire 51-page section to tailings and pipeline safety
8  that addresses all of Dr. Emerman's concerns.  The agency undertook an exhaustive and
9  collaborative process to assess the inherent risks in the tailings designs and a range of
10  breach scenarios."  (*San Carlos*, Doc. 116 at 32.)  Furthermore, although "Dr. Emerman
11  states that he would have relied more heavily on a different analytical method that
12  estimated the pipeline failure risk to be higher, 0.62 incidents per 1,000 miles," this merely
13  reflects that "one engineer disagreed with other engineers about the best way to evaluate
14  the risk of pipeline failures" and "[b]oth *Seven County* and long-time NEPA precedents
15  unambiguously teach that this Court should decline to interject itself into disputes about
16  technical details—reached after a painstaking process fully described in the FEIS—and
17  should instead defer to the agency's well-reasoned analysis."  (*Id.* at 33.)  And again,
18  although Dr. Emerman raises criticisms regarding "the Forest Service's methodology for
19  modeling the risk of tailings dam failure, its selection of tailings dam engineering criteria,
20  and its alleged failure to consider international standards for tailings dam locations," "[t]he
21  Forest Service addressed these engineering minutiae in detail in the FEIS and its supporting
22  analyses, explaining how the agency exercised its judgment and referencing a massive
23  library of technical documents supporting that judgment.  Among these are a
24  comprehensive breach (*i.e.*, total failure) analysis for each of the Project alternatives.
25  These are again simply instances of one engineer disagreeing with others.  They supply no
26  basis to find the FEIS arbitrary and capricious . . . ."  (*Id.*)

27  In reaching this conclusion, the Court does not mean to diminish the gravity of the
28  concerns raised by Dr. Emerman.  Among other things, Dr. Emerman contends that the

actual failure rate for tailings pipelines "is 21 times the annual failure rate estimated in the FEIS" (*San Carlos*, Doc. 109-6 at 10); that, as a result, "tailings pipeline failure should be regarded as an expected outcome for the Resolution Copper project" (*id.* at 12); that "a great deal of toxic tailings and water could be released before the pipeline is shut down upon detecting that a leak has occurred" (*id.* at 14); that "the failure of a concentrate pipeline is an expected outcome of the Resolution Copper project" (*id.* at 16); that the cost of performing Dr. Emerman's preferred form of dam breach analysis would have been quite low, ranging from $10,000 to $35,000 (*id.* at 18, 23); that "the Skunk Camp site might not even be suitable for a tailings storage facility" due to flaws in the Forest Service's analysis of its foundation (*id.* at 26-27); and that "the tailings dam (outer embankment) of the tailings storage facility at the Skunk Camp site (Alternative 6) will be a source of uncontrolled acid mine drainage into the underlying aquifer and downstream waterways" (*id.* at 36). It is difficult to read Dr. Emerman's report without developing a sense of unease. Even so, the Forest Service was aware of his criticisms and provided extensive, reasoned analysis to justify its conclusions. "Black-letter administrative law instructs that when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its 'most deferential.'" *Seven County Infrastructure Coalition*, 145 S. Ct. at 1512. "Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 1513. Courts must resist the urge to "fly-speck" the agency's analysis and "act[] as a type of omnipotent scientist." *Audubon Society of Portland*, 240 F.4th at 984.

### f.   Lack Of Supplemental EIS

The Tribe's second NEPA argument is that because the FEIS included new "substantive" modeling and analysis that did not appear in the 2021 version of the EIS, "the Forest Service was required to issue a supplemental DEIS for public comment." (*San Carlos*, Doc. 105 at 22.) In support, the Tribe proffers a declaration from Dr. James Wells. (*San Carlos*, Doc. 109-7 at 2-6.) Among other things, Dr. Wells asserts that "[t]he new

information that should have been published for public comment in a supplemental DEIS includes nine reports totaling thousands of pages on issues related to the Skunk Camp tailings storage facility ('TSF') site, stability analyses, aquifer testing, seismic hazard analyses, water quality and level analyses, TSF seepage analyses, groundwater flow models, site investigation summaries, and conceptual hydrogeological models." (*Id.* at 4 ¶ 5.) Enclosed as an attachment to Dr. Wells's declaration is a 24-page report from Dr. Wells. (*Id.* at 7-30.) In that report, Dr. Wells opines that the NEPA implementing regulations at 40 C.F.R. § 1502.9 provide the foundation for his "professional opinion that [the Forest Service] had no discretion under NEPA regulations and should have published a Supplemental Draft EIS because there were significant new circumstances or information relevant to environmental concerns bearing on the proposed action." (*Id.* at 11-12.)

As a threshold matter, Dr. Wells is not qualified to opine on legal issues, such as when NEPA's implementing regulations require the issuance of a draft EIS. As a further threshold matter, Dr. Wells fails to acknowledge that the regulation on which he bases his impermissible legal opinion was rescinded in February 2025, several months before the FEIS's publication. (*San Carlos*, Doc. 105-9 at 54 [FEIS page 9: "In January 2025, Executive Order 14154 was issued, directing the CEQ to propose rescinding CEQ's NEPA regulations found at 40 CFR 1500 et. seq. In February 2025, CEQ published an interim final rule removing CEQ regulations from the Code of Federal Regulations."].)

Yet even assuming the rescinded regulation still applied at the time of the FEIS's publication,[15] the Tribe has not established a likelihood of success on this claim. "[T]he standard that governs an agency's decision whether to prepare a supplemental EIS . . . [is] that an agency should apply a 'rule of reason' . . . . [A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."

---

[15] The Tribe argues in its reply that the rescinded regulation remained applicable based on a memo issued by the President's chief of staff. (*San Carlos*, Doc. 119 at 16 n.7.) For the reasons outlined above, it is unnecessary to resolve this issue.

1     *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 373 (1980). "If an agency had to file a

2 supplemental draft EA and repeat the public comment process every time it makes any . . .

3 modifications, the NEPA review process would never end . . . ." *Earth Island Inst. V. U.S.*

4 *Forest Serv.*, 87 F.4th 1054, 1067 (9th Cir. 2023).

5     The now-rescinded 40 C.F.R. § 1502.9(d) provided that an agency "shall prepare

6 supplements to either draft or final environmental impact statements if a major Federal

7 action is incomplete or ongoing, and . . . [t]here are substantial new circumstances or

8 information about the significance of adverse effects that bear on the analysis." *Id.* "The

9 "supplement requirement is triggered by 'new circumstances' when the underlying *project*

10 significantly changes." *Greer Coal., Inc. v. U.S. Forest Serv.*, 470 F. App'x 630, 633 (9th

11 Cir. 2012). And "[w]hether new information is sufficiently significant to necessitate an

12 SEIS turns on the value of the new information to the still pending decisionmaking

13 process." *Protect Our Cmtys. Found. v. Lacounte*, 939 F.3d 1029, 1040 (9th Cir. 2019)

14 (cleaned up). By the Tribe's own account, that standard was not satisfied here—the Tribe

15 contends the "added content" was merely included in an "attempt[] to shore up glaring

16 deficiencies in the now-withdrawn EIS that the Forest Service published in 2021." (*San*

17 *Carlos*, Doc. 105 at 3.) Particularly in light of the deferential standard that applies in this

18 context—"Courts must uphold an agency determination that a supplemental EIS is not

19 required if that determination is not arbitrary and capricious," *Or. Natural Res. Council v.*

20 *Lyng*, 882 F.2d 1417, 1422 (9th Cir. 1989)—the Tribe is unlikely to succeed on this claim.

21 *Cf. Protect Our Cmtys. Found.*, 939 F.3d at 1040-41 ("We agree with the district court that

22 the new information is not significant because it merely confirmed concerns that the 2011

23 EIS already articulated and considered.") (cleaned up).

24            **g.**    **Acid Rock Drainage And Associated Errors**

25     The Tribe's third NEPA argument is that "the FEIS erroneously concludes there

26 would be no acid rock drainage during mine operation" and also "underestimates

27 groundwater impacts downstream of the tailings storage facility," which errors render the

28 "selection of the Skunk Camp action alternative . . . arbitrary and capricious." (*San Carlos*,

1    Doc. 105 at 22-23.)  In support, the Tribe once again relies on the declaration of Dr. Wells.

2    (*Id.*)  The Federal Defendants move to strike Dr. Wells's declaration and the Tribe defends

3    it.  (*San Carlos*, Docs. 115, 120.)

4           The threshold analysis regarding the admissibility of Dr. Wells's declaration mirrors

5    the analysis regarding Dr. Emerman's declaration.  Although one of the obvious purposes

6    of Dr. Wells's declaration is to substantively attack the Forest Service's conclusions, Dr.

7    Wells was personally involved in Forest Service's analytical process.  (*San Carlos*, Doc.

8    114 at 28 n.14 [Federal Defendants' acknowledgement that "Dr. Wells on behalf of the San

9    Carlos Apache Tribe" was one of the "38 participants" who formed the "workgroups" that

10   contributed to the Forest Service's "water analysis"]; *San Carlos*, Doc. 116 at 25

11   [Resolution Copper's acknowledgement that "[t]he FEIS process also included two

12   working groups formed to evaluate water concerns" and "[t]ribal consultant James Wells

13   participated extensively in both"].)  Thus, at least some aspects of Dr. Wells's declaration

14   can be viewed as being offered for the permissible purpose of identifying the opinions and

15   information that were before the Forest Service at the time it made the challenged decision

16   (which may be helpful in determining whether the agency failed to consider the relevant

17   factors and properly explained its decision).

18          Nevertheless, on the merits, Dr. Wells's declaration does not establish a likelihood

19   that the Forest Service acted arbitrarily and capriciously.  The Federal Defendants' brief

20   persuasively explains why, and the Court agrees with that analysis: "Dr. Wells's criticism

21   of the Forest Service's conclusions related to the risks of acid rock drainage . . . second-

22   guesses the Forest Service's scientific and technical analysis to which this Court must

23   defer.  The FEIS analyzed the likelihood that oxygen would penetrate the tailings, causing

24   a risk of acid rock drainage, disclosed uncertainties in the modeling related to this issue,

25   and assessed the reasonableness of various assumptions.  The Forest Service therefore gave

26   a hard look to the likely effects . . . ."  (*San Carlos*, Doc. 114 at 32-33, citations omitted.)

27          Just as with Dr. Emerman, the Court does not mean to diminish the seriousness of

28   the concerns raised by Dr. Wells.  Among other things, Dr. Wells contends that "it is highly

irregular (from a policy as well as scientific perspective) that water quality impacts from the various alternatives would be addressed using different methodologies" (*San Carlos*, Doc. 109-7 at 13); that the Forest Service "ask[ed] too much of a single groundwater model" and although "it is a great technical challenge to construct a groundwater model of this size and complexity, . . . 'best we can do' is not an adequate answer if the calibration issues render the model unreliable for its intended purpose" (*id.* at 15-16); that the Forest Service "is giving the public a false sense that it understands the future groundwater impacts from this project . . . when, in reality, the uncertainties in the groundwater modeling are often too large for the modeling results to be considered reliable at that scale" (*id.* at 17); and that "the FEIS fails to take a hard look at one of the most important environmental issues facing virtually any hard-rock mine: acid rock drainage," as its "conclusions on this issue are illogical and unsupported by reliable scientific analysis" (*id.* at 18). Again, these are alarming criticisms, but "when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its 'most deferential.'" *Seven County Infrastructure Coalition*, 145 S. Ct. at 1512. Courts must resist the urge to "fly-speck" the agency's analysis and "act[] as a type of omnipotent scientist." *Audubon Society of Portland*, 240 F.4th at 984.

### h.    **Failure To Address The Tribe's Hydrological Concerns**

The Tribe's fourth NEPA argument is that the FEIS "fails to address the hydrological impacts that the Tribe raised in its comment of December 23, 2019, related to the regional subsidence that would result from groundwater depletion and the effects on the precipitation and groundwater flows that would follow." (*San Carlos*, Doc. 105 at 23.)

The Tribe is unlikely to succeed on this claim because it is belied by the record. The FEIS expressly acknowledges and addresses the hydrology concerns that were raised by the Tribe. (*San Carlos*, Doc. 114-1 at 42 [FEIS page 437: "During the re-initiation of Tribal consultation in 2021–2022, concerns were raised by the San Carlos Apache Tribe about indirect impacts to Tribal water resources in the Cutter Basin caused by Resolution

1    Copper dewatering around the East Plant Site, as well as long-term changes in regional

2    groundwater from block-caving.  The concern raised was not that drawdown from the

3    Resolution Copper Project would directly impact the Cutter Basin, but that drawdown from

4    the Resolution Copper Project would impact regional water supplies, which might then

5    result in water users replacing lost water resources with additional pumping in the Cutter

6    Basin.  In response to these comments, the Forest Service conducted an analysis of these

7    potential indirect effects (Garrett 2023b), summarized below."]; *id.* at 237 [FEIS page R-

8    356: "Comment response: WT30, Hydrologic connection to San Carlos Apache

9    Reservation. . . .  After the January 2021 publication of the Rescinded FEIS, we received

10   further insights into the concerns raised by the San Carlos Apache Tribe with respect to

11   water impacts.  We understand that the concern is not of direct drawdown impacts but of

12   the potential for cascading regional effects to cause greater groundwater use near Tribal

13   lands.  An analysis of this potential has now been added to section 3.7.1 of the FEIS."].)

14                    3.    Summary As To NEPA Claims

15        It is unlikely that Plaintiffs will be able to survive all of the jurisdictional and

16   threshold challenges that Defendants have raised to their NEPA claims.  Plaintiffs are also

17   unlikely to prevail on the merits of their NEPA claims.

18        C.    **Consultation Claims**

19                    1.    Threshold Issues

20                    a.    **Standing/Redressability**

21        The Tribe will likely be able establish standing/redressability in relation to his

22   consultation claims.  An order vacating the FEIS pending additional consultation would, at

23   a minimum, postpone the land exchange and thus create more time for members of the

24   Tribe to continue using Oak Flat in is current, unspoiled form for religious purposes and

25   ceremonies.  As discussed in relation to Plaintiffs' NEPA claims, the Ninth Circuit has

26   indicated that the temporary cessation of a planned development so an agency can comply

27   with its procedural obligations, which will in turn lead to the temporary cessation of the

28   challenger's asserted injuries arising from the planned development, may be enough to

1    establish the relaxed showing of redressability that is required in the APA context.  *W.*
2    *Watersheds Project*, 921 F.3d at 1148.  The Ninth Circuit has also indicated that
3    establishing redressability is not an onerous task in the context of consultation claims under
4    NHPA seeking injunctive relief.  *Ctr. for Biological Diversity*, 868 F.3d at 826
5    ("Redressability . . . is a more relevant difference when comparing declaratory and
6    injunctive relief because redressability depends on the relief envisioned.  Here, CBD seeks
7    injunctive relief via an order that the Government not undertake any activities in
8    furtherance of the FRF project . . . [and] rescind any such permits or approvals already
9    granted, until it complies with section 402 of the NHPA.  The grant of injunctive relief in
10   this case will result in (1) an adequate NHPA Section 402 process with (2) some likelihood
11   of protecting CBD's interests.  Courts often exercise power under the APA to grant
12   injunctive relief analogous to the halt that CBD requests.  Accordingly, CBD has satisfied
13   the requirement of redressability.") (cleaned up).

14                    b.    **Implicit Preclusion Of Judicial Review**

15          Defendants' "implicit preclusion" argument fails in relation to the Tribe's
16   consultation claims.  SALECA does not expressly preclude judicial review and a strong
17   presumption exists in favor of judicial review.  *Bowen*, 476 U.S. at 670-72; *KOLA, Inc*,
18   882 F.2d at 363.  The statutory features that Defendants emphasize are too ambiguous to
19   overcome this presumption, particularly given SALECA's express requirement that the
20   Forest Service "engage in government-to-government consultation with affected Indian
21   tribes concerning issues of concern to the affected Indian tribes related to the land
22   exchange" and then "consult with Resolution Copper" to "seek to find mutually acceptable
23   measures to . . . address the concerns of the affected Indian tribes; and . . . minimize the
24   adverse effects on the affected Indian tribes resulting from mining and related activities on
25   the Federal land conveyed to Resolution Copper under this section."  16 U.S.C.
26   § 539p(c)(3).  Additionally, SALECA does not even mention NHPA, an omission that is
27   difficult to reconcile with the idea that Congress clearly and unambiguously intended to
28   preclude judicial review of NHPA claims related to the land exchange.

1                        c.    **Final Agency Action**

2            The Tribe's consultation claims are based on alleged violations of the consultation

3    obligations set forth in SALECA and NHPA, but neither statute has a private right of

4    action.  *San Carlos Apache Tribe*, 417 F.3d at 1093 (no private right of action under

5    NHPA); *Concerned Citizens*, 279 F. Supp. 3d at 942-43 (no private right of action under

6    SALECA).  Thus, the Tribe must once again assert those claims via the APA, which

7    requires a showing of final agency action.  *Tohono O'odham Nation*, 138 F.4th at 1200

8    ("Plaintiffs bring their NHPA challenge under the APA.  The APA allows judicial review

9    only of a 'final agency action.'").  As noted, the following two-part test governs whether

10   agency action is considered final: *first*, the action must mark the consummation of the

11   agency's decision-making process; and *second*, the action must determine rights or

12   obligations or be one from which legal consequences will flow.  *Envt'l Defense Ctr.*, 36

13   F.4th at 867-68.

14           The starting point for the finality analysis regarding the Tribe's consultation claims

15   is the Ninth Circuit's recent decision in *Tohono O'odham Nation*.  There, a private

16   company filed an application with BLM in 2008 for permission to build a 515-mile

17   transmission line through New Mexico and Arizona.  *Tohono O'odham Nation*, 138 F.4th

18   at 1194-95.  "A portion of the Route runs through the San Pedro Valley, northeast of

19   Tucson.  The Valley is of great historic and cultural importance to several Native American

20   Tribes, including the Tohono O'odham Nation, the San Carlos Apache Tribe, the Hopi

21   Tribe, and the Zuni Pueblo."  *Id.* a 1195.  BLM then conducted an environmental review

22   of the proposal under NEPA; issued a FEIS in June 2013; issued a final programmatic

23   agreement ("PA") in December 2014 that addressed its consultation obligations under

24   NHPA; and issued a ROD in January 2015 that granted the right-of-way application.  *Id.*

25   However, the ROD clarified that that the company could not actually begin construction

26   until it received a subsequent "limited notice to proceed" ("LNTP") and specified that that

27   an LNTP could not be issued until the BLM's consultation obligations set forth in the PA

28   were fulfilled.  *Id.*  Years later, in September and November 2023, BLM issued two LNTPs

to the company, which prompted the company to begin construction activities. *Id.* at 1197-98. In response, various tribal and environmental organizations filed a lawsuit and sought a preliminary injunction, claiming among other things "that the Department violated the NHPA by authorizing Project construction to begin in the San Pedro Valley before completing its NHPA obligations." *Id.* at 1198. The district court denied the request for injunctive relief and dismissed the lawsuit but the Ninth Circuit reversed the dismissal order. The court identified one of the "key issue[s]" as "whether the LNTPs constitute final agency actions." *Id.* at 1200. As for the first element of *Bennett*'s finality test, the court concluded that "the LNTPs mark the consummation of the agency's decisionmaking process about whether there are historic properties present in the San Pedro Valley" and "also represent the agency's final determination that construction will not restrict subsequent mitigation measures to protect historic properties, as such a determination was a prerequisite to authorizing construction under the PA." *Id.* at 1201 (cleaned up). As for the second element of *Bennett*'s finality test, the court concluded that "[t]he LNTPs also determine 'rights'" because, "[m]ost importantly, they expressly grant SunZia the right to begin construction in the San Pedro Valley." *Id.* Finally, the court rejected the defendants' argument "that the ROD is the only final agency action relevant here," explaining that "the ROD could not have marked the consummation of the Department's NHPA process under the PA; that process was incomplete when the ROD was issued." *Id.* "In sum, we hold that the LNTPs constitute final agency actions because they represent the Department's final decision that the PA requirements had been satisfied, and that [the company] could therefore begin construction in the San Pedro Valley." *Id.* at 1201-02.

Although the parallels between the two cases are not exact, *Tohono O'odham Nation* makes it likely the Tribe will be able to establish the finality element of its consultation claims. The analysis as to the second finality element is straightforward—just as the LNTPs in *Tohono O'odham Nation* determined rights because they served as the prerequisite for construction of the transmission line to begin, the FEIS determines rights and causes legal consequences to flow because it serves as the triggering event for the land

1  exchange.

2      The more complicated question is whether the FEIS marks the consummation of the

3  Forest Service's consultation obligations under SALECA and NHPA in the same way that

4  the LNTPs in *Tohono O'odham Nation* marked the consummation of BLM's consultation

5  obligations.  According to the Federal Defendants, the answer is no: "[T]hose limited

6  notices to proceed are not analogous to the FEIS and Draft ROD here.  The limited notices

7  to proceed 'expressly' authorized construction to commence.  Here, the FEIS describes and

8  analyzes the consultation that occurred, and the Draft ROD identifies the decisions that the

9  Forest Service will make—*but has not yet made*—with respect to mitigation measures.

10 Thus, neither document is a final agency action with respect to the NHPA."  (*San Carlos*,

11 Doc. 93 at 13.)

12     As explained in earlier portions of this order, the Court agrees with Defendants that

13 in the *NEPA* context, the Forest Service has likely not yet made any final discretionary

14 decisions and won't do so until it issues the ROD.  But for *consultation* purposes, the

15 analysis is somewhat different.  Although it's possible that comments and objections to the

16 DROD will prompt the Forest Service to revisit its proposed determinations and, perhaps,

17 engage in additional consultation, it's also possible that no further consultation will occur.

18 It can't be overlooked that the government's stated reason for rescinding the previous EIS

19 in March 2021 was that it had "concluded that additional time is necessary to fully

20 understand concerns raised by Tribes and the public and the project's impacts to these

21 important resources and ensures the agency's compliance with federal law," and thus "it

22 directed the Forest Service to take appropriate steps to re-initiate consultation."  (*San*

23 *Carlos*, Doc. 36-1 ¶ 6, cleaned up.)  The reissuance of the FEIS in June 2025 is a sign that

24 the government believes it has now satisfied those obligations.  To that end, the FEIS

25 expressly states that the consultation process under § 106 of NHPA has now been

26 completed.  (*San Carlos*, Doc. 106-3 at 171 [FEIS page 1000: "In accordance with 36 CFR

27 800.7(c)(4), the Secretary of Agriculture delivered a written response to the ACHP on April

28 17, 2025, and that response concluded the Section 106 process for this undertaking."].  *See*

1   *also San Carlos*, Doc. 82-15 [Secretary of Agriculture's letter to ACHP].)

2   　　　Given this backdrop, and acknowledging that the issue is not free from doubt, the

3   Court concludes that the Tribe will likely be able to establish the "final agency action"

4   element of its consultation claims.

5   　　　　　　　　　　　d.   **No Agency Discretion**

6   　　　The Court is unpersuaded by Defendants' "no agency discretion" arguments as

7   applied to the Tribe's consultation claims.   The Forest Service possesses discretion

8   regarding its consultation obligations, both with respect to how to fulfill them and in

9   determining when they have been satisfied.  Additionally, as noted in relation to Plaintiffs'

10  NEPA claims, Defendants' counterarguments conflate the substance of the Tribe's

11  consultation claims with the remedy the Tribe seeks.

12  　　　　　　　　　　　e.   **Vacatur As A Remedy**

13  　　　Earlier portions of this order explain why Defendants' arguments regarding the

14  permissibility of vacatur as a remedy do not stand as an obstacle to preliminary injunctive

15  relief on Plaintiffs' appraisal and NEPA claims.  The same is true with respect to the Tribe's

16  consultation claims.   Even assuming that Defendants' cited NEPA cases apply in this

17  context, they counsel against vacatur where, unlike here, the underlying project has already

18  begun and actions have already been undertaken in reliance on the agency's challenged

19  decision.

20  　　　　　　　　　2.   Merits

21  　　　　　　　　　　　a.   **Tribal Consultation**

22  　　　"The NHPA involves a series of measures designed to encourage preservation of

23  sites and structures of historic, architectural, or cultural significance." *San Carlos Apache*

24  *Tribe*, 417 F.3d at 1093-94 (cleaned up).  For instance, "[s]ection 106 [of NHPA] requires

25  that federal agencies take into account the effect of their undertakings on any district, site,

26  building, structure, or object that is included in or eligible for inclusion in the National

27  Register." *Id.* at 1094 (cleaned up).  "If a proposed undertaking will have an effect on

28  historic properties to which Indian tribes attach religious and cultural significance, [NHPA]

requires the federal agency to consult with the affected tribes before proceeding." *Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1059 (9th Cir. 2007), *overruled on other grounds*, 535 F.3d 1058 (9th Cir. 2008). *See also* 36 C.F.R. § 800.2(c)(2)(ii) ("[T]he agency official [must] consult with any Indian tribe . . . that attaches religious and cultural significance to historic properties that may be affected by an undertaking."). Under the relevant regulations, "[c]onsultation means the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process." 36 C.F.R. § 800.16(f). "The agency official shall ensure that consultation . . . provides the Indian tribe . . . a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." 36 C.F.R. § 800(c)(2)(A).

SALECA also requires "government-to-government consultation with affected Indian tribes concerning issues of concern to the affected Indian tribes related to the land exchange." 16 U.S.C. § 539p(c)(3)(A). It further requires the government to "consult with Resolution Copper and seek to find mutually acceptable measures to . . . address the concerns of the affected Indian tribes" and "minimize the adverse effects on the affected Indian tribes resulting from mining and related activities" on federal land included in the exchange. *Id.* § 539p(c)(3)(B). This "government-to-government consultation" and "minimize adverse effects" language mirrors the governing NHPA regulations. 36 C.F.R. § 800.2(c)(ii)(C) ("Consultation with an Indian tribe must recognize the government-to-government relationship between the Federal Government and Indian tribes."); *id.* § 800.6(a) ("The agency official shall consult with . . . other consulting parties, including Indian tribes . . . to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize or mitigate adverse effects on historic properties.") In light of this parallel language, and because the Tribe has not argued that SALECA's requirements

1  are materially different from NHPA's requirements,[16] the Court will assume without

2  deciding that these requirements are the same.

3  <p align="center">i.      <u>Relevant Facts</u></p>

4  Appendix S of the FEIS suggests that discussions between the federal government

5  and members of the Tribe regarding the land exchange began in 2003.  (*San Carlos*, Doc.

6  109-2 at 405.)  That year, Forest Service staff members met with members of the Western

7  Apache Coalition, including the Tribe, to "discuss[] proposed land exchange and request[]

8  Apache assistance in reviewing a CR survey."  (*Id.*)  In the two decades that followed,

9  Resolution Copper asserts, without contradiction, that "the Forest Service conducted . . .

10  434 documented consultations with the San Carlos Apache Tribe."  (*San Carlos*, Doc. 116

11  at 41.)[17]  The following non-exhaustive list of tribal contacts is instructive:

12  Between 2003 and 2008, the Forest Service sent several official letters to the San

13  Carlos Apache "Tribal Chair[]" and cultural staff; hosted a "formal" meeting[18] with "San

14  Carlos Cultural Staff"; and hosted an "[i]nformal meeting with the Western Apache

15  coalition."  (*San Carlos*, Doc. 109-2 at 405-07.)

16  Between 2008 and 2015, the Forest Service continued communications with the

17  Tribe through various emails and letters, as well as through formal and informal meetings.

18  (*Id.* at 406-21.)  Some of the topics discussed during this period included the possibility of

19  a "pre-feasibility" or "baseline" study regarding the proposed mine (*id.* at 406-07, 415) and

20  the possibility of an "[e]thnographic" study of the region (*id.* at 413).  Following these

21  discussions, the Tribe executed a Memorandum of Understanding ("MOU") with the

22  Forest Service outlining "[p]rotocols for San Carlos participation in

23  Ethnohistoric/Ethnographic Study."  (*Id.* at 414.)

---

24  [16]   One possible exception is that SALECA explicitly requires the FEIS to incorporate
25  discussion of adverse effects on cultural resources and possible mitigation measures.
16 U.S.C. § 539p(c)(9)(C).

26  [17]   The Tribe does not dispute this number.  Instead, as discussed in more detail below,
27  the Tribe disputes whether certain consultations qualify as meaningful and/or
"government-to-government" consultations.

28  [18]   Appendix S notes that meetings are designated as "formal" when a "Forest Service
line officer [is] present."  (*See, e.g.*, *San Carlos*, Doc. 109-2 at 406.)

1    In 2015, the "Ethnographic and Ethnohistoric Study" was completed (*id.* at 416),

2    including a literature review of "archival and existing literature" as well as "oral interviews

3    and field visits with Tribal members to collect oral history and knowledge" (*San Carlos*,

4    Doc. 106-3 at 44).    Members of the Tribe (as well as members of other tribes)

5    "accompanied research staff to important places throughout the study area and shared

6    information about those places." (*Id.*)    As a result of that study and "Tribal Monitor

7    surveys," the Forest Service recorded "594 special interest areas," including various

8    "cultural resources" and "natural resources." (*Id.* at 50.)    In addition, "the ethnographic

9    study identified seven places of traditional and cultural importance within the direct

10    analysis area." (*Id.* at 51.)

11    Between 2015 and 2016, the Forest Service continued communications with the

12    Tribe concerning the proposed "Baseline" project for "Hydrologic and Geotechnical Data

13    Gathering Activities" and an accompanying environmental assessment of that proposed

14    plan ("EA"). (*San Carlos*, Doc. 109-2 at 415, 417-25.)    Following publication of the EA,

15    the Tribe brought a lawsuit that challenged, *inter alia*, the sufficiency of the tribal

16    consultations.    *Concerned Citizens*, 279 F. Supp. 3d at 939-42.    Judge Campbell rejected

17    that challenge, explaining:

> 18    Consultation is a two-way street.  The administrative record makes clear that
> 19    the Forest Service made numerous and substantial efforts to consult, while
> the Tribe made no meaningful effort to engage with the Forest Service.  Were
> 20    the Court to find that an agency had not satisfied the NHPA's consultation
> requirements simply because no actual consultation occurred, a tribe could
> 21    block any undertaking by refusing to cooperate.  The NHPA does not
> 22    guarantee actual meaningful consultation, only that the tribe will have a
> reasonable opportunity for such consultation.  The Tribe had such an
> 23    opportunity here.

24

25    *Id.* at 942.

26    In August 2015, following the passage of SALECA, the Forest Service sent an

27    "[o]fficial letter" to the Tribe's "[l]eaders and cultural staff" inviting them "to consult about

28    the NDAA Land exchange." (*San Carlos*, Doc. 109-2 at 419.)

From 2015 to 2021, the Forest Service communicated regularly with tribal members through emails and letters.  (*See generally id.* at 418-87.)  The Forest service also hosted formal and informal meetings with "[t]ribal leaders and staff." (*See, e.g.*, *id.* at 427.)  The topics discussed during this period included: the possibility of a MOU between the Tribe and the Forest Service (*id.* at 423); the forthcoming EIS (*id.* at 427); the proposed "mining technique[] and water analyses" (*id.* at 443); and the development of a proposed Programmatic Agreement ("PA") to guide further consultations (*id.* at 435).

In November 2018, the Forest Service made a "Field Trip" in the "Camp Verde area" along with members of the Tribe and other tribes to examine "potential groves." (*Id.* at 438.)  And in May 2019, tribal monitors led a tour of the proposed Skunk Camp tailings storage alternative, which tour included members of the Tribe. (*Id.* at 442.)

Between 2018 and 2021, the Forest Service began including the Tribe in the development of a PA (*id.* at 434-82) with the aim of guiding future tribal consultations and outlining various mitigation measures concerning the land exchange and mine.  (*San Carlos*, Doc. 109-5 at 4-5 [ACHP comments: "Consultation has included the . . . San Carlos Apache Tribe . . . and resulted in the development of a draft PA that would provide a mechanism for further identification and evaluation of historic properties . . . as well as a broad array of measures to attempt to resolve identified adverse effects."].)  This process involved at least eight different versions of the PA, with the Forest Service soliciting comments and input from the Tribe (both in-person and via letter) concerning the successive drafts. (*See, e.g.*, *San Carlos*, Doc. 109-2 at 475 ["San Carlos Apache Tribe . . . Provided comments on PA version 8."]; *id.* at 479 ["Reply to San Carlos . . . comments on PA version 8."].)

On November 22, 2019, the Forest Service met with the San Carlos Apache Tribal Council "during a special Tribal Council meeting." (*San Carlos*, Doc. 116-2 at 42.)  At the meeting, the Forest Service solicited comments on the Draft EIS (*id.*), and the parties discussed the "[u]pdated status of EIS process, answered questions" and heard a "presentation by San Carlos water consultant." (*San Carlos*, Doc. 109-2 at 455.  *See also*

*San Carlos*, Doc. 106-3 at 169 ["A seventh meeting, with the San Carlos Apache Tribe, took place on November 22, 2019."].)

Between 2019 and 2021, the parties continued exchanging emails and letters and participating in meetings concerning many of the same topics outlined above. (*San Carlos*, Doc. 109-2 at 456-88.)  During this period, the Tribe also began expressing concerns about the need for a supplemental EIS.  (*Id.* at 481.)

On March 1, 2021, the Secretary of Agriculture directed the Forest Service to "rescind the FEIS and ROD" because "additional time [was] necessary to fully understand concerns raised by Tribes and the public and the project's impacts to these important resources and ensure the agency's compliance with federal law."  (Doc. 36 at 2.)

In September 2021, the Forest Service sent an email inviting the Tribe to participate in an October 2021 listening session to "re-initiate consultations."  (*San Carlos*, Doc. 109-2 at 488, 491.)  On October 19, 2021, the listening session took place.  (*Id.* at 491.)

Between 2021 and 2025, the Forest Service continued sending emails and letters to the Tribe, attempting to arrange meetings (*id.* at 488-510), and providing updates on topics such as "water quality documents" and continued "review of hydrology aspects of the RCM EIS" (*see, e.g.*, *id.* at 494, 500).  The Forest Service also continued its consultation efforts with the various other tribal parties.  (*Id.* at 488-510.)

In November 2021, the Tribe's Chairman ("Chairman Rambler") "authorized his admin to set a telephone meeting with [Associate Deputy Chief] Gyant."  (*Id.* at 492.)

In December 2021, the Forest Service sent an email "[a]sk[ing] San Carlos Tribe to select date and time for meeting and provide topics they would like to discuss."  (*Id.* at 493.)

On February 10, 2022, the Forest Service met with Chairman Rambler, as well as with the Tribe's attorney general ("San Carlos AG"), at Oak Flat in a meeting marked in the FEIS as "CONFIDENTIAL."  (*Id.* at 495.)  The next day, another meeting was held in Peridot, Arizona, to discuss "San Carlos' concerns about the project and the FEIS" and other confidential topics.  (*Id.*)

In March 2023, the "USDA Under Secretary Wilkes" and other Forest Service staff attended a tour of Oak Flat along with "[p]resentations by proponents for saving Oak Flat." (*Id.* at 503.)

In April 2023, the Forest Service held another tribal listening session with multiple tribal members present, including members of the Tribe, and "[d]iscussed issues identified by Tribes and the status of the EIS." (*Id.* at 504.)

In August 2023, Chairman Rambler sent a letter to the Forest Service "propos[ing] a MOU, a working group, and 6 topics to be discussed by the working group." (*Id.* at 505.)

On May 15, 2024, after exchanging drafts of the MOU, the Forest Service met with the San Carlos Tribal Council in San Carlos, Arizona, to "[d]iscuss[] EIS and proposed consultation MOU." (*Id.* at 507.)

On June 7, 2024, the Forest Service met virtually with the San Carlos AG and other tribal staff to continue discussions of the proposed MOU. (*Id.* at 509. *See also San Carlos*, Doc. 119-2 [meeting agenda and transcript].) From the Tribe's perspective, the meeting was insulting. (*San Carlos*, Doc. 119 at 18 ["[A] 'transcript' of that June 7, 2024, meeting . . . [demonstrates] that the Forest Service resisted even the most basic acknowledgements, including whether Oak Flat was part of the Tribe's ancestral territory."].)

In April 2025, the Secretary of Agriculture sent a letter to the Tribe "[c]onvey[ing] USDA decision to publish the FEIS and draft Record of Decision, and conclude NHPA Section 106 process." (*San Carlos*, Doc. 109-2 at 510.)

## ii.    Sufficiency Of Consultation

Two baseline principles guide the analysis of the Tribe's challenge to the Forest Service's compliance with its tribal consultation obligations under NHPA and SALECA. First, the obligation to engage in consultation is not the same thing as an obligation to reach an outcome that is acceptable from the perspective of the party being consulted. Section 106 of NHPA is simply "a 'stop, look, and listen' provision." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999). It is "chiefly procedural in nature." *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 859 (9th Cir. 1982). Second, as

1    discussed, because NHPA and SALECA do not create a private right of action, the Tribe's

2    challenge to the Forest Service's compliance with the consultation obligations created by

3    those statutes arises under the APA.  *Tohono O'odham Nation*, 138 F.4th at 1200

4    ("Plaintiffs bring their NHPA challenge under the APA."); *San Carlos*, 417 F.3d at 1093.

5    The APA's arbitrary-and-capricious standard thus applies.  *See, e.g.*, *Morongo Band of*

6    *Mission Indians v. F.A.A.*, 161 F.3d 569, 573 (9th Cir. 1998) ("Decisions regarding NHPA

7    . . . [are] reviewed under the arbitrary and capricious standard."); *Western Watersheds*

8    *Project v. McCullough*, 2023 WL 4557742, *2 (9th Cir. 2023) ("The BLM's identification

9    of tribes for consultation was not arbitrary or capricious and did not violate NHPA . . . .").

10   Under that "deferential" standard, the question is whether the Forest Service's consultation

11   efforts fell "within a zone of reasonableness."  *Prometheus Radio Project*, 592 U.S. at 423.

12        Applying those standards, the Tribe is unlikely to prevail on its tribal consultation

13   challenges.  As noted, the governing regulations only require the Forest Service to "seek[],

14   discuss[], and consider[] the views" of the Tribe and "*where feasible*, seek[] agreement."

15   36 C.F.R. § 800.16(f) (emphasis added).  This requires the Forest Service to provide the

16   Tribe "a *reasonable opportunity* to identify its concerns" and "articulate its views on the

17   undertaking's effects on [affected] properties, and participate in the resolution of adverse

18   effects."  36 C.F.R. § 800(c)(2)(iii) (emphasis added).  The voluminous letters, emails, and

19   meetings documented in the FEIS demonstrate that the Forest Service consistently sought

20   the Tribe's input regarding the project over a period of more than two decades and provided

21   many, many opportunities for the Tribe to participate in the decision-making process.  Nor

22   can it be ignored that the Tribe brought a previous challenge regarding the adequacy of the

23   Forest Service's consultation efforts related to the land exchange, only for Judge Campbell

24   to determine that those consultation efforts were sufficient, in part because the Tribe

25   refused to engage in good faith.  *Concerned Citizens*, 279 F. Supp. 3d at 941-42.  Although

26   the Tribe is dissatisfied with the outcome that ultimately resulted from the tribal

27   consultation process, such dissatisfaction does not show the process itself was insufficient.

28   *See, e.g.*, *Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dept. of Interior*, 608 F.3d

592, 610 (9th Cir. 2010) ("In sum and as reflected in the record, the BLM has consulted with the Tribe regarding PCRIs within the project area for many years. In addition, the Tribe has made no showing that it would have provided new information had it been consulted again earlier in the Amendment's approval process. We therefore conclude that the BLM did not violate its obligation to consult with the Tribe and thus did not violate the NHPA."); *Navajo Nation*, 479 F.3d at 1060 ("[B]ecause of the extensive record of consultation undertaken by the Forest Service in this case, we agree with the district court that although the consultation process did not end with a decision the tribal leaders supported, this does not mean that the Forest Service's consultation process was substantively and procedurally inadequate.") (cleaned up).

The Tribe's more specific objections do nothing to change this conclusion. First, the Tribe appears to argue that any tribal consultations that took place before the March 2021 withdrawal of the initial EIS are irrelevant. (*San Carlos*, Doc. 105 at 23-24.) But the Ninth Circuit has rejected variants of this argument. *See, e.g.*, *Te-Moak*, 608 F.3d at 608-10 (rejecting NHPA-based tribal consultation challenge in part due to "BLM's previous consultation with the Tribe for the original HC/CUEP and other projects in the area" and emphasizing that those earlier consultation efforts took place "for many years"); *Summit Lake Paiute Tribe of Nev. v. U.S. Bureau of Land Mgmt.*, 496 F. App'x 712, 714-15 (9th Cir. 2012) ("The Tribe argues that BLM did not adequately consult with it regarding the proposed re-route, depriving it of its right to participate in the resolution of adverse effects as required by the regulations. *In addressing the adequacy of consultation, we consider both the consultation on the re-routing and the consultation that was conducted in connection with the initial approval of the project*. Indeed, it was BLM's consultation with the Tribe, which started at least as early as January 2009, that led it to propose the re-route in the first place, and BLM conducted four site visits with the Tribe to try to ascertain the boundaries of the traditional cultural property. We hold that this process, taken as a whole, fulfilled BLM's consultation obligation.") (emphasis added) (cleaned up). As noted, Judge Campbell previously rejected a challenge to the adequacy of one component of those earlier

1    consultation efforts.  *Concerned Citizens*, 279 F. Supp. 3d at 941-42.

2         Second, the Tribe argues for the first time in its reply brief that only consultations

3    with the San Carlos Apache *Tribal Council* qualify as "government-to-government

4    consultation."  (*San Carlos*, Doc. 119 at 17.)[19]  The Tribe thus argues that many of the

5    letters, phone calls, "listening sessions," and other meetings identified in the FEIS, which

6    involved communications with other San Carlos officials (including the San Carlos AG),

7    do not count.  (*Id.*)  As an initial matter, this argument is likely forfeited because it was

8    raised for the first time in a reply brief, *Zamani*, 491 F.3d at 997, and the Tribe did not cite

9    any supporting authority in its reply.  Moreover, given the interconnected nature of the

10   voluminous tribal contacts described in the FEIS, which suggests the Tribal Council was

11   kept apprised of the Forest Service's consultation efforts with other tribal officials and

12   representatives, it would be surprising if those consultation efforts were *irrelevant* for

13   purposes of evaluating the adequacy of the Forest Service's consultation efforts.[20]

14        In any case, the record establishes that the Forest Service's 400+ consultations and

15   communications with tribal representatives included two formal meetings, in November

16   2019 and May 2024, with the Tribal Council (*San Carlos*, Doc. 109-2 at 258, 455, 507);

17   additional formal meetings with individual members of the Tribal Council, such as the

18   Vice-Chair (*id.* at 417); and a variety of efforts to schedule even more formal meetings

19   with the Tribal Council (*see, e.g.*, *id.* at 430) and/or meetings and phone calls with

20   Chairman Rambler, the chairman of the Tribal Council (*see, e.g.*, *id.* at 492, 503).  It is

21   difficult to see how such consultation efforts could be deemed inadequate under the

22   ────────────────
     [19]    The portion of the Tribe's motion raising consultation-related challenges says
23   nothing about the consultations being directed toward the wrong tribal representatives.
     (*San Carlos*, Doc. 105 at 23-24.)

24   [20]    With that said, the Court has identified authority from outside the Ninth Circuit that
     may provide support for the Tribe's position regarding which representatives matter for
25   purposes of "government-to-government" consultation duties.  *City of Phoenix, Ariz. v.
     Huerta*, 869 F.3d 963, 971 (D.C. Cir. 2017) ("[T]he FAA failed to fulfill these obligations
26   because it consulted only low-level employees in the City's Aviation Department, whom
     the City had never designated as its representatives.  True, the City never informed the
27   FAA that low-level Aviation Department employees were inadequate points of contact, but
     that is irrelevant.  Neither statute nor regulation imposes a duty on local governments to
28   affirmatively inform the agency of their chosen representatives.  Just the opposite: the
     agency must ask local governments who their authorized representatives are.").

- 74 -

1    relevant Ninth Circuit precedents.  *Te-Moak*, 608 F.3d at 609 (9th Cir. 2010) (rejecting

2    tribal consultation claim where "as reflected in the record, the BLM has consulted with the

3    Tribe regarding PCRIs within the project area for many years"); *Navajo Nation*, 479 F.3d

4    at 1060 (rejecting tribal consultation claim in light "of the extensive record of consultation

5    undertaken by the Forest Service in this case").  *See also Concerned Citizens*, 279 F. Supp.

6    3d at 942 ("The administrative record makes clear that the Forest Service made numerous

7    and substantial efforts to consult . . . .").

8         Third, the Tribe contends the formal May 2024 meeting between the Forest Service

9    and the Tribal Council was not meaningful because "[a]t most, the Forest Service consulted

10   with the San Carlos Council about the terms of a [MOU] to guide consultation that was

11   never executed."  (*San Carlos*, Doc. 119 at 17.)  But Chairman Rambler's declaration does

12   not support the assertion that the parties only discussed the MOU at the May 2024 meeting.

13   (*San Carlos*, Doc. 89-5.)    In that declaration, Chairman Rambler lists various "concerns

14   that the Tribe expressed at the meeting," which included, among other things, (1) concerns

15   that the "EIS is deeply flawed," (2) concerns about "[w]hether the Forest Service would

16   fully assess the water needs and assess the viability of potential water sources," and (3)

17   concerns about "[w]hether the Forest Service would provide thorough written responses to

18   BLM's concerns."  (*Id.* ¶ 7.)

19        Fourth, to the extent the Tribe contends that various features of the parties'

20   consultations (such as the fact that no MOU was ever finalized) show that the Forest

21   Service acted in bad faith when carrying out its consultation duties, this claim is not

22   supported by the law, *see Navajo Nation*, 479 F.3d at 1060 ("[a]lthough the consultation

23   process did not end with a decision the tribal leaders supported, this does not mean that the

24   Forest Service's consultation process was substantively and procedurally inadequate"), or

25   by the record.  For example, the Tribe argues that "the Forest Service resisted even the

26   most basic acknowledgements, including whether Oak Flat was part of the Tribe's ancestral

27   territory."  (*San Carlos*, Doc. 119 at 18.)  To support this argument, the Tribe cites the June

28   7, 2024 transcript of a virtual meeting between the Forest Service and certain tribal

representatives, including the San Carlos AG.  (*San Carlos*, Doc. 119-2.)  In that meeting, the Forest Service representative explained the decision to strike certain land acknowledgements from the proposed MOU: "[T]he concern of the Forest Service here was that . . . enumerating these facts might implicate some of the facts in the ongoing litigation regarding the land exchange."  (*Id.* at 27.)  The Forest Service then asked if these acknowledgments could be characterized as "[t]he San Carlos's perspective on these facts" and the tribal representatives pushed back, explaining that these acknowledgments were important for "establishing trust with the Council and the tribe."  (*Id.* at 27-28.)  As a possible compromise, the Tribe proposed "putting a 408 label"[21] on the proposed acknowledgments and the Forest Service asked if the Tribe would be "willing to draft up some of that . . . 408 language."  (*Id.* at 28.)  Rather than evincing bad faith, this exchange demonstrates—at least to the Court's eye—the enormous difficulties the parties faced in finding common ground given the specter of ongoing litigation and the Tribe's vehement opposition to the land exchange.

Fifth, the Tribe argues the Forest Service's consultation efforts were insufficient because they were not "responsive to the issues raised by the Tribe" and therefore not "meaningful."  (*San Carlos*, Doc. 119 at 17-18.)  However, the record demonstrates that the Forest Service responded to many of the Tribe's concerns.  For example, during the early phases of tribal consultation, the Tribe participated extensively in the development of a PA to identify possible mitigation measures concerning the land exchange.  Although "the PA was never executed," some of the "mitigation measures identified in the PA . . . will now be implemented through the final ROD and special use permit for use of Forest Service lands."  (*San Carlos*, Doc. 106-3 at 171 [FEIS page 1000].)  Among the mitigation measures addressed in the original PA and incorporated into the DROD are "preparation of an archeological [historic properties treatment plan]"; an "archeological research design" that will be "completed prior to the proposed ground-disturbing activities in the GPO project areas"; a plan to mitigate adverse "visual, atmospheric, auditory, and

---

[21]  Presumably this refers to Federal Rule of Evidence 408.

cumulative effects"; and an "archeological database fund"[22] "[i]n recognition of the substantial loss of cultural resources and historic properties on State Trust Lands." (*San Carlos*, Doc. 116-2 at 49-50 [DROD pages 38-39].)

In addition, following the May 2024 meeting between the Forest Service and the Tribal Council, a Forest Service representative, Troy Heithecker, sent a letter to Chairman Rambler assuring him that "issues raised through consultation have been considered and carefully analyzed." (*San Carlos*, Doc. 85-8 at 2.) Heithecker went on to address some of the concerns raised in the May 2024 meeting, explaining that "[b]ased on the information obtained through our consultation efforts and reviews of the withdrawn FEIS, the Forest Service is not aware of any information that would require a complete reinitiation of the [FEIS] process." (*Id.* at 3.) Heithecker also explained that, in response to tribal concerns about the mine's impact on water, the Forest Service conducted "additional analysis of potential indirect impacts to groundwater in the area known as the Cutter Basin" and "engaged a Bureau of Land Management (BLM) hydrological review team to review the water analysis section of the FEIS." (*Id.*) Heithecker concluded: "While we have determined that further discussion on some issues is complete, we recognize that compliance with Congress's mandate to complete the SALECA land exchange cannot be reconciled with Tribal concerns and understand there are still issues that allow for further engagement. I am committed to continued collaborative dialogue. Therefore, I am inviting you to reach out directly to me to engage on this proposed project in formal consultation at a time and place convenient for you and your leadership." (*Id.* at 4.)

More substantively, it appears the Forest Service incorporated a more thorough response to the Tribe's concerns regarding water at page 437 of the FEIS:

> During the re-initiation of Tribal consultation in 2021-2022, concerns were raised by the San Carlos Apache Tribe about indirect impacts to Tribal water resources in the Cutter Basin caused by Resolution Copper dewatering around the East Plant Site, as well as long-term changes in regional

---

[22]   The Forest Service Acknowledges that it "no longer has the authority to require this measure" but that the measure is enforceable through "Letter Agreements" with Resolution "dated January 12, 2021." (*San Carlos*, Doc. 116-2 at 50.)

groundwater from block-caving. . . .   In response to these comments, the Forest Service Conducted an analysis of these potential indirect effects . . . .

(*San Carlos*, Doc. 106-2 at 68.  *See also AMRC*, Doc. 93-1 at 235 [FEIS page R-356: "After the January 2021 publication of the Rescinded FEIS, we received further insights into the concerns raised by the San Carlos Apache Tribe with respect to water impacts.  We understand that the concern is not of direct drawdown impacts but of the potential for cascading regional effects to cause greater groundwater use near Tribal lands.  An analysis of this potential has now been added to section 3.7.1 of the FEIS."].)

### b.   **ACHP Consultation**

In addition to challenging the sufficiency of the Forest Service's tribal consultation efforts, the Tribe also argues that the Forest Service failed to adequately consult ACHP. As part of the NHPA consultation process, the Forest Service must "afford [ACHP] a reasonable opportunity to comment with regard to the undertaking."  *Tohono O'odham Nation*, 138 F.4th at 1193 (quoting 54 U.S.C. § 306108) (cleaned up).  After identifying potential adverse effects on a historic property, "[t]he agency official shall notify [ACHP][23] of the adverse effect" and "invite [ACHP] to participate in the consultation" "to seek ways to avoid, minimize or mitigate the adverse effects."  36 C.F.R. § 800.6(a)(1), (b)(2).[24]  For "certain complex project situations or multiple undertakings," ACHP "and the agency official may negotiate a programmatic agreement to govern the implementation of a particular program or the resolution of adverse effects."  *Id.* § 800.14(b).

"After consulting . . . the agency official, the [State Historic Preservation Officer/Tribal Historic Preservation Officer], or [ACHP] may determine that further consultation will not be productive and terminate consultation.  Any party that terminates consultation shall notify the other consulting parties and provide them the reasons for

---

[23]   The regulations refer to ACHP as the "Council."  36 C.F.R. § 800.16(g) ("*Council* means the Advisory Council on Historic Preservation or a Council member or employee designated to act for the Council.").

[24]   Alternatively, ACHP has the option to enter "into the section 106 process . . . [w]hen the Council determines that its involvement is necessary."  36 C.F.R. § 800.2(b).

terminating in writing." *Id.* § 807(a).  "If [ACHP] terminates consultation, the [ACHP] shall notify the agency official . . . of the termination" and "transmit its comments within 45 days." *Id.* § 800.7(a)(4), (c)(2).  The head of the agency, in turn, "shall take into account [ACHP's] comments in reaching a final decision on the undertaking," including "[p]reparing a summary of the decision that contains the rationale for the decision and evidence of consideration of [ACHP's] comments" and "providing [the summary] to [ACHP] prior to approval of the undertaking." *Id.* § 800.7(c)(4).

i.    ACHP Consultations Generally

The evidence bearing on the issue of ACHP consultations is as follows.  "On December 7, 2017, the [Forest Service] notified the ACHP of its finding of adverse effect" regarding the proposed mine and the land exchange, "and on December 21, 2017, the ACHP informed the [Forest Service] that it would participate in the consultation." (*San Carlos*, Doc. 109-5 at 4.)  Over the next four years, ACHP "participated in the Section 106 consultation to seek ways to avoid, minimize, or mitigate adverse effects to historic properties that would result from this undertaking." (*San Carlos* 109-3 at 2.)  ACHP also assisted in coordinating consultations with interested parties and "the development of a draft PA that would provide a mechanism of further identification and evaluation of historic properties." (*San Carlos*, Doc. 109-5 at 4-5.)  As discussed in the preceding section, the PA went through numerous iterations.  Except for ACHP, all of the other required signatories signed the PA.  (*San Carlos*, Doc. 82-15 at 1.)

On February 11, 2021, ACHP notified the Forest Service that "further consultation in this case would be unproductive and therefore, we are hereby terminating consultations pursuant to 36 CFR § 800.7(a)(4)." (*San Carlos*, Doc. 109-3 at 2.)  ACHP reached this decision because "it [was] clear that the proposed undertaking would destroy significant historic properties, including the highly significant Oak Flat, and the measures in the PA [were] not sufficient to adequately resolve those adverse effects." (*Id.*)

On March 29, 2021, 45 days later, ACHP transmitted its comments to the Secretary of Agriculture.  (*San Carlos*, Doc. 109-5.)

1    On April 17, 2025, the Secretary of Agriculture responded to those comments in a

2    five-page letter. (*San Carlos*, Doc. 82-15.) The Secretary addressed each of ACHP's

3    comments individually and explained how those comments informed the ultimate decision

4    to publish the FEIS and the DROD. (*Id.*) More specifically, in response to ACHP's

5    comment that the Secretary "should work with the Administration and Congress to . . .

6    amend or repeal [SALECA]," the Secretary explained that the USDA is prohibited by

7    statute from engaging in lobbying activities. (*Id.* at 3.) As for ACHP's recommendation

8    to "use further discussions with Tribes and other stakeholders to develop and evaluate

9    alternatives and further modifications to the undertaking," the Secretary summarized the

10   additional consultation efforts that took place following ACHP's comments in 2021 and

11   explained that the USDA hadn't been able to identify better alternatives or permissible

12   modifications under SALECA. (*Id.* at 3-4.) As for ACHP's recommendation to "commit

13   to carrying out mitigation measures in the proposed PA" even though the PA was never

14   fully executed, the Secretary responded that the USDA "remained committed" to carrying

15   out those mitigation measures that remained in its power. (*Id.* at 4.) The remaining three

16   comments from ACHP concerned systematic changes the USDA should implement in

17   future consultation efforts not involving Oak Flat. (*Id.* at 4-6.) The Secretary explained,

18   in response, how the USDA would address those concerns moving forward. (*Id.*)

19   The Tribe argues these consultation efforts were inadequate because "[t]he Forest

20   Service has not substantively addressed the comments ACHP offered when it terminated

21   consultation or that it presented by letter on March 29, 2021." (*San Carlos*, Doc. 105 at

22   23.) The Tribe also faults the Secretary for "defend[ing] the 2021 FEIS, a position contrary

23   to the Forest Service's statements when it withdrew the 2021 FEIS." (*Id.* at 24.)

24   There is little caselaw on this subject. What appears to be the most on-point case

25   comes from the Third Circuit in *Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686 (3d

26   Cir. 1999). There, the plaintiff challenged a decision by the Federal Highway

27   Administration ("FHWA") to place a new bridge in a location that would send traffic

28   through a nearby historic district. *Id.* at 690. As part of the challenge, the plaintiff argued

1    that FHWA failed to adequately defer to the ACHP's preferred alternative route.  *Id.* at

2    695-97.  The court rejected this argument, concluding that FHWA adequately considered

3    ACHP's input because (1) ACHP was heavily involved in the planning process, (2) FHWA

4    hired a consultant recommended by ACHP, and (3) FHWA's disagreement with ACHP

5    was adequately justified and not arbitrary and capricious.  *Id.*  In short, the agency

6    "demonstrate[d] that it ha[d] read and considered" ACHP's comments and "gave the

7    ACHP's conclusion genuine attention." *Id.* at 696.  Here, too, the Secretary acknowledged

8    ACHP's concerns and recommendations and provided detailed, reasoned responses to

9    them.  ACHP was involved in the Forest Service's consultation efforts early on, and the

10    Secretary provided adequate justifications for its decision to publish the FEIS,

11    notwithstanding ACHP's comments.

12        As for the Tribe's assertion that the Secretary's response to ACHP's comments was

13    inadequate because the Secretary "defended the 2021 FEIS"—it's not entirely clear what

14    the Tribe is referring to.  It seems this argument concerns the Secretary's response to

15    ACHP's second comment that "USDA should use further discussions with Tribes and other

16    stakeholders to develop and evaluate alternatives and further modifications to the

17    undertaking . . . ." (*San Carlos*, Doc. 82-15 at 3.)  In response, the Secretary stated that

18    "USDA worked extensively with Tribes and other stakeholders to identify potential

19    modifications and mitigations that might avoid adverse effects." (*Id.*)  The Secretary then

20    stated that "[n]evertheless, in 2021, the Secretary of Agriculture ordered the re-initiation

21    of consultation with Tribal nations after the [FEIS] was rescinded to redouble the agency's

22    efforts . . . .  To date, additional consultations with the Tribes has not uncovered other

23    potential mitigation or alternatives that would allow USDA to comply with the SALECA

24    while avoiding adverse impacts to Tribal interests." (*Id.*)  Nothing in this passage is

25    arbitrary or capricious—as discussed elsewhere in this order, the tribal consultation process

26    was quite complicated due to the Tribe's vehement, if understandable, opposition to the

27    very concept of the land exchange.

28        …

1        ii.    <u>Programmatic Agreement</u>

2        The Tribe also contends the Forest Service's consultation efforts with ACHP were

3    inadequate because "[t]he Forest Service did not complete a Programmatic Agreement for

4    treatment of historic and cultural properties in 2021 and still has not done so." (*San Carlos*,

5    Doc. 105 at 23.)  But this argument misunderstands the nature of the PA.  The regulations

6    provide that "the Advisory Council and the agency *may* negotiate a programmatic

7    agreement." *Tohono O'odham Nation*, 138 F.4th at 1194 (cleaned up).  Although violating

8    a *fully executed* PA might violate NHPA, *id.* at 1202-04, the PA in this case was never fully

9    executed.  As explained above, if ACHP and the agency are unable to reach an agreement

10   on the PA, ACHP can terminate consultations and transmit its comments to the agency

11   within 45 days.  So long as the agency responds to those comments and takes them into

12   account when making a final decision—which occurred here—nothing in NHPA or its

13   governing regulations prevents the project from moving forward.

14        3.    <u>Summary As To Consultation Claims</u>

15        Although the Tribe will likely be able to overcome the jurisdictional and other

16   threshold challenges that Defendants have raised to its consultation claims, the Tribe has

17   not shown a likelihood of success on the merits of those claims or even serious questions

18   going to the merits of those claims.

19        D.    **NFMA Claims**

20        1.    <u>Threshold Issues</u>

21        The parties' briefing regarding the jurisdictional and threshold issues raised by

22   Defendants focuses almost exclusively on how those arguments apply to Plaintiffs'

23   appraisal, NEPA, and consultation claims.  The one specific argument that Resolution

24   Copper raises in relation to AMRC's NFMA claims is that they are "premature because the

25   draft ROD is not a final agency action."  (*AMRC*, Doc. 94 at 45-46.)

26        The Court agrees and thus finds it unnecessary to address how the remaining

27   jurisdictional and threshold issues apply in this context.  As with all of the other claims at

28   issue here, "agency decision-making under NFMA is governed by the judicial review

1    provisions of the APA because NFMA does not contain an express provision for judicial

2    review." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir.

3    2005).  As a result, the "final agency action" requirement again applies.

4          AMRC's essential argument is that the Forest Service violated NFMA's

5    implementing regulations, which require any change to a forest plan to be preceded by a

6    formal notice-and-comment process, by including changes to the Forest Plan in the FEIS

7    and DROD without following such a process.  But as discussed in relation to Plaintiffs'

8    NEPA claims, the proposed changes to the Forest Plan discussed in the FEID and DROD

9    are just that—proposed changes.  No final decisions or changes have been made yet.  It

10   follows that there has been no consummation of the agency's decision-making process, as

11   required to satisfy the first element of *Bennett*'s finality test.

12                     2.   <u>Merits</u>

13         Although the analysis could end there, the Court will also address the merits.

14   According to AMRC, 36 C.F.R. Part 219 provides that any proposed amendment to a forest

15   plan must be preceded by a period of public review, comment, and notice.  (*AMRC*, Doc.

16   87 at 27-29.)  AMRC further contends that the FEIS "included, for the first time, a new

17   proposal to substantially amend the Tonto National Forest Plan."  (*Id.*)  It follows,

18   according to AMRC, that "the agency's decision to bypass public review and amend the

19   Forest Plan . . . violates the substantive and procedural requirements of the NFMA."  (*Id.*)[25]

20         AMRC is unlikely to succeed on this claim.  As background, NFMA provides the

21   statutory framework for management of National Forest lands. Under NFMA, the Forest

22   Service and Secretary of Agriculture must develop and maintain a forest plan for each unit

23   of the National Forest System.  16 U.S.C. § 1604(a).  "[T]he Forest Service implements

24   each forest plan by approving or disapproving site-specific actions."  *N. Cascades

25   Conservation Council v. United States Forest Serv.*, 2021 WL 8344155, *5 (W.D. Wash.

26   _____

27   [25]     AMRC also makes a passing assertion that the Forest Service's challenged conduct
     violates FLPMA and NEPA (*AMRC*, Doc. 87 at 29), but AMRC does not develop this
     assertion in any depth or elaborate on this assertion in its reply brief.  *Martinez-Serrano v.*
28   *INS*, 94 F.3d 1256, 1259 (9th Cir. 1996) ("Issues raised in a brief that are not supported by
     argument are deemed abandoned.").

1  2021), *report and recommendation adopted*, 2022 WL 1043930 (W.D. Wash. 2022). *See*

2  *also* 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments

3  for the use and occupancy of National Forest System lands shall be consistent with the land

4  management plans.").

5     The Secretary of Agriculture is also required to "promulgate regulations . . . that set

6  out the process for the development and revision of the land management plans." 16 U.S.C.

7  § 1604(g). The regulations create at least two possibilities for amending a forest plan.

8  Under the first option, "the responsible official shall . . . [p]rovide opportunities for public

9  participation as required in § 219.4 and public notification as required in § 219.16." 36

10  C.F.R. § 219.13(b)(2). Part 219.4, in turn, requires "[t]he responsible official" to "provide

11  opportunities to the public for participating in the assessment process; developing a plan

12  proposal; . . . [and] commenting on the proposal." 36 C.F.R. § 219.4(a). Part 219.16

13  requires "formal public notification" to "be provided . . . [t]o invite comments on a

14  proposed plan, plan amendment, or plan revision, and associated environmental analysis"

15  with the comment period lasting "at least 90 days" for a plan requiring a draft EIS. 36

16  C.F.R. § 219.16(a)(2).

17     Meanwhile, the second option applies "when a plan amendment is approved in a

18  decision document approving a project or activity and the amendment applies only to the

19  project or activity," in which case "the notification requirements of 36 CFR part 215 or

20  part 218, subpart A, appl[y] instead." 36 C.F.R. § 219.16(b). *See also* 36 C.F.R.

21  § 219.59(b) ("When a plan amendment is approved in a decision document approving a

22  project or activity and the amendment applies only to the project or activity, the

23  administrative review process of 36 CFR part 215 or part 218, subpart A, applies instead

24  of the objection process established in this subpart."). Part 218 creates a modified

25  "objection" process where public participation takes place contemporaneously with

26  publication of a final EIS: "[T]he responsible official must promptly make available the

27  final EIS . . . and a [DROD] to those who have requested the documents or are eligible to

28  file an objection" and publish "legal notice of the opportunity to object" "in the applicable

1    newspaper of record."  36 C.F.R. § 218.7(b)-(c).  "Written objections, including any

2    attachments, must be filed with the reviewing officer within 45 days following the

3    publication date of the legal notice."  36 C.F.R. § 218.26(a).  "The responsible official may

4    not sign a ROD . . . until the reviewing officer has responded in writing to all pending

5    objections."  36 C.F.R. § 218.12(a).

6          Here, it fell within the "broad zone of reasonableness," *Seven County Infrastructure*

7    *Coalition*, 145 S. Ct. at 1513, for the Forest Service to conclude that the proposed

8    amendments to the Forest Plan set forth in the FEIS are project-specific—indeed, all of

9    those changes will flow from the land exchange and Resolution Copper's plan to begin

10   mining for copper.  And if the proposed changes are project-specific, this means that "the

11   notification requirements of 36 CFR part 215 or part 218, subpart A, appl[y] instead" of

12   the more formal requirements described elsewhere in Part 219.  36 C.F.R. § 219.16(b).

13   Consistent with the requirements set forth in Part 218,[26] the Forest Service published the

14   requisite legal notice in the *Arizona Capitol Times* on June 20, 2025.  *Copper Project &*

15   *Land Exchange and Project–Specific Forest Plan Amendment, Legal Notice*, Ariz. Capitol

16   Times, (June 20, 2025), https://www.resolutionmineeis.us/sites/default/files/feis/arizona-

17   capitol-times-resolution-feis-drod-20250620.pdf.  The *Arizona Capitol Times* is the

18   applicable "newspaper of record" as defined in 36 C.F.R. § 218.2.  *Newspapers Used for*

19   *Publication of Legal Notices in the Southwestern Region, Which Includes Arizona, New*

20   *Mexico, and Parts of Oklahoma and Texas*, 89 Fed. Reg. 92,888, 92,889 (Nov. 25, 2024)

21   ("Notices for Availability for Comments, Decisions, and Objections by Forest Supervisor,

22   Cave Creek Ranger District, and Mesa Ranger District are published in:—'Arizona Capitol

23   Times', in Phoenix, Arizona.").  Following this publication, the 45-day "objection" period

24   began, and there is no suggestion—let alone evidence—that concerned parties who met the

25   requirements of 36 C.F.R. § 218.5 were denied an opportunity to participate in that

26

27   _____

28   [26]    In 2014, the Forest Service repealed 36 C.F.R. Part 215.  *Notice, Comment, and*
     *Appeal Procedures for National Forest System Projects and Activities and Project-Level*
     *Predecisional Administrative Review Process*, 79 Fed. Reg. 44,291 (July 31, 2014).

1    process.[27]

2       AMRC also contends that the FEIS and proposed Forest Plan amendments fail to

3    "explain the agency's dramatic departure from its policies and regulation from 2021 to

4    2025." (*AMRC*, Doc. 87 at 38.)  Charitably construed, this argument invokes the so-called

5    "change-in-position doctrine." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,

6    145 S. Ct. 898, 918 (2025).  This doctrine "asks two questions": *first*, "whether an agency

7    changed existing policy"; and *second*, whether "the agency display[ed] awareness that it is

8    changing position and offer[ed] good reasons for the new policy." *Id.* (internal quotation

9    marks omitted).  There is "no basis in the [APA] or in our opinions for a requirement that

10   all agency change be subjected to more searching review." *FCC v. Fox Television Stations*,

11   556 U.S. 502, 514 (2009).  Instead, the ordinary arbitrary-and-capricious standard applies,

12   so long as the agency accounts for "factual findings that contradict those which underlay

13   its prior policy" or "serious reliance interests" that "its prior policy has engendered." *Id.*

14   at 515.

15       AMRC's argument appears twofold.  First, AMRC argues that proposing

16   "numerous Plan Amendments" was "a complete reversal from the 2021 DROD, which

17   specifically stated that: 'I find that the authorized uses do not require an amendment to the

18   forest plan.'" (*AMRC*, Doc. 87 at 28.)  Second, AMRC appears to argue that the proposed

19   amendments themselves are a "dramatic departure" from pre-existing agency policy

20   because "the eliminated Plan requirements were enacted to protect valuable resources such

21   as the recognized Traditional Cultural Property of Ga'an Canyon . . . as well as wildlife

22   migration routes." (*Id.* at 28-29.)  This second argument is premature because the proposed

23   Forest Plan amendments have not yet been adopted.  As for the first argument, it's unclear

24   that the Forest Service was required to give any justification for its change in position

25   because neither the 2021 FEIS nor the 2021 DROD represented official agency policy.

26   *Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219, 1226 (9th Cir. 2015) ("Admittedly,

27   _____

28   [27]    In fact, counsel for AMRC represented at oral argument that AMRC filed objections
     to the proposed Forest Plan amendments on Monday, August 4, 2025.

the BLM initially indicated that consultation might be required for the Wind Project. However, the BLM's evolving analysis was not a change in a published regulation or official policy.").[28]  Further, it's unclear that the proposal to amend the Forest Plan represents a true change in position.  As the Forest Service points out, "[a]s early as March 2016 the Forest Service informed the public that a Forest Plan amendment could be needed."  U.S. Dep't of Agric., *Request for Comments and Notice of Public Scoping on Resolution Copper Project and Land Exchange EIS* (Mar. 2016), https://www.resolutionmineeis.us/documents/usfs-tonto-legal-notice-scoping-schedule-201603 ("The Tonto National Forest (TNF) is preparing an environmental impact statement (EIS) to evaluate and disclose the potential environmental effects from: . . . amendments to the Tonto National Forest Land and Resource Management Plan.").  The 2021 EIS also reiterated that:

> An initial review of the consistency of the proposed GPO with the forest plan indicates that approval of the proposed GPO would result in conditions that are inconsistent with the forest plan for some alternatives.  If needed, an amendment to the forest plan would address the necessary changes to relevant standards and guidelines for managing visual quality and recreation opportunities, as determined by the project's record of decision.

(*AMRC*, Doc. 9-1 at 9.)  In this way, the proposal in the FEIS to amend the Forest Plan appears consistent with the agency's pre-existing position that such amendments might be needed.

Regardless, the Forest Service demonstrated awareness that it was changing position by noting that "[t]he [Forest Plan] was revised and implemented in December 2023" (*AMRC*, Doc. 87-2 at 59) and including an additional 36 pages of analysis in the FEIS specifically devoted to discussion of the new proposed amendments (*id.* at 59-95).  *See*

---

[28]    The Supreme Court has likewise expressed doubt that the "change-in-position" doctrine applies to informal and non-binding agency action, although it declined to decide the issue definitively.  *Food & Drug Admin.*, 145 S. Ct. at 918 n.5 ("We have traditionally applied the change-in-position doctrine when an agency shifts from a position expressed in a more formal setting.  True, we have on at least one occasion applied the doctrine when an agency altered a position first stated in a policy statement.  But as we explained in that case, the policy statement instituted 'a standardized review process' that 'effectively' resembled adjudication.").

*also Sierra Club*, 786 F.3d at 1226 ("[T]he BLM's change of view regarding the need for consultation was adequately justified after further investigation demonstrated the feasibility of private access.  Thus, the BLM did not act arbitrarily or capriciously when it changed its unofficial position regarding consultation.") (citation omitted).

### 3.   Summary As To NFMA Claims

It is unlikely that AMRC will be able to establish final agency action in relation to its NFMA claims.  Furthermore, AMRC is unlikely to prevail on the merits.

## II.   The Second *Winter* Factor

The second *Winter* factor asks whether the movant is "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  The Tribe contends it will suffer several "textbook examples of irreparable harm" once the land exchange occurs, including that "the Tribe and its members would lose access to all but 50 of Oak Flat's 2,422 acres, and even the limited access that remains would be temporary and subject to Resolution's unilateral choice."  (*San Carlos*, Doc. 105 at 24-25.)  AMRC reiterates these arguments, emphasizing that "the immediate loss of access for cultural and spiritual purposes for [tribal members] is profound," and contends that "the Exchange will also immediately and permanently [sic] eliminate the legal ability of members of the other Plaintiff groups to access and use these lands for hiking, rock climbing, appreciating and viewing of wildlife, plants, and waters on these lands, camping, and other recreational and aesthetic purposes."  (*AMRC*, Doc. 87 at 5.)

The Federal Defendants disagree, arguing that Plaintiffs cannot make the required showing because the exchange will not "cut off access to *all* the exchanged lands." (*AMRC*, Doc. 93 at 48, emphasis added.)  The Federal Defendants emphasize that, under SALECA, Resolution Copper is require to "provide access to the surface of the Oak Flat Campground to members of the public, including Indian tribes, to the maximum extent practicable, consistent with health and safety requirements, until such time as the operation of the mine precludes continued public access for safety reasons, as determined by Resolution Copper."  (*San Carlos*, Doc. 114 at 48, quoting 16 U.S.C. § 539p(i)(3).)

1    Meanwhile, Resolution Copper argues that Plaintiffs will still have access to all of the

2    federal land being exchanged following the transfer, because Resolution Copper has

3    "committed to maintaining current recreational access to the federal land for at least the

4    next ten years"; that "there will be no impact at all to the surface of the federal land being

5    conveyed to Resolution in the exchange until 2026"; and that any future "changes in the

6    land's status are the ultimate result mandated by Congress." (*AMRC*, Doc. 94 at 47-49.)

7          Plaintiffs have the better of these arguments. SALECA itself only guarantees

8    access—and even then, only temporary access that may be rescinded "for safety reasons,

9    as determined by Resolution Copper," 16 U.S.C. § 539p(i)(3)—to the Oak Flat

10   *Campground*, which is a small fraction of overall area to be exchanged. As for Resolution

11   Copper's contention that it will provide recreational access to all of exchanged land for at

12   least 10 years, although the Court accepts and has no reason to question the sincerity of

13   this contention, it does not appear to be legally enforceable. (*San Carlos*, Doc. 116-9

14   ¶¶ 13-14 [declaration from Victoria Peacey, Resolution Copper's president and general

15   manager: "[S]ubsidence of the ground surface is anticipated to occur beginning

16   approximately 6 years after initiation of mining—or approximately 16 years. Access to

17   Oak Flat will remain largely unchanged for this period of 16 years. . . . Until that time,

18   existing access to the entire Oak Flat Parcel will remain largely unchanged. The Oak Flat

19   campground will remain open to the public and available for tribal events and

20   ceremonies."].) Thus, it appears that nothing would stop Resolution Copper from

21   reconsidering this proposed grant of access following the land exchange. *See also Apache*

22   *Stronghold v. United States*, 2025 WL 1360694, *6 (D. Ariz. 2025) ("Nothing about

23   Resolution Copper's broad 'commitment' to public access is legally binding; furthermore,

24   even their statutorily mandated duty to maintain access to the Oak Flat Campground is (1)

25   contingent on their *discretionary* determination that access is 'practicable' and 'consistent

26   with health and safety requirements,' and (2) fails to account for the fact that the Oak Flat

27   Campground represents only a tiny portion of Oak Flat itself.") (citations omitted).

28         More important, it is undisputed that once the land exchange is completed,

Resolution Copper will begin changing Oak Flat in irreversible ways. Resolution Copper plans to begin "construction of initial data-gathering tunnels through the resource and beneath Oak Flat" following the land exchange. (*San Carlos*, Doc. 116-9 ¶ 13.) Although this activity may not immediately cause any perceptible change to the surface of the land, it is still an irreversible change. Furthermore, Resolution Copper will begin engaging in surface disturbances of Oak Flat in 2026. (*San Carlos*, Doc. 116-9 ¶ 15 ["It will be months—that is, not until 2026—before Resolution creates new surface disturbance of the Oak Flat parcel. . . . This will be for the purpose of creation of four new drill pads (soil clearings), two access roads (soil/gravel), equipment storage (soil clearing), and a medical evacuation area (soil clearing)."].) Although Resolution Copper contends these activities will only affect a small fraction of Oak Flat, they are still surface disturbances, and they will begin before the case would otherwise reach a conclusion—there is no way this complicated case, in which the administrative record is not yet even filed, would proceed past summary judgment by the start of 2026.

It follows that absent injunctive relief, tribal members are at most guaranteed to have access to some portion of Oak Flat for some period of time following the land exchange. That access, moreover, will be to land that will immediately start being laced with subterranean data-gathering tunnels and then, beginning in 2026, will start undergoing surface disturbances. Continued access to such land is not meaningless, but to a tribal member who sincerely "believe[s] the destruction of Oak Flat will close off a portal to the Creator forever and will completely devastate the Western Apaches' spiritual lifeblood," *Apache Stronghold*, 145 S. Ct. at 1480-82 (Gorsuch, J., dissenting from the denial of certiorari), it is easy to see why being given limited access to the post-land exchange version of Oak Flat is no substitute for, and thus does not remediate the irreparable injury flowing the lack of unlimited access to, Oak Flat in its current form.

III.   The Third And Fourth *Winter* Factors

When, as here, "a government agency is a party," "the final two injunction factors—the balance of equities and the public interest—merge." *Assurance Wireless*, 100 F.4th at

1    1031.

2        There is no doubt that an array of equities and public-interest considerations favor

3    Plaintiffs, for the reasons discussed above in relation to the second *Winter* factor and for

4    the additional reasons that various judges have observed during the course of the *Apache*

5    *Stronghold* proceedings.  *Apache Stronghold v. United States*, 2021 WL 12295173, *7 (9th

6    Cir. 2021) ("[A]ll citizens have a stake in upholding the Constitution.  This is particularly

7    so where religious rights are at issue, because protecting religious liberty and conscience

8    is obviously in the public interest.") (Bumatay, J., dissenting) (cleaned up); *Apache*

9    *Stronghold v. United States*, 2025 WL 1360694, *5-9 (D. Ariz. 2025) (Logan, J., granting

10   stay pending resolution of Apache Stronghold's petition for certiorari).

11       However, there are also weighty equities and public-interest considerations on the

12   other side of the ledger.  As discussed at the outset of this order, SALECA represents a

13   considered choice by the political branches to prioritize the significant potential benefits

14   that Resolution Copper's mining activity is expected to generate—not only boosting

15   Arizona's economy to the tune of over $1 billion per year but also promoting critical

16   national security interests—at the expense of potential devastation to the religious beliefs

17   and practices of the Tribe and to the environment.  These are profound tradeoffs, and the

18   litigation in this case has made clear that many affected parties strongly disagree with the

19   choice that Congress made.  Even so, the presence of a preliminary injunction request does

20   not give the Court license, under the guise of the evaluating the third and fourth *Winter*

21   factors, to second-guess the political branches' wisdom in deciding how to balance those

22   considerations.  *Oakland Cannabis Buyers' Co-op.*, 532 U.S. at 497 ("[A] court sitting in

23   equity cannot ignore the judgment of Congress, deliberately expressed in legislation. . . .

24   Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a

25   statute.") (cleaned up).[29]  It follows that there is a public interest in allowing the land

26   ─────────────────
     [29]    In a related vein, the Court is unpersuaded by Plaintiffs' attempts to downplay the
27   national security ramifications of securing a domestic supply of copper.  (*San Carlos*, Doc.
     119 at 20; *AMRC*, Doc. 97 at 20.)  Regardless of the location of the smelting facilities, the
     political branches have determined that it is "imperative for our national security that the
28   United States take immediate action to facilitate domestic mineral production to the
     maximum possible extent."  Exec. Order No. 14241, § 1, 90 Fed. Reg. 13,673 (Mar. 20,

1    exchange to occur *even when* all of its profound tradeoffs, and the corresponding equities

2    and public-interest considerations that favor Plaintiffs, are factored into the calculus.

3    AMRC also contends the third and fourth *Winter* factors cut in Plaintiffs' favor

4    because they will suffer immediate, irreparable harm if the land exchange is not enjoined,

5    whereas "a temporary injunction would not stop Resolution from mining a single ounce of

6    copper should the transfer be upheld." (*AMRC*, Doc. 97 at 20, cleaned up.)  Although this

7    line of reasoning might have more force in a different case, *see, e.g.*, *League of Wilderness*

8    *Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th

9    Cir. 2014) ("[T]he balance of equities tips toward the LOWD plaintiffs, because the harms

10   they face are permanent, while the intervenors face temporary delay."), it ignores the

11   unique features of SALECA.  First, as noted, Congress specified that it wished for the land

12   exchange to occur within 60 days of the issuance of the FEIS and clarified that "[t]he

13   purpose of this section is to authorize, direct, facilitate, *and expedite* the exchange of land

14   between Resolution Copper and the United States."  16 U.S.C. § 539p(a) (emphasis added).

15   It follows that there is a public interest in allowing the land exchange to proceed on the

16   expedited timetable Congress contemplated, as opposed to delaying it for years pending

17   the resolution of these lawsuits.  Second, given the indications by the political branches

18   that securing access to a domestic supply of copper has significant national security

19   ramifications—a determination this Court possesses neither the competence nor

20   prerogative to second-guess—the Court is unwilling to conclude that a multi-year delay in

21   pursuing that objective can be disregarded as insignificant.

22   Given these considerations, the third and fourth *Winter* factors do not tip sharply in

23   Plaintiffs' favor.

24   IV.    Conclusion As To The *Winter* Factors

25   Because Plaintiffs have not established a likelihood of success or even serious

26   questions going to the merits of any of their claims, their requests for a preliminary

27   injunction must be denied.  *Critchfield*, 137 F.4th at 922 ("In the absence of serious

28   _____

2025).

1   questions going to the merits, the court need not consider the other factors.") (cleaned up).

2       Moreover, even if Plaintiffs had established serious questions going to the merits, a

3   preliminary injunction could only "issue if the balance of hardships tips sharply in the

4   plaintiff's favor, and the other two *Winter* factors are satisfied." *Shell Offshore, Inc.*, 709

5   F.3d at 1291. As discussed in Part III above, those requirements are not satisfied here.

6   V.    Request For Injunction Pending Appeal

7       During oral argument, Plaintiffs asked the Court to issue an injunction pending

8   appeal if it denied their preliminary injunction requests.

9       It is understandable why Plaintiffs made this request. Plaintiffs intend to seek

10  emergency injunctive relief from the Ninth Circuit should their motions be denied, and

11  under Rule 8(a)(1)(C) of the Federal Rules of Appellate Procedure, "[a] party must

12  ordinarily move first in the district court for . . . an order suspending, modifying, restoring,

13  or granting an injunction while an appeal is pending." *Id.* Rule 62(d) of the Federal Rules

14  of Civil Procedure, in turn, provides "*[w]hile an appeal is pending* from an interlocutory

15  order or final judgment that . . . refuses . . . an injunction, the court may . . . grant an

16  injunction on terms for bond or other terms that secure the opposing party's rights." *Id.*

17  (emphasis added). As things currently stand, no "appeal is pending," so Plaintiffs' request

18  appears to be premature.

19      Nevertheless, in an abundance of caution, the Court clarifies that it would deny a

20  request for an injunction pending appeal even if such a request were properly before it.[30]

21  Although "Rule 62(d) contemplates that there will be situations where district courts can

22  grant injunctions pending appeal even after denying a preliminary injunction," "the fact

23  that a court previously found that a preliminary injunction was not warranted should carry

24  significant weight, so the circumstances must be of unusual magnitude to justify a district

---

[30]     With that said, the Court notes that it previously issued an order—which remains in effect—that "[t]he federal defendants are enjoined from conveying the federal land described in § 3003 of NDAA until August 19, 2025." (*San Carlos*, Doc. 99 at 20.) Thus, as a practical matter, Plaintiffs will have a period of time following the issuance of this order to attempt to obtain emergency injunctive relief from the Ninth Circuit. The Court endeavored to finalize and issue this order by August 15, 2025, which was no small task, so that Plaintiffs would have that period of time.

court granting an injunction pending appeal after denying a preliminary injunction. Only when the legal question raised is particularly important and serious questions going to the merits have been raised should a district court consider such a course of action." *NetChoice v. Bonta*, 761 F. Supp. 3d 1232, 1235-36 (N.D. Cal. 2025) (cleaned up). "This can occur when the trial court is charting a new and unexplored ground by ruling on an admittedly difficult legal question, and when the equities of the case suggest that the status quo should be maintained." *Id.* (cleaned up).

Although these cases are undoubtedly important, of an unusual magnitude, and raise an array of difficult and unsettled legal questions, those difficult and unsettled legal questions relate to the jurisdictional and threshold issues raised by Defendants. In contrast, the *merits* of Plaintiffs' claims do not, in the Court's view, present close or serious questions, especially in light of *Seven County Infrastructure Coalition*. The Court therefore cannot find, in good conscience, that the Rule 62(d) standard is satisfied.

This conclusion is also informed by two other considerations. First, it is notable that the Supreme Court recently denied certiorari in *Apache Stronghold* despite the presence of claims that, in the Court's view, present much closer and more serious merits questions than the substantive claims at issue here. Second, as discussed in Part III above, SALECA evinces a public interest in expediting the land exchange and allowing it to occur on the timetable that Congress contemplated.

Accordingly,

**IT IS ORDERED** that:

1. San Carlos's motion for preliminary injunction (*San Carlos*, Doc. 105) is **denied**.

2. AMRC's motion for preliminary injunction (*AMRC*, Doc. 87) is **denied**.

3. Federal Defendants' motion to strike (*San Carlos*, Doc. 115) is **denied**.

Dated this 15th day of August, 2025.

Dominic W. Lanza
United States District Judge

No. 25-5185

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION
OF ARIZONA, INC.; CENTER FOR BIOLOGICAL DIVERSITY;
EARTHWORKS; THE ACCESS FUND; and SIERRA CLUB.

*Plaintiffs-Appellants*,

v.

BROOKE L. ROLLINS, U.S. SECRETARY OF AGRICULTURE; UNITED
STATES FOREST SERVICE; and NEIL BOSWORTH, SUPERVISOR OF THE
TONTO NATIONAL FOREST.

*Defendants-Appellees*,

and

RESOLUTION COPPER MINING, LLC

*Intervenor-Defendant-Appellee.*

_____

On Appeal from the United States District
Court for the District of Arizona
(District Judge Dominic W. Lanza)

_____

**PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD
VOLUME 2 of 5**
*In Support of*
**PLAINTIFFS-APPELLANTS' EMERGENCY MOTION UNDER
CIRCUIT RULE 27-3
RELIEF REQUESTED BY AUGUST 18, 2025, AS THE LAND TITLE
TRANSFER WILL OCCUR ON AUGUST 19, 2025**

Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
mfink@biologicaldiversity.org

Allison N. Henderson
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs-Appellants*

Susan B. Montgomery
Robyn L. Interpreter
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorneys for the Inter Tribal Association of Arizona, Inc.*

**INDEX**

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| **Volume 1 of 5 [99 pages]** | | | |
| Order (August 15, 2025) | 8/15/2025 | 99 | 6-99 |
| **Volume 2 of 5 [268 pages]** | | | |
| Federal Defendants' Memo in Support of Summary Judgment, *CBD v. USFS*, Case No. 23-cv-00928 (DLF) (D.D.C., August 22, 2024) | 8/4/2025 | 97-1 | 105-154 |
| BLM Review of Hydrology Aspects of the Resolution Copper Project | 7/14/2025 | 87-1 | 155-180 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, June 2025 | 7/14/2025 | 87-2 | 181-275 |
| Draft Record of Decision, June 2025 | 7/14/2025 | 87-3 | 276-367 |
| **Volume 3 of 5 [180 pages]** | | | |
| Declaration of Maria Dadgar | 7/14/2025 | 87-5 | 373-380 |
| Declaration of Roger Featherstone | 7/14/2025 | 87-6 | 381-387 |

| | | | |
|---|---|---|---|
| Declaration of Russ McSpadden | 7/14/2025 | 87-7 | 388-399 |
| Declaration of Erik Murdock | 7/14/2025 | 87-8 | 400-403 |
| Declaration of Sandra Bahr | 7/14/2025 | 87-9 | 404-408 |
| Master Water Plan for Superstition Vistas, Apache Junction, Arizona | 7/14/2025 | 87-10 | 409-547 |
| **Volume 4 of 5 [195 pages]** | | | |
| Appraisal Report Summary: Mining Claim Zone MCZ Parcel | 7/14/2025 | 87-11 | 553-567 |
| Appraisal Report Summary: Mineral Withdrawal Area (MWA) Parcel | 7/14/2025 | 87-12 | 568-595 |
| Technical Appraisal Review Report: MWA Parcel (excerpts) | 7/14/2025 | 87-13 | 596-598 |
| Oversight and Legislative Hearing Before the U.S. House of Representatives Subcommittee on Energy & Mineral Resources, March 2013 | 7/14/2025 | 87-14 | 599-715 |
| Congressional Budget Office Cost Estimate, July 2013 | 7/14/2025 | 87-15 | 716-717 |

| | | | |
|---|---|---|---|
| House Natural Resources Committee House Report No. 113-167, July 2013 | 7/14/2025 | 87-16 | 718-742 |
| **Volume 5 of 5 [296 pages]** | | | |
| Uniform Appraisal Standards for Federal Land Acquisitions | 7/14/2025 | 87-17 | 748-1009 |
| Excerpt from Resolution Copper Mining's General Plan of Operations, 2016 | 7/14/2025 | 87-18 | 1010 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, January 2021 (rescinded) | 7/14/2025 | 87-19 | 1011-1013 |
| USDA Memo for Withdrawal of Notice of Availability, Rescind Final Environmental Impact Statement and Draft Record of Decision | 3/2/2021 | 26-2 | 1014 |
| Notice of Appeal | 8/15/2025 | 100 | 1015-1020 |
| Civil Docket for Case No. 2:21-cv-00122-DWL – United States District Court, District of Arizona (Phoenix) – *Arizona Mining Reform Coalition, et al. v. United States Forest Service, et al.* | | | 1021-1038 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | |
| Plaintiff, | |
| v. | |
| UNITED STATES FOREST SERVICE, | Civil Action No. 23-0928 (DLF) |
| Defendant, | |
| RESOLUTION COPPER MINING, LLC, | |
| Intervenor. | |

## **DEFENDANT'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Contents ................................................................................................. i

Table of Authorities ........................................................................................... iii

Background ........................................................................................................... 1

    I.     The Southeast Arizona Land Exchange and Conservation Act of 2013 ................ 1

    II.    The Forest Service's Contracted Appraisal and Role in the Approval Process ...... 3

    III.   Plaintiff's FOIA Request and FOIA Complaint. .................................................. 6

Legal Standards .................................................................................................... 7

Argument ............................................................................................................ 10

    I.     The Forest Service Performed A Reasonable Search ......................................... 10

    II.    Neither the Appraisal nor the Data Upon Which the Appraisal is Based are Agency Records ........................................................... 14

    III.   The Forest Service Properly Withheld Information Under FOIA Exemption 4 ... 17

         A.    All of the Withheld Information at Issue Here is "Commercial Information." ........................................................................... 17

         B.    All Information Withheld Under Exemption 4 Was Obtained from a "Person." .................................................................... 20

         C.    All Information Withheld Under Exemption 4 Is Customarily and Actually Treated as Confidential. ........................................... 21

         D.    The Agency Need Not Demonstrate that the Withheld Information Was Provided Under an Assurance of Privacy ................................ 25

         E.    Disclosure of Confidential Commercial Information Would Lead to Foreseeable Harm. ...................................................... 26

    IV.   The Forest Service Properly Withheld Information Under FOIA Exemption 5 ... 30

         A.    The Withheld Information Is Inter-Agency Communication Protected by FOIA Exemption 5 ............................................ 31

         B.    The Withheld Information Is Covered by the Deliberative Process Privilege as Predecisional ......................................... 32

C.    The Withheld Information Is Covered by the Deliberative Process
      Privilege as Deliberative ........................................................ 35

D.    The Forest Service Has Established that Disclosure of the Withheld
      Records Will Cause Foreseeable Harm. .................................. 37

V.    The Forest Service Produced All Segregable Information .................................. 40

Conclusion ........................................................................................................... 42

# TABLE OF AUTHORITIES

Cases ............................................................................................................. Page(s)

*100Reporters LLC v. Dep't of Just.*,
   248 F. Supp. 3d 115 (D.D.C. 2017) ......................................................... 27
*Access Reps. v. Dep't of Just.*,
   926 F.2d 1192 (D.C. Cir. 1991) .............................................................. 33
*Agrama v. IRS*,
   282 F. Supp. 3d 264 (D.D.C. 2017) ......................................................... 40
*Allnet Commc'n Servs., Inc. v. FCC*,
   800 F. Supp. 984 (D.D.C. 1992) ............................................................. 20
*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................. 7
*Animals v. Nat'l Insts. of Health*,
   543 F. Supp. 2d 83 (D.D.C. 2008) ........................................................... 21
*Apache Stronghold v. United States*,
   101 F.4th 1036 (9th Cir. 2014) ................................................................ 2
*Baker & Hostetler LLP v. Dep't of,*
   *Com.*, 473 F.3d 312 (D.C. Cir. 2006) ...................................................... 18
*Bd. of Trade of City of Chi. v. Commodity Futures Trading Comm'n*,
   627 F.2d 392 (D.C. Cir. 1980) .......................................................... 17, 20
*Boyd v. Crim. Div.*,
   475 F.3d 381 (D.C. Cir. 2007) ................................................................ 41
*Brayton v. Off. of U.S. Trade,*
   *Rep.*, 641 F.3d 521 (D.C. Cir. 2011) ......................................................... 8
*Burka v. Department of Health & Human Services*,
   87 F.3d 508 (D.C. Cir. 1996) .................................................................. 14
*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................. 7
*Citizens for Resp. & Ethics in Wash. ("Crew") v. Dep't of Labor*,
   478 F. Supp. 2d 77 (D.D.C. 2007) ....................................................... 8, 9
*Clemente v. FBI*,
   867 F.3d 111 (D.C. Cir. 2017) ................................................................ 10
*Coastal States Gas Corp. v. Dep't of Energy*,
   617 F.2d 854 (D.C. Cir. 1980) .................................................... 33, 36, 38
*Comm. for Freedom of the Press v. FBI*,
   3 F.4th 350 (2021) ...................................................................... 35, 37, 38
*Consumer Fed'n of Am. v. Dep't of Agric.*,
   455 F.3d 283 (D.C. Cir. 2006) ................................................................ 14
*Ctr. for Auto Safety v. Dep't of Treasury*,
   133 F. Supp. 3d 109 (D.D.C. 2015) ......................................................... 20
*Ctr. for Investigative Rep. v. U.S. Customs & Border Prot.*,
   436 F. Supp. 3d 90 (D.D.C. 2019) ........................................................... 26
*Defenders of Wildlife v. Dep't of Interior*,
   314 F. Supp. 2d 1 (D.D.C. 2004) ............................................................. 11

*Defenders of Wildlife v. U.S. Border Patrol*,
   623 F. Supp. 2d 83 (D.D.C. 2009) .................................................. 8, 11

*Dep't of Health & Hum. Servs.*,
   975 F. Supp. 2d 81 (D.D.C. 2013) ..................................................... 19

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
   532 U.S. 1 (2001) ............................................................... 30, 31, 32

*Dep't of Just. v. Julian*,
   486 U.S. 1 n.1 (1988) ...................................................................... 31

*Dep't of Just. v. Tax Analysts*,
   492 U.S. 136 (1989) ..................................................................... 9, 14

*Donatos Sarras v. Dep't of Just.*,
   Civ. A. No. 19-0861 (CRC), 2021 WL 9909763 (D.D.C. Aug. 5, 2021) ........... 39, 40

*EPA v. Mink*,
   410 U.S. 73 (1973) ....................................................................... 31, 39

*Fish & Wildlife Serv. v. Sierra Club, Inc.*,
   592 U.S. 261 (2021) ................................................................... passim

*Food Marketing Institute v. Argus Leader Media*,
   588 U.S. 427 (2019) ......................................................... 21, 22, 25, 26

*Forest Cnty. Potawatomi Cmty. v. Zinke*,
   278 F. Supp. 3d 181 (D.C. Cir. 2017) ............................................... 14, 16

*Frontier Found. v. Dep't of Just.*,
   739 F.3d 1 (D.C. Cir. 2014) ............................................................... 33

*Gallant v. Nat'l Lab. Rels. Bd.*,
   26 F.3d 168 (D.C. Cir. 1994) .............................................................. 9

*Greenberg v. Dep't of Treasury*,
   10 F. Supp. 2d 3 (D.D.C. 1998) ......................................................... 10

*Greenspan v. Bd. of Governors of Fed. Reserve Sys.*,
   643 F. Supp. 3d 176 (D.D.C. 2022) ..................................................... 30

*Ground Saucer Watch, Inc. v. CIA*,
   692 F.2d 770 (D.C. Cir. 1981) ............................................................. 8

*Gulf & W. Indus. v. United States*,
   615 F.2d 527 (D.C. Cir. 1979) ....................................................... 20, 21

*Info. Corp. v. Dep't of Interior*,
   976 F.2d 1429 (D.C. Cir. 1992) ...................................................... 32, 38

*Info. Ctr. v. Dep't of Just.*,
   320 F. Supp. 3d 110 (D.D.C. 2018) ..................................................... 36

*Jones & Co., Inc. v. Gen. Servs. Admin.*,
   714 F. Supp. 35 (D.D.C. 1989) .......................................................... 15

*Jud. Watch, Inc. v. Dep't of*,
   *Def.*, 847 F.3d 735 (D.C. Cir. 2017) ................................................... 34

*Jud. Watch, Inc. v. Dep't of State*,
   306 F. Supp. 3d 97 (D.D.C. 2018) ...................................................... 30

*Jud. Watch, Inc. v. Rossotti*,
   285 F. Supp. 2d 17 (D.D.C. 2003) ...................................................... 10

*Jud. Watch, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*,
   20 F. Supp. 3d 247 (D.D.C. 2014) ........................................................ 8

*Judicial Watch, Inc. v. Department of Justice,*
   20 F.4th 49 (D.C. Cir. 2021) ........................................................... 35

*Kahn v. Fed. Motor Carrier Safety Admin.,*
   648 F. Supp. 2d 31 (D.D.C. 2009) .................................................. 18

*Kowalczyk v. Dep't of Just.,*
   73 F.3d 386 (D.C. Cir. 1996) .......................................................... 11

*Larson v. Dep't of State,*
   565 F.3d 857 (D.C. Cir. 2009) ........................................................ 8

*Leopold v. Dep't of Just.,*
   Civ. A. No. 19-3192 (RC), 2021 WL 124489 (D.D.C. Jan. 13, 2021) ............................. 27, 28

*Machado Amadis v. Dep't of State,*
   971 F.3d 364 (D.C. Cir. 2020) .............................................. 31, 32, 35

*Marks v. Dep't of Just.,*
   578 F.2d 261 (9th Cir. 1978) .......................................................... 11

*McGehee v. CIA,*
   697 F.2d 1095 (D.C. Cir. 1983) ....................................................... 8

*Mead Data Cent., Inc. v. Dep't of Air Force,*
   566 F.2d 242 (D.C. Cir. 1977) ..................................................... 9, 40

*Media Rsch. Ctr. v. Dep't of Just.,*
   818 F. Supp. 2d 131 (D.D.C. 2011) ................................................. 8

*Military Audit Project v. Casey,*
   656 F.2d 724 (D.C. Cir. 1981) ...................................................... 8, 9

*Nat'l Ass'n of Home Builders v. Norton,*
   309 F.3d 26 (D.C. Cir. 2002) ......................................................... 19

*Nat'l Lab. Rels. Bd. v. Sears, Roebuck & Co.,*
   421 U.S. 132 (1975) .......................................................... 30, 32, 33

*Nat'l Parks & Conservation Ass'n v. Morton,*
   498 F.2d 765 (D.C. Cir. 1974) ........................................................ 26

*Nat. Res. Def. Council, Inc. v. Nuclear Regul. Comm'n,*
   216 F.3d 1180 (D.C. Cir. 2000) ....................................................... 9

*Nat'l Treasury Emps. Union v. U.S. Customs Serv.,*
   802 F.2d 525 (D.C. Cir. 1986) ........................................................ 9

*Nat'l Wildlife Fed. v. U.S. Forest Serv.,*
   861 F.2d 1114 (9th Cir. 1988) ........................................................ 36

*Oglesby v. Dep't of Army,*
   920 F.2d 57 (D.C. Cir. 1990) ..................................................... 10, 11

*People for the Ethical Treatment of Animals ("PETA") v. Dep't of Health & Hum. Serv.,*
   901 F.3d 343 (D.C. Cir. 2018) ........................................................ 28

*Perrin v. United States,*
   444 U.S. 37 (1979) .................................................................... 22

*Perry v. Block,*
   684 F.2d 121 (D.C. Cir. 1982) ........................................................ 10

*Pub. Citizen Health Rsch. Grp. v. FDA,*
   704 F.2d 1280 (D.C. Cir. 1983) ............................................... 17, 18, 20

*Pub. Emps. for Env't Resp. v. Dep't of Homeland Sec.,*
   575 F. Supp. 3d 34 (D.D.C. 2021) ................................................... 38

*Renegotiation Bd. v. Grumman Aircraft*,
  421 U.S. 168 (1975) ................................................................................ 32, 35
*Renewable Fuels Assoc. v. EPA*,
  Civ. A. No. 18-2031 (JEB), 2021 WL 602913 (D.D.C. Feb. 16, 2021) .......................... 25, 26
*Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*,
  878 F.3d 1258 (10th Cir. 2018) ........................................................................ 17
*S. All. for Clean Energy v. Dep't of Energy*,
  853 F. Supp. 2d 60 (D.D.C. 2012) ...................................................................... 21
*SafeCard Servs., Inc. v. SEC*,
  926 F.2d 1197 (D.C. Cir. 1991) ..................................................................... 8, 10
*Schlefer v. United States*,
  702 F.2d 233 (D.C. Cir. 1983) ......................................................................... 37
*Senate of the Commonwealth of P.R. v. Dep't of Just.*,
  823 F.2d 574 (D.C. Cir. 1987) ......................................................................... 37
*Spirko v. U.S. Postal Serv.*,
  147 F.3d 992 (D.C. Cir. 1998) .......................................................................... 9
*Summers v. Dep't of Just.*,
  140 F.3d 1077 (D.C. Cir. 1998) ........................................................................ 41
*Tax Analysts v. IRS*,
  152 F. Supp. 2d 1 (D.D.C. 2001) ...................................................................... 33
*Truitt v. Dep't of State*,
  897 F.2d 540 (D.C. Cir. 1990) ......................................................................... 10
*United States v. Torres*,
  115 F.3d 1033 (D.C. Cir. 1997) ....................................................................... 26
*Valencia-Lucena v. U.S. Coast Guard*,
  180 F.3d 321 (D.C. Cir. 1999) ......................................................................... 10
*Vaughn v. Rosen*,
  484 F.2d 820 (D.C. Cir. 1973) .......................................................................... 9
*Vaughn v. Rosen*,
  523 F.2d 1136 (D.C. Cir. 1975) ....................................................................... 35
Wash. Post Co. v. Dep't of Health & Human Servs.,
  690 F.2d 252 (D.C. Cir. 1982) ......................................................................... 17
*Wilson v. FCC*,
  Civ. A. No. 21-0895 (RMM), 2022 WL 4245485 (D.D.C. Sept. 15, 2022) ...................... 20
*Wolfe v. Dep't of Health & Hum. Servs.*,
  839 F.2d 768 (D.C. Cir. 1988) ......................................................................... 36
*Worthington Compressors, Inc. v. Costle*,
  662 F.2d 45 (D.C. Cir. 1981) .......................................................................... 27
*WP Co. LLC v. Small Bus. Admin.*,
  Civ. A. No. 20-1240 (JEB), 2020 WL 6504534 (D.D.C. Nov. 5, 2020) ......................... 17

Statutes

5 U.S.C. § 552(a)(4)(B) ................................................................................... 9, 14
5 U.S.C. § 552(a)(8)(A) ..................................................................................... 26
5 U.S.C. § 552(a)(8)(A)(i) .................................................................................. 37
5 U.S.C. § 552(b) .......................................................................................... 9, 40

5 U.S.C. § 552(b)(4) .................................................................................. 17

5 U.S.C. § 552(b)(5) .............................................................................. 30, 31

5 U.S.C. § 551(1) ...................................................................................... 31

16 U.S.C. § 539p(a) .................................................................................... 2

16 U.S.C. § 539p(c)(3)(A) ........................................................................... 3

16 U.S.C. § 539p(c)(3)(B) ........................................................................... 3

16 U.S.C. § 539p(c)(4) ............................................................................. 3, 4

16 U.S.C. § 539p(c)(9)(B) ........................................................................... 3

42 U.S.C. § 4321 ........................................................................................ 3

Pub. L. No. 113-291 .................................................................................... 1

Rules

Fed. R. Civ. P. 56(a) ................................................................................... 7

Regulations

36 C.F.R. § 254.4 .................................................................................... 5, 6

In this Freedom of Information Act ("FOIA") case, Plaintiff requests records related to the appraisal of land to be exchanged by statute between the federal government and a private mining company, Resolution Copper, LLC ("Resolution Copper"). Specifically, Plaintiff submitted two FOIA requests to Defendant, the United States Forest Service ("Forest Service" or "Agency") on November 22, 2022 and March 29, 2023, seeking records that (1) the contracted appraiser submitted to the Forest Service on which its final report will be based and (2) documenting the contracted appraiser's completed work provided to the Forest Service for the Oak Flat appraisal, respectively.

As demonstrated below, the Forest Service has fully and properly responded to Plaintiff's FOIA requests pursuant to its obligations under FOIA. The Forest Service completed an adequate search and gathered all responsive records within its control and, after review, released all reasonably segregable, non-exempt records to Plaintiff. The Forest Service withheld only information the release of which would trigger foreseeable harm to the interests protected under FOIA Exemptions 4, 5, and 6.[1] Thus, the Forest Service is entitled to summary judgment.

## BACKGROUND

### I.    The Southeast Arizona Land Exchange and Conservation Act of 2013.

In 2014, Congress passed, and the President signed federal land exchange legislation that directs the exchange of land between the United States and Resolution Copper, LLC ("Resolution Copper"), a private mining company. *See* Pub. L. No. 113-291, 128 Stat. 3292 (2014); Declaration of Margret Scofield ("Scofield Decl.") ¶ 4; Def.'s Stmt. of Undisputed Material Facts ("Def.'s Stmt.") ¶ 1. Specifically, the land exchange statute provides that "if Resolution Copper offers to

---

[1]    Plaintiff does not challenge the Agency's application of Exemption 6 withholdings in this case. *See* Apr. 19, 2024, Jt. Status Rep., ECF No. 3.

convey to the United States, all right, title, and interest of Resolution Copper" in certain "non-Federal land," then "the Secretary [of Agriculture ("Secreatary")] is authorized and directed to convey to Resolution Copper, all right, title, and interest of the United States in and to the Federal land." 16 U.S.C. § 539p(a).

The "Federal land," described in the statute comprises of approximately 2,422 acres of federally owned land in Pinal County, Arizona, and includes most notably a sacred site for the San Carlos Apache Tribe, commonly known as "Oak Flat," located within the Tonto National Forest. *See Apache Stronghold v. United States*, 101 F.4th 1036, 1044–46 (9th Cir. 2014); Scofield Decl. ¶ 4; Def.'s Stmt. ¶¶ 2–3. Underneath the surface of this sacred land and at near what is known as the "Copper Triangle," sits the third-largest known copper deposit in the world—two billion tons of "copper resource." *Apache Stronghold*, 101 F.4th at 1044–46; Scofield Decl. ¶ 4; Def.'s Stmt. ¶ 3.

The legislation describes "non-Federal land" to include land "necessary to equalize the land exchange." *Id.* § 539p(b). But the two parcels of land need to be of equal value. Under the statute, "[i]f the final appraised value of the Federal land exceeds the value of the non-Federal land," the exchange could be equalized by other means, including cash payment, conveyance of additional non-Federal land, or a combination of the two." *Id.* § 539p(c)(5)(B); *see* Scofield Decl. ¶ 9. And, to further help facilitate the land exchange, Congress waived the Federal Land Policy and Management Act of 1976's cash equalization limit of twenty-five percent to allow for more cash supplementation should the parcels of land be found to not be equal in value. *See* 16 U.S.C. § 539p(c)(5)(B)(ii); Scofield Decl. ¶ 9.

Recognizing the sanctity of the land involved in the land exchange to the San Carlos Apache Tribe, Congress included a provision under the law that directs the Secretary to "engage

in government-to-government consultation with affected Indian tribes" to address concerns "related to the land exchange." 16 U.S.C. § 539p(c)(3)(A); Scofield Decl. ¶ 5. The statute also requires the Secretary of Agriculture to work with Resolution Copper to address the Western Apache Indian Tribe's concerns and to mitigate any possible "adverse effects on the affected Indian tribes." 16 U.S.C. § 539p(c)(3)(B); Scofield Decl. ¶ 5. Moreover, Congress has also required that the land exchange be governed by the National Environmental Policy Act ("Policy Act"), 42 U.S.C. § 4321 *et seq.*, which requires that an environmental impact statement be prepared before the Secretary can execute the land exchange. 16 U.S.C. § 539p(c)(9)(B); Scofield Decl. ¶ 5. Once a Final Environment Impact Statement ("Final Statement") is prepared according to the Policy Act review process, the Secretary has no more than sixty days to "convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper." *Id.* § 539p(c)(10); Scofield Decl. ¶ 5. A Final Statement, however, will not be completed until the Tribal consultation process is complete. *See* Scofield Decl. ¶ 5; Def.'s Stmt. ¶ 24.

## II.   The Forest Service's Contracted Appraisal and Role in the Approval Process.

As directed by Congress, to equalize the value of the land exchange, Congress required the parcels of land subject to the land exchange to be independently appraised. *See* 16 U.S.C. § 539p(c)(4); Scofield Decl. ¶ 6; Def.'s Stmt. ¶ 5. To obtain an independent appraisal, the Forest Service and specifically its Southwest Regional Office, which manages in part the federal land being exchanged, entered Contract No. 12837120C0041 for Appraisals Services supporting the land exchange (the "Contract") with Weissenborn Appraisal LLC ("Appraiser") on May 26, 2020. *See id.* The Forest Service refers to the land exchange and its work on that exchange as the Resolution Copper Project and Land Exchange ("Resolution Copper Project"). *See* Def.'s Stmt. ¶ 4. The lead contracted appraiser ("Lead Appraiser") is Barry Weissenborn. *See* Scofield Decl.

¶ 6; Def.'s Stmt.¶ 6.  The Review Appraiser for the Forest Service, also referred to as "Chief Appraiser," is Gerald Sanchez.  *See id.*

To date, Sanchez is the only Forest Service employee who has been authorized to view the final report of the appraisal (the "Appraisal") and the underlying data and information supporting it.  *See* Def.'s Stmt. ¶ 7.  He is also one of only three Forest Service employees who are contractually permitted to receive information about the assignment, appraisal results, or portions thereof.  *See id.* ¶ 8.  Contractually, the Appraisal may be released to Resolution Copper and the Forest Service after the Appraisal is reviewed and approved by the Secretary.  *See id.* ¶ 10.  But the unauthorized release of the Appraisal prior to the completion of this review will invalidate its use—to provide the basis of value for the legislated land exchange.  *See id.*

After being granted permission to view the underlying data and information on which the Appraisal was based, Sanchez began to prepare a technical review of the results of the Appraisal as required by Forest Service Policy and the Uniform Appraisal Standards for Federal Land Acquisition.  *See id.* ¶ 11.  Sanchez viewed the underlying data and information on which the Appraisal was based, via a virtual electronic vault paid for by the Appraiser.  *See id.* ¶¶ 51–52. The Appraiser could track what Sanchez was viewing and for how long.  *See id.* ¶ 52.  Most importantly, Sanchez could not electronically copy any information he viewed in the vault.  *See id.* ¶ 53.  And when required to discuss this information with the Appraiser, all communications took place via Microsoft Teams call and were not recorded.  *See id.* ¶ 53.

Eventually, on January 20, 2023, the Appraiser completed the Appraisal and, on January 22, 2023, "provided" it to the Forest Service, meaning that Sanchez was granted authorization to view it.  *See id.* ¶ 12.  On January 25, 2023, Sanchez completed the technical review of the results of the Appraisal and issued a Technical Appraisal Review Report.  *See id.* ¶ 13.

The Technical Appraisal Review Report is a comprehensive assessment of the completeness and accuracy of the Appraisal, which also ensures that the Appraisal used appropriate appraisal methods and techniques, and that the Appraisal's conclusions, analyses, and opinions are reasonably supported with market data. *See id.* ¶ 14. In addition, Sanchez also prepared an Appraisal Report Summary, summarizing the appraisal concerning the value of land to be exchanged, and to meet the statutory requirement that the Secretary share either the approved Appraisal or a summary thereof before the land exchange is consummated. *See id.* ¶ 15. Both documents were prepared to assist the Secretary when making his decision to accept the Appraisal and move forward with the land exchange. *See id.* ¶ 20.

To date, however, no one other than Sanchez, and those needed to prepare the two reports to respond to Plaintiff's FOIA requests, have viewed the full Technical Appraisal Review Report and the Appraisal Report Summary. *See id.* ¶ 21. Eventually, both documents will be submitted up the chain of review to the Secretary. *See id.* ¶¶ 25, 27. At present, however, the review process of the Appraisal has not begun and, thus, the Secretary has not yet received a copy of the Appraisal, a summary thereof, or a copy of the Technical Appraisal Review Report. *See id.* ¶¶ 25–27. The reason for this is twofold.

First, approving the Appraisal too early may result in the unnecessary delay of having to update the Appraisal or complete an entirely new Appraisal before the land exchange is complete. *See id.* ¶ 27. Under the statute, the Secretary must conduct a new appraisal or update current one three years after the Appraisal is approved, unless the Forest Service and Resolution Copper reach an exchange agreement—a non-binding document that outlines the responsibilities of both parties to a land exchange, *see* 36 C.F.R. § 254.4—before then. *See* 16 U.S.C. §539p(c)(4)(B)(ii); Def.'s Stmt. ¶ 28. Because information gathered from the Tribal consultation process, however, is often

part of the considerations included in the exchange agreement between parties, such agreement is unlikely to be entered into until that Tribal consultation process is complete. *See* Def.'s Stmt. ¶ 29. Thus, to avoid any delay necessitated by the need to complete a new or updated appraisal if an exchange agreement is not reached within three years of the Appraisal's approval, the Secretary will not begin this approval process until at least the Tribal consultation process is complete. *See* Scofield Decl. ¶ 12.

Second, the Secretary has not begun the review process to approve the Appraisal, as updates to the Appraisal, along with the Technical Appraisal Review Report and Appraisal Report Summary, may still need to be made after the Tribal consultation process is completed and the Final Statement is issued. *See* Def.'s Stmt. ¶ 30. This is because if the consultation process or the Final Statement results in a mutual agreement to reconfigure the parcels of land to be exchanged, then an updated Appraisal may need to be completed to account for that reconfiguration. *See id.* For this reason, again, the Secretary will not begin the review process for approving the Appraisal until after the Tribal consultation process and Final Statement is complete. *See id.*

### III.   **Plaintiff's FOIA Requests and FOIA Complaint.**

On November 22, 2022, Plaintiff submitted a FOIA request to the Forest Service seeking the following records:

> [T]he records that document the information submitted to the Forest Service by the aforementioned contracted appraiser(s). This refers to the information or data from your contractor upon which your final report will be based.

*Id.* ¶ 31. Although the request was received by the Southwest Region al FOIA Service Center, it was forwarded first to Washington D.C. Office for processing before returned to the Southwest Regional Office. *See id.* ¶¶ 32–36. In the meantime, on March 29, 2023, Plaintiff submitted a second FOIA request seeking:

The records documenting the completed work the appraiser provided to the Forest
Service for the Oak Flat appraisal.

*Id.* ¶ 37.

After completing a search for all responsive records, on April 17, 2024, the Forest Service
produced to Plaintiff a copy of the Technical Appraisal Review Report and Appraisal Report
Summary with partial redactions to protect material exempt pursuant to FOIA Exemptions 4, 5,
and 6. *See id.* ¶¶ 38–39.

Meanwhile, Plaintiff filed its initial complaint in this case on April 5, 2023, and later
amended it on June 29, 2023. *See* Compl., ECF No. 1; Am. Compl., ECF No. 13. On April 19,
2024, the parties represented that Plaintiff does not contest the Forest Service's withholdings of
Exemption 6 material but challenges the Forest Service's search for responsive records and
application of Exemptions 4, and 5. *See* Apr. 19, 2024, Jt. Status Rep., ECF No. 31. Accordingly,
the current motion will only focus on defending the Forest Service's invocation of FOIA
Exemptions 4 and 5 to protect the withheld information.

## LEGAL STANDARDS

Summary judgment is appropriate when the pleadings and evidence "show[] that there is
no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex
Corp. v. Catrett*, 477 U.S. 317, 322 (1986). It is up to the party moving for summary judgment to
demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. A
genuine issue is one that "might affect the outcome of the suit under the governing law." *Anderson*,
477 U.S. at 248. Once the moving party has met its burden, the nonmoving party "may not rest
upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing
that there is a genuine issue for trial." *Id.*

"[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011); *see also Media Rsch. Ctr. v. Dep't of Just.*, 818 F. Supp. 2d 131, 136 (D.D.C. 2011) ("FOIA cases typically and appropriately are decided on motions for summary judgment.") (quoting *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)). A government agency may obtain summary judgment in a FOIA case by relying on "relatively detailed" and "nonconclusory" declarations. *McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983). "[T]he Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Labor*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)). "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Media Rsch.*, 818 F. Supp. 2d at 137 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). Courts give agency declarations "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)).

An agency is entitled to summary judgment if it shows that "it has fully discharged its obligations under . . . FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." *Jud. Watch, Inc. v. U.S. Dep't of Hous. & Urb. Dev*, 20 F. Supp. 3d 247, 253 (D.D.C. 2014). FOIA requires that an agency

release responsive information unless it is protected from disclosure by one or more of the Act's

nine exemptions.  *See* 5 U.S.C. § 552(b); *Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 150–51

(1989).  The agency bears the burden of demonstrating that any withheld information falls into

one or more of those exemptions.  5 U.S.C. § 552(a)(4)(B); *Nat. Res. Def. Council, Inc. v. Nuclear*

*Regul. Comm'n*, 216 F.3d 1180, 1190 (D.C. Cir. 2000).  An agency may meet its burden to

establish the applicability of an exemption by providing a *Vaughn* index or declaration that

"permit[s] adequate adversary testing of the agency's claimed right to an exemption."  *Nat'l*

*Treasury Emps. Union v. U.S. Customs Serv.*, 802 F.2d 525, 527 (D.C. Cir. 1986) (citing *Mead*

*Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977), and *Vaughn v. Rosen*,

484 F.2d 820, 828 (D.C. Cir. 1973)). The supporting documentation must contain "an adequate

description of the records" and "a plain statement of the exemptions relied upon to withhold each

record."  *Nat'l Treasury Emps.*, 802 F.2d at 527 n.9.

Although a *Vaughn* index is a common device used by agencies to meet their burden of

proof, "the Court may award summary judgment solely on the basis of information provided by

the department or agency in declarations when the declarations describe 'the documents and the

justifications for nondisclosure with reasonably specific detail, demonstrate that the information

withheld logically falls within the claimed exemption, and are not controverted by either contrary

evidence in the record nor by evidence of agency bad faith.'"  *CREW*, 478 F. Supp. 2d at 80

(quoting *Military Audit Project*, 656 F.2d at 738); *see Spirko v. U.S. Postal Serv.*, 147 F.3d 992,

998 n.4 (D.C. Cir. 1998) ("The form of the *Vaughn* index is unimportant and affidavits providing

similar information can suffice.") (citing *Gallant v. Nat'l Lab. Rels. Bd.*, 26 F.3d 168, 172-73 (D.C.

Cir. 1994)).

Once the court determines that an agency has released all non-exempt material, it has no

further judicial function to perform under FOIA and the FOIA claim is moot. *See Perry v. Block*,

684 F.2d 121, 125 (D.C. Cir. 1982).

## ARGUMENT

The parties have conferred, and Plaintiff has agreed not to challenge any of the invocations

of Exemption 6 to protect personally identifying information. Plaintiff therefore challenges the

Agency's search for responsive records and its withholdings of certain information contained the

Technical Appraisal Review Report and Appraisal Report Summary. Each challenge is discussed

below.

## I.     The Forest Service Performed A Reasonable Search

An agency is entitled to summary judgement in a FOIA case with respect to the adequacy

of its search if it shows "'that it made a good faith effort to conduct a search for the requested

records, using methods which can be reasonably expected to produce information requested.'"

*Clemente v. FBI*, 867 F.3d 111, 117 (D.C. Cir. 2017) (quoting *Oglesby v. Dep't of Army*, 920 F.2d

57, 68 (D.C. Cir. 1990)). "An agency fulfills its obligations under FOIA if it can demonstrate

beyond material doubt that its search was 'reasonably calculated to uncover all relevant

documents.'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting

*Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)).

A search is not inadequate merely because it failed to "uncover[] every document extant."

*SafeCard Servs.*, 926 F.2d at 1201; *see Jud. Watch, Inc. v. Rossotti*, 285 F. Supp. 2d 17, 26 (D.D.C.

2003) ("Perfection is not the standard by which the reasonableness of a FOIA search is measured").

It is appropriate for an agency to search for responsive records in accordance with the manner in

which its records systems are indexed. *Greenberg v. Dep't of Treasury*, 10 F. Supp. 2d 3, 13

(D.D.C. 1998). FOIA does not require that an agency search every division or field office on its

own initiative in response to a FOIA request if responsive records are likely to be located in a particular place. *Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 388 (D.C. Cir. 1996); *Marks v. Dep't of Just.*, 578 F.2d 261, 263 (9th Cir. 1978). Nor does FOIA require that an agency search every record system. *Oglesby*, 920 F.2d at 68.

Where an agency affidavit attests that a reasonable search was conducted, the agency is entitled to a presumption of good faith. *Defenders of Wildlife v. Dep't of Interior*, 314 F. Supp. 2d 1, 8 (D.D.C. 2004). "To meet its burden, the agency may submit affidavits or declarations that explain in reasonable detail the scope and method of the agency's search." *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 91 (D.D.C. 2009). Applying these principles, the Forest Service is entitled to summary judgment with respect to the adequacy of its search.

Here, there is no material doubt that the Forest Service performed an adequate and reasonable search in response to Plaintiff's two FOIA requests because its search was reasonably calculated to uncover all relevant documents. As the Scofiled declaration explained in detail, the Agency searched all locations reasonably believed to contain responsive records. In response to Plaitniff's first request—which seeks "the records that document the information submitted to the Forest Service by the aforementioend contracted appraiser(s)," including "the information or data from your contracor upon which your final report will be based"—the Forest Service assigned it to Sanchez, the Chief Appraiser for the Resolution Copper Project, the only custodian reasonably believed to have responsive records. Scofield Decl. ¶ 18; Def.'s Stmt. ¶¶ 31, 35, 41. Indeed, Sanchez is the only Forest Service employee who has seen a copy of the Appraisal and has access to view the underlying data and information on which it is based. *See* Def.'s Stmt. ¶ 7. However, when Mr. Sanchez received the request in January 2023, Mr. Sanchez replied that while he had access to the Appraisal and the undelrying supporting data and information, he had no records

responsive to Plaintiff's first FOIA request. *See* Scofield Decl. ¶ 19–21; Def.'s Stmt. ¶ 34–36, 42. According to both Sanchez and the Director of Lands and Minerals for the Southwest Region of the Forest Service ("Regional Land Director"), the Agency does not have possession of the Appraisal or any data submitted to form the basis for the Appraisal because those documents are in the Appraiser's possession. *See* Scofield Decl. ¶¶ 18, 32; Def.'s Stmt. ¶ 38, 43. Sanchez further suggested that the request should remain with the Southwest Regional Office of the Forest Service, as it was the official record holder for the Resolution Copper Project. *See* Scofield Decl. ¶¶ 21–22; Def.'s Stmt. ¶ 36. In March 2023, Plaintiff's November 2022 request was then transferred back to the Southwest Regional Office for procesisng. *See* Def.'s Stmt. ¶ 36.

Meanwhile, Plaintiff submitted a second FOIA request for the "records documenting the completed work the appraiser provided to the Forest Service for the Oak Flat appraisal." *See id.* ¶ 37. The Southwest Regional Office searched all locations at the Southwest Regional Office reasonably believed to contain responsive records to both of Plaitniff's FOIA requests. *See* Scofield Decl. ¶¶ 26–29; Def.'s Stmt. ¶ 38, 44. Specifically, the Director of Lands and Minerals for the Southwest Region, Tracy Parker, searched his emails using the search terms, "Resolution Copper" and "Oak Flats Appraisal," but found no responsive documents. *See* Scofield Decl. ¶ 27; Def.'s Stmt. ¶ 45. This finding, however, is entirely consistent with the fact that Sanchez is the only Forest Service Employee who has been authorized to view the Appraisal and the supporting data and information, and any conversations about the Appraisal and the data used in the Appraisal were done via Microsoft Teams Phone calls, not via email, and the calls which were not recorded by the Forest Service. *See* Def.'s Stmt. ¶¶ 7–10, 43, 52–56.

Parker then searched the only other location reasonably believed to contain documents responsive to Plaintiff's two FOIA requests—a restricted Pinyon (Box) folder for the Resolution

Copper Project, accessible only by Parker and Sanchez.   *See* Scofield Decl. ¶ 28; Def.'s Stmt. ¶ 46.   Per standard practice, this electronic folder is the official repository of any documents that the Forest Service created or retained for the Resolution Copper Project.  *See* Scofield Decl. ¶ 28; Def.'s Stmt. ¶ 47.  From there, Parker recovered two records responsive to Plaintiff's request: the Technical Appraisal Review Report and the Appraisal Report Summary.  *See* Scofield Decl. ¶ 28; Def.'s Stmt. ¶ 48.  Again, this result is consistent with the fact that while Sanchez had been approved to view the Appraisal and its supporting data and information, all of those records are maintained in the Appraiser's custody only, pursuant to the Appraiser's contract with the Forest Service.  *See* Def.'s Stmt. ¶¶ 9–10, 43, 51–54.

Notably, no other custodians were asked to search for responsive records because there not a need to do so.  *See* Scofield Decl. ¶ 29; Def.'s Stmt. ¶ 49.   According to Parker, he and Sanchez were the only two Forest Service employees involved in the land exchange during the timeframe that the Appraisal was being completed and up to the time of the search for responsive records.  *See id.*  Although one other Regional Appraiser for the Forest Service was previously involved in the land exchange and authorized to receive information about the Appraisal from the Appraiser, Parker confirmed that the former Regional Appraiser would not have had any responsive records as he no longer worked for the Forest Service at the time the Appraisal was completed and because none of the information or data from the Appraiser underlying the Appraisal was conveyed to the Forest Service other than through unrecorded Microsoft Teams calls.  *See* Scofield Decl. ¶ 50; Def.s Stmt. ¶ 50.

Thus, these facts show  the Forest Service searched all locations reasonably believed to have responsive records. The Court should enter judgment the Forest Service's favor on the adequacy of the search issue.

## II.   Neither the Appraisal nor the Data Upon Which the Appraisal is Based are Agency <u>Records</u>

FOIA applies only to "agency records[.]" 5 U.S.C. § 552(a)(4)(B). FOIA but does not define the term "agency record" in either its text or in its legislative history, *see Tax Analysts*, 492 U.S. at 142. The Supreme Court has held that documents constitute "agency records" subject to FOIA if they are (1) created or obtained by an agency, and (2) in the agency's control. *Id.* at 144-46. Thus, to be considered an "agency record," a document must have been both created or obtained by an agency and in the agency's control.

Whether an agency controlled the record at the time of a FOIA request, depends on the "'totality of the circumstances test' to determine whether documents are 'agency records.'" *Forest Cnty. Potawatomi Cmty. v. Zinke*, 278 F. Supp. 3d 181 (D.C. Cir. 2017) (quoting *Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006)). In *Burka v. Department of Health & Human Services*, 87 F.3d 508, 515 (D.C. Cir. 1996), the court examined four factors in determining whether an agency controls a record or document: (1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record or system of files. *Burka*, 87 F.3d at 515. As shown below, the Forest Service does not "control" the Appraisal or it supporting data because the Appraiser has retained complete control over those records, the Agency cannot use and dispose of the records as it sees fit. Moreover, the extent to which Agency personnel have read or relied on the records is extremely limited, and the records are not integrated the data into the Forest Service's files.

First, in storing the Appraisal and its supporting data in its virtual vault, called Digify, for which the Appraiser pays to keep records securely stored, and limits who has access to view those

records, the Appraiser has indicated his intention to retain exclusive control over the records and underlying information. *See* Def.'s Stmt. ¶ 7, 51; *Jones & Co., Inc. v. Gen. Servs. Admin.*, 714 F. Supp. 35, 38, 39 (D.D.C. 1989) ("[M]aintenance of the list in a locked safe and his granting of very limited access are indicative of his intention to retain close personal control over the list at all times."). Here, Sanchez was the only person from the Forest Service who was given access to view the Appraisal and its data. *See* Def.'s Smt. ¶ 7. To view these records, Sanchez was given his own password, by which the Appraiser could use to track what Sanchez was viewing in the vault and for how long. *See id.* ¶ 52. This shows that the Appraiser maintains complete control of the Appraisal and the data, even though it gives Sanchez periodic access to the information.

Second, because of the Appraiser maintains the Appraisal and its data upon in such a secure vault, the Agency cannot use and dispose of the records as it sees fit. Although permitted to view the Appraisal when necessary, Sanchez was unable to print it, screenshot it, forward it, or take any sort of action where he could remove the actual document or the information contained in the document from the virtual vault. *See id.* ¶ 53. Likewise, all communications between Sanchez and the Appraiser regarding the Appraisal and its data was conducted via Microsoft Teams calls only, and not by any other media (such as messages) that could be saved and disposed of at the will by the Forest Service. *See id.* ¶ 55. Indeed, until the Appraisal is approved, the Contract prohibits the Appraiser from releasing it to the Forest Service. *See id.* ¶ 10.

Third, consistent with the Appraiser's contractual requirements, the Appraiser further limits the extent to which Forest Service personnel have access to read or rely upon the document. *See id.* ¶ 9. Under the contract, "information about the assignment, appraisal results, or portions thereof" can be conveyed "only to the Contracting Officer, Forest Service Review Appraiser, or Chief Appraiser." *See id.* And here, only Sanchez, who was named as both the Forest Service

Review Appraiser and Chief Appraiser in the contract, had permission to review the Appraisal for Agency use. *See id.* ¶¶ 7–8. Because Sanchez' access to read and rely upon the Appraisal was so restricted, it took the majority of 2022 for Sanchez to draft the Technical Appraisal Review Report and the subsequent Summary Review Appraisal—the two documents upon which the Secretary will rely to assist with his decision on whether to approve the Appraisal. *See id.* ¶¶ 11, 15, 20, 56. And until the Final Statement and Tribal Consultation process is complete, these documents will not be shared with anyone else. *See id.* ¶ 23.

Fourth, neither the Appraisal nor any of the underlying data or information was imported into the Forest Service's Pinyon folder for the Resolution Copper Project—the official repository in which any documents that the Forest Service created or retained for the Resolution Copper Project is stored. *See* Scofield Decl. ¶30; Def.'s Stmt. ¶¶ 46–47, 54.

Given that none of the *Burka* factors evidencing agency control are present here, the Court should find that the Appraisal and its supporting data are not agency records over which the Forest Service had control at the time it completed its search. *See Zinke*, 278 F. Supp. 3d at 195-96 (finding third party contractor records not agency records despite fact that that agency created or obtained records where it exercised supervision and control over collection and analysis of data because control factors did not demonstrate that defendant controlled records).

As a final matter, to the extent Plaintiff may argue that, at some point in the future, the Forest Service may have access to the Appraisal and its underlying, this argument is irrelevant. As the Tenth Circuit has aptly pointed out, "it does not matter that the Forest Service could possess the documents by requesting them from [the contractor]: a federal right of access does not render a private organization's data 'agency records' subject to FOIA, because 'FOIA applies to records

which have been in fact obtained, and not to records which merely could have been obtained.'"

*See Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, 878 F.3d 1258, 1263 (10th Cir. 2018).

## III.     The Forest Service Properly Withheld Information Under FOIA Exemption 4

Exemption 4 protects from disclosure "trade secrets and commercial or financial information obtained from a person and privilege or confidential." 5 U.S.C. § 552(b)(4). As Congress explained, this exemption is meant to protect information "which would customarily not be released to the public by the person from whom it was obtained" such as "business sales statistics" and "customer lists." *See* S. Rep. No. 813, 89th Cong., 1st Sess., 9 (1965).  Courts in this Circuit have distilled Exemption 4 into a three-part test where information is protected from disclosure if it is "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential." *WP Co. LLC v. Small Bus. Admin.*, Civ. A. No. 20-1240 (JEB), 2020 WL 6504534, at \*5 (D.D.C. Nov. 5, 2020) (quoting *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)).  As demonstrated below, the Forest Service properly applied this exemption to withhold certain information contained in the Technical Appraisal Review Report and the Appraisal Report Summary which contain submitters' confidential commercial information. Such information, moreover, was obtained from a person and is customarily and actually treated as confidential.  Likewise, its disclosure would cause foreseeable harm to the submitters' interests protected by Exemption 4.

### A.     All of the Withheld Information at Issue Here is "Commercial Information."

The courts in this Circuit have long held that "commercial or financial information" are broad terms to be given their "ordinary meanings." *Pub. Citizen*, 704 F.2d at 1290 (citing Wash. Post Co. v. Dep't of Health & Human Servs., 690 F.2d 252, 266 (D.C. Cir. 1982), and *Bd. of Trade of City of Chi. v. Commodity Futures Trading Comm'n*, 627 F.2d 392, 403 (D.C. Cir. 1980)). "[R]ecords that actually reveal basic commercial operations, such as sales statistics, profits and

losses, and inventories, or relate to the income-producing aspects of a business" contain "commercial" information. *Pub. Citizen*, 704 F.2d at 1290. However, "Exemption 4 is not confined only to records that 'reveal basic commercial operations . . . or relate to the income producing aspects of a business.'" *Baker & Hostetler LLP v. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006) (emphasis is original). Indeed, "the question of whether information is 'commercial' boils down to a commonsense inquiry into whether the proponent has a business interest in that information." *Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36 (D.D.C. 2009) (citing *Pub. Citizen*, 704 F.2d at 1290 (describing manufacturers' interest in the documentation of the health and safety experience of their products as a clear "commercial interest")).

Here, the Forest Service has identified that the information withheld in its Technical Appraisal Review Report and the Appraisal Report Summary under Exemption 4 was obtained from three different sources, each of which have a business interest in the protected information. *See* Def.'s Decl. ¶¶ 57–59. These sources include (1) experts in the minerals field and providers of reports sold only to those in the mining and appraisal industries, (2) Resolution Copper, and (3) the Appraiser. *See id.* ¶ 59.

First, the information provided by mineral experts and providers of mining reports are commercial in nature because they contain assessments of the strength of various mineral deposits and their effects on the real estate market for parcels of land containing those deposits. *See* Scofield Decl. ¶ 48; Def.'s Stmt. ¶ 64. This information procured from mineral experts and mining reports include: the names of providers, such as consulting geologist, and their summaries of confidential and propriety technical reports and data; the number of international projects analyzed; the geographic locations, descriptions, metal content, property rights, and financing

terms of selected comparable sales; direct sales comparison sales summary table; the results of independent studies; concentrate transport costs; metal recovery information; treatment and refining cost information; metal pricing information; royalty (net smelter return) information and royalty calculation table information; and discount rate information. *See id.* ¶ 65. The real estate market is "by its nature," a "commercial enterprise." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 39 (D.C. Cir. 2002). Moreover, information relating to the effects on the real estate market is commercial "in its function," as the mineral experts and providers of mining reports sell their work product for profit. *See id.*

Second, the information provided by Resolution Copper is also commercial because it comprises the Appraiser's descriptions of and inferences from information about how Resolution Copper operates its business, such as how it uses its land, the intricacies of its smelting processes, project timelines, transportation costs, and cash flows. *See* Scofield Decl. ¶ 51; Def.'s Stmt. ¶ 69; *Pub. Citizen Health Rsch. Grp. v. Dep't of Health & Hum. Servs.*, 975 F. Supp. 2d 81, 105 (D.D.C. 2013) (finding information related to business-related processes, decisions, and conduct to be "sufficiently commercial" to benefit from Exemption 4). Specifically, this includes the information in the Technical Appraisal Review Report and the Appraisal Report Summary described as: "resource classification; deposit size and estimated billions of pounds; zoning use; orebody specific parameters; and project delay information." Def.'s Stmt. ¶ 70.

The remaining information that the Forest Service withheld under Exemption 4 derived from the Appraiser includes (1) the Appraiser's own opinions regarding the market value of the parcels of land subject to appraisal and (2) the Appraiser's forecast on the project stages about prefeasibility and feasibility and exploration and stages of selected comparable sales. *See* Scofield Decl. ¶ 52; Def.'s Stmt. ¶¶ 75. Both categories of withheld information are commercial in nature

as they relate, again, to the market and commercial value of the parcels of land subject to appraisal and comparable sales. *See* Def.'s Stmt. ¶ 76; *Wilson v. FCC*, Civ. A. No. 21-0895 (RMM), 2022 WL 4245485, at *7 (D.D.C. Sept. 15, 2022) (finding that withheld documents concerning "the market value and proposed sale prices for various broadcast stations, negotiations and possible structures for divestiture deals, and discussions surrounding the planned Sinclair-Tribune transaction" fit "snugly within the 'ordinary meanings' of the terms 'commercial' and 'financial'") (citing *Pub. Citizen*, 704 F.2d at 1290). Accordingly, the Forest Service properly determined that the withheld information constitutes "commercial information" under FOIA Exemption 4.

### B. All Information Withheld Under Exemption 4 Was Obtained from a "Person."

Exemption 4 also requires that the information be obtained from a "person," which covers "a wide range of entities including corporations, associations and public or private organizations other than agencies." *Allnet Commc'n Servs., Inc. v. FCC*, 800 F. Supp. 984, 988 (D.D.C. 1992). In determining whether information is "obtained from a person," the D.C. Circuit has taken a plain language approach that focuses on whether the information at issue originated outside the federal agency. *See Bd. of Trade*, 627 F.2d at 404 (finding that information is considered "obtained from a person" if the information originated from an individual, corporation, or other entity, and so long as the information did not originate within the federal government). Similarly, information that was supplied to the government by a "person" outside of government is considered "obtained from a person" for purposes of Exemption 4, even when that information appears in Department generated documents. *See Gulf & W. Indus. v. United States*, 615 F.2d 527, 529–30 (D.C. Cir. 1979) (finding that information submitted to the government and then incorporated into Agency documents was "obtained from a person" for purposes of Exemption 4); *Ctr. for Auto Safety v. Dep't of Treasury*, 133 F. Supp. 3d 109, 123 (D.D.C. 2015) (holding that "[i]nformation originally

obtained from an outside source, but later included in Agency documents, may be considered 'obtained from a person'" and qualify for Exemption 4 protection). The key inquiry is who "the source of the information [was] in the first instance," and not who created the document. *Def. of Animals v. Nat'l Insts. of Health*, 543 F. Supp. 2d 83, 103 (D.D.C. 2008)

Here, the information withheld pursuant to Exemption 4 meets the "obtained from a person" criteria as it was gathered and developed from "persons" outside of government. Specifically, as just described, the withheld information was gathered by the Appraiser from three difference sources outside the government, including (1) mineral experts and providers of mining reports, (2) Resolution Copper, and (3) the Appraiser. *See* Def.'s Stmt. ¶ 59. That the Appraiser included this information gathered from non-government sources, "in the first instance," in the Appraisal and then Sanchez included it in the Technical Appraisal Review Report and Appraisal Summary Report, thereafter, does not change the fact that the information satisfies the criterion of being obtained from a person. *See* Scofield Decl. ¶ 55; Def.'s Stmt. ¶¶ 17–18; 57–58; *Def. of Animals*, 543 F. Supp. 2d at 103; *S. All. for Clean Energy v. Dep't of Energy*, 853 F. Supp. 2d 60, 68 (D.D.C. 2012) (holding that even "information in an agency-generated [document] is still 'obtained from a person' if such information was supplied to the agency by a person or could allow others to 'extrapolate' such information." (citing *Gulf & W. Indus.*, 615 F.2d at 529–30 (protecting contractor information contained in agency audit report))). Accordingly, Exemption 4 clearly covers information obtained (1) mineral experts and providers of mining reports, (2) Resolution Copper, and (3) the Appraiser because they are "persons" for purposes of Exemption 4.

## C. All Information Withheld Under Exemption 4 Is Customarily and Actually Treated as Confidential.

The key consideration in evaluating the application of Exemption 4 is "confidential[ity]." In *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427 (2019), the Supreme Court held

that the term "confidential," as it is used in Exemption 4, must be given its "ordinary, contemporary, common meaning" at the time the statute was enacted in 1966 and that "[t]he term 'confidential' meant then, as it does now, 'private' or 'secret.'" 588 U.S. at 433 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). The Court observed that "FOIA expressly recognizes that 'important interests [are] served by [its] exemptions,' . . . and '[t]hose exemptions are as much part of [FOIA's] purpose[s and policies] as the [statute's disclosure] requirements.'. . . So just as we cannot properly expand Exemption 4 beyond what its terms permit, we cannot arbitrarily constrict it either by adding limitations found nowhere in its terms." *Argus Leader*, 588 U.S. at 439 (citations omitted, alterations and emphasis in original). In *Argus Leader*, the Supreme Court held that, to qualify as "confidential," the information must be customarily and actually kept private, or at least closely held. *See id.* at 434. As the Court explained, it would be "hard to see how information could be deemed confidential if its owner shares it freely." *Id.*; *see also Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992) (holding "commercial information provided to the Government on a voluntary basis is 'confidential' for the purpose of Exemption 4 if it is of a kind that would customarily not be released to the public by the person [or entity] from whom it was obtained.").

Here, all information withheld under Exemption 4 is confidential information because it is customarily and actually kept closely held. First, regarding information gathered from mineral expert assessments and providers mining reports, to protect its commercial value, this information is not available publicly. *See* Scofield Decl. ¶ 49; Def.'s Stmt. ¶ 66. Indeed, these assessments from mineral experts and providers of mining reports are the very business from which these sources make their profit and cannot be publicly released without undermining the providers' own business viability. *See* Scofield Decl. ¶ 49; Def.'s Stmt. 67. Thus, this information can and is

obtained for payment by appraisers, but not without customary assurances that the information

purchased will be protected under confidentiality agreements and not made publicly available. *See*

Scofield Decl. ¶ 49; Def.'s stmt. ¶ 66.

Likewise, when the Appraiser purchased information from mineral experts and mining

reports, he did so only after providing assurances that the assessments from mineral experts and

mining reports would be kept confidential by both the Appraiser, and the intended users of the

Appraisal to the full extent possible under law. *See* Def.'s Smt. ¶ 59–61, 66. To that end, the

Appraiser, as described above, has kept the Appraisal and all underlying data and information

supporting it, very tightly secured in an electronic vault to which only one employee at the Forest

Service has access. *See id.* ¶¶ 7, 51. As contractually required, moreover, the Appraiser has

labeled confidential and closely held information from providers in the Appraisal, so that they may

be protected to the full extent under law. *See* Scofield Decl. ¶ 47, 7; Def.'s Stmt. ¶ 62. Not only

is the entire Appraisal as confidential, but at multiple points, the Appraisal includes the statement:

> This is a CONFIDENTIAL REPORT, possession of this report, or a copy thereof,
> does not carry with it the right of publication. It may not be used for any purpose
> by any person other than the party to whom it is addressed without prior written
> consent of the appraiser[.]

Def.'s Stmt. ¶ 62.

Similarly, to protect this same provider information from the Appraisal in the Summary

Review Appraisal and the Technical Appraisal Review Report, the unredacted versions of two

documents are secured in a password protected Pinyon box with the Forest Service, accessible by

only Sanchez and Parker until the appropriate time the documents will be shared with the Secretary

to assist with his decision to approve the Appraisal. *See* Def.'s Stmt. ¶¶ 46, 48. And before

releasing the redacted versions in this case, the Forest Service conferred with the Appraisal to

ensure that all such confidential provider information was properly redacted as such.  *See id.* ¶¶ 57–58.

Similarly, regarding information gathered from Resolution Copper, the Appraiser confirmed that such information gleaned from Resolution Copper is not part of current public disclosure made by Resolution Copper.  *See id.* ¶ 72.  It is also actually kept confidential as the Appraiser was not able to obtain this information without providing assurances of confidentiality to Resolution Copper.  *See* Scofield Decl. ¶ 51; Def.'s Stmt. ¶¶ 60–61.  And as described above, to keep this information confidential, the Appraiser has kept the Appraisal and all underlying data and information tightly secured in an electronic vault with notice on the Appraisal that the report and specific parts thereof are confidential.  *See id.* ¶¶ 51, 62.  The Forest Service, in turn, has protected the unredacted versions of the Technical Appraisal Review Report and Summary Review Appraisal in a password protected Pinyon box, and before releasing redacted versions of the same, conferred with the Appraisal to determine which part of those documents reflect the information derived from Resolution Copper that was included first in the Appraisal and is confidential.  *See id.* ¶¶ 46–48, 57–58.

In addition, the Appraiser's (1) own opinions regarding the market value of the parcels of land subject to appraisal and (2) forecast on the project stages about prefeasibility and feasibility and exploration and stages of selected comparable sales are kept confidential.  Indeed, it is very clear that none of the Appraiser's opinions regarding the market value of the parcels of land in the exchange has been made public, yet, given that this appraisal value has not yet even been approved by the Secretary.  *See id.* ¶¶ 10, 26, 78.  And as indicated, the Appraiser and Forest Service are taking every precaution to ensure that such information is kept confidential pending approval of the Appraisal by the Secretary. *See id.* ¶¶ 9–10, 46, 48; *see also* Scofield Decl. ¶¶ 10, 53.  Likewise,

the Appraiser's own assessment of comparable sales is also kept confidential because this information, like information from mineral experts and mining reports, is the result of the Appraiser's own professional knowledge, and thus the Appraiser's developed forecast model can be used in products sold to other clients. *See* Scofield Decl. ¶ 54. This information is thus not made readily available to the public but can be purchased by clients under assurances of confidentiality. *See id.*; Def.'s Stmt. ¶¶ 66, 81. Therefore, when identifying that this information is confidential in the Appraisal, the Appraiser noted that any re-articulation of the same information in the Technological Appraisal Review Report and the Summary Review Report should be kept protected as well. *See* Def.'s Stmt. ¶ 82.

### D. The Agency Need Not Demonstrate that the Withheld Information Was Provided Under an Assurance of Privacy

The Court in *Argus Leader* questioned whether, in some instances, it might be possible for "privately held information [to] *lose* its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private[.]" 588 U.S. at 434–435 (emphasis in original). The Supreme Court had no need to resolve that question, however, because it was clear in *Argus Leader* that such assurances had been made. *Id.* In the cases that have been decided since, none have held that the absence of an assurance of privacy is, in and of itself, sufficient to defeat an Exemption 4 assertion. *Renewable Fuels Assoc. v. EPA*, Civ. A. No. 18-2031 (JEB), 2021 WL 602913, at *7 (D.D.C. Feb. 16, 2021) ("[N]o court has yet held that 'privately held information lose[s] its confidential character for purposes of Exemption 4 if it's communicated to the government without' privacy assurances." (quoting *Argus Leader*, 588 U.S. at 434)).

"The current law of the D.C. Circuit, which remains binding authority, is that information is confidential under Exemption 4 'if it is of a kind that would customarily not be released to the

public by the person [or entity] from whom it was obtained.'" *Renewable Fuels*, 2021 WL 602913, at *7 (quoting *Critical Mass*, 975 F.2d at 879); *see also Ctr. for Investigative Rep. v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 109 (D.D.C. 2019) ("*Critical Mass* and its progeny . . . supply the framework."). "Were this Court to hold that the information is not confidential because a second necessary condition exists that is not met here, it would essentially be overruling [*Critical Mass*] or at least declining to faithfully apply it." *Renewable Fuels*, 2021 WL 602913, at *7. "Absent a Supreme Court holding squarely abrogating Circuit precedent—which [*Argus Leader*] clearly is not—this Court has no power to depart from the result mandated by that precedent." *Id.* (citing *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997)). Thus, under the controlling authority in this Circuit, to establish confidentiality, the Agency need only demonstrate that the information was customarily and actually treated as private—as it has already shown above.

### E. Disclosure of Confidential Commercial Information Would Lead to Foreseeable Harm.

Under the FOIA Improvement Act, an agency is permitted to withhold information if "(I) the agency reasonably foresees that disclosure would harm an interest protected by [a FOIA] exemption; or (II) disclosure is prohibited by law[.]" 5 U.S.C. § 552(a)(8)(A). "To meet this requirement, the defendants must explain how disclosing, in whole or in part, the specific information withheld under Exemption 4 would harm an interest protected by this exemption, such as by causing 'genuine harm to [the submitter's] economic or business interest.'" *Ctr. for Investigative Rep.*, 436 F. Supp. 3d at 113 (quoting *Argus Leader*, 588 U.S. at 443, and citing *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 768 (D.C. Cir. 1974)). "The FOIA Improvement Act's 'foreseeable harm' requirement replaces to some extent the 'substantial competitive harm' test that the Supreme Court overruled in [*Argus Leader*]." *Id.* Caselaw that addresses the "substantial competitive harm" test prior to *Argus Leader*, may therefore be

instructive. At that time, the D.C. Circuit followed the general principle that "'competition in business turns on the relative costs and opportunities faced by members of the same industry,' and thus, 'there is a potential windfall for competitors to whom valuable information is released under FOIA.'" *100Reporters LLC v. Dep't of Just.*, 248 F. Supp. 3d 115, 140 (D.D.C. 2017) (citing *Worthington Compressors, Inc. v. Costle*, 662 F.2d 45, 51 (D.C. Cir. 1981)).

Here, release of the information that Plaintiff seeks would cause serious financial and competitive harm for multiple sources whose confidential commercial information was included in the Appraisal, and now in the Technical Appraisal Review Report and the Appraisal Report Summary. As for information from mineral experts and mining reports, the Appraiser confirmed that the public release of this information would foreseeably undermine its commercial value and affect the ability of mineral experts and providers of mining reports to make a profit form that information in the future, which in turn affects its business viability. *See* Scofield Decl. ¶ 49. Specifically, the information, if released, could be used by competitors wishing to capitalize on a similar product to sell to clients of the providers who submitted this information, and at a lower cost that is not economically profitable for the providers who spent resources to develop those assessments in the first instance. *See id.*; Def.'s Stmt. ¶ 67; *Leopold v. Dep't of Just.*, Civ. A. No. 19-3192 (RC), 2021 WL 124489, * 7 (D.D.C. Jan. 13, 2021) (finding that defendant met the standard of showing foreseeable harm when "[t]he release of [withheld] information could disadvantage [the submitter] and provide an unfair advantage to its competitors."). That the Summary Review Appraisal may be released in full at some time before the land exchange is consummated, does not negate the foreseeable immediate harm on the profitability of the information currently protected as the business viability of the providers depends on this singular window of time to profit from their assessments. *See* Scofield Decl. ¶ 50; Def.'s Stmt. ¶ 68.

Next, releasing the Appraiser's descriptions and inferences from information about how Resolution Copper operates its business could harm Resolution Copper competitively and financially. *See* Scofield Decl. ¶ 51. These descriptions and inferences, even filtered through the Appraiser, about Resolution Copper's mining operations, would build a mosaic of information regarding protected business information that is not part of current public disclosures made by Resolution Copper. *See id.* For example, even the commercial values of the proposed parcels of land may reflect commercial information about specific mining operations relative to the effectiveness of those mining operations. *See id.* Thus, disclosure of this information, to the extent it may disclose proprietary commercial information about specific mining operations may, immediately run the risk of absorption and use by competitors to Resolution Copper. *See* Def.'s Stmt. ¶ 72. These competitors, in turn, may seek to replicate Resolution Copper's operations in their own to try to see an end product at the lowest possible cost, undermining Resolution Copper's profits, which for business viability purposes, must account for resource and development expenditures of those operations that competitors now need not expend. *See id.*; *People for the Ethical Treatment of Animals ("PETA") v. Dep't of Health & Hum. Serv.*, 901 F.3d 343, 354 (D.C. Cir. 2018) (agreeing with the agency that disclosing the airline carriers and transport routes used by private importers would provide an unfair "windfall" to competitors who could thereby "enter the market without the startup costs associated with researching successful importation means and practices"). Likewise, earlier disclosure of this information prior to the Appraisal's approval by the Secretary may run the risk of public misperception or misunderstanding as to the value of the Resolution Copper's business to the company's detriment, including possibly financially. *See* Def.'s Stmt. ¶ 74.

There is another foreseeable harm at issue should confidential commercial information provided to the Appraisal from mining experts, providers of mining reports, and Resolution Copper be released. Indeed, the Appraiser gathered this information under assurances of confidentiality to the providers who rely on the Appraiser's assurances and discretion. *See id.* ¶ 60. If the protected information is released, the Appraiser's own business would suffer, as providers and similar providers may decline to allow the Appraiser to avail itself of their information in the future, which would affect the Appraiser's competitive business operations and ability to provide competitive work for clients. *See id.* ¶ 63.

In addition, the Appraiser's (1) own opinions regarding the market value of the parcels of land subject to appraisal and (2) forecast on the project stages about prefeasibility and feasibility and exploration and stages of selected comparable sales, if released, would cause foreseeable financial harm to the Appraiser. First, the Appraiser's opinions as to the market value of the parcels of land subject to appraisal, if released is, at bottom, the essence of the Appraisal itself. *See* Def.'s Stmt. ¶ 79. It is this value of land which the Secretary must review and approve before the land exchange is completed. *See id.* ¶ 16. Contractually, the early release of this information, may very well invalidate its use in supporting the Agency Action. *See id.* ¶ 10. In which case, this would compromise any remaining business interest that the Appraiser may still have under the Contract with the Forest Service. *See* ¶ 79. Second, regarding the Appraiser's own assessment of comparable sales, this information, like information from mineral experts and mining reports, can be sold to other clients. *See id.* ¶ 80. But if it is released publicly, the commercial value of this information decreases, undermining the Appraiser's ability to make a profit from the information, thus harming the Appraiser's business and financial interest as explained similarly above. *See id.* ¶ 81

Because each of these concretely explain harms are "textbook articulations of foreseeable harm" for which Exemption 4 protects and the Scofield declaration articulates a "link between the specified harm and the specific information contained in the material withheld," withholding the information provided by mineral experts, providers of mining reports, Resolution Copper, and the Appraiser, under Exemption 4 was proper. *Greenspan v. Bd. of Governors of Fed. Reserve Sys.*, 643 F. Supp. 3d 176, 189 (D.D.C. 2022).

## IV.    The Forest Service Properly Withheld Information Under FOIA Exemption 5

Exemption 5 allows agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).  As a general matter, intra-agency communications are those between employees within a single executive branch agency, and inter-agency communications are between employees of different agencies or departments. *Jud. Watch, Inc. v. Dep't of State*, 306 F. Supp. 3d 97, 109 (D.D.C. 2018) (also discussing intra-agency consultant corollary).  One well-recognized civil discovery privilege that permits agencies to withhold records under Exemption 5 is the deliberative process privilege. *Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 263 (2021).

The deliberative process privilege shields from disclosure "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Nat'l Lab. Rels. Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975).  The object of the privilege is to enhance the "quality of agency decisions" by "protecting open and frank discussion among those who make [decisions] within Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001) (quoting *Sears*, 421 U.S. at 151).  This privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front

page news." *Klamath*, 532 U.S. at 9; *Sierra Club*, 592 U.S. at 267 (noting the privilege encourages candor among agency officials and "blunts the chilling effect that accompanies the prospect of disclosure."); *EPA v. Mink*, 410 U.S. 73, 87 (1973) (explaining that Government decision making would be greatly hampered if agencies were "prematurely forced to 'operate in a fishbowl.'") (referencing S. Rep. No. 813, at 9 (1965)).

To properly assert the deliberative process privilege under Exemption 5, the Agency must show that the contested intra or inter-agency records are both "'predecisional' and 'deliberative.'" *Machado Amadis v. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020). Here, the Agency has shown both.

### A. The Withheld Information Is Inter-Agency Communication Protected by FOIA Exemption 5.

FOIA Exemption 5 permits agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The FOIA statute defines "agency" as "an authority of the Government of the United States" including "any executive department," "establishment in the executive branch of the Government," or "independent regulatory agency." 5 U.S.C. §§ 551(1), 552(f). "Intra-agency" memorandum generally refers to those documents "addressed both to and from employees of a single agency." *Klamath*, 532 U.S. at 9-10 (quoting *Dep't of Just. v. Julian*, 486 U.S. 1, at 18 n.1 (1988) (Scalia, J. dissenting)).

Here, the Agency withheld parts of two documents—the Technical Review Appraisal Report and the Summary Review Appraisal. *See* Def.'s Stmt. ¶¶ 39–40. The withheld information is covered under Exemption 5 as inter-agency communications because both documents were created by Sanchez for the Forest Service. *See id.* ¶ 11, 13–15, 19–20, 22, 25. Except for purposes of responding to the FOIA request at issue in this case, these documents have not been released to

anyone outside the Forest Service.  *See id.* ¶¶ 21–22.  Eventually, the Technical Review Appraisal Report will be shared with the Forest Supervisor and the Regional Director of Lands to decide whether to recommend to the Secretary to move forward with the land exchange.  *See id.* ¶ 25. Likewise, the Appraisal Report Summary will be provided to the Secretary to give the Secretary the best information to work from while making his decision to accept the Appraisal and move forward with the land exchange.  *See id.* ¶¶ 18–19, 25.  Until then, both documents are maintained in the Forest Service's official repository for all Agency records created or retained by the Forest Service for the Resolution Copper Project and Land Exchange files.  *See id.* ¶¶ 46–48.

## B. The Withheld Information Is Covered by the Deliberative Process Privilege as Predecisional

To qualify for protection under Exemption 5, the United States Supreme Court has held that "a document must thus satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  *Klamath*, 532 U.S. at 8.  Interpreting the second condition, the Supreme Court stated that Exemption 5 covers civil discovery privileges, including the deliberative process privilege, a form of executive privilege.  *Id.*  The deliberative process privilege permits the agency to withhold "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."  *Sears*, 421 U.S. at 150.  To be covered by this privilege, the agency must show that the withheld documents are both predecisional and deliberative.  *Machado, 971 F.3d at 370.*

"A document is predecisional if it was 'prepared in order to assist an agency decision maker in arriving at his decision,' rather than to support a decision already made."  *Petrol. Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting *Renegotiation Bd. v. Grumman*

*Aircraft*, 421 U.S. 168, 184 (1975)).  The agency's categorization of a document as predecisional is not dispositive: courts should undertake a functional analysis of "whether the agency treats the document as its final view on the matter."  *Sierra Club*, 592 U.S. at 268.  Predecisional documents can lose that status if adopted as the agency's final position on the matter, but the privilege still protects information that was part of the agency's "group thinking in the process of working out its policy."  *Elec. Frontier Found. v. Dep't of Just.*, 739 F.3d 1, 8 (D.C. Cir. 2014); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  To show that a document is predecisional, the agency does not need to identify a specific final decision on the subject, if one exists at all, but should explain the role the contested document played in the deliberative process. *Access Reps. v. Dep't of Just.*, 926 F.2d 1192, 1196 (D.C. Cir. 1991); *see Sears*, 421 U.S. at 151 n.18 (noting that not all recommendations will ripen into agency decisions).

The same information that the Forest Service withheld under Exemption 4, it also withheld under Exemption 5, because the information, at bottom, reflects either the express proposed opinion of value placed on the parcels of land being exchanged, or at a minimum, information which can be compiled to discern an opinion of value on the parcels of land being exchanged, which is still being deliberated and has not yet been reviewed and approved by the Secretary.  *See id.* ¶ 83.  The purpose of this withheld information is to assist the Secretary make that very determine whether to approve the appraised value of the parcels of land being exchanged.  *See id.* ¶ 84; *see e.g. Tax Analysts v. IRS*, 152 F. Supp. 2d 1, 24-25 (D.D.C. 2001) (protecting memoranda "written by a component office without decisionmaking authority to a different component office" that had such authority), *aff'd in part, rev'd in part on other grounds & remanded*, 294 F.3d 71 (D.C. Cir. 2002).  Specifically, Sanchez authored the Technical Appraisal Review Report to provide to the Secretary the with a comprehensive assessment of the completeness and accuracy

of the Appraisal, so that the Secretary could ensure that the Appraisal used appropriate appraisal methods and techniques, and that the Appraisal's conclusions, analyses, and opinions are reasonably supported with market data as required under Forest Service Policy and the Uniform Appraisal Standards for Federal Land Acquisitions. *See* Scofield Decl. ¶ 40; Def.'s Stmt. ¶ 14, 25. Likewise, Sanchez authored the Appraisal Report Summary to provide the Secretary with the best information to work from while making his decision to accept the Appraisal and move forward with the land exchange. *See* Def.'s Stmt. ¶ 18. Likewise, because the Secretary is required, under statute, to publish a copy of either the Appraisal or a summary thereof before the land exchange is consummated, the Appraisal Report Summary will be provided to the Secretary so that he can have all the information necessary to decide whether to release the Appraisal or the summary thereof, as already drafted and for his review. *See id.* ¶ 19. Thus, the reason the Forest Service created the withheld material is consistent with it being predecisional, particularly when the Secretary has not made a decision on the Appraisal or approved the land exchange.

In addition, nothing in the record, moreover, suggests that the information withheld under Exemption 5 has lost its status as predecisional by being formally and explicitly adopted as the Agency's final decision on the matter. *Sierra Club*, 592 U.S. at 268 (finding the rationale behind the deliberative process privilege "does not apply, of course, to documents that embody a final decision, because once a decision has been made, the deliberations are done."); *Jud. Watch, Inc. v. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017) (explaining predecisional materials can lose status as such in certain cases where there is an express adoption). As Ms. Socfield explained, the Secretary has not approved the Appraisal, nor has he even received the Technical Appraisal Review Report or the Appraisal Report Summary to assist with this decision as both documents are still subject to revision. *See* Scofield Decl. ¶ 58.

### C.   The Withheld Information Is Covered by the Deliberative Process Privilege as Deliberative

Deliberative records are those "prepared to help the agency formulate its position," *Sierra Club,* 592 U.S. at 268, by implicating the "consultative process" including communications which reflect the "type of back-and-forth exchange of ideas, constructive feedback, and internal debate over how best to promote and to preserve" the agency's proposed policies. *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 364 (2021). In short, the "key to whether a document is deliberative is whether it is part of the 'give-and-take' of the 'consultative process.'" *Id.* (quoting *Machado*, 971 F.3d at 370); *see Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975) (stating that documents part of the deliberative process make recommendations or express opinions on legal or policy matters).

In order to assist court's in evaluating whether disputed records are deliberative, the D.C. Circuit in *Judicial Watch, Inc. v. Department of Justice*, 20 F.4th 49, 55 (D.C. Cir. 2021), advised agencies to explain four factors: (1) what deliberative process is involved; (2) the role played by the disputed documents in the course of that process; (3) the nature of the decision making authority vested in the person issuing the disputed document; and (4) the relative position in the agency's chain of command of the persons authoring and receiving the document.

Here, the Agency's explanation shows that the material it has withheld under Exemption 5 is deliberative. First, the deliberative process involved is the Secretary's ultimate decision whether to approve the Appraisal for the parcels of land subject to the pending land exchange. *See* Def.'s Stmt. ¶ 85. This process is plainly consistent with the Supreme Court's definition of "deliberative" communications as those "prepared to help the agency formulate its position." *Sierra Club*, 141 S. Ct. at 786; *Grumman Aircraft*, 421 U.S. at 184 (noting materials protected by the privilege are

"predecisional memoranda prepared in order to assist an agency decisionmaker in arriving at his decision[.]").

Next, the Technical Review Appraisal Report and the Review Summary Appraisal are the two most significant documents assisting the Secretary make that ultimate decision. *See id.* ¶ 85. The information, specifically withheld under Exemption 5 goes to the heart of the Secretary's decision, as it reflects either express proposed opinions on the values of the parcels of land being exchanged or the most relevant information from which those proposed values can be discerned. *See id.* ¶ 83. Indeed, when determining whether information protected under Exemption 5 is deliberative, the D.C. Circuit has declared that redacted information should be examined "in the light of the policies and goals that underlie" the privilege and in the "context in which the materials are used," *Wolfe v. Dep't of Health & Hum. Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988), and here, the "ultimate objective" of Exemption 5 is to safeguard agencies' deliberative process, *Nat'l Wildlife Fed. v. U.S. Forest Serv.*, 861 F.2d 1114, 1119 (9th Cir. 1988); *see also Elec. Priv. Info. Ctr. v. Dep't of Just.*, 320 F. Supp. 3d 110, 119 (D.D.C. 2018) (noting that "the selection or organization of facts can be part of an agency's deliberative process and so exempt from FOIA"). Thus, the role played by the information protected plainly falls within the course of the Forest Service's deliberative process to determine whether to approve the Appraisal of land values subject to a legislative land exchange.

In addition, the direction by which the protected pre-decisional information flows is precisely the direction that expected for protection warranted under Exemption 5. *Coastal States*, 617 F.2d at 868 ("[A] document from a subordinate to a superior official is more likely to be predecisional."). Here, Sanchez, who created the Technical Review Appraisal Report, and the Review Summary Appraisal is an employee of the Forest Service who was approved to review the

Appraisal and create these two documents to assist the Secretary, and other decisionmakers, assess the Appraisal's opinions regarding the value of the lands being exchanged. *See id.* ¶ 11, 13–15, 25. Eventually both the Technical Review Appraisal Report and the Review Summary Appraisal will be submitted up the decisional chain to the Forest Supervisor and the Regional Director of Lands to decide whether to recommend to the Secretary to move forward with the land exchange. *See id.* ¶ 25. Thus, the third and fourth factors that assist Courts with determining whether information is deliberative, clearly reflect the deliberative nature of the information being withheld as they show to the extent deliberative information is being considered from "subordinate" to "superior." *Senate of the Commonwealth of P.R. v. Dep.'t of Just.*, 823 F.2d 574, 586 (D.C. Cir. 1987) (referencing *Schlefer v. United States*, 702 F.2d 233, 238 (D.C. Cir. 1983)).

### D. The Forest Service Has Established that Disclosure of the Withheld Records Will Cause Foreseeable Harm.

In addition to showing that specific documents qualify for protection under a named Exemption, the FOIA Improvement Act of 2016 further requires that an agency show that it (i) "reasonably foresees that disclosure would harm an interest protected by an exemption" to FOIA or (ii) "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). "The foreseeable harm requirement imposes an independent and meaningful burden on agencies." *Reps. Comm.*, 3 F.4th at 369. To carry this burden, an agency withholding documents under the deliberative process privilege must provide "a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Id.* at 370. Agencies must explain the "particular sensitivity of the types of information at issue or the role that they play in the relevant agency decisional processes[,]" and must "articulate the link between the specified harm and specific

information contained in the material withheld." *Id.* at 369, 372 (referencing H.R. Rep. No. 391, at 9 (2016)).

Here, disclosure of the withheld materials will cause foreseeable harm to at least two interest protected by the deliberative process privilege: (1) public confusion of the Agency's position on controversial issues and (2) ensuring that Agency employees are able to engage in full and frank discussion. *See* Def.'s Stmt. ¶ 86; *Coastal States*, 617 F.2d at 866 (describing the purpose of the deliberative process privilege to preserve frank discussions between government officials, protect against the premature disclosure of proposed policies, and avoid public confusion from releasing inaccurate information.); *see also Pub. Emps. for Env't Resp. v. Dep't of Homeland Sec.*, 575 F. Supp. 3d 34, 51–52 (D.D.C. 2021) ("[T]he D.C. Circuit has long recognized that the risk of public confusion "has a special force with respect to disclosures of agency positions or reasoning concerning proposed policies." (citing *Petrol. Info.*, 976 F.2d at 1436 n.10)).

Here, the Secretary must approve the Appraisal and thus the value of the appraised parcels of land subject to the land exchange before any land or cash can be conveyed. *See* Def.'s Stmt. ¶ 16. And because various considerations weigh on the timing of this approval, the Secretary is not expected to begin this approval process until at least Tribal consultations and the Final Statement are completed. *See id.* ¶¶ 27–30. Thus, if the information withheld under Exemption 5 and reflecting the actual or discernible proposed value of the parcels of land being exchanged is released, this will sow confusion publicly as to whether (1) the Tribal consultation and Final Statement are completed, which they are not and (2) that proposed value is the actual approved value for the parcels of land being exchanged. *See id.* ¶ 87. The value of the land being exchange is an extremely sensitive and controversial issue. *See* Scofield Decl. ¶¶ 4–5, 10, 67, 70. As previously mentioned, the San Carlos Apache Tribe views the land being exchanged known as

Oak Flat as sacred and thus, Congress has specifically required the Forest Service to address and mitigate with Resolution Copper issues surrounding the land exchange raised by local Indian Tribes. *See id.* Thus, there is substantial potential for the public to construe the release of this information as an inaccurate representation of the Secretary's decision regarding the value of the sensitive parcels of land being exchanged.

More importantly, however, the release of information withheld under Exemption 5 in all responsive records would foreseeably harm the Forest Service's ability to complete its frank and candid consultation process with local Tribes. *See* Def.'s Stmt. ¶ 88; *Mink*, 410 U.S. at 87 (explaining that the objective of the deliberative process privilege is to protect the candor of agency decision-making which would be harmed if employees were forced to "operate in a fishbowl"); *Donatos Sarras v. Dep't of Just.*, Civ. A. No. 19-0861 (CRC), 2021 WL 9909763, at *8 (D.D.C. Aug. 5, 2021) (recognizing candor as an interest protected by Exemption 5). Currently, the Forest Service is still engaged in government-to-government discussions with local Indian Tribes regarding the land exchange. *See* Def.'s Stmt. ¶ 89. The premature release of the proposed value or discernible value of the parcels of land being exchanged may not be reflective of current government-to-government discussions regarding the intrinsic value placed on the land by these tribes. *See id.* While these considerations by Tribal members could be addressed through other terms of exchange mutually agreed upon with Resolution Copper at the time when Tribal consultations and a Final Statement is complete, the current Appraisal of the parcels of land subject to exchange by statue will not reflect those considerations. *See id.* As a result, frank and open discussions in the Tribal consultation process will be tempered or derailed until any misconceptions surrounding the premature release of the proposed value or discernible value of the parcels of land being exchanged dissipates. *See id.* This in turn will chill these discussions

and cause further delay to the completion of the land exchange. *See id.* Indeed, until these consultations are complete, neither the Final Statement, nor the Secretary's final decision to review and approve the Appraisal will be completed, and the triggering events necessary for completing the land exchange will be delayed or possibly stalled indefinitely. *See id.* ¶¶ 27–30; Scofield Decl. ¶ 14, 68.

Likewise, the Agency continues to engage in government-to-government consultation with local tribes in a variety of other matters. *See* Scofield Decl. ¶ 69–70; Def.'s Stmt. ¶ 90. Any potential negative effect on the current consultation process with the Resolution Copper Project and Land Exchange will, in turn, negatively affect the consultation process in these other matters as well, to the extent that any premature disclosure of Exemption 5 information sows discord that goes beyond the current project and leads to distrust and erosion in the Agency's government-to-government relationship with San Carlos and other tribes in the region. *See id.*

At bottom, the evidence in the record clearly shows that the foreseeable harm caused by releasing the disputed information withheld from disclosure includes the very interests protected by the deliberative process privilege of Exemption 5. The material withheld under Exemption 5 is therefore proper.

## V.    The Forest Service Produced All Segregable Information

While an agency may properly withhold records or parts of records under one or more FOIA exemptions, it "must release 'any reasonably segregable portions' of responsive records that do not contain exempt information.'" *Agrama v. IRS*, 282 F. Supp. 3d 264, 275 (D.D.C. 2017); *see* 5 U.S.C. § 552(b) (requiring "any reasonably segregable portion of a record shall be provided to [the requester] after deletion of the portions which are exempt"). Non-exempt portions of a document "must be disclosed unless they are inextricably intertwined with exempt portions." *Mead Data*, 566 F.2d at 260. Before approving the application of a FOIA exemption, district courts

must make specific findings of segregability regarding the material to be withheld. *Summers v. Dep't of Just.*, 140 F.3d 1077, 1081 (D.C. Cir. 1998). Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material. *Boyd v. Crim. Div.*, 475 F.3d 381, 391 (D.C. Cir. 2007).

As explained in the Scofield Declaration, the Forest Service undertook a careful page-by-page, and line-by-line analysis of the two documents produced in response to Plaintiff's FOIA request, and concluded they had released all reasonably segregable, non-exempt material. *See* Scofield Decl. ¶¶ 71–74; Def.'s Stmt. ¶ 91–92. The Forest Service further concluded that all information withheld from disclosure under Exemptions 4, 5, and 6 could not be further segregated of meaningful information in the page or portion of the pages withheld without disclosing information that warrants protection under those same three exemptions. *See id.* Moreover, all information not exempted from disclosure under the cited exemptions was correctly segregated and released. *See id.* Thus, the Forest Service has provided all non-exempt records responsive to Plaintiff's request.

<div align="center">*     *     *</div>

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant summary judgment in its favor.

Dated: August 22, 2024                        Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division


By: _____ */s/ Anna D. Walker*_____
ANNA D. WALKER
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-2544

*Attorneys for the United States of America*

**Bureau of Land Management Review of Hydrology Aspects of the Resolution Copper Project**

**Lisa Dubas[1], James Johnsen[2], Steve Rice[3]**

**June 13, 2022**

At the request of the Department of Agriculture – U.S. Forest Service (USFS), the Bureau of Land Management (BLM) provided a targeted technical review of the 2021 Final Environmental Impact Statement for the Resolution Copper (RC) Project and Land Exchange (FEIS) and supporting documents.

For this review, a team of Bureau of Land Management hydrology specialists (BLM reviewers) reviewed the hydrology and water resources aspects of the project and assessed whether the FEIS adequately addressed comments received during the FEIS development.  The team focused on comments and questions raised by the Salt River Pima-Maricopa Indian Community (SRPMIC), other Tribes, and governments.  All but the targeted list of SRPMIC concerns were in Volume 6 of the FEIS.  Due to the substantial number of supplemental studies and amount of analysis conducted to develop the multi-volume FEIS, and the relatively short time in which to evaluate, the BLM reviewers consider this document to be a high-level review which focuses on broader topics that we believe may be deficient, under-developed, or improperly analyzed rather than a point-by-point list of technical comments.

The BLM reviewers would like to acknowledge the extensive amount of time and effort that has gone into developing this FEIS and for the obvious high level of staff and time commitment by the Tonto National Forest on the National Environmental Policy Act (NEPA) process.  The NEPA process and the resulting documents in the hydrology focus area were considered sufficient except where highlighted in this summary document.

While not unexpected, the FEIS struggles under the extensive scope of the proposed project and the scale of the studies needed to inform it.  Several perceived deficiencies in data analysis and interpretation or in adequacy of describing cumulative effects were later rationalized by searching the enormous number of supplementary reports, studies, and memos to file.  By not adequately incorporating this information into the FEIS, the final document often reads as incomplete and subjective in its preferred approaches. As difficult as it is for seasoned technical reviewers to follow the analyses, discussion, and reasoning for the assumptions and conclusions made in this FEIS, it must pose significant difficulty for a lay audience to process the scope and scale of the impacts predicted by this project, and whether they were predicted in an adequate and reasonable way.  It is understood that the magnitude of a project such as this is difficult to convey in a single document, even an expansive multi-volume one, but the reviewers felt that excessive time was spent tracking down the source material and studies necessary to understand the information and conclusions that are presented in the FEIS.

This document is structured to provide a general assessment of the FEIS and supporting documentation, followed by more specific topic area discussion containing comments and findings the BLM reviewers felt

---

[1] Hydrogeologist, Arizona State Office
[2] Hydrologist, Upper Snake Field Office, Idaho
[3] Hydrogeologist, BLM National Operations Center, Colorado

1

did not meet the analysis standards of NEPA, or suffered from insufficient evaluation or unsupported conclusions.

**Table of Contents**

**Executive Summary** ................................................................................................................. 3
**General comments on the FEIS** ............................................................................................ 6
 Summarize Additional Studies within FEIS ....................................................................... 6
 Additional Figures Would Benefit the Readers ................................................................ 6
 Arizona Water Law ........................................................................................................... 7
 Review Applicability of New CEQ Regulations .................................................................. 8
 General Comments About Report Organization (not related to submitted comments) ......... 9
**Technical Comments** ............................................................................................................. 9
 Introduction ..................................................................................................................... 9
 Detailed Technical Comments ......................................................................................... 13
  Baseline Conditions ...................................................................................................... 13
  Concerns about Native Waters / Tribal Water Supplies ................................................ 13
  Impacts of Climate Change ........................................................................................... 14
   Alternatives Analysis and Climate Change .................................................................. 14
   Groundwater Model and Climate Change .................................................................... 15
  Suggestions for Analysis of Alternatives ....................................................................... 16
  Characterization of Preferred Alternative Skunk Camp TSF .......................................... 17
  Impacts to Water Sources (springs, seeps, aquifer) ...................................................... 18
  Mitigation (water) ......................................................................................................... 20
  Limitations of Modeling Effort ..................................................................................... 22
   Skunk Camp Model ..................................................................................................... 22
   The Mine Model ........................................................................................................... 22
   The East Salt River Valley Project Model ..................................................................... 25

**Executive Summary**

The BLM reviewers believe that all additional studies referenced in the FEIS should be summarized in the FEIS to promote accessibility.  These additions would ultimately benefit the FEIS and the public's understanding of the action.  These summaries should be sufficiently technical (as to provide the needed information) and approachable (for less technical readers to grasp the concepts). Where feasible, selected public comments could also be referenced in the FEIS in their respective sections, especially when the comment led to additional studies being performed.

The BLM reviewers identified the need for figures, coupled with a short discussion of terminology, to explain how the effects of this project are limited spatially and temporally. An example would be a figure of the geographic limitations on surface and groundwater flow.

The BLM reviewers found a few references to Arizona water law throughout the documents they reviewed but believe there is a need for a consolidated section within the FEIS that gives a brief overview of Arizona water rights related to this project.

The BLM reviewers note that the Council on Environmental Quality (CEQ) Executive Office of the President recently issued new regulations concerning NEPA.[4]  Our understanding of the regulations is that the USFS *may* (but is not required to) apply the new regulations to this FEIS since the NEPA process started before September 14, 2020.[5] However, we suggest that the USFS consult with their Solicitor's Office or USFS implementation guidance (if available) about the implications of the new regulations.

With literature suggesting a higher likelihood for severe storm events in the future, the BLM reviewers believe alternatives lack sufficient discussion on climate change and the potential for catastrophic events.  Climate change predictions should be discussed, and potential impacts of floods greater than the 200-year event should be incorporated into the FEIS analysis and discussion.

The FEIS groundwater model scenarios used to predict water resources impacts into the future did not incorporate any changes over time for precipitation and recharge in transient simulations.  The FEIS docket contains a "Climate Change" scenario run that does not appear to be discussed in the FEIS.  That scenario indicated that when reductions in recharge were simulated (which is common during drought), there were higher rates of drawdown at wells and springs compared to the static recharge scenarios presented in the FEIS, particularly to the north and east of the model area.  The BLM reviewers believe the "Climate Change" scenario model run and the results from the model run should be discussed in the FEIS.

The BLM reviewers believe the potential to store some or all tailings in existing open pits in the area was dismissed too quickly and that this option should be given more than passing consideration and rise to the level of "detailed analysis".  To minimize impacts, it may be feasible to place a portion of the tailings in existing pits in the area.  If these existing pits cannot accommodate all the tailings from the proposed

---

[4] Effective May 20, 2022.  See https://ceq.doe.gov/docs/laws-regulations/NEPA-Implementing-Regulations-Desk-Reference-2022.pdf
[5] See § 1506.13 Effective date.

action, a smaller tailings storage facility (TSF) alternative than that which was analyzed could be proposed for the remaining tailings.

The BLM reviewers note that the Global Tailings Review published new guidelines and industry standards for tailings management in August 2020.[6] If practicable, the FEIS would benefit from TSF breach analysis consistent with the Global Tailings Review guidelines and standards for all alternatives. If breach analysis for all alternative TSF's is impactable, a breach analysis for the preferred alternative is recommended.  Based on the changing industry standards for TSFs, it may be feasible to reconsider all alternatives, including those alternatives that were originally dismissed from the analysis.

The BLM reviewers suggest looking at alternate Pyrite Cell locations within the Skunk Camp TSF layout to potentially negate exposure of the highest concentration tailings to stormwater runoff greater than the 200-year flood event.  Alternatively, analysis is recommended for the permanent rerouting of Stone Cabin and Skunk Camp Washes to the west of the Skunk Camp TSF.  The BLM reviewers believe a more thorough surface water hydrology characterization, as it concerns to climate change, needs to be completed for the Skunk Camp TSF.

Additional geologic cross sections should be developed, expanding beyond the eastern bounds of the groundwater model area to the Cutter Basin to highlight both the distance and the controls to groundwater flow between these two areas.  The potential for the Cutter Basin to be viewed as a potential alternate water supply in the future is a plausible indirect effect of the proposed mine.

The BLM reviewers found no mention of a date for steady state in the Skunk Camp groundwater model, other than a statement that average values were used.  The reviewers also found no mention within the Skunk Camp model of flood events being incorporated into the groundwater model.  It is unclear whether 100, 200, and 500-year flood events factored into the projection runs.

While dewatering of the Resolution graben has been occurring since 2009, the baseline condition for analysis would be set to the start of mining.  The BLM reviewers note that baseline monitoring occurred from 2003 to 2017, but dewatering started in 2009.  Please explain whether the short time-period between the start of dewatering and the end of monitoring is cause for concern.  For example, did the short time-period account for a delay in response between deep dewatering and a near-surface expression of the dewatering?

The BLM reviewers strongly recommend: implementing an adaptive monitoring and mitigation plan until the effects of mining have stabilized; using site photographs, vegetation monitoring, and water levels at the associated primary monitoring well (PMW) where direct measurements of spring discharge are not feasible; obtaining mitigation make up water from outside the project area; and using a threshold for potential effects to springs and GDEs that is more stringent (expanded area of impact) than the threshold used for wells. In addition, the BLM reviewers recommend that control sites be proactively implemented for data collection, a one-mile buffer be added around the modeled extent of mining impacts to the Apache Leap tuff aquifer, and that the wells, springs, and GDEs between the 10-foot

---

[6] See "Global Industry Standard on Tailings Management," available at https://globaltailingsreview.org/global-industry-standard/ (accessed May 10, 2022). The Global Tailings Review was convened by the International Council on Mining and Metals, the United Nations Environment Programme, and the Principles for Responsible Investment. The stated goal is to "establish an international standard for the safer management of tailings storage facilities."

contour and the 1-mile buffer be part of the monitoring and mitigation plan. Finally, the BLM reviewers suggest some of the 'potential future measures' like PF-WR-03 become a required measure.

BLM reviewers do not believe the north, south and east groundwater boundaries of the mine model are sufficient because the boundaries were not extended beyond the area of potential impact. Mineral Creek is defined as a boundary in the mine model, but the Apache Leap tuff aquifer extends past this creek and literature states that Mineral Creek is fed by the Apache Leap tuff aquifer. Additionally, the BLM reviewers suggest a figure be added that shows the spatial distribution of error between measured and simulated water levels of the mine model. How many wells will be impacted by the proposed mining and what could be the potential impacts?

The BLM reviewers note that several comments were directed at the surface water and the potential for contamination. The reviewers believe that the predicted outcome of impacts at 200 years is insufficient to address the true cumulative hydrological impacts of the action. The reviewers believe the surface water time scale should match the groundwater predictions (noting that the groundwater model was run out 1,000 years). Further, with literature pointing to less frequent but larger storms in the future because of climate change, the 1000-year flood event calculated today has the potential to be recalculated soon with a higher possibility of recurrence. A longer view of the impacts would help the public understand what impact a 1000-year stormwater event would have on the preferred alternative TSF and what the final condition of the aquifers in the mine model would be once they have adjusted to the new equilibrium. The BLM reviewers suggest additional cross-sections showing the north, south, and east mine model boundaries with justification for why the model boundaries were chosen.

Other comments from the BLM reviewers address the groundwater models for Skunk Camp and the East Salt River Valley Project.

**General comments on the FEIS**

**Summarize Additional Studies within FEIS**

Several perceived deficiencies in data analysis and interpretation or inadequacy of describing cumulative effects were later rationalized by searching the enormous number of supplementary reports, studies, and memos to file.  By not adequately incorporating this information into the FEIS, the final document often reads as incomplete and subjective in its preferred approaches. The BLM reviewers believe all additional studies referred to in the FEIS should be summarized in the FEIS to promote accessibility. These comments should be sufficiently technical as to provide the needed information, but also approachable for less technical readers to grasp the concepts. Where feasible, selected comments could also be referenced in the FEIS in their respective sections, especially when the comment led to additional studies being performed.

For example, the BLM reviewers believe the mining methods section does not sufficiently present or discuss why other known mining methods were not appropriate for the project location.  In Appendix F of the FEIS under *Post-DEIS Analysis of Alternative Mining Techniques*, where M3 Engineering and Technology Corporation is listed as a source for in-situ mining, the USFS could simply add the following paragraph, which was in the referenced July 13, 2020 M3 report, *Viability of In-Situ Leaching of the Resolution Copper Deposit*: "Expected copper recovery would be approximately 15%, as the Resolution Copper deposit is mostly comprised of chalcopyrite and bornite ore and not copper oxide ore, which is readily leachable."  Instead, the FEIS just states it was reviewed but found not appropriate, with the M3 report listed as a source of that statement.  The Reviewers believe that short statements like these, added to the FEIS for all the considered mining methods, would satisfy the comments concerned about why other mining methods were not discussed.

In another example, a comment questioned whether riparian habitats was adequately addressed in the DEIS. The response in Volume 6 of the FEIS was that the commenter was "unaware of the substantial background information, either in the project record or cited as DEIS references, that contributed to the analysis statements contained in the DEIS."  The BLM reviewers believe this comment would likely have not been submitted if previous studies had been summarized within the FEIS,.


**Additional Figures Would Benefit the Readers**

The BLM reviewers understand hydrologic concepts like model boundaries, boundary conditions and what they represent, cumulative impacts on surface and subsurface waters from stormwater runoff with dilution, and deposition of contaminated sediments later mobilized and transported further downstream, etc.  However, some of the comments indicate there are others who do not have this knowledge but are attempting to understand the effects of the proposed project.

The following comments by the BLM reviewers relate to the need for figures, coupled with a short discussion of terminology, to explain how the effects of this project are limited spatially and temporally because of geographic limitations on surface and groundwater flow.  The BLM reviewers believe that the FEIS would benefit from at least one figure that shows the various basins/subbasins in the area, with a discussion about what basins/subbasins are and how they contribute to the flow of surface water and groundwater.

For example, one of the comments received by the USFS included a figure that connected the contour lines provided in the East Salt River Valley (ESRV) groundwater model report with the contour lines provided in the mine groundwater model report, and then stated there would be cumulative effects within the mine area from pumping being done in the ESRV area. The aquifer in the ESRV is not connected to the Apache Leap tuff aquifer, which could have been more apparent to the readers if a figure of basins/subbasins had been included in the FEIS and/or the geologic controls delineating these basin boundaries was shown.

The BLM reviewers also noted comments submitted that referenced shortages of water in the Pinal Active Management Area (AMA), with reference to the ESRV model domain and the area of the mine project. ADWR's Pinal AMA groundwater model covers the Maricopa-Stanfield subbasins only, and the estimates provided on depletions within the aquifer are limited to those two subbasins and do not cross into the ESRV area adjacent to the wellfield, or the area of the proposed mining activity. The BLM reviewers believe the above-mentioned figure of basins/subbasins with supporting text could have helped someone who was speculating that the depletion estimates from the Pinal AMA groundwater model could be applied to this study area. A figure of basins/subbasins would have showed that these areas are not connected, and that any reference to a depleted aquifer in the Pinal AMA should not be used to prove depletions today or in the future for the areas referenced in the FEIS.

The BLM reviewers believe there should be a map (or several maps) that show the six alternative locations plus the HUC 12 or HUC 10 outlines from USGS (depending on the circumstances) that show each alternative and how it relates to places like "Cutter Basin", Maricopa-Stanfield, the ESRV area, the Gila River, and Top of the World. The BLM reviewers would also like to see such a map under the discussions for each alternative.


**Arizona Water Law**

A general discussion of water law in Arizona could be warranted – for example surface water rights not being adjudicated yet and no groundwater water rights in Arizona. Additional topics that could be addressed in this discussion are if there are any Federal or State regulations that prevent destruction of springs, if anything in the basin has been assigned a water right by the Arizona Adjudication Court, if the wells take groundwater out of the Phoenix AMA and if so, what does the law state on taking water out of an AMA? The BLM reviewers found a few references to Arizona water law throughout the documents they reviewed but believe there needs to be a consolidated section within the FEIS that gives a brief overview of Arizona water rights related to this project.

The BLM reviewers believe there needs to be a discussion about the potential for a subflow zone to be established in the project area, and if the project could potentially remove water from any proposed subflow zone. Even though a subflow zone has not been established within the project area, past precedence tells us any future subflow zone will be defined using floodplain alluvial sediments, but not bedrock or older consolidated sediments. This suggestion is not implying that the USFS needs to show where that subflow zone would be drawn, just an acknowledgement that one will be defined and if the project would impact it. The FEIS also needs a discussion about only major rivers and potentially mountain front streams being involved in Arizona Adjudication proceedings, and if there is a potential to impact these rivers. The BLM reviewers would also like to see a list of the Statement of Claimants (39s)

in the study area that would likely lose their ability to claim a water right when the Adjudication Court reaches the area as part of the Adjudication proceedings.

RC is currently dewatering the aquifer and some of the comments that were expressed denote confusion about the purpose and reasoning for the pumping. The BLM reviewers suggest a paragraph be added to the FEIS to tell readers what a mineral extraction withdrawal permit is, what the purpose of such withdrawals are, and how long RC can withdrawal under that permit, even without the new project. This paragraph should also state that permits must be renewed through the State of Arizona and state how often the permits need to be renewed.

Does the General Mining Law of 1872 have a higher priority than state and federal water rights? If the General Mining Law of 1872 is a dominant factor in the water rights at stake in the project area, the BLM reviewers want to see a paragraph stating as such in the FEIS. If the law of 1872 is not a dominant factor, the BLM reviewers want to see a discussion about other Federal rights already given and any state-based water right claims that would have an earlier priority date than RC.

A GIS layer of NHD points obtained by the BLM reviewers shows a lot more springs in the area of interest than are shown in the FEIS. Are the rest of these springs/seeps already dry? Why are they not mentioned? If they are mentioned in other literature available through the FEIS web page the BLM reviewers believe there needs to be a summary in the FEIS where the groundwater dependent ecosystem (GDEs)/springs are discussed. Would it help to tally up the number of springs that would not be impacted by the project versus how many would be impacted? Do they have 39s filed on them?

The BLM reviewers noted the mention of Superstition Vistas within Chapter 4, with the statement that the project is speculative and therefore not included in the analysis. We think it is important to provide more information related to what Superstition Vistas has managed to procure with regards to Assured and Adequate Water Supply permits and what is currently considered speculative. Superstition Vistas has obtained the rights to pump in that area, but only for a fraction of their conceptual project area.

The 39s filed with ADWR as part of the Gila River Adjudication are not mentioned in the FEIS. There are several comments that were submitted about how this project will affect water rights, but only Federal water rights would have been decided to date. Have any Federal water rights been approved within the project area? How many state-based claims have been filed with ADWR within the project area? Are there any surface water claims filed with ADWR in the area? How many parties will not be able to get a state-based water right because the water source no longer exists due to the dewatering of the Apache Leap tuff aquifer? The BLM reviewers found information within the FEIS lacking about water rights in Arizona, but we acknowledge the information could have potentially been included in another report related to the FEIS that was not reviewed by the BLM reviewers. There should also be a paragraph added that state-based rights in the area have not yet gone through the adjudication court.

**Review Applicability of New CEQ Regulations**

As stated in the Executive Summary, the CEQ issued new regulations concerning NEPA. The BLM reviewers believe that the USFS *may* (but is not required to) apply the new regulations to this FEIS since the NEPA process started before September 14, 2020. This understanding is based on § 1506.13 Effective Date which reads "the regulations in this subchapter apply to any NEPA process begun after

September 14, 2020. An agency may apply the regulations in this subchapter to ongoing activities and environmental documents begun before September 14, 2020."

We understand that the USFS (or the U.S. Department of Agriculture) may have implementation guidance on how to interpret or comply with the CEQ regulations with respect to the FEIS. Therefore, we suggest that the USFS consult with their Solicitor's Office or USFS implementation guidance (if available) about the implications of the new regulations.

The BLM reviewers note that if the USFS applies the new CEQ regulations to the FEIS, it could require the addition of information to the FEIS. For example, information might be required related to the proposed or potential smelting operations. Page 58 of the FEIS states the final smelter destination for copper concentrate has not been determined. Though this has not been determined, it will occur somewhere, and smelting is known to have potentially significant effects on the local air and water quality at which it occurs. If the smelter location is beyond the extent of cumulative effects analysis, it still should be acknowledged as an associated environmental consequence of the action. Not currently knowing the location does not preclude a discussion of potential effects.

**General Comments About Report Organization (not related to submitted comments)**

Volume 1 p. 87 of the FEIS states "This alternative is required by regulation 40 CFR 1502.14(d)." The placement of this statement makes it appear that the mine is required to do these activities because of this regulation. The BLM reviewers looked up this regulation and it stipulates that when a study with alternatives is completed, then a no-action alternative must be considered. The statement in the text is misleading.

If discussions about the alternatives were decided based on information presented in other sections within the FEIS, the BLM reviewers believe those sections should be called out in the FEIS text along with the decision. For example, "For a discussion of the potential impacts to water rights from this alternative see Chapter #, Section #".

Add the water use number to the summary table given in each alternative. For example, the text earlier in the section says 590,000 acre-feet (AF) so add a line to the table that says 590,000 AF of water will be used for that alternative. Land acreage could also be added to the table as well (private, FS, BLM, State, etc.).

**Technical Comments**

**Introduction**

Adequate understanding of the surface water hydrology and hydrogeology of the mine area and proposed TSFs are key to accurately assessing the effects of mining, recovery, and for long-term stability. This includes baseline conditions, dewatering needs, drawdown in the Apache Leap tuff aquifer, impacts to groundwater dependent ecosystems and stream baseflow, seepage and transport of contaminants from the mine workings and tailings facilities, and effects of climate change, among others.

9

Considering the complex geology and mining-specific changes with time and the spatial and temporal scope of evaluation, all modeling and assumptions resulting from it need to be tempered with the appropriate level of acknowledgement of its limitations and uncertainty. It will be imperative that adequate monitoring be conducted and that observations are fed back into the model on a regular basis to increase the predictive capacity of the models as tools to estimate impacts. The presented extents of modeled impacts provide best estimates with reasonable degrees of certainty, but these extents should not be construed as evidence that impacts are not occurring beyond the boundaries of the presented extents. It will be imperative that adequate monitoring be conducted and that observations are fed back into the model on a regular basis to increase the predictive capacity of the models as tools to estimate impacts.

The RC project has the potential to generate significant tonnage of important ore materials, but as a result will have a significant lasting impact on the landscape that will not be repaired with any level of mitigation. Even after mining and dewatering ceases, and water levels begin to recover, hydrologic features and processes in the project area will be altered forever and, in many cases, destroyed in perpetuity.

Future precipitation and recharge conditions must be adequately addressed to evaluate the cumulative effects of mine dewatering on the impacts and recovery of water levels in wells, spring discharge, and baseflow to streams.  Climate predictions of an increase in the severity of convective storm events must be adequately incorporated into assessments of future event magnitude and severity of storms related to the proposed tailings facility at Skunk Camp.

When it comes to surface features and mine waste it is important to ensure that impacts are disclosed well past the life of the mine.  This involves identification of potential failure modes and more robust facilities design as these features continue in perpetuity.  Because of the episodic nature of stresses like climate, earthquakes, wildfire, and stormwater events, catastrophic failure and rare natural events were not often seen as driving factors in alternative selection or mitigation planning. However, in the last few decades, with increasing news reports of tailings facility failures occurring, the potential impacts of these rare natural events appear to be increasing in importance.

According to Table R-2 in Appendix R of the FEIS, 472 comments were received with the general category of "Water resources" and comments that could touch on water related issues could also be within the general categories of "Alternative-related comments" and "Mitigation-related comments". The number of comments received on water and water resources alone, speaks to the importance of this issue to the submitters of comments.  Table 1 summarizes the topics of interest found within these comments in Volume 6 Appendix R, and those topics of interest served as a guide through the review process and for writing this report.

**Table 1.** Comments to the DEIS Which Guided the BLM Reviewers Strategy During Their Review

| Sub-Topic | Comment/Response Number | Number of Comments |
|---|---|---|
| **Characterization of Skunk Camp Alternative** | 30078-34 (WT7), 30078-35 (WT7), 463-3 (MIT3), 28824-1 (MIT1), 314-1 (MIT1), 524-15 (MIT17) lack of 200-yr, 524-18 (WT92), 524-21 (ALT1), | 8 |
| **Impacts of Climate Change** | 30078-18 (WT4), 30075-9 (AQ11), 28449-54 (WT4) | 3 |
| **Environmental Impacts** | 463-2 (CR12), 8030-12 (ALT22), 30078-1 (NS1), 261-10 (MIT1), 30075-3 (WT8), 30075-4 (DOC1), 30075-6 (DOC1), 30075-29 (WT17), 524-9 (WT76) only median flow used, 28449-54 (WT4) | 10 |
| **Impacts to Water Sources (springs, seeps, aquifer)** | 235-2 (CR4), 235-18 (WT30), 235-20 (CR21), 235-23 (WT50), 8030-9 (ALT22), 30078-3 (CR4), 30078-13 (WT4_A), 30078-14 (WT42), 30078-15 (WT4), 30078-24 (WT69), 30078-25 (NS2),   30078-26 (WT19), 30078-29 (MIT3), 30078-30 (MIT1), 30078-31 (MIT1), 30078-32 (MIT1), 30078-36 (WT4), 30078-37 (DOC1), 30078-44 (NEPA-44), 30078-45 (WT54), 30078-51 (WT10), 30079-3 (WT4), 30079-4 (WT4), 322-5 (MIT1), 261-3 (MIT1), 30075-21 (MIT3), 30075-30 (MIT30), 30075-44 (WI3), 30075-46 (MIT1), 562-2 (NS1)?, 562-4 (WT4_G), 562-7 (MIT1), F1 (ALT22, ALT5, NEPA2, NS1, TS2, WT1), F2 (ALT22, ALT5, NEPA2, NS1, TS2, WT1), F3 (NS1), F4 (ALT22, ALT5, NEPA2, NS1, TS2, WT1), F6 (ALT22, NEPA2, NEPA33, NS1, TS2, WT1, WT8), 29449-56 (NEPA54), 28449-55 (WT33), F10 (ALT22, NS1, WT4, WT6) | 40 |
| **Mitigation** | 30075-96 (MIT38), 30075-108 (MIT3), 30075-133 (MIT1), 30075-117 (MIT1), 30075-123 (MIT1), 524-6 (MIT27), 524-7 (MIT1) | 7 |
| **Concerns About Native Waters** | 30078-17 (WT4), 30079-5 (CR4), | 2 |
| **Arizona Water Law** | 30078-19 (WT4_H), 30078-42 (NEPA14), 30078-43 (NEPA14), 30078-44 (NEPA14), 30078-46 (WT21_C), 30078-48 (WT19), 562-6 (NEPA20) jurisdictional waters, 524-2 (MIT27) jurisdictional waters, 524-3 (MIT27), 524-5 (MIT27) jurisdictional waters | 10 |
| **Baseline Conditions** | 30078-20 (NEPA19), 30078-21 (NEPA19), 524-1 (ALT22) | 3 |
| **Basin/Sub-Basin Concerns** | 30078-23 (WT71), 30078-40 (WT30), 30078-41 (WT30) | 3 |
| **Alternative Mining Methods** | 30078-28 (AMT1_B), 30078-38 (AMT1), F5 (AMT1), F6 (ALT22, NEPA2, NEPA33, NS1, TS2, WT1, WT8) | 4 |
| **Limitations of Modeling Effort** | 30078-27 (WT61),30078-33 (WT49), 30075-18 (WT79), 30075-20 (WT79), 30075-22 (WT79), 30075-1 (WT82), | 14 |

11

| Sub-Topic | Comment/Response Number | Number of Comments |
|---|---|---|
| | 30075-23 (WT79), 30075-25 (WT8), 30075-24 (WT62), 30075-2 (WT16), 30075-26 (WT61), 30075-34 (DOC1), 28449-155 (WT81), 28449-52 (WT7) | |
| **Impacts to Water Sources** | 235-2 (CR4), 235-18 (WT30), 235-20 (CR21)?, 235-23 (WT50), 8030-9 (ALT22), 30078-3 (CR4), 30078-13 (WT4_A), 30078-14 (WT42), 30078-15 (WT4), 30078-24 (WT69), 30078-25 (NS2),   30078-26 (WT19), 30078-29 (MIT3), 30078-30 (MIT1), 30078-31 (MIT1), 30078-32 (MIT1), 30078-36 (WT4), 30078-37 (DOC1), 30078-44 (NEPA-44), 30078-45 (WT54), 30078-51 (WT10), 30079-3 (WT4), 30079-4 (WT4), 322-5 (MIT1), 261-3 (MIT1), 30075-21 (MIT3), 30075-30 (MIT30), 30075-44 (WI3), 30075-46 (MIT1), 562-2 (NS1)?, 562-4 (WT4_G), 562-7 (MIT1), F1 (ALT22, ALT5, NEPA2, NS1, TS2, WT1), F2 (ALT22, ALT5, NEPA2, NS1, TS2, WT1), F3 (NS1), F4 (ALT22, ALT5, NEPA2, NS1, TS2, WT1), F6 (ALT22, NEPA2, NEPA33, NS1, TS2, WT1, WT8), 29449-56 (NEPA54), 28449-55 (WT33), F10 (ALT22, NS1, WT4, WT6) | 40 |
| **Contamination/Water Quality** | 30078-33 (WT49), 30078-52 (TS24), 30078-53 (TS24), 30078-54 (TS24), 30075-31 (WT49), 30075-32 (WT44), 30075-33 (WT48), 30075-35 (WT44), 30075-36 (WT49), 30075-37 (DOC1), 30075-38 (WT44), 30075-42 (WT44), 30075-43 (WT44), 30075-33 (WT48), 30075-41 (WT7), 30075-45 (WT57), 30075-130 (DOC1) is only asking for something to be added to a table, 30075-131 (DOC1) correction to table, 30075-132 (DOC1), correction to table, 28449-5 (DOC1) asks for an add to a sentence, 28449-49 (WT32), 28449-89 (DOC1), 524-1 (ALT22), 524-4 (WT7), 524-8 (WT37), 524-10 (WT84), 524-11 (WT32), 524-12 (WT78), 524-13 (WT47), 524-14 (WT46), 524-16 (WI26), 28449-53 (DOC1), | 32 |

**Detailed Technical Comments**

**Baseline Conditions**

In reference to comment response WT31 and WT45, many comments centered on when the baseline condition started, on which impacts due to mining will be compared.  The Groundwater Modeling Workgroup also discussed the issue, but no consensus was ever reached on which baseline condition would be most appropriate for groundwater modeling and the NEPA analysis.  Concern was expressed in the comments that while dewatering of the Resolution graben has been occurring since 2009, the baseline condition for analysis would be set to the start of mining.  The BLM reviewers share this concern because baseline monitoring occurred from 2003 to 2017, but dewatering started in 2009.  The short time-period between the start of dewatering and the end of monitoring did not take into consideration a delay in response between deep dewatering and a near-surface expression of the dewatering.  The BLM reviewers believe it may be more appropriate to analyze available groundwater level information from wells, between where dewatering is occurring and the four springs in Devils Canyon and the 14 sites on Oak Flat.  A study of historical groundwater level information could identify if pre-mining dewatering appears to be expanding towards the locations being monitored, or if impacts are already being realized.

CEQ regulations define cumulative effect as one that "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable actions, regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time" (40 CFR 1508.7) p. 911. By not adequately addressing the importance of regional pre-mining groundwater conditions and the effects of early dewatering associated with the Magma mine, and by including continued dewatering in the analysis of the No Action alternative, the approach to assessing cumulative impacts does not meet the requirements of the above definition.


**Concerns about Native Waters / Tribal Water Supplies**

The San Carlos Sub-Basin of the Safford Groundwater Basin, otherwise known as the Cutter Basin, is located east of the predicted extent of mining influence but remains a concern to tribal entities who obtain groundwater there.  Modeling results and geologic controls, mainly the basement rock complex of the Pinal Mountains, indicate that the likelihood of mining impacts propagating to the Cutter Basin is low.  To better address the concerns regarding the Cutter Basin, an additional geologic cross section should be developed, expanding beyond the eastern bounds of the model area to the Cutter Basin, highlighting both the distance and the controls to groundwater flow between these two areas.  Comment response WT30 addresses the structural and distance controls between the modeled extent of impact and the Cutter Basin, but the text of the FEIS does not appear to.

However, the BLM reviewers believe that geologic isolation does not preclude indirect effects of mining impacting groundwater resources in the Cutter Basin.  Should the effects of mining degrade water availability or water quality in the Superior Basin, the Top-of-the-World area, or potential new areas of population development, especially beyond the boundaries of model-predicted effects that may not be subject to mitigation/compensation for loss, water users may have to go elsewhere for water supply.  As

13

an adjacent basin, the Cutter Basin may be viewed as a potential alternative supply, which could lead to an indirect effect of mining on the water resources within the Cutter Basin.

**Impacts of Climate Change**

*Alternatives Analysis and Climate Change*

All alternatives for the tailing facilities have advantages and disadvantages in their location, construction, drainage management, breach control, and other factors. With literature in the last decade pointing to a higher likelihood for severe storm events in the future, the BLM reviewers believe there could be an increase in their recurrence.  Examples include:

- o "Average air temperatures are rising, and it is likely that continued warming will accentuate the temperature difference between the Southwest and the tropical Pacific Ocean, enhancing the strength of the southwesterly winds that carry moist air from the tropics into the Southwest during the monsoon. This scenario may increase the monsoon's intensity, or its duration, or both, in which case floods will occur with greater frequency. Hurricanes and other tropical cyclones are projected to become more intense in the future. Since Arizona and New Mexico typically receive 10 percent or more of their annual precipitation from tropical storms, it is likely that this change will also increase flooding." https://climas.arizona.edu/blog/climate-and-floods-southwest

- o "We find that floods generated by convective storms have become more common and more extreme. On the other hand, rain-on-snow floods have become rarer and less extreme." https://doi.org/10.1029/2021GL097022

- o "A growing body of work suggests that the extreme weather events that drive inland flooding are likely to increase in frequency and magnitude in a warming climate, thus potentially increasing flood damages in the future." https://doi.org/10.5194/nhess-17-2199-2017

The BLM reviewers located only brief references to the analysis of flood events at each of the alternative TSF. In addition, discrepancies were noted in discussions of 100-year vs 200-year flood events. Furthermore, no discussion was found of flood events greater than 200 years. We believe each alternative lacks sufficient discussion on climate change and the potential for catastrophic events.

Please incorporate climate change predictions into the stormwater event discussion and analyze the impacts of larger floods (1,000-year flood event has been suggested by the review team) into the analysis of all alternatives. In addition, please provide a summary for each alternative that states the predicted 1,000-year event entering and exiting the TSFs. Please provide the expected spill threshold for all alternatives. This could include buffering and storage based on the TSF pond depth. Also, please provide the expected contaminants and concentrations and their change as the contact water moves downstream and additional waters dilute. Finally, please provide the required mitigation measures if such an event takes place and provide impacts analysis and extent of the contaminants. Results should

14

be reported in acre feet per day and ft$^3$/s. Results should also be added to the text of the FEIS and provided in simple visual figures and tables for reference.

*Groundwater Model and Climate Change*

Regarding comment response WT4 on water scarcity and competing water uses, the USFS response states "cumulative effects analysis has been expanded in chapter 4 of the FEIS to quantify the cumulative effects of competing water uses in the region and the ramifications of ongoing drought or climate change" The section in chapter 4 recognizes that temperatures continue to rise and that there is a general agreement that timing and intensity of precipitation events would change, however, the groundwater model scenarios used to predict water resources impacts in the future did not incorporate any changes over time for precipitation and recharge in transient simulations.  The BLM reviewers believe this results in an under-representation of the extent and magnitude of drawdown induced by mine operation (recharge was increased during simulations for the subsidence zone), which is supported by the "Climate Change" scenario that was requested to be conducted by the Groundwater Modeling Workgroup.  The "Climate Change" scenario run indicated that when reductions in recharge (which is common during drought) were simulated, there were higher rates of drawdown at wells and springs compared to the static recharge scenarios presented in the FEIS, particularly to the north and east of the model area.  Examples include a nearly 150-foot increase in projected drawdown between the proposed action scenario and the climate change scenario at well HRES-06 near Top-of-the-World, and significant (greater than 10 feet) additional increases in drawdown at locations such as McGinnel Spring, Rock Horizontal Spring, Queen Creek 17.39, DHRES-16, Devils Canyon 6.1E, 6.6W, and 8.8C, and Mineral Creek 6.9.  The examples given are in different areas within the model, and in a variety of lithologies.  The BLM reviewers could not find any discussion of the "Climate Change Scenario" within the FEIS and believe the model run and the results from the model run should be discussed within the FEIS.

According to the Arizona State Climate Office, in May 2022 Arizona is in the 27th year of a long-term drought.  Data shown on the website *azclimate.asu.edu/drought* shows drought has affected Arizona many times throughout recorded history.  The BLM reviewers are concerned that the FEIS does not adequately account for permitting processes for water use, CAP water availability, partially planned developments, and decreased precipitation (and therefore changes in recharge).  The Drought Contingency Plan is mentioned, but with a short comment that the drought contingency plan is ending in 2026 and therefore will not affect the project.  The BLM reviewers believe the FEIS treats other water uses as "speculative," even though there is a high probability that some of these actions will either affect the amount of water available to RC, or the amount of water withdrawn by RC will affect other planned developments.  There are many assumptions in the FEIS regarding availability of water to RC, but few assumptions on the availability of water due to an extended drought or other planned projects.

Impacts from climate change will have significant ramifications on hydrologic conditions in the project area during both mine operation and the extended recovery period.  Increases in temperature leading to more ET losses to aquifer systems, a reduction in recharge-inducing snowfall, increase in the severity and occurrence interval of convective storm events, and basin-scale drought (reducing not only local water supplies but regional ones including where the Desert Wellfield is proposed), are all factors that influence the cumulative impact of the mining operation and tailings storage on the landscape.  The BLM reviewers do not believe factors known to be associated with climate change, such as higher average temperatures, decreased precipitation, higher evapotranspiration, more frequent and potentially more

15

severe flooding, increase in forest fires due to dry vegetation, increased groundwater pumping due to the reduction of surface flows, and salinity, were thoroughly addressed within the FEIS.

**Suggestions for Analysis of Alternatives**

Tailings storage facilities continue in perpetuity after mine closure. The potential energy of upper drainage TSFs like Skunk Camp increases the likelihood of TSF failure and increases the potential spatial extent of impacts. Because of the episodic nature of stresses like earthquakes and stormwater events, the chance for catastrophic tailings storage failure during the life of the mine is low. However, for the communities and environment they depend on for resources like water, the chance for catastrophic failure and the associated impacts is an important consideration.

In August of 2020, in response to the increasing number of TSF failures around the world, the Global Industry Standard on Tailings Management was published with the goal "of zero harm to people and the environment with zero tolerance for human fatality. It requires Operators to take responsibility and prioritize the safety of tailings facilities, through all phases of a facility's lifecycle, including closure and post-closure. It also requires the disclosure of relevant information to support public accountability."

The BLM reviewers believe TSF breach analysis should be conducted for the preferred alternative following the guidelines and standards put forth by the Global Industry Standard on Tailings Management. Study results should be disclosed in the FEIS to inform alternative selection and support public accountability. This analysis is typically conducted by a qualified third party, and like other external studies, the findings should be summarized in the FEIS and should include maps for the extent of impacts and modeling outputs to inform the public. If practicable, breach analysis or some variance thereof for all alternatives should be included in the alternatives analysis to inform the decision-making process. Results from additional breach analysis will inform other permitting data needs and emergency planning and response.

With the potential for extreme stormwater events on the rise and flows that would be catastrophic to downstream resources if the proposed Skunk Camp impoundment failed, what would be the extent of the damage? Has this potential stress on the TSF been considered in the design and placement of materials? What would the extent of the damage be for all the alternatives (not just Skunk Camp)? The BLM reviewers recommend a detailed analysis of the potential extent and impacts associated with each of the alternative tailing facility locations if a catastrophic failure occurred due to the Global Industry Standard 10,000-year stormwater runoff event.

Owing to the changing standards for TSFs, it may be feasible to reopen alternatives that were originally dismissed from the analysis. An alternative that was discussed in Appendix F (Alternatives considered but dismissed from detailed analysis) was the potential to store tailings in existing open pits in the area. While many of them have legitimate rationale for dismissal, the prospect of splitting the PAG tailings into multiple sites such as Casa Grande, Copperstone, and Tohono Cyprus appears viable. It is unclear how much analysis went into the feasibility of a multi-site disposal plan, but it seems that this option should be given more than passing consideration and rise to the level of "detailed analysis" even if it were ultimately dismissed. Even if a combination of available sites still are not sufficient in storing the PAG tailings, the remainder could potentially be stored in a scaled-down version of one of the other

alternatives that was analyzed. The BLM reviewers believe this should be explored more as continued evaluation of the preferred alternative approach could potentially reveal an increasing number of concerns about its long-term reliability.

The Reviewers found no evidence within the FEIS or supporting materials that forest fires were considered in the analysis for the alternatives presented for the TSF. Due to the decades long drought Arizona is currently experiencing there is a greater chance for wildfires in the state, and the Skunk Camp location is adjacent to several mountain ranges. If a wildfire were to occur upgradient of the tailings pile, the lack of vegetation caused by the fire could have a profound effect on the local hydrology and the BLM reviewers believe this scenario needs to be addressed as an environmental impact, or as part of a climate change discussion.

It is possible the following information has been presented in other documents that were provided as reference, but the BLM reviewers believe the FEIS should state that contamination of the aquifer and rivers/streams is possible during stormwater events. Please indicate in the FEIS under what scenarios this will happen and identify the extent of contamination for each scenario. The BLM reviewers noted 10 comments expressing concern about the environmental impacts of the TSF and 40 comments about impacts to water quality. The BLM Reviewers believe there needs to be a more thorough discussion in the FEIS about this topic.

Water quality modeling results are based on the seepage collection efficiency for each alternative. However, there is little documentation on what the confidence levels are on seepage efficiency of theoretical tailings facilities. If the values presented are average or expected values, but may vary plus/minus 5% for example, how much variability does that introduce into the modeled water quality results? The reviewers believe this deserves further explanation.

**Characterization of Preferred Alternative Skunk Camp TSF**

BLM reviewers recognize that the alternatives presented in the FEIS are not fully developed and that the purpose of the alternatives analysis is to consider a reasonable range of alternatives that can accomplish the purpose and need of the proposed action. With that in mind the following comments are concerns about the preferred alternative. The layout and positioning of the facilities for the Skunk Camp TSF illustrated in Appendix F of the FEIS shows Pyrite Cell 1 is planned in the path of the two largest drainages entering the Skunk Camp TSF (Stone Cabin and Skunk Camp Wash). The USGS StreamStats calculated 500-year event for the Skunk Camp Wash entering the TSF is 4750 ft3/s (PII 2430 and PIu 9270 ft3/s) while the Stone Cabin Wash for the same recurrence interval is 3760 ft3/s (PII 1910 and PIu 7390 ft3/s) (StreamStats (usgs.gov) accessed on 05/03/2022).

The BLM reviewers suggest looking at alternate Pyrite Cell locations within the Skunk Camp TSF layout to potentially negate exposure of the highest concentration tailings to stormwater runoff greater than the 200-year event. Alternatively, please analyze the feasibility of permanently rerouting Stone Cabin and Skunk Camp Washes around the Skunk Camp TSF to the west. The USGS StreamStats calculated 500-year event for the Skunk Camp Wash at the downstream extent of the TSF is 13,100 ft3/s (PII 5900 and PIu 29,100 ft3/s) (StreamStats (usgs.gov) accessed on 05/03/2022). Diverting all the upstream inflow to the TSF from Skunk Camp and Stone Cabin Washes would reduce the 500-year flood event volume of

17

water coming into contact with tailings in the Skunk Camp TSF by more than 50%. This has the long-term benefit of rerouting potential peak flows around the tailings facility and potentially generating more robust excavated material for tailings impoundment structures. The new alignment appears to be a paleo alignment of those washes prior to the washes eroding through the bed rock.

Permanent diversion dams for the Stone Wash and Skunk Camp Washes potentially entering the TSF should be of significant size and construction to prevent the suggested 1,000-year stormwater event from gaining contact with the TSF. As mentioned above, the probability of a 1,000-year stormwater event occurring during mining operations is low, but viewed at a longer temporal scale, it is an important consideration.

The BLM reviewers believe a more thorough surface water hydrology characterization as it concerns to climate change needs to be completed for the Skunk Camp TSF.  This location has the largest 100-year floodplain footprint when compared to other drainages in the area and BLM reviewers are concerned that more frequent and more severe flood events that could result from climate change have not been addressed.  The more severe flood events could cause erosion and breach of the tailings pile, which would lead to contamination and impact the Gila River.  This location is mostly surrounded by mountains, and with wildfires more likely due to a drier climate, the risk of flood flows caused by fires in the mountains is also a concern for the reviewers.

The BLM reviewers found no mention of a date for steady state in the Skunk Camp groundwater model, other than a statement that average values were used.  Does that mean all historical water levels were averaged and that the data used was not representative of a single moment in time?  There needs to be more of a discussion in the FEIS about the steady state heads used in the groundwater model.

The Reviewers found no mention within the Skunk Camp model of flood events being incorporated into the groundwater model.  Were 100, 200, 500, etc. flood events factored into the projection runs?  The groundwater model seemed to mainly be a tracer type study to show how far contaminants would travel if they got into the aquifer or streambed.

**Impacts to Water Sources (springs, seeps, aquifer)**

After significant study of the FEIS and supplemental studies the BLM reviewers believe the characterization of GDEs is inadequate.  On the United States Department of Agriculture RC Project and Land Exchange Environmental Impact Statement web page under "Baseline Reports" there are inventories of springs, but only a few of those springs were included in the FEIS.  The BLM reviewers did not see a discussion in the FEIS about why only a few of these GDEs were included within the study.

One of the questions sent to the USFS was a concern that there could be an impact to the subflow zone along the Salt River, due to pumping associated with the project.  Since the project is nowhere near the Salt River, the BLM reviewers wonder if this comment is concerned about pumping near the Gila River. If that is the case, a cross-section showing the general geology from the East Valley wellfield to the Gila River could be used to show that pumping for this project can not impact the Gila River.

The BLM reviewers believe the FEIS does not provide enough information to satisfy the concern that the damage to the aquifer from future subsidence at Oak Flat will impact the water in Mineral Creek.  If that

information is available within a supplemental source, a summary of the study should be provided in the FEIS.

In Comment Response WT19, which concerns mitigating lost flows to Queen Creek, the response states that through mitigation (measure FS-WR-04) lost flows would be replaced by direct input of water from existing wells.  Since the loss of flows due to subsidence are a permanent feature of the post-mining landscape, are mitigation flows to Queen Creek planned to be permanent, or will this mitigation be like the mitigation planned for springs and GDEs, where after 10 years past active dewatering the mitigation could potentially cease.  The BLM reviewers believe the response as written requires additional clarification to be adequate.

The area encompassed by the RC project, within any scenario, consists of lands managed by the USFS, State Land, and BLM, as well as interspersed private ownership.  The BLM reviewers wondered if the dewatering of the shallow aquifer will forever prevent any future landowner or development from using the shallow Apache Leap tuff aquifer as a water source, which would force any development or landowner to either drill a more expensive well to a deeper water source, or force them to obtain water from another basin?

In the water budget information presented in Volume 4 Appendix H of the FEIS, there are three periods discussed which include construction, operation, and rampdown, but there is no indication that any water budget analysis was done for the period following year 45 (end of rampdown).  Water budget values should be presented for out-years (perhaps 200 years to match the groundwater model) to compare the budget to pre-mining conditions.

The water balance information shown in Volume 4 Appendix H of the FEIS has exact numbers given to represent water use for each aspect of the project and is meant to convey water use between mine years 6-12, mine years 13-36, and mine years 37-46.  The BLM reviewers wonder how such specific values can be calculated before the project has even begun.  As part of any groundwater modeling process the initial step of creating a water budget always involves coming up with ranges based on available literature.  The exact numbers presented in this report could likely change as mining progresses, and therefore should be represented as a range of values instead of exact values.  The BLM reviewers would also like to see, built into the FEIS, mitigation efforts by RC if water use ends up higher than the new range of values.

The BLM reviewers believe the cumulative impact to groundwater users in the affected area are not well quantified, which should include costs to deepen or relocate wells and added costs to draw groundwater from deeper depths or treat for degraded quality prior to use.  Effects more difficult to directly quantify are the long-term impacts related to loss of basin storage due to irreversible subsidence.

In Volume 2 of the FEIS on page 384 Figure 3.7.1-6 depicts "Apache Leap tuff aquifer water-level elevations and general flow directions".  The BLM reviewers think there should be a similar figure which shows the predicted water level once the upper and lower aquifers become connected through subsidence and new steady state conditions are created.

**Mitigation (water)**

The BLM reviewers did not find any references within the FEIS to monitoring data being added back into the mine groundwater model to determine if initial predictions were accurate or if more mitigation measures needed to be considered to get the results intended under the mitigation plan. The reviewers also wondered if the data obtained through the mitigation efforts were to be entered back into the model and the results showed mitigation efforts were not moving in the direction intended, what would RC do with the result to ensure mitigation efforts stay on track?

The BLM reviewers do not believe the FEIS does enough to acknowledge that although subsidence will be monitored, there is not much that can be done to mitigate once block caving has started. The BLM reviewers believe there needs to be a discussion within the FEIS about the limitations of mitigating the effects of subsidence and an acknowledgement that subsidence could occur in a way that has not been predicted by the modeling efforts.

According to the FEIS, the groundwater model was based on a 200-year timeframe and effects of the mining project could go on for much longer than 200 years. However, the monitoring plan (2020 Monitoring and Mitigation Plan for Groundwater Ecosystems and Water Wells by Montgomery and Associates) states monitoring will only be done for 10 years after dewatering has ceased. The BLM reviewers believe 10 years is not adequate, considering the effects will be felt for hundreds of years, and that the monitoring and mitigation action should be in place until the effects of mining on those sources have been mitigated from the effects of the mining project.

As stated in Volume 4 of the FEIS on page J-2, "The role of the Tonto National Forest under its primary authorities in the Organic Administration Act, Locatable Regulations (36 Code of Federal Regulations (CFR) 228 Subpart A), and Multiple-Use Mining Act is to ensure that mining activities minimize adverse environmental effects on National Forest System (NFS) surface resources." The BLM reviewers want to know if the contents of this statement inhibit the agency's ability to mitigate impacts to groundwater resources (the Apache Leap tuff aquifer) that provide water to surface resources, like springs fed by water from the Apache Leap tuff aquifer?

In Table 2 of the monitoring plan, the measurement type at the springs is listed as "visual estimate" of flow. The BLM reviewers believe "visual estimate" of flow is a qualitative, subjective, and un-repeatable approach that should not be used in the statistical analysis of discharge trends over time. If spring flow cannot be measured directly (volumetric, weir, etc.) it should not be recorded, and site photographs, vegetation monitoring, and water levels at the associated primary monitoring well (PMW) should be used instead.

Contingent monitoring wells (CMWs) are planned at some of the GDE sites, but the CMWs are only planned to be constructed and monitored once trigger levels are met at a nearby PMW. The BLM reviewers believe, when the compartmentalization by faults and the heterogeneity of the fractured Apache Leap tuff are taken into consideration, it seems plausible that impacts will be realized at some GDE sites without a nearby PMW having reached the threshold necessary to move forward with a site-specific CMW.

Installation of wells, or systems to harvest precipitation or surface water flows to mitigate for spring flow loss is a flawed approach which follows the 'rob Peter to pay Paul' logic (FEIS p.421) and would

more accurately be called 'passing the buck' or 'kicking the can' than 'mitigation'. The water captured by a well in the discharging aquifer system of the spring, or capturing rainfall or flow is simply taking water that would have provided another resource further downgradient. From a water budgeting perspective, the only true means of compensating for loss of spring flow is to make up for the loss of system water by augmenting with water from outside that system. Otherwise, it should be acknowledged that the mitigations as proposed have the potential for future negative impacts on other undetermined downgradient resources. The only in-basin alternative that would not impair the collective water resources of the area would be after subsidence connects the Apache Leap aquifer with the deeper aquifer; water could be collected via wells prior to being lost to the lower aquifer and redistributed back on the landscape.

The monitoring plan shows many springs having been historically impounded, diverted, or otherwise influenced. Restoration of these sites may offset the impacts of potential reductions in flow or add habitat to compensate for other areas that may experience significant reductions or total loss of discharge. The reviewers propose that a mitigation for springs and GDEs could be to remove the development structures which inhibit full ecological utilization of the groundwater discharge. However, this is the opposite of what is proposed in the plan, where impacts to flow would trigger more construction of spring boxes. If the springs in question are within a 10-foot drawdown area, only substantial site work could create a spring box that would continue to supply groundwater to the surface.

The potential for a 10-foot water level decline in a well could result in an inconvenience or could make a well non-viable for water production. By contrast, a 1-foot decline in the water table from an aquifer that supplies water to a spring could prevent discharge from occurring at the spring entirely. The BLM reviewers believe the threshold for potential effects to springs and GDEs should be more stringent (expanded area of impact) than the threshold used for wells.

A 10-foot contour line, as stated within the FEIS and provided literature, was the highest accuracy decided upon to represent the effects to the Apache Leap tuff aquifer due to mining activity, and nothing less than 10-feet of drawdown was presented. The 10-foot contour line represents the drawdown limit after 200 years, but it has been acknowledged that drawdown will still be occurring after 200 years. The BLM reviewers suggest a one-mile buffer be added around the modeled extent of mining impacts to the Apache Leap tuff aquifer, and that the wells, springs, and GDEs between the 10-foot contour and the 1-mile buffer be part of the monitoring and mitigation plan.

The BLM reviewers believe the monitoring plan should have control sites outside of the mine project area to study non-mine related impacts such as precipitation patterns, temperature, non-mine pumping, wildfire potential, etc. Control sites were mentioned as a potential in Level 2 trigger, but these control sites should be proactively implemented for data collection, rather than implemented as a reaction to decreasing flows or water levels. The use of control sites would also improve the confidence in the analysis results.

Measure PF-WR-03 is another 'potential future measure' that should become a required measure. The EIS states that quality impacts and water level declines are not anticipated due to operation of the Desert Wellfield, it should not be a voluntary potential future mitigation. If no effects are observed, there will be no action necessary, however, the BLM reviewers believe it should be a mandatory

mitigation if in fact negative impacts are observed. The uncertainty in occurrence should not preclude the requirement for action should it occur; as such, this should be a required measure.

**Limitations of Modeling Effort**

*Skunk Camp Model*

See earlier discussion of the Skunk Camp model in the "Suggestions for Analysis of Alternatives" section.

*The Mine Model*

The BLM reviewers do not believe the north, south, and east boundaries of the mine model extend far enough, and that the reasoning given (that only one of the sensitivity runs showed depletion at the boundaries of the model domain and therefore the boundaries are sufficient) is not an adequate justification as the impacts are based on extent of an arbitrarily selected impact threshold, and not the extent of potentially measurable impact.

Model boundaries should extend beyond areas that could potentially be impacted by the project, and since the project will impact the Apache Leap tuff aquifer, and has the potential to impact Mineral Creek, the BLM reviewers believe the FEIS did not adequately explain why Mineral Creek was chosen as a general head boundary (GHB) in the mine model, while a map of the Apache Leap tuff reviewed by the BLM reviewers shows the unit extending beyond Mineral Creek. There is also reference in the literature that states Mineral Creek is fed in places by the Apache Leap tuff aquifer, yet Mineral Creek was chosen as the boundary for the groundwater model.

The BLM reviewers noted that no pumping other than mine related pumping was added to the mine groundwater model, or at least we did not see any evidence that current stresses outside those caused by the RC mine were incorporated into the model. The BLM reviewers believe model boundaries far away from stresses to the aquifer cannot be accurately chosen unless all pumping within the Apache Leap tuff and deeper aquifer are included within the groundwater model.

Many WT comment responses provide the estimated water budget values for varying components of the mine operations, stating that while this is "complex", values are presented to the single acre-foot. By contrast, model estimates of mine impact are not presented past 10 feet of drawdown because of uncertainty. The BLM reviewers wondered if the values used to calculate the water budget (fracture flow drainage, ore moisture, tailings facility seepage control efficiency, etc.) are so well constrained that this level of precision is justified? A review of Appendix H (Mine water balance and use) does not indicate that the presented values are an average, median, or range of potential values, they are presented as one static value for each component of the overall balance.

Comment response WT36 the states "In the DEIS we compared the elevations of the subsidence crater and modeled elevations of groundwater during recovery and found that even after a period of 1,000 years they did not intersect." The BLM reviewers noted up to a 500 ft error in the water levels for the deeper aquifer in the hydrographs. Did the USFS choose water levels from hydrographs that had a lower error rate? Or did the USFS use water level elevations presented as part of the final scenario run? We are concerned that error prone water levels were used to make this assumption.

A secondary purpose of the mine model is to evaluate the effects of dewatering on the Apache Leap tuff aquifer. The BLM reviewers wondered if the collapse of Oak Flat causes the Apache Leap tuff aquifer to dewater, does the GHB used in the mine model at Mineral Creek permit the stream to dewater if the effects of the dewatering extend to Mineral Creek?

The BLM reviewers suggest a figure that shows the spatial distribution of error between measured and simulated water levels for the Apache Leap tuff aquifer and the deep aquifer are needed with any discussion of model related error in the FEIS. For example, The ADWR Salt River Valley 2009 model report has such a figure (https://new.azwater.gov/sites/default/files/SRV8306_Model_Report_1.pdf) which makes it easy to determine where the groundwater model was under and over simulating water levels in the chosen calibration run of the model.

The BLM reviewers looked at the hydrographs within the February 2019 RC Groundwater Flow Model Report in Appendix C and it appears that the Apache Leap tuff aquifer heads were simulated adequately, but that the deeper aquifer heads had errors up to several hundred feet. Is this an accurate interpretation of the hydrographs? If this is an accurate interpretation, does this error reflect the collapse of the mine over time? If that is the case, then the report needs further explanation so the reader can make the connection. If not, then there needs to be some explanation as to why the error is acceptable for the deep aquifer.

In Section 1.1 of the SWCA Environmental Consultants *Review of Numerical Groundwater Model Construction and Approach (Mining and Subsidence Area) Final* report, the modeling work group stated "Number of known private and public water supply wells within the geographic extent of the water-level impact, and assessment of impact to these water supplies". The BLM reviewers wonder if this was ever completed. If as part of the groundwater model discussion the results are to be presented using a representative well, so that a real well owned by a private entity is not used in the analysis, the BLM reviewers understand that decision. But the USFS needs to also state how many wells are registered with ADWR that could potentially be impacted given the extent of impact shown in the groundwater model. Exact locations and registry numbers are not required.

On page 410 and 411 of the FEIS the comment about well impacts is misleading. The model presented impacts at a well that was created only to symbolize pumping in a specific area (Top of the World, Superior, Boyce Thompson Arboretum). But as stated in a comment submitted to the draft EIS, all wells produce differently based on varying hydraulic conductivity and depths. The BLM reviewers believe Table 3.7.1-4 is misleading because one well is used to represent Superior, Boyce Thompson Arboretum, and Top-of-the-World. If other wells in those areas have different hydraulic conductivities or are screened in slightly different locations, the drawdown in those wells could be different from the well chosen to represent the area. Table 3.7.1-4 at least needs a statement that these wells were chosen to represent each area and a similar analysis at other wells within the same generalized area could produce different results.

Previous reviewers point to lack of adequate scientific data within the groundwater model (Comment ID 30078-27,30075-26, 28449-62, 28449-155, BGC Engineering USA Inc, 2020) which made the model a generic representation of the system versus a complex representation of the system. When beginning a groundwater model of this scale, the best approach is to build a model based on a very generic system, get it calibrated, then add complexity as the model progresses. In response to the concerns expressed by past reviewers, a generalized USFS response was given that adding additional complexity could

produce more model uncertainty by requiring additional parameters to be estimated in the absence of value data (SWCA memo 2020). The BLM reviewers looked to ADWR's approach with the complex regional groundwater models that they have built. These models are used by countless entities in support of assured and adequate water supply designations in the State of Arizona. The ADWR models follow proven groundwater methodology, and they take time to calibrate and refine their modeling approach to incorporate more complex data. Examples of data that would improve the mine model are variations of recharge, variations to evapotranspiration rates, and stresses on the aquifer not limited to RC pumping.

Comprehensive reviews of the model had been conducted prior to the release of the FEIS in 2021 by various parties. The BLM reviewers evaluated the model report, and the description of predicted impacts, prior to evaluating past assessments of the model, as well as the Water Resources Workgroup responses and modifications based on these evaluations. Remarkably, many of the same concerns expressed in past assessments of the model were identified by the BLM reviewers, indicating the concerns had never been incorporated into the groundwater model by the time the FEIS was released. According to the October 2020 SWCA report *Evaluation and Response to Public Comments on Groundwater Modeling Analysis*, prepared for the USFS, the various reasons behind not addressing these concerns were listed under "General categories of comments received" which included four categories of comments and an accompanying table (Table 1). The "General categories of comments received" section, and the accompanying table, did not address that there were definite concerns with the mine model. The section only lists reasons why the legitimate concerns should not be addressed.

The FEIS states that the model was run to 1,000 years, as this was likely necessary to bring the model to a point when effects of mine dewatering were no longer expanding, and that water levels at the edges of mine influence begin to recover. Model scenarios indicate that impacts beyond 200 years are predicted in the areas of natural discharge in Queen Creek, Telegraph Canyon, and Arnett Creek, and in water supply wells in Superior and Top of the World for many hundreds of years up to roughly 900 years. (FEIS p.411). The BLM reviewers believe it should be recognized and highlighted within the FEIS that the information presented in the FEIS does not represent the bounds of predicted impacts, merely those which can be reasonably predicted at an arbitrarily determined time step. We also believe that analyzing only three predicted outcomes, no action (with continued dewatering), life of mine, and impacts at 200 years, is insufficient to address the true cumulative effects of the action.

As addressed in comment response WT16, long term trends shown by the groundwater model have been limited to 200 years. While this time period was agreed upon by the Groundwater Modeling Group, there appears to be no reasoning provided as to why it is anything other than an arbitrary value. The BLM reviewers wondered if there were indications that there is an inflection point in predictive capability at 200 years and beyond this point certainty drops off? Without explanations as to why this alternative was chosen, one could assume that a reason 200 years was chosen was because if the spatial extent of the model was beyond this time period (say 300 or 400 years) the groundwater model results would show that mining impacts extend a significant distance past the model boundary, which would warrant an expansion of the model domain and re-analysis. The comment on the use of the 200-year time period has been mentioned multiple times in past reviews, but the response from the USFS has simply been that 200 years was the agreed-on time frame. The use of drawdown at 200 years and 10 feet was not universally agreed upon by the internal Groundwater Modeling Workgroup.

24

Regarding the potential formation of a pit lake, comment response WT36 states that comments on water levels rebounding and forming a pit lake are inaccurate, because "changes wrought to the aquifer by the block caving fundamentally change the hydrologic and geologic framework of the system. A return to pre-mining conditions is not anticipated, and a return to pre-mining groundwater levels is not inevitable." Model results have been provided to 200 years and have been qualitatively described as continuing to expand for many hundreds of years, even more than 1,000 years, but there is little description or presentation of what will be the new groundwater condition in this area long into the future.  This project is not one where after time, even a very long time, conditions return to an approximate pre-mining condition.  The BLM reviewers believe a description of what the new system will look like and how it will behave is warranted. Uncertainty may be high in this assessment, but it should not be avoided.

The WSP (2018) block cave report states that once subsidence connects the Apache Leap aquifer with the lower system (mine year 16), the Apache Leap will be draining nearly 1,600 gallons per minute (gpm) out of the upper aquifer system into the lower workings.  This rate will decrease over time, but at mine year 50 it will still be draining nearly 380 gpm (600 acre-feet per year) as the Apache Leap tuff continues to move towards a new equilibrium condition.  While these flows will be removed from the lower aquifer via the mine drains during mine operation, once mining is completed these flows will continue to drain from the upper aquifer until another equilibrium condition is reached, either by filling the extent of the workings and subsidence area or draining the Apache Leap aquifer. This drainage likely accounts for the single largest output of groundwater from the Apache Leap aquifer, so what does this do to new equilibrium groundwater flow directions and gradients compared to the pre-mining condition?  Will existing drain points for this aquifer ever recover to pre-mining conditions or will the generation of this new base level permanently alter this system, and what is the ultimate drain point for the lower aquifer?

Figure 2.1, Surface Geology Map, within the WSP February 2019 RC Groundwater Flow Model Report, shows the locations of cross-section A-A' and B-B' which are centered on the Oak Flat area of the project.  The BLM reviewers noted that neither cross-section can be used to help orient readers as to why the north, south and east groundwater model boundaries were chosen.  We would like to see either new cross-sections added to the FEIS, or modifications to these cross-sections, that would help explain to reviewers of the EIS as to why WSP chose those boundary locations for the groundwater model.  The BLM reviewers also believe such cross-sections would help to explain the science between basins/sub-basins and surface water/groundwater flow.

*The East Salt River Valley Project Model*

The BLM reviewers did not see any reference within the FEIS or provided documents to indicate site geology was used to update the 2009 ADWR Salt River Valley groundwater model.  A study was published in 2017 by the Arizona Geological Survey, with funding provided by RC, of the Superstition Vistas Planning Area, within the area shown in the FEIS and accompanying documents that would be used by RC for their East Salt River Valley pumping wells.  The BLM reviewers did not read this report, but the publication stated, "Depth to bedrock, and saturated thickness, were significantly increased throughout SVPA, especially along bedrock piedmonts adjacent to the Superstition Mountains and Mineral Mountains."  The increased depth to bedrock has not yet been included in a published ADWR

25

groundwater model of the East Salt River Valley, but the BLM reviewers believe this information should be reviewed and incorporated into the groundwater model that evaluates the pumping wells for the RC project.

The BLM reviewers want more of an explanation into how dry cells were modified within the East Salt River Valley Project Model when cells went dry.  The literature stated cells that went dry were modified, but the BLM reviewers did not find anything cited within the literature to indicate what scientific data was used to give the cells a greater depth to bedrock.

The BLM reviewers found, related to the FEIS, that the pumping model within the East Salt River Valley states the groundwater model takes into consideration past stored water credits that RC has in the East Valley.  Within a few years other entities that have stored water within the East Salt River Valley will also be removing their stored water credits. BLM reviewers would like to know if the pumping model factors in other entities removing stored credits.

The BLM reviewers noted the location of the modeled 25-foot drawdown contour but found no mention of other water users within that 25-foot drawdown zone.  Are there current water users within that 25 ft drawdown zone, and are there any future projects already approved by ADWR within that area?

The BLM reviewers believe change maps should be included in the ESRV model report, in addition to the contour maps provided in the groundwater model report.  For example, illustrating how much has depth to water changed between the no-action alternative and the other alternatives.

**Forest Service**

U.S. DEPARTMENT OF AGRICULTURE

---

**Tonto National Forest**        **MB-R3-12-10**        **June 2025**

# **FINAL** Environmental Impact Statement
## Resolution Copper Project and Land Exchange
Coconino, Gila, Maricopa, Pinal, Santa Cruz, and Yavapai Counties, Arizona



### Forest Service
U.S. DEPARTMENT OF AGRICULTURE

**Tonto National Forest** | **MB-R3-12-10** | **June 2025**

# **FINAL** Environmental Impact Statement
## Resolution Copper Project and Land Exchange
Coconino, Gila, Maricopa, Pinal, Santa Cruz, and Yavapai Counties, Arizona



In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

**Front Cover photo captions:**

*Top:* Map of the Preferred Alternative Project location and the Tonto National Forest

*Bottom Left:* Oak Flat Federal Parcel

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1304 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 5 of 96

Final Environmental Impact Statement

# Executive Summary

## ES-1. Introduction

This executive summary provides an overview of the final environmental impact statement (FEIS) for the proposed Resolution Copper Project and Land Exchange (herein called the project). The FEIS describes the process undertaken by the U.S. Forest Service (Forest Service), a land management agency under the U.S. Department of Agriculture (USDA), to evaluate the predicted effects of and issues related to the submittal of a mining General Plan of Operations (GPO) by Resolution Copper Mining LLC (Resolution Copper), along with a connected, legislatively mandated land exchange of Federal and private parcels in southeastern Arizona (figure ES-1).

This Executive Summary does not provide all the details contained in the FEIS. Please refer to the FEIS, its appendices, or referenced reports for more information. The FEIS and supporting documents are available on the project website at https://www.ResolutionMineEIS.us/.

## ES-1.1 Background

Resolution Copper proposes to develop an underground copper mine on unpatented mining claims on National Forest System (NFS) land near the town of Superior in Pinal County, Arizona, approximately 60 miles east of Phoenix. Resolution Copper is a limited liability company that is owned by Rio Tinto (55 percent) and BHP Copper, Inc. (45 percent). Rio Tinto is the managing member.

Resolution Copper has ties to the century-old Magma Mine, located in Superior, Arizona. The Magma Mine began production in 1910. In addition to constructing substantial surface facilities in Superior, the Magma Mine created approximately 42 miles of underground workings.

In 1995, the Magma Copper Company discovered a copper deposit about 1.2 miles south of the Magma Mine through exploration of those underground workings. The ore deposit lies between 4,500 and 7,000 feet below the surface.

In 1996, BHP Copper, Inc., acquired the Magma Copper Company, along with the Resolution Copper Mine deposit. Later that year, BHP closed operations at the Magma Mine, but exploration of the copper deposit continued.

In 2001, Kennecott Exploration, a subsidiary of Rio Tinto, signed an earn-in agreement with BHP and initiated a drilling program to further explore the deposit. Based on drilling data, officials believe the Resolution Copper Mine deposit to be one of the largest undeveloped copper deposits in the world, with an estimated copper resource of 1,970 billion metric tonnes at an average grade of 1.54 percent copper.

The portion of the Resolution Copper Mine deposit explored to date is located primarily on the Tonto National Forest and open to mineral entry under the General Mining Law of 1872. The copper deposit likely extends underneath an adjacent 760-acre section of NFS land known as the "Oak Flat Withdrawal Area." The 760-acre Oak Flat Withdrawal Area was withdrawn from mineral entry in 1955 by Public Land Order 1229, which prevented Resolution Copper from conducting mineral exploration or other mining-related activities. Resolution Copper pursued a land exchange for more than 10 years to acquire lands northeast of the copper deposit.

Resolution Copper Project and Land Exchange



**Figure ES-1. Resolution Copper Project vicinity map**

ES-2

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1306 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 7 of 96

Final Environmental Impact Statement

In December 2014, Congress authorized a land exchange pending completion of the environmental impact statement (EIS), as outlined in Section 3003 of the Carl Levin and Howard P. 'Buck' McKeon National Defense Authorization Act for Fiscal Year 2015 (which is referred to as Public Law (PL) 113-291). The exchange parcel to be conveyed to Resolution Copper includes not only the Oak Flat Withdrawal Area but also the NFS lands above the location of the copper deposit. This collective 2,422-acre tract of land is known as the "Oak Flat Federal Parcel."

The draft EIS (DEIS) was published for public review and comment in August 2019.

The FEIS was completed and originally published on January 15, 2021. On March 1, 2021, the USDA directed the Forest Service to withdraw the Notice of Availability and rescind the FEIS and draft record of decision. The USDA took this step to provide an opportunity for the agency to conduct a thorough review; to ensure regulatory compliance of environmental, cultural, and archaeological analyses; and to provide time for the Forest Service to fully understand concerns raised by Tribes and the public and the project's impact to these important resources.

The FEIS is being republished at this time. The FEIS contains corrections, modifications, and additional analysis in direct response to public comments submitted on the DEIS. Appendix R of the FEIS contains written responses to all public comments received. In addition, revisions have been made since the original publication in January 2021 in response to events and changes since that time.

## ES-1.2    Project Overview

Resolution Copper is proposing to develop an underground copper mine at a site in Pinal County, about 60 miles east of Phoenix near Superior, Arizona. Project components include the mine site, associated infrastructure, a transportation corridor, and a tailings storage facility.

The project would progress through three distinct phases: construction (mine years 1 to 9), operations, also referred to as the production phase (mine years 6 to 46), and reclamation (mine years 46 to 51–56). At the end of operations, facilities would be closed and reclaimed in compliance with permit conditions.

Operational projections anticipate removal of 1.4 billion tons of ore and production of 40 billion pounds of copper using a mining technique known as panel caving. Using this process, a network of shafts and tunnels is constructed below the ore body. Access to the infrastructure associated with the panel caving would be from vertical shafts in an area known as the East Plant Site, which would be developed adjacent to the Oak Flat Federal Parcel. This area would include mine shafts and a variety of surface facilities to support mining operations. This area currently contains two operating mine shafts, a mine administration building, and other mining infrastructure. Portions of the East Plant Site would be located on NFS lands and would be subject to Forest Service regulatory jurisdiction. Ore processing would take place at the old Magma Mine site in Superior.

A tailings storage facility would be constructed to house the waste material that remains after processing. The facility disturbance footprint would occupy between 2,300 and 5,900 acres, depending on the location and embankment design. Pipelines would be constructed to transport the tailings waste from the ore processing facility to the tailings storage facility.

The estimated total quantity of external water needed for the life of the mine (construction through closure and reclamation) is substantial and varies by alternative (180,000 to 590,000 acre-feet). Resolution Copper proposes to use water either directly from the Central Arizona Project (CAP) canal and/or groundwater pumped from the East Salt River valley. Over the past decade, Resolution Copper has obtained banked water credits for recharging aquifers in central Arizona; the groundwater pumped would

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1307 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 8 of 96

Resolution Copper Project and Land Exchange

be through recovery of those banked water credits, or groundwater use authorized by the State of Arizona under a mineral extraction withdrawal permit.

While all mining would be conducted underground, removing the ore would cause the ground surface to collapse, creating a subsidence area at the Oak Flat Federal Parcel. The crater would start to appear in year 6 of active mining. The crater ultimately would be between 800 and 1,115 feet deep and roughly 1.8 miles across. The Forest Service assessed alternative mining techniques in an effort to prevent subsidence, but alternative methods were considered unreasonable.

The workforce during construction/ramp-up is expected to peak at 1,600 personnel in Pinal County and another 1,600 in other areas. During operations, the project would employ an average of approximately 2,100 people annually in Pinal County and another 1,700 in other areas. During the reclamation phase, employment is projected to be 600 in Pinal County and 600 in other areas.

## ES-1.3    Areas of Controversy

The Resolution Copper Project and Land Exchange is controversial for several reasons.

Foremost among them are the expected significant environmental impacts and loss of the Oak Flat area, historically used by Native Americans, who hold the land as sacred and use the area for spiritual and traditional uses. Additionally, in March 2016, the Oak Flat area was listed in the National Register of Historic Places (NRHP) as a traditional cultural place (TCP).

Measures to resolve adverse effects on known historic properties, including but not limited to data recovery, have been developed through consultation with the State Historic Preservation Office, Tribes, and others. However, there is the potential for some portion of existing yet currently unidentified prehistoric and historic artifacts and resources to be disturbed or destroyed, especially within the Oak Flat subsidence area and the footprint of the tailings storage area. These losses could include human burials within these areas.

Water use is a major concern among the public, other government agencies, and interested parties. Recycling and reuse would happen extensively throughout the mine operations, but as previously mentioned, additional external water is needed for processing.

There are concerns regarding how public safety may be affected by the project. This includes the physical safety of persons in areas of subsidence and adjacent communities, as well as increased traffic and effects on air and water quality.

There is public apprehension over the creation, and type, of a tailings embankment for the tailings storage facility. The catastrophic collapse of the Brumadinho tailings dam in Brazil in January 2019, resulting in 259 confirmed fatalities with 11 people still missing (Nogueira and Plumb 2020), has heightened concerns.

In January 2019, Representative Raul Grijalva, a Democrat who serves as the U.S. Representative for Arizona's 3rd congressional district (which includes the western third of Tucson), and Senator Bernie Sanders, an Independent from Vermont, introduced legislation that would overturn the land exchange described in Section 3003 of PL 113-291. Congressman Grijalva cited the need to protect Oak Flat and restore some balance to the country's natural resource policies. In November 2020, Congressman Grijalva released an opinion article admonishing Rio Tinto for its role in destroying a centuries-old Aboriginal heritage site in Australia and subsequently tying the global mining company's trustworthiness to the Resolution Copper Project.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1308 of 2158
Case 2:21-cv-00122-DWL   Document 87-2   Filed 07/14/25   Page 9 of 96

Final Environmental Impact Statement

In January 2021, three lawsuits were filed seeking to halt the land exchange. The consolidated cases were stayed in May 2021 due to the rescinding of the January 2021 FEIS by the Forest Service. The District Court ruling in one of those cases (Apache Stronghold v. U.S.) denied an injunction. That District Court ruling was appealed to the Ninth Circuit, and the District Court ruling was upheld. The Apache Stronghold case is based on arguments involving religious freedom and treaty obligations. In November 2022, the Ninth Circuit vacated that ruling and ordered the appeal to be heard en banc. The en banc hearing occurred in March 2023, and a ruling was issued in May 2024 in which the en banc court affirmed the District Court ruling denying an injunction.

# ES-1.4    Lead and Cooperating Agency Roles

In compliance with the National Environmental Policy Act (NEPA), the Forest Service is the lead agency preparing this FEIS. The Forest Supervisor, Tonto National Forest, is the primary deciding official for the proposed GPO submitted by Resolution Copper.

The Forest Service's role as lead agency includes the following:

- Analyzing and disclosing environmental effects of the proposed mine and the land exchange on private, State, and NFS lands or other Federal lands

- Conducting government-to-government consultations with potentially affected Tribes

- Developing mitigations to protect surface resources of the Tonto National Forest and recommending mitigations for lands not under Forest Service jurisdiction

Authorization of more than 25 permits and plans from various jurisdictions are required for this mine project. Representatives from Federal, State of Arizona, and county governments are serving as cooperating agencies with the Forest Service in developing this EIS. Cooperating agencies have jurisdiction over some part of the project by law or have special expertise in the environmental effects that are addressed in the EIS. Monthly calls and meetings between the lead and cooperating agencies have occurred since November 2017. The nine cooperating agencies are as follows:

- U.S. Army Corps of Engineers (USACE)

- U.S. Department of the Interior Bureau of Land Management (BLM)

- U.S. Environmental Protection Agency

- Arizona State Land Department

- Arizona Department of Environmental Quality

- Arizona Department of Water Resources

- Arizona Game and Fish Department

- Arizona State Mine Inspector

- Pinal County Air Quality Control District

Pursuant to Section 404 of the Clean Water Act, Resolution Copper has asked for authorization to discharge fill material into waters of the U.S. for the construction of a tailings storage facility at certain proposed locations. Because Congress directed that a single EIS is to support all Federal decisions related to the proposed mine, the USACE is relying on this EIS to support a decision for issuance of a Section 404 permit.

The 404 permitting process includes Resolution Copper's submittal of a document called a "404(b)1 alternatives analysis" to USACE. The purpose of the 404(b)1 alternatives analysis is to identify the least environmentally damaging practicable alternative. Part of USACE's permitting responsibility is to identify the least environmentally damaging practicable alternative, as well as to require adequate mitigation to compensate for impacts to waters of the U.S.

While most of the impacts considered under the USACE process are identical to those considered in this EIS, some impacts considered under the USACE process are specific only to that permitting process, which may have a different scope of analysis than the EIS. Because of these differences, the 404(b)1 alternatives analysis is a document strongly related to the EIS, but also separate. Accordingly, the 404(b)1 alternatives analysis is attached to the FEIS as appendix C.

## ES-1.5    Purpose and Need

The purpose of and need for this project is twofold:

1.  To consider approval of a proposed GPO governing surface disturbance on NFS lands—outside the exchange parcels—from mining operations that are reasonably incident to extraction, transportation, and processing of copper and molybdenum.

2.  To consider the effects of the exchange of lands between Resolution Copper and the United States as directed by Section 3003 of PL 113-291.

The role of the Forest Service under its primary authorities in the Organic Administration Act, Locatable Minerals Regulations (36 Code of Federal Regulations (CFR) 228 Subpart A), and the Multiple-Use Mining Act is to ensure that mining activities minimize adverse environmental effects on NFS surface resources and comply with all applicable environmental laws. The Forest Service may impose reasonable conditions to protect surface resources.

Through the Mining and Mineral Policy Act, Congress has stated that it is the continuing policy of the Federal Government, on behalf of national interests, to foster and encourage private enterprise in

- development of economically sound and stable domestic mining, minerals, and metal and mineral reclamation industries; and

- orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help ensure satisfaction of industrial, security, and environmental needs.

Secretary of Agriculture regulations that govern the use of surface resources in conjunction with mining operations on NFS lands are set forth under 36 CFR 228 Subpart A. These regulations require that the Forest Service respond to parties who submit proposed plans to conduct mining operations on or otherwise use NFS lands in conjunction with mining for part or all of their planned actions.

Compliance with other laws and regulations, such as State of Arizona water and air regulations, the Endangered Species Act, the Clean Water Act, and the National Historic Preservation Act, also frames the proposed mining activities.

The EIS also serves to support other Federal decisions, including those of the USACE and the BLM. These agencies only have decisions to be supported under certain alternatives.

## ES-1.6    Proposed Action

The proposed action consists of (1) approval of a proposed GPO for operations on NFS lands associated with a proposed large-scale mine, which would be on private land after the land exchange, (2) a land

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1310 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 11 of 96

Final Environmental Impact Statement

exchange between Resolution Copper and the United States directed by PL 113-291, (3) amendments to the "Tonto National Forest Land Management Plan" (forest plan) if needed, and (4) mitigations to offset impacts from the proposed project. The next two sections summarize the proposed GPO and land exchange actions.

## ES-1.6.1    General Plan of Operations

A detailed description of the GPO can be found in section 2.2.2.2. The complete GPO is available on the project website, www.ResolutionMineEIS.us.

The type of copper deposit that would be mined at the East Plant Site is a porphyry deposit, a lower grade deposit that requires higher mine production rates to be economically viable. The copper deposit that Resolution Copper proposes to mine averages 1.54 percent copper (i.e., every ton of ore would on average contain 31 pounds of copper).

Mined ore would be crushed underground and then transported underground approximately 2.5 miles west to an area known as the West Plant Site, where ore would be processed to produce copper and molybdenum concentrates. Portions of the West Plant Site would be located on NFS lands and would be subject to Forest Service regulatory jurisdiction.

Once processed, the copper concentrate would be pumped as a slurry through a 22-mile pipeline to a filter plant and loadout facility located near Florence Junction, Arizona, where copper concentrate would be filtered and then sent to off-site smelters via rail cars or trucks. The molybdenum concentrate would be filtered, dried, and sent to market via truck directly from the West Plant Site.

The copper concentrate slurry pipeline corridor would be located along an existing, previously disturbed right-of-way known as the Magma Arizona Railroad Company (MARRCO) corridor. The MARRCO corridor would also host other mine infrastructure, including water pipelines, power lines, pump stations, and groundwater wells. A portion of the MARRCO corridor is located on NFS lands and would be subject to Forest Service regulatory jurisdiction.

Tailings produced at the West Plant Site would be pumped as a slurry through several pipelines for 5.3 miles to a tailings storage facility. The tailings storage area would gradually expand over time, eventually reaching about 3,300 acres in size. A fence constructed around the tailings to prevent public access would enclose about 4,900 acres. The proposed tailings storage facility would be located on NFS lands and would be subject to Forest Service regulatory jurisdiction.

All power to the mine would be supplied by the Salt River Project. Portions of the proposed electrical infrastructure would be located on NFS land and would be subject to Forest Service regulatory jurisdiction. A Forest Service special use permit would be required to approve construction and operation of new power lines on NFS lands by the Salt River Project.

Access to the mine facilities at the East Plant Site would be provided by existing roads. The Magma Mine Road would eventually be relocated as a result of expected subsidence.

Water for the process would come from a variety of sources. Filtrate from the filter plant, recycled water from the tailings storage facility, and recovered water from the concentrator complex would be recycled back into the mining process. Additional water would be obtained from dewatering of the mine workings, pumping from a well field along the MARRCO corridor, or potentially direct delivery of CAP water.

Reclamation would be conducted to achieve post-closure land use objectives. This would include closing and sealing the mine shafts, removing surface facilities and infrastructure, and establishing self-sustaining

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1311 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 12 of 96

Resolution Copper Project and Land Exchange

vegetative communities using local species. The proposed tailings storage facility would be reclaimed in place, providing for permanent storage of mine tailings.

An initial review of the consistency of the proposed GPO with the forest plan indicates that approval of the proposed GPO would result in conditions that are inconsistent with the forest plan for some alternatives. If needed, an amendment to the forest plan would address the necessary changes to relevant standards and guidelines for managing visual quality and recreation opportunities, as determined by the project's record of decision.

## ES-1.6.2    Land Exchange

Section 3003 of PL 113-291 directs the conveyance of specified Federal lands to Resolution Copper if Resolution Copper offers to convey the specified non-Federal land to the United States. Section (i)(2) of Section 3003 of PL 113-291 allows for modifications to the acreages from those disclosed in the Act due to minor errors, conflict, and mutual agreement. The acreages shown here are the current acres agreed to by all parties and supported by cadastral surveys. For further information on acreage changes between PL 113-291 and publication of this FEIS, see appendix B. Summaries of the appraisals for each parcel were publicly released by the Forest Service on April 22, 2025. The following summarizes the land parcels that would be exchanged.

- The United States would transfer the 2,422-acre **Oak Flat Federal Parcel** to Resolution Copper
- Resolution Copper would offer to transfer the following parcels to the U.S. Department of Agriculture:
  - 140 acres near Superior in Pinal County, Arizona, known as the **Apache Leap South End Parcel**, to be administered by the Tonto National Forest
  - 148 acres in Yavapai County, Arizona, known as the **Tangle Creek Parcel**, to be administered by the Tonto National Forest
  - 147 acres in Gila County, Arizona, known as the **Turkey Creek Parcel**, to be administered by the Tonto National Forest
  - 149 acres near Cave Creek in Maricopa County, Arizona, known as the **Cave Creek Parcel**, to be administered by the Tonto National Forest
  - 640 acres north of Payson in Coconino County, Arizona, known as the **East Clear Creek Parcel**, to be administered by the Coconino National Forest
- Resolution Copper would offer to transfer the following parcels to the U.S. Department of the Interior:
  - 3,120 acres near Mammoth in Pinal County, Arizona, known as the **Lower San Pedro River Parcel**, to be administered by the BLM as part of the San Pedro Riparian National Conservation Area
  - 956 acres south of Elgin in Santa Cruz County, Arizona, known as the **Appleton Ranch Parcel**, to be administered by the BLM as part of the Las Cienegas National Conservation Area
  - 160 acres near Kearny in Gila and Pinal Counties, Arizona, known as the **Dripping Springs Parcel**, to be administered by the BLM
- An additional PL 113-291 requirement calls for the United States to convey upon payment the following land to Superior, Arizona, if the Town of Superior requests it:
  - 30 acres associated with the Fairview Cemetery
  - 250 acres associated with parcels contiguous to the Superior Airport
  - 265 acres of Federal reversionary interest associated with the Superior Airport

In October 2021, the Town of Superior requested the land transfer.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1312 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 13 of 96

Final Environmental Impact Statement

## ES-1.7    Nature of Lead Agency Decision

With regard to the proposed GPO, the Forest Supervisor, Tonto National Forest, would make the following decisions using the analysis in the EIS and supporting documentation:

- Decide whether to approve the proposed GPO submitted by Resolution Copper or require changes or additions to the proposed GPO to meet the requirements for environmental protection and reclamation set forth in 36 CFR 228 Subpart A before approving a final GPO. The Forest Service decision may be to authorize use of the surface of NFS lands in connection with mining operations under the GPO such that the authorized use is composed of elements from one or more of the alternatives considered.

- Decide which alternative to select for approval in the final GPO, which must minimize adverse impacts on NFS surface resources to the extent feasible and must comply with all Federal and State laws and regulations

- Decide whether to approve amendments to the forest plan, which would be required to approve the final GPO

- Decide whether to approve a special use permit for the Salt River Project to authorize construction and operation of power lines on NFS lands

- Decide whether to approve a special use permit for Resolution Copper to authorize construction and operation of pipelines on NFS lands. This decision is applicable to Alternatives 5 and 6. For both of these alternatives, the tailings storage facility is located off NFS lands, with only the pipeline/power line corridor crossing NFS lands. Hence, the NFS authorization would no longer occur under 36 CFR 228 Subpart A (mineral regulations), but rather under 36 CFR 251.50 (special uses).

With regard to the land exchange, Section 3003 of PL 113-291 directs the Secretary of Agriculture to convey to Resolution Copper all right, title, and interest of the United States in and to identified Federal land if Resolution Copper offers to convey to the United States all right, title, and interest of Resolution Copper in and to identified non-Federal lands. Note that the acreages shown in this section are those offered by Resolution Copper to the Federal Government, after completion of cadastral surveys, map revisions, and at the time of publication of this FEIS. Ultimately, the Federal Government may not accept all portions of these lands. The exact parcels and acreage have been assessed through the land appraisal process; summaries of the appraisals for each parcel were publicly released by the Forest Service on April 22, 2025. The Forest Supervisor, Tonto National Forest, has limited discretion to (1) address concerns of affected Tribes; (2) ensure that title to the non-Federal lands offered in the exchange is acceptable; (3) accept additional non-Federal land or a cash payment from Resolution Copper to the United States in the event that the final appraised value of the Federal land exceeds the value of the non-Federal land; or (4) address other matters related to the land exchange that are consistent with Section 3003 of PL 113-291.

## ES-1.8    Public Participation

The Forest Service sought public input during several phases of the environmental review process prior to publication of the FEIS.

The public scoping period began on March 18, 2016, with the Forest Service publication of a notice of intent to prepare an EIS in the Federal Register. Scoping is the first step in the NEPA process and seeks input from within the agency, from the public, and from other government agencies in order to define the scope of issues to be addressed in depth in the EIS.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1313 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 14 of 96

Resolution Copper Project and Land Exchange

The Forest Service planned for a 60-day public scoping period from March 18, 2016, to May 17, 2016.

Numerous individuals and several organizations requested an extension of the public scoping period, as well as additional public scoping meetings. The Forest Supervisor, Tonto National Forest, accommodated these requests by extending the public scoping period through July 18, 2016, resulting in a total overall scoping period of 120 days.

Between March and June 2016, the Forest Service held five EIS public scoping meetings.

A scoping report summarizing 133,512 public comments was completed and made available online on the project website on March 9, 2017 (U.S. Forest Service 2017i).

The Forest Service conducted two public workshops to collect information on public opinion regarding where to site a mine tailings storage facility.

Internal scoping efforts included several meetings and field trips with the NEPA interdisciplinary (ID) team. ID team members include Forest Service resource specialists and planners representing anticipated topics of analysis in the NEPA process, managers, and Tonto National Forest line officers.

Cooperating agency scoping was conducted through a kick-off meeting and through comments submitted by cooperating agencies and Tribes during the public scoping comment period.

Between May 2017 and October 2020, the Forest Service participated in numerous informal meetings (one or more per month) with key stakeholders, Tribes, and cooperating agencies regarding technical feasibility of the project and alternatives, differing environmental impacts and tradeoffs among the alternatives, and mitigations for reducing expected impacts of the proposed GPO and land exchange.

Additional details about scoping conducted during Tribal consultation can be found in section 1.6.5, chapter 5, and appendix S of the FEIS.

The Tonto National Forest released the DEIS on August 9, 2019. A notice of availability was published alongside the DEIS in the Federal Register. This began a 90-day public comment period that ended on November 7, 2019.

The Forest Service conducted six public meetings to present information, answer questions, and receive public comments. Over 29,000 comment submittals were received and responded to as recorded in appendix R. Tribes requested an extended comment period and meeting, which were granted by the Forest Service. Tribes were given a 45-day extension to submit comments; the extension concluded on December 23, 2019.

## ES-1.9    Issues Selected for Analysis

Issues help set the scope of the actions, alternatives, and effects to consider in the Forest Service's analysis (Forest Service Handbook 1909.15.12.4).

Comments submitted during the 2016 scoping period were used to formulate issues concerning the proposed action. An issue is a point of dispute or disagreement with the proposed action based on some anticipated environmental effect. The DEIS disclosed known information and impacts on these issues.

Below are the social, physical, and biological resources or other concerns that the Forest Service selected for analysis, based on scoping comments.

**Issues carried forward for analysis**

| Social and Cultural Issues | Physical and Biological Issues |
|---|---|
| • Cultural Resources | • Air Quality |
| • Environmental Justice | • Geology, Minerals, and Subsidence |
| • Public Health and Safety | • Livestock and Grazing |
| • Recreation | • Noise and Vibration |
| • Socioeconomics | • Scenic Resources |
| • Transportation and Access | • Soils and Vegetation |
| • Tribal Values and Concerns | • Water Resources |
| | • Wildlife and Special Status Species |

Section 1.7, Issues, in chapter 1 of the FEIS provides a snapshot of these issues. Detailed information about these issues appears in chapter 3 of the FEIS.

# ES-2.   Alternatives

NEPA requires consideration of a reasonable range of alternatives that can accomplish the purpose of and need for the proposed action. The Forest Service studied a range of alternatives to the Resolution Copper GPO, each of which

- responds to key issues raised during public scoping; project purpose and need; and applicable Federal and State laws and regulations;

- considers input from resource specialists, mining experts (project team), cooperating agency representatives, Tribes, and stakeholders; and

- is technically feasible to implement—but with differing environmental impacts and tradeoffs.

The alternatives include five action alternatives (out of 30+ considered) at four separate locations, including one location not on Federal land.

In addition, the Forest Service did the following:

- Assessed alternative mining techniques in an effort to prevent subsidence. No alternative methods were considered reasonable.

- Assessed tailings disposal in brownfield sites (old mine pits). No reasonable brownfield locations were found.

- Identified three separate methods of depositing tailings, including using filtered (dry-stack) tailings.

Environmental impacts and tradeoffs among the five action alternatives vary due to the differences in the tailings embankment design, the tailings deposition method, or the geographic location and affected surroundings of the proposed tailings storage facility (figure ES-2). Ore extraction and processing activities as proposed in the GPO remain similar between all action alternatives.

Additional alternatives were considered but dismissed from detailed analysis for various reasons. See appendix F of the FEIS for discussion of the other alternatives considered and the rationale for their dismissal.



**Figure ES-2. Overview of project alternative locations**

ES-12

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1316 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 17 of 96

Final Environmental Impact Statement

## ES-2.1    No Action Alternative

The no action alternative provides a basis for comparison in the EIS. Under this alternative, the Forest Service would not approve the GPO, none of the activities in the final GPO would be implemented on NFS lands, and the mineral deposit would not be developed. Additionally, the land exchange would not take place.

The no action alternative serves as a point of comparison for the proposed action and action alternatives.

## ES-2.2    Alternative 2 – Near West Proposed Action

This alternative is a variation of the proposed action described in the May 9, 2016, version of the Resolution Copper GPO. In early 2018, Resolution Copper changed its original plan for an "upstream" embankment design to a "modified-centerline" configuration for a tailings storage facility.

Alternative 2 would include a split-stream tailings processing method with two tailings types:

- Non-potentially acid generating (NPAG) tailings
- Potentially acid generating (PAG) tailings

PAG tailings have a greater potential to oxidize and generate acidic seepage to groundwater or surface waters. To minimize this potential, PAG tailings would be deposited centrally in the tailings storage facility and surrounded by NPAG tailings. A 5- to 10-foot-deep water cap would keep PAG tailings saturated to reduce exposure to oxygen during tailings storage facility development.

Additionally, the larger NPAG deposit would act as a buffer between the PAG tailings and areas outside the tailings storage facility. Water spigots would keep the NPAG tailings "beach" area wet, ensuring effective dust management during operations.

The modified centerline embankment construction would consist of earthfill and cyclone sand from the NPAG tailings stream. This sand results from tailings processed through one or more dedicated centrifuges to separate larger tailings particles from the finer particles.

A suite of engineered seepage controls, including engineered low-permeability liners, compacted fine tailings, and/or a "grouting" process to seal ground fractures, would limit and contain seepage. Uncontained seepage would be collected in downstream ponds and pumped back to the tailings storage facility. Figure ES-3 provides an overview of Alternative 2.

**Alternative 2 Facility Details**

| | |
|---|---|
| Ownership | Tonto National Forest |
| Tailings facility footprint | 3,309 acres |
| Area excluded from public access during operations | 4,903 acres |
| Embankment height | 520 feet |
| Embankment length | 10 miles |
| Tailings type | Slurry |

Resolution Copper Project and Land Exchange



**Figure ES-3. Alternative 2 – Near West Proposed Action**

ES-14

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1318 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 19 of 96

Final Environmental Impact Statement

# ES-2.3    Alternative 3 – Near West – Ultrathickened

## ES-2.3.1    Similarities with Alternative 2

This alternative represents a variation of the proposed action described in the May 2016 GPO. It includes a change in embankment design for a tailings storage facility to a "modified-centerline" configuration consisting of earthfill and cycloned sand.

Alternative 3 has a split-stream tailings processing method with two tailings types:

- NPAG tailings
- PAG tailings

A suite of engineered seepage controls, including engineered low-permeability liners, compacted fine tailings, and/or a "grouting" process to seal ground fractures, would limit and contain seepage, along with downstream seepage collection ponds.

The location on the Tonto National Forest would be identical. Figure ES-4 provides an overview of Alternative 3.

## ES-2.3.2    Differences from Alternative 2

This alternative would use physical barriers to segregate PAG tailings in a separate cell from NPAG tailings. Cycloned sand would be used to build low-permeability "splitter berms" between the two tailings storage areas.

This alternative has a proposal to reduce initial amounts of water retained in NPAG tailings and encourage rapid evaporation, as well as reduce seepage potential, through

- additional on-site thickening of NPAG tailings, which would increase the thickness by 5 percent, reducing the overall amount of water in the facility; and
- possible use of "thin-lift" (also known as thin layer) deposition, to enhance evaporation and further reduce the amount of water in the facility.

Alternative 3 would require less time to close the recycled water pond, compared with Alternative 2. By using ultrathickening methods that reduce water entering the tailings, officials estimate closure in 5 years, compared with 25 years estimated for Alternative 2.

**Alternative 3 Facility Details**

| Ownership | Tonto National Forest |
|---|---|
| Tailings facility footprint | 3,309 acres |
| Area excluded from public access during operations | 4,903 acres |
| Embankment height | 510 feet |
| Embankment length | 10 miles |
| Tailings type | Thickened slurry |

Resolution Copper Project and Land Exchange



**Figure ES-4. Alternative 3 – Near West – Ultrathickened**

ES-16

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1320 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 21 of 96

Final Environmental Impact Statement

# ES-2.4    Alternative 4 – Silver King

This is the lone alternative proposing to use filtered tailings—instead of slurry tailings—at the tailings storage facility.

As with other alternatives, Alternative 4 would include a split-stream tailings processing method with two tailings types:

- NPAG tailings

- PAG tailings

From the West Plant Site, pipelines would transport the two tailings slurry streams to filter plants at the Silver King location north of the West Plant Site and the town of Superior. Pressure filters would extract about 85 percent of the water from the tailings, resulting in a more solid product and a decrease in water pumped for operations. The water would be recycled in the process water at the West Plant Site.

Conveyors and mobile equipment would mechanically deposit NPAG and PAG tailings in two separate, adjacent tailings storage facilities. Figure ES-5 provides an overview of Alternative 4.

To limit exposure of tailings to water, all runoff would be directed to perimeter ditches, sumps, and/or underdrains. Water coming into contact with exposed tailings would be collected in large ponds located in natural valleys downstream of the tailings storage facility. Large diversions also would be needed to keep upstream stormwater from reaching the tailings storage facility.

Unlike for the proposed action and other alternatives, the filter plant and loadout facilities would be constructed at the West Plant Site, and copper ore would be transported by rail car to the railhead by Magma Junction along the MARRCO corridor.

## ES-2.4.1    Arizona National Scenic Trail

The tailings storage facility and associated auxiliary facilities would impact approximately 5.5 miles of the Arizona National Scenic Trail, resulting in the rerouting of that portion of the trail.

**Alternative 4 Facility Details**

| | |
|---|---|
| **Ownership** | Tonto National Forest |
| **Tailings facility footprint** | 2,266 acres |
| **Area excluded from public access during operations** | 5,660 acres |
| **Embankment height** | Filtered tailings do not use an embankment to contain tailings. However, for comparison with the other alternatives, the overall height of the facility would be approximately 1,000 feet. |
| **Embankment length** | Not applicable |
| **Tailings type** | Filtered |



**Figure ES-5. Alternative 4 – Silver King**

ES-18

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1322 of 2158
Case 2:21-cv-00122-DWL   Document 87-2   Filed 07/14/25   Page 23 of 96

Final Environmental Impact Statement

# ES-2.5   Alternative 5 – Peg Leg

This alternative allows for an evaluation of a tailings site that is more isolated from existing communities while remaining adjacent to areas of active mining on the landscape.

Alternative 5 also provides for a comparison of the impacts of slurry tailings if placed on a flatter, alluvial landscape instead of an upland wash or canyon.

As with other alternatives, Alternative 5 would include a split-stream tailings processing method with two tailings types:

- NPAG tailings
- PAG tailings

The tailings slurry streams would be transported via 23 miles of pipeline to the Peg Leg tailings storage facility. Two separate storage facilities for NPAG and PAG tailings would exist throughout the life of the mine.

The PAG facility would consist of four separate cells. This would reduce the pond size required for operations and allow for progressive reclamation. Only one cell would be operational at a time. A downstream embankment consisting of earthfill and cycloned sand is proposed for the PAG cells.

NPAG tailings would be located primarily on an alluvial soil foundation to the west and slightly downslope of the PAG site. A centerline embankment, also consisting of earthfill and cycloned sand, is proposed for NPAG tailings. Figure ES-6 provides an overview of Alternative 5.

Officials project higher seepage because of the alluvial foundation. A suite of engineered seepage controls, including low-permeability layers at the PAG facility and low-permeability barriers (liners or fine-grained tailings) for the NPAG tailings, would limit and control seepage. A downstream well field would capture seepage and return it to the tailings storage facility.

**Alternative 5 Facility Details**

| | |
|---|---|
| **Ownership** | BLM; Arizona State Land Department |
| **Tailings facility footprint** | 5,889 acres |
| **Area excluded from public access during operations** | 10,781 acres |
| **Embankment height** | 310 feet |
| **Embankment length** | 7 miles |
| **Tailings type** | Slurry |



**Figure ES-6. Alternative 5 – Peg Leg**

ES-20

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1324 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 25 of 96

Final Environmental Impact Statement

# ES-2.6    Alternative 6 – Skunk Camp

> ## Preferred Alternative
>
> The Forest Service has identified Alternative 6 (Skunk Camp) as the Lead Agency's preferred alternative.

This alternative was developed with consideration for its geospatial features:

- Its location is largely isolated from human residences and other infrastructure.

- It is adjacent to an existing mine (Ray Mine).

- Its location enables use of cross-valley embankments, requiring less fill to retain tailings, compared with a ring-like impoundment. This, in turn, simplifies construction and operations.

As with other alternatives, Alternative 6 would include a split-stream tailings processing method with two tailings types:

- NPAG tailings
- PAG tailings

The tailings slurry streams would be transported via 20 miles of pipeline to the Skunk Camp tailings storage facility. NPAG tailings would be cycloned to produce embankment fill with cycloned overflow—the finer particles—thickened at the tailings storage facility before discharge into the impoundment. PAG tailings would be deposited in two separate cells, behind a separate cycloned sand downstream-type embankment, to the north (upstream) end of the facility. Only one cell would be operational at a time, providing for early reclamation of the first cell. The much larger volume of NPAG tailings would be behind its own embankment of compacted cycloned sand and deposited immediately south of (downstream) and adjacent to the PAG tailings.

A suite of engineered seepage controls, including engineered low-permeability liners, compacted fine tailings, and/or a "grouting" process to seal ground fractures, would provide a low-permeability layer to limit and control seepage. A seepage collection pond also would be placed downstream. Figure ES-7 provides an overview of Alternative 6.

**Alternative 6 Facility Details**

| | |
|---|---|
| **Ownership** | Private land; Arizona State Land Department |
| **Tailings facility footprint** | 4,002 acres |
| **Area excluded from public access during operations** | 9,218 acres |
| **Embankment height** | 490 feet |
| **Embankment length** | 3 miles |
| **Tailings type** | Slurry |



**Figure ES-7. Alternative 6 – Skunk Camp (preferred alternative)**

ES-22

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1326 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 27 of 96

Final Environmental Impact Statement

# ES-3.    Summary of Impacts

## ES-3.1    Introduction

Information in chapter 3 of the FEIS describes the natural and human environment that may be affected by the proposed action and its alternatives and discloses the direct, indirect, and cumulative impacts that could occur as a result of implementation of the proposed action or alternatives. The effects of the legislated land exchange are also disclosed in the FEIS. Once the land exchange is completed, Forest Service management regulations would no longer apply on 2,422 acres of the Oak Flat Federal Parcel transferred to Resolution Copper, and 5,460 acres scattered across southeast Arizona would transfer from private ownership into Federal ownership and regulation.

## ES-3.2    Geology, Minerals, and Subsidence

This section describes known geological characteristics at each of the major facilities of the proposed mine—including alternative tailings storage locations—and how the development of the project may impact existing cave and karst features, paleontological resources, area seismicity, and unpatented mining claims. It also outlines subsidence impacts that would result from Resolution Copper's plans to extract the ore from below the deposit using a mining technique known as "block caving" or "panel caving." The analysis concludes the following:

- The subsidence zone at the Oak Flat Federal Parcel would break through to the surface at mine year 6, would be between 800 and 1,115 feet deep, and would be about 1.8 miles in diameter.

- No damage is expected to Apache Leap, Devil's Canyon, or U.S. Route 60 as a result of the subsidence. The mine is also unlikely to induce seismic activity that would cause damage.

- Some unpatented mining claims not belonging to Resolution Copper are located within the project footprint, and access to these claims may be inhibited.

## ES-3.3    Soils and Vegetation

This section explains how the proposed mine would disturb large areas of ground and potentially destroy native vegetation, including species given special status by the Forest Service, and encourage noxious or invasive weeds. The analysis concludes the following:

- Between 9,900 and 17,000 acres of soil and vegetation would be disturbed by the project.

- Revegetation success in these desert ecosystems is demonstrated. However, impacts to soil health and productivity may last centuries to millennia, and the ecosystem may not meet desired future conditions. The habitat may be suitable for generalist wildlife and plant species, but rare plants and wildlife with specific habitat requirements are unlikely to return.

- Arizona hedgehog cactus (endangered) may be impacted during operations at the East Plant Site, by ground subsidence, and by the pipeline/power line corridor for Alternative 6. The pipeline corridor associated with Alternative 5 would impact critical habitat for acuña cactus (endangered).

- Reclamation of disturbed areas would decrease but not eliminate the likelihood of noxious weeds' becoming established or spreading.

## ES-3.4    Noise and Vibration

This section provides a detailed analysis of estimated impacts from noise and vibration under the proposed GPO and each of the alternatives. The analysis concludes the following:

- Noise impacts were modeled for 15 sensitive receptors representing residential, recreation, and conservation land uses. Under most conditions, predicted noise and vibration during construction and operations, for blasting and non-blasting activities, at sensitive receptors are below thresholds of concern. Rural character would not change due to noise.

- One exception is that noise along Dripping Springs Road (Alternative 6) is above thresholds of concern. However, no residual impacts would occur once mitigation is implemented. After mitigation, no unavoidable adverse impacts are anticipated from noise or vibration from any alternative.

## ES-3.5    Transportation and Access

This section discusses how the proposed Resolution Copper Mine would increase traffic on local roads and highways and likely alter local and regional traffic patterns and levels of service. This section also examines NFS road closures, along with accelerated deterioration of local roadways as a result of increased use. The analysis concludes the following:

- Approximately 8.0 miles of NFS roads are expected to be decommissioned or lost from the East Plant Site, West Plant Site, or subsidence area.

- An additional 21.7 miles of NFS roads would be lost as a result of the Alternative 2 and 3 tailings storage facility. Another 17.7 miles of NFS roads would be lost as a result of the Alternative 4 tailings storage facility. Approximately 29 miles of BLM inventoried roads would be lost as a result of the Alternative 5 tailings storage facility. The Alternative 6 tailings storage facility would impact 5.7 miles of private roads.

- NFS roads lost to the subsidence area provide access to areas that include Apache Leap and Devil's Canyon. Access to these areas still would be available but would require using routes that are not as direct or convenient. Alternative 4 would also change access to the highlands north of Superior, as well as to private inholdings in the Tonto National Forest.

## ES-3.6    Air Quality

This section analyzes potential impacts from an increase in dust, wind-borne particulates, and transportation-related emissions as a result of construction, mining, and reclamation activities at the mine and along transportation and utility corridors. The analysis concludes the following:

- Neither daily nor annual maximum impacts for fugitive dust (particulate matter 2.5 ($PM_{2.5}$) and particulate matter 10 ($PM_{10}$)) would exceed established air quality thresholds.

- None of the predicted results are anticipated to exceed the National Ambient Air Quality Standards at the project fence line (where public access is excluded).

- Impacts on air quality related values (deposition and visibility) at Class 1 and other sensitive areas would be within acceptable levels.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1328 of 2158
Case 2:21-cv-00122-DWL   Document 87-2   Filed 07/14/25   Page 29 of 96

Final Environmental Impact Statement

# ES-3.7   Water Resources

This section analyzes how the Resolution Copper Project could affect water availability and quality in three key areas: groundwater quantity and groundwater-dependent ecosystems (GDEs), groundwater and surface water quality, and surface water quantity. The analysis concludes the following:

- Impacts to between 18 and 20 GDEs are anticipated. Six of these are springs that are anticipated to be impacted by groundwater drawdown under the no action alternative as a result of ongoing dewatering by Resolution Copper. When block caving occurs, groundwater impacts would expand to overlying aquifers, and two more springs would be impacted. Direct disturbance within the project footprint would impact another six to nine springs or ponds. Depending on the alternative, GDEs associated with Queen Creek, Devil's Canyon, and the Gila River would be impacted as a result of reductions in surface runoff. The loss of water would be mitigated for some GDEs, but impacts to the natural setting would remain.

- Groundwater supplies in Superior and Top-of-the-World could be impacted by groundwater drawdown but would be replaced through mitigation.

- Over the mine life, 87,000 acre-feet of water would be pumped from the mine, and between 180,000 and 590,000 acre-feet of makeup water would be pumped from the Desert Wellfield in the East Salt River valley. Alternative 4, which uses filtered (dry-stack) tailings, requires the least amount of makeup water. The wellfield pumping would incrementally contribute to the lowering of groundwater levels and cumulatively reduce overall groundwater availability in the area.

- After closure, the reflooded block-cave zone could have poor water quality. However, a lake in the subsidence zone is not anticipated, and no other exposure pathways exist for this water.

- Stormwater runoff could have poor water quality, but under normal conditions no stormwater contacting tailings or facilities would be released during operations or post-closure until reclamation is successful. For some combination of extreme storms (300-year return period or greater) and operational upset conditions, stormwater could be released over the spillway of the seepage pond.

- All of the tailings facilities would lose seepage with poor water quality to the environment, and all are dependent on a suite of engineered seepage controls to reduce this lost seepage. Modeling indicates that seepage from Alternatives 2 and 4 would result in water quality problems in Queen Creek; Alternative 3 would not, but requires highly efficient seepage control to achieve this (99.5 percent capture). Seepage from Alternatives 5 and 6 would not result in any anticipated water quality problems. These two alternatives also have substantial opportunity for additional seepage controls if needed.

- There would be a reduction in average annual runoff as a result of the capturing of precipitation by the subsidence zone and tailings facilities, varying by alternative: 3.5 percent at the mouth of Devil's Canyon, between 6.5 and 8.9 percent in Queen Creek at Whitlow Ranch Dam, and between 0.2 and 0.5 percent in the Gila River. Alternative 4 also would result in an almost 20 percent loss of flow in Queen Creek at Boyce Thompson Arboretum.

- Under the Clean Water Act, Alternatives 2, 3, and 4 would impact zero acres of jurisdictional waters, based on a decision by the USACE that no such waters exist above Whitlow Ranch Dam. Alternative 5 directly would impact about 180 acres, and Alternative 6 would directly impact about 130 acres of potentially jurisdictional waters.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1329 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 30 of 96

Resolution Copper Project and Land Exchange

# ES-3.8    Wildlife and Special Status Wildlife Species

This section describes how impacts to wildlife can occur from habitat loss and fragmentation, as well as from artificial lighting, noise, vibration, traffic, loss of water sources, or changes in air or water quality. The analysis concludes the following:

- Habitat would be impacted in the analysis area for about 50 special status wildlife species. General impacts include a high probability of mortality or injury with vehicles or from grading; increased stress due to noise, vibration, and artificial light; and changes in cover. Changes in behavior include changes in foraging efficiency and success, changes in reproductive success, changes in growth rates of young, changes in predator–prey relationships, increased movement, and increased roadkill.

- There would be loss and fragmentation of movement and dispersal habitats from the subsidence area and tailings storage facility. Ground-clearing and consequent fragmentation of habitat blocks for other mine-related facilities would also inhibit wildlife movement and increase edge effects.

- For Tonto National Forest and BLM sensitive wildlife species, the proposed project may adversely impact individuals but is not likely to result in a loss of viability in the analysis area, nor is it likely to cause a trend toward Federal listing of these species as threatened or endangered.

- The general removal of vegetation, increased activity, and potential changes in streamflow and associated riparian vegetation along Devil's Canyon could impact the yellow-billed cuckoo (threatened); during consultation under Section 7 of the Endangered Species Act, U.S. Fish and Wildlife Service concurred that the project may affect, but is not likely to adversely affect, the yellow-billed cuckoo and designated critical habitat.

- The pipeline crossings of the Gila River under Alternative 5, including removal of vegetation and increased activity, could impact southwestern willow flycatcher (endangered).

- Critical habitat for Gila chub (endangered) occurs in Mineral Creek above Devil's Canyon. No individuals have been identified here during surveys, and this area is not anticipated to be impacted by groundwater drawdown. During consultation under Section 7 of the Endangered Species Act, U.S. Fish and Wildlife Service concurred that the project may affect, but is not likely to adversely affect, the Gila chub and designated critical habitat.

# ES-3.9    Recreation

This section quantifies, when possible, anticipated changes to some of the area's natural features and recreational opportunities as a result of infrastructure development related to the project. The analysis concludes the following:

- Public access (Tonto National Forest, Arizona State Land Department, and BLM lands) would be eliminated on 8,400 to 15,200 acres. Alternatives 2, 3, and 4 would result in 7,200 to 7,900 acres of access lost on Tonto National Forest land. Alternative 5 would primarily impact access to 2,600 acres of Tonto National Forest land and 7,000 acres of BLM land, as well as 4,600 acres of Arizona State land, and Alternative 6 would primarily impact access to 11,600 acres, of which 8,200 acres is Arizona State land.

- There would be changes to the recreation opportunity spectrum acres within the Globe Ranger District, with losses of 18 to 166 acres of semi-primitive non-motorized areas.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1330 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 31 of 96

Final Environmental Impact Statement

- Visitors to the Superstition Wilderness, Picketpost Mountain, and Apache Leap would have foreground and background views of the tailings facilities from trails and overlooks, and the recreation setting from certain site-specific views could change. Three miles of the Arizona National Scenic Trail would be impacted by Alternative 4 and require rerouting, whereas pipeline corridor crossings for Alternatives 2 and 5 would impact the trail.

- The exchange of the Oak Flat Federal Parcel would remove world-recognized rock climbing areas from public access, as well as Oak Flat campground. Both of these would be partially mitigated by replacement areas.

- The number of Arizona hunting permits that are issued in individual Game Management Units would not change as a result of implementation of any of the action alternatives.

## ES-3.10   Public Health and Safety

This section addresses three areas of interest: tailings embankment safety, fire risks, and the potential for releases or public exposure to hazardous materials. The analysis concludes the following:

- The risk of embankment failure for all alternatives would be minimized by required adherence to Federal and Arizona design standards and by applicant-committed environmental protection measures.

- The consequences of a catastrophic failure and the downstream flow of tailings would include possible loss of life and limb, destruction of property, displacement of large downstream populations, disruption of the Arizona economy, contamination of soils and water, and risk to water supplies and key water infrastructure like the CAP canal. The highest population is located downstream of Alternative 2.

- All alternative designs are built to the same safety standards, but they have inherent differences in their resilience when unexpected events or upsets happen. Alternatives 2 and 3 are the least resilient because they use modified-centerline embankments, have long (10-mile) freestanding embankments, and do not use separately contained PAG storage cells. Alternative 6 is the most resilient of the slurry tailings alternatives because it uses a centerline embankment that is only 3 miles long and anchored on each side and has separate PAG storage cells that use downstream embankments.

- Alternative 4, using filtered (dry-stack) tailings, is more resilient than slurry tailings alternatives and would have the fewest consequences if a failure occurred, collapsing as a slump or landslide, and impacting the local vicinity only.

- With respect to other public safety risks, the risk of inadvertent ignition and resulting wildland fire is considered quite low. However, Alternative 4 includes areas classified with shrub fuels that burn with high intensity in the event of ignition. As the Mine Safety and Health Administration and other regulations and standards govern the transport and storage of explosives and hazardous chemicals, risks of spills or releases are therefore considered possible, but unlikely, with appropriate response plans in place.

## ES-3.11   Scenic Resources

This section addresses the existing conditions of scenic resources (including dark skies) in the area of the proposed action and alternatives. It also addresses the potential changes to those conditions from construction and operation of the proposed project. The analysis concludes the following:

- All tailings facilities would be visible from long distances, and the change in contrast caused by land disturbance and vegetation removal, dust, and equipment would strongly impact viewers, including recreationists on scenic highways.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1331 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 32 of 96

Resolution Copper Project and Land Exchange

- Alternatives 2 and 3 would impact Arizona National Scenic Trail users and off-highway vehicle users, as would Alternative 4. Alternative 4 would be the tallest facility when viewed (1,000 feet high). It would dominate the scene and be viewable from sensitive locations (like Picketpost Mountain). Alternative 5 would also be highly visible and would impact Arizona National Scenic Trail and off-highway vehicle users. Alternative 6 would be visible from within the valley of Dripping Spring Wash but otherwise would not be as visible on the landscape as the other alternatives.

## ES-3.12   Cultural Resources

This section analyzes potential impacts on all known cultural resources within the project area. The analysis concludes the following:

- The NRHP-listed *Chí'chil Biłdagoteel* Historic District TCP would be directly and permanently damaged by the subsidence area at the Oak Flat Federal Parcel.

- A Programmatic Agreement (PA) was pursued and drafted during the Section 106 consultation process. The Rescinded FEIS included that PA (appendix O). All signatories, other than the Advisory Council on Historic Preservation (ACHP), had signed the PA as of January 15, 2021. On February 11, 2021, ACHP notified the Forest Service that "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture delivered a written response to the ACHP on April 17, 2025, and that response concluded the Section 106 process for this undertaking. Since ACHP did not sign the PA, the PA was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final record of decision and special use permit for use of NFS lands, through enforcement by other State and federal agencies, and through third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

- All alternative area surveys anticipated are complete at this time. Any remaining acreage slated for ground disturbance or land sale would be inventoried and cultural sites identified and addressed in accordance with several agreements that are detailed in appendix J. From surveyed areas, the number of NRHP-eligible sites are as follows:

  o Alternatives 2 and 3: 120 NRHP-eligible sites and 18 sites of undetermined eligibility would be directly affected, and 59 sites would be indirectly affected;

  o Alternative 4: 145 NRHP-eligible sites and 2 sites of undetermined eligibility would be directly affected, and 55 sites would be indirectly affected;

  o Alternative 5: 154 NRHP-eligible sites and 3 sites of undetermined eligibility would be directly affected, and 77 sites would be indirectly affected; and

  o Alternative 6: 377 NRHP-eligible sites and 3 sites of undetermined eligibility would be directly affected, and 55 sites would be indirectly affected.

## ES-3.13   Socioeconomics

This section examines the social and economic impacts on the quality of life for neighboring communities near the proposed mine. The analysis concludes the following:

- On average, the mine is projected to directly employ 1,434 workers, pay about $149 million per year in total employee compensation, and purchase about $490 million per year in goods and

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1332 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 33 of 96

Final Environmental Impact Statement

services. Including direct and multiplier effects, the proposed mine is projected to increase the average annual economic value added in Arizona by about $1.2 billion.

- The proposed mine is projected to generate an average of between $80 and $120 million per year in State and local tax revenues and would also produce substantial revenues for the Federal Government, estimated at more than $200 million per year. There would be a loss of hunting revenue as a result of the tailings storage facilities. With Alternatives 2, 3, and 4, the loss would be highest in the Superior area.

- Construction and operations of the proposed mine could affect costs for both the Town of Superior and Pinal County to maintain street and road networks and could strain public services. A number of agreements between Resolution Copper and the Town of Superior would offset impacts to quality of life, education, and emergency services.

- Property values are expected to decline in close proximity to the tailings storage facilities.

## ES-3.14   Tribal Values and Concerns

This section discusses the potential for the proposed mine to directly, adversely, and permanently affect numerous cultural artifacts, sacred seeps and springs, traditional ceremonial areas, resource gathering localities, burial locations, and other places and experiences of high spiritual and other value to Tribal members.

Under all action alternatives, the Oak Flat Federal Parcel will be adversely impacted by the proposed mining operation. Extraction of the ore via block caving will eventually lead to the subsidence of the parcel; access to Oak Flat and the subsidence zone will be curtailed once it is no longer safe for visitors. Several springs located on the Oak Flat Federal Parcel will be lost due to the development of the subsidence area. The subsidence has a high potential to directly and permanently adversely affect numerous cultural resources sites, including the following: archaeological resources; areas with sacred values such as springs, seeps, and prayer locations; resource gathering sites; ancestor burial sites; traditional ceremonial and dance locations; and other places of spiritual and cultural significance to members of federally recognized Tribes.

## ES-3.15   Environmental Justice

This section has been removed in compliance with Executive Orders 14148 and 14173.

## ES-3.16   Livestock and Grazing

This section discloses the impacts to currently authorized livestock grazing on lands managed by the Forest Service, BLM, or Arizona State Land Department that are located within the project area. The analysis concludes the following:

- There would be a reduction in available allotment acreage (BLM, Forest Service, and Arizona State land) ranging from around 8,600 to 15,700 acres and a proportional reduction in livestock capacity from around 700 to 2,800 animal-unit months. The water sources and grazing infrastructure associated with these allotment areas would also be lost.

## ES-3.17   Impact Avoidance, Minimization, and Mitigation

The FEIS serves in part to inform the public and review agencies of design features, best management practices, and mitigation measures that are included with the project to reduce or avoid impacts. The Forest Service views these elements as part of the project and considers Resolution Copper's

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1333 of 2158
Case 2:21-cv-00122-DWL   Document 87-2   Filed 07/14/25   Page 34 of 96

Resolution Copper Project and Land Exchange

proposed mitigation measures, described in appendix J of the FEIS, as inherent to the proposed alternative, as well as other action alternatives' applicable components.

To the extent possible, these measures, including any potential impacts associated with these measures, were considered when assessing the impacts of the project on the resources. Where there is insufficient detail to determine whether an impact can be avoided or minimized, the measure cannot be incorporated into the impact analysis but serves to inform the public of Resolution Copper's plans.

Additional mitigation measures identified or recommended to date during the NEPA process have been compiled and will be considered by the Forest Service and cooperating agencies as part of their permit decisions to further minimize project impacts. This list will be further updated upon completion of the Forest Service administrative review process (objection process), as needed, to provide a comprehensive list of all measures identified during the NEPA process.

All measures will be assessed with the goal of disclosing the likelihood that the measures would be adopted by the applicant or implemented as a condition in a State, Federal, or local permit by the responsible agencies as part of their permit decisions following completion of the NEPA process. Specific mitigation conditions would be determined following completion of the environmental review and would be included in the record of decision for any permit that may be issued.

Compensatory mitigation for unavoidable impacts to aquatic resources may be required to ensure that activities requiring a permit comply with 404(b)(1) guidelines. Compensatory mitigation is the restoration (reestablishment or rehabilitation), establishment (creation), enhancement, and/or in certain circumstances preservation of aquatic resources to offset unavoidable adverse impacts.

Resolution Copper has developed a draft conceptual compensatory mitigation plan outlining its proposed approach for compensatory mitigation. The draft conceptual compensatory mitigation plan would be amended in the future to include proposed mitigation plans. In addition, Resolution Copper proposes to use monitoring measures through construction, operation, and closure of the project to assess predicted project impacts and the effectiveness of mitigation measures.

The draft conceptual compensatory mitigation plan submitted to the USACE by Resolution Copper is included in the EIS as appendix D.

# ES-4.   FEIS Appendices

The final section of the FEIS provides detailed information on 21 subjects. These appendices are as follows:

- Appendix A: Section 3003 of PL 113-291

- Appendix B: Existing Conditions of Offered Lands

- Appendix C: Clean Water Act 404(B)(1) Alternatives Analysis – Resolution Copper

- Appendix D: Clean Water Act Section 404 Conceptual Mitigation Plan – Resolution Copper Project

- Appendix E: Alternatives Impact Summary

- Appendix F: Alternatives Considered but Dismissed from Detailed Analysis

- Appendix G: Further Details of East Plant Site, West Plant Site, MARRCO Corridor, and Filter Plant and Loadout Facility Infrastructure

- Appendix H: Further Details of Mine Water Balance and Use

- Appendix I: Summary of Effects of the Land Exchange

- Appendix J: Mitigation and Monitoring Strategy

- Appendix K: Summary of Content of Resource Analysis Process Memoranda

- Appendix L: Detailed Hydrographs Describing Impacts on Groundwater-Dependent Ecosystems

- Appendix M: Water Quality Modeling Results for Constituents of Concern

- Appendix N: Summary of Existing Groundwater and Surface Water Quality

- Appendix O: *This appendix has been removed from the FEIS*

- Appendix P: Final Biological Opinion Completing Consultation under Section 7 of the Endangered Species Act

- Appendix Q: Special Use Permit Applications

- Appendix R: Response to Comments Received on the DEIS

- Appendix S: Consultation History

- Appendix T: Proposed Forest Plan Amendment and NFMA Compliance Determination for Preferred Alternative

- Appendix U: Supplemental Information for Section 3.14, Tribal Values and Concerns

*This page intentionally left blank.*

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1336 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 37 of 96

Resolution Copper Project and Land Exchange

- The land exchange would not take place;

- Certain ongoing activities on Resolution Copper private land, such as reclamation of the historic Magma Mine, exploration, monitoring of historic mining facilities such as tailings under existing State programs and permits, maintenance of existing shaft infrastructure, including dewatering, and water treatment and piping of treated water along the MARRCO corridor to farmers for beneficial use, would continue regardless of GPO approval;

- Ongoing trends not related to the proposed project would continue, such as population growth, ongoing impacts on air quality from fugitive dust and vehicle emissions, human-caused fires, ranching, and a corresponding increase in use of public lands; and

- A project-specific forest plan amendment would not be needed for compliance with the forest plan.

### 2.2.3.1    Need for Inclusion of Land Exchange in Document

PL 113-291 directs the Forest Service to prepare a single EIS prior to the final execution of the land exchange to serve as the basis for all Federal decisions related to the proposed mine. The proposed action and action alternatives analyzed in detail in chapter 3 therefore assume that the land exchange would occur as directed by Congress; for this reason, it is included as a component common to all action alternatives (see section 2.2.2.1).

However, even though directed by Congress, the land exchange remains a discretionary decision on the part of Resolution Copper, which may or may not choose to undertake the exchange after receipt of the appraised value. It is possible that mining under the proposed action or action alternatives could also take place without the land exchange occurring. If the land exchange did not occur, the 760-acre Oak Flat Withdrawal Area would remain closed to mineral entry. While under the proposed action no mining panels are located below the Oak Flat Withdrawal Area, the proposed action might require modification to limit subsidence into that area. Regardless, mining without a land exchange would be a possibility. The single EIS must therefore allow for a comparison of potential impacts of mining that occurs on land remaining in Federal ownership with potential impacts that would occur following the land exchange. Whether the land exchange occurs or not, the mine would be developed in accordance with the Federal, State, and local laws governing mining operations. However, these laws could differ, depending on whether or not a land exchange occurred.

The no action alternative provides one baseline against which the proposed action and action alternatives may be compared. The no action alternative assumes no land exchange and no Forest Service approval of a GPO. This baseline allows a direct comparison of the effects of most of the mining impacts that would occur from the proposed action and action alternatives. However, the no action alternative is not sufficient to fully analyze the effects of the exchange of the selected lands.

Two other combinations of no action were considered during analysis:

- A fully executed land exchange, but no approval of the GPO; and

- The land exchange would not occur, Oak Flat would stay in Federal management, and the GPO would be approved with the mining taking place on public land.

The first combination was not carried forward as the Forest Service is unable to refuse approval of the GPO within their regulations and guidance. The second combination was considered because the land exchange is a discretionary action on the part of Resolution Copper. Therefore, an analysis was completed that compared the regulatory framework of mining activity on lands remaining in Federal ownership with the regulatory framework on lands being transferred to private ownership (appendix I). This provides the

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1337 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 38 of 96

Final Environmental Impact Statement

### 3.5.4    Environmental Consequences of Implementation of the Proposed Mine Plan and Alternatives

#### 3.5.4.1    Alternative 1 – No Action

**Traffic Volume/Level of Service**

Under the no action alternative, no mine expansion would occur and the existing transportation patterns and existing infrastructure in the analysis area would continue (Southwest Traffic Engineering LLC 2017, 2020b).

While normal background growth and area development will increase traffic, intersections in the analysis area generally are expected to operate within an acceptable LOS in years 2022 and 2027 (see table 3.5.4-3 later in this section). The exception would be the Combs Road/Schnepf Road intersection, which is expected to operate with a side street LOS E/F by year 2022 through 2027. A traffic signal may be required at this intersection, along with exclusive turn lanes for all approaches, to alleviate delays expected to occur with or without the project.

**Transportation Routes**

Under the no action alternative, existing transportation routes would not change. There would be no direct, indirect, or cumulative effects on the transportation routes as a result.

**Changes in Access**

Public access to NFS land and transportation infrastructure would not be impacted under the no action alternative because there would be no new roads, updates to existing roads, or closures of existing roads under this alternative. There would be no direct, indirect, or cumulative effects on changes in access as a result.

#### 3.5.4.2    Impacts Common to All Action Alternatives

**Effects of the Land Exchange**

The land exchange would have significant effects on transportation and access. The Oak Flat Federal Parcel would leave Forest Service jurisdiction, and with it public access would be lost to the parcel itself, as well as passage through the parcel to other destinations, including Apache Leap and Devil's Canyon. These locations have other means of access, but those routes may not be as direct or convenient. Resolution Copper may keep portions of the property open for public access, as feasible.

The offered land parcels would enter either Forest Service or BLM jurisdiction. The eight parcels would have beneficial effects; they would become accessible by the public and be managed by the Federal Government for multiple uses. Roads and access would be managed in accordance with the appropriate management plans and agency direction.

**Effects of Forest Plan Amendment**

No components of the 2023 forest plan directly relate to transportation and access that require amendment.

Forest Service
U.S. DEPARTMENT OF AGRICULTURE

**Tonto National Forest**  **MB-R3-12-10**  **June 2025**

# **FINAL** Environmental Impact Statement
## Resolution Copper Project and Land Exchange
Coconino, Gila, Maricopa, Pinal, Santa Cruz, and Yavapai Counties, Arizona



Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1339 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 40 of 96

Final Environmental Impact Statement

**Mineral Creek**

Mineral Creek is similar in nature to lower Devil's Canyon. While flows are supported in part by near-surface storage of seasonal precipitation, the available evidence indicates that these waters arise partially from the Apache Leap Tuff aquifer and other regional sources. For the purposes of analysis, Mineral Creek is considered to be connected with regional aquifers, which could potentially be impacted by groundwater drawdown caused by the block-cave mining and dewatering; whether this impact is predicted to occur or not is determined using the results of the groundwater modeling.

Approximately the lower 4 miles of Mineral Creek exhibits perennial flow that supports riparian galleries and aquatic habitat. Three perennial springs also contribute to Mineral Creek (Government Springs, MC-8.4C, and MC-3.4W or Wet Leg Spring). Government Springs is the farthest upstream, roughly 5.4 miles above the confluence with Devil's Canyon (Garrett 2018e).

Mineral Creek is designated as critical habitat for Gila chub. The AGFD has conducted fish surveys on Mineral Creek periodically since 2000 and has not identified Gila chub in Mineral Creek since 2000. While the presence of amphibians suggested acceptable water quality in this reach, until 2006 no fish populations were observed despite acceptable habitat. AGFD stocked native longfin dace in Mineral Creek downstream of Government Springs in 2006, and as of 2017, these fish were still present in the stream, though Gila chub have not been seen (Crowder et al. 2014; WestLand Resources Inc. 2018a).

**Arnett Creek**

Fairly strong and consistent evidence indicates that several reaches of Arnett Creek likely receive some contribution from groundwater that looks similar to the Apache Leap Tuff aquifer, though these units are not present in this area. This includes Blue Spring (located in the channel of Arnett Creek above Telegraph Canyon) and in the downstream portions of Arnett Creek immediately downstream of Telegraph Canyon. Arnett Creek is considered to be connected with regional aquifers, which could potentially be impacted by groundwater drawdown caused by the block-cave mining and dewatering; whether this impact is predicted to occur or not is determined using the results of the groundwater modeling.

**Telegraph Canyon**

Telegraph Canyon is a tributary to Arnett Creek. Unlike Arnett Creek, there was insufficient evidence to determine whether or not these waters were tied to the regional aquifers. In such cases, the Forest Service policy is to assume that a connection exists; therefore, Telegraph Canyon is also considered to be connected with the regional aquifers, which could potentially be impacted by groundwater drawdown caused by the block-cave mining and dewatering; whether this impact is predicted to occur or not is determined using the results of the groundwater modeling.

**Tributaries to Queen Creek and Devil's Canyon**

A number of tributaries were evaluated originating in the Oak Flat area and feeding either Queen Creek or Devil's Canyon. These include Number 9 Wash and Oak Flat Wash (Queen Creek drainage) and Iron Canyon, Hackberry Canyon, and Rancho Rio Canyon (Devil's Canyon drainage). Sufficient evidence existed for all of these tributaries to demonstrate that they most likely have local water sources that are not connected to the regional Apache Leap Tuff aquifer (Garrett 2018e).

WATER SUPPLY WELLS

GDEs represent natural systems that could be impacted by the project, but human communities also rely on groundwater sources in the area. In lieu of analyzing individual wells, typical wells in key

communities were analyzed using the groundwater flow model (Newell and Garrett 2018d). These areas include the following:

- **Top-of-the-World**. Many wells in this location are relatively shallow and rely on near-surface fracture systems and shallow perched alluvial deposits (see attachment 7 in Garrett (2018e)); these wells would not be impacted by changes in the regional aquifers. However, other wells in this area could be completed deeper into the Apache Leap Tuff aquifer. Impacts on well HRES-06 is used as a proxy for potential impacts on water supplies and individual wells in this area.

- **Superior**. The Arizona Water Company serves the Town of Superior; the water comes from the East Salt River valley. Even so, there are assumed to still be individual wells within the town that use local groundwater (stock wells, domestic wells, commercial wells). As with Top-of-the-World, some of these wells may rely on near-surface groundwater and would not be impacted by changes in the regional aquifers. Other wells could be completed in geological units in hydraulic connection to the deep groundwater system. Well DHRES-16_743 is used as a proxy for potential impacts on water supplies and individual wells in this area.

- **Boyce Thompson Arboretum**. The Gallery Well is used as a proxy for impacts on water supplies associated with Boyce Thompson Arboretum. This well likely uses groundwater from local sources, but for the purposes of analysis it is assumed to be connected to regional aquifers.

Public comments suggested that focusing on proxies instead of specific individual wells was an inappropriate approach. The rationale for using proxies was provided in DEIS references (Newell and Garrett 2018c), but bears repeating here.

In order to evaluate the effects of groundwater drawdown on an individual well, a number of details need to be known about the well construction and operation. These include depth to water, depth of well, location of perforated intervals, and the type and depth of pump equipment in the well. In general, individual water supply wells vary so much a hypothetical 10-foot drop in the water table could leave a shallow well completely dry (requiring it to be redrilled), could cause a different well to lower a pump but otherwise remain unaffected, or could have no noticeable effect at all for deeper wells. Most of these key details are unknown through existing data sources, and unable to be collected without disrupting water service.

The proxy wells described above provide a reasonable estimate of impacts that any individual well owner could apply to their own well if located in the same area. If an individual well owner is not located near these areas, drawdown can be spatially seen in figures 3.7.1-2 (for drawdown near the Desert Wellfield) and 3.7.1-3 (for drawdown near the mine site). Drawdown also is detailed for any of the GDE locations (see hydrographs in appendix L, with the specific location shown on figure 3.7.1-9). If proxy wells are insufficient for a given individual well owner, all of these sources also are indicative of drawdown in the regional aquifer that could impact individual wells.

The Forest Service received comments suggesting an expansion of the analysis of individual wells. Specifically, even if the impact to individual wells cannot be undertaken with any certainty, the total number of wells potentially impacted could be disclosed. This analysis has been undertaken and added to the FEIS (Garrett 2023a).

We also received cautions about the ability to apply the proxy wells to all wells in the geographic area. We recognize this limitation. The proxy well locations are meant to reflect the drawdown that can be expected in a specific location, at a specific time, in a specific hydrogeologic unit. Other wells in the area could experience no impact at all (if drawing water from shallow alluvium or fractures) or different impacts (if completed in some other hydrogeologic units). The proxy wells are meant to reflect the most likely impacts in those areas: for Top-of-the-World drawdown in the Apache Leap Tuff, for Superior

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1341 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 42 of 96

Resolution Copper Project and Land Exchange

## SUMMARY OF APPLICANT-COMMITTED ENVIRONMENTAL PROTECTION MEASURES

A number of environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on groundwater quantity and GDEs. These are non-discretionary measures and their effects are accounted for in the analysis of environmental consequences.

From the GPO (2016c), Resolution Copper has committed to various measures to reduce impacts on groundwater quantity and GDEs:

- Groundwater levels will be monitored at designated compliance monitoring wells located downstream of the tailings storage facility seepage recovery embankments in accordance with the requirements of the APP program;

- All potentially impacted water will be contained on-site during operations and will be put to beneficial use, thereby reducing the need to import makeup water;

- Approximately 60 percent of Resolution Copper's water needs will be sourced from long-term storage credits (surface stored underground[69]). In addition, in September 2021, the allocation of a Non-Indian Agriculture CAP allotment was finalized. In 2022, this water was delivered to NMIDD and may be used similarly in the future for continued aquifer recharge;

- As much water as possible will be recycled for reuse; and

- The water supply will also include the beneficial reuse of existing low-quality water sources such as impacted underground mine dewatering water.

## HYDROLOGIC CHANGES ANTICIPATED FROM MINING ACTIVITIES

The block caving conducted to remove the ore body would unavoidably result in fracturing and subsidence of overlying rocks. These effects would propagate upward until reaching the ground surface approximately 6 years after block caving begins (Garza-Cruz and Pierce 2017). It is estimated that the subsidence area that would develop at the surface would be approximately 800 to 1,100 feet deep (see Section 3.2, Geology, Minerals, and Subsidence).

Fracturing and subsidence of rock units would extend from the ore body to the surface. This includes fracturing of the Whitetail Conglomerate that forms a barrier between the deep groundwater system and the Apache Leap Tuff aquifer. When the Whitetail Conglomerate fractures and subsides, a hydraulic connection is created between all aquifers. Effects of dewatering from the deep groundwater system would extend to the Apache Leap Tuff aquifer at this time.

## CHANGES IN BASIN WATER BALANCE – MINE DEWATERING

Mine dewatering is estimated to remove approximately 87,000 acre-feet of water from the combined deep groundwater system and Apache Leap Tuff aquifer over the life of the mine, or about 1,700 acre-feet per year (Meza-Cuadra et al. 2018a).

## ANTICIPATED IMPACTS FOR GROUNDWATER-DEPENDENT ECOSYSTEMS (UP TO 200 YEARS AFTER START OF MINING)

As assessed in this EIS, GDEs can be impacted in several ways:

- Ongoing dewatering (described in the no action alternative section)

---

[69] More discussion about Resolution Copper's accumulation of long-term storage credits, or agreements for obtaining long-term storage credits, is included in Chapter 4, Cumulative Effects.

### Forest Service
#### U.S. DEPARTMENT OF AGRICULTURE

---

**Tonto National Forest**                **MB-R3-12-10**                June 2025

# **FINAL** Environmental Impact Statement
## Resolution Copper Project and Land Exchange
Coconino, Gila, Maricopa, Pinal, Santa Cruz, and Yavapai Counties, Arizona



Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1343 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 44 of 96

Final Environmental Impact Statement

A specific loss of water sources for specific grazing allotments is not known for any of the RFFAs.

## 4.3.4    Further Discussion of Key Topics

The following discussions concern several topics that have cumulative impacts that are not adequately captured in the cumulative effects analysis undertaken in sections 4.3.1 through 4.3.3. In some cases this is because many of the reasonably foreseeable actions have been screened out for lack of sufficient detail, but are still likely to happen in some unspecified fashion, such as increasing competition for water supplies. In other cases, such as future meteorological trends, the effects are not tied to a single reasonably foreseeable future action but have ramifications on many aspects of the analysis.

### 4.3.4.1    Cumulative Effects on Regional Water Supplies

We received many comments expressing concern with regional water supplies, current and future stresses on water supplies from drought and future meteorological trends, and the ramifications of Resolution Copper's use of water in the face of competing water uses.

We considered a number of specific projects or actions related to water supplies during the cumulative effects analysis process, including the following:

- Arizona's Drought Contingency Plan
- Resolution Copper's Potential Allocation of CAP Water
- Town of Florence Development Projects
- Population Change
- Recent Modeling Reports Projecting Water Shortages in Pinal County
- Assured Water Supplies in the East Salt River Valley
- Future Superstition Vistas Development Area on Arizona State Trust Land

Some of these normally would not be analyzed as cumulative effects because they do not meet the appropriate screening criteria to be considered reasonably foreseeable future actions (Debauche 2023; Newell et al. 2020; SWCA Environmental Consultants 2020b). For example, the provisions of the drought contingency plan expire in 2026 and would not overlap in time with the Resolution Copper Project's operational pumping. Similarly, water shortages in Pinal County are outside the spatial area impacted by Resolution Copper Project's pumping, and the effects of groundwater drawdown would not overlap. The Superstition Vistas development area would likely overlap in both space and time with the Resolution Copper Project's operational pumping. However, the development plans are conceptual and lack adequate detail to allow substantial analysis of resource effects and thus normally would be considered speculative, not reasonably foreseeable.

Regardless of the screening outcomes, due to the great interest expressed by the public and cooperating agencies in water-related issues, we have added this section to the cumulative effects analysis to discuss these regional water supply issues in the context of the Resolution Copper Project's use of water.

### Regulatory Framework and Appropriateness of Resolution Copper's Water Use

Many comments express a value judgment that use of water for the Resolution Copper Project is an inappropriate use of Arizona's limited water resources, especially in the context of current drought and future meteorological trends.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1344 of 2158
Case 2:21-cv-00122-DWL   Document 87-2   Filed 07/14/25   Page 45 of 96

Resolution Copper Project and Land Exchange

Tribes that receive water from the Non-Indian Agricultural (NIA) pool (Person 2021; Whitehill 2019). Though internal to Arizona, the drought contingency plan also provides for mitigation measures (including wet water replacement and financial compensation) that are meant to reduce impacts on end users.

One provision of the drought contingency plan is to allow irrigation districts in central Arizona to pump an additional 70,000 acre-feet of groundwater per year, which would only replace part of the Colorado River water that Pinal County farmers will have to relinquish under Tier 2 restrictions (James 2020). Some amount of CAP water has also been banked annually for future use as groundwater since 1996, but between 1996 and 2016, only 9 million total acre-feet of water was banked. This is the equivalent of about 1 year of total water usage for the state, or 9 years of total water usage for the Phoenix and Tucson AMAs (Hirt et al. 2017). With Tier 2 restrictions (as occurred in 2023), banking of CAP water for future use is likely to be further reduced, increasing the net reduction in available groundwater. There already is a demand/supply gap with respect to groundwater in Arizona, resulting in long-term depletion of aquifers (Eden et al. 2015). If water use restrictions continue or increase and the amount of groundwater recharge continues to decrease, this would only increase the rate at which groundwater supplies are depleting.

### Ramifications of Future Colorado River Shortages on the Resolution Copper Project

In June 2020, the U.S. Department of the Interior published a proposed decision for the reallocation of NIA priority CAP water (U.S. Department of the Interior 2020). The reallocation decision originated with the 2004 Arizona Water Settlements Act, which led to an ADWR recommendation in January 2014 to reallocate a pool of CAP water to a number of entities, including Resolution Copper. ADWR recommended that Resolution Copper receive 2,238 acre-feet of CAP water annually. The Bureau of Reclamation undertook a NEPA analysis for the potential reallocation, which culminated in the completion of a Final Environmental Assessment and Finding of No Significant Impact in November 2019. On September 20, 2021, Resolution Copper entered into a subcontract with the United States and the Central Arizona Water Conservation District for the approved annual allocation of 2,238 acre-feet of NIA CAP water (Antone 2022b). In 2022, Resolution's NIA CAP allocation was delivered to New Magma Irrigation and Drainage District's Groundwater Savings Facility. Availability of the Resolution Copper NIA CAP water in future years will be subject to both physical availability and the terms of the drought contingency plan.

The DEIS disclosed the potential for Resolution Copper to use CAP water directly as one possible water source, along with pumping groundwater from the Desert Wellfield. However, because Resolution Copper did not have an approved CAP allotment, for the purposes of impact analysis, all makeup water for the mine was assumed to be physically pumped from the Desert Wellfield. This choice was made to ensure that impacts caused by groundwater drawdown in the East Salt River valley are not underestimated. The FEIS continues to assume that all makeup water for the mine is physically pumped from the Desert Wellfield.

Now that Resolution Copper has received the CAP allocation, it could potentially be used to offset about 100,000 acre-feet of groundwater pumping over the operational life of the mine. This could be accomplished by direct use of CAP water but more likely would be accomplished by using the allotment to acquire additional long-term storage credits, as was done in 2022. If this occurs, the impacts to regional groundwater would be less than those disclosed in section 3.7.1 of the January 2021 Rescinded FEIS.

Under Tier 1 and 2 shortages on the Colorado River, or similar shortages required by future iterations of management plans once the drought contingency plan expires, Resolution Copper's CAP allocation may not be fully available. In this case, the disclosures of impacts to regional groundwater in the FEIS would remain appropriate.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1345 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 46 of 96

Resolution Copper Project and Land Exchange

agreements, Resolution Copper would have roughly 318,000 acre-feet of long-term storage credits, which accounts for roughly 60 percent of the water needs for the preferred alternative.

It is foreseeable that ADWR would make the remainder of the necessary groundwater available to Resolution Copper. Resolution Copper would likely receive a Permit to Withdraw Groundwater for Mineral Extraction and Metallurgical Processing. Under State law, this is a non-discretionary permit, provided that certain conditions are met (ARS 45-514).

OTHER FUTURE WATER USERS IN THE EAST SALT RIVER VALLEY

One of the primary mechanisms by which groundwater is managed in the AMAs is the Assured Water Supply program. Under this program, the act of subdividing land for development requires proof that enough water is physically and legally available to supply those homes for 100 years. As the intent of this program is to foster use of renewable sources of water, there are restrictions on how much groundwater can be used to make this demonstration. There is a total of roughly 24,000 acre-feet of annual future committed demand through approved Assured Water Supplies in the East Salt River valley (Barter et al. 2020). This is above and beyond the amount of agricultural, industrial, and municipal pumping already taking place in this part of the basin.

Superstition Vistas is a 275-square mile area of Arizona State Trust land in the East Salt River valley. Conceptually, this area has been identified for residential and commercial development, with a number of different scenarios considered (Morrison Institute for Public Policy 2006); however, at the time of this January 2021 Rescinded FEIS, the ASLD had taken no concrete steps for auction of this land. This has since changed, but only for a small portion of the Superstition Vistas area, described in the "Analysis of Cumulative Effects in the East Salt River Valley" section below. While the lack of detailed water use plans prevents specific analysis of most of the Superstition Vistas development, some estimates indicate that a population of 900,000 could live in this area. Throughout the Resolution Copper Project NEPA process, the ASLD has raised concerns about the potential future water supply to support the Superstition Vistas development. The cumulative effects modeling described below was undertaken in part to investigate the potential impacts to the Superstition Vistas water supply.

LONG-TERM STORAGE CREDITS IN EAST SALT RIVER VALLEY

Aside from the long-term storage credit portfolio acquired by Resolution Copper, a substantial amount of groundwater in the East Salt River valley is already "spoken for" because it represents banked water or long-term storage credits acquired through physical recharge of water to the aquifer or "in-lieu" recharge of water to the aquifer (foregoing otherwise legal groundwater pumping by providing alternative water supplies, like excess CAP water). The amount of stored water is substantial. Approximately 7 million acre-feet of long-term storage credits were stored in the entire Phoenix AMA at the end of 2017 (Barter et al. 2020).

ANALYSIS OF CUMULATIVE EFFECTS IN THE EAST SALT RIVER VALLEY

The analysis of impacts to the East Salt River valley aquifer as a result of the Desert Wellfield pumping was conducted for the EIS using a groundwater flow model. This groundwater flow model was built from an existing, calibrated, regulatory model prepared by ADWR. In some form, this model has been used widely for basin-wide planning purposes since the 1990s, as well as to estimate project-specific water supply impact. The appropriateness of using this model to predict impacts from the Desert Wellfield was further assessed by the NEPA team and found to be reasonable (Walser 2020a).

An additional set of model runs was conducted through the year 2118 to simulate cumulative effects from the water users described above: existing pumping, permitted Assured Water Supplies, recovery of long-term storage credits, and pumping from the Desert Wellfield (Barter et al. 2020). The following represent

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1346 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 47 of 96

Final Environmental Impact Statement

the approximate stresses applied in the model (for the entire Phoenix AMA, not just the East Salt River valley):

- Non-recovery agricultural pumping: 530,000 acre-feet/year

- Non-recovery non-agricultural pumping: 200,000 acre-feet/year

- Recovery of storage credits accrued through 2017 (including Resolution Copper credits): 112,000 acre-feet/year

- Recovery of additional storage credits accrued after 2017: 14,300 acre-feet/year

- Permitted Assured Water Supply groundwater demands: 105,000 acre-feet/year

- Non-recovery Desert Wellfield pumping: 6,700 acre-feet per year

Results indicate that by 2118, groundwater levels in the East Salt River valley would experience drawdown up to roughly 450 feet below current water levels, with or without Desert Wellfield pumping. As shown in figure 4.3.4-1, Resolution Copper's pumping increases drawdown as would be anticipated, primarily in the immediate vicinity of the Desert Wellfield.



**Figure 4.3.4-1. Projected drawdown in the East Salt River valley in 2118 caused by cumulative water use, with (right) and without (left) Resolution Copper pumping**

In the center of the Desert Wellfield, without Resolution Copper pumping, water levels would decline roughly 75 feet from current levels by 2118. With Resolution Copper pumping, water levels would decline roughly 100 feet by 2118. Note that operational pumping has ceased, and groundwater levels have

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1347 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 48 of 96

Resolution Copper Project and Land Exchange

partially recovered by 2118. Maximum drawdown in the center of the Desert Wellfield of just over 200 feet would occur at the peak of operational pumping (around 2060).

A depth-to-water of 1,000 feet below land surface is often used as a limit of physically available groundwater in the Phoenix AMA. Maximum depth-to-water in 2118 with all cumulative groundwaters uses ranges up to 850 feet as shown in figure 4.3.4-2, with a large cone of depression forming near Apache Junction. In addition, some model cells near Apache Junction and at the periphery of the basin show drying by 2118, indicating that groundwater would not be available in these areas. The depth-to-water in the center of the Desert Wellfield in 2118 is 550 feet below ground surface without Resolution Copper pumping, and 575 feet below ground surface with Resolution Copper pumping.



**Figure 4.3.4-2. Projected depth-to-water in the East Salt River valley in 2118 caused by cumulative water use, with (right) and without (left) Resolution Copper pumping**

### Sufficiency of Regional Water Supplies

Groundwater modeling, using the best available estimates of all regional groundwater users over the next 100 years, indicates that regional groundwater supplies generally are sufficient to satisfy committed demands. Full drying of the aquifer is limited to peripheral areas, and depth-to-groundwater generally does not exceed limits of physical availability (1,000 feet). However, there likely would be certain areas that experience lack of well capacity and groundwater shortages, particularly around the edges of the basin.

Further, the cost and energy required for pumping increases as groundwater deepens, and infrastructure costs would increase as wells and pumps need to be lowered or replaced. According to one estimate, an additional 1.02 to 2.56 kilowatt-hours of energy, depending on pump efficiency, are required to lift an

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1348 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 49 of 96

Final Environmental Impact Statement

acre-foot of water an additional foot (Peacock n.d. [1996]). The above quantitative modeling analysis includes known population increases through the incorporation of permitted Assured Water Supplies. At the time of the January 2021 FEIS, no portion of Superstition Vistas had been concretely planned for development. This has now changed. The first Superstition Vistas parcels (2,783 acres) were auctioned by the ASLD in 2020, purchased by DR Horton. Prior to subdivision, this parcel will require demonstration of a 100-year water supply under the Assured Water Supply program. There are generally two ways a developer can demonstrate this 100-year water supply: either by obtaining a separate, independent Assured Water Supply for the parcel from the ADWR, or relying on a designation of Assured Water Supply already obtained by a water provider from the ADWR. In this case, the auctioned Superstition Vista parcels are relying on previous designation obtained by the Apache Junction Water Department. Sufficient water has not been demonstrated to develop the entire Superstition Vistas area, but Apache Junction Water Department has demonstrated enough water rights to begin development on the auctioned properties (Hilgartwilson LLC 2021). Importantly, those committed Assured Water Supplies were included in the Desert Wellfield modeling report described above (Barter et al. 2020).

In summary, the portion of Superstition Vistas that has a demonstrated source of water has been quantified and included in the regional cumulative effects groundwater model. Other portions of Superstition Vistas without demonstrated water supplies are speculative and not explicitly modeled.

Resolution Copper and ASLD have discussed potential wellfield layouts for Superstition Vistas, informed by these modeling results, but no firm water supply planning has been undertaken. Conceptual water use estimates for the entirety of Superstition Vistas range anywhere from 100,000 to 190,000 acre-feet/year, depending on the progressiveness of water conservation (Morrison Institute for Public Policy 2006).

While adequate groundwater exists for committed regional demands, including Resolution Copper's Desert Wellfield, as demonstrated by the cumulative effects model presented above, those demands are met in part by mining of non-renewable groundwater and result in an overall lowering of groundwater levels over the next 100 years. While the next 100 years are demonstrated through this modeling to be manageable without exhausting groundwater supplies in the East Salt River valley, ultimately, the long-term use of groundwater may become unsustainable, even without considering Superstition Vistas' growth. The potential new future residential demand from Superstition Vistas represents between seven and 13 times the annual groundwater pumping by Resolution Copper over the operational life of the mine. More importantly, these residential water demands are in perpetuity, rather than for a limited time frame (four decades in the case of Resolution Copper). While the cumulative effects modeling does not preclude the future Superstitions Vistas' development and the population growth it portends, the cumulative effects modeling suggests that regional water supplies would become more limited and would need to be carefully assessed for sufficiency based on actual development plans for the area. This assessment would take place at a basin-wide planning level by ASLD before auctioning of the land, as well as through the existing regulatory framework, which requires Assured Water Supply permitting before approving each subdivided parcel.

In its comments on the DEIS, ASLD indicated that the water use of the Desert Wellfield would preclude the development of 3,440 acres of otherwise developable State Trust land and calculated a potential loss in revenue. This comment fundamentally suggests that the Desert Wellfield and full and complete development of Superstition Vistas are mutually exclusive, based on the assumption that groundwater supplies would not be sufficient for all development. The cumulative effects modeling cannot fully answer this question. The recent auctioned land described above is an example of some Superstition Vistas parcels whose water use is already effectively included in the cumulative effects modeling. The outcome of the cumulative effects modeling indicates there is still groundwater available for use after 100 years, even after all committed demands are accounted for. Whether these water supplies would be sufficient for full development of Superstition Vistas depends on the details of that development, which

**Forest Service**

U.S. DEPARTMENT OF AGRICULTURE

**Tonto National Forest**                    **MB-R3-12-10**                    **June 2025**

# **FINAL** Environmental Impact Statement
## Resolution Copper Project and Land Exchange

Coconino, Gila, Maricopa, Pinal, Santa Cruz, and Yavapai Counties, Arizona



| | | Operations Rampup (Mine Years 6–12) | Peak Operations (Mine Years 13–36) | Operations Rampdown to Closure (Mine Years 37–46) | Total Water Use All Phases |
|---|---|---|---|---|---|
| Desert Wellfield pumping (AF/year) | Alternative 5 | 7,416 | 17,244 | 7,901 | |
| Total AF per Phase | Alternative 5 | 51,912 | 413,856 | 79,010 | 544,778 |
| Desert Wellfield pumping (AF/year) | Alternative 6 | 5,578 | 17,948 | 7,506 | |
| Total AF per Phase | Alternative 6 | 39,046 | 430,752 | 75,060 | 544,858 |

# Post-Closure Water Budget

The post-closure water budget is substantially different from the operational water budget described in this appendix. With respect to water sources:

- No further pumping from the Desert Wellfield occurs,

- No further capture and recycling of stormwater occurs, and

- No further removal of water from the block-cave area occurs.

With respect to water losses:

- Water is no longer lost due to tailings entrainment,

- Water is no longer lost due to concentrate entrainment,

- Water is no longer consumed for refrigeration/ventilation, and

- Water is no longer lost to evaporation from tailings ponds (the water lost to evaporation post-closure from the store-and-release closure cover on the tailings storage facility derives from precipitation).

The sole water component remaining after closure is seepage from the tailings storage facility. The continuation of seepage is discussed under each alternative (see "Ramifications for Long-Term Closure" in section 3.7.2).

| Resource affected/impacts being mitigated: |
| :--- |
| Livestock grazing and socioeconomics |

| Applicable alternatives: |
| :--- |
| All |

| Authority to require: |
| :--- |
| As an applicant-proposed mitigation measure, implementation is not assured. However, all grazing leases within the footprint are under Resolution Copper management and require implementation of management practices covering maintenance, including fencing, and stock ponds. |

| Funded by: |
| :--- |
| Resolution Copper |

| Additional ground disturbance: |
| :--- |
| None. |

## Mitigation and Monitoring that Could Be Required by Other Regulatory and Permitting Agencies

Potential mitigation and monitoring measures associated with the permits listed below are within the authority of other regulatory permitting agencies and could be required, including ADEQ and Arizona Department of Water Resources. These measures were not considered in the chapter 3 impacts analysis. The Forest Service has no authority, obligation, or expertise to determine or enforce compliance for the measures associated with the permits listed in this section, as they have not yet been required by other agencies, nor have they been agreed to by Resolution Copper. The mitigation and monitoring measures in this section include permit requirements and stipulations from legally binding permits and authorizations such as the air quality permit, APP, and groundwater withdrawal permit.

Many of these permits have not yet been issued but are anticipated to be issued prior to approval of the final mining plan of operations or special use permit. Those permits received prior to the issuance of the final ROD may need to be modified to reflect the alternative selected by the deciding official. These regulatory and permitting agencies would share monitoring results and any instances of noncompliance with the Forest Service. The Forest Service would use the information provided by the regulatory and permitting agencies to determine compliance with the decision that would be documented in the ROD and compliance with the final mining plan of operations or special use permit. Some of the other permits, licenses, and authorizations (see FEIS table 1.5.4-1 in chapter 1) that are anticipated to be required for the mine to be operational (and may involve additional mitigations beyond those noted here) include the following:

- Aquifer Protection Permit (APP)

- Arizona Pollutant Discharge Elimination System (AZPDES) Permit

- Clean Water Act Section 401 Certification

- Special Use Permits

- Project-Specific Section 404 Clean Water Act Permit

- Air Quality Control Permit

**Forest Service**

U.S. DEPARTMENT OF AGRICULTURE

Tonto National Forest                    MB-R3-12-10                    June 2025

# **FINAL** Environmental Impact Statement
## Resolution Copper Project and Land Exchange

Coconino, Gila, Maricopa, Pinal, Santa Cruz, and Yavapai Counties, Arizona





Douglas A. Ducey
Governor

Lisa A. Atkins
Commissioner

**Arizona State Land Department**
1616 West Adams, Phoenix, AZ 85007
(602) 542-4621

November 7, 2019

Mr. Neil Bosworth
District Supervisor
Tonto National Forest
PO Box 34468
Phoenix, AZ 85067-4468

RE: Resolution Copper Draft Environmental Impact Statement Comments

Dear Supervisor Bosworth,

As a cooperating agency, the Arizona State Land Department (ASLD) appreciates the opportunity to submit comments for the record on the Resolution Copper Draft Environmental Impact Statement (DEIS).

The ASLD manages a perpetual land Trust consisting of approximately 9.2 million acres located throughout the State, including subsurface mineral estate. Our comments reflect ASLD's responsibility to ensure the land is best managed on behalf of the Trust's beneficiaries and therefore, ASLD must evaluate the potential risks and contributions for all projects on land and resources within the Trust.

ASLD recognizes and appreciates the mineral development, financial, technological, and career opportunities that Resolution Copper brings to the State, and ASLD supports the advancement of the project. However, ASLD does have concerns regarding the selected preferred alternative tailing facility site within the Skunk Camp/Dripping Springs Valley. The location is predominately State Trust land, and it is highly likely that this location will adversely impact the Trust.

This comment letter constitutes the official response of ASLD and has been organized into the following sections: 1) general comments (including the location of the preferred alternative tailing location at Skunk Camp), 2) DEIS comments from internal ASLD subject matter experts, and 3) concluding remarks.

**GENERAL COMMENTS:**
**SKUNK CAMP TAILING FACILITY – PREFERRED ALTERNATIVE**
ASLD acknowledges that the Skunk Camp tailing facility location has been identified as the preferred alternative in the DEIS prepared by the Tonto National Forest (TNF). ASLD prefers Silver King as the location for the tailings site, as it is located on federally managed land and requires significantly less water over the life-of-mine (LOM). In contrast, the Skunk Camp alternative location is comprised of over 65 percent State Trust land and requires much higher volumes of water to support the tailing slurry pipeline.

Comment ID: S62-1 Response: NS1

Comment ID: S62-2 Response: NS1

Comment ID: S62-3 Response: ALT30

**SLURRY PIPELINE ON STATE TRUST LAND**

In order to minimize the amount of water necessary to supply the Skunk Camp alternative location's slurry pipeline, the tailings should be dewatered to the maximum extent possible with the most current technology. The recovered slurry water should then be recycled (in addition to any contaminated groundwater pumped from beneath the tailing facility) and reused within the system.

Comment ID: S62-8 Response: WT23

Skunk Camp's proposed slurry pipeline would be constructed over eight miles of State Trust land in the Dripping Springs Valley. In order to minimize the potential environmental risk, ASLD requests that all components of the pipeline be engineered and constructed pursuant to best management practices to reduce the possibility of a breach or spill occurring on State Trust land. These design methods may include using thick single-walled or double-walled pipe sections lined with high-density polyethylene, installing a comprehensive pipeline monitoring network, and peer-review of the construction and design.

Comment ID: S62-9 Response: MIT1

ASLD also requests that TNF provide written confirmation acknowledging approval of the pipeline corridor that crosses land under its jurisdiction. Receipt of this document is necessary for ASLD to begin issuing Rights-of-Way for the selected pipeline alignment.

Comment ID: S62-10 Response: NEPA42

**CULTURAL RESOURCES OF SKUNK CAMP**

The results of cultural resources inventories for all alternatives have not yet been fully reported or evaluated. The DEIS provides some preliminary numbers for the significant cultural resources that will be directly impacted based on the different alternatives. These are the cultural resources that have been recommended as eligible for listing on the Arizona and National Registers of Historic Places (A/NRHP) and those that need testing to determine their register eligibility. Final determinations of eligibility and effect have not been completed, but the preliminary numbers indicate that the Skunk Camp alternative will directly impact significantly more cultural resources than any of the other alternatives (Table 1; Figure 1). Skunk Camp with the North Pipeline alternative will impact 2.8 to 4.3 times more cultural resources than the other alternatives, while the South Pipeline alternative will impact 3.3 to 5.4 times more.

Comment ID: S62-11 Response: CR5

**Table 1. Cultural resources directly impacted by the different alternatives**

| Tailing Storage Alternatives | Cultural Resources Directly Impacted |
|---|---|
| Skunk Camp (South Pipeline Alternative) | 301 |
| Skunk Camp (North Pipeline Alternative) | 253 |
| Peg Leg (West Pipeline Alternative) | 75 |
| Peg Leg (East Pipeline Alternative) | 90 |
| Silver King | 60 |
| Near West (both Alternatives 2 and 3) | 56 |

Continued

3

---

The greatest potential adverse impact to the Trust will be the water (usage of approximately 600,000 acre-feet (AF) over the LOM) that will be extracted from the aquifer beneath the Superstition Vistas Planning Area (SVPA). This level of water consumption is partially a result of the potential need to transport a projected 1.7 trillion tons of waste material to the Skunk Camp location. Based upon the anticipated groundwater requirements contained in the DEIS, the negative impact of the proposed water consumption sourced from the Superstition Vistas Planning Area (SVPA) far outweighs the estimated financial benefits to the Trust resulting from other aspects of the project by a factor of 20:1 (based on current growth projections for the Pinal County portion of the East Salt River Valley developed by the Maricopa Association of Governments).

Comment ID: S62-4 Response: WT4_G

ASLD is also concerned that a potential sale of the State Trust land directly at or near the Skunk Camp property would not adequately recognize the future value of the Skunk Camp property and fails to consider the inherent decrease in surrounding property values once the facility is established. As this area is immediately adjacent to the SVPA, it has future value as recreational, development, or open space property that supports the anticipated growth in the SVPA. By encumbering a large area with mine tailing storage, the surrounding State Trust land will be depreciated to the detriment of the Trust.

Comment ID: S62-5 Response: SO18

The Skunk Camp location would require a US Army Corps Jurisdictional Determination (JD) for the Dripping Springs Wash. If this watershed were determined to be a Jurisdictional Water(s) of the U.S., this decision could greatly complicate ASLD's ability to realize the highest value for those State Trust lands located downstream. As upstream determinations set precedence, this JD has the potential to expose these lands to additional Federal regulation that they would not have been absent such a determination.

Comment ID: S62-6 Response: NEPA20

**SUBJECT-SPECIFIC DEIS COMMENTS:**
**WATER IMPACTS**

Resolution's proposed withdrawal of water for mining operations from wells to be drilled along the MARRCO (Magma Arizona Railroad Company) rail corridor is estimated to range from 180,000 AF to as much as 600,000 AF over the LOM. Resolution has stored and/or obtained Long-Term Storage Credits (LTSCs) for approximately 313,000 AF of Central Arizona Project (CAP) water, of which approximately 256,000 AF are located within the Phoenix Active Management Area (AMA). However, the location along the rail corridor where Resolution proposes to withdraw the water is outside the area of hydrologic impact (AOI) where the water storage occurred. Therefore, the local aquifer in the central portion of the SVPA, and not the one(s) where the storage occurred, will be the aquifer impacted by Resolution's proposed withdrawals. In terms of a 100-year Assured Water Supply (AWS), the water represents the equivalent of an annual buildout demand of up to 6,000 AF per year (AFY).

Comment ID: S62-7 Response: MIT1

Resolution could partially mitigate this impact by withdrawing its 256,000 AF of Phoenix AMA LTSCs from within the AOI of storage. This would have the effect of reducing the local area impact in the central SVPA to around 3,440 AFY. Even with this mitigation, at a density of three units per acre, assuming three persons per household, and using a water demand of one AFY per acre (Source: Arizona Department of Water Resources' Fourth Management Plan models for new single-family residential development), Resolution's withdrawals, if mitigated by recovering the LTSCs from within the AOI of storage, would still potentially result in the loss of the development of at least 3,440 acres of State Trust lands. State Trust land has recently been auctioned for residential development in the area near the SVPA for approximately $156,000 per acre. Therefore, even with partial mitigation, the loss of 3,440 acres of developable State Trust land represents a minimum potential loss to the Trust of at least $536,640,000 in revenue.

Continued



**Figure 1: Cultural Resources Directly Impacted**

Regardless of the pipeline corridor selected, the Skunk Camp alternative will directly impact significantly more cultural resources, most of which are on State Trust lands. While the reporting of the Skunk Camp inventories has not been completed, the preliminary results given to the ASLD Cultural Resources Section indicate that almost all the cultural resources in the Skunk Camp alternative consist of Classic period Salado sites. Previous research in the region has revealed that habitation sites from this time period have the potential for large numbers of human burials (for example, partial excavation of Togetzoge Pueblo near Top-of-the World resulted in the recovery of 70 burials), and the numbers of sites in the Skunk Camp alternative suggests that several hundred burials could be impacted.

Comment ID: S62-11 Response: CR5

ASLD will assure that the requirements of the Arizona Antiquities Act and the State Historic Preservation Act are fulfilled for those cultural resources on State Trust lands, but the identified preferred alternative (Skunk Camp) has the most significant impact to cultural resources and will require the most mitigation of the adverse impacts.

**LESSEE IMPACTS OF SKUNK CAMP**

The Skunk Camp tailing facility greatly impacts several long-term ASLD grazing lessees and compromises future revenue generation for the Trust. A total of three grazing leases are likely to be impacted with an estimated minimum loss of 173 animal units. Over the approximately 40-year LOM, the Trust will recognize an estimated grazing revenue loss of $800,000 at the Skunk Camp location.

Comment ID: S62-12 Response: LG3

Additional impacts to grazing lessees downstream from the mine may include the potential loss of surface water for which claims have been filed in the General Stream Adjudication. Loss of surface water may require lessees downstream of the mine to install wells to provide stockwatering.

**CONCLUDING REMARKS:**

ASLD appreciates the time and efforts of the collaborative TNF and SWCA teams in producing the multi-year DEIS project, and for ASLD's ability to participate as a cooperating agency on behalf of the State Land Trust and its Beneficiaries.

4

The Resolution Copper project has the potential to positively and negatively affect future development within the region. As the mine expands, available housing will be in short supply in the East Valley and this may act as a catalyst for the development of land within the SVPA. As demand for housing increases, the corresponding land values will increase. The Trust has the opportunity to recognize significant future revenue from these land sales. Conversely, the extraction and transportation of groundwater out of the SVPA greatly compromises the ability to develop these lands to their full planned potential, and as a result reduces the income and value of the Trust.

**Comment ID:** 562-13
**Response:** SO18

ASLD requests continued involvement in the completion of the final Environmental Impact Statement (EIS) as a cooperating agency stakeholder. ASLD asks that the TNF's project team continue to work with ASLD's Mineral, Cultural Resources, and Water Rights sections throughout all remaining stages of the EIS process. ASLD points of contact for this project include Aaron Magezi (amagezi@azland.gov) regarding minerals and rights-of-way, Pam Muse (pmuse@azland.gov) regarding water rights and Michael O'Hara (mohara@azland.gov) regarding cultural resources.

Sincerely,

Lisa A. Atkins
Commissioner
Arizona State Land Department

---

LORENZO SIERRA
1700 WEST WASHINGTON, SUITE H
PHOENIX, ARIZONA 85007-2844
CAPITOL PHONE: (602) 926-3211
TOLL FREE: 1-800-352-8404
lsierra@azleg.gov

DISTRICT 19

COMMITTEES:
GOVERNMENT
WAYS & MEANS

October 14, 2019

Tonto National Forest
Resolution EIS Comments
PO Box 34468
Phoenix AZ 85067-4468

Re: Resolution Copper DEIS comment

To whom it may concern:

As a longtime Arizonan, former city council member and legislator, I understand the importance of copper to the state. I have taken the time to learn about the Resolution Copper project in Superior, and I believe it offers immense value to Arizona.

As a mining region with a legacy of tailings, I am encouraged to learn about the reclamation work that has already been done in Superior, and the fact that progressive reclamation will occur as the project moves forward.

The economic benefit to the state will be a tremendous asset for decades to come. In a traditional mining region that has faced recent economic hardships, the numerous jobs this project will create will play a role in strengthening the economy in Superior and beyond. It is my understanding many of them will be high-tech STEM jobs, which is important to the United States and Arizona's future economic growth.

I commend the U.S. Forest Service for the thorough process it has conducted on this process, and I urge you to complete it in a timely matter. Please don't hesitate to reach out anytime if you have any thoughts or questions.

**Comment ID:** 282-1
**Response:** NS1

Sincerely,

Lorenzo Sierra

---

ROBERT MEZA
1700 WEST WASHINGTON, SUITE H
PHOENIX, ARIZONA, 85007-2844
CAPITOL PHONE: (602) 926-3425
TOLL FREE: 1-800-352-8404
rmeza@azleg.gov

DISTRICT 30

COMMITTEES:
COMMERCE
TECHNOLOGY
FEDERAL RELATIONS



**Arizona House of Representatives**
Phoenix, Arizona 85007

October 29, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth,

First, I congratulate the United State Forest Service for completion of the Draft Environmental Impact Statement for this project, which I support, as quickly as possible.

**Comment ID:** 285-1
**Response:** NS1

Second, I understand this project has gone above and beyond the norm of a typical NEPA as it relates to tribal/public engagement and I encourage the project and USFS to continue this practice. Specifically, I am extremely supportive of the Tribal Monitoring Program and Community Working Group which the USFS and Resolution Copper have established to not only engage with stakeholders but also participate in development of the project.

Finally, as the USFS has identified the Skunk Camp Alternative as its preferred TSF location can the USFS further analyze the workforce development, job training, and local economic impacts to the communities of Winkelman, Kearny, and Hayden? It is vital that these communities receive benefits that are equal to the footprint impact to their region should the TSF be constructed at Skunk Camp.

**Comment ID:** 285-2
**Response:** SO10

Thank you for your consideration of these comments during the development of the Final Environmental Impact Statement.

Respectfully,

Robert Meza
House of Representatives
Legislative District 30

---

LEO BIASIUCCI
1700 WEST WASHINGTON, SUITE H
PHOENIX, ARIZONA, 85007-2844
CAPITOL PHONE: (602) 926-3018
TOLL FREE: 1-800-352-8404
lbiasiucci@azleg.gov

DISTRICT 5

COMMITTEES:
TRANSPORTATION
Vice Chairman
COMMERCE
EDUCATION
TECHNOLOGY



**Arizona House of Representatives**
Phoenix, Arizona 85007

October 10, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth,

Thank you for the opportunity to comment during development of the Final Environmental Impact Statement for the Resolution Copper Project. I hope the United State Forest Service has the resources to quickly complete the Environmental Impact Statement for this project, which I support.

**Comment ID:** 296-1
**Response:** NS1

As an elected official to rural an Arizona community, I am was pleased to see the economic impacts the project will have on the east valley when reviewing the DEIS. This project is vital to our national security and specifically the defense industry which operates in my community. As I think about our state's economic stability, projects like the Resolution Copper project will be vital to a healthy stable economy in Arizona going forward.

I understand there will be several thousand construction jobs and more than 1,500 permanent jobs created by the project's development. It is important to create as many jobs in rural AZ, and I am grateful that the Resolution Copper project will do that.

Thank you for your consideration of these comments and questions.

Sincerely,

---

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1355 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 56 of 96

Appendix R

| **Comment response**: MIT29 Seepage controls for Skunk Camp | Page 1 of 1 |
|---|---|
| **Responsive to these comments**: 555-14, 8032-34 | |

These comments express concerns with the seepage controls associated with the Skunk Camp alternative location, particularly the potential impacts on Arizona Water Company water supplies. We have refined the analysis of seepage controls and potential water quality impacts for Alternative 6 in section 3.7.2 of the FEIS. The refined analysis indicates that no exceedances of numeric aquifer water quality standards or surface water quality standards are anticipated at the point Dripping Spring Wash enters the Gila River.

Comments also express the need for more monitoring. New monitoring wells were installed along Dripping Spring Wash by Resolution Copper and will continue to be part of the monitoring network for water quality impacts (see FEIS appendix J, mitigation measure RC-WR-03).

| **Comment response**: MIT30 Water monitoring and mitigation | Page 1 of 1 |
|---|---|
| **Responsive to these comments**: 1361-6, 30075-10, 43-3, 8031-65 | |

This comment indicates that inadequate monitoring and mitigation were included in the DEIS with respect to water quantity impacts.

There are two major areas where drawdown associated with project groundwater pumping would occur and have the potential to impact natural systems of water supplies: near the mine site, and near the Desert Wellfield in the East Salt River valley.

The DEIS included monitoring and mitigation for groundwater impacts near the mine site, including impacts to groundwater-dependent ecosystems (GDEs), natural systems, and water supplies. These are included in mitigation measure RC-211 (DEIS, appendix J, p. J-9), with full details contained in Montgomery and Associates (Montgomery and Associates Inc. 2019b). This mitigation measure will "ensure that groundwater supported flow that is lost due to mining activity is replaced and continues to be available to the ecosystem." Effectiveness of this mitigation measure is assessed in section 3.7.1 (DEIS, pp. 343–344). This same measure (with modifications) has been carried forward into the FEIS (appendix J, mitigation measure FS-WR-01).

The comment is correct that no specific monitoring or mitigation measures are included in the DEIS specific to the Desert Wellfield in the East Salt River valley. This groundwater pumping is subject to permitting by the ADWR. Monitoring requirements may be established during this permitting process but are not under the jurisdiction of the Forest Service and are not incorporated into either the DEIS or the FEIS. See response MIT8 for more discussion of the role of State permits in mitigation.

Note that additional water monitoring and mitigation measures were brought forward between DEIS and FEIS. These are included in appendix J and assessed in section 3.7.1.

| **Comment response**: MIT33 Reclamation and revegetation | Page 1 of 1 |
|---|---|
| **Responsive to these comments**: 30075-57, 541-2, 8032-235 | |

We have added further discussion concerning reclamation and closure plans, revegetation techniques, and revegetation potential to section 3.3 of the FEIS.

# Appendix T. Proposed Forest Plan Amendment and NFMA Compliance Determination for Preferred Alternative

# Introduction

## *Tonto National Forest Land Management Plan*

The "Tonto National Forest Land Management Plan" (forest plan) was revised and implemented in December 2023 (U.S. Forest Service 2023d) under the 2012 Planning Rule (36 Code of Federal Regulations (CFR) § 219). The forest plan contains over 600 plan components consisting of desired conditions, guidelines, standards, and objectives.

Forest-wide plan direction is broken into 23 major categories, with further sub-categories in some instances (e.g., recreation is a major category that also includes forest-wide direction for developed recreation, dispersed recreation, motorized recreation, non-motorized recreation, water-based recreation, recreational shooting, and wildlife related recreation). The forest plan also includes Management Area Plan Direction for 12 discrete management areas.

The Resolution Copper Project preferred alternative (Alternative 6 – Skunk Camp) proposes a multi-component forest plan amendment that would except the Resolution Copper Project from nine guidelines and seven desired conditions. No standards or objectives would be excepted. Other than the proposed exceptions, no other changes to the forest plan would occur with the proposed amendment.

While the 2025 Resolution Copper Project final environmental impact statement (FEIS) addresses forest plan compliance for all six action alternatives, this appendix (appendix T) focuses only on the preferred alternative.

In appendix (appendix T), the Resolution Copper Project FEIS is cited as follows: citations listed as 2021 Resolution Copper Project FEIS refer to language or sections from the initial FEIS issued in January 2021; citations listed as 2025 Resolution Copper Project FEIS refer to language or sections from the FEIS issued in 2025 of which this appendix (appendix T) is a part; and citations listed as Resolution Copper Project FEIS refer to sections or language that are consistent in both versions of the FEIS (2021 and 2025).

## *Forest Plan Amendment Process and Compliance with 2012 Planning Rule*

This provides an overview of the process used to amend a forest plan for a specific project. It includes a section discussing how the proposed amendment meets the 2012 Planning Rule requirements.

The Forest and Rangeland Renewable Resources Planning Act of 1974, as amended by the National Forest Management Act of 1976 (NFMA), requires national forests to be managed under the land and resource management plan (land management plan or forest plan). The NFMA requires proposed projects, such as the Resolution Copper Project, to be consistent with a land management plan of the national forest where the project occurs (Forest Service Handbook (FSH) 1909.12 (U.S. Forest Service 2015b:chapter 20, section 21.33)). When a proposed project is not consistent with applicable plan components contained within the land management plan,[182] the U.S. Forest Service (Forest Service) has the following options: (1) modify the proposed project to make it consistent with the applicable plan; (2) reject the proposal; (3) amend the plan so that the project would be consistent with the plan as amended; or (4) amend the plan contemporaneously with the approval of the project so the project would be consistent with the plan, as amended. The fourth option may be limited to only the project.

---

[182] Title 36 Code of Federal Regulations (CFR) 219.15(c) (U.S. Forest Service 2023d:22).

A review of the Resolution Copper Project FEIS in relation to the December 2023 "Tonto National Forest Land Management Plan" indicated that the preferred alternative, as proposed, cannot adhere to nine forest plan guidelines and seven forest plan desired conditions that are intended to protect soil productivity, scenic resources, national scenic trails, recreation resources, wildlife habitat, and cultural resources.

This appendix (appendix T) describes how the Forest Service proposes to implement the fourth option described above and amend the forest plan contemporaneously with the approval of the project so that the project would be consistent with the plan as amended." The proposed amendment would be limited to apply only to this project.

Land management plans are like municipal zoning plans, which take a geographic area, for example a city or county, and partition it into zones to promote various objectives such as economic development, traffic flow, etc. To achieve those objectives, the zoning plan provides codes that limit or promote certain activities within a zone. In a municipal zoning plan, alterations to zoning codes, often called variances or modifications, are allowed to provide exceptions to a code restriction for a developer or property owner.

Similar to partitioning a city under a municipal zoning plan, a land management plan partitions a national forest into areas called management areas or where specific forest plan components apply. A land management plan defines the intentions through forest-wide guidelines, objectives, standards, and desired conditions. Each resource area or management area has an emphasis that is articulated in desired conditions and objectives, which are achieved through limiting or promoting certain activities through standards and guidelines. The 2012 Planning Rule (36 CFR Part 219) requires the following plan components: desired conditions, objectives, standards, guidelines, and suitability of lands. Like a municipal zoning plan, a land management plan allows for variances or modifications through the plan amendment process. "Project specific amendments give a way to deal with exceptions. An exception is similar to a variance to a county zoning ordinance" (77 Federal Register (FR) 21239).

Land management plan revisions are comprehensive changes to a plan, whereas plan amendments are more limited changes to a plan to accommodate specific projects and/or activities, or to adapt to changing conditions. In December 2016, the U.S. Department of Agriculture issued a final rule that amended the 2012 Planning Rule and clarified the U.S. Department of Agriculture's direction for amending land management plans. The 2016 final rule stated, "No individual amendment is required to do the work of a revision" (81 FR 90725). "The process requirements for plan amendments . . . are simpler than those for new plan development or plan revisions in order to . . . keep plans current and adapt to new information or changed conditions" (77 FR 21237).

A plan amendment is the adding, removing, or modification of one or more plan components or the changing of how or where one or more plan components apply to the plan area (36 CFR § 219.12(a)). As stated above, plan components include desired conditions, objectives, standards, guidelines, and suitability of uses. There are two types of plan amendments: programmatic amendments and project-specific amendments. Programmatic amendments are performed independently of any specific project or activity, although they may have been prompted by a specific proposal that is not consistent with a land management plan. Programmatic amendments result in a permanent change to the land management plan and apply to all future projects. On the other hand, project-specific amendments are applicable to only a single project, amending the land management plan solely for the life of the project or activity. A project-specific amendment is crafted in conjunction with a project proposal and is approved within a project's decision document.

"The point of a project-specific amendment is to allow a project that would otherwise not be consistent with the plan to be authorized" (77 FR 21239). The Forest Service is proposing a project-specific amendment with multiple components for the Resolution Copper Project.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1360 of 2158
Case 2:21-cv-00122-DWL   Document 87-2   Filed 07/14/25   Page 61 of 96

Appendix T

Plan amendments are guided by Federal regulations at 36 CFR § 219 (NFMA implementing regulations, 2012 Planning Rule, or Planning Rule). The plan amendment process consists of three primary steps:

- Determine which plan components must be modified to allow the project to be consistent with the amended plan (36 CFR § 219.13(a)).

- Determine which of the substantive requirement(s) within §§ 219.8 through 219.11 are directly related to the proposed amendment based on the purpose for and the effects of the amendment (36 CFR § 219.13(b)(5)).

- Apply[183] those directly related substantive requirements to the amended plan within the scope and scale of the proposed amendment (36 CFR § 219.13(b)(5)).

### *Scope and Scale of the Amendment*

The 2012 Planning Rule gives the responsible official the discretion, within the framework of the rule's requirements, to tailor the scope and scale of an amendment to reflect the need to change the plan (81 FR 90725). The 2012 Planning Rule, at 36 CFR § 219.13(a), states, "A plan may be amended at any time. Plan amendments may be broad or narrow, depending on the need for change, and should be used to keep plans current and help units adapt to new information or changing conditions. The responsible official has the discretion to determine whether and how to amend the plan and to determine the scope and scale of any amendment. Except as provided by paragraph (c) of this section, a plan amendment is required to add, modify, or remove one or more plan components, or to change how or where one or more plan components apply to all or part of the plan area (including management areas or geographic areas)." Title 36 CFR § 219.13(b)(1) states, "When a plan amendment is made together with, and only applies to, a project or activity decision, the analysis prepared for the project or activity may serve as the documentation for the preliminary identification of the need to change the plan."

Title 36 CFR § 219.13(b)(5) states:

> [d]etermine which specific substantive requirement(s) within §219.8 through §219.11 are directly related to the plan direction being added, modified, or removed by the amendment and apply such requirement(s) within the scope and scale of the amendment.

> (ii) When basing the determination on adverse effects:

>> (A) The responsible official must determine that a specific substantive requirement is directly related to the amendment when scoping or NEPA effects analysis for the proposed amendment reveals substantial adverse effects associated with that requirement, or when the proposed amendment would substantially lessen protections for a specific resource or use.

The scope of an amendment is generally considered to be the extent of the changes to the land management plan. The scope of this proposed project-specific amendment is the exception of nine forest plan guidelines and seven forest plan desired conditions for the Resolution Copper Project for the duration of the project.

The scale of a project-specific amendment is generally considered to be the extent of the direct impacts to a resource related to a substantive requirement and varies for each resource. For example, for the Resolution Copper Project preferred alternative, the scope of the amendment differs by resource, but at its greatest extent represents about 2,500 acres of National Forest System (NFS) land on the Tonto National Forest that will be disturbed by the preferred alternative. This is composed of 2,458 acres of mine

---

[183] The 2012 Planning Rule regulations do not explicitly state what is intended by "apply." The FR notice from December 16, 2016, demonstrates that "apply" can mean determine that the plan needs additional components in order to provide for the identified directly related substantive requirement.

infrastructure and 44 acres of NFS land where recreation mitigation is required, for a total of 2,502 acres. This area is referred to as the "preferred alternative area of disturbance." This is the area in which construction of electrical transmission lines, pipelines, and associated infrastructure would be located.

## Applying the Directly Related Substantive Requirements

In December 2016, the U.S. Department of Agriculture issued a final rule that amended the 2012 Planning Rule (81 FR 90723) clarifying that the responsible official is not required to apply every substantive requirement (36 CFR §§ 219.8 through 219.11) to every acre of land within the planning unit. The December 2016 final rule amending the 2012 Planning Rule clarifies that any evaluation of effects of amending the plan needs to remain focused on the amendment itself—its purpose, scope, and scale. "No individual amendment is required to do the work of a revision. While the 2012 rule sets forth a series of substantive requirements for land management plans within §§219.8 through 219.11, not every section or requirement within those sections will be directly related to the scope and scale of a given amendment. Although the Department recognizes that resources and uses are connected, the Department does not expect an individual plan amendment to do the work of a revision to bring an underlying plan into compliance with all the substantive requirements identified in §§219.8 through 219.11" (81 FR 90725).

Appropriate application of the directly related substantive requirements, within the scope and scale of the amendment, makes certain that the amended land management plan has the components necessary to ensure that meeting those requirements within the plan area will not be compromised by any single project. If a directly related substantive requirement is not meeting the Planning Rule intent through existing land management plan direction due to the amendment, then additional plan components need to be included as part of the amendment in order to satisfy the substantive requirement in question.

This understanding further supports that the purpose of the amendment is not to ensure compliance of the entire land management plan with all the substantive requirements of the 2012 Planning Rule, but rather to apply only those substantive requirements that are directly related to the amendment and the area affected by the amendment.

## Purpose of the Amendment

The NFMA requires proposed projects, including proposals from non-Federal entities subject to permits, to be consistent with the applicable forest plan (16 United States Code § 1604(i)). The December 2023 "Tonto National Forest Revised Land Management Plan" (forest plan) states on page 22, "All projects and activities authorized by the Forest Service must be consistent with the land management plan (16 USC 1604(i) and 36 CFR 219.15(b-c))."

As mentioned, the Resolution Copper Project preferred alternative, as proposed, cannot adhere to nine forest plan guidelines and seven forest plan desired conditions. Therefore, the purpose of the proposed amendment is to except specific plan desired conditions and guidelines to allow the project to be consistent with the forest plan. All other desired conditions, objectives, standards, and guidelines would remain unexcepted and applicable to all other activities across the planning unit (Tonto National Forest), including the preferred alternative. The Resolution Copper Project preferred alternative would be excepted from the desired conditions and guidelines, but they would continue to apply to the remainder of the planning unit.

# Step 1: Determine the Plan Components to Be Excepted

After reviewing the forest plan, the responsible official determined the Resolution Copper Project preferred alternative, as proposed, would be inconsistent with nine guidelines and seven desired conditions in the forest plan. The Forest Service proposes a project-specific amendment to except the

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1362 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 63 of 96

Appendix T

Resolution Copper Project from the nine guidelines and seven desired conditions to meet the requirement that the Resolution Copper Project be consistent with the forest plan. The proposed amendment would except the Resolution Copper Project from complying with the nine guidelines and seven desired conditions, which would apply to 2,502 acres of NFS land that would be disturbed by the preferred alternative (preferred alternative area of disturbance).

The following desired conditions and guidelines are proposed to be excepted. They are presented in the order in which they appear in the 2023 forest plan. The Resolution Copper Project preferred alternative would be excepted from each of these desired conditions and guidelines.

- **Recreation Guideline 10 (REC-G-10) - All project-level decisions, implementation activities, and management activities should be consistent with or move the area toward the appropriate recreation opportunity spectrum (ROS), or current protocol over the long term (forest plan, p. 31).** The pipeline, electrical transmission line, and associated infrastructure that would be authorized with the preferred alternative would not meet current ROS criteria.

- **Wildlife Related Recreation Guideline 03 (REC-WR-G-03) - Wildlife connectivity for economically important and other species should be maintained and/or enhanced (forest plan, p. 44).** The analysis of wildlife connectivity concludes there would be a loss of long-term movement habitat along pipeline corridors with the preferred alternative, therefore wildlife connectivity would not be maintained or enhanced.

- **Cultural and Historic Resources Desired Condition 01 (CUH-DC-01) - Historic properties, including traditional cultural properties, retain all of the characteristics that qualify the property for listing in the National Register of Historic Places and convey its historical significance, including any aspects of the property's integrity (e.g., location, design, setting, materials, workmanship, feeling, or association) that have been identified as supporting its eligibility (forest plan p. 55).** Although the preferred alternative includes mitigation measures designed to avoid, minimize, rectify, reduce, or compensate for resource impacts, impacts to historic properties cannot be avoided or fully mitigated. It is not feasible to retain all characteristics that qualify impacted properties for listing.

- **Cultural and Historic Resources Desired Condition 02 (CUH-DC-02) - Historic properties are not threatened by human disturbances (forest plan, p. 55).** The pipeline, electrical transmission, lines and associated infrastructure constructed and operated with the preferred alternative would impact historic properties.

- **Cultural and Historic Resources Desired Condition 07 (CUH-DC-07) - Cultural resources (including artifacts) are preserved in place (forest plan, p. 55).** The preferred alternative would disturb cultural resources, including artifacts, and data recovery and curation would be conducted on these sites.

- **Scenery Desired Condition 03 (SC-DC-03) - High quality scenery dominates the landscape in areas valued by the public (e.g., state designated scenic routes, major roads, developed recreation sites, wilderness, national scenic trails, and wild and scenic rivers) (forest plan, p. 67).** Infrastructure constructed with the preferred alternative would not meet criteria for existing Scenic Integrity Objectives (SIOs) and would degrade views from U.S. Route (U.S.) 60, a State designated scenic route.

- **Scenery Guideline 01 (SC-G-01) - Management activities and newly constructed features (e.g., facilities and infrastructure) should minimize visual disturbances and be consistent with or move the area towards achieving scenic integrity objectives (as defined in the Scenery Management System, or similar protocol) (forest plan, p. 67).** Infrastructure

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1363 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 64 of 96

Appendix T

constructed with the preferred alternative, including transmission lines and pipelines, would not be consistent with or move the area toward achieving SIOs.

- **Scenery Guideline 03 (SC-G-03) - Management activities that result in short-term impacts inconsistent with the scenic integrity objectives, as defined in the scenery management system or similar protocol, should achieve, or move the project towards, the scenic integrity objectives over the long-term (forest plan, p. 67).** It is not currently known whether the electrical transmission line constructed with the preferred alternative would remain in place after reclamation has occurred. Therefore, the preferred alternative may not achieve or move toward achieving SIOs in the long term.

- **Fish, Wildlife and Plants Guideline 06 (WFP-G-06) - Landscape and vegetation alterations that significantly contribute to uncharacteristic habitat fragmentation should be avoided. Project design should provide for movement and dispersal of species between treated and untreated areas (forest plan, p. 142).** The analysis of wildlife connectivity concludes that there would be a loss of long-term movement habitat along pipeline corridors by the preferred alternative; therefore, dispersal and movement of species would be adversely affected.

- **Fish, Wildlife and Plants Guideline 07 (WFP-G-07) - New infrastructure or constructed features (e.g., fences, roads, recreation sites, facilities, drinkers, and culverts) should be designed and maintained to minimize negative impacts to the movement and dispersal of wildlife, fish, and rare plants. Infrastructure and constructed features already present that negatively impact movement and dispersal should be modified or removed when no longer in use in order to improve connectivity. Barriers may be used to protect native species or prevent movement of nonnative species (forest plan, p. 142).** The analysis of wildlife connectivity concludes that there would be a loss of long-term movement habitat along pipeline corridors with the preferred alternative; therefore, dispersal and movement of wildlife would be adversely affected.

- **Soils Guideline 02 (SL-G-02) - Where biological soil crusts exist, ground disturbing activities should identify areas for protection and minimize disturbance (forest plan, p. 147).** The preferred alternative would disturb and impact soils on NFS land. Biological crust soils (referred to as biotic soils and desert pavement in the FEIS) are present in some of these areas and cannot be completely avoided.

- **National Trails Management Area Desired Condition 03 (NTMA-DC-03) - Visitor access, use, and management activities are consistent with the recreational, scenic, ecological, cultural, traditional, wildlife resources, and the nature and purpose for which the trail is designated (forest plan, p. 182).** New pipelines constructed within the Magma Arizona Railroad Company (MARRCO) corridor[184] would cross the Arizona National Scenic Trail. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purpose of the Arizona National Scenic Trail.

- **National Trails Management Area Desired Condition 06 (NTMA-DC-06) - The Arizona National Scenic Trail and corridor are well-defined and provide high-quality, primitive hiking, mountain biking, equestrian opportunities, and other compatible nonmotorized trail activities. The significant scenic, natural, historic, and cultural resources within the trail's corridor are conserved. The trail provides visitors with expansive views of the natural-appearing landscapes (forest plan, p. 182).** New pipelines constructed within the MARRCO corridor would cross the Arizona National Scenic Trail. The preferred alternative would not meet

---

[184] The MARRCO corridor is an existing utility corridor containing Arizona Water Company facilities, water lines, a Qwest fiber-optic line, an El Paso Natural Gas pipeline, a power line, and a telephone line in its right-of-way. The preferred alternative would construct additional pipelines and an access road within this existing corridor.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1364 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 65 of 96

Appendix T

the criteria to provide visitors with expansive views of a naturally appearing landscape along all segments of the Arizona National Scenic Trail, or conserve scenic resources within the Trail corridor.

- **National Trails Management Area Desired Condition 07 (NTMA-DC-07) - Scenery viewed from the Arizona National Scenic Trail is consistent with high or very high scenic integrity objectives. The foreground of the trail is natural-appearing (forest plan, p. 182).** New pipelines constructed within the MARRCO corridor would cross the Arizona National Scenic Trail. The preferred alternative would not be consistent with or move the area toward high or very high SIOs.

- **National Trails Management Area Guideline 01 (NTMA-G-01) - National trails should be consistent with management direction in the trail establishment reports as well as the maintenance standards for trail class and use (forest plan, p. 182).** New pipelines and access road constructed within the MARRCO corridor would cross the Arizona National Scenic Trail. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purposes of the Arizona National Scenic Trail.

- **National Trails Management Area Guideline 08 (NTMA-G-08) - If management activities result in short-term impacts to the scenic character of the Arizona National Scenic Trail, design elements should be included (e.g., screening, feathering, and other scenery management techniques) at the project level (forest plan, p. 183).** The preferred alternative would result in impacts to the scenic character of the Arizona National Scenic Trail that cannot be fully mitigated through design elements.

# Step 2: Determine Directly Related Substantive Requirements

The purpose of Step 2 is to identify which 2012 Planning Rule substantive requirement(s) within 36 CFR §§ 219.8 through 219.11 are directly related to the amendment. Whether a substantive requirement is directly related to an amendment is determined by either the purpose or effects—beneficial or adverse—of the amendment (36 CFR § 219.13(b)(5)(i)). When basing the determination on adverse effects, a substantive requirement is directly related if the adverse effects are substantial or when the amendment would substantially lessen plan protections of a specific resource (36 CFR § 219.13(b)(5)(ii)(A)). Therefore, a substantive requirement is directly related to an amendment through one of the following: the amendment, or a substantial lessening of plan protections by the amendment (36 CFR § 219.13(b)(5)).

The scope of this proposed project-specific amendment is defined as the nine guidelines and seven desired conditions that would not be met if the Resolution Copper Project preferred alternative were implemented and the exception of the Resolution Copper Project from of those nine guidelines and seven desired conditions. The scale for the proposed project-specific amendment varies by resource as described in Step 3.

The determination of the directly related substantive requirements is organized by resource group.

## *Soil Productivity*

One forest plan guideline associated with soil productivity is proposed to be excepted in this amendment (SL-G-02). This one guideline cannot be met using standard industry construction methods like those proposed with the Resolution Copper Project.

- SL-G-02 requires that areas of biological crust soil be protected and disturbance minimized. Biological crust soils exist within the 2,502 acres of disturbance that will occur with this project, and disturbance cannot be fully avoided.

It is not practical to modify the Resolution Copper Project construction methods in a manner that would achieve consistency with this one guideline. Therefore, the Forest Service proposes to except this one guideline for the Resolution Copper Project.

**Purpose** - The purpose of excepting  guideline SL-G-02 is to allow the Resolution Copper Project to exceed  one of 12 forest-wide guidelines for soil protection.[185] The exception of this guideline is directly related to § 219.8(a)(2)(ii) – soils and soil productivity.

**Effects** - The effect of the exception of the one guideline includes minor adverse effects of vegetation removal, erosion and sedimentation, soil compaction, runoff potential, soil fertility, revegetation potential, and soil carbon budget (2021 Resolution Copper FEIS,[186] p. 238). The reduction of soil protection measures constitutes an adverse impact, but effects are not expected to be substantial. The greatest impact to soils would be during the construction period.

Guideline SL-G-02 is focused on maintaining soil productivity. The FEIS analysis of impacts on soil productivity concludes that the preferred alternative would impact soils through compaction, erosion, excavation, etc. However, the analysis of impacts along the pipeline and power line corridor, where all activities authorized by this alternative would occur, states, "Soil loss from construction and operations in the pipeline and power line corridor is expected to be minimal after compliance with applicant-committed environmental protection measures (SWPPPs and erosion and sediment controls), and post-closure after reclamation when the surface has stabilized from revegetation" (FEIS, section 3.3.4.7).

The effects noted would occur on 2,500 acres or less of NFS land (less than 0.09 percent of the total NFS land on the Tonto National Forest[187]); therefore, the one guideline would not hinder the Forest Service's ability to implement the forest plan to maintain or restore soils.

Required mitigation measures designed to minimize soil effects include (2021 Resolution Copper Project FEIS, section 3.3.4.9):

- **Revised reclamation and closure plans (FS-SV-03).** Implementing the reclamation and closure plans ensures that the post-closure landscape is successfully revegetated to the extent practicable and that the landforms are stable and safe. This measure is effective at partially replacing habitat and vegetation over the long term, reducing long-term effects on surface water quality from erosion.

- **Design feature:** Two different tailings corridor options were considered for the preferred alternative (north and south). The south corridor was eliminated from consideration due to impacts along Arnett Creek that otherwise would remain undisturbed and had greater surface disturbance. The north pipeline corridor was further revised to include the co-location of the

---

[185] The 2023 forest plan components associated with soil protection consist of the following: Desired Conditions – REC-DIS-DC-04, REC-DIS-MO-DC-03, GRZ-DC-03, FP-DC-05, RD-DC-04, FC-DC-02, ERU-DC-13, ERU-DES-DC-05, ERU-DES-DC-09, ERU-IC-DC-07, ERU-PPE-PG-DC-08, ERU-PPE-SS-DC-04, ERU-PPF-DC-05, ERU-MCD-DC-05, ERU-MCW-DC-06, ERU-MCW-DC-14, RERU-DC-06, RERU-DC-07, RERU-DC-11, RERU-DC-14, ERU-MEWMPO-DC-05, WAT-DC-04, WAT-DC-05, WAT-DC-07, RMZ-DC-02, RMZ-DC-05, SL-DC-01, SL-DC-02, SL-DC-03, SL-DC-04, SL-DC-05, SL-DC-06, RNBAMA-DC-03, SWBMA-DC-02, SRHMA-DC-03; Guidelines - REC-G-03, REC-DIS-G-02, ERU-G-02, ERU-G-04, ERU-SDG-G-01, RMZ-G-03, INS-G-07, SL-G-01, SL-G-02, SL-G-03, SL-G-04, LRMA-G-04; Standards – FP-S-01, FP-S-06, WAT-S-01; and Objectives – WAT-O-03.

[186] The Resolution Copper Project FEIS is cited as follows: citations listed as 2021 Resolution Copper Project FEIS refer to language or sections from the initial FEIS issued in January 2021; citations listed as 2025 Resolution Copper Project FEIS refer to language or sections from the FEIS issued in 2025 of which this appendix (appendix T) is a part; and citations listed as Resolution Copper Project FEIS refer to sections or language that are consistent in both versions of the FEIS (2021 and 2025).

[187] The Tonto National Forest totals 2,965,716 acres (U.S. Forest Service 2023b:1).

power line and pipeline within the same corridors. In addition, several aspects were changed to reduce impacts to sensitive drainages, including a span over Devil's Canyon and Queen Creek Canyon and directional drilling to avoid trenching through Mineral Creek. Overall, this reroute measurably reduced surface disturbance.

Environmental protection measures that are incorporated into the design of the project would act to reduce potential impacts on soils. The non-discretionary applicant-committed environmental protection measures related to soils include the following (Resolution Copper FEIS, section 3.3.4.2):

- Road embankment slopes will be graded and stabilized with vegetation or rock as practicable to prevent erosion;

- During construction and operations, diversions will be constructed around the affected areas to minimize erosion. A number of best management practices, including check dams, dispersion terraces, and filter fences, also will be used during construction and operations;

- Off-road vehicle travel across Tonto National Forest will generally be avoided;

- Newly reclaimed areas on Tonto National Forest will be monitored for weeds and invasive plants for the first 5 years after reclamation. Infestations of invasive species will be treated as soon as they are identified, or as soon as weather conditions are appropriate for treatment; and

- On NFS lands, seed mixes used in reclamation will be certified free of seeds listed on the Forest Service's noxious weed list and will contain only species native to the project area. Seed mixes will be developed from a native species seed list approved by the Forest Service.

Most impacts would occur during the construction phase of project, which would be considered minor and temporary adverse effects when considered on a forest-wide basis. Although impacts on soils and vegetation could take hundreds of years to fully recover, these impacts would affect less than 0.09 percent of the plan area (Tonto National Forest).

Because there would be no substantial environmental effects from the proposed exception of the one guideline, the proposed amendment is not directly related to any substantive requirements based on adverse or beneficial effects.

Guideline SL-G-02 would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative. The one excepted guideline would only apply to the 2,502 acres of NFS land where construction of electric transmission lines, pipelines, and associated infrastructure would disturb soils and vegetation, which would not constitute a substantial lessening of plan protections. Therefore, the proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

The 2023 forest plan contains the following soil protection components: 35 desired conditions, 12 guidelines, three standards, and one objective. This amendment would except the Resolution Copper Project from one guideline. The remaining 35 desired conditions, 11 guidelines, three standards, and one objective would remain applicable to the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. The one excepted guideline would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

In conclusion, the proposed exception of the one guideline related to soils (SL-G-02) is directly related to substantive requirement and § 219.8(a)(2)(ii) – soils and soil productivity. These two substantive requirements are directly related to the proposed amendment through the purpose of the amendment. None of the substantive requirements are directly related through beneficial effects, substantial adverse effects, or substantial lessening of plan protections.

## Scenic Resources—Scenic Integrity Objectives

A number of forest plan desired conditions and guidelines require all new projects to meet or move toward meeting specific scenery conditions. Three forest plan desired conditions and three forest plan guidelines associated with scenic resources are proposed to be excepted in this amendment (SC-DC-03, SC-G-01, SC-G-03, NTMA-DC-06, NTMA-DC-07, and NTMA-G-08).

- SC-DC-03 requires that high quality scenery dominates the landscape in areas valued by the public, including state designated scenic routes and national scenic trails. The facilities constructed under the Resolution Copper Project preferred alternative would be visible from U.S. 60, a State designated scenic route. SIOs would also be reduced along segments of the Arizona National Scenic Trail.

- SC-G-01 requires that management activities and newly constructed features minimize visual disturbance and be consistent with or move the area toward achieving SIOs. Under the Resolution Copper Project preferred alternative, electric transmission lines, pipelines, and associated infrastructure would be constructed that would not be consistent with or move the area toward achieving SIOs.

- SC-G-03 requires that management activities that result in short-term impacts inconsistent with the SIOs achieve, or move the project toward, the SIOs over the long term. It is not currently known whether the electrical transmission line constructed with the preferred alternative would remain in place after reclamation has occurred. Therefore, the preferred alternative may not achieve or move toward achieving SIOs in the long-term.

- NTMA-DC-06 requires that the Arizona National Scenic Trail provide visitors with expansive views of the natural appearing landscape. Under the Resolution Copper Project preferred alternative, electric transmission lines, pipelines, and associated infrastructure would be constructed that would be visible from some trail segments and would not be compatible with a natural appearing landscape.

- NTMA-DC-07 requires that scenery viewed from the Arizona National Scenic Trail be consistent with high or very high SIOs and that the foreground of the trail be natural appearing. The preferred alternative would lower existing SIOs, and segments of the trail would not be consistent with high or very high SIOs. Pipelines and associated infrastructure would also cross the Arizona National Scenic Trail in the MARRCO corridor, and the foreground of the trail would not be natural appearing.

- NTMA-G-08 requires that management activities that result in short-term impacts to scenic conditions include design elements to mitigate the impacts. As stated above, feasible measures to mitigate adverse impacts on scenic conditions have not been identified.

The Resolution Copper Project preferred alternative would occur in areas with high and moderate existing SIOs. Scenery analysis in the Resolution Copper Project FEIS concludes that the facilities constructed under the preferred alternative would not meet high and moderate SIOs. High SIO areas should appear unaltered to the casual observer, whereas moderate SIO areas may appear slightly altered but should borrow from elements of form, line, color, texture, and scale found in the characteristic landscape. The clearing of the transmission/pipeline corridor would highlight the linear nature of the pipelines and electric transmission lines and would not be consistent with the natural form, lines, and scales in the adjacent landscape. This alteration of the landscape would be obvious to the casual observer. It is not practical to modify the Resolution Copper Project construction methods and achieve consistency with high and moderate SIOs due to the linear nature of pipelines and the need to remove the vegetation along the corridor, which creates an unnatural form on the landscape. Therefore, the Forest Service proposes to

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1368 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 69 of 96

Appendix T

except the Resolution Copper Project from SC-DC-03, SC-G-01, SC-G-03, NTMA-DC-06, NTMA-DC-07, and NTMA-G-08.

**Purpose** - The purpose of excepting desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, and NTMA-G-08 is to allow the Resolution Copper Project to exceed three of the 12 forest-wide desired conditions for scenery; and three of the 17 forest-wide guidelines for scenery.[188] Therefore, due to the purpose of the amendment, the exception of these desired conditions and guidelines is directly related to § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character.

**Effects** - The effect of the exception of desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, and NTMA-G-08 would be a reduction in SIOs inconsistent with these forest plan components. Although this is an adverse impact to scenery, it is not a substantial adverse impact due to the limited extent to the scenery resource of the project on the Tonto National Forest and the implementation of mitigation measures.

Implementation of the Resolution Copper Project preferred alternative would reduce 516 acres of high SIO to the low category; and reduce 345 acres of moderate SIO to the low category (2025 Resolution Copper Project FEIS, table 3.11.4-2). These numbers include impacts to scenic resources in the Arizona National Scenic Trail corridor, which would reduce 20 acres of high SIO to low SIO (2025 Resolution Copper Project FEIS, table 3.11.4-3). There is a total of 1,706,521 acres of high SIO on the Tonto National Forest (see table 64, Alternative B, in the FEIS for the 2023 forest plan (U.S. Forest Service 2023b)). A reduction of 516 acres constitutes a change to 0.03 percent of the amount of high SIO across the forest. There is a total of 597,020 acres of moderate SIO on the Tonto National Forest (see table 64, Alternative B, in the FEIS for the 2023 forest plan (U.S. Forest Service 2023b)). A reduction of 345 acres constitutes a change to 0.06 percent of the amount of moderate SIO across the forest.

Required mitigation measures to reduce impacts on scenic resources include the following (Resolution Copper Project FEIS, section 3.11.4.9):

- **Revised reclamation and closure plans (FS-SV-03).** This measure would have long-term beneficial effects on scenic resources, reducing the contrast with the natural landscape.

- **GDEs and water well mitigation (FS-WR-01).** This measure would be effective at preserving riparian vegetation and aquatic habitats, which are of scenic value.

- **Clean Water Act Section 404 compensatory mitigation plan (FS-WR-02).** This measure would be effective at replacing xeroriparian habitat lost within the project footprint. Overall, these would be beneficial to scenic resources, though not necessarily in the vicinity of the impact area.

- **Replacement of water in Queen Creek (FS-WR-04).** This measure would be effective at minimizing impacts to scenic resources along this riparian corridor.

- **Minimize visual impacts from transmission lines (FS-SR-01).** Resolution Copper would use best management practices or other guidelines (when on NFS lands) that would minimize visual impacts from transmission lines. Measures could include using non-specular transmission lines, transformers, and towers; avoiding use of monopole transmission structures; avoiding "skylining"

---

[188] December 2023 forest plan components associated with scenic resources consist of the following: Desired Conditions – REC-DEV-DC-05, SC-DC-01, SC-DC-02, SC-DC-03, SC-DC-04, SC-DC-05, MMAM-DC-01, IRAMA-DC-04, NTMA-DC-03, NTMA-DC-06, NTMA-DC-07, NTMA-DC-10; Guidelines – REC-G-02, REC-G-03, REC-DIS-NMO-G-04, SU-G-07, EG-G-02, EG-G-06, TRB-G-04, SC-G-01, SC-G-02, SC-G-03, FC-G-04, RWMA-G-10, IRAMA-G-02, NTMA-G-02, NTMA-G-06, NTMA-G-08, NTMA-G-012; and Standards – FP-S-07.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1369 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 70 of 96

Appendix T

transmission and communication towers and other structures (i.e., considering topography when siting transmission structures to avoid "skylining" structures on high ridges in the landscape); and using air transport capability to mobilize equipment and materials for clearing, grading, and erecting transmission towers in areas with the highest visual sensitivity with difficult access. These measures would be effective at reducing and minimize the scenery impacts and project contrast of mining operations in the surrounding landscape and impacts on sensitive viewers.

Environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on scenic resources. The non-discretionary applicant-committed environmental protection measures related to scenic resources include the following (Resolution Copper FEIS, section 3.11.4.2):

- Implement an outdoor lighting plan that would reduce potential impacts from artificial night lighting;

- Reduce illumination levels where appropriate while still providing safe working conditions;

- Adhere to the Pinal County Outdoor Lighting Code;

- Use control systems that can turn off lights at particular times of night or that are activated by detecting motion while still providing safe working conditions;

- Use non-reflective earth-tone paints on buildings and structures to the extent practicable;

- Bury pipelines to the extent practicable;

- Build rust-colored towers or use wooden poles on transmission lines;

- Use a reclamation seed mix of weed-free native species consistent with surrounding vegetation; and

- Use colors that blend in with the desert environment.

Excepting desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, and NTMA-G-08 through the proposed amendment would not cause a substantial lessening of plan protections.

These excepted desired conditions and guidelines would continue to apply across the forest. The Resolution Copper Project preferred alternative would affect only 516 acres of 1,706,521 acres of high SIO forest-wide and 345 acres 597,020 of moderate SIO forest-wide. Because excepting the Resolution Copper Project from desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, and NTMA-G-08 would not constitute a substantial lessening of plan protections, in part due to the implementation of required mitigation, the proposed excepted desired conditions and guidelines are not directly related to any substantive requirements based on substantial lessening of plan protections.

The 2023 forest plan contains the following scenery protection components: 12 desired conditions, 17 guidelines, and one standard. This amendment would except three desired conditions and three guidelines. The remaining nine desired conditions, 14 guidelines, and one standard would remain applicable to the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. The three excepted desired conditions and three excepted guidelines would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

In conclusion, the proposed exception of desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, and NTMA-G-08 is directly related to substantive requirement

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1370 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 71 of 96

Appendix T

§ 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character. This substantive requirement is only directly related to the proposed amendment through the purpose of the amendment. None of the substantive requirements are directly related through beneficial effects, substantial adverse effects, or substantial lessening of plan protections.

## *National Scenic Trails*

The direction in the forest plan considered here applies to the National Scenic Trails Management Area and not to the entire forest. Specifically, the area addressed here is the Arizona National Scenic Trail corridor on the Tonto National Forest.[189]

The 2023 forest plan contains a number of desired conditions and guidelines that focus on protection of user experience on the Arizona National Scenic Trail. Several of those desired conditions and guidelines are addressed under the Scenic Resources—Scenic Integrity Objectives section earlier in this document. The Resolution Copper Project preferred alternative would not be consistent with two other Arizona National Scenic Trail components: desired condition NTMA-DC-03 and guideline NTMA-G-01.

- NTMA-DC-03 requires visitor access, use, and management activities to be consistent with the recreational, scenic, ecological, traditional, and wildlife resources and the nature of and purpose for which the trail is designated. The preferred alternative would construct pipelines and an access road across the Arizona National Scenic Trail within the MARRCO corridor. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purpose of the Arizona National Scenic Trail (2021 Resolution Copper Project FEIS, p. 626).

- NTMA-G-01 requires national trails to be consistent with management direction in the trail establishment report. As previously stated, the preferred alternative would construct pipelines and an access road across the Arizona National Scenic Trail within the MARRCO corridor. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purpose of the Arizona National Scenic Trail (2021 Resolution Copper Project FEIS, p. 626).

The proposed amendment of desired condition NTMA-DC-03 and guideline NTMA-G-01 would allow for pipelines and an access road to cross the Arizona National Scenic Trail within the MARRCO corridor, a location where other major effects already exist.

**Purpose** - The purpose of excepting desired condition NTMA-DC-03 and guideline NTMA-G-01 is to allow the Resolution Copper Project to exceed one out of 10 forest plan desired conditions for the Arizona National Scenic Trail corridor and exceed one out of 13 forest plan guidelines for the Arizona National Scenic Trail corridor. Therefore, the exception of desired condition NTMA-DC-03 and guideline NTMA-G-01 is directly related by the purpose of the amendment to § 219.10(a)(3) – appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors, and to § 219.10(b)(1)(i) – sustainable recreation.

**Effects** - The effect of the exception of the desired condition NTMA-DC-03 and guideline NTMA-G-01 would be the allowance of a new pipeline and access road to cross the Arizona National Scenic Trail at a location where major effects already exist. As disclosed in the following paragraph, although this is an adverse impact to Arizona National Scenic Trail, it is not a substantial adverse impact because effects would primarily be limited to the construction period.

---

[189] The Arizona National Scenic Trail corridor is defined as approximately 0.5 mile from the centerline of the trail (U.S. Forest Service 2023d:181).

The Resolution Copper Project preferred alternative would construct pipelines and an associated access road within the MARRCO corridor. The pipelines would move concentrate to the filter plant near the train and move recovered water and newly pumped water from the Desert Wellfield back to the West Plant Site. The pipelines and access road would cross Passage 18 of the Arizona National Scenic Trail in the MARRCO corridor. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purpose of the Arizona National Scenic Trail. There would be short-term impacts on trail users during construction activities when disturbance precludes use for safety reasons (e.g., active grading, transport of heavy equipment, active construction).

The scale of the Arizona National Scenic Trail component of the project-specific amendment encompasses the immediate location in the MARRCO Corridor where the pipeline and access road cross the Arizona National Scenic Trail. New pipelines constructed within the MARRCO corridor would cross Passage 18 of the Arizona National Scenic Trail (2021 Resolution Copper Project FEIS, p. 626.). In the Passage 18 segment, 0.07 mile of the proposed tailings pipeline corridor would intersect the Arizona National Scenic Trail. The Arizona National Scenic Trail corridor extends 0.5 mile on either side of the Arizona National Scenic Trail; the proposed tailings pipeline corridor would affect approximately 45 acres of the Arizona National Scenic Trail corridor (2021 Resolution Copper Project FEIS, p. 630).

As stated above, the Arizona National Scenic Trail corridor is defined as approximately 0.5 mile from the centerline of the trail. The Tonto National Forest manages about 200 miles of the Arizona National Scenic Trail (forest plan, p. 181). The Arizona National Scenic Trail totals about 128,000 acres,[190] and the area impacted by the Resolution Copper Project preferred alternative would be less than 0.04 percent of the Arizona National Scenic Trail corridor. The area impacted by Resolution Copper Project is a minor portion of the Arizona National Scenic Trail on the Tonto National Forest.

Disruption to Arizona National Scenic Trail users would occur during the activity, and when conditions are safe for hikers, cyclists, and equestrian users, the disruption would cease. Contractors would provide necessary detours or signage for Arizona National Scenic Trail user awareness during these activities. Existing disturbances in this area include a railroad corridor, trailhead parking, and Hewitt Station Road.

Required mitigation measures to reduce impacts on the Arizona National Scenic Trail include the following (Resolution Copper Project FEIS, section 3.11.4.9):

- **New mitigation aspects of revised road use plan (FS-TA-01).** Implementing the revised road use plan would help reduce the conflicts with existing traffic and recreational road users that would occur during construction and operations. New mitigation measures incorporated in response to disclosed impacts include additional mitigation that would be effective at reducing the impacts of road and pipeline crossings, especially with the Arizona National Scenic Trail.

Environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on the Arizona National Scenic Trail. The non-discretionary applicant-committed environmental protection measures related to national scenic trails include the following (Resolution Copper FEIS, section 3.9.4.2):

- Developing a concentrate pipeline corridor management plan to reestablish crossing on the Arizona National Scenic Trail after construction.

As stated above, the area of impact is a small fraction of the Arizona National Scenic Trail on the Tonto National Forest. Mitigation measures would further reduce impacts. Therefore, no substantive requirements are directly related due to beneficial effects or substantial adverse effects.

---

[190] 200 miles long × 1 mile wide = 200 square miles × 640 acres per square mile.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1372 of 2158
Case 2:21-cv-00122-DWL   Document 87-2   Filed 07/14/25   Page 73 of 96

Appendix T

Excepting desired condition NTMA-DC-03 and guideline NTMA-G-01 would not cause a substantial lessening of plan protections. Desired condition NTMA-DC-03 and guideline NTMA-G-01 would continue to apply to the remaining 199+ miles of the Arizona National Scenic Trail corridor on the Tonto National Forest, and nine other desired conditions and 12 other guidelines focused on protecting user experience on the Arizona National Scenic Trail would be unaffected by the proposed amendment. Because allowing the pipeline to go over the Arizona National Scenic Trail would not constitute a substantial lessening of plan protections, the proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

The forest plan contains the following National Scenic Trail protection components: 10 desired conditions, 13 guidelines, and three standards. This amendment would except one desired condition and one guideline. The remaining nine desired conditions, 12 guidelines, and three standards would remain applicable to the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. The one excepted desired condition and one excepted guideline would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

In conclusion, the proposed exception of desired condition NTMA-DC-03 and guideline NTMA-G-01 is directly related to substantive requirements § 219.10(a)(3) – appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors, and to § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character. These two substantive requirements are only directly related to the proposed amendment through the purpose of the amendment. None of the substantive requirements are directly related through beneficial effects, substantial adverse effects, or substantial lessening of plan protections.

### *Recreation Resources—Recreation Opportunity Spectrum*

The Resolution Copper Project preferred alternative would not be consistent with one guideline related to the ROS: REC-G-10.

* REC-G-10 requires all decisions and activities to be consistent with or move the area toward the appropriate ROS. The preferred alternative would reduce nonmotorized ROS to motorized ROS in some areas; therefore, it is not consistent with this guideline.

**Purpose** - The purpose of excepting guideline REC-G-10 is to allow the Resolution Copper Project to exceed one out of 52 forest plan guidelines for recreation.[191] The exception of guideline REC-G-10 is

---

[191] December 2023 forest plan components associated with recreation and ROS consist of the following: Desired Conditions – PV-DC-01, PV-DC-02, REC-DC-01, REC-DC-02, REC-DC-03, REC-DC-04, REC-DC-05, REC-DC-06, REC-DC-07, REC-DC-08, REC-DC-09, REC-DC-10, REC-DEV-DC-01, REC-DEV-DC-02, REC-DEV-DC-03, REC-DEV-DC-04, REC-DEV-DC-05, REC-DIS-DC-01, REC-DIS-DC-02, REC-DIS-DC-03, REC-DIS-DC-04, REC-DIS-DC-05, REC-DIS-DC-06, REC-DIS-MO-DC-01, REC-DIS-MO-DC-02, REC-DIS-MO-DC-03, REC-DIS-MO-DC-04, REC-DIS-MO-DC-05, REC-DIS-NMO-DC-01, REC-DIS-NMO-DC-02, REC-DIS-NMO-DC-03, REC-DIS-NMO-DC-04, REC-DIS-WB-DC-01, REC-DIS-WB-DC-02, REC-DIS-WB-DC-03, REC-DIS-WB-DC-04, REC-DIS-RS-DC-01, REC-DIS-RS-DC-02, REC-DIS-RS-DC-03, REC-DIS-RS-DC-04, REC-DIS-RS-DC-05, REC-WR-DC-01, REC-WR-DC-02, REC-WR-DC-03, SC-DC-03, SC-DC-04, RD-DC-03, FC-DC-07, FC-DC-08, LA-DC-02, FF-DC-01, WAT-DC-01, WAT-DC-08, AQ-DC-01, DWMA-DC-01, DWMA-DC-02, DWMA-DC-03, DWMA-DC-04, DWMA-DC-05, DWMA-DC-06, DWMA-DC-07, DWMA-DC-08, DWMA-DC-09, DWMA-DC-10, DWMA-DC-11, RWMA-DC-02, RWMA-DC-03, RWMA-DC-05, RWMA-DC-06, RWMA-DC-07, IRAMA-DC-04, NTMA-DC-01, NTMA-DC-02, NTMA-DC-03, NTMA-DC-06, NTMA-DC-10, LRMA-DC-01, LRMA-DC-02, LRMA-DC-04, LRMA-DC-05; Guidelines - REC-G-01, REC-G-02, REC-G-03, REC-G-04, REC-G-05, REC-G-06, REC-G-07, REC-G-08, REC-G-09, REC-G-10, REC-DEV-G-01, REC-DIS-G-01, REC-DIS-G-02, REC-DIS-G-03, REC-DIS-G-04, REC-DIS-MO-G-01, REC-DIS-MO-G-02, REC-DIS-MO-G-03, REC-DIS-MO-G-04, REC-DIS-NMO-G-01, REC-DIS-NMO-G-02, REC-DIS-NMO-G-03, REC-DIS-NMO-G-04, REC-DIS-NMO-G-05, REC-DIS-NMO-G-06, REC-DIS-WB-G-01, REC-DIS-RS-G-01, REC-DIS-RS-G-02, REC-WR-G-01, REC-WR-G-02, REC-WR-G-03, RD-G-01, RD-G-02, INS-G-05, AQ-G-01, DWMA-G-10, RWMA-G-09, EWSRMA-G-03, IRAMA-G-01, NTMA-G-01, NTMA-G-02, NTMA-G-03, NTMA-G-04, NTMA-G-05, NTMA-G-06, NTMA-G-07, NTMA-G-08, NTMA-G-10, NTMA-G-11, NTMA-G-13, LRMA-G-03, ALSMA-G-02; Standards – REC-S-01, REC-DEV-S-01, REC-DEV-S-02, REC-DIS-S-01, REC-DIS-MO-S-01, REC-DIS-MO-S-02, REC-DIS-MO-S-03, REC-DIS-RS-S-01, FP-S-01, FP-S-06, DWMA-S-01, DWMA-S-02, NTMA-S-01, NTMA-S-02, NTMA-S-03; and Objectives – REC-O-01, REC-O-02, REC-O-03, REC-O-04, REC-O-05, REC-O-06, REC-DEV-O-01, REC-DIS-RS-O-01, WAT-O-05.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1373 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 74 of 96

Appendix T

directly related by the purpose of the amendment to § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character.

**Effects** - The effect of the exception of the guideline REC-G-10 would be to allow construction, operation, and maintenance of new pipelines, electrical transmission lines, and associated infrastructure that would result in a reduction of 166 acres from semiprimitive nonmotorized ROS to semiprimitive motorized ROS (2025 Resolution Copper Project FEIS, table 3.9.4-2). Implementation of the Resolution Copper Project preferred alternative would reduce the amount of semiprimitive nonmotorized ROS on the forest from 715,024[192] acres to 714,858 acres, a reduction of 0.02 percent forest-wide. Semiprimitive motorized recreation would increase from 1,072,671 acres to 1,072,837 acres, an increase of less than 0.02 percent forest-wide. Although this has an adverse impact on nonmotorized recreation, it is not a substantial adverse impact due to the relatively small amount of effects across the Tonto National Forest.

Required mitigation measures to reduce impacts on recreation resources include the following (Resolution Copper Project FEIS, section 3.9.4.9):

- **Revised reclamation and closure plans (FS-SV-03).** Implementing reclamation and closure plans ensures that the post-closure landscape is successfully revegetated to the extent practicable. Eventually these areas could be reopened to recreational activities.

- **New mitigation aspects of revised road use plan (FS-TA-01).** Implementing the revised road use plan would help reduce the conflicts with existing traffic and recreational road users that would occur during construction and operations. This mitigation would be effective at reducing impacts of road and pipeline crossings.

- **GDEs and water well mitigation (FS-WR-01).** This measure would be effective at preserving riparian vegetation and aquatic habitats, which are of importance to recreational users of the Tonto National Forest.

- **Clean Water Act Section 404 compensatory mitigation plan (FS-WR-02).** The Queen Creek parcel would likely be effective at improving recreational opportunities in the immediate vicinity of Superior, when considered in combination with implementing the Tonto National Forest multi-use trail plan (FS-RC-03) and replacement of water in Queen Creek (FS-WR-04).

- **Replacement of water in Queen Creek (FS-WR-04).** This measure would be effective at minimizing impacts to recreational users and birdwatchers drawn to riparian habitat in this area.

- **Access to Oak Flat campground (FS-RC-02).** Maintaining access to Oak Flat campground, to the extent practicable with respect to safety, would be effective at reducing impacts caused by the loss of the Oak Flat area to subsidence.

- **Mitigation for adverse impacts to recreational trails (forest multi-use trail plan) (FS-RC-03).** This plan would replace over 20 miles of motorized routes and nonmotorized trail on the Tonto National Forest around Superior. It would be effective at expanding the motorized and nonmotorized travel routes and recreational opportunities.

Environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on recreation. The non-discretionary applicant-committed environmental protection measures related to recreation include the following (Resolution Copper FEIS, section 3.9.4.2):

- Developing traditional and sport climbing open to the public on Resolution Copper property outside the mining footprint through agreement with Queen Creek Coalition.

---

[192] See table 15 in the FEIS for the 2023 forest plan (U.S. Forest Service 2023b) for total acres by ROS on the forest.

Case: 25-5185  08/16/2025  DktEntry: 12.1  Page 1374 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 75 of 96

Appendix T

The amount of reduction in semiprimitive ROS is a small fraction of the available semiprimitive ROS on the Tonto National Forest (0.02 percent). Mitigation measures and design features would further reduce impacts to recreation. Therefore, no substantive requirements are directly related due to beneficial effects or substantial adverse effects.

Excepting guideline REC-G-10 would not cause a substantial lessening of plan protections. Guideline REC-G-10 would continue to apply to the remaining 714,858 acres of semiprimitive nonmotorized ROS and 1,072,837 acres of semiprimitive motorized ROS on the Tonto National Forest.

The minor scale of the change in ROS would not constitute a substantial lessening of plan protections. The proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

The 2023 forest plan contains the following components focused on managing and providing recreation opportunities: 80 desired conditions; 52 guidelines; 15 standards; and nine objectives. This amendment would except one guideline. The remaining 51 guidelines, 80 desired conditions, 15 standards, and nine objectives would remain applicable to the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. The one excepted guideline would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

In conclusion, the proposed exception of guideline REC-G-10 is directly related to substantive requirements § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character. This substantive requirement is only directly related to the proposed amendment through the purpose of the amendment. None of the substantive requirements are directly related through beneficial effects, substantial adverse effects, or substantial lessening of plan protections.

## *Wildlife Habitat—Connectivity and Movement*

The forest plan contains guidelines that focus on maintenance of habitat connectivity and wildlife movement. The Resolution Copper Project preferred alternative would not be consistent with three habitat connectivity and wildlife movement guidelines: REC-WR-G-03, WFP-G-06, and WFP-G-07.

- REC-WR-G-03 requires that wildlife connectivity for economically important and other species be maintained or enhanced. The reduction in movement habitat with the preferred alternative would not maintain or enhance wildlife connectivity.

- WFP-G-06 requires that landscape and vegetation alterations that significantly contribute to uncharacteristic habitat fragmentation be avoided and that project design provide for movement and dispersal of species. The preferred alternative would not provide for movement and dispersal of species.

- WFP-G-07 requires that new infrastructure or constructed features be designed and maintained to minimize negative impacts to movement and dispersal of wildlife. Impacts to wildlife movement and dispersal would not be maintained or minimized with the preferred alternative.

**Purpose** - The purpose of excepting guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07 is to allow Resolution Copper Project to exceed three out of seven forest plan guidelines related to wildlife movement and habitat connectivity.[193] Therefore, the exception of guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07 is directly related by the purpose of the amendment to §219.8(a)(1)(i) – ecosystem

---

[193] December 2023 forest plan components associated with wildlife habitat—connectivity and movement consist of the following: Desired Conditions – FP-DC-01, FP-DC-05, MMAM-DC-01, LA-DC-01, DWMA-DC-02, RWMA-DC-02, SRHMA-DC-03, WAT-DC-08, RMZ-DC-07, ERU-DC-11 and WFP-DC-05; Guidelines – MMAM-G-06, LA-G-01(c), REC-WR-G-03, RD-G-04, WFP-G-06, WFP-G-07, and REC-WR-G-03; and Standard – FP-S-07.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1375 of 2158
Case 2:21-cv-00122-DWL   Document 87-2   Filed 07/14/25   Page 76 of 96

Appendix T

integrity, interdependence of terrestrial and aquatic ecosystems in the plan area; and to §219.9(a)(2)(i) – ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types.

**Effects** - The effect of excepting guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07 would be to allow construction, operation, and maintenance of new pipelines, electrical transmission lines, and associated infrastructure that would result in 1,417 acres of habitat disturbance in the tailings corridor, transmission line corridor, and access roads (2025 Resolution Copper Project FEIS, table 3.8.4-1). This would result in a loss of long-term movement habitat along pipeline corridors since vegetation would be expected to eventually reestablish in the disturbed areas but would be unlikely to return to preconstruction conditions (2021 Resolution Copper Project FEIS, p. 581). The total acres of intact habitat connectivity on the Tonto National Forest is not known. However, the 1,417 acres of habitat connectivity that would be affected by the Resolution Copper Project preferred alternative is a minor component of the habitat available across the 2,965,716 acres of the Tonto National Forest. Potential impacts to biodiversity would likely be limited to impacts at the local level for most species and would not be significant at the population level (2021 Resolution Copper Project FEIS, p. 581).

Excepting guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07 would not cause a substantial lessening of plan protections. Guideline REC-WR-G-03, WFP-G-06, and WFP-G-07 would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

Required mitigation measures to reduce impacts on wildlife habitat include the following (Resolution Copper Project FEIS, section 3.8.4.4):

- **Revised reclamation and closure plans (FS-SV-03).** This measure would be effective at partially replacing habitat and vegetation for wildlife over the long term.

- **GDEs and water well mitigation (FS-WR-01).** This measure would be effective at preserving riparian vegetation and aquatic habitats available for wildlife.

- **Replacement of water in Queen Creek (FS-WR-04).** This measure would be highly effective at minimizing impacts to surface water quantity and riparian habitat, which would prevent impacts to wildlife using this habitat.

- **New mitigation aspects of revised wildlife management plan (FS-WI-01).** Adherence to the revised wildlife management plan would reduce effects on habitat and to individuals of species.

- **Maintain or replace access to stock tanks and AGFD wildlife waters (FS-WI-04).** This measure would ensure that these water sources are available for wildlife, preventing additional impacts to species from disruption of available water.

Environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on wildlife habitat. The non-discretionary applicant-committed environmental protection measures related to wildlife habitat include the following (Resolution Copper FEIS, section 3.8.4.2):

- In order to minimize the potential risk for bird collisions with transmission lines, the lines and structures would be designed in accordance with "Reducing Avian Collision with Power Lines" (Avian Power Line Interaction Committee 2012).

- Resolution Copper prepared a noxious weed and invasive species management plan for NFS lands (Resolution Copper 2019). Resolution Copper further agreed to prepare reports 2 years after construction begins and every 5 years during operations.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1376 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 77 of 96

Appendix T

- Developing a site-specific wildlife mitigation plan in coordination with the AGFD, FWS, and Forest Service biologists to address construction-related actions. Intent is to avoid, minimize, and mitigate impacts on special status species.

- Ensuring that all ground-disturbing activities associated with pipeline and power line work near Mineral Creek and Gila chub designated critical habitat are performed outside the ordinary high-water mark and designated critical habitat.

- Using trenchless/non-surface impact methods (such as horizontal drilling or micro-tunneling) in areas where project facilities intersect Mineral Creek to avoid surface disturbance within the ordinary high-water mark and designated critical habitat.

- Clearly defining the perimeter of the construction footprint with flagging or other appropriate markers to restrict heavy equipment use and other surface-disturbing activities to areas within the construction footprint. The biological monitor will be present at all times during construction and will help ensure that construction activities and equipment remain within designated limits.

- Conducting annual yellow-billed cuckoo surveys in Devil's Canyon and Mineral Creek immediately upstream and downstream of disturbance areas and crossings. Annual surveys will begin 2 years prior to surface-disturbing activities. Surveys will continue until pipeline construction has been completed, including reclamation of temporary construction disturbance.

- In areas where surveys have detected the presence of yellow-billed cuckoo, avoiding vegetation clearing and ground-disturbing activities associated with pipeline construction within 500 feet of the ordinary high-water mark of Mineral Creek from May 1 through September 30, to remain outside the breeding season.

- Avoiding when possible large trees (greater than 12 inches in diameter), including Fremont cottonwood (*Populus fremontii*) and willow species (*Salix* spp.), as well as dense stands of vegetation.

- Cutting riparian trees to ground level when they are removed. When possible, root masses will be left intact to help stabilize soils and provide opportunities for regrowth through adventitious shoots (e.g., in the case of willows).

The minor scale of the change in wildlife habitat connectivity would not constitute a substantial lessening of plan protections. The proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

The forest plan contains the following habitat connectivity wildlife movement protection components: 11 desired conditions, seven guidelines, and one standard. This amendment would except three guidelines. The remaining 11 desired conditions, four guidelines, and one standard would remain applicable to the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. The three excepted guidelines would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

In conclusion, the proposed exception of guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07 is directly related to substantive requirements §219.8(a)(1)(i) – ecosystem integrity, interdependence of terrestrial and aquatic ecosystems in the plan area; and to §219.9(a)(2)(i) – ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types. These substantive requirements are only directly related to the proposed amendment through the purpose of the amendment. None of the substantive requirements are directly related through beneficial effects, substantial adverse effects, or substantial lessening of plan protections.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1377 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 78 of 96

Appendix T

## *Cultural Resources*

Three forest plan desired conditions associated with protection of cultural resources are proposed to be excepted in this amendment: CUH-DC-01, CUH-DC-02, and CUH-DC-07. These three desired conditions cannot be met using standard industry construction methods like those proposed with the Resolution Copper Project.

- CUH-DC-01 requires that historic properties retain all of the characteristics that qualify the property for listing in the National Register of Historic Places (NRHP). Impacts to historic properties cannot be avoided or fully mitigated, and it is not feasible to retain all the characteristics that qualify impacted properties for listing.

- CUH-DC-02 requires that historic properties not be threatened by human disturbance. As previously stated, it is not feasible to avoid all impacts to historic properties.

- CUH-DC-07 requires that cultural resources, including artifacts, be preserved in place. Ground disturbance associated with the Resolution Copper Project preferred alternative would disturb hundreds of archaeological sites. Mitigation would include data recovery and curation of artifacts.

It is not practical to modify the Resolution Copper Project location or construction methods in a manner that would achieve consistency with these three desired conditions. Therefore, the Forest Service proposes to except the Resolution Copper Project from these three desired conditions.

**Purpose** - The purpose of excepting desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07 is to allow the Resolution Copper Project to exceed three of the 18 forest-wide desired conditions for cultural resource protection.[194] The modification of these desired conditions are directly related to § 219.8(a)(b) – social and economic sustainability – cultural and historic resources and uses; to § 219.10(a)(1) – integrated resource management for multiple use – cultural and heritage resources; and to § 219.10(b)(1)(ii) – protection of cultural and historic resources.

**Effects** - The effect of the exception of desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07 includes minor adverse effects on historic and archaeological resources. The reduction in cultural resource protection measures constitutes an adverse impact, but effects are not expected to be substantial. The greatest impacts to cultural resources would be during the construction period.

The cultural resources analysis in the Resolution Copper Project FEIS lists hundreds of historic and archaeological sites likely to be directly by the preferred alternative (2021 Resolution Copper Project FEIS, pp. 785-786). However, that analysis includes areas where the forest plan does not apply, such as private land and land administered by the State of Arizona and Bureau of Land Management. The Forest Service decision to implement the Resolution Copper Project preferred alternative would not authorize any activities on land that are not administered by the Forest Service. A review of impacted sites by landownership concludes that eight of these sites are located on NFS land associated with the preferred alternative area of disturbance (Newell 2018a). While it is not possible to know the total number of cultural resource sites on the Tonto National Forest, eight cultural sites represents a small amount of the number of sites on the forest.

---

[194] December 2023 forest plan components associated with cultural resources consist of the following: Desired Conditions – CUH-DC-01, CUH-DC-02, CUH-DC-03, CUH-DC-04, CUH-DC-05, CUH-DC-06, CUH-DC-07, CUH-DC-08, TRB-DC-01, TRB-DC-02, TRB-DC-03, TRB-DC-04, TRB-DC-05, LA-DC-01, REC-DIS-RS-DC-04, NTMA-DC-06, ALSMA-DC-01, CVK-DC-01; Guidelines – SU-G-04, EG-G-04, EG-G-06(b), CUH-G-01, CUH-G-02, CUH-G-03, CUH-G-04, CUH-G-05, TRB-G-01, TRB-G-02, TRB-G-03, TRB-G-04, TRB-G-05, MMAM-G-06, LA-G-01(c), FF-G-03, FF-G-04, CVK-G-03, ALSMA-G-01; and Standards – CUH-S-01, CUH-S-02, TRB-S-01, TRB-S-02, TRB-S-03, TRB-S-04, FF-S-04, SU-S-01.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1378 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 79 of 96

Appendix T

Any direct ground disturbance runs the risk of disturbing cultural resources. Implementation of the Resolution Copper Project preferred alternative would result in construction, use, and maintenance of electrical transmission lines, pipelines, and associated infrastructure that would disturb 2,502 acres of NFS lands and not affect that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative. This is a minor amount of impact when considered on a forest-wide basis.

The direct effects noted would occur on 2,502 acres or less of NFS land (less than 0.09 percent of the total NFS land on the Tonto National Forest); the three excepted desired conditions would not hinder the Forest Service's ability to implement the forest plan to protect cultural resources across that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

Required mitigation measures designed to minimize impacts on cultural resources include the following (Resolution Copper Project FEIS, section 3.12.4.9):

- **Implementation of Oak Flat HPTP (FS-CR-01).** The Oak Flat historic properties treatment plan (HPTP) sets out a plan for treatments to resolve the adverse effects on 42 historic properties that have been identified within the Oak Flat Federal Parcel.

- **GPO research design (FS-CR-02).** The GPO research design and data recovery plans will detail treatments to resolve adverse effects on historic properties within the GPO project area, with the exception of those in the Oak Flat Federal Parcel. Data recovery would be conducted on archaeological sites eligible for the NRHP under Criterion D within the GPO project area. Project materials and archaeological collections would be curated in accordance with 36 CFR 79 (Curation of Federally-Owned and Administered Archaeological Collections) with the Gila River Indian Community, Salt River Pima-Maricopa Indian Community, and Arizona State Museum.

- **Visual, atmospheric, auditory, socioeconomic, and cumulative effects mitigation plan (FS-CR 03).** The Forest Service will ensure that additional mitigation plan(s) are prepared after the publication of the FEIS that describe mitigation measures to address effects on historic properties.

- **Design criteria:** Two different tailings corridor options were considered for the preferred alternative (north and south), and the south corridor was eliminated from consideration due to impacts along Arnett Creek that otherwise would remain undisturbed and had greater surface disturbance. The north pipeline corridor was further revised based in part on public comments. Key changes include the co-location of the power line and pipeline within the same corridors, moving the corridor away from paralleling perennial reaches of lower Mineral Creek, and relocating it around Government Springs Ranch.

Environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on cultural resources. Specifically, Resolution Copper has committed to following the Section 106 process for the resolution of adverse effects on historic properties and will design the footprint of the project to avoid resources to the maximum extent possible (Resolution Copper FEIS, section 3.12.4.2).

Most impacts would occur during the construction phase of project, which would be considered minor adverse effects when considered on a forest-wide basis. These impacts would affect only eight cultural resource sites located on less than 0.09 percent of the forest plan area (Tonto National Forest).

Because there would be no substantial environmental effects from the proposed exception of these desired conditions and guidelines, the proposed amendment is not directly related to any substantive requirements based on adverse or beneficial effects.

Desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07 would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative. The

excepted three desired conditions would only apply to the 2,502 acres of NFS land where construction of electric transmission lines, pipelines, and associated infrastructure would occur and would not constitute a substantial lessening of plan protections. Therefore, the proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

The forest plan contains the following cultural resource protection components: 18 desired conditions, 19 guidelines, and eight standards. This amendment would except three desired conditions. The remaining 15 desired conditions, 19 guidelines, and eight standards would remain applicable to the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. The three excepted desired conditions would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

In conclusion, the proposed exception of the three desired conditions related to cultural resource areas (CUH-DC-01, CUH-DC-02, and CUH-DC-07) are directly related to substantive requirements § 219.8(a)(b) – social and economic sustainability – cultural and historic resources and uses; § 219.10(a)(1) – integrated resource management for multiple use – cultural and heritage resources; and § 219.10(b)(1)(ii) – protection of cultural and historic resources. These substantive requirements are directly related to the proposed amendment through the purpose of the amendment. None of the substantive requirements are directly related through beneficial effects, substantial adverse effects, or substantial lessening of plan protections.

## *Directly Related Substantive Requirements*

Based on the criteria and analyses described above, the substantive requirements that are directly related include:

- § 219.8(a)(2)(ii) – Soils and soil productivity due to the exception of guideline SL-G-02.

- § 219.10(b)(1)(i) – Sustainable recreation due to the exception of desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, NTMA-G-01, and NTMA-G-08 (Scenic Integrity Objectives); desired condition NTMA-DC-03 and guideline NTMA-G-01 (Arizona National Scenic Trail); and guideline REC-G-10 (Recreational Opportunity Spectrum).

- § 219.8(a)(1)(i) – Ecosystem integrity, interdependence of terrestrial and aquatic ecosystems in the plan area due to exception of guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07.

- § 219.9(a)(2)(i) – ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types due to the exception of guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07.

- § 219.8(a)(b) – social and economic sustainability – cultural and historic resources and uses due to the exception of desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07.

- § 219.10(a)(1) – Integrated resource management for multiple use – cultural and heritage resources due to the exception of desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07.

- § 219.10(a)(3) – Appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors, due to the exception of desired conditions and guidelines NTMA-DC-03 and NTMA-G-01.

- § 219.10(b)(1)(ii) – protection of cultural and historic resources due to the exception of desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07.

# Step 3: Apply the Directly Related Substantive Requirement

The purpose of Step 3 is to take the directly related substantive requirements (identified above in Step 2) and apply them within the scope and scale of the proposed amendment. In applying those requirements, the Forest Service must ensure that the forest plan, as amended, contains plan components that meet the 2012 Planning Rule substantive requirements across the planning unit within the scope and scale of the proposed amendment. A plan amendment is not expected to bear the burden of a plan revision and bring the entire plan into consistency with the 2012 Planning Rule. Rather, the plan amendment shall only apply the directly related substantive requirements and only in a manner commensurate with the scope and scale of the amendment.

In applying the directly related substantive requirements to those components related through "purpose" or "beneficial effect," the responsible official may determine that additional plan components are necessary to ensure compliance with the 2012 Planning Rule.[195] When a directly related substantive requirement is determined to be related by "adverse effect" in Step 2, the responsible official is required to either modify the proposal or review the amended plan to determine the need or benefit of additional plan components.

Based on the Step 2 analysis, the forest plan, as amended, must contain plan components that maintain or restore[196] ecosystem integrity and diversity of plant and animal communities (36 CFR §§ 219.8 and 219.9) and provide for multiple uses (36 CFR § 219.10). Each of these substantive requirements contains direction regarding their application to the plan. For some substantive requirements like ecosystem integrity and diversity (36 CFR §§ 219.8 and 219.9), the plan's components must strive to "maintain or restore."

When applying directly related substantive requirements, the scope of the proposed project-specific forest plan amendment is the exception of the following out of more than 600 forest plan components (see the Introduction section above):

- One of 35 forest-wide desired conditions for soil protection.

- Three of 12 forest-wide desired conditions and three of 17 forest-wide guidelines for scenery.

- One of 10 forest-wide desired conditions and one of 13 forest-wide guidelines for the Arizona National Scenic Trail corridor.

- One of 52 forest-wide guidelines for recreation.

- Three of seven forest-wide guidelines related to wildlife movement and habitat connectivity.

- Three of 18 forest-wide desired conditions for cultural resource protection.

Therefore, the proposed amendment leaves the following forest plan components related to the proposed amendment <u>unchanged</u>:

- Soil Productivity – 34 desired conditions, 12 guidelines, three standards, and one objective;

---

[195] When a directly related substantive requirement is determined to be related by "substantial adverse effect" in Step 2, the responsible official is required to either modify the proposal to avoid the "substantial adverse effect determination" or verify whether the existing plan provides sufficient plan components for the directly related substantive requirement. If the plan does not, the responsible official must add additional plan components to make certain the Planning Rule requirements are met.

[196] The Planning Rule defines restore as "[t]o renew by the process of restoration (see restoration)." It defines restoration as "[t]he process of assisting the recovery of an ecosystem that has been degraded, damaged, or destroyed. Ecological restoration focuses on reestablishing the composition, structure, pattern, and ecological processes necessary to facilitate terrestrial and aquatic ecosystem sustainability, resilience, and health under current and future conditions" (36 CFR § 219.19).

- Scenic Resources (SIO) – nine desired conditions, 14 guidelines, and one standard;

- National Scenic Trails – nine desired conditions, 12 guidelines, and three standards;

- Recreation Resources (ROS) – 80 desired conditions, 51 guidelines, 15 standards, and nine objectives;

- Wildlife Habitat (Connectivity and Movement) – 11 desired conditions, four guidelines, and one standard; and

- Cultural Resources – 15 desired conditions, 19 guidelines, and eight standards.

Through actions that require adherence to State standards and practices, actions that avoid or mitigate erosion, and practices that require restoration, these unexcepted desired conditions, guidelines, objectives, and standards would continue to maintain or restore terrestrial ecological integrity, soils and soil productivity, scenery, riparian areas, recreation, wildlife habitat, cultural resources, and ecosystem diversity.

The following analysis of the application of the directly related substantive requirements considers the extent of the proposed amendment (scope) and area of the forest affected by the proposed amendment (scale), evaluates the desired future conditions contained in the forest plan, and uses best available science data such as monitoring reports and other scientific information. The direction required by each substantive requirement is included in the analysis below.

## *Section 219.8(a)(2)(ii) – Soils and Soil Productivity*

Substantive requirement § 219.8(a)(2)(ii) – soils and soil productivity is directly related to the proposed amendment through the purpose of excepting guideline SL-G-02. The overarching goal of the substantive requirements found in § 219.8 is for the plan to provide for social, economic, and ecological sustainability within Forest Service authority and the inherent capability of the plan area. The substantive requirement specific to soils and soil productivity is to include plan components to maintain or restore soils and soil productivity, including guidance to reduce soil erosion and sedimentation. To "maintain" a resource is defined by the Planning Rule as "to keep in existence or continuance of the desired ecological condition in terms of desired composition, structure, and processes" (36 CFR § 219.19) and to "restore" means bring back to a baseline condition. This does not infer that there must be *no net loss* to the resource in question across the plan area. However, it does mean that over time, the trend for the resource in question should be moving toward the desired condition or is constant (sideways trend). Like any trend line, there can be peaks and troughs within the trendline; as long as over time the primary trend is toward the desired condition or is constant, then maintenance of the resource is being achieved.

**Scope**

The scope of this component of the project-specific amendment is the exception of one out of 12 soil productivity guidelines as they are applied to the 2,502 acres of NFS land where construction of electric transmission lines, pipelines, and associated infrastructure would occur with the Resolution Copper Project preferred alternative (area of disturbance). The proposed amendment would only apply to the Resolution Copper Project and not except any other projects.

**Scale**

The scale of the project-specific amendment for this resource is the preferred alternative area of disturbance (2,502 acres), which is less than 0.09 percent of the 2,965,716-acre Tonto National Forest. The project-specific amendment would be limited to the area of disturbance for the life of the pipelines and electrical transmission lines.

**Application**

Excepting the Resolution Copper Project from adhering to this soil productivity guideline would have an adverse impact on the soil resource within the 2,502-acre preferred alternative area of disturbance. However, as discussed below, excepting the Resolution Copper Project from the soil productivity guideline would not detract from the Forest Service's ability to implement the forest plan to provide for the ecological integrity of the forest-wide soil resource, and the mandates of the 2012 Planning Rule would be met. As previously described, implementation of the preferred alternative would include mandatory measures to minimize impacts to soil and soil productivity from the Resolution Copper Project and thus would minimize impacts to ecosystem integrity as it relates to soil resources.

Soil loss from construction and operations in the pipeline and power line corridor (preferred alternative area of disturbance) is expected to be minimal after compliance with applicant-committed environmental protection measures (stormwater pollutant prevention plans and erosion and sediment controls) and after reclamation when the surface has stabilized from revegetation (2021 Resolution Copper Project FEIS, p. 255). Over the long term, with implementation of reclamation measures and mitigation, soil productivity would improve in the preferred alternative area of disturbance (2021 Resolution Copper Project FEIS, pp. 247–248).

Multiple unexcepted forest-wide plan components to maintain or restore soils and soil productivity would remain in place throughout the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. These include 35 unexcepted desired conditions, 11 unexcepted guidelines, three unexcepted standards, and one unexcepted objective that would remain in place throughout that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative. In addition, the original requirements of guideline SL-G-02 continue to apply to 99.9 percent of the Tonto National Forest. As such, the scope and scale of the proposed amendment is negligible in context of the forest-wide soil resource. Considering the scale of the plan amendment, the unaffected plan components maintain or restore soil resources, and the measures imposed on the Resolution Copper Project for construction and the forest plan direction for the Tonto National Forest, including the project-specific amendment, are sufficient to maintain the soil resource.

In conclusion, the substantive requirement § 219.8(a)(2)(ii) – soils and soil productivity would be sufficiently applied within the scope and scale of the project-specific amendment to maintain or restore soils/soil productivity across the planning unit (i.e., the plan area) because of

- the limited scale of the proposed exception to the soil productivity guideline;

- the limited soil loss and displacement from the construction, operation, and maintenance of the pipeline due to implementation of the design criteria and mitigation measures;

- the limited scope of the proposed amendment to soil guideline (one of 12 forest-wide soil productivity guidelines) and continued application of the unexcepted desired conditions, guidelines, standards, and objectives across the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance.

### *Section 219.10(b)(1)(i) – Sustainable Recreation, Including Recreation Setting, Opportunities, Access; and Scenic Character*

Substantive requirement § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character is directly related to the proposed amendment through the purpose of excepting the following: desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, NTMA-G-01, and NTMA-G-08 (Scenic Integrity Objectives); desired condition NTMA-DC-03 and guideline NTMA-G-01 (Arizona National Scenic Trail); and guideline

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1383 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 84 of 96

Appendix T

REC-G-10 (Recreational Opportunity Spectrum). The overarching goal of the substantive requirements found in § 219.10 is to provide for ecosystem services and multiple uses within Forest Service authority and the inherent capability of the plan area. The substantive requirement specific to recreation settings, opportunities, access; and scenic character is to include plan components to provide for sustainable conditions for these resources.

This section is organized based on major resource categories pertinent to this substantive requirement.

## SCENIC RESOURCES—SCENIC INTEGRITY OBJECTIVES

**Scope**

The scope of this component of the project-specific amendment is the exception of the following: desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, and NTMA-G-08 as they are applied to the Resolution Copper Project preferred alternative area of disturbance. The proposed amendment would only apply to the Resolution Copper Project and not except any other projects.

**Scale**

The scale of the scenic component of the project-specific amendment encompasses areas of high SIO (516 acres), moderate SIO (345 acres), and low SIO, representing approximately 0.03 percent of the amount of high SIO across the forest and 0.06 percent of the amount of moderate SIO across the forest.

**Application**

Excepting Resolution Copper Project from adhering to these three desired conditions and three guidelines would have an adverse impact on the scenery resource. However, as discussed below, excepting Resolution Copper Project from these desired conditions and guidelines would not detract from the Forest Service's ability to implement the forest plan to provide for sustainable scenery resources, and the mandates of the 2012 Planning Rule would be met.

Resolution Copper would use best management practices or other guidelines (when on NFS lands) that would minimize visual impacts from transmission lines. Other required mitigation measures to reduce impacts on scenic resources include measures to reduce the contrast with the natural landscape; preserve riparian vegetation and aquatic habitats, which are of scenic value; replace xeroriparian habitat, which would be beneficial to scenic resources; and replace water in Queen Creek, which would minimize impacts to scenic resources along this riparian corridor. These measures would be effective at reducing and minimizing the scenery impacts and the project contrast of mining operations in the surrounding landscape and impacts upon sensitive viewers.

Users of the Arizona National Scenic Trail would encounter the pipeline at the location where the pipeline crosses the trail and in an area where there are already pipelines and utilities crossing the trail (MARRCO Corridor). There is a total of 55 miles of the Arizona National Scenic Trail in the scenery analysis area (2025 Resolution Copper Project FEIS, section 3.11.3-2). Within the trail corridor, there is currently a total of 42,209 acres of high SIO. Implementation of the Resolution Copper Project preferred alternative would impact 20 acres of high SIO, which would then meet the criteria for low SIO (2025 Resolution Copper Project FEIS, table 3.11.4-3). Less than 0.05 percent of the high SIO in the analysis area would be affected by the Resolution Copper Project preferred alternative.

The forest plan includes numerous forest-wide desired conditions, guidelines, standards, and objectives for scenery that would not be subject to exception from this proposed amendment, including nine desired conditions, 14 guidelines, and one standard. The three excepted desired conditions and three excepted

guidelines would continue to apply to 99.9 percent of the Tonto National Forest. The amended forest plan direction would provide for sustainable scenic character for the Tonto National Forest.

As stated previously, only 516 acres of high SIO and 345 acres of moderate SIO would not meet the assigned SIO. This would be minor in the context of scenic conditions across the plan unit. Forest-wide the Tonto National Forest would remain predominantly natural appearing and natural evolving. In addition, the main plan component for managing for sustainable scenic character, the assigned SIO map for the Tonto National Forest, would remain in place and unaffected by the proposed amendment.

The substantive requirement § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character would be sufficiently applied within the scope and scale of the project-specific amendment, and the mitigation measures would provide for sustainable scenic character because

- required mitigation would reduce scenic impacts;

- the limited scope of this component of the proposed amendment and the fact that the proposed exceptions would only apply to three out of 12 forest-wide scenery desired conditions and three of 17 forest-wide guidelines in the forest plan;

- forest-wide, the scenery resources would continue toward meeting the desired conditions;

- the limited area the proposed exceptions to scenic desired conditions and guideline would be applied to: 516 acres of high SIO and 345 acres of moderate SIO; and

- the application of scenery desired conditions and guidelines would continue across the remaining plan area.

## NATIONAL SCENIC TRAILS[197]

**Scope**

The scope of this component of the project-specific amendment is the exception of desired condition NTMA-DC-03 and guideline NTMA-G-01 as they are applied to the Resolution Copper Project preferred alternative. The proposed amendment would only apply to the Resolution Copper project and not except any other projects.

**Scale**

The scale of the national scenic trails component of the project-specific amendment encompasses the immediate location in the MARRCO Corridor where new pipelines and an access road would cross the Arizona National Scenic Trail. New pipelines constructed within the MARRCO corridor would cross Passage 18 of the Arizona National Scenic Trail (2021 Resolution Copper Project FEIS, p. 626.). In the Passage 18 segment, 0.07 mile of the proposed tailings pipeline corridor would intersect the Arizona National Scenic Trail. The Arizona National Scenic Trail management corridor extends 0.5 mile on either side of the Arizona National Scenic Trail; the proposed tailings pipeline corridor would affect approximately 45 acres of the Arizona National Scenic Trail corridor (2021 Resolution Copper Project FEIS. p. 630). The Tonto National Forest manages about 200 miles of the Arizona National Scenic Trail (forest plan, p. 181). The Arizona National Scenic Trail corridor totals about 128,000 acres, and the area

---

[197] The forest plan contains a number of desired conditions and guidelines that focus on protection of visitor experience on the Arizona National Scenic Trail. Several of those desired conditions and guidelines for scenic conditions are addressed under scenic resources earlier in this document.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1385 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 86 of 96

Appendix T

impacted by the Resolution Copper Project preferred alternative would be less than 0.04 percent of the Arizona National Scenic Trail corridor.

**Application**

Excepting Resolution Copper Project from adhering to this one desired condition and one guideline would have an adverse impact on the Arizona National Scenic Trail. However, as discussed previously, excepting the Resolution Copper Project from these desired conditions and guidelines would not detract from the Forest Service's ability to implement the forest plan to provide for sustainable scenery resources, and the mandates of the 2012 Planning Rule would be met.

There would be short-term impacts on trail users during construction of pipelines and an access road when disturbance precludes use for safety reasons (e.g., active grading, transport of heavy equipment, active construction). These impacts would occur during construction, and when conditions are safe for hikers, cyclists, and equestrian users, the impact would cease. Contractors would provide necessary detours or signage for Arizona National Scenic Trail user awareness during these activities. Existing disturbances in this area include a railroad corridor, trailhead parking, and Hewitt Station Road.

As mentioned, the area impacted by Resolution Copper Project is a minor portion of the Arizona National Scenic Trail on the Tonto National Forest, affecting only 45 acres of the 128,000-acre Arizona National Scenic Trail corridor on the Tonto National Forest.

Required mitigation to reduce impacts on the Arizona National Scenic Trail include a measure that would reduce impacts of road and pipeline crossings, especially with the Arizona National Scenic Trail.

As stated, the area of impact is a small fraction of the Arizona National Scenic Trail on the Tonto National Forest. Mitigation measures and design features would further reduce impacts. Therefore, no substantive requirements are directly related due to beneficial effects or substantial adverse effects.

Excepting desired condition NTMA-DC-03 and guideline NTMA-G-01 would not cause a substantial lessening of plan protections. Desired condition NTMA-DC-03 and guideline NTMA-G-01 would continue to apply to the remaining 199+ miles of the Arizona National Scenic Trail corridor on the Tonto National Forest, and nine other desired conditions, 12 other guidelines, and three standards focused on protecting user experience on the Arizona National Scenic Trail would be unaffected by the proposed amendment. Because allowing the pipelines to go over the Arizona National Scenic Trail would not constitute a substantial lessening of plan protections, the proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

The substantive requirement § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character would be sufficiently applied within the scope and scale of the project-specific amendment, and mitigation measures would provide for sustainable scenic character because

- required mitigation would limit impacts to Arizona National Scenic Trail users to brief periods only during construction activities;

- the limited scope of this component of the proposed amendment and the fact that the proposed exceptions would only apply to one of 10 forest-wide scenery desired conditions and one of 13 forest-wide guidelines in the forest plan;

- forest-wide, management of the Arizona National Scenic Trail would continue toward meeting desired conditions;

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1386 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 87 of 96

Appendix T

- the limited area to which the proposed exceptions to scenic desired conditions and guideline would be applied: 45 acres of the 128,000-acre Arizona National Scenic Trail corridor on the Tonto National Forest; and

- the application of scenery desired conditions, guidelines, and standard would continue across the remaining plan area.

## RECREATION RESOURCES—RECREATION OPPORTUNITY SPECTRUM

**Scope**

The scope of this component of the project-specific amendment is the exception of guideline REC-G-10 as it applies to the Resolution Copper Project preferred alternative area of disturbance. The proposed amendment would only apply to the Resolution Copper Project and not except any other projects.

**Scale**

The scale of the recreational opportunity spectrum component of the project-specific amendment encompasses the area of the Resolution Copper Project preferred alternative 2,502-acre area of disturbance, where construction of electrical transmission lines, pipelines, and associated infrastructure would impact existing ROS designations.

**Application**

Excepting Resolution Copper Project from adhering to this one guideline would have an adverse impact on the existing ROS designation in the preferred alternative area of disturbance. However, as discussed previously, excepting Resolution Copper Project from this guideline would not detract from the Forest Service's ability to implement the forest plan to provide for sustainable scenery resources, and the mandates of the 2012 Planning Rule would be met.

There would be short-term impacts on trail users during construction of pipelines and an access road; and during construction, operation, and maintenance of new pipelines, electrical transmission lines, and associated infrastructure that would result in a reduction of 166 acres from semiprimitive nonmotorized ROS to semiprimitive motorized ROS (2025 Resolution Copper Project FEIS, table 3.9.4-2). Implementation of the Resolution Copper Project preferred alternative would reduce the amount of semiprimitive nonmotorized ROS on the forest from 715,024[198] acres to 714,858 acres, a reduction of 0.02 percent forest-wide. Semiprimitive motorized recreation would increase from 1,072,671 acres to 1,072,837 acres, an increase of less than 0.02 percent forest-wide. Although this has an adverse impact on nonmotorized recreation, it is not a substantial adverse impact due to the relatively small amount of effects across the Tonto National Forest.

Excepting guideline REC-G-10 would not cause a substantial lessening of plan protections. Guideline REC-G-10 would continue to apply to the remaining 714,858 acres of semiprimitive nonmotorized ROS, and 1,072,837 acres of semiprimitive motorized ROS on the Tonto National Forest and 51 other recreation-focused guidelines on the Tonto National Forest would be unaffected by the proposed amendment.

The minor scale of the change in ROS would not constitute a substantial lessening of plan protections. The proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

---

[198] See table 15 in the FEIS for the 2023 forest plan (U.S. Forest Service 2023b) for total acres by ROS on the forest.

The application of the proposed Resolution Copper Project–specific amendment demonstrates that the amendment is consistent with the 2012 Planning Rule and that no additional provisions are needed to ensure the forest plan's consistency with the 2012 Planning Rule. Furthermore, the remainder of the forest plan is unaffected by the Resolution Copper Project–specific amendment and is adequately protecting and maintaining recreation and scenic resources. The substantive requirement § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character would be sufficiently applied within the scope and scale of the project-specific amendment because

- required mitigation and design features would reduce impacts to scenic resources and the Arizona National Scenic Trail;

- the limited scope of this component of the proposed amendment and the fact that the proposed exceptions would only apply to one of 52 forest-wide recreation guidelines;

- forest-wide, scenery resources management of the Arizona National Scenic Trail and recreation opportunity spectrum would continue toward meeting the desired conditions;

- the limited area of the proposed exceptions to scenic resources, the Arizona National Scenic Trail corridor, and recreation opportunity spectrum in the plan area; and

- the application of scenery, Arizona National Scenic Trail, and recreation opportunity spectrum desired conditions and guidelines would continue across the remaining plan area.

### Section 219.8(a)(1)(i) – Ecosystem Integrity, Interdependence of Terrestrial and Aquatic Ecosystems in the Plan Area; and Section 219.9(a)(2)(i) – Ecosystem Diversity, Key Characteristics Associated with Terrestrial and Aquatic Ecosystem Types

Substantive requirements §219.8(a)(1)(i) – ecosystem integrity, interdependence of terrestrial and aquatic ecosystems in the plan area; and § 219.9(a)(2)(i) – ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types are directly related to the proposed amendment through the purpose of excepting guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07. The overarching goal of the substantive requirements found in § 219.8 is to provide for social, economic, and ecological sustainability within Forest Service authority and the inherent capability of the plan area. The substantive requirement for ecosystem integrity is to include plan components to maintain or restore the ecological integrity of terrestrial and aquatic ecosystems and watersheds in the plan area. The substantive requirement specific to riparian areas is to include plan components to maintain or restore the ecological integrity of riparian areas in the plan area. To "maintain" a resource is defined by the Planning Rule as "to keep in existence or continuance of the desired ecological condition in terms of desired composition, structure, and processes" (36 CFR § 219.19), and to "restore" means bring back to a baseline condition. This does not infer that there must be *no net loss* to the resource in question across the plan area. However, it does mean that over time, the trend for the resource in question should be moving toward the desired condition or is constant (sideways trend). Like any trend line, there can be peaks and troughs within the trendline. As long as over time the primary trend is toward the desired condition or is constant, then maintenance of the resource is being achieved.

#### Scope

The scope of this component of the project-specific amendment is the exception of the following: three out of seven forest plan guidelines—REC-WR-G-03, WFP-G-06 and WFP-G-07—related to wildlife movement and habitat connectivity, as it applies to the Resolution Copper Project preferred alternative area of disturbance. The proposed amendment would only apply to the Resolution Copper Project and not except any other projects.

**Scale**

The scale of the amendment in the context of the substantive requirements § 219.8(a)(1) – ecosystem integrity and § 219.9(a)(2)(i) – ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types is 1,417 acres of habitat disturbance in the tailings corridor, transmission line corridor, and access roads (FEIS, table 3.8.4-1) out of the 2,965,716 acres of the Tonto National Forest, or less than 0.05 percent of the Tonto National Forest.

**Application**

Excepting the Resolution Copper Project from adhering to the three guidelines would have an adverse impact to wildlife movement habitat in the preferred alternative area of disturbance. However, as discussed previously, excepting Resolution Copper Project from these desired conditions and guidelines would not detract from the Forest Service's ability to implement the forest plan to provide for the ecological integrity of terrestrial and aquatic ecosystems, and the mandates of the 2012 Planning Rule would be met.

The Resolution Copper Project preferred alternative includes measures to minimize impacts to wildlife movement habitat from the Resolution Copper Project and thus would minimize impacts to ecosystem integrity as it relates to wildlife habitat. These include measures that would improve wildlife connectivity by protecting habitat blocks, partially replace habitat and vegetation for wildlife over the long term, preserve riparian vegetation and aquatic habitats available for wildlife, prevent impacts to wildlife using habitat along Queen Creek, and reduce effects on habitat and on individuals of species.

There are 11 area desired conditions, four guidelines, and one standard to protect habitat connectivity and wildlife movement in the forest plan that are not subject to exception as part of this proposed amendment; those forest plan components continue to apply throughout the Tonto National Forest, including in the project area. The total acreage of intact habitat connectivity on the Tonto National Forest is unknown. However, the 1,417 acres of habitat connectivity that would be impacted by the Resolution Copper Project preferred alternative is a minor component of the habitat available across the 2,965,716 acres of the Tonto National Forest. Potential impacts to biodiversity would likely be limited to impacts at the local level for most species and would not be significant at the population level (2021 Resolution Copper Project FEIS, p. 581).

The proposed amendment would not affect the vast majority of wildlife habitat connectivity across the forest. Although there would be an adverse impact through removal of wildlife movement habitat, it would be limited to 1,417 acres and would not be significant enough to affect forest-wide trends toward desired conditions. This would not impede the Forest Service's ability to implement the forest plan to move toward the desired condition over the majority of the forest.

The remainder of the forest plan is unaffected by the project-specific amendment. The substantive requirements § 219.8(a)(1) – ecosystem integrity and § 219.9(a)(2)(i) – ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types would be sufficiently applied within the scope and scale of the project-specific amendment that ecological integrity of wildlife connectivity across the plan area would be maintained or restored because

- required mitigation and design features would reduce impacts to habitat connectivity and wildlife movement habitat;

- the limited scope of this component of the proposed amendment and the fact that the proposed exceptions would only apply to three of seven forest-wide guidelines;

- forest-wide, habitat connectivity and wildlife movement habitat would continue toward meeting the desired conditions;

- the limited area of the proposed exception to habitat connectivity and wildlife movement habitat in the plan area; and

- the application of habitat connectivity and wildlife movement habitat desired conditions and guidelines would continue across the remaining plan area.

### Section 219.8(a)(b) – Social and Economic Sustainability – Cultural and Historic Resources and Uses, Section 219.10(a)(1) – Integrated Resource Management for Multiple Use – Cultural and Heritage Resources, and Section 219.10(b)(1)(ii) – Protection of Cultural and Historic Resources

Substantive requirements § 219.8(a)(b) – Social and economic sustainability – cultural and historic resources and uses, § 219.10(a)(1) – Integrated resource management for multiple use – cultural and heritage resources, and § 219.10(b)(1)(ii) – Protection of cultural and historic resources are directly related to the proposed amendment based on the purpose of excepting desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07 as they apply to the Resolution Copper Project preferred alternative area of disturbance. The proposed amendment would only apply to the Resolution Copper Project and would not except any other future projects.

**Scope**

The scope of this component of the project-specific amendment is the exception of three forest plan components—desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07—as they apply to the Resolution Copper Project preferred alternative area of disturbance. The proposed amendment would only apply to the Resolution Copper Project and would not except any other projects.

**Scale**

The scale of the amendment in the context of the substantive requirements § 219.8(a)(b) – Social and economic sustainability – cultural and historic resources and uses, § 219.10(a)(1) – Integrated resource management for multiple use – cultural and heritage resources, and § 219.10(b)(1)(ii) – Protection of cultural and historic resources is disturbance of 2,502 acres of NFS lands out of the 2,965,716 acres of the Tonto National Forest, or less than 0.09 percent of the Tonto National Forest.

**Application**

Excepting the Resolution Copper Project from adhering to the three desired conditions would have an adverse impact on cultural resources in the preferred alternative area of disturbance. However, as discussed previously, excepting the Resolution Copper Project from these desired conditions would not detract from the Forest Service's ability to implement the forest plan to provide for the protection of cultural and historic resources, and the mandates of the 2012 Planning Rule would be met.

The Resolution Copper Project preferred alternative includes measures to minimize impacts to cultural resources from the Resolution Copper Project, although it is recognized that mitigation is primarily effective off-site and of benefit from a forest-wide perspective. These include measures that would require mitigating the loss of Oak Flat campground (which has cultural significance), resolving adverse effects on 41 historic properties that have been identified within the Oak Flat Federal Parcel, conducting data recovery on archaeological sites eligible for the NRHP with curated project materials and

archaeological collections, and preparing additional mitigation plan(s) that describe mitigation measures to address effects on historic properties. A design feature to select a tailings corridor location with fewer impacts is built into the preferred alternative.

There are 15 desired conditions, 19 guidelines, and eight standards to protect cultural resources in the forest plan that are not subject to exception as part of this proposed amendment; those forest plan components continue to apply throughout the Tonto National Forest, including in the project area.

The implementation of the Resolution Copper Project preferred alternative would result in construction, use, and maintenance of electrical transmission lines, pipelines, and associated infrastructure that would disturb 2,502 acres of NFS lands and not affect that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative. This is less than 0.09 percent of the Tonto National Forest, which is a minor amount of impact when considered on a forest-wide basis.

The proposed amendment would not affect the majority of cultural resources across the forest. Although there would be an adverse impact through direct impacts to eight cultural sites (Newell 2018a), within the 2,502-acre preferred alternative area of disturbance of NFS lands, it would be limited and would not be significant enough to affect forest-wide trends toward desired conditions. This would not impede the forest plan's movement toward the desired condition over the majority of the forest.

The remainder of the forest plan is unaffected by the project-specific amendment. The substantive requirements § 219.8(a)(b) – Social and economic sustainability – cultural and historic resources and uses, § 219.10(a)(1) – Integrated resource management for multiple use – cultural and heritage resources, and § 219.10(b)(1)(ii) – Protection of cultural and historic resources would be sufficiently applied within the scope and scale of the project-specific amendment that ecological integrity of wildlife connectivity across the plan area are maintained or restored because

- required mitigation and design features would compensate for impacts to cultural resources in the preferred alternative area of disturbance;

- the limited scope of this component of the proposed amendment and the fact that the proposed exceptions would only apply to three out of 18 forest-wide desired conditions;

- forest-wide, cultural resource management would continue toward meeting the desired conditions;

- the limited area of the proposed exception to cultural resources in the plan area; and

- the application of cultural resource desired conditions and guidelines would continue across the remaining plan area.

### Section 219.10(a)(3) – Appropriate Placement and Sustainable Management of Infrastructure, such as Recreational Facilities and Transportation and Utility Corridors

Substantive requirement § 219.10(a)(3) – Appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors, is directly related to the proposed amendment through the purpose of excepting desired condition NTMA-DC-03 and guideline NTMA-G-01. The overarching goal of the substantive requirements found in § 219.10 is to provide for ecosystem services and multiple uses within Forest Service authority and the inherent capability of the plan area. The substantive requirement specific to utility corridors is consideration of appropriate placement and sustainable management of infrastructure, including utility corridors.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1391 of 2158
Case 2:21-cv-00122-DWL    Document 87-2    Filed 07/14/25    Page 92 of 96

Appendix T

**Scope**

The scope of this component of the project-specific amendment is the exception of desired condition NTMA-DC-03 and guideline NTMA-G-01 as they apply to the Resolution Copper Project preferred alternative area of disturbance. The proposed amendment would only apply to the Resolution Copper Project and not except any other projects.

**Scale**

The scale of the amendment is the 2,502 acres of land in the Resolution Copper Project preferred alternative area of disturbance. These acreages correlate to less than 0.09 percent of the total Tonto National Forest.

**Application**

The forest plan includes forest-wide desired conditions, guidelines, standards, and objectives for lands, special uses, and energy production and distribution, which include utility corridors, electrical transmission lines, and pipelines. The forest plan also includes forest-wide desired conditions, guidelines, standards, and objectives for recreational facilities, including recreation, developed recreation, facilities, cultural resources, and roads. The amended forest plan direction provides sufficient direction for future placement of infrastructure, including utility corridors, as well as recreational facilities.

The application of the proposed Resolution Copper Project–specific amendment demonstrates that the amendment is consistent with the 2012 Planning Rule. Furthermore, the remainder of the forest plan is unaffected by the Resolution Copper Project–specific amendment and is adequately protecting and maintaining the riparian resources. The substantive requirement § 219.10(a)(3) – Appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors, would be sufficiently applied within the scope and scale of the project-specific amendment, and no additional plan components are needed to ensure appropriate placement and sustainable management of infrastructure, including utility corridors and recreational facilities because

- the limited footprint of the impact to the Arizona National Scenic Trail from the Resolution Copper Project preferred alternative would be 45 acres of the 128,000 acres of Arizona National Scenic Trail corridor on the Tonto National Forest; and

- forest plan direction for recreational facilities and transportation and utility corridors would continue to apply across the forest, along with other forest plan direction, which does not foreclose future placement of infrastructure.

# Compliance with the Planning Rule Regulations

This section provides the agency's view of why the updated proposed amendment is consistent with the 2012 Planning Rule, specifically 36 CFR § 219.13, the section outlining the requirements for forest plan amendments.

The NFMA regulation at **36 CFR § 219.13(a)** states:

> A plan may be amended at any time. Plan amendments may be broad or narrow, depending on the need for change, and should be used to keep plans current and help units adapt to new information or changing conditions. The responsible official has the discretion to determine whether and how to amend the plan and to determine the scope and scale of any amendment. Except as provided by paragraph (c) of this section, a plan amendment is required to add, modify, or remove one or more plan components, or to change how or where one or more plan

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1392 of 2158
Case 2:21-cv-00122-DWL   Document 87-2   Filed 07/14/25   Page 93 of 96

Appendix T

components apply to all or part of the plan area (including management areas or geographic areas).

The responsible official used his discretion to propose an amendment to allow the Resolution Copper Project to move forward. The proposed amendment is narrow and is limited to the Resolution Copper Project. The amendment excepts the Resolution Copper Project from nine guidelines and seven desired conditions. The exception only applies to the Resolution Copper Project preferred alternative. The preferred alternative would issue a special use authorization to construct, operate, and maintain electrical transmission lines, pipelines, and associated infrastructure. The FEIS analysis indicates that 2,502 acres of land would be disturbed. The proposed amendment is consistent with the direction at 36 CFR § 219.13(a).

The NFMA regulation at **36 CFR § 219.13(b)(1)** states:

> Base an amendment on a preliminary identification of the need to change the plan. The preliminary identification of the need to change the plan may be based on a new assessment; a monitoring report; or other documentation of new information, changed conditions, or changed circumstances. When a plan amendment is made together with, and only applies to, a project or activity decision, the analysis prepared for the Project or activity may serve as the documentation for the preliminary identification of the need to change the plan.

The proposed amendment is a project-specific amendment, and the 2025 Resolution Copper Project FEIS serves as the documentation for the need to change the plan. This is consistent with the direction at 36 CFR § 219.13(b)(1).

The NFMA regulation at **36 CFR § 219.13(b)(2)** states:

> Provide opportunities for public participation as required in § 219.4 and public notification as required in § 219.16. The responsible official may combine processes and associated public notifications where appropriate, considering the scope and scale of the need to change the plan. The responsible official must include information in the initial notice for the amendment (§ 219.16(a)(1)) about which substantive requirements of §§ 219.8 through 219.11 are likely to be directly related to the amendment (§ 219.13(b)(5)).

Opportunities for public participation have been extensive for this project. The 2021 Resolution Copper Project FEIS section 1.6 (pp. 34 to 39) describes the public involvement process used to develop the 2021 Resolution Copper Project FEIS. The 2025 Resolution Copper Project FEIS section 1.6 describes the public involvement process used to develop the 2025 Resolution Copper Project FEIS and resulting 2025 Forest Service draft record of decision. The Forest Service used a wide variety of tools to engage the public, including mailings, public meetings, legal notices in local newspapers and the Federal Register, distribution of information on the Internet, and intake of comments electronically and in writing. Federal agencies have conducted outreach to affected landowners, public and private organizations, individuals, State and local governments, and Tribes. The Forest Service consulted on a government-to-government basis with federally recognized Native American Tribes having traditional interests in and/or ties to the lands potentially affected by a proposed action and alternatives. The public participation process, which began in March 2016 and continues today, is consistent with 36 CFR § 219.4.

This proposed amendment is a project-specific amendment; therefore, the notification requirements of 36 CFR Part 218 were followed, in accordance with direction at 36 CFR § 219.16(b). The notice of availability for this FEIS serves as the required Federal Register notice for inviting comments on the proposed amendment (36 CFR § 219.16(c)(3)). The public notification process is consistent with 36 CFR § 219.16.

The initial notice for this proposed amendment was the notice of intent for this FEIS, and it included information on which substantive requirements are likely to be directly related to the amendment. The

public participation effort undertaken for this proposed amendment is consistent with 36 CFR § 219.13(b)(2).

The NFMA regulation at **36 CFR § 219.13(b)(3)** states:

> Amend the plan consistent with Forest Service NEPA procedures. The appropriate NEPA documentation for an amendment may be an environmental impact statement, an environmental assessment, or a categorical exclusion, depending upon the scope and scale of the amendment and its likely effects. Except for an amendment that applies only to one project or activity, a proposed amendment that may create a significant environmental effect and thus requires preparation of an environmental impact statement is considered a significant change in the plan for the purposes of the NFMA and therefore requires a 90-day comment period for the proposed plan and draft environmental impact statement (§ 219.16(a)(2)), in addition to meeting the requirements of this section.

This amendment applies only to the Resolution Copper Project; therefore, the amendment is not considered a significant change in the plan for the purposes of the NFMA. A 90-day comment period is not required. This comment period for this proposed amendment is consistent with 36 CFR § 219.13(b)(3).

The NFMA regulation at **36 CFR § 219.13(b)(4)** states:

> Follow the applicable format for plan components set out at § 219.7(e) for the plan direction added or modified by the amendment, except that where an amendment to a plan developed or revised under a prior planning regulation would simply modify the area to which existing direction applies, the responsible official may retain the existing formatting for that direction.

This proposed amendment excepts nine guidelines and seven desired conditions by describing where the desired conditions and guidelines would not apply, which is consistent with 36 CFR § 219.7(e). The Resolution Copper Project–specific amendment is only applicable to the Resolution Copper Project, which is consistent with 36 CFR § 219.7(e). Therefore, the proposed amendment is consistent with 36 CFR § 219.13(b)(4).

The NFMA regulation at **36 CFR § 219.13(b)(5)** states:

> Determine which specific substantive requirement(s) within §§ 219.8 through 219.11 are directly related to the plan direction being added, modified, or removed by the amendment and apply such requirement(s) within the scope and scale of the amendment. The responsible official is not required to apply any substantive requirements within §§ 219.8 through 219.11 that are not directly related to the amendment.

The "Step 2" section in this document describes which specific substantive requirements are directly related to the proposed amendment. Each desired condition and guideline proposed to be excepted were reviewed for purpose and effect of the amendment. Excepted desired conditions and guidelines that would result in an adverse effect require further review to determine whether the adverse effects were substantial, would substantially lessen plan protections, or would be beneficial. Ten substantive requirements were found to be directly related due to purpose of the amendment. No substantive requirements were found to be directly related due to adverse effects, and no substantive requirements were found to be directly related due to beneficial effects. The determination of directly related substantive requirements is consistent with 36 CFR § 219.13(b)(5).

The "Step 3" section in this document applies to the directly related substantive requirements. The Forest Service must ensure that the forest plan will contain components that meet the directly related substantive requirements even after the Resolution Copper Project–specific amendment takes effect. Specifically, the

amended plan must contain plan components that maintain or restore[199] ecosystem integrity and diversity (36 CFR § 219.8 and 219.9), guide the plan area's contribution to social and economic sustainability (36 CFR § 219.10), and guide timber management within the plan area (36 CFR § 219.11). To "maintain" a resource is defined by the rule as "to keep in existence or continuance of the desired ecological condition in terms of desired composition, structure, and processes" (36 CFR § 219.19). This does not infer that there must be *no net loss* to the resource in question across the plan area.

---

[199] The process of assisting the recovery of an ecosystem that has been degraded, damaged, or destroyed. Ecological restoration focuses on reestablishing the composition, structure, pattern, and ecological processes necessary to facilitate terrestrial and aquatic ecosystem sustainability, resilience, and health under current and future conditions (36 CFR § 219.19).

*This page intentionally left blank.*

**Forest Service**
U.S. DEPARTMENT OF AGRICULTURE

**Tonto National Forest**                    MB-R3-12-10                    **June 2025**

# **DRAFT** Record of Decision

# Authorization of Special Use Permits, Road Use Permits, and Plan Amendment, Resolution Copper Project

Gila and Pinal Counties, Arizona

ABSTRACT

The final environmental impact statement (FEIS) for the Resolution Copper and Land Exchange Project analyzes the potential environmental effects from the disposition of National Forest System (NFS) land and development of the proposed Resolution Copper Mine near Superior, Arizona. Under the Southeast Arizona Land Exchange and Conservation Act (16 U.S.C. § 539p) Congress mandated that the U.S. Forest Service dispose of certain NFS land by exchange. Congress further specifies that proposed mining operations on land to be conveyed in the exchange are not to be regulated by the Forest Service.

The Forest Service does regulate uses of NFS land outside of the exchange area that will be required to conduct mining operations. This draft record of decision (ROD) documents the Forest Service's decision to authorize uses of NFS land by issuing special use authorizations for pipeline and powerline corridors, road use permits, and a project-specific Forest Plan Amendment associated with the Resolution Copper Project.

*In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.*

*Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.*

*To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.*

*USDA is an equal opportunity provider, employer, and lender.*

# Draft Record of Decision

# Authorization of Special Uses and Road Use Resolution Copper Project

LEAD AGENCY:                   U.S. Department of Agriculture

Tonto National Forest

2324 East McDowell Road

Phoenix, Arizona 85006

(602) 225-5200

DATE DECISION SIGNED:        _____

COOPERATING AGENCIES:    U.S. Army Corps of Engineers

U.S. Department of the Interior Bureau of Land Management

U.S. Environmental Protection Agency

Arizona State Land Department

Arizona Department of Environmental Quality

Arizona Department of Water Resources

Arizona Game and Fish Department

Arizona State Mine Inspector

Pinal County Air Quality Control District

# Table of Contents

Part 1 Introduction ........................................................................................................................ 1
   1.1    About This Document ........................................................................................................ 1
   1.2    Proposed Resolution Copper Mine Project ...................................................................... 2
        1.2.1   Project Overview (as originally proposed) ........................................................ 2
        1.2.2   Changes to the Proposed Action during the NEPA Process ................................ 3
Part 2 Decision .............................................................................................................................. 5
   2.1    Introduction and Decision Authority ................................................................................ 5
        2.1.1   Authorization of Special Use for Salt River Project Power Lines ...................... 6
        2.1.2   Authorization of Special Use for Resolution Copper Pipelines ......................... 7
        2.1.3   Road Use Permit ................................................................................................ 7
        2.1.4   Approval of Project-Specific Land Management Plan Amendment ............................... 8
Part 3 Principal Reasons for the Decision .................................................................................... 15
   3.1    Water Quality .................................................................................................................. 15
   3.2    Groundwater-Dependent Ecosystems ............................................................................ 16
   3.3    Recreation and Scenic Resources .................................................................................. 16
   3.4    Public Safety and Long-Term Management .................................................................... 17
   3.5    Socioeconomics .............................................................................................................. 17
   3.6    Tribal Values .................................................................................................................. 18
   3.7    Meeting Project's Purpose and Need .............................................................................. 18
Part 4 Applicant-Committed Environmental Protection Measures, Monitoring, And Mitigation ............. 19
   4.1    General ............................................................................................................................ 20
   4.2    Geology and Subsidence ................................................................................................ 20
   4.3    Soils, Vegetation, and Reclamation .............................................................................. 21
   4.4    Transportation and Access ............................................................................................. 22
   4.5    Air Quality ...................................................................................................................... 23
   4.6    Water Resources ............................................................................................................. 23
   4.7    Wildlife .......................................................................................................................... 24
   4.8    Recreation ....................................................................................................................... 26
   4.9    Public Health and Safety ................................................................................................ 26
        4.9.1   Tailings and Pipeline Safety ............................................................................ 26
        4.9.2   Fire Safety ........................................................................................................ 27
        4.9.3   Hazardous Materials ........................................................................................ 28
   4.10  Scenic Resources ........................................................................................................... 28
   4.11  Cultural Resources ......................................................................................................... 29
Part 5 Public Involvement and Issues .......................................................................................... 30
   5.1    Public Involvement Process ............................................................................................ 30
        5.1.1   Scoping ............................................................................................................. 30
        5.1.2   Project Update and Alternatives Development Workshop ................................ 31
        5.1.3   Public Comments on the Draft Environmental Impact Statement ..................... 31
   5.2    Consultation with Other Agencies ................................................................................. 31
   5.3    Summary of Public Comment on Draft Environmental Impact Statement ..................... 32
        5.3.1   NEPA, Regulatory, or Procedural Comments .................................................. 32
        5.3.2   Water-Related Comments ................................................................................. 32
        5.3.3   Mitigation-Related Comments .......................................................................... 32

5.3.4    Other Issues ................................................................................................ 33

Part 6 Alternatives Considered ................................................................................................ 34
6.1    Alternatives Considered in Detail in the Final Environmental Impact Statement ................... 34
6.2    Environmentally Preferred Alternative ...................................................................... 35
6.3    Alternatives Eliminated from Detailed Analysis .......................................................... 35

Part 7 Legally Required Findings ............................................................................................. 37
7.1    Tribal Consultation and Coordination (Executive Order 13175) and Consultation with
Tribes on Indian Sacred Sites (Executive Order 13007) ............................................... 37
7.1.1    Tribal Consultation ........................................................................... 37
7.1.2    Development of Programmatic Agreement .................................................. 38
7.1.3    American Indian Religious Freedom Act of 1978 and Religious Freedom
Restoration Act of 1993 ...................................................................... 41
7.1.4    Summary of Compliance with Executive Orders 13175 and 13007, and with
Section 3003 of PL 113-291 ................................................................. 41
7.2    National Forest Management Act of 1976 and the Tonto National Forest Revised Forest
Plan .............................................................................................................. 42
7.3    National Environmental Policy Act .......................................................................... 42
7.4    Organic Administration Act of 1897 ........................................................................ 43
7.5    Endangered Species Act ...................................................................................... 43
7.6    National Historic Preservation Act .......................................................................... 43
7.7    Migratory Birds ............................................................................................... 44
7.8    Water Pollution Control Act of 1972 (Clean Water Act) ................................................ 45
7.9    Federal Noxious Weed Act of 1974 and Invasive Species (Executive Order 13112) ............. 45
7.10   Wetlands (Executive Order 11990) and Floodplains (Executive Order 11988) ................... 46
7.11   Clean Air Act of 1963 ........................................................................................ 46
7.12   Special Uses ................................................................................................... 47
7.13   Resource Conservation and Recovery Act ................................................................. 47

Part 8 Administrative Review Opportunities ................................................................................ 48
8.1    Implementation Timeline ..................................................................................... 48
8.2    Contact Person ................................................................................................ 49

References ........................................................................................................................ 50

## APPENDICES

Appendix A.    Summary of Applicant-Committed Environmental Protection Measures, Monitoring,
and Mitigation Not Included as Terms and Conditions for Authorized Use of NFS Lands

Appendix B.    Maps of Pipeline/Power Line Routes for Authorization

# Acronyms and Abbreviations

| ACRONYM / ABBREVIATION | DEFINITION |
| --- | --- |
| ACHP | Advisory Council on Historic Preservation |
| ADEQ | Arizona Department of Environmental Quality |
| AGFD | Arizona Game and Fish Department |
| ASLD | Arizona State Land Department |
| AZPDES | Arizona Pollutant Discharge Elimination System |
| BLM | Bureau of Land Management |
| CAA | Clean Air Act |
| CFR | Code of Federal Regulations |
| CWA | Clean Water Act |
| DEIS | draft environmental impact statement |
| EIS | environmental impact statement |
| FEIS | final environmental impact statement |
| forest plan | Tonto National Forest Land Management Plan |
| Forest Service | U.S. Department of Agriculture Forest Service |
| FWS | U.S. Department of the Interior Fish and Wildlife Service |
| GDE | groundwater-dependent ecosystem |
| GPO | General Plan of Operations |
| HPTP | historic properties treatment plan |
| kV | kilovolt |
| MARRCO | Magma Arizona Railroad Company |
| MOU | memorandum of understanding |
| MSHA | Mine Safety and Health Administration |
| NEPA | National Environmental Policy Act |
| NFS | National Forest System |
| NHPA | National Historic Preservation Act |
| NPAG | non-potentially acid generating |
| PA | Programmatic Agreement |
| PAG | potentially acid generating |
| PL | Public Law |
| project | Resolution Copper Project and Land Exchange |

| ACRONYM / ABBREVIATION | DEFINITION |
| --- | --- |
| Resolution Copper | Resolution Copper Mining LLC |
| ROD | record of decision |
| ROS | recreation opportunity spectrum |
| SHPO | State Historic Preservation Office |
| SRP | Salt River Project |
| SUA | special use authorization |
| USACE | U.S. Army Corps of Engineers |
| U.S.C. | United States Code |
| USDA | U.S. Department of Agriculture |
| VQO | Visual Quality Objective |

# Preface

In December 2014, the Tonto National Forest accepted a proposed General Plan of Operations (GPO) submitted to the Tonto National Forest by Resolution Copper Mining LLC (Resolution Copper). Resolution Copper is proposing to develop an underground copper mine currently on National Forest System (NFS) land that is to be conveyed to Resolution Copper near the town of Superior in Pinal County, Arizona, approximately 60 miles east of Phoenix, Arizona, where Resolution Copper currently holds unpatented mining claims. Resolution Copper is a limited liability company that is owned by Rio Tinto (55 percent) and BHP (45 percent). Rio Tinto is the managing member. The portion of the Resolution Copper Mine deposit explored to date is located primarily on NFS land that is open to mineral entry under the General Mining Law of 1872. The land exchange, and the proposed mine, will also include land within the Oak Flat Withdrawal Area that has been withdrawn from entry under the Mining Laws.

In December 2014, Congress mandated a land exchange pending completion of the environmental impact statement (EIS), as outlined in the Southeast Arizona Land and Conservation Act, 16 United States Code (U.S.C.) § 539p (which is referred to in this document as Public Law (PL) 113-219). The NFS land to be conveyed to Resolution Copper encompasses the copper deposit. PL 113-291 further specified the following:

> Prior to conveying Federal land under this section, the Secretary shall prepare a single environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities.

The EIS therefore considered the environmental impacts not only of the mining proposal and all connected actions, but also of the land exchange itself. However, the decisions to be made by the Forest Service are limited to authorization of the proposed uses of NFS land outside of the land to be exchanged, since PL 113-291 mandates the land exchange if certain requirements are met, and specifies that mining operations to be conducted on the NFS land to be conveyed are to be regulated under State and local laws that pertain to mining operations on private land (16 U.S.C. § 539p(c)(8)). Accordingly, mining operations within the area to be conveyed by the Forest Service in the exchange will not be subject to regulation by the Forest Service, since Forest Service regulation of mining operations pertains only to mining operations conducted on NFS land under the jurisdiction of the Secretary of Agriculture (36 Code of Federal Regulations (CFR) § 228.2). Further, PL 113-291 requires that the EIS consider impacts to cultural and archaeological resources that may be located on Federal land, and identify measures that may be taken to minimize potential impacts to those resources (16 U.S.C. § 639p(c)(9)(C)). Based on this analysis, and consultation with Indian Tribes, the Forest Service is required to consult with Resolution Copper to find mutually acceptable measures to address concerns of the Indian Tribes and minimize adverse effects on the affected Indian Tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper (16 U.S.C. § 539p(c)(3)).

PL 113-291 directs, "Not later than 60 days after the date of publication of the final environmental impact statement, the Secretary shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper" (16 U.S.C. § 539p(c)(3)).

This draft record of decision (Draft ROD) is being published in conjunction with the final environmental impact statement (FEIS) for the Resolution Copper Project and Land Exchange.[1] The Final ROD will not be signed until after conclusion of the pre-decisional objection process, as required under 36 CFR § 218 Subparts A and B. As a result of this timing, it is likely that the decision described in this Draft ROD document will be made after transfer of the Oak Flat Federal Parcel to Resolution Copper.

Following the land exchange, all mineral extraction operations will take place on private land. In addition, Resolution Copper has indicated that it intends to place the tailings storage facility on private lands or Arizona State Trust lands. As a result, the only decision to be made by the Forest Service concerns the proposed use of NFS roads, and the use of NFS land for a tailings pipeline corridor and power line corridors across NFS lands. The authorization for uses of NFS lands and roads associated with the Resolution Copper Project would be implemented by issuance of authorizations under 36 CFR § 251 Subpart B and 36 CFR § 212 Subpart A, since they will be associated with mining operations that take place exclusively on private land, and not on Federal land under the Mining Laws.

This document has been written to reflect the conditions at the point in time the Final ROD will be published, not the conditions at the time the Draft ROD was published.

This Draft ROD is being shared with those on the project mailing list, as well as the general public via the Internet. Questions regarding this Forest Service draft decision document can be directed to Michelle Tom, Engineering and Minerals Staff Officer, Tonto National Forest, Phoenix, Arizona, and emailed to comments-southwestern-tonto@usda.gov.

---

[1] The titles of the FEIS and Draft ROD intentionally differ. The FEIS includes analysis of both the Resolution Copper Mine project, and the congressionally mandated land exchange. This Draft ROD addresses decisions only related to the Resolution Copper Mine project, as there is no discretion or decision to be made with respect to the land exchange.

# PART 1 INTRODUCTION

## 1.1    About This Document

The U.S. Forest Service (Forest Service), in cooperation with the U.S. Army Corps of Engineers (USACE), U.S. Department of the Interior Bureau of Land Management (BLM), U.S. Environmental Protection Agency, Arizona State Land Department (ASLD), Arizona Department of Environmental Quality (ADEQ), Arizona Department of Water Resources, Arizona Game and Fish Department (AGFD), Arizona State Mine Inspector, and Pinal County Air Quality Control District, prepared an environmental impact statement (EIS) to review the potential environmental impacts of the Resolution Copper Project and Land Exchange (herein called the project).

In addition to the proposed action, four action alternatives were considered, along with the no action alternative. Public scoping for this project began in 2016 and resulted in the identification of the issues described in part 5.3 of this draft record of decision (Draft ROD). The Final EIS (FEIS) (U.S. Forest Service 2021) was released to the public in January 2021, along with this Draft ROD. However, on March 1, 2021, the U.S. Department of Agriculture (USDA) directed the Forest Service to withdraw the notice of availability and rescind the FEIS and Draft ROD. The USDA took this step to provide an opportunity for the agency to conduct a thorough review, to ensure regulatory compliance of environmental, cultural, and archaeological analyses, and to provide time for the Forest Service to fully understand concerns raised by Tribes and the public and the project's impact to these important resources.

The notice of availability of the republished FEIS (U.S. Forest Service 2025) was released to the public in the Federal Register in June 2025, along with the notification of the opportunity to object on the republished Draft ROD in the "Arizona Capitol Times" (paper of record). This Forest Service Draft ROD is specific to the authorization of special uses on National Forest System (NFS) lands.

This ROD is organized into eight parts:

- *Part 1 – Introduction* provides background information about the proposed Resolution Copper Mine from Resolution Copper Mining LLC (Resolution Copper), which has mineral claims for the Oak Flat area.

- *Part 2 – Decision* explains the authorities of the Forest Service to regulate use and occupancy of NFS lands for special use permit activities associated with development of the Resolution Copper Project.

- *Part 3 – Principal Reasons for the Decision* explains the circumstances and rationale behind the Forest Service decisions.

- *Part 4 – Applicant-Committed Environmental Protection Measures, Monitoring, and Mitigation* specifies the requirements necessary for implementation of special use permit activities.

- *Part 5 – Public Involvement and Issues* describes the public involvement process, a summary of public comments, a description of government consultation, and a summary of the issues.

- *Part 6 – Alternatives Considered* briefly summarizes the no action alternative and the action alternatives that were considered in detail, the environmentally preferred alternative, and alternatives that were eliminated from detailed analysis.

- *Part 7 – Legally Required Findings* lists the laws and regulations that were considered during the decision-making process.

- *Part 8 – Administrative Review Opportunities* describes the opportunity provided for pre-decisional administrative review under 36 Code of Federal Regulations (CFR) § 218 Subparts A and B, identifies the contact person for the project, and documents the signature authorizing this decision.

## 1.2    Proposed Resolution Copper Mine Project

### 1.2.1    Project Overview (as originally proposed)

In November 2013, Resolution Copper submitted a General Plan of Operations (GPO) to the Tonto National Forest for development and operation of a large-scale mine near Superior, Arizona. The proposed GPO sought authorization for surface disturbance on NFS lands for mining operations and processing of copper and molybdenum. The proposed mine would be located in the Tonto National Forest Globe and Mesa Ranger Districts. The Forest Service determined that the proposed GPO was complete in December 2014. The GPO describes the full breadth of activities that would take place for construction, operation, closure, and reclamation of the mine project. These activities are also described in detail in chapter 2 of the FEIS. They are briefly summarized below to provide context to the decisions considered in this Draft ROD.

The project will progress through three distinct phases: construction (years 1 to 9), operations (years 6 to 46), and closure and reclamation (years 46 and beyond). The type of copper deposit that would be mined at the East Plant Site is a porphyry deposit, a lower-grade deposit that requires higher mine production rates to be economically viable. The copper deposit that Resolution Copper proposes to mine averages 1.54 percent copper (i.e., every ton of ore would on average contain 31 pounds of copper). Operational projections are removal of 1.4 billion tons of ore and production of 40 billion pounds of copper using a mining technique known as panel caving. Using this process, a network of shafts and tunnels is constructed below the ore body. Access to the infrastructure associated with the panel caving would be from vertical shafts in an area known as the East Plant Site, located on an area known as Oak Flat. This area would include mine shafts and a variety of surface facilities to support mining operations. As originally proposed in 2013, portions of the East Plant Site were located on NFS lands and would have been subject to Forest Service regulation; however, these operations will now be occurring on private lands following the land exchange and will be subject to regulations outside the Forest Service.

While all mining will be conducted underground, removing the ore would cause the ground surface to collapse, creating a subsidence area at Oak Flat. The crater will start to appear in year 6 of active mining. The subsidence area ultimately will be between 800 and 1,115 feet deep and roughly 1.8 miles across. The EIS evaluated alternative mining techniques that could avoid subsidence, and explains why the Forest Service determined that those mining techniques were not reasonable alternatives to consider in detail. As the mine will be on private land, the Forest Service will not be approving any mining method.

Under Resolution Copper's proposed plan, mined ore will be crushed underground and then transported underground approximately 2.5 miles west to an area known as the West Plant Site (the location of the old Magma Mine in Superior, Arizona), where ore will be processed to produce copper and molybdenum concentrates. As originally proposed, a portion of the West Plant Site would have been located on NFS lands, which would have been subject to Forest Service regulatory jurisdiction. Resolution Copper later modified this portion of the West Plant Site to avoid use of NFS land (see "Changes to the Proposed Action during the NEPA Process" below).

Once processed, the copper concentrate will be pumped as a slurry through a 22-mile pipeline to a filter plant and loadout facility located near Florence Junction, Arizona, where copper concentrate will be filtered and then sent to off-site smelters via rail cars or trucks. The molybdenum concentrate will be filtered, dried, and sent to market via truck directly from the West Plant Site.

The copper concentrate slurry pipeline corridor will be located along an existing, previously disturbed right-of-way known as the Magma Arizona Railroad Company (MARRCO) corridor. The MARRCO corridor will also host other infrastructure for the mine, including water pipelines, power lines, pump

stations, and groundwater wells. Resolution Copper holds an existing right-of-way for those portions of the MARRCO corridor that cross NFS lands.

Tailings produced at the West Plant Site will be pumped as a slurry through several pipelines to a tailings storage facility. The tailings storage area will gradually expand over time. As originally proposed, the tailings storage facility was to have been located on NFS lands, which would have been subject to Forest Service regulatory jurisdiction. Resolution Copper later modified that part of the proposed mine plan to avoid use of NFS land (see "Changes to the Proposed Action during the NEPA Process" below).

All power to the mine will be supplied by the Salt River Project (SRP). Portions of the proposed electrical infrastructure will be located on NFS land and will require Forest Service authorization.

Water for the process will come from a variety of sources. Filtrate from the filter plant, recycled water from the tailings storage facility, and recovered water from the concentrator complex will be recycled for use in the mining process. Additional water will be obtained from dewatering of the mine workings, potential direct delivery of Central Arizona Project water, and pumping from a well field along the MARRCO corridor.

Reclamation will be conducted to achieve post-closure land use objectives, including closing and sealing the mine shafts, removing surface facilities and infrastructure, and establishing self-sustaining vegetative communities using local species. The proposed tailings storage facility will be reclaimed in place, providing for permanent storage of mine tailings.

### 1.2.2   Changes to the Proposed Action during the NEPA Process

In March 2016, the Tonto National Forest undertook preparation of an EIS in order to (1) consider the effects of anticipated mining operations that would be reasonably incident to extraction, transportation, and processing of copper and molybdenum, and (2) consider the effects of the exchange of lands between Resolution Copper and the United States as directed by the Southeast Arizona Land and Conservation Act, 16 United States Code (U.S.C.) § 539p (which is referred to in this document as Public Law (PL) 113-219).

During this process, a number of alternatives to the proposed action were considered for purposes of the environmental analysis. These include the following:

- Facilities near the West Plant Site on NFS lands were redesigned to avoid the need to use NFS lands.

- A number of tailings storage facility alternatives were considered, including the location evaluated in Alternative 6 – Skunk Camp, under which the tailings storage facility will be located off of Federal lands, on private and Arizona State Trust lands (which Resolution Copper will need to acquire). Alternative 6 – Skunk Camp became the preferred alternative in the FEIS.

As a result of these changes and the congressionally mandated land exchange, the elements of the mine project to be located on NFS land, and thus subject to Forest Service regulations, have changed since initial submittal of the GPO. The activities or surface disturbance associated with the East Plant Site, subsidence area, West Plant Site, and tailings storage facility will no longer take place on NFS lands. These components of the project therefore will require no decision or authorization by the Forest Service.

The sole remaining uses of NFS lands associated with the Resolution Copper Project are as follows:

- several new or upgraded power lines;

- a pipeline corridor to convey tailings slurry from the West Plant Site to the tailings storage facility; and

- the upgrade, maintenance, construction, and use of NFS roads.

The decisions in the Draft ROD apply only to these project components as analyzed in the FEIS.

# PART 2  DECISION

## 2.1    Introduction and Decision Authority

In December 2014, Congress mandated a land exchange pending completion of the EIS, as outlined in the Southeast Arizona Land and Conservation Act, 16 U.S.C. § 539p (which is referred to in this document as PL 113-219). The NFS land to be conveyed to Resolution Copper encompasses the copper deposit. PL 113-291 specified,

> *Prior to conveying Federal land under this section, the Secretary shall prepare a single environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities.*

The EIS therefore considered the environmental impacts not only of the mining proposal and all connected actions, but also of the land exchange itself. PL 113-291 further directed, "Not later than 60 days after the date of publication of the final environmental impact statement, the Secretary shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper" (16 U.S.C. 539p(c)(3)).

Mining operations within the area conveyed by the Forest Service in the exchange are not subject to regulation by the Forest Service, since Forest Service regulation of mining operations pertains only to mining operations conducted on NFS land under the jurisdiction of the Secretary of Agriculture (36 CFR § 228.2). The decisions to be made by the Forest Service are limited to authorization of the proposed uses of NFS land outside the exchanged land.

The Forest Service and USACE are making separate but coordinated decisions related to the proposed Resolution Copper Project. These decisions are based on the FEIS and applicable laws, regulations, and policies. The Forest Service is making a decision regarding whether and how to authorize the use and occupancy of NFS land for mine-related pipeline and power line infrastructure crossing NFS lands, along with maintenance, reconstruction, and use of NFS roads.

Any associated uses of NFS land for pipelines and utilities are special uses and are regulated under 36 CFR § 251.50 because they are associated with mining on private property and therefore do not involve operations conducted under the U.S. mining laws. Authorization for a special use or occupancy of NFS lands requires submittal of a special use application (SF-299). This application process is designed to ensure that authorizations to use and occupy NFS lands are in the public interest (36 CFR § 251, Subpart B). Once submitted, this application is subject to initial screening (36 CFR § 251.54(e)(1)). After completion of the initial screening, a secondary screening is undertaken (36 CFR § 251.54(e)(5)). After consideration of the screening criteria, the Forest Service may decide to accept an application for processing (36 CFR § 251.54(g)). In processing the application, the Forest Service must consider the potential environmental effects of authorizing the proposed uses of NFS land in accordance with the National Environmental Policy Act (NEPA), and the Forest Supervisor must proceed to either approve or deny the authorization. The special use authorization (SUA) must include terms and conditions (36 CFR § 251.56), including minimizing damage to the environment, protecting the public interest, and requiring compliance with water and air quality standards.

The following applications have been submitted to the Tonto National Forest:

- SRP would be the owner and operator of the power line to the tailings storage facility, largely co-located with the tailings slurry pipelines. SRP would be responsible for construction, operation, and maintenance of the power line and would hold the special use permit. SRP submitted an SF-299 Special Use Permit application on November 11, 2020. Tonto National Forest staff carried out initial and secondary screenings and accepted the application on November 18, 2020. These documents are found in appendix Q of the FEIS.

- Resolution Copper submitted an SF-299 Special Use Permit application on September 7, 2020. Tonto National Forest staff carried out initial and secondary screenings and accepted the application on September 28, 2020. These documents are found in appendix Q of the FEIS.

The Tonto National Forest implemented a new "Tonto National Forest Land Management Plan" (forest plan) in December 2023 (U.S. Forest Service 2023). The Resolution FEIS and project record contain an analysis of the project's compliance with the new forest plan, which determined that the selection of Alternative 6 – Skunk Camp would require a multi-component amendment to the forest plan. The forest plan would be amended as part of the action to approve the project. The proposed amendment would be limited to apply only to this project. Only the selected Federal action detailed in this Draft ROD would be excepted from the specific current plan desired conditions and guidelines included in the amendment. This project complies with all other desired conditions, objectives, standards, and guidelines applicable to the actions of this project. Refer to appendix T of the republished FEIS for more detailed information on the specific proposed amendment for the selected Federal action, as well as assessment of the consistency of the forest plan amendment with the National Forest Management Act.

It is expected that the USACE will issue an individual permit under Section 404 of the Clean Water Act (CWA) for dredge and fill of waters of the U.S. associated with the tailings storage facility and the tailings pipeline corridor. Because of separate agency authorities, the Forest Service and USACE each prepare a separate ROD for their respective decision. The decision of each agency is developed in close coordination with the other because operations are interconnected and the FEIS was required to support both decisions. This Forest Service decision presumes that the USACE will select the preferred alternative (Alternative 6 – Skunk Camp) identified in the FEIS, as opposed to the no action alternative.

### 2.1.1 Authorization of Special Use for Salt River Project Power Lines

My decision approves the issuance of an SUA in order to allow the construction, operation, maintenance, and reclamation of transmission lines by SRP across NFS lands. These include the following:

- A new 3.6-mile, 230-kilovolt (kV) power line from the Silver King substation to Oak Flat substation, to serve the East Plant Site.

- A new 16.9-mile power line from the existing Silver King substation to the Skunk Camp tailings storage facility. Preliminary assessment of line voltage options show that either a 69-kV or 115-kV voltage level would be adequate to supply power to the tailings storage facility; the design is for a 115-kV line. The power line would almost entirely follow the same corridor as the tailings pipelines, except for a section between the Silver King substation and the tailings pipeline corridor where the 115-kV line parallels the existing 230-kV power line. Approximately 298 acres of NFS lands would be included in the power line corridor, which is collocated with the pipeline corridor described below. An additional 28 acres of NFS lands would be required outside the collocated corridor for power poles and access roads or trails.[2]

---

[2] These acreages reflect the conditions after the land exchange has occurred.

- Maps of the SUA routes are included as appendix A. It should be noted that SRP must obtain a Certificate of Environmental Compatibility from the Arizona Corporation Commission, following what is known as the "line siting" process. The SUA would not be issued to SRP until this process is complete.

### 2.1.2  Authorization of Special Use for Resolution Copper Pipelines

My decision approves the issuance of an SUA in order to allow the construction, operation, maintenance, and reclamation of tailings and water pipelines by Resolution Copper across NFS lands, including the following:

- A 19.6-mile pipeline corridor from the West Plant Site to the Skunk Camp tailings storage facility. Approximately 593 acres of NFS lands would be part of the pipeline corridor.

- Maps of the SUA routes are included as appendix A.

### 2.1.3  Road Use Permit

My decision approves the commercial use of NFS roads in accordance with 36 CFR § 212, Subpart A, which will include the construction, reconstruction, use, and maintenance of NFS roads in the vicinity of the West Plant Site and the MARRCO corridor. Resolution Copper has submitted a revised road use plan describing the planned uses (Resolution Copper 2020b).[3] The road use plan as submitted includes the following components (a final road use plan will be included with the appropriate request for authorization):

- There are 17 proposed access points from NFS roads along the MARRCO corridor for use for both construction and operation/maintenance purposes.

- Several NFS roads intersect the MARRCO corridor. The sections of NFS roads that cross the pipeline will be temporarily closed in coordination with the Forest Service and/or other relevant land management agencies (e.g., ASLD), and then reestablished to their existing maintenance level after construction.

- The tailings storage facility will not impact NFS roads. However, the tailings pipeline and the various power line corridors will cross NFS roads. The pipeline infrastructure will be buried via trench installation during construction (except for tunnel and bridge span sections). The sections of NFS roads that cross the pipeline will be temporarily closed in coordination with Forest Service and ASLD as needed, and then reestablished to their existing maintenance level after construction in coordination with Forest Service, ASLD, and Pinal County as needed. Two new road segments (PNR-1 and PNR-2) would need to be constructed on Tonto National Forest land for access to the tailings pipeline and power line corridor.

- Approximately 20 NFS roads will be maintained by Resolution Copper at a range of maintenance levels.

- Resolution Copper has also proposed an alternative routing of Silver King Mine Road (NFS Road 229), which would be used to transport mine personnel, equipment, supplies, and molybdenum and other mine products, to and/or from the West Plant Site, as described in section 2.2.9.2 of the FEIS.

---

[3] Any existing routes will be maintained in compliance with the Final ROD for Travel Management on the Tonto National Forest, which is anticipated to be signed before the Resolution Copper Final ROD, and in compliance with the published Motor Vehicle Use Map, which is produced yearly by the Tonto National Forest. The revised road use plan is available as a reference to the FEIS and includes a detailed list of the specific roads to be used.

As the Forest Service responsible official, I have decided to issue SUAs to permit these activities associated with the Resolution Copper Project under regulations codified at 36 CFR § 251 Subpart B, and permission for road use under regulations codified at 36 CFR § 212 Subpart A, and to determine the terms and conditions of such authorizations.

### 2.1.4  Approval of Project-Specific Land Management Plan Amendment

Additionally, my decision approves the multi-component project-specific plan amendment to the 2023 "Tonto National Forest Land Management Plan" (U.S. Forest Service 2023).

## Details of Amendment

The full context of 2023 forest plan desired conditions, objectives, standards, and guidelines (plan components) were taken into consideration in making this decision, as detailed in the forest plan consistency review (SWCA Environmental Consultants 2025). Under the National Forest Management Act and its implementing regulations at 36 CFR § 219 (2012 Planning Rule), a plan may be amended at any time. Plan amendments may be broad or narrow, depending on the need for the change. The responsible official has the discretion to determine whether and how to amend the forest plan and to determine the scope and scale of any amendment.

The selected Federal action would not comply with all forest plan components without an amendment. The purpose of this amendment is to except the selected Federal action from complying with specific forest plan desired conditions and guidelines, which would allow this project to be consistent with the forest plan. This multi-component, project-specific forest plan amendment includes nine guidelines and seven desired conditions. The amendment of the forest plan components would except the activities approved as part of the selected Federal action, including the powerline, pipeline, and road uses from complying with the specified plan components. Other than the proposed exceptions, no other changes to the forest plan would occur with the proposed amendment. The effects of the project-specific plan amendment is documented in chapter 3 of the FEIS following Forest Service NEPA procedures at 36 CFR § 220 and are summarized below in table 1. Because the amendment applies to only this project, and because potential adverse effects from project implementation will be addressed through environmental protection measures and mitigation, they are not considered a significant change to the forest plan for the purposes of the National Forest Management Act (36 CFR § 219.13(b)(5)).

The date of the Final ROD for the Resolution Copper Project marks the date when the amendments are effective. Since the plan amendments apply to only one specific project, they are effective on the date on which the project is implemented in accordance with administrative review regulations at 36 CFR § 218, Subpart A (36 CFR § 219.17(a)(3)). The objection process under 36 CFR § 218 was used for both the project activities and the project-specific amendments (36 CFR § 219.59(b)).

**Table 1. Multiple-component, project-specific amendment to the forest plan for the Resolution Copper Project**

| Forest Plan Component | Reason for Amendment |
|---|---|
| Recreation Guideline 10 (REC-G-10) (forest plan, p. 31) | The pipeline, electrical transmission line, and associated infrastructure that would be authorized with the selected Federal action would not meet current recreation opportunity spectrum (ROS) criteria. |
| Wildlife Related Recreation Guideline 03 (REC-WR-G-03) (forest plan, p. 44) | The analysis of wildlife connectivity concludes there would be a loss of long-term movement habitat along pipeline corridors with the selected Federal action; therefore, wildlife connectivity would not be maintained or enhanced. |

| Forest Plan Component | Reason for Amendment |
|---|---|
| Cultural and Historic Resources Desired Condition 01 (CUH-DC-01) (forest plan, p. 55) | While the selected Federal action includes mitigation measures designed to avoid, minimize, rectify, reduce, or compensate for resource impacts, impacts to historic properties cannot be avoided or fully mitigated. It is not feasible to retain all characteristics that qualify impacted properties for listing. |
| Cultural and Historic Resources Desired Condition 02 (CUH-DC-02) (forest plan, p. 55) | The pipeline, electrical transmission lines and associated infrastructure constructed and operated with the selected Federal action would impact historic properties. |
| Cultural and Historic Resources Desired Condition 07 (CUH-DC-07) (forest plan, p. 55) | The selected Federal action would disturb cultural resources, including artifacts, and data recovery and curation would be conducted on these sites. |
| Scenery Desired Condition 03 (SC-DC-03) (forest plan, p. 67) | Infrastructure constructed with the selected Federal action would not meet criteria for existing Scenic Integrity Objectives (SIOs) and would degrade views from U.S. Route 60, a state designated scenic route. |
| Scenery Guideline 01 (SC-G-01) (forest plan, p. 67) | Infrastructure constructed with the selected Federal action, including transmission lines and pipelines, would not be consistent with or move the area toward achieving SIOs. |
| Scenery Guideline 03 (SC-G-03) (forest plan, p. 67) | It is not currently known whether the electrical transmission line constructed with the selected Federal action would remain in place after reclamation has occurred. Therefore, the selected Federal action may not achieve or move toward achieving SIOs in the long term. |
| Wildlife, Fish, and Plants Guideline 06 (WFP-G-06) (forest plan, p. 142) | The analysis of wildlife connectivity concludes that there would be a loss of long-term movement habitat along pipeline corridors with the selected Federal action; therefore, dispersal and movement of species would be adversely affected. |
| Wildlife, Fish, and Plants Guideline 07 (WFP-G-07) (forest plan, p. 142) | The analysis of wildlife connectivity concludes that there would be a loss of long-term movement habitat along pipeline corridors with the selected Federal action; therefore, dispersal and movement of wildlife would be adversely affected. |
| Soils Guideline 02 (SL-G-02) (forest plan, p. 147) | The selected Federal action would disturb and impact soils on NFS land. Biological crust soils (referred to as biotic soils and desert pavement in the FEIS) are present in some of these areas and cannot be completely avoided. |
| National Trails Management Area Desired Condition 03 (NTMA-DC-03) (forest plan, p. 182) | New pipelines constructed within the MARRCO corridor[4] would cross the Arizona National Scenic Trail. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purposes of the Arizona National Scenic Trail. |

---

[4] The MARRCO corridor is an existing utility corridor containing Arizona Water Company facilities, water lines, a Qwest fiber-optic line, an El Paso Natural Gas pipeline, a power line, and a telephone line in its right-of-way. The selected alternative would construct additional pipelines and an access road within this existing corridor.

| Forest Plan Component | Reason for Amendment |
|---|---|
| National Trails Management Area Desired Condition 06 (NTMA-DC-06) (forest plan, p. 182) | New pipelines constructed within the MARRCO corridor would cross the Arizona National Scenic Trail. The selected Federal action would not meet the criteria to provide visitors with expansive views of a natural-appearing landscape along all segments of the Arizona National Scenic Trail, or conserve scenic resources within the trail corridor. |
| National Trails Management Area Desired Condition 07 (NTMA-DC-07) (forest plan, p. 182) | New pipelines constructed within the MARRCO corridor would cross the Arizona National Scenic Trail. The selected Federal action would not be consistent with or move the area toward high or very high SIOs. |
| National Trails Management Area Guideline 01 (NTMA-G-01) (forest plan, p. 182) | New pipelines and access road constructed within the MARRCO corridor would cross the Arizona National Scenic Trail. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purposes of the Arizona National Scenic Trail. |
| National Trails Management Area Guideline 08 (NTMA-G-08) (forest plan, p. 183) | The selected Federal action would result in impacts to the scenic character of the Arizona National Scenic Trail that cannot be fully mitigated through design elements. |

## Substantive Provisions for Project-Specific Amendments

The specific substantive rule provisions within 36 CFR § 219.8 through 36 CFR § 219.11 that are directly related and therefore applicable to the amendment are described in appendix T of the FEIS and summarized below. As described below, the project-specific amendment complies with the procedural provisions of the 2012 Planning Rule (36 CFR § 219.13(b)). The amendment is based on a review of relevant scientific information, consideration of responsible opposing views, and the acknowledgment of any incomplete or unavailable information, scientific uncertainty, and risk. The specific substantive provisions evaluated relative to the project-specific amendments are as follows:

- § 219.8(a)(2)(ii) – Soils and soil productivity due to the exception of guideline SL-G-02 [forest plan, p. 147].

- § 219.10(b)(1)(i) – Sustainable recreation due to the exception of desired conditions SC-DC-03 [forest plan, p. 67], NTMA-DC-06 [forest plan, p. 182], and NTMA-DC-07 [forest plan, p. 182]; and guidelines SC-G-01 [forest plan, p. 67], SC-G-03 [forest plan, p. 67], NTMA-G-01 [forest plan, p. 182], and NTMA-G-08 [forest plan, p. 183] (SIO); desired condition NTMA-DC-03 [forest plan, p. 182] and guideline NTMA-G-01 [forest plan, p. 182] (Arizona National Scenic Trail); and guideline REC-G-10 [forest plan, p. 31] (ROS).

- § 219.8(a)(1)(i) – Ecosystem integrity, interdependence of terrestrial and aquatic ecosystems in the plan area due to exception of guidelines REC-WR-G-03 [forest plan, p. 44], WFP-G-06 [forest plan, p. 142] and WFP-G-07 [forest plan, p. 142].

- § 219.9(a)(2)(i) – Ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types due to the exception of REC-WR-G-03 [forest plan, p. 44], WFP-G-06 [forest plan, p. 142] and WFP-G-07 [forest plan, p. 142].

- § 219.8(a)(b) – Social and economic sustainability – cultural and historic resources and uses due to the exception of desired conditions CUH-DC-01 [forest plan, p. 55], CUH-DC-02 [forest plan, p. 55], and CUH-DC-07 [forest plan, p. 55].

- § 219.10(a)(1) – Integrated resource management for multiple use – cultural and heritage resources due to the exception of desired conditions CUH-DC-01 [forest plan, p. 55], CUH-DC-02 [forest plan, p. 55], and CUH-DC-07 [forest plan, p. 44].

- § 219.10(a)(3) – Appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors due to the exception of desired conditions and guidelines NTMA-DC-03 [forest plan, p. 182] and NTMA-G-01 [forest plan, p. 182].

- § 219.10(b)(1)(ii) – protection of cultural and historic resources due to the exception of desired conditions CUH-DC-01 [forest plan, p. 55], CUH-DC-02 [forest plan, p. 55], and CUH-DC-07 [forest plan, p. 55].

## Rationale for Exception from Land Management Plan Desired Conditions and Guidelines

The project was reviewed for consistency with the 2023 forest plan. The consistency evaluation (SWCA Environmental Consultants 2025) demonstrated the need for exception from nine guidelines and seven desired conditions from the forest plan. The rationale for exception is detailed in appendix T of the FEIS and summarized in table 2.

**Table 2. Rationale for exception from forest plan for the Resolution Copper Project**

| Forest Plan Component | Rationale for Exception |
|---|---|
| Recreation Guideline 10 (REC-G-10) (forest plan, p. 31) | Construction, operation, and maintenance of new pipelines, electrical transmission lines and associated infrastructure would result in a reduction of 166 acres from semiprimitive nonmotorized ROS to semiprimitive motorized ROS). Implementation of the Resolution Copper Project selected Federal action would reduce the amount of semiprimitive nonmotorized ROS on the Forest from 715,024 acres to 714,858 acres, a reduction of 0.02 percent forest-wide. Semiprimitive motorized recreation would increase from 1,072,671 acres to 1,072,837 acres, an increase of less than 0.02 percent forest-wide. Although this has an adverse impact on nonmotorized recreation, it is not a substantial adverse impact due to the relatively small amount of effects across the Tonto National Forest. |
| | Non-discretionary environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on recreation. |
| | The remaining 51 guidelines, 80 desired conditions, 15 standards, and nine objectives would remain applicable to the entire Tonto National Forest, including the selected Federal action area of disturbance. The one excepted guideline would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the selected Federal action. |

| Forest Plan Component | Rationale for Exception |
|---|---|
| Wildlife Related Recreation Guideline 03 (REC-WR-G-03) (forest plan, p. 44)<br><br>Wildlife, Fish, and Plants Guideline 06 (WFP-G-06) (forest plan, p. 142)<br><br>Wildlife, Fish, and Plants Guideline 07 (WFP-G-07) (forest plan, p. 142) | Construction, operation and maintenance of new pipelines, electrical transmission lines and associated infrastructure would result in 1,417 acres of habitat disturbance in the tailings corridor, transmission line corridor, and access roads. This would result in a loss of long-term movement habitat along pipeline corridors since vegetation would be expected to eventually reestablish in the disturbed areas but would be unlikely to return to preconstruction conditions. The total acres of intact habitat connectivity on the Tonto National Forest is not known. However, the 1,417 acres of habitat connectivity that would be affected by the selected Federal action is a minor component of the habitat available across the 2,965,716 acres of the Tonto National Forest. Potential impacts to biodiversity would likely be limited to impacts at the local level for most species and would not be significant at the population level.<br><br>Non-discretionary environmental protection measures and mitigation measures are incorporated into the design of the project that would act to reduce potential impacts on wildlife connectivity.<br><br>The remaining 11 desired conditions, four guidelines, and one standard related to wildlife connectivity would remain applicable to the entire Tonto National Forest, including the selected Federal action area of disturbance. The one excepted desired condition and three excepted guidelines would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the selected Federal action. |
| Scenery Desired Condition 03 (SC-DC-03) (forest plan, p. 67)<br><br>Scenery Guideline 01 (SC-G-01) (forest plan, p. 67)<br><br>Scenery Guideline 03 (SC-G-03) (forest plan, p. 67)<br><br>National Trails Management Area Desired Condition 06 (NTMA-DC-06) (forest plan, p. 182)<br><br>National Trails Management Area Desired Condition 07 (NTMA-DC-07) (forest plan, p. 182)<br><br>National Trails Management Area Goal 08 (NTMA-G-08) (forest plan, p. 183) | Construction, operation, and maintenance of new pipelines, electrical transmission lines, and associated infrastructure would reduce 516 acres of high SIO to the low category and reduce 345 acres of moderate SIO to the low category. There are 1,706,521 acres of high SIO on the Tonto National Forest. A reduction of 516 acres constitutes a change to 0.03 percent of the amount of high SIO across the forest. These numbers include impacts to scenic resources in the Arizona National Scenic Trail corridor, which would reduce 20 acres of high SIO to the low category. There are 597,020 acres of moderate SIO on the Tonto National Forest. A reduction of 345 acres constitutes a change to 0.06 percent of the amount of moderate SIO across the forest. Although this is an adverse impact to scenery, it is not a substantial adverse impact due to the limited extent to the scenery resource of the project on the Tonto National Forest and the implementation of mitigation measures.<br><br>Non-discretionary environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on scenery.<br><br>The remaining nine desired conditions, 14 guidelines, and one standard related to scenery would remain applicable to the entire Tonto National Forest, including the selected Federal action area of disturbance.<br><br>The three excepted desired conditions and three excepted guidelines would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the selected Federal action. |

| Forest Plan Component | Rationale for Exception |
|---|---|
| Cultural and Historic Resources Desired Condition 01 (CUH-DC-01) (forest plan, p. 55)<br><br>Cultural and Historic Resources Desired Condition 02 (CUH-DC-02) (forest plan, p. 55)<br><br>Cultural and Historic Resources Desired Condition 07 (CUH-DC-07) (forest plan, p. 55) | The reduction of cultural resource protection measures constitutes an adverse impact, but effects are not expected to be substantial. The greatest impacts to cultural resources would be during the construction period. The cultural resources analysis in the Resolution Copper Project FEIS lists hundreds of historic and archaeological sites likely to be directly impacted by the selected Federal action. However, that analysis includes areas where the forest plan does not apply, such as private land and land administered by the State of Arizona and BLM. The Forest Service decision to implement the selected Federal action would not authorize any activities on land that are not administered by the Forest Service. A review of impacted sites by land ownership concludes that eight of these sites are located on NFS land associated with the selected Federal action area of disturbance. While it is not possible to know the total number of cultural resource sites on the Tonto National Forest, eight cultural sites is a small amount of the number of sites on the Forest.<br><br>Any direct ground disturbance runs the risk of disturbing cultural resources. Implementation of the selected Federal action would result in construction, use, and maintenance of electrical transmission lines, pipelines, and associated infrastructure that would disturb 2,502 acres of NFS lands and not affect that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the selected Federal action. This is a minor amount of impact when considered on a forest-wide basis.<br><br>Non-discretionary environmental protection measures and mitigation measures are incorporated into the design of the project that would act to reduce potential impacts on cultural resources.<br><br>The remaining 13 desired conditions, 19 guidelines, and eight standards would remain applicable to the entire Tonto National Forest, including the selected Federal action area of disturbance. The three excepted desired conditions would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the selected Federal action. |
| Soils Guideline 02 (SL-G-02) (forest plan, p. 147) | Soil loss from construction and operations in the pipeline and power line corridor is expected to be minimal after compliance with applicant-committed environmental protection measures (stormwater pollution prevention plan and erosion and sediment controls) and post-closure after reclamation when the surface has stabilized from revegetation.<br><br>The effects noted would occur on 2,502 acres or less of NFS land (less than 0.09 percent of the total NFS land on the Tonto National Forest); therefore, the one guideline would not hinder the forest plan's ability to maintain or restore soils.<br><br>Non-discretionary environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on soils.<br><br>The remaining 35 desired conditions, 11 guidelines, three standards, and one objective related to soils would remain applicable to the entire Tonto National Forest, including the selected Federal action area of disturbance. The one excepted guideline would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the selected Federal action. |

| Forest Plan Component | Rationale for Exception |
|---|---|
| National Trails Management Area Desired Condition 03 (NTMA-DC-03) (forest plan, p. 182)<br><br>National Trails Management Area Goal 01 (NTMA-G-01) (forest plan, p. 182) | A new pipeline and access road to cross the Arizona National Scenic Trail at a location where major effects already exist. Although this is an adverse impact to the Arizona National Scenic Trail, it is not a substantial adverse impact because effects would primarily be limited to the construction period. Disruption to trail users would occur during the activity, and when conditions are safe for hikers, cyclists, and equestrian users, the disruption would cease. Contractors would provide necessary detours or signage for Arizona National Scenic Trail user awareness during these activities.<br><br>The scale of the Arizona National Scenic Trail component of the project-specific amendment encompasses the immediate location in the MARRCO Corridor where the pipeline and access road cross the trail. New pipelines constructed within the MARRCO corridor would cross Passage 18 of the Arizona National Scenic Trail. In the Passage 18 segment, 0.07 mile of the proposed tailings pipeline corridor would intersect the Arizona National Scenic Trail. The Tonto National Forest manages about 200 miles of the Arizona National Scenic Trail. The selected Federal action would be less than 0.04 percent of the trail corridor. The area impacted by the selected Federal action is a minor portion of the Arizona National Scenic Trail on the Tonto National Forest.<br><br>Non-discretionary environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on the trail.<br><br>The remaining nine desired conditions, 12 guidelines, and three standards related to the trail would remain applicable to the entire Tonto National Forest, including the selected Federal action area of disturbance. The one excepted desired condition and one excepted guideline would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the selected Federal action. |

# PART 3 PRINCIPAL REASONS FOR THE DECISION

My decision is based on review of the FEIS and project record, which shows a thorough examination of relevant and best available scientific information, consideration of reasonable opposing views, and the acknowledgment of incomplete or unavailable information, scientific uncertainty, and risk. My decision is also informed by the legislative direction provided in PL 113-291 to "facilitate and expedite" the land exchange between Resolution Copper and the United States.

I have taken into consideration the degree to which the applicant-committed environmental protection measures,[5] monitoring, and mitigation measures will reasonably reduce potential impacts to the environment, and the predicted effects of the action alternatives on resources, including soils, vegetation, wildlife, including special status species, noise, transportation and access, air quality, the quantity and quality of surface water and groundwater, cultural resources, tribal values and concerns, socioeconomics, scenery, recreation, and public safety. All practicable means to avoid or reduce environmental harm have been adopted. I have ensured that a thorough evaluation of the potential environmental impacts in the FEIS was accomplished through coordination with other ongoing and planned studies by State and Federal agencies in cooperation with Resolution Copper.

My decision to authorize pipelines and power lines across NFS lands is based on a review not only of the impacts of these structures, but of the entire mining operation as proposed by Resolution Copper. The decision to authorize these linear features on NFS lands is predicated on Resolution Copper's decision to use Alternative 6 – Skunk Camp for tailings disposal.

I recognize that each of the action alternatives would result in significant environmental and social impacts and that the no action alternative is the environmentally preferable alternative (see part 6.2 of this document for further detail). My rationale for selecting Alternative 6 – Skunk Camp for the authorization of proposed uses of NFS lands and roads includes the commitments in part 4 of this document and is detailed below.

## 3.1   Water Quality

1. Alternative 6 – Skunk Camp will provide a greater protection of water quality than any other action alternative. The tailings storage facility presents the greatest risk of impacts to water quality through the release of tailings seepage (which contains elevated levels of dissolved metals and other contaminants) into the environment, not just during operations but for many decades after closure. All action alternatives would result in tailings seepage entering the environment, and all action alternatives would require seepage capture systems located downgradient from the tailing storage facility. Capture of seepage at the Skunk Camp location is simpler than other alternatives, and therefore more effective with less risk of impact to water quality downstream from the tailings storage facility. The geography of the Dripping Spring Wash basin requires a single seepage collection pond, compared with multiple ponds (up to nine) for other action alternatives.

2. Any tailings storage facility will require appropriate water quality permits from ADEQ prior to operation, to ensure compliance with State water quality standards. This includes permits for stormwater discharges under the Arizona Pollutant Discharge Elimination System (AZPDES) program and permits under the Aquifer Protection Permit program. Resolution Copper will be responsible for obtaining these permits.

---

[5] See part 4 of this Draft ROD for a description of what constitutes an "applicant-committed environmental protection measure."

While no Forest Service authorizations or actions are required for activities that will not occur on NFS land, the FEIS analyzes potential effects of the proposed mining operation and alternatives as a whole.

The analysis showed that Alternatives 2, 3, and 4 either could not demonstrate concentrations of dissolved metals and other contaminants below numeric water quality standards, or would require extremely high seepage collection efficiencies to maintain concentrations of dissolved metals and other contaminants below these thresholds. Further, due to the proximity to Queen Creek, there are limitations to the ability to install additional seepage controls for these alternatives. The analysis showed that both Alternatives 5 and 6 not only can meet these acceptable thresholds, but also allow substantial flexibility for installing additional seepage controls, as needed, if indicated by monitoring during operations.

Alternative 6 – Skunk Camp ultimately demonstrated the best ability to control seepage of any action alternative. Two separate water quality analyses for Alternative 6 – Skunk Camp were conducted. The analysis of anticipated effects on water quality in the Draft EIS (DEIS) was based on a mixing-cell model. The analysis of anticipated effects on water quality in the FEIS supplemented the DEIS analysis with a numerical groundwater flow model that incorporated additional site-specific information collected at the Skunk Camp location, including aquifer tests, boreholes, water level measurements, and water quality sampling. Both models demonstrate the ability to keep concentrations of dissolved metals and other contaminants below numeric water quality standards under normal conditions. The FEIS water quality model additionally demonstrates that even under low-flow conditions, concentrations of dissolved metals and other contaminants in downstream surface waters would remain below numeric water quality standards.

3.  Alternative 6 – Skunk Camp also allows the greatest margin for error and opportunity for any additional needed mitigation in the event that modeling estimates are incorrect. The nearest surface water (the Gila River) is located approximately 12 miles downstream. This is the longest distance to perennial surface waters of any action alternative. This means that there is substantial space and opportunity to install additional seepage controls—such as pumpback systems—in the event that predictions turn out to be inaccurate and that monitoring identifies unanticipated degradation of water quality.

## 3.2    Groundwater-Dependent Ecosystems

1.  The Alternative 6 – Skunk Camp tailings storage facility and pipeline corridor do not directly impact any groundwater-dependent ecosystems (GDEs), which include springs and perennial streams, or special aquatic sites like wetlands. Alternatives 2, 3, and 4 all would physically disturb springs.

2.  The Alternative 6 – Skunk Camp location results in less reduction in runoff to support downstream perennial waters. Alternatives 2, 3, and 4 would reduce average annual flow in Queen Creek at Whitlow Ranch Dam from 6.5 to 9 percent (of which 3.5 percent is caused by the subsidence area, not the tailings storage facility). By contrast, Alternative 6 – Skunk Camp would reduce average annual flow in the Gila River by 0.5 percent below Dripping Spring Wash.

## 3.3    Recreation and Scenic Resources

1.  All alternatives would impact scenic resources. However, the Skunk Camp location is relatively remote, and the impact is more confined than the other action alternatives. Alternatives 2, 3, and 4 would be seen from most locations in the Superior basin, as well as from key sensitive areas such as the Superstition Wilderness, Picketpost Mountain, Boyce Thompson Arboretum, and Apache Leap. Alternative 5 would be seen from Florence and elsewhere in the East Salt River valley, and

from the White Canyon Wilderness. The Alternative 6 – Skunk Camp location generally can only be seen within the Dripping Spring Wash valley, and from locations to the north in the Pinal Mountains.

3. The Skunk Camp location in Dripping Spring Wash is less used for recreation than locations identified in the other alternatives. Alternatives 2, 3, and 4 would occupy highly used recreation lands in and around the town of Superior, and Alternative 5 would prohibit recreational use of some of the BLM lands nearest to the East Salt River valley. Additionally, because the Alternative 6 – Skunk Camp tailings storage facility occupies the upper end of the Dripping Spring Wash valley, there is less restriction of through-access to other recreation areas.

4. Alternative 6 – Skunk Camp is the only alternative that does not substantially impact the Arizona National Scenic Trail, either with trail crossings by tailings pipelines or proximity of the tailings storage facility to trail users.

5. The Alternative 6 – Skunk Camp location consolidates large-scale mining activity on the larger landscape of central Arizona. Alternatives 2, 3, and 4 are largely surrounded by Forest Service lands that have not been disturbed by mining. The Skunk Camp location is in close proximity to the ASARCO Ray Mine open pit; the ASARCO land exchange parcels, which are expected to be mined in the future; the Christmas mine; and the recently permitted Ripsey Wash tailings facility.

## 3.4   Public Safety and Long-Term Management

1. The analysis included an evaluation for the safety of the tailings storage facilities and the potential for catastrophic failure. All alternatives are built to the same design standards and safety factors, and therefore no alternative is inherently safer than another. However, certain designs are more resilient and more able to withstand unexpected events or accumulated errors. The Skunk Camp location allows for a less complicated cross-valley embankment, with a single face, tied into bedrock on both sides, whereas Alternatives 2, 3, and 5 would require free-standing embankments with three sides. The approximate crest length of the Alternative 6 – Skunk Camp embankment is 3 miles, which is substantially less than Alternatives 2 and 3 (10 miles) and Alternative 5 (7 miles of non-potentially acid generating (NPAG) embankment and 4 miles of potentially acid generating (PAG) embankment).

2. The locations of Alternative 5 and 6 allow for the construction of a true centerline-type embankment, in contrast to the modified-centerline embankment that must be used at the Alternative 2 or 3 location due to space concerns. As noted, all embankments are built to the same design standards and safety factors; however, centerline construction is more robust and resilient than modified-centerline construction when unplanned circumstances are encountered.

3. After purchase of Arizona State Trust lands, the Alternative 6 – Skunk Camp tailings storage facility would be located entirely on private lands. Public lands would not be encumbered in perpetuity with a reclaimed mine structure, and neither the Forest Service nor the BLM would have to devote resources to managing a reclaimed facility in perpetuity.

## 3.5   Socioeconomics

The socioeconomic analysis identified both positive and negative impacts. The positive impacts are largely independent of alternative. On average, the mine is projected to employ over 1,400 workers, pay about $149 million per year in total employee compensation, and purchase about $490 million per year in goods and services. Including direct and multiplier effects, the proposed mine is projected to increase average annual economic value in Arizona by about $1.2 billion. The mine is also projected to generate an average of $80 million to $120 million per year in State and local tax revenues, as well as more than $200 million per year for the Federal government. Negative impacts include a loss of hunting revenue,

strain on street and road networks and other public services, and decreases in property values near the tailings storage facility. Based on the socioeconomics study, reductions in property values are predicted in the immediate vicinity of the tailings facility, and property values could be further exacerbated by impacts to private water supplies. While private property would still be impacted by Alternative 6 – Skunk Camp, the overall impact would be less than other alternatives, which have more private lots in close proximity.

## 3.6    Tribal Values

None of the action alternatives are acceptable to the consulting Tribes, as all would impact Tribal values and cultural heritage. Specific concerns have been consistently expressed by the Tribes throughout the process about the impacts of the required land exchange, the impacts from the mining operations, and the proposed tailings storage facility in the vicinity of sacred sites, including Apache Leap, Picketpost Mountain, and the Superstition Wilderness. In general, each of the consulted Tribes considers the impacts from the land exchange and related mining activities to their Tribal values as a loss that cannot be mitigated. However, given the land exchange requirements put forth in PL 113-291, I have limited discretion to completely eliminate impacts to expressed Tribal values.

I find that Alternative 6 – Skunk Camp, along with the commitments described in part 7.1 of the Draft ROD, while not alleviating overall impacts to Tribal values and still having impacts to cultural resources, is preferable as the activities there will have lesser impact to these specific sacred areas than the other action alternatives considered and will better address the impacts that represent risks to social sustainability.[6]

## 3.7    Meeting Project's Purpose and Need

The purpose of and need for the project that formed the foundation for the NEPA process was (1) to consider the effects of anticipated mining operations that would be reasonably incident to extraction, transportation, and processing of copper and molybdenum; and (2) to consider the effects of the exchange of lands between Resolution Copper and the United States.

The decision to authorize pipeline and power line features on NFS lands is predicated on Resolution Copper's decision to use Alternative 6 – Skunk Camp for tailings disposal. For the collective reasons stated above, this alternative best meets the purpose of and need for the project, as stated in chapter 1 of the FEIS. Authorizing pipeline and power line features across NFS land to the Alternative 6 – Skunk Camp tailings storage location results in reduced impacts with respect to water quality, water resources, public safety, recreation and scenic values, and Tribal values.

---

[6] For more detailed information, see section 7.2 of this Draft ROD.

# PART 4 APPLICANT-COMMITTED ENVIRONMENTAL PROTECTION MEASURES, MONITORING, AND MITIGATION

Applicant-committed environmental protection measures are features incorporated into the design of the project by Resolution Copper to reduce potential impacts on resources. The effects of these measures are accounted for in the analysis of environmental consequences disclosed in the FEIS.

However, not all applicant-committed environmental protection measures detailed in the FEIS are applicable to the decision by the Forest Service on special use and road authorizations. Measures applicable to uses on NFS land will be included as terms and conditions in the Forest Service authorizations. These measures are described in this section. The remainder of the applicant-committed environmental protection measures are listed in appendix B. Many of these measures would be required under other binding agreements or by other State or Federal agencies. Any such mechanisms that would make these measures binding also are described in appendix B.

After analyzing project impacts, the FEIS identified a substantial mitigation and monitoring strategy for the Resolution Copper Project to avoid, minimize, rectify, reduce, or compensate for resource impacts. These mitigation and monitoring measures are detailed in appendix J of the FEIS, and Resolution Copper has committed to implementing these measures both on and off of NFS land. Further, they may be required by other State and Federal agencies through their permits. Mitigation and monitoring measures applicable to uses on NFS land will be included as terms and conditions in the Forest Service authorizations; these measures are described in this section. The remainder of the mitigation and monitoring measures are listed in appendix B. As with applicant-committed environmental protection measures, many of the mitigation and monitoring measures would be required under other binding agreements or by other State or Federal agencies. Any such mechanisms that would make these measures binding also are described in appendix B.

Three regulatory processes that were conducted in parallel with the FEIS process are considered:

1. The Forest Service expects that required mitigation and monitoring will include compensatory mitigation requirements approved by the USACE as part of issuing an individual permit under Section 404 of the CWA. This mitigation will not be a term and condition of the Forest Service authorizations for use of NFS land, and therefore it appears only in appendix B.

2. A Programmatic Agreement (PA) was developed under Section 106 of the National Historic Preservation Act (NHPA) and in compliance with PL 113-291. All signatories, other than the Advisory Council on Historic Preservation (ACHP), had signed the PA as of January 15, 2021 (date of publication of the rescinded FEIS). On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR § 800.7(c)(4), the Secretary of Agriculture delivered a written response to the ACHP on April 17, 2025, and that response concluded the Section 106 process for this undertaking. Since ACHP did not sign the PA, it was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through other authorities. Changes in enforcement of the measures described in the draft PA are further described in appendix J of the FEIS and part 7.1 of this Draft ROD.

3. The Biological Opinion issued by the U.S. Department of the Interior Fish and Wildlife Service (FWS) after consultation under Section 7 of the Endangered Species Act (included as appendix P of the FEIS) contains a number of conservation measures. Many of these conservation measures are applicable to the pipeline and power line corridors that require authorization for use of NFS land. Those measures will be included as terms and conditions of the Forest Service authorizations for use of NFS land and therefore are included in this section. Other conservation

measures contained in the Biological Opinion not related to use of NFS land appear only in appendix B.

## 4.1  General

The special use and road use authorizations will contain general conditions of approval, to allow proper administration of uses of NFS lands. As authorized under 36 CFR § 251.56, these conditions are allowable for the following reasons:

- carry out the purpose of the applicable statutes and rules;

- minimize damage to scenic and esthetic values, and fish and wildlife habitat, and otherwise protect the environment;

- comply with applicable air and water quality standards under Federal or State law;

- comply with State standards for public health and safety, environmental protection, and siting, construction, operations, and maintenance;

- protect Federal property and economic interests;

- manage efficiently the lands subject to the use;

- protect other lawful users of the lands adjacent to or occupied by the use;

- protect lives and property;

- protect the interests of individuals living in the general area who rely on resources for subsistence;

- require siting to cause the least damage to the environment, taking into consideration feasibility; or

- otherwise protect the public interest.

## 4.2  Geology and Subsidence

In the GPO (Resolution Copper 2016a), Resolution Copper committed to various measures to reduce impacts from subsidence. Additional subsidence monitoring and mitigation measures by Resolution Copper are identified in a revised subsidence monitoring plan (Davies 2020) developed by Resolution Copper as part of the NEPA process. The monitoring and mitigation actions in the revised subsidence monitoring will reduce impacts from subsidence to Apache Leap, Queen Creek Canyon, or Devil's Canyon, including potential impacts to the pipeline and power line corridors on NFS land.

The Forest Service also has required several additional conditions for the subsidence monitoring, developed in response to comments received on the DEIS. These are described as mitigation measure "FS-GS-01:[7] New stipulations on subsidence monitoring plan" in appendix J of the FEIS.

The subsidence monitoring as proposed by Resolution Copper as an applicant-committed environmental protection measure, in addition to the additional stipulations required by the Forest Service as a mitigation measure, will be included as terms and conditions for authorizing use of NFS lands.

---

[7] The designations for each mitigation and monitoring measure, such as "FS-GS-01," are unique identifiers used in appendix J of the FEIS.

## 4.3    Soils, Vegetation, and Reclamation

In the GPO (Resolution Copper 2016b), Section 4.5, Water Resources, Resolution Copper outlined a variety of measures to reduce impacts on soils by uses on NFS lands:

- Road embankment slopes will be graded and stabilized with vegetation or rock as practicable to prevent erosion.

- During construction and operations, diversions will be constructed around the affected areas to minimize erosion. A number of best management practices, including check dams, dispersion terraces, and filter fences, also will be used during construction and operations.

- Off-road vehicle travel across Tonto National Forest will generally be avoided.

Resolution Copper also developed a noxious weed plan (Resolution Copper 2019) during the NEPA process to reduce impacts on vegetation by uses on NFS lands:

- Newly reclaimed areas on Tonto National Forest will be monitored for weeds and invasive plants for the first 5 years after reclamation. Infestations of invasive species would be treated as soon as they are identified, or as soon as weather conditions are appropriate for treatment.

- Additionally, elsewhere Resolution Copper stipulated that on NFS lands, seed mixes used in reclamation will be certified free of seeds listed on the Forest Service's noxious weed list and contain only species native to the project area. Seed mixes will be developed from a native species seed list approved by the Forest Service.

Additional conservation measures specific to Arizona hedgehog cactus were developed as part of consultation with the FWS and are included in the final Biological Opinion (see FEIS appendix P). These measures apply to uses on NFS lands, including pipeline construction and maintenance and power line construction and maintenance, which includes vegetation management for fire safety purposes. These conservation measures state the following:

- Prior to any ground-disturbing activities, suitable habitat within the project area will be surveyed for Arizona hedgehog cactus.

- Before construction begins within the Arizona hedgehog cactus known range, a biological monitor—a Forest Service–approved entity—will establish and clearly flag Arizona hedgehog cactus avoidance areas where individual cacti will be left in place based on preconstruction surveys.

- Prior to any ground-disturbing activities, a biological monitor will salvage Arizona hedgehog cacti that are inside the construction footprint in areas where ground disturbance will occur.

- Healthy salvaged Arizona hedgehog cacti that occur in areas that will be disturbed will be replanted outside the construction footprint but within the action area on Federal lands.

- Prior to relocation and salvage efforts, Resolution Copper will work with the FWS and the Forest Service to develop an Arizona hedgehog cactus relocation, salvage, and monitoring plan. The plan will provide criteria for determining which cacti are suitable for immediate relocation as well as measures to collect seed or to salvage healthy stems from individuals that otherwise cannot be salvaged.

- A mechanical mower for routine vegetation maintenance will not be used within Arizona hedgehog cactus occupied habitat.

- For vegetation maintenance and line maintenance work, vehicles will drive only on existing roads and utility access routes to access the right-of-way. Vehicles will not be driven off-road within the right-of-way.

- During vegetation management work, crews will check for Arizona hedgehog cactus under target plants prior to treatment. If crews find a cactus, they will implement appropriate conservation measures to avoid the cactus.

- During manual vegetation maintenance work, if an Arizona hedgehog cactus occurs underneath and is shaded by a shrub to be cut, the target shrub will be left untreated. In very rare circumstances, the nurse plant may be selectively trimmed in a manner to maintain the same shading protection for the Arizona hedgehog cactus. No more than 30 percent of the nurse plant may be trimmed.

The project reclamation and closure plan (Tetra Tech Inc. 2020) and the tailings storage facility reclamation and closure plan (KCB Consultants Ltd. 2020) expand on environmental protection measures that would be part of reclamation of project facilities, including those on NFS lands. The Forest Service has required implementation of these reclamation and closure plans in mitigation measure "FS-SV-03: Revised reclamation and closure plans" in appendix J of the FEIS.

The Forest Service also is requiring that resource salvage take place, including for the pipeline and power line corridors on NFS lands. This is detailed in mitigation measure "FS-SV-01: Resource salvage" in appendix J of the FEIS.

The activities proposed by Resolution Copper as applicant-committed environmental protection measures, including those developed during Section 7 consultation, as well as the Forest Service mitigation requirements to allow resource salvage and implement reclamation plans, will be included as terms and conditions for authorizing use of NFS lands.

## 4.4    Transportation and Access

The GPO (Resolution Copper 2016b) outlines applicant-committed environmental protection measures by Resolution Copper in Appendix K, Road Use Plan. This plan was subsequently updated (Resolution Copper 2020b) to include measures developed during the NEPA process. The Forest Service has required implementation of these new measures, as detailed in "FS-TA-01: New mitigation aspects of revised road use plan" in appendix J of the FEIS. The following applicant-committed measures are related to transportation and access, including use of NFS roads:

- Public access to the lands in the vicinity of the East Plant Site will be maintained via State Route 177 and NFS Road 315 as well as U.S. Route 60 and NFS Road 469 (until access is no longer possible).

- A number of best management practices for road construction and maintenance were identified in the GPO:
  - To the extent practicable, vegetation will not be removed except from those areas to be directly affected by road reconstruction activities.
  - Cut-and-fill slopes for road reconstruction will be designed to prevent soil erosion.
  - Drainage ditches with cross drains will be constructed where necessary. Disturbed slopes will be revegetated, mulched, or otherwise stabilized to minimize erosion as soon as practicable following construction.
  - Road embankment slopes will be graded and stabilized with vegetation approved by the Forest Service or rock as practicable to prevent erosion.

- o Runoff from roads will be handled through best management practices, including sediment traps, settling ponds, berms, sediment filter fabric, wattles, etc. Design of these features will be based on an analysis of local hydrologic conditions.
- o Off-road vehicle travel will generally be avoided.
- o During construction and operations, diversions will be constructed around affected areas to minimize erosion. A number of best management practices, including check dams, dispersion terraces, and filter fences, also will be used during construction and operations.

The activities proposed by Resolution Copper as applicant-committed environmental protection measures will be included as terms and conditions for authorizing use of NFS lands.

## 4.5    Air Quality

In the GPO (Resolution Copper 2016b), Resolution Copper has committed to a variety of measures to reduce potential impacts on air quality, including measures involving NFS roads:

- Dust control on roads, including regular watering, road base maintenance and dust suppression, and setting reasonable speed limits on access roads within the operational footprint.

The activities proposed by Resolution Copper as applicant-committed environmental protection measures will be included as terms and conditions for authorizing use of NFS lands.

## 4.6    Water Resources

In the GPO (Resolution Copper 2016b), Resolution Copper has committed to various measures to reduce impacts on surface water quantity or quality, including by uses on NFS lands:

- To the extent practicable, stormwater flows upgradient of the facilities will be diverted around the disturbed areas and returned to the natural drainage system.
- Runoff from roads, buildings, and other structures will be handled through best management practices, including sediment traps, settling ponds, berms, sediment filter fabric, wattles, etc.

The Forest Service also is requiring monitoring and mitigation for GDEs that occur on NFS lands. This is described in mitigation measure "FS-WR-01: GDEs and water well mitigation" in appendix J of the FEIS. The "Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells" (Montgomery and Associates Inc. 2020a) developed by Resolution Copper during the NEPA process outlines a monitoring plan to assess potential impacts on each GDE, identifies triggers and associated actions to be taken by Resolution Copper to ensure that GDEs are preserved, and identifies mitigation measures for each GDE if it is impacted by future mine dewatering. The stated goal of the plan is "to ensure that groundwater supported flow that is lost due to mining activity is replaced and continues to be available to the ecosystem."

The Forest Service also is requiring mitigation for surface water losses that occur on NFS lands. This is described in mitigation measure "FS-WR-04: Replacement of water in Queen Creek" in appendix J of the FEIS. This measure requires that water be discharged to Queen Creek to offset losses in average annual runoff caused by the capture of precipitation within the subsidence area.

The activities proposed by Resolution Copper as applicant-committed environmental protection measures, as well as the Forest Service mitigation requirements to mitigate impacts to GDEs and Queen Creek, will be included as terms and conditions for authorizing use of NFS lands.

## 4.7    Wildlife

In the GPO (Resolution Copper 2016b) and in the Biological Opinion (included as appendix P of the FEIS), Resolution Copper has committed to a variety of measures to reduce potential impacts on wildlife, including by uses on NFS lands:

- Designing lines and structures in accordance with "Reducing Avian Collision with Power Lines" (Avian Power Line Interaction Committee 2012), in order to minimize the potential risk for bird collisions with transmission lines. Line marking devices, i.e., flight diverters, will be placed at the proposed crossings of Queen Creek, Devil's Canyon, and Mineral Creek, especially in areas where there is suitable habitat for the yellow-billed cuckoo.

- Managing noxious and invasive weeds. Resolution Copper prepared a "Noxious Weed and Invasive Species Management Plan on National Forest System Lands" (Resolution Copper 2019). Resolution Copper will also prepare reports 2 years after construction begins and every 5 years during operations. These reports will update the Tonto National Forest and FWS on surveys, control, and activities related to noxious and invasive weed management.

- Conducting preconstruction surveys for Sonoran desert tortoise and Gila monster before surface ground-disturbing activities start. A biological monitor will monitor for Sonoran desert tortoise and Gila monster during construction activities. The monitor will flag Sonoran desert tortoise and Gila monster shelter sites/burrows. These flagged areas will be inspected, and any Gila monsters or tortoises discovered will be relocated outside project activity areas.

- Informing project crews of the potential to encounter Sonoran desert tortoise and Gila monster within the surface project area. Work crews will be instructed to check below equipment prior to moving and to cover and/or backfill holes that can potentially entrap these species. If these species are observed, work crews will stop work until the biological monitor has relocated these species out of harm's way.

- Establishing tortoise crossings, as needed and applicable within areas containing suitable habitat.

- Ensuring that all ground-disturbing activity associated with the tailings pipeline and power line work near Mineral Creek and Gila chub designated critical habitat occurs outside the ordinary high-water mark and designated critical habitat.

- Using trenchless/non-surface impact methods (such as horizontal drilling or micro-tunneling) in areas where project facilities intersect Mineral Creek, to avoid surface disturbance within the ordinary high-water mark and designated critical habitat.

- Clearly defining the perimeter of the construction footprint with flagging or other appropriate markers to restrict heavy equipment use and other surface-disturbing activities to areas within the construction footprint. The biological monitor will be present at all times during construction and will help ensure that construction activities and equipment remain within designated limits and outside the ordinary high-water mark and designated critical habitat.

- Developing a stormwater pollution prevention plan to reduce potential project-related increases in sedimentation to Mineral Creek.

- Ensuring that a qualified biological monitor is present in work areas that contain suitable habitat for the southwestern willow flycatcher and yellow-billed cuckoo along Mineral Creek during all surface-disturbing activities between May and September each year.

- Conducting annual yellow-billed cuckoo surveys in Devil's Canyon and Mineral Creek immediately upstream and downstream of disturbance areas and crossings. Annual surveys will

begin 2 years prior to surface-disturbing activities. Surveys will continue until pipeline construction has been completed, including reclamation of temporary construction disturbance.

- Avoiding vegetation clearing and ground-disturbing activities associated with pipeline construction, as well as reclamation and closure activities, within 500 feet of the ordinary high-water mark of Mineral Creek in areas where surveys have detected the presence of yellow-billed cuckoo, from May 1 through September 30 each year, to remain outside the breeding season for yellow-billed cuckoo and to prevent direct effects on the species (injuries or fatalities to adults, eggs, or young).

- Avoiding when possible large trees (greater than 12 inches in diameter), including Fremont cottonwood and willow species, as well as dense stands of vegetation.

- Cutting riparian trees to ground level when they are removed. When possible, root masses will be left intact to help stabilize soils and provide opportunities for regrowth through adventitious shoots (e.g., in the case of willows).

- Conducting yellow-billed cuckoo surveys every 5 years during mine operations in Devil's Canyon and Mineral Creek in potentially suitable habitats immediately upstream and downstream of project areas (crossings) to monitor cuckoo presence in the area and prevent/minimize direct effects on cuckoos.

- Avoiding large-scale, major noise-producing activities within 500 feet of the ordinary high-water mark of Mineral Creek in areas where surveys show the presence of possible, probable, or confirmed breeding of yellow-billed cuckoos, to the extent possible (e.g., maintenance activities associated with pipeline replacement and cleaning that may affect cuckoo habitat during the breeding season (May 1 to September 30, annually)).

Resolution Copper included a wildlife management plan as an appendix to its original GPO. After publication of the DEIS, Resolution Copper consulted with the AGFD in response to comments submitted by AGFD on the DEIS. The revised wildlife management plan (Resolution Copper 2020c) includes a number of these new measures. The Forest Service is requiring that the revised plan be implemented. This is detailed in mitigation measure "FS-WI-01: Revised wildlife management plan" in appendix J of the FEIS.

Resolution Copper also committed to the following:

- implementing conservation actions for reptiles and Sonoran desert tortoise, as detailed in measure "FS-WI-02: Reptile and Sonoran desert tortoise (ESA-CCA) plan" in appendix J of the FEIS;

- mitigating loss of habitat for bats, as detailed in measure "FS-WI-03: Mitigation of loss of abandoned mine or cave habitat for bats" in appendix J of the FEIS; and

- maintaining or replacing access to wildlife waters, as detailed in measure "FS-WI-04: Maintain or replace access to stock tanks and Arizona Game and Fish Department wildlife waters" in appendix J of the FEIS.

The Forest Service is requiring that these three measures be implemented.

The activities proposed by Resolution Copper as applicant-committed environmental protection measures, as well as the Forest Service mitigation requirements to implement the revised wildlife plan, implement reptile and Sonoran desert tortoise conservation measures, mitigate bat habitat, and maintain access to wildlife waters, will be included as terms and conditions for authorizing use of NFS lands.

## 4.8    Recreation

Applicant-committed environmental protection measures by Resolution Copper include the following to protect recreation resources from uses of NFS lands:

- To prevent exposure of the public to geological hazards, Resolution Copper will use fencing, berms, locking gates, signage, natural barriers/steep terrain (25 to 30 percent or greater), and site security measures to limit access roads and other locations near areas of heavy recreational use.

The Tonto National Forest has developed a recommended multi-use trail plan to mitigate recreational impacts. The recommendations include 9.3 miles of motorized trail and 11.5 miles of non-motorized trail that will be located on and managed by Tonto National Forest. Resolution Copper has committed to funding the construction and maintenance of the new multi-use trail network on the Tonto National Forest, with the further intent that investment funding can be supported by additional grants and funds from recreational groups and other organizations to further expand recreational opportunities. The Forest Service is requiring that the multi-use trail plan be implemented, as detailed in "FS-RC-03: Mitigation for adverse impacts to recreational trails (Tonto National Forest multi-use trail plan)" in appendix J of the FEIS.

PL 113-291 also requires Resolution Copper to ensure access to the Oak Flat campground to members of the public and Tribes as long as safety allows, as detailed in "FS-RC-02: Access to Oak Flat campground" in appendix J of the FEIS.

The activities proposed by Resolution Copper as applicant-committed environmental protection measures, as well as the Forest Service mitigation requirements to implement the multi-use trail plan and access to Oak Flat campground, will be included as terms and conditions for authorizing use of NFS lands.

## 4.9    Public Health and Safety

### 4.9.1    Tailings and Pipeline Safety

Applicant-committed environmental protection measures for tailings and pipeline safety include those outlined in the tailings design documents (Klohn Crippen Berger Ltd. 2018), a pipeline protection and integrity plan specific to the Skunk Camp location (Golder Associates Inc. 2020), and the GPO (Resolution Copper 2016b). The Forest Service is requiring that the pipeline integrity plan be implemented, as detailed in measure "FS-PH-03: Skunk Camp pipeline protection and integrity plan" in appendix J of the FEIS. As part of preparing these plans, Resolution Copper completed a failure modes analysis for the tailings pipelines. The analysis informed the following design measures for the tailings pipelines, which enhance the safety of the pipelines on NFS lands:

- Install pipe bridges for concentrate pipeline over Queen Creek outside the ordinary high-water mark of that drainage.

- Where the tailings pipeline crosses Devil's Canyon and Mineral Creek, the pipeline corridor will pass overhead or beneath the streams, with no disturbance to riparian habitat or waters within the ordinary high-water mark.

- Fabricate and test all tailings pipelines in accordance with the requirements of American Society of Mechanical Engineers (ASME) standards or equivalent for quality assurance and quality control purposes. A quality assurance/quality control system will be in place during construction (required by code and standards). A post-construction hydrostatic test will be conducted to prove the integrity of the newly installed pipeline.

- Locate pressure indicators on non-buried pipelines intermittently along water and tailings pipelines. Flow indicators will be placed near the tailings pumps and at the end of the line. A leak detection system will connect via fiber-optic cable to the control room at the West Plant Site and the control room at the tailings facility if a separate facility exists.

- Bury pipelines where feasible, given the geological setting, and buried pipelines will be appropriately wrapped. Field assessments will confirm the characterization of the pipeline route, including site-specific geophysical survey to approximate the extent of any suspected subsurface voids, and routing adjustments within the approved corridor will avoid unstable slopes or areas.

- Install sacrificial anodes at determined intervals on select sections of tailings pipelines to mitigate corrosion of pipeline sections. Installation of sacrificial anodes will follow appropriate best practices for proper placement in order to minimize the potential for migration of metals resulting from dissolved or decayed metallic anodes.

- Locate shut-off valves at booster pump stations.

- Tailings pipelines will be sleeved under major crossings. Expansion loops will be incorporated along the pipeline corridor.

- Maintain a minimum of 3.3 feet of horizontal and vertical separation between pipelines and existing utilities or infrastructure.

- The tailings pipeline will likely be carbon steel and pressurized.

- Contain aboveground tailings pipelines in a secondary containment ditch where possible and paint them with an epoxy coating to prevent degradation.

In addition, a number of operational or management control measures for pipelines have been identified:

- A tailings pipeline operations manual will be developed to summarize inspection and maintenance protocols (Operations, Maintenance, and Surveillance manual).

- Resolution Copper will have equipment available and/or contractors readily available on-site for pipeline repair. The pipeline access road will provide access to the full length of the line.

- There will be regular periodic patrols along the pipelines to look for leaks; containment spills, sediment build-up, and breaches; drainage sediment build-up, blockages, and wash-outs; access road erosion and damage; pipe bridges and over/underpass damage; landslides; third-party interference; and other potential hazards.

- The Operations, Maintenance, and Surveillance manual will be followed for immediately investigating, reporting, and implementing a response plan for suspected leaks from the tailings pipeline. Aberrations in flow rate, pump operation, and pressures will trigger investigations and emergency response if needed, as well as coordination with any agencies with surface management responsibility, such as the Forest Service.

- A tailings pipeline spill prevention and response plan (pipeline management plan) will be prepared as part of the comprehensive pipeline integrity program. The program will include maintenance of records, regular review of leak monitor data, regular corridor inspections, regular internal inspections using "smart-pigs," development of spill response plans, and having pre-positioned equipment and teams trained to respond to spills.

### 4.9.2 Fire Safety

In appendix M of the GPO (Resolution Copper 2016b), Resolution Copper has committed to various measures to reduce impacts on fuels and fire management:

- Any vegetation cleared from the site will be temporarily stored on-site at a location with minimal fire risk, well within a cleared area away from ignition sources. Handheld and large equipment (e.g., saws, tractors) used for vegetation clearing will be equipped with working spark arresters. Resolution Copper will take additional precautions if work is to be conducted during the critical dry season, which may include larger amounts of extinguishing agents, shovels, and possibly a fire watch.

- Parking will be prohibited on vegetated areas and proper disposal of smoking materials will be required. All surface mine vehicles will be equipped with, at a minimum, fire extinguishers and first aid kits.

- Resolution Copper will establish an emergency service or maintain contracts and agreements with outside emergency response contractors for emergency response support services to surface facilities on a 24/7 on-call basis. Fire emergency and response procedures specific to underground operations will be prepared and implemented.

### 4.9.3 *Hazardous Materials*

Applicable emergency response protection plans include the following:

- Spill Prevention Control and Countermeasures Plan (appendix O of the GPO)

- Emergency Response and Contingency Plan (appendix L of the GPO)

- Stormwater Pollution Prevention Plan (appendix W of the GPO)

- Fire Prevention and Response Plan (appendix M of the GPO)

- Environmental Materials Management Plan (appendix V of the GPO)

- Explosives Management Plan (appendix P of the GPO)

- Hydrocarbon Management Plan (appendix U of the GPO)

The activities related to pipeline safety, fire safety, and hazardous materials proposed by Resolution Copper as applicant-committed environmental protection measures, as well as the Forest Service mitigation requirements to implement the tailings pipeline protection and integrity plan, will be included as terms and conditions for authorizing use of NFS lands.

## 4.10  Scenic Resources

Applicant-committed environmental protection measures by Resolution Copper with respect to impacts to scenic resources from use of NFS lands include the following:

- Use non-reflective earth-tone paints on buildings and structures to the extent practicable.

- Build rust colored towers or use wooden poles on transmission lines.

- Bury tailings and other pipelines to the extent practicable.

- Use a reclamation seed mix of weed-free native species consistent with surrounding vegetation.

- Use colors that blend in with the desert environment.

Resolution Copper also has committed to minimizing visual impacts from transmission lines by using best management practices or other guidelines on NFS lands, as detailed in measure "FS-SR-01: Minimize visual impacts from transmission lines" in appendix J of the FEIS**.**

The activities proposed by Resolution Copper as applicant-committed environmental protection measures, as well as the Forest Service mitigation requirement to implement visual impact mitigations, will be included as terms and conditions for authorizing use of NFS lands.

## 4.11  Cultural Resources

A number of measures related to cultural resources were developed as part of the Programmatic Agreement (PA) and are described in more detail in part 7.1 of this Draft ROD, "Tribal Consultation and Coordination (Executive Order 13175) and Consultation with Tribes on Indian Sacred Sites (Executive Order 13007)." As noted in the introduction to part 4 of this document, since that ACHP terminated consultation and did not sign the PA, the PA was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through other authorities. Changes in enforcement of the measures described in the draft PA are further described in appendix J. All measures identified in the PA are still intended to be implemented; however, of the 12 measures originally required, only nine remain under Forest Service authority to require. The remaining three measures have been redesignated as "Resolution committed" measures. While Resolution Copper has committed to these measures in contractual, financial, or other agreements with non-Forest entities, the Tonto National Forest cannot ensure the implementation of these measures, and they cannot be included as conditions of the special use permits. See section 7.1.2 below for identification and description of these measures.

# PART 5 PUBLIC INVOLVEMENT AND ISSUES

## 5.1 Public Involvement Process

The public had multiple opportunities to provide input and comment on the Resolution Copper Project and the NEPA process undertaken by the Forest Service.

### 5.1.1 Scoping

The purpose of the scoping process is to obtain input from agencies and members of the public on the extent of the proposed project, the range of alternatives, and the content of the issue analysis in the EIS. The scoping process is described fully in section 1.6.1 of the FEIS.

The public scoping period commenced on March 18, 2016, with the Forest Service publication of the notice of intent to prepare an EIS in the Federal Register. The Forest Service planned for a 60-day public scoping period from March 18, 2016, to May 17, 2016. Numerous individuals and several organizations requested an extension of the public scoping period, as well as additional public scoping meetings. The Tonto National Forest Supervisor accommodated these requests by extending the public scoping period through July 18, 2016, resulting in a total overall scoping period of 120 days.

Tonto National Forest staff held five scoping meetings in the project area that provided the public with an opportunity to ask questions, learn about the proposed project, and provide comments on issues and concerns that should be addressed in the EIS and alternatives that should be evaluated. Internal scoping efforts included several meetings and field trips with the NEPA interdisciplinary team, cooperating agencies, and Tribes.

In total, 133,653 submittals were collected during public scoping. Scoping comments were analyzed and categorized and resulted in the identification of 13 issues, divided into 28 sub-issues, to be evaluated during the NEPA process. These issues are as follows:

- Tribal values and concerns

- Socioeconomics

- Cultural resources

- Public health and safety, including tailings and pipeline safety, wildfires, and hazardous materials

- Water resources, including groundwater drawdown from mine dewatering; potential impacts to springs, streams, and other GDEs; potential impacts to water supplies and wells; potential impacts to groundwater and surface water quality; and potential impacts to surface water runoff amounts

- Biological resources, including threatened, endangered, and other special-status species

- Air quality

- Long-term land suitability

- Recreation

- Scenic resources, including dark sky impacts

- Transportation and access

- Noise and vibration

- Land ownership and boundary management

### 5.1.2  Project Update and Alternatives Development Workshop

As part of the NEPA process, the Forest Service is required to investigate alternatives to various aspects of the proposed action. During the alternatives development process, in March 2017, the Forest Service hosted two in-person public workshops and one online workshop to (1) update the public on the status of the EIS process, (2) describe the alternatives development process, and (3) solicit input on the criteria being used to evaluate alternative tailings storage facility locations. The public responses showed that the tailings storage location was their primary concern, with protection of streams and springs having the highest concern. The Forest Service used the information gathered to inform the evaluation and comparison of alternative tailings storage facility locations during the alternative development process.

### 5.1.3  Public Comments on the Draft Environmental Impact Statement

The DEIS public comment period disclosed analyses and anticipated impacts from the proposed project and alternatives considered. The August 9, 2019, publication of the notice of availability for the DEIS in the Federal Register initiated the comment period. In addition to the Federal Register notice, the Forest Service used other outreach and means of notification, including more than 15,200 postal mailings and more than 23,000 emails to the project mailing list, social media posts, news releases, website announcements, 16 newspaper notices (in English and Spanish), and posters physically displayed at 37 various local bulletin boards and areas in the project vicinity. The Forest Service held six public meetings in local communities in the vicinity of the project during the 90-day public comment period, which ended on November 7, 2019.

The locations of these meetings were chosen because they mirrored locations used during the scoping period. Meetings were held mid-week during the evening hours in Superior, San Tan Valley, Kearny, Globe, Queen Valley, and Tempe, Arizona. The Forest Service added the Tempe meeting as a result of public requests for a meeting closer to central Phoenix. The Forest Service conducted a seventh meeting with the San Carlos Apache Tribe during a special Tribal Council meeting on November 22, 2019. This occurred within an extended 135-day comment period for Tribes, which ended on December 22, 2019.

Tonto National Forest received, analyzed, and responded to over 29,000 submittals on the DEIS. Comments were reviewed and categorized based on topic. Over 5,200 individual comments extracted from the submittals were assessed. Responses to these comments are included in appendix R of the FEIS, and the FEIS was revised based on comments received.

## 5.2    Consultation with Other Agencies

Forest Service NEPA regulations require identification of lead, joint lead, or cooperating agencies (36 CFR § 220.5(b)(3)). A cooperating agency is any Federal agency (other than the lead agency) and any State or local agency or Indian Tribe with jurisdictional authority or special expertise with respect to any environmental impact involved in a proposal. Nine cooperating agencies with jurisdictional authority and/or applicable special expertise cooperated in the development of this EIS. These are as follows:

- Arizona Department of Environmental Quality

- Arizona Department of Water Resources

- Arizona Game and Fish Department

- Arizona State Land Department

- Arizona State Mine Inspector

- Bureau of Land Management

- Pinal County Air Quality Control District
- U.S. Army Corps of Engineers
- U.S. Environmental Protection Agency

Arizona State Parks (Arizona State Historic Preservation Office (SHPO)) declined status as a cooperating agency; however, the agency has a consulting role under Section 106 of the NHPA.

The cooperating agencies assisted with EIS preparation in a number of ways, including providing research and baseline data information, reviewing scientific reports, identifying issues, assisting with the formulation of alternatives, and reviewing preliminary DEIS content and other EIS materials. Of particular importance was the participation of cooperating agencies in the Groundwater Modeling Workgroup and Water Resources Workgroup, both before and after the publication of the DEIS. In these workgroups, cooperating agencies assisted the Tonto National Forest by providing their professional viewpoints on a wide variety of water-related topics, including groundwater modeling, mitigation and monitoring, and water quality impacts.

Government-to-government tribal consultation is described in detail in part 7.1 of the Draft ROD.

## 5.3    Summary of Public Comment on Draft Environmental Impact Statement

Comments are summarized in appendix R of the FEIS, along with the responses to those comments. The Tonto National Forest received public comments on the DEIS on virtually every issue raised during scoping. Of the 5,209 individual comments coded, 51 percent generally expressed opposition or support for the project but contained no specific written comments. From the remaining comments, several issues stood out as receiving the most comments, and in general, the most complex and detailed comments.

### 5.3.1   NEPA, Regulatory, or Procedural Comments

These comments generally focused on whether the DEIS is sufficient with respect to the requirements of NEPA, focused on whether the comment periods provided by the Forest Service were adequate, or expressed concerns over the land exchange and the appraisal process. These comments represented roughly 10 percent of the individual comments that were coded.

### 5.3.2   Water-Related Comments

These comments focused largely on the scarcity of water in Arizona and the appropriateness of the project's water use in the face of future meteorological trends, Colorado River shortages, and drought. Many comments questioned whether the project's water use was accurately portrayed in the DEIS. These comments also included several detailed expert reports commenting on the groundwater modeling and water quality analyses in the DEIS. These comments represented roughly 9 percent of the individual comments that were coded.

### 5.3.3   Mitigation-Related Comments

One primary goal of the Tonto National Forest in publishing the DEIS was to identify mitigation suggestions for the impacts disclosed for the project, so that these mitigation concepts could be explored and potentially incorporated into the FEIS. The process the Tonto National Forest undertook to explore these mitigation concepts is described in section 2.3.1.2 of the FEIS, and the final outcomes (required or

voluntary measures) are described in appendix J of the FEIS. These comments represented roughly 7 percent of the individual comments that were coded.

### 5.3.4   Other Issues

Other issues with relatively high numbers of comments include alternatives-related comments (5 percent), Tribal values (3 percent), and socioeconomics (3 percent). Many comments were received directly from Tribal members about the sacredness and importance of Oak Flat to them, their lives, their culture, and their children. Many expressed their sadness and anger that their sacred place would be destroyed and that they would lose access to their oak groves and ceremonial grounds.

Based on these comments, it was determined that the DEIS discussion of Tribal impacts (section 3.14) failed to capture the true magnitude and nature of the impacts, as being shared with the Tonto National Forest during scoping comments, DEIS comments, and Tribal consultation. In response, the Tonto National Forest added information on the history of Oak Flat and its significance to the Tribes; expanded the plant resources list with information gathered by the Tribal Monitors; included Tribal Monitor survey results conducted since the DEIS for special interest areas; and disclosed information from the ethnographic report while respecting the sensitive nature of that data. More importantly, in order to demonstrate in their own words the Tribal members' heartbreak and pain caused by this project, the Tonto National Forest also included excerpts from the congressional testimony of Wendsler Nosie Sr., Chairman Terry Rambler, and Naelyn Pike, as well as personal perspectives and comments from Tribal members collected during the DEIS comment period.

# PART 6 ALTERNATIVES CONSIDERED

## 6.1    Alternatives Considered in Detail in the Final Environmental Impact Statement

NEPA requires consideration of a range of reasonable alternatives that can accomplish the purpose of and need for the proposed action. The Forest Service evaluated a range of alternatives to the Resolution Copper GPO, each of which does the following:

- responds to key issues raised during public scoping; project purpose and need; and applicable Federal and State laws and regulations;

- considers input from resource specialists, mining experts (project team), cooperating agency representatives, Tribes, and stakeholders; and

- is technically feasible to implement—but with differing environmental impacts and tradeoffs.

The proposed action and alternatives, including the preferred alternative (Alternative 6 – Skunk Camp), are described in detail in chapter 2 of the FEIS. The alternatives include the no action alternative and five action alternatives (out of more than 30 considered) at four separate locations, including one location not on Federal land.

Given that the location of the mine must remain where the ore body is, and the processing facilities are located on previously disturbed private land, much of the alternatives development process focused on the tailings storage facilities. One consistent public concern raised during scoping was the location of the tailings storage facility proposed in the Resolution Copper GPO. Concerns identified with the original location (known as the Near West site) included impacts to recreational use; impacts to the viewshed from the town of Superior and surrounding lands; and safety, air quality, and water quality concerns because of the proximity to Queen Valley. Scoping meetings and Tribal consultation also made clear that this location was in close proximity to a number of sites of cultural importance to Tribes. In addition to the *Chí'chil Biłdagoteel* Historic District (Oak Flat), a tailings storage facility at the Near West location would impact Apache Leap and the Apache Leap Special Management Area, the Superstition Mountains, and Picketpost Mountain. As a result of these impacts, the alternatives development process considered locations for tailings storage facilities away from the Superior area, even though these would require pumping of tailings over longer distances. Ultimately, this led to the tailings locations for Alternatives 5 and 6. Alternative 6 – Skunk Camp is identified as the preferred alternative in the FEIS, in part because it is relatively remote and not in proximity to the culturally important features identified around Superior.

Ore extraction and processing activities as proposed in the GPO remain similar between all action alternatives, but the environmental impacts and tradeoffs among the five action alternatives vary due to the differences summarized below:

- Tailings embankment design. Alternatives 2 and 3 would use a modified-centerline embankment, Alternative 4 (as dry-stack tailings) would not require an embankment, and Alternatives 5 and 6 would use centerline embankments, with downstream embankments for the separate PAG tailings cells. In addition, Alternative 6 – Skunk Camp is constructed as a single-face, cross-valley embankment, compared with Alternatives 2, 3, and 5, which all would be free-standing (not tied into bedrock) with multiple faces.

- Tailings deposition method. All of the alternatives would transport the tailings to the tailings storage facility in pipelines as a slurry. The alternatives then differ on the treatment of the tailings prior to deposition. Alternatives 2, 5, and 6 would all use thickened slurry tailings (50 to 70 percent solids). Alternative 3 would use ultrathickened tailings with even less water content

(70 percent solids). Alternative 4 would use filtered tailings (over 85 percent solids), which are no longer considered a slurry, but instead are handled and stacked as solids using conveyors and mechanical equipment.

- Geographic location and affected surroundings of the proposed tailings storage facility. Tailings for Alternatives 2 and 3 are placed at the location proposed by Resolution Copper in the GPO, on Tonto National Forest lands, west of the town of Superior. This area has high recreation use and high visibility. The proximity to Queen Creek also makes control of seepage from the tailings storage facility difficult to control. Alternative 4 (a dry-stack facility) is located on Tonto National Forest lands adjacent to the West Plant Site. This area is also highly visible, the terrain is steep and challenging, and control of seepage is also a concern. Alternative 5 is located on BLM-managed and Arizona State Trust lands east of the town of Florence, almost 30 miles from the mine. This area is more remote than the other locations, but still in relatively close proximity to the town of Florence and a highly used recreation area. Seepage losses are greater at this location because the foundation is porous alluvial material, but the distance downstream to the Gila River is great enough that there is adequate opportunity to capture and control seepage. Alternative 6 – Skunk Camp (the preferred alternative) is the most remote location, roughly adjacent to the Ray Mine, in Dripping Spring Wash, on private and Arizona State Trust lands. Alternative 6 – Skunk Camp offers the best ability to control seepage and protect water quality, has the least visibility, and is located in an area with relatively little recreation use.

## 6.2  Environmentally Preferred Alternative

Forest Service NEPA regulations define the "environmentally preferable alternative" (36 CFR 220.3), but there is no requirement that the environmentally preferable alternative be selected. The environmentally preferable alternative is the alternative that will promote the national environmental policy, as expressed in NEPA Section 101, and that will cause the least damage to the biological and physical environment and best protect, preserve, and enhance historic, cultural, and natural resources. As described in part 3 of the Draft ROD, of the action alternatives the Alternative 6 – Skunk Camp tailings storage location results in reduced impacts with respect to water quality, water resources, public safety, recreation and scenic values, and Tribal values.

The no action alternative analyzed in the FEIS would have the least environmental impact of all the analyzed alternatives and is the environmentally preferred alternative. Under the no action alternative, the proposed Resolution Copper Project would not be approved for mining or any associated development. This would eliminate the risk of local environmental impacts from mining, including preventing a subsidence area, eliminating the water use required for the mine, and eliminating the need for a tailings storage facility.

The no action alternative cannot be selected in this Draft ROD because the land exchange was mandated by Congress, and the Forest Service does not regulate mining operations on private land. The FEIS necessarily analyzed the possibility that the land exchange would not occur, and under this scenario the Forest Service would regulate mining operations in the area to be mined on Oak Flat. The land exchange is not discretionary since it was mandated by Congress (16 U.S.C. § 539p). In accordance with the land exchange, Oak Flat will be private property; and as recognized by PL 113-291, the Forest Service does not regulate mining operations on private property.

## 6.3  Alternatives Eliminated from Detailed Analysis

The Forest Service analyzed other potential alternatives as well, seeking to minimize project impacts, but ultimately these alternatives were eliminated from detailed analysis. These are detailed in appendix F of the FEIS and included the following:

- Assessment of alternative mining techniques, other than the proposed block caving method. Using other underground techniques potentially had great benefits, potentially preventing a subsidence crater from developing and allowing for backfill of tailings underground. Ultimately, however, no alternative mining methods were considered reasonable.

- Assessment of placement of tailings in brownfield sites, particularly old mine pits in central and southern Arizona. No reasonable brownfield locations were found during this assessment.

- Assessment of over a dozen other locations for the tailings storage facility, including areas in the Superior Basin, in the East Salt River valley, south of the Gila River (where Alternative 5 is located), and east of the proposed mine (where Alternative 6 – Skunk Camp is located).

# PART 7 LEGALLY REQUIRED FINDINGS

My decision is specific to authorization of road use, power lines, and pipelines of the project. However, the following subparts demonstrate the legal, regulatory, and procedural compliance of the project in its entirety.[8]

## 7.1 Tribal Consultation and Coordination (Executive Order 13175) and Consultation with Tribes on Indian Sacred Sites (Executive Order 13007)

### 7.1.1 Tribal Consultation

Federal agencies are required to consult with American Indian Tribes as part of the ACHP regulations, Protection of Historic Properties (36 CFR § 800), implementing Section 106 of the NHPA. Accordingly, the NHPA outlines when Federal agencies must consult with Tribes and the issues and other factors this consultation must address. Pursuant to Executive Order 13175, executive departments and agencies are charged with engaging in regular and meaningful consultation and collaboration with Tribal officials in the development of Federal policies that have Tribal implications and are responsible for strengthening the government-to-government relationship between the United States and Indian Tribes.

Executive Order 13007 requires Federal agencies, to the extent practicable, to accommodate access to and use of sacred sites by Indian religious practitioners and to avoid adversely affecting the physical integrity of such sacred sites.

Additionally, PL 113-291 mandates that the Forest Service engage in government-to-government consultation with affected Indian Tribes concerning issues of concern related to the land exchange. Subsequent to this Tribal consultation, the Forest Service was mandated to consult with Resolution Copper and "seek to find mutually acceptable measures to address tribal concerns and minimize the adverse effects to affected Tribes resulting from mining and related activities on the Federal land conveyed to RCM" (PL 113-299). Surface disturbance will result in significant and irreversible impacts to *Chí'chil Bildagoteel* Historic District (Oak Flat), a traditional cultural place listed in the National Register of Historic Places.

The Tonto National Forest has been conducting Tribal consultation related to various Resolution Copper projects, the land exchange, and the Apache Leap Special Management Area environmental assessment. This consultation has included formal and informal meetings, correspondence, information sharing, site visits, and documentation of Tribal comments and concerns by the Forest Service. Opportunity for consultations is ongoing and will continue through the end of the project. A full list of consultation efforts is contained in appendix S of the FEIS. The following affected Tribes are involved in the consultation process:

- Fort McDowell Yavapai Nation
- Gila River Indian Community
- Hopi Tribe
- Mescalero Apache Tribe
- Pueblo of Zuni

---

[8] This list is not exhaustive. For a complete list of all applicable laws, regulations, and agency policies for this project, see chapters 1 and 3 of the FEIS, and the project record.

- Salt River Pima-Maricopa Indian Community
- San Carlos Apache Tribe
- Tonto Apache Tribe
- White Mountain Apache Tribe
- Yavapai-Apache Nation
- Yavapai-Prescott Indian Tribe

Additional Tribes were included in consultation with the introduction of the Peg Leg alternative location. These Tribes, included at the BLM's request, are as follows:

- Ak-Chin Indian Community
- Fort Sill Apache Tribe
- Pascua Yaqui Tribe
- Tohono O'odham Nation

One reason for the March 2021 withdrawal of the notice of availability and rescinding of the January 2021 FEIS was to allow the Forest Service to re-engage with consulting Tribes to fully understand their concerns. On September 20, 2021, the Forest Service notified Tribes that the Forest Service would reinitiate Tribal consultation. This was followed by a Tribal listening session on October 19, 2021, and subsequent consultation and staff meetings thereafter. The reinitiated Tribal consultation has informed the republished FEIS and this decision.

### 7.1.2  Development of Programmatic Agreement

As noted in part 7.6, throughout the process the Forest Service complied with Section 106 of the NHPA through the development of a PA in consultation with the SHPO, ACHP, USACE, BLM, Tribes, and other consulting parties. The final version of the PA circulated for signature was included as appendix O of the January 2021 Rescinded FEIS.

The PA outlined the roles and responsibilities of parties, the procedure for identification and evaluation of historic properties, assessment for effects, and each party's responsibilities for resolving adverse effects from the project. The execution of the agreement evidences the agency official's compliance with Section 106. The agency official then must ensure that the undertaking is carried out in accordance with the agreement.

All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)."

Since ACHP did not sign the PA, it was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the Final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J of the FEIS and are summarized below.

Section 3003 of PL 113-291 required Resolution Copper and the Forest Service to develop mutually acceptable measures to address Tribal concerns and minimize the adverse effects on affected Tribes. During government-to-government consultation, the affected Tribes provided the Forest Service with

numerous suggestions on ways to help minimize the adverse effects of the proposed project on areas and resources of Tribal interest. The mitigation measures that the Forest Service developed in response to Tribal input are contained in the former PA.

Several components of the former PA directly addressed the treatment of historic properties:

1. **Oak Flat Historic Properties Treatment Plan (HPTP):** The Forest Service has completed preparation of an archaeological HPTP for the Oak Flat Federal Parcel to resolve adverse effects on historic properties eligible for the National Register of Historic Places under Criterion D. The implementation of the Oak Flat HPTP will begin prior to the land transfer, but the work is not likely to be completed prior to the land transfer. However, the transfer will not disrupt the completion of the measures listed in the HPTP. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. See "FS-CR-01: Implementation of Oak Flat HPTP," in appendix J of the FEIS.

2. **GPO Research Design and Treatment Plans:** The Forest Service has prepared an archaeological research design (GPO Research Design) in consultation with the SHPO, Tribes, and appropriate managing agencies to guide the development of treatment plans to address adverse effects on historic properties within the other Resolution Copper GPO project areas, and the Section 404 permit compensatory mitigation parcels (i.e., West Plant Site, MARRCO corridor, tailings facility, etc.), depending on the final alternative that is selected. The Forest Service determined, in consultation with the signatories and consulting parties, that the multiple treatment plans approach, rather than a single GPO HPTP, is needed because the GPO covers several large areas, each with its own cultural background and topography. The individual treatment plans will be tiered to the GPO Research Design, and tailored to fit the mitigation needs of each GPO project area. The work identified in the treatment plans will be completed prior to the proposed ground-disturbing activities in the GPO project areas. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. See "FS-CR-02: GPO research design," in appendix J of the FEIS.

3. **Visual, Atmospheric, Auditory, Socioeconomic, and Cumulative Effects Mitigation Plan(s)**: Within 9 months of the issuance of the Final ROD, the Forest Service will prepare, in consultation with SHPO and the other consulting parties, a draft plan or plans outlining a process to mitigate visual, atmospheric, auditory, and cumulative effects (indirect or direct) identified within the visual/auditory/atmospheric/socioeconomic area of potential effects. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. Note that this measure has already been completed. See "FS-CR-03: Visual, atmospheric, auditory, socioeconomic, and cumulative effects mitigation plan" in appendix J of the FEIS.

4. **Archaeological Database Funds:** In recognition of the substantial loss of cultural resources and historic properties on State Trust lands, Resolution Copper will fund the creation and/or enhancement of existing electronic archaeological databases to assist the State of Arizona with management of these assets. The Forest Service no longer has the authority to require this measure. This measure has been changed to a Resolution Copper–committed measure that is enforceable through Letter Agreements dated January 12, 2021, and March 10, 2025, with the SHPO. See "RC-CR-07: Archaeological database funds" in appendix J of the FEIS.

Resolution Copper has committed to create three compensatory mitigation funds for five Tribal programs that will be available to the 11 consulting Tribes. The administration and management of the three funds will be the responsibility of a to-be-determined 501(c)(3) organization(s). The National Forest Foundation is a candidate for the administration of those programs and funds, which require coordination with the Forest Service, although the final selection is yet to be made. Funding for the programs is timed to

specific milestones/actions and will be memorialized in a separate agreement between the Forest Service and Resolution Copper. The five programs are as follows:

5. **The Emory Oak Collaborative Tribal Restoration Initiative**: Funds the implementation of the treatments for the Emory Oak Collaborative Tribal Restoration Initiative, a multi-year restorative fieldwork program for Emory oak groves located in the Tonto and Coconino National Forests. Developed through consultation with the Forest Service and Tribes, the program is designed to restore and protect Emory oak groves that are accessed by Apache communities for traditional subsistence gathering and ensure their sustainability for future generations. The program funds the long-term restorative treatment, maintenance, and monitoring for the Emory oak, and includes research, cultural activities, and educational activities. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. See "FS-CR-05: Emory Oak Collaborative Tribal Restoration Initiative" in appendix J of the FEIS.

6. **Tribal Monitor Program**: Funds the long-term continuation of the existing Tribal Monitor Program and administration, program development, training, and funding for Tribal Monitors working on NHPA Section 106 and 110 projects on public lands. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. See "FS-SO-02: Establish foundations for long-term funding, including the Tribal Monitor Program" in appendix J of the FEIS.

7. **Tribal Youth Program**: Funds the development of a Tribal Youth Program in partnership with the Forest Service and consulting Tribes to provide cultural and educational opportunities to Tribal Youth on NFS lands. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. See "FS-SO-02: Establish foundations for long-term funding, including the Tribal Monitor Program" in appendix J of the FEIS.

8. **Tribal Cultural Fund**: Funds to address unique and specific Tribal proposals brought forth by Tribes during government-to-government consultation. The fund will provide a mechanism to fulfill Tribal requests that do not fit under the other funding programs, such as direct funding to assist Tribal projects, programs, and infrastructure. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. See "FS-CR-06: Tribal Cultural Heritage Fund" in appendix J of the FEIS.

9. **Tribal Education Fund**: Funds scholarships for 2-year and 4-year programs of study for members of the consulting Tribes. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. See "FS-CR-08: Tribal Education Fund" in appendix J of the FEIS.

Several other non-financial measures were included in the former PA as well, to address the concerns of the affected Tribes and minimize the adverse effects from mining and related activities on the conveyed lands. These include the following:

10. **Resource Salvage**. The Forest Service is facilitating the salvage of resources (e.g., culturally important plants and mineral resources) to address the loss of access to traditional collection areas and a loss of access to the *Chí'chil Biłdagoteel* Historic District within the Oak Flat Federal Parcel (selected lands). To the extent practicable and in collaboration and partnership with Tribes, an inventory will be conducted to identify the natural resources within the Oak Flat Federal Parcel area, pipeline corridor, and tailings storage facility footprint. When the inventory is complete, the resources will be "salvaged" (collected) and the material gathered will be distributed amongst the Tribes for traditional and cultural use. This measure remains a Forest Service–required measure; however, this authority only exists for NFS lands. Other

implementation, including on Oak Flat, would remain a commitment in Resolution Copper Cultural Heritage Management Plan and co-management of heritage on private lands developed in consultation and coordination with consulting Tribes. See "FS-SV-01: Resource salvage" in appendix J of the FEIS.

11. **Access to Oak Flat:** Resolution Copper will provide access to the surface of the Oak Flat campground to members of the public and Tribes, to the maximum extent practicable and consistent with health and safety requirements, until the operation of the mine precludes public access for safety reasons. An Oak Flat campground and access management plan is complete and follows the current management practices of the Tonto National Forest for the site (Resolution Copper 2020a). The plan ensures access to Oak Flat campground to the public and Tribal members and provides stipulations for closing the campground to accommodate Tribal ceremonies and other activities. Resolution Copper will allow access to and use of the Oak Flat campground until such time as mining activities make further use unsafe. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. See "FS-RC-02: Access to Oak Flat campground" in appendix J of the FEIS.

### 7.1.3 American Indian Religious Freedom Act of 1978 and Religious Freedom Restoration Act of 1993

The American Indian Religious Freedom Act states that no Federal lands may be managed in a manner that undermines and frustrates a traditional Native American religion or religious practice, except management decisions for those lands where it is necessary to protect a compelling government interest. The law states, "In making such a management decision, the Federal agency shall attempt to accommodate the various competing interests and shall, to the greatest extent feasible, select the course of action that is least intrusive on traditional Native religions or religious practices."

The Religious Freedom Restoration Act states that the government shall not substantially burden a person's exercise of religion, with the following exception. A government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. The Act allows for judicial relief for a person whose religious exercise has been burdened in violation of this Act.

The Forest Service has a responsibility to ensure that decisions affecting NFS lands do not substantially burden the rights of Native Americans and others to practice their religion.

The exchange of lands with Resolution Copper is congressionally mandated and is not part of this Draft ROD. The decisions to authorize special uses on NFS land for the pipelines, power lines, and use of roads do not substantially burden the rights of Native Americans and others to practice their religion. Therefore, I find that the selected Federal action complies with the American Indian Religious Freedom Act and the Religious Freedom Restoration Act.

### 7.1.4 Summary of Compliance with Executive Orders 13175 and 13007, and with Section 3003 of PL 113-291

In addition to binding requirements for treatment of historic properties and for implementing measures to address impacts to resources of Tribal interest, the former PA also served to clearly acknowledge the continued Tribal opposition to the project. As articulated in the final version of the PA circulated for signature included with the January 2021 Rescinded FEIS (appendix O), representatives of the Hopi

Tribe, Mescalero Apache Tribe, Pueblo of Zuni, San Carlos Apache Tribe, Tonto Apache Tribe, and White Mountain Apache Tribe have crafted the following statement:

> The Tribes have had the opportunity to be active in the consultation, review, and comment processes of the project and it has been made clear to the Forest Service that no Tribe supports the desecration/destruction of ancestral places where ancestors have lived, as these are considered alive and sacred. It is a tribal cultural imperative that these places should not be disturbed for any reason. For tribal members, continued access to the land and all its resources is necessary for their culture and they have expressed that access should be accommodated for present and future generations. Tribal members have communicated that participation in the design of this destructive activity has caused considerable emotional stress and brings direct harm to the traditional way of life to Tribes; however, it is still deemed necessary to ensure ancestral homes and ancestors receive the most thoughtful and respectful treatment possible.

While the PA is no longer in effect, I acknowledge the opposition to the Resolution Copper Project by the consulted Tribes. Through the development of alternatives, I have sought to place the tailings storage facility away from sensitive cultural places, including Apache Leap, Picketpost Mountain, and the Superstition Mountains. Through consultation I have sought with Tribal input to identify and require mutually acceptable measures to address the concerns of the affected Tribes and minimize the adverse effects from mining and related activities on the conveyed lands. These measures are incorporated into and required by this decision.

I find that the selected Federal action complies with Executive Orders 13175 and 13007, and with Section 3003 of PL 113-291.

## 7.2    National Forest Management Act of 1976 and the Tonto National Forest Revised Forest Plan

The National Forest Management Act of 1976 requires that all development, maintenance, permits, contracts, and other instruments for the use and occupancy of NFS land be consistent with Forest Service land management plans.

A review of all components (over 600) of the 2023 forest plan was conducted to identify the need for amendment due to the effects of the project, including both the land exchange and the proposed mine plan of operations. The Tonto National Forest then analyzed the effects of any forest plan amendment in the FEIS.

As described in detail in part 2 of this document, I find that the selected Federal action requires a multi-component, project-specific amendment that includes nine guidelines and seven desired conditions of the 2023 forest plan.

The forest plan amendment is consistent with the National Forest Management Act and its implementing regulations at 36 CFR § 219 (known as the 2012 Planning Rule), focusing on "management of NFS lands so that they are ecologically sustainable and contribute to social and economic sustainability" 36 CFR § 219.1(c). Specific assessment of compliance with the 2012 Planning Rule is assessed in appendix T of the FEIS.

## 7.3    National Environmental Policy Act

The Resolution Copper Project has the potential to result in significant effects on the environment. Therefore, in accordance with the provisions of NEPA, this decision considers alternatives and mitigation developed to minimize degradation to the environment. In addition, Congress required in PL 113-291 that

the Tonto National Forest prepare a single EIS "which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities."

My conclusions are based on a review of the project record that shows a thorough review of relevant scientific information, a consideration of responsible opposing views, and the acknowledgement of incomplete or unavailable information, scientific uncertainty, and risk. Chapter 7 of the FEIS contains a list of published scientific documents referenced in preparation of the EIS. Specifically, with respect to water resources, including analysis of impacts from groundwater modeling and water quality, and subsidence-related impacts, the Forest Service undertook substantial multidisciplinary investigation. The Tonto National Forest formed multiple workgroups with qualified professionals from multiple agencies and interested parties to ensure that the full range of professional opinions was considered and disclosed.

The FEIS discloses potential project impacts and makes environmental information available to agency decision makers, other agencies, Tribes, and the public. Therefore, I find that the selected Federal action complies with the National Environmental Policy Act, as amended.

## 7.4    Organic Administration Act of 1897

The Organic Administration Act, as amended, authorizes the Forest Service to regulate use and occupancy on NFS lands. The Forest Service's special use regulations are promulgated at 36 CFR § 251, Subpart B (see part 2 above in this document). The selected Federal action includes feasible and practicable measures to minimize adverse environmental impacts to NFS surface resources (see FEIS appendix J and part 4 above in this document) to ensure compliance with applicable environmental laws and regulations. Therefore, I find that the selected Federal action complies with the 1897 Organic Administration Act, as amended.

## 7.5    Endangered Species Act

Under Section 7 of the Endangered Species Act, the Forest Service must consult with the FWS to ensure that its actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species" that the Secretary of the Interior determines to be critical (16 U.S.C. § 1536).

A Biological Assessment was prepared for the Resolution Copper Project to identify endangered or threatened species likely to be affected by this decision. The Biological Assessment states that implementation of this decision "may affect and is likely to adversely affect" endangered Arizona hedgehog cactus and "may affect but is not likely to adversely affect" Gila chub, Gila chub designated critical habitat, northern Mexican gartersnake, southwestern willow flycatcher, yellow-billed cuckoo, and yellow-billed cuckoo proposed critical habitat. The FWS issued a Biological Opinion in December 2020 containing concurrence with these effects determinations. Therefore, I find that the selected Federal action complies with the Endangered Species Act.

## 7.6    National Historic Preservation Act

Section 106 of the NHPA requires Federal agencies to identify historic properties, assess effects of their undertakings on historic properties, and afford the ACHP an opportunity to comment on such undertakings. The SHPO administers the national historic preservation program at the State level.

The Section 106 process seeks to accommodate historic preservation concerns with Federal undertakings through consultation among the agency officials and other parties with an interest in the effects of the undertaking on historic properties.

The Forest Service initiated consultation with the SHPO on March 31, 2017; with the ACHP on December 7, 2017; and with 11 Tribes on the prefeasibility exploration plan for the Resolution Copper Project via a letter dated June 6, 2008, for the land exchange via a letter dated August 4, 2015, and with four additional Tribes on December 3, 2018.

The Forest Service determined that due to the complexity of the project, a PA would be needed to modify the Section 106 processing moving forward. The Forest Service has developed a PA in consultation with the SHPO, ACHP, Tribes, and other consulting parties. The PA outlined the roles and responsibilities of parties, the procedure for identification and evaluation of historic properties, assessment for effects, and each party's responsibilities under the Section 106 process. The January 2021 Rescinded FEIS included that PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, ACHP notified the Forest Service that "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." Since ACHP did not sign the PA, the PA was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the Final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

In accordance with 36 CFR § 800.7(c)(4), the Secretary of Agriculture delivered a written response to the ACHP on April 17, 2025, and that response concluded the Section 106 process for this undertaking. Therefore, while the PA is no longer in effect, I find that the Forest Service has complied with its Federal responsibilities under the National Historic Preservation Act.

## 7.7  Migratory Birds

The Migratory Bird Treaty Act of 1918, as amended, makes it illegal for anyone to take, possess, import, export, transport, sell, purchase, barter, or offer for sale, purchase, or barter, any migratory bird, or the parts, nests, or eggs of such a bird except under the terms of a valid permit issued pursuant to Federal regulations. In January 2001, President Clinton signed Executive Order 13186 requiring Federal agencies (specifically, those taking actions that may negatively impact migratory birds) to develop a memorandum of understanding (MOU) with the FWS to promote the recommendations of various migratory bird programs and conservation considerations. The Forest Service developed an MOU with the FWS in 2008. The needs of migratory birds have been incorporated into the Tonto National Forest planning process, and specific mitigation measures are required in this decision.

Potential impacts to migratory birds are described in section 3.8.4.2 of the FEIS. Unintentional take will likely impact individual birds and local migratory bird populations, varying by species due to life history traits and habitat use. Potential population-level impacts will likely be greater for species that breed in the analysis area and less for species that use the area only during migration or as wintering habitat. However, impacts on regional and overall migratory bird populations will likely be negligible. Appropriate measures to minimize those impacts, such as ground clearing new mining areas outside nesting seasons, are described in part 4 of this document.

A State law related to migratory birds is Arizona Revised Statutes 17-236. This law indicates, "It is unlawful to take or injure any bird or harass any bird upon its nest, or remove the nests or eggs of any bird, except as may occur in normal horticultural and agricultural practices and except as authorized by commission order." Mitigation measures to prevent this occurrence are discussed in measure FS-WI-01

and in the wildlife management plan. These measures were developed by Resolution Copper in collaboration with the AGFD and provided to the Forest Service in October 2020. In the wildlife management plan, all birds are treated as if they are migratory and protected under the Migratory Bird Treaty Act: "For practical purposes, virtually any bird that could be encountered within the GPA should be considered a migratory species (in addition to any special status species noted above)." Measure FS-WI-01 in appendix J of the FEIS clarifies the requirement that meets Arizona Revised Statutes 17-236 and the Migratory Bird Treaty Act: "Preconstruction surveys and nest location for golden eagles, peregrine falcon, and migratory or breeding birds, with mitigation if occurrences are found."

While the selected Federal action could result in unintentional take of migratory bird species, approval of these special use authorizations considers these impacts and includes measures to minimize impacts. Therefore, I find the selected Federal action complies with the Migratory Bird Treaty Act, as amended, the Bald and Golden Eagle Protection Act, as amended, and Arizona Revised Statutes 17-236.

## 7.8    Water Pollution Control Act of 1972 (Clean Water Act)

The Federal Water Pollution Control Act of 1972 (PL 92-500), as amended in 1977 (PL 95-217) and 1987 (PL 100-4), is also known as the Clean Water Act (CWA). The CWA establishes a non-degradation policy for all federally proposed projects to be accomplished through planning, application, and monitoring of best management practices. Identification of best management practices is mandated by Section 319 of the Water Quality Act of 1987, which states, "It is national policy that programs for the control of non-point sources of pollution be developed and implemented." Sediment control best management practices are required for road construction and maintenance. The stormwater permit(s), if needed, will also require best management practices for operational control of runoff and sediment.

The Forest Service is responsible for ensuring that operations on NFS lands obtain the proper permits and certifications to demonstrate they comply with applicable Federal and State water quality standards, including regulations issued pursuant to the CWA. My decision to approve these special uses requires that in accordance with

- Section 401 of the CWA, the proponent obtain a water quality certification from the ADEQ, unless the ADEQ waives its issuance;[9] and

- Section 402 of the CWA, the proponent obtain any appropriate 402 stormwater or surface water discharge permits from the ADEQ, if determined by that agency to be required. ADEQ has primacy for implementing this provision of the CWA; and

- Section 404 of the CWA, if the USACE has determined that a permit for any dredge or fill activities to waters of the U.S. is required, as is currently understood, the proponent must obtain the Section 404 permit to be in compliance with the CWA.

The issuance of these permits, along with the USACE's permit decision and conditions on the 404 permit, constitute compliance with CWA requirements. Therefore, with these conditions in place, I find that the selected Federal action complies with the Clean Water Act.

## 7.9    Federal Noxious Weed Act of 1974 and Invasive Species (Executive Order 13112)

The Noxious Weed Act was established for the control and eradication of noxious weeds, and the regulation of the movement in interstate or foreign commerce of noxious weeds and potential carriers thereof, and for other purposes. Similarly, Executive Order 13112 directs Federal agencies (in part) to

---

[9] The ADEQ issued the Section 401 water quality certification for the Resolution Copper Project on December 22, 2020.

prevent the introduction of invasive species; provide for their control; and minimize the economic, ecological, and human health impacts that invasive species cause.

Resolution Copper and SRP are required as a condition of the special use authorizations to update their invasive species management plan in coordination with the Tonto National Forest. The invasive species management plan will address the treatment and control of noxious weeds throughout all pipeline and power line corridors. Preparation and implementation of this plan will meet the requirements of the Noxious Weed Act. Therefore, with these conditions, I find that the selected Federal action complies with Executive Order 13112 and the Noxious Weed Act.

## 7.10  Wetlands (Executive Order 11990) and Floodplains (Executive Order 11988)

Executive Order 11990 requires Federal agencies to avoid, to the extent possible, the long- and short-term adverse effects associated with the destruction or modification of wetlands. Federal agencies must find that there is no practicable alternative to new construction located in wetlands, and that the selected Federal action includes all practicable measures to minimize harm to wetlands. Agencies may take into account economic, environmental, and other pertinent factors in making this finding.

Section 404 of the CWA authorizes the USACE to issue permits for activities that will result in the placement of dredged or fill material in waters of the U.S., which include special aquatic sites like wetlands. Before a permit can be issued, Section 404(b)(1) guidelines require that projects avoid impacts to the extent possible, minimize impacts that cannot be avoided, and provide compensatory mitigation for impacts that occur. The estimated total impacts to waters of the U.S. from the tailings storage facility footprint, pipeline corridor, and associated facilities is 188.3 acres. Resolution Copper will be required by conditions in the special use authorization to obtain Section 404 approval from the USACE prior to impacting potentially jurisdictional waters of the U.S., if the USACE determines that a permit is required. The issuance of the Section 404 permit will affirm my finding that the selected Federal action complies with Executive Order 11990.

Executive Order 11988, as amended by Executive Order 13690, requires Federal agencies to avoid, to the extent possible, the long- and short-term adverse impacts associated with the occupancy and modification of floodplains and to avoid direct and indirect support of floodplain development wherever there is a practicable alternative. Federal agencies must take floodplain management into account, consistent with the Federal Flood Risk Management Standard, when formulating or evaluating water and land use plans and require land and water resources use appropriate to the degree of flood hazard involved.

Operations under these special uses will have limited impacts on floodplains. The pipeline corridor crosses Queen Creek, Devil's Canyon, and Mineral Creek, but does not impact mapped floodplains. Instead, the corridor spans Queen Creek and Devil's Canyon, and uses a trenchless crossing for Mineral Creek. Due to the limited area of impacted floodplains, I find that approval of these special uses complies with Executive Order 11988.

## 7.11  Clean Air Act of 1963

The Clean Air Act (CAA), as amended, is designed to control air pollution on a national level by establishing a Federal program for monitoring and controlling air pollution by regulating air emissions from stationary and mobile sources. The Forest Service is responsible for ensuring that uses on NFS lands comply with applicable Federal and State air quality standards, including the CAA requirements. Consequently, Resolution Copper will be required to obtain a State of Arizona or Pinal County air quality permit if applicable for its activities on NFS land. Whichever agency has primacy over implementation of

CAA regulations—the ADEQ or the Pinal County Air Quality Control District—would determine the necessity of such permitting.

The issuance of an air quality permit, if required, constitutes compliance with CAA requirements. Therefore, with these permits in place, I find that the selected Federal action complies with the Clean Air Act, as amended.

## 7.12  Special Uses

The "Tonto National Forest Land Management Plan" allows special uses that serve the public, promote public health and safety, protect the environment, are legally mandated, and are compatible with other resources. This may include special uses for linear corridors for pipelines and power lines. The portions of the project that are authorized in this Draft ROD meet the special uses screening criteria and considerations put forth at 36 CFR § 251 Subpart B.

## 7.13  Resource Conservation and Recovery Act

Hazardous waste is regulated under the Federal Resource Conservation and Recovery Act regulations (40 CFR § 260 et seq.). Generators of hazardous waste must follow strict rules regarding the generation, storage, handling, and disposal of their wastes. Resolution Copper would comply with applicable State and Federal hazardous waste regulations. There is an exclusion for "solid waste from the extraction, beneficiation, and processing of ores and minerals;" therefore, the tailings transported by the pipelines are not considered hazardous waste (40 CFR § 261.4(b)(7)). No hazardous waste would be generated, stored, handled, or disposed of on NFS lands. Therefore, I find that the selected Federal action complies with the Resource Conservation and Recovery Act.

# PART 8 ADMINISTRATIVE REVIEW OPPORTUNITIES

This proposed decision to authorize the use of NFS land and roads is subject to predecisional objection pursuant to 36 CFR § 218, Subparts A and B. Objections to the Resolution Copper Project will only be accepted from those who have previously submitted timely comments regarding this project proposal during a designated opportunity for public comment, unless based on information not available during an earlier designated opportunity for public comment (i.e., new information).

Objections on the Resolution Copper Project must be submitted within 45 calendar days following the publication of the legal notice in the "Arizona Capitol Times." The date the legal notice is published in the "Arizona Capitol Times" is the exclusive means for calculating the time to file an objection. A copy of this legal notice will be posted on the website (link provided above) once published.

Those wishing to object should not rely upon dates or timeframe information provided by any other source. A timely submission will be determined by USPS postmark; the agency's electronically generated posted date and time for electronic submission; or shipping date for delivery by private carrier. It is the objector's responsibility to ensure timely filing of a written objection with the reviewing officer pursuant to § 218.9. All objections are available for public inspection during and after the objection process.

Electronic objections may be submitted using the Public Comment Form at https://cara.fs2c.usda.gov/Public/CommentInput?Project=48956. Electronic submissions, including attachments, must be submitted in a format (Microsoft Word, portable document format (PDF), or rich text format (RTF)) that is readable and searchable. Written objections may be submitted by mail to: Reviewing Official, Regional Forester, filed via mail or express delivery to 333 Broadway Boulevard SE, Albuquerque, New Mexico 87102.

At a minimum, an objection must include the following: (1) The objector's name and address, along with a telephone number or email address if available; (2) Signature or other verification of authorship upon request (a scanned signature for electronic mail may be filed with the objection); and (3) Identification of the lead objector, when multiple names are listed on an objection, and verification of the identity of the lead objector, if requested. Individual members of an entity must have submitted their own individual comments in order to have eligibility to object as an individual. Additional requirements are included below.

The reviewing officer must set aside and not review an objection when one or more of the following applies: (1) it is not filed in a timely manner; (2) the proposed project or forest plan amendment is not subject to the objection procedures; (3) the individual or entity did not submit timely and specific written comments or substantive formal comments during opportunities for public comment; (4) except for issues that arose after the opportunities for comment, none of the issues included in the objection are based on previously submitted written comments and the objector has not provided a statement demonstrating a connection between the comments and the objection issue; (5) the objection does not provide sufficient information as required; (6) the objector withdraws the objection; (7) an objector's identify is not provided or cannot be determined from the signature, and a reasonable means of contact is not provided; or (8) the objection is illegible for any reason, including submissions in an electronic format different from that specified in the legal notice, and (9) the responsible official cancels the objection process underway to reinitiate the objection procedures at a later date or withdraw the proposed project or activity.

## 8.1   Implementation Timeline

When no objection is filed within the objection filing period (in accordance with 36 CFR §§ 218.26 and 218.32), the reviewing officer must notify the responsible official. Approval of the proposed project or

activity documented in the Final ROD may occur on, but not before, the fifth business day following the end of the objection filing period (36 CFR § 218.12(c)(1 and 2)).

When an objection is filed, the responsible official may not sign the Final ROD subject to the provisions of 36 CFR § 218.12 until the reviewing officer has responded in writing to all pending objections (see 36 CFR § 218.11(b)(1)). Additionally, the responsible official may not sign the Final ROD subject to the provisions of 36 CFR § 218 until all concerns and instructions identified by the reviewing officer in the objection response have been addressed (36 CFR § 218.12(b)). Once the responsible official has complied with any instructions from the reviewing officer, the ROD can be signed, and implementation can take place immediately.

## 8.2   Contact Person

For additional information concerning this decision or the Forest Service administrative review process, contact Michelle Tom, Engineering and Minerals Staff Officer, Tonto National Forest Supervisor's Office, located at 2324 East McDowell Road, Phoenix, Arizona 85006, or emailed to comments-southwestern-tonto@usda.gov.

## Signature and Date

As the Forest Service responsible official, I certify that this agency decision was informed by all of the alternatives, information, analyses, and objections submitted by Tribal, State, and local governments and public commenters for consideration by the lead and cooperating agencies in developing the environmental impact statement.


_____              _____

Forest Supervisor                                            Date
Tonto National Forest

# REFERENCES

Air Sciences Inc. 2018. *Final Air Quality Impacts Analysis Modeling Plan, Resolution Copper Project, AZ*. Project No. 262. Golden, Colorado: Air Sciences Inc. March.

Avian Power Line Interaction Committee. 2012. *Reducing Avian Collisions with Power Lines: The State of the Art in 2012*. Washington, D.C.: Edison Electric Institute and Avian Power Line Interaction Committee. October.

Dark Sky Partners LLC. 2018. *Impact Assessment of the Proposed Resolution Copper Mine on Night Sky Brightness: Final Report*. Prepared for Resolution Copper. Tucson, Arizona: Dark Sky Partners LLC. February.

Davies, A. 2020. *Subsidence Monitoring and Management Plan - August*. Superior, Arizona: Resolution Copper.

Golder Associates Inc. 2020. *Resolution Copper Skunk Camp Pipelines: Pipeline Protection and Integrity Plan*. CCC.03-81900-EP-REP-00007_Rev0. Walnut Creek, California: Golder Associates Inc. May 15.

International Council on Mining and Metals, United Nations Environment Programme, and Principles for Responsible Investment. 2020. Global Industry Standard on Tailings Management. August. Available at: https://globaltailingsreview.org/wp-content/uploads/2020/08/global-industry-standard_EN.pdf. Accessed October 30, 2020.

KCB Consultants Ltd. 2020. *Resolution Copper Project: Skunk Camp TSF Reclamation Plan*. Doc. # CCC.03-81600-EX-REP-00023 - Rev. 0. Phoenix, Arizona: KCB Consultants Ltd. June 10.

Klohn Crippen Berger Ltd. 2018. *Resolution Copper Project: DEIS Design for Alternative 6 - Skunk Camp*. Doc. # CCC.03-81600-EX-REP-00006 - Rev.1. Vancouver, Canada: Klohn Crippen Berger Ltd. August 8.

———. 2019. *Resolution Copper Project DEIS Alternatives Failure Modes*. Doc. # CCC.03-81600-EX-REP-00011 - Rev.0. Vancouver, Canada: Klohn Crippen Berger Ltd. January.

M3 Engineering and Technology Corporation. 2019. *Resolution Copper Project: Concentrate Pipeline Corridor Management Plan, Superior, Arizona*. Revision 4. Project No. M3-PN140023.603. Chandler, Arizona: M3 Engineering and Technology Corporation. May 2.

Montgomery and Associates Inc. 2020a. *Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells*. Prepared for Resolution Copper. Tucson, Arizona: Montgomery and Associates. September 1.

———. 2020b. *Skunk Camp Water Quality Monitoring Program, Pinal and Gila Counties, Arizona*. Prepared for Resolution Copper. Tucson, Arizona: Montgomery and Associates Inc. August 28.

Oliver, D. 2020. *Queen Creek Climbing Mitigation and Access Plan*. F102201102-TE-MEM-01. Greenwood, Colorado: FloSolutions USA, Ltd. September 10.

Pilz, J. 2019. *Alternative 5 - Impacts to Public Safety*. Project No. 1788500.002 TM01 Rev0. Technical memorandum. Salt Lake City, Utah: Golder Associates Inc. January 11.

Resolution Copper. 2016a. Appendix E: Subsidence Management Plan. In *General Plan of Operations, Resolution Copper Mining*. Superior, Arizona. May 9.

———. 2016b. *General Plan of Operations Resolution Copper Mining*. Superior, Arizona. May 9.

———. 2019. *Resolution Copper Project, Noxious Weed and Invasive Species Management Plan on National Forest System Lands*. Prepared for Tonto National Forest. Superior, Arizona: Resolution Copper. May.

———. 2020a. *Access and Management Plan: Oak Flat Campground*. Superior, Arizona: Resolution Copper. November 13.

———. 2020b. *General Plan of Operations: Road Use Plan*. Superior, Arizona: Resolution Copper. August.

———. 2020c. *Wildlife Management Plan*. Superior, Arizona: Resolution Copper. October.

SWCA Environmental Consultants. 2025. *Resolution Copper Project Consistency with the Tonto National Forest Plan*. Process memorandum to file. Phoenix, Arizona: SWCA Environmental Consultants. January.

Tetra Tech Inc. 2020. *Draft Reclamation Plan: Preferred Alternative*. #114-570991. Prepared for Resolution Copper. Missoula, Montana: Tetra Tech Inc. June.

U.S. Forest Service. 2021. *Final Environmental Impact Statement: Resolution Copper Project and Land Exchange - Rescinded*. MB-R3-10. Phoenix, Arizona: U.S. Forest Service. January.

———. 2023. *Tonto National Forest Land Management Plan.* Coconino, Gila, Maricopa, Pinal, and Yavapai Counties, Arizona. MB-R3-12-13. U.S. Forest Service, Southwestern Region. December.

———. 2025. *Final Environmental Impact Statement: Resolution Copper Project and Land Exchange*. Coconino, Gila, Maricopa, Pinal, Santa Cruz, and Yavapai Counties, Arizona. MB-R3-12-10. Phoenix, Arizona: U.S. Forest Service. June.

*This page intentionally left blank.*

**APPENDIX A**

**SUMMARY OF APPLICANT-COMMITTED ENVIRONMENTAL PROTECTION MEASURES, MONITORING, AND MITIGATION NOT INCLUDED AS TERMS AND CONDITIONS FOR AUTHORIZED USE OF NATIONAL FOREST SYSTEM LANDS**

This appendix describes applicant-committed environmental protection measures, mitigation, and monitoring measures that are not related to uses of NFS land and are therefore not being required as terms and conditions of authorizing uses of NFS land. Many of the measures listed in this appendix will be required under other legally binding agreements or by other State or Federal agencies, and this is noted for each measure when applicable. Other measures listed in this appendix remain solely voluntary on the part of Resolution Copper, though Resolution Copper has publicly committed to implementing them and future binding agreements could incorporate them.

## Soils, Vegetation, and Reclamation

### Arizona State Land Department Right-of-way Permits

The applicant-committed environmental protection measures related to soils, vegetation, and reclamation that were described in part 4 of the Draft ROD may also be included as conditions in right-of-way permits or other authorizations for the portions of the tailings pipeline and power line corridors that cross Arizona State Trust land.

### Arizona State Mine Inspector

As noted in part 4 of the Draft ROD, the Forest Service is requiring implementation of reclamation plans for uses on NFS land. The reclamation activities applicable to NFS land are part of a larger reclamation plan for the entire Resolution Copper facility, including the East Plant Site, West Plant Site, filter plant and loadout facility, and tailings storage facility.

The Arizona State Mine Inspector regulates mining activities on private land in Arizona, and the primary action required is the implementation of reclamation activities at the site, including requirements for certification, plan updates, annual reporting, and financial assurance. Resolution Copper currently holds a plan authorizing the reclamation of surface disturbances at the East Plant Site and West Plant Site.

Implementation of reclamation plans for all mine activities, not just those on NFS land, will be required by the Arizona State Mine Inspector, who will determine what reclamation is appropriate under pertinent regulations.

### Biological Opinion

The many applicant-committed environmental protection measures related to soils, vegetation, and reclamation that were described in part 4 of the Draft ROD are also included as conservation measures in the Biological Opinion signed by the FWS on December 31, 2020 (appendix P of the FEIS). The analysis of impacts to threatened and endangered species contained in the Biological Opinion, and notably impacts to the endangered Arizona hedgehog cactus, accepts that the conservation measures will occur as described as a foundation for the analysis of impacts.

One specific conservation measure included in the Biological Opinion was developed during Section 7 consultation. Resolution Copper committed to recording a conservation easement on portions of the JI Ranch. The conservation easement's purpose shall be for the protection of the Arizona hedgehog cactus and will be at least 100 acres, comprising one or multiple parcels excluding roads and trails, for the life of the project. The Forest Service included this as measure "FS-SV-02: JI Ranch" in appendix J of the FEIS.

The Biological Opinion includes a reinitiation clause. Reinitiation considerations include new information that reveals effects of the agency action (authorizing use of NFS land) that may affect listed species or critical habitat in a manner or to an extent not considered in the Biological Opinion, or if the action is subsequently modified in a manner that causes an effect on the listed species or critical habitat not

considered in the Biological Opinion. If Resolution Copper does not implement these conservation measures as assumed in the Biological Opinion, reinitiation of consultation under Section 7 of the Endangered Species Act may be warranted.

### Programmatic Agreement

As noted in part 4 of the Draft ROD, the Forest Service is requiring resource salvage on NFS lands. This measure remains a Forest Service–required measure; however, this authority only exists for NFS lands. Other implementation, including on Oak Flat, would remain a commitment in the Resolution Copper cultural heritage management plan and co-management of heritage on private lands developed in consultation and coordination with consulting Tribes.

### Voluntary Measures and Other Future Agreements

As a voluntary measure, Resolution Copper has agreed to continue cooperative management of the 7B Ranch until BLM management can be implemented. This would involve private arrangements with The Nature Conservancy, which has not yet been undertaken and may or may not occur as planned. This is detailed as measure "RC-SV-04: Voluntary cooperative management of 7B Ranch" in appendix J of the FEIS.

## Noise and Vibration

### Voluntary Measures and Other Future Agreements

The GPO (Resolution Copper 2016b) outlines applicant-committed environmental protection measures by Resolution Copper in the "Environmental Protection Elements" section, including these measures pertinent to noise and vibration:

- Mining activities, primary crushing and conveying, will take place underground, and exhaust fans will be equipped with silencers for noise reduction. Milling will take place within a fully enclosed building.

Resolution Copper has also committed to addressing noise and vibration near the tailings facility specific to the presence of residential areas in Section 29, Township 3 South, Range 15 East, including the following measures prior to ground-disturbing activities: paving Dripping Springs Road, setting the speed limit to 15 miles per hour, and requiring the deliveries of equipment and materials to occur during the daytime. Resolution Copper has also already purchased properties in the footprint and vicinity of the tailings storage facility. This is detailed as measure "RV-NV-01: Dripping Springs Road mitigations" in appendix J of the FEIS.

At this time, these measures remain solely as voluntary measures, unrelated to use on NFS land. These measures may or may not occur as planned. Gila County has the legal authority to maintain Dripping Springs Road. As such, Resolution Copper will need to work with Gila County to implement the measures, including reduced speeds and selective paving.

## Air Quality

### Air Quality Permits from Pinal County and ADEQ

The various dust control measures identified in part 4 of the Draft ROD are likely to be required not only for uses on NFS land, but also as part of air quality permits. Resolution Copper currently holds an air quality control permit that pertains to the historical mining (reclamation) and development and

exploratory mining exploration facilities operated by Resolution Copper. A similar air quality permit will be required for the full operations.

The tailings facility lies within Gila County. Gila County relies on ADEQ to issue air permits within the county. At this time, it is anticipated that air permits would be obtained from the Pinal County Air Quality Control District for operations solely within Pinal County (East Plant Site, West Plant Site, filter plant and loadout facility), and from ADEQ for the tailings storage facility. Pinal County may also issue dust permits for construction, earthwork, and land development. Additional measures that Resolution Copper has committed to that may be required by the air quality permits include the following:

- Dust control on roads, including regular watering, road base maintenance and dust suppression, paving select access roads to the East Plant Site and West Plant Site with asphalt, and setting reasonable speed limits on access roads within the operational footprint.

- Dust control at the tailings storage facility, including delivering tailings to the storage facility via distribution pipelines and continuously wetting the tailings during active deposition. During non-active periods, dust emissions would be managed by establishing a temporary vegetative cover on construction areas that would be inactive and exposed for longer than 12 months, wetting inactive beaches and embankment surfaces with irrigation from sprinkler systems, and treating with chemical or polymer dust suppressants, if necessary.

- Dust control at East Plant Site, including periodic water and/or chemical dust suppressant, normal mining controls such as wet drilling and the wetting of broken rock, application of water suppression spray to control dust ore conveyance, dedicated exhaust ventilation systems and/or enclosures for crushers and transfer points underground, performing of primary crushing and conveying underground, and saturation of underground exhaust ventilation.

- Dust control at West Plant Site, including housing main active ore stockpiles in fully covered buildings, applying water suppression spray to control dust ore conveyance, processing ore in a new enclosed building, and enclosing conveyor transfer points within the concentrator building. Once arriving at the concentrator complex, the ore would either be processed immediately or stockpiled in an enclosed structure for future processing.

- Dust control during shipping, including bagging molybdenum concentrate at the concentrator facility before shipping and enclosing loadout building and storage shed.

Other applicant-committed environmental protection measures committed to by Resolution Copper include those outlined in the "Final Air Quality Impacts Analysis Modeling Plan" (Air Sciences Inc. 2018) and Resolution Copper's current air quality permit. Measures that may be required by the air quality permits include the following:

- use of low-sulfur diesel in mobile and stationary equipment;

- use of a scrubber to control sulfur dioxide emissions from the drying of molybdenum concentrate at the West Plant Site;

- use of Tier 4 diesel engines (or greater); and

- use of fencing, berms, locking gates, signage, natural barriers/steep terrain (25 to 30 percent or greater), and site security measures to limit access roads and other locations near areas of heavy recreational use. These same methods would be required to limit public access within the mine site (i.e., the air modeling boundary) to prevent public exposure to mine emissions.

### Solar Participation Agreement

In November 2019, Resolution Copper entered into a Solar Participation Agreement with the Salt River Project Agricultural Improvement and Power District to obtain solar power from a 100-megawatt solar photovoltaic generating facility. In furthering its commitment to increase its reliance on renewable energy, Resolution Copper subscribed to 4.6 percent of the generating facility's solar power. Accordingly, by entering into the agreement, Resolution Copper has sourced renewable energy credits constituting approximately 25 percent of Resolution Copper's estimated baseload in 2022. Resolution Copper will continue to explore other opportunities to obtain renewable energy credits as the project moves forward. This is detailed as measure "RC-AQ-01: Salt River Project solar participation agreement" in appendix J of the FEIS.

## Water Resources

### Arizona Department of Environmental Quality Water Permits

In the GPO and subsequent design documents, Resolution Copper has committed to various measures to reduce impacts on water quality:

- groundwater levels will be monitored at designated compliance monitoring wells located downstream of the tailings storage facility seepage recovery embankments in accordance with the requirements of the Aquifer Protection Permit program;
- all potentially impacted water will be contained on-site during operations and will be put to beneficial use, thereby reducing the need to import makeup water;
- stormwater controls (described in detail in section 3.7.2 of the FEIS);
- engineered seepage controls (described in detail in section 3.7.2 of the FEIS);
- to the extent practicable, stormwater flows upgradient of the facilities will be diverted around the disturbed areas and returned to the natural drainage system;
- permanent diversion channels will be designed for operations and closure; and
- runoff from roads, buildings, and other structures will be handled through best management practices, including sediment traps, settling ponds, berms, sediment filter fabric, wattles, etc.

Resolution Copper will be required to obtain two permits from ADEQ: an Aquifer Protection Permit for discharges to groundwater, and a stormwater permit under the Arizona Pollutant Discharge Elimination System, which would include both operational and construction stormwater discharges. The measures described above will likely be required as part of these two permits.

Resolution Copper has also developed a water quality monitoring plan for surface water and groundwater resources located in Dripping Spring Wash downgradient of the tailings storage facility (Montgomery and Associates Inc. 2020b). The Skunk Camp water quality monitoring plan includes monitoring of numerous wells and springs along or adjacent to Dripping Spring Wash and in the Gila River just downstream of its confluence of Dripping Spring Wash. While portions of this plan overlap permitting requirements, this monitoring plan exceeds the likely monitoring requirements to be implemented under the two ADEQ water quality permits. The monitoring above and beyond the ADEQ permits reflects a voluntary measure, unrelated to use on NFS land. These measures may or may not occur as planned.

### Compensatory Mitigation under Section 404 Individual Permit

Resolution Copper has proposed a package of compensatory mitigation as part of the CWA Section 404 permitting process. This compensatory mitigation is detailed in measure "FS-WR-02: 404 compensatory mitigation plan" in appendix J of the FEIS. This package has been approved by the USACE and is included in appendix D of the FEIS. The three compensatory mitigation parcels approved under the Section 404 permitting process are the MAR-5 Wetland/Olberg Road site, the Queen Creek site, and the H&E Farm site.

### Voluntary Measures and Other Future Agreements

Resolution Copper also has committed to various measures to reduce the amount of water used by the project, including the following:

- recycling as much water as possible for reuse;

- sourcing approximately one-half of Resolution Copper's water needs from long-term storage credits (surface water stored underground); and

- including the beneficial reuse of existing low-quality water sources, such as impacted underground mine dewatering water, in the project water supply.

The primary water supply for the Resolution Copper Project is obtained from the Desert Wellfield, located in the East Salt River valley, which is within the Phoenix Active Management Area. Under Arizona water law, all groundwater pumped within an Active Management Area must obtain a groundwater right from the Arizona Department of Water Resources. While Resolution Copper has obtained long-term storage credits to offset groundwater use, this is not required under water use regulations.

Resolution Copper has provided a robust water quality monitoring program around the proposed tailings storage facility (Montgomery and Associates Inc. 2020b) that exceeds the likely monitoring requirements to be implemented under the Arizona Protection Permit or AZPDES permits. The Skunk Camp Water Quality Monitoring Plan includes monitoring of numerous wells and springs along or adjacent to Dripping Spring Wash, and in the Gila River just downstream of its confluence of Dripping Spring Wash. Authority for these measures will ultimately reside with ADEQ under the Arizona Protection Permit and AZPDES programs; however, it is anticipated that much of the sampling detailed in the plan will remain voluntary by Resolution Copper, as detailed in "RC-WR-03: Skunk Camp water quality monitoring plan" in appendix J of the FEIS.

At this time, these measures remain solely as voluntary measures, unrelated to use on NFS land. These measures may or may not occur as planned.

## Wildlife

### Arizona State Land Department Right-of-Way Permits

The applicant-committed environmental protection measures related to wildlife that were described in part 4 of the Draft ROD may also be included as conditions in right-of-way permits or other authorizations for the portions of the tailings pipeline and power line corridors that cross Arizona State Trust land.

### Biological Opinion

The many applicant-committed environmental protection measures related to wildlife that were described in part 4 of the Draft ROD are also included as conservation measures in the Biological Opinion signed by the FWS on December 31, 2020 (appendix P of the FEIS). The analysis of impacts to threatened and endangered species contained in the Biological Opinion, and notably impacts to the endangered Arizona hedgehog cactus, accepts that the conservation measures will occur as described as a foundation for the analysis of impacts.

As described earlier in this appendix, if Resolution Copper does not implement these conservation measures as assumed in the Biological Opinion, reinitiation of consultation under Section 7 of the Endangered Species Act may be warranted.

### Voluntary Measures and Other Future Agreements

In the GPO and in the Biological Opinion, Resolution Copper has committed to a variety of measures to reduce potential impacts on wildlife not related to uses on NFS land, including those outlined in appendix P of the FEIS.

- Some additional non-lethal harassment and scare devices to deter and disperse wildlife from the PAG tailings, non-contact and contact stormwater catchment basins, and process water ponds may also be considered and could include the following:
  - Plastic ball covers, vehicle lights and horns, motion-sensor lights, flags, perch deterrents, shell crackers, bird bangers, screamers, distress cries/electronic noise systems, bird scare balloons, propane cannons, and mylar scare tape.
  - A bird hazing protocol would be developed for Resolution Copper employees and would include a combination of harassment techniques. Additional hazing techniques may be adjusted or added as necessary based on field observations and ongoing research efforts. The protocol would include an inspection schedule, acceptable harassment techniques, a field log procedure, and incident reporting procedures. Resolution Copper staff responsible for implementing the bird hazing program would be trained on the protocol prior to its initiation.
- Vegetation growth within the contact and non-contact stormwater catchment basins and process water ponds would be monitored and periodically removed as often as necessary to further discourage the presence of wading birds.

At this time, these measures remain solely as voluntary measures, unrelated to use on NFS land. These measures may or may not occur as planned.

## Recreation

### Programmatic Agreement

One recreational measure unrelated to uses on NFS land was required under the former PA. Resolution Copper also was to establish an alternative campground site, known as Castleberry, to mitigate the loss of Oak Flat campground, which is a historic property. The Forest Service has no authority over management of lands that will be private after the land exchange. As the PA is no longer valid, this measure has been changed to a Resolution Copper–committed measure, enforceable under third-party agreements dated January 14, 2021, between Resolution Copper and the Town of Superior. This is detailed in measure "RC-RC-04: Establish an alternative campground site (Castleberry) to mitigate the loss of Oak Flat Campground" in appendix J of the FEIS.

### *Voluntary Measures and Other Future Agreements*

Applicant-committed environmental protection measures by Resolution Copper include the following:

- Developing plans to reestablish a crossing on the Arizona National Scenic Trail after construction of the concentrate pipeline (along the MARRCO corridor). Further detail can be found in the Concentrate Pipeline Corridor Management Plan (M3 Engineering and Technology Corporation 2019).

Resolution Copper has committed to mitigating impacts to climbing resources, as described in the "Queen Creek Climbing and Mitigation Access Plan" (Oliver 2020), including new access to bouldering and climbing resources known as "The Inconceivables and Chill Hill Boulders." Additionally, Resolution Copper has agreed to mitigation efforts in the combined "Queen Creek Climbing Area," which includes 10 discrete climbing areas: The Pond, Atlantis, Oak Flat, Euro Dog Valley, The Mine Area, Apache Leap, Northern Devil's Canyon, Upper Devil's Canyon, and Lower Devil's Canyon, and Hackberry Creek/The Refuge. Some of these areas will be impacted, and Resolution Copper has proposed the following mitigation:

- Oak Creek and Euro Dog Valley: May eventually be impacted by subsidence. Funds for a new access road (crossing NFS lands) to the Inconceivables and Chill Hill Boulders.

- The Mine Area: Mining impacts will likely include closure of the current access route via Magma Mine Road and closure of some of the climbing area. Resolution Copper will work with local climbing groups and climbers to evaluate the feasibility of an alternate access route (trail) on private lands.

- Apache Leap: Access via Magma Mine Road and NFS Road 315 will be closed due to mining impacts. Resolution Copper will work with local climbing groups and climbers to evaluate the feasibility of an alternate access route (trail) across private lands. Although access from NFS Road 2440 via the Cross Canyon Road would not be impacted by mining activities, there may be possible restrictions for climbing as a result of the climbing management plan for Apache Leap Special Management Area.

- Upper Devil's Canyon: Access from NFS Road 2438 and/or 2439 via NFS Road 469 (Magma Mine Road) will most likely remain. However, in the event that parts of NFS Road 2438 are closed due to subsidence, Resolution Copper will work with local climbing groups and climbers to evaluate the feasibility of an alternate access route.

- Lower Devil's Canyon, Hackberry Creek/The Refuge: Access will remain from the south from NFS Road 315 via State Route 177, but access from Magma Mine Road will be closed.

These activities are detailed in measure "RC-RC-05: Mitigation for impacts on climbing resources" in appendix J of the FEIS.

Resolution Copper also has agreed to open Signal Mountain Road on the JI Ranch for public access to the Tonto National Forest for wildlife-related recreation through an agreement with the AGFD. This is detailed in measure "RV-RC-06: Mitigation for public access to JI Ranch through AGFD cooperative agreement" in appendix J of the FEIS. These actions are currently agreed to in concept but may eventually be executed in a road agreement with AGFD.

At this time, these measures remain solely as voluntary measures, unrelated to use on NFS land. These measures may or may not occur as planned.

# Public Health and Safety

## *Arizona Department of Environmental Quality Water Permits*

Applicant-committed environmental protection measures for tailings and pipeline safety include those outlined in the tailings design documents (Klohn Crippen Berger Ltd. 2018), a pipeline protection and integrity plan specific to the Skunk Camp location (Golder Associates Inc. 2020); the concentrate pipeline corridor management plan (M3 Engineering and Technology Corporation 2019), and the GPO (Resolution Copper 2016b).

The following measures that enhance the safety of the tailings storage facility have been incorporated into the tailings design for Alternative 6 – Skunk Camp:

- Use a centerline embankment for NPAG tailings

- Use full downstream embankment for PAG tailings

- Perform thickening of both PAG, NPAG, and NPAG overflow tailings

- Segregate PAG tailings into smaller separate cells.

A failure modes analysis has already been completed to identify all potential failure modes and to align them with design measures appropriate to address those modes (Klohn Crippen Berger Ltd. 2019; Pilz 2019). The design measures are aligned with international best practice and Federal and State regulations. Resolution Copper has identified preventive measures to minimize the potential for failure, as well as reactive measures if problems develop. These are considered applicant-committed environmental protection measures and are summarized in table 3.10.1-5 in the FEIS.

Given the location of the tailings storage facility off of Federal land, many of the design and operational features developed to reduce the risk of failure of the tailings storage facility or pipelines are dictated solely by industry best practice. However, the Aquifer Protection Permit that Resolution Copper is required to obtain for the tailings storage facility includes design criteria to which Resolution Copper must adhere. The standards under the Aquifer Protection Permit are described in detail in section 3.10.1 of the FEIS.

## *Global Tailings Standard*

As described in section 3.10.1 of the FEIS, in August 2020, the Global Industry Standard on Tailings Management was launched (International Council on Mining and Metals et al. 2020). The preamble to the new Global Industry Standard states:

> *The Global Industry Standard on Tailings Management (herein 'the Standard') strives to achieve the ultimate goal of zero harm to people and the environment with zero tolerance for human fatality. It requires Operators to take responsibility and prioritise the safety of tailings facilities, through all phases of a facility's lifecycle, including closure and post-closure. It also requires the disclosure of relevant information to support public accountability.*

International Council on Mining and Metals (ICMM) member companies will implement the Global Industry Standard as a commitment of membership. Both Rio Tinto and BHP, partners in Resolution Copper, are members of ICMM. Adherence to this standard is detailed in measure "RC-PH-05: Adhere to Global Tailings Standard" in appendix J of the FEIS.

***Voluntary Measures and Other Future Agreements***

Resolution Copper has committed to maintaining the existing hotline set up for community complaints via email and telephone, described on the Resolution Copper website. This hotline is meant to provide immediate feedback on any tailings, pipeline, transportation, hazardous material, air quality, or other adverse issues observed by the public. This is detailed in measure "RV-PH-04: Maintain the existing hotline for community complaints" in appendix J of the FEIS.

At this time, this measure remains solely as a voluntary measure, unrelated to use on NFS land. This measure may or may not occur as planned.

## Scenic Resources

***Voluntary Measures and Other Future Agreements***

Applicant-committed environmental protection measures by Resolution Copper include those outlined in the dark skies analysis (Dark Sky Partners LLC 2018):

- Implement an outdoor lighting plan that would reduce potential impacts from artificial night lighting.
- Reduce illumination levels where appropriate while still meeting Mine Safety and Health Administration (MSHA) requirements for lighting sufficient to provide safe working conditions.
- Adhere to the Pinal County Outdoor Lighting Code.
- Use control systems that can turn off lights at particular times of night or are activated by detecting motion while still meeting MSHA requirements for lighting sufficient to provide safe working conditions.

At this time, these dark sky measures remain solely as voluntary measures, unrelated to use on NFS land. These measures may or may not occur as planned.

## Cultural Resources

***Programmatic Agreement***

As detailed in part 7.1 of the Draft ROD, a number of agreements related to cultural resources were required in the PA, and are now either required under other authorities or have become voluntary measures. These include the following:

- Oak Flat HPTP: The Forest Service has completed preparation of an archaeological HPTP for the Oak Flat Federal Parcel to resolve adverse effects on historic properties eligible for the National Register of Historic Places under Criterion D. The implementation of the Oak Flat HPTP will begin prior to the land transfer, but the work is not likely to be completed prior to the land transfer. However, the transfer will not disrupt the completion of the measures listed in the HPTP. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. These actions are detailed in measure "FS-CR-01: Implementation of Oak Flat HPTP" in appendix J of the FEIS.
- GPO Research Design and Treatment Plans: The Forest Service has prepared an archaeological research design (GPO research design) in consultation with the SHPO, Tribes, and appropriate managing agencies to guide the development of treatment plans to address adverse effects on historic properties within the other Resolution Copper GPO project areas, and the Section 404

permit compensatory mitigation parcels (i.e., West Plant Site, MARRCO corridor, tailings facility, etc.), depending on the final alternative that is selected. The Forest Service determined, in consultation with the consulting parties, that the multiple treatment plans approach, rather than a single GPO HPTP, is needed because the GPO covers several large areas, each with its own cultural background and topography. The individual treatment plans will be tiered to the GPO research design, and tailored to fit the mitigation needs of each GPO project area. The work identified in the treatment plans will be completed prior to the proposed ground-disturbing activities in the GPO project areas. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. These actions are detailed in measure "FS-CR-02: GPO research design" in appendix J of the FEIS.

- Visual, Atmospheric, Auditory, Socioeconomic, and Cumulative Effects Mitigation Plan(s): Within 9 months of the issuance of the Final ROD, the Forest Service will prepare, in consultation with SHPO and the other consulting parties, a draft plan or plans outlining a process to mitigate visual, atmospheric, auditory, and cumulative effects (indirect or direct) identified within the visual/auditory/atmospheric/socioeconomic area of potential effects. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. Note that this measure has already been completed. These actions are detailed in measure "FS-CR-03: Visual, atmospheric, auditory, socioeconomic, and cumulative effects mitigation plan" in appendix J of the FEIS.

- Archaeological Database Funds: In recognition of the substantial loss of cultural resources and historic properties on State Trust lands, Resolution Copper will fund the creation and/or enhancement of existing electronic archaeological databases to assist the State of Arizona with management of these assets. This measure is no longer Forest-required, but is enforceable through Letter Agreements dated January 12, 2021, and March 10, 2025, with the SHPO. This is detailed in measure "RC-CR-07: Archaeological database funds" in appendix J of the FEIS.

The PA is a binding agreement executed between Resolution Copper, the Forest Service, the USACE, the BLM, the ASLD, the Arizona State Museum, the Arizona SHPO, SRP, and the ACHP.

## Socioeconomics

### *Programmatic Agreement*

Under the PA, Resolution Copper was to establish a fund to be focused on the built environment located within cultural resources area of potential effects. The primary purpose of the fund was to address effects from the project on historic properties and other community infrastructure within the communities of Superior, Miami, Globe, Kearny, Hayden, and Winkelman. All funded projects must comply with the Secretary of the Interior's Standards for the Treatment of Historic Properties, and compliance with these Standards was to be determined by SHPO. Specific parameters for the Community Development Fund were to be defined through consultation between Resolution Copper, the applicable administering organization, and SHPO, and must include the following:

- availability to municipalities, counties, non-profits, private citizens, and private organizations;

- preference for projects participating in other historic preservation incentive programs;

- preference for projects agreeing to repay funds within 5 years of award, with extensions possible.

Purchase or rehabilitation of the Harding building in Superior (a specific suggestion made in public comments) is a project that may be covered by this fund.

This Forest Service no longer has the authority to require this measure. This measure has been changed to a Resolution Copper–committed measure that is enforceable under several third-party agreements between Resolution Copper and the Town of Superior, and through Letter Agreements dated January 12, 2021, and March 10, 2025 with the SHPO. These actions are detailed in measure "RC-SO-01: Community Development Fund" in appendix J of the FEIS.

### Town of Superior Agreements

The following applicant-committed environmental protection measures have been committed to by Resolution Copper:

- In February 2019, Resolution Copper entered into an Entrepreneurship and Innovation Center Gift Agreement with the Town of Superior, to fund a number of programs meant to diversify the economic base of the community.

- In February 2019, Resolution Copper entered into a Multigenerational Center Development Gift Agreement with the Town of Superior, to help fund the final studies, design, and construction of a multigenerational center. The goal of the center is to improve the overall quality of life for Superior residents, local employers, and their employees, expand the quality of life amenities and services that are essential to retraining and attracting residents and employers, allow for consolidation of Town services and decrease the overall administrative burden of the Town, and further develop public, private, civic, and educational sectors of the community.

- In February 2019, Resolution Copper entered into an Education Funding Agreement with the Superior Unified School District, dedicating funding to a number of classroom enhancements and educational programs over the next 4 years.

- In February 2019, Resolution Copper entered into a Park Improvement Agreement with the Town of Superior, to fund improvements to the U.S. 60 Caboose Park.

- In March 2016, Resolution Copper entered into an Emergency Response Services agreement with the Town of Superior, to fund the provision of fire and other emergency services to the mine facilities by the Town.

A projected increase in tax revenue is a factor of Resolution Copper's business impacts on the Town of Superior, driven mainly through increased sales taxes from Resolution Copper employees and contractors within the town, and to a lesser extent property and sales tax increases benefiting the Town through Pinal County and State apportionments. Resolution Copper has historically paid the Town for more public safety coverage than a standard level of service requires at a mine site. Resolution Copper is committed to public safety and will continue to work with the Town to agree annually on projected net direct costs that will be Resolution Copper's responsibility. This commitment is detailed in measure "RC-SO-06: Agreement with Town of Superior to cover direct costs" in appendix J of the FEIS.

At this time, these socioeconomic remain solely as voluntary measures, unrelated to use on NFS land. These measures may or may not occur as planned.

### Voluntary Measures and Other Future Agreements

Through investment of an initial endowment, Resolution Copper will develop a sustainable regional economic development entity (or entities) to provide programming and investment in the Copper Triangle communities (Superior, Hayden, Winkelman, and Kearney). This new community-based entity will partner with external organizations, local municipalities, and stakeholders. Specifically, partnerships will be sought with organizations having certain expertise and tools to support and enhance the quality of life in the region, such as strategic planning for economic reinvestment and workforce development. These

activities are detailed in measure "RC-SO-03: Establish a regional economic development entity for Copper Triangle communities" in appendix J of the FEIS.

The Resolution Copper social investment program and corporate giving program have been established to support economic development and enhance quality of life. This includes programs that help create a diverse local business community and programs that help build a healthier and safer community, including parks/pool facilities and schools. Through these programs Resolution Copper has worked with cities, towns, governments, and school districts to fund existing projects, including pool repair and upgrades as well as school programs. These requests are defined and based on the needs of those local municipalities and school districts. These activities are detailed in measure "RV-SO-04: Resolution Copper social investment program" in appendix J of the FEIS.

Based on regular project budgeting, Resolution Copper plans to continue funding the Community Working Group. This is detailed in measure "RC-SO-05: Continue funding Community Working Group" in appendix J of the FEIS.

In May 2024, Resolution Copper entered into a Good Neighbor Agreement with a number of entities, including: Town of Superior, Arizona Trail Association, Boyce Thompson Arboretum, Cobre Valley Medical Center, Copper Community Alliance, Queen Valley, Queen Valley Fire Department, Queen Valley Golf Association, Queen Valley Historic Society, Rebuild Superior, Inc., Superior Chamber of Commerce, Superior Optimist Club, Superior Unified School District, Top of the World, Town of Miami, Town of Kearney, Town of Winkelman, Gila County, Pinal County, and the City of Globe. The Good Neighbor Agreement provides for the continued funding of the Community Working Group. Working with the Community Working Group, and combined with Rio Tinto corporate requirements for health, safety, and environmental protection, Resolution Copper will ensure all possible measures are taken to identify and mitigate public health, safety, and environmental issues before they occur, with transparency with local communities. Additionally, Resolution Copper will comply with the Rio Tinto Community and Social Performance Standard, which requires comprehensive engagement throughout the life of the project. The standard specifically requires effective engagements with communities on social, environmental, and other issues, disclosure of project-related information, and consultation with communities on matters that directly affect them, throughout the life of the project. This involvement includes continuing the Community Monitoring Program.

Resolution Copper has also committed at a corporate level to hiring qualified candidates locally, with the intention to track employee proximity to the mine, and to using local suppliers and services wherever possible.

At this time these remain solely as voluntary measures, unrelated to use on NFS land. These measures may or may not occur as planned.

## Tribal Values

### *Programmatic Agreement*

As detailed in part 7.1 of this Draft ROD, several agreements related impacts to resources of Tribal interest were required in the former PA. These include the following:

- The Emory Oak Collaborative Tribal Restoration Initiative: Funds the implementation of the treatments for the Emory Oak Collaborative Tribal Restoration Initiative, a multi-year restorative fieldwork program for Emory oak groves located in the Tonto and Coconino National Forests. Developed through consultation with the Forest Service and Tribes, the program is designed to restore and protect Emory oak groves that are accessed by Apache communities for traditional

subsistence gathering and ensure their sustainability for future generations. The program funds the long-term restorative treatment, maintenance, and monitoring for the Emory oak, and includes research, cultural activities, and educational activities. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. These activities are detailed in measure "FS-CR-05: Emory Oak Collaborative Tribal Restoration Initiative" in appendix J of the FEIS.

- Tribal Monitoring Program: Funds the long-term continuation of the existing Tribal Monitor Program and administration, program development, training, and funding for monitors working on public projects. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. This program is detailed in measure "FS-SO-02: Establish foundations for long-term funding, including the Tribal Monitor Program" in appendix J of the FEIS.

- Tribal Youth Program: Funds the development of a Tribal Youth Program in partnership with the Tonto National Forest and consulting Tribes to provide cultural and education opportunities to Tribal youth on NFS lands. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. This program is detailed in measure "FS-SO-02: Establish foundations for long-term funding, including the Tribal Monitor Program" in appendix J of the FEIS.

- Tribal Cultural Fund: Funds to address unique and specific Tribal proposals brought forth by Tribes during government-to-government consultation. The fund will provide a mechanism to fulfill Tribal requests that do not fit under the other funding programs such as direct funding to assist Tribal projects, programs, and infrastructure. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. This program is detailed in measure "FS-CR-06: Tribal Cultural Heritage Fund" in appendix J of the FEIS.

- Tribal Education Fund: Funds scholarships for 2-year and 4-year programs of study for members of the consulting Tribes. This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. This program is detailed in measure "FS-CR-08: Tribal Education Fund" in appendix J of the FEIS.

### *Voluntary Measures and Other Future Agreements*

Resolution Copper will donate 32 acres of privately owned land within the Apache Leap South End Parcel, in addition to 807 acres of land required by Section 3003 of PL 113-291. With this additional land, the Apache Leap Special Management Area (SMA), a sacred landscape for the Apache and Yavapai, will be 839 acres. The Apache Leap SMA is named after its signature feature, an escarpment of sheer cliff faces and hoodoos, and preserves the natural character of Apache Leap, allows for traditional uses of the area by Native Americans, and protects and conserves the cultural and archaeological resources of the area. This action is detailed in measure "RC-CR-04: Increase size of Apache Leap Special Management Area" in appendix J of the FEIS.

At this time, this remains solely as a voluntary measure, unrelated to use on NFS land. This measure may or may not occur as planned.

# Livestock and Grazing

## *Voluntary Measures and Other Future Agreements*

Resolution Copper will continue to work collaboratively with ranchers who hold private property and/or grazing leases/rights within the vicinity of the proposed project footprint. To minimize ranching impacts, the corridor pipeline/power line has been designed consistent with feedback from ranchers to have minimal impact on ranching land uses and day-to-day activities. In the event that other ranching and range improvements may be impacted in the future, Resolution Copper would replace those improvements as a result of the construction of the pipeline corridor. Range fencing will be opened during pipeline construction with temporary fencing installed at the end of each work day to prevent livestock migration. Permanent repairs will be made to the fencing including a gate to permit right-of-way access for inspection and maintenance activities along the pipeline corridor. These actions are detailed in measure "RV-LG-01: Mitigation for impacts to ranching and grazing leases" in appendix J of the FEIS.

At this time this remains solely as a voluntary measure, unrelated to use on NFS land. This measure may or may not occur as planned.

**APPENDIX B**

**MAPS OF PIPELINE/POWER LINE ROUTES FOR AUTHORIZATION**





2-ER-358





**Legend**

Existing Powerlines

Skunk Camp Tunnel, Spans and Trenchless Crossings

230 kV Powerline

Skunk Camp Pipeline–Powerline Corridors (DEIS)

North Pipeline Route

500 ft Corridor

Skunk Camp Pipeline–Powerline Corridors

AHC Predicted Habitat (Baker 2013)

**Post Land Exchange Surface Management**

Private Land (No Color)

State Trust Land (ASLD)

US Forest Service (USFS)

Note: Within the 500 Foot Corridor for the North Pipeline Route, only 200 feet will actually be disturbed.

Pinal and Gila Counties, Arizona
Globe and Mesa 1:100,000 USGS Quadrangles
Data Sources: Post Land Exchange Surface Management,
BLM, WR Modified 2017; SWCA DEIS 8-20-2018,
SRP Powerline Data, /5-2020, and
Golden Associates, 5-2020

WestLand Resources

**RESOLUTION COPPER**
Skunk Camp Comparison Memo

ARIZONA HEDGEHOG CACTUS PREDICTED HABITAT
Figure 3

Co-located 230 kV and 115 kV Powerlines

Trenchless Crossing at US 60

Span Across Devil's Canyon

Co-located 500 Foot Pipeline Corridor and 115 kV Powerline

Silver King Substation

Span Across Queen Creek

Tunnel

East Plant Site

230 kV Powerline

Existing Powerlines

West Plant Site

Data Sources:
Pinal County Open Space and Trails Master Plan 2007
ALRIS AZ Roads, TIGER 2011
USFS Forest Maps and AZ Recreation Map
Arizona Trail Provided by Arizona Trail Association aaron@aztrail.org
USDA Forest Service, Tonto National Forest Roads 6-9-2014
Post Land Exchange Surface Management, BLM, WRI Modified 2017, SWCA DEIS 8-20-2018, SRP Powerline Data, 8-2020, and Golder Associates, 5-2020.
Image Source ArcGIS Online World Imagery 2-6-2018

RESOLUTION COPPER
General Plan of Operations

ROAD USE PLAN
OVERVIEW
Figure 1

**Legend**

Offroad
Arboretum
Campground
Trailhead

Proposed New Road
Existing Road To Be Decommissioned-Restricted from Public Access
Existing State Land Road - Public Access To Be Maintained
Existing County Road - Public Access To Be Maintained
Existing Forest Road - Public Access To Be Maintained
Private Road

Trail
Proposed Drainage Trail
Arizona National Scenic Trail Polyline
TNF Ranger District Boundary

115 kV Power Structure
Skunk Camp Tunnel, Spans and Trenchless Crossings
Preferred Alternative
Skunk Camp Seepage Dam
Sheet Index

TNF Roads
US Highways
Highways
Arterials
Streets
Primitive Roads

Post Land Exchange Resolution Holdings
Post Land Exchange Surface Management
Bureau of Land Management (BLM)
Bureau of Reclamation
Private Land (No Color)
State Trust Land
National Forest System

East Plant Site
West Plant Site
230 kV Corridor
Utility Corridor
MARRCO Corridor
Skunk Camp TSF
Trenchless Crossing

GLOBE RANGER DISTRICT BOUNDARY
MESA RANGER DISTRICT BOUNDARY

Figure 2
Figure 3
Figure 4
Figure 5
Figure 6
Figure 7

N

0    5,000    10,000 Feet

2-ER-361

## Legend

- ● MARRCO Corridor Access Point (MCA)
- ▬ Existing Forest Road - Public Access To Be Maintained
- - - - Proposed Drainage Trail
- ▬ ▬ TNF Ranger District Boundary
- ▬ TNF Roads
- Preferred Alternative
- Post Land Exchange Surface Management
- Bureau of Land Management (BLM)
- Private Land (No Color)
- State Trust Land
- National Forest System

Data Sources:
Pinal County Open Space and Trails Master Plan
2007
USDA Forest Service, Tonto National Forest Roads
6-9-2014
SWCA DEIS
8-26-2018
Post Land Exchange Surface Management,
BLM, WRI Modified 2017
Image Source: Florence Junction & Picketpost
Mountain USGS 7.5 Minute Quadrangles

**RESOLUTION COPPER**
General Plan of Operations

MARRCO
Figure 2

0   900   1,800
Feet

2-ER-362

**Legend**

- MARRCO Corridor Access Point (MCA)
- Arboretum
- Trailhead
- Existing Forest Road – Public Access To Be Maintained
- TNF Roads
- Lost Trail
- Proposed Drainage Trail
- Arizona National Scenic Trail Polyline
- TNF Ranger District Boundary
- Preferred Alternative
- Post Land Exchange Surface Management
- Private Land (No Color)
- State Trust Land
- National Forest System

Data Sources:
Pinal County Open Space and Trails Master Plan 2007
USFS Forest Maps and AZ Recreation Map
Arizona Trail Provided by Arizona Trail Association
aaron@aztrail.org
USDA Forest Service, Tonto National Forest Roads
6-9-2014
SWCA DEIS
8-20-2018
Post Land Exchange Surface Management
BLM, WRI Modified 2017
Image Source: Pickethpost Mountain
USGS 7.5 Minute Quadrangles

**RESOLUTION COPPER**
General Plan of Operations
MARRCO TO WEST PLANT SITE
Figure 3

2-ER-363

**Legend**

- Gate
- MARRCO Corridor Access Point
- Campground
- Private Road
- Proposed New Road
- Existing Road To Be Decommissioned-Restricted from Public Access
- Existing Forest Road – Public Access To Be Maintained
- Lost Trail
- Arizona National Scenic Trail Polyline
- TNF Ranger District Boundary
- TNF Roads
- Subsidence Zone
- Fracture Zone
- Skunk Camp Tunnel, Spans Preferred Alternative
- Post Land Exchange Surface Management
- Private Land (No Color)
- State Trust Land
- National Forest System

Note: Project area around disturbance area as defined by modeled zone of continuous subsidence.

Data Sources:
Pinal County Open Space and Trails Master Plan, 2007
ALRIS AZ Roads, TIGER 2011
USFS Forest Maps and AZ Recreation Map
Arizona Trail Provided by Arizona Trail Association
aarons@aztrail.org
SWCA DEIS 8-20-2018
Subsidence and Fracture Zone 2017
West Plant Facilities
Provided by M3 Engineering, July 6, 2020
USDA Forest Service, Tonto National Forest Roads
6-9-2014
Post Land Exchange Surface Management,
BLM, WRI Modified 2017,
SRP Powerline Data, 6-2020, and
Golden Associates, 5-2020
Image Source: Pickerpost Mountain & Superior
USGS 7.5 Minute Quadrangles

**RESOLUTION COPPER**
General Plan of Operations
WEST AND EAST PLANT SITES
Figure 4

0   1,500   3,000 Feet

2-ER-364



Legend

Gate
Mine
Proposed New Road
Existing State Land Road - Public Access To Be Maintained
Existing County Road - Public Access To Be Maintained
Existing Forest Road - Public Access To Be Maintained
TNF Roads
Skunk Camp Tunnel, Spans and Trenchless Crossings
TNF Ranger District Boundary
Preferred Alternative
Post Land Exchange Surface Management
Bureau of Land Management (BLM)
Private Land (No Color)
State Trust Land
National Forest System

Data Sources:
ALRIS AZ Roads, TIGER 2011
USDA Forest Service, Tonto National Forest Roads 6-9-2014
Post Land Exchange Surface Management, BLM, WRI Modified 2017,
SRP Powerline Data, 6-2020, and Golder Associates, 5-2020
Image Source: Superior and Pinal Ranch
USGS 7.5 Minute Quadrangles

N

0    1,400    2,800 Feet

RESOLUTION COPPER
General Plan of Operations

UTILITY CORRIDOR
Figure 5

2-ER-365



2-ER-366



2-ER-367

No. 25-5185

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION
OF ARIZONA, INC.; CENTER FOR BIOLOGICAL DIVERSITY;
EARTHWORKS; THE ACCESS FUND; and SIERRA CLUB.

*Plaintiffs-Appellants*,

v.

BROOKE L. ROLLINS, U.S. SECRETARY OF AGRICULTURE; UNITED
STATES FOREST SERVICE; and NEIL BOSWORTH, SUPERVISOR OF THE
TONTO NATIONAL FOREST.

*Defendants-Appellees*,

and

RESOLUTION COPPER MINING, LLC

*Intervenor-Defendant-Appellee.*

_____

On Appeal from the United States District
Court for the District of Arizona
(District Judge Dominic W. Lanza)

_____

**PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD
VOLUME 3 of 5**
*In Support of*
**PLAINTIFFS-APPELLANTS' EMERGENCY MOTION UNDER
CIRCUIT RULE 27-3
RELIEF REQUESTED BY AUGUST 18, 2025, AS THE LAND TITLE
TRANSFER WILL OCCUR ON AUGUST 19, 2025**

Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
mfink@biologicaldiversity.org

Allison N. Henderson
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs-Appellants*

Susan B. Montgomery
Robyn L. Interpreter
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorneys for the Inter Tribal Association of Arizona, Inc.*

**INDEX**

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| **Volume 1 of 5 [99 pages]** | | | |
| Order (August 15, 2025) | 8/15/2025 | 99 | 6-99 |
| **Volume 2 of 5 [268 pages]** | | | |
| Federal Defendants' Memo in Support of Summary Judgment, *CBD v. USFS*, Case No. 23-cv-00928 (DLF) (D.D.C., August 22, 2024) | 8/4/2025 | 97-1 | 105-154 |
| BLM Review of Hydrology Aspects of the Resolution Copper Project | 7/14/2025 | 87-1 | 155-180 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, June 2025 | 7/14/2025 | 87-2 | 181-275 |
| Draft Record of Decision, June 2025 | 7/14/2025 | 87-3 | 276-367 |
| **Volume 3 of 5 [180 pages]** | | | |
| Declaration of Maria Dadgar | 7/14/2025 | 87-5 | 373-380 |
| Declaration of Roger Featherstone | 7/14/2025 | 87-6 | 381-387 |

| | | | |
|---|---|---|---|
| Declaration of Russ McSpadden | 7/14/2025 | 87-7 | 388-399 |
| Declaration of Erik Murdock | 7/14/2025 | 87-8 | 400-403 |
| Declaration of Sandra Bahr | 7/14/2025 | 87-9 | 404-408 |
| Master Water Plan for Superstition Vistas, Apache Junction, Arizona | 7/14/2025 | 87-10 | 409-547 |
| **Volume 4 of 5 [195 pages]** | | | |
| Appraisal Report Summary: Mining Claim Zone MCZ Parcel | 7/14/2025 | 87-11 | 553-567 |
| Appraisal Report Summary: Mineral Withdrawal Area (MWA) Parcel | 7/14/2025 | 87-12 | 568-595 |
| Technical Appraisal Review Report: MWA Parcel (excerpts) | 7/14/2025 | 87-13 | 596-598 |
| Oversight and Legislative Hearing Before the U.S. House of Representatives Subcommittee on Energy & Mineral Resources, March 2013 | 7/14/2025 | 87-14 | 599-715 |
| Congressional Budget Office Cost Estimate, July 2013 | 7/14/2025 | 87-15 | 716-717 |

| | | | |
|---|---|---|---|
| House Natural Resources Committee House Report No. 113-167, July 2013 | 7/14/2025 | 87-16 | 718-742 |
| **Volume 5 of 5 [296 pages]** | | | |
| Uniform Appraisal Standards for Federal Land Acquisitions | 7/14/2025 | 87-17 | 748-1009 |
| Excerpt from Resolution Copper Mining's General Plan of Operations, 2016 | 7/14/2025 | 87-18 | 1010 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, January 2021 (rescinded) | 7/14/2025 | 87-19 | 1011-1013 |
| USDA Memo for Withdrawal of Notice of Availability, Rescind Final Environmental Impact Statement and Draft Record of Decision | 3/2/2021 | 26-2 | 1014 |
| Notice of Appeal | 8/15/2025 | 100 | 1015-1020 |
| Civil Docket for Case No. 2:21-cv-00122-DWL – United States District Court, District of Arizona (Phoenix) – *Arizona Mining Reform Coalition, et al. v. United States Forest Service, et al.* | | | 1021-1038 |

Roger Flynn (CO Bar # 21078) (*pro hac vice*)
Jeffrey C. Parsons (CO Bar #30210) (*pro hac vice*)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738; wmap@igc.org

Susan B. Montgomery (AZ Bar # 020595)
Robyn L. Interpreter (AZ BAR # 020864)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825; smontgomery@milawaz.com
*Counsel for Inter Tribal Association of Arizona*

Marc D. Fink (MN Bar #343407) (*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
(218) 464-0539; mfink@biologicaldiversity.org

Allison N. Henderson (CO Bar #45088) (*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008; AHenderson@biologicaldiversity.org
*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| Arizona Mining Reform Coalition, *et al.,* ) | Case No. 2:21-cv-00122-DWL |
| Plaintiffs ) | |
| ) | |
| vs. ) | **DECLARATION OF** |
| ) | **MARIA DADGAR** |
| United States Forest Service, *et al.,* ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| Resolution Copper Mining, ) | |
| ) | |
| Defendant-Intervenor. ) | |
| ) | |

1

I, Maria Dadgar, pursuant to 28 U.S.C. § 1746, declare as follows:

1. The facts set forth in this declaration are based on my personal and professional knowledge and understanding. If called as a witness, I could and would competently testify thereto under oath.

2. I am the Executive Director of the Inter Tribal Association of Arizona, Inc. ("ITAA") and have served in this role since 2014.

3. I am an enrolled tribal member of the Piscataway Tribe of Maryland.

4. The ITAA is an intertribal, 501(c)(4) nonprofit organization composed of 21 federally recognized Indian Tribes with lands located primarily in Arizona, as well as in California, New Mexico, and Nevada.

5. As Executive Director of ITAA I am responsible for managing ITAA's operations in achieving its advocacy mission, goals, and objectives for our Member Tribes.

6. ITAA's Member Tribes are the Ak-Chin Indian Community, the Cocopah Tribe, the Colorado River Indian Tribes, the Fort McDowell Yavapai Nation, the Fort Mojave Indian Tribe, the Gila River Indian Community, the Havasupai Tribe, the Hopi Tribe, the Hualapai Indian Tribe, the Kaibab Band of Paiute Indians, the Pascua Yaqui Tribe, the Quechan Tribe, the Salt River Salt River Pima-Maricopa Indian Community, the San Carlos Apache Tribe, the San Juan Southern Paiute Tribe, the Tohono O'odham Nation, the Tonto Apache Tribe, the White Mountain Apache Tribe, the Yavapai-Apache Nation, the Yavapai-Prescott Indian Tribe, and the Zuni Tribe.

7. The representatives of ITAA are the highest elected tribal officials from each of the Member Tribes, including tribal chairpersons, presidents, and governors.

8. ITAA's Member Tribes have worked together since 1952 to provide a united voice for Tribes on matters of common concern for their respective Tribes and tribal members. To this end, ITAA Member Tribes have firmly stood shoulder-to-shoulder for nearly 20 years in united opposition to the transfer of the public lands at Oak Flat for the development of the Resolution Copper Mine.

2

9.    ITAA's President and individual Tribal Leaders from many of our Member Tribes have testified before Congress against the Resolution Copper Mine and Land Exchange numerous times.  We have also written countless letters and comments, passed Resolutions in opposition to the exchange and mine both through ITAA and through the Tribal Councils of our individual Member Tribes, and we have taken other measures towards the shared goal of protecting the approximately 2,400 acres of Tribal ancestral lands, located within the Tonto National Forest in Arizona, known as "Oak Flat" or, for the Western Apache, "Chi'chil Biłdagoteel."

10.    Since time immemorial, Oak Flat has been a place of profound religious, cultural, and historical significance for certain of ITAA's Member Tribes, including the San Carlos Apache Tribe, the Fort McDowell Yavapai Nation, and others.

11.    I have personally visited Oak Flat to spend time in nature with friends and their family and to stand with our Member Tribes and their tribal members in support of protecting Oak Flat from future harms, including the irreparable harms presented by its potential exchange to private interests for mining purposes.

12.    Many of the ancestors of our tribal members of at least one or more of our member tribes have used Oak Flat for religious, traditional or cultural practices since time immemorial. To the best of my knowledge and understanding, many current tribal members of at least one or more of our member tribes have continued to use Oak Flat for religious, traditional, or cultural practices on a regular basis and fully intend to continue doing so.

13.    To this end, I fully anticipate that numerous individual tribal members from our Member Tribes will use Oak Flat for cultural, traditional, spiritual or other important purposes in the coming months and years.

14.    The importance of Oak Flat is not based on a mere vestige of the past. Oak Flat remains a place that many tribal members of our Member Tribes visit to this day, in order to gather important plants for medicine and ceremony, to harvest vitamin rich foods like acorns and lemon berries, and to gather, pray, and perform tribal ceremonies. The continued existence of Oak Flat as a natural place has such a critical role in the religious practices of

3

many tribal members – practices that will be irreparably harmed if Oak Flat is conveyed to Resolution Copper for mining purposes.

15. Under Section 3003 of the National Defense Authorization Act for Fiscal Year 2015 for fiscal year 2015. Pub. L. 113-291 ("NDAA" or "Section 3003") it is my understanding that the United States intends to transfer the sacred site of Oak Flat to the multinational mining conglomerate, London-based Rio Tinto Corp. ("Rio Tinto," "Resolution," or "Resolution Copper") no later than March 16, 2021, resulting in the loss of these sacred public lands forever.

16. The Resolution Copper Mine will collapse the very heart of Oak Flat into a massive subsidence crater, rendering Oak Flat forever inaccessible to current and future generations of the public and those tribal members of ITAA's Member Tribes who need to access this place to support their religious, traditional, and cultural practices.

17. Standing up for the protection of Oak Flat and the protection of the religious, traditional, and cultural practices of our Member Tribes is the type of issue of common interest and concern that goes to the core mission of ITAA. This is why ITAA is a plaintiff in this case.

18. ITAA has been harmed by the Forest Service's failure to adequately consider the impacts related to the Land Exchange as well as the proposed mine, and the Forest Service's failure to adequately involve the public in its decision-making process.

19. The new Final EIS and Draft ROD have numerous revisions from the prior versions. Yet since the 2021 versions were rescinded until now, the agencies have not engaged in any public review. The new Draft ROD also contains 16 brand-new proposed amendments to the Tonto National Forest Plan which the agency says are needed to approve the pipelines, transmission lines, and other infrastructure. These Forest Plan amendments, on which there has been no public review and comment, will eliminate existing protections for the wildlife and cultural resources in the Oak Flat area which are valuable to the public as well as tribal members of ITAA's Member Tribes.

20.     In December 2020 and again in April 2025, ITAA provided supplemental materials to the agencies containing new significant information on new environmental conditions, new activities in the area, and other new information since the prior 2021 FEIS was rescinded. The April 2025 supplement contained dozens of new documents on these topics. The agencies have not acknowledge receipt or responded to the April 2025 supplement.

**Irreparable Harm from the Land Exchange**

21.     Immediately upon the exchange of these 2,400 acres of Forest Service lands, all Federal laws and regulations governing access and use of Oak Flat will cease to be applicable, along with the United States' trust responsibility to our Member Tribes, which presently extends to the U.S. Forest Service's management of this culturally important place. Instead, the future management of this sacred place and the terms upon which access may be conditioned for our Member Tribes and their tribal members, will transfer into the sole discretion of Resolution Copper as the private landowner. This will occur on the day of the land exchange.

22.     While I understand that under the NDAA Resolution Copper may agree to provide limited (but temporary) access to the tribal members of ITAA's Member Tribes "to the maximum extent practicable, consistent with health and safety requirements" to a very small 50 acre portion of land referred to as the Oak Flat campground in Section 3003(i)(3) of the NDAA (a much-smaller piece of the original 760-acre Oak Flat Campground withdrawn from mining in 1955), the terms of this "access" will be in the sole discretion of Resolution Copper and Resolution Copper alone. Moreover, there is nothing in the NDAA that suggests any obligation on the part of Resolution Copper to provide access to the remaining approximately 2,350 acres of the wider Oak Flat area with any of its significant features and resources that are integral to the vitality of this place as a sacred site. Resolution Copper appears to have the unlimited right to exclude access to virtually all of the Oak Flat area immediately upon taking ownership.

5

23.    The very act of seeking permission from a foreign mining interest to access a limited corner of this sacred site will visit trauma on the tribal members of our Member Tribes. Further, if Oak Flat is taken away, the security of those who have long accessed this site will be shattered, since agents, representatives, employees, or other personnel of Resolution Copper may require formal permission to access the small 50-acre portion of this sacred site and may demand proof of such permission at any time, disrupting the religious, traditional, cultural, or other practices or activities carried out by tribal members of our Member Tribes at this small portion of the Oak Flat area. Permission to access even the small 50-acre Oak Flat campground could be severely restricted or denied altogether.

24.    In my experience as a tribal member and as the Executive Director of ITAA, this constant and real threat of disturbance would have a chilling and disturbing effect on tribal members attempting to engage in traditional, cultural, and religious practices at Oak Flat – which can and often are of a deeply personal and private nature.

25.    Moreover, even while access to the small 50 acre Oak Flat campground at Oak Flat may be permitted for a period of time after the lands are exchanged into private ownership (and before the eventual destruction and inaccessibility of the area from mining activity), various noisy, disruptive and possibly even dangerous pre-mine construction activities will be occurring at the site. Not only would this be a major source of distraction, anger, and anxiety for tribal members engaged in cultural and religious practices, it will be a glaring reminder of the impending destruction of the area.

26.    In addition, if Oak Flat is taken away and becomes the private property of a mining company that, by its very nature, plans to engage in activities resulting in the physical desecration and destruction of Oak Flat, tribal members will no doubt be aware that each visit to this sacred place to gather plants, perform religious ceremonies or to pray – practices that have been performed since time immemorial – could be their last. The emotional trauma and harm for our Member Tribes, their tribal members, and to ITAA's mission caused by the exchange will be immediate and irreparable.

6

27.     Overall, in my experience as a tribal person and as the Executive Director of ITAA, the act of the exchange itself – that is the transfer of this sacred site to private interests for commercial profit – will permanently disrupt the religious and cultural foundation of certain of our Member Tribes, creating a dark cloud that will continue for future generations.

28.     Tribal loss of place, displacement, forced removals, and cultural and religious disruption and genocide permeate American and Arizona history. The shadows of this grim history exist to this day and are keenly felt by current generations of tribal people.

29.     Involuntary loss of land is a particularly prevalent source of historical trauma that has led to numerous social ills and other challenges for our Member Tribes.

30.     The exchange of this deeply significant Oak Flat area into private ownership for destructive purposes would be a painful and very real reminder to ITAA Member Tribes and their tribal members that injuries like these are not wrongs relegated to the past, but rather, are wrongs that can and will continue to be perpetuated on tribal people today and in the future.

31.     Even now, the scheduled loss and destruction of Oak Flat under the land exchange and mining plan is a source of great anxiety for tribal members of certain of ITAA's Member Tribes, but this anxiety would transform into deep grief if these lands are transferred to Resolution Copper resulting in an immeasurable and permanent loss of cultural heritage and religious identity for tribal people.

**Irreparable Harm from the Resolution Copper Mine Project**

32.     The Resolution Copper Mine project would involve the extraction of 1.4 billion tons of ore from deep underneath Oak Flat, collapsing the land surface into a 2-mile wide, 1,000 foot deep crater.

33.     Once the land surfaces begin to collapse, access to the Oak Flat area will become dangerous, physically impossible, and/or limited or curtailed entirely Resolution Copper.

34.     The Oak Flat area is within the Chi'chil Biłdagoteel Historic District, a Traditional Cultural Property on the National Register of Historic Places, recognized by the

7

federal government for its enduring and vast archaeological, cultural, and historic resources and its deep significance to many of ITAA's Member Tribes. The integrity of Chi'chil Biłdagoteel as a Traditional Cultural Property would be permanently and irreversibly destroyed by the land subsidence and other activities from this mine project.

35.   The development of the mine at Oak Flat would also have irreparable and wide-reaching harmful impacts to the natural systems at Oak Flat, including its many plants and animals, and the water sources that have supported the health and vitality of Oak Flat since time immemorial.

36.   The mine project would also deposit 1.37 billion tons of mine tailings (much of them toxic) on nearby lands only a short distance from the Gila River, forever a physical reminder of the irreparable loss of Oak Flat to our Member Tribes and their tribal members. This massive mine tailings site will also provide a perpetual threat of contamination, which would loom over Arizona's waters for many centuries to come, if not forever, including waters used and relied upon by our Member Tribes for survival.

37.   I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this 12th day of July, 2025 in Phoenix, Arizona.

_____

Maria Dadgar, Executive Director
Inter Tribal Association of Arizona, Inc.

8

Roger Flynn (CO Bar #21078) (pro hac vice)
Jeffrey C. Parsons (CO Bar #30210) (pro hac vice)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738; wmap@igc.org

Marc D. Fink (MN Bar #343407) (pro hac vice)
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
(218) 464-0539; mfink@biologicaldiversity.org

Allison N. Henderson (CO Bar #45088) (pro hac vice)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008; ahenderson@biologicaldiversity.org
*Counsel for Plaintiffs*

Susan B. Montgomery (AZ Bar #020595)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825; smontgomery@milawaz.com
*Counsel for Inter Tribal Association of Arizona*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| Arizona Mining Reform Coalition, *et al.*, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>United States Forest Service, *et al.*, )<br><br>Defendants, )<br>and )<br><br>Resolution Copper Mining, )<br><br>Defendant-Intervenor. ) | Case No.  CV-21-00122-PHX-DWL<br><br>**DECLARATION OF ROGER FEATHERSTONE** |

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I, Roger Featherstone, declare as follows:

1.      The facts set forth in this declaration are based on my personal knowledge. If called as a witness, I could and would testify competently to these facts. As to those matters which reflect an opinion, they reflect my personal opinion and judgment on the matter.

2.      I reside in Tucson, Arizona, where I have lived since 2005.

3.      I am a member of the Arizona Mining Reform Coalition (AMRC), one of the Plaintiffs in this case.  I am the former Director of AMRC, a position I held for many years until earlier this year.  I am currently the Board Secretary of AMRC.  I am also a member of Earthworks, also a Plaintiff in this case.

4.      AMRC is comprised of Arizona groups and individuals that work to ensure that responsible mining contributes to healthy communities, a healthy environment, and, when all costs are factored in, is a net benefit to Arizona.  AMRC expects the mining industry to clean up after itself, comply fully with the spirit of safeguards in place to protect Arizona, and to interact in a transparent and open manner with Arizona citizens.

5.      AMRC works to protect Arizona's environmental and community values from the adverse impacts of industrial mine development – to protect these values for both the current generation as well as future generations.  I have worked for decades in Arizona, as a member of AMRC and other conservation organizations, to protect these values – values that will be irrevocably destroyed by the land exchange and then the Resolution Project.

6.      Earthworks is a nonprofit organization dedicated to protecting communities and the environment from the adverse impacts of mineral and energy development while promoting sustainable solutions.  Earthworks stands for clean air, water and land, healthy communities, and corporate accountability.  Earthworks supports solutions that protect both the Earth's resources and our communities.  Along with the other Plaintiff groups, Earthworks submitted detailed comments to the Forest Service regarding the agency's review of the proposed Land Exchange and Mine.

2

7.     I first went to Oak Flat in 2004 and have visited there frequently ever since.  On average, I have visited Oak Flat on average about 4 times a year and over certain periods, especially since 2011, much more frequently.  From my many trips to Oak Flat, I know the area intimately.

8.     My last visit to Oak Flat was in the late Fall of 2024, and I intend to return regularly.  Over the next year, I anticipate that I will visit Oak Flat at least a few times.

9.     While visiting Oak Flat, I enjoy viewing wildlife, visiting and communing with my favorite plants, visiting and communing with my favorite places within Oak Flat, drinking the water (with filter, of course), photography, hiking, camping, scientific research (our camera project), communing with nature, and recharging my spiritual batteries, in these trying times especially.  I believe that Oak Flat is critical for my mental, emotional and spiritual health.

10.    If the land exchange is executed, I would no longer have the ability to visit Oak Flat with the knowledge that it is public land, and partially belonging to me as a United States citizen and taxpayer.  Instead, I would know during my visits that Oak Flat is in the ownership and control of foreign mining companies that would be able to condition my future visitation and use of Oak Flat for any reason, which would be devastating to my mental, emotional, and spiritual health.  The specter of Resolution Copper owning Oak Flat and the mining company's prominent presence on the land would loom over my psyche and irreparably taint my experience to the point that I would no longer be able to enjoy my time at Oak Flat.  In short, having to ask the permission of a mining company to visit would ruin the experience.

11.    Additionally, if the land exchange is executed, I would no longer be able to conduct my scientific research in this area, which is important to me, and AMRC, and for the public because our camera project is the longest running and most rigorous wildlife camera trap study in the area.  If these lands are privatized, there would also no longer be public notice of proposed projects and activities that may adversely impact Oak Flat and the surrounding

3

1  areas, and I would no longer be able to be involved in the development, analysis, and

2  oversight of those projects and activities.

3  12.    Previously, the company had stated that it would allow after the land transfer, at its

4  discretion, the use of roughly 50 acres of land at the current Oak Flat Campground. As I

5  have stated, this is unacceptable and does not alleviate the immediate and irreparable harm

6  to my uses and enjoyment. In addition, this hollow gesture does not apply to the other lands

7  with the 700+ acre Withdrawn Area, let alone the over 1,600 acres of current national forest

8  land adjacent to the Withdrawn Area that I use and enjoy as noted above.

9  13.    The privatization of these lands will also prevent my access to other public lands,

10  such as the state trust lands south of Oak Flat, that I use and enjoy for recreational, aesthetic,

11  and scientific purposes (similar to my uses of the lands to be exchanged-away).



4

Photo taken by Roger Featherstone on December 13, 2019, on Arizona State Trust land south of the Oak Flat Campground parcel. Access to this location is via roads that would be privatized if the land exchange is consummated.

14.    The knowledge that Oak Flat is currently protected from mining, no matter how imperfect that protection may be, is comforting to me during my visits to Oak Flat. If the land exchange is executed, I fear that this loss of comfort would be too high a burden for me to bear.

15.    If after the land exchange the proposed copper mine at Oak Flat is allowed to proceed, all of my concerns and injuries would be greatly magnified by the physical destruction of Oak Flat, the transformation of Oak Flat into an industrial wasteland, and the knowledge that the adverse effects of a mine would go far beyond Oak Flat. The loss of water would damage the livelihood of many people in the East Valley and even in the Phoenix area, some of which are our members.

16.    I have regularly contacted the management of Rio Tinto/Resolution Copper regarding the severe and irreparable impacts to public values and resources at Oak Flat that will be destroyed by the Project, as well as the Forest Service's truncated and limited public review of the Exchange. In response to my letter, the CEO of Rio Tinto reiterated that the Exchange could not be authorized/approved unless the FEIS was fully compliant with NEPA:

> The Resolution land exchange, in contrast to other land exchanges mandated by Congress, is subject to completion of an environmental impact assessment under the National Environmental Policy Act (NEPA) by the US Forest Service. Other land exchanges mandated by Congress occur 60 days after passage without a review under NEPA. Making the Resolution land exchange contingent on a full NEPA review was one of the requirements that bipartisan leaders included in the legislation prior to its passage in 2014.

Email response from Jakob Stausholm, CEO of Rio Tinto, to Roger Featherstone (a true and correct copy was attached to my previous Declaration, ECF No. 9-3, Feb. 19, 2021).

17.    In addition to these imminent, substantive, and irreparable harms to the environment and my uses of the affected lands, the Forest Service's failure to comply with the

5

1  requirements of the National Environmental Policy Act and other federal laws for the Land

2  Exchange and Resolution Copper Project has significantly harmed my ability, and the

3  ability of other members of AMRC and the public, to fully and adequately participate in the

4  required public participation process for this proposal.

5  18.     For example, on April 11, 2025, AMRC and the other plaintiffs submitted over 40

6  relevant documents, containing significant information regarding the new environmental

7  conditions, other new activities in the area, and other information that had arisen since the

8  rescission of the 2021 FEIS and DROD, requesting that the agency consider the new

9  information in the new FEIS (which had yet to be noticed). (April 11, 2025 letter attached to

10  this Declaration). The agency refused, as there is no reference, let alone analysis, of these

11  changed conditions and new information.

12  19.     In fact, the Forest Service did not allow, let alone consider, any public review or

13  comment on its decision-making between 2019 (issuance of Draft EIS) and its issuance of

14  the new FEIS and DROD in 2025. This is despite the many changes that the agency made to

15  the EIS after 2019, up to 2025.

16  20.     To make matters worse, the agency, for the first time in June 2025, included a whole

17  new Appendix T to the FEIS, proposing to make significant amendments to the Tonto

18  Forest Plan – amendments the agency says are needed for it to approve the mine's

19  infrastructure.  The public was not aware of this, and the agency never solicited public

20  comments, with is required by NEPA, FLPMA, and other federal laws.  Indeed, in the 2021

21  DROD, the Forest Supervisor said that amendments to the Forest Plan were not needed to

22  approve the Project.

23  21.     AMRC has been diligently monitoring actions of the Tonto National Forest regarding

24  the Exchange and mine, and certainly would have submitted comments detailing the many

25  legal and factual errors in Appendix T and the new section of the DROD (2.1.4).

26

27  I declare under penalty of perjury that the foregoing is true and correct.

28

6

1

2   Executed July  7, 2025, in Tucson, Arizona.

3

4

5

6   Roger Featherstone

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

Roger Flynn (CO Bar #21078) (pro hac vice)
Jeffrey C. Parsons (CO Bar #30210) (pro hac vice)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738; wmap@igc.org

Marc D. Fink (MN Bar #343407) (pro hac vice)
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
(218) 464-0539; mfink@biologicaldiversity.org

Allison N. Henderson (CO Bar #45088) (pro hac vice)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008; ahenderson@biologicaldiversity.org
*Counsel for Plaintiffs*

Susan B. Montgomery (AZ Bar #020595)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825; smontgomery@milawaz.com
*Counsel for Inter Tribal Association of Arizona*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| Arizona Mining Reform Coalition, *et al.*, | No. CV-21-00122-PHX-DWL |
| Plaintiffs, | |
| vs. | **DECLARATION OF RUSSELL McSPADDEN** |
| United States Forest Service, *et al.*, | |
| Defendants, | |
| and | |
| Resolution Copper Mining, | |
| Defendant-Intervenor. | |

1

I, Russell McSpadden, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury:

1. The facts set forth in this declaration are based on my personal knowledge. If called as a witness, I could and would testify competently to these facts. As to those matters which reflect an opinion, they reflect my personal opinion and judgment.

2. I reside in Tucson, Arizona where I have lived since 2012. I have a master's degree in history, with a focus on environmental history, from Florida Atlantic University.

3. I am a member of the Center for Biological Diversity ("the Center"), a national nonprofit organization headquartered in Tucson, Arizona, that works to protect imperiled species and wild places. I have been a member and have worked at the Center since 2012 and in that time have actively engaged in advocacy and public education around threats to Arizona's public lands and biodiversity, including the proposed Resolution Copper Mine and Land Exchange.

4. The Resolution Copper Mine and Land Exchange is proposed for an area known as Oak Flat, which is within the Tonto National Forest in eastern Arizona. The Center has long been involved in protecting Oak Flat and opposing the proposed Resolution Copper Mine and Land Exchange. The Center has submitted extensive comments on the Draft and Final Environmental Impact Statements, filed Freedom of Information Act requests, coordinated media coverage, and engaged in coalition work with Indigenous and environmental partners. The Center has a strong institutional interest in protecting Oak Flat for its ecological,

2

recreational, and cultural values and to protect biodiversity and prevent the extinction of species that rely on the area's fragile ecosystems.

5.    Personally, I have visited Oak Flat regularly for the past 10 years. My connection to the area is grounded in both my conservation work and in my personal, meaningful time spent there. I have camped, hiked, birdwatched, and explored the area's canyons, seeps, springs, and ephemeral waterfalls. I have participated in ceremonies and events including multi-day campouts, marches, and meetings with Tribal leaders and elected officials at Oak Flat.

6.    My first visit to Oak Flat occurred from February 6 through February 8, 2015, during the First All Nations Spiritual Gathering held at the Oak Flat campground in the Tonto National Forest. This event would become known as the first annual march and spiritual gathering to oppose the potential loss of the sacred site of Oak Flat to the Resolution Copper Mine and Land Exchange. There have now been 11 annual marches and gatherings. I took my son, who at the time was 2 years old and we camped beside a running stream at the campground. We participated in the events of the gathering and spent time exploring the surrounding Emory oaks, played in the streams, and took small hikes through the beautiful diversity of agaves and rock formations nearby. There were a great many children from the nearby San Carlos Reservation, as well as from other Tribal lands and from communities across Arizona.

7.    At the gathering I listened to many speakers, including Terry Rambler, chairman of the San Carlos Apache Tribe; Dennis Welch, treasurer of the National Congress of American Indians; and Kieran Suckling, executive director of the Center for Biological

3

Diversity. Each speaker outlined the historical, spiritual and ecological values of Oak Flat and the surrounding Tonto National Forest. Part of my professional work includes videography and I recorded these speeches and edited a video that was published on the Center for Biological Diversity's YouTube channel.

8.      From February 26-27 of 2016, I also attended what was called the Second March to Freedom, which was the second annual march and gathering at Oak Flat to oppose the destruction of the area by Resolution Copper Company. On February 26, I visited a site at the San Carlos Apache Reservation and met with representatives of Apache Stronghold and there was a ceremony and prayer at sunset. I visited a series of intriguing statues that evening, which depicted Apache figures on horseback and on foot. One statue depicted an Apache man on a horse with his arms raised to the sky. I read inscriptions on the statues that depicted quotes about the imprisonment of the Apache at San Carlos. The location of the statues was beautiful, tucked in a wild, open space with a large wetland, beautiful cactus and sweeping views of mountains. Part of my work is as a photographer, and I took photographs of the landscapes and statues.

4



Photograph I took of statue during the second annual March and Gathering for Oak Flat in February 2016

9.     On February 27, 2016, I attended a ceremony and prayer at sunrise and then helped support marchers walking from San Carlos to Oak Flat. I had a truck full of water and snacks and provided those items during the march. I also picked up marchers and runners and drove them to various locations because the march had a relay style process for those that were not intending to do the entire march from San Carlos to Oak Flat.

10.    Over the years, starting in 2016, I've been a part of a wildlife monitoring project using numerous trail cameras in and around Oak Flat and several of the nearby canyons, including Ga'an Canyon, also known as Devil's Canyon. In partnership with the Arizona Mining Reform Coalition, I have helped check these remote cameras. This work is ongoing. Detections include mountain lions, black bears, coati, deer, and other species. We have used these trail camera photos and videos to help tell the story of the wildlife of Oak Flat in social

5

media and through traditional media outlets. I use wildlife cameras as part of my profession. I've personally reviewed this footage and consider this work important for documenting species that may be impacted by mining and land transfer activities. I will continue to check trail cameras in and around Oak Flat several times a year, including later this year in May and October.



Trail camera video still of mountain lion and her two cubs in a canyon very near the Oak Flat campground.

11.     From February 17-20, 2022, in coordination with the 8th Annual Oak Flat March/Run, I joined Indigenous youth from the Brophy Native American Club, affiliated with Brophy College Preparatory in Phoenix, Arizona, on a 227-mile prayer run from Flagstaff to Oak Flat. I both documented the event on video and participated in parts of the relay run. Together with the students I spent several nights out under the stars and days running from the snowy elevations near Flagstaff, across the Verde River, and all the way to Oak Flat. The run was an act of activism and spiritual journey for the students who often remarked that they,

6



like myself, consider Oak Flat an irreplaceable refuge for reflection, connection to nature, and community. My participation in this journey changed my life in ways that are not easy to explain. The connection and inspiration I felt with the student runners continues today. Their devotion to wildlife protection, Native American religious liberty and the environment invigorates my life professionally, personally and spiritually. I created a video that was used broadly in traditional and social media to tell the story of the student's journey.



Photographs that I took during the 227-mile run to Oak Flat, February 2022

12.    I have made several trips to Oak Flat to photograph and video the landscapes including in 2016, 2017, 2019, 2022, and 2024 and 2025. I like to make images of the canyons and flora and fauna of the region. I have visited known occurrences of the endangered Arizona hedgehog cactus and believe the site offers potential habitat for ocelots, a species I care deeply about and which I have documented and written about in other Sky Island ecosystems. The creation of these images are both personal and professional. Many of the images (photographs and videos) have been used by the Center for Biological Diversity and other groups and organizations, including media outlets, for educational and advocacy uses.



Image of Arizona hedgehog cactus I took in August 2022.

13.    On January 19, 2024, I was invited by the San Carlos Apache Tribal Council to present at the Tribal Council chambers to the Tribe and to Governor Katie Hobbs about the

8

ecological and wildlife impacts that could result from Resolution Copper's proposed mine at Oak Flat. I then attended a lunch at Oak Flat with Governor Hobbs, her staff, and members of the San Carlos Apache Tribal Council and community members where we ate acorn stew from local Emory Oaks.

14.    On June 7, 2025, I visited Oak Flat following my presence the day before at a court hearing in Phoenix about the Oak Flat Land Exchange. It felt important to me to visit the landscape. I wandered the Emory oak groves of the campground, and wandered beyond the campground to explore the geology and plant life of the surrounding Tonto National Forest land. I hiked a few miles beyond the campground. I sat in the shade of oaks and manzanita trees and contemplated the natural world around me and what could be lost. There was new growth and a delicate vibrancy from recent precipitation in early June and the I watched the beautiful golden hour. Those things gave me hope.

15.    I plan to continue visiting Oak Flat in the future. I have already scheduled a camping, wildlife photography and trail camera trip in the fall of 2025 and plan to return again in the spring of 2026 to check on trail cameras and visit seeps, springs and wildlife corridors. I also expect to join annual events organized by Indigenous-led organizations and conservation groups, including educational hikes and overnight visits focused on biocultural stewardship. My continued use and enjoyment of Oak Flat is ongoing, regular, and essential to my physical, emotional, and professional well-being.

16.    If the land exchange authorized by the 2015 National Defense Authorization Act is executed and Oak Flat is transferred to Resolution Copper Company, my ability to visit and use the site as I have in the past would be severely and irreparably impaired. Oak Flat

9

would be transferred from public national forests lands that I can visit freely and enjoy at any time, to the private mining company. Losing access to the public lands to be transferred, including lands outside the immediate 50-acre Oak Flat Campground, would immediately prevent me from visiting these lands and would eliminate my uses described above. I assume that I would also immediately no longer be able to continue my wildlife monitoring project using trail cameras once these lands are privatized. These irreparable harms will occur immediately, long before the mine would begin, and would be in addition to the harms caused by the mine itself.

17.    The mine project would destroy key surface features, including springs, riparian areas, cliffs, boulder formations, and cultural landmarks, making the area inaccessible, unsafe, or spiritually defiled. The proposed block cave mining would result in a massive subsidence crater, eliminating many of the places I have come to know intimately through years of visits.

18.    The mine and associated infrastructure would fundamentally alter the natural soundscape and night skies that define the Oak Flat experience. The quiet and darkness that make it possible to hear owls, observe bat activity, or photograph stars would be lost to light pollution, noise, and industrial activity. The wildlife that I monitor and photograph would either be displaced or perish as the habitat is fragmented or destroyed. If the land becomes private property controlled by a multinational mining company, I would no longer feel safe camping or exploring there, especially given the history of harassment and violence near extractive sites, which is particularly concerning to many of us in the conservation community.

10

19.     Once the public lands are transferred, and then also if Oak Flat is mined, I will no longer be able to experience this landscape in the ways I have come to rely on. My plans to return, my enjoyment of the area, and my ability to support ecological monitoring would be irreparably harmed. The loss of Oak Flat would not just be a personal loss, but also a blow to the broader public interest in preserving public lands for future generations and protecting biodiversity in Arizona's Sky Islands.

20.     In my role as Southwest Conservation Advocate for the Center, and as a member of the Center, I have been, and continue to be, harmed by the Forest Service's failures to adequately consider all of the impacts related to the Exchange and proposed mine, as well as its failure to adequately involve the public in the decision-making process.

21.     As just two examples: (1) the new Final EIS and Draft Record of Decision (DROD) contain numerous revisions from the 2021 versions. Yet despite over 4 years of review (after the 2021 FEIS and DROD were rescinded), the agency did not solicit any public review; (2) in addition, the new DROD contains, for the first time, 16 proposed amendments to the Tonto National Forest Plan, which the agency says are needed in order for it to approve the pipelines, transmission lines, roads, and other infrastructure. These amendments would eliminate existing protections for the wildlife and cultural resources that I value and have enjoyed for years, as detailed above.

22.     If the agency had allowed for public comment on these new changes, I and the Center would have been able to inform the agency of the need to keep the Forest Plan protections, as well as informing them of the various changed conditions in the region (such as water development) that should have undergone public review and agency considerations.

11

23.    I respectfully request that the Court grant the relief sought in this case and halt the land exchange and Resolution Copper Project so that Oak Flat, including the over 2,300 acres of current public lands to be transferred, remains protected public land available for my cultural, spiritual, recreational, and ecological use.

Executed this 8th day of July, 2025.



_____
Russell McSpadden

12

Roger Flynn (CO Bar #21078) (pro hac vice)
Jeffrey C. Parsons (CO Bar #30210) (pro hac vice)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738; wmap@igc.org

Marc D. Fink (MN Bar #343407) (pro hac vice)
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
(218) 464-0539; mfink@biologicaldiversity.org

Allison N. Henderson (CO Bar #45088) (pro hac vice)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008; ahenderson@biologicaldiversity.org
*Counsel for Plaintiffs*

Susan B. Montgomery (AZ Bar #020595)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825; smontgomery@milawaz.com
*Counsel for Inter Tribal Association of Arizona*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| Arizona Mining Reform Coalition, *et al.*, | Case No. CV-21-00122-PHX-DWL |
| Plaintiffs, | |
| vs. | |
| United States Forest Service, *et al.*, | **DECLARATION OF ERIK MURDOCK** |
| Defendants, | |
| and | |
| Resolution Copper Mining, | |
| Defendant-Intervenor. | |

1

I, Erik Murdock, declare as follows:

1. I am the Deputy Director of Programs, Policy and Government Affairs for the Access Fund, and also a member of the Access Fund, a Plaintiff in this case. The Access Fund represents millions of climbers nationwide in all forms of climbing: rock climbing, ice climbing, mountaineering, and bouldering. At the Access Fund, our mission is to keep climbing areas open and conserve the climbing environment. The Access Fund not only protects access to climbing landscapes and experiences, but also protects the integrity of these valuable landscapes.

2. I lived in Tempe and Tucson, Arizona from 1994 to 2017, and currently reside in Estes Park, Colorado.

3. I have been going out to Oak Flat with my friends and family since 1994 to hike and rock climb. Oak Flat is a unique and irreplaceable climbing and bouldering area, having a prominent place in the history of climbing in Arizona. Oak Flat was the site of the world's largest climbing competition from 1989 through 2004. I volunteered at the competition from 1995-1997.

4. I visit Oak Flat frequently, along with other members of the Access Fund. While studying at Arizona State University from 1995 to 1998, I lived in Tempe, AZ and visited Oak Flat several times per week. After I moved to Tucson, AZ in 1998, I would visit Oak Flat several times per year to rock climb and explore the desert. Just being outdoors there and climbing is rejuvenating. The climbing at Oak Flat is quite varied—and that is unusual for most climbing areas. Most areas are known primarily as bouldering areas, sport climbing areas, or traditional (trad) climbing areas—while Oak Flat has an abundance of all three.

5. I have been to Oak Flat as recently as March, 2023. I bouldered at Oak Flat West and sport climbed at the Magma Mine area. Prior to this visit, I would make annual trips to Oak

2

Flat to climb at Lower Devils Canyon, Upper Devils Canyon, Euro Dog Valley, Magma Mine, and Oak Flat East and West bouldering areas.

6. I plan to continue visiting Oak Flat, including within the coming year. My daughter is a fourteen year old competitive climber who will join me for the climbing trips. It would be harmful to me if my daughter could not experience the climbing at Oak Flat as I have for the past thirty years. Oak Flat is a pivotal climbing area for my lifelong climbing career and I look forward to sharing the experience with my child.

7. If the Forest Service approves and executes the Oak Flat land exchange with Resolution Copper, this would take Oak Flat out of public ownership and preclude my rights to use public lands at the site. Additionally, once this land is no longer US Forest Service land (after the land exchange) Resolution Copper can do whatever it wants to with the land, even if it turns out to be impractical to build the mine. Even if the mine is never built, the area could be lost to recreation forever, if (for instance) Resolution decides to let a real estate developer build a housing community there.

8. If the proposed copper mine and related infrastructure at Oak Flat is approved and proceeds, there would be a complete and permanent loss of Oak Flat to climbers. The loss of Oak Flat would be immeasurable to all climbers who currently use and enjoy Oak Flat, including myself, as well as future generations that would be harmed by the loss of access to Oak Flat.

9. In addition to the loss of access to longstanding climbing areas on US Forest Service lands, if the US Forest Service executes the land transfer to Resolution Copper, access to world-class climbing on Arizona State Trust land, such as Lower Devils Canyon, will also be diminished or lost.

10. Oak Flat is only 60 miles from central Phoenix, Arizona, and there is no other similar climbing area (in terms of size, proximity, convenience) available to climbers in the area who would be displaced from Oak Flat.

3

11. If Plaintiffs succeed in this lawsuit, and the Final Environmental Impact Statement and Record of Decision are vacated and remanded to the Forest Service, and the lands stay in public ownership, I would retain my rights and ability to regularly visit Oak Flat, and I, alongside my daughter, would continue to regularly enjoy the area for climbing and other recreation.

12. In addition, the failure of the Forest Service to provide for public review and comment, since the Draft EIS in 2019, harms the ability of me, as well as the Access Fund, to participate in the required public and agency reviews under NEPA, the NDAA, and FLPMA. The Access Fund, along with other plaintiffs submitted a letter on April 11, 2025, enclosing dozens of documents showing the new and significant changed circumstances that have arisen since 2019.  The Forest Service failed to respond or otherwise include the new information in the new FEIS and DROD.

13. This is in addition to the agency's failure to have public comment or notice, whatsoever, regarding the newly-proposed 16 amendments to the Tonto Forest Plan.  The failure of the agency to provide any notice or comment opportunities violates my, and the Access Fund's, rights under NEPA, the NDAA, and FLPMA.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of July, 2025, in Estes Park, Colorado.

_Erik Murdock_

_____

Erik Murdock

4

1  Roger Flynn (CO Bar #21078) (pro hac vice)
   Jeffrey C. Parsons (CO Bar #30210) (pro hac vice)
2  WESTERN MINING ACTION PROJECT
   P.O. Box 349; 440 Main Street, #2
3  Lyons, CO 80540
   (303) 823-5738; wmap@igc.org
4
5  Marc D. Fink (MN Bar #343407) (pro hac vice)
   CENTER FOR BIOLOGICAL DIVERSITY
6  209 East 7th Street
7  Duluth, Minnesota 55805
   (218) 464-0539; mfink@biologicaldiversity.org
8
9  Allison N. Henderson (CO Bar #45088) (pro hac vice)
   CENTER FOR BIOLOGICAL DIVERSITY
10 P.O. Box 3024
11 Crested Butte, CO 81224
   (970) 309-2008; ahenderson@biologicaldiversity.org
12 *Counsel for Plaintiffs*

13 Susan B. Montgomery (AZ Bar #020595)
14 MONTGOMERY & INTERPRETER, PLC
   3301 E. Thunderbird Rd.
15 Phoenix, AZ 85032
   (480) 513-6825; smontgomery@milawaz.com
16 *Counsel for Inter Tribal Association of Arizona*

17
18                    IN THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF ARIZONA
19                              PHOENIX DIVISION

20  Arizona Mining Reform Coalition, *et al.*,      )    Case No. CV-21-00122-PHX-
                                                    )    DWL
21                        Plaintiffs,               )
                                                    )
22          vs.                                     )
                                                    )    **DECLARATION OF**
23  United States Forest Service, *et al.*,         )    **SANDRA BAHR**
                                                    )
24                        Defendants,               )
             and                                    )
25                                                  )
    Resolution Copper Mining,                       )
26                                                  )
                          Defendant-Intervenor.     )
27  _____        )

28
                                                                              1

1  I, Sandra Bahr, hereby declare:

2  1. I am over eighteen years old and am competent to give this declaration. The information

3  in this declaration is true and correct to the best of my knowledge, information, and belief

4  and is based on my personal experience, unless otherwise indicated.

5  2. I live in Phoenix, Arizona.

6  3. I have been a life member of Sierra Club since 1994.

7  4. I am the Chapter Director of Sierra Club's Arizona chapter, the Grand Canyon Chapter. I

8  have held this position for 27 years, since 1998.

9  5. My work as Chapter Director involves conservation outreach and organizing, advocacy at

10  the state legislature, and state and federal agencies, public education on conservation

11  priorities, and supervising staff and volunteers, among other activities.

12  6. According to Sierra Club's membership database, as of May 2025, Sierra Club has over

13  620,000 members nationally, including over 12,000 members in Arizona.

14  7. The Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to

15  practice and promote the responsible use of the Earth's resources and ecosystems; and to

16  educate and enlist humanity to protect and restore the quality of the natural and human

17  environment.

18  8. Preserving and protecting public lands, including our national forests, are key priorities

19  for Sierra Club, including for the Grand Canyon Chapter. Sierra Club members enjoy

20  national forests for their scenic views, recreational opportunities, wildlife viewing, and

21  ecological value.

22  9. I use and enjoy the public lands in the proposed Resolution Copper Mine project area and

23  specifically the lands at Oak Flat proposed to be exchanged to Resolution Copper Company,

24  including the lands at and adjacent to the Oak Flat Campground. My first experience with

25  Oak Flat was visiting there not long after I moved to Arizona in 1987. I drove out to

26  Superior and then on to Globe with my partner and we stopped at the Oak Flat

27  Campground, observing what a nice campground it is and enjoying the shade of the large

28

2

1    old oak trees. Later, I visited Oak Flat periodically with my family, some of whom were

2    climbing in the area. I would read, hike, and enjoy the area, including the shade of the oak

3    trees, while they climbed. I have a favorite memory of visiting there with my nephew when

4    he was about seven years old.

5    10. I have visited the lands at and immediately adjacent to the Resolution Copper Mine

6    project site many times in the last few years. During these visits, I hike, camp, sightsee,

7    watch wildlife, view historic and archeological sites, enjoy the solitude and views, and

8    otherwise use and enjoy the public lands in these areas. I especially love the large old

9    Emory oaks in the Oak Flat area and the shade and habitat for birds they provide. I most

10    recently visited Oak Flat on April 26, 2025 and spent the entire day there along with dozens

11    of other individuals. We had a potluck, listened to speakers, and generally enjoyed the

12    beauty and wonder of the place, worrying that it might be our last opportunity to enjoy it as

13    we were aware of and discussed the impending threats.

14    11. I have been very involved in opposing the Oak Flat land exchange since its inception. I

15    have provided and assisted with public comments, provided oral testimony and filed written

16    testimony against it with Congress, participated in and helped organize protests, reviewed

17    hundreds of pages of documents, spoke at public meetings and forums, advocated against

18    bills intended to facilitate the exchange by providing special consideration for Resolution

19    Copper at the Arizona Legislature, among other activities.

20    12. My use of the area and that of other Sierra Club members will be immediately and

21    irreparably harmed if the land exchange occurs, depriving me of my uses of the privatized

22    lands. This is in addition to the irreparable harm that will occur if the mine occurs. The

23    land exchange and mining project will cause significant impacts to the environment,

24    solitude, and unspoiled resources of the Oak Flat area that I use and value and will preclude

25    my access to the area.

26    13. The Oak Flat area has been valued by Sierra Club members, including me, for many

27    years. It contains world-class recreational values and is a refuge for people who come to

28

3

1  experience the unique scenery, wildlife, solitude, history, and other irreplaceable values. All

2  of these values are at risk from this land exchange and mining project and will be severely

3  and irreparably harmed if the project is allowed to begin operations.

4  14. The land exchange will facilitate the Resolution Copper Mine's mining, construction,

5  road construction/reconstruction, noise and light pollution, truck traffic, the privatization of

6  the campground and limits on access, plus removal of the old oak trees, and other activities,

7  and represent a severe intrusion into the unspoiled resources of the Oak Flat area that I use

8  and value.  These activities are totally incompatible with my uses of these public lands and

9  will severely and irreparably damage, if not eliminate, my ability to use these public lands

10  for aesthetic and emotional enjoyment, peace and solitude, hiking, camping, viewing

11  wildlife and scenery, and appreciating the Oak Flat area's invaluable environmental,

12  historical, and cultural treasures.

13  15. I intend to continue to visit and use Oak Flat, and those adjacent public lands that will

14  also be immediately and irreparably harmed by the exchange and the mine, to continue my

15  above noted uses. If the lands remain public, I intend to visit these Oak Flat lands at least

16  once, if not more, in the coming year.

17  16. The only way to protect my interests and uses of Oak Flat and other public lands and

18  waters affected by the land exchange and the mine, and the similar interests and uses of

19  members of the Sierra Club, from irreparable injury is for the Forest Service to reconsider

20  its analysis and decision, and that this land exchange and proposed mine would not proceed,

21  and Oak Flat and the surrounding areas would remain public lands, so I could continue my

22  regular use and enjoyment of the area.

23  17.     In addition to the immediate and irreparable harm caused by the Exchange (and later

24  mine), the Forest Service has injured my, and the Sierra Club's, rights to an adequate

25  agency review under NEPA, the NDAA, and other federal laws – including the agency's

26  failure to provide for public review after the Draft EIS was issued in 2019.  This is despite

27

28                                                                                                   4

1   all of the new information and changed circumstances that have arisen over the last 5+

2   years.

3   18.    This includes the new FEIS and DROD's inclusion, for the first time, a proposal to

4   enact 16 amendments to the Tonto National Forest Plan – stripping away current protections

5   for wildlife, cultural resources, recreation, and other public values. Myself, and the Sierra

6   Club, have for decades participated in the agency's Forest Planning process, through the

7   required public review process under the National Forest Management Act (NFMA) and

8   NEPA. For the agency to now amend the Tonto Plan without any public review represents a

9   significant departure from the NFMA and NEPA requirements, to the detriment of my and

10   the Sierra Club's rights under these laws.

11

12

13   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

14   and correct.

15   Executed this 2nd day of July, 2025, in Phoenix, Arizona.

16

17   _____

18   Sandra Bahr

19

20

21

22

23

24

25

26

27

28

5



# MASTER WATER PLAN

## FOR

## *SUPERSTITION VISTAS*

### APACHE JUNCTION, ARIZONA

Prepared For:
**DR Horton**
20410 N 19th Avenue, Suite 100
Phoenix, AZ 85027



&

**Brookfield Properties**
14646 N Kierland Boulevard, Suite 165
Scottsdale, AZ 85254

**Brookfield**
Residential

Prepared By:
**HILGARTWILSON, LLC**
2141 E. Highland Avenue, Suite 250
Phoenix, AZ 85016
Phone: (602) 490-0535



September 2021
HW Project No. 1635



## MASTER WATER PLAN
### FOR
### *SUPERSTITION VISTAS*

### TABLE OF CONTENTS

| | | |
|---|---|---|
| **1.0** | **EXECUTIVE SUMMARY** | **1** |
| **2.0** | **INTRODUCTION** | **2** |
| 2.1 | Background and Project Location | 2 |
| 2.2 | General Description | 2 |
| 2.3 | Purpose of Report | 2 |
| 2.4 | Existing Conditions | 3 |
| 2.5 | Previous Studies | 3 |
| **3.0** | **DESIGN CRITERIA** | **4** |
| 3.1 | Water System Design Criteria | 4 |
| **4.0** | **WATER DEMANDS** | **6** |
| 4.1 | Land Use | 6 |
| 4.2 | Water Demand Calculations | 6 |
| **5.0** | **WATER SYSTEM INFRASTRUCTURE** | **9** |
| 5.1 | Existing Water System | 9 |
| 5.2 | Proposed Water System Improvements | 9 |
| 5.3 | Water Supply - Wells | 11 |
| 5.4 | Treatment & Transmission Main | 12 |
| 5.5 | Storage | 13 |
| 5.6 | Booster Pumps | 14 |
| 5.7 | Water Improvements Phasing | 14 |
| 5.8 | Assured Water Supply & Water Rights | 16 |
| 5.9 | Wet Water Availability | 17 |
| **6.0** | **ADDITIONAL GROUNDWATER SUPPLY** | **17** |
| 6.1 | Groundwater Wells | 17 |
| **7.0** | **ONE WATER & SUSTAINABILITY GOALS** | **18** |
| 7.1 | Direct & Indirect Potable Reuse | 18 |
| **8.0** | **HYDRAULIC MODEL AND RESULTS** | **18** |
| 8.1 | Design Methodology | 18 |
| 8.2 | Auction Property Model | 19 |
| 8.3 | Site Model | 20 |
| **9.0** | **CONCLUSIONS** | **21** |
| **10.0** | **REFERENCES** | **23** |

3-ER-410



**APPENDICES**

A.    Figures
B.    Superstition Vistas Water System Calculations and Tables
C.    Superstition Vistas Hydraulic Modeling Results
D.    Designation of Assured Water Supply
E.    Carollo Water Study – Distribution & Transmission Main Exhibits

**FIGURES**

1.    Superstition Vistas Vicinity Map .................................................................. Appendix A
2.    Superstition Vistas Development Unit Exhibit ............................................. Appendix A
3.    Superstition Vistas Water System Improvements (Auction Property)..................... Appendix A
4.    Superstition Vistas Water System Improvements (Site)........................................ Appendix A

**TABLES**

1.    Water System Design Criteria.................................................................................. 5
2.    Land Use Summary.................................................................................................. 6
3.    Water Demand Calculations Summary (Including Irrigation)................................ 7
4.    Water Demand Calculations Summary (Offset Irrigation) .................................... 8
5.    Storage Capacity Summary................................................................................... 14
6.    Booster Pump Summary........................................................................................ 14
7.    Auction Property Development Schedule.............................................................. 15
8.    AJWD 2019 Paper Water Portfolio Summary ...................................................... 16
9.    AJWD Water Use & Water Ordered........................................................................ 16
10.    Hydraulic Model Results Summary – Auction Property...................................... 20
11.    Hydraulic Model Results Summary – Site............................................................ 21
B.1.1    Superstition Vistas Water Demand Calculations................................................... Appendix B
B.1.2    Superstition Vistas Water Demand Calculations (Offset Irrigation)...................... Appendix B
B.2    Superstition Vistas Transmission Main Sizing Calculations................................... Appendix B
B.3    Superstition Vistas Storage Requirements Calculations ....................................... Appendix B
B.4    Superstition Vistas Booster Pump Calculations ..................................................... Appendix B
B.5    Overall Property Density Allocation......................................................................... Appendix B
B.6    AJWD Water System Design Criteria........................................................................ Appendix B
B.7    Well Capacity Calculations ...................................................................................... Appendix B
B.8.1    Auction Property Development Schedule (No Irrigation) ...................................... Appendix B
B.8.2    Auction Property Development Schedule (Including Irrigation) ............................. Appendix B



## 1.0 EXECUTIVE SUMMARY

Superstition Vistas is a proposed 8,090-acre planned development (Site) located west of the Central Arizona Project (CAP) canal, east of Meridian Road, north of the Frye Road alignment (future SR-24 alignment) and south of Baseline Road in Pinal County, Arizona. It is comprised of eight (8) Development Units and will consist of various uses ranging from residential to industrial development. Of this overall assemblage, Development Units 1 & 2 (Auction Property, or "Property") is a proposed 2,783 acre master planned community located west of the Idaho Road alignment, east of Meridian Road, north of the Ray Road alignment, and south of the Elliot Road alignment. The Auction Property will consist of approximately 10,940 residential units. The Auction Property will also contain approximately 466 acres of non-residential use, comprised of commercial properties, neighborhood open space, and community open space.

The scope of this Master Water Plan will detail the water infrastructure needed to serve the Auction Property and will provide a regional framework for the anticipated infrastructure needed for the surrounding area around Development Units 1 & 2 totaling approximately 5,307 acres (Retained Property). The Retained Property is located within Pinal County and will be annexed into the City of Apache Junction.

Given the timing and scale of the development for the overall project, this Master Water Plan is organized into evaluations specific to the Auction Property and Site. Since the timing of the Auction Property is immediate, the level of analysis for the Auction Property is specific with corresponding recommendations for improvements. For the Retained Property, the evaluation is focused on establishing the primary water infrastructure network for future development. For both scenarios, water demands for Superstition Vistas have been estimated based on the proposed land uses established by the Client and design criteria as approved by the Apache Junction Water District (AJWD, or "District"). The scope of this plan also includes evaluation of water supply, transmission main facilities, treatment, storage, pumping and distribution facilities.

The intent of this Master Plan is to be used as the basis for final design as each Development Unit proceeds to development. The size and scale of both the Auction Property and Site are such that individual unit or parcel water reports are to be prepared to confirm the intensity and land use as the basis for final water demands, and substantiate the scope of water infrastructure needed. There may be instances where this Master Plan may need to be amended to update the various elements contained in this Plan. These amendments may range from updating the demand factors that reflect actual rates to revised locations of primary water infrastructure to corroborate with the most current District Water Master Plan at that respective time.



## 2.0   INTRODUCTION

### 2.1   Background and Project Location

Superstition Vistas is a proposed 8,090-acre planned development (Site) located west of the Central Arizona Project (CAP) canal, east of Meridian Road, north of the Frye Road alignment (future SR-24 alignment) and south of Baseline Road in Pinal County, Arizona. Superstition Vistas will be annexed into the City of Apache Junction. It is comprised of eight (8) Development Units (DU) and will consist of various uses ranging from residential to industrial development.   Of this overall assemblage, Development Units 1 & 2 (Auction Property, or "Property") is a proposed 2,783 acre master planned community located west of the Idaho Road alignment, east of Meridian Road, north of the Ray Road alignment, and south of the Elliot Road alignment, in Sections 17, 18, 19, 20, and a portion of 30 of Township 1 South, Range 8 East of the Gila and Salt River Meridian.

The portion of Superstition Vistas outside Development Units 1 & 2 (Retained Property) totals approximately 5,307 acres and is currently located within Pinal County. The entire Site will be annexed into the City of Apache Junction, Arizona. The Retained Property includes Sections 7, 28, 29, and portions of Sections 6, 8, 16, 21, 27, 30, 31, 32, 33, and 34 of Township 1 South, Range 8 East of the Gila and Salt River Meridian.

Figure 1 in Appendix A provides a vicinity map for the Project.

### 2.2   General Description

Superstition Vistas Development Units 1 & 2 will consist of approximately 10,940 residential units, as well as approximately 466 acres of non-residential use, including commercial use, neighborhood open space, and community open space. Based on proposed land uses within the Auction Property and preliminary land uses within the Retained Property area, the Site is planned to have a total of approximately 27,370 single-family residential units at build-out, as well as 2,394 acres of non-residential use, comprised of commercial properties, neighborhood open space, community open space, schools, business parks, and industrial properties.

Development Units 1 & 2 are located within the Apache Junction Water District (AJWD) service area and are situated within a single pressure zone. The majority of the Retained Property is also within the same pressure zone within the AJWD service area.  However, portions of DU 7 & 8 (within Sections 6 and 7 bounded by Meridian Road, Baseline Road, the Ironwood Road alignment, and the Elliot Road alignment) are within Arizona Water Company's service area.

### 2.3   Purpose of Report

The purpose of this Master Water Plan is to detail the water infrastructure needed to serve the Auction Property and provide a regional framework for the anticipated infrastructure needed for the remainder of the Site.  This Master Plan identifies and evaluates the proposed water infrastructure and distribution system required to serve the Auction Property based on the current land use plan and the design criteria as approved by the AJWD.  In addition, the water infrastructure needed to serve the



Retained Property is identified on a conceptual level. A Development Unit exhibit is provided in Figure 2 in Appendix A.

This Master Plan identifies the projected water demands for the Auction Property and Site for average day, maximum day, peak hour, and maximum day plus fire flow conditions. It also discusses the water supply, storage, booster pumping station, and treatment facilities required to serve both the Auction Property and the Retained Property, and presents results from hydraulic models of the proposed water infrastructure. The demand calculations presented in this Master Plan are based on the current land uses planned for the Auction Property and the preliminary conceptual land uses identified for the Retained Property. In addition, after connection of the 500th equivalent dwelling unit ("EDU") constructed, the District shall analyze the average flows for one year to determine the actual flows used per EDU, and shall use such actual flows (plus or minus 20%, depending on environmental conditions) to calculate future capacity and infrastructure required. The water analysis presented in this Master Plan is based on the City of Apache Junction *Engineering Design Guidelines and Policies* (City of Apache Junction) and general design criteria as agreed upon by the AJWD.

The intent of this Master Plan is to be used as the basis for final design as each Development Unit proceeds to development. The size and scale of both the Auction Property and Retained Property are such that individual unit or parcel water reports are to be prepared to confirm the intensity and land use as the basis for final water demands, and substantiate the scope of water infrastructure needed. There may be instances where this Master Plan needs to be amended to update the various elements contained in this Plan. These amendments may range from updating the demand factors that reflect actual rates to revised locations of primary water infrastructure to corroborate with the most current City General Plan and Water Master Plan at that respective time. At no point should the demands go below 360 gallons per day per EDU.

## 2.4    Existing Conditions

The Auction Property and Retained Property sites generally consist of undeveloped desert land that generally slopes toward the southwest at a rate of approximately 0.5%. The CAP canal borders the Retained Property to the east. In addition, there is existing residential development bordering the Project to the west and north. There are also multiple existing utility easements that intersect the Property and Retained Property areas. An existing drainage easement for the Powerline Channel extends from the CAP canal, just north of the northeast corner of Development Unit 2, to the southwest, crossing Meridian Road between Warner Road and Ray Road. In addition, an existing electrical transmission easement extends to the southeast near the southwest corner of Development Unit 1. A separate electrical transmission easement extends east-west through the Retained Property in Development Unit 7. See Figure 1 in Appendix A for the Vicinity Map and Figure 2 in Appendix A for the Development Unit Exhibit, which shows the easements crossing the Auction Property and Retained Property areas.

## 2.5    Previous Studies

In November 2019, Kimley-Horn & Associates, Inc. (KHA) prepared the *Infrastructure*



*Assessment Study ASLD 8500.* The KHA study identified preliminary design standards and preliminary concepts for extending water, wastewater, roadway, and drainage infrastructure to serve Superstition Vistas at buildout. Elements of this study served as the basis of this Plan, however, it should be noted that the demands identified in the KHA study are different from what is established in this Plan due to revised demand criteria and land use designations.

In addition to the KHA efforts, Carollo has been recently engaged by AJWD to develop the AJWD Master Plan for the area south of Baseline Road. The purpose of the AJWD Master Plan is to provide information to developers to help them understand the master plan for AJWD and how AJWD operates and plans. The first part of this work resulted in concepts for potential distribution and transmission main networks for a large portion of the AJWD service area, including the Auction Property and Retained Property areas, as well as other future development west of the CAP canal. This initial Carollo effort was reviewed by HILGARTWILSON and was used to help coordinate and corroborate HILGARTWILSON's efforts. Exhibits showing Carollo's conceptual distribution and transmission main networks are included in Appendix E of this Master Plan for reference.

This Master Plan provides an updated analysis for water infrastructure needed to serve the Superstition Vistas development with design/demand factors as approved by the AJWD.

## 3.0   DESIGN CRITERIA

### 3.1   Water System Design Criteria

The proposed water system infrastructure for the Auction Property and the regional framework for the infrastructure to serve the Retained Property have been prepared and evaluated consistent with the design criteria as approved by the AJWD. The criteria are summarized below in Table 1 and supplement the City's other design criteria as identified in the City's *Engineering Design Guidelines and Policies* (City of Apache Junction). In developing this Master Plan, HILGARTWILSON worked with AJWD staff to develop the criteria identified in Table 1, which is to be used for sizing of master-planned water infrastructure for the Property and Retained Property areas. In addition, the demand criteria will be used to help procure and establish both rights and physical water availability to the Auction Property and Retained Property. Since these latter elements (water rights and physical availability) are interrelated to AJWD's overall water portfolio, which is inclusive of, but not limited to, effluent recharge credits, implementation of reuse of effluent to offset demands, actual customer demands, it is expected that the scale and intensity of these demand factors may be reevaluated and amended from time to time during the development of both Projects.

A full summary of AJWD water system design criteria identified for the Superstition Vistas development is shown in Table B.6 in Appendix B. Table B.6 also notes relative design requirements of other municipalities and water providers for reference.



| Table 1: Water System Design Criteria | | |
|---|---|---|
| **Land Use** | **Value** | **Unit** |
| *Average Day Demands* | | |
| Single Family Low Density Residential (1-2 DU/ac) | 592 | gpd/DU |
| Single Family Med Density Residential (2-10 DU/ac) | 555 | gpd/DU |
| Single Family High Density Residential (10+ DU/ac) | 370 | gpd/DU |
| Multi-Family Residential | 315 | gpd/DU |
| Commercial | 2,000 | gpad |
| Office / Business Park | 2,000 | gpad |
| School | 5,000 | gpad |
| Malls/Retail | 0.5 | gpd/sq. ft. |
| Industrial | 2,000 | gpad |
| Hotel/Motel | 150 | gpd/room |
| Turf/Irrigation | 4,400 | gpad |
| Xeriscape/Low Water Use Irrigation | 1,000 | gpad |
| *Peaking Factors* | | |
| Maximum Day Demand = 2.0 x Average Day Demand | | |
| Peak Hour Demand = 1.7 x Maximum Day Demand | | |
| *Fire Flow[2]* | | |
| Residential | 1,500 | gpm for 2 hours |
| Commercial | 4,000 | gpm for 4 hours |
| Industrial | 4,000 | gpm for 4 hours |
| School | 4,000 | gpm for 4 hours |
| Office/Business | 4,000 | gpm for 4 hours |
| *Minimum Pipe Sizes* | | |
| Looped Water Main | 8 | inch |
| Water Main in Collector Streets | 12 | inch |
| Water Main in Arterial Streets | 16 | inch |
| *System Hydraulics* | | |
| Minimum Pressure - Average Day, Max Day, Peak Hour | 50 | psi |
| Minimum Pressure - Maximum Day plus Fire Flow | 20 | psi |
| Maximum Velocity (Peak Hour Demand) | 5 | fps |
| Maximum Velocity (Max Day + Fire Flow) | 10 | fps |
| Maximum Head Loss (Peak Hour) | 10 | ft/1,000 ft |
| Hazen Williams 'C' Factor | 120 | |

Notes:
1. Design criteria are based on factors agreed upon by the AJWD for the master planning of the Auction Property and Retained Property.
2. Fire flows shown are for planning purposes. All parcel phases will be required to meet the International Fire Code (IFC) 2015 Appendix B fire flow requirements.
3. A full summary of AJWD water system design criteria is provided in Table B.6 in Appendix B.



## 4.0   WATER DEMANDS

### 4.1   Land Use

Superstition Vistas Development Units 1 & 2 will consist of approximately 10,940 single-family residential units, as well as approximately 466 acres of non-residential use, comprised of commercial development, neighborhood open space, and community open space. Preliminary conceptual land uses have also been identified for the Retained Property area (Development Units 3-8). Table 2 below summarizes the current projected land uses that have been identified for master planning purposes. Table B.5 in Appendix B shows more detail for the land uses allocated for each Development Unit within Superstition Vistas, and the allocations that were used in developing this Master Plan.  For reference, Figure 2 in Appendix A shows the anticipated boundaries for each of the Development Units.

| Table 2: Land Use Summary | | | | | | | |
|---|---|---|---|---|---|---|---|
| Dev. Unit | Gross Area (ac) | Neighborhood Open Space (ac) | Industrial (ac) | Commercial (ac) | School | Community Open Space (ac) | SFR (Med Density) (DU) |
| 1 | 1,375 | 138 | 0 | 20 | 0 | 83 | 5,470 |
| 2 | 1,408 | 135 | 0 | 20 | 0 | 70 | 5,470 |
| 3 | 1,355 | 136 | 0 | 0 | 60 | 81 | 6,400 |
| 4 | 638 | 64 | 0 | 240 | 0 | 38 | 2,730 |
| 5 | 1,169 | 117 | 0 | 20 | 60 | 70 | 3,790 |
| 6 | 714 | 71 | 0 | 0 | 0 | 43 | 2,170 |
| 7 | 899 | 90 | 100 | 110 | 0 | 54 | 1,340 |
| 8 | 532 | 53 | 400 | 90 | 0 | 32 | 0 |
| Total: | 8,090 | 803 | 500 | 500 | 120 | 406 | 27,370 |

Notes:
1. Residential, Industrial, Commercial, and School land uses are derived from the latest density and intensity projections for Development Units 1-8. There are currently not any site plans for Sections 17, 18, and 20. Projections for Development Units 3-8 are assumed for master planning purposes.
2. Based on information from the Developer, DU 2 is anticipated to contain 135 acres of Neighborhood Open Space and 70 acres of Community Open Space.
3. For all Development Units (not including DU 2), 10% of gross area is assumed to be Neighborhood Open Space and 6% of gross area is assumed to be Community Open Space.
4. See Table B.5 (Overall Property Density Allocation) in Appendix B for detailed land use summary.

### 4.2   Water Demand Calculations

Anticipated water demands for the Auction Property and Retained Property have been calculated in accordance with the design criteria listed in Table 1.  The projected water demands are summarized in Table 3 below and detailed water demand calculations are provided in Table B.1.1 in Appendix B. The Project area and the majority of the Retained Property area are within the AJWD service area, with exception of approximately 1,076 acres within Development Units 7 and 8 that are located within AZWC's service area.  Table 3 includes a breakdown of water demands by water service provider. This table represents a conservative scenario that assumes that all irrigation demands for DUs 1-8 will be supplied by the proposed potable water system. These demands were utilized for infrastructure sizing to help establish this scenario.



| Table 3: Water Demand Calculations Summary (Including Irrigation) – Superstition Vistas | | | | |
|---|---|---|---|---|
| Development Unit | Xeriscape / Turf Irrigation Demand (gpm)[5] | Average Day Demand (gpm) | Maximum Day Demand (gpm) | Peak Hour Demand (gpm) |
| Apache Junction Water District Service Area | | | | |
| 1 | 419 | 2,555 | 4,691 | 7,681 |
| 2 | 386 | 2,522 | 4,658 | 7,648 |
| Erie Lift Station | 0 | 1.4 | 1.4 | 1.4 |
| *Subtotal – Dev. Units 1 & 2 (Incl. Irrigation)* | *805* | *5,078* | *9,350* | *15,331* |
| 3 | 413 | 3,088 | 5,763 | 9,508 |
| 4 | 194 | 1,580 | 2,965 | 4,905 |
| 5 | 356 | 2,053 | 3,750 | 6,125 |
| 6 | 218 | 1,054 | 1,890 | 3,061 |
| 7 (334 acres) | 102 | 402 | 702 | 1,123 |
| 8 (21 acres) | 6 | 34 | 62 | 101 |
| *Subtotal - AJWD Service Area (Incl. Irrigation)* | *2,094* | *13,289* | *24,483* | *40,154* |
| Arizona Water Company Service Area | | | | |
| 7 (565 acres) | 172 | 680 | 1,188 | 1,899 |
| 8 (511 acres) | 156 | 808 | 1,461 | 2,375 |
| *Subtotal - AZWC Service Area (Incl. Irrigation)* | *328* | *1,489* | *2,649* | *4,274* |
| GRAND TOTAL (Incl. Irrigation) | 2,422 | 14,778 | 27,132 | 44,428 |

Notes:
1. Residential, Industrial, Commercial, and School demands are calculated using land uses derived from the latest density and intensity projections for Development Units 1-8.
2. The demands shown in Table 3 represent a conceptual demand for the future development.
3. Irrigation demands are not peaked, as these are anticipated to remain constant. Community Open Space is assumed to be 70% Turf and 30% Xeriscape. Neighborhood Open Space is assumed to be 40% Turf and 60% Xeriscape. See Table B.1.1 in Appendix B for detailed demand calculations.
4. A commercial demand for 1 acre of 2,000 gpd (1.4 gpm) will be needed to serve the proposed Erie Lift Station (ELS), located at the southeast corner of Meridian Road and Erie Street. This demand is not peaked.
5. Table 3 above assumes that all irrigation demands will be supplied by the potable water system. It is anticipated that a non-potable water system will offset irrigation demands within DU 2, 3, 5, 6, and a portion of DU 1 (north of Warner Road). Therefore, potable water demand shown in Table 3 may be reduced. See Table 4 for reduced water demands offset by the proposed non-potable water system in DUs 1, 2, 3, 5, and 6.

In contrast to the above table, Table 4 assumes that irrigation demands throughout the Site will be supplemented by the proposed non-potable water system. More specifically, irrigation demands in DUs 2, 3, 5, 6, and a portion of DU 1 (north of Warner Road) are anticipated to be supplied by a separate proposed non-potable water system, as referenced in the *Master Non-Potable Water Plan for Superstition Vistas* (Wood, Patel & Associates, Inc., 2021). To illustrate how the non-potable water system could offset irrigation demands from the proposed potable water system, revised demands are provided in Table 4. Both demand scenarios are provided to



outline the potential minimum and maximum demands anticipated to be supplied by the proposed potable water system. This table shows demands for the development with the assumption that irrigation demands in DUs 2, 3, 5, 6, and a portion of 1 (north of Warner Road) are offset by a separate non-potable water system. Detailed calculations for this demand scenario are provided in Table B.1.2 in Appendix B.

| Table 4: Water Demand Calculations Summary (Offset Irrigation) – Superstition Vistas | | | | |
|---|---|---|---|---|
| Development Unit | Xeriscape / Turf Irrigation Demand (gpm)[5] | Average Day Demand (gpm) | Maximum Day Demand (gpm) | Peak Hour Demand (gpm) |
| Apache Junction Water District Service Area | | | | |
| 1 | 246 | 2,382 | 4,518 | 7,509 |
| 2 | 0 | 2,136 | 4,272 | 7,262 |
| Erie Lift Station | 0 | 1.4 | 1.4 | 1.4 |
| Subtotal – Dev. Units 1 & 2 (Incl. Irrigation) | 246 | 4,520 | 8,792 | 14,773 |
| 3 | 0 | 2,675 | 5,350 | 9,095 |
| 4 | 194 | 1,580 | 2,965 | 4,905 |
| 5 | 0 | 1,697 | 3,394 | 5,769 |
| 6 | 0 | 836 | 1,673 | 2,844 |
| 7 (334 acres) | 102 | 402 | 702 | 1,123 |
| 8 (21 acres) | 6 | 34 | 62 | 101 |
| Subtotal - AJWD Service Area (Incl. Irrigation) | 549 | 11,744 | 23,938 | 38,609 |
| Arizona Water Company Service Area | | | | |
| 7 (565 acres) | 172 | 680 | 1,188 | 1,899 |
| 8 (511 acres) | 156 | 808 | 1,461 | 2,375 |
| Subtotal - AZWC Service Area (Incl. Irrigation) | 328 | 1,489 | 2,649 | 4,274 |
| GRAND TOTAL (Incl. Irrigation) | 877 | 13,233 | 25,587 | 42,883 |

Notes:
1. Residential, Industrial, Commercial, and School demands are calculated using land uses derived from the latest density and intensity projections for Development Units 1-8.
2. The demands shown in Table 3 represent a conceptual demand for the future development.
3. Irrigation demands are not peaked, as these are anticipated to remain constant. Community Open Space is assumed to be 70% Turf and 30% Xeriscape. Neighborhood Open Space is assumed to be 40% Turf and 60% Xeriscape. See Table B.1.2 in Appendix B for detailed calculations.
4. A commercial demand for 1 acre of 2,000 gpd (1.4 gpm) will be needed to serve the proposed Erie Lift Station (ELS), located at the southeast corner of Meridian Road and Erie Street. This demand is not peaked.
5. This table assumes that irrigation demands in DU 4, 7, 8, and a portion of DU 1 (south of Warner Road) will be supplied by the potable water system. This table assumes that a non-potable water system will fully offset irrigation demands within DU 2, 3, 5, 6, and a portion of DU 1 (north of Warner Road). For calculation purposes, approximately 41% of DU 1's irrigation demand is assumed to be offset by the non-potable system.



## 5.0   WATER SYSTEM INFRASTRUCTURE

### 5.1   Existing Water System

The AJWD owns and operates an existing surface water treatment facility, the Superstition Area Water Plant (SAWP), which is located north of the CAP canal and west of Ironwood Road. The SAWP has a current surface water treatment capacity of 2.0 million gallons per day (MGD), with a planned build-out capacity of 10.0 MGD. The plant is currently operating at approximately 1.5 MGD. AJWD staff have indicated that 6.0 MGD of the plant's build-out capacity is allocated to the Auction Property and Retained Property, and that the remaining 2.0 MGD of treatment capacity is being reserved for future development within the City and may or may not be available for use by the Auction Property.  Additional water demands beyond the 6.0 MGD currently reserved for the Auction Property and any portion of the remaining 2.0 MGD capacity that the City decides to allocate to the Project from the SAWP, will need to be sourced from a separate interim source and future distribution facility (herein referred to as Water Treatment Facility 2 and conceptually located along the CAP canal). The source of additional water supply may be from a future water treatment facility; direct potable reuse at the existing SAWP; and/or from groundwater wells on an interim basis. It is anticipated that the Water Treatment Facility 2 will be developed after the Auction Property as a part of the Retained Property. The AJWD currently has two wells, Well 5 and Well 6, which each have a capacity of 0.7 MGD, but per AJWD staff are currently reserved for back-up purposes. Well 5 is located near the intersection of 16th Avenue and Delaware Drive and Well 6 is located near Baseline Road and Winchester Road. These groundwater wells are used during annual CAP canal maintenance and for emergencies as they arise.

Figure 4 in Appendix A shows a conceptual layout and sizing for infrastructure needed to serve the Site at full buildout. As there is not currently any existing water infrastructure in place to serve the Auction Property or Retained Property areas, additional surface water treatment facilities and/or wells, along with transmission mains, storage facilities, booster pump stations, and distribution water mains will be required to extend water service to the development.

### 5.2   Proposed Water System Improvements

As noted previously, the purpose of this Master Water Plan is to detail the water infrastructure needed to serve the Auction Property and provide a regional framework for the anticipated infrastructure needed for the Retained Property.  The proposed water system infrastructure for serving the Auction Property is shown in Figure 3 in Appendix A.  The proposed water system has been designed to function as a stand-alone system for serving the Auction Property, as well as an integrated part of the build-out water system to serve both the Auction Property and Retained Property once the area is fully developed.  The conceptual water system infrastructure that will be required to serve the Retained Property at full build-out is shown in Figure 4 in Appendix A. Based on existing topography across the Site, the entire portion of the development within the AJWD service area will be served by a single pressure zone.

As shown in Figure 3 in Appendix A, the proposed water system for serving the Project is comprised of 12-inch, 16-inch, and 24-inch water distribution mains located within the arterial streets, 12-inch mains within the collector streets, and



looped 8-inch mains within the local streets within the individual parcels.

Water supply for the first phases of the Auction Property will be provided by a proposed 30-inch transmission main that will convey treated water from the AJWD SAWP facility, located north of the CAP canal and west of Ironwood Road, south to a proposed water storage and booster pumping facility (referred to herein as Water Campus 1), which is conceptually located west of Ironwood Road, between Elliot Road and Warner Road. The SAWP has a current treatment capacity of 2.0 MGD and can adequately meet current demands in the system but will need to be expanded to serve the Auction Property. This expansion will consist of the addition of treatment trains and pumping capacity at the plant to increase the plant's current capacity, with each new treatment train sized to provide an additional 2.0 MGD of treatment capacity.

Once the treatment capacity that has been allocated to the Auction Property and Retained Property from the SAWP has been reached, another source of supply will need to be developed. If limited to the current allocation of 6.0 MGD from the SAWP and none of the excess 2.0 MGD capacity is made available for use by the Auction Property, an additional supply of approximately 7.46 MGD will be required to meet the projected maximum day demand of 13.46 MGD for Development Units 1 & 2. Initially, as an interim solution, groundwater wells will be developed to supply any remaining demands needed for the Auction Property. Groundwater wells will be used on an interim basis until a future second water treatment facility (Water Treatment Facility 2) is constructed. This second facility, anticipated to be located along Ray Road, just west of the CAP canal, will supplement the SAWP and Water Campus 1 for sourcing, storing, and conveying water to the Auction Property and Retained Property and will be developed when the property along Ray Road becomes available.

AJWD is currently independent of groundwater sources and has stated an ultimate goal of continuing to use renewable resources to serve future customers. Of AJWD's total current water rights portfolio, approximately one-third of their available rights are from a groundwater allocation. Given the scale of the overall Auction Property, the development of new groundwater production wells is anticipated to be needed as an interim condition source. The approach will allow an immediate path to augment current water production to enable development of the Auction Property and to utilize the current allocation of groundwater rights. In the long term, wells may be used as an emergency potable water source to recover groundwater recharge credits. The development of a well (or series of wells, as may be needed depending on actual production) will enable water system planning to continue to plan for and site a second surface water treatment plant, which is planned to be developed once the Retained Property is developed. Additional detail and discussion are provided in Section 6.0.

The anticipated location of a future second water treatment plant is along the Ray Road alignment, near the CAP canal. This alignment is a logical location, effectively bridging the Auction Property boundary to the southern development areas of the Retained Property along the proposed regional transportation corridor. It is anticipated that Water Treatment Facility 2 will provide for supply, storage, and pumping capacities that will benefit both the Auction Property and Retained Property. Proposed infrastructure and distribution mains are identified in Figures 3-6 in Appendix A.



To meet additional future demands within the southern areas of the Retained Property area as it builds out, a third water storage/distribution facility (Water Campus 3) will be constructed. Conceptually, Water Campus 3 will be located near the intersection of the Williams Field Road and Ironwood Road alignments. Final locations and sizing for Water Treatment Facility 2 and Water Campus 3 will be determined at the time of final design.

The following sections discuss the water supply, treatment, storage, and booster pumping requirements for serving the Auction Property and Retained Property at buildout. These improvements may be phased with the phasing of development within the community to ensure each phase has adequate water service without having to construct the entire water system at the time the first parcels are developed. Pipe sizes identified in this Master Plan have been determined using demand factors that have been agreed upon by the AJWD. These factors are used for sizing infrastructure on a master-planning level. As the Site is built out, water campus, treatment, transmission main sizing, and distribution main sizing may be refined based on actual water usage.

### 5.3    Water Supply - Wells

While water supply for Superstition Vistas will primarily be provided by treated CAP surface water, AJWD staff has indicated that the existing wells are to provide supply redundancy for the AJWD system. Furthermore, additional water supply may be needed beyond the reserved capacity at the SAWP facility to meet the demands of the Auction Property at buildout, which will be initially provided by groundwater wells if additional surface water treatment is unavailable. Wells may be used as an interim source until the construction of Water Treatment Facility 2 is completed with the Retained Property. In the long term, these interim wells are to be used during emergency scenarios or while the CAP canal undergoes maintenance, which results in dry-ups every 2 to 3 years. These dry-ups can typically range from at least one week to a month in duration. A hydrogeological analysis has not yet been completed for the Site to determine preferred well locations, flow rates, and water quality, but is proposed to identify potential well locations. Once a hydrogeologic study is completed, an anticipated well capacity can be determined. If one or more wells are constructed within the Auction Property, transmission mains will also be installed to convey water from the wells to Water Campus 1, where the raw water will be treated, stored, and pumped out to distribution. The specific treatment required for the groundwater will depend on the contaminant levels identified during groundwater sampling as the wells are developed. The final locations and number of future wells will be determined as the Auction Property is built-out. It is anticipated that a future well site will be proposed near a future irrigation lake in DU 2 to fill the lake during interim conditions.

As discussed in Section 5.2, additional water supply from groundwater wells may be required to meet the maximum day demands of the Auction Property at buildout until the future Water Treatment Facility 2 is developed. The Auction Property will require up to 7.46 MGD (5,183 gpm if pumping 24 hours per day) to meet the Auction Property's maximum day demand at buildout. If used, groundwater wells may be proposed at Water Campus 1, Water Treatment Facility 2, and potentially at the proposed lake site within Development Unit 2, as well as at other locations within the



Project as identified by a well siting study. Water from the wells would be routed to Water Campus 1 for treatment, storage, and pumping to distribution. The demand used to determine required well capacity assumes that all irrigation demands will be provided by the potable water system. Demand and required well capacity may be reduced if the non-potable water system offsets irrigation demands in DU 2, 3, 5, 6, and 1 (north of Warner Road).

### 5.4    Treatment & Transmission Main

The initial water supply for the Auction Property will be from the AJWD SAWP facility, located west of Ironwood Road on the north side of the CAP canal. The existing facility has a constructed capacity of 2.0 MGD, with potential to expand in 2.0 MGD increments up to a total capacity of 10.0 MGD at buildout. To meet demands as the Auction Property area develops, the SAWP facility will need to be expanded. Once the Retained Property develops, Water Treatment Facility 2 will be constructed along the CAP canal near Ray Road (for surface water supply and treatment)). If groundwater wells are used to supplement the surface water supply or to provide system redundancy, groundwater treatment will be needed. The type of treatment needed will depend on final water quality results as the wells are drilled and tested. It is anticipated that Water Campus 1 will contain groundwater treatment.

To provide the initial supply for the Auction Property, a 30-inch transmission main will be constructed along Ironwood Road and will convey treated surface water from the SAWP facility south to Water Campus 1 located along Ironwood Road between Elliot Road and Warner Road. This 30-inch transmission main is anticipated to convey 6.0 MGD at a velocity of 1.89 fps. The main is also sufficiently sized to convey 8.0 MGD if available from the SAWP facility, for a velocity of 2.52 fps. Transmission main calculations are provided in Table B.2 in Appendix B. The 30-inch transmission main within Ironwood Road will extend to the south to the intersection of Ray Road and Ironwood Road.

As the Retained Property develops, the capacity at Water Treatment Facility 2 will increase and ultimately, a future transmission main will be constructed to convey water to the proposed Water Campus 3 to serve the southern portion of the Retained Property at buildout. Based on preliminary sizing, it is anticipated that a 36-inch transmission main will be developed to convey a flow of approximately 15.36 MGD of treated water from Water Treatment Facility 2 to the intersection of Ray Road and Ironwood Road at build-out. Conceptually, this 36-inch transmission main will extend from Water Treatment Facility 2 west along Ray Road, then south as a 30-inch transmission main along Ironwood Road to the proposed Water Campus 3 site. The final alignment and sizing for this future transmission main will depend on the location of Water Campus 3 and other factors. In addition, demand calculations used to size this transmission main assume that irrigation demands for all DUs will be supplied by the proposed potable water system. Demand and transmission main sizing may be reduced if the non-potable water system offsets irrigation demands in DUs 2, 3, 5, 6, and a portion of 1. Preliminary sizing calculations for this future transmission main are included in Table B.2 in Appendix B and may be refined as the Retained Property area develops.

Rights-of-way are available for the offsite transmission main alignment along Ironwood Road. Additional rights-of-way may be required in areas so that all utilities



can fit. If additional easements or rights-of-way are required, they will need to be acquired from State Land for the offsite transmission mains and for Water Treatment Facility 2, should those facilities be located outside the Auction Property area. An easement will be required along Ironwood Road north of the Auction Property to allow for the installation of the 30-inch transmission main between the SAWP and the Project. Other required easements or rights-of-way may include those for future water campus locations and distribution/transmission main alignments.

The proposed distribution and transmission mains will be located in standard alignments throughout the overall Site. Where reasonable, water and sewer mains will be installed on opposite sides of the roadway, and will consider other wet and dry utilities. There may be instances where non-standard alignments may be needed to reflect development timing and sequencing. The exact locations and alignments of water and sewer infrastructure within each alignment will be determined during future reports.

### 5.5 Storage

The criteria agreed upon by the AJWD requires sufficient storage to be provided to meet 40 percent of the maximum day demand plus fire flow. Table 5 below summarizes the storage capacity needed to serve Superstition Vistas at various phases of development. It is anticipated that this total storage requirement for the Auction Property at build-out will be provided at Water Campus 1 (6.4 MG). Water Campus 1 will need to be sized to potentially contain all 6.4 MG of storage needed to serve the Auction Property. If the area of Retained Property for Water Treatment Facility 2 is acquired, then storage can be installed at Water Treatment Facility 2 to serve the Auction Property. However, Water Campus 1 will still be required to be sized for all 6.4 MG of storage.

At full build-out, the Auction Property and Retained Property will require a total of 17.0 MG of storage capacity for the portions of the community in the AJWD service area. Conceptual sizing to meet this build-out storage capacity is shown in Table B.3 in Appendix B and includes 6.4 MG of storage at Water Campus 1, 4.7 MG of storage at Water Treatment Facility 2, and 5.9 MG of storage at Water Campus 3. As each phase of the Site is developed, actual water usage should be monitored and the storage requirement be refined based on actual water usage to minimize the potential for oversized water facilities. These storage requirements assume that irrigation demands will be supplied by the proposed potable water system. It is anticipated that a non-potable water system will supply irrigation demands for DUs 2, 3, 5, 6, and a portion of 1. Therefore, storage requirements for the Auction Property may be reduced. Storage capacity calculations for Superstition Vistas are provided in Table B.3 in Appendix B and required storage at buildout is summarized in Table 5 below.



| Table 5: Storage Capacity Summary | | |
|---|---|---|
| Total Required Storage at Build-Out (gpm) | | |
| Auction Property (Build-Out) | AJWD Service Area (Auction Property & Retained Property) | Entire Site[1] |
| 6.4 MG | 17.0 MG | 18.6 MG |
| Notes:<br>1. Entire Site includes AJWD service area and current Arizona Water Company service area. | | |

## 5.6    Booster Pumps

The design criteria agreed upon by the AJWD indicate that sufficient booster pumping capacity shall be provided to meet the greater of the maximum day demand plus fire flow demand or the peak hour demand with the largest pump out of service. A booster pump station is proposed at Water Campus 1 to meet the Auction Property's booster pumping requirement of 15,331 gpm. Table 6 below shows the total pumping capacity required for the Auction Property at buildout, and for the Auction Property and Retained Property areas within AJWD's service area at buildout. Detailed pump capacity calculations are provided in Table B.4 in Appendix B. As the Project is built out, it is anticipated that the buildout pumping capacity requirement will be met by the combined capacities of pumps at Water Campus 1. At buildout of the Auction Property and Retained Property, the pumping capacity will be provided by a combination of pumping capacities at Water Campus 1, Water Treatment Facility 2, and Water Campus 3. These booster pumping requirements assume that irrigation demands will be supplied by the proposed potable water system. It is anticipated that a non-potable water system will supply irrigation demands for DUs 2, 3, 5, 6, and a portion of 1. Therefore, booster pumping requirements for the Auction Property may be reduced.

| Table 6: Booster Pump Summary | | |
|---|---|---|
| Required Pumping Capacity (gpm) | | |
| Auction Property (Build-Out)[1] | AJWD Service Area (Auction Property & Retained Property)[1] | All of Site[1, 2] |
| 15,331 | 40,154 | 44,428 |
| Notes:<br>1. Peak hour demand is controlling scenario.<br>2. Total area includes AJWD service area and current Arizona Water Company service area within the Site. | | |

## 5.7    Water Improvements Phasing

It is anticipated that Auction Property and Retained Property will be developed in several phases, with the initial phase anticipated to be within Development Unit 1 & Development Unit 2. The water mains, wells, treatment, storage, and pumping facilities required to serve each phase will similarly be constructed in phases as required to serve each phase of development. For any given phase, the offsite water infrastructure required to serve that phase will be constructed at the same time the phase is developed. Furthermore, the water mains that are installed will be sized for build-out conditions and will meet the required fire flows for the area that is



developed.

The size and scale of the Auction Property and Retained Property are such that individual unit or parcel reports will be prepared as each unit or parcel is developed to confirm the intensity and land use as the basis for final water demands, and to substantiate the scope of water infrastructure needed for the given unit or parcel. Infrastructure sizing will be phased and expanded over time to meet the demands within the Site area as it develops. It is also anticipated that storage and pumping capacity at Water Campus 1 will be expanded in phases as the SAWP capacity increases. Phasing will similarly apply to storage, treatment, and pumping facilities.

Residential dwelling units within the Auction Property are anticipated to be developed in phases, with an estimated combined 2,350 homes to be constructed in Development Units 1 & 2 by the end of 2023. Table 7 below summarizes an anticipated development schedule for the Auction Property. Table 7 assumes that irrigation demands within the Auction Property are fully offset by a non-potable water system. Detailed development schedules for the Auction Parcel are also provided in Tables B.8.1 and B.8.2 in Appendix B. Table B.8.1 summarizes a development schedule with the assumption that irrigation demands are offset by the non-potable water system and Table B.8.2 summarizes a development schedule with the assumption that irrigation demands within the Auction Property are to be supplied by the potable water system.

| Table 7: Auction Property Development Schedule | | |
|---|---|---|
| Year | Construction Activity | Source |
| 2021 | Begin grading / infrastructure improvements | SAWP |
| 2022 | Infrastructure construction / begin home construction | SAWP |
| 2023 | 2,350 homes | SAWP (2.6 MGD Max Day) |
| 2024 | 3,805 homes | SAWP (4.2 MGD Max Day) |
| 2025 | 5,165 homes | SAWP (5.7 MGD Max Day) |
| 2026 | 6,880 homes, 20.5 AC commercial | SAWP (6.0 MGD Max Day), Well(s) (1.7 MGD Max Day) |
| 2027 | 8,450 homes, 20.5 AC commercial | SAWP (6.0 MGD Max Day), Well(s) (3.5 MGD Max Day) |
| 2028 | 9,580 homes, 30 AC commercial | SAWP (6.0 MGD Max Day), Well(s) (4.8 MGD Max Day) |
| 2029 | 10,080 homes, 30 AC commercial | SAWP (6.0 MGD Max Day), Well(s) (5.3 MGD Max Day) |
| 2030 | 10,545 homes, 35 AC commercial | SAWP (6.0 MGD Max Day), Well(s) (5.8 MGD Max Day) |
| 2031 | 10,940 homes, 40 AC commercial | SAWP (6.0 MGD Max Day), Well(s) (6.3 MGD Max Day) |
| Notes: 1. This table does not include irrigation demands for the Auction Property. 2. Construction Activity totals are cumulative. 3. Detailed calculations and development schedule assumptions are provided in Tables B.8.1 and B.8.2 in Appendix B. | | |



**5.8    Assured Water Supply & Water Rights**

The AJWD ("Apache Junction Water Company", DWR 86-002025.0001) is included in the Arizona Department of Water Resources (ADWR) *List of Municipal Water Providers Designated as having an Assured or Adequate Water Supply as of February, 19, 2020.* The current designation of assured water supply from ADWR and a summary of water rights is included in Appendix D for reference. Although the AJWD is included on the current list of designated providers, additional water supply and water rights will be required to serve the Auction Property and Retained Property at build-out.

The AJWD 2019 paper water portfolio includes a variety of sources that equate to approximately 7,393 acre-ft/year. These sources and their associated volumes are summarized in Table 8 below and were provided by AJWD staff.

| Table 8: AJWD 2019 Paper Water Portfolio Summary | |
| --- | --- |
| **AJWD Paper Water Rights** | |
| **Source** | **Value (acre-ft/year)** |
| CAP | 2,919 |
| Gila River Indian Community (GRIC) Lease | 1,000 |
| Non-Indian Agriculture (NIA) | 817 |
| Groundwater | 2,372 |
| Long-Term Storage Credits (LTSC) | 285 |
| **Total:** | **7,393** |

Per discussions with AJWD staff, the AJWD currently has 1,919 acre-ft/year of committed water and 2,893 acre-ft/year of water rights reserved for existing and future customers within the AJWD service area. Additionally, the AJWD has issued Commitment to Serve letters for three other individual communities within AJWD's service area, with a commitment of 350 acre-ft/year to serve 564 lots. As of mid-2020, the existing customers in the AJWD use 2,400 acre-ft/year. AJWD has indicated that they are currently working on acquiring additional water rights to meet the demands of the Auction Property and Retained Property. AJWD currently has enough paper water rights to get the Auction Property started, however, it is anticipated that additional water rights will be acquired in the future. Table 9 below summarizes the AJWD 2020 water use and the volume of water ordered for 2021.

| Table 9: AJWD Water Use & Water Ordered | | |
| --- | --- | --- |
| **Source** | **2020 Water Use (acre-ft/year)** | **2021 Water Ordered (acre-ft/year)** |
| SAWP | 1,485 | 1,545 |
| Mesa Water Interconnect | 15 | 24 |
| Groundwater Storage Facility (GSF) | 900 | 1,000 |
| **Total:** | **2,400** | **2,569** |



The demand criteria utilized in this master plan incorporate components needed to account for potable water consumption for both domestic and fire protection needs and infrastructure sizing. While this is typical for municipal providers, it should be noted that the criteria utilized herein is more conservative than other more established municipal providers. An important distinction is that these demand criteria do not necessarily correlate to actual water rights needed to continue to support the District designation boundary. As the Site develops, actual demands should be monitored in concert with annual reporting requirements, and amended as needed. This should be done to appropriately size the needed infrastructure and establish additional water rights as needed for the District.

### 5.9    Wet Water Availability

The SAWP currently operates at approximately 1.5 MGD and has a current capacity of 2.0 MGD. The plant has a planned future buildout capacity of 10.0 MGD. Based on initial discussions with AJWD, a total of 6.0 MGD of the buildout capacity is allocated for the Auction Property and Retained Property, and an additional 2.0 MGD of capacity at buildout is available for general development in the City. Once the Auction Property's demands reach the allocated capacity at the SAWP (6.0 MGD plus any portion of the 2.0 MGD of excess capacity that the City allocates to the Auction Property in the future), additional wet water supply will need to be developed to meet the projected demands of the Auction Property and the Retained Property. However, it may be possible for additional water to be supplied by the SAWP, based on timing of development and availability. To minimize the volume of treated water needed to serve the Auction Property and Retained Property, the projected irrigation demands in DU 2, 3, 5, 6, and a portion of 1 may be served by reclaimed water from the Guadalupe Wastewater Treatment facility that is operated by the Superstition Mountains Community Facilities District No. 1 (SMCFD).

## 6.0    ADDITIONAL GROUNDWATER SUPPLY

### 6.1    Groundwater Wells

As discussed earlier in this Master Plan, once the Auction Property's maximum day demand reaches the allocated supply available from the SAWP, additional water supply and treatment facilities will need to be developed. A future second surface water sourcing facility and water campus (Water Treatment Facility 2) are preliminarily planned along the Ray Road alignment near the CAP canal as a part of the Retained Area development. However, water supply may be provided in the interim by drilling and equipping one or more wells within the Auction Property area. Wells would be located as identified in a future well siting study and would convey water through transmission mains to Water Campus 1 for treatment, storage, and distribution. Treatment requirements for the groundwater will be determined once the wells are drilled and tested.

Assuming 6.0 MGD would be distributed by Water Campus 1, the wells would need to supply the Auction Property's remaining buildout maximum day demand of 7.46 MGD (5,183 gpm). Well capacity calculations to meet this demand are provided in Table B.7 in Appendix B. As shown, when pumping 24 hours per day, the wells would need a capacity of 5,183 gpm. When pumping 18 hours per day, the wells would need a



capacity of 6,911 gpm. As the area develops and actual demands are known, the required well capacity may be revisited and updated to better reflect the actual maximum day demand.

## 7.0    ONE WATER & SUSTAINABILITY GOALS

As the Auction Property and Retained Property areas develop, the One Water and/or other sustainability goals of the City, the AJWD, the SMCFD, and other Project stakeholders will be considered in an effort to effectively manage the available water resources for the community and surrounding areas. Opportunities to offset potable water use may include an integrated approach to water supply by using one or more sources such as potable water, non-potable reuse, potable reuse, wastewater, stormwater, and others. AJWD is currently under contract with a consultant to further develop One Water goals. Further discussions will be held with the Project stakeholders as the Auction Property and Retained Property areas develop to optimize water management considerations and solutions.

### 7.1    Direct & Indirect Potable Reuse

It is a goal of AJWD to implement direct and indirect potable water reuse (DPR & IPR) into its water system capabilities to conserve water and support One Water goals. As the Superstition Vistas development progresses, this system will be evaluated further to determine the feasibility of DPR & IPR capabilities.

## 8.0    HYDRAULIC MODEL AND RESULTS

### 8.1    Design Methodology

The proposed conceptual water system for Superstition Vistas was modeled using WaterCAD Connect Edition by Bentley Systems, Inc. Two models were prepared for this evaluation. The first represents the Auction Property at buildout (see Figure 3 in Appendix A). The second model represents the Site (i.e., both the Auction Property and Retained Property) at buildout (see Figure 4 in Appendix A). Both models include Water Campus 1. The model for the Site at buildout also includes Water Treatment Facility 2 and Water Campus 3 for improved distribution within the Retained Property area. The Arizona Water Company (AWC) service area in Sections 6 and 7 of the Retained Property are also modeled in the second model with a separate reservoir and distribution piping from that used for the AJWD service area. The model results for the AWC service area are included only for reference. Model scenarios utilized demands with the assumption that irrigation demands would be supplied by the potable water system, as shown in Table 3 and Table B.1.1 in Appendix B, to simulate conservative demand factors.

Each model includes five scenarios: average day, maximum day, peak hour, residual fire flow during maximum day conditions, and available fire flow during maximum day conditions. A residual fire flow analysis applies the applicable fire flow to each corresponding junction in the system to confirm the system's ability to meet the minimum pressure and maximum velocity requirements while providing the required



fire flow during maximum day conditions. The available fire flow analysis estimates the maximum flow available at each junction while maintaining the minimum allowable residual pressure throughout the proposed system during maximum day conditions.

### 8.2    Auction Property Model

The proposed conceptual water system layout for the Auction Property at buildout is shown in Figure 3 of Appendix A. The hydraulic model uses one reservoir, R-1, to represent Water Campus 1. The static head reservoir for R-1 is set to a hydraulic grade line (HGL) of 1,710-feet to provide the appropriate minimum pressure as required by the AJWD (50 psi) during peak hour conditions.

Junctions are distributed along arterial and collector streets throughout the Auction Property based on conceptual land use plans and the demands for Development Units 1 & 2 were distributed to provide an accurate representation of anticipated pressures and flows throughout the modeled system. Irrigation demands were distributed evenly among the 12-inch mains in the collectors. Residential and irrigation demands were also applied to junctions J-39, J-46, and J-53. A fire flow requirement of 4,000 gpm is applied to junctions within arterial streets. Generally, water mains within proposed arterial streets are at least 16 inches in diameter and water mains within collector streets are generally 12 inches in diameter. However, a 12-inch main is proposed along Meridian Road along the western Auction Property boundary since no development is planned to be served by AJWD west of Meridian Road. As shown in Figure 3, a few arterial streets will have 24-inch mains to keep velocities generally below 5 fps. If the non-potable water system offsets irrigation demands within the Auction Property, it is not anticipated that any 24-inch mains would be able to be reduced to 16-inch mains within the Auction Property. Internal local streets and some collectors will have 8-inch looped water mains. It is anticipated that additional 8-inch loops will be developed along the other local streets within the community as it develops. A 12-inch main extends to the south along Meridian Road from the southwest corner of the Auction Property to serve the proposed Erie Lift Station, located near the intersection of Erie Street and Meridian Road. A residential fire flow is applied to J-205 and J-ELS, since there is not anticipated to be any additional development served by this extended 12-inch main during the Auction Property's development.

Detailed hydraulic model results for the proposed water system for the Auction Property at buildout are provided in Appendix C. Table 10 below summarizes the results. As shown in Table 10, all pressures remain between 61.3 psi and 108.8 psi for the average day, maximum day, and peak hour scenarios. Velocities and head losses for all pipes generally remain below their respective maximum allowable limits (5 fps and 10 ft/1,000 ft, respectively). Two pipes have velocities that slightly exceed 5 fps during peak hour conditions. However, it is anticipated that actual demands for the system will be lower than those identified in Table B.1.1, resulting in lower velocities than are shown in the model. The fire flow analysis results show that the proposed system can adequately provide the required 1,500 gpm of fire flow to residential areas and 4,000 gpm of fire flow to commercial/industrial/school areas during maximum day conditions, while maintaining a residual pressure of at least 20 psi and a maximum velocity of less than 10 feet per second.



| Table 10: Hydraulic Model Results Summary – Auction Property | | | | | |
|---|---|---|---|---|---|
| | **Average Day** | | **Maximum Day** | | **Peak Hour** | |
| | Value | Location | Value | Location | Value | Location |
| Minimum Pressure (psi) | 66.3 | J-15 | 64.7 | J-15 | 61.3 | J-15 |
| Maximum Pressure (psi) | 108.8 | J-ELS | 106.5 | J-ELS | 101.5 | J-ELS |
| Maximum Velocity (fps)[2] | 1.92 | P-133 | 3.53 | P-133 | 5.79 | P-133 |
| Maximum Headloss (ft/1,000 ft of pipe) | 0.921 | P-27 | 2.840 | P-27 | 7.080 | P-27 |
| **Residual Fire Flow Analysis (at Maximum Day)** | | | | | |
| | Value | | Location | | Fire Flow Location and Flow |
| Minimum Residual Pressure (psi) | 58.4 | | J-15 | | J-15 @ 4,000 gpm |
| Maximum Velocity (fps) | 7.10 | | P-34 | | J-39 @ 1,500 gpm |
| **Available Fire Flow Analysis (at Maximum Day)** | | | | | |
| | | | Value | | Location |
| Minimum Available Fire Flow – Residential (gpm) | | | 2,207 | | J-39 |
| Minimum Available Fire Flow – Commercial/Industrial/School (gpm) | | | 7,088 | | J-41 |

Notes:
1. Full hydraulic model results can be seen in Appendix C.
2. Pipe velocity only exceeds 5 fps in two pipes during peak hour conditions. It is anticipated that actual demands will be lower and system velocities will not exceed 5 fps.
3. Any structure experiencing pressures greater than 80 psi shall have an individual PRV.

### 8.3    Site Model

The proposed conceptual water system layout for the Site, including both the Auction Property and Retained Property areas, at buildout is shown in Figure 4 in Appendix A. The primary purpose of this model is to demonstrate that the infrastructure improvements proposed for the Auction Property can support the conceptual future infrastructure within the Retained Property area and to establish the primary water infrastructure network for future development in the Retained Property area. The model includes three static head reservoirs (R-1, R-2, and R-3) placed at the proposed water campus locations. These reservoirs represent Water Campus 1, Water Treatment Facility 2, and Water Campus 3, respectively. The water main alignments and sizing for the Auction Property area remain the same as shown in the Site model. In the Retained Property area, infrastructure is placed along arterial and collector streets to provide a conceptual representation of the future system at buildout.

A site plan has not yet been developed for the Retained Property area. Therefore, the demands identified for each individual Development Unit in the Retained Property area are split evenly among junctions within the given Development Unit. Commercial and industrial demands for the Retained Property are distributed along adjacent arterial streets for Development Units 3 through 8 and the static head reservoirs are set to an HGL of 1,710-feet. Flow control valves are set at reservoirs R-2 and R-3 to limit flows to the peak hour pumping capacities of Water Treatment Facility 2 and Water Campus 3; 10,410 gpm and 14,413 MGD, respectively. These flows are representative of the conceptual pumping capacities that will be at Water Treatment Facility 2 and Water Campus 3. A fourth reservoir is placed near the intersection of



Baseline Road and Meridian Road to simulate a separate water source for the AWC service area. This reservoir is set to an HGL of 1,720-feet to produce sufficient pressures for the AWC service area.

As shown in Table 11, all pressures throughout the modeled area remain between 57.4 psi and 110.5 psi for the average day, maximum day, and peak hour scenarios. Velocities and head losses for all pipes generally remain below their respective maximum allowable limits, with only one pipe having a velocity that slightly exceeds 5 fps during peak hour conditions. However, it is anticipated that actual demands for the system will be lower than those identified in Table B.1.1, resulting in lower velocities than are shown in the model. In addition, if the non-potable system offsets irrigation demands within the Retained Property, it is anticipated that some downsizing of certain 24-inch mains may be possible within the arterial streets of the Retained Property. The fire flow analysis results show that the proposed system can adequately provide the required 1,500 gpm of fire flow to residential areas and 4,000 gpm of fire flow to commercial/industrial areas during maximum day conditions, while maintaining a residual pressure of at least 20 psi and a maximum velocity of less than 10 feet per second.

| Table 11: Hydraulic Model Results Summary – Site | | | | | | |
|---|---|---|---|---|---|---|
| | Average Day | | Maximum Day | | Peak Hour | |
| | Value | Location | Value | Location | Value | Location |
| Minimum Pressure (psi) | 63.0 | J-223 | 62.2 | J-223 | 57.4 | J-223 |
| Maximum Pressure (psi) | 110.5 | J-204 | 109.4 | J-204 | 103.5 | J-204 |
| Maximum Velocity (fps) | 1.40 | P-134 | 2.56 | P-134 | 5.24 | P-133 |
| Maximum Headloss (ft/1,000 ft of pipe) | 0.720 | P-27 | 2.222 | P-27 | 6.545 | P-27 |
| Residual Fire Flow Analysis (at Maximum Day) | | | | | | |
| | Value | Location | | Fire Flow Location and Flow | | |
| Minimum Residual Pressure (psi) | 40.0 | J-232 | | J-232 @ 4,000 gpm | | |
| Maximum Velocity (fps) | 7.58 | P-240 | | J-219 @ 4,000 gpm | | |
| Available Fire Flow Analysis (at Maximum Day) | | | | | | |
| | Value | | | Location | | |
| Minimum Available Fire Flow – Residential (gpm) | 2,145 | | | J-39 | | |
| Minimum Available Fire Flow – Commercial/Industrial/School (gpm) | 5,458 | | | J-219 | | |

Notes:
1. Model results summary in Table 11 does not include results from the Arizona Water Company service area.
2. Pipe velocity only exceeds 5 fps during peak hour conditions. It is anticipated that actual demands will be lower and actual system velocities will not exceed 5 fps.
3. Any structure experiencing pressures greater than 80 psi shall have an individual PRV.
4. Full hydraulic model results can be seen in Appendix C.

## 9.0  CONCLUSIONS

The proposed water system discussed in this Master Water Plan will adequately serve the Superstition Vistas development.  This report has determined that:

- Based on the approved AJWD demand factors, preliminary land uses, the average



day, maximum day and peak hour demands for the Auction Property are 7,312,250 gpd (5,078 gpm), 13,463,950 gpd (9,350 gpm) and 22,076,330 gpd (15,331 gpm), respectively. These demand factors assume that all irrigation demands will be supplied by the potable water system. Anticipated potable water demands may be reduced if proposed non-potable water system offsets irrigation demands within DU 2 and a portion of DU 1.

- Based on the approved AJWD demand factors, preliminary land uses, the average day, maximum day and peak hour demands for the portions of the Site (Auction Property and Retained Property) within the AJWD service area are 19,136,153 gpd (13,289 gpm), 35,255,193 gpd (24,483 gpm) and 57,821,849 gpd (40,154 gpm), respectively. These demand factors assume that all irrigation demands will be supplied by the potable water system. Anticipated potable water demands may be reduced if the proposed non-potable water system offsets irrigation demands within DU 2, 3, 5, 6, and a portion of DU 1.

- The demands identified within this Water Master Plan are used primarily for infrastructure and facility sizing. These demands are not intended to outline the amount of legal water rights and/or resources that will need to be obtained as the Auction Property develops into the future. It is anticipated that actual system demands will be lower than those identified within this Water Master Plan and a separate water resources analysis should be completed to determine actual water rights to be acquired for the Auction Property as the Property develops.

- The hydraulic model shows the Auction Property can be adequately served by the proposed system of 8-inch to 24-inch looped water mains. In addition, model results show that the distribution system infrastructure proposed for the Auction Property integrates well into the future system development in the Retained Property at full buildout.

- Water for the Auction Property will initially be supplied by the AJWD SAWP through a 30-inch transmission main along Ironwood Road. A future second water treatment facility is proposed as part of the Retained Property development. In the interim, groundwater wells will be used to supply the remaining demands for the Auction Property until Water Treatment Facility 2 is active. A third water campus is proposed to meet the full buildout demands within the Retained Property area.

- Superstition Vistas Retained Property is situated within a single pressure zone of Apache Junction Water District's water system. Sections 6 and 7 within the Retained Property are within the AWC service area.

- The proposed water system for Superstition Vistas is anticipated to consist of transmission mains, treatment facilities, storage facilities, booster pumping facilities, and water distribution mains.

- The proposed system can provide the required fire flow (1,500 gpm for residential areas and 4,000 for commercial/industrial/school/office areas) during maximum day conditions while maintaining a residual pressure of at least 20 psi, as required by the AJWD.

- It is anticipated that procurement of additional paper and wet water supply will be needed as the Auction Property and Retained Property develop. Potential options for obtaining additional water may include groundwater, surface water, DPR and IPR, and others.



- Groundwater wells used to supply water for the Auction Property in the interim will be used as emergency and backup water sources in the long-term.

- The intent of this Master Plan was to establish the basis for future final design as each Development Unit proceeds to development. The size and scale of both the Auction Property and Retained Property are such that individual unit or parcel water reports are to be prepared to confirm the intensity and land use as the basis for final water demands, and substantiate the scope of water infrastructure needed.

- This Master Plan may need to be amended in the future to update the various elements contained in this Plan. These amendments may range from updating the demand factors that reflect actual rates to revised locations of primary water infrastructure to corroborate with the most current District Water Master Plan at that respective time.

## 10.0 REFERENCES

Arizona Department of Water Resources (2020). *List of Municipal Water Providers Designated as Having an Assured or Adequate Water Supply as of February 19, 2020.* February 2020, Phoenix, AZ.

Kimley-Horn & Associates, Inc. (2019). *Infrastructure Assessment Study ASLD 8500.* November 2019, Mesa, AZ.

Wood, Patel & Associates, Inc. (2021). *Master Non-Potable Water Plan for Superstition Vistas.* April 2021, Phoenix, AZ.



APPENDIX A
FIGURES

1. SUPERSTITION VISTAS VICINITY MAP
2. SUPERSTITION VISTAS DEVELOPMENT UNIT EXHIBIT
3. SUPERSTITION VISTAS WATER SYSTEM IMPROVEMENTS
(AUCTION PROPERTY)
4. SUPERSTITION VISTAS WATER SYSTEM IMPROVEMENTS
(SITE)





LEGEND

SITE BOUNDARY

AUCTION PROPERTY LOCATION

DEVELOPMENT UNIT 1

DEVELOPMENT UNIT 2

DEVELOPMENT UNIT 3

DEVELOPMENT UNIT 4

DEVELOPMENT UNIT 5

DEVELOPMENT UNIT 6

DEVELOPMENT UNIT 7

DEVELOPMENT UNIT 8

2500  1250  0        2500

SCALE                FEET

| PROJ. NO.: | 1635 |
| DATE: | APR 2021 |
| SCALE: | 1" = 2,500' |
| DRAWN BY: | SL |
| CHECKED BY: | MI |

SUPERSTITION VISTAS

APACHE JUNCTION, ARIZONA

FIG 2  DEVELOPMENT UNIT EXHIBIT

HILGARTWILSON
2141 E. HIGHLAND AVE., STE. 250
PHOENIX, AZ 85016
P: 602.490.0535 / F: 602.368.2436

3-ER-437







# APPENDIX B
## SUPERSTITION VISTAS WATER SYSTEM CALCULATIONS & TABLES

**TABLE B.1.1: SUPERSTITION VISTAS WATER DEMAND CALCULATIONS**
**TABLE B.1.2: SUPERSTITION VISTAS WATER DEMAND CALCULATIONS (OFFSET IRRIGATION)**
**TABLE B.2: SUPERSTITION VISTAS TRANSMISSION MAIN SIZING CALCULATIONS**
**TABLE B.3: SUPERSTITION VISTAS STORAGE REQUIREMENT CALCULATIONS**
**TABLE B.4: SUPERSTITION VISTAS BOOSTER PUMP CALCULATIONS**
**TABLE B.5: SUPERSTITION VISTAS OVERALL PROPERTY DENSITY ALLOCATION**
**TABLE B.6: AJWD WATER SYSTEM DESIGN CRITERIA**
**TABLE B.7: WELL CAPACITY CALCULATIONS**
**TABLE B.8.1: AUCTION PROPERTY DEVELOPMENT SCHEDULE (NO IRRIGATION)**
**TABLE B.8.2: AUCTION PROPERTY DEVELOPMENT SCHEDULE (INCLUDING IRRIGATION)**

HILGARTWILSON, LLC

# Table B.1.1 - Water Demand Calculations
## Superstition Vistas
Pinal County, Arizona
April 2024

HILGARTWILSON

| Development Unit | Gross Area (ac) | Neighborhood Open Space (ac) | Commercial Area (ac) | Industrial Area (ac) | School (ac) | Community Open Space (ac) | MFR (Medium Density) (DU) | Turf Demand (gpd) | Turf Demand (gpm) | Average Day Demand (gpd) | Average Day Demand (gpm) | Maximum Day Demand (gpd) | Maximum Day Demand (gpm) | Peak Hour Demand (gpd) | Peak Hour Demand (gpm) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Apache Junction Water District Service Area** | | | | | | | | | | | | | | | |
| 1 | 1,375 | 138 | 20 | 0 | 0 | 83 | 5,470 | 605,350 | 419 | 3,879,200 | 2,695 | 6,758,850 | 4,691 | 11,061,243 | 7,681 |
| 2 | 1,408 | 135 | 20 | 0 | 0 | 70 | 5,470 | 555,000 | 386 | 3,631,050 | 2,522 | 6,706,900 | 4,656 | 11,013,050 | 7,646 |
| Eloi Lift Station | - | - | - | - | - | - | - | - | - | 2,000 | 1.4 | 2,000 | 1.4 | 2,000 | 1.4 |
| Development Unit 1 & 2 Subtotal | 2,783 | 273 | 40 | 0 | 0 | 153 | 10,940 | 1,160,350 | 805 | 7,512,260 | 8,078 | 13,465,600 | 9,360 | 22,076,330 | 15,331 |
| **Arizona Water Company Service Area** | | | | | | | | | | | | | | | |
| 3 | 1,395 | 136 | 0 | 0 | 60 | 81 | 6,400 | 596,574 | 413 | 4,446,574 | 3,088 | 9,298,514 | 5,783 | 13,691,274 | 9,508 |
| 4 | 638 | 64 | 240 | 0 | 0 | 38 | 2,730 | 279,994 | 194 | 2,275,104 | 1,580 | 4,270,264 | 2,965 | 7,053,464 | 4,906 |
| 5 | 1,169 | 117 | 20 | 0 | 60 | 70 | 3,790 | 512,957 | 356 | 2,956,407 | 2,053 | 5,399,887 | 3,750 | 8,820,687 | 6,125 |
| 6 | 714 | 71 | 0 | 37 | 0 | 43 | 2,170 | 313,503 | 218 | 1,517,653 | 1,054 | 2,722,043 | 1,890 | 4,406,093 | 3,061 |
| 7 (334 acres) | 334 | 33 | 41 | 16 | 0 | 20 | 498 | 146,550 | 102 | 578,949 | 402 | 1,011,309 | 702 | 1,616,660 | 1,123 |
| 8 (21 acres) | 21 | 2 | 4 | 0 | 0 | 1 | 1 | 9,215 | 6 | 49,215 | 34 | 88,215 | 62 | 146,215 | 101 |
| Retained Property (AWC) Subtotal | 4,271 | 423 | 305 | 83 | 120 | 254 | 15,588 | 1,858,683 | 1,289 | 11,823,903 | 8,211 | 21,791,343 | 15,139 | 35,745,533 | 24,823 |
| **AWSD SERVICE AREA TOTAL:** | 7,014 | 696 | 345 | 83 | 120 | 406 | 26,528 | 3,015,113 | 2,094 | 19,336,163 | 13,399 | 35,856,593 | 24,483 | 57,821,849 | 40,164 |
| **SITE GRAND TOTAL:** | 9,080 | 803 | 500 | 600 | 120 | 471 | 27,970 | 3,467,282 | 2,422 | 21,379,612 | 14,779 | 38,096,862 | 27,132 | 63,976,452 | 44,439 |

**Detailed Factors (based on AJWD tenant):**
Single-Family (Low Density; 1-2 DU/Acre)
Single-Family (Medium Density; 2-5 DU/Acre)
Single-Family (High Density; 10+ DU/Acre)
Multi-Family Residential:

School:
Commercial:
Industrial:
Metal/Retail:
Office/Business:
Hotel/Motel:

Turf/Irrigation:
Xeriscape/Low Water Use Irrigation:

**Peaking Factors:**
Maximum Day
Peak Hour

**Fire Flow:**
Residential:
Commercial:
Industrial:

592 gpd/DU
656 gpd/DU
370 gpd/DU
385.0 gpd/DU

5,000 gpsd
2,000 gpsd
2,000 gpsd
0.5 gpd/sq ft
2,000 gpsd
190 gpd/room

4,400 gpsd
1,000 gpsd

Average Day x   2.0
Maximum Day x   1.7

1,500 gpm
4,000 gpm
4,000 gpm

**Notes:**
1. DU 2 is anticipated to contain 180 acres of Neighborhood Open Space and 70 acres of Community Open Space, according to the Developer.
2. For all Development Units (not including DU 2), 10% of gross area is assumed to be Neighborhood Open Space and 6% of gross area is assumed to be Community Open Space. Neighborhood & Community Open Space densities are not peaked as these demands are anticipated to remain constant.
3. Area for Community Open Space is assumed to be 70% Turf and 30% Xeriscape.
4. Neighborhood Open Space is assumed to be 40% Turf and 60% Xeriscape.
5. Unit demands are based on factors as agreed upon by Apache Junction Water District and are used for infrastructure sizing.
6. A demand factor for 1 acre of 2,000 gpd 1.4 gpm is assumed to be needed to serve the proposed Fire Lift Station (ELS), located at the southwest corner of Meridian Road and Elix Street. A peaking factor is not applied to this demand.
7. The demand table assumes that all irrigation demands will be supplied by the potable water system. It is anticipated that a non-potable water system will offset irrigation demands within DU 2, 3, 6, and a portion of DU 1 (north of Warner Road). Therefore, potable water demand shown in this table above may be reduced.

## Table B.1.2 - Water Demand Calculations (Offset Irrigation)

**Superstition Vistas**
Pinal County, Arizona
April 2021

| Development Unit | Gross Area (ac) | Neighborhood Open Space (ac) | Commercial Area (ac) | Industrial Area (ac) | School (ac) | Community Open Space (ac) | SFR (Medium Density) (DU) | Xeriscape/Turf Demand (gpd) | (gpm) | Average Day Demand (gpd) | (gpm) | Maximum Day Demand (gpd) | (gpm) | Peak Hour Demand (gpd) | (gpm) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Apache Junction Water District Service Area** | | | | | | | | | | | | | | | |
| 1 | 1,375 | 138 | 20 | 0 | 0 | 83 | 5,470 | 384,912 | 246 | 3,430,762 | 2,382 | 6,506,612 | 4,518 | 10,812,802 | 7,509 |
| 2 | 1,408 | 135 | 20 | - | - | 70 | 5,470 | 0 | - | 3,076,850 | 2,136 | 6,151,700 | 4,272 | 10,467,890 | 7,282 |
| Era Lift Station | - | - | - | - | - | - | - | 2,000 | - | 2,000 | 1.4 | 2,000 | 1.4 | 2,000 | 1.4 |
| **Development Unit 1 & 2 Subtotal** | 2,783 | 273 | 40 | 0 | 0 | 153 | 10,940 | 384,912 | 246 | 6,509,612 | 4,520 | 12,660,312 | 8,792 | 21,272,682 | 14,773 |
| 3 | 1,365 | 136 | 0 | 0 | 60 | 81 | 6,400 | 0 | - | 3,852,000 | 2,675 | 7,704,000 | 5,350 | 13,096,800 | 9,095 |
| 4 | 638 | 64 | 260 | 0 | 0 | 38 | 2,730 | 279,964 | 194 | 2,275,104 | 1,580 | 4,270,254 | 2,965 | 7,083,464 | 4,906 |
| 5 | 1,169 | 117 | 20 | 0 | 60 | 70 | 3,780 | 0 | - | 2,443,450 | 1,697 | 4,886,900 | 3,394 | 8,307,730 | 5,769 |
| 6 | 7,134 | 71 | 0 | 0 | 0 | 43 | 2,170 | 0 | - | 1,324,350 | 838 | 2,424,700 | 1,673 | 4,094,790 | 2,844 |
| 7 (334 acres) | 384 | 33 | 41 | 87 | 0 | 20 | 498 | 146,869 | 102 | 578,949 | 402 | 1,011,339 | 702 | 1,616,685 | 1,123 |
| 8 (21 acres) | 21 | 2 | 4 | 18 | 0 | 1 | 0 | 9,215 | 6 | 49,215 | 34 | 86,216 | 60 | 145,215 | 101 |
| **Relabeled Property (AJWD) Subtotal** | 4,331 | 423 | 306 | 105 | 83 | 254 | 15,688 | 435,728 | 303 | 10,400,068 | 7,224 | 20,370,408 | 14,146 | 34,924,684 | 23,837 |
| **AJWD SERVICE AREA TOTAL:** | 7,054 | 696 | 346 | 105 | 120 | 408 | 26,628 | 790,640 | 549 | 16,911,680 | 11,744 | 33,030,720 | 22,938 | 56,697,578 | 38,609 |
| **Arizona Water Company Service Area** | | | | | | | | | | | | | | | |
| 7 (835 acres) | 565 | 67 | 69 | 63 | 0 | 34 | 842 | 247,922 | 172 | 979,232 | 680 | 1,710,942 | 1,188 | 2,734,376 | 1,899 |
| 8 (2011 acres) | 511 | 61 | 86 | 384 | 0 | 31 | 0 | 224,277 | 156 | 1,164,227 | 808 | 2,104,217 | 1,462 | 3,420,227 | 2,375 |
| **AZWC SERVICE AREA TOTAL:** | 1,076 | 108 | 155 | 447 | 0 | 66 | 842 | 472,149 | 328 | 2,143,459 | 1,489 | 3,854,789 | 2,649 | 6,154,603 | 4,274 |
| **SITE GRAND TOTAL:** | 8,090 | 803 | 500 | 600 | 120 | 471 | 27,370 | 1,282,789 | 877 | 19,056,159 | 13,333 | 36,945,489 | 26,587 | 61,761,979 | 42,883 |

**Notes:**

Demand Factors (based on AWWA Values)
Single-Family (Low Density, 1-2 DU/acre)
Single-Family (Medium Density, 2-5 DU/acre)
Single-Family (High Density, 10+ DU/acre)
Multi-Family Residential:

| | |
|---|---|
| Single-Family (Low Density, 1-2 DU/acre) | 590 gpd/DU |
| Single-Family (Medium Density, 2-5 DU/acre) | 956 gpd/DU |
| Single-Family (High Density, 10+ DU/acre) | 370 gpd/DU |
| Multi-Family Residential: | 3150 gpd/DU |

| School: | 5,000 gpad |
| Commercial: | 2,000 gpad |
| Industrial: | 2,000 gpad / 0.6 gpd/sq. ft. |
| Office/Business: | 2,000 gpad |
| Hotel/Motel: | 150 gpd/room |

| Turf/Irrigation: | 4,400 gpad |
| Xeriscape/Low Water Use Irrigation: | 1,000 gpad |

Peaking Factors:
Maximum Day — Average Day x 2.0
Peak Hour — Maximum Day x 1.7

Fire Flow:
| Residential: | 1,500 gpm |
| Commercial: | 4,000 gpm |
| Industrial: | 4,000 gpm |

1. DU 2 is anticipated contain 136 acres of Neighborhood Open Space and 70 acres of Community Open Space. Neighborhood/Community Open Space demands are not peaked as these demands are anticipated to be low contact.
2. For all Development Units (not including DU 2), 30% of gross area is assumed to be Neighborhood Open Space.
3. Area for Community Open Space is assumed to be Neighborhood Open Space.
4. Neighborhood Open Space is assumed to be at 40% Turf and 60% Xeriscape.
5. Unit demands are based on factors as agreed upon by Apache Junction Water District and are used for infrastructure sizing.
6. A commercial demand for 1 acre of 2,000 gpd at 1.4 gpm is assumed to be needed to serve the proposed Era Lift Station (ELS), located at the southeast corner of Meridian Road and Elliot Street. A peaking factor is not applied to this demand.
7. The demand table assumes that all irrigation demands in DU 4, 7, 8, and a portion of DU 1 (north of Warner Road). For calculation purposes, approximately 41% of DU 1's irrigation demand is assumed to be offset by the non-potable system.

# Table B.2 - Transmission Main Sizing Calculations

Superstition Vistas
Pinal County, Arizona
July 2021



| AIWD SAWP Facility to Water Campus 1 (2 MGD) | |
|---|---|
| Diameter | 30 in |
| Flowrate | 1,389 gpd (2 MGD) |
| Velocity | 0.63 fps |
| Headloss | 0.062 ft/1,000 ft |

| AIWD SAWP Facility to Water Campus 1 (6 MGD) | |
|---|---|
| Diameter | 30 in |
| Flowrate | 4,167 gpm (6 MGD) |
| Velocity | 1.89 fps |
| Headloss | 0.477 ft/1000 ft |

| AIWD SAWP Facility to Water Campus 1 (8 MGD) | |
|---|---|
| Diameter | 30 in |
| Flowrate | 5,556 gpm (6 MGD) |
| Velocity | 2.52 fps |
| Headloss | 0.812 ft/1000 ft |

| AIWD SAWP Facility to Water Campus 1 (4 MGD) | |
|---|---|
| Diameter | 30 in |
| Flowrate | 2,778 gpm (4 MGD) |
| Velocity | 1.26 fps |
| Headloss | 0.225 ft/1000 ft |

| Water Treatment Facility 2 to Ironwood Road & Ray Road (15.36 MGD) | |
|---|---|
| Diameter | 36 in |
| Flowrate | 10,669 gpm (15.36 MGD) |
| Velocity | 3.36 fps |
| Headloss | 1.119 ft/1000 ft |

| Ironwood Road & Ray Road to Water Campus 3 (15.36 MGD) | |
|---|---|
| Diameter | 30 in |
| Flowrate | 10,669 gpm (15.36 MGD) |
| Velocity | 4.84 fps |
| Headloss | 2.718 ft/1000 ft |

Note:
1) Conceptual transmission pipeline sizes are based on maintaining velocities below 5 fps and headloss below 10 feet per 1,000 feet
2) 30" transmission main sized to convey 2 MGD, 4 MGD, 6 MGD, and 8 MGD as pumping capacity increases at the existing AIWD CAP facility.
3) Water Treatment Facility 2 to Ironwood Road & Ray Road, to Water Campus 3 transmission mains sized to convey maximum day demand output from Water Campus 3 for Site Build-Out conditions.
4) Demand calculations used for sizing assume that irrigation demands for DUs 2, 3, 5, 6, and a portion of DU 1 (north of Warner Road) will be supplied by the proposed potable water system.
It is anticipated that a non-potable water system will offset irrigation demands within DU 2, 3, 5, 6, and a portion of DU 1. Therefore, demand and transmission main size from Water Campus 2 to Water Campus 3 shown in table above may be reduced.

U:\160011635\1635.02 DR Horton\REPORTS\WATER\Master\Tables\21-0712_LO_TransmissionCalcs.xlsx

# Table B.3 - Storage Requirement Calculations
## Superstition Vistas
Pinal County, Arizona
July 2021

HILGARTWILSON
Calculated By: AP
Checked By: M

**Storage Requirements[4]:**

Storage shall be sized by using the following criteria:
1) 40% of Maximum Day demand + Fire Flow

| | Phase(s): | Auction Property (Build-Out) | AJWD Service Area (Auction Property & Retained Property) | All of Site[6] |
|---|---|---|---|---|
| | | **STORAGE CAPACITY** | | |
| Requirement 1: | Maximum Day Demand (gallons): | 13,463,950 | 35,255,193 | 39,069,962 |
| | 40% of Maximum Day Demand (gallons): | 5,385,580 | 14,102,077 | 15,627,985 |
| | Commercial/Industrial Fire Flow (4,000 gpm for 4 hrs, gallons)[2]: | 960,000 | 2,880,000 | 2,880,000 |
| | **Total Storage (gallons):** | **6,345,580** | **16,982,077** | **18,507,985** |
| Total Storage Required: | Storage Required: | 6,345,580 | 16,982,077 | 18,507,985 |
| | Storage to be Provided: | 6,400,000 | 17,000,000 | 18,800,000 |
| Storage by Water Campus: | Phase(s): | Auction Property (Build-Out) | AJWD Service Area (Auction Property & Retained Property) | |
| | Water Campus 1: | 6,400,000 | 8,400,000 | |
| | Water Treatment Facility 2: | - | 4,700,000 | |
| | Water Campus 3: | - | 5,900,000 | |
| | **Total Storage:** | **6,400,000** | **17,000,000** | |

**Notes:**

1) Storage requirements based on design criteria as agreed upon by the Apache Junction Water District.

2) A commercial/industrial fire flow storage of 960,000 MG will be required at all water campuses. It is anticipated that within the AJWD service area, Water Campus 1, and Water Campus 3 will contain a combined fire flow storage of 2,880,000 gal.

3) It is anticipated that the storage at proposed Water Campus 1 will meet the minimum storage required for all of Development Unit 1 & 2. Water Campus 1 will be required to space plan for at least 6.4 MG of available storage.

4) It is anticipated that the storage at proposed Water Campus 1, Water Treatment Facility 2, and Water Campus 3 will combine to meet the minimum storage required for all of AJWD's service area (Auction Property and Retained Property). The calculations shown above assume that Water Treatment Facility 2 will account for storage needed to serve the approximate areas of DU 5 & 6 and portions of DU 7 & 8 in AJWD's service area. Water Campus 3 will account for the storage needed to serve the approximate areas of DU 3 & 4.

5) Storage to be provided is rounded up to 100,000 gallons.

6) Total Site area includes AJWD service area and current Arizona Water Company service area.

7) Storage calculations shown in table above assume that all irrigation demands will be provided by the potable water system. It is anticipated that a non-potable water system will offset irrigation demands within DU 2, 3, 5, 6, and a portion of DU 1 (north of Warner Road). Therefore demand and required storage capacity shown in table above may be reduced.

U:\1400\1435\1435-00 DR Horton\REPORTS\WATER\Master\Tables\Latest Master Plan Table\21-0709_Storage\Pumping\Well Calcs for LD.xlsx

7/15/2021

# Table B.4 - Booster Pump Calculations

**Superstition Vistas**
Pinal County, Arizona
July 2021

HILGARTWILSON
Calculated By: AP
Checked By: MI

| | | PUMPING CAPACITY | | |
|---|---|---|---|---|
| | Phase(s): | Auction Property (Build-Out) | AWD Service Area (Auction Property & Retained Property) | All of Site[1] |
| **Booster Pump Requirements:** | | | | |
| *Shall meet or exceed the greater of:* | | | | |
| *Peak Hour Demand OR* | | | | |
| *Maximum Day Demand + Fire Flow* | | | | |
| **Peak Hour Demand:** | | | | |
| Peak Hour Demand (gpm): | | 15,331 | 40,154 | 44,428 |
| Firm Pumping Capacity (gpm): | | 15,331 | 40,154 | 44,428 |
| **Maximum Day Demand + Fire Flow:** | | | | |
| Maximum Day Demand (gpm): | | 9,350 | 24,483 | 27,132 |
| Fire Flow (gpm): | | 4,000 | 4,000 | 4,000 |
| Firm Pumping Capacity (gpm): | | 13,350 | 28,483 | 31,132 |
| **Firm Pumping Capacity:** | | 15,331 | 40,154 | 44,428 |

| | Phase(s): | Auction Property (Build-Out) | AWD Service Area (Auction Property & Retained Property) | |
|---|---|---|---|---|
| **Pumping Capacity by Water Campus:** | Water Campus 1: | 15,331 | 15,331 | |
| | Water Treatment Facility 2: | - | 10,410 | |
| | Water Campus 3: | - | 14,413 | |
| | **Total Firm Pumping Capacity:** | **15,331** | **40,154** | |

**Notes:**

1) Total Site area includes AWD service area and current Arizona Water Company service area.

2) Booster pump calculations shown in table above assume that all irrigation demands will be provided by the potable water system. It is anticipated that a non-potable water system will offset irrigation demands within DU 2, 3, 5, 6, and a portion of DU 1 (north of Warner Road). Therefore demand and required booster pump capacity shown in table above may be reduced.



**TABLE B.5: OVERALL PROPERTY DENSITY ALLOCATION**

| Description | Gross Acreage | Acres (AC.) | Units (D.U.) | Density (D.U./AC.) | Maximum Density Transfer In (D.U.) | Units with Maximum Transfer In (D.U.) | Maximum Density Transfer Out (D.U.) | Units with Maximum Transfer Out (D.U.) | Floor Area (S.F.) | Maximum Floor Area Transfer In (S.F.) | Floor Area With Maximum Transfer In (S.F.) | Maximum Floor Area Transfer Out (S.F.) | Floor Area With Maximum Transfer Out (S.F.) | F.A.R. | Commercial/Retail/Restaurant/Office (AC.) | Industrial (AC.) | Civic/School (AC.) | Regional Open Space | Power Line Corridor Easement (AC.) | Powerline Floodway Channel (AC.) | Total Area Non-reside ntial (AC.) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Development Unit 1 | 1375 | 1,335 | 5,670 | 4.10 | 1640 | 7,310 | 1640 | 3,830 | 221,700 | 66,500 | 288,200 | 66,500 | 155,200 | 0.25 | 20 | | | | 3 | 17 | 40 |
| Development Unit 2 | 1408 | 1,775 | 9,670 | 4.29 | 1640 | 7,310 | 1640 | 3,830 | 221,700 | 66,500 | 288,200 | 66,500 | 155,200 | 0.25 | 20 | | | 36 | | 77 | 133 |
| Development Unit 3 | 1355 | 1,280 | 6,400 | 5.00 | 1920 | 8,320 | 1920 | 4,440 | | | | | | | | | 60 | | 15 | | 75 |
| Development Unit 4 | 638 | 390 | 2,730 | 7.00 | 820 | 3,550 | 820 | 1,910 | 2,733,600 | 790,100 | 2,523,700 | 790,100 | 1,943,500 | 0.26 | 240 | | | | | 8 | 248 |
| Development Unit 5 | 1169 | 1,010 | 3,780 | 3.75 | 1140 | 4,930 | 1140 | 2,650 | 185,300 | 58,600 | 233,900 | 58,600 | 126,700 | 0.22 | 20 | | 60 | 52 | 27 | | 159 |
| Development Unit 6 | 714 | 668 | 2,170 | 3.25 | 650 | 2,820 | 650 | 1,530 | | | | | | 0.00 | | | | | 33 | 13 | 46 |
| Development Unit 7 | 899 | 520 | 1,340 | 2.58 | 400 | 1,740 | 400 | 940 | 2,235,600 | 688,700 | 2,884,300 | 688,700 | 1,606,000 | 0.25 | 110 | 100 | | 53 | 79 | 37 | 379 |
| Development Unit 8 | 532 | | | | 810 | 810 | | | 4,332,100 | 1,299,600 | 5,631,700 | 1,299,600 | 3,032,500 | 0.20 | 90 | 400 | | 42 | | | 532 |
| Total | 8,090 | 6,478 | 27,570 | 4.28 | 9,020 | 36,290 | 8,210 | 19,160 | 10,000,000 | 2,970,000 | 12,970,000 | 2,970,000 | 7,033,000 | | 500 | 500 | 120 | 183 | 165 | 144 | 1612 |



SUPERSTITION VISTAS

OVERALL PROPERTY DENSITY ALLOCATION

| DATE | 02-26-2021 | SCALE | 1" = 3000' | SHEET | 1 OF 1 |
| JOB NO. | 205166 | DESIGN | DM | DRAWN | LL |

WOOD PATEL

NOT FOR CONSTRUCTION OR RECORDING

3-ER-447

0   3000   6000
Horz. 1 in. = 3000 ft.

LEGEND

DU 1
DU 2
DU 3
DU 4
DU 5
DU 6
DU 7
DU 8
OPEN SPACE & POWERLINE FLOODWAY
POWER LINE CORRIDOR

DU BOUNDARY
AUCTION PROPERTY BOUNDARY

N

## Table B.6 - AJWD Water System Design Criteria

**Superstition Vistas**
Pinal County, Arizona
March 2021

HILGARTWILSON
ENGINEER | PLAN | SURVEY | MANAGE

| Criterion Category | Units | Eastmark | Mesa[1] | Phoenix[2] | Gilbert[3] | Buckeye[4] | Queen Creek[5] | Apache Junction[6] | HILGARTWILSON / AJWD Recommended Population Value | HILGARTWILSON / AJWD Recommended Values |
|---|---|---|---|---|---|---|---|---|---|---|
| **RESIDENTIAL WATER DEMANDS** | | | | | | | | | | |
| Single Family (Low Density, 1-2 DU/Acre) | gpd/DU | 470-490 | 470-490 | 360 | 550-1,600 gpad | 362 | 200 gpcpd (3.2 Persons/DU)[A] | 440 gpcpd (maximum day demand)[B] | 3.2 Persons/DU | 185 gpcpd (592 gpd/DU) |
| Single Family (Medium Density, 2-10 DU/Acre) | gpd/DU | 254-420 | 254-420 | 360 | 1,450-1,790 gpad | 362 | | 440 gpcpd (maximum day demand)[B] | 3.0 Persons/DU | 185 gpcpd (555 gpd/DU) |
| Single Family (High Density, 10+ DU/Acre) | gpd/DU | 154-194 | 154-194 | 360 | 1,370-3,100 gpad | 283 | 125 gpcpd (3.2 Persons/DU)[A] | 440 gpcpd (maximum day demand)[B] | 2.0 Persons/DU | 185 gpcpd (370 gpd/DU) |
| Multi-Family Residential | gpd/DU | | | 240 | - | | 110 gpcpd (2.0 Persons/DU) | - | 1.7 Persons/DU | 185 gpcpd (315 gpd/DU) |
| **NON-RESIDENTIAL WATER DEMANDS** | | | | | | | | | | |
| Commercial | Varies | 80 gpd/person | 0.2 gpd/sq. ft. (retail), 0.4 gpd/sq. ft. (high-rise) | 0.125 gpd/sq. ft. | 1,010 gpad, 1,325 gpad (regional) | 130 gppd (specific use), 2,009 gpad (master planning) | 1,700 gpad | 240 gpcpd | 30 Persons/Acre | 2,000 gpad |
| Office | Varies | 80 gpd/person | 0.4 gpd/sq. ft. | 0.115 gpd/sq. ft. | | | | - | 30 Persons/Acre | 2,000 gpad |
| Industrial | Varies | | 1,500 gpad | 0.065 gpd/sq.ft. | 690 gpad | 240 gppd (specific use), 2,009 gpad (master planning) | | 130 gpcpd | 20 Persons/Acre | 2,000 gpad |
| School | Varies | 40 gpd/person[C] | 60 gpd/person | 25 gal/student | 920-1,460 gpad | 75 gal/student (no lunch/shower), 125 gal/student (with lunch/shower), 5,000 gpad (master planning) | | 75 gal/student (no lunch/shower), 125 gal/student (with lunch/shower) | 200 Students & Staff/Acre (Elementary School), 100 Students & Staff/Acre (Middle/High School) | 5,000 gpad |
| Malls/Retail | Varies | 80 gpd/person | 0.2 gpd/sq. ft. | 0.125 gpd/sq. ft. | | 0.5 gal/sq. ft. | | 1.5 gal/sq. ft. | 30 Persons/Acre | 0.5 gpd/sq. ft. |
| Turf/Landscaping/Open Space | gpad | 4,400 gpad (turf), 800 gpad (low water use landscaping) | 4,400 gpad | 4,374 gpad (general landscaping), 1,339 gpad (public right-of-way) | 0 gpad | 4,325 gpad (turf), 1,786 gpad (developed open space) | | | | 4,400 gpad (turf), 1,000 gpad (developed open space) |
| Hotel/Motel | gpd/room | 150 gpd/room | 150 gpd/room | 140 gal/room (no restaurant), 200 gal/room (restaurant) | | 200 gal/room | | 200 gal/room | 2.5 Persons/room | 150 gpd/room |
| Tech Industrial | | | | - | | | | - | | |
| **HYDRAULIC MODEL CRITERIA** | | | | | | | | | | |
| **PEAKING FACTORS** | | | | | | | | | | |
| Maximum Day | x Ave Day Demand | 2.0 | 2.0 | | 1.55 | 1.8 | **1.8** | | | 2.0 x Average Day Demand |
| Peak Hour | x Ave Day Demand | 3.0 | 3.0 | 1.7 | 1.8-2.4 x Maximum Day Demand | 3.0 | 3.0 | 1.7 | | 1.7 x Maximum Day Demand |
| **MODELED FIRE HYDRANT FLOW (MINIMUMS)** | | | | | | | | | | |
| Residential | gpm | 1,500 | 1,500 (City of Mesa Fire Code) | 1,000 | 1,000 | 1,500 | | | | 1,500 |
| Commercial | gpm | 4,000 | 3,000 (City of Mesa Fire Code) | 3,000 | 3,500 | 4,000 | | | | 4,000 (commercial), 4,000 (industrial) |
| **ON-SITE HYDRAULICS** | | | | | | | | | | |
| Minimum Residual Pressure (Peak Hour) | psi | 40 | 40 | 50 | 40 | 50 | 40 | 40 | | 50 |
| Minimum Residual Pressure (Max Day + Fire Flow) | psi | 20 | 20 | 25 | 20 | 20 | 20 | | | 20 |
| Maximum Velocity (Peak Hour Demand) | fps | 5 | 5 | 5 | 5 (maximum day), 7 (peak hour) | 5 | | 5 | | 5 |
| Maximum Velocity (Max Day + FF) | fps | 10 | 10 | 10 | 10 | 10 | | - | | 10 |
| Maximum Head Loss (Peak Hour) | ft/1,000 ft | 10 | | 6.06 (16-in pipe), 4.56 (20-in pipe) | | 6.17 (12-in pipe), 6.06 (16-in pipe) | - | 10 | | 10 |
| Minimum Looped Pipe Diameter | in | 8 | 8 | 6 | 8 | 8 | 8 | 8 | - | 8 |
| Pipe Material | | | - | - | | | | Class 350 DIP | | DIP |
| Hazen-Williams 'C' Factor | | 120 | 130 | 120 | | 110 (Ductile Iron), 130 (PVC) | - | | | 120 |
| Minimum Storage Requirement | | | | - | | | - | | | 40% of maximum day demand plus fire flow |
| Minimum Pumping Requirement | | - | | - | | | | | - | Larger of the following: maximum day demand plus fire flow, or, peak hour demand |

Notes:

In developing the Master Water Plan for Superstition Vistas, HILGARTWILSON worked with AJWD to develop highlighted water criteria for the sizing of master-planned water infrastructure.

Sources:
1) *City of Mesa Engineering & Design Standards* (2019)
2) *City of Phoenix Design Standards Manual for Water and Wastewater Systems* (2017)
3) *Town of Gilbert Public Works & Engineering Standards* (2019)
4) *City of Buckeye Engineering Design Standards* (2020)
5) *Design and Construction Standards Manual for Water, Wastewater, and Irrigation Systems for Town of Queen Creek, Arizona* (2013)
6) *Apache Junction Engineering Design Guidelines and Policies*

Abbreviations:
gpd = gallons per day
gpm = gallons per minute
DU = dwelling unit
gpad = gallons per acre per day
gpcpd = gallons per capita per day
in = inch
FF = fire flow
ft = feet
fps = feet per second
sf = square feet

Footnotes:
A) Densities for high and low density single-family residential units are not provided in the *Design and Construction Standards Manual for Water, Wastewater, and Irrigation Systems for Town of Queen Creek, Arizona* (2013).

B) The population density for less than 5 DU/acre is 3.2 persons/DU, and 2.0 persons/DU for population densities of 5 DU/acre or more.

C) Population densities of 200 persons/acre and 100 persons/acre are assumed for elementary schools and middle schools, respectively.

# Table B.7 - Well Capacity Calculations

## Superstition Vistas

Pinal County, Arizona

July 2021

**HILGARTWILSON**

Calculated By: AP
Checked By: MI

| | WELL CAPACITY |
|---|---|
| Maximum Day Demand for Auction Property: | 9,350 gpm |
| | 13,463,950 gpd |

**Well Requirements:**

Wells shall be sized to provide capacity for the following:

1) Maximum Day Demand and;

2) Redundancy to meet Maximum Day Demand with largest well out of service.

Requirement:

| Phase(s): | Auction Property |
|---|---|
| Maximum Day Demand (gpm) | 9,350 |
| 6 MGD Demand Supplied By SAWP (gpm) | 4,167 |
| Remaining Maximum Day Demand (gpm, not including 6 MGD from SAWP): | 5,183 |
| 24 Hour Firm Well Capacity Required (gpm): | 5,183 |
| **18 Hour Firm Well Capacity Required (gpm):** | **6,911** |

Notes:

1) Wells are anticipated to run for 18 hours a day and, therefore, must provide the equivalent of a 24-hour period.

2) Well capacity shown in table above only includes maximum day demand for Auction Property, assuming that 6 MGD is already supplied by SAWP.

3) Calculations for demand shown in table above assume that all irrigation demands will be provided by the potable water system. It is anticipated that a non-potable water system will offset irrigation demands within DU 2, 3, 5, 6, and a portion of DU 1 (north of Warner Road). Therefore demand and required well capacity shown in table above may be reduced.

U:\16001\16351\635.02 DR Horton\REPORTS\WATER\Master\Tables\21-0709_StoragePumpWell Calcs for LD.xlsx

7/12/2021

**Table B.8.1 - Auction Property Development Schedule (No Irrigation)**
Superstition Vistas
Pinal County, Arizona
July 2021

HILGARTWILSON

| Year | Construction Activity | Source | Storage Requirement MG | Irrigated Areas (ac)³ Neighborhood Open Space | Community Open Space | Xeriscape/Turf Demand (gpd) | (gpm) | Average Day Demand (gpd) | (gpm) | Maximum Day Demand (gpd) | (gpm) | Peak Hour Demand (gpd) | (gpm) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021 | Begin grading / Infrastructure improvements | SWMP | - | - | - | - | - | - | - | - | - | - | - |
| 2022 | Infrastructure construction / begin home construction | SWMP | - | - | - | - | - | - | - | - | - | - | - |
| 2023 | 2,350 homes | SWMP (2.6 MGD Max Day) | 1.2 | 59 | 33 | 0 | 0 | 1,304,250 | 905.7 | 2,608,500 | 1,811.5 | 4,434,450 | 3,079.5 |
| 2024 | 3,805 homes | SWMP (4.2 MGD Max Day) | 1.9 | 95 | 53 | 0 | 0 | 2,111,775 | 1,466.5 | 4,223,550 | 2,933.0 | 7,180,035 | 4,986.1 |
| 2025 | 5,185 homes | SWMP (5.7 MGD Max Day) | 2.5 | 129 | 72 | 0 | 0 | 2,868,575 | 1,991.7 | 5,733,150 | 3,981.4 | 9,746,355 | 6,768.3 |
| 2026 | 6,890 homes, 20.5 AC commercial | SWMP (6.0 MGD Max Day), Wells (1.2 MGD Max Day) | 4.0 | 171 | 96 | 0 | 0 | 3,859,400 | 2,680.1 | 7,718,800 | 5,360.3 | 13,121,960 | 9,112.5 |
| 2027 | 8,450 homes, 20.5 AC commercial | SWMP (6.0 MGD Max Day), Wells (3.5 MGD Max Day) | 4.7 | 210 | 118 | 0 | 0 | 4,730,750 | 3,285.2 | 9,461,500 | 6,570.5 | 16,084,550 | 11,169.8 |
| 2028 | 9,580 homes, 30 AC commercial | SWMP (6.0 MGD Max Day), Wells (4.8 MGD Max Day) | 5.3 | 239 | 134 | 0 | 0 | 5,376,900 | 3,734.0 | 10,753,800 | 7,467.9 | 18,281,460 | 12,695.5 |
| 2029 | 10,080 homes, 30 AC commercial | SWMP (6.0 MGD Max Day), Wells (5.3 MGD Max Day) | 5.5 | 251 | 141 | 0 | 0 | 5,654,400 | 3,926.7 | 11,308,800 | 7,853.3 | 19,224,960 | 13,350.7 |
| 2030 | 10,545 homes, 35 AC commercial | SWMP (6.0 MGD Max Day), Wells (5.8 MGD Max Day) | 5.7 | 263 | 147 | 0 | 0 | 5,922,475 | 4,112.8 | 11,844,950 | 8,225.7 | 20,136,415 | 13,983.6 |
| 2031 | 10,940 homes, 40 AC commercial | SWMP (6.0 MGD Max Day), Wells (6.3 MGD Max Day) | 5.9 | 273 | 153 | 0 | 0 | 6,151,700 | 4,272.0 | 12,303,400 | 8,544.0 | 20,915,780 | 14,524.8 |

Notes:
1) Unit demands are based on factors as agreed upon by Apache Junction Water District and are used for infrastructure sizing.
2) Neighborhood Open Space and Community Open Space scaled by number of residential units.
3) Neighborhood Open Space is assumed to be 40% Turf and 60% Xeriscape.
4) Community Open Space is assumed to be 70% Turf and 30% Xeriscape.
5) Average Day, Maximum Day, and Peak Hour demands shown in table above do not include irrigation demands.
6) Total demands listed in table above do not include 2,000 gpd demand for Enki Lift Station.
7) The table above assumes that irrigation demands within the Auction Property will be supplied by the non-potable water system.
8) The table above assumes that 6.0 MGD would be available for the Auction Property from the SWMP. Additional water supply from the SWMP may be available for the Auction Property.
9) Construction Activity totals are cumulative.

Demand Factors:
Single-Family (Medium Density) Residential:      555 gpd/DU
Commercial:      2,000 gpad
Turf/Irrigation:      4,400 gpad
Xeriscape/Low Water Use Irrigation:      1,000 gpad

Peaking Factors:
Maximum Day Demand:      2 x Average Day Demand
Peak Hour Demand:      1.7 x Maximum Day Demand

Abbreviations:
SWMP: Superstition Area Water Plant

**Table B.8.2 - Auction Property Development Schedule (Including Irrigation)**
Superstition Vistas
Pinal County, Arizona
July 2021

HILGARTWILSON

| Year | Construction Activity | Source | Storage Requirement MG | Irrigated Areas (ac)³ Neighborhood Open Space | Irrigated Areas (ac)³ Community Open Space | Xeriscape/Turf Demand (gpd) | Xeriscape/Turf Demand (gpm) | Average Day Demand (gpd) | Average Day Demand (gpm) | Maximum Day Demand (gpd) | Maximum Day Demand (gpm) | Peak Hour Demand (gpd) | Peak Hour Demand (gpm) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021 | Begin grading / infrastructure improvements | SAWP | - | - | - | - | - | - | - | - | - | - | - |
| 2022 | Infrastructure construction / begin home construction | SAWP | - | - | - | - | - | - | - | - | - | - | - |
| 2023 | 2,350 homes | SAWP (2.9 MGD Max Day) | 1.3 | 59 | 33 | 248,866 | 173 | 1,553,116 | 1,078.6 | 2,857,366 | 1,984.3 | 4,683,316 | 3,252.3 |
| 2024 | 3,805 homes | SAWP (4.6 MGD Max Day) | 2.0 | 95 | 53 | 402,951 | 280 | 2,514,726 | 1,746.3 | 4,626,501 | 3,212.8 | 7,582,986 | 5,266.0 |
| 2025 | 5,165 homes | SAWP (6.0 MGD Max Day) Wells (0.3 MGD Max Day) | 2.7 | 129 | 72 | 946,975 | 380 | 3,413,550 | 2,370.5 | 6,280,125 | 4,361.2 | 10,293,330 | 7,148.1 |
| 2026 | 6,880 homes | SAWP (6.0 MGD Max Day) Wells (2.4 MGD Max Day) | 4.3 | 171 | 96 | 728,595 | 506 | 4,587,995 | 3,186.1 | 8,447,395 | 5,866.2 | 13,850,555 | 9,618.4 |
| 2027 | 8,450 homes, 20.0 AC commercial | SAWP (6.0 MGD Max Day) Wells (4.4 MGD Max Day) | 5.1 | 210 | 118 | 894,858 | 621 | 5,626,608 | 3,906.7 | 10,356,558 | 7,191.9 | 16,979,408 | 11,791.3 |
| 2028 | 9,580 homes, 30 AC commercial | SAWP (6.0 MGD Max Day) Wells (5.8 MGD Max Day) | 5.7 | 239 | 134 | 1,014,526 | 705 | 6,391,426 | 4,438.5 | 11,768,226 | 8,172.4 | 19,295,986 | 13,400.0 |
| 2029 | 10,080 homes, 30 AC commercial | SAWP (6.0 MGD Max Day) Wells (6.4 MGD Max Day) | 5.9 | 251 | 141 | 1,067,476 | 741 | 6,721,876 | 4,668.0 | 12,376,276 | 8,594.6 | 20,292,436 | 14,092.0 |
| 2030 | 10,045 homes, 35 AC commercial | SAWP (6.0 MGD Max Day) Wells (7.2 MGD Max Day) | 6.1 | 263 | 147 | 1,116,710 | 775 | 7,039,194 | 4,888.3 | 12,961,669 | 9,001.2 | 21,253,134 | 14,759.1 |
| 2031 | 10,040 homes, 40 AC commercial | SAWP (6.0 MGD Max Day) Wells (7.5 MGD Max Day) | 6.4 | 273 | 153 | 1,156,050 | 805 | 7,310,250 | 5,076.6 | 13,461,950 | 9,348.6 | 22,074,330 | 15,329.4 |

Notes:
1. Unit demands are based on factors as agreed upon by Apache Junction Water District and are used for infrastructure sizing.
2. Neighborhood Open Space and Community Open Space scaled by number of residential units. This assumes that DU 1 and 2 are fully irrigated by the potable water system.
3. Neighborhood Open Space is assumed to be 40% Turf and 60% Xeriscape.
4. Community Open Space is assumed to be 70% Turf and 30% Xeriscape.
5. Average Day, Maximum Day, and Peak Hour demands shown in table above include irrigation demands. Irrigation demands are not peaked, as these are anticipated to remain constant.
6. Total demands listed in table above do not include 2,000 gpd demand for Erie Lift Station.
7. The table above assumes that irrigation demands within the Auction Property will be supplied by the potable water system.
8. The table above assumes that 6.0 MGD would be available for the Auction Property from the SAWP. Additional water supply from the SAWP may be available for the Auction Property.
9. Construction Activity totals are cumulative.

Demand Factors:
Single-Family (Medium Density) Residential: 555 gpd/DU
Commercial: 2,000 gpd/ac
Turf Irrigation: 4,400 gpd/ac
Xeriscape/Low Water Use Irrigation: 1,000 gpd/ac

Peaking Factors:
Maximum Day Demand: 2 x Average Day Demand
Peak Hour Demand: 1.7 x Maximum Day Demand

Abbreviations:
SAWP: Superstition Area Water Plant

U:\140\140533.01.08 Memos\02\POST\[AJWTFMaster\Calcs\21-072 Water Phasing Schedule.xls



# APPENDIX C
## SUPERSTITION VISTAS WATER HYDRAULIC MODELING RESULTS
### (AUCTION PROPERTY AND SITE MODELS)

### AVERAGE DAY DEMAND RESULTS
### MAXIMUM DAY DEMAND RESULTS
### PEAK HOUR DEMAND RESULTS
### MAXIMUM DAY + FIRE FLOW RESULTS (AVAILABLE)
### MAXIMUM DAY + FIRE FLOW RESULTS (RESIDUAL)

HILGARTWILSON, LLC



# AUCTION PROPERTY
# HYDRAULIC MODELING RESULTS



**AUCTION PROPERTY**
**AVERAGE DAY DEMAND RESULTS**

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario:  Average Day - Auction
Property

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|------------|---------|------------------|----------|
| J-1  | 1,518.46 | 0   | 1,708.47 | 82.2  |
| J-2  | 1,524.42 | 0   | 1,709.16 | 79.9  |
| J-3  | 1,534.31 | 0   | 1,709.55 | 75.8  |
| J-4  | 1,536.36 | 14  | 1,709.36 | 74.8  |
| J-5  | 1,511.94 | 0   | 1,708.41 | 85.0  |
| J-6  | 1,496.19 | 0   | 1,708.27 | 91.8  |
| J-7  | 1,487.97 | 0   | 1,707.79 | 95.1  |
| J-8  | 1,482.10 | 0   | 1,707.65 | 97.6  |
| J-9  | 1,489.31 | 0   | 1,707.66 | 94.5  |
| J-10 | 1,498.18 | 0   | 1,707.71 | 90.7  |
| J-11 | 1,505.45 | 0   | 1,707.95 | 87.6  |
| J-12 | 1,528.22 | 0   | 1,708.17 | 77.9  |
| J-13 | 1,541.89 | 0   | 1,708.04 | 71.9  |
| J-14 | 1,551.18 | 0   | 1,708.22 | 67.9  |
| J-15 | 1,555.10 | 192 | 1,708.30 | 66.3  |
| J-16 | 1,547.57 | 0   | 1,708.64 | 69.7  |
| J-17 | 1,539.63 | 0   | 1,708.96 | 73.3  |
| J-18 | 1,536.04 | 0   | 1,707.86 | 74.3  |
| J-19 | 1,531.88 | 0   | 1,707.86 | 76.1  |
| J-20 | 1,525.85 | 0   | 1,707.85 | 78.7  |
| J-21 | 1,509.31 | 0   | 1,707.85 | 85.9  |
| J-22 | 1,500.29 | 14  | 1,707.87 | 89.8  |
| J-23 | 1,507.70 | 0   | 1,708.01 | 86.7  |
| J-24 | 1,478.32 | 0   | 1,707.52 | 99.2  |
| J-25 | 1,468.56 | 0   | 1,707.49 | 103.4 |
| J-26 | 1,470.59 | 0   | 1,707.41 | 102.5 |
| J-27 | 1,491.65 | 149 | 1,707.66 | 93.5  |
| J-28 | 1,494.43 | 149 | 1,707.73 | 92.3  |
| J-29 | 1,504.84 | 0   | 1,708.07 | 87.9  |
| J-30 | 1,509.95 | 149 | 1,708.16 | 85.8  |
| J-31 | 1,506.31 | 149 | 1,707.80 | 87.2  |
| J-32 | 1,510.99 | 149 | 1,708.04 | 85.3  |
| J-33 | 1,517.93 | 149 | 1,708.35 | 82.4  |
| J-34 | 1,523.42 | 149 | 1,708.73 | 80.2  |
| J-35 | 1,500.26 | 0   | 1,708.10 | 89.9  |
| J-36 | 1,519.89 | 0   | 1,708.43 | 81.6  |
| J-37 | 1,497.84 | 0   | 1,707.71 | 90.8  |
| J-38 | 1,508.75 | 0   | 1,707.77 | 86.1  |
| J-39 | 1,509.06 | 192 | 1,707.89 | 86.0  |
| J-40 | 1,519.34 | 0   | 1,708.69 | 81.9  |
| J-41 | 1,493.31 | 0   | 1,708.11 | 92.9  |
| J-42 | 1,520.78 | 0   | 1,708.71 | 81.3  |
| J-43 | 1,528.04 | 192 | 1,708.20 | 77.9  |
| J-44 | 1,539.15 | 192 | 1,708.49 | 73.3  |
| J-45 | 1,525.42 | 0   | 1,708.63 | 79.3  |
| J-46 | 1,536.25 | 192 | 1,708.89 | 74.7  |
| J-47 | 1,523.18 | 0   | 1,708.44 | 80.2  |
| J-48 | 1,543.23 | 0   | 1,708.18 | 71.4  |
| J-49 | 1,544.66 | 192 | 1,708.23 | 70.8  |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 2

3-ER-455

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario: Average Day - Auction
Property

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|----------------|--------------|----------------------|----------------|
| J-50 | 1,550.01 | 0 | 1,708.26 | 68.5 |
| J-51 | 1,551.30 | 0 | 1,708.18 | 67.9 |
| J-52 | 1,541.61 | 0 | 1,708.12 | 72.0 |
| J-53 | 1,482.08 | 149 | 1,707.45 | 97.5 |
| J-54 | 1,476.49 | 0 | 1,707.54 | 100.0 |
| J-55 | 1,480.56 | 0 | 1,707.34 | 98.1 |
| J-56 | 1,481.69 | 149 | 1,707.24 | 97.6 |
| J-57 | 1,483.32 | 0 | 1,707.36 | 96.9 |
| J-58 | 1,478.32 | 0 | 1,707.39 | 99.1 |
| J-59 | 1,473.68 | 0 | 1,707.44 | 101.1 |
| J-60 | 1,475.18 | 0 | 1,707.29 | 100.4 |
| J-61 | 1,474.72 | 149 | 1,707.26 | 100.6 |
| J-62 | 1,493.15 | 149 | 1,707.25 | 92.6 |
| J-63 | 1,494.82 | 149 | 1,707.39 | 92.0 |
| J-64 | 1,489.78 | 0 | 1,707.37 | 94.1 |
| J-65 | 1,486.52 | 149 | 1,707.33 | 95.5 |
| J-66 | 1,484.90 | 0 | 1,707.56 | 96.3 |
| J-67 | 1,492.33 | 0 | 1,707.38 | 93.0 |
| J-68 | 1,498.85 | 149 | 1,707.46 | 90.3 |
| J-69 | 1,504.49 | 0 | 1,707.57 | 87.9 |
| J-70 | 1,496.77 | 149 | 1,707.25 | 91.1 |
| J-71 | 1,492.39 | 149 | 1,707.24 | 93.0 |
| J-72 | 1,489.15 | 149 | 1,707.24 | 94.4 |
| J-73 | 1,526.88 | 0 | 1,707.72 | 78.2 |
| J-74 | 1,522.81 | 192 | 1,707.59 | 79.9 |
| J-75 | 1,517.39 | 192 | 1,707.59 | 82.3 |
| J-76 | 1,513.14 | 192 | 1,707.63 | 84.1 |
| J-77 | 1,518.58 | 192 | 1,707.57 | 81.8 |
| J-78 | 1,525.14 | 192 | 1,707.71 | 79.0 |
| J-79 | 1,521.50 | 0 | 1,707.82 | 80.6 |
| J-80 | 1,521.52 | 0 | 1,708.26 | 80.8 |
| J-81 | 1,507.88 | 0 | 1,707.73 | 86.5 |
| J-82 | 1,511.68 | 192 | 1,707.69 | 84.8 |
| J-83 | 1,530.12 | 192 | 1,707.68 | 76.8 |
| J-84 | 1,534.97 | 0 | 1,707.77 | 74.8 |
| J-85 | 1,520.43 | 0 | 1,707.67 | 81.0 |
| J-86 | 1,512.42 | 0 | 1,707.81 | 84.5 |
| J-87 | 1,519.02 | 0 | 1,707.87 | 81.7 |
| J-90 | 1,553.44 | 0 | 1,708.26 | 67.0 |
| J-91 | 1,501.89 | 0 | 1,707.86 | 89.1 |
| J-92 | 1,529.36 | 0 | 1,710.00 | 78.2 |
| J-93 | 1,513.70 | 0 | 1,707.85 | 84.0 |
| J-94 | 1,544.69 | 28 | 1,708.11 | 70.7 |
| J-95 | 1,552.90 | 0 | 1,708.50 | 67.3 |
| J-205 | 1,458.56 | 0 | 1,707.49 | 107.7 |
| J-ELS | 1,456.01 | 1 | 1,707.49 | 108.8 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 2

3-ER-456

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Average Day - Auction Property

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-1 | 1,337 | 24.0 | 120 | J-1 | J-2 | 2,420 | 1.72 | 0.516 |
| P-2 | 1,236 | 24.0 | 120 | J-3 | J-4 | 1,258 | 0.89 | 0.154 |
| P-3 | 2,654 | 16.0 | 120 | J-5 | J-6 | 237 | 0.38 | 0.050 |
| P-4 | 2,643 | 12.0 | 120 | J-7 | J-8 | 113 | 0.32 | 0.052 |
| P-5 | 1,373 | 16.0 | 120 | J-8 | J-9 | 73 | 0.12 | 0.006 |
| P-6 | 1,371 | 16.0 | 120 | J-10 | J-11 | 472 | 0.75 | 0.181 |
| P-7 | 1,867 | 16.0 | 120 | J-9 | J-10 | 154 | 0.25 | 0.023 |
| P-7 | 1,712 | 16.0 | 120 | J-11 | J-1 | 625 | 1.00 | 0.303 |
| P-8 | 1,252 | 16.0 | 120 | J-16 | J-17 | 568 | 0.91 | 0.254 |
| P-9 | 1,335 | 16.0 | 120 | J-17 | J-4 | 618 | 0.99 | 0.297 |
| P-10 | 1,872 | 16.0 | 120 | J-13 | J-18 | 331 | 0.53 | 0.094 |
| P-11 | 817 | 16.0 | 120 | J-18 | J-19 | 101 | 0.16 | 0.010 |
| P-12 | 2,582 | 16.0 | 120 | J-19 | J-20 | 36 | 0.06 | 0.002 |
| P-13 | 2,636 | 24.0 | 120 | J-22 | J-23 | 699 | 0.50 | 0.052 |
| P-14 | 2,640 | 24.0 | 120 | J-23 | J-1 | 1,355 | 0.96 | 0.176 |
| P-15 | 2,850 | 16.0 | 120 | J-24 | J-25 | 105 | 0.17 | 0.011 |
| P-16 | 1,880 | 12.0 | 120 | J-25 | J-26 | 103 | 0.29 | 0.044 |
| P-17 | 1,357 | 12.0 | 120 | J-9 | J-27 | 6 | 0.02 | 0.000 |
| P-18 | 1,167 | 12.0 | 120 | J-27 | J-28 | 122 | 0.35 | 0.060 |
| P-19 | 1,813 | 8.0 | 120 | J-28 | J-29 | 78 | 0.50 | 0.187 |
| P-20 | 781 | 8.0 | 120 | J-29 | J-30 | 58 | 0.37 | 0.109 |
| P-21 | 997 | 12.0 | 120 | J-30 | J-5 | 265 | 0.75 | 0.251 |
| P-22 | 1,324 | 12.0 | 120 | J-7 | J-28 | 104 | 0.30 | 0.044 |
| P-23 | 2,040 | 12.0 | 120 | J-28 | J-31 | 89 | 0.25 | 0.033 |
| P-24 | 935 | 12.0 | 120 | J-31 | J-32 | 270 | 0.77 | 0.261 |
| P-25 | 1,071 | 12.0 | 120 | J-32 | J-33 | 284 | 0.81 | 0.285 |
| P-26 | 757 | 12.0 | 120 | J-33 | J-34 | 386 | 1.09 | 0.504 |
| P-27 | 888 | 12.0 | 120 | J-34 | J-3 | 534 | 1.52 | 0.921 |
| P-28 | 1,587 | 8.0 | 120 | J-29 | J-35 | 20 | 0.13 | 0.015 |
| P-29 | 1,506 | 8.0 | 120 | J-30 | J-36 | 77 | 0.49 | 0.184 |
| P-30 | 1,149 | 8.0 | 120 | J-36 | J-33 | 47 | 0.30 | 0.073 |
| P-31 | 1,110 | 8.0 | 120 | J-27 | J-37 | 33 | 0.21 | 0.038 |
| P-32 | 1,560 | 8.0 | 120 | J-37 | J-38 | 33 | 0.21 | 0.039 |
| P-33 | 895 | 8.0 | 120 | J-38 | J-31 | 33 | 0.21 | 0.038 |
| P-34 | 783 | 8.0 | 120 | J-11 | J-39 | 47 | 0.30 | 0.074 |
| P-35 | 1,356 | 8.0 | 120 | J-39 | J-40 | 145 | 0.92 | 0.590 |
| P-36 | 792 | 8.0 | 120 | J-40 | J-2 | 145 | 0.92 | 0.590 |
| P-37 | 807 | 12.0 | 120 | J-6 | J-41 | 237 | 0.67 | 0.204 |
| P-38 | 1,833 | 12.0 | 120 | J-41 | J-7 | 217 | 0.62 | 0.173 |
| P-39 | 949 | 8.0 | 120 | J-35 | J-41 | 20 | 0.13 | 0.015 |
| P-40 | 2,155 | 16.0 | 120 | J-4 | J-42 | 625 | 1.00 | 0.303 |
| P-41 | 1,477 | 16.0 | 120 | J-42 | J-5 | 502 | 0.80 | 0.202 |
| P-42 | 614 | 8.0 | 120 | J-36 | J-42 | 124 | 0.79 | 0.442 |
| P-43 | 1,556 | 12.0 | 120 | J-32 | J-30 | 135 | 0.38 | 0.072 |
| P-44 | 689 | 12.0 | 120 | J-12 | J-43 | 90 | 0.25 | 0.034 |
| P-45 | 1,946 | 12.0 | 120 | J-43 | J-44 | 202 | 0.57 | 0.153 |
| P-46 | 2,073 | 8.0 | 120 | J-44 | J-45 | 45 | 0.29 | 0.068 |
| P-47 | 969 | 8.0 | 120 | J-45 | J-2 | 139 | 0.88 | 0.546 |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 3

3-ER-457

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Average Day - Auction
Property

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-48 | 1,168 | 8.0 | 120 | J-3 | J-46 | 142 | 0.90 | 0.567 |
| P-49 | 911 | 8.0 | 120 | J-46 | J-17 | 50 | 0.32 | 0.083 |
| P-50 | 742 | 8.0 | 120 | J-45 | J-47 | 94 | 0.60 | 0.263 |
| P-51 | 921 | 8.0 | 120 | J-47 | J-43 | 94 | 0.60 | 0.263 |
| P-52 | 2,082 | 8.0 | 120 | J-43 | J-48 | 15 | 0.09 | 0.009 |
| P-53 | 1,325 | 8.0 | 120 | J-48 | J-49 | 34 | 0.22 | 0.040 |
| P-54 | 1,465 | 12.0 | 120 | J-49 | J-44 | 220 | 0.62 | 0.178 |
| P-55 | 1,495 | 12.0 | 120 | J-49 | J-14 | 28 | 0.08 | 0.004 |
| P-56 | 743 | 8.0 | 120 | J-49 | J-50 | 34 | 0.21 | 0.040 |
| P-57 | 1,129 | 8.0 | 120 | J-50 | J-15 | 34 | 0.21 | 0.040 |
| P-58 | 931 | 16.0 | 120 | J-51 | J-14 | 242 | 0.39 | 0.052 |
| P-59 | 1,264 | 8.0 | 120 | J-48 | J-51 | 5 | 0.03 | 0.001 |
| P-60 | 2,202 | 16.0 | 120 | J-12 | J-52 | 151 | 0.24 | 0.022 |
| P-61 | 885 | 16.0 | 120 | J-52 | J-94 | 112 | 0.18 | 0.012 |
| P-62 | 840 | 8.0 | 120 | J-48 | J-52 | 44 | 0.28 | 0.064 |
| P-63 | 906 | 8.0 | 120 | J-9 | J-53 | 88 | 0.56 | 0.234 |
| P-64 | 910 | 12.0 | 120 | J-54 | J-8 | 186 | 0.53 | 0.130 |
| P-65 | 721 | 8.0 | 120 | J-53 | J-54 | 61 | 0.39 | 0.119 |
| P-66 | 983 | 8.0 | 120 | J-24 | J-55 | 79 | 0.50 | 0.190 |
| P-67 | 1,333 | 8.0 | 120 | J-55 | J-56 | 46 | 0.30 | 0.071 |
| P-68 | 1,116 | 8.0 | 120 | J-56 | J-57 | 57 | 0.36 | 0.104 |
| P-69 | 729 | 8.0 | 120 | J-57 | J-58 | 37 | 0.24 | 0.048 |
| P-70 | 857 | 12.0 | 120 | J-26 | J-59 | 88 | 0.25 | 0.032 |
| P-71 | 1,622 | 12.0 | 120 | J-59 | J-54 | 125 | 0.35 | 0.062 |
| P-72 | 936 | 8.0 | 120 | J-58 | J-59 | 37 | 0.24 | 0.048 |
| P-73 | 1,459 | 8.0 | 120 | J-55 | J-60 | 28 | 0.18 | 0.028 |
| P-74 | 1,114 | 8.0 | 120 | J-60 | J-61 | 28 | 0.18 | 0.028 |
| P-75 | 1,054 | 12.0 | 120 | J-61 | J-26 | 191 | 0.54 | 0.137 |
| P-76 | 1,140 | 12.0 | 120 | J-61 | J-56 | 70 | 0.20 | 0.021 |
| P-77 | 855 | 12.0 | 120 | J-62 | J-63 | 206 | 0.58 | 0.157 |
| P-78 | 905 | 12.0 | 120 | J-63 | J-10 | 318 | 0.90 | 0.353 |
| P-79 | 831 | 8.0 | 120 | J-63 | J-64 | 20 | 0.13 | 0.015 |
| P-80 | 1,177 | 8.0 | 120 | J-64 | J-57 | 20 | 0.13 | 0.015 |
| P-81 | 1,245 | 8.0 | 120 | J-55 | J-65 | 5 | 0.03 | 0.001 |
| P-82 | 2,151 | 16.0 | 120 | J-22 | J-66 | 419 | 0.67 | 0.144 |
| P-83 | 1,176 | 16.0 | 120 | J-66 | J-24 | 183 | 0.29 | 0.031 |
| P-84 | 1,113 | 12.0 | 120 | J-65 | J-66 | 236 | 0.67 | 0.202 |
| P-85 | 1,034 | 8.0 | 120 | J-65 | J-67 | 37 | 0.23 | 0.046 |
| P-86 | 1,662 | 8.0 | 120 | J-67 | J-68 | 37 | 0.23 | 0.046 |
| P-87 | 1,161 | 12.0 | 120 | J-68 | J-23 | 372 | 1.06 | 0.471 |
| P-88 | 1,359 | 8.0 | 120 | J-68 | J-69 | 50 | 0.32 | 0.082 |
| P-89 | 1,832 | 8.0 | 120 | J-69 | J-63 | 56 | 0.35 | 0.100 |
| P-90 | 1,005 | 12.0 | 120 | J-68 | J-70 | 237 | 0.67 | 0.204 |
| P-91 | 573 | 12.0 | 120 | J-70 | J-62 | 27 | 0.08 | 0.004 |
| P-92 | 1,409 | 12.0 | 120 | J-65 | J-71 | 128 | 0.36 | 0.065 |
| P-93 | 1,201 | 12.0 | 120 | J-56 | J-72 | 24 | 0.07 | 0.003 |
| P-94 | 503 | 12.0 | 120 | J-72 | J-62 | 84 | 0.24 | 0.030 |
| P-95 | 736 | 12.0 | 120 | J-71 | J-72 | 40 | 0.11 | 0.008 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 3

3-ER-458

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario:  Average Day - Auction Property

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|-------|------|------|-----|------|------|-------|------|-------|
| P-96 | 718 | 12.0 | 120 | J-71 | J-70 | 61 | 0.17 | 0.016 |
| P-97 | 1,047 | 8.0 | 120 | J-19 | J-73 | 65 | 0.41 | 0.133 |
| P-98 | 1,393 | 12.0 | 120 | J-83 | J-74 | 128 | 0.36 | 0.066 |
| P-99 | 903 | 12.0 | 120 | J-74 | J-75 | 29 | 0.08 | 0.004 |
| P-100 | 1,063 | 12.0 | 120 | J-21 | J-76 | 238 | 0.67 | 0.205 |
| P-101 | 1,185 | 12.0 | 120 | J-76 | J-77 | 116 | 0.33 | 0.054 |
| P-102 | 939 | 12.0 | 120 | J-77 | J-74 | 76 | 0.22 | 0.025 |
| P-103 | 1,124 | 12.0 | 120 | J-74 | J-78 | 169 | 0.48 | 0.109 |
| P-104 | 1,019 | 8.0 | 120 | J-78 | J-79 | 56 | 0.36 | 0.103 |
| P-105 | 1,354 | 16.0 | 120 | J-1 | J-80 | 440 | 0.70 | 0.158 |
| P-106 | 894 | 16.0 | 120 | J-80 | J-12 | 335 | 0.53 | 0.096 |
| P-107 | 1,486 | 8.0 | 120 | J-76 | J-81 | 43 | 0.27 | 0.062 |
| P-108 | 1,004 | 12.0 | 120 | J-75 | J-82 | 163 | 0.46 | 0.102 |
| P-109 | 1,106 | 12.0 | 120 | J-82 | J-23 | 284 | 0.80 | 0.285 |
| P-110 | 1,868 | 8.0 | 120 | J-81 | J-82 | 22 | 0.14 | 0.019 |
| P-111 | 1,711 | 12.0 | 120 | J-78 | J-12 | 274 | 0.78 | 0.267 |
| P-112 | 675 | 8.0 | 120 | J-73 | J-83 | 38 | 0.24 | 0.049 |
| P-113 | 1,008 | 8.0 | 120 | J-83 | J-84 | 52 | 0.33 | 0.089 |
| P-114 | 1,673 | 8.0 | 120 | J-84 | J-52 | 83 | 0.53 | 0.209 |
| P-115 | 1,776 | 8.0 | 120 | J-78 | J-84 | 31 | 0.19 | 0.033 |
| P-116 | 1,656 | 8.0 | 120 | J-73 | J-85 | 27 | 0.17 | 0.026 |
| P-117 | 1,568 | 8.0 | 120 | J-85 | J-76 | 27 | 0.17 | 0.026 |
| P-118 | 1,542 | 8.0 | 120 | J-82 | J-86 | 49 | 0.31 | 0.078 |
| P-119 | 532 | 8.0 | 120 | J-79 | J-87 | 56 | 0.36 | 0.103 |
| P-120 | 1,177 | 8.0 | 120 | J-87 | J-80 | 105 | 0.67 | 0.325 |
| P-121 | 801 | 8.0 | 120 | J-86 | J-87 | 49 | 0.31 | 0.078 |
| P-122 | 931 | 12.0 | 120 | J-83 | J-18 | 230 | 0.65 | 0.194 |
| P-125 | 839 | 16.0 | 120 | J-14 | J-90 | 214 | 0.34 | 0.042 |
| P-126 | 1,077 | 16.0 | 120 | J-90 | J-15 | 214 | 0.34 | 0.042 |
| P-128 | 1,309 | 24.0 | 120 | J-21 | J-91 | 201 | 0.14 | 0.005 |
| P-129 | 1,332 | 24.0 | 120 | J-91 | J-22 | 267 | 0.19 | 0.009 |
| P-130 | 974 | 8.0 | 120 | J-81 | J-91 | 65 | 0.42 | 0.136 |
| P-133 | 1,322 | 24.0 | 120 | J-2 | J-92 | 2,703 | 1.92 | 0.634 |
| P-134 | 1,322 | 24.0 | 120 | J-92 | J-3 | 1,934 | 1.37 | 0.341 |
| P-135 | 1,774 | 24.0 | 120 | J-20 | J-93 | 36 | 0.03 | 0.000 |
| P-136 | 778 | 24.0 | 120 | J-93 | J-21 | 36 | 0.03 | 0.000 |
| P-137 | 786 | 16.0 | 120 | J-13 | J-94 | 331 | 0.53 | 0.094 |
| P-138 | 1,159 | 16.0 | 120 | J-94 | J-51 | 247 | 0.39 | 0.054 |
| P-139 | 2,314 | 12.0 | 120 | J-44 | J-16 | 128 | 0.36 | Headloss |
| P-140 | 1,166 | 8.0 | 120 | J-11 | J-69 | 105 | 0.67 | 0.328 |
| P-141 | 890 | 16.0 | 120 | J-95 | J-16 | 440 | 0.70 | 0.158 |
| P-142 | 1,256 | 16.0 | 120 | J-15 | J-95 | 440 | 0.70 | 0.158 |
| P-143 | 2,336 | 12.0 | 120 | J-44 | J-92 | 441 | 1.25 | 0.645 |
| P-204 | 2,317 | 12.0 | 120 | J-205 | J-25 | 1 | 0.00 | 0.000 |
| P-259 | 1,600 | 12.0 | 120 | J-ELS | J-205 | 1 | 0.00 | 0.000 |
| P-500 | 679 | 48.0 | 120 | R-1 | J-92 | 5,078 | 0.90 | 0.071 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 3

3-ER-459

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Reservoir Table

Active Scenario:  Average Day - Auction
Property

| Label | Elevation (ft) | Flow (Out net) (gpm) | Hydraulic Grade (ft) |
|-------|----------------|----------------------|----------------------|
| R-1   | 1,710.00       | 5,078                | 1,710.00             |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 1

3-ER-460



# AUCTION PROPERTY
## MAXIMUM DAY DEMAND RESULTS

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario: Max Day - Auction
Property

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|---------------|--------------|---------------------|----------------|
| J-1   | 1,518.46      | 0            | 1,705.27            | 80.8           |
| J-2   | 1,524.42      | 0            | 1,707.40            | 79.2           |
| J-3   | 1,534.31      | 0            | 1,708.60            | 75.4           |
| J-4   | 1,536.36      | 28           | 1,708.02            | 74.3           |
| J-5   | 1,511.94      | 0            | 1,705.08            | 83.6           |
| J-6   | 1,496.19      | 0            | 1,704.67            | 90.2           |
| J-7   | 1,487.97      | 0            | 1,703.18            | 93.1           |
| J-8   | 1,482.10      | 0            | 1,702.75            | 95.5           |
| J-9   | 1,489.31      | 0            | 1,702.78            | 92.4           |
| J-10  | 1,498.18      | 0            | 1,702.91            | 88.6           |
| J-11  | 1,505.45      | 0            | 1,703.67            | 85.8           |
| J-12  | 1,528.22      | 0            | 1,704.33            | 76.2           |
| J-13  | 1,541.89      | 0            | 1,703.92            | 70.1           |
| J-14  | 1,551.18      | 0            | 1,704.49            | 66.3           |
| J-15  | 1,555.10      | 354          | 1,704.74            | 64.7           |
| J-16  | 1,547.57      | 0            | 1,705.79            | 68.5           |
| J-17  | 1,539.63      | 0            | 1,706.78            | 72.3           |
| J-18  | 1,536.04      | 0            | 1,703.38            | 72.4           |
| J-19  | 1,531.88      | 0            | 1,703.35            | 74.2           |
| J-20  | 1,525.85      | 0            | 1,703.34            | 76.8           |
| J-21  | 1,509.31      | 0            | 1,703.34            | 83.9           |
| J-22  | 1,500.29      | 28           | 1,703.40            | 87.9           |
| J-23  | 1,507.70      | 0            | 1,703.82            | 84.9           |
| J-24  | 1,478.32      | 0            | 1,702.34            | 96.9           |
| J-25  | 1,468.56      | 0            | 1,702.24            | 101.1          |
| J-26  | 1,470.59      | 0            | 1,701.99            | 100.1          |
| J-27  | 1,491.65      | 273          | 1,702.78            | 91.3           |
| J-28  | 1,494.43      | 273          | 1,703.00            | 90.2           |
| J-29  | 1,504.84      | 0            | 1,704.05            | 86.2           |
| J-30  | 1,509.95      | 273          | 1,704.31            | 84.1           |
| J-31  | 1,506.31      | 273          | 1,703.21            | 85.2           |
| J-32  | 1,510.99      | 273          | 1,703.96            | 83.5           |
| J-33  | 1,517.93      | 273          | 1,704.91            | 80.9           |
| J-34  | 1,523.42      | 273          | 1,706.08            | 79.0           |
| J-35  | 1,500.26      | 0            | 1,704.12            | 88.2           |
| J-36  | 1,519.89      | 0            | 1,705.16            | 80.2           |
| J-37  | 1,497.84      | 0            | 1,702.91            | 88.7           |
| J-38  | 1,508.75      | 0            | 1,703.10            | 84.1           |
| J-39  | 1,509.06      | 354          | 1,703.48            | 84.1           |
| J-40  | 1,519.34      | 0            | 1,705.96            | 80.7           |
| J-41  | 1,493.31      | 0            | 1,704.16            | 91.2           |
| J-42  | 1,520.78      | 0            | 1,706.00            | 80.1           |
| J-43  | 1,528.04      | 354          | 1,704.40            | 76.3           |
| J-44  | 1,539.15      | 354          | 1,705.32            | 71.9           |
| J-45  | 1,525.42      | 0            | 1,705.76            | 78.0           |
| J-46  | 1,536.25      | 354          | 1,706.55            | 73.7           |
| J-47  | 1,523.18      | 0            | 1,705.15            | 78.7           |
| J-48  | 1,543.23      | 0            | 1,704.35            | 69.7           |
| J-49  | 1,544.66      | 354          | 1,704.51            | 69.2           |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 2

3-ER-462

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario: Max Day - Auction
Property

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|---|---|---|---|---|
| J-50 | 1,550.01 | 0 | 1,704.60 | 66.9 |
| J-51 | 1,551.30 | 0 | 1,704.34 | 66.2 |
| J-52 | 1,541.61 | 0 | 1,704.18 | 70.3 |
| J-53 | 1,482.08 | 273 | 1,702.13 | 95.2 |
| J-54 | 1,476.49 | 0 | 1,702.39 | 97.7 |
| J-55 | 1,480.56 | 0 | 1,701.76 | 95.7 |
| J-56 | 1,481.69 | 273 | 1,701.47 | 95.1 |
| J-57 | 1,483.32 | 0 | 1,701.83 | 94.5 |
| J-58 | 1,478.32 | 0 | 1,701.94 | 96.8 |
| J-59 | 1,473.68 | 0 | 1,702.08 | 98.8 |
| J-60 | 1,475.18 | 0 | 1,701.64 | 98.0 |
| J-61 | 1,474.72 | 273 | 1,701.55 | 98.1 |
| J-62 | 1,493.15 | 273 | 1,701.51 | 90.1 |
| J-63 | 1,494.82 | 273 | 1,701.92 | 89.6 |
| J-64 | 1,489.78 | 0 | 1,701.89 | 91.8 |
| J-65 | 1,486.52 | 273 | 1,701.76 | 93.1 |
| J-66 | 1,484.90 | 0 | 1,702.45 | 94.1 |
| J-67 | 1,492.33 | 0 | 1,701.91 | 90.7 |
| J-68 | 1,498.85 | 273 | 1,702.14 | 88.0 |
| J-69 | 1,504.49 | 0 | 1,702.49 | 85.7 |
| J-70 | 1,496.77 | 273 | 1,701.51 | 88.6 |
| J-71 | 1,492.39 | 273 | 1,701.48 | 90.5 |
| J-72 | 1,489.15 | 273 | 1,701.46 | 91.9 |
| J-73 | 1,526.88 | 0 | 1,702.92 | 76.2 |
| J-74 | 1,522.81 | 354 | 1,702.53 | 77.8 |
| J-75 | 1,517.39 | 354 | 1,702.52 | 80.1 |
| J-76 | 1,513.14 | 354 | 1,702.66 | 82.0 |
| J-77 | 1,518.58 | 354 | 1,702.46 | 79.6 |
| J-78 | 1,525.14 | 354 | 1,702.91 | 76.9 |
| J-79 | 1,521.50 | 0 | 1,703.24 | 78.6 |
| J-80 | 1,521.52 | 0 | 1,704.60 | 79.2 |
| J-81 | 1,507.88 | 0 | 1,702.95 | 84.4 |
| J-82 | 1,511.68 | 354 | 1,702.84 | 82.7 |
| J-83 | 1,530.12 | 354 | 1,702.82 | 74.7 |
| J-84 | 1,534.97 | 0 | 1,703.10 | 72.7 |
| J-85 | 1,520.43 | 0 | 1,702.79 | 78.9 |
| J-86 | 1,512.42 | 0 | 1,703.21 | 82.5 |
| J-87 | 1,519.02 | 0 | 1,703.41 | 79.8 |
| J-90 | 1,553.44 | 0 | 1,704.60 | 65.4 |
| J-91 | 1,501.89 | 0 | 1,703.36 | 87.2 |
| J-92 | 1,529.36 | 0 | 1,710.00 | 78.2 |
| J-93 | 1,513.70 | 0 | 1,703.34 | 82.1 |
| J-94 | 1,544.69 | 56 | 1,704.14 | 69.0 |
| J-95 | 1,552.90 | 0 | 1,705.36 | 66.0 |
| J-205 | 1,458.56 | 0 | 1,702.24 | 105.4 |
| J-ELS | 1,456.01 | 1 | 1,702.24 | 106.5 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 2

3-ER-463

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Max Day - Auction
Property

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-1 | 1,337 | 24.0 | 120 | J-1 | J-2 | 4,456 | 3.16 | 1.599 |
| P-2 | 1,236 | 24.0 | 120 | J-3 | J-4 | 2,317 | 1.64 | 0.476 |
| P-3 | 2,654 | 16.0 | 120 | J-5 | J-6 | 435 | 0.69 | 0.155 |
| P-4 | 2,643 | 12.0 | 120 | J-7 | J-8 | 208 | 0.59 | 0.160 |
| P-5 | 1,373 | 16.0 | 120 | J-8 | J-9 | 133 | 0.21 | 0.017 |
| P-6 | 1,371 | 16.0 | 120 | J-10 | J-11 | 866 | 1.38 | 0.554 |
| P-7 | 1,867 | 16.0 | 120 | J-9 | J-10 | 281 | 0.45 | 0.069 |
| P-7 | 1,712 | 16.0 | 120 | J-1 | J-11 | 1,147 | 1.83 | 0.933 |
| P-8 | 1,252 | 16.0 | 120 | J-16 | J-17 | 1,048 | 1.67 | 0.789 |
| P-9 | 1,335 | 16.0 | 120 | J-17 | J-4 | 1,141 | 1.82 | 0.924 |
| P-10 | 1,872 | 16.0 | 120 | J-13 | J-18 | 608 | 0.97 | 0.288 |
| P-11 | 817 | 16.0 | 120 | J-18 | J-19 | 183 | 0.29 | 0.031 |
| P-12 | 2,582 | 16.0 | 120 | J-19 | J-20 | 64 | 0.10 | 0.004 |
| P-13 | 2,636 | 24.0 | 120 | J-22 | J-23 | 1,289 | 0.91 | 0.161 |
| P-14 | 2,640 | 24.0 | 120 | J-23 | J-1 | 2,495 | 1.77 | 0.546 |
| P-15 | 2,850 | 16.0 | 120 | J-24 | J-25 | 190 | 0.30 | 0.033 |
| P-16 | 1,880 | 12.0 | 120 | J-25 | J-26 | 189 | 0.54 | 0.134 |
| P-17 | 1,357 | 12.0 | 120 | J-9 | J-27 | 14 | 0.04 | 0.001 |
| P-18 | 1,167 | 12.0 | 120 | J-27 | J-28 | 225 | 0.64 | 0.186 |
| P-19 | 1,813 | 8.0 | 120 | J-28 | J-29 | 143 | 0.91 | 0.578 |
| P-20 | 781 | 8.0 | 120 | J-29 | J-30 | 107 | 0.68 | 0.337 |
| P-21 | 997 | 12.0 | 120 | J-30 | J-5 | 486 | 1.38 | 0.774 |
| P-22 | 1,324 | 12.0 | 120 | J-7 | J-28 | 191 | 0.54 | 0.137 |
| P-23 | 2,040 | 12.0 | 120 | J-28 | J-31 | 164 | 0.46 | 0.103 |
| P-24 | 935 | 12.0 | 120 | J-31 | J-32 | 498 | 1.41 | 0.807 |
| P-25 | 1,071 | 12.0 | 120 | J-32 | J-33 | 522 | 1.48 | 0.881 |
| P-26 | 757 | 12.0 | 120 | J-33 | J-34 | 709 | 2.01 | 1.554 |
| P-27 | 888 | 12.0 | 120 | J-34 | J-3 | 981 | 2.78 | 2.840 |
| P-28 | 1,587 | 8.0 | 120 | J-29 | J-35 | 36 | 0.23 | 0.045 |
| P-29 | 1,506 | 8.0 | 120 | J-30 | J-36 | 142 | 0.90 | 0.567 |
| P-30 | 1,149 | 8.0 | 120 | J-36 | J-33 | 86 | 0.55 | 0.224 |
| P-31 | 1,110 | 8.0 | 120 | J-27 | J-37 | 61 | 0.39 | 0.120 |
| P-32 | 1,560 | 8.0 | 120 | J-37 | J-38 | 61 | 0.39 | 0.120 |
| P-33 | 895 | 8.0 | 120 | J-38 | J-31 | 61 | 0.39 | 0.120 |
| P-34 | 783 | 8.0 | 120 | J-11 | J-39 | 88 | 0.56 | 0.235 |
| P-35 | 1,356 | 8.0 | 120 | J-39 | J-40 | 266 | 1.70 | 1.825 |
| P-36 | 792 | 8.0 | 120 | J-40 | J-2 | 266 | 1.70 | 1.825 |
| P-37 | 807 | 12.0 | 120 | J-6 | J-41 | 435 | 1.23 | 0.629 |
| P-38 | 1,833 | 12.0 | 120 | J-41 | J-7 | 399 | 1.13 | 0.536 |
| P-39 | 949 | 8.0 | 120 | J-35 | J-41 | 36 | 0.23 | 0.045 |
| P-40 | 2,155 | 16.0 | 120 | J-4 | J-42 | 1,149 | 1.83 | 0.936 |
| P-41 | 1,477 | 16.0 | 120 | J-42 | J-5 | 921 | 1.47 | 0.622 |
| P-42 | 614 | 8.0 | 120 | J-36 | J-42 | 227 | 1.45 | 1.362 |
| P-43 | 1,556 | 12.0 | 120 | J-32 | J-30 | 248 | 0.70 | 0.223 |
| P-44 | 689 | 12.0 | 120 | J-12 | J-43 | 164 | 0.47 | 0.103 |
| P-45 | 1,946 | 12.0 | 120 | J-43 | J-44 | 373 | 1.06 | 0.473 |
| P-46 | 2,073 | 8.0 | 120 | J-44 | J-45 | 83 | 0.53 | 0.212 |
| P-47 | 969 | 8.0 | 120 | J-45 | J-2 | 256 | 1.63 | 1.695 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 3

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Max Day - Auction
Property

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-48 | 1,168 | 8.0 | 120 | J-3 | J-46 | 261 | 1.67 | 1.762 |
| P-49 | 911 | 8.0 | 120 | J-46 | J-17 | 93 | 0.59 | 0.260 |
| P-50 | 742 | 8.0 | 120 | J-45 | J-47 | 173 | 1.10 | 0.818 |
| P-51 | 921 | 8.0 | 120 | J-47 | J-43 | 173 | 1.10 | 0.818 |
| P-52 | 2,082 | 8.0 | 120 | J-43 | J-48 | 27 | 0.17 | 0.027 |
| P-53 | 1,325 | 8.0 | 120 | J-48 | J-49 | 62 | 0.40 | 0.124 |
| P-54 | 1,465 | 12.0 | 120 | J-49 | J-44 | 406 | 1.15 | 0.554 |
| P-55 | 1,495 | 12.0 | 120 | J-49 | J-14 | 52 | 0.15 | 0.012 |
| P-56 | 743 | 8.0 | 120 | J-49 | J-50 | 62 | 0.40 | 0.123 |
| P-57 | 1,129 | 8.0 | 120 | J-50 | J-15 | 62 | 0.40 | 0.123 |
| P-58 | 931 | 16.0 | 120 | J-51 | J-14 | 446 | 0.71 | 0.163 |
| P-59 | 1,264 | 8.0 | 120 | J-48 | J-51 | 10 | 0.06 | 0.004 |
| P-60 | 2,202 | 16.0 | 120 | J-12 | J-52 | 280 | 0.45 | 0.068 |
| P-61 | 885 | 16.0 | 120 | J-52 | J-94 | 207 | 0.33 | 0.039 |
| P-62 | 840 | 8.0 | 120 | J-48 | J-52 | 80 | 0.51 | 0.198 |
| P-63 | 906 | 8.0 | 120 | J-9 | J-53 | 161 | 1.03 | 0.720 |
| P-64 | 910 | 12.0 | 120 | J-54 | J-8 | 341 | 0.97 | 0.401 |
| P-65 | 721 | 8.0 | 120 | J-53 | J-54 | 112 | 0.71 | 0.365 |
| P-66 | 983 | 8.0 | 120 | J-24 | J-55 | 144 | 0.92 | 0.584 |
| P-67 | 1,333 | 8.0 | 120 | J-55 | J-56 | 85 | 0.54 | 0.219 |
| P-68 | 1,116 | 8.0 | 120 | J-56 | J-57 | 104 | 0.67 | 0.322 |
| P-69 | 729 | 8.0 | 120 | J-57 | J-58 | 68 | 0.44 | 0.147 |
| P-70 | 857 | 12.0 | 120 | J-26 | J-59 | 161 | 0.46 | 0.100 |
| P-71 | 1,622 | 12.0 | 120 | J-59 | J-54 | 230 | 0.65 | 0.193 |
| P-72 | 936 | 8.0 | 120 | J-58 | J-59 | 68 | 0.44 | 0.147 |
| P-73 | 1,459 | 8.0 | 120 | J-55 | J-60 | 51 | 0.32 | 0.084 |
| P-74 | 1,114 | 8.0 | 120 | J-60 | J-61 | 51 | 0.32 | 0.085 |
| P-75 | 1,054 | 12.0 | 120 | J-61 | J-26 | 350 | 0.99 | 0.421 |
| P-76 | 1,140 | 12.0 | 120 | J-61 | J-56 | 128 | 0.36 | 0.065 |
| P-77 | 855 | 12.0 | 120 | J-62 | J-63 | 378 | 1.07 | 0.485 |
| P-78 | 905 | 12.0 | 120 | J-63 | J-10 | 585 | 1.66 | 1.088 |
| P-79 | 831 | 8.0 | 120 | J-63 | J-64 | 36 | 0.23 | 0.045 |
| P-80 | 1,177 | 8.0 | 120 | J-64 | J-57 | 36 | 0.23 | 0.045 |
| P-81 | 1,245 | 8.0 | 120 | J-55 | J-65 | 9 | 0.05 | 0.003 |
| P-82 | 2,151 | 16.0 | 120 | J-22 | J-66 | 765 | 1.22 | 0.441 |
| P-83 | 1,176 | 16.0 | 120 | J-66 | J-24 | 334 | 0.53 | 0.095 |
| P-84 | 1,113 | 12.0 | 120 | J-65 | J-66 | 431 | 1.22 | 0.620 |
| P-85 | 1,034 | 8.0 | 120 | J-65 | J-67 | 67 | 0.43 | 0.142 |
| P-86 | 1,662 | 8.0 | 120 | J-67 | J-68 | 67 | 0.43 | 0.142 |
| P-87 | 1,161 | 12.0 | 120 | J-68 | J-23 | 682 | 1.93 | 1.447 |
| P-88 | 1,359 | 8.0 | 120 | J-68 | J-69 | 92 | 0.58 | 0.253 |
| P-89 | 1,832 | 8.0 | 120 | J-69 | J-63 | 102 | 0.65 | 0.308 |
| P-90 | 1,005 | 12.0 | 120 | J-68 | J-70 | 434 | 1.23 | 0.626 |
| P-91 | 573 | 12.0 | 120 | J-70 | J-62 | 50 | 0.14 | 0.011 |
| P-92 | 1,409 | 12.0 | 120 | J-65 | J-71 | 234 | 0.66 | 0.200 |
| P-93 | 1,201 | 12.0 | 120 | J-56 | J-72 | 45 | 0.13 | 0.009 |
| P-94 | 503 | 12.0 | 120 | J-71 | J-62 | 155 | 0.44 | 0.093 |
| P-95 | 736 | 12.0 | 120 | J-71 | J-72 | 73 | 0.21 | 0.023 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 3

3-ER-465

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Max Day - Auction
Property

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-96 | 718 | 12.0 | 120 | J-71 | J-70 | 111 | 0.32 | 0.050 |
| P-97 | 1,047 | 8.0 | 120 | J-19 | J-73 | 119 | 0.76 | 0.413 |
| P-98 | 1,393 | 12.0 | 120 | J-83 | J-74 | 237 | 0.67 | 0.204 |
| P-99 | 903 | 12.0 | 120 | J-74 | J-75 | 53 | 0.15 | 0.013 |
| P-100 | 1,063 | 12.0 | 120 | J-21 | J-76 | 439 | 1.24 | 0.639 |
| P-101 | 1,185 | 12.0 | 120 | J-76 | J-77 | 214 | 0.61 | 0.169 |
| P-102 | 939 | 12.0 | 120 | J-77 | J-74 | 140 | 0.40 | 0.077 |
| P-103 | 1,124 | 12.0 | 120 | J-74 | J-78 | 311 | 0.88 | 0.338 |
| P-104 | 1,019 | 8.0 | 120 | J-78 | J-79 | 104 | 0.66 | 0.319 |
| P-105 | 1,354 | 16.0 | 120 | J-1 | J-80 | 813 | 1.30 | 0.494 |
| P-106 | 894 | 16.0 | 120 | J-80 | J-12 | 620 | 0.99 | 0.299 |
| P-107 | 1,486 | 8.0 | 120 | J-76 | J-81 | 79 | 0.51 | 0.194 |
| P-108 | 1,004 | 12.0 | 120 | J-75 | J-82 | 301 | 0.85 | 0.318 |
| P-109 | 1,106 | 12.0 | 120 | J-82 | J-23 | 524 | 1.49 | 0.888 |
| P-110 | 1,868 | 8.0 | 120 | J-81 | J-82 | 41 | 0.26 | 0.058 |
| P-111 | 1,711 | 12.0 | 120 | J-78 | J-12 | 505 | 1.43 | 0.828 |
| P-112 | 675 | 8.0 | 120 | J-73 | J-83 | 70 | 0.45 | 0.153 |
| P-113 | 1,008 | 8.0 | 120 | J-83 | J-84 | 96 | 0.61 | 0.275 |
| P-114 | 1,673 | 8.0 | 120 | J-84 | J-52 | 152 | 0.97 | 0.648 |
| P-115 | 1,776 | 8.0 | 120 | J-78 | J-84 | 56 | 0.36 | 0.103 |
| P-116 | 1,656 | 8.0 | 120 | J-73 | J-85 | 49 | 0.32 | 0.081 |
| P-117 | 1,568 | 8.0 | 120 | J-85 | J-76 | 49 | 0.32 | 0.081 |
| P-118 | 1,542 | 8.0 | 120 | J-82 | J-86 | 89 | 0.57 | 0.242 |
| P-119 | 532 | 8.0 | 120 | J-79 | J-87 | 104 | 0.66 | 0.320 |
| P-120 | 1,177 | 8.0 | 120 | J-87 | J-80 | 193 | 1.23 | 1.009 |
| P-121 | 801 | 8.0 | 120 | J-86 | J-87 | 89 | 0.57 | 0.242 |
| P-122 | 931 | 12.0 | 120 | J-83 | J-18 | 425 | 1.21 | 0.603 |
| P-125 | 839 | 16.0 | 120 | J-14 | J-90 | 395 | 0.63 | 0.129 |
| P-126 | 1,077 | 16.0 | 120 | J-90 | J-15 | 395 | 0.63 | 0.130 |
| P-128 | 1,309 | 24.0 | 120 | J-21 | J-91 | 375 | 0.27 | 0.016 |
| P-129 | 1,332 | 24.0 | 120 | J-91 | J-22 | 496 | 0.35 | 0.027 |
| P-130 | 974 | 8.0 | 120 | J-81 | J-91 | 121 | 0.77 | 0.423 |
| P-133 | 1,322 | 24.0 | 120 | J-2 | J-92 | 4,978 | 3.53 | 1.963 |
| P-134 | 1,322 | 24.0 | 120 | J-92 | J-3 | 3,560 | 2.52 | 1.055 |
| P-135 | 1,774 | 24.0 | 120 | J-20 | J-93 | 64 | 0.05 | 0.001 |
| P-136 | 778 | 24.0 | 120 | J-93 | J-21 | 64 | 0.05 | 0.001 |
| P-137 | 786 | 16.0 | 120 | J-13 | J-94 | 608 | 0.97 | 0.288 |
| P-138 | 1,159 | 16.0 | 120 | J-94 | J-51 | 456 | 0.73 | 0.169 |
| P-139 | 2,314 | 12.0 | 120 | J-44 | J-16 | 237 | 0.67 | 0.204 |
| P-140 | 1,166 | 8.0 | 120 | J-11 | J-69 | 194 | 1.24 | 1.012 |
| P-141 | 890 | 16.0 | 120 | J-95 | J-16 | 811 | 1.29 | 0.491 |
| P-142 | 1,256 | 16.0 | 120 | J-15 | J-95 | 811 | 1.29 | 0.491 |
| P-143 | 2,336 | 12.0 | 120 | J-44 | J-92 | 813 | 2.31 | 2.002 |
| P-204 | 2,317 | 12.0 | 120 | J-205 | J-25 | 1 | 0.00 | 0.000 |
| P-259 | 1,600 | 12.0 | 120 | J-ELS | J-205 | 1 | 0.00 | 0.000 |
| P-500 | 679 | 48.0 | 120 | R-1 | J-92 | 9,350 | 1.66 | 0.214 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 3

3-ER-466

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Reservoir Table

Active Scenario: Max Day - Auction
Property

| Label | Elevation (ft) | Flow (Out net) (gpm) | Hydraulic Grade (ft) |
|-------|----------------|----------------------|----------------------|
| R-1   | 1,710.00       | 9,350                | 1,710.00             |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 1

3-ER-467



**AUCTION PROPERTY**
**PEAK HOUR DEMAND RESULTS**

21-0708_1635 LD Water                                                    Active Scenario: Peak Hour - Auction
Model(AJWD_3CAMPUS).wtg                                                                          Property
FlexTable: Junction Table

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|---|---|---|---|---|
| J-1 | 1,518.46 | 0 | 1,698.17 | 77.8 |
| J-2 | 1,524.42 | 0 | 1,703.51 | 77.5 |
| J-3 | 1,534.31 | 0 | 1,706.51 | 74.5 |
| J-4 | 1,536.36 | 47 | 1,705.04 | 73.0 |
| J-5 | 1,511.94 | 0 | 1,697.72 | 80.4 |
| J-6 | 1,496.19 | 0 | 1,696.69 | 86.7 |
| J-7 | 1,487.97 | 0 | 1,692.98 | 88.7 |
| J-8 | 1,482.10 | 0 | 1,691.92 | 90.8 |
| J-9 | 1,489.31 | 0 | 1,691.98 | 87.7 |
| J-10 | 1,498.18 | 0 | 1,692.30 | 84.0 |
| J-11 | 1,505.45 | 0 | 1,694.19 | 81.7 |
| J-12 | 1,528.22 | 0 | 1,695.82 | 72.5 |
| J-13 | 1,541.89 | 0 | 1,694.79 | 66.2 |
| J-14 | 1,551.18 | 0 | 1,696.23 | 62.8 |
| J-15 | 1,555.10 | 581 | 1,696.85 | 61.3 |
| J-16 | 1,547.57 | 0 | 1,699.48 | 65.7 |
| J-17 | 1,539.63 | 0 | 1,701.95 | 70.2 |
| J-18 | 1,536.04 | 0 | 1,693.45 | 68.1 |
| J-19 | 1,531.88 | 0 | 1,693.39 | 69.9 |
| J-20 | 1,525.85 | 0 | 1,693.36 | 72.5 |
| J-21 | 1,509.31 | 0 | 1,693.36 | 79.6 |
| J-22 | 1,500.29 | 47 | 1,693.50 | 83.6 |
| J-23 | 1,507.70 | 0 | 1,694.57 | 80.8 |
| J-24 | 1,478.32 | 0 | 1,690.87 | 92.0 |
| J-25 | 1,468.56 | 0 | 1,690.64 | 96.1 |
| J-26 | 1,470.59 | 0 | 1,690.01 | 94.9 |
| J-27 | 1,491.65 | 446 | 1,691.98 | 86.7 |
| J-28 | 1,494.43 | 446 | 1,692.52 | 85.7 |
| J-29 | 1,504.84 | 0 | 1,695.14 | 82.3 |
| J-30 | 1,509.95 | 446 | 1,695.80 | 80.4 |
| J-31 | 1,506.31 | 446 | 1,693.05 | 80.8 |
| J-32 | 1,510.99 | 446 | 1,694.93 | 79.6 |
| J-33 | 1,517.93 | 446 | 1,697.29 | 77.6 |
| J-34 | 1,523.42 | 446 | 1,700.22 | 76.5 |
| J-35 | 1,500.26 | 0 | 1,695.32 | 84.4 |
| J-36 | 1,519.89 | 0 | 1,697.93 | 77.0 |
| J-37 | 1,497.84 | 0 | 1,692.31 | 84.1 |
| J-38 | 1,508.75 | 0 | 1,692.78 | 79.6 |
| J-39 | 1,509.06 | 581 | 1,693.72 | 79.9 |
| J-40 | 1,519.34 | 0 | 1,699.91 | 78.1 |
| J-41 | 1,493.31 | 0 | 1,695.43 | 87.4 |
| J-42 | 1,520.78 | 0 | 1,700.01 | 77.5 |
| J-43 | 1,528.04 | 581 | 1,696.00 | 72.7 |
| J-44 | 1,539.15 | 581 | 1,698.30 | 68.9 |
| J-45 | 1,525.42 | 0 | 1,699.40 | 75.3 |
| J-46 | 1,536.25 | 581 | 1,701.36 | 71.4 |
| J-47 | 1,523.18 | 0 | 1,697.88 | 75.6 |
| J-48 | 1,543.23 | 0 | 1,695.86 | 66.0 |
| J-49 | 1,544.66 | 581 | 1,696.27 | 65.6 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario:  Peak Hour - Auction
Property

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|------|------|------|------|
| J-50 | 1,550.01 | 0 | 1,696.50 | 63.4 |
| J-51 | 1,551.30 | 0 | 1,695.85 | 62.5 |
| J-52 | 1,541.61 | 0 | 1,695.45 | 66.6 |
| J-53 | 1,482.08 | 446 | 1,690.35 | 90.1 |
| J-54 | 1,476.49 | 0 | 1,691.01 | 92.8 |
| J-55 | 1,480.56 | 0 | 1,689.44 | 90.4 |
| J-56 | 1,481.69 | 446 | 1,688.72 | 89.6 |
| J-57 | 1,483.32 | 0 | 1,689.61 | 89.3 |
| J-58 | 1,478.32 | 0 | 1,689.88 | 91.5 |
| J-59 | 1,473.68 | 0 | 1,690.22 | 93.7 |
| J-60 | 1,475.18 | 0 | 1,689.14 | 92.6 |
| J-61 | 1,474.72 | 446 | 1,688.90 | 92.7 |
| J-62 | 1,493.15 | 446 | 1,688.81 | 84.7 |
| J-63 | 1,494.82 | 446 | 1,689.84 | 84.4 |
| J-64 | 1,489.78 | 0 | 1,689.75 | 86.5 |
| J-65 | 1,486.52 | 446 | 1,689.43 | 87.8 |
| J-66 | 1,484.90 | 0 | 1,691.15 | 89.2 |
| J-67 | 1,492.33 | 0 | 1,689.80 | 85.4 |
| J-68 | 1,498.85 | 446 | 1,690.39 | 82.9 |
| J-69 | 1,504.49 | 0 | 1,691.25 | 80.8 |
| J-70 | 1,496.77 | 446 | 1,688.82 | 83.1 |
| J-71 | 1,492.39 | 446 | 1,688.73 | 84.9 |
| J-72 | 1,489.15 | 446 | 1,688.69 | 86.3 |
| J-73 | 1,526.88 | 0 | 1,692.31 | 71.6 |
| J-74 | 1,522.81 | 581 | 1,691.33 | 72.9 |
| J-75 | 1,517.39 | 581 | 1,691.31 | 75.2 |
| J-76 | 1,513.14 | 581 | 1,691.65 | 77.2 |
| J-77 | 1,518.58 | 581 | 1,691.15 | 74.7 |
| J-78 | 1,525.14 | 581 | 1,692.28 | 72.3 |
| J-79 | 1,521.50 | 0 | 1,693.10 | 74.2 |
| J-80 | 1,521.52 | 0 | 1,696.49 | 75.7 |
| J-81 | 1,507.88 | 0 | 1,692.38 | 79.8 |
| J-82 | 1,511.68 | 581 | 1,692.11 | 78.1 |
| J-83 | 1,530.12 | 581 | 1,692.05 | 70.1 |
| J-84 | 1,534.97 | 0 | 1,692.74 | 68.3 |
| J-85 | 1,520.43 | 0 | 1,691.97 | 74.2 |
| J-86 | 1,512.42 | 0 | 1,693.04 | 78.1 |
| J-87 | 1,519.02 | 0 | 1,693.52 | 75.5 |
| J-90 | 1,553.44 | 0 | 1,696.50 | 61.9 |
| J-91 | 1,501.89 | 0 | 1,693.41 | 82.9 |
| J-92 | 1,529.36 | 0 | 1,710.00 | 78.2 |
| J-93 | 1,513.70 | 0 | 1,693.36 | 77.7 |
| J-94 | 1,544.69 | 94 | 1,695.36 | 65.2 |
| J-95 | 1,552.90 | 0 | 1,698.39 | 62.9 |
| J-205 | 1,458.56 | 0 | 1,690.64 | 100.4 |
| J-ELS | 1,456.01 | 1 | 1,690.64 | 101.5 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 2

3-ER-470

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Peak Hour - Auction
Property

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-1 | 1,337 | 24.0 | 120 | J-1 | J-2 | 7,306 | 5.18 | 3.995 |
| P-2 | 1,236 | 24.0 | 120 | J-3 | J-4 | 3,800 | 2.69 | 1.191 |
| P-3 | 2,654 | 16.0 | 120 | J-5 | J-6 | 713 | 1.14 | 0.387 |
| P-4 | 2,643 | 12.0 | 120 | J-7 | J-8 | 341 | 0.97 | 0.400 |
| P-5 | 1,373 | 16.0 | 120 | J-8 | J-9 | 219 | 0.35 | 0.043 |
| P-6 | 1,371 | 16.0 | 120 | J-10 | J-11 | 1,416 | 2.26 | 1.379 |
| P-7 | 1,867 | 16.0 | 120 | J-9 | J-10 | 458 | 0.73 | 0.171 |
| P-7 | 1,712 | 16.0 | 120 | J-11 | J-1 | 1,878 | 3.00 | 2.326 |
| P-8 | 1,252 | 16.0 | 120 | J-16 | J-17 | 1,719 | 2.74 | 1.975 |
| P-9 | 1,335 | 16.0 | 120 | J-17 | J-4 | 1,872 | 2.99 | 2.311 |
| P-10 | 1,872 | 16.0 | 120 | J-13 | J-18 | 995 | 1.59 | 0.717 |
| P-11 | 817 | 16.0 | 120 | J-18 | J-19 | 297 | 0.47 | 0.077 |
| P-12 | 2,582 | 16.0 | 120 | J-19 | J-20 | 101 | 0.16 | 0.010 |
| P-13 | 2,636 | 24.0 | 120 | J-22 | J-23 | 2,116 | 1.50 | 0.403 |
| P-14 | 2,640 | 24.0 | 120 | J-23 | J-1 | 4,092 | 2.90 | 1.365 |
| P-15 | 2,850 | 16.0 | 120 | J-24 | J-25 | 310 | 0.49 | 0.083 |
| P-16 | 1,880 | 12.0 | 120 | J-25 | J-26 | 308 | 0.88 | 0.333 |
| P-17 | 1,357 | 12.0 | 120 | J-9 | J-27 | 24 | 0.07 | 0.003 |
| P-18 | 1,167 | 12.0 | 120 | J-27 | J-28 | 369 | 1.05 | 0.465 |
| P-19 | 1,813 | 8.0 | 120 | J-28 | J-29 | 234 | 1.50 | 1.443 |
| P-20 | 781 | 8.0 | 120 | J-29 | J-30 | 175 | 1.12 | 0.842 |
| P-21 | 997 | 12.0 | 120 | J-30 | J-5 | 796 | 2.26 | 1.929 |
| P-22 | 1,324 | 12.0 | 120 | J-7 | J-28 | 313 | 0.89 | 0.342 |
| P-23 | 2,040 | 12.0 | 120 | J-28 | J-31 | 269 | 0.76 | 0.257 |
| P-24 | 935 | 12.0 | 120 | J-31 | J-32 | 816 | 2.31 | 2.015 |
| P-25 | 1,071 | 12.0 | 120 | J-32 | J-33 | 855 | 2.43 | 2.199 |
| P-26 | 757 | 12.0 | 120 | J-33 | J-34 | 1,161 | 3.29 | 3.877 |
| P-27 | 888 | 12.0 | 120 | J-34 | J-3 | 1,607 | 4.56 | 7.080 |
| P-28 | 1,587 | 8.0 | 120 | J-29 | J-35 | 59 | 0.38 | 0.113 |
| P-29 | 1,506 | 8.0 | 120 | J-30 | J-36 | 232 | 1.48 | 1.414 |
| P-30 | 1,149 | 8.0 | 120 | J-36 | J-33 | 140 | 0.89 | 0.556 |
| P-31 | 1,110 | 8.0 | 120 | J-27 | J-37 | 101 | 0.64 | 0.299 |
| P-32 | 1,560 | 8.0 | 120 | J-37 | J-38 | 101 | 0.64 | 0.299 |
| P-33 | 895 | 8.0 | 120 | J-38 | J-31 | 101 | 0.64 | 0.299 |
| P-34 | 783 | 8.0 | 120 | J-11 | J-39 | 145 | 0.92 | 0.592 |
| P-35 | 1,356 | 8.0 | 120 | J-39 | J-40 | 436 | 2.78 | 4.556 |
| P-36 | 792 | 8.0 | 120 | J-40 | J-2 | 436 | 2.78 | 4.556 |
| P-37 | 807 | 12.0 | 120 | J-6 | J-41 | 713 | 2.02 | 1.570 |
| P-38 | 1,833 | 12.0 | 120 | J-41 | J-7 | 654 | 1.85 | 1.337 |
| P-39 | 949 | 8.0 | 120 | J-35 | J-41 | 59 | 0.38 | 0.113 |
| P-40 | 2,155 | 16.0 | 120 | J-4 | J-42 | 1,881 | 3.00 | 2.333 |
| P-41 | 1,477 | 16.0 | 120 | J-42 | J-5 | 1,509 | 2.41 | 1.552 |
| P-42 | 614 | 8.0 | 120 | J-36 | J-42 | 372 | 2.37 | 3.393 |
| P-43 | 1,556 | 12.0 | 120 | J-32 | J-30 | 407 | 1.15 | 0.556 |
| P-44 | 689 | 12.0 | 120 | J-12 | J-43 | 268 | 0.76 | 0.257 |
| P-45 | 1,946 | 12.0 | 120 | J-43 | J-44 | 611 | 1.73 | 1.182 |
| P-46 | 2,073 | 8.0 | 120 | J-44 | J-45 | 137 | 0.87 | 0.531 |
| P-47 | 969 | 8.0 | 120 | J-45 | J-2 | 420 | 2.68 | 4.242 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 3

3-ER-471

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Peak Hour - Auction Property

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-48 | 1,168 | 8.0 | 120 | J-3 | J-46 | 428 | 2.73 | 4.410 |
| P-49 | 911 | 8.0 | 120 | J-46 | J-17 | 153 | 0.97 | 0.651 |
| P-50 | 742 | 8.0 | 120 | J-45 | J-47 | 283 | 1.81 | 2.045 |
| P-51 | 921 | 8.0 | 120 | J-47 | J-43 | 283 | 1.81 | 2.045 |
| P-52 | 2,082 | 8.0 | 120 | J-43 | J-48 | 45 | 0.29 | 0.068 |
| P-53 | 1,325 | 8.0 | 120 | J-48 | J-49 | 102 | 0.65 | 0.310 |
| P-54 | 1,465 | 12.0 | 120 | J-49 | J-44 | 666 | 1.89 | 1.385 |
| P-55 | 1,495 | 12.0 | 120 | J-49 | J-14 | 84 | 0.24 | 0.030 |
| P-56 | 743 | 8.0 | 120 | J-49 | J-50 | 102 | 0.65 | 0.307 |
| P-57 | 1,129 | 8.0 | 120 | J-50 | J-15 | 102 | 0.65 | 0.307 |
| P-58 | 931 | 16.0 | 120 | J-51 | J-14 | 732 | 1.17 | 0.406 |
| P-59 | 1,264 | 8.0 | 120 | J-48 | J-51 | 16 | 0.10 | 0.010 |
| P-60 | 2,202 | 16.0 | 120 | J-12 | J-52 | 460 | 0.73 | 0.172 |
| P-61 | 885 | 16.0 | 120 | J-52 | J-94 | 342 | 0.55 | 0.099 |
| P-62 | 840 | 8.0 | 120 | J-48 | J-52 | 131 | 0.84 | 0.493 |
| P-63 | 906 | 8.0 | 120 | J-9 | J-53 | 264 | 1.68 | 1.795 |
| P-64 | 910 | 12.0 | 120 | J-54 | J-8 | 559 | 1.59 | 1.002 |
| P-65 | 721 | 8.0 | 120 | J-53 | J-54 | 183 | 1.17 | 0.908 |
| P-66 | 983 | 8.0 | 120 | J-24 | J-55 | 235 | 1.50 | 1.453 |
| P-67 | 1,333 | 8.0 | 120 | J-55 | J-56 | 139 | 0.88 | 0.544 |
| P-68 | 1,116 | 8.0 | 120 | J-56 | J-57 | 171 | 1.09 | 0.804 |
| P-69 | 729 | 8.0 | 120 | J-57 | J-58 | 112 | 0.71 | 0.366 |
| P-70 | 857 | 12.0 | 120 | J-26 | J-59 | 265 | 0.75 | 0.251 |
| P-71 | 1,622 | 12.0 | 120 | J-59 | J-54 | 377 | 1.07 | 0.482 |
| P-72 | 936 | 8.0 | 120 | J-58 | J-59 | 112 | 0.71 | 0.366 |
| P-73 | 1,459 | 8.0 | 120 | J-55 | J-60 | 83 | 0.53 | 0.210 |
| P-74 | 1,114 | 8.0 | 120 | J-60 | J-61 | 83 | 0.53 | 0.210 |
| P-75 | 1,054 | 12.0 | 120 | J-61 | J-26 | 573 | 1.63 | 1.050 |
| P-76 | 1,140 | 12.0 | 120 | J-61 | J-56 | 210 | 0.60 | 0.163 |
| P-77 | 855 | 12.0 | 120 | J-62 | J-63 | 619 | 1.76 | 1.210 |
| P-78 | 905 | 12.0 | 120 | J-63 | J-10 | 958 | 2.72 | 2.714 |
| P-79 | 831 | 8.0 | 120 | J-63 | J-64 | 59 | 0.38 | 0.112 |
| P-80 | 1,177 | 8.0 | 120 | J-64 | J-57 | 59 | 0.38 | 0.113 |
| P-81 | 1,245 | 8.0 | 120 | J-55 | J-65 | 14 | 0.09 | 0.008 |
| P-82 | 2,151 | 16.0 | 120 | J-22 | J-66 | 1,251 | 2.00 | 1.096 |
| P-83 | 1,176 | 16.0 | 120 | J-66 | J-24 | 545 | 0.87 | 0.235 |
| P-84 | 1,113 | 12.0 | 120 | J-65 | J-66 | 706 | 2.00 | 1.541 |
| P-85 | 1,034 | 8.0 | 120 | J-65 | J-67 | 110 | 0.70 | 0.354 |
| P-86 | 1,662 | 8.0 | 120 | J-67 | J-68 | 110 | 0.70 | 0.354 |
| P-87 | 1,161 | 12.0 | 120 | J-68 | J-23 | 1,116 | 3.16 | 3.600 |
| P-88 | 1,359 | 8.0 | 120 | J-68 | J-69 | 150 | 0.96 | 0.632 |
| P-89 | 1,832 | 8.0 | 120 | J-69 | J-63 | 167 | 1.06 | 0.768 |
| P-90 | 1,005 | 12.0 | 120 | J-68 | J-70 | 710 | 2.01 | 1.557 |
| P-91 | 573 | 12.0 | 120 | J-70 | J-62 | 81 | 0.23 | 0.028 |
| P-92 | 1,409 | 12.0 | 120 | J-65 | J-71 | 383 | 1.09 | 0.498 |
| P-93 | 1,201 | 12.0 | 120 | J-56 | J-72 | 73 | 0.21 | 0.023 |
| P-94 | 503 | 12.0 | 120 | J-71 | J-62 | 254 | 0.72 | 0.232 |
| P-95 | 736 | 12.0 | 120 | J-71 | J-72 | 119 | 0.34 | 0.057 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 3

3-ER-472

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario:  Peak Hour - Auction
Property

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|-------|------|------|------|------|------|------|------|------|
| P-96 | 718 | 12.0 | 120 | J-71 | J-70 | 182 | 0.52 | 0.126 |
| P-97 | 1,047 | 8.0 | 120 | J-19 | J-73 | 196 | 1.25 | 1.035 |
| P-98 | 1,393 | 12.0 | 120 | J-83 | J-74 | 389 | 1.10 | 0.511 |
| P-99 | 903 | 12.0 | 120 | J-74 | J-75 | 87 | 0.25 | 0.032 |
| P-100 | 1,063 | 12.0 | 120 | J-21 | J-76 | 721 | 2.04 | 1.602 |
| P-101 | 1,185 | 12.0 | 120 | J-76 | J-77 | 351 | 1.00 | 0.423 |
| P-102 | 939 | 12.0 | 120 | J-77 | J-74 | 230 | 0.65 | 0.193 |
| P-103 | 1,124 | 12.0 | 120 | J-74 | J-78 | 509 | 1.45 | 0.843 |
| P-104 | 1,019 | 8.0 | 120 | J-78 | J-79 | 170 | 1.09 | 0.800 |
| P-105 | 1,354 | 16.0 | 120 | J-1 | J-80 | 1,336 | 2.13 | 1.238 |
| P-106 | 894 | 16.0 | 120 | J-80 | J-12 | 1,019 | 1.63 | 0.749 |
| P-107 | 1,486 | 8.0 | 120 | J-76 | J-81 | 130 | 0.83 | 0.487 |
| P-108 | 1,004 | 12.0 | 120 | J-75 | J-82 | 494 | 1.40 | 0.796 |
| P-109 | 1,106 | 12.0 | 120 | J-82 | J-23 | 860 | 2.44 | 2.225 |
| P-110 | 1,868 | 8.0 | 120 | J-81 | J-82 | 68 | 0.43 | 0.146 |
| P-111 | 1,711 | 12.0 | 120 | J-78 | J-12 | 828 | 2.35 | 2.071 |
| P-112 | 675 | 8.0 | 120 | J-73 | J-83 | 115 | 0.73 | 0.385 |
| P-113 | 1,008 | 8.0 | 120 | J-83 | J-84 | 157 | 1.00 | 0.687 |
| P-114 | 1,673 | 8.0 | 120 | J-84 | J-52 | 249 | 1.59 | 1.618 |
| P-115 | 1,776 | 8.0 | 120 | J-78 | J-84 | 92 | 0.59 | 0.257 |
| P-116 | 1,656 | 8.0 | 120 | J-73 | J-85 | 81 | 0.52 | 0.202 |
| P-117 | 1,568 | 8.0 | 120 | J-85 | J-76 | 81 | 0.52 | 0.202 |
| P-118 | 1,542 | 8.0 | 120 | J-82 | J-86 | 147 | 0.94 | 0.605 |
| P-119 | 532 | 8.0 | 120 | J-79 | J-87 | 170 | 1.09 | 0.800 |
| P-120 | 1,177 | 8.0 | 120 | J-87 | J-80 | 317 | 2.02 | 2.524 |
| P-121 | 801 | 8.0 | 120 | J-86 | J-87 | 147 | 0.94 | 0.605 |
| P-122 | 931 | 12.0 | 120 | J-83 | J-18 | 698 | 1.98 | 1.509 |
| P-125 | 839 | 16.0 | 120 | J-14 | J-90 | 648 | 1.03 | 0.324 |
| P-126 | 1,077 | 16.0 | 120 | J-90 | J-15 | 648 | 1.03 | 0.324 |
| P-128 | 1,309 | 24.0 | 120 | J-21 | J-91 | 619 | 0.44 | 0.041 |
| P-129 | 1,332 | 24.0 | 120 | J-91 | J-22 | 818 | 0.58 | 0.069 |
| P-130 | 974 | 8.0 | 120 | J-81 | J-91 | 199 | 1.27 | 1.061 |
| P-133 | 1,322 | 24.0 | 120 | J-2 | J-92 | 8,162 | 5.79 | 4.904 |
| P-134 | 1,322 | 24.0 | 120 | J-92 | J-3 | 5,836 | 4.14 | 2.635 |
| P-135 | 1,774 | 24.0 | 120 | J-20 | J-93 | 101 | 0.07 | 0.001 |
| P-136 | 778 | 24.0 | 120 | J-93 | J-21 | 101 | 0.07 | 0.001 |
| P-137 | 786 | 16.0 | 120 | J-13 | J-94 | 995 | 1.59 | 0.717 |
| P-138 | 1,159 | 16.0 | 120 | J-94 | J-51 | 748 | 1.19 | 0.423 |
| P-139 | 2,314 | 12.0 | 120 | J-44 | J-16 | 389 | 1.10 | 0.511 |
| P-140 | 1,166 | 8.0 | 120 | J-11 | J-69 | 317 | 2.02 | 2.522 |
| P-141 | 890 | 16.0 | 120 | J-95 | J-16 | 1,330 | 2.12 | 1.228 |
| P-142 | 1,256 | 16.0 | 120 | J-15 | J-95 | 1,330 | 2.12 | 1.228 |
| P-143 | 2,336 | 12.0 | 120 | J-44 | J-92 | 1,333 | 3.78 | 5.006 |
| P-204 | 2,317 | 12.0 | 120 | J-205 | J-25 | 1 | 0.00 | 0.000 |
| P-259 | 1,600 | 12.0 | 120 | J-ELS | J-205 | 1 | 0.00 | 0.000 |
| P-500 | 679 | 48.0 | 120 | R-1 | J-92 | 15,331 | 2.72 | 0.547 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 3

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Reservoir Table

Active Scenario: Peak Hour - Auction
Property

| Label | Elevation (ft) | Flow (Out net) (gpm) | Hydraulic Grade (ft) |
|-------|----------------|----------------------|----------------------|
| R-1 | 1,710.00 | 15,331 | 1,710.00 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 1

3-ER-474



**AUCTION PROPERTY**
**MAXIMUM DAY + FIRE FLOW RESULTS (RESIDUAL)**
**MAXIMUM DAY + FIRE FLOW RESULTS (AVAILABLE)**

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Residual - Auction Property

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-1 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 78.1 | 63.0 | J-15 | 78.1 | 63.0 | P-133 | 5.51 | True |
| J-2 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 77.4 | 63.7 | J-15 | 77.4 | 63.7 | P-133 | 5.83 | True |
| J-3 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 73.9 | 64.0 | J-15 | 73.9 | 64.0 | P-134 | 4.91 | True |
| J-4 | 28 | 4,000 | 4,028 | 4,000 | 4,028 | 72.1 | 63.6 | J-15 | 72.1 | 63.6 | P-134 | 4.68 | True |
| J-5 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 76.1 | 63.5 | J-15 | 76.1 | 63.5 | P-27 | 4.94 | True |
| J-6 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 78.9 | 63.5 | J-15 | 78.9 | 63.5 | P-27 | 4.94 | True |
| J-7 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 82.4 | 63.4 | J-15 | 82.4 | 63.4 | P-133 | 4.84 | True |
| J-8 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 86.8 | 63.2 | J-15 | 86.8 | 63.2 | P-133 | 5.06 | True |
| J-9 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 84.8 | 63.2 | J-15 | 84.8 | 63.2 | P-133 | 5.09 | True |
| J-10 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 82.3 | 63.1 | J-15 | 82.3 | 63.1 | P-133 | 5.21 | True |
| J-11 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 80.2 | 63.1 | J-15 | 80.2 | 63.1 | P-133 | 5.30 | True |
| J-12 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 71.6 | 61.9 | J-15 | 71.6 | 61.9 | P-133 | 5.23 | True |
| J-13 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 64.1 | 61.6 | J-15 | 64.1 | 61.6 | P-133 | 5.20 | True |
| J-14 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 60.5 | 60.1 | J-15 | 60.5 | 60.1 | P-133 | 5.02 | True |
| J-15 | 354 | 4,000 | 4,000 | 4,000 | 4,000 | 58.4 | 60.0 | J-90 | 58.4 | 60.0 | P-133 | 4.92 | True |
| J-16 | 0 | 4,000 | 4,354 | 4,000 | 4,354 | 63.7 | 60.8 | J-15 | 63.7 | 60.8 | P-133 | 4.75 | True |
| J-17 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 68.3 | 61.9 | J-15 | 68.3 | 61.9 | P-9 | 4.80 | True |
| J-18 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 66.2 | 62.1 | J-15 | 66.2 | 62.1 | P-133 | 5.28 | True |
| J-19 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 67.6 | 62.3 | J-15 | 67.6 | 62.3 | P-133 | 5.30 | True |
| J-20 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 71.0 | 62.5 | J-15 | 71.0 | 62.5 | P-133 | 5.34 | True |
| J-21 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 78.8 | 62.6 | J-15 | 78.8 | 62.6 | P-133 | 5.35 | True |
| J-22 | 28 | 4,000 | 4,028 | 4,000 | 4,028 | 83.3 | 62.7 | J-15 | 83.3 | 62.7 | P-133 | 5.37 | True |
| J-23 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 80.8 | 62.8 | J-15 | 80.8 | 62.8 | P-133 | 5.41 | True |
| J-24 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 87.5 | 62.9 | J-15 | 87.5 | 62.9 | P-133 | 5.31 | True |
| J-25 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 87.8 | 62.9 | J-15 | 87.8 | 62.9 | P-133 | 5.29 | True |
| J-26 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 88.4 | 63.0 | J-15 | 88.4 | 63.0 | P-133 | 5.26 | True |
| J-27 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 88.3 | 64.2 | J-15 | 88.3 | 64.2 | P-133 | 4.06 | True |
| J-28 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 87.5 | 64.3 | J-15 | 87.5 | 64.3 | P-133 | 4.04 | True |
| J-29 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 80.5 | 64.4 | J-15 | 80.5 | 64.4 | P-20 | 4.52 | True |
| J-30 | 273 | 4,000 | 4,273 | 4,000 | 4,273 | 74.2 | 63.5 | J-15 | 74.2 | 63.5 | P-21 | 5.47 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 4

3-ER-476

Active Scenario: Max Day + FF Residual - Auction Property

Superstition Vistas
HILGARTWILSON, LLC

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node Flex Table: Fire Flow Report

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-31 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 82.1 | 64.3 | J-15 | 82.1 | 64.3 | P-133 | 3.99 | True |
| J-32 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 80.8 | 64.3 | J-15 | 80.8 | 64.3 | P-133 | 3.94 | True |
| J-33 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 78.3 | 64.4 | J-15 | 78.3 | 64.4 | P-27 | 4.29 | True |
| J-34 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 76.5 | 64.4 | J-15 | 76.5 | 64.4 | P-27 | 4.99 | True |
| J-35 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 79.0 | 64.3 | J-15 | 79.0 | 64.3 | P-39 | 5.60 | True |
| J-36 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 76.0 | 64.3 | J-15 | 76.0 | 64.3 | P-42 | 4.60 | True |
| J-37 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 77.7 | 64.3 | J-15 | 77.7 | 64.3 | P-31 | 5.74 | True |
| J-38 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 73.9 | 64.3 | J-15 | 73.9 | 64.3 | P-33 | 6.14 | True |
| J-39 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 74.0 | 64.3 | J-15 | 74.0 | 64.3 | P-34 | 7.10 | True |
| J-40 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 72.2 | 64.3 | J-15 | 72.2 | 64.3 | P-36 | 7.03 | True |
| J-41 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 78.7 | 63.5 | J-15 | 78.7 | 63.5 | P-37 | 5.80 | True |
| J-42 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 74.0 | 63.5 | J-15 | 74.0 | 63.5 | P-40 | 4.98 | True |
| J-43 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 74.5 | 63.7 | J-15 | 74.5 | 63.7 | P-133 | 4.13 | True |
| J-44 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 70.3 | 63.7 | J-15 | 70.3 | 63.7 | P-133 | 4.04 | True |
| J-45 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 73.6 | 63.9 | J-15 | 73.6 | 63.9 | P-47 | 4.56 | True |
| J-46 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 65.3 | 64.2 | J-15 | 65.3 | 64.2 | P-49 | 6.05 | True |
| J-47 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 72.3 | 63.8 | J-15 | 72.3 | 63.8 | P-50 | 4.90 | True |
| J-48 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 66.5 | 63.5 | J-15 | 66.5 | 63.5 | P-133 | 4.12 | True |
| J-49 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 67.0 | 63.7 | J-15 | 67.0 | 63.7 | P-133 | 4.12 | True |
| J-50 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 60.4 | 63.2 | J-15 | 60.4 | 63.2 | P-56 | 4.07 | True |
| J-51 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 60.5 | 60.7 | J-15 | 60.5 | 60.7 | P-133 | 5.25 | True |
| J-52 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 64.9 | 61.5 | J-15 | 64.9 | 61.5 | P-133 | 5.07 | True |
| J-53 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 87.3 | 64.2 | J-15 | 87.3 | 64.2 | P-65 | 5.18 | True |
| J-54 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 86.0 | 63.2 | J-15 | 86.0 | 63.2 | P-64 | 5.88 | True |
| J-55 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 91.4 | 64.1 | J-15 | 91.4 | 64.1 | P-133 | 6.16 | True |
| J-56 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 91.9 | 64.1 | J-15 | 91.9 | 64.1 | P-133 | 4.19 | True |
| J-57 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 88.4 | 64.1 | J-15 | 88.4 | 64.1 | P-133 | 4.18 | True |
| J-58 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 88.8 | 64.1 | J-15 | 88.8 | 64.1 | P-72 | 5.00 | True |
| J-59 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 86.2 | 63.0 | J-15 | 86.2 | 63.0 | P-133 | 5.23 | True |
| J-60 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 88.2 | 64.1 | J-15 | 88.2 | 64.1 | P-74 | 5.14 | True |

**21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg**
**Fire Flow Node Flex Table: Fire Flow Report**

Active Scenario: Max Day + FF Residual - Auction Property

Superstition Vistas
HILGARTWILSON, LLC

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-61 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 94.7 | 64.1 | J-15 | 94.7 | 64.1 | P-133 | 4.18 | True |
| J-62 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 87.4 | 64.1 | J-15 | 87.4 | 64.1 | P-133 | 4.19 | True |
| J-63 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 87.0 | 64.2 | J-15 | 87.0 | 64.2 | P-133 | 4.18 | True |
| J-64 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 83.6 | 64.2 | J-15 | 83.6 | 64.2 | P-79 | 5.56 | True |
| J-65 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 90.3 | 64.1 | J-15 | 90.3 | 64.1 | P-133 | 4.19 | True |
| J-66 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 86.5 | 62.9 | J-15 | 86.5 | 62.9 | P-133 | 5.32 | True |
| J-67 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 81.5 | 64.1 | J-15 | 81.5 | 64.1 | P-85 | 5.33 | True |
| J-68 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 85.4 | 64.1 | J-15 | 85.4 | 64.1 | P-133 | 4.20 | True |
| J-69 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 80.4 | 64.2 | J-15 | 80.4 | 64.2 | P-133 | 4.19 | True |
| J-70 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 85.9 | 64.1 | J-15 | 85.9 | 64.1 | P-133 | 4.19 | True |
| J-71 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 87.6 | 64.1 | J-15 | 87.6 | 64.1 | P-133 | 4.19 | True |
| J-72 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 89.0 | 64.1 | J-15 | 89.0 | 64.1 | P-133 | 4.19 | True |
| J-73 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 71.5 | 63.9 | J-15 | 71.5 | 63.9 | P-133 | 4.20 | True |
| J-74 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 75.4 | 63.9 | J-15 | 75.4 | 63.9 | P-133 | 4.20 | True |
| J-75 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 77.1 | 64.0 | J-15 | 77.1 | 64.0 | P-133 | 4.21 | True |
| J-76 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 79.3 | 64.0 | J-15 | 79.3 | 64.0 | P-133 | 4.21 | True |
| J-77 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 76.4 | 64.0 | J-15 | 76.4 | 64.0 | P-133 | 4.21 | True |
| J-78 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 74.5 | 63.9 | J-15 | 74.5 | 63.9 | P-133 | 4.20 | True |
| J-79 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 71.7 | 63.9 | J-15 | 71.7 | 63.9 | P-119 | 5.07 | True |
| J-80 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 74.7 | 62.2 | J-15 | 74.7 | 62.2 | P-133 | 5.30 | True |
| J-81 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 79.3 | 64.0 | J-15 | 79.3 | 64.0 | P-133 | 4.21 | True |
| J-82 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 80.2 | 64.0 | J-15 | 80.2 | 64.0 | P-133 | 4.22 | True |
| J-83 | 354 | 4,000 | 4,354 | 4,000 | 4,354 | 66.1 | 62.3 | J-15 | 66.1 | 62.3 | P-122 | 5.51 | True |
| J-84 | 354 | 1,500 | 1,500 | 1,500 | 1,500 | 67.6 | 63.9 | J-15 | 67.6 | 63.9 | P-133 | 4.19 | True |
| J-85 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 67.8 | 64.0 | J-15 | 67.8 | 64.0 | P-117 | 4.94 | True |
| J-86 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 73.8 | 64.0 | J-15 | 73.8 | 64.0 | P-121 | 5.30 | True |
| J-87 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 74.3 | 63.9 | J-15 | 74.3 | 63.9 | P-133 | 4.20 | True |
| J-90 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 59.0 | 59.4 | J-15 | 59.0 | 59.4 | P-133 | 4.97 | True |
| J-91 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 82.3 | 62.6 | J-15 | 82.3 | 62.6 | P-133 | 5.36 | True |
| J-92 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 78.2 | 64.7 | J-15 | 78.2 | 64.7 | P-133 | 3.53 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

A. Padora
Page 3 of 4

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Residual - Auction Property

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-93 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 76.7 | 62.6 | J-15 | 76.7 | 62.6 | P-133 | 5.35 | True |
| J-94 | 56 | 4,000 | 4,056 | 4,000 | 4,056 | 63.8 | 61.4 | J-15 | 63.8 | 61.4 | P-133 | 5.16 | True |
| J-95 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 60.2 | 59.7 | J-15 | 60.2 | 59.7 | P-133 | 4.84 | True |
| J-205 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 96.0 | 64.1 | J-15 | 96.0 | 64.1 | P-204 | 4.26 | True |
| J-ELS | 1 | 1,500 | 1,501 | 1,500 | 1,501 | 92.8 | 64.1 | J-15 | 92.8 | 64.1 | P-259 | 4.26 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 4 of 4

3-ER-479

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Active Scenario: Max Day + FF Available - Auction Property

Superstition Vistas
HILGARTWILSON, LLC

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-1 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 78.1 | 63.0 | J-15 | 72.3 | 59.4 | P-133 | 8.40 | True |
| J-2 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 77.4 | 63.7 | J-15 | 73.3 | 61.4 | P-133 | 9.11 | True |
| J-3 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 73.9 | 64.0 | J-15 | 70.8 | 62.0 | P-134 | 8.05 | True |
| J-4 | 28 | 4,000 | 4,028 | 10,000 | 10,028 | 72.1 | 63.6 | J-15 | 67.6 | 60.5 | P-134 | 7.45 | True |
| J-5 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 76.1 | 63.5 | J-15 | 51.8 | 59.0 | P-41 | 9.12 | True |
| J-6 | 0 | 4,000 | 4,000 | 9,617 | 9,617 | 78.9 | 63.5 | J-15 | 41.8 | 53.6 | P-37 | 10.00 | True |
| J-7 | 0 | 4,000 | 4,000 | 9,514 | 9,514 | 82.4 | 63.4 | J-15 | 48.8 | 61.0 | P-22 | 10.00 | True |
| J-8 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 86.8 | 63.2 | J-15 | 59.8 | 60.2 | P-5 | 8.49 | True |
| J-9 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 84.8 | 63.2 | J-15 | 62.9 | 60.2 | P-7 | 8.00 | True |
| J-10 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 82.3 | 63.1 | J-15 | 64.9 | 59.9 | P-6 | 7.98 | True |
| J-11 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 80.2 | 63.1 | J-15 | 65.3 | 59.7 | P-6 | 9.28 | True |
| J-12 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 71.6 | 61.9 | J-15 | 59.5 | 55.4 | P-133 | 7.79 | True |
| J-13 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 64.1 | 61.6 | J-15 | 51.6 | 51.6 | P-137 | 9.82 | True |
| J-14 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 60.5 | 60.1 | J-15 | 42.5 | 44.2 | P-58 | 7.23 | True |
| J-15 | 354 | 4,000 | 4,354 | 10,000 | 10,354 | 58.4 | 60.0 | J-90 | 38.0 | 43.9 | P-141 | 8.27 | True |
| J-16 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 63.7 | 60.8 | J-15 | 48.9 | 48.4 | P-8 | 8.62 | True |
| J-17 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 68.3 | 61.9 | J-15 | 56.2 | 54.7 | P-9 | 9.80 | True |
| J-18 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 66.2 | 62.1 | J-15 | 48.0 | 52.7 | P-133 | 7.86 | True |
| J-19 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 67.6 | 62.3 | J-15 | 47.9 | 51.4 | P-11 | 8.18 | True |
| J-20 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 71.0 | 62.5 | J-15 | 55.3 | 57.8 | P-133 | 8.08 | True |
| J-21 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 78.8 | 62.6 | J-15 | 65.8 | 58.1 | P-133 | 8.11 | True |
| J-22 | 28 | 4,000 | 4,028 | 10,000 | 10,028 | 83.3 | 62.7 | J-15 | 72.5 | 58.6 | P-133 | 8.15 | True |
| J-23 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 80.8 | 62.8 | J-15 | 71.9 | 58.9 | P-133 | 8.20 | True |
| J-24 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 87.5 | 62.9 | J-15 | 61.4 | 59.6 | P-83 | 8.18 | True |
| J-25 | 0 | 4,000 | 4,000 | 9,365 | 9,365 | 87.8 | 62.9 | J-15 | 48.1 | 52.4 | P-16 | 10.00 | True |
| J-26 | 0 | 4,000 | 4,000 | 9,387 | 9,387 | 88.4 | 63.0 | J-15 | 54.5 | 59.9 | P-70 | 10.00 | True |
| J-27 | 273 | 1,500 | 1,773 | 7,162 | 7,434 | 88.3 | 64.2 | J-15 | 59.8 | 62.0 | P-17 | 10.00 | True |
| J-28 | 273 | 1,500 | 1,773 | 10,000 | 10,273 | 87.5 | 64.3 | J-15 | 45.1 | 53.1 | P-22 | 9.79 | True |
| J-29 | 0 | 1,500 | 1,500 | 10,000 | 10,000 | 80.5 | 64.3 | J-15 | 64.3 | 62.0 | P-20 | 10.00 | True |
| J-30 | 273 | 4,000 | 4,273 | 7,788 | 8,060 | 74.2 | 63.5 | J-15 | 55.7 | 62.1 | P-21 | 10.00 | True |

A. Paciora
Page 1 of 4

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wig
Fire Flow Node Flex Table: Fire Flow Report

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wig
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

Active Scenario: Max Day + FF Available - Auction Property

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated @ Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-31 | 273 | 1,500 | 1,773 | 6,355 | 6,627 | 82.1 | 64.3 | J-15 | 57.3 | 59.9 | P-24 | 10.00 | True |
| J-32 | 273 | 1,500 | 1,773 | 8,616 | 8,889 | 80.8 | 64.3 | J-15 | 49.1 | 57.2 | P-25 | 10.00 | True |
| J-33 | 273 | 1,500 | 1,773 | 6,301 | 6,574 | 78.3 | 64.4 | J-15 | 60.4 | 62.9 | P-27 | 10.00 | True |
| J-34 | 273 | 1,500 | 1,773 | 4,841 | 5,114 | 76.5 | 64.4 | J-15 | 67.0 | 63.5 | P-27 | 10.00 | True |
| J-35 | 0 | 1,500 | 1,500 | 2,676 | 2,676 | 79.0 | 64.3 | J-15 | 63.3 | 63.9 | P-39 | 10.00 | True |
| J-36 | 0 | 1,500 | 1,500 | 3,533 | 3,533 | 76.0 | 64.3 | J-15 | 63.4 | 63.7 | P-42 | 10.00 | True |
| J-37 | 0 | 1,500 | 1,500 | 2,607 | 2,607 | 77.7 | 64.3 | J-15 | 63.9 | 63.9 | P-31 | 10.00 | True |
| J-38 | 0 | 1,500 | 1,500 | 2,607 | 2,607 | 73.9 | 64.3 | J-15 | 60.2 | 64.0 | P-33 | 10.00 | True |
| J-39 | 0 | 1,500 | 2,450 | 2,450 | 2,450 | 73.9 | 64.0 | J-15 | 60.6 | 64.0 | P-31 | 10.00 | True |
| J-40 | 354 | 1,500 | 1,854 | 2,207 | 2,561 | 74.0 | 64.3 | J-15 | 65.6 | 63.9 | P-34 | 10.00 | True |
| J-41 | 0 | 1,500 | 1,500 | 2,265 | 2,265 | 72.2 | 64.3 | J-15 | 64.1 | 64.1 | P-36 | 10.00 | True |
| J-42 | 0 | 4,000 | 4,000 | 7,088 | 7,088 | 78.7 | 63.5 | J-15 | 59.0 | 62.1 | P-37 | 10.00 | True |
| J-43 | 354 | 1,500 | 1,854 | 9,680 | 9,680 | 74.0 | 63.5 | J-15 | 56.1 | 60.9 | P-40 | 10.00 | True |
| J-44 | 354 | 1,500 | 1,854 | 6,767 | 7,121 | 74.5 | 63.7 | J-15 | 59.9 | 59.0 | P-44 | 10.00 | True |
| J-45 | 0 | 1,500 | 1,500 | 10,000 | 10,354 | 70.3 | 63.7 | J-15 | 49.7 | 54.4 | P-143 | 8.80 | True |
| J-46 | 354 | 1,500 | 1,854 | 3,606 | 3,606 | 73.6 | 63.9 | J-15 | 62.6 | 62.2 | P-47 | 10.00 | True |
| J-47 | 0 | 1,500 | 1,500 | 2,649 | 3,003 | 65.3 | 64.2 | J-15 | 52.9 | 63.7 | P-49 | 10.00 | True |
| J-48 | 0 | 1,500 | 1,500 | 3,077 | 3,077 | 72.3 | 63.8 | J-15 | 55.8 | 62.8 | P-51 | 10.00 | True |
| J-49 | 354 | 1,500 | 1,854 | 5,032 | 5,032 | 66.5 | 63.5 | J-15 | 59.9 | 59.9 | P-62 | 10.00 | True |
| J-50 | 0 | 1,500 | 1,500 | 8,577 | 8,931 | 67.0 | 63.4 | J-15 | 40.2 | 44.7 | P-54 | 10.00 | True |
| J-51 | 0 | 1,500 | 1,500 | 2,850 | 2,850 | 60.4 | 63.2 | J-15 | 47.4 | 61.6 | P-56 | 10.00 | True |
| J-52 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 60.5 | 60.7 | J-15 | 42.9 | 61.6 | P-138 | 7.82 | True |
| J-53 | 273 | 1,500 | 1,773 | 3,001 | 3,001 | 87.3 | 61.5 | J-15 | 49.2 | 47.3 | P-133 | 7.60 | True |
| J-54 | 0 | 4,000 | 4,000 | 6,700 | 6,700 | 94.9 | 64.2 | J-15 | 71.2 | 51.7 | P-65 | 10.00 | True |
| J-55 | 0 | 1,500 | 1,500 | 5,074 | 5,074 | 91.4 | 64.1 | J-15 | 65.5 | 61.9 | P-64 | 10.00 | True |
| J-56 | 273 | 1,500 | 1,773 | 8,165 | 8,438 | 91.9 | 64.1 | J-15 | 58.2 | 63.7 | P-66 | 10.00 | True |
| J-57 | 0 | 1,500 | 1,500 | 4,043 | 4,043 | 88.4 | 64.1 | J-15 | 62.4 | 60.7 | P-93 | 10.00 | True |
| J-58 | 0 | 1,500 | 1,500 | 3,014 | 3,014 | 88.8 | 64.1 | J-15 | 70.9 | 63.0 | P-68 | 10.00 | True |
| J-59 | 0 | 4,000 | 4,000 | 7,636 | 7,636 | 86.2 | 63.0 | J-15 | 63.1 | 63.5 | P-72 | 10.00 | True |
| J-60 | 0 | 1,500 | 1,500 | 2,904 | 2,904 | 88.2 | 64.1 | J-15 | 67.7 | 61.1 | P-70 | 10.00 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node Flex Table: Fire Flow Report

Active Scenario: Max Day + FF Available - Auction Property

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-61 | 273 | 1,500 | 1,773 | 7,365 | 7,638 | 94.7 | 64.1 | J-15 | 61.6 | 61.2 | P-75 | 10.00 | True |
| J-62 | 273 | 1,500 | 1,773 | 9,236 | 9,508 | 87.4 | 64.1 | J-15 | 57.0 | 60.0 | P-77 | 10.00 | True |
| J-63 | 273 | 1,500 | 1,773 | 7,149 | 7,421 | 87.0 | 64.2 | J-15 | 67.6 | 61.4 | P-78 | 10.00 | True |
| J-64 | 0 | 1,500 | 1,500 | 2,695 | 2,695 | 83.6 | 64.2 | J-15 | 69.7 | 63.6 | P-79 | 10.00 | True |
| J-65 | 273 | 1,500 | 1,773 | 7,784 | 8,057 | 90.3 | 64.1 | J-15 | 63.0 | 60.8 | P-84 | 10.00 | True |
| J-66 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 86.5 | 62.9 | J-15 | 64.3 | 59.2 | P-82 | 9.40 | True |
| J-67 | 0 | 1,500 | 1,500 | 2,799 | 2,799 | 81.5 | 64.1 | J-15 | 63.8 | 63.5 | P-85 | 10.00 | True |
| J-68 | 273 | 1,500 | 1,773 | 7,010 | 7,282 | 85.4 | 64.1 | J-15 | 66.7 | 61.3 | P-87 | 10.00 | True |
| J-69 | 0 | 1,500 | 1,500 | 4,102 | 4,102 | 80.4 | 64.2 | J-15 | 57.2 | 63.0 | P-140 | 10.00 | True |
| J-70 | 273 | 1,500 | 1,773 | 9,338 | 9,611 | 85.9 | 64.1 | J-15 | 54.1 | 59.9 | P-90 | 10.00 | True |
| J-71 | 273 | 1,500 | 1,773 | 9,543 | 9,816 | 87.6 | 64.1 | J-15 | 52.2 | 59.7 | P-96 | 10.00 | True |
| J-72 | 273 | 1,500 | 1,773 | 8,513 | 8,786 | 89.0 | 63.9 | J-15 | 60.5 | 60.4 | P-94 | 10.00 | True |
| J-73 | 0 | 1,500 | 1,500 | 3,545 | 3,545 | 71.5 | 63.9 | J-15 | 60.6 | 62.6 | P-112 | 10.00 | True |
| J-74 | 354 | 1,500 | 1,854 | 10,000 | 10,354 | 75.4 | 63.9 | J-15 | 46.3 | 53.0 | P-103 | 8.48 | True |
| J-75 | 354 | 1,500 | 1,854 | 6,302 | 6,656 | 77.1 | 64.0 | J-15 | 56.1 | 60.9 | P-99 | 10.00 | True |
| J-76 | 354 | 1,500 | 1,854 | 6,737 | 7,091 | 79.3 | 64.0 | J-15 | 59.8 | 60.6 | P-100 | 10.00 | True |
| J-77 | 354 | 1,500 | 1,854 | 6,078 | 6,432 | 76.4 | 64.0 | J-15 | 55.5 | 61.0 | P-102 | 10.00 | True |
| J-78 | 354 | 1,500 | 1,854 | 8,732 | 9,086 | 74.5 | 63.9 | J-15 | 45.4 | 57.5 | P-111 | 10.00 | True |
| J-79 | 0 | 1,500 | 1,500 | 3,027 | 3,027 | 71.7 | 63.9 | J-15 | 63.0 | 63.0 | P-119 | 10.00 | True |
| J-80 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 74.7 | 62.2 | J-15 | 62.4 | 56.8 | P-105 | 8.69 | True |
| J-81 | 0 | 1,500 | 1,500 | 3,830 | 3,830 | 79.3 | 64.0 | J-15 | 60.0 | 62.7 | P-130 | 10.00 | True |
| J-82 | 354 | 1,500 | 1,854 | 6,706 | 7,060 | 80.2 | 64.0 | J-15 | 61.8 | 60.8 | P-109 | 10.00 | True |
| J-83 | 354 | 4,000 | 4,354 | 7,903 | 8,257 | 66.1 | 62.3 | J-15 | 50.4 | 58.1 | P-122 | 10.00 | True |
| J-84 | 0 | 1,500 | 1,500 | 3,989 | 3,989 | 67.6 | 63.9 | J-15 | 45.8 | 62.1 | P-113 | 10.00 | True |
| J-85 | 0 | 1,500 | 1,500 | 3,015 | 3,015 | 67.8 | 64.0 | J-15 | 41.0 | 63.1 | P-117 | 10.00 | True |
| J-86 | 0 | 1,500 | 1,500 | 2,874 | 2,874 | 73.8 | 64.0 | J-15 | 55.2 | 63.1 | P-121 | 10.00 | True |
| J-87 | 0 | 1,500 | 1,500 | 3,871 | 3,871 | 74.3 | 63.9 | J-15 | 52.1 | 58.8 | P-120 | 10.00 | True |
| J-90 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 75.0 | 59.4 | J-15 | 38.6 | 43.4 | P-125 | 8.72 | True |
| J-91 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 82.3 | 59.0 | J-15 | 70.3 | 58.3 | P-133 | 8.13 | True |
| J-92 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 78.2 | 64.7 | J-15 | 78.2 | 64.7 | P-133 | 3.53 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 4

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Available - Auction Property

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated) Residual @ Total Flow Needed (psi) | Pressure (Calculated) Zone Lower Limit @ Total Flow Needed (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-93 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 76.7 | 62.6 | J-15 | 62.8 | 57.9 | P-133 | 8.10 | True |
| J-94 | 56 | 4,000 | 4,056 | 10,000 | 10,056 | 63.8 | 61.4 | J-15 | 49.0 | 49.7 | P-133 | 7.52 | True |
| J-95 | 0 | 4,000 | 4,000 | 9,916 | 9,916 | 60.2 | 59.7 | J-15 | 41.8 | 45.2 | P-141 | 10.00 | True |
| J-205 | 0 | 1,500 | 1,500 | 3,524 | 3,524 | 96.0 | 64.1 | J-15 | 64.1 | 63.2 | P-204 | 10.00 | True |
| J-ELS | 1 | 1,500 | 1,501 | 3,524 | 3,525 | 92.8 | 64.1 | J-15 | 44.3 | 63.2 | P-259 | 10.00 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 4 of 4

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1604 of 2158
Case 2:21-cv-00122-DWL   Document 87-10   Filed 07/14/25   Page 77 of 140



# SITE
# HYDRAULIC MODELING RESULTS

HILGARTWILSON, LLC



# SITE
# AVERAGE DAY DEMAND RESULTS

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg                                    Active Scenario: Average Day - Site
FlexTable: Junction Table

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|---|---|---|---|---|
| AZWC-J-1 | 1,565.65 | 96 | 1,717.17 | 65.6 |
| AZWC-J-2 | 1,566.00 | 0 | 1,718.48 | 66.0 |
| AZWC-J-3 | 1,562.39 | 96 | 1,719.53 | 68.0 |
| AZWC-J-4 | 1,549.27 | 192 | 1,717.00 | 72.6 |
| AZWC-J-5 | 1,549.29 | 14 | 1,717.15 | 72.6 |
| AZWC-J-6 | 1,550.00 | 14 | 1,718.56 | 72.9 |
| AZWC-J-7 | 1,540.00 | 14 | 1,717.14 | 76.6 |
| AZWC-J-8 | 1,540.19 | 96 | 1,720.00 | 77.8 |
| AZWC-J-9 | 1,532.76 | 74 | 1,716.86 | 79.7 |
| AZWC-J-10 | 1,532.13 | 96 | 1,716.88 | 79.9 |
| AZWC-J-11 | 1,530.66 | 192 | 1,717.00 | 80.6 |
| AZWC-J-12 | 1,530.39 | 96 | 1,718.65 | 81.5 |
| AZWC-J-13 | 1,516.54 | 55 | 1,716.89 | 86.7 |
| AZWC-J-14 | 1,511.49 | 55 | 1,716.86 | 88.9 |
| AZWC-J-15 | 1,510.00 | 192 | 1,717.09 | 89.6 |
| AZWC-J-16 | 1,510.00 | 96 | 1,717.38 | 89.7 |
| AZWC-J-17 | 1,498.95 | 55 | 1,716.90 | 94.3 |
| AZWC-J-18 | 1,496.42 | 55 | 1,716.87 | 95.4 |
| J-1 | 1,518.46 | 0 | 1,709.23 | 82.5 |
| J-2 | 1,524.42 | 0 | 1,709.57 | 80.1 |
| J-3 | 1,534.31 | 0 | 1,709.53 | 75.8 |
| J-4 | 1,536.36 | 28 | 1,709.31 | 74.8 |
| J-5 | 1,511.94 | 0 | 1,708.70 | 85.1 |
| J-6 | 1,496.19 | 0 | 1,708.63 | 91.9 |
| J-7 | 1,487.97 | 0 | 1,708.40 | 95.4 |
| J-8 | 1,482.10 | 0 | 1,708.39 | 97.9 |
| J-9 | 1,489.31 | 0 | 1,708.40 | 94.8 |
| J-10 | 1,498.18 | 0 | 1,708.49 | 91.0 |
| J-11 | 1,505.45 | 0 | 1,708.73 | 87.9 |
| J-12 | 1,528.22 | 0 | 1,708.84 | 78.1 |
| J-13 | 1,541.89 | 0 | 1,708.75 | 72.2 |
| J-14 | 1,551.18 | 0 | 1,708.75 | 68.2 |
| J-15 | 1,555.10 | 192 | 1,708.77 | 66.5 |
| J-16 | 1,547.57 | 14 | 1,708.94 | 69.8 |
| J-17 | 1,539.63 | 0 | 1,709.09 | 73.3 |
| J-18 | 1,536.04 | 0 | 1,708.77 | 74.7 |
| J-19 | 1,531.88 | 0 | 1,708.85 | 76.6 |
| J-20 | 1,525.85 | 0 | 1,709.19 | 79.3 |
| J-21 | 1,509.31 | 0 | 1,709.16 | 86.5 |
| J-22 | 1,500.29 | 14 | 1,709.17 | 90.4 |
| J-23 | 1,507.70 | 0 | 1,709.15 | 87.2 |
| J-24 | 1,478.32 | 0 | 1,708.73 | 99.7 |
| J-25 | 1,468.56 | 0 | 1,708.66 | 103.9 |
| J-26 | 1,470.59 | 0 | 1,708.37 | 102.9 |
| J-27 | 1,491.65 | 149 | 1,708.33 | 93.7 |
| J-28 | 1,494.43 | 149 | 1,708.34 | 92.5 |
| J-29 | 1,504.84 | 0 | 1,708.49 | 88.1 |
| J-30 | 1,509.95 | 149 | 1,708.52 | 85.9 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg                                        Active Scenario:  Average Day - Site
FlexTable: Junction Table

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|----------------|--------------|----------------------|----------------|
| J-31 | 1,506.31 | 149 | 1,708.34 | 87.4 |
| J-32 | 1,510.99 | 149 | 1,708.44 | 85.4 |
| J-33 | 1,517.93 | 149 | 1,708.62 | 82.5 |
| J-34 | 1,523.42 | 149 | 1,708.89 | 80.2 |
| J-35 | 1,500.26 | 0 | 1,708.53 | 90.1 |
| J-36 | 1,519.89 | 0 | 1,708.69 | 81.7 |
| J-37 | 1,497.84 | 0 | 1,708.33 | 91.1 |
| J-38 | 1,508.75 | 0 | 1,708.34 | 86.4 |
| J-39 | 1,509.06 | 192 | 1,708.62 | 86.3 |
| J-40 | 1,519.34 | 0 | 1,709.22 | 82.2 |
| J-41 | 1,493.31 | 0 | 1,708.55 | 93.1 |
| J-42 | 1,520.78 | 0 | 1,708.89 | 81.4 |
| J-43 | 1,528.04 | 192 | 1,708.83 | 78.2 |
| J-44 | 1,539.15 | 192 | 1,708.92 | 73.5 |
| J-45 | 1,525.42 | 0 | 1,709.11 | 79.5 |
| J-46 | 1,536.25 | 192 | 1,708.98 | 74.7 |
| J-47 | 1,523.18 | 0 | 1,708.99 | 80.4 |
| J-48 | 1,543.23 | 0 | 1,708.76 | 71.6 |
| J-49 | 1,544.66 | 192 | 1,708.75 | 71.0 |
| J-50 | 1,550.01 | 0 | 1,708.76 | 68.7 |
| J-51 | 1,551.30 | 0 | 1,708.75 | 68.1 |
| J-52 | 1,541.61 | 0 | 1,708.76 | 72.3 |
| J-53 | 1,482.08 | 149 | 1,708.24 | 97.8 |
| J-54 | 1,476.49 | 0 | 1,708.37 | 100.3 |
| J-55 | 1,480.56 | 0 | 1,708.41 | 98.6 |
| J-56 | 1,481.69 | 149 | 1,708.23 | 98.0 |
| J-57 | 1,483.32 | 0 | 1,708.30 | 97.3 |
| J-58 | 1,478.32 | 0 | 1,708.33 | 99.5 |
| J-59 | 1,473.68 | 0 | 1,708.37 | 101.5 |
| J-60 | 1,475.18 | 0 | 1,708.32 | 100.9 |
| J-61 | 1,474.72 | 149 | 1,708.25 | 101.0 |
| J-62 | 1,493.15 | 149 | 1,708.24 | 93.1 |
| J-63 | 1,494.82 | 149 | 1,708.30 | 92.4 |
| J-64 | 1,489.78 | 0 | 1,708.30 | 94.5 |
| J-65 | 1,486.52 | 149 | 1,708.41 | 96.0 |
| J-66 | 1,484.90 | 0 | 1,708.77 | 96.9 |
| J-67 | 1,492.33 | 0 | 1,708.44 | 93.5 |
| J-68 | 1,498.85 | 149 | 1,708.49 | 90.7 |
| J-69 | 1,504.49 | 0 | 1,708.51 | 88.3 |
| J-70 | 1,496.77 | 149 | 1,708.25 | 91.5 |
| J-71 | 1,492.39 | 149 | 1,708.24 | 93.4 |
| J-72 | 1,489.15 | 149 | 1,708.23 | 94.8 |
| J-73 | 1,526.88 | 0 | 1,708.73 | 78.7 |
| J-74 | 1,522.81 | 192 | 1,708.57 | 80.4 |
| J-75 | 1,517.39 | 192 | 1,708.57 | 82.7 |
| J-76 | 1,513.14 | 192 | 1,708.74 | 84.6 |
| J-77 | 1,518.58 | 192 | 1,708.57 | 82.2 |
| J-78 | 1,525.14 | 192 | 1,708.60 | 79.4 |

3-ER-487

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario:  Average Day - Site

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|---|---|---|---|---|
| J-79 | 1,521.50 | 0 | 1,708.71 | 81.0 |
| J-80 | 1,521.52 | 0 | 1,708.97 | 81.1 |
| J-81 | 1,507.88 | 0 | 1,708.87 | 87.0 |
| J-82 | 1,511.68 | 192 | 1,708.73 | 85.3 |
| J-83 | 1,530.12 | 192 | 1,708.63 | 77.2 |
| J-84 | 1,534.97 | 0 | 1,708.65 | 75.1 |
| J-85 | 1,520.43 | 0 | 1,708.73 | 81.5 |
| J-86 | 1,512.42 | 0 | 1,708.75 | 84.9 |
| J-87 | 1,519.02 | 0 | 1,708.76 | 82.1 |
| J-88 | 1,543.79 | 211 | 1,709.44 | 71.7 |
| J-89 | 1,561.51 | 211 | 1,710.00 | 64.2 |
| J-90 | 1,553.44 | 0 | 1,708.76 | 67.2 |
| J-91 | 1,501.89 | 0 | 1,709.16 | 89.7 |
| J-92 | 1,529.36 | 0 | 1,710.00 | 78.2 |
| J-93 | 1,513.70 | 0 | 1,709.17 | 84.6 |
| J-94 | 1,544.69 | 28 | 1,708.75 | 71.0 |
| J-95 | 1,552.90 | 0 | 1,708.89 | 67.5 |
| J-200 | 1,496.00 | 309 | 1,709.37 | 92.3 |
| J-201 | 1,488.00 | 489 | 1,710.00 | 96.0 |
| J-202 | 1,470.66 | 489 | 1,709.47 | 103.3 |
| J-203 | 1,458.00 | 489 | 1,708.73 | 108.5 |
| J-204 | 1,453.24 | 0 | 1,708.72 | 110.5 |
| J-205 | 1,458.56 | 0 | 1,708.68 | 108.2 |
| J-206 | 1,496.31 | 489 | 1,709.32 | 92.2 |
| J-207 | 1,517.23 | 496 | 1,709.09 | 83.0 |
| J-208 | 1,519.99 | 316 | 1,709.09 | 81.8 |
| J-209 | 1,504.30 | 309 | 1,709.12 | 88.6 |
| J-210 | 1,475.66 | 309 | 1,708.81 | 100.9 |
| J-211 | 1,463.36 | 309 | 1,708.56 | 106.1 |
| J-212 | 1,454.56 | 125 | 1,708.82 | 110.0 |
| J-213 | 1,466.18 | 125 | 1,709.25 | 105.2 |
| J-214 | 1,480.99 | 125 | 1,709.56 | 98.9 |
| J-215 | 1,494.36 | 125 | 1,709.24 | 93.0 |
| J-216 | 1,510.97 | 180 | 1,709.01 | 85.7 |
| J-217 | 1,559.60 | 253 | 1,709.43 | 64.8 |
| J-218 | 1,554.84 | 253 | 1,709.08 | 66.7 |
| J-219 | 1,549.95 | 253 | 1,708.67 | 68.7 |
| J-220 | 1,529.45 | 253 | 1,708.77 | 77.6 |
| J-221 | 1,536.00 | 253 | 1,709.11 | 74.9 |
| J-222 | 1,536.00 | 260 | 1,709.07 | 74.9 |
| J-223 | 1,563.53 | 260 | 1,709.10 | 63.0 |
| J-224 | 1,560.58 | 253 | 1,708.79 | 64.1 |
| J-225 | 1,550.03 | 211 | 1,708.69 | 68.6 |
| J-226 | 1,551.62 | 211 | 1,708.66 | 67.9 |
| J-227 | 1,546.70 | 211 | 1,708.75 | 70.1 |
| J-228 | 1,534.99 | 113 | 1,709.02 | 75.3 |
| J-229 | 1,550.60 | 73 | 1,708.92 | 68.5 |
| J-230 | 1,544.78 | 113 | 1,708.98 | 71.0 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 4

3-ER-488

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg                                          Active Scenario:  Average Day - Site
FlexTable: Junction Table

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|---|---|---|---|---|
| J-231 | 1,539.83 | 73 | 1,708.98 | 73.2 |
| J-232 | 1,550.00 | 34 | 1,708.98 | 68.8 |
| J-233 | 1,547.13 | 0 | 1,708.98 | 70.0 |
| J-ELS | 1,456.01 | 1 | 1,708.70 | 109.3 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario:  Average Day - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| AZWC-P-1 | 1,622 | 12.0 | 120 | AZWC-J-18 | AZWC-J-17 | 70 | 0.20 | 0.022 |
| AZWC-P-2 | 2,123 | 12.0 | 120 | AZWC-J-17 | AZWC-J-15 | 152 | 0.43 | 0.090 |
| AZWC-P-3 | 3,095 | 16.0 | 120 | AZWC-J-4 | AZWC-J-11 | 34 | 0.05 | 0.001 |
| AZWC-P-4 | 2,970 | 16.0 | 120 | AZWC-J-11 | AZWC-J-15 | 179 | 0.29 | 0.030 |
| AZWC-P-5 | 2,054 | 12.0 | 120 | AZWC-J-13 | AZWC-J-11 | 116 | 0.33 | 0.054 |
| AZWC-P-6 | 2,990 | 12.0 | 120 | AZWC-J-17 | AZWC-J-13 | 27 | 0.08 | 0.004 |
| AZWC-P-7 | 1,705 | 12.0 | 120 | AZWC-J-14 | AZWC-J-13 | 60 | 0.17 | 0.016 |
| AZWC-P-8 | 2,436 | 16.0 | 120 | AZWC-J-4 | AZWC-J-1 | 282 | 0.45 | 0.069 |
| AZWC-P-9 | 3,055 | 16.0 | 120 | AZWC-J-8 | AZWC-J-3 | 434 | 0.69 | 0.155 |
| AZWC-P-10 | 1,316 | 16.0 | 120 | AZWC-J-15 | AZWC-J-16 | 523 | 0.84 | 0.218 |
| AZWC-P-11 | 2,912 | 16.0 | 120 | AZWC-J-16 | AZWC-J-12 | 762 | 1.22 | 0.438 |
| AZWC-P-12 | 2,013 | 16.0 | 120 | AZWC-J-12 | AZWC-J-8 | 958 | 1.53 | 0.669 |
| AZWC-P-13 | 2,178 | 12.0 | 120 | AZWC-J-1 | AZWC-J-2 | 425 | 1.21 | 0.603 |
| AZWC-P-14 | 2,649 | 12.0 | 120 | AZWC-J-2 | AZWC-J-3 | 339 | 0.96 | 0.396 |
| AZWC-P-15 | 1,502 | 12.0 | 120 | AZWC-J-5 | AZWC-J-7 | 33 | 0.09 | 0.005 |
| AZWC-P-16 | 2,991 | 12.0 | 120 | AZWC-J-16 | AZWC-J-7 | 143 | 0.41 | 0.080 |
| AZWC-P-17 | 1,931 | 12.0 | 120 | AZWC-J-5 | AZWC-J-1 | 47 | 0.13 | 0.010 |
| AZWC-P-18 | 2,422 | 12.0 | 120 | AZWC-J-6 | AZWC-J-2 | 86 | 0.24 | 0.031 |
| AZWC-P-19 | 2,346 | 12.0 | 120 | AZWC-J-6 | AZWC-J-12 | 100 | 0.28 | 0.042 |
| AZWC-P-20 | 1,354 | 12.0 | 120 | AZWC-J-11 | AZWC-J-7 | 162 | 0.46 | 0.101 |
| AZWC-P-21 | 2,644 | 12.0 | 120 | AZWC-J-18 | AZWC-J-14 | 15 | 0.04 | 0.001 |
| AZWC-P-22 | 3,404 | 12.0 | 120 | AZWC-J-14 | AZWC-J-9 | 20 | 0.06 | 0.002 |
| AZWC-P-23 | 1,779 | 12.0 | 120 | AZWC-J-9 | AZWC-J-10 | 54 | 0.15 | 0.013 |
| AZWC-P-24 | 3,067 | 12.0 | 120 | AZWC-J-10 | AZWC-J-13 | 27 | 0.08 | 0.004 |
| AZWC-P-25 | 1,946 | 12.0 | 120 | AZWC-J-10 | AZWC-J-4 | 123 | 0.35 | 0.061 |
| P-1 | 1,337 | 24.0 | 120 | J-1 | J-2 | 1,639 | 1.16 | 0.251 |
| P-2 | 1,236 | 24.0 | 120 | J-3 | J-4 | 1,378 | 0.98 | 0.182 |
| P-3 | 2,654 | 16.0 | 120 | J-5 | J-6 | 165 | 0.26 | 0.026 |
| P-4 | 2,643 | 12.0 | 120 | J-7 | J-8 | 29 | 0.08 | 0.004 |
| P-5 | 1,373 | 16.0 | 120 | J-8 | J-9 | 49 | 0.08 | 0.003 |
| P-6 | 1,371 | 16.0 | 120 | J-10 | J-11 | 468 | 0.75 | 0.177 |
| P-7 | 1,867 | 16.0 | 120 | J-9 | J-10 | 232 | 0.37 | 0.049 |
| P-7 | 1,712 | 16.0 | 120 | J-11 | J-1 | 614 | 0.98 | 0.294 |
| P-8 | 1,252 | 16.0 | 120 | J-16 | J-17 | 379 | 0.60 | 0.120 |
| P-9 | 1,335 | 16.0 | 120 | J-17 | J-4 | 442 | 0.71 | 0.160 |
| P-10 | 1,872 | 16.0 | 120 | J-13 | J-18 | 92 | 0.15 | 0.009 |
| P-11 | 817 | 16.0 | 120 | J-18 | J-19 | 341 | 0.54 | 0.098 |
| P-12 | 2,582 | 16.0 | 120 | J-19 | J-20 | 401 | 0.64 | 0.133 |
| P-13 | 2,636 | 24.0 | 120 | J-22 | J-23 | 215 | 0.15 | 0.006 |
| P-14 | 2,640 | 24.0 | 120 | J-23 | J-1 | 529 | 0.38 | 0.031 |
| P-15 | 2,850 | 16.0 | 120 | J-24 | J-25 | 163 | 0.26 | 0.025 |
| P-16 | 1,880 | 12.0 | 120 | J-25 | J-26 | 202 | 0.57 | 0.152 |
| P-17 | 1,357 | 12.0 | 120 | J-9 | J-27 | 110 | 0.31 | 0.049 |
| P-18 | 1,167 | 12.0 | 120 | J-27 | J-28 | 32 | 0.09 | 0.005 |
| P-19 | 1,813 | 8.0 | 120 | J-28 | J-29 | 52 | 0.33 | 0.088 |
| P-20 | 781 | 8.0 | 120 | J-29 | J-30 | 28 | 0.18 | 0.028 |
| P-21 | 997 | 12.0 | 120 | J-30 | J-5 | 224 | 0.64 | 0.184 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 5

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg                                          Active Scenario: Average Day - Site
FlexTable: Pipe Table

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-22 | 1,324 | 12.0 | 120 | J-7 | J-28 | 113 | 0.32 | 0.051 |
| P-23 | 2,040 | 12.0 | 120 | J-28 | J-31 | 16 | 0.05 | 0.001 |
| P-24 | 935 | 12.0 | 120 | J-31 | J-32 | 172 | 0.49 | 0.113 |
| P-25 | 1,071 | 12.0 | 120 | J-32 | J-33 | 213 | 0.60 | 0.168 |
| P-26 | 757 | 12.0 | 120 | J-33 | J-34 | 319 | 0.91 | 0.355 |
| P-27 | 888 | 12.0 | 120 | J-34 | J-3 | 468 | 1.33 | 0.720 |
| P-28 | 1,587 | 8.0 | 120 | J-29 | J-35 | 24 | 0.15 | 0.021 |
| P-29 | 1,506 | 8.0 | 120 | J-30 | J-36 | 60 | 0.39 | 0.117 |
| P-30 | 1,149 | 8.0 | 120 | J-36 | J-33 | 43 | 0.27 | 0.061 |
| P-31 | 1,110 | 8.0 | 120 | J-27 | J-37 | 7 | 0.05 | 0.002 |
| P-32 | 1,560 | 8.0 | 120 | J-37 | J-38 | 7 | 0.05 | 0.002 |
| P-33 | 895 | 8.0 | 120 | J-38 | J-31 | 7 | 0.05 | 0.002 |
| P-34 | 783 | 8.0 | 120 | J-11 | J-39 | 68 | 0.43 | 0.146 |
| P-35 | 1,356 | 8.0 | 120 | J-39 | J-40 | 124 | 0.79 | 0.443 |
| P-36 | 792 | 8.0 | 120 | J-40 | J-2 | 124 | 0.79 | 0.443 |
| P-37 | 807 | 12.0 | 120 | J-6 | J-41 | 165 | 0.47 | 0.105 |
| P-38 | 1,833 | 12.0 | 120 | J-41 | J-7 | 142 | 0.40 | 0.079 |
| P-39 | 949 | 8.0 | 120 | J-35 | J-41 | 24 | 0.15 | 0.021 |
| P-40 | 2,155 | 16.0 | 120 | J-4 | J-42 | 492 | 0.79 | 0.195 |
| P-41 | 1,477 | 16.0 | 120 | J-42 | J-5 | 389 | 0.62 | 0.126 |
| P-42 | 614 | 8.0 | 120 | J-36 | J-42 | 103 | 0.66 | 0.314 |
| P-43 | 1,556 | 12.0 | 120 | J-32 | J-30 | 108 | 0.31 | 0.047 |
| P-44 | 689 | 12.0 | 120 | J-12 | J-43 | 43 | 0.12 | 0.008 |
| P-45 | 1,946 | 12.0 | 120 | J-43 | J-44 | 105 | 0.30 | 0.045 |
| P-46 | 2,073 | 8.0 | 120 | J-44 | J-45 | 54 | 0.34 | 0.094 |
| P-47 | 969 | 8.0 | 120 | J-45 | J-2 | 128 | 0.82 | 0.469 |
| P-48 | 1,168 | 8.0 | 120 | J-3 | J-46 | 129 | 0.82 | 0.475 |
| P-49 | 911 | 8.0 | 120 | J-46 | J-17 | 63 | 0.40 | 0.128 |
| P-50 | 742 | 8.0 | 120 | J-46 | J-47 | 74 | 0.47 | 0.171 |
| P-51 | 921 | 8.0 | 120 | J-47 | J-43 | 74 | 0.47 | 0.171 |
| P-52 | 2,082 | 8.0 | 120 | J-43 | J-48 | 30 | 0.19 | 0.032 |
| P-53 | 1,325 | 8.0 | 120 | J-48 | J-49 | 16 | 0.10 | 0.010 |
| P-54 | 1,465 | 12.0 | 120 | J-49 | J-44 | 173 | 0.49 | 0.114 |
| P-55 | 1,495 | 12.0 | 120 | J-49 | J-14 | 15 | 0.04 | 0.001 |
| P-56 | 743 | 8.0 | 120 | J-49 | J-50 | 18 | 0.11 | 0.012 |
| P-57 | 1,129 | 8.0 | 120 | J-50 | J-15 | 18 | 0.11 | 0.012 |
| P-58 | 931 | 16.0 | 120 | J-51 | J-14 | 14 | 0.02 | 0.000 |
| P-59 | 1,264 | 8.0 | 120 | J-48 | J-51 | 17 | 0.11 | 0.012 |
| P-60 | 2,202 | 16.0 | 120 | J-12 | J-52 | 188 | 0.30 | 0.033 |
| P-61 | 885 | 16.0 | 120 | J-52 | J-94 | 139 | 0.22 | 0.019 |
| P-62 | 840 | 8.0 | 120 | J-48 | J-52 | 3 | 0.02 | 0.000 |
| P-63 | 906 | 8.0 | 120 | J-9 | J-53 | 74 | 0.47 | 0.169 |
| P-64 | 910 | 12.0 | 120 | J-54 | J-8 | 78 | 0.22 | 0.026 |
| P-65 | 721 | 8.0 | 120 | J-53 | J-54 | 75 | 0.48 | 0.175 |
| P-66 | 983 | 8.0 | 120 | J-24 | J-55 | 105 | 0.67 | 0.324 |
| P-67 | 1,333 | 8.0 | 120 | J-55 | J-56 | 65 | 0.41 | 0.134 |
| P-68 | 1,116 | 8.0 | 120 | J-56 | J-57 | 42 | 0.26 | 0.058 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario:  Average Day - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|-------|------|----------|-------|-----------|----------|-------|----------|----------|
| P-69 | 729 | 8.0 | 120 | J-57 | J-58 | 35 | 0.22 | 0.042 |
| P-70 | 857 | 12.0 | 120 | J-26 | J-59 | 31 | 0.09 | 0.005 |
| P-71 | 1,622 | 12.0 | 120 | J-59 | J-54 | 3 | 0.01 | 0.000 |
| P-72 | 936 | 8.0 | 120 | J-58 | J-59 | 35 | 0.22 | 0.042 |
| P-73 | 1,459 | 8.0 | 120 | J-55 | J-60 | 43 | 0.27 | 0.061 |
| P-74 | 1,114 | 8.0 | 120 | J-60 | J-61 | 43 | 0.27 | 0.061 |
| P-75 | 1,054 | 12.0 | 120 | J-61 | J-26 | 171 | 0.48 | 0.112 |
| P-76 | 1,140 | 12.0 | 120 | J-61 | J-56 | 65 | 0.18 | 0.019 |
| P-77 | 855 | 12.0 | 120 | J-62 | J-63 | 139 | 0.39 | 0.076 |
| P-78 | 905 | 12.0 | 120 | J-63 | J-10 | 236 | 0.67 | 0.202 |
| P-79 | 831 | 8.0 | 120 | J-63 | J-64 | 7 | 0.04 | 0.002 |
| P-80 | 1,177 | 8.0 | 120 | J-64 | J-57 | 7 | 0.04 | 0.002 |
| P-81 | 1,245 | 8.0 | 120 | J-65 | J-55 | 3 | 0.02 | 0.000 |
| P-82 | 2,151 | 16.0 | 120 | J-22 | J-66 | 480 | 0.77 | 0.186 |
| P-83 | 1,176 | 16.0 | 120 | J-66 | J-24 | 179 | 0.29 | 0.030 |
| P-84 | 1,113 | 12.0 | 120 | J-65 | J-66 | 301 | 0.85 | 0.318 |
| P-85 | 1,034 | 8.0 | 120 | J-65 | J-67 | 28 | 0.18 | 0.028 |
| P-86 | 1,662 | 8.0 | 120 | J-67 | J-68 | 28 | 0.18 | 0.028 |
| P-87 | 1,161 | 12.0 | 120 | J-68 | J-23 | 413 | 1.17 | 0.571 |
| P-88 | 1,359 | 8.0 | 120 | J-68 | J-69 | 20 | 0.13 | 0.015 |
| P-89 | 1,832 | 8.0 | 120 | J-69 | J-63 | 59 | 0.38 | 0.112 |
| P-90 | 1,005 | 12.0 | 120 | J-68 | J-70 | 256 | 0.73 | 0.236 |
| P-91 | 573 | 12.0 | 120 | J-70 | J-62 | 69 | 0.20 | 0.021 |
| P-92 | 1,409 | 12.0 | 120 | J-65 | J-71 | 177 | 0.50 | 0.119 |
| P-93 | 1,201 | 12.0 | 120 | J-56 | J-72 | 23 | 0.06 | 0.003 |
| P-94 | 503 | 12.0 | 120 | J-72 | J-62 | 59 | 0.17 | 0.016 |
| P-95 | 736 | 12.0 | 120 | J-71 | J-72 | 67 | 0.19 | 0.020 |
| P-96 | 718 | 12.0 | 120 | J-71 | J-70 | 39 | 0.11 | 0.007 |
| P-97 | 1,047 | 8.0 | 120 | J-19 | J-73 | 60 | 0.38 | 0.117 |
| P-98 | 1,393 | 12.0 | 120 | J-83 | J-74 | 99 | 0.28 | 0.040 |
| P-99 | 903 | 12.0 | 120 | J-74 | J-75 | 13 | 0.04 | 0.001 |
| P-100 | 1,063 | 12.0 | 120 | J-21 | J-76 | 340 | 0.96 | 0.398 |
| P-101 | 1,185 | 12.0 | 120 | J-76 | J-77 | 192 | 0.55 | 0.139 |
| P-102 | 939 | 12.0 | 120 | J-77 | J-74 | 0 | 0.00 | 0.000 |
| P-103 | 1,124 | 12.0 | 120 | J-74 | J-78 | 80 | 0.23 | 0.027 |
| P-104 | 1,019 | 8.0 | 120 | J-78 | J-79 | 56 | 0.36 | 0.102 |
| P-105 | 1,354 | 16.0 | 120 | J-1 | J-80 | 495 | 0.79 | 0.197 |
| P-106 | 894 | 16.0 | 120 | J-80 | J-12 | 421 | 0.67 | 0.145 |
| P-107 | 1,486 | 8.0 | 120 | J-76 | J-81 | 52 | 0.33 | 0.157 |
| P-108 | 1,004 | 12.0 | 120 | J-75 | J-82 | 205 | 0.58 | 0.157 |
| P-109 | 1,106 | 12.0 | 120 | J-82 | J-23 | 331 | 0.94 | 0.379 |
| P-110 | 1,868 | 8.0 | 120 | J-81 | J-82 | 48 | 0.30 | 0.075 |
| P-111 | 1,711 | 12.0 | 120 | J-78 | J-12 | 190 | 0.54 | 0.136 |
| P-112 | 675 | 8.0 | 120 | J-73 | J-83 | 68 | 0.44 | 0.147 |
| P-113 | 1,008 | 8.0 | 120 | J-83 | J-84 | 21 | 0.13 | 0.016 |
| P-114 | 1,673 | 8.0 | 120 | J-84 | J-52 | 46 | 0.29 | 0.071 |
| P-115 | 1,776 | 8.0 | 120 | J-78 | J-84 | 25 | 0.16 | 0.024 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 5

3-ER-492

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Average Day - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-116 | 1,656 | 8.0 | 120 | J-73 | J-85 | 8 | 0.05 | 0.003 |
| P-117 | 1,568 | 8.0 | 120 | J-85 | J-76 | 8 | 0.05 | 0.003 |
| P-118 | 1,542 | 8.0 | 120 | J-82 | J-86 | 19 | 0.12 | 0.013 |
| P-119 | 532 | 8.0 | 120 | J-79 | J-87 | 56 | 0.36 | 0.102 |
| P-120 | 1,177 | 8.0 | 120 | J-80 | J-87 | 75 | 0.48 | 0.173 |
| P-121 | 801 | 8.0 | 120 | J-86 | J-87 | 19 | 0.12 | 0.013 |
| P-122 | 931 | 12.0 | 120 | J-83 | J-18 | 201 | 0.57 | 0.151 |
| P-123 | 2,664 | 24.0 | 120 | J-20 | J-88 | 946 | 0.67 | 0.091 |
| P-124 | 2,422 | 24.0 | 120 | J-88 | J-89 | 1,574 | 1.12 | 0.233 |
| P-125 | 839 | 16.0 | 120 | J-14 | J-90 | 115 | 0.18 | 0.013 |
| P-126 | 1,077 | 16.0 | 120 | J-90 | J-15 | 115 | 0.18 | 0.013 |
| P-128 | 1,309 | 24.0 | 120 | J-21 | J-91 | 64 | 0.05 | 0.001 |
| P-129 | 1,332 | 24.0 | 120 | J-22 | J-91 | 164 | 0.12 | 0.003 |
| P-130 | 974 | 8.0 | 120 | J-81 | J-91 | 100 | 0.64 | 0.298 |
| P-133 | 1,322 | 24.0 | 120 | J-2 | J-92 | 1,891 | 1.34 | 0.327 |
| P-134 | 1,322 | 24.0 | 120 | J-92 | J-3 | 1,974 | 1.40 | 0.354 |
| P-135 | 1,774 | 24.0 | 120 | J-20 | J-93 | 336 | 0.24 | 0.013 |
| P-136 | 778 | 24.0 | 120 | J-93 | J-21 | 336 | 0.24 | 0.013 |
| P-137 | 786 | 16.0 | 120 | J-13 | J-94 | 92 | 0.15 | 0.009 |
| P-138 | 1,159 | 16.0 | 120 | J-94 | J-51 | 31 | 0.05 | 0.001 |
| P-139 | 2,314 | 12.0 | 120 | J-44 | J-16 | 48 | 0.14 | 0.011 |
| P-140 | 1,166 | 8.0 | 120 | J-11 | J-69 | 79 | 0.50 | 0.190 |
| P-141 | 890 | 16.0 | 120 | J-16 | J-95 | 268 | 0.43 | 0.063 |
| P-142 | 1,256 | 16.0 | 120 | J-15 | J-95 | 324 | 0.52 | 0.090 |
| P-143 | 2,336 | 12.0 | 120 | J-44 | J-92 | 369 | 1.05 | 0.463 |
| P-200 | 2,335 | 24.0 | 120 | J-201 | J-202 | 1,550 | 1.10 | 0.226 |
| P-201 | 2,336 | 16.0 | 120 | J-202 | J-203 | 641 | 1.02 | 0.318 |
| P-202 | 1,418 | 16.0 | 120 | J-203 | J-204 | 64 | 0.10 | 0.004 |
| P-204 | 2,317 | 12.0 | 120 | J-205 | J-25 | 39 | 0.11 | 0.007 |
| P-205 | 2,640 | 24.0 | 120 | J-201 | J-206 | 1,657 | 1.18 | 0.256 |
| P-206 | 2,639 | 24.0 | 120 | J-206 | J-207 | 934 | 0.66 | 0.088 |
| P-207 | 2,567 | 12.0 | 120 | J-208 | J-209 | 49 | 0.14 | 0.011 |
| P-208 | 2,713 | 12.0 | 120 | J-209 | J-200 | 157 | 0.44 | 0.095 |
| P-209 | 2,452 | 12.0 | 120 | J-24 | J-210 | 88 | 0.25 | 0.033 |
| P-210 | 2,672 | 24.0 | 120 | J-22 | J-200 | 873 | 0.62 | 0.078 |
| P-211 | 2,633 | 12.0 | 120 | J-209 | J-21 | 61 | 0.17 | 0.016 |
| P-212 | 2,662 | 16.0 | 120 | J-208 | J-20 | 208 | 0.33 | 0.040 |
| P-213 | 2,706 | 12.0 | 120 | J-202 | J-210 | 261 | 0.74 | 0.244 |
| P-214 | 1,265 | 12.0 | 120 | J-203 | J-211 | 186 | 0.53 | 0.131 |
| P-215 | 1,876 | 12.0 | 120 | J-211 | J-205 | 122 | 0.35 | 0.060 |
| P-216 | 2,801 | 12.0 | 120 | J-200 | J-210 | 235 | 0.67 | 0.201 |
| P-217 | 2,687 | 24.0 | 120 | J-200 | J-201 | 1,573 | 1.12 | 0.232 |
| P-218 | 2,651 | 12.0 | 120 | J-206 | J-209 | 141 | 0.40 | 0.078 |
| P-219 | 2,641 | 16.0 | 120 | J-207 | J-208 | 16 | 0.03 | 0.000 |
| P-220 | 2,285 | 12.0 | 120 | J-203 | J-212 | 99 | 0.28 | 0.040 |
| P-221 | 2,358 | 12.0 | 120 | J-212 | J-213 | 223 | 0.63 | 0.183 |
| P-222 | 2,276 | 12.0 | 120 | J-213 | J-214 | 189 | 0.54 | 0.135 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 4 of 5

3-ER-493

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario:  Average Day - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|-------|------|------|-----|--------|--------|--------|------|-------|
| P-223 | 2,646 | 12.0 | 120 | J-214 | J-215 | 178 | 0.51 | 0.120 |
| P-224 | 2,674 | 12.0 | 120 | J-215 | J-216 | 147 | 0.42 | 0.084 |
| P-225 | 2,288 | 16.0 | 120 | J-216 | J-207 | 188 | 0.30 | 0.033 |
| P-226 | 2,254 | 12.0 | 120 | J-213 | J-202 | 159 | 0.45 | 0.097 |
| P-227 | 2,266 | 16.0 | 120 | J-201 | J-215 | 492 | 0.78 | 0.195 |
| P-228 | 2,289 | 12.0 | 120 | J-206 | J-215 | 93 | 0.27 | 0.036 |
| P-229 | 2,627 | 24.0 | 120 | J-222 | J-207 | 233 | 0.17 | 0.007 |
| P-230 | 2,665 | 12.0 | 120 | J-219 | J-220 | 92 | 0.26 | 0.035 |
| P-231 | 2,652 | 12.0 | 120 | J-220 | J-216 | 155 | 0.44 | 0.093 |
| P-232 | 2,707 | 12.0 | 120 | J-221 | J-222 | 56 | 0.16 | 0.014 |
| P-233 | 2,657 | 24.0 | 120 | J-218 | J-222 | 161 | 0.11 | 0.003 |
| P-234 | 2,252 | 12.0 | 120 | J-220 | J-222 | 190 | 0.54 | 0.135 |
| P-235 | 2,583 | 12.0 | 120 | J-88 | J-88 | 183 | 0.52 | 0.126 |
| P-236 | 2,638 | 24.0 | 120 | J-89 | J-217 | 1,510 | 1.07 | 0.216 |
| P-237 | 2,620 | 12.0 | 120 | J-208 | J-221 | 42 | 0.12 | 0.008 |
| P-238 | 2,942 | 12.0 | 120 | J-221 | J-217 | 169 | 0.48 | 0.109 |
| P-239 | 2,825 | 24.0 | 120 | J-217 | J-223 | 1,088 | 0.77 | 0.118 |
| P-240 | 1,107 | 12.0 | 120 | J-224 | J-219 | 162 | 0.46 | 0.101 |
| P-241 | 903 | 24.0 | 120 | J-223 | J-218 | 414 | 0.29 | 0.020 |
| P-242 | 2,212 | 16.0 | 120 | J-223 | J-224 | 415 | 0.66 | 0.142 |
| P-243 | 1,160 | 16.0 | 120 | J-225 | J-94 | 234 | 0.37 | 0.049 |
| P-244 | 3,411 | 12.0 | 120 | J-88 | J-227 | 235 | 0.67 | 0.201 |
| P-245 | 2,726 | 12.0 | 120 | J-227 | J-225 | 72 | 0.20 | 0.022 |
| P-246 | 855 | 12.0 | 120 | J-225 | J-226 | 95 | 0.27 | 0.038 |
| P-247 | 1,678 | 12.0 | 120 | J-226 | J-14 | 116 | 0.33 | 0.054 |
| P-248 | 1,900 | 12.0 | 120 | J-18 | J-227 | 47 | 0.13 | 0.010 |
| P-249 | 2,011 | 16.0 | 120 | J-4 | J-228 | 415 | 0.66 | 0.142 |
| P-250 | 1,945 | 12.0 | 120 | J-16 | J-229 | 49 | 0.14 | 0.011 |
| P-251 | 1,597 | 16.0 | 120 | J-228 | J-230 | 157 | 0.25 | 0.024 |
| P-253 | 1,930 | 12.0 | 120 | J-229 | J-231 | 81 | 0.23 | 0.028 |
| P-254 | 558 | 12.0 | 120 | J-231 | J-228 | 144 | 0.41 | 0.082 |
| P-255 | 842 | 16.0 | 120 | J-230 | J-232 | 37 | 0.06 | 0.002 |
| P-256 | 552 | 8.0 | 120 | J-230 | J-233 | 7 | 0.05 | 0.003 |
| P-257 | 1,595 | 8.0 | 120 | J-233 | J-231 | 10 | 0.06 | 0.004 |
| P-258 | 330 | 12.0 | 120 | J-232 | J-233 | 2 | 0.01 | 0.000 |
| P-259 | 1,600 | 12.0 | 120 | J-ELS | J-205 | 63 | 0.18 | 0.017 |
| P-260 | 1,038 | 12.0 | 120 | J-204 | J-ELS | 64 | 0.18 | 0.018 |
| P-261 | 3,327 | 12.0 | 120 | J-210 | J-205 | 99 | 0.28 | 0.041 |
| P-262 | 2,378 | 12.0 | 120 | J-95 | J-229 | 57 | 0.16 | 0.014 |
| P-500 | 679 | 48.0 | 120 | R-1 | J-92 | 4,234 | 0.75 | 0.048 |
| P-501 | 600 | 48.0 | 120 | R-2 | FCV-2 | 3,295 | 0.58 | 0.024 |
| P-502 | 566 | 48.0 | 120 | FCV-2 | J-89 | 3,295 | 0.58 | 0.049 |
| P-503 | 604 | 48.0 | 120 | R-3 | FCV-3 | 5,760 | 1.02 | 0.098 |
| P-504 | 604 | 48.0 | 120 | FCV-3 | J-201 | 5,760 | 1.02 | 0.073 |
| P-505 | 861 | 48.0 | 120 | R-AZWC | AZWC-J-8 | 1,489 | 0.26 | 0.012 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 5 of 5

3-ER-494

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: FCV Table

Active Scenario:  Average Day - Site

| Label | Elevation (ft) | Diameter (Valve) (in) | Flow Setting (Initial) (gpm) | Minor Loss Coefficient (Local) | Flow (gpm) | Hydraulic Grade (From) (ft) | Hydraulic Grade (To) (ft) | Headloss (ft) |
|---|---|---|---|---|---|---|---|---|
| FCV-2 | 1,561.51 | 48.0 | 10,410 | 0.0000000 | 3,295 | 1,710.00 | 1,710.00 | 0.00 |
| FCV-3 | 1,488.00 | 48.0 | 14,413 | 0.0000000 | 5,760 | 1,710.00 | 1,710.00 | 0.00 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 1

3-ER-495

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Reservoir Table

Active Scenario: Average Day - Site

| Label | Elevation (ft) | Flow (Out net) (gpm) | Hydraulic Grade (ft) |
|---|---|---|---|
| R-1 | 1,710.00 | 4,234 | 1,710.00 |
| R-2 | 1,710.00 | 3,295 | 1,710.00 |
| R-3 | 1,710.00 | 5,760 | 1,710.00 |
| R-AZWC | 1,720.00 | 1,489 | 1,720.00 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 1

3-ER-496



.

# SITE
# MAXIMUM DAY DEMAND RESULTS

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario:  Max Day - Site

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|---|---|---|---|---|
| AZWC-J-1 | 1,565.65 | 177 | 1,711.85 | 63.3 |
| AZWC-J-2 | 1,566.00 | 0 | 1,715.63 | 64.7 |
| AZWC-J-3 | 1,562.39 | 177 | 1,718.62 | 67.6 |
| AZWC-J-4 | 1,549.27 | 351 | 1,711.35 | 70.1 |
| AZWC-J-5 | 1,549.29 | 14 | 1,711.80 | 70.3 |
| AZWC-J-6 | 1,550.00 | 14 | 1,715.86 | 71.8 |
| AZWC-J-7 | 1,540.00 | 14 | 1,711.78 | 74.3 |
| AZWC-J-8 | 1,540.19 | 177 | 1,720.00 | 77.8 |
| AZWC-J-9 | 1,532.76 | 130 | 1,710.97 | 77.1 |
| AZWC-J-10 | 1,532.13 | 173 | 1,711.03 | 77.4 |
| AZWC-J-11 | 1,530.66 | 351 | 1,711.37 | 78.2 |
| AZWC-J-12 | 1,530.39 | 177 | 1,716.12 | 80.4 |
| AZWC-J-13 | 1,516.54 | 91 | 1,711.07 | 84.2 |
| AZWC-J-14 | 1,511.49 | 91 | 1,711.00 | 86.3 |
| AZWC-J-15 | 1,510.00 | 351 | 1,711.62 | 87.2 |
| AZWC-J-16 | 1,510.00 | 177 | 1,712.44 | 87.6 |
| AZWC-J-17 | 1,498.95 | 91 | 1,711.10 | 91.8 |
| AZWC-J-18 | 1,496.42 | 91 | 1,711.01 | 92.8 |
| J-1 | 1,518.46 | 0 | 1,707.63 | 81.8 |
| J-2 | 1,524.42 | 0 | 1,708.66 | 79.7 |
| J-3 | 1,534.31 | 0 | 1,708.57 | 75.4 |
| J-4 | 1,536.36 | 56 | 1,707.88 | 74.2 |
| J-5 | 1,511.94 | 0 | 1,706.00 | 84.0 |
| J-6 | 1,496.19 | 0 | 1,705.79 | 90.7 |
| J-7 | 1,487.97 | 0 | 1,705.07 | 93.9 |
| J-8 | 1,482.10 | 0 | 1,705.03 | 96.5 |
| J-9 | 1,489.31 | 0 | 1,705.05 | 93.3 |
| J-10 | 1,498.18 | 0 | 1,705.32 | 89.6 |
| J-11 | 1,505.45 | 0 | 1,706.07 | 86.8 |
| J-12 | 1,528.22 | 0 | 1,706.42 | 77.1 |
| J-13 | 1,541.89 | 0 | 1,706.18 | 71.1 |
| J-14 | 1,551.18 | 0 | 1,706.16 | 67.1 |
| J-15 | 1,555.10 | 354 | 1,706.24 | 65.4 |
| J-16 | 1,547.57 | 28 | 1,706.77 | 68.9 |
| J-17 | 1,539.63 | 0 | 1,707.23 | 72.5 |
| J-18 | 1,536.04 | 0 | 1,706.22 | 73.6 |
| J-19 | 1,531.88 | 0 | 1,706.46 | 75.5 |
| J-20 | 1,525.85 | 0 | 1,707.51 | 78.6 |
| J-21 | 1,509.31 | 0 | 1,707.40 | 85.7 |
| J-22 | 1,500.29 | 28 | 1,707.42 | 89.6 |
| J-23 | 1,507.70 | 0 | 1,707.37 | 86.4 |
| J-24 | 1,478.32 | 0 | 1,706.05 | 98.5 |
| J-25 | 1,468.56 | 0 | 1,705.82 | 102.7 |
| J-26 | 1,470.59 | 0 | 1,704.97 | 101.4 |
| J-27 | 1,491.65 | 273 | 1,704.85 | 92.2 |
| J-28 | 1,494.43 | 273 | 1,704.86 | 91.0 |
| J-29 | 1,504.84 | 0 | 1,705.36 | 86.8 |
| J-30 | 1,509.95 | 273 | 1,705.43 | 84.6 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 4

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario: Max Day - Site

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|---|---|---|---|---|
| J-31 | 1,506.31 | 273 | 1,704.87 | 85.9 |
| J-32 | 1,510.99 | 273 | 1,705.20 | 84.0 |
| J-33 | 1,517.93 | 273 | 1,705.76 | 81.3 |
| J-34 | 1,523.42 | 273 | 1,706.59 | 79.2 |
| J-35 | 1,500.26 | 0 | 1,705.46 | 88.8 |
| J-36 | 1,519.89 | 0 | 1,705.98 | 80.5 |
| J-37 | 1,497.84 | 0 | 1,704.85 | 89.6 |
| J-38 | 1,508.75 | 0 | 1,704.87 | 84.8 |
| J-39 | 1,509.06 | 354 | 1,705.72 | 85.1 |
| J-40 | 1,519.34 | 0 | 1,707.58 | 81.4 |
| J-41 | 1,493.31 | 0 | 1,705.52 | 91.8 |
| J-42 | 1,520.78 | 0 | 1,706.58 | 80.4 |
| J-43 | 1,528.04 | 354 | 1,706.40 | 77.2 |
| J-44 | 1,539.15 | 354 | 1,706.68 | 72.5 |
| J-45 | 1,525.42 | 0 | 1,707.27 | 78.7 |
| J-46 | 1,536.25 | 354 | 1,706.86 | 73.8 |
| J-47 | 1,523.18 | 0 | 1,706.89 | 79.5 |
| J-48 | 1,543.23 | 0 | 1,706.20 | 70.5 |
| J-49 | 1,544.66 | 354 | 1,706.17 | 69.9 |
| J-50 | 1,550.01 | 0 | 1,706.20 | 67.6 |
| J-51 | 1,551.30 | 0 | 1,706.16 | 67.0 |
| J-52 | 1,541.61 | 0 | 1,706.20 | 71.2 |
| J-53 | 1,482.08 | 273 | 1,704.57 | 96.3 |
| J-54 | 1,476.49 | 0 | 1,704.96 | 98.8 |
| J-55 | 1,480.56 | 0 | 1,705.08 | 97.1 |
| J-56 | 1,481.69 | 273 | 1,704.54 | 96.4 |
| J-57 | 1,483.32 | 0 | 1,704.74 | 95.8 |
| J-58 | 1,478.32 | 0 | 1,704.84 | 98.0 |
| J-59 | 1,473.68 | 0 | 1,704.96 | 100.1 |
| J-60 | 1,475.18 | 0 | 1,704.81 | 99.4 |
| J-61 | 1,474.72 | 273 | 1,704.60 | 99.5 |
| J-62 | 1,493.15 | 273 | 1,704.56 | 91.5 |
| J-63 | 1,494.82 | 273 | 1,704.76 | 90.8 |
| J-64 | 1,489.78 | 0 | 1,704.75 | 93.0 |
| J-65 | 1,486.52 | 273 | 1,705.09 | 94.6 |
| J-66 | 1,484.90 | 0 | 1,706.17 | 95.7 |
| J-67 | 1,492.33 | 0 | 1,705.18 | 92.1 |
| J-68 | 1,498.85 | 273 | 1,705.32 | 89.3 |
| J-69 | 1,504.49 | 0 | 1,705.39 | 86.9 |
| J-70 | 1,496.77 | 273 | 1,704.59 | 89.9 |
| J-71 | 1,492.39 | 273 | 1,704.58 | 91.8 |
| J-72 | 1,489.15 | 273 | 1,704.53 | 93.2 |
| J-73 | 1,526.88 | 0 | 1,706.08 | 77.5 |
| J-74 | 1,522.81 | 354 | 1,705.59 | 79.1 |
| J-75 | 1,517.39 | 354 | 1,705.60 | 81.4 |
| J-76 | 1,513.14 | 354 | 1,706.10 | 83.5 |
| J-77 | 1,518.58 | 354 | 1,705.59 | 80.9 |
| J-78 | 1,525.14 | 354 | 1,705.69 | 78.1 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 4

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario: Max Day - Site

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|---|---|---|---|---|
| J-79 | 1,521.50 | 0 | 1,706.01 | 79.8 |
| J-80 | 1,521.52 | 0 | 1,706.81 | 80.2 |
| J-81 | 1,507.88 | 0 | 1,706.51 | 85.9 |
| J-82 | 1,511.68 | 354 | 1,706.08 | 84.1 |
| J-83 | 1,530.12 | 354 | 1,705.77 | 76.0 |
| J-84 | 1,534.97 | 0 | 1,705.83 | 73.9 |
| J-85 | 1,520.43 | 0 | 1,706.09 | 80.3 |
| J-86 | 1,512.42 | 0 | 1,706.14 | 83.8 |
| J-87 | 1,519.02 | 0 | 1,706.18 | 81.0 |
| J-88 | 1,543.79 | 378 | 1,708.26 | 71.2 |
| J-89 | 1,561.51 | 378 | 1,710.00 | 64.2 |
| J-90 | 1,553.44 | 0 | 1,706.20 | 66.1 |
| J-91 | 1,501.89 | 0 | 1,707.40 | 88.9 |
| J-92 | 1,529.36 | 0 | 1,710.00 | 78.2 |
| J-93 | 1,513.70 | 0 | 1,707.43 | 83.8 |
| J-94 | 1,544.69 | 56 | 1,706.16 | 69.9 |
| J-95 | 1,552.90 | 0 | 1,706.60 | 66.5 |
| J-200 | 1,496.00 | 576 | 1,708.06 | 91.7 |
| J-201 | 1,488.00 | 917 | 1,710.00 | 96.0 |
| J-202 | 1,470.66 | 917 | 1,708.34 | 102.8 |
| J-203 | 1,458.00 | 917 | 1,706.01 | 107.3 |
| J-204 | 1,453.24 | 0 | 1,705.99 | 109.4 |
| J-205 | 1,458.56 | 0 | 1,705.86 | 107.0 |
| J-206 | 1,496.31 | 917 | 1,707.89 | 91.5 |
| J-207 | 1,517.23 | 931 | 1,707.17 | 82.2 |
| J-208 | 1,519.99 | 590 | 1,707.17 | 81.0 |
| J-209 | 1,504.30 | 576 | 1,707.25 | 87.8 |
| J-210 | 1,475.66 | 576 | 1,706.29 | 99.8 |
| J-211 | 1,463.36 | 576 | 1,705.49 | 104.8 |
| J-212 | 1,454.56 | 230 | 1,706.30 | 108.9 |
| J-213 | 1,466.18 | 230 | 1,707.66 | 104.5 |
| J-214 | 1,480.99 | 230 | 1,708.62 | 98.5 |
| J-215 | 1,494.36 | 230 | 1,707.63 | 92.3 |
| J-216 | 1,510.97 | 341 | 1,706.93 | 84.8 |
| J-217 | 1,559.60 | 462 | 1,708.24 | 64.3 |
| J-218 | 1,554.84 | 462 | 1,707.15 | 65.9 |
| J-219 | 1,549.95 | 462 | 1,705.91 | 67.5 |
| J-220 | 1,529.45 | 462 | 1,706.19 | 76.5 |
| J-221 | 1,536.00 | 462 | 1,707.24 | 74.1 |
| J-222 | 1,536.00 | 476 | 1,707.12 | 74.0 |
| J-223 | 1,563.53 | 476 | 1,707.21 | 62.2 |
| J-224 | 1,560.58 | 462 | 1,706.25 | 63.0 |
| J-225 | 1,550.03 | 378 | 1,705.99 | 67.5 |
| J-226 | 1,551.62 | 378 | 1,705.89 | 66.7 |
| J-227 | 1,546.70 | 378 | 1,706.17 | 69.0 |
| J-228 | 1,534.99 | 201 | 1,707.04 | 74.4 |
| J-229 | 1,550.60 | 121 | 1,706.72 | 67.5 |
| J-230 | 1,544.78 | 201 | 1,706.93 | 70.2 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 4

3-ER-500

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario:  Max Day - Site

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|----------------|--------------|----------------------|----------------|
| J-231 | 1,539.83 | 121 | 1,706.91 | 72.3 |
| J-232 | 1,550.00 | 62 | 1,706.93 | 67.9 |
| J-233 | 1,547.13 | 0 | 1,706.93 | 69.1 |
| J-ELS | 1,456.01 | 1 | 1,705.94 | 108.1 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 4 of 4

3-ER-501

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario:  Max Day - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| AZWC-P-1 | 1,622 | 12.0 | 120 | AZWC-J-18 | AZWC-J-17 | 120 | 0.34 | 0.058 |
| AZWC-P-2 | 2,123 | 12.0 | 120 | AZWC-J-17 | AZWC-J-15 | 260 | 0.74 | 0.243 |
| AZWC-P-3 | 3,095 | 16.0 | 120 | AZWC-J-4 | AZWC-J-11 | 60 | 0.10 | 0.004 |
| AZWC-P-4 | 2,970 | 16.0 | 120 | AZWC-J-11 | AZWC-J-15 | 314 | 0.50 | 0.085 |
| AZWC-P-5 | 2,054 | 12.0 | 120 | AZWC-J-13 | AZWC-J-11 | 196 | 0.56 | 0.144 |
| AZWC-P-6 | 2,990 | 12.0 | 120 | AZWC-J-17 | AZWC-J-13 | 49 | 0.14 | 0.011 |
| AZWC-P-7 | 1,705 | 12.0 | 120 | AZWC-J-14 | AZWC-J-13 | 102 | 0.29 | 0.043 |
| AZWC-P-8 | 2,436 | 16.0 | 120 | AZWC-J-4 | AZWC-J-1 | 502 | 0.80 | 0.202 |
| AZWC-P-9 | 3,055 | 16.0 | 120 | AZWC-J-8 | AZWC-J-3 | 774 | 1.24 | 0.451 |
| AZWC-P-10 | 1,316 | 16.0 | 120 | AZWC-J-15 | AZWC-J-16 | 925 | 1.48 | 0.626 |
| AZWC-P-11 | 2,912 | 16.0 | 120 | AZWC-J-16 | AZWC-J-12 | 1,350 | 2.15 | 1.262 |
| AZWC-P-12 | 2,013 | 16.0 | 120 | AZWC-J-12 | AZWC-J-8 | 1,698 | 2.71 | 1.929 |
| AZWC-P-13 | 2,178 | 12.0 | 120 | AZWC-J-1 | AZWC-J-2 | 753 | 2.14 | 1.737 |
| AZWC-P-14 | 2,649 | 12.0 | 120 | AZWC-J-2 | AZWC-J-3 | 597 | 1.69 | 1.130 |
| AZWC-P-15 | 1,502 | 12.0 | 120 | AZWC-J-5 | AZWC-J-7 | 59 | 0.17 | 0.016 |
| AZWC-P-16 | 2,991 | 12.0 | 120 | AZWC-J-16 | AZWC-J-7 | 248 | 0.70 | 0.222 |
| AZWC-P-17 | 1,931 | 12.0 | 120 | AZWC-J-5 | AZWC-J-1 | 74 | 0.21 | 0.023 |
| AZWC-P-18 | 2,422 | 12.0 | 120 | AZWC-J-6 | AZWC-J-2 | 156 | 0.44 | 0.094 |
| AZWC-P-19 | 2,346 | 12.0 | 120 | AZWC-J-6 | AZWC-J-12 | 170 | 0.48 | 0.111 |
| AZWC-P-20 | 1,354 | 12.0 | 120 | AZWC-J-11 | AZWC-J-7 | 293 | 0.83 | 0.303 |
| AZWC-P-21 | 2,644 | 12.0 | 120 | AZWC-J-18 | AZWC-J-14 | 29 | 0.08 | 0.004 |
| AZWC-P-22 | 3,404 | 12.0 | 120 | AZWC-J-14 | AZWC-J-9 | 40 | 0.11 | 0.007 |
| AZWC-P-23 | 1,779 | 12.0 | 120 | AZWC-J-9 | AZWC-J-10 | 90 | 0.26 | 0.034 |
| AZWC-P-24 | 3,067 | 12.0 | 120 | AZWC-J-10 | AZWC-J-13 | 52 | 0.15 | 0.012 |
| AZWC-P-25 | 1,946 | 12.0 | 120 | AZWC-J-10 | AZWC-J-4 | 211 | 0.60 | 0.165 |
| P-1 | 1,337 | 24.0 | 120 | J-1 | J-2 | 3,015 | 2.14 | 0.776 |
| P-2 | 1,236 | 24.0 | 120 | J-3 | J-4 | 2,516 | 1.78 | 0.555 |
| P-3 | 2,654 | 16.0 | 120 | J-5 | J-6 | 305 | 0.49 | 0.080 |
| P-4 | 2,643 | 12.0 | 120 | J-7 | J-8 | 57 | 0.16 | 0.014 |
| P-5 | 1,373 | 16.0 | 120 | J-8 | J-9 | 91 | 0.15 | 0.009 |
| P-6 | 1,371 | 16.0 | 120 | J-10 | J-11 | 859 | 1.37 | 0.547 |
| P-7 | 1,867 | 16.0 | 120 | J-9 | J-10 | 426 | 0.68 | 0.149 |
| P-7 | 1,712 | 16.0 | 120 | J-11 | J-1 | 1,130 | 1.80 | 0.907 |
| P-8 | 1,252 | 16.0 | 120 | J-16 | J-17 | 691 | 1.10 | 0.365 |
| P-9 | 1,335 | 16.0 | 120 | J-17 | J-4 | 809 | 1.29 | 0.489 |
| P-10 | 1,872 | 16.0 | 120 | J-18 | J-19 | 162 | 0.26 | 0.025 |
| P-11 | 817 | 16.0 | 120 | J-18 | J-19 | 618 | 0.99 | 0.297 |
| P-12 | 2,582 | 16.0 | 120 | J-19 | J-20 | 730 | 1.16 | 0.404 |
| P-13 | 2,636 | 24.0 | 120 | J-22 | J-23 | 386 | 0.27 | 0.017 |
| P-14 | 2,640 | 24.0 | 120 | J-23 | J-1 | 981 | 0.70 | 0.097 |
| P-15 | 2,850 | 16.0 | 120 | J-24 | J-25 | 305 | 0.49 | 0.080 |
| P-16 | 1,880 | 12.0 | 120 | J-25 | J-26 | 366 | 1.04 | 0.456 |
| P-17 | 1,357 | 12.0 | 120 | J-9 | J-27 | 199 | 0.56 | 0.147 |
| P-18 | 1,167 | 12.0 | 120 | J-27 | J-28 | 60 | 0.17 | 0.016 |
| P-19 | 1,813 | 8.0 | 120 | J-28 | J-29 | 96 | 0.61 | 0.275 |
| P-20 | 781 | 8.0 | 120 | J-29 | J-30 | 52 | 0.33 | 0.090 |
| P-21 | 997 | 12.0 | 120 | J-30 | J-5 | 412 | 1.17 | 0.569 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 5

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg                                                      Active Scenario: Max Day - Site
FlexTable: Pipe Table

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-22 | 1,324 | 12.0 | 120 | J-7 | J-28 | 205 | 0.58 | 0.157 |
| P-23 | 2,040 | 12.0 | 120 | J-28 | J-31 | 31 | 0.09 | 0.005 |
| P-24 | 935 | 12.0 | 120 | J-31 | J-32 | 318 | 0.90 | 0.353 |
| P-25 | 1,071 | 12.0 | 120 | J-32 | J-33 | 393 | 1.11 | 0.521 |
| P-26 | 757 | 12.0 | 120 | J-33 | J-34 | 587 | 1.67 | 1.096 |
| P-27 | 888 | 12.0 | 120 | J-34 | J-3 | 860 | 2.44 | 2.222 |
| P-28 | 1,587 | 8.0 | 120 | J-29 | J-35 | 43 | 0.28 | 0.063 |
| P-29 | 1,506 | 8.0 | 120 | J-30 | J-36 | 111 | 0.71 | 0.363 |
| P-30 | 1,149 | 8.0 | 120 | J-36 | J-33 | 78 | 0.50 | 0.189 |
| P-31 | 1,110 | 8.0 | 120 | J-27 | J-37 | 14 | 0.09 | 0.008 |
| P-32 | 1,560 | 8.0 | 120 | J-37 | J-38 | 14 | 0.09 | 0.008 |
| P-33 | 895 | 8.0 | 120 | J-38 | J-31 | 14 | 0.09 | 0.008 |
| P-34 | 783 | 8.0 | 120 | J-39 | J-11 | 126 | 0.80 | 0.456 |
| P-35 | 1,356 | 8.0 | 120 | J-39 | J-40 | 228 | 1.46 | 1.372 |
| P-36 | 792 | 8.0 | 120 | J-40 | J-2 | 228 | 1.46 | 1.372 |
| P-37 | 807 | 12.0 | 120 | J-6 | J-41 | 305 | 0.87 | 0.327 |
| P-38 | 1,833 | 12.0 | 120 | J-41 | J-7 | 262 | 0.74 | 0.246 |
| P-39 | 949 | 8.0 | 120 | J-35 | J-41 | 43 | 0.28 | 0.063 |
| P-40 | 2,155 | 16.0 | 120 | J-4 | J-42 | 907 | 1.45 | 0.604 |
| P-41 | 1,477 | 16.0 | 120 | J-42 | J-5 | 717 | 1.14 | 0.391 |
| P-42 | 614 | 8.0 | 120 | J-36 | J-42 | 190 | 1.21 | 0.974 |
| P-43 | 1,556 | 12.0 | 120 | J-32 | J-30 | 198 | 0.56 | 0.147 |
| P-44 | 689 | 12.0 | 120 | J-12 | J-43 | 76 | 0.21 | 0.025 |
| P-45 | 1,946 | 12.0 | 120 | J-43 | J-44 | 196 | 0.56 | 0.144 |
| P-46 | 2,073 | 8.0 | 120 | J-44 | J-45 | 98 | 0.62 | 0.286 |
| P-47 | 969 | 8.0 | 120 | J-45 | J-2 | 234 | 1.49 | 1.434 |
| P-48 | 1,168 | 8.0 | 120 | J-3 | J-46 | 236 | 1.51 | 1.461 |
| P-49 | 911 | 8.0 | 120 | J-46 | J-17 | 118 | 0.75 | 0.404 |
| P-50 | 742 | 8.0 | 120 | J-46 | J-47 | 136 | 0.87 | 0.525 |
| P-51 | 921 | 8.0 | 120 | J-47 | J-43 | 136 | 0.87 | 0.525 |
| P-52 | 2,082 | 8.0 | 120 | J-43 | J-48 | 54 | 0.34 | 0.095 |
| P-53 | 1,325 | 8.0 | 120 | J-48 | J-49 | 28 | 0.18 | 0.028 |
| P-54 | 1,465 | 12.0 | 120 | J-49 | J-44 | 318 | 0.90 | 0.352 |
| P-55 | 1,495 | 12.0 | 120 | J-49 | J-14 | 27 | 0.08 | 0.003 |
| P-56 | 743 | 8.0 | 120 | J-49 | J-50 | 35 | 0.22 | 0.040 |
| P-57 | 1,129 | 8.0 | 120 | J-50 | J-15 | 35 | 0.22 | 0.040 |
| P-58 | 931 | 16.0 | 120 | J-51 | J-14 | 33 | 0.05 | 0.001 |
| P-59 | 1,264 | 8.0 | 120 | J-48 | J-51 | 31 | 0.20 | 0.034 |
| P-60 | 2,202 | 16.0 | 120 | J-12 | J-52 | 339 | 0.54 | 0.097 |
| P-61 | 885 | 16.0 | 120 | J-52 | J-94 | 248 | 0.40 | 0.055 |
| P-62 | 840 | 8.0 | 120 | J-48 | J-52 | 4 | 0.03 | 0.001 |
| P-63 | 906 | 8.0 | 120 | J-9 | J-53 | 136 | 0.87 | 0.524 |
| P-64 | 910 | 12.0 | 120 | J-54 | J-8 | 148 | 0.42 | 0.085 |
| P-65 | 721 | 8.0 | 120 | J-53 | J-54 | 137 | 0.87 | 0.534 |
| P-66 | 983 | 8.0 | 120 | J-24 | J-55 | 191 | 1.22 | 0.984 |
| P-67 | 1,333 | 8.0 | 120 | J-55 | J-56 | 119 | 0.76 | 0.409 |
| P-68 | 1,116 | 8.0 | 120 | J-56 | J-57 | 76 | 0.49 | 0.181 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021                              Superstition Vistas                        A. Paciora
                                      HILGARTWILSON, LLC                          Page 2 of 5

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Max Day - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-69 | 729 | 8.0 | 120 | J-57 | J-58 | 63 | 0.40 | 0.128 |
| P-70 | 857 | 12.0 | 120 | J-26 | J-59 | 52 | 0.15 | 0.012 |
| P-71 | 1,622 | 12.0 | 120 | J-59 | J-54 | 11 | 0.03 | 0.001 |
| P-72 | 936 | 8.0 | 120 | J-58 | J-59 | 63 | 0.40 | 0.127 |
| P-73 | 1,459 | 8.0 | 120 | J-55 | J-60 | 78 | 0.50 | 0.187 |
| P-74 | 1,114 | 8.0 | 120 | J-60 | J-61 | 78 | 0.50 | 0.187 |
| P-75 | 1,054 | 12.0 | 120 | J-61 | J-26 | 313 | 0.89 | 0.343 |
| P-76 | 1,140 | 12.0 | 120 | J-61 | J-56 | 118 | 0.34 | 0.056 |
| P-77 | 855 | 12.0 | 120 | J-62 | J-63 | 256 | 0.73 | 0.236 |
| P-78 | 905 | 12.0 | 120 | J-63 | J-10 | 434 | 1.23 | 0.626 |
| P-79 | 831 | 8.0 | 120 | J-63 | J-64 | 13 | 0.08 | 0.007 |
| P-80 | 1,177 | 8.0 | 120 | J-64 | J-57 | 13 | 0.08 | 0.007 |
| P-81 | 1,245 | 8.0 | 120 | J-55 | J-65 | 6 | 0.04 | 0.001 |
| P-82 | 2,151 | 16.0 | 120 | J-22 | J-66 | 888 | 1.42 | 0.581 |
| P-83 | 1,176 | 16.0 | 120 | J-66 | J-24 | 338 | 0.54 | 0.097 |
| P-84 | 1,113 | 12.0 | 120 | J-65 | J-66 | 550 | 1.56 | 0.970 |
| P-85 | 1,034 | 8.0 | 120 | J-65 | J-67 | 52 | 0.33 | 0.088 |
| P-86 | 1,662 | 8.0 | 120 | J-67 | J-68 | 52 | 0.33 | 0.088 |
| P-87 | 1,161 | 12.0 | 120 | J-68 | J-23 | 759 | 2.15 | 1.763 |
| P-88 | 1,359 | 8.0 | 120 | J-68 | J-69 | 36 | 0.23 | 0.046 |
| P-89 | 1,832 | 8.0 | 120 | J-69 | J-63 | 108 | 0.69 | 0.344 |
| P-90 | 1,005 | 12.0 | 120 | J-68 | J-70 | 471 | 1.34 | 0.728 |
| P-91 | 573 | 12.0 | 120 | J-62 | J-70 | 126 | 0.36 | 0.063 |
| P-92 | 1,409 | 12.0 | 120 | J-65 | J-71 | 323 | 0.92 | 0.363 |
| P-93 | 1,201 | 12.0 | 120 | J-56 | J-72 | 41 | 0.12 | 0.008 |
| P-94 | 503 | 12.0 | 120 | J-72 | J-62 | 109 | 0.31 | 0.049 |
| P-95 | 736 | 12.0 | 120 | J-71 | J-72 | 123 | 0.35 | 0.061 |
| P-96 | 718 | 12.0 | 120 | J-71 | J-70 | 72 | 0.21 | 0.023 |
| P-97 | 1,047 | 8.0 | 120 | J-19 | J-73 | 112 | 0.72 | 0.369 |
| P-98 | 1,393 | 12.0 | 120 | J-83 | J-74 | 185 | 0.53 | 0.129 |
| P-99 | 903 | 12.0 | 120 | J-74 | J-75 | 22 | 0.06 | 0.002 |
| P-100 | 1,063 | 12.0 | 120 | J-21 | J-76 | 623 | 1.77 | 1.223 |
| P-101 | 1,185 | 12.0 | 120 | J-76 | J-77 | 352 | 1.00 | 0.426 |
| P-102 | 939 | 12.0 | 120 | J-77 | J-74 | 2 | 0.00 | 0.000 |
| P-103 | 1,124 | 12.0 | 120 | J-74 | J-78 | 149 | 0.42 | 0.086 |
| P-104 | 1,019 | 8.0 | 120 | J-78 | J-79 | 103 | 0.66 | 0.314 |
| P-105 | 1,354 | 16.0 | 120 | J-1 | J-80 | 904 | 1.44 | 0.601 |
| P-106 | 894 | 16.0 | 120 | J-80 | J-12 | 766 | 1.22 | 0.442 |
| P-107 | 1,486 | 8.0 | 120 | J-76 | J-81 | 96 | 0.61 | 0.277 |
| P-108 | 1,004 | 12.0 | 120 | J-75 | J-82 | 376 | 1.07 | 0.480 |
| P-109 | 1,106 | 12.0 | 120 | J-82 | J-23 | 608 | 1.72 | 1.169 |
| P-110 | 1,868 | 8.0 | 120 | J-81 | J-82 | 87 | 0.56 | 0.231 |
| P-111 | 1,711 | 12.0 | 120 | J-78 | J-12 | 352 | 1.00 | 0.425 |
| P-112 | 675 | 8.0 | 120 | J-73 | J-83 | 125 | 0.80 | 0.450 |
| P-113 | 1,008 | 8.0 | 120 | J-83 | J-84 | 38 | 0.25 | 0.051 |
| P-114 | 1,673 | 8.0 | 120 | J-84 | J-52 | 86 | 0.55 | 0.226 |
| P-115 | 1,776 | 8.0 | 120 | J-78 | J-84 | 48 | 0.30 | 0.076 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 5

3-ER-504

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Max Day - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-116 | 1,656 | 8.0 | 120 | J-73 | J-85 | 13 | 0.08 | 0.006 |
| P-117 | 1,568 | 8.0 | 120 | J-85 | J-76 | 13 | 0.08 | 0.006 |
| P-118 | 1,542 | 8.0 | 120 | J-82 | J-86 | 35 | 0.22 | 0.043 |
| P-119 | 532 | 8.0 | 120 | J-79 | J-87 | 103 | 0.66 | 0.314 |
| P-120 | 1,177 | 8.0 | 120 | J-87 | J-80 | 138 | 0.88 | 0.540 |
| P-121 | 801 | 8.0 | 120 | J-86 | J-87 | 35 | 0.22 | 0.043 |
| P-122 | 931 | 12.0 | 120 | J-83 | J-18 | 376 | 1.07 | 0.480 |
| P-123 | 2,664 | 24.0 | 120 | J-88 | J-20 | 1,748 | 1.24 | 0.282 |
| P-124 | 2,422 | 24.0 | 120 | J-88 | J-89 | 2,892 | 2.05 | 0.718 |
| P-125 | 839 | 16.0 | 120 | J-90 | J-90 | 214 | 0.34 | 0.042 |
| P-126 | 1,077 | 16.0 | 120 | J-90 | J-15 | 214 | 0.34 | 0.041 |
| P-128 | 1,309 | 24.0 | 120 | J-21 | J-91 | 114 | 0.08 | 0.002 |
| P-129 | 1,332 | 24.0 | 120 | J-22 | J-91 | 298 | 0.21 | 0.011 |
| P-130 | 974 | 8.0 | 120 | J-81 | J-91 | 183 | 1.17 | 0.915 |
| P-133 | 1,322 | 24.0 | 120 | J-2 | J-92 | 3,477 | 2.47 | 1.010 |
| P-134 | 1,322 | 24.0 | 120 | J-92 | J-3 | 3,611 | 2.56 | 1.083 |
| P-135 | 1,774 | 24.0 | 120 | J-20 | J-93 | 626 | 0.44 | 0.042 |
| P-136 | 778 | 24.0 | 120 | J-93 | J-21 | 626 | 0.44 | 0.042 |
| P-137 | 786 | 16.0 | 120 | J-13 | J-94 | 162 | 0.26 | 0.025 |
| P-138 | 1,159 | 16.0 | 120 | J-94 | J-51 | 64 | 0.10 | 0.004 |
| P-139 | 2,314 | 12.0 | 120 | J-44 | J-16 | 95 | 0.27 | 0.038 |
| P-140 | 1,166 | 8.0 | 120 | J-11 | J-69 | 144 | 0.92 | 0.589 |
| P-141 | 890 | 16.0 | 120 | J-95 | J-16 | 490 | 0.78 | 0.193 |
| P-142 | 1,256 | 16.0 | 120 | J-15 | J-95 | 603 | 0.96 | 0.284 |
| P-143 | 2,336 | 12.0 | 120 | J-44 | J-92 | 675 | 1.91 | 1.420 |
| P-200 | 2,335 | 24.0 | 120 | J-201 | J-202 | 2,878 | 2.04 | 0.712 |
| P-201 | 2,336 | 16.0 | 120 | J-202 | J-203 | 1,188 | 1.90 | 0.996 |
| P-202 | 1,418 | 16.0 | 120 | J-203 | J-204 | 111 | 0.18 | 0.012 |
| P-204 | 2,317 | 12.0 | 120 | J-205 | J-25 | 61 | 0.17 | 0.016 |
| P-205 | 2,640 | 24.0 | 120 | J-201 | J-206 | 3,063 | 2.17 | 0.798 |
| P-206 | 2,639 | 24.0 | 120 | J-206 | J-207 | 1,715 | 1.22 | 0.273 |
| P-207 | 2,567 | 12.0 | 120 | J-208 | J-209 | 89 | 0.25 | 0.033 |
| P-208 | 2,713 | 12.0 | 120 | J-209 | J-200 | 290 | 0.82 | 0.296 |
| P-209 | 2,452 | 12.0 | 120 | J-24 | J-210 | 157 | 0.45 | 0.095 |
| P-210 | 2,672 | 24.0 | 120 | J-22 | J-200 | 1,599 | 1.13 | 0.240 |
| P-211 | 2,633 | 12.0 | 120 | J-209 | J-21 | 118 | 0.33 | 0.056 |
| P-212 | 2,662 | 16.0 | 120 | J-208 | J-20 | 392 | 0.63 | 0.128 |
| P-213 | 2,706 | 12.0 | 120 | J-202 | J-210 | 481 | 1.36 | 0.757 |
| P-214 | 1,265 | 12.0 | 120 | J-203 | J-211 | 344 | 0.98 | 0.408 |
| P-215 | 1,876 | 12.0 | 120 | J-211 | J-205 | 232 | 0.66 | 0.197 |
| P-216 | 2,801 | 12.0 | 120 | J-200 | J-210 | 436 | 1.24 | 0.632 |
| P-217 | 2,687 | 24.0 | 120 | J-200 | J-201 | 2,901 | 2.06 | 0.722 |
| P-218 | 2,651 | 12.0 | 120 | J-206 | J-209 | 259 | 0.73 | 0.240 |
| P-219 | 2,641 | 16.0 | 120 | J-207 | J-208 | 27 | 0.04 | 0.001 |
| P-220 | 2,285 | 12.0 | 120 | J-203 | J-212 | 184 | 0.52 | 0.128 |
| P-221 | 2,358 | 12.0 | 120 | J-212 | J-213 | 414 | 1.17 | 0.574 |
| P-222 | 2,276 | 12.0 | 120 | J-213 | J-214 | 351 | 1.00 | 0.424 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 4 of 5

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Max Day - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-223 | 2,646 | 12.0 | 120 | J-214 | J-215 | 328 | 0.93 | 0.374 |
| P-224 | 2,674 | 12.0 | 120 | J-215 | J-216 | 271 | 0.77 | 0.262 |
| P-225 | 2,288 | 16.0 | 120 | J-216 | J-207 | 351 | 0.56 | 0.104 |
| P-226 | 2,254 | 12.0 | 120 | J-213 | J-202 | 292 | 0.83 | 0.302 |
| P-227 | 2,266 | 16.0 | 120 | J-214 | J-201 | 910 | 1.45 | 0.608 |
| P-228 | 2,289 | 12.0 | 120 | J-206 | J-215 | 172 | 0.49 | 0.113 |
| P-229 | 2,627 | 24.0 | 120 | J-222 | J-207 | 406 | 0.29 | 0.019 |
| P-230 | 2,665 | 12.0 | 120 | J-219 | J-220 | 166 | 0.47 | 0.105 |
| P-231 | 2,652 | 12.0 | 120 | J-220 | J-216 | 281 | 0.80 | 0.280 |
| P-232 | 2,707 | 12.0 | 120 | J-221 | J-222 | 105 | 0.30 | 0.045 |
| P-233 | 2,657 | 24.0 | 120 | J-218 | J-222 | 312 | 0.22 | 0.012 |
| P-234 | 2,252 | 12.0 | 120 | J-220 | J-222 | 347 | 0.98 | 0.413 |
| P-235 | 2,583 | 12.0 | 120 | J-221 | J-88 | 338 | 0.96 | 0.394 |
| P-236 | 2,638 | 24.0 | 120 | J-89 | J-217 | 2,780 | 1.97 | 0.667 |
| P-237 | 2,620 | 12.0 | 120 | J-208 | J-221 | 82 | 0.23 | 0.029 |
| P-238 | 2,942 | 12.0 | 120 | J-221 | J-217 | 311 | 0.88 | 0.339 |
| P-239 | 2,825 | 24.0 | 120 | J-217 | J-223 | 2,007 | 1.42 | 0.365 |
| P-240 | 1,107 | 12.0 | 120 | J-224 | J-219 | 296 | 0.84 | 0.308 |
| P-241 | 903 | 24.0 | 120 | J-223 | J-218 | 774 | 0.55 | 0.062 |
| P-242 | 2,212 | 16.0 | 120 | J-223 | J-224 | 758 | 1.21 | 0.433 |
| P-243 | 1,160 | 16.0 | 120 | J-225 | J-94 | 419 | 0.67 | 0.144 |
| P-244 | 3,411 | 12.0 | 120 | J-88 | J-227 | 429 | 1.22 | 0.612 |
| P-245 | 2,726 | 12.0 | 120 | J-227 | J-225 | 130 | 0.37 | 0.067 |
| P-246 | 855 | 12.0 | 120 | J-225 | J-226 | 170 | 0.48 | 0.111 |
| P-247 | 1,678 | 12.0 | 120 | J-226 | J-14 | 208 | 0.59 | 0.160 |
| P-248 | 1,900 | 12.0 | 120 | J-18 | J-227 | 79 | 0.22 | 0.027 |
| P-249 | 2,011 | 16.0 | 120 | J-4 | J-228 | 743 | 1.19 | 0.418 |
| P-250 | 1,945 | 12.0 | 120 | J-16 | J-229 | 77 | 0.22 | 0.025 |
| P-251 | 1,597 | 16.0 | 120 | J-228 | J-230 | 282 | 0.45 | 0.069 |
| P-253 | 1,930 | 12.0 | 120 | J-229 | J-231 | 157 | 0.45 | 0.096 |
| P-254 | 558 | 12.0 | 120 | J-231 | J-228 | 260 | 0.74 | 0.243 |
| P-255 | 842 | 16.0 | 120 | J-230 | J-232 | 67 | 0.11 | 0.005 |
| P-256 | 552 | 8.0 | 120 | J-230 | J-233 | 14 | 0.09 | 0.008 |
| P-257 | 1,595 | 8.0 | 120 | J-233 | J-231 | 19 | 0.12 | 0.013 |
| P-258 | 330 | 12.0 | 120 | J-232 | J-233 | 5 | 0.01 | 0.000 |
| P-259 | 1,600 | 12.0 | 120 | J-ELS | J-205 | 109 | 0.31 | 0.049 |
| P-260 | 1,038 | 12.0 | 120 | J-204 | J-ELS | 111 | 0.31 | 0.050 |
| P-261 | 3,327 | 12.0 | 120 | J-210 | J-205 | 184 | 0.52 | 0.127 |
| P-262 | 2,378 | 12.0 | 120 | J-95 | J-229 | 113 | 0.32 | 0.052 |
| P-500 | 679 | 48.0 | 120 | R-1 | J-92 | 7,763 | 1.38 | 0.143 |
| P-501 | 600 | 48.0 | 120 | R-2 | FCV-2 | 6,050 | 1.07 | 0.098 |
| P-502 | 566 | 48.0 | 120 | FCV-2 | J-89 | 6,050 | 1.07 | 0.098 |
| P-503 | 604 | 48.0 | 120 | R-3 | FCV-3 | 10,669 | 1.89 | 0.269 |
| P-504 | 604 | 48.0 | 120 | FCV-3 | J-201 | 10,669 | 1.89 | 0.293 |
| P-505 | 861 | 48.0 | 120 | R-AZWC | AZWC-J-8 | 2,649 | 0.47 | 0.024 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 5 of 5

3-ER-506

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: FCV Table

Active Scenario: Max Day - Site

| Label | Elevation (ft) | Diameter (Valve) (in) | Flow Setting (Initial) (gpm) | Minor Loss Coefficient (Local) | Flow (gpm) | Hydraulic Grade (From) (ft) | Hydraulic Grade (To) (ft) | Headloss (ft) |
|---|---|---|---|---|---|---|---|---|
| FCV-2 | 1,561.51 | 48.0 | 10,410 | 0.0000000 | 6,050 | 1,710.00 | 1,710.00 | 0.00 |
| FCV-3 | 1,488.00 | 48.0 | 14,413 | 0.0000000 | 10,669 | 1,710.00 | 1,710.00 | 0.00 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 1

3-ER-507

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Reservoir Table

Active Scenario: Max Day - Site

| Label | Elevation (ft) | Flow (Out net) (gpm) | Hydraulic Grade (ft) |
|---|---|---|---|
| R-1 | 1,710.00 | 7,763 | 1,710.00 |
| R-2 | 1,710.00 | 6,050 | 1,710.00 |
| R-3 | 1,710.00 | 10,669 | 1,710.00 |
| R-AZWC | 1,720.00 | 2,649 | 1,720.00 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 1

3-ER-508



# SITE
# PEAK HOUR DEMAND RESULTS

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario: Peak Hour - Site

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|---|---|---|---|---|
| AZWC-J-1 | 1,565.65 | 292 | 1,700.32 | 58.3 |
| AZWC-J-2 | 1,566.00 | 0 | 1,709.46 | 62.1 |
| AZWC-J-3 | 1,562.39 | 292 | 1,716.66 | 66.7 |
| AZWC-J-4 | 1,549.27 | 573 | 1,699.13 | 64.8 |
| AZWC-J-5 | 1,549.29 | 14 | 1,700.23 | 65.3 |
| AZWC-J-6 | 1,550.00 | 14 | 1,710.02 | 69.2 |
| AZWC-J-7 | 1,540.00 | 14 | 1,700.17 | 69.3 |
| AZWC-J-8 | 1,540.19 | 292 | 1,720.00 | 77.8 |
| AZWC-J-9 | 1,532.76 | 207 | 1,698.24 | 71.6 |
| AZWC-J-10 | 1,532.13 | 281 | 1,698.38 | 71.9 |
| AZWC-J-11 | 1,530.66 | 573 | 1,699.16 | 72.9 |
| AZWC-J-12 | 1,530.39 | 292 | 1,710.62 | 78.0 |
| AZWC-J-13 | 1,516.54 | 142 | 1,698.48 | 78.7 |
| AZWC-J-14 | 1,511.49 | 142 | 1,698.31 | 80.8 |
| AZWC-J-15 | 1,510.00 | 573 | 1,699.76 | 82.1 |
| AZWC-J-16 | 1,510.00 | 292 | 1,701.75 | 83.0 |
| AZWC-J-17 | 1,498.95 | 142 | 1,698.56 | 86.4 |
| AZWC-J-18 | 1,496.42 | 142 | 1,698.34 | 87.4 |
| J-1 | 1,518.46 | 0 | 1,700.26 | 78.7 |
| J-2 | 1,524.42 | 0 | 1,704.61 | 78.0 |
| J-3 | 1,534.31 | 0 | 1,705.57 | 74.1 |
| J-4 | 1,536.36 | 96 | 1,703.40 | 72.3 |
| J-5 | 1,511.94 | 0 | 1,697.50 | 80.3 |
| J-6 | 1,496.19 | 0 | 1,696.73 | 86.8 |
| J-7 | 1,487.97 | 0 | 1,693.99 | 89.1 |
| J-8 | 1,482.10 | 0 | 1,693.41 | 91.4 |
| J-9 | 1,489.31 | 0 | 1,693.47 | 88.3 |
| J-10 | 1,498.18 | 0 | 1,694.04 | 84.7 |
| J-11 | 1,505.45 | 0 | 1,696.08 | 82.5 |
| J-12 | 1,528.22 | 0 | 1,697.27 | 73.1 |
| J-13 | 1,541.89 | 0 | 1,696.38 | 66.8 |
| J-14 | 1,551.18 | 0 | 1,696.69 | 63.0 |
| J-15 | 1,555.10 | 581 | 1,697.28 | 61.5 |
| J-16 | 1,547.57 | 48 | 1,699.44 | 65.7 |
| J-17 | 1,539.63 | 0 | 1,701.16 | 69.9 |
| J-18 | 1,536.04 | 0 | 1,696.33 | 69.4 |
| J-19 | 1,531.88 | 0 | 1,696.61 | 71.3 |
| J-20 | 1,525.85 | 0 | 1,698.06 | 74.5 |
| J-21 | 1,509.31 | 0 | 1,697.77 | 81.5 |
| J-22 | 1,500.29 | 47 | 1,697.81 | 85.5 |
| J-23 | 1,507.70 | 0 | 1,698.07 | 82.4 |
| J-24 | 1,478.32 | 0 | 1,693.74 | 93.2 |
| J-25 | 1,468.56 | 0 | 1,693.01 | 97.1 |
| J-26 | 1,470.59 | 0 | 1,692.24 | 95.9 |
| J-27 | 1,491.65 | 446 | 1,693.35 | 87.3 |
| J-28 | 1,494.43 | 446 | 1,693.57 | 86.2 |
| J-29 | 1,504.84 | 0 | 1,695.46 | 82.5 |
| J-30 | 1,509.95 | 446 | 1,695.86 | 80.4 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 4

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario: Peak Hour - Site

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|----------------|--------------|----------------------|----------------|
| J-31 | 1,506.31 | 446 | 1,693.81 | 81.1 |
| J-32 | 1,510.99 | 446 | 1,695.17 | 79.7 |
| J-33 | 1,517.93 | 446 | 1,697.12 | 77.5 |
| J-34 | 1,523.42 | 446 | 1,699.75 | 76.3 |
| J-35 | 1,500.26 | 0 | 1,695.65 | 84.5 |
| J-36 | 1,519.89 | 0 | 1,697.63 | 76.9 |
| J-37 | 1,497.84 | 0 | 1,693.49 | 84.7 |
| J-38 | 1,508.75 | 0 | 1,693.69 | 80.0 |
| J-39 | 1,509.06 | 581 | 1,695.51 | 80.7 |
| J-40 | 1,519.34 | 0 | 1,701.25 | 78.7 |
| J-41 | 1,493.31 | 0 | 1,695.77 | 87.6 |
| J-42 | 1,520.78 | 0 | 1,699.34 | 77.3 |
| J-43 | 1,528.04 | 581 | 1,697.29 | 73.2 |
| J-44 | 1,539.15 | 581 | 1,698.82 | 69.1 |
| J-45 | 1,525.42 | 0 | 1,700.33 | 75.7 |
| J-46 | 1,536.25 | 581 | 1,700.53 | 71.1 |
| J-47 | 1,523.18 | 0 | 1,698.97 | 76.1 |
| J-48 | 1,543.23 | 0 | 1,696.73 | 66.4 |
| J-49 | 1,544.66 | 581 | 1,696.80 | 65.8 |
| J-50 | 1,550.01 | 0 | 1,696.99 | 63.6 |
| J-51 | 1,551.30 | 0 | 1,696.58 | 62.9 |
| J-52 | 1,541.61 | 0 | 1,696.60 | 67.1 |
| J-53 | 1,482.08 | 446 | 1,692.01 | 90.8 |
| J-54 | 1,476.49 | 0 | 1,692.76 | 93.6 |
| J-55 | 1,480.56 | 0 | 1,692.14 | 91.5 |
| J-56 | 1,481.69 | 446 | 1,691.18 | 90.6 |
| J-57 | 1,483.32 | 0 | 1,691.87 | 90.2 |
| J-58 | 1,478.32 | 0 | 1,692.07 | 92.5 |
| J-59 | 1,473.68 | 0 | 1,692.34 | 94.6 |
| J-60 | 1,475.18 | 0 | 1,691.67 | 93.7 |
| J-61 | 1,474.72 | 446 | 1,691.31 | 93.7 |
| J-62 | 1,493.15 | 446 | 1,691.27 | 85.7 |
| J-63 | 1,494.82 | 446 | 1,692.05 | 85.3 |
| J-64 | 1,489.78 | 0 | 1,691.98 | 87.5 |
| J-65 | 1,486.52 | 446 | 1,692.15 | 89.0 |
| J-66 | 1,484.90 | 0 | 1,694.26 | 90.6 |
| J-67 | 1,492.33 | 0 | 1,692.53 | 86.6 |
| J-68 | 1,498.85 | 446 | 1,693.15 | 84.1 |
| J-69 | 1,504.49 | 0 | 1,693.63 | 81.8 |
| J-70 | 1,496.77 | 446 | 1,691.32 | 84.2 |
| J-71 | 1,492.39 | 446 | 1,691.24 | 86.0 |
| J-72 | 1,489.15 | 446 | 1,691.17 | 87.4 |
| J-73 | 1,526.88 | 0 | 1,695.45 | 72.9 |
| J-74 | 1,522.81 | 581 | 1,694.36 | 74.2 |
| J-75 | 1,517.39 | 581 | 1,694.36 | 76.6 |
| J-76 | 1,513.14 | 581 | 1,695.26 | 78.8 |
| J-77 | 1,518.58 | 581 | 1,694.33 | 76.0 |
| J-78 | 1,525.14 | 581 | 1,694.83 | 73.4 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 4

3-ER-511

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Junction Table

Active Scenario: Peak Hour - Site

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|------|------|------|------|
| J-79  | 1,521.50 | 0    | 1,695.62 | 75.3 |
| J-80  | 1,521.52 | 0    | 1,698.21 | 76.4 |
| J-81  | 1,507.88 | 0    | 1,696.09 | 81.4 |
| J-82  | 1,511.68 | 581  | 1,695.33 | 79.5 |
| J-83  | 1,530.12 | 581  | 1,694.97 | 71.3 |
| J-84  | 1,534.97 | 0    | 1,695.21 | 69.3 |
| J-85  | 1,520.43 | 0    | 1,695.35 | 75.7 |
| J-86  | 1,512.42 | 0    | 1,695.79 | 79.3 |
| J-87  | 1,519.02 | 0    | 1,696.03 | 76.6 |
| J-88  | 1,543.79 | 612  | 1,700.05 | 67.6 |
| J-89  | 1,561.51 | 612  | 1,704.55 | 61.9 |
| J-90  | 1,553.44 | 0    | 1,696.95 | 62.1 |
| J-91  | 1,501.89 | 0    | 1,697.78 | 84.8 |
| J-92  | 1,529.36 | 0    | 1,710.00 | 78.2 |
| J-93  | 1,513.70 | 0    | 1,697.86 | 79.7 |
| J-94  | 1,544.69 | 94   | 1,696.40 | 65.6 |
| J-95  | 1,552.90 | 0    | 1,698.76 | 63.1 |
| J-200 | 1,496.00 | 951  | 1,698.12 | 87.4 |
| J-201 | 1,488.00 | 1,517 | 1,700.44 | 91.9 |
| J-202 | 1,470.66 | 1,517 | 1,696.99 | 97.9 |
| J-203 | 1,458.00 | 1,517 | 1,692.45 | 101.4 |
| J-204 | 1,453.24 | 0    | 1,692.47 | 103.5 |
| J-205 | 1,458.56 | 0    | 1,692.59 | 101.3 |
| J-206 | 1,496.31 | 1,517 | 1,696.83 | 86.8 |
| J-207 | 1,517.23 | 1,540 | 1,695.83 | 77.3 |
| J-208 | 1,519.99 | 974  | 1,696.12 | 76.2 |
| J-209 | 1,504.30 | 951  | 1,696.31 | 83.1 |
| J-210 | 1,475.66 | 951  | 1,693.77 | 94.4 |
| J-211 | 1,463.36 | 951  | 1,691.38 | 98.7 |
| J-212 | 1,454.56 | 377  | 1,692.87 | 103.1 |
| J-213 | 1,466.18 | 377  | 1,695.55 | 99.2 |
| J-214 | 1,480.99 | 377  | 1,697.66 | 93.7 |
| J-215 | 1,494.36 | 377  | 1,696.12 | 87.3 |
| J-216 | 1,510.97 | 566  | 1,695.07 | 79.7 |
| J-217 | 1,559.60 | 754  | 1,699.39 | 60.5 |
| J-218 | 1,554.84 | 754  | 1,696.02 | 61.1 |
| J-219 | 1,549.95 | 754  | 1,692.86 | 61.8 |
| J-220 | 1,529.45 | 754  | 1,693.45 | 71.0 |
| J-221 | 1,536.00 | 754  | 1,696.50 | 69.4 |
| J-222 | 1,536.00 | 777  | 1,695.82 | 69.1 |
| J-223 | 1,563.53 | 777  | 1,696.25 | 57.4 |
| J-224 | 1,560.58 | 754  | 1,693.79 | 57.6 |
| J-225 | 1,550.03 | 612  | 1,695.97 | 63.1 |
| J-226 | 1,551.62 | 612  | 1,695.82 | 62.4 |
| J-227 | 1,546.70 | 612  | 1,696.17 | 64.7 |
| J-228 | 1,534.99 | 324  | 1,700.92 | 71.8 |
| J-229 | 1,550.60 | 189  | 1,699.40 | 64.4 |
| J-230 | 1,544.78 | 324  | 1,700.62 | 67.4 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 4

3-ER-512

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg                                              Active Scenario: Peak Hour - Site
FlexTable: Junction Table

| Label | Elevation (ft) | Demand (gpm) | Hydraulic Grade (ft) | Pressure (psi) |
|-------|----------------|--------------|----------------------|----------------|
| J-231 | 1,539.83 | 189 | 1,700.42 | 69.5 |
| J-232 | 1,550.00 | 101 | 1,700.60 | 65.2 |
| J-233 | 1,547.13 | 0 | 1,700.60 | 66.4 |
| J-ELS | 1,456.01 | 1 | 1,692.51 | 102.3 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Peak Hour - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| AZWC-P-1 | 1,622 | 12.0 | 120 | AZWC-J-18 | AZWC-J-17 | 190 | 0.54 | 0.136 |
| AZWC-P-2 | 2,123 | 12.0 | 120 | AZWC-J-17 | AZWC-J-15 | 412 | 1.17 | 0.568 |
| AZWC-P-3 | 3,095 | 16.0 | 120 | AZWC-J-4 | AZWC-J-11 | 98 | 0.16 | 0.010 |
| AZWC-P-4 | 2,970 | 16.0 | 120 | AZWC-J-11 | AZWC-J-15 | 502 | 0.80 | 0.202 |
| AZWC-P-5 | 2,054 | 12.0 | 120 | AZWC-J-13 | AZWC-J-11 | 309 | 0.88 | 0.334 |
| AZWC-P-6 | 2,990 | 12.0 | 120 | AZWC-J-17 | AZWC-J-13 | 80 | 0.23 | 0.027 |
| AZWC-P-7 | 1,705 | 12.0 | 120 | AZWC-J-14 | AZWC-J-13 | 160 | 0.45 | 0.099 |
| AZWC-P-8 | 2,436 | 16.0 | 120 | AZWC-J-4 | AZWC-J-1 | 810 | 1.29 | 0.490 |
| AZWC-P-9 | 3,055 | 16.0 | 120 | AZWC-J-8 | AZWC-J-3 | 1,250 | 1.99 | 1.094 |
| AZWC-P-10 | 1,316 | 16.0 | 120 | AZWC-J-15 | AZWC-J-16 | 1,487 | 2.37 | 1.509 |
| AZWC-P-11 | 2,912 | 16.0 | 120 | AZWC-J-16 | AZWC-J-12 | 2,173 | 3.47 | 3.048 |
| AZWC-P-12 | 2,013 | 16.0 | 120 | AZWC-J-12 | AZWC-J-8 | 2,733 | 4.36 | 4.659 |
| AZWC-P-13 | 2,178 | 12.0 | 120 | AZWC-J-1 | AZWC-J-2 | 1,212 | 3.44 | 4.195 |
| AZWC-P-14 | 2,649 | 12.0 | 120 | AZWC-J-2 | AZWC-J-3 | 958 | 2.72 | 2.716 |
| AZWC-P-15 | 1,502 | 12.0 | 120 | AZWC-J-5 | AZWC-J-7 | 96 | 0.27 | 0.038 |
| AZWC-P-16 | 2,991 | 12.0 | 120 | AZWC-J-16 | AZWC-J-7 | 395 | 1.12 | 0.527 |
| AZWC-P-17 | 1,931 | 12.0 | 120 | AZWC-J-5 | AZWC-J-1 | 110 | 0.31 | 0.049 |
| AZWC-P-18 | 2,422 | 12.0 | 120 | AZWC-J-6 | AZWC-J-2 | 254 | 0.72 | 0.231 |
| AZWC-P-19 | 2,346 | 12.0 | 120 | AZWC-J-6 | AZWC-J-12 | 268 | 0.76 | 0.256 |
| AZWC-P-20 | 1,354 | 12.0 | 120 | AZWC-J-11 | AZWC-J-7 | 477 | 1.35 | 0.746 |
| AZWC-P-21 | 2,644 | 12.0 | 120 | AZWC-J-18 | AZWC-J-14 | 48 | 0.14 | 0.011 |
| AZWC-P-22 | 3,404 | 12.0 | 120 | AZWC-J-14 | AZWC-J-9 | 67 | 0.19 | 0.020 |
| AZWC-P-23 | 1,779 | 12.0 | 120 | AZWC-J-9 | AZWC-J-10 | 140 | 0.40 | 0.077 |
| AZWC-P-24 | 3,067 | 12.0 | 120 | AZWC-J-10 | AZWC-J-13 | 87 | 0.25 | 0.032 |
| AZWC-P-25 | 1,946 | 12.0 | 120 | AZWC-J-10 | AZWC-J-4 | 335 | 0.95 | 0.387 |
| P-1 | 1,337 | 24.0 | 120 | J-1 | J-2 | 6,539 | 4.64 | 3.253 |
| P-2 | 1,236 | 24.0 | 120 | J-3 | J-4 | 4,680 | 3.32 | 1.751 |
| P-3 | 2,654 | 16.0 | 120 | J-5 | J-6 | 612 | 0.98 | 0.291 |
| P-4 | 2,643 | 12.0 | 120 | J-7 | J-8 | 247 | 0.70 | 0.220 |
| P-5 | 1,373 | 16.0 | 120 | J-8 | J-9 | 220 | 0.35 | 0.044 |
| P-6 | 1,371 | 16.0 | 120 | J-10 | J-11 | 1,477 | 2.36 | 1.492 |
| P-7 | 1,867 | 16.0 | 120 | J-9 | J-10 | 624 | 1.00 | 0.302 |
| P-7 | 1,712 | 16.0 | 120 | J-11 | J-1 | 1,927 | 3.07 | 2.439 |
| P-8 | 1,252 | 16.0 | 120 | J-16 | J-17 | 1,416 | 2.26 | 1.379 |
| P-9 | 1,335 | 16.0 | 120 | J-17 | J-4 | 1,574 | 2.51 | 1.677 |
| P-10 | 1,872 | 16.0 | 120 | J-18 | J-13 | 167 | 0.27 | 0.026 |
| P-11 | 817 | 16.0 | 120 | J-18 | J-19 | 668 | 1.07 | 0.343 |
| P-12 | 2,582 | 16.0 | 120 | J-19 | J-20 | 871 | 1.39 | 0.561 |
| P-13 | 2,636 | 24.0 | 120 | J-22 | J-23 | 992 | 0.70 | 0.099 |
| P-14 | 2,640 | 24.0 | 120 | J-23 | J-1 | 3,123 | 2.22 | 0.828 |
| P-15 | 2,850 | 16.0 | 120 | J-24 | J-25 | 570 | 0.91 | 0.256 |
| P-16 | 1,880 | 12.0 | 120 | J-25 | J-26 | 346 | 0.98 | 0.412 |
| P-17 | 1,357 | 12.0 | 120 | J-9 | J-27 | 154 | 0.44 | 0.092 |
| P-18 | 1,167 | 12.0 | 120 | J-27 | J-28 | 228 | 0.65 | 0.191 |
| P-19 | 1,813 | 8.0 | 120 | J-28 | J-29 | 197 | 1.26 | 1.042 |
| P-20 | 781 | 8.0 | 120 | J-29 | J-30 | 135 | 0.86 | 0.516 |
| P-21 | 997 | 12.0 | 120 | J-30 | J-5 | 730 | 2.07 | 1.643 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 5

3-ER-514

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Peak Hour - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|-------|------|------|------|------|------|------|------|------|
| P-22 | 1,324 | 12.0 | 120 | J-7 | J-28 | 303 | 0.86 | 0.321 |
| P-23 | 2,040 | 12.0 | 120 | J-28 | J-31 | 175 | 0.50 | 0.117 |
| P-24 | 935 | 12.0 | 120 | J-31 | J-32 | 685 | 1.94 | 1.460 |
| P-25 | 1,071 | 12.0 | 120 | J-32 | J-33 | 772 | 2.19 | 1.821 |
| P-26 | 757 | 12.0 | 120 | J-33 | J-34 | 1,094 | 3.10 | 3.474 |
| P-27 | 888 | 12.0 | 120 | J-34 | J-3 | 1,541 | 4.37 | 6.545 |
| P-28 | 1,587 | 8.0 | 120 | J-29 | J-35 | 62 | 0.40 | 0.123 |
| P-29 | 1,506 | 8.0 | 120 | J-30 | J-36 | 210 | 1.34 | 1.177 |
| P-30 | 1,149 | 8.0 | 120 | J-36 | J-33 | 124 | 0.79 | 0.444 |
| P-31 | 1,110 | 8.0 | 120 | J-27 | J-37 | 64 | 0.41 | 0.129 |
| P-32 | 1,560 | 8.0 | 120 | J-37 | J-38 | 64 | 0.41 | 0.129 |
| P-33 | 895 | 8.0 | 120 | J-38 | J-31 | 64 | 0.41 | 0.129 |
| P-34 | 783 | 8.0 | 120 | J-11 | J-39 | 162 | 1.03 | 0.727 |
| P-35 | 1,356 | 8.0 | 120 | J-39 | J-40 | 419 | 2.68 | 4.233 |
| P-36 | 792 | 8.0 | 120 | J-40 | J-2 | 419 | 2.68 | 4.233 |
| P-37 | 807 | 12.0 | 120 | J-6 | J-41 | 612 | 1.73 | 1.183 |
| P-38 | 1,833 | 12.0 | 120 | J-41 | J-7 | 549 | 1.56 | 0.970 |
| P-39 | 949 | 8.0 | 120 | J-35 | J-41 | 62 | 0.40 | 0.123 |
| P-40 | 2,155 | 16.0 | 120 | J-4 | J-42 | 1,676 | 2.67 | 1.884 |
| P-41 | 1,477 | 16.0 | 120 | J-42 | J-5 | 1,342 | 2.14 | 1.248 |
| P-42 | 614 | 8.0 | 120 | J-36 | J-42 | 334 | 2.13 | 2.781 |
| P-43 | 1,556 | 12.0 | 120 | J-32 | J-30 | 360 | 1.02 | 0.442 |
| P-44 | 689 | 12.0 | 120 | J-12 | J-43 | 82 | 0.23 | 0.029 |
| P-45 | 1,946 | 12.0 | 120 | J-43 | J-44 | 491 | 1.39 | 0.787 |
| P-46 | 2,073 | 8.0 | 120 | J-44 | J-45 | 162 | 1.03 | 0.729 |
| P-47 | 969 | 8.0 | 120 | J-2 | J-45 | 429 | 2.74 | 4.411 |
| P-48 | 1,168 | 8.0 | 120 | J-3 | J-46 | 423 | 2.70 | 4.310 |
| P-49 | 911 | 8.0 | 120 | J-46 | J-17 | 158 | 1.01 | 0.693 |
| P-50 | 742 | 8.0 | 120 | J-45 | J-47 | 267 | 1.70 | 1.830 |
| P-51 | 921 | 8.0 | 120 | J-47 | J-43 | 267 | 1.70 | 1.830 |
| P-52 | 2,082 | 8.0 | 120 | J-48 | J-49 | 94 | 0.60 | 0.267 |
| P-53 | 1,325 | 8.0 | 120 | J-48 | J-49 | 39 | 0.25 | 0.051 |
| P-54 | 1,465 | 12.0 | 120 | J-49 | J-44 | 664 | 1.88 | 1.378 |
| P-55 | 1,495 | 12.0 | 120 | J-49 | J-14 | 137 | 0.39 | 0.073 |
| P-56 | 743 | 8.0 | 120 | J-49 | J-50 | 92 | 0.59 | 0.255 |
| P-57 | 1,129 | 8.0 | 120 | J-50 | J-15 | 92 | 0.59 | 0.255 |
| P-58 | 931 | 16.0 | 120 | J-51 | J-14 | 373 | 0.60 | 0.117 |
| P-59 | 1,264 | 8.0 | 120 | J-48 | J-51 | 61 | 0.39 | 0.119 |
| P-60 | 2,202 | 16.0 | 120 | J-12 | J-52 | 627 | 1.00 | 0.305 |
| P-61 | 885 | 16.0 | 120 | J-52 | J-94 | 525 | 0.84 | 0.219 |
| P-62 | 840 | 8.0 | 120 | J-48 | J-52 | 72 | 0.46 | 0.161 |
| P-63 | 906 | 8.0 | 120 | J-9 | J-53 | 249 | 1.59 | 1.619 |
| P-64 | 910 | 12.0 | 120 | J-54 | J-8 | 467 | 1.33 | 0.718 |
| P-65 | 721 | 8.0 | 120 | J-53 | J-54 | 197 | 1.26 | 1.044 |
| P-66 | 983 | 8.0 | 120 | J-24 | J-55 | 250 | 1.60 | 1.629 |
| P-67 | 1,333 | 8.0 | 120 | J-55 | J-56 | 161 | 1.03 | 0.723 |
| P-68 | 1,116 | 8.0 | 120 | J-56 | J-57 | 149 | 0.95 | 0.622 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 5

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Peak Hour - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-69 | 729 | 8.0 | 120 | J-57 | J-58 | 96 | 0.62 | 0.279 |
| P-70 | 857 | 12.0 | 120 | J-59 | J-26 | 174 | 0.49 | 0.115 |
| P-71 | 1,622 | 12.0 | 120 | J-59 | J-54 | 270 | 0.77 | 0.261 |
| P-72 | 936 | 8.0 | 120 | J-58 | J-59 | 96 | 0.62 | 0.279 |
| P-73 | 1,459 | 8.0 | 120 | J-55 | J-60 | 104 | 0.66 | 0.321 |
| P-74 | 1,114 | 8.0 | 120 | J-60 | J-61 | 104 | 0.66 | 0.321 |
| P-75 | 1,054 | 12.0 | 120 | J-61 | J-26 | 520 | 1.48 | 0.876 |
| P-76 | 1,140 | 12.0 | 120 | J-61 | J-56 | 178 | 0.50 | 0.120 |
| P-77 | 855 | 12.0 | 120 | J-62 | J-63 | 532 | 1.51 | 0.914 |
| P-78 | 905 | 12.0 | 120 | J-63 | J-10 | 853 | 2.42 | 2.192 |
| P-79 | 831 | 8.0 | 120 | J-63 | J-64 | 52 | 0.33 | 0.090 |
| P-80 | 1,177 | 8.0 | 120 | J-64 | J-57 | 52 | 0.33 | 0.090 |
| P-81 | 1,245 | 8.0 | 120 | J-65 | J-55 | 15 | 0.10 | 0.009 |
| P-82 | 2,151 | 16.0 | 120 | J-22 | J-66 | 1,559 | 2.49 | 1.648 |
| P-83 | 1,176 | 16.0 | 120 | J-24 | J-66 | 769 | 1.23 | 0.445 |
| P-84 | 1,113 | 12.0 | 120 | J-65 | J-66 | 790 | 2.24 | 1.900 |
| P-85 | 1,034 | 8.0 | 120 | J-65 | J-67 | 112 | 0.72 | 0.369 |
| P-86 | 1,662 | 8.0 | 120 | J-67 | J-68 | 112 | 0.72 | 0.369 |
| P-87 | 1,161 | 12.0 | 120 | J-68 | J-23 | 1,219 | 3.46 | 4.242 |
| P-88 | 1,359 | 8.0 | 120 | J-68 | J-69 | 110 | 0.70 | 0.355 |
| P-89 | 1,832 | 8.0 | 120 | J-69 | J-63 | 177 | 1.13 | 0.861 |
| P-90 | 1,005 | 12.0 | 120 | J-68 | J-70 | 770 | 2.19 | 1.814 |
| P-91 | 573 | 12.0 | 120 | J-70 | J-62 | 153 | 0.44 | 0.091 |
| P-92 | 1,409 | 12.0 | 120 | J-65 | J-71 | 441 | 1.25 | 0.644 |
| P-93 | 1,201 | 12.0 | 120 | J-56 | J-72 | 42 | 0.12 | 0.008 |
| P-94 | 503 | 12.0 | 120 | J-72 | J-62 | 239 | 0.68 | 0.208 |
| P-95 | 736 | 12.0 | 120 | J-71 | J-72 | 165 | 0.47 | 0.105 |
| P-96 | 718 | 12.0 | 120 | J-70 | J-71 | 171 | 0.48 | 0.111 |
| P-97 | 1,047 | 8.0 | 120 | J-19 | J-73 | 203 | 1.30 | 1.108 |
| P-98 | 1,393 | 12.0 | 120 | J-83 | J-74 | 356 | 1.01 | 0.435 |
| P-99 | 903 | 12.0 | 120 | J-74 | J-75 | 32 | 0.09 | 0.005 |
| P-100 | 1,063 | 12.0 | 120 | J-21 | J-76 | 888 | 2.52 | 2.360 |
| P-101 | 1,185 | 12.0 | 120 | J-76 | J-77 | 490 | 1.39 | 0.784 |
| P-102 | 939 | 12.0 | 120 | J-77 | J-74 | 91 | 0.26 | 0.035 |
| P-103 | 1,124 | 12.0 | 120 | J-74 | J-78 | 348 | 0.99 | 0.415 |
| P-104 | 1,019 | 8.0 | 120 | J-78 | J-79 | 168 | 1.07 | 0.775 |
| P-105 | 1,354 | 16.0 | 120 | J-1 | J-80 | 1,489 | 2.38 | 1.513 |
| P-106 | 894 | 16.0 | 120 | J-80 | J-12 | 1,221 | 1.95 | 1.048 |
| P-107 | 1,486 | 8.0 | 120 | J-76 | J-81 | 140 | 0.90 | 0.559 |
| P-108 | 1,004 | 12.0 | 120 | J-75 | J-82 | 549 | 1.56 | 0.969 |
| P-109 | 1,106 | 12.0 | 120 | J-82 | J-23 | 912 | 2.59 | 2.478 |
| P-110 | 1,868 | 8.0 | 120 | J-81 | J-82 | 118 | 0.75 | 0.406 |
| P-111 | 1,711 | 12.0 | 120 | J-78 | J-12 | 677 | 1.92 | 1.427 |
| P-112 | 675 | 8.0 | 120 | J-73 | J-83 | 161 | 1.03 | 0.719 |
| P-113 | 1,008 | 8.0 | 120 | J-83 | J-84 | 90 | 0.57 | 0.243 |
| P-114 | 1,673 | 8.0 | 120 | J-84 | J-52 | 174 | 1.11 | 0.828 |
| P-115 | 1,776 | 8.0 | 120 | J-78 | J-84 | 84 | 0.54 | 0.216 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 5

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario: Peak Hour - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-116 | 1,656 | 8.0 | 120 | J-73 | J-85 | 42 | 0.27 | 0.061 |
| P-117 | 1,568 | 8.0 | 120 | J-85 | J-76 | 42 | 0.27 | 0.061 |
| P-118 | 1,542 | 8.0 | 120 | J-82 | J-86 | 100 | 0.64 | 0.299 |
| P-119 | 532 | 8.0 | 120 | J-79 | J-87 | 168 | 1.07 | 0.775 |
| P-120 | 1,177 | 8.0 | 120 | J-87 | J-80 | 268 | 1.71 | 1.847 |
| P-121 | 801 | 8.0 | 120 | J-86 | J-87 | 100 | 0.64 | 0.299 |
| P-122 | 931 | 12.0 | 120 | J-83 | J-18 | 687 | 1.95 | 1.466 |
| P-123 | 2,664 | 24.0 | 120 | J-20 | J-88 | 2,954 | 2.10 | 0.747 |
| P-124 | 2,422 | 24.0 | 120 | J-88 | J-89 | 4,829 | 3.42 | 1.856 |
| P-125 | 839 | 16.0 | 120 | J-14 | J-90 | 629 | 1.00 | 0.306 |
| P-126 | 1,077 | 16.0 | 120 | J-90 | J-15 | 629 | 1.00 | 0.306 |
| P-128 | 1,309 | 24.0 | 120 | J-21 | J-91 | 215 | 0.15 | 0.006 |
| P-129 | 1,332 | 24.0 | 120 | J-22 | J-91 | 473 | 0.34 | 0.025 |
| P-130 | 974 | 8.0 | 120 | J-81 | J-91 | 259 | 1.65 | 1.731 |
| P-133 | 1,322 | 24.0 | 120 | J-2 | J-92 | 7,387 | 5.24 | 4.077 |
| P-134 | 1,322 | 24.0 | 120 | J-92 | J-3 | 6,644 | 4.71 | 3.350 |
| P-135 | 1,774 | 24.0 | 120 | J-20 | J-93 | 1,079 | 0.77 | 0.116 |
| P-136 | 778 | 24.0 | 120 | J-93 | J-21 | 1,079 | 0.77 | 0.116 |
| P-137 | 786 | 16.0 | 120 | J-13 | J-94 | 167 | 0.27 | 0.026 |
| P-138 | 1,159 | 16.0 | 120 | J-94 | J-51 | 434 | 0.69 | 0.154 |
| P-139 | 2,314 | 12.0 | 120 | J-44 | J-16 | 273 | 0.78 | 0.266 |
| P-140 | 1,166 | 8.0 | 120 | J-11 | J-69 | 287 | 1.83 | 2.103 |
| P-141 | 890 | 16.0 | 120 | J-95 | J-16 | 1,027 | 1.64 | 0.761 |
| P-142 | 1,256 | 16.0 | 120 | J-15 | J-95 | 1,302 | 2.08 | 1.180 |
| P-143 | 2,336 | 12.0 | 120 | J-44 | J-92 | 1,301 | 3.69 | 4.783 |
| P-200 | 2,335 | 24.0 | 120 | J-201 | J-202 | 4,273 | 3.03 | 1.479 |
| P-201 | 2,336 | 16.0 | 120 | J-202 | J-203 | 1,703 | 2.72 | 1.942 |
| P-202 | 1,418 | 16.0 | 120 | J-203 | J-204 | 103 | 0.16 | 0.011 |
| P-204 | 2,317 | 12.0 | 120 | J-205 | J-25 | 224 | 0.64 | 0.184 |
| P-205 | 2,640 | 24.0 | 120 | J-201 | J-206 | 4,096 | 2.91 | 1.368 |
| P-206 | 2,639 | 24.0 | 120 | J-206 | J-207 | 2,050 | 1.45 | 0.380 |
| P-207 | 2,567 | 12.0 | 120 | J-208 | J-209 | 136 | 0.39 | 0.073 |
| P-208 | 2,713 | 12.0 | 120 | J-209 | J-200 | 449 | 1.27 | 0.668 |
| P-209 | 2,452 | 12.0 | 120 | J-210 | J-24 | 51 | 0.15 | 0.012 |
| P-210 | 2,672 | 24.0 | 120 | J-22 | J-200 | 1,087 | 0.77 | 0.117 |
| P-211 | 2,633 | 12.0 | 120 | J-209 | J-21 | 406 | 1.15 | 0.553 |
| P-212 | 2,662 | 16.0 | 120 | J-208 | J-20 | 1,004 | 1.60 | 0.729 |
| P-213 | 2,706 | 12.0 | 120 | J-202 | J-210 | 614 | 1.74 | 1.189 |
| P-214 | 1,265 | 12.0 | 120 | J-203 | J-211 | 511 | 1.45 | 0.848 |
| P-215 | 1,876 | 12.0 | 120 | J-211 | J-205 | 440 | 1.25 | 0.642 |
| P-216 | 2,801 | 12.0 | 120 | J-200 | J-210 | 709 | 2.01 | 1.553 |
| P-217 | 2,687 | 24.0 | 120 | J-200 | J-201 | 3,196 | 2.27 | 0.864 |
| P-218 | 2,651 | 12.0 | 120 | J-206 | J-209 | 232 | 0.66 | 0.197 |
| P-219 | 2,641 | 16.0 | 120 | J-207 | J-208 | 362 | 0.58 | 0.110 |
| P-220 | 2,285 | 12.0 | 120 | J-203 | J-212 | 222 | 0.63 | 0.180 |
| P-221 | 2,358 | 12.0 | 120 | J-212 | J-213 | 599 | 1.70 | 1.137 |
| P-222 | 2,276 | 12.0 | 120 | J-213 | J-214 | 537 | 1.52 | 0.928 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 4 of 5

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Pipe Table

Active Scenario:  Peak Hour - Site

| Label | Length (Scaled) (ft) | Diameter (in) | Hazen-Williams C | Start Node | Stop Node | Flow (Absolute) (gpm) | Velocity (ft/s) | Headloss Gradient (ft/1000ft) |
|---|---|---|---|---|---|---|---|---|
| P-223 | 2,646 | 12.0 | 120 | J-214 | J-215 | 417 | 1.18 | 0.582 |
| P-224 | 2,674 | 12.0 | 120 | J-215 | J-216 | 337 | 0.96 | 0.392 |
| P-225 | 2,288 | 16.0 | 120 | J-216 | J-207 | 657 | 1.05 | 0.332 |
| P-226 | 2,254 | 12.0 | 120 | J-213 | J-202 | 439 | 1.25 | 0.641 |
| P-227 | 2,266 | 16.0 | 120 | J-201 | J-214 | 1,331 | 2.12 | 1.229 |
| P-228 | 2,289 | 12.0 | 120 | J-206 | J-215 | 297 | 0.84 | 0.311 |
| P-229 | 2,627 | 24.0 | 120 | J-222 | J-207 | 215 | 0.15 | 0.006 |
| P-230 | 2,665 | 12.0 | 120 | J-219 | J-220 | 247 | 0.70 | 0.221 |
| P-231 | 2,652 | 12.0 | 120 | J-220 | J-216 | 428 | 1.21 | 0.610 |
| P-232 | 2,707 | 12.0 | 120 | J-221 | J-222 | 266 | 0.75 | 0.253 |
| P-233 | 2,657 | 24.0 | 120 | J-218 | J-222 | 870 | 0.62 | 0.078 |
| P-234 | 2,252 | 12.0 | 120 | J-220 | J-222 | 573 | 1.63 | 1.049 |
| P-235 | 2,583 | 12.0 | 120 | J-221 | J-88 | 664 | 1.88 | 1.375 |
| P-236 | 2,638 | 24.0 | 120 | J-89 | J-217 | 4,969 | 3.52 | 1.956 |
| P-237 | 2,620 | 12.0 | 120 | J-208 | J-221 | 197 | 0.56 | 0.144 |
| P-238 | 2,942 | 12.0 | 120 | J-221 | J-217 | 553 | 1.57 | 0.981 |
| P-239 | 2,825 | 24.0 | 120 | J-217 | J-223 | 3,662 | 2.60 | 1.112 |
| P-240 | 1,107 | 12.0 | 120 | J-219 | J-224 | 507 | 1.44 | 0.834 |
| P-241 | 903 | 24.0 | 120 | J-223 | J-218 | 1,624 | 1.15 | 0.247 |
| P-242 | 2,212 | 16.0 | 120 | J-223 | J-224 | 1,260 | 2.01 | 1.111 |
| P-243 | 1,160 | 16.0 | 120 | J-225 | J-94 | 697 | 1.11 | 0.371 |
| P-244 | 3,411 | 12.0 | 120 | J-88 | J-227 | 599 | 1.70 | 1.138 |
| P-245 | 2,726 | 12.0 | 120 | J-227 | J-225 | 135 | 0.38 | 0.072 |
| P-246 | 855 | 12.0 | 120 | J-225 | J-226 | 220 | 0.62 | 0.178 |
| P-247 | 1,678 | 12.0 | 120 | J-226 | J-14 | 392 | 1.11 | 0.519 |
| P-248 | 1,900 | 12.0 | 120 | J-18 | J-227 | 148 | 0.42 | 0.086 |
| P-249 | 2,011 | 16.0 | 120 | J-4 | J-228 | 1,334 | 2.13 | 1.235 |
| P-250 | 1,945 | 12.0 | 120 | J-16 | J-229 | 67 | 0.19 | 0.020 |
| P-251 | 1,597 | 16.0 | 120 | J-228 | J-230 | 485 | 0.77 | 0.189 |
| P-253 | 1,930 | 12.0 | 120 | J-229 | J-231 | 396 | 1.12 | 0.529 |
| P-254 | 558 | 12.0 | 120 | J-231 | J-228 | 525 | 1.49 | 0.893 |
| P-255 | 842 | 16.0 | 120 | J-230 | J-232 | 132 | 0.21 | 0.017 |
| P-256 | 552 | 8.0 | 120 | J-230 | J-233 | 28 | 0.18 | 0.029 |
| P-257 | 1,595 | 8.0 | 120 | J-233 | J-231 | 59 | 0.38 | 0.113 |
| P-258 | 330 | 12.0 | 120 | J-232 | J-233 | 31 | 0.09 | 0.005 |
| P-259 | 1,600 | 12.0 | 120 | J-ELS | J-205 | 104 | 0.30 | 0.045 |
| P-260 | 1,038 | 12.0 | 120 | J-204 | J-ELS | 103 | 0.29 | 0.043 |
| P-261 | 3,327 | 12.0 | 120 | J-210 | J-205 | 320 | 0.91 | 0.356 |
| P-262 | 2,378 | 12.0 | 120 | J-95 | J-229 | 275 | 0.78 | 0.268 |
| P-500 | 679 | 48.0 | 120 | R-1 | J-92 | 15,331 | 2.72 | 0.547 |
| P-501 | 600 | 48.0 | 120 | R-2 | FCV-2 | 10,410 | 1.85 | 0.269 |
| P-502 | 566 | 48.0 | 120 | FCV-2 | J-89 | 10,410 | 1.85 | 0.269 |
| P-503 | 604 | 48.0 | 120 | R-3 | FCV-3 | 14,413 | 2.56 | 0.488 |
| P-504 | 604 | 48.0 | 120 | FCV-3 | J-201 | 14,413 | 2.56 | 0.488 |
| P-505 | 861 | 48.0 | 120 | R-AZWC | AZWC-J-8 | 4,274 | 0.76 | 0.049 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 5 of 5

3-ER-518

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg                                          Active Scenario: Peak Hour - Site
FlexTable: FCV Table

| Label | Elevation (ft) | Diameter (Valve) (in) | Flow Setting (Initial) (gpm) | Minor Loss Coefficient (Local) | Flow (gpm) | Hydraulic Grade (From) (ft) | Hydraulic Grade (To) (ft) | Headloss (ft) |
|-------|----------------|------------------------|-------------------------------|--------------------------------|------------|------------------------------|----------------------------|---------------|
| FCV-2 | 1,561.51 | 48.0 | 10,410 | 0.0000000 | 10,410 | 1,710.00 | 1,704.55 | 5.45 |
| FCV-3 | 1,488.00 | 48.0 | 14,413 | 0.0000000 | 14,413 | 1,710.00 | 1,700.45 | 9.55 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg              Superstition Vistas                  A. Paciora
7/12/2021                           HILGARTWILSON, LLC                   Page 1 of 1

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
FlexTable: Reservoir Table

Active Scenario: Peak Hour - Site

| Label | Elevation (ft) | Flow (Out net) (gpm) | Hydraulic Grade (ft) |
|-------|----------------|----------------------|----------------------|
| R-1 | 1,710.00 | 15,331 | 1,710.00 |
| R-2 | 1,710.00 | 10,410 | 1,710.00 |
| R-3 | 1,710.00 | 14,413 | 1,710.00 |
| R-AZWC | 1,720.00 | 4,274 | 1,720.00 |

21-0708_1635 LD Water
Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 1

3-ER-520



**SITE**
**MAXIMUM DAY + FIRE FLOW RESULTS (RESIDUAL)**
**MAXIMUM DAY + FIRE FLOW RESULTS (AVAILABLE)**

HILGARTWILSON, LLC

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Residual - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AZWC-J-1 | 177 | 4,000 | 4,177 | 4,000 | 4,177 | 39.9 | 47.9 | AZWC-J-4 | 39.9 | 47.9 | AZWC-P-12 | 7.23 | True |
| AZWC-J-2 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 48.3 | 49.5 | AZWC-J-1 | 48.3 | 49.5 | AZWC-P-12 | 6.63 | True |
| AZWC-J-3 | 177 | 4,000 | 4,177 | 4,000 | 4,177 | 58.2 | 58.0 | AZWC-J-2 | 58.2 | 58.0 | AZWC-P-9 | 5.67 | True |
| AZWC-J-4 | 351 | 4,000 | 4,351 | 4,000 | 4,351 | 45.5 | 41.7 | AZWC-J-1 | 45.5 | 41.7 | AZWC-P-12 | 7.28 | True |
| AZWC-J-5 | 14 | 4,000 | 4,014 | 4,000 | 4,014 | 40.0 | 41.4 | AZWC-J-1 | 40.0 | 41.4 | AZWC-P-12 | 7.28 | True |
| AZWC-J-6 | 14 | 4,000 | 4,014 | 4,000 | 4,014 | 50.3 | 52.3 | AZWC-J-2 | 50.3 | 52.3 | AZWC-P-12 | 7.06 | True |
| AZWC-J-7 | 14 | 4,000 | 4,014 | 4,000 | 4,014 | 48.7 | 42.4 | AZWC-J-1 | 48.7 | 42.4 | AZWC-P-12 | 7.31 | True |
| AZWC-J-8 | 177 | 4,000 | 4,177 | 4,000 | 4,177 | 77.8 | 62.2 | J-223 | 77.8 | 62.2 | AZWC-P-12 | 2.71 | True |
| AZWC-J-9 | 130 | 4,000 | 4,130 | 4,000 | 4,130 | 35.7 | 42.7 | AZWC-J-1 | 35.7 | 42.7 | AZWC-P-12 | 7.31 | True |
| AZWC-J-10 | 173 | 4,000 | 4,173 | 4,000 | 4,173 | 44.9 | 42.5 | AZWC-J-1 | 44.9 | 42.5 | AZWC-P-12 | 7.31 | True |
| AZWC-J-11 | 351 | 4,000 | 4,351 | 4,000 | 4,351 | 54.6 | 42.5 | AZWC-J-1 | 54.6 | 42.5 | AZWC-P-12 | 7.31 | True |
| AZWC-J-12 | 177 | 4,000 | 4,177 | 4,000 | 4,177 | 70.6 | 54.3 | AZWC-J-1 | 70.6 | 54.3 | AZWC-P-12 | 7.64 | True |
| AZWC-J-13 | 91 | 4,000 | 4,091 | 4,000 | 4,091 | 54.6 | 42.7 | AZWC-J-1 | 54.6 | 42.7 | AZWC-P-12 | 7.32 | True |
| AZWC-J-14 | 91 | 4,000 | 4,091 | 4,000 | 4,091 | 51.2 | 42.8 | AZWC-J-1 | 51.2 | 42.8 | AZWC-P-12 | 7.32 | True |
| AZWC-J-15 | 351 | 4,000 | 4,351 | 4,000 | 4,351 | 64.8 | 43.7 | AZWC-J-1 | 64.8 | 43.7 | AZWC-P-12 | 7.35 | True |
| AZWC-J-16 | 177 | 4,000 | 4,177 | 4,000 | 4,177 | 67.6 | 45.2 | AZWC-J-1 | 67.6 | 45.2 | AZWC-P-12 | 7.39 | True |
| AZWC-J-17 | 91 | 4,000 | 4,091 | 4,000 | 4,091 | 59.9 | 43.1 | AZWC-J-1 | 59.9 | 43.1 | AZWC-P-12 | 7.33 | True |
| AZWC-J-18 | 91 | 4,000 | 4,091 | 4,000 | 4,091 | 53.4 | 42.9 | AZWC-J-1 | 53.4 | 42.9 | AZWC-P-12 | 7.32 | True |
| J-1 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 80.7 | 62.0 | J-223 | 80.7 | 62.0 | P-133 | 3.60 | True |
| J-2 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 78.7 | 62.0 | J-223 | 78.7 | 62.0 | P-133 | 4.20 | True |
| J-3 | 56 | 4,000 | 4,056 | 4,000 | 4,056 | 74.1 | 62.1 | J-223 | 74.1 | 62.1 | P-134 | 4.68 | True |
| J-4 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 72.5 | 62.1 | J-223 | 72.5 | 62.1 | P-134 | 4.32 | True |
| J-5 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 77.1 | 62.1 | J-223 | 77.1 | 62.1 | P-27 | 4.57 | True |
| J-6 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 80.1 | 62.1 | J-223 | 80.1 | 62.1 | P-27 | 4.61 | True |
| J-7 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 84.1 | 62.0 | J-223 | 84.1 | 62.0 | P-27 | 4.31 | True |
| J-8 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 89.3 | 62.0 | J-223 | 89.3 | 62.0 | P-27 | 3.80 | True |
| J-9 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 87.4 | 62.0 | J-223 | 87.4 | 62.0 | P-27 | 3.76 | True |
| J-10 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 85.2 | 62.0 | J-223 | 85.2 | 62.0 | P-27 | 3.84 | True |
| J-11 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 83.0 | 62.0 | J-223 | 83.0 | 62.0 | P-7 | 4.52 | True |
| J-12 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 74.3 | 62.0 | J-223 | 74.3 | 62.0 | P-105 | 3.35 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 1 of 5

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Residual - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-13 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 67.1 | 62.0 | J-223 | 67.1 | 62.0 | P-137 | 3.58 | True |
| J-14 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 63.1 | 62.0 | J-223 | 63.1 | 62.0 | P-134 | 3.31 | True |
| J-15 | 354 | 4,000 | 4,354 | 4,000 | 4,354 | 60.7 | 62.0 | J-223 | 60.7 | 62.0 | P-142 | 3.68 | True |
| J-16 | 28 | 4,000 | 4,028 | 4,000 | 4,028 | 65.5 | 62.0 | J-223 | 65.5 | 62.0 | P-134 | 3.71 | True |
| J-17 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 69.3 | 62.1 | J-223 | 69.3 | 62.1 | P-9 | 3.99 | True |
| J-18 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 70.4 | 61.9 | J-223 | 70.4 | 61.9 | P-133 | 3.08 | True |
| J-19 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 72.1 | 61.9 | J-223 | 72.1 | 61.9 | P-12 | 3.36 | True |
| J-20 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 77.5 | 61.8 | J-223 | 77.5 | 61.8 | P-133 | 2.96 | True |
| J-21 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 84.5 | 61.8 | J-223 | 84.5 | 61.8 | P-133 | 3.05 | True |
| J-22 | 28 | 4,000 | 4,028 | 4,000 | 4,028 | 88.6 | 61.9 | J-223 | 88.6 | 61.9 | P-133 | 3.14 | True |
| J-23 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 85.0 | 62.0 | J-223 | 85.0 | 62.0 | P-133 | 3.35 | True |
| J-24 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 94.4 | 62.0 | J-223 | 94.4 | 62.0 | P-82 | 3.52 | True |
| J-25 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 96.6 | 62.0 | J-223 | 96.6 | 62.0 | P-87 | 3.33 | True |
| J-26 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 93.3 | 62.0 | J-223 | 93.3 | 62.0 | P-16 | 4.50 | True |
| J-27 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 89.5 | 62.1 | J-223 | 89.5 | 62.1 | P-27 | 3.09 | True |
| J-28 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 88.7 | 62.1 | J-223 | 88.7 | 62.1 | P-27 | 3.16 | True |
| J-29 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 81.4 | 62.1 | J-223 | 81.4 | 62.1 | P-20 | 4.42 | True |
| J-30 | 273 | 4,000 | 4,273 | 4,000 | 4,273 | 75.3 | 62.1 | J-223 | 75.3 | 62.1 | P-21 | 5.46 | True |
| J-31 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 83.0 | 62.1 | J-223 | 83.0 | 62.1 | P-27 | 3.35 | True |
| J-32 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 81.7 | 62.1 | J-223 | 81.7 | 62.1 | P-27 | 3.51 | True |
| J-33 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 79.0 | 62.1 | J-223 | 79.0 | 62.1 | P-27 | 3.93 | True |
| J-34 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 77.1 | 62.1 | J-223 | 77.1 | 62.1 | P-27 | 4.51 | True |
| J-35 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 79.9 | 62.1 | J-223 | 79.9 | 62.1 | P-39 | 5.62 | True |
| J-36 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 76.6 | 62.1 | J-223 | 76.6 | 62.1 | P-42 | 4.48 | True |
| J-37 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 78.9 | 62.1 | J-223 | 78.9 | 62.1 | P-31 | 5.76 | True |
| J-38 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 74.9 | 62.1 | J-223 | 74.9 | 62.1 | P-33 | 6.10 | True |
| J-39 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 75.3 | 62.1 | J-223 | 75.3 | 62.1 | P-34 | 7.22 | True |
| J-40 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 73.3 | 62.1 | J-223 | 73.3 | 62.1 | P-36 | 6.91 | True |
| J-41 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 80.0 | 62.0 | J-223 | 80.0 | 62.0 | P-37 | 5.64 | True |
| J-42 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 74.8 | 62.1 | J-223 | 74.8 | 62.1 | P-40 | 4.67 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 5

3-ER-523

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Residual - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-43 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 75.8 | 62.1 | J-223 | 75.8 | 62.1 | P-134 | 2.79 | True |
| J-44 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 71.4 | 62.1 | J-223 | 71.4 | 62.1 | P-134 | 2.83 | True |
| J-45 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 74.6 | 62.1 | J-223 | 74.6 | 62.1 | P-47 | 4.45 | True |
| J-46 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 65.5 | 62.1 | J-223 | 65.5 | 62.1 | P-49 | 6.14 | True |
| J-47 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 73.4 | 62.1 | J-223 | 73.4 | 62.1 | P-50 | 4.81 | True |
| J-48 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 67.8 | 62.1 | J-223 | 67.8 | 62.1 | P-62 | 2.99 | True |
| J-49 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 68.2 | 62.1 | J-223 | 68.2 | 62.1 | P-134 | 2.84 | True |
| J-50 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 61.6 | 62.1 | J-223 | 61.6 | 62.1 | P-56 | 5.24 | True |
| J-51 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 62.9 | 62.0 | J-223 | 62.9 | 62.0 | P-134 | 3.26 | True |
| J-52 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 67.6 | 62.0 | J-223 | 67.6 | 62.0 | P-134 | 3.18 | True |
| J-53 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 88.9 | 62.1 | J-223 | 88.9 | 62.1 | P-65 | 5.93 | True |
| J-54 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 89.0 | 62.0 | J-223 | 89.0 | 62.0 | P-64 | 5.85 | True |
| J-55 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 93.9 | 62.1 | J-223 | 93.9 | 62.1 | P-66 | 3.46 | True |
| J-56 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 94.2 | 62.1 | J-223 | 94.2 | 62.1 | P-87 | 2.95 | True |
| J-57 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 90.5 | 62.1 | J-223 | 90.5 | 62.1 | P-68 | 3.66 | True |
| J-58 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 91.0 | 62.1 | J-223 | 91.0 | 62.1 | P-72 | 5.00 | True |
| J-59 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 90.3 | 62.0 | J-223 | 90.3 | 62.0 | P-70 | 5.63 | True |
| J-60 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 90.6 | 62.1 | J-223 | 90.6 | 62.1 | P-74 | 5.11 | True |
| J-61 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 97.0 | 62.1 | J-223 | 97.0 | 62.1 | P-87 | 2.87 | True |
| J-62 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 89.6 | 62.1 | J-223 | 89.6 | 62.1 | P-87 | 3.09 | True |
| J-63 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 89.0 | 62.1 | J-223 | 89.0 | 62.1 | P-87 | 2.99 | True |
| J-64 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 85.6 | 62.1 | J-223 | 85.6 | 62.1 | P-79 | 5.54 | True |
| J-65 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 92.7 | 62.1 | J-223 | 92.7 | 62.1 | P-84 | 3.91 | True |
| J-66 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 92.1 | 62.0 | J-223 | 92.1 | 62.0 | P-82 | 3.01 | True |
| J-67 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 83.8 | 62.1 | J-223 | 83.8 | 62.1 | P-85 | 5.35 | True |
| J-68 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 87.6 | 62.1 | J-223 | 87.6 | 62.1 | P-87 | 3.61 | True |
| J-69 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 82.3 | 62.1 | J-223 | 82.3 | 62.1 | P-140 | 3.79 | True |
| J-70 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 88.0 | 62.1 | J-223 | 88.0 | 62.1 | P-79 | 3.16 | True |
| J-71 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 89.8 | 62.1 | J-223 | 89.8 | 62.1 | P-87 | 3.10 | True |
| J-72 | 273 | 1,500 | 1,773 | 1,500 | 1,773 | 91.2 | 62.1 | J-223 | 91.2 | 62.1 | P-87 | 3.08 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 5

3-ER-524

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Residual - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-73 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 73.7 | 62.1 | J-223 | 73.7 | 62.1 | P-112 | 4.08 | True |
| J-74 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 77.6 | 62.1 | J-223 | 77.6 | 62.1 | P-133 | 2.73 | True |
| J-75 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 79.3 | 62.1 | J-223 | 79.3 | 62.1 | P-109 | 2.92 | True |
| J-76 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 81.8 | 62.1 | J-223 | 81.8 | 62.1 | P-100 | 3.46 | True |
| J-77 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 78.7 | 62.1 | J-223 | 78.7 | 62.1 | P-100 | 2.92 | True |
| J-78 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 76.4 | 62.1 | J-223 | 76.4 | 62.1 | P-134 | 2.73 | True |
| J-79 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 73.6 | 62.1 | J-223 | 73.6 | 62.1 | P-119 | 5.03 | True |
| J-80 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 77.4 | 62.0 | J-223 | 77.4 | 62.0 | P-105 | 4.05 | True |
| J-81 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 81.9 | 62.1 | J-223 | 81.9 | 62.1 | P-130 | 4.23 | True |
| J-82 | 354 | 1,500 | 1,854 | 1,500 | 1,854 | 82.4 | 62.1 | J-223 | 82.4 | 62.1 | P-109 | 3.39 | True |
| J-83 | 354 | 4,000 | 4,354 | 4,000 | 4,354 | 70.0 | 61.9 | J-223 | 70.0 | 61.9 | P-122 | 5.56 | True |
| J-84 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 69.5 | 62.1 | J-223 | 69.5 | 62.1 | P-113 | 3.73 | True |
| J-85 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 70.1 | 62.1 | J-223 | 70.1 | 62.1 | P-117 | 4.97 | True |
| J-86 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 75.7 | 62.1 | J-223 | 75.7 | 62.1 | P-121 | 5.23 | True |
| J-87 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 76.2 | 62.1 | J-223 | 76.2 | 62.1 | P-120 | 3.98 | True |
| J-88 | 378 | 4,000 | 4,378 | 4,000 | 4,378 | 70.2 | 61.8 | J-223 | 70.2 | 61.8 | P-124 | 3.24 | True |
| J-89 | 378 | 4,000 | 4,378 | 4,000 | 4,378 | 64.2 | 62.2 | J-223 | 64.2 | 62.2 | AZWC-P-12 | 2.71 | True |
| J-90 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 61.5 | 61.7 | J-15 | 61.5 | 61.7 | P-125 | 3.55 | True |
| J-91 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 87.7 | 61.9 | J-223 | 87.7 | 61.9 | P-133 | 3.09 | True |
| J-92 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 78.2 | 62.2 | J-223 | 78.2 | 62.2 | P-120 | 2.71 | True |
| J-93 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 82.6 | 62.2 | J-223 | 82.6 | 62.2 | AZWC-P-12 | 3.02 | True |
| J-94 | 56 | 4,000 | 4,056 | 4,000 | 4,056 | 66.6 | 61.8 | J-223 | 66.6 | 61.8 | P-133 | 3.20 | True |
| J-95 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 62.5 | 62.0 | J-223 | 62.5 | 62.0 | P-134 | 3.61 | True |
| J-200 | 576 | 4,000 | 4,576 | 4,000 | 4,576 | 90.8 | 61.9 | J-223 | 90.8 | 61.9 | P-217 | 3.14 | True |
| J-201 | 917 | 4,000 | 4,917 | 4,000 | 4,917 | 95.9 | 62.1 | J-223 | 95.9 | 62.1 | P-200 | 2.71 | True |
| J-202 | 917 | 4,000 | 4,917 | 4,000 | 4,917 | 101.0 | 62.1 | J-223 | 101.0 | 62.1 | AZWC-P-12 | 4.02 | True |
| J-203 | 917 | 4,000 | 4,917 | 4,000 | 4,917 | 101.2 | 62.1 | J-223 | 101.2 | 62.1 | P-200 | 4.89 | True |
| J-204 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 100.6 | 62.1 | J-223 | 100.6 | 62.1 | P-201 | 4.70 | True |
| J-205 | 0 | 4,000 | 4,000 | 4,000 | 4,000 | 99.8 | 62.1 | J-223 | 99.8 | 62.1 | P-201 | 3.94 | True |
| J-206 | 917 | 4,000 | 4,917 | 4,000 | 4,917 | 90.3 | 61.4 | J-223 | 90.3 | 61.4 | P-205 | 3.48 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 4 of 5

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Active Scenario: Max Day + FF Residual - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-207 | 931 | 4,000 | 4,931 | 4,000 | 4,931 | 80.6 | 60.9 | J-223 | 80.6 | 60.9 | P-205 | 3.15 | True |
| J-208 | 590 | 4,000 | 4,590 | 4,000 | 4,590 | 78.3 | 61.4 | J-223 | 78.3 | 61.4 | P-205 | 2.87 | True |
| J-209 | 576 | 4,000 | 4,576 | 4,000 | 4,576 | 83.0 | 61.7 | J-223 | 83.0 | 61.7 | P-208 | 3.33 | True |
| J-210 | 576 | 4,000 | 4,576 | 4,000 | 4,576 | 94.1 | 62.0 | J-223 | 94.1 | 62.0 | P-213 | 3.78 | True |
| J-211 | 576 | 4,000 | 4,576 | 4,000 | 4,576 | 90.9 | 62.0 | J-223 | 90.9 | 62.0 | P-214 | 7.19 | True |
| J-212 | 230 | 1,500 | 1,730 | 1,500 | 1,730 | 105.7 | 62.1 | J-223 | 105.7 | 62.1 | AZWC-P-12 | 2.71 | True |
| J-213 | 230 | 1,500 | 1,730 | 1,500 | 1,730 | 102.5 | 62.1 | J-223 | 102.5 | 62.1 | AZWC-P-12 | 2.71 | True |
| J-214 | 230 | 1,500 | 1,730 | 1,500 | 1,730 | 97.4 | 62.1 | J-223 | 97.4 | 62.1 | AZWC-P-12 | 2.71 | True |
| J-215 | 230 | 1,500 | 1,730 | 1,500 | 1,730 | 90.7 | 61.9 | J-223 | 90.7 | 61.9 | AZWC-P-12 | 2.71 | True |
| J-216 | 341 | 4,000 | 4,341 | 4,000 | 4,341 | 79.5 | 61.0 | J-223 | 79.5 | 61.0 | P-225 | 4.07 | True |
| J-217 | 462 | 4,000 | 4,462 | 4,000 | 4,462 | 62.8 | 61.0 | J-223 | 62.8 | 61.0 | P-236 | 3.56 | True |
| J-218 | 462 | 4,000 | 4,462 | 4,000 | 4,462 | 63.8 | 60.2 | J-223 | 63.8 | 60.2 | P-236 | 3.12 | True |
| J-219 | 462 | 4,000 | 4,462 | 4,000 | 4,462 | 52.1 | 56.1 | J-224 | 52.1 | 56.1 | P-240 | 7.51 | True |
| J-220 | 462 | 4,000 | 4,462 | 4,000 | 4,462 | 66.5 | 59.5 | J-224 | 66.5 | 59.5 | P-234 | 5.22 | True |
| J-221 | 462 | 4,000 | 4,462 | 4,000 | 4,462 | 69.2 | 61.2 | J-223 | 69.2 | 61.2 | P-235 | 3.50 | True |
| J-222 | 476 | 4,000 | 4,476 | 4,000 | 4,476 | 72.1 | 60.6 | J-223 | 72.1 | 60.6 | P-205 | 3.03 | True |
| J-223 | 476 | 4,000 | 4,476 | 4,000 | 4,476 | 60.1 | 61.1 | J-224 | 60.1 | 61.1 | P-236 | 3.17 | True |
| J-224 | 462 | 4,000 | 4,462 | 4,000 | 4,462 | 53.8 | 59.2 | J-219 | 53.8 | 59.2 | P-242 | 5.91 | True |
| J-225 | 378 | 1,500 | 1,878 | 1,500 | 1,878 | 66.1 | 62.1 | J-223 | 66.1 | 62.1 | P-134 | 2.80 | True |
| J-226 | 378 | 1,500 | 1,878 | 1,500 | 1,878 | 64.4 | 62.1 | J-223 | 64.4 | 62.1 | P-246 | 2.94 | True |
| J-227 | 378 | 1,500 | 1,878 | 1,500 | 1,878 | 67.2 | 62.1 | J-223 | 67.2 | 62.1 | P-134 | 2.76 | True |
| J-228 | 201 | 4,000 | 4,201 | 4,000 | 4,201 | 67.3 | 60.8 | J-232 | 67.3 | 60.8 | P-249 | 5.37 | True |
| J-229 | 121 | 4,000 | 4,121 | 4,000 | 4,121 | 59.8 | 62.0 | J-223 | 59.8 | 62.0 | P-250 | 4.24 | True |
| J-230 | 201 | 4,000 | 4,201 | 4,000 | 4,201 | 57.6 | 55.4 | J-232 | 57.6 | 55.4 | P-251 | 5.85 | True |
| J-231 | 121 | 1,500 | 1,621 | 1,500 | 1,621 | 70.3 | 62.1 | J-223 | 70.3 | 62.1 | P-134 | 3.12 | True |
| J-232 | 62 | 4,000 | 4,062 | 4,000 | 4,062 | 53.7 | 55.4 | J-233 | 53.7 | 55.4 | P-251 | 5.74 | True |
| J-233 | 0 | 1,500 | 1,500 | 1,500 | 1,500 | 66.0 | 62.1 | J-223 | 66.0 | 62.1 | P-134 | 3.15 | True |
| J-ELS | 1 | 4,000 | 4,001 | 4,000 | 4,001 | 96.1 | 62.0 | J-223 | 96.1 | 62.0 | P-260 | 5.97 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wig
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Available - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AZWC-J-1 | 177 | 4,000 | 4,177 | 6,061 | 6,238 | 39.9 | 47.9 | AZWC-J-4 | 20.0 | 29.6 | AZWC-P-12 | 9.54 | True |
| AZWC-J-2 | 0 | 4,000 | 4,000 | 7,475 | 7,475 | 48.3 | 49.5 | AZWC-J-1 | 21.6 | 29.8 | AZWC-P-12 | 10.00 | True |
| AZWC-J-3 | 177 | 4,000 | 4,177 | 7,936 | 8,113 | 58.2 | 58.0 | AZWC-J-2 | 39.5 | 48.5 | AZWC-P-9 | 10.00 | True |
| AZWC-J-4 | 351 | 4,000 | 4,351 | 6,378 | 6,729 | 45.5 | 41.7 | AZWC-J-1 | 20.8 | 20.6 | AZWC-P-12 | 10.00 | True |
| AZWC-J-5 | 14 | 4,000 | 4,014 | 5,530 | 5,544 | 40.0 | 40.0 | AZWC-J-1 | 23.0 | 28.6 | AZWC-P-12 | 9.03 | True |
| AZWC-J-6 | 14 | 4,000 | 4,014 | 6,487 | 6,501 | 50.3 | 52.3 | AZWC-J-2 | 24.3 | 40.6 | AZWC-P-19 | 10.00 | True |
| AZWC-J-7 | 14 | 4,000 | 4,014 | 6,340 | 6,354 | 48.7 | 42.4 | AZWC-J-1 | 22.6 | 22.7 | AZWC-P-12 | 10.00 | True |
| AZWC-J-8 | 177 | 4,000 | 4,177 | 10,000 | 10,177 | 77.8 | 62.2 | J-223 | 77.8 | 62.2 | AZWC-P-12 | 2.71 | True |
| AZWC-J-9 | 130 | 4,000 | 4,130 | 4,899 | 5,029 | 35.7 | 42.7 | AZWC-J-1 | 20.0 | 35.8 | AZWC-P-23 | 8.35 | True |
| AZWC-J-10 | 173 | 4,000 | 4,173 | 5,790 | 5,963 | 44.9 | 42.5 | AZWC-J-1 | 20.0 | 22.9 | AZWC-P-12 | 9.37 | True |
| AZWC-J-11 | 351 | 4,000 | 4,351 | 6,340 | 6,690 | 54.6 | 42.5 | AZWC-J-1 | 31.8 | 22.8 | AZWC-P-12 | 10.00 | True |
| AZWC-J-12 | 177 | 4,000 | 4,177 | 5,919 | 6,096 | 70.6 | 54.3 | AZWC-J-1 | 63.2 | 47.5 | AZWC-P-12 | 10.00 | True |
| AZWC-J-13 | 91 | 4,000 | 4,091 | 6,329 | 6,420 | 54.6 | 42.7 | AZWC-J-1 | 24.6 | 22.3 | AZWC-P-12 | 10.00 | True |
| AZWC-J-14 | 91 | 4,000 | 4,091 | 6,009 | 6,100 | 51.2 | 42.8 | AZWC-J-1 | 20.0 | 20.4 | AZWC-P-12 | 9.63 | True |
| AZWC-J-15 | 351 | 4,000 | 4,351 | 6,286 | 6,637 | 64.8 | 43.7 | AZWC-J-1 | 25.9 | 25.9 | AZWC-P-12 | 10.00 | True |
| AZWC-J-16 | 177 | 4,000 | 4,177 | 6,236 | 6,413 | 67.6 | 45.2 | AZWC-J-1 | 43.7 | 28.9 | AZWC-P-12 | 10.00 | True |
| AZWC-J-17 | 91 | 4,000 | 4,091 | 6,315 | 6,406 | 59.9 | 43.1 | AZWC-J-1 | 27.2 | 24.2 | AZWC-P-12 | 10.00 | True |
| AZWC-J-18 | 91 | 4,000 | 4,091 | 5,879 | 5,970 | 53.4 | 42.9 | AZWC-J-1 | 27.3 | 27.3 | AZWC-P-1 | 9.76 | True |
| J-1 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 80.7 | 62.0 | J-223 | 78.4 | 61.7 | P-133 | 5.28 | True |
| J-2 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 78.7 | 62.0 | J-223 | 77.0 | 61.8 | P-133 | 6.35 | True |
| J-3 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 74.1 | 62.1 | J-223 | 71.4 | 62.0 | P-134 | 7.58 | True |
| J-4 | 56 | 4,000 | 4,056 | 10,000 | 10,056 | 72.5 | 62.1 | J-223 | 68.4 | 62.0 | P-134 | 6.98 | True |
| J-5 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 77.1 | 62.1 | J-223 | 53.9 | 61.3 | P-41 | 8.97 | True |
| J-6 | 0 | 4,000 | 4,000 | 9,506 | 9,506 | 80.1 | 62.1 | J-223 | 45.0 | 56.8 | P-37 | 10.00 | True |
| J-7 | 0 | 4,000 | 4,000 | 9,545 | 9,545 | 84.1 | 62.0 | J-223 | 52.0 | 61.9 | P-37 | 10.00 | True |
| J-8 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 89.3 | 62.0 | J-223 | 65.5 | 61.8 | P-5 | 8.49 | True |
| J-9 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 87.4 | 62.0 | J-223 | 68.6 | 61.8 | P-7 | 8.29 | True |
| J-10 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 85.2 | 62.0 | J-223 | 71.5 | 61.8 | P-7 | 7.87 | True |
| J-11 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 83.0 | 62.0 | J-223 | 71.6 | 61.8 | P-6 | 9.15 | True |
| J-12 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 74.3 | 62.0 | J-223 | 65.7 | 60.7 | P-106 | 6.84 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wig
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Padora
Page 1 of 5

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wig
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Available - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-13 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 67.1 | 62.0 | J-223 | 54.1 | 56.8 | P-137 | 9.24 | True |
| J-14 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 63.1 | 62.0 | J-223 | 50.8 | 52.0 | P-58 | 6.11 | True |
| J-15 | 354 | 4,000 | 4,354 | 10,000 | 10,354 | 60.7 | 62.0 | J-223 | 45.2 | 51.2 | P-142 | 8.24 | True |
| J-16 | 28 | 4,000 | 4,028 | 10,000 | 10,028 | 65.5 | 62.0 | J-223 | 54.7 | 54.5 | P-8 | 6.91 | True |
| J-17 | 28 | 4,000 | 4,028 | 10,000 | 10,028 | 69.3 | 62.0 | J-223 | 58.6 | 58.8 | P-9 | 8.82 | True |
| J-18 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 70.4 | 61.9 | J-223 | 59.6 | 59.6 | P-11 | 6.18 | True |
| J-19 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 72.1 | 61.9 | J-223 | 60.7 | 60.8 | P-11 | 7.56 | True |
| J-20 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 77.5 | 61.9 | J-223 | 74.9 | 61.3 | P-124 | 4.04 | True |
| J-21 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 84.5 | 61.8 | J-223 | 81.5 | 61.4 | P-133 | 3.93 | True |
| J-22 | 28 | 4,000 | 4,028 | 10,000 | 10,028 | 88.6 | 61.9 | J-223 | 86.1 | 61.5 | P-133 | 4.22 | True |
| J-23 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 85.0 | 61.9 | J-223 | 82.1 | 61.7 | P-133 | 4.66 | True |
| J-24 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 94.4 | 62.0 | J-223 | 80.8 | 61.4 | P-83 | 4.56 | True |
| J-25 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 96.6 | 62.0 | J-223 | 74.8 | 61.3 | P-15 | 7.60 | True |
| J-26 | 0 | 4,000 | 4,000 | 9,698 | 9,698 | 93.3 | 62.0 | J-223 | 66.2 | 61.7 | P-16 | 7.60 | True |
| J-27 | 273 | 1,500 | 1,773 | 6,987 | 7,260 | 89.5 | 62.1 | J-223 | 64.1 | 61.7 | P-17 | 10.00 | True |
| J-28 | 273 | 1,500 | 1,773 | 10,000 | 10,273 | 88.7 | 62.1 | J-223 | 48.5 | 56.3 | P-22 | 9.83 | True |
| J-29 | 0 | 1,500 | 1,500 | 3,411 | 3,411 | 81.4 | 62.1 | J-223 | 65.2 | 62.1 | P-20 | 10.00 | True |
| J-30 | 273 | 4,000 | 4,273 | 7,800 | 8,073 | 75.3 | 62.1 | J-223 | 57.5 | 61.9 | P-21 | 10.00 | True |
| J-31 | 273 | 1,500 | 1,773 | 6,471 | 6,744 | 83.0 | 62.1 | J-223 | 58.2 | 61.2 | P-24 | 10.00 | True |
| J-32 | 273 | 1,500 | 1,773 | 8,790 | 9,063 | 81.7 | 62.1 | J-223 | 49.9 | 58.6 | P-25 | 10.00 | True |
| J-33 | 273 | 1,500 | 1,773 | 6,462 | 6,735 | 79.0 | 62.1 | J-223 | 60.7 | 62.0 | P-27 | 10.00 | True |
| J-34 | 273 | 1,500 | 1,773 | 4,977 | 5,249 | 77.1 | 62.1 | J-223 | 67.2 | 62.1 | P-27 | 10.00 | True |
| J-35 | 0 | 1,500 | 1,500 | 2,675 | 2,675 | 79.9 | 62.1 | J-223 | 64.3 | 62.1 | P-39 | 10.00 | True |
| J-36 | 0 | 1,500 | 1,500 | 3,545 | 3,545 | 76.6 | 62.1 | J-223 | 64.2 | 62.1 | P-42 | 10.00 | True |
| J-37 | 0 | 1,500 | 1,500 | 2,600 | 2,600 | 78.9 | 62.1 | J-223 | 61.5 | 62.1 | P-31 | 10.00 | True |
| J-38 | 0 | 1,500 | 1,500 | 2,460 | 2,460 | 74.9 | 62.1 | J-223 | 61.3 | 62.1 | P-33 | 10.00 | True |
| J-39 | 354 | 1,500 | 1,854 | 2,182 | 2,536 | 75.3 | 62.1 | J-223 | 67.5 | 62.1 | P-34 | 10.00 | True |
| J-40 | 0 | 1,500 | 1,500 | 2,289 | 2,289 | 73.3 | 62.0 | J-223 | 64.8 | 62.1 | P-36 | 10.00 | True |
| J-41 | 0 | 4,000 | 4,000 | 7,189 | 7,189 | 80.0 | 62.0 | J-223 | 60.2 | 62.0 | P-37 | 10.00 | True |
| J-42 | 0 | 4,000 | 4,000 | 9,906 | 9,906 | 74.8 | 62.1 | J-223 | 57.0 | 61.9 | P-40 | 10.00 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wig
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 2 of 5

3-ER-528

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Available - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated) Residual @ Total Flow Needed) (psi) | Pressure (Calculated) Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated) Lower System Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-43 | 354 | 1,500 | 1,854 | 6,572 | 6,926 | 75.8 | 62.1 | J-223 | 64.0 | 61.9 | P-44 | 10.00 | True |
| J-44 | 354 | 1,500 | 1,854 | 10,000 | 10,354 | 71.4 | 62.1 | J-223 | 53.4 | 58.9 | P-143 | 8.06 | True |
| J-45 | 0 | 1,500 | 1,500 | 3,640 | 3,640 | 74.6 | 62.1 | J-223 | 58.4 | 62.0 | P-47 | 10.00 | True |
| J-46 | 354 | 1,500 | 1,854 | 2,625 | 2,979 | 65.5 | 62.1 | J-223 | 53.6 | 62.1 | P-49 | 10.00 | True |
| J-47 | 0 | 1,500 | 1,500 | 3,058 | 3,058 | 73.4 | 62.1 | J-223 | 57.6 | 62.0 | P-51 | 10.00 | True |
| J-48 | 0 | 1,500 | 1,500 | 4,999 | 4,999 | 67.8 | 62.1 | J-223 | 49.4 | 61.9 | P-62 | 10.00 | True |
| J-49 | 354 | 1,500 | 1,854 | 8,844 | 9,198 | 68.2 | 62.1 | J-223 | 43.4 | 48.5 | P-54 | 10.00 | True |
| J-50 | 0 | 1,500 | 1,500 | 2,852 | 2,852 | 61.6 | 62.1 | J-223 | 49.1 | 62.0 | P-56 | 10.00 | True |
| J-51 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 62.9 | 62.0 | J-223 | 43.4 | 54.3 | P-56 | 10.00 | True |
| J-52 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 67.6 | 62.0 | J-223 | 49.7 | 49.7 | P-138 | 7.51 | True |
| J-53 | 273 | 1,500 | 1,773 | 2,716 | 2,989 | 88.9 | 62.0 | J-223 | 56.4 | 57.4 | P-61 | 7.63 | True |
| J-54 | 0 | 1,500 | 1,500 | 6,935 | 6,935 | 96.6 | 62.1 | J-223 | 77.4 | 62.1 | P-65 | 10.00 | True |
| J-55 | 0 | 1,500 | 1,500 | 4,911 | 4,911 | 93.9 | 62.1 | J-223 | 74.6 | 61.9 | P-64 | 10.00 | True |
| J-56 | 273 | 1,500 | 1,773 | 8,395 | 8,667 | 94.2 | 62.1 | J-223 | 73.4 | 62.0 | P-66 | 10.00 | True |
| J-57 | 0 | 1,500 | 1,500 | 4,027 | 4,027 | 90.5 | 62.1 | J-223 | 66.1 | 61.8 | P-93 | 10.00 | True |
| J-58 | 0 | 1,500 | 1,500 | 3,015 | 3,015 | 91.0 | 62.1 | J-223 | 74.2 | 62.0 | P-68 | 10.00 | True |
| J-59 | 0 | 4,000 | 4,000 | 7,149 | 7,149 | 90.3 | 62.0 | J-223 | 74.3 | 61.9 | P-72 | 10.00 | True |
| J-60 | 0 | 1,500 | 1,500 | 2,912 | 2,912 | 90.6 | 62.1 | J-223 | 71.2 | 62.0 | P-70 | 10.00 | True |
| J-61 | 273 | 1,500 | 1,773 | 7,245 | 7,517 | 97.0 | 62.1 | J-223 | 71.4 | 61.9 | P-75 | 10.00 | True |
| J-62 | 273 | 1,500 | 1,773 | 9,754 | 10,027 | 89.6 | 62.1 | J-223 | 63.7 | 61.8 | P-77 | 10.00 | True |
| J-63 | 273 | 1,500 | 1,773 | 7,534 | 7,807 | 89.0 | 62.1 | J-223 | 71.8 | 61.9 | P-78 | 10.00 | True |
| J-64 | 0 | 1,500 | 1,500 | 2,702 | 2,702 | 85.6 | 62.1 | J-223 | 72.4 | 62.0 | P-79 | 10.00 | True |
| J-65 | 273 | 1,500 | 1,773 | 7,353 | 7,626 | 92.7 | 62.1 | J-223 | 74.8 | 61.8 | P-84 | 10.00 | True |
| J-66 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 92.1 | 62.1 | J-223 | 80.6 | 61.4 | P-82 | 8.02 | True |
| J-67 | 0 | 1,500 | 1,500 | 2,790 | 2,790 | 83.8 | 62.1 | J-223 | 67.2 | 62.0 | P-85 | 10.00 | True |
| J-68 | 0 | 1,500 | 1,773 | 6,987 | 7,259 | 87.6 | 62.1 | J-223 | 73.4 | 61.8 | P-87 | 10.00 | True |
| J-69 | 0 | 1,500 | 1,500 | 4,150 | 4,150 | 82.3 | 62.1 | J-223 | 60.0 | 62.0 | P-140 | 10.00 | True |
| J-70 | 273 | 1,500 | 1,773 | 9,365 | 9,638 | 88.0 | 62.1 | J-223 | 63.4 | 61.8 | P-90 | 10.00 | True |
| J-71 | 273 | 1,500 | 1,773 | 9,811 | 10,083 | 89.8 | 62.1 | J-223 | 61.0 | 61.7 | P-96 | 10.00 | True |
| J-72 | 273 | 1,500 | 1,773 | 8,756 | 9,028 | 91.2 | 62.1 | J-223 | 68.1 | 61.8 | P-94 | 10.00 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 3 of 5

3-ER-529

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Available - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-73 | 0 | 1,500 | 1,500 | 3,562 | 3,562 | 73.7 | 62.1 | J-223 | 60.3 | 61.9 | P-112 | 10.00 | True |
| J-74 | 354 | 1,500 | 1,854 | 10,000 | 10,354 | 77.6 | 62.1 | J-223 | 55.8 | 61.6 | P-98 | 8.15 | True |
| J-75 | 354 | 1,500 | 1,854 | 6,344 | 6,698 | 79.3 | 62.1 | J-223 | 61.8 | 61.8 | P-99 | 10.00 | True |
| J-76 | 354 | 1,500 | 1,854 | 6,453 | 6,807 | 81.8 | 62.1 | J-223 | 68.6 | 61.7 | P-100 | 10.00 | True |
| J-77 | 354 | 1,500 | 1,854 | 6,224 | 6,578 | 78.7 | 62.1 | J-223 | 61.0 | 61.8 | P-102 | 10.00 | True |
| J-78 | 354 | 1,500 | 1,854 | 8,598 | 8,952 | 76.4 | 62.1 | J-223 | 53.0 | 61.7 | P-103 | 10.00 | True |
| J-79 | 0 | 1,500 | 1,500 | 3,035 | 3,035 | 73.6 | 62.1 | J-223 | 58.0 | 62.0 | P-119 | 10.00 | True |
| J-80 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 77.4 | 62.0 | J-223 | 68.6 | 61.7 | P-105 | 8.65 | True |
| J-81 | 0 | 1,500 | 1,500 | 3,781 | 3,781 | 81.9 | 62.1 | J-223 | 65.0 | 61.9 | P-130 | 10.00 | True |
| J-82 | 354 | 1,500 | 1,854 | 6,622 | 6,976 | 82.4 | 62.1 | J-223 | 68.6 | 61.8 | P-109 | 10.00 | True |
| J-83 | 354 | 4,000 | 4,354 | 7,744 | 8,098 | 70.0 | 61.9 | J-223 | 58.7 | 61.7 | P-122 | 10.00 | True |
| J-84 | 0 | 1,500 | 1,500 | 3,961 | 3,961 | 69.5 | 62.1 | J-223 | 49.4 | 61.9 | P-113 | 10.00 | True |
| J-85 | 0 | 1,500 | 1,500 | 3,006 | 3,006 | 70.1 | 62.1 | J-223 | 44.7 | 62.0 | P-117 | 10.00 | True |
| J-86 | 0 | 1,500 | 1,500 | 2,890 | 2,890 | 75.7 | 62.1 | J-223 | 57.7 | 62.0 | P-121 | 10.00 | True |
| J-87 | 0 | 1,500 | 1,500 | 3,915 | 3,915 | 76.2 | 62.1 | J-223 | 54.7 | 61.6 | P-120 | 10.00 | True |
| J-88 | 378 | 4,000 | 4,378 | 10,378 | 10,378 | 70.2 | 61.8 | J-223 | 67.5 | 60.9 | P-124 | 4.76 | True |
| J-89 | 378 | 4,000 | 4,378 | 10,000 | 10,378 | 64.2 | 62.2 | J-223 | 60.7 | 59.7 | P-205 | 3.42 | True |
| J-90 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 61.5 | 62.1 | J-15 | 46.1 | 50.5 | P-125 | 9.03 | True |
| J-91 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 87.7 | 61.9 | J-223 | 84.7 | 61.4 | P-133 | 4.07 | True |
| J-92 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 78.2 | 62.2 | J-223 | 78.2 | 62.2 | P-500 | 3.15 | True |
| J-93 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 82.6 | 62.1 | J-223 | 79.5 | 61.4 | P-133 | 3.86 | True |
| J-94 | 56 | 4,000 | 4,056 | 10,056 | 10,056 | 66.6 | 62.0 | J-223 | 57.1 | 55.1 | P-61 | 5.51 | True |
| J-95 | 0 | 4,000 | 4,000 | 10,000 | 10,000 | 62.5 | 62.0 | J-223 | 49.3 | 52.3 | P-141 | 8.20 | True |
| J-200 | 576 | 4,000 | 4,576 | 10,576 | 10,576 | 90.8 | 61.9 | J-223 | 87.5 | 61.0 | P-217 | 4.42 | True |
| J-201 | 917 | 4,000 | 4,917 | 10,000 | 10,917 | 95.9 | 62.1 | J-223 | 92.6 | 60.4 | P-133 | 3.78 | True |
| J-202 | 917 | 4,000 | 4,917 | 10,000 | 10,917 | 101.0 | 62.1 | J-223 | 94.0 | 60.5 | P-200 | 6.71 | True |
| J-203 | 917 | 4,000 | 4,917 | 10,000 | 10,917 | 101.2 | 62.1 | J-223 | 80.3 | 60.7 | P-201 | 9.79 | True |
| J-204 | 0 | 4,000 | 4,000 | 8,668 | 8,668 | 100.6 | 62.1 | J-223 | 76.7 | 61.1 | P-202 | 10.00 | True |
| J-205 | 0 | 1,500 | 1,500 | 10,000 | 10,000 | 105.2 | 62.1 | J-223 | 73.2 | 60.9 | P-204 | 8.77 | True |
| J-206 | 917 | 4,000 | 4,917 | 10,000 | 10,917 | 90.3 | 61.4 | J-223 | 86.0 | 58.9 | P-205 | 5.12 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021

Superstition Vistas
HILGARTWILSON, LLC

A. Paciora
Page 4 of 5

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
Fire Flow Node FlexTable: Fire Flow Report

Active Scenario: Max Day + FF Available - Site

| Label | Demand (gpm) | Fire Flow (Needed) (gpm) | Flow (Total Needed) (gpm) | Fire Flow (Available) (gpm) | Flow (Total Available) (gpm) | Pressure (Calculated Residual @ Total Flow Needed) (psi) | Pressure (Calculated Zone Lower Limit @ Total Flow Needed) (psi) | Junction w/ Minimum Pressure (Zone @ Total Flow Needed) | Pressure (Calculated Residual) (psi) | Pressure (Calculated System Lower Limit) (psi) | Pipe w/ Maximum Velocity | Velocity of Maximum Pipe (ft/s) | Satisfies Fire Flow Constraints? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| J-207 | 931 | 4,000 | 4,931 | 10,000 | 10,931 | 80.6 | 60.9 | J-223 | 75.7 | 57.6 | P-205 | 4.51 | True |
| J-208 | 590 | 4,000 | 4,590 | 10,000 | 10,590 | 78.3 | 61.4 | J-223 | 69.4 | 59.7 | P-212 | 6.08 | True |
| J-209 | 576 | 4,000 | 4,576 | 10,000 | 10,576 | 83.0 | 61.7 | J-223 | 65.1 | 60.4 | P-211 | 7.57 | True |
| J-210 | 576 | 4,000 | 4,576 | 10,000 | 10,576 | 94.1 | 62.0 | J-223 | 72.8 | 61.0 | P-216 | 7.57 | True |
| J-211 | 576 | 4,000 | 4,576 | 10,000 | 10,576 | 90.9 | 62.0 | J-223 | 79.4 | 61.9 | P-214 | 8.18 | True |
| J-212 | 230 | 1,500 | 1,730 | 5,790 | 6,366 | 90.9 | 62.1 | J-223 | 70.5 | 61.5 | P-216 | 10.00 | True |
| J-213 | 230 | 1,500 | 1,730 | 6,647 | 6,877 | 105.7 | 62.1 | J-223 | 61.5 | 61.9 | P-220 | 10.00 | True |
| J-214 | 230 | 1,500 | 1,730 | 8,830 | 9,060 | 102.5 | 62.1 | J-223 | 60.8 | 60.8 | P-226 | 10.00 | True |
| J-215 | 230 | 1,500 | 1,730 | 10,000 | 10,230 | 97.4 | 62.1 | J-223 | 76.6 | 60.1 | P-227 | 9.53 | True |
| J-216 | 341 | 4,000 | 4,341 | 9,431 | 9,661 | 90.7 | 61.9 | J-223 | 58.8 | 59.4 | P-228 | 10.00 | True |
| J-217 | 462 | 4,000 | 4,462 | 10,000 | 10,341 | 79.5 | 61.0 | J-223 | 60.3 | 56.8 | P-225 | 9.46 | True |
| J-218 | 462 | 4,000 | 4,462 | 10,000 | 10,462 | 62.8 | 61.0 | J-223 | 57.5 | 56.2 | P-236 | 5.61 | True |
| J-219 | 462 | 4,000 | 4,462 | 10,000 | 10,462 | 63.8 | 60.2 | J-223 | 57.0 | 54.1 | P-236 | 4.83 | True |
| J-220 | 462 | 4,000 | 4,462 | 5,481 | 5,942 | 52.1 | 56.1 | J-224 | 42.0 | 51.9 | P-240 | 10.00 | True |
| J-221 | 462 | 4,000 | 4,462 | 8,362 | 8,824 | 66.5 | 59.5 | J-224 | 43.3 | 49.4 | P-234 | 10.00 | True |
| J-222 | 462 | 4,000 | 4,462 | 10,000 | 10,462 | 69.2 | 61.2 | J-223 | 50.7 | 58.6 | P-235 | 7.91 | True |
| J-223 | 476 | 4,000 | 4,476 | 10,000 | 10,476 | 72.1 | 60.6 | J-223 | 66.1 | 55.9 | P-236 | 4.53 | True |
| J-224 | 476 | 4,000 | 4,476 | 10,000 | 10,476 | 60.6 | 61.1 | J-224 | 53.5 | 54.7 | P-236 | 4.94 | True |
| J-225 | 462 | 4,000 | 4,462 | 7,427 | 7,889 | 53.8 | 59.2 | J-219 | 38.5 | 46.5 | P-242 | 10.00 | True |
| J-226 | 378 | 1,500 | 1,878 | 9,625 | 10,003 | 66.1 | 62.1 | J-223 | 46.4 | 48.7 | P-243 | 10.00 | True |
| J-227 | 378 | 1,500 | 1,878 | 5,865 | 6,243 | 64.4 | 62.1 | J-223 | 60.1 | 60.1 | P-246 | 10.00 | True |
| J-228 | 378 | 1,500 | 1,878 | 8,787 | 9,165 | 67.2 | 62.1 | J-223 | 48.2 | 59.6 | P-248 | 10.00 | True |
| J-229 | 201 | 4,000 | 4,121 | 8,041 | 8,243 | 67.3 | 60.8 | J-232 | 38.2 | 45.6 | P-249 | 10.00 | True |
| J-230 | 201 | 4,000 | 4,201 | 9,663 | 9,785 | 59.8 | 62.0 | J-223 | 32.6 | 56.9 | P-250 | 10.00 | True |
| J-231 | 121 | 4,000 | 4,201 | 7,027 | 7,229 | 57.6 | 55.4 | J-232 | 37.7 | 35.6 | P-251 | 10.00 | True |
| J-232 | 121 | 1,500 | 1,621 | 6,508 | 6,629 | 70.3 | 62.1 | J-232 | 51.8 | 54.2 | P-254 | 10.00 | True |
| J-233 | 62 | 4,000 | 4,062 | 7,173 | 7,235 | 53.7 | 61.9 | J-233 | 29.3 | 32.1 | P-251 | 10.00 | True |
| J-232 | 0 | 1,500 | 1,500 | 5,823 | 5,823 | 66.0 | 62.1 | J-223 | 39.4 | 42.5 | P-258 | 10.00 | True |
| J-ELS | 1 | 1,500 | 1,501 | 6,722 | 6,723 | 105.6 | 62.1 | J-223 | 78.6 | 61.7 | P-260 | 10.00 | True |

21-0708_1635 LD Water Model(AJWD_3CAMPUS).wtg
7/12/2021



# APPENDIX D
# DESIGNATION OF ASSURED WATER SUPPLY

**JANICE K. BREWER**

Governor



**HERBERT R. GUENTHER**

Director

### ARIZONA DEPARTMENT OF WATER RESOURCES

3550 North Central Avenue, Second Floor
PHOENIX, ARIZONA 85012-2105
(602) 771-8500

September 29, 2010

**Via Certified Mail**
7004 2510 0000 8660 1031

Water Utilities Community Facility District
George Hoffman
District Manager
PO Box 4768
Apache Junction, AZ 85278-4768

<div align="center">

**Re: Designation of Assured Water Supply (DWR No. 86-002025.0001)
Water Utilities Community Facility District**

</div>

Dear Mr. Hoffman:

I am pleased to inform you that the Arizona Department of Water Resources has approved the Modification of the Water Utilities Community Facilities District's ("WUCFD") Designation of Assured Water Supply. We have enclosed the formal Decision and Order. The Decision and Order includes an itemization of the WUCFD's responsibilities in maintaining the Designation.

WUCFD's status as a designated water provider demonstrates that the WUCFD is taking a long-term perspective in managing water resources. The WUCFD's commitment to sound water management represents a major contribution to the State's water management goal of achieving safe-yield in the Phoenix Active Management Area.

If you have any questions regarding these documents, please contact Scott Miller at (602) 771-8604.

Sincerely,

Sandra Fabritz Whitney
Assistant Director

cc:     Via electronic mail:
        Frank Blanco, WUCFD
        Robin King, Arizona Department of Real Estate
        J. Scott Miller, Manager, Groundwater Permitting and Wells

**DEPARTMENT OF WATER RESOURCES**

**BEFORE THE DIRECTOR**

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF APACHE JUNCTION WATER UTILITIES COMMUNITY FACILITIES DISTRICT FOR A DESIGNATION AS HAVING AN ASSURED WATER SUPPLY | ) AWS No. 2010-014<br>)<br>) **DECISION AND ORDER**<br>)<br>) No. 86-002025.0001<br>) |

## I.    INTRODUCTION

On September 29, 2008 the Department of Water Resources ("Department") received an application from Apache Junction Water Utilities Community Facilities District ("WUCFD") requesting that the Department modify WUCFD's designation of assured water supply pursuant to A.R.S. § 45-576 *et seq*. and A.A.C. R12-15-701 *et seq*.  On July 15, 2010 and July 22, 2010, the Department gave public notice of the application pursuant to A.R.S. § 45-578.  One objection to the application was filed with the Department.

After receiving WUCFD's application to modify its designation of assured water supply, the Department reviewed relevant information regarding the modification request, including: 1) hydrologic information and other information on file with the Department for the proposed groundwater supply, 2) information regarding WUCFD's consistency with the management plan and the management goal of the Phoenix Active Management Area ("Phoenix AMA"); 3) information regarding WUCFD's financial capability to construct the necessary delivery system, treatment works and storage facilities; and 4) the issues raised by the objection to the application.  Based on that information, the Department makes the following Findings of Fact, Conclusions of Law and Order of Designation and Conditions of Designation:

1

## II.    FINDINGS OF FACT

### A.    General

1. WUCFD is a community facilities district established under A.R.S. § 48-701 *et.seq.*

2. WUCFD has the legal authority to deliver water to its customers located within its service area.

3. WUCFD currently serves water through its municipal distribution system to its customers.

4. On February 1, 2005 WUCFD was designated as having an assured water supply in Decision and Order AWS 2005-003, No. 26-400989.0000.

### B.    Water Demands

5. WUCFD's current demand as of calendar year 2008 is 1,843.29 acre-feet per year ("current demand").

6. WUCFD's committed demand as of calendar year 2008 is 43.04 acre-feet per year ("committed demand").

7. WUCFD's projected demand in 2025 is 1,675.71 acre-feet per year ("2025 projected demand"). The 2025 projected demand does not include the current demand or the committed demand, but does include the demand at build-out of plats reasonably projected to be approved through calendar year 2025.

8. WUCFD's annual estimated water demand in 2025, which is the sum of its current demand, committed demand, and 2025 projected demand, is 3,562.04 acre-feet per year ("2025 annual estimated water demand").

### C.    Physical Availability of Groundwater and Stored Water Recovered Outside the Area of Impact

9. WUCFD has demonstrated that after withdrawing 276,900 acre-feet, or an average of 2,769 acre-feet per year over 100 years, of groundwater and stored water recovered outside the area of impact (*see* Finding of Fact No. 28), the depth-to-static water level within WUCFD's service area is not expected to exceed 1,000 feet below land surface. For purposes of this Decision and Order, that volume includes the following:

2

a.    39,126.18 acre-feet, or an average of 391.26 acre-feet per year over 100 years, of future and existing long-term storage credits to be recovered outside the area of impact. See Finding of Fact No. 28.

b.    584 acre-feet, or an average of 5.84 acre-feet per year over 100 years, of groundwater that WUCFD may use to supplement its CAP water supplies, pursuant to A.A.C. R12-15-717(D)(2). See Finding of Fact No. 30.

c.    237,190 acre-feet, or an average of 2,371.9 acre-feet per year over 100 years, of groundwater to meet annual demands. See Finding of Fact No. 20.

## D.    Groundwater

10.    WUCFD has demonstrated that it has wells of sufficient capacity to withdraw at least 2,899.75 acre-feet per year of groundwater for 100 years.

11.    WUCFD has the right to withdraw and deliver groundwater to its customers pursuant to service area right No. 56-002025.

12.    As of the date of this Decision and Order, WUCFD's current groundwater allowance is 463.02 acre-feet, or an average of 4.63 acre-feet per year over 100 years, pursuant to A.A.C. R12-15-724(A)(2).

13.    Pursuant to A.A.C. R12-15-724(A)(4), the Director shall add a volume for incidental recharge to WUCFD's groundwater allowance for each calendar year, based upon its total water use from any source in the previous calendar year.

14.    Based on its reported water use within its service area for calendar year 2008, WUCFD's incidental recharge volume for calendar year 2009 is 80.54 acre-feet.

15.    If WUCFD delivers 3,383 acre-feet per year of water for use within its service area in calendar year 2024, its incidental recharge volume for calendar year 2025 will be 135.32 acre-feet ("2025 incidental recharge volume").

16.    The sum of WUCFD's current groundwater allowance and 2025 incidental recharge volume is 139.95 acre-feet per year.  This volume of groundwater will be consistent with the management goal each year for 100 years.

17.    WUCFD is a member service area of the Central Arizona Groundwater Replenishment District (CAGRD). The Member Service Area Agreement between WUCFD and the CAGRD (Agreement) does not limit the volume of excess groundwater, as defined in the

3

1    Agreement.

2    18.   The Director has made a determination, which has not expired, that the most recent

3          CAGRD Plan of Operation is consistent with the management goal of the Phoenix AMA.

4    19.   As of the date of this decision and order, the CAGRD is in compliance with its

5          groundwater replenishment obligation for the Phoenix AMA.

6    20.   WUCFD has demonstrated that an average of 2,371.9 acre-feet per year of groundwater

7          to meet annual demands will be physically, continuously and legally available for 100

8          years and consistent with the management goal of the Phoenix AMA.

9    21.   In addition to the groundwater supplies described in Finding of Fact No. 20, WUCFD

10         has demonstrated that 584 acre-feet, or an average of 5.84 acre-feet per year over 100

11         years, of groundwater will be physically, continuously and legally available to

12         supplement its CAP water supplies, pursuant to A.A.C. R12-15-717(D)(2). See Finding

13         of Fact No. 30.

14                          **E.**     **Storage and Recovery**

15   22.   WUCFD holds Water Storage Permit No. 73-545695.7000, which allows storage of a

16         maximum volume of 20,000 acre-feet per year of CAP water at the RWCD

17         Groundwater Savings Facility.

18   23.   WUCFD holds Recovery Well Permit No. 74-576703.0001, which allow recovery of a

19         total of 2,899.75 acre-feet per year outside the area of impact of storage.

20                          **F.**     **Long-Term Storage Credits**

21   24.   As of December 31, 2008, WUCFD holds 24,286.18 acre-feet of long-term storage

22         credits.

23   25.   On January 17, 2006, WUCFD and the Superstition Mountains Community Facilities

24         District ("SMCFD") entered into an intergovernmental agreement ("IGA") for the sale

25         and purchase of long term storage credits to be earned by SMCFD at Underground

26         Storage Facility No. 71-584469.0000.

     26.   The term of the agreement expires on December 31, 2015.

4

27.    Pursuant to the IGA, WUCFD may purchase 14,840 acre-feet of long-term storage credits during the term of the IGA.

28.    WUCFD has demonstrated that up to 39,126.18 acre-feet, or an average of 391.26 of long-term storage credits to be recovered outside the area of impact will be physically, continuously and legally available for 100 years, for purposes of this Decision and Order.

### G.    CAP Water:  Physical, Continuous and Legal Availability

#### i.    WUCFD M&I CAP Water Allocation

29.    WUCFD holds a long-term, non-declining municipal and industrial ("M&I") subcontract for CAP water with the Central Arizona Water Conservation District for 2,919 acre-feet per year.

#### ii.    Continuous Availability of CAP Water

30.    The volume of groundwater and stored water to be recovered outside the area of impact of storage described in Finding of Fact No. 9 includes 584 acre-feet, or an average of 5.84 acre-feet per year over 100 years, of groundwater that WUCFD may use to supplement its CAP water supplies, pursuant to A.A.C. R12-15-717(D)(2).

#### iii.    Treatment Facilities

31.    Pursuant to an agreement between WUCFD and the City of Mesa ("Mesa") dated March 17, 2006, WUCFD has treatment capacity to treat up to a total of 2,919 acre-feet per year of CAP water at Mesa's Brown Road CAP Water Treatment Plant until March 17, 2016.

32.    According to WUCFD's 5 year (2010 – 2014) Water System Capital Improvements Plan, a Water Treatment Plant with a treatment capacity of approximately 1,232 acre feet per year will be built to treat WUCFD's CAP allocation.

#### iv.    Summary

33.    The total volume of CAP Water is 2,919 which includes WUCFD's CAP M&I allocation.  WUCFD has demonstrated that 1,232 acre-feet per year of CAP water to be treated and delivered without storage is physically, continuously and legally available for 100 years.

5

1          **H.**     **Consistency with the Management Plan**

2  34.    WUCFD is currently regulated as a large municipal provider under the Municipal

3  Conservation Program in the Third Management Plan for the Phoenix AMA

4  ("Management Plan"). As of the date the application was filed, WUCFD has not been

   found to be out of compliance with the Management Plan.

5

6          **I.**     **Water Quality**

7  35.    WUCFD is regulated by the Arizona Department of Environmental Quality as a public

8  water system pursuant to A.R.S. § 49-351, *et seq.*

9

10         **J.**     **Financial Capability**

   36.    WUCFD's five-year capital improvement plan provides for the creation of a water
11
   treatment facility to treat 1,232 acre-feet per year of CAP water

12 37.    WUCFD has constructed the remaining delivery system and storage facilities necessary

13 to satisfy its 2025 annual estimated water demand.

14

15       **III.**    **CONCLUSIONS OF LAW**

16
   Having reviewed the Findings of Fact, the Department makes the following Conclusions of
17 Law:

18 1.    For purposes of this Decision and Order, WUCFD has demonstrated that 2,371.9 acre-

19 feet per year of groundwater, 391.26 acre-feet per year of long-term storage credits to be

20 recovered outside the area of impact, and 1,232 acre-feet per year of CAP water to be

   treated and delivered without storage, will be physically, continuously and legally
21
   available for at least 100 years and will be consistent with the management goal.

22 A.A.C. R12-15-716, R12-15-717, R12-15-718, R12-15-722. The sum of these

23 volumes, 3,995.16 acre-feet per year, exceeds the 2025 annual estimated water demand

24 of 3,562.04 acre-feet per year. *See* Attachment A to this Decision and Order.

25 2.    WUCFD has also demonstrated that 584 acre-feet, or an average of 5.84 acre-feet per

26 year over 100 years, of groundwater will be physically, continuously and legally

   available to supplement its CAP water supplies. A.A.C. R12-15-717(D)(2). *See*

1    Attachment A to this Decision and Order.

2    3.    For purposes of A.A.C. R12-15-716(B)(3)(c)(ii), the volume of WUCFD's 2025 annual

3          estimated water demand that will be met with groundwater and stored water recovered

4          outside the area of impact is 276,900 acre-feet, or an average of 2,769 acre-feet per year

     over 100 years. See Attachment A to this Decision and Order.

5    4.    In accordance with A.A.C. R12-15-722, WUCFD has demonstrated that its projected

6          use of groundwater is consistent with the management goal of the Phoenix AMA.

7    5.    The water supply served by WUCFD will be of adequate quality pursuant to A.A.C.

8          R12-15-719.

9    6.    In accordance with A.A.C. R12-15-721, WUCFD meets the standard established for

           determining consistency with the Management Plan for the Phoenix AMA.

10   7.    WUCFD has satisfied the financial capability criteria prescribed in A.A.C. R12-15-720.

11   8.    WUCFD has satisfied all the requirements for a designation of an assured water supply.

12

13   **IV.    ORDER OF DESIGNATION AND CONDITIONS OF DESIGNATION**

14

15   Having reviewed the Findings of Fact and Conclusions of Law, the Department hereby issues

16   this Decision and Order designating WUCFD as having an assured water supply, subject to the

     following conditions:

17   1.    The Director's determination that an assured water supply exists for WUCFD is based

18         on its analysis of the water supplies pledged by WUCFD. Nothing in this Decision and

19         Order limits or reduces WUCFD's legal authority to use any water supply in any year.

20   2.    The Director reserves the right under A.A.C. R12-15-711(C) to periodically review and

           modify the designation for good cause as conditions warrant.

21   3.    Pursuant to A.A.C. R12-15-711(F), the Director may, at any time revoke this

22         designation if the findings of fact or the conclusions of law upon which the designation

23         is based change or are invalid, or if an assured water supply no longer exists.

24   4.    WUCFD shall submit an application to modify this decision and order designating

25         WUCFD as having an assured water supply to increase the term of the designation

26         when the sum of WUCFD current demand, committed demand and two years of

7

1    projected demand exceeds 3,562.04 acre-feet per year, or by December 31, 2023,
2    whichever is earlier.

3    5.    Pursuant to A.A.C. R12-15-719, WUCFD shall satisfy any state water quality
4          requirements established for its proposed use after the date of this designation.

5    6.    WUCFD shall annually provide to the Department the following information for the
6          previous calendar year in the manner prescribed in A.A.C. R12-15-711(A):

6          a.    An estimate of the demand of platted, undeveloped lots located in WUCFD's
7                service area.

8          b.    An estimate of the projected demand at build-out for customers with which
9                WUCFD has entered into a notice of intent to serve agreement in the preceding
10               calendar year.

10         c.    A report regarding WUCFD's compliance with water quality requirements.

11         d.    The depth-to-static water level of all wells from which WUCFD withdrew water
12               during the previous calendar year.

13         e.    Any other information requested by the Director to determine whether WUCFD
14               continues to meet all the requirements necessary to maintain this designation of
15               assured water supply.

16
17   **IT IS HEREBY ORDERED THAT WUCFD BE DESIGNATED AS HAVING AN
     ASSURED WATER SUPPLY UNTIL DECEMBER 31, 2025.**

18
19   DATED this _29th_ day of _September_, 2010.

20
21
22
23                                   Herbert R. Guenther
                                     Director
24                                   Arizona Department of Water Resources
25
26

8

1  A copy of the foregoing
   **Decision and Order** mailed
2  by certified mail this _29th_ day
3  of _SEPTEMBER_, 2010, to:

4  WUCFD                                    Certified Mail No.:
   George Hoffman                           _7004 2510 0000 8660 1031_
5  District Manager
   PO Box 4768                              Sent by: _MICHELLE MORENO_
6  Apache Junction, AZ 85278-4768

7  A copy of the foregoing sent by
8  electronic mail this _29th_ day
   of _SEPTEMBER_, 2010, to:
9
10 WUCFD
   Frank Blanco
   PO Box 4768
11 Apache Junction, AZ 85278-4768
12
   Cliff Neal
13 CAGRD
   23636 N 7th St
14 Phoenix, AZ 85024

15 Robin King
16 Arizona Department of Real Estate
   2910 N. 44th Street
17 WUCFD, AZ 85018

18 J. Scott Miller
   ADWR
19 3550 North Central Avenue
   WUCFD, AZ 85012
20

21 _____

22

23

24

25

26

9

Decision and Order No. 86-002025.0001 (WUCFD Designation as Having an Assured Water Supply): Attachment A

| Source | Approved (af/yr) | Capacity | Legal Authority | Comments |
|---|---|---|---|---|
| **Total Groundwater to Meet Annual Demands** | 2,371.9 | Physical availability of groundwater and stored water recovered outside the area of impact (AOI) = 2,769 af/yr<br><br>Groundwater Well Capacity = 2,899.75 af/yr | Service Area Right No. 56-002520.0000<br><br>Groundwater allowance: A.A.C. R12-15-724(A)(2): 2009 Groundwater Allowance 4.63 af/yr<br><br>Incidental Recharge: A.A.C. R12-15-724(A)(4): 2019 water use times IR factor of 4.00% (3,383 x 0.04 = 135.32)<br><br>Total Groundwater Allowance for 2020: 139.95 af/yr | Total Groundwater to meet annual demands include:<br>2,769 physically available<br>• minus 391.26 af/yr of long-term storage credits to be recovered outside the area of impact ("AOI")<br>• minus 5.84 af/yr of groundwater to supplement CAP water supplies<br>=2,371.9 af/yr. |
| **Total Existing Long Term Storage Credits** | 391.26 | Recovery Well Permit No: 74-576703.0001<br><br>Recovery Well Capacity =2,899.75 af/yr<br><br>Recharge Storage Permit Capacity = 20,000 af/yr<br><br>Physical availability of groundwater + stored water recovered outside AOI = 2,769 af/yr | Long Term Storage Account No: 70- 441152<br><br>Water Storage Permit No: 73-545695.7000 | 2008 balance of 39,126.18 af divided by 100 years. |

Decision and Order No. 86-002025.0001 (WUCFD Designation as Having an Assured Water Supply): Attachment A

| Source | Approved (af/yr) | Capacity | Legal Authority | Comments |
|---|---|---|---|---|
| Total CAP water – M&I subcontract | 1,232 | Treatment capacity pursuant to CIP = 1,232 af/yr | M&I Subcontract No: 07-XX-30-W0494 | M&I Subcontract is 2,919 af/yr |
| Total 2025 Supplies | 3,995.16 | | | |
| Total 2025 Demand | 3,562.04 | | | |

* Note: Abbreviations are consistent with those identified in Decision and Order No. 86-002025.0001



# APPENDIX E
# CAROLLO WATER STUDY – DISTRIBUTION & TRANSMISSION MAIN EXHIBITS

HILGARTWILSON, LLC



Figure 3 State Lands Area Water Distribution System

3-ER-546



Figure 2 State Lands Area Water Treatment and Transmission System

No. 25-5185

———————————————————————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

———————————————————————————————

ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION
OF ARIZONA, INC.; CENTER FOR BIOLOGICAL DIVERSITY;
EARTHWORKS; THE ACCESS FUND; and SIERRA CLUB.

*Plaintiffs-Appellants*,

v.

BROOKE L. ROLLINS, U.S. SECRETARY OF AGRICULTURE; UNITED
STATES FOREST SERVICE; and NEIL BOSWORTH, SUPERVISOR OF THE
TONTO NATIONAL FOREST.

*Defendants-Appellees*,

and

RESOLUTION COPPER MINING, LLC

*Intervenor-Defendant-Appellee.*

————————————————————————

On Appeal from the United States District
Court for the District of Arizona
(District Judge Dominic W. Lanza)

————————————————————————

**PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD
VOLUME 4 of 5**
*In Support of*
***PLAINTIFFS-APPELLANTS' EMERGENCY MOTION UNDER
CIRCUIT RULE 27-3
RELIEF REQUESTED BY AUGUST 18, 2025, AS THE LAND TITLE
TRANSFER WILL OCCUR ON AUGUST 19, 2025***

Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
mfink@biologicaldiversity.org

Allison N. Henderson
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs-Appellants*

Susan B. Montgomery
Robyn L. Interpreter
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorneys for the Inter Tribal Association of Arizona, Inc.*

**INDEX**

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| **Volume 1 of 5 [99 pages]** | | | |
| Order (August 15, 2025) | 8/15/2025 | 99 | 6-99 |
| **Volume 2 of 5 [268 pages]** | | | |
| Federal Defendants' Memo in Support of Summary Judgment, *CBD v. USFS*, Case No. 23-cv-00928 (DLF) (D.D.C., August 22, 2024) | 8/4/2025 | 97-1 | 105-154 |
| BLM Review of Hydrology Aspects of the Resolution Copper Project | 7/14/2025 | 87-1 | 155-180 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, June 2025 | 7/14/2025 | 87-2 | 181-275 |
| Draft Record of Decision, June 2025 | 7/14/2025 | 87-3 | 276-367 |
| **Volume 3 of 5 [180 pages]** | | | |
| Declaration of Maria Dadgar | 7/14/2025 | 87-5 | 373-380 |
| Declaration of Roger Featherstone | 7/14/2025 | 87-6 | 381-387 |

| Declaration of Russ McSpadden | 7/14/2025 | 87-7 | 388-399 |
|---|---|---|---|
| Declaration of Erik Murdock | 7/14/2025 | 87-8 | 400-403 |
| Declaration of Sandra Bahr | 7/14/2025 | 87-9 | 404-408 |
| Master Water Plan for Superstition Vistas, Apache Junction, Arizona | 7/14/2025 | 87-10 | 409-547 |
| **Volume 4 of 5 [195 pages]** | | | |
| Appraisal Report Summary: Mining Claim Zone MCZ Parcel | 7/14/2025 | 87-11 | 553-567 |
| Appraisal Report Summary: Mineral Withdrawal Area (MWA) Parcel | 7/14/2025 | 87-12 | 568-595 |
| Technical Appraisal Review Report: MWA Parcel (excerpts) | 7/14/2025 | 87-13 | 596-598 |
| Oversight and Legislative Hearing Before the U.S. House of Representatives Subcommittee on Energy & Mineral Resources, March 2013 | 7/14/2025 | 87-14 | 599-715 |
| Congressional Budget Office Cost Estimate, July 2013 | 7/14/2025 | 87-15 | 716-717 |

| | | | |
|---|---|---|---|
| House Natural Resources Committee House Report No. 113-167, July 2013 | 7/14/2025 | 87-16 | 718-742 |
| **Volume 5 of 5 [296 pages]** | | | |
| Uniform Appraisal Standards for Federal Land Acquisitions | 7/14/2025 | 87-17 | 748-1009 |
| Excerpt from Resolution Copper Mining's General Plan of Operations, 2016 | 7/14/2025 | 87-18 | 1010 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, January 2021 (rescinded) | 7/14/2025 | 87-19 | 1011-1013 |
| USDA Memo for Withdrawal of Notice of Availability, Rescind Final Environmental Impact Statement and Draft Record of Decision | 3/2/2021 | 26-2 | 1014 |
| Notice of Appeal | 8/15/2025 | 100 | 1015-1020 |
| Civil Docket for Case No. 2:21-cv-00122-DWL – United States District Court, District of Arizona (Phoenix) – *Arizona Mining Reform Coalition, et al. v. United States Forest Service, et al.* | | | 1021-1038 |



| Forest | Washington | 1400 Independence Avenue, SW |
|---|---|---|
| Service | Office | Washington, DC 20250 |

# Appraisal Report Summary

### Mining Claim Zone MCZ Parcel  (Federal)
### Pinal County, Arizona

### Resolution Copper Legislated Land Exchange
### (Southeast Arizona Land Exchange and Conservation Act, 16 U.S.C. §539p)



### Date of Appraisal Report
December 30, 2022
(Provided to US Forest Service on January 6, 2023)

### Date of Appraisal Review
January 24, 2023

### Appraisal Report Prepared By
Marc P. Springer, SFMC Mining Geologist/Mineral Appraiser
Spanish Flat Mining Company (sub-contractor to Weissenborn Appraisal, LLC)
7024 Snapdragon Drive
Carlsbad, CA 92011



**America's Working Forests – Caring Every Day in Every Way**   Printed on Recycled Paper

MCZ Parcel (Federal)                                                                  Page 1 of 14
Pinal County, Arizona

# Appraisal Summary

## **Appraisal Report under Review**

**Appraiser**

Marc P. Springer, SFMC Mining Geologist/Mineral Appraiser
Arizona Certified General Real Estate Appraiser #1036208 (Expires 02/29/2024)
California Certified General Real Estate Appraiser # AG044432 (Expires 09/20/2023)
International Institute of Mineral Appraisers, #2006-4
CA State Registered Professional Geologist PG# 7831
BLM Certified Mineral Examiner CME #0139
Spanish Flat Mining Company (sub-contractor to Weissenborn Appraisal, LLC)
7024 Snapdragon Drive
Carlsbad, CA 92011

*(Note: Per USDA Forest Service Contract No. 12837120C0041, Weissenborn Appraisal LLC commissioned Spanish Flat Mining Company who has extensive experience, professional knowledge, and expertise in the valuation of mineralized and mine-related properties).*

**Date of Inspection**

The Subject Property was inspected on April 12, 2022 which is the effective date of the appraisal. Prior to this inspection, the mineral appraiser, Mr. Halmbacher (deceased) inspected the property on May 08, 2019. Between these dates, the Telegraph Fire started on June 4, 2021 and burned portions of the Subject. The appraisal notes burned areas were still apparent during the property inspection. The property owner(s) were provided the opportunity to accompany the appraiser on the property inspection.

**Date of Report**

December 30, 2022 (Provided to US Forest Service on January 6, 2023)

**Owner**

The United States of America

**Client**

As part of USDA Forest Service Contract No. 12837120C0041, Weissenborn Appraisal LLC commissioned Spanish Flat Mining Company who has extensive experience, professional knowledge, and expertise in the valuation of mineralized and mine-related properties. Weissenborn Appraisal, LLC is the primary appraisal contractor for the USFS, relative to the Federal and non-Federal parcels of the Southeast Arizona Land Exchange and Conservation Act. Weissenborn Appraisal LLC commissioned Spanish Flat Mining Company to complete appraisals on the Federal real property (selected lands) portion of the land exchange; the appraisal will be used by the USFS to facilitate the land exchange. Although the appraisal completed for Weissenborn Appraisal LLC by Spanish Flat Mining Company as a sub-contractor states the Client is Weissenborn Appraisal LLC, the letter of transmittal from Weissenborn Appraisal LLC to the USDA Forest Service states that the Client in the assignment is the USDA Forest Service specifically the USDA Forest Service, Director of Lands and Minerals, Southwestern Region.



MCZ Parcel (Federal)                                                      Page 2 of 14
Pinal County, Arizona

**Intended Use**
To provide a basis of value for the legislated land exchange between the United States of America and
Resolution Copper Mining, LLC pursuant to 16 U.S.C. §539p.

**Intended User(s)**
In the original appraisal contract, the intended users were broadly defined.  It shall be noted that the
intended users of the appraisal report are specifically identified as the USDA Forest Service, Director of
Lands and Minerals, Southwestern Region, USDA Office of General Counsel, and Resolution Copper
Mining, LLC.

**Professional Standards**
The appraisal standards required for this assignment were the *Uniform Appraisal Standards for Federal
Land Acquisitions* and *Uniform Standards of Professional Appraisal Practice*.

**Estate Appraised**
Fee Simple Interest, subject to valid and existing rights including all unpatented mining claims held by
Resolution Copper as listed in Section G of the Federal Status Report dated September 28, 2017.

    **Outstanding Rights**

    The appraisal adequately considered the following outstanding rights and reservations on the
Subject Property:

    Unpatented Mining Claims: All unpatented mining claims as listed in Section G of the
Federal Status Report dated September 28, 2017. These unpatented mining claims confer all
right to locatable minerals on the Subject Property, and the right to use the surface for
mining purposes, including destructive use of the surface reasonably incident to mining, to
a third party, and which rights are therefore no longer held by the United States.

    Existing Easements:  Highway Easement Deed granted to State of Arizona, recorded on 3/18/91
in the records of Pinal County, Arizona. Federal parcel will be conveyed subject to the easement.
GLO101208 ADOT US60 EASEMENT.  United States Department of Interior Easement for
Right-of-Way for Electric Transmission Line granted to Arizona Public Service Company, dated
12/22/75. Federal parcel will be conveyed subject to the easement GLO401905 APS 500KV
POWERLINE.

    Permits and Temporary Easements to convert to Easements in perpetuity: Permit to Salt River
Project Agricultural Improvement and Power District for an overhead transmission line
Amendment dated 7/8/85. At closing, Resolution Copper Mining shall grant a replacement
authorization to Salt River Project Agricultural Improvement and Power District for those
sections involved in the conveyance It shall contain terms at least equivalent to those in the
permit. Forest Service shall amend the permit to reflect those deletions. GLO401137 OAK
FLAT 115KV PERMIT

    Permit to Quest/Century Link for a telephone line dated 7/2/73. At closing, Resolution Copper
Mining shall grant a replacement easement to Salt River Project Agricultural Improvement and
Power District for those sections involved in the conveyance It shall contain terms at least
equivalent to those in the permit. MASTER SPECIAL USE PERMIT FO209



In the context and scope of this appraisal GLO101208 ADOT US60 EASEMENT, GLO401905 APS 500KV POWERLINE, GLO401137 OAK FLAT 115KV PERMIT, MASTER SPECIAL USE PERMIT FO209, have no effect on the value of the Subject.

**Definition of Value**
Market Value means the most probable price in cash, or terms equivalent to cash, which lands or interest in lands should bring in a competitive and open market under all conditions requisite to a fair sale, where the buyer and seller each acts prudently and knowledgeable, and the price is not affected by undue influence (36 CFR 254.2).

**Extraordinary Assumptions**
The appraisal is not based upon any Extraordinary Assumptions.

**Hypothetical Conditions**
The appraisal was prepared subject to the following FS instructed Hypothetical Condition: The Federal Property shall be appraised as though it is in private ownership, is freely alienable, and zoned consistently with other similarly situated non-Federal properties within the jurisdiction of the zoning authority. Federal law provides that, upon conveyance, "[t]he Federal Property shall be available to Resolution Copper for mining and related activities subject to and in accordance with applicable Federal, State, and local laws pertaining to mining and related activities on land in private ownership." 16 U.S.C. §539p(c)(8). This hypothetical condition does not alter the facts that: the Federal Property is encumbered by mining claims held by a party other than the United States; said mining claims confer all rights to locatable minerals to that party in accordance with the Mining Law and are not part of the estate owned by the United States, 30 U.S.C. §§26, 181, 611; that the United States currently holds the rights to reasonably regulate surface use of the Federal land for mining purposes under 36 C.F.R. 228 Subpart A, 16 U.S.C. § 551; or that the United States may not prohibit the use of the surface of NFS land for mining purposes, nor may it materially interfere with such uses. 30 U.S.C. § 612.

***Rationale for the Hypothetical Condition:*** The hypothetical condition is based upon direction and guidance from 36 CFR 254.9(b)(ii), FSH 5409.12_65.11(5) which was updated in 2021 to FSH 5409.12_45.1a, FSM 5454, and 16 U.S.C. §539p(c)(8). Federal land is generally not freely alienable, local government entities do not have the authority to zone land owned by the United States, and mining operations on National Forest System land are subject to federal laws and regulations applicable to the administration of the National Forest System and are often exempt from State and local laws. For the purposes of appraisal, the appraiser shall determine and support a conclusion of zoning based on similarly situated private property within the jurisdiction of the zoning authority. This hypothetical condition does not alter or affect the rights of Resolution Copper to the unpatented mining claims and locatable minerals on the Federal land pursuant to the United States Mining Law, or the estate to be appraised in consideration of the existence of the mining claims. The hypothetical condition shall be prominently reported on the transmittal letter, summary page, conclusion page, and certification.

**Jurisdictional Exception**
The appraisal has been prepared in conformance with UASFLA, which requires that the opinion of value not be linked to a specific exposure time as required by USPAP SR 1-2(c) & UASFLA 1.2.4 & 4.2.1.2.



Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1677 of 2158
Case 2:21-cv-00122-DWL    Document 87-11    Filed 07/14/25    Page 6 of 16

MCZ Parcel (Federal)                                                    Page 4 of 14
Pinal County, Arizona

**Legal Description**

        **Gila and Salt River Meridian, Arizona:**

                T. 1 S., R. 13 E., partly surveyed, Tracts 49 (864.79 ac)

                T. 2 S., R. 12 E., Tract 37 (385.9ac)

                T. 2 S., R. 13 E., partly surveyed Sec. 6 (404.84 ac)

                Total acreage: 1,655.53

The following maps are for illustration purposes:

### Topographic View of Subject MCZ Property



1:40,000

### Aerial View of Subject MCZ Property



**Property Description -** The Subject Property is 1,655.53 acres of vacant land east of Superior and just south of U.S. 60. It is adjacent to the Magna No. 9 headframe. Much of the property is within the site of the proposed Resolution Copper underground copper mine. The project is to include mining of portions of this property, referred to as the Mining Claim Zone.

> **Location:** The Subject Property is located about 1.5 miles east of the town of Superior and the northwest corner of the parent parcel adjoins Resolution patented lands at the Magma Mine No. 9 Shaft location. The property is bounded on the north by U.S. 60 and the Oak Flat Mineral Withdrawal Area at the northeast corner. The property adjoins additional Tonto National Forest lands to the south and southwest and Arizona State Trust land to the southeast. The subject neighborhood is the area in and adjacent to the Arizona Copper Triangle which extends from west of Superior to Globe/Miami, and southerly to Winkleman. The area is generally rural where mining and ranching occur. However, active mining, including processing and exploration operations, are common.

The following map illustrates the Arizona Copper Triangle:

**Subject MCZ located within Arizona Copper Triangle**



**Configuration:** The larger parcel is a single irregular parcel with a 40-acre private inholding that is owned by Resolution Copper at the west side of the tract just south of the patents around the #9 shaft.

**Size:** The Subject Property is 1,655.53 acres.

**Topography:** From U.S. 60 south to the south edge of Section 33, the terrain is gentle at around the 4,200-foot elevation. Terrain becomes increasingly rough and rocky moving westward. The eastern portion is generally dissected rolling hills with low to moderate sloping topography which becomes more irregular and steeper as you move west towards the Apache Leap escarpment.

**Soil Types:** The Phase 1 ESA reports that most of the soils on the subject are unmapped on the Web Soil Survey. The property previously mapped on the ALRIS General soil map with more than half showing as Mined Land and Rock Outcrop-Woodcutter complex, tuff. Significant areas were unmapped on the ALRIS map as well. The ESA, however, did not agree with this assessment and concluded that the soils were primarily rock outcrop with loamy and gravelly slope alluvium.

**Water :** Three surface water rights belonging to the Tonto National Forest are noted on the Subject Property. All are filled by unnamed washes. These are:

38-23975 Apache Leap Tank – Stock/Wildlife Tank - 0.26 - acre feet

38-65060 Oak Flat Tank – Stock/Wildlife Tank - 3.26-acre feet

33-77040 Rim Pond - Stock/Wildlife Tank – 0.77-acre feet

There is a total of 51 wells on the Subject Property. Many are co-located and for those wells there is a total of 151 registrations.

S 1 T.2S. R.12E. 1 well 2 registry numbers
S 6 T.2S R.13E. 18 wells 27 registry numbers
S 28, 29, 32, 33 T.1S. R.13E. 32 wells 52 registrations

Resolution Copper Mining LLC is the named owner of most of these wells with co-located owners including BHP Copper, Rio Tinto, the University of Arizona, and the Tonto National Forest. Nearly all the wells are of the type "Other" and are actually exploratory bore holes. A few are identified in ADWR records as Monitor wells. Reported depths range from around 150 feet to 7,977 feet. Many are cased with casing typically ranging from 5 to 10 inches in diameter. Where reported, water levels range widely from a couple hundred feet to over 4,600 feet. The wells were drilled from the early 1980s through early 2020.

**Flood Zone:** The Phase I Environmental Site Assessment (ESA) indicates there are no identified flood hazard areas on the Subject Property. The area has been mapped by the Federal Emergency Management Agency (FEMA) map panels showing that the entirety of the Property is designated as flood Zone D, which is the designation for areas where FEMA has not conducted a flood hazard analysis and the potential flood hazard has not been determined. There are no FEMA-designated floodplains identified within the Property and none were observed during previous site visits (WestLand 2004a, 2015).

**Utilities:** Electricity is served to the No. 9 Shaft site at the northwest corner of the Subject Property. In addition, Qwest/Century Link has a permit for a telephone line which shows up on the topo map running across the northwest corner of the subject. No water or sewer systems on or near the Subject Property .

**Access:** Access to the property is available from U.S. 60 which runs along the north boundary of the Subject parcel. The Subject parcel is about 60 miles east of Phoenix and about 5 miles east of Superior. Internal access is available from FR 469 which travels from U.S. 60, southerly to FR 2432 which goes to the south and then northwesterly to the No. 9 Shaft parcel. FR 315 (a 4WD road) connects to FR 2432 and travels to the south, leaving the subject near the southeast corner.

**Timber:**  N/A

**Minerals:**  The estate appraised is the fee simple interest, subject, in part, to 148 unpatented mining claims held by Resolution Copper. It is understood that a significant porphyry copper deposit exists beneath the Subject Property but the right to mine the deposit is not a property



right included with the Subject Property. An unpatented mining claim is a conditional, possessory, interest in real property ownership of a mineral estate in accordance with the Mining Law (30 U.S.C) and is subject to a discovery of a valuable mineral deposit within the bounds of the location, and completion of annual assessment work/filing, or payment of an annual maintenance fee, within the regulatory timeframe. Since the Subject Property is encumbered by mining claims held by a party other than the United States; said mining claims confer all rights to locatable minerals to that party in accordance with the Mining Law and are not part of the estate owned by the United States, 30 U.S.C. §§26, 181, 611.

**Environmental Hazards:** The Phase I ESA concluded that there are no Recognized Environmental Conditions (REC) on the Subject Property but noted that surface water quality in the Devils Canyon Watershed and the Queen Creek Watershed is in overall compliance with applicable surface water standards with the following exceptions: arsenic, copper, dissolved oxygen, E. coli bacteria, iron, lead, pH, and selenium (Resolution 2016). Water quality in regional groundwater basins meets EPA and State of Arizona overall drinking water standards, with a few exceptions. Several samples fell below the federal secondary standard for pH and slightly above the federal secondary standards for iron and manganese. In addition, several samples did not meet federal secondary standards for total dissolved solids and sulfate, and one sample also exceeded federal and state primary standards for nitrate (Resolution 2016). It is not known if these conditions are naturally occurring and/or the result of anthropogenic activity. Approximately six small spills of petroleum products (less than 100 gallons) have occurred at the drilling sites and immediately off-site between 2015 and 2020. Information provided from Resolution indicates that these spills were cleaned up and reported to the USFS pursuant to the requirements of the SPCC plan. WestLand did not observe any visible evidence of product spills on the Property. Due to the small quantity and number of spills, this is considered a de minimis condition. Known regional exceedances do not necessarily indicate contamination at the Property that would be considered environmental liabilities associated with the Property. Given the Highest and Best Use of the property is surface land use in support of a mining operation, it is unlikely that these environmental conditions would affect the overall value of the property.

**Improvements**
None

**Use, Rent and Sale History**
The subject is and has been the site of mineral exploration activity pursuant to the mining claims held by Resolution Copper. The property has never been sold or rented and is not currently listed for sale.

**Zoning and Land Use Restrictions**
The following is a requirement regarding disclosure and analysis of property zoning:

"Determine "consistent" zoning (and other land use restrictions) of Federal land by research and analysis, not by making an assumption. As instructed, the appraisal considered the hypothetical condition that the Federal land be appraised as though in private ownership and zoned consistent with other non-Federal lands. In determining consistent zoning for the Federal land, the appraisal should not consider entitlements such as master planning that are not in place as of the date of value."

The appraisal concluded that the Subject Property is zoned Pinal County GR – General Rural Zone. This is the predominant rural classification throughout the county and permitted uses include single family



dwellings, various agricultural uses and quasi-public uses such as parks and schools. The minimum lot size is 1.25 acres. This classification does not specifically allow or prohibit mining but according to the Arizona Revised Statutes:

11-812. Restriction on regulation; exceptions; aggregate mining regulation; definitions

A. Nothing contained in any ordinance authorized by this chapter shall:

2. Prevent, restrict or otherwise regulate the use or occupation of land or improvements for railroad, mining, metallurgical, grazing or general agricultural purposes, if the tract concerned is five or more contiguous commercial acres.  For the purposes of this paragraph:

(b) "Mining" has the same meaning prescribed in section 27-301…

10. "Mining" means those activities conducted to develop or extract materials from a mine including on-site transportation, concentrating, milling, leaching, smelting or other processing of ores or other materials. Mining includes mined land reclamation activities regulated pursuant to chapter 5 or 6 of this title.

Pinal County Code affirms the state statutes at 2.05-050 – Statutory Exemptions:
  As specified in A.R.S. title 11, Ch. 6 (A.R.S. § 11-801 et seq.), the provisions of this title shall not prevent, restrict, or otherwise regulate in any zoning district the use or occupation of land or improvements for railroad, mining, metallurgical, grazing or general agriculture purposes, as defined herein, provided the tract or premises so used is five or more contiguous commercial acres.

The county zoning map for the Ray Mine and surrounding area was also reviewed. All land in that area, including the mine, is zoned GR as well.

**Highest and Best Use**
It is reported that the uses that meet the tests of legally permissible, physically possible, and financially feasible resulting in the highest value is of surface land use in support of a mining operation.

**Larger Parcel Determination**
The report indicates the subject property is contiguous, in the same ownership, and has a single, unified highest and best use.  The appraisal report concludes that the subject parcel is considered the larger parcel.

**Selection of Approaches to Value**
The appraisal included a **sales comparison approach** using sales of similar properties which are competitive in the marketplace having the same or similar highest and best use as the Subject.

The **income capitalization approach** was used in the appraisal to fulfill the requirement of the legislation which requires the use of a detailed income capitalization approach analysis of the federal land.  It is noted in the appraisal that the Income Approach is not typically considered by buyers of mine support lands similar to the Subject Property but was included to comply with the legislation.

The **cost approach** is based upon the principal of substitution that a prudent buyer would not pay more for a property than the cost to acquire a similar site and construct improvements of a similar utility



without undue delay. The cost approach was not included in the appraisal and is not applicable as the property is vacant land.

**Sales Comparison Approach**
The appraisal considered 7 comparable sales for analysis. Of these 7 comparable sales, the appraiser selected 5 primary sales to compare to the subject. One of these sales was dismissed (See Conditions of Sale below) leaving 4 primary sales for direct comparison to the subject, presented in a narrative format, and included a summary adjustment grid listing the comparable sales and their comparison to the subject property. The sales bracket the subject property in a number of elements that include size, location, and zoning.

The **unit of comparison** selected for the analysis is price per acre. The market area and timeframe analyzed for the comparable sales was from September 2018 to March 2020 and all were within close proximity to the Subject Property.

The appraisal analysis continued with the analysis of the characteristics of each individual sale to the subject property in both narrative format and on the adjustment grid for each sale. Quantitative and/or qualitative adjustments were made for the various elements cited as affecting overall value.

**Property Rights**
The property rights for the comparable sales ranged from fee simple to split estate. The Subject Property was regarded as a split estate since the unpatented mining claims confer all rights to locatable minerals. The appraisal report indicated that buyers' motivation for land purchases were for the surface estate to support mining operations with mineral rights not considered important or necessary. Therefore, the total purchase price is allocated to the surface interest, with no adjustments applied.

**Financing Terms**
Financing terms for all the sales were reported as being cash or cash equivalent, with no adjustments required.

**Conditions of Sale**
The appraisal report indicated that buyer's motivation was a long-term use of the land to support a mine/processing operation with the seller motivated by the highest price offered for the land. Adjustments for conditions of sale usually reflect the motivations of the buyer and seller. Most mining operations require substantial land holdings for mine infrastructure, material/equipment storage, fluids management, office/dry room/warehouse buildings, processing facilities, ore/waste stockpiles, tailings management and storage, waste water ponds, equipment and supply storage, employee parking and other mine infrastructure requirements.

One of the five comparable sales mentioned above was not originally listed for sale and the owners were not motivated to sell (willing buyer, unwilling seller). The buyer needed a ROW across the private land, and after several failed negotiations to acquire the ROW, the buyer ultimately purchased the entire ranch including the deeded land, the Forest grazing allotment, the State grazing lease, as well as the ranch improvements which included the main house (approximately 1,400 SF), bunk house (approximately 530 SF with 154 SF porch), storage room/studio (approximately 840 sf), and barn/tack room/corral for an "exceptional price" that far exceeded market value for this type of property.

The appraisal notes that non-mineral surface land transactions supporting mine/processing operations



are specifically driven by the needs of the mining companies. The primary use of four of the five sales was for tailings management, treatment, and storage. The transaction for the ROW does not meet the market value standard since the sale price was unduly influenced by the seller and the buyer was leveraged into acquiring the entire ranch. The appraisal dismissed this comparable sale from further analysis since the transaction did not represent an arm's length transaction.

**Market Conditions**
The comparable sales dates ranged from September 2018 to March 2020. The appraisal took into consideration the effective date of value of April 12, 2022. The appraisal anecdotally states there is a linkage to commodity prices and a demand for mining related transactions. As commodity prices increased, there is a corresponding increase in mining related transactions. Although the appraisal states the recent uptick in copper mining is due to increased copper demand and price increases since mid-2020 and is a key market condition factor considered for adjustment, no adjustment was made to the comparable sales for market conditions.

<p align="center"><strong>Property Adjustments</strong></p>

**Location**
The location of suitable mine support properties for mining/mineral processing operations is of primary importance for mining operations. The Subject Property's surface lands overlie the unpatented mining claims held by Resolution Copper and are likely to directly support the mining operation. The appraisal evaluated five land sales purchased by Resolution Copper or their subsidiary along US Highway 60 corridor for their location influence on value. After discussion with respect to the sales comparability with respect to proximity to associated mining/mineral processing operations, access and environmental considerations, the appraisal concluded that no adjustment for location could be derived. No adjustments were applied.

**Physical Characteristics**
The Subject Property has gentle terrain along the east side and becomes increasingly rough and rocky moving westward. The eastern portion is generally dissected rolling hills with low to moderate sloping topography which becomes more irregular and steeper as you move west towards the Apache Leap escarpment. The comparable sales are typically high desert terrain with desert washes similar to the Subject, therefore the appraisal did not make an adjustment for physical characteristics.

**Size**
The Subject Property is 1,655.53 acres. The sales ranged in size from 400 acres to 7,391 acres. The sales were arrayed which indicated that the unit rates trended lower as the size increased. To illustrate this relationship and develop a basis for quantitative adjustments, a linear regression analysis was utilized. Results of the analysis indicated upward adjustments to Sales 1 and 3 which were larger than the subject, and downward adjustments for Sales 2 and 4 which were smaller than the subject.

**Zoning/Land Use**
The Subject Property and all of the comparable sales had the same General Rural/Vacant Ranch Land zoning. No adjustments were required as reflected on the grid.

The unadjusted and adjusted sale prices are reflected below.



MCZ Parcel (Federal)
Pinal County, Arizona

**Direct Sales Comparison Sales Summary**

| SALE | DATE | ACRES | UNADJUSTED $/AC | ADJUSTED $/AC |
|------|------|-------|-----------------|---------------|
| 1 | Feb-2019 | 2,191 | $994 | $1,036 |
| 2 | Mar-2020 | 1,299 | $1,106 | $1,078 |
| 3 | Sep-2018 | 7,391 | $789 | $1,242 |
| 4 | Jan-2019 | 400 | $1,498 | $1,399 |
| | | | | |
| Low | 2018 | 400 | $789 | $1,036 |
| High | 2020 | 7,391 | $1,498 | $1,399 |

**Reconciliation**

The appraisal report addresses the overall comparability of the sales as required by UASFLA. The appraisal stated that the land sales, before adjustments, show a range of indicated values from a low of $789 per acre to a high of $1,498 per acre with the mid-range at $1,100 per acre. The comparable sales after adjustments ranged from $1,036 per acre to $1,399 per acre with a mid-range at $1,200 per acre. Based on the limited quantity of comparable sales similar to the subject, Seller motivation, and the size difference between the subject and comparable sales, the appraisal concluded at $1,200 per acre.

The opinion of value conclusion is $1,200 per acre for the subject's 1,655.53 acres, equivalent to $1,990,000 rounded.

1,655.53 acres x $1,200 per acre = $1,990,000 ROUNDED

MCZ Parcel (Federal)                                                                                    Page 13 of 14
Pinal County, Arizona

**Income Capitalization Approach**

This approach was presented in the appraisal because the Southeast Arizona Land Exchange and
Conservation Act – 303, Sec. 4(C) required the use of a detailed Income Capitalization Approach of the
federal land.

The appraisal states the Income Approach is not typically considered by buyers of mine support lands
that are similar to the Subject Property. It is uncommon for mining companies to lease surface mine
support land from property owners due to the high risk of potential environment issues, costly cleanup,
and liabilities associated with mining. Market dynamics for these types of properties demonstrates that
mining companies prefer to purchase rather than lease surface mine support lands.

Although private land leases for mine support land were not available in the market, the appraisal
presented land lease transactions between mining companies and the Arizona State Lands Department
(ASLD). These leases are negotiated in an open auction setting which are advertised and exposed to the
market.  Mineral royalties paid by the mining company are excluded from the land use rental payment.
The basis for the land use rental fees are land values for **non-mining purposes** which is a different
highest and best use of the Subject Property.

The appraisal presented the following leases for analysis:

| ASLD Lease | County | Acres | Market Value | Rent $/year | Rent $/AC/Year | Effective Date | Cap Rate (Ro) |
|---|---|---|---|---|---|---|---|
| 11-98925 | Pima (Cu) | 574.79 | $1,380,000 | $47,644 | $ 83 | Dec 2010 | 3.5% |
| 11-26500 | Pinal (Cu) | 160.00 | $1,760,000 | $60,500 | $378 | Jul 2014 | 3.4% |
| 11-118141 | Yavapai (Au) | 120.00 | $  228,000 | $10,640 | $ 89 | Sep 2015 | 4.7% |

Based on this information and recognition of location, highest and best use and property size
differentials, the appraisal estimated the rent for the Subject Property at $78/acre to derive the annual
income:

$$1,655.53 \text{ acres} \times \$78/\text{acre} = \$129,131 \text{ annual income.}$$

The appraisal estimated the Subject Ro from the above rental data and determined that a mid-range of
4.0% would be applied to the subject:

$$\$129,131 \div 4.0\% = \textbf{\$3,230,000 ROUNDED}$$



MCZ Parcel (Federal)
Pinal County, Arizona

**Reconciliation and Final Value Opinion**
The Sales Comparison Approach provides an opinion of value of $1,990,000. The Income Approach provides an opinion of value of $3,230,000. The appraisal placed equal weight on both opinions of value and concluded an opinion of value at the mid-range of $2,610,000.

The opinion of value conclusion is $2,610,000 for the subject's 1,655.53 acres, equivalent to $1,577 per acre (Rounded).

### Value Indications

| | |
|---|---|
| Cost Approach | $0 |
| Sale Comparison Approach | $1,990,000 |
| Income Capitalization Approach | $3,230,000 |
| **Conclusion** | **$2,610,000** |

**Transaction Scale Analysis**
As a final step in the valuation of each larger parcel, in accordance with the SOW requirement, the appraisal analyzed the parcels comprising each side of the exchange as a whole in the context of the market and report if there is an additional increment of value or discount attributable to portfolio enhancement or the bulk nature of the transaction. Any value enhancement or diminution under this provision shall be recognized in the concluded values for each of the larger parcels as noted in the SOW.

As stated in the report, the Subject MCZ parcel is one of two federal parcels included in the Southeast Arizona Land Exchange and Conservation Act. Although they are contiguous parcels, they are two different properties with different highest and best uses subject to two separate and distinct market forces and dynamics. The appraisal concluded that the properties would not compete against each other due to the different highest and best uses, and there would be no enhancement or diminution of value to either parcel. Further, the appraisal concluded there is no market data that would suggest an increment in value, or a discount attributable to the bulk nature of the legislated transaction.

| **Forest** | **Washington** | **1400 Independence Avenue, SW** |
|---|---|---|
| **Service** | **Office** | **Washington, DC 20250** |

# Appraisal Report Summary

### Mineral Withdrawal Area MWA (Federal)
### Pinal County, Arizona

### Resolution Copper Legislated Land Exchange
### (Southeast Arizona Land Exchange and Conservation Act, 16 U.S.C. §539p)



### Date of Appraisal Report
January 20, 2023
(Provided to US Forest Service on January 22, 2023)

### Date of Appraisal Review
January 25, 2023

### Appraisers
Marc P. Springer, SFMC Mining Geologist/Mineral Appraiser
Spanish Flat Mining Company (sub-contractor to Weissenborn Appraisal, LLC)
7024 Snapdragon Drive
Carlsbad, CA 92011

Evan Mudd, PE, CG, MBA, PMP, QP, CMA
Mining Engineer, Mineral Appraiser
Arizona Certified General Real Estate Appraiser #1037748 (Expires
03/31/2024) Rock Associates, Ltd
Overland Park, KS 66214



**America's Working Forests – Caring Every Day in Every Way**    Printed on Recycled Paper



Case 2:21-cv-00122-DWL    Document 87-12    Filed 07/14/25    Page 3 of 29

# Appraisal Summary

## Appraisal Report under Review
**Appraisers**
Marc P. Springer, SFMC Mining Geologist/Mineral Appraiser
Arizona Certified General Real Estate Appraiser #1036208 (Expires 02/29/2024)
California Certified General Real Estate Appraiser # AG044432 (Expires 09/20/2023)
International Institute of Mineral Appraisers, 2006-4
CA State Registered Professional Geologist PG# 7831
BLM Certified Mineral Examiner CME #0139
Spanish Flat Mining Company (sub-contractor to Weissenborn Appraisal, LLC)
7024 Snapdragon Drive
Carlsbad, CA 92011

Evan Mudd, PE, CG, MBA, PMP, QP, CMA
Mining Engineer, Mineral Appraiser
Arizona Certified General Real Estate Appraiser #1037748 (Expires 03/31/2024)
Rock Associates, Ltd
Overland Park, KS 66214

*(Note: Per USDA Forest Service Contract No. 12837120C0041, Weissenborn Appraisal LLC commissioned Spanish Flat Mining Company who has extensive experience, professional knowledge, and expertise in the valuation of mineralized and mine-related properties).*

**Date of Inspection**
The Subject Property was inspected on April 12, 2022 which is the effective date of the appraisal. Prior to this inspection, the mineral appraiser, Mr. Halmbacher (deceased) inspected the property on May 08, 2019. Between these dates, the Telegraph Fire started on June 4, 2021 and burned portions of the Subject. The appraisal notes burned areas were still apparent during the property inspection. The property owner(s) were provided the opportunity to accompany the appraiser on the property inspection.

**Date of Report**
January 20, 2023

**Owner**
The United States of America

**Client**
As part of USDA Forest Service Contract No. 12837120C0041, Weissenborn Appraisal LLC commissioned Spanish Flat Mining Company who has extensive experience, professional knowledge, and expertise in the valuation of mineralized and mine-related properties. Weissenborn Appraisal, LLC is the primary appraisal contractor for the USFS, relative to the Federal and non-Federal parcels of the Southeast Arizona Land Exchange and Conservation Act. Weissenborn Appraisal LLC commissioned Spanish Flat Mining Company to complete appraisals on the Federal real property (selected lands) portion of the land exchange; the appraisal will be used by the USFS to facilitate the land exchange.



Case: 25-5185, 08/16/2025, DktEntry: 12-1, Page 1690 of 2158

MWA Parcel (Federal)                                    Case 2:21-cv-00122-DWL    Document 87-12    Filed 07/14/25    Page 4 of 29
                                                                                                                Page 2 of 28
Pinal County, Arizona

Although the appraisal completed for Weissenborn Appraisal LLC by Spanish Flat Mining Company as a sub-contractor states the Client is Weissenborn Appraisal LLC, the letter of transmittal from Weissenborn Appraisal LLC to the USDA Forest Service states that the Client in the assignment is the USDA Forest Service specifically the USDA Forest Service, Director of Lands and Minerals, Southwestern Region.

**Intended Use**

To provide a basis of value for the legislated land exchange between the United States of America and Resolution Copper Mining, LLC pursuant to 16 U.S.C. §539p.

**Intended User(s)**

In the original appraisal contract, the intended users were broadly defined. It shall be noted that the intended users of the appraisal report are specifically identified as the USDA Forest Service, Director of Lands and Minerals, Southwestern Region, USDA Office of General Counsel, and Resolution Copper Mining, LLC.

**Professional Standards**

The appraisal standards required for this assignment were the *Uniform Appraisal Standards for Federal Land Acquisitions* and *Uniform Standards of Professional Appraisal Practice*.

**Estate Appraised**

The property rights reported and appraised includes the fee simple interest subject to valid and existing rights encompassing 766.58 acres.

> **Outstanding Rights**
>
> The appraisal adequately considered the following outstanding rights and reservations on the Subject Property: <u>Existing Easements</u>: United States Department of Interior Easement for Right-of-Way for Electric Transmission Line granted to Arizona Public Service Company, dated 12/22/75. Federal parcel will be conveyed subject to easement GLO401905 APS 500KV POWERLINE.
>
> <u>Permits and Temporary Easements to convert to Easements in perpetuity:</u> Permit to Salt River Project Agricultural Improvement and Power District for an overhead transmission line Amendment dated 5/21/74. At closing, Resolution Copper Mining shall grant a replacement authorization to Salt River Project Agricultural Improvement and Power District for those sections involved in the conveyance. It shall contain terms at least equivalent to those in permit GLO4011143 SRP PERMIT.
>
> In the context and scope of the appraisal, GLO401905 APS 500KV POWERLINE and GLO4011143 SRP PERMIT have no effect on the value of the subject MWA parcel.

**Definition of Value**

Market Value means the most probable price in cash, or terms equivalent to cash, which lands or interest in lands should bring in a competitive and open market under all conditions requisite to a fair sale, where the buyer and seller each acts prudently and knowledgeable, and the price is not affected by undue influence (36 CFR 254.2).



**Extraordinary Assumptions**
The appraisal is not based upon any Extraordinary Assumptions.

**Hypothetical Conditions**
The appraisal was prepared subject to the following FS instructed Hypothetical Condition: The Federal Property shall be appraised as though it is in private ownership, is freely alienable, and zoned consistently with other similarly situated non-Federal properties within the jurisdiction of the zoning authority. Federal law provides that, upon conveyance, "[t]he Federal Property shall be available to Resolution Copper for mining and related activities subject to and in accordance with applicable Federal, State, and local laws pertaining to mining and related activities on land in private ownership." 16 U.S.C. §539p(c)(8). This hypothetical condition does not alter the facts that: the Federal Property is encumbered by mining claims held by a party other than the United States; said mining claims confer all rights to locatable minerals to that party in accordance with the Mining Law and are not part of the estate owned by the United States, 30 U.S.C. §§26, 181, 611; that the United States currently holds the rights to reasonably regulate surface use of the Federal land for mining purposes under 36 C.F.R. 228 Subpart A, 16 U.S.C. § 551; or that the United States may not prohibit the use of the surface of NFS land for mining purposes, nor may it materially interfere with such uses. 30 U.S.C. § 612.

***Rationale for the Hypothetical Condition:*** The hypothetical condition is based upon direction and guidance from 36 CFR 254.9(b)(ii), FSH 5409.12_65.11(5) which was updated in 2021 to FSH 5409.12_45.1a, FSM 5454, and 16 U.S.C. §539p(c)(8). Federal land is generally not freely alienable, local government entities do not have the authority to zone land owned by the United States, and mining operations on National Forest System land are subject to federal laws and regulations applicable to the administration of the National Forest System and are often exempt from State and local laws. For the purposes of appraisal, the appraiser shall determine and support a conclusion of zoning based on similarly situated private property within the jurisdiction of the zoning authority. This hypothetical condition does not alter or affect the rights of Resolution Copper to the unpatented mining claims and locatable minerals on the Federal land pursuant to the United States Mining Law, or the estate to be appraised in consideration of the existence of the mining claims. The hypothetical condition shall be prominently reported on the transmittal letter, summary page, conclusion page, and certification.

**Jurisdictional Exception**
The appraisal has been prepared in conformance with UASFLA, which requires that the opinion of value not be linked to a specific exposure time as required by USPAP SR 1-2(c) & UASFLA 1.2.4 & 4.2.1.2.

**Legal Description**
Lands comprising the Oak Flat Withdrawal Area; Tract 50; partially surveyed, T.1S., R.13E., for 766.58 acres.

The following maps are for illustration purposes:

MWA Parcel (Federal)
Pinal County, Arizona

## Topographic View of Subject MWA Property



1:40,000

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1693 of 2158
Case 2:21-cv-00122-DWL   Document 87-12   Filed 07/14/25   Page 7 of 29

MWA Parcel (Federal)                                                    Page 5 of 28
Pinal County, Arizona

### Aerial View of Subject MWA Property



1:40,000

**Property Description -** The Subject Property is 766.58 acres located east of Superior and just south of U.S. 60.

> **Location:** The Subject Property is located about two miles east-northeast of the town of Superior at the Oak Flat Campground on the Tonto National Forest. The subject neighborhood is the area in and adjacent to the Arizona Copper Triangle which extends from west of Superior to Globe/Miami, and southerly to Winkleman. The area is generally rural where mining and ranching occur. However, active mining, including processing and exploration operations, are common.

The following map illustrates the Arizona Copper Triangle:

**Subject MCZ located within Arizona Copper Triangle**



**Configuration:** The Subject MWA Property is generally equidimensional, contiguous with, and bounded on three sides by the Mining Claim Zone (MCZ) federal property.

**Size:** The Subject Property is 766.58 acres.

**Topography:** The landscape is southcentral Arizona high desert terrain with elevations around 4,200 feet. The land is generally flat with moderate vegetation in the northern portion with moderately rolling hill, sparser vegetation and prominent volcanic rock outcrop in the southern portion. The Subject is in the Lower Mogollon Transition Zone Ecoregion.

**Soil Types:** The Phase 1 ESA reports that most of the soils on the subject are unmapped on the Web Soil Survey. The property previously mapped on the ALRIS General soil map with more than half showing as Mined Land and Rock Outcrop-Woodcutter complex, tuff. Significant areas were unmapped on the ALRIS map as well. The ESA, however, did not agree with this assessment and concluded that the soils were primarily rock outcrop with loamy and gravelly slope alluvium.

**Water :** There are two surface water rights belonging to the Tonto National Forest on or adjacent to the Subject Property.  The water sources are filled by unnamed washes. These are:

- 38-65060 Oak Flat Tank – Stock/Wildlife Tank - 3.26-acre feet

- 33-77040 Rim Pond - Stock/Wildlife Tank – 0.77-acre feet

**Flood Zone:** The Phase I Environmental Site Assessment (ESA) indicates there are no identified flood hazard areas on the Subject Property. The area has been mapped by the Federal Emergency Management Agency (FEMA) map panels showing that the entirety of the Property is designated as flood Zone D, which is the designation for areas where FEMA has not conducted a flood hazard analysis and the potential flood hazard has not been determined. There are no FEMA-designated floodplains identified within the Property and none were observed during previous site visits (WestLand 2004a, 2015).

**Utilities:** There are no electrical, telephone, natural gas, water or sewer systems apparent on the Subject Property.

**Access:** Access to the property is available from U.S. 60. The Subject Property is about 60 miles east of Phoenix and about 2 miles east of Superior. Internal access is available from FR 469 which travels from U.S. 60, southerly to FR 2432 (Magma Mine Road) which goes to the south and then northwesterly towards the No. 9 Shaft parcel. A portion of the northwest corner of the Subject Property can be accessed by heading west on FR 2432. The northeast corner is traversed by E Oak Flat Road and FR 2438 which runs easterly from FR 469 through the Oak Flat area. E Oak Flat Road turns north and return to U.S. 60.

**Timber:**  N/A

**Minerals:**  The mineral rights have been withdrawn from mineral entry since September 27, 1955 and are owned by the United States.

**Environmental Hazards:** The Phase I ESA concluded that there are no Recognized Environmental Conditions (REC) on the Subject Property but noted that surface water quality in the Devils Canyon Watershed and the Queen Creek Watershed is in overall compliance with applicable surface water standards with the following exceptions: arsenic, copper, dissolved oxygen, E. coli bacteria, iron, lead, pH, and selenium (Resolution 2016).  Water quality in regional groundwater basins meets EPA and State of Arizona overall drinking water standards, with a few exceptions. Several samples fell below the federal secondary standard for pH and slightly above the federal secondary standards for iron and manganese. In addition, several samples did not meet federal secondary standards for total dissolved solids and sulfate, and one sample also exceeded federal and state primary standards for nitrate (Resolution 2016). It is not known if these conditions are naturally occurring and/or the result of anthropogenic activity. Approximately six small spills of petroleum products (less than 100 gallons) have occurred at the drilling sites and immediately off-site between 2015 and 2020. Information provided from Resolution indicates that these spills were cleaned up and reported to the USFS pursuant to the requirements of the SPCC plan. WestLand did not observe any visible evidence of product spills on the Property. Due to the small quantity and number of spills, this is considered a de minimis condition. Known regional exceedances do not necessarily indicate contamination at the Property



that would be considered environmental liabilities associated with the Property. Given the Highest and Best Use of the property, it is unlikely that these environmental conditions would affect the overall value of the property.

**Improvements**
USA-owned improvements located on the Subject Property are limited to two (2) vault toilets within the Oak Flat Campground. The appraisal states that since the highest and best use of the subject is exploration and development of the Subject MWA mineral resource as a portion of the Resolution Copper Deposit and the focus of the valuation is on the subsurface interest, surface improvements do not contribute value to the subsurface interest and suggests the UASFLA unit rule precludes adding the value of various interests, different physical elements, or components of a tract of land are not to be separately valued and added together.

Since the appraisal did not provide information on the vault toilets, the following discussion is provided for information purposes. The vault toilets were installed in 1994 (28 years ago) and have a 30-year economic life. The replacement costs range from $60,000 to $90,000. Applying a 93% depreciation rate (28/30), provides a range of $4,200 - $6,300 which suggests a nominal stand-alone value as they are almost fully depreciated and likely eligible for replacement if the exchange did not occur.

**Use, Rent and Sale History**
The primary use for the Subject Property is public recreation and has never been sold or rented.

**Zoning and Land Use Restrictions**
The following is a requirement regarding disclosure and analysis of property zoning:

"Determine "consistent" zoning (and other land use restrictions) of Federal land by research and analysis, not by making an assumption. As instructed, the appraisal considered the hypothetical condition that the Federal land be appraised as though in private ownership and zoned consistent with other non-Federal lands. In determining consistent zoning for the Federal land, the appraisal should not consider entitlements such as master planning that are not in place as of the date of value."

The appraisal concluded that the Subject Property is zoned Pinal County GR – General Rural Zone. This is the predominant rural classification throughout the county and permitted uses include single family dwellings, various agricultural uses and quasi-public uses such as parks and schools. The minimum lot size is 1.25 acres. This classification does not specifically allow or prohibit mining but according to the Arizona Revised Statutes:

11-812. Restriction on regulation; exceptions; aggregate mining regulation; definitions

A. Nothing contained in any ordinance authorized by this chapter shall:

2. Prevent, restrict or otherwise regulate the use or occupation of land or improvements for railroad, mining, metallurgical, grazing or general agricultural purposes, if the tract concerned is five or more contiguous commercial acres. For the purposes of this paragraph:

(b) "Mining" has the same meaning prescribed in section 27-301…

10. "Mining" means those activities conducted to develop or extract materials from a mine including



Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1697 of 2158
Case 2:21-cv-00122-DWL   Document 87-12   Filed 07/14/25   Page 11 of 29

MWA Parcel (Federal)
Pinal County, Arizona

Page 9 of 28

on-site transportation, concentrating, milling, leaching, smelting or other processing of ores or other materials. Mining includes mined land reclamation activities regulated pursuant to chapter 5 or 6 of this title.

Pinal County Code affirms the state statutes at 2.05-050 – Statutory Exemptions:
  As specified in A.R.S. title 11, Ch. 6 (A.R.S. § 11-801 et seq.), the provisions of this title shall not prevent, restrict, or otherwise regulate in any zoning district the use or occupation of land or improvements for railroad, mining, metallurgical, grazing or general agriculture purposes, as defined herein, provided the tract or premises so used is five or more contiguous commercial acres.

The county zoning map for the Ray Mine and surrounding area was also reviewed. All land in that area, including the mine, is zoned GR as well.

## Highest and Best Use
The Highest and Best use was determined to be exploration and development of a mineral resource as a portion of the Resolution Copper deposit.

## Larger Parcel Determination
The report indicates the subject property is contiguous, in the same ownership, and has a single, unified highest and best use. The appraisal report concludes that the subject parcel is considered the larger parcel.

## Selection of Approaches to Value
The appraisal included a **sales comparison approach** using sales of similar properties which are competitive in the marketplace having the same or similar highest and best use as the Subject.

The **income capitalization approach** was used in the appraisal to fulfill the requirement of the legislation which requires the use of a detailed income capitalization approach analysis of the federal land. It is noted in the appraisal that the Income Approach is not typically considered by buyers of mine support lands similar to the Subject Property but was included to comply with the legislation.

The **cost approach** is based upon the principal of substitution that a prudent buyer would not pay more for a property than the cost to acquire a similar site and construct improvements of a similar utility without undue delay. The cost approach was not included in the appraisal.

## Sales Comparison Approach
The appraisal gathered and analyzed 68 international copper projects from the USA, Pakistan, Peru, Ecuador, Chile, Indonesia, Philippines, Argentina, Mexico, Fiji, Democratic Republic of the Congo, Canada, Papua New Guinea, Mongolia, Kazakhstan, Nambia, Sweden, and Colombia. The copper projects were examined using the following criteria; **deposit setting**, **transaction date**, **transaction framework, deposit type** and **metal content**. The first set of criteria regarded deposit setting and mining methods. The Subject is proposed as an underground block-cave mine at a depth of 7,000 feet. The infrastructure required to support an underground mine is more extensive than surface mine requirements. As such, projects that utilized surface mining methods were removed from the data set. The remaining 13 comparable sales that had a combination of surface and underground mining were retained for further analysis. The next set of criteria regarded the transaction date. Those comparable sales older than five years were removed from the list. This narrowed the list to four comparable sales. The criteria for deposit type and metal content was examined on the remaining four comparable sales.



Since the MWA copper deposit consists of approximately 94% copper, comparable sales with similar metal content were selected. One of the sales (Cascabel Project in Ecuador) had significant gold and silver content and was excluded from the list. The remaining three sales were used for direct comparison to the Subject Property. Two of these sales were from the USA, and one was from Peru. They occurred from 2017-2022 and had a metal content ranging from 86%-100% copper.

The **unit of comparison** used within the appraisal report is US price per pound ($/lb). This unit of comparison is also reflected in the comparable sales and provides for an analysis that is consistent with industry standards.

The appraisal analysis continued with the analysis of the characteristics of each individual sale to the subject property in both narrative format and on the adjustment grid for each sale. Quantitative and/or qualitative adjustments were made for the various elements cited as affecting overall value.

**Property Rights**
The property rights for the subject includes the surface and sub-surface mineral interests. It does not include any business, marketing, or other values associated with mineral exploration. Sale 1 included both an operation firm and the mineral deposit and was considered superior to the subject due to these additional components of value and a downward adjustment was applied to the sale. Sale 2 included an interest holding real estate interests in the project and also actively participating in development which was regarded as superior to the subject and was adjusted downward. Sale 3 was a private equity placement that procured three stakes in the transaction. This form of ownership includes company attributes in addition to the mineral deposit, which is considered a superior form of ownership. However the sale include the acquisition of a partial interest, which is less than the fee simple estate as compared to the subject. The appraisal concluded the form of ownership, and the partial interest were offset, with no adjustment applied.

**Financing Terms**
Financing terms that involve non-market terms require adjustments for cash equivalency. Sale 1 was an all-stock transaction where stockholders of the acquired company were compensated with 0.929 shares of stock for each share in the previously held company. This is considered to be slightly inferior to a cash payment since stock equity has a degree of market risk, thus an upward adjustment was applied to Sale 1. Sales 2 and 3 were cash transactions with no adjustment applied.

**Conditions of Sale**
The appraisal report indicated that Sales 1 and 3 reflected typical sale conditions, no adjustment applied. Sale 2 involved a sale to a related firm that had controlling interest in the property. During the exploration state, an Australian firm owned 100% of the property. The initial exploration reported a reserve that was downgraded as a result of additional exploration. The company sold 51% ownership in 2016 which required the buyer to carry all project costs leading to a completed feasibility study. In 2017 the buyer purchased the remaining 49% interest for what was considered a significant discount from the previous sale. Company news releases at the time of sale indicated the seller desired to exit the project for strategic reasons and re-deploy capital on an alternate project. The conditions of this sale are inferior to the subject and an upward adjustment was made to this sale.

**Market Conditions**
The comparable sales dates ranged from June 2017 to April 2022. The appraisal anecdotally states there is a linkage to commodity prices and a demand for mining related transactions. The appraisal further states that market elements such as inflation, deflation, competitive landscape changes, commodity price

fluctuations, and other factors may influence the sale price. The appraisal maintains that since the comparable sales include exploration and development projects, they are influenced by the commodity price. Therefore 2 of the 3 comparable sales were adjusted upward for metal pricing based on commodity prices at the time of sale as compared to commodity prices as of the effective date of value.

<center><strong>Property and Physical Adjustments</strong></center>

**Geographic Location**
Sales 1 and 3 are in the Copper Triangle Region of Arizona which is similar to the subject. No adjustment applied to these sales. Sale 2 is located in a high-altitude mountainous region of Peru that has a complexity of political, social, labor, infrastructure, and jurisdictional risk challenges and is considered inferior to the subject with an upward adjustment applied.

**Mining Method**
Two of the three sales had a combination surface/underground mining operation, and one sale is a block cave mining operation. The appraisal states that surface mining operations are generally less costly to operate on a per-ton basis than underground operations. Surface mining generally uses large excavating/hauling equipment with lower unit cost methods. The surface mines are able to mine lower grade ore since they are well suited for low to moderate grade porphyry copper deposits and able to afford moderate dilution. Deep sulfide mineralization like the Subject is generally mined by underground methods. Underground mining requires costly development of an underground infrastructure capable of operating within the constraints of an underground environment. They are also subject to a variety of infrastructure requirements such as hoisting, pumping, and ventilation. Since Sales 1 and 3 were a combination open pit/underground mine, a downward adjustment was applied.

**Project Stage**
The Subject Property is considered to be in the Prefeasibility/Feasibility stage. It has not been explored, but all metal grade and rock mechanics data are inferred from exploration on adjacent properties. As noted in the appraisal, the Subject is in an advanced Exploration/Prefeasibility Stage with a conceptual mine plan and project economics being studied. Sale 1 is in the Exploration Stage and has established mineral resources with infill drilling planned but a mine plan or prefeasibility/feasibility economics has not been established and considered inferior to the subject with an upward adjustment applied. Sale 2 is in the Exploration/Prefeasibility Stage, it has an established mineral resource that had a feasibility study in process at the time of sale. Since this is similar to the Subject, no adjustment was made. Sale 3 had an established mineral resource and at the time of sale updated the mineral resource estimate and was updating the Preliminary Economic Assessment (PEA). Since the mineral resource estimate was completed and is in the Prefeasibility Stage it was considered superior to the Subject with a downward adjustment applied.

**Resource Classification**
The Subject is considered an Inferred Resource since it has not been explored and the quantity, grade, and quality of the deposit is based on limited geological evidence and sampling. An Inferred Resource has the lowest level of confidence of all resource classes. Indicated and Measured Resource classes have higher levels of confidence and are generally reported separately and in a combination which provides a benchmark to gauge the quantity of resources that fall within the higher confidence classes. The appraisal compared the combinations of Indicated and Measured resource classes to the Subject. All three sales had a combination of Indicated and Measured classes and were considered superior to the Subject with downward adjustments applied to all three sales.



<center>4-ER-579</center>

MWA Parcel (Federal)                                                                      Page 12 of 28
Pinal County, Arizona

**Deposit Size**
The deposit size is directly related to mine capital and operating costs. Larger operations are typically able to extract and process material at a lower unit cost ($/ton) relative to small operations. In general, deposits operating at a larger scale can extract and process generally lower grades with better economies of scale than smaller scale deposits. The appraisal states the Subject deposit is estimated at approximately 5.33 billion lbs., plus other base metals Cu equivalent of 0.28 billion lbs., plus precious metal Cu equivalent of 0.07 billion lbs., for an estimated total Cu and equivalent deposit of 5.68 billion lbs.  Sale 1 was similar in size, so no adjustment was made. Sales 2 and 3 were smaller in size and considered inferior to the Subject with an upward adjustment applied to both sales.

**Zoning/Land Use**
Although the appraisal did not include Zoning/Land Use in the sales comparison grid, it did discuss Zoning and Land Use throughout the report. Sale 1 and Sale 3 had the same General Rural/Vacant Ranch Land zoning that allowed mining and Sale 2 is located in a mining district. No adjustment applied.

The unadjusted and adjusted sale prices are reflected below.

### Direct Sales Comparison Sales Summary

| Sale | Date | Billion lbs. | Unadjusted $/lb | Adjusted $/lb |
|------|------|------|------|------|
| 1 | June-2018 | 4.65 | $0.0022 | $0.0026 |
| 2 | June-2017 | 3.29 | $0.0015 | $0.0034 |
| 3 | April-2022 | 3.59 | $0.0077 | $0.0045 |
| | | | | |
| Low | 2017 | 3.29 | $0.0015 | $0.0026 |
| High | 2022 | 4.65 | $0.0077 | $0.0045 |

**Reconciliation**
The appraisal report addressed the overall comparability of the sales as required by UASFLA. The appraisal stated that the comparable sales, after adjustments, shows a range of indicated values from a low of $0.0026 per pound to a high of $0.0045 per pound. The appraisal placed equal weight on all the comparable sales and concluded an opinion of value of $0.0037 per pound.

The opinion of value conclusion is $0.0037 per pound.

5.68 Billion lbs. X $0.0037 per pound = $21,000,000 (ROUNDED)



**Income Capitalization Approach**

In developing an opinion of value using the income approach for a mineral property, it is generally recognized that the most appropriate method of capitalization is yield capitalization most notably the discounted cash flow (DCF) analysis (UASFLA). The income that is evaluated is the royalty income as opposed to the income or profit generated by the business of mining and selling the mineral. The income approach utilized to value mineral properties is commonly referred to as the royalty income approach by the Uniform Appraisal Standards for Federal Land Acquisitions (UASFLA). The royalty income paid to the landowner over the life of the mine is capitalized to a net present value (NPV) using a discounted cash flow (DCF) analysis. The DCF analysis can be highly complex as a detailed mining plan for the property is often required.

Besides the mining plan, essential components include:

- the royalty rate,
- the unit sale price of the mineral to which the royalty rate is applied,
- the projected annual amount of mineral production,
- projected number of years of production,
- bonus payments prior to production,
- the year production will begin,
- transportation and smelter/refinery costs,
- metal recovery rates,
- NPV discount rate

**MWA Mineral Resources**

For purposes of this appraisal, independent studies were completed by Dassault Systemes, an international mine modeling firm often utilized by mining companies worldwide who seek solutions to mine productivity, and Dr. David Wahl, Jr., PHD, Consulting Geologist. The results of these confidential and proprietary studies were used in the MWA appraisal. Dassault Systemes is home to world-renowned and award-winning mining solutions utilized by industry thought leaders who are pushing the boundaries of what's possible in mining, through the GEOVIA brand. The largest global supplier of mining software, GEOVIA delivers comprehensive solutions in all major mining centers in more than 130 countries at over 4,000 sites. Although these are confidential and proprietary reports, the Review Appraiser had controlled access to these reports during the course of the review. In May of 2019 the caving specialists of Dassault Systemes, owners of PCBC (Personal Computer Block Caving) Software and PCBC's Footprint Finder Application, were requested by the Forest Service to complete an evaluation of the annual mine production of the MWA block cave deposit. PCBC software is considered the standard software package for block cave mines across the globe and is used virtually by every mining company involved in block caving to improve profits through better mine plans, schedules and production management. The focus of the study was to independently determine the schedules with annual tons and grade, inside and outside of the MWA. Orebody specific parameters provided by Resolution Copper that included geologic and geotechnical data gathered from 15 years of exploratory drilling and subsequent analysis, testing, modeling and third-party validation were benchmarked against similar block cave operations worldwide. Ore body parameters for cave design and scheduling specific to the deposit included; density of caved material, drawpoint spacing and design, drawcone diameter, caveability and hydraulic radius, geotechnical domains and fines assumptions, inter-panel pillars, mixing and slicefile parameters, recompaction rule and panel sequencing, stress, and undercutting orientation.



Dassault utilized their proprietary software to independently develop a mine plan for the subject MWA property and Dr. Wahl, PHD independently evaluated the Dassault results and produced a consulting report that analyzed generalized geological mining scenarios, net smelter returns and discounted cash flow rates. The input variables of Dr Wahl's report were independently reviewed by a Forest Service Certified Mineral Examiner/Geologist and concluded the information presented in the report was supported with market/consensus/benchmarking data.

The results from the independent studies of the MWA deposit and Dassault Mine Plan are as follows:
- Block cave underground mine design with 10-year pre-production construction timeframe
- Mine life of 31 years
- Mining activities reach 2,175 feet below sea level (Approximately 6,400 feet below surface)
- 141,874,468 tons of inferred mineral resource grading 1.88% copper
- 5.33 billion pounds of copper within MWA minable ore
- 90% recovery of copper from ore body
- Maximum production of approximately 58,000 tons/day (reached in year 11)
- Overall metal content is 94% copper and 6% molybdenum and silver equivalents
- Molybdenum and silver production to occur concurrently with copper production
- In-place molybdenum resources at 81.23 million pounds
- In-place silver resources at 17.98 million ounces

**Net Smelter Return (NSR)**
The royalty rate for the subject MWA property was determined using the Net Smelter Return (NSR) rate. The Net Smelter Return (NSR) is what a landowner is paid after the metals have been smelted and refined at a toll-based treatment facility. There are fees for these processes that take into account metal recovery and small metal deductions as part of the toll smelting/refining agreement. Once the ore is extracted, it is converted into a concentrated form that is shipped to a smelting facility. The cost to transport concentrates to the toll-based treatment facility and the metal treatment charged are deducted from the NSR that is paid to the landowner. To illustrate this, if a mine operator receives $1,000 from a toll-based treatment facility as payment for the ore concentrates and say the cost of concentrate transport and processing was $300, the final royalty payment to the landowner with a 3% NSR would be: $1,000 - $300 = $700 x .03 (NSR) = $210.

**Concentrate Transport Costs**
The appraisal evaluated the transport costs based on Dr. Wahl's research which concluded that the most likely copper smelting location for the copper concentrate is southeast Asia. Transportation costs for copper is based on freight to Wilmington Port, California then shipped to southeast Asia. Molybdenum processing is likely to occur in Mexico and Belgium. The appraisal cross-checked Dr. Wahl's transportation cost estimates against freight cost and ocean carrier estimates using the Mine Cost Service and affirmed the estimates. The appraisal estimated transport costs that include mine to port, ocean transport, and destination port to smelter and concluded a transport cost of approximately $80-$90 per ton which is similar to Dr. Wahl's estimate. The transport costs used in the appraisal are $88.57 per concentrate ton.

**Metal Recovery**
The estimate of metal recovery from concentrating and smelting the mined ore was based on the independent research conducted by Dassault and Dr. Wahl. The subject MWA recovery of copper, molybdenum, and silver metals include 90% for copper and 75% for molybdenum. After concentrate transport; smelter and roast recoveries are estimated to include a 96.6% smelter recovery for copper and



MWA Parcel (Federal)                                                          Page | 15 of 28
Pinal County, Arizona

a 99% roasting recover for molybdenum. Silver is a minor byproduct of the MWA. Overall, 70% of the
silver is projected to be recovered through both the concentrator and smelting processes.

**Treatment and Refining Cost**
After transporting metal concentrates to the smelter, Treatment and Refinement costs are charged to
refine concentrate into the finished metal. At the smelter, high temperatures are used to further purify
the ore through smelting and electrolytic metal recovery. Based on research by Dr. Wahl, these costs are
estimated to fall near $84.82 per concentrate ton. Similar to the transportation cost estimates, the
appraisers cross-checked Dr Wahl's estimates with publications from Mining Cost Service (Smelting
and Refining, 2018) and found them to be reasonable by comparison to the Mine Cost Service industry
survey.

**Metal Pricing**
Commodity prices were determined by using consensus pricing from international investment banks,
advisory firms, and data from the Arizona Department of Revenue. Long-term copper pricing was
estimated at $3.4514 per lb. The long-term pricing for molybdenum was estimated at $10.6505 per lb,
and the long-term silver pricing was estimated at $20.80 per lb. The appraisal validated these forecasts
against long-term projections by the Commodity Research Bureau (accessed via market data firm
Barchart) and found them to be in alignment with industry-standard projections.

**Royalty (Net Smelter Return)**
There are numerous factors that influence the NSR rate. Factors like, how promising does the project
appear, how advanced is the project and how much has the NSR recipient done to advance the project?
Dr. Wahl conducted a study of 13 NSR private, porphyry-type mining NSR royalty agreements in the
Southwest United States with 11 in Arizona. The results show that 9 of the royalty agreements had a 2%
NSR and four had a 2.5% NSR. A NSR between 2% and 2.5% would appear to be the only obligation
the mining company would once it goes into production. It should be noted that private party options
commonly have significant "up-front" payments due long before production begins. Typically payments
are required to exercise an option, and yearly payments plus work commitments follow that. Also, as
progress is made and certain milestones are reached, benchmark payments may be required. Initial
resource estimates, pre-feasibility studies and feasibility studies are accomplishments that may initiate
benchmark payments. So, by the time a mine goes into production, the "up-front" payments received by
the royalty holders have significantly augmented the actual NSR payments due at production.

The appraisal reviewed the royalty agreements and cross-checked them with sources to verify their
validity and applicability. The subject MWA is most similar to six specific agreements that call for
varying degrees of "up-front" payments, milestone payments, advanced minimum royalties, and NSR
payments. Most weight was given to royalty agreements that occurred within the past five years, were
similar to the subject and did not involve complex stock transfers, "work-in" components, or
connections with other related deal transactions. The appraisal concluded that a royalty structure with
slightly lower "up-front" payments and higher NSR would be applied in the valuation of the subject
MWA. Based on the body of work reviewed, the appraisal concluded a NSR of 2.5% be applied to the
subject MWA parcel.



MWA Parcel (Federal)                                                                                   Page 16 of 28
Pinal County, Arizona

**Royalty Calculations**

Utilizing the subject MWA parcel's metal pricing, concentrator recovery, smelting metal recovery, transportation costs, refining cost, and net smelter return, the royalty calculation is summarized as follows:

### Copper Royalty Summary

| Description | Amount |
|---|---|
| Potential Gross Revenue ($/lb) | $3.45 |
| Payable Metal Recovery (%) | 96.60% |
| Estimated Gross Revenue$/lb) | $3.33 |
| | |
| Transportation Cost ($/lb) | -$0.15 |
| Treatment Cost ($/lb) | -$0.14 |
| Refining Cost ($/lb) | -$0.09 |
| Net Smelter Return ($/lb) | $2.95 |
| | |
| 2.5% Royalty | 2.5% |
| **Royalty ($/lb)** | **$0.074** |

### Molybdenum Royalty Summary

| Description | Amount |
|---|---|
| Potential Gross Revenue ($/lb) | $10.65 |
| Payable Metal Recovery (%) | 99.0% |
| Estimated Gross Revenue$/lb) | $10.54 |
| | |
| Transportation Cost ($/lb) | -$0.40 |
| Roasting Cost ($/lb) | -$0.98 |
| Net Smelter Return ($/lb) | $9.16 |
| | |
| 2.5% Royalty | 2.5% |
| **Royalty ($/lb)** | **$0.229** |

### Silver Royalty Summary

| Description | Amount |
|---|---|
| Potential Gross Revenue ($/oz) | $20.80 |
| 2.5% Royalty | 2.5% |
| **Royalty ($/lb)** | **$0.520** |

The Dassault Mine model estimates that over the life of the mine, the MWA portion will be paid for:

- 4,634,308,108 lbs. of copper
- 60,316,000 lbs. of molybdenum
- 12,582,647 oz. of silver.

If the MWA produces in excess of these amounts, a royalty will be paid to the United States as production continues as directed by the Southeast Arizona Land Exchange and Conservation Act.

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1705 of 2158
Case 2:21-cv-00122-DWL   Document 87-12   Filed 07/14/25   Page 19 of 29

MWA Parcel (Federal)                                                    Page 17 of 28
Pinal County, Arizona

### Discount Rate

The discount rate reflects the degree of risk associated with the property appraised.  It is the rate that discounts all future benefits to an estimated present value. The appraisal analyzed the independent research conducted by Dr. Wahl regarding discount rates for mineral properties at various project stages ranging from early exploration, pre-feasibility, feasibility, initial production, and mid-life production. Mineral properties that are in the early exploration phase have higher discount rates, around 20% while those in the production phase have lower discount rates at 5% or less. The higher the risk, the higher the discount rate.  Although block cave mining is the most efficient mining method for the MWA parcel, it also requires extensive pre-production development costs prior to generating any cash flows from mining. For the subject MWA parcel, it is conceivable that mine production would not begin until ten years after all permits and agreements are in place. Upfront payments for metal recovery values that are expected to come out of the ground at least ten to 41 years after the payment date are discounted to account for the time value of money over a long period of time.

The risks associated with mining the MWA parcel correlates to the confidence of the mineral deposit, tonnage and grade, political stability and social/environmental issues, commodity prices, and demand. The undrilled nature of the MWA poses a risk in the grade and tonnage of the ore that will be mined. Mining at great depths in unknown conditions coupled with social, political and environmental issues also contribute to the risk associated with the subject MWA parcel.

Since the MWA has not been drilled, it could be considered being in the early exploration phase. However, since there is known mineralization and significant development work on the adjacent property, the subject MWA is considered to be at an advanced level beyond the early exploration stage.

The appraisal opined that the subject MWA is between the late pre-feasibility to early feasibility stage.

Figure 1 below illustrates different discount rates for various project stages and suggests a range of 10% to 15% for the subject MWA:





**Figure 1 -** *Components of real discount rates at different stages of project development. Revenue factors include metal price, grade, recovery, and throughput, 100% equity (Smith 2003b)*

The following Table provided by the Wahl report illustrates discount rates for each project stage. The data is a culmination of the average discount rates from various sources for base metals projects:

| PROJECT STAGE | DISCOUNT RATE |
|---|---|
| Exploration/Scoping | 14% to 20% |
| Pre-feasibility | 12% to 15% |
| Feasibility | 10% to 12.5% |
| Operational | 8% to 8.5% |

Since the appraisal opined that the subject MWA parcel was between Pre-Feasibility and Feasibility stages the table suggests a discount rate between 10% to 15%.

In developing the discount rate for the subject MWA parcel, the appraisal utilized a variety of resources including market-based information and industry studies conducted pertaining to discount rates for properties with similar mineral resources as the subject.

The findings from Dr. Wahl's report were augmented with other market-based discount rate information of copper properties that also produced molybdenum and silver.

The Arizona Department of Revenue publishes an annual study on discount rates for mining properties. A base capitalization rate for discounting cash flows is determined annually by reviewing current industry practice. During the year, numerous transactions related to the metals industry is collected from merger and acquisition developments, technical project reports, annual financial reports, press releases, professional journals, and other publications. Based on this information, the range of discount rates for copper properties that includes a mix of pre-tax and post-tax rates ranges from 5% to 15%. Since all but one of these properties were surface mines, the appraisal conducted additional research and analysis to develop a discount rate using the Arizona Discount Rate Dataset Average for copper, molybdenum, and silver, while also addressing the after-tax premium, geologic certainty premium, project stage premium, and project specific premium to derive a discount rate of 14.25%.

The appraisal also utilized a Weighted Average Cost of Capital (WACC) approach that was derived by using five base metal mining companies for the past 5 years. All 5 of the companies have significant involvement in copper projects but also allocate financial resources to other commodities such as precious metals. The appraisal developed the WACC for copper, molybdenum, and silver and also accounted for after-tax premium, capital constraints, project risk, and capital appreciation to conclude a discount rate of 15.25%.

The state of Utah publishes an annual discount rate study. It derives discount rates from publicly traded equities of mining companies in coal, precious metals, non-precious metal, non-metals, and other types of mining. Using the equity yield rate for non-precious metals, adjusted for inflation, project-specific risks, and capital constraints, a discount rate of at least 15% was derived.

The appraisal took into consideration the following information to conclude a discount rate for the subject MWA parcel:
- Dr. Wahl's report – 10% -15%
- Metal mining project discount rate studies by Lawrence Smith  – 14%
- Arizona DOR transaction surveys – 14.25%
- Arizona Valuation guidelines – Discount Rate dataset for CU, Mo, AG – 14%
- Weighted Average Cost of Capital (WACC) – 15.25%
- Utah State Tax Commission non-precious metal equity rate – 15%

The appraisal states the weighted average cost of capital indication is believed to be less reliable and was not given any weight. The Arizona DOR survey is considered a strong indicator because it is based on actual transactions involving copper, molybdenum, and silver properties.  After taking into consideration the body of work analyzed, the appraisal concluded a discount rate of **14.25%** for the subject MWA parcel.

**Project Delay**
The appraisal indicated that it is likely that production would not occur until year 14 from the effective date of value. The first 13 years will provide for non-production payments as identified by the Dassault Mine Model.



**Royalty Income Capitalization Approach Determination/Conclusion –** <u>Adequate</u>

The royalty income capitalization approach provides for 13 years of non-production payments, 31 years of production payments for Copper, Molybdenum, and Silver using a discount rate of 14.25%. The commodity production and recoverable metals was based on Dassault Systemes Mine Model.

The following table compares the DCF results between the appraisal and the FS review:

| Summary of MWA Royalty | | |
|---|---|---|
| **Present Value 14.25%** | **Appraisal Results** | **FS Review Calc** |
| Non-Production | $ 3,693,465 | $ 3,693,465 |
| Copper Royalty | $ 17,584,784 | $ 17,615,854 |
| Molybdenum Royalty | $ 647,547 | $ 647,270 |
| Silver Royalty | $ 297,191 | $ 297,864 |
| Total Royalty | $ 22,222,986 | $ 22,254,453 |
| Deduct Feasibility Milestones (-$500K per year, Yrs 14-18) | $ (301,939) | $ (301,939) |
| **Grand Total $** | **$ 21,921,047** | **$ 21,952,514** |
| *FS - Apppraisal Difference* | *$ 31,467* | *0.1435%* |

A difference of $31,467 (which falls within the range of tolerance) is likely attributed to the difference in the number of decimal places used in the calculations.

Based on the Royalty income approach, the appraisal concluded an opinion of value for the Subject MWA parcel of $22,000,000 (Rounded)

**Final Reconciliation –** <u>Adequate</u>

The appraisal has completed a sales comparison and income capitalization analysis to provide a final opinion of value for the subject MWA parcel. The appraisal placed more weight on the income approach to value and states the sales comparison approach is used as a test of reasonableness regarding the magnitude and conclusion of the income approach.

<u>**VALUE INDICATIONS**</u>

Cost Approach: N/A

Sales Comparison Approach: $21,000,000

Income Approach: $22,000,000

**Conclusion: $22,000,000**

MWA Parcel (Federal)                                                    Page 21 of 28
Pinal County, Arizona

**Transaction Scale Analysis**
As a final step in the valuation of each larger parcel, in accordance with the SOW requirement, the appraisal analyzed the parcels comprising each side of the exchange as a whole in the context of the market and report if there is an additional increment of value or discount attributable to portfolio enhancement or the bulk nature of the transaction. Any value enhancement or diminution under this provision shall be recognized in the concluded values for each of the larger parcels as noted in the SOW.

As stated in the report, the Subject MWA parcel is one of two federal parcels included in the Southeast Arizona Land Exchange and Conservation Act. Although they are contiguous parcels, they are two different properties with different highest and best uses subject to two separate and distinct market forces and dynamics. The appraisal concluded that the properties would not compete against each other due to the different highest and best uses, and there would be no enhancement or diminution of value to either parcel. Further, the appraisal concluded there is no market data that would suggest an increment in value, or a discount attributable to the bulk nature of the legislated transaction.

MWA Parcel (Federal)                                                    Page 22 of 28
Pinal County, Arizona

## MWA CASH FLOWS – Non-Production Payments

| Non-Production Payment Calculation | | 14.25% | | FS Calc | Appraisal Calc | PV Factor @14.25% | FS Calc | Appraisal Calc |
|---|---|---|---|---|---|---|---|---|
| Period/Year | Option/Bonus $ | Advanced $ | Milestone $ | Non-Prod TTL Pmts $ | Non-Prod TTL Pmts APR | | PV of Cash Flow $ | PV CF $ Appraisal |
| 1.0 | $ 1,000,000 | $ 200,000 | $ – | $ 1,200,000 | $ 1,200,000 | 0.87527 | $ 1,050,328 | $ 1,050,328 |
| 2.0 | $ – | $ 200,000 | $ – | $ 200,000 | $ 200,000 | 0.76610 | $ 153,221 | $ 153,221 |
| 3.0 | $ – | $ 200,000 | $ – | $ 200,000 | $ 200,000 | 0.67055 | $ 134,110 | $ 134,110 |
| 4.0 | $ – | $ 200,000 | $ 500,000 | $ 700,000 | $ 700,000 | 0.58691 | $ 410,840 | $ 410,840 |
| 5.0 | $ – | $ 200,000 | $ – | $ 200,000 | $ 200,000 | 0.51371 | $ 102,742 | $ 102,742 |
| 6.0 | $ – | $ 200,000 | $ 1,000,000 | $ 1,200,000 | $ 1,200,000 | 0.44964 | $ 539,565 | $ 539,565 |
| 7.0 | $ – | $ 200,000 | $ – | $ 200,000 | $ 200,000 | 0.39356 | $ 78,711 | $ 78,711 |
| 8.0 | $ – | $ 200,000 | $ 2,500,000 | $ 2,700,000 | $ 2,700,000 | 0.34447 | $ 930,067 | $ 930,067 |
| 9.0 | $ – | $ 250,000 | $ – | $ 250,000 | $ 250,000 | 0.30150 | $ 75,376 | $ 75,376 |
| 10.0 | $ – | $ 250,000 | $ – | $ 250,000 | $ 250,000 | 0.26390 | $ 65,975 | $ 65,975 |
| 11.0 | $ – | $ 250,000 | $ – | $ 250,000 | $ 250,000 | 0.23098 | $ 57,746 | $ 57,746 |
| 12.0 | $ – | $ 250,000 | $ – | $ 250,000 | $ 250,000 | 0.20217 | $ 50,544 | $ 50,544 |
| 13.0 | $ – | $ 250,000 | $ – | $ 250,000 | $ 250,000 | 0.17696 | $ 44,239 | $ 44,239 |
| 14.0 | $ – | $ – | $ – | $ – | $ – | 0.15489 | $ – | $ – |
| 15.0 | $ – | $ – | $ – | $ – | $ – | 0.13557 | $ – | $ – |
| 16.0 | $ – | $ – | $ – | $ – | $ – | 0.11866 | $ – | $ – |
| 17.0 | $ – | $ – | $ – | $ – | $ – | 0.10386 | $ – | $ – |
| 18.0 | $ – | $ – | $ – | $ – | $ – | 0.09091 | $ – | $ – |
| 19.0 | $ – | $ – | $ – | $ – | $ – | 0.07957 | $ – | $ – |
| 20.0 | $ – | $ – | $ – | $ – | $ – | 0.06964 | $ – | $ – |
| 21.0 | $ – | $ – | $ – | $ – | $ – | 0.06096 | $ – | $ – |
| 22.0 | $ – | $ – | $ – | $ – | $ – | 0.05335 | $ – | $ – |
| 23.0 | $ – | $ – | $ – | $ – | $ – | 0.04670 | $ – | $ – |
| 24.0 | $ – | $ – | $ – | $ – | $ – | 0.04087 | $ – | $ – |
| 25.0 | $ – | $ – | $ – | $ – | $ – | 0.03578 | $ – | $ – |
| 26.0 | $ – | $ – | $ – | $ – | $ – | 0.03131 | $ – | $ – |
| 27.0 | $ – | $ – | $ – | $ – | $ – | 0.02741 | $ – | $ – |
| 28.0 | $ – | $ – | $ – | $ – | $ – | 0.02399 | $ – | $ – |
| 29.0 | $ – | $ – | $ – | $ – | $ – | 0.02100 | $ – | $ – |
| 30.0 | $ – | $ – | $ – | $ – | $ – | 0.01838 | $ – | $ – |
| 31.0 | $ – | $ – | $ – | $ – | $ – | 0.01609 | $ – | $ – |
| 32.0 | $ – | $ – | $ – | $ – | $ – | 0.01408 | $ – | $ – |
| 33.0 | $ – | $ – | $ – | $ – | $ – | 0.01232 | $ – | $ – |
| 34.0 | $ – | $ – | $ – | $ – | $ – | 0.01079 | $ – | $ – |
| 35.0 | $ – | $ – | $ – | $ – | $ – | 0.00944 | $ – | $ – |
| 36.0 | $ – | $ – | $ – | $ – | $ – | 0.00826 | $ – | $ – |
| 37.0 | $ – | $ – | $ – | $ – | $ – | 0.00723 | $ – | $ – |
| 38.0 | $ – | $ – | $ – | $ – | $ – | 0.00633 | $ – | $ – |
| 39.0 | $ – | $ – | $ – | $ – | $ – | 0.00554 | $ – | $ – |
| 40.0 | $ – | $ – | $ – | $ – | $ – | 0.00485 | $ – | $ – |
| 41.0 | $ – | $ – | $ – | $ – | $ – | 0.00425 | $ – | $ – |
| 42.0 | $ – | $ – | $ – | $ – | $ – | 0.00372 | $ – | $ – |
| 43.0 | $ – | $ – | $ – | $ – | $ – | 0.00325 | $ – | $ – |
| 44.0 | $ – | $ – | $ – | $ – | $ – | 0.00285 | $ – | $ – |
| TOTAL | $ 1,000,000 | $ 2,850,000 | $ 4,000,000 | $ 7,850,000 | $ 7,850,000 | | $ 3,693,465 | $ 3,693,465 |

Summary:
| Total PMTS | $7,850,000 |
|---|---|
| PV @ 14.25% | |
| FS calc | $3,693,465 |
| Appraisal calc | $3,693,465 |
| Diff | $0 |

MWA Parcel (Federal)
Pinal County, Arizona

Page 23 of 28

## MWA CASH FLOWS – COPPER

| Copper Production | | | 14.25% | | | 1,000,000.00 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Period/Year | Prod (Mlbs) | Short Tons (2K) | Recovery (Mlbs) | Recovery rate calc | Royalty $/lb | Royalty $ FS calc | Appraisal $calc | PV Factor @14.25% | PV of Cash Flow FS calc | Appraisal $calc | FS - Apprsl Diff |
| 1.0 | 0.00 | | 0.00 | | $0.000 | $ - | $ - | 0.87527 | $ - | $ - | $ - |
| 2.0 | 0.00 | | 0.00 | | $0.000 | $ - | $ - | 0.76610 | $ - | $ - | $ - |
| 3.0 | 0.00 | | 0.00 | | $0.000 | $ - | $ - | 0.67055 | $ - | $ - | $ - |
| 4.0 | 0.00 | | 0.00 | | $0.000 | $ - | $ - | 0.58691 | $ - | $ - | $ - |
| 5.0 | 0.00 | | 0.00 | | $0.000 | $ - | $ - | 0.51371 | $ - | $ - | $ - |
| 6.0 | 0.00 | | 0.00 | | $0.000 | $ - | $ - | 0.44964 | $ - | $ - | $ - |
| 7.0 | 0.00 | | 0.00 | | $0.000 | $ - | $ - | 0.39356 | $ - | $ - | $ - |
| 8.0 | 0.00 | | 0.00 | | $0.000 | $ - | $ - | 0.34447 | $ - | $ - | $ - |
| 9.0 | 0.00 | | 0.00 | | $0.000 | $ - | $ - | 0.30150 | $ - | $ - | $ - |
| 10.0 | 0.00 | | 0.00 | | $0.000 | $ - | $ - | 0.26390 | $ - | $ - | $ - |
| 11.0 | 0.00 | | 0.00 | | $0.000 | $ - | $ - | 0.23098 | $ - | $ - | $ - |
| 12.0 | 0.00 | | 0.00 | | $0.000 | $ - | $ - | 0.20217 | $ - | $ - | $ - |
| 13.0 | 0.00 | | 0.00 | | $0.000 | $ - | $ - | 0.17696 | $ - | $ - | $ - |
| 14.0 | 8.03 | 4,015.00 | 7.22 | 89.913% | $0.074 | $ 534,280 | $ 533,556 | 0.15489 | $ 82,753 | $ 82,641 | $ 112 |
| 15.0 | 80.11 | 40,055.00 | 72.09 | 89.989% | $0.074 | $ 5,334,660 | $ 5,325,562 | 0.13557 | $ 723,209 | $ 721,975 | $ 1,233 |
| 16.0 | 159.95 | 79,975.00 | 143.95 | 89.997% | $0.074 | $ 10,652,300 | $ 10,633,552 | 0.11866 | $ 1,263,991 | $ 1,261,767 | $ 2,225 |
| 17.0 | 242.56 | 121,280.00 | 218.30 | 89.996% | $0.074 | $ 16,154,200 | $ 16,125,587 | 0.10386 | $ 1,677,760 | $ 1,674,789 | $ 2,972 |
| 18.0 | 254.86 | 127,430.00 | 229.40 | 90.010% | $0.074 | $ 16,975,690 | $ 16,945,843 | 0.09091 | $ 1,543,169 | $ 1,540,464 | $ 2,705 |
| 19.0 | 136.18 | 68,090.00 | 122.56 | 89.999% | $0.074 | $ 9,069,440 | $ 9,053,214 | 0.07957 | $ 721,627 | $ 720,336 | $ 1,291 |
| 20.0 | 141.30 | 70,650.00 | 127.17 | 90.000% | $0.074 | $ 9,410,580 | $ 9,394,211 | 0.06964 | $ 655,379 | $ 654,239 | $ 1,140 |
| 21.0 | 329.47 | 164,735.00 | 296.52 | 89.999% | $0.074 | $ 21,942,480 | $ 21,903,549 | 0.06096 | $ 1,337,536 | $ 1,335,162 | $ 2,373 |
| 22.0 | 668.34 | 334,170.00 | 601.50 | 89.999% | $0.074 | $ 44,511,000 | $ 44,432,377 | 0.05335 | $ 2,374,620 | $ 2,370,626 | $ 4,195 |
| 23.0 | 928.33 | 464,165.00 | 835.50 | 90.000% | $0.074 | $ 61,827,090 | $ 61,717,271 | 0.04670 | $ 2,887,257 | $ 2,882,132 | $ 5,124 |
| 24.0 | 805.57 | 402,785.00 | 725.01 | 90.000% | $0.074 | $ 53,650,740 | $ 53,555,628 | 0.04087 | $ 2,192,940 | $ 2,189,052 | $ 3,888 |
| 25.0 | 383.53 | 191,765.00 | 345.17 | 89.990% | $0.074 | $ 25,542,580 | $ 25,497,626 | 0.03578 | $ 913,818 | $ 912,209 | $ 1,608 |
| 26.0 | 78.14 | 39,070.00 | 70.32 | 89.992% | $0.074 | $ 5,203,680 | $ 5,194,704 | 0.03131 | $ 162,948 | $ 162,667 | $ 281 |
| 27.0 | 1.46 | 730.00 | 1.32 | 90.411% | $0.074 | $ 97,680 | $ 97,341 | 0.02741 | $ 2,677 | $ 2,666 | $ 9 |
| 28.0 | 0.92 | 460.00 | 0.83 | 90.217% | $0.074 | $ 61,420 | $ 61,268 | 0.02399 | $ 1,473 | $ 1,470 | $ 4 |
| 29.0 | 113.51 | 56,755.00 | 102.16 | 90.001% | $0.074 | $ 7,559,840 | $ 7,546,067 | 0.02100 | $ 158,739 | $ 158,450 | $ 289 |
| 30.0 | 195.39 | 97,695.00 | 175.85 | 89.999% | $0.074 | $ 13,012,900 | $ 12,990,026 | 0.01838 | $ 239,160 | $ 238,739 | $ 420 |
| 31.0 | 203.43 | 101,715.00 | 183.09 | 89.903% | $0.074 | $ 13,548,660 | $ 13,524,575 | 0.01609 | $ 217,948 | $ 217,561 | $ 387 |
| 32.0 | 173.02 | 89,010.00 | 160.22 | 90.001% | $0.074 | $ 11,856,280 | $ 11,835,542 | 0.01408 | $ 166,936 | $ 166,641 | $ 295 |
| 33.0 | 157.74 | 78,870.00 | 141.96 | 89.996% | $0.074 | $ 10,505,040 | $ 10,486,518 | 0.01232 | $ 129,462 | $ 129,234 | $ 228 |
| 34.0 | 113.33 | 56,665.00 | 102.00 | 90.003% | $0.074 | $ 7,548,000 | $ 7,534,564 | 0.01079 | $ 81,418 | $ 81,273 | $ 145 |
| 35.0 | 79.73 | 39,865.00 | 71.76 | 90.004% | $0.074 | $ 5,310,240 | $ 5,300,563 | 0.00944 | $ 50,136 | $ 50,044 | $ 91 |
| 36.0 | 28.27 | 14,135.00 | 25.44 | 89.989% | $0.074 | $ 1,882,560 | $ 1,879,247 | 0.00826 | $ 15,557 | $ 15,530 | $ 27 |
| 37.0 | 2.34 | 1,170.00 | 2.11 | 90.171% | $0.074 | $ 155,840 | $ 155,810 | 0.00723 | $ 1,129 | $ 1,127 | $ 2 |
| 38.0 | 10.11 | 5,055.00 | 9.10 | 90.010% | $0.074 | $ 673,400 | $ 672,420 | 0.00633 | $ 4,263 | $ 4,257 | $ 6 |
| 39.0 | 11.98 | 5,990.00 | 10.78 | 89.983% | $0.074 | $ 797,720 | $ 796,580 | 0.00554 | $ 6,420 | $ 4,416 | $ 6 |
| 40.0 | 10.36 | 5,180.00 | 9.33 | 90.058% | $0.074 | $ 690,420 | $ 688,835 | 0.00485 | $ 3,349 | $ 3,341 | $ 8 |
| 41.0 | 4.73 | 2,365.00 | 4.26 | 90.063% | $0.074 | $ 315,240 | $ 314,330 | 0.00425 | $ 1,338 | $ 1,334 | $ 4 |
| 42.0 | 1.70 | 850.00 | 1.53 | 90.000% | $0.074 | $ 113,220 | $ 113,024 | 0.00372 | $ 421 | $ 420 | $ 1 |
| 43.0 | 0.93 | 465.00 | 0.83 | 89.247% | $0.074 | $ 61,420 | $ 61,602 | 0.00325 | $ 200 | $ 200 | $ (1) |
| 44.0 | 0.12 | 60.00 | 0.11 | 91.667% | $0.074 | $ 8,140 | $ 8,012 | 0.00285 | $ 23 | $ 23 | $ 0 |
| TOTAL | 5,330.44 | 2,665,220.00 | 4,797.39 | 90.000% | $0.074 | $ 355,006,880 | $ 354,378,874 | | $ 17,615,854 | $ 17,584,784 | $ 31,070 |

Summary:
Total PMTS        $555,006,860

PV @ 14.25% FS calc    $17,615,854
Appraisal calc         $17,584,784

Diff              $31,070

MWA Parcel (Federal)                                                                 Page 24 of 28
Pinal County, Arizona

## MWA CASH FLOWS – MOLYBDENUM

| Molybdenum Production | 14.25% | | | 1,000,000.00 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Period/Year | Prod (Mlbs) | Recovery (Mlbs) | Recovery rate calc | Royalty $/lb | Royalty $ FS calc | Appraisal Scalc | PV Factor @14.25% | PV of Cash Flow $ FS calc | Appraisal Scalc | FS - Apprsl Diff |
| 1.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.87527 | $ - | $ - | $ - |
| 2.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.76610 | $ - | $ - | $ - |
| 3.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.67055 | $ - | $ - | $ - |
| 4.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.58691 | $ - | $ - | $ - |
| 5.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.51371 | $ - | $ - | $ - |
| 6.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.44964 | $ - | $ - | $ - |
| 7.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.39356 | $ - | $ - | $ - |
| 8.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.34447 | $ - | $ - | $ - |
| 9.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.30150 | $ - | $ - | $ - |
| 10.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.26390 | $ - | $ - | $ - |
| 11.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.23098 | $ - | $ - | $ - |
| 12.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.20217 | $ - | $ - | $ - |
| 13.0 | 0.00 | 0.00 | | $0.000 | $ - | $ - | 0.17696 | $ - | $ - | $ - |
| 14.0 | 0.20 | 0.15 | 75.000% | $0.229 | $ - | $ - | 0.15489 | $ - | $ - | $ - |
| 15.0 | 1.71 | 1.28 | 74.854% | $0.229 | $ 293,120 | $ 293,542 | 0.13557 | $ 39,738 | $ 39,795 | $ (57) |
| 16.0 | 2.46 | 1.84 | 74.797% | $0.229 | $ 421,360 | $ 422,187 | 0.11866 | $ 49,998 | $ 50,096 | $ (98) |
| 17.0 | 2.23 | 1.68 | 75.336% | $0.229 | $ 384,720 | $ 384,075 | 0.10386 | $ 39,957 | $ 39,890 | $ 67 |
| 18.0 | 1.73 | 1.29 | 74.566% | $0.229 | $ 295,410 | $ 296,511 | 0.09091 | $ 26,854 | $ 26,954 | $ (100) |
| 19.0 | 1.18 | 0.89 | 75.424% | $0.229 | $ 203,810 | $ 203,646 | 0.07957 | $ 16,217 | $ 16,203 | $ 13 |
| 20.0 | 3.59 | 2.70 | 75.209% | $0.229 | $ 618,300 | $ 617,680 | 0.06964 | $ 43,060 | $ 43,017 | $ 43 |
| 21.0 | 8.45 | 6.34 | 75.030% | $0.229 | $ 1,451,860 | $ 1,452,318 | 0.06096 | $ 88,500 | $ 88,528 | $ (28) |
| 22.0 | 11.73 | 8.80 | 75.021% | $0.229 | $ 2,015,200 | $ 2,016,282 | 0.05335 | $ 107,518 | $ 107,576 | $ (58) |
| 23.0 | 11.43 | 8.58 | 75.066% | $0.229 | $ 1,964,820 | $ 1,965,228 | 0.04670 | $ 91,755 | $ 91,774 | $ (19) |
| 24.0 | 7.69 | 5.77 | 75.033% | $0.229 | $ 1,321,330 | $ 1,321,759 | 0.04087 | $ 54,009 | $ 54,026 | $ (18) |
| 25.0 | 3.37 | 2.53 | 75.074% | $0.229 | $ 579,370 | $ 579,059 | 0.03578 | $ 20,728 | $ 20,717 | $ 11 |
| 26.0 | 0.72 | 0.54 | 75.000% | $0.229 | $ 123,660 | $ 124,447 | 0.03131 | $ 3,872 | $ 3,897 | $ (25) |
| 27.0 | 0.02 | 0.01 | 50.000% | $0.229 | $ 2,290 | $ 2,741 | 0.02741 | $ 63 | $ 75 | $ (12) |
| 28.0 | 0.03 | 0.03 | 100.000% | $0.229 | $ 6,870 | $ 5,786 | 0.02399 | $ 165 | $ 139 | $ 26 |
| 29.0 | 3.48 | 2.61 | 75.000% | $0.229 | $ 597,690 | $ 597,371 | 0.02100 | $ 12,550 | $ 12,543 | $ 7 |
| 30.0 | 5.50 | 4.12 | 74.909% | $0.229 | $ 943,480 | $ 944,969 | 0.01838 | $ 17,340 | $ 17,367 | $ (27) |
| 31.0 | 4.84 | 3.63 | 75.000% | $0.229 | $ 831,270 | $ 831,125 | 0.01609 | $ 13,372 | $ 13,370 | $ 2 |
| 32.0 | 3.54 | 2.65 | 74.859% | $0.229 | $ 606,850 | $ 608,012 | 0.01408 | $ 8,544 | $ 8,561 | $ (16) |
| 33.0 | 2.92 | 2.19 | 75.000% | $0.229 | $ 501,510 | $ 501,343 | 0.01232 | $ 6,181 | $ 6,178 | $ 2 |
| 34.0 | 1.97 | 1.48 | 75.127% | $0.229 | $ 338,920 | $ 338,630 | 0.01079 | $ 3,656 | $ 3,653 | $ 3 |
| 35.0 | 1.11 | 0.83 | 74.775% | $0.229 | $ 190,070 | $ 190,229 | 0.00944 | $ 1,795 | $ 1,796 | $ (1) |
| 36.0 | 0.31 | 0.23 | 74.194% | $0.229 | $ 52,670 | $ 53,747 | 0.00826 | $ 435 | $ 444 | $ (9) |
| 37.0 | 0.05 | 0.04 | 80.000% | $0.229 | $ 9,160 | $ 8,154 | 0.00723 | $ 66 | $ 59 | $ 7 |
| 38.0 | 0.24 | 0.18 | 75.000% | $0.229 | $ 41,220 | $ 40,862 | 0.00633 | $ 261 | $ 259 | $ 2 |
| 39.0 | 0.29 | 0.23 | 77.586% | $0.229 | $ 51,525 | $ 50,202 | 0.00554 | $ 286 | $ 278 | $ 7 |
| 40.0 | 0.27 | 0.20 | 74.074% | $0.229 | $ 45,800 | $ 45,964 | 0.00485 | $ 222 | $ 223 | $ (11) |
| 41.0 | 0.14 | 0.10 | 71.429% | $0.229 | $ 22,900 | $ 23,728 | 0.00425 | $ 97 | $ 101 | $ (4) |
| 42.0 | 0.03 | 0.03 | 100.000% | $0.229 | $ 6,870 | $ 5,919 | 0.00372 | $ 26 | $ 22 | $ 4 |
| 43.0 | 0.01 | 0.01 | 100.000% | $0.229 | $ 2,290 | $ 1,545 | 0.00325 | $ 7 | $ 5 | $ 2 |
| 44.0 | 0.00 | 0.00 | 0.000% | $0.229 | $ - | $ 146 | 0.00285 | $ - | $ 0 | $ (0) |
| TOTAL | 81.24 | 60.96 | | | $ 13,924,345 | $ 13,927,207 | | $ 647,270 | $ 647,547 | $ (276) |

Summary:
| | |
|---|---|
| Total PMTS | $13,924,345.00 |
| PV @ 14.25% | |
| FS calc | $647,270 |
| Appraisal calc | $ 647,547 |
| Diff | -$276.13 |

MWA Parcel (Federal)
Pinal County, Arizona
Page 25 of 28

## MWA CASH FLOWS – SILVER

| Silver Calc | | 14.25% | | | 1,000,000.00 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Period/Year | Prod (Moz) | Recovery (Moz) | Recovery rate calc | Royalty $/lb | Royalty $ FS calc | Appraisal $calc | PV Factor @14.25% | PV of Cash Flow $ FS calc | Appraisal $calc | FS - Apprsl Diff |
| 1.0 | 0.00 | 0.00 | | $0.000 | $ – | $ – | 0.87527 | $ – | $ – | $ – |
| 2.0 | 0.00 | 0.00 | | $0.000 | $ – | $ – | 0.76610 | $ – | $ – | $ – |
| 3.0 | 0.00 | 0.00 | | $0.000 | $ – | $ – | 0.67055 | $ – | $ – | $ – |
| 4.0 | 0.00 | 0.00 | | $0.000 | $ – | $ – | 0.58691 | $ – | $ – | $ – |
| 5.0 | 0.00 | 0.00 | | $0.000 | $ – | $ – | 0.51371 | $ – | $ – | $ – |
| 6.0 | 0.00 | 0.00 | | $0.000 | $ – | $ – | 0.44964 | $ – | $ – | $ – |
| 7.0 | 0.00 | 0.00 | | $0.000 | $ – | $ – | 0.39356 | $ – | $ – | $ – |
| 8.0 | 0.00 | 0.00 | | $0.000 | $ – | $ – | 0.34447 | $ – | $ – | $ – |
| 9.0 | 0.00 | 0.00 | | $0.000 | $ – | $ – | 0.30150 | $ – | $ – | $ – |
| 10.0 | 0.00 | 0.00 | | $0.000 | $ – | $ – | 0.26390 | $ – | $ – | $ – |
| 11.0 | 0.00 | 0.00 | | $0.000 | $ – | $ – | 0.23098 | $ – | $ – | $ – |
| 12.0 | 0.00 | 0.00 | | $0.000 | $ – | $ – | 0.20217 | $ – | $ – | $ – |
| 13.0 | 0.00 | 0.00 | | $0.000 | $ – | $ – | 0.17696 | $ – | $ – | $ – |
| 14.0 | 0.02 | 0.02 | 100.000% | $0.520 | $ 10,400 | $ 8,256 | 0.15489 | $ 1,611 | $ 1,279 | 332 |
| 15.0 | 0.20 | 0.14 | 70.000% | $0.520 | $ 72,800 | $ 73,218 | 0.13557 | $ 9,869 | $ 9,926 | (57) |
| 16.0 | 0.35 | 0.25 | 38.462% | $0.520 | $ 130,000 | $ 129,175 | 0.11866 | $ 15,426 | $ 15,328 | 98 |
| 17.0 | 0.46 | 0.33 | 44.000% | $0.520 | $ 171,600 | $ 169,140 | 0.10386 | $ 17,822 | $ 17,567 | 255 |
| 18.0 | 0.49 | 0.34 | 29.825% | $0.520 | $ 176,800 | $ 178,387 | 0.09091 | $ 16,072 | $ 16,216 | (144) |
| 19.0 | 0.65 | 0.46 | 23.232% | $0.520 | $ 239,200 | $ 237,236 | 0.07957 | $ 19,032 | $ 18,876 | 156 |
| 20.0 | 0.75 | 0.52 | 23.529% | $0.520 | $ 270,400 | $ 272,303 | 0.06964 | $ 18,831 | $ 18,964 | (133) |
| 21.0 | 1.14 | 0.80 | 33.058% | $0.520 | $ 416,000 | $ 416,469 | 0.06096 | $ 25,358 | $ 25,386 | (29) |
| 22.0 | 1.98 | 1.38 | 64.486% | $0.520 | $ 717,600 | $ 718,967 | 0.05335 | $ 38,287 | $ 38,359 | (73) |
| 23.0 | 2.21 | 1.55 | 131.356% | $0.520 | $ 806,000 | $ 805,327 | 0.04670 | $ 37,639 | $ 37,608 | 31 |
| 24.0 | 2.42 | 1.70 | 3400.000% | $0.520 | $ 884,000 | $ 882,355 | 0.04087 | $ 36,133 | $ 36,066 | 67 |
| 25.0 | 2.14 | 1.50 | 70.093% | $0.520 | $ 780,000 | $ 778,549 | 0.03578 | $ 27,905 | $ 27,854 | 52 |
| 26.0 | 1.18 | 0.83 | 70.339% | $0.520 | $ 431,600 | $ 429,005 | 0.03131 | $ 13,515 | $ 13,434 | 81 |
| 27.0 | 0.05 | 0.04 | 80.000% | $0.520 | $ 20,800 | $ 19,826 | 0.02741 | $ 570 | $ 543 | 27 |
| 28.0 | 0.00 | 0.00 | #DIV/0! | $0.520 | $ – | $ 831 | 0.02399 | $ – | $ 20 | (20) |
| 29.0 | 0.34 | 0.24 | 70.588% | $0.520 | $ 124,800 | $ 125,017 | 0.02100 | $ 2,621 | $ 2,625 | (5) |
| 30.0 | 0.63 | 0.44 | 69.841% | $0.520 | $ 228,800 | $ 228,708 | 0.01838 | $ 4,205 | $ 4,203 | 2 |
| 31.0 | 0.64 | 0.45 | 70.313% | $0.520 | $ 234,000 | $ 233,653 | 0.01609 | $ 3,764 | $ 3,759 | 6 |
| 32.0 | 0.54 | 0.38 | 70.370% | $0.520 | $ 197,600 | $ 195,001 | 0.01408 | $ 2,782 | $ 2,746 | 37 |
| 33.0 | 0.50 | 0.35 | 70.000% | $0.520 | $ 182,000 | $ 181,313 | 0.01232 | $ 2,243 | $ 2,234 | 8 |
| 34.0 | 0.43 | 0.30 | 69.767% | $0.520 | $ 156,000 | $ 157,804 | 0.01079 | $ 1,683 | $ 1,702 | (19) |
| 35.0 | 0.43 | 0.30 | 69.767% | $0.520 | $ 156,000 | $ 154,774 | 0.00944 | $ 1,473 | $ 1,461 | 12 |
| 36.0 | 0.25 | 0.17 | 68.000% | $0.520 | $ 88,400 | $ 89,530 | 0.00826 | $ 731 | $ 740 | (9) |
| 37.0 | 0.01 | 0.00 | 0.000% | $0.520 | $ – | $ 2,435 | 0.00723 | $ – | $ 18 | (18) |
| 38.0 | 0.03 | 0.02 | 66.667% | $0.520 | $ 10,400 | $ 9,320 | 0.00633 | $ 66 | $ 59 | 7 |
| 39.0 | 0.04 | 0.03 | 75.000% | $0.520 | $ 15,600 | $ 13,009 | 0.00554 | $ 86 | $ 72 | 14 |
| 40.0 | 0.04 | 0.03 | 75.000% | $0.520 | $ 15,600 | $ 15,501 | 0.00485 | $ 76 | $ 75 | 0 |
| 41.0 | 0.03 | 0.02 | 66.667% | $0.520 | $ 10,400 | $ 10,418 | 0.00425 | $ 44 | $ 44 | (0) |
| 42.0 | 0.01 | 0.01 | 100.000% | $0.520 | $ 5,200 | $ 4,430 | 0.00372 | $ 19 | $ 16 | 3 |
| 43.0 | 0.01 | 0.00 | 0.000% | $0.520 | $ – | $ 2,587 | 0.00325 | $ – | $ 8 | (8) |
| 44.0 | 0.00 | 0.00 | 0.000% | $0.520 | $ – | $ 423 | 0.00285 | $ – | $ 1 | (1) |
| TOTAL | 17.97 | | | $0.520 | $ 6,552,000 | $ 6,542,977 | | $ 297,864 | $ 297,191 | 673 |

Summary:
| | | |
|---|---|---|
| Total PMTS | $ | 6,552,000 |
| PV @ 14.25% | | |
| FS calc | $ | 297,864 |
| Appraisal calc | $ | 297,191 |
| Diff | $ | 673 |

MWA Parcel (Federal)
Pinal County, Arizona

Page 26 of 28

## MWA CASH FLOWS – TOTAL CASH FLOWS

| Period/Year | Copper $Appraisal | Copper $ FS calc | Molydenum $Appraisal | Molydenum $ FS calc | Silver $Appraisal | Silver $ FS calc | Non-Production Cash Flows | Deduct Feasibility Milestone (-500k/yr) | TOTAL PMTS $ Appraisal | Total PMTS $ FS calc | PV Factor @14.25% | PV Cash Flow $ FS calc | PV Cash Flow $ Appraisal | FS - Appraisal Difference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.0 | | | | | | | $ 1,200,000 | $ - | $ 1,200,000 | $ 1,200,000 | 0.875274 | $ 1,050,328 | $ 1,050,328 | $ - |
| 2.0 | | | | | | | $ 200,000 | $ - | $ 200,000 | $ 200,000 | 0.766104 | $ 153,221 | $ 153,221 | $ - |
| 3.0 | | | | | | | $ 200,000 | $ - | $ 200,000 | $ 200,000 | 0.670550 | $ 134,110 | $ 134,110 | $ - |
| 4.0 | | | | | | | $ 700,000 | $ - | $ 700,000 | $ 700,000 | 0.586915 | $ 410,840 | $ 410,840 | $ - |
| 5.0 | | | | | | | $ 200,000 | $ - | $ 200,000 | $ 200,000 | 0.513711 | $ 102,742 | $ 102,742 | $ - |
| 6.0 | | | | | | | $ 1,200,000 | $ - | $ 1,200,000 | $ 1,200,000 | 0.449630 | $ 539,565 | $ 539,565 | $ - |
| 7.0 | | | | | | | $ 200,000 | $ - | $ 200,000 | $ 200,000 | 0.393556 | $ 78,711 | $ 78,711 | $ - |
| 8.0 | | | | | | | $ 2,700,000 | $ - | $ 2,700,000 | $ 2,700,000 | 0.344469 | $ 930,067 | $ 930,067 | $ - |
| 9.0 | | | | | | | $ 250,000 | $ - | $ 250,000 | $ 250,000 | 0.301505 | $ 75,376 | $ 75,376 | $ - |
| 10.0 | | | | | | | $ 250,000 | $ - | $ 250,000 | $ 250,000 | 0.263899 | $ 65,975 | $ 65,975 | $ - |
| 11.0 | | | | | | | $ 250,000 | $ - | $ 250,000 | $ 250,000 | 0.230984 | $ 57,746 | $ 57,746 | $ - |
| 12.0 | | | | | | | $ 250,000 | $ - | $ 250,000 | $ 250,000 | 0.202174 | $ 50,544 | $ 50,544 | $ - |
| 13.0 | | | | | | | $ 250,000 | $ - | $ 250,000 | $ 250,000 | 0.176958 | $ 44,239 | $ 44,239 | $ - |
| 14.0 | $ 533,556.00 | $ 534,280.00 | $ - | $ - | $ 8,256 | $ 10,400 | $ - | $ (500,000) | $ 41,812 | $ 44,680 | 0.154886 | $ 6,920 | $ 6,478 | $ 444 |
| 15.0 | $ 5,525,962.00 | $ 5,334,660.00 | $ 293,542.00 | $ 293,120 | $ 73,218 | $ 72,800 | $ - | $ (500,000) | $ 5,392,322 | $ 5,200,580 | 0.135560 | $ 705,032 | $ 703,912 | $ 1,120 |
| 16.0 | $ 10,633,552.00 | $ 10,852,300.00 | $ 422,187.00 | $ 421,980 | $ 129,175 | $ 130,000 | $ - | $ - | $ 10,684,914 | $ 10,703,680 | 0.118659 | $ 1,270,086 | $ 1,267,861 | $ 2,224 |
| 17.0 | $ 16,125,507.00 | $ 16,154,200.00 | $ 384,075.00 | $ 384,720 | $ 169,140 | $ 171,600 | $ - | $ (500,000) | $ 16,178,802 | $ 16,210,520 | 0.103859 | $ 1,603,610 | $ 1,600,315 | $ 3,294 |
| 18.0 | $ 16,945,843.00 | $ 16,975,600.00 | $ 296,511.00 | $ 295,410 | $ 178,587 | $ 176,800 | $ - | $ (500,000) | $ 16,920,941 | $ 16,947,810 | 0.090905 | $ 1,540,642 | $ 1,538,182 | $ 2,461 |
| 19.0 | $ 9,053,214.00 | $ 9,069,440.00 | $ 203,646.00 | $ 203,810 | $ 237,236 | $ 239,200 | $ - | $ - | $ 9,494,096 | $ 9,512,450 | 0.079567 | $ 756,375 | $ 755,415 | $ 1,460 |
| 20.0 | $ 9,594,211.00 | $ 9,430,500.00 | $ 617,680.00 | $ 618,300 | $ 272,303 | $ 270,400 | $ - | $ - | $ 10,284,194 | $ 10,299,280 | 0.069643 | $ 717,270 | $ 716,239 | $ 1,051 |
| 21.0 | $ 21,909,549.00 | $ 21,942,480.00 | $ 1,452,318.00 | $ 1,451,880 | $ 416,449 | $ 416,000 | $ - | $ - | $ 23,772,336 | $ 23,810,540 | 0.060956 | $ 1,451,394 | $ 1,449,077 | $ 2,317 |
| 22.0 | $ 44,432,377.00 | $ 44,531,000.00 | $ 2,016,282.00 | $ 2,015,200 | $ 718,967 | $ 717,600 | $ - | $ - | $ 47,167,626 | $ 47,243,800 | 0.053354 | $ 2,520,625 | $ 2,516,561 | $ 4,064 |
| 23.0 | $ 61,717,271.00 | $ 61,827,000.00 | $ 1,965,228.00 | $ 1,964,820 | $ 805,327 | $ 806,000 | $ - | $ - | $ 64,487,826 | $ 64,597,820 | 0.046699 | $ 3,016,651 | $ 3,011,514 | $ 5,137 |
| 24.0 | $ 53,555,628.00 | $ 53,650,740.00 | $ 1,321,759.00 | $ 1,321,330 | $ 882,355 | $ 884,000 | $ - | $ - | $ 55,759,742 | $ 55,856,070 | 0.040874 | $ 2,283,081 | $ 2,279,144 | $ 3,937 |
| 25.0 | $ 23,497,628.00 | $ 23,542,500.00 | $ 579,059.00 | $ 579,370 | $ 778,549 | $ 780,000 | $ - | $ - | $ 24,855,234 | $ 26,901,950 | 0.035776 | $ 962,451 | $ 960,779 | $ 1,671 |
| 26.0 | $ 5,194,704.00 | $ 5,203,660.00 | $ 124,447.00 | $ 123,680 | $ 429,005 | $ 431,600 | $ - | $ - | $ 5,748,196 | $ 5,758,940 | 0.031314 | $ 180,335 | $ 179,998 | $ 338 |
| 27.0 | $ 97,541.00 | $ 97,680.00 | $ 2,741.00 | $ 2,290 | $ 19,026 | $ 20,000 | $ - | $ - | $ 119,908 | $ 120,770 | 0.027408 | $ 3,310 | $ 3,286 | $ 24 |
| 28.0 | $ 61,268.00 | $ 61,420.00 | $ 5,786.00 | $ 6,870 | $ 331 | $ - | $ - | $ - | $ 67,885 | $ 68,290 | 0.023990 | $ 1,638 | $ 1,629 | $ 10 |
| 29.0 | $ 7,546,087.00 | $ 7,559,040.00 | $ 597,571.00 | $ 597,690 | $ 125,017 | $ 124,600 | $ - | $ - | $ 8,268,475 | $ 8,282,330 | 0.020998 | $ 173,908 | $ 173,618 | $ 291 |
| 30.0 | $ 12,990,026.00 | $ 13,012,900.00 | $ 944,969.00 | $ 943,480 | $ 228,706 | $ 228,500 | $ - | $ - | $ 14,163,701 | $ 14,185,180 | 0.018379 | $ 260,705 | $ 260,310 | $ 395 |
| 31.0 | $ 13,524,575.00 | $ 13,548,660.00 | $ 831,125.00 | $ 831,270 | $ 233,653 | $ 234,000 | $ - | $ - | $ 14,589,353 | $ 14,613,930 | 0.016086 | $ 235,085 | $ 234,689 | $ 395 |
| 32.0 | $ 11,835,542.00 | $ 11,856,280.00 | $ 608,012.00 | $ 606,350 | $ 195,001 | $ 197,600 | $ - | $ - | $ 12,638,555 | $ 12,660,730 | 0.014080 | $ 178,263 | $ 177,947 | $ 315 |
| 33.0 | $ 10,486,518.00 | $ 10,505,000.00 | $ 501,343.00 | $ 501,510 | $ 181,313 | $ 182,000 | $ - | $ - | $ 11,169,174 | $ 11,188,350 | 0.012324 | $ 137,886 | $ 137,647 | $ 239 |
| 34.0 | $ 7,534,584.00 | $ 7,548,000.00 | $ 338,630.00 | $ 338,920 | $ 157,804 | $ 156,000 | $ - | $ - | $ 8,031,018 | $ 8,042,920 | 0.010787 | $ 86,757 | $ 86,628 | $ 128 |
| 35.0 | $ 5,300,533.00 | $ 5,310,240.00 | $ 190,229.00 | $ 180,070 | $ 154,774 | $ 156,000 | $ - | $ - | $ 5,645,586 | $ 5,656,510 | 0.009441 | $ 53,403 | $ 53,302 | $ 101 |
| 36.0 | $ 1,879,247.00 | $ 1,882,560.00 | $ 53,747.00 | $ 52,670 | $ 89,530 | $ 88,400 | $ - | $ - | $ 2,022,524 | $ 2,023,650 | 0.008264 | $ 16,723 | $ 16,714 | $ 8 |
| 37.0 | $ 159,810.00 | $ 156,140.00 | $ 8,154.00 | $ 9,160 | $ 2,435 | $ - | $ - | $ - | $ 166,399 | $ 165,300 | 0.007233 | $ 1,196 | $ 1,204 | $ (8) |
| 38.0 | $ 672,420.00 | $ 673,400.00 | $ 40,862.00 | $ 43,220 | $ 9,320 | $ 10,400 | $ - | $ - | $ 722,602 | $ 723,020 | 0.006331 | $ 4,590 | $ 4,575 | $ 15 |
| 39.0 | $ 796,500.00 | $ 797,720.00 | $ 50,202.00 | $ 51,525 | $ 13,009 | $ 13,600 | $ - | $ - | $ 859,791 | $ 864,845 | 0.005541 | $ 4,792 | $ 4,764 | $ 28 |
| 40.0 | $ 688,055.00 | $ 690,420.00 | $ 45,964.00 | $ 45,800 | $ 15,501 | $ 13,600 | $ - | $ - | $ 750,300 | $ 751,820 | 0.004850 | $ 3,646 | $ 3,639 | $ 7 |
| 41.0 | $ 314,930.00 | $ 315,240.00 | $ 23,728.00 | $ 22,900 | $ 10,428 | $ 10,400 | $ - | $ - | $ 349,486 | $ 348,540 | 0.004245 | $ 1,480 | $ 1,479 | $ 0 |
| 42.0 | $ 113,024.00 | $ 113,220.00 | $ 5,919.00 | $ 6,870 | $ 4,430 | $ 5,200 | $ - | $ - | $ 123,373 | $ 125,290 | 0.003716 | $ 466 | $ 458 | $ 7 |
| 43.0 | $ 61,602.00 | $ 61,420.00 | $ 1,545.00 | $ 2,290 | $ 2,587 | $ - | $ - | $ - | $ 65,734 | $ 63,710 | 0.003252 | $ 207 | $ 214 | $ (7) |
| 44.0 | $ 8,012.00 | $ 8,140.00 | $ 146.00 | $ - | $ 423 | $ - | $ - | $ - | $ 8,591 | $ 8,140 | 0.002847 | $ 25 | $ 24 | $ (1) |
| TOTAL | $ 354,378,874.00 | $ 355,006,860.00 | $ 13,927,207.00 | $ 13,924,345.00 | $ 6,542,977 | $ 6,552,000 | $ 7,850,000 | $ (2,500,000) | $ 380,199,058 | $ 380,833,205 | | $ 21,952,514 | $ 21,921,047 | $ 31,467 |

| Summary: | |
|---|---|
| Total PMTS | 380,833,205 |
| PV @ 14.25% FS calc | 21,952,514 |
| Appraisal calc | 21,921,047 |
| Diff | $ 31,467 |

## MWA CASH FLOWS – SUMMARY AND MILESTONE DEDUCTIONS

| Summary of MWA Royalty | | | |
|---|---|---|---|
| **Present Value 14.25%** | **Appraisal Results** | **FS Review Calc** | |
| Non-Production | $ 3,693,465 | $ 3,693,465 | |
| Copper Royalty | $ 17,584,784 | $ 17,615,854 | |
| Molybdenum Royalty | $ 647,547 | $ 647,270 | |
| Silver Royalty | $ 297,191 | $ 297,864 | |
| Total Royalty | $ 22,222,986 | $ 22,254,453 | |
| Deduct Feasibility Milestones (-$500K per year, Yrs 14-18) | $ (301,939) | $ (301,939) | |
| **Grand Total $** | **$ 21,921,047** | **$ 21,952,514** | |
| *FS - Apppraisal Difference* | *$ 31,467* | *0.1435%* | |
| | | | |
| | | | |
| | | | |
| **Feasibility Milestone Deductions PV @ 14.25%** | | | **PV - Feasibility Milestones** |
| Yr 14 | $ (500,000) | 0.154886326 | $ (77,443) |
| Yr 15 | $ (500,000) | 0.1355679 | $ (67,784) |
| Yr 16 | $ (500,000) | 0.118658993 | $ (59,329) |
| Yr 17 | $ (500,000) | 0.103859075 | $ (51,930) |
| Yr 18 | $ (500,000) | 0.090905099 | $ (45,453) |
| | | | $ (301,939) |



January 22, 2023

Gerald Sanchez, RPRA, Chief Appraiser
USDA Forest Service, Washington Office Lands & Realty
333 Broadway SE, Room 333
Albuquerque, New Mexico 87102

RE:    Real Property Appraisal Report
       Southeast Arizona Land Exchange and Conservation Act
       Selected Federal Land – Mineral Withdrawal Area (MWA)
       Pinal County, Arizona

Greetings Jerry:

Per USDA Forest Service Contract No. 12837120C0041, I have commissioned an appraisal and
submit herewith the report relating the findings thereof for the Mineral Withdrawal Area portion
of the Selected Federal Lands included in the Southeast Arizona Land Exchange and
Conservation Act. The 766.58-acre subject property, referred to in the report as the Mineral
Withdrawal Area, or MWA, is located just east of the historic Magma Mine, near Superior,
Arizona. It includes the fee simple interest in the surface and underlying mineral estate.

**This is a CONFIDENTIAL REPORT. Possession of this report, or a copy thereof, does not
carry with it the right of publication. It may not be used for any purpose by any person
other than the party to whom it is addressed without the prior written consent of the
appraiser, and in any event only with properly written qualifications and only in its
entirety.**

The client in this appraisal assignment is the USDA Forest Service.

Weissenborn Appraisal, LLC is the contractor under the above referenced contract and is
providing appraisals of the Offered Non-federal Land component of the Southeast Arizona Land
Exchange and Conservation Act. But Weissenborn Appraisal lacks the professional background
and expertise necessary to provide credible valuations of the Selected Federal Land component
of the exchange. Accordingly, Weissenborn Appraisal commissioned Spanish Flat Mining
Company, which has extensive experience in the valuation of mineralized and mine-related
properties and possesses the professional expertise necessary to complete this leg of the
assignment.

The accompanying report correctly identifies Weissenborn Appraisal, LLC as the client of
Spanish Flat Mining Company, but it was, and still is, recognized that the report was prepared
for submittal to the Forest Service under Contract No.12837120C0041.

The intended users of the appraisal report are the USDA Forest Service, the USDA Office of
General Counsel and Resolution Copper Mining, LLC. The appraisal and report are not
intended for any other user.

contiguous commercial acres. Mining is considered a legally permissible use by Pinal County; the permitting authority for mining related activities is under state and county jurisdictions.

The Pinal County Comprehensive Plan (PCCP), updated January 2021, states …*all private and public entities share the responsibilities of ...encourage retention of existing and creation of new (and diverse) employment opportunities, including mining*… Pinal County claims 1,757 mining industry jobs county wide, which accounts for 3.2% of its total jobs.

The PCCP, in its Commerce-Related Land Uses section specific to Mining/Extraction,

> *Identifies those areas where mineral resources have been identified or are likely to be identified in the future. The intent of this designation is to protect the mineral resources by minimizing conflicts with surrounding land uses. This designation recognizes the rights of exploration, mining, and processing of mineral resources. Copper mining is currently occurring around Superior and Kearny. All mining operations conducted by whatever techniques and technologies employed are required to comply with all applicable federal, state, and local laws providing for the protection of environmental resources.*

## Regulatory & Permitting Structure

National Forest System surface resources are managed by the USFS; the subsurface (mineral interest) is managed by the BLM. The Subject is in the Tonto National Forest, Globe Ranger District jurisdiction; however, for the purpose of this Report, the Subject is considered fee simple ownership, *as though it is in private ownership, is freely alienable, and zoned consistently with other similarly situated non-Federal properties within the jurisdiction of the zoning authority*.

RCM submitted an updated General Plan of Operations (POO, aka GPO) to the USFS in August 2016 to evaluate environmental baseline data for proposed surface disturbances and resource impacts, as required by the Southeast Arizona Land Exchange and Conservation Act (the Act):

> *The Act requires that the land exchange and the GPO be considered and evaluated by the Forest Service in a single EIS. In order to support the environmental evaluation of both the GPO and the land exchange, this GPO identifies where mine development would occur on or under public lands included in the exchange.*

The USFS is charged with processing POOs, as well as bonding, monitoring, reclamation, final mine closure, and compliance issues; compliance with NEPA, via the Council on Environmental Quality, is also a regulatory requirement. However, because the Subject is considered, *as though it is in private ownership*, RCM's proposed POO will be processed as if under state jurisdiction

and the USFS surface management authorities/responsibilities are not a component of the estate to be appraised.

The privately owned land surrounding the National Forest System lands, including the Subject, are zoned GR under Pinal County jurisdiction, which allows mining related activities as a legally permissible use. The Arizona State Mine Inspector (ASMI) must be notified prior to starting, moving or stopping a mining operation. The Arizona Department of Mines & Mineral Resources (ADMMR) is the principal authority for mine permitting and reclamation, which is regulated by the ASMI. ADMMR requires the mine operator to submit a Mined Land Reclamation Plan and financial assurance (reclamation bond), for all metalliferous mining units and exploration operations with surface disturbances on private lands greater than five acres. Mine operators are responsible for obtaining all necessary environmental, planning, building, and operational permits; operators are referred to the Arizona Mining Permitting Guide, 2nd Edition, published by the US Department of the Interior, and compiled/edited by the ADMMR, for permitting assistance.

The statutory laws of Arizona are referred to as the Arizona Revised Statutes (ARS), organized by subject area into Titles, Chapters, Articles and Sections ( https://www.azleg.gov/arstitle/); there are currently 49 titles, although three have been repealed.  ARS Titles include ARS Title 1- General Provisions through ARS Title 49- The Environment; a few citations in this report are from Minerals, Oil and Gas (ARS Title 27).

The Pinal County Comprehensive Plan (updated January 2021) is a broad policy statement, which addresses most of the County's future planning objectives and provides guidelines for sustainable growth.   Pinal County Planning & Development Department provides information, regulatory requirements, and permitting guidelines for specific: multi-family dwelling units, such as planned unit developments (PUDs); large commercial and industrial developments and special land uses; and institutional developments, such as schools, libraries and churches.

Pinal County Building Safety Department (PCBSD) requires building permits and inspections, via their building code ordinance, as amended (2018); PCBSD provides inspection, plan review and investigative services to the unincorporated areas of the county.

Mine safety and health compliance is regulated and inspected by state and federal authorities. ASMI is the state agency charged with safety and health regulatory compliance for mining operations.  Mine Safety and Health Administration (MSHA) is the federal authority for training, regulatory compliance and inspecting active mining operations.  No permitting structure exists for mine safety/health programs, but notification, prior to initiating mining operations, and regulatory compliance is required by both ASMI and MSHA.

## OVERSIGHT HEARING TITLED "AMERICA'S MINERAL RESOURCES: CREATING MINING AND MANUFACTURING JOBS AND SECURING AMERICA"; AND LEGISLATIVE HEARING ON H.R. 1063, H.R. 687, H.R. 697, H.R. 761, H.R. 767, H.R. 957, AND H.R. 981

# OVERSIGHT AND LEGISLATIVE HEARING

BEFORE THE

## SUBCOMMITTEE ON ENERGY AND MINERAL RESOURCES

OF THE

## COMMITTEE ON NATURAL RESOURCES U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED THIRTEENTH CONGRESS

FIRST SESSION

Thursday, March 21, 2013

## Serial No. 113–7

Printed for the use of the Committee on Natural Resources



Available via the World Wide Web: http://www.fdsys.gov
or
Committee address: http://naturalresources.house.gov

U.S. GOVERNMENT PRINTING OFFICE

80–077 PDF          WASHINGTON : 2014

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

COMMITTEE ON NATURAL RESOURCES

DOC HASTINGS, WA, *Chairman*
EDWARD J. MARKEY, MA, *Ranking Democratic Member*

Don Young, AK
Louie Gohmert, TX
Rob Bishop, UT
Doug Lamborn, CO
Robert J. Wittman, VA
Paul C. Broun, GA
John Fleming, LA
Tom McClintock, CA
Glenn Thompson, PA
Cynthia M. Lummis, WY
Dan Benishek, MI
Jeff Duncan, SC
Scott R. Tipton, CO
Paul A. Gosar, AZ
Raúl R. Labrador, ID
Steve Southerland, II, FL
Bill Flores, TX
Jon Runyan, NJ
Mark E. Amodei, NV
Markwayne Mullin, OK
Chris Stewart, UT
Steve Daines, MT
Kevin Cramer, ND
Doug LaMalfa, CA
*Vacancy*

Peter A. DeFazio, OR
Eni F. H. Faleomavaega, AS
Frank Pallone, Jr., NJ
Grace F. Napolitano, CA
Rush Holt, NJ
Raúl M. Grijalva, AZ
Madeleine Z. Bordallo, GU
Jim Costa, CA
Gregorio Kilili Camacho Sablan, CNMI
Niki Tsongas, MA
Pedro R. Pierluisi, PR
Colleen W. Hanabusa, HI
Tony Cárdenas, CA
Steven A. Horsford, NV
Jared Huffman, CA
Raul Ruiz, CA
Carol Shea-Porter, NH
Alan S. Lowenthal, CA
Joe Garcia, FL
Matt Cartwright, PA

Todd Young, *Chief of Staff*
Lisa Pittman, *Chief Legislative Counsel*
Jeffrey Duncan, *Democratic Staff Director*
David Watkins, *Democratic Chief Counsel*

————

SUBCOMMITTEE ON ENERGY AND MINERAL RESOURCES

DOUG LAMBORN, CO, *Chairman*
RUSH HOLT, NJ, *Ranking Democratic Member*

Louie Gohmert, TX
Rob Bishop, UT
Robert J. Wittman, VA
Paul C. Broun, GA
John Fleming, LA
Glenn Thompson, PA
Cynthia M. Lummis, WY
Dan Benishek, MI
Jeff Duncan, SC
Paul A. Gosar, AZ
Bill Flores, TX
Mark E. Amodei, NV
Steve Daines, MT
Kevin Cramer, ND
Doc Hastings, WA, *ex officio*

Steven A. Horsford, NV
Matt Cartwright, PA
Jim Costa, CA
Niki Tsongas, MA
Jared Huffman, CA
Alan S. Lowenthal, CA
Peter A. DeFazio, OR
Tony Cárdenas, CA
Raúl M. Grijalva, AZ
Colleen W. Hanabusa, HI
Joe Garcia, FL
*Vacancy*
*Vacancy*
Edward J. Markey, MA, *ex officio*

————

(II)

# CONTENTS

———————

|  | Page |
|---|---|
| Hearing held on Thursday, March 21, 2013 | 1 |

Statement of Members:
| Holt, Hon. Rush, a Representative in Congress from the State of New Jersey | 5 |
| Prepared statement of | 6 |
| Lamborn, Hon. Doug, a Representative in Congress from the State of Colorado | 2 |
| Prepared statement of | 4 |

Statement of Witnesses:
| Batulis, Ruthe, President, Dakota County Regional Chamber of Commerce, and President, Minnesota Conference of Chamber Executives | 23 |
| Prepared statement on the Oversight Hearing | 24 |
| Connell, Jamie E., Acting Deputy Director, Bureau of Land Management, U.S. Department of the Interior | 46 |
| Prepared statement: | |
| on H.R. 687 | 49 |
| on H.R. 697 | 51 |
| on H.R. 761 and H.R. 1063 | 48 |
| on H.R. 767 | 52 |
| on H.R. 957 | 54 |
| on H.R. 981 | 55 |
| Questions submitted for the record | 56 |
| Gosar, Hon. Paul A., a Representative in Congress from the State of Arizona | 7 |
| Prepared statement on H.R. 687 | 9 |
| Grijalva, Hon. Raúl M., a Representative in Congress from the State of Arizona, Oral statement on H.R. 687 | 13 |
| Heck, Hon. Joseph J., a Representative in Congress from the State of Nevada | 14 |
| Prepared statement on H.R. 697 | 15 |
| Hohn, Mike, General Manager, Soda Ash Business OCI Chemical Corporation | 83 |
| Prepared statement on H.R. 957 | 85 |
| Iwanicki, James M., P.E., Engineer Manager, Marquette County Road Commission | 18 |
| Prepared statement on the Oversight Hearing | 20 |
| Johnson, Hon. Henry C. "Hank," Jr., a Representative in Congress from the State of Georgia, Oral statement on H.R. 981 | 17 |
| Kirkpatrick, Hon. Ann, a Representative in Congress from the State of Arizona | 12 |
| Prepared statement on H.R. 687 | 13 |
| Krill, Jennifer, Executive Director, Earthworks | 28 |
| Prepared statement on the Oversight Hearing, H.R. 687, H.R. 697, H.R. 761, and H.R. 957 | 29 |
| McGroarty, Daniel, President, American Resources Policy Network | 80 |
| Prepared statement on H.R. 1063 | 81 |
| Melander, Harry, President, Minnesota Building and Construction Trades Council | 25 |
| Prepared statement on the Oversight Hearing | 26 |
| Miller, Stephen Q., Chairman, Board of Supervisors, Pinal County District 3, Casa Grande, Arizona | 72 |
| Prepared statement on H.R. 687 | 74 |

(III)

IV

Page

Statement of Witnesses—Continued
    Miller, Stephen Q., Chairman, Board of Supervisors, Pinal County
        District 3, Casa Grande, Arizona—Continued
            Question submitted for the record .......................................................... 75
    Neatby, Pierre, Vice President, Sales & Marketing, Avalon Rare Metals ... 87
        Prepared statement on H.R. 1063, H.R. 761, and H.R. 981 ................ 88
    Peralta, Soyla "Kiki," Council Member, Superior Town Council, Superior,
        Arizona ........................................................................................................... 102
        Prepared statement on H.R. 687 ............................................................. 103
    Quinn, Hal, President and CEO, National Mining Association ................... 76
        Prepared statement on H.R. 761 ............................................................. 77
    Rambler, Terry, Chairman, San Carlos Apache Tribe ................................. 91
        Prepared statement on H.R. 687 ............................................................. 92
        Questions submitted for the record ......................................................... 101
    Wagner, Mary, Associate Chief, U.S. Forest Service, U.S. Department
        of Agriculture ............................................................................................... 57
        Prepared statement on H.R. 687 ............................................................. 58
Additional materials submitted for the record:
    List of documents retained in the Committee's official files ......................... 112

OVERSIGHT HEARING ON "AMERICA'S MINERAL RESOURCES: CREATING MINING AND MANUFACTURING JOBS AND SECURING AMERICA"; AND A LEGISLATIVE HEARING ON H.R. 1063, "NATIONAL STRATEGIC AND CRITICAL MINERALS POLICY ACT OF 2013"; H.R. 687, "SOUTHEAST ARIZONA LAND EXCHANGE AND CONSERVATION ACT OF 2013"; H.R. 697, "THREE KIDS MINE REMEDIATION AND RECLAMATION ACT"; H.R. 761, "NATIONAL STRATEGIC AND CRITICAL MINERALS PRODUCTION ACT OF 2013"; H.R. 767, TO AMEND THE ENERGY POLICY ACT OF 2005 TO MODIFY THE PILOT PROJECT OFFICES OF THE FEDERAL PERMIT STREAMLINING PILOT PROJECT; H.R. 957, "AMERICAN SODA ASH COMPETITIVENESS ACT"; AND H.R. 981, "RESOURCE ASSESSMENT OF RARE EARTHS ACT OF 2013."

---

Thursday, March 21, 2013
U.S. House of Representatives
Subcommittee on Energy and Mineral Resources
Committee on Natural Resources
Washington, D.C.

---

The Subcommittee met, pursuant to notice, at 10:07 a.m., in room 1334, Longworth House Office Building, Hon. Doug Lamborn [Chairman of the Subcommittee] presiding.

Present: Representatives Lamborn, Broun, Lummis, Benishek, Duncan, Gosar, Daines, Cramer, Holt, Horsford, Huffman, Lowenthal, DeFazio, Grijalva, Hanabusa, and Garcia.

Also Present: Representatives Heck, Napolitano, Johnson of Georgia, and Kirkpatrick.

Mr. LAMBORN. The Committee will come to order. We are going to go ahead and get an expedited start here. As the Ranking Member comes in he will make his opening statement at an opportune time. But with votes pending, and then with people wanting to catch planes later in the day, we thought we should go ahead and get started.

The Chairman notes the presence of a quorum, which, under Committee Rule 3(e), is 2 Members. The Subcommittee on Energy

(1)

2

and Mineral Resources hearing today is to hear testimony on an oversight hearing on, America's Mineral Resources: Creating Mining and Manufacturing Jobs and Securing America, and we are going to have a legislative hearing on H.R. 1063, I introduced it, it is National, Strategic, and Critical Minerals Policy Act of 2013; H.R. 687 by Representatives Gosar and Kirkpatrick on Southeast Arizona Land Exchange and Conservation Act of 2013; H.R. 697 by Representative Heck, Three Kids Mine Remediation and Reclamation Act; H.R. 761, by Representative Amodei, National Strategic and Critical Minerals Production Act of 2013; H.R. 767 by Representative Cramer to amend the Energy Policy Act of 2005 to modify the Pilot Project offices of the Federal Permit Streamlining Pilot Project; H.R. 957 by Representative Lummis, America Soda Ash Competitiveness Act; and H.R. 981 by Representative Johnson of Georgia and Markey, Resource Assessment of Rare Earths Act of 2013.

Under Committee Rule 4(f), opening statements are limited to the Chairman and Ranking Member. However, I ask unanimous consent to include any other Members' opening statements in the hearing record if submitted to the clerk by close of business today.

[No response.]

Mr. LAMBORN. Hearing no objection, so ordered.

I also ask unanimous consent that the following Members be allowed to participate in today's hearing: the gentlelady from California, Mrs. Napolitano; the gentlelady from Arizona, Mrs. Kirkpatrick, the gentleman from Nevada, Mr. Heck, and the gentleman from Georgia, Mr. Johnson.

[No response.]

Mr. LAMBORN. Hearing no objection, so ordered.

## STATEMENT OF THE HON. DOUG LAMBORN, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF COLORADO

Mr. LAMBORN. I would like to welcome everybody to the hearing today, and who are listening via our webcast, to the Subcommittee on Energy and Mineral Resources oversight, and the legislative hearing focusing on assessing the Nation's solid mineral resources, and examining our national strategic and critical minerals policy.

As I have stated before, our national minerals policy has been neglected for far too long. And as evidenced by the bipartisan nature of the legislation we will be considering today, there is a clear recognition that, as a Nation, we can no longer afford to have our domestic mineral needs or policy put on the back burner.

Strategic and critical minerals are essential to our economy, livelihoods and national security, as well. Renewable energy, national defense equipment, agriculture, health care, and everyday items such as televisions, telephones, computers, light bulbs, and so on, are all dependent on minerals. Currently, the United States relies on foreign sources for a majority of our non-fuel mineral materials. And, according to the USGS, we are 100 percent dependent on foreign sources for rare earth minerals.

Mining creates tangible value, introducing new money into the Nation's economic system. Additional tangible value is added to the raw mined production through manufacturing, construction, and other uses. Harvesting domestic mineral resources contributes to

3

local economies, and it also contributes to the Nation's overall economic security from the most basic level up.

Mining and the associated businesses and industry have been one of the few growth areas during our country's prolonged recession, and has provided employment opportunities for skilled labor, scientists, engineers, and others. These are not your everyday, run-of-the-mill jobs, but high-paying, family wage jobs with generous benefits. A recent CRS analysis shows the non-supervisory positions in the energy and mineral sectors pays $1,200 to $1,500 per week, respectively.

I would like to point out that domestic mining isn't just about jobs in the mines. It is thousands of geologists, biologists, and environmental engineers. It is about the tens of thousands of jobs in the industries that support our miners, from the Caterpillar factories in Illinois to Redwing Boots in Minnesota, from St. Pierre chains in Worcester, Massachusetts to AirFlow Catalyst Systems in Rochester, New York.

As an added benefit, the Nation will become more self-reliant on the raw, mined materials our society depends on, as well as increasing opportunities for growth in our domestic manufacturing sector. We will also have improved economic and national security. The end result is Americans everywhere benefit from more domestic mining.

Now, we have an interesting and exciting hearing before us today. We will start with a bipartisan panel of our colleagues on both sides of the legislation before us. We will have an oversight panel following that will provide testimony on America's mineral resources creating mining and manufacturing jobs and securing America.

Domestic mining faces many challenges in the U.S., permitting and access being only a sliver of the numerous challenges facing mine development. However, it holds great promise. So we will hear from folks who see a bright future and opportunity. Just as the United States has experienced significant growth in oil and natural gas reserves and resources, mainly from private and State mineral-rich lands, there is an opportunity for significant growth in domestic, non-fuel, strategic, and critical minerals production, as well.

Now, this oversight hearing will be followed by an administration panel that will provide testimony on the legislation under consideration today.

And finally, we will hear from our legislative panel. We are getting a lot of things done today. With the exception of my colleague Kevin Cramer's bill to amend the Energy Policy Act of 2005 to modify the Pilot Project offices that were referred to earlier, the other pieces of legislation have passed out of the House Committee on Natural Resources and, in some cases, the Floor of the House during the last Congress, unfortunately only to languish in the Senate.

Here I would like to make a pitch for my legislation, H.R. 1063, the National Strategic and Critical Minerals Policy Act of 2013, which I strongly believe will provide the agencies with the information they need to make better decisions for the country when it comes to the development of our non-fuel solid mineral resources.

4

Other important bipartisan pieces of legislation under consideration today that will not be considered by the Members panel, so I should give them a little emphasis right here, H.R. 761, the National Strategic and Critical Minerals Production Act of 2013, which uses the President's Executive order requiring coordination between agencies when permitting infrastructure projects in order to expedite construction and job creation; and H.R. 957, the American Soda Ash Competitiveness Act, which sets the Federal royalty rate for soda ash at 2 percent, allowing the domestic soda ash industry to remain competitive with international producers.

I look forward to hearing from our witnesses today, and I would like to recognize the Ranking Member, from New Jersey, Representative Holt.

[The prepared statement of Mr. Lamborn follows:]

PREPARED STATEMENT OF THE HONORABLE DOUG LAMBORN, CHAIRMAN,
SUBCOMMITTEE ON ENERGY AND MINERAL RESOURCES

I would like to welcome everyone in the room here today and listening via our webcast to the Subcommittee on Energy and Mineral Resources oversight and legislative hearing focusing on accessing the Nation's solid mineral resources and examining our national Strategic and Critical Minerals Policy. As I've stated before—our national minerals policy has been neglected for far too long. And as evidenced by the bipartisan nature of the legislation we will be considering today there is a clear recognition that as a Nation we can no longer afford to leave our domestic mineral needs or policy on the back burner.

Strategic and critical minerals are essential to our economy, livelihood and national security. Renewable energy, national defense equipment, agriculture, healthcare and everyday items such as televisions, telephones, computers and light bulbs are all dependent on minerals. Currently the United States relies on foreign sources for a majority of our non-fuel mineral materials and, according to the USGS, is 100 percent dependent on foreign sources for rare earth minerals.

Mining creates tangible value, introducing new money into the Nation's economic system. Additional tangible value is added to the raw mined product through manufacturing, construction, and other uses. Harvesting domestic mineral resources contributes to local economies, and to the nation's overall economic security from the most basic level up.

Mining and the associated businesses and industry have been one of the few growth areas during the country's prolonged recession providing employment opportunities for skilled labor, scientist, engineers and others.

These are not your everyday run of the mill jobs but high-paying-family wage jobs with generous benefits. A recent CRS analysis shows the non- supervisory positions in the energy and minerals sector pay $1,535 and $1,220 per week respectively.

I'd like to point out that domestic mining isn't just about jobs in the mines, its thousands of geologists, biologists, and environmental engineers, it is about the tens of thousands of jobs in the industries that support our miners. From the Caterpillar factories in Illinois to Red Wing Boots in Minnesota, from St. Pierre Chains in Wooster, MA to Airflow Catalyst Systems in Rochester, NY.

As an added benefit—the Nation will become more self-reliant on the raw mined materials our society depends on as well as increasing opportunities for growth in our domestic manufacturing sector, and improving the Nation's economic and national security. The end result is Americans everywhere benefit from more domestic mining.

**Members Panel**

We have an exciting hearing before us today; we will start with a bipartisan panel of our colleagues, on both sides of the legislation before us.

**Oversight Panel**

The Members panel will be followed by our oversight panel that will provide testimony on *"America's Mineral Resources: Creating Mining and Manufacturing Jobs and Securing America."* Domestic mining faces many challenges in the U.S., permitting and access being only a sliver of the numerous challenges facing mine development. However, it also holds great promise as we will hear from folks who see a bright future and opportunity.

5

Just as the U.S. has experienced significant growth in Oil and Natural Gas reserves and resources—mainly from private and state mineral rich lands—there is an opportunity for significant growth in domestic non-fuel strategic and critical minerals production as well.

**ADMINISTRTION PANEL**

The Oversight panel will be followed by the Administration Panel that will provide testimony on the Legislation under consideration today.

**Legislative Panel**

Finally, we will hear from our legislative panel. With the Exception of my colleague Kevin Cramer's bill to amend the Energy Policy Act of 2005 to modify the Pilot Project offices of the Federal Permit Streamlining Pilot Project to include Montana and South Dakota, the other pieces of legislation have passed out of the House Committee on Natural Resources and in some cases the floor of the House during the last Congress only to languish in the Senate.

Here I'd like to make a pitch for my legislation H.R. 1063 the *"National Strategic and Critical Minerals Policy Act of 2013,"* which I strongly believe will provide the agencies with the information they need to make better decisions for the country when it comes to the development of our non-fuel solid mineral resources.

Other important bipartisan pieces of legislation under consideration today that will not be discussed by the Members panel are:

- H.R. 761 the *"National Strategic and Critical Minerals Production Act of 2013"* which uses the President's Executive Order requiring coordination between agencies when permitting infrastructure projects in order to expedite construction and JOB creation as a template for permitting reform for advanced mineral exploration and mine development projects—the foundation of other more familiar Infrastructure projects such as roads and bridges—leading to JOB creation and economic and national security; and

- H.R. 957 the *"American Soda Ash Competitiveness Act"* sets the Federal royalty rate for soda ash at 2 percent allowing the domestic soda ash industry to remain competitive with international producers—namely China—and protects domestic JOBS in the mining, transportation and shipping sectors.

I look forward to hearing from our witnesses today.

––––––––

**STATEMENT OF THE HON. RUSH HOLT, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NEW JERSEY**

Dr. HOLT. Thank you, Mr. Chairman. Let me see if I can keep my remarks to a minute or two. The bells have sounded. We have Members waiting, and we clearly won't be able to get through everything.

But I am pleased we are examining rare earth and critical minerals. I am pleased that H.R. 1063, introduced by Chairman Lamborn, includes compromised language agreed to in the last Congress.

I would point out that, despite being entitled, "National Strategic and Critical Minerals Production Act of 2013," H.R. 761 has nothing to do with developing these minerals. In fact, it is about gutting environmental safeguards and proper review of large mining projects.

Another bill today, H.R. 687 that looks at exchanging land at the Tonto National Forest with regard to copper mining, raises numerous concerns about the impacts on the environment. And I will be interested to hear more about that.

H.R. 957 would impose reduced royalty rate for soda ash produced on Federal lands. We can and should debate the impact of such a reduction. But the ability of the soda ash industry to increase production should be part of that conversation.

And, overall, we have to understand that all of this debate is done in the context of the archaic Mining Law of 1872. Ranking

6

Member Markey and Representative Grijalva and I will be introducing legislation that would ensure that large companies extracting minerals belonging to the taxpayer from public lands pay for the privilege of doing so, as they do for oil and gas. More about that later.

But to save time, let me end my remarks and come back to them in the course of the questioning. Thank you.

[The prepared statement of Dr. Holt follows:]

PREPARED STATEMENT OF THE HONORABLE RUSH HOLT, RANKING MEMBER,
SUBCOMMITTEE ON ENERGY AND MINERAL RESOURCES

Thank you.

I am pleased that we are examining rare earth and other critical and strategic minerals that are indispensable in the manufacture of high-tech goods. Everything from solar panels and iPhones, to missile guidance systems and MRI machines requires one or several of the world's 17 minerals collectively known as rare earths. H.R. 981, the RARE Act, tasks the U.S. Geological Society with conducting a global assessment of rare earth mineral resources and potential supply sources. And I am pleased that H.R. 1063, introduced by Chairman Lamborn, also includes compromise language agreed to in the last Congress that would accomplish the same goals of improving our understanding of these important rare earth minerals.

Unfortunately, while these two bills will improve our understanding of critical and strategic minerals, other pieces of legislation that we are considering today represent nothing more than huge giveaways to the mining industry and rollbacks of environmental protections for our public lands. Many of these measures passed the House in the last Congress but were too extreme to pass the Senate. Yet, today we are considering these same extreme bills with few or no changes.

For instance, despite being entitled the "National Strategic and Critical Minerals Production Act of 2013," H.R. 761 has absolutely NOTHING to do with developing these minerals. In fact, this bill is all about gutting the environmental safeguards and the proper review of large mining projects on public lands for virtually all minerals. The bill would really waive proper environmental review and public input for large mining operations on public lands for abundant minerals like gold, silver or copper.

Another bill we are considering today, H.R. 687, would transfer approximately 2,400 acres of land in the Tonto National Forest, including 760 acres that were withdrawn from mining operations by President Eisenhower in 1955, to a subsidiary of two foreign mining companies—Rio Tinto and BHP Billiton. This bill raises numerous concerns about the impacts on the environment, surrounding communities and Native American sacred sites.

Allowing copper mining in this area could have significant impacts on the quality and quantity of drinking water for thousands of people in this already drought prone area. This proposal could decimate the economic benefits of recreation. It could devastate an area sacred to Native People. And this legislation would hand over billions of dollars worth of mineral resources to foreign mining companies without receiving a fair return. All while waiving proper review under the National Environmental Policy Act. In addition, support for this mining proposal has been eroding. The town of Superior, Arizona—the town that would be most directly impacted—recently adopted a resolution opposing the deal.

H.R. 957 would re-impose a reduced royalty rate for soda ash produced from Federal lands. We can and should debate the impact of such a reduction but the ability of the soda ash industry to increase production, exports, and employment last year following the expiration of the reduced royalty rate should be part of that conversation.

And while many of the bills we are considering today provide new giveaways to large, multinational mining companies, they do nothing to update the Mining Law of 1872, which allows mining companies to pull taxpayer-owned hardrock minerals out of our public lands virtually for free. In fact, under this 140-year old law, mining companies can extract gold, silver, uranium, copper and other hardrock minerals without paying taxpayers a dime in royalties for those minerals. This law isn't just outdated, it's outrageous. That is why I will be introducing legislation with Ranking Member Markey, and Representative Grijalva that would ensure that large companies extracting these minerals on public lands pay taxpayers for the privilege of doing so, just as oil, gas and coal companies do now. As we are looking at ways to

7

reduce our deficit, updating this law should be a common sense reform. But instead, the Majority continues to focus on heaping new giveaways on this industry.

———

Mr. LAMBORN. OK, certainly. And thank you, Representative Holt. We now have five Members who have come forward for our first panel. We have about 8 minutes or so before we have to scurry over there to catch the first vote, because the 15-minute period is running. Hopefully we can get through the testimony. If not, we will just reconvene after votes. But we will be in recess in about 8 minutes or so.

Let's start now with Representative Paul Gosar of Arizona.

### STATEMENT OF THE HON. PAUL A. GOSAR, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF ARIZONA

Dr. GOSAR. Thank you, Chairman Lamborn, and thanks for scheduling today's legislative hearing on the Southeast Arizona Land Exchange and Conservation Act. When I was first elected to Congress a little over 2 years ago, one of the first initiatives the people of Arizona brought to my attention was this land exchange.

H.R. 687 facilitates a land exchange that will bring into Federal stewardship 5,500 acres of high-priority conservation lands that contain endangered species, sensitive ecosystems, recreational sites, and historical landmarks, in exchange for 2,600 acres of Federal land in Pinal County, Arizona, containing one of the largest undeveloped copper resources in the world. It is a critical first step in the development of the largest producing mine in North America.

The potential economic benefits of this legislation are staggering. Upon passage of the bill, Resolution Copper estimates that it will be able to employ nearly 3,000 workers during a 6-year construction period, and that is just the start. The mine, assuming the company's mine plan of operation, complies with all environmental laws. Let me repeat. It is a requirement explicitly by my bill that they comply with all environmental bills.

When they go into full production, they will directly employ another 1,400 people. These are high-paying jobs, ranging from $40,000 to $120,000 salaries per year in a region that is struggling, economically. As many people familiar with mining communities know, an influx of over 1,000 mining jobs will spur economic development growth in the community. These mine workers need restaurants to eat at, convenience stores to shop at, and homes to live in. A recent economic study estimates an additional 2,300 jobs could be created due to these demands. That brings the estimated total number of jobs resulting from this legislation to 3,700.

Overall, independent analysis estimates the total economic impact of the project will be over $61 billion. That is over $1 billion per year over the life of the mine, which equates to over $19 billion to Federal, State, county, and local tax revenues—$19 billion in tax revenues. In these tough fiscal times, I think we could all agree our local governments, and certainly the U.S. Treasury, could use those funds.

This legislation has national security implications. The U.S. currently imports 30 percent of our copper demands, and the demand is skyrocketing. This critical mineral is used in virtually all mod-

8

ern-day technology, ranging from renewable energy and hybrid cars to everyday electronics like cell phones and iPads. Our country must use domestic resources to meet this growing demand, and this project could yield enough copper to meet 25 percent of our current needs.

This legislation is not only a jobs bill, it is a conservation bill. The lands that the Federal Government acquires in the exchange are highly coveted recreational and conservation areas. It protects one of the few remaining undammed rivers in Arizona, the San Pedro River. The Dripping Springs property is a superb hiking and climbing location. The Cave Creek property will protect a riparian corridor, as well as numerous archeological sites, and nearly 100 acres of private land adjacent to culturally important Apache Leap is placed into the Federal stewardship.

A few of the witnesses today are going to testify that Congress is rushing consideration of the land project exchange, and that there are many unanswered questions surrounding the project. That could not be further from the truth. Over the past 8 years, this exchange and the potential mine have been subject to intensive review, public consideration, and modification. Today will be the fifth legislative hearing in either the House or the Senate held to examine the specifics of this legislation. This exact language passed the U.S. House with bipartisan support, and was almost signed into law last year.

Many of the issues that the detractors of this project will bring up in today's hearing have been addressed in the Congressional Record at some point. Congresswoman Kirkpatrick and I are committed to addressing the few concerns that have not as we move forward in this legislative process, in particular the concerns about the land that will be conveyed to the Town of Superior.

But don't be fooled. This land exchange has strong bipartisan support across the State of Arizona. I would like to submit letters of support from the State Government delegation of the affected region: Governor Jan Brewer, Democrat State Senator Barb McGuire, Republican State Representatives Frank Pratt and T.J. Shope, and Brenda Barton. I would like to submit these for the record.

Mr. LAMBORN. With no objection, so ordered.

Dr. GOSAR. Also for the record, a resolution unanimously passed by the bipartisan Pinal County Board of Supervisors and letters of support from the entire bipartisan Gila County Board of Supervisors.

Mr. LAMBORN. With no objection, so ordered.

Dr. GOSAR. These two counties encompass the area's most affected by the exchange.

And finally, I have letters from the Town of Payson; the Mayor of Globe, Terry Wheeler; a Superior Councilman, John Tameron; and a resolution of support from the Town of Kearny.

Mr. LAMBORN. Seeing no objection, so ordered.

[The information submitted for the record by Dr. Gosar has been retained in the Committee's official files:]

Dr. GOSAR. Each of these officials was elected to their position in some part because of their support for this land exchange. Their constituents—our constituents—want Congress to approve this land exchange.

9

Thank you for the opportunity to testify. I urge my colleagues to support the legislation because I know it will lead to a better future for my constituents and this country. Thank you, sir.

[The prepared statement of Dr. Gosar follows:]

PREPARED STATEMENT OF PAUL A. GOSAR, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF ARIZONA, ON H.R. 687

First, I would like to thank Chairman Lamborn for scheduling today's legislative hearing on the Southeast Arizona Land Exchange and Conservation Act. When I was first elected to Congress a little over 2 years ago, one of the first initiatives the people of Arizona brought to my attention was this land exchange.

H.R. 687 facilitates a land exchange that will bring into Federal stewardship 5,500 acres of high-priority conservation lands that contain endangered species, sensitive ecosystems, recreational sites, and historic landmarks, in exchange for 2,600 acres of Federal land in Pinal County, Arizona containing one of the largest undeveloped copper resources in the world. It is the critical first step to the development of the largest producing mine in North America.

The potential economic benefits of this legislation are staggering. Upon passage of the bill, Resolution Copper estimates it will be able to employ nearly 3,000 workers during a 6-year construction period—and that is just the start. The mine, assuming the company's mine plan of operation complies with all environmental laws, which let me repeat—is required explicitly by my bill before the company can begin production, will directly employ around 1,400 people. These are high-paying jobs, ranging from $40,000 to $120,000 salaries per year, in a region that is struggling economically.

As many people familiar with mining communities know, an influx of over 1,000 mining jobs will spur additional economic growth in a community. Those mine workers need restaurants to eat at, convenience stores to shop at, and homes to live. A recent economic study estimates an additional 2,300 jobs could be created due to these demands. That brings the estimated total number of jobs resulting from this legislation to 3,700.

Overall, independent analysis estimates the total economic impact of the project will be over $61 billion. That is over $1 billion per year over the life of the mine, which equates to over $19 billion in Federal, State, county, and local tax revenue. Nineteen billion dollars in tax revenue—in these tough fiscal times I think we can all agree our local governments and certainly the U.S. Treasury could use those funds.

This legislation also has national security implications. The United States currently imports 30 percent of our copper and demand is skyrocketing. This critical mineral is used in virtually all modern day technology ranging from renewable energy and hybrid cars, to your everyday electronics like cell phones and iPods. Our country must use domestic resources to meet this growing demand; this project could yield enough copper to meet 25 percent of our current needs.

This legislation is not only a jobs bill, it's a conservation bill. The lands the Federal Government acquires in the exchange are highly-coveted recreational and conservation areas. It protects one of the few remaining undammed rivers in Arizona, the San Pedro River. The Dripping Springs property is a superb hiking and climbing location. The Cave Creek property will protect a riparian corridor as well as numerous archaeological sites. And nearly 100 acres of private land adjacent to the culturally important Apache Leap is being placed into Federal stewardship.

A few of the witnesses today are going to testify that Congress is rushing consideration of the land exchange and that there are many unanswered questions surrounding the project. That could not be further from the truth. Over the past 8 years, this exchange and the potential mine has been subject to intensive review, public consideration, and modification. Today will be the sixth legislative hearing, in either the House or the Senate, held to examine the specifics of this legislation. This exact language passed the U.S. House with bipartisan support and was almost signed into law last year.

Many of the issues that the detractors of this project will bring up in today's hearing have been addressed in the Congressional record at some point. Congresswoman Kirkpatrick and I are committed to addressing the few concerns that have not as we move forward in the legislative process, in particular concerns about the land that will be conveyed to the Town of Superior.

But don't be fooled—this land exchange has strong bipartisan support across the State of Arizona.

10

I would like to submit letters of support from the State government delegation of the affected region—Democrat State Senator Barb McGuire, and Republican State Representatives Frank Pratt, T.J. Shope, and Brenda Barton.

Also for the record—a resolution unanimously passed by the bipartisan Pinal County Board of Supervisors and letters of support from the entire bipartisan Gila County Board of Supervisors. These two counties encompass the areas most affected by the exchange.

Finally, I have letters from the Town of Payson, the Mayor of Globe Terry Wheeler, Superior Councilman John Tameron, and a resolution of support from the Town of Kearney.

Each of these officials was elected to their positions in some part because of their support for this land exchange. Their constituents . . . OUR constituents, want Congress to approve this land exchange.

Thank you for the opportunity to testify. I urge my colleagues to support the legislation because I know it will lead to a better future for my constituents and this country.

———

Mr. LAMBORN. OK, thank you.

We will now hear from Representative Grijalva.

## STATEMENT OF THE HON. RAÚL M. GRIJALVA, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF ARIZONA

Mr. GRIJALVA. Thank you, Mr. Chairman. I appreciate the time. And I think, as President Reagan said famously in a debate once, "Here we go again." And as my friend, Mr. Gosar, said, this is about the fifth, sixth version of this piece of legislation.

And before I make any comments on this legislation, I want to advise the Chairman and the Ranking Member that I made a request to Chairman Hastings and Ranking Member Markey to delay this hearing until there is meaningful government-to-government consultation between the Federal Government and tribal Nations affected by this legislation. And that is consistent with the Federal agency and tribal memorandum of understanding that is in place right now. And I would again urge that consideration.

I am also asking that we ask the State Department to verify that this particular decision on H.R. 687 does not violate any resolution that this Congress has passed with regards to sanctions, economic sanctions in Iran, or any company or entity that does business with them. It is our understanding that Rio Tinto, the parent company of subsidiary Resolution Copper, jointly operates a uranium mine, of all things, in Namibia.

And I would suggest that before you take my word for it or take the denials as truth, that a formal request from the Chair and the Ranking Member to the State Department to validate and verify that. We have all passed resolutions and the urgency of those resolutions has come for the protection of Israel. I would suggest that that is one. The last time we had a motion to recommit on the same subject, we split entirely along party lines. Democrats supported the motion to recommit, and every Republican opposed to it. Before we cross that bridge again I would suggest we get information.

This legislation, quite frankly, Mr. Chairman, is a deception. Even today we have no one from Rio Tinto or its subsidiary, Resolution, as a witness available to answer questions, questions dealing with transparency, the due diligence, and what is the return for the taxpayer. There is a tattered history to this legislation and

11

this deal. But the fundamental and consistent reasons for opposition remain the same.

Pre or post-NEPA, the company says, "We are going to obey everything," but once it is in their hands and it is privatized, the Federal land, no matter what is found in NEPA, no matter what is found in the environmental impact statement, there is nothing the Government can do to assure compliance. So when we say we are OK with NEPA, after the fact, the law is moot after the fact.

Native Americans, and you are going to hear from them today, we have the Chairman and the President of the Hopi and Navajo Nation, as well as the Chairman of the All-Indian Pueblo Council, representing 20 pueblos in New Mexico and Texas that are here, not only in support of their colleagues, San Carlos Apaches, but also in opposition to this bill.

And the opposition continues the same. What is the value of the resource? $60 billion? $100 billion? What is under that land? And is the trade that we are talking about, is that a fair return for the taxpayer? I understand the value is proprietary to the company, but I think some due diligence on the part of this Committee to understand value and what we are giving back to the taxpayer is an important issue.

I mentioned the issue of sanctions. I think all the legitimate opposition and concerns that we have are always met with, "You are anti-jobs, you are anti-mining." Well, I think there is a rush for this legislation because there is an erosion of local support. There is unanimous opposition among Native Americans, not only in Arizona but across the country. And there is a track record for Rio Tinto with regards to labor violations, environmental violations, and failure to do reclamation.

So, why the rush? Perhaps there is a feeling there is a much more accommodating presence at the Senate that would allow this bill to go as is. Perhaps it is that there is hemorrhaging local support in the region for the mine, and let's do it now before that support eradicates entirely.

Mr. Chairman, I hope that we do our due diligence and be true stewards of our public lands and the responsibility we own. We are not Wal-Mart greeters for Rio Tinto or its subsidiary. We are not facilitators or brokers. This cozy deal before us today in the form of H.R. 687 is the same deal we saw before, and before, and before. We are doing it again, and the opposition to the points remain the same. Thank you, Mr. Chairman.

Mr. LAMBORN. OK, thank you for your testimony. I apologize that we couldn't finish the remainder of the panel. We will go into recess now to vote. I am going to let the audience know I am estimating about 45 minutes or so before we come back. But at that point we will reconvene, hear from the rest of the panel, and then go into our other panels.

We will be in recess.

[Recess.]

Mr. LAMBORN. The Subcommittee will come back to order. We have a couple Members who are on their way from the voting that just concluded, but one Member is here and I see another Member coming in. Excellent. So we will go ahead and, since Mrs. Kirk-

12

patrick is here and we are still on the subject of H.R. 687, we will hear her testimony and then go to Mr. Heck of Nevada.

Mrs. Kirkpatrick, the floor is yours.

## STATEMENT OF THE HON. ANN KIRKPATRICK, A REPRESENT-ATIVE IN CONGRESS FROM THE STATE OF ARIZONA

Mrs. KIRKPATRICK. Thank you, Mr. Chairman and Ranking Member Holt. I am proud to represent Arizona's first district. It covers 60,000 square miles, 80 rural communities, including the Town of Superior, whose leaders are here today. And it has 12 Native American Tribes, including the San Carlos Apache Tribe, whose leaders are here today.

I am here today testifying in support of H.R. 687, the Southeastern Arizona Land Exchange, of which I am an original cosponsor. I would like to start by first recognizing there are pros and cons to this legislation and to the land exchange. My testimony will touch on both aspects of this project. However, it is my belief that there is a way to work together and use the legislative process to develop a piece of legislation that brings a diversified and stable economy to this region. But not without first addressing the project's impact on our environment, water, and lands.

My district includes Arizona's Copper Corridor, which has more than a century's legacy of copper mining. It includes communities like Superior, Globe, Miami, Hayden, Winkelman, and Kearny. Copper is part of Arizona's heritage. It is one of the four C's represented in our State Seal.

The Copper Corridor has played a major role in our State's early growth and economic development. Folks here have remained in these towns for generations, and have expressed strong support over the years for the Superior mine. They have raised their families here, worked the mines, run their own businesses. But small towns in Arizona have been hit hard by the Great Recession. They have been set back by changing economic realities. The median household income in my district is just over $30,000. These are working families; they struggle. But they love their communities and they want to stay if there is a way.

Across the globe there is a great need, an economic demand for the high-grade copper these communities can produce. I know this, and so does my colleague, Congressman Gosar. That is why each of us tried in previous Congresses to make this project a reality. And that is why, in this Congress, we have joined together to try again in hopes that a bipartisan approach could make the difference.

My district is also home to the San Carlos Apache Tribe. The testimony of Chairman Rambler must also be taken into account as we move through the legislative process. The Tribe's concerns about the impact this project will have on sacred sites and land are valid concerns. The Tribe's concerns about the impact of the project on our environment, water, and public health are also valid concerns. I am committed to using the legislative process to represent their concerns. This process must be transparent. It must reflect our shared interest in the public good. And that means recognizing that these communities cannot have long-term economic stability without clean water, air, and land.

13

The voices of tribal and environmental groups should be heard and respected, and that is where the legislative process comes in. I support requiring government-to-government tribal consultations prior to the land exchange. We also need to include environmental protections for the water and land in and around the Copper Corridor very likely prior to the land exchange.

If people are going to live, work, and raise their families in these areas, these factors must be addressed. I will be working toward including responsible provisions like these in a final version of this legislation. I believe that if these provisions are included, it will help ensure that Superior Mine can finally move forward.

I offer my sincere thanks to all of those who came here today to testify about this legislation and make your voices heard.

And I want to especially thank Congressman Gosar and his staff for working together with us on this important effort. Thank you very much.

[The prepared statement of Mrs. Kirkpatrick follows:]

PREPARED STATEMENT OF THE HONORABLE ANN KIRKPATRICK, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF ARIZONA, ON H.R. 687

I am proud to represent Arizona's first district, which covers 60,000 square miles, 80 rural communities, including the town of Superior whose leaders are here today, and 12 Native American tribes—including the San Carlos Apache Tribe, whose leaders are here today.

I stand here today testifying in support of H.R. 687—the Southeastern Arizona Land Exchange, of which I am an original co-sponsor.

I would like to start by recognizing there are pros and cons to this legislation and to the land exchange. My testimony will touch on both aspects of this project.

However, it is my belief that there is a way to work together, and use the legislative process to develop a piece of legislation that brings a diversified and stable economy to the region—but not without first addressing the project's impact on our environment, water and lands.

My district includes Arizona's Copper Corridor, which has more than a century's legacy of copper mining.

It includes communities like Superior. Globe. Miami. Hayden. Winkelman and Kearny.

Copper is part of Arizona's heritage—it's one of the five C's represented in our State seal.

The Copper Corridor has played a major role in our State's early growth and economic development.

Folks here have remained in these towns for generations and have expressed strong support over the years for the Superior mine.

They've raised their families here. Worked the mines. Run their own businesses.

But small towns in Arizona have been hit hard by the great recession.

They've been set back by changing economic realities.

The median income in my district is just over $30,000 a year.

These are working families. They struggle.

But they love their communities and they want to stay—if there's a way.

Across the globe, there is a great need—an economic demand—for the high-grade copper these communities can produce.

I know this, and so does my colleague, Congressman Gosar.

That's why each of us tried in previous Congresses to make this project a reality.

And that's why in this Congress, we have joined together to try again, in hopes that a bipartisan approach could make the difference.

Now, my district is also home to the San Carlos Apache Tribe. The testimony of Chairman Rambler must also be taken into account as we move through the legislative process.

The tribe's concerns about the impact this project will have on sacred sites and land are valid concerns.

The tribe's concerns about the impact of the project on our environment, water and public health are also valid concerns.

I am committed to using the legislative process to represent their concerns.

14

This process must be transparent. It must reflect our shared interest in the public good.

And that means recognizing that these communities cannot have long-term economic stability without clean water, air and land.

The voices of tribal and environmental groups should be heard and respected.

And that's where the legislative process comes in:

I support requiring government-to-government tribal consultations prior to the land exchange.

We also need to include environmental protections for the water and land in and around the Copper Corridor—very likely, prior to the land exchange.

If people are going to live, work and raise their families in these areas, these factors must be addressed.

I will be working toward including responsible provisions like these in a final version of this legislation.

I believe that if these provisions are included, it will help ensure the Superior mine can finally move forward.

I offer my sincere thanks to all those who came here today to testify about this legislation and make your voices heard.

And I want to thank Congressman Gosar and his staff for working together with us on this important effort.

Thank you.

———

Mr. LAMBORN. Thank you, Representative. And as each Member provides their testimony, feel free to be excused. I know there are other Committees going on and other pressing matters. Thank you.

Mrs. KIRKPATRICK. Mr. Chairman, may I be excused?

Mr. LAMBORN. Please, yes.

Mrs. KIRKPATRICK. Thank you.

Mr. LAMBORN. Thank you for being here. And now we will hear from Representative Heck of Nevada on his bill.

## STATEMENT OF THE HON. JOSEPH J. HECK, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NEVADA

Mr. HECK. Chairman Lamborn, thank you for inviting me back to testify before the Subcommittee on an innovative solution for restoring the environment, improving safety, and creating jobs in my district in Southern Nevada.

As you know, I originally introduced the Three Kids Mine Remediation and Reclamation Act in the previous Congress. This legislation was passed successfully through the Natural Resources Committee and passed the House by a voice vote, but unfortunately, did not receive consideration in the Senate before the 112th Congress adjourned. I have since re-introduced the legislation as H.R. 697.

Mr. LAMBORN. Representative, is your microphone on?

Mr. HECK. Yes, it is.

Mr. LAMBORN. OK, excellent. Maybe pull it a little closer.

Mr. HECK. And I appreciate the opportunity to come back and testify before the Subcommittee to talk about a serious environmental public safety and abandoned mine reclamation issue in the city of Henderson, Nevada. In the interest of time, I am going to abbreviate my remarks, but request that my full statement be entered into the record.

Mr. LAMBORN. No objection, so ordered.

Mr. HECK. And I also request that a written statement of The Honorable Andy Hafen, Mayor, City of Henderson, Nevada, be entered into the record.

Mr. LAMBORN. Without objection, so ordered.

15

[The information submitted for the record by Mr. Heck has been retained in the Committee's official files:]

Mr. HECK. The Three Kids Mine is an abandoned manganese mine and mill site consisting of approximately 1,262 acres of Federal and private lands which lies within the Henderson City limits, and is literally across from Lake Mead Parkway, from an increasing number of homes and businesses. The Three Kids Mine was owned and operated by various parties, including the United States, from approximately 1917 through 1961, and used as a storage area for Federal manganese ore reserves from the late 1950s through 2003.

The project site contains numerous large, unstable, sheer cliff open pits as deep as 400 feet, and huge volumes of mine overburden and tailings, mill facility remnants, and waste disposal areas.

To give a sense of scale, the mine overburden is 10 stories high in some areas. Abandoned waste ponds are up to 60 feet deep and filled with over 1 million cubic yards of gelatinous tailings containing high concentrations of arsenic, lead, and petroleum compounds. Reclaiming the project site will require the excavation and management of at least 12 million cubic yards of material, enough to fill a modern sports stadium 6 times. The presumptive remedy for the project site is to use the existing mine pits as permanent repositories for the mine residue in an appropriately engineered manner.

The legislation I have introduced with the support of the entire Nevada Delegation is the result of over 5 years of work among the City of Henderson Redevelopment Agency, the Department of the Interior, the State of Nevada, and private entities to develop a program to finally clean up the Three Kids Mine site.

Boiled down to its simplest form, the Secretary of the Interior will convey the Federal lands at the project site, approximately 948 acres, at fair market value, taking into account the cost of investigating and remediating the entire site, which includes an additional 314 acres of now private lands that were used historically in mine operations. The Federal Government will receive a release of liability for clean-up of both the Federal lands and the private lands.

This is a unique and complex public-private partnership proposal. It will finally lead to the clean-up of the Three Kids Mine site at no cost to the Federal Government.

In closing, I want to once again thank Chairman Lamborn and Ranking Member Holt, as well as the other members of the Subcommittee for holding a hearing on this serious problem of abandoned mine lands and innovative solutions for addressing the problem. And I would be happy to answer any questions the Subcommittee might have.

[The prepared statement of Mr. Heck follows:]

PREPARED STATEMENT OF THE HONORABLE JOSEPH J. HECK, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NEVADA, ON H.R. 697

Chairman Lamborn and Ranking Member Holt, thank you for inviting me back testify before the Subcommittee on an innovative solution for restoring the environment, improving safety, and creating jobs in my District in southern Nevada. As you know, I originally introduced the Three Kids Mine Remediation and Reclamation Act in the previous Congress. This legislation was passed successfully through the

16

Natural Resources Committee and the House, but unfortunately, did not receive consideration in the Senate before the 112th Congress adjourned. I have since re-introduced this legislation as H.R. 697, and I appreciate the opportunity to come back and testify before the Subcommittee to talk about a serious environmental, public safety, and abandoned mine reclamation issue in the City of Henderson, Nevada.

* * *

The Three Kids Mine is an abandoned manganese mine and mill site consisting of approximately 1,262 acres of Federal and private lands which lies within the Henderson City limits and is literally across Lake Mead Parkway from an increasing number of homes and businesses. The Three Kids Mine was owned and operated by various parties, including the United States, from approximately 1917 through 1961, and used as a storage area for Federal manganese ore reserves from the late 1950s through 2003. The project site contains numerous large unstable sheer-cliff open pits as deep as 400 feet, huge volumes of mine overburden/tailings, mill facility remnants and waste disposal areas. To give a sense of scale, mine overburden is ten stories high in some areas; abandoned waste "ponds" are up to 60 feet deep and filled with over 1 million cubic yards of gelatinous tailings containing high concentrations of arsenic, lead and petroleum compounds. Reclaiming the Project Site will require the excavation and management of at least 12 million cubic yards of material (enough to fill a modern sports stadium six times). The "Presumptive Remedy" for the Project Site is to use the existing mine pits as permanent repositories for the mine residue, in an appropriately engineered manner.

* * *

The Nevada Division of Environmental Protection has identified the Three Kids Mine as a high priority for the implementation of a comprehensive environmental investigation, remediation, and reclamation program. Numerous unsuccessful proposals to clean up and redevelop the Project Site have been advanced over the years. All were ultimately abandoned due to unrealistic estimates of the scale of required remediation, as well as the complexities posed by the mix of private and Federal ownership at the Project Site. Something must be done to address this serious blight on the Henderson community.

* * *

The legislation I have introduced, with the support of the entire Nevada Delegation, is the result of over 5 years of work among the City of Henderson Redevelopment Agency, the Department of the Interior, the State of Nevada, and private entities to develop a program to finally clean up the Three Kids Mine site. Boiled down to its simplest form, the Secretary of the Interior will convey the Federal lands at the project site—approximately 948 acres—at fair market value taking into account the costs of investigating and remediating the entire site, which includes an additional 314 acres of now-private lands that were used historically in mine operations. The Federal Government will receive a release of liability for cleanup of both the Federal lands and the private lands. Under the legislation, before the Federal lands are conveyed, the State must enter into a binding consent agreement under which the cleanup of the entire Project Site will occur. The consent agreement must include financial assurances to ensure the completion of the remediation and reclamation of the Site. The cleanup will be financed with private capital and Nevada tax increment financing at no cost to the Federal Government.

In more detail, the legislation would direct the Secretary to convey the 948 Federal acres of the Three Kids Mine project site to the Henderson Redevelopment Agency for fair market value, discounted to reflect the costs of cleanup of the entire Project Site. According to preliminary estimates, the cleanup costs for the Project Site range from a low of $300 million to a high of nearly $1 billion. The BLM's preliminary estimate of the value of the lands to be conveyed as if they were "clean" ranges from $95 million to $190 million. The value and costs will be determined by the Secretary under the legislation using established national appraisal methods, environmental assessment standards, and cost estimating procedures. We fully expect the cleanup costs to substantially exceed the value of the lands to be conveyed. Moreover, given the mix of private and Federal lands at the project site and the substantial cleanup costs involved, there is no viable solution to remediate and reclaim the Federal lands without the private lands.

Before any conveyance of Federal land, the legislation requires an executed Mine Remediation and Reclamation Agreement between a responsible party and the State of Nevada that would govern the "CERCLA-protective" cleanup program for the entire Project Site (Federal and private lands) and ensure that the program is fully funded. Finally, in exchange for the conveyance, the Federal Government's responsi-

17

bility for the cleanup of this site will be assumed and paid for by a responsible third party and the Secretary's land will also be cleaned up at no cost to the Federal Government.

* * *

Fundamental to the economic viability of the entire project is the availability of "tax increment financing" under the Nevada Community Redevelopment Law. The Nevada Redevelopment Law allows the Redevelopment Agency to fund the cleanup of blighted conditions such as an abandoned mine and environmental contamination through use of an "increment" of property taxes collected within a designated redevelopment area over a 30-year "capture period." The "increment" is a portion of the assessed value of the property which predictably increases in value following cleanup and as the subsequent commercial and residential redevelopment build-out occurs. To advance this important project, the City of Henderson completed annexation of the Three Kids site in January 2009, and the Lakemoor Canyon Redevelopment Area was established in February 2009.

* * *

This is a unique and complex "public/private partnership" proposal. It will finally lead to the cleanup of the Three Kids Mine site at no cost to the Federal Government. Millions of dollars have been spent on this effort to date on environmental assessment work at the Project Site and to advance discussions and negotiations among project stakeholders. I believe that this initiative offers a viable solution for the cleanup and reclamation of the Three Kids Mine and could serve as a model for other similar sites across the country. I would respectfully request that the Subcommittee grant expeditious consideration of the Three Kids Mine Remediation and Reclamation Act.

In closing, I want to once again thank Chairman Lamborn and Ranking Member Holt, as well as the other members of the Subcommittee, for holding a hearing on the serious problem of abandoned mined lands, and innovative solutions for addressing the problem. I would be happy to answer any questions the Subcommittee might have.

————

Mr. LAMBORN. OK, thank you for your testimony. Feel free to be excused. I know there are other pressing issues and Committee hearings. Thank you for being here.

We will now hear from Senator—excuse me, Representative Johnson—there is an interesting Senate race going on in Georgia, but I should say Representative Johnson of Georgia.

## STATEMENT OF THE HON. HENRY C. "HANK," JOHNSON, JR., A REPRESENTATIVE IN CONGRESS FROM THE STATE OF GEORGIA

Mr. JOHNSON OF GEORGIA. Well, I tell you, I am going to stay right where I am and stay out of that big fight.

[Laughter.]

Mr. JOHNSON OF GEORGIA. But thanks for the elevation, anyway.

Mr. LAMBORN. We just made some news today here.

Mr. JOHNSON OF GEORGIA. Thanks, Mr. Chairman. I want to thank you, Chairman Lamborn. Also, Ranking Member Horsford, for allowing me to join you today.

Mr. Chairman, it is a testament to the statesmanship of the Chairman and Ranking Members that you have placed a bill offered by a Democrat on the table for discussion today. That bipartisan approach will be necessary if we are going to rise to the challenges of our time.

I also must thank Ranking Member Markey for his and his staff's hard work in developing H.R. 981, the Resource Assessment of Rare Earths Act of 2013, or the RARE Act, which we jointly introduced this year.

18

Ranking Member Holt I also want to thank for his support for this legislation.

This hearing on creating mining and manufacturing jobs here in America, and the securing of our access to necessary minerals is critically important. The RARE Act will help ensure that our Nation is able to assess rare earth elements, which are necessary components of numerous products, from wind turbines to solar panels to energy-efficient light bulbs and a number of Department of Defense applications, as well.

The bill is simple and I would also argue that it is also non-partisan. It directs the U.S. Geological Survey to lead a global, multilateral assessment of rare earth element deposits to develop a comprehensive understanding of their distribution around the world.

We need this bill because China now accounts for upwards of 90 percent of U.S. rare earth element supply. This Chinese monopoly is a potentially ruinous economic and geopolitical vulnerability for the United States. In recent years, China has shown a willingness to exploit its monopoly by restricting rare earth elements exports, undermining U.S. national security and competitiveness in defense and clean energy. A better understanding of where these critical elements are will enable us to adjust to supply disruptions from any particular region.

As I said, this is a non-partisan issue, and that is why I am happy to see Chairman Lamborn's bill, H.R. 1063, which is under consideration today, and which includes language that mirrors the rare earth assessments called for in my bill.

Thank you, Mr. Chairman, for holding this hearing today. I look forward to the comments from the witnesses which I will take in via webcast. And thank you, members of the Committee.

Mr. LAMBORN. OK, thank you, Representative Johnson, for being here today and providing your testimony.

That concludes our first panel. We will now move to the second panel of witnesses for oversight. And I invite forward Mr. James Iwanicki, Engineer Manager for the Marquette County Road Commission; Ms. Ruthe Batulis, President of the Dakota County Regional Chamber of Commerce, and President of the Minnesota Conference of Chamber Executives; Mr. Harry Melander, President of the Minnesota Building and Construction Trades Council; and Ms. Jennifer Krill, Executive Director of Earthworks.

Like all our witnesses, your written testimony will appear in full in the record. So I ask that you keep your oral statements to 5 minutes, as outlined in our invitation letter and our Committee rules.

Our microphones are not automatic, so you have to push a button to be heard. And the way the timing works is that when you press the button a green light comes on, and the 5-minute timer starts counting down. After 4 minutes, the yellow light comes on, and then the red light at 5 minutes.

So, we will start in with our testimony. Mr. Iwanicki, you may begin.

**STATEMENT OF JAMES M. IWANICKI, P.E., ENGINEER MANAGER, MARQUETTE COUNTY ROAD COMMISSION**

Mr. IWANICKI. Hi. I am James M. Iwanicki, Engineer and Manager of the Marquette County Road Commission. Thank you, Mr.

19

Chairman and members of the Committee. Thank you for asking me here to testify about our experiences with trying to create a new county road, County Road 595, to improve the quality of life, the health, safety, and welfare of our citizens. County Road 595 would have had a positive impact on the mining, logging, recreation, and tourist industries.

Rio Tinto was willing to fund an $83 million, 21-mile public road project to access a remote but key area of the county. The road would have had a major positive economic and public safety impact for the area and region. The road is located in a working woods. It would have replaced a system of two track roads that are currently used to access the area.

As a local government official, it was very frustrating in dealing with the EPA throughout this project. If I operated the Marquette County Road Commission the way the EPA handled this permit, I would not be sitting here today. It is even more surprising, when you consider the list of support that we had. County Road 595 was supported by all local units of government in Marquette County and where County Road 595 would either go, or where the existing road to the mine goes through. This includes three cities, Marquette, Ishpeming, and Negaunee; eight townships; the Marquette County Board; two Michigan State House of Representative Members, one Democrat, one Republican; the Michigan State Senator of the area, a Republican; 63 of the 110 Members of the 96th Michigan State House; 28 of the 38 Senators from the 96th Michigan State Senate; the Governor of the State of Michigan; the Michigan Department of Transportation; the Michigan Department of Environmental Quality; the Michigan Department of Natural Resources; the Michigan State Police; Republican Dan Benishek of the U.S. House; and both Democratic U.S. Senators, Carl Levin and Debbie Stabenow.

EPA over-reached their authority on this project in at least five different ways to kill County Road 595. EPA did not allow Marquette County Road Commission to use any creation of wetlands for mitigation, forested wetlands in particular, as allowed by 40 CFR Part 230.92 and 230.92a2. The preservation ratios EPA required were beyond that which were reasonable, and not compliant with 40 CFR Part 230. Michigan Department of Environmental Quality rules allowed a maximum ratio of 12-to-1 for wetland preservation.

EPA imposed requirements that required mineral rights to be obtained for wetland preservation areas. Federal rules only required that site protection should include measures to protect sites to the extent appropriate and practical in regard to mineral extraction and other threats.

EPA continually changed the rules in regards to what was required for mitigation on the project. EPA suggested that wetland preservation be at 20-to-1 replacement ratio in June 2012 to cover indirect and secondary impacts. But in December 2012 it required additional mitigation to address secondary impacts and gave Marquette County Road Commission less than 30 days, including Christmas and New Year's holidays, to come up with such measures. The EPA public hearing in this process was held over 3 months prior to the December 4, 2012 EPA letter, and the timing

20

of the letter did not allow sufficient time for the Marquette County Road Commission and MDEQ to respond to the requirements of EPA's letter, due to the holidays.

EPA would not allow the Marquette County Road Commission, Marquette County, or Michigamme Township, all legal governmental entities in the State of Michigan, to be the land stewards for the proposed wetland mitigation area, as allowed in 230.97(a).

Because of the EPA decision, we have gone from having a common-sense practical solution to solve public safety issues and improve the economics of the region to the use of the existing road system which will not be as safe as the proposed solution, cause more air pollution, and stagnate the economic development of the area.

In conclusion, it is hard for the people in the area to understand how a Federal agency that does not live and work in our community can make such an important decision for us, 350 miles away in Chicago.

Thank you for your time. I would be happy to answer any questions the Committee may have.

[The prepared statement of Mr. Iwanicki follows:]

PREPARED STATEMENT OF JAMES M. IWANICKI, P.E., ENGINEER MANAGER, MARQUETTE COUNTY ROAD COMMISSION

Mr. Chairperson and Members of the Committee:

Thank you for asking me here today to testify about our experiences with trying to create a new county road, CR 595, to improve the quality of life, the health, the safety, and the welfare of our citizens. CR 595 would have had a positive economic impact on the Mining, Logging, Recreation, and Tourism Industries.

**Background Information**

In January of 2012 Marquette County Road Commission (MCRC) submitted a Section 404 permit application to fill approximately 26 acres of wetland to construct 21 miles of road at a cost of $83 million. CR 595 was going to be funded by Rio Tinto through a public-private partnership. In addition Rio Tinto spent over $20 million to permit CR 595.

Rio Tinto was interested in funding the project because they were constructing a new nickel and copper underground mine called the Eagle Mine. The company is also refurbishing the old Humboldt Mill to process the ore. The mine and the mill will create about 300 direct new jobs. (See Figure 2) The distance between the mine and the mill as the crow flies is about 19 miles. Using the existing road system to go from the mine to the mill would be approximately 60 miles one way. CR 595 would reduce travel time by an hour. The construction of CR 595 would have lasted 2 years and employed over 100 people during that timeframe.

CR 595 would have been built in a working woods not in pristine wilderness. The road alignment is based on existing public and private roads. (See Figures 4 and 6–9.)

CR 595 was the common sense solution to Marquette County's transportation needs.

If you cannot build CR 595 then you can never build any new road in Marquette County or the Upper Peninsula of Michigan.

**EPA**

- In April of 2012 EPA objected to MCRC's project purpose.
- EPA held a public hearing on CR 595 in August of 2012.
- EPA lifted their objection to the project purpose on December 4, 2012 but had other objections which needed to be satisfied by January 3, 2013 (within 30 days) or jurisdiction would revert to the Army Corps of Engineers.
- Rio Tinto needed certainty in their transportation route by January of 2013. Failure to have a permit for CR 595 in January 2013 would cause Rio Tinto to pull their $83 million funding commitment for CR 595 and they would use the existing road system to truck the ore.
- EPA did not like how we proposed to mitigate the impacts of CR 595. Our proposed mitigation plan involved preserving over 1,576 Acres of land (2.5 square

21

miles) adjacent to McCormick Tract in the Ottawa National Forrest. The area included approximately 647 acres of high quality wetland (25 to 1 ratio) including an additional 929 acres of uplands (60 to 1, total acreage). (See Figure 5)

- EPA was very aloof doing the whole permit process. They would not tell us what would be acceptable. In fact during the last month of the project they would not even tell us who the decision maker was going to be. They were unwilling to negotiate resolutions openly by telling us directly what would satisfy their issues.
- EPA wanted additional wildlife protection and they proposed creating wildlife crossings (tunnels or bridges) large enough to accommodate moose, bear, and cougar and to place fencing to guide wildlife to the crossing. But they would not tell us where these crossings needed to go.
- EPA wanted to limit secondary road connections to CR 595 by placing deed restrictions on CR 595 so adjacent land owners could not connect to the road.

**EPA's Overreach of Their Authority**

The Marquette County Road Commission (MCRC) believes the EPA overstepped its authority in the following areas:

1. EPA would not allow MCRC to use any creation ("establishment") of wetlands for mitigation, forested wetlands in particular, as allowed by 40 CFR part 230.92 and 230.93(a)(2).

2. The preservation ratios EPA required (i.e. 20:1) were beyond what was reasonable and not compliant with 40 CFR part 230. Michigan Department of Environmental Quality (MDEQ) rules allow a maximum replacement ratio of 12:1 for wetland preservation.

3. EPA imposed requirements that required mineral rights to be obtained for the wetland preservation areas. Federal rules only require that site protection should include measures to protect sites *"to the extent appropriate and practicable"* (230.97(a)(2)) in regard to mineral extraction and other threats.

4. EPA continually changed the "rules" in regards to what was required for mitigation on the project. EPA suggested that wetland preservation be at a 20:1 replacement ratio in June 2012 to cover indirect and secondary impacts but in December 2012 it required additional mitigation measures to address secondary impacts and gave MCRC less than 30 days (including Christmas and New Year holidays) to come up with such measures. The EPA public hearing in this process was held over three months prior to the December 4, 2012 EPA letter and the timing of the letter did not allow sufficient time for MDEQ or MCRC to respond to the requirements of EPA's letter due in substantial part to the holidays.

5. EPA would not allow the Marquette County Road Commission, Marquette County, or Michigamme Township (all legal governmental entities in the State of Michigan) to be the land steward of the proposed wetland preservation area, as allowed in 230.97(a).

**Political Support for CR595**

CR 595 is supported by all local units of government in Marquette County where CR 595 would either go through or where the existing road to the mine goes through. This includes 3 cities, (Marquette, Ishpeming, Negaunee) 8 townships, the Marquette County Board, the two Michigan State House of Representatives members that represent Marquette County, the Michigan State Senate senator who represents Marquette County, 63 of the 110 members of the 96th Michigan State House, and 28 of 38 senators from the 96th Michigan State Senate, the Governor of the State of Michigan, Michigan Department of Transportation, Michigan Department of Environmental Quality, Michigan Department of Natural Resources, the Michigan State Police, Dan Benishek (R) U.S. House of Representative, and both U.S. Senators Carl Levin (D), and Debbie Stabenow (D).

**Result of EPA's Overreach**

- Heavy truck traffic will now be routed through the populated areas of Marquette County.
- Local Units of government are trying to address the safety issues created by EPA's lack of regards for people and local units of government.
- The following are excerpts from The Mining Journal, the local newspaper:

**Headline: CR 595 project killed**
Date: January 4, 2013
Online location: http://www.miningjournal.net/page/content.detail/id/583130/CR-595-project-killed.html
Author: John Pepin, Staff Writer

22

Quotes:

- Road Commission Engineer-Manager Jim Iwanicki said the U.S. Environmental Protection Agency's refusal to remove objections to the project prevented the DEQ from issuing a permit that had the required Federal backing.

  "It's a shame that the EPA has killed a good project," Iwanicki said. "The EPA's action is going to affect a lot of lives in Marquette County and the road commission believes it will affect them negatively."

- Iwanicki said the EPA "stonewalled" road commission efforts to comply with the agency's request in several phone conversations held with the road commission, EPA and DEQ in December.

  "The EPA moved the bar every time we got close," Iwanicki said. "Throughout the whole process, it's been an ever-changing target."

  The road commission responded on Dec. 27 to the EPA's requirements for removing its remaining objections, but Iwanicki said it became clear before Christmas; the Federal agency would not be satisfied.

- Iwanicki said the agency never liked the project from the start and for months worked to change expectations and requirements. He said Thursday's official finality to the project was expected and was "just the bow on the package."

  "They played a good game of bureaucratic nonsense," Iwanicki said of the EPA.

**Headline: City wants joint meeting on truck traffic**
Date: March 12, 2013
Online location: http://www.miningjournal.net/page/content.detail/id/585271/City-wants-joint-meeting-on-truck-traffic.html
Author: Kyle Whiney—Journal Staff Writer

Quotes:

- In the wake of the Michigan Department of Environmental Quality's decision to not permit the proposed Marquette County Road 595, local groups have been working to determine the route mining company Rio Tinto will use to transport ore from its Eagle Mine to the Humboldt Mill.

- The city commission also charged its special legal counsel with determining how best to communicate with the U.S. Environmental Protection Agency concerning Rio Tinto traffic on city streets.

  In an August letter to the EPA, the city voiced concerns related to the prospect of mine trucks traveling through Marquette.

  At that time, according to the letter, the city had no plans "for expanding local infrastructure to support increased heavy truck traffic." The alternate route would "create substantial negative social impacts, as well as drastically undermine decades of transitional economic development and tens of millions of dollars of investment supporting Marquette's current economy."

**Editorial: Finding new truck route worth the effort**
Date: March 14, 2013
Online location: http://www.miningjournal.net/page/content.detail/id/585322/Finding-new-truck-route-worth-the-effort.html
Author: Mining Journal Editorial

Quotes:

- Concerns over the increase in truck traffic from the mine, which is expected to begin production in 2014, became more significant when a plan to construct a new north-south haul road—Marquette County Road 595—through the woods from the mine to the mill was scrapped.

  Rio Tinto now plans to use its originally intended route, which involves trucking the ore from Eagle Mine on County Road AAA to CR 510, then on CR 510 to CR 550, south on CR 550 to the City of Marquette, then on Wright Street to U.S. 41 and finally west on U.S. 41 to the mill. While we maintain our stance that the CR 595 option was by far the best route, particularly for public safety reasons, it's a good idea to have the county, city and township seriously explore an alternative to driving the trucks through residential areas and on busy roads.

23

Mr. LAMBORN. Mr. Iwanicki, thank you for your testimony. We will now hear from Ms. Batulis.

**STATEMENT OF RUTHE BATULIS, PRESIDENT, DAKOTA COUNTY REGIONAL CHAMBER OF COMMERCE, PRESIDENT, MINNESOTA CONFERENCE OF CHAMBER EXECUTIVES**

Ms. BATULIS. Mr. Chair and Members, thank you for having us here today. I want to bring greetings from Minnesota, where yesterday it was minus 7 degrees. So we are glad to be here. My name is Ruthe Batulis. I represent a statewide association of chamber of commerce executives, and I am President of Dakota County Regional Chamber of Commerce.

As you know, business and labor do not always agree. But when it comes to job creation, and specifically the jobs that come from the mining of strategic metals, we could not agree more. You will hear from my friend, Harry Melander next to me, from the Building and Trades Association in a minute. We are tremendously excited about the Jobs for Minnesotans Coalition, and what strategic metal mining can do for the entire State of Minnesota and our country.

You have heard previous testimony about the jobs that are created, ancillary jobs that are created from the strategic metal mining and the production of materials and entrepreneurs that can really drive creation of jobs throughout the State. These strategic metals such as nickel and copper are used in the green economy in electric cars, wind turbines, and, of course smart phones and other high-tech equipment.

Imagine Minnesota's high-tech manufacturing industry, where contractors and suppliers have the opportunity to creatively utilize those strategic metals mined right in Minnesota. That is on the horizon.

In Minnesota, we have some of the best schools in the country. We know that providing for a good education and a good investment isn't cheap. Resources for our schools are constantly an issue of public debate and discussion. Our schools will gain tremendously from an emerging strategic metals industry in Minnesota because royalties generated from the projects directly benefit our schools. In Minnesota, these royalties from mining go directly into what our lawmakers call the School Trust Fund. At this time about $5 million a year goes into the Trust Fund. That is $26 for every student. Imagine the impact of $2.5 billion going into the school district.

The addition of strategic metal mining in Minnesota will add to this existing fund. Businesses and construction unions alike need skilled workers. And, as such, the education and workforce development issues are paramount. The prospect of this kind of investment is thrilling.

Our members are always seeking ways to make their processes more efficient and effective to serve their customers. In fact, you are all working together to make the permitting process more efficient and effective, and it is a great sign for all of us, this renewed commitment and job creation.

We are blessed in Minnesota that any large-scale projects and the jobs that follow come with the equivalent of the Good Housekeeping Seal of Approval. Our environmental laws are among the

24

most stringent in the world, ensuring that our precious waters are protected from the outset through our permitting processes. Our citizens can always rest assured that permitting projects have undergone responsible and extensive scrutiny by the Department of Natural Resources, the Minnesota Pollution Control Agency and other State agencies.

Minnesotans have just recently worked across party lines to ensure responsible scrutiny is done in an effective manner that allows permit seekers to have certainty and investors to continue to seek opportunities in Minnesota and the United States.

I applaud you for all that you do here in Washington, and appreciate what you are about to accomplish to foster job creation in Minnesota and the United States.

Thank you for hearing us here today, and I can answer any questions that you might have.

[The prepared statement of Ms. Batulis follows:]

PREPARED STATEMENT OF RUTHE BATULIS, PRESIDENT OF THE MINNESOTA CONFERENCE OF CHAMBER EXECUTIVES

Mr. Chairman, Members of the Committee, good morning, my name is Ruthe Batulis and I am the President of the Dakota County Regional Chamber of Commerce, also in Minnesota. We are a regional chamber of commerce in the southeast suburbs of the Twin Cities. We proudly serve the cities of Eagan, Farmington, Lilydale, Mendota Heights, Mendota, Rosemount, Sunfish Lake, and West St. Paul. And we're proud to contribute to the outstanding quality of life our businesses enjoy every day. I also currently serve as President of the Minnesota Conference of Chamber Executives—the professional association for chamber leaders across our State.

We are also tremendously excited about the Jobs for Minnesotans Coalition, and what strategic metals mining means for the *entire* State of Minnesota and the country.

As you know—business and labor don't always agree, but when it comes to job creation, and specifically the jobs that will come with the mining of strategic metals in Northern Minnesota, we couldn't agree more.

Minnesota is fortunate to have an abundance of natural resources. We are literally "by nature" an agricultural state, a timber State and a mining State.

What people don't necessarily think of when it comes to our natural resources—and for us what is very exciting—is that thousands of associated and spinoff jobs are created as a result of our natural resources industry. When the strategic metals mines start producing materials, entrepreneurs and workers across Minnesota and throughout the Twin Cities will have new opportunities in all kinds of industries. These strategic metals are used in electric car batteries, smart phones, wind turbines and other high tech equipment. The sky is the limit.

Imagine Minnesota's medical device manufacturing industry, or Minnesota's many national defense contractors and suppliers with the opportunity to creatively utilize strategic metals mined right here in Minnesota. That is on the horizon.

Furthermore, Minnesota (especially Dakota County) has some of the best schools in the country. Providing for schools is a good investment, but it isn't cheap! Resources for our schools will be constantly an issue of public discussion and debate. Our schools will gain tremendously from an emerging strategic metals industry in Minnesota, because of the royalties generated from the projects that directly benefit our schools. In Minnesota, royalties from mining go directly into what our law makers call our "school trust fund." The addition of Strategic Metals Mining in Minnesota will add to this existing fund. Businesses and construction unions alike need skilled workers for the future, and as such, education and workforce development issues are paramount. The prospect of this kind of new investment is thrilling.

My members are always seeking ways to make their processes more efficient and effective to serve their customers. The fact that you are all working together to make the permitting process more efficient and effective is a wonderful sign to us of a renewed commitment to my members and businesses in general.

We are blessed in Minnesota that any large-scale projects and the jobs that follow come with the equivalent of "Good Housekeeping Seal of Approval." Our environmental laws are among the most stringent in the world, ensuring that our precious waters are protected from the outset through our thorough permitting process. Our

25

citizens can always rest assured that permitted projects have undergone responsible and extensive scrutiny by the Department of Natural Resources, the Minnesota Pollution Control Agency and other State agencies.

As my friend Harry said during his testimony, Minnesotans just recently worked across party lines to ensure this responsible scrutiny is done in an efficient manner so that permit seekers have certainty and investors will continue to seek opportunities in Minnesota and the United States.

I applaud you all for working to do the same here in Washington, and appreciate what you are about to accomplish to help foster job creation in Minnesota and across the country.

I am happy to answer any questions you may have.

———

Mr. LAMBORN. Thank you for your testimony and for being here. And we will now hear from Mr. Melander.

## STATEMENT OF HARRY MELANDER, PRESIDENT, MINNESOTA BUILDING AND CONSTRUCTION TRADES COUNCIL

Mr. MELANDER. Chair, Committee members, my name is Harry Melander, and I work as the President of the Minnesota Building and Construction Trades Council, an organization that represents over 50,000 unionized workers throughout the State of Minnesota, and also the Co-Chair of Jobs for Minnesota, with David Olson, the President of the Minnesota Chamber of Commerce, and working very closely with Ruthe on this issue.

David, Ruthe, and I, along with other business, labor, local bodies of government, professional associations, and the heart and backbone of our State, small businesses, and its employers, form this diverse group of Minnesotans to focus on jobs, jobs that will be created in the development of strategic metals in our State.

Minnesota has a long history of iron ore mining for well over 100 years, and is on the verge of its next generation of mining metals. These metals, copper, nickel, and others, are used in the production, as indicated earlier, in smart and green products that we all use today. These metals will also be used in products yet to be designed that will save lives and also create new jobs for Northeastern Minnesota that will last for generations, revitalizing an industry and its region.

Minnesota has one of the largest untapped sources of these metals in the world. If allowed to move permitting forward, we will have the second-largest deposit of nickel, globally. We think that is important for our Nation's independence and its security.

Jobs for Minnesota is here today encouraging you and others to use what we call "The Minnesota Model." As indicated in our written comments, 2 years ago, with a Republican-led House and Senate and a Democratic Governor, we were able to create a law that limited the time applicants have to get permits. In the report submitted to you today, that good work by different interests has benefited Minnesota, limiting the time it takes to issue permits in our State.

What you are doing here today will have a positive effect on the permitting process on a national level. Members, we can no longer look to others for materials that are already limited, globally. We believe what Minnesota has done is only a start. The work you do today in efficient permitting will make our country prosperous and allow us to continue to grow technology with an abundant source of metals used in advancing technologies around the world.

26

You have an opportunity to create and expedite always safe means of permitting on our limited resources. Please do not lose sight of this opportunity. If we can do it in Minnesota, others can do that. Thousands of Minnesotans and others in our country are waiting for jobs.

Thank you. And if there is any questions, I would be more than happy to answer those.

[The prepared statement of Mr. Melander follows:]

PREPARED STATEMENT OF HARRY MELANDER, PRESIDENT, MINNESOTA BUILDING AND CONSTRUCTION TRADES COUNCIL

Mr. Chairman, Members of the Committee, good morning, my name is Harry Melander and I am the President of the Minnesota Building and Construction Trades Council. We are the advocate and voice for unionized construction workers in Minnesota. Fifty thousand members strong, we have provided leadership and advocacy for construction workers in Minnesota for 60 years.

On behalf of my members, I have recently teamed up with David Olson, the President of the Minnesota Chamber of Commerce, to form the Jobs for Minnesotans Coalition.

Jobs for Minnesotans is a growing coalition of labor organizations, businesses and business associations, middle class workers, local governments, educators and other supporters of job creation in the State of Minnesota. The initial focus of this diverse coalition is to champion the development of critical and strategic metals (copper, nickel, platinum, palladium and gold) mining in Minnesota and provide information about the direct and ancillary job creation that strategic metals mining will produce for the state, once permitted to begin operations.

Why this Coalition?

Minnesota is on the verge of becoming one of the most significant producers of strategic metals in the world. Right now, the United States has no domestic source of nickel, a key element in many products used for our national security. If those seeking permits in Minnesota are able to proceed, Minnesota will become the 2nd largest producer of nickel globally. This is critically important.

For my members, a recent University of Minnesota Duluth study shows that strategic metals projects could mean the potential for 1,300 jobs in Minnesota. A job surge of this magnitude in Minnesota's Iron Range would have a significant, lasting impact on our State's, and the region's economy. By moving forward to safely extract these minerals from one of the world's largest known, untapped deposits in what is known as Minnesota's "Duluth Complex" means jobs for generations for hard working Minnesotans.

The Minnesota Department of Natural Resources is charged with issuing the permits to mine. Just 2 years ago, labor and business, our Democratic governor and Republican legislature stood together to pass landmark permit efficiency legislation, much like that which you are considering here at a Federal level. There was no discussion of who was going to get a political win. It was about getting Minnesotans back to work; together—and doing it in an environmentally sensitive way.

In fact, during the last Legislature, streamlining permits in Minnesota was House File 1. And Governor Dayton, early in that session, issued similar executive orders while the legislature passed this landmark legislation which the he then signed into law.

Both branches of government are actively working together again this legislative session to shorten the permitting time. In fact it was a key policy point made by Governor Dayton's Chief of Staff at the Minnesota Chamber of Commerce's legislative banquet earlier this year.

My point here is that an efficient permitting process can be something that policymakers of all political stripes can and should stand together to support. I am enclosing for the record the recent February 2013 report by the Minnesota Pollution Control Agency which outlines the successes of efficient environmental permitting in Minnesota today, due to the laws we passed.

What you are working on here is a natural extension of what we did, working together in Minnesota. On behalf of the 50,000 men and women I represent through the Building and Construction Trades Council, and the growing coalition I am leading with my State chamber counterpart, I'd ask that you too stand together for jobs and pass significant permitting efficiency legislation here in Washington.

I am happy to answer any questions you may have.

27

**Note:** The report entitled, "Environmental Permitting: MPCA's Semiannual Permitting Efficiency Report" Minnesota Pollution Control Agency, (February 1, 2013) (*http://www.pca.state.mn.us/index.php/view-document.html?gid=18982*) has been retained in the Committee's official files. Minnesota Pollution Control Agency, 520 Lafayette Road North, Saint Paul, Minnesota 55155–4194. This report is available in alternative formats upon request, and online at *www.pca.state.mn.us.* Document number: lrp–gen–10sy13.

———

JOBS FOR MINNESOTANS

MINNESOTA—PERMITTING EFFICIENCY LAW

During the 2011–2012 biennium, Democratic Governor Mark Dayton and the Republican-controlled Legislature worked on a bi-partisan basis to enact the permitting efficiency law. The bills were in response to concerns expressed about the overall length and uncertainty associated with regulatory processes, including both environmental review and permitting.

Minnesota House File 1/Senate File 42 (2011)
Minnesota House File 2095/Senate File 1567 (2012)

- Established a 150-day goal for the Minnesota Pollution Control Agency (MPCA) and Minnesota Department of Natural Resources (DNR) to issue permits and requires a report on applications not meeting that goal.
- Allows a project proposer the option to prepare the draft Environmental Impact Statement (EIS), rather than a regulated government unit such as a State agency or local government.
- Requires that final decisions on permits be made within 30 days—rather than 90 days—of the final approval of an EIS.
- Eliminated district court review of environmental review decisions and sends all appeals directly to the Court of Appeals.
- Requires that when the MPCA adopts standards that exceed federal standards, the MPCA must document that federal standards are not protective enough.
- Allows a permit applicant to begin new construction or an extension before a national pollutant discharge elimination system (NPDES) or State disposal system (SDS) permit is issued by the MPCA, unless Federal law prohibits the action.
- Established a permits coordinator required to assist permit applicants.
- Allowed DNR permit holders who have a permit or have applied for a permit to continue to operate during a suspension of government services as long as they abide by all rules and regulations in the permit.

On February 1, 2013 the MPCA released its semiannual report to the Legislature. In its findings, the MPCA acknowledged that full implementation would take additional time but that they are pleased with the overall results. Most notably the MPCA continues issuing more than 90 percent of priority (construction) permits within the 150-day goal while ensuring the protection of human health and the environment.

Since the enactment of the Permitting Efficiency Law, the MPCA has initiated a number of improvement endeavors:

- Improving communication around permitting metrics through the Agency electronic dashboard.
- Standardizing permitting processes across media and programs to minimize business and technology system duplication and establish a unified agency-approach, where possible, to permit delivery.
- Developing new technology tools to improve data integration and utilization of data, and system efficiency.

*The MPCA Report can be accessed here: *http://www.pca.state.mn.us/index.php/view-document.html?gid=18982.*

———

Mr. LAMBORN. Thank you for your testimony.
We will now hear from Ms. Krill.

28

## STATEMENT OF JENNIFER KRILL, EXECUTIVE DIRECTOR, EARTHWORKS

Ms. KRILL. Thank you. Mr. Chairman, Ranking Member Holt, and members of the Subcommittee, for giving me the opportunity to testify here today. My name is Jennifer Krill, and I am the Executive Director of Earthworks. We are a nonprofit organization dedicated to protecting communities and the environment from the destructive impacts of mineral and energy development.

Earthworks opposes H.R. 761, the National Strategic and Critical Minerals Production Act of 2013. The authors and advocates of this legislation, the mining industry lobby and its champions, would have you believe that mining companies in the United States are stifled by the current regulatory system. The truth is the mining lobby's vision of a mining-hostile United States is, in our view, pure fantasy. Our stable democracy, our courts that enforce contracts, and an orderly and reliable process for public input in permitting decisions make this country one of the best places for mining investment.

Hard-rock mining companies in the United States also enjoy a myriad of subsidies and loopholes that create an extremely friendly regulatory environment.

First, they have the 1872 Mining Law, which was mentioned earlier today, a law that allows mining companies, foreign and domestic, to take gold, copper, silver, uranium, and any other mineral from public lands for free. The Forest Service has repeatedly said that because of this antiquated law, they cannot deny mine proposals on our National Forests. While operating under this 140-year-old law, mining companies are also given free reign to pollute our water, thanks to two Clean Water Act loopholes that allow mining waste to be dumped directly into streams, rivers, lakes, and wetlands. The metals mining industry is the single largest source of toxic pollution in this country.

An extremely favorable tax code rounds out the fantastic regulatory environment for hard-rock mining. The percentage depletion allowance allows a company to deduct a fixed percentage from their gross income, which costs taxpayers over $500 million per year.

In the case of minerals mined on public lands, mining companies, because of the percentage depletion allowance, sometimes get paid by the government to mine minerals that the public gave them for free.

According to the Frasier Institute, a center-right Canadian think tank which annually surveys mining companies around the world, three U.S. States, Nevada, Utah, and Wyoming, are ranked in the top 10 highest jurisdiction for investment, according to the opinions of mining company managers and executives from around the world.

Environmental review does not discourage mining investment in the United States. We know this because the Frasier survey asked that question of these global companies, and the answer was no.

This is not an issue of too many lawyers or regulators. It is an economics issue. Mining occurs where minerals are, and where the target mineral price makes the process economically viable. H.R. 761 is a bill written for a problem that does not exist. This legislation would negatively impact the environment and our public lands

29

and the communities surrounding them, while doing little to give mining companies the social license to operate that they often claim that they desire.

By seriously impairing the public's ability to review and provide input on the uses of its lands, this legislation simply adds another special favor to an overly blessed industry. What we believe is really needed is a concerted mining industry effort to work with communities to build more responsible mines, to reform outdated policies, and to play by the rules with which other industries already profitably comply.

I would like to take my last minute and turn to H.R. 687, the Southeast Arizona Land Exchange and Conservation Act of 2013. This is a bill that is also opposed by Earthworks. A foreign-owned mining company is planning a massive mine in southeast Arizona. Because the area is partially protected and would be destroyed by the mining process, this company would like to privatize 2,600 acres of public lands.

As you will hear from the Chairman of the San Carlos Apache Tribe later today, the Oak Flat Campground, which has been protected since 1955 under the Eisenhower Administration, is a sacred area to Tribes and is used often for religious purposes. In addition to the destruction of this sacred site, this land exchange would end public access to some of the most spectacular outdoor recreation and wildlife viewing areas in Arizona.

This bill would sacrifice the interests of Arizonans and all Americans in order to enrich foreign shareholders. We strongly urge you to protect these public lands for future use. Thank you.

[The prepared statement of Ms. Krill follows:]

PREPARED STATEMENT OF JENNIFER KRILL, EXECUTIVE DIRECTOR, EARTHWORKS

**H.R. 761—*"National Strategic and Critical Minerals Production Act of 2013"***

Thank you Mr. Chairman for the opportunity to testify before your Committee in opposition to H.R. 761, the National Strategic and Critical Minerals Production Act of 2013. My name is Jennifer Krill, and I am the Executive Director of Earthworks. We are a non-profit organization dedicated to protecting communities and the environment from the destructive impacts of mineral and energy development. We work closely with a broad coalition of local governments, Native Americans, citizen groups and other conservation organizations to improve the policies governing hardrock mining and oil and gas development.

The authors and advocates of H.R. 761—the mining industry lobby and its champions—would have you believe that mining companies in the United States are stifled by the current regulatory system. They describe a country where mineral development is stymied by Federal rules that divert companies to spend their mineral investment dollars elsewhere. But the mining lobby's vision of a mining-hostile United States is pure fantasy.

In reality, hardrock mining companies in the United States enjoy subsidies and loopholes that create an extremely friendly regulatory environment for them.

It starts with the 1872 Mining Law—a law that allows mining companies, foreign and domestic, to take gold, copper, silver, uranium and any critical or strategic minerals from public lands for free, without paying a royalty to the taxpayer. Years of case law define hardrock mining as the highest and best use of public lands; Federal land managers now give hardrock mineral extraction precedence over hunting, fishing, sacred sites and all other uses of public lands. The Forest Service has repeatedly said that because of this antiquated law, they cannot deny mine proposals on our national forests.

In addition to royalty-free mining, the 1872 Mining Law collects no reclamation fee from the industry. The EPA estimates that the clean up cost of these hardrock abandoned mine sites is $50 billion—all of which is currently being paid for by the taxpayer.

30

While operating under this 140-year-old law, mining companies are also given free rein to pollute our waters thanks to two Clean Water Act loopholes that allow mining waste to be dumped directly into streams, rivers, lakes and wetlands. The metals mining industry is the single largest source of toxic waste and one of the most environmentally destructive industries in the country. In fact, the Environmental Protection Agency estimates hardrock mining pollutes 40 percent of the headwaters of watersheds in the western United States.

An extremely favorable tax code rounds out the regulatory fantasy for hardrock mining companies in the United States. The Percentage Depletion Allowance (PDA) permits a company to deduct a fixed percentage from their gross income according to the mineral extracted, ranging from 22 percent for uranium to 15 percent for silver and other hardrock minerals. In some cases this deduction actually exceeds costs. The result is a situation where mining companies not only pay virtually nothing for the deposit royalty for the public's minerals, but also get paid by the government to mine public minerals they were freely given under the PDA. This subsidy costs taxpayers over $500 million every year.

This trifecta of an outdated mining law, the ability to dump mine waste directly into fresh water and enormous tax breaks for the industry makes hardrock mining unique in this country, and renders H.R. 761 unnecessary and absurd.

The United States of America is one of the world's best places for mining investment. We have stable Democratic institutions, courts that enforce contracts, favorable tax and environmental policy, and an orderly and reliable process for public input in permitting decisions.

Just ask the mining companies. According to the Fraser Institute—a center-right Canadian think tank who annually survey approximately 700 mining, exploration, development companies around the world—Nevada, Utah, and Wyoming, rank in the top 10 most attractive jurisdictions for mineral exploration investment, according to mining company managers and executives surveyed.

THE NEVADA EXAMPLE

According to the University of Nevada Reno, more than 80 percent of Nevada's surface area is public land managed by the Federal Government in trust for all Americans by the Bureau of Land Management and the U.S. Forest Service. Consequently, Federal law—and NEPA in particular—applies to the vast majority of Nevada.

As a result, if permitting delays imposed on public lands were so burdensome, one would expect that Nevada would be unattractive relative to other potential mineral investment destinations.

The opposite is true.

Consider again the Fraser Institute survey and its most important criteria included in the composition its "Policy Potential Index" (i.e. policy attractiveness):

"The Policy Potential Index is a composite index that measures the effects on exploration of government policies including uncertainty concerning the administration, interpretation, and enforcement of existing regulations; environmental regulations; regulatory duplication and inconsistencies; taxation; uncertainty concerning native land claims and protected areas; infrastructure; socioeconomic agreements; political stability; labor issues; geological database; and security."

Note what is absent from that ranking: mineral potential. The ranking is based on policies, and things that result from policies, alone.

In the most recent survey (2012–2013 edition), Nevada—in terms of the aggregate effect of the various policies that apply to mining within the State—is the 7th most attractive mineral investment destination in the world. Wyoming, another State known for its abundance of public lands, ranks 5th. Utah, another public lands State, follows close behind.

The aforementioned Policy Potential Index includes areas in which Nevada would score well but is conceivably not directly attributable to regulation (e.g. infrastructure). Do environmental regulation and permitting drag down mineral investment in Nevada and the rest of public lands in the United States?

The answer is "no". In fact, the Fraser Survey also includes a ranking of the relative attractiveness of regions' "current mineral potential with no regulations in place and assuming [only] industry best practices".

If the claim that existing regulations actually restrict mineral investment in Nevada and Federal public lands around the nation were true—then one would expect

31

survey participants to find the absence of regulations to increase Nevada's mineral investment appeal.

Instead, the opposite is true. According to the Fraser Survey, when mining industry insiders were asked to assume no government regulations in a jurisdiction, Nevada's mineral investment attractiveness ranking in the 2012–13 survey remains unchanged. In past years, it actually dropped.

Furthermore, the 2012–13 Fraser Survey directly asks survey respondents whether a jurisdiction's environmental regulations deter investment, encourage investment, or have no effect. 69 percent of respondents said environmental rules in Nevada—80 percent of whose area is subject to Federal oversight—either encourage mineral investment or do not deter it.

Taken as a whole, the Fraser Survey is a direct refutation for the need for this bill. In fact, the only evidence found in the survey suggest that existing oversight—including Federal policies like NEPA—is a relative competitive advantage, not disadvantage.

DEFINITION OF STRATEGIC MINERALS

The bill broadly defines critical and strategic minerals as those that "support domestic manufacturing, agriculture, housing, telecommunications, healthcare, and transportation infrastructure." In other words, all minerals including gold, the most valuable mineral mined in Nevada.

Gold is particularly inappropriate for designation as a critical or strategic mineral for the simple reason that the majority of it in the United States—54 percent in 2011 according to the USGS—is used in jewelry fabrication. 54 percent is actually quite low in terms of jewelry's historic percentage of U.S. gold demand. As recently as 2008, it was 84 percent.

Since jewelry fabrication is neither a critical nor strategic use for gold, then no critical or strategic purpose is served by exempting its mining from our most basic environmental protections like NEPA review.

THE IMPORTANCE OF PUBLIC PARTICIPATION, PUBLIC LANDS, AND ENVIRONMENTAL PROTECTION

When the National Environmental Policy Act (NEPA) was enacted in 1969 by an overwhelming bi-partisan majority and signed by President Richard Nixon, the goal of the legislation was to create a process by which the environmental impacts of large industrial projects could be explored, weighed and eventually mitigated.

NEPA makes sure that in addition to government and industry input, everyday citizens can take part in the development and oversight of projects that affect our social, economic, and environmental health. The NEPA process provides citizens an opportunity to learn about proposed Federal actions and offers agencies an opportunity to receive valuable input from the public.

The average time it takes BLM to permit a large mine is 4 years—not 10, not even 7. When a particular permit takes longer, the reason either has to do with State processes or, more likely, delays created by the mining company themselves—sometime for perfectly legitimate reasons like changes in market conditions.

Under current law, agencies must fully evaluate the environmental impacts of actions that may significantly affect the environment. Though, it is important to point out that the law does not require that the decision-making agency choose the most environmentally-friendly option, it only requires that they weigh all the options.

Furthermore, the NEPA process is the public's window on how a mining operator plans to comply with environmental law. Without NEPA, the public is forced to rely on the mining company, and the permitting agency, to verify that mining operator's plan of operations can realistically do so.

While such faith is touching, the facts indicate it is sadly unfounded.

In a unprecedented 2008 research paper commissioned by Earthworks, conducted by a member of the National Academies of Science Earth Science Board, and reviewed by regulators and industry, mining industry promises of environmental compliance for "major" mines undergoing full NEPA review were compared against what actually happened at the mines. The most disappointing finding: 100 percent of mines in the study predicted environmental compliance; 75 percent of them did not.

The only reason we know of industry (and permitting agencies') failure to adequately govern mining operations: NEPA review. If not for NEPA, citizens would not know how badly the mining industry performs, nor be able to use this information to pressure permitting agencies to improve its behavior.

32

This legislation would run roughshod over the values of transparency and public participation that are at the heart of NEPA—essentially taking public review out of potential uses of our public lands.

While mining on public lands helps stimulate economic activity, protection of those lands is also vital to the western economy. Last year, over 100 economists including 3 Nobel laureates, sent a letter to President Obama stressing the importance of the protection of our public lands to our national economy. They said:

"The rivers, lakes, canyons, and mountains found on public lands serve as a unique and compelling backdrop that has helped to transform the western economy from a dependence on resource extractive industries to growth from in-migration, tourism, and modern economy sectors such as finance, engineering, software development, insurance, and health care."

They also note, "increasingly, entrepreneurs are basing their business location decisions on the quality of life in an area. Businesses are recruiting talented employees by promoting access to beautiful, nearby public lands . . . Together with investment in education and access to markets, studies have repeatedly shown that protected public lands are significant contributors to economic growth."

Section 103 reprioritizes the entire field of public land and environmental law regarding mineral operations, making "development of the mineral resource" the "priority of the lead agency."

Under current law, the Federal land agencies are subject to a variety of congressional mandates that attempt to balance mineral production with the protection of human health, water and air quality, wildlife, etc. For example, if a mining project may adversely affect a threatened or endangered species, then as the Supreme Court has held pursuant to the Endangered Species Act, "Congress intended endangered species to be afforded the highest of priorities." *TVA* v. *Hill*, 437 U.S. 153 (1978). If the ESA is not applicable, then other congressional policies apply, such as the prevention of "unnecessary or undue degradation" to public land under the Federal Land Policy and Management Act of 1976, 43 U.S.C. 1732(b). See *Mineral Policy Center* v. *Norton*, 292 F.Supp.2d 30, 33 (D.D.C. 2003) (discussing competing congressional mandates for mining operations on Interior Department lands).

H.R. 761 essentially eliminates these long-standing congressional mandates, and subjects the BLM and Forest Service to a new "maximize mineral development" standard. Although Section 103 states that the agency must "mitigate environmental impacts," that vague language does little to protect environmental values in light of the new overarching development standard. For example, under current environmental law, "mitigation" can mean simply "minimizing impacts" or "reducing the impact over time." 40 CFR 1508.20. Coupled with the "maximize development" priority, as well as the requirement that the agencies ensure that "more of the mineral resource can be brought to the market place," an agency's "mitigation" authority is thus severely curtailed.

EQUAL ACCESS TO JUSTICE ACT

H.R. 761 also allows regulators to exempt mining projects from the Equal Access to Justice Act (EAJA). In many cases, affected communities cannot afford to hire a lawyer, much less the litany of scientific and technical experts needed to mount a serious challenge to a major multinational mining corporation. The practical effect of this provision would leave many communities unable to sue for the contamination of their lands and waters.

CONCLUSION

In sum, environmental reviews and legal challenges do not substantially affect mining investment, employment, or the reserves of certain critical minerals. The market has long ago priced in these costs and the result is that many of our Western States are among the best places for mineral investment and have substantially lower unemployment rates than surrounding communities. This is not an issue of too many lawyers or regulators; it's an economics issue. Mining occurs where the target mineral price makes the process economically viable.

NEPA has been in place for more than 40 years. Federal Government agencies and the mining companies they regulate understand the process well and value the market certainty NEPA creates and investors crave. Dismantling this well-established process could undermine the purported purpose of this bill of encouraging investment and securing more critical mineral resources.

The consequences of H.R. 761 would negatively impact the environment of publicly owned lands within mining States, and the communities surrounding them, while doing little to give mining companies the social license to operate that they

often claim they desire. By seriously impairing the public's ability to review and provide input on the uses of its lands, this legislation simply adds another special favor to an already overly blessed industry.

H.R. 761 is a bill in search of a problem that does not exist. What is really needed is a concerted mining industry effort to work with communities to build more responsible mines, to reform the outdated policies that haunt them, and to play by the rules with which other industries profitably, comply.

**H.R. 687—"Southeast Arizona Land Exchange and Conservation Act of 2013"**

On behalf of Earthworks and the thousands of members we represent in Arizona and nationwide, we also urge you to oppose H.R. 687 the Southeastern Arizona Land Exchange and Conservation Act of 2013 (the "land exchange bill") that would, in part, revoke a mining prohibition on 760 acres of public lands in the Tonto National Forest in the area of the Oak Flat Campground 60 miles east of Phoenix.

Resolution Copper Company (RCC), a foreign-owned mining company, is planning a massive block-cave mine and seeks to acquire Oak Flat Campground and the surrounding public lands through this land exchange bill. If they succeed, the campground and an additional 2,300 acres of the Tonto National Forest will become private property, forever off limits to many recreationists and other users. Privatization of this land would end public access to some of the most spectacular outdoor recreation and wildlife viewing areas in Arizona. And massive surface subsidence will leave a permanent scar on the landscape, eliminating the possibility of a diversified economy for the region.

The Eisenhower Administration recognized the Oak Flat Campground as an important recreational resource in 1955, specifically placing it off limits to future mining activity. Oak Flat should remain under Federal jurisdiction for its continued protection. With tens-of-thousands of visitors each year, Oak Flat contains a world-class natural resource for birding, bouldering, camping, hiking, hunting, picnicking, rock climbing and other recreational uses. On the eastern border lies Gaan Canyon, one of the crown jewels of Arizona's State trust lands with some of the finest remaining riparian habitat in the State.

Oak Flat Campground and the surrounding area has long been an important cultural site for Western Apaches. The Tonto National Forest recognized at least a dozen archeological sites in and around Oak Flat and traditional Apache continue to use the Campground area for performing religious and cultural rites. Privatizing Oak Flat and destroying its surface would forever eliminate Apache traditional practices in the area, since they would be unable to access the land.

Transfer of part of our national forests to a multinational copper mining company will almost certainly deplete and contaminate water resources and nearby watersheds. Surface water, tributary water, and aquifers are located where the copper ore body resides. Excavating this ore risks contamination. Many billions of gallons of water are necessary to carry migrating slurry to and from the ore body over the decades long life of the mine. Altering the surface and subsurface geological structure of this area via the impending subsidence will forever change the natural state of aquifers and drainage of watersheds through out the region.

Section 4(j) of H.R. 687 provides sham compliance with the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321). This is because the environmental impact statement (EIS) occurs only after privatizing the land. By that point, the Government loses the opportunity to act on reasonable alternatives, and the mine becomes a forgone conclusion regardless of the potential impacts the EIS finds.

In addition, as soon as this bill becomes law, the land becomes available for mining activities. Section 4(h) mandates that only laws pertaining to mining on private land will apply. The Secretary will also issue a special use permit for exploration of Oak Flat within 30 days of Resolution Copper's request (Section 4(f)). Only after Resolution Copper has built mine shafts, adits, tunnels, and tailings deposition areas will the Secretary then receive a mine plan of operations.

Finally, this land exchange bill would set a chilling precedent allowing for the revocation of similar land withdrawals such as parks, recreation areas, and wildlife refuges. Public lands such as Oak Flat that are set aside for recreation should remain protected for future generations. This land exchange bill would sacrifice the interests of Arizonans, and all Americans, to enrich foreign shareholders. It would destroy sacred sites for short terms gains. Thirty years from now—when the mining jobs once again leave—the region will be much worse off because the landscape will be ruined. We strongly urge you to protect these public lands for the public's future use and preserve the unique opportunities for Arizonans that the Oak Flat area provides.

34

**H.R. 957—*American Soda Ash Competitiveness Act***

Earthworks also respectfully opposes H.R. 957, The American Soda Ash Competitiveness Act. The experience gained from the last time Congress lowered the royalty on soda ash and related sodium minerals teaches us that this industry remains competitive regardless of the royalty rate. The U.S. Department of Interior's Report to Congress on the Soda Ash Royalty Reduction Act of 2006 makes this clear.

Despite cutting the royalty from a weighted average of 5.6 percent to 2 percent, the soda ash industry experienced almost no change in the volume of production, leases, or sales. Overall capital investment since FY 2006 has fallen. Domestic employment in the soda ash industry has similarly dropped since FY 2006. While industry revenues increased significantly, the Department of the Interior attributes this to a spike in prices coupled with a sharp decline in production costs—due to historically low prices of the natural gas used to power these operations.

Instead, this bill amounts to an unnecessary extension of a taxpayer giveaway first granted in 2006. Without the royalty reduction, DOI estimates States alone would have received $62.1 million more from FY 2007–2010. They estimate total lost royalty revenues between FY 2007–2011 at more than $150 million. Additionally, BLM regulation (43 CFR 3513) provides an administrative process through which Federal sodium lessees may individually seek royalty rate reductions. Creating an industry wide reduction only encourages a trend toward shifting soda ash extraction from State and private lands to Federal lands just to take advantage of the lower royalty. The end result is simply lower government revenues, without the benefits of more jobs or greater global competitiveness.

————

Mr. LAMBORN. Thank you. And thank you all for being here and providing testimony. We will now have a round of questions for the witnesses from the members of the Committee. And I will start by asking a question of Mr. Iwanicki.

Later today on another panel we are going to hear from BLM and others that requiring agencies, including the EPA, to better coordinate on NEPA documents and mine permits is unnecessary and will somehow hinder their ability to follow their multiple-use mandate. How would you respond to that?

Mr. IWANICKI. I am not quite sure of that question. I know for us, with our project with County Road 595, we had all private funds that were being used to build this county road. And, therefore, we did not have to go through the Federal process. And we did follow a lot of those guidelines in doing our permit process with our Department of Environmental Quality and with the EPA, but we did not follow all the rules of the NEPA process through our project.

Mr. LAMBORN. OK, thank you. And I am going to ask a question now of Ms. Batulis and Mr. Melander. What advice do you have for us in Washington to try and streamline the permitting and NEPA processes so it doesn't take 7 to 10 years, or even more, to permit a project?

Mr. MELANDER. Want to go? Me?

Ms. BATULIS. You go.

Mr. MELANDER. Chair, Committee members, a response to that question is that I think looking at what the State of Minnesota, as indicated in my comments, what we call "The Minnesota Model" is something to look at. We have a State that is beautiful, other than being cold, as Ruthe had indicated, and we love our State. But we have opportunities here that we need to take advantage of in a safe way. But using the model that Minnesota has developed, I think, is a good start.

Mr. LAMBORN. Ms. Batulis?

35

Ms. BATULIS. I would agree with Harry. What really happened in Minnesota was both sides of the aisle worked together to find a common ground that would work for everyone. And it was about streamlining the process so that we can create jobs. It is all about jobs now. And we really saw some extraordinary work done across the aisle that we are all very proud of. So that would be our suggestion.

Mr. LAMBORN. OK. Thank you. And I would like to note at this time that both Michigan and Minnesota—Michigan is represented very well by Representative Benishek, who is here on the Committee—are home to, in the case of Minnesota, the 3rd largest producer of non-fuel minerals, and Michigan, the 10th largest producer of non-fuel minerals in the country. So, there are significant deposits of strategic and critical minerals.

Ms. Krill, I would like to ask you a question real quick here. Is there any new proposed mine in the United States that your organization does approve of?

Ms. KRILL. Our organization approves of mines—I am sorry, am I on? Yes.

Mr. LAMBORN. I can hear you.

Ms. KRILL. Our organization would approve of mining that has attained the free, prior, and informed consent of indigenous communities, that does not pollute waterways or allow the dumping of tailings or mine waste into waterways, rivers, lakes, streams, and wetlands, that enjoy the community support of the local community, that do not impact areas of high biodiversity, and follow international labor organizational standards for labor organizing.

At this time, there are some mines that follow some of these principles, and others that we would support. We haven't found a mine in the United States that follows all of these principles that we would support. And we encourage industry and are working actively with industry in dialog to identify a way that we can move forward.

Mr. LAMBORN. Well, it sounds to me that if there is no new mine in this country that you support, that you could be accused of opposing for the sake of opposing, that you will always find some reason to oppose.

Ms. KRILL. We don't oppose mines, either. In fact, many mines we don't take a position on. There are some areas where we feel like mining is not an appropriate activity. And in those instances we do take a position of opposition.

Mr. LAMBORN. OK. At this point I am going to turn to Representative Holt for his questions.

Dr. HOLT. Thank you. Let me begin with just a comment following from that last exchange. I would say that the standards that Ms. Krill, that you laid out are attainable and desirable. And I would hope that all operations, mining and otherwise, would work to achieve those.

Ms. Krill, the Interior Department has stated that H.R. 761 is, "drafted in such," and this is a quotation, "drafted in such a manner as to cover virtually all hard-rock mining on Federal lands." Do you believe that a bill that is intended to deal with strategic minerals should also be broad enough to cover clay, coal, crushed stone, sand, gravel, scrap iron?

36

Ms. KRILL. No, we do not. We oppose H.R. 761 because, in large part, because of how broad it really is. As I said earlier, mining companies mine where minerals are. The economics of mining in the United States favor the ability of mining companies to mine in the United States.

Dr. HOLT. Ms. Batulis, simple question. Could you define for us a critical and strategic mineral?

Ms. BATULIS. Copper, nickel.

Dr. HOLT. OK.

Ms. BATULIS. And I think the——

Dr. HOLT. And would you include crushed stone, granite, gravel, clay?

Ms. BATULIS. Mr. Chair, Committee members, no.

Dr. HOLT. No? Yes. Mr. Melander?

Mr. MELANDER. The same question, sir?

Dr. HOLT. Yes, please.

Mr. MELANDER. As indicated by Ruthe, those precious metals. And regarding sand and gravel, I would not consider those precious metals.

Dr. HOLT. Yes. I think we might have some redrafting to do, or some amending here, then.

Do you include gold and silver in that?

Mr. MELANDER. Gold, correct.

Dr. HOLT. OK. Ms. Krill, in a later panel, we will hear testimony that the United States is putting itself at a competitive disadvantage with other countries, because of permitting time. And yet, in your testimony you say that the United States is one of the best places in the world for mining investment. Which is it?

Ms. KRILL. Well, if Mr. Holt, if you listen——

Dr. HOLT. Would you care to elaborate on the statement that you made in your testimony?

Ms. KRILL. Absolutely. If you listen to the opinions of mining managers from a global perspective, they do indeed favor the United States as a place for mining investment. The BLM says that the average time for permitting in the United States is 4 years. With various other regulatory conditions, the United States is, indeed, considered a favorable place by mining investment, worldwide, to mine.

Dr. HOLT. Ms. Krill, in light of the conditions under which the Mining Act of 1872 was passed—we were trying to build a Nation and expand to fill the western territories—would you say that this bill is up to date? In particular, do you think at a time that there is so much talk about reducing the deficit we should be asking mining companies to pay a royalty rate for extracting these minerals?

Ms. KRILL. I——

Dr. HOLT. And should it be comparable to what is done for, say, oil and gas?

Ms. KRILL. I absolutely agree that mining companies should be paying a royalty rate. Mining companies shouldn't be granted access to public lands and public minerals for free. And if there is an interest in reforming how mining is done in this country, I would suggest we start with reforming the Mining Law of 1872.

Dr. HOLT. Yes. The name itself suggests some dated characteristic of it.

37

[Laughter.]

Dr. HOLT. Just in the few seconds that remain, Ms. Krill, do you know whether Western States charge a royalty rate for extraction of minerals, different from the Mining Act of 1872, different from the Federal——

Ms. KRILL. There are Western States that charge a royalty rate for mining. federally, on a national level, we do not.

Dr. HOLT. Well, I think my time has expired. I thank the witnesses and I thank the Chair.

Mr. LAMBORN. Thank you. And I would point out to the Ranking Member that the Mining Law of 1872 has been amended many times over the years. So let's keep up on the amendments.

And, Ms. Krill, I would like to point out to you that when you say that minerals are extracted for free, you are neglecting State severance taxes, you are neglecting the taxes that are paid by mining companies on a corporate income, taxes paid by their employees on personal income, sales tax, property tax, and on and on and on.

OK. We are going to go to our next witness—excuse me, next Committee member. I would like to point out that we are missing Representative Amodei. Unfortunately, his mother passed away earlier this week, so our thoughts and prayers are with him. But we will go instead next to Representative Gosar.

Dr. GOSAR. Thank you. I want the record very, very clear. Ms. Krill, have you ever endorsed or supported—careful wording here—any mining operation in the United States, your organization?

Ms. KRILL. Have we ever endorsed——

Dr. GOSAR. Or supported a mining operation in the United States.

Ms. KRILL. A single operation.

Dr. GOSAR. Absolutely.

Ms. KRILL. No. We have endorsed and supported principles for——

Dr. GOSAR. I am getting at that point. It seems like, I am going back with the Chairman's connotation, that no is an answer. No is not an answer any more in America. It is how do we accomplish this under the protocols.

Let me ask you the next question. In regards to the United States, isn't it a lot about our mineral composition, that we are rich with minerals in the United States that so many foreign and national mining companies really would like to work here, because it is a concentration and plethora of minerals that we actually have here? Is that not true, compared to about any other continent?

Ms. KRILL. Mining companies do mine where the minerals are.

Dr. GOSAR. So we are very rich, and that is why. So I mean we want to make sure we are careful about how we look at those things.

Chairman, for the record, what I would also like to do is, put in the record a letter from the Nature Conservancy and this is an op ed from the Arizona Republic, as well as a climbing recreational group from Queen Creek for the record that support this mine.

Mr. LAMBORN. Seeing no objection, so ordered.

[The information that Dr. Gosar submitted for the record has been retained in the Committee's official files:]

38

Dr. GOSAR. Let me ask you one more question, Ms. Krill. You know, has your organization ever been out to the mine?

Ms. KRILL. I am sorry, which mine?

Dr. GOSAR. Resolution Copper in Southeast Arizona.

Ms. KRILL. Yes.

Dr. GOSAR. You have actually toured the mine?

Ms. KRILL. I have not personally, no.

Dr. GOSAR. No, I don't think anybody has toured the mine, frankly. I just checked with the company. You have not toured the mine, as far as I can understand.

Let me ask you another question.

Ms. KRILL. I thought you were referring to Oak Flat Campground.

Dr. GOSAR. That is the campgrounds.

Ms. KRILL. The site.

Dr. GOSAR. I am looking at the mining site.

Ms. KRILL. OK.

Dr. GOSAR. You know, hands-on are a lot of different things. There is being able to see, to dialog about the facts. You know, facts are kind of an interesting thing. It is hard to argue around facts, because the facts set you free. I know that there was an invitation, was there not, from the company to come out and review the mine?

Ms. KRILL. I have not received a invitation, but I would be happy——

Dr. GOSAR. I think you need to go back in your records to do your due diligence to find out that they actually extended that, and they were turned away. So I would hope that you would go back into your records.

And I would invite you, like I would invite the Member from Arizona who has not been in his tenure, out to the mine. Because I think those are the things that answer questions. You know, facts set you free. And I think Arizona has been stalwart in that aspect in regards to doing this, with all the magical features that we have been able to do and to build Arizona.

And I think that I would leave my questions at that. Thank you. I yield back, Mr.——

Mr. LAMBORN. All right, thank you. We will now go to Representative Grijalva.

Mr. GRIJALVA. Thank you very much. Ms. Krill, a couple of quick questions. In reference to the first part of your testimony, there was a time prior to President Nixon signing the NEPA Act where there was no NEPA, that we can talk—it is not about "what if," there was none.

Consequences of that lack of oversight, transparency, public participation, what drove that Congress, that President to enact the NEPA Act? What was the situation in terms of not just the environment, but communities as well?

Ms. KRILL. That is a very good question, Representative Grijalva. I think that the critical thing that NEPA provides to communities and to the public is an opportunity to participate in a clear and transparent and consistent process. The minerals, for example, in mining, which we are discussing, the minerals are minerals that belong to the public. And it is very important, in our democratic

39

society, that the public has this opportunity to comment on and to participate in a process about what we do with public minerals.

Mr. GRIJALVA. And you mentioned the H.R. 687. H.R. 761 is kind of the same process as H.R. 687, only taken to steroid quality, in the sense that we would do away with all regulatory controls, to do it after the fact, when there is nothing to bind, an action or a remedy. Fair or unfair comparison between the two bills?

Ms. KRILL. I think that is a fair comparison.

Mr. GRIJALVA. I was going to ask Mr. Melander, on all these issues, and I think my friend from Arizona has mentioned that this is about how you say yes, not just no. And I couldn't agree more. But the point is that everything, and you said it is about the jobs and it is about creating that kind of a sustainability in Minnesota, and everybody is at the table at that effort.

Verification of the job numbers, do you verify them yourself? Or, let's say, for instance, we are working off in Resolution Copper, the job analysis by the company, themselves, and it is a movable target. And so, how do you validate that you are making a commitment, whether it is regulatory, whether it is government assistance, based on a sole source, proprietary source of analysis by the company on job production, or do you seek an independent source to verify that that is indeed what is going to be there at the end of the day, in terms of number of jobs?

Mr. MELANDER. Chair, Representative—and that, too, is a good question. And one can get in trouble indicating the amount of jobs.

The first part of your question, when we make reference to our specific State in regards to the opportunity in generational employment, it is done working with our partners in trying to get a realistic expectation.

What we like to do, and we do this consistently, is we talk about work hours that will be generated. I mean it is really hard to describe, I mean, to really be clear. But when we, whether it is, and this has nothing to do with it, but whether we are building stadiums or projects, we base it off of work hours, because it is a better way to describe the opportunities for individuals, at least within our industry.

Mr. GRIJALVA. OK. As you generate precious metals, copper, gold, and I think, I don't know who stated that those are for use and for the industries as they grow here in that country, what is a ratio of export versus keeping the product domestic? What is the emphasis? For instance, the other legislation, the CEO, that said the Resolution Copper mine will help meet this need, and the need is that China will build three more cities larger than Sydney every year until 2030, and that the major stockholder in Rio Tinto, the parent company, is, indeed, China.

And so, we take out our domestic taxpayer resource and ship it overseas, no royalties, no payback, no infrastructure, no sustainability in that community. Is there a ratio that you think is appropriate? Anybody can answer it.

Mr. MELANDER. Chair, Representative, by no means were we prepared to start to give a statistical or analytical information in regards to export and import of these precious metals, strategic metals.

Mr. GRIJALVA. I appreciate——

40

Mr. MELANDER. We were here today to talk about the opportunities that we believe are——

Mr. GRIJALVA. You are absolutely right, and it is probably an unfair question. If Resolution or Rio Tinto were sitting in your seat, they might have an answer. Thank you.

Dr. GOSAR [presiding]. Thank you very much. I would like to yield to the gentleman from Michigan, Dr. Benishek.

Dr. BENISHEK. Thank you, Mr. Chairman. I want to thank the Chairman for holding this important hearing today, and I want to also thank Mr. Jim Iwanicki from my district in Northern Michigan for coming to Washington to tell us about the tremendous obstacles he had in simply building a county road through a working forest in the Upper Peninsula, and the difficulties he has had with the EPA.

Mr. Iwanicki, can you tell me some of the most frustrating part of dealing with the EPA? And I heard in your testimony about the changing goal post, how to deal with them, and they seem to change the rules halfway through the process. Can you elaborate on that a little bit more?

Mr. IWANICKI. Well, the EPA was kind of cold to the idea of building a county road in this working woods area from the start. And it took great effort on our part locally and with your help and the help of our Democratic Senators to at least get them to listen and evaluate the permit, which we thought was a huge deal. And any time we seemed to come to a conclusion and thought we had solved their issue, they would come back and say, "Well, that is not really what we meant, we were looking for something more like this," and that was very evident when you took a look a the wetland mitigation process and the process that went through the wetland mitigation.

We first proposed doing some creation of forested wetlands, and the EPA said, "No, we don't like the creation aspect; we would like more preservation." We then turned around and came up with a preservation plan for them, and then they started with the issues of, "Well, we don't like who the land stewards are going to be, we don't like the way you have the mineral rights in protecting that preservation area and the lack of mineral rights for it." So again, it was very frustrating.

Dr. BENISHEK. Let me ask you a question. How many acres of wetlands would need to be mitigated by the construction of the road?

Mr. IWANICKI. It was 25 acres of wetland that needed to be mitigated, and we proposed giving them 2.5 square miles of land. The wetland being protected was about 25-to-1, I believe, in that 2.5 square miles, and that was next to a National Forest. And again, so it was very frustrating that they wouldn't——

Dr. BENISHEK. Now, as I understand it, not only did you have to give—was it 2.5 square miles for the 25 acres?

Mr. IWANICKI. Correct.

Dr. BENISHEK. But you also had to have an environmental steward of that land in perpetuity. Is that correct?

Mr. IWANICKI. That is correct. And again, none of the local agencies were considered a viable steward for that land.

41

Dr. BENISHEK. This is the Michigan Department of Environmental Quality, is that correct?

Mr. IWANICKI. Well, again, we worked with the Michigan Department of Environmental Quality and the State DNR. And the State DNR in December agreed that they would be the stewards of the land. And when we said that to the EPA, the EPA was not sure that the State DNR was an acceptable agency to be the steward of this land, and the State DNR addresses all the public lands and takes care of all the public lands the State owns in the State.

Dr. BENISHEK. They are the stewards of all the public lands within the State.

Mr. IWANICKI. Right.

Dr. BENISHEK. The State-owned public lands, is that correct?

Mr. IWANICKI. Correct.

Dr. BENISHEK. And they have been doing that for hundreds of years, is that right?

Let me ask you another question about this road, because this is dear to me. In other words, now I know that this road is a 22-mile road which will take the place of a 66-mile road going through downtown Marquette that the ore trucks will now have to drive through. Can you explain to me, how is that better for our local environment, going through the 66 miles?

Mr. IWANICKI. Again, it isn't. And again, the EPA put the animals and the environment in front of all the concerns of public safety and safety of our community, in front of all those. So, again, it was very frustrating. And you can see from all of our public support that we had on the political end of things that it was something that the people wanted and something that we wanted, as a community.

Dr. BENISHEK. Do you think there has ever been the kind of requirements of any other county road in the country that you are aware of to deal with the requirements this road needed?

Mr. IWANICKI. I am unaware of any. And again, if these requirements are out there for all new road projects, it is a good thing our grandfathers and great-grandfathers built a lot of the infrastructure here in the United States.

Dr. BENISHEK. I think my time has expired. Thank you very much, sir.

Dr. GOSAR. I thank the gentleman. Now I would like to go to Mr. Lowenthal from California.

Dr. LOWENTHAL. Pass.

Dr. GOSAR. You are going to pass? That would be, then, Ms. Hanabusa from Hawaii.

Ms. HANABUSA. Thank you very much, Mr. Chair. My questions are directed to Ms. Krill. Ms. Krill, I am talking here about H.R. 687. And I just want to know if you are reading the bill very similarly to the way I am.

My first question is really beginning on page 12, and that is the environmental compliance section, which if you just read it sort of quickly, it seems like NEPA applies. However, if you read it, I think carefully, it doesn't kick in until after the transfer is made to Resolution Copper. And it is prior to the commencing of any production in commercial quantities of any valuable minerals. And

42

then it gives 3 years for the Secretary to then actually complete a review under Section 102 of NEPA. Am I reading that correctly?

Ms. KRILL. I believe you are reading that correctly.

Ms. HANABUSA. So, as opposed to a situation where before the Secretary would even consider doing this transfer, which clearly has a lot of environmental implications, and what I am concerned about are the cultural aspects of it, as well, the EIS is not, and there is no requirement for any review. That is correct.

Ms. KRILL. That is my understanding, yes.

Ms. HANABUSA. OK. Now, the other part of this that I am concerned about in reading is the references, of course, to the Oak Flat withdrawal area, and Apache Leap. Apache Leap, as I understand it, is not directly covered by this potential transfer.

Notwithstanding, the Secretary is told in this bill that they can give special use permits to Resolution Copper to actually tunnel under the surface of Apache Leap. It says you are not supposed to mine under Apache Leap, but you have the right to tunnel under Apache Leap. But Apache Leap is outside of the area of the transfer. Is that correct?

Ms. KRILL. I believe so, although I would defer to the gentleman who will be testifying later from the San Carlos Apache Tribe.

Ms. HANABUSA. I understand that. I just want to know if you are reading this bill very similarly to how I am.

I am also curious about—and the same thing applies, by the way, to the Oak Flat area, which is supposed to be withdrawn, but you can still tunnel under it, or you can give a permit for tunneling under that.

You do reference in here in your testimony the fact that there is a way of the extraction. And I think it is some kind of a—let's see, block cave mine.

Ms. KRILL. Yes.

Ms. HANABUSA. Are you familiar with this methodology enough to explain it to me? What does it mean to be a block cave mining whatever? Massive block cave mine is what you are saying they are intending to do. Can you explain to me what you mean by block cave mine, and how you developed that understanding that Resolution Copper is going to do this?

Ms. KRILL. I will do my best to explain it in layman's terms. I am not a mining engineer, and I have never performed block cave mining. What block cave mining is, in my understanding, is creating a very large, open space, a cave, to extract the ore body with some supports, and then letting the supports go, so you have significant surface subsidence into the area. It is essentially creating an open pit, and turning the surface area into rubble above it.

Ms. HANABUSA. So it is like extracting whatever minerals or whatever that they want underneath, and then, after that, letting nature take its course. In other words, you don't fill it back up. Is that what you are saying?

Ms. KRILL. Yes.

Ms. HANABUSA. And evidence of this used in other areas have resulted with the ground settling and leaving pits in various locations?

Ms. KRILL. Yes. The technique causes severe impacts on the surface. It also causes severe impacts to the water table below the

43

mine. And this is a area where we are very concerned about water, as well.

Ms. HANABUSA. So though they do not permit this block cave mining, it appears, under Apache Leap, which has very major cultural significance, as well as Oak Flat, what they are permitting, however, is for Resolution Copper to get a permit to tunnel under that. We have no idea what it means to tunnel under those specific areas.

Ms. KRILL. That is correct. And we are very concerned for that reason about the impacts on those areas.

Ms. HANABUSA. Thank you. I yield back, Mr. Chair.

Mr. LAMBORN [presiding]. OK, thank you. We will now have questions from Representative Daines.

Mr. DAINES. Thank you, Mr. Chairman. I am going to yield my time to the gentleman from Arizona.

Dr. GOSAR. Thank you very, very much. First of all, I would like to address Ms. Hanabusa, just to make sure we understand this. In this language, that is why my bill will protect Apache Leap beyond the current land management situation. It places nearly 100 acres of Apache Leap currently owned by the mining company into Federal stewardship. Additionally, as a condition of the land exchange, Resolution Copper will surrender its right to commercially extract any minerals under Apache Leap.

Finally, I would like to point out that the company will have over a billion dollars of infrastructure located between the underground mine and Apache Leap. And, in other words, the company would have to destroy a billion—with a B—dollars before Apache Leap's structural integrity could be jeopardized. Without a doubt, Apache Leap would be protected, more so than the current situation, if this legislation is signed into law. So, I wanted to make sure we are clear on that.

Ms. Krill, what size of parcel of land would be too small to have a NEPA done? What kind of acreage would we have to do a NEPA on?

Ms. KRILL. I am not sure of the answer to that question, but I can get back to you.

Dr. GOSAR. Let me ask you a question, then. Let me ask you a question. So you are a homeowner, and what you do is you go buy a piece of property. Would that homeowner have to have a pre-NEPA?

Ms. KRILL. No.

Dr. GOSAR. Why not?

Ms. KRILL. Because I know that is too small.

Dr. GOSAR. Oh. Interesting. So, I mean, it is part of a plan.

Let me ask you the next question. In regards to the mining operation, is anything—let me rephrase that—is anything in the NEPA process short-cutted with this process?

Ms. KRILL. I am sorry, which process?

Dr. GOSAR. In the process I outline in this bill. They cannot go forward, they cannot do anything, without a full NEPA going through. Is that true?

Ms. KRILL. My understanding is that is after the land transfers.

Dr. GOSAR. Well, I am making a correlation here, yes. But the NEPA, I mean, they can't do anything to the land. They are just

44

getting a transfer. So they can't do anything on the land until the NEPA process goes through. Is that true? There are no shortcuts?

Ms. KRILL. [No response.]

Dr. GOSAR. Let me answer it for you. There are no shortcuts. There are absolutely no shortcuts. And our next witness will validate that, as well.

This comes back to the facts. We have to deal in facts, because the facts set you free. Not scaring people, not fear-mongering. We have to deal in the facts.

Let me ask you another question. You know how Arizona was founded? Do you know the five areas in which Arizona was founded? Its principle—what made Arizona special? It is called the five C's: cattle, citrus, climate, cotton, and what would be the fifth one?

Ms. KRILL. I believe that would be copper.

Dr. GOSAR. I thank you very, very much. It is called gold-leaf copper, or leaf copper here. It forms naturally.

You also made another comment in regards to that mining has been the source of the largest pollution in this country. I would like to see your facts on that. Because I would like to show you a case in point of Rio Tinto and stewardship. This is in Wisconsin, very close to Congressman Obey's congressional district. This is an open pit mine. I just want to make sure we get this straight, too. This is an open pit mine, where we actually open a big, large top—OK? It is much more conventional in copper. And this is exactly how it was mitigated, OK?

In block mining, what we do is we have a small opening where we go down. OK? So you are going deep in the ground. And that is where robotics come in, where we hear this problem with robotics. Because we want miners' safe, do we not? I would really be concerned about mining safety. And so, the robots actually go down into the ground and mines this ore and brings it back up. Right? Am I right so far?

Ms. KRILL. I am not familiar with that particular mine.

Dr. GOSAR. Well, cave mining, you made a comment here, cave mining and open pit mining, very different. And once again, you need to make sure you are solidly on the facts, OK? But this shows mitigation. And it is wonderful. I mean this is an extraction. I think Congressman Obey would tell you this is incredible. This is a great company, OK?

And are you familiar with all their investments and good stewardship in Superior?

Ms. KRILL. Am I familiar with Rio Tinto's investments?

Dr. GOSAR. Yes.

Ms. KRILL. No, but I would like to answer your earlier——

Dr. GOSAR. No? Would you also like to know that what they did is they actually came in and helped mitigate problems from previous mining claims? Now they have been a very good steward with us, the City of Superior. They have helped out all over.

And so, I think, and this is getting back to what the Ranking Member and I were talking about back there, that is why I asked you the question, "Have you ever supported a mine claim," because it is not good enough just to say we take no action, it is that you have to start rewarding good behavior and proper behavior that you illicitly want to see done.

45

Ms. KRILL. The source for the statistic about the toxic releases of the mining industry is the Toxic Release Inventory, which is released annually. The mining industry tops the list of industries, as far as toxic releases in the United States.

Dr. GOSAR. I would challenge that, in regards to the waste that comes out of urban areas. And so I think what we ought to do is go back to the facts and look carefully at what that is in mitigation. So I would like to see that answer.

So, without further ado, I am out of time.

Mr. LAMBORN. OK, thank you. Representative Lowenthal.

Dr. LOWENTHAL. Thank you, Mr. Chair. I would like to yield my time to Mr. Grijalva.

Mr. GRIJALVA. Thank you. Mr. Chairman. One of the things that Rio Tinto touts, Ms. Krill, part of the panel was about employment, so I won't go back and ask any questions there, they tout the fact that they are an automated mine. They are the mine of the future. And you get mixed messages.

You get the message where we did our job and we are going to have 1,500 people, and they are going to get paid from $40,000 to $100,000, and it will be the greatest boon that ever happened to Arizona. But in other statements that the executives and CEOs of Rio Tinto make talking about Resolution Copper, that it is the mine of the future, and that they will be able to reduce employment because of automation, and there will be a central place where there will be a minimum amount of maintenance work required there. So it kind of runs counter to the proposal that this is all about jobs.

I preface that because I think there is an important point. I understand that we have to deal in facts, and I wouldn't like anything better than for us to be able to factually deal with this question of Resolution Copper. But since all we have is the legislation to go by as fact, while I am a trusting person, I also like to verify. And part of the verification process has to be some independent look at what this mine is going to be.

Let me ask you one question. Ms. Krill, the Forest Service in its testimony said that, "An environmental review document after the exchange would" and this is talking about Resolution "would preclude the U.S. Forest Service from developing a reasonable range of alternatives to the proposal and providing the public and local and tribal governments with opportunities to comment on the proposal." As a result, wouldn't the bill, as drafted, prevent the Forest Service from properly identifying or considering any mitigation measures that may be necessary, including the tunnels under Apache Leap and Oak Flat?

Ms. KRILL. Yes, it would. Once the land is in private hands, then the Forest Service would not have the ability to develop alternatives, as they would if it continued to be on public lands.

Mr. GRIJALVA. Thank you. And as my State that I love very much evolves, I try to add an additional C to the five C's, conscientious compassion. I hope we get compassion as one of the C's down the road.

Anyway, I yield back, Mr. Chair.

Mr. LAMBORN. OK, thank you. That concludes our questions for this panel. I know that those of you from Michigan and Minnesota

46

didn't know as much about Arizona issues, but I appreciate the testimony that you gave today, all four of you, so thank you for your testimony.

Mr. MELANDER. Thank you.

Mr. IWANICKI. Thank you.

Ms. BATULIS. Thank you.

Ms. KRILL. Thank you.

Mr. LAMBORN. We will now go to our third panel, and I would like to invite forward Ms. Jamie Connell, BLM Acting Deputy Director in the U.S. Department of the Interior, accompanied by Larry Meinert, Mineral Resources Program Coordinator for the U.S. Geological Survey; and Ms. Mary Wagner, Associate Chief of the U.S. Forest Service within the Department of Agriculture.

Like all of our witnesses, your written testimony will appear in full in the hearing record, so I ask that you keep your oral statements to 5 minutes, as outlined in our invitation letter.

You have to press the button on the microphone to be heard in this room. The timing lights, as I said earlier, start at 5 minutes, runs down to turn yellow at one minute, and then runs out and turns red at 5 minutes.

Thank you all for being here. And Deputy Director Connell, you may begin.

**STATEMENT OF JAMIE E. CONNELL, ACTING DEPUTY DIRECTOR, BUREAU OF LAND MANAGEMENT, U.S. DEPARTMENT OF THE INTERIOR**

Ms. CONNELL. Mr. Chairman, Members of the Subcommittee——

Mr. LAMBORN. Pull it a little closer, please. Thank you.

Ms. CONNELL. Is that better?

Mr. LAMBORN. Yes.

Ms. CONNELL. Mr. Chairman, members of the Subcommittee, thank you for the opportunity to present testimony today on a number of bills on behalf of the Bureau of Land Management. My permanent job is as the BLM's Montana-Dakota State Director, but I am currently acting in the position of Deputy Director for the BLM here in Washington.

I am accompanied today by Larry Meinert with the USGS. He is a Mineral Resource Program Coordinator. He is available to answer questions on H.R. 981, the Resource Assessment of Rare Earths Act, and USGS-related questions on H.R. 1063, the National Strategic and Critical Minerals Policy Act.

I have submitted testimony for the record on each of the bills being presented. I will briefly summarize the Administration's position on each of these, and ask that my entire statements be made a part of the official record.

The Administration has several concerns with the complex land exchange proposed in H.R. 687, the Southeastern Arizona Land Exchange and Conservation Act. Two of the Administration's principal concerns with the legislation pertain to the timing of NEPA analysis and tribal consultation. In general, the Department of the Interior defers to the Forest Service on H.R. 687, as it relates primarily to Forest Service-managed lands and associated valuation issues.

47

H.R. 697, the Three Kids Mine Remediation and Reclamation Act, provides legislative solutions to the issues surrounding the abandoned Three Kids Mine in Henderson, Nevada, and clears the way for the area's development. The BLM supports innovative proposals to address the clean-up of the Three Kids Mine, and we support this proposal to transfer 948 acres of public land to the Henderson Redevelopment Agency at fair market value, subject to valid existing rights.

The Department shares the Committee's interest in developing rare earth elements and other critical mineral resources on our Nation's public lands, consistent with environmental protection and public involvement in agency decisionmaking. H.R. 761 expedites critical mineral exploration and mine permitting on public lands managed by the Departments of the Interior and Agriculture. The bill would limit public involvement in review of mining proposals and the formulation of alternatives, which are vital components of the BLM's multiple-use management of the Nation's public lands. As such, the Department opposes H.R. 761.

H.R. 767 expands the scope of the Federal permit streamlining project to include all of the field offices within the jurisdiction of BLM's Montana-Dakota State office. The BLM supports the goal of the bill to better conform the pilot office authority to current permitting demands. This flexibility would be especially useful for the BLM's North Dakota field office in Dickinson, North Dakota, where permitting demand has increased substantially in recent years.

In addition, the BLM would like to work with the sponsor and the Committee in clarifying amendments as well as language that would provide additional flexibilities nationwide. There are many BLM field offices that are not part of the Pilot Project, but are receiving hundreds of drilling applications per year.

H.R. 957, the American Soda Ash Competitiveness Act, would reinstate for 5 years the royalty rate reduction provided under the Soda Ash Royalty Rate Reduction Act of 2006, which expired in October of 2011. Because the bill would waive the fair market value requirements of the Federal Land Policy and Management Act, and the terms of any applicable leases, and for the reasons outlined in the Department's 2011 report to Congress, the BLM cannot support H.R. 957.

H.R. 1063 requires the Secretary of the Interior, through the BLM and the USGS, to assess the capability of the United States to meet the demands for minerals essential to manufacturing and competitiveness and economic and national security. The Department supports the goals of H.R. 1063. We would like to work with the Committee and other affected departments to further these goals, while taking into account time and resource considerations.

Finally, H.R. 981 directs the Secretary of the Interior, acting through the Director of the USGS, to conduct a global assessment of rare earth elements. The Department supports the goals of this bill, although we note that the activities called for in H.R. 981 are within the scope of the existing Department of the Interior authorities.

Mr. Chairman, thank you for the opportunity to testify today, and I would be happy to take any questions.

[The prepared statement of Ms. Connell follows:]

48

PREPARED STATEMENT OF JAMIE E. CONNELL, ACTING DEPUTY DIRECTOR, BUREAU OF
LAND MANAGEMENT, U.S. DEPARTMENT OF THE INTERIOR

H.R. 761—NATIONAL STRATEGIC AND CRITICAL MINERALS PRODUCTION ACT AND
H.R. 1063—NATIONAL STRATEGIC AND CRITICAL MINERALS POLICY ACT

**Introduction**

Thank you for the opportunity to testify for the Department of the Interior on two
bills pertaining to the development of strategic and critical mineral resources on our
Nation's public lands: H.R. 761, the National Strategic and Critical Minerals Pro-
duction Act, and H.R. 1063, National Strategic and Critical Minerals Policy Act.
These bills seek to expedite the development of strategic, critical and rare earth
minerals on public lands managed by the Departments of the Interior and of Agri-
culture. This statement addresses the provisions relevant to the Department of the
Interior.

The Department shares the Committee's interest in identifying opportunities for
increasing efficiencies in the development of rare earth elements and other critical
mineral resources on our Nation's public lands consistent with environmental pro-
tection and public involvement in agency decision-making. We also encourage find-
ing ways to make permitting less complex, costly, and time-consuming. The Bureau
of Land Management (BLM) would like to work with the Committee to further these
shared goals.

The Department has concerns with these two bills. Public involvement in review
of mining proposals and the formulation of alternatives—critical components of
BLM's multiple-use management of public lands—would be constrained under
H.R. 761, and therefore, the Department opposes H.R. 761. While the Department
supports the goals of H.R. 1063, we have concerns and would like to work with the
Committee to address them. The Department looks forward to continuing a dialogue
with the Congress on these important matters.

**Background**

The BLM administers over 245 million surface acres of public land located in the
12 Western States, including Alaska, as well as 700 million acres of sub-surface
mineral estate throughout the Nation. The public lands not only produce commod-
ities, but also offer hunting, angling, and other recreational opportunities that help
provide economic stability and growth for local and regional communities. Under its
multiple-use mandate, BLM is working with local communities, tribes, State regu-
lators, industry, and other Federal agencies to promote environmentally responsible
development of mineral resources on Federal and Indian lands with a fair return
to the American people.

The BLM manages mineral development under a number of different authorities,
including the Federal Land Policy and Management Act, the Mineral Leasing Act
of 1920, the Materials Act of 1947, and the Mining Law of 1872. Each of these au-
thorities, along with BLM regulations and guidance, provides a legal framework for
the development of minerals.

Global manufacturing demand for critical mineral commodities, including rare
earth elements (REE), is on the rise, with increasing applications in consumer prod-
ucts such as renewable energy technology, computers, automobiles, aircraft, and
other advanced technology products. While no REE are being mined on public lands
at this time, some portions of the Federal mineral estate hold potential for REE de-
velopment and deposits are being evaluated in three areas: the Bear Lodge Project
in northeast Wyoming; the Bokan Mountain/Dotson Zone in southeastern Alaska;
and potential expansion onto public lands of Molycorp's Mountain Pass exploration
operations in California.

**H.R. 761—National Strategic and Critical Minerals Production Act**

The stated purpose of H.R. 761, the National Strategic and Critical Minerals Pro-
duction Act of 2013, is to increase the flow of critical and strategic minerals to the
U.S. manufacturing sector by expediting the critical mineral exploration and mine
permitting process on public lands managed by the Departments of the Interior and
Agriculture. However, H.R. 761 is drafted in such a manner as to cover virtually
all hard rock mining on Federal lands. H.R. 761 includes numerous provisions that
circumvent sound Federal decision-making and existing law calling for the multiple
uses of public lands, including public involvement, the application of the National
Environmental Policy Act (NEPA), the management of permit applications, the re-
view of *Federal Register* notices for such projects, and the handling by the courts
of civil actions arising from disputes over mine proposals. The bill's provisions also
could apply retroactively to an application for a mineral exploration or mine permit
that is pending at the time of the bill's enactment, upon the request of the applicant

49

to the lead agency. The legislation defines critical and strategic mineral mines as "infrastructure projects" so that they will fall under the March 22, 2012, Executive order "Improving Performance of Federal Permitting and Review of Infrastructure Projects."

While the Department strongly supports the development of rare earth elements and other critical minerals, it strongly opposes H.R. 761. This legislation would remove many of the environmental safeguards for almost all types of hardrock mines on public lands, bypass evaluation of potential impacts under NEPA, and limit public involvement in agency decision-making.

Additionally, H.R. 761 lacks clarity on a number of issues, including how the rights of surface owners in split estate situations might be affected in an expedited review process. It is also unclear how Section 103, which requires maximizing recoverable resources while mitigating environmental impacts, would affect the Department's authority under the Federal Land Policy and Management Act to prevent "undue and unnecessary degradation of the public lands." H.R. 761 also does not discuss the consequences of missing the 30-month deadline on permitting decisions and how State permitting authorities relate to this timeline. The provision allowing for retroactive application of the bill to permit applications could have the effect of requiring the BLM or another agency to abandon in-progress environmental reviews of proposed actions.

Some of the bill's provisions also duplicate actions the BLM has already implemented, including the formulation of memoranda of understanding among agencies and proponents, the concurrent gathering and review of data, and the appointment of project leads who are assigned to a project through completion.

Finally, the Department of the Interior defers to the Department of Justice regarding the provisions of H.R. 761 (Title II) pertaining to judicial review procedures.

### H.R. 1063—National Strategic and Critical Minerals Policy Act

H.R. 1063 requires the Secretary of the Interior—through the BLM and the U.S. Geological Survey—to assess the capability of the United States to meet the demands for minerals essential to manufacturing competitiveness and economic and national security. It requires the Secretary, in consultation with the Secretary of Agriculture, to produce a report to Congress within 180 days of enactment that includes an inventory of the non-fossil-fuel mineral potential of lands under the jurisdiction of the BLM and the U.S. Forest Service. The report must identify anticipated mineral requirements for the U.S. manufacturing sector, current sources of these minerals, implications of shortages, timelines for mineral development projects on public lands, and the cost of litigation. In addition, the report must include an assessment of the Federal workforce and its ability to meet the challenges of the critical minerals issue. The report must also include an inventory of rare earth element potential on Federal lands, impediments and restrictions to exploration or development, and recommendations to reduce such impediments. Finally, the bill directs the USGS to conduct national and global assessments of critical mineral resources.

H.R. 1063 requires far-reaching analysis of vast amounts of data spanning the jurisdictions of the Departments of the Interior, Agriculture, Defense, Commerce, and Justice, as well as the Office of Personnel Management. While we share the goals of H.R. 1063, it would entail much more than producing a report, likely requiring the development and implementation of data tracking systems and an ongoing commitment of staff resources to gather, input, analyze, and update the data. The administrative time and cost of this work would exceed the 180 days and $1 million authorized by the legislation. Regarding the national and global assessments of critical minerals, we note that these activities are already authorized by existing USGS authorities. These studies would require substantial resources and, absent authorized appropriations, would significantly impact other program mission activities.

We would like to work with the Committee and the other affected Departments to further the goals of the bill taking into account time and resource considerations. We would also like to work with the Committee to provide clarification on some provisions of the bills, such as the minerals under consideration and the designation of impediments and restrictions.

Thank you for the opportunity to testify on H.R. 761 and H.R. 1063. I will be glad to respond to questions.

#### H.R. 687—SOUTHEAST ARIZONA LAND EXCHANGE AND CONSERVATION ACT

Thank you for the opportunity to present testimony on H.R. 687, the Southeast Arizona Land Exchange and Conservation Act. The legislation provides for the exchange of a 2,422-acre parcel of U.S. Forest Service-managed land to a private company in exchange for a number of parcels within the State of Arizona for management by the U.S. Forest Service (FS) and the Bureau of Land Management (BLM).

50

Three of the private parcels are identified for transfer to the Secretary of the Interior.

In general, the Department of the Interior (DOI) defers to the FS on the issues directly related to FS-managed lands and associated valuation issues. We believe that the intent of the legislation is to facilitate an exchange of land with Resolution Copper Mining, LLC. Resolution Copper has indicated its intention to develop a copper mine near Superior, Arizona, and wishes to acquire the 2,422-acre FS parcel overlying the copper deposit as well as the Federal subsurface rights.

**Conveyance of Parcels to the Bureau of Land Management**

H.R. 687 provides for the conveyance of three parcels to the Secretary of the Interior to be managed by the BLM. The parcels identified are located in Gila, Pinal, and Santa Cruz Counties and include:

- 3,050 acres along the lower San Pedro River near Mammoth, Arizona;
- 160 acres within the Dripping Springs area near Kearny, Arizona; and
- the 940-acre Appleton Ranch parcel adjacent to the Las Cienegas National Conservation Area near Sonoita, Arizona.

We would note that the maps for these three parcels are inaccurately described in the legislation and we would like to work with the sponsor and the Committee to correct those descriptions.

The lower San Pedro parcel is east of the town of Mammoth, Arizona, and straddles the San Pedro River. The acquisition of these lands would enhance key migratory bird habitat along the San Pedro River. H.R. 687 provides for the lower San Pedro parcel to be managed as part of the BLM's existing San Pedro Riparian National Conservation Area (NCA) designated by Public Law 100–696. The lower San Pedro parcel lies along the same riparian corridor as the NCA, but it is at least 60 miles downstream (north) of the existing NCA and has substantially different resource issues and needs. If this parcel is conveyed to the Secretary of the Interior and incorporated into the NCA, the Department recommends that the existing 80 acres of adjacent BLM-managed public land likewise be included within the NCA to facilitate the efficient and effective management of this important riparian corridor.

The legislation also proposes to transfer 160 acres in the Dripping Springs area near Kearny, Arizona, to the Secretary of the Interior. This private parcel is an inholding within a larger block of public lands and has important resource values, including sensitive Desert Tortoise habitat.

Finally, the bill provides for the transfer of the 940-acre Appleton Ranch parcel to the Secretary of the Interior. This parcel is located on the southern end of the BLM's Las Cienegas NCA. These lands lie within the "Sonoita Valley Acquisition Planning District" established by Public Law 106–538, which designated the Las Cienegas NCA. That law directs the Department to acquire lands from willing sellers within the planning district for inclusion in the NCA to further protect the important resource values for which the Las Cienegas NCA was designated. These lands are part of a significant wildlife corridor. The acquisition of these lands advances important conservation goals associated with this unique and special natural resource.

**General Concerns**

The Administration has several concerns with the Southeast Arizona Land Exchange and Conservation Act and cannot support H.R. 687 as written. Two of the Administration's principal concerns with the legislation pertain to the timing of NEPA analysis and tribal consultation.

H.R. 687 requires the Forest Service to prepare an environmental review document under the National Environmental Policy Act (NEPA) *after* the land exchange is completed rather than in advance of the exchange. It is this Administration's policy that NEPA be fully complied with to address all Federal agency actions and decisions, including those necessary to implement congressional direction.

In addition, increasing and improving tribal consultation with Indian tribes by all Federal agencies is a key accomplishment of this Administration, and concerns have been raised by Indian tribes nationwide that the legislation is contrary to laws and policies and Executive orders that direct Federal land management agencies to engage in meaningful government-to-government consultation with interested Indian tribes, and to protect and preserve sites sacred to Native Americans. This consultation framework includes, including the recent Memorandum of Understanding among the Departments of Defense, Interior, Agriculture, Energy and the Advisory Council of Historic Preservation Regarding Interagency Coordination and Collabora-

51

tion for the Protection of Indian Sacred Sites, which was signed on December 4, 2012.

Many of the lands to be exchanged in this legislation hold significant cultural value to Indian tribes. In particular, the Apache Leap area, the Oak Flat Campground, and Devil's Canyon are culturally significant to the San Carlos Apache Tribe and the Fort McDowell Yavapai Nation. For the San Carlos Apache, the Yavapai, this area is a place of ancient settlements and burial sites. Tribal members still go to these areas to pray, conduct ceremonies, and gather medicines and ceremonial items.

The Administration is concerned that any consultations under H.R. 687 would not be meaningful under Executive Order 13175, "Consultation and Coordination with Indian Tribal Governments," because the legislation limits the Secretary of Agriculture's discretion regarding the land exchange. Engaging in government-to-government consultation prior to the Secretary of Agriculture's public interest determination would better allow for meaningful consultation and coordination with interested tribes.

Section 4(i) of H.R. 687 expresses the intent of Congress that the exchange be completed within 1 year. Based on our experience with exchanges, we believe the amount of time provided in H.R. 687 is insufficient to review and finalize the necessary environmental documents, mineral report, and appraisals, as well as to conduct the final verification and prepare title documents. We are also concerned that 1 year may not be sufficient to complete analysis of any historic and sacred sites in the exchange area as required by the Native American Graves Protection Act and the National Historic Preservation Act.

Preparation of a mineral report is a crucial first step toward an appraisal of the Federal parcel because the report provides important information about the Federal mineral deposit. The bill does not address access to confidential exploration and development data and company analyses on the mineral deposits underlying the Federal land in order to ensure a timely and accurate appraisal. Such information is essential for the mineral report, particularly in the context of this exchange, because of the size of the proposed mining operation and the proposed mining technique.

Section 6 of H.R. 687 provides for an annual value adjustment payment to the United States if the cumulative production of locatable minerals exceeds the projected production used in the appraisal required by section 4. This provision recognizes that an accurate projection of future production as part of the appraisal process will be difficult to develop, and provides a mechanism for additional payments to the United States if the actual production exceeds the projected production. The Department generally defers to the FS on the specific provisions of section 6 of the bill. However, we note that this section creates a new fund in the U.S. Treasury for the deposit of these value adjustment payments. The Department believes that these funds should be dedicated to Federal land acquisition in the same manner as the initial land equalization payments provided for in section 4(e)(2)(C) of the bill. Because these funds are to compensate for a possible initial inadvertent under-appraisal of land values, it is appropriate that the value when captured be used in the same manner as if it had been included in the initial appraisal.

Finally, there are a number of issues of a more technical nature, including appropriate map references, which we would welcome the opportunity to discuss as this legislation moves forward.

**Conclusion**

Thank you for the opportunity to testify. The exchange proposed in H.R. 687 is complex. The Departments of Agriculture and of the Interior seek to assure that the Federal Government's interest is appropriately protected in any final legislation and tribal interests are considered.

H.R. 697—THREE KIDS MINE REMEDIATION AND RECLAMATION ACT

**Introduction**

Thank you for the opportunity to testify on H.R. 697, the Three Kids Mine Remediation and Reclamation Act. During the past 5 years, the Bureau of Land Management (BLM) has worked with Nevada governmental entities in search of administrative remedies to the problems posed by the abandoned Three Kids Mine, in Henderson, Nevada. The BLM supports H.R. 697, which provides legislative solutions to the issues surrounding the Three Kids Mine area and clears the way for its eventual development.

**Background**

The Three Kids Mine is an abandoned manganese mine and mill site located along the south side of Lake Mead Drive, across the highway from Lake Las Vegas,

52

in Henderson, Nevada. The mine and mill operated from 1917 through 1961 on 314 acres of private land, in part providing steel-strengthening manganese to the defense industry and contributing to the United States' efforts in World War I and II. Federal manganese reserves were stored in the area from the late 1950s through 2003.

H.R. 697 would direct that 948 acres of the public lands adjacent to the private site be conveyed to the Henderson Redevelopment Agency, bringing the total size of the project area to 1,262 acres. Of the 948 acres of public lands, 146 acres are contaminated and will require mine reclamation and environmental remediation. The most severe contamination appears to be on the 314 private acres where the mine and mill were located. No viable former operator or responsible party has been identified to remediate and reclaim the abandoned mine and mill site. Today, the site's deep open pits, large volumes of mine overburden and tailings, mill facility ruins, and solid waste disposal areas pose significant risks to public health, safety and the environment. The Nevada Division of Environmental Protection (NDEP) identified the Three Kids Mine site as a high priority for the implementation of a comprehensive environmental investigation, remediation, and reclamation program.

Representatives of the BLM, the Bureau of Reclamation, and the Department of the Interior Solicitor's Office have worked with the City of Henderson and representatives of developer Lakemoor Canyon, LLC, to find solutions to the complex challenges this site presents. Discussions have focused on overlapping Federal agency jurisdictions, land management designations and other resource issues, Resource Management Plan amendments, future liability, and an important utility corridor that traverses the site.

### H.R. 697

H.R. 697 would designate the combined 314 acres of private land and 948 acres of public land as the 1,262-acre "Three Kids Mine Project Site" and provide for the conveyance of the public lands to the Henderson Redevelopment Agency. The legislation also provides that fair market value for the Federal lands to be conveyed should be determined through standard appraisal practices, and that, subsequent to that determination, the Secretary should determine the "reasonable approximate estimation of the costs to assess, remediate, and reclaim the Three Kids Mine Project Site." That cost would then be deducted from the fair market value of the public land to be conveyed. The Henderson Redevelopment Agency would pay the adjusted fair market value of the conveyed land, if any, and the Federal Government would be released from "any and all liabilities or claims of any kind arising from the presence, release, or threat of release of any hazardous substance, pollutant, contaminant, petroleum product (or derivative of a petroleum product of any kind), solid waste, mine materials or mining related features" at the site in existence on or before the date of the conveyance.

While the BLM has not established a range for the cost of cleanup, a proponent of the transaction, Lakemoor Canyon, LLC, estimates the cost of remediating the public and private lands at between $300 million and $1.3 billion. While it is possible that the cost of remediating and reclaiming the entire project area might exceed the fair market value of the Federal land to be conveyed, the cost of the transaction will only be known after the Secretary completes the appraisal and remediation cost estimate process as outlined in the legislation.

The BLM supports innovative proposals to address the cleanup of the Three Kids Mine, and we support this proposal to transfer the entire 948 acres of public land to the Henderson Redevelopment Agency at fair market value, subject to valid existing rights. However, the BLM recognizes that the transfer would include a small portion of the River Mountains ACEC, and we would like to discuss with the committee opportunities to mitigate that loss.

### Conclusion

Thank you for inviting the Administration to testify on H.R. 697. The Three Kids Mine problem needs to be resolved, and we look forward to working toward a solution that protects the environment and serves the public interest. I would be happy to answer your questions.

H.R. 767—OIL AND GAS PILOT PROJECT OFFICES

### Introduction

Thank you for the opportunity to testify on H.R. 767, which would amend the Energy Policy Act of 2005 to modify the Federal Permit Streamlining Pilot Project. The bill would expand the Federal Permit Streamlining Pilot Project to include all of the field offices within the jurisdiction of the BLM's Montana/Dakotas State Office. The BLM supports the goal of H.R. 767 to better conform the pilot office authority to

53

current permitting demands. However, the BLM would like to work with the sponsor and the Committee on clarifying amendments as well as language that would provide additional flexibilities nationwide to utilize the pilot office authority to respond as permitting demands shift over time.

## Background

Section 365 of the Energy Policy Act of 2005 established the Federal Permit Streamlining Pilot Project with the intent to improve the efficiency of processing oil and gas use authorizations and environmental stewardship on Federal lands. It designated seven pilot project offices: Miles City, Montana; Buffalo and Rawlins, Wyoming; Vernal, Utah; Grand Junction/Glenwood Springs, Colorado; and Farmington and Carlsbad, New Mexico.

Section 365 also established the Permit Processing Improvement Fund, an account of approximately $18 million annually, to support the pilot project for 10 years. Specifically, it directed 50 percent of the income derived from Federal onshore oil and gas lease rental payments outside of Alaska to the Fund. For FY 2006 through FY 2015, the section made the Fund available to the Secretary of the Interior for expenditure without further appropriation to enhance coordination and processing of oil and gas use authorizations on Federal land under the jurisdiction of the designated pilot project offices.

In addition to the BLM, Section 365 authorized the Secretary to transfer monies from the Permit Processing Improvement Fund as necessary to the Fish and Wildlife Service, the Bureau of Indian Affairs, the Forest Service, the Environmental Protection Agency, the Army Corps of Engineers, and the States of Wyoming, Montana, Colorado, Utah, and New Mexico. It also prohibited the BLM from establishing cost recovery fees for processing applications for oil and gas permits to drill. The President's 2013 budget proposed to repeal this fee prohibition. In lieu of the budget proposal, we note that the Congress has implemented permit fees through appropriations language for the last several years.

The agencies involved in the pilot project have made significant progress in a number of areas. Additional resources, such as personnel devoted to processing oil and gas use authorizations, have enabled the various bureaus and agencies to increase the pace of permitting and completing environmental reviews, particularly given the complex resource issues we face. The time taken for interagency consultations has been reduced due to improved communication and through programmatic streamlining efforts, which have been used in multiple projects and permits.

Also, the BLM has increased inspection and enforcement capability as a result of the hiring of additional skilled specialists in the pilot project offices. The increase in inspections has led to better compliance by the industry and a reduction in major violations due to the increased number of inspectors in the field. Increasing the number of inspectors has allowed the BLM to identify issues early; intervene in nascent violation situations; and improve interim reclamation work on lands disturbed by oil and gas operations. The pilot project offices are also better staffed to help new industry permitting specialists understand the BLM's requirements for obtaining an oil and gas use authorization.

## H.R. 767

H.R. 767 would substitute the BLM's Montana/Dakotas State Office for the current pilot project office in Miles City, Montana, with the goal of broadening the geographic scope of the pilot project authority. This broadened geographic scope would allow BLM to better allocate some resources based on current permitting demands and new exploration and development of oil and gas fields and plays. For example, this flexibility would be especially useful for processing permits received in the North Dakota Field Office in Dickinson, North Dakota, which received 701 applications for permits to drill (APDs) in FY 2012, compared to 147 APDs received in FY 2009.

In addition, the BLM would like to work with the sponsor and the Committee on language that would allow greater flexibilities nationwide to adjust permitting resources based on demand. There are many BLM field offices that are not part of the pilot project, but are receiving hundreds of APDs per year. Of the 10 field offices that received the most APDs during FY 2012, only 5 are currently designated as pilot project offices. For example, in FY 2012, the Pinedale Field Office in Pinedale, Wyoming, received 325 APDs; the Bakersfield Field Office in Bakersfield, California, received 286 APDs; and the Oklahoma Field Office in Tulsa, Oklahoma, received 157 APDs. Although these offices have received high volumes of APDs, none are currently designated as pilot project offices, and none would be designated as such under the bill. At the same time, some of the currently designated pilot project of-

54

fices have received relatively few APDs in recent years; for example, the Grand Junction Field Office received only 47 APDs in FY 2012.

**Conclusion**

Thank you for the opportunity to provide testimony on H.R. 767. I would be happy to answer any questions you may have.

H.R. 957—AMERICAN SODA ASH COMPETITIVENESS ACT

**Introduction**

Thank you for the opportunity to testify on H.R. 957, the American Soda Ash Competitiveness Act. This bill would reinstate for five years the royalty rate reduction provided for under the Soda Ash Royalty Rate Reduction Act of 2006, which expired in October 2011. The BLM cannot support H.R. 957.

**Background**

Soda ash is one of several products derived from sodium minerals mined on public lands and is used in many common products, including glass, pulp, detergents, and baking soda. The mineral trona is a naturally occurring mixture of sodium carbonate, sodium bicarbonate, and water. Soda ash may be either natural or synthetic. It can be extracted from mined natural trona deposits, or it can be manufactured synthetically. Synthetic soda ash production began in this country in the 1880s and increased as the demand for soda ash increased. In the early 1950s, the modern natural soda ash industry began in the Green River Basin of Wyoming, home of the world's largest known natural deposit of trona, where soda ash, or "sodium carbonate," is refined from trona mined at depths of between 800 and 1,600 feet below the surface.

In 2012, the U.S. soda ash industry consisted of five companies that mine and mill soda ash, four of which operate five plants in Wyoming. One company in California produces soda ash from sodium-carbonate rich brines. At the end of FY 2012, there were 86 Federal sodium leases covering 111,185 acres in Wyoming, California, Colorado, Arizona, and New Mexico. Sixty-three of these Federal sodium leases were located in Wyoming. The soda ash industry is a substantial contributor to the gross domestic product of the United States, with the total value of domestic soda ash produced in 2012 being about $1.6 billion and the industry supplying over 2,200 direct jobs. Soda ash is also a key ingredient in many diversified products, including flat glass used by the automobile and construction industries.

**Soda Ash Royalty Rate Reduction Act**

In 2006, Congress passed the Soda Ash Royalty Rate Reduction Act (2006 Act), which reduced the Federal royalty rate for soda ash to 2 percent. Before the 2006 Act went into effect, the BLM was charging royalty rates of 6 and 8 percent. The BLM established these rates based on a 1996 study to examine the fair market value in the sodium industry in Wyoming. The study reviewed many comparable State and private leases and found that fair market value in Wyoming appeared to be somewhat higher than the 5 percent being charged by the BLM previously. As a result of the study, the BLM determined that the royalty rate for all then-existing leases would be increased from 5 to 6 percent at the lease renewal date. The BLM, based on the study, also determined that the royalty rate on all new leases would be 8 percent. In the Green River Basin at that time, the royalty rate on most private land was 8 percent and 5 percent on State lands.

**Report to Congress**

As mandated by the 2006 Act, the BLM reported to Congress in the fall of 2011 on the impact of the reduction over the previous 5 years, in the "U.S. Department of the Interior Report to Congress: The Soda Ash Royalty Rate Reduction Act of 2006." The report found that the 2006 Act resulted in a substantial loss of royalty revenues to the Federal Government and the States which exceeded congressional estimates at the time of enactment. It also stated that the royalty rate reduction did not appear to have contributed in a significant way to the creation of new jobs within the industry, to increased exports, or to a notable increase in capital expenditures to enhance production. Furthermore, the report found that the royalty rate reduction appeared to have influenced a shift of production away from State leases and private lands and onto Federal leases, and that, with regard to global competitiveness, U.S. production remained stable.

**H.R. 957**

H.R. 957 would reinstate for 5 years the 2 percent royalty rate for soda ash which expired in October 2011. Specifically, the bill would apply an across-the-board reduc-

55

tion in the royalty rate on soda ash leases from an average of 5.6 percent to 2 percent. In FY 2012, the soda ash industry paid over $47 million in royalty for production from Federal lands. If the royalty rate had been reduced to 2 percent during FY 2012, the royalty revenue for that year would have been approximately $17 million, a reduction of about $30 million. Furthermore, the bill could be subject to the Statutory Pay-As-You-Go Act of 2010.

H.R. 957 would waive the requirements of section 102(a)(9) of the Federal Land Policy Management Act of 1976 (FLPMA) and the terms of any applicable leases. Section 102(a)(9) of FLPMA states that it is the policy of the United States to receive fair market value for the use of public lands and their resources unless otherwise provided by statute. For these reasons and for the reasons outlined in the Department's 2011 report, the BLM cannot support H.R. 957.

**Conclusion**

Thank you for the opportunity to provide testimony on H.R. 957. I would be happy to answer any questions you may have.

H.R. 981—RESOURCE ASSESSMENT OF RARE EARTHS ACT OF 2013

Thank you for the opportunity to present the Department of the Interior's views on H.R. 981, directing the Secretary of the Interior, acting through the Director of the U.S. Geological Survey (USGS), to conduct a global assessment of rare earth element resources. The Department supports the goals of this bill, although we note that the activities called for in H.R. 981 are within the scope of existing Department of the Interior authorities.

The USGS is responsible for conducting research and collecting data on a wide variety of fuel and nonfuel mineral resources, including rare earth elements (REE). For nonfuel minerals, research is conducted to understand the geologic processes of concentrated known mineral resources at specific localities in the Earth's crust and to estimate (or assess) quantities, qualities, and areas of undiscovered mineral resources, or potential future supply. USGS scientists also conduct research on the interactions of mineral resources with the environment, both natural and as a result of resource extraction, to better predict the degree of impact that resource development may have on human and ecosystem health. USGS mineral commodity specialists collect, analyze, and disseminate data and information that document current production and consumption for about 100 mineral commodities, both domestically and internationally for 180 countries. This full spectrum of mineral resource science allows for a comprehensive understanding of the complete life cycle of mineral resources and materials—resource formation, discovery, production, consumption, use, recycling, and reuse—and allows for an understanding of environmental issues of concern throughout the life cycle.

Global demand for critical mineral commodities is on the rise with increasing applications in consumer products, computers, automobiles, aircraft, and other advanced technology products. Much of this demand growth is driven by new technologies that increase energy efficiency and decrease reliance on fossil fuels. In 2010, the USGS completed an inventory of known domestic rare-earth reserves and resources (Long and others, 2010). The report documents 28 deposits and includes information on the location, exploration status, past production, and estimated resources. The report also includes an overview of known global rare-earth resources and discusses the reliability of alternative foreign sources of rare earths. Known U.S. deposits of REE comprise about 13 percent of the global reserve of REE and are located on a mix of public (BLM and USFS) and private lands in 14 States. The primary U.S. source for REE is the Mountain Pass mine in California, operated by Molycorp Minerals, a Colorado-based company. Advanced exploration projects for new REE deposits are underway at Bokan Mountain, AK and Bear Lodge, WY. In 2011, USGS released two additional REE reports, "China's Rare-Earth Industry" (Tse, 2011) and "Rare Earth Elements—End Use and Recyclability" (Goonan, 2011).

The logical next steps are to (1) update a global inventory of rare earth resources published by the USGS in 2002 (Orris and Grauch, 2002), (2) review principal REE deposits outside of China and evaluate their geologic, economic, and development potential, and (3) conduct a comprehensive assessment of undiscovered REE resources. H.R. 981, the RARE Act of 2013, outlines a reasonable approach to properly assess the global endowment of REE resources, to identify potential future supplies of REE resources, and to better understand future potential sources of REE needed for United States industry.

The USGS maintains a workforce of geoscientists (geologists, geochemist, geophysicists, and resource specialists) with expertise in critical minerals and materials, including REE. The USGS continuously collects, analyzes, and disseminates data and information on domestic and global REE reserves and resources, produc-

56

tion, consumption, and use. This information is published annually in the USGS Mineral Commodity Summaries (USGS, 2013) and includes a description of current events, trends, and issues related to REE supply and demand.

The USGS stands ready to fulfill its role as the sole Federal provider of unbiased mineral resource research on known REE resources, assessment of undiscovered REE resources, and information on domestic and global production and consumption of REE resources for use in global REE supply chain analysis. We note, however, that the activities called for in H.R. 981 are already authorized by existing authorities. Any study conducted to fulfill the objectives of the bill will require substantial resources that, without additional support, would significantly impact other program mission activities.

Thank you for the opportunity to present the views of the Department on H.R. 981.

References Cited

Goonan, T.G., 2011, Rare earth elements—End use and recyclability: U.S. Geological Survey Scientific Investigations Report 2011–5094, 15 p., available only at *http://pubs.usgs.gov/sir/2011/5094/*.

Long, K.R., Van Gosen, B.S., Foley, N.K., and Cordier, Daniel, 2010, The principal rare earth elements deposits of the United States—A summary of domestic deposits and a global perspective: U.S. Geological Survey Scientific Investigations Report 2010–5220, 96 p. Available at *http://pubs.usgs.gov/sir/2010/5220/*.

Orris, G.J., and Rauch, R.I., 2002, Rare earth element mines, deposits, and occurrences: U.S. Geological Survey Open-File Report 2002–0189, 174 p. Available at *http://pubs.usgs.gov/of/2002/of02-189/*.

Tse, Pui-Kwan. (2011) *China's Rare-Earth Industry.* U.S. Geological Survey Open-File Report 2011–2042.

USGS, 2013, Mineral Commodity Summaries 2013, p. 128–129

————

QUESTIONS SUBMITTED FOR THE RECORD TO JAMIE E. CONNELL

QUESTIONS SUBMITTED FOR THE RECORD BY THE HONORABLE GRACE F. NAPOLITANO

*Question.* Can you clarify how many acre-feet of water will be utilized in the mining process to cool the drill? It is my understanding it would be about 40,000 acre-feet. of water. My concern is the current drought condition of the City of Superior and surrounding area.

Answer. The Department of the Interior does not have this information.

*Question.* Are there current environmental studies in process or have any been completed on the examination of the land prior to the exchange into private ownership?

Answer. The Department of the Interior defers to the Forest Service on issues directly related to the transfer of Forest Service-managed lands and associated valuation issues.

*Question.* Wouldn't the normal process of requesting an environmental study be the first step? H.R. 687 waives compliance with NEPA prior to the exchange, meaning that the Forest Service or the public will *never* have access to information documenting the potential environmental impacts of a large copper mining operation in the area.

Answer. It is the Administration's policy that NEPA be fully complied with to address all Federal actions and decisions prior to the exchange.

————

QUESTION SUBMITTED FOR THE RECORD BY THE HONORABLE KEVIN CRAMER, A REPRESENTATIVE IN CONGRESS FOR THE STATE OF NORTH DAKOTA

*Question.* Ms. Connell, on page 2, 2nd paragraph of your March 21, 2013, pre-filed testimony, you stated:

"The agencies involved in the pilot project have made significant progress in a number of areas. Additional resources, such as personnel devoted to processing oil and gas use authorizations, have enabled the various bureaus and agencies to increase the pace of permitting and completing environmental reviews, particularly given the complex resource issues we face. The time taken for interagency consultations has been reduced due to improved communication and through programmatic streamlining efforts, which have been used in multiple projects and permits."

57

Do you have specific results to show that this Pilot Project has improved the Federal permit process? (i.e. A backlog of X amount of Applications for Permit to Drill (APDs) has been reduced to X amount, reduced average time to process an APD from X to X, X amount of inspections before compared to X amount of inspections now.)

Answer. The pilot office authority has allowed the BLM and other pilot office agencies to better coordinate permitting and related environmental reviews, which along with additional funding has allowed us to increase the pace of permitting. The pilot project offices approved approximately 54 percent of all APDs received from FY 2006 to FY 2012. From FY 2006 to FY 2012, the amount of time it took for all BLM field offices to process and approve complete APDs fell from 127 to 77 days. The number of complete APDs pending more than 90 days (the "backlog") at all BLM offices declined from 1,486 to 551 from FY 2006 to FY 2012. (Note: only after an applicant has submitted all the required components of an APD package is the BLM able to complete its review and make a decision on an APD.) The number of inspections completed by all BLM offices rose 73 percent from FY 2006 to FY 2012, from 19,974 to 34,571.

————

Mr. LAMBORN. OK, thank you for being here and for your testimony.

We will now hear from Ms. Wagner.

### STATEMENT OF MARY WAGNER, ASSOCIATE CHIEF, U.S. FOREST SERVICE, U.S. DEPARTMENT OF AGRICULTURE

Ms. WAGNER. Good morning, Mr. Chairman and members of the Committee. Thanks for the opportunity to provide the Department of Agriculture's views on H.R. 687, the Southeast Arizona Land Exchange and Conservation Act of 2013.

We have had the opportunity to share our perspective on previous versions of this bill, and we have not changed our position since our last testimony. I know you have had an opportunity to review the detailed written testimony. I am going to focus on a few key points in my oral remarks.

We support environmentally sound mineral development. We also recognize the benefit of copper mine development to economic and employment conditions in the State of Arizona and the Nation. We acknowledge the environmental benefits and qualities of the non-Federal land parcels considered in this exchange, and we appreciate the efforts to resolve land use issues for the Town of Superior. Last, we appreciate the recognition and protection of important values of Apache Leap.

While the Department understands and appreciates the potential economic benefits and value of the lands to be acquired by the American public, the Department cannot support the bill as written, but is looking forward to working with sponsors and the Committee to resolve concerns. The two principal concerns with the bill are that it would require the Agency to prepare an environmental review document under NEPA after the land exchange is completed, and the land exchange and subsequent mining activities have the potential to impact a landscape considered sacred to a number of federally recognized Tribes, without environmental review or consultation with the Tribes.

The Department believes that adhering to the Federal Land Policy Management Act and other laws that guide administrative land exchanges ensures a sound process for determining the public interest and disclosing environmental impacts. It requires that before making a discretionary decision, the Federal agency considers the

58

environmental impacts of a proposed major Federal action, and alternatives of such an action.

It is this Administration's policy that NEPA be fully complied with to address all Federal actions and decisions, including those necessary to implement congressional direction. NEPA conducted in advance of the exchange would create an opportunity for meaningful tribal consultation, as envisioned by numerous laws that acknowledge that consultation with tribal governments is legally mandated and integral to the Federal Government's trust responsibility to Tribes. Consultation becomes the vehicle where tribal concerns and interests are identified, addressed, and potentially mitigated.

We have a number of technical concerns with the bill, including the timeframe to complete the land exchange, appraisal provisions, value adjustment provisions, and the purpose of funds from value adjustment payments. And we would like to work with the Committee to resolve those issues.

This concludes my statement. I am happy to answer any questions you might have.

[The prepared statement of Ms. Wagner follows:]

PREPARED STATEMENT OF MARY WAGNER, ASSOCIATE CHIEF, U.S. FOREST SERVICE, U.S. DEPARTMENT OF AGRICULTURE, ON H.R. 687

Mr. Chairman and members of the Committee, thank you for the opportunity to appear before you today to provide the Department of Agriculture's views on H.R. 687, the "Southeast Arizona Land Exchange and Conservation Act of 2013". I am Mary Wagner, Associate Chief of the U.S. Forest Service. H.R. 687 would direct the Secretary of Agriculture to convey Federal land for use as an underground copper mine in exchange for environmentally sensitive non-Federal land in Arizona. We defer to the Department of the Interior on provisions relating to lands to be managed by the Bureau of Land Management (BLM).

H.R. 687 would direct the Secretary of Agriculture to convey to Resolution Copper Mining, LLC (Resolution Copper), a 2,422 acre parcel of land on the Tonto National Forest. The Federal land to be conveyed, known as Oak Flat, contains a potentially sizeable copper ore body and adjoins an existing copper mine on private land owned by Resolution Copper. In exchange, Resolution Copper would convey five parcels of land to the Forest Service and three parcels of land to BLM. The total non-Federal acreage that would be conveyed by Resolution Copper is 5,344 acres, all of which are in Arizona.

The Bill calls for an equal value exchange in section 4(e). If the value of the Federal land (including the ore body) to be conveyed exceeds the value of the parcels to be acquired, the Bill would allow for a cash equalization payment by Resolution Copper in excess of 25 percent. Under current law, cash equalization payments may not exceed 25 percent (section 206(b) of Federal Land Policy and Management Act of 1976 (43 U.S.C. 1716(b)). A cash equalization payment resulting from the exchange would be deposited in the Sisk Act account to be used, upon appropriation by Congress, for acquisition of land for addition to the National Forest System within the State of Arizona.

Section 6(b) of the Bill would require Resolution Copper to make value adjustment payments if, as the mine is developed, production of the mine exceeds expectations documented in the appraisal. Those funds would be deposited in a special account in the Treasury to be used, upon appropriation by Congress, for maintenance, repair, and rehabilitation projects on BLM and National Forest System lands. The Department's position is that any value adjustment payments should be used for land acquisition.

The Bill also would provide for the sale of: a 30 acre parcel of land currently being used as a cemetery; a reversionary interest and reserved mineral rights in a 265 acre parcel; and 250 acres near the Superior Airport at market value to the Town of Superior. Sale proceeds would be deposited in the Sisk Act account to be used, upon appropriation by Congress, for acquisition of land to the National Forest System in Arizona.

59

H.R. 687 would require Resolution Copper to pay all costs associated with the exchange, including any environmental review document. The Bill provides that it is the intent of Congress that the exchange be completed not later than 1 year after the date of enactment.

At the request of Resolution Copper, the Bill would require the Secretary, within 30 days of such request, to issue a special use permit to Resolution Copper to carry out mineral exploration activities under the Oak Flat Withdrawal Area, from existing drill pads located outside the area, if such activities would not disturb the surface of the Area. At the request of Resolution Copper, within 90 days, the Bill would require the Secretary to issue a special use permit to Resolution Copper to carry out mineral exploration activities under the Oak Flat Withdrawal Area (but not within the Oak Flat Campground), if the activities are conducted from a single exploratory drill pad which is located to reasonably minimize visual and noise impacts to the Campground.

H.R. 687 would require the Secretary of Agriculture to complete an environmental review document after the exchange, and after the above-noted activities were permitted to take place, but before Resolution Copper's commencement of commercial mineral production on the land it would acquire in the exchange. Specifically, once the land exchange is consummated, and these lands are in the private ownership of Resolution Copper, Resolution Copper is authorized to submit a mine plan of operation to the Secretary. Thereafter, the Secretary must complete an environmental review document within 3 years that is limited to section 102(2) of the National Environmental Policy Act of 1969 (NEPA). The environmental document would be used as the basis for any Federal action or authorization related to the proposed mine and mine plan of operations of Resolution Copper, including the construction of associated power, water, transportation, processing, tailings, waste dump, and other ancillary facilities. After the exchange, Resolution Copper may need to use the adjoining National Forest System land for ancillary activities related to the mining development, such as rights-of-way for electric lines, pipelines, or roads.

The Bill would add five parcels of land totaling almost 1,200 acres to the National Forest System. Most of these parcels include riparian areas which are somewhat rare in Arizona. One of the parcels that would be acquired adjoins the Apache Leap area on the Tonto National Forest. Additionally, as a condition of the land exchange, Resolution Copper would surrender its rights to commercially extract minerals under Apache Leap.

While the Department understands and appreciates the potential economic benefits and the value of the lands to be acquired by the American public, the Department cannot support the Bill as written but is looking forward to working with the Sponsor and the Committee. The principal concern is that the Bill would require the agency to prepare an environmental review document under NEPA *after* the land exchange is completed. Also of concern is the fact the Bill would immediately authorize mining exploration activities under an area that is considered sacred to a number of federally recognized Indian tribes (the Western Apache, including the San Carlos Tribe and of the Fort McDowell Yavapai Nation, and certain other tribes in Arizona and New Mexico) without a review or study or consultation with Tribes.

NEPA is a forward looking statute setting out procedural obligations to be carried out before a Federal action is taken. It requires that, before taking a discretionary decision, the Federal agency consider the environmental impacts of a proposed major Federal action and alternatives of such action. It is this Administration's policy that NEPA be fully complied with to address all Federal agency actions and decisions, including those necessary to implement congressional direction.

The purpose of the requirement in the bill that the agency prepare a limited NEPA review *after* the exchange, when the land is in private ownership, is unclear because the bill provides the agency limited discretion to exercise. An environmental review document after the exchange would preclude the U.S. Forest Service from developing a reasonable range of alternatives to the proposal and providing the public and local and tribal governments with opportunities to comment on the proposal. In addition, the U.S. Forest Service does not have an understanding of the impacts the proposed mine will have on local or regional water supplies, water quality, or possible dewatering of the area. No studies or assessments of the water supplies have been conducted. That is information which could and should be obtained by the Forest Service with NEPA analysis *before* the exchange. A NEPA analysis after the exchange would not allow the Forest Service to recommend alternatives since the exchanged parcel would already be in private ownership.

The Bill should be amended to require the preparation of an environmental analysis *before* the land exchange is completed. The purpose of preparing an environmental analysis before consummating the land exchange would be to analyze the effects of the transfer of the Federal land to Resolution Copper, any activities that

60

are reasonably foreseeable to occur on the transferred land (including mineral development), and the acquisition of the non-Federal land resulting from the exchange. The agency would use the environmental analysis to make a decision on whether and how to proceed with the exchange and what mitigation conditions would be required to mitigate the identified impacts.

The legislation states that it is Congressional intent that the exchange be completed within 1 year. Based on our experience with complex land exchanges, this is clearly an insufficient amount of time to complete the exchange. Given the requirement of mineral reports, appraisals, title documents, environmental analysis and government to government consultation with local Indian Tribes, a 2 to 3-year timeframe is much more realistic.

The agency also understands that a number of federally recognized Indian tribes and regional and national tribal organizations are concerned that the H.R. 687 circumvents various laws, policies, and Executive order that directs the Federal land managing agencies to engage in formal consultation with the interested Indian tribes. Indian tribes have also raised important concerns that the Bill is sensitive to various policies and Executive Orders that Federal land managing agencies protect and preserve sites that are sacred to Native Americans. The Forest Service understands that the land is considered sacred by the tribe and holds significant traditional and historic value. Because of these expressed concerns and because this specific site has been the focus of historic Government protection it is important that this Bill provide for the process of formal tribal consultation to ensure both tribal participation in cultural impact analysis and protection of this site.

We hold in public trust a great diversity landscapes and sites held sacred by Indian tribes. Last year, the Department and the Forest Service issued the "Indian Sacred Sites Policy Review and Recommendations". The Report acknowledges that consultation "with Tribal governments is legally mandated and integral to the agency's trust responsibility to tribes. Among the laws that specifically require consultation are the Archeological Resources Protection Act (ARPA), Native American Graves Protection and Repatriation Act (NAGPRA), and the National Historic Preservation Act (NHPA)." On December 5, 2012, the Departments of Defense, Interior, Agriculture, and Energy, and the Advisory Council on Historic Preservation entered into a Memorandum of Understanding (MOU) Regarding Interagency Coordination and Collaboration for the Protection of Indian Sacred Sites to improve the protection of and tribal access to Indian sacred sites through enhanced and improved interdepartmental coordination and collaboration. The MOU is based on the requirements of Executive Order 13007, Indian Sacred Sites, and provisions of the National Historic Preservation Act.

The Bill would require the Secretary to prepare a management plan for Apache Leap. Further, the Federal lands to be exchanged (Oak Flat) hold significant cultural values to Indian Tribes. Although the Bill would require government-to-government consultation, any consultation would not be considered meaningful under Executive Order 13175, "Consultation and Coordination with Indian Tribal Governments", because the bill as introduced, limits the Secretary's discretion regarding the land exchange. The focus of the consultations would likely be the management of those areas over which the agency would have discretion, namely, the Federal land adjacent to the mine and Apache Leap.

For example, the Secretary would not have discretion over the conveyance or onsite management of the Oak Flat site, which under the legislation would be conveyed to Resolution Copper. The San Carlos Apache Tribe considers the Oak Flat area to be a sacred site. They have expressed concerns that block cave mining would cause subsidence that would impact the fundamental religious nature of the site. They have also expressed concerns regarding potential impacts on water quality. They have detailed in correspondence to Secretary Vilsack, the importance of traditional acorn gathering and religious ceremonies which still occur on this site. The Department has a responsibility to consider the Tribes' concerns and these can only be adequately addressed if a pre-exchange environmental analysis is the first step.

There is no doubt that the lands that would be acquired and managed by the U.S. Forest Service under H.R. 687 have important resource values that should be protected. It is also clear that the economic benefits from the production of copper could be significant in creating family wage jobs in tough economic times. However, it is important to more fully understand the scope of the project before proceeding and address potentially significant environmental concerns and sites of high importance to local Tribes. In addition to the concerns expressed in testimony, the Department would like to work with the Committee on a number of significant technical concerns.

This concludes my statement and I would be happy to answer any questions you may have.

61

Mr. LAMBORN. OK, thank you for your testimony and all three of you for being here. We will now have questions from the Committee. And I will start, and I will ask the first one to Ms. Connell.

Can you tell me how many acres are currently being explored, developed, or mined on BLM lands under a notice of intent or plan of operation?

Ms. CONNELL. We have plans of operations on more than 260,000 acres of public lands in the United States.

Mr. LAMBORN. OK. Thank you. That is exactly what I have. In fact, I have, when you combine those two categories together, approximately 260,000 acres. So our numbers correlate exactly.

Now, out of the 247 million acres of land that BLM manages, 260,000 is about $\frac{1}{10}$ of 1 percent, when you do the math. So, $\frac{1}{10}$ of 1 percent of the lands you actually manage are authorized for disturbance and it is not all disturbed today, it is just theoretically could go up to that amount for mineral exploration, development, or mining. I don't see a problem, when the mission of BLM is to allow for multiple uses of public lands, recreation, hunting, fishing, hiking, et cetera, et cetera, why $\frac{1}{10}$ of 1 percent for mining is overdoing it in any way, and is a cause for huge concern. Could you respond to that?

Ms. CONNELL. Certainly the Department of the Interior, the Bureau of Land Management has a multiple-use mission that includes mining. And we very much support mining development on public lands in the United States, subject to the public involvement requirements, the environmental protection requirements. It is definitely a part of our mission, and we look forward to working with the Committee on any issues related to that.

Mr. LAMBORN. So, what objection is there, for instance, in working more with other agencies, State and Federal agencies, as some of these bills call for?

Ms. CONNELL. We work very——

Mr. LAMBORN. And is your microphone on?

Ms. CONNELL. It is. You want me to—I will try and speak up.

Mr. LAMBORN. Sure, thank you.

Ms. CONNELL. We do not have a concern with working closely with other agencies. In fact, I have been a field manager in the BLM for more than 20 years before I became a State director. And some of our most successful efforts have occurred in working at the local level with local managers from other agencies. And I have seen that at the regional level, as well.

And so, the concerns that we have are not with the requirements for our organizations to work closely together.

Mr. LAMBORN. OK, thank you. I have a question now for Ms. Wagner. And Mr. Meinert, if you want to chime in at any point, feel free to do so.

Do you believe that understanding the mineral resource needs of the Nation and knowing where they are located should have an equal priority to things that are already in the budget for BLM for things like figuring out what surface changes might occur if climate gets warmer or colder?

Ms. WAGNER. I will defer to the Department of the Interior for that.

Mr. LAMBORN. Excuse me?

62

Ms. WAGNER. I would like to defer to the—excuse me. I would like to defer to the Department of the Interior for that question.

Mr. LAMBORN. Oh, I am sorry. I should have redirected that. Thank you for the clarification. Yes.

Ms. CONNELL. The question is regarding whether or not we should place priority on identifying where our particular minerals are. And certainly the Department of the Interior is interested very much in understanding the resources that we hold in trust for the American public. And I think that any way that we can gain better information to make better decisions is a good thing.

I would ask if my colleague from the USGS has comments on the ability to collect that information and the cost that might be associated.

Mr. MEINERT. The gist of your question is really a policy question about relative priorities, which, for the United States Geological Survey, I can't really get into, because we are a science agency.

But for the part of the question concerning the knowledge about mineral resources, that is a central part of our mission. It goes all the way back to the founding Organic Act that says that it is part of our job description to understand about the mineral resources of the United States. And we have a very high level of scientific expertise to bring to bear on those subjects, and that is something that we do on a continuing basis.

Mr. LAMBORN. Well, thank you. I like that answer, because this does get back to the original mission. And unfortunately, my figures show that zero dollars are being spent now in locating rare earth and critical mineral and strategic mineral resources, and what the obstacles are to using those, that is getting zero dollars. And yet there is $25 million going to climate change centers.

So, even though you say there is the mission to know where our resources are located, as two of these bills call for, you are allocating zero dollars to do that. Yet there is $25 million going for climate change centers. So I think that that first category, knowing where our resources are, is just as important. So I think——

Mr. MEINERT. I couldn't agree more.

Mr. LAMBORN [continuing]. We shouldn't have—excuse me?

Mr. MEINERT. About the importance of mineral resources. And we have many ongoing programs looking exactly at that question. So I don't think it would be true to say that there are zero resources being allocated to this. We, in fact, have many ongoing programs looking at mineral resources.

Mr. LAMBORN. Well, I am glad to hear that. But I am perplexed by the opposition to the legislation.

OK. I am at this point going to recognize Representative Holt for questions.

Dr. HOLT. Thank you, Mr. Chairman. I thank the witnesses. It is good to see you here. I appreciate your good work.

Ms. Connell, you indicated that public involvement in the review of mining proposals would be constrained under H.R. 761. You also testified that "public lands not only produce commodities, but also offer hunting, angling, and other recreational opportunities."

I am trying to understand. Do you think that H.R. 761 would adversely affect other uses of public lands, such as hunting, fishing, recreational shooting, and so forth?

63

Ms. CONNELL. Based on our review of the language of this bill, our concerns lie more with the language in the bill. Our concerns lie with our ability to conduct a timely version of the environmental review and public involvement. And so, we certainly support the development of rare earth elements and any critical minerals that exist on the public lands in the United States——

Dr. HOLT. Yes, we are talking—I am sorry, we are talking about H.R. 761.

Ms. CONNELL. H.R. 761, which is the Critical Minerals Production Act.

Dr. HOLT. Yes.

Ms. CONNELL. Right.

Dr. HOLT. OK, OK, I am sorry.

Ms. CONNELL. So that is what I was answering.

Dr. HOLT. I beg your pardon. OK.

Ms. CONNELL. OK.

Dr. HOLT. Please go ahead, then. Thank you.

Ms. CONNELL. But that is a concern that we have with this bill, is the way that the language isn't clear to us that it provides as much of an opportunity for public involvement as we would have liked to have seen.

Dr. HOLT. OK. Now, further on H.R. 761, do you agree that this bill has little to do with critical and strategic minerals, and would cover lots of other things? Perhaps even coal mining?

Ms. CONNELL. The language, when we reviewed it, it was unclear as to the definition of what "strategic" or "critical minerals" might be, and it could actually incorporate a large number of the mineral activities.

Dr. HOLT. OK.

Ms. CONNELL. And it was uncertain to us as to whether that was the intent of the bill or not.

Dr. HOLT. And probably would include gold and silver, as written?

Ms. CONNELL. All of the basic——

Dr. HOLT. OK.

Ms. CONNELL [continuing]. Basic minerals that were mined under the 1872 Mining Law, as amended.

Dr. HOLT. Let me turn to H.R. 957, Ms. Connell. The 2011 report by the Department said that royalty reduction for soda ash mining meant a loss of some hundreds of millions of dollars of revenue to the Government, which is five times the amount anticipated by Congress. The industry, those who use the soda ash, disputes these findings and the conclusion of the report.

So, I wanted to ask if you have met with the industry on this, if the Bureau or the Department has met with the industry, and if you can help me understand what the disagreement is, and how that would be resolved.

Ms. CONNELL. Well, certainly——

Dr. HOLT. Do you still stand by the report, for example?

Ms. CONNELL. The report that you are speaking of is the 2011 Report to Congress——

Dr. HOLT. Yes.

Ms. CONNELL [continuing]. That BLM was required to submit. Correct?

64

Dr. HOLT. Yes.

Ms. CONNELL. And that is accurate, that the numbers that were concluded in that report by the Department of the Interior and its partners were basically the data, when we compared that data with the information that came out from the industry's report, the data was very, very similar. It was the conclusions or the interpretations of that data where we found differences.

And, I apologize, I am not familiar with any meetings that have occurred between the BLM and industry, but we could certainly get that information to you on the record, if you would like us to do that.

Dr. HOLT. I would appreciate it if you would provide that to us.

And, well, in the three-quarters of a minute remaining, let me ask what might be a quick question, Ms. Wagner, on H.R. 687. What can you say in general terms about the impact on water for local communities in the area from these activities that would take place there?

Ms. WAGNER. For the mining operation, the question is still a bit outstanding. The company has not submitted a mine plan of operations, and with this proposed bill would not be required to do so until 3 years after the land exchange was codified. The lands would be in private ownership at that point in time, and be governed by the State of Arizona's provisions for private land——

Dr. HOLT. So we would not know in advance of voting on this bill, and maybe we should, do you think?

Ms. WAGNER. The absence of a provision for NEPA to explore the issues surrounding the land exchange, some of which might be impacts to the highest and best use of that land, in this case, perhaps mineral development, would not be known prior to the land exchange.

Dr. HOLT. Thank you.

Mr. LAMBORN. OK, thank you. Representative Gosar?

Dr. GOSAR. Thank you. Thank you, Ms. Wagner, and thank you for being so quick with your comments. That is a long day. I have a quick question for you, not just on the Administration, but a question came up in testimony last year that I want you to clarify.

When the United States Forest Service does an appraisal, they use what they call the DOJ Yellow Book, or the DOJ's guidelines for appraisals, is that not correct?

Ms. WAGNER. We use the uniform appraisals standard guidebook.

Dr. GOSAR. So more specifically, the appraisal must comply with Section 254.9 of Title 36, Code of Federal Regulations and Nationally Recognized Appraisal Standards, which include the uniform appraisal standards for the Federal land acquisitions and the uniform standards of professional appraisal practice. Right?

Ms. WAGNER. Correct.

Dr. GOSAR. OK. Now, the Department of Justice guidelines for appraisals has been very carefully drafted, revised, and updated over many decades. It requires the appraiser to look at the actual facts that apply to a particular property, including associated mineral values.

Last year, some in the minority tried to make the case that my legislation requires some unusual appraisal process. I would like to point out that Section 4 of H.R. 687 specifically requires the same

65

appraisal standards that the agencies are required to use to determine fair market value. There is nothing unusual about it; it is a standard procedure.

When Resolution files its Mine Plan of Operation, then it will go through the NEPA process, and the public will have ample opportunity to provide comments, as guaranteed under the law. Is that not true?

Ms. WAGNER. The Mine Plan of Operations, as I understand the bill, Mr. Gosar, would be looking at the ancillary activities to the plan of operations outside of the private land. So, if the mine needed utility corridors, power corridors, roads, tailing, waste dump, ancillary facilities, that would be what the question on the Federal lands would be about.

Dr. GOSAR. I think that what you have is a full NEPA disclosure. There would be no shortcuts for the NEPA process in regards to the way this language is written.

Ms. WAGNER. On the private land, would they not be governed by the laws of Arizona for private land mineral development?

Dr. GOSAR. I mean, in fact, in some cases, Arizona is more stringent than the U.S. Code. Is it not?

Ms. WAGNER. So, to your point, what would govern the private land, should the land exchange go forward, would be the laws governing private lands in the State of Arizona.

Dr. GOSAR. And the full NEPA process is not subjugated or shortchanged.

Ms. WAGNER. If that is what is required in the State of Arizona.

Dr. GOSAR. That is exactly what is required here. So I wanted to make sure, because we had a witness prior that could not answer that question appropriately.

Ms. Connell, in your testimony you mention my bill doesn't touch on the disclosure of mineral reports. In Section 4(d)1 on page 6, language was inserted to ensure that the appraisal must comply with the requirements of Section 254.9 of Title 36, Code of Federal Regulations. Section 254.9 of Title 36, Code of Federal Regulations states, "Appraisals prepared for exchange purposes must contain the following minimum information: 11, copies of relevant written reports, studies, or summaries, conclusions prepared by others in association with the appraisal assignment, which were relied upon by the appraisal to estimate value, which may include, but is not limited to, current title reports, mineral reports, or timber crews, as prepared for qualified specialists."

Can you clarify why you don't believe we don't touch on mineral reports? Because our intention is full disclosure, and I believe the code we cite in the bill requires our full disclosure.

Ms. WAGNER. I am not an expert appraiser, obviously, but my understanding of the concern was that some of the information that might be needed to develop an appraisal would be not accessible to the Federal Government unless it were made available by a private entity.

Dr. GOSAR. And what part would that be?

Ms. WAGNER. The mineral quantities from the samples——

Dr. GOSAR. Now let me ask you a question. Isn't that part of the State jurisdiction and oversight? You don't trust the State?

Ms. WAGNER. I can't answer that question for you.

66

Dr. GOSAR. I mean we have kind of a funny thing about facts here, is that the State is very, very articulate about this. And once again, some of the State laws are much more onerous than the Federal laws.

What about Section 6 that specifies the Resolution Copper must report annually to the Federal Government and the State of Arizona if the total mine production ever exceeds appraisal production, estimates Resolution Copper must make an annual royalty-like adjustment payment to the United States on all excess productions? Would that also require mineral reports? Correct?

Ms. WAGNER. That is correct.

Dr. GOSAR. Yes. That is what I thought. So I have further questions, but we will start that under somebody else. Thank you.

Mr. LAMBORN. OK, thank you. We will now hear questions from Representative Grijalva.

Is your microphone on?

Mr. GRIJALVA. Sorry. The public interest requires a complete and full informed appraisal, equalization of values be performed prior to a congressional passage of this bill, not after. Do you see that as a public interest requirement or a requirement in the appraisal process as you see it, that the appraisal process be done prior to, rather than after the passage of the bill?

Ms. WAGNER. Is that question to me, Mr. Grijalva?

Mr. GRIJALVA. Yes.

Ms. WAGNER. The public interest determination that is usually done when a land exchange is considered is actually pre-NEPA. It actually looks at the qualities of the non-Federal parcels, the issues of the Federal parcels. It is not predicated on a appraisal of the lands, a complete appraisal of the lands. An estimate of values is done to determine a public interest.

Mr. GRIJALVA. And that is for both witnesses. Throughout his Administration, President Obama has been committed to enhancing the partnership with Native Nations and the Federal Government, very vocal about his support for a real consultation process, and a government-to-government relationship that has formality and process.

If this bill were to become law, will the Federal Government be able to meet its commitment, whether it is a memorandum of understanding your agency might have, or the initiative of the President, would you be able to meet that commitment to a meaningful consultation with Native Nations affected by this legislation?

Ms. WAGNER. The Department of Agriculture doesn't believe that meaningful consultation can occur without the NEPA process preceding the land exchange decision.

Mr. GRIJALVA. Resolution Copper's mining operation is going to require 20,000 acre-feet per year. That is their number. Apparently, the company says that it has been banking water, and has indicated it will use excess CAP water to support its mine operations.

Just so that I am clear, has Resolution Copper provided any analysis about any potential impact or any mitigation plan in place to protect the resource? The resource being ground water in the area, the resource being acid mine drainage into the ground water. And an analysis, is this 20,000 feet per year enough to support the

67

mining activities for the life of the mine? Have any of those been
provided to you, the agency, or any that you know of?

Ms. WAGNER. The NEPA that has been conducted with the
Forest Service and Resolution Copper has been on pre-feasibility
exploration by the company on parcels adjacent——

Mr. GRIJALVA. NEPA question. And correct me. I just want to be
clear, we keep going over this. NEPA is triggered if a Federal ac-
tion is likely to have significant impact on human development.
While numerical values of proposed action are relevant, the num-
ber of acres or megawatts, or whatever, there is no numerical cap
or limit on NEPA application. The point is to determine environ-
mental impacts and things like the number of acres involved can-
not always answer the question.

This bill, I think, plainly waives NEPA with regard to the land
exchange. The decision to trade Federal land, forest land, particu-
larly land that was set aside during the Eisenhower Administra-
tion, and withdraw it from mining—to a mining company, a for-
eign-owned mining company, is likely to impact the human envi-
ronment. NEPA would be required prior to the exchange, if this bill
did not specifically waive that application. Right or wrong?

Ms. WAGNER. That is correct.

Mr. GRIJALVA. And just, I think, for the record, because we were
talking about 1/10 of 1 percent, Mr. Chairman, I am happy to an-
nounce that the Federal judge in Arizona threw out the case, the
withdrawal of the 1 million acres around the Grand Canyon. And
we can rest assured for a little while that beautiful icon will con-
tinue to be a beautiful icon. I yield back.

Mr. LAMBORN. We will now hear from Representative Cramer.

Mr. CRAMER. Thank you, Mr. Chairman and Ranking Member,
and thank you to the witnesses. My, of course, interest is on my
bill, H.R. 767, and all my questions will be for answering by Ms.
Connell.

And, first of all, let me say, publicly thank you for your service
and for being here. Having been an energy and environmental reg-
ulator for nearly 10 years in North Dakota, I always found the re-
lationship between the State and your agency to be very profes-
sional and productive, and I appreciate that, which is why I think
this makes so much sense, what we are talking about today.

You know, H.R. 676 simply just adds the word "Dakota," basi-
cally, to the Montana-Dakota State office, since that is our State
office, and it wasn't originally part of the original bill in 2005, the
Act in 2005. But this Pilot Project probably, in 2005, wasn't even
envisioned to be as active as it is today. And so we want to include
North Dakota as part of the streamlining Pilot Project.

Could you in the first few seconds or minute, describe what that
Pilot Project is, exactly? What specifically helps streamline the per-
mitting process? And is there any environmental compromising as
a result of it?

Ms. CONNELL. The Energy Policy Act of 2005 identified 7 offices
managed by the Bureau of Land Management that would receive
funding which is acquired from rentals for public land leases across
the Nation. And, as a result of that additional source of income, we
were able to establish some teams that would be set aside in each
of those various offices to focus on developing the oil and gas re-

68

sources in that area. At the time, the price of natural gas was very high, and so many of those offices are areas where we have natural gas activity.

North Dakota has boomed, the Bakken play there is a world-class, amazing oil resource for this country. And the Dickenson field office for the BLM has very much been trying to keep up with the activity. Should the Dickenson office be made a part of this pilot effort, we would be able to take advantage of utilizing extra resources from across the county in our ability to bring the oil reserves from the Bakken from the Federal lands and from Indian Trust estate to the surface and make it part of the oil resources available to the American public.

Mr. CRAMER. Exactly how does that happen? In other words, how is the streamlining—how does that happen? What do you do to streamline, if you——

Ms. CONNELL. Well, we streamline in some ways by bringing everyone close together: representatives who work for the Bureau of Indian Affairs, for the BLM, for the Fish and Wildlife Service. We are located very close together, and we have streamlined some of the processes at the local level, depending on what the issues are. We have actually been able to streamline some of the work that is done out in the field.

The number of environmental inspections has more than doubled, as well as the drilling and production inspections. And we also in the pilot office have been able to process more drilling permits with an equal amount of environmental oversight that we were before the implementation of the law.

Mr. CRAMER. Thank you. Now I want to get to your testimony where you have some suggestions for us. And I have been sort of thinking about it all morning. Realizing that this pilot project is due to expire at the end of 2015, so we are about 7.5 years into it, as I understand, and your suggestion is that perhaps we could, by giving BLM more flexibility, utilize the resources in places other than those original 7-plus North Dakota offices.

Do you have any concern that would dilute the intent of the pilot, or would we be better off, and I am really asking, I really don't know, or would we be better off sticking sort of to this mission, seeing how it goes, realizing you now have a world-class play right in the middle, surrounded by public and State activity, that we could do a real experiment, if you will, and gather real information, and then perhaps look at doing something larger down the road? And I am just honestly asking.

Ms. CONNELL. I think that broadening the effort across the Nation would help in a few other places that are having similar struggles to the Bakken area. I think you would still continue to see the focus of the pilot efforts in the highest density of drilling areas, North Dakota would and Eastern Montana would likely remain in the eye of that development activity for the foreseeable future.

Mr. CRAMER. All right. Thanks for the clarity. And again, thanks for the great job you do in protecting our resources. And I just look forward to continuing that same level of protection, while also providing opportunity for economic growth.

Thank you, Mr. Chairman.

69

Mr. LAMBORN. You are welcome. We will now hear questions from Representative DeFazio.

Mr. DEFAZIO. Thank you, Mr. Chairman. Mr. Chairman, I do have questions about H.R. 687 that I hope to get to. But I do, given the opportunity of having Deputy Chief Wagner here, there is something of immediate concern, which is I disagree strongly with the Office of Management and Budget that the safe and secure county rural schools funds are subject to sequestration, particularly since these were funds for Fiscal Year 2012, when sequestration did not exist.

We seem somehow to have lost that battle. We have been sequestered on the BLM funds. And now we are being told you are going to sequester the funds from the Forest Service. So my question is, since the money has been dispersed to the States and spent or programmed for education and public works roads purposes, where are you going to get that money? How are we going to do it? The only thing I can see that you might be able to do is to cut out Title 2 funds. And Title 2, of course, actually benefits the Forest Service, in terms of projects on Forest Lands, and employs people.

So, is that where we are headed? We are about to do this sequestration to the detriment of activities on the Forest Service lands and loss of jobs? Is that where we are headed?

Ms. WAGNER. We had the secure rural schools funding distributed as quickly as we could because it works for schools, for roads——

Mr. DEFAZIO. Right, right.

Ms. WAGNER [continuing]. For emergency protection and services. And last, Title 2 funds are investments in conservation projects.

It is unfortunate, but we find ourselves in a situation of having to have notified the States of the impacts of sequester, and that we are going to have to ask for a return of 5.5 percent of those funds back to Treasury. We have done that, and the only option as we see right now, because, as you said, those funds have been programmed to important investments at the county level, would be to consider using the Title 2 as offsets to return the 5.5 percent to treasury.

Mr. DEFAZIO. But what happens, not everybody gets a Title 2.

Ms. WAGNER. Exactly.

Mr. DEFAZIO. So you are going to take sort of doubly out of the States where they get Title 2 money, will be penalized more?

Ms. WAGNER. It is unfortunate we have to ask for that money back, but that is where we find ourselves.

Mr. DEFAZIO. This is extraordinary, and I just find this very, very hard to believe.

Back to a more general question about H.R. 687, for many years I have been involved in the fight over mining reform, and I did the royalty amendment back in 1994, when we passed a bill on mining reform. This seems to me a very unusual process by which we would, the taxpayers would, realize value from this unbelievably valuable asset. And I don't understand why we wouldn't just want to assess a straight-up royalty, which would be predictable both to the producer, and it would be predictable to or more predictable, to the government and benefit the taxpayers.

70

Have you reviewed this proposal on how we would get future revenues from the production of this asset, either—yes, OK.

Ms. WAGNER. Yes, Mr. DeFazio. The company would be, should the estimate of mineral value or quantity differ from what was assumed in the appraisal process, if the company actually produced more than what was estimated, there is a provision in this bill for an income capitalization approach to the taxpayers receiving some——

Mr. DEFAZIO. Is this something routinely used, income capitalization for this sort of an asset?

Ms. WAGNER. I am not aware of other——

Mr. DEFAZIO. So this would be a first impression. They get to deduct——

Ms. WAGNER. I am not aware of other——

Mr. DEFAZIO [continuing]. All of their estimated construction, operating, maintenance costs on an annual basis, from their production, and then that would come up with this theoretical appraised or annual value.

Ms. WAGNER. The appraisal actually would be done by somebody who has expertise in appraising properties that have mineral value. And they would use a cost sale comparison methodology. They might use the income capitalization approach. It is a multi-faceted approach to get——

Mr. DEFAZIO. Right. But why would we create a new and novel process for such an incredibly valuable asset? Why wouldn't we just say we want a royalty?

Ms. WAGNER. My understanding is that it is the vehicle to protect the interests of the public if the appraisal estimate of material removed from the mine didn't match up with the actual production of the mine.

Mr. DEFAZIO. Yes, but if we are doing a royalty on growth, that is very predictable, and there is no way to harm the public there.

Ms. WAGNER. We would be happy to work with the Committee on language that would work to achieve the public interest that I think that provision was intended to achieve.

Mr. DEFAZIO. I am not following that at all. Thank you, Mr. Chairman.

Mr. LAMBORN. OK, thank you. Representative Lummis.

Mrs. LUMMIS. Thank you, Mr. Chairman. I am going to concentrate my time on the soda ash bill. I appreciate Ms. Connell's remarks about how the data was very similar between the BLM and the industry, and the fact that it is how you interpret it that makes the difference.

And there is a reason that the interpretations that were drawn by the employer and employee groups that support this bill convinced both the gentleman from New Jersey and the gentleman from Oregon here present to support this bill in the last Congress. And the reason is that both the employer and employee organizations, industry and labor unions, are supporting this bill because they recognize what China is doing.

Soda ash is a natural product. And it is produced in the United States and shipped overseas, a large part of it. It is used to make glass and soda, baking soda, and laundry detergent, and things like that. It is a hard rock. China produces synthetic soda ash in great

71

quantities, and subsidizes it to the tune of $30 million annually. So, if we increase the royalty, which we have now allowed to occur on naturally occurring soda ash in the United States, we are charging $25 million more annually for soda ash, while the Chinese are subsidizing theirs to the tune of $30 million. And that just creates a lopsided competitive disadvantage for U.S. soda ash that costs jobs and costs production, costs our competitive edge around the globe. So, that is why this bill enjoys the support of both labor unions and industry.

Congress set a 2 percent royalty rate back in 2006. And during those following 5 years of the 2-percent royalty rate, U.S. soda ash manufacturers increased employment, increased production and exports, and increased the royalties paid to the Federal and State coffers, as compared to the previous 5 years. Now, that royalty rate of 2 percent was allowed to expire. It has gone up to 6 percent. And that is why labor unions and industry have joined forces on this bill to allow for more royalty dollars to be paid to the U.S. Government and the taxpayers of this country, by allowing our product to remain competitive globally against this Chinese synthetic product that is subsidized.

So, Mr. Chairman, I want to point that out and maybe conclude with this question for Ms. Connell. Isn't it true that during the years 2006 to 2011 the United States suffered a recession and unemployment levels were at double digits? But at the same time, when we had a lower royalty rate on soda ash, its employment base increased, the production increased, exports increased, and we actually collected more than the previous 5 years under a 6 percent royalty?

Ms. CONNELL. During the year that you are asking about would have been during the 5 years while the royalty rate was lower. Correct?

Mrs. LUMMIS. While the royalty rate was at 2 percent we enjoyed an increase in production and an increase in employment in the soda ash industry because our product was more competitive overseas, as compared to the Chinese synthetic product.

Ms. CONNELL. Certainly the soda ash industry in the United States has remained very competitive, worldwide. And from the information that I have been provided, it has remained competitive through 2012, despite the fact that we have had economic difficulties, as well as the increase in the royalty rate.

Mrs. LUMMIS. Well, it is not easy, once employment and contracts have been established globally under a 2-percent royalty rate, to immediately change those contracts. And isn't that the case? I mean some contracts to provide soda ash would run beyond the expiration of the 2-percent royalty rate, simply because the contract term runs beyond the expiration of the 2-percent royalty rate. Isn't that possible?

Ms. CONNELL. That could definitely be true.

Mrs. LUMMIS. Thank you, Mr. Chairman. My time is up and I yield back.

Mr. LAMBORN. Thank you. I want to thank the panel for being here today. Let me ask a couple of clarifications.

72

Mr. Meinert, you referred earlier to the fact that USGS was working on some projects to both search for and list critical and strategic minerals today. Could you supply me with that list?

Mr. MEINERT. To clarify, I stated that we have many projects researching mineral resources, including strategic minerals. And we would be happy, for the record, to provide you with further information about those projects.

Mr. LAMBORN. Please do so. Thank you for that offer. And to clarify something you said, Ms. Wagner, during your testimony, is it your position that NEPA should be complied with before land exchanges and conveyances take place?

Ms. WAGNER. That is the position of the Administration, yes.

Mr. LAMBORN. OK. I thought you would be interested to know that we passed a bill yesterday in this Committee, Full Committee, and it also passed the last Congress by unanimous consent. It is a bill by Representative Grijalva, H.R. 507, to convey land into a trust involving a golf course without NEPA being complied with.

Ms. WAGNER. It is certainly true that Congress has the authority to waive provisions of NEPA.

Mr. LAMBORN. OK. Thank you for that clarification, and thank you for being here. Members of the Committee may have questions for you to follow up, and we would ask that you respond to those questions, if they are submitted to you in writing. Thank you.

We will now go to our fourth and final panel. And I would like to invite forward the witnesses for this panel: Mr. Stephen Miller, Chairman of the Board of Supervisors of Pinal County District 3; Mr. Hal Quinn, President and CEO of the National Mining Association; Mr. Dan McGroarty, Principal and Director of American Resources Policy Network; Mr. Mike Hohn, General Manager of the Soda Ash Business of OCI Chemical Corporation; Mr. Terry Rambler, Chairman of San Carlos Apache Tribe; Mr. Pierre Neatby, Vice President of Sales and Marketing for Avalon Rare Metals; and Ms. Soyla Peralta, Council Member of the Superior Town Council.

Like all of our witnesses, your written testimony will appear in full in the hearing record, so I would ask that you keep your oral statements to 5 minutes. You have to turn on the microphone to be heard. The countdown begins at 5 minutes with a green light, turns to yellow after 4 minutes, and then turns red after 5 minutes.

Thank you all for being here. We look forward to your testimony, and we will start with Mr. Miller. Thank you for being here.

### STATEMENT OF STEPHEN Q. MILLER, CHAIRMAN OF THE BOARD OF SUPERVISORS, PINAL COUNTY DISTRICT 3

Mr. MILLER. Mr. Chairman and members of the Subcommittee, my name is Steve Miller, I serve as Chairman of the Pinal County Board of Supervisors. I appreciate the opportunity to testify before you——

Mr. LAMBORN. Are you speaking into the microphone?

Mr. MILLER. I believe I am. Is that better?

Mr. LAMBORN. OK. Make it a little closer. Yes, thank you.

Mr. MILLER. OK. I appreciate the opportunity to testify before you today and would like to personally thank Congressman Paul Gosar and Congresswoman Ann Kirkpatrick for working together

73

in a bipartisan manner to advance legislation which is important to the people of Arizona.

I must acknowledge my colleagues in the Pinal County Board of Supervisors, and especially Supervisor Pete Rios, who hoped to testify here today, but was not able to make it. I know that my complete testimony will appear in the record, so let me be brief and summarize my remarks. Then I will be pleased to answer any questions.

First, support for this bill is bipartisan and very strong. Support for this bill from a bipartisan Board of Supervisors is unanimous, and the vast majority of residents of Pinal County and all Arizona supports this mine.

Nowhere is the support stronger than the citizens of Superior. Fourth generation resident Mila Besich Lira spoke at the Board of Supervisors meeting and said, "Resolution Copper has been very generous and transparent with the people of Superior and the entire mining triangle." She credited Resolution for the exponential rise in the elementary school math scores and the success of the local schools in the competition with the schools throughout the Southwest.

Second, the bill and the proposed mine will be a net positive environment. The mine's operation being proposed by the Resolution Copper looks very different than the standard open pit mine. Based upon the county's long-standing working relationship with Resolution Copper, we believe this project is going to be one of the most environmentally-sensitive mines in the Nation, even the world. They have taken it upon themselves to reclaim an old mine in Superior decades before they were required to do so at the cost of $50 million.

One parcel in Pinal County that the Federal Government will receive is the 7B Ranch, 3,050 acres of ranch land, covers 7 miles of both sides of the San Pedro River. Resolution Copper has already put it under the management of Nature Conservancy. And in addition, stepped up to the plate, and at their own expense, have addressed the huge problem of illegal dumping on an otherwise pristine piece of property. Actions speak louder than words.

Third, this mine is just the kind of economic stimulus our county, our State and our Nation needs. The citizens of Pinal County need more high-quality paying jobs. Our unemployment rate is about 8 percent. The unemployment rate on the Indian Reservation is more than triple that number. The Resolution Copper project will put over 1,400 people in excellent jobs, direct jobs, as a result of passage of this legislation. It will create thousands more indirect jobs, combine these jobs, have the potential of creating more than $60 billion of economic benefit over the life of the mine.

This project also benefits the public sector beyond the lands the U.S. Government will receive. The mine will yield more than $16 billion in new revenues to the Federal Government. Last I checked, you could use a few billion here.

Back in Arizona, in the State, county, and local governments, they will receive another $2 billion in revenue. Every day that passes without this legislation, we lose out on all these economic benefits. As an elected official, my responsibility is to improve the quality of life for the constituents. I came here today to urge you

74

to join me and the citizens of Pinal County to support the land exchange. I ask that you pass H.R. 687 immediately. The residents of Pinal County and the State of Arizona are looking to you for action.

Mr. Chairman, thank you for the honor of appearing here today, and I look forward to answering any questions.

[The prepared statement of Mr. Miller follows:]

PREPARED STATEMENT OF CHAIRMAN STEPHEN Q. MILLER, PINAL COUNTY
BOARD OF SUPERVISORS, DISTRICT 3, ON H.R. 687

Mr. Chairman and Members of the Subcommittee:

My name is Steve Miller. I serve as the Chairman of the Pinal County Board of Supervisors. I appreciate the opportunity to testify before you today, and would like to personally thank Congressman Paul Gosar for inviting me to testify. I would also like to thank Congresswoman Ann Kirkpatrick for her leadership on the issue before us today.

I was born in Arizona and have lived in Pinal County for almost 42 years. During that time, I've been through a lot of ups and downs in our community. As a husband, father, and grandfather, economic and community issues drove me to get involved in public and community service. Sure, I had my livelihood as a builder and truss manufacturer to consider, but I have always known people are what matter and few issues today are as important to the people of this County as this legislation and the jobs that will be created by the development of the Resolution Copper Mine.

I am fortunate to serve with some great leaders and I must acknowledge my colleagues on the Pinal County Board of Supervisors, especially Supervisor Pete Rios. Pete also hoped to testify here today, but could not be here. He has been an ardent supporter of the Resolution Copper Mining project from the days when he served in the Arizona State Senate to now.

The Pinal County Board of Supervisors, made up of Republicans and Democrats, just unanimously passed a resolution supporting H.R. 687. The vast majority of residents of Pinal County support this land exchange and this mine. Nowhere is support stronger than with the citizens of Superior, Arizona where polling shows support of the mine exceeds 80 percent. Strong words of support were spoken at our Board meeting by Superiorites like fourth generation resident Mila Besich Lira who stated that Resolution Copper has been very generous and transparent with people in Superior and the entire mining triangle. She credited Resolution's support of local schools for the exponential rise in elementary school math scores and the success local Superior schools have had in competitions with schools throughout the Southwest.

Let me tell you a little about Pinal County. We are right in the middle of the State between Arizona's two largest counties—Maricopa to the north and Pima to the south. Like many of the counties in Arizona, we have a large geographic footprint—just a little larger than Connecticut. Our population has exploded from 60,000 in 1965 to more than 375,000. We need high quality, good paying jobs for our citizens today and into the future. Passage of this bill will help create those jobs.

Pinal County is not only large, but also diverse. The western part of the County, which I represent, is mostly low desert where irrigated farming has dominated over the years. The eastern part of the County is mountainous with elevations as high as 6,000 feet. It is home to what we've called the "copper triangle"—an area known for its long history as a copper mining region.

While I may be new to the Board of Supervisors, I'm not new to Pinal County and I'm very familiar with this legislation and the proposed mine. Mr. Chairman and Members, you need to understand the mining operation being proposed by Resolution Copper looks very different than the standard open pit mine. Based upon the County's long-standing working relationship with Resolution Copper, we believe this project is going to be one of the most environmentally-sensitive mines in the Nation . . . even the world. On behalf of our citizens, the Board will hold Resolution to the highest standard of environmental stewardship; and based on their actions so far, it is clear to me they intend to hold themselves to the same standard.

Let me explain what I see as evidence of Resolution Copper's commitment to the environment. First, the legislation being considered today is the result of extensive consultation between Resolution Copper, Federal agencies, and various non-governmental organizations like The Nature Conservancy and the Audubon Society to find

75

the best lands to exchange for the Oak Flat Campground. The Federal Government is the overwhelming beneficiary of this lands package. For example, one parcel in Pinal County the Federal Government would receive through passage of this bill is known as the 7B Ranch—3,050 acres of ranch land that covers 7 miles on both sides of the San Pedro River. Resolution Copper has already put it under the management of the Nature Conservancy, and has additionally stepped up to the plate and, at its own expense, addressed the huge problem of illegal dumping on this otherwise pristine piece of property. Actions speak louder than words. Resolution Copper set a high standard for others to follow.

Resolution Copper's actions also speak loudly in Superior, Arizona. It took over the nearly century-old Magma Mine site in Superior, which required an extensive environmental cleanup. Resolution Copper was not obligated to complete cleanup for decades, but decided to begin the $50 million reclamation. Today, that cleanup is over 70 percent complete. These actions will ensure a safer, cleaner and healthier environment for the residents of Superior. Resolution Copper knows what it takes to be a good corporate citizen and a good community partner. They are helping improve Superior schools, send high school graduates to college, make it possible for younger kids to play little league on a field with grass, provide funding for community programs such as Superior's signature event, Apache Leap Mining Festival, and provide much needed support for the fire and police departments. They understand that Superior is their home and the home to many of their current and future employees.

Let me say something more about economic growth. The citizens of Pinal County need more high-quality, good paying jobs. Our unemployment rate is about 8 percent. The unemployment rate on our Indian reservations is more than triple that number. The Resolution Copper project will put over 1,400 people into excellent jobs—direct jobs as a result of the passage of this legislation. It will create thousands more indirect jobs. Combined, these jobs have the potential to create more than $60 billion in economic benefit over the life of the mine.

This project also benefits the public sector beyond the lands the U.S. Government will receive. The mine will yield more than $16 billion in new revenue to the Federal Government. Last I checked, you could use a few billion dollars. Back in Arizona, the State, county and local governments stand to receive another $2 billion in revenues. It has been said by many others, far better than I can say it, but this bill is a true stimulus bill that doesn't cost taxpayers one dime. By the way, dimes are currently made with 91 percent copper.

As an elected official, my responsibility is to improve the quality of life for my constituents. I came here today to urge you to join me, and the citizens of Pinal County, in support of this land exchange. I ask you to pass H.R. 687 immediately. The residents of Pinal County and the State of Arizona are looking to you for action.

Mr. Chairman, thank you for the honor of appearing before your subcommittee. I look forward to answering any questions the Subcommittee may have.

———

QUESTION SUBMITTED FOR THE RECORD TO STEPHEN Q. MILLER

QUESTION SUBMITTED FOR THE RECORD BY THE HONORABLE. GRACE F. NAPOLITANO

*Question.* Is it the normal process for the county to give the mining business to companies outside the United States, in this case to the UK and Australia? Why not seek U.S. owned companies to build U.S. investments in our companies?

Answer. Pinal County is a firm believer in the free-enterprise system, a system that today thrives within a global economy. As such, the county does not dictate company ownership or where a mining company may choose to stake claims and invest its capital to develop a mine. The practice of isolationism in this country in the past was not found to be practical or profitable for the nation.

Pinal County did not choose the mining company and direct them to make an investment here. Resolution Copper, a subsidiary of Rio Tinto, explored this site and has determined that the ore body in Superior, Arizona is one of the *10 largest ore bodies in the world.* The company has made multimillion dollar investments in exploring high-tech ways to extract the ore that sends the fewest number of miners underground. The company will be able to mine this ore through the extensive use of robotics and skilled workers.

The jobs created at the mine will be American jobs, pulling a global commodity from American soil to make the sorts of products that power this Nation—from motors to cell phones, to the piping that runs through our homes.

Pinal County seeks to provide opportunity for any company that wants to make investments in our county which will generate wealth and provide economic growth

76

and opportunity for our citizens. Pinal County enjoys the presence of a number of foreign companies which have created a tremendous number of jobs.

Some of those companies are:

| | | |
|---|---|---|
| Hexcel Composites | Abbott Nutrition | Phoenix Mart |
| ACO Polymers | ASARCO Groupo | Bright International |

It strikes me that this project presents the single biggest opportunity for Congress to show America that it is serious about creating jobs, spurring a healthy economy, producing a commodity that is in global demand and reducing our dependence on foreign sources of raw materials.

———

Dr. GOSAR [presiding]. Thank you, Mr. Miller.
Now I would like to have Mr. Quinn for 5 minutes.

### STATEMENT OF HAL QUINN, PRESIDENT AND CEO, NATIONAL MINING ASSOCIATION

Mr. QUINN. Thank you, Mr. Chairman, members of the Committee. I appreciate the invitation to testify today on H.R. 761. And I also want to thank you all for your continued efforts in trying to find and advance enabling public policies that will positively affect our mineral supply chain here in the United States.

Let me begin maybe with a little global context to frame out not only H.R. 761, but also a number of the other pieces of legislation on minerals that you are considering today. Today about three-quarters of all the economic growth globally comes from emerging economies. And some estimate at this rate, by 2050, 80 percent of the entire global GDP will be allocated to what is today the emerging nations and economies.

Now, these trends are often compared to the Industrial Revolution, but their pace and scope today are simply unprecedented. Consider that in the space of 25 years the GDP of China grew by a factor of 10, took the better part of 70 years for Britain's GDP to grow by a factor of 4 after 1830. And while the Industrial Revolution was a story of about perhaps 100 million people, the story unfolding before us today that we are witnessing really involves billions of people and for the foreseeable future.

And I say the foreseeable future, because the developing nations have per capita consumption rates of energy and commodities that are still just a fraction of the developed world.

So resource competition will be fierce over the next 20 years. Demand for minerals will soar, and stable and reliable supplies will become increasingly difficult to sustain. Here in the United States, our share of global exploration investments is less than half the levels attracted 20 years ago. At the same time, our dependence upon foreign sources of key minerals has doubled. Today domestic minerals supply less than half the needs of all U.S. manufacturing.

Now, these trends are not due to the lack of mineral resources. In fact, in the United States we are blessed with a world-class mineral resource base. Unfortunately, we are cursed with a third-world permitting system, one that is cumbersome, duplicative, and unpredictable. Now, finding minerals in developing mines requires substantial investments, hundreds of millions and even billions of dollars. As a consequence, regulatory certainty is a highly valued commodity. Lengthy delays and permit reviews compromise the commercial viability of projects by increasing costs, reducing the net

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 1799 of 2158
Case 2:21-cv-00122-DWL    Document 87-14    Filed 07/14/25    Page 82 of 118

77

present value of those projects, and impairing financing arrangements.

So, the efficiency and predictability of the permitting process matters in decisions where to invest. The choice can be very stark. Invest in countries that provide a predictable pathway for receiving permits within 2 to 3 years, or here in the United States, where it may take three to five times longer.

Now, let me be clear. Valid concerns about environmental protection should be fully considered and addressed. At the same time, they should not serve as an excuse to trap mining projects in a limbo of duplicative, unpredictable, and endless review without a decision point. We should not confuse the length of the process with the rigor of the review. Countries like Canada and Australia, which share our same core principles of responsible resource development, have demonstrated that permit views and decisions can be both thorough and timely. They understand that we are in a global competition for mining investment, and that an effective and efficient permitting process provides a competitive advantage.

H.R. 761 provides a big step for the United States to catch up in this race for investments in minerals. The bill reflects best practices for coordination among State and Federal agencies, clarifies responsibilities, minimizes duplication, sets goals and timeframes, and, frankly, brings just more accountability to the process.

H.R. 761 provides the opportunity to establish a permitting system that prepares us for the challenges of the new global reality, one that will allow our manufacturing, technology, and other industries to compete with the world's fastest-growing economies.

Thank you very much for the opportunity to testify today.

[The prepared statement of Mr. Quinn follows:]

PREPARED STATEMENT OF HAL QUINN, PRESIDENT AND CEO, NATIONAL MINING ASSOCIATION, ON H.R. 761

Good morning. I am Hal Quinn, President and Chief Executive Officer of the National Mining Association (NMA). NMA is the national trade association representing the producers of most of the Nation's coal, metals, industrial and agricultural minerals; manufacturers of mining and mineral processing machinery, equipment and supplies; and engineering and consulting firms, financial institutions and other firms serving U.S. mining.

Today I am testifying in support of H.R. 761, the National Strategic and Critical Minerals Production Act of 2013. I want to thank Representative Amodei for reintroducing this very important legislation. It enjoys bi-partisan support and addresses a key issue for the country's future economic growth and manufacturing revival: the painfully slow permitting process for the mines that supply metals and minerals essential for our basic industries, our national defense and the consumer products we use. I also want to thank the subcommittee, especially Congressman Lamborn, for the leadership and persistence in raising the visibility of a growing problem—the availability and security of mineral supplies critical to innovation, manufacturing, national security and our economic growth.

**U.S. Mining's Contribution to Society**

Mining's contributions to our economy and society are significant. The value added by major industries that consume the $77 billion of minerals produced in the United States was an estimated $2.4 trillion in 2012, or 15 percent of our GDP. Mining's direct and indirect economic contribution includes nearly 2 million jobs with wage and benefits well above the State average for the industrial sector. In addition, domestic mining generated $50 billion in tax payments to Federal, State and local governments.

In addition to these economic contributions, U.S. metals mining's commitment to employee safety and health has led to continuing improvements in our performance and includes the introduction of our CORESafety® initiative last year, which relies

78

on a systems approach to eliminate fatalities and reduce the injury rate at U.S. mines by 50 percent within 5 years. We also developed last year a systems approach to environmental management at hardrock mines with a special emphasis on practices to assist smaller operations with improvements in environmental outcomes.

**U.S. Mining's Potential**

Mining's potential is even greater than its current performance. The United States has an immense and enviable mineral endowment waiting to be tapped. For example, Resolution Copper's world class copper deposit represents one of the largest undeveloped copper resources in the world and is anticipated to have a 50 year mine life that will support over 3,700 jobs annually.

Overall, when viewed through the lens of resource potential, the United States is underperforming, a fact that will have increasing consequences as global demand for minerals becomes more competitive due to the demands of developing economies, where millions are being propelled into a rising global middle class. Last week, the United Nations Development Program released a report that examines the profound shift in global dynamics driven by the fast-rising new powers of the developing world.

The report, *The Rise of the South: Human Progress in a Diverse World,* includes in its classification of "the South" nations in the Southern Hemisphere as well as China and India. The report emphasizes the shift is occurring not just in large middle-income developing nations such as Brazil, Argentina, India and China, but also in more than 40 other up-and-coming countries that in recent decades have made astonishing gains in what's called human development. As one of the report's authors noted, "The Industrial Revolution was a story of perhaps a hundred million people, but this is a story about billions of people."

Clearly demand for minerals will continue to grow, fueled by these fast growing economies. Growing demand presents opportunities and challenges for both U.S. mining and the Nation. These trends point to enormous growth and job-creation opportunities if U.S. mining is allowed to perform to its potential. If we do not and become increasingly marginalized, the consequences are severe for our Nation's global competitiveness, forcing us to become more reliant upon extended and unstable supply chains for what we can produce here.

**Permitting Poses a Major Obstacle**

So while the United States has one of the world's greatest mineral repositories, our ability to get these minerals into the supply chain to help meet more of America's needs is threatened. A major obstacle to the U.S.' reaching its potential is the length of time consumed in obtaining permits to mine in the United States. Authorities ranging from the National Academy of Sciences to the Departments of Energy and Defense to international mining consulting firms have identified permitting delays as among the most significant risks and impediments to mining projects in the United States.[1]

The United States has one of the longest permitting processes in the world for mining projects. In fact, the length, complexity and uncertainty of the permitting process are the primary reasons investors give for not investing is U.S. minerals mining. In the United States, necessary government authorizations now take approximately 7 to 10 years to secure, placing the United States at a competitive disadvantage and forcing our economy to become increasingly reliant on foreign producers for minerals we can produce domestically. Our dependence on foreign minerals has doubled in the past 20 years.

Despite the Nation's rich mineral endowment, our flawed permitting system significantly impedes the ability to attract investment to our shores. In 1993, the United States attracted 20 percent of worldwide exploration investment dollars. Today, our share has eroded to just 8 percent. The percentage of global exploration spending the United States attracts is critically important since exploration spending is a leading indicator of where future development capital will be deployed.

**The Permitting Scheme Harms U.S. Manufacturing**

More than the future of domestic mining is at risk from our cumbersome and inefficient permitting scheme. Today, less than half of the mineral needs of U.S. manufacturing are met from domestically mined minerals, a trend that has been building for nearly 30 years and will only worsen unless we reform the permitting process

---

[1] *See* National Resources Council, *Hardrock Mining on Federal Lands,* National Academy Press (1999); U.S. Department of Energy, *Critical Materials Strategy* (Dec. 2010); U.S. Geological Survey USGS, *the Principal Rare Earth Elements Deposits of the United States—A Summary of Domestic Deposits and a Global Perspective,* (2010); Behre Dolbear, *Where Not to Invest* (2012).

79

responsible for it. Our broken permitting process also slows creation of high-wage jobs supported by mineral mining.

As the recent Rand Corporation study, *Critical Materials: Present Danger to U.S. Manufacturing*, warns:

> While the United States has extensive mineral resources and is a leading materials producer, a high percentage of many materials critical to U.S. manufacturing are imported, sometimes from a country that has the dominant share of a material's global production and export. In this situation, U.S. manufacturers are vulnerable to export restrictions that limit their access to these materials and that can result in two-tier pricing, under which domestic manufacturers in the producing country have access to materials at lower prices than those charged for exports, thereby hindering the international competitiveness of U.S. manufacturers and creating pressure to move manufacturing away from the United States and into the producing country. (p. ix)

The Rand Study also notes a potential ripple effect on U.S. innovation:

> The U.S. science and technology base that support manufactured products was built on and depends upon the presence of U.S. manufacturers producing these products from raw and semi-finished materials. Prolonged disruption in the supply of raw and semi-finished materials required by these manufacturers could put the science and technology base in jeopardy, which would further reduce U.S. innovation capability and competiveness in the development of new, higher-performance products. (p.1)

To ease mineral supply constraints on U.S. manufacturers, the study indicates the most effective action that can be taken would be to encourage diversified production, i.e., the operation of mines in several different countries. This diversification should include the United States and would be accomplished by encouraging domestic production of the resources needed for the manufacturing supply chain through modernization of our permitting structure.

**The Solution is a Modern Permitting Process**

Similar to the bill passed overwhelmingly by the U.S. House of Representatives in the 112th Congress, H.R. 761 carefully addresses the deficiencies of our outdated and underperforming permitting system. Without changing environmental and other protections afforded by current laws and regulations, it provides for efficient, timely and thorough permit reviews and incorporates best practices for coordination between State and Federal agencies.

As an example, Canada is a global mining leader that continues to take advantage of its efficient permitting system, large pool of junior explorers and exploration-focused tax incentives to attract 16 percent of all global exploration dollars in 2012. Canada maintains an expedient, approximately 2-year, permitting timeline by implementing a flexible system that seeks to minimize duplication, uncertainty and delays. Canada recognizes mining is a key economic driver. A recent Conference Board of Canada report, *The Future of Mining in Canada's North*, anticipates the country's overall metal and non-metallic mineral production will grow by 91 percent from 2011 to 2020. Canada recognizes long-term global demand for commodities is increasing and is positioning itself to take advantage of this opportunity and provide minerals for both domestic and global use.

Further, many of the approaches contained in H.R. 761 are comparable to those recently praised by the Government Accountability Office as significantly improving the permitting process for wind and solar renewable energy projects on Federal lands. The GAO report, *Renewable Energy: Agencies Have Taken Steps Aimed at Improving the Permitting Process for Development on Federal Lands*, found that wind and solar permitting times at the Bureau of Land Management were reduced from 4 years for applications filed in 2006 to 1.5 years for applications filed in 2009. Ironically, the same agency that permits these alternative energy projects cannot streamline the permitting process for mining projects that supply minerals essential for building renewable energy infrastructure and technology.

**Conclusion**

Using our country's minerals responsibly and efficiently must be a bi-partisan priority for strengthening our manufacturing base and the jobs it provides. NMA urges Congress to pass H.R. 761 to provide a more predictable regulatory environment, one that will attract additional investments and allow U.S. mining to build on our positive contribution to the U.S. economy and host communities. The legislation will bring the United States in line with our competitors for minerals exploration and

80

development investments—countries such as Australia and Canada that have already modernized their permitting regime. The permitting efficiencies set forth in H.R. 761 will allow the United States to unlock its full potential. Thank you for the opportunity to testify today.

————

Dr. GOSAR. Thank you, Mr. Quinn. Mr. McGroarty—hopefully I said that right.

Mr. MCGROARTY. You did, thank you. Am I being heard? All right.

## STATEMENT OF DAN MCGROARTY, PRINCIPAL AND DIRECTOR, AMERICAN RESOURCES POLICY NETWORK

Mr. MCGROARTY. Thanks to the Committee for the opportunity to testify today. I am Dan McGroarty, President of American Resources Policy Network, a nonprofit think tank and experts organization dedicated to informing the public and the ongoing policy debate on the importance of developing U.S. minerals and metals resources, and reducing America's dangerous dependency on foreign sources of supply. I am also an officer and director of U.S. Rare Earths, developing rare earths properties in three States, with the aim of adding to domestic supply of these metals that are so critical to our high-tech and green-tech sectors, as well as our advanced military weapons systems.

The subject before the Subcommittee this morning is key to so many of the pressing policy issues before the Congress today, whether it is restoring America's manufacturing prowess or supporting our high-tech sector and our green-tech transition. And, of course, as the last portion of the title today suggests, securing America.

As a significant first step toward aligning our public policy with the goals of strengthening our resource sector, I want to focus on one of the bills before this Committee and this Congress, H.R. 1063, the National Strategic and Critical Minerals Policy Act of 2013, introduced by Chairman Lamborn. As the bill notes—and I quote—"The United States has vast mineral resources, but is becoming increasingly dependent on foreign sources." The bill buttresses this statement. With data on the degree to which the United States is 100 percent foreign-dependent on certain metals and minerals, 18 at present, triple the number 25 years ago.

Last year, when my organization did a risk screen for metals used in defense applications, we derived a risk pyramid with 46 metals on it, China being the single largest provider. But when we looked at known resources in the United States, we found that the U.S. is home to 40 of the 46 metals and minerals on our risk pyramid. In other words, if we are foreign-dependent for a wide range of hard rock resources, it is a dependency that is largely self-inflicted.

The Lamborn bill takes three steps that would help the United States formulate a targeted policy to reduce and, in the case of many metals, eventually eliminate our foreign dependence.

First, via Section 4, the bill strengthens our assessment capability. We can't begin to reduce our resource dependence if we lack current and comprehensive data on the depth of that dependence. Because in a world of resource nationalism, foreign dependence for

81

critical metals can be used as leverage, commercial, but also strategic, that can induce economic shock to the American system.

The second key section in the Lamborn legislation is eliminating needless duplication in the mine permitting process, a process that today, in the leading independent study, earns the United States the worst in the world ranking, tied for last with Papua New Guinea, with an average mine permitting process in the United States taking 7 to 10 years. And this metric is getting worse, not better.

Just 4 years ago in 2009, the same study found the U.S. process took an average of 5 to 7 years. Little wonder why. One day the DOD releases a study showing 23 metals and minerals in potential shortfall, and the DOE declares a dozen minerals critical to greentech and clean energy transition, but at the very same time the U.S. EPA moves to stop a proposed American copper mine, a metal whose short supply DOD tells us has already caused a significant weapons system delay, before the permitting process has even begun.

With so many mixed signals coming from the Federal Government, let's ask ourselves if you were an American manufacturer, dependent on metals and minerals engineered into your products, could you risk waiting for a reliable source of American supply? Or would you build your new facility where the metals are? In China perhaps, exporting jobs and intellectual property, sacrificing GDP, and feeding a negative balance of trade as we buy back products that could have been, that should have been, made here in America? We need to recognize that Made in America often begins with Mined in America. And the Lamborn bill puts us back on that track.

The final feature in H.R. 1063 that I would like to focus on today is the call for a national mineral assessment updated at 2-year intervals. Critical metals are technology-dependent. As technology evolves over time, so too will our tool kit of critical metals. In Roman times sodium chloride, salt, was a critical mineral essential to preserving food for armies on the march. In our Moore's Law world, as technology cycles are measured in months, not years, we must constantly update our understanding of what metals and minerals deserve to be called critical.

The Lamborn bill is a solid test of our seriousness on this issue. If enacted, it would provide the fact base for a data-driven assessment of the obstacles that stand between us and a greater degree of resource independence. Thank you.

[The prepared statement of Mr. McGroarty follows:]

PREPARED STATEMENT OF DANIEL McGROARTY, PRESIDENT, AMERICAN RESOURCES POLICY NETWORK, ON H.R. 1063

Chairman Lamborn, my thanks to you and your colleagues on the House Subcommittee on Energy and Mineral Resources for the opportunity to testify today. I am Daniel McGroarty, President of the American Resource Policy Network, a non-profit think tank and experts organization dedicated to informing the public—and the ongoing policy debate—on the importance of developing U.S. mineral and metals resources—and reducing America's dangerous dependency on foreign sources of supply.

I am also an officer and director of U.S. Rare Earths, a publicly-held company currently developing Rare Earths properties in three States, with the aim of adding to the domestic supply of metals critical to our high-tech and green-tech sectors, as well as the U.S. military's advanced defense systems. The subject before this subcommittee this morning—America's Mineral Resources: Creating Mining & Manu-

82

facturing Jobs and Securing America—is critical to so many of the pressing policy issues before the Congress today, whether it's the restoration of American manufacturing prowess, or restoring our economy to sustainable growth, or supporting our high-tech sector and our green-tech transition—and of course, as the last portion of our title today suggests: "Securing America."

As a significant first step toward aligning our public policy with the goal of strengthening our resource sector, I want to focus on one of the bills before this Committee and this Congress: H.R. 1063, the "National Strategic and Critical Minerals Policy Act of 2013," introduced by Chairman Lamborn.

As the bill notes—and I quote—"the United States has vast mineral resources but is becoming increasingly dependent on foreign sources." The bill buttresses this statement with data on the degree to which the United States is 100 percent foreign-dependent on certain metals and minerals—18 at present—up from 6—25 years ago. Last year, when my organization, American Resources, did a risk screen for metals and minerals used in defense applications, we derived a "risk pyramid," with 46 metals on it—with China being the single largest supplier. But as we looked further at known resources located in the United States, we found that the United States is home to resources for 40 of the 46 metals and minerals on our risk pyramid.



In other words, if we are foreign-dependent for a wide range of hard rock resources, it is a dependency that is largely self-inflicted.

As I see it, the Lamborn bill takes three steps that would help the United States formulate a targeted policy to reduce—and in the case of many metals, eventually eliminate—our foreign dependence.

First—via Section 4—the bill strengthens our assessment capability. We can't begin to systematically address our resource dependence if we lack current, comprehensive data on the depth of that dependence. And that assessment, in turn, requires solid data on the extent to which potential resources might be found on Federal lands—including lands withdrawn from mineral exploration and development—as well as the uses to which various metals are put across our economy and in our defense sector—and finally, a review of our current foreign suppliers, with an assessment of the likelihood of shortfalls or supply disruptions. Because in a world of resource nationalism, foreign dependence for critical metals can be used as leverage—commercial, but also military—that can induce economic shock to the American system.

And yet even before the U.S. Government begins collecting data, the agencies involved must begin by sorting through a half-dozen conflicting definitions of critical

83

and strategic metals—one so tight that it produced a single strategic metal to the exclusion of all others—and some so vague that the entire Periodic Table might be eligible for inclusion.

The second key section in the Lamborn legislation concerns eliminating needless duplication in the mine permitting process—a process that today, in the leading independent study, earns the United States worst-in-the-world ranking, tied for last with Papua New Guinea, with the average mine permitting process in the United States taking 7–10 years. And this metric is getting worse, not better: Just 4 years ago, in 2009, the same study found the U.S. process took an average of 5 to 7 years.

And little wonder why. One day, the DOD releases a study showing 23 metals and minerals in potential shortfall, while the DOE declares a dozen minerals critical to the green-tech and clean-energy transition. But at the very same time the U.S. EPA moves to stop a proposed American copper mine—a metal whose short supply, DOD tells us, has already caused "a significant weapon system production delay"—before the permitting process has even begun.

So with so many mixed signals coming from the Federal Government, let's ask ourselves: If you were an American manufacturer, dependent on metals and minerals engineered into your products, could you risk waiting for a reliable source of American supply? Or would you build your new facility where the metals are—in China, perhaps—exporting jobs and Intellectual Property, sacrificing GDP and feeding a negative balance of trade as we buy back products that could have been, should have been, made here in America?

Mr. Chairman, we need to recognize that Made in America often begins with Mined in America. The Lamborn bill puts us back on that track.

The third feature in H.R. 1063 that I want to mention today is the requirement for a National Mineral Assessment, updated at 2-year intervals. Critical metals are technology-dependent; and as technology evolves over time, so too will our tool-kit of critical metals. In Roman times, sodium chloride—salt—was a critical mineral, essential to preserving food for armies on the move. In Adam Smith's time, he classed gunpowder and sailcloth as critical materials, and the father of free-market theory warned Britain against being dependent on foreign sources of supply. In our Moore's Law world, as technology cycles are measured in months, not years, we will need to constantly update our understanding of what metals and minerals deserve to be called critical.

The Lamborn bill is a solid test of our seriousness on this issue. If enacted, it would provide the fact-base for a data-driven assessment of our domestic resource potential, our vulnerability to foreign supply, and the obstacles that stand between us and a greater degree of resource independence.

I commend the Chairman for his leadership on the critical issue of critical metals, and for the Committee's focus today on the various bills that are the focus of this hearing. America has the good fortune to be a resource-rich nation. Sound policy can help ensure that our resources will be used to support our economic strength and our national security—and reduce the dangers of resource dependence in our uncertain world.

Thank you.

———

Mr. LAMBORN [presiding]. Well, thank you for your excellent, excellent testimony.

[Laughter.]

Mr. LAMBORN. I would like to now hear from Mr. Hohn, please.

## STATEMENT OF MIKE HOHN, GENERAL MANAGER, SODA ASH BUSINESS OCI CHEMICAL CORPORATION

Mr. HOHN. Chairman Lamborn and members of the Committee, my name is Mike Hohn, and I am the General Manager of Soda Ash Business for OCI Chemical Corporation. I am here today on behalf of the U.S. Soda Ash industry, and I thank you for the opportunity to testify on this vital legislation for our industry.

The U.S. soda ash industry contributes some $1 billion net positive to the U.S. balance of trade annually, and is the single largest inorganic chemical export from the United States. Soda ash is produced by one of two methods: the natural method used in the

84

United States; and through synthetic processes elsewhere in the world, and primarily in China.

The cleaner, natural method only accounts for 25 percent of the global soda ash production. The American Soda Ash Competitiveness Act will lead to the growth of jobs at U.S. soda ash facilities, the growth of jobs in the transportation sector that supports the U.S. industry, and the growth of jobs at the ports that support growing exports, including the ports in Portland, Oregon; Long Beach, California; and Port Arthur, Texas.

During the recent economic downturn, when a similar royalty reduction was in place, the U.S. soda ash facilities experienced the addition of about 100 jobs in the United States. Now, while that may not seems significant, it certainly beats the 1,000-plus jobs that the industry lost in the period from 1996 to 2006, when the royalty rate was 6 percent, which is the current Federal royalty rate.

It should be noted that these are high-paying jobs in a very rural community, with an average wage roughly six times higher than the U.S. minimum wage. We have already witnessed significant market downturn over the last year that is similar to what the industry was facing in the late 1990s, and we do not want to risk a full-blown return to those conditions.

OCI is one of 4 companies that produce about 90 percent of the world's natural soda ash in Sweetwater County, Wyoming. The remainder is produced in Trona, California. U.S. soda ash producers, on average, emit about three times less greenhouse gas emissions and three times less energy consumed than the synthetic soda ash plants in the rest of the world. Export growth is essential to job growth in the U.S. soda ash industry. One of every two jobs in the U.S. soda ash is directly attributable to exports.

Therefore, policies which help to grow exports will mean a growth in U.S. jobs. We believe the Soda Ash Competitiveness Act will accelerate this job growth. Exports increased by some 11.7 percent in the period during which the 2 percent royalty was in effect, 2006 to 2011. U.S. soda ash exports also rose by more than 1 million tons in the same period. Thus, the 2 percent rate resulted in the sort of jobs and export growth consistent with the President's national export initiative.

Now, during that period, the U.S. soda ash industry increased investment in the local community and U.S. soda ash facilities through increased capital investments, which led to increased economic activity in the communities in which we operate.

In our current environment, we believe that U.S. soda ash jobs are at risk to Chinese expansion, export, and pricing practices. Chinese soda ash production is now the largest in the world, and they are currently engaged in a price war for valuable export business in Asia, Africa, and South America. In the decade of the 1990s, China went from importing over 1 million tons of soda ash per year to becoming a 1 million-ton net exporter. By 2000, China had become the world's largest producer of soda ash, though not the most efficient. Maintaining our competitiveness is important, as we compete with state-owned Chinese producers.

Mr. Chairman, we hear a lot of discussion about how Congress can help U.S. manufacturing to restore jobs and economic growth,

85

i.e. to recapture our economic swagger. As an industry, we were encouraged by the President's State of the Union Address when he referenced climate change and the need to do something. He also indicated he wants to increase job growth through exports. The U.S. soda ash industry provides a unique opportunity to accomplish both of these goals. Our industry has proven that it will increase jobs by increasing exports.

And by increasing the U.S. industry's market share, we will also be reducing greenhouse gases. Because the U.S. soda ash industry uses a natural method of producing soda ash, the U.S. industry uses roughly, again, three times less energy and emits three times less greenhouse gases than our Chinese competitors relying the synthetic method for production.

Make no mistake. Throughout history, soda ash is required to produce glass, for autos, homes, and bottles, containers, as well as detergents and chemicals that are demanded by an emerging middle class. The demand for soda ash will be met in some way. This Committee has the opportunity to reduce global greenhouse gases and increase jobs by investing in the U.S. soda ash industry.

We would suggest the bill before you has already proved successful in doing so for one important sector of our economy. We believe the 2 percent rate should be reinstated.

Thank you for your consideration of our views. I would be pleased to take any questions from the Committee.

[The prepared statement of Mr. Hohn follows:]

PREPARED STATEMENT OF MIKE HOHN, GENERAL MANAGER, SODA ASH BUSINESS OCI CHEMICAL CORPORATION, ON H.R. 957

Chairman Lamborn and Ranking Member Holt, I would like to thank you for the opportunity to testify on H.R. 957, the "American Soda Ash Competitiveness Act." I am the General Manager, Soda Ash Business for OCI Chemical Corporation, and I am here today on behalf of the U.S. Soda Ash industry. I am pleased to report that the soda ash mined and processed on Federal lands contributes nearly $1 billion annually to our balance of trade, $20 million in Federal royalties, and some 3,000 direct jobs.

Up until October of 2011 when the BLM raised our royalty from 2 percent to 6 percent, our industry was experiencing job growth, and there were plans for expansion, despite the economy still suffering from the worst recession in decades. Enactment of H.R. 957 is important to insuring that we remain a strong American employer and exporter in the years ahead. It means the industry will continue to pay our fair share for the privilege of mining on Federal lands, while creating the conditions for positive economic growth that are in all of our best interests.

From the recent experience of the 2006 Soda Ash Royalty Reduction Act, we know that a 2 percent, as opposed to 6 percent Federal royalty rate, can have positive impacts:

• First, it will lead to robust export growth consistent with the President's National Export Initiative (NEI).
• Second, it will lead to expanded domestic manufacturing capacity and jobs growth; and
• Third, it will result in an increase, rather than a decrease, in Federal royalty revenues by spurring development of the resource.

Mr. Chairman, the 2006 act was enacted by Congress out of a recognition that global economic conditions, specifically the emergence of stiff Chinese competition, was eroding America's natural soda ash advantage. We need to continue the positive trajectory that Act created for this important domestic manufacturing sector by enacting H.R. 957.

Indeed, our continued competitiveness in world markets is far from certain, in fact over the last year since the royalty increase has been in effect, the industry has seen a steady decline in our total exports. This reality was well recognized by Congress in 2006, when it enacted the Soda Ash Royalty Relief Act, which reestablished

86

a 2 percent royalty on every ton of soda ash produced. In October 2011, the BLM saw fit to raise the rate to 6 percent. We believe this rate increase is not only counterproductive to increasing Federal revenues from soda ash production, but threatens our industry's exports and jobs growth.

Let me briefly revisit the global conditions that caused Congress to set the rate at 2 percent in 2006. In the 15 years between 1982 and 1997, our domestic soda ash industry enjoyed a steady and significant growth in exports. But after 1997, our export growth slowed dramatically. By 2003, our U.S. exports were only 4 percent above their 1997 levels. This rapid decline in export growth resulted from a sudden and dramatic change in global competition. In the brief span of the decade of the 1990s, China went from importing over 1 million tons of soda ash per year to becoming a 2 million ton net exporter. By 2000, China had become the world's largest producer of soda ash, though hardly the most efficient. A growing number of state owned Chinese producers making soda ash from a more energy intensive and more greenhouse gas generating synthetic process flooded international markets with lower priced material aided by an export VAT rebate incentive. Not only were these exports responsible for a greater carbon footprint, they were also hurting our cleaner, more efficient American natural soda ash producers in growing markets, particularly those in Asia and South America.

Faced with this state owned competition, we identified innovative ways to reduce spiraling structural costs, and the increasing prices we paid for energy and transportation. However, as our export growth slowed in the early part of the last decade we also had to reduce employment. To remain globally competitive, we regrettably shed almost 1,000 jobs as an industry. Mr. Chairman, this was not a preferred option. It was in this context that we decided to ask the Congress to consider that the royalty we pay on each ton of soda ash be assessed at 2 percent as called for originally in the underlying Minerals Leasing Act.

Mr. Chairman, in 2006, just as today, our low cost natural soda ash production process when allowed to compete fairly on a level playing field can beat any other producer in the world. In sum, then as now, if conditions are equal, we know we can compete with any other global producer. We can mine the vast underground trona ore reserves in Wyoming or in lakebeds in California, and bring this raw material to be processed into soda ash. We can then ship it by rail to Long Beach, California, Portland Oregon, or Port Arthur, Texas, and deliver it to any Asian or South American port and effectively compete for our fair share of global business against the Chinese.

Mr. Chairman, as a result of the action Congress took in 2006, our industry came out of its downward spiral and experienced sustained growth driven by our ability to again grow exports. Despite a global recession and a continuing slow recovery, the American Natural Soda Ash industry did not lose jobs during the recent recession, and in fact added almost 100 new jobs in 2010. To put this in perspective, one out of every two jobs in our U.S. soda ash industry is now the direct result of exports. U.S. soda ash exports had risen by more than 1 million tons since enactment of the soda ash royalty legislation. As Mr. Robert Abbey, former Director Bureau of Land Management, stated in his Senate testimony on August 3, 2011, exports increased by some 11.7 percent in the 5-year period during which the 2006 Act was in place. It thus puzzled us as to why the BLM saw fit to immediately reinstate the 6 percent rate when the 2006 Act expired in October.

Very simply, the 2006 Act allowed us to grow exports in large part because we could reinvest in our business at higher rates. During the 5 years this Act was in effect, we reinvested in our businesses at rates well above those before its passage. In 2005, the year before the royalty was enacted; the U.S. soda ash industry spent some $88 million in capital improvements. In 2006, the year after passage, and with the predictability of a stable 2 percent royalty, the U.S. soda ash industry nearly doubled its rate of investment in our future, spending over $158 million dollars to expand capacity and make needed improvements.

However, Mr. Chairman since the BLM reinstated the 6 percent royalty, the industry is headed towards a bleaker future similar to the circumstances in place in the early 2000s. Across the industry, jobs are going unfilled, planned expansions are being put on hold, and our exports have fallen off significantly. While the BLM had indicated that they would entertain individual lease-by-lease application for waivers of their 6 percent royalty, nothing in their 100-page guidance document addresses export growth. When we attempted as an industry last year to submit a streamlined application for relief that was based upon maximization of production on Federal lands, we were denied. We would be pleased to make our application available to the Committee for its review.

Thus, Mr. Chairman, we again turn to Congress to restore the 2 percent royalty rate by enacting H.R. 957. In sum, soda ash production represents hardcore U.S.

87

manufacturing at its best. We hear every day how American manufacturing jobs are disappearing and we have a shrinking middle class. The production of soda ash from U.S. natural resources in Wyoming and California is done by skilled workers with an average salary of about $85,000 per year in very small, rural communities. Growing U.S. soda ash exports will increase the number of those jobs. Moreover, it will help grow revenues at Treasury. When the Congressional Budget Office (CBO) produced cost estimates for legislation implementing the 2006 royalty reduction, it concluded that the Government would lose $15 million in direct spending and $15 million in payments to States in which the royalties were generated. In actuality, over the 5-year period, royalties tallied over $85 million because of the increased production the royalty reduction helped to generate.

Mr. Chairman, we hear a lot of discussion about how Congress can help U.S. manufacturing to restore jobs and economic growth; i.e., to recapture our economic swagger. As an industry, we were encouraged by the President's State of the Union address when he referenced climate change and the need to do something. He also indicated he wants to increase job growth through exports. The U.S. Soda Ash industry provides a unique opportunity to accomplish both of these goals. Our industry has proven that it will increase jobs by increasing exports, and by increasing the U.S. industry's market share we will also be reducing greenhouse gases. Because the U.S. soda ash industry uses a natural method of producing soda ash, the U.S. industry uses roughly three times less energy and emits three times less greenhouse gases than our Chinese competitors relying on the synthetic method for production. Make no mistake, throughout history; soda ash has been produced to supply the glass (glass for autos, homes and bottles) as well as detergents and chemicals that are required by emerging markets to grow. The demand for soda ash will be met in some way. This Committee has the opportunity to reduce global greenhouse gases and increase jobs by supporting the U.S. Soda Ash industry. We would suggest the bill before you has already proved successful in doing so for one important sector of our economy. We believe the 2 percent rate should be reinstated. Thank you for your consideration of our views. I would be pleased to take any questions from the Committee.

————

Dr. GOSAR [presiding]. Thank you very, very much.
Now, Mr. Neatby.

### STATEMENT OF PIERRE NEATBY, VICE PRESIDENT, SALES AND MARKETING, AVALON RARE METALS

Mr. NEATBY. Thank you very much, Mr. Chairman. My name is Pierre Neatby, and I am Vice President of Sales and Marketing for Avalon Rare Metals, Inc. I will briefly describe Avalon and then provide some comments in support of bill H.R. 981.

Avalon Rare Metals is a Canadian-headquartered mineral development company publicly traded in New York and Toronto. Our flagship project is the Nechalacho Rare Earth Deposit at Thor Lake, Northwest Territories, Canada, that contains 25 percent heavy rare earths, which are the truly rare rare earths, and our project plan is to mine and do initial processing in the Northwest Territories and further refine the rare earths in Geismar, Louisiana, in the United States.

H.R. 981 proposes to fund a study of current and future rare earth deposits and an analysis of the rare earth supply chain. I believe the focus of the bill should be on the analysis of the supply chain. There are hundreds of deposits that have been identified around the world. But the biggest issue facing our industry is the processing of rare earths and the production of downstream products that can be used as inputs into final products.

Why are rare earths important? They are important for jobs and economic growth. They play a vital role in a multitude of applications, many in the clean energy sector. These includes motors for electric and hybrid vehicles, generators for wind turbines, solar

88

panel systems, and phosphors for energy-efficient lighting. We believe the next few years will be critical for the development of the clean energy sector.

I have highlighted clean energy applications of rare earth, but other very significant end-use applications include smart phones, oil refining catalysts, MRI machines, and various military uses that are also growing.

Rare earth demand is expected to grow at a rate of 7 to 12 percent per year to the year 2020. This demand needs a secure supply chain outside China, if the demand is going to grow outside China, and specifically to determine if the new jobs stemming from this growth are going to be here in the United States and other western countries, or in China.

So, China produces over 95 percent of the world's rare earth elements, and China has recently been implementing a range of policies to control its domestic rare earth industry: consolidation of ownership, restriction of foreign ownership, export taxes, export quotas, environmental regulations, limiting illegal mining, and price controls. The outcome of these policies has been the ability to restrict exports and increase prices outside China. China limited exports in 2010, and this caused prices to increase dramatically in 2011. China is in a better position today to restrict exports and manipulate prices outside China than it was in 2010.

The supply chain includes mining, processing, separation, metal and alloy production, and manufacturing of products sold to end users. We would like to add recycling and the human resource aspect to the supply chain. Recycling makes the supply chain more efficient and less costly to the end user. This is important for competitiveness. Human resources are the people that bring know-how to the supply chain: geologists, engineers, technicians, operators, and researchers.

Growth can't take place if there is no expertise in the processing and use of rare earths. This is where universities, colleges, and government can take a key role in our industry, possibly in conjunction with an industry association, such as the new Rare Earth Technology Alliance, right here in Washington. China has hundreds and hundreds of scientists dedicated to rare earths, and have rare earth courses in universities. If North America is going to develop its rare earth infrastructure, it needs educated people specializing in rare earths.

In conclusion, many growth industries depend on rare earths, and China will continue to be the dominant supplier, not only in mining, but also in processing and manufacturing of final products. China wants the downstream for manufacturing, because that is where the jobs are. We need action now to stem the flow of jobs going to China. Thank you very much.

[The prepared statement of Mr. Neatby follows:]

PREPARED STATEMENT OF PIERRE NEATBY, VICE PRESIDENT FOR SALES AND MARKETING, AVALON RARE METALS INC., ON H.R. 1063, H.R. 761, AND H.R. 981

Avalon Rare Metals Inc. is Canadian headquartered mineral development company, publicly traded in Toronto and New York, with a primary focus on the rare metals and minerals in North America. Americans comprise a high proportion of our current shareholders.

89

Our flagship project, the 100-percent-owned Nechalacho Rare Earth Element Deposit, Thor Lake, Northwest Territories, Canada is one of the largest undeveloped rare earth elements resources in the world. Its exceptional enrichment in the more valuable Heavy Rare Earth Elements (HREEs) is key to enabling advances in clean energy technologies, national defense and other growing high-tech applications. Nechalacho is one of the few potential sources of these critical elements outside of China, currently the source of over 95 percent of the world supply.

Avalon is well funded to complete its Feasibility Study (expected in Q2 2013) and has no debt. Our project includes a mine and processing facility in the Northwest Territories of Canada and plans for a refinery in Geismar, Louisiana. This project will cost over $1.2 billion to build. It is one of very few projects outside China to be at the final Feasibility stage, the last stage before full project financing is secured and construction begins.

Avalon also explores for and owns other rare metals and minerals project in Canada and the United States, of which two are at advanced stages of development: Separation Rapids (lithium) in Ontario, and East Kemptville, Nova Scotia, a tin-in-dium-gallium-germanium project where large inferred resources have been identified requiring further drilling to bring the project to the pre-feasibility stage.

Avalon is proud to be a charter member of the Rare Earths Technology Alliance (RETA), a Washington, DC-based international industry association (non-lobbyist) whose membership includes producers and users of rare earths and also includes academic institutions engaged in rare earths research and development. RETA's primary goal is to promote the development of the rare earth industry through education, market development and dealing with common issues facing the industry. It is in that spirit of education and insight into this emerging industry, in recognition of the U.S.-Canada trade relationship, and in support of clean technologies and their contribution to future growth economies that we appear before the committee today to support the RARE Act of 2013.

### Rare Earths—Jobs and Economic Growth

According to the Industrial Minerals Corporation of Australia (IMCOA), an Australian-based authority on the rare earth market, rare earth demand is expected to grow at a rate of 7–12 percent per year to 2020. Rare earths are used in a multitude of applications, many in the clean energy sector. These include electric and hybrid vehicles, wind turbines, solar panels, and energy-efficient lighting. The next few years will be crucial to the clean energy sector as it develops. Rare earth magnets and phosphors are key building blocks for companies developing these technologies and they need access to a competitive and secure rare earth supply chain to prosper.

Other end use applications include smart phones, oil refining catalysts, MRI machines, other medical diagnostics and treatments, and various military applications. Demand outside China is expected to grow from 35,000 tonnes in 2012 to 55,000 tonnes in 2016. This increase in demand assumes that export quotas from China will remain around 30,000 tonnes and that no new export restrictions on rare earths are imposed so that rare earth consuming industries outside China will be allowed to grow.

### China's Dominance—Threat to Jobs in the U.S. and North America.

Today, China produces over 95 percent of the world's rare earth elements, even as new sources are being developed in other countries, including the United States, Canada, and Australia. However, China has been implementing a range of policies to control its domestic rare earth industry: reducing the number of companies involved in the extraction and processing of rare earths, imposing limits on foreign ownership in the rare earth sector, imposing export taxes, export quotas, curbing illegal mining, implementing and enforcing strict environmental regulations, and attempting to set prices. The outcome of these policies is reduced availability of rare earths outside China, higher prices and potentially greater price volatility outside China and the threat of further export restrictions, which ultimately create the potential for severe supply shortages. While we currently see relatively low rare earth prices, our interest is that when they spike again, the United States and North America should not be impacted as much as we have been. Industry experts believe export restrictions, specifically on the scarce heavy rare earths, are likely in the coming years. Western companies are essentially being forced to set up manufacturing inside China, which puts at risk their intellectual property and eliminates jobs in countries like the United States. This is troublesome not only for Avalon, but other companies along the supply chain and should remain a major security concern for western governments.

90

## The Importance of the Secure Supply Chain

Avalon is pleased to see the introduction of the RARE Act of 2013 with its focus on conducting global census of the identity and availability of rare earths elements and an analysis of the supply chain. We believe that the results of this proposed undertaking will better inform industry participants and end-users on how all parties can work collaboratively to offset actions by a single monopolistic supplier (i.e., China) that can disrupt pricing, availability, and security of supply. Given the wide variety of applications of rare earths in many critical sectors such as clean energy, defense and national security, we believe this type of assessment and analysis is more important than ever before.

I believe that the U.S. Geological Service (USGS) and U.S.-based experts like Technology Metal Research (TMR), have endeavored to identify the hundreds of potential rare earth deposits outside China. (For example TMR currently tracks the development of over 440 projects in 37 countries and closely follows some 46 projects it defines as 'advanced' in 14 countries). These projects will generally only produce mixed concentrates or possibly separated rare earth oxides, with very few projects pursuing the further value-added processing of such into phosphors, metals, alloys, magnets or motors which are essentially the products that consumers need. China's strategy has been to fulfill the needs of the full downstream processing supply chain and end products, generating more profits and, more importantly, creating more high skilled labor and greater job opportunities in China.

One suggested addition to H.R. 981 is to include recycling and human resources to the discussion about fulfilling the rare earth supply chain. Recycling is the key to an efficient use of resources in the rare earth supply chain to achieve low cost manufacturing. A diverse range of people (e.g. geologists; metallurgical, chemical, process engineers and technicians; business people, operators, researchers) are required to establish, maintain and improve a supply chain outside China.

It is not enough to establish mines and processing plants outside China. End consumers want reliable, long term, price competitive supply chains. Currently, some companies are specifying inferior solutions for certain applications due to fears of high prices or fear of lack of availability of neodymium and dysprosium (e.g. substituting ferrite and other magnets where rare earth magnets increase performance). This strategy is highly detrimental to longer term business and domestic economic development. Using less efficient inputs (such as ferrite magnets rather than rare earth magnets) in certain applications could lead to loss of competitiveness and replacement by most probably foreign-based suppliers, that can build more efficient products using superior raw materials.

The supply chain analysis that H.R. 981 would provide will help government and industry determine where the most sensitive and cost effective investment should take place and highlight the importance of investment at all levels of the supply chain to be able to effectively offer a secure alternative to China.

## Corporate Social Responsibility

Social responsibility and environmental stewardship are corporate cornerstones for Avalon. Avalon believes that environmental, economic and social responsibility are integral to the upstream and downstream activities used to create these critical materials; from exploration and development to production. In 2010, Avalon was recognized by the Prospectors and Developers Association of Canada with its award for Environmental & Social Responsibility. Avalon is also one of only a very few junior resource companies in the world to have published a comprehensive Sustainability Report, prepared to the Global Reporting Initiative standard, in which Avalon fully discloses its policies and practices on social and environmental responsibility, including its performance against specific targets.

## Permitting

The permitting and environmental assessment process is different across the world, and is dependent upon the national and local jurisdictions in which the deposit and or operating facilities are to be established. Avalon's Nechalacho deposit is located in the Northwest Territories and is regulated under the Mackenzie Valley Resource Management Act. Avalon is nearing completion of the Environmental Assessment for the project, a critical step in the permitting process, and has already established strong community relationships with local Aboriginal groups where Avalon is considered an industry leader in best practice. In Geismar, Louisiana Avalon has an option on a property where permitting for a separation plant was initiated in December 2012 and is expected to be completed by the end of 2013.

———

Dr. GOSAR. Thank you very much.

91

Our next witness is Chairman Terry Rambler.

### STATEMENT OF TERRY RAMBLER, CHAIRMAN, SAN CARLOS APACHE TRIBE

Mr. RAMBLER. Can you hear me? OK. Good morning, Chairman Lamborn, Ranking Member Holt, and members of the Subcommittee. My name is Terry Rambler, I am the Chairman of the San Carlos Apache Tribe, and President of the Inter-Tribal Council of Arizona. On behalf of my Tribe and ITCA, thank you for this opportunity to testify.

Joining me today are San Carlos Apache Councilman Windsor Nosy, Sr., tribal leaders, local elected officials from communities directly impacted by this bill, and representatives from different organizations throughout the country. I would like for all of them to stand. Thank you. This group is diverse and growing. And it also includes Tribes and tribal organizations nationwide. We bring our united front in strong opposition to H.R. 687.

We strongly oppose this bill and the land transfer it mandates for three reasons: one, it will destroy our sacred areas; two, it will deplete and contaminate the region's already overdrawn water supply; and three, it is a bad deal for the American taxpayer. H.R. 687 would transfer 2,422 acres of our sacred land, known as Oak Flat in the Tonto National Forest, to Resolution Copper to develop a massive copper mine. Oak Flat is one of our holy places, where spiritual deities reside. Just as a church is a place of worship to Christians and the Vatican is a holy place to Catholics, Oak Flat is the equivalent for Apaches, Yavapais, and others. My people have always gone to Oak Flat to pray, to gather ceremonial items, to seek peace, and to conduct ceremonial dances of our ancestors, such as the sunrise dance that celebrates a young woman coming of age. You can see some of those.

I have a map here that shows the Oak Flat in relation to our Reservation. As you can see, the forest borders our Reservation, and Oak Flat is just 15 miles away. These lands are our aboriginal homelands. I have a second map here that shows Oak Flat and the forest outlined in red. The black outline shows land withdrawn from mining by President Eisenhower's public land order, which protected this area. Federal laws and policies require meaningful consultation with Tribes before Federal action. However, once Oak Flat is held in private ownership, as this bill directs, these Federal protections will disappear and the sacred area will be destroyed without our input.

Resolution Copper plans to use the block cave method to extract the copper ore body underneath Oak Flat because it is far cheaper than other methods. However, the process is also more destructive to the land. The diagram here depicts the block cave mining process. The company would dig a tunnel 7,000 feet down and then dig a horizontal tunnel to extract 1 cubic mile of ore. It will take 1,400 Cowboy Stadiums to hold 1 cubic mile of ore. The next diagram shows what happens next. The surface will eventually collapse, and the area will become an open pit about 2 miles in diameter. Like a crater, the pit will be visible from outer space.

Our second major concern is the loss of water in the region, and our water rights. One of the primary purposes for establishing the

92

Tonto National Forest in 1905 was to protect the watersheds and the quality of the water. H.R. 687 undermines these purposes because this project will require at least 20,000 acre-feet of water annually to keep the mine from flooding. To put that in perspective, that amounts to the annual life water supply for 180,000 Arizona citizens. According to a recent study, this massive groundwater pumping would be unsustainable, harmful to the region's water supply, and threatens surface water resources and riparian habitats.

Here is a picture of a perennial spring at Oak Flat. Mining here will contaminate and dry up this spring and other water resources at Oak Flat. Here is another picture of the Oak Flat area, an ancient oak tree that has nourished us for centuries with its acorns. It takes a century to produce the first acorn from these trees. These trees will be destroyed when the land collapses.

My final point is that at a time when all Americans are being asked to tighten our belts, this bill will result in a giveaway of American wealth to a foreign-owned mining company. The appraisal requirements included in H.R. 687 do not insure that the public will receive fair value. As a result, the American taxpayer stands to receive only a small fraction of what the Federal minerals are worth.

In closing, the Federal Government should continue to be stewards of this land to sustain the well-being of my people. Our people dance and pray at Oak Flat, just as our ancestors did. I ask for your help to ensure that our children and theirs will be able to do the same, well into the future.

Again, thank you for this opportunity. [Speaks in Apache.] What I said to you was, "May God watch over you and give you guidance." Thank you.

[The prepared statement of Mr. Rambler follows:]

PREPARED STATEMENT OF TERRY RAMBLER, CHAIRMAN, SAN CARLOS APACHE TRIBE, ON H.R. 687

My name is Terry Rambler. I am the Chairman of the San Carlos Apache Tribe ("Tribe"), representing 15,000 tribal members. The San Carlos Apache Reservation ("Reservation") is located within part of our aboriginal territory, and spans 1.8 million acres in southeastern Arizona. I am also President of the Inter Tribal Council of Arizona ("ITCA"), a non-profit organization representing 20 federally recognized Indian tribes. Thank you for the opportunity to testify about our views on H.R. 687, the Southeast Arizona Land Exchange and Conservation Act of 2013. On behalf of the San Carlos Apache Tribe and ITCA, we strongly oppose H.R. 687 and respectfully urge Members of the Subcommittee to oppose this bill for the reasons set forth below.

### Summary of Objections to H.R. 687

H.R. 687 would direct the Secretary of Agriculture to convey 2,422 acres of U.S. Forest Service lands in an area called Oak Flat and the copper ore body underneath it into the private ownership of Resolution Copper Mining, LLC ("Resolution Copper" or "Resolution")—a subsidiary of foreign mining giants Rio Tinto (United Kingdom) and BHP Billiton, Ltd. (Australia) for block cave mining. The bill would require this transfer of the Oak Flat area to Resolution Copper within *1* year of enactment.

In the decade since this project has been in development, Resolution Copper has consistently refused to provide details regarding the environmental and economic impacts of the project to the local community and region. H.R. 687 would give the Oak Flat area to Resolution Copper for a bare fraction of its actual value. Once the land is privatized under H.R. 687, Federal laws and policies that currently protect the area and tribal rights would no longer apply.

93

As details about the impacts of H.R. 687 have emerged, public opposition has grown and is diverse. Joining us today are local officials representing the Town of Superior and the Queen Valley Homeowner's Association. In addition, the City of Globe recently tabled its support for this project. These communities located near the Oak Flat area have either expressed opposition to H.R. 687 or serious concerns about it. Further, many tribes and tribal organizations nationwide oppose the bill because it would transfer Federal land encompassing a known tribal sacred area to a mining company whose mining activities will ultimately destroy the area and circumvent government-to-government consultation requirements with Indian tribes. Tribal organizations opposing this bill include the National Congress of American Indians, the Inter Tribal Council of Nevada, the United South and Eastern Tribes, Midwest Alliance of Sovereign Tribes, the Great Plains Tribal Chairman's Association, the Affiliated Tribes of Northwest Indians, the Eight Northern Pueblos Council, the All Indian Pueblo Council, and many other tribes and tribal organizations. Other groups that oppose this bill include the Association of Retired Miners, the Arizona Mining Reform Coalition, the Sierra Club, the Audubon Society, and others.

Our opposition to H.R. 687 is based upon the following points: (1) the bill would desecrate and destroy an area of religious and sacred significance to the Apache and Yavapai people, which conflicts with Federal laws and policies governing meaningful consultation with Indian tribes and protection and preservation of sacred sites; (2) the bill mandates, in direct violation of NEPA, the transfer of the Oak Flat area to Resolution Copper without first informing the public about the adverse impacts on the quality and quantity of the region's precious water supply, the environment, and the potential health and safety risks to the public; and (3) the bill constitutes a multi-billion dollar giveaway to a foreign-owned mining company that is partnering with the country of Iran on a uranium mine in Namibia. Simply put, the American public cannot afford this deal.

**H.R. 687 Would Result in Desecration and Destruction of a Native American Religious and Sacred Site**

The 2,422 acres of lands to be conveyed pursuant to H.R. 687 are located in the Tonto National Forest and include the 740 acres of the Oak Flat Withdrawal where the Oak Flat Campground is located and the surrounding area (collectively referred to as the "Oak Flat area"). The San Carlos Apache Reservation is bordered on the west by the Tonto National Forest. The Oak Flat area is 15 miles from our Reservation. The Forest and the Oak Flat area are part of our and other Western Apaches' aboriginal lands and it has always played an essential role in the Apache religion, traditions, and culture. In the late 1800s, the U.S. Army forcibly removed Apaches from our lands, including the Oak Flat area, to the San Carlos Apache Reservation. We were made prisoners of war there until the early 1900s. Our people lived, prayed, and died in the Oak Flat area. At least eight Apache Clans and two Western Apache Bands document their history in the area. Since time immemorial, Apache religious ceremonies and traditional practices have been held at Oak Flat. Article 11 of the Apache Treaty of 1852, requires the United States to "so legislate and act to secure the permanent prosperity and happiness" of the Apache people. Clearly, H.R. 687 fails to live up to this promise. The Oak Flat area, as well as other nearby locations, are eligible for inclusion in, and protection under, the National Historic Preservation Act of 1966, as well as many other laws, Executive orders and policies.

Today, the Oak Flat area continues to play a vital role in Apache ceremonies, religion, tradition, and culture. In Apache, the Oak Flat area is *Chich'il Bildagoteel* (a "Flat with Acorn Trees"). The Oak Flat area is a place filled with power—a place where Apaches today go for prayer, to conduct ceremonial dances such as the sunrise dance that celebrates a young woman's coming of age, to gather medicines and ceremonial items, and to seek and obtain peace and personal cleansing. The Oak Flat area and everything in it belongs to powerful *Diyin,* or Medicine Men, and is the home of a particular kind of *Gaan,* which are mighty Mountain Spirits and Holy Beings on whom we Apaches depend for our well-being.

Apache Elders tell us that mining on the Oak Flat area will adversely impact the integrity of the area as a holy and religious place. Mining the Oak Flat area will desecrate the *Gaan's* home and would diminish the power of the place. Without the power of *Gaan,* the Apache people cannot conduct our ceremonies. We become vulnerable to a variety of illnesses and our spiritual existence is threatened. There are no human actions or steps that could make this place whole again or restore it once lost.

The unique nature of the Oak Flat area has long been recognized and not just by the Apache. The Oak Flat Withdrawal was set aside from appropriation under

94

the mining laws by President Eisenhower and reaffirmed by President Nixon.[1] U.S. Department of Agriculture (USDA) Secretary Tom Vilsack has acknowledged the Oak Flat area as a "special place" that should be protected from harm "for future generations." Protecting the Oak Flat area as a sacred site is consistent with the articles of the United Nations Declaration on the Rights of Indigenous Peoples, which was adopted by the U.N. General Assembly in September of 2007, and for which President Obama announced U.S. support in December of 2012.[2] The Obama Administration tied its support of the Declaration to the current Federal policies of government-to-government consultations with Indian tribes and maintaining cultures and traditions of Native Peoples.[3]

The mining project proposed by Resolution Copper will destroy the Oak Flat area. The block cave mining technique will permanently ruin the surface of the area. As explained below, the water required for the project will forever alter the medicinal plants and trees in the area upon which our people rely for healing and prayer. The ore body that Resolution seeks lies 4,500 to 7,000 feet beneath the Oak Flat area. Resolution admits that the ore body is "technologically difficult" to mine, that it may take up to a decade to develop this technology, and that temperatures as high as 175 degrees Fahrenheit will be encountered.[4] It also acknowledges that the land above the ore body, the Oak Flat Campground, will subside and cave in.[5] The mine will destroy the nature of the land, its ecology, and its sacred powers forever. For my constituents, this reason alone is enough to oppose H.R. 687.

**H.R. 687 Circumvents Federal Laws and Policies Designed To Protect Native American Religious and Sacred Sites**

Indian tribes, including the San Carlos Apache Tribe, ceded and had taken from us hundreds of millions of acres of tribal homelands to help build this great Nation. The United States has acknowledged that, despite the transfer in title of these lands to the United States, it retained an obligation to accommodate access to and ceremonial use of religious and sacred sites by Native Americans. This solemn obligation is codified in a number of Federal laws, regulations, and policies.[6] A core aspect of each of these Federal enactments is the requirement that the United States must conduct *meaningful* government-to-government consultation with affected Indian tribes *prior* to making a decision that will impact a Native sacred area.

Executive Order 13175 on tribal consultation requires Federal agencies to conduct consultations with tribes when proposed legislation has substantial direct effects on one or more Indian tribes.[7] USDA Secretary Vilsack acknowledged "it is important that [the Southeast Arizona Land Exchange] engage in a process of formal tribal consultation to ensure both tribal participation and the protection of this site."[8] President Obama stated in his 2009 Memorandum affirming and requiring agency implementation of E.O. 13175, that "[h]istory has shown that failure to include the voices of tribal officials in formulating policy affecting their tribal communities has all too often led to undesirable and, at times, devastating and tragic results."[9]

To strengthen Federal polices pertaining to Indian tribes, the Obama Administration recently acted to improve protections of Native religions and sacred areas. In December of 2012, the USDA released a report titled, "USDA and Forest Service: Sacred Sites Policy Review and Recommendations," which provides a framework for how and why the United States, and specifically USDA and the Forest Service, is legally obligated to protect and preserve sacred sites located on Federal lands. The Report acknowledges, "Like almost all public and private lands in the United States, all or part of every national forest is carved out of the ancestral lands of American Indian and Alaska Native people." It affirms and lists the Administration's Federal

---

[1] Public Land Orders 1229 (1955) and 5132 (1971).

[2] See *http://www.ohchr.org/english/issues/indigenous/declaration.htm.*

[3] Available at *http://www.state.gov/s/tribalconsultation/decls/index.htm.*

[4] *See* S. Hrg. 110–572, p. 44 (July 9, 2008) (Hearing before the Subcommittee on Public Lands and Forests of the Committee on Energy and Natural Resources, United States Senate, S. 3157 110th Cong.).

[5] *See* Resolution Copper website available at *http://www.resolutioncopper.com/sdr/2011/environment.*

[6] *See* Executive Order 13007: Indian Sacred Sites (May 24, 1996); the Native American Graves Protection and Repatriation Act, 25 U.S.C. 3001 et seq.; the American Indian Religious Freedom Act, 42 U.S.C. 1996; the National Historic Preservation Act, 16 U.S.C. 470 et seq.; the Religious Freedom Restoration Act, 42 U.S.C. 2000bb et seq.; and Executive Order 13175: Consultation with Indian Tribal Governments (Nov. 6, 2000).

[7] 59 Fed. Reg. 22951 (April 29, 1994).

[8] *See* Letter from USDA Secretary Vilsack to Chairman of the Senate Energy and Natural Resources Committee, Subcommittee on Public Lands and Forests (July 13, 2009).

[9] 74 Fed. Reg. 57881 (Nov. 5, 2009).

95

legal obligations to protect and provide access to Indian sacred sites and to consult with tribes on any Federal actions that will impact sacred sites.

On December 5, 2012, five Federal agencies, including USDA, the Departments of the Interior, Defense, Energy, and the Advisory Council on Historic Preservation entered into a MOU to develop guidance for the management and treatment of Native sacred areas, to develop a public outreach plan to acknowledge the importance of maintaining the integrity of Native sacred areas and to protect and preserve such sites, and to establish practices to foster the collaborative stewardship of sacred sites, among other goals. On March 5, 2013, these Federal agencies adopted an action plan to implement the MOU, which entails working to "improve the protection of and tribal access to Indian sacred sites, in accordance with Executive Order 13007 [on Indian Sacred Sites] and the MOU, through enhanced and improved interdepartmental coordination and collaboration and through consultation with Indian tribes."

H.R. 687 will make an end run around these legal and policy obligations by transferring the Oak Flat area to Resolution Copper in private ownership. Once the lands are in private hands, the obligations to protect the Tribe's religious and sacred areas and accommodate tribal access will have no force of law. Section 4(c) of the bill requires tribal consultation, but earlier provisions of the bill mandate that the land be transferred regardless of the outcome of that consultation, rendering the act of consultation a mere formality with no meaningful effect.

### H.R. 687 Authorizes the Project To Move Forward Without Informing the Public of the Adverse Impacts to the Region's Water, Environment, and Health and Human Safety

#### Bill Circumvents NEPA and Public Interest Requirements

H.R. 687 undermines the National Environmental Policy Act (NEPA), which requires an analysis of potential impacts, including providing public notice and an opportunity to comment, *before* Federal actions are taken. The bill fails to require an environmental review, including consideration of mitigation measures, of the mining project before the land exchange is completed. The bill mandates that USDA convey the lands to Resolution Copper within 1 year of enactment.[10] Once the lands are transferred to Resolution Copper, NEPA review will not have any real impact because the land would already be in private ownership. Because the bill is a mandatory transfer, the Secretary of Agriculture has no discretionary authority to determine under the Federal Land Policy Management Act (FLPMA) or other laws whether the exchange is a bad deal for the American taxpayer, the local residents, and the local economy, which would be the case if an administrative transfer were required.

In May 2007, the Forest Service published its "Technical Guide to Managing Groundwater Resources." The Technical Guide examined the Forest Service's compliance with FLPMA and NEPA.[11] The Guide references the Service's experience with the Carlota Mine also located in the Tonto National Forest. It was determined through the evaluative procedures of FLPMA and NEPA that Carlota Mine's groundwater pumping would impact the Tonto Forest's surface waters and the Service's appropriated water rights. The Carlota Mine was required to mitigate the impacts of its groundwater demands for the mining operation before the mine was permitted. The Carlota project illustrates the importance of NEPA review *before* this land exchange is completed. The surface waters and aquifers that were affected by the Carlota Mine are the same surface waters and aquifers that will be impacted by Resolution Copper's mine. Under H.R. 687, Resolution Copper will be able to evade this type of analysis and can ignore mitigation conditions.

Resolution Copper has no intention of sharing any relevant information with the public prior to taking the lands in private ownership. Resolution's Jon Cherry told the Senate Environment and Natural Resources Committee in February of 2012 that Resolution Copper "will be in a position to file our Mine Plan of Operations (MPO) which will begin the NEPA EIS process over the entire project area including the area of the subject exchange" by the "second quarter of 2012."[12] To our knowledge, Resolution Copper has not fulfilled this promise.

Section 4(j)(1) of H.R. 687 requires only that Resolution Copper submit a MPO to the Secretary prior to commencing production in commercial quantities. There are

---

[10] Section 4(i) of the bill states, "the land exchange directed by this Act *shall be* consummated not later than 1 year after the date of enactment of this Act." (Emphasis added).

[11] *See* Technical Guide to Managing Groundwater Resources, U.S. Forest Service, FS–88, pp. 20–22 (May 2007).

[12] *See* S. Hrg. 112–486, pp. 28, 29 (Feb. 9, 2012) (Hearing Before the Committee on Energy and Natural Resources, United States Senate, 112th Congress).

96

no requirements to guarantee that the MPO will contain a complete description of mining activities and measures Resolution Copper will take to protect environmental and cultural resources, which are normally required by law. Under Resolution Copper's proposed timeline, the MPO could take close to a decade. Regarding actual environmental review, Section 4(j)(2) of the bill requires only that the Secretary, within 3 years of receiving Resolution Copper's MPO, prepare an environmental review that must be conducted under the framework of subparagraph 4322(2) of NEPA. Again, this review will be conducted long *after* the lands are exchanged and in private ownership.

Section 4(h) of the bill makes clear that Federal laws will not limit Resolution Copper's activities on the land after the mandated exchange. It provides that the lands conveyed "shall be available to Resolution Copper for mining and related activities subject to and in accordance with applicable Federal, State, and local laws pertaining to mining and related activities on land in private ownership." As a result, the Secretary will have no discretion to exercise meaningful authority over the MPO or mining activities on private land after the exchange absent a Federal nexus. There is no requirement in the bill for the Secretary to examine the direct, indirect and cumulative impacts of exploratory activities, pre-feasibility, feasibility operations, or mine facility construction that will be conducted after the exchange.

Further, upon enactment of H.R. 687, Resolution Copper will almost immediately begin activities that will harm our sacred area and the region's water supply, again without any public disclosures of information. Section 4(f) mandates that the Secretary "shall" provide Resolution with a special use permit within 30 days of enactment to engage in mineral exploration activities at Oak Flat Withdrawal and, within 90 days, the Secretary is required to allow mineral exploration. The integrity of Oak Flat could be substantially harmed by exploratory activities *before* the limited environmental review requirements in Sec. 4(j)(2) are triggered. The limited environmental review of the MPO will have little or no benefit. The Secretary lacks any authority to propose alternatives to interim activities that might be necessary to protect water resources, landscape, plants, ecosystems or the integrity of Oak Flat as a traditional cultural property and sacred site. The immediate exploration of Oak Flat contemplated by Section 4(j) constitutes an "irretrievable commitment of resources" in contravention of NEPA.

Joel Holtrop, Deputy Chief of the National Forest Service, stated that a MPO containing subsurface information is "essential in order to assess environmental impacts, including hydrological conditions, subsidence, and other related issues."[13] Similar concerns were expressed by the Forest Service Associate Chief Mary Wagner who noted that the Service could not support the bill given that it "limited the discretion" of the Service to develop a reasonable range of alternatives and lacked the opportunity for public comment on the proposal.[14] Likewise, USDA Secretary Vilsack stated:

> The purpose of a requirement that the agency prepare the EIS after the exchange, when the land is in private ownership, is unclear because *the bill provides the agency with no discretion to exercise after completing the EIS.* If the objective of the environmental analysis is to ascertain the impacts of the potential commercial mineral production on the parcel to be exchanged, then the analysis should be prepared before an exchange, not afterwards, and only if the agency retains the discretion to apply what it learns in the EIS to its decision about the exchange. *It seems completion of the exchange prior to the EIS would negate the utility of the EIS.*[15]

Further, H.R. 687 does not allow for a supplemental EIS document if additional review is needed to examine the direct, indirect and cumulative impacts of mining activities by Resolution. Sec. 4(j)(2) makes clear that the Secretary may only use the *single environmental review document* prepared within 3 years of the submission of a MPO as the basis for *all* "decisions under applicable Federal laws, rules and regulations regarding any Federal actions or authorizations related to the proposed mine or plan of operations." (Emphasis added).

---

[13] *See* S. HRG. 111–65 (June 17, 2009) p. 41, Hearing before the Subcommittee on Public Lands and Forests of the Committee on Energy and Natural Resources, United States Senate (S. 409 111th Cong.).

[14] *See* S. HRG. 112–486 (June 14, 2011) p. 16, Hearing before the Committee on Energy and Natural Resources, United States Senate (H.R. 1904 and S. 409 112th Cong.).

[15] *See* Letter from USDA Secretary Vilsack to Chairman of the Senate Energy and Natural Resources Committee, Subcommittee on Public Lands and Forests (July 13, 2009) (emphasis added).

Case: 25-5185  08/16/2025  DktEntry: 12.1  Page 1819 of 2158
Case 2:21-cv-00122-DWL    Document 87-14    Filed 07/14/25    Page 102 of 118

97

Again, the bill conflicts with the purposes of NEPA and the bill fails to vest any real discretion in the Secretary to address the many concerns presented by the mining operation proposed for Oak Flat. It simply does not make sense for this bill to limit the Secretary's discretion, undermine the NEPA process, and ignore the environmental and tribal concerns related to the mining project.

Moreover, the potential for negative economic impacts to the local economy through a loss of recreation and tourism could be substantial. In 2009, detailed direct travel impact estimated for Pinal County totaled $421 million dollars, with over $16 million spent by those visiting the nearby campground areas.[16] Many of these dollars were spent in and around the area of this proposed mine.

If enacted, H.R. 687 will result in disastrous consequences, which Resolution seeks to downplay and conceal given that the bill requires no cost-benefit analysis of the potential environmental impacts. Resolution would be able to mine copper without environmental permitting, cultural protections or financial assurances necessary for responsible stewardship. As a limited liability corporation, the Company could simply walk away from potentially billions of dollars of environmental and infrastructure damages to this sacred area.

**Southeast Arizona's Water Supply Cannot Sustain This Project**

Resolution Copper has not been transparent with the public or its neighbors in the Oak Flat area. In 2009, Resolution explained that it was purchasing water and reclaiming contaminated waters in order "to build the needed water supplies for mining activities that are a full decade or more away." Resolution claimed to be "managing water by taking into account the needs of both current and future users of this precious resource."[17] Resolution claimed that it had purchased and "banked" over 120,000 acre feet of Central Arizona Project ("CAP") water from 2006 through 2008 with Irrigation Districts near Phoenix, enough to operate the mine for 6 years at a projected use of 20,000 acre feet per year.[18] Resolution further reported in 2008 that it "installed several hydrology wells to assist in developing models that will determine if mining may affect the regional aquifers, and . . . what mitigation options are viable."[19]

H.R. 687 does not require Resolution Copper to perform or disclose its studies of the impacts on the regional water supply and hydrology. Repeated requests for an independent agency, such as the U.S. Geological Survey ("USGS"), to conduct studies have been ignored or opposed. Resolution Copper's failure to disclose critical information about the impacts on the region's water has united a diverse group that opposes H.R. 687.

Our neighbors to the West in Queen Valley have already felt Resolution's insatiable thirst for water. Since 2008, Resolution has been pumping groundwater to dewater parts of the decommissioned Magma Mine. Water levels in the Magma shaft have declined nearly 2,000 feet and water levels in the surrounding aquifer will inevitably decline as well. The Queen Valley Homeowners Association reported that since Resolution began pumping 900,000 gallons of water a day, the community's water supply fell to a historic low requiring water rationing for the community golf course. The Association passed a resolution opposing the mine.

According to USGS records, since 2008, the average streamflow in Queen Creek (downstream from the mine site) has been less than half the average streamflow for 2001–2007 before Resolution began dewatering at Magma Mine. Resolution's dewatering efforts removes far less water than the mine sought, though H.R. 687 will require (approximately 920 acre feet per year compared to the mine's eventual need for 20,000 acre feet per year). The simple act of dewatering will have negative effects on regional water supplies. If Resolution depends on even more groundwater for its mining operations, the negative impacts will grow.

In 2009, Senator Bingaman questioned the Forest Service about the impacts of the mine on the local water supplies and quality. Deputy Chief Holtrop responded:

> At this time the U.S. Forest Service does not have an understanding of the impacts of the proposed mine will have on local or regional water supplies, water quality, or possible dewatering of the area. No studies or assessments of the water supplies have been conducted. That is information which could be obtained by the Forest Service with NEPA analysis *before* the exchange.

---

[16] See *Arizona Travel Impacts 1998–2009p, July 2010 Report*, Arizona Office of Tourism, Phoenix, Arizona.
[17] Previously on Resolution Copper webpage, now missing file: *http://www.resolutioncopper.com/res/environment/ddnav.css*
[18] *Id.*
[19] See Resolution Copper webpage.

98

A NEPA analysis after the exchange would not allow the Forest Service to recommend alternatives since the exchanged parcel would already be in private ownership. Data and analyses in the possession of Resolution Copper Mining would be of assistance to the Forest Service in evaluating the impacts of the proposed mine on local and regional water supplies and quality.[20]

In order to better inform the public of the potential impacts, L. Everett & Associates (LEA), an internationally recognized environmental consulting firm made up of hydrogeologists, engineers, and geologists, conducted a review recently of potential environmental impacts to the region that would be caused by H.R. 687. The following excerpts from the review clearly rebuff Resolution Copper's water claims:

"[I]t is highly speculative that CAP water will be a reliable source for Resolution over the decades-long lifetime of the mine. In fact, Resolution correctly admitted that 'excess CAP water will not always be available for purchase and other sources will be needed.' It seems apparent that Resolution will need to rely on local groundwater resources to provide a significant percentage of Resolution's water supply if it is to be a viable project.

"It is virtually impossible for Resolution to meet even a fraction of its water needs from local groundwater in a sustainable manner: the amount of water needed is just too vast for the natural processes that recharge the aquifer in this arid region of Arizona to replenish the needed withdrawals.

"Because groundwater and surface water systems are intimately interrelated, pumping too much groundwater will have a negative impact on nearby surface water resources because lowering the water table can starve the local streams of recharge from the aquifer. This is a serious issue that is very difficult if not impossible to mitigate. For example, the nearby Carlota Mine uses much less water than the proposed Resolution Mine (approximately 1,000 acre feet per year). In a 25-day pump test at the Carlota Mine, stream flow in Haunted Canyon (2,300 feet from the nearest well) declined from 45 gallons per minute to 5 gallons per minute, thus threatening the sensitive riparian habitat."[21]

Following its assessment of the dewatering process that will be required to operate Resolution's mine, LEA added, "Given the depth of the ore body and the need to dewater the mine workings that are deep below the water table, Resolution will have to aggressively pump groundwater from the aquifer. The effect of this pumping will be felt far beyond the boundaries of the mine."

Throughout the mining process, water will migrate to the vacant ore body and mining tunnels. For example, Resolution estimates that inflows to the existing workings at Magma Mine are 300 million gallons per year. If mining production on this new project is authorized, the mine dewatering will deplete many billions of gallons of water from surface waters and groundwater throughout the region, resulting in the loss of important seeps, springs, and streams and depleting the perennial pools in *Gaan* (Devil's) Canyon and streamflows in Queen Creek and other surface waters.

The alteration of subsurface and surface geological structures because of block caving and the admitted collapse of the land surface will alter the natural state of the aquifers and surface drainage of the watersheds forever. Resolution has refused to publish the potential impacts on the water supplies of the region despite the fact that this legislation has been introduced in the Congress over the past 8 years. Instead, Resolution has simply claimed that it is urgent for Congress to pass this land exchange.

### Additional Damage to the Southeast Arizona Environment

While water is a paramount concern for the opponents of H.R. 687, it is not the only concern. Resolution Copper has failed to provide data pertaining to its mining and post-mining subsidence analysis, water quality contamination analysis (including acid mine drainage and subsequent pollution), air quality compliance, tailings and overburden storage and placement.

---

[20] *See* S. Hrg. 111–65, p. 42 (June 17, 2009) (Hearing before the Subcommittee on Public Lands and Forests of the Committee on Energy and Natural Resources, United States Senate, S. 409 111th Cong.) (emphasis original).

[21] Letter from LEA Principal Geologist, James T. Wells, PhD, PG, to San Carlos Apache Tribe, Chairman Terry Rambler (March 18, 2013) (Attached to this testimony) (hereinafter "LEA Analysis").

99

On March 15, 2013, the local Town of Superior adopted a resolution opposing H.R. 687. The nearby City of Globe has tabled a proposed resolution to support the bill until its questions about the bill have been satisfactorily answered about the impacts of this mine. This bill touts jobs for the local economy. But local community leaders rightfully ask: "What good are jobs if our communities are environmental disaster areas lacking water to support our citizens?"

It is common knowledge that acid mine drainage leaking into groundwater and surface water is a widespread consequence of copper mining. Acid-generating mines pollute surface water and groundwater requiring expensive reclamation and long-term water treatment. The water Resolution is pumping from the Magma Mine shaft is contaminated with heavy metals. That water is being treated at Resolution's water treatment facility. In order for that treated water to be reclaimed and re-used, it has to be diluted with clean CAP before being transported for use on crops to the Irrigation Districts.

Instead, Resolution and its foreign corporate parents avoid the true costs of environmental compliance through this land exchange. Once these public lands are conveyed, under the permissive mining and reclamation laws of the State of Arizona, Resolution will probably not be required to post a cash bond to underwrite either the cost of remediation during its mining operations or for clean-up upon mine closure. Typically, only self-bonding or *corporate guarantees* are all that is required. This is woefully insufficient to protect the public from bearing the potentially astronomic costs of clean-up resulting from a limited liability company's massive mining operations. As stated earlier, Resolution can simply walk away from damage to the Oak Flat area. As a result, American taxpayers would be left without any revenue and will be on the hook for the future cost of any environmental remediation.

There are too many environmental questions that Resolution Copper has failed to answer. This land exchange allows Resolution to avoid responding to these questions that Federal law otherwise requires every other company in America to answer. The Subcommittee should ask why Resolution deserves special treatment?

**H.R. 687 is a Massive Giveaway of Taxpayer Resources to Foreign, Special Interests**

At a time when all Americans are being asked to tighten our belts, H.R. 687 will result in a giveaway of American wealth to a foreign-owned mining company. The appraisal requirements of H.R. 687 are unique to this land transfer and do not adequately ensure that the public will receive fair value. Since the bill does not afford the Federal agencies the opportunity to perform a substantive economic evaluation of the lands along with the copper and other minerals to be exchanged to Resolution, it is impossible for the Congressional Budget Office and/or Office of Management and Budget to effectively evaluate H.R. 687. The public interest requires that a complete and fully informed appraisal and equalization of values be performed *prior to* Congressional passage of H.R. 687, *not after*. Resolution Copper has variously estimated the mineral wealth in the lands ranging from $100 to $200 billion. Resolution's *self evaluation* of the ore body underlying Oak Flat is orders of magnitude greater in value than that of the non-Federal parcels offered in exchange to the public.

A significant amount of information is required for a meaningful and accurate appraisal. Under the Uniform Appraisal Standards for Federal Land Acquisition (UASFLA) requirements, a detailed mining plan is necessary to properly assess the value of the exchanged land. UASFLA requires that production level estimates should be supported by documentation regarding production levels achieved in similar operations. However, it is unknown at this time what Resolution Copper's production estimates are since mining plan data has not been forthcoming.

UASFLA royalty income approach also requires several economic predictions including a cash-flow projection of incomes and expenses over the life-span of the project and a determination of the Net Present Value (NPV), including the NPV of the profit stream, based on a discount factor.

Deputy Chief Holtrop and BLM Deputy Director Luke Johnson informed the Subcommittee on National Parks, Forests and Public Lands on an earlier version of this bill that the completion of the exchange within 1 year (as required by H.R. 687 Section 4(i)) was insufficient time to complete the required appraisals.[22] Specifically, Mr. Johnson stated:

---

[22] *See* S.110–52 (Nov. 1, 2007), pp. 4, 5, 8 (Legislative Hearing before the Subcommittee on National Parks, Forests and Public Lands of the Committee on Natural Resources U.S. House Of Representatives, 112th Congress).

100

Based on our experience with exchanges, we do not believe that this is sufficient time for the completion and review of a mineral report, completion and review of the appraisals, and final verification and preparation of title documents. Preparation of a mineral report is a crucial first step toward an appraisal of the Federal parcel because the report provides the foundation for an appraisal where the land is underlain by a mineral deposit. Accordingly, adequate information for the mineral report is essential.

Given the evaluation standards prescribed by the UASFLA, coupled with the lack of factual data from Resolution, the American taxpayer will once again be short-changed.

**Resolution Copper's Corporate Parents Partner With Iran and China**

Resolution is not deserving of the special treatment given it under H.R. 687. The Company is a subsidiary of Rio Tinto (55 percent majority owner) (UK headquarter/Australian offices) and BHP Billiton (45 percent shareholder) (Australia headquarter/UK offices). Rio Tinto is a partner with Iran in the Rössing *uranium* mine in Namibia.

Rio Tinto currently owns a majority stake in the Rössing mine; while, the Iran Foreign Investment Company (IFIC) owns a 15 percent stake in the same mine. The IFIC is wholly owned by the Iranian government. United Against Nuclear Iran (UANI) raised concerns about Rio Tinto partnership and called on Rio Tinto and Rössing to sever ties with the Iranian government. In a letter to the Chairman of Rio Tinto, UANI President, Ambassador Mark D. Wallace, wrote:

Thank you for the letter of November 8, 2010 from the Rio Tinto Group. While your letter attempts to address some of the concerns . . . the largest issue—the current Iranian government's 15 percent stake—remains outstanding and is of serious concern to UANI and many within the international community . . .. You dismiss the concerns raised by UANI because the government of Iran initially acquired its share in the Rössing mine in 1975 . . .. This fact is not relevant in 2011 when the government that has been profiting from the mine for over three decades is one that is pursuing an illegal nuclear weapons program, [and] sponsoring terrorism in the region . . .."

Letter from Former U.S. Ambassador and UANI CEO Mark Wallace to Rio Tinto Group Chairman Jan du Plessis (Jan. 13, 2011).

In addition, there are no guarantees that the copper mined pursuant to H.R. 687 will even be processed or used in the U.S. Chinalco, owned by the Chinese government, holds a 9 percent stake in the Rio Tinto Group. Nothing in the bill requires Resolution Copper, Rio Tinto's subsidiary, to process or sell the copper to U.S. companies or even use U.S. resources to mine the copper.

Based upon the history of parent company Rio Tinto's business relations with Iran and China and in light of the U.S. and international sanctions against Iran, it is not in America's interests to trade valuable Federal land to this foreign-owned mining company.

**Speculative Economic Benefits**

Without substantiation, Resolution has touted local job creation as the primary justification for this land exchange. Resolution's jobs claims have varied widely over the years that this project has been proposed. Because Resolution is not required to publicly disclose a MPO before the land transfer, Resolution's jobs claims are speculative at best. Resolution takes pride in the fact that they are building the mine of the future. Resolution's Vice President stated, "Our grandfathers wouldn't recognize the mines of today." The proposed mine, under H.R. 687, will be highly automated and the likely actual jobs produced will come in far below the speculative figures promised. In addition, Resolution has opposed all efforts to amend the bill to require that: (1) the project headquarters to be located in Southeast Arizona; (2) local Arizonans be considered first for any job opportunities that may result from the project; and (3) the ore is processed and used in the United States—and not in China or another foreign nation. Further, Resolution has admitted that it will take at least 10 years to develop technology to access the ore body given that it is 1-mile beneath the surface of the earth where it is a temperature of 175 degrees.

**Conclusion**

In 1871, the U.S. established our Reservation. Since then, the United States diminished our Reservation several times due to the discovery of silver, copper, coal, water and other minerals and natural resources. Our burial sites, living areas, and

101

farmlands on our Reservation were flooded for a Federal dam for the benefit of others. Based upon this history and for the reasons stated above, the Tribe strongly opposes H.R. 687 or any other conveyance of our tribal ancestral lands in the Oak Flat area to Resolution Copper for mining that would permanently destroy this sacred site. Once done, this action cannot be undone.

[Note.—The material attached to Mr. Rambler's Prepared Statement and the letter referred to in footnote 21 have been retained in the Committee's official files.]

QUESTIONS SUBMITTED FOR THE RECORD TO TERRY RAMBLER

QUESTIONS SUBMITTED FOR THE RECORD BY THE HONORABLE GRACE F. NAPOLITANO

*Question.* Where are tribal sacred sites located?

Answer. Apache culture, heritage and religion do not focus upon a specific site or place as sacred, in the traditional convention of Anglo-European site location. Instead, an area or region is deemed by the Apache People to have cultural, sacred and religious significance.

The Apache lands which are impacted by the land exchange with Resolution Copper Mining cover a wide area and include lands known in Apache as *Chi'chil bigagoteel. Chi'chil bigagoteel* encompasses the Oak Flat campground. Nearby is *Dibecho Nadil* (Bighorn Sheep Are Put There), the geological feature known as Apache Leap. *Chi'chil bigagoteel* is bounded by *Gan Bikoh* (Crowndancers Canyon), also known as Devil's Canyon. To the north it is bounded by *Ga'an Daszin* (Mountain Spirits Standing), also called Queen Creek Canyon.

This area is documented as the ancestral home of the Pinal and Aravaipa Apache Bands of the Western Apache, San Carlos Apache Group. It was also known to have significance to the Western Apache, Tonto Apache Group.

Apache spiritual beings, *Ga'an,* live and exist within the sacred sites of Oak Flat, *Ga'an* Canyon (Devil's Canyon) and Apache Leap. The *Ga'an* are spirit entities made for the Apache People by *Yusn,* Life Giver, and are responsible for teaching the Apache People the proper way of living. *Chi'chil bigagoteel* is recognized as home of the *Ga'an.*

Oak Flat has, for generations, played a crucial role in the exercise of the religious, traditional and cultural practices of the Western Apache. These practices continue to this day. Oak Flat and the surrounding area have long been used—and are used today—for religious ceremonies, sweat lodge ceremonies, and Sunrise Dances (puberty ceremonies). *Chi'chil bigagoteel* provides plants and other natural resources for spiritual, ceremonial and medicinal uses. It has been said by San Carlos Apache Tribal Cultural Officer, Vernelda Grant, that the uniqueness of the ecosystem of this area adds to significance and sacredness of the area to the Apache People.

Losing access to these ecosystems, both by their closure [to Apache People] or their destruction profoundly weakens the strength to both Apache and Indigenous peoples' prayer and ceremony, and severely limits the abilities of Apaches and Indigenous peoples to effectively practice their religion, ultimately resulting in physical and spiritual harm to Apaches and Indigenous peoples and neighboring communities.

*Question.* Are sacred sites in jeopardy?

Answer. There is no question that Apache sacred areas are in jeopardy as a consequence of the *Southeast Arizona Land Exchange and Conservation Act of 2013.*

The ore body which Resolution Copper Mining (RCM) seeks to exploit lies directly under Oak Flat, *Chi'chil bigagoteel.* As pointed out in my testimony on March 21, 2013, the surface lands of Oak Flat will collapse as a result of the mining method, block caving, RCM will employ to extract the ore body. RCM's own website admits to such subsidence. The exhibits which were presented with my testimony exemplify how the block cave mining method works and the land subsidence which inescapably follows. Virtually the entirety of *Chi'chil bigagoteel* will be destroyed by RCM's mining operation.

RCM's mining operation will also require enormous quantities of water estimated at 20,000 acre feet per annum, or 600,000 acre feet over the life span of the mine. Groundwater pumping will inevitably be a large source for that water. Seeps, springs and streams well beyond the physical boundaries of Oak Flat will be affected by this pumping. Furthermore, in order to operate the mine at depths of 4,500 to 7,000 feet below the surface of the earth, RCM will be required to pump groundwater to keep its mine from flooding further depleting water resources throughout the area. RCM's groundwater pumping activities will destroy the medicines and plants that we gather, which will effectively suffocate the practice of our religion.

102

Certainly, the land subsidence and groundwater pumping will destroy Apache sacred areas. Without belaboring the point, other aspects of the mining operation, such as toxic water pollution associated with copper mining and tailings waste sites, will further contribute to the destruction of areas sacred to the Apache and other Indigenous people.

*Question.* Does H.R. 687 provide adequate protections to avoid the land from collapsing?

Answer. H.R. 687 provides no protections to avoid the land from collapsing. Indeed, the protections which are usually afforded the public under various Federal laws, such as National Environmental Policy Act (NEPA), to assess potential harms and suggest possible alternatives are circumvented by H.R. 687. Once the land is in the private ownership of Resolution Copper and its parent corporations Rio Tinto and BHP Billiton, NEPA and other protections will be lost. H.R. 687 virtually eliminates the Secretary of Agriculture's discretionary authority to determine under the Federal Land Policy Management Act (FLPMA) or other laws the best interests of the public and the American taxpayer. Please see my written testimony at pages four to seven.

———

Dr. GOSAR. Thank you, Chairman Rambler.

Our next guest is Ms. Soyla Peralta, otherwise known as Kiki.

## STATEMENT OF SOYLA "KIKI" PERALTA, COUNCIL MEMBER, SUPERIOR TOWN COUNCIL

Ms. PERALTA. Good morning, members of the Subcommittee. My name is Kiki Peralta, and I am councilwoman for the Town of Superior. The project mandated by H.R. 687 will have the most direct and greatest impact on our town. This project will be in our back yard. And we can't let that happen, because this is our town. We were born and raised in Superior. I was married in Superior, and I raised my children in Superior.

Unfortunately, we are here because we want our voices heard. Our county and Arizona Delegation is not listening.

I support the mining industry. The Town of Superior supports the mining industry and recognizes the role that copper mining has played in Superior's history and economy. My father, brother, husband were all miners. As a matter of fact, I was the first female hired by Magna-Copper Company in 1975 as a laborer.

I have to let you know up front that in the past this Council has supported this project. However, for the following reasons, the Town of Superior now opposes the Southeast Arizona Land Exchange. Information has been difficult to come by. But with the little information that we have, we have learned the true impacts of this project. This has forced me and our Town Council to rethink our position.

Our opposition to this project is based on three major points: number one, the lack of a NEPA study to show what impacts we will be facing; number two, the impact of our water and/or hydrology studies; and three, the impacts of block cave mining on our environment, and the lack of jobs that it will produce.

First, on the NEPA and Mining Plan of Operation. We strongly oppose this land exchange moving forward without first performing the NEPA studies and informing our town about the negative impacts of this project. Section 4(h) of the bill provides that if this bill is passed, the lands will be treated as if they are in private ownership. As a result, no tribal consultation or no NEPA studies will be required.

103

A Mining Plan of Operation will also help inform our community. Where will the tailings and waste products be dumped? What impacts will they have on our town and surrounding communities? My question is, once again, why must this project move forward before informing our community what we can expect? This is like playing Russian Roulette with our community.

Next, the water. It is often said that whiskey is for drinking and water is for fighting. Water in Southeast Arizona is more precious than gold, and it is surely worth more than copper. Where will this water come from? And what effects will such large water consumption have on the regional water balance? Again, where are the hydrology studies? Again, I ask, how can this project move forward before a question as vital to our lives as water is answered?

Finally, we have serious concerns with the block cave method of mining. Block cave mining historically has not been used in Superior. We know mining, and this method is proven to be destructive and harmful to the environment. My other concern with block cave mining is the jobs. Resolution promises jobs for our community. But in reality, with the use of block cave mining, most of it will be mechanized and employ only a small workforce.

I wish that Resolution Copper would answer these questions today, and I wish that the Arizona Delegation and Congress would demand these answers. But the bottom line is that today I am here to represent my community and to protect the long-term interest of my town.

It was great to hear Pinal County Chairman Miller speak today. Unfortunately, this is the first time I have seen him. Neither him nor Congressman Gosar or Kirkpatrick have met with us on this issue. Yet again, our town will suffer the most direct impacts of this project. Our water, our environment, our air will all be harmed. Yet no one has come to me with our Council. Unfortunately, our county and congressional delegation are not listening. I wish that my Congresswoman, Ann Kirkpatrick, could have stayed to listen.

With that said, I am here to fight for my community and I am glad that you are here to listen. I urge you to oppose this bill. The Town of Superior can't afford this deal. I again want to thank you for this opportunity.

[The prepared statement of Ms. Peralta follows:]

PREPARED STATEMENT OF SOYLA "KIKI" PERALTA, COUNCIL MEMBER, SUPERIOR TOWN COUNCIL, ON H.R. 687

The Town Council of the Town of Superior, Arizona realizes that Superior, Arizona, was born as a mining community and has lived through the mining booms and busts of the Silver King Mine, the Queen Mine, the Belmont Mine, the Magma Mine and the Broken Hill Proprietary Mine over the history of our 100 plus years. Because we recognize that mining is a large part of our history and will potentially be a larger part of our future, we are not opposed to mining. In fact, we strongly support responsible mining policies, and practices in and around our community. However, we believe that H.R. 687 is unacceptable as it presents serious negative impacts to us and our surrounding community as it seeks to circumvent the important National Environmental Policy Act (NEPA) review and analysis process. This is public land, and the public must be heard openly and fairly under the NEPA process. A decision regarding these public lands should be made with the utmost knowledge and care. Once these lands are lost to the public, they can never be regained.

104

We appreciate and thank you for the opportunity to express our views and voice our concerns about H.R. 687, the Southeast Arizona Land Exchange and Conservation Act of 2013 that will profoundly affect our Town and Region.

**Oak Flat Land Exchange and Loss of Important Public Campground and Recreational Areas**

Resolution Copper Mining, LLC, owned by Rio Tinto based in the United Kingdom, and BHP-Billiton based in Australia, is planning a massive block-cave mine and seeks to acquire Oak Flat Campground and the surrounding public lands for its use through this land exchange bill. If they succeed, the campground and an additional 2,406 acres of the Tonto National Forest will become private property and forever off limits to recreationists and other users. Privatizing this land would end public access to some of the most popular outdoor recreation and wildlife viewing areas in Arizona. It would deprive the Town of Superior, currently land-locked at only 4 square miles, from economic diversification in and around our community. It would also deprive the San Carlos Apache Tribe of their religious and cultural attachments to the area.

Located just 5 miles east of Superior, Oak Flat and Devil's Canyon are recognized as some of the most unique, scenic, popular and unspoiled areas in the State of Arizona; and they are an important part of our history and our economic diversification. It has long been prized for its recreational variety. This area is exquisite and easily accessible to millions of visitors from the Phoenix and Tucson metropolitan areas, as well as the outlying areas of Gold Canyon, Queen Valley, Florence, Kearny, Winkelman, Hayden, Globe, Miami, Top of the World and Superior. It is significant to our citizens, our neighbors, and the Apache people, for their cultural values and religious heritage.

The Oak Flat Campground, Apache Leap, and the surrounding area are important to the Apaches who gather acorns and pine nuts that are used both traditionally and ceremonially. Apache Leap is an historical land known as the Apache's Masada. It is there that many Apaches leaped to their deaths rather than be captured by the U.S. Army approximately 125 years ago. One of our local historians, Christine Marin, Ph.D., Archivist and Historian for Arizona State University and who is a former resident of Globe, Arizona, and still has family in Superior, Arizona, published an article in the *Copper Country News* dated June 11, 2008. In her article entitled, "Apache Leap Legend: Now We Have 'The Rest of the Story'," Dr. Marin indicated that the story of the Apache warriors is verified by two historical publications. We believe that these lands have significant import to the Apaches and that their wishes should be carefully considered and respected. It is because of this that our Resolution No. 451 (attached) includes this reference.

You, our Federal legislators, are being asked to give up these publicly owned lands that have been in trust for the American and Native peoples since 1955, when President Eisenhower signed BLM Public Land Order 1229. This Order specifically put Oak Flat *off-limits to all future mining activity.* In 1971, President Nixon issued BLM Public Land Order 5132 to modify PLO 1229 and allow "all forms of appropriation under the public land laws applicable to national forest lands—*except under the U.S. mining laws.*" These two executive orders from two different Republican administrations both mandated that these lands were to be preserved in perpetuity with special emphasis on prohibiting mining activities on Oak Flat. There is no compelling reason for these Orders to be overturned.

We are particularly concerned that this legislated land exchange of the Oak Flat Campground and surrounding area would bypass critical environmental impact studies. We fear that natural and cultural resources will not be protected. We know, without a doubt, that subsidence will occur and that it will adversely affect our community. We don't have any information regarding RCC's proposed disposition of the massive amounts of tailings that will be produced and where they will reside. We are terrified that downstream pollution will affect the Town of Superior and everyone who depends upon the nearby aquifers for drinking water. Our local water supplier recently imposed an additional "arsenic surcharge." While The Magma Mine was operational, local residents were told that there was no pollution or effects on the water supply. Now, 20 plus years later, we find that there was—and continues to be—a price to pay for giving a foreign-owned mining company carte blanche because we trusted the mine explicitly. We are also worried that a mine would dry up not only the Town of Superior's water supply, but a portion of the water supply for the Phoenix metropolitan area. We also have good reason to believe that mining at Oak Flat will destroy the riparian habitat not only at Oak Flat, but the nearby Devil's Canyon which is one of Arizona's great undiscovered riparian treasures. It is for these reasons and many more that we oppose the enactment of the Southeast Arizona Land Exchange and Conservation Act prior to proper NEPA reviews.

105

## Water, the Environment, and Destruction of Land Surface

The Town believes it is critical that Hydrology Surveys, Environmental Impact Studies, Subsidence Analyses and Transportation and Circulation Plans be conducted **PRIOR** to discussion of **any** land exchange and/or different use.

Resolution Copper Company's Environmental Impact Assessment Manager, Bruce Marsh, has indicated that the new mine would utilize 40,000 acre feet of water per year. He further indicated that they would be buying excess water from the tribes and other sources, however, they are merely banking those water rights and the sources are not secured. This is a concern because: (1) Arizona is still in the grip of a decades long drought with dwindling Central Arizona Project supplies, and we do not have any assurances that water will still be available when Resolution Copper Company begins mining in the next 10 years; (2) Superior is located in the Maricopa AMA rather than the Pinal AMA, and Phoenix metropolitan area water supplies depend upon the Queen Creek aquifers; (3) The close proximity of the Queen Creek aquifer to such a massive mining operation will negatively disrupt the underground water flow and negatively impact hundreds of thousands of residents; and (4) Neither the State of Arizona nor the local residents should have to bear the burden of restoring clean and sustainable water utilized by mining.

RCC has already begun to dewater shafts to prepare for additional exploration of the ore deposit. We fear that in removing the more than 2 billion gallons of water that have accumulated in the mine since it was last shut down in 1996 will upset the water balance of the Oak Flat, Apache Leap, and Devil's Canyon riparian areas. In 1946, Queen Creek was called a perennial flowing stream. Our Town elders tell us that when the Magma Mine was in full production during the 60s and 70s, riparian areas at Oak Flat and in the Town of Superior dried up. An independent analysis of the impact of a potential mine at Oak Flat to the water balance of the entire region should be conducted before this bill should even be considered by Congress.

The Town is alarmed about the issue of subsidence from Resolution Copper Company's proposed block-cave mining method and its effect on Oak Flat Campground, Apache Leap escarpment, US Highway 60, and the Town of Superior. Resolution Copper Company has admitted to only "minimal subsidence." However, they admittedly chose this method of mining as it is the least expensive and quickest method to approach this massive ore body. However, experts have demonstrated that there will be irreparable destruction of unknown extent to the surface utilizing the block-cave method of mining. This is absolutely unacceptable. Does block cave mining eventually lead to open pit?

Resolution Copper Company has not yet determined the manner in which the tailings will be accumulated. Since there will be a considerable volume of tailings that will be created by this method of mining, The Town is concerned about the contamination associated with this activity. We are also concerned regarding reclamation of these tailings upon mine closure.

H.R. 687 mentions the National Environmental Policy Act (NEPA) but the bill does not provide for even the most basic study and analysis of these issues and concerns **prior to** obtaining the land exchange. Furthermore, if the land exchange is granted, the "NEPA" language in the bill is so vague that the company could easily avoid doing any "NEPA" analysis. Even if a "NEPA" study were to be conducted after the land exchange went into effect, the results would be meaningless as the outcome of the study would already be mandated by law.

The Town believes that Resolution Copper Company should not be exempt from the required national permitting studies and analyses that have been required of the other mines in the area by virtue of a land exchange. **No other mining corporation in this area has been allowed to bypass the Federal permitting and NEPA process.**

If the start-up timeframe proposed by Resolution Copper Company is correct, then there is plenty of time to conduct the full public review process. Additionally, if Resolution Copper Company is as "transparent" as they profess, they should welcome this endeavor to put all the "cards on the table" and hear everyone's input.

We also believe that details of the project and potential impacts (Mining Plan of Operation) should be made available to our residents and to the general public up front. We continually hear that Resolution Copper Company will make this plan available later—after the land exchange. We feel that if the land exchange is of utmost importance, Resolution Copper Company should accelerate production of their plan NOW—before the land exchange.

## Threat to the Town of Superior's Economic Diversification and Sustainability

Many citizens of the Town have lived through the boom and bust cycle of mining. After closure of the Magma/BHP mine in the 1990s, many people fled the commu-

106

nity in search of jobs, medical treatment facilities and amenities that were not available in Superior. Voters taxed the political body to create a more diversified and sustainable economic base for its residents. The Town received grants to develop an Industrial Park, a low-income housing subdivision, a new swimming pool, second fire station, airport, rest stop and numerous parks and trails. These projects were initiated to create jobs for our local residents, to increase State-shared revenue and local taxes and to encourage eco-tourism.

The Town believes that in order to sustain growth and development, *we cannot rely on any one industry to support us.* Mining has an allure and historical ties in our community. However, just as in the past, mining has a short life. We cannot base our future on one single industry or employer. Additionally, the process of mining in the 21st century is very technologically advanced and requires specialized training. Resolution Copper Company has not indicated that they will hire untrained, local labor. In fact, today's activity on the project reflects an influx of mining technicians from outside the community. We routinely see vehicles with license plates from Utah, Colorado and Mexico. We are seeing more and more articles regarding the development of robotic workers for future mining activities. These robotic systems are being tested today in South American and Australian mining operations. It would be no surprise if many of the technical jobs that are available will be held by highly trained individuals sitting at a computer in another state—or even another country—controlling our robotic work-force remotely. The loss of this natural resource and already protected public lands compromises the potential for our community to foster and promote a more diversified economy based upon tourism and outdoor activity. At a minimum, the Boyce Thompson State Park to the west and the Oak Flat Campground to the east create a natural flow of traffic to and through the Town. Tourists, Boy Scout troops and other individuals and groups routinely pass through to camp overnight at the Oak Flat Campground. They stop for gas, sundries and refreshments at local establishments in far greater numbers than local workers. Superior is a natural "pit stop" for eco-tourism and this is the type of activity that sustains our economy.

While Resolution Copper Company has promised great hope for another "boom," they do not willingly embrace annexation into our town limits, they have purposely depreciated their land values in anticipation of the land exchange and they have strong-armed our local government into accepting less than adequate compensation for future use of the Town's services and support.

**Summary**

Resolution Copper Company has divided this community by demanding that the Town Council speak for the residents of Superior in unwavering and unqualified support of a land exchange that is not necessary in order for Resolution Copper Company to mine. Behind the scenes, their representatives have attempted to force the firing of individuals opposing the Land Exchange. Those individuals who question Resolution Copper Company in any fashion are deemed to be "anti-mine." Businesses deemed "anti-mine" are not supported by Resolution Copper Company, their employees or agents—in fact RCC employees are urged to boycott! These strong-arm tactics should not be allowed to pervade a community already distraught from previous "boom and bust" mining cycles.

H.R. 687 does not represent a land exchange that is in the broader public interest. It is clear to the Town that Presidents Eisenhower and Nixon believed that they were protecting Oak Flat from big business interests in acquiring public lands for development, mining and transportation. Oak Flat has been important enough to protect from mining and other elements for over 50 years, and it should not be so easily conveyed to a foreign-owned mining interest. This land exchange would set a terrible precedent.

The Town urges this Committee to ensure that **the concerns of all public interests** are addressed prior to consideration of any Federal land exchange. We believe you should protect these public lands for the public's future use and preserve the unique opportunities for Arizonans—and especially Superiorites—that the Oak Flat area provides.

For these and many other reasons, we oppose H.R. 687, the Southeast Arizona Land Exchange and Conservation Act of 2013 and feel that it should be rejected, until such time as our concerns are at least addressed through proper NEPA studies.

Thank you for your time and consideration.

————

Dr. GOSAR. Thank you very, very much. There are two things now—if we can have the screens cleared, please? Thank you.

107

The Chairman would like, by unanimous consent, to have two things, the "Pentagon Warns of Mineral Shortfalls," and a Congressional Research memorandum to be included in the record. So ordered?

[No response.]

Dr. GOSAR. No objections, so ordered.

[The information submitted for the record by Dr. Gosar has been retained in the Committee's official files:]

Dr. GOSAR. I would like to acknowledge myself for the first aspects of questioning.

Ms. Peralta, thank you for coming here today. I noticed in your testimony that you made the following statement, "This is public land, and the public must be heard openly and fairly under the NEPA process." You are aware that when Resolution files its Mining Plan of Operations, that it will go through the environmental review process, and that the public will have opportunity to provide comments, as guaranteed in the law. Are you familiar with that?

Ms. PERALTA. Yes, I am.

Dr. GOSAR. Thank you. Sections 4(i) and 4(j) address explicitly and implicitly compliance with the Federal environmental laws and regulations pertaining to conveyances of Federal land and approval of Mining Plan of Operations. My bill is clear that the mine can only move forward following preparation of a full environmental impact study that is in accordance with NEPA and all other applicable Federal laws and regulations. That includes national historic preservation acts, endangered species acts, Executive orders pertaining to wetlands and floodlands, and hazardous material surveys.

Additional environmental compliance requirements will also have to be addressed at the State and local levels in order for this mine to be developed. As you know, and should know, many of Arizona's environmental compliance laws are even stronger than those of the Federal laws. This legislation promotes economic development in an environmentally responsible way.

Now, I agree that the public should be heard, and that is why we invited you here today. Why do you feel it is so important for the public to be heard in the NEPA process, while you and your colleagues silenced the voices of almost 200 citizens last week at your Council meeting when you adopted your resolution to oppose this bill? You stated that you had made up your mind, no executive session was necessary, no public input would be taken, and that if anyone acted up, they would be escorted out by the police. Is that fair, Ms. Peralta?

Ms. PERALTA. Once again——

Dr. GOSAR. Is it fair, ma'am?

Ms. PERALTA. Yes, it is. According to the open meeting law, I had those rights. I was the Chair of the meeting.

Dr. GOSAR. Thank you very much. For the record, even my chief of staff went to the meeting at my request, tried to meet with members of the Council prior to the meeting, and was not given the opportunity to address the Council. In fact, everyone in the town that attended your 4-minute meeting—4 minutes, 4-minute meeting—was threatened with police removal if they spoke. It doesn't really sound like you or your town manager want to engage at all.

108

I have been humbled by the outpouring of support of your community that was given to Congressman Kirkpatrick and myself in our efforts to take action. I have been submitted, in regards to the record, over 400 letters and petition signatures opposing the town's actions and supporting our bill collected over the span of just 3 days. The Town of Superior has little over 2,500 residents. This is pretty incredible.

Ms. Peralta, is it true that petitions have been taken out to recall you from your seat on the Council?

Ms. PERALTA. Yes, it is.

Dr. GOSAR. Yes, it is. They were actually filed this morning.

Ms. PERALTA. But—yes, they were.

Dr. GOSAR. Yes, thank you.

Ms. PERALTA. And I think they have been taken out before——

Dr. GOSAR. The Town of Superior held local elections just a week ago, after the current Council broke its Mutual Benefits Agreement off with Resolution Copper. The two top vote-getters in the pick-three election were the only two candidates in the race to express vocal opposition to the current Council's actions. Two of the current Council members who were part of this action were the bottom two vote-getters.

I would like to submit for the record the results of the March 12th election and the statements of the opposition to the current Council's actions.

I would also like to submit the local media accounts of the report: the Superior Sun: "Business Owners, Townspeople React to Superior's Council Decision;" "Thank You, Town Council, for Losing Superior's Jobs with Resolution Copper," right here on the front page. "The Copper New Superior Council Meeting Stirs Anger."

Ms. Peralta, it appears the only person dividing your Council is you and the three Council members that have spearheaded this effort. I encourage you to read these letters, these petitions, and hear from your citizens and what they are telling you. I am hard-pressed to believe that you would be here today with your position if you had listened to your community.

Ms. Peralta, what is the current financial situation and status of the town?

Ms. PERALTA. We are broke.

Dr. GOSAR. Yes. My understanding is the community is in dire financial conditions. Four months ago you could not even meet payroll or pay for garbage collection. Is it true that Resolution advanced monies due in 2013 under your Mutual Benefits Agreement to cover these bills?

Ms. PERALTA. Yes, it is.

Dr. GOSAR. Hardly sounds like a bad partner. Supervisor Miller, why do you think the Town Council has taken such a radical reversal in position?

Mr. MILLER. Congressman Gosar, I don't know what the total motivation was. I thought it was interesting that, at my board of supervisors meeting, we had 12 residents from Superior in support of the resolution that we passed, and 2 against it, one of which was the new town manager, who stood up and advised us that they were broke, that they couldn't even put two police cars back into duty. I thought that was awfully telling as to their status.

109

Dr. GOSAR. Supervisor Miller, just one last question. In my tenure in representing District 1, have you seen my presence in and around Superior in regards to being accessible and answering questions? Because the witness prior said that I was not accessible and never had been consulted about this mine.

Mr. MILLER. Congressman Gosar, you have been one of the most accessible legislators I have ever seen. And if there was an issue and we called you, you made yourself available at any time.

Dr. GOSAR. For the record, without objection, I would like to highlight those things that I highlighted. And one last exception is a letter in regards to Chairman Rambler dated April 15, 2011 in regards to my office in regards to the issues with tribal consultation and tribal issue in regards to this mine that was prepared by my staff and experts in Native American law that I would like submitted for the record.

[No response.]

Dr. GOSAR. No objection, so done.

[The information submitted for the record by Dr. Gosar has been retained in the Committee's official files:]

Dr. GOSAR. I would like to now turn it over to the Ranking Member, Raúl Grijalva.

Mr. GRIJALVA. Thank you very much, Mr. Chairman. Ms. Peralta, welcome and thank you for taking the time. Can you tell us about the City Council? There is a number of your colleagues that can't vote on this issue. Is that correct?

Ms. PERALTA. That is correct. We——

Mr. GRIJALVA. How many?

Ms. PERALTA. We have our Mayor and our Vice Mayor, John Tameron, who are in conflict.

Mr. GRIJALVA. Conflict because of what?

Ms. PERALTA. Our Vice Mayor's son is employed by Resolution.

Mr. GRIJALVA. It is because of employment?

Ms. PERALTA. And then our Mayor's daughter is married to him, so that puts him in conflict, also. And our Councilman John Tameron has a contract with Resolution for cleaning services he provides.

Mr. GRIJALVA. It is my understanding that one of the councilmen, I don't know how recently, left the Council after some adjudication?

Ms. PERALTA. Yes, which is why we had to—which is why the mutual benefits agreement is null and void. Councilman Hank Gutierrez was indicted for conflict of interest.

Mr. GRIJALVA. And he works where?

Ms. PERALTA. He has a contract with Resolution.

Mr. GRIJALVA. Thank you, Ms. Peralta. I also wanted to ask you. There was a, you know, we get into the discussion, and I appreciate the Supervisor's point that Resolution has not only raised the reading scores in the area but is prepared to spend $16 billion of revenue. At some point we will follow up with the Supervisor and get some information and some facts. It is nice to put a little facts, figures around, but you know, at some point you have to substantiate them. And we will be following up with questions.

Chairman Rambler, and thank you very much for being here, as well. Oak Flats' significance; you hear that we are going to leave

110

the surface alone, so what is the problem? Proponents of the legis-
lation say, "We are going to leave the surface alone, so what is the
problem?" And would you please tell them what the problem is
going to be down the road, not only in terms of a sacred site, but
in terms of the excavation that could potentially occur underneath?

Mr. RAMBLER. Yes, thank you. I know in reading some parts of
the bill itself, the proposed bill, it talks about surface, but it doesn't
talk about subsurface. So, on the surface, for example, Oak Flat
and Apache Leap itself, even though in this particular case the bill
itself may say Apache Leap will not be disturbed and a fence may
be put around it to not disturb it further, but there is nothing there
that prevents it from being disturbed underneath.

So, when we look at it, we look at it in total, the sacredness of
the whole area in total. And so, when underground it is going to
be disturbed, when there is going to be a big hole left under there,
and we don't know what the potential impact is to the water re-
sources, but we know from history that when there is a big hole
and it rains and it snows and water comes running down, where
is that water going to go, it is going to go to that big hole, and so
we don't know what the impacts are, and that is how we believe
that what is going to happen under ground is going to affect what-
ever is going to be on the surface.

Mr. GRIJALVA. Thank you. And there has been discussion saying
that this bill does not weaken the NEPA process, and so people are
convinced that the State of Arizona permitting process for mines
and private lands is the same as NEPA. Even if we side-step NEPA
on this one, that is absolutely not true. The State is far weaker.
The public comment period is short. There is no quick turnaround
in the submission of critical documents. There is no pre-scoping,
and the process does not require bonding to guarantee a clean-up
and reclamation after the fact. And that is just the environmental
side of it. On the consultation, that is a whole other story that
doesn't exist.

And so, there is no substitute for, one, skipping over NEPA and
doing it after the fact where there is no enforceability, and saying,
well, the State can take care of it. The State can't take care of it.
The State won't take care of it. This NEPA process guarantees not
only the people of Superior and the surrounding community, but
the viability and the intended or unintended consequences of this
mine everybody is going to know up front.

And I, for the life of me, you know, many of the critics of this
process could have, would have been shut up a long time ago, 5
years ago. But for some reason there is a drive to get it done with-
out NEPA, do it after the fact. If there would have been agreement,
"Let's do NEPA now," we would be waiting and resolving and de-
bating what the remediation would have had to be. The consulta-
tion government-to-government, we would have dealt with those
consequences, and maybe they wouldn't have been good.

One suspects, and it is only a suspicion, that a full-blown NEPA
process with public comment is going to disclose and make trans-
parent some consequences that not only the Tribes and the Council
lady from Superior are going to be opposed to, they are going to
have some consequences that the whole region will be very, very

111

concerned, particularly around water and sacred sites. Thank you very much, Mr. Chairman.

Dr. GOSAR. Thank you. I would like to acknowledge the gentlewoman from Wyoming, Ms. Lummis.

Mrs. LUMMIS. Thank you, Mr. Chairman. And I would like to slip back in to the much more mundane topic of soda ash in Trona.

[Laughter.]

Mrs. LUMMIS. Mr. Hohn, give everybody just a little break, could you explain a little bit about China and its trade practices that are distorting the markets for soda ash, globally?

Mr. HOHN. Absolutely. You know, the facts are China's capacity to produce synthetic soda ash is growing. Another fact is that China's exports of soda ash are growing. Another known fact is that China has incentives such as the VAT that enables China to sell soda ash below their cash costs. These are all facts that we are dealing with within the global soda ash markets.

Mrs. LUMMIS. I have another quick question, and it relates to the checkerboard. I think a lot of people don't understand that the Union Pacific Railroad, when it was given its right-of-way across the Untied States, was given every other section, and that this area where the Trona resource lies is within that checkerboard.

So, the surface, and, therefore, the subsurface mineral interests under it—lie 640 acres of private land, and next to that, 640 acres of public land, and that the mining technology is such that when you are mining a long wall, those things are enormously expensive to move. Almost indescribably expensive to move, a long wall, once you set it up and start along its mining course of action.

Is it possible to just lift those up, or lift your mining up and go where the royalty is the lowest?

Mr. HOHN. It is very, very, very difficult. It requires years of advanced mine planning as we look at how we mine the checkerboard, as you just described. I can assure you with confidence that, prior to my current role as General Manager of the Soda Ash Business for OCI Chemical Corporation I was the Site Manger out in our facility out in Green River, Wyoming. And while we employ a bit of a different mining technique, it is a continuous miner operation with room and pillar advancement—it is impossible to pick up and just change a mine plan very, very rapidly. And while I don't have the long wall mining experience, I can assure you also that from my education, that also requires many years of advanced mine planning.

Mrs. LUMMIS. Thank you. And, Mr. Chairman, I will save the rest of my time and yield back to you to use for whatever purpose you wish to use it for.

Dr. GOSAR. I thank the gentlelady. Before her time runs out I would like to address some issues laid out in the Administration's testimony regarding tribal consultation and the protection of historical significant sites.

As someone who has lived among Native Americans my entire life, first in Wyoming, then in Creighton University in Omaha, Nebraska, and finally in Northern Arizona, tribal consultation and Congress's trust responsibility to Tribes is very important to me. In fact, I have been very outspoken in favor of the policies that benefit Tribes in my short time in Congress. That is why, in crafting this

112

legislation, I have taken specific measures to protect those interests.

However, regarding Oak Flat Campground, I wanted to correct some of the misinformation that has been thrown around here. When the Oak Flat Picnic and Campground was withdrawn in 1955 by a Public Order, PLO1229, in the text it read, "Reserving lands within National Forests for use of the Forest Service as campgrounds, recreation areas, and for other public purposes." The withdrawal was done to protect the Federal Government's interest in the capital improvement of the campground. It made no mention of tribal sacred sites. In fact, members of communities that surround the area have given firsthand accounts that the San Carlos did not utilize the area for ceremonies until this project was announced about a decade ago. I will submit a variety of accounts longtime residents of the area have provided for the record.

I would also like to point out on September 20, 1971 the Oak Flat Picnic and Campground withdrawal area was modified by Public Land Order 5132 by Assistant Secretary of the Interior Harrison Loche. Since then, the 760 acres, known as Oak Flat Picnic and Campground Area, has been eligible for disposal by land exchange and other disposal authorities of the Forest Service.

Once again, I would like to keep the discussion about facts, because the facts set you free.

The Ranking Member has two articles that he would like to be included?

Mr. GRIJALVA. Thank you, Mr. Chairman. And an inventory and a list of all the Native Nations and tribal governments that are in opposition of the legislation. Also we will be submitting for Chairman Lamborn a kind of an explanation between fee simple and trust land that is for the purpose and use by Native Tribes under law.

And, Mr. Rambler, thank you. I like the NEPA process, I like consultation, government-to-government, because I don't try to tell you what to do and what you need.

Dr. GOSAR. Without objection, so ordered.

[The information submitted for the record by Mr. Grijalva has been retained in the Committee's official files:]

Dr. GOSAR. As of this, with no further objections—oh, no, I am sorry. Mr. Cramer?

Mr. CRAMER. I have nothing, Mr. Chairman, but would yield my time to the Chair, if he needs it.

Dr. GOSAR. Well, thank you very, very much. Without further ado, I know a number of you have to catch your planes. So thank you very, very much for the testimony, and as of now—thank you— we stand adjourned.

[Whereupon, at 2:05 p.m., the Subcommittee was adjourned.]

## [Additional Materials Submitted for the Record]

The documents listed below have been retained in the Committee's official files.

Submitted for the record by Representative Paul A. Gosar on H.R. 687:

113

- Letters of support from the State government delegation of the affected region: Governor Jan Brewer, State Senator Barb McQuire, State Representatives Frank Pratt, T.J. Shope, and Brenda Barton
- A resolution unanimously passed by the bipartisan Pinal County Board of Supervisors and letters of support from the entire bipartisan Gila County Board of Supervisors. These two counties encompass the areas most affected by the exchange.

Additional material submitted for the record by Representative Paul A. Gosar:
- Article: Hope for Resolution Copper mine is bipartisanship, By Editorial board, The Republic/azcentral.com, 2/19/13
- E&E Article—Pentagon Warns of Mineral Shortfalls, 3/20/13
- Letter of support from Senate President Biggs
- Letter from the Queen Creek Coalition (rock climbing group)
- Superior Town Council election results with quotes from two candidates and links to news articles where they were quoted
- News Articles: Superior Sun and the Cooper Country News
- CRS Report on Earnings of Mining and Tourism Industries
- Letter from Representative Paul A. Gosar to Chairman Rambler dated April 15, 2011
- Petition and letters of support for H.R. 687, 400 signatures
- Letter of support from The Nature Conservancy
- Letter of support from the Sonoran Institute

Additional material submitted for the record on H.R. 687:
- Access Fund Executive Director Brady Robinson
- Affiliated Tribes of NW Indians
- Colorado River Indian Tribes
- Fort McDowell Yavapai Nation
- Inter Tribal Council of AZ Tribes
- National Center for Policy Analysis Finding Sources of Rare Earths beyond China
- Ramona Band of Cahuilla Indians
- Letters from the Mayor of the Town of Payson, the Mayor of Globe, Terry Wheeler, Superior Councilman John Tameron, and a resolution of support from the Town of Kearney

Submitted for the record by Representative Raúl M. Grijalva:
- Written Testimony of Roger Featherstone, Director, Arizona Mining Reform Coalition, Testimony on H.R. 687

Submitted for the record in response to James M. Iwanicki's testimony:
- Keweenaw Bay Indian Community
- Upper Peninsula Environmental Coalition

Submitted for the record by Representative Joseph J. Heck on H.R. 697:
- Historic Defense Plant Corporation areas
- Three Kids Mine and Mill Site Layout
- Three Kids Mine Project Site Map Final
- Statement of the Honorable Andy Hafen, Mayor, City of Henderson, Nevada, on H.R. 697

○



# CONGRESSIONAL BUDGET OFFICE
## COST ESTIMATE

July 11, 2013

---

## H.R. 687
### Southeast Arizona Land Exchange and Conservation Act of 2013

*As ordered reported by the House Committee on Natural Resources on May 15, 2013*

---

H.R. 687 would authorize a land exchange in Arizona between the federal government and a mining company. Based on information provided by the affected agencies, CBO estimates that implementing the bill would cost less than $500,000 annually, assuming the availability of appropriated funds. Those costs would include preparing management plans and administering private lands received in exchange for federal land.

Enacting the legislation could increase offsetting receipts, which are treated as reductions in direct spending; however, CBO has insufficient information to estimate whether any receipts would be collected under the bill. Because enacting the bill could affect direct spending, pay-as-you-go procedures apply.

Under H.R. 687, the Forest Service would convey about 2,400 acres of land in southeast Arizona to Resolution Copper Mining LLC in exchange for about 5,400 acres of company-owned land. Of the company land, about 1,200 acres would become part of the National Forest System, and about 4,200 acres would be administered as conservation areas by the Bureau of Land Management.

If the property sought by Resolution Copper is appraised at more than the appraised value of the property that the company offers for exchange, the company could donate additional land or make a cash payment to the United States to make the final exchange of equal value. If the company's property is appraised for more than the federal acreage, the difference in the value would be considered a donation to the federal government. Any cash payment received by the Forest Service would be deposited in the U.S. Treasury as an offsetting receipt. In addition, after completion of the exchange, Resolution Copper would have to pay the federal government a portion of any future income earned on the former federal property if the company determines that the actual cumulative production of minerals located on that property exceeds the value of the estimated production used in the original appraisal process.

The bill's effect on offsetting receipts would depend on the outcome of formal appraisals of the federal and private properties that would be conducted after enactment. Those appraisals would determine the relative values of the properties affected by the exchange,

including the value of mineral deposits that underlie the federal land. If the value of the federal land were to exceed the value of the company land, Resolution Copper could pay the government a lump sum equal to the difference in property values in the year or two following enactment. That payment might be significant; however, because there are no publicly available estimates regarding the quantity of copper underlying the federal land, CBO has no basis for estimating the value of that land relative to the value of the company land. Therefore, we cannot determine whether the company would make a payment or estimate the size of any such payment.

In addition, if the company extracts more mineral resources than assumed in the original appraisal, Resolution Copper would make annual payments to the federal government. Such payments might be significant; however, based on information provided by Resolution Copper, CBO expects that those lands would not be mined within 10 years of the enactment of H.R. 687. Therefore, no payments would be made over the next 10 years.

The bill contains no intergovernmental or private-sector mandates as defined in the Unfunded Mandates Reform Act and would impose no costs on state, local, or tribal governments.

The CBO staff contact for this estimate is Jeff LaFave. The estimate was approved by Theresa Gullo, Deputy Assistant Director for Budget Analysis.

| 113TH CONGRESS<br>*1st Session* | } | HOUSE OF REPRESENTATIVES | { | REPORT<br>113–167 |

## SOUTHEAST ARIZONA LAND EXCHANGE AND CONSERVATION ACT OF 2013

———————————

JULY 22, 2013.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

———————————

Mr. HASTINGS of Washington, from the Committee on Natural Resources, submitted the following

# R E P O R T

together with

## DISSENTING VIEWS

[To accompany H.R. 687]

[Including cost estimate of the Congressional Budget Office]

The Committee on Natural Resources, to whom was referred the bill (H.R. 687) to facilitate the efficient extraction of mineral resources in southeast Arizona by authorizing and directing an exchange of Federal and non-Federal land, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike all after the enacting clause and insert the following:

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Southeast Arizona Land Exchange and Conservation Act of 2013".

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Findings and purpose.
Sec. 3. Definitions.
Sec. 4. Land exchange.
Sec. 5. Conveyance and management of non-Federal land.
Sec. 6. Value adjustment payment to United States.
Sec. 7. Withdrawal.
Sec. 8. Apache leap.
Sec. 9. Miscellaneous provisions.

**SEC. 2. FINDINGS AND PURPOSE.**

(a) FINDINGS.—Congress finds that—

29–006

2

(1) the land exchange furthers public objectives referenced in section 206 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1716) including—

(A) promoting significant job and other economic opportunities in a part of the State of Arizona that has a long history of mining, but is currently experiencing high unemployment rates and economic difficulties;

(B) facilitating the development of a world-class domestic copper deposit capable of meeting a significant portion of the annual United States demand for this strategic and important mineral, in an area which has already been subject to mining operations;

(C) significantly enhancing Federal, State, and local revenue collections in a time of severe governmental budget shortfalls;

(D) securing Federal ownership and protection of land with significant fish and wildlife, recreational, scenic, water, riparian, cultural, and other public values;

(E) assisting more efficient Federal land management via Federal acquisition of land for addition to the Las Cienegas and San Pedro National Conservation Areas, and to the Tonto and Coconino National Forests;

(F) providing opportunity for community expansion and economic diversification adjacent to the towns of Superior, Miami, and Globe, Arizona; and

(G) protecting the cultural resources and other values of the Apache Leap escarpment located near Superior, Arizona; and

(2) the land exchange is, therefore, in the public interest.

(b) PURPOSE.—It is the purpose of this Act to authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States.

**SEC. 3. DEFINITIONS.**

In this Act:

(1) APACHE LEAP.—The term "Apache Leap" means the approximately 807 acres of land depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Apache Leap" and dated February 2013.

(2) FEDERAL LAND.—The term "Federal land" means the approximately 2,422 acres of land located in Pinal County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Federal Parcel–Oak Flat" and dated February 2013.

(3) INDIAN TRIBE.—The term "Indian tribe" has the meaning given the term in section 4 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450b).

(4) NON-FEDERAL LAND.—The term "non-Federal land" means the parcels of land owned by Resolution Copper that are described in section 5(a) and, if necessary to equalize the land exchange under section 4, section 4(e)(2)(A)(i).

(5) OAK FLAT CAMPGROUND.—The term "Oak Flat Campground" means the approximately 50 acres of land comprising approximately 16 developed campsites depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Oak Flat Campground" and dated February 2013.

(6) OAK FLAT WITHDRAWAL AREA.—The term "Oak Flat Withdrawal Area" means the approximately 760 acres of land depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Oak Flat Withdrawal Area" and dated February 2013.

(7) RESOLUTION COPPER.—The term "Resolution Copper" means Resolution Copper Mining, LLC, a Delaware limited liability company, including any successor, assign, affiliate, member, or joint venturer of Resolution Copper Mining, LLC.

(8) SECRETARY.—The term "Secretary" means the Secretary of Agriculture.

(9) STATE.—The term "State" means the State of Arizona.

(10) TOWN.—The term "Town" means the incorporated town of Superior, Arizona.

**SEC. 4. LAND EXCHANGE.**

(a) IN GENERAL.—Subject to the provisions of this Act, if Resolution Copper offers to convey to the United States all right, title, and interest of Resolution Copper in and to the non-Federal land, the Secretary is authorized and directed to convey to Resolution Copper, all right, title, and interest of the United States in and to the Federal land.

(b) CONDITIONS ON ACCEPTANCE.—Title to any non-Federal land conveyed by Resolution Copper to the United States under this Act shall be in a form that—

(1) is acceptable to the Secretary, for land to be administered by the Forest Service and the Secretary of the Interior, for land to be administered by the Bureau of Land Management; and

3

(2) conforms to the title approval standards of the Attorney General of the United States applicable to land acquisitions by the Federal Government.

(c) CONSULTATION WITH INDIAN TRIBES.—If not undertaken prior to enactment of this Act, within 30 days of the date of enactment of this Act, the Secretary shall engage in government-to-government consultation with affected Indian tribes concerning issues related to the land exchange, in accordance with applicable laws (including regulations).

(d) APPRAISALS.—

(1) IN GENERAL.—As soon as practicable after the date of enactment of this Act, the Secretary and Resolution Copper shall select an appraiser to conduct appraisals of the Federal land and non-Federal land in compliance with the requirements of section 254.9 of title 36, Code of Federal Regulations.

(2) REQUIREMENTS.—

(A) IN GENERAL.—Except as provided in subparagraph (B), an appraisal prepared under this subsection shall be conducted in accordance with nationally recognized appraisal standards, including—

(i) the Uniform Appraisal Standards for Federal Land Acquisitions; and

(ii) the Uniform Standards of Professional Appraisal Practice.

(B) FINAL APPRAISED VALUE.—After the final appraised values of the Federal land and non-Federal land are determined and approved by the Secretary, the Secretary shall not be required to reappraise or update the final appraised value—

(i) for a period of 3 years beginning on the date of the approval by the Secretary of the final appraised value; or

(ii) at all, in accordance with section 254.14 of title 36, Code of Federal Regulations (or a successor regulation), after an exchange agreement is entered into by Resolution Copper and the Secretary.

(C) IMPROVEMENTS.—Any improvements made by Resolution Copper prior to entering into an exchange agreement shall not be included in the appraised value of the Federal land.

(D) PUBLIC REVIEW.—Before consummating the land exchange under this Act, the Secretary shall make the appraisals of the land to be exchanged (or a summary thereof) available for public review.

(3) APPRAISAL INFORMATION.—The appraisal prepared under this subsection shall include a detailed income capitalization approach analysis of the market value of the Federal land which may be utilized, as appropriate, to determine the value of the Federal land, and shall be the basis for calculation of any payment under section 6.

(e) EQUAL VALUE LAND EXCHANGE.—

(1) IN GENERAL.—The value of the Federal land and non-Federal land to be exchanged under this Act shall be equal or shall be equalized in accordance with this subsection.

(2) SURPLUS OF FEDERAL LAND VALUE.—

(A) IN GENERAL.—If the final appraised value of the Federal land exceeds the value of the non-Federal land, Resolution Copper shall—

(i) convey additional non-Federal land in the State to the Secretary or the Secretary of the Interior, consistent with the requirements of this Act and subject to the approval of the applicable Secretary;

(ii) make a cash payment to the United States; or

(iii) use a combination of the methods described in clauses (i) and (ii), as agreed to by Resolution Copper, the Secretary, and the Secretary of the Interior.

(B) AMOUNT OF PAYMENT.—The Secretary may accept a payment in excess of 25 percent of the total value of the land or interests conveyed, notwithstanding section 206(b) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1716(b)).

(C) DISPOSITION AND USE OF PROCEEDS.—Any amounts received by the United States under this subparagraph shall be deposited in the fund established under Public Law 90–171 (commonly known as the "Sisk Act"; 16 U.S.C. 484a) and shall be made available, in such amounts as are provided in advance in appropriation Acts, to the Secretary for the acquisition of land for addition to the National Forest System.

(3) SURPLUS OF NON-FEDERAL LAND.—If the final appraised value of the non-Federal land exceeds the value of the Federal land—

(A) the United States shall not make a payment to Resolution Copper to equalize the value; and

(B) the surplus value of the non-Federal land shall be considered to be a donation by Resolution Copper to the United States.

4

(f) OAK FLAT WITHDRAWAL AREA.—

(1) PERMITS.—Subject to the provisions of this subsection and notwith-standing any withdrawal of the Oak Flat Withdrawal Area from the mining, mineral leasing, or public land laws, the Secretary, upon enactment of this Act, shall issue to Resolution Copper—

(A) if so requested by Resolution Copper, within 30 days of such request, a special use permit to carry out mineral exploration activities under the Oak Flat Withdrawal Area from existing drill pads located outside the Area, if the activities would not disturb the surface of the Area; and

(B) if so requested by Resolution Copper, within 90 days of such request, a special use permit to carry out mineral exploration activities within the Oak Flat Withdrawal Area (but not within the Oak Flat Campground), if the activities are conducted from a single exploratory drill pad which is lo-cated to reasonably minimize visual and noise impacts on the Campground.

(2) CONDITIONS.—Any activities undertaken in accordance with this sub-section shall be subject to such reasonable terms and conditions as the Sec-retary may require.

(3) TERMINATION.—The authorization for Resolution Copper to undertake mineral exploration activities under this subsection shall remain in effect until the Oak Flat Withdrawal Area land is conveyed to Resolution Copper in accord-ance with this Act.

(g) COSTS.—As a condition of the land exchange under this Act, Resolution Copper shall agree to pay, without compensation, all costs that are—

(1) associated with the land exchange and any environmental review docu-ment under subsection (j); and

(2) agreed to by the Secretary.

(h) USE OF FEDERAL LAND.—The Federal land to be conveyed to Resolution Cop-per under this Act shall be available to Resolution Copper for mining and related activities subject to and in accordance with applicable Federal, State, and local laws pertaining to mining and related activities on land in private ownership.

(i) INTENT OF CONGRESS.—It is the intent of Congress that the land exchange di-rected by this Act shall be consummated not later than one year after the date of enactment of this Act.

(j) ENVIRONMENTAL COMPLIANCE.—Compliance with the requirements of the Na-tional Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) under this Act shall be as follows:

(1) Prior to commencing production in commercial quantities of any valuable mineral from the Federal land conveyed to Resolution Copper under this Act (except for any production from exploration and mine development shafts, adits, and tunnels needed to determine feasibility and pilot plant testing of commer-cial production or to access the ore body and tailing deposition areas), Resolu-tion Copper shall submit to the Secretary a proposed mine plan of operations.

(2) The Secretary shall, within 3 years of such submission, complete prepara-tion of an environmental review document in accordance with section 102(2) of the National Environmental Policy Act of 1969 (42 U.S.C. 4322(2)) which shall be used as the basis for all decisions under applicable Federal laws, rules and regulations regarding any Federal actions or authorizations related to the pro-posed mine and mine plan of operations of Resolution Copper, including the con-struction of associated power, water, transportation, processing, tailings, waste dump, and other ancillary facilities.

**SEC. 5. CONVEYANCE AND MANAGEMENT OF NON-FEDERAL LAND.**

(a) CONVEYANCE.—On receipt of title to the Federal land, Resolution Copper shall simultaneously convey—

(1) to the Secretary, all right, title, and interest that the Secretary determines to be acceptable in and to—

(A) the approximately 147 acres of land located in Gila County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Con-servation Act of 2013–Non-Federal Parcel–Turkey Creek" and dated Feb-ruary 2013;

(B) the approximately 148 acres of land located in Yavapai County, Ari-zona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Non-Federal Parcel–Tangle Creek" and dated February 2013;

(C) the approximately 149 acres of land located in Maricopa County, Ari-zona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Non-Federal Parcel–Cave Creek" and dated Feb-ruary 2013;

5

(D) the approximately 640 acres of land located in Coconino County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Non-Federal Parcel–East Clear Creek" and dated February 2013; and

(E) the approximately 110 acres of land located in Pinal County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Apache Leap South End" and dated February 2013; and

(2) to the Secretary of the Interior, all right, title, and interest that the Secretary of the Interior determines to be acceptable in and to—

(A) the approximately 3,050 acres of land located in Pinal County, Arizona, identified as "Lands to DOI" as generally depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Non-Federal Parcel–Lower San Pedro River" and dated February 2013;

(B) the approximately 160 acres of land located in Gila and Pinal Counties, Arizona, identified as "Lands to DOI" as generally depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Non-Federal Parcel–Dripping Springs" and dated February 2013; and

(C) the approximately 940 acres of land located in Santa Cruz County, Arizona, identified as "Lands to DOI" as generally depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2013–Non-Federal Parcel–Appleton Ranch" and dated February 2013.

(b) MANAGEMENT OF ACQUIRED LAND.—

(1) LAND ACQUIRED BY THE SECRETARY.—

(A) IN GENERAL.—Land acquired by the Secretary under this Act shall—

(i) become part of the national forest in which the land is located; and

(ii) be administered in accordance with the laws applicable to the National Forest System.

(B) BOUNDARY REVISION.—On the acquisition of land by the Secretary under this Act, the boundaries of the national forest shall be modified to reflect the inclusion of the acquired land.

(C) LAND AND WATER CONSERVATION FUND.—For purposes of section 7 of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 4601–9), the boundaries of a national forest in which land acquired by the Secretary is located shall be deemed to be the boundaries of that forest as in existence on January 1, 1965.

(2) LAND ACQUIRED BY THE SECRETARY OF THE INTERIOR.—

(A) SAN PEDRO NATIONAL CONSERVATION AREA.—

(i) IN GENERAL.—The land acquired by the Secretary of the Interior under subsection (a)(2)(A) shall be added to, and administered as part of, the San Pedro National Conservation Area in accordance with the laws (including regulations) applicable to the Conservation Area.

(ii) MANAGEMENT PLAN.—Not later than 2 years after the date on which the land is acquired, the Secretary of the Interior shall update the management plan for the San Pedro National Conservation Area to reflect the management requirements of the acquired land.

(B) DRIPPING SPRINGS.—Land acquired by the Secretary of the Interior under subsection (a)(2)(B) shall be managed in accordance with the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.) and applicable land use plans.

(C) LAS CIENEGAS NATIONAL CONSERVATION AREA.—Land acquired by the Secretary of the Interior under subsection (a)(2)(C) shall be added to, and administered as part of, the Las Cienegas National Conservation Area in accordance with the laws (including regulations) applicable to the Conservation Area.

(c) SURRENDER OF RIGHTS.—In addition to the conveyance of the non-Federal land to the United States under this Act, and as a condition of the land exchange, Resolution Copper shall surrender to the United States, without compensation, the rights held by Resolution Copper under the mining laws and other laws of the United States to commercially extract minerals under Apache Leap.

**SEC. 6. VALUE ADJUSTMENT PAYMENT TO UNITED STATES.**

(a) ANNUAL PRODUCTION REPORTING.—

(1) REPORT REQUIRED.—As a condition of the land exchange under this Act, Resolution Copper shall submit to the Secretary of the Interior an annual report indicating the quantity of locatable minerals produced during the preceding calendar year in commercial quantities from the Federal land conveyed to Resolution Copper under section 4. The first report is required to be submitted not later than February 15 of the first calendar year beginning after the date of

6

commencement of production of valuable locatable minerals in commercial quantities from such Federal land. The reports shall be submitted February 15 of each calendar year thereafter.

(2) SHARING REPORTS WITH STATE.—The Secretary shall make each report received under paragraph (1) available to the State.

(3) REPORT CONTENTS.—The reports under paragraph (1) shall comply with any recordkeeping and reporting requirements prescribed by the Secretary or required by applicable Federal laws in effect at the time of production.

(b) PAYMENT ON PRODUCTION.—If the cumulative production of valuable locatable minerals produced in commercial quantities from the Federal land conveyed to Resolution Copper under section 4 exceeds the quantity of production of locatable minerals from the Federal land used in the income capitalization approach analysis prepared under section 4(d), Resolution Copper shall pay to the United States, by not later than March 15 of each applicable calendar year, a value adjustment payment for the quantity of excess production at the same rate assumed for the income capitalization approach analysis prepared under section 4(d).

(c) STATE LAW UNAFFECTED.—Nothing in this section modifies, expands, diminishes, amends, or otherwise affects any State law relating to the imposition, application, timing, or collection of a State excise or severance tax.

(d) USE OF FUNDS.—

(1) SEPARATE FUND.—All funds paid to the United States under this section shall be deposited in a special fund established in the Treasury and shall be available, in such amounts as are provided in advance in appropriation Acts, to the Secretary and the Secretary of the Interior only for the purposes authorized by paragraph (2).

(2) AUTHORIZED USE.—Amounts in the special fund established pursuant to paragraph (1) shall be used for maintenance, repair, and rehabilitation projects for Forest Service and Bureau of Land Management assets.

**SEC. 7. WITHDRAWAL.**

Subject to valid existing rights, Apache Leap and any land acquired by the United States under this Act are withdrawn from all forms of—

(1) entry, appropriation, or disposal under the public land laws;

(2) location, entry, and patent under the mining laws; and

(3) disposition under the mineral leasing, mineral materials, and geothermal leasing laws.

**SEC. 8. APACHE LEAP.**

(a) MANAGEMENT.—

(1) IN GENERAL.—The Secretary shall manage Apache Leap to preserve the natural character of Apache Leap and to protect archeological and cultural resources located on Apache Leap.

(2) SPECIAL USE PERMITS.—The Secretary may issue to Resolution Copper special use permits allowing Resolution Copper to carry out underground activities (other than the commercial extraction of minerals) under the surface of Apache Leap that the Secretary determines would not disturb the surface of the land, subject to any terms and conditions that the Secretary may require.

(3) FENCES; SIGNAGE.—The Secretary may allow use of the surface of Apache Leap for installation of fences, signs, monitoring devices, or other measures necessary to protect the health and safety of the public, protect resources located on Apache Leap, or to ensure that activities conducted under paragraph (2) do not affect the surface of Apache Leap.

(b) PLAN.—

(1) IN GENERAL.—Not later than 3 years after the date of enactment of this Act, the Secretary, in consultation with affected Indian tribes, the Town, Resolution Copper, and other interested members of the public, shall prepare a management plan for Apache Leap.

(2) CONSIDERATIONS.—In preparing the plan under paragraph (1), the Secretary shall consider whether additional measures are necessary to—

(A) protect the cultural, archaeological, or historical resources of Apache Leap, including permanent or seasonal closures of all or a portion of Apache Leap; and

(B) provide access for recreation.

(c) MINING ACTIVITIES.—The provisions of this section shall not impose additional restrictions on mining activities carried out by Resolution Copper adjacent to, or outside of, the Apache Leap area beyond those otherwise applicable to mining activities on privately owned land under Federal, State, and local laws, rules and regulations.

7

**SEC. 9. MISCELLANEOUS PROVISIONS.—**

(a) REVOCATION OF ORDERS; WITHDRAWAL.—

(1) REVOCATION OF ORDERS.—Any public land order that withdraws the Federal land from appropriation or disposal under a public land law shall be revoked to the extent necessary to permit disposal of the land.

(2) WITHDRAWAL.—On the date of enactment of this Act, if the Federal land or any Federal interest in the non-Federal land to be exchanged under section 4 is not withdrawn or segregated from entry and appropriation under a public land law (including mining and mineral leasing laws and the Geothermal Steam Act of 1970 (30 U.S.C. 1001 et seq.)), the land or interest shall be withdrawn, without further action required by the Secretary concerned, from entry and appropriation. The withdrawal shall be terminated—

(A) on the date of consummation of the land exchange; or

(B) if Resolution Copper notifies the Secretary in writing that it has elected to withdraw from the land exchange pursuant to section 206(d) of the Federal Land Policy and Management Act of 1976, as amended (43 U.S.C. 1716(d)).

(3) RIGHTS OF RESOLUTION COPPER.—Nothing in this Act shall interfere with, limit, or otherwise impair, the unpatented mining claims or rights currently held by Resolution Copper on the Federal land, nor in any way change, diminish, qualify, or otherwise impact Resolution Copper's rights and ability to conduct activities on the Federal land under such unpatented mining claims and the general mining laws of the United States, including the permitting or authorization of such activities.

(b) MAPS, ESTIMATES, AND DESCRIPTIONS.—

(1) MINOR ERRORS.—The Secretary concerned and Resolution Copper may correct, by mutual agreement, any minor errors in any map, acreage estimate, or description of any land conveyed or exchanged under this Act.

(2) CONFLICT.—If there is a conflict between a map, an acreage estimate, or a description of land in this Act, the map shall control unless the Secretary concerned and Resolution Copper mutually agree otherwise.

(3) AVAILABILITY.—On the date of enactment of this Act, the Secretary shall file and make available for public inspection in the Office of the Supervisor, Tonto National Forest, each map referred to in this Act.

PURPOSE OF THE BILL

The purpose of H.R. 687 is to facilitate the efficient extraction of mineral resources in southeast Arizona by authorizing and directing an exchange of Federal and non-Federal land.

BACKGROUND AND NEED FOR LEGISLATION

Resolution Copper Mining LLC (Resolution Copper) owns land and holds mining claims near the Town of Superior, in southeastern Arizona. In the late 1990s, Resolution Copper's exploratory activities revealed the existence of a very large copper deposit on its claims, located between 4,500 to 7,000 feet below the surface. Resolution Copper is interested in developing a large underground mine where the ore would be extracted and removed.

The Oak Flat Campground, part of the Tonto National Forest, is located in the center of Resolution Copper's land holdings and mining claims. Approximately 760 acres of National Forest lands in and around the Oak Flat Campground were withdrawn from entry under the mining laws in 1955 along with numerous other tracks of land for the purpose of establishing several campgrounds on the public lands. See Public Land Order 1229 (Sept. 27, 1955); 20 Fed. Reg. 7336–37 (Oct. 1, 1955).

Members of the Arizona Delegation have proposed a land exchange allowing Resolution Copper to acquire the campground and adjacent withdrawn National Forest lands so the company can proceed with development of the mine. The Secretary of Agriculture would convey to Resolution Copper certain lands and interests in

8

the Tonto National Forest, Arizona, in exchange for private lands of environmental and archeological significance in the State of Arizona for management by the U.S. Forest Service and the Bureau of Land Management (BLM). Legislation is required for the proposed land exchange because it includes National Forest System lands.

The three-part land exchange would occur under H.R. 687, as follows:

U.S. Forest Service acquisition of land from Resolution Copper: The Forest Service would acquire a total of 1,194 acres from five different locations. These include Resolution Copper lands located within Coconino (640 acres), Gila (147 acres), Maricopa (149 acres), Pinal (110 acres) and Yavapai (148 acres) Counties. These lands contain riparian habitats and sensitive cultural areas, in addition to the several hundred acres that contain habitat for endangered species, and archeological sites.

BLM acquisition of land from Resolution Copper: BLM would acquire a total of 4,150 acres from three separate locations. Three thousand fifty acres would be acquired from the lower San Pedro River area, which includes one of the largest mesquite bosques (dense forest) left in Arizona, critical habitat for several endangered species, and critical bird habitat. This would be an important addition to the San Pedro Conservation Area. BLM would also acquire 160 acres in Gila County and 940 acres in Santa Cruz County.

Resolution Copper acquisition of land from Forest Service: Resolution Copper will acquire the 2,422 acre "Oak Flat" parcel, which is checker-boarded within Resolution Copper's lands. Resolution Copper already has unpatented mining claims that cover about 75% of the parcel, including the culturally sensitive Apache Leap area. This exchange will provide more protection for Apache Leap since the conveyance will prohibit any type of extraction activity and transfer this land to the federal government indefinitely. If the land received by Resolution Copper exceeds the value of the lands received by the federal government, Resolution Copper may provide additional lands to equal the exchange or provide a monetary payment. Any cash payment will be deposited in a fund established under the Sisk Act and the proceeds used to buy additional forest land for the National Forest System nationally and maintain existing federal facilities.

Enactment of this land exchange would allow for development of the mine while adding other important lands for Federal management. The mine could provide up to one-quarter of the nation's estimated annual copper needs. Resolution Copper estimates that the total economic impact of the mine will exceed $60 billion and support 3,700 jobs annually.

COMMITTEE ACTION

H.R. 687 was introduced on February 14, 2013, by Congressman Paul Gosar (R–AZ). The bill was referred to the Committee on Natural Resources, and within the Committee to the Subcommittees on Energy and Mineral Resources and Public Lands and Environmental Regulation. On March 21, 2013, the Subcommittee on Energy and Mineral Resources held a hearing on the bill. On May 15, 2013, the Full Natural Resources Committee met to consider the

9

bill. The Subcommittees on Energy and Mineral Resources and Public Lands and Environmental Regulation were discharged by unanimous consent. Congressman Gosar offered an amendment designated #1 to the bill; the amendment was adopted by voice vote. Congressman Peter DeFazio (D–OR) offered an amendment designated .001 to the bill; the amendment was not adopted by a bipartisan roll call vote of 16 to 24, as follows:

10

**Committee on Natural Resources**
U.S. House of Representatives
113th Congress

Date:   May 15, 2013                                    Recorded Vote #:  4

Meeting on / Amendment on: **H.R. 687 - DeFazio.001,** Not agreed to by vote of 16 yeas and 24 nays

| MEMBERS | Yea | Nay | Pres | MEMBERS | Yea | Nay | Pres |
|---|---|---|---|---|---|---|---|
| **Mr. Hastings, WA, Chairman** | | X | | **Mr. Duncan, SC** | | X | |
| *Mr. Markey, MA, Ranking* | | | | *Ms. Hanabusa, HI* | X | | |
| **Mr. Young, AK** | | X | | **Mr. Tipton, CO** | | X | |
| *Mr. Defazio, OR* | X | | | *Mr. Cardenas, CA* | X | | |
| **Mr. Gohmert, TX** | | | | **Mr. Gosar, AZ** | | X | |
| *Mr. Faleomavaega, AS* | | | | *Mr. Horsford, NV* | | X | |
| **Mr. Bishop, UT** | | X | | **Mr. Labrador, ID** | | X | |
| *Mr. Pallone, NJ* | X | | | *Mr. Huffman, CA* | X | | |
| **Mr. Lamborn, CO** | | X | | **Mr. Southerland, FL** | | X | |
| *Mrs. Napolitano, CA* | X | | | *Mr. Ruiz, CA* | X | | |
| **Mr. Wittman, VA** | | X | | **Mr. Flores, TX** | | X | |
| *Mr. Holt, NJ* | X | | | *Ms. Shea-Porter, NH* | X | | |
| **Mr. Broun, GA** | | | | **Mr. Runyan, NJ** | | X | |
| *Mr. Grijalva, AZ* | X | | | *Mr. Lowenthal, CA* | X | | |
| **Mr. Fleming, LA** | | X | | **Mr. Amodei, NV** | | X | |
| *Ms. Bordallo, GU* | X | | | *Mr. Garcia, FL* | X | | |
| **Mr. McClintock, CA** | | X | | **Mr. Mullin, OK** | | X | |
| *Mr. Costa, CA* | | | | *Mr. Cartwright, PA* | X | | |
| **Mr. Thompson, PA** | | X | | **Mr. Stewart, UT** | | X | |
| *Mr. Sablan, CNMI* | X | | | **Mr. Daines, MT** | | X | |
| **Ms. Lummis, WY** | | X | | **Mr. Cramer, ND** | | X | |
| *Ms. Tsongas, MA* | X | | | **Mr. LaMalfa, CA** | | X | |
| **Mr. Benishek, MI** | | X | | | | | |
| *Mr. Pierluisi, PR* | | | | | | | |
| | | | | | | | |
| | | | | **TOTALS** | 16 | 24 | |

11

Congressman Tony Cárdenas (D–CA) offered an amendment designated .003 to the bill; the amendment was not adopted by a roll call vote of 18 to 22, as follows:

12

**Committee on Natural Resources**
U.S. House of Representatives
113th Congress

Date:   May 15, 2013                                    Recorded Vote #:  5

Meeting on / Amendment on: **H.R. 687 - Cardenas.003**, Not agreed to by vote of 18 yeas and 22 nays

| MEMBERS | Yea | Nay | Pres | MEMBERS | Yea | Nay | Pres |
|---|---|---|---|---|---|---|---|
| **Mr. Hastings, WA, Chairman** | | X | | **Mr. Duncan, SC** | | X | |
| *Mr. Markey, MA, Ranking* | | | | *Ms. Hanabusa, HI* | X | | |
| **Mr. Young, AK** | | X | | **Mr. Tipton, CO** | | X | |
| *Mr. Defazio, OR* | X | | | *Mr. Cardenas, CA* | X | | |
| **Mr. Gohmert, TX** | | | | **Mr. Gosar, AZ** | | X | |
| *Mr. Faleomavaega, AS* | | | | *Mr. Horsford, NV* | X | | |
| **Mr. Bishop, UT** | | X | | **Mr. Labrador, ID** | | X | |
| *Mr. Pallone, NJ* | X | | | *Mr. Huffman, CA* | X | | |
| **Mr. Lamborn, CO** | | X | | **Mr. Southerland, FL** | | X | |
| *Mrs. Napolitano, CA* | X | | | *Mr. Ruiz, CA* | X | | |
| **Mr. Wittman, VA** | | X | | **Mr. Flores, TX** | | X | |
| *Mr. Holt, NJ* | X | | | *Ms. Shea-Porter, NH* | X | | |
| **Mr. Broun, GA** | | | | **Mr. Runyan, NJ** | | X | |
| *Mr. Grijalva, AZ* | X | | | *Mr. Lowenthal, CA* | X | | |
| **Mr. Fleming, LA** | | X | | **Mr. Amodei, NV** | | X | |
| *Ms. Bordallo, GU* | X | | | *Mr. Garcia, FL* | X | | |
| **Mr. McClintock, CA** | | X | | **Mr. Mullin, OK** | X | | |
| *Mr. Costa, CA* | | | | *Mr. Cartwright, PA* | X | | |
| **Mr. Thompson, PA** | | X | | **Mr. Stewart, UT** | | X | |
| *Mr. Sablan, CNMI* | X | | | **Mr. Daines, MT** | | X | |
| **Ms. Lummis, WY** | | X | | **Mr. Cramer, ND** | | X | |
| *Ms. Tsongas, MA* | X | | | **Mr. LaMalfa, CA** | | X | |
| **Mr. Benishek, MI** | | X | | | | | |
| *Mr. Pierluisi, PR* | | | | | | | |
| | | | | | | | |
| | | | | **TOTALS** | 18 | 22 | |

13

Congressman Rául Grijalva (D–AZ) offered an amendment designated .036 to the bill; the amendment was not adopted by a roll call vote of 18 to 22, as follows:

14

**Committee on Natural Resources**
U.S. House of Representatives
113th Congress

Date:   May 15, 2013                                          Recorded Vote #:  6

Meeting on / Amendment on: **H.R. 687 - Grijalva.036**, Not agreed to by vote of 18 yeas and 22 nays

| MEMBERS | Yea | Nay | Pres | MEMBERS | Yea | Nay | Pres |
|---|---|---|---|---|---|---|---|
| **Mr. Hastings, WA, Chairman** | | X | | **Mr. Duncan, SC** | | X | |
| *Mr. Markey, MA, Ranking* | | | | *Ms. Hanabusa, HI* | X | | |
| **Mr. Young, AK** | | X | | **Mr. Tipton, CO** | | X | |
| *Mr. Defazio, OR* | X | | | *Mr. Cardenas, CA* | X | | |
| **Mr. Gohmert, TX** | | | | **Mr. Gosar, AZ** | | X | |
| *Mr. Faleomavaega, AS* | | | | *Mr. Horsford, NV* | X | | |
| **Mr. Bishop, UT** | | X | | **Mr. Labrador, ID** | | X | |
| *Mr. Pallone, NJ* | X | | | *Mr. Huffman, CA* | X | | |
| **Mr. Lamborn, CO** | | X | | **Mr. Southerland, FL** | | X | |
| *Mrs. Napolitano, CA* | X | | | *Mr. Ruiz, CA* | X | | |
| **Mr. Wittman, VA** | | X | | **Mr. Flores, TX** | | X | |
| *Mr. Holt, NJ* | X | | | *Ms. Shea-Porter, NH* | X | | |
| **Mr. Broun, GA** | | | | **Mr. Runyan, NJ** | | X | |
| *Mr. Grijalva, AZ* | X | | | *Mr. Lowenthal, CA* | X | | |
| **Mr. Fleming, LA** | | X | | **Mr. Amodei, NV** | | X | |
| *Ms. Bordallo, GU* | X | | | *Mr. Garcia, FL* | X | | |
| **Mr. McClintock, CA** | | X | | **Mr. Mullin, OK** | X | | |
| *Mr. Costa, CA* | | | | *Mr. Cartwright, PA* | X | | |
| **Mr. Thompson, PA** | | X | | **Mr. Stewart, UT** | | X | |
| *Mr. Sablan, CNMI* | X | | | **Mr. Daines, MT** | | X | |
| **Ms. Lummis, WY** | | X | | **Mr. Cramer, ND** | | X | |
| *Ms. Tsongas, MA* | X | | | **Mr. LaMalfa, CA** | | X | |
| **Mr. Benishek, MI** | | X | | | | | |
| *Mr. Pierluisi, PR* | | | | | | | |
| | | | | | | | |
| | | | | **TOTALS** | 18 | 22 | |

15

Congressman Rául Grijalva (D–AZ) offered an amendment designated .037 to the bill; the amendment was not adopted by voice vote. Congressman Rául Grijalva (D–AZ) offered an amendment designated .040 to the bill; the amendment was not adopted by a roll call vote of 17 to 23, as follows:

16

**Committee on Natural Resources**
U.S. House of Representatives
113th Congress

Date:   May 15, 2013                                      Recorded Vote #:  7

Meeting on / Amendment on: **H.R. 687 - Grijalva.040**, Not agreed to by vote of 17 yeas and 23 nays

| MEMBERS | Yea | Nay | Pres | MEMBERS | Yea | Nay | Pres |
|---|---|---|---|---|---|---|---|
| **Mr. Hastings, WA, Chairman** | | X | | **Mr. Duncan, SC** | | X | |
| *Mr. Markey, MA, Ranking* | | | | *Ms. Hanabusa, HI* | X | | |
| **Mr. Young, AK** | | X | | **Mr. Tipton, CO** | | X | |
| *Mr. Defazio, OR* | X | | | *Mr. Cardenas, CA* | X | | |
| **Mr. Gohmert, TX** | | | | **Mr. Gosar, AZ** | | X | |
| *Mr. Faleomavaega, AS* | | | | *Mr. Horsford, NV* | X | | |
| **Mr. Bishop, UT** | | X | | **Mr. Labrador, ID** | | X | |
| *Mr. Pallone, NJ* | X | | | *Mr. Huffman, CA* | X | | |
| **Mr. Lamborn, CO** | | X | | **Mr. Southerland, FL** | | X | |
| *Mrs. Napolitano, CA* | X | | | *Mr. Ruiz, CA* | X | | |
| **Mr. Wittman, VA** | | X | | **Mr. Flores, TX** | | X | |
| *Mr. Holt, NJ* | X | | | *Ms. Shea-Porter, NH* | X | | |
| **Mr. Broun, GA** | | | | **Mr. Runyan, NJ** | | X | |
| *Mr. Grijalva, AZ* | X | | | *Mr. Lowenthal, CA* | X | | |
| **Mr. Fleming, LA** | | X | | **Mr. Amodei, NV** | | X | |
| *Ms. Bordallo, GU* | X | | | *Mr. Garcia, FL* | X | | |
| **Mr. McClintock, CA** | | X | | **Mr. Mullin, OK** | | X | |
| *Mr. Costa, CA* | | | | *Mr. Cartwright, PA* | X | | |
| **Mr. Thompson, PA** | | X | | **Mr. Stewart, UT** | | X | |
| *Mr. Sablan, CNMI* | X | | | **Mr. Daines, MT** | | X | |
| **Ms. Lummis, WY** | | X | | **Mr. Cramer, ND** | | X | |
| *Ms. Tsongas, MA* | X | | | **Mr. LaMalfa, CA** | | X | |
| **Mr. Benishek, MI** | | X | | | | | |
| *Mr. Pierluisi, PR* | | | | | | | |
| | | | | | | | |
| | | | | **TOTALS** | 17 | 23 | |

17

    Congresswoman Grace Napolitano (D–CA) offered an amendment designated .002 to the bill; the amendment was not adopted by a roll call vote of 18 to 23, as follows:

18

**Committee on Natural Resources**
U.S. House of Representatives
113th Congress

Date:   May 15, 2013                                    Recorded Vote #:  8

Meeting on / Amendment on: **H.R. 687 - Napolitano.002**, Not agreed to by vote of 18 yeas and 23 nays

| MEMBERS | Yea | Nay | Pres | MEMBERS | Yea | Nay | Pres |
|---------|-----|-----|------|---------|-----|-----|------|
| **Mr. Hastings, WA, Chairman** | | X | | **Mr. Duncan, SC** | | X | |
| *Mr. Markey, MA, Ranking* | | | | *Ms. Hanabusa, HI* | X | | |
| **Mr. Young, AK** | | X | | **Mr. Tipton, CO** | | X | |
| *Mr. Defazio, OR* | X | | | *Mr. Cardenas, CA* | X | | |
| **Mr. Gohmert, TX** | | | | **Mr. Gosar, AZ** | | X | |
| *Mr. Faleomavaega, AS* | | | | *Mr. Horsford, NV* | X | | |
| **Mr. Bishop, UT** | | X | | **Mr. Labrador, ID** | | X | |
| *Mr. Pallone, NJ* | X | | | *Mr. Huffman, CA* | X | | |
| **Mr. Lamborn, CO** | | X | | **Mr. Southerland, FL** | | X | |
| *Mrs. Napolitano, CA* | X | | | *Mr. Ruiz, CA* | X | | |
| **Mr. Wittman, VA** | | X | | **Mr. Flores, TX** | | X | |
| *Mr. Holt, NJ* | X | | | *Ms. Shea-Porter, NH* | X | | |
| **Mr. Broun, GA** | | | | **Mr. Runyan, NJ** | | X | |
| *Mr. Grijalva, AZ* | X | | | *Mr. Lowenthal, CA* | X | | |
| **Mr. Fleming, LA** | | X | | **Mr. Amodei, NV** | | X | |
| *Ms. Bordallo, GU* | X | | | *Mr. Garcia, FL* | X | | |
| **Mr. McClintock, CA** | | X | | **Mr. Mullin, OK** | | X | |
| *Mr. Costa, CA* | | | | *Mr. Cartwright, PA* | X | | |
| **Mr. Thompson, PA** | | X | | **Mr. Stewart, UT** | | X | |
| *Mr. Sablan, CNMI* | X | | | **Mr. Daines, MT** | | X | |
| **Ms. Lummis, WY** | | X | | **Mr. Cramer, ND** | | X | |
| *Ms. Tsongas, MA* | X | | | **Mr. LaMalfa, CA** | | X | |
| **Mr. Benishek, MI** | | X | | | | | |
| *Mr. Pierluisi, PR* | X | | | | | | |
| | | | | | | | |
| | | | | **TOTALS** | 18 | 23 | |

19

No further amendments were offered and the bill, as amended, was then adopted and ordered favorably reported to the House of Representatives by a bipartisan roll call vote of 23 to 19, as follows:

20

**Committee on Natural Resources**
U.S. House of Representatives
113th Congress

Date:   May 15, 2013                                      Recorded Vote #:  9

Meeting on / Amendment on: **H.R. 687 -** To adopt and favorably report the bill to the House, as amended, agreed to by a vote of 23 yeas to 19 nays

| MEMBERS | Yea | Nay | Pres | MEMBERS | Yea | Nay | Pres |
|---|---|---|---|---|---|---|---|
| **Mr. Hastings, WA, Chairman** | X | | | **Mr. Duncan, SC** | X | | |
| *Mr. Markey, MA, Ranking* | | | | *Ms. Hanabusa, HI* | | X | |
| **Mr. Young, AK** | X | | | **Mr. Tipton, CO** | X | | |
| *Mr. Defazio, OR* | | X | | *Mr. Cardenas, CA* | | X | |
| **Mr. Gohmert, TX** | | | | **Mr. Gosar, AZ** | X | | |
| *Mr. Faleomavaega, AS* | | | | *Mr. Horsford, NV* | X | | |
| **Mr. Bishop, UT** | X | | | **Mr. Labrador, ID** | X | | |
| *Mr. Pallone, NJ* | | X | | *Mr. Huffman, CA* | | X | |
| **Mr. Lamborn, CO** | X | | | **Mr. Southerland, FL** | X | | |
| *Mrs. Napolitano, CA* | | X | | *Mr. Ruiz, CA* | | X | |
| **Mr. Wittman, VA** | X | | | **Mr. Flores, TX** | X | | |
| *Mr. Holt, NJ* | | X | | *Ms. Shea-Porter, NH* | | X | |
| **Mr. Broun, GA** | | | | **Mr. Runyan, NJ** | X | | |
| *Mr. Grijalva, AZ* | | X | | *Mr. Lowenthal, CA* | | X | |
| **Mr. Fleming, LA** | X | | | **Mr. Amodei, NV** | X | | |
| *Ms. Bordallo, GU* | | X | | *Mr. Garcia, FL* | | X | |
| **Mr. McClintock, CA** | X | | | **Mr. Mullin, OK** | | X | |
| *Mr. Costa, CA* | | X | | *Mr. Cartwright, PA* | | X | |
| **Mr. Thompson, PA** | X | | | **Mr. Stewart, UT** | X | | |
| *Mr. Sablan, CNMI* | | X | | **Mr. Daines, MT** | X | | |
| **Ms. Lummis, WY** | X | | | **Mr. Cramer, ND** | X | | |
| *Ms. Tsongas, MA* | | X | | **Mr. LaMalfa, CA** | X | | |
| **Mr. Benishek, MI** | X | | | | | | |
| *Mr. Pierluisi, PR* | | X | | | | | |
| | | | | | | | |
| | | | | **TOTALS** | 23 | 19 | |

21

COMMITTEE OVERSIGHT FINDINGS AND RECOMMENDATIONS

Regarding clause 2(b)(1) of rule X and clause 3(c)(1) of rule XIII of the Rules of the House of Representatives, the Committee on Natural Resources' oversight findings and recommendations are reflected in the body of this report.

COMPLIANCE WITH HOUSE RULE XIII

1. Cost of Legislation. Clause 3(d)(1) of rule XIII of the Rules of the House of Representatives requires an estimate and a comparison by the Committee of the costs which would be incurred in carrying out this bill. However, clause 3(d)(2)(B) of that rule provides that this requirement does not apply when the Committee has included in its report a timely submitted cost estimate of the bill prepared by the Director of the Congressional Budget Office under section 402 of the Congressional Budget Act of 1974. Under clause 3(c)(3) of rule XIII of the Rules of the House of Representatives and section 403 of the Congressional Budget Act of 1974, the Committee has received the following cost estimate for this bill from the Director of the Congressional Budget Office:

*H.R. 687—Southeast Arizona Land Exchange and Conservation Act of 2013*

H.R. 687 would authorize a land exchange in Arizona between the federal government and a mining company. Based on information provided by the affected agencies, CBO estimates that implementing the bill would cost less than $500,000 annually, assuming the availability of appropriated funds. Those costs would include preparing management plans and administering private lands received in exchange for federal land.

Enacting the legislation could increase offsetting receipts, which are treated as reductions in direct spending; however, CBO has insufficient information to estimate whether any receipts would be collected under the bill. Because enacting the bill could affect direct spending, pay-as-you-go procedures apply.

Under H.R. 687, the Forest Service would convey about 2,400 acres of land in southeast Arizona to Resolution Copper Mining LLC in exchange for about 5,400 acres of company-owned land. Of the company land, about 1,200 acres would become part of the National Forest System, and about 4,200 acres would be administered as conservation areas by the Bureau of Land Management.

If the property sought by Resolution Copper is appraised at more than the appraised value of the property that the company offers for exchange, the company could donate additional land or make a cash payment to the United States to make the final exchange of equal value. If the company's property is appraised for more than the federal acreage, the difference in the value would be considered a donation to the federal government. Any cash payment received by the Forest Service would be deposited in the U.S. Treasury as an offsetting receipt. In addition, after completion of the exchange, Resolution Copper would have to pay the federal government a portion of any future income earned on the former federal property if the company determines that the actual cumulative production of minerals located on that property exceeds the value of the estimated production used in the original appraisal process.

22

The bill's effect on offsetting receipts would depend on the outcome of formal appraisals of the federal and private properties that would be conducted after enactment. Those appraisals would determine the relative values of the properties affected by the exchange, including the value of mineral deposits that underlie the federal land. If the value of the federal land were to exceed the value of the company land, Resolution Copper could pay the government a lump sum equal to the difference in property values in the year or two following enactment. That payment might be significant; however, because there are no publicly available estimates regarding the quantity of copper underlying the federal land, CBO has no basis for estimating the value of that land relative to the value of the company land. Therefore, we cannot determine whether the company would make a payment or estimate the size of any such payment.

In addition, if the company extracts more mineral resources than assumed in the original appraisal, Resolution Copper would make annual payments to the federal government. Such payments might be significant; however, based on information provided by Resolution Copper, CBO expects that those lands would not be mined within 10 years of the enactment of H.R. 687. Therefore, no payments would be made over the next 10 years.

The bill contains no intergovernmental or private-sector mandates as defined in the Unfunded Mandates Reform Act and would impose no costs on state, local, or tribal governments.

The CBO staff contact for this estimate is Jeff LaFave. The estimate was approved by Theresa Gullo, Deputy Assistant Director for Budget Analysis.

2. Section 308(a) of Congressional Budget Act. As required by clause 3(c)(2) of rule XIII of the Rules of the House of Representatives and section 308(a) of the Congressional Budget Act of 1974, this bill does not contain any new budget authority, spending authority, credit authority, or an increase or decrease in revenues or tax expenditures. Based on information provided by the affected agencies, CBO estimates that implementing the bill would cost less than $500,000 annually, assuming the availability of appropriated funds.

3. General Performance Goals and Objectives. As required by clause 3(c)(4) of rule XIII, the general performance goal or objective of this bill is to facilitate the efficient extraction of mineral resources in southeast Arizona by authorizing and directing an exchange of Federal and non-Federal land.

EARMARK STATEMENT

This bill does not contain any Congressional earmarks, limited tax benefits, or limited tariff benefits as defined under clause 9(e), 9(f), and 9(g) of rule XXI of the Rules of the House of Representatives.

COMPLIANCE WITH PUBLIC LAW 104–4

This bill contains no unfunded mandates.

23

COMPLIANCE WITH H. RES. 5

Directed Rule Making. The Chairman does not believe that this bill directs any executive branch official to conduct any specific rule-making proceedings.

Duplication of Existing Programs. This bill does not establish or reauthorize a program of the federal government known to be duplicative of another program. Such program was not included in any report from the Government Accountability Office to Congress pursuant to section 21 of Public Law 111–139 or identified in the most recent Catalog of Federal Domestic Assistance published pursuant to the Federal Program Information Act (Public Law 95–220, as amended by Public Law 98–169) as relating to other programs.

PREEMPTION OF STATE, LOCAL OR TRIBAL LAW

This bill is not intended to preempt any State, local or tribal law.

CHANGES IN EXISTING LAW

If enacted, this bill would make no changes in existing law.

DISSENTING VIEWS

H.R. 687 will rob Native People of their heritage, local people of their water and the American people of valuable natural resources, all to benefit two large, foreign-owned mining corporations. This legislation is an abdication of our responsibilities as stewards of the public lands and the public trust and it should be rejected by the House.

Resolution Copper Mining, LLC (Resolution Copper) is a subsidiary of Rio Tinto and BHP-Billiton. Resolution Copper owns land and holds mining claims on the Tonto National Forest in Southeastern Arizona. The company believes the area is home to a significant copper deposit and is seeking to develop a lucrative copper mining operation. However, approximately 760 acres of national forest land in the area was withdrawn from mining by President Eisenhower in 1955. Resolution Copper is seeking H.R. 687 to require the federal government to exchange the withdrawn forest land for land owned by the Company so that the mining operation can proceed.

Evaluating the merits of land exchanges is difficult under the best of circumstances; H.R. 687 would require this land exchange to proceed under the worst of circumstances. By waiving timely Tribal consultation, standard appraisal requirements and meaningful compliance with the National Environmental Policy Act (NEPA) (42 U.S.C. § 4321 et seq.), H.R. 687 would require that the exchange go forward without mitigation or even analysis of its potentially devastating impacts.

Testimony received by the Committee indicates that the mining operation planned by Resolution Copper would require 40,000 acre-feet of water per year; roughly the amount used by the city of Tempe (population 160,000). The company has been less than transparent regarding where they would find this massive quantity of water in Southeastern Arizona. Past practice for mining companies has been to simply sink deeper wells and take the water they need, leaving their neighbors literally high and dry.

Securing a fair return to taxpayers on this exchange is difficult given that the most valuable aspect of the exchange by far is the copper, the value of which is speculative but estimated to be worth billions of dollars. Rather than clarifying the valuation issue, H.R. 687 further muddies the waters by requiring highly unusual appraisal procedures which fail to guarantee that Resolution Copper will pay a fair price for the copper it stands to receive from the American people.

The principal justification for this land exchange is the creation of jobs in Southeastern Arizona. These claims are highly suspect, however, given that Rio Tinto and BHP-Billiton are pioneers in the automation and remote control of mining operations.

(24)

25

Finally, H.R. 687 trades away several sites that are sacred to Native People. The hearing record includes desperate pleas from the San Carlos Apache Tribe, White Mountain Apache Tribe, Yavapai-Apache Nation, Tonto Apache Tribe, Fort McDowell Yavapai Nation, Hualapai Tribe, Jicarilla Apache Nation, Mescalero Apache Tribe, the Pueblo of Zuni and other Native Nations to respect their religious and cultural traditions.

Instead, the bill waives compliance with NEPA, the Native American Graves Protection Act, and all other statutes that might give Tribes a voice. The final insult comes when the bill requires consultation with Native People—*after* the land exchange has occurred.

The majority rejected an amendment from Representative DeFazio (D–OR) that would have imposed a royalty rate of 12.5 percent on minerals produced from the conveyed federal land, required Resolution Copper to annually report to the Secretary of the Interior the amount of minerals produced from the conveyed federal land, and required that the funds received from the royalty payments be used for abandoned hardrock mine lands reclamation.

The Majority also rejected an amendment from Water and Power Subcommittee Ranking Member Napolitano (D–CA) that would have prevented adverse impacts on water quantity and quality in the development of this project.

The Majority rejected three amendments from Public Lands and Environmental Regulation Subcommittee Ranking Member Grijalva (D–AZ). The first would have excluded any Native American sacred or cultural sites, including Apache Leap, from the federal land conveyance.

The second Grijalva amendment would have required the mining plan for the conveyed federal land to support the local workforce, while the third would have made the conveyance of federal land contingent on the Secretary of the Interior completing an environmental review document regarding the land exchange, proposed mine, and mine plan of operations in accordance with NEPA.

In one fell swoop, H.R. 687 would gather up hundreds of acres of sacred land, thousands of acre-feet of precious water, and millions of tons of valuable copper, and hand it all over to Resolution Copper and its owners, Rio Tinto and BHP-Billiton. Such a move would be a disservice to local residents, Tribes and taxpayers. The House should reject this irresponsible and unwise proposal.

Peter DeFazio.
Grace F. Napolitano.
Rush Holt.
Raúl M. Grijalva.

○

No. 25-5185

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION
OF ARIZONA, INC.; CENTER FOR BIOLOGICAL DIVERSITY;
EARTHWORKS; THE ACCESS FUND; and SIERRA CLUB.

*Plaintiffs-Appellants*,

v.

BROOKE L. ROLLINS, U.S. SECRETARY OF AGRICULTURE; UNITED
STATES FOREST SERVICE; and NEIL BOSWORTH, SUPERVISOR OF THE
TONTO NATIONAL FOREST.

*Defendants-Appellees*,

and

RESOLUTION COPPER MINING, LLC

*Intervenor-Defendant-Appellee.*

_____

On Appeal from the United States District
Court for the District of Arizona
(District Judge Dominic W. Lanza)
_____

**PLAINTIFFS-APPELLANTS' EXCERPTS OF RECORD
VOLUME 5 of 5**
*In Support of*
***PLAINTIFFS-APPELLANTS' EMERGENCY MOTION UNDER
CIRCUIT RULE 27-3
RELIEF REQUESTED BY AUGUST 18, 2025, AS THE LAND TITLE
TRANSFER WILL OCCUR ON AUGUST 19, 2025***

Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
mfink@biologicaldiversity.org

Allison N. Henderson
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs-Appellants*

Susan B. Montgomery
Robyn L. Interpreter
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorneys for the Inter Tribal Association of Arizona, Inc.*

**INDEX**

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| **Volume 1 of 5 [99 pages]** | | | |
| Order (August 15, 2025) | 8/15/2025 | 99 | 6-99 |
| **Volume 2 of 5 [268 pages]** | | | |
| Federal Defendants' Memo in Support of Summary Judgment, *CBD v. USFS*, Case No. 23-cv-00928 (DLF) (D.D.C., August 22, 2024) | 8/4/2025 | 97-1 | 105-154 |
| BLM Review of Hydrology Aspects of the Resolution Copper Project | 7/14/2025 | 87-1 | 155-180 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, June 2025 | 7/14/2025 | 87-2 | 181-275 |
| Draft Record of Decision, June 2025 | 7/14/2025 | 87-3 | 276-367 |
| **Volume 3 of 5 [180 pages]** | | | |
| Declaration of Maria Dadgar | 7/14/2025 | 87-5 | 373-380 |
| Declaration of Roger Featherstone | 7/14/2025 | 87-6 | 381-387 |

| | | | |
|---|---|---|---|
| Declaration of Russ McSpadden | 7/14/2025 | 87-7 | 388-399 |
| Declaration of Erik Murdock | 7/14/2025 | 87-8 | 400-403 |
| Declaration of Sandra Bahr | 7/14/2025 | 87-9 | 404-408 |
| Master Water Plan for Superstition Vistas, Apache Junction, Arizona | 7/14/2025 | 87-10 | 409-547 |
| **Volume 4 of 5 [195 pages]** | | | |
| Appraisal Report Summary: Mining Claim Zone MCZ Parcel | 7/14/2025 | 87-11 | 553-567 |
| Appraisal Report Summary: Mineral Withdrawal Area (MWA) Parcel | 7/14/2025 | 87-12 | 568-595 |
| Technical Appraisal Review Report: MWA Parcel (excerpts) | 7/14/2025 | 87-13 | 596-598 |
| Oversight and Legislative Hearing Before the U.S. House of Representatives Subcommittee on Energy & Mineral Resources, March 2013 | 7/14/2025 | 87-14 | 599-715 |
| Congressional Budget Office Cost Estimate, July 2013 | 7/14/2025 | 87-15 | 716-717 |

| | | | |
|---|---|---|---|
| House Natural Resources Committee House Report No. 113-167, July 2013 | 7/14/2025 | 87-16 | 718-742 |
| **Volume 5 of 5 [296 pages]** | | | |
| Uniform Appraisal Standards for Federal Land Acquisitions | 7/14/2025 | 87-17 | 748-1009 |
| Excerpt from Resolution Copper Mining's General Plan of Operations, 2016 | 7/14/2025 | 87-18 | 1010 |
| Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange, January 2021 (rescinded) | 7/14/2025 | 87-19 | 1011-1013 |
| USDA Memo for Withdrawal of Notice of Availability, Rescind Final Environmental Impact Statement and Draft Record of Decision | 3/2/2021 | 26-2 | 1014 |
| Notice of Appeal | 8/15/2025 | 100 | 1015-1020 |
| Civil Docket for Case No. 2:21-cv-00122-DWL – United States District Court, District of Arizona (Phoenix) – *Arizona Mining Reform Coalition, et al. v. United States Forest Service, et al.* | | | 1021-1038 |

*Interagency Land Acquisition Conference*

# UNIFORM APPRAISAL STANDARDS FOR FEDERAL LAND ACQUISITIONS

2016



The Yellow Book is available in an enhanced electronic version and in print from The Appraisal Foundation. Please visit these links to purchase your copy today!

**Yellow Book Electronic PDF Edition**
**Yellow Book in Print** (available mid-February 2017)

The Uniform Appraisal Standards for Federal Land Acquisitions have been developed, revised, approved, adopted and promulgated on behalf of the Interagency Land Acquisition Conference. The Conference is solely and exclusively responsible for the content of the Standards. The Appraisal Foundation provided editing and technical assistance to the Standards, but neither undertakes nor assumes any responsibility whatsoever for the content of the Standards. The Appraisal Foundation has published the Uniform Appraisal Standards for Federal Land Acquisitions on behalf of the Conference and in cooperation with the United States Department of Justice.

**Printed in the United States of America**

**ISBN:** 978-0-09892208-8-0



THE APPRAISAL FOUNDATION
*Authorized by Congress as the Source of Appraisal*
*Standards and Appraiser Qualifications*

The Appraisal Foundation is the nation's foremost authority on the valuation profession. The organization sets the Congressionally authorized standards and qualifications for real estate appraisers, and provides voluntary guidance on recognized valuation methods and techniques for all valuation professionals. This work advances the profession by ensuring that appraisals are independent, consistent, and objective.

# TABLE OF CONTENTS

**FOREWORD** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**ACKNOWLEDGEMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**0. INTRODUCTORY MATERIAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   0.1.  Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   0.2.  Governing Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   0.3.  Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

   0.4.  About the Sixth Edition to the "Yellow Book." . . . . . . . . . . . . . . 6

   0.5.  Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**1. APPRAISAL DEVELOPMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   1.1.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   1.2.  Problem Identification . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      1.2.1. Client . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      1.2.2. Intended Users . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      1.2.3. Intended Use. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      1.2.4. Type of Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      1.2.5. Effective Date.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      1.2.6. Relevant Characteristics of the Subject Property. . . . . . . . . . . 11

         1.2.6.1. Property Interest(s) to be Appraised . . . . . . . . . . . . . 11

         1.2.6.2.Legal Description . . . . . . . . . . . . . . . . . . . . . . . 11

         1.2.6.3. Property Inspections . . . . . . . . . . . . . . . . . . . . . 12

         1.2.6.4. Contacting Landowners . . . . . . . . . . . . . . . . . . . 12

      1.2.7. Assignment Conditions . . . . . . . . . . . . . . . . . . . . . . . 12

         1.2.7.1. Instructions, Hypothetical Conditions, Extraordinary Assumptions. . . . . . . . 13

         1.2.7.2. Jurisdictional Exceptions . . . . . . . . . . . . . . . . . . 14

         1.2.7.3. Special Rules and Methods . . . . . . . . . . . . . . . . . 15

            1.2.7.3.1. Larger Parcel . . . . . . . . . . . . . . . . . . . 16

            1.2.7.3.2. Unit Rule . . . . . . . . . . . . . . . . . . . . . 16

            1.2.7.3.3. Government Project Influence and the "Scope of the Project" Rule  16

            1.2.7.3.4. Before and After Rule . . . . . . . . . . . . . . . 17

            1.2.7.3.5. Damages. . . . . . . . . . . . . . . . . . . . . . 17

            1.2.7.3.6. Benefits . . . . . . . . . . . . . . . . . . . . . . 18

      1.2.8. Scope of Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

   1.3.  Data Collection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      1.3.1. Property Data.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

         1.3.1.1. Land . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

         1.3.1.2. Improvements . . . . . . . . . . . . . . . . . . . . . . . . 18

         1.3.1.3. Zoning and Land Use Controls . . . . . . . . . . . . . . . 19

        1.3.1.4. Use History . . . . . . . . . . . . . . . . . . . . . . . .20
        1.3.1.5. Sales History . . . . . . . . . . . . . . . . . . . . . .21
        1.3.1.6. Rental History . . . . . . . . . . . . . . . . . . . . .21
        1.3.1.7. Assessed Value and Annual Tax Load . . . . . . . . . .21
1.4.    Data Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        1.4.1. Area and Neighborhood Analysis . . . . . . . . . . . . . .22
        1.4.2. Marketability Studies . . . . . . . . . . . . . . . . . . .22
        1.4.3. Highest and Best Use . . . . . . . . . . . . . . . . . . .22
        1.4.4. Definition . . . . . . . . . . . . . . . . . . . . . . . .22
        1.4.5. Four Tests . . . . . . . . . . . . . . . . . . . . . . . .22
                1.4.5.1. Economic Use . . . . . . . . . . . . . . . . . . 23
        1.4.6. Larger Parcel Analysis . . . . . . . . . . . . . . . . . .23
        1.4.7. Highest and Best Use Conclusion . . . . . . . . . . . . .24
1.5.    Application of Approaches to Value . . . . . . . . . . . . . . . . 25
        1.5.1. Land Valuation . . . . . . . . . . . . . . . . . . . . . .25
                1.5.1.1. Sales Comparison Approach . . . . . . . . . . . .25
                1.5.1.2. Subdivision Development Method . . . . . . . . . 25
                1.5.1.3. Ground Leases . . . . . . . . . . . . . . . . . 26
        1.5.2. Sales Comparison Approach . . . . . . . . . . . . . . . .26
                1.5.2.1. Prior Sales of Subject Property . . . . . . . . 26
                1.5.2.2. Selection and Verification of Sales . . . . . . 26
                1.5.2.3. Adjustment Process . . . . . . . . . . . . . . .27
                1.5.2.4. Sales Requiring Extraordinary Verification . . .28
        1.5.3. Cost Approach . . . . . . . . . . . . . . . . . . . . . . 33
                1.5.3.1. Critical Elements . . . . . . . . . . . . . . . 34
                        1.5.3.1.1. Reproduction and Replacement Costs . .34
                        1.5.3.1.2. Depreciation . . . . . . . . . . . . .34
                        1.5.3.1.3. Entrepreneurial Profit . . . . . . . .35
                        1.5.3.1.4. Unit Rule . . . . . . . . . . . . . . 35
        1.5.4. Income Capitalization Approach . . . . . . . . . . . . . .35
                1.5.4.1. Market Rent . . . . . . . . . . . . . . . . . . 35
                1.5.4.2. Comparable Leases . . . . . . . . . . . . . . . 35
                1.5.4.3. Expense Analysis . . . . . . . . . . . . . . . .35
                1.5.4.4. Direct Capitalization . . . . . . . . . . . . . 36
                1.5.4.5. Yield Capitalization (Discounted Cash-Flow [DCF] Analysis) . . . . . . .36
1.6.    The Reconciliation Process and Final Opinion of Value . . . . . . . 36
1.7.    Partial Acquisitions . . . . . . . . . . . . . . . . . . . . . . . .37
        1.7.1. Before and After Rule (Federal Rule) . . . . . . . . . . .37
                1.7.1.1. Damages . . . . . . . . . . . . . . . . . . . . 38
                1.7.1.2. Benefits . . . . . . . . . . . . . . . . . . . .38
                1.7.1.3. Offsetting of Benefits . . . . . . . . . . . . .39
                1.7.1.4. Takings Plus Damages Procedure (State Rule) . . 39
1.8.    Leasehold Acquisitions . . . . . . . . . . . . . . . . . . . . . . 39
        1.8.1. Market Rent and Highest and Best Use . . . . . . . . . . .39

1.8.2. Leasehold Estate Acquired . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

1.8.3. Larger Parcel Concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

1.9. Temporary Acquisitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

1.9.1. Temporary Construction Easements (TCEs) . . . . . . . . . . . . . . . . . . . . . . 42

1.9.2. Temporary Inverse Takings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

1.10. Acquisitions Involving Natural Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

1.10.1. The Unit Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

1.10.2. Highest and Best Use Considerations. . . . . . . . . . . . . . . . . . . . . . . . . 44

1.10.3. Special Considerations for Minerals Properties. . . . . . . . . . . . . . . . . . . . 45

1.10.4. Special Considerations for Forested Properties . . . . . . . . . . . . . . . . . . . . 48

1.10.5. Water Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

1.11. Special Considerations in Appraisals for Inverse Condemnations . . . . . . . . . . . . . . 49

1.12. Special Considerations in Appraisals for Federal Land Exchanges . . . . . . . . . . . . . . 50

1.13. Supporting Experts Opinions and Reports . . . . . . . . . . . . . . . . . . . . . . . . . . 53

1.14. Appraisers as Expert Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

1.15. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**2. APPRAISAL REPORTING** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **56**

2.1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

2.2. Appraisal Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

2.2.1. Oral Appraisal Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

2.2.2. Restricted Appraisal Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

2.2.3. Compliance with Rule 26 of the Federal Rules of Civil Procedure . . . . . . . . . . 57

2.2.4. Electronic Transmission of Appraisal Reports . . . . . . . . . . . . . . . . . . . . . 57

2.2.5. Draft Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

2.3. Content of Appraisal Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

2.3.1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

2.3.1.1. Title Page . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

2.3.1.2. Letter of Transmittal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

2.3.1.3. Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

2.3.1.4. Appraiser's Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

2.3.1.5. Executive Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

2.3.1.6. Photographs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

2.3.1.7. Statement of Assumptions and Limiting Conditions . . . . . . . . . . . . 59

2.3.1.8. Description of Scope of Work . . . . . . . . . . . . . . . . . . . . . . . . 60

2.3.2. Factual Data—Before Acquisition . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

2.3.2.1. Legal Description. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

2.3.2.2. Area, City, and Neighborhood Data . . . . . . . . . . . . . . . . . . . . . 61

2.3.2.3. Property Data. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

2.3.2.3.1. Site. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

2.3.2.3.2. Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . 62

2.3.2.3.3. Fixtures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

2.3.2.3.4. Use History . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

2.3.2.3.5. Sales History. . . . . . . . . . . . . . . . . . . . . . . . . . . 62

2.3.2.3.6. Rental History . . . . . . . . . . . . . . . . . . . . . . . . 63

2.3.2.3.7. Assessed Value and Annual Tax Load. . . . . . . . . . . . . . .63

2.3.2.3.8. Zoning and Other Land Use Regulations. . . . . . . . . . . . .63

2.3.3. Data Analysis and Conclusions – Before Acquisition. . . . . . . . . . . . . .63

2.3.3.1. Highest and Best Use. . . . . . . . . . . . . . . . . . . . . . . . . .63

2.3.3.1.1. Four Tests . . . . . . . . . . . . . . . . . . . . . . . . .64

2.3.3.1.2. Larger Parcel . . . . . . . . . . . . . . . . . . . . . . . .65

2.3.3.2. Land Valuation . . . . . . . . . . . . . . . . . . . . . . . . . . . . .65

2.3.3.2.1. Sales Comparison Approach . . . . . . . . . . . . . . . . .65

2.3.3.2.2. Subdivision Development Method . . . . . . . . . . . . . . . 65

2.3.3.3. Cost Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . .66

2.3.3.4. Sales Comparison Approach. . . . . . . . . . . . . . . . . . . . . . .66

2.3.3.5. Income Capitalization Approach . . . . . . . . . . . . . . . . . . . .67

2.3.3.6. Reconciliation and Final Opinion of Market Value . . . . . . . . . . .68

2.3.4. Factual Data—After Acquisition (Partial Acquisitions Only). . . . . . . . . . .68

2.3.4.1. Legal Description. . . . . . . . . . . . . . . . . . . . . . . . . . . .68

2.3.4.2. Neighborhood Factors . . . . . . . . . . . . . . . . . . . . . . . . .68

2.3.4.3. Property Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . .69

2.3.4.3.1. Site. . . . . . . . . . . . . . . . . . . . . . . . . . . . .69

2.3.4.3.2. Improvements . . . . . . . . . . . . . . . . . . . . . . . .69

2.3.4.3.3. Fixtures . . . . . . . . . . . . . . . . . . . . . . . . . . .69

2.3.4.3.4. History. . . . . . . . . . . . . . . . . . . . . . . . . . . .69

2.3.4.3.5. Assessed Value and Tax Load . . . . . . . . . . . . . . . . 69

2.3.4.3.6. Zoning and Other Land Use Regulations . . . . . . . . . . . 69

2.3.5. Data Analysis and Conclusions—After Acquisition (Partial Acquisitions Only) . . . . .69

2.3.5.1. Analysis of Highest and Best Use . . . . . . . . . . . . . . . . . . .70

2.3.5.2. Land Valuation . . . . . . . . . . . . . . . . . . . . . . . . . . . . .70

2.3.5.3. Cost Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . .70

2.3.5.4. Sales Comparison Approach . . . . . . . . . . . . . . . . . . . . . .70

2.3.5.5. Income Capitalization Approach . . . . . . . . . . . . . . . . . . . .70

2.3.5.6. Reconciliation and Final Opinion of Market Value . . . . . . . . . . .70

2.3.6. Acquisition Analysis (Partial Acquisitions Only) . . . . . . . . . . . . . . . . .70

2.3.6.1. Recapitulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

2.3.6.2. Allocation and Damages . . . . . . . . . . . . . . . . . . . . . . . .71

2.3.6.3. Special Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . .71

2.3.7. Exhibits and Addenda . . . . . . . . . . . . . . . . . . . . . . . . . . . .71

2.4.   Reporting Requirements for Leasehold Acquisitions . . . . . . . . . . . . . . . . . .72

2.4.1. Property Rights Appraised . . . . . . . . . . . . . . . . . . . . . . . . . .72

2.4.2. Improvements Description . . . . . . . . . . . . . . . . . . . . . . . . . .72

2.4.3. Highest and Best Use and Larger Parcel . . . . . . . . . . . . . . . . . . .72

2.5.   Project Appraisal Reports. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .72

3. **APPRAISAL REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **80**

   3.1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .80

      3.1.1. Government Review Appraisers. . . . . . . . . . . . . . . . . . . . . . .80

      3.1.2. Contract Review Appraisers . . . . . . . . . . . . . . . . . . . . . . . . .81

      3.1.3. Rebuttal Experts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .82

   3.2. Types of Appraisal Reviews . . . . . . . . . . . . . . . . . . . . . . . . . . 82

   3.3. Problem Identification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .83

      3.3.1. Client . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84

      3.3.2. Intended Users . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84

      3.3.3. Intended Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84

      3.3.4. Type of Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84

      3.3.5. Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84

      3.3.6. Subject of the Assignment . . . . . . . . . . . . . . . . . . . . . . . .84

      3.3.7. Assignment Conditions . . . . . . . . . . . . . . . . . . . . . . . . . .85

   3.4. Responsibilities of the Review Appraiser . . . . . . . . . . . . . . . . . .85

   3.5. Review Appraiser Expressing an Opinion of Value . . . . . . . . . . . . 86

   3.6. Review Appraiser's Use of Information Not Available to Appraiser . . . . . . . . . 86

   3.7. Review Reporting Requirements. . . . . . . . . . . . . . . . . . . . . . . . 87

   3.8. Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .88

4. **LEGAL FOUNDATIONS FOR APPRAISAL STANDARDS** . . . . . . . . . . . . . . . . . **89**

   4.1. Introduction to Legal Foundations . . . . . . . . . . . . . . . . . . . . . . . 89

      4.1.1. Requirement of Just Compensation. . . . . . . . . . . . . . . . . . . 89

      4.1.2. Market Value: The Measure of Just Compensation . . . . . . . . . . . . .90

      4.1.3. Federal Law Controls . . . . . . . . . . . . . . . . . . . . . . . . . . .90

      4.1.4. Defining Property Interests . . . . . . . . . . . . . . . . . . . . . . . .91

      4.1.5. About the Sixth Edition. . . . . . . . . . . . . . . . . . . . . . . . . . .92

   4.2. Market Value Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

      4.2.1. Market Value Definition . . . . . . . . . . . . . . . . . . . . . . . . . .93

         4.2.1.1. Date of Value. . . . . . . . . . . . . . . . . . . . . . . . . . .93

         4.2.1.2. Exposure on the Open, Competitive Market . . . . . . . . . . . .95

         4.2.1.3. Willing and Reasonably Knowledgeable Buyers and Sellers. . . . . . . . . . 95

         4.2.1.4. All Available Economic Uses . . . . . . . . . . . . . . . . . . .96

      4.2.2. The Unit Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

         4.2.2.1. Ownership Interests (the Undivided Fee) . . . . . . . . . . . . . 97

         4.2.2.2. Physical Components . . . . . . . . . . . . . . . . . . . . . . . 97

            4.2.2.2.1. Existing Government Improvements . . . . . . . . . . .98

         4.2.2.3. Allocations and Administrative Payments Under the Uniform Act . . . . . . .98

         4.2.2.4. Departure from the Unit Rule . . . . . . . . . . . . . . . . . . .99

      4.2.3. Objective Market Evidence; Conjectural and Speculative Evidence . . . . . . . . . .99

      4.2.4. Refinements of Market Value Standard . . . . . . . . . . . . . . . . . 100

      4.2.5. Special Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

      4.2.6. Exceptions to Market Value Standard . . . . . . . . . . . . . . . . . 101

4.3.   Highest and Best Use  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101
  4.3.1. Highest and Best Use Definition . . . . . . . . . . . . . . . . . . . 102
  4.3.2. Criteria for Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . 102
    4.3.2.1. All Possible Uses . . . . . . . . . . . . . . . . . . . . . 103
    4.3.2.2. Market Demand . . . . . . . . . . . . . . . . . . . . . . 104
    4.3.2.3. Economic Use . . . . . . . . . . . . . . . . . . . . . . . 105
    4.3.2.4. Zoning and Permits . . . . . . . . . . . . . . . . . . . . 107
      4.3.2.4.1. Exceptions . . . . . . . . . . . . . . . . . . 109
  4.3.3. Larger Parcel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
  4.3.4. Criteria for Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . 111
    4.3.4.1. Unity of Use . . . . . . . . . . . . . . . . . . . . . . . 111
    4.3.4.2. Unity of Ownership (Title) . . . . . . . . . . . . . . . . 113
    4.3.4.3. Physical Unity (Contiguity or Proximity) . . . . . . . . . . . . . 115
    4.3.4.4. Legal Instructions . . . . . . . . . . . . . . . . . . . . 116
    4.3.4.5. Special Considerations in Partial Acquisitions . . . . . . . . . . 117
    4.3.4.6. Special Considerations in Riparian Land Acquisitions . . . . . . 117
    4.3.4.7. Special Considerations in Land Exchanges . . . . . . . . . 117
    4.3.4.8. Special Considerations in Inverse Takings . . . . . . . . . . . 117
4.4.   Valuation Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
  4.4.1. The Three Approaches to Value . . . . . . . . . . . . . . . . . . . 118
  4.4.2. Sales Comparison Approach. Under federal law . . . . . . . . . . . . . . . 119
    4.4.2.1. Comparability . . . . . . . . . . . . . . . . . . . . . . 120
    4.4.2.2. Adjustments . . . . . . . . . . . . . . . . . . . . . . . 121
    4.4.2.3. Sales Verification . . . . . . . . . . . . . . . . . . . . . 122
    4.4.2.4. Transactions Requiring Extraordinary Care . . . . . . . . . . . . . 122
      4.4.2.4.1. Prior Sales of the Same Property . . . . . . . . 123
      4.4.2.4.2. Transactions with Potential Nonmarket Motivations . . . . . . . 124
      4.4.2.4.3. Exchanges of Property . . . . . . . . . . . . 128
      4.4.2.4.4. Sales that Include Personal Property . . . . . . . 128
      4.4.2.4.5. Contingency Sales . . . . . . . . . . . . . . 129
      4.4.2.4.6. Offers, Listings, Contracts, and Options . . . . . 129
      4.4.2.4.7. Sales After the Date of Valuation . . . . . . . . . . 130
  4.4.3. Cost Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131
    4.4.3.1. Foundations of the Cost Approach . . . . . . . . . . . . . . . 132
    4.4.3.2. Value of the Land (Site) as if Vacant . . . . . . . . . . . . . . 134
    4.4.3.3. Reproduction Cost and Replacement Cost . . . . . . . . . . 134
    4.4.3.4. Depreciation . . . . . . . . . . . . . . . . . . . . . . . 135
    4.4.3.5. Entrepreneurial Incentive and Entrepreneurial Profit . . . . . . . . . . 135
    4.4.3.6. Unit Rule and the Cost Approach . . . . . . . . . . . . . . 136
  4.4.4. Income Capitalization Approach . . . . . . . . . . . . . . . . . . . . 136
    4.4.4.1. Applications . . . . . . . . . . . . . . . . . . . . . . . 137
    4.4.4.2. Income to Be Considered . . . . . . . . . . . . . . . . . 140
    4.4.4.3. Capitalization Rate or Discount Rate . . . . . . . . . . . . . 140
    4.4.4.4. Unit Rule Implications . . . . . . . . . . . . . . . . . . . 141
    4.4.4.5. Further Guidance . . . . . . . . . . . . . . . . . . . . . 142

4.4.5. Subdivision Valuation and the Development Method . . . . . . . . . . . . . . . . 142
    4.4.5.1. Reasonable Probability of Development . . . . . . . . . . . . . . . . . . . . 143
    4.4.5.2. Application to Undeveloped Land . . . . . . . . . . . . . . . . . . . . . . . 144
    4.4.5.3. Credible Cost Estimate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144
    4.4.5.4. Availability of Comparable Sales . . . . . . . . . . . . . . . . . . . . . . 145
4.5. Project Influence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145
    4.5.1. The Scope of the Project Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146
    4.5.2. Application of the Scope of the Project Rule . . . . . . . . . . . . . . . . . . . 149
    4.5.3. Legal Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149
    4.5.4. Impact on Market Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149
    4.5.5. Limits of the Scope of the Project Rule . . . . . . . . . . . . . . . . . . . . . . 150
    4.5.6. Further Guidance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150
4.6. Partial Acquisitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151
    4.6.1. The Federal Rule: Before and After Methodology . . . . . . . . . . . . . . . . 152
        4.6.1.1. Larger Parcel Determination . . . . . . . . . . . . . . . . . . . . . . . . . 153
    4.6.2. Damage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154
        4.6.2.1. Compensable (Severance) Damages . . . . . . . . . . . . . . . . . . . . . 155
        4.6.2.2. Necessary Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156
        4.6.2.3. Non-Compensable (Consequential) Damages . . . . . . . . . . . . . . . 159
    4.6.3. Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161
    4.6.4. Exceptions to the Federal Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165
        4.6.4.1. Taking Plus Damages (the "State Rule") . . . . . . . . . . . . . . . . . . 166
    4.6.5. Easement Valuation Issues. In general terms . . . . . . . . . . . . . . . . . . . 168
        4.6.5.1. Dominant Easement Interests . . . . . . . . . . . . . . . . . . . . . . . . 169
            4.6.5.1.1. "Going Rates" and Nonmarket Considerations. . . . . . . . . . . 171
            4.6.5.1.2. Temporary Easements. . . . . . . . . . . . . . . . . . . . . . . . . 171
            4.6.5.1.3. Sale or Disposal of Easements . . . . . . . . . . . . . . . . . . . 171
        4.6.5.2. Lands Encumbered by Easements . . . . . . . . . . . . . . . . . . . . . . 172
        4.6.5.3. Appurtenant Easements to the Servient Estate . . . . . . . . . . . . . . 172
4.7. Leaseholds and Other Temporary Acquisitions . . . . . . . . . . . . . . . . . . . . . . 174
    4.7.1. Leaseholds. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175
    4.7.2. Temporary Inverse Takings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177
4.8. Natural Resources Acquisitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178
    4.8.1. Unit Rule and Natural Resources . . . . . . . . . . . . . . . . . . . . . . . . . . 178
    4.8.2. Highest and Best Use and Natural Resources . . . . . . . . . . . . . . . . . . . 179
    4.8.3. Valuation Approaches for Mineral Resources . . . . . . . . . . . . . . . . . . . 180
    4.8.4. Timber . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182
    4.8.5. Water Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183
4.9. Inverse Takings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184
4.10. Land Exchanges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185
4.11. Special Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187
    4.11.1. Riparian Lands and the Federal Navigational Servitude . . . . . . . . . . . . 187
    4.11.2. Federal Grazing Permits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195
    4.11.3. Streets, Rail Corridors, Infrastructure, and Public Facilities . . . . . . . . . . 195

4.11.3.1. Streets, Highways, Roads, and Alleys . . . . . . . . . . . . . . . . . . . . . 196

4.11.3.2. Corridors and Rights of Way . . . . . . . . . . . . . . . . . . . . . 198

4.11.3.3. Substitute-Facility Compensation . . . . . . . . . . . . . . . . . . . . . 199

4.12.  Appraisers' Use of Supporting Experts' Opinions . . . . . . . . . . . . . . . . . . . . 201

4.13.  Common Purpose (Roles and Responsibilities) . . . . . . . . . . . . . . . . . . . . . 203

4.13.1. Appraisers and Other Experts . . . . . . . . . . . . . . . . . . . . 203

4.13.2. Government Agency Staff . . . . . . . . . . . . . . . . . . . . . . 205

4.13.3. Landowners . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

4.13.4. Attorneys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

**APPENDIX** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **207**

A.   Appraisal Report Documentation Checklist . . . . . . . . . . . . . . . . . . . . . 208

B.   Recommended Appraisal Report Format for Total Acquisition . . . . . . . . . . . . . 212

C.   Recommended Appraisal Report Format for Partial Acquisitions . . . . . . . . . . . . 214

D.   Recommended Project Appraisal Report Format . . . . . . . . . . . . . . . . . . . . 216

E.   Extraordinary Verification of Sales . . . . . . . . . . . . . . . . . . . . . . . . . 218

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **220**

**INDEX** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **245**

# FOREWORD

This is the sixth edition of the Uniform Appraisal Standards for Federal Land Acquisitions, known to many as the Yellow Book. The valuation of real estate in federal acquisitions—serving public purposes that range from national parks and public buildings to infrastructure and national security needs—must satisfy not only appraisal industry standards authorized by Congress, but also the command of the Fifth Amendment to the U.S. Constitution: that no property shall "be taken for public use, without just compensation." Sound appraisals are vital to ensure that government acquisitions do justice to both the individual whose property is taken and the public which must pay for it. These federal Standards, frequently cited in legislation and court rulings, have guided the appraisal process in the valuation of real estate in federal acquisitions since their original publication by the Interagency Land Acquisition Conference in 1971.

The Attorney General formed the Interagency Land Acquisition Conference in 1968. Since its inception, the Conference has been "fueled by the common purpose and dedication" of its participants—any and all federal agencies that acquire property for public uses. Their shared objectives are to promulgate uniform, fair, and efficient appraisal standards for federal acquisitions; to identify and find the best solutions to the problems incident to acquiring land for public purposes; and to consider all acquisition-related matters with the twin aims of protecting the public interest and ensuring fair and equitable treatment of landowners whose property is affected by public projects.

The Conference is chaired by the Assistant Attorney General for the Environment and Natural Resources Division, Department of Justice, and Andrew M. Goldfrank, Chief of the Division's Land Acquisition Section, serves as Conference Executive.

In updating the Standards for the first time in 16 years, we incorporated relevant new appraisal methodology and theory, integrated new case law, and ensured appropriate consistency with professional appraisal standards. The content is also restructured and revised for clarity and readability, resulting in practical and understandable guidance for appraisers, attorneys, and the general public. The final text reflects the contributions of the Conference agencies' representatives, who shared valuable insights and suggestions on the previous Standards and commented on drafts of the sixth edition.

The Appraisal Foundation provided technical assistance in preparing these Standards for publication. To ensure the Yellow Book is easily available to all interested users, The Appraisal Foundation is publishing this 2016 edition in both print and electronic forms under a cooperative agreement with the Department of Justice. A free electronic version is also available on the Department of Justice website.

I commend the sixth edition of the Yellow Book to all readers as the foremost authority on real estate valuation in federal eminent domain, and an indispensable resource for the appraisal of property for all types of federal acquisitions. And, I would like to single out for special recognition appraisal unit chief Brian Holly, MAI, and trial attorney Georgia Garthwaite, of the Department of Justice, who led the effort that resulted in this sixth edition of the Uniform Appraisal Standards for Federal Land Acquisitions, with the assistance of Mr. Goldfrank.

John C. Cruden, Chair
Interagency Land Acquisition Conference
December 6, 2016

# ACKNOWLEDGEMENTS

The Interagency Land Acquisition Conference gratefully acknowledges the important contributions of the following individuals.

**United States Department of Justice**
Jennifer Campbell, Supervisory Paralegal
Eric Chiapponi, Review Appraiser
Hannah Flesch, Paralegal
Kristine Hartley, Review Appraiser
Jacqueline Hyatt, Law Clerk
Daniel Kastner, Trial Attorney
Kristin Muenzen, Trial Attorney
Erica Pencak, Trial Attorney
Wade Schroeder, Review Appraiser
Michelle Sellers, Paralegal
Lucy Shepherd, Staff Assistant
Moriah Sulc, Paralegal
Reade Wilson, Trial Attorney

**General Services Administration**
Nicholas Hufford, Chief Appraiser

**United States Army Corps of Engineers**
Mary Arndt, Chief Appraiser

**United States Forest Service**
Jerry Sanchez, Chief Appraiser

**United States Department of the Interior**
Timothy Hansen, Chief Appraiser

**United States Department of the Navy**
Mark Worthen, Chief Appraiser

**The Appraisal Foundation**
Magdalene Vasquez, Editor

5-ER-759

# 0.  INTRODUCTORY MATERIAL

**0.1.**     **Purpose.** The purpose of the *Uniform Appraisal Standards for Federal Land Acquisitions* (Standards) is to promote fairness, uniformity, and efficiency in the appraisal of real property in federal acquisitions. Just compensation must be paid for property acquired for public purposes, whether by voluntary purchase, land exchange, or the power of eminent domain. Landowners should be treated equitably no matter which agency is acquiring their land. The use of public funds compels efficient, cost-effective practices.

The same goals of uniformity, efficiency, and fair treatment of those affected by public projects underlie the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (hereinafter Uniform Act).[1] The Uniform Act applies to federal acquisitions as well as many state and local government acquisitions involving federal funds.

In federal acquisitions, the purpose of an appraisal—whether prepared for the government or a landowner—is to develop an opinion of market value that can be used to determine just compensation under federal law. As a result, appraisals in federal acquisitions face different—and often more rigorous— valuation problems and standards than those typically encountered in appraisals for other purposes, such as private sales, tax, mortgage, rate-making, or insurance. These Standards set forth the guiding principles, legal requirements, and practical implications for the appraisal of property in all types of federal acquisitions.

These Standards may need to be modified to meet specific requirements of agency programs, special legislation, or negotiated agreements between agencies and landowners.[2] Any such modifications to these Standards require specific written instructions from the acquiring agency, as do modifications to comply with court rulings or stipulations between parties in litigation.

Legal questions often arise when applying these Standards to the facts of a specific appraisal assignment, requiring appropriate written legal instructions. Appraisers and agency counsel should work closely to ensure legal instructions not only are legally correct, but also adequately address the valuation problem to be solved. Federal agencies are also encouraged to consult with the U.S. Department of Justice on challenging legal and valuation issues, regardless of whether condemnation is anticipated. Appropriate legal instructions can resolve doubt about the proper method of valuation or the application of particular rules to specific factual situations. If these Standards are properly applied, under sound legal instructions,

---

[1]    The Uniform Act, also called the URA, is discussed throughout these Standards. The Uniform Act addresses two principal areas:

- *Real Property Acquisition* policies set out agency appraisal criteria and negotiation obligations in order to encourage acquisitions by agreement, avoid litigation, ensure consistent treatment for landowners across federal programs, and promote public confidence in federal property acquisition practices.

- *Relocation Assistance* policies are designed to ensure uniform, fair, and equitable treatment of those who are displaced by government programs and projects, and to minimize the hardships displaced persons may face as a result of programs and projects intended to benefit the public as a whole.

Federal regulations direct agencies to implement the Uniform Act in an efficient, cost-effective manner, and specifically reference these appraisal Standards at 49 C.F.R. § 24.103. In turn, these appraisal Standards presume full compliance with all applicable provisions of the Uniform Act and related regulations. The full Uniform Act is codified at 42 U.S.C. §§ 4601 to 4655, and enforced by federal regulations at 49 C.F.R. Part 24.

[2]    Some federal agencies have adopted appraisal and/or appraisal review handbooks or manuals that may modify these Standards to meet other criteria for specific acquisition programs.

the resulting appraisal will be a credible, reliable, and accurate opinion of market value that can be used for purposes of just compensation.

**0.2.**    **Governing Principles.** Federal acquisitions entail different appraisal standards than other types of property transactions because they involve payment of just compensation. As the measure of just compensation is a question of substantive right "grounded upon the Constitution of the United States," just compensation must be determined under federal common law—that is, case law.[3] Federal case law holds that just compensation must reflect basic principles of fairness and justice for both the individual whose property is taken and the public which must pay for it. To achieve this, an objective and practical standard was required, and the Supreme Court has long adopted the concept of market value to measure just compensation. As a result, just compensation is measured by the market value of the property taken. "To award [a landowner] less would be unjust to him; to award him more would be unjust to the public."[4]

> ". . . nor shall private property be taken for public use, without just compensation."
>
> — U.S. Constitution, amendment v

Most of the case law on just compensation stems from the federal exercise of eminent domain, but the resulting practical, objective rules for determining market value have been adopted in numerous federal statutes, rules and regulations, and programs and agency policies. As a result, the federal eminent domain-based valuation requirements reflected in these Standards apply to all types of federal acquisitions.[5] And because these Standards require appraisers to provide an opinion of market value and not just compensation, they also apply to the appraisal of property for many types of government transactions that require a reliable determination of market value without reference to just compensation, such as land exchanges under the Federal Land Policy and Management Act (FLPMA).[6]

Certain types of transactions may require exceptions to specific valuation rules contained in these Standards—for example, to comply with special legislation—but the underlying principles of just compensation remain in force. In addition, while just compensation does not exceed market value fairly determined, Congress has the power to allow or require the United States to pay more than the just compensation required under the Fifth Amendment. For example, under the Uniform Act, people and businesses displaced by public projects receive moving and relocation expenses in addition to the market-value-based just compensation received for the acquisition.

Just compensation is determined under federal rather than state law. Appraisers must apply federal law throughout the process of opining on market value, recognizing that federal and state laws differ in important respects. Most appraisals for federal acquisitions involve straightforward application of established law to the facts. But some valuation problems require nuanced legal instructions to address complicated or undecided questions of law. These Standards address both routine and complex legal issues that arise in federal acquisitions.

---

3    *United States v. Miller*, 317 U.S. 369, 380 (1943); *see Marbury v. Madison*, 5 U.S. 137 (1803).

4    *Bauman v. Ross*, 167 U.S. 548, 574 (1897).

5    Similarly, the appraisal requirements set forth in the Uniform Act regulations "are necessarily designed to comply with . . . Federal eminent domain based appraisal requirements." 49 C.F.R. app. A § 24.103(a).

6    See Sections 1.12 and 4.10 for a discussion of special considerations arising in the appraisal of property for federal land exchanges under FLPMA, 43 U.S.C. § 1716, and other statutes.

Where just compensation is concerned, a reliable process is
necessary to ensure a just result. For federal acquisition purposes,
the appraisal process must result in opinions of market value
that are credible, reliable, and accurate. These federal Standards
governing the appraisal process protect against allowing
"mere speculation and conjecture to become a guide for the
ascertainment of value—a thing to be condemned in business
transactions as well as in judicial ascertainment of truth."[7]

**0.3.   Scope.** These Standards cover the following areas:
(1)  Appraisal Development
(2)  Appraisal Reporting
(3)  Appraisal Review
(4)  Legal Foundations

> **"[O]ur cases have set forth a clear and administrable rule for just compensation: 'The Court has repeatedly held that just compensation normally is to be measured by 'the market value of the property at the time of the taking.'"**
>
> **— *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2432 (2015) (quoting *United States v. 50 Acres of Land (Duncanville)*, 469 U.S. 24, 29 (1984))**

Section 1: Appraisal Development sets forth the standards
that must be followed in developing an appraisal for federal acquisition purposes to ensure a
credible, reliable, and accurate valuation that reflects just compensation mandated by the United
States Constitution. Section 1 derives from generally accepted professional appraisal standards
and federal law. Competent development of an appraisal under these Standards requires an
understanding of applicable law, described in Section 4: Legal Foundations and Guidance.

Section 2: Appraisal Reporting presents the content and documentation required for
appraisals developed in compliance with these Standards and applicable law. Section 2 also
includes a recommended appraisal report format. Agencies may modify these documentation
and formatting requirements in certain circumstances to ensure appropriate flexibility to
accomplish agency program goals.

Section 3: Appraisal Review addresses technical and administrative reviews of appraisals by
appraisers and non-appraisers, and is derived from generally accepted appraisal review standards
and federal law and regulations. The purpose of Section 3 is to ensure that appraisals used by the
government in its land acquisitions are credible, reliable and accurate and have been conducted
in an unbiased, objective, and thorough manner, in accordance with applicable law.

Section 4: Legal Foundations explains the federal law that dictates these appraisal Standards,
which apply to appraisals for all federal acquisitions involving the measure of just compensation.
Federal case law, cited throughout the section, has long held that market value is normally
the measure of just compensation; the rare departures from the *market value* standard are
also discussed. Appraisers who make market value appraisals for federal acquisitions must
understand and apply federal law in the development, reporting, and review of appraisals in
federal acquisitions. Section 4 also includes a discussion of the legal standards that apply to many
recurring valuation problems, as well as guidance on specialized appraisal issues that are unique
to federal acquisitions.

---

[7]   *Olson v. United States*, 292 U.S. 246, 257 (1934).

As a whole, these Standards aim to encourage uniform, reliable, and fair approaches to appraisal problems, and to ensure consistent, effective practices for evaluating appraisal reports for federal acquisition purposes. Nothing in these Standards is intended to limit the scope of appraisal investigations or to undermine the independence and objectivity of appraisers engaged in providing opinions of market value for just compensation purposes.

With appropriate modifications, these Standards—or rather, portions of these Standards—may be applied to valuations for non-acquisition purposes, such as appraisals for conveyance, sale, or other disposals of federal property. Some rules that must be followed in valuing real property for federal acquisition purposes are inapt or impossible to apply to federal disposals. As discussed in Section 1.2.8, these Standards do not prohibit adapting these valuation rules to address the distinct challenges of appraising federal property for disposal purposes.

**0.4.    About the Sixth Edition to the "Yellow Book."** In this sixth edition, the *Uniform Appraisal Standards for Federal Land Acquisitions* have been updated to reflect developments in appraisal methodology and theory, case law, and other federal requirements since the fifth edition was published in 2000. These Standards have also been restructured for clarity, convenience, and consistency with professional appraisal standards, as appropriate.

The four-part structure is designed to follow the appraisal process, from development, to reporting, to review, while the final section explains the legal foundations for the appraisal development, reporting, and review requirements, and provides practical examples of how the underlying law applies to actual valuation problems in federal acquisitions. This sixth edition is also broadly consistent with the structure of the current Uniform Standards of Professional Appraisal Practice (USPAP) and federal regulations implementing the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Uniform Act or URA).

The sixth edition's structure reflects the evolution of USPAP (which did not exist in early editions of these Standards) as the congressionally authorized minimum standards for the appraisal profession. It also continues the fifth edition's focus on the practical effects of federal valuation requirements on appraisals in federal acquisitions.[8] Broadly speaking, this sixth edition incorporates previous editions as follows:

Section 1: Appraisal Development addresses the appraisal process and the scope of work appropriate for appraisals in federal acquisitions, integrating appraisal development topics from the fifth edition's Parts A, B, C, and D with USPAP's Scope of Work Rule (created since the fifth edition);

Section 2: Appraisal Reporting incorporates the contents of the fifth edition's Part A, Data Documentation and Appraisal Reporting Standards;

---

[8]   Recognizing that the vast majority of federal acquisitions are accomplished by voluntary means, the fifth edition placed technical appraisal requirements up front. Previous editions led off with discussion of federal law on valuation issues, primarily focusing on eminent domain litigation. To reduce confusion, topics in this sixth edition are organized by number, unlike the lettered subparts in earlier editions. A detailed cross-reference table is included in the Appendix.

Section 3: Appraisal Review incorporates the contents of the fifth edition's Part C, Standards for the Review of Appraisals; and

Section 4: Legal Foundations integrates and updates the topics in the fifth edition's Part B, Legal Basis for Appraisal Standards for Federal Land Acquisitions, and several legal topics previously in Part D as miscellaneous. Of particular note, the fifth edition's lengthy Part D-9, Comparable Sales Requiring Extraordinary Verification and Treatment, is now addressed in Section 1.5.2.4, and the legal foundations for these heightened requirements are explained in Section 4.4.2.4. A verification checklist is also included in the Appendix.

0.5.    **Policy.** In acquiring real property, or any interest in real property, the United States will impartially protect the interests of the public and ensure the fair and equitable treatment of those whose property is needed for public purposes. As a general policy, the United States bases its property acquisitions on appraisals of market value, the standard adopted by the courts as the practical, objective measure of just compensation.

> **"[I]t is the duty of the state, in the conduct of the inquest by which the compensation is ascertained, to see that it is just, not merely to the individual whose property is taken but to the public which is to pay for it."**
>
> **— *Bauman v. Ross*, 167 U.S. 548, 574 (1897)**

# 1.  APPRAISAL DEVELOPMENT

**1.1.**    **Introduction.** These Standards reflect the application of the appraisal process to valuation assignments for federal property acquisitions. The goal of every appraisal prepared under these Standards is a well-supported opinion of market value that is credible, reliable, and accurate. These requirements and rules are set forth to ensure that the appraiser's opinion of market value can be used for purposes of just compensation under the United States Constitution. The appraisal process provides a logical framework for the identification and proper solution of an appraisal problem. The general steps of the appraisal process are:

- Problem identification
- Scope of work
- Data collection
- Data analysis
- Application of approaches to value
- Reconciliation and final opinion of market value
- Report of opinion of market value

The first step in the appraisal process is to *identify the appraisal problem* to be solved. To do so, the appraiser and the client[9] must address seven critical assignment elements presented in Section 1.2. This discussion summarizes each of the seven elements and in particular addresses the assignment conditions associated with appraisals prepared for federal property acquisitions. The special legal rules and methods required under these Standards are identified and briefly addressed. This section is intended to assist appraisers and agencies in determining the appropriate scope of work for each appraisal assignment.

Section 1 also addresses the next four steps in the appraisal process. Section 1.3 addresses data collection concerning the subject property and the market, respectively. Section 1.4 addresses data analysis, including highest and best use, and larger parcel and market analysis. Section 1.5 addresses the application of the approaches to value including land valuation, the sales comparison approach, the income capitalization approach, and the cost approach. Section 1.6 addresses the reconciliation process and the final opinion of market value. Section 1 also contains appraisal development requirements specific to certain types of federal acquisitions including partial acquisitions, leasehold acquisitions, temporary acquisitions, natural resources acquisitions, inverse takings, and federal land exchanges. Finally, Section 1 provides guidance concerning the use of reports by other experts and the appraiser's responsibilities in litigation.

Section 1 is generally consistent with Standard 1 of USPAP, but provides more in-depth discussion of each topic to address the heightened requirements for appraisals prepared for just compensation purposes. These Standards do not cover all of the valuation problems that

---

9    See Section 1.2.1 for discussion concerning the client.

might be encountered in the appraisal of real property for government acquisitions. Instead, the Standards address the fundamental scope of work issues associated with preparing sound appraisals for federal agencies. Proper application of the scope of work will ensure that federal agencies obtain appraisals that are credible, reliable, and accurate and result in uniform, fair treatment of property owners during the acquisition process.

The acquisition of private property by government agencies can create difficult and complex valuation problems, the solutions to which must be developed with great care. It is critical that in those instances when proposed acquisitions are complex, high value, sensitive, or controversial or when the matter must be referred to the Department of Justice for litigation, the full scope of work described in these Standards must be applied. In other assignments, it is appropriate to modify the scope of work when the acquisition is noncomplex and/or to ensure the cost of the appraisal is consistent with the requirements of the client agency. Under no circumstances may the scope of work result in an appraisal that does not meet the minimum requirements under the Uniform Act.

**1.2.**  **Problem Identification.** The problem identification process ensures that the appraiser identifies and understands the critical assignment elements associated with developing an appraisal for federal acquisition purposes under these Standards. Federal appraisal requirements are often different than those of private clients, and the appraiser must fully understand and comply with these requirements.

The scope of work[10] must address seven critical assignment elements for each appraisal assignment:

- Client
- Intended users
- Intended use
- Type and definition of value
- Effective date
- Relevant characteristics about the subject property
- Assignment conditions

**1.2.1.**  **Client.** The client is the party or parties engaging an appraiser in an assignment. The client is the appraiser's primary contact and provides all of the information about the assignment. Most importantly, the client is the entity to whom the appraiser owes confidentiality. The client must be established before the appraiser begins the assignment. Under these Standards, the client is the federal agency that is requesting the appraisal.

**1.2.2.**  **Intended Users.** All intended users of an appraisal must be identified at the outset of the assignment. Intended users often include not only the client agency but also other federal, state, or local agencies. In appraisals for land exchanges, discussed in more detail in Section 1.12, intended users may include landowners. In appraisals for acquisitions referred to the Department of Justice for condemnation litigation purposes, the intended users may include

---

10  THE APPRAISAL FOUNDATION, UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE (USPAP) 17-18 (2016-2017) [hereinafter USPAP]. See Scope of Work Rule and Standards Rule 1-2.

the federal court, landowners, and their counsel. The appraiser must fully identify and understand who the intended users are before initiating the appraisal assignment.

**1.2.3.**   **Intended Use.** The intended use of the appraisal is one of the most important elements of the problem identification process. In most assignments, the intended use of the appraisal is to assist the client agency in its determination of the amount to be paid as just compensation for the property rights acquired or conveyed. In those cases that have been referred to the Department of Justice for litigation, the intended use will be to assist government's trial counsel and the court in determining market value for the purpose of just compensation.

**1.2.4.**   **Type of Opinion.** In all assignments for federal acquisitions under these Standards, the type of opinion to be developed is market value. It is imperative that the appraiser utilize the correct definition of market value. In all federal acquisitions except leasehold acquisitions, appraisers must use the following federal definition of market value:[11]

> **Definition of Market Value**
> Market value is the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would have sold on the effective date of value, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither acting under any compulsion to buy or sell, giving due consideration to all available economic uses of the property.

Appraisers should not *link* opinions of value under these Standards to a specific opinion of exposure time, unlike appraisal assignments for other purposes under USPAP Standards Rule 1-2(c). This requires a jurisdictional exception to USPAP because, as discussed in Section 4.2.1.2, the federal definition of market value already presumes that the property was exposed on the open market for a *reasonable* length of time, given the character of the property and its market.

Similarly, estimates of marketing time are not appropriate for just compensation purposes, and must not be included in appraisal reports prepared under these Standards.[12] While estimates of marketing time may be appropriate in other contexts and are often required by relocation companies, mortgage lenders, and other users, "provid[ing] a reasonable marketing time opinion exceeds the normal information required for the conduct of the appraisal process"[13] and is beyond the scope of the appraisal assignment under these Standards.

**1.2.5.**   **Effective Date.**  The effective date of value for the assignment is dependent on the intended use, which depends on the legal nature of the acquisition and is further discussed in Section 4.2.1.1.  In most direct acquisitions (such as voluntary purchases), the effective date of value will be as near as possible to the date of the acquisition—typically the date of final inspection. In "quick-take" condemnations under the Declaration of Taking Act, the date of value is the earlier of (1) the date the United States files a declaration of taking and deposits estimated compensation with the court, or (2) the date the government enters into possession of the property. In "complaint-only" straight condemnations under the General Condemnation

---

11   See Section 4.2.1 for the legal basis for this definition.
12   Marketing time refers to the period of time it would take to sell the appraised property, after the effective date of value, at its appraised value.
13   USPAP, Advisory Opinion 7, *Marketing Time Opinions*.

Act in which no declaration of taking is filed, there may be two valuation dates: the first date will likely be the date of final inspection; the second date is when the appraiser is asked to form a new opinion of value (a new appraisal assignment) effective as of the date of trial. In inverse takings, the date of value is the date of taking, typically established by the court. When necessary, the client must provide the appraiser with a **legal instruction** regarding the appropriate effective date of value and the legal basis for the date to be used in the assignment. For assignments in which the effective date of value is prior to the date of the report, the appraiser should consult USPAP guidance regarding retrospective value opinions.[14] The identification of the effective date of value does not preclude consideration of market data after that date. Comparable sales and rentals occurring after the effective date of value may be considered (see Section 4.4.2.4.7). Market data after the effective date of value that confirms market trends identified as of the effective date of value may also be considered.

**1.2.6.    Relevant Characteristics of the Subject Property.** The subject property is the property that is being appraised.[15] In the context of these Standards the term may refer to the property that is the larger parcel. In developing an appraisal under these Standards the appraiser must complete a comprehensive study of the physical, legal, and economic characteristics of the subject property as well as the neighborhood and market in which it is located.

**1.2.6.1.    Property Interest(s) to be Appraised.** It is the responsibility of the acquiring agency to provide the appraiser with an accurate description of the property interest(s) to be appraised in each assignment.

Often, the property interest being acquired and appraised is the fee simple estate. This is so even when the real estate has been divided into multiple estates with different owners. This is an application of the unit rule, which will be discussed in greater detail in Section 1.2.7.3.2 and 4.2.2. Federal agencies can also acquire something less than the fee simple interest in property, for example by excluding easements for roads and utilities, mineral rights, water rights, or mineral leases. Agencies can also acquire partial interests such as permanent and temporary easements, rights of entry, and leaseholds. The appraiser must fully understand the nature of the estate(s) to be acquired, and request **legal instructions** if clarification is needed, for each assignment.

**1.2.6.2.    Legal Description.** It is the responsibility of the agency to provide the appraiser with an accurate legal description of the subject property prior to initiating the assignment. If the assignment is a partial acquisition, the appraiser should receive both a legal description of the larger parcel and a legal description of the remainder property, or alternatively, a legal description of the area to be acquired and/or encumbered. Since the larger parcel is determined by the appraiser as part of the highest and best use analysis, it is possible that a legal description for the larger parcel must be developed at that point in the appraisal development process.

The appraiser should verify the legal description (1) on the ground during a physical inspection of the property; (2) with the owner of the property (if possible); (3) by comparing it with aerial or other maps available in city, county, or other governmental offices; and (4) by comparing it

---

14    USPAP, Advisory Opinion 34, *Retrospective and Prospective Value Opinions.*
15    *Subject Property*, THE DICTIONARY OF REAL ESTATE APPRAISAL (6th ed. 2015).

with public records in the recorder's, auditor's, assessor's, tax collector's, or other appropriate city or county offices. If the appraiser discovers a significant error or inconsistency, the appraiser should consult the client for clarification before proceeding with the appraisal.

**1.2.6.3.** **Property Inspections.** The appraiser must personally inspect the subject property in every assignment. Appraisers should recognize that they may have only one opportunity to physically inspect the property and should ensure that they have collected all information required to identify all property characteristics (land and improvements) that influence value.

In partial acquisitions in which the appraiser's inspection precedes the acquisition, the appraiser should request that the agency stake the portion(s) of the property to be acquired before the inspection so that the impact of the acquisition on the remainder can be visualized. If the appraiser's inspection occurs after construction of the government's project begins (most commonly in Declaration of Taking cases), the appraiser must learn about the property as it existed before the taking to ensure that the property characteristics influencing value before the taking are properly accounted for.[16] In acquisitions of such large or inaccessible properties that a physical on-the-ground inspection may be impossible or not useful, the client may modify the scope of work to allow for an aerial inspection of the property.

In most assignments, the appraiser should also conduct a physical inspection of all properties used as sales or rental comparables. The level of detail of these inspections is dependent on the complexity of the appraisal problem to be solved. Physical inspection of all properties used as sales or rental comparables is required for any appraisal being prepared for the U.S. Department of Justice for litigation purposes.

**1.2.6.4.** **Contacting Landowners.** During the course of inspecting the subject property, the appraiser is expected to meet with the property owner or, in the owner's absence, the owner's agent or representative. If a property owner is represented by legal counsel, all owner contact and property inspections must be arranged through the owner's attorney, unless the attorney specifically authorizes the appraiser to make direct contact with the owner. Owners are generally a prime source of detailed information concerning the history, management, and operation of the property.

Under the Uniform Act, the owner or the owner's designated representative must be given an opportunity to accompany the acquiring agency's appraiser during the appraiser's inspection of the property.[17]

**1.2.7.** **Assignment Conditions.** In developing an appraisal under these Standards, appraisers must understand the special assignment conditions associated with the valuation of property being acquired by federal agencies. These special assignment conditions include the use of instructions, hypothetical conditions, extraordinary assumptions, and jurisdictional exceptions from USPAP as well as the special rules and methods required in these appraisals.

---

16   J.D. Eaton, Real Estate Valuation in Litigation 272-73 (2d ed. 1995) [hereinafter Eaton].
17   42 U.S.C. § 4651(2).

5-ER-769

**1.2.7.1.** **Instructions, Hypothetical Conditions, Extraordinary Assumptions.** Application of these Standards may require instructions from the acquiring agency. For example, agency instructions can provide clarification about the legal description of the property to be appraised and/or the property rights being acquired. Agency instructions that result in assumptions, hypothetical conditions, or extraordinary assumptions that impact the appraisal process or the appraisal results should be carefully considered before being issued. An appraiser cannot make an assumption or accept an instruction that is unreasonable or misleading, nor can an appraiser make an assumption that corrupts the credibility of the opinion of market value[18] or alters the scope of work required by the appraiser's contract. For example, it is improper (unless specifically instructed otherwise) for an appraiser to make an assumption that the property being appraised is free of contamination when there is evidence from the property inspection or the past use of the property that contamination may exist. Instructions should always be in writing, retained in the appraiser's workfile, and included in the addenda of the report.

**Hypothetical Conditions.** "A hypothetical condition[19] may be used in an assignment only if:

- use of the hypothetical condition is clearly required for legal purposes, for purposes of reasonable analysis, or for purposes of comparison;
- use of the hypothetical condition results in a credible analysis; and
- the appraiser complies with the disclosure requirements set forth in USPAP for hypothetical conditions."[20]

The appraiser must always consult with the client and/or counsel before employing a hypothetical condition. If utilization of a hypothetical condition is required by the facts or nature of the acquisition, then written **legal instructions** must be provided to the appraiser and included within the appraisal report. The appraiser must also comply with USPAP requirements regarding disclosure and impact on the value conclusion.[21]

**Extraordinary Assumptions.** "An extraordinary assumption[22] may be used in an assignment only if:

- it is required to properly develop credible opinions and conclusions;
- the appraiser has a reasonable basis for the extraordinary assumption;
- use of the extraordinary assumption results in a credible analysis; and
- the appraiser complies with the disclosure requirements set forth in USPAP for extraordinary assumptions."[23]

---

18  *See* Section 4.4 (Valuation Process).
19  "Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis." USPAP, Definitions, 3.
20  USPAP, Comment to Standards Rule 1-2(g), 19.
21  USPAP, Standards Rule 2-2(a)(xi), (b)(xi), 25, 27.
22  "Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis." USPAP, Comment to Extraordinary Assumption, 3.
23  USPAP, Comment to Standards Rule 1-2(f), 19.

It is improper for an appraiser to classify conclusions reached after investigation and analysis as assumptions. For example, after proper investigation and analysis, an appraiser can *conclude* that a probability of rezoning for the subject property exists, but it would be improper to *assume* such a probability. The appraiser must also comply with USPAP requirements regarding disclosure and impact on the value conclusion.

Circumstances arise in which a **legal instruction** is necessary to properly complete the appraisal assignment. Examples of situations in which a **legal instruction** may be required include: unity of title questions in a larger parcel analysis, scope of the government's project questions, compensability of damages questions, special benefits questions, and effective date of value questions. Resolving questions such as these is a proper role for agency counsel (and Department of Justice trial attorneys) and appraisers must follow their guidance. In situations where the legal outcome is uncertain, counsel may direct the appraiser to develop a dual premise appraisal.

**1.2.7.2.    Jurisdictional Exceptions.** While these Standards generally conform to USPAP,[24] in certain instances it is necessary to invoke USPAP's Jurisdictional Exception Rule to comply with federal law relating to the valuation of real estate for just compensation purposes. Areas of these Standards that preclude compliance with USPAP and therefore require invoking the Jurisdictional Exception Rule are briefly discussed here.

USPAP's Jurisdictional Exception Rule simply provides that "[i]f any applicable law or regulation precludes compliance with any part of USPAP, only that part of USPAP becomes void for that assignment." Further, a <u>Comment</u> in the Jurisdictional Exception Rule states, in part, "When an appraiser properly follows this Rule in disregarding a part of USPAP, there is no violation of USPAP."[25]

As made clear below, the conflicts between these Standards and USPAP that require invocation of USPAP's Jurisdictional Exception Rule are limited and supported by clearly established federal law, which is further discussed in Section 4. The Jurisdictional Exception Rule should never be invoked lightly or without reference to the overriding federal law, rule, or regulation that requires it. USPAP and these Standards require full and prominent disclosure to avoid misleading intended users (or even casual readers) of the appraisal report.

While these Standards are not *law* in and of themselves, they are based on, and describe, federal law (including case law, legislation, administrative rules, and regulations). These Standards have also been specifically incorporated by reference into a number of statutes and regulations, including the regulations that implement the Uniform Act.[26] It is clear that the deviations between the requirements of these Standards and USPAP noted below fall under

---

24    For purposes of this discussion, the 2016-2017 edition of USPAP has been used. Appraisers are cautioned that USPAP changes frequently and, thus, additional jurisdictional exceptions to USPAP may be required.

25    USPAP, Jurisdictional Exception Rule, 16.

26    49 C.F.R. § 24.103; *see, e.g.,* 113 Stat. 1693 § 4(b), (Pub. L. No. 106-138); 112 Stat. 879 § 1(c), (Pub. L. No. 105-208); 112 Stat. 2681 §357(1), § 605(a)(3), (Pub. L. No. 105-277); 110 Stat. 4093 § 304(c)(4)(A) (Pub. L. No. 104-333); 106 Stat. 2112 § 7(b) (Pub. L. No. 102-415); 106 Stat. 2258 § 2(d)(2)(A) (Pub. L. No. 102-453); 105 Stat. 1150 § 8126(a) (Pub. L. No. 102-172); 102 Stat. 1086 § 3(a) (Pub. L. No. 100-409), amending 43 U.S.C. § 1716; 100 Stat. 4274 § 8(o) (Pub. L. No. 99-663); 36 C.F.R. § 254.9; 43 C.F.R. § 2201.3.

USPAP's Jurisdictional Exception Rule; the legal authority justifying these exceptions consists of these Standards and the federal case law, legislation, and federal regulations upon which these Standards are based.

**Linking Estimate of Value to Specific Exposure Time.** Section 1.2.4 provides that the appraiser shall not *link* an opinion of market value for federal acquisition purposes to a specific exposure time. The legal basis for this jurisdictional exception to USPAP Standards Rule 1-2(c) and may be found in Section 4.2 of these Standards.

**Consideration of Land Use Regulations and Anticipated Public Projects.** Section 1.2.7.3.3 of these Standards provides that the appraiser disregard any changes in a property's neighborhood brought about by the government's project. Section 1.4.3 further instructs appraisers to disregard recent rezoning (or the probability of rezoning) of the subject property if such action was the result of the government's project. Section 4.3.2.4.1 (Exceptions, under Zoning and Permits) explains the legal basis for these instructions. These instructions are contrary to USPAP Standards Rule 1-3(a), which requires appraisers to identify and analyze the effect on use and value of existing land use regulations and probable modifications thereof, and to USPAP Standards Rule 1-4(f), which requires appraisers to analyze the effect on value of anticipated public improvements located on or off site. Therefore, the instructions to appraisers in these Standards in this regard are considered jurisdictional exceptions.

**Specific Legislation and Regulations.** Each land acquisition agency has its own rules and regulations relating to its land acquisition activities. While all of these rules and regulations work from a base of the Uniform Act and its implementing regulations, specific agency program activities sometimes make it necessary to adopt rules and regulations that are, or may be construed to be, contrary to USPAP.

Also, it is not uncommon for Congress to enact specific legislation relating to the acquisition of a specific property or properties to be acquired for a specific public project. In some instances, adherence to the provisions of that specific legislation may require the appraiser to invoke USPAP's Jurisdictional Exception Rule and/or prepare an appraisal under a hypothetical condition or extraordinary assumption. In such instances, it is the agency's responsibility to advise the appraiser of the special conditions under which the appraisal is to be conducted, of the specific law requiring the invocation of USPAP's Jurisdictional Exception Rule, and, if applicable, of the hypothetical condition or extraordinary assumption.

Any time appraisers confront a potential conflict between USPAP and these Standards or the client's instructions, they should always analyze the apparent conflict and avoid invocation of USPAP's Jurisdictional Exception Rule whenever possible. Often, these Standards and the agency's special appraisal instructions do not require a jurisdictional exception, but rather merely that the appraiser conduct an appraisal under a hypothetical condition or by adopting an extraordinary assumption.

**1.2.7.3.** **Special Rules and Methods.** An important aspect of assignment conditions under these Standards is compliance with the special rules and methods that apply to the development of

appraisals of market value for federal acquisition purposes. These special rules and methods are summarized briefly below, and explained in greater detail throughout these Standards. The legal foundations for these rules are found in the appropriate sections of Section 4 (Legal Foundations).

**1.2.7.3.1. Larger Parcel.** Essential to the appraiser's conclusion of highest and best use is the determination of the <u>larger parcel</u>.[27] The appraiser must make a larger parcel determination in every appraisal conducted under these Standards, even in minor partial acquisitions in which the appraiser is instructed not to do a complete before and after appraisal.

**1.2.7.3.2. Unit Rule.** There are several aspects of the unit rule that are important for appraisers to understand in developing appraisals under these Standards. The unit rule requires valuing property as a whole rather than by the sum of the values of the various interests into which it has been carved—such as lessor and lessee, or life tenant and the holder of the remainder. This requirement holds true in circumstances where the physical components of the property are held under different ownership such as the surface estate, mineral rights, water rights, or timber. Even when the physical components of a property are under the same ownership, it is improper to separately value the various components (improvements, minerals, standing timber, crops, and land) and then add them up. This procedure results in an improper <u>summation</u> or <u>cumulative appraisal</u>, which is inconsistent with both federal appraisal standards and USPAP.[28]

**1.2.7.3.3. Government Project Influence and the "Scope of the Project" Rule.** Any increase or decrease in the market value of real property prior to the date of valuation caused by the government project for which the property is being acquired must be disregarded in developing the appraisal. Under federal law, valuations for just compensation purposes must disregard any government <u>project influence</u> on a property's market value once it is within the scope of the government's project. The resulting <u>scope of the project rule</u>, when properly applied, ensures fair results for both landowners and the public, as discussed in Section 4.5.

> **Proper application of the <u>scope of the project rule</u> is complex, and virtually always requires a <u>legal instruction</u>.**
>
> **Simply directing appraisers to follow these Standards is not a sufficient legal instruction for purposes of the scope of the project rule.** *See* **Section 4.5.**

The scope of the project rule applies only to changes in value *attributable to the government's project*; it does not allow an appraiser to disregard changes in value attributable to other factors. For this reason, changes in value prior to the date of valuation due to physical deterioration within the landowner's reasonable control must be considered.

In partial acquisitions, the scope of the project rule typically excludes consideration of government project influence on the value of the larger parcel before the acquisition, and includes consideration of government project influence on the value of the remainder after the acquisition.[29]

---

27   As discussed in Section 4.3.3, the <u>larger parcel</u>, for purposes of these Standards, is defined as that tract or those tracts of land that possess a unity of ownership and have the same, or an integrated, highest and best use. Elements of consideration by the appraiser in making a determination in this regard are contiguity, or proximity, as it bears on the highest and best use of the property, unity of ownership, and unity of highest and best use.
28   USPAP, Standards Rule 1-4(e).
29   *See* Sections 4.5 and 4.6 (especially 4.6.1, 4.6.2, and 4.6.3).

**5-ER-773**

Because the scope of the project rule involves interrelated factual and legal questions, the appraiser must request appropriate **legal instruction** if there is evidence the government's project affected the market value of the property being appraised.[30] The appraiser may be asked to gather and/or analyze data to inform the legal analysis. Counsel (or the Court) will instruct the appraiser as to (1) *whether* the scope of the project rule applies; (2) *how* the rule must be applied to the specific property under appraisal; and, if applicable (3) *when* the scope of the project rule applies, i.e., the date as of which the rule is triggered. As discussed in Section 4.5, these legal instructions are the criteria the appraiser must follow in determining the fair market value of the property. As with other complex legal questions, counsel may direct the appraiser to perform a dual-premise appraisal if the legal outcome is uncertain.[31]

**1.2.7.3.4.    Before and After Rule.** In partial acquisitions, these Standards require application of the before and after rule, also known as the federal rule, in which the appraiser estimates both the market value of the larger parcel before the government's acquisition and the market value of the remainder property after the government's acquisition.[32] Requiring this method of valuation allows acquiring agencies, the Department of Justice, and the courts to calculate a reasonable measure of compensation by deducting the appraiser's estimated remainder or after value from the appraiser's estimate of the larger parcel's before value. The result of this procedure is a figure that includes the value of the property acquired as well as any compensable damages and/or special benefits to the remainder property.

Appraisers should note that these are two separate appraisals within the same assignment and require the appraiser to perform a new analysis and valuation of the remainder after the acquisition.

**1.2.7.3.5.    Damages.** Because damage to the remainder is automatically included in the before and after valuation, damages are not separately appraised in federal acquisitions. However, to properly estimate the value of the remainder after the acquisition, appraisers must understand the concept of damages for federal acquisition purposes.  The legal terminology associated with damages is confusing, perhaps because the same terms have been applied to different concepts under federal and state laws. Under federal law, damage to a property's market value is either compensable and must be considered, or non-compensable and must be disregarded.[33] The term *severance damages* has been used to describe those damages for which the United States must pay compensation. The term *consequential damages* has been used to describe damages for which the United States is not obligated to pay compensation.  For the purposes of these Standards and to reduce confusion, appraisers should use the term compensable rather than severance and non-compensable instead of consequential. Further discussion regarding the proper development of appraisals concerning partial acquisitions is found in Section 1.7.

---

30    *See* Section 4.5. If there is no evidence the government's project affected the market value, the scope of the project rule does not apply. *See id.*
31    *See* Section 1.2.7.
32    *See* Section 4.6.1.
33    As discussed in Section 4.6.2, the United States reimburses landowners for many types of non-compensable damage through administrative payments under the Uniform Act. These statutory benefits to persons and businesses affected by federal acquisitions are separate from, and in addition to, just compensation paid for the property acquired.

---

**1.2.7.3.6. Benefits.** Broadly, benefits are positive effects on market value that result from the public project for which the property was acquired. There are two categories of benefits for federal acquisition purposes: direct (special) benefits, which must be offset against total compensation, and general (indirect) benefits, which must be ignored. As with damages, whether a benefit is general or direct is a mixed fact/law question that requires a **legal instruction**.

**1.2.8.    Scope of Work.** A full understanding of the critical assignment elements discussed above is essential to a proper scope of work that will enable appraisers to solve the appraisal problem they have been hired to solve. It is ultimately the appraisers' responsibility to discuss these critical elements with the client at the time they are engaged to perform the assignment to ensure the resulting appraisal is credible, reliable, and accurate. The scope of work should reflect the complexity of the property and the market. The intended use and intended users are also critical factors that will impact scope of work decisions.

It is recognized that federal agencies may use (or are directed by statute or other authority to use) these Standards outside the realm of acquisitions/exchanges (for sales or conveyances of federal land, leases, and fee determinations). In these situations, the scope of work may be modified. For example, some of the special rules and methods, including the larger parcel analysis and the before and after methodology, may not apply in these appraisal assignments. Additional hypothetical conditions related to highest and best use and ownership may be required as well. The protection of the public trust remains paramount and must be the foundation that appraisers and client agencies operate from when making these determinations.

**1.3.    Data Collection.** As discussed in Section 1.2 (Problem Identification), the starting point for developing an appraisal under these Standards is the legal description of the property to be acquired and the property rights to be appraised. All of the information concerning the characteristics of the land and improvements that influence the value of the subject property must be collected by the appraiser during the process of property inspection and market research.

**1.3.1.    Property Data.**

**1.3.1.1.    Land.** In the development of the appraisal, the appraiser must collect and properly analyze data about the subject property. The appraiser must identify all characteristics that impact value, which may include access and road frontage, topography, soils, vegetation (including timber and crops), views, land area and shape, utilities, mineral deposits, water rights, and easements or other encumbrances. The presence of hazardous substances should be considered by appraisers in accordance with the assignment conditions.

**1.3.1.2.    Improvements.** The appraiser must collect and properly analyze data about all improvements located on the subject property. This includes building dimensions; square foot measurements; chronological and effective ages; type and quality of construction; present use and occupancy; interior finishes; type and condition of the roof; type and condition of mechanical, electrical, and plumbing systems; and dates of any significant remodeling or renovations. The appraiser must identify and properly calculate the appropriate method of

5-ER-775

measurement used in determining rentable areas. In addition, the appraiser must identify the type, quality, and condition of all site improvements, including fencing, landscaping, paving (both roadways and parking areas), irrigation systems, and domestic and private water systems.

Questions regarding whether an item is a fixture (real estate) or equipment (personal property) must be referred to legal counsel for clarification. In making this referral, appraisers should bear in mind that the determination of whether an item is a fixture or equipment, for federal acquisition purposes, may not always be consistent with laws of the state in which the property is located.[34] In those instances where specialty fixtures are encountered or when the fixtures will represent a substantial portion of the property's value, consideration should be given to the retention of a fixture valuation specialist.[35]

**1.3.1.3.**    **Zoning and Land Use Controls.** Zoning is a factor to be considered in evaluating property. Accordingly, if the property to be appraised is subject to zoning, the appraiser must identify the applicable restrictions and interpret the impact of such restrictions on the utility and value of the subject property. If zoning is uncertain, **legal instruction** may be required. In selecting comparable sales for use in the appraisal, the appraiser should select those sales that have the same or similar zoning as the property being appraised.[36]

The appraiser must consider not only the use restrictions of the zoning ordinance, but also other provisions of the zoning ordinance that may affect value. Examples include lot area requirements, building setback requirements, floor/area ratios, lot coverage ratios, off-street parking, landscaping requirements, height limitations, treatment of preexisting nonconforming uses, and treatment of uses that became nonconforming after adoption of the zoning ordinance. If the appraisal involves a partial acquisition, the appraiser must consider the effect of the zoning provisions on both the larger parcel and the remainder property.

Special care must be taken to determine the effect of a zoning ordinance on a remainder property that has been converted to a nonconforming use by the government's partial acquisition. Some ordinances have specific provisions to reclassify or "grandfather in" properties that have become nonconforming by reason of a partial acquisition by a governmental agency. Other ordinances contain no mechanism for converting a property that has become nonconforming after adoption of the zoning ordinance into a conforming property or classifying it as a preexisting nonconforming use. Penalties for nonconformity can be severe under such circumstances.

The appraiser must consider not only the effect of existing land use regulations, but also the effect of reasonably probable modifications of such land use regulations,[37] such as what impact on value any probability of a rezoning of the subject property might have. Although an appraiser might conclude that a property could be put to a more profitable highest and best use if it were zoned differently, this does not in itself suggest that a probability of rezoning exists.

---

34    *See* Section 4.1.
35    *See* Section 1.13.
36    *See* Sections 4.3.2.4 (Zoning and Permits), 4.4.2.1 (Comparability), and 4.4.2.4.5 (Contingency Sales).
37    *See* Section 4.3.2.4; *see also* USPAP, Standards Rule 1-3(a).

An investigation of the probability of rezoning should include:

- interviews of zoning administrators and members of the legislative body that make final zoning determinations;
- reviews of all rezoning activity of nearby property (both approvals and denials), land use patterns in the neighborhood (and any recent changes), physical characteristics of the subject and nearby properties, neighborhood growth patterns, and land use planning document provisions;
- investigation of neighborhood attitudes concerning rezones;
- determination of the age of the zoning ordinance; and
- analysis of sales of similar property to determine whether the sale prices reflect anticipated rezoning.

If the probability of a rezoning is impacted, either positively or negatively, by the government project for which the subject property is being acquired, such impact must be disregarded under the scope of the project rule.[38] In partial acquisitions, the probability of rezoning must be separately analyzed in regard to the larger parcel before acquisition, and the remainder property after acquisition. If the remainder property has a greater probability of rezoning, there may be a direct benefit to the property that must be offset against the total;[39] if such probability has been diminished, a compensable damage may have occurred.[40]

In addition to zoning, the appraiser must consider the impact of other land use regulations on the utility and value of the subject property. These land use regulations may be of local, state, regional, or national origin. Many common land use regulations that may have an impact on property value are listed in the sidebar. The client agency should advise the appraiser of any special or unique land use regulations it has identified that may affect the value of the property.

**Common land use regulations that can affect market value:**

- building codes
- health code regulations
- subdivision regulations
- development moratoria
- other development restrictions
- environmental impact statements
- shorelines management requirements
- coastal zone management
- flood plain management regulations
- comprehensive land use plans
- mining regulations
- timber harvesting regulations
- wetland regulations
- open space requirements
- endangered species protections
- noise, air, or water pollution controls
- hazardous or toxic waste controls

**1.3.1.4. Use History.** In developing the appraisal, the appraiser must identify the purpose for which the improvements were designed and the dates of original construction and major renovations, additions, and/or conversions. This is particularly important for properties located in transitional areas (such as a residential neighborhood being converted to higher density residential and commercial uses) or special-use properties (such as church buildings converted to a commercial or residential use). The appraiser should identify a 10-year history of the use and occupancy of the property, if available. Past uses of the property may suggest historical contamination by hazardous substances.

---

38   *See* Section 4.5.
39   *See* Section 4.3.3.
40   *See* Section 4.3.4.

**1.3.1.5.  Sales History.** Since any recent, unforced sale of the subject property can be the best evidence of its value, it is important to collect data on all sales of the property for the 10 years prior to the effective date of value.[41] Any offers to buy or sell the subject property should also be identified and evaluated if available. If no sale of the property has occurred in the past 10 years, the appraiser shall identify the most recent sale of the property, whenever it occurred.

> **These Standards require a *10-year sales history*— longer than that required in appraisals for many other purposes—for the reasons discussed in Section 4.4.2.**

Information to be identified and reported under Section 2 shall include name of the seller, name of the buyer, date of sale, price, terms, and conditions of sale.[42] As part of this process, the appraiser should verify the information with a party to the transaction and determine whether the transaction met the conditions required for a comparable sale under Section 1.5.2.1.

**1.3.1.6.  Rental History.** The appraiser must collect historical rental or lease history of the property for at least the past three years, if this information can be ascertained. All current leases should be identified and information collected, including: the date of the lease, name of the tenant, rental amount, term of the lease, parties responsible for property expenses, and other lease provisions that impact whether the lease reflects market rent.

**1.3.1.7.  Assessed Value and Annual Tax Load.** The appraiser must collect all information related to the current assessment and dollar amount of real estate taxes. If assessed value is statutorily a percentage of market value, determine the percentage. If the property is not assessed or taxed, the appraiser should collect all necessary information to support an estimate of the assessment and the tax rate to support an estimate of the dollar amount of tax. In some jurisdictions, certain types of property may be assessed based on *current use* rather than *highest and best use*. These programs often relate to farmlands, timberlands, and open space; to be eligible, owners may have to agree to leave the property in its existing use for a certain period of time.[43] In such situations, the appraiser should collect the data necessary to support both the current assessed value and taxes for the property's existing use and the estimated assessed value and tax load for the property at its highest and best use.

**1.4.  Data Analysis.** A well-supported market analysis is a critical element in every appraisal prepared under these Standards. The data and analysis developed in this process are fundamental to the highest and best use and the larger parcel analyses that follow.  The area and neighborhood analysis leads directly to a more detailed marketability study focused on the market characteristics of the subject property.

> **Market decides the use. Use determines value.**

---

41   In comparison, USPAP requires a three-year sales history, while the Uniform Act requires at least a five-year sales history.
42   Terms and conditions of sale cannot, of course, conclusively be determined from the public record. Therefore, appraisers should confirm the sales of the subject property with one of the parties to the transaction.
43   Many of these programs require owners to pay back taxes and a substantial penalty if land is converted from its existing use before the agreed time period. These back taxes and penalties become an encumbrance on the land when it is converted to an alternate use. However, since appraisers should estimate the market value of property as if free and clear, the indebtedness, or potential indebtedness, imposed under these programs is not to be considered by the appraiser in estimating the property's market value.

1.4.1.    **Area and Neighborhood Analysis.** In developing an area and neighborhood analysis, the appraiser must identify the characteristics of the area or neighborhood that directly influence the subject property.  These data (demographic and economic) should include only the information that directly affects the appraised property, together with the appraiser's conclusions as to significant trends. The use of "boilerplate" or general demographic and economic data is unnecessary and should not be included unless the specific data directly impacts the current market value of the subject property.  As discussed in Section 4.6 and Section 1.2.7.3.3, the appraiser must disregard changes in the neighborhood brought about by the government's project for which the subject property is being acquired. This specific standard regarding government *project influence* requires a jurisdictional exception to USPAP Standards Rule 1-4(f).

1.4.2.    **Marketability Studies.** In complex or unusual appraisal problems, a marketability study may be required as part of the scope of work.  Marketability studies are often required for appraisals of properties located in transitional areas, properties that contain special-use improvements, or properties for which the highest and best use is unclear without in-depth study. In acquisitions referred to the U.S. Department of Justice, a marketability study will be required.

A marketability study should include a detailed analysis of the subject property and its economic environment.  This should include an analysis of the potential physically possible and legally permissible uses of the subject property and its competitive position within the market.  A detailed supply and demand analysis should be developed for the various uses possible for the subject property. In appraisals of properties with income producing improvements, the marketability study should identify the quality class of the improvements and the existing and future competitive supply of similar improvements.  Vacancy levels in the market, rental rates, and operating expenses should also be addressed.

1.4.3.    **Highest and Best Use.** The appraiser's determination of highest and best use is one of the most important elements of the entire appraisal process.[44] Therefore, appraisers must apply their skill with great care and provide market support for the highest and best use conclusion(s) developed in the appraisal.

1.4.4.    **Definition.** For just compensation purposes, market value must be determined with reference to the property's highest and best use, that is,[45]

> The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.

1.4.5.    **Four Tests.** First, the appraiser should form an opinion of the highest and best use of the land, as if vacant. If the land is improved, the appraiser forms an opinion of the highest and best use of the property, as improved. The highest and best use of some property cannot be reliably estimated without extensive marketability and/or feasibility studies, which may

---

44    *See* Section 4.3.
45    See Section 4.3 for the legal basis for this definition.

require the assistance of special consultants in particularly complex assignments.[46] To be a property's highest and best use, the use must be (1) physically possible; (2) legally permissible; (3) financially feasible; and (4) must result in the highest value. Each of these four tests must be fully analyzed in the appraisal development process. A property's highest and best use will ordinarily be its existing use, as an owner will normally put property to its maximum (highest-value) use. A determination that the property has a different highest and best use than its existing use requires evidence that the property is physically and legally adaptable for that use and there is market demand for that use in the reasonably near future.

In assignments involving improved properties, it is important to fully develop both analyses of highest and best use (as if vacant and as improved). Land can be influenced by the size, shape, function, and remaining life of the improvements. For example, there may be surplus or excess land when considered in light of the existing pattern of development. For this reason, all four tests of highest and best use must be addressed in the analysis of highest and best use as improved.

For any highest and best use that will require a property to be rezoned, the probability of that rezoning must be thoroughly investigated and analyzed. Likewise, the probability of obtaining any other forms of government approvals necessary for a proposed highest and best use must be investigated and analyzed. The extent of the investigation and analysis required to meet this requirement can be found in Section 1.3.1.3.

Generally, the government's intended use of the property after acquisition is an improper highest and best use and cannot be considered. It is the property's *market value* that is to be estimated, not the property's value to the government. If it is solely the government's need that creates a market for the property, this special need must be excluded from consideration by the appraiser. The government's intended use of the property can only be considered as a potential highest and best use if there is *competitive demand for that use in the private market*, separate and apart from the government project for which the property is being acquired. Section 4.3 discusses the legal bases for these requirements.

**1.4.5.1.    Economic Use.** For purposes of just compensation, opinions of market value must be based on an <u>economic</u> highest and best use. Therefore, appraisals in federal acquisitions cannot be based on noneconomic or nonmarket uses. To be an economic use, the use must contribute to the property's actual market value, and there must be competitive supply and demand for that use in the private market. Whether or not a particular use is economic and therefore appropriate to consider depends on the relevant market, not the use itself. This topic is discussed in depth in Section 4.3.2.3.

**1.4.6.    Larger Parcel Analysis.** Essential to the appraiser's analysis of highest and best use is the determination of the <u>larger parcel</u>. These Standards define the larger parcel as that tract, or those tracts, of land that possess a unity of ownership and have the same, or an integrated, highest and best use.

> **The <u>larger parcel</u> is that tract of land which possesses a unity of *ownership* and has the same, or an integrated, *highest and best use*.**
>
> **Determining unity of ownership may require <u>legal instruction</u>.**

---

46    *See* Section 1.13.

Elements to be considered in determining the larger parcel are contiguity (or proximity) as it bears on the highest and best use of the property, unity of ownership, and unity of highest and best use.

The appraiser must make a larger parcel determination in every appraisal developed under these Standards.[47] It is not uncommon for an appraiser's conclusion regarding the larger parcel to be different from the specific parcel the client agency identified to be appraised, as the appraiser cannot determine highest and best use without considerable investigation and analysis. In such instances, the appraiser shall inform the client agency of the determination of the larger parcel and the agency shall amend the appraisal assignment accordingly.

The appraiser must make a larger parcel determination regardless of whether the agency designated an acquisition as a total acquisition or a partial acquisition. This is so because whether an acquisition is a total or partial acquisition cannot be determined until the appraiser has determined the highest and best use and the larger parcel. Under the rules for larger parcel determination, as described in Section 4.3.4, two physically separate tracts may constitute a single larger parcel, or a single contiguous physical tract may constitute multiple larger parcels. This can be important not only in consideration of damages and benefits, but also in the selection and analysis of comparable sales.[48]

In light of the discussion in Section 4.3.4 regarding the larger parcel, it is recommended that the appraiser begin an analysis of the unity of ownership test with the premise that, in making a larger parcel determination, it is allowable to consider all lands that are under the beneficial control of a single individual or entity even though title is not identical in all areas of the tract(s). If the appraiser then concludes that the larger parcel constitutes lands that are under the beneficial control of a single entity (but title is not identical), the appraiser's larger parcel determination, together with the facts upon which it is based, should be submitted to the client agency's legal counsel for review before the appraiser proceeds. Based on applicable case law and the facts of the case, legal counsel can then determine whether, as a matter of law, the unity of ownership test of the larger parcel is present, and provide written **legal instructions** to the appraiser accordingly.

Larger parcel determinations in appraisals for federal land exchanges, or in connection with inverse condemnation claims, may require different considerations than those described above. For a discussion of those potential differences, appraisers should refer to Section 1.12 regarding federal land exchange appraisals and to Section 1.11 regarding inverse condemnation appraisals.

**1.4.7.**    **Highest and Best Use Conclusion.** In reaching a conclusion regarding a property's highest and best use and regarding the larger parcel, the appraiser must identify the *most probable buyer* and/or the *most probable user* of the subject property under that highest and best use.  The appraiser must also reach a conclusion concerning the *timing* of any highest and best use that is different than the current use.

---

47    The appraiser must make a larger parcel determination even for minor partial acquisitions in which the appraiser is instructed not to perform a complete before and after appraisal. *See* Section 4.6.4.1.

48    For instance, if an appraiser determined that the larger parcel was a 10-acre tract out of a total ownership of 200 acres, the unit (e.g., per square foot or per acre) value may well be different for the smaller tract and the appraiser would utilize comparable sales similar in size to the 10-acre larger parcel rather than sales similar in size to the entire 200-acre ownership.

5-ER-781

1.5.     **Application of Approaches to Value.** The following sections outline the standards for the application of the three approaches to value. The approaches to be used to value land as if vacant are presented first. The application of the <u>sales comparison approach</u>, the <u>income capitalization approach</u>, and the <u>cost approach</u> for the valuation of the property as improved follows.

1.5.1.   **Land Valuation.** When the subject property is unimproved or the cost approach is being used, the primary method of land valuation is the sales comparison approach as described below. The subdivision development method and the capitalization of ground leases are to be used only in rare cases when the property has a highest and best use for subdivision development or the property is subject to a long-term ground lease. Even when those situations exist, the latter two methods are better used as additional support for the sales comparison approach.

1.5.1.1. **Sales Comparison Approach.** The appraiser shall develop an opinion of the value of the land for its highest and best use, as if vacant and available for such use. In doing so, the appraiser's opinion of value shall be supported by confirmed sales of comparable or nearly comparable lands[49] having like optimum uses. Differences shall be weighed and considered to determine how they indicate the value of the subject land. Items of comparison shall include property rights conveyed, financing terms, conditions of sale, market conditions, location, and physical characteristics. The appraiser shall obtain adequate information concerning each comparable sale used and perform a comparative analysis to form a supported opinion of the market value of the subject property as if vacant. See Section 1.5.2 for a full discussion of the Sales Comparison Approach.

1.5.1.2. **Subdivision Development Method.** When the highest and best use of a property is for subdivision purposes and comparable sales do not exist, resorting to the <u>subdivision development method</u>[50] to land value may be appropriate if adequate market and/or technical data are available to reliably estimate the property value. This method of estimating land value can also be used to test the appraiser's highest and best use conclusion and to check against the indicated value of the land developed by the use of comparable sales when the sales data is limited. However, this approach to value is complex, often requires the assistance of other experts,[51] and always requires substantial amounts of research, analysis, and supporting documentation.

In applying this technique, appraisers must bear in mind that a property must be valued in its *as-is* condition. Therefore, consideration must be given to the time lag that is typically necessary between the date of value and the projected date when developed lots would become marketable. This time lag must provide for the time necessary to procure all land use permits and approvals, as well as the time necessary for the physical construction of the infrastructure that will be required to convert the land into marketable lots. One of the most critical factors in the application of this technique is, of course, selection of the appropriate discount rate to be applied to the income streams generated by the development. This discount rate should be derived from and supported by direct market data whenever possible.

---

49   For a discussion of what legally constitutes a comparable sale and the admissibility of comparable sales information, see Section 4.4.2.
50   For a discussion of the courts' view of this valuation technique, see Section 4.4.5.
51   Such as marketing and feasibility consultants, land use planners, civil engineers, and contractors. *See* Section 4.12 (Appraisers' Use of Supporting Experts' Opinions); USPAP Competency Rule (acquiring competency).

1.5.1.3.    **Ground Leases.** In those rare circumstances when the property being appraised is under a long-term ground lease, the appraiser must analyze the lease and determine whether it is appropriate to use a direct capitalization of the ground lease to develop an opinion of the market value of the land. The appraiser must be able to identify comparable properties in the area that are subject to similar ground leases in order to ensure that the ground lease is a market rent, as well as adequate market data to support the selection of a capitalization rate. This procedure should be used to support a conclusion of land value developed by the sales comparison approach rather than as the only method used to develop an opinion of market value.

1.5.2.    **Sales Comparison Approach.** The sales comparison approach is normally the preferred method of valuation for property being acquired under these Standards. The sales comparison approach is a systematic procedure in which appraisers study the market for sales of properties with the same highest and best use as the subject property that are as close in proximity and time as possible.  Each sale is verified with parties to the transaction to ensure that information is accurate and the sale is a market transaction. Each sale is adjusted for elements that are different from the subject property and the resulting array of sales data is reconciled to a final opinion of market value.  Analysis of sales shall be made using a market derived unit of comparison such as price per acre, price per square foot, or animal unit month.  In some markets, more than one unit of comparison may be used by market participants and care should be used to maintain consistency.

1.5.2.1.    **Prior Sales of Subject Property.** Since any recent and unforced sale of the subject property can be the best evidence of its value,[52] any such sale is treated as a <u>comparable sale</u> in this approach to value. It must be analyzed like any other comparable sale and given appropriate weight by the appraiser in forming a final opinion of the market value of the subject property. As noted in Section 1.3.1.5, the appraiser must verify the most recent sale of the subject property with the parties to the transaction to ensure that the sale provides an indication of market value.

1.5.2.2.    **Selection and Verification of Sales.** In selecting the comparable sales to be used in valuing a given property, it is fundamental that all sales have the same economic highest and best use as the subject property and that the greatest weight be given to the properties most comparable to the subject property. In this regard, appraisers must recognize that when valuing a property with a highest and best use that will require rezoning or extensive permitting, sales of similar properties may require extensive analysis and adjustment before they can be deemed economically comparable. The analysis and adjustment of such sales is discussed below.

All comparable sales used must be confirmed by the buyer, seller, broker, or other person having knowledge of the price, terms, and conditions of sale.[53] When a comparable sale is of questionable nature and/or admissibility (e.g., sales to a government entity), special care must be

---

52    *See* Section 4.4.2.4.1.
53    These Standards require that sales verification be conducted by competent and reliable personnel, and if the case goes into condemnation, the sale must be personally verified by the appraiser who will testify. However, appraisers should recognize that some agencies may require in their appraisal contracts that initial verification be made by the appraiser who will sign the appraisal report.

taken in the verification of the circumstances of the sale.[54] The appraiser must collect adequate information about each sales transaction to support a detailed analysis in the adjustment process. In most cases this would include a physical inspection of each property selected as a comparable sale. If the appraisal is being prepared for the Department of Justice, a physical inspection of each sale selected as a comparable is required.

The appraiser should collect and analyze the recent sales history of properties selected as comparable sales. This information can be useful in analyzing trends in the market and evaluating the impact of the government project on market value after acquisition.

**1.5.2.3.    Adjustment Process.** Comparison of sales transactions to the subject property is the essence of the sales comparison approach to value. The basic elements of comparison to be considered are recognized as:

- Property rights conveyed
- Financing terms
- Conditions of sale
- Expenditures made immediately after purchase
- Market conditions (historically referred to as a *time* or *date of sale* adjustment)
- Location
- Physical characteristics
- Economic characteristics
- Legal characteristics (land use, zoning)
- Non-realty components of value included in the sale property[55]

The comparable sales should be adjusted through quantitative and/or qualitative analysis, depending on the market data available, to derive an indication of the market value of the subject property.[56] Quantitative adjustments should be made whenever adequate market data exist to support dollar or percentage amount adjustments. Qualitative adjustments (i.e., inferior, superior) can be made when market data is not sufficient to support reliable quantitative adjustments.[57] Quantitative and qualitative adjustments are not mutually exclusive methodologies: because one factor of adjustment cannot be quantified by market data does not mean that all adjustments to a sale property must be qualitative. All factors that can be reliably quantified should be adjusted accordingly. When using quantitative adjustments, appraisers must recognize that not all factors are suitable for percentage adjustments. Percentage and dollar adjustments may, and often should, be combined.[58] Each item of adjustment must be carefully analyzed to determine

---

54    For a description of the verification process required by these Standards for such sales, see Section 1.5.2.4. See Section 4.4.2.4 for the legal bases for these requirements.

55    *See generally* APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 403-37 (14th ed. 2013) (discussing elements of comparison).

56    *See* Section 4.4.2.2.

57    Both quantitative and qualitative adjustments have strengths and weaknesses—and both can be misleading and unreliable without careful support. Without adequate market data, the apparent precision of quantitative adjustments can convey a false sense of accuracy. Similarly, without careful explanation of each element of comparison for each sale, qualitative adjustments can improperly obscure key aspects of the appraiser's analysis.

58    For instance, a percentage adjustment for market conditions (time) may be appropriate, but an adjustment for the fact that the property under appraisal is 300 feet from a sewer connection and all of the comparable sales are connected to sewer should often be made in a lump sum dollar amount to reflect the cost to cure the subject property's comparative deficiency. If a percentage adjustment were applied to the price per unit (e.g., per acre, per square foot) of each comparable, the adjustment to each of the comparables would vary, depending on the price per unit of the comparable, and might have no relationship to the cost to cure the subject property's deficiency.

whether a percentage or dollar adjustment is appropriate. When both quantitative and qualitative adjustments are used, all quantitative adjustments should be made first.[59]

When appraisers must resort to qualitative adjustments, more extensive discussion of the appraiser's reasoning is generally required. This methodology may also require the presentation of a greater number of comparable sales to develop a reliable opinion of value. It is essential that the appraiser specifically state whether each comparable sale is generally either overall superior or inferior to the property under appraisal. The comparable sales utilized should include both sales that are overall superior and overall inferior to the property being appraised, rather than merely demonstrating the property is worth more (if all sales are inferior to the subject property) or less than a certain amount (if all sales are superior to the subject property).

The definition of market value used in these Standards requires that the opinion of value be made in terms of cash or its equivalent, as discussed in Section 4.2. Therefore, the appraiser must make a diligent investigation to determine the financial terms of each comparable sale. When comparing the sale to the property being appraised, the appraiser shall analyze and make appropriate adjustments to any comparable sale that included favorable or unfavorable financing terms as of the date of sale. Such adjustment must reflect the difference between what the comparable sold for with the favorable or unfavorable financing and the price at which it would have sold for cash or its equivalent.

While cash equivalency of favorable or unfavorable financing can be estimated by discounting the contractual terms at current market or yield rates for the same type of property and loan term over the expected holding period of the property, the preferred method of estimating a proper cash equivalency adjustment is by the analysis of actual market data, if such data is available.

In developing a final opinion of market value by the sales comparison approach, the appraiser shall consider the comparative weight given to each comparable sale, regardless of whether quantitative or qualitative adjustments or a combination thereof are used.

**1.5.2.4.    Sales Requiring Extraordinary Verification.** Certain types of sales can be used only under certain circumstances or for limited purposes in appraisals for federal acquisitions. As a result, these sales require <u>extraordinary verification</u> to ensure the appraiser's opinion does not reflect any legally improper considerations. Section 4.4.2.4 addresses several types of sales that require this extraordinary treatment and the legal reasons for this requirement. This Section explains the verification process required for sales to government entities, sales to environmental organizations, and contingency sales.[60]

---

59  THE APPRAISAL OF REAL ESTATE, *supra note* 55, at 433-36.
60  *See* Sections 4.4.2.4.2., Item (5) (Sales Involving the Government or Other Condemnation Authority), 4.4.2.4.2., Item (6) (Sales Involving Environmental or Other Public Interest Organizations), and 4.4.2.4.5 (Contingency Sales); *see generally* Section 4.4.2.4 (Transactions Requiring Extraordinary Care).

**Sales to Government Entities.** Because sales to government entities routinely involve nonmarket considerations, sales to the government should be immediately viewed by appraisers as *suspect* in appraisals for federal acquisitions.[61] Sales to the government should not be used as comparable sales unless there is such a paucity of private market data as to make a reliable estimate of market value impossible without the use of government purchases. The types of transactions conducted and lands acquired by governments are often unique. For instance, lands acquired for conservation or preservation are often of extraordinary size, have little economic utility or value, and are located in remote areas with little market activity. To develop a reliable and supported estimate of market value in these situations, appraisers may be forced to consider sales to the government in the sales comparison approach to value.

If the appraiser determines, after careful analysis and verification required under these Standards, that a sale to the government was a true open-market transaction, the sale may be appropriate to consider as a potential comparable sale. There are certain steps that the appraiser must take before a sale to the government can be qualified as a valid comparable sale. Comprehensive and documented verification of government transactions is essential.

The type and amount of sales documentation and other information available to an appraiser about a sale to the government that is potentially comparable to the subject property will vary, depending on the land acquisition documentation requirements of the entity that acquired the potentially comparable property. Small governmental entities, such as local service districts, may acquire property without written appraisals, appraisal reviews, or written records of negotiations. On the other hand, state and federal government acquisitions are usually subject to the Uniform Act (or comparable state statutes) and require extensive documentation of land acquisitions, including formal documented appraisals, written appraisal reviews, and written records of the negotiating process.

First, the appraiser should review the legislation that authorized and/or mandated the government's acquisition of the potentially comparable property to determine whether the legislation provided that such property would be acquired at market value. Legislation that mandates acquisition at a price other than market value or provides for acquisition at a price unaffected by particular market forces (e.g., disregard of the influence of the Endangered Species Act) may not result in a valid comparable sale representative of market value. Likewise, legislation that allows the acquiring agency to deviate from the market value measure if it finds it in the public interest to do so will often not result in a price representative of market value.

**The availability of sales documentation for inspection and analysis may vary by agency.**

**The appraisal report must note any sales documentation that was not available for inspection, and explain the impact on the reliability of the transaction as a comparable sale.**

The appraiser should next contact the acquiring agency and ask to inspect the <u>appraisal</u> upon which the acquisition was based, the agency review of that appraisal, the negotiator's report (or file) in conjunction with the acquisition, and the agency's acquisition file.

---

[61]   *See* Section 4.4.2.4.2, Item (5) (Sales Involving the Government or Other Condemnation Authority).

Examination and analysis of the agency's appraisal should include:

- Determination of whether the sale was a <u>total acquisition</u> of the landowner's property indicating the value of the property acquired or a <u>partial acquisition</u> that reflects not only the value of the part acquired but also damage to the remainder.
- Determination of whether the sale was for the fee simple interest in the property or a total interest similar to the interest being appraised (e.g., leasehold of the entire property). Sales of something less than the fee simple interest in an entire property (e.g., easement acquisitions) may not be valid comparable sales.
- A review of the highest and best use determination. The highest and best use upon which the value opinion was based must be an *economic* use, and must be the *same* as, or *highly similar* to, the highest and best use of the property under appraisal before the transaction can be considered a reliable comparable sale. A highest and best use of *sale to the government*, conservation, or any use that contemplates noneconomic considerations is not a valid highest and best use upon which to estimate market value.
- A review of the appraiser's final opinion of value. Determine whether the price paid for the property was equivalent to its appraised value. If not, determine whether the price paid was within the range of values indicated by the appraiser's comparable sales in the sales comparison approach and/or by the different approaches to value developed by the appraiser.
- A review of the sales used by the appraiser in developing an opinion of value. If the sales relied on by the appraiser were influenced by nonmarket factors (e.g., political pressure), they would be invalid indicators of market value; thus, any value conclusion reached based on such sales may, likewise, be invalid.
- A review of any value allocation or breakdown included in the appraisal report, such as different unit values for different land types included in the sale property or the contributory value of improvements.

Next, the appraiser must examine the agency's <u>appraisal review</u>, and make particular note of any technical or factual errors reported by the review appraiser. The requirements for appraisal reviews for federal acquisition purposes can be found in Section 3.

The appraiser must also review the negotiator's report and the agency's acquisition file regarding the process of negotiation between the agency and the property owner. Any suggestion that the property would be condemned if agreement could not be reached should be noted. Likewise, any indication that the property owner accepted the price paid with the understanding that the agency would support (or not oppose) the property owner's attempt to take a tax write-off for a donation for some amount in excess of the actual price paid should be noted. Either of these circumstances may suggest a price below market value. Any suggestion that a property owner may have threatened to damage the property for the government's intended use (e.g., cutting the timber from land slated for acquisition as a park) if the owner's asking price was not paid can result in a price in excess of market value. Sales involving the exchange of property are generally unreliable for use as comparable sales.[62]

---

62   *See* Section 4.4.2.4.3.

A determination should be made whether the property owner or the owner's representative submitted an appraisal or any meaningful market data to the agency that may have supported a value higher than the government's appraisal and the agency's subsequent determination to pay more than its appraisal. If so, the submitted material should be analyzed.

The appraiser should read any correspondence from the property owner's political representatives, and the agency's response thereto, to determine whether there may have been nonmarket pressure to consummate a sale at something other than market value. The appraiser should also review any media coverage concerning the property and the government project to determine whether there was an undue amount of public pressure on the agency or the property owner to consummate a quick sale. Such public pressure can result in a price that is above or below the market value of the property.

Conveyance and closing documents will reveal the exact estate conveyed to the government. It should be confirmed that the estate that was conveyed is the same estate that was appraised. In negotiations, some agencies may allow the property owner to retain some rights in the property after acquisition not contemplated by the government's appraiser (for example, a life estate in the property or an estate for years, at zero or nominal rent, or the right to continue to grow crops on the land or use it for grazing or a physical reduction in the land area acquired).

If the estate acquired was only an easement, the sale is not a valid comparable either as an indication of fee simple value or of the value of the easement. If only an easement is being acquired from the subject property, the measure of value should not be based on the price paid for similar easements but rather upon the federal <u>before and after method</u>.[63]

There are a number of legitimate reasons why a government agency would pay a price in excess of its approved appraisal for a specific acquisition. A reading and analysis should be undertaken of any documents produced by the agency or others in an attempt to justify payment in excess of the approved appraisal. An agency's appraisal does not represent the only reasonable estimate of market value. But if the government paid more for the property than its approved appraisal, the appraiser must determine the government's justification for doing so and whether it was based on market considerations.

A price in excess of an agency's approved appraisal may still represent a *valid indication of market value* if:
- The appraisal is outdated in a rapidly appreciating market.
- The price remains within the range of values indicated by the comparable sales developed by the appraiser.
- The price remains within the range of values indicated by the different approaches to value developed by the appraiser.
- Factual information about the property, the appraisal, or the comparable sales used came to light after the appraisal and review that revealed errors in the appraisal that could be mechanically corrected.

---

63   *See* Section 4.6.1.

On the other hand, a price in excess of an agency's approved appraisal would *not* be a valid indication of market value, and therefore would not be a valid comparable sale (at least without adjustment) if:

- The price in excess of market value was warranted due to costs and risks inherent in a condemnation trial.
- The threat of imminent destruction of the property for the government's intended use existed.
- The cost of project delay caused by the failure to acquire the property offsets the price paid in excess of its market value.
- The administrator of the public agency found it to be in the public interest to pay in excess of market value.
- The tract acquired was a key tract, or the last tract to be acquired, for the government's project.
- The economy of land management of a consolidated ownership by the government outweighed the price in excess of market value paid for the tract.

Once the foregoing investigation and analysis have been completed, the appraiser should personally verify the sale with the purchaser *and* the seller or their representatives. In conducting this verification, the appraiser should clear up any questions that may have arisen as a result of earlier research.

**Sales to Environmental or Other Public Interest Organizations.** Sales to environmental or other public interest organizations are also prone to reflecting nonmarket considerations, as discussed in Section 4.4.2.4.2., Item (6). As a result, these transactions are subject to the same extraordinary verification measures as sales to government entities. When public interest organizations work closely with government agencies that administer conservation or similar projects, extensive sale documentation may be available. Before using such a transaction as a comparable sale, the appraiser must determine whether the sale was based on a competent appraisal of market value of the property for its *economic* highest and best use, whether any tax write-offs were taken, and whether the transaction was impacted by the pendency of the government's project.[64] If the purchase price was not based on the market value of the property for an economic highest and best use, the sale will normally have to be discarded as a comparable sale. The same is true if tax write-offs were involved or if project influence was present, although it is sometimes possible to make adjustments to the sale for these factors. If, subsequent to the sale, the property has been transferred by the environmental group to the government, the facts and circumstances of the transfer must be reported.

**Contingency Sales.** Potentially comparable sales for a property with a highest and best use that requires procurement of rezoning or a land use permit must also be verified and treated with great care. Sales of such property in the private market generally take the form of initial options or <u>contingency sales</u>, with the contingency being the purchaser's ability to procure the necessary rezoning or permitting to develop the property to its highest and best use. If the rezoning or

---

64    Such transactions may well reflect project influence, as discussed in Section 4.5.

permitting is denied, the contingency is not met and the sale does not close (or the option is not exercised). Therefore, when consummated, such sales reflect the price of property already rezoned or permitted for development to its highest and best use. All of the risks, time delays, and costs associated with a rezoning or permitting have been removed from the transaction.

Such sales are typically not comparable to the property being appraised for federal acquisition purposes. Generally, properties under appraisal for government acquisition purposes that have a highest and best use that requires a rezone and/or permits to be developed to their highest and best use do not have the zoning or permitting in place. Thus, on the theoretical date of the sale's closing (i.e., the effective date of valuation), the purchaser must assume the risks, time delay, and costs of procuring the rezone and/or permitting. Properties seldom sell in such a condition in the private market; thus, there are few truly comparable sales available for the appraiser's use in developing a value for the property under appraisal by the sales comparison approach.

Accordingly, appraisers must often resort to using sales that already have, on the date of consummation, their needed zoning/permitting in place. Under these circumstances, it is essential that the appraiser adjust the sales to reflect the differences in the regulatory environments of both the sales at the time of closing and the subject property as of the effective date of the appraisal. Such adjustments must account for the risks inherent in the procurement of a rezoning or permitting, including the possibility that the regulatory agency may deny such a request or place conditions on it.[65] The time delays encountered in procurement of the rezoning and/or permitting and the costs associated with their procurement must also be considered. In certain circumstances, a purchaser may require an entrepreneurial profit in addition to an adjustment for risk.

Appraisers cannot merely assume that such a rezoning/permit is in place for the subject property, or assume that such a rezone/permit will be granted. They must appraise the property only in light of the probability of obtaining the rezone/permit. If appraisers use sales of properties with zoning/permitting in place at the time of sale, they must clearly and specifically explain how they accounted for the regulatory environmental differences between these sales and the subject property and how they quantified the adjustment(s) for this factor, based on market evidence whenever possible.

**1.5.3.**    **Cost Approach.** In the cost approach, the market value of the vacant land is added to the depreciated reproduction or replacement cost (contribution) of the improvements to arrive at an indication of the value of the property. The value of the land, vacant and subject to improvement, is generally developed by the sales comparison approach for land (see Section 1.5.1.1.). The estimate of the reproduction or replacement cost of the improvements is based on current local market cost of labor and materials for construction of improvements. All forms of depreciation are deducted from the cost new estimate, as discussed below. This approach to value is most useful in developing the value of a property in which the improvements are new (and actual costs are known) and there is no evidence of depreciation. The cost approach is also used

---

65    See Section 4.3.2.4 regarding the consideration of the possibility of rezoning or permitting.

as a check on the opinion of market value indicated by the sales comparison approach and for appraising highly improved properties with no known comparable sales.

In the case of special-purpose properties[66] that are not generally bought and sold, it is sometimes necessary to resort to reproduction cost new less depreciation for want of any more reliable method of determining market value. If it is necessary to resort to the cost approach, all forms of depreciation—physical deterioration, functional obsolescence, and external (or economic) obsolescence—must be accurately reflected and deducted from the reproduction or replacement cost before the value of the land and the contributory value of the improvements are added together to develop an indication of market value by the cost approach. Whenever the cost approach is utilized and it can be determined at what time and at what cost the improvements were erected, a trending up—or down, as appropriate—of such initial costs becomes an important part of the analysis.

**1.5.3.1.    Critical Elements.** In developing an opinion of market value by the cost approach, the appraiser must recognize the critical elements that must be well supported by market evidence: reproduction and replacement costs, depreciation, and entrepreneurial profit.

**1.5.3.1.1.    Reproduction and Replacement Costs.** The appraiser must recognize the distinction between reproduction cost and replacement cost.[67] Reproduction cost is the present cost of reproducing the improvement with an exact replica; replacement cost is the present cost of replacing the improvement with one having equal utility. If the cost approach is applicable, the appraiser may use either the reproduction or replacement cost method, but must account for all forms of depreciation appropriate under the particular method chosen. In developing the cost estimate, the appraiser must account for all *direct* and *indirect* costs associated with constructing the improvements. Direct (hard) costs include the labor and materials required to construct the improvements. Indirect (soft) costs include such items as architectural and engineering design fees, legal fees, costs of permits and other similar expenses associated with obtaining approvals, and designing and overseeing the construction of the improvements.

If a national cost-estimating service is used, the appraiser should ensure that the most similar improvement type is selected and that all adjustment factors such as locality adjustments developed for the service are properly accounted for. If the appraiser may place considerable weight on the cost approach to value in reaching a final opinion of value, a contractor or professional cost estimator should be retained to assist in developing the reproduction or replacement cost estimate.

**1.5.3.1.2.    Depreciation.** The depreciation from all causes—including physical deterioration, functional obsolescence, and economic or external obsolescence—must be properly identified and analyzed. The estimated dollar amounts associated with each form of depreciation must be supported by market data using the breakdown method or the market extraction method. Depreciation should not be estimated by the use of published tables or age-life computations.

---

66    Also referred to as special-use properties or limited-market properties.
67    *See* Section 4.4.3.3.

**1.5.3.1.3. Entrepreneurial Profit.** The estimate of the contribution of entrepreneurial profit should be supported by market data developed from properties similar to the subject improvements.

**1.5.3.1.4. Unit Rule.** In developing the cost approach, appraisers must distinguish between calculating an improvement's replacement cost and estimating market value. It is the contribution of the improvements (and all of its components) to the market value of the whole that is being measured.[68]

**1.5.4. Income Capitalization Approach.** In appraising property that generates income, it may be appropriate to develop an opinion of market value using the income capitalization approach. This approach should generally be used in addition to the sales comparison approach and can serve as additional support for the final opinion of market value. In developing the income capitalization approach, it is critical that the appraiser have market support for every component such as income, expenses, capitalization, and/or discount rates.

**1.5.4.1. Market Rent.** The income that is to be capitalized in the income approach is the market or economic rent for the subject property. These Standards use the following definition of market rental value:[69]

> **Definition of Market Rental Value**
> Market rental value is the rental price in cash or its equivalent that the leasehold would have brought on the date of value on the open market, at or near the location of the property acquired, assuming reasonable time to find a tenant.

The appraiser should not consider the fact that a property may be under lease to a third party, except to the extent that the rent specified in the lease may be indicative of the property's market rental value. The value to be appraised is the market value of the property as a whole, not the value of the various interests into which it may have been carved.[70]

**1.5.4.2. Comparable Leases.** The opinion of market rent should be based on an analysis of comparable leases extracted from the market. As with the sales comparison approach, the comparable leases selected in this analysis should have the same or similar highest and best use as the subject property and reflect leases as close as possible to the effective date of value. The lease data shall be verified with a party to the transaction. It is important to identify the operating expenses paid by each party (landlord and tenant), the basis for the calculation of the leased area, and any concessions (free rent and/or tenant improvements) offered by the landlord. A physical inspection of each rent comparable is necessary to identify the quality of tenant finishes, overall building condition, and quality and location difference with the subject. As with the sales comparison approach, the appraiser must collect market data to support adjustments (quantitative and/or qualitative) to the comparable leases for differences between them and the subject property.

**1.5.4.3. Expense Analysis.** In developing the estimate of net operating income that will be capitalized to develop an opinion of the market value of the subject property, the appraiser must collect market

---

68    *See* Section 4.4.3.1.
69    See Section 4.7 for the legal basis for this definition.
70    See Section 4.2.2 concerning the Unit Rule.

data to support the estimated vacancy and credit loss, as well as operating expenses and any set asides for reserves for replacement. If available, the operating history of the subject property provides an important basis for these estimates, but data collected from other similar competitive buildings in the market area is also important to provide market support for these determinations.

1.5.4.4.    **Direct Capitalization.** Capitalization of the net operating income shall be at a rate prevailing for the type of property and location. The preferred source of an applicable capitalization rate is from actual capitalization rates reflected by comparable sales. The selection of the capitalization rate is one of the most critical factors to be applied in the income capitalization approach to value. Accordingly, developing capitalization rates from the improved sales used in the sales comparison approach provides the best market support for the rate selected for the subject property. Capitalization rates identified in national publications can be used as support for the estimated capitalization rate selected for the subject but should not be the only source for this determination.

1.5.4.5.    **Yield Capitalization (Discounted Cash-Flow [DCF] Analysis).** A second method of valuation used in the income capitalization approach is known as the <u>yield capitalization</u> method. This method is also often referred to as the <u>discounted cash-flow (DCF)</u> analysis and has been an accepted valuation method within the appraisal profession for several decades. This method is often used in the valuation of investment grade properties such as multi-tenant office buildings, retail centers, apartment complexes, and industrial warehouse facilities and reflects the way sophisticated buyers and sellers consider the potential income generated by a property to arrive at a purchase or sale price.

The yield capitalization method has limited use in an eminent domain setting because it requires the appraiser to forecast a number of different factors into the future such as income change, holding period, property value at the end of the holding period, and the yield rate or discount rate to be applied to the future stream of income in order to arrive at the present value of the property. Because of this, valuations based on this method can be complicated, confusing, and speculative. If this method is to be used in developing an appraisal under these Standards, it is critical that the appraiser develop market support for each of the many factors that must be forecasted in order to show that the analysis reflects what buyers and sellers for that property type are considering on the effective date of value. If appraisers are considering the use of this method, they should discuss it with their client as part of the scope of work conversation.

The yield capitalization method can be a useful tool in testing feasibility in highest and best analysis and as support for the other approaches to value. This method can be very useful in appraisals of leasehold acquisition involving potential damages to a remainder after the taking. It is useful as a means of determining the value of the property before and after the leasehold taking in order to identify the difference.[71]

1.6.    **The Reconciliation Process and Final Opinion of Value.** A critical part of developing an appraisal under these Standards and forming a final opinion of market value is the reconciliation process. This process requires a careful examination of the factual data about the subject property

---

71    Eaton, *supra* note 16, at 414.

and the market. The highest and best use and larger parcel analyses are considered in light of the factual data to ensure consistency and accuracy. All of the supporting data for each of the approaches to value is examined for consistency and accuracy with the subject property and market data as well as the highest and best use and larger parcel analyses. For example, if both the sales comparison and income capitalization approaches were developed, the appraiser should examine the adjustment processes in both approaches to ensure that adjustments for location and other physical characteristics of the subject property were consistently applied in both.

Each of the approaches to value developed in the analysis are examined for the quality and extent of the supporting data. In the sales comparison approach, the appraiser should consider the proximity in time and location of the sales to the subject property. The level of market support for the adjustment process and the number and size of the adjustments should also be considered. A similar analysis should be followed in the income capitalization approach. The appraiser should also evaluate the market support for estimates of vacancy, credit loss, and expenses as well as capitalization and discount rates. If the cost approach has been developed, the appraiser should consider the level of support for all of the elements of cost new, depreciation, and entrepreneurial profit. Every calculation in each approach should be double-checked for accuracy.

The final opinion of market value should not be derived by applying a formulaic approach such as averaging the values from the various approaches developed in the appraisal. The goal is to provide the client agency and intended users with a clear, logical analysis of the results of each approach to value developed in the appraisal and the reasons for the weight given to each approach in forming a final opinion of market value.

**1.7.    Partial Acquisitions.** There are many situations in which a client agency is only acquiring a part of a larger parcel. This can occur when the client agency is acquiring an interest less than the fee simple, such as an easement, water rights, subsurface rights, or air rights. This can also occur when the agency is acquiring the fee interest in only a portion of a larger parcel. This section of the Standards addresses the appraisal requirements under these circumstances.

**1.7.1.    Before and After Rule (Federal Rule).** The federal rule—also known as the before and after rule—applies in all appraisals involving partial acquisitions. Under this procedure, the appraiser develops opinions of both the market value before the acquisition and the market value after the acquisition. Requiring this valuation procedure allows acquiring agencies, the Department of Justice, and the courts to calculate a reasonable measure of compensation by deducting the remainder or after value from the larger parcel's before value. The result is a figure that includes the value of the property acquired as well as any compensable damages and/or direct (special) benefits to the remainder property. It should be noted that these are two separate appraisals within the same assignment requiring the appraiser to perform a new analysis and valuation of the remainder after the taking. It should also be noted that it is improper for an appraiser to develop an opinion of the market value of the larger parcel in the before situation and then deduct the opinion of value of the property acquired together with separately calculated damages to arrive at the value of the remainder.

If the appraisal is prepared for the Department of Justice, the scope of work will typically not include allocation of the difference between the before and after values into the components of the contributory value of the property acquired and compensable damages to the remainder. However, in assignments for other client agencies the scope of work may include such an allocation in order to assist the agency in meeting their obligations under the Uniform Act.

**1.7.1.1.** **Damages.** When considering damages to remainder properties, appraisers must understand that state and federal rules may differ on which items of damage may be compensable (severance) and which items may be non-compensable (consequential). It is recommended that appraisers seek guidance from agency legal counsel if there is any question about whether an element of damage is compensable.

The fundamental basis for a claim of compensable damages is a diminution in the market value of the remainder. The extent to which the utility of a property has been impacted by the acquisition must be established by factual information and analysis and must never be assumed or based on speculation. Evidence that the highest and best use of the remainder property has changed as a result of the taking provides support for the existence of damages. Factual evidence of a change in the intensity of the highest and best use, such as from a balanced farm to an unbalanced farm, may also provide support for the conclusion.

In certain circumstances, damage to the remainder may be cured by remedial action. This is generally called the cost to cure and is a proper measure of damage only when it is no greater in amount than the decrease in the market value of the remainder if left as it stood. When the cost to cure is less than the compensable damages if the cure were undertaken, the cost to cure is the proper measure of damage and the United States is not obligated to pay in excess of that amount. Developing the cost to cure requires that the appraiser develop a well-supported cost estimate in the same manner as described in Section 1.5.3, which describes the critical elements in developing a cost approach.

If a consultant's services are used to assist an appraiser in estimating a cost to cure damage amount in a partial acquisition, the appraiser must review and analyze the cost estimate with great care. Even though a cost to cure method of estimating the diminution of value may be appropriate, it must be remembered that the remainder property is still to be valued in its uncured condition. Therefore, it is important that any cost to cure estimate of damage include not only the direct costs of the cure, but also the indirect cost, any effects of delay, and if appropriate, an entrepreneurial profit factor.

**1.7.1.2.** **Benefits.** As with damages, appraisers must be aware that the legal rules regarding what constitutes indirect (general) benefits and what constitutes direct (special) benefits may differ between state and federal rules. The extent of a benefit to a remainder parcel is a fact question that must be well supported by the appraiser. Whether the benefit is general or direct (special) is a mixed fact/law question and client agency counsel should be consulted to resolve any question about this classification.

Appraisers should give the same consideration to benefits as they do to damages in developing an opinion of the market value of remainder properties.  Benefits can take many forms, such as when the project has caused the remainder to have lake frontage, frontage on a better road, more convenient access, improved drainage, irrigated land, and an improved view.  An upward shift in highest and best use of the remainder property is often an indication of direct (special) benefits, and direct benefits must be considered when appraisers develop an opinion of the value of remainder properties, even though other lands may have the same benefits from the project.

1.7.1.3.   **Offsetting of Benefits.** Direct (special) benefits may offset the contributory value of the part taken and any damages to the remainder caused by the government's project.  To take into account any direct benefits from the project, appraisers must apply the before and after rule by forming an opinion of the market value of the larger parcel at the time of acquisition (excluding any enhancement or diminution resulting from the project) and deducting the market value of the remainder property (including any direct benefit or diminution from the project).

Appraisers should note that the federal rule in this regard may be different from state rules and they should consult client agency counsel if there is a question.

1.7.1.4.   **Takings Plus Damages Procedure (State Rule).** There may be rare circumstances in federal acquisitions when strict adherence to the before and after rule will create costly and/or difficult burdens on the appraiser.  Examples of such situations are minor fee or easement acquisitions (for flowage, wetland or habitat protection, roads, pipelines) from large parcels, where the cost of performing a full before and after appraisal is unwarranted in view of the minor nature of the acquisition and there are clearly minor or no damages to the remainder. In those rare situations, the client agency may alter the scope of work to allow a <u>takings plus damages procedure</u>, sometimes called the state rule. Under this procedure, the appraiser must still determine the larger parcel and develop an opinion of the value of the part taken as it contributes to the larger parcel. Minor damages are added to the opinion of value of the part taken to provide an estimate of the compensation to be paid by the client agency.

1.8.   **Leasehold Acquisitions.** The government will sometimes acquire only a leasehold estate in all or a portion of a property, thus acquiring the right of use and occupancy of the property for an identified period of time. This section of the Standards will address the requirements for developing an appraisal for this purpose.

1.8.1.   **Market Rent and Highest and Best Use.**  As discussed in the income capitalization approach section of these Standards, in developing an appraisal for a leasehold acquisition, the appraiser must use the definition of <u>market rental value</u> found in Section 1.5.4.1.

As part of the development of an appraisal for a leasehold acquisition, the appraiser must determine the highest and best use of the property (as improved) that is the subject of the leasehold. This requirement is critical to the selection of comparable rents used in the valuation process. Where necessary, the appraiser may need to perform a marketability study to aid in this analysis.

1.8.2.    **Leasehold Estate Acquired.** It is critical that the client agency provide the appraiser with a description of the leasehold estate it plans to acquire. In turn, the appraiser must fully understand the estate to be appraised and the impact on the market value of the property.

It is important for the appraiser to recognize the characteristics of the rental or income streams being evaluated. Most often rent is paid periodically (e.g., monthly) in advance. However, when the government acquires a leasehold interest or right of use and occupancy in a property, it will usually pay rent in a manner that is inconsistent with the market. If the leasehold interest is acquired by condemnation, all of the rent due for the entire term of its occupancy is usually paid in a lump sum at the beginning of the occupancy (or on the date of acquisition). Therefore, an appraiser must convert any opinion of periodic market rent into a single lump sum present value or payment to be paid in advance. If the leasehold is acquired by negotiation, the rent may be paid in arrears or at different frequencies than is typical in the market, and the appraiser must account for this difference.

If rent is paid by the government in a single lump sum, adjustment for this factor is typically accomplished by applying an ordinary annuity factor (present worth of 1 per period factor) to the periodic market rent (if the opinion of rent is projected to remain constant over the government's occupancy). If the appraiser concludes that the market rent will not be constant throughout the government's occupancy, the periodic rent is typically converted into a lump sum present worth by the use of present worth of 1 factors or by discounted cash-flow (DCF) analysis.

The discount rate to be applied to the periodic rent should reflect the rates of return typical for the type of property involved. The selected discount rate should be supported by market data whenever possible.

Appraisers must bear in mind that the leasehold estate acquired by the government may vary substantially from the terms of a typical lease in the private market. For instance, the term of the lease may be longer or shorter than typical for the type of space under appraisal. Expenses paid by the government may differ from those paid by the typical lessee, and there may be no provisions for expense stops and rental escalations during the lease term. The parking ratio for the space occupied by the government may vary from the market standard and there will be no provisions for rent concessions or lessor buildout of the occupied space. The appraiser must consider all of these factors when estimating the market or economic rent for the acquired space, and comparable rentals must be adjusted to account for these differences. Table 1 summarizes the most commonly encountered differences between private and government leases which must be accounted for in the adjustment process.

**Table 1. Common Differences Between Private and Government Leases**

| Adjustment Factors | Private Leases | Federal Leases |
|---|---|---|
| **Measurements** | Typical for market—often BOMA based | Generally inconsistent with local market and/or standards such as BOMA or IPMS |
| **Term (duration)** | Typical for market (e.g., five years) | Shorter or longer terms—often unusual (e.g., 33 months) |
| **Base rent** | Dollar per square foot monthly in advance | Lump sum in advance, or monthly in arrears |
| **Rent adjustments** | Index leases, graduated leases, percentage leases | Level payment over term (no adjustments) or adjustments built into lump sum |
| **Expenses** | Full service, gross, modified gross, net | Expense stops not included. May include excess janitorial, security services |
| **Parking** | x spaces per x square feet | More or less spaces than market norm |
| **Tenant improvements (TIs)** | Landlord provides dollar amount for tenant improvements (TIs) | No tenant improvements (TIs) |
| **Rent concessions** | Landlord provides free rent dependent on size and length of lease | No rent concessions |
| **Renewal options** | Established in lease | May condemn another term if needed |
| **At lease end** | Lessor retains TIs | May allow the government to destructively remove specialized equipment |
| **At lease extension/ renewal** | Market rent for finished out space | Government won't pay twice for TIs already paid for |

1.8.3.   **Larger Parcel Concerns.** There are occasions when the government acquires the leasehold interest in only a portion of a larger property. In those instances, the appraiser must consider the possibility of damages to the remainder property (i.e., that portion not to be occupied by the government). In those instances where severance damages may be significant, appraisers should consult with their client agency and/or its legal counsel before proceeding with the appraisal assignment to ensure that the appraisal will be prepared in accordance with current applicable law.

1.9.   **Temporary Acquisitions.** In addition to leasehold acquisitions, there are generally two situations in which the acquisition by the government may be temporary: temporary construction easements (TCEs), and temporary acquisitions by inverse condemnations. TCEs and temporary inverse condemnation acquisitions will be discussed separately below because of their uniquely different characteristics.

**1.9.1.** **Temporary Construction Easements (TCEs).** A temporary construction easement (TCE) is generally acquired in conjunction with a permanent acquisition and often abuts the boundaries of the permanent acquisition. The permanent acquisition area is used for permanent placement of the public improvement, whereas the TCE is used in addition to the permanent acquisition area for initial construction of the public improvement. After initial construction of the public improvement is completed, the construction easement expires and the unencumbered fee interest in the land reverts back to the owner. Similar to TCEs but shorter in nature is an easement for a right of entry onto the land for purposes of surveying, inspection, and/or testing for contamination. These rights of entry are generally very short term in nature and are treated in the same manner as TCEs.[72]

Damages that result from TCEs are usually based on the economic or market rent of the affected area for the term of the temporary easement. Usually, the land area affected is so small and the term of the easement so short that compensation for the TCE is nominal. As a result, many agencies and appraisers have adopted a shortcut for its estimation. A reasonable return rate, rather than the economic or market rent based on comparable rentals, is estimated and applied to the encumbered land's fee value for the term of the easement. The rent loss or appropriate return is often not converted to a present value through the application of a discount rate because of the short term of the easement and the nominal nature of the indicated rent loss.

Even though technically incorrect, as discussed below, this shortcut is generally acceptable to agencies because of the nominal nature of the TCE acquisition and the cost/time savings associated with the shortcut. However, appraisers must recognize that the shortcut methodology will be found unacceptable under these Standards if the indicated compensation is more than nominal. When the indicated compensation for the acquisition of a TCE is more than nominal, the appraiser must use proper appraisal methodology to develop the present value of the rent loss. This will entail the use and presentation of properly documented comparable rentals, and the discounting of the lost rental income stream into a present value.

The appraiser must also consider whether the existence of a TCE will restrict the property owner from using the unencumbered portion of the land for its highest and best use during the easement's term. Often an appropriate method to estimate the proper adjustment to reflect the diminution in the land's value by reason of the temporary easement is to apply the rent loss to all lands so affected. (If the property can be rented for a lesser use during the term of the TCE, the measure of damage is usually measured by the rent differential between the before and after situations.)

Appraisers must remember that the loss in value caused by a TCE acquisition is not an independent acquisition, and the compensation for it cannot be added to the indicated diminution in value by reason of the associated permanent acquisition. The rent loss associated with a TCE should be used as the basis for an adjustment to the remainder property's after value, not as something to be added to the difference between the before and after value of the property.

---

72  These rights of entry are often so short term in nature (sometimes as short as 24 hours) and their purpose so restricted that agencies do not have an appraisal conducted of such properties, but rather they make an administrative determination of a nominal compensation for the acquisition.

**1.9.2.**    **Temporary Inverse Takings.** Temporary acquisitions by inverse condemnation may be by either a physical invasion of the property by the government (or an agent of the government)[73] or by regulation.[74] The measure of value in a temporary inverse case is the same as in the acquisition of a TCE, that is, the rental value of the land taken for the term of the taking. The substitution of a return on the fee value of the land for an opinion of the rental value of the land is not generally an accepted alternative.[75]

What generally makes temporary acquisitions by inverse condemnation uniquely different from the acquisition of a TCE is the amount of indicated compensation. An inverse condemnation acquisition usually involves whole ownerships rather than a small geographical portion of the ownership, and the term of the alleged inverse taking is generally of a substantially longer period of time than the duration of a TCE. For that reason, greater care must be employed by the appraiser in developing an opinion of the value of such properties. Department of Justice legal counsel will generally provide the appraiser with the effective date of the appraisal and the duration and extent of the alleged taking.

In a regulatory taking situation, it is possible that the regulation temporarily precludes the use of the land for its highest and best use, but secondary uses of the property remain available to the property owner. In such a case, opinions of the before and after market rent are developed to determine the difference in the rent that could have been commanded by the property during the inverse taking period. The *before* rent is the market or economic rent of the property for its highest and best use for the duration of the taking, and the *after* rent is the market or economic rent of the property for its secondary, but allowable, use during the taking period. In estimating the potential use of the subject property during the taking period, appraisers must take into account the limited duration of the period of use.[76]

Because inverse condemnation cases (either permanent or temporary) are very fact-specific, it is essential that the appraiser work very closely with the Department of Justice attorney assigned to the case. Both appraiser and attorney must understand the precise question that must be addressed by the appraiser and the acceptable methodology to be used to answer it. This will often involve substantial legal research by the attorney, concluding with written **legal instructions** to the appraiser.[77]

**1.10.**    **Acquisitions Involving Natural Resources.** The appraisal of properties containing valuable natural resources such as minerals, timber, and water is a complex subject requiring specialized training and experience (see USPAP Competency Rule). A critical first step in developing an appraisal of properties containing resource assets is identifying the property

---

73    *See, e.g., 767 Third Ave. Assocs. v. United States*, 30 Fed. Cl. 216 (1993), *aff'd* 48 F. 3d 1575 (Fed. Cir. 1995).

74    *See, e.g., First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304 (1987).

75    *United States v. 883.89 Acres of Land in Sebastian Cty.*, 442 F.2d 262, 264, 265 (8th Cir. 1971), *aff'g* 314 F. Supp. 238 (W.D. Ark. 1970); *United States v. Michoud Indus. Facilities*, 322 F.2d 698, 707 (5th Cir. 1963); *United States v. 117,763 Acres of Land in Imperial Cty.*, 410 F. Supp. 628 (S.D. Cal. 1976), *aff'd sub nom. United States v. Shewfelt Inv. Co.*, 570 F.2d 290 (9th Cir. 1977).

76    For instance, if the denial of a permit for a period of three years precluded the use of a property for commercial purposes, a secondary use of industrial warehousing during the taking period would not be appropriate because the short-term life of the secondary use would not be economically feasible. However, a secondary use as an industrial equipment storage yard might be a suitable secondary use because such a use would not involve the construction of substantial improvements or a commitment to a long-term use.

77    See Section 1.9 for additional discussion of inverse condemnations.

rights to be acquired and the ownership interests into which they may be divided. The appraiser and the client agency must work together to obtain title information and legal descriptions to ensure that the appraisal properly addresses these components and their contribution to the value of the larger parcel.

While the valuation of these diverse resource assets requires different considerations, there are common elements that apply in all appraisals of these properties: the <u>unit rule</u>, <u>highest and best use</u>, and <u>larger parcel analyses</u>.

1.10.1. **The Unit Rule.** In the development of an appraisal concerning properties containing resource assets, it is particularly important to understand the unit rule.[78] Property must be valued as a whole for federal acquisition purposes, with due consideration of all of the components that make up its value. Its constituent parts are considered only in light of how they enhance or diminish the value of the whole, with care being exercised to avoid so-called <u>cumulative</u> or <u>summation appraisals</u>.[79]

Accordingly, it is improper to estimate the value of the surface of the property, add to it a valuation of the minerals or other resource such as water or timber (as estimated by a separate expert), and thereby conclude an opinion of total market value for the property. Not only would this result in an improper summation appraisal, as a practical matter it would also mean that no one individual could testify to the market value of the property as a whole should the matter go to litigation. For these reasons, when consultants' reports are used in the valuation of mineral property, appraisers must strictly adhere to the requirements of Section 1.13 of these Standards relating to the use of consultants' reports.

1.10.2. **Highest and Best Use Considerations.** Highest and best use analysis is a critical element in the development of a reliable appraisal of property containing valuable natural resources. As a first step, a market analysis should be performed to identify the market supply and demand for the resource located on the property. If no market exists for the resource, then the quantity and quality of the commodity need not be determined. The market analysis provides the foundation for the appraiser's conclusions regarding the marketability, price, and competition for the commodity found on the property.

If a market exists for a mineral or other resource, then a supported determination must be made concerning both the *legal permissibility* of extracting the mineral (or harvesting the timber) and the *physical characteristics* of the minerals or timber located on the property. These determinations often require special expertise, including:

- Interpretation of permitting and other environmental requirements that may necessitate the assistance of a consultant with specialized knowledge and experience in the relevant market.
- Studies regarding the physical characteristics of the minerals that are usually conducted by specialists (usually geologists and/or engineers) who make determinations concerning such

---

78   See Section 4.2.2 for a discussion of the legal basis for the unit rule.
79   *See* Section 4.2.2.

important factors as the location, quantity, quality of the mineral deposit, and any variations in the quality that might be found on the property.

• Additional determinations regarding such factors as accessibility (due to topographical constraints or distance to road or rail line, for example) and problems and costs of extraction or harvest.

• A cruise plan, timber cruise, and check cruise for land containing valuable timber.

This information provides the basis for developing an opinion of the value of the property using the sales comparison and income capitalization approaches to value. However, before the adoption of these interpretations, studies, or determinations, it is the professional responsibility[80] of the appraiser to thoroughly analyze and understand the reports prepared by other experts and adopt them only if the analysis and conclusions were prepared according to appropriate standards, are sound, and are adequately supported.

As with all other appraisals prepared under these Standards, the appraiser must identify the most likely purchaser and user of the subject property as well as the timing of the use (for example, mineral extraction or timber harvesting). In addition, a larger parcel analysis must be completed. For property containing valuable natural resources, this analysis may require an examination of minerals or timber holdings beyond the land being acquired by the government that meet the three tests of the larger parcel.[81]

### 1.10.3.    Special Considerations for Minerals Properties.

**Property Rights and Interests.** It is fundamental that the property rights and interests in minerals properties are identified as part of the problem identification process. The client agency must identify the property rights and interests that are to be acquired and valued. A comprehensive understanding of the rights and interests to be appraised is critical to the proper development of both the sales comparison and income capitalization approaches to value.

In the oil and gas industry there is a distinction between the working interest and the royalty interest. For example, in a federal lease sale the successful bidder acquires a working interest through payment of a bonus bid while the United States retains the royalty interest. In hard rock mining, these two interests are sometimes referred to as the contributing and noncontributing interests. The contributing interest is controlled by the mining company, which contributes the capital required for exploration, ore definition, and mining of a property. The noncontributing interest is a passive interest in the land and is essentially a nonparticipating royalty interest. Both contributing and noncontributing interests can be present in leased fee and fee simple estates. In the case of fee ownership, the contributing and noncontributing interests may be held by the same party.

The selection and evaluation of comparable sales in the sales comparison approach and the methodology selected for the income capitalization approach are both driven by the interests being acquired and valued. For example, when valuing a noncontributing interest, the sales selected for analysis should be transfers of property with the same interest. The income analyzed would be the present worth of the anticipated future royalty income.

---

80    See Section 1.13 for further discussion of an appraiser's reliance on the work of other experts.
81    See Section 4.3.3 for further discussion of the legal requirements for a larger parcel analysis.

Appraisers valuing mineral properties impacted by the 1872 Mining Law are advised to coordinate with client agency staff to clarify the approaches to valuing those interests.

**Sales Comparison Approach to Value.** Despite the common use of the income capitalization approach for industry purposes, in federal acquisitions the sales comparison approach is normally considered the most reliable approach for minerals as for other property types.[82] As a result, the appraiser cannot default to using an income approach or other valuation method that may be acceptable for typical industry or other purposes. It is unacceptable for an appraiser to simply state that there are no comparable sales transactions without providing adequate support for the conclusion.

To properly develop a sales comparison approach to value for a mineral-bearing property, the appraiser must understand the level of information available concerning the mineralization found on the subject property. It is then important to identify comparable sales that had similar levels of information about mineralization available at the time of sale. Significant variables typically include rights conveyed, conditions of sale, the presence of multiple ores on the same property, access for extraction purposes, topography and cover (stripping ratios), transportation availability and cost, and distance to smelters or refineries. All of these factors may require adjustment.[83]

In analyzing a sale of a mining property as a comparable sale, the sale may include the mine, mill, extraction plant, offices, and various other support facilities. These capital improvements are part of the real property and are also components of the business of mining and selling the mineral. The appraiser must understand the complex interplay of the real property components and identify where the real property ends and the business interests begin.

The verification of comparable sales data is a critical component of this analysis, and the assistance of experts in identifying all necessary areas of inquiry during the verification process may be required. The appraiser may need to consult geologists, engineers, and other experts for producing or nonproducing oil and gas, fissionable and hard rock, or other locatable minerals.

Also important in the sales comparison approach is the selection of the appropriate unit of comparison. Such selection should generally mirror that unit of comparison used by participants in the market and, as such, will generally result in the tightest bracket of value for the subject property.[84]

> **In valuing mineral properties using the income capitalization approach, "[g]reat care must be taken, or such valuations can reach wonderland proportions."**
>
> **— *United States v. 47.14 Acres of Land in Polk Cty.*, 674 F.2d 722, 726 (8th Cir. 1982).**

**Income Capitalization Approach to Value.** The income capitalization approach to value is also a valid means for developing an opinion of the market value of mineral properties, but should never be used exclusively if comparable sales are available for use in the sales comparison approach. The income capitalization approach can be especially applicable when the subject

---

82  *See* Section 4.8.
83  For a general discussion of the application of the sales comparison approach, see Sections 1.5.2 and 4.4.2.
84  *See* Section 4.8.

property is already being mined, and thus the historical income stream from the property is available for analysis. In applying the income capitalization approach, appraisers must take care to consider only the income that the property itself will produce—not income produced from the business enterprise conducted on the property (i.e., the business of mining).[85] An appraiser who is not thoroughly experienced in the appraisal of mineral properties should not attempt to employ the income capitalization approach. Even when used by an appraiser experienced in this field, this appraisal approach can be highly speculative, and great care must be exercised in its use.

In developing an opinion of value by the income capitalization approach for a mineral property, it is generally recognized that the most appropriate method of capitalization is yield capitalization, most notably discounted cash flow (DCF) analysis. The income that may be capitalized is the royalty income, and not the income or profit generated by the business of mining and selling the mineral. For this reason, the income capitalization approach, when applied to mineral properties, is sometimes referred to as the royalty income approach.

In conducting a DCF analysis, the appraiser must avoid estimating a property-specific investment value to a particular owner instead of developing an opinion of the market value of the property if it were placed for sale on the open market. Like application of the subdivision development method to value, DCF analysis in the valuation of mineral properties can be highly complex.[86] Creation of a detailed mining plan for the property is often required. The essential components of this approach are: (1) the royalty rate; (2) the unit sale price of the mineral to which the royalty rate is applied (e.g., $20 per ton); (3) the projected annual amount of mineral production (e.g., 100,000 tons per year)—with the product of this ingredient and the prior two ingredients yielding the annual income; (4) the projected number of years of production and the year when the production will begin; and (5) the proper capitalization or discount rate.

In developing an estimated income stream, the proper royalty rate can be derived from comparable mineral lease transactions, and the mineral unit price to which the royalty rate is applied may be derived from appropriate market transactions. The annual amount of production and the number of years of production are more difficult (and speculative) to estimate, and at a minimum require not only physical tests of the property to determine the quantity and quality of the mineral present, but also market studies to determine the volume and duration of the demand for the mineral in the subject property. Production level estimates should be supported by documentation regarding production levels achieved in similar operations. Production levels should also be consistent with the mining plan's labor and equipment estimates. Numerous other factors may have to be considered, such as the amount of overburden, the method of mining (e.g., surface or deep mining), the requirements of permitting and applicable reclamation laws, the hauling distance to market, competition from other sites, the size and timing of the investment needed to construct any necessary access or processing plant, and so on.

When the interest to be acquired and appraised includes the working or contributing interest, the income analysis should also consider the size and timing of the investment needed. Capital costs will include expenditures for services, construction, and equipment related to mine development,

---

85   *See* Sections 4.4.4 and 4.8.
86   See Sections 1.5.1.2 for discussion of the subdivision development method.

preproduction, and production. Among the factors to be considered in this portion of the analysis are preliminary studies such as exploration and environmental and engineering studies required to define the location and nature of the resource sufficiently to support the mining plan and ensure compliance with all applicable governmental permitting and land use regulations. The engineering costs related to the mining operation design must include contractors' fees and management. Other elements to be considered include the costs of site preparation, facilities and improvements (including off-site improvements, such as rail or road facilities), mining equipment, and preproduction (including all of the costs required to bring the extraction process to full production, including the costs of time lag and permitting).[87]

Operating costs are the expenditures incurred during the ongoing extraction process. These cost elements include labor, materials, supplies, utility costs, payroll overhead, management, indirect costs, and contingencies. Also, appropriate deductions for all relevant taxes associated with the operation must be made. As in the subdivision development approach, the estimation of an appropriate level of entrepreneurial profit is a critical element in the DCF analysis of any mineral property and is a factor that should be supported by direct market data whenever possible.

One of the most critical factors in the application of DCF analysis is the selection of the discount rate. Attempts have been made to apply various statistical techniques (such as probability weighted scenarios, Monte Carlo analysis, marketing uncertainty analysis, and timing of development analysis) to mineral valuations to account for the extraordinary high risks associated with such operations. However, the application of various statistical techniques is not a substitute for discount rate selection derived from and supported by direct market data,[88] which is the preferred and most widely accepted approach.[89]

### 1.10.4. Special Considerations for Forested Properties.

In developing an appraisal of forested properties, the appraiser must determine whether any merchantable timber is located on the property and whether the tree products located on the property are marketable and saleable. There must be sufficient volumes for profitable harvesting under existing state forest practice rules (or other applicable jurisdiction if appropriate). Merchantable timber may contribute value to the property. Pre-merchantable timber may or may not contribute value to the property and in some cases is included in the land value.

A critical part of the valuation of forested property is a timber cruise. A cruise plan should be developed that establishes the cruise procedures to be used in accordance with current market practices for the area and type of timber. The objective is to establish cruise standards and sampling errors based on private market expectations in the local market when timber is sold with the land.

---

87  This factor can have a significant impact on the value of mineral property because the time lag between the effective date of an appraisal and the projected date upon which all studies have been completed, all permits issued, all construction completed, and an actual income stream can be generated may be extended.

88  For a discussion of market extraction of discount rates, see the American Society of Farm Managers and Rural Appraisers' 2012 course, "Appraising Natural Resources," 18-19.

89  *See* Section 1.5.1.2.

**5-ER-805**

The sales comparison and income capitalization approaches are both appropriate for use in valuing properties with a highest and best use for timber production. In developing the sales comparison approach, the selection of the unit of comparison should be based on common local market practices. In developing the income capitalization approach, the appraiser must consider all factors including lumber selling price and absorption period (based on supply and demand analysis in the market), all harvesting and transportation costs, costs of sales, and profit. The discount rate used to estimate present value must be market supported and should reflect timber investment rates and risk associated with the subject property.

**1.10.5.**    **Water Rights.** In appraising properties in which water rights contribute to the overall value of the property, the appraiser must recognize that water rights are established under state law. Appraisers should research sales in the same district or drainage basin and take into account water-rights seniority, past demand, drought, past depletion type of use, historic place of use, conversion, and statutory limitations on transferring place of use. There may be many other market factors that should be considered, such as costs of hydrologic and engineering studies as well as legal fees that must be addressed. The appraiser should consult with the client agency and agency counsel to ensure that the characteristics of the water rights that contribute value to the larger parcel are properly accounted for.

**1.11.**    **Special Considerations in Appraisals for Inverse Condemnations.** Unlike direct condemnations and other intentional acquisitions, inverse taking or inverse condemnation claims involve a threshold question of government liability. In filing a direct condemnation, the United States expressly acknowledges the actual or proposed acquisition and its obligation to pay compensation. In the inverse taking claim, on the other hand, the United States may contest the landowner's claim that a taking occurred for which just compensation must be paid under the Fifth Amendment. Accordingly, in an inverse taking claim, the court must first determine whether a taking of property occurred for which just compensation must be paid. Appraisers may be retained to develop opinions in connection with the liability phase, the compensation phase, or both. If the government's action resulted in the government's permanent physical occupation of the land in question, the liability issue is a rather straightforward one.[90] However, in the context of a taking by regulation, the federal courts have developed various *tests* to determine whether a taking has occurred: the character of the government action; the extent to which the regulation interferes with distinct, investment-backed expectations; and the economic impact of the regulation.[91]

The economic impact test above involves the valuation of the property in question before and after the government's action.[92] When conducting such an analysis, the appraiser's application of the larger parcel tests may vary from those applied in the direct acquisition or condemnation[93] because of the investment-backed expectations test noted above. Investment-backed expectations

---

90   "[A] permanent physical occupation is a government action of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 (1982).

91   *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

92   Such action generally relates to the denial of a government permit, such as a permit to fill wetlands.

93   In the context of inverse condemnation cases the courts have sometimes referred to the larger parcel determination as the issue of the denominator. *See, e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987). For a discussion of the larger parcel tests in direct acquisitions, see Sections 1.2.7.3.1 and 4.3.

are typically considered as of the date upon which the owner acquired the property and in the regulatory environment that existed at that time. But, on the date of the alleged taking, the owner may have sold portions of the property previously acquired. For the court to accurately assess the *economic impact of the regulation*, it must know how the regulation impacted the owner's reasonable investment-backed expectations.[94] For that reason, it may be necessary for the appraiser to disregard the <u>unity of title</u> test of the larger parcel and to value the entirety of the tract that was originally acquired. Because the tests applied by the courts to determine the question of liability (i.e., whether a compensable taking has occurred) are quite complex, it is essential for the appraiser to confirm with legal counsel the appropriateness of the larger parcel determination before proceeding with the appraisal assignment.

In providing appraisal services to the government in connection with the liability phase of an inverse condemnation action, it is imperative for both the appraiser and the trial attorney to completely understand what the appraiser's valuations are intended to measure. For that reason, continual contact and conferencing between the appraiser and trial counsel throughout the development of the appraisal is essential. Government's trial counsel must determine *what* is to be measured, while the appraiser determines *how* to measure it.

If the court finds that a compensable taking has occurred, the appraiser's function generally is to develop an opinion of the market value of the affected property before and after the taking, as of the date of the taking, which should be provided to the appraiser by legal counsel. In this valuation phase of the inverse condemnation litigation, the appraiser will generally utilize the same larger parcel tests that are applied in direct acquisitions or condemnations. In other words, the larger parcel used in the liability phase of the trial may be different than the larger parcel used in the valuation phase of the trial. Inverse condemnation actions relating to temporary takings are discussed in Section 1.9.2.

**1.12.** **Special Considerations in Appraisals for Federal Land Exchanges.** Federal land exchanges differ from other federal land acquisitions in that an exchange must always be voluntary and the parties must reach agreement on the value of the properties. In direct acquisitions, the government has the authority to force owners to transfer their land by the exercise of its power of eminent domain as long as the government's use of the land will be for a public purpose and the government pays the owner just compensation for the land. However, the government does not have the authority to force individuals to convey their lands and accept federal lands as compensation. Likewise, the government "is not required to exchange any Federal lands. Land exchanges are discretionary, voluntary real estate transactions between the Federal and non-Federal parties."[95] This does not mean that such transactions are exempt from litigation relating to the valuation of the property involved and/or the adequacy of the appraisal report upon which the transaction was based.[96]

---

94   For example, the owner may have acquired 100 acres, but as of the date of the alleged taking may have sold 75 acres of the tract, leaving an ownership on the date of valuation of only 25 acres.
95   36 C.F.R. § 254.3(a). *See also* 43 C.F.R. § 2200.0-6(a).
96   *See, e.g.*, *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000).

Most federal land exchanges are accomplished pursuant to the Federal Land Policy and Management Act of 1976 (FLPMA), as amended (43 U.S.C. § 1701 *et seq.*). There are a number of specific statutes authorizing land trades that may not be entirely consistent with the provisions of FLPMA, as for example, certain National Wildlife Refuge System and National Park System exchange acts; the Alaska Native Claims Settlement Act, as amended (43 U.S.C. § 1621); and the Alaska National Interest Lands Conservation Act (16 U.S.C. 3192). Appraisers must therefore confer with the agency to ensure complete understanding of the appraisal development and appraisal report requirements applicable to the specific appraisal assignment.

The two agencies most actively involved in federal land exchanges are the U.S. Forest Service and the Bureau of Land Management (BLM). Both the Forest Service and BLM have adopted regulations that implement FLPMA and control their land exchange activities.[97] Forest Service and BLM regulations are similar and both require some modifications of these Standards. These regulations define appraisal, highest and best use, and market value,[98] and appraisers must use these definitions when conducting appraisals for federal land exchanges.

Exchanges can be proposed by the Forest Service, BLM, or any person, state, or local government. To assess the feasibility of an exchange proposal, the agency may complete a feasibility analysis of the lands involved in the proposal. Valuation input into the feasibility analysis may or may not include an appraisal, but shall always be prepared by a qualified agency appraiser in compliance with the requirements of USPAP.[99]

If the feasibility analysis does not provide an opinion of value, it may not fall under these Standards but would still be considered part of appraisal practice under USPAP.[100] The requirements for classification as a qualified appraiser under these exchange regulations are essentially the same as those for a contract appraiser under 49 C.F.R. § 24.103(d)(2) and these Standards.[101]

One of the initial steps in an exchange involving federal lands is the formulation of an Agreement to Initiate an Exchange (ATI).[102] This nonbinding agreement outlines the exchange process, identifies the proposed lands or interests in lands to exchange, and memorializes the responsibilities of each party (including the appraisal costs and other costs associated with processing the exchange). The ATI also documents whether the proposed land exchange will be processed as an assembled or non-assembled land exchange.

A qualified appraiser shall be an individual acceptable to all parties and approved by the authorized officer. The appraiser shall be competent, reputable, impartial, and have training and experience in appraising property similar to the property involved in the appraisal assignment pursuant to these Standards. The appraisal report must reference and be prepared according to the applicable regulations and, to the extent appropriate, these Standards.[103] All appraisal reports

---

97   Forest Service regulations may be found in 36 C.F.R. § 254 *et seq.*, and BLM regulations may be found in 43 C.F.R. § 2200 *et seq.*
98   36 C.F.R. § 254.2; 43 C.F.R. § 2200.0-5.
99   43 C.F.R. § 2201.1(b); *see also* 36 C.F.R. § 254.4(b).
100  If the feasibility analysis provides a value opinion, it would fall under these Standards and must comply with USPAP's Standard 1 and Standard 2.
101  *See* 36 C.F.R § 254.9(a)(2); 43 C.F.R. § 2201.3-1(b).
102  43 C.F.R. § 2201.1; 36 C.F.R. § 254.4.
103  36 C.F.R. § 254.9; 43 C.F.R. § 2201.3.

5-ER-808

prepared for federal exchanges are subject to review by federal agency review appraisers.[104] Therefore, appraisers conducting appraisals for federal exchange purposes have a professional responsibility to recognize the federal agency as the client and the private landowners as *intended users* of the appraisal report and to identify them as such in the appraisal report.[105]

If any party issues an instruction to the appraiser to make an extraordinary assumption or to employ a hypothetical condition in the conduct of the appraisal that would conflict with the exchange regulations, the ATI, or these Standards, the appraiser must advise the client of the conflict. If the client provides written instructions to the appraiser to make the assumption or employ the condition in conducting the appraisal, the appraiser may make the appraisal but must clearly identify the assumption and/or condition in the appraisal report and also report that the opinion of value has not been prepared in accordance with the exchange regulations, the ATI, and/or these Standards, so as to ensure that the *intended users* of the report are not misled.

The major technical difference between appraisals prepared for federal land exchange purposes and those typically prepared under these Standards relates to the appraisal of multiple tracts and the appraiser's determination of the larger parcel.[106] For a non-assembled land exchange appraisal (similar to the typical acquisition appraisal, although the estate to be appraised has been identified in the ATI), the appraiser will apply the tests of unity of ownership, of unity of highest and best use, and of contiguity or proximity as it bears on unity of use in determining the larger parcel. However, for purposes of an assembled exchange appraisal, the tracts to be appraised are defined in the property description contained in the ATI. The nonfederal ownerships being assembled for exchange shall be appraised based on the sum of the value of the separate ownerships in the manner they were acquired and conveyed as individual transactions.

If an appraiser concludes that the property described in the ATI constitutes two or more separate larger parcels, the method of valuation is generally fact dependent and, in most cases, will be controlled by the provisions of the ATI. In some instances, the appraiser may be instructed to value the different larger parcels as separate entities, while under other circumstances the appraiser may be instructed to value the larger parcels only as they contribute to the whole, as if the property described in the ATI would be sold from one seller to one buyer in one transaction.[107] If appraiser instructions are contrary to the appraiser's highest and best use or larger parcel conclusion, the appraiser must advise the client that it may be necessary to identify the instruction as an extraordinary assumption or hypothetical condition under USPAP. It is important, however, for the appraiser to recognize that the same method of valuation must be utilized for both the federal and nonfederal lands.[108]

---

104   36 C.F.R. § 254.9(d); 43 C.F.R. § 2201.3-4.
105   USPAP, Standards Rule 2-2(a)(i) and 2-2(b)(i), 23, 25.
106   For discussion of the larger parcel, see Sections 1.4.6 and 4.3.3.
107   In other words, the value of the whole property cannot be estimated by simply adding together the independently appraised values of the larger parcels, unless market evidence demonstrates that the larger parcels would contribute their full value to the value of the whole property as defined in the ATI.
108   36 C.F.R. § 254.9(b)(v); 43 C.F.R. § 2201.3-2(a)(5).

The regulations provide for special treatment of the larger parcel issue in assembled land exchanges.[109] This term is defined differently in Forest Service and BLM regulations[110] and, for that reason, assembled land exchanges may be administered differently by these agencies. Again, depending on the provisions of the ATI, the value of the various parcels may be estimated as independent parcels, or as a single tract to be sold in a single transaction.

When appraising the federal land portion of the exchange, the regulations require that the appraiser "estimate the value of the lands and interests as if in private ownership and available for sale in the open market."[111] This is an assignment condition that requires a **legal instruction** and creates a hypothetical condition. Because the federal land is appraised as if in private ownership, to its highest and best use, any other surrounding federal land cannot be part of a larger parcel because (due to the hypothetical condition) it is under different ownership and has a different highest and best use.

Because of the complexity of appraising multiple tracts of land for exchange purposes and the fact that their treatment is often fact specific, it is essential that agencies provide clear written instructions to the appraiser in this regard and that the appraiser insist upon such instructions at the initiation of the appraisal assignment.

**1.13.**    **Supporting Experts Opinions and Reports.** Real estate appraisal is becoming increasingly sophisticated. Preparation of an adequately supported opinion of market value often requires the assistance of consultants with special expertise. Before issuing an appraisal assignment, agencies should attempt to identify the need for such special consultants and make arrangements for such services, either by contracting with the consultant directly or by providing for the appraiser's retention of the consultant in the appraisal contract. If an agency retains the consultant directly, it should select the consultant in cooperation with the appraiser, who will ultimately have to rely on the consultant's analysis and conclusions. The agency and the appraiser should jointly determine the scope of work and establish qualification criteria for any consultant retained. Regardless of whether the consultant is retained by the agency or the appraiser, selection of the consultant must be by concurrence of both the appraiser and the agency.

If the appraiser finds that an appraisal cannot be completed without a consultant's assistance, the appraiser should notify the agency involved immediately. The appraiser may not adopt unauthorized, unreasonable, or unsupported assumptions in making an appraisal in lieu of obtaining specialized consultant assistance.

Types of special consultants often needed include:

- Fixture appraisers
- Environmental engineers and auditors

---

109  36 C.F.R. § 254.5; 43 C.F.R. § 2201.1-1.
110  An "[a]ssembled land exchange means an exchange of Federal land for a package of multiple ownership parcels of non-Federal land consolidated for purposes of one land exchange transaction." 36 C.F.R. § 254.2; An "[a]ssembled land exchange means the consolidation of multiple parcels of Federal and/or non-Federal lands for purposes of one or more exchange transactions over a period of time." 43 C.F.R. § 2200.0-5(f).
111  43 C.F.R. § 2201.3-2(2); 36 C.F.R. § 254.9(b)(ii).

- Civil engineers
- Cost estimators and contractors
- Market experts
- Feasibility and planning experts
- Statisticians
- Geologists/mining engineers/mineral specialists
- Hydrologists
- Timber cruisers/foresters/forestry engineers
- Communications experts

In using these opinions and reports, the appraiser cannot merely accept such consultant reports as accurate, but rather must analyze such reports and adopt them only if reasonable and adequately documented and supported. The results of secondary valuation reports (minerals, fixtures, or timber valuations) cannot simply be added to the value of the land to arrive at a value of the property as a whole without proper analysis by the appraiser. To do so would violate the unit rule and professional standards. The appraiser must consider these components of the property in light of how they contribute to the market value of the property as a whole.

**1.14.**   **Appraisers as Expert Witnesses.** When contracting for appraisals, it is important to require the individual appraiser with whom the contract is made to actually prepare or be principally responsible for developing the appraisal and the appraisal report, and to be prepared to testify in court if it becomes necessary. There are additional reporting requirements for appraisals prepared for trial purposes (refer to Section 2.2.3 for additional requirements).

The appraiser's role as an expert witness in litigation carries with it a heavy responsibility that should not be taken lightly no matter how many times the appraiser has testified before.  In addition, federal eminent domain cases are generally complex matters involving discovery, depositions, and testimony that require the appraiser to be well prepared and thorough.  Unlike other forms of litigation such as bankruptcy cases, attorneys involved in eminent domain cases are often as knowledgeable about appraisal standards, methodology, and theory as the appraisers appearing as expert witnesses. Section 4.13.1 of these Standards is required reading for any appraiser who has been identified as an expert witness by the U.S. Department of Justice.

**1.15.**   **Confidentiality.** Appraisers' valuations and supporting appraisal reports are confidential information and appraisers shall strictly abide by the following confidentiality of USPAP's Ethics Rule:

(1)   An appraiser must protect the confidential nature of the appraiser-client relationship.

(2)   An appraiser must act in good faith with regard to the legitimate interests of the client in the use of confidential information and in the communication of assignment results.

(3)   An appraiser must not disclose confidential information or assignment results prepared for a client to anyone other than: a) the client and persons specifically authorized by the client; b) state appraiser enforcement agencies and such third parties as may be authorized by due process of law; and c) a duly authorized professional peer review committee.

Under item (1) above, appraisers must obtain written authorization from the client agency (or the Department of Justice if a case has been filed) before disclosure. The passage of time in and of itself does not extinguish either the appraiser's responsibility for confidentiality or the appraiser/client relationship. The appraiser/client relationship is extinguished only upon written release from the client agency or upon the consummation of the government's acquisition of the property appraised. Even though the appraiser/client relationship may terminate, the appraiser remains subject to the confidentiality provisions of USPAP.

Appraisers have an extraordinary duty to maintain confidentiality when the acquisition of the property appraised may have to be accomplished by condemnation, and any appraisal report prepared for the purposes of government acquisition should be considered the subject of potential litigation until such time as the government has consummated its acquisition.

If an appraiser receives a request or order, under items (2) or (3) above, to provide confidential information relating to an appraisal conducted for the government to a state appraiser enforcement agency or professional peer review committee, the appraiser must provide the government with written notice of the request or order *prior* to providing the confidential information to the state appraiser enforcement agency or professional peer review committee. If litigation is pending, the Department of Justice may elect to intercede if it determines such intercession would be in the best interest of the government.

Appraisers must use extreme caution in choosing what information to cite in developing their opinions of value. While it is common practice for appraisers in non-litigation appraisals to report that they have relied upon confidential information (such as information learned in the conduct of other appraisals, or information provided to the appraiser by market participants on the condition that it not be disclosed) in addition to the supporting data reported, in developing their opinion of value such a reference in a litigation report may subject the information to discovery. Appraisers should not reference such information in litigation reports unless they are prepared to reveal the information, which occurs often by order of the court.

# 2. APPRAISAL REPORTING

2.1. **Introduction.** These Standards address the content and level of information and analysis required to communicate the results of an appraisal prepared for federal property acquisitions. These Standards are intended to establish requirements for appraisal report *content* and *documentation*. These Standards are not, however, intended to establish an absolute requirement for appraisal report *formatting*. The report formats described in Section 2.3, consisting of a four-part appraisal report for total acquisition appraisals and a seven-part appraisal report for partial acquisition appraisals, are recommended guides that agencies can modify as appropriate for agency needs. Appraisers are cautioned to closely examine their appraisal contract or assignment letter for report formatting requirements, as many agencies mandate report formatting in accordance with the recommendations herein. For ease of reference, the recommended formatting for appraisal reports is shown in the addenda of these Standards, marked as Appendix B and Appendix C.

These Standards also address the additional content and documentation requirements for appraisal reports to be used by appraisers who will testify as expert witnesses in federal court under Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. Finally, the reporting requirements for leasehold acquisitions and project appraisal reports are addressed under Sections 2.4 and 2.5 respectively.

2.2. **Appraisal Reports.** There are two written reporting options established under USPAP: an *appraisal report* and a *restricted appraisal report*. In addition, USPAP permits an appraiser to provide an *oral report*. For the reasons discussed under Sections 2.2.1 and 2.2.2 below, oral reports and restricted appraisal reports are not permitted under these Standards. The reporting formats set forth under Sections 2.3, 2.4, and 2.5 below are consistent with and/or exceed the requirements for an appraisal report under Standard 2 of USPAP.

2.2.1. **Oral Appraisal Reports.** Oral appraisal reports are not permitted under these Standards. An oral report is inconsistent with the intended use and intended users of an appraisal prepared for federal acquisitions. Even with the appraiser's workfile available, an oral report does not satisfy agency record-keeping requirements, and cannot be reliably reviewed. The number of intended users of appraisals in federal acquisitions also makes such a practice impossible.

2.2.2. **Restricted Appraisal Reports.** For most acquisitions and all litigation matters, restricted appraisal reports are not permitted.[112] These reports cannot be reviewed to the level of detail required for federal acquisition appraisals; the intended user of the report is restricted to the client only,[113] a condition that cannot be met for federal acquisition appraisals because it should

---

112  This does not prevent agencies from using restricted appraisal reports performed by internal agency appraisal staff for low value noncomplex acquisitions (in general accordance with the waiver valuation procedures established under the URA) or for internal portfolio valuation purposes.

113  USPAP, Standards Rule 2-2 and Advisory Opinion 12, *Use of the Appraisal Report Options of Standards Rules 2-2, 8-2,* and *10-2, 22* and *103*.

be anticipated that others such as landowners, legislators, or the courts will be asked to use and rely on the appraisal report.

**2.2.3.**   **Compliance with Rule 26 of the Federal Rules of Civil Procedure.** If an appraiser may testify as an expert witness in a federal trial or deposition, the appraiser's report must satisfy not only these appraisal Standards, but also the content requirements of Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

Rule 26(a)(2)(B) requires a written report, prepared and signed by the expert, that contains:

  i.   a complete statement of all opinions the witness will express and the basis and reasons for them;
 ii.   the facts or data considered by the witness in forming them;
iii.   any exhibits that will be used to summarize or support them;
 iv.   the witness's qualifications, including a list of all publications authored in the previous 10 years;
  v.   a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
 vi.   a statement of the compensation to be paid for the study and testimony in the case.[114]

Appraisal reports prepared in accordance with these appraisal Standards will normally satisfy parts (i), (ii) and (iii) of Rule 26(a)(2)(B).[115] However, many appraisers' qualification resumes or curriculum vitae typically do not include the information required in parts (iv), (v), and (vi). Appraisers must therefore supplement their customary qualification resumes to list (iv) all publications authored in the previous 10 years; all trial or deposition testimony within the previous four years; and (vi) the appraiser's fees for the appraisal assignment and for potential testimony. The appraiser must comply with Rule 26 if an appraisal report may be used for litigation purposes. In addition, because litigation may arise even when testimony is not anticipated, appraisers may wish to include such information in any report being prepared for federal acquisition purposes.

**2.2.4.**   **Electronic Transmission of Appraisal Reports.** It is common for appraisers to deliver appraisal reports electronically.  The appraiser is responsible for the security of the report when it is submitted in this manner.

**2.2.5.**   **Draft Reports.** Agencies may request that the appraiser provide a draft of all or a portion of the appraisal report prior to delivery of a final report. This requirement should be addressed as part of the scope of work with the agency before initiating the assignment. A draft should <u>not</u> be signed and must be clearly marked as a draft or a work in progress.

**2.3.**   **Content of Appraisal Report.**

---

114   FED. R. CIV P. 26(a)(2)(B) (through amendments effective Dec. 1, 2015).
115   *See*, e.g., *United States v. 12.94 Acres of Land in Solano Cty.*, No. CIV. S-07-2172, 2009 WL 4828749, at *4, *7, 2009 U.S. Dist. LEXIS 114581, at *11, *20-*21 (E.D. Cal. Dec. 9, 2009).

### 2.3.1.  Introduction.

**2.3.1.1.  Title Page.** This should include (1) the name, street address, and agency assigned tract or parcel number (if any) of the property appraised; (2) the name and address of the individual(s) making the report; and (3) the effective date of the appraisal.

**2.3.1.2.  Letter of Transmittal.** This should include the date of the letter; identification of the property and property rights appraised; a reference that the letter is accompanied by an appraisal report; a statement of the effective date of the appraisal; identification of any hypothetical conditions, extraordinary assumptions, limiting conditions, or legal instructions; the value opinion (or, in a partial acquisition, opinions of the value of the larger parcel before the acquisition and the remainder property after the acquisition, the difference); and the appraiser's signature.

**2.3.1.3.  Table of Contents.** The major parts of the appraisal report and their subheadings should be listed. Items in the addenda of any report shall be listed individually in the table of contents.

**2.3.1.4.  Appraiser's Certification.** The appraisal report shall include an appraiser's signed certification statement that is consistent with the certification requirements of USPAP Standard 2.  In addition, the following statements related to these Standards must be included:

- the appraisal was developed and the appraisal report was prepared in conformity with the *Uniform Appraisal Standards for Federal Land Acquisitions*;
- the appraisal was developed and the appraisal report prepared in conformance with the Appraisal Standards Board's *Uniform Standards of Professional Appraisal Practice* and complies with USPAP's Jurisdictional Exception Rule when invoked by Section 1.2.7.2 of the *Uniform Appraisal Standards for Federal Land Acquisitions*; and
- the appraiser has made a physical inspection of the property appraised and that the property owner, or [his][her] designated representative, was given the opportunity to accompany the appraiser on the property inspection.

The appraiser's certification shall also include the appraiser's opinion of the market value of the subject property as of the effective date of the appraisal. If the government's acquisition comprises only a portion of the whole property or property rights appraised, the certification shall include both the appraiser's opinion of the market value of the whole property as of the effective date of the appraisal and the appraiser's opinion of the remainder property's market value after the government's acquisition and the difference between them as of the effective date of the appraisal.

Appraisers may also add to their certifications certain items that may be required by law and the appraiser's professional organization(s). However, appraisers should avoid adding certifications that are not pertinent to the specific appraisal (e.g., that the report was prepared in accordance with the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 [FIRREA]) or that are beyond the scope of the appraisers' assignment (e.g., certifying an opinion of just compensation).

**2.3.1.5.    Executive Summary.** The appraiser shall report the major facts and conclusions that led to the final opinions(s) of value. This summary should include an identification of the property appraised; the highest and best use of the property (both before and after the acquisition if a partial acquisition); brief description of improvements (both before and after the acquisition if a partial acquisition); the indicated value of the property by each approach to value employed (both before and after the acquisition if a partial acquisition); the final opinion of value (both before and after the acquisition if a partial acquisition); any hypothetical conditions, extraordinary assumptions, limiting conditions, or instructions; and the effective date of the appraisal.

**2.3.1.6.    Photographs.** Photographs shall show the front elevation of the major improvements, any unusual features, views of the abutting properties on either side, views of the property directly opposite, and interior photographs of any unique features. When a large number of buildings are involved, including duplicates, one photograph may be used for each type. Except for an overall view, photographs may be incorporated in the body of the report as appropriate, or may be placed in the addenda of the report.

Each photograph should be numbered and show the identification of the property, the date taken, and the name of the person taking the photograph. The location from which each photograph was taken and the direction the camera lens was facing should be shown on the plot plan of the property in the report's addenda.

In selecting photographs for inclusion in their reports, appraisers should bear in mind that some government appraisal reviewers and other readers of the report may never have an opportunity to personally view the property. Therefore, they must rely on the photographs and the narrative description of the property provided by the appraiser to gain an adequate understanding of the physical characteristics of the property to judge the accuracy and reasonableness of the appraiser's analyses and value estimate(s). Thus, the appraiser may need to include aerial photographs in the report to ensure that readers can accurately visualize the property.

In taking photographs, appraisers should also be guided by the knowledge that the government may be unable to acquire the property voluntarily and may take possession of the property well before the question of value is settled; thus, the land may be substantially altered and improvements demolished prior to a final decision in a condemnation trial.

**2.3.1.7.    Statement of Assumptions and Limiting Conditions.** Any assumptions and limiting conditions that are necessary to the background of the appraisal shall be stated. Any agency or special **legal instructions** provided to the appraiser shall be referenced and a copy of such instructions shall be included in the addenda of the appraisal report.[116]

If the appraisal has been made subject to any encumbrances against the property, such as easements, these shall be stated. In this regard, it is unacceptable to state that the property has

---

116  Appraisers must bear in mind that if a client or legal instruction has not been provided to them in writing, it is not considered a binding instruction. Therefore, if the appraiser accepts an oral instruction from the client or legal counsel, the appraiser becomes wholly responsible for it. Reference to a client or legal instruction, a copy of which is not in the addenda of the appraisal report, will not be acceptable justification for acceptance or adoption of the instruction and may result in disapproval of the appraisal report.

been appraised as if free and clear of all encumbrances, *except as stated in the body of the report*; the encumbrances *must* be identified in this portion of the report.

The appraiser must avoid including "boilerplate" assumptions and limiting conditions. For instance, an assumption that improvements are free from termite infestations is inappropriate in the appraisal of vacant land. Also, assumptions and limiting conditions cannot be used by an appraiser to alter an appraisal contract, assignment letter, or the appraiser's scope of work. Unauthorized hypothetical conditions, assumptions, or limiting conditions may result in disapproval of the appraisal report.

In a partial acquisition, the appraiser should identify those hypothetical conditions, assumptions, and limiting conditions that apply to both the before and after acquisition appraisals, those that apply only to the appraisal of the larger parcel before the acquisition, and those that apply only to the appraisal of the remainder. Appraiser assumptions and limiting conditions, as well as client and **legal instructions**, are discussed in greater detail in Section 1.2 of these Standards.

**2.3.1.8. Description of Scope of Work.** The appraiser shall use this section of the report to identify the seven critical elements that defined the appraisal problem to be solved:

- Client
- Intended users
- Intended use
- Definition of market value
- Effective date
- Property characteristics
- Assignment conditions

This section shall include an explanation of the intended use for the appraisal, and a description of the property rights appraised, which should be provided to the appraiser by the client agency. In most instances the intended use of the appraisal will be to provide an opinion of the market value as of a specific date.[117] In an appraisal assignment involving a partial acquisition, the intended use of the appraisal will be to provide an opinion of the market value of the larger parcel before the acquisition and an opinion of the market value of the remaining property after the acquisition.

It is imperative that the appraiser utilize the correct definition of market value. For appraisals prepared under these Standards, appraisers shall use the definition of market value found in Section 1.2.4 of these Standards.

This definition must be placed in this portion of the appraisal report. No other definition of market value for purposes of appraisals made under these Standards is acceptable,[118] unless otherwise required by a specific and cited federal law or regulation.

---

117  For a discussion of the legal requirements regarding the effective date of value, see Section 4.2.1.1.
118  For a discussion of the legal basis for this definition of market value and this specific requirement, see Section 4.2.

The appraiser should describe the investigation and analysis that was undertaken in developing the appraisal. The geographical area and time span searched for market data should be included, as should a description of the type of market data researched and the extent of market data confirmation. The appraiser should state the references and data sources relied upon in developing the appraisal.

The applicability of all approaches to value shall be discussed and the exclusion of any approach to value shall be explained.

The appraiser has the burden of clearly identifying and explaining the implications of any hypothetical condition or extraordinary assumption adopted. The required explanation and discussion of the implications of such hypothetical conditions or extraordinary assumptions must be included in this portion of the appraisal report. Each hypothetical condition and extraordinary assumption must be labeled as such and any legal instructions must be included in the addenda of the report.

## 2.3.2.   Factual Data—Before Acquisition.[119]

### 2.3.2.1.   Legal Description. This description must be sufficiently detailed to properly identify the property appraised. If lengthy, it should be referenced and included in the addenda of the report. If the client agency has assigned a parcel or tract number to the property, that information should also be referenced. A more detailed standard concerning the legal description of the property to be appraised appears in Section 1.1.1 of these Standards.

### 2.3.2.2.   Area, City, and Neighborhood Data. This data (mostly demographic and economic) must be kept to an absolute minimum and should only include information that directly affects the subject property, together with the appraiser's conclusions as to significant trends. The use of "boilerplate" demographic and economic data is unnecessary and, unless the appraiser demonstrates that the specific data directly impacts the current market value of the subject property, it should be excluded.

Changes in the neighborhood brought about by the government's project for which the property under appraisal is being acquired shall be disregarded. This specific Standard is contrary to USPAP Standards Rule 1-4(f) and is considered a jurisdictional exception. See Section 4.5 (Project Influence) for a discussion of the legal basis for this specific Standard.

### 2.3.2.3.   Property Data.

#### 2.3.2.3.1.   Site. Describe the present use, accessibility and road frontage, land contours and elevations, soils, vegetation (including timber), views, land area, land shape, utilities, mineral deposits, water rights associated with the property, and relevant easements, etc. A statement must be made concerning the existence or nonexistence of commercially valuable mineral deposits.

---

[119]  If the government's acquisition is a partial acquisition, it is imperative that the sections of the appraisal report in Section 2.3.2 relate only to the before situation. The appraiser must not attempt to combine the discussion of the factual data after acquisition with the factual data relating to the before situation.

Also discuss the beneficial and detrimental factors inherent in the location of the property.[120] The presence of hazardous substances should be addressed in accordance with Sections 1.3.1.1 of these Standards. An affirmative statement is required if the property is located within a flood hazard area.[121]

**2.3.2.3.2.   Improvements.** Describe the following: all improvements including their dimensions; square foot measurements, chronological and effective age, and dates of any significant remodeling/renovation; condition; type and quality of construction; and present use and occupancy. This description may be in narrative or schedule form. Where appropriate, a statement of the method of measurement used in determining gross building area and net rentable areas should be included. All site improvements, including fencing, landscaping, paving, irrigation systems, and domestic and private water systems require description. The appraiser should coordinate such description with the photographs of the property included in the report and with the plot plan (and floor plan, if included).  If the appraiser will rely on the cost approach to value, or if the acquisition is a partial acquisition that will structurally impact the improvements, a more comprehensive improvement description is required. These items are described in more detail in Section 2.3.7.

**2.3.2.3.3.   Fixtures.** All fixtures are to be described in narrative or schedule report form with a statement of the type and purpose of each. The current physical condition, relative utility, and obsolescence should be stated for each item or group included in the appraisal, and whenever applicable the repair or replacement requirements to bring the fixture to a usable condition.[122]

**2.3.2.3.4.   Use History.** State briefly the history of the use of the property as vacant and as improved. If improved, state the purpose for which the improvements were designed and the dates of original construction and major renovations, additions, and/or conversions. Include a 10-year history of the use and occupancy of the property.[123] If any of the foregoing information is indeterminable, the appraiser must report that fact.

**2.3.2.3.5.   Sales History.** Include a 10-year record of all sales and, if the information is available, any offers to buy or sell the subject property. If no sale of the property has occurred in the past 10 years, the appraiser must report the last sale of the property, irrespective of date.

Information to be reported must include the name of the seller, name of the buyer, date of sale,[124] price, terms and conditions of sale,  and the appraiser's verification of the sale and whether the transaction met the conditions required for a comparable sale under Section 1.5.2.2.

---

120   Beneficial factors may include such items as desirable views, proximity to desirable public or cultural facilities, or proximity to dedicated open space or greenbelts. Detrimental factors may include such items as offensive odors, undesirable land uses, contamination, and noxious weeds. Farm properties can be especially impacted by environmental factors such as noxious weeds, frost, incidence of hail, floods and droughts, and variations in crop yields. Appraisers should list and describe those beneficial and detrimental factors that may impact the utility and value of the land.

121   For this purpose, appraisers should refer to Federal Emergency Management Agency (FEMA) flood hazard maps.

122   *See* Section 1.3.1.2.

123   Past uses of the property may suggest its historical contamination by hazardous substances.

124   Terms and conditions of sale cannot, of course, be conclusively determined from the public record. Therefore, appraisers should confirm the sales of the subject property with one of the parties to the transaction.

5-ER-819

**2.3.2.3.6. Rental History.** Report the historical rental or lease history of the property for at least the past three years, if this information can be ascertained. All current leases should be reported, including the date of the lease, name of the tenant, rental amount, term of the lease, parties responsible for property expenses, and other pertinent lease provisions. The appraiser must describe the verification process and whether the lease(s) meets the conditions required for a comparable lease.

**2.3.2.3.7. Assessed Value and Annual Tax Load.** Include the current assessment and dollar amount of real estate taxes. If assessed value is statutorily a percentage of market value, state the percentage.

Some jurisdictions have developed programs wherein property will be assessed based on its current use rather than its highest and best use. These programs often relate to farmlands, timberlands, and open space; for purposes of eligibility, owners may have to agree to leave the property in its existing use for a certain period of time.[125] In such a case, the appraiser should report both the current assessed value and taxes for the property's existing use and the estimated assessed value and tax load for the property at its highest and best use.

**2.3.2.3.8. Zoning and Other Land Use Regulations.** Identify the zoning for the subject property. This must be reported in descriptive terms (e.g., multifamily residential, 5000 sq. ft. of land per unit) rather than by zoning code (e.g., MF-2). Other local land use regulations that have an impact on the highest and best use and value of the property, including setback requirements, off-street parking requirements, and open space requirements must be reported. The appraiser should also note any master or comprehensive land use plan in existence that may affect the utility or value of the property.

If the property was recently rezoned, that must be reported. The appraiser must determine whether such rezoning was a result of the government's project for which the subject property is being acquired. If so, the appraiser must justify this conclusion and disregard the rezoning.[126] If the rezoning of the property is imminent or probable, discuss in detail the investigation and analysis that led to that conclusion under Section 2.3.3.1 (Highest and Best Use).[127] The mere assertion by an appraiser that a property could be rezoned is insufficient.[128] In addition to zoning, the appraiser must identify all other land use and environmental regulations that have an impact on the highest and best use and value of the property.[129] The impact of the regulations must also be discussed in the highest and best use analysis. The appraiser must also discuss the impact of any private restrictions on the property, such as deed and/or plat restrictions.

**2.3.3.    Data Analysis and Conclusions – Before Acquisition.**

**2.3.3.1.    Highest and Best Use.** The appraiser's determination of highest and best use is one of the most important elements of the entire appraisal process. Therefore, appraisers must apply their skill with great care and clearly support the highest and best use conclusion in the appraisal report.

---

125  *See* Section 1.3.1.7.
126  For the legal basis for this standard, see Section 4.5.3. Under USPAP, invocation of this standard would result in an appraisal prepared under a hypothetical condition.
127  For a discussion of the extent of the required investigation that must be taken by the appraiser in this regard, see Section 1.3.1.3.
128  *See* Section 1.3.1.3.
129  *See* Section 1.3.1.3.

The highest and best use of the land, as if vacant, is addressed first. If the land is improved, the highest and best use of the property, as improved, is then addressed. In some cases, the highest and best use of property cannot be reliably determined without extensive marketability and/or feasibility studies, which in complex cases may require the assistance of special consultants.

**2.3.3.1.1. Four Tests.** The four tests of highest and best use are physically possible, legally permissible, financially feasible, and highest value. Each of these four criteria must be addressed in the appraisal report. The level of supporting data and analysis presented in the report for each criteria will depend in part on the complexity of the appraisal problem.

In all assignments, the appraiser must describe the analysis developed under Section 1.4 concerning the highest and best use of the property as if vacant. The physical characteristics of the property that impact value must be addressed. Property size, shape, topography, access, road frontage, and utilities are all examples of physical characteristics of a property that may influence use and value and should be described in adequate detail for the client and intended users to understand how they may influence the determination of highest and best use.

The appraiser must describe the legal constraints on the property that were identified and analyzed under Sections 1.3.1.3 and 1.4.5. Zoning requirements, height restrictions, setback and open space requirements, and all other legal constraints on the property should be described and their impact discussed. If the appraiser concludes a highest and best use that will require rezoning of the property, the investigations and analyses developed under Section 1.3.1.3 concerning the probability of obtaining that zoning change should be reported here in sufficient detail for the client and intended users to understand the reasons for the conclusion. If the appraiser concludes that the highest and best use requires some other form of government approval, the investigations and analyses developed under Sections 1.3.1.3 and 1.4.5 concerning the probability of obtaining those approvals must be described in sufficient detail for the client and intended users to understand the reasons for the conclusion.

The financial feasibility of those uses, which are both physically possible and legally permitted, should be addressed. All feasibility or comparative studies developed under Section 1 should be described here, so the client and intended users can understand those uses that may have been eliminated in that analysis. Finally, the appraiser should discuss the use of the property as if vacant, which results in the highest value, and the analysis that supports that conclusion. The appraiser should identify the timing of the use and the likely purchaser and user.

If the property contains improvements, the appraiser must address the highest and best use as improved. The same process described above should be followed. This analysis is focused on the contribution of the improvements to the property overall, taking into account the highest and best use of the property as if vacant. After addressing each of the four tests and making a determination of the highest and best use as improved, the appraiser should identify the timing of the use and the likely purchaser and user.

**2.3.3.1.2.  Larger Parcel.** In every appraisal report prepared under these Standards, the appraiser must describe the factual basis and analysis underlying the conclusion of the larger parcel analysis. The three tests developed under the larger parcel analysis—unity of highest and best use, unity of title, and contiguity—should be addressed here.[130] Each of the three tests (with emphasis on the unity of highest and best use) must be reported in sufficient detail for the client and intended users to fully understand the factual and analytical basis for the conclusion.

**Application of the Approaches to Value**

**2.3.3.2.      Land Valuation.** The appraiser shall report the opinion of value of the land for its highest and best as if vacant and available for such use. See Sections 1.5.1 and 4.4.2 for a detailed discussion concerning the approaches to value and the legal foundation for these Standards. In all assignments, the sales comparison approach is the preferred valuation approach for forming an opinion of the market value of the land as if vacant. However, in some assignments the subdivision development method may be appropriate. The following sections describe the reporting requirements for the land valuation process.

**2.3.3.2.1.  Sales Comparison Approach.** In reporting the results of the sales comparison approach for land valuation, the appraiser shall provide detailed descriptions of confirmed sales of lands that have the same or similar highest and best use as the subject property. The description of each sale transaction used as a comparable sale should at a minimum include the date of the transaction, the price paid, the name of the seller, the name of the buyer, the size of the property, the location of the property, the zoning or other legal constraints on the property, and a description of the physical characteristics of the property. The person with whom the transaction was verified should also be identified.

Differences between the comparable sales and the subject property shall be considered and adjustments made to the sales to address these differences. Items of comparison shall include property rights conveyed, financing terms, conditions of sale, market conditions, location, physical characteristics, economic characteristics, legal characteristics, and non-realty components of value. The adjustments must be summarized in an adjustment grid and each adjustment (whether qualitative or quantitative) should be supported with market data. The data and analysis must provide sufficient detail for the client and intended users to understand the data, the analysis, and the logic of the appraiser's opinion of market value for the subject land as if vacant.

**2.3.3.2.2.  Subdivision Development Method.** In those circumstances where the property has a highest and best use for subdivision purposes and the appraiser has developed the subdivision development method, the report must address all of the factors and assumptions used in sufficient detail for the client and intended users to understand the outcome of this method. The market support for each factor (lot sale price, absorption rate, development costs, expenses, time lag, and discount rate) used in this analysis must be clearly presented in the report. The discounted cash flow analysis prepared as part of this analysis must be included in the report.

---

130   See Sections 1.5.3, 4.3.3, and 4.3.4 for an in-depth discussion of the analysis required and the legal basis for the larger parcel analysis.

5-ER-822

2.3.3.3.    **Cost Approach.** This portion of the report should be in the form of computational data, arranged in sequence, beginning with reproduction or replacement cost. The report should state the source (book and page—including last date of page revision—if a national service) of all figures used. Entrepreneur's profit, as an element of reproduction or replacement cost, must be considered and discussed and if applicable, should be derived from market data whenever possible. If the appraiser retained the services of a contractor or professional cost estimator to assist in developing the reproduction or replacement cost estimate, this data should be referenced and the estimator's report included in the addenda of the appraisal report.

The dollar amount of depreciation from all causes, including physical deterioration, functional obsolescence, and economic or external obsolescence shall be explained and deducted from reproduction or replacement cost. See Section 1.5.3 for a discussion concerning the preferred methods of estimating depreciation under these Standards.

2.3.3.4.    **Sales Comparison Approach.** Each appraisal report must contain a sufficient description of the comparable sales[131] used so that it is possible for the reader to understand the conclusions drawn by the appraiser from the comparable sales data. Photographs of the comparable sales are valuable visual aids that indicate the comparability of the property recently sold with the subject property. Such photographs must accompany each appraisal report not only to aid the review appraiser but also for the agency's records and for later use in possible condemnation litigation. In addition to the identification of the property, every photograph should show the date taken and the name of the person taking the photograph.

Documentation of each comparable sale shall include the name of the buyer and seller, date of sale, legal description,[132] type of sale instrument, document recording information, price, terms of sale, location, zoning, present use, highest and best use, and a brief physical description of the property. A plot plan or sketch of each comparable property should be included, not only to facilitate the reader's understanding of the relationship between the sale property and the subject property, but also to locate the sale property in the field. This information may be summarized for each sale on a <u>comparable sales form</u> and included in this section or in the addenda of the report. As noted, a photograph of each comparable sale shall also be included. A comparable sales map showing the relative location of the comparable sales to the subject property[133] shall be included, either in this section or in the addenda of the report. Inclusion of a copy of the transfer document (e.g., deed, contract) in the report is neither required nor desirable, unless there is something in the document that is unusual or particularly revealing.

As discussed in Section 1.5.2.3, the preferred method of adjusting comparable sales is through the use of quantitative adjustments (whenever adequate market data exists to support them). Only when adequate market data does not exist to support quantitative adjustments should the appraiser resort to qualitative adjustments (i.e., inferior, superior). Appraisers must bear in mind that quantitative and qualitative adjustments are not mutually exclusive methodologies. Because

---

131  See Section 1.5.2 for discussion of Selection and Verification of Comparable Sales, The Adjustment Process, and Sales Requiring Extraordinary Verification.

132  This may be abbreviated if lengthy, or reference may be made to a tax parcel number.

133  It is important that the locations of the comparable sales and the subject property are shown on the same map so that a reader of the report who may not be familiar with the area can understand the relative proximity of the properties and locate them in the field.

one factor of adjustment cannot be quantified by market data does not mean that all adjustments to a sale property must be qualitative. All factors that can be quantified should be adjusted accordingly. When quantitative and qualitative adjustments are both used in the adjustment process, all quantitative adjustments should be made first. When using quantitative adjustments, appraisers must recognize that not all factors are suitable for percentage adjustments. Percentage and dollar adjustments may and often should be combined.[134] Each item of adjustment must be carefully analyzed to determine whether a percentage or dollar adjustment is appropriate.

When appraisers must resort to qualitative adjustments, they must recognize that this form of comparative analysis will often require more extensive discussion of the appraiser's reasoning. This methodology may also require the presentation of a greater number of comparable sales. It is essential, of course, that the appraiser specifically state whether each comparable sale is generally either overall superior or inferior to the property under appraisal. To develop a valid indication of value of the property under appraisal by the use of qualitative analysis, it is essential that the comparable sales utilized include both sales that are overall superior and overall inferior to the subject property. If this is not done, the appraiser will have merely demonstrated that the property is worth more than a certain amount (if all of the sales are inferior to the subject property) or less than a certain amount (if all of the sales are superior to the subject property).

In developing a final opinion of value by the sales comparison approach, the appraiser shall explain the comparative weight given to each comparable sale, no matter whether quantitative or qualitative adjustments or a combination thereof are used. A comparative adjustment chart or graph is required and may assist appraisers in explaining their analysis in this regard.

**2.3.3.5.    Income Capitalization Approach.** The appraisal report shall include adequate factual data to support each figure and factor used and should be arranged in detailed form to show at least (1) estimated gross economic (or market) rent, or income; (2) allowance for vacancy and credit losses; (3) an itemized estimate of total expenses; and (4) an itemized estimate of the reserves for replacements, if applicable. Section 1.5.4 discusses the income capitalization approach in detail.

Capitalization of net income shall be at the rate prevailing for this type of property and location. The capitalization technique, method, and rate used should be explained in narrative form and supported by a statement of the sources of rates and factors. The preferred source of an applicable capitalization rate is from actual capitalization rates reflected by comparable sales.[135]

As with a recent and unforced sale of the subject property (see Section 2.3.3.4), if the property is actually rented, its current rent is often the best evidence of its economic (or market) rent and should be given appropriate consideration by the appraiser in developing an opinion of the gross economic rent of the property. Likewise, the appraiser should attempt to obtain at least the last three years' historical income and expense statements for the property. These

---

134  For instance, a percentage adjustment for market conditions (time) may be appropriate, but an adjustment for the fact that the subject property is 300 feet from a sewer connection and all of the comparable sales are connected to sewer should often be made in a lump sum dollar amount to reflect the cost to cure the subject property's comparative deficiency. If a percentage adjustment were applied to the price-per-unit (e.g., per acre, per square foot) of each comparable, the adjustment to each of the comparable sales would vary depending on the price-per-unit of the comparable and might have no relationship to the cost to cure the subject's deficiency.

135  *See* Section 4.4.4.

can generally be developed into a reliable reconstructed operating statement. If this historical income and expense information is available, it should be included in this portion of the appraisal report or in the addenda.

**2.3.3.6.** **Reconciliation and Final Opinion of Market Value.** The appraiser must explain the reasoning applied to arrive at the final opinion of value and how the results of each approach to value were weighed in that opinion, and the reliability of each approach to value for solving the particular appraisal problem. See Section 1.6.

The appraiser shall also state the final opinion of value of all of the property under appraisal as a single amount, including the contributory value of fixtures, timber, minerals, and water rights, if any. The appraiser must avoid making a summation appraisal.[136] The appraiser is solely responsible for the final opinion of value. If that value opinion includes elements of value that were based on estimates developed by others (e.g., timber cruisers, mineral appraisers), the appraiser cannot merely assume their accuracy. The reasonableness of the subsidiary estimates must be confirmed in accordance with Section 1.13.

**2.3.4.** **Factual Data—After Acquisition (Partial Acquisitions Only).**

**2.3.4.1.** **Legal Description.** The legal description of the remainder property shall be included. If a legal description of the remainder property is not available, appraisers may develop their own by utilizing the before acquisition legal description and excluding from it the legal description of the real estate acquired by the government.

If the *estate acquired* is less than a fee interest (e.g., an easement), the legal description under Section 2.3.2.1 may be referenced and the legal description of the property encumbered by the estate acquired should be included. If lengthy, the legal description should be briefly referenced and the full legal description should be included in the report's addenda.

**2.3.4.2.** **Neighborhood Factors.** The appraiser shall describe the government project for which the property is being acquired and its impact, if any, on the neighborhood and the remainder property. The degree of detail regarding the government's project included in this section should relate directly to the complexity of the government's project and its impact on the remainder property.[137] The aspects of the government's project that will result in damages to the remainder property should be described in specific detail.

---

136  *See* Section 4.2.2.

137  For example, in a fee acquisition of a portion of the property for inclusion in a wildlife refuge without any substantial construction, the description of the government's project could probably be brief. If, on the other hand, the government's acquisition was a permanent easement through the parcel for construction of a flood control levee with associated temporary construction easements, a detailed description of the government's project may be necessary. Such a description might include such things as height of the levee; width at the base and at the top of the levee; degree of side slopes of the levee; finish material (e.g., riprap, seeded soil) of the slopes; any provisions for access over the levee; any provisions for drainage; duration of temporary construction easements and the use to which the government will put the easement areas during construction; anticipated condition of the temporary construction easement areas at termination; and anticipated impact on future flooding, as compared to historical flooding.

5-ER-825

**2.3.4.3.    Property Data.**

**2.3.4.3.1.    Site.** The appraiser must describe the remainder site, paying particular attention to the shape, size, available utilities, and available access to the remainder site, addressing all requirements listed in Section 2.3.2.3.1.

**2.3.4.3.2.    Improvements.** The appraiser must describe those improvements remaining in whole or in part, addressing all requirements listed in Section 2.3.2.3.2.

**2.3.4.3.3.    Fixtures.** The appraiser must describe those fixtures remaining, addressing all requirements listed in Section 2.3.2.3.3.

**2.3.4.3.4.    History.** If the appraisal is prepared after the date of acquisition, the appraiser must report the utilization of the remainder property since the date of acquisition as well as any sales or rentals of the remainder property, addressing all requirements listed in Sections 2.3.2.3.4 (Use History), 2.3.2.3.5 (Sales History), and 2.3.2.3.6 (Rental History).

**2.3.4.3.5.    Assessed Value and Tax Load.** The appraiser must estimate what the assessed value and annual tax load will be on the remainder property. This estimate is particularly critical if the income capitalization approach is to be utilized in developing an opinion of the value of the remainder property. In this connection, discussions with local assessing authorities are often helpful in making these estimates. All requirements listed in Section 2.3.2.3.7 must be addressed.

**2.3.4.3.6.    Zoning and Other Land Use Regulations.** The appraiser must report the influence of zoning and other land use regulations on the remainder property.[138] Specific attention should be given to the probability of a rezone, either up or down, of the property caused by the government's project and the possibility that because of the acquisition, the remainder property has become nonconforming to land use regulations in areas such as lot area requirements, setbacks, and off-street parking. All requirements in Section 2.3.2.3.8 must be addressed.

**2.3.5.    Data Analysis and Conclusions—After Acquisition (Partial Acquisitions Only).**

**Introductory Note:** These analyses and valuation sections relating to the remainder property constitute a new appraisal. In cases of an insignificant taking, the remainder may be so similar to the larger parcel before the acquisition that the same highest and best use analysis and the same cost, market, and income data and analysis will remain applicable and can therefore be referenced and employed in reporting the opinion of the market value of the remainder property. However, a change in the basic physical or economic character of the remainder may result in a change in the remainder's highest and best use or the intensity of that use and may result in damages or benefits, which will require different market data and/or analysis than that which was used in the larger parcel valuation.[139]

---

138   *See* Sections 2.3.2.3.4 to 2.3.2.3.6 and Section 2.3.2.3.8.
139   *See* Section 4.3.4.5.

**2.3.5.1.    Analysis of Highest and Best Use.** The appraiser shall state and explain the highest and best use of both the remainder land (as if vacant) and the remainder property (as improved). Impacts of the acquisition on the property's highest and best use or the intensity of that use shall be specifically addressed and described. If restoration or rehabilitation of the remainder property will be required before it can be put to its highest and best use, the physical and economic feasibility of such restoration or rehabilitation shall be explained and justified. Major restoration or rehabilitation may require the services of an expert in the field, such as an architect, engineer, and/or contractor.[140] If the acquisition includes a temporary construction easement, or other temporary property interest, the effect of such temporary acquisition on the remainder property's highest and best use must be discussed.[141]

**2.3.5.2.    Land Valuation.** The appraiser will develop an opinion of the market value of the remainder land for its highest and best use as if vacant and available for such use.[142]

If the acquisition includes one or more temporary construction easements, the impact of those easements on the value of the remainder property must be accounted for in the valuation of the land after acquisition. Any diminution in the remainder land value by reason of the temporary easements must be measured in accordance with Section 1.9.1, and then be used as the basis for an adjustment to the remainder's land value in this section of the report. The diminution in the remainder's land value by reason of temporary easements should not be treated as an additive to be added to the difference between the before and after value of the property.

**2.3.5.3.    Cost Approach** – See Section 2.3.3.3.

**2.3.5.4.    Sales Comparison Approach** – See Section 2.3.3.4.

**2.3.5.5.    Income Capitalization Approach** – See Section 2.3.3.5.

**2.3.5.6.    Reconciliation and Final Opinion of Market Value.** The appraiser must describe the reasoning applied to arrive at the final opinion of value of the remainder property, addressing all the requirements in Section 2.3.3.6.

**2.3.6.    Acquisition Analysis (Partial Acquisitions Only).** This part of these Standards is applicable only in partial acquisition appraisals. The requirements in Sections 2.3.6.2 and 2.3.6.3 are identified to assist agencies in meeting their obligations under the Uniform Act.  If the appraisal report is being prepared for condemnation trial purposes, trial counsel for the United States may instruct the appraiser to omit these sections.

**2.3.6.1.    Recapitulation.** The appraiser must report the difference between the value of the larger parcel and the value of the remainder by deducting the property's after value from its before value.

---

140  *See* Section 1.13.
141  *See* Section 1.9.1.
142  For requirements of land valuation, see Section 2.3.3.2.

**2.3.6.2.   Allocation and Damages.** Damages, as such, are not appraised. However, the appraiser shall briefly explain any damages to the remainder property and allocate the difference in the value of the property before and after the acquisition between the value of the acquisition and damages to the remainder. The appraiser should note that such allocation is an accounting tabulation and not necessarily indicative of the appraisal method employed.

If damages have been measured by a <u>cost to cure</u>, the appraiser must justify the cost to cure[143] and demonstrate that the cost to cure is less than the damage would be if the cure was not undertaken.

**2.3.6.3.   Special Benefits.** The appraiser shall identify any special or direct benefits accruing to the remainder property and explain how and why those benefits have occurred.

**2.3.7.   Exhibits and Addenda.**

**Legal Instructions.** Any legal instructions must be presented.

**Location Map.** This exhibit should display the location of the subject property within the city or area in which the property is located.  All maps should include a north arrow and the identification of the subject property.

**Comparable Data Maps.** These maps might include, among other items, a comparable land sales map, a comparable improved sales map, and a comparable rentals map.  The maps should include a north arrow and show the locations of both the comparable sales and/or rentals and the subject property. If this requires the use of a map that is not of a readable scale, secondary maps showing the specific location of each comparable should be included.

**Details of Comparable Sales and Rental Data.** This data may be included in the body of the report. Photographs of each comparable property must be included.

**Plot Plan.** A plot plan should help the reader to visualize the property and the scope of the appraisal considerations. The plot plan should depict the entire subject property, including dimensions and street frontages. Structural improvements should be shown in their approximate locations; significant on-site improvements and easements should also be shown. The dimensions of improvements should be noted. The plot plan should include a directional north arrow. The location from which each of the subject photographs was taken should be identified on the plot plan, as well as the photograph identification number and the direction in which the photo was taken.

In a partial acquisition, the plot plan should identify the remainder area and its dimensions. Any significant construction features of the government project for which the property is being acquired should be shown. If the subject property or area acquired is complex, a separate plot plan of the remainder property may be desirable.

---

143   This may require the services of a consultant. *See* Section 1.13.

Uniform Appraisal Standards for Federal Land Acquisitions  /  Appraisal Reporting                                    71

**Floor Plan.** Floor plans are required only for reports related to leasehold acquisitions or when they are necessary to describe a unique property feature.

**Title Evidence Report.** If the agency provided a title evidence report to the appraiser it should be included, but if it is lengthy it may be referenced.

**Other Pertinent Reports and Exhibits.** These would include, for example, any written instructions given to the appraiser by the agency or its legal counsel, any specialist reports (such as timber appraisals, environmental studies, mineral or water-rights studies or appraisals, reproduction cost estimates, cost to cure estimates, fixture valuations), any pertinent title documents (such as leases or easements), and any charts or illustrations that may have been referenced in the body of the report.

**Qualifications of the Appraiser.** Include the qualifications of all appraisers or technicians who made significant contributions to the completion of the appraisal assignment. If appraisal reports are being prepared for trial purposes, appraisers must ensure that the content of their qualifications conform with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

2.4.    **Reporting Requirements for Leasehold Acquisitions.** The reporting Standards presented above provide the framework for reporting the results of an appraisal developed for a leasehold acquisition. The following are additional reporting requirements that apply to these special assignments.

2.4.1.    **Property Rights Appraised.** The terms of the leasehold estate acquired must be clearly discussed in the appraisal. Any differences between the government's lease and typical leases in the market must be described and analyzed. The analysis should address all of the differences identified in Section 1.8.

2.4.2.    **Improvements Description.** The description of the improvements must address all exterior and interior features of the building improvements in which the leasehold will be located. The physical location of the government's leasehold space within the building must be described in sufficient detail to allow the client and intended users to understand the impact (if any) of the government's leasehold on the rest of the building.

2.4.3.    **Highest and Best Use and Larger Parcel.** The appraiser must describe the factual basis and analysis concerning the highest and best use of the building in which the government's leasehold is located, including those situations in which the leasehold is the entire building. This analysis is critical in determining the position of the building within the market. This analysis is critical in situations where the property is located in a market in transition. The appraiser must also present the larger parcel analysis developed under Section 1.8. The result of this analysis will dictate whether a before and after valuation must be performed.

2.5.    **Project Appraisal Reports.** Some government projects require the acquisition of many parcels of real property, and individual appraisers are assigned to appraise a number of these

properties at the same time. On occasion, it is logical to include the appraisal of more than one parcel in a single report. Such project appraisal reports (or multiple-parcel appraisal reports) are not appraisal shortcuts; they are clerical shortcuts. A separate opinion of market value must still be *developed* for each acquisition; but the results of each valuation can be *reported* in a more efficient form. Project appraisal reports that meet the criteria set forth here may be acceptable for agency negotiation purposes under the Uniform Act and for initial review purposes by the Department of Justice.

Project appraisal reports are rarely conducive to litigation purposes, as they typically contain opinions of value of properties owned by persons not parties to the lawsuit and introduce a myriad of collateral issues.[144] But they can be a useful tool to assist in fair and efficient acquisitions for agencies engaged in large projects in which the vast majority of acquisitions can be completed voluntarily without condemnation litigation.

**A project appraisal report may be appropriate if:**

(1) All parcels are total acquisitions OR all are partial acquisitions of a nominal and/or consistent nature;

(2) All parcels are vacant OR all have similar improvements;

(3) All parcels are located within a geographic area with a relatively similar land use pattern;

(4) All parcels have the same or similar highest and best use;

(5) The most relevant approach to value is the same for all parcels; and

(6) The same array of market data can be relied on in the valuation of each parcel.

The project appraisal report consists of three major parts: **Part I** contains an introduction, factual data, and analysis relating to all properties included in the report; **Part II** includes the individual parcel reports; and **Part III** provides addenda and exhibits relating to all properties included in the report.

## Part I—Introduction, General Factual Data, and Analysis

(1) **Title Page.** This should include the government project title, the number of individual parcels included in the report, the name and address of the individual(s) making the report, and the date on which the appraisals were prepared.

(2) **Letter of Transmittal.** This should include the date of the letter; identification of the government project; the number of parcels included in the appraisal report; statement of the range of effective dates of the appraisals; identification of any hypothetical conditions, extraordinary assumptions, limiting conditions or **legal instructions** relating to all parcels included in the report; and the appraiser's signature.

(3) **Table of Contents.** The major parts of the appraisal report and their subheadings shall be listed. The location of each individual parcel report shall be specifically identified and items in the addenda of the report shall be individually listed in the table of contents.

(4) **Executive Summary.** The appraiser should report the value findings for each parcel

---

144 For the same reasons, project appraisal reports generally should not be used for acquisitions in which an agency will need to release the underlying appraisals to comply with specific statutory or other requirements, unless the agency and the appraiser are prepared to significantly revise the appraisal scope of work. *See* Section 1.2.6.

appraised. These findings should include the agency-assigned parcel number, the owner of the property, the effective date of the value estimate(s), and the value conclusion(s). In partial acquisitions, the before value, after value, and difference should be shown. If the project appraisal encompasses a larger number of parcels, it is desirable to include a second summary listed alphabetically, by owners' names.

(5) **Statement of Assumptions and Limiting Conditions.** The requirements of Section 2.3.1.7 must be addressed. All assumptions and limiting conditions that universally apply to the appraisal of all parcels in the project appraisal report must be listed. Assumptions and limiting conditions that are not applicable to all parcels included in the project appraisal report should not be included in this section, but rather should be noted in the individual parcel reports.

(6) **Scope of Work.** The requirements of Section 2.3.1.8 must be addressed.

(7) **Area, City, and Neighborhood Data.** The requirements of Section 2.3.2.3.2 must be addressed. In partial acquisitions, this discussion should be clearly broken down into two subsections: before the acquisitions and after the acquisitions.

(8) **Zoning and Other Land Use Regulations.** Include a general discussion of the zoning and other land use regulations that affect all parcels in the report. General trends in land use regulations in the area and recent zoning activity should be discussed. In partial acquisitions, this discussion should be clearly broken down into two subsections: before the acquisitions and after the acquisitions.

(9) **Analysis of Highest and Best Use.** The general content requirements of Section 2.3.3 must be addressed. Inasmuch as all parcels in the report will have the same or similar highest and best use, the appraiser should discuss and develop the highest and best use of the parcels in this section. If, after in-depth analysis an appraiser determines that the highest and best use of a parcel is not the same as or similar to that of the other parcels to be included in the report, the unique parcel should be excluded from the project report and a separate narrative appraisal report should be prepared for this unique parcel in accordance with Section 2.3 of these Standards. In partial acquisitions, this discussion should be clearly divided into two subsections: before the acquisitions and after the acquisitions.

(10) **Discussion of Approaches to Value.** The appraiser should discuss the standard approaches to value and their applicability or non-applicability to the subject parcels in the project appraisal report. If any modification to the typical application of the approaches to value is required, such modification should be discussed. In partial acquisitions, this discussion should be clearly broken down into two subsections: before the acquisitions and after the acquisitions.

(11) **Land Valuation.** The appraiser should identify, describe, and discuss all comparable land sales that will be used in the individual parcel reports. A discussion of how the

comparable sales will be used in the individual reports can be included in this section of the report. Reference should be made to comparable sales data sheets, photos, and a comparable sales map, which shall be included in the addenda of the report.

Universal adjustments to the comparable sales should be discussed and developed in this section of the report. Adjustments classified as universal would include such adjustments as time (or market conditions), cash equivalency, and those adjustments that are not subject property dependent. Also, the general results of any study relating to land value (e.g., a size adjustment study) developed under item (15) (Special Studies) should be discussed. In partial acquisitions, this discussion should be clearly divided into two subsections: before the acquisitions and after the acquisitions.

If a parcel requires land valuation by means other than comparable sales, as a general rule that parcel is not appropriate for inclusion in a project report.

**(12)  Cost Approach.** The appraiser should describe the methodology used to develop reproduction or replacement cost and depreciation estimates. If a national cost service has been used in estimating reproduction or replacement costs, that publication should be specifically identified. If entrepreneur's profit has been included in reproduction or replacement cost, its derivation should be explained.

If depreciation studies using the market extraction or sales comparison method have been developed, their content and development should be discussed and the general conclusions reached should be reported. Discussion of partial acquisitions should be clearly divided into two subsections: before the acquisitions and after the acquisitions.

**(13)  Sales Comparison Approach.** The appraiser should identify, describe, and discuss all improved property comparable sales that will be used in the individual parcel reports. A discussion of how the comparable sales will be used in the individual reports can be included in this section of the report. Reference should be made to comparable sales data sheets, photos, and a comparable sales map, which shall be included in the addenda of the report. Universal adjustments to the comparable sales should be discussed and developed in this section of the report. Adjustments classified as universal would include time, market conditions, cash equivalency adjustments; i.e., those adjustments that are not subject property dependent. The discussion of partial acquisitions should be clearly divided into two subsections: before the acquisitions and after the acquisitions.

**(14)  Income Capitalization Approach.** The appraiser should identify, describe, and discuss all comparable rental properties to be used in the individual parcel reports. A discussion of how the comparable rentals will be used in the individual reports can be included in this section of the report. Reference should be made to comparable rental data sheets, photos, and a comparable rentals map, which shall be included in the addenda of the report.

Because a high degree of similarity exists between all individual parcels included in the project report, capitalization rates applicable to each should be the same or fit into a relatively narrow bracket. Therefore, the development of applicable capitalization rates should be presented in this section of the report. Discussion of partial acquisitions should be clearly broken down into two subsections: before the acquisitions and after the acquisitions.

**(15) Special Studies.** Present any special studies that are appropriate and apply to all, or most, of the individual parcels included in the project appraisal report. Such studies might include easement studies (the impact of easements on encumbered areas and abutting unencumbered areas), size adjustment studies, proximity studies (impact on remainder property values due to proximity to various public improvements), land lock studies, special benefit studies, and project influence studies. These studies may relate to the before situation, the after situation, or both, and are in addition to the capitalization rate, time or market conditions, entrepreneurial profit, depreciation, and cash equivalency studies previously mentioned.

## Part II—Individual Parcel Report

Each individual parcel report should contain the following information. In partial acquisitions, item (26) through (34) should be repeated in the after situation, which is further discussed in Section 2.3.4.

**(16) Title Page.** See Section 2.3.1.1 for content requirements.

**(17) Table of Contents.** See Section 2.3.1.3 for content requirements.

**(18) Appraiser's Certification.** See Section 2.3.1.4 for content requirements.

**(19) Summary of Salient Facts and Conclusions.** See Section 2.3.1.7 for content requirements.

**(20) Photographs of Subject Property.** See Section 2.3.1.6 for content requirements.

**(21) Statement of Assumptions and Limiting Conditions.** The appraiser should state that the assumptions and limiting conditions stated in item (5) of Part I of the project report are applicable to this parcel. If any additions, modifications, or deletions to the general assumptions and limiting conditions are necessary, they shall be noted.

**(22) Scope of Work.** The appraiser should state that the scope of work for this appraisal stated in item (6) of Part I of the project report is applicable to this parcel. If any additions, modifications, or deletions to the general discussion are necessary, they shall be noted.

**(23) Executive Summary.** The appraiser should discuss any specific appraisal problem unique to the individual subject parcel and briefly describe its treatment.

(24) **Legal Description.** See Section 2.3.2.1 for content requirements.

(25) **Area, City, and Neighborhood Data.** The appraiser should reference the area, city, and neighborhood data in item (7) of Part I of the project report, discuss the parcel's location within the neighborhood, and note any specific neighborhood factors uniquely affecting the subject parcel.

(26) **Property Data.**

    a.  <u>Site</u>. See Sections 2.3.2.3.1 and 2.3.4.3.1 for content requirements.
    b.  <u>Improvements</u>. See Sections 2.3.2.3.2 and 2.3.4.3.2 for content requirements.
    c.  <u>Fixtures</u>. See Sections 2.3.2.3.3 and 2.3.4.3.3 for content requirements .
    d.  <u>Use History</u>. See Sections 2.3.2.3.4 and 2.3.4.3.4 for content requirements.
    e.  <u>Sales History</u>. See Sections 2.3.2.3.5 and 2.3.4.3.4 for content requirements.
    f.  <u>Rental History</u>. See Sections 2.3.2.3.6 and 2.3.4.3.4 for content requirements.
    g.  <u>Assessed Value and Annual Tax Load</u>. See Sections 2.3.2.3.7 and 2.3.4.3.5 for content requirements.
    h.  <u>Zoning and Other Land Use Regulations</u>. The appraiser should reference the discussion of zoning and other land use regulations in Part I, item (8) of the project report. If additions, modifications, or deletions from that general discussion are required as they relate to the specific parcel, this should be noted.

(27) **Analysis of Highest and Best Use.** The appraiser should reference the discussion of highest and best use in item (9) of Part I of the project appraisal report and relate that discussion specifically to the subject parcel. The appraiser shall specifically state the highest and best use of the property, both in the before and after situations if a partial acquisition, and thoroughly explain the reasoning that led to the conclusion.

(28) **Land Valuation.** For content requirements, see Section 2.3.3.2. The appraiser should reference the data and discussion of land sales in item (11) of Part I of the project appraisal report and shall specifically identify which of those sales are most comparable to the parcel under appraisal and have been relied upon in developing an opinion of the parcel's value. A comparative analysis between each of the selected comparable sales and the subject property shall be included.

If adjustments are based on universal adjustments and/or studies discussed and developed in Part I of the appraisal, the discussion or study should be specifically referenced and related to the subject property.

(29) **Value Indication by the Cost Approach.** For content requirements, see Section 2.3.3.3. The appraiser should reference the general discussion of the cost approach in item (12) of Part I of the project report. If computations or estimates are based on studies discussed and developed in Part I of the project appraisal report, the studies should be specifically referenced and related to the subject parcel.

**5-ER-834**

(30) **Value Indication by the Sales Comparison Approach.** For content requirements, see Section 2.3.3.4. The appraiser should reference the data and discussion of the whole property sales in item (13) of Part I of the project appraisal report and shall specifically identify which of these sales are most comparable to the subject parcel and have been relied upon in developing an opinion of the parcel's value. A comparative analysis between each of the selected comparable sales and the subject property shall be included.

If adjustments are based on universal adjustments and/or studies discussed and developed in Part I of the project appraisal report, the discussion or study should be specifically referenced and related to the subject property.

(31) **Value Indication by the Income Capitalization Approach.** For content requirements, see Section 2.3.3.5. The appraiser should reference the data and discussion of whole property rentals in item (14) of Part I of the project appraisal report and shall specifically identify which of those rentals are most comparable to the subject parcel and have been relied upon in developing an opinion of the parcel's economic (or market) rent. A comparative analysis between each of the selected comparable rentals and the subject property shall be included.

If the capitalization rate selected for the subject property is based on studies discussed and developed in Part I of the project appraisal report, the study should be specially referenced and related to the subject property.

(32) **Reconciliation and Final Opinion of Value.** For content requirements, see Section 2.3.3.6.

(33) **Acquisition Analysis.** In a partial acquisition, the appraisal report shall include an analysis of the government's acquisition in accordance with the requirements of Section 2.3.6 of these Standards.

(34) **Exhibits and Addenda.** For content requirements, see Section 2.3.7 of these Standards.

 a. Location Map
 b. Comparable Data Maps. If the comparable data maps included in Part III of the project report are not clear enough to ensure complete understanding of the relationship between the subject property and the comparable data relied on in the individual parcel report, comparable data maps should be included in the addenda of the individual parcel reports.
 c. Details of Comparable Sales and Rental Data. Detailed comparable data sheets must be included in Part III of the project report. Those comparable data sheets relating to the specific comparable sales and/or rentals relied on in estimating the value of the individual parcel may also be included here for ease of reference.

    d.   <u>Plot Plan</u>

    e.   <u>Floor Plan</u>

    f.   <u>Title Evidence Report</u>

    g.   <u>Other Pertinent Reports and Exhibits</u>

### Part III—General Exhibits and Addenda

Exhibits and addenda items should relate to all or most of the parcels included in the project appraisal report. Exhibits and addenda items relating only to one or a small portion of the parcels appraised should be included in the addenda of the individual parcel reports.

**(35)** **Location Map.** (Within the city or area.) All maps should include a north arrow and the identification of the subject parcels.

**(36)** **Comparable Data Maps.** These maps might include, among others things, a comparable land sales map, a comparable improved sales map, and a comparable rentals map. The maps should include a north arrow that shows the locations of the comparable sales and/or rentals, and shows the parcels appraised. If this requires use of a map that is not of a readable scale, secondary maps showing the specific location of each comparable relied on in making the individual parcel appraisals should be included in the addenda of the individual parcel reports.

**(37)** **Detail of Comparable Sales and Rental Data.** See Section 2.3.7.

**(38)** **Other Pertinent Exhibits.** These would include, for example, any written instructions given the appraiser by the agency or its legal counsel relating to all parcels in the project report, such as environmental studies relating to all parcels; fixture, timber, and/or mineral appraisals relating to multiple parcels; and any charts or illustrations that may have been referenced in the body of the report and relate to all or most of the parcels in the project report.

**(39)** **Qualifications of Appraiser.**

# 3. APPRAISAL REVIEW

**3.1.**     **Introduction.** The appraisal review process in federal acquisitions should be developed and reported in conformity with these Standards, which are compatible with standards and practices of the appraisal profession and with the current edition of USPAP. This Section of the Standards addresses the types of reviews completed by government appraisers (technical reviews and administrative reviews) as well scope of work considerations.

**3.1.1.**     **Government Review Appraisers.** Government review appraisers are often assigned administrative duties in addition to the technical review of individual appraisal reports. Those administrative duties vary from agency to agency and may range from contract administration or counseling management for general valuation issues to assisting the agency to meet both its non-appraisal and appraisal obligations under the Uniform Act. Some of these duties may fall outside the scope of <u>valuation services</u> as defined in USPAP.[145] These administrative duties are also considered to fall outside the scope of these Standards and are therefore not covered in the following discussion.

The review of appraisal reports by a qualified reviewing appraiser is required. The federal regulations implementing the Uniform Act require agencies to have an <u>appraisal review process</u> that at a minimum requires the following:

(a)     A *qualified review appraiser* shall examine the presentation and analysis of market information in all appraisals to ensure that they meet all applicable appraisal requirements and support the appraiser's opinion of value. The level of review analysis depends on the complexity of the appraisal problem. As needed, the review appraiser shall, prior to acceptance, seek necessary corrections or revisions.

The review appraiser shall identify each appraisal report as *recommended* (as the basis for the establishment of the amount believed to be just compensation), *accepted* (meets all requirements, but not selected as recommended or approved), or *not accepted*.

If authorized by the agency to do so, the staff review appraiser shall also *approve* the appraisal (as the basis for the establishment of the amount believed to be just compensation), and if also authorized to do so, develop and report the amount believed to be just compensation.

(b)     If the review appraiser is unable to recommend (or approve) an appraisal as an adequate basis for the establishment of the offer of just compensation and it is determined by the acquiring agency that it is not practical to obtain an additional appraisal, the review appraiser may, as part of the review, present and analyze market information in conformance with § 24.103 to support a recommended (or approved) value.

---

145   USPAP, Definitions, 4.

5-ER-837

(c)   The review appraiser shall prepare a written report that identifies the appraisal reports reviewed and documents the findings and conclusions arrived at during the review of the appraisal(s). Any damages or benefits to any remaining property shall be identified in the review appraiser's report. The review appraiser shall also prepare a signed certification that states the parameters of the review. The certification shall state the approved value, and if the review appraiser is authorized to do so, the amount believed to be just compensation for the acquisition.[146]

Federal agencies have adopted various policies and rules to implement these regulations.[147] Therefore, review appraisers should refer to the agency-specific review standards for a detailed discussion of appraisal review requirements. Agency appraisal review standards generally set appraisal review requirements from USPAP as minimum appraisal review standards.

In accordance with agency requirements, prior to approving an appraisal of property having more than nominal value, the review appraiser for each agency should prepare a written review report indicating the scope of work for the review and the reviewer's analysis and support for the action recommended. It is the review appraiser's responsibility to determine whether the appraisal is adequately supported, complies with recognized appraisal principles and practices, complies with the appraiser's contract (or assignment letter) and these Standards, and conforms to all governing legal premises prescribed by written **legal instruction**.

Appraisals provided by an agency to the U.S. Department of Justice in support of a request to initiate condemnation proceedings shall be reviewed by the Appraisal Unit of the Department. It is the responsibility of the Appraisal Unit to ensure that credible, reliable, and accurate appraisals are available for litigation purposes, including settlement negotiations and trial. In this regard, the Appraisal Unit shall confirm both technical conformance with these Standards and the reasonableness of the appraiser's opinion of value. In addition, the Appraisal Unit shall determine the suitability of the appraisal report for trial purposes: it will identify weaknesses and strengths of the report under review and recommend actions that the government's appraiser and/or trial counsel can take prior to trial to improve the appraisal report and provide better support for its conclusions. Appraisal reports may be found to be unsuitable for trial purposes even if they are in technical conformance with these Standards and the appraiser's opinion(s) of value are reasonable.[148] Due to the intended use and intended user of these appraisal reviews, review appraisers within the Appraisal Unit shall not develop their own independent opinions of value.

**3.1.2.**   **Contract Review Appraisers.** Some agencies may have the authority to engage a qualified non-agency review appraiser to review an appraisal report.  In most instances the contract review appraiser will be bound by the requirements discussed in Section 3.1.1 above and Section 3.2 below. But different requirements may apply in some instances (e.g., review

---

146  49 C.F.R. § 24.104(a)-(c); *see also* 49 C.F.R. § 24.103(d)(1) (requiring agencies to establish qualifications for review appraisers) and app. A, § 24.104 (review of appraisals).

147  *E.g.*, U.S. Dept of Agric., Forest Service Manual FSM § 5400 (2005) and Forest Service Handbook FSH 5409.12 (2006); U.S. Army Corps of Eng'rs, Real Estate Engineer Regulations, EC 405-1-04 (2016).

148  For instance, a prior appraisal of the same property by the appraiser, which may have been provided to the property owner by the agency during the negotiating process or may be subject to discovery, may have contained inconsistent or erroneous conclusions and if brought to light during trial, could undermine the credibility of the appraiser and the ultimate opinion(s) of value and testimony.

appraisers engaged as rebuttal experts). Not all agencies have authority to engage non-agency review appraisers. Refer to specific agency regulations, guidelines, and authorities.

### 3.1.3. Rebuttal Experts.

Contract review appraisers may be engaged as rebuttal experts in litigation. *Rebuttal* is a legal term meaning evidence introduced by a party to meet new facts brought out in the opponent's case in chief.[149] Its function is to "explain, repel, counteract or disprove evidence of the adverse party."[150]

> **In federal condemnation cases, proper rebuttal of an appraisal report typically addresses flaws in the appraiser's data and basic assumptions, but does not itself contain an independent opinion of value.** *E.g. United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1141 (9th Cir. 1999).

Rebuttal experts are typically engaged by the Department of Justice in condemnation trial proceedings to contradict or rebut the analysis and conclusions of another appraiser. As a rebuttal expert, a review appraiser may be asked to review an entire appraisal report or to focus on a specific element of an appraisal (for example, the quality and reasonableness of the highest and best use conclusion or a specific approach to value employed).

Review appraisers who prepare rebuttal reports for federal litigation purposes must comply with USPAP and the Federal Rules of Civil Procedure, particularly Rule 26(a)(2) regarding expert reports.[151] As with all assignments, review appraisers must never allow the assignment conditions or a client's objectives to cause the results of a rebuttal assignment to be biased or not credible.[152]

### 3.2. Types of Appraisal Reviews.

Federal acquisitions generally involve two types of agency appraisal reviews: a technical review, which can only be developed and reported by an appraiser, and an administrative (or compliance) review, which may be performed by a non-appraiser.[153]

A <u>technical review</u> is developed and reported by an appraiser in accordance with these Standards, which require conformity with USPAP and with agency polices, rules, and regulations. In completing a technical review, the review appraiser renders opinions on the quality of an appraisal report and whether the opinion(s) of value are adequately supported and in compliance with all appropriate standards, laws, and regulations relating to the appraisal of property for federal acquisition purposes. In addition, as a part of a technical review, the review appraiser may reach a conclusion regarding whether to approve (or recommend approval of), modify, or not accept or modify the conclusions presented in the appraisal report under review. If appropriate to the assignment, the agency review appraiser performing a technical review may render a separate opinion of value. However, if the review appraiser renders a separate opinion of value, the value opinion must be developed and reported in accordance with the appraisal development and content requirements for these Standards. The development of such opinions and further review

---

149  *Morgan v. Commercial Union Assurance Cos.*, 606 F.2d 554, 555 (5th Cir. 1979).

150  *United States v. Finis P. Ernest, Inc.*, 509 F.2d 1256, 1263 (7th Cir. 1975), *cert. denied*, 423 U.S. 893.

151  *See Standard 2.2.3 for an explanation of the requirements under Rule 26 of the Federal Rules of Civil Procedure.*

152  USPAP, Scope of Work Rule, 14-15.

153  USPAP formerly included guidance discussing both types of review in Advisory Opinion 6 (AO-6), which was retired in 2004. While USPAP no longer addresses administrative reviews, they continue to be a useful tool for many agencies to ensure quality control and inform agency decisions, among other purposes.

of the initial reviewer's opinion of value and the support therefore may also be subject to the pertinent agency's policies, rules, and/or regulations.

An <u>administrative review</u> may be performed by an appraiser or a non-appraiser and is sometimes referred to as a compliance review. The content and scope of an administrative review will vary with the intended use and intended user of the administrative review. Some federal agencies have specific policies regarding the development and use of administrative reviews. An administrative review may include confirmation that the appraisal report conforms to contract/assignment letter requirements and to applicable federal law for federal land acquisition appraisals, and/or that the report includes a signed certification stating that the report has been prepared in compliance with these Standards. The administrative reviewer may also verify if the correct subject property has been appraised, if photographs of the subject property and comparable market data are included, if the analyses reflect the government's most recent project plans, and if the factual data and the mathematics presented in the appraisal report are correct. The administrative reviewer shall not, however, form an opinion regarding the quality of the analysis, judgment, or opinion(s) of value contained within the appraisal report under review.[154] As such, administrative reviews do not meet the requirements of 49 C.F.R. § 24.104. Administrative reviewers often use a checklist as a guide in making their determinations; a model checklist is provided in the Appendix of these Standards for convenience.[155]

### 3.3. Problem Identification.
The research and analyses necessary to develop credible assignment results will vary depending on the scope of work for an appraisal review assignment.  For example, technical reviews may be conducted as either desk reviews or field reviews. In addition to confirmation that the report was prepared in accordance with these Standards, a desk review involves a thorough review and analysis of the information and analysis contained in the appraisal report under review and a careful examination of the internal logic and consistency. In a desk review, the review appraiser limits the examination to the information and analysis presented within the appraisal report. The data contained within the appraisal report may or may not be confirmed and the review appraiser may or may not identify additional comparative market data.

The most significant difference between a desk review and a field review is the level of evaluation accorded the factual data presented in the appraisal report. A field review always requires at least an exterior field inspection of the subject property and often of the properties used as comparable data in the appraisal report. In addition, the data contained within the appraisal report is usually independently confirmed during the review process. A field review may be used to obtain additional market data beyond that provided by the appraiser or to resolve factual differences between two appraisals with divergent market value estimates. The field review represents the highest level of due diligence within the appraisal review practice.

---

154  If the administrative reviewer is an appraiser and forms an opinion regarding the analysis, judgment, or opinion(s) of value contained in the appraisal report, the review becomes a technical review and falls under the requirements of Standard 3 of USPAP. If appraisers complete a compliance review they must still comply with the portions of USPAP related to appraisal practice such as the Definitions, Preamble, Ethics Rule, Competency Rule, and Jurisdictional Exception Rule.

155  This checklist is not intended to be used as part of a technical appraisal review and is included merely for easy reference by appraisers and reviewers.

The appropriate scope of work to be performed within the review process may be based on the dollar value of the property and/or the complexity of the valuation problem, as dictated by the regulatory and policy requirements of the acquiring agency. The degree of controversy surrounding a particular acquisition (or the agency's project generally) may also play a role in determining the scope of work.

It is critical that the review appraiser clearly identify the precise scope of work and extent of the review process for each appraisal review assignment. Terms such as <u>administrative</u> or <u>technical review</u>, <u>desk review</u> and <u>field review</u> may not be understood by all users or readers of the review, and require precise definition if used. This can be done while disclosing the mandatory assignment elements for a scope of work[156] that are outlined in sections 3.3.1 through 3.3.7 below.

If an appraisal review results in a request for corrective action by the appraiser, the review appraiser should maintain a complete file memorandum of the results of the preliminary review and the requested corrective action. The practice of maintaining only the final corrected appraisal report and the final review thereof should be avoided.

3.3.1.    **Client.** The review appraiser must identify who engaged the review appraiser to perform the appraisal review assignment together with all relevant contact information for the client(s).

3.3.2.    **Intended Users.** The review appraiser must disclose the review appraiser's understanding of who intends to use the appraisal review assignment results.

3.3.3.    **Intended Use.** The review appraiser must disclose the review appraiser's understanding of the intended use of the appraisal review assignment results by both the client and intended users.

3.3.4.    **Type of Opinion.** The review appraiser must disclose the type of opinion being rendered, which in an appraisal review assignment is generally an opinion about the quality of the appraisal work under review. If applicable, the review appraiser should discuss the actions to be taken in accordance with the implementing regulations of the Uniform Act (e.g., accept, approve, or not accept the appraisal, etc.).

3.3.5.    **Effective Date.** The date of the review appraiser's report will normally reflect the effective date of the review appraiser's opinions and conclusions. The appraisal review report must clearly disclose the date of the report and the effective date of the appraisal under review.

3.3.6.    **Subject of the Assignment.** An appraisal review must identify what is being reviewed by the review appraiser. Typically, this will be an appraisal report so the review appraiser must provide identifying details relating to the report under review, its author(s), the subject of the report, etc. However, review appraisers should also recognize that a specific scope of work may call for a review to include the workfile for the appraisal assignment, just a portion of the appraisal report, or any combination of these items.

---

156   USPAP, Scope of Work Rule, <u>Problem Identification</u> section, 14.

**3.3.7.** **Assignment Conditions.** The type and extent of research and analyses undertaken as part of the appraisal review process must be clearly identified. If the review appraiser required significant assistance in arriving at conclusions, then the extent of that assistance should be summarized in the scope of work together with the names of those providing assistance (which must also be stated in the certification). Other assignment conditions to be discussed can include assumptions, extraordinary assumptions, hypothetical conditions, laws and regulations, or other conditions that affect the scope of work. Care should be taken to focus on assignment conditions applied to the appraisal review assignment itself and not just those adopted in the report that has been reviewed.

**3.4.** **Responsibilities of the Review Appraiser.** Like the appraiser, review appraisers must remain objective in their appraisal review activities. They cannot let agency goals or adversarial pressure influence their opinions of an appraisal report's appropriateness or of the value opinion(s) it reports, nor can they let their personal opinions regarding an agency's proposed acquisition enter into the review process. Also, review appraisers should not attempt to substitute their judgment for that of the appraiser unless they are willing and able to develop their own opinions of value and become the appraiser of record.

Review appraisers must recognize that technical deficiencies can be found in nearly every appraisal report. However, minor technical nonconformance with these Standards or USPAP Standards should not be the reason to not accept an appraisal report, unless the deficiency affects the credibility of the opinion of value, or the opinion of value itself. Minor technical nonconformance with these Standards should never be used as an excuse to not accept a report if the underlying reason for not accepting it is the review appraiser's differing opinion of the market value of the property appraised.

In conducting an appraisal review the review appraiser must:

- Identify the scope of work performed in the review consistent with the seven elements described above under problem identification.

- Develop an opinion as to the completeness of the appraisal report under review within the scope of work applicable to the appraisal assignment, which shall include these Standards.

- Develop an opinion as to the adequacy and relevance of the data and the adequacy of market support for any adjustments to the data.

- Develop an opinion as to the appropriateness of the appraisal methods and techniques used and describe the reasons for any disagreements.

- Develop an opinion as to whether the analyses, opinions, and conclusions in the appraisal report under review are appropriate, reasonable, and adequately supported by market data and describe the reasons for any disagreement.

5-ER-842

- Prepare an appraisal review report in compliance with agency policies, rules, and regulations and in accordance with these Standards, which include USPAP.

3.5. **Review Appraiser Expressing an Opinion of Value.** If a review appraiser cannot accept or recommend approval of an appraisal report reviewed for Uniform Act purposes and it is determined that it is not practical to obtain an additional appraisal, the review appraiser may be authorized to develop an independent opinion of value.[157] Various federal agencies have adopted policies, rules, and procedures that regulate the circumstances in which a reviewing appraiser may develop an independent opinion of value and become the agency's appraiser of record.[158]

The review appraiser may recommend, accept, or not accept an appraisal report based upon compliance with these Standards and the appropriateness of the methods and analyses employed in the appraisal report. Such actions do not constitute an opinion of value on the part of the review appraiser, nor do they infer that the reviewing appraiser has taken ownership of, or is responsible for, the value opinion expressed in the appraisal report under review.

When it is appropriate for a review appraiser to develop an opinion of value and become the appraiser of record, that value opinion must be supported and documented in accordance with these Standards. This does not require the review appraiser to replicate the steps completed by the original appraiser. The data and analysis that the reviewer determined to be credible and in compliance with these Standards can be incorporated by reference into the review appraiser's review report using an extraordinary assumption.[159] Those portions of the appraiser's report that the reviewer determined not credible or inconsistent with these Standards must be replaced in the review report with additional data and analysis by the review appraiser.[160] The reviewer may use additional information that was not available to the original appraiser, but under such circumstances the effective date of the reviewer's opinion of value will generally be later in time than the effective date of the original appraiser's opinion of value. Therefore, in most cases, the original appraiser's opinion of value generally cannot be compared directly to the reviewer's later opinion of value for any legitimate purpose.

3.6. **Review Appraiser's Use of Information Not Available to Appraiser.** The scope of work for an appraisal review assignment involving a federal acquisition typically exceeds that of the usual appraisal review because Uniform Act regulations require the reviewer to determine whether the appraisal report under review can be the basis for the establishment of an offer of just compensation.[161] In making that determination, the review appraiser may need to consider information that was not available to the appraiser who prepared the

---

157 Under 49 C.F.R. § 24.104, the independent opinion of value must be developed and reported in accordance with the appraisal criteria set forth in 49 C.F.R. § 24.103.

158 Some of those policies, rules, and procedures may require invocation of USPAP's Jurisdictional Exception Rule. If so, reviewers must specifically identify the jurisdictional exception and the section(s) of USPAP to which it applies and include that information in the appraisal review report.

159 The extraordinary assumption would be to assume that the facts relied upon and reported by the original appraiser that are incorporated into the reviewer's report are accurate.

160 While this procedure may produce a report suitable for the establishment of an offer of just compensation under 49 C.F.R. § 24.104, it would not, of course, produce a report suitable for litigation purposes.

161 *See* 49 C.F.R. § 24.104(a)-(c).

5-ER-843

appraisal report under review.[162] In light of the intended use (i.e., establishing a basis for offer of just compensation) and intended user (i.e., agency management), the reviewer is required to consider all available information in making a recommendation. A recommendation based on outdated or incomplete information would fail to meet the agency's obligation to determine a *current* offer of just compensation, and would not conform to the intent of the Uniform Act and its implementing regulations.

Consideration of information not available to the original appraiser is also consistent with USPAP requirements.[163] The current USPAP document expressly contemplates that review appraisers may need to consider such information to produce credible assignment results:

> Information that should have been considered by the original appraiser can be used by the reviewer in developing an opinion as to the quality of the work under review.

> Information that was not available to the original appraiser in the normal course of business may also be used by the reviewer; however, the reviewer must not use such information in the reviewer's development of an opinion as to the quality of the work under review.[164]

Accordingly, a review appraiser's use of subsequent information necessary to produce credible assignment results for the scope of work does not require a jurisdictional exception to USPAP. Of course, an appraisal reviewer may find that an appraisal report under review was prepared in accordance with these Standards and that the opinion of value reported was reasonable and reliable as of the effective date of the appraisal, and yet still find that the opinion of value is unreliable as the basis for an offer to purchase by the government because of changed circumstances or new information that has become available. In such an instance, the review appraiser must clearly explain all pertinent findings in the review report to avoid any impression that the appraisal report under review was not accepted because of its quality or the reasonableness of the opinion of value as of the effective date of the appraisal. In these circumstances, some agency reviewers *accept* but do not *approve* the appraisal report.

3.7.    **Review Reporting Requirements.** Oral appraisal review reports are contrary to Uniform Act regulations and these Standards. Therefore, oral appraisal review reports as the end-result or final conclusion of an appraisal review assignment are not permitted. However, an oral appraisal review may be reported if the scope of work for an appraisal review assignment requires an oral review to be conducted in advance of a final written appraisal review report and there is adequate support for the oral review in the review appraiser's workfile for the assignment.

These Standards do not require a specific review report format or structure. A number of federal agencies have required or recommended formats for review reports to provide consistency and

---

162  Information not available until after completion of the original appraisal report might include additional market activity that occurred after the effective date of the appraisal, a change in the estate to be acquired by the government, information from other appraisals of different properties by different appraisers for the same project, or information that became available as a result of negotiations or though the discovery process in litigation.

163  Previously, USPAP was more restrictive of review appraisers' consideration of information not available to the appraiser. Compare USPAP Standards Rule 3-1(c) (2000 ed.) with USPAP Standards Rule 3-2(g) (2016-2017 ed.). But USPAP has since been updated to allow reviewers "broad flexibility and significant responsibility in determining the appropriate scope of work in an appraisal review assignment."

164  USPAP, Comment to Standards Rule 3-2(g), 31.

efficiency in the review reporting process. Review appraisers for these agencies should, of course, be familiar with and follow these agency-required or recommended formats. Irrespective of the review report format, all appraisal review reports must be in writing and contain, at a minimum, the following:

- Identification of the client and intended users of the review report, the intended use of the review, and the purpose of the review assignment;

- Identification of the appraisal report under review, the date of the review report, the property and ownership interest appraised in the report under review, the date of the report under review and the effective date of the value opinion(s) reported, and the names of the appraisers that completed the report under review; and

- Description of the scope of work performed in the review;

- Statement of opinions, reasons, and conclusions reached concerning the appraisal report under review; and

- Review appraiser's signed certification, in accordance with these Standards and USPAP.

The scope of work undertaken in the review assignment must be adequately described so that the intended user of the review report will understand the type and level of review completed.

**3.8.** **Certification.** The technical appraisal review report shall include the reviewing appraiser's signed certification statement consistent with the certification requirements in Standard 3 of the current edition of USPAP and the following statements related to these Standards:

- The appraisal review was developed and the review report prepared in conformity with the *Uniform Appraisal Standards for Federal Land Acquisitions*.

- My analyses, opinions, and conclusions were developed and this review report was prepared in conformity with the *Uniform Standards of Professional Appraisal Practice*, and complies with those areas of the *Uniform Appraisal Standards for Federal Land Acquisitions* that might require invocation of USPAP's Jurisdictional Exception Rule (see scope of work for details).

- Review appraisers should also include any additional certification statements required by professional organizations in which they are members.

5-ER-845

# 4. LEGAL FOUNDATIONS FOR APPRAISAL STANDARDS

4.1.   **Introduction to Legal Foundations.** This Section explains the legal foundations for Sections 1, 2, and 3. It is written for both lawyers and non-lawyers—including appraisers, who must correctly apply federal law in the development, reporting, and review of market value appraisals in federal acquisitions. This Section discusses the legal standards that govern many recurring valuation problems, and provides guidance on specialized appraisal issues that are unique to federal acquisitions. The legal foundations discussed here hold significance even for those who are not bound to follow these Standards but must adhere to the federal law these Standards summarize and explain.

4.1.1.   **Requirement of Just Compensation.** Federal acquisitions entail different appraisal standards than other types of valuation problems because they involve payment of just compensation, and the meaning of just compensation is a question of substantive right "grounded upon the Constitution of the United States."[165] Because only the United States Supreme Court can make binding interpretations of the Constitution,[166] questions with respect to just compensation must be resolved under federal common law—that is, case law.[167] These questions most frequently arise in federal condemnation cases. As the Supreme Court observed: "Our jurisprudence involving condemnations…is as old as the Republic and, for the most part, involves the straightforward application of *per se* rules."[168] Those rules form the basis of these Standards. While most of the case law cited in these Standards stems from the federal exercise of eminent domain, just compensation must be paid in many other types of federal acquisitions, whether or not condemnation may be involved.[169]

> ". . . nor shall private property be taken for public use, without just compensation."
>
> – U.S. Constitution, amendment v

These Standards explain the valuation requirements that apply to all federal acquisitions involving "the measure of compensation…grounded upon the Constitution of the United States."[170] The underlying principles of just compensation remain in force even if special legislation or other considerations may require exceptions to certain aspects of these Standards. Where just compensation is concerned, a reliable process is necessary to ensure a just result,[171] "and it is the duty of the state, in the conduct of the inquest by which the compensation is ascertained, to see

---

165   *United States v. Miller,* 317 U.S. 369, 380 (1943); U.S. CONST. amend. v.

166   *Marbury v. Madison,* 5 U.S. 137 (1803).

167   *Miller,* 317 U.S. at 380; *Norfolk Redev. & Hous. Auth. v. Chesapeake & Potomac Tel. Co.,* 464 U.S. 30, 36 (1983); *see United States v. New River Collieries Co.,* 262 U.S. 341, 343-44 (1923); *Kohl v. United States,* 91 U.S. 367, 376-77 (1875).

168   *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 322 (2002); *cf.* 1 LEWIS ORGEL, VALUATION UNDER THE LAW OF EMINENT DOMAIN v (2d ed. 1953) [hereinafter ORGEL] ("eminent domain furnishes perhaps the richest case law on the valuation of real property[, giving the] subject a significance even for [those] who may never be faced with a condemnation case").

169   *See* ORGEL, *supra* note 191, at v; *see, e.g.,* Uniform Act, § 301, 42 U.S.C. § 4651.

170   *Miller,* 317 U.S. at 380.

171   *Rasmuson v. United States,* 807 F.3d 1343, 1346 (Fed. Cir. 2015) (vacating compensation award based on valuation that applied incorrect methodology under federal law).

---

that it is just, not merely to the individual whose property is taken, but to the public which is to pay for it."[172]

**4.1.2.** **Market Value: The Measure of Just Compensation.** To ensure a fair, objective and practical standard, federal courts have long held that market value is normally the measure of just compensation.[173] The market value measure "has an external validity which makes it a fair measure of public obligation to compensate the loss incurred by an owner as a result of the taking of his property for public use."[174] The "appraiser's function is to assist…in [the] determination of just compensation by furnishing an opinion of market value."[175] Opinions of market value for federal acquisition purposes must follow federal law to provide a fair measure of just compensation. Otherwise, "a finding on the value of a [property interest] that 'is derived from the application of an improper legal standard to the facts' must be remanded for new factual findings for application of the correct legal standard."[176]

**4.1.3.** **Federal Law Controls.** Just compensation is determined in accordance with federal rather than state law.[177] Both appraisers and attorneys must correctly apply federal law as it affects the appraisal process in the estimations of market value, recognizing that federal and state laws differ in important respects. Appraisals for federal acquisitions must follow the appropriate legal standards.[178] Most appraisals for federal acquisitions involve straightforward application of established legal standards to the facts.[179] But some valuation problems require nuanced **legal instructions** to address complicated or undecided questions of law.[180] If the correct legal standard is unclear, agencies may find it prudent to procure a dual-premise appraisal.[181]

Federal courts have jurisdiction to determine title (ownership) questions in federal condemnation proceedings, but sometimes refer to state law in resolving the nature of property rights acquired.[182] The United States Supreme Court has stated that "[t]hough the meaning of 'property'…in the Fifth Amendment is a federal question, it will normally obtain its content by

---

172 *Bauman v. Ross*, 167 U.S. 548, 574 (1897); *Searl v. Sch. Dist. in Lake Cty.*, 133 U.S. 553, 562 (1890); *cf. Kelo v. City of New London*, 545 U.S. 469, 489 n.21 (2005) (noting importance of "questions about the fairness of the measure of just compensation").

173 *E.g., Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2432 (2015); *United States v. 50 Acres of Land* (*Duncanville*), 469 U.S. 24, 29 (1984); *Miller*, 317 U.S. at 374; *Olson v. United States*, 292 U.S. 246, 255 (1934); *Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 407-08 (1878).

174 *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949).

175 EATON, *supra* note 16, at 19-22 ("[A]ppraisers are experts in estimating value, not just compensation.").

176 *Rasmuson*, 807 F.3d at 1345 (quoting *Walther v. Sec'y of Health & Human Servs.*, 485 F.3d 1146, 1152 (Fed. Cir. 2007)); *cf. Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 149-50 (1997) (Breyer, J., concurring) (observing that subjecting expert opinions to appropriate legal standards "will help secure the basic objectives of . . . the ascertainment of truth and the just determination of proceedings" (citing FED. R. EVID. 102)); *Olson*, 292 U.S. at 257 ("[T]o allow mere speculation and conjecture to become a guide for the ascertainment of value [is] a thing to be condemned in business transactions as well as in judicial ascertainment of truth.").

177 *United States v. Miller*, 317 U.S. 369, 379-80 (1943) ("We need not even determine what is the local law . . . [on] the measure of compensation,—grounded upon the Constitution of the United States.").

178 *Cf. Rasmuson*, 807 F.3d at 1345.

179 *Kimball Laundry*, 338 U.S. at 4; *cf. Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2432 (2015); *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002).

180 *See Kimball Laundry*, 338 U.S. at 4 ("novel and serious questions in determining what is 'just compensation' are not resolved by the familiar formulas available for the conventional situationswhich gave occasion for their adoption").

181 *See, e.g., United States v. Eastman* (*Eastman III*), 714 F.2d 76, 77 (9th Cir. 1983), *adopting* 528 F. Supp. 1177 (D. Or. 1981), and aff'g 528 F. Supp. 1184, 1184 (D. Or. 1981) ("dual set of findings" of market value so that "if the Court of Appeals reverses my preliminary [legal] ruling, it may then evaluate the correctness of the alternative finding"); *see United States v. Reynolds*, 397 U.S. 14, 15 (1970) ("There being a conflict between the circuits on this question, we granted certiorari to consider a recurring problem of importance in federal condemnation proceedings.").

182 *See United States v. Causby*, 328 U.S. 256, 266 (1946); *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 279 (1943); *United States v. 0.073 Acres of Land* (*Mariner's Cove*), 705 F.3d 540, 544 (5th Cir. 2013); *United States v. 79.31 Acres of Land*, 717 F.2d 646, 647-48 (1st Cir. 1983); *United States v. 1,629.6 Acres of Land in Sussex Cty.* (*Island Farm III*), 503 F.2d 764, 766-67 & n.3 (3d Cir. 1974).

---

5-ER-847

reference to local law."[183] It is also established that the United States can acquire any property interest it deems necessary, whether or not the interest is recognized under state laws.[184] Federal law is "wholly applicable" to condemnations by federal agencies,[185] controlling procedural as well as substantive matters under Rule 71.1 of the Federal Rules of Civil Procedure.[186]

### 4.1.4. Defining Property Interests.

An appraiser cannot develop an opinion of market value for just compensation purposes without knowing what, exactly, the United States will acquire.[187] A legal description identifies a property's precise physical or geographic location. The property interest or interests to be acquired must be described with equal precision. The nature and extent of any property interest being acquired is determined by the acquiring agency, as delegated by Congress—not the appraiser, the landowner, or the courts.[188] Under federal title regulations, the property interest must be sufficient for the government's purpose in acquiring it,[189] balanced against "the Government's natural desire and duty to deplete the public purse no further than necessary in carrying out its projects"[190] and other considerations that may be imposed by specific statutes and regulations. "Of course, payment need only be made for what is taken, but for all that the Government takes it must pay."[191] It is therefore critical for the agency to carefully and precisely define the property interest(s) being acquired and expressly state what interest(s), if any, will remain with the landowner.[192]

> **An underline interest is a legal share in property, such as a right to possess, use or convey it to another. An estate is the amount, degree, nature, and quality of a person's interest in property. The broadest possible estate is fee simple absolute (often shortened to fee simple or fee).**

Agencies are well advised to follow the maxim "measure twice, cut once" in defining the property interests to be acquired. An opinion of market value can only be used for just compensation

---

183  *Powelson*, 319 U.S. at 279; *cf. Rogers v. United States*, 814 F.3d 1299, 1307-08 (Fed. Cir. 2015) and *Rogers v. United States*, 184 So.3d 1087, 1090 (Fla. 2015) (Federal Circuit's certification of property law question to Florida Supreme Court). But this does not mean "that every local idiosyncrasy . . . will be accepted." *Nebraska v. United States*, 164 F.2d 866, 868 (8th Cir. 1947).

184  *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 604 (1973); *United States v. Certain Interests in Prop. in Champaign Cty.*, 271 F.2d 379, 384 (7th Cir. 1959); *see United States v. 32.42 Acres of Land in San Diego Cty.*, 683 F.3d 1030, 1039 (9th Cir. 2012) ("Having paid just compensation, the United States is entitled to the interest it sought.").

185  *United States v. 93.970 Acres of Land* (*Illinois Aircraft*), 360 U.S. 328, 332-33 & n.7 (1959).

186  Rule 71.1 (formerly Rule 71A) ended the use of state procedures in federal condemnations in 1951, establishing "a uniform set of procedures governing federal condemnation actions." *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 3-4 & n.2 (1984) (discussing Rule 71A); FED. R. CIV. P. 71.1. However, condemnations by pipeline companies under the Natural Gas Act are governed by state law in some circuits. *E.g., Rockies Express Pipeline LLC v. 4.895 Acres of Land*, 734 F.3d 424, 429-30 (6th Cir. 2013); *but see, e.g., S. Nat. Gas Co. v. Land, Cullman Cty.*, 197 F.3d 1368 (11th Cir. 1999) (applying federal procedural law); *see also Portland Nat. Gas Transmission Sys. v. 19.2 Acres of Land*, 318 F.3d 279, 282 n.1 (1st Cir. 2003) ("Perhaps surprisingly, several circuits [apply] state substantive law as well as formal practice [in Natural Gas Act condemnations].". Cases decided on state law grounds are not applicable to federal acquisitions, in which compensation must be determined under federal law. *United States v. Miller*, 317 U.S. 369, 379-80 (1943).

187  *See United States v. Causby*, 328 U.S. 256, 268 (1946) ("Since [the terms of the property interests acquired are] not clear…, it would be premature for us to consider whether the amount of the award…was proper."); *United States v. 21.54 Acres of Land in Marshall Cty.*, 491 F.2d 301, 305 (4th Cir. 1973) (discrepancies in legal description of easement boundaries required determination "whether the government has, in fact, accurately described the land in which it intends to take easements").

188  *See Berman v. Parker*, 348 U.S. 26, 35-36 (1954); *Shoemaker v. United States*, 147 U.S. 282, 298 (1893); *United States v. Gettysburg Elec. Ry. Co.*, 160 U.S. 668, 685 (1896); *United States v. 3,218.9 Acres of Land in Warren Cty.*, 619 F.2d 288, 291 (3d Cir. 1980); *cf. United States v. Meyer*, 113 F.2d 387, 392 (7th Cir. 1940) (citing cases); *United States ex rel. Tenn. Valley Auth. v. Russell*, 87 F. Supp. 386, 389 (E.D. Tenn. 1948) (citing cases).

189  Regulations of the Attorney General Governing the Review and Approval of Title for Federal Land Acquisitions (2016); *cf. United States v. City of Tacoma*, 330 F.2d 153, 155, n.6 (9th Cir. 1964) (noting Attorney General could not "render . . . a written opinion as to the validity of the Government's title, without noticing the very serious impediment on that title left undecided by the judgment" of the lower court).

190  *See United States v. 62.17 Acres of Land in Jasper Cty.*, 538 F.2d 670, 676 (5th Cir. 1976); *cf. United States ex rel. Tenn. Valley Auth. v. Welch*, 327 U.S. 546, 554 (1946) ("The cost of public projects is a relevant element in all of them, and the government, just like anyone else, is not required to proceed oblivious to elements of cost.").

191  *United States v. Dickinson*, 331 U.S. 745, 750 (1947).

192  *See Causby*, 328 U.S. at 268; *see also* Sections 4.6, 4.7, and 4.8.

purposes if it reflects the market value of the precise property interest being acquired.[193] If an appraiser is provided an incorrect or outdated property interest, the resulting opinion of market value—no matter how well supported—will be of little or no use for purposes of just compensation.[194] Moreover, in condemnation, agencies must stand by and pay compensation for the stated terms of the property interest taken.[195] If those terms are not carefully defined, a condemning authority may well "'discover[ ] that the judgment it won gave it more of a title than it wanted to pay for,' but it must pay for what it won nonetheless."[196]

> **Measure Twice, Cut Once**
>
> An opinion of market value can be useful for just compensation purposes only if it reflects the market value of the precise property interest to be acquired.
>
> **Agencies** must carefully define the interest(s) to be acquired and expressly state what interests (if any) will remain with the landowner.
>
> **Appraisers** must ensure they understand the precise property interest(s) invloved and request **legal instruction** to clarify any uncertainty.

**4.1.5.   About the Sixth Edition.** As noted, this is the sixth edition of the *Uniform Appraisal Standards for Federal Land Acquisitions*. With the passage of 16 years since publication of the previous edition, some topics of great importance in past decades have become less significant, and some issues that were controversial or unsettled have been resolved by the courts. Of course, some valuation problems remain as vital today as in years past. And while the underlying legal principles are unchanged, recent court rulings contain practical examples of how to apply the underlying law to actual valuation problems. Therefore, this Section includes case studies and citations to instructive court opinions. Most of these citations are eminent domain cases, which are often difficult to distinguish by case name.[197] To assist the reader, frequently cited cases include common names or reference a distinctive property location, landowner name, or public project for which property was acquired.[198] A table of all cases and other authorities cited in these Standards is included in the Appendix.

**4.2.   Market Value Standard.** Under established law, the measure of just compensation is the market value of the property acquired. As stated by the United States Supreme Court, just compensation "means in most cases the fair market value of the property on the date it is appropriated. Under this standard, the owner is entitled to receive what a willing buyer would pay in cash to a willing seller at the time of the taking."[199] The Supreme Court has often repeated this "clear and administrable rule for just compensation: 'The court has repeatedly

---

193  *See Causby*, 328 U.S. at 268; *Benecke v. United States*, 356 F.2d 439, 441 (5th Cir. 1966) (remanding for new trial where appraisal witnesses "valued somewhat less than the entire tract" actually taken).

194  As a result, in the appraisal review process under the Uniform Act, an appraisal may be *accepted* as meeting applicable standards but not *recommended* or *approved* as a basis for establishing just compensation, and the agency may need to obtain an additional appraisal. *See* Section 3.

195  *See, e.g., Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15, 19-21 (5th Cir. 1969) (proper to measure compensation based on actual easement language in pleadings, not condemnor's assertions that landowner would be allowed to make more extensive use of remainder).

196  *Vector Pipeline, L.P. v. 68.55 Acres of Land*, 157 F. Supp. 2d 949, 958 (N.D. Ill. 2001); *see United States v. Dickinson*, 331 U.S. 745, 750 (1947).

197  Federal condemnation cases are generally styled (named) as United States v. [#] Acres of Land, rather than United States v. [Landowner], because a condemnation proceeding is an action *in rem*, that is, a taking of a thing itself—the real property. In contrast, a legal proceeding against a person is an action *in personam*, taking the rights of persons in the thing. *See Dunnington*, 146 U.S. at 352-53; *In Personam* and *In Rem*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see also* FED. R. CIV. P. 71.1(c)(1) (requiring case caption to name "the property—designated generally by kind, quantity, and location—and at least one owner of some part of or interest in the property").

198  For example, the Supreme Court case *United States v. 50 Acres of Land* (*Duncanville*) concerned the United States' condemnation of 50 acres owned by the City of Duncanville, Texas. 469 U.S. 24 (1984).

199  *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 9-10 (1984) (internal quotations & citations omitted); *accord Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 407-08 (1878).

held that just compensation normally is to be measured by "the market value of the property taken at the time of the taking.""""[200] As a result, these Standards require use of the following definition of market value in the appraisal of property for federal acquisitions:

### 4.2.1.    Market Value Definition.

> #### Definition of Market Value
>
> Market value is the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would have sold on the effective date of value, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither compelled to buy or sell, giving due consideration to all available economic uses of the property.

The federal definition of market value is based on Supreme Court cases that establish and explain the market value standard as the measure of just compensation.[201] It applies to all types of federal acquisitions that involve payment of just compensation, whether or not condemnation may be involved.[202] In most situations, the market value measure "achieves a fair 'balance between the public's need and the claimant's loss.'"[203] Thus, while the "Court has never attempted to prescribe a rigid rule for determining what is 'just compensation' under all circumstances and in all cases[,]  market value has normally been accepted as a just standard."[204] These Standards follow the practical, objective, clear, and administrable rule of market value as the measure of just compensation, established by the Supreme Court nearly 140 years ago.[205]

### 4.2.1.1.    Date of Value. The date of value is generally determined by law (or a **legal instruction**, for the appraiser's purposes) based on the nature of the acquisition.[206]

---

200  *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2432 (2015) (quoting *Duncanville*, 469 U.S. at 29, and *Olson v. United States*, 292 U.S. 246, 255 (1934)).

201  *E.g., Kirby Forest Indus., Inc.*, 467 U.S. at 10; *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 471-72, 474 (1973); *United States v. Reynolds*, 397 U.S. 14, 17 (1970); *United States v. Miller*, 317 U.S. 369, 374 (1943); *McCoy v. Union Elevated R.R. Co.*, 247 U.S. 354, 359 (1918); *Kerr v. S. Park Comm'rs*, 117 U.S. 379, 386-87 (1886).

202  As discussed in Section 0.2.4, only the Supreme Court can define just compensation. *See Miller*, 317 U.S. at 380; *United States v. New River Collieries Co.*, 262 U.S. 341, 343-44 (1923); *Marbury v. Madison*, 5 U.S. 137 (1803).

203  *Duncanville*, 469 U.S. at 33. Other measures of just compensation "are employed only 'when market value [is] too difficult to find, or when its application would result in manifest injustice to owner or public.'" *Kirby Forest Indus., Inc.*, 467 U.S. at 10 n.14 (quoting *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950)).

204  *Commodities Trading*, 339 U.S. at 123; *see Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949) ("The value of property springs from subjective needs and attitudes, its value to the owner may therefore differ widely from its value to the taker. Most things, however, have a general demand which gives them a value transferable from one owner to another. As opposed to such personal and variant standards as value to the particular owner whose property has been taken, this transferable value has an external validity which makes it a fair measure of public obligation to compensate the loss incurred by an owner as a result of the taking of his property for public use.").

205  *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2432 (2015) ("clear and administrable rule for just compensation"); *United States v. 564.54 Acres of Land (Lutheran Synod)*, 441 U.S. 506, 511 (1979) ("relatively objective working rule . . . a useful . . . tool"); *Kimball Laundry*, 338 U.S. at 5 ("a fair measure of public obligation to compensate the loss incurred by an owner as a result of the taking of his property for public use"); *Miller*, 317 U.S. at 374 ("practical standard"); *Bauman v. Ross*, 167 U.S. 548, 574 (1897) ("The just compensation required by the constitution to be made to the owner is to be measured by the loss caused to him by the appropriation. He is entitled to receive the value of what he has been deprived of, and no more."); *Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 408 (1878) ("The inquiry in such cases must be what is the property worth in the market . . . from its availability for valuable uses.").

206  *See United States v. Dow*, 357 U.S. 17, 22 (1958) ("that event which gives rise to the claim for compensation and fixes the date as of which the land is to be valued").

- In most <u>direct acquisitions</u> (such as voluntary purchases), the date of value should be as near as possible to the date of the acquisition—typically the date of the appraiser's last property inspection.[207]

- In "quick-take" condemnations involving a <u>declaration of taking</u>, the date of value is the earlier of (1) the date the United States files a declaration of taking and deposits estimated compensation with the court, or (2) the date the government enters into possession of the property.[208]

- In "complaint-only" <u>straight condemnations</u> in which no declaration of taking is filed, the date of value is the date trial commences.[209]

- In <u>inverse takings</u>, the date of value is the date of taking, which should be provided by legal counsel.[210]

- For <u>property exchanges</u>, the date of value may be set by the parties or established by statute, and should be provided by legal counsel or the appraiser's client.[211]

In each type of acquisition, a property's market value is to be ascertained as of the appropriate date of value, considering the property as it existed on that date.[212] The appraiser must disregard physical changes (such as government construction) as well as changes in market value that occur after the date of value.[213] But this does not necessarily prohibit consideration of market data or events that occurred after the date of value: For example, market data after the date of value may be considered for the purpose of corroborating the market expectations or trends that existed on the date of value.[214] Sales that occurred after the date of value may be appropriate to consider, as discussed in Section 4.4.2.4.7. And in acquisitions under the

---

207  *Cf.* 49 C.F.R. § 24.102(g) (updating offer of just compensation under Uniform Act); *United States v. 790.71 Acres of Land in Cotton, Comanche & Stephens Ctys.*, 550 F. Supp. 690, 691 (W.D. Okla. 1981) (holding changes in appraisals of same property were due to later appraisal's inclusion of recently discovered comparable sales, not bad faith or unfair treatment).

208  *Dow*, 357 U.S. at 21-22; *see* Declaration of Taking Act, 40 U.S.C. § 3114 (corresponds to Act of February 26, 1931, 46 Stat. 1421, originally codified at 40 U.S.C. §§ 258a-258b).

209  *See Kirby Forest Indus., Inc.*, 467 U.S. at 16-17; General Condemnation Act, 40 U.S.C. § 3113 (corresponds to Act of August 1, 1888, 25 Stat. 357, originally codified at 40 U.S.C. § 257).

210  *See United States v. Clarke*, 445 U.S. 253, 258 (1980); *see generally* Section 4.9.

211  E.g., *Greer Coal., Inc. v. U.S. Forest Serv.*, 470 F. App'x 630, 636 (9th Cir. 2012) (unpubl.); *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1185-86 & nn.17-18 (9th Cir. 2000); *see generally* Section 4.10.

212  *Kerr v. S. Park Comm'rs*, 117 U.S. 379, 385-87 (1886); *accord United States v. Reynolds*, 397 U.S. 14, 16 (1970); *United States v. Miller*, 317 U.S. 369, 374 (1943); *see, e.g., United States v. 125.2 Acres of Land in Nantucket*, 732 F.2d 239, 244 (1st Cir. 1984) ("well-settled rule"); *United States v. 161.99 Acres of Land in Collins Cty.*, 512 F.2d 65, 66 (5th Cir. 1975); *see also Rasmuson v. United States*, 807 F.3d 1343, 1346 (Fed. Cir. 2015) ("A proper appraisal methodology has to account for those physical conditions [that existed on the date of value].").

213  *See Kirby Forest Indus., Inc.*, 467 U.S. at 16-18 & n.29; *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 76 (1913); *Searl v. Sch. Dist. in Lake Cty.*, 133 U.S. 553, 562-65 (1890); *United States v. Certain Land in Lincoln*, 343 F. Supp. 155 (D. Neb. 1972).

214  *Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 337 n.5 (Ct. Cl. 1980) (allowing post-taking data "for purposes of corroborating the reasonableness of the views of a . . . prospective purchaser and seller as to their anticipations" as of the date of taking); *e.g., United States v. Certain Lands in Wappinger*, 67 F. Supp. 905, 907-08, 909-11 (S.D.N.Y. 1946) (considering market trends); *see Hickey v. United States*, 208 F.2d 269, 277-78 (3d Cir. 1953) ("A witness may state that his conclusion on an initial examination was confirmed by later events, when additional information is available."); *United States v. 765.56 Acres of Land in Southampton* (*765.56 Acres I*), 164 F. Supp. 942, 947 (E.D.N.Y. 1958), *aff'd sub nom. United States v. Glanat Realty Corp.*, 276 F.2d 264 (2d Cir. 1960) (noting "zoning regulations [that] had been under consideration . . . for some time" as of date of value "had become a fact" at time of trial); *see also* USPAP Advisory Opinion 34 ("Data subsequent to the effective date may be considered in developing a restrospective value as a confirmation of trends that would reasonably be considered by a buyer or seller as of that date."); *cf. Dugan v. Rank*, 372 U.S. 609, 624 (1963) (noting "[p]arenthetically" that federal dam project had indeed been operating in accordance with previously stated plans).

Uniform Act, the assignment may instruct the appraiser to consider changes in value due to physical deterioration within the owner's reasonable control.[215]

### 4.2.1.2. Exposure on the Open, Competitive Market.

The federal definition of market value presumes that the property, prior to the date of value, was on the open market for a reasonable length of time to find a buyer who was ready, willing, and able to consummate a purchase on the date of valuation.[216] Value is to be determined by what the property "would sell for in the market for cash in the due course of business . . . under ordinary circumstances . . . ."[217]

> **Appraisers should not link an opinion of market value made for federal acquisition purposes to a specific exposure time. This <u>jurisdictional exception</u> to USPAP is required for appraisals applying the federal definition of market value.**

In determining just compensation, federal courts have neither defined a "reasonable" length of time nor required that an estimate of market value be linked to a specified exposure time on the open market. For these reasons, appraisers should not link opinions of market value for federal acquisitions to a specific exposure time.[218] To do so in an appraisal for federal acquisition purposes would needlessly place a limiting condition on the opinion that is irrelevant and could undermine the reliability of the entire appraisal.[219]

### 4.2.1.3. Willing and Reasonably Knowledgeable Buyers and Sellers.

*Willing* and *reasonably knowledgeable* buyers and sellers are not defined as all-knowing, but rather as having the knowledge possessed by the "typical 'willing buyer-willing seller'" in the marketplace.[220] An arm's-length transaction cannot be disregarded solely because a buyer or seller lacked "perfect" knowledge.[221] For example, the Federal Circuit held that it was appropriate to consider "a relevant market made up of investors who are real but are speculating in whole or major part."[222] And as the same court held in a later appeal, "uncontroverted evidence of an active real estate market compels the conclusion that the typical 'willing buyer-willing seller'

---

215  *See* Uniform Act, § 301 (3), 42 U.S.C. § 4651(3). This is an express statutory exception to the rule that property must be valued as it existed on the date of value. *E.g., Rasmuson*, 807 F.3d at 1346 (noting that a calculation that does not consider existing conditions "will result in an artificially inflated value and yield a windfall"); *cf. 161.99 Acres in Collins*, 512 F.2d at 66 (holding compensation must be measured as of date of taking, regardless of subsequent changes in property's market value).

216  *See, e.g., Kimball Laundry Co. v. United States*, 338 U.S. 1, 6 (1949) ("the equivalent arrived at by the haggling of the market"); *McCoy v. Union Elevated R.R. Co.*, 247 U.S. 354, 359 (1918).

217  *McCoy*, 247 U.S. at 359; *see Kerr v. S. Park Comm'rs*, 117 U.S. 379, 386-87 (1886) ("what land would have sold for in cash, or on such time and terms as would be equivalent to cash").

218  This <u>jurisdictional exception</u> to USPAP Standards Rule 1-2(c) is required for appraisals for federal acquisitions—i.e., appraisals applying the federal definition of market value—to ensure the opinion of value can be used as a reliable measure of just compensation under the Fifth Amendment to the U.S. Constitution. *See* USPAP Advisory Opinion 35, *Reasonable Exposure Time in Real Property and Personal Property Opinions of Value*; USPAP Frequently Asked Question 108. Appraisers may be accustomed to linking opinions of value to specific exposure times in other types of assignments. *Cf. Robinson v. United States*, 305 F.3d 1330, 1332 (Fed. Cir. 2002) (distinguishing "quick sale value" as amount expected if property's market exposure was limited to specific term, and "liquidation value" as amount expected if property "is sold without reasonable market exposure"); *In re Dyevoich*, No. 11–2551 (MLC), 2012 WL 194677 (D.N.J. Jan. 23, 2012) (unpubl.) (distinguishing "reasonable market exposure time" from "restricted market exposure time").

219  *See* EATON, *supra* note 16, at 18-19.

220  *See* Fla. Rock Indus., Inc. v. United States (<u>Florida Rock III</u>), 18 F.3d 1560, 1567 (Fed. Cir. 1994).

221  *See id.* at 1566 n.12 ("The market from which a fair market value may be ascertained need not contain only legally trained (or advised) persons who fully investigate current land use regulations; ignorance of the law is every buyer's right."); id. at 1567 ("When the market provides a well-substantiated value for a property, a court may not substitute its own judgment as to what is a wise investment. . . . Should a landowner wish to pick and choose her buyers, that luxury is not chargeable to the federal fisc.").

222  *Fla. Rock Indus. v. United States* (<u>Florida Rock II</u>), 791 F.2d 893, 903 (Fed. Cir. 1986); *see United States v. 69.1 Acres of Land* (<u>Sand Mountain</u>), 942 F.2d 290, 294 (4th Cir. 1991) ("The buyers in the sand reserve market are limited to those with foresight and patience, but they are nonetheless real buyers in a real market.").

requirement of fair market value had been met . . . ."[223]

As a result, "[w]hile an [appraiser] might be justified in adjusting the fair market value figure by discarding aberrational values based upon sales between related entities or fraudulent sales . . . , an [appraiser] may not discard an entire market as aberrational."[224]

The hypothetical <u>buyer</u> and <u>seller</u> under the federal definition of market value are objective market participants, motivated by typical market considerations: "[T]he same considerations are to be regarded as in the sale of property between private parties[,]"[225] having regard for "the existing business or wants of the community . . . ."[226] As the Supreme Court warned, "care must be taken to avoid . . . supposing the hypothetical purchaser to have either the same idiosyncrasies as the owner, or the same opportunities for use of the property as a taker armed with the power of eminent domain."[227]

> **"Speculation"**
>
> While *market participants* may speculate, *appraisers* cannot. The finder of fact "must not, itself, speculate, i.e., guess, about potential end uses or markets when the speculation is so remote or improbable that one would not invest his money in it." *Fla. Rock Indus., Inc. v. United States* (<u>*Florida Rock II*</u>), 791 F.2d 893, 903 (Fed. Cir. 1986); *see* Section 4.3.

**4.2.1.4.** **All Available Economic Uses.** Compensation "is to be arrived at upon just consideration of all the uses for which [a property] is suitable."[228] As the Supreme Court stated in *Olson v. United States*, "[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered . . . ."[229] That use must be considered "to the full extent that the prospect of demand for such use affects the market value while the property is privately held."[230] As discussed in Section 4.3, in valuations for just compensation purposes, only profitable—i.e., economic—uses can be considered.[231] Nonmarket considerations such as *value to the public* "afford[ ] no just criterion for estimating what the owner should receive" and must be disregarded.[232]

---

223  *Florida Rock III*, 18 F.3d at 1567; *accord Sand Mountain*, 942 F.2d at 294 (4th Cir. 1991) ("The existence of six other recent sales of properties in the area to sand producers lends further support . . . that a market exists for minable reserves . . . .").

224  *Florida Rock III*, 18 F.3d at 1567; *cf. United States v. 381.76 Acres of Land* (<u>*Montego Group*</u>), No. 96-1813-CV, 2010 WL 3734003, at *7 (S.D. Fla. Aug. 3, 2010) (qualitative analysis of comparable sales was the "superior" approach "to determine the value of peculiar properties in a peculiar market while taking complex factors into account"), *adopted sub nom. United States v. 10.00 Acres of Land*, No. 99-0672-CIV, 2010 WL 3733994 (S.D. Fla. Sept. 22, 2010), *aff'd sub nom. United States v. Gonzalez*, 466 F. App'x 858 (11th Cir. 2012) (per curiam).

225  *Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 407-08 (1878); *see United States v. 6.24 Acres of Land* (<u>*Weber*</u>), 99 F.3d 1140, 1996 WL 607162, at *5 (6th Cir. 1996) (per curiam) (unpubl.) ("We assume that buyers and sellers of ordinary prudence are knowledgeable and that they are not motivated by speculation or conjecture."); *accord United States v. 760.807 Acres of Land in Honolulu*, 731 F.2d 1443, 1446 (9th Cir. 1984).

226  *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 77-78 (1913); *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5-6 (1949); *see Olson v. United States*, 292 U.S. 246, 257 (1934) (In estimating market value, "there should be taken into account all considerations that fairly might be brought forward and reasonably be given substantial weight" in "fair negotiations between an owner willing to sell and a purchaser desiring to buy.").

227  *Kimball Laundry*, 338 U.S. at 6 n.3; *Chandler-Dunbar*, 229 U.S. at 79-81; *see United States v. 564.54 Acres of Land* (<u>*Lutheran Synod*</u>), 441 U.S. 506, 514 (1979) ("[N]ontransferable values arising from the owner's unique need for the property are not compensable . . . ."); *see also Boom Co.*, 98 U.S. at 408 ("Others may be able to use [the property], and make it subserve the necessities or conveniences of life. Its capability of being made thus available gives it a market value which can be readily estimated."); *Florida Rock III*, 18 F.3d at 1567 ("Dollars are fungible . . . . Should a landowner wish to pick and choose her buyers, that luxury is not chargeable to the federal fisc.").

228  *Olson v. United States*, 292 U.S. 246, 255 (1934).

229  *Id.*; *see* Section 4.3 (Highest and Best Use).

230  *Olson*, 292 U.S. at 255.

231  *See id.*; *see also Monongahela Nav. Co v. United States*, 148 U.S. 312, 328 (1893).

232  *Chandler-Dunbar*, 229 U.S. at 80.

**4.2.2.**    **The Unit Rule.** The market value concept in federal acquisitions generally requires application of the so-called <u>unit rule</u>, a principle developed by the federal courts that dictates what is to be valued for just compensation purposes.[233] Under the unit rule, the property being appraised must be valued as a unitary whole and held in single ownership.[234] The value of the whole cannot be derived by adding together the separate values of various interests or components.[235] As a result, summation or cumulative appraisals are improper under federal law.[236] The unit rule relates to *ownership* interests (estates) in real estate—such as landlord and tenant, or mortgagor and mortgagee—and to various *physical* components of real estate—such as timber, mineral deposits, farmland, and buildings.[237] As discussed in Section 4.6, the unit rule can raise particularly challenging valuation issues in appraisals for partial acquisitions, especially if easements are involved.

**4.2.2.1.**    **Ownership Interests (the Undivided Fee).** A property with multiple ownership interests or estates—such as lessor and lessee, life tenant and the holder of the remainder, or mortgagor and mortgagee—must be valued as a whole, embracing all of the rights, estates, and interests of all who may claim, and as if in one ownership.[238] For example, in an acquisition of property in fee simple absolute, the property must be appraised as an <u>undivided fee</u>.[239] Similarly, in acquisitions of less-than-fee interests, the interests being appraised must be valued as if under single ownership.[240] The market value of the whole is later apportioned among "the respective interest holders . . . either by contract or judicial intervention."[241] This is because just compensation is for the property itself, not the various ownership interests; thus, "the appraised value of the property represents the whole fee."[242] This aspect of the unit rule ensures the public is not charged twice in federal acquisitions.[243]

**4.2.2.2.**    **Physical Components.** Buildings and improvements, timber, crops, sand, gravel, minerals, oil, and so forth, in or upon the property are to be considered *to the extent they contribute to the market value of the property as a whole.* "[I]t is firmly settled that one does not value the [ ]land as one factor and then value the improvements as another factor and then add the two values to determine market

---

233   *See United States v. 6.45 Acres of Land (Gettysburg Tower)*, 409 F.3d 139, 146 & n.13 (3d Cir. 2005) ("[W]e have applied the unit rule as the legal procedure by which just compensation is to be determined and apportioned."); *United States v. 1.377 Acres of Land (Hotel San Diego)*, 352 F.3d 1259, 1269 (9th Cir. 2003) (government provides just compensation, then respective interest holders apportion award).

234   *United States v. Dunnington*, 146 U.S. 338, 351 (1892); *United States v. 25.936 Acres of Land in Edgewater*, 153 F.2d 277, 279 (3d Cir. 1946).

235   *E.g., Dunnington*, 146 U.S. at 351; *Bogart v. United States*, 169 F.2d 210, 213 (10th Cir. 1948); *Nebraska v. United States*, 164 F.2d 866, 868 (8th Cir. 1947); *25.936 Acres in Edgewater*, 153 F.2d at 279; *Meadows v. United States*, 144 F.2d 751, 753 (4th Cir. 1944).

236   *See, e.g., United States v. Gonzalez*, 466 F. App'x 858 (11th Cir. 2012) (per curiam).

237   *United States v. 91.90 Acres of Land in Monroe Cty. (Cannon Dam)*, 586 F.2d 79, 87 (8th Cir. 1978).

238   *E.g., Dunnington*, 146 U.S. at 351; *Bogart*, 169 F.2d at 213; *Nebraska*, 164 F.2d at 868; *25.936 Acres in Edgewater*, 153 F.2d at 279; *Meadows*, 144 F.2d at 753; *cf. United States v. 499.472 Acres of Land in Brazoria Cty.*, 701 F.2d 545, 552 (5th Cir. 1983) (emphasizing "importance of presenting in a single trial to a single jury all interests of all parties in the condemned property.").

239   *Gettysburg Tower*, 409 F.3d at 145-47 & nn.12-13; *United States v. 1.377 Acres of Land (Hotel San Diego)*, 352 F.3d 1259, 1269 (9th Cir. 2003); *Nebraska*, 164 F.2d at 868-69.

240   *E.g., United States v. 237,500 Acres of Land*, 236 F. Supp. 44, 55 (S.D. Cal. 1964) (valuing placer mining claims as a whole, then apportioning locators', lease and option interests). Applying the unit rule can be particularly complex in acquisitions of less-than-fee estates such as easement (Section 4.6.5) or leasehold (Section 4.7) interests, or in acquisitions involving minerals, timber or other natural resources (Section 4.8).

241   *Hotel San Diego*, 352 F.3d at 1269. This apportionment is generally beyond the scope of the appraiser's assignment.

242   *Dunnington*, 146 U.S. at 351; *see Gettysburg Tower*, 409 F.3d at 146.

243   *Dunnington*, 146 U.S. at 353-54.

value."[244] Rather, the measure of just compensation is the market value of the entire property—not the total of the money values of the separate items. As a result, in developing an opinion of value for federal acquisitions, the appraiser must consider all the elements that "contribute to make the property valuable, all . . . that detract from it, and finally, weighing all those elements, determine [the market value of] the single piece of property . . . ." acquired.[245]

The unit rule is often misapplied in valuations involving natural resources such as minerals, oil, and gas.[246] As with any other component, the possible or actual existence of such resources can only be considered to the extent it would contribute to the market value of the whole property. Section 4.8 discusses valuation issues that commonly arise in appraising natural resource properties.

**4.2.2.2.1.   Existing Government Improvements.** The presence of *government-constructed* buildings and improvements on the property on the date of value may significantly affect the analysis of market value. Proper treatment of improvements often turns on the legal effects of a lease, if one exists, as "any valuation should take into account the lease terms covering improvements" of significance to a reasonable buyer.[247] But regardless of a contractual agreement, "the equitable principle which condemns unjust enrichment [may] prevent[ ] the value of [government-built] premises becoming a windfall to the owner of the land in the guise of fair compensation."[248] Depending on the facts of the acquisition, the appraiser may need to determine a buyer's cost to remove such improvements, estimate any contributory value, or exclude them from consideration entirely, among other courses.[249] Therefore, appraisers should request **legal instructions** on how to treat government-constructed improvements that predate the date of value.[250]

**4.2.2.3.   Allocations and Administrative Payments Under the Uniform Act.** Valuations for federal acquisitions must follow the unit rule. But some appraisal assignments may require the appraiser to subsequently allocate the market value of the whole property, once properly determined under the unit rule, for administrative or other purposes. Thus, the appraiser may be directed to apportion the whole property's value among separate estates or interests

---

244   *United States v. 91.90 Acres of Land in Monroe Cty.* (*Cannon Dam*), 586 F.2d 79, 87 (8th Cir. 1978) ("[T]he value of the improved property may be greater than, equal to, or even less than the property in its unimproved state."); *accord United States v. 6.24 Acres of Land* (*Weber*), 99 F.3d 1140, 1996 WL 607162 (6th Cir. 1996) (per curiam) (unpubl.); *United States v. Lewis*, 308 F.2d 453, 457-59 (9th Cir. 1962); *United States v. 158.76 Acres of Land in Townshend*, 298 F.2d 559, 561 (2d Cir. 1962); *United States v. Certain Parcels of Land in Rapides Par.*, 149 F.2d 81, 82 (5th Cir. 1945); *United States v. Meyer*, 113 F.2d 387, 397 (7th Cir. 1940); *United States v. 33.92356 Acres of Land* (*Piza-Blondet Trial Op.*), No. 98-1664, 2008 WL 2550586, at *10-*11 (D.P.R. June 13, 2008), aff'd, 585 F.3d 1, 11 (1st Cir. 2009); *United States ex rel. Tenn. Valley Auth. v. Harralson*, 43 F.R.D. 318, 321 (W.D. Ky. 1966) (mem.); *see Morton Butler Timber Co. v. United States*, 91 F.2d 884, 888 (6th Cir. 1937); *United States v. Wise*, 131 F.2d 851, 852-53 (4th Cir. 1942); *cf. United States v. Sowards*, 370 F.2d 87, 90-91 (10th Cir. 1966) (improper to value property by multiplying amount of coal *in situ* by price per ton).

245   *Wise*, 131 F.2d at 852-53 ("[When a] shrewd, able purchaser who was interested in that property . . . finally came to determine what he would pay, it would be a single figure.").

246   *See, e.g, Cannon Dam*, 586 F.2d at 88-89 ("serious error" to permit aggregation of estimated surface value and estimated value of underlying clay).

247   *United States v. 32.42 Acres of Land* (*Fleet ASW*), No. 05cv1137 DMS, 2009 WL 2424303, at *6 (S.D. Cal. Aug. 6, 2009) (citing *Kimball Laundry Co. v. United States*, 338 U.S. 1, 16 (1949)); *United States v. Certain Space in Rand McNally Bldg.*, 295 F.2d 381, 383-84 (7th Cir. 1961).

248   *Bibb Cty. v. United States*, 249 F.2d 228, 230 (5th Cir. 1957); *see also Searl v. Sch. Dist. in Lake Cty.*, 133 U.S. 553, 562-65 (1890); *United States v. Del., Lackawana & W.R.R. Co.*, 264 F.2d 112, 116-17 (3d Cir. 1959).

249   *See Fleet ASW*, 2009 WL 2424303, at *6; *cf. United States v. City of Columbus*, 180 F. Supp. 775, 775 (S.D. Ohio 1959) (lease provision allowed tenant United States reasonable time to remove improvements); *San Nicolas v. United States*, 617 F.2d 246 (Ct. Cl. 1980) (lease provision obligated tenant United States to restore property to condition at lease onset).

250   *See, e.g., Old Dominion Land Co. v. United States*, 269 U.S. 55, 65 (1925); *Searl*, 133 U.S. at 562-65; *Wash. Metro. Area Transit Auth. v. One Parcel of Land*, 780 F.2d 467, 471 (4th Cir. 1986); *Del., Lackawana*, 264 F.2d at 116-17; *Bibb Cty.*, 249 F.2d at 230; but see *Rand McNally Bldg.*, 295 F.2d at 383-84.

for negotiating purposes and/or to comply with agency obligations under the Uniform Act. Such an allocation should be reported in a separate, supplemental report, rather than in the appraisal report of the market value of the whole property.[251] Similarly, some assignments may require a determination of the contributory value of buildings, structures, or other improvements that will be removed or adversely affected due to the government project.[252] If applicable, the appraiser should clearly state that any such allocations do not indicate the appraisal method(s) employed.[253]

#### 4.2.2.4. Departure from the Unit Rule.

Federal courts have repeatedly emphasized that the unit rule is "a 'carefully guarded' one and that only in rare and exceptional types of situations [should] departures from it be[ ] permitted."[254] Thus, while the courts recognize the unit rule "manifestly is not without hardships in practical operation,"[255] under federal law departure from the unit rule is permitted only in "extraordinary," "unique," "rare and compelling" circumstances.[256] Any departure from the unit rule requires a **legal instruction**, as "the determination as to [the unit rule's] applicability is one made by a court as a matter of law rather than by an appraiser."[257]

#### 4.2.3. Objective Market Evidence; Conjectural and Speculative Evidence.

For compensation to be "just, not merely to the individual whose property is taken, but to the public which is to pay for it[,]" its measure must be objective.[258] The determination of market value must therefore take into account all considerations that might fairly be brought forward

> **Any departure from the unit rule requires a <u>legal instruction</u>, because the applicability of the rule is a matter of law that cannot be determined by an appraiser.**

> **"[I]t is the owner's loss, not the taker's gain, which is the measure of compensation . . . ."**
>
> **—*United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 281 (1943)**

---

251 Unless specifically instructed, apportionment (allocation) of the market value of the whole property is generally beyond the scope of the appraiser's assignment. *See United States v. Dunnington*, 146 U.S. 338, 351 (1892); *United States v. 6.45 Acres of Land* (<u>Gettysburg Tower</u>), 409 F.3d 139, 146-47 & n.13 (3d. Cir. 2005); *United States v. 1.377 Acres of Land* (<u>Hotel San Diego</u>), 352 F.3d 1259, 1269 (9th Cir. 2003).

252 Section 302 of the Uniform Act directs agencies to acquire proportional interest in such structures. 42 U.S.C. § 4652; *see United States v. 158.00 Acres in Clay Cty.*, 562 F.2d 11, 13 (8th Cir. 1977) (noting "contributory value of improvements may be only a subsidiary fact supporting the ultimate finding of just compensation" but "has independent significance" under the Act). Administrative benefits under the Act or other statutes are separate from compensation under the Fifth Amendment. *See United States v. Gen. Motors*, 323 U.S. 373, 379-80 (1945); *United States v. Willow River Power Co.*, 324 U.S. 499, 510 (1945); *Ackerley Commc'ns of Fla. v. Henderson*, 881 F.2d 990, 992-93 & n.2 (11th Cir. 1989) ("[S]uch benefits should be viewed as administrative payments to displaced persons." (quoting H.R. REP. NO. 91-1656, at 5-6 (1970), as reprinted in 1970 U.S.C.C.A.N. 5854)).

For a thorough analysis of the legislative history and intent of the Uniform Act, *see Barnhart v. Brinegar*, 362 F. Supp. 464 (W.D. Mo. 1973) (adopted by *Ackerley Commc'ns*, 881 F.2d at 992); *United States v. 320 Acres of Land*, 605 F.2d 762, 823 (5th Cir. 1979); *Roth v. U.S. Dep't of Transp.*, 572 F.2d 183, 184 (8th Cir. 1978), *Rhodes v. City of Chi. for Use of Sch.*, 516 F.2d 1373, 1378 (7th Cir. 1975); *cf. Clear Sky Car Wash, LLC v. City of Chesapeake*, 910 F. Supp. 2d 861, 878 n.13 (E.D. Va. 2012).

253 *See United States v. 91.90 Acres of Land in Monroe Cty.* (<u>Cannon Dam</u>), 586 F.2d 79, 87 (8th Cir. 1978) ("[I]t is firmly settled that one does not value the [l]and as one factor and then value the improvements as another factor and then add the two values to determine market value. That is true because the value of the improved property may be greater than, equal to, or even less than the property in its unimproved state.").

254 *United States v. 6.45 Acres of Land* (<u>Gettysburg Tower</u>), 409 F.3d 139, 148 (3d Cir. 2005) (quoting *Nebraska v. United States*, 164 F.2d 866, 869 (8th Cir. 1947)).

255 *Nebraska*, 164 F.2d at 868.

256 *Gettysburg Tower*, 409 F.3d at 147-48 (citing, inter alia, *United States v. Welch*, 217 U.S. 333, 338 (1910); *Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910); *United States v. 499.472 Acres of Land in Brazoria Cty.*, 701 F.2d 545, 549 (5th Cir. 1983); *United States v. Corbin*, 423 F.2d 821, 828 (10th Cir. 1970)).

257 *Gettysburg Tower*, 409 F.3d at 142 n.5.

258 *Bauman v. Ross*, 167 U.S. 548, 574 (1897); *see United States v. 564.54 Acres of Land* (<u>Lutheran Synod</u>), 441 U.S. 506, 511 (1979) ("we have recognized the need for a relatively objective working rule"); *United States v. Miller*, 317 U.S. 369, 375 (1943); *cf. City of New York v. Sage*, 239 U.S. 57, 61 (1915) ("[I]t is to be considered only so far as the public would have considered it if the land had been offered for sale . . . .").

and reasonably be given substantial weight in bargaining between buyer and seller.[259] But the appraiser must disregard any *special value to the owner* "who may not want to part with his land because of its special adaptability to his own use" as well as *any special value to the government* because of the government's needs or the property's "peculiar fitness" for the government's purposes.[260] Only "value transferable from one owner to another . . . has an external validity which makes it a fair measure of public obligation to compensate the loss incurred by an owner as a result of the taking of his property for public use."[261] As a result, "loss to the owner of nontransferable values deriving from his unique need for property or idiosyncratic attachment to it, like loss due to an exercise of the police power, is properly treated as part of the burden of common citizenship."[262] Similarly, "the Fifth Amendment allows the owner only the fair market value of his property; it does not guarantee him a return of his investment."[263]

Moreover, just compensation cannot be based on mere speculation or conjecture. As the Supreme Court stated in *Olson v. United States*:

> Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth.[264]

**4.2.4.    Refinements of Market Value Standard.** The Fifth Amendment requirement of just compensation "derives as much content from the basic equitable principles of fairness as it does from technical concepts of property law."[265] With this in mind, the Supreme Court has honed the basic foundation of market value "with certain refinements developed over the years in the interest of effectuating the constitutional guarantee" of just compensation.[266] Valuations for federal acquisitions must comply with these refinements, which reflect the Supreme Court's recognition that "strict adherence to the criterion of market value may involve . . . elements which, though they affect such value, must in fairness be eliminated."[267] These refinements reflect the practical applications of the principles of fairness underlying

> **Appraisers estimate market value, not just compensation. Departure from the market value standard is rarely justified in federal acquisitions, and inevitably requires appropriate <u>legal instruction</u>.**

---

259   *Olson v. United States*, 292 U.S. 246, 257 (1934); *Rasmuson v. United States*, 807 F.3d 1343, 1346 (Fed. Cir. 2015).

260   *Miller*, 317 U.S. at 375; *see* Section 4.4.2.4.2.5 (Sales to a Party with Condemnation Authority); *see also United States v. Fuller*, 409 U.S. 488, 491 (1973). In developing the market value standard as the measure of just compensation, the federal courts have used terms such as *value, market value, fair market value,* and *market value fairly determined* interchangeably without altering the meaning of *market value* for federal acquisition purposes. *See Miller*, 317 U.S. at 374 & nn.10-14 (citing cases).

261   *United States v. 50 Acres of Land (Duncanville)*, 469 U.S. 24, 36 (1984) (quoting *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949)).

262   *Duncanville*, 469 U.S. at 36.

263   *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 285 (1943); *see Olson*, 292 U.S. at 255 ("The public may not by any means confiscate the benefits, or be required to bear the burden, of the owner's bargain."); *see, e.g., United States v. 15,478 Square Feet of Land (Balaji Sai)*, No. 2:10-cv-00322, 2011 WL 2471586, at *6 (E.D. Va. June 20, 2011).

264   *Olson*, 292 U.S. at 257.

265   *Fuller*, 409 U.S. at 490.

266   *United States v. Reynolds*, 397 U.S. 14, 16 (1970).

267   *United States v. Miller*, 317 U.S. 369, 375 (1943); *see also Fuller*, 409 U.S. at 491. In developing the market value standard as the measure of just compensation, the federal courts have employed terms such as *value, market value, fair market value,* and *market value fairly determined* interchangeably; the adding of adjectives such as *fair* or *cash* to the term *market value* does not alter its meaning for federal acquisition purposes. *See Miller*, 317 U.S. at 374 & nn.10-14 (citing cases).

the Fifth Amendment.[268] They include the analysis of highest and best use (Section 4.3) and determination of the larger parcel (Section 4.3.3); acceptable approaches to value (Section 4.4); the treatment of government project influence on market value (Section 4.5); partial acquisitions and the before and after valuation method (Section 4.6.1), compensable damages (4.6.2), offsetting benefits (4.6.3), and easement valuation issues (4.6.5); and the market rental value standard for leasehold and other temporary acquisitions (Section 4.7). These refinements can lead to particularly complex valuation problems in acquisitions involving natural resources (Section 4.8), inverse takings (Section 4.9), and land exchanges (Section 4.10).

**4.2.5.**   **Special Rules.** Certain types of federal acquisitions raise unique compensation questions that have led the courts to craft special valuation rules with limited applicability, which is discussed in Section 4.11. The general principle that just compensation does not include value created by the United States has specific implications in the appraisal of riparian lands involving the United States' navigational servitude (Section 4.11.1) and of ranch lands involving federal grazing permits (Section 4.11.2). Similarly, the valuation of public roads, infrastructure, and facilities sometimes requires special treatment to ensure that compensation will reflect the owner's loss, not the government's gain (Section 4.11.3).

**4.2.6.**   **Exceptions to Market Value Standard.** These Standards direct appraisers to estimate a property's market value—not the just compensation due for a government acquisition[269]—because appraisers do not have the authority to determine just compensation under the Fifth Amendment.[270] Rarely, deviation from market value as the measure of just compensation may be required in federal acquisitions, but "only 'when market value has been too difficult to find, or when its application would result in manifest injustice to owner or public.'"[271] Such situations are highly unusual,[272] and moreover, inevitably require appropriate **legal instruction**.[273] Whether departure from the established market value standard is appropriate in a given set of facts is a legal question beyond the scope of an appraiser to determine.[274]

**4.3.**   **Highest and Best Use.** Market value must be determined by considering a property's highest and best use, a term of art defined by the Supreme Court in 1934 as the "highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future."[275] The Court went on to explain that a property's highest and best use must be considered "not necessarily as the measure of value, but to the full extent

268  *See Powelson*, 319 U.S. at 285; *Bauman v. Ross*, 167 U.S. 548, 574 (1897); *Shoemaker v. United States*, 147 U.S. 282 (1893); *Kerr v. S. Park Comm'rs*, 117 U.S. 379 (1886).

269  *See United States v. New River Collieries Co.*, 262 U.S. 341, 343-44 (1923); *cf. United States v. 33.92356 Acres of Land (Piza-Blondet Trial Op.)*, No. 98-1664, 2008 WL 2550586, at *1-*2, *6 (D.P.R. June 13, 2008) (distinguishing valuation evidence from determination of just compensation), *aff'd*, 585 F.3d 1 (1st Cir. 2009); *cf. United States v. Foster*, 131 F.2d 3, 6-7 (8th Cir. 1942).

270  *See Monongahela Nav. Co. v. United States*, 148 U.S. 312, 327-28 (1893).

271  *United States v. 50 Acres of Land (Duncanville)*, 469 U.S. 24, 29 (1984) (quoting *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950), and *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 n.14 (1984)).

272  *See Duncanville*, 469 U.S. at 30 ("This case is not one in which an exception to the normal measure of just compensation is required because fair market value is not ascertainable. Such cases, for the most part, involve properties that are seldom, if ever, sold in the open market.").

273  *See Monongahela*, 148 U.S. at 327 ("what shall be the measure of compensation . . . . is a judicial . . . question"); *see Rasmuson v. United States*, 807 F.3d 1343, 1345 (Fed. Cir. 2015); *United States v. 4.105 Acres of Land in Pleasanton*, 68 F. Supp. 279, 292-93 (N.D. Cal. 1946).

274  *See Kimball Laundry Co. v. United States*, 338 U.S. 1, 4 (1949) (granting certiorari in case "rais[ing] novel and serious questions in determining what is 'just compensation' under the Fifth Amendment" that "are not resolved by the familiar formulas available for the conventional situations which gave occasion for their adoption").

275  *Olson v. United States*, 292 U.S. 246, 255 (1934); *see United States ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land*, 821 F.3d 742, 752 (6th Cir. 2016) ("a term of art" (citing *Olson*)).

that the prospect of demand for such use affects the market value while the property is privately held."[276]

### 4.3.1.  Highest and Best Use Definition.

> **Definition of Highest and Best Use**
> The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.

A highest and best use must be reasonably probable. The determination of market value must take into account all considerations that might fairly be brought forward and reasonably be given substantial weight in bargaining between buyer and seller.[277] But the Supreme Court has stated: "Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration."[278]

A significant practical implication of this legal rule is that a specific highest and best use can only be considered "if the use is likely to be reasonably probable 'in the reasonably near future.'"[279] Accordingly, there must be proof of "present or future demand, the connecting link from adaptability to value."[280] Similarly, if a property could not legally be used for residential development without rezoning or some variance or permit, that use cannot be considered in determining value unless there is "a reasonable probability that the property would be rezoned or that a variance could have been obtained in the near future."[281] This requirement "ensures that the landowner is put in as good a position as he would have occupied if his property had not been taken, but that he does not profit" from a government acquisition for public purposes.[282]

> **Criteria for Analysis**
> Each potential highest and best use must be analyzed using four criteria as stated in Section 1.5.2:
>
> (1) Physical possibility,
> (2) Legal permissibility,
> (3) Financial feasibility, and
> (4) Degree of profitability.

The fact that a parcel's highest and most profitable use "can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value."[283] But "there must be a reasonable probability of the lands in question being combined with other tracts for that purpose in the reasonably near future."[284]

### 4.3.2.  Criteria for Analysis.  As discussed in Section 1.5.2, in determining a property's highest and best use, each potential use must be analyzed using four criteria: (1) physical possibility, (2) legal

---

276  *Olson*, 292 U.S. at 255; *cf. Kerr v. S. Park Comm'rs*, 117 U.S. 379, 386 (1886) ("What would any one needing lands for residence, business, or any other purpose have paid for them in cash?").

277  *Olson*, 292 U.S. at 257; *Rasmuson*, 807 F.3d at 1346.

278  *Olson*, 292 U.S. at 257; *see also United States v. 320 Acres of Land*, 605 F.2d 762, 814-20 (5th Cir. 1979).

279  *United States v. 33.92356 Acres of Land* (*Piza-Blondet*), 585 F.3d 1, 7-8 (1st Cir. 2009) (quoting *Olson*, 292 U.S. at 255-56); *accord TVA v. 1.72 Acres*, 821 F.3d at 752-53.

280  *St. Joe Paper Co. v. United States*, 155 F.2d 93, 97 (5th Cir. 1946); *accord TVA v. 1.72 Acres*, 821 F.3d at 755-56; *see* Section 4.3.2.2 (Market Demand).

281  *Piza-Blondet*, 585 F.3d at 7-8; *see* Section 4.3.2.4 (Zoning and Permits).

282  *TVA v. 1.72 Acres*, 821 F.3d at 752-53 (citing *Olson*, 292 U.S. at 255, 257).

283  *Olson*, 292 U.S. at 256.

284  *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 275-76 (1943) (citing *Olson*, 292 U.S. at 255).

permissibility, (3) financial feasibility and (4) degree of profitability. Because most property is adaptable to several uses, the highest and best use is the physically possible, legally permissible, and financially feasible use that results in the highest value. [285]

**4.3.2.1.    All Possible Uses.** As "economic demands normally result in an owner's putting his land to the most advantageous use[,]"[286] a property's highest and best use is ordinarily its existing use on the date of value.[287] Many courts describe this precept as a *presumption* in favor of a property's existing use;[288] others simply regard an existing use as "compelling evidence" of highest and best use when a different proposed use is asserted.[289] Either rationale has the same result: to assert a highest and best use other than a property's existing use, there must be evidence "that this [different] use is 'reasonably probable' and that the probability has a real market value."[290] Similarly, in litigation (such as condemnation proceedings), the party claiming a property's highest and best use is not the existing use bears the burden of proof.[291]

Any presumption favoring the existing use does not preclude consideration of other uses in the highest and best use analysis. In fact, any reasonably probable use should be considered to the extent a property's potential for such use affects its market value.[292] As the Fifth Circuit stated:

> owners of property [may seek] to prove, if they can, that the actual use to which they are putting it is not the highest and best use for the property as viewed by a potential purchaser. [But where] there has been no such proof[, t]here is nothing more than speculation that…a purchaser could be interested in buying the land [for another use].[293]

Moreover, a potential future use, even if profitable, is not necessarily the measure of the property's value: "Instead, it is to be considered to the extent the prospect of demand for the use affects market value."[294]

---

285  *See United States v. 69.1 Acres of Land (Sand Mountain)*, 942 F.2d 290, 292 (4th Cir. 1991); Section 1.6.

286  *United States v. Buhler*, 305 F.2d 319, 328 (5th Cir. 1962).

287  *United States v. L.E. Cooke Co.*, 991 F.2d 336, 341 (6th Cir. 1993); *United States v. 62.50 Acres of Land in Jefferson Par.*, 953 F.2d 886, 890 (5th Cir. 1992); *Sand Mountain*, 942 F.2d at 292.

288  *E.g., United States ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land*, 821 F.3d 742, 753 (6th Cir. 2016); *L.E. Cooke*, 991 F.2d at 341 ("In the absence of proof to the contrary, the current use is presumed to be the best use."); *62.50 Acres in Jefferson*, 953 F.2d at 890 ("A landowner can overcome this presumption only by showing a reasonable probability that the land is adaptable and needed for the potential use in the near future."); *Sand Mountain*, 942 F.2d at 292; *United States v. 158.24 Acres of Land in Bee Cty.*, 515 F.2d 230, 233 (5th Cir. 1975).

289  *E.g., Buhler*, 305 F.2d at 328-29; *see United States v. 25.202 Acres of Land (Amexx I)*, 860 F. Supp. 2d 165, 177-79 (N.D.N.Y. 2010) ("A potential use should be considered only to the extent that the prospect of demand for such use would have affected the price that a willing buyer would have offered for the property just prior to the taking."), *aff'd*, 502 F. App'x 43, 45 (2d Cir. 2012).

290  *United States v. 1.604 Acres of Land (Granby I)*, 844 F. Supp. 2d 668, 679-81 (E.D. Va. 2011); *accord 62.50 Acres in Jefferson*, 953 F.2d at 890; *United States v. 27.93 Acres of Land in Cumberland Cty.*, 924 F.2d 506, 512-14 (3d Cir. 1991).

291  *E.g., TVA v. 1.72 Acres*, 821 F.3d at 753-54, 756; *United States v. 100.00 Acres of Land in Livingston Cty.*, 369 F. Supp. 195, 200 (W.D. Ky. 1973); *United States v. 429.59 Acres of Land (Imperial Beach)*, 612 F.2d 459, 460, 461-62 (9th Cir. 1980); *62.50 Acres in Jefferson*, 953 F.2d at 890; *see United States v. 33.92356 Acres of Land (Piza-Blondet)*, 585 F.3d 1, 7-8 (1st Cir. 2009) ("If a claimed use is prohibited by zoning, the property owner must show that it is reasonably probable that the relevant restrictions will be removed in the reasonably near future."), *aff'g* 2008 WL 2550586, at *7 (D.P.R. June 13, 2008) ("[E]vidence of a proposed use must be excluded if the landowner fails to demonstrate reasonable probability that a permit would be issued for the proposed use.").

292  *Olson v. United States*, 292 U.S. 246, 255 (1934); *Sand Mountain*, 942 F.2d at 292; *United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 394 (5th Cir. 1982).

293  *Buhler*, 305 F.2d at 329; *see TVA v. 1.72 Acres*, 821 F.3d at 754 ("[T]here must be demonstrated an actual profitable use or a market demand for the prospective use.").

294  *62.50 Acres in Jefferson*, 953 F.2d at 890; *accord Olson*, 292 U.S. at 255.

**4.3.2.2.** **Market Demand.** Any highest and best use requires a showing of <u>market demand</u>. As the Supreme Court observed, "most things…have a general demand which gives them a value transferable from one owner to another…[T]his transferable value has an external validity which makes it a fair measure" of just compensation.[295] Accordingly, "it is generally accepted that there must be demonstrated an actual profitable use or a market demand for the prospective use."[296] To meet this standard, "objective evidence substantiating [the appraiser's] market demand analysis" is required.[297] "Value implies demand and a buyer"—and each must be proven, never assumed.[298]

> **Government demand cannot support a highest and best use.**

Highest and best use cannot be predicated on demand created solely by the government project for which the property is acquired; as the Supreme Court held, "[i]t is not fair that the government be required to pay the enhanced price which its demand alone has created."[299] To illustrate, a property's highest and best use cannot be commercial rock quarrying if there is no likely market demand for gravel except in connection with the public highway project for which the property is acquired.[300]

Similarly, the government's intended use of the property—such as a military bombing range, national monument, or habitat conservation—cannot be considered unless there is competitive demand for that use in the private market.[301] As the Ninth Circuit reasoned:

> [V]alues resulting from the urgency or uniqueness of the government's need for the property or from the uniqueness of the use to which the property will be put do not reflect what a willing buyer would pay to a willing seller . . . . [G]overnment projects may render property valuable for a unique purpose. Value for such a purpose, if considered, would cause "the market to be an unfair indication of value," because there is no market apart from the government's demand.[302]

The Sixth Circuit recently explored what must be shown "to prove the existence of a market demand for something."[303] To show market demand for a proposed use of hotel development, examples of "objective evidence substantiating [a] market demand analysis" would include proof of preliminary discussions with a prospective hotel chain, market studies showing sufficient

---

295  *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949) (rejecting "such personal and variant standards as value to the particular owner whose property has been taken" or "gain to the taker [which] may be wholly unrelated to the deprivation imposed upon the owner").

296  *TVA v. 1.72 Acres*, 821 F.3d at 754 (quoting *United States ex rel. Tenn. Valley Auth. v. An Easement & Right-of-Way* (*Hadley*), 447 F.2d 1317, 1319 (6th Cir. 1971)).

297  *TVA v. 1.72 Acres*, 821 F.3d at 755; *accord United States v. 341.45 Acres of Land in St. Louis Cty.*, 633 F.2d 108, 113 (8th Cir. 1980).

298  *341.45 Acres in St. Louis*, 633 F.2d at 113 (quoted in *TVA v. 1.72 Acres*, 821 F.3d at 755); *see Olson*, 292 U.S. at 256 (highest and most profitable use is to be considered "to the full extent that the prospect of demand for such use affects the market value while the property is privately held").

299  *United States v. Cors*, 337 U.S. 325, 333 (1949); *accord United States v. 320 Acres of Land*, 605 F.2d 762, 811 n.107 (5th Cir. 1979); *United States v. 46,672.96 Acres of Land in Doña Ana Ctys.*, 521 F.2d 13, 15, 16 (10th Cir. 1975); *J.A. Tobin Constr. Co. v. United States*, 343 F.2d 422, 423 (10th Cir. 1965); *United States v. 158.76 Acres of Land in Townshend*, 298 F.2d 559, 560 (2d Cir. 1962).

300  *J.A. Tobin*, 343 F.2d 422.

301  *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 80-81 (1913); *320 Acres*, 605 F.2d at 783 n.26, 811 n.107; *46,672.96 Acres in Doña Ana*, 521 F.2d at 15-16; *United States v. 275.81 Acres of Land* (*Flight 93 Memorial*), No. 09-233, 2014 WL 1248205, at *4 (W.D. Pa. March 26, 2014) (compensation cannot reflect change in value due to United States' development of public Flight 93 National Memorial).

302  *United States v. Weyerhaeuser Co.*, 538 F.2d 1363, 1366, 1367 (9th Cir. 1976) (internal citations omitted); *accord 46,672.96 Acres in Doña Ana*, 521 F.2d at 15-17; *United States v. Whitehurst*, 337 F.2d 765 (4th Cir. 1964).

303  *TVA v. 1.72 Acres*, 821 F.3d at 755 (citing *341.45 Acres in St. Louis*, 633 F.2d 108).

---

**5-ER-861**

demand for a hotel, or market sales of land for hotel development purposes.[304] With no such evidence presented, hotel development was correctly excluded from consideration as the property's highest and best use.[305]

#### 4.3.2.3. Economic Use.

For just compensation purposes, market value must be based on a property's highest and *most profitable use*—that is, an *economic* use.[306] The inquiry must be "what is the property worth in the market . . . from its availability for valuable uses."[307] And *valuable uses* are those which "the prospect of demand for such use affects the market value while the property is privately held."[308] Because "[c]onsiderations that may not reasonably be held to affect *market value* are excluded[,]"[309] *noneconomic* uses cannot be considered in determining market value for federal acquisitions.[310] Federal courts have also rejected valuations that improperly fail to consider an economic use.[311]

"The federal concept of market value is intimately related to selling price on the market" in federal case law.[312] Indeed, the Supreme Court has recognized that "the 'market price' becomes so important a standard of reference" because it reflects the value "arrived at by the haggling of the market . . . ."[313] Accordingly, in determining market value for just compensation purposes, a use cannot be considered unless there is competitive demand for that use in the private market.[314] This means that a use can be considered as a highest and best use only if that use contributes to the property's actual market value—that is, to the amount for

---

### Market Value and Economic Use

"Value is a word of many meanings"—but "the *value* compensable under the Fifth Amendment … is only that which is capable of transfer from owner to owner and thus of exchange for some equivalent." *Kimball Laundry Co. v. United States*, 338 U.S. 1, 4-5 (1949). Thus market value, as the measure of just compensation, cannot reflect nonmarket or noneconomic considerations.

The federal concept of market value is fundamentally different from the real estate appraisal concept of public interest value, which links highest and best use to noneconomic uses and public policy benefits rather than market considerations. Because noneconomic uses reflect something other than market value, **appraisals for federal acquisitions cannot consider public interest value or related concepts** (such as habitat value or preservation value).

---

304  *TVA v. 1.72 Acres*, 821 F.3d at 755.

305  *Id.* at 755-56.

306  *See Olson v. United States*, 292 U.S. 246, 255-56 (1934) ("highest and most profitable use"); *Monongahela Nav. Co v. United States*, 148 U.S. 312, 328 (1893) ("The value of property, generally speaking, is determined by its productiveness,—the profits which its use brings to the owner.").

307  *Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 407-08 (1878) ("[C]ompensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonable expected in the immediate future."); *see Olson*, 292 U.S. at 255-57 ("The highest and most profitable use . . . is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held.").

308  *Olson*, 292 U.S. at 255 (citing *Boom Co.*, 98 U.S. at 408 ("In determining the value of land appropriated for public purposes, the same considerations are to be regarded as in a sale of property between private parties.")).

309  *Olson*, 292 U.S. at 256 (emphasis added), *quoted in United States v. 50 Acres of Land* (*Duncanville*), 469 U.S. 24, 29 (1984).

310  *See, e.g.*, *United States v. 46,672.96 Acres of Land in Doña Ana Ctys.*, 521 F.2d 13, 17 (10th Cir. 1975); *United States v. 1.57 Acres of Land in San Diego Cty.*, No. 12cv3055, 2015 WL 5254558 (S.D. Cal. Sept. 9, 2015) (excluding from consideration all evidence not "relating to market value" in valuation of conservation easement); *see also United States v. 275.81 Acres of Land* (*Flight 93 Memorial*), No. 09-233, 2014 WL 1248205, at *4 (W.D. Pa. March 26, 2014); *United States v. 1.604 Acres of Land* (*Granby I*), 844 F. Supp. 2d 668, 679-81 (E.D. Va. 2011) (excluding all evidence of proposed highest and best use not shown to be financially feasible).

311  *See, e.g.*, *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1185 (9th Cir. 2000).

312  *United States v. Sowards*, 370 F.2d 87, 89 (10th Cir. 1966).

313  *Kimball Laundry Co. v. United States*, 338 U.S. 1, 6 (1949).

314  *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 80-81 (1913); *United States v. 320 Acres of Land*, 605 F.2d 762, 783 n.26, 811 n.107 (5th Cir. 1979); *United States v. Weyerhaeuser Co.*, 538 F.2d 1363, 1366, 1367 (9th Cir. 1976); *46,672.96 Acres in Doña Ana*, 521 F.2d at 15-16; *United States v. Whitehurst*, 337 F.2d 765 (4th Cir. 1964); *Flight 93 Memorial*, 2014 WL 1248205, at *4; see, e.g., *1.57 Acres in San Diego*, 2015 WL 5254558, at *3 (evidence unrelated to market value cannot be considered in determining whether conservation easement had "significant private market value").

which the property would sell in the open competitive market.[315] As to what constitutes an open competitive market, the Supreme Court held that where prices are "controlled by the supply and demand[, t]hese facts indicate a free market."[316]

Federal courts consistently reject alternative measures of compensation that reflect something other than market value based on an economic use indicated by supply and demand in the open, competitive market.[317] Uses based on *preservation*, *conservation*, or *open space*, among other priorities, typically lack the competitive supply and demand necessary to indicate a free market and therefore cannot be considered in determining market value for federal acquisitions.[318] As the Supreme Court has held for over a century: "That [a] property may have to the public a greater value than its fair market value affords no just criterion for estimating what the owner should receive."[319]

The Supreme Court bluntly rejected the addition of nonmarket, noneconomic considerations to market value in *City of New York v. Sage*, in which land commissioners improperly awarded compensation "over and above the market value" of the property acquired due to "what they thought a fair proportion of the increase" for its availability and adaptability for a public reservoir.[320]

> Upon that point . . . they were wrong . . . . [W]hat the owner is entitled to is the value of the property taken, and that means what it fairly may be believed that a purchaser in fair market conditions would have given for it in fact,—not what a tribunal at a later date may think a purchaser would have been wise to give . . . . Any rise in value before the taking, not caused by the expectation of that event, is to be allowed, but we repeat, it must be a rise in what a purchaser might be expected to give.[321]

---

315  *See, e.g., 46,672.96 Acres in Doña Ana*, 521 F.2d at 17 ("[T]he land had little, if any, market value. . . . The fact that [the property] has very little value cannot justify . . . using an inapplicable measure, namely, its highest and best use being a missile range."). A related issue is that sales to government entities and certain other transactions frequently involve noneconomic or nonmarket considerations. As discussed in Section 4.4.2.4, such sales cannot be used without "great caution" because they are "an inaccurate indicator of market value." *Id.* at 17. *See* Section 1.5.2.4 and the appendix regarding the extraordinary verification and treatment necessary to rely on such sales.

316  *United States v. New River Collieries Co.*, 262 U.S. 341, 345 (1923); *see also L. Vogelstein & Co. v. United States*, 262 U.S. 337, 338 (1923) ("market price as fixed by supply and demand and other elements in normal trading") (decided the same day as *New River*); *Desert Citizens*, 231 F.3d at 1185 ("A regional market and the presence of competitors sponsoring similar projects made reasonably probable . . . that use of the lands for landfill purposes was financially feasible [and should have been considered as a potential highest and best use].").

317  *See, e.g., New River*, 262 U.S. at 345 (refusing to depart from market value standard where prices "were controlled by the supply and demand. These facts indicate a free market").

318  *Cf. United States v. 15.00 Acres of Land in Miss. Cty.*, 468 F. Supp. 310, 314-16 & n.9 (E.D. Ark. 1979) ("The court is not unmindful of the special significance of this land to the [landowners], their families, friends and associates. And, while the court is sympathetic to the unique problems posed by the increasing demand for the limited natural resources involved in this case, the court must resolve the issues herein on the same basis as a jury, without regard to sympathy or prejudice or like or dislike of any party to this suit. . . . [W]hile the value of the . . . tract for duck hunting purposes is conceded, it does not follow that the [landowners] are to be compensated on the basis of that particular value . . . ."); APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 331 (14th ed. 2013) ("[H]ighest and best use . . . is an economic concept"); id. 334 ("[C]onservation and preservation are not uses of land. Rather, they are the motivations of individuals or groups for acquiring certain properties.").

As discussed in Section 4.4.2.4, sales of properties for conservation or similar purposes may also reflect project influence from the government project, which must be disregarded. As a result, such sales cannot be relied on as comparable sales without great caution.

319  *Chandler-Dunbar*, 229 U.S. at 80.

320  239 U.S. 57, 61 (1915).

321  *Id.* at 61; *accord Five Tracts of Land in Cumberland Twp. v. United States*, 101 F. 661, 664-65 (3d Cir. 1900) ("There is no doubt that historic association may enter into the market value of the land, but you are not to give, as separate items- First, market value; and, second, historic value.").

Whether a specific use is economic and therefore appropriate to consider depends on the market, not the use itself.[322] For example, in a market in which real estate developers are required to acquire and set aside suitable land to mitigate the impacts of and obtain approvals for real estate development projects, competitive demand in the private market could make mitigation an economic use.[323] But in a market lacking private competitive demand—due to insufficient development activity, absence of mitigation requirements, excess supply of suitable mitigation land, or other reasons—mitigation would not be an economic use.[324] A recent example can be found in a condemnation involving an existing conservation easement.[325] Recognizing "private market value" as the measure of compensation for the easement, the district court excluded all evidence not "relating to market value" from consideration, as "[c]onsiderations that may not reasonably be held to affect market value are excluded."[326] Thus, under federal law, whether mitigation or a similar use is economic (and therefore appropriate to consider) in a given valuation assignment cannot be assumed, but rather must be demonstrated on the specific facts of the property being appraised and the relevant market.[327]

### 4.3.2.4. Zoning and Permits.

A proposed highest and best use cannot be considered reasonably probable unless it is *legally permissible*.[328] Zoning regulations, permits, and other land use restrictions are therefore of critical importance in analyzing highest and best use because they restrict the uses to which property can lawfully be devoted.[329] Indeed, "regulatory restrictions may preclude an otherwise possible use even more decisively than the inherent physical characteristics of a property."[330] And "it is clear that just compensation must be determined in

---

322 *Compare United States v. Whitehurst*, 337 F.2d 765, 775 (4th Cir. 1964) (rejecting valuation based on use of gravel quarrying because "under the facts of this case, . . . extensive use to supply . . . sand and gravel demand is merely a figment of the imagination"), *with United States v. 237,500 Acres of Land*, 236 F. Supp. 44, 53 (S.D. Cal. 1964), *aff'd sub nom. United States v. Am. Pumice Co.*, 404 F.2d 336 (9th Cir. 1968) (allowing valuation based on use of pumice mining because "in this case, there was not only a prior market, but an existing and rising one on the date of taking, and the [landowners] were in active operation of the pumice mines").

323 *E.g.*, *Otay Mesa Property, L.P. v. United States*, 110 Fed. Cl. 732, 734 n.1 (2013) (*Otay Mesa II*), *aff'd in relevant part*, 779 F.3d 1315 (Fed. Cir. 2015) (*Otay Mesa III*); *see Olson v. United States*, 292 U.S. 246, 256 (1934) ("[P]ublic service corporations and others having that power [of eminent domain] frequently are actual or potential competitors [for property]. And, to the extent that probable demand by prospective purchasers or condemnors affects market value, it is to be taken into account."); *see also Sage*, 239 U.S. at 61 ("Any rise in value before the taking, not caused by the expectation of that event, is to be allowed, but we repeat, it must be a rise in what a purchaser might be expected to give.").

324 *See United States v.15.00 Acres of Land in Miss. Cty.*, 468 F. Supp. 310, 315 n.9, 316 (E.D. Ark. 1979) (Despite "special significance of this land to the [landowners and others, and] increasing demand for the limited natural resources[, . . . ] it does not follow that the [landowners] are to be compensated on the basis of that particular value[;]" rather, "all factors should be considered which would influence a person of ordinary prudence desiring to purchase the property involved."); *see also United States v. 46,572.96 Acres of Land in Doña Ana Ctys.*, 521 F.2d 13, 16 (10th Cir. 1975) ("In our case there is absolutely no evidence that anyone other than the government could or would use the land for a missile range."); *Olson v. United States*, 67 F.2d 24, 30 (8th Cir. 1933), *aff'd*, 292 U.S. 246 (1934) ("In using this defined standard [of market value] no account is given to values or necessities peculiar to the seller, or the buyer, but only such matters as would affect the ordinary seller and buyer in negotiating a fair price."); *cf. Chandler-Dunbar*, 229 U.S. at 80 ("no just criterion for estimating what the owner should receive"); *Sage*, 239 U.S. at 62 (rejecting compensation award reflecting not only market value but also "additional value gained by the [government's] acquisition that a commission felt] should be taken into account and shared between the [government] and the owner of the land,—a proposition to which we cannot assent").

325 *United States v. 1.57 Acres of Land in San Diego Cty.*, No. 12-cv-3055, 2015 WL 5254558 (S.D. Cal. Sept. 9, 2015).

326 *Id.* at *2-3 (quoting *United States v. 50 Acres of Land* (*Duncanville*), 469 U.S. 24, 29 (1984). Similarly, in a condemnation of land being used as a park, the Eighth Circuit found no "justification for a departure from the concept of market value as the standard of just compensation" and ordered a new trial in which "market value is not [to be] abandoned as the ultimate test . . . ." *United States v. S.D. Game, Fish & Parks Dep't*, 329 F.2d 665, 666-69 (8th Cir. 1964) (citing, *inter alia*, *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949); *Olson*, 292 U.S. at 254; *Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 408 (1878); and *L. Vogelstein & Co. v. United States*, 262 U.S. 337, 340 (1923)).

327 *1.57 Acres in San Diego*, 2015 WL 5254558. Note that even if mitigation is an economic use appropriate for consideration in a given assignment, the *price of mitigation credits* cannot equate to the value of property suitable for mitigation use.

328 *See United States v. 480.00 Acres of Land* (*Fornatora*), 557 F.3d 1297, 1312 (11th Cir. 2009); *United States v. 429.59 Acres of Land* (*Imperial Beach*), 612 F.2d 459, 462 (9th Cir. 1980); *United States v. 320 Acres of Land*, 605 F.2d 762, 818 & n.128 (5th Cir. 1979); *see also Olson*, 292 U.S. at 256-57 ("physical adaptability alone cannot be deemed to affect market value").

329 *See, e.g., United States ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land*, 821 F.3d 742, 753-54 (6th Cir. 2016); *United States v. 33.92356 Acres of Land* (*Piza-Blondet*), 585 F.3d 1, 7-9 (1st Cir. 2009); *Fornatora*, 557 F.3d 1297, 1313; *Imperial Beach*, 612 F.2d at 462; *320 Acres*, 605 F.2d at 818.

330 *320 Acres*, 605 F.2d at 818.

light of such regulatory restrictions."[331] As a result, any zoning or other use restrictions that are applied to the property and its proposed use on the date of valuation must be considered.[332] Under federal law, a "use is not possible and probable if it is prohibited by a zoning regulation that is not likely to change."[333] For any use that requires a permit, license, or rezoning, "it must be shown that there is a reasonable probability that such permit or license will be issued or that a re-zoning will occur to make the use legal."[334]

Of course, zoning regulations may change, and prospective purchasers may well consider the potential for a zoning change or variance when determining the price they would pay for the property.[335] Thus, if there was "a reasonable probability that the property would be rezoned or that a variance could have been obtained in the near future[,]" this probability should be considered in arriving at the value estimate[336]—but only to the extent that this probability would have *affected the price* a willing buyer would have paid for the property at the time of the government's acquisition.[337] It is legally improper to assume that a permit, license, or rezoning would be obtained.[338] Rather, the appraiser's opinion as to whether there is a reasonable probability of a zoning change must have a factual foundation; an unsupported statement that a zoning change is reasonably probable is insufficient.[339] To demonstrate a reasonable probability of rezoning or obtaining a variance requires concrete factual support; examples of such support might include, as the First Circuit recently suggested, instances of similar properties receiving similar variances, permits being granted to develop the subject property for the proposed use (not merely pending applications), or actual development of the proposed use on similarly zoned properties.[340] The test is not the probability (or possibility) of rezoning in absolute terms, but rather the market value of the property "in the light of the chances as they would appear to the hypothetical willing buyer and seller."[341]

---

331  *Id.* at 818 & n.128 (citing *United States v. Commodities Trading Corp.*, 339 U.S. 121 (1950)); *United States v. 765.56 Acres of Land in Southampton* (*765.56 Acres I*), 164 F. Supp. 942, 947 (E.D.N.Y. 1958) ("of course it is necessary . . . to consider the possibility and probability of the future use of this land . . . and the appropriate zoning for such use"), *aff'd sub nom. United States v. Glanat Realty Corp.*, 276 F.2d 264 (2d Cir. 1960).

332  *TVA v. 1.72 Acres*, 821 F.3d at 753-54; *Piza-Blondet*, 585 F.3d at 7-9; *United States v. 27.93 Acres of Land in Cumberland Cty.*, 924 F.2d 506, 512-14 (3d Cir. 1991); *United States v. 174.12 Acres of Land in Pierce Cty.*, 671 F.2d 313, 315-16 (9th Cir. 1982); *320 Acres*, 605 F.2d 762, 818; *United States v. Eden Mem'l Park Ass'n*, 350 F.2d 933, 936 (9th Cir. 1965); *H & R Corp. v. District of Columbia*, 351 F.2d 740, 742-43 (D.C. Cir. 1965); *Rapid Transit Co. v. United States*, 295 F.2d 465, 466-67 (10th Cir. 1961); *United States v. Meadow Brook Club*, 259 F.2d 41, 45 (2d Cir. 1958); *see, e.g., Wash. Metro. Area Transit Auth. v. One Parcel of Land* (*Old Georgetown*), 691 F.2d 702, 703-04 (4th Cir. 1982).

333  *Fornatora*, 557 F.3d at 1312; *see Piza-Blondet*, 585 F.3d at 7-8 (use can only be considered if it is "likely to be reasonably probable 'in the reasonably near future,'" quoting *Olson*, 292 U.S. at 255-56)); *320 Acres*, 605 F.2d at 818 & n.129 ("if existing zoning restrictions preclude a more profitable use, ordinarily such use should not be considered in the evaluation"); *Meadow Brook*, 259 F.2d at 45.

334  *Fornatora*, 557 F.3d at 1300.

335  *E.g., 320 Acres*, 605 F.2d at 818-19 & nn.128-29; *see Piza-Blondet*, 585 F.3d at 7-8.

336  *Piza-Blondet*, 585 F.3d at 7-8; *see 320 Acres*, 605 F.2d at 818-19.

337  *Olson*, 292 U.S. at 255, 256; *Virgin Islands v. 2.7420 Acres of Land*, 411 F.2d 785, 786 (3d Cir. 1969); *Wolff v. Puerto Rico*, 341 F.2d 945, 946 n.3 (1st Cir. 1965); *Meadow Brook*, 259 F.2d at 45; *H & R Corp.*, 351 F.2d at 743.

338  *E.g., United States ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land*, 821 F.3d 742, 753-54 (6th Cir. 2016); *Piza-Blondet*, 585 F.3d at 8; *see United States v. 62.50 Acres of Land in Jefferson Par.*, 953 F.2d 886, 888-93 (5th Cir. 1992); *see also H & R Corp.*, 351 F.2d at 742-43 ("[A] witness' bare assertion that zoning change was probable [does not allow the probability of a change in zoning to be considered]. His opinion must have some foundation in fact.").

339  *320 Acres*, 605 F.2d at 819 & n.130; H & R Corp., 351 F.2d at 742-43.

340  *See Piza-Blondet*, 585 F.3d at 8 (excluding appraiser's opinion that "failed to document a single instance in which the Board has ever, or is likely to, approve residential housing developments" on land with same zoning as the subject property); *accord United States ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land*, 821 F.3d 742, 754 (6th Cir. 2016).

341  *Wolff*, 341 F.2d at 946 n.3; *see United States v. 62.50 Acres of Land in Jefferson Par.*, 953 F.2d 886, 890 (5th Cir. 1992) ("If regulatory contingencies mean that a buyer would consider the use insignificant in deciding how much to pay for the property, the use does not contribute to the property's market value."); *United States v. 8,968.06 Acres of Land in Chambers & Liberty Ctys.*, 326 F. Supp. 546, 548 (S.D. Tex. 1971) (requiring proponent of prospective use requiring permit to "demonstrate that a willing buyer and seller would have regarded the issuance of the permit as reasonably probable").

These principles apply with equal force to regulations that preclude a particular use unless permits are issued by regulating authorities.[342] As held in a case recently affirmed by the Eleventh Circuit, the issue is whether there is a reasonable probability that permits for the proposed use would have been granted: if so, the market value "would be based on the property value as if it had obtained the necessary permits"—while if not, the value "would be based on conditions at the time" of the acquisition.[343] As with the possibility of rezoning, a reasonable possibility of obtaining necessary permits must be demonstrated with concrete factual support. The fact that the parcels under appraisal "are adjacent and proximate to established and permitted [uses] is not, without more, determinative."[344] Permitting issues often arise in connection with a proposed use of wetlands, which require permits to discharge dredged or fill material under the Clean Water Act as administered by the U.S. Army Corps of Engineers.[345] Such uses of wetlands may require not only federal but also state and/or municipal permits.[346] Other frequently encountered permits are discussed in Section 1.3.1.3.

**4.3.2.4.1.   Exceptions.** A narrow exception to the general rule that zoning and other land use regulations must be considered in determining a property's highest and best use may arise under the <u>scope of the project rule</u>.[347] As discussed in Section 4.5, the scope of the project rule ensures that compensation does not reflect changes in market value due to the influence of the government project prompting the acquisition. In most valuation assignments, zoning and other land use restrictions are not a form of *project influence*—they are simply "the legal framework of land use restrictions to which virtually all private real estate is subject," and so they must be considered regardless of whether the scope of the project rule applies.[348]

> **Whether the <u>scope of the project rule</u> applies and if so, how to apply it, are complex questions that require <u>legal instruction</u>. See Section 4.5.**

However, in limited circumstances—and only with appropriate **legal instructions**—application of the scope of the project rule may allow or require the appraiser to disregard the impact of a zoning restriction on a piece of property.[349] The Eleventh Circuit recently stated this narrow exception as follows:

> [I]n order to have a zoning restriction excluded from a calculation of a property's value, a landowner must show that the primary purpose of the regulation was to depress the property

---

342  *See, e.g., United States v. 381.76 Acres of Land (Montego Group)*, No. 96-1813-CV, 2010 WL 3734003, at *3-5 (S.D. Fla. Aug. 3, 2010), *adopted sub nom. United States v. 10.00 Acres of Land*, No. 99-0672-CIV, 2010 WL 3733994 (S.D. Fla. Sept. 22, 2010), *aff'd sub nom. United States v. Gonzalez*, 466 F. App'x 858 (11th Cir. 2012) (per curiam); *62.50 Acres in Jefferson*, 953 F.2d at 890-93; *8,968.06 Acres in Chambers*, 326 F. Supp. at 548.

343  *Montego Group*, 2010 WL 3734003, at *4.

344  *Id.; see also 320 Acres*, 605 F.2d at 819 n.130 ("[A] party obviously cannot . . . simply . . . assert[] that a particular use is reasonably practicable and reasonably probable, or that there is a reasonable possibility of obtaining a permit; . . . there must be some foundation in fact.").

345  Section 301(a) of the Clean Water Act prohibits the discharge of pollutants into the nation's waters, except for discharges made in compliance with other sections of the Act, including Section 404. Pursuant to Section 404, the U.S. Army Corps of Engineers administers a permit program for the discharge of dredged or fill material ("pollutants" under the Act) into navigable waters, including wetlands. The Clean Water Act is codified at 33 U.S.C. § 1251 *et seq. See* 33 C.F.R. § 323.2 (implementing regulations).

346  *See generally Montego Group*, 2010 WL 3734003.

347  *United States v. 480.00 Acres of Land (Fornatora)*, 557 F.3d 1297, 1307 (11th Cir. 2009).

348  *320 Acres*, 605 F.2d at 818 ("[I]t is clear that just compensation must be determined in light of such regulatory restrictions."); *see id.* at 818 n.128 (citing cases, including *United States v. Commodities Trading Corp.*, 339 U.S. 121 (1950) (wartime price controls); *United States v. Eden Mem'l Park Ass'n*, 350 F.2d 933, 936 (9th Cir. 1965); *Fairfield Gardens, Inc. v. United States*, 306 F.2d 167, 170 (9th Cir. 1962); *United States v. Delano Park Homes, Inc.*, 146 F.2d 473, 474 (2d Cir. 1944)); *see also Fornatora*, 557 F.3d at 1311.

349  *Fornatora*, 557 F.3d at 1307; *320 Acres*, 605 F.2d at 820 n.131.

value of land or that the ordinance was enacted with the *specific intent* of depressing property value for the purpose of later condemnation.[350]

Federal case law makes clear that this narrow test is not satisfied simply because the government advocated for or against a local zoning decision. Thus, the Second Circuit held it was improper to consider an improbable prospective rezoning (and therefore a more profitable use) even though the government's opposition was the primary obstacle to rezoning: "Clearly the United States, like any adjoining landowner, was a proper party to resist zoning."[351] The Second Circuit's reasoning has been widely adopted by federal courts, most recently by the Eleventh Circuit.[352]

### 4.3.3. Larger Parcel.

In adopting "working rules in order to do substantial justice[,]" the Supreme Court established that "a parcel of land which has been used and treated as an entity shall be so considered in assessing compensation for the taking of part or all of it."[353] That "parcel of land," reflecting the whole property to be considered for compensation purposes, is called the <u>larger parcel</u>. It is the economic unit to be valued.[354] Under federal law, the larger parcel is the tract or tracts of land that possess a unity of ownership and have the same, or an integrated, highest and best use.[355]

> **Definition of Larger Parcel**
> The tract or tracts of land that possess a unity of ownership and have the same, or an integrated, highest and best use.

The larger parcel may or may not have the same boundaries as the government's acquisition.[356] As a result, the appraiser must determine the larger parcel in every appraisal for federal acquisition purposes. This determination will distinguish whether a total or partial acquisition is involved, and therefore will dictate the valuation method to be used.[357] In a total acquisition, the United States acquires an entire larger parcel, and compensation is measured by the market value of the

**A <u>total acquisition</u> is an acquisition of an entire larger parcel. A <u>partial acquisition</u> is an acquisition of only part of a larger parcel.**

---

350  *Fornatora*, 557 F.3d at 1311 (emphases added); *accord United States v. Land & Cris Realms Inc.*, 213 F.3d 830, 834-36 (5th Cir. 2000); *United States v. 27.93 Acres of Land in Cumberland Cty.*, 924 F.2d 506 (3d Cir. 1991); *United States v. Meadow Brook Club*, 259 F.2d 41 (2d Cir. 1958); *see also 320 Acres*, 605 F.2d at 820 n.131.

351  *Meadow Brook*, 259 F.2d at 45; *accord Fornatora*, 557 F.3d at 1311; *see also Cris Realms*, 213 F.3d at 836.

352  *See, e.g., Fornatora*, 557 F.3d at 1311; *Cris Realms*, 213 F.3d at 834-36; *27.93 Acres in Cumberland*, 924 F.2d at 511.

353  *United States v. Miller*, 317 U.S. 369, 375-76 (1943); *see Sharp v. United States*, 191 U.S. 341, 354-55 (1903), *aff'g Sharpe v. United States*, 112 F. 893 (3d Cir. 1902).

354  *See United States v. 6.45 Acres of Land* (<u>Gettysburg Tower</u>), 409 F.3d 139, 147-48 & n.15 (3d Cir. 2005); *United States v. 0.21 Acres of Land*, 803 F.2d 620, 623-24 (11th Cir. 1986); *United States v. 429.59 Acres of Land* (<u>Imperial Beach</u>), 612 F.2d 459, 461 (9th Cir. 1980); *United States v. Buhler*, 254 F.2d 876, 882 & n.10 (5th Cir. 1958); *United States v. Waymire*, 202 F.2d 550, 554-55 (10th Cir. 1953).

355  *See Miller*, 317 U.S. at 375-76; *Sharp*, 191 U.S. at 351-56; *United States v. 33.92356 Acres of Land* (<u>Piza-Blondet</u>), 585 F.3d 1, 10 (1st Cir. 2009); *United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 392-93 & n.6 (5th Cir. 1982); *Imperial Beach*, 612 F.2d at 464-65; *Bank of Edenton v. United States*, 152 F.2d 251, 253 (4th Cir. 1945); *United States v. 25.202 Acres of Land* (<u>Amexx I</u>), 860 F. Supp. 2d 165, 179-81 (N.D.N.Y. 2010), aff'd, 502 F. App'x 43, 45-46 (2d Cir. 2012); *cf. Gettysburg Tower*, 409 F.3d at 148 & n.15, *and on remand*, No. 1:CV-99-2128, 2006 WL 839375 (M.D. Pa. March 27, 2006).

356  *See United States v. Grizzard*, 219 U.S. 180, 181-85 (1911). As discussed in Section 1.4.6, if the appraiser determines the boundaries of the larger parcel are different than those of the specific parcel initially identified for appraisal, the appraisal assignment may need to be modified. *Cf.* EATON, *supra* note 16, at 89-90 ("Appraisers, whether they are retained by the condemnor or the condemnee, have a tendency to estimate the value of the parcel shown on the condemnor's right-of-way map, *often without adequately analyzing the larger parcel*." (emphasis added)).

357  *See Miller*, 317 U.S. at 375-76; *Piza-Blondet*, 585 F.3d at 10; *see, e.g., Winn v. United States*, 272 F.2d 282 (9th Cir. 1959); *see generally* EATON, *supra* note 16, at 88-92 (stating "appraisers must make a determination of the larger parcel in all cases" and rejecting "myth that the larger parcel determination is only important in damage and/or benefit cases").

property acquired. In a partial acquisition, the United States acquires only part of a larger parcel, and compensation is measured by the difference between the market value of the larger parcel before the government's acquisition and the market value of the remainder after the government's acquisition.[358] A single acquisition for government purposes may involve more than one larger parcel (or parts of more than one larger parcel) for compensation and valuation purposes.[359]

The larger parcel determination is integral to the analysis of highest and best use.[360] It is fact-specific and rarely simple, but it is necessary for purposes of just compensation. As the Supreme Court explained:

> It is often difficult . . . to determine what is a distinct and independent tract; but the character of the holding, and the distinction between the residue of a tract whose integrity is destroyed by the taking, and what are merely other parcels or holdings of the same owner, must be kept in mind in the practical application of the requirement to render just compensation for property taken for public uses. How it is applied must largely depend upon the facts of the particular case . . . .[361]

**4.3.4.    Criteria for Analysis.** In determining the larger parcel, federal courts consider unity of use, unity of ownership (title), and physical unity (proximity or contiguity) as it relates to highest and best use—factors historically called the three unities.[362] Because this analysis typically involves questions of law as well as fact, appropriate **legal instructions** are often required.[363]

**4.3.4.1.    Unity of Use.** The key question in determining the larger parcel is whether parcels have an integrated use.[364] To meet the unity of use test in federal acquisitions, the lands in question must have the same or an integrated highest and best use.[365] Lands with dissimilar uses are not part of the same larger parcel, and must be considered as separate and distinct tracts for compensation and valuation purposes.[366]

> **Determination of the larger parcel is necessary in both total and partial acquisitions.**
>
> **Partial acquisitions (Section 4.6) require two larger parcel determinations. The larger parcel _before_ acquisition is also called the parent tract, and the larger parcel _after_ acquisition is the remainder.**

---

358  The before and after method of valuation and other issues specific to partial acquisitions are discussed in depth in Section 4.6.

359  *See, e.g., Gettysburg Tower*, 409 F.3d at 148 & n.15; *United States v. 6.24 Acres of Land* (*Weber*), 99 F.3d 1140, 1996 WL 607162 (6th Cir. 1996) (*per curiam*) (unpubl.). The unit rule (Section 4.2.2) would not prohibit a well-supported determination that an acquisition encompasses more than one larger parcel. As reasoned in *Weber*, considering a property's distinct features and then arriving at a value for the land as a whole does "not violate the spirit nor the application of the unit rule as employed by the courts." *Weber*, 1996 WL 607162 at *4.

360  *See, e.g., Piza-Blondet*, 585 F.3d at 3-4, 10; *8.41 Acres in Orange*, 680 F.2d at 390-91 & n.1 ("[Y]ou must first determine the fair cash market value, immediately before the taking, of the entire tract of land of which the portion taken was a part, in the light of the highest and best use at the time of the entire tract as a single unit. You must next determine the fair cash market value, immediately after the taking, of the remainder of the tract not taken, bearing in mind that the highest and best use of the remainder after the taking may not be the same as the highest and best use of the entire tract before the taking.").

361  *Sharp v. United States*, 191 U.S. 341, 354 (1903) (quoting and affirming *Sharpe v. United States*, 112 F. 893, 896 (1902)).

362  *See, e.g., 8.41 Acres in Orange*, 680 F.2d at 390-91, 394-95.

363  *See, e.g., Sharp*, 191 U.S. at 354; *Gettysburg Tower*, 409 F.3d at 148 & n.15; *United States v. 429.59 Acres of Land* (*Imperial Beach*), 612 F.2d 459, 463-64 (9th Cir. 1980) (approving instruction "to value the property as a unit" because "it was 'reasonably probable that the properties would be used in combination'"); *8.41 Acres in Orange*, 680 F.2d at 393.

364  *Piza-Blondet*, 585 F.3d at 10 (quoting *Baetjer v. United States*, 143 F.2d 391, 394-95 (1st Cir. 1944)); *8.41 Acres in Orange*, 680 F.2d at 393; *United States v. 25.202 Acres of Land* (*Amexx I*), 860 F. Supp. 2d 165, 179 (N.D.N.Y. 2010), *aff'd*, 502 F. App'x 43, 45 (2d Cir. 2012); *see Wash. Metro. Area Transit Auth. v. One Parcel of Land* (*Old Georgetown*), 691 F.2d 702, 704-05 (4th Cir. 1982); *Imperial Beach*, 612 F.2d at 463-64; *cf. United States v. 105.40 Acres of Land in Porter Cty.*, 471 F.2d 207, 211-12 (7th Cir. 1972); *United States v. Evans*, 380 F.2d 761, 763-64 (10th Cir. 1967).

365  *Old Georgetown*, 691 F.2d 702, 704-05 (4th Cir. 1982); *United States v. 158.24 Acres of Land in Bee Cty.*, 515 F.2d 230, 232 (5th Cir. 1975); *United States v. Wateree Power Co.*, 220 F.2d 226, 231-32 (4th Cir. 1955); *Baetjer*, 143 F.2d 391.

366  *See, e.g., Piza-Blondet*, 585 F.3d at 4-5, 9-10; *Winn v. United States*, 272 F.2d 282, 286-87 (9th Cir. 1959).

As with any other aspect of the highest and best use analysis, actual use is compelling evidence of highest and best use.[367] An integrated use that is merely planned or hoped for is not sufficient to meet the unity of use test.[368] In determining the larger parcel, a potential use "may be weighed only if there is a 'reasonable probability' the lands in question will be put to that use in the reasonably near future."[369] Even then, "potential use is only one factor to consider in determination of the 'unity' issue, along with unity of ownership, contiguity, and existing use."[370]

The federal unity of use test turns on an integrated highest and best use. But some courts have invoked a different unity of use test (rarely applicable in federal acquisitions) to determine whether to allow separate valuations of property taken and of damage to property not taken[371]—loosely, and misleadingly, called <u>severance damage</u>.[372] This taking plus damages compensation formula, also known as the State Rule, is generally improper in federal acquisitions regardless of unity of use.[373] Still, based on the State Rule measure of compensation, courts have required proof of *actual unitary use* with the part taken to allow consideration of separately calculated severance damage to a landowner's other property.[374] The actual unitary use test reflects the requirement that compensation cannot be charged for damage to separate and independent parcels belonging to the same owner as the property taken.[375] Under the Federal Rule, compensation in partial acquisitions is measured by the difference in the market value of the landowner's property *before* and *after* the government's acquisition, as discussed in Section 4.6. Using this federal measure, "there is no occasion for the making of any special award or determination of 'severance damage,' because the matter is included in the finding of what the remainder of the land was worth immediately after the taking."[376] For this reason, severance damage "concepts have no application" to acquisitions

---

367  *See, e.g., United States v. 50.50 Acres of Land*, 931 F.2d 1349, 1359 (9th Cir. 1991); *United States v. 33.92356 Acres* (<u>*Piza-Blondet Trial Op.*</u>), No. 98-1664, 2008 WL 2550586 (D.P.R. June 13, 2008), *aff'd, Piza-Blondet*, 585 F.3d 1.

368  *8.41 Acres in Orange*, 680 F.2d at 394 n.8 (citing *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266 (1943)); *United States v. Mattox*, 375 F.2d 461, 463-64 (4th Cir. 1967) ("there must exist a reasonable probability that the separate tracts would have been combined for such integrated use"); *Cole Inv. Co. v. United States*, 258 F.2d 203, 205 (9th Cir. 1958) (finding no unity of use where evidence "would only show a planned unity of use"); *cf. Powelson*, 319 U.S. at 284 ("the possibility or probability of [a future] action, so far as it affects present values, is a proper subject for consideration in valuing property for purposes of a condemnation award" (emphasis added)).

369  *E.g., Piza-Blondet Trial Op.*, 2008 WL 2550586; *8.41 Acres in Orange*, 680 F.2d at 394 n.8 (citing *Powelson*, 319 U.S. 266); *Imperial Beach*, 612 F.2d at 463-64.

370  *8.41 Acres in Orange*, 680 F.2d at 394 n.8.

371  *United States v. Certain Land Situated in Detroit* (<u>*DIBCO I*</u> (*for Detroit Int'l Bridge Co.*)), 188 F. Supp. 2d 747, 755 (E.D. Mich. 2002), *aff'd*, 450 F.3d 205 (6th Cir. 2006); *United States v. Honolulu Plantation Co.*, 182 F.2d 172, 179 (9th Cir. 1950); *see United States v. 10.0 Acres of Land*, 533 F.2d 1092, 1095 n.1 (9th Cir. 1976).

372  *United States v. Miller*, 317 U.S. 369, 376 (1943) ("loosely"); *United States v. 9.20 Acres of Land in Polk Cty.*, 638 F.2d 1123, 1125 n.2 & 1127 (8th Cir. 1981) (discussing "misleading" nature of term and concept of 'severance damages'; *United States v. 91.90 Acres of Land in Monroe Cty.* (<u>*Cannon Dam*</u>), 586 F.2d 79, 86 (8th Cir. 1978) ("[W]hile the solution to the problem [of measuring compensation in partial takings] is simple, it seems to be frequently missed. And, the difficulty seems to arise out of the concept of 'severance damage.'"); *Honolulu Plantation*, 182 F.2d at 175 n.1 ("The use of this term is to be criticized because it is apt to lead to loose thinking.").

373  As discussed in Section 4.6.4.1, the *taking plus damages* or State Rule formula not only is more complicated than the *before and after* or Federal Rule, but also frequently results in something other than just compensation under the Fifth Amendment.

374  *See DIBCO I*, 188 F. Supp. 2d at 749-55 (rejecting "severance damages" for owner's other property not in actual unitary use with part taken, and rejecting before and after valuation because there was no reasonable probability that owner's other property would be used in conjunction with part taken in reasonably near future).

375  *See Miller*, 317 U.S. at 376; *8.41 Acres in Orange*, 680 F.2d at 393 & n.6; *Cole Inv. Co. v. United States*, 258 F.2d 203, 205 (9th Cir. 1958) ("The test in severance damage cases [is] that market value is the criterion for severance damages and that 'strict proof of the loss in market value to the remaining parcel is obligatory.'" (quoting *Honolulu Plantation*, 182 F.2d at 179)); *United States v. Certain Parcel of Land in Jackson Cty.*, 322 F. Supp. 841, 850 (W.D. Mo. 1971) ("'Adaptability to a common use, or an intention on the part of the owner to put the property to a common use, is not enough to admit their being treated as a separate subject of damages.'" (quoting 6 A.L.R. 2d 1197, 1202)); see also *United States v. Mattox*, 375 F.2d 461, 463 (4th Cir. 1967) ("[I]t does not follow that the mere proximity or possibility of the integrated use will confer upon the owner a right to severance damages.").

376  *United States v. 403.14 Acres of Land in St. Clair Cty.*, 553 F.2d 565, 567 n.2 (8th Cir. 1977); *accord United States v. 6.24 Acres of Land* (<u>*Weber*</u>), 99 F.3d 1140, 1996 WL 607162, at *4 (6th Cir. 1996) (per curiam) (unpubl.); *United States v. 2.33 Acres of Land in Wake Cty.*, 704 F.2d 728, 730 (4th Cir. 1983); *see United States v. 33.92356 Acres of Land* (<u>*Piza-Blondet*</u>), 585 F.3d 1, 9 (1st Cir. 2009) ("The before and after method is particularly advantageous where either it is difficult to value fairly the condemned tract as a separate parcel or one of the parties contends that the remainder was harmed or benefitted by the condemnation.").

that are subject to "a before-and-after valuation . . . ."[377] With no separate calculation of severance damage under the Federal Rule, actual unitary use is not determinative, but merely a factor to be considered in determining the larger parcel in federal acquisitions.[378] For a full discussion of the Federal Rule, the State Rule, appropriate treatment of damages and benefits, and other issues arising in partial acquisitions, see Section 4.6.

In federal acquisitions, whether under the Federal Rule or (with appropriate **legal instructions**) the State Rule, the ultimate goal is to fairly measure the owner's actual compensable loss.[379] As a result, "strict proof of the loss in market value to the remaining parcel is obligatory."[380] Similarly, the availability of replacement property for the part acquired must be considered, as reasonable buyers and sellers would do.[381]

### 4.3.4.2. Unity of Ownership (Title).

**4.3.4.2.    Unity of Ownership (Title).** The larger parcel must also have *unity of ownership*—that is, there must be uniform control over the ownership and future of all property making up the larger parcel.[382] Principles of fairness underlie the unity of ownership concept and form the basis of the Supreme Court's reasoning in *Campbell v. United States*:

> [I]f the land taken from plaintiff had belonged to another, or if it had not been deemed part and parcel of this estate, he would not have been entitled to anything on account of the diminution in value of his estate. It is only because of the taking of a part of his land that he became entitled to any damages resulting to the rest.[383]

Thus, to allow landowners to receive compensation not only for their property but for diminution in value to land owned by another would be a windfall and an unfair enrichment rather than just compensation.[384]

Historically, unity of ownership (or unity of title) was held to require all property comprising a single larger parcel to be owned to precisely the same extent (e.g., in fee simple) by precisely the

---

377  *United States v. 10.0 Acres*, 533 F.2d 1092, 1095 n.1 (9th Cir. 1976) (noting "severance-damage cases . . . are not in point" regarding "a before-and-after valuation"); *accord Cannon Dam*, 586 F.2d at 86; *United States v. 765.56 Acres of Land in Southampton (765.56 Acres II)*, 174 F. Supp. 1, 13-14 (E.D.N.Y. 1959), *aff'd sub nom. United States v. Glanat Realty Corp.*, 276 F.2d 264 (2d Cir. 1960).

378  *See 8.41 Acres in Orange*, 680 F.2d at 393-94 & n.8; *United States v. 105.40 Acres of Land in Porter Cty.*, 471 F.2d 207, 210-12 (7th Cir. 1972); *Baetjer v. United States*, 143 F.2d 391, 394 (1st Cir. 1944); *see 403.14 Acres in St. Clair*, 553 F.2d at 567 n.2; *see also United States v. 429.59 Acres of Land (Imperial Beach)*, 612 F.2d 459, 463 (9th Cir. 1980) (affirming valuation of properties as a unit because it was "reasonably probable that the properties would be used in combination"); *cf. United States v. Grizzard*, 219 U.S. 180, 185-86 (1911) ("The determining factor was that the value of that part of the Grizzard farm not taken was $1,500, when the value of the entire place before the taking was $3,000.").

379  *See, e.g., Bauman v. Ross*, 167 U.S. 548, 574 (1897) ("The just compensation required by the constitution to be made to the owner is to be measured by the loss caused to him by the appropriation. He is entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public.").

380  *Cole Inv.*, 258 F.2d at 205 (quoting *Honolulu Plantation*, 182 F.2d at 179)).

381  *See* Section 4.6 and cases cited therein. This federal requirement may differ from state law.

382  *Imperial Beach*, 612 F.2d at 463-64; *United States v. 17.69 Acres of Land in San Diego (Nat'l Enterprises)*, No. 99cv1248 DMS (JMA), slip op. at 8 (S.D. Cal. Aug. 30, 2004) ECF No. 272; *United States v. 14.36 Acres of Land in McMullen Cty.*, 252 F. Supp. 2d 361, 363 (S.D. Tex. 2002).

383  *Campbell v. United States*, 266 U.S. 368, 371 (1924); *see Sharp v. United States*, 191 U.S. 341, 355 (1903) ("'It is solely by virtue of his ownership of the tract invaded that the owner is entitled to . . . damages.'").

384  *See Campbell*, 266 U.S. at 371; *United States v. Grizzard*, 219 U.S. 180, 184 (1911) ("The 'just compensation' thus guaranteed obviously requires that the recompense *to the owner* for the loss *caused to him* by the taking of a part of a parcel, or single tract of land, shall be measured by the *loss resulting to him* from the appropriation." (emphases added)); *Sharp*, 191 U.S. at 354; *see also United States ex rel. Tenn. Valley Auth. v. Stewart*, 429 F. Supp. 658, 659-61 (E.D. Tenn. 1976) ("it would be wholly inequitable to allow other parties owning . . . different tracts . . . [to] secure damages to which they are not entitled").

same owner.[385] But modern case law has recognized that at times, the strict traditional rule may ignore market realities that should in fairness be considered.[386] As a result, the unity of ownership inquiry focuses on whether a *single decision maker* has *actual legal control* of all property at issue.[387] Ultimately, unity of ownership turns on what "is more consistent with the goal of just compensation . . . ."[388] Because unity of ownership raises not only factual but legal questions, appraisers must obtain **legal instructions** if they conclude that a single larger parcel exists when the ownership interests in all parts of the whole are not identical.[389] This is one of many issues on which federal and state law may differ.[390]

Federal courts have held that fairness compels consideration of market realities in determining unity of ownership. Accordingly, the Ninth Circuit found unity of title was satisfied for properties owned by three corporations because a single person served as the president, chairman of the board, and chief executive officer for all three entities.[391] As one district court recently reasoned, a person with personal control of Parcel A and actual control of Parcel B as the sole owner of a corporation "would never negotiate against or attempt to undermine himself in a transaction. The relevant 'economic realities of the marketplace simply do not produce those kind of results.'"[392] Moreover, as another district court observed, "the buyer in the marketplace could readily acquire both parcels from the same operative vendors, exercising the same business judgment in the transaction."[393]

But "a group of individuals is significantly different than a single decision maker operating through a variety of corporate forms."[394] Fairness and market realities therefore dictate that unity of ownership does not exist when *multiple* decision makers are involved—that is, as one district court recently stated, "when the wishes of different individuals, and not a single individual wearing multiple hats, must be spanned to achieve unity of title."[395] As a result, unity of ownership has been ruled lacking when one tract was owned by one person and a second tract by a spouse,[396] sibling,[397] or adult child.[398] Similarly, the existence of common or overlapping owners among multiple decision makers is not sufficient for unity of ownership. Thus, a court found unity of ownership was lacking among three tracts: one owned by one person, the second owned by the same person and a sibling, and the third owned by the same person and his spouse.[399]

385  *United States v. 87.30 Acres of Land*, 430 F.2d 1130, 1133 (9th Cir. 1970); *Stewart*, 429 F. Supp. at 660-61; *United States v. Certain Parcel of Land in Jackson Cty.*, 322 F. Supp. 841, 848-49 (W.D. Mo. 1971).

386  *See Imperial Beach*, 612 F.2d at 464; *14.36 Acres in McMullen*, 252 F. Supp. 2d at 363-64.

387  *E.g., So. Supply Header, LLC v. 110 Acres in Covington Cty.* (*SESH*), No. 2:07-CV-291 KS-MTP, 2008 WL 127490, at *2 (S.D. Miss. Jan. 10, 2008); *Nat'l Enterprises*, slip op. at 4-8, ECF No. 272; *14.36 Acres in McMullen*, 252 F. Supp. 2d at 363-64; *see Imperial Beach*, 612 F.2d at 463-64.

388  *14.36 Acres in McMullen*, 252 F. Supp. 2d at 364; *accord United States v. Miller*, 317 U.S. 369, 375-76 (1943) (larger parcel requirement and subsidiary rules developed "in order to do substantial justice").

389  *See 14.36 Acres in McMullen*, 252 F. Supp. 2d at 364; *see also Miller*, 317 U.S. at 375-76; *Sharp*, 191 U.S. at 354.

390  *See 14.36 Acres in McMullen*, 252 F. Supp. 2d at 363 (disregarding state law on unity of use because federal law controls in federal condemnation cases); *see also Oncor Elec. Delivery Co. v. Brown*, 451 S.W.3d 128, 132 (Tex. Ct. App. 2014) (citing *14.36 Acres* and noting differences in federal and state law).

391  *Imperial Beach*, 612 F.2d at 463-64.

392  *SESH*, 2008 WL 127490, at *2 (quoting *14.36 Acres in McMullen*, 252 F. Supp. 2d at 364).

393  *14.36 Acres in McMullen*, 252 F. Supp. 2d at 363-64 (quoting JULIUS L. SACKMAN ET AL., NICHOLS ON EMINENT DOMAIN § 1202[1] (rev. 3d ed. 2001)).

394  *SESH*, 2008 WL 127490, at *2.

395  *Id.*

396  *United States ex rel. Tenn. Valley Auth. v. Stewart*, 429 F. Supp. 658, 660-61 (E.D. Tenn. 1976).

397  *Id.*

398  *United States v. 87.30 Acres of Land in Whitman & Garfield Ctys.*, 430 F.2d 1130, 1133 (9th Cir. 1970) (cited with approval in *United States v. 50.50 Acres of Land*, 931 F.2d 1349, 1350 (9th Cir. 1991)); *SESH*, 2008 WL 127490, at *2-3; *see Stewart*, 429 F. Supp. at 660 n.3 ("familial relationship to the other owners [is] a consideration not relevant to this analysis" (citing *87.30 Acres in Whitman, supra*)).

399  *Stewart*, 429 F. Supp. at 660-61 ("For whatever reason, they have treated the three tracts as independent with regard to the ownership interests held therein."); *accord SESH*, 2008 WL 127490, at *1-3 (no unity of ownership among two adjacent tracts, one owned in fee by one person and the second owned by the same person and his parents).

5-ER-871

Tracts that lack unity of ownership cannot be treated as a single larger parcel for just compensation purposes, regardless of whether they share an integrated or actual use. Accordingly, a district court recently found no unity of ownership among one tract owned by one person in fee, and a second tract owned by the same person and his parents, observing that "[d]espite the present harmony of the . . . family, either [the son] or his parents could prevent a transaction to acquire a present possessory interest in the [combined tracts]."[400] The court ultimately concluded:

> Although both parents and son benefit from the uninterrupted use of the whole, the division of ownership between the . . . parents and their son has legal consequences in an eminent domain proceeding. The potentially conflicting interests between the parents' use of their life estates and the son's vested remainder make it impossible . . . to recognize a unity of title consistent with available case law.[401]

### 4.3.4.3.  Physical Unity (Contiguity or Proximity). Under federal law, physical unity is considered within the context of integrated use rather than as a stand-alone test. As the First Circuit emphasized:

> Physical contiguity is important, however, in that it frequently has great bearing on the question of unity of use. Tracts physically separated from one another frequently, but we cannot say always, are not and cannot be operated as a unit, and the greater the distance between them the less is the possibility of unitary operation . . . .[402]

Accordingly, the physical unity (proximity) or separation of a tract is an important consideration, but not necessarily determinative of the ultimate question of what constitutes a single tract.[403]

The availability of replacement property for the part acquired must always be considered (as noted above) and can be particularly important in partial acquisitions involving noncontiguous parcels devoted to a unitary use, such as a livestock ranch or a timber and milling operation.[404] The effect of the existence (or absence) of replacement property on the market value of the remainder property must be shown, as it will vary depending on the property, its use, and the relevant market. For example, in *International Paper Co. v. United States*, the Fifth Circuit found no unitary use between woodland acres and the same landowner's paper mill in another state, as neither the existing operation nor any reasonable expectation in the foreseeable future showed any difference between the owner's small woodland tracts and "the tracts of small owners whose products would be available on a competitive basis."[405] Moreover, the landowner could "turn right around and

---

400  *SESH*, 2008 WL 127490, at *2.

401  *Id.* at *3.

402  *Baetjer v. United States*, 143 F.2d 391, 395 (1st Cir. 1944); *cf. Sharpe v. United States*, 112 F. 893, 895-96 (3d Cir. 1902), *aff'd sub nom. Sharp v. United States*, 191 U.S. 341 (1903) (discussing "22 acres of meadow . . . not adjoining or a part of [the farm tract with which it had been purchased], nor was it used in connection therewith, but was such a considerable distance away, and of so little value, that no attention was paid to it by either [party], either as to value or damages").

403  *Baetjer*, 143 F.2d at 395.

404  *See, e.g., United States v. Evans*, 380 F.2d 761, 764 (10th Cir. 1967) (livestock ranch); *Int'l Paper Co. v. United States*, 227 F.2d 201, 206-07 (5th Cir. 1955) (paper mill operation); *Baetjer*, 143 F.2d at 396-97 (sugar cane production); *Ga.-Pac. Corp. v. United States*, 640 F.2d 328 (Ct. Cl. 1980) (per curiam) (burden to show that "replacement old-growth timber was not available, or if available, at least, the burden to show persuasively that under existing circumstances it would be economically unfeasible to obtain available replacement timber"); *cf. United States v. 711.57 Acres of Land in Alameda Cty.*, 51 F. Supp. 30, 33 (N.D. Cal. 1943) (awarding compensation reflecting availability of alternative access to severed tract).

405  *Int'l Paper*, 227 F.2d at 206. The Fifth Circuit went on to state that regardless of whether a unitary tract existed (which it called "quite doubtful"), there was "no doubt whatever about the correctness" of the finding that the taking of woodland acreage did not diminish the value of the remainder property (the paper mill). *Id.* at 206-07.

make its acreage whole by buying [similarly located timber property to replace that taken] with the proceeds of the condemnation award."[406] Meanwhile in *United States v. Evans*, different facts led the Tenth Circuit to uphold a finding that pastureland was part of a single economic unit with noncontiguous but "integrated" and "interdependent" croplands, feeding yards, and ranch headquarters with silage land within economical hauling distance.[407]   In *Evans*, there was evidence that such physical separation of integrated tracts was not only common for ranching in the area but considered desirable to take advantage of variations in rainfall, soil types, and other factors, and that "pasture land sold separately would bring a lower price than if sold as part of a ranch—a balanced unit."[408] Even so, the Tenth Circuit cautioned, the *Evans* case "must be considered to be an extreme one, as to the noncontiguous tract problem; however, the record shows unusually clear evidence on the point. The damages have been well limited to the integrated lands."[409] Critically, both *Evans* and *International Paper* "restricted damages to the realities of the situation . . . ."[410] Of course, depending on "the realities of the situation," even a demonstrated lack of available replacement property may not diminish the value of remainder property.[411]

### 4.3.4.4. Legal Instructions.

**4.3.4.4.   Legal Instructions.** While the larger parcel must ultimately be determined by the appraiser, **legal instructions** are often required to address questions of law that arise within the appraiser's analysis. For example, whether unity of ownership exists based on the quality of the property interests held in different tracts raises not only factual but legal questions.[412] Thus, an appraiser must obtain **legal instructions** if the ownership interests in all parts of the whole are not identical in a potential larger parcel. Similarly, whether there is sufficient evidence to support a finding of an integrated use involves legal as well as factual analysis.[413] In addition, in federal condemnation litigation, the appraiser's larger parcel analysis and conclusions will be evaluated by the court and/or the finder of fact (jury, land commission, or judge).[414]

**4.3.4.5.   Special Considerations in Partial Acquisitions.** In partial acquisitions, the appraiser must make two separate determinations of highest and best use: once for the larger parcel

---

406  *Id.* at 207 (noting that the landowner in fact "actually purchased [such replacement property] subsequent to the taking here involved").

407  *Evans*, 380 F.2d at 764.

408  *Id.* at 764; *cf.* APPRAISAL INST. & AM. SOC'Y OF FARM MANAGERS, THE APPRAISAL OF RURAL PROPERTY 343, 323-60 (2d ed. 2000) ("[T]he highest and best use of a ranch property is directly related to ranch balance." (Chapter 19: The Valuation of Livestock Ranches)).

409  *Evans*, 380 F.2d at 764.

410  *Id.* (analyzing Int'l Paper, 227 F.2d 201).

411  *Id.*; e.g., *Baetjer*, 143 F.2d at 396, and on remand, *United States v. 7936.6 Acres of Land*, 69 F. Supp. 328, 332 (D.P.R. 1947) ("[W]hile there has been a severance in the legal sense such severance has caused no compensable damage to the market value of the properties not taken."); *see also Int'l Paper*, 227 F.2d at 207 n.7 (discussing *Baetjer* and result on remand).

412  *See, e.g.*, *United States v. 429.59 Acres of Land* (*Imperial Beach*), 612 F.2d 459, 463-64 (9th Cir. 1980); *United States v. 14.26 Acres of Land in McMullen Cty.*, 252 F. Supp. 2d 361, 363-64 (S.D. Tex. 2002); *United States v. 17.69 Acres of Land in San Diego* (*Nat'l Enterprises*), No. 99cv1248 DMS (JMA) (S.D. Cal. Aug. 30, 2004), ECF No. 272; *Se. Supply Header, LLC v. 110 Acres in Covington Cty.* (*SESH*), No. 2:07-CV-291 KS-MTP, 2008 WL 127490, at *2 (S.D. Miss. Jan. 10, 2008).

413  *See, e.g.*, *United States v. 33.92356 Acres of Land* (*Piza-Blondet*), 585 F.3d 1, 10 (1st Cir. 2009); *United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 393 (5th Cir. 1982); *United States v. 25.202 Acres of Land* (*Amexx I*), 860 F. Supp. 2d 165, 179-81 (N.D.N.Y. 2010), aff'd, 502 F. App'x 43, 45-46 (2d Cir. 2012); *SESH*, 2008 WL 127490, at *3; *United States v. Certain Land Situated in Detroit* (*DIBCO I* (for *Detroit Int'l Bridge Co.*)), 188 F. Supp. 2d 747, 755 (E.D. Mich. 2002), aff'd, 450 F.3d 205 (6th Cir. 2006).

414  There is a split of authority among federal courts on this issue, although it does not affect the appraiser's role of determining the larger parcel in keeping with appropriate legal instructions. The Supreme Court has held that in a federal condemnation case, "except for the single issue of just compensation, the trial judge is to decide all issues, legal and factual, that may be represented." *United States v. Reynolds*, 397 U.S. 14, 19 (1970); *see* FED. R. CIV. P. 71.1(h). Many federal circuits hold based on *Reynolds* that "[u]nity of use is an issue for the court to decide." *Amexx I*, 860 F. Supp. 2d at 179; *accord DIBCO*, 450 F.3d at 208-11; *Imperial Beach*, 612 F.2d at 463-64; *United States v. 105.40 Acres of Land in Porter Cty.*, 471 F.2d 207, 212 (7th Cir. 1972); *see Piza-Blondet*, 585 F.3d at 10 ("While unity of use is an issue for the court to decide, unless some party objects, there is no ground for overturning a decision by the trial judge to submit the question to the jury in an advisory capacity."). But some federal courts hold that "the issue of unity or separateness of tracts is a question of fact to be presented to the trier of fact." *8.41 Acres in Orange*, 680 F.2d at 393; *see also Nat'l Enterprises*, slip op. at 2 n.1 (S.D. Cal. Aug. 30, 2004), ECF No. 271 ("The Court also questions Defendants' assertion that the issue of unity or separateness of tracts is a matter of law to be decided by the Court."). Even under the latter rule, however, the court will reject the fact-finder's identification of the unitary parcel if it is unsupported, speculative, or otherwise legally erroneous. *E.g.*, *8.41 Acres in Orange*, 680 F.2d at 393-94 & n.8 (rejecting commission's "clearly erroneous . . . finding that the strips of condemned land were 'severed' from their parent tracts").

---

5-ER-873

before acquisition, and once for the remainder after acquisition. As J.D. Eaton cautioned: "If the appraiser does not estimate the property's highest and best use correctly in both the before and after situations, it will be impossible to estimate the property's value correctly."[415]

The existence and extent of any change in highest and best use due to the government's acquisition requires careful analysis.[416] The highest and best use of the remainder may reflect a complete change, a change in intensity, or no change from the highest and best use of the larger parcel before acquisition.[417] A change in a property's highest and best use may have a positive, negative, or negligible impact on its market value. For example, if what was farmland before acquisition becomes lakefront property with a highest and best use for recreational home sites, offsetting special or direct benefits may apply, as discussed in Section 4.5.5.[418] On the other hand, if a remainder property has a less valuable highest and best use after acquisition, the difference in the values before and after acquisition will reflect any compensable diminution in the value of the remainder resulting from acquisition, as discussed in in Section 4.5.2.

**4.3.4.6.    Special Considerations in Riparian Land Acquisitions.** When developing an opinion of the highest and best use of land riparian to navigable water, there are special considerations that must be taken into account, as discussed in Section 4.11.1.

**4.3.4.7.    Special Considerations in Land Exchanges.** Different considerations may be required in determining the larger parcel in appraisals for federal land exchanges (see Section 1.12). In such situations, **legal instructions** for the appraiser to assume a specific larger parcel determination may be necessary to comply with statutes or other federal requirements, as discussed in Section 4.10.

> **Determining the larger parcel in inverse takings claims raises complex legal issues. Close consultation between appraisers and legal counsel is essential.**

**4.3.4.8.    Special Considerations in Inverse Takings.** Determining the larger parcel in connection with inverse taking claims for liability purposes requires different considerations than in eminent domain-based valuations because of the distinct—and complex—legal issues involved.[419] As the Ninth Circuit explained, in eminent domain cases the issue is *how much* is due the landowner as just compensation: "[But i]n inverse condemnation the issue is liability: Has the government's action effected a taking of the landowner's property? [T]he boundaries of the property allegedly taken must be determined by taking jurisprudence rather than the laws of eminent domain."[420]

---

415  Eaton, *supra* note 16, at 104; see *Olson v. United States*, 292 U.S. 246, 255 (1934).

416  *See, e.g., Rousseaux v. United States*, 394 F.2d 123, 124 (5th Cir. 1968) (per curiam) ("The parties did not dispute that the highest and best use of the land after the easement was imposed was for growing timber. However, the highest and best use of the land before the taking was sharply contested, as was the issue of value.").

417  *E.g., E. Tenn. Nat. Gas Co. v. 7.74 Acres of Land*, 228 F. App'x 323 (4th Cir. 2007) (unpubl.) (highest and best use changed from commercial development before taking to agricultural or residential use after taking); *Wash. Metro. Area Transit Auth. v. One Parcel of Land* (*Old Georgetown*), 691 F.2d 702, 703 (4th Cir. 1982) (change in intensity from low-density to high-density residential development in new mass-transit "impact zone"); *United States v. Werner*, 36 F.3d 1095 (4th Cir. 1994) (no change in highest and best use of large-lot residential development); *8.41 Acres in Orange*, 680 F.2d at 394-95 (no change in highest and best use for industrial plant sites).

418  *E.g., United States v. Trout*, 386 F.2d 216 (5th Cir. 1967).

419  *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002) ("Our regulatory takings jurisprudence . . . is characterized by 'essentially ad hoc, factual inquiries,' designed to allow 'careful examination and weighing of all relevant circumstances'" (quoting *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978), and *Palazzolo v. Rhode Island*, 533 U.S. 606, 636 (2001) (O'Connor, J., concurring)).

420  *Am. Savings & Loan Ass'n v. County of Marin*, 653 F.2d 364, 369 (9th Cir. 1981).

In the context of regulatory inverse takings claims, the larger parcel is commonly referred to as the <u>parcel as a whole</u> or the <u>denominator</u>.[421] It is the relevant parcel against which to measure the economic impact of the regulation being challenged.[422] As a result, determination of the parcel as a whole plays a critical role in regulatory takings cases in determining liability—i.e., whether a compensable taking occurred.[423] This complex legal determination requires careful consideration of all relevant facts, making close consultation between the appraiser and legal counsel essential.[424]

The typical starting point is "the metes and bounds that describe [the] geographic dimensions" of contiguous acres held under common ownership,[425] with a focus on the property owned by the plaintiff at the time of the government action giving rise to the taking. As a result, the unity-of-ownership test may need to be disregarded, or applied on an earlier date, so that the parcel as a whole will include properties originally (but no longer) held in common ownership on the date of valuation.[426] The owner's actual and projected use of the property must also be considered. Other relevant factors include the timing of an owner's acquisition of property interests, the timing of the imposition of the regulations being challenged, the owner's demonstrated expectations for the property, whether the extent to which property is linked through a common development scheme, and the extent to which regulated portions are integrated with and enhance the value of unregulated portions of the property.

The Supreme Court has consistently rejected the "circular" approach of "defining the [relevant parcel] in terms of the very regulation being challenged."[427] But lower federal courts' rulings weighing the various factors listed above have resulted in contradictory opinions, with some facing Supreme Court review as these Standards went to publication.[428]

## 4.4.    Valuation Process.

### 4.4.1.    The Three Approaches to Value.
For purposes of just compensation, market value must be determined "with an approach which seeks with the aid of all relevant data to find an amount representing value to any normally situated owner or purchaser of the interests taken . . . ."[429] Three approaches to value are recognized in federal acquisitions: (1) the <u>sales comparison approach</u>, (2) the <u>cost approach</u>, and (3) the <u>income capitalization approach</u>.[430]

---

421    *E.g., Palazzolo*, 533 U.S. at 631 ("the difficult, persisting question of what is the proper denominator in the takings fraction"); *Penn Cent.*, 438 U.S. at 130-31 ("In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole . . . .").

422    *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987) ("Because our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction.'").

423    *See, e.g., Tahoe-Sierra*, 535 U.S. at 330-31; *Penn Cent.*, 438 U.S. at 130-31.

424    *Cf. Tahoe-Sierra*, 535 U.S. at 322; *Palazzolo*, 533 U.S. at 636 (O'Connor, J., concurring); *Penn Cent.*, 438 U.S. at 124.

425    *See Tahoe-Sierra*, 535 U.S. at 331.

426    *E.g., Norman v. United States*, 429 E3d 1081, 1087, 1091 (Fed. Cir. 2005) (including previously sold property in parcel as a whole).

427    *Tahoe-Sierra*, 535 U.S. at 331.

428    *See, e.g., Lost Tree Village Corp. v. United States*, 787 F.3d 1111 (Fed. Cir. 2015), *petition for cert. docketed*, No. 15-1192 (March 23, 2016); *Murr v. Wisconsin*, 359 Wis. 2d 675 (Wis. Ct. App. 2014), *review denied*, 366 Wis. 2d 59 (2015), *cert. granted*, 136 S. Ct. 890 (2016).

429    *Kimball Laundry v. United States*, 338 U.S. 1, 20 (1949).

430    *See generally United States v. 25.202 Acres of Land* (<u>Ameex I</u>), 860 F. Supp. 2d 165, 174-75 (N.D.N.Y. 2009), *adopted by* 860 F. Supp. 2d 165 (N.D.N.Y. 2010), *aff'd*, 502 F. App'x 43, 45 (2d Cir. 2012). As discussed in Section 4.4.5, it may be appropriate to incorporate aspects of all three approaches to value in the *development method*, a technique for appraising undeveloped acreage with a highest and best use for subdivision into lots. *E.g., United States v. 99.66 Acres of Land* (<u>Sunburst Invs.</u>), 970 F.2d 651, 655-56 (9th Cir. 1992).

---

5-ER-875

Because the "federal conception of market value . . . is intimately related to selling prices in the market,"[431] the sales comparison approach is normally preferred as the best evidence of market value in federal acquisitions, but not to the exclusion of other relevant evidence of value based on market data.[432] One or more approaches to value may be appropriate—even necessary—to derive a reliable estimate of market value in a given appraisal problem.[433] As the Supreme Court recognized:

> Valuation is not a matter of mathematics . . . . Rather, the calculation of true market value is an applied science, even a craft. Most appraisers estimate market value by employing not one methodology but a combination. These various methods generate a range of possible market values which the appraiser uses to derive what he considers to be an accurate estimate of market value, based on careful scrutiny of all the data available.[434]

Of course, not every approach to value is appropriate for every valuation assignment: in determining market value in federal acquisitions, appraisers must not use an approach that "though perhaps making it easier to reach some solution, only ma[kes] the proper solution more difficult."[435] Federal courts have repeatedly prohibited the use of an approach to value that is unreliable in light of the facts and circumstances of a given valuation problem.[436] Where just compensation is concerned, a reliable valuation process is necessary to ensure a just result, "and it is the duty of the state, *in the conduct of the inquest by which the compensation is ascertained*, to see that it is just, not merely to the individual whose property is taken, but to the public which is to pay for it."[437]

**4.4.2.   Sales Comparison Approach.** Under federal law, unforced, arm's-length transactions of properties in the vicinity of and comparable to the property being appraised, reasonably near the

---

431   *United States v. 60.14 Acres of Land*, 362 F.2d 660, 665 (3d Cir. 1966).

432   *See United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 402-404 (1949); *United States v. Miller*, 317 U.S. 369, 374-75 (1943); *United States v. 320 Acres of Land*, 605 F.2d 762, 798-99 & n. 61 (5th Cir. 1979) (citing cases).

433   *Toronto, Hamilton*, 338 U.S. at 402-405 ("Were market conditions normal, we could hardly call an award 'just compensation' unless relevant . . . sales, in available markets, were considered. . . . The question is of course one of degree, and we do not mean to foreclose the consideration of each case upon its facts."); *see CSX Transp., Inc. v. Ga. State Bd. of Equalization*, 552 U.S. 9, 17 (2007) ("Appraisers typically employ a combination of methods because no one approach is entirely accurate, at least in the absence of an established market for the type of property at issue. The individual methods yield sometimes more, sometimes less reliable results depending on the peculiar features of the property evaluated."); *Seravalli v. United States*, 845 F.2d 1571, 1575 (Fed. Cir. 1988) ("The method of valuation that is most appropriate in the light of the facts of the particular case . . . . may be a single method or some combination of different methods."); *Sill Corp. v. United States*, 343 F.2d 411, 416 (10th Cir. 1965).

434   *CSX Transp.*, 552 U.S. at 16-17.

435   *United States v. Benning Hous. Corp.*, 276 F.2d 248, 253 (5th Cir. 1960); *cf. CSX Transp.*, 552 U.S. at 18 (rejecting contention that it is "as likely to get an accurate result by [one valuation method] as it is by employing another method altogether" because "some approximations [a]re better than others").

436   *See, e.g.*, *United States v. 25.202 Acres of Land* (*Amexx I*), 860 F. Supp. 2d 165, 174-179 (N.D.N.Y. 2009), *adopted by* 860 F. Supp. 2d 165 (N.D.N.Y. 2010), *aff'd*, 502 F. App'x 43, 45 (2d Cir. 2012); *United States v. 33.92356 Acres of Land* (*Piza-Blondet*), 585 F.3d 1, 7-8 (1st Cir. 2009); *see United States v. Wise*, 131 F.2d 851, 851-52 (4th Cir. 1942); *cf. Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146-47 (1997) (expert opinions are to be rejected when "there is simply too great an analytical gap between the data and the opinion proffered"); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) (expert opinions must be "not only relevant, but reliable").

437   *Bauman v. Ross*, 167 U.S. 548, 574 (1897) (emphasis added) quoting *Searl v. Sch. Dist. in Lake City*, 133 U.S. 553, 562 (1890); *cf. Gen. Elec.*, 522 U.S. at 149-50 (Breyer, J., concurring) (observing that subjecting expert opinions to appropriate legal standards "will help secure the basic objectives of . . . the ascertainment of truth and the just determination of proceedings" and citing FED. R. EVID. 102); *Olson v. United States*, 292 U.S. 246, 257 (1934) ("to allow mere speculation and conjecture to become a guide for the ascertainment of value [is] a thing to be condemned in business transactions as well as in judicial ascertainment of truth").

time of acquisition, are normally the best evidence of market value.[438] The process of forming an opinion of a property's market value through comparison with such <u>comparable sales</u> is known as the <u>sales comparison approach to value</u>.[439] The sales comparison approach is normally preferred in federal acquisitions as the best evidence of value, but not to the exclusion of other relevant evidence of value based on market data.[440] The essence of the sales comparison approach to value is the comparison of sales transactions to the property being appraised.[441] "Generally, the more comparable a sale is, the more probative it will be of the fair market value" of the property being appraised.[442] The converse is also true, as one court observed:

> Significant differences as to location, size, topography, market area, and recreational potential existed between most comparable sales and the subject property. This makes comparison extremely shaky because of the necessity of substantial adjustments required between the comparable and the subject.[443]

As a result, the most recent sale of the property being appraised may well be the most comparable of all the comparable sales, as discussed further in Section 4.4.2.4.1.[444]

**4.4.2.1.    Comparability.** A sale's comparability "is largely a function of three variables: characteristics of the properties, their geographic proximity to one another, and the time differential."[445] The significance of different elements of comparison will vary with the type of property being appraised and the relevant market. For example, as the Sixth Circuit explained:

---

438   *E.g., El Paso Nat. Gas Co. v. Fed. Energy Regulatory Comm'n*, 96 F.3d 1460, 1464 (D.C. Cir. 1996); *United States v. 819.98 Acres of Land*, 78 F.3d 1468, 1471 (10th Cir. 1996); *United States v. 24.48 Acres of Land*, 812 F.2d 216, 218 (5th Cir. 1987); *United States v. 47.14 Acres of Land in Polk Cty.*, 674 F.2d 722, 725 (8th Cir. 1982); *United States v. 103.38 Acres of Land in Morgan Cty.* (*Oldfield*), 660 F.2d 208, 211 (6th Cir. 1981); *United States v. 320 Acres of Land*, 605 F.2d 762, 798 & n.61 (5th Cir. 1979) (citing cases); *United States v. 100 Acres of Land*, 468 F.2d 1261, 1265 (9th Cir. 1972); *United States v. Upper Potomac Props. Corp.*, 448 F.2d 913, 918 (4th Cir. 1971); *United States v. 344.85 Acres of Land*, 384 F.2d 789, 791-92 (7th Cir. 1967); *United States v. 60.14 Acres of Land*, 362 F.2d 660, 665 (3d Cir. 1966).

439   The sales comparison approach was formerly called the market data approach, a problematic term because "[i]n essence, all approaches to value (particularly when the purpose of the appraisal is to establish market value) are market data approaches since the data inputs are presumably market derived." Byrl N. Boyce, Real Estate Appraisal Terminology 136 (1st ed. 1975) (defining "market data approach"); *compare* The Appraisal of Real Estate 273-314 (7th ed. 2d prtg. 1979) ("market data approach") and *United States v. Eden Mem'l Park Ass'n*, 350 F.2d 933, 935 (9th Cir. 1965) ("market data approach or consideration of comparable sales") *with* The Appraisal of Real Estate (8th ed. 1983) 309-31 ("sales comparison approach") and *Amex I*, 860 F. Supp. 2d at 174 ("market approach (also known as the sales comparison approach)").

440   *El Paso Nat. Gas*, 96 F.3d at 1464; *819.98 Acres of Land*, 78 F.3d at 1471; *Seravalli v. United States*, 845 F.2d 1571, 1575 (Fed. Cir. 1988); *United States v. 421.89 Acres of Land*, 465 F.2d 336, 338-39 (8th Cir. 1972); *Upper Potomac*, 448 F.2d at 917; *344.85 Acres*, 384 F.2d at 792.

441   *Cf. United States v. New River Collieries Co.*, 262 U.S. 341, 344 (1923) ("Where private property is taken for public use, and there is a market price prevailing at the time and place of the taking, that price is just compensation.").

442   *320 Acres*, 605 F.2d at 798.

443   *United States v. Eastman* (*Eastman II*), 528 F. Supp. 1184, 1186 (D. Or. 1981), *aff'd*, 714 F. 2d 76, 77 (9th Cir. 1983).

444   *Cf. Hickey v. United States*, 208 F.2d 269, 273 (3d Cir. 1953).

445   *320 Acres*, 605 F.2d at 798 & n.61 (citing cases). In appraisal terminology, typical elements of comparison include property rights conveyed, financing terms, conditions of sale (i.e., buyer and seller motivations), expenditures made immediately after purchase, market conditions (i.e., time- or date-of-sale adjustment), location, physical characteristics, economic characteristics, legal characteristics (i.e., zoning and permits) and non-realty components of value included in sale. *See* Section 1.5.2.3; Appraisal Inst., The Appraisal of Real Estate 390-92, 404-25 (14th ed. 2013); *see, e.g., United States v. 480.00 Acres of Land* (*Fornatora*), 557 F.3d 1297, 1304-05, 1312 (11th Cir. 2009) (applicable zoning restrictions, buyer motivations, conditions of sale); *United States v. 124.84 Acres of Land in Warrick Cty.*, 387 F.2d 912, 915 (7th Cir. 1968) (physical characteristics including soil type and susceptibility to flooding); *Knollman v. United States*, 214 F.2d 106 (6th Cir. 1954) (character and location); *United States v. 68.94 Acres of Land in Kent Cty.*, 736 F. Supp. 541, 549-550 (D. Del. 1990) (time, size, tillable soil percentage, effects of easements on property rights conveyed, buyer motivations); *Eastman II*, 528 F. Supp. at 1185-86 (time, size, location, topography); *cf. BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537-40 (1994) (noting "'fair market value' presumes market conditions that, by definition, simply do not obtain in the context of a forced sale"); *United States v. 564.54 Acres of Land* (*Lutheran Synod*), 441 U.S. 506, 513-14 (1979) (noting new facilities would bear financial burdens imposed by regulations that did not apply to comparable existing facilities).

---

On the point of similarity in character and locality, obviously if part of an allotment is condemned, sales, in order to be evidence of market value, should be of lots either within the immediate vicinity or very close. But when large areas of open country are involved, similarity of character and locality depends not upon mere propinquity. The character of such land situated several miles from land condemned may well be more comparable than that within a few hundred feet.[446]

**4.4.2.2.    Adjustments.** Depending on the property involved and the relevant market, the appraiser may need to adjust each comparable sale through quantitative and/or qualitative analysis to derive an indication of the market value of the subject property. Adjustments are made "up or down, depending upon such factors as time of sale, size of parcel, location, topography, and other such variables."[447] Quantitative adjustment, qualitative analysis, or both may be appropriate depending on the specific facts of the valuation problem.[448]

Quantitative adjustment is appropriate when there are adequate market data to reliably quantify the effect of a sale characteristic in terms of a percentage or dollar amount:

For example, if the comparable sale occurred one year before the taking of the subject property and during a period of rising prices, the appraiser will adjust upward, that is, he will derive a value (either on a per-acre or per-parcel basis) for the comparable. This will be adjusted in accord with the percent by which sales of that kind of property increased over the period of time between the two relevant dates.[449]

Some characteristics may require quantitative rather than qualitative adjustment, such as market conditions (time) as described above, or expenditures made immediately after purchase.[450] But quantitative adjustment is not appropriate for characteristics for which reliable numerical adjustments cannot be derived from market data.[451] Indeed, without adequate market support, the apparent precision of quantitative adjustments would convey a false sense of accuracy.[452]

Qualitative adjustment may also be appropriate—and necessary—where market data does not support a quantitative adjustment. As another court recognized:

[The appraiser's] decision to make qualitative rather than quantitative adjustments to his identified comparable sales . . . is reasonable in light of the multiple factors involved in each of the sales and the complex market in which the subject tracts are located. Further, . . . [the

---

446  *Knollman v. United States*, 214 F.2d 106, 109 (6th Cir. 1954) (citation omitted).

447  *Eastman II*, 528 F. Supp. at 1186.

448  *E.g.*, *Childers v. United States*, 116 Fed. Cl. 486, 498-99 (Fed. Cl. 2013); *United States v. 381.76 Acres of Land* (*Montego Group*), No. 96-1813-CV, 2010 WL 3734003, at *7 (S.D. Fla. Aug. 3, 2010), *adopted sub nom. United States v. 10.00 Acres of Land*, No. 99-0672-CIV, 2010 WL 3733994 (S.D. Fla. Sept. 22, 2010), *aff'd sub nom. United States v. Gonzalez*, 466 F. App'x 858 (11th Cir. 2012) (per curiam).

449  *Eastman II*, 528 F. Supp. at 1186; *see also McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608, 619-22 (Fed. Cl. 2013).

450  *See Eastman II*, 528 F. Supp. at 1186; Section 1.5.2.3; Section 4.4.2.1.

451  *McCann Holdings*, 111 Fed. Cl. at 622-23 ("This Court is not persuaded that [the appraiser's] numbers were derived from sufficient market data. While [the] expert applied various percentage-based adjustments, it is not clear what market data supported a particular adjustment or why a given numerical adjustment was chosen.").

452  *Cf. Borman v. Raymark Indus., Inc.*, 960 F.2d 327, 334 n.12 (3d Cir. 1992) ("Requiring the experts to speak in terms of numerical percentages introduces a false precision into the evidence. . . . Honest, but more flexible, words such as 'substantial factor', 'major contribution' or 'significant cause' are more suitable to the . . . function of justly and fairly resolving uncertainties."); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 596 (S.D.N.Y. 1992).

appraiser] initially attempted to use a quantitative approach to appraise one of the [tracts] but found that method to be problematic . . . . While [qualitative analysis] is not without flaws, it appears to this Court that it is the superior approach, especially considering the . . . market and . . . the parcels at issue.[453]

Qualitative analysis can be particularly useful in evaluating considerations such as development restrictions, particular land use restrictions, allowable density, the presence of environmental lands, and the impact of easements or encumbrances.[454]

**4.4.2.3.   Sales Verification.** In developing an opinion of market value for the purpose of determining just compensation, the appraiser must verify sales amounts and ascertain whether terms and conditions of a sale were conventional and under open competitive market conditions.[455] Verification typically requires interviews and discussions with the seller, the buyer, the closing agency, and/or the broker handling the transaction in addition to confirming recordation.[456] As federal courts recognize, prices reported in public records may not tell the whole story:

> [C]ertainly most transactions are likely to be influenced by the motives of the parties thereto, such as the special needs or the strong desires of the buyer, the financial or other exigencies of the seller, and the whims, follies, fancies or ignorance of local values on the part of one or both of them . . . . [T]hese are all matters of which persons . . . such as a party to the sale itself or the broker or agent who affected it, can be expected to know at least something . . . . More often than not the true consideration paid is not stated in a deed . . . . And . . . accurate knowledge of the price paid cannot be calculated from revenue stamps without accurate knowledge of liens and encumbrances on the land at the time of the sale which might or might not appear in the records . . . .[457]

Verification must be accomplished by competent and reliable personnel, and if the case goes into condemnation, the appraiser who will testify must personally verify the sale. As the Third Circuit explained, the appraiser's function is "to express his opinion of the value of real estate which he has personally examined and studied . . . ."[458] A real estate appraiser, "no matter how well qualified he may be in general, . . . is not an expert on the value of property which is unknown to him or is situated in an area which is unfamiliar to him."[459]

**4.4.2.4.   Transactions Requiring Extraordinary Care.** Not all property transactions can be used as potential comparable sales in valuations for federal acquisitions. While few types of

---

453   *Montego Group*, 2010 WL 3734003, at *7 (citations omitted) (accepting valuation opinions derived from qualitative analysis as "honest attempts to determine the value of peculiar properties in a peculiar market while taking complex factors into account").

454   *Childers*, 116 Fed. Cl. at 498-99.

455   *Accord United States v. 5,139.5 Acres of Land*, 200 F.2d 659, 662 (4th Cir. 1952); *see United States v. 429.59 Acres of Land* (*Imperial Beach*), 612 F.2d 459, 462 (9th Cir. 1980) ("[T]he proper inquiry is whether the expert has made careful inquiry into the facts of the other sales, and whether his opinion is founded upon such careful inquiry.").

456   *See United States v. Katz*, 213 F.2d 799, 800 (1st Cir. 1954).

457   *Id.*

458   *United States v. 60.14 Acres of Land*, 362 F.2d 660, 668 (3d Cir. 1966).

459   *Id.* ("Instead the essential elements of the real estate expert's competency include his knowledge of the property and of the real estate market in which it is situated, as well as his evaluating skill and experience as an appraiser.").

transactions are categorically excluded from consideration under modern jurisprudence,[460] as a matter of law several types of sales can be considered only under certain circumstances or for limited purposes. Accordingly, careful verification and analysis of each sale is required to ensure the appraiser's opinion of value does not reflect any legally improper considerations.[461] Of course, extraordinary verification alone would not allow an appraiser to rely on a sale that cannot be considered for other reasons, such as a sale involving a different property interest than the property under appraisal,[462] or a sale excluded from consideration under a **legal instruction** applying the scope of the project rule.[463]

> Some transactions require special attention, verification, and analysis, including:
>
> - **Prior sales of the same property**
> - **Transactions with potential nonmarket motivations**
> - **Exchanges of property**
> - **Sales that include personal property**
> - **Contingency sales**
> - **Offers, listings, contracts, and options**
> - **Sales after the date of valuation**

**4.4.2.4.1. Prior Sales of the Same Property.** Prior sales of the same property, if unforced, arm's-length, for cash or its equivalent, and reasonably recent to the date of valuation, are extremely probative evidence of market value.[464] Accordingly, the appraiser must determine what the owner paid for the property being appraised.[465] In analyzing prior sales, adjustments may be necessary to account for changes in market conditions, transaction conditions, or other factors.[466] Prior sales of the same property are not categorically entitled to more weight than sales of other comparable properties: the relative importance of each must be analyzed under the particular facts of the appraisal assignment.[467]

Each appraisal report must state and support the consideration accorded to the immediate past sale of the property under appraisal, even if the appraiser concludes the circumstances of the prior sale may have rendered it irrelevant to the determination of the market value as of the date of valuation.[468] An unsupported statement that the sale did not represent market value, or was not an arm's-length transaction is not sufficient: as the Eighth Circuit admonished, disregarding

---

460  *United States v. 320 Acres of Land*, 605 F.2d 762, 798-99 & nn.65-66 (5th Cir. 1979) (citing cases); *see, e.g., United States v. 4.85 Acres of Land in Lincoln Cty.*, 546 F.3d 613, 618-19 (9th Cir. 2008) (post-acquisition sales) (citing cases).

461  *See Olson v. United States*, 292 U.S. 246, 256 (1934) ("Considerations that may not reasonably be held to affect market value are excluded."); *see, e.g., 4.85 Acres*, 546 F.3d at 619 (requiring ". . . separate findings of the comparability of each of the proffered comparable properties to the [subject] property . . . ." (quoting *United States v. 68.94 Acres of Land*, 918 F.2d 389, 399 (3d Cir. 1990))).

462  *United States v. 46,672.96 Acres of Land in Doña Ana Ctys.*, 521 F.2d 13, 17 (10th Cir. 1975).

463  *See* Section 4.5; *see generally 320 Acres*, 605 F.2d at 798-803 & nn.61-81.

464  *United States v. 100.01 Acres of Land*, 102 F. App'x 295, 298 (4th Cir. 2004) (unpubl.); *United States v. 428.02 Acres of Land*, 687 F.2d 266, 271 (8th Cir. 1982); *Surfside of Brevard, Inc. v. United States*, 414 F.2d 915, 917 (5th Cir. 1969); *United States v. Leavell & Ponder, Inc.*, 286 F.2d 398, 403-04 (5th Cir. 1961); *Simmonds v. United States*, 199 F.2d 305, 307-08 (9th Cir. 1952); *Baetjer v. United States*, 143 F.2d 391, 397 (1st Cir. 1944); *United States ex rel. Tenn. Valley Auth. v. Harralson*, 43 F.R.D. 318, 323-24 (W.D. Ky. 1966) (mem.).

465  During litigation, the appraiser should consult with the attorney on how to obtain this information, as communications with landowners may need to go through counsel.

466  *See, e.g, United States v. 633.07 Acres of Land*, 362 F. Supp. 451, 453 (M.D. Pa. 1973) (upholding admission of prior sale, reflecting payment of preexisting debt, because it was a "bona fide and voluntary transaction" and circumstances were fully explained and went to weight, not admissibility; court warned that if the prior sale had been admitted "without explanation as to the circumstances surrounding the transaction, . . . reversible error would have been committed"); *cf. United States v. Certain Land Situated in Detroit (DIBCO III* (for *Detroit Int'l Bridge Co.*)), 600 F. Supp. 2d 880, 897 (E.D. Mich. 2009), *aff'd*, 633 F.3d 418 (6th Cir. 2011) (reasonable for appraiser to discount prior sale of property "due to evidence that it was not an arms length transaction").

467  *Hickey v. United States*, 208 F.2d 269, 273 (3d Cir. 1953) ("While it is true that prior sales of the condemned property eliminate any question as to whether another sale was of a comparable piece of property, nevertheless the comparison of sales of other properties have their advantages too. For example, the sale of another property may be closer in time to the date of the taking, and therefore would reflect more accurately the condition of the market at the time of the taking.").

468  *See* Section 1.3.1.5. Appraisals subject to the Uniform Act must include "at least a 5-year sales history of the property." 49 C.F.R. § 24.103(a)(2)(i).

a prior transaction without first contacting the participants "to ascertain their motives" would be based on "nothing but speculation[.]"[469]

These requirements reflect the federal courts' recognition that considering a property's sale and use history is simply good practice in "forming an intelligent opinion" of its value.[470] Because a prior sale of the property being acquired is extremely pertinent, such evidence has been allowed even when a considerable period of time has elapsed between the sale and the date of valuation.[471] The sales history should also include prior transactions involving a portion of the property under appraisal, such as sales of individual parcels that were subsequently assembled to form the single property under appraisal.[472]

**Under these Standards, appraisal reports must include:**

- a *10-year sales history* of the subject property (including the whole property or portions);
- the *most recent sale* of the subject property (regardless of when it occurred); and
- an *analysis of the most recent sale's relevance* (or lack of relevance) to the property's market value on the date of valuation.

#### 4.4.2.4.2. Transactions with Potential Nonmarket Motivations.

Not all property transactions can be used as potential comparable sales in valuations for federal acquisitions. While few types of transactions are categorically excluded from consideration under modern jurisprudence,[473] as a matter of law several types of sales can be considered only under certain circumstances or for limited purposes. Accordingly, careful verification and analysis of each sale is required to ensure the appraiser's opinion of value does not reflect any legally improper considerations.[474] Transactions that involve potential nonmarket motivations include: (1) forced sales, (2) distress sales, (3) settlement negotiations, (4) sales between related parties or entities, (5) sales to government or other entities with condemnation authority, (6) sales to environmental or other public interest organizations, and (7) project-influenced sales.

**(1) Forced Sales.** Forced sales are transactions that occur under a form of legal compulsion such as foreclosure or condemnation, are nonmarket transactions as a matter of law, and therefore cannot be considered as comparable sales.[475] Forced sales include sales "at foreclosure, under deed of trust securing indebtedness, at execution of attachment, at auction, under the pressure of the exercise of the power of eminent domain, or other coercion *sui generis*—types of legal

---

469  *428.02 Acres*, 687 F.2d at 270-72, 271 n.5; *see Olson v. United States*, 292 U.S. 246, 257 (1934) (prohibiting "mere speculation and conjecture" as basis for determining value).

470  *See Int'l Paper Co. v. United States*, 227 F.2d 201, 208 (5th Cir. 1955).

471  *E.g. Carlstrom v. United States*, 275 F.2d 802, 809 (9th Cir. 1960) (sale six or seven years prior to valuation date); *Dickinson v. United States*, 154 F.2d 642,43 (4th Cir. 1946) (six years); *United States v. Becktold Co.*, 129 F.2d 473, 479 (8th Cir. 1942) (passage of 14 years "went to the weight of the evidence, rather than to its admissibility.").

472  *See United States v. 1.604 Acres of Land* (*Granby III*), 844 F. Supp. 2d 685, 688-89 (E.D. Va. 2011) (finding more facts were needed to determine admissibility of prior sales of individual parcels in valuation of ensuing assembled property; prior sales of parcels were ultimately admitted for purpose of comparison with concurrent comparable sales, but not as evidence of value of the property as assembled).

473  *United States v. 320 Acres of Land*, 605 F.2d 762, 798-99 & nn.65-66 (5th Cir. 1979) (citing cases); *see, e.g., United States v. 4.85 Acres of Land in Lincoln Cty.*, 546 F.3d 613, 618-19 (9th Cir. 2008) (refusing to categorically exclude post-acquisition sales) (citing cases).

474  *See Olson*, 292 U.S. at 256 ("Considerations that may not reasonably be held to affect market value are excluded."); *see, e.g., 4.85 Acres*, 546 F.3d at 619 (requiring "'separate findings of the comparability of each of the proffered comparable properties to the [subject] property'"), quoting *United States v. 68.94 Acres of Land*, 918 F.2d 389, 399 (3d Cir. 1990).

475  *United States v. Certain Land in Fort Worth*, 414 F.2d 1029, 1031-32 (5th Cir. 1969); *D.C. Redev. Land Agency v. 61 Parcels of Land*, 235 F.2d 864, 865-66 (D.C. Cir. 1956); *Hickey v. United States*, 208 F.2d 269, 275 (3d Cir.1953) ("A forced sale is one which has no probative value whatever and therefore must be excluded from evidence."); *United States v. 5139.5 Acres of Land*, 200 F.2d 659, 661 (4th Cir. 1952); *Baetjer v. United States*, 143 F.2d 391, 397 (1st Cir. 1944); *see United States v. 79.95 Acres of Land*, 459 F.2d 185, 187 (10th Cir. 1972); *cf. BFP v. Resolution Trust Corp.*, 511 U.S. 531, 538 (1994) ("'[F]air market value' presumes market conditions that, by definition, simply do not obtain in the context of a forced sale.").

compulsion generally disclosed by public records."[476] Appraisers must carefully investigate the circumstances of a potential forced sale to ensure they do not consider a transaction in which "elements of compulsion so affected the seller that the sale could not be said to be fairly representative of market value at the time made."[477]

(2) **Distress Sales.** Similarly, distress sales and sales with atypical financing terms are questionable indicators of value and can be used only with great care.[478] If limited market data necessitates reference to such a sale or sales, the appraiser must carefully analyze the circumstances of each transaction[479] and make proper adjustments to account for any nonmarket motivations.[480]

(3) **Settlement Negotiations.** It is generally recognized that offers of settlement are not reliable indicators of market value because such offers are often in the nature of compromise to avoid the expense and uncertainty of litigation.[481] As a result, appraisers cannot rely on settlement negotiations or completed settlements as evidence of market value. As early as its October 1876 term, the Supreme Court noted that well-recognized principles made an offer of compromise inadmissible.[482] The prohibition against the admissibility of offers to compromise and completed compromises is also codified in Rule 408 of the Federal Rules of Evidence.[483] As with any sale, the appraiser should not simply assume that a transaction was a settlement to avoid or resolve litigation, but rather should contact the participants to ascertain their motives.[484]

(4) **Sales Between Related Parties or Entities.** Sales between members of a family or closely related business entities are not arm's-length transactions, and since they may involve other factors than market value considerations, such sales generally cannot be considered.[485]

(5) **Sales Involving the Government or Other Condemnation Authority.** Sales to government entities are inherently problematic for federal appraisal purposes because they routinely

---

476   *Fort Worth*, 414 F.2d at 1031-32 (quoting *61 Parcels*, 235 F.2d at 865-66); *see 79.95 Acres*, 459 F.2d at 187 ("[A] foreclosure sale is not an arms length transaction involving a willing buyer and a willing seller. The amount of money one has 'invested', i.e., paid, in the acquisition of property by foreclosure is not relevant . . . . It is not evidence of fair market value."); *cf. BFP*, 511 U.S. at 537 ("Market value . . . is the very antithesis of forced-sale value.").

477   *Hickey*, 208 F.2d at 275; *Baetjer*, 143 F.2d at 397 ("Only sales on foreclosure and similar forced transactions not on the open market are without probative force as a matter of law. The motivation behind other transactions can be shown . . . ."); *accord 5139.5 Acres*, 200 F.2d at 661.

478   *United States v. 480.00 Acres of Land* (*Fornatora*), 557 F.3d 1297, 1305 (11th Cir. 2009) ("distress sales . . . offer[] little insight"); Hickey, 208 F.2d at 275 ("[C]ompulsion may also be that created by business circumstances. For example, a property taken in discharge of a debt may be considered a forced sale, where the creditor had little choice in the matter."); *cf. United States v. Deist*, 442 F.2d 1325, 1327 (9th Cir. 1971) ("a 'forced' or 'distress' sale wherein the seller was shown to have been in financial difficulty and in need of making a sale").

479   *See, e.g., Hickey*, 208 F.2d at 275-76.

480   *See, e.g., Fornatora*, 557 F.3d at 1305; *Deist*, 442 F.2d at 1327 (finders of fact "recognized the [forced or distress] sales for what they were and gave little weight to either").

481   *United States v. 10.48 Acres of Land*, 621 F.2d 338, 339-40 (9th Cir. 1980); *Slattery Co. v. United States*, 231 F.2d 37, 41 (5th Cir. 1956); *United States v. 46,672.96 Acres of Land in Doña Ana Ctys.*, 521 F.2d 13 (10th Cir. 1975); *Evans v. United States*, 326 F.2d 827 (8th Cir. 1964); *United States v. Foster*, 131 F.2d 3 (8th Cir. 1942).

482   *Home Ins. Co. v. Balt. Warehouse Co.*, 93 U.S. 527, 548 (1876); *United States v. Playa De Flor Land & Improvement Co.*, 160 F.2d 131, 136 (5th Cir. 1947); *cf. Barnes v. S.C. Pub. Serv. Auth.*, 120 F.2d 439, 440 (4th Cir. 1941).

483   Rule 408 is designed "to encourage settlements which would be discouraged if such evidence were admissible." FED. R. EVID. 408, notes of Committee on the Judiciary, Senate Report No. 93-1277.

484   *See United States v. 428.02 Acres of Land*, 687 F.2d 266, 270-72, 272 n.5 (8th Cir. 1982).

485   *See Deist*, 442 F.2d at 1327 ("purported sale was shown to have been an 'intra-family' transaction"); *see United States v. 47.14 Acres of Land*, 674 F.2d 722, 726 (8th Cir. 1982) ("[C]omparable sales are the best evidence of the value . . . , which sales on the whole reflect the principle of a willing seller and a willing buyer concluding arms-length negotiations."); *Welch v. Tenn. Valley Auth.*, 108 F.2d 95, 101 (6th Cir. 1939) ("Sales at arms length of similar property are the best evidence of market value."); *cf. United States v. Leavell & Ponder, Inc.*, 286 F.2d 398, 405-06 (5th Cir. 1961) (describing transaction in which the parties " 'reach(ed) up in mid-air and pull(ed) down a figure—any figure they wanted to,' and that is what they reported for income tax purposes").

involve nonmarket considerations, making them inaccurate indicators of market value and therefore improper to consider as comparable sales.[486] For example, as recognized by the federal courts, such transactions tend to reflect payments "in the nature of compromise to avoid the expense and uncertainty of litigation and are not fair indications of market value."[487] Courts also exclude such evidence in litigation because it "complicates the record, confuses the issue, is misleading, and especially in condemnation cases, raises collateral issues as to the conditions under which such sales were made . . . ."[488]

**Sales to government entities are inherently suspect and cannot be relied on as comparable sales without a determination that they are true open-market transactions.**

Sales to government entities must therefore be viewed as *suspect* from the outset, but they cannot, and should not, be rejected by appraisers as categorically invalid comparable sales.[489] If the appraiser determines, after careful analysis and verification, that a sale to a government entity was a true open-market transaction, the sale may be appropriate to consider,[490] particularly if there is a paucity of private sales available for use in the sales comparison approach to value.[491] But such a determination requires extraordinary verification due to the nonmarket considerations inherent in most government acquisitions.[492] Mere conclusory statements that a transaction was voluntary or did not involve the threat of condemnation are not sufficient.[493] For example, the Tenth Circuit barred consideration of the government transactions at issue despite one witness's testimony that the transactions were "voluntary," pointing out that the same witness "also admitted that the government was eager to obtain the [properties] without using the condemnation process."[494]

While some cases allude to a split of legal authority on the admissibility of prices paid by entities with the power of eminent domain,[495] the federal courts uniformly hold that such sales *cannot*

---

486   *See United States v. 0.59 Acres of Land*, 109 F.3d 1493, 1498 (9th Cir. 1997); *10.48 Acres*, 621 F.2d at 339; *United States v. 25.02 Acres of Land*, 495 F.2d 1398, 1403 (10th Cir. 1974); *Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15, 17-18 (5th Cir. 1969); *Evans*, 326 F.2d at 831; *Slattery*, 231 F.2d at 40-41.

487   *10.48 Acres*, 621 F.2d at 339 (quoting *Slattery*, 231 F.2d at 41).

488   *United States ex rel. Tenn. Valley Auth. v. Bailey*, 115 F.2d 433, 434 (5th Cir. 1940); *see also Duk Hea Oh v. Nat'l Capital Revitalization Corp.*, 7 A.3d 997, 1010-11 (D.C. 2010) (barring evidence of other government acquisitions that would "bias the [government] by requiring it to explain its compromise decision and 'what's going on with the government' and would occasion a 'frolic and detour' that would 'bias' the [government]").

489   *See 10.48 Acres*, 621 F.2d at 339-40; *cf. Olson v. United States*, 292 U.S. 246, 256 (1934) ("'[T]o the extent that probable demand by prospective purchasers or condemnors affects market value, it is to be taken into account. But . . . . [v]alue to the taker of a piece of land combined with other parcels for public use is not the measure of or a guide to the compensation to which the owner is entitled.") (citation omitted).

490   *Transwestern*, 418 F.2d at 18 (Sales to condemnors can be considered "only when it is certain that those sales truly represent the market value of the land in question."); *25.02 Acres*, 495 F.2d at 1403 (Such sales "often involve compulsion, coercion or compromise . . . . [A] condemning party might be willing to give more than the property is worth, and the owner might be willing to take less than it is worth rather than undergo a lawsuit.").

491   *E.g., United States v. 264.80 Acres of Land in Ramsey Cty.*, 360 F. Supp. 1381, 1383 (D. N.D. 1973) ("[T]his purchase of land in the area by [a government agency] was not an isolated transaction. The [agency] had made several other purchases in the area, and . . . taken together, all of these purchases had a significant impact on the general market value of land in that community."); *see Olson*, 292 U.S. at 257.

492   *E.g., United States v. 46,672.96 Acres in Doña Ana Ctys.*, 521 F.2d 13, 17 (10th Cir. 1975) ("[G]reat caution should be used . . . since [the price paid by a condemnor] is an inaccurate indicator of market value."); *see also United States v. 2.739 Acres of Land in Santa Cruz Cty.*, 609 F. App'x 436, 437-38 (9th Cir. 2015) (unpubl.) (upholding use of sale to government entity given "evidence that the sale had been voluntary"); *cf. Olson*, 292 U.S. at 256 ("Considerations that may not reasonably be held to affect market value are excluded. Value to the taker of a piece of land combined with other parcels for public use is not the measure of or a guide to . . . compensation . . . .").

493   *Transwestern*, 418 F.2d at 19; *see, e.g., 264.80 Acres in Ramsey*, 360 F. Supp. at 1383.

494   *46,672.96 Acres in Doña Ana*, 521 F.2d at 17.

495   *See Duk Hea Oh v. Nat'l Capital Revitalization Corp.*, 7 A.3d 997, 1010-11 (D.C. Cir. 2010) (noting D.C. Circuit's conflicting holdings in *Nash*, 395 F.2d at 573, 575-76, and *Hannan v. United States*, 131 F.2d 441, 442-43 (D.C. Cir. 1942). Compare *Transwestern*, 418 F.2d at 18-19 ("generally prevailing rule" excludes sales to buyers with the power of eminent domain, subject to "sensible exception" if party "show[s] that the sales in question were made willingly, without coercion, compulsion, or compromise") *with Nash v. D.C. Redev. Land Agency*, 395 F.2d 571, 575 (D.C. Cir. 1967) (McGowan, J., explaining why petition for rehearing en banc should be denied) ("minority rule . . . [admits] such evidence . . . provided the purchase by the condemnor was made without compulsion").

be considered if they are compelled by nonmarket considerations, but *may* be considered if they are *true open-market transactions free of compulsion*.[496] Indeed, the federal courts have recognized a multitude of motivations that may compel a government entity (or other entity with the power of eminent domain[497]) to acquire lands at a price other than market value. For example, "the necessity of the purchaser, the disposition of the vendor, and peculiar circumstances and conditions may be such as to oblige a purchaser to submit to severe exactions in order to consummate a purchase without delay."[498] Or, "in an accumulation for a project such as a large airplane plant, the last parcels are undoubtedly more difficult to obtain, at their fair value, since the purpose of the acquisition is then usually known[,]" and due to "the exigencies which necessitated speed[, the] . . . parcels were urgently wanted and they were bought without regard to the real value . . . ."[499] Moreover, "a condemning party might be willing to give more than the property is worth, and the owner might be willing to take less than it is worth rather than undergo a lawsuit."[500] Because of the likelihood of such nonmarket motivations, appraisers can consider sales to buyers with the power of eminent domain as "evidence of market value only when it is certain that those sales *truly* represent the market value of the land in question."[501]

To ensure compliance with federal case law, the appraiser must identify, analyze, and rule out or appropriately adjust for all potential nonmarket motivations before relying on a sale to a government entity as a comparable sale.[502] Appraisers must carefully verify the circumstances surrounding a sale to a government entity to ensure that it meets the criteria of market value or can be accurately adjusted to reflect market value.[503] See Section 1.5.2.4 and Appendix E.

**(6) Sales Involving Environmental or Other Public Interest Organizations.** Sales to environmental or other public interest organizations may be similarly suspect. For example, acquisitions may be authorized for a government conservation or preservation project before adequate funds are appropriated to acquire the entire project area.[504] Conservation or other environmental organizations may then voluntarily acquire lands within the project area for the sole purpose of transferring them to the government once funding becomes available.[505] Sales made

---

496   *United States v. 0.59 Acres of Land*, 109 F.3d 1493, 1498 (9th Cir. 1997); *46,672.96 Acres in Doña Ana*, 521 F.2d at 17; *Transwestern*, 418 F.2d at 18-19; *Evans v. United States*, 326 F.2d 827, 831 (8th Cir. 1964); *Slattery Co. v. United States*, 231 F.2d 37, 40-41 (5th Cir. 1956).

497   For example, Congress can delegate a limited right of eminent domain to private entities "to be exercised by them in the execution of works in which the public is interested." *Miss. & Rum R. Boom Co. v. Patterson*, 98 U.S. 403, 406 (1878); *e.g.*, Natural Gas Act, 15 U.S.C. § 717f(h) (giving gas companies power of eminent domain for construction of natural gas pipelines).

498   *United States v. Freeman*, 113 F. 370, 371 (D. Wash. 1902) (excluding "the price of adjoining lands, which was fixed by agreement, and was paid by the government" from consideration); *see Justice v. United States*, 145 F.2d 110, 111 (9th Cir. 1944) (rejecting consideration of "the sum paid by the Government for comparable lands" (citing *Freeman*, 113 F. at 371)).

499   *Phillips v. United States*, 148 F.2d 714, 716 (2d Cir. 1945); *see Olson*, 292 U.S. at 257.

500   *25.02 Acres*, 495 F.2d at 1403; *see 46,672.96 Acres in Doña Ana*, 521 F.2d at 17.

501   *Transwestern*, 418 F.2d at 19.

502   As J.D. Eaton observed, "unlike most private purchases, a government purchase and the decision-making process that led to it are usually well documented. The appraiser can take advantage of that documentation in the sales verification process. In fact, the appraiser *must* take advantage of it." Eaton, *supra* note 16, at 222.

503   Sales to a *buyer* with condemnation authority are inherently suspect, and cannot be relied on as comparable sales without a determination that they are true open-market transactions. But sales involving a *seller* with condemnation authority are a different matter.

504   For example, Congress authorized an expansion of the boundaries of Everglades National Park in 1989, but did not provide funding for the private land acquisition necessary for expansion until 1992, and the expansion was not fully funded until 1999. *See* 16 U.S.C. §§ 410r-5 *et seq.*; *United States v. 480.00 Acres of Land* (*Fornatora*), 557 F.3d 1297, 1300 (11th Cir. 2009) (discussing East Everglades Acquisition Project); *see also* Section 4.5 (Project Influence).

505   *See, e.g.*, 16 U.S.C. § 410r-9(2)(B) (authorizing acquisition "from willing sellers by donation, purchase with donated or appropriated funds, or exchange" of property interests "within the area . . . to be added to Everglades National Park").

under such circumstances may well reflect project influence, which cannot be considered.[506] And of course, where "a market for a particular use is created solely as a result of the project for which the land is condemned, value based on that use must be excluded."[507] Moreover, such sales, like direct sales to the government, typically involve nonmarket motivations and considerations beyond the property's market value for its "highest and most profitable use…."[508] But "[c]onsiderations that may not reasonably be held to affect market value are excluded."[509] Thus, as with sales to government entities, sales to public interest organizations cannot be used as comparable sales without careful analysis to identify and rule out or adjust for potential nonmarket motivations.[510]

(7) **Project-Influenced Sales.** As discussed in depth in Section 4.5, valuations must disregard any value attributable to the government project prompting the acquisition.[511] Consideration of <u>project influence</u> on market value is prohibited under the <u>scope of the project rule</u>. Whether the rule applies and how to apply it in a particular valuation assignment will require **legal instructions**.

**4.4.2.4.3.  Exchanges of Property.** Sales involving an exchange of property generally introduce too many collateral issues to be reliable indicators of market value. As the Fifth Circuit explained, if evidence of an exchange "is to be considered as proof of present valuation, the values of such exchanged lands obviously must be proved by the same standards as attends proof of value of the property being condemned."[512]

**4.4.2.4.4.  Sales that Include Personal Property.** Sales that include personal property cannot be considered unless they can be adjusted to reliably reflect only the real property transaction.[513] For example, in considering the sale of a farm in which the price included personal property, the Second Circuit held it was legal error to exclude reliable evidence of "the actual consideration received for [the] realty."[514] In the sale of a farm, the purchase price often includes equipment, livestock, and other items of consideration.[515]

---

506  *See* Section 4.5; *cf. United States v. Miller*, 317 U.S. 369, 376-77 (1943) ("If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.").

507  *United States v. 46,672.96 Acres of Land in Doña Ana Ctys.*, 521 F.2d 13, 15-16 (10th Cir. 1975); *cf. Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 410 (1878) ("[T]he proper inquiry was, 'What is the value of the property for the most advantageous uses to which it may be applied?'" (quoting *In re Furman Street*, 17 Wend. 649 (N.Y. Sup. Ct. 1836)).

508  *Olson v. United States*, 292 U.S. 246, 255 (1934); *see* Section 4.3. This may be true of not only the buyer's but also the seller's motivations (e.g., sellers may claim such sales as a tax write-off). *Cf. United States v. Leavell & Ponder, Inc.*, 286 F.2d 398, 405-06 (5th Cir. 1961).

509  *Olson*, 292 U.S. at 256; *cf. Boom Co.*, 98 U.S. at 407-08 ("In determining the value of land appropriated for public purposes, the same considerations are to be regarded as in a sale of property between private parties. . . . [The amount] is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community . . . .").

510  Where public interest organizations work closely with the government agency administering conservation or similar projects, extensive sale documentation may be available. In such sales, the government agency commonly approves an organization's selection of appraisers, provides or assists in the development of appraiser instructions, and reviews the appraisal before the organization makes an offer to purchase the property. *See* note 528, *supra*, quoting EATON, *supra* note 16, at 221-23.

511  *United States v. Reynolds*, 397 U.S. 14, 16-17 (1970); *Miller*, 317 U.S. at 376-77; *United States v. 320 Acres of Land*, 605 F.2d 762, 781-90 (5th Cir. 1979).

512  *Leavell & Ponder*, 286 F.2d at 406.

513  *Cf. Stephenson Brick Co. v. United States ex rel. Tenn. Valley Auth.*, 110 F.2d 360, 361 (5th Cir. 1940) ("the fair value . . . , excluding personal property, ought to be ascertained").

514  *United States v. 18.46 Acres of Land in Swanton*, 312 F.2d 287, 289 (2d Cir. 1963).

515  *See* APPRAISAL INST. & AM. SOC'Y OF FARM MANAGERS, THE APPRAISAL OF RURAL PROPERTY 234-35 (2d ed. 2000).

**4.4.2.4.5.  Contingency Sales.** Sales of property with a highest and best use for some form of development that requires rezoning or land use permits generally take the form of *contingency sales* or initial options.[516] Such sales are *contingent* on the would-be purchaser's ability to procure the rezoning or permitting necessary to develop the property to its highest and best use; if the rezoning or permitting is denied, the contingency is not met and the sale does not close (or the option is not exercised). Therefore, when such sales are actually consummated, they reflect the price of property *already rezoned or permitted for development to its highest and best use*. If, on the date of value, the property being appraised would require rezoning or permits to be developed to its highest and best use, completed contingency sales cannot be considered as comparable sales without appropriate adjustments to account for the risks, time delays, and costs associated with rezoning or permitting.[517] As discussed in Section 4.3.2.4, appraisers cannot merely assume that such a rezoning/permit is in place for the property under appraisal or assume that such a rezoning/permit will be granted.[518]

**4.4.2.4.6.  Offers, Listings, Contracts, and Options.** Unconsummated transactions are generally not reliable indicators of value and therefore cannot be used as comparable sales. Appraisers should still carefully analyze such data, which may be appropriate to consider for certain limited purposes.[519] "An opinion, however, largely based on owners' asking prices ought to be rejected, for the courts have decided that even offers by buyers are too unreliable to be considered."[520]

A *binding and unconditional* contract of sale can generally be considered as evidence of value, even if title has yet to be conveyed.[521] By contrast, mere nonbinding offers or unexercised options are not permissible evidence of value, and therefore the appraiser should give little or no weight to such options except to the extent that they may set limits of value.[522]

<u>Listings</u> and other <u>nonbinding offers</u> to buy or sell real estate generally cannot be relied on as comparable sales.[523] As the Supreme Court explained:

It is frequently very difficult to show precisely the situation under which these offers were

---

516  *See, e.g., United States v. 429.59 Acres of Land (Imperial Beach)*, 612 F.2d 459 (9th Cir. 1980); *United States v. Meadow Brook Club*, 259 F.2d 41, 46 (2d Cir. 1958), *aff'g United States v. 50.8 Acres of Land in Hempstead*, 149 F. Supp. 749 (E.D.N.Y. 1957).

517  *Meadow Brook Club*, 259 F.2d at 46; *see Imperial Beach*, 612 F.2d at 462-63; *Foster v. United States*, 2 Cl. Ct. 426, 447-48 & n.19 (1983) (Sale was "of questionable comparability" because "it was unlikely that a conditional use permit could be obtained.").

518  *See Olson v. United States*, 292 U.S. 246, 257 (1934); *United States v. 33.92356 Acres of Land (Piza-Blondet)*, 585 F.3d 1, 4-5, 7-9 (2009); *United States v. 320 Acres of Land*, 605 F.2d 762, 818 & n.128 (5th Cir. 1979) (citing cases); *Meadow Brook Club*, 259 F.2d at 45.

519  *See* note 498, *infra; cf.* USPAP, Standards Rule 1-5 (appraisers must analyze "all agreements of sale, options, and listings of the subject property current as of the effective date of the appraisal" in developing opinion of market value).

520  *United States v. Dillman*, 146 F.2d 572, 575 (5th Cir. 1944) (quoting *Atlantic Coast Line R. Co. v. United States*, 132 F.2d 959, 963 (5th Cir. 1943)); *United States v. 0.59 Acres of Land in Pima Cty.*, 109 F.3d 1493, 1496 (9th Cir. 1997) ("[a] letter containing a mere offer to buy 'comparable' property [was] plainly inadmissible."); *accord United States v. 10,031.98 Acres of Land*, 850 F.2d 634, 637 (10th Cir. 1988) (Where witness "used the offering price of replacement property as the basis for figuring the value of his own property . . . , his opinion of the value . . . cannot be separated from the basis on which he arrived at that opinion even though [he] factored in the difference" between the subject property and those on which the offers were received.).

521  *United States v. 312.50 Acres of Land*, 812 F.2d 156, 157 (4th Cir. 1987); *United States v. 428.02 Acres of Land*, 687 F.2d 266, 270-71 (8th Cir. 1982); *United States v. 114.64 Acres of Land*, 504 F.2d 1098, 1100 (9th Cir. 1974); *United States v. Smith*, 355 F.2d 807, 811-12 (5th Cir. 1966).

522  *0.59 Acres in Pima*, 109 F.3d at 1495-96; *10,031.98 Acres*, 850 F.2d at 637; *United States v. 158.24 Acres of Land*, 696 F.2d 559, 565 (8th Cir. 1982); *United States v. Certain Land in Fort Worth*, 414 F.2d 1029, 1032 (5th Cir. 1969).

523  *10,031.98 Acres*, 850 F.2d at 637 ("It has long been held in condemnation suits that the offering price of replacement properties cannot be used to show the fair market value of the condemned land."); *158.24 Acres*, 696 F.2d at 565 (landowner demand/offer to sell); *Smith*, 355 F.2d at 811-13 ("transactions which were in fact mere offers and not sales and which were, therefore, of no probative value on the question of market value"); *Bank of Edenton v. United States*, 152 F.2d 251, 253 (4th Cir. 1945).

made. In our judgment they do not tend to show value, and they are unsatisfactory, easy of fabrication and even dangerous in their character as evidence upon this subject.[524]

These risks are still greater "when the offers are proved only by the party to whom they are alleged to have been made, and not by the party making them."[525]

An <u>option to purchase</u> is a form of an offer; it is an offer that is irrevocable for the period stipulated. <u>Unexercised options</u> "represent only what a willing seller would take for his land but not, unless and until exercised by the holder of the option, what a willing buyer would give for it."[526] As a result, even if consideration has been paid for it, an unexercised option—like an unaccepted offer—is inadmissible to establish market value. As the Fifth Circuit reasoned:

> We cannot agree that paying a consideration for the granting of an option to purchase property at a stipulated price changes its basic character or increases its reliability as an indicia of value. The payment of consideration makes the landowner's offer irrevocable for the period of time stipulated in the option, . . . and thus assures the holder that amount of time in which to consider all the facts which he deems relevant and to decide at his leisure whether or not to buy. The payment thus merely binds the landowner and indicates the bona fides of his asking price. It does not in any way bind the holder to buy at that price or indicate that he regards that price as a fair one from a purchaser's standpoint. An option, even though paid for, may well have been acquired for purely speculative reasons.[527]

<u>Exercised options</u>, on the other hand, "when they result in a binding agreement between buyer and seller, do not differ, from a probative standpoint, from completed transactions."[528]

**4.4.2.4.7. Sales After the Date of Valuation.** Sales that occurred after the date of valuation may be considered if they are not otherwise incompetent as evidence of value.[529] In the words of the Eleventh Circuit: "While post-taking sales are not automatically appropriate evidence of comparable value, neither are they automatically inappropriate."[530] But post-acquisition sales may be tainted by government project influence and reflect elements of value that cannot be considered under the scope of the project

> **Sales after the date of valuation may be considered if they are reliable indicators of value. Post-acquisition sales may be particularly useful in valuing the remainder property in partial acquisitions.**

---

524 *Sharp v. United States*, 191 U.S. 341, 349 (1903).

525 *Id.* In condemnation proceedings, evidence of owners' offers to sell their own property may be permitted as admissions of value. *Albert Hanson Lumber Co. v. United States*, 261 U.S. 581, 589 (1923) ("the specified price was fixed with perfect freedom; they show a completed agreement of purchase and sale; and there is no reason why they should not be considered as the owner's admission of the then value of the property"); *cf. United States v. Hart*, 312 F.2d 127, 130 (6th Cir. 1963) ("The testimony was that of the offerors themselves under oath, and not that of the offerees. [It] was not tendered primarily for valuation purposes, negativing any apparent motive for fabrication." citing *Erceg v. Fairbanks Expl. Co.*, 95 F.2d 850, 853-54 (9th Cir. 1938)).

526 *Smith*, 355 F.2d at 811.

527 *Id.* at 812 (quoting *Sharp*, 191 U.S. at 348 ("Pure speculation may have induced it . . . .")).

528 *Smith*, 355 F.2d at 812 (citing, *inter alia*, *United States v. Certain Parcels of Land in Phila.*, 144 F.2d 626, 629-30 (3d Cir. 1944)).

529 *United States v. 4.85 Acres of Land in Lincoln Cty.*, 546 F.3d 613, 618-19 (9th Cir. 2008); *United States v. 68.94 Acres of Land in Kent Cty.*, 918 F.2d 389, 398-99 & n.6 (3d Cir. 1990); *United States v. 0.161 Acres of Land in Birmingham*, 837 F.2d 1036, 1044 (11th Cir. 1988); *United States v. 312.50 Acres of Land in Prince William Cty.*, 812 F.2d 156, 157 n.3 (4th Cir. 1987); *United States v. 428.02 Acres of Land in Newton & Searcy Ctys.*, 687 F.2d 266, 270 (8th Cir. 1982); *United States v. 320 Acres of Land*, 605 F.2d 762, 799-803 (5th Cir. 1979); *United States v. 691.81 Acres of Land in Clark Cty.*, 443 F.2d 461, 462 (6th Cir. 1971); *United States v. 63.04 Acres of Land at Lido Beach*, 245 F.2d 140, 144 (2d Cir. 1957).

530 *0.161 Acres in Birmingham*, 837 F.2d at 1044.

rule.[531] As a result, before considering such sales, the appraiser must analyze "whether the sales are tainted and how much the taint distorts true market value . . . ."[532]

In partial acquisitions, post-acquisition sales that reflect the influence of the government project can be highly comparable in valuing the remainder property after acquisition.[533] For example, "[s]uch sales should be particularly useful when the measure of [compensation] … is the difference between the market value before and after imposition of an easement."[534]

### 4.4.3. Cost Approach.

Where appropriate, appraisers can employ the <u>cost approach</u> in valuing property with existing physical improvements.[535] In this approach, the <u>reproduction</u> or <u>replacement cost</u> of the improvements, less appropriate <u>depreciation</u>, is added to the estimated market value of the *land as if vacant* to derive an indication of the market value of the property as a whole.[536] It bears noting that the cost approach can yield *an indication* of market value, but "cost is not synonymous with market value. *A fortiori*, cost of land and cost of improvements taken separately and added are not to be equalized with fair market value."[537] Rather, the elements are considered under the cost approach in developing an opinion of the market value of the property as a whole.[538]

**Cost of improvements (incl. entrepreneurial profit)**

**- depreciation**

**+ land value**

**= indication of market value of whole property**

While not inherently flawed, the cost approach has often been misused, leading a number of courts to identify the cost approach as "one of the least reliable indicia of market value" for the purpose of measuring just compensation.[539] Indeed, as the Fifth Circuit observed, when improperly applied, "reproduction cost evidence, though perhaps making it easier to reach some solution, only ma[kes] the proper solution more difficult."[540] As a result, the cost approach is rarely

531   *See 4.85 Acres in Lincoln*, 546 F.3d at 618; *68.94 Acres in Kent*, 918 F.2d at 398-99; *320 Acres*, 605 F.2d at 799; Section 4.5.

532   *320 Acres*, 605 F.2d at 802. In some cases, post-acquisition sales may be so distorted by project influence that they must be categorically excluded, particularly if sufficient untainted sales are available for a fair comparison – but this would be a legal determination beyond the scope of the appraiser. *See id.* at 802-03; *68.94 Acres in Kent*, 918 F.2d at 398-99; *see also United States v. Reynolds*, 397 U.S. 14, 20-21 (1970); *4.85 Acres in Lincoln*, 546 F.3d at 618-19 (noting "necessity of a case-by-case approach"); *Lido Beach*, 245 F.2d at 144 ("In every case it is a question of judgment . . . .").

533   Project influence on market value normally must be disregarded, as discussed in Section 4.5. But partial acquisitions present a special situation, as explained in Section 4.6: the measure of compensation for a partial acquisition is the difference in the market value of the landowner's property before and after the government's acquisition. As a result, the impact of the government project would normally be disregarded for the "before" value but considered for the "after" value.

534   *United States v. 1129.75 Acres of Land in Cross & Pointsett Ctys.*, 473 F.2d 996, 999 (8th Cir. 1973).

535   *Compare United States v. 1.604 Acres of Land* (*Granby I*), 844 F. Supp. 2d 668, 682 (E.D.Va. 2011) (allowing cost approach in valuation of partially improved property), *with United States v. 15,478 Square Feet of Land* (*Balqi Sai*), No. 2:10-cv-00322, 2011 WL 2471586 at *5 (E.D.Va. June 20, 2011) (rejecting cost approach in valuation of vacant property).

536   *Granby I*, 844 F. Supp. 2d at 682; see *United States v. 100 Acres of Land*, 468 F.2d 1261, 1265 (9th Cir. 1972) (citing *United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 402, 403 (1949)). While replacement cost and reproduction cost are distinct appraisal concepts as discussed below, the terms sometimes appear interchangeably in case law.

537   *Kinter v. United States*, 156 F.2d 5, 7 (3d Cir. 1946).

538   *See, e.g., United States v. Becktold Co.*, 129 F.2d 473, 478-79 (8th Cir. 1942) (question is "the value of the land as enhanced by the buildings thereon" (citations omitted)); *United States v. Wise*, 131 F.2d 851, 853 (4th Cir. 1942) (whether existence of improvements "contributes anything to the fair market value of the whole").

539   *United States v. Certain Interests in Prop. in Champaign Cty.*, 271 F.2d 379, 382 (7th Cir. 1959); *accord United States v. 55.22 Acres of Land in Yakima Cty.*, 411 F.2d 432, 435 (9th Cir. 1969); *United States v. 49,375 Square Feet of Land in Manhattan* (*252 Seventh Ave.*), 92 F. Supp. 384, 387-88 (S.D.N.Y. 1950), *aff'd sub nom. United States v. Tishman Realty & Constr. Co.*, 193 F.2d 180 (2d Cir. 1952) (per curiam) (affirming on opinion of trial court) ("[The cost approach] is in itself absurd in the ordinary case, because even in ordinary times it is ridiculous to suppose that anyone would think of reproducing this or any like property, and that same thing would be true in the vast majority of cases, I should think."); *see* EATON, *supra* note 16, at 159 (noting "flagrant misuse of the approach by appraisers [who err] from lack of knowledge [or] use the cost approach to intentionally exaggerate the market value of property").

540   *United States v. Benning Hous. Corp.*, 276 F.2d 248, 253 (5th Cir. 1960).

acceptable as a stand-alone indication of value for federal acquisitions;[541] instead, it is typically employed either to test the financial feasibility of a potential highest and best use[542] or to "check" or test the reasonableness of estimates of value indicated by other approaches.[543] Use of the cost approach may be appropriate in the valuation of properties with highly specialized improvements that have no known comparable sales in the area.[544] Proper application of the cost approach for any purpose under these Standards requires an understanding of its underlying foundations in the context of determining just compensation, as well as the specific elements involved.[545]

### 4.4.3.1. Foundations of the Cost Approach.

Like the sales comparison and income capitalization approaches to value, the cost approach is based on the principle of substitution: a prudent buyer will pay no more for one property than for a similarly desirable property.[546] Likewise, when several similar properties are available, the one with the lowest price will attract the greatest demand.[547] The cost approach specifically "reflects the notion that one will not pay more for an existing property than it would cost to construct one's own replacement for the property."[548] But as the Supreme Court recognized, "the value of property may be greater or less than its cost . . . . It is the property and not the cost of it that is protected by the Fifth Amendment."[549] Thus, the cost approach as a means of measuring value "may have relevance—but only, of course, as bearing on what a prospective purchaser would have paid."[550] Its relevance to market value therefore cannot be merely assumed in federal acquisitions; rather, the appraiser must demonstrate that application of the cost approach to a specific property would be relevant to market participants.[551] The Ninth Circuit suggested possible ways to make the necessary showing in *United States v. 55.22 Acres of Land*, such

---

541  *E.g.*, *55.22 Acres in Yakima*, 411 F.2d at 435 & n.2 (rejecting reproduction cost as direct evidence of value (citing *Toronto, Hamilton*, 338 U.S. at 403)).

542  *See also United States v. 0.59 Acres*, 109 F.3d 1493, 1497 (9th Cir. 1997) (holding it is improper to "artificially increase or decrease the value of the condemnees' land by ignoring a condition that the Government did not create"); *cf. 252 Seventh Ave.*, 92 F. Supp. at 389 ("it is obvious that to make [the building] suitable for the particular industry would mean . . . a very large expense and a considerable diminution of income . . . ."). Of course, "the determination of a highest and best use does not obviate the need to determine the fair market value in light of the physical condition of the property." *Rasmuson v. United States*, 807 F.3d 1343, 1346 n.1 (Fed. Cir. 2015) (citing *Olson*, 292 U.S. at 255).

543  *See United States v. Certain Interests in Prop. in Brooklyn*, 326 F.2d 109, 114-15 (2d Cir. 1964); *Fairfield Gardens, Inc. v. United States*, 306 F.2d 167, 173-74 (9th Cir. 1962); *cf. 252 Seventh Ave.*, 92 F. Supp. at 396 (award of compensation "is not based upon any one abstraction or method of valuation, nor on any one isolated circumstance or even set of circumstances[;]" rather it "take[s] into consideration the physical characteristics of the property, the peculiarities of the area in which it is located, the teachings of the history of property in that area and adjacent areas, [an] inspection of the building and of comparable properties, sales which were brought forward on the theory that they involved equivalent buildings, and every bit of information that seemed relevant"). See generally USPAP Standards Rule 1-4(b) (specifying appraisers' professional obligations "[w]hen a cost approach is necessary for credible assignment results"), Section 1.6 (The Approaches to Value); Section 1.6.5 (Reconciliation Process and Final Opinion of Value).

544  *E.g.*, *United States v. Becktold Co.*, 129 F.2d 473 (8th Cir. 1942) (allowing cost approach in valuation of book bindery plant with large, heavy machinery bolted in place, where no bindery sales had occurred in 20 years and no other sales upon which to base valuation had occurred in vicinity, and under state law, machinery was part of realty (see Section 4.1.3)); *see 55.22 Acres in Yakima*, 411 F.2d at 435-36 (prohibiting cost approach as direct evidence of value where improvements were not "of an unusual nature, such as a church, for which comparable sales or other indicia of market value would probably be unavailable").

545  *Cf. Standard Oil Co. of N.J. v. S. Pac. Co.*, 268 U.S. 146, 155-56 (1925) ("It is to be borne in mind that value is the thing to be found and that neither cost of reproduction new, nor that less depreciation, is the measure or sole guide." (citing *Minnesota Rate Cases*, 230 U.S. 352, 434 (1913)).

546  *See United States v. 1.604 Acres of Land* (*Granby I*), 844 F. Supp. 2d 668, 682 (E.D.Va. 2011); *cf. Int'l Paper Co. v. United States*, 227 F.2d 201, 207 (5th Cir. 1955).

547  *Cf. United States v. 25.202 Acres of Land* (*Amexx I*), 860 F. Supp. 2d 165, 178 (N.D.N.Y. 2009), *adopted by* 860 F. Supp. 2d 165 (N.D.N.Y. 2010), *aff'd*, 502 F. App'x 43 (2d Cir. 2012).

548  *Granby I*, 844 F. Supp. 2d at 682.

549  *Brooks-Scanlon Corp. v. United States*, 265 U.S. 106, 123 (1924).

550  *United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 402-03 (1949) (naming reproduction cost a "'false standard of the past' . . . when no one would think of reproducing the property").

551  *United States v. 55.22 Acres of Land in Yakima Cty.*, 411 F.2d 432, 435-36 (9th Cir. 1969); *United States v. Certain Interests in Prop. in Cumberland Cty.*, 296 F.2d 264, 269-70 (4th Cir. 1961) ("It seems plain that a showing . . . that a reasonable investor would reproduce the project for the amount given as reproduction or replacement cost would be required before a willing vendee would consider such a figure relevant in his negotiations with a willing vendor."); *see Toronto, Hamilton*, 338 U.S. at 402-03.

---

as with evidence that "a prudent investor would reproduce the improvements at the reproduction cost figure [stated]," or that "willing vendees and vendors would deem reproduction cost less depreciation relevant in negotiating a purchase and sale of the property."[552] The court further suggested that limited use of the cost approach as but "one guide" considered by the appraiser in arriving at a fair market value might have been acceptable.[553]

Federal courts agree that reliance on the cost approach is improper "when no one would think of reproducing the property," or when no prudent investor would reproduce it for the figure or amount estimated as replacement or reproduction cost.[554] Thus courts reject the cost approach without "unequivocal evidence that the [improvements] involved would be reproduced by private investors at the risk of private capital."[555]

**The cost approach is generally inapplicable to vacant land, as any value contributed by bringing a property to its vacant state are reflected in the comparison of the parcel to the prices paid on the market for other vacant parcels.**

Because the cost approach is designed to inform the valuation of properties with existing physical improvements, it is generally inapplicable to vacant lands, regardless of costs the landowner may have incurred to remove prior improvements. As a district court recently explained in rejecting any use of the cost approach to value a vacant site:

> Efforts and expenditures made by the landowner to bring the property to its present, vacant state, and to maintain it as such, are reflected in the comparison of the parcel to the prices paid on the market for other vacant parcels. Costs to demolish buildings extant on the property and the associated site work, and property maintenance costs such as real estate taxes capitalized, do not inure to the benefit of a prospective buyer over and above any increase in value from the property's status as vacant land.[556]

Moreover, the mere existence of improvements does not automatically justify application of the cost approach; its use is inappropriate where the improvements would be of no value to a prudent buyer due to the nature or condition of the improvements or of the market or other factors,[557] or simply because "the original builder guessed wrong."[558] Again, "cost is not synonymous with market value."[559] Thus the Fourth Circuit emphasized the distinction

---

552  *55.22 Acres in Yakima*, 411 F.2d at 435-36 (citations omitted).

553  *Id.* at 435-36; *see* 2 ORGEL, *supra* note 191, at 57 ("The really important problem is that of the use to be made of the evidence [of value derived from the cost approach] rather than the technical question as to its admissibility.").

554  *Toronto, Hamilton*, 338 U.S. at 403; *55.22 Acres in Yakima*, 411 F.2d at 435-36; *Interests in Cumberland*, 296 F.2d at 269-70; *United States v. Benning Hous. Corp.*, 276 F.2d 248, 253 (5th Cir. 1960); *Buena Vista Homes, Inc. v. United States*, 281 F.2d 476, 478 (10th Cir. 1960).

555  *Benning Hous. Corp.*, 276 F.2d at 253.

556  *United States v. 15,478 Square Feet of Land* (*Balaji Sai*), No. 2:10-CV-00322, 2011 WL 2471586, at *6 (E.D. Va. June 20, 2011) (citing *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 285 (1943)).

557  *E.g., United States v. 25.202 Acres of Land* (*Amexx I*), 860 F. Supp. 2d 165, 178 (N.D.N.Y. 2009), *adopted by* 860 F. Supp. 2d 165 (N.D.N.Y. 2010), *aff'd*, 502 F. App'x 43 (2d Cir. 2012) (cost approach did not apply in acquisition where "only structure was an old building that had not been used in years and whose demolition was necessary in any event"); *55.22 Acres in Yakima*, 411 F.2d at 436 ("No doubt, having regard for [the landowner's] personal circumstances, these improvements were satisfactory for his purposes, but they were not shown to be of such a character that, if not on the land, one purchasing the acreage would have wished to construct generally similar improvements.").

558  *United States v. 49,375 Square Feet of Land in Manhattan* (*252 Seventh Ave.*), 92 F. Supp. 384, 387-88 (S.D.N.Y. 1950), *aff'd sub nom. United States v. Tishman Realty & Constr. Co.*, 193 F.2d 180 (2d Cir. 1952) (per curiam) (affirming on opinion of trial court); *Balaji Sai*, 2011 WL 2471586, at *6 ("To the extent the inclusion of [demolition and other] costs in the valuation is an attempt to collect reimbursement for [the landowner's] prior investment in the property, the costs are impermissible, as the Fifth Amendment does not guarantee the landowner a return on his investment." (citing *Powelson*, 319 U.S. at 285)).

559  *Kinter v. United States*, 156 F.2d 5, 7 (3d Cir. 1946).

between merely calculating a building's replacement cost and actually determining a property's market value:

> [T]he purpose behind determining replacement cost, or original cost, or any of those things[,] is to aid you in determining whether or not the existence of those buildings on the land contributes anything to the fair market value of the whole, and, if it does contribute to it, how much does it contribute? That applies to each and every structure that was on or in the property.[560]

To ensure a reliable indication of market value, every element of the cost approach methodology and its underlying assumptions must be carefully scrutinized, supported by market research, and directly linked to the property's highest and best use.[561]

**4.4.3.2.** **Value of the Land (Site) as if Vacant.** The value of the site as if vacant and available for its highest and best use is generally estimated by analysis of comparable sales (i.e., by application of the sales comparison approach).[562] Of course, this does not allow an appraiser to disregard actual physical conditions that a reasonably prudent buyer would consider: "A proper appraisal methodology has to account for those physical conditions."[563]

**4.4.3.3.** **Reproduction Cost and Replacement Cost.** The appraiser must distinguish between reproduction cost and replacement cost, despite the fact that many courts have used the terms interchangeably.[564] Reproduction cost is the present cost of reproducing the improvement with an exact replica using the same physical materials; replacement cost is the present cost of replacing the improvement with one of equal utility.[565] The appraiser may typically use either measure, but must demonstrate the relevance of the selected measure to the market value of the specific property being appraised and account for all forms of depreciation appropriate to the selected method.[566]

The estimate of the reproduction or replacement cost of the improvements must be based on current local market cost of labor and materials for construction of improvements; to be considered, such improvements and any associated cost data must be relevant to the property's highest and best use.[567]

---

560   *United States v. Wise*, 131 F.2d 851, 853 (4th Cir. 1942) (quoting trial court's instructions to jury); *see 55.22 Acres in Yakima*, 411 F.2d at 435-36 (accepting valuation of improved property derived from analysis of comparable sales and incremental value of improvements).

561   *See United States v. 1.604 Acres of Land* (*Granby I*), 844 F. Supp. 2d 668, 683-84 (E.D. Va. 2011); USPAP SR 1-4(b) ("When a cost approach is necessary for credible assignment results, an appraiser must: (i) develop an opinion of site value by an appropriate appraisal method or technique; (ii) analyze such comparable cost data as are available to estimate the cost new of the improvements (if any); and (iii) analyze such comparable data as are available to estimate the difference between the cost new and the present worth of the improvements (accrued depreciation)."); *see also Olson v. United States*, 292 U.S. 246, 257 (1934) ("Elements affecting value that depend upon events or combinations of occurrences which . . . are not fairly shown to be reasonably probable should be excluded from consideration . . . .").

562   *E.g.*, *55.22 Acres in Yakima*, 411 F.2d at 436; *cf. Morris v. Comm'r*, 761 F.2d 1195, 1196 (6th Cir. 1985) (tax case).

563   *Rasmuson v. United States*, 807 F.3d 1343, 1346 (Fed. Cir. 2015) (holding valuation of agricultural property that "does not take into account the costs of removing [existing] physical remnants of [a] railway will result in an artificially inflated value and yield a windfall to the landowner").

564   *E.g.*, *Winston v. United States*, 342 F.2d 715, 724 (9th Cir. 1965). In particular, the phrases "reproduction cost new less depreciation" and "replacement cost new less depreciation" often appear with little precision or explanation. Nonetheless, "[i]n appraisal the distinction between reproduction cost and replacement cost is quite clear." EATON, *supra* note 16, at 161.

565   EATON, *supra* note 16, at 161.

566   *See In re U.S. Comm'n to Appraise Wash. Mkt. Co. Prop.*, 295 F.950, 957-58 (D.C. Cir. 1924) (discussing forms of depreciation to be considered in reproduction cost method);

567   *United States v. 1.604 Acres* (*Granby I*), 844 F. Supp. 2d 668, 684 (E.D. Va. 2011); *see United States v. Wise*, 131 F.2d 851, 853 (4th Cir. 1942); *see also Olson v. United States*, 292 U.S. 246, 255 (1934).

**4.4.3.4.**  **Depreciation.** All appropriate forms of depreciation, including <u>physical deterioration</u>, <u>functional obsolescence</u>, and <u>economic obsolescence</u>, must be derived from market data and deducted from the estimated reproduction or replacement cost.[568] Depreciation may vary depending on the locality, purpose, and type of improvements, among other factors.[569] "The sales comparison or abstraction method of estimating depreciation is particularly reliable."[570]

**4.4.3.5.**  **Entrepreneurial Incentive and Entrepreneurial Profit.** Current appraisal methodology recognizes <u>entrepreneurial incentive</u>—the amount an entrepreneur expects to receive from developing a real estate project—as an element of the cost approach to valuation.[571] Similarly, <u>entrepreneurial profit</u> (also <u>developer's profit</u>) is the amount actually received, reflecting the difference between the total cost of development and its market value after completion.[572] Of course, not all developments live up to expectations: "It must be remembered that an entrepreneur is not guaranteed a profit."[573]

The Supreme Court has yet to address the propriety of entrepreneurial incentive or entrepreneurial profit in the cost approach to valuation in federal acquisitions.[574] Still, rulings from one of the only federal courts to consider this issue are instructive:

> Because the [amount] due an entrepreneur or developer for assuming the risk of a development project and coordinating and managing the development is a real cost to constructing a replacement for the existing property, inclusion of entrepreneurial incentive may be necessary to ensure the accuracy of the cost approach valuation methodology. The goal of the cost approach is to estimate the market value of the property. Thus, consideration of entrepreneurial incentive comports with current law. [575]

If considered as a potential element of reproduction or replacement cost, entrepreneurial profit or entrepreneurial incentive must be "based on market research and data" and reflect the subject property's highest and best use,[576] and will "be scrutinized to ensure that [estimates] do not take

---

568  *Wash. Mkt. Co. Prop.*, 295 F.at 957-58; *see United States v. Certain Interests in Prop. in Cumberland Cty.*, 296 F.2d 264, 266 n.1 (4th Cir. 1961) ("replacement cost, or reproduction costs, may be considered only when proper deductions are made for physical and economic depreciation and obsolescence"); *cf. United States v. 3,727.91 Acres of Land in Pike Cty.* (<u>Elsberry Drainage Dist.</u>), 563 F.2d 357, 360 n.4 (8th Cir. 1977) (noting challenged finding on depreciation was "supported by substantial evidence").

569  *See, e.g.*, *United States v. Becktold Co.*, 129 F.2d 473, 479 (8th Cir. 1942).

570  EATON, *supra* note 16, at 169; *cf. Becktold*, 129 F.2d at 479-80.

571  *United States v. 15,478 Square Feet of Land* (<u>Balaji Sai</u>), No. 2:10-cv-00322, 2011 WL 2471586, at *6 (E.D. Va. June 20, 2011); *see United States v. 1.604 Acres of Land* (<u>Granby I</u>), 844 F. Supp. 2d 668, 682-84 (E.D. Va. 2011); EATON, *supra* note 16, at 168-170.

572  *See Entrepreneurial Profit*, THE DICTIONARY OF REAL ESTATE APPRAISAL (6th ed. 2015).

573  EATON, *supra* note 16, at 168; *cf. United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 285 (1943) ("[T]he Fifth Amendment allows the owner only the fair market value of this property; it does not guarantee him a return of his investment.").

574  *Granby I*, 844 F. Supp. 2d at 683; *see United States v. 8.34 Acres of Land in Ascension Par.*, No. 04-5-D-MI, 2006 WL 6860387, at *5 (M.D. La. June 12, 2006) (describing "'entrepreneur's profit" as "a controversial legal-economic issue"); EATON, *supra* note 16, at 168 ("Entrepreneurial profit is a relatively new concept, at least as a separate item of cost in the cost approach."); *cf. 2* ORGEL, *supra* note 191, at 57 ("The failure of the courts to keep abreast of current appraisal theory is not to be explained entirely on the ground that the law lags behind the times. It is partly due to the peculiar problem of finding satisfactory judicial proof.").

575  *Granby I*, 844 F. Supp. 2d at 683; *see United States v. 1.604 Acres of Land* (<u>Granby III</u>), 844 F. Supp. 2d 685, 690 (E.D. Va. 2011); *Balaji Sai*, 2011 WL 2471586, at *4-7; *see also United States v. 1.604 Acres of Land* (<u>Granby II</u>), No. 2:10-cv-00320, 2011 WL 1810594, at *3 (E.D. Va. May 11, 2011). The *Granby* and *Balaji* cases, involving concurrent acquisitions of adjacent properties, were decided by the same district judge.

576  *Granby I*, 844 F. Supp. 2d at 683-84; *see Granby III*, 844 F. Supp. 2d at 690; *Granby II*, 2011 WL 1810594, at *1, *3 (barring consideration of costs premised on unsupported highest and best use); *see also Olson*, 292 U.S. at 255.

into account any improper considerations."[577] It is impermissible to calculate entrepreneurial incentive (in whole or in part) as a percentage of land value or land cost because "the fair market value of the land already encapsulates the incentive necessary to entice an entrepreneur or developer to [acquire] the property."[578]

#### 4.4.3.6. Unit Rule and the Cost Approach.
Valuations derived from the cost approach and any other approach to value must follow the <u>unit rule</u>, which requires property to be valued as a whole, as discussed in Section 4.2.2. Indeed, "it is firmly settled that one does not value the [ ] land as one factor and then value the improvements as another factor and then add the two values to determine market value."[579] In using the cost approach, it is therefore critical to distinguish between calculating the cost of improvements and estimating the market value of the property as a whole, considering the contributory value of improvements.[580]

As discussed in Section 4.2.2.3, some assignments may require separate allocation of the contributory value of improvements that will be removed or adversely affected due to the government project (if applicable, the appraiser should clearly state that any such allocations do not indicate the appraisal method(s) employed).[581]

#### 4.4.4. Income Capitalization Approach.
The third recognized approach to value in federal acquisitions is the income capitalization approach, which involves capitalizing[582] a property's anticipated net income to derive an indication of its present market value.[583] When properly applied, the income approach can indicate what a buyer would pay at the present time for the anticipated future benefits, discounted for risk and other variables, of owning a property.[584] The income capitalization approach is relevant only in certain circumstances—namely, in the

---

577  *Granby I*, 844 F. Supp. 2d at 683-84; *cf. Kimball Laundry Co. v. United States*, 338 U.S. 1, 5-6 (1949) ("The value compensable under the Fifth Amendment, therefore, is only that value which is capable of transfer from owner to owner and thus of exchange for some equivalent."); *Olson*, 292 U.S. at 257 ("Elements affecting value that . . . are not fairly shown to be reasonably probable, should be excluded from consideration . . . .").

578  *Granby III*, 844 F. Supp. 2d at 690; *see Powelson*, 319 U.S. at 285 ("[T]he Fifth Amendment . . . does not guarantee [a landowner] a return of his investment."); *Olson*, 292 U.S. at 255 ("It is the property and not the cost of it that is safeguarded by [the Fifth Amendment]."); *Granby I*, 844 F. Supp. 2d at 684; *cf. United States v. Gen. Motors Corp.*, 323 U.S. 373, 379 (1945) ("compensation . . . does not include future loss of profits").

579  *United States v. 91.90 Acres of Land in Monroe Cty.* (*Cannon Dam*), 586 F.2d 79, 87 (8th Cir. 1978); *accord Kinter v. United States*, 156 F.2d 5, 7 (3d Cir. 1946) ("[C]ost is not synonymous with market value. *A fortiori*, cost of land and cost of improvements taken separately and added are not to be equalized with fair market value.").

580  *See United States v. Wise*, 131 F.2d 851, 853 (4th Cir. 1942); *United States v. Becktold Co.*, 129 F.2d 473, 478 (8th Cir. 1942) (noting it may be proper to consider evidence "'as to the value of the building separate from the land, and all the land separate from the building, where from such evidence the [factfinder] can reach . . . the market value of the land including the building'" (quoting *Devou v. City of Cincinnati*, 162 F. 633, 636 (6th Cir. 1908))); *cf. United States v. 158.00 Acres of Land in Clay Cty.*, 562 F.2d 11, 13 (8th Cir. 1977) ("As just compensation is determined by valuing a parcel as a whole, not mechanically adding together its separate components, the contributory value of improvements may be only a subsidiary fact supporting the ultimate finding of just compensation.").

581  *See 158.00 Acres in Clay*, 562 F.2d at 13 ("the contributory value of the [improvements] has independent significance in the comprehensive statutory scheme [of the Uniform Act]").

582  Capitalization is the conversion of income into value. *Capitalization*, THE DICTIONARY OF REAL ESTATE APPRAISAL (6th ed. 2015).

583  *United States v. 25.202 Acres of Land* (*Amexx I*), 860 F. Supp. 2d 165, 174-75 (N.D.N.Y. 2009), *adopted by* 860 F. Supp. 2d 165 (N.D.N.Y. 2010), *aff'd* 502 F. App'x 43 (2d Cir. 2012); *United States v. 6.45 Acres of Land* (*Gettysburg Tower*), 409 F.3d 139, 143 n.6 (3d Cir. 2005); *Foster v. United States*, 2 Cl. Ct. 426, 447 (1983), *aff'd*, 746 F.2d 1491 (Fed. Cir. 1984); EATON, *supra* note 16, 173-96; *see United States v. 47.14 Acres of Land in Polk Cty.*, 674 F.2d 722, 725-26 (8th Cir. 1982); *Income Capitalization Approach*, THE DICTIONARY OF REAL ESTATE APPRAISAL (5th ed. 2010); *cf.* APPRAISAL INST. & AM. SOC'Y OF FARM MANAGERS, THE APPRAISAL OF RURAL PROPERTY 506-11 (2d ed. 2000).

584  *See United States v. 25.202 Acres of Land* (*Amexx II*), No. 5:06-CV-428, 2011 WL 4595009, at *2 n.4 (N.D.N.Y. Sept. 30, 2011), *aff'd*, 502 F. App'x 43 (2d Cir. 2012) ("evidence of income-producing potential of the property is relevant only to the extent that it would affect how much a willing buyer would be willing to pay."); *see Gettysburg Tower*, 409 F.3d at 143 n.6.

5-ER-893

valuation of income-producing property with no available comparable sales.[585] Even then, "[g]reat care must be taken, or such valuations can reach wonderland proportions."[586]

For this reason, federal courts have often found iterations of the income capitalization approach to value "ill-suited to the purposes" of just compensation.[587]

> These valuations almost always achieve chimerical magnitude, because, in the mythical business world of income capitalization, nothing ever goes wrong. There is always a demand; prices always go up; no competing material displaces the market.[588]

As the Fourth Circuit warned, "to allow value to be proved in such a suspect manner, impeccably objective and convincing evidence is required."[589] Accordingly, every factor to be considered in the income capitalization approach in federal acquisitions must be properly supported.[590] In valuations for just compensation purposes, the goal is "to duplicate marketplace calculations to the greatest possible extent."[591] Courts have therefore rejected income capitalization without evidence that "rates are in fact fixed in the marketplace by a process which parallels [the expert's] calculations."[592]

Proper application of the income capitalization approach requires a distinction between income generated by *the property itself* (such as rental or royalty income), which can be considered, and income generated by *a business conducted on the property*, which must be disregarded.[593]

## 4.4.4.1. Applications.
While federal courts recognize the income capitalization may be a valid and reliable approach to value in certain cases, they uniformly hold that it should be used only

---

585  *Amexx I*, 860 F. Supp. 2d at 176-77; *United States v. 33.92356 Acres of Land* (*Piza-Blondet Trial Op.*), No. 98-1664, 2008 WL 2550586, at *11-12 (D.P.R. June 13, 2008), *aff'd*, 585 F.3d 1, 11 (1st Cir. 2009); *United States v. 100.80 Acres of Land* (*Parrish*), 657 F. Supp. 269, 274 (M.D.N.C. 1987); see *United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 403 (1949) ("past earnings are significant only when they tend to reflect future returns").

586  *47.14 Acres in Polk*, 674 F.2d at 726; *see United States v. 69.1 Acres of Land* (*Sand Mountain*), 942 F.2d 290, 293-94 (4th Cir. 1991) ("These valuations almost always achieve chimerical magnitude, because, in the mythical business world of income capitalization, nothing ever goes wrong."); *cf. United States v. Whitehurst*, 337 F.2d 765, 772 (4th Cir. 1964) ("[A] change of even a fraction of one per cent will produce a surprisingly material change in the result."); EATON, *supra* note 16, at 174 ("To address the increasing complexity of real estate investment and financing, and the inflationary and recessionary trends of the 1970s and 1980s, more sophisticated investment analysis was developed. New techniques of analysis probably contributed in some degree to the financial woes of the banking industry, not because these techniques are flawed, but because they can easily be misused and manipulated.").

587  *United States v. 103.38 Acres of Land in Morgan Cty.* (*Oldfield*), 660 F.2d 208, 214 (6th Cir. 1981); *accord Sand Mountain*, 942 F.2d at 294 ("As the seminal case on the subject stated, 'it would require the enumeration of every cause of business disaster to point out the fallacy of using this method of arriving at just compensation.'" (quoting *United States ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*, 40 F. Supp. 811, 822 (E.D. Tenn. 1941))); *see Parrish*, 657 F. Supp. at 274 ("[D] angers present in the discounted royalty method [include] the dangers of speculation about future market demand and the vagaries of operating a business.").

588  *Sand Mountain*, 942 F.2d at 293.

589  *Id.* at 294; *see, e.g., Oldfield*, 660 F.2d at 214-15 (requiring strict evidence of basis in market for use of income capitalization approach); *Parrish*, 657 F. Supp. at 275 (accepting well-supported income capitalization approach that is "substantial, rational, nonspeculative, credible, and based upon the realities of the market place").

590  *47.14 Acres in Polk*, 674 F.2d at 726; *Oldfield*, 660 F.2d at 214-15 (requiring "evidence derived from or demonstrably related to the actual market" as "essential characteristics"); *Whitehurst*, 337 F.2d at 771-74; *United States v. 158.76 Acres of Land in Townshend*, 298 F.2d 559, 561 (2d Cir. 1962); *Parrish*, 657 F. Supp. at 275-77 (approving analysis that "relied on market and economic realities"); *see, e.g., Amexx I*, 860 F. Supp. 2d at 176-78, aff'd, 502 F. App'x at 45 (noting lower court's "thorough report exposing the unreliability of the expert's methods"); *see also United States v. Sowards*, 370 F.2d 87, 90-92 (10th Cir. 1966); *Likins-Foster Monterey Corp. v. United States*, 308 F.2d 595, 597-99 (9th Cir. 1962), *aff'g United States v. Certain Interests in Prop. in Monterey Cty.*, 186 F. Supp. 167 (N.D. Cal. 1960); *United States v. Leavell & Ponder, Inc.*, 286 F.2d 398, 406-08 (5th Cir. 1961).

591  *Oldfield*, 660 F.2d at 212; *see Cementerio Buxeda, Inc. v. Puerto Rico*, 196 F.2d 177, 181 (1st Cir. 1952) (allowing consideration of income and expense figures that "are factors which would be considered by a prospective buyer").

592  *Oldfield*, 660 F.2d at 214 ("The fatal flaw in the owners' . . . method is its lack of demonstrable relationship with this 'real' market . . . ."); *see Parrish*, 657 F. Supp. 275-77 (accepting analysis of expert who "relied on market and economic realities to derive his opinion on a royalty").

593  *Parrish*, 657 F. Supp. at 274, 277; *see United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 403 n.6 (1949) (citing *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949)); *Cementerio Buxeda*, 196 F.2d at 180-81; Section 4.6.2.

"when there are *no* comparable sales and market value must be estimated."[594] Accordingly, the fact that a property produces (or could potentially produce) income will not, on its own, justify use of the income capitalization approach. Rather, its relevance to what a willing buyer would pay to a willing seller must be demonstrated.[595]

The income capitalization approach may refer to either <u>direct capitalization</u> or <u>yield capitalization</u> techniques:

- Direct capitalization techniques are used to derive an indication of the market value of a stabilized income-producing property by applying an overall capitalization rate to a property's single-year net income.[596]

- Yield capitalization techniques are used to derive an indication of the market value of an income-producing property with varying forecasted income or expenses, typically using discounted cash-flow (DCF) analysis. Forecasts of net income, expenses, cash flow and other factors over a holding or projection period are required.[597]

Due to the relatively recent development of these techniques in the appraisal of real estate, some specific iterations have faced little or no scrutiny in federal courts.[598] But existing case law makes clear that regardless of the technique used, there must be sufficient market data to ensure a reliable indication of value for the specific property being appraised.[599]

Use of the income capitalization approach is improper when the future use or demand for that use is speculative.[600] As stated in an opinion affirmed by the Second Circuit:

---

594  *United States v. 25.202 Acres of Land* (*Amexx I*), 860 F. Supp. 2d 165, 176-77 (N.D.N.Y. 2009), *adopted by* 860 F. Supp. 2d 165 (N.D.N.Y. 2010), *aff'd*, 502 F. App'x 43 (2d Cir. 2012); *accord Oldfield*, 660 F.2d at 211-13; *Sowards*, 370 F.2d at 89; *United States v. 33.92356 Acres of Land* (*Piza-Blondet Trial Op.*), No. 98-1664, 2008 WL 2550586 (D.P.R. June 13, 2008), *aff'd*, 585 F.3d 1, 11 (1st Cir. 2009); *Parrish*, 657 F. Supp. at 274; *see United States v. Whitehurst*, 337 F.2d 765, 775 (4th Cir. 1964).

595  *Oldfield*, 660 F.2d at 212-15 ("[T]o validate [this] approach in our eyes, the owners would have to establish that royalty rates are in fact fixed in the marketplace by a process which parallels [the expert's] calculations."); *see Foster v. United States*, 2 Cl. Ct. 426, 448 (1983), *aff'd*, 746 F.2d 1491 (Fed. Cir. 1984) ("situations where income producing potential is a key element for both buyer and seller . . . in arriving at a fair price"); *Whitehurst*, 337 F.2d at 775; *Cementerio Buxeda*, 196 F.2d at 180; *see also Sowards*, 370 F.2d at 90 ("whatever method is employed, the evidence offered must have a bearing upon what a willing buyer would pay a willing seller for the property on the date of the taking"); *cf. Kimball Laundry*, 338 U.S. at 5-6.

596  *See Amexx I*, 860 F. Supp. 2d at 174-75; *United States v. 15.00 Acres of Land in Miss. Cty.*, 468 F. Supp. 310, 315 (E.D. Ark. 1979) (discussing direct capitalization); *Direct Capitalization*, THE DICTIONARY OF REAL ESTATE APPRAISAL (6th ed. 2015).

597  *See Amexx I*, 860 F. Supp. 2d at 174-75; *Yield Capitalization*, THE DICTIONARY OF REAL ESTATE APPRAISAL (6th ed. 2015); *cf. United States v. 6.45 Acres of Land* (*Gettysburg Tower*), 409 F.3d 139 (3d Cir. 2005), *and on remand*, No. 1:CV-99-2128, 2006 WL 839375 (M.D. Pa. March 27, 2006) (yield capitalization technique).

598  *See* EATON, supra note 16, at 173 ("In the past 25 years, the income capitalization approach has been modified and expanded more dramatically than any other procedure in real estate appraisal.").

599  *See Whitehurst*, 337 F.2d at 776 ("[I]f all of the factors which must necessarily be taken into account are established by proper evidence, there would appear to be no valid reason to judicially condemn, prohibit or outlaw the use of [the income capitalization approach].We do hold, however, in the instant case that the determination of the several elements or factors which were here relied upon was based upon pure speculation and was without objective evidential support."); *accord United States v. 69.1 Acres of Land* (*Sand Mountain*), 942 F.2d 290, 293-94 (4th Cir. 1991) (discussing *Whitehurst*, 337 F.2d at 771); *United States v. 47.14 Acres of Land in Polk Cty.*, 674 F.2d 722, 726 (8th Cir. 1982) ("[W]here such method is used all of the factors that must necessarily be taken into account should be established by proper evidence. . . . [W]ithout objective evidential support, that method is faulty and can obviously lead to unfounded and enhanced valuations."); *Oldfield*, 660 F.2d at 214-15 (holding royalties in cash flow analysis must be "derived from or demonstrably related to the actual market in mineral royalties"); *Sowards*, 370 F.2d at 90-92 ("[T]o have probative value, that opinion or estimate [of value] must be founded upon substantial data, not mere conjecture, speculation or unwarranted assumption. It must have a rational foundation."); *Parrish*, 657 F. Supp. at 274-75.

600  *Amexx I*, 860 F. Supp. 2d at 176-77; *accord United States v. 75.13 Acres in Polk Cty.*, 693 F.2d 813, 816 (8th Cir. 1982).

---

The mere physical adaptability to a given use is insufficient to invoke the capitalization method, and the landowner must show that "an income producing market existed at the date of the taking or will exist in the reasonably near future."[601]

Of course, the highest and best use of a property may increase the value of vacant land because a buyer may pay more for property that is capable of being developed into a profitable operation.[602] But "if there is no currently operating business, it would be 'improper to value the property as if it were *actually being used* for the more valuable purpose.'"[603]

Direct capitalization techniques cannot be used to value property that is not generating income as of the date of value:

> [D]irect capitalization of net income is an appropriate method of valuation only when the landowner can establish actual income, application of the capitalization approach is thus necessarily limited to those situations where eminent domain proceedings impinge an established, on-going business' opportunity for *continued* as opposed to *prospective* profit. There can be no capitalization of income unless the fact of income is itself first established. Any other rule would permit a valuation, speculative *ab initio*, to be seriously compounded.[604]

Yield capitalization techniques may be appropriate to value property with a highest and best use of development into a profitable operation that is not yet generating income on the date of value.[605] But such property "may not be valued on the basis of conjectural future demand for [the proposed use]. There must be some objective support for the future demand, including volume and duration."[606] Accordingly, the Sixth Circuit rejected a valuation based on costs fixed on the date of value because it did not reflect the fact that the property interest being valued—the right to remove sand—"extended over a period of years: the value of the deposit might be affected by prospects of future increase or decrease in the cost of similar sand."[607]

Well-documented market support is critical because "[t]his method is highly susceptible to overvaluation, because of the tendency to overestimate the [annual income] and the tendency to employ a capitalization rate that is too low to reflect the hazards of the industry."[608] Market support for yield capitalization techniques should include investigation and analysis of potentially relevant sales. Even if there are insufficient sales to support a reliable sales comparison approach,

---

601  *Amexx I*, 860 F. Supp. 2d at 176-77 (quoting *75.13 Acres in Polk*, 693 F.2d at 816); *accord United States v. 1,291.83 Acres of Land in Adair & Taylor Ctys.*, 411 F.2d 1081, 1084-85 (6th Cir. 1969); *see also Hembree v. United States*, 347 F.2d 109, 111-14 (8th Cir. 1965).

602  *See Olson v. United States*, 292 U.S. 246, 255 (1934); *Amexx I*, 860 F. Supp. 2d at 176-77.

603  *Amexx I*, 860 F. Supp. 2d at 177 (quoting *United States v. Meadow Brook Club*, 259 F.2d 41, 45 (2d Cir. 1958), and *Olson*, 292 U.S. at 255); *see 1,291.83 Acres*, 411 F.2d at 1084-85.

604  *United States v. 15.00 Acres of Land in Miss. Cty.*, 468 F. Supp. 310, 315 (D. Ark. 1979); (citation omitted); *accord Amexx I*, 860 F. Supp. 2d at 175-81 & n.20; *Foster v. United States*, 2 Cl. Ct. 426, 448 (1983), *aff'd*, 746 F.2d 1491 (Fed. Cir. 1984) ("Direct capitalization of net income is an appropriate method only when actual income from the property can be established in a continuing ongoing business.").

605  *See Olson*, 292 U.S. at 255; *Amexx I*, 860 F. Supp. 2d at 176-77.

606  *United States v. Whitehurst*, 337 F.2d 765, 771-72 (4th Cir. 1964); *accord Mills v. United States*, 363 F.2d 78, 81 (8th Cir. 1966); *see United States v. 237,500 Acres of Land*, 236 F. Supp. 44, 49-51 (S.D. Cal.1964), *aff'd with qualifications sub nom. United States v. Am. Pumice Co.*, 404 F.2d 336 (9th Cir. 1968).

607  *United States v. Pa.-Dixie Cement Corp.*, 178 F.2d 195, 200 (6th Cir. 1949).

608  *Whitehurst*, 337 F.2d at 773; *United States v. 69.1 Acres of Land (Sand Mountain)*, 942 F.2d 290, 293-94 (4th Cir. 1991) ("[I]n the mythical business world of income capitalization, nothing ever goes wrong. There is always a demand; prices always go up; no competing material displaces the market.").

"that does not put out of hand the bearing which the scattered sales may have on what an ordinary purchaser would have paid for the claimant's property."[609] This holds true for all types of properties, including mineral properties: "There may be cases where quite distant properties can be shown to be comparable in an economic or market sense, due allowance being made for variables" such as (for a mineral property) "quantity, quality, mining costs and access to market . . . ."[610] And sales prices may support a "bonus value" due to a property's potential for development[611]—or "demonstrate[ ] that there [i]s no such enhanced value in the market."[612]

**4.4.4.2.  Income to Be Considered.** The Supreme Court has instructed that "separation…must be made, in any case, between the value of the property and the value of the claimant's own business skill . . . ."[613] As a result, in determining the market value of the property, only income generated by the *real estate* itself—typically rental or royalty income—can be considered and capitalized.[614] In contrast, income generated by a *business* conducted on the property (such as a farming operation) is not considered.[615] As the First Circuit stated: "It is the value of the real estate, not the business that we are concerned with in this case. To allow evidence of past and future business profits would only confuse the value of the business with the value of the real estate."[616] The Supreme Court has recognized a single exception to this rule, allowing consideration of *business* income, rather than *real estate* income, only in those rare instances where the United States has condemned a business or franchise itself, and not merely a property on which business is conducted.[617]

**4.4.4.3.  Capitalization Rate or Discount Rate.** Determination of the capitalization or discount rate in an income capitalization approach is critical. This rate "reflects the degree of risk in the undertaking involved. It is an extremely important figure in the computation because a change of even a fraction of one percent will produce a surprisingly material change in the result."[618] As a result, federal courts have rejected use of the income capitalization approach if the discount rate is not supported by appropriate market evidence.[619]

---

609  *United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 402 (1949); *Mills*, 363 F.2d at 80-81; *Whitehurst*, 337 F.2d at 775.

610  *Am. Pumice Co.*, 404 F.2d at 336-37.

611  *Mills*, 363 F.2d at 80-81.

612  *Whitehurst*, 337 F.2d at 775.

613  *Toronto, Hamilton*, 338 U.S. at 403 n. 6 (citing *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949)); *Cementerio Buxeda, Inc. v. Puerto Rico*, 196 F.2d 177, 180-81 (1st Cir. 1952).

614  *See Toronto, Hamilton*, 338 U.S. at 403 & n.6 (citing *Kimball Laundry*, 338 U.S. 1); *A.G. Davis Ice Co. v. United States*, 362 F.2d 934, 936-37 (1st Cir. 1966); *United States v. 100.80 Acres of Land* (*Parrish*), 657 F. Supp. 269, 274 (M.D.N.C. 1987).

615  *United States v. 33.92356 Acres of Land* (*Piza-Blondet Trial Op.*), No. 98-1664, 2008 WL 2550586, at *11-12 (D.P.R. June 13, 2008), aff'd, 585 F.3d 1, 11 (1st Cir. 2009); *Stipe v. United States*, 337 F.2d 818, 820-21 & nn.3-4 (10th Cir. 1964); *see also In re Cool*, 81 B.R. 614, 616 (D. Mont. 1987) (discussing "the failings made by appraisers in cases where the appraiser attempts to capitalize the profits of the particular farm operation as opposed to fixing the intrinsic value of the land based on production or reasonable rental value").

616  *A.G. Davis Ice*, 362 F.2d at 936-37; *see, e.g., Parrish*, 657 F. Supp. at 274 (accepting opinion of value by expert who "was careful to rely on the income generable by the mineral itself (a royalty)—which is correctly attributable to the value of the land—and did not rely on an estimate of an operator's profit—which would not be attributable to the land").

617  *See Kimball Laundry*, 338 U.S. at 15 ("It is a difference in degree wide enough to require a difference in result."); *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 281-85 (1943); *Monongahela Nav. Co. v. United States*, 148 U.S. 312, 326-29, 343-44 (1893); *Stipe*, 337 F.2d 818  (rejecting valuation based on business income where owner's loss was "due to the destruction or frustration of his business, and not the taking of the property" because "[s]uch losses are not compensable").

618  *United States v. Whitehurst*, 337 F.2d 765, 771-72 (4th Cir. 1964).

619  *E.g., Whitehurst*, 337 F.2d at 771-72; *United States v. 158.76 Acres of Land in Townshend*, 298 F.2d 559, 561 (2d Cir. 1962); *United States v. Leavell & Ponder, Inc.*, 286 F.2d 398, 407 (5th Cir. 1961); *see Parrish*, 657 F. Supp. at 274 (noting discount rate was "supported" unlike in *Whitehurst, supra*).

The capitalization or discount rate must be derived from actual market data, through comparison if possible:

> [A] capitalization rate…should be ascertained by reference to the best evidence—the most similar property—as well as dissimilar investments if that proves necessary. "The selection of a capitalization rate by comparison is perhaps the most widely accepted approach. It recognizes the behavioristic nature of economics, because by comparison one gets the reaction of people in the market place."[620]

**4.4.4.4.** **Unit Rule Implications.** The underlined unit rule, discussed in Section 4.2.2, applies in valuations using the income capitalization approach as in all other approaches to value.[621] "The subsidiary interests in a fee cannot add to its market value and compensation for these interests must be paid out of the amount awarded for the whole."[622] Accordingly, in federal acquisitions, if using the income capitalization approach to value, appraisers must value the property being acquired as if in single ownership—not by "computing separately the value of the various constituent legal interests" (such as lessor/lessee or operator/owner) in the property.[623]

For example, in *United States v. 6.45 Acres of Land* (*Gettysburg Tower*), the United States acquired two adjacent tracts in fee simple: Tract 4-203, owned in fee by landowner Enggren and under a 99-year lease to landowner Overview, and Tract 4-204, owned in fee by landowner Overview.[624] On the date of value, Overview had built an observation tower on Tract 4-203 overlooking the Gettysburg Battlefield and was operating the tower as a tourist attraction and making payments to Enggren under the lease; Overview also owned and operated a gift shop, restaurant, and parking lot on Tract 4-204. The Third Circuit determined the following appraisal methodology correctly followed the unit rule for this property:

> [The appraiser] explained that because he was valuing the *fee* as a whole, lease payments were not considered an expense but merely a transfer of funds between interest holders that would cancel out under a unit valuation. Because [the appraiser's] task was neither to appraise Overview's interest nor the Enggrens' interest, but rather the composite value of all interests, he did not count as an expense what was simply a transfer of value between interest holders that had no bearing on the land's inherent capacity to generate income.[625]

---

620  *United States v. Certain Interests in Prop. in Monterey Cty.*, 186 F. Supp. 167, 170 (N.D. Cal. 1960), *aff'd sub nom. Likins-Foster Monterey Corp. v. United States*, 308 F.2d 595 (9th Cir. 1962); *see 158.76 Acres in Townshend*, 298 F.2d at 561 ("Capitalization of income comprehends the use of a rate of return in comparable investments."); *Leavell & Ponder*, 286 F.2d at 407.

621  *See, e.g., United States v. 6.45 Acres of Land* (*Gettysburg Tower*), 409 F.3d 139 (3d Cir. 2005).

622  *A.G. Davis Co. v. United States*, 362 F.2d 934,  936-37 (1st Cir. 1966); *see Eagle Lake Improvement Co. v. United States* (*Eagle Lake II*), 160 F.2d 182, 184 n.1 (5th Cir. 1947) ("For example, . . . the owner of the surface . . . claimed a value of $350 to $400 per acre on the theory that the best use of the tract was for subdivision purposes. The owners of the mineral interests on that same parcel claimed values of $350 to $700 per acre for the leasehold and $175 to $300 per acre for the royalty interest. Certainly, the surface could not be used for a residential subdivision if oil wells were drilled and producing. These are inconsistent uses.").

623  *Gettysburg Tower*, 409 F.3d at 148.

624  *Id.* at 148. The acquisition also included easements and other interests and other tracts not relevant to this issue. *See id.* at 142-43.

625  *Id.* at 149. The court noted that it also would be acceptable under the unit rule to value Tracts 4-203 and 4-204 separately—i.e., valuing each unit (each tract) as if it was held in fee simple ownership. *Id.* at 148 n.15. "What the [fact-finder] could not do, consistent with the unit rule, was… [to] comput[e] separately the value of the various constituent legal interests in the Condemned Properties." *Id.* at 148.

The Third Circuit therefore reversed the district court's ruling, which had improperly added to the valuation just described above a separate valuation of the Enggrens' interest in the lease payments—thereby "double-count[ing] the substantial value of the lease."[626]

As discussed in Section 4.8.1, the unit rule is frequently misapplied in valuations of properties containing minerals or other natural resources.

**4.4.4.5.   Further Guidance.** The income capitalization approach to value in the appraisal of real estate generally—not only in the context of federal acquisitions—has evolved significantly in recent decades.[627] The basic parameters for its use for just compensation purposes can be found in Supreme Court cases such as *United States v. Toronto, Hamilton & Buffalo Navigation Co.*,[628] and several recent circuit court cases cited in this Section provide more concrete analysis.[629] The district court rulings affirmed by or on remand from three recent circuit court opinions are also instructive—see the *Gettysburg Tower* litigation in the Third Circuit, the *Amexx* litigation in the Second Circuit, and the *Piza-Blondet* litigation in the First Circuit.[630] The *Parrish* case, an older district court ruling from the Middle District of North Carolina, provides a sound analysis of the appropriate determination and use of royalty rates in estimating market value.[631] Also informative are *In re Cool*, a bankruptcy case discussing the income approach based on legal principles derived from eminent domain case law,[632] and *Denver v. Quick*, a state law case—cited with approval by a number of federal circuit courts—analyzing the consideration of income derived from the land itself.[633]

**4.4.5.   Subdivision Valuation and the Development Method.** When appropriate, aspects of the sales comparison, income capitalization, and cost approaches to valuation can be incorporated into a technique for appraising undeveloped acreage having a highest and best use for subdivision into lots. A federal court recently explained this <u>development method</u>[634] as follows:

---

626   *Id.* at 150 & n.17 (aggregated award "includes '$2.7 million worth of prejudice'").

627   *See* Eaton, *supra* note 16, at 173-75.

628   *Toronto, Hamilton*, 338 U.S. 396, 403 & n.6 (1949) ("'[P]ast earnings are significant only when they tend to reflect future returns. We see no relevance in the [property's] earnings between 1916 and 1932 on the issue of capacity to earn after 1942 . . . . On this record they are entirely too remote to bear on [its] value when taken."); *see Mitchell v. United States*, 267 U.S. 341 (1925); *Joslin Co. v. Providence*, 262 U.S. 668, 675 (1923) ("Injury to a business carried on upon lands taken for public use, it is generally held, does not constitute an element of just compensation, in the absence of a statute expressly allowing it.") (citations omitted) (applying state law).

629   *E.g.*, *United States v. 6.45 Acres of Land* (*Gettysburg Tower*), 409 F.3d 139 (3d Cir. 2005); *United States v. 25.202 Acres of Land* (*Amexx I*), 860 F. Supp. 2d 165 (N.D.N.Y. 2009), adopted by 860 F. Supp. 2d 165 (N.D.N.Y. 2010), *aff'd*, 502 F. App'x 43 (2d Cir. 2012) (affirming in all respects, "[l]argely for the reasons that the district court articulated in its memorandum-decision and order").

630   *United States v. 6.45 Acres of Land*, No. 1:CV-99-2128, 2006 WL 839375 (M.D. Pa. Mar. 27, 2006) (on remand from *Gettysburg Tower*, 409 F.3d 139); *United States v. 25.202 Acres of Land* (*Amexx I*), 860 F. Supp. 2d 165 (N.D.N.Y. 2009), *new trial denied*, No. 5:06-CV-428, 2011 WL 4595009 (N.D.N.Y. Sept. 30, 2011), *aff'd*, 502 F. App'x 43 (2d Cir. 2012); *United States v. 33.92356 Acres of Land* (*Piza-Blondet Trial Op.*), No. 98-1664, 2008 WL 2550586 (D.P.R. June 13, 2008), *aff'd*, 585 F.3d 1, 11 (1st Cir. 2009).

631   *United States v. 100.80 Acres of Land* (*Parrish*), 657 F. Supp. 269, 272-80 (M.D.N.C. 1987). Modern technology allows for more sensitive formula to determine the present value of royalty income than the "Morkill formula" adopted by the court in 1987. *See id.* at 278 & n. 15. But the court's analysis of the concepts underlying proper discounting of future income to value as of the date of taking, the considerations that must be taken into account and those that must be disregarded, the market support necessary for elements of the income capitalization approach, and the flaws in the formula applied by the fact-finder, remains sound. *See id.* at 273-79.

632   *In re Cool*, 81 B.R. 614, 616-18 (D. Mont. 1987).

633   *Denver v. Quick*, 108 Colo. 111 (1941) (cited in *Hicks v. United States ex rel. Tenn. Valley Auth.*, 266 F.2d 515, 519 (6th Cir. 1959); *Cementerio Buxeda, Inc. v. Puerto Rico*, 196 F.2d 177, 180-81 (1st Cir. 1952); *Chapman v. United States*, 169 F.2d 641, 644 (10th Cir. 1948); and *In re Cool*, 81 B.R. at 618).

634   The development method is not an approach to value; it is a valuation method or technique. The development method is also referred to as the *lot method, land residual approach, developer's residual approach, anticipated use method, or subdivision development method.*

[O]ne first determines or projects both how the land would be subdivided and the prices at which those lots would sell. The projected gross sale proceeds for all lots in the tract are then aggregated and a deduction is made for all projected direct and indirect costs of maintenance and sale, including development [i.e., the developer's anticipated profit] and marketing. Finally, the net amount is discounted to present value to reflect that the lots would be sold over time, i.e., an absorption period, considering projected market demand.[635]

The remaining sum (the *residual*) is said to represent the market value of the raw land on the date of value. This highly sensitive and complex method of valuation "relies upon layers of hypothetical assumptions regarding the prospects, costs, and timing of subdivision, development, and sales of multiple lots in an uncertain future."[636] As a result, under federal law it can be used only in limited circumstances, and then only with rigorous evidentiary support.[637]

## 4.4.5.1.  Reasonable Probability of Development.

Under federal law, the development method cannot be used unless the property was "'needed or likely to be needed in the reasonably near future' for residential subdivision."[638] And showing "that a few new homes had been built in the area around the time" of valuation is insufficient: There must be "evidence 'of…current demand or potential for subdivisions in the neighborhood[.]'"[639] To credibly establish demand for such lots, "there must be some evidence that others have developed and sold such lots, so as to establish a trend, at least, toward that type of development of [similar] property."[640]

Use of the development method requires evidence that on the date of value, there was a reasonable probability that the property could be developed as a residential subdivision and that its lots would be sold within a reasonable time.[641] It cannot be used "if the subdivision is improbable or unrealistic or merely theoretical or speculative or capable of realization only in the remote future . . . ."[642]

As practical guidance, consider these district court instructions in one case regarding the evidence necessary to support the use of the development method:

> [I]f you conclude that this property by map was subdivided into individual lots; that the property was adaptable for residential subdivision purposes; that physical changes were made on the land, such as the digging of a well with a sufficient water supply for development

---

635  *United States ex rel. Tenn. Valley Auth. v. An Easement & Right-of-Way over 6.09 Acres of Land* (*TVA v. 6.09 Acres*), 140 F. Supp. 3d 1218, 1247-48 (N.D. Ala. 2015); *see generally id.* at 1247-56; *see also United States v. 99.66 Acres of Land* (*Sunburst Invs.*), 970 F.2d 651, 655-56 (9th Cir. 1992); *United States v. 47.3096 Acres of Land*, 583 F.2d 270, 271-72 (6th Cir. 1978).

636  *TVA v. 6.09 Acres*, 140 F. Supp. 3d at 1251; *see generally* Eaton, *supra* note 16, at 245-70.

637  *See TVA v. 6.09 Acres*, 140 F. Supp. 3d at 1247-56; *Sunburst Invs.*, 970 F.2d at 655-56; Eaton, *supra* note 16, at 246 ("[I]n many cases the development approach has been applied under the wrong circumstances or in the wrong way. If all of the land that has been appraised by the development approach were actually subdivided, there would be enough subdivision lots on the market to last hundreds of years and little, if any, farmland left in the United States.").

638  *47.3096 Acres*, 583 F.2d at 272 (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)); *Sunburst Invs.*, 970 F.2d at 655-56; *United States v. 341.45 Acres of Land*, 633 F.2d 108, 112 (8th Cir. 1980); *United States v. 147.47 Acres of Land* (*Delagap*), 352 F. Supp. 1055, 1061-62 & n.7 (M.D. Pa. 1972).

639  *47.3096 Acres*, 583 F.2d at 272 (quoting *United States v. 478.34 Acres*, 578 F.2d 156, 159 (6th Cir. 1978)); *341.45 Acres*, 633 F.2d at 112 ("more than a few sporadic sales of such lots are necessary"); *see Olson*, 292 U.S. at 255.

640  *341.45 Acres*, 633 F.2d 108, 112 (8th Cir. 1980). In fact, "if there is an actual demand for [such] lots we believe the landowners will be able to show such demand." *Id.*

641  *Delagap*, 352 F. Supp. at 1061-62 & n.7.

642  *Id.*; *see Olson*, 292 U.S. at 255-56.

purposes; constructing a lake; road grading and other physical changes in the condition of the land; that some lot sales had actually taken place; that there was a reasonable probability that this property could be developed as a residential subdivision; that the anticipated expenses of development would be as [estimated]; that there would be a market for the sale of these lots and that these lots would be sold within a reasonable time…then you may accept the opinion based upon [this method].[643]

### 4.4.5.2. Application to Undeveloped Land.
It is rarely appropriate to apply the development method to undeveloped land.[644] As a district court recently explained, the development method

> effectively values a parcel of land, even if undivided and unimproved, virtually as if it has *already* been subdivided and sold. Such a valuation calculation…requires more than just that a hypothetical purchaser at the time of the taking would consider development potential; it generally requires that landowner demonstrate that subdivision of the unimproved land was reasonably certain in the near future at the time of the taking.[645]

Use of the development method cannot be justified based on a landowner's "inchoate plans, intention, or profit expectations" for a property as assumptions underlying the development method are too speculative when a landowner has "not actually subdivided, improved, or sold any of the land .…"[646] As the Supreme Court admonished in *Olson v. United States*, "allow[ing] mere speculation and conjecture to become a guide for the ascertainment of value [is] a thing to be condemned in business transactions as well as in judicial ascertainment of truth."[647] As a result, "even though the highest and best use of a property is for a residential subdivision, if no meaningful steps have been taken in that direction, viz., construction expenses and actual lot sales, then a '[development] method' appraisal…would be inappropriate."[648] Rather, in such cases, "the appropriate market [is] for the entire tract as investment property for future subdivision development."[649]

### 4.4.5.3. Credible Cost Estimate.
Even if subdivision was a demonstrably reasonable certainty, federal law requires credible evidence of projected subdivision costs: "In the absence of credible cost evidence, [one should] exclude[ ] the [development] method valuation altogether."[650] Mere unsupported assertions are insufficient.[651] Costs that must be reliably estimated and considered

---

643  *Delagap*, 352 F. Supp. at 1061-62 & n.7.

644  *See United States ex rel. Tenn. Valley Auth. v. An Easement & Right-of-Way over 6.09 Acres of Land* (*TVA v. 6.09 Acres*), 140 F. Supp. 3d 1218, 1250-51 (N.D. Ala. 2015) (citing cases); *compare United States v. 99.66 Acres of Land* (*Sunburst Invs.*), 970 F.2d 651, 655-56 (9th Cir. 1992) (affirming exclusion of method for valuation of "paper subdivision and nothing more") *and United States v. 100 Acres of Land*, 468 F.2d 1261, 1266-67 (9th Cir. 1972) (permitting method for valuation of property which was part of a subdivision that was partially under development on date of value).

645  *TVA v. 6.09 Acres*, 140 F. Supp. 3d at 1255; *see generally id.* at 1247-56. Courts express similar concerns outside federal condemnation. *E.g., United States v. Hickey*, 360 F.2d 127, 137 (7th Cir. 1966) ("Whatever its merit to builders and developers might be, the speculative and unrealistic character of 'lot-method' appraisals in assessing the value of vacant land as security for mortgage loans is apparent. 'Lot-method' appraisal is a reflection of a value which may be achieved at some time in the future when the land is subdivided, improved, and ready to be sold in individual residential lots. It does not reflect the present fair market value of the vacant land . . . .").

646  *TVA v. 6.09 Acres*, 140 F. Supp. 3d at 1252-53.

647  *Olson*, 292 U.S. at 257.

648  *Delagap*, 352 F. Supp. at 1060.

649  *Sunburst Invs.*, 970 F.2d at 655-56; *see* Section 4.2.2 (Unit Rule).

650  *United States v. 47.3096 Acres of Land*, 583 F.2d 270, 272 (6th Cir. 1978).

651  *Id.*; *see Sunburst Invs.*, 970 F.2d at 655-56; *United States v. 341.45 Acres of Land*, 633 F.2d 108, 112-13 (8th Cir. 1980).

include direct costs of development (such as surveying, design, engineering, permitting, grading, clearing, sewers, street paving, curbs and gutters, water lines, and other utilities); indirect costs (including financing, insurance, real property taxes, sales, advertising, accounting, legal and closing costs, project overhead, and supervision); and the developer's expected profit.[652]

**4.4.5.4.   Availability of Comparable Sales.** When a property's market value can be reliably estimated using comparable sales, the development approach should not be relied upon as a primary indicator of value, as its underlying assumptions are "largely speculative" and "subjective elements…enhance the risk of error[.]"[653] However, the development method can be utilized in such situations to *test* a highest and best use conclusion[654] or to support a value indicated by the sales comparison approach.[655] It also bears noting that "[w]hile a lack of sales and/or development activity may indicate an insufficient supply of land suitable for such use, it can also indicate a lack of demand."[656] And without "credible evidence that there is an actual demand for [subdivision development] or that such demand will occur in the reasonably near future[,]" subdivision cannot be considered as a highest and best use.[657]

**4.5.   Project Influence.** At times, the market value of the property being acquired may be affected, positively or negatively, by the very project prompting the government's acquisition. This <u>project influence</u> on value is potentially problematic in federal acquisitions because "to permit compensation to be either reduced or increased because of an alteration in market value attributable to the project itself would not lead to the 'just compensation' that the Constitution requires."[658] The Supreme Court has ruled that in fairness, the United States cannot be charged for value it created in constructing the government project for which the property is being acquired. Similarly, an owner cannot be penalized for any diminution in value due to that very government project.[659] Accordingly, in valuations for just compensation purposes, once a property is "within the scope" of the government project, all project influence on the property's market value must be disregarded.[660]

> **Change in market value due to the government project— <u>project influence</u>—must be disregarded under the <u>scope of the project rule</u>.**

---

652   See *TVA v. 6.09 Acres*, 140 F. Supp. 3d at 1247-48 ("all projected direct and indirect costs of maintenance and sale, including development and marketing"); *47.3096 Acres*, 583 F.2d at 272  ("expense of clearing and improving the land, surveying and dividing it into lots, advertising and selling, holding it, and paying taxes and interest until all lots are sold"); *United States v. 100 Acres of Land*, 468 F.2d 1261, 1266 (9th Cir. 1972) ("selling and advertising expenses, engineering and development costs, overhead costs, taxes, buyers' anticipated profits, and for acreage loss for streets, etc."); Section 4.4.3.5 (Entrepreneurial Incentive and Entrepreneurial Profit).

653   See *TVA v. 6.09 Acres*, 140 F. Supp. 3d at 1250-52 (quoting *United States v. 50 Acres of Land (Duncanville)*, 469 U.S. 24, 36 & n.23 (1984)); *see also Norman v. United States*, 63 Fed. Cl. 231, 271 (Ct. Cl. 2004) ("approach 'is highly speculative [and] prone to error'"), *aff'd*, 429 F.3d 1081 (Fed. Cir. 2005); *cf. Olson v. United States*, 292 U.S. 246, 257 (1934). Courts have also found the development method unreliable in other contexts. E.g., *Rockies Express Pipeline LLC v. Hopkins*, 131.495 Acres, No. 1:08-cv-00751-RLY-DML, 2012 WL 1622532, at *4 (S.D. Ind. May 9, 2012) (noting "susceptibility to misuse" and "speculative nature" in valuation under state law).

654   See, e.g., *United States v. 125.07 Acres of Land (Pond Road I)*, 667 F.2d 243, 246 (1st Cir. 1981); *United States v. 1,291.83 Acres of Land in Adair & Taylor Ctys.*, 411 F.2d 1081, 1087 (6th Cir. 1969).

655   EATON, *supra* note 16, at 247, 268; *see, e.g., United States v. 3.544 Acres of Land*, 147 F.2d 596 (3d Cir. 1945); *United States v. 147.47 Acres of Land (Delargo)*, 352 F. Supp. 1055, 1059 (M.D. Pa. 1972) (using lot values as market data in addition to comparable sales).

656   EATON, *supra* note 16, at 248; *e.g., United States v. 341.45 Acres of Land in St. Louis Cty.*, 633 F.2d 108, 112-13 (8th Cir. 1980) ("[T]here must be some evidence that others have developed and sold such lots . . . . [I]f there is an actual demand for [such] lots we believe the landowners will be able to show such demand."); *cf. Delargo*, 352 F. Supp. at 1058 n.4, 1057-61.

657   *341.45 Acres in St. Louis Cty.*, 633 F.2d at 112-14; *see Olson*, 292 U.S. at 255.

658   *United States v. Reynolds*, 397 U.S. 14, 16 (1970)

659   *Shoemaker v. United States*, 147 U.S. 282, 303-05 (1893); *United States v. Miller*, 317 U.S. 369, 376-79 (1943); *United States v. Va. Elec. & Power Co.*, 365 U.S. at 636; *Reynolds*, 397 U.S. at 16-18; *see United States v. 320 Acres*, 605 F.2d 762, 781-82 (5th Cir. 1979).

660   *Reynolds*, 397 U.S. at 16-18; *Miller*, 317 U.S. at 376-77; *320 Acres*, 605 F.2d at 781-84 & nn.24-27; *United States v. Cwance*, 341 F.2d 161, 165 (8th Cir. 1965) ("[A] landowner cannot claim a benefit from a proximate improvement when inclusion of his land in the improvement from the outset renders impossible enjoyment of the claimed benefit."). As discussed below, whether a particular property was within the scope of a particular government project on a particular date is one of several legal questions that must be determined by the court (or a legal instruction), not by the appraiser.

The <u>scope of the project rule</u> excluding project influence is "one of the secondary rules refining the concept of market value as the basic measurement of compensation so that injustice does not result . . . ."[661] The rule functions to adjust, limit, or exclude certain evidence from consideration to ensure the appraisal does not unfairly reflect any change in market value caused by the government project for which the property is acquired, or by the likelihood the property would be acquired for such public project.[662] Proper application of the scope of the project rule requires careful legal and factual analysis of the government project and its influence on market value.[663] **Legal instruction** is required, as the scope of the project rule raises questions of law "which limit[ ] the factors necessary to the determination of 'just compensation'"[664] and go beyond the appraiser's function of assessing the government project's influence, if any, on market value.[665]

The mere existence of a government project does not automatically invoke the scope of the project rule; it merely marks the beginning of a complex legal and factual inquiry to determine whether the evidence warrants application of the rule.[666] In a scope of the project rule inquiry, legal determinations will be required regarding: (1) the date as of which the property was probably within the scope of the project;[667] (2) whether application of the scope of the project rule is warranted;[668] and (3) if so, how to apply the scope of the project rule to ensure a just result.[669]

**4.5.1.  The Scope of the Project Test.** To fairly apply the principle excluding *project influence*, the Supreme Court created the <u>scope of the project</u> test in *United States v. Miller*: "[I]f the 'lands were probably within the scope of the project from the time the Government was committed to it,' no [change] in value attributable to the project is to be considered in awarding compensation."[670] Accordingly, if the scope of the project rule applies, project influence on market value must be disregarded.[671] Conversely, if properties *not* originally within the scope of the project are later acquired by the government, the United States "must pay their market value as enhanced [or diminished] by this factor of proximity" to the project—so any project influence on value, positive or negative, must in fairness be considered.[672]

---

661  *320 Acres*, 605 F.2d at 782; *United States v. 428.02 Acres of Land*, 687 F.2d 266, 269 (8th Cir. 1982); *see Cors*, 337 U.S. at 332 ("Any increase in value due to [the government's planned project] in fairness should be excluded from the determination of what compensation would be just."); *cf. United States v. 480.00 Acres of Land* (*Fornatora*), 557 F.3d 1297, 1311 (11th Cir. 2009) ("Courts have only applied exceptions to a general takings doctrine when it is necessary to do so in order to protect the rights of both the taking body and the landowner.").

662  *E.g.*, *320 Acres*, 605 F.2d at 800 (discussing application of rule by exclusion of "evidence of sales possibly tainted by the Government's condemnation activities"), 798-803 & nn.61-80 (citing cases applying rule); *Kerr v. S. Park Comm'rs*, 117 U.S. 379, 386 (1886) (sales affected by government project were properly excluded); *cf. Fornatora*, 557 F.3d at 1313 (valuation must consider preexisting zoning regulations because regulations' impact was not "project influence").

663  *See generally 320 Acres*, 605 F.2d 762 (comprehensive analysis of scope of the project rule); *see also Reynolds*, 397 U.S. 14; *Miller*, 317 U.S. 369; *Fornatora*, 557 F.3d at 1311-13.

664  *Reynolds*, 397 U.S. at 20 & n.14 (quoting and adopting *Wardy v. United States*, 402 F.2d 762, 763 (5th Cir. 1968)).

665  *E.g.*, *Fornatora*, 557 F.3d at 1312; *United States v. Eastman* (*Eastman I*), 528 F. Supp. 1177, 1178 & n.1 (D. Or. 1981), *aff'd*, 714 F.2d 76 (9th Cir. 1983); *see Reynolds*, 397 U.S. at 21.

666  *See United States v. 1.604 Acres of Land* (*Granby I*), 844 F. Supp. 2d 674, 675-76 (E.D. Va. 2011).

667  *Reynolds*, 397 U.S. at 20-21; *Miller*, 317 U.S. at 377.

668  *Fornatora*, 557 F.3d at 1313; *see Cors*, 337 U.S. at 332-34 ("a value which the government itself created and hence in fairness should not be required to pay"); *Wardy*, 402 F.2d at 763 (scope of the project is "equitable" rule), *adopted by Reynolds*, 397 U.S. at 20.

669  *See 320 Acres*, 605 F.2d at 796 ("But what is the 'just' application of the rule with respect to [these properties]? . . . [T]he rule is not to be divorced from its objective – compensation awards that are just to both the public and the dispossessed landowner.").

670  *Reynolds*, 397 U.S. at 21 (quoting *Miller*, 317 U.S. at 377).

671  As the Old Fifth Circuit noted in *320 Acres*, the scope of the project rule "is primarily concerned with awards that are unjust from the perspective of the public footing the bill" – i.e., enhancements in value due to the project. 605 F.2d at 782. But "the scope-of-the-project rule is also applicable to 'depreciations in value . . . attributable to the Government project for which property is taken.'" *United States v. Land & Cris Realms Inc.*, 213 F.3d 830, 834 (5th Cir. 2000) (alteration in original) (quoting *320 Acres*, 605 F.2d at 787 n.32).

672  *Miller*, 317 U.S. at 376. The scope of the project rule applies to both positive and negative effects on market value. See supra note 694.

The *Miller* test concerns "whether the . . . lands were probably within the scope of the project from the time the Government was committed to it."[673] This determination can be particularly complex in connection with acquisitions in later stages of large government projects that span several years or require boundary adjustments, such as flood control and reservoir projects.[674] In making this determination, courts typically consider the government's representations to the landowner or the public regarding the property and/or the project boundaries;[675] how foreseeable it was at the outset of the project that the property would be needed for it;[676] and the length of time between the original and subsequent acquisitions, if applicable.[677] The rule does not require that the land ultimately acquired was actually specified in the original project plans. It need only be shown that during the course of the planning or original construction it became evident that land so situated would probably be needed for the public project.[678]

Some courts have framed this inquiry in terms of reasonable expectations, i.e., whether, after announcement of the government project, a reasonable buyer could reasonably anticipate being able to devote the subject property to its highest and best use without serious apprehension that it would soon be condemned for the government project.[679] For example, the Tenth Circuit held that landowners could not have reasonably believed that their property had been removed from the scope of a reservoir project despite mistakenly being left off some project maps: the property not only was clearly covered by the government's statements of intent, but also had been partly "covered with water nearly all of the time since the lake filled . . . ; obviously the government intended this property to be part of the project."[680] But both frameworks reflect a common aim:

> Regardless of how the inquiry is framed, however—whether in terms of the *Miller* test or in terms of reasonable expectations—the object is the same: to distinguish value attributable to Government demand from true fair market value of Government-conferred benefits, and to ensure that the landowner is not awarded a premium for the former but, at the same time, is justly compensated for the latter.[681]

The *date* on which the government's project commences also requires legal determination. In making this determination, courts typically consider three legal requirements of a "project": a *public purpose* for which property is to be acquired, *identification of the particular properties* to be acquired for that public purpose, and imminent acquisition that is *evident to the public*.[682] As the former Fifth

---

673  *Miller*, 317 U.S. at 377; *Reynolds*, 397 U.S. at 21.

674  *E.g.*, *Miller*, 317 U.S. at 370-73; *United States v. Eastman* (*Eastman III*), 714 F.2d 76 (9th Cir. 1983); *United States v. 49.01 Acres of Land in Osage Cty.*, 669 F.2d 1364, 1366-69 (10th Cir. 1982); *United States v. 62.17 Acres of Land in Jasper Cty.*, 538 F.2d 670, 678 (5th Cir. 1976) ("We cannot straitjacket the government in defining scope of the project, but on the other hand, we cannot permit global meanderings to enclave areas not reasonably to have been conceived as included at its inception."); *United States v. 172.80 Acres of Land in Mercer Cty.*, 350 F.2d 957 (3d Cir. 1965); *United States v. Crance*, 341 F.2d 161 (8th Cir. 1965).

675  *62.17 Acres in Jasper*, 538 F.2d at 680-681.

676  *United States v. Eastman* (*Eastman I*), 528 F. Supp. 1177, 1182-83 (D. Or. 1981), *aff'd, Eastman III*, 714 F.2d at 77; *62.17 Acres in Jasper*, 538 F.2d at 680-81.

677  *62.17 Acres in Jasper*, 538 F.2d at 681("time can be a factor in removing the mote of potential acquisition from the eyes of area landowners"); *Eastman I*, 528 F. Supp. at 1183.

678  *Reynolds*, 397 U.S. at 21.

679  *See 320 Acres*, 605 F.2d at 792-93 & nn.44-46; *Eastman III*, 714 F.2d at 77; *49.01 Acres in Osage*, 669 F.2d at 1367-69; *62.17 Acres in Jasper*, 538 F.2d at 678-81.

680  *49.01 Acres in Osage*, 669 F.2d at 1369.

681  *320 Acres*, 605 F.2d at 793 (quoted in *Eastman I*, 528 F. Supp. at 1182).

682  *United States v. 1.604 Acres of Land* (*Granby I*), 844 F. Supp. 2d 674, 674-75 (E.D. Va. 2011); *see United States v. Miller*, 317 U.S. 369, 376, 377 (1943); *Reynolds*, 397 U.S. 14, 21 (1970); *320 Acres*, 605 F.2d at 808.

Circuit reasoned:

> It is the date as of which the landowners or prospective purchasers no longer could reasonably anticipate being able to devote these properties to their highest and best use in the context of the surrounding governmental project, without serious apprehension that the properties would soon be condemned. In other words, it is the date as of which the prospect of imminent condemnation becomes sufficiently definite that it would be a major factor in the decision of any reasonable person to buy or develop the property.[683]

Once that date has been legally determined, the appraiser "*must* disregard any . . . alterations in value [due to the project] which it finds to have occurred thereafter."[684]

The nature of the government project and its alleged influence on value may also require legal analysis. For example, in *United States v. 480.00 Acres of Land* (*Fornatora*), the Eleventh Circuit determined that the scope of the project rule did not allow appraisers to disregard preexisting zoning restrictions that affected the market value of property being acquired for the East Everglades expansion of Everglades National Park.[685] There, county regulations had restricted development of the properties being acquired since 1981, well before the properties were acquired by condemnation starting in 2000.[686] The landowners argued the county regulations should be disregarded under the scope of the project rule, claiming they reflected the influence of the federal government in an attempt to depress market value in anticipation of future federal acquisitions. To determine this legal question, the lower court correctly conducted an extensive review of evidence surrounding the county's passage of the 1981 zoning ordinance, ultimately finding that the evidence failed to show that "the primary purpose of the regulation was to depress the property value of land or that the ordinance was enacted with the specific intent of depressing property value for the purpose of later condemnation."[687] As a result, the 1981 county ordinance "was not within 'the scope' of [the federal government's] decision seven years later to expand Everglades National Park or its decision nineteen years later to begin condemning properties."[688] The Eleventh Circuit affirmed, holding that the district court "acted correctly in ruling on [the landowners] objection regarding the zoning restrictions as a matter of law and in then excluding evidence regarding this objection from the fact-finding Commission."[689]

---

683  *320 Acres*, 605 F.2d at 807; *cf. Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions rendered by the former Fifth Circuit prior to October 1, 1981); Fifth Circuit Court of Appeals Reorganization Act of 1980, Pub. L. No. 96-452, 94 Stat. 1994 (1980) (codified as amended in scattered sections of 28 U.S.C.).

684  *Id.* at 807 n.90 (emphasis added).

685  *United States v. 480.00 Acres* (*Fornatora*), 557 F.3d 1297 (11th Cir. 2009); *see* 16 U.S.C. §§ 410r-5 *et seq.* (authorizing expansion).

686  *Fornatora*, 557 F.3d at 1300; *see id.* (discussing Dade County's 1981 East Everglades Zoning Overlay restricting development to one dwelling per 40 acres with no agricultural use allowed); *cf.* Code of Miami-Dade Cty., Fla., Municipal Code §1-4.2 (renaming Dade County).

687  *Fornatora*, 557 F.3d at 1299; *see id.* at 1304 ("The evidence instead shows that the purpose and intent of the regulations was for the ecological reasons set out in the Ordinance . . . . Additionally, . . . there is clearly insufficient evidence to show that the United States acted in concert or agreement to depress the property values. All the evidence . . . shows is that the federal government shared the concerns expressed by the state and local governments in ensuring the continued vitality of the natural resources of South Florida." (quoting magistrate judge's findings adopted by district court)).

688  *Id.* at 1313. Congress authorized the East Everglades expansion project in 1989, but did not provide any funding for acquisitions until 1992, and the expansion was not fully funded until 1999. Once "[a]rmed with sufficient funding," the United States began acquiring properties by condemnation in 2000. *Id.* at 1300.

689  *Id.* at 1313.

**4.5.2.**  **Application of the Scope of the Project Rule.** Application of the scope of the project test to any set of facts "requires discriminating judgment."[690] Thus, even if a property is unquestionably within the scope of the government project, a "mechanical application of the . . . rule" is insufficient.[691] Rather, "the rule is not to be divorced from its objective— compensation awards that are just to both the public and the dispossessed landowner."[692] A nuanced factual and legal inquiry is necessary to determine what must be considered and what must be disregarded to ensure the appraiser's opinion of market value does not unfairly reflect project influence. Depending on the specific facts of each acquisition, it may be appropriate or necessary to carefully scrutinize, adjust, or even entirely disregard potentially comparable sales that may have been tainted by the government's acquisition activities, as indicated by date, location, applicable zoning or other factors.[693]

**4.5.3.**  **Legal Instructions.** Because the scope of the project rule involves interrelated factual and legal questions, the appraiser must request appropriate **legal instruction** if there is evidence the government's project affected the market value of the property being appraised.[694] The appraiser may be asked to gather and/or analyze data to inform the legal analysis. Counsel (or the Court) will instruct the appraiser as to (1) whether the scope of the project rule applies, and, if so, (2) how the rule must be applied to the specific property under appraisal, and, if applicable (3) when the scope of the project rule applies, (i.e., the date as of which the rule is triggered).[695] These legal instructions are "the criteria [the appraiser] must follow in determining" the fair market value of the property.[696] As with other complex legal questions, counsel may direct the appraiser to perform a dual-premise appraisal if the legal outcome is uncertain.[697]

> **Proper application of the scope of the project rule requires careful legal and factual analysis. The appraiser should request legal instructions from counsel.**
>
> **If the legal outcome is uncertain, the agency/client may find it prudent to direct the appraiser to perform a dual-premise appraisal.**

**4.5.4.**  **Impact on Market Value.** The scope of the project rule only arises if there is evidence the government's project affected the market value of the property being appraised. If there is no evidence the government project influenced the property's market value, no determination of the scope of the project is required because there is no project influence to disregard.[698] And while possible project influence on market value can prompt an analysis of the scope of

---

690  *United States v. Reynolds*, 397 U.S. 14, 21 (1970).

691  *United States v. 320 Acres*, 605 F.2d 762, 796, 782 (5th Cir. 1979); *see also United States v. 49.01 Acres of Land in Osage Cty.*, 669 F.2d 1364, 1369 (10th Cir. 1982) (refusing to apply scope of the project rule where landowners could not have reasonably believed their submerged property was no longer within the scope of a government reservoir project).

692  *320 Acres*, 605 F.2d at 796.

693  *See, e.g., Kerr v. S. Park Comm'rs*, 117 U.S. 379, 386 (1886); *Fornatora*, 557 F.3d at 1311-13; *see generally 320 Acres*, 605 F.2d at 798-803 & nn.61-80 (citing cases).

694  *See 320 Acres*, 605 F.2d at 789-90; *Reynolds*, 397 U.S. at 21 ("application to any particular set of facts requires discriminating judgment"); *United States v. 1.604 Acres of Land* (*Granby I*), 844 F. Supp. 2d 668, 674 (E.D. Va. 2011). If there is no evidence the government's project affected the market value, the scope of the project rule does not apply. *Granby I*, 844 F. Supp. 2d at 675.

695  *See 320 Acres*, 605 F.2d at 806 & nn.87-88, 808-09.

696  *Reynolds*, 397 U.S. at 20; *accord 320 Acres*, 605 F.2d at 809; *Granby I*, 844 F. Supp. 2d at 674.

697  Note that simply directing an appraiser to follow these Standards is not a sufficient legal instruction for purposes of the scope of the project rule.

698  *Granby I*, 844 F. Supp. 2d at 675-76 ("[The Court] need not resolve whether imminent acquisition of the property was evident to the public [before the date of valuation] because there is scant evidence that the government's actions actually affected the market value of the property.").

the project, project influence on a property's *marketability* cannot: Even a substantial decrease in marketability, decreasing the number of potential buyers, must be disregarded if the *price* at which the property would be sold is not affected.[699] This is because the federal definition of market value assumes the property has already had reasonable exposure time on the open market on the effective date of value.[700] Similarly, a substantial decrease in the *number of market sales* within an announced project boundary would not be considered unless the project has affected the price at which the property could be sold.

**4.5.5.**    **Limits of the Scope of the Project Rule.** The scope of the project rule "is designed to ensure that the landowner is neither hurt nor helped in a takings valuation by any action done by the Government within the scope of the project leading to the taking."[701] The scope of the project rule applies only to changes in value attributable to the government's project: the rule does not allow an appraiser to disregard changes in value attributable to other factors.[702] For this reason, changes in value prior to the date of valuation due to physical deterioration within the landowner's reasonable control must be considered.[703] Similarly, the scope of the project rule does not permit the appraiser to ignore market realities beyond the government project.[704] It also bears noting that the requirement to consider the government project's *direct and special benefits* to remainder property in partial acquisitions (discussed in Section 4.6) does not conflict with the scope of the project rule.[705] Rather, as the Fifth Circuit explored at length in *320 Acres*, these requirements stem from the same underlying principles.[706]

**4.5.6.**    **Further Guidance.** As often observed, the scope of the project rule may "be stated easily enough" but "is not so easily understood or applied."[707] For further guidance, the two major Supreme Court decisions on the scope of the project rule are *United States v. Miller* and *United States v. Reynolds*.[708] The Fifth Circuit's influential opinion in *United States v. 320 Acres* analyzes

---

699   *See Marketability*, THE DICTIONARY OF REAL ESTATE APPRAISAL (6th ed. 2015) ("The relative desirability of a property (for sale or lease) in comparison with similar or competing properties in the area."); *United States v. 881.39 Acres of Land*, 254 F. Supp. 294, 297 (E.D. Okla. 1966) (discussing marketability); *United States v. 48.10 Acres of Land in New Windsor*, 144 F. Supp. 258, 264-265 (S.D.N.Y. 1956) (allowing compensation for taking of easements where not only marketability, but market value was affected); *see also United States v. 58.1 Acres of Land in Hempstead*, 151 F. Supp. 631, 634 (E.D.N.Y. 1957) (discussing market value impacts in *48.10 Acres in New Windsor*); Section 1.4.2 (marketability studies); *cf. United States v. 6.24 Acres of Land* (*Weber*), 99 F.3d 1140, 1996 WL 607162, at *6 (6th Cir. 1996) (per curiam) (unpubl.) ("diminution in value caused by fear may be recoverable when such fear affects the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller"); *accord United States v. 760.807 Acres of Land*, 731 F.2d 1443, 1446-1447 (9th Cir. 1984).

700   *See* Section 4.2.1.2.

701   *United States v. 480.00 Acres* (*Fornatora*), 557 F.3d 1297, 1312 (11th Cir. 2009).

702   *320 Acres*, 605 F.2d at 803 ("The [scope of the project] rule refines the concept of fair market value only with respect to alterations in value attributable to the [specific government project at issue]. It has no bearing whatsoever upon alterations in value attributable to other events or market forces."); *Granby I*, 844 F. Supp. 2d at 674, 675-79 (finding scope of the project rule did not apply, "given the multitude of other plausible—and more likely—explanations for the financial difficulties" of landowner's proposed development besides alleged project influence); *see City of New York v. Sage*, 239 U.S. 57, 60-62 (1915) ("The [government] is not to be made to pay for any part of what it has added to the land by thus uniting it with other lots, if that union would not have been practicable or have been attempted except by the intervention of eminent domain. Any rise in value before the taking, not caused by the expectation of that event, is to be allowed, but we repeat, it must be a rise in what a purchaser might be expected to give.").

703   Uniform Act, § 301(3), 42 U.S.C. § 4651(3) (2012); *Granby I*, 844 F. Supp. 2d at 674; *cf. Rasmuson v. United States*, 807 F.3d 1343, 1346 (Fed. Cir. 2015) ("proper appraisal methodology must account for those physical conditions . . . a reasonably prudent buyer would consider . . . when formulating an offer").

704   *320 Acres*, 605 F.2d at 803; *Granby I*, 844 F. Supp. 2d at 674, 675-79.

705   *See United States v. Fuller*, 409 U.S. 488, 492 (1973)

706   *320 Acres*, 605 F.2d at 781-89.

707   *Id.* at 781-82; *see United States v. Reynolds*, 397 U.S. 14, 21 (1970) ("application to any particular set of facts requires discriminating judgment"); *United States v. Eastman* (*Eastman I*), 528 F. Supp. 1177, 1179 n.2 (D. Or. 1981), *aff'd*, 528 F. Supp. 1177 (9th Cir. 1983).

708   *United States v. Miller*, 317 U.S. 369 (1943); *Reynolds*, 397 U.S. 14 (1970).

applications of the rule as well as its historical and legal origins.[709] Two more recent cases on the applicability of the scope of the project rule are also instructive: *United States v. 480.00 Acres* (*Fornatora*), from the Eleventh Circuit, and *United States v. 1.604 Acres* (*Granby I*), from the Eastern District of Virginia.[710]

**4.6.**    **Partial Acquisitions.** Just compensation must put a landowner "in the same position monetarily as he would have occupied if his property had not been taken."[711] The landowner "must be made whole but is not entitled to more."[712] Under this principle, compensation for a <u>partial acquisition</u>—when the United States acquires only part of a unitary holding—must reflect not only the property interest acquired, but also any change in the value of the remainder directly caused by the government's acquisition or planned use of the part acquired.[713] As a result, the federal measure of compensation in partial acquisitions is the difference between the value of the landowner's property before and after the government's acquisition.[714] Accordingly, appraisers must apply the *before and after* method of valuation in partial acquisitions under federal law, developing opinions of both (1) the market value of the whole property before the acquisition, and (2) the market value of the remainder property after the acquisition.[715] Valuations must analyze and reflect all <u>compensable damages</u> and <u>direct (special) benefits</u> to the value of the remainder property due to the government's acquisition and disregard all <u>non-compensable damages</u> and <u>indirect (general) benefits</u>.[716]

> **In <u>partial acquisitions</u> the measure of compensation is the difference between the market value of the landowner's property before and after the government's acquisition.**

There are important differences between federal and many state laws governing the valuation of partial acquisitions for just compensation purposes.[717] Valuations in federal acquisitions must apply the correct valuation method, analyze and consider compensable damages and benefits, and disregard non-compensable damages and benefits in accordance with federal law.[718] As discussed below, these critical distinctions are often complex and always require careful analysis. Of course, the overarching goal is to ensure that compensation reflects "the value of what [the landowner] has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public."[719]

---

709   *320 Acres*, 605 F.2d 762 (5th Cir. 1979); *see generally id.* at 781-85 (historical and legal foundations of rule), 785-90 (analysis of *Miller* and *Reynolds*), 790-98 (applicability of rule), 798-803 (implementation of rule) & 803-811 (case-specific analysis). The opinion is widely cited across the federal courts. *See, e.g.*, *United States v. 480.00 Acres* (*Fornatora*), 557 F.3d 1297, 1306-07, 1311-13 (11th Cir. 2009); *Eastman I*, 528 F. Supp. at 1179 n.2; *United States v. 428.02 Acres of Land*, 687 F.2d 266, 270 (8th Cir. 1982); *United States v. 49.01 Acres of Land in Osage Cty.*, 669 F.2d 1364 (10th Cir. 1982); *United States v. 125.07 Acres of Land* (*Pond Road I*), 667 F.2d 243, 248-49 (1st Cir. 1981); *Granby I*, 844 F. Supp. 2d at 674-75.

710   *Fornatora*, 557 F.3d at 1307, 1311; *Granby I*, 844 F. Supp. 2d at 674-75.

711   *United States v. Reynolds*, 397 U.S. 14, 16 (1970); *accord United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 633 (1961); *Olson v. United States*, 292 U.S. 246, 255 (1934); *United States v. New River Collieries Co.*, 262 U.S. 341, 343 (1923); *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 304 (1923).

712   *Va. Elec.*, 365 U.S. at 633 (quoting *Olson*, 292 U.S. at 255).

713   *United States v. Miller*, 317 U.S. 369, 376 (1943); *United States v. Grizzard*, 219 U.S. 180, 183 (1911); *Bauman v. Ross*, 167 U.S. 548, 574-75 (1897).

714   *Va. Elec.*, 365 U.S. at 632. *Partial* acquisitions are distinct from *temporary* acquisitions. *See United States v. Banisadr Bldg Joint Venture*, 65 F.3d 374, 378 (4th Cir. 1995); Section 4.7.

715   *Va. Elec.*, 365 U.S. at 632; *United States v. 68.94 Acres of Land*, 918 F.2d 389, 393 n.3 (3d Cir. 1990); *United States v. 91.90 Acres of Land in Monroe Cty.* (*Cannon Dam*), 586 F.2d 79, 86 (8th Cir. 1978); *Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 336 (Ct. Cl. 1980) (per curiam).

716   *See Bauman*, 167 U.S. at 574.

717   *See Mitchell v. United States*, 267 U.S. 341, 345-46 & n.1 (1925); *Ga.-Pac.*, 640 F.2d at 361 & n.43.

718   *See Miller*, 317 U.S. at 376 & nn.20-21.

719   *Bauman*, 167 U.S. at 574.

While outside the appraiser's assignment, it bears noting that landowners are reimbursed for many types of non-compensable damage—such as moving expenses and relocation costs—through the Uniform Act or other federal statutes.[720] As the Supreme Court explained, "[s]uch losses may be compensated by legislative authority, not by force of the Constitution alone."[721] These administrative payments for *people or businesses* affected by federal acquisitions are separate from, and in addition to, just compensation for the *property* acquired.[722] Accordingly, an appraisal that improperly includes non-compensable elements not only would be legally incorrect for just compensation purposes, but also could result in double payment.[723]

### 4.6.1. The Federal Rule: Before and After Methodology.

The before and after method of valuation for partial acquisitions is accepted in all federal courts.[724] It is often called the <u>federal rule</u>, although it also applies in many (but not all) state jurisdictions.[725] A before and after valuation requires careful determination of the larger parcel (or parent tract) at issue—which may differ before and after the acquisition—and proper consideration of damages and benefits to the remainder property due to the government acquisition. Each of these issues will be addressed below, along with limited exceptions to the before and after method.

**In partial acquisitions, <u>compensable damages</u> and <u>direct (special) benefits</u> to the remainder must be reflected.**

**<u>Non-compensable damages</u> and <u>indirect (general) benefits</u> must be disregarded.**

**These federal rules may differ from state law or local practice.**

The before and after method is "particularly advantageous" where the remainder may have been damaged and/or benefitted by the government's acquisition.[726] As recognized by the federal courts, proper application of the before and after method will result in a figure that reflects the value of the land actually acquired as well as any compensable damages and direct and special benefits to the remainder property.[727] "All of the elements of value entering into just compensation"—i.e., the part acquired, compensable damage to the remainder and compensable

---

720 State laws governing relocation benefits vary. *See generally* Nicole Stelle Garnett, *The Neglected Political Economy of Eminent Domain*, 105 MICH. L. REV. 101, 121-26 & nn.111-53 (2006) (discussing federal and state relocation benefits and empirical studies of same).

721 *United States v. Willow River Power Co.*, 324 U.S. 499, 510 (1945); *see also United States v. Gen. Motors Corp.*, 323 U.S. 373, 382 (1945).

722 *See United States v. 3.66 Acres of Land in S.F.*, 426 F. Supp. 533, 537 (N.D. Cal. 1977) ("While Congress has recognized that landowners sometimes deserve more compensation than the fair market value alone would provide, it did not intend such compensation to be recovered . . . in a condemnation action."). The Uniform Act expressly states that it does not "creat[e] . . . any element of value or of damage" in eminent domain proceedings to determine just compensation. 42 U.S.C. § 4602(b); *see generally* note 1, *supra*.

723 *Cf. Gen. Motors*, 323 U.S. at 379-80, 382.

724 *E.g.*, *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 632 (1961); *Rasmuson v. United States*, 807 F.3d 1343, 1345 (Fed. Cir. 2015); *United States v. 33.92356 Acres of Land* (*Piza-Blondet*), 585 F.3d 1, 9 (1st Cir. 2009); *United States v. 4.27 Acres of Land*, 271 F. App'x 424, 425 (5th Cir. 2008) (per curiam) (unpubl.); *United States v. 6.24 Acres of Land* (*Weber*), 99 F.3d 1140, 1996 WL 607162 (6th Cir. 1996) (per curiam) (unpubl.); *United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 374, 376 (4th Cir. 1995); *United States v. 760.807 Acres of Land in Honolulu*, 731 F.2d 1443, 1445-46 (9th Cir. 1984); *United States v. 68.94 Acres of Land in Kent Cty.*, 918 F.2d 389, 393, n.3 (3d Cir. 1990); *United States v. 91.90 Acres of Land in Monroe Cty.* (*Cannon Dam*), 586 F.2d 79, 86 (8th Cir. 1978); *United States v. 105.40 Acres of Land in Porter Cty.*, 471 F. 2d 207, 210 (7th Cir. 1972); *United States v. 901.89 Acres of Land in Davidson & Rutherford Ctys.* (*Davenport*), 436 F.2d 395 (6th Cir. 1970); *Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15, 21 (5th Cir. 1969); *United States v. Evans*, 380 F.2d 761, 765 (10th Cir. 1967); *United States v. Glanat Realty Corp.*, 276 F.2d 264, 265 (2d Cir. 1960), *aff'g United States v. 765.56 Acres of Land in Southampton* (*765.56 Acres II*), 174 F. Supp. 1 (E.D.N.Y. 1959), and *United States v. 765.56 Acres of Land in Southampton* (*765.56 Acres I*), 164 F. Supp. 942 (E.D.N.Y. 1958). The before and after method is the only method of valuation allowed for partial acquisitions in the Fifth Circuit. *United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 392, n.5 (5th Cir. 1982).

725 *See generally* EATON, *supra* note 16, at 23-43; 4A-14 NICHOLS ON EMINENT DOMAIN § 14.02 (Just Compensation for Partial Takings).

726 *Piza-Blondet*, 585 F.3d at 9-10 & n.6 (citing *United States v. Miller*, 317 U.S. 369, 375-76 (1943)).

727 *Piza-Blondet*, 585 F.3d at 9-10 & n.6 (citing *Miller*, 317 U.S. at 375-76).

---

benefit to the remainder—"are contained in the federal formula."[728]

#### 4.6.1.1.  Larger Parcel Determination.

By definition, a partial acquisition involves property that is some part of a unitary holding (the "whole"),[729] commonly called the <u>larger parcel</u> or parent tract.[730] In a partial acquisition, "[i]t is often difficult . . . to determine what is a distinct and independent tract"—the whole property, comprising the part acquired and the remainder.[731] But this determination of the larger parcel is critical for proper consideration of compensable damages and offsetting benefits.[732] As discussed in Section 4.3.3, the key factors in determining the larger parcel are (1) unity of use (i.e., highest and best use), (2) unity of ownership, and (3) physical unity (proximity or contiguity).

Certain aspects of the larger parcel determination merit particular emphasis in partial acquisitions. Appraisers must bear in mind "the distinction between a residue of a tract whose integrity is destroyed [or impaired] by the [acquisition] and what are merely other parcels or holdings of the same owner" that are not part of the remainder for compensation or valuation purposes.[733] Also, the availability of replacement property for the parcel acquired must be considered—as reasonable buyers

#### Availability of Replacement Property

In *Baetjer v. United States*, the United States acquired more than 7,900 acres of land from a large, integrated sugar cane operation spanning 30,000 acres in Puerto Rico and the neighboring island of Vieques. 143 F.2d 391 (1st Cir. 1944). The landowners claimed the sugar cane capacity of the condemned land could not be economically replaced. The court found that a compensable loss could result—*if* a lack of available replacement property would affect market value for a hypothetical willing buyer. The court therefore remanded the case to determine whether the sugar mills had an uneconomic over-capacity so that they could not be operated by anyone as profitably after the taking, such that market value would be affected. *Id.* at 396.

In contrast, take the case of *International Paper Co. v. United States*, a condemnation of over 9,500 acres of timber property, which the landowner claimed shared an integrated use with a paper mill under the same ownership. 227 F.2d 201 (5th Cir. 1955). Citing an industry "rule of thumb" that a paper mill should have one acre of woodland for every ton of paper it produced annually, the landowner claimed that falling below this acreage threshold because of the taking had significantly decreased the value of its paper mill. The court rejected this claim because the landowners' experts failed to consider the availability of replacement property that would in all respects make up the deficiency in acreage due to the taking. Without proof that similar land was unavailable, the court held, damage to the paper mill could not be considered, as the landowner could simply buy replacement acreage to effectively restore the value of the paper mill. *Id.* at 207.

---

728  *United States ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*, 40 F. Supp. 811, 820 (E.D. Tenn. 1941), cited with approval by *City of Van Buren v. United States*, 697 F.2d 1058, 1062 (Fed. Cir. 1983), and *United States v. 2,847.58 Acres of Land in Bath Ctys.*, 529 F.2d 682, 686 (6th Cir. 1976); see *United States v. 760.807 Acres of Land in Honolulu*, 731 F.2d 1443, 1445 (9th Cir. 1984) ("Using [the before and after] method, any diminution in value of the remainder resulting from the taking and use of part of the original parcel, sometimes termed 'severance damages,' would be included in the award.").

729  *See Sharp v. United States*, 191 U.S. 341, 353-55 (1903), *aff'g Sharpe v. United States*, 112 F.893, 896 (3d Cir. 1902).

730  *See United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996). Otherwise, the property under appraisal would be a total acquisition, leaving no remainder.

731  *Sharpe*, 112 F. at 896.

732  *See id.*

733  *See id.*; *see also United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 393 (5th Cir. 1982).

and sellers would do.[734] This may be contrary to some state law and practice.[735] But in federal acquisitions, failing to consider the availability of replacement property may result, in the words of the Fifth Circuit, in a valuation that "offends any rules relating to the awarding of just compensation for property taken for public use."[736]

**The availability of replacement property to restore the usability of the remainder must be considered in federal partial acquisitions.**

4.6.2.    **Damage.** Just compensation is measured by the owner's loss, not the government's gain.[737] In partial acquisitions when only part of a larger parcel is acquired, the value of the part acquired is not the sole measure of compensation; the "injury or benefit to the part not taken is also to be considered."[738] If the part not acquired, the landowner's *remainder*, is "left in such shape or condition as to be in itself of less value than before, the owner is entitled to additional damages on that account."[739] In legal terms, decreases in the market value of the remainder property for which compensation must be paid are <u>compensable damage</u> and must be considered in valuations for federal acquisitions. Compensable diminution in value is also loosely, and misleadingly, referred to as <u>severance damages</u>.[740] Compensable damages are not a distinct item to be added to compensation; rather, they are already reflected and automatically included in a before and after method of valuation.[741]

But "not all losses suffered by the owner are compensable under the Fifth Amendment."[742] <u>Non-compensable damages</u> cannot be considered in valuations for federal just compensation purposes.[743] The distinction between compensable and non-compensable losses is rooted in the market value standard as the measure of just compensation: under the Fifth Amendment, the Supreme Court held, just compensation does not include "indirect or remote injuries" beyond market value "which would ensue the sale of the property to someone other than the sovereign."[744] Such losses are not compensable because they fluctuate with the

**<u>Damage</u> to a property's market value is <u>compensable</u> or <u>non-compensable</u> for federal acquisition purposes.**

**The confusing terms *severance damage* and *consequential damage* can generally be avoided.**

---

734    *Baetjer v. United States*, 143 F.2d 391 at 396-97 (1st Cir. 1944); *accord Int'l Paper Co. v. United States*, 227 F.2d 201 (5th Cir. 1955); *Porrata v. United States*, 158 F.2d 788, 790 (1st Cir. 1947) ("Certainly one of the elements which would be considered by the mythical 'willing buyer' of the [remainder property] would be the availability of a suitable substitute . . . to take the place of the one formerly on [the part taken]."); *see Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 359 (Ct. Cl. 1980) (per curiam) (burden to show that "replacement old-growth timber was not available, or if available, at least, the burden to show persuasively that under existing circumstances it would be economically unfeasible to obtain available replacement timber"); *see also United States v. 711.57 Acres of Land in Alameda Cty.*, 51 F. Supp. 30, 33 (N.D. Cal. 1943) (awarding compensation reflecting availability of alternative access to severed tract).

735    *See Miller v. United States*, 620 F.2d 812, 831-32 & n.17 (1980). (noting that while some state law cases hold otherwise, "the better rule" applied in federal court holds that "the future availability of other land should be considered as the hypothetical 'willing buyer' of the [remainder] would consider such a factor") (citing *Porrata*, 158 F.2d 788).

736    *Int'l Paper*, 227 F.2d at 207 (case study).

737    *Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910); *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 281 (1943).

738    *Bauman v. Ross*, 167 U.S. 548, 574 (1897).

739    *Id.*

740    *See, e.g.*, *United States v. Miller*, 317 U.S. 369, 376 (1943) ("loosely"); *United States v. 9.20 Acres of Land in Polk Cty.*, 638 F. 2d 1123, 1127 (8th Cir. 1981) (discussing "misleading nature of the term 'severance damages' as used in partial taking cases"); *see United States v. Honolulu Plantation Co.*, 182 F.2d 172, 175 & n.1 (9th Cir. 1950) ("The use of this term is to be criticized because it is apt to lead to loose thinking." (citing *Miller*, 317 U.S. at 376)); *United States v. 760.807 Acres of Land in Honolulu*, 731 F.2d 1443, 1448 (9th Cir. 1984).

741    *United States v. 33.92356 Acres of Land (Piza-Blondet)*, 585 F.3d 1, 9 & n.6 (1st Cir. 2009); *United States v. 91.90 Acres of Land in Monroe Cty. (Cannon Dam)*, 586 F.2d 79, 86 (8th Cir. 1978); *United States v. 711.57 Acres of Land in Alameda Cty.*, 51 F. Supp. 30, 33 (N.D. Cal. 1943) ("Such . . . damage is a part of the whole damage suffered by the owner upon the taking."); see *Miller*, 317 U.S. at 375-76.

742    *Powelson*, 319 U.S. at 281.

743    *United States v. Westinghouse Elec. & Mfg. Co.*, 339 U.S. 261, 264 (1950).

744    *United States v. Gen. Motors Corp.*, 323 U.S. 373, 382, 379 (1945).

needs of the owner, not the market; they are "apart from the value of the thing taken."[745] Non-compensable damages have often been called <u>consequential damages</u>, but this term has caused confusion in both valuation and legal analyses.[746]

Federal law prohibits consideration of non-compensable damages that may be compensable under many state laws and therefore considered in other contexts.[747] Under federal law, some types of damage may be compensable if proved. Some other types of damage—such as lost profits—are never compensable, even if proved, because "not all losses are compensable."[748] And some types of damage may be compensable (if proved) in specific types of acquisitions, but are never compensable in other types of acquisitions.

#### 4.6.2.1. Compensable (Severance) Damages.
In the context of the Fifth Amendment, *damage* is simply "the equivalent for the injury done," just as *compensation*, "standing by itself, carries the idea of an equivalent."[749] Yet the concept of compensable damage is often misunderstood, as the Eighth Circuit explained:

> It is incorrect to think of "severance damages" as a separate and distinct item of just compensation apart from the difference between the market value of the entire tract immediately before the taking and the market value of the remainder immediately after the taking. In the case of a partial taking, if the "before and after" measure of compensation is properly [applied], there is no occasion . . . to talk about "severance damages" as such, and indeed it may be confusing to do so. The matter is taken care of automatically in the "before and after" submission.[750]

> **It is incorrect to think of severance damages as a separate item apart from the difference in the property's market value before and after the government's acquisition.**

---

745  *United States v. Petty Motor Co.*, 327 U.S. 372, 377-78 (1946); *United States v. 50 Acres of Land (Duncanville)*, 469 U.S. 24, 33 (1984); *see also United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 76 (1913) ("These additional values represent, therefore, no actual loss, and there would be no justice in paying for a loss suffered by no one in fact.").

746  *See Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 361 n.44 (Ct. Cl. 1980) (per curiam) ("The concept of consequential damages, however, is sometimes troublesome and confusing in severance damage situations."); *see also* EATON, *supra* note 16, at 289-90 ("'[T]he term consequential damages introduces nothing but confusion to what, from a valuation standpoint, would merely appear [to] be a question of compensability.'").

747  *See Mitchell v. United States*, 267 U.S. 341, 345-46 (1925); *Batten v. United States*, 306 F.2d 580, 583-84 (10th Cir. 1962) (citing *Richards v. Wash. Terminal Co.*, 233 U.S. 546, 554 (1914)); *cf. Bauman v. Ross*, 167 U.S. 548, 575-84 (1897) (quoting state constitutional provisions regarding just compensation).

748  *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 281 (1943); *cf. United States v. 101.88 Acres of Land in St. Mary Par. (Avoca Island)*, 616 F.2d 762, 770 (5th Cir. 1980) (noting case law draws "distinction between damages allowable in the condemnation proceeding, and claims for damages that are not allowable . . . in a condemnation proceeding").

749  *Monongahela Nav. Co. v. United States*, 148 U.S. 312, 326 (1893) (distinguishing "damages by way of compensation . . . from punitive or exemplary damages").

750  *United States v. 9.20 Acres of Land in Polk Cty.*, 638 F.2d 1123, 1127 (8th Cir. 1981) (quoting *United States v. 91.90 Acres of Land in Monroe Cty. (Cannon Dam)*, 586 F.2d 79, 86 (8th Cir. 1978)); *accord United States v. 25.202 Acres of Land (Amexx I)*, 860 F. Supp. 2d 165 (N.D.N.Y. 2010), *aff'd*, 502 F. App'x 43, 45 (2d Cir. 2012) (unpubl.); *United States v. 6.24 Acres of Land (Weber)*, 99 F.3d 1140, 1996 WL 607162 (6th Cir. 1996) (per curiam) (unpubl.); *United States v. Werner*, 36 F.3d 1095, 1994 WL 507461, *6 (4th Cir. 1994) (per curiam) (unpubl.); *United States v. 50.50 Acres of Land*, 931 F.2d 1349, 1358 (9th Cir. 1991); *United States v. 2,560.00 Acres of Land in Wash. Cty.*, 836 F.2d 498, 502 (10th Cir. 1988); *United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 390-92 & n.1 (5th Cir. 1982); *see also United States v. 33.92356 Acres of Land (Piza-Blondet)*, 585 F.3d 1, 8-10 & n.6 (1st Cir. 2009); *Baetjer v. United States*, 143 F.2d 391, 395-96 (1st Cir. 1944).

---

Compensable damages may reflect a decrease in the market value of the remainder arising from (1) the government's planned use of the part acquired, and/or (2) the relation of the part acquired to the larger parcel.[751]

### 4.6.2.2.  Necessary Support.

Of course, the mere fact of a partial acquisition will not necessarily entitle a landowner to damages.[752] It may well be "that while there has been a severance in the legal sense such severance has caused no compensable damage to the market value of the properties not taken."[753]

And legally compensable damages can only be considered if proved: as with any element affecting value, damage to the remainder (i.e., diminution in value) can never be assumed but must always be fully supported by the facts of each situation.[754] Damage that is "vague and speculative in character" or premised on "possibilities more or less remote" cannot be considered.[755] As a result, it is improper to use damage as a catchall, simply stating an amount without specifying the basis for the opinion. One court criticized parties who failed to furnish factual data to support claimed diminution in value to the remainder as follows: "Not only were the opinions of their experts based largely on speculation and conjecture, but these witnesses totally disregarded available evidence of comparable sales before and after the taking of the easement."[756] In short, damage is "compensable only if the landowner incurs a direct loss reflected in the market place that results from the [acquisition]."[757] Moreover, not merely damage, but *causation* must be proved: for compensation to reflect diminution in value to the remainder, the "landowner must demonstrate that the taking caused the . . . damage[ ]."[758]

**Conjecture and Speculation.** Of course, even potentially compensable damages must be disregarded if based on mere speculation and conjecture.[759] Thus, the federal courts have barred

---

751  *Baetjer*, 143 F.2d at 392 n.2; *see, e.g., Sharpe v. United States*, 112 F. 893, 896 (3d Cir. 1902), *aff'd sub nom. Sharp v. United States*, 191 U.S. 341 (1903) ("proper to include the damages in the shape of deterioration in value which will result to the residue of the tract from the occupation of the part so taken"); *United States v. Miller*, 317 U.S. 369, 376 (1943) ("compensation . . . includes any element of value arising out of the relation of the part taken to the entire tract"); *cf. United States v. 105.40 Acres of Land in Porter Cty.*, 471 F.2d 207, 211 n.8 (7th Cir. 1972) ("It might be argued that recovery of damages arising from a) the relation of the 'remainder tract' to the whole, and b) the relation of the 'condemned tract' to the whole, have both been 'loosely spoken of' and treated as severance damages." (quoting *Miller*, 317 U.S. at 376)); *Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 336 (Ct. Cl. 1980) (per curiam).

752  *United States v. Mattox*, 375 F.2d 461, 463-64 (4th Cir. 1967); *Baetjer*, 143 F.2d at 395-96.

753  *United States v. 7,936.6 Acres of Land*, 69 F. Supp. 328, 332 (D.P.R. 1947), *on remand from Baetjer*, 143 F.2d at 395-96.

754  *Olson v. United States*, 292 U.S. 246, 257 (1934); *Baetjer*, 143 F.2d at 395-96 (remanding for evidence on "whether or not the [landowners] have suffered a compensable loss, and if they have, its extent"); *Sharpe*, 112 F. at 897.

755  *Sharpe*, 112 F. at 897.

756  *United States v. 26.07 Acres of Land in Nassau Cty.*, 126 F. Supp. 374, 377 (E.D.N.Y. 1954). In contrast, "the Government's expert made a detailed survey of sales of residential and industrial parcels in the immediate vicinity of the defendants' properties, before and after the appropriation of the easement, which plainly indicated that there was no appreciable depreciation in the market value of similar parcels as a result of the imposition of the easement." *Id.*

757  *United States v. 760.807 Acres of Land in Honolulu*, 731 F.2d 1443, 1448 (9th Cir. 1984); *United States v. 6.24 Acres of Land (Weber)*, 99 F.3d 1140, 1996 WL 607162, at *5 (6th Cir. 1996) (per curiam) (unpubl.).

758  *760.807 Acres in Honolulu*, 731 F.2d at 1448; *Hendler v. United States*, 175 F.3d 1374, 1384-85 (Fed. Cir. 1999) (affirming finding that diminution in market value of contaminated property was due to preexisting contamination caused by third parties, not government's subsequent remediation activities). Proof of causation is also required to consider the effects of the government project in total acquisitions. *See, e.g., United States v. 1.604 Acres of Land (Granby I)*, 844 F. Supp. 2d 668, 675-76 (E.D. Va. 2011) ("[The court] need not resolve [project influence issues] because there is scant evidence that the government's actions actually affected the market value of the property.").

759  *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 275-76 (1943); *Olson v. United States*, 292 U.S. 246, 257 (1934).

consideration of damages that are not supported by actual market evidence.[760] These items must be disregarded in determining market value for federal acquisitions because consideration of such elements would "add to just compensation something that the law does not allow."[761] Elements that have been excluded from consideration because they were not shown to be reasonably probable run the gamut from an assertion that "buyers would suddenly become fearful of explosive hazards" due to a safety buffer zone "created to ease public fear of explosive hazards"[762] to claimed damage due to the threat that "marauding bears" would "specifically foray from [a] newly created park" to attack young-growth trees on remainder property.[763]

**Anticipated Physical Invasion of the Remainder.** Damage due to anticipated physical invasion of the remainder resulting from the intended use of the land acquired is not compensable in federal acquisitions.[764] For example, in the federal acquisition of a flowage easement for construction of a reservoir, an opinion of market value must disregard any damage to the remainder from anticipated wave action above the line of the acquisition during periods of high winds.[765] To do otherwise would in essence expand the government's acquisition, which neither appraisers nor landowners—nor the courts—have the power to do.[766]

**Use of Others' Lands.** Similarly, diminution in value of a landowner's remainder caused by the United States' use of *other* lands is not compensable and cannot be considered in valuations for just compensation purposes.[767] The Supreme Court created this rule in *Campbell v. United States*, reasoning:

> If the former private owners [of adjacent property] had devoted their lands to the identical uses for which they were acquired by the United States . . . , they would not have become liable for the resulting diminution in value of [the remainder] property. The liability of the United States is not greater than would be that of the private users.[768]

---

760  *E.g.*, *United States v. Honolulu Plantation Co.*, 182 F.2d 172, 179 (9th Cir. 1950) ("[S]trict proof of the loss in market value to the remaining parcel is obligatory."); *26.07 Acres in Nassau*, 126 F. Supp. at 377; *see 760.807 Acres in Honolulu*, 731 F.2d at 1448 (finding appraiser's determination was "insufficient" without "market surveys or other data" that showed damages actually recognized in the market); *United States v. 122.63 Acres of Land in Norfolk Cty.*, 526 F. Supp. 539 (D. Mass. 1981) (declining to award damages for taking of easement where there was no proof of such damage); *see also Weber*, 99 F.3d 1140, 1996 WL 607162, at *4-6 (rejecting one appraiser's finding of stigma damage where record was "devoid of evidence" showing such damage, and accepting another appraiser's finding that no stigma damage existed based on comparison of similar properties and interviews of market participants involved with the purchase of similar property); *Sharpe*, 112 F. at 897.

761  *Intertype Corp. v. Clark-Congress Corp.*, 240 F.2d 375, 380 (7th Cir. 1957).

762  *760.807 Acres in Honolulu*, 731 F.2d at 1448-49 (noting government's acquisition of safety buffer zone "could very well have *increased* the value of the remainder" due to public confidence that remainder was safe from explosive hazards).

763  *Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 362-63 & n.47 (Ct. Cl. 1980) (per curiam) (finding "no reasonable probability supportive of such a belief in this record" (citing *Olson*, 292 U.S. at 257) and noting it "is questionable, in any event, if such intrusions provide a basis for recovery of severance damages" (citing *United States v. Pope & Talbot, Inc.*, 293 F.2d 822, 826 (9th Cir. 1961))).

764  Such damage may be compensable in a separate acquisition or inverse taking claim (Section 4.9). *United States v. 38.60 Acres of Land in Henry Cty.*, 625 F.2d 196, 199-200 (8th Cir. 1980); *United States v. 101.88 Acres of Land in St. Mary Par. (Avoca Island)*, 616 F.2d 762, 768 (5th Cir. 1980).

765  *E.g.*, *38.60 Acres in Henry*, 625 F.2d at 199-200; *see also Avoca Island*, 616 F.2d at 768 (improper to value as if United States would deposit dredging spoil on remainder land); *United States v. 3,317.39 Acres of Land in Jefferson Cty.*, 443 F.2d 104 (8th Cir. 1971) (error to consider damage for possible flooding of remainder property); *United States v. Brendum*, 272 F.2d 642 (5th Cir. 1959) (error to value taking of easement to cut trees and remove obstructions as if it also included avigation rights to fly aircraft over area).

766  *38.60 Acres in Henry*, 625 F.2d at 199-200; *Avoca Island*, 616 F.2d at 768; *United States v. 3,317.39 Acres of Land in Jefferson Cty.*, 443 F.2d 104, 105-06 (8th Cir. 1971); *see Berman v. Parker*, 348 U.S. 26, 35-36 (1954); *United States v. 3,218.9 Acres of Land in Warren Cty.*, 619 F.2d 288, 290-93 (3d Cir. 1980); *United States v. 40.60 Acres of Land in Contra Costa Cty.*, 483 F.2d 927, 928 (9th Cir. 1973); *see also United States v. 21.54 Acres of Land in Marshall Cty.*, 491 F.2d 301, 304-06 (4th Cir. 1973).

767  *Campbell v. United States*, 266 U.S. 368, 371-72 (1924); *760.807 Acres in Honolulu*, 731 F.2d at 1447; *Avoca Island*, 616 F.2d at 769; *United States v. Kooperman*, 263 F.2d 331, 332 (2d Cir. 1959); *Winn v. United States*, 272 F.2d 282, 286-87 (9th Cir. 1959); *Boyd v. United States*, 222 F.2d 493, 494 (8th Cir. 1955).

768  *Campbell*, 266 U.S. at 371-72 (noting a landowner "ha[d] no right to prevent the taking and use of the lands of others"); *accord United States v. 15.65 Acres of Land in Marin Cty.* (*Marin Ridgeland Co.*), 689 F.2d 1329, 1331-32 (9th Cir. 1982).

The Ninth Circuit created a narrow exception to the *Campbell* rule in *United States v. Pope & Talbot, Inc.* to allow compensation for damage resulting from the use of another's property in limited circumstances.[769] Thus, in the Ninth Circuit, damage to the remainder resulting from the use of others' property may be considered if (1) the part acquired is *indispensable* to the government project; (2) the part acquired contributes *substantially* (not inconsequentially) to the project and the resulting damage; and (3) damage to the remainder due to the use of the part acquired is *inseparable* from damage to the remainder due to the government's use of its adjoining land in the project.[770] For example, consider a partial taking of a tract for construction of a contaminated soils depository, which would be constructed partly on the property taken and partly on property acquired from others: it might not be practical to separate the diminution in value of the remainder caused by the use of *the property acquired* from that caused by the use of *lands acquired from others*. In such situations, the appraiser should seek **legal guidance**. The Ninth Circuit's exception to the *Campbell* rule has not been adopted by other federal courts,[771] and even in the Ninth Circuit is rarely invoked.[772] And as the Ninth Circuit made clear in subsequent rulings, regardless of the *Pope & Talbot* exception, damage is "compensable only if the landowner incurs a direct loss reflected in the market place that results from the [acquisition]."[773] Moreover, causation must be proved: a "landowner must demonstrate that the taking caused the . . . damage[ ]."[774]

**Stigma, Fear, and Contamination.** If stigma or fear of a "hazard would affect the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller, diminution in value caused by that fear may be recoverable as part of just compensation."[775] The threshold question is not whether the fear or stigma is rational or well-founded, but rather whether and to what extent it affects the market.[776] There must be evidence "connecting the safety issue to the real estate market."[777] Moreover, it is improper to simply assume that a hazard, or the fear of a hazard, has an effect on market value. As the Ninth Circuit explained in a condemnation for construction of high-voltage transmission lines and potential fears of electromagnetic fields (EMFs):

> In the absence of relevant and probative evidence, a [fact-finder] could only speculate concerning the effect of a particular measurement on public perception. Perhaps the general public, unschooled in the significance of the milligauss, is afraid of actual EMFs in any quantity, so long as they come from a big power line. Or perhaps the levels of EMFs that exist on [the subject property] would even *ease* public fears in the marketplace. There is simply no way for a [fact-finder] to tell. Without any evidence . . . that higher levels of EMF generate higher levels of buyer aversion and lower sale prices, [evidence] about specific EMF levels has little to no probative value.[778]

---

769  *United States v. Pope & Talbot, Inc.*, 293 F.2d 822 (9th Cir. 1961).

770  *Marin Ridgeland Co.*, 689 F.2d at 1332; *Pope & Talbot*, 293 F.2d at 825.

771  *See E. Tenn. Nat. Gas Co. v. 2.93 Acres of Land*, No. 4:02CV00179, 2007 WL 2688414, *2 (W.D. Va. Sept. 13, 2007) (citing cases); *cf. Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 363 (Ct. Cl. 1980) (per curiam) (citing but not applying *Pope & Talbot* analysis).

772  *See, e.g.*, *760.807 Acres in Honolulu*, 731 F.2d at 1447-48 (finding *Pope & Talbot* exception did not apply where "alleged severance damage, if resulting from any use, could not be caused by any use of the condemned property"); *St. Regis Paper Co. v. United States*, 313 F.2d 45 (9th Cir. 1962) (finding reduced access to remainder was due to use to which adjoining land owned by others was put, and therefore not compensable under *Campbell*, and *Pope & Talbot* did not apply).

773  *760.807 Acres in Honolulu*, 731 F.2d at 1448.

774  *Id.*

775  *Id.* at 1447.

776  *United States v. 87.98 Acres of Land in Merced Cty.*, 530 F.3d 899, 904-05 (9th Cir. 2008); *Basset, New Mexico LLC v. United States*, 55 Fed. Cl. 63, 75 (2002).

777  *87.98 Acres in Merced*, 530 F.3d at 905 (analyzing *760.807 Acres in Honolulu*, 731 F.2d at 1449).

778  *87.98 Acres in Merced*, 530 F.3d at 905-06 (internal citations omitted).

Further, fear or stigma associated with anticipated damage may also be recoverable if it would affect the market price a knowledgeable and prudent buyer would pay for the property on the date of value.[779] Causation between the stigma or fear and the government's acquisition must be shown.[780] And diminution in value resulting from fear or stigma due to the actions of a third party or to pre-existing conditions cannot be considered.[781] For these reasons, appraisers must obtain clear written instructions regarding appropriate consideration of environmental contamination or other hazards, as discussed in Section 1.2.7.1.[782]

### 4.6.2.3.  Non-Compensable (Consequential) Damages.

Because the compensability of a particular aspect of damage stems from its treatment in the open market between willing buyers and sellers, losses that are not reflected in sales prices in the private market cannot be considered in federal acquisitions. Applying this principle, federal courts have determined that the following losses are not compensable under the Fifth Amendment: loss of business value or going concern value;[783] loss of or damage to goodwill;[784] future loss of profits;[785] frustration of plans;[786] frustration of contract or contractual expectations;[787] loss of opportunity or business prospect;[788] frustration of an enterprise;[789] loss of customers;[790] expenses of moving removable fixtures and personal property;[791] depreciation in value of furniture and removable equipment;[792] increased production or management costs;[793] damage to inventory or equipment;[794] expense of adjusting or restructuring manufacturing operations;[795] incurrence of removal or relocation costs;[796] loss or cancellation of revocable permits or licenses;[797] loss of ability to collect assessments;[798] uncertainty premium due to tenant's status as a government entity;[799] and interference with development

779  *United States v. 33.5 Acres of Land*, 789 F.2d 1396, 1398 (9th Cir. 1986).

780  *760.807 Acres in Honolulu*, 731 F.2d at 1447.

781  *Hendler v. United States*, 175 F.3d 1374, 1384-85 (Fed. Cir. 1999); *760.807 Acres in Honolulu*, 731 F.2d at 1448.

782  *See, e.g., Hendler*, 175 F.3d at 1384-85; *760.807 Acres in Honolulu*, 731 F.2d at 1448.

783  *Mitchell v. United States*, 267 U.S. 341, 345 (1925); *United States v. 1735 N. Lynn St.*, 676 F. Supp. 693, 697-98 (E.D. Va. 1987).

784  *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945).

785  *Id.*; *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 283 (1943); *Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577, 1581-82 (Fed. Cir. 1990); *Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 360-61 (Ct. Cl. 1980) (per curiam).

786  *1735 N. Lynn St.*, 676 F. Supp. at 701 (citing *Powelson*, 319 U.S. at 281-82 & n.12, and *Omnia Commercial Co. v. United States*, 261 U.S. 502, 513 (1923)).

787  *Omnia*, 261 U.S. at 513; *United States v. 57.09 Acres of Land in Skamania Cty.* (*Peterson II*), 757 F.2d 1025, 1027 (9th Cir. 1985); *United States v. 677.50 Acres of Land*, 420 F.2d 1136, 1138-39 (10th Cir. 1970); *Hooten v. United States*, 405 F.2d 1167, 1168 (5th Cir. 1969); *United States v. 1.604 Acres of Land* (*Granby I*), 844 F. Supp. 2d 668, 681-82 (E.D. Va. 2011); *United States v. Gossler*, 60 F. Supp. 971, 976-77 (D. Or. 1945).

788  *Omnia*, 261 U.S. at 513; *United States v. Grand River Dam Auth.*, 363 U.S. 229, 236 (1960); *Powelson*, 319 U.S. at 283.

789  *Omnia*, 261 U.S. at 513; *Grand River*, 363 U.S. at 236.

790  *S. Ctys. Gas Co. of Cal. v. United States*, 157 F. Supp. 934, 935-36 (Ct. Cl. 1958), *cert. denied*, 358 U.S. 815 (1958); *R.J. Widen Co. v. United States*, 357 F.2d 988, 990, 993-94 (Ct. Cl. 1966); *see Stipe v. United States*, 337 F.2d 818, 819-21 & n.3 (10th Cir. 1964).

791  *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945).

792  *Certain Land in City of Washington v. United States*, 355 F.2d 825, 826 (D.C. Cir. 1965); *see County of Ontonagon v. Land in Dickinson Cty.*, 902 F.2d 1568, 1990 WL 66813, *3-*4 (6th Cir. 1990) (unpubl.).

793  *PVM Redwood Co. v. United States*, 686 F.2d 1327, 1328-29 (9th Cir. 1982); *Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 360 n.44, 363-65 (Ct. Cl. 1980) (per curiam).

794  *Klein v. United States*, 375 F.2d 825, 829 (Ct. Cl. 1967).

795  *United States v. 91.90 Acres of Land in Monroe Cty.* (*Cannon Dam*), 586 F.2d 79, 87-88 (8th Cir. 1978); *Klein*, 375 F.2d 825 at 829.

796  *United States v. Westinghouse Elec. & Mfg. Co.*, 339 U.S. 261, 264 (1950); *United States v. Petty Motor Co.*, 327 U.S. 372, 377-78 (1946); *Intertype Corp. v. Clark-Congress Corp.*, 240 F.2d 375 (7th Cir. 1957); *Ga.-Pac.*, 640 F.2d at 361 n.44. But see exception discussed below regarding temporary acquisitions that interrupt but do not terminate a longer term.

797  *Acton v. United States*, 401 F.2d 896, 897-900 (9th Cir. 1968); *United States v. Cox*, 190 F.2d 293, 295-96 (10th Cir. 1951); *see also* Section 4.11.2 (Federal Grazing Permits).

798  *United States v. 0.073 Acres of Land* (*Mariner's Cove*), 705 F.3d 540, 546-49 (5th Cir. 2013); *but see Adaman Mut. Water Co. v. United States*, 278 F.2d 842 (9th Cir. 1960) (regarding restrictive covenants for collection of assessments for water extracted from burdened properties).

799  *United States v. 131,675 Rentable Square Feet of Space* (*GSA-VA St. Louis I*), No. 4:14-cv-1077 (CEJ), 2015 WL 4430134, *4 (E.D. Mo. July 20, 2015); *see United States v. Gen. Motors Corp.*, 323 U.S. 373, 379-80 (1945); *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 276 (1943).

agreements,[800] among others. [801] Such losses must be disregarded—even if proved—because by law, they are not compensable under the Fifth Amendment.

**Acquisitions of Fee or Other Full-Term Interests.** Under federal law, compensation for a fee acquisition does not include "future loss of profits, the expense of moving removable fixtures and personal property from the premises, the loss of good-will which inheres in the location of the land, or other like consequential losses which would ensue the sale of the property to someone other than the sovereign."[802] The Supreme Court explained the reasons for this rule as follows:

> Whatever of property the citizen has the government may take. When it takes the property, that is, the fee, the lease, whatever he may own, terminating altogether his interest, under the established law it must pay him for what is taken, not more; and he must stand whatever indirect or remote injuries are properly comprehended within the meaning of "consequential damage" as that conception has been defined in such cases. Even so the consequences often are harsh. For these whatever remedy may exist lies with Congress.[803]

While beyond the scope of the appraiser's assignment, Congress has enacted remedies: people and businesses affected by federal acquisitions receive replacement housing, moving expenses, and relocation services under the Uniform Act.[804] Similarly, Congress authorized administrative payments for losses due to the cancellation of federal grazing permits for war purposes.[805] Administrative benefits under the Uniform Act or other statutes are separate from compensation under the Fifth Amendment (and again, beyond the scope of the appraiser's assignment to develop an opinion of market value for a federal acquisition).[806]

**Temporary Acquisitions.** The rules above apply with equal force to temporary acquisitions (Section 4.7) that acquire or terminate the full remaining term, because in such situations a "lessee would have to move at the end of his term unless the lease was renewed" regardless of the federal acquisition.[807] "The compensation for the value of his leasehold covers the loss from the premature termination . . . ."[808] As a result, the Supreme Court held, when there is an acquisition of an entire property interest, "whether that property represents the interest in a leasehold or a fee, the expenses of removal or of relocation are not to be included in valuing what is taken."[809]

**Temporary Acquisitions Interrupting a Longer Term.** The valuation of a temporary acquisition that interrupts but does not terminate a longer interest—such as a sublet for less than the outstanding term of an existing leasehold—may involve a nuanced refinement of the

---

800  *United States v. 1.604 Acres of Land (Granby I)*, 844 F. Supp. 2d 668, 681-82 (E.D. Va. 2011); *Kaiser Dev. Co. v. Honolulu*, 649 F. Supp. 926, 936-37 (D. Haw. 1986), *aff'd for reasons stated by district court*, 898 F. 2d 112 (9th Cir. 1990) (mem.).

801  As observed in a leading appraisal text, "[i]t is simply impossible to develop an all-inclusive list of the potential damages that could accrue to property in a partial taking case." EATON, *supra* note 16, at 309.

802  *Gen. Motors*, 323 U.S. at 379-80 (footnotes omitted).

803  *Id.* at 382.

804  *See* note 1, *supra*; 49 C.F.R. §§ 24.1 to 24.603 (implementing regulations).

805  43 U.S.C. § 315q; *see United States v. Cox*, 190 F.2d 293, 296 (10th Cir. 1951); Section 4.11.2 (Federal Grazing Permits).

806  *See Gen. Motors*, 323 U.S. at 379-80; *United States v. Willow River Power Co.*, 324 U.S. 499, 510 (1945); *Cox*, 190 F.2d at 296.

807  *United States v. Petty Motor Co.*, 327 U.S. 372, 378-79 (1946); *Intertype Corp. v. Clark-Congress Corp.*, 240 F.2d 375 (7th Cir. 1957).

808  *Petty Motor*, 327 U.S. at 379; *Intertype Corp.*, 240 F.2d 375.

809  *United States v. Westinghouse Elec. & Mfg. Co.*, 339 U.S. 261, 264 (1950) (citing *Gen. Motors*, 323 U.S. at 379); *Intertype Corp.*, 240 F.2d at 380-81 ("the measure of its damages would have been . . . just compensation—which does not include . . . the cost of removal and other such consequential items").

rule stated above.[810] As a result, the market value of this type of temporary interest may need to reflect reasonable costs for tenant relocation, preparing the space for the new occupant, and storage of goods pending the displaced tenant's return.[811] Such items may be considered "not as independent items of damage but to aid in the determination of what would be the usual—the market—price which would be asked and paid for such temporary occupancy of the building then in use under a long term lease."[812]

The Supreme Court has emphasized that consideration of reasonable relocation costs in temporary interrupting acquisitions does not "depart from the settled rule against allowance for 'consequential losses' in federal condemnation proceedings."[813] Rather, relocation costs may be relevant to the market value of a temporary interrupting acquisition of less than the outstanding term—such as a sublet of an occupied building—and therefore compensable and appropriate to consider in such acquisitions. But relocation costs are merely incidental to the value of an acquisition of the *entire* interest (whether temporary or permanent) and therefore must be disregarded in acquisitions of the entire interest.[814] In short, as the Seventh Circuit stated, "if the Government takes over only a portion of a lease, then the cost of removal may be considered in determination of just compensation" but if it acquires "the entire lease, such consequential losses are not to be considered."[815] The reasons for this distinction can be found in *United States v. Petty Motor Co.*:

> There is a fundamental difference between the taking of a part of a lease and the taking of the whole lease. That difference is that the lessee must return to the leasehold at the end of the Government's use or at least the responsibility for the period of the lease, which is not taken, rests upon the lessee. . . . Because of that continuing obligation in all takings of temporary occupancy of leaseholds, the value of the rights of the lessees, which are taken, may be affected by evidence of the cost of temporary removal.[816]

**Exceptions.** Federal courts have recognized rare exceptions to the foregoing rules, allowing normally non-compensable damage to be reflected in unusual circumstances, such as the temporary acquisition of a business property or a partial acquisition with the effect of a total taking.[817] Such exceptions always require **legal instruction**.

---

810  *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949); *Gen. Motors*, 323 U.S. 373. These temporary interrupting acquisitions have chiefly occurred in "'response to the uncertainties of the Government's needs in wartime.'" *Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 519 (2012) (quoting *Westinghouse*, 339 U.S. at 267); *see United States v. 1735 N. Lynn St.*, 676 F. Supp. 693, 696 (E.D. Va. 1987) ("Exigencies of [World War II] moved the government to adopt a policy of acquiring properties for short periods with options to renew.").

811  *Gen. Motors*, 323 U.S. at 383. Unlike benefits under the Uniform Act (see note 828, *supra*), consideration of relocation costs in this specific circumstance would be within the scope of the appraiser's assignment because they bear on market value and just compensation. *See Westinghouse*, 339 U.S. at 263-64 & n.2 ("This holding in the *General Motors* case was the Court's determination, without any congressional action, of what constituted 'just compensation' under the Fifth Amendment."); *see also United States v. Willow River Power Co.*, 324 U.S. 499, 510 (1945) ("Such losses may be compensated by legislative authority, not by force of the Constitution alone.").

812  *Gen. Motors*, 323 U.S. at 383; *see United States v. 131,675 Rentable Square Feet of Space* (*GSA-VA St. Louis I*), No. 4:14-cv-1077 (CEJ), 2015 WL 4430134, *4 (E.D. Mo. July 20, 2015); *see also 1735 N. Lynn St.*, 676 F. Supp. at 696-99.

813  *Westinghouse*, 339 U.S. at 264; *accord Gen. Motors*, 323 U.S. at 383.

814  *United States v. Petty Motor Co.*, 327 U.S. 372, 379-80 (1946); *see Kimball Laundry*, 338 U.S. at 15 ("The temporary interruption as opposed to the final severance of occupancy so greatly narrows the range of alternatives open to the condemnee that it substantially increases the condemnor's obligation to him. It is a difference in degree wide enough to require a difference in result.").

815  *Intertype Corp. v. Clark-Congress Corp.*, 240 F.2d 375, 380 (7th Cir. 1957).

816  *Petty Motor*, 327 U.S. at 379-80.

817  *Kimball Laundry*, 338 U.S. 1 (allowing compensation for going concern value where government temporarily took business); *United States v. 38,994 Net Usable Square Feet at 910 S. Mich. Ave.*, No. 87 C 8569, 1989 WL 51395 (N.D. Ill. May 11, 1989) (government's holdover and subsequent condemnation of a lease interest in part of an otherwise vacant office building slated for demolition and renovation was effectively temporary taking of entire building; court directed compensation to be measured as difference between property before and after government announced holdover, including in "after" valuation costs buyer would consider such as anticipated carrying costs, etc.).

**4.6.3.** **Benefits.** Federal acquisitions and the projects they serve can also enhance properties' market value, often raising complicated valuation questions.[818] Under federal law, compensation for a partial acquisition must reflect any <u>direct and special benefits</u> to the remainder due to the government project.[819] <u>Indirect and general benefits</u>, on the other hand, are not considered because they are enjoyed by the public as a whole rather than arising from an acquisition's particular impact on a specific property.[820] Distinctions between these types of benefits are discussed in more detail below.

The same principles guide the analysis of benefits and damages in valuations for federal acquisitions.[821] Just compensation turns on the question, "What has the owner lost? not, What has the taker gained?"[822] In legal terms, direct and special benefits are a form of just compensation, no different than a monetary award or payment.[823] As a result, any direct and special benefits must be *set off* against the total compensation because when a landowner's remainder property "is specially and directly increased in value by the public improvement, the damages to the whole parcel by the appropriation of part of it are lessened."[824] One federal court explained the fairness of this principle as follows:

> **Distinguishing special and direct benefits from general and indirect benefits can raise complicated factual and legal questions, and virtually always requires a <u>legal instruction</u>.**

> It is not in contemplation of law . . . that after the sovereign has taken from a citizen and paid him for that which it has taken, that the citizen can on the same market sell his residue for an amount which, added to the compensation he has received, aggregates more than the value of the whole from which the part was taken. That cannot be just compensation . . . .[825]

Direct and special benefits commonly include "new access to a waterway or highway, or filling in of swampland."[826] An upward shift in the remainder property's highest and best use is often an indication of special and direct benefits. For example, a partial acquisition for the extension of a mass transit system had a special and direct benefit on remainder property that was eligible for special zoning that would allow higher-density residential development due to its location within

---

818  *See Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2432 (2015).

819  *See Bauman v. Ross*, 167 U.S. 548, 574 (1897).

820  *Id.* at 581-82.

821  *See id.* at 574-75 ("injury or benefit to the part not taken is also to be considered").

822  *Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910) (quoted in *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 236 (2003)); *see Bauman*, 167 U.S. at 574; *Olson v. United States*, 292 U.S. 246, 255 (1934); *see also United States v. Sponenbarger*, 308 U.S. 256, 266-67 (1939).

823  *McCoy v. Union Elevated R.R. Co.*, 247 U.S. 354, 366 (1918) ("[I]n arriving at the amount of damage to property not taken allowance should be made for peculiar and individual benefits conferred upon it; compensation to the owner in that form is permissible."); *United States ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*, 40 F. Supp. 811, 819 (E.D. Tenn. 1941) ("compensation shall be paid, whether in cash or in benefits incident to the use to which the property taken is put by the condemnor"); *see Bauman*, 167 U.S. at 581; *Sponenbarger*, 308 U.S. at 265-70 (finding taking without compensation had not occurred as "lands were not damaged, but actually benefited"); *United States v. 901.89 Acres of Land (Davenport)*, 436 F.2d 395, 397-98 (6th Cir. 1970) (discussing historical consideration of benefits in assessing compensation); *cf. Horne*, 135 S. Ct. at 2432 (reiterating that special benefits are deducted from compensation in partial takings while rejecting contention that general regulatory activity can constitute just compensation for a specific physical taking).

824  *Bauman*, 167 U.S. at 574; *see Indian Creek Marble Co.*, 40 F. Supp. at 818 ("compensation is simply that amount of money required to leave the owner with property, including his compensation, of the same market value as that which he had prior to the taking").

825  *Indian Creek Marble Co.*, 40 F. Supp. at 818; *accord Bauman*, 167 U.S. at 581-82 (quoting Justice Brewer's analysis in *Pottawatomie Cty. Comm'rs v. O'Sullivan*, 17 Kan. 58, 59-60 (1876)); *Sponenbarger*, 308 U.S. at 266-67 ("[I]f governmental activities inflict slight damage upon land in one respect and actually confer great benefits when measured in the whole, to compensate the landowner further would be to grant him a special bounty.")

826  *Horne*, 135 S. Ct. at 2432; *see, e.g.*, *Davenport*, 436 F.2d 395 (proximity to and view of lake created by reservoir project was a special and direct benefit). Special valuation rules apply to partial acquisitions affected by the federal navigational servitude. *See* Section 4.11.1.

a certain distance of a new mass transit station.[827] Comparable sales typically provide the best evidence of special and direct benefits.[828] The existence or absence of special and direct benefits turns not on the specifications of the government project, but on its impact in the market. For instance, in a partial acquisition for reservoir purposes: "The question is whether the market value of the remainder was increased by its prospective frontage on the [new reservoir created by the government project, which spurred demand for lakeside subdivision]. Market value 'is . . . a reflection of the state of mind of the public with respect to the property.'"[829]

General and indirect benefits, in contrast, are those "which result to the public as a whole, and therefore to the individual as one of the public; for he pays in taxation for his share of such general benefits."[830] Thus, compensation would not be offset by the benefit of a "general increase in the value of property in the neighborhood" caused by a government project.[831] In modern federal acquisitions, appraisers are rarely—if ever—asked to analyze and estimate general and indirect benefits, which relate to taxation, not just compensation.[832] But this makes the distinction between the types of benefits no less critical.[833]

The *extent* of a special and direct benefit is a fact question to be determined by the appraiser.[834] But correctly distinguishing special and direct benefits (to be considered) from general and indirect benefits (to be ignored) "can raise complicated questions" in practice,[835] and virtually always requires a **legal instruction**.[836] The distinction stems from principles of fairness:

> [I]f the proposed road or other improvement inure to the *direct and special benefit* of the individual out of whose property a part is taken, he receives something which none else of the public receive, and it is just that this should be taken into account in determining what is compensation. Otherwise, he is favored above the rest, and,

**Benefits: *Bauman v. Ross***

*Bauman v. Ross*, 167 U.S. 548 (1897), illustrates the distinction between benefit types: in 1893, Congress authorized an expansion of the highway grid system in Washington, D.C., to be funded by an assessment (tax) against area landowners *generally benefited* by the expansion. The expansion also conferred *special benefits* on some remainder properties after partial takings for the project.

As a result, the fact-finder had to (1) determine just compensation for the property taken, offsetting any *special and direct benefits* to the remainder, and (2) quantify the *general* and *indirect benefits* to all area landowners for assessment purposes to fund the project.

In contemporary federal acquisitions, appraisers are rarely asked to quantify *indirect* and *general benefits* in making valuations for just compensation purposes.

---

827  *See, e.g.*, *Wash. Metro. Area Transit Auth. v. One Parcel of Land* (*Old Georgetown*), 691 F.2d 702 (4th Cir. 1982).
828  *United States v. Trout*, 386 F.2d 216, 222-24 (5th Cir. 1967) ("If the best evidence of market value, i.e., evidence of comparable sales, indicates that there were special benefits to the remainder, it cannot be rejected . . . without an adequate explanation.").
829  *Id.* at 223 & n.9, 224 (noting that "in demanding evidence pertaining to the structure of the reservoir, the commission misconceived the issue of special benefits").
830  *Bauman*, 167 U.S. at 581.
831  *Id.* at 580; *United States v. River Rouge Improvement Co.*, 269 U.S. 411 (1926); *Davenport*, 436 F.2d at 397-99; *6,816.5 Acres of Land v. United States*, 411 F.2d 834, 837 (10th Cir. 1969); *United States v. 2,477.79 Acres of Land in Bell Cty.*, 259 F.2d 23, 28-29 (5th Cir. 1958).
832  *See Bauman*, 167 U.S. at 574-75, 587-88 (discussed in sidebar); *cf. Trout*, 386 F.2d at 220 (same amount before and after taking attributed to general benefits of increased property values over county resulting from contemplated government project).
833  *See, e.g.*, *Hendler v. United States*, 175 F.3d 1374 (Fed. Cir. 1999); *Davenport*, 436 F.2d at 397-99.
834  *2,477.79 Acres in Bell*, 259 F.2d at 28.
835  *See Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2432 (2015).
836  *See, e.g.*, *Davenport*, 436 F.2d at 400-01 (valuation by appraiser who was correctly "instructed to appraise the 'after' value of the subject property considering the reservoir enhancement," as a direct and special benefit of the government's acquisition, was "the only [opinion] which had probative value and discloses the proper compensation"); *see also Hendler*, 175 F.3d 1374.

instead of simply being made whole, he profits by the appropriation, and the taxes of the others must be increased for his special advantage.[837]

Applying these principles, "any special and direct benefits [that are] capable of present estimate and reasonable computation" must be deducted for purposes of just compensation.[838]

Special and direct benefits can accrue to more than one property, such as a new or widened street benefiting multiple abutting properties. "The benefit is not the less direct and special to the [property at issue], because other estates upon the same street are benefited in a similar manner."[839] The Supreme Court reasoned:

> [t]he advantages of more convenient access to a particular lot of land in question, and of having a front upon a more desirable avenue, are direct benefits to that lot, giving it increased value in itself. It may be the same, in greater or less degree, with each and every lot of land upon the same street. But such advantages are direct and special to each lot.[840]

On the other hand, "sharing in the common advantage and convenience of increased public facilities, and the general advance in value of real estate in the vicinity by reason thereof" would be indirect and general benefits.[841]

To take into account any special benefits from the project, appraisers apply the before and after rule of valuation, developing opinions of the market value of the larger parcel (the entire tract) *before* acquisition *excluding* any enhancement or diminution from the project, and the market value of the remainder *after* acquisition *including* any special benefit or diminution due to the government project. In a practical example, the Sixth Circuit described the valuation of a partial acquisition for construction of a dam and lake:

> An appraiser . . . valued [the landowner's entire tract before acquisition] at $80,000, or about $365 per acre, as of the day of the taking. That was its market value without any enhancement because of its proximity to the already projected development of the [dam and lake]. The [appraiser] buttressed his valuation by referring to comparable sales.

> He then valued the [remainder property], title to which would remain in [the landowner after acquisition], at $30,000 or about $404 an acre. In valuing this remainder, he gave consideration to the enhancement that would accrue to it from its proximity to the lake and the advantage of an unobstructed view thereof.

---

837  *Bauman*, 167 U.S. at 581-82 (quoting Justice Brewer's analysis in *Pottawatomie Cty. Comm'rs v. O'Sullivan*, 17 Kan. 58, 59-60 (1876) (emphasis added)).
838  *Id.* at 584. In a regulatory inverse taking case, the Supreme Court recently rejected the contention that the effects of general regulatory activity—such as higher consumer demand due to government enforcement of quality standards and promotional activities—can offset the total just compensation due for a specific physical taking. *Horne*, 135 S. Ct. at 2432. The Court expressly clarified that this ruling, concerning certain regulatory benefits, does not affect the deduction of special benefits from the amount of compensation paid in partial takings. *Id.* (discussing concerns raised in dissent; *see id.* at 2435-36 (Breyer, J., concurring in part and dissenting in part) ("it is unclear to me what distinguishes this case from . . . other types of partial takings").
839  *United States v. River Rouge Improvement Co.*, 269 U.S. 411, 416 (1926).
840  *Id.*
841  *Id.*

Deducting this $30,000 from the $80,000 value placed on the entire tract, he came up with a figure of $50,000 representing the fair compensation that should be paid . . . . This appraiser's method was correct.[842]

In this way, the value of any special or direct benefits is offset against the total value.[843]

Consideration and offset of the government project's direct and special benefits to remainder property does not violate the <u>scope of the project rule</u>, discussed in Section 4.5. Rather, the general principle, as the Supreme Court expressly stated in *United States v. Fuller*, is that the United States "may not be required to compensate a [landowner] for elements of value that the Government has created . . . ."[844] And this general principle does not prevent application of the scope of the project rule to exclude increments in value due to the government's project when necessary "to do substantial justice."[845] Application of the scope of the project rule turns on the question: "Should the owner have the benefit of any increment of value added to the property taken by the action of the public authority[?]"[846] As discussed in Section 4.5, the answer to this question depends on the precise facts of each acquisition, and "requires discriminating judgment" and **legal instructions**.[847]

### 4.6.4.   Exceptions to the Federal Rule.

The federal courts' universal preference for the before and after method makes clear that departures may be appropriate, if at all, only in "very unique and complex" circumstances.[848] "[A]ny other method of arriving at compensation could conceivably arrive at something else, either more or less, than compensation."[849] Nevertheless, some federal courts have accepted valuation methods other than the before and after rule in partial acquisitions where necessary to reach a fair and practical result.[850] But in those unusual circumstances, as the Court of Claims warned, "[t]he particular evaluation approach utilized by a party in severance damage situations can sometimes serve to increase the burden it must

---

842   *United States v. 901.89 Acres of Land (Davenport)*, 436 F.2d 395, 396 (6th Cir. 1970).

843   Agencies may need to instruct the appraiser to allocate the result of a before and after valuation between the value of the property being acquired, and damages (and/or benefits) to the remainder – for example, for negotiating purposes and/or to comply with agency obligations under the Uniform Act. *See* 42 U.S.C. § 4561(3). Such an allocation should be reported in a separate, supplemental report, rather than in the appraisal report of the market value of the property as a whole. *Cf. United States v. Grizzard*, 219 U.S. 180, 185-86 (1911) ("That the [fact-finder allocated] the damages for the land and for the easement of access separately is not controlling. The determining factor was that the value of that part of the Grizzard farm not taken was $1,500, when the value of the entire place before the taking was $3,000. . . . Judgment [of $1,500] affirmed.").

844   *United States v. Fuller*, 409 U.S. 488, 492 (1973).

845   *Id.* (quoting *United States v. Miller*, 317 U.S. 369, 374, 375 (1943); *see also United States v. 320 Acres of Land*, 605 F.2d 762, 781-89 (5th Cir. 1979) (exploring history and underlying principles of scope of the project rule and treatment of benefits due to government project).

846   *Miller*, 317 U.S. at 375.

847   *United States v. Reynolds*, 397 U.S. 14, 21 (1970); *320 Acres*, 605 F.2d at 796; *see generally* Section 4.5.

848   *See Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 336-37 (1980) (per curiam); *cf. United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 632 (1961) (before and after method is "an acceptable method of appraisal, indeed the conventional method"). As noted, the Fifth Circuit "requires the exclusive use of the before-and-after method of valuation." *United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 392, n.5 (5th Cir. 1982); *see United States v. 4.27 Acres*, 271 F. App'x 424, 425 (5th Cir. 2008).

849   *United States ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*, 40 F. Supp. 811, 818 (E.D. Tenn. 1941), *cited with approval in United States v. 2,847.58 Acres of Land in Bath Ctys.*, 529 F.2d 682, 686 (6th Cir. 1976).

850   *See, e.g., Ga.-Pac.*, 640 F.2d at 336-37 ("The approaches to severance damages herein represent practical efforts by the parties to reach valuation determinations in a very unique and complex set of circumstances."); *but see United States v. 33.92356 Acres of Land (Piza-Blondet)*, 585 F.3d 1, 9 (1st Cir. 2009) (refusing alternative valuation method when there was "no persuasive reason why the before and after method would be unfair in assessing the value" in a partial taking).

carry in persuading that speculation and conjecture are not the essence of its presentation."[851]

### 4.6.4.1. Taking Plus Damages (the "State Rule").

Many appraisers may be familiar with an alternative *taking plus damages* (or *taking + damages*) method for valuing partial acquisitions, also referred to as the state rule. Because the taking plus damages method is apt to "arrive at something else, either more or less, than compensation" under the Fifth Amendment,[852] it is generally improper in valuations for federal acquisition purposes, and cannot be used without **legal instruction** from the acquiring agency or the U.S. Department of Justice.[853]

The taking plus damages method lacks the "effectiveness of the before and after method in clearly and simply dealing with . . . damages" and benefits in partial acquisitions.[854] Moreover, as recognized by the federal courts, the taking plus damages method is subject to error and apt to result in improper duplication or *double damage*.[855] As a result, the taking plus damages method is generally improper in valuations for federal acquisitions: "It is not compensation but more than compensation to twice give the owner severance damage."[856] For example, the Fourth Circuit[857] was forced to vacate a compensation award based on a taking plus damages calculation that was nearly four times greater than

> Some assignments may require *allocation* of the difference in the property's value before and after acquisition, between (1) the part acquired and (2) damage to the remainder, to meet agency obligations under the Uniform Act, 42 U.S.C. § 4561(3).
>
> This accounting exercise is not an exception to the federal rule that partial acquisitions must be valued using the before and after method.
>
> Any allocations must be clearly labeled as <u>accounting tabulations</u> that do not indicate the appraisal method(s) employed.

---

851  *Ga.-Pac.*, 640 F.2d at 337; *see United States ex rel. Tenn. Valley Auth. v. Robertson*, 354 F.2d 877, 880-81 (5th Cir. 1966) ("[Elements] which make the property less desirable and thus diminish the market value of the property are proper to be considered, though as a separate item of damage might be too speculative and conjectural to be submitted . . . ."); *see also United States v. Honolulu Plantation Co.*, 182 F.2d 172, 179 (9th Cir. 1950) ("[S]trict proof of the loss in market value to the remaining parcel is obligatory.").

852  *Indian Creek Marble Co.*, 40 F. Supp. at 818.

853  *See Piza-Blondet*, 585 F.3d at 9 (refusing alternative valuation method when there was "no persuasive reason why the before and after method would be unfair in assessing the value"); *United States v. 12.94 Acres of Land in Solano Cty.*, No. CIV. S-07-2172, 2009 WL 4828749, at *5-*6, 2009 U.S. Dist LEXIS 114581, at *15-*21 (E.D. Cal. Dec. 9, 2009) (error to analyze value of the part taken separately from the total); *cf. United States v. Miller*, 317 U.S. 369, 375-76 (1943) (discussing "working rules" that have been "adopt[ed] in order to do substantial justice" in partial takings).

854  *Piza-Blondet*, 585 F.3d at 9 n.6 (citing 4A Nichols, The Law of Eminent Domain § 14.02[4] (rev. 3d ed. 1981); *United States v. 760.807 Acres of Land in Honolulu*, 731 F.2d 1443, 1445 (9th Cir. 1984) ("Using [the before and after] method, any diminution in value of the remainder resulting from the taking and use of part of the original parcel, sometimes termed 'severance damages,' would be included in the award."); *cf. United States v. 901.89 Acres of Land in Davidson & Rutherford Ctys.* (*Davenport*), 436 F.2d 395, 399 (6th Cir. 1970) (reversing lower court's rejection of before and after valuation that reflected direct and special benefits to remainder after taking); *United States v. Werner*, 36 F.3d 1095, 1994 WL 507461, at *5 (4th Cir. 1994) (unpubl.) ("'[T]he taking may not affect the value of the remainder in any way [or] it may either damage or benefit the remainder. . . . In any such situation the measure of just compensation is the same, that is, the difference between the fair and reasonable market value of the land immediately before the taking and the fair and reasonable market value of the portion that remains after the taking.'" (alterations in original).

855  *Indian Creek Marble Co.*, 40 F. Supp. at 818-19 ("the inevitable result would be that the land owner would twice receive incidental damages, either in cash compensation or partly in cash and partly in incidental benefits"); *see, e.g.*, Eaton, *supra* note 16 at 32-33 (noting a "chronic and dangerous problem—double damage, i.e., the duplication of just compensation' and illustrating "how easy it is to double damage using the taking plus damages (state) rule").

856  *Indian Creek Marble Co.*, 40 F. Supp. at 818.

857  While the Fourth Circuit previously broke from other federal courts in adopting the taking plus damages method, it subsequently embraced the federal before and after rule, observing "it is well settled that in the event of a 'partial taking' . . . the measure of just compensation is the difference between the fair and reasonable market value of the land immediately before the taking and the fair and reasonable market value of the portion that remains after the taking." *United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 374, 378 (4th Cir. 1995); *cf. United States v. 97.19 Acres of Land*, 582 F.2d 878, 881 (4th Cir. 1978) ("this circuit measures damages as the fair market value of the parcel actually taken plus the severance damages, if any, to the portion of the tract retained by the landowner"), *abrogated by Banisadr*, 65 F.3d at 378, *and United States v. 2.33 Acres of Land in Wake Ctys.*, 704 F.2d 728, 730 (4th Cir. 1983), *as recognized in United States v. 0.39 Acres of Land*, No. 2:11-0259, 2013 WL 3874472, at *4 (S.D.W. Va. July 25, 2013).

the landowners' actual loss revealed by applying the before and after method to the same facts.[858] The court remanded for new proceedings "to the end that duplications in just compensation are eliminated."[859]

The taking plus damages method may be appropriate or even mandated in nonfederal acquisitions, as certain *state* laws offset benefits against "severance damage" to the remainder but not against the value of the part acquired, necessitating separate findings of "severance damage" and the value of the part acquired.[860] But federal law makes no such distinction,[861] recognizing that under the U.S. Constitution, just compensation turns on the question, "What has the owner lost? not, What has the taker gained?"[862] Based on this principle, under federal law, compensation must reflect "the effect of the appropriation of a part of a single parcel upon the remaining interest of the owner, by taking into account both the benefits which accrue and the depreciation which results to the remainder in its use and value."[863] The taking plus damages method was developed to measure a different question, and thus generally has no place in valuations for federal acquisition purposes.[864]

Still, there may be "persuasive reason[s] why the before and after method would be unfair in assessing the value" of a specific partial acquisition.[865] Whether the taking plus damages method can be relied on for federal just compensation purposes in a specific valuation assignment is a **legal determination**, not one that can be made by an appraiser.[866] For example, partial acquisitions affected by the federal navigational servitude may require use of a taking plus damages method due to the unique constitutional and statutory requirements governing compensation for such acquisitions.[867] The taking plus damages method may also be appropriate in certain minor partial acquisitions, such as acquisitions of easements or other minor interests for flowage or road purposes from large ranches or industrial complexes.[868] Whether a partial acquisition is sufficiently "minor" to make the taking plus damages method a fair and practical alternative to the before and after rule depends on the acquisition's impact *on the*

> Whether the *taking plus damages* method can be used in a specific valuation assignment is a **legal determination** that cannot be made by an appraiser.

---

858  *2.33 Acres*, 704 F.2d at 729-31. The vacated award valued the larger parcel before the taking at $296,870 and the remainder after the taking at $240,663, a difference of approximately $56,000, yet would have awarded total compensation in excess of $200,000. *See id.*

859  *Id.* at 731 ("Again the conclusion that the landowner was overcompensated . . . ineluctably follows."); *see also Indian Creek Marble Co.*, 40 F. Supp. at 818-19.

860  *See McCoy v. Union Elevated R.R. Co.*, 247 U.S. 354, 365 (1918); *Harris v. United States*, 205 F.2d 765, 767 (10th Cir. 1953) (distinguishing between federal and state constitutional provisions for just compensation); *cf.* EATON, *supra* note 16, at 41-42 & nn.26-31 ("most authorities argue that the complexity of the state rule and its potential for double damages are so great that the before and after rule should be adopted").

861  Under federal law, "if the taking has in fact benefitted the remainder, the benefit may be set off against the value of the land taken." *United States v. Miller*, 317 U.S. 369, 376 (1943); *Bauman v. Ross*, 167 U.S. 548, 584 (1897).

862  *Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910), quoted in *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 236 (2003); *Bauman*, 167 U.S. at 574.

863  *United States v. Grizzard*, 219 U.S. 180, 184-85 (1911).

864  *See Indian Creek Marble Co.*, 40 F. Supp. at 819 (state rule method of determining "so-called compensation is and must be grounded upon . . . an artificial measure based upon neither justice nor the settled conception of the meaning of the word 'compensation'"); *cf.* EATON, *supra* note 16, at 40-43 ("The state rule is generally used in jurisdictions that do not allow benefits to be set off against the value of the part taken and/or damages.").

865  *See United States v. 33.92356 Acres of Land* (*Piza-Blondet*), 585 F.3d 1, 9-10 (1st Cir. 2009); *cf. Miller*, 317 U.S. at 375-76 (recognizing need to "adopt working rules in order to do substantial justice" in measuring compensation for partial takings).

866  *Piza-Blondet*, 585 F.3d at 9 (refusing alternative valuation method when there was "no persuasive reason why the before and after method would be unfair in assessing the value"); *Ga.-Pac. Corp. v. United States*, 226 Ct. Cl. 95, 107, 640 F.2d 328, 336-37 (1980) (per curiam); *United States v. 12.94 Acres of Land in Solano Cty.*, No. CIV. S-07-2172, 2009 WL 4828749, at *5-*6, 2009 U.S. Dist. LEXIS 114581, at *15-*17 (E.D. Cal. Dec. 9, 2009) (error to analyze value of the part taken separately from the total).

867  *See* Section 4.11.1.

868  *See, e.g., Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 336-37 (1980) (per curiam).

*owner's property.*[869] As a result, use of the taking plus damages method is generally limited to acquisitions that cause *no damage to the remainder*. If the "usefulness and value of the remainder" are or may be affected, however,

> [t]o say that such an owner would be compensated by paying him only for the narrow strip actually appropriated, and leaving out of consideration the depreciation to the remaining land by the manner in which the part was taken, and the use to which it was put, would be a travesty upon justice.[870]

**4.6.5.**   **Easement Valuation Issues.** In general terms, an <u>easement</u> is a limited right to use or control land owned by another for specified purposes.[871] An easement is a property interest less than the fee estate, with the owner of the underlying fee (the <u>servient estate</u>) retaining full dominion over the realty, subject only to the easement (the <u>dominant estate</u>); the fee owner may make any use of the realty that does not interfere with the easement holder's reasonable use of the easement and is not specifically excluded by the terms of the easement.

**In easement acquisitions, the agency must provide the appraiser with a written description of the precise estate(s) being acquired. There is no "generic" road easement, conservation easement, or any other type of easement.**

Easements are either appurtenant or in gross. An <u>appurtenant easement</u> benefits another tract of land, and typically is useful only in conjunction with other property but has no independent utility—for example, a highway access easement for adjacent land. An <u>easement in gross</u> benefits a person or entity, and typically has utility in and of itself or in conjunction with other easements—such as a continuous easement across multiple tracts of land, forming a right of way.

Federal acquisitions involve a wide variety of easements, including road, pipeline, transmission line, levee, flowage, clearance, avigation, scenic, conservation, tunnel, sewer line, construction, access, and safety zone easements, among others.[872] Easements may be permanent (perpetual) or temporary.[873]

Easement-related valuation problems typically arise in federal acquisitions in one of three scenarios: (1) direct acquisition of an easement—that is, a *dominant* easement interest*—and its resulting impact on the value of the larger parcel; (2) acquisition of a *servient estate* encumbered by an existing (dominant) easement; or (3) acquisition that *affects or extinguishes an existing easement benefitting another*

**A <u>dual-premise appraisal</u> may be useful to evaluate how acquisitions of various partial interests affect market value.**

---

869   *See United States v. Grizzard*, 219 U.S. 180, 184 (1911) ("'just compensation' . . . obviously requires that the recompense to the owner for the loss caused to him by the taking of a part of a parcel, or single tract of land, shall be measured by the loss resulting to him from the appropriation"); *Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910) ("What has the owner lost? not, What has the taker gained?"); *cf. Miller*, 317 U.S. at 375 ("Since the owner is to receive no more than indemnity for his loss, his award cannot be enhanced by any gain to the taker.").

870   *Grizzard*, 219 U.S. at 184, 185-86.

871   Black's Law Dictionary defines an easement as "[a]n interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose . . . ." *Easement*, Black's Law Dictionary (10th ed. 2014).

872   Easements that affect or relate to riparian uses—such as flowage, levee or irrigation easements—may raise special valuation issues due to the United States' dominant navigational servitude. *See* Section 4.11.1; *cf. Weatherford v. United States*, 606 F.2d 851 (9th Cir. 1979).

873   *See* Section 4.7; *cf. Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 517-19 (2012).

*parcel* (the affected easement may be *appurtenant* or *in gross*). In each scenario addressed below, the effect of the easement must be analyzed to reach a supported opinion of value.

As discussed in Section 4.1.4, the nature and extent of the easement (or any other interest in property) being acquired will be determined by the agency, as delegated by Congress. In easement acquisitions, this means the agency must carefully and precisely define the property interest(s) being acquired and expressly state what interest(s), if any, will remain with the landowner.[874] As the Supreme Court held, if the terms of the easement being acquired are unclear, "it would be premature for us to consider whether the amount of the award . . . was proper."[875]

### 4.6.5.1.   Dominant Easement Interests.
Compensation for the acquisition of a dominant easement interest is measured by "the difference in the value of the servient land before and after the Government's easement was imposed."[876] Accordingly, federal acquisitions of dominant easement interests must be valued using a before and after methodology, reflecting compensable damage and special (direct) benefits to the remainder, as with all other partial acquisitions.[877]

If an acquisition imposes an easement upon an entire ownership, there is a remainder estate in the land within the easement.[878] If the easement is impressed upon less than the full area of the larger parcel, the remainder will also include the portion of the parcel outside the easement.[879] In either setting, it is well established that "[t]he valuation of an easement upon the basis of its destructive impact upon other uses of the servient fee is a universally accepted method of determining worth."[880] Accordingly, in a valuation involving acquisition of a dominant easement, the appraiser must clearly understand the specific terms of the easement involved to analyze the burden the easement imposes on the servient estate and the resulting impact on the value of the affected land.[881] As the Sixth Circuit observed, "for the commissioners to determine the 'before and after' value of the land, it was necessary that they clearly understood what rights the landowner would retain in the land subject to the easement."[882]

---

874   *Compare United States v. 3,218.9 Acres of Land in Warren Cty.*, 619 F.2d 288, 289-91 (3d Cir. 1980) (noting "explicit" description of "the nature of the estate to be taken" and "clear" language that "third party mineral rights are not intended to be affected"), *with United States v. City of Tacoma*, 330 F.2d 153, 155-56 (9th Cir. 1964) (reversing judgment of compensation that did not resolve "the nature of the easement taken," as leaving "this critical issue undecided" was detrimental to both the United States and the landowner).

875   *United States v. Causby*, 328 U.S. 256, 268 (1946); *see City of Tacoma*, 330 F.2d at 155-56.

876   *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 626 n.2, 632 (1961); *Dugan v. Rank*, 372 U.S. 609, 626 (1963).

877   *Va. Elec.*, 365 U.S. at 632; *Rasmuson v. United States*, 807 F.3d 1343, 1345 (Fed. Cir. 2015); *United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 392 (5th Cir. 1982); *United States v. 38.60 Acres of Land in Henry Cty.*, 625 F.2d 196, 198-99 (8th Cir. 1980); *Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15, 21 (5th Cir. 1969); *see United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 374 (4th Cir. 1995).

878   *E.g.*, *United States v. 68.94 Acres of Land in Kent Cty.*, 918 F.2d 389 (3d Cir. 1990).

879   *E.g.*, *United States v. 38.60 Acres of Land*, 625 F.2d 196 (8th Cir. 1980); *Transwestern Pipeline*, 418 F.2d 15.

880   *Va. Elec.*, 365 U.S. at 630; *see 68.94 Acres*, 918 F.2d at 393 n.3; *38.60 Acres*, 625 F.2d at 198 & n.1; *Transwestern Pipeline*, 418 F.2d at 21.

881   *United States v. Causby*, 328 U.S. 256, 268 (1946) ("Since . . . it is not clear whether the easement taken is a permanent or a temporary one, it would be premature for us to consider whether the amount of the award . . . was proper.").

882   *Evans v. Tenn. Valley Auth.*, 922 F.2d 841, 1991 WL 1113, at *2 (6th Cir. 1991) (unpubl.) (discussing *United States ex rel. Tenn. Valley Auth. v. An Easement & Right-of-Way*, 182 F. Supp. 899 (M.D. Tenn. 1960)); *cf. Monongahela Nav. Co. v. United States*, 148 U.S. 312, 344 (1893) ("doubtless the existence of [a] reserved right to take the property upon certain specified terms may often, and perhaps in the present case, materially affect the question of value").

For example, consider the acquisition of an easement with the right "to cut and remove any and all trees now or hereafter growing" alongside a right of way.[883] To develop an opinion of market value, the appraiser must understand whether or not the tree-cutting privilege is "coupled with liability for future cuttings" under the terms of the easement:[884]

> It is conceivable that the market value of [remainder] land would vary as between the alternatives. . . . What difference would the choice make to a prospective purchaser? What difference would it make in the market value of the land? . . . [S]peculative damages need not be considered, except as an estimate of them might affect market value.[885]

A district court explained these considerations as follows:

> The question is, how does the easement affect the market price of the property? Here again we have the willing and intelligent buyer and seller, neither acting under compulsion. They agree upon a price before the easement is imposed.

> But before the sale is closed the easement is imposed. They meet again, both willing to deal on the basis, of course, of the fair market value. But the situation is changed in one particular— the imposition of the easement or easements. The question is, how does the changed situation affect the market price?

> The willing prospective buyer examines the instrument creating the outstanding easement as to its terms, whether it is perpetual; to what extent does it limit the use of the servient estate, and what are the maximum uses granted by the instrument? All in all, how much less valuable do the outstanding easements make the whole property?[886]

Federal courts have rejected other methods for valuing dominant easement interests—even though those methods may be accepted in other settings—because they do not reflect just compensation under the Fifth Amendment.[887] Thus, where only an easement is acquired, the full fee value of the land within the easement is not a proper measure of damages since the rights remaining in the owners of the servient estate may be substantial.[888] Moreover, valuing only the area subject to the easement (i.e. "strip valuation") fails to "compar[e] the fair market value of the *entire* tract affected by the taking before and after the taking . . . [that is] the correct measure of value in federal court condemnation."[889]

---

883  Similar easements are acquired to remove "danger trees" near high-voltage transmission lines, where they can present potentially serious hazards. *See, e.g., Evans*, 1991 WL 1113, at *2 n.2.

884  *United States ex rel. Tenn. Valley Auth. v. Russell*, 87 F. Supp. 386, 389 (E.D. Tenn. 1948).

885  *Id.* (citing *Olson v. United States*, 292 U.S. 246 (1934)); *cf. Monongahela Nav.*, 148 U.S. at 344 (existence of a reserved right in property may often materially affect value).

886  *United States ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*, 40 F. Supp. 811, 821 (E.D. Tenn. 1941), *cited with approval in United States v. 2,847.58 Acres of Land*, 529 F.2d 682, 686 (6th Cir. 1976).

887  *E.g., Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15, 21 (5th Cir. 1969); *see United States v. 33.92356 Acres of Land (Piza-Blondet)*, 585 F.3d 1, 4, 9-10 (1st Cir. 2009); *Calvo v. United States*, 303 F.2d 902, 909 (9th Cir. 1962); *United States v. Glanat Realty Corp.*, 276 F.2d 264, 265 (2d Cir. 1960).

888  *E.g., United States v. An Easement & Right-of-Way Over Two Strips of Land*, 284 F. Supp. 71, 73 (W.D. Ky. 1968), citing *United States v. Cress*, 243 U.S. 316, 328-29 (1917) ("If any substantial enjoyment of the land still remains to the owner . . . . less than the whole has been taken and is to be paid for . . . ."), *discussed in Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 518-20 (2012); *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 633-35 (1961); *see United States v. Grizzard*, 219 U.S. 180, 185-86 (1911).

889  *Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15, 21 (5th Cir. 1969) (emphasis added); *Grizzard*, 219 U.S. at 185-86.

---

5-ER-927

**4.6.5.1.1.  "Going Rates" and Nonmarket Considerations.** For some types of easements, such as for electric, telephone, fiber optics, cable, transmission line, or pipeline purposes, there may be a customary "going rate" (per pole, per line-mile, or per rod, for example). But while customary rates may offer a convenient pricing system in other settings, going rates cannot be used as a proxy for market value in federal acquisitions requiring payment of just compensation.[890] Going rates tend to reflect non-compensable considerations above the market value of the property acquired, such as avoiding the cost of condemnation or other litigation, and economic pressures to complete construction and place the planned facility or infrastructure in operation. As the Fifth Circuit recognized, "consideration of the expense and lost motion involved in relocation, additional construction, pipe and material costs and delay—none of which relate to the fair market value—are inevitably involved."[891] Amid such nonmarket considerations, "[t]here is no basis for translating a dollar per rod settlement figure into a market value per acre figure."[892] Moreover, the use of a "going rate" improperly assumes the easement acquired is a separate economic unit to be valued based on the government's planned use of the property—assumptions the federal courts reject as improper.[893] For these reasons, appraisals of easements for federal acquisitions cannot be based upon going rates but rather must be based upon the accepted before and after appraisal method.[894]

**4.6.5.1.2.  Temporary Easements.** For temporary easements, like other temporary acquisitions, compensation is measured by the <u>market rental value</u> for the term of the easement, adjusted as may be appropriate for the rights of use, if any, reserved to the owner.[895] Federal courts apply this measure even to acquisitions of temporary property interests that are "seldom exchanged."[896] "After all, what . . . is required . . . is to determine the figure which would compensate [the landowner] for the loss it suffered by being deprived of this property for this period of time.'"[897]

**4.6.5.1.3.  Sale or Disposal of Easements.** Although the before and after method of valuation is required by these Standards when the government *acquires* easements,[898] use of the before and after method of valuation is not required when the government sells or otherwise *disposes* of an easement interest. In disposing of easement interests, agencies are therefore free to consider the value of the easement to the acquirer, customary "going rates" or other measures, as well as the diminution to the government's property by reason of the encumbrance.

---

890  *Cf. Olson v. United States*, 292 U.S. 246, 256-57 (1934); *Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 408-10 (1878). These Standards do not prohibit consideration of customary going rates in federal *disposals* of easement interests. *See* Section 4.6.5.1.3.

891  *Transwestern Pipeline*, 418 F.2d at 18; *see also United States v. 10.48 Acres of Land*, 621 F.2d 338, 339 (9th Cir. 1980) (prices paid by entity with condemnation authority to acquire easements "are in the nature of compromise to avoid the expense and uncertainty of litigation and are not fair indications of market value").

892  *Transwestern Pipeline*, 418 F.2d at 18.

893  *E.g.*, *United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 392 (5th Cir. 1982); *see Etalook v. Exxon Pipeline Co.*, 831 F.2d 1440, 1447 n.4 (9th Cir. 1987) ("improperly attributes to the tract an increase in value caused by the very improvements for which condemnation was sought"), citing *United States v. 320 Acres of Land*, 605 F.2d 762, 811-20 (5th Cir. 1979); *cf. United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 633 (1961) ("no evidence of a market in flowage easements of the type here involved").

894  *8.41 Acres in Orange*, 680 F.2d at 392.

895  *See Kimball Laundry Co. v. United States*, 338 U.S. 1, 7 (1949) ("[T]he proper measure of compensation [in a temporary taking] is the rental that probably could have been obtained . . . ."); Section 4.7; *cf. United States v. 883.89 Acres of Land in Sebastian Cty.*, 442 F.2d 262, 265 (8th Cir. 1971), *aff'g* 314 F. Supp. 238 (W.D. Ark. 1970) ("The comparable sales of other leaseholds in the immediate area were adequate and substantial evidence of the market value of this leasehold.").

896  *E.g.*, *Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577, 1582 (Fed. Cir. 1990).

897  *See United States v. Michoud Indus. Facilities*, 322 F.2d 698, 707 (5th Cir. 1963).

898  *See Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910) ("[T]he question is, What has the owner lost? not, What has the taker gained?").

**4.6.5.2.  Lands Encumbered by Easements.** In federal acquisitions of property already encumbered by an easement, the appraiser must value the property in light of the preexisting easement—and not as an unencumbered fee.[899] As the Supreme Court held:

> [T]he Constitution does not require a disregard of the mode of ownership—of the state of the title. It does not require a parcel of land to be valued as an unencumbered whole when it is not held as an unencumbered whole. It merely requires that an owner of property taken should be paid for what is taken from him. It deals with persons, not with tracts of land. And the question is what has the owner lost,? not What has the taker gained?[900]

As a result, it is improper to disregard preexisting encumbrances and their impact on the property, as "there is 'no justice in (requiring the Government to pay) for a loss suffered by no one in fact.'"[901] In a <u>total acquisition</u> of property encumbered by a preexisting easement, the measure of compensation is the market value of the property as encumbered.[902] In a <u>partial acquisition</u> of property encumbered by a preexisting easement, the measure of compensation is the difference between the market value of the property as encumbered before the acquisition, and the market value of the remainder property—subject to the preexisting *and* newly acquired easements—after acquisition.[903] Regarding an appraiser who misunderstood the nature and extent of the interests being acquired and failed to consider preexisting encumbrances, one court held, "his appraisals and estimates of damage are largely, if not entirely, based upon unwarranted and unjustified theories of law and assumptions of fact and, as such, must be completely rejected . . . ."[904]

Appraisals must "take into account all encumbrances on the land" as the question is "the fair market [value] of what the [landowners] had left . . . ."[905] Depending on the nature of the preexisting and newly acquired easements, the difference in market value may be nominal.[906]

**4.6.5.3.  Appurtenant Easements to the Servient Estate.** Slightly different valuation issues arise when the United States' acquisition of a servient estate also acquires or extinguishes a third party's appurtenant easement; for example, in a fee acquisition of Owner A's parcel through which Owner B has an access easement to connect B's other property to a highway. In such an acquisition, Owner A is entitled to compensation for "what the owner has lost"—i.e., the encumbered fee.[907] And Owner B, "the owner of a condemned access easement[,] is entitled to

> **Legal instruction is required for any departure from the unit rule, as the rule's application is a matter of law that cannot be determined by an appraiser.**

---

899  *United States v. 765.56 Acres of Land in Southampton* (<u>765.56 Acres I</u>), 164 F. Supp. 942, 946, 948 (E.D.N.Y. 1958), *aff'd sub nom. United States v. Glanat Realty Corp.*, 276 F.2d 264, 267 (2d Cir. 1960); *see also United States v. 765.56 Acres of Land in Southampton* (<u>765.56 Acres II</u>), 174 F. Supp. 1, 10 (E.D.N.Y. 1959), *aff'd sub nom. Glanat Realty*, 276 F.2d 264.

900  *Bos. Chamber of Commerce*, 217 U.S. at 195.

901  *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 642 (1961) (Whittaker, J., dissenting) (quoting *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 76 (1913)).

902  *Cf. Nebraska v. United States*, 164 F.2d 866, 869 (8th Cir. 1947), *cert. denied*, 334 U.S. 815 (1948) (no compensation for "a diminution in the market value of the [landowner's] rights through the creation of a leasehold, easement, or other interest in the land by the [landowner's] own acts" preceding United States' acquisition; *United States v. 32.42 Acres of Land*, No. 05cv1137 DMS, 2009 WL 2424303 (S.D. Cal. Aug. 6, 2009) (measure of compensation for acquisition of leased fee excluding existing leasehold is market value of lessor's reversionary leased-fee interest).

903  *See, e.g.*, *United States v. 3.6 Acres of Land in Spokane Cty.*, 395 F. Supp. 2d 982 (E.D. Wash. 2004); *765.56 Acres I*, 164 F. Supp. at 945-47.

904  *765.56 Acres I*, 164 F. Supp. at 948.

905  *United States v. 79.20 Acres of Land in Stoddard Cty.*, 710 F.2d 1352, 1355 (8th Cir. 1983).

906  *E.g.*, *3.6 Acres*, 395 F. Supp. 2d at 992 (finding $1.00 was just compensation for acquisition of easement that did not exceed preexisting easement).

907  *Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910); *79.20 Acres in Stoddard*, 710 F.2d at 1354-55.

compensation for the diminution in value of the property which it serves."[908] In such instances, departure from the <u>unit rule</u> "may be necessary to avoid grossly unjust results[,]"[909] as the usual valuation of the property as an <u>undivided fee</u> would not result in just compensation.[910]

The federal courts' solution to this valuation challenge reflects "[t]he guiding principle of just compensation . . . that the *owner* of the condemned property 'must be made whole but is not entitled to more.'" [911] Acquisitions of this sort involve two larger parcels and require two appraisal assignments:

- <u>To measure compensation for Owner A</u>, one appraisal must develop an opinion of the value of the *encumbered fee* (discussed in Section 4.6.5.2), "tak[ing] into account all encumbrances on the land."[912] This is because "the Constitution does not require a disregard of the mode of ownership,—of the state of the title."[913] Just compensation will not result if a parcel of land is "valued as an unencumbered whole when it is not held as an unencumbered whole."[914] The appraisal of the encumbered fee may require a before and after valuation if the acquisition is only a portion of a *larger parcel*.[915]

- <u>To measure compensation for Owner B</u>, another appraisal must develop an opinion of the value of the *appurtenant easement* (discussed in Section 4.6.5.1), which "cannot be ascertained without reference to the dominant estate to which it was attached."[916] As a partial acquisition, the before and after rule applies, so the appraiser must develop an opinion of the value of the property served by the easement before (with the easement) and after (without the easement) the government's acquisition.[917] The difference between the before and after values is the measure of compensation.

In neither appraisal will the appraiser develop an opinion of the market value of the property as if unencumbered. The value of the undivided fee is simply not relevant to compensation for such peculiar acquisitions, as the Fourth Circuit reasoned:

---

908  *United States v. 57.09 Acres of Land in Skamania Cty.* (*Peterson I*), 706 F.2d 280, 281 (9th Cir. 1983), citing *United States v. Grizzard*, 219 U.S. 180 (1911), *and United States v. Welch*, 217 U.S. 333, 339 (1910) ("the value of the easement cannot be ascertained without reference to the dominant estate to which it was attached").

909  *United States v. 6.45 Acres of Land* (*Gettysburg Tower*), 409 F.3d 139, 148 (3d Cir. 2005); *cf. United States v. 499.472 Acres of Land in Brazoria Cty.*, 701 F.2d 545, 552 (5th Cir. 1983) (emphasizing that "limited" holding to permit separate valuations in particular condemnation did not "sanction any departure from valuation of condemned property as a unit" and "simply acknowledges that there are rare circumstances where separate trials are justified").

910  *See* Section 4.2.2 (The Unit Rule); *Grizzard*, 219 U.S. at 184-85 ("[J]ustice . . . required that regard be had to the effect of the appropriation of a part of a single parcel upon the remaining interest of the owner, by taking into account both the benefits which accrue and the depreciation which results to the remainder in its use and value."); *Bos. Chamber*, 217 U.S. at 194-95 (The government cannot "be made to pay for a loss of theoretical creation, suffered by no one in fact. . . . [The] Constitution does not require a disregard of the mode of ownership . . . ."); *see also Gettysburg Tower*, 409 F.3d at 145-48 & nn.11-15 (analyzing unit rule principle and rare exceptions and citing cases).

911  *United States v. 564.54 Acres of Land* (*Lutheran Synod*), 441 U.S. 506, 516 (1979) (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)); *see Gettysburg Tower*, 409 F.3d at 145-46 & nn.11-12.

912  *79.20 Acres in Stoddard*, 710 F.2d at 1355.

913  *Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910).

914  *Id.*

915  *See* Section 4.5.1; *see generally* EATON, *supra* note 16, at 365-68.

916  *United States v. Welch*, 217 U.S. 333, 339 (1910).

917  *United States v. Grizzard*, 219 U.S. 180, 184-85 (1911); *United States v. 57.09 Acres of Land in Skamania Cty.* (*Peterson I*), 706 F.2d 280, 281 (9th Cir. 1983).

> [W]ith property whose use is divided, . . . the compensation to be paid to any one
> whose interest is taken must be reckoned by the value of the use to which he is
> entitled and not by the value which the land, if unencumbered, would have.[918]

Moreover, as the Fourth Circuit recognized, while the "sum of these values may at times
approximate the value of the unencumbered fee[,]" it may be "much less. Indeed, the sum of
these values may be only nominal."[919]

**4.7.**   **Leaseholds and Other Temporary Acquisitions.** When the government acquires a
leasehold or other temporary interest in property, the measure of compensation is the <u>market
rental value</u> of the premises acquired for the term acquired.[920]

> ### Definition of Market Rental Value
> The rental price in cash or its equivalent that the leasehold would have brought on the date
> of value on the open competitive market, at or near the location of the property acquired,
> assuming reasonable time to find a tenant.

As with <u>market value</u>, the federal definition of *market rental value*[921] requires willing and reasonably
knowledgeable market participants, not compelled to buy or sell, giving due consideration to
all available economic uses of the property.[922] Temporary acquisitions also require a rigorous,
well-supported analysis of highest and best use—as in permanent acquisitions.[923] As a district
court recently held, "only direct evidence of market rental value, to the exclusion of remote,
hypothetical conjecture, should be considered in ascertaining just compensation for a taking."[924]
In keeping with the <u>unit rule</u> (Section 4.2.2), market rental value must be determined for the

---

918  *Mayor & City Council of Baltimore v. United States,* 147 F.2d 786, 789 (4th Cir. 1945).

919  *Id.*

920  *Kimball Laundry Co. v. United States,* 338 U.S. 1, 7 (1949); *United States v. Gen. Motors Corp.,* 323 U.S. 373, 382-83 (1945); *United States v. Petty Motor Co.,* 327 U.S. 372, 378-79 (1946); *United States v. Banisadr Bldg. Joint Venture,* 65 F.3d 374, 378 (4th Cir. 1995); *Yuba Nat. Res., Inc. v. United States,* 904 F.2d 1577, 1580-81 (Fed. Cir. 1990).

921  *Kimball Laundry,* 338 U.S. at 7; *Gen. Motors,* 323 U.S. at 382-383; *Banisadr,* 65 F.3d at 378; *United States v. 46,672.96 Acres in Doña Ana Ctys.,* 521 F.2d 13, 17-18 (10th Cir. 1975); *United States v. 1735 N. Lynn St.,* 676 F. Supp. 693, 706 (E.D. Va. 1987); *see First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 319 (1987) ("[T]he Just Compensation Clause of the Fifth Amendment requires that the government pay the landowner for the value of the use of the land during this period."); *Carlock v. United States,* 60 App. D.C. 314, 315-16 (D.C. Cir. 1931) ("The present money value of a leasehold interest is the present market value of the residue of the term yet to run with reference to the most valuable use or uses to which the same may be lawfully put; that is, what would be its present money worth over and above the obligations of the lease, to an assignee or purchaser willing and able to assume and perform the obligation of the lease for the residue of the term after the return of the award."); *cf. 46,672.96 Acres in Doña Ana,* 521 F.2d 13, 17-18 (10th Cir. 1975) ("[T]he evidence offered must have a bearing upon what a willing buyer would pay a willing seller for the property on the date of the taking. . . . [W]e are here concerned with leasehold interests and . . . the amount of the award . . . must bear a realistic relationship to reasonable market value.").

922  *Kimball Laundry,* 338 U.S. at 7 ("[D]etermination of the value of temporary occupancy can be approached only on the supposition that free bargaining between petitioner and a hypothetical lessee of that temporary interest would have taken place in the usual framework of such negotiations."); *cf.* Section 4.2.1 (Market Value Definition).

923  *E.g., Banisadr,* 65 F.3d at 378 (affirming finding that highest and best use of building was for regular office space at low-end rent based on detailed analysis of leases on several comparable buildings, rather than for specialized high-tech use, which lacked any supporting data).

924  *United States v. 131,675 Rentable Square Feet of Space (GSA-VA St. Louis I),* No. 4:14-cv-1077, slip op. at *9, 2015 WL 4430134 (E.D. Mo. July 20, 2015) (citing *Olson v. United States,* 292 U.S. 246, 257 (1934)).

---

5-ER-931

property as an unencumbered whole, regardless of any sub-leases or other subsidiary interests into which it may have been divided.[925]

The measure of compensation for temporary acquisitions rarely arose in federal jurisprudence until the World War II era, when war-time exigencies prompted condemnations of leaseholds and other temporary interests.[926] As Justice Reed observed in 1951, "[t]he relatively new technique of temporary taking . . . is a most useful administrative device[,]" allowing for properties to be occupied for public uses "for a short time to meet war or emergency needs," and then "returned to their owners."[927] But temporary acquisitions present "a host of difficult problems . . . in the fixing of just compensation."[928] Of these valuation problems, perhaps the most frequently encountered arise in the context of federal leasehold acquisitions—particularly leaseholds of office space.

**4.7.1.** **Leaseholds.** As in appraising a fee estate, the best evidence of the market rental value of a leasehold estate is comparable transactions—for leaseholds, comparable lease transactions.[929] As the Eighth Circuit stated, "comparable sales of other leaseholds in the immediate area [a]re adequate and substantial evidence of the market value of this leasehold."[930] Generally, "the more comparable a sale is, the more probative it will be" of the market value of the property being appraised.[931] Elements of comparability in leasehold valuations include the familiar elements of size, time, location, and so forth (discussed in Section 4.4.2),[932] as well as the period (term) of the lease (e.g., six months, one year, five years, etc.),[933] the number and terms

> **A lease is a contract arrangement in which an owner (landlord or lessor) conveys to another (tenant or lessee) the rights to use and occupy property for a period of time in exchange for payment.**
>
> **During the lease, the tenant/lessee owns a possessory interest called the leasehold estate, and the landlord/lessor owns the remaining interest, called the leased fee estate.**

---

925   *See Carlock*, 53 F.2d at 927; *A.G. Davis Ice Co. v. United States*, 362 F.2d 934, 937 (1st Cir. 1966); *see also Autozone Dev. Corp. v. District of Columbia*, 484 F. Supp. 2d 24, 31 (D.D.C. 2007) ("Put simply, when all of the interests in a land are condemned, the total amount paid by the condemning authority to everyone with an interest should not be more than the amount it would pay if only one person owned the land." (discussing *Carlock*).

If the government's acquisition will interrupt or extinguish an existing lease of the property, the lessee's compensation (if any) is a question of distribution, not of valuation, and therefore generally beyond the scope of the appraiser's assignment. Thus, under these Standards the appraiser should not separately value a third-party leasehold estate unless specifically instructed to do so—for example, if needed for negotiating purposes and/or to comply with agency obligations under the Uniform Act. Similarly, the appraiser should not apportion values of subsidiary interests unless instructed. *See* Section 4.2.2; *cf. United States v. Rodgers*, 461 U.S. 677, 704-05 & n.33 (1983) (noting challenges of apportioning compensation in eminent domain proceedings involving subsidiary homestead or life-estate interests, and citing cases); *Pa. Ave. Dev. Corp. v. One Parcel of Land in D.C.*, 670 F.2d 289, 292 (D.C. Cir. 1981) ("Under most leases, allocation of the award between lessor and lessee is not problematical because 'leases generally include a clause which makes them terminate in case of condemnation.'").

926   *E.g., United States v. Westinghouse Elec. & Mfg. Co.*, 339 U.S. 261 (1950); *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949); *United States v. Petty Motor Co.*, 327 U.S. 372 (1946); *United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945); see *Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 519-520 (2012); *United States v. 1735 N. Lynn St.*, 676 F. Supp. 696-97 (E.D. Va. 1987); *United States v. Flood Bldg.*, 157 F. Supp. 438, 440-42 (N.D. Cal. 1957).

927   *United States v. Pewee Coal Co.*, 341 U.S. 114, 119 (1951) (Reed, J., concurring).

928   *Id.*

929   *United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 374, 378 (4th Cir. 1995); *United States v. 883.89 Acres of Land in Sebastian Cty.*, 442 F.2d 262, 265 (8th Cir. 1971), *aff'g* 314 F. Supp. 238 (W.D. Ark. 1970).

930   *883.89 Acres in Sebastian*, 442 F.2d at 265. Note that the term *sale* refers to a transaction involving the property interest at issue – here, a leasehold. *Id.*

931   *United States v. 320 Acres of Land*, 605 F.2d 762, 798 (5th Cir. 1979); *United States v. 46,672.96 Acres of Land in Doña Ana Ctys.*, 521 F.2d 13, 17 (10th Cir. 1975).

932   *See, e.g., 883.89 Acres in Sebastian*, 442 F.2d at 265.

933   *See United States v. Gen. Motors Corp.*, 323 U.S. 373, 382 (1945) (long-term rental value did not reflect market rental value of short-term occupancy of same space); *see also 46,672.96 Acres in Doña Ana*, 521 F.2d at 17 ("A further reason for rejecting the [proposed comparable] lease evidence is that these interests are dissimilar to the interest [being valued].").

of any option(s) to renew,[934] tenant build-out,[935] and the nature and extent of services provided by the lessor and/or the lessee.[936] Section 1.6 notes several terms and services in government leases that often differ from those typically encountered in the market and therefore require careful adjustment. All terms must be evaluated in regard to the market rental value of the space in the open, competitive market.[937] In no event can the market rental value reflect the government's special need for the property or the risk that the government may exercise the power of eminent domain at some future point.[938]

The period of the leasehold being acquired may require careful consideration. For example, as the Supreme Court recognized in *United States v. General Motors Corp.*, if a short-term occupancy is being acquired, its market rental value may not be accurately reflected by the long-term market rental value of the same space.[939] Rather, the market rental value of the short-term occupancy "is to be ascertained, not treating what is taken as an empty warehouse to be leased for the long term, but what would be the market rental value of such a building on a lease by the long-term tenant to the temporary occupier."[940]

It is improper to develop an opinion of the market rental value of a leasehold estate based on the value of the underlying fee—that is, a percentage-of-fee value method.[941] Among other problems, this method (1) does not reflect how rental rates are established in the market;[942] (2) assumes full utilization of—and payment for—all leasable space, regardless of existing supply and demand in the competitive market;[943] and (3) relies on a supposed return on value or a return on an owner's investment, rather than market value.[944] As a result, use of a percentage-of-fee-value method can lead to "gross over-valuation" of a leasehold interest.[945] Moreover, federal courts have rejected percentage-of-fee-value methods even if comparable lease transactions are not available.[946] In

---

934 *See United States v. 131,675 Rentable Square Feet of Space (GSA-VA St. Louis I)*, No. 4:14-cv-1077, slip op. at *10, 2015 WL 4430134 (E.D. Mo. July 20, 2015) (condemned leasehold interest contained no option to renew, holdover, or terminate early); *see also 883.89 Acres in Sebastian*, 442 F.2d at 265 (valuation properly reflected no value for renewal options because "[t]here was no evidence . . . that these options had any value"); *United States v. Right to Use & Occupy 3.38 Acres in Alexandria*, 484 F.2d 1140, 1145 (4th Cir. 1973) (no evidence of any difference in value whether renewal option required 30 or 90 days' notice to exercise).

935 *See United States v. Bedford Assocs.*, 548 F. Supp. 732, 743-45 (S.D.N.Y. 1982) (considering whether property should be valued in 'as is' condition or whether determination of market rental price should include renovations), *modified in other respects*, 713 F.2d 895 (2d Cir. 1983); *United States v. Flood Bldg.*, 157 F. Supp. 438, 442-44 (N.D. Cal. 1957) (tenant alterations "did not wreak havoc and destruction to the interior" but rather made space "suitable for occupation by commercial type tenants, and owing to the excellent location of the building . . . its continuing utility can readily be perceived").

936 *See Bedford Assocs.*, 548 F. Supp.at 743-45 (finding operating expenses borne by tenant must be deducted from expected rental income to lessor), *modified in other respects*, 713 F.2d 895 (2d Cir. 1983).

937 See, e.g., id.

938 *See, e.g., GSA-VA St. Louis I*, 2015 WL 4430134, at *10-*11 ("The market value of the property taken should be assessed uninfluenced by [the government's] right to exercise its power of eminent domain in the future. . . . In the event of a future taking, [a landowner] may be assured that the law would require [the government] to provide just compensation again [i.e., in a separate proceeding]."); *cf. United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 276 (1943).

939 *United States v. Gen. Motors Corp.*, 323 U.S. 373, 382 (1945).

940 *Id.* at 382; *United States v. 1735 N. Lynn St.*, 676 F. Supp. 693, 696-97 (E.D. Va. 1987).

941 *See United States v. 883.89 Acres of Land in Sebastian Cty.*, 314 F. Supp. 238, 240-42 (W.D. Ark. 1970), *aff'd*, 442 F.2d 262, 264-65 (8th Cir. 1971); *United States v. Michoud Indus. Facilities*, 322 F.2d 698, 707 (5th Cir. 1963); *United States v. 117,763 Acres of Land in Imperial Cty.*, 410 F. Supp. 628, 631 (S.D. Cal. 1976), *aff'd sub nom. United States v. Shewfelt Inv. Co.*, 570 F.2d 290, 291-92 (9th Cir. 1977).

942 *See 883.89 Acres in Sebastian*, 314 F. Supp. at 240-42; *Michoud*, 322 F.2d at 706-08.

943 *Michoud*, 322 F.2d at 706-08.

944 *Id.* at 707; *see United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 285 (1943) ("[T]he Fifth Amendment allows the owner only the fair market value of this property; it does not guarantee him a return of his investment."); *Olson v. United States*, 292 U.S. 246, 255 (1934) ("[T]he market value of the property at the time of the [acquisition] . . . may be more or less than the owner's investment. . . . The public may not by any means confiscate the benefits, or be required to bear the burden, of the owner's bargain.").

945 *Michoud*, 322 F.2d at 707; *cf. 117,763 Acres in Imperial*, 410 F. Supp. at 631 ("[T]here is no rule that, where what is taken has a minimal value, something more than that value must be allowed.").

946 *Shewfelt Inv.*, 570 F.2d at 291-92.

temporary acquisitions, as in permanent acquisitions, "lack of comparable [transactions] does not change the measure of compensation[.]"[947]

Temporary acquisitions may be partial or total. At times, the acquisition of a leasehold estate over only a portion of a larger property may cause the diminution in the market rental value of the area not leased by the government that must be considered.[948] For example, in an acquisition of a leasehold of a portion of a commercial office building, if the rental value of the remainder is diminished unless offered together with the space acquired by the government, then the diminution in rental value of the remainder would be compensable and must be considered.[949] However, appraisers must take care to disregard non-compensable damage such as frustration of plans or lost opportunities.[950] As discussed in Section 4.6, specific aspects of diminution in value may be legally compensable, and therefore must be considered in a *partial* leasehold acquisition—but are legally non-compensable, and therefore must be disregarded, in a *complete* leasehold acquisition.[951] "By the same token, a taking may conceivably enhance the value of a residue[,]" meaning such benefits must also be considered in the remainder's value after acquisition.[952] Valuation issues in partial acquisitions, including treatment of compensable damages and benefits, are addressed in Section 4.6.

**4.7.2. Temporary Inverse Takings.** The measure of compensation for temporary inverse takings is the same as for other temporary acquisitions—that is, the market rental value of the property acquired for the term of the acquisition.[953] Temporary inverse takings may be *physical* or *regulatory* in nature.[954] And whether a compensable temporary inverse taking occurred will be determined by the court, using a "more complex balancing process" than in alleged permanent takings.[955]

> **Whether an inverse taking occurred, and if so whether it is *temporary* or *permanent*, are legal questions that require legal instruction.**

Similarly, whether an alleged inverse taking is *temporary* or *permanent* is a legal question requiring **legal instruction**. In deciding this issue, "[t]he essential element of a temporary taking is a finite start and end to the taking."[956] This determination can have a significant impact on the

---

947  *United States v. 46,672.96 Acres in Doña Ana Ctys.*, 521 F.2d 13, 18 (10th Cir. 1975) (quoting *United States v. Sowards*, 370 F.2d 87, 90 (10th Cir. 1966)); *see United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 402-03 (1949).

948  *United States v. 1735 N. Lynn St.*, 676 F. Supp. 693, 698-99 (E.D. Va. 1987).

949  *Id.*

950  *Id.* at 701; *United States v. 131,675 Rentable Square Feet of Space (GSA-VA St. Louis I)*, No. 4:14-cv-1077, slip op. at *8-*11, 2015 WL 4430134 (E.D. Mo. July 20, 2015). Damages are discussed in detail in Section 4.6.

951  *See United States v. Petty Motor Co.*, 327 U.S. 372, 379-80 (1946) (explaining "fundamental difference between the taking of a part of a lease and the taking of the whole lease"); *Intertype Corp. v. Clark-Cong. Corp.*, 240 F.2d 375, 380 (7th Cir. 1957) (analyzing *Petty Motor*, *supra*; *United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945); and *United States v. Westinghouse Elec. & Mfg. Co.*, 339 U.S. 261 (1950)).

952  *1735 N. Lynn St.*, 676 F. Supp. at 698-99 (citing *United States v. Miller*, 317 U.S. 369, 376 (1943)).

953  *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 318 (1987) (citing, *inter alia*, *United States v. Dow*, 357 U.S. 17 (1958); *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949); *United States v. Causby*, 328 U.S. 256 (1946); *Petty Motor*, 327 U.S. 372; and *Gen. Motors*, 323 U.S. 373); *Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577, 1580-81 (Fed. Cir. 1990).

954  *See, e.g.*, *767 Third Ave. Assocs. v. United States*, 48 F.3d 1575 (Fed. Cir. 1995) (affirming dismissal of alleged temporary physical and regulatory takings); *First English*, 482 U.S. 304 (alleged regulatory inverse taking).

955  *See Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 521 (2012) ("temporary limitations are subject to a more complex balancing process [than permanent occupations] to determine whether they are a taking" (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982))).

956  *Otay Mesa Property, L.P. v. United States (Otay Mesa I)*, 670 F.3d 1358, 1365 n.5 (Fed. Cir. 2012) (quoting *Wyatt v. United States*, 271 F.3d 1090, 1097 n.6 (Fed. Cir. 2001)).

valuation, and therefore on the amount of compensation awarded.[957] Indeed, the Supreme Court has held that until it is determined a taking is permanent or temporary, "it would be premature . . . to consider whether the amount of the award . . . was proper." [958] Accordingly, the appraiser must receive appropriate **legal instructions** regarding the precise terms of the property interest(s) to be valued in an alleged inverse taking.

The Supreme Court recently held that recurrent floodings, even if of finite duration (i.e., temporary), are not categorically exempt from Takings Clause liability.[959] Alleged takings of this sort are therefore subject to the same liability and valuation inquiries as other types of inverse takings.[960]

**4.8.**     **Natural Resources Acquisitions.** Property acquisitions involving natural resources—such as minerals, timber, or water rights—are subject to the same valuation standards as any other type of property acquisition.[961] While such acquisitions may present particularly complex valuation problems for purposes of just compensation, "whatever the difficulties may be in making such appraisals with complete accuracy, it does not defeat the existence of a 'market value' . . . and it does not suffice as a reason to depart from the ordinary requirements that the law imposes on such transactions." [962] Moreover, "the degree of speculation can and should be minimized."[963] Specialized expertise is typically required, either by the appraiser or through appropriate subsidiary experts, subject to the requirements discussed in Sections 1.11 and 4.12.[964] Several frequently encountered (and often confused) valuation issues are discussed below.

**4.8.1.**     **Unit Rule and Natural Resources.** The <u>unit rule</u>, discussed in Section 4.2.2, is often misapplied in the valuation of properties with possible or proven natural resources such as minerals, timber, or oil and gas. For just compensation purposes, property must be valued as a whole—not by summation of its constituent parts.[965] Thus, the possible or actual existence of a resource in a property can only be considered to the extent its possible or actual existence would contribute to the market value of the whole property.[966] For example,

---

957   *See, e.g., Otay Mesa I*, 670 F.3d 1358 (rejecting compensation award of approximately $3 million based on erroneous finding of temporary taking), *and on remand*, 110 Fed. Cl. 732 (2013) (*Otay Mesa II*) (awarding $455,520 based on finding of permanent taking), *aff'd*, 779 F.3d 1315 (Fed. Cir. 2015) (*Otay Mesa III*).

958   *Causby*, 328 U.S. at 268.

959   *Ark. Game*, 133 S. Ct. at 515.

960   *Id.* at 519-23.

961   *Mont. Ry. Co. v. Warren*, 137 U.S. 348, 352-53 (1890) (reiterated in *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 628 n.3 (1989)); *United States v. Consol. Mayflower Mines, Inc.*, 60 F.3d 1470, 1477 (10th Cir. 1995).

962   *ASARCO*, 490 U.S. at 628 n.3 (citing *Mont. Ry.*, 137 U.S. at 352-53); *accord. Mayflower Mines*, 60 F.3d at 1476; *see Eagle Lake Improvement Co. v. United States* (*Eagle Lake I*), 141 F.2d 562, 564 (5th Cir. 1944) ("[if] mineral interests . . . are bought and sold in arms-length transactions for a valuable consideration, they have a market price translative into a fair market value").

963   *United States v. 103.38 Acres in Morgan Cty.* (*Oldfield*), 660 F.2d 208, 212 (6th Cir. 1981).

964   *See, e.g., United States v. 100.80 Acres of Land* (*Parrish*), 657 F. Supp. 269, 276 (M.D.N.C. 1987) (rejecting valuation of real estate appraiser whose expertise did not extend to minerals; *see also* USPAP Competency Rule; *cf. United States v. Sowards*, 370 F.2d 87, 92 (10th Cir. 1966) ("owner's qualification to testify does not change the 'market value' concept and permit him . . . to establish a value based entirely upon speculation").

965   *E.g., United States v. 381.76 Acres of Land* (*Montego Group*), No. 96-1813-CV, 2010 WL 3734003 (S.D. Fla. Aug. 3, 2010), *aff'd*, Doc. No. 239 (S.D. Fla. Sept. 22, 2010), *aff'd sub nom. United States v. Gonzalez*, 466 F. App'x 858 (11th Cir. 2012) (unpubl.) (per curiam).

966   *United States v. 499.472 Acres in Brazoria Cty.*, 701 F.2d 545, 549 (5th Cir. 1983); *Oldfield*, 660 F.2d at 212; *United States v. 91.90 Acres of Land in Monroe Cty.* (*Cannon Dam*), 586 F.2d 79, 87 (8th Cir. 1978); *United States v. 158.76 Acres in Townshend*, 298 F.2d 559, 561 (2d Cir. 1962); *Ga. Kaolin Co. v. United States*, 214 F.2d 284, 286 (5th Cir. 1954); *United States v. Meyer*, 113 F.2d 387, 397 (7th Cir. 1940); *United States v. 33.92536 Acres of Land* (*Piza-Blondet Trial Op.*), No. 98-1664, 2008 WL 2550586, at *11 (D.P.R. June 13, 2008), *aff'd*, 585 F.3d 1 (1st Cir. 2009); *United States ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*, 40 F. Supp. 811, 817-18, 822 (E.D. Tenn. 1941); *see Sowards*, 370 F.2d at 91 ("The mere adaptability of the coal deposit to a use does not establish a market."); *accord United States v. Whitehurst*, 337 F.2d 765, 771-72 (4th Cir. 1964); *see also United States v. 22.80 Acres in San Benito Cty.*, 839 F.2d 1362, 1364 n.2 (9th Cir. 1988) (distinguishing taking of "land on which mineral resources are incidentally located" from taking of "the limestone and granite itself, not the overlying parcel of land").

---

[for] land that is underlaid with marketable minerals, . . . the existence of those minerals is a factor of value to be considered in determining the market value of the property, but the landowner is not entitled to have the surface value of the land and the value of underlying minerals aggregated to determine market value.[967]

Indeed, in any given acquisition, it is possible that "the whole property is worth more than, the same as, or even less than the mineral [or other resource] it contains."[968]

**4.8.2.** **Highest and Best Use and Natural Resources.** The mere presence of minerals or other resources in a property does not allow the appraiser to forego a careful analysis of highest and best use (discussed in Section 4.3).[969] "The mere adaptability of [a mineral] deposit to a use does not establish a market."[970] Federal courts require "a showing of some sort of sort of market, poor or good, great or small, for the commodity in question before the quantity and price of the commodity or substance may . . . be used as a factor in the expert's opinion . . . ."[971]

In valuing property with mineral or other subsurface resources, appraisers must carefully distinguish between a highest and best use of mineral *extraction*[972] and a highest and best use of mineral *exploration*.[973] "Where a proffered highest and best use is extraction of some sort of mineral, the landowner must show not only the presence of the mineral in commercially exploitable amounts, but also that a market exists for the mineral that would justify its extraction in the reasonably foreseeable future."[974] For example, a highest and best use of quarrying requires supporting evidence that is

specific as to the suitability and availability of the property for a quarry, considering all factors, such as . . . plant expense, operation expense, transportation, and the presence or reasonable probability of a commercial market, . . . that would have affected the market price of the property on that date.[975]

On the other hand, a highest and best use of mineral exploration requires a reasonable probability that market participants would attempt to explore the property for such a use—and would pay more for property on the date of value with such a prospect than without.[976] That

---

967 *Cannon Dam*, 586 F.2d at 87.

968 *Oldfield*, 660 F.2d at 212; *see, e.g., Cameron Dev. Co. v. United States*, 145 F.2d 209, 210 (5th Cir. 1944) ("The mere physical adaptability of the property to use as a source of supply of shell marl, in the absence of a market for its commercial production, did not effect an increase in its market value.").

969 *Olson v. United States*, 292 U.S. 246, 255, 257 (1934); *see, e.g., United States v. Consol. Mayflower Mines, Inc.*, 60 F.3d 1470, 1476-77 (10th Cir. 1995) (rejecting contention that "the *Olson* standard for considering a use not yet undertaken must be relaxed where the use is the extraction of minerals").

970 *Sowards*, 370 F.2d at 89-90; *accord Whitehurst*, 337 F.2d at 771-72; *Cameron Dev.*, 145 F.2d at 210.

971 *United States v. Land in Dry Bed of Rosamond Lake*, 143 F. Supp. 314, 322 (S.D. Cal. 1956).

972 *E.g., Oldfield*, 660 F.2d at 208; *United States v. 1,629.6 Acres in Sussex Cty.* (*Island Farm II*), 360 F. Supp. 147, 151-53 (D. Del. 1973), *aff'd*, 503 F.2d 764, 766 (3d Cir. 1974); *United States v. Upper Potomac Props. Corp.*, 448 F.2d 913, 914-15 (4th Cir. 1971).

973 *E.g., Mont. Ry. Co. v. Warren*, 137 U.S. 348 (1890); *Mayflower Mines*, 60 F.3d at 1477; *Phillips v. United States*, 243 F.2d 1 (9th Cir. 1957); *Eagle Lake I*, 141 F.2d at 564; *see also United States v. 69.1 Acres* (*Sand Mountain*), 942 F.2d 290, 292-94 (4th Cir. 1991) (highest and best use of holding sand reserves for future development based on "reasonable probability that the sand will be needed and wanted at a near enough point in the future to affect the current value of the property" (emphasis added)).

974 *Sand Mountain*, 942 F. 2d at 292.

975 *United States v. 599.86 Acres of Land in Johnson & Logan Ctys.*, 240 F. Supp. 563, 570 (W.D. Ark. 1965), *aff'd sub nom. Mills v. United States*, 363 F.2d 78 (8th Cir. 1966).

976 *Phillips v. United States*, 243 F.2d 1, 6 (9th Cir. 1957); *Eagle Lake I*, 141 F.2d at 564 ("[if] mineral interests . . . are bought and sold in arms-length transactions for a valuable consideration, they have a market price translative into a fair market value"); *see, e.g., Montana Ry.*, 137 U.S. at 352-53.

reasonable probability can be demonstrated "from the fact that such prospects are the constant subject of barter and sale."[977]

With a proposed highest and best use of holding for future mineral extraction, the *timing* of future use and its *relation to current market value* (i.e., as of the date of valuation) are critical.[978] Similarly, extraction of a mineral or other resource cannot be considered as a highest and best use absent "proof that it would be legally permissible to exploit that resource" in the reasonably near future.[979] Accordingly, the First Circuit recently held that sand extraction could not be considered as a highest and best use because there was no proof of "a reasonable probability that the property would be rezoned or that a variance could have been obtained in the near future" to make sand extraction legally permissible.[980]

Moreover, to prevent confusion, injustice, and improper duplication of value, market value cannot be premised on inconsistent or incompatible uses.[981] Of particular importance in properties with minerals or oil and gas resources, "[t]he fact that the minerals, if any, are located beneath the surface of the parcels condemned cannot be ignored."[982] Thus, while a parcel's surface might be suitable for subdivision purposes and the same parcel's subsurface oil and gas resources suitable for extraction, "[c]ertainly, the surface could not be used for a residential subdivision if oil wells were drilled and producing. These are inconsistent uses."[983] This would not prevent a well-supported determination that different parts of a property have different highest and best uses—as long as those uses are compatible and consistent (for example, residential or commercial use along highway frontage and agricultural use for the rear land).[984] To avoid improper duplication of value, a determination of multiple highest and best uses must not (1) attribute two highest and best uses to the same acres, or (2) accept conflicting and incompatible uses.[985]

> **Market value cannot be premised on inconsistent or incompatible uses. Disregarding this rule is a common error in mineral property valuations.**

### 4.8.3. Valuation Approaches for Mineral Resources.
Under federal law, the sales comparison approach is normally the most reliable approach to value for properties involving minerals.[986]

---

977 *Montana Ry.*, 137 U.S. at 352-53; *Phillips*, 243 F.2d at 6; *Eagle Lake I*, 141 F.2d at 564.

978 *Sand Mountain*, 942 F.2d at 292-94 & n.3; *United States v. 494.10 Acres in Cowley Cty.*, 592 F.2d 1130, 1131-32 (10th Cir. 1979).

979 *United States v. 33.92536 Acres of Land* (*Piza-Blondet Trial Op.*), No. 98-1664, 2008 WL 2550586, at *9 (D.P.R. June 13, 2008), *aff'd*, 585 F.3d 1 (1st Cir. 2009).

980 *United States v. 33.92536 Acres* (*Piza-Blondet*), 585 F.3d 1, 7-8 (1st Cir. 2009).

981 *United States v. 320 Acres of Land*, 605 F.2d 762, 817 n.124 (5th Cir. 1979) ("To the extent that potential uses are inconsistent or incompatible uses, whatever value the land possesses because of its suitability for each of these uses cannot be aggregated in determining fair market value and just compensation."); *United States v. Carroll*, 304 F.2d 300, 306 (4th Cir. 1962); *Eagle Lake Improvement Co. v. United States* (*Eagle Lake II*), 160 F.2d 182, 184 & n.1 (5th Cir. 1947) ("It becomes manifest . . . that separate valuation [of surface rights and mineral rights] . . . would bring about confusion and injustice in condemnation cases. . . . [S]eparate awards . . . might include valuation based on inconsistent uses of the property, and consequent duplication of value."); *see, e.g., United States v. 15.00 Acres in Miss. Cty.*, 468 F. Supp. 310 (E.D. Ark. 1979).

982 *Eagle Lake II*, 160 F.2d at 184 n. 1.

983 *Id.*

984 *E.g., United States v. 179.26 Acres in Douglas Cty.*, 644 F.2d 367, 371 (10th Cir. 1981) (consistent uses of commercial rock quarry and improved livestock and grain farm); *United States v. 1,629.6 Acres in Sussex Cty.* (*Island Farm II*), 360 F. Supp. 147, 152-53 (D. Del. 1973), *aff'd*, 503 F.2d 764, 766 (3d Cir. 1974) ("we affirm on the basis of the district court's fine opinions").

985 *Island Farm II*, 360 F. Supp. at 153.

986 *United States v. 24.48 Acres of Land*, 812 F.2d 216, 218 (5th Cir. 1987); *Cloverport Sand & Gravel Co. v. United States*, 6 Cl. Ct. 178, 189 (1984); *United States v. 103.38 Acres of Land in Morgan Cty.* (*Oldfield*), 660 F.2d 208, 212 (6th Cir. 1981) ("the value of the coal in place would be fully reflected in the sale price of comparable properties"); *United States v. Upper Potomac Props. Corp.*, 448 F.2d 913, 916-18 (4th Cir. 1971); *see United States v. Sowards*, 370 F.2d 87, 89-90 (10th Cir. 1966); *United States v. Whitehurst*, 337 F.2d 765, 775-76 (4th Cir. 1964).

As a result, in federal acquisitions the appraiser cannot default to using an income approach or other valuation method that may be acceptable for typical industry purposes.[987] Indeed, both federal courts and industry professionals have criticized valuations of mineral property for just compensation purposes that improperly disregard the sales comparison approach.[988] An unsupported statement that comparable sales do not exist is insufficient.[989] Moreover, in appraising property involving minerals, "[e]lements of sales of quite distant properties, even those with different mineral content, may be comparable in an economic or market sense when due allowance is made for variables."[990] Significant variables or elements for mineral properties may include location (relative to market demand, processing facilities, transportation options, etc.), certainty (e.g., proven or unproven deposits), mineral content or type, mineral quality, mineral quantity, and zoning or permitting status.[991] The sales comparison approach and comparability generally are discussed in Section 4.4.2.

Use of the sales comparison approach requires the appraiser to determine the appropriate <u>unit of comparison</u> (per acre, per square foot, etc.). The unit of comparison should generally reflect that used by market participants. Regardless of what unit of comparison is selected, however, "arriving at a valuation by multiplying an assumed quantity of mineral reserves by a unit price is almost universally disapproved by the courts."[992]

Under certain circumstances, it may be appropriate to apply the income capitalization approach to value mineral properties. As discussed in Section 4.4.4, the income approach involves capitalizing a property's anticipated net income to derive an indication of its present market value. This approach cannot be used as a stand-alone approach to value if comparable sales are available.[993] Even if comparable sales are lacking, however, federal courts have repeatedly held that the income approach can be used only with great caution for purposes of just compensation. As the Eighth Circuit warned:

> **If comparable sales are not available, use of the <u>income capitalization approach</u> may be appropriate in valuing mineral property. When applying this approach to mineral properties, <u>yield capitalization</u> techniques (e.g. discounted cash-flow [DCF] analysis) are typically more appropriate than <u>direct capitalization</u> techniques.**

> Great care must be taken, or such valuations can reach wonderland proportions. It is necessary to take into consideration manifold and varied factors, like future supply and demand, economic conditions, estimates of mineral recoverability, the value of currency, changes in the

---

987  *Foster v. United States*, 2 Cl. Ct. 426, 448-455 (1983); *Upper Potomac*, 448 F.2d at 917.
988  *See, e.g., United States v. Am. Pumice Co.*, 404 F.2d 336, 336-37 (9th Cir. 1968) (rejecting assumption that mineral properties could rarely be comparable to one another unless nearly adjacent), *modifying in relevant part United States v. 237,500 Acres in Inyo & Kern Ctys.*, 236 F. Supp. 44, 51 (S.D. Cal. 1964); *Whitehurst*, 337 F.2d at 775 (finding valuation that ignored or rejected comparable sales evidence in valuing alleged mineral property was "grossly mistaken"); A.K. Stagg, P.G., A.I.M.A., *Federal Condemnation and Takings – A Journey Down the Yellow Book Road*, to Soc'y of Mining, Metallurgy, & Exploration, Inc. (Denver, Colo., March 1, 2011) (noting "predisposition on the part of many mineral appraisers to believe that the sales comparison approach simply cannot be used" and stating that sales comparison approach "can be used quite adequately in mineral appraisals, albeit, perhaps, with a little extra effort involved"); *see generally* Trevor R. Ellis, *Sales Comparison Valuation of Development and Operating Stage Mineral Properties*, MINING ENG'G 89 (April 2011).
989  *See, e.g., Whitehurst*, 337 F.2d at 770-72.
990  *Foster*, 2 Cl. Ct. at 448; *accord Am. Pumice*, 404 F.2d at 336-37.
991  *United States v. 100.80 Acres of Land* (*Parrish*), 657 F. Supp. 269, 276 n.13 (M.D.N.C. 1987); *Am. Pumice*, 404 F.2d at 336-37; *Foster*, 2 Cl. Ct. at 448-55; *see United States v. 33.92356 Acres* (*Piza-Blondet*), 585 F.3d 1 (1st Cir. 2009) (affirming exclusion of highest and best use of sand extraction without evidence of reasonable probability permit could be obtained).
992  *Cloverport*, 6 Cl. Ct. at 188.
993  *E.g., Whitehurst*, 337 F.3d at 770-72; *see United States v. 24.48 Acres of Land*, 812 F.2d 216, 218 (5th Cir. 1987).

marketplace, and technological advances. Many of these factors are impossible to predict with reasonable accuracy.[994]

Similarly, the Fourth Circuit observed, valuations of mineral property based on the income capitalization approach "almost always achieve chimerical magnitude, because, in the mythical business world of income capitalization, nothing ever goes wrong. There is always a demand; prices always go up; no competing material displaces the market."[995] As a result, the Fourth Circuit concluded, "to allow value to be proved in such a suspect manner, *impeccably objective and convincing evidence* is required."[996] Stated another way, "failure to anchor assumptions to information corroborated by demonstrable facts renders the computations mathematical exercises unrelated to reality."[997]

As discussed in Section 4.4.4, the income capitalization approach may include direct capitalization or yield capitalization techniques.[998] When applicable to mineral properties, yield capitalization is generally the more appropriate of these two techniques, and typically involves a discounted cash-flow (DCF) analysis.[999] The income capitalization approach requires a distinction between income generated by the property itself (the <u>royalty income</u> in producing mining properties), which can be considered, and income generated by a business conducted on the property (i.e., a mining enterprise), which must be disregarded.[1000] For this reason, the income capitalization approach is sometimes called the <u>royalty income approach</u> when applied to mineral properties.

Every factor considered in an income capitalization approach must be properly supported.[1001] In DCF analysis, one of the most critical factors is the selection of the <u>discount rate</u>, which should be derived from and supported by direct market data.[1002] Because the market value measure of just compensation is intended "to duplicate marketplace calculations to the greatest possible extent[,]"[1003] courts have rejected income capitalization without evidence that "rates are in fact fixed in the marketplace by a process which parallels [the expert's] calculations."[1004]

---

994  *United States v. 47.14 Acres of Land*, 674 F.2d 722, 726 (8th Cir. 1982).

995  *United States v. 69.1 Acres of Land* (*Sand Mountain*), 942 F.2d 290, 293-94 (4th Cir. 1991).

996  *Id.* at 294; *United States ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*, 40 F. Supp. 811, 822 (E.D. Tenn. 1941) ("It would require the enumeration of every cause of business disaster to point out the fallacy of using this method of arriving at just compensation.").

997  *Foster*, 2 Cl. Ct. at 451 ("Although the calculation may be internally consistent, the capitalization of income approach frequently does not produce reasonably persuasive evidence of value.").

998  *Direct capitalization* techniques apply an overall capitalization rate to a property's single-year net income. *Yield capitalization* techniques typically use a discounted cash-flow (DCF) analysis to evaluate varying forecasted income or expenses. *See* Section 4.4.4 (Income Capitalization Approach).

999  *Whitney Benefits v. United States*, 18 Cl. Ct. 394, 408 (1989); *Foster*, 2 Cl. Ct. at 448-49.

1000  *Cloverport*, 6 Cl. Ct. at 191; *see United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 403 n.6 (1949); *see generally* Section 4.4.4 (Income Capitalization Approach).

1001  *47.14 Acres*, 674 F.2d at 726; *United States v. 103.38 Acres of Land in Morgan Cty.* (*Oldfield*), 660 F.2d 208, 214-15 (6th Cir. 1981) (requiring "evidence derived from or demonstrably related to the actual market" as "essential characteristics"); *Whitehurst*, 337 F.2d at 771-74; *United States v. 158.76 Acres of Land in Townshend*, 298 F.2d 559, 561 (2d Cir. 1962); *see, e.g.*, *United States v. 25.202 Acres of Land* (*Amexx I*), 860 F. Supp. 2d 165, 176-78 (N.D.N.Y. 2010), *aff'd*, 502 F. App'x 43, 45 (2d Cir. 2012) (noting lower court's "thorough report exposing the unreliability of the expert's methods"); *see also United States v. Sowards*, 370 F.2d 87, 90-92 (10th Cir. 1966); *Likins-Foster Monterey Corp. v. United States*, 308 F.2d 595, 597-99 (9th Cir. 1962), *aff'g United States v. Certain Interests in Prop. in Monterey Cty.*, 186 F. Supp. 167 (N.D. Cal. 1960); *United States v. Leavell & Ponder, Inc.*, 286 F.2d 398, 406-08 (5th Cir. 1961).

1002  *Prop. in Monterey*, 186 F. Supp. at 170; *see also Leavell & Ponder*, 286 F.2d at 407; *158.76 Acres in Townshend*, 298 F.2d at 561.

1003  *Oldfield*, 660 F.2d at 212; *see Cementerio Buxeda, Inc. v. Puerto Rico*, 196 F.2d 177, 181 (1st Cir. 1952) (allowing consideration of income and expense figures that "are factors which would be considered by a prospective buyer").

1004  *Oldfield*, 660 F.2d at 214 ("The fatal flaw in the owners' . . . method is its lack of demonstrable relationship with this 'real' market . . . .").

**4.8.4.    Timber.** The sales comparison approach is also typically the most reliable approach to value for properties involving timber.[1005] Appraising property with a potential highest and best use for timber production typically requires special expertise and analysis, including a *timber cruise* to inventory the timber involved, evaluation of logging conditions, and investigation of potential timber sales.[1006] Such information may be particularly useful as a "check" on the appraiser's estimate of contributory timber values gleaned from comparable sales and other market data.[1007] But it is never appropriate to simply add timber value to land value to determine the market value of the property as a whole.[1008]

Important considerations in valuing timber properties may include the quantity and quality of merchantable timber, topography, and feasible logging methods.[1009] In addition, applicable local, state, and federal laws may significantly affect the value of forested properties and must be considered in valuations for federal acquisitions. For example, the Ninth Circuit held that "in appraising privately owned forest land in California, . . . evaluation witnesses must determine the highest and best use of the land in a manner that is not violative of the Forest Practice Act of the State of California."[1010]

**4.8.5.    Water Rights.** Water rights may have a substantial impact on the uses to which property can be put and, as a result, on market value.[1011] The laws governing water rights vary significantly by state, county, or other local jurisdiction. Water-rights law may also be an important consideration in determining liability in inverse takings.[1012] Applicable water laws must be taken into account in determining market value for purposes of just compensation,[1013] and appropriate **legal instructions** may be required.

State laws on surface water rights generally follow one of three systems. In most Eastern states, water law is based on the doctrine of riparian rights. Broadly, water rights are allocated to owners of riparian land—that is, land adjacent to a body of water. Various laws in riparian-doctrine states regulate *reasonable use* to protect other riparian owners. In most Western states, where the water supply is more limited, water law is based on a prior appropriation system. Under this "first in time, first in right" concept, water rights are allocated based on when a person puts a quantity of water to actual *beneficial use*, regardless of whether that person owns riparian land. Finally,

---

1005 *United States v. 2,175.86 Acres in Hardin & Jefferson Ctys.*, 687 F. Supp. 1079, 1085-86 (E.D. Tex. 1988), on remand from *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1 (1984).

1006 E.g., *United States v. 15.00 Acres of Land in Miss. Cty.*, 468 F. Supp. 310, 313 & n.6 (E.D. Ark. 1979); *2,175.86 Acres in Hardin & Jefferson*, 687 F. Supp. at 1085-86.

1007 E.g., *2,175.86 Acres in Hardin & Jefferson*, 687 F. Supp. at 1085-87.

1008 *Id.* at 1086-87; *see generally* Section 4.2.2.

1009 E.g, *Ga.-Pac. Corp. v. United States*, 640 F.2d 328, 345-46 (Ct. Cl. 1980) (per curiam); *2,175.86 Acres in Hardin & Jefferson*, 687 F. Supp. at 1085-87.

1010 E.g., *Scott Lumber Co. v. United States*, 390 F.2d 388, 395-96 (9th Cir. 1968); *see also United States v. 320 Acres of Land*, 605 F.2d 762, 818-19 & n. 128 (5th Cir. 1979) (legal framework affecting uses of property must be taken into account).

1011 E.g, *Wilson v. United States*, 350 F.2d 901, 908 (10th Cir. 1965) (rejecting proposed use of hay production through projected irrigation installations because of "question[able] feasibility of the development of some of the lands for which water rights were pending") (citing *Olson v. United States*, 292 U.S. 246, 255 (1934)); *see United States v. 46,672.96 Acres in Doña Ana Ctys.*, 521 F.2d 13, 14-15 (10th Cir. 1975) (noting evidence that value of properties with potential uses of grazing purposes, rural homesites, recreational sites or roadside businesses "depend[ed] on availability of water and roads").

1012 *Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 522 (2012) (noting that bearing of Arkansas water-rights law on whether taking occurred should be addressed on remand).

1013 *See, e.g., United States v. 320 Acres of Land*, 605 F.2d 762, 818-19 & n.128 (5th Cir. 1979) (legal framework affecting uses of property must be taken into account). Note that this is not an exception to the rule that federal, not state, law controls. *Scott Lumber Co.*, 390 F.2d at 395-96 (rejecting valuation based on proposed highest and best use that violated state law); *see* Section 4.1.

---

several Western states (including California, Texas, and Oklahoma) originally recognized riparian rights but later incorporated an appropriation system, creating a <u>hybrid system</u> with both riparian and appropriation elements. Beyond these three surface-water-rights systems, unique variations apply in Hawaii and Louisiana, and pueblo water rights affect a few places in the Southwest. Groundwater rights in the United States are generally allocated based on ownership of overlying land, prior appropriation, or state management.[1014]



Special rules regarding riparian lands adjacent to navigable waters and the federal navigational servitude are discussed in Section 4.11.1.

**4.9.**     **Inverse Takings.** Most valuation assignments under these Standards involve intentional acquisitions, in which the United States purposely seeks to acquire property (by negotiated purchase, exchange, or eminent domain). But actions of the United States may also result in its taking property without intending to do so. In such a situation, called an <u>inverse taking</u> (or <u>inverse condemnation</u>), a landowner can sue the United States for compensation.[1015] Inverse takings claims involve important legal and practical differences from other types of federal acquisitions.[1016]

The most significant difference between an inverse taking claim and a direct condemnation or other affirmative acquisition is the threshold question of liability: In filing a direct condemnation, the United States expressly acknowledges the actual or proposed property acquisition and its obligation to pay compensation. In an inverse taking claim, on the other hand, the United States may contest the landowner's claim that a taking occurred for which just compensation must be paid under the Fifth Amendment.[1017] Accordingly, in an inverse taking claim, the court must

---

1014 *See generally United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 742-55 (1950) (exploring development of water law systems in the United States generally and California in particular); *cf.* DAVID H. GETCHES ET AL., WATER LAW IN A NUTSHELL (5th ed. 2015).

1015 The U.S. Court of Federal Claims has exclusive jurisdiction over inverse takings claims exceeding $10,000 under the Tucker Act. 28 U.S.C. § 1491. Federal district courts have concurrent jurisdiction for claims for $10,000 or less. 28 U.S.C. § 1346(a)(2) (the "Little Tucker Act"). These statutes waive sovereign immunity, allowing the United States to be sued, in recognition of the fact that unintended takings may occur despite federal agencies' efforts to avoid them. *Cf.* Uniform Act, 42 U.S.C. § 4651(8) ("No Federal agency head shall intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the taking of his real property."); 49 C.F.R. § 24.102(*l*) ("If the Agency intends to acquire any interest in real property by exercise of the power of eminent domain, it shall institute formal condemnation proceedings and not intentionally make it necessary for the owner to institute legal proceedings to prove the fact of the taking of the real property."); *see also Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 6 (1984) (noting Uniform Act "enjoins federal agencies . . . to attempt to acquire property by negotiation rather than condemnation, and whenever possible not to take land by physical appropriation").

1016 *See United States v. Clarke*, 445 U.S. 253, 255 (1980).

1017 The United States can also concede liability as appropriate. *E.g.*, *Otay Mesa Property, L.P. v. United States* (*Otay Mesa III*), 779 F.3d 1315 (Fed. Cir. 2015).

first determine whether a taking occurred for which just compensation must be paid. If so, the case can then proceed to the compensation phase to determine what amount of compensation is due. Appraisers may be retained to develop opinions in connection with the liability phase, the compensation phase, or both.

The liability inquiry will vary depending on the nature of the inverse taking claim. The issue is rather straightforward if the government's action resulted in the government's permanent physical occupation of the land in question.[1018] But "[i]n view of the nearly infinite variety of ways in which government actions or regulations can affect property interests, the Court has recognized few invariable rules in this area."[1019] In regulatory takings claims, the federal courts have developed various tests to determine whether a taking has occurred: the character of the government action; the extent to which the regulation interferes with distinct, investment-backed expectations; and the economic impact of the regulation.[1020] These distinct inquiries may alter the appropriate considerations (as well as the terminology) for determining the larger parcel for liability purposes in inverse takings claims, as discussed in Section 4.3.4.8.

If the court finds that a compensable taking occurred, litigation will proceed to the compensation phase, in which the standard valuation rules apply. Generally, the appraiser will be asked to develop opinions of the market value of the affected property before and after the taking. As discussed in Section 4.2.1.1, the date of value is typically the date of taking, which should be provided by legal counsel.

## 4.10. Land Exchanges.

Federal land exchanges are voluntary real estate transactions between the United States and a nonfederal landowner. The parties must agree on the market value of the properties being exchanged, and neither the United States nor a nonfederal landowner is required to participate in an exchange.[1021] Nevertheless, federal land exchanges may still result in litigation relating to the valuation of the property involved and/or the adequacy of the appraisal supporting the transaction.[1022] Most federal land exchanges are authorized under the Federal Land Policy and Management Act of 1976 (FLPMA).[1023] Exchanges can be initiated by any party. By law, for an exchange to occur the public interest must be well served, and the estimated value of the nonfederal land must be within 25 percent of the estimated value of the federal land, among other requirements.[1024] Some land exchanges are specifically legislated by Congress, sometimes with special provisions that differ from the usual federal exchange process.[1025]

---

1018 *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 (1982) ("[A] permanent physical occupation is a government action of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine.").

1019 *Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 518 (2012).

1020 *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

1021 In contrast, direct acquisitions, while often voluntary, may involve at least a possibility that the government can exercise the power of eminent domain to take property for a public purpose with payment of just compensation.

1022 *E.g.*, *Greer Coal., Inc. v. U.S. Forest Serv.*, 470 F. App'x 630 (9th Cir. 2012) (unpubl.); *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.* (*NPCA v. BLM*), 606 F.3d 1058 (9th Cir. 2010); *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000). Litigation also arises over the determination that an exchange is in the public interest, and agency environmental compliance. *E.g.*, *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633 (9th Cir. 2010); *Lodge Tower Condo. Ass'n v. Lodge Props., Inc.*, 85 F.3d 476 (10th Cir. 1996), *aff'g* 880 F. Supp. 1370 (D. Colo. 1995).

1023 43 U.S.C. §§ 1701-1785 (2012).

1024 43 U.S.C. § 1716.

1025 *See, e.g.*, Mt. St. Helens National Volcanic Monument Act, Pub. L. No. 97-243, 96 Stat. 301 (1982), 16 U.S.C. § 431 note (1982) (repealed 2014).

Federal land exchanges are subject to the same valuation requirements as other types of federal acquisitions. In fact, federal regulations specifically require appraisals in many federal land exchanges to comply with these Standards.[1026] But special **legal instructions** may be necessary due to statutory or regulatory requirements for land exchanges. Special rules commonly dictate the larger parcel determination, reflecting federal statutes and agency regulations.[1027] The appraiser must also obtain instructions regarding the appropriate date of valuation,[1028] which may be negotiated by the parties involved in the exchange in accordance with agency regulations[1029] or dictated by statute.[1030] For example, following the volcanic eruption at Mount St. Helens in 1980, Congress authorized the acquisition of lands by donation or exchange in what is now the Mount St. Helens National Volcanic Monument.[1031] Most of these acquisitions required appraisal of the properties' current market value, but the statute expressly provided for timber acquisitions to be valued as of July 1, 1982, in recognition of rapid deterioration of timber in the area.[1032]

As in other types of acquisitions, analysis of a property's highest and best use is critical in appraising property for federal land exchanges.[1033] As discussed in Section 4.3.2, a property's existing use is normally its highest and best use on the date of value because "economic demands normally result in an owner's putting his land to the most advantageous use."[1034] But federal lands typically involve other considerations: as the Supreme Court observed over a century ago, "property may have to the public a greater value than its fair market value . . . ."[1035] As a practical matter, then, the federal lands to be exchanged likely are not being put to their highest and best use on the date of value,[1036] while the nonfederal party's proposed use may well be a feasible highest and best use that must be considered.[1037] For this reason, a nonfederal party's proposed use, if reasonably probable, must be analyzed as a part of the highest and best use determination.[1038] As with any possible highest and best use, neither an existing federal use nor a nonfederal party's proposed use can be considered unless there is competitive demand for that use in the private market.[1039] And of course, any proposed use, no matter how probable or

---

1026 *See, e.g.*, *NPCA v. BLM*, 606 F.3d at 1066 (citing 43 C.F.R. § 2201.3).

1027 *See* Section 4.3.3.

1028 *See Greer Coal., Inc. v. U.S. Forest Serv.*, 470 F. App'x 630, 636 (9th Cir. 2012) (unpubl.) ("an exchange is concerned with the relative value of two sets of property rather than the absolute value of either"); *see generally* Section 4.2 (discussing date of valuation).

1029 *See, e.g.*, *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1185 (9th Cir. 2000); *cf.* 43 U.S.C. § 1716(d).

1030 *See Mt. St. Helens Mining & Recovery Ltd. P'ship v. United States*, 384 F.3d 721, 729 (9th Cir. 2004) (noting date of valuation for specific acquisitions set by statute).

1031 Mt. St. Helens National Volcanic Monument Act, Pub. L. No. 97-243, 96 Stat. 301 (1982), 16 U.S.C. § 431 note (1982) (repealed 2014).

1032 *Mt. St. Helens Mining*, 384 F.3d at 729; Pub. L. No. 97-243, § 3(b); 36 C.F.R. § 254.9(b) (2015).

1033 *See* Section 4.3.

1034 *United States v. Buhler*, 305 F.2d 319, 328 (5th Cir. 1962); *see* Section 4.3.2.1.

1035 *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 80 (1913).

1036 *See United States v. Weyerhaeuser Co.*, 538 F.2d 1363, 1366-67 (9th Cir. 1976) ("[G]overnment projects may render property valuable for a unique purpose."); *see, e.g.*, *United States v. 46,672.96 Acres of Land in Doña Ana Ctys.*, 521 F.2d 13, 15-16 (10th Cir. 1975) ("absolutely no evidence that anyone other than the government could or would use the land for a missile range"); *cf. United States v. 320 Acres of Land*, 605 F.2d 762, 783 n.26 (5th Cir. 1979) ("[T]he use which the Government proposes to devote the property to should not be considered unless the private owners could also reasonably devote the property to that use.").

1037 *See, e.g.*, *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.* (*NPCA v. BLM*), 606 F.3d 1058, 1066-69 (9th Cir. 2010); *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1181-85 (9th Cir. 2000).

1038 *Desert Citizens*, 231 F.3d at 1181; *accord NPCA v. BLM*, 606 F.3d at 1067-68; *see* Section 4.3.

1039 *Chandler-Dunbar*, 229 U.S. at 80-81; *compare NPCA v. BLM*, 606 F.3d at 1067-68 (noting "obvious and well-known presence of competing . . . proposals" for nonfederal party's proposed use), *and Desert Citizens*, 231 F.3d at 1185 (noting "regional market and the presence of competitors" pursuing similar projects to nonfederal party's proposed use), *with Doña Ana*, 521 F.2d at 16 ("no basis whatsoever for considering that the highest and best use was for a missile range" without "evidence that anyone other than the government could or would use the land for [that purpose]"), *and J.A. Tobin Constr. Co. v. United States*, 343 F.2d 422, 425 (10th Cir. 1965) ("there was no market for an ordinary commercial quarry in the area involved"); *see 320 Acres*, 605 F.2d at 811 n.107 ("[T]he use must be one which a *private* owner might reasonably develop or enjoy." (emphasis added)).

profitable, is to be considered only "to the full extent that the prospect of demand for the use affects market value."[1040]

4.11.   **Special Rules.** Federal acquisitions of certain types of property involve special valuation rules to comply with constitutional or specific statutory provisions. The special valuation rules discussed in Section 4.11.1 (Riparian Lands [Navigation Servitude]) and Section 4.11.2 (Federal Grazing Permits) arise from the general principle that the United States is not compelled to compensate "for elements of value that the Government has created, or that it might have destroyed under the exercise of governmental authority other than the power of eminent domain."[1041] In the words of Justice Jackson: "Such losses may be compensated by legislative authority, not by force of the Constitution alone."[1042] Specifically, Section 4.11.1 addresses the valuation of property involving the federal navigation servitude over waters of the United States. This section also explains special valuation requirements for partial and total acquisitions under 33 U.S.C. § 595a, which authorizes compensation for certain elements beyond what the Fifth Amendment requires.[1043] Section 4.11.2 discusses the valuation of property involving federal grazing permits, which are administered primarily by the U.S. Forest Service and the Bureau of Land Management.[1044] Section 4.11.3, on the other hand, discusses the application of the standard valuation rules to special types of property, guided by the principles of fairness and indemnity underlying the Fifth Amendment.[1045] Valuation issues arising in inverse taking claims under the National Trails System Act and Amendments[1046] are also addressed, as well as the substitute-facility form of compensation.

4.11.1.   **Riparian Lands and the Federal Navigational Servitude.** Special valuation rules apply in acquisitions affected by the navigational servitude, a dominant federal easement over the nation's navigable waters.[1047] Arising under the U.S. Constitution, the federal navigation servitude is a preexisting limitation on the ownership of the flow of navigable waters and underlying streambeds.[1048] This has important ramifications for the compensation due not only for navigable waters, which encompass the entire streambed up to the high-water mark, but also for riparian fast lands (upland) lying above the high-water mark.[1049] In addition, by federal

---

1040 *Olson v. United States*, 292 U.S. 246, 255 (1934).

1041 *United States v. Fuller*, 409 U.S. 488, 492 (1973) (citing *United States v. Rands*, 389 U.S. 121 (1967), *United States v. Twin City Power Co.*, 350 U.S. 222 (1956), and *United States v. Commodore Park, Inc.*, 324 U.S. 386 (1945)).

1042 *United States v. Willow River Power Co.*, 324 U.S. 499, 510 (1945); *accord Fuller*, 409 U.S. at 494 ("Congress may, of course, provide in connection with condemnation proceedings that particular elements of value or particular rights be paid for even though in the absence of such provision the Constitution would not require payment."); *cf. United States v. Bodcaw Co.*, 440 U.S. 202, 204 (1979) ("such compensation is a matter of legislative grace rather than constitutional command").

1043 Rivers and Harbors Act of 1970 § 111, 33 U.S.C. § 595a (2012); *see United States v. 30.54 Acres of Land in Greene Cty.* (*Filiaggi*), 90 F.3d 790, 793-94, 794 n.3 (3d Cir. 1996).

1044 Taylor Grazing Act of 1934, 43 U.S.C. § 315(b) (2012); Granger-Thye Act of 1950, 16 U.S.C. § 580l (2012).

1045 *See United States v. 50 Acres of Land* (*Duncanville*), 469 U.S. 24, 30 (1984); *United States v. 564.54 Acres of Land* (*Lutheran Synod*), 441 U.S. 506, 517 (1979); *see also United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 281 (1943) ("it is the owner's loss, not the taker's gain, which is the measure of just compensation").

1046 National Trails System Act, 16 U.S.C. §§ 1241-51 (2012); *see* 1983 Amendments, Pub. L. No. 98-11, 97 Stat. 48 (railbanking provisions).

1047 *See United States v. Rands*, 389 U.S. 121, 122-23 (1967); *Gilman v. City of Philadelphia*, 70 U.S. 713, 724-25 (1865); *Gibbons v. Ogden*, 22 U.S. 1, 189-93 (1824); *United States v. 30.54 Acres of Land in Greene Cty.* (*Filiaggi*), 90 F.3d 790, 795 (3d Cir. 1996). A servitude is an easement or other legal right to limited use of property without possession of it. *See* Section 4.6.5 (Easement Valuation Issues).

1048 *United States v. Twin City Power Co.*, 350 U.S. 222, 227 (1956); *see Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1028-29 (1992); *United States v. Cherokee Nation*, 480 U.S. 700, 707 (1987); *Rands*, 389 U.S. at 123; *United States v. Commodore Park Inc.*, 324 U.S. 386, 391 (1945); *United States v. Chi., M., St. P. & P. R. Co.*, 312 U.S. 592, 597 (1941); *Scranton v. Wheeler*, 179 U.S. 141, 163 (1900).

1049 *Rands*, 389 U.S. at 122-26; *see United States v. Willow River Power Co.*, 324 U.S. 499, 509 (1945); *see also United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 628-29 (1961); *cf. Cherokee Nation*, 480 U.S. at 704; *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979) ("fast lands"); *Scranton*, 179 U.S. at 163 ("upland").

statute, Congress has increased compensation above what the Constitution requires in certain acquisitions of fast lands.[1050] These constitutional and statutory requirements establish when market value due to a property's access to or use of navigable waters can be considered, and when it must be disregarded, in appraisals for federal acquisitions relating to navigation.

**Origins of the Navigational Servitude.** Although the federal navigation servitude affects compensation under the Fifth Amendment, it arises from Congress' power to regulate commerce under Article I of the U.S. Constitution.[1051] "Commerce includes navigation"[1052]—and so the Commerce Clause "confers a unique position upon the Government in connection with navigable waters."[1053] As a result, the great inland waterways have long been deemed national assets rather than the private property of riparian owners: they are "the public property of the nation."[1054] And while lands adjacent to or beneath navigable waters may be owned by states or individuals, their ownership "is always subject to the servitude in respect of navigation created in favor of the federal government by the constitution."[1055]

The Commerce Clause "speaks in terms of power, not of property."[1056] The navigational servitude "encompasses the exercise of this federal power with respect to the stream itself and the lands beneath and within its high-water mark."[1057] Accordingly, when the United States properly exercises its navigational servitude, no property is taken within the meaning of the Fifth Amendment, and no compensation is due.[1058]

**Navigable Waters.** While the term navigable waters is significant in different areas of the law, only its meaning in the context of the navigational servitude is relevant here.[1059] The basic

---

1050 See 33 U.S.C. § 595a (codifying Section 111 of the Rivers and Harbors Act of 1970); see also United States v. Gerlach Live Stock Co., 339 U.S. 725, 739-42 (1950); cf. United States v. Fuller, 409 U.S. 488, 494 (1973) ("Congress may, of course, provide . . . that particular elements of value or particular rights be paid for even though in the absence of such provision the Constitution would not require payment.").

1051 U.S. Const. art. 1, § 8, cl. 3 ("Congress shall have power . . . [t]o regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes"); see Twin City Power, 350 U.S. at 224-25.

1052 Gilman, 70 U.S. at 724; accord Gibbons, 22 U.S. at 190 ("All America understands, and has uniformly understood, the word 'commerce,' to comprehend navigation. It was so understood, and must have been so understood, when the constitution was framed. The power over commerce, including navigation, was one of the primary objects for which the people of America adopted their government, and must have been contemplated in forming it."); see United States v. Appalachian Elec. Power Co., 311 U.S. 377, 426-27 (1940).

1053 Rands, 389 U.S. at 123; accord Cherokee Nation, 480 U.S. at 704.

1054 Gilman, 70 U.S. at 725 ("For [navigation] purposes, Congress possesses all the powers which existed in the States before the adoption of the national Constitution, and which have always existed in the Parliament in England."); see United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 69 (1913) ("that the running water in a great navigable stream is capable of private ownership is inconceivable").

1055 Gibson v. United States, 166 U.S. 269, 272 (1897); see Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1028-29 (1992) ("a pre-existing limitation upon the land owner's title"); Rands, 389 U.S. at 123 ("a power to which the interests of riparian owners have always been subject"); Scranton v. Wheeler, 179 U.S. 141, 163 (1900); see also Lambert Gravel Co. v. J.A. Jones Constr. Co., 835 F.2d 1105, 1112 (5th Cir. 1988); cf. Ronald C. Allen, Federal Evaluation of Riparian Property: Section 111 of the Rivers and Harbors Act of 1970, 24 Me. L. Rev. 175, 197-98 (1972) ("[The] servitude exemplifies the only clear cut instance when we as a nation have maintained a common property right exclusively for common benefit when needed.").

1056 Twin City Power, 350 U.S. 222, 225 (1956); accord United States v. Certain Parcels in Valdez, 666 F.2d 1236, 1238 (9th Cir. 1982).

1057 United States v. Va. Elec. & Power Co., 365 U.S. 624, 628 (1961). Federal courts have used the terms high-water mark and ordinary high-water mark interchangeably in describing the boundary of the federal navigational servitude. Banks v. United States, 71 Fed. Cl. 501, 506 (2006) (noting both terms "refer to the same boundary" despite "any distinction in nomenclature" and citing cases).

1058 Cherokee Nation, 480 U.S. at 704; Rands, 389 U.S. at 123; United States v. Kan. City Life Ins. Co., 339 U.S. 799, 804 (1950); see Lucas, 505 U.S. at 1028-29; United States v. 30.54 Acres of Land in Greene Cty. (Filiaggi), 90 F.3d 790, 795 (3d Cir. 1996) ("Exercise of the servitude did nothing more than realize a limitation always inherent in the landowners' title. It was not a taking."); Pub. Util. Dist. No. 1 v. City of Seattle, 382 F.2d 666, 669 (9th Cir. 1967) ("[T]he navigational servitude, by its nature, does not destroy or exclude all property rights in the beds and banks of navigable streams. Such rights continue to exist but are held subject to the governmental power in the nature of an easement.").

1059 See Kaiser Aetna v. United States, 444 U.S. 164, 170-79 (1979); see also PPL Montana, LLC v. Montana 132 S. Ct. 1215, 1228-29 (2012); The Propeller Genesee Chief v. Fitzhugh, 12 How. 443, 454-57 (1851) (exploring inadequacy of English common-law concept of navigable waters, based on ebb and flow of tide, for American geography); Kaiser Aetna, 444 U.S. at 182-83 (Blackmun, J., dissenting) (discussing same); cf. Rapanos v. United States, 547 U.S. 715 (2006) (construing "navigable waters" and "waters of the United States" as used in Clean Water Act); Tundidor v. Miami-Dade Cty., 831 F.3d 1328, 1333 (11th Cir. 2016) (citing cases).

standard is <u>navigability in fact</u>.[1060] Waterways are "navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce."[1061] But this threshold question is not the end of the inquiry: for purposes of compensation under the Fifth Amendment, "the Supreme Court has rejected a mechanical test imposing the [navigational] servitude on all waters navigable in fact."[1062] Thus, whether the navigational servitude applies under federal law to a specific body of water that is navigable in fact must be determined on a case-by-case basis.[1063] Arising mainly (but not only) in inverse takings claims, this determination cannot be made by the appraiser; **legal instructions** are required.[1064]

**Scope of the Navigational Servitude.** The navigational servitude extends "to the entire bed of a stream, which includes the lands below ordinary high-water mark."[1065] It "applies to *all* holders of riparian and riverbed interests."[1066] Accordingly, property within the bed of a navigable stream is always subject to the potential exercise of the navigational servitude.[1067] And while the navigational servitude does not extend beyond the high-water mark, it does affect the compensation for fast lands acquired by the United States in connection with navigation.[1068]

Whether the federal project prompting an acquisition is related to navigation is determined by Congress or the agency officials to whom Congress has delegated this authority—primarily the U.S. Army Corps of Engineers.[1069] "If the interests of navigation are served, it is constitutionally irrelevant that other purposes may also be advanced."[1070] Accordingly, "[o]nce Congress determines that an action will improve or protect navigation, the Government may rely on the navigation servitude to accomplish that action."[1071] And federal courts have repeatedly held that proper exercise of the navigation servitude stems from the purposes of the federal project as a whole rather than the immediate facts of a specific acquisition.[1072] Indeed, the United States may "block navigation at one place to foster it at another."[1073]

Congress may also decide not to assert the navigational servitude in a specific acquisition or project—in other words, Congress may authorize payment of compensation above what the

---

1060  E.g., *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 406 & n.21 (1940); *see Kaiser Aetna*, 444 U.S. at 175.

1061  *The Daniel Ball*, 77 U.S. 557, 563 (1870); *see Arizona v. California*, 283 U.S. 423, 452 n.2 (1931) (citing cases).

1062  *Boone v. United States*, 944 F.2d 1489, 1495 n.12 (9th Cir. 1991) (citing *Kaiser Aetna*, 444 U.S. at 175).

1063  *See, e.g., United States v. 102.871 Acres of Land in Cameron Par.* (*La. Jetty*), No. 2:13 CV 2508, 2015 WL 5794073 (W.D. La. Oct. 2, 2015); *see also Banks v. United States*, 71 Fed. Cl. 500 (2006). In practice, "this important public interest has generally led to the conclusion that the navigational servitude will preclude the payment of compensation in cases involving waters navigable in interstate commerce . . . ." *Boone*, 944 F.2d at 1501.

1064  *See, e.g., Owen v. United States*, 851 F.2d 1404 (Fed. Cir. 1988); *Banks*, 71 Fed. Cl. 501; *Alameda Gateway, Ltd. v. United States*, 45 Fed. Cl. 757 (1999). The issue arises less frequently in other types of federal acquisitions. *See, e.g., La. Jetty*, 2015 WL 5794073; *see also United States v. 30.54 Acres of Land in Greene Cty.* (*Filiaggi*), 90 F.3d 790 (3d Cir. 1996).

1065  *United States v. Chi., M., St. P. & P. R. Co.*, 312 U.S. 592, 596-97 (1941); *accord United States v. Cherokee Nation*, 480 U.S. 700, 704 (1987); *United States v. Rands*, 389 U.S. 121, 123 (1967); *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 625 (1961).

1066  *Cherokee Nation*, 480 U.S. at 706; *see id.* at 706-07 (citing cases).

1067  *Rands*, 389 U.S. at 123; *Lewis Blue Point Oyster Cultivation Co. v. Briggs*, 229 U.S. 82, 88 (1913); *Alameda Gateway*, 45 Fed. Cl. at 763.

1068  *Va. Elec.*, 365 U.S. at 629; *accord Rands*, 389 U.S. at 123-24; *United States v. Twin City Power Co.*, 350 U.S. 222, 225 (1956); *see also Kaiser Aetna v. United States*, 444 U.S. 164, 175-77 (1979).

1069  *Twin City Power*, 350 U.S. at 224; *United States v. Commodore Park, Inc.*, 324 U.S. 386, 392 (1945); *see, e.g., United States v. Certain Parcels of Land in Valdez*, 666 F.2d 1236, 1239 (9th Cir. 1982) (discussing Ports and Waterways Safety Act of 1972, codified at 33 U.S.C. § 1221).

1070  *Twin City Power*, 350 U.S. at 224.

1071  *Valdez*, 666 F.2d at 1239 (citing *Chi., M., St. P. & P. R. Co.*, 312 U.S. at 597); *cf. United States v. Gerlach Live Stock Co.*, 339 U.S. 725 (1950) (finding Congress had not intended to exercise navigation servitude in acquisitions for specific dam project).

1072  *Commodore Park*, 324 U.S. at 392-93; *see, e.g., Weatherford v. United States*, 606 F.2d 851, 853 (9th Cir. 1979) (holding navigational servitude applied to acquisition for purpose of relocating highway that would be submerged by construction of dam in navigable stream).

1073  *Commodore Park*, 324 U.S. at 393.

Constitution requires.[1074] But "[s]uch a waiver of sovereign authority will not be implied . . . . [I]t must be 'surrendered in unmistakable terms.'"[1075]

**Elements of Value Under the Navigational Servitude.** Market value that is "attributable in the end to the flow of the stream—over which the Government has exclusive dominion"— is not compensable under the Fifth Amendment.[1076] Similarly, any market value that arises from access to or use of navigable waters is allocable to the public, not to private owners.[1077] Paying compensation for such values would permit private owners to receive windfalls to which they are not entitled under the Fifth Amendment.[1078] Accordingly, while access to navigable waters may enhance the market value of fast land, any such value must be disregarded in federal acquisitions pursuant to the navigational servitude, except as provided below.[1079] Under this established principle of law, "all value attributable to the riparian location of the land" is excluded from consideration under the Fifth Amendment.[1080] As a result, when the United States acquires riparian fast lands in an exercise of its power to control commerce, elements of value that are not compensable under the Fifth Amendment include: port site value;[1081] power site or power development value;[1082] value due to riparian rights of access to navigable waters;[1083] irrigation value;[1084] and recreational value for boating, fishing, and hunting.[1085] Any value arising from a property's access to or use of navigable

> **Values Due to Access to or Use of Navigable Water**
> In federal acquisitions related to navigation, the following elements are not compensable under the Fifth Amendment:
>
> - Port site value
> - Power site value
> - Riparian rights of access to navigable waters
> - Irrigation value
> - Recreational value for boating, fishing, and hunting
>
> These values must be disregarded in federal acquisitions of fast land, except as required by federal statute. *See* 33 U.S.C. § 595a.

---

1074 *Gerlach Live Stock*, 339 U.S. at 739; *Lambert Gravel Co. v. J.A. Jones Constr. Co.*, 835 F.2d 1105, 1110 (5th Cir. 1988); *cf. Turner v. Kings River Conservation Dist.*, 360 F.2d 184, 192-93 (9th Cir. 1966) (analyzing Flood Control Act of 1944 § 8, codified at 33 U.S.C. § 701-1(b) (1996).

1075 *United States v. Cherokee Nation*, 480 U.S. 700, 707 (1987) (quoting *Bowen v. Pub. Agencies Opposed to Soc. Security Entrapment*, 477 U.S. 41, 52 (1986)); *accord Lambert Gravel*, 835 F.2d at 1109-10.

1076 *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 629 (1961); *accord United States v. Twin City Power Co.*, 350 U.S. 222, 225-27 (1956) ("a value in the flow of the stream [is] a value that inheres in the Government's servitude and one that under our decisions the Government can grant or withhold as it chooses").

1077 *United States v. Rands*, 389 U.S. 121, 124-25 (1967); *accord United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 427 (1940) ("[T]here is no private property in the flow of the stream. This has no assessable value to the riparian owner.").

1078 *Rands*, 389 U.S. at 126; *see also United States v. 30.54 Acres of Land in Greene Cty. (Filiaggi)*, 90 F.3d 790, 795 (3d Cir. 1996).

1079 *Rands*, 389 U.S. at 126 ("[T]hese rights and values are not assertable against the superior rights of the United States, are not property within the meaning of the Fifth Amendment, and need not be paid for when appropriated by the United States."); *see Twin City Power*, 350 U.S. at 227 ("it is the water power that creates the special value, whether the lands are above or below ordinary high water").

1080 *Va. Elec.*, 365 U.S. at 631; *accord Twin City Power*, 350 U.S. at 225-26 ("It is no answer to say that payment is sought only for the location value of the fast lands. That special location value is due to the flow of the stream . . . .").

1081 *Rands*, 389 U.S. at 126; *see also Filiaggi*, 90 F.3d at 796; *United States v. 87.30 Acres of Land*, 430 F.2d 1130, 1133 (9th Cir. 1970).

1082 *E.g., Va. Elec.*, 365 U.S. at 629; *Twin City Power*, 350 U.S. at 228; *United States v. Willow River Power Co.*, 324 U.S. 499, 511 (1945); *see Appalachian Elec.*, 311 U.S. at 424 (describing federal "dominion over flowage and its product, energy").

1083 *United States v. Commodore Park, Inc.*, 324 U.S. 386, 390-91 (1945); *Scranton v. Wheeler*, 179 U.S. 141, 152-53 (1900); *Gibson v. United States*, 166 U.S. 269, 275-76 (1897); *see South Carolina v. Georgia*, 93 U.S. 4, 10-11 (1876) (no compensation for diverting channel).

1084 *Weatherford v. United States*, 606 F.2d 851, 853 (9th Cir. 1979) (Kennedy, Circuit J.); *United States v. Birnbach*, 400 F.2d 378, 381-82 (8th Cir. 1968) (before Blackmun, Circuit J.).

1085 *Commodore Park*, 324 U.S. at 391 ("no private riparian rights of access to the waters to do such things as 'fishing and boating and the like'"); *Birnbach*, 400 F.2d at 382 ("boating, fishing and hunting"); *see also Lewis Blue Point Oyster Cultivation Co. v. Briggs*, 229 U.S. 82, 88 (1913) (no compensation for right to use bed for oyster cultivation); *but see* 28 U.S.C. § 1497 (permitting oyster growers to seek damages for destruction of oyster beds cultivated on private lands).

Federal law limits the navigational use of waters in the western United States so as not to "conflict with any beneficial consumptive use, present or future, . . . of such waters for domestic, municipal, stock water, irrigation, mining, or industrial purposes." 33 U.S.C. § 701-1(b) (2012) (applicable to "waters arising in States lying wholly or partly west of the ninety-eighth meridian"); *see In re Operation of the Mo. River Sys. Litig.*, 363 F. Supp. 2d 1145, 1153-54 (D. Minn. 2004), *aff'd in part and vacated in part*, 421 F.3d 618 (8th Cir. 2005) (discussing statute); *Turner v. Kings River Conservation Dist.*, 360 F.2d 184, 190-98 (9th Cir. 1966) (same). Appraisers should obtain legal guidance on the applicability of this Act.

---

waters must therefore be disregarded in valuations for federal acquisitions relating to navigation—except as required by 33 U.S.C. § 595a, the federal statute discussed below.[1086]

**Statutory Modification.** Congress modified the compensation rule disregarding value due to water access or use from consideration in 1970, with the enactment of 33 U.S.C. § 595a.[1087] This statute specifically authorizes compensation for market value due to water uses—that is, for more than what the constitution requires—for lands *above the high-water mark* that are *actually acquired* by the United States.[1088] But the statute does not allow compensation for loss of water access from property not acquired by the United States (remainder property),[1089] nor for any property below the high-water mark.[1090] The statute also made "no change in existing law with respect to the offsetting of special [direct] benefits to remaining real property against the just compensation" to be paid.[1091] As a result, § 595a has different implications for total and partial acquisitions.[1092]

**Total Acquisitions Under 33 U.S.C. § 595a.** In total acquisitions, in which the United States acquires an entire larger parcel, 33 U.S.C. § 595a creates an exception to the rule to disregard market value due to water access or use for property above the high-water mark.[1093] The statute provides that in connection with any improvement of rivers, harbors, canals, or waterways of the United States:

> [T]he compensation to be paid for real property taken by the United States above the normal high water mark of navigable waters of the United States shall be the fair market value of such real property based upon all uses to which such real property may reasonably be put, including its highest and best use, any of which uses may be dependent upon access to or utilization of such navigable waters.[1094]

As a result, valuations of total acquisitions under § 595a are fairly straightforward: the appraiser must consider water-dependent uses in determining the highest and best use, and the market value of fast land actually acquired should include any value due to its riparian location.[1095]

---

1086 As the Supreme Court observed, since its decision in *Rands* (1967), *Va. Electric* (1961), and *Twin City Power* (1956), "the elements of compensation for which the Government must pay when it condemned fast lands riparian to a navigable stream have remained largely settled." *Kaiser Aetna v. United States*, 444 U.S. 164, 176-77 (1979) (citing *Rands*, 389 U.S. at 123; *Va. Elec.*, 365 U.S. at 628; and *Twin City Power*, 350 U.S. at 226).

1087 Rivers and Harbors Act of 1970, Pub. L. No. 91-611, § 111, 84 Stat. 1818, 1821 (codified at 33 U.S.C. § 595a (2012)). These Standards refer to this statute as § 595a, using the official U.S. Code citation. The same statute has been referred to as Section 111 (an abbreviation of the session laws citation) in prior editions of these Standards and a few early federal cases.

1088 33 U.S.C. § 595a; *United States v. 967,905 Acres of Land in Cook Cty.* (*Pete*), 447 F.2d 764, 770-72 (8th Cir. 1971); *United States v. 71.29 Acres of Land in Catahoula Par.*, 376 F. Supp. 1221, 1225-26 (W.D. La. 1974); *United States v. 8,968.06 Acres of Land in Chambers & Liberty Ctys.* (*Wallisville*), 326 F. Supp. 546, 547-48 (S.D. Tex. 1971).

1089 33 U.S.C. § 595a; *United States v. 13.20 Acres of Land in Lincoln Cty.*, 629 F. Supp. 242, 247 (E.D. Wash. 1986); *see United States v. 30.54 Acres of Land in Greene Cty.* (*Filiaggi*), 90 F.3d 790, 795-96 (3d Cir. 1996); *see also Weatherford*, 606 F.2d 851 (no compensation for loss of irrigation rights for remainder property).

1090 *See, e.g., United States v. Certain Parcels of Land in Valdez*, 666 F.2d 1236 (9th Cir. 1982) (no compensation for alteration of improvements located in navigable waters); *United States v. 422,978 Square Feet of Land in S.F.*, 445 F.2d 1180 (9th Cir. 1971) (no compensation for use of submerged land beneath navigable waters); *see also United States v. Cherokee Nation*, 480 U.S. 700, 701-05 (1987) (no compensable taking arises from "interference with in-stream interests result[ing] from an exercise of the Government's power to regulate navigational uses of 'the deep streams which penetrate our country in every direction'" (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 195 (1824))).

1091 H.R. REP. No. 91-1665, at 31 (1970) (quoted in *Filiaggi*, 90 F.3d at 794 n.3).

1092 *Filiaggi*, 90 F.3d at 794 & n.3; *13.20 Acres in Lincoln*, 629 F. Supp. at 247; *see Pete*, 447 F.2d at 771. As discussed in Section 4.3.3, the appraiser must determine the larger parcel to distinguish whether a total or partial acquisition is involved.

1093 *See Filiaggi*, 90 F.3d at 795-96 & nn.4-5 (noting § 595a's limited nature).

1094 33 U.S.C. § 595a.

1095 *Pete*, 447 F.2d at 771; *United States v. 8,968.06 Acres of Land in Chambers & Liberty Ctys.* (*Wallisville*), 326 F. Supp. 546, 547-48 (S.D. Tex. 1971); *see United States v. 71.29 Acres of Land in Catahoula Par.*, 376 F. Supp. 1221, 1225-26 (W.D. La. 1974).

Section 595a does not alter the rule that no compensation is due for lands *below* the high-water mark.[1096] Such lands include property located in the bed of a navigable stream[1097] or "spoil islands" and other infilled land created by the United States' dredging activity.[1098] And this rule does not change simply because the legal description of property being acquired may include or contain some land below the high-water mark—for example, if a deed is the source of a legal description, reflecting "a measure of convenience [rather] than a waiver of the navigational servitude."[1099] Note also that § 595a does not alter or replace the scope of the project rule, which bars consideration of changes in market value due to government project influence (see Section 4.5). As a result, application of the scope of the project rule and application of § 595a are separate inquiries.[1100]

**Partial Acquisitions Under 33 U.S.C. § 595a.** Partial acquisitions under 33 U.S.C. § 595a require a special valuation method because Congress expressly did not authorize compensation for diminution in value of landowners' remaining property because of lost or reduced access to navigable waters. The statute provides:

> In cases of partial takings of real property, no depreciation in the value of any remaining real property shall be recognized and no compensation shall be paid for any damages to such remaining real property which result from loss of or reduction of access from such remaining real property to such navigable waters because of the taking of real property or the purposes for which such real property is taken.[1101]

As a result, in partial acquisitions of riparian land under § 595a, access to or use of navigable waters must be considered in valuing the *part acquired*, but cannot be considered in evaluating any damage to the *remainder property*.[1102] Moreover, because § 595a does not alter "existing law with respect to the offsetting of special benefits to remaining real property,"[1103] any direct and special benefit to the remainder property—including benefits resulting from new or enhanced access to navigable waters due to the government's acquisition—must be considered.[1104]

---

1096 33 U.S.C. § 595a; *Filiaggi*, 90 F.3d at 795-96; *see United States v. 101.88 Acres of Land in St. Mary Par.* (*Avoca Island*), 616 F.2d 762, 768 (5th Cir. 1980) (noting government may use submerged lands subject to navigational servitude "for any purpose in aid of navigation without compensating the owner").

1097 *Greenleaf-Johnson Lumber Co. v. Garrison*, 237 U.S. 251 (1915) (wharf); *Lewis Blue Point Oyster Cultivation Co. v. Briggs*, 229 U.S. 82 (1913) (oyster cultivation); *W. Chi. St. R.R. v. Ill. ex rel. Chi.*, 201 U.S. 506 (1906) (tunnel); *Alameda Gateway, Ltd. v. United States*, 45 Fed. Cl. 757, 764 (1999) (pier).

1098 E.g., *United States v. 49.79 Acres of Land in New Castle Cty.* (*Cherry Island*), 582 F. Supp. 368, 374 (D. Del. 1983); *United States v. 102.871 Acres of Land in Cameron Par.* (*La. Jetty*), No. 2:13 CV 2508, 2015 WL 5794073, *7-*8 (W.D. La. Oct. 2, 2015) (holding servitude applied to spoil island created by dredge cast into navigable waters). Lands created by private dredging activity may require compensation, however. See *Kaiser Aetna v. United States*, 444 U.S. 164, 178-80 (1979).

1099 *See, e.g., Lambert Gravel Co. v. J.A. Jones Constr. Co.*, 835 F.2d 1105, 1111 (5th Cir. 1988); *see also Avoca Island*, 616 F.2d at 764-69 (noting government's original legal description of property relied on disputed ordinary high-water mark, but after amendment to "describe the above water ridges in courses and distances, there was little question about the accuracy of the description").

1100 E.g., *United States v. 13.20 Acres of Land in Lincoln Cty.*, 629 F. Supp. 242, 243-47 (E.D. Wash. 1986). Similarly, application of the scope of the project rule is also distinct from application of the navigational servitude, regardless of whether § 595a applies. *See United States v. Birnbach*, 400 F.2d 378 (8th Cir. 1968).

1101 33 U.S.C. § 595a; *see* Section 4.6 (Partial Acquisitions); *see also Palm Beach Isles Assocs. v. United States*, 42 Fed. Cl. 340, 352 (Fed. Cl. 1998) (noting provision "does not abrogate the navigational servitude generally, . . . nor provide compensation for loss or reduction of access to navigable waters"), *vacated on other grounds*, 208 F.3d 1374 (Fed. Cir. 2000).

1102 *United States v. 13.20 Acres in Lincoln Cty.*, 629 F. Supp. 242, 247 (E.D. Wash. 1986); *see also Good v. United States*, 39 Fed. Cl. 81, 97 (1997), *aff'd*, 189 F.3d 1355 (Fed. Cir. 1999).

1103 *United States v. 30.54 Acres of Land in Greene Cty.* (*Filiaggi*), 90 F.3d 790, 794 n.3 (3d Cir. 1996) (quoting H.R. REP. NO. 91-1665, at 31 (1970)); *see* Section 4.6.3 (Benefits).

1104 *See United States v. Rands*, 389 U.S. 121, 125-26 (1967); *Filiaggi*, 90 F.3d at 794 & nn.2-3; *Miller v. United States*, 550 F. Supp. 669, 674 n.3 (Cl. Ct. 1982), *aff'd*, 714 F.2d 160 (Fed. Cir. 1983) (mem.); *see also* 33 U.S.C. § 595 (2012) (codifying offset of "special and direct benefits to the remainder" for partial takings "in connection with any improvement of rivers, harbors, canals, or waterways of the United States"); *cf. Horne v. Dep't of Agric.*, 135 S.Ct. 2419, 2432 (2015) (noting regulatory taking ruling does not affect provisions for offset of "special benefits—such as new access to a waterway" in partial takings).

The portion of § 595a prohibiting consideration of damage for remainder property's loss of riparian access has been upheld as constitutional.[1105] But federal courts have not specifically addressed the appropriate valuation method to measure compensation in partial acquisitions under the statute.[1106] The usual before and after valuation method for partial acquisitions[1107] does not readily allow the different treatment of the part acquired and the remainder property that § 595a requires.[1108] As a result, valuing partial acquisitions under § 595a may require use of a taking plus damages method—but only with appropriate **legal instructions**.[1109]

As explained in Section 4.6.4.1, the taking plus damages method is subject to error and apt to result in improper duplication (double damage), and is therefore generally improper in valuations for federal acquisitions. Its use is recommended here solely to address the unique challenges of valuing partial acquisitions under 33 U.S.C. § 595a. As discussed above, valuations of partial acquisitions under this statute must incorporate the following:

Each of the steps in this rare application of the taking plus damages method requires great care to ensure its results can be used for purposes of just compensation. Note also that the portion being valued at each step must be valued as part of the appropriate larger parcel (Section 4.6.1.1).

- Estimate the market value of the part acquired, *including* value due to water access. The market value of the part acquired must be estimated as a part of the larger parcel. As a result, the appraiser must estimate the market value of the larger parcel based on its highest and best use, *including* uses that depend on access to or utilization of navigable waters, *before* acquisition; then allocate that value to determine the contributory value of the *part being acquired*.[1110]

---

1105 *13.20 Acres of Land in Lincoln*, 629 F. Supp. at 247 (citing *Rands*, 389 U.S. 121).

1106 *E.g.*, *13.20 Acres in Lincoln*, 629 F. Supp. at 247 ("[Section] 595a will apply to the valuation of the remaining parcels, and severance damages regarding those parcels will not include loss of access to Lake Roosevelt."). Indeed, the only other cases to directly address valuation issues under § 595a involved total, not partial, acquisitions. *Filiaggi*, 90 F.3d 790; *United States v. 967, 905 Acres of Land in Cook Cty.* (*Pete*), 447 F.2d 764, 771 (8th Cir. 1971); *United States v. 71.29 Acres of Land in Catahoula Par.*, 376 F. Supp. 1221, 1225-26 (W.D. La. 1974); *United States v. 8,968.06 Acres of Land in Chambers & Liberty Ctys.* (*Wallisville*), 326 F. Supp. 546, 547-50 (S.D. Tex. 1971), *vacating* 318 F. Supp. 698 (S.D. Tex. 1970) *in view of statute*. The legislative history of § 595a is similarly sparse. *See* Ronald C. Allen, *Federal Evaluation of Riparian Property: Section 111 of the Rivers and Harbors Act of 1970*, 24 ME. L. REV. 175 (1972); Kerry R. Brittain, Comment, *Navigation Servitude—The Shifting Rule of No Compensation*, 7 LAND & WATER L. REV. 501 (1972); Charles E. Corker, *Federal-State Relations in Water Rights Adjudication and Administration*, 17 ROCKY MTN. MIN. L. INST. 21 (1972); *see also* Alan T. Ackerman & Noah Eliezer Yanich, *Just and Unjust Compensation: The Future of the Navigational Servitude in Condemnation Cases*, 34 U. MICH. J.L. REFORM 573 (2001).

1107 In partial acquisitions (Section 4.6), the measure of compensation is normally the difference between the market value of the landowner's property before and after the government's acquisition. *E.g.*, *United States v. Birnbach*, 400 F.2d 378, 382 (8th Cir. 1968). Appraisers therefore apply the before and after valuation method (the Federal Rule), estimating the market value of the larger parcel *before* the acquisition, and subtracting the market value of the remainder property *after* acquisition, to determine the difference (diminution) in market value. *See* Section 4.6.1.

1108 *Cf. Birnbach*, 400 F.2d at 382-83 (holding that in determining damage to remainder property in partial taking affected by navigational servitude, an "important distinction must be made so that the enhancement in value 'flowing' from a riparian location may not be recognized when the riparian character of the [remainder] land is destroyed"). While *Birnbach* predated § 595a, the statute did not change the compensation for damage to remainder property. *See Pete*, 447 F.2d at 770-71 (discussing *Birnbach* and § 595a).

1109 As discussed in Section 4.6.4.1, the taking plus damages valuation method (the State Rule) is generally improper in valuations for federal acquisition purposes. It cannot be used in federal acquisitions (under § 595a or otherwise) without appropriate **legal instructions**. *See* EATON, *supra* note 16, at 30-40 (discussing taking plus damages valuation methods); *see also United States v. 97.19 Acres of Land*, 582 F.2d 878, 880-81 (4th Cir. 1978); *United States v. 344.85 Acres of Land*, 384 F.2d 789, 792 (7th Cir. 1967).

1110 *See* Section 4.3.3; *cf. Olson v. United States*, 292 U.S. 246, 256 (1934) (addressing uses made in combination with other lands); *United States v. 429.59 Acres of Land* (*Imperial Beach*), 612 F.2d 459, 463-64 (9th Cir. 1980) (approving instruction to "value the property as a unit" because "it was 'reasonably probable that the properties would be used in combination'").

- Estimate damage (diminution in value) to the remainder property resulting from the government's acquisition, *disregarding* any damage due to lost or impaired water access. That is, what is the difference in value of the *remainder property* before and after the acquisition, based on its highest and best use *excluding* uses that depend on access to or utilization of navigable waters? There may or may not be any diminution in value of the remainder resulting from the government's acquisition that is unrelated to water use or access.[1111]

- Estimate special and direct benefits to the remainder resulting from the government's project, *including* those due to new or enhanced riparian access.[1112] For example, such benefits include direct river access from the remainder property from which a landowner can build docks or piers (subject to applicable laws)[1113] or improved bank stabilization and flood control due to a revetment project that allows remainder property to be converted to a more valuable use.[1114] Any direct and special benefits resulting from the project must be offset against the total compensation to be paid.[1115]

Following these steps, the ultimate calculation will reflect the market value of the part acquired (including water access) plus damage to the remainder (disregarding lost water access), offset by direct and special benefits to the remainder (including new or improved water access).

**The Navigational Servitude and Inverse Taking Claims.** As the Supreme Court has observed, the navigational servitude does not create a blanket exception to the Takings Clause whenever Congress exercises its authority to promote navigation under the Commerce Clause.[1116] In inverse takings claims, courts must consider the factual circumstances of each case regarding the scope of the navigational servitude to determine whether a public action has effected a taking.[1117]

---

1111 *See United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 629-30 (1961) (remanding for determination of "depreciative impact of the [acquisition] upon the nonriparian uses of the property").

1112 *United States v. Rands*, 389 U.S. 121, 125-26 (1967); *United States v. River Rouge Improvement Co.*, 269 U.S. 411, 417-18 (1926); *see* 33 U.S.C. § 595 (2012) (mandating that in partial takings in connection with improvement of rivers, harbors, canals or waterways of the United States, award of just compensation "shall take into consideration by way of reducing the amount of compensation or damages any special and direct benefits to the remainder arising from the improvement"); *see also United States v. Eastman* (*Eastman I*), 528 F. Supp. 1177, 1179 n.2 (D. Or. 1981), *adopted* 714 F.2d 76, 77 (9th Cir. 1983) (per curiam) ("Where only part of a tract of land is taken, the government is entitled to deduct from the condemnation award benefits which accrue to the landowner's remaining land in the same tract." (citing § 595)).

1113 *River Rouge*, 269 U.S. at 417-18. While the remainder property may be subject to the navigational servitude, it is "fundamental error" to "over-emphasi[ze] the contingent character of the rights of the riparian owners." *Id.* at 420-21.

1114 *E.g.*, *United States v. Fort Smith River Dev. Corp.*, 349 F.2d 522, 525-26 (8th Cir. 1965) (reversing award that failed to consider special benefits due to United States' revetment project that "manifestly" protected remainder land "from further reliction or erosion. That fact alone apparently places [the remainder] in a 'better position' because of the taking" and must be considered).

1115 H.R. Rep. No. 91-1665, at 31 (1970) (noting § 595a does not change federal law on offsetting special benefit to remainder "against the just compensation that would otherwise be paid for the real property taken and for damages to remaining real property"); *United States v. 30.54 Acres of Land in Greene Cty.*, (*Filiaggi*), 90 F.3d 790, 794 n.3 (3d Cir. 1996) (quoting H.R. Rep. No. 91-1665); *see Rands*, 389 U.S. at 125-26 ("compensation award for the part of the property taken by the Government was reduced by the value of the special and direct benefits to the remainder of the land" (describing *River Rouge*)); *see also Bauman v. Ross*, 167 U.S. 548 (1897); *Hendler v. United States*, 175 F.3d 1374, 1379-80 (Fed. Cir. 1999) (noting differences in federal and state laws regarding offset of benefits).

1116 *Kaiser-Aetna*, 444 U.S. 164, 172 (1979).

1117 *E.g.*, *Owen v. United States*, 851 F.2d 1404 (Fed. Cir. 1988); *Banks v. United States*, 71 Fed. Cl. 501 (2006); *Alameda Gateway, Ltd. v. United States*, 45 Fed. Cl. 757 (1999).

**5-ER-951**

**4.11.2.**  **Federal Grazing Permits.** In federal acquisitions involving ranch lands, appraisers must disregard any value added to those lands as a result of their actual or potential use in combination with adjacent federal lands under revocable grazing permits.[1118] Federal grazing permits are chiefly administered by the Bureau of Land Management (U.S. Department of Interior) under the Taylor Grazing Act[1119] and the Forest Service (U.S. Department of Agriculture) under the Granger-Thye Act.[1120] By law, these federal permits to use the public domain for grazing are revocable and create no property rights in the holder.[1121] Thus, while grazing permits typically remain with a privately owned base property for many years, permits revert to the federal agency when the base property is sold and may or may not be granted to the new owner.[1122] As a result, in federal acquisitions, privately owned lands cannot be aggregated with permitted public lands for valuation purposes, as "[t]o require the United States to pay for this . . . value would be to create private claims in the public domain."[1123] Appraisers must therefore disregard the use or potential use of the subject property in conjunction with federal grazing permit lands—even if "this element of value would be considered by a potential buyer in the open market"—because the government "need not compensate for value which it could remove by revocation of a permit for the use of lands that it owned outright."[1124]

Because Congress elected not to create compensable rights out of what are now licensees, landowners "have no compensable right in the land covered by their grazing permits or in the permits themselves."[1125] As a result, federal grazing permits cannot be considered in estimating market value.[1126]

> **Whether departure from the market value measure of just compensation is required, and if so, what alternative measure of compensation is appropriate, are legal determinations that cannot be made by the appraiser.**

**4.11.3.**  **Streets, Rail Corridors, Infrastructure, and Public Facilities.** Federal acquisitions may involve property already being used to benefit the public—such as a street, landfill, or other public facility—owned by public or private entities that may be obligated to replace the facility acquired by the United States. But the Supreme Court has unanimously held that none of these facts

---

1118 *United States v. Fuller*, 409 U.S. 488, 492-93 (1973); *see Bischoff v. Glickman*, 54 F. Supp. 2d 1226, 1230-31 (D. Wyo. 1999); *see also Estate of Hage v. United States*, 687 F.3d 1281, 1291-92 (Fed. Cir. 2012).

1119 Taylor Grazing Act of 1934, 43 U.S.C. § 315(b) (2012) (grazing permits on rangelands in the public domain administered by the Bureau of Land Management, U.S. Department of the Interior); *see generally Public Lands Council v. Babbitt*, 529 U.S. 728, 731-39 (2000) (purpose, history, and administration of Taylor Grazing Act).

1120 Granger-Thye Act of 1950, 16 U.S.C. § 580*l* (2012) (grazing permits on National Forest System lands, administered by the U.S. Forest Service).

1121 43 U.S.C. § 315b ("issuance of a permit pursuant to [this provision] shall not create any right, title, interest or estate in or to the lands"); *Fuller*, 409 U.S. at 492-93.

1122 APPRAISAL INSTITUTE & AM. SOC'Y OF FARM MANAGERS, THE APPRAISAL OF RURAL PROPERTY 325 (2d ed. 2000); *see generally id.* 324-27; *Public Lands Council*, 529 U.S. at 743 (noting "well-established [agency] powers to cancel, modify, or decline to renew individual permits" under Taylor Grazing Act).

1123 *Fuller*, 409 U.S. at 493 (citation omitted).

1124 *Id.* at 491-92; *see, e.g., Estate of Hage*, 687 F.3d at 1291-92.

1125 *Hage v. United States*, 51 Fed. Cl. 570, 587-88 (Fed. Cl. 2002); *see Estate of Hage*, 687 F.3d at 1291-92; *see also Monongahela Nav. Co. v. United States*, 148 U.S. 312, 327 (1893) ("The legislature may determine what . . . property is needed for public purposes[,]" but determining the measure of compensation "is a judicial, and not a legislative, question."); *Hage v. United States*, 35 Fed. Cl. 147, 170 (Fed. Cl. 1996) ("[B]ased upon the language and history of the Granger-Thye Act and the Taylor Grazing Act, . . . Congress had no legislative intention of creating a property interest in the permit just as Congress had no legislative intention of creating a property interest in the underlying federal lands.").

1126 *Fuller*, 409 U.S. at 491-92. Congress has provided for *administrative* payments for losses due to cancellation of Taylor grazing permits for war purposes. *See* 43 U.S.C. § 315q (2012); *United States v. Cox*, 190 F.2d 293, 296 (10th Cir. 1951). But these administrative benefits created by statute are separate from compensation under the Fifth Amendment, and beyond the scope of the appraiser's assignment to estimate market value. *See United States v. Westinghouse Elec. & Mfg. Co.*, 339 U.S. 261, 263-64, 264 n.2 (1950); *United States v. Gen. Motors Corp.*, 323 U.S. 373, 379-80 (1945); *United States v. Willow River Power Co.*, 324 U.S. 499, 510 (1945).

"require suspension of the normal rules for determining just compensation.'"[1127] Accordingly, compensation for streets, highways, roads, alleys, other infrastructure, or public facilities is measured by the same market value standard applied to other types of property, whether publicly or privately owned. "Deviation from this measure of just compensation [is] required only 'when market value [is] too difficult to find, or when its application would result in manifest injustice to owner or public.'"[1128] Appraisals for federal acquisitions of streets, infrastructure, or public facilities must therefore follow the same valuation standards as for any other property, whether privately or publicly owned.[1129]

### 4.11.3.1. Streets, Highways, Roads, and Alleys.

Under federal law, streets, roads, highways, and alleys typically have only nominal market value, and therefore only nominal compensation is due for their acquisition.[1130] This is because streets and similar property are normally long narrow strips of land that have been legally dedicated to use as streets or highways, depriving them of value except as thoroughfares.[1131] As discussed in more detail in Section 4.6.5 (Easement Valuation Issues), it is critical for the appraiser to understand the precise property interest(s) being acquired and the impact of any existing encumbrances.[1132] **Legal instructions** are typically required. The Ninth Circuit explained the process for determining just compensation for the taking of state-owned lands dedicated as public thoroughfares in *California v. United States* (*Naval Shipyard*):

> "Just compensation" is to be measured by what the State lost by the taking, and, [here], this is the value of the lands in question burdened as they were. The *legal effect of the dedication* under the law of the State must first be determined. That question of law resolved, the monetary *value, if any,* of the loss to the State *of the lands so burdened* must then be ascertained . . . .[1133]

Federal courts have repeatedly upheld the payment of only nominal compensation for streets and similar property with only nominal market value.[1134] If the owner of a street acquired by the United States is not required to replace it, the owner—typically a city or other municipal

---

1127 *United States v. 564.54 Acres of Land* (*Lutheran Synod*), 441 U.S. 506, 516 (1979) (rejecting demand of owner, a private nonprofit organization, for compensation measured by cost of substitute facility rather than market value); *United States v. 50 Acres of Land* (*Duncanville*), 469 U.S. 24, 33-34 (1984) (rejecting municipal owner's demand for same).

1128 *Duncanville*, 469 U.S. at 29 (quoting *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950)); *accord Lutheran Synod*, 441 U.S. at 512-13; *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 n.14 (1984); *see United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 402 (1949) ("[When there are insufficient comparable sales to determine market value, w]e then say that there is 'no market' for the property in question. . . . And it is here that other means of measuring [market] value may have relevance—but only, of course, as bearing on what a prospective purchaser would have paid.").

1129 *See Duncanville*, 469 U.S. at 26 (holding public condemnees are not entitled to substitute-facilities compensation if market value can be ascertained); *Lutheran Synod*, 441 U.S. at 516-17 (holding private condemnees are not entitled to substitute-facilities compensation).

1130 *United States v. Streets, Alleys & Pub. Ways in Vill. of Stoutsville*, 531 F.2d 882, 887 (8th Cir. 1976).

1131 *E.g.*, *Mayor & City Council of Baltimore v. United States*, 147 F.2d 786, 788-89 (4th Cir. 1945) ("The fact is that the value of the land in the bed of the highway as land has been diminished by its devotion to a limited purpose."); *see United States v. 3,727.91 Acres of Land* (*Elsberry Drainage District*), 563 F.2d 357, 359-60 (8th Cir. 1977) ("[When] the public condemnee has held only a right of way easement in a public street or alley, and, upon condemnation, they retained no interest in the property[, . . .] only nominal compensation is held to be proper."); *California v. United States* (*Naval Shipyard*), 395 F.2d 261, 266-68 (9th Cir. 1968) (discussing possible impacts of dedication on lands' use and market value).

1132 Encumbrances affecting streets could include dedication to highway use, prohibitions on non-road use, or reversionary rights, for example. Such legal encumbrances are a type of easement, that is, a limited right to use or control land owned by another for specified purposes. Federal acquisitions of streets, roads, highways, and alleys may involve dominant easement interests (Section 4.6.5.1), lands encumbered by easements (Section 4.6.5.2), and/or appurtenant easements to the servient estate (Section 4.6.5.3). Section 4.6.5 addresses the valuation issues that commonly arise in acquisitions involving each type of easement.

1133 *Naval Shipyard*, 395 F.2d at 266-67 (emphases added).

1134 *See Caporal v. United States*, 577 F.2d 113, 117-18 (10th Cir. 1978); *Elsberry Drainage District*, 563 F.2d at 359-60; *Vill. of Stoutsville*, 531 F.2d at 887; *United States v. City of New York*, 168 F.2d 387, 389-90 (2d Cir. 1948); *Woodville v. United States*, 152 F.2d 735, 736-37 (10th Cir. 1946), *cert. denied*, 328 U.S. 842 (1946); *United States v. Des Moines City.*, 148 F.2d 448, 449 (8th Cir. 1945).

entity—suffers no *loss*, and therefore no compensation is due.[1135] Such federal acquisitions may even *benefit* the owner economically by relieving the owner of the cost of maintaining the land as a highway.[1136] Nominal compensation in such circumstances is therefore consistent with the basic Fifth Amendment principles of indemnity and fairness.[1137] Alternatively, as discussed below, it is constitutionally permissible for the United States to provide compensation in the form of a *substitute facility* instead of cash.[1138]

Even strips of land that may have been intended for use as a street, but are not legally encumbered (or "dedicated") to prohibit non-street use, typically have limited market value. Indeed, it is legally improper to simply assume such strips have the same market value as surrounding lands.[1139] As the Federal Circuit explained:

> The point is that the property at issue here consists of strips of land, rather than one large, easily developable tract. The question . . . is, what is the fair market value of such odd pieces of land, taking into account their potential uses, current condition and the improvements thereon, and considering the most profitable uses to which the pieces of land can probably be put in the reasonably near future.[1140]

Again, **legal instructions** are typically required regarding the precise property interest(s) to be appraised and the effects of any encumbrances. Existing legal encumbrances must be considered when developing opinions of market value.[1141]

Acquisitions of existing roads or rights of way may also involve land with physical impediments or conditions—such as embankments, underground utility lines, rail ties, or poor soil conditions.[1142] Preexisting physical conditions, like legal encumbrances, must be considered when developing opinions of market value.[1143] For example, in an inverse taking of a railway corridor with physical remnants of the abandoned railway that would require removal to put the property

---

1135 *Vill. of Stoutsville*, 531 F.2d at 886; *Naval Shipyard*, 395 F.2d at 266-67; *Washington v. United States* (*Hanford*), 214 F.2d 33, 39 (9th Cir. 1954); *see United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 281 (1943) ("it is the owner's loss, not the taker's gain, which is the measure of compensation for the property taken").

1136 *Jefferson Cty. v. Tenn. Valley Auth.*, 146 F.2d 564, 566 (6th Cir. 1945); *see Naval Shipyard*, 395 F.2d at 268 ("The State has lost the profit potential, if any, which these lands may have had as part of the 'channel.' On the other hand, the untaken lands have been relieved of the burdens of the dedication. These and other relevant factors must be considered . . . to determine whether the taking resulted in a decrease in the value of the untaken portion of the channel . . . .").

1137 *See United States v. 50 Acres of Land* (*Duncanville*), 469 U.S. 24, 30 (1984) ("basic principles of indemnity embodied in the Just Compensation Clause"); *United States v. 564.54 Acres of Land* (*Lutheran Synod*), 441 U.S. 506, 517 (1979) ("'basic equitable principles of fairness' underlying the Just Compensation Clause" (quoting *United States v. Fuller*, 409 U.S. 488, 490 (1973))); *cf. United States v. 46,672.96 Acres of Land in Doña Ana Ctys.*, 521 F.2d 13, 17 (10th Cir. 1975) ("The fact that [property] has very little value cannot justify . . . using an inapplicable measure . . . .").

1138 *See Duncanville*, 469 U.S. at 33 (discussing *Brown v. United States*, 263 U.S. 78 (1923)).

1139 *Bd. of Cty. Supervisors v. United States* (*Prince William Cty. II*), 116 F.3d 454, 458 (Fed. Cir. 1997) (holding lower court "erred as a matter of law in reading our decision as foreclosing an inquiry into whether the value of the [strips of land] was different from the value of the surrounding land").

1140 *Id.*; *see Naval Shipyard*, 395 F.2d at 266-68.

1141 *Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910); *see United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 76 (1913) ("[T]here would be no justice in paying for a loss suffered by no one in fact."); *cf. Nebraska v. United States*, 164 F.2d 866, 869 (8th Cir. 1947), *cert. denied*, 334 U.S. 815 (1948) (no compensation for "a diminution in the market value of the [landowner's] rights through the creation of a leasehold, easement, or other interest in the land by the [landowner's] own acts" preceding United States' acquisition).

1142 *See, e.g.*, *Rasmuson v. United States*, 807 F.3d 1343, 1346 (Fed. Cir. 2015) (inverse taking of railway corridor converted to trail use). See Section 4.11.3.2 for discussion of inverse takings claims regarding *rails-to-trails* conversions under the 1983 Amendments to the National Trails System Act.

1143 *Rasmuson*, 807 F.3d at 1346; *United States v. 0.59 Acres of Land*, 109 F.3d 1493, 1497 (9th Cir. 1997) (holding "the condition of condemned land is relevant" and it would be improper to "ignor[e] a condition that the Government did not create" – namely, a preexisting power transmission line within abutting right of way); *United States v. 320 Acres of Land*, 605 F.2d 762, 818 (5th Cir. 1979) (noting "inherent physical characteristics of a property" may "decisively" preclude an otherwise possible use; *see also Olson v. United States*, 292 U.S. 246, 256 (1934) ("highest and most profitable use for which the property is adaptable"); Section 4.3 (Highest and Best Use).

---

to its highest and best use, the Federal Circuit recently held that failing to consider the removal costs "will result in an artificially inflated value and yield a windfall to the landowner."[1144] Physical remnants of *improvements made by the United States* may require special treatment, and the appraiser must request appropriate **legal instruction**. This issue is discussed in Section 4.2.2.2.1 and the accompanying case study.

At times, streets or similar facilities may be "so infrequently traded" that their market value may be too difficult to ascertain, at least from comparable sales.[1145] But a market need not be "an extremely active one" to allow market value to be ascertained.[1146] And market value can generally be determined even when no comparable sales are available.[1147] Accordingly, it is legally improper to assume that market value cannot be ascertained, even if no comparable sales are available.[1148] Whatever valuation method is used, "the equitable principles underlying just compensation require that any profitable uses of the lands which are left open by the dedication must be considered in determining the fact of loss and in calculating its monetary equivalent."[1149]

### 4.11.3.2. Corridors and Rights of Way.

Acquisitions of strips, corridors, or rights of way via negotiated purchase or affirmative condemnation involve many similar valuation problems to those found in acquisitions of streets. Such acquisitions often involve preexisting encumbrances, such as easements for rail or transmission line use, that may deprive them of value for other uses.[1150] The appraiser must understand the precise property interest(s) being acquired and the impact of any existing encumbrances.[1151] Typically, **legal instructions** are required.[1152]

**Rails-to-Trails Claims.** These issues frequently arise in so-called *rails-to-trails* cases. The

---

1144 *Rasmuson*, 807 F.3d at 1346.

1145 *See United States v. 564.54 Acres of Land* (*Lutheran Synod*), 441 U.S. 506, 513 (1979) ("This might be the case, for example, with respect to . . . roads or sewers."); *United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 402 (1949) ("At times, however, peculiar circumstances may make it impossible to determine a 'market value.' There may have been, for example, so few sales of similar property that we cannot predict with any assurance that the prices paid would have been repeated in the sale we postulate of the property taken. We then say that there is 'no market' for the property in question. But that does not put out of hand the bearing which the scattered sales may have on what an ordinary purchaser would have paid for the claimant's property. We simply must be wary that we give these sparse sales less weight than we accord 'market' price, and take into consideration those special circumstances in other sales which would not have affected our hypothetical buyer. And it is here that other means of measuring value may have relevance—but only, of course, as bearing on what a prospective purchaser would have paid.").

1146 *See Lutheran Synod*, 441 U.S. at 513.

1147 *Toronto, Hamilton*, 338 U.S. at 402; *see, e.g., United States v. 3,727.91 Acres of Land* (*Elsberry Drainage District*), 563 F.2d 357, 361-62 (8th Cir. 1977) (error to assume market value of levees and ditches could not be determined without comparable sales evidence and to disregard other evidence of market value).

1148 *Elsberry Drainage District*, 563 F.2d at 361-62; *California v. United States* (*Naval Shipyard*), 395 F.2d 261, 264-67 (9th Cir. 1968); *see Toronto, Hamilton*, 338 U.S. at 402.

1149 *Naval Shipyard*, 395 F.2d at 267 (reversing lower court's failure to consider evidence of market value of lands dedicated as streets); *accord Elsberry Drainage District*, 563 F.2d at 362 (quoting *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473 (1973)) ("The district court ruled that without the comparable sale as evidence of value the appraisers did not have an adequate basis for their valuation . . . . [But i]n light of the underlying policy in condemnation proceedings of providing the 'full monetary equivalent of the property taken,' we think [the appraiser's] testimony [based on other evidence of market value] deserved to be given greater weight.").

1150 *See, e.g.,* Interstate Commerce Act, 49 U.S.C. § 10903 (2012) (generally requiring rail carrier to continue to offer service over its lines to shippers unless it first obtains authority to abandon or discontinue lines from Interstate Commerce Commission); *United States v. Chi., B. & Q. R. Co.*, 82 F.2d 131, 140 (8th Cir. 1936) (discussing similarities between public highways and railways).

1151 *See* Section 4.6.5; *cf. Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910).

1152 Whether or not a rail right of way had been legally abandoned or discontinued as of the date of value is often key. *See Preseault v. Interstate Commerce Comm'n* (*Preseault I*), 494 U.S. 1, 5 n.3 (1990) (discussing important distinction between legal "abandonment" of a rail line and "discontinuance" of service under Interstate Commerce Act, 49 U.S.C. § 10903 (1982)); *see, e.g., Terminal Coal Co. v. United States*, 172 F.2d 113, 114-16 (3d Cir. 1949) (finding railroad had not abandoned right of way that was actively used for railroad purposes until taking, therefore owner of reversionary interest in underlying land in event of abandonment was entitled to only nominal compensation); *Woodville v. United States*, 152 F.2d 735, 737-39 (10th Cir. 1946), *cert. denied*, 328 U.S. 842 (1946) (same result where owner of reversionary interest was municipality).

National Trails System Act Amendments of 1983[1153] has prompted numerous inverse takings claims regarding adjacent landowners' potential reversionary interests in rail corridor lands.[1154] As in any inverse taking claim, the court must first determine liability (i.e., whether a taking occurred for which just compensation must be paid) before the case can proceed to the compensation phase (i.e., what amount of compensation is due) in which appraisers are retained to develop opinions of market value.[1155] If a taking occurred and the United States is liable for compensation, the standard federal valuation rules apply in the compensation phase of a rails-to-trails case, as in other inverse takings.[1156] Rails-to-trails takings may be permanent or temporary in nature.[1157] Rail corridors frequently include preexisting improvements or physical remnants of rail use—such as embankments, rail ties, or poor soil conditions—which must be considered in developing an opinion of market value.[1158] As the Federal Circuit held, in a rails-to-trails case "the fair market value of the land includes the physical remnants of the railway that would have remained on the landowners' property" but for the conversion of the corridor to trail use.[1159] Accordingly, failing to consider the removal costs is an improper appraisal methodology that "will result in an artificially inflated value and yield a windfall to the landowner."[1160]

**4.11.3.3.   Substitute-Facility Compensation.** As noted above, it is constitutionally permissible for the United States to provide compensation in the form of a <u>substitute facility</u> instead of cash.[1161] This form of compensation may be the most practical and equitable means of compensating landowners in certain "peculiar" acquisitions.[1162] In such circumstances— typically acquisitions of properties that are owned by a public entity, dedicated to public use, and for which a functional substitute is required and payment of market value would deviate significantly from making the owner whole—"compensation by substitution would seem to be the best means of making the parties whole."[1163]

But while a substitute facility is a constitutionally acceptable *form* of just compensation instead of cash, the Supreme Court has repeatedly rejected attempts to *measure* just compensation by

---

1153 16 U.S.C. § 1241-51 (2012) (1983 Amendments, Pub. L. No. 98-11, 97 Stat. 42, 48, amended the National Trails System Act, Pub. L. No. 90-543, 82 Stat. 919 (1968)); *see generally Preseault I*, 494 U.S. at 5-8 (discussing Act and Amendments), 15-16 (distinguishing types of acquisitions).

1154 *See, e.g.*, *Ladd v. United States*, 630 F.3d 1015 (Fed. Cir. 2010); *Ellamae Phillips Co. v. United States*, 564 F.3d 1367 (Fed. Cir. 2009); *Preseault v. United States* (*Preseault II*), 100 F.3d 1525, 1533 (Fed. Cir. 1996).

1155 *See Preseault I*, 494 U.S. at 16 ("only some rail-to-trail conversions will amount to takings"); *cf. United States v. Clarke*, 445 U.S. 253, 255-58 (1980) (discussing "important legal and practical differences" between affirmative condemnation proceedings and inverse takings). See *generally* Section 4.9.

1156 *See, e.g.*, *Rasmuson v. United States*, 807 F.3d 1343, 1345-46 (2015) (citing these Standards).

1157 *Ladd*, 630 F.3d at 1025; *Caldwell v. United States*, 391 F.3d 1226, 1234 (Fed. Cir. 2004).

1158 *See, e.g.*, *Rasmuson*, 807 F.3d at 1345-46.

1159 *Id.* (noting railway companies were not obligated to remove physical railroad construction features and landowners would have regained possession of corridor land with physical structures still on it).

1160 *Id.* at 1346.

1161 *United States v. 50 Acres of Land* (*Duncanville*), 469 U.S. 24, 33 (1984) (discussing *Brown v. United States*, 263 U.S. 78 (1923)).

1162 *E.g.*, *Brown*, 263 U.S. at 81 (United States provided new town site and relocated buildings as compensation for flooding of three-quarters of town due to reservoir project); *United States v. Streets, Alleys & Pub. Ways in Vill. of Stoutsville*, 531 F.2d 882 (8th Cir. 1976) (affirming United States' plan to construct substitute road facilities to compensate Village in kind, rather than monetarily, for taking of gravel streets, public alleys and sidewalks); *United States v. 10.56 Acres of Land in Whatcom Cty.* (*Peace Arch II*), No. C07-1261RAJ, 2010 WL 415244, at *2 (W.D. Wash. Jan. 27, 2010) (United States' condemnation of interstate highway conduit to construct elevated roadway and then convey new roadway to state).

1163 *Brown*, 263 U.S. at 81-83; *see Duncanville*, 469 U.S. at 30-34, 30 n.12; *United States v. 564.54 Acres of Land* (*Lutheran Synod*), 441 U.S. 506, 513 (1979); *see also Duncanville*, 469 U.S. at 37 (O'Connor, J., concurring) ("When a local governmental entity can prove that the market value of its property deviates significantly from the make-whole remedy intended by the Just Compensation Clause and that a substitute facility must be acquired to continue to provide an essential service, limiting compensation to the fair market value in my view would be manifestly unjust.").

the cost of a substitute facility instead of the market value standard.[1164] The Court unanimously criticized the "substitute facility doctrine" as an unfair measure of compensation: among other flaws, it increases the risk of error, prejudice, and windfall awards; adds uncertainty and complexity to the valuation process without any necessary improvement; and departs from the established "principle that just compensation must be measured by an objective standard that disregards subjective values which are only of significance to an individual landowner."[1165]

If the United States provides compensation in the form of a substitute facility, "the market value of the . . . property is no longer relevant."[1166] As a result, appraisals of market value are generally inapplicable in such situations,[1167] although appraisers or other experts may be retained to estimate costs, perform traffic studies, or conduct other analyses in connection with compensation by substitution.[1168] But determining whether substitute-facility compensation would be appropriate for a given acquisition is beyond the scope of the appraiser's task of developing an opinion of market value.[1169]

Congress can specifically authorize substitute-facility compensation, regardless of whether the standard market value measure of just compensation would be adequate.[1170] Absent a congressional mandate to provide substitute-facility compensation, agencies are to be guided in this determination by the basic principles of just compensation: fairness to both landowners and the public, and making the landowner whole.[1171] With substitute-facilities compensation, as with monetary compensation, "the question is, What has the owner lost? not, What has the taker gained?"[1172] Accordingly, appropriate compensation will turn on the impact of the government's

---

1164 *Duncanville*, 469 U.S. at 32-33; *Lutheran Synod*, 441 U.S. at 513-17; *see Peace Arch II*, 2010 WL 415244, at *2 (noting "mistaken[ ] belie[f] that the substitute facilities doctrine deems the cost of a substitute facility to be 'the equivalent' of a property's market value[,]" as "the cost of a substitute facility is an alternate measure of just compensation, it is not the equivalent of fair market value").

1165 *Duncanville*, 469 U.S. at 33-35; *Lutheran Synod*, 441 U.S. at 511, 514-16; *see id.* at 517-19 (White, J., concurring) ("The substitute-facilities doctrine is unrelated to fair market value and . . . unabashedly demands additional compensation over and above market value in order to allow the replacement of the condemned facility . . . . It seems to me that the argument for enhanced compensation . . . is nothing more than a particularized submission that the award should exceed fair market value because of the unique uses to which the property has been put by the condemnee or because of the unique value the property has for it.").

1166 *Peace Arch II*, 2010 WL 415244, at *2; *accord Vill. of Stoutsville*, 531 F.2d at 885 (discussing substitute-facilities compensation "in place of the conventional fair market value concept of determining compensation"); *see also United States v. 10.56 Acres in Whatcom Cty.* (*Peace Arch I*), No. C07-1261RAJ, 2008 WL 3977614, at *2 (W.D. Wash. Aug. 22, 2008) (discussing substitute-facility compensation).

1167 *See* EATON, *supra* note 16, at 19-22 ("[A]ppraisers are experts in estimating value, not just compensation."); Section 4.1.2 (Market Value: The Measure of Just Compensation); Section 4.2.6 (Exceptions to Market Value Standard).

1168 *See, e.g.*, *Peace Arch II*, 2010 WL 415244, at *2 (dispute over maintenance and operating costs of substitute highway provided as compensation).

1169 *See Duncanville*, 469 U.S. at 32-33 (quoting *Brown v. United States*, 263 U.S. 78, 81 (1923)), 37 (O'Connor, J., concurring); *Lutheran Synod*, 441 U.S. at 513-17 ("we find no circumstances here that require suspension of the normal rules for determining just compensation"); *see also* EATON, *supra* note 16, at 234 ("The doctrine of substitute facilities is not a valuation or appraisal technique, but a concept that has evolved from court decisions.").

1170 *See, e.g.*, Tenn. Valley Auth. Act, 16 U.S.C. § 831q (2012) (authorizing condemnation of property for purpose of relocating railroad tracks, highways, and other properties, enterprises and projects whose removal may be necessary to carry out purposes of Act); *Berberich v. United States*, 5 Cl. Ct. 652, 655 (1984) (discussing statutory authorization for relocation of North Bonneville, Wash., in connection with construction of new powerhouse at Bonneville Dam); *Brown*, 263 U.S. at 80 (quoting statute authorizing and appropriating funds for condemnation of replacement town site as compensation for flooding of American Falls, Idaho); *see also Lutheran Synod*, 441 U.S. at 519 n.6 (White, J., concurring); *cf. Duncanville*, 469 U.S. at 33 (holding that while substitute-facility compensation may be constitutionally permissible, the United States has no duty to provide anything more than market value (discussing *Brown*, 263 U.S. 78)).

1171 *See Duncanville*, 469 U.S. at 30 ("basic principles of indemnity embodied in the Just Compensation Clause"); *Lutheran Synod*, 441 U.S. at 517 ("'basic equitable principles of fairness' underlying the Just Compensation Clause" (quoting *United States v. Fuller*, 409 U.S. 488, 490)); *see also Town of Clarksville v. United States*, 198 F.2d 238, 242-43 (4th Cir. 1952) ("Of course, the interests of the public, upon which the payment burden rests, are at stake, too, and the award must not be in excess of strict equivalence.").

1172 *Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910); *see Brown*, 263 U.S. at 83 ("A method of compensation by substitution would seem to be the best means of making the parties whole" in "peculiar" circumstances presented.); *see also Duncanville*, 469 U.S. at 37 (O'Connor, J., concurring) ("the make-whole remedy intended by the Just Compensation Clause"); *Lutheran Synod*, 441 U.S. at 511 ("compensation required to make the owner whole"), 516 ("The guiding principle of just compensation . . . is that the *owner* of the condemned property 'must be made whole but is not entitled to more.'" (quoting *Olson v. United States*, 292 U.S. 246, 255)).

---

5-ER-957

Uniform Appraisal Standards for Federal Land Acquisitions  /  Legal Foundations For Appraisal Standards

acquisition, not the nature of the acquisition itself. Regardless of the form of compensation, the Fifth Amendment does not require any award for non-compensable (or "consequential") damages, further discussed in Section 4.6.[1173]

**Reliance on unsupported subsidiary expert opinions can undermine or even invalidate the appraiser's valuation analysis and conclusions.**

In practice, substitute-facility compensation is often extremely complex and arises only in "peculiar" situations.[1174] As for the specifics of this form of compensation for a given acquisition, the Fourth Circuit's discussion in *Town of Clarksville v. United States* is instructive:

> Of course, the interests of the public, upon which the payment burden rests, are at stake, too, and the award must not be in excess of strict equivalence. Yet we are not here dealing with a rigid, blind measure, that grants compensation only on a pound of flesh basis, but rather with an equitable concept of justice and fairness that accords with the Fifth Amendment's mandate. Accordingly, the equivalence requirement which must be met with respect to the substitute facility is more that of utility than of mere dollar and cents value.[1175]

As the Supreme Court held in rejecting a substitute-facilities measure of compensation for the taking of a municipal landfill in *Duncanville*, "[i]n this case, as in most, the market measure of compensation achieves a fair 'balance between the public's need and the claimant's loss.'"[1176] To be just, compensation—whether in the form of cash or substitute facility—must achieve that "fair balance."[1177]

4.12.    **Appraisers' Use of Supporting Experts' Opinions.** Some appraisal assignments may require the appraiser to rely on other experts' opinions on technical or other specialized issues.[1178] "An expert cannot be an expert in all fields, and it is reasonable to expect that experts will rely on the opinion of experts in other fields as background material for arriving at an

---

1173 *See Duncanville*, 469 U.S. at 33. Congress can authorize compensation for otherwise non-compensable damage in connection with substitute-facility compensation. For example, in the relocation of the Town of Bonneville, Washington (population 650), in connection with the construction of a new powerhouse at Bonneville Dam, special legislation authorized the U.S. Army Corps of Engineers to provide not only substitute streets and utilities, but also city planning assistance, cooperation with nonfederal entities, and other elements above and beyond the constitutional requirements of just compensation. *See* Act of Mar. 7, 1974, Pub. L. No. 93-251, § 83, 88 Stat. 12, 35 (authorizing legislation); *cf. Berberich v. United States*, 5 Cl. Ct. 652, 655 (1984) (discussing specific statutory authorization for relocation of town). This endeavor generated years of litigation. *See Town of N. Bonneville v. Callaway*, 10 F.3d 1505 (9th Cir. 1993); *Town of N. Bonneville v. U.S. Dist. Court*, 732 F.2d 747 (9th Cir. 1984); *Town of N. Bonneville v. United States*, 833 F.2d 1024, 1987 WL 38842 (Fed. Cir. Oct. 28, 1987) (unpubl.); *Town of N. Bonneville v. United States*, 5 Cl. Ct. 312 (1984).

1174 *See, e.g., Brown*, 263 U.S. at 81-83 (providing new town site as compensation for flooding of three-quarters of existing town); *Washington v. United States* (*Hanford*), 214 F.2d 33, 38-39, 41-43 (9th Cir. 1954) (providing nominal compensation for taking of part of state highway where existing highways were adequate substitute, as rerouted traffic would "impose no appreciable burden" and state "has suffered no money loss and has been relieved of the burden of maintaining the road taken"); *see also United States v. 10.56 Acres in Whatcom Cty.* (*Peace Arch II*), No. C07-1261RAJ, 2010 WL 415244, at *2-*3 (W.D. Wash. Jan. 27, 2010) (providing new highway as compensation with consideration of costs saved by and imposed on state due to substitute; *see also California v. United States* (*Naval Shipyard*), 395 F.2d 261 (9th Cir. 1968) (compensation for state road measured by market value).

1175 *Clarksville*, 198 F.2d at 242-43.

1176 *Duncanville*, 469 U.S. at 33 (quoting *United States v. Toronto, Hamilton & Buffalo Navigation Co.*, 338 U.S. 396, 402 (1949)).

1177 *See id.*; *Bauman v. Ross*, 167 U.S. 548 (1897) (Compensation must be "just, not merely to the individual whose property is taken, but to the public which is to pay for it." (quoting *Searl v. Sch. Dist. in Lake Cty.*, 133 U.S. 553, 562 (1890)).

1178 *See* USPAP, Competency Rule: Acquiring Competency, comment ("Competency can be acquired in various ways, including, but not limited to, personal study by the appraiser . . . or retention of others who possess the necessary knowledge and/or experience."). For topics that often require additional expertise in appraisals for federal acquisitions, see Section 1.13.

opinion."[1179] But the appraiser cannot merely assume such supporting experts' reports are accurate and reliable. Rather, the appraiser must review all supporting opinions and can rely on or adopt them only if the appraiser determines, after review, that all supporting opinions are credible, reliable, and factually supported.[1180] As the Tenth Circuit succinctly stated: "[Any expert] opinion . . . must be founded upon substantial data, not mere conjecture, speculation or unwarranted assumption. It must have a rational foundation."[1181] An appraiser who fails to ensure the rational foundation of all supporting opinions and other underlying assumptions will be left with an "ultimate opinion of value [that] is virtually devoid of factual moorings, depriving it of virtually any evidentiary value."[1182]

The appraiser must carefully analyze subsidiary experts' reports to ensure a full understanding of the bases for their findings and the impact on the appraisal. The precise steps necessary to ensure the reliability of a particular subsidiary expert's opinion will of course depend on the subject matter. Broadly, however, important considerations for the appraiser include:

- Are subsidiary experts' opinions confirmed by market studies or other appropriate analyses?
- Did subsidiary experts credibly reconcile data or other facts that may contradict their conclusions?
- Did subsidiary experts gather relevant data in a methodical manner?
- Are the assumptions underlying subsidiary experts' opinions reasonable and appropriate?
- Are subsidiary experts' conclusions substantiated by other evidence?

Appraisers' reliance on subsidiary expert opinions that failed to adequately address these concerns has resulted in the rejection of all valuation evidence based on such unsupported opinions—including appraisers' conclusions of highest and best use, methodology, and ultimate opinions of value.[1183] However, with appropriate verification of reliability and support (as recognized in a case affirmed by the Eleventh Circuit), "relying on a sub-consultant's report is a common, respected, and approved occurrence in appraisal practice and[ ] 'to hold otherwise would effectively demand an inconceivably broad area of expertise from any appraiser.'"[1184]

**Unit Rule Considerations.** The results of subsidiary valuation reports, such as mineral, fixture, or timber valuations, cannot simply be added to the value of the land to arrive at a value of the property as a whole without proper analysis by the appraiser. To do so would

---

1179 *United States v. 1,014.16 Acres of Land in Vernon Cty.*, 558 F. Supp. 1238, 1242 (W.D. Mo. 1983), *aff'd*, 739 F.2d 1371, 1373 (8th Cir. 1984) ("The district court properly noted that in condemnation cases, federal procedural and evidentiary rules apply."); *see* Fed. R. Evid. 703 (bases of an expert opinion).

1180 *See, e.g., United States v. 1.604 Acres of Land (Granby I)*, 844 F. Supp. 2d 668, 678 (E.D. Va. 2011); *United States v. 381.76 Acres of Land (Montego Group)*, No. 96-1813-CV, 2010 WL 3734003, *7 (S.D. Fla. Aug. 3, 2010), *adopted sub nom. United States v. 10.00 Acres of Land*, No. 99-0672-CIV, 2010 WL 3733994 (S.D. Fla. Sept. 22, 2010), *aff'd sub nom. United States v. Gonzalez*, 466 F. App'x 858 (11th Cir. 2012) (per curiam) (unpubl.); *1,014.16 Acres in Vernon*, 558 F. Supp. at 1242.

1181 *United States v. Sowards*, 370 F.2d 87, 92 (10th Cir. 1966).

1182 *Brace v. United States*, 72 Fed. Cl. 337, 352-53 (2006) ("the *ipse dixit* of that reliance does not make those facts, data or opinions true"), *aff'd*, 250 F. App'x 359 (Fed. Cir. 2007) (per curiam) (unpubl.) ("affirmed based upon the well-reasoned opinion of the trial court"); *see, e.g., Granby I*, 844 F. Supp. 2d at 676-81 (excluding all valuation and other evidence based on highest and best use that was premised on unreliable, unsupported opinions of subsidiary experts).

1183 *Granby I*, 844 F. Supp. 2d at 676-81 (detailing failures of subsidiary experts' opinions, holding such opinions were "without support" and excluding from consideration all valuation and other evidence based on unsupported subsidiary opinions); *see also United States v. 1.604 Acres of Land (Granby III)*, 844 F. Supp. 2d 685, 689 (E.D. Va. 2011) (excluding opinions of five experts based on *Granby I* ruling).

1184 *Montego Group*, 2010 WL 3734003, at *5; *accord 1,014.16 Acres in Vernon*, 558 F. Supp. at 1242.

violate the <u>unit rule</u> (discussed in Section 4.2.2) and professional appraisal standards.[1185] These components are to be considered, but only in light of how they contribute to the market value of the property as a whole.[1186]

**4.13.**     **Common Purpose (Roles and Responsibilities).** The importance of sound appraisals in federal acquisitions cannot be overstated. It is the United States' obligation to serve the general public and protect the common welfare by paying just compensation whenever property is needed for public purposes, and reliable, objective valuations are critical to achieving this end.[1187] Appraisers, landowners, attorneys, and government agency staff all play important roles in the federal acquisition process, whether or not litigation is anticipated.

**4.13.1.**     **Appraisers and Other Experts.** Appraisers assist in the determination of just compensation by developing an opinion of market value,[1188] often in consultation with experts in other fields.[1189] In fact, there is a long history in the United States of objective evaluators appraising property value to assist and inform the determination of just compensation—since well before a distinct real estate appraisal profession began to emerge in the early twentieth century.[1190]

Serving this important function requires expertise, diligence, sound judgment, and objectivity, whether appraisers or other experts are retained by the United States, landowners, or other parties.[1191] The appraiser must be diligent in data collection and competently apply the accepted methods and techniques of the appraisal profession as well as the special rules and requirements set forth in these Standards (e.g., larger parcel, unit rule, before and after method). The following describes an appraiser's job well done:

> A comprehensive investigation of [the] parcels was made . . . . [The appraiser] thoroughly surveyed each of the parcels and completely catalogued and examined all of the improvements on each parcel; in addition [the appraiser] investigated and checked all sales made in the immediate vicinity for several years prior to the [date of value] and interviewed a number of persons of long experience and familiarity with the property and its uses. Both [t]his investigation and appraisal appear to me to have been thoroughly and conscientiously conducted with a view to a just evaluation. [The appraiser's] conclusions were wholly impersonal and not actuated by any adversary concept.[1192]

---

1185 USPAP Standards Rule 1-4(e) ("An appraiser must refrain from valuing the whole solely by adding together the individual values of the various estates or component parts.").

1186 *See* Sections 4.8 and 4.8.1; *see also* Sections 4.8.3 and 4.8.4.

1187 *See, e.g., Hoover v. U.S. Dep't of Interior*, 611 F.2d 1132, 1138 (5th Cir. 1980).

1188 *See* EATON, *supra* note 16, at 19-22; Section 4.1.2.

1189 *See* Sections 1.11 and 4.12.

1190 For example, in 1878, the Supreme Court described a condemnation involving the "appointment of commissioners to . . . secure a fair appraisement of [a property's] value" followed by a court determination "as to the amount of compensation the owner of the land was entitled to receive[.]" *Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 404-405 (1878). Similarly, in 1893 the Court noted that "[v]iewers were appointed, who reported the value . . . . [and then] the matter was tried before the court . . . as to the question of amount of compensation." *Monongahela Nav. Co. v. United States*, 148 U.S. 312, 314 (1893); *cf.* James H. Boykin, *Real Property Appraisal in the American Colonial Era*, THE APPRAISAL J. 361, 366-367 (July 1976) (describing property valuation in legal disputes); Norman G. Miller, Jr. & Sergey Markosyan, *The Academic Roots and Evolution of Real Estate Appraisal*, THE APPRAISAL J. 172, 172 (April 2003) (appraisal as a distinct professional field began in about 1902).

1191 *See* USPAP Ethics Rule ("An appraiser must promote and preserve the public trust inherent in appraisal practice by observing the highest standards of professional ethics.").

1192 *United States v. 711.57 Acres in Alameda Cty.*, 51 F. Supp. 30, 32 (N.D. Cal. 1943); *see also* USPAP Ethics Rule – Conduct ("[Appraisers] must not advocate the cause or interest of any party or issue . . . .").

While this description arose from an appraiser's work as an expert witness in condemnation litigation, the same qualities are necessary for any appraisal for federal acquisition purposes. Appraisers must exercise sound judgment based on known pertinent facts and circumstances, and it is their responsibility to obtain knowledge of all pertinent facts and circumstances that can be acquired with diligent inquiry and search. They must then weigh and consider the relevant facts, exercise sound judgment, and develop an opinion that is completely unbiased by any consideration favoring either the landowner or the government. For this reason, it is inappropriate for an appraiser to "give the benefit of the doubt" to either a landowner or the United States.

> **It is inappropriate to "give the benefit of the doubt" to either a landowner or the United States.**

While the vast majority of federal acquisitions do not involve litigation, every appraisal and report should be prepared with recognition of the possibility that the question of value may be litigated, since it is not possible to predetermine which tracts will be acquired by voluntary means.[1193] The fact that a new appraisal and report may be required prior to trial (to bring the effective date of valuation into conformance with the legally required date of valuation[1194]) does not excuse an ill-prepared initial appraisal. *All* appraisal reports are often subject to discovery, and a poorly prepared initial appraisal may not only embarrass an appraiser, but also weaken a client's case.

**Appraisers Retained as Expert Witnesses by the U.S. Department of Justice.** Expert witnesses for litigation have additional obligations. It is the responsibility of the appraiser to spend adequate time and effort to thoroughly prepare to testify in depositions and at trial. Prior to undertaking this preparation and any necessary updating of the appraisal report, the appraiser will confer with the trial attorney.

Appraisers must conform their appraisal reports with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, as discussed in Section 2.2.3. In addition, the particular court in which a case will be tried may have local rules regarding expert reports. The United States' legal counsel should advise the appraiser of any such local rules. In preparing the initial appraisal report, the appraiser may have had comparable sales verified by personnel from his or her office. In litigation, however, the appraiser must personally verify all comparable sales prior to testifying in deposition or at trial.

The trial attorney will often provide the appraiser with observations and suggestions for strengthening the appraisal report. Both appraisers and attorneys should distinguish between a rigorous exploration of the appraiser's methodologies, analysis, and factual support—and improper pressure that undermines the objectivity and reliability of the appraiser's conclusions. Embracing the former with a clear eye on the appraiser's independence will strengthen the appraisal and reinforce the appraiser's credibility at trial. Any suggestion of the latter, on the other hand, should be immediately addressed and clarified to ensure appraisers' objectivity and the integrity of their opinions.

---

1193 Moreover, even voluntary acquisitions may generate litigation over valuation matters or the sufficiency of appraisals. *See, e.g., Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000).

1194 *E.g., United States v. 8.34 Acres of Land in Ascension Par.*, No. 04-50D-MI, 2006 WL 6860387, at *4 (M.D. La. June 12, 2006); see *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 (1984).

In conferring with the attorney, the appraiser should advise the attorney of any information that would be helpful in strengthening the report that was not available to the appraiser.[1195] The attorney may be able to procure this information from the landowner's legal counsel or through the discovery process, if necessary. The appraiser and the attorney should also discuss the logistics of a site inspection and appropriate communication with the landowner (if the landowner is represented by an attorney, all communications must go through legal counsel).

In condemnation proceedings, appraisers' only function is to testify to their impartial opinion of market value. While it is important that appraisers testify with the conviction that their valuations are correct, appraisers are not advocates for their clients: that role is exclusively reserved to attorneys. Nor do appraisers determine what is *fair* or *just*: that is the responsibility of the fact-finder—a jury, land commission, or judge. The appraiser is employed to develop and express an objective opinion of market value, following federal law, that is supported by factual data to warrant being accorded weight.[1196]

**4.13.2.** **Government Agency Staff.** Federal realty acquisitions require the contributions of a variety of government agency staff, including realty specialists, surveyors, engineers, title researchers, negotiators, project managers, contract procurement specialists, executives, appraisers, review appraisers, and attorneys. Critical to the valuation process, agency staff identify property for federal acquisition; work with government and outside appraisers to develop an appropriate scope of work for each valuation assignment; provide necessary information to appraisers, such as property descriptions, title information, maps, surveys and other data; and issue **legal instructions**. Agency staff are also tasked with explaining the United States' offer of just compensation and its basis, which often involves explaining the appraisal process, the data considered by the appraiser, and the reasons improper considerations are disregarded. Agency staff also rely on appraisals to determine just compensation for the purpose of making offers under the Uniform Act, estimate project acquisition costs, and make judicious use of public funds. Finally, while only a small fraction of federal acquisitions involve litigation, it is impossible to predict with certainty which acquisitions—even voluntary acquisitions—will result in litigation.[1197] Even if a new appraisal may be obtained for litigation (often required in condemnation to reflect the appropriate date of value),[1198] *every* appraisal should be well prepared, reflecting sound instructions and a scope of work appropriate for its purpose.

---

1195 Examples might include the property's historical income and expense information that a landowner had not previously provided to the appraiser, or verification of the price, terms, and conditions of a prior sale of the property being appraised.

1196 *See, e.g.*, *Washington v. United States* (*Hanford*), 214 F.2d 33, 43 (9th Cir. 1954) ("Opinion evidence is only as good as the facts upon which it is based. . . . Opinion evidence without any support in the demonstrated facts . . . can have no weight . . . .").

1197 *See, e.g.*, *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000).

1198 *See 8.34 Acres in Ascension*, 2006 WL 6860387, at *4; *cf. Kirby Forest Indus., Inc.*, 467 U.S. at 10.

4.13.3.   **Landowners.** Each and every federal acquisition involves a landowner—usually, but not always, as a willing participant. Landowners are entitled to just compensation if their property is acquired for public purposes, and to receive fair and equitable treatment no matter which agency is acquiring their land. During the appraisal process, landowners must be given an opportunity to accompany the United States' appraiser on the inspection of their property under the Uniform Act.[1199] The site visit is a chance for landowners to share information about their property that they believe should be considered in the valuation process (Section 1.2.6.4).

4.13.4.   **Attorneys.** Attorneys play a critical role in appraisals for federal acquisitions, whether or not litigation is involved. **__Legal instructions__** are necessary on a variety of valuation issues addressed throughout these Standards, such as ownership and title questions affecting the larger parcel determination (Section 4.3.3) or the proper application of the scope of the project rule to exclude government project influence on market value (Section 4.5). To do so, attorneys—whether agency counsel, Department of Justice attorneys, or landowners' counsel—must often engage in nuanced discussions with appraisers to determine what legal instructions are necessary and appropriate. Agency counsel should consult the U.S. Department of Justice for assistance on novel or complex issues.

---

[1199] 42 U.S.C. § 4651(2); *see* Section 1.2.6.4. Landowners can also designate a representative to attend the property inspection on their behalf.

5-ER-963

# APPENDIX

# APPENDIX A

## Appraisal Report Documentation Checklist

**INTRODUCTION**

**Title Page**

|  | Agency name |  | Appraiser's name(s) |
|--|-------------|--|---------------------|
|  | Agency tract no. |  | Appraiser's address |
|  | Property address |  | Effective date of value |

**Transmittal Letter**

|  | Date of letter |  | Client and legal instructions |
|--|----------------|--|-------------------------------|
|  | Property identification |  | Opinion of value before acquisition |
|  | Property rights appraised |  | Opinion of value after acquisition |
|  | Effective date of value |  | Difference |
|  | Extraordinary assumptions |  | Appraiser signature |
|  | Table of Contents |  |  |

**Appraiser's Certification**

|  | Conforms to USPAP |  | Opinion of value after acquisition |
|--|-------------------|--|-------------------------------------|
|  | Conforms to Federal Standards |  | Difference |
|  | Property inspection |  | Effective date of value |
|  | Offered owner accompaniment |  | Appraiser signature |
|  | Opinion of value before acquisition |  |  |

**Executive Summary**

|  | Property identification |  | Highest and best use – after acquisition |
|--|-------------------------|--|------------------------------------------|
|  | Effective date of value |  | Description before |
|  | Highest and best use – before acquisition |  | Description after |

| Value before |  | Value after |  |
|--------------|--|-------------|--|
|  | Cost approach |  | Cost approach |
|  | Sales comparison approach |  | Sales comparison approach |
|  | Income capitalization approach |  | Income capitalization approach |
|  | Final opinion of value |  | Final opinion of value |
|  | Photos of subject |  | Assumptions and limiting conditions |

## Scope of Work Description

|  | Client |  | Property characteristics |
|---|---|---|---|
|  | Intended users |  | Assignment conditions |
|  | Intended use |  | Geographic area and timespan of market data research |
|  | Definition of market value |  | Type of market data researched |
|  | Definition of market rental value |  | Extent of market data confirmation |
|  | Effective date |  | Data sources |

## FACTUAL DATA AND ANALYSIS – BEFORE ACQUISITION

|  | Legal description |  | Area data |
|---|---|---|---|

## Site Data

|  | Existing use |  | Land Shape |
|---|---|---|---|
|  | Access |  | Utilities |
|  | Topography |  | Minerals |
|  | Soils |  | Easements |
|  | Vegetation |  | Hazards |
|  | Land Area |  |  |

## Improvement Data

|  | Type |  | Condition |
|---|---|---|---|
|  | Size |  | Quality |
|  | Actual age |  | Occupancy |
|  | Effective age |  | On-site improvements |
|  | Fixtures |  | Sales history |
|  | Use history |  | Rental history |

## Tax/Assessments

|  | Assessed value |  | Tax load |
|---|---|---|---|
|  | Zoning and land use regulations |  |  |

## Highest and Best Use

|  | As vacant |  | Financial feasibility |
|---|---|---|---|
|  | As improved |  | Degree of profitability |
|  | Physical possibility |  | Larger parcel |
|  | Legal permissibility |  |  |

## Land Valuation

|  | Describe comparables |  | Analysis of comparables |
|---|---|---|---|
|  | Photos of comparables |  | Final value analysis/opinion of value |

5-ER-966

**Cost Approach**

| | Included *or* [ ] omission explained | | Market support |
|---|---|---|---|
| | Reproduction/replacement cost | | Final value analysis/opinion of value |
| | Depreciation | | |

**Sales Comparison Approach**

| | Included | | Analysis of comparables |
|---|---|---|---|
| | Describe comparables | | Final value analysis/opinion of value |
| | Photos of comparables | | |

**Income Capitalization Approach**

| | Included *or* [ ] omission explained | | Operating expenses |
|---|---|---|---|
| | Market rental comparables | | Market support for capitalization rate |
| | Gross income estimate | | Explain selection of capitalization rate |
| | Vacancy | | Final value analysis/opinion of value |
| | Fixed expenses | | |

**Reconciliation and Final Opinion of Value**

| | Provided | | Avoid summation appraisal |
|---|---|---|---|

**FACTUAL DATA AND ANALYSIS – AFTER ACQUISITION**

**Legal Description/Description of Acquisition**

| | Legal description of remainder *or* [ ] description of acquisition |
|---|---|

**Area Data**

| | Describe government project | | Address project impact |
|---|---|---|---|

**Site Data**

| | Shape | | Utilities |
|---|---|---|---|
| | Size | | Access |
| | Easements | | Relationship to project |

**Improvement Data**

| | Describe improvements | | |
|---|---|---|---|
| | Fixtures | | Rental history after acquisition |
| | Use after acquisition | | |

**Tax/Assessments**

| | Est. assessed value | | Est. tax load |
|---|---|---|---|

5-ER-967

**Zoning and Land Use Regulations**

|  | Re-zone considered |  |  |
|---|---|---|---|

**Highest and Best Use**

|  | Change considered |  | Effects of TCEs *or* [ ] n/a |
|---|---|---|---|
|  | Intensity considered |  | Zoning non-conformance addressed |
|  | Restoration considered |  |  |

**Land Valuation**

|  | Same *or* different comparables |  | Analysis of comparables |
|---|---|---|---|
|  | Describe comparables |  | Final value analysis/opinion of value |
|  | Photos of comparables |  |  |

**Cost Approach**

|  | Included *or* [ ] omission explained |  | Market support |
|---|---|---|---|
|  | Reproduction cost |  | Final value analysis/opinion of value |
|  | Depreciation |  |  |

**Sales Comparison Approach**

|  | Included |  | Photos of comparables |
|---|---|---|---|
|  | Same *or* [ ] different comparables |  | Analysis of comparables |
|  | Describe comparables |  | Final value analysis/opinion of value |

**Income Capitalization Approach**

|  | Included *or* [ ] omission explained |  | Operating expenses |
|---|---|---|---|
|  | Gross income estimate |  | Market support for capitalization rate |
|  | Vacancy |  | Explain selection of capitalization rate |
|  | Fixed expenses |  | Final value analysis/opinion of value |

**Reconciliation and Final Opinion of Value**

|  | Provided |  | Avoided summation appraisal |
|---|---|---|---|

**Acquisition Analysis**

|  | Recapitulation |  | Proper format |
|---|---|---|---|

**Damage (if applicable)**

|  | Allocate part acquired vs. damage to remainder or [ ] n/a |  | Estimate cost to cure damage |
|---|---|---|---|
|  | Note allocation is accounting exercise |  |  |

**Benefits (if applicable)**

|  | Consider direct (special) benefits |  | Explain benefits analysis |
|---|---|---|---|
|  | Disregard indirect (general) benefits |  |  |

5-ER-968

**ADDENDA AND EXHIBITS**

|  | Location map |  | Comparable sales data maps |
|---|---|---|---|

**Comparable Sales Data Sheets**

|  | Sales confirmed |  | Existing use |
|---|---|---|---|
|  | Terms reported |  | Highest and best use |
|  | Buyer and seller |  | Zoning |
|  | Date of sale |  | Legal |
|  | Recording information |  | Physical description |
|  | Location |  |  |

**Subject Property Plot Plan**

|  | Property boundaries shown |  | Street frontage after acquisition |
|---|---|---|---|
|  | Dimensions before acquisition |  | Photo locations |
|  | Dimensions after acquisition |  | Improvement locations |
|  | Street frontage before acquisition |  |  |
|  | Subject property floor plan |  | Other exhibits |
|  | Title report |  | Appraiser qualifications |

# APPENDIX B

**Recommended Appraisal Report Format for Total Acquisitions**

**2.3.1    Introduction**
    (2.3.1.1)    Title Page
    (2.3.1.2)    Transmittal Letter
    (2.3.1.3)    Table of Contents
    (2.3.1.4)    Appraiser's Certification
    (2.3.1.5)    Executive Summary
    (2.3.1.6)    Photographs
    (2.3.1.7)    Statement of Assumptions and Limiting Conditions
    (2.3.1.8)    Description of Scope of Work

**2.3.2    Factual Data**
    (2.3.2.1)    Legal Description
    (2.3.2.2)    Area, City, and Neighborhood Data
    (2.3.2.3)    Property Data
        (2.3.2.3.1)    Site
        (2.3.2.3.2)    Improvements
        (2.3.2.3.3)    Fixtures
        (2.3.2.3.4)    Use History
        (2.3.2.3.5)    Sales History
        (2.3.2.3.6)    Rental History
        (2.3.2.3.7)    Assessed Value and Annual Tax Load
        (2.3.2.3.8)    Zoning and Other Land Use Regulations

**2.3.3    Data Analysis and Conclusions**
    (2.3.3.1)    Highest and Best Use
        (2.3.3.1.1)    Four Tests
        (2.3.3.1.2)    Larger Parcel
    (2.3.3.2)    Land Valuation
        (2.3.3.2.1)    Sales Comparison Approach
        (2.3.3.2.2)    Subdivision Development Method
    (2.3.3.3)    Cost Approach
    (2.3.3.4)    Sales Comparison Approach
    (2.3.3.5)    Income Capitalization Approach
    (2.3.3.6)    Reconciliation and Final Opinion of Market Value

**2.3.7    Exhibits and Addenda**

Location Map

Comparable Data Maps

Detail of Comparable Sales and Rental Data

Plot Plan

Floor Plan

Title Evidence Report

Other Pertinent Exhibits

Qualifications of the Appraiser

# APPENDIX C

**Recommended Appraisal Report Format for Partial Acquisitions**

**2.3.1**    **Introduction**
    (2.3.1.1)    Title Page
    (2.3.1.2)    Transmittal Letter
    (2.3.1.3)    Table of Contents
    (2.3.1.4)    Appraiser's Certification
    (2.3.1.5)    Executive Summary
    (2.3.1.6)    Photographs
    (2.3.1.7)    Statement of Assumptions and Limiting Conditions
    (2.3.1.8)    Description of Scope of Work

**2.3.2**    **Factual Data – Before Acquisition**
    (2.3.2.1)    Legal Description
    (2.3.2.2)    Area, City, and Neighborhood Data
    (2.3.2.3)    Property Data
        (2.3.2.3.1)    Site
        (2.3.2.3.2)    Improvements
        (2.3.2.3.3)    Fixtures
        (2.3.2.3.4)    Use History
        (2.3.2.3.5)    Sales History
        (2.3.2.3.6)    Rental History
        (2.3.2.3.7)    Assessed Value and Annual Tax Load
        (2.3.2.3.8)    Zoning and Other Land Use Regulations

**2.3.3**    **Data Analysis and Conclusions – Before Acquisition**
    (2.3.3.1)    Highest and Best Use
        (2.3.3.1.1)    Four Tests
        (2.3.3.1.2)    Larger Parcel
    (2.3.3.2)    Land Valuation
        (2.3.3.2.1)    Sales Comparison Approach
        (2.3.3.2.2)    Subdivision Development Method
    (2.3.3.3)    Cost Approach
    (2.3.3.4)    Sales Comparison Approach
    (2.3.3.5)    Income Capitalization Approach
    (2.3.3.6)    Reconciliation and Final Opinion of Market Value – Before Acquisition

**2.3.4    Factual Data – After Acquisition**

(2.3.4.1)     Legal Description
(2.3.4.2)     Neighborhood Factors
(2.3.4.3)     Property Data

(2.3.4.3.1)     Site
(2.3.4.3.2)     Improvements
(2.3.4.3.3)     Fixtures
(2.3.4.3.4)     History
(2.3.4.3.5)     Assessed Value and Tax Load
(2.3.4.3.6)     Zoning and Other Land Use Regulations

**2.3.5    Data Analysis and Conclusions – After Acquisition**

(2.3.5.1)     Analysis of Highest and Best Use
(2.3.5.2)     Land Valuation
(2.3.5.3)     Cost Approach
(2.3.5.4)     Sales Comparison Approach
(2.3.5.5)     Income Capitalization Approach
(2.3.5.6)     Reconciliation and Final Opinion of Value – After Acquisition

**2.3.6    Acquisition Analysis**

(2.3.6.1)     Recapitulation
(2.3.6.2)     Allocation and Damages
(2.3.6.3)     Special Benefits

**2.3.7    Exhibits and Addenda**

Location Map
Comparable Data Maps
Details of Comparable Sales and Rental Data
Plot Plan
Floor Plan
Title Evidence Report
Other Pertinent Exhibits
Qualifications of the Appraiser

# APPENDIX D

**(2.5)  Recommended Project Appraisal Report Format**

**Part I – Introduction, General Factual Data and Analysis**

Introduction

    (1)  Title Page

    (2)  Transmittal Letter

    (3)  Table of Contents

    (4)  Executive Summary

    (5)  Statement of Assumptions and Limiting Conditions

    (6)  Description of Scope of Work

General Factual Data

    (7)  Area, City, and Neighborhood Data

    (8)  Zoning and Other Land Use Regulations

Analysis

    (9)  Analysis of Highest and Best Use

    (10)  Discussion of Approaches to Value

    (11)  Land Valuation

    (12)  Cost Approach

    (13)  Sales Comparison Approach

    (14)  Income Capitalization Approach

    (15)  Special Studies

**Part II – Individual Parcel Report**

Introduction

    (16)  Title Page

    (17)  Table of Contents

    (18)  Appraiser's Certification

    (19)  Summary of Salient Facts and Conclusions

    (20)  Photographs of Subject Property

    (21)  Statement of Assumptions and Limiting Conditions

    (22)  Description of Scope of Work

    (23)  Executive Summary

Factual Data [total acquisitions] or Factual Data – Before Acquisition [partial acquisitions]

    (24)  Legal Description

   (25)  Area, City, and Neighborhood Data
   (26)  Property Data
      a.  Site
      b.  Improvements
      c.  Fixtures
      d.  Use History
      e.  Sales History
      f.  Rental History
      g.  Assessed Value and Annual Tax Load
      h.  Zoning and Other Land Use Regulations

<u>Data Analysis and Conclusions</u> [total acquisitions] or <u>Data Analysis and Conclusions</u> – After Acquisition [partial acquisitions]

   (27)  Analysis of Highest and Best Use
   (28)  Land Valuation
   (29)  Value Estimate by Cost Approach
   (30)  Value Estimate by Sales Comparison Approach
   (31)  Value Estimate by Income Capitalization Approach
   (32)  Reconciliation and Final Opinion of Value

<u>Factual Data – After Acquisition</u> [partial acquisitions only]

     Items (24) to (26) in after situation

<u>Data Analysis and Conclusions – After Acquisition</u> [partial acquisitions only]

     Items (27) to (32) in after situation

<u>Acquisition Analysis</u> [partial acquisitions only]

   (33)  Acquisition Analysis

<u>Exhibits and Addenda</u>

   (34)  Exhibits and Addenda
      a.  Neighborhood Map
      b.  Comparable Data Map
      c.  Detail of Comparative Data
      d.  Plot Plan
      e.  Floor Plan
      f.  Title Evidence Report
      g.  Other Pertinent Exhibits

**Part III – General Exhibits and Addenda**

   (35)  Location Map
   (36)  Comparable Data Maps
   (37)  Details of Comparative Data
   (38)  Other Pertinent Exhibits
   (39)  Qualifications of Appraiser

# APPENDIX E

**Extraordinary Verification of Sales - Section 1.5.2.4**

1.      **Examine Authorizing Legislation**
    - Does the legislation require purchase based on market value?
    - Does the legislation mandate purchase at other than market value?
    - Does the legislation provide for acquisition based on non- market considerations (e.g., unaffected by Endangered Species Act even though an endangered species is found on the property)?

2.      **Contact Acquiring Agency**
    - Examine the Appraisal
      - Was the appraisal based on a partial or total acquisition?
      - What property interest was valued?
      - Was the highest and best use an economic use?
      - Was the highest and best use the same or similar to the subject property?
      - Were the sales used in the appraisal influenced by non-market factors?
      - Was there an allocation of value in the appraisal addressing the contributions of different land types or improvements?
    - Examine the Appraisal Review
      - Did the appraisal review identify any factual or technical errors in the appraisal report?
    - Examine the Negotiators Report
      - Was there threat of condemnation if agreement could not be reached?
      - Was the price paid based on agency support for a tax write-off for the seller?
      - Did the owner threaten to damage property if the asking price was not paid?
      - Was the sale part of a land exchange?
      - Did the owner submit an appraisal or other market data to the agency during the negotiation?
    - Examine the Correspondence File
      - Was there correspondence between the agency and the owner's political representatives?
      - Was there public pressure on the agency about the purchase?
      - Was there media coverage about the purchase?
    - Examine the Conveyance and Closing Documents
      - Was the estate conveyed the same as the estate valued in the appraisal?
      - Was the estate conveyed an easement?
      - Was the price paid for the property equivalent to the appraiser's final opinion of value?
      - Was the price paid within the appraisal's range of value?
      - Did the conveyance allow the seller to remain on the property or continue to use the property for a period of time (e.g., life estate)?

3.      **Verify Sale with Buyer and Seller**

# TABLE OF AUTHORITIES

## Cases

*6,816.5 Acres of Land v. United States*, 411 F.2d 834 (10th Cir. 1969) . . . . . . . . . . . . . . . . . . . 163

*767 Third Ave. Assocs. v. United States*, 30 Fed. Cl. 216 (1993), *aff'd*, 48 F.3d 1575 (Fed. Cir. 1995) . . . . . . . . . . 43

*767 Third Ave. Assocs. v. United States*, 48 F.3d 1575 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . 177

*A.G. Davis Ice Co. v. United States*, 362 F.2d 934 (1st Cir. 1966) . . . . . . . . . . . . . . . . . . . 140-41, 175

*Ackerley Commc'ns of Fla., Inc. v. Henderson*, 881 F.2d 990 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . 99

*Acton v. United States*, 401 F.2d 896 (9th Cir. 1968) . . . . . . . . . . . . . . . . . . . 159

*Adaman Mut. Water Co. v. United States*, 278 F.2d 842 (9th Cir. 1960) . . . . . . . . . . . . . . . . . . . 159

*Alameda Gateway, Ltd. v. United States*, 45 Fed. Cl. 757 (1999) . . . . . . . . . . . . . . . . . 115, 154, 189, 192, 194, 203

*Albert Hanson Lumber Co. v. United States*, 261 U.S. 581 (1923) . . . . . . . . . . . . . . . . . . . 130

*Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470 (1973) . . . . . . . . . . . . . . . . . . . 93, 198

*Am. Savings & Loan Ass'n v. County of Marin*, 653 F.2d 364 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . 117

*Arizona v. California*, 283 U.S. 423 (1931) . . . . . . . . . . . . . . . . . . . 189

*Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511 (2012) . . . . . . . . . . . . 161, 168, 170, 175, 177, 183, 185

*ASARCO, Inc. v. Kadish*, 490 U.S. 605 (1989) . . . . . . . . . . . . . . . . . . . 178

*Atlantic Coast Line R. Co. v. United States*, 132 F.2d 959 (5th Cir. 1943) . . . . . . . . . . . . . . . . . . . 129

*Autozone Dev. Corp. v. Dist. of Columbia*, 484 F. Supp. 2d 24 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . 175

*Baetjer v. United States*, 143 F.2d 391 (1st Cir. 1944) . . . . . . . . . . . . . . . . . . . 111, 113, 115-16, 123-25, 153-56

*Bank of Edenton v. United States*, 152 F.2d 251 (4th Cir. 1945) . . . . . . . . . . . . . . . . . . . 110, 129

*Banks v. United States*, 71 Fed. Cl. 501 (2006) . . . . . . . . . . . . . . . . . . . 188-89, 194

*Barnes v. S.C. Pub. Serv. Auth.*, 120 F.2d 439 (4th Cir. 1941) . . . . . . . . . . . . . . . . . . . 125

*Barnhart v. Brinegar*, 362 F. Supp. 464 (W.D. Mo. 1973) . . . . . . . . . . . . . . . . . . . 99

*Basset, New Mexico LLC v. United States*, 55 Fed. Cl. 63 (2002) . . . . . . . . . . . . . . . . . . . 158

*Batten v. United States*, 306 F.2d 580 (10th Cir. 1962) . . . . . . . . . . . . . . . . . . . 155

*Bauman v. Ross*, 167 U.S. 548 (1897) . . . . . . . . 4, 6, 90, 93, 99, 101, 113, 119, 151, 154-55, 162-63, 167, 194, 201

**5-ER-977**

*Bd. of Cty. Supervisors v. United States* (*Prince William Cty. II*), 116 F.3d 454 (Fed. Cir. 1997) . . . . . . . . . . . . . . 197

*Benecke v. United States*, 356 F.2d 439 (5th Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . .92

*Berberich v. United States*, 5 Cl. Ct. 652 (1984) . . . . . . . . . . . . . . . . . . . . . . 200-01

*Berman v. Parker*, 348 U.S. 26 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91, 157

*BFP v. Resolution Tr. Corp.*, 511 U.S. 531 (1994) . . . . . . . . . . . . . . . . . . . . 120, 124-25

*Bibb Cty. v. United States*, 249 F.2d 228 (5th Cir. 1957) . . . . . . . . . . . . . . . . . . . . .98

*Bischoff v. Glickman*, 54 F. Supp. 2d 1226 (D. Wyo. 1999) . . . . . . . . . . . . . . . . . . . 195

*Bogart v. United States*, 169 F.2d 210 (10th Cir. 1948) . . . . . . . . . . . . . . . . . . . . .97

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) . . . . . . . . . . . . . . . . . . 148

*Boone v. United States*, 944 F.2d 1489 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . 189

*Borman v. Raymark Indus., Inc.*, 960 F.2d 327 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . 121

*Bos. Chamber of Commerce v. City of Boston*, 217 U.S. 189 (1910) . . . . . . . . . . . . . 99, 162, 172-73, 197-98, 200

*Bowen v. Pub. Agencies Opposed to Soc. Security Entrapment*, 477 U.S. 41 (1986) . . . . . . . . . . 190

*Boyd v. United States*, 222 F.2d 493 (8th Cir. 1955) . . . . . . . . . . . . . . . . . . . . . . 157

*Brace v. United States*, 72 Fed. Cl. 337 (2006), *aff'd*, 250 F. App'x 359 (Fed. Cir. 2007) (per curiam) (unpubl.) . . . . 202

*Brooks-Scanlon Corp. v. United States*, 265 U.S. 106 (1924) . . . . . . . . . . . . . . . . . . 132

*Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003) . . . . . . . . . . . . . . . . . . . . . 162

*Brown v. United States*, 263 U.S. 78 (1923) . . . . . . . . . . . . . . . . . . . . 197, 199, 200-01

*Buena Vista Homes, Inc. v. United States*, 281 F.2d 476 (10th Cir. 1960) . . . . . . . . . . . . . . . . 133

*Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . 199

*California v. United States* (*Naval Shipyard*), 395 F.2d 261 (9th Cir. 1968) . . . . . . . . . . . 196, 198, 201

*Calvo v. United States*, 303 F.2d 902 (9th Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . 170

*Cameron Dev. Co. v. United States*, 145 F.2d 209 (5th Cir. 1944) . . . . . . . . . . . . . . . . 179

*Campbell v. United States*, 266 U.S. 368 (1924) . . . . . . . . . . . . . . . . . . . . 113, 157-58

*Caporal v. United States*, 577 F.2d 113 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . . 196

*Carlock v. United States*, 60 App. D.C. 314 (D.C. Cir. 1931) . . . . . . . . . . . . . . . . . 174-75

*Carlstrom v. United States*, 275 F.2d 802 (9th Cir. 1960) . . . . . . . . . . . . . . . . . . . 124

*Cementerio Buxeda, Inc. v. Puerto Rico*, 196 F.2d 177 (1st Cir. 1952) . . . . . . . . 137-38, 140, 142, 182

*Certain Land in City of Washington v. United States*, 355 F.2d 825 (D.C. Cir. 1965) . . . . . . . . . . . . . . . 159

*Chapman v. United States*, 169 F.2d 641 (10th Cir. 1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

*Childers v. United States*, 116 Fed. Cl. 486 (Fed. Cl. 2013). . . . . . . . . . . . . . . . . . . . . . 121-22

*City of New York v. Sage*, 239 U.S. 57 (1915) . . . . . . . . . . . . . . . . . . . . . . . . 99, 106, 150

*City of Van Buren v. United States*, 697 F.2d 1058 (Fed. Cir. 1983). . . . . . . . . . . . . . . . . . . 153

*Clear Sky Car Wash., LLC v. City of Chesapeake*, 910 F. Supp. 2d 861 (E.D. Va. 2012) . . . . . . . . . . . . . . . .99

*Cloverport Sand & Gravel Co. v. United Sates*, 6 Cl. Ct. 178 (1984) . . . . . . . . . . . . . . . 180-82

*Cole Inv. Co. v. United States*, 258 F.2d 203 (9th Cir. 1958) . . . . . . . . . . . . . . . . . . . . . 112

*County of Ontonagon v. Land in Dickinson Cty.*, 902 F.2d 1568, 1990 WL 66813 (6th Cir. 1990) (unpubl.) . . . . . . . 159

*CSX Transp., Inc. v. Ga. State Bd. of Equalization*, 552 U.S. 9 (2007). . . . . . . . . . . . . . . . . . . 119

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633 (9th Cir. 2010) . . . . . . . . . . . . . . . . 185

*D.C. Redev. Land Agency v. 61 Parcels of Land*, 235 F.2d 864 (D.C. Cir. 1956) . . . . . . . . . . . . . . . . . 124

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . 119

*Denver v. Quick*, 108 Colo. 111 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

*Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000). . . . . . . . . . 50, 94, 105-06, 185-86, 204-05

*Devou v. City of Cincinnati*, 162 F. 633 (6th Cir. 1908) . . . . . . . . . . . . . . . . . . . . . . . . 136

*Dickinson v. United States*, 154 F.2d 642 (4th Cir. 1946) . . . . . . . . . . . . . . . . . . . . . . . . 124

*Dugan v. Rank*, 372 U.S. 609 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94, 169

*Duk Hea Oh v. Nat'l Capital Revitalization Corp.*, 7 A.3d 997 (D.C. 2010) . . . . . . . . . . . . . . . . . 126

*E. Tenn. Nat. Gas Co. v. 2.93 Acres of Land*, No. 4:02CV00179, 2007 WL 2688414 (W.D. Va. Sept. 13, 2007) . . . . 158

*E. Tenn. Nat. Gas Co. v. 7.74 Acres of Land*, 228 F. App'x 323 (4th Cir. 2007) (unpubl.) . . . . . . . . . . . . . . . 117

*Eagle Lake Improvement Co. v. United States* (*Eagle Lake I*), 141 F.2d 562 (5th Cir. 1944) . . . . . . . . . . . . . 178-80

*Eagle Lake Improvement Co. v. United States* (*Eagle Lake II*), 160 F.2d 182 (5th Cir. 1947). . . . . . . . . . . . 141, 180

*El Paso Nat. Gas Co. v. Fed. Energy Regulatory Comm'n*, 96 F.3d 1460 (D.C. Cir. 1996) . . . . . . . . . . . . . . . 120

*Ellamae Phillips Co. v. United States*, 564 F.3d 1367 (Fed. Cir. 2009). . . . . . . . . . . . . . . . . . . . 199

*Erceg v. Fairbanks Expl. Co.*, 95 F.2d 850 (9th Cir. 1938) . . . . . . . . . . . . . . . . . . . . . . . . 130

*Estate of Hage v. United States*, 687 F.3d 1281 (Fed. Cir. 2012) . . . . . . . . . . . . . . . . . . . . 195

*Etalook v. Exxon Pipeline Co.*, 831 F.2d 1440 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . 171

*Evans v. Tenn. Valley Auth.*, 922 F.2d 841, 1991 WL 1113 (6th Cir. 1991) (unpubl.) . . . . . . . . . . . . . 169-70

*Evans v. United States*, 326 F.2d 827 (8th Cir. 1964). . . . . . . . . . . . . . . . . . . . . . . . 125-27

*Fairfield Gardens, Inc. v. United States*, 306 F.2d 167 (9th Cir. 1962) . . . . . . . . . . . . . . . . . . . . . 109, 132

*First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304 (1987) . . . . . . . . . . . . 43, 174, 177

*Five Tracts of Land in Cumberland v. United States*, 101 F. 661 (3d Cir. 1900) . . . . . . . . . . . . . . . . 106

*Fla. Rock Indus., Inc. v. United States* (*Florida Rock II*), 791 F.2d 893 (Fed. Cir. 1986). . . . . . . . . . . . . . .95, 96

*Fla. Rock Indus., Inc. v. United States* (*Florida Rock III*), 18 F.3d 1560 (Fed. Cir. 1994) . . . . . . . . . . . . . . .95, 96

*Foster v. United States*, 2 Cl. Ct. 426 (1983), *aff'd*, 746 F.2d 1491 (Fed. Cir. 1984) . . . . . . 129, 136, 138-39, 181-82

*Ga. Kaolin Co. v. United States*, 214 F.2d 284 (5th Cir. 1954) . . . . . . . . . . . . . . . . . . . . . . . 178

*Ga.-Pac. Corp. v. United States*, 640 F.2d 328 (Ct. Cl. 1980) (per curiam) . . . . . . 94, 115, 151, 154-59, 165-67, 183

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90, 119

*Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824) . . . . . . . . . . . . . . . . . . . . . . . . . . 187-88, 191

*Gibson v. United States*, 166 U.S. 269 (1897). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188, 190

*Gilman v. City of Philadelphia*, 70 U.S. 713 (1865) . . . . . . . . . . . . . . . . . . . . . . . . . . 187-88

*Good v. United States*, 39 Fed. Cl. 81 (1997), *aff'd*, 189 F.3d 1355 (Fed. Cir. 1999) . . . . . . . . . . . . . . 192

*Greenleaf Johnson Lumber Co. v. Garrison*, 237 U.S. 251 (1915) . . . . . . . . . . . . . . . . . . . . . 192

*Greer Coal., Inc. v. U.S. Forest Serv.*, 470 F. App'x 630 (9th Cir. 2012) (unpubl.). . . . . . . . . . . . . . . 94, 185-86

*H & R Corp. v. District of Columbia*, 351 F.2d 740 (D.C. Cir. 1965). . . . . . . . . . . . . . . . . . . . 108

*Hage v. United States*, 35 Fed. Cl. 147 (Fed. Cl. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 195

*Hage v. United States*, 51 Fed. Cl. 570 (Fed. Cl. 2002). . . . . . . . . . . . . . . . . . . . . . . . . 195

*Hannan v. United States*, 131 F.2d 441 (D.C. Cir. 1942). . . . . . . . . . . . . . . . . . . . . . . . 126

*Harris v. United States*, 205 F.2d 765 (10th Cir. 1953) . . . . . . . . . . . . . . . . . . . . . . . . 167

*Hembree v. United States*, 347 F.2d 109 (8th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . 139

*Hendler v. United States*, 175 F.3d 1374 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . 156, 159, 163, 194

*Hickey v. United States*, 208 F.2d 269 (3d Cir. 1953). . . . . . . . . . . . . . . . . . . . . 94, 120, 123-25

*Hicks v. United States ex rel. Tenn. Valley Auth.*, 266 F.2d 515 (6th Cir. 1959). . . . . . . . . . . . . . . 142

*Home Ins. Co. v. Balt. Warehouse Co.*, 93 U.S. 527 (1876) . . . . . . . . . . . . . . . . . . . . . . . 125

*Hooten v. United States*, 405 F.2d 1167 (5th Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . 159

*Hoover v. U.S. Dep't of Interior*, 611 F.2d 1132, 1138 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . 203

*Horne v. Dep't of Agric.*, 135 S. Ct. 2419 (2015). . . . . . . . . . . . . . . . . . 5, 90, 93, 162-64, 192

*In re Cool*, 81 B.R. 614 (D. Mont. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140, 142

*In re Dyevoich*, No. 11-2551 (MLC), 2012 WL 194677 (D.N.J. Jan. 23, 2012) (unpubl.) . . . . . . . . . . . . . . . . . . 95

*In re Furman Street*, 17 Wend. 649 (N.Y. Sup. Ct. 1836) . . . . . . . . . . . . . . . . . . . . . . . 128

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . 121

*In re Operation of the Mo. River Sys. Litig.*, 363 F. Supp. 2d 1145 (D. Minn. 2004),
*aff'd in part and vacated in part*, 421 F.3d 618 (8th Cir. 2005) . . . . . . . . . . . . . . . . . 190

*In re U.S. Comm'n to Appraise Wash. Mkt. Co. Prop.*, 295 F. 950 (D.C. Cir. 1924) . . . . . . . . . . . . . . . . . 134

*Int'l Paper Co. v. United States*, 227 F.2d 201 (5th Cir. 1955) . . . . . . . . . . . . . 115-16, 124, 132, 153-54

*Intertype Corp. v. Clark-Congress Corp.*, 240 F.2d 375 (7th Cir. 1957) . . . . . . . . . . . . . . . 157, 159-61, 177

*J.A. Tobin Constr. Co. v. United States*, 343 F.2d 422 (10th Cir. 1965) . . . . . . . . . . . . . . . . . 104, 186

*Jefferson Cty. v. Tenn. Valley Auth.*, 146 F.2d 564 (6th Cir. 1945) . . . . . . . . . . . . . . . . . . . . 197

*Joslin Co. v. Providence*, 262 U.S. 668 (1923) . . . . . . . . . . . . . . . . . . . . . . 142

*Justice v. United States*, 145 F.2d 110 (9th Cir. 1944) . . . . . . . . . . . . . . . . . . . . . . 127

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) . . . . . . . . . . . . . . . . . 187-89, 191-92, 194

*Kaiser Dev. Co. v. Honolulu*, 649 F. Supp. 926 (D. Haw. 1986), *aff'd*, 898 F.2d 112 (9th Cir. 1990) (mem.) . . . . . . . 160

*Kelo v. City of New London*, 545 U.S. 469 (2005) . . . . . . . . . . . . . . . . . . . . . . 90

*Kerr v. S. Park Comm'rs*, 117 U.S. 379 (1886) . . . . . . . . . . . . . . . 93, 94, 95, 101-02, 146, 149

*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987) . . . . . . . . . . . . . . . . . 49, 118

*Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . 90, 93, 95-96, 98, 100-01, 104-05, 107, 118, 136-38, 140, 161, 171, 174-75, 177

*Kinter v. United States*, 156 F.2d 5 (3d Cir. 1946) . . . . . . . . . . . . . . . . . . . 131, 133, 136

*Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1 (1984) . . . . . . . . . . . . . . . 91-94, 101, 183-84, 196, 204-05

*Klein v. United States*, 375 F.2d 825 (Ct. Cl. 1967) . . . . . . . . . . . . . . . . . . . . . . 159

*Knollman v. United States*, 214 F.2d 106 (6th Cir. 1954) . . . . . . . . . . . . . . . . . . . . . 120-21

*Kohl v. United States*, 91 U.S. 367 (1875) . . . . . . . . . . . . . . . . . . . . . . 89

*L. Vogelstein & Co. v. United States*, 262 U.S. 337 (1923) . . . . . . . . . . . . . . . . . . . . 106-07

*Ladd v. United States*, 630 F.3d 1015 (Fed. Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . 199

*Lambert Gravel Co. v. J.A. Jones Constr. Co.*, 835 F.2d 1105 (5th Cir. 1988) . . . . . . . . . . . . . . 188, 190, 192

*Lewis Blue Point Oyster Cultivation Co. v. Briggs*, 229 U.S. 82 (1913) . . . . . . . . . . . . . . . 189-90, 192

*Likins-Foster Monterey Corp. v. United States*, 308 F.2d 595 (9th Cir. 1962) . . . . . . . . . . . . . . 137, 141, 182

*Lodge Tower Condo. Ass'n v. Lodge Props., Inc.*, 85 F.3d 476 (10th Cir.1996) . . . . . . . . . . . . . . . . . 185

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) . . . . . . . . . . . . . . . . . . . . . 49, 177, 185

*Lost Tree Village Corp. v. United States*, 787 F.3d 1111 (Fed. Cir. 2015),
*petition for cert. docketed*, No. 15-1192 (U.S. March 23, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 187-88

*Marbury v. Madison*, 5 U.S. 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 89, 93

*Mayor & City Council of Baltimore v. United States*, 147 F.2d 786 (4th Cir. 1945) . . . . . . . . . . . . . . 174, 196

*McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608 (Fed. Cl. 2013) . . . . . . . . . . . . . . . . . . 121

*McCoy v. Union Elevated R.R. Co.*, 247 U.S. 354, 365 (1918) . . . . . . . . . . . . . . . . . 93, 95, 162, 167

*Meadows v. United States*, 144 F.2d 751 (4th Cir. 1944) . . . . . . . . . . . . . . . . . . . . . . . . . . .97

*Miller v. United States*, 550 F. Supp. 669 (Cl. Ct. 1982), *aff'd*, 714 F.2d 160 (Fed. Cir. 1983) (mem.). . . . . . . . . 192

*Miller v. United States*, 620 F.2d 812 (Ct. Cl. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

*Mills v. United States*, 363 F.2d 78 (8th Cir. 1966). . . . . . . . . . . . . . . . . . . . . . . . 139-140, 179

*Minnesota Rate Cases*, 230 U.S. 352 (1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

*Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403 (1878) . . . . . . . . 90, 92-93, 96, 105, 107, 127-28, 171, 203

*Mitchell v. United States*, 267 U.S. 341 (1925) . . . . . . . . . . . . . . . . . . . . . . 142, 151, 155, 159

*Monongahela Nav. Co. v. United States*, 148 U.S. 312 (1893) . . . . . . . . 96, 101, 105, 140, 155, 169-70, 195, 203

*Mont. Ry. Co. v. Warren*, 137 U.S. 348 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178-79

*Morgan v. Commercial Union Assurance Cos.*, 606 F.2d 554 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . .82

*Morris v. Comm'r*, 761 F.2d 1195 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

*Morton Butler Timber Co. v. United States*, 91 F.2d 884 (6th Cir. 1937) . . . . . . . . . . . . . . . . . . . .98

*Mt. St. Helens Mining & Recovery Ltd. P'ship v. United States*, 384 F.3d 721 (9th Cir. 2004) . . . . . . . . . . . . . 186

*Murr v. Wisconsin*, 359 Wis. 2d 675 (Wis. Ct. App. 2014), *review denied*, 366 Wis. 2d 59 (2015),
*cert. granted*, 136 S. Ct. 890 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Nash v. D.C. Redev. Land Agency*, 395 F.2d 571 (D.C. Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . 126

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt. (NPCA v. BLM)*, 606 F.3d 1058 (9th Cir. 2010). . . . . 185-86

*Nebraska v. United States*, 164 F.2d 866 (8th Cir. 1947) . . . . . . . . . . . . . . . . . . . 91, 97, 99, 172, 197

*Norfolk Redev. & Hous. Auth. v. Chesapeake & Potomac Tel. Co.*, 464 U.S. 30 (1983) . . . . . . . . . . . . . . .89

*Norman v. United States*, 429 F.3d 1081 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Norman v. United States*, 63 Fed. Cl. 231 (Ct. Cl. 2004), *aff'd*, 429 F.3d 1081 (Fed. Cir. 2005) . . . . . . . . . . . 145

*Old Dominion Land Co. v. United States*, 269 U.S. 55 (1925) . . . . . . . . . . . . . . . . . . . . . . . . .98

*Olson v. United States*, 292 U.S. 246 (1934) . . . 5, 90, 93, 96, 100-05, 107-08, 117, 119, 123-24, 126-29, 132, 134-36, . . . . . . . . . . . . . . . . . . . . . . .139, 143-45, 151, 156-57, 162, 170-71, 173, 174, 176, 179, 183, 187, 193, 197, 200

*Olson v. United States*, 67 F.2d 24 (8th Cir. 1933), *aff'd*, 292 U.S. 246 (1934) . . . . . . . . . . . . . . . . . . . . . 107

*Omnia Commercial Co. v. United States*, 261 U.S. 502 (1923) . . . . . . . . . . . . . . . . . . . . . . . . 159

*Oncor Elec. Delivery Co. v. Brown*, 451 S.W.3d 128 (Tex. Ct. App. 2014) . . . . . . . . . . . . . . . . . 114

*Otay Mesa Prop., L.P. v. United States* (*Otay Mesa I*), 670 F.3d 1358 (Fed. Cir. 2012) . . . . . . . . . . . . . . . . 177-78

*Otay Mesa Prop., L.P. v. United States* (*Otay Mesa II*), 110 Fed. Cl. 732 (Fed. Cl. 2013) . . . . . . . . . . . . 107, 178

*Otay Mesa Prop., L.P. v. United States* (*Otay Mesa III*), 779 F.3d 1315 (Fed. Cir. 2015) . . . . . . . . . . .107, 178, 184

*Owen v. United States*, 851 F.2d 1404 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . 189, 194

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 117-18

*Palm Beach Isles Assocs. v. United States*, 42 Fed. Cl. 340 (Fed. Cl. 1998). . . . . . . . . . . . . . . . . . 192

*Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978) . . . . . . . . . . . . . . 49, 117-18, 185

*Pa. Ave. Dev. Corp. v. One Parcel of Land in D.C.*, 670 F.2d 289 (D.C. Cir. 1981). . . . . . . . . . . . . . . . 175

*Phillips v. United States*, 148 F.2d 714 (2d Cir. 1945) . . . . . . . . . . . . . . . . . . . . . . . . . 127

*Phillips v. United States*, 243 F.2d 1 (9th Cir. 1957) . . . . . . . . . . . . . . . . . . . . . . . . . 179-80

*Porrata v. United States*, 158 F.2d 788 (1st Cir. 1947) . . . . . . . . . . . . . . . . . . . . . . . . 154

*Portland Nat. Gas Transmission Sys. v. 19.2 Acres of Land*, 318 F.3d 279 (1st Cir. 2003) . . . . . . . . . . . . . .91

*Pottawatomie Cty. Comm'rs v. O'Sullivan*, 17 Kan. 58 (1876) . . . . . . . . . . . . . . . . . . . . 162, 164

*PPL Montana, LLC v Montana*, 132 S. Ct. 1215 (2012) . . . . . . . . . . . . . . . . . . . . . . . 188

*Preseault v. Interstate Commerce Comm'n* (*Preseault I*), 494 U.S. 1 (1990) . . . . . . . . . . . . . . . . . . . 198-99

*Preseault v. United States* (*Preseault II*), 100 F.3d 1525 (Fed. Cir. 1996). . . . . . . . . . . . . . . . . . 199

*Public Lands Council v. Babbitt*, 529 U.S. 728 (2000) . . . . . . . . . . . . . . . . . . . . . . . . 195

*Pub. Util. Dist. No. 1 v. City of Seattle*, 382 U.S. 666, 669 (9th Cir. 1967) . . . . . . . . . . . . . . . . 188

*PVM Redwood Co. v. United States*, 686 F.2d 1327 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . 159

*R.J. Widen Co. v. United States*, 357 F.2d 988 (Ct. Cl. 1966) . . . . . . . . . . . . . . . . . . . . . 159

*Rapanos v. United States*, 547 U.S. 715 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*Rapid Transit Co. v. United States*, 295 F.2d 465 (10th Cir. 1961) . . . . . . . . . . . . . . . . . . . 108

*Rasmuson v. United States*, 807 F.3d 1343 (Fed. Cir. 2015) . . . 89-90, 94-95, 100-02, 132, 134, 150, 152, 169, 197-99

*Rhodes v. City of Chi. for Use of Sch.*, 516 F.2d 1373 (7th Cir. 1975). . . . . . . . . . . . . . . . . . . .99

*Richards v. Wash. Terminal Co.*, 233 U.S. 546 (1914) . . . . . . . . . . . . . . . . . . . . . . . 155

*Robinson v. United States*, 305 F.3d 1330 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . .95

*Rockies Exp. Pipeline LLC v. 4.895 Acres of Land*, 734 F.3d 424 (6th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . .91

*Rockies Exp. Pipeline LLC v. Hopkins, 131.495 Acres*, No. 1:08-cv-00751-RLY-DML, 2012 WL 1622532 (S.D. Ind. May 9, 2012) . . . . . . . . . . . . . . . . . . . . . . . 145

*Rogers v. United States*, 184 So.3d 1087 (Fla. 2015) . . . . . . . . . . . . . . . . . . . . . . .91

*Rogers v. United States*, 814 F.3d 1299 (Fed. Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . .91

*Roth v. U.S. Dep't of Transp.*, 572 F.2d 183 (8th Cir. 1978) . . . . . . . . . . . . . . . . . . . .99

*Rousseaux v. United States*, 394 F.2d 123 (5th Cir. 1968) (per curiam) . . . . . . . . . . . . . . . 117

*S. Ctys. Gas Co. of Cal. v. United States*, 157 F. Supp. 934 (Ct. Cl. 1958), *cert. denied*, 358 U.S. 815 (1958) . . . . . . . 159

*S. Nat. Gas Co. v. Land, Cullman Cty.*, 197 F.3d 1368 (11th Cir. 1999) . . . . . . . . . . . . . . . .91

*San Nicolas v. United States*, 617 F.2d 246 (Ct. Cl. 1980) . . . . . . . . . . . . . . . . . . . . . .98

*Scott Lumber Co. v. United States*, 390 F.2d 388 (9th Cir. 1968) . . . . . . . . . . . . . . . . . . 183

*Scranton v. Wheeler*, 179 U.S. 141 (1900) . . . . . . . . . . . . . . . . . . . . . . . 187-88, 190

*Se. Supply Header, LLC v. 110 Acres in Covington Cty.* (*SESH*), No. 2:07-CV-291 KS-MTP, 2008 WL 127490 (S.D. Miss. Jan. 10, 2008) . . . . . . . . . . . . . 114, 116

*Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299 (1923) . . . . . . . . . . . . . . . . . . 151

*Searl v. School Dist.*, 133 U.S. 553 (1890) . . . . . . . . . . . . . . . . 90, 94, 98, 119, 201

*Seravalli v. United States*, 845 F.2d 1571 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . 119-20

*Sharp v. United States*, 191 U.S. 341 (1903) . . . . . . . . . . . . . . 110-14, 130, 153, 156

*Sharpe v. United States*, 112 F. 893 (3d Cir. 1902), *aff'd sub nom. Sharp v. United States*, 191 U.S. 341 (1903) . . . . . . . . . . . . . . . . 110-11, 115, 153, 156

*Shoemaker v. United States*, 147 U.S. 282 (1893) . . . . . . . . . . . . . . . . . . . . 91, 101, 145

*Sill Corp. v. United States*, 343 F.2d 411 (10th Cir. 1965) . . . . . . . . . . . . . . . . . . . . 119

*Simmonds v. United States*, 199 F.2d 305 (9th Cir. 1952) . . . . . . . . . . . . . . . . . . . . . 123

*Slattery Co. v. United States*, 231 F.2d 37 (5th Cir. 1956) . . . . . . . . . . . . . . . . . . . 125-27

*South Carolina v. Georgia*, 93 U.S. 4 (1876) . . . . . . . . . . . . . . . . . . . . . . . . 190

*St. Joe Paper Co. v. United States*, 155 F.2d 93 (5th Cir. 1946) . . . . . . . . . . . . . . . . . . 102

*St. Regis Paper Co. v. United States*, 313 F.2d 45 (9th Cir. 1962) . . . . . . . . . . . . . . . . . . 158

*Standard Oil Co. of N.J. v. S. Pac. Co.*, 268 U.S. 146 (1925) . . . . . . . . . . . . . . . . . . . 132

*Stephenson Brick Co. v. United States ex rel. Tenn. Valley Auth.*, 110 F.2d 360 (5th Cir. 1940) . . . . . . . . . . . . . . . 128

*Stipe v. United States*, 337 F.2d 818 (10th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . 140, 159

*Surfside of Brevard, Inc. v. United States*, 414 F.2d 915 (5th Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . 123

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002) . . . . . . . . . . . . 89-90, 117-18

*Terminal Coal Co. v. United States*, 172 F.2d 113 (3d Cir. 1949) . . . . . . . . . . . . . . . . . . . . . . 198

*The Daniel Ball*, 77 U.S. 557 (1870) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

*The Propeller Genesee Chief v. Fitzhugh*, 12 How. 443 (1852) . . . . . . . . . . . . . . . . . . . . . . . 188

*Town of Clarksville v. United States*, 198 F.2d 238 (4th Cir. 1952) . . . . . . . . . . . . . . . . . . . . 200-01

*Town of N. Bonneville v. Callaway*, 10 F.3d 1505 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 201

*Town of N. Bonneville v. U.S. Dist. Court*, 732 F.2d 747 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . 201

*Town of N. Bonneville v. United States*, 5 Cl. Ct. 312 (1984) . . . . . . . . . . . . . . . . . . . . . . . 201

*Town of N. Bonneville v. United States*, 833 F.2d 1024 (Fed. Cir. Oct. 28, 1987) (unpubl.) . . . . . . . . . . . . . . . 201

*Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15 (5th Cir. 1969) . . . . . . . . . . 92, 126-27, 152, 169-71

*Tundidor v. Miami-Dade Cty.*, 831 F.3d 1328 (11th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . 188

*Turner v. Kings River Conservation Dist.*, 360 F.2d 184 (9th Cir. 1966) . . . . . . . . . . . . . . . . . . 190

*United States ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land*, 821 F.3d 742 (6th Cir. 2016) . . . . . . . . .  101-05, 107-08

*United States ex rel. Tenn. Valley Auth. v. An Easement & Right-of-Way*, 182 F. Supp. 899 (M.D. Tenn. 1960) . . . . . . 169

*United States ex rel. Tenn. Valley Auth. v. An Easement & Right-of-Way* (*Hadley*), 447 F.2d 1317 (6th Cir. 1971) . . . . . . 104

*United States ex rel. Tenn. Valley Auth. v. An Easement & Right-of-Way over 6.09 Acres of Land* (*TVA v. 6.09 Acres*), 140 F. Supp. 3d 1218 (N.D. Ala. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143-45

*United States ex rel. Tenn. Valley Auth. v. Bailey*, 115 F.2d 433 (5th Cir. 1940) . . . . . . . . . . . . . . . . 126

*United States ex rel. Tenn. Valley Auth. v. Harralson*, 43 F.R.D. 318 (W.D. Ky. 1966) (mem.) . . . . . . . . . . . 98, 123

*United States ex rel. Tenn. Valley Auth. v. Indian Creek Marble Co.*, 40 F. Supp. 811 (E.D. Tenn. 1941) . . . . . . . . . . . . . . . . . 137, 153, 162, 165-66, 167, 170, 178, 182

*United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266 (1943) . . . . . . . . . . . . . . . 90, 91, 99-102, 112, 133, 135-36, 140, 154-56, 159, 176, 187, 197

*United States ex rel. Tenn. Valley Auth. v. Robertson*, 354 F.2d 877 (5th Cir. 1966) . . . . . . . . . . . . . . . 166

*United States ex rel. Tenn. Valley Auth. v. Russell*, 87 F. Supp. 386 (E.D. Tenn. 1948) . . . . . . . . . . . . . . 91, 170

*United States ex rel. Tenn. Valley Auth. v. Stewart*, 429 F. Supp. 658 (E.D. Tenn. 1976) . . . . . . . . . . . . . 113-14

*United States ex rel. Tenn. Valley Auth. v. Welch*, 327 U.S. 546, 554 (1946) . . . . . . . . . . . . . . . . . . .91

*United States v. 0.073 Acres of Land (Mariner's Cove)*, 705 F.3d 540 (5th Cir. 2013) . . . . . . . . . . . . . . . . . 90, 159

*United States v. 0.161 Acres of Land in Birmingham*, 837 F.2d 1036 (11th Cir. 1988) . . . . . . . . . . . . . . . . . 130

*United States v. 0.21 Acres of Land*, 803 F.2d 620 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . 110

*United States v. 0.39 Acres of Land*, No. 2:11-0259, 2013 WL 3874472 (S.D.W. Va. July 25, 2013) . . . . . . . . . 166

*United States v. 0.59 Acres of Land in Pima Cty.*, 109 F.3d 1493 (9th Cir. 1997) . . . . . . . . . . 126-27, 129, 132, 197

*United States v. 1,014.16 Acres of Land in Vernon Cty.*, 558 F. Supp. 1238 (W.D. Mo. 1983),
*aff'd*, 739 F.2d 1371 (8th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

*United States v. 1,291.83 Acres of Land in Adair & Taylor Ctys.*, 411 F.2d 1081 (6th Cir. 1969) . . . . . . . . . 139, 145

*United States v. 1,629.6 Acres of Land in Sussex Cty. (Island Farm II)*,
360 F. Supp. 147 (D. Del. 1973), *aff'd*, 503 F.2d 764 (3d Cir. 1974) . . . . . . . . . . . . . . . . . . . . . 179-80

*United States v. 1,629.6 Acres of Land in Sussex Cty. (Island Farm III)*, 503 F.2d 764 (3d Cir. 1974) . . . . . . . . . . . . .90

*United States v. 1.377 Acres of Land (Hotel San Diego)*, 352 F.3d 1259 (9th Cir. 2003) . . . . . . . . . . . . . . . .97, 99

*United States v. 1.57 Acres of Land in San Diego Cty.*, No. 12cv3055,
2015 WL 5254558 (S.D. Cal. Sept. 9, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105, 107

*United States v. 1.604 Acres of Land (Granby I)*,
844 F. Supp. 2d 668 (E.D. Va. 2011) . . . . . . . . . 103, 105, 131-32, 134-36, 146-47, 149-51, 156, 159, 160, 202

*United States v. 1.604 Acres of Land (Granby II)*, No. 2:10-cv-00320, 2011 WL 1810594 (E.D. Va. May 11, 2011) . . 135

*United States v. 1.604 Acres of Land (Granby III)*, 844 F. Supp. 2d 685 (E.D. Va. 2011) . . . . . . . . . .124, 135-36, 202

*United States v. 10,031.98 Acres of Land in Las Animas Cty.*, 850 F.2d 634 (10th Cir. 1988) . . . . . . . . . . . . . . . 129

*United States v. 10.0 Acres of Land*, 533 F.2d 1092 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . 112-13

*United States v. 10.00 Acres of Land*, No. 99-0672-CIV, 2010 WL 3733994 (S.D. Fla. Sept. 22, 2010),
*aff'd sub nom. United States v. Gonzalez*, 466 F. App'x 858 (11th Cir. 2012) (per curiam) . . . . . . . . 96, 109, 121, 202

*United States v. 10.48 Acres of Land*, 621 F.2d 338 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . 125-26, 171

*United States v. 10.56 Acres in Whatcom Cty. (Peace Arch I)*, No. C07-1261RAJ,
2008 WL 3977614 (W.D. Wash. Aug. 22, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

*United States v. 10.56 Acres in Whatcom Cty. (Peace Arch II)*, No. C07-1261RAJ,
2010 WL 415244 (W.D. Wash. Jan. 27, 2010) . . . . . . . . . . . . . . . . . . . . . . . 199, 201

*United States v. 100 Acres of Land*, 468 F.2d 1261 (9th Cir. 1972) . . . . . . . . . . . . . . . . . . .120, 131, 144-45

*United States v. 100.00 Acres of Land in Livingston Cty.*, 369 F. Supp. 195 (W.D. Ky. 1973). . . . . . . . . . . . . . . 103

*United States v. 100.01 Acres of Land in Buchanan Cty.*, 102 F. App'x 295 (4th Cir. 2004) (unpubl.) . . . . . . . . . . 123

*United States v. 100.80 Acres of Land (Parrish)*, 657 F. Supp. 269 (M.D.N.C. 1987) . . . . . . . 137, 140, 142, 178, 181

*United States v. 101.88 Acres of Land in St. Mary Par. (Avoca Island)*, 616 F.2d 762 (5th Cir. 1980) . . . . . .155, 157, 192

*United States v. 102.871 Acres of Land in Cameron Par.* (*La. Jetty*), No. 2:13 CV 2508,
2015 WL 5794073 (W.D. La. Oct. 2, 2015) . . . . . . . . . . . . . . . . . . . . 189, 192

*United States v. 103.38 Acres of Land in Morgan Cty.* (*Oldfield*), 660 F.2d 208 (6th Cir. 1981). . . 120, 137-38, 178-80, 182

*United States v. 105.40 Acres of Land in Porter Cty.*, 471 F.2d 207 (7th Cir. 1972) . . . . . . . . 111, 113, 116, 152, 156

*United States v. 1129.75 Acres of Land in Cross & Pointsett Ctys.*, 473 F.2d 996 (8th Cir. 1973). . . . . . . . . . . . 131

*United States v. 114.64 Acres of Land*, 504 F.2d 1098 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . 129

*United States v. 117,763 Acres of Land in Imperial Cty.*, 410 F. Supp. 628 (S.D. Cal. 1976),
aff'd sub nom. *United States v. Shewfelt Inv. Co.*, 570 F.2d 290 (9th Cir. 1977). . . . . . . . . . . . . . . . . . . . . 43, 176

*United States v. 12.94 Acres of Land in Solano Cty.*, No. S-07-2172,
2009 WL 4828749, 2009 U.S. Dist. LEXIS 114581 (E.D. Cal. Dec. 9, 2009). . . . . . . . . . . . . . . . 57, 166-67

*United States v. 122.63 Acres of Land in Norfolk Cty.*, 526 F. Supp. 539 (D. Mass. 1981). . . . . . . . . . . . . . 157

*United States v. 124.84 Acres of Land in Warrick Cty.*, 387 F.2d 912 (7th Cir. 1968) . . . . . . . . . . . . . . 120

*United States v. 125.07 Acres of Land* (*Pond Road I*), 667 F.2d 243 (1st Cir. 1981) . . . . . . . . . . . . . . . . . 145, 151

*United States v. 125.2 Acres of Land in Nantucket*, 732 F.2d 239 (1st Cir. 1984). . . . . . . . . . . . . . . .94

*United States v. 13.20 Acres of Land in Lincoln Cty.*, 629 F. Supp. 242 (E.D. Wash. 1986) . . . . . . . . . . . . . . 191-93

*United States v. 131,675 Rentable Square Feet of Space* (*GSA-VA St. Louis I*),
No. 4:14-cv-1077, 2015 WL 4430134 (E.D. Mo. July 20, 2015) . . . . . . . . . . . . . 159, 161, 174, 176-77

*United States v. 14.36 Acres of Land in McMullen Cty.*, 252 F. Supp. 2d 361 (S.D. Tex. 2002). . . . . . . . . . . . 113-14

*United States v. 14.38 Acres of Land*, 80 F.3d 1074 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . 153

*United States v. 147.47 Acres of Land* (*Delegap*), 352 F. Supp. 1055 (M.D. Pa. 1972) . . . . . . . . . . . . . . . 143, 145

*United States v. 15,478 Square Feet of Land* (*Balaji Sai*), No. 2:10-cv-00322,
2011 WL 2471586 (E.D. Va. June 20, 2011) . . . . . . . . . . . . . . . . . . . . . . . .100, 131, 133, 135

*United States v. 15.00 Acres of Land in Miss. Cty.*, 468 F. Supp. 310 (E.D. Ark. 1979) . . . . . . 106-07, 138-39, 180, 183

*United States v. 15.65 Acres of Land in Marin Cty.* (*Marin Ridgeland Co.*), 689 F.2d 1329 (9th Cir. 1982) . . . . . . . 157-58

*United States v. 158.00 Acres of Land in Clay Cty.*, 562 F.2d 11 (8th Cir. 1977). . . . . . . . . . . . . . . . 99, 136

*United States v. 158.24 Acres of Land in Bee Cty.*, 515 F.2d 230 (5th Cir. 1975) . . . . . . . . . . . . . . 103, 111

*United States v. 158.24 Acres of Land*, 696 F.2d 559 (8th Cir. 1982) . . . . . . . . . . . . . . . . . . 129

*United States v. 158.76 Acres of Land in Townshend*, 298 F.2d 559 (2d Cir. 1962) . . . . . 98, 104, 137, 140-41, 178, 182

*United States v. 161.99 Acres of Land in Collins Cty.*, 512 F.2d 65 (5th Cir. 1975) . . . . . . . . . . . . . . .94-95

*United States v. 17.69 Acres of Land in San Diego* (*Nat'l Enterprises*),
No. 99cv1248 DMS (JMA) (S.D. Cal. Aug. 30, 2004) . . . . . . . . . . . . . . . . . . . . 113, 116

*United States v. 172.80 Acres of Land in Mercer Cty.*, 350 F.2d 957 (3d Cir. 1965) . . . . . . . . . . . . . . . . . 147

*United States v. 1735 N. Lynn St.*, 676 F. Supp. 693 (E.D. Va. 1987) . . . . . . . . . . . .159, 161, 174-77

*United States v. 174.12 Acres of Land in Pierce Cty.*, 671 F.2d 313 (9th Cir. 1982) . . . . . . . . . . . . . . . 108

*United States v. 179.26 Acres of Land in Douglas Cty.*, 644 F.2d 367 (10th Cir. 1981) . . . . . . . . . . . . . 180

*United States v. 18.46 Acres of Land in Swanton*, 312 F.2d 287 (2d Cir. 1963) . . . . . . . . . . . . . . . . . 128

*United States v. 2,175.86 Acres of Land in Hardin & Jefferson Ctys.*, 687 F. Supp. 1079 (E.D. Tex. 1988) . . . . . . . 183

*United States v. 2,477.79 Acres of Land in Bell Cty.*, 259 F.2d 23 (5th Cir. 1958) . . . . . . . . . . . . . . . 163

*United States v. 2,560.00 Acres of Land in Wash. Cty.*, 836 F.2d 498 (10th Cir. 1988) . . . . . . . . . . . . . 155

*United States v. 2,847.58 Acres of Land in Bath Ctys.*, 529 F.2d 682 (6th Cir. 1976) . . . . . . . . . .153, 165, 170

*United States v. 2.33 Acres of Land in Wake Cty.*, 704 F.2d 728 (4th Cir. 1983) . . . . . . . . . . . . . .112, 166, 167

*United States v. 2.739 Acres of Land in Santa Cruz Cty.*, 609 F. App'x 436 (9th Cir. 2015) (unpubl.) . . . . . . . . . . 126

*United States v. 21.54 Acres of Land in Marshall Cty.*, 491 F.2d 301 (4th Cir. 1973) . . . . . . . . . . . . . . 91, 157

*United States v. 22.80 Acres of Land in San Benito Cty.*, 839 F.2d 1362 (9th Cir. 1988) . . . . . . . . . . . . . 178

*United States v. 237,500 Acres of Land*, 236 F. Supp. 44 (S.D. Cal. 1964),
*aff'd sub nom. United States v. Am. Pumice Co.*, 404 F.2d 336 (9th Cir. 1968)  . . . . . . . . . . . . . 97, 107, 139, 181

*United States v. 24.48 Acres of Land*, 812 F.2d 216 (5th Cir. 1987) . . . . . . . . . . . . . . . . . 120, 180-81

*United States v. 25.02 Acres of Land*, 495 F.2d 1398 (10th Cir. 1974) . . . . . . . . . . . . . . . . . 126-127

*United States v. 25.202 Acres of Land (Amexx I)*, 860 F. Supp. 2d 165 (N.D.N.Y. 2009),
*adopted* 860 F. Supp. 2d 165 (N.D.N.Y. 2010),
*aff'd*, 502 F. App'x 43 (2d Cir. 2012) . . . . . . . . 103, 110-11, 116, 118-20, 132-33, 136-38, 142, 155, 182, 189

*United States v. 25.202 Acres of Land (Amexx II)*, No. 5:06-CV-428,
2011 WL 4595009 (N.D.N.Y. Sept. 30, 2011), *aff'd*, 502 F. App'x 43 (2d Cir. 2012) . . . . . . . 136

*United States v. 25.936 Acres of Land in Edgewater*, 153 F.2d 277 (3d Cir. 1946) . . . . . . . . . . . . . . . .97

*United States v. 26.07 Acres of Land in Nassau Cty.*, 126 F. Supp. 374 (E.D.N.Y. 1954) . . . . . . . . . . . . .156-57

*United States v. 264.80 Acres of Land in Ramsey Cty.*, 360 F. Supp. 1381 (D.N.D. 1973) . . . . . . . . . . . . . 126

*United States v. 27.93 Acres of Land in Cumberland Cty.*, 924 F.2d 506 (3d Cir. 1991) . . . . . . . . . . .103, 108, 110

*United States v. 275.81 Acres of Land (Flight 93 Memorial)*,
No. 09-233, 2014 WL 1248205 (W.D. Pa. Mar. 26, 2014) . . . . . . . . . . . . . . . . . . . . . 104-05

*United States v. 3,218.9 Acres of Land in Warren Cty.*, 619 F.2d 288 (3d Cir. 1980) . . . . . . . . . . 91, 157, 169

*United States v. 3,317.39 Acres of Land in Jefferson Cty.*, 443 F.2d 104 (8th Cir. 1971) . . . . . . . . . . . . . 157

*United States v. 3,727.91 Acres of Land (Elsberry Drainage District)*, 563 F.2d 357 (8th Cir. 1977) . . . . . . . .135, 196, 198

*United States v. 3.544 Acres of Land*, 147 F.2d 596 (3d Cir. 1945) . . . . . . . . . . . . . . . . . . . . . . . 145

*United States v. 3.6 Acres of Land in Spokane Cty.*, 395 F. Supp. 2d 982 (E.D. Wash. 2004) . . . . . . . . . . . . . . . . 172

*United States v. 3.66 Acres of Land in S.F.*, 426 F. Supp. 533 (N.D. Cal. 1977). . . . . . . . . . . . . . . . . . . . . . 152

*United States v. 30.54 Acres of Land in Greene Cty. (Filiaggi)*, 90 F.3d 790 (3d Cir. 1996) . . . . . . . . . . . 187-92, 194

*United States v. 312.50 Acres of Land in Prince William Cty.*, 812 F.2d 156 (4th Cir. 1987) . . . . . . . . . . . . . . 129-30

*United States v. 32.42 Acres of Land (Fleet ASW)*, No. 05cv1137 DMS,
2009 WL 2424303 (S.D. Cal. Aug. 6, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98, 172

*United States v. 32.42 Acres of Land in San Diego Cty.*, 683 F.3d 1030 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . .91

*United States v. 320 Acres of Land*, 605 F.2d 762
(5th Cir. 1979) . . . .  99, 102, 104-06, 107-10, 119-120, 123-24, 129-30, 145-50, 165, 171, 175, 180, 183, 186, 197

*United States v. 33.5 Acres of Land*, 789 F.2d 1396 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 159

*United States v. 33.92356 Acres of Land (Piza-Blondet)*,
585 F.3d 1 (1st Cir. 2009) . . . . . . . . . 102-03, 107-08, 110-12, 116, 119, 129, 152, 154-55, 165-67, 170, 180-81

*United States v. 33.92356 Acres of Land (Piza-Blondet Trial Op.)*,
Nos. 98-1664 & 98-2344, 2008 WL 2550586 (D.P.R. June 13, 2008),
*aff'd*, 585 F.3d 1 (1st Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . 98, 101, 112, 137-38, 140, 142, 178, 180

*United States v. 341.45 Acres of Land in St. Louis Cty.*, 633 F.2d 108 (8th Cir. 1980) . . . . . . . . . . . . . 104, 143-45

*United States v. 344.85 Acres of Land*, 384 F.2d 789 (7th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . 120, 193

*United States v. 38,994 Net Usable Square Feet at 910 S. Mich. Ave.*, No. 87 C 8569,
1989 WL 51395 (N.D. Ill. May 11, 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

*United States v. 38.60 Acres of Land in Henry Cty.*, 625 F.2d 196 (8th Cir. 1980) . . . . . . . . . . . . . . . . 157, 169

*United States v. 381.76 Acres of Land (Montego Group)*, No. 96-1813, 2010 WL 3734003
(S.D. Fla. Aug. 3, 2010), *adopted sub nom. United States v. 10.00 Acres of Land*, No. 99-0672-CIV,
2010 WL 3733994 (S.D. Fla. Sept. 22, 2010), *aff'd sub nom. United States v. Gonzalez*,
466 F. App'x 858 (11th Cir. 2012) (per curiam). . . . . . . . . . . . . . . . . . . . .96, 109, 121, 178, 202

*United States v. 4.0 Acres of Land*, 175 F.3d 1133 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . .81

*United States v. 4.105 Acres of Land in Pleasanton*, 68 F. Supp. 279 (N.D. Cal. 1946) . . . . . . . . . . . . . . . . . 101

*United States v. 4.27 Acres of Land*, 271 F. App'x 424, 2008 WL 830711 (5th Cir. 2008) (per curiam) (unpubl.) . 152, 165

*United States v. 4.85 Acres of Land in Lincoln Cty.*, 546 F.3d 613 (9th Cir. 2008) . . . . . . . . . . . . . . .123-24, 130-31

*United States v. 40.60 Acres of Land in Contra Costa Cty.*, 483 F.2d 927 (9th Cir. 1973). . . . . . . . . . . . . . . . 157

*United States v. 403.14 Acres of Land in St. Clair Cty.*, 553 F.2d 565 (8th Cir. 1977) . . . . . . . . . . . . . . . 112-13

*United States v. 421.89 Acres of Land*, 465 F.2d 336 (8th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . 120

*United States v. 422,978 Square Feet of Land in S.F.*, 445 F.2d 1180 (9th Cir. 1971) . . . . . . . . . . . . . . . . 191

*United States v. 428.02 Acres of Land in Newton & Searcy Ctys.*, 687 F.2d 266 (8th Cir. 1982) . . 123-25, 129-30, 146, 151

*United States v. 429.59 Acres of Land* (*Imperial Beach*), 612 F.2d 459 (9th Cir. 1980) . 103, 107, 110-14, 116, 122, 129, 193

*United States v. 46,672.96 Acres of Land in Doña Ctys.*,
521 F.2d 13 (10th Cir. 1975). . . . . . . . . . . . . . . . 104-06, 123, 125, 126-28, 174, 175, 177, 183, 186, 197

*United States v. 47.14 Acres of Land in Polk Cty.*, 674 F.2d 722 (8th Cir. 1982). . . . . . 46, 120, 125, 136, 137, 138, 182

*United States v. 47.3096 Acres of Land*, 583 F.2d 270 (6th Cir. 1978) . . . . . . . . . . . . . . . . . 143-45

*United States v. 478.34 Acres of Land*, 578 F.2d 156 (6th Cir. 1978) . . . . . . . . . . . . . . . . . 143

*United States v. 48.10 Acres of Land in New Windsor*, 144 F. Supp. 258 (S.D.N.Y. 1956) . . . . . . . . . . . . . . . . . 150

*United States v. 480.00 Acres of Land* (*Fornatora*),
557 F.3d 1297 (11th Cir. 2009) . . . . . . . . . . . . . . . . . 107, 109, 120, 125, 127, 146, 148, 150-51

*United States v. 49,375 Square Feet of Land in Manhattan* (*252 Seventh Ave.*),
92 F. Supp. 384 (S.D.N.Y. 1950), *aff'd sub nom. United States v.
Tishman Realty & Constr. Co.*, 193 F.2d 180 (2d Cir. 1952) (per curiam) . . . . . . . . . . . . . . . . . 131, 133

*United States v. 49.01 Acres of Land in Osage Cty.*, 669 F.2d 1364 (10th Cir. 1982). . . . . . . . . . . . . . .147, 149, 151

*United States v. 49.79 Acres of Land in New Castle Cty.* (*Cherry Island*), 582 F. Supp. 368 (D. Del. 1983) . . . . . . . . 192

*United States v. 494.10 Acres of Land in Cowley Cty.*, 592 F.2d 1130 (10th Cir. 1979) . . . . . . . . . . . . . . . 180

*United States v. 499.472 Acres of Land in Brazoria Cty.*, 701 F.2d 545 (5th Cir. 1983) . . . . . . . . . . 97, 99, 173, 178

*United States v. 5,139.5 Acres of Land*, 200 F.2d 659 (4th Cir. 1952) . . . . . . . . . . . . . . . . . 122

*United States v. 50 Acres of Land* (*Duncanville*),
469 U.S. 24 (1984) . . . . . . . . . . . . . . . . . .5, 90, 92-93, 100-01, 105, 107, 145, 155, 187, 196-97, 199, 200-01

*United States v. 50.50 Acres of Land*, 931 F.2d 1349 (9th Cir. 1991) . . . . . . . . . . . . . . . . .112, 114, 155

*United States v. 55.22 Acres of Land in Yakima Cty.*, 411 F.2d 432 (9th Cir. 1969) . . . . . . . . . . . . . . . . . 131-34

*United States v. 564.54 Acres of Land* (*Lutheran Synod*), 441 U.S. 506 (1979) . . . . . . 93, 96, 99-120, 173, 187, 196-200

*United States v. 57.09 Acres of Land in Skamania Cty.* (*Peterson I*), 706 F.2d 280 (9th Cir. 1983). . . . . . . . . . . . . 173

*United States v. 57.09 Acres of Land in Skamania Cty.* (*Peterson II*), 757 F.2d 1025 (9th Cir. 1985). . . . . . . . . . . . 159

*United States v. 58.1 Acres of Land in Hempstead*, 151 F. Supp. 631 (E.D.N.Y. 1957) . . . . . . . . . . . . . . . . . 150

*United States v. 599.86 Acres in Johnson & Logan Ctys.*, 240 F. Supp. 563 (W.D. Ark. 1965),
*aff'd sub nom. Mills v. United States*, 363 F.2d 78 (8th Cir. 1966). . . . . . . . . . . . . . . . . . 179

*United States v. 6.24 Acres of Land* (*Weber*), 99 F.3d 1140,
1996 WL 607162 (6th Cir. 1996) (per curiam) (unpubl.) . . . . . . . . . . . . . . . 96, 98, 111-12, 150, 152, 155-57

*United States v. 6.45 Acres of Land* (*Gettysburg Tower*), 409 F.3d 139 (3d Cir. 2005).  97, 99, 110-11, 136, 138, 141-42, 173

*United States v. 6.45 Acres of Land*, No. 1:CV-99-2128, 2006 WL 839375
(M.D. Pa. Mar. 27, 2006), *on remand from* 409 F.3d 139 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . 138, 142

*United States v. 60.14 Acres of Land*, 362 F.2d 660 (3d Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . .119, 120, 122

*United States v. 62.17 acres of Land in Jasper Cty.*, 538 F.2d 670 (5th Cir. 1976) . . . . . . . . . . . . . . . . . 91, 147

*United States v. 62.50 Acres of Land in Jefferson Par.*, 953 F.2d 886 (5th Cir. 1992) . . . . . . . . . . 103, 108-09

*United States v. 63.04 Acres of Land at Lido Beach*, 245 F.2d 140 (2d Cir. 1957) . . . . . . . . . . . . . . . . . . 130

*United States v. 633.07 Acres of Land*, 362 F. Supp. 451 (M.D. Pa. 1973) . . . . . . . . . . . . . . . . . . . . . . 123

*United States v. 677.50 Acres of Land*, 420 F.2d 1136 (10th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . 159

*United States v. 68.94 Acres of Land in Kent Cty.*, 918 F.2d 389 (3d Cir. 1990) . . . . . .120, 123-24, 130-31, 151-52, 169

*United States v. 69.1 Acres of Land* (*Sand Mountain*), 942 F.2d 290 (4th Cir. 1991) . . . .  95-96, 103, 137-39, 179-80, 182

*United States v. 691.81 Acres of Land in Clark Cty.*, 443 F.2d 461 (6th Cir. 1971) . . . . . . . . . . . . . . . . . 130

*United States v. 71.29 Acres in Catahoula Par.*, 376 F. Supp. 1221 (W.D. La. 1974). . . . . . . . . . . . . 191, 193

*United States v. 711.57 Acres of Land in Alameda Cty.*, 51 F. Supp. 30 (N.D. Cal. 1943) . . . . . . . . . . .115, 154, 203

*United States v. 75.13 Acres in Polk Cty.*, 693 F.2d 813 (8th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . 138-39

*United States v. 760.807 Acres of Land in Honolulu*, 731 F.2d 1443 (9th Cir. 1984) . . . . . .96, 150, 152-54, 156-59,166

*United States v. 765.56 Acres of Land in Southampton* (*765.56 Acres I*), 164 F. Supp. 942 (E.D.N.Y. 1958),
*aff'd sub nom. United States v. Glanat Realty Corp.*, 276 F.2d 264 (2d Cir. 1960). . . . . . . . . . . . . . 94, 108, 152, 172

*United States v. 765.56 Acres of Land in Southampton* (*765.56 Acres II*), 174 F. Supp. 1 (E.D.N.Y. 1959),
*aff'd sub nom. United States v. Glanat Realty Corp.*, 276 F.2d 264 (2d Cir. 1960). . . . . . . . . . . . . . .113, 152, 172

*United States v. 79.20 Acres of Land in Stoddard Cty.*, 710 F.2d 1352 (8th Cir. 1983) . . . . . . . . . . . . . . . . 172-73

*United States v. 79.31 Acres of Land*, 717 F.2d 646 (1st Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . .90

*United States v. 79.95 Acres of Land*, 459 F.2d 185 (10th Cir. 1972). . . . . . . . . . . . . . . . . . . . . . 124-25

*United States v. 790.71 Acres of Land in Cotton, Comanche & Stephens Ctys.*, 550 F. Supp. 690 (W.D. Okla. 1981) . . . . .94

*United States v. 7,936.6 Acres of Land*, 69 F. Supp. 328 (D.P.R. 1947) . . . . . . . . . . . . . . . . . . . . . . 116

*United States v. 8,968.06 Acres in Chambers & Liberty Ctys.* (*Wallisville*), 326 F. Supp. 546 (S.D. Tex. 1971) . .108, 191, 193

*United States v. 8,968.06 Acres of Land in Chambers & Liberty Ctys.*,318 F. Supp. 698 (S.D. Tex. 1970),
*vacated* 326 F. Supp. 546 (S.D. Tex. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

*United States v. 8.34 Acres of Land in Ascension Par.*, No. 04-5-D-MI,
2006 WL 6860387 (M.D. La. June 12, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135, 204-05

*United States v. 8.41 Acres of Land in Orange Cty.*,
680 F.2d 388 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . .103, 110-13, 116-17, 152-53, 155, 165, 169, 171

5-ER-991

*United States v. 819.98 Acres of Land*, 78 F.3d 1468 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . 120

*United States v. 87.30 Acres of Land in Whitman & Garfield Ctys.*, 430 F.2d 1130 (9th Cir. 1970) . . . . . . . . 113, 190

*United States v. 87.98 Acres of Land in Merced Cty.*, 530 F.3d 899 (9th Cir. 2008) . . . . . . . . . . . . . . 158

*United States v. 881.39 Acres of Land*, 254 F. Supp. 294 (E.D. Okla. 1966) . . . . . . . . . . . . . . . . 150

*United States v. 883.89 Acres of Land in Sebastian Cty.*, 314 F. Supp. 238 (W.D. Ark. 1970),
*aff'd*, 442 F.2d 262 (8th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 171, 175

*United States v. 883.89 Acres of Land in Sebastian Cty.*, 442 F.2d 262 (8th Cir. 1971) . . . . . . . . . . . 43, 171, 175-76

*United States v. 9.20 Acres of Land in Polk Cty.*, 638 F.2d 1123 (8th Cir. 1981) . . . . . . . . . . . 112, 154-55,

*United States v. 901.89 Acres of Land in Davidson & Rutherford Ctys. (Davenport)*,
436 F.2d 395 (6th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . 152, 162-63, 166

*United States v. 91.90 Acres of Land in Monroe Cty. (Cannon Dam)*,
586 F.2d 79 (8th Cir. 1978) . . . . . . . . . . . . . 97-99, 112-13, 136, 151-52, 154-55, 159, 178-79

*United States v. 93.970 Acres of Land (Illinois Aircraft)*, 360 U.S. 328 (1959) . . . . . . . . . . . . . . . 91

*United States v. 967,905 Acres of Land in Cook Cty. (Pete)*, 447 F.2d 764 (8th Cir. 1971) . . . . . . . . . . . 191, 193

*United States v. 97.19 Acres of Land*, 582 F.2d 878 (4th Cir. 1978) . . . . . . . . . . . . . . . . . 166, 193

*United States v. 99.66 Acres of Land (Sunburst Invs.)*, 970 F.2d 651 (9th Cir. 1992) . . . . . . . . . . 118, 143-44

*United States v. Am. Pumice Co.*, 404 F.2d 336 (9th Cir. 1968) . . . . . . . . . . . . . . . . . . . . 140, 181

*United States v. An Easement & Right-of-Way Over Two Strips of Land*, 284 F. Supp. 71 (W.D. Ky. 1968) . . . . . . . . 170

*United States v. Appalachian Elec. Power Co.*, 311 U.S. 377 (1940) . . . . . . . . . . . . . . . . . . 188-90

*United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 374 (4th Cir. 1995) . . . . . . . . . . . 151-52, 166, 169, 174-75

*United States v. Becktold Co.*, 129 F.2d 473 (8th Cir. 1942) . . . . . . . . . . . . . . . . . 124, 131-32, 135-36

*United States v. Bedford Assocs.*, 548 F. Supp. 732 (S.D.N.Y. 1982) . . . . . . . . . . . . . . . . . . 176

*United States v. Benning Hous. Corp.*, 276 F.2d 248 (5th Cir. 1960) . . . . . . . . . . . . . . . . . 119, 131, 133

*United States v. Birnbach*, 400 F.2d 378 (8th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . 190, 192-93

*United States v. Bodcaw Co.*, 440 U.S. 202 (1979) . . . . . . . . . . . . . . . . . . . . . . . . 187

*United States v. Brondum*, 272 F.2d 642 (5th Cir. 1959) . . . . . . . . . . . . . . . . . . . . . . 157

*United States v. Buhler (Buhler I)*, 254 F.2d 876 (5th Cir. 1958) . . . . . . . . . . . . . . . . . . . 110

*United States v. Buhler (Buhler II)*, 305 F.2d 319 (5th Cir. 1962) . . . . . . . . . . . . . . . . . . 103, 186

*United States v. Carroll*, 304 F.2d 300 (4th Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . 180

*United States v. Causby*, 328 U.S. 256 (1946) . . . . . . . . . . . . . . . . . . . . . . 90-92, 169, 177-78

*United States v. Certain Interests in Prop. in Brooklyn*, 326 F.2d 109 (2d Cir. 1964) . . . . . . . . . . . . . . . . . . . . 132

*United States v. Certain Interests in Prop. in Champaign Cty.*, 271 F.2d 379 (7th Cir. 1959) . . . . . . . . . . . 91, 131

*United States v. Certain Interests in Prop. in Cumberland Cty.*, 296 F.2d 264 (4th Cir. 1961). . . . . . . . . . .132, 133, 135

*United States v. Certain Interests in Prop. in Monterey Cty.*, 186 F. Supp. 167 (N.D. Cal. 1960),
*aff'd sub nom. Likins-Foster Monterey Corp. v. United States*, 308 F.2d 595 (9th Cir. 1962) . . . . . . . . . .137, 141, 182

*United States v. Certain Land in Fort Worth*, 414 F.2d 1029 (5th Cir. 1969) . . . . . . . . . . . . . . . . . 124-25, 129

*United States v. Certain Land in Lincoln*, 343 F. Supp. 155 (D. Neb. 1972) . . . . . . . . . . . . . . . . . . .94

*United States v. Certain Lands in Wappinger*, 67 F. Supp. 905 (S.D.N.Y. 1946) . . . . . . . . . . . . . . . .94

*United States v. Certain Land Situated in Detroit (DIBCO I)*, 188 F. Supp. 2d 747 (E.D. Mich. 2002),
*aff'd*, 450 F.3d 205 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112, 116

*United States v. Certain Land Situated in Detroit (DIBCO III)*, 600 F. Supp. 2d 880 (E.D. Mich. 2009),
*aff'd*, 633 F.3d 418 (6th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*United States v. Certain Parcel of Land in Jackson Cty.*, 322 F. Supp. 841 (W.D. Mo. 1971) . . . . . . . . . . . 112, 114

*United States v. Certain Parcels of Land in Phila.*, 144 F.2d 626 (3d Cir. 1944) . . . . . . . . . . . . . . . 130

*United States v. Certain Parcels of Land in Rapides Par.*, 149 F.2d 81 (5th Cir. 1945). . . . . . . . . . . . . .98

*United States v. Certain Parcels of Land in Valdez*, 666 F.2d 1236 (9th Cir. 1982) . . . . . . . . . . 188-89, 191

*United States v. Certain Space in Rand McNally Bldg.*, 295 F.2d 381 (7th Cir. 1961). . . . . . . . . . . . . . . .98

*United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53 (1913) . . . . . .94, 96, 104-07, 155, 172, 186, 188, 197

*United States v. Cherokee Nation*, 480 U.S. 700 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . 187-91

*United States v. Chi., B. & Q.R. Co.*, 82 F.2d 131 (8th Cir. 1936) . . . . . . . . . . . . . . . . . . . . . 198

*United States v. Chi., M., St. P. & P. R. Co.*, 312 U.S. 592 (1941). . . . . . . . . . . . . . . . . . . . . 187-89

*United States v. City of Columbus*, 180 F. Supp. 775 (S.D. Ohio 1959). . . . . . . . . . . . . . . . . . . . .98

*United States v. City of New York*, 168 F.2d 387 (2d Cir. 1948). . . . . . . . . . . . . . . . . . . . . . . 196

*United States v. City of Tacoma*, 330 F.2d 153 (9th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . 91, 169

*United States v. Clarke*, 445 U.S. 253 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . 94, 184, 199

*United States v. Commodities Trading Corp.*, 339 U.S. 121 (1950) . . . . . . . . . . . . . . . . .93, 101, 108-09, 196

*United States v. Commodore Park, Inc.*, 324 U.S. 386 (1945). . . . . . . . . . . . . . . . . . . . . 187, 189-90

*United States v. Consol. Mayflower Mines, Inc.*, 60 F.3d 1470 (10th Cir. 1995) . . . . . . . . . . . . . . . 178-79

*United States v. Corbin*, 423 F.2d 821 (10th Cir. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . .99

*United States v. Cors*, 337 U.S. 325 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104, 146

5-ER-993

*United States v. Cox*, 190 F.2d 293 (10th Cir. 1951) . . . . . . . . . . . . . . . . . . . . . . . . 159-160, 195

*United States v. Crance*, 341 F.2d 161 (8th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . 145, 147

*United States v. Cress*, 243 U.S. 316 (1917) . . . . . . . . . . . . . . . . . . . . . . . . . . 170

*United States v. Deist*, 442 F.2d 1325 (9th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . 125

*United States v. Delano Park Homes, Inc.*, 146 F.2d 473 (2d Cir. 1944) . . . . . . . . . . . . . . . 109

*United States v. Del., Lackawana & W.R.R. Co.*, 264 F.2d 112 (3d Cir. 1959) . . . . . . . . . .98

*United States v. Des Moines Cty.*, 148 F.2d 448 (8th Cir. 1945) . . . . . . . . . . . . . . . . . 196

*United States v. Dickinson*, 331 U.S. 745 (1947) . . . . . . . . . . . . . . . . . . . . . . . . 91-92

*United States v. Dillman*, 146 F.2d 572 (5th Cir. 1944) . . . . . . . . . . . . . . . . . . . . . 129

*United States v. Dow*, 357 U.S. 17 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . 93-94

*United States v. Dunnington*, 146 U.S. 338 (1892) . . . . . . . . . . . . . . . . . . . . . 92, 97, 99

*United States v. Eastman (Eastman I)*, 528 F. Supp. 1177 (D. Or. 1981),
*adopted* 714 F.2d 76 (9th Cir. 1983) (per curiam) . . . . . . . . . . . . . 90, 146-47, 150, 194

*United States v. Eastman (Eastman II)*, 528 F. Supp. 1184 (D. Or. 1981),
*aff'd*, 714 F.2d 76 (9th Cir. 1983) (per curiam) . . . . . . . . . . . . . . . . . 90, 120-21

*United States v. Eastman (Eastman III)*, 714 F.2d 76 (9th Cir. 1983) . . . . . . . . . . 90, 147, 194

*United States v. Eden Mem'l Park Ass'n*, 350 F.2d 933 (9th Cir. 1965) . . . . . . . . . 108-09, 120

*United States v. Evans*, 380 F.2d 761 (10th Cir. 1967) . . . . . . . . . . . . . . . 111, 115-16, 152

*United States v. Finis P. Ernest, Inc.*, 509 F.2d 1256 (7th Cir. 1975), *cert. denied*, 423 U.S. 893 (1975) . . . . . . . . . .82

*United States v. Flood Bldg.*, 157 F. Supp. 438 (N.D. Cal. 1957) . . . . . . . . . . . . . . 175-76

*United States v. Fort Smith River Dev. Corp.*, 349 F.2d 522 (8th Cir. 1965) . . . . . . . . . . . 194

*United States v. Foster*, 131 F.2d 3 (8th Cir. 1942) . . . . . . . . . . . . . . . . . . . . 101, 125

*United States v. Freeman*, 113 F. 370 (D. Wash. 1902) . . . . . . . . . . . . . . . . . . . . 127

*United States v. Fuller*, 409 U.S. 488 (1973) . . . . . . . . . . . . . . . 100, 150, 165, 187-88, 195, 197

*United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945) . . . . . . . . . 99, 136, 152, 154, 159, 160-61, 174-77, 195

*United States v. Gerlach Live Stock Co.*, 339 U.S. 725 (1950) . . . . . . . . . . . . . 184, 188-190

*United States v. Gettysburg Elec. Ry. Co.*, 160 U.S. 668 (1896) . . . . . . . . . . . . . . . . .91

*United States v. Glanat Realty Corp.*, 276 F.2d 264 (2d Cir. 1960) . . . . . . . . . . . . . 152, 170

*United States v. Gonzalez*, 466 F. App'x 858 (11th Cir. 2012) (per curiam) . . . . . . . . . . . .97

*United States v. Gossler*, 60 F. Supp. 971 (D. Or. 1945) . . . . . . . . . . . . . . . . . . . 159

*United States v. Grand River Dam Auth.*, 363 U.S. 229 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*United States v. Grizzard*, 219 U.S. 180 (1911). . . . . . . . . . . . . . . . . . . . . . 110, 113, 151, 165, 167-68, 170, 173

*United States v. Hart*, 312 F.2d 127, 130 (6th Cir. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*United States v. Hickey*, 360 F.2d 127 (7th Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

*United States v. Honolulu Plantation Co.*, 182 F.2d 172 (9th Cir. 1950) . . . . . . . . . . . 112-13, 154, 157, 166

*United States v. Kan. City Life Ins. Co.*, 339 U.S. 799 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*United States v. Katz*, 213 F.2d 799 (1st Cir. 1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

*United States v. Kooperman*, 263 F.2d 331 (2d Cir. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

*United States v. L.E. Cooke Co.*, 991 F.2d 336 (6th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*United States v. Land & Cris Realms, Inc.*, 213 F.3d 830 (5th Cir. 2000) . . . . . . . . . . . . . . . . . 110, 146

*United States v. Land in Dry Bed of Rosamond Lake*, 143 F. Supp. 314 (S.D. Cal. 1956) . . . . . . . . . . 179

*United States v. Leavell & Ponder, Inc.*, 286 F.2d 398 (5th Cir. 1961) . . . . . . . . . . .123, 125, 128, 137, 140-41, 182

*United States v. Lewis*, 308 F.2d 453 (9th Cir. 1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .98

*United States v. Little Lake Misere Land Co.*, 412 U.S. 580 (1973). . . . . . . . . . . . . . . . . . . . . . . . . .91

*United States v. Mattox*, 375 F.2d 461 (4th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112, 156

*United States v. Meadow Brook Club*, 259 F.2d 41 (2d Cir. 1958). . . . . . . . . . . . . . . . . 108, 110, 129, 139

*United States v. Meyer*, 113 F.2d 387 (7th Cir. 1940). . . . . . . . . . . . . . . . . . . . . . . . . . . 91, 98, 178

*United States v. Michoud Indus. Facilities*, 322 F.2d 698 (5th Cir. 1963). . . . . . . . . . . . . . . . 43, 171, 176

*United States v. Miller,*
317 U.S. 369 (1943) . .4, 89, 90-91, 93-94, 99, 100, 110, 112, 114, 119, 128, 145-47, 150-52, 154, 156, 165-68, 177

*United States v. New River Collieries Co.*, 262 U.S. 341 (1923) . . . . . . . . . . . . . . . . . .89, 93, 101, 106, 120, 151

*United States v. Pa.-Dixie Cement Corp.*, 178 F.2d 195 (6th Cir. 1949) . . . . . . . . . . . . . . . . . . . . . 139

*United States v. Petty Motor Co.*, 327 U.S. 372 (1946). . . . . . . . . . . . . . . . . . . 155, 159-61, 174-75, 177

*United States v. Pewee Coal Co.*, 341 U.S. 114 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

*United States v. Playa De Flor Land & Improvement Co.*, 160 F.2d 131 (5th Cir. 1947) . . . . . . . . . . . . . 125

*United States v. Pope & Talbot, Inc.*, 293 F.2d 822 (9th Cir. 1961) . . . . . . . . . . . . . . . . . . . . . . 157-58

*United States v. Rands*, 389 U.S. 121 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187-94

*United States v. Reynolds*, 397 U.S. 14 (1970) . . . . . . . . .90, 93-94, 100, 116, 128, 131, 145-47, 149, 150-51, 165

*United States v. Right to Use & Occupy 3.38 Acres in Alexandria*, 484 F.2d 1140 (4th Cir. 1973) . . . . . . . . . . . . 176

*United States v. River Rouge Improvement Co.*, 269 U.S. 411 (1926) . . . . . . . . . . . . . . . . . . . . . . . 163-64, 194

*United States v. Rodgers*, 461 U.S. 677 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

*United States v. S.D. Game, Fish & Parks Dep't*, 329 F.2d 665 (8th Cir. 1964) . . . . . . . . . . . . . . . . 107

*United States v. Smith*, 355 F.2d 807 (5th Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . 129-30

*United States v. Sowards*, 370 F.2d 87 (10th Cir. 1966)  . . . . . . . . . . . . . . 98, 105, 137-38, 177-80, 182, 202

*United States v. Sponenbarger*, 308 U.S. 256 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

*United States v. Streets, Alleys & Pub. Ways in Vill. of Stoutsville*, 531 F.2d 882 (8th Cir. 1976) . . . . . . . 196-97, 199-200

*United States v. Tishman Realty & Constr. Co.*, 193 F.2d 180 (2d Cir. 1952) (per curiam) . . . . . . . . . . . . . . . . 131

*United States v. Toronto, Hamilton & Buffalo Nav. Co.*,
338 U.S. 396 (1949) . . . . . . . . . . . . . . . . . . . . . . 119, 131-33, 137, 140, 142, 177, 182, 196, 198, 201

*United States v. Trout*, 386 F.2d 216 (5th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . 117, 163

*United States v. Twin City Power Co.*, 350 U.S. 222 (1956) . . . . . . . . . . . . . . . . . . . . . . . 187-91

*United States v. Upper Potomac Props. Corp.*, 448 F.2d 913 (4th Cir. 1971) . . . . . . . . . . . . . . . . . 120, 179-81

*United States v. Va. Elec. & Power Co.*, 365 U.S. 624 (1961) . . . . . . . . . . . 145, 151-52, 165, 169-172, 187-91, 194

*United States v. Wateree Power Co.*, 220 F.2d 226 (4th Cir. 1955) . . . . . . . . . . . . . . . . . . . . . . . 111

*United States v. Waymire*, 202 F.2d 550 (10th Cir. 1953) . . . . . . . . . . . . . . . . . . . . . . . . . . 110

*United States v. Welch*, 217 U.S. 333 (1910) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99, 173

*United States v. Werner*, 36 F.3d 1095 (4th Cir. 1994) (unpubl.) . . . . . . . . . . . . . . . . . . . . 117, 155, 166

*United States v. Westinghouse Elec. & Mfg.*, 339 U.S. 261 (1950) . . . . . . . . . . . . . 154, 159-61, 175, 177, 195

*United States v. Weyerhaeuser Co.*, 538 F.2d 1363 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . 104-05, 186

*United States v. Whitehurst*, 337 F.2d 765 (4th Cir. 1964) . . . . . . . . . . . . . 104-05, 107, 137-40, 178-82

*United States v. Willow River Power Co.*, 324 U.S. 499 (1945) . . . . . . . . . . 99, 152, 160-61, 187, 190, 195

*United States v. Wise*, 131 F.2d 851 (4th Cir. 1942) . . . . . . . . . . . . . . . . . 98, 119, 131, 134, 136

*Vector Pipeline, L.P. v. 68.55 Acres of Land*, 157 F. Supp. 2d 949 (N.D. Ill. 2001) . . . . . . . . . . . . . . . . . . 92

*Virgin Islands v. 2.7420 Acres of Land*, 411 F.2d 785 (3d Cir. 1969) . . . . . . . . . . . . . . . . . . . . . 108

*W. Chi. St. R.R. v. Ill. ex rel. Chi.*, 201 U.S. 506 (1906) . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

*Walther v. Secretary of Health & Human Servs.*, 485 F.3d 1146 (Fed. Cir. 2007) . . . . . . . . . . . . . . . . . 90

*Wardy v. United States*, 402 F.2d 762 (5th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

*Wash. Metro. Area Transit Auth. v. One Parcel of Land (Old Georgetown)*, 691 F.2d 702 (4th Cir. 1982) . . . 108, 111, 117, 163

*Wash. Metro. Area Transit Auth. v. One Parcel of Land*, 780 F.2d 467 (4th Cir. 1986) . . . . . . . . . . . . . . . . . .98

*Washington v. United States* (*Hanford*), 214 F.2d 33 (9th Cir. 1954) . . . . . . . . . . . . . . . . . . . .197, 201, 205

*Weatherford v. United States*, 606 F.2d 851 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . 168, 189-91

*Welch v. Tenn. Valley Auth.*, 108 F.2d 95 (6th Cir. 1939) . . . . . . . . . . . . . . . . . . . . . . . . 125

*Whitney Benefits v. United States*, 18 Cl. Ct. 394 (1989) . . . . . . . . . . . . . . . . . . . . . . . 182

*Wilson v. United States*, 350 F.2d 901 (10th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . 183

*Winn v. United States*, 272 F.2d 282 (9th Cir. 1959) . . . . . . . . . . . . . . . . . . . . . . . 110-11, 157

*Winston v. United States*, 342 F.2d 715 (9th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . 134

*Wolff v. Puerto Rico*, 341 F.2d 945 (1st Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . 108

*Woodville v. United States*, 152 F.2d 735 (10th Cir. 1946), *cert. denied*, 328 U.S. 842 (1946) . . . . . . . . . . 196, 198

*Wyatt v. United States*, 271 F.3d 1090 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . 177

*Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577 (Fed. Cir. 1990) . . . . . . . . . . . . . . .159, 171, 174, 177

**United States Constitution**

U.S. Const. amend. v . . . . . . . . . . . . . . . . . . .1, 4, 49, 89-90, 95, 99-101, 105-112, 132-33, 135-36, 154-55,
. . . . . . . . . . . . . . . . . . . . . . . . . . 159-61, 166, 170, 174, 176, 184, 187-190, 195, 197, 201

U.S. Const. art. 1, § 8, cl. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .188

**Statutes**

100 Stat. 4274 § 8(o) (Pub. L. No. 99-663) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

102 Stat. 1086 § 3(a) (Pub. L. No. 100-409), amending 43 U.S.C. § 1716 . . . . . . . . . . . . . . . 4, 14

105 Stat. 1150 § 8126(a) (Pub. L. No. 102-172). . . . . . . . . . . . . . . . . . . . . . . . . . . .14

106 Stat. 2112 § 7(b) (Pub. L. No. 102-415). . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

106 Stat. 2258 § 2(d)(2)(A) (Pub. L. No. 102-453) . . . . . . . . . . . . . . . . . . . . . . . . . .14

110 Stat. 4093 § 304(c)(4)(A) (Pub. L. No. 104-333) . . . . . . . . . . . . . . . . . . . . . . . . .14

112 Stat. 879 § 1(c) (Pub. L. No. 105-208) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

112 Stat. 2681 §357(1), § 605(a)(3) (Pub. L. No. 105-277) . . . . . . . . . . . . . . . . . . . . . .14

113 Stat. 1693 § 4(b) (Pub. L. No. 106-138) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

Act of Mar. 7, 1974, Pub. L. No. 93-251, § 83, 88 Stat. 12 . . . . . . . . . . . . . . . . . . . . . 201

Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3192 . . . . . . . . . . . . . . . . . . . . . . . . . .51

Alaska Native Claims Setlement Act, as amended, 43 U.S.C. § 1621 . . . . . . . . . . . . . . . . . . . . . . . .51

Clean Water Act, 33 U.S.C. § 1251 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

Declaration of Taking Act, 40 U.S.C. § 3114 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10, 94

Everglades National Park Protection and Expansion Act of 1989, 16 U.S.C. § 410r-5 *et seq.* . . . . . . . . 127, 148

Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701-1785 . . . . . . . 4, 14, 51, 185

Fifth Circuit Court of Appeals Reorganization Act of 1980, Pub. L. No. 96-452,
94 Stat. 1994 (1980) (codified as amended in scattered sections of 28 U.S.C.). . . . . . . . . . . . . . . . . . . . . 148

Flood Control Act of 1944 § 8, 33 U.S.C. § 701-1(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

General Condemnation Act, 40 U.S.C. § 3113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .94

Granger-Thye Act of 1950, 16 U.S.C. § 580*l* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187, 195

Interstate Commerce Act, 49 U.S.C. § 10903 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

Little Tucker Act, 28 U.S.C. § 1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

Mount St. Helens National Volcanic Monument Act, Pub. L. No. 97-243,
96 Stat. 301 (1982), 16 U.S.C. § 431 note (1982) (repealed 2014) . . . . . . . . . . . . . . . . . . . . . . . . 185-86

National Trails System Act, as amended, 16 U.S.C. §§ 1241-51 (2012) . . . . . . . . . . . . . . . . . . . . 187, 199

Natural Gas Act, 15 U.S.C. § 717f(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Ports and Waterways Safety Act of 1972, 33 U.S.C. § 1221 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Rivers and Harbors Act of 1970, § 111, 33 U.S.C. § 595a . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187-93

Taylor Grazing Act of 1934, 43 U.S.C. § 315(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187, 195

Tennessee Valley Authority Act, 16 U.S.C. § 831q . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

Tucker Act, 28 U.S.C. § 1491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

Uniform Relocation Assistance & Real Property Acquisition Policies Act of 1970
(Uniform Act), 42 U.S.C. §§ 4601-4655 . . . . .3, 6, 9, 12, 14-15, 17, 21, 29, 38, 70, 73, 80, 84, 86-87, 89, 92, 94-95,
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98-99, 123, 136, 150, 152, 160-61, 163, 165-66, 175, 184, 205-06

16 U.S.C. § 410r-9(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

43 U.S.C. § 315q. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160, 195

Code of Miami-Dade Cty., Fla., Municipal Code §1-4.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

**Legislative Materials**

H.R. Rep. No. 91-1656, 91st Cong., 2d Sess. (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .99

H.R. Rep. No. 91-1665, 91st Cong., 2d Sess. (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . 191-92, 194

**Rules**

Federal Rules of Civil Procedure, Rule 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .56-57, 72, 82

Federal Rules of Civil Procedure, Rule 71.1 (formerly Rule 71A) . . . . . . . . . . . . . . . . . . . 91-92, 116

Federal Rules of Evidence, Rule 102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90, 119

Federal Rules of Evidence, Rule 408 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .125

Federal Rules of Evidence, Rule 703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .202

**Regulations and Administrative Materials**

33 C.F.R. § 323.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .109

36 C.F.R. § 254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

36 C.F.R. § 254.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51, 53

36 C.F.R. § 254.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

36 C.F.R. § 254.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

36 C.F.R. § 254.4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

36 C.F.R. § 254.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53

36 C.F.R. § 254.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14, 51

36 C.F.R. § 254.9(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

36 C.F.R. § 254.9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .186

36 C.F.R. § 254.9(b)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53

36 C.F.R. § 254.9(b)(v) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

36 C.F.R. § 254.9(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

43 C.F.R. § 2200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

43 C.F.R. § 2200.0-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

43 C.F.R. § 2200.0-5(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53

43 C.F.R. § 2200.0-6(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

5-ER-999

43 C.F.R. § 2201.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

43 C.F.R. § 2201.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

43 C.F.R. § 2201.1-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53

43 C.F.R. § 2201.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 51, 186

43 C.F.R. § 2201.3-1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

43 C.F.R. § 2201.3-2(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53

43 C.F.R. § 2201.3-2(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

43 C.F.R. § 2201.3-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

49 C.F.R. pt. 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

49 C.F.R. § 24.102(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .94

49 C.F.R. § 24.102(l) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

49 C.F.R. § 24.103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14, 86

49 C.F.R. § 24.103(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

49 C.F.R. § 24.103(a)(2)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

49 C.F.R. § 24.103(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .81

49 C.F.R. § 24.103(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

49 C.F.R. § 24.104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .83, 86

49 C.F.R. § 24.104(a)-(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .81, 86

Regulations of the Attorney General Governing the Review and Approval of Title
for Federal Land Acquisitions (Attorney General's Title Regulations) (2016) . . . . . . . . .91

U.S. Army Corps of Eng'rs, Real Estate Engineer Regulations, EC 405-1-04 (2016) . . . . . . . . . . . .81

U.S. Dep't of Agric., Forest Service Manual FSM § 5400 (2005) . . . . . . . . . . . . . .81

U.S. Dep't of Agric., Forest Service Handbook FSH 5409.12 (2006) . . . . . . . . . . . . . . . . . .81

**Professional Standards**

The Appraisal Foundation, Uniform Standards of Professional Appraisal Practice (USPAP) (2016-17) . . . . .
. . . . . . . . . . . 6, 8, 9-16, 19, 21, 22, 25, 43, 51, 52, 54-56, 58, 61, 63, 80-88, 94-95, 129, 132, 134, 178, 201, 203

## Books and Treatises

Appraisal Inst., The Dictionary of Real Estate Appraisal (6th ed. 2015) . . . . . . . . . . 11, 135-36, 138, 150
(5th ed. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

Appraisal Inst., The Appraisal of Real Estate (14th ed. 2013) . . . . . . . . . . . . . 27, 106, 120
(8th ed. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120
(7th ed. 2d prtg. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

Appraisal Inst. & Am. Soc'y of Farm Managers, The Appraisal of Rural Property
(2d ed. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116, 128, 136, 195

Black's Law Dictionary (10th ed. 2014) . . . . . . . . . . . . . . . . . . . . . . 92, 168

Byrl N. Boyce, Real Estate Appraisal Terminology (1st ed. 1975) . . . . . . . . . . . . 120

J.D. Eaton, Real Estate Valuation in Litigation (2d. ed. 1995) . . . . . . . . . . . . . . . . .
. . . . . . . . 12, 36, 90, 95, 110, 117, 127-28, 131, 134-38, 142-43, 145, 152, 155, 160, 166-67, 173, 193, 200, 203

David H. Getches et al., Water Law in a Nutshell (5th ed. 2015) . . . . . . . . . . . . . 184

Lewis Orgel, Valuation Under the Law of Eminent Domain (2d ed. 1953) . . . . . . . 89, 133, 135

Julius L. Sackman, et al., Nichols on Eminent Domain (rev. 3d ed. 2001) . . . . . . . . . . . .114, 152, 156

## Articles and Presentations

Alan T. Ackerman & Noah Eliezer Yanich, *Just and Unjust Compensation: The Future of the Navigational Servitude in Condemnation Cases*, 34 U. Mich. J.L. Reform 573 (2001) . . . . . . . . . . . . . . . . . . . . 193

Ronald C. Allen, *Federal Evaluation of Riparian Property: Section 111 of the Rivers and Harbors Act of 1970*,
24 Me. L. Rev. 175 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188, 193

Am. Soc'y of Farm Managers & Rural Appraisers, 2012 course, *Appraising Natural Resources* (2012) . . . . . . .48

James H. Boykin, *Real Property Appraisal in the American Colonial Era*, The Appraisal J. (July 1976) . . . . . . . . . . 203

Kerry R. Brittain, Comment, *Navigation Servitude—The Shifting Rule of No Compensation*,
7 Land & Water L. Rev. 501 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . 193

Charles E. Corker, *Federal-State Relations in Water Rights Adjudication and Administration*,
17 Rocky Mtn. Min. L. Inst. 21 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . 193

Trevor R. Ellis, *Sales Comparison Valuation of Development and Operating Stage Mineral Properties*,
Mining Engineering 89 (April 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 181

Nicole Stelle Garnett, *The Neglected Political Economy of Eminent Domain*, 105 Mich. L. Rev. 101 (2006) . . . . . . . 152

Norman G. Miller, Jr. & Sergey Markosyan, *The Academic Roots and Evolution of Real Estate Appraisal*,
The Appraisal J. (April 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203

Alan K. Stagg, P.G., *Federal Condemnation and Takings–A Journey Down the Yellow Book Road*,
to Soc'y of Mining, Metallurgy, & Exploration, Inc. (Denver, Colo., March 1, 2011) . . . . . . . . . . . . . . . . . 181

5-ER-1001

# INDEX

acquisition analysis, 70, 78

admissibility, 27, 125-26, 130

adjustment
  *sales adjustment grid*, 65
  *quantitative adjustment*, 27-28, 36, 37, 67, 121-22
  *qualitative adjustment*, 27-28, 36, 67, 121-22
  *in sales comparison approach*, 121-22

administrative review, 83

administrative benefits, 98-99, 152, 160; *see also*
  Uniform Act

after acquisition, 20, 23, 27, 31, 60-61, 68-70

alleys, 196-98

allocations, 38, 71, 98-99, 166; *see also* Uniform Act

appraisal
  *appraisal development*, 5-6, 8-55
  *appraisal report*, 56-79
  *appraisal review*, 80-88

appraiser's certification, 58, 81, 83, 85, 88

appraiser's responsibility, 85-86

approaches to value
  *generally*, 25-26
  *reconciliation*, 25, 37, 68, 70, 78
  *see also* sales comparison approach, cost approach,
    income capitalization approach

assessed value, 21, 63, 69

assumptions and limiting conditions, 12-14, 59-60; *see
  also* extraordinary assumptions

avigation easements, 157n765, 168

before acquisition, 61-63

before and after method (before and after rule)
  (Federal Rule), 17-18, 31, 37-39, 73, 152
  *larger parcel*, 71, 110, 152-54
  *parent tract*, 111, 152
  *remainder*, 17-19, 130-31, 150-52

benefits
  *direct (special) benefits*, 20, 39, 71, 161-65, 194
  *indirect (general) benefits*, 39, 151, 162-65
  *offset*, 18, 20, 39, 117, 153, 163, 165, 167, 191-92, 194
  *and navigational servitude*, 187-94
  *see also* partial acquisitions

buildings; *see* improvements

business
  *business income*, 47-48, 140,
  *business losses*, 154-55, 159-60
  *business value*, 159

capitalization
  *direct capitalization*, 36, 138-140, 181-82
  *income capitalization approach*, 25, 35-6, 47-49, 67-68, 70,
    76, 78, 119, 136-40
  *yield capitalization*, 36-37, 47, 138-40, 181-82

capitalization rate, 36, 67, 76-78, 138, 141

cash equivalency, 28, 75-76

certification; *see* appraiser's certification

choice of law, 4, 49, 90, 91n186, 114n390, 151-52,
  154-55, 167, 183

client, 9, 54-55, 59-61, 84, 88

client instructions, 72, 79

common law (case law), 4, 89

comparable sales
  *adjustments*, 121-22
  *approach to value*, 66-67, 119-20
  *comparability*, 66, 120-21
  *comparable lease transactions*, 35-36, 63, 175-76
  *comparable sales map*, 66, 75
  *sales requiring extraordinary verification and treatment*, 28-33
  *sales after date of value*, 123-24, 130-31
  *transactions with potential non-market considerations*, 124-28
  *see also* sales; sales comparison approach

compensable damage
  *compensable elements*, 38
  *generally*, 154-56
  *in temporary acquisitions*, 160

condemnation; *see* eminent domain; inverse takings
  (inverse condemnation)
  *direct (affirmative) condemnation*, 10-11, 40, 81, 184,
    198-99

confidentiality, 54-55

confirmation
  *of comparable sales*, 25-27, 65

*of sales with potential nonmarket considerations*, 96, 126-27, 171
*see also extraordinary verification*, 28-33, 123-26
conjectural evidence, 99-100
consequential damages; *see* non-compensable damages
conservation, 30, 32, 104, 106, 127
conservation easements, 107, 168
consultants, 48, 44, 53-54, 202
contamination, 13, 20, 71, 158-59
contract of sale, 129
contracting for services, 53-54
cost approach 25, 34-35, 66, 75, 78, 119, 131-36
cost to cure, 38-39, 71
costs, 32, 33-34, 38-39, 48-49, 133, 142, 144-45
Court of Federal Claims, 184n1044
crops, 16, 18, 31, 97
cumulative appraisal (cumulative valuation); *see* summation
customers, loss of, 159
damages, 41-42, 71, 104, 170
  *compensable damage*, 17, 20, 38, 151-56, 169
  *non-compensable damage*, 17, 38, 151-55, 159-61, 177, 201
  *consequential damage*, 17, 38, 151-55, 159-61, 177, 201
  *severance damages*, 17, 38, 41, 112, 154-56, 166-67
date
  *date of valuation*, 10-11, 16, 25, 33, 35, 60, 65, 93-95, 98, 107, 118, 123-24, 139, 143, 150, 174, 186, 204
  *date of sale*, 21, 28, 63, 65-66
  *effective date of appraisal*, 10-11, 16, 25, 33, 35, 43, 58-59, 60, 65, 84, 86-87, 93-95, 98, 107, 118, 143, 139, 143, 150, 174, 186, 204
  *instructions*, 11, 14, 93, 98, 186
  *sales after the date of valuation*, 123, 130
DCF; *see* discounted cash-flow analysis
declaration of taking, 10-11, 94
demand; *see* market demand
denominator, issue of, 118
Department of Justice, 3, 9-10, 14, 17, 22, 27, 38, 43, 54-55, 73, 81-82, 166, 204, 206
depreciation, 34-35, 37, 66, 75, 131, 134-35, 167-68
developer's residual approach; *see* development approach
development approach, 25-26, 48, 142n633,145
development method (lot method, subdivision method), 25-26, 47-48, 65, 142-45
direct acquisition, 10, 50, 94, 169

direct benefits (special benefits), 17-18, 38-39, 71, 150-52, 161-65, 194, 192-93
discount rate, 47
  *selection of*, 26, 40, 48, 141, 182
  *importance of*, 35-36, 47, 140, 182
  *support for*, 35, 37, 49, 66, 182
discounted cash-flow (DCF) analysis, 36, 40, 47-48, 66, 138, 181-82
discovery, 54-55, 204-05
disposals of property, 6, 171, 181
draft reports (draft appraisal reports), 57
dual-premise appraisal, 17, 90, 149, 168
easements, 11, 30-31, 41-42, 68, 70, 168-73, 187, 198
economic investment backed expectations, 40, 50, 198
economic use, 30, 106-07
  *and noneconomic use*, 23, 105
  *necessary proof*, 107
  *requirement of*, 10, 23, 96, 105, 174
eminent domain
  *as source of case law on just compensation*, 4, 54, 89, 117, 142, 187
  *case names*, 92
  *date of valuation in*, 36, 127, 139
  in rem *nature of proceedings*, 92n197
  *sales to entities with power of eminent domain*, 96, 124, 126-27
  *see also* inverse taking (inverse condemnation)
entrepreneurial incentive (entrepreneurial profit), 33-35, 48, 131, 135-36
equipment, 19, 48, 128, 159
estate, 11, 31, 39, 40, 91, 97, 113, 168-69, 172, 175-77
estate acquired, 11, 31, 39, 40, 68, 72, 168-69, 172, 177
exchanges of land, 4, 9, 50-53, 117, 128, 185-86
expenses, 4, 21-22, 34-36, 40-41, 67-68, 138, 152, 159-60, 179
expert, 25, 44-46, 53-54, 57, 70, 82, 178, 183, 201-04
exposure time, 10, 15, 93, 95, 150, 158-59
extraordinary assumption, 13, 15, 52, 61, 86
fair market value; *see* market value
federal law 3-5, 14
  *binding nature*, 89
  *differences from state law*, 4, 90-91, 151, 167
Federal Rules of Civil Procedure. 56-57, 72, 82, 91, 204
Federal Rules of Evidence, 125
financial feasibility, 64, 102-03, 132
FIRREA, 59

fixtures, 19, 62, 69, 77, 159-60

flood hazard, 62

floor plan, 62, 72, 79

forced sales, 124-25

general benefits; *see* benefits

goodwill, loss of or damage to, 159

government
    *sales to government entities*, 27, 29-32, 125-27
    *government project*, 27, 31, 73-74, 99, 162-65
    *government project influence*, 16-17, 22, 128, 130-31,
       145-46, 149-50
    *demand due to government project*, 23, 104
    *non-federal governmental entities*, 50-53

grazing permits, 187, 195
    *and administrative payments*, 160

ground leases; *see* leases

highest and best use, 22
    *analysis*, 30-31, 44-45, 64, 70, 72-74, 77
    *and market value*, 40, 65, 104-05
    *definition*, 22-25, 64, 101-03
    *criteria*, 44-45, 96-97, 111-18

history; *see* rental history; sales history; use history

homeowner's association, 159

hypothetical condition, 13-14, 18, 53

impartiality, 51

improvements, 18-19, 23, 62, 69, 72, 98

*in rem* nature of condemnation proceeding, 92n197

income
    *business income*, 140
    *property income*, 139-40

income approach; *see* income capitalization approach

income capitalization approach, 35, 47-48, 67-68, 76,
    136-42
    *approach to value*, 35, 67-68, 76, 136-42
    *direct capitalization*, 36, 138-39
    *yield capitalization*, 36-37, 138-39
    *for mineral property*, 45-46, 181-82

inconsistent uses, 180

indirect benefits (general benefits), 39, 151, 162-65

inspection
    *site inspection*, 205
    *property inspection*, 12-13, 58, 94
    *opportunity for landowner to attend*, 12
    *comparable sale inspection*, 12, 27, 35-36
    *intensity of use*, 38, 70, 117

interest
    *interest in property (ownership interest)*, 44-46, 97, 114

inverse taking (inverse condemnation)
    *date of valuation*, 94
    *generally*, 11, 49-50, 184-85, 194
    *larger parcel determination*, 117-18
    *Rails to Trails cases*, 199
    *temporary inverse takings*, 43, 177-78

investment-backed expectations, 49-50, 185

janitorial services, 41

jurisdictional exception
    *applicability in appraisal reviews*, 10, 15-16, 95
    *consideration of land use regulations and anticipated public*
       *projects*, 22
    *exposure time*, 10, 95
    *generally*, 14-15
    *see also* project influence; *specific legislation and regulations;*
       appraiser certification

just compensation, 4-7, 89-91, 100

land exchange, 50-53,

land residual approach, 25-26, 65-66, 142-45

land use regulations
    *zoning*, 19-20, 33, 63-64, 69, 74, 107-10, 129
    *permits*, 19-20, 33, 107-10
    *reasonable probability of re-zoning*, 29-20, 102, 108-09
    *contingency sales*, 33, 129

land valuation, 25, 65, 70, 75, 77-78

landlord; *see* lessor

landowner, right to accompany appraiser, 12

larger parcel, 16, 23-24, 41, 65, 72-73, 110-18, 153-54

lease, 21, 26, 35-36, 39-41, 63, 174-77

leased fee, 175

leasehold, 39-41, 72-73, 160-61, 174-178

leasehold valuation, 175-77

legal description, 11-12, 61, 68, 77

legal instruction
    *benefit setoff*, 162-65
    *compensability of damage*, 13-14
    *date of valuation and legal bases*, 11, 14, 93, 98, 186
    *departure from the unit rule*, 99, 172-73
    *deviation from market value standard*, 101
    *dual-premise appraisals*, 17, 90, 149
    *form*, 13, 24, 43
    *government-constructed improvements*, 93
    *hypothetical conditions*, 13, 53

*project influence (scope of the project rule)*, 16, 17, 109, 123, 128, 146, 149, 206

*unity of title (ownership) (larger parcel determination)*, 14, 23, 24, 111, 114, 116-17, 186, 206

*zoning and permitting issues*, 19, 109

legal permissibility, 44

lessee (tenant), 16, 21, 35-36, 40-41, 63, 97, 160-61, 175-76

lessor (landlord), 16, 41, 97, 175-76

letter of transmittal, 58, 73

limited appraisal, 146

limiting conditions, 59-60, 74, 76-77, 95

litigation, 9-10
   *eminent domain*, 54, 103, 116
   *in voluntary transactions*, 51, 125-26, 185
   *inverse takings claims*, 50, 117, 184
   *likelihood of*, 204-05
   *role of agency in*, 81
   *role of expert witness in*, 54-55, 57, 82, 185, 204

lost profits; *see* profits

lot method; *see* development method

market area, 36, 120

market demand, 22-23, 44, 47, 49, 96, 102-07, 139, 143, 145, 186

market evidence, 33, 34, 99

market price, 105

market rental value
   *applicability*, 40, 171, 174, 177
   *definition*, 35, 174
   *legal foundations*, 174-75

market trends, 11

market value
   *as measure of just compensation*, 3-5, 7-8, 10, 22-23, 90-93, 98, 100, 105, 110, 112, 118, 122, 131, 146, 154-57, 171-72, 182-83, 190-91, 195-96, 199, 203
   *definition*, 10, 28, 51, 60, 93, 95-96, 150

marketability, 21-22, 40, 44, 64

mineral
   *mineral rights*, 11, 16, 45
   *mineral interests*, 11, 44-48, 140, 180-82
   *mineral appraisal*, 72, 79
   *mineral expert*, 45, 54, 68
   *mineral valuation*, 44, 46-48, 97-98, 178-82, 202
   *mineral resource(s)*, 18, 43, 44, 47, 62, 68, 97-98, 178, 180
   *mineral property*, 44-48, 140, 180-82

mitigation, 107

modifications of Standards, 3, 6, 51

moving expenses, 152, 160

navigable waters, 187-94

navigational servitude, 101, 187-94

negotiations, 30-31, 40, 73, 124-45; *see also* offers

neighborhood data, 61, 74, 77

non-compensable damages (consequential damages)
   *generally*, 17, 38, 151-55, 159-61, 177, 201
   *exceptions*, 161

noneconomic use, 23, 105

offers
   *to compromise*, 125-26
   *as admissions*, 125-26
   *to purchase*, 21, 62, 87, 129-30
   *to sell*, 21, 62, 87, 129-30

office space, lease of, 175

offset; *see* benefits

option
   *contingency*, 33, 123, 129
   *to purchase*, 130

partial acquisition (partial taking), 12, 20, 30, 37, 71-78
   *allocation*, 165n843
   *determination of larger parcel*, 11, 16, 24, 50, 110-11, 117, 153
   *valuation methods*, 16-17,60, 130-31, 151-52, 154, 162-168, 172-73, 192-93
   *see also* before and after method

permits; *see* land use regulations

photographs, 59, 62, 66, 71-72

physical components, 16, 97

physical invasion, 43, 157

physical possibility, 102

plot plan, 59, 62, 66, 71-72

police power, 100

policy underlying Standards, 7

post-acquisition sales; *see* comparable sales (sales after date of value)

price
   *paid by condemnor*, 125-28

principle of substitution, 132

profitability, degree of, 102-03

profits, loss of, 159-60, 155

5-ER-1005

project
   *government project*, 91, 104, 127-28, 131, 189, 194
   *project enhancement, see* 18, 39, 104, 146-48, 177, 162-65, 194*; see also project influence*
   *project influence*, 16-17, 22, 32, 99, 104, 109, 128, 130-31, 145-50, 162-65, 192, 194
   *scope of the project rule*, 16-17, 20, 109, 123, 128, 130, 145-51, 165, 192
project appraisal reports, 73-79
project influence, 16-17, 22, 32, 99, 104, 109, 128, 130-31, 145-50, 162-65, 192, 194
property data, 61-63, 77
property history, 12, 20-21, 36, 62-63, 69
property rights,
   *state law generally defines*, 90-91
public facilities, 164, 195-96
purpose of acquisition, 50, 91, 102, 127, 147, 189
purpose of appraisal, 60-61
purpose of Standards, 3
public infrastructure, 195-96
public interest value; *see* economic use
qualifications of appraiser, 53, 57, 72
qualitative adjustments, 27-28, 67, 121-22
quantitative adjustments, 27-28, 67, 121-22
Rails to Trails cases, 199
reasonability
   *reasonably knowledgeable buyers and sellers*, 10, 95, 134, 147-48, 174
   *reasonably near future*, 22-23, 95, 101-02, 112, 139, 143-45, 179-80, 197
   *reasonably probable use*, 22-23, 95, 101-03, 107-08, 112, 186, 191, 197
   *test of reasonableness*, 132
reasonable probability, 143-44, 179-80
rebuttal
   *experts*, 82
   *in litigation*, 81-82
reconciliation and final opinion of value, 8, 37, 68, 70, 78
relocation; *see* Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970
relocation expenses; *see* Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970
remainder, 152-58, 162-70, 172, 177, 191-94

rent
   *market rental value*, 35, 40, 171, 174-77
   *market rent*, 21, 26, 35, 40, 41-43
rentable area, determination of, 18, 62
rental history of property, 21, 63
replacement cost, 34-35, 66, 75, 131, 134-35
replacement property, 113, 115-16, 153-54
reproduction cost, 34-35, 131, 133-35
restoration, 70
review
   *administrative review*, 80, 83-84
   *appraisal review*, 5, 30, 52, 73, 80-88
   *review appraiser*, 30, 52, 80-88
   *technical review*, 81-84, 80-88
reviewer's certification, 81, 83, 88
rezoning; *see* land use regulations
riparian
   *doctrine*, 183
   *land*, 117, 183-84, 187, 192
   *owner*, 183, 188
   *rights*, 183-84, 184, 189-90
Rivers and Harbors Act, 187-88, 191
royalty income capitalization, 47, 137, 140, 182
sales
   *adjustments*, 26-28, 32-37, 46, 65-67, 75-76, 121-23, 125, 129
   *after the date of value*, 94, 123, 130-31
   *arm's-length*, 95, 119-20, 123
   *between related persons or entities*, 96, 124-25
   *comparable sales*, 25-36, 45-47, 65-67, 71, 75-79, 120-134, 145, 163-64, 175, 181
   *contingency sales*, 33, 123, 129
   *contracts*, 123, 129
   *distress sales*, 125
   *elements of comparison*, 27, 120-21
   *extraordinary verification requirements*, 28, 32, 123, 126
   *forced sales*, 124-25
   *fraudulent sales*, 96
   *including exchange of property*, 128
   *including personal property*, 123-128
   *leasehold transactions*, 30, 175-77
   *listings*, 123, 129-30
   *non-market considerations*, 124-28
   *offers to sell*, 129-30
   *options*, 33, 123, 129-30
   *prior sales of the same property*, 123-24
   *project-influenced sales*, 128

*sales history*, 27, 62-63, 124
  *to environmental organizations*, 32-33, 127-28
  *to government entities*, 29-33, 125-28
  *to public interest organizations*, 32-33, 127-28
  *verification of*, 26-27, 29, 46, 63, 204
  *transactions*, 4, 26-27, 29, 46, 50-52, 119-20, 122-30,
    175, 185
sales adjustment grid, 65
sales comparison approach (comparable sales
    approach), 25-30, 32-33, 45-49, 65-67, 75, 78-79,
    119-121, 134, 145, 163-64, 175, 181
sales data sheets, 75
scope of appraisal, 6
scope of Standards, 5
scope of the project rule, 16-17, 20, 109, 123, 128,
    130, 145-51, 165, 192; *see also* project influence
scope of work, 9, 18, 60-61, 74, 77
setoff; *see* benefits
settlement negotiations, 124-25
severance damage; *see* compensable damage
site data, 69, 77
site inspection, 205; *see* inspection
special benefits (direct benefits), *see* benefits
special-purpose properties, 34
speculation
  *as highest and best use*, 103
  *generally*, 96
speculative evidence, 99-100
state law, 4, 49, 90-91
state rule; *see* taking + damages valuation
streets, highways, roads, 196-98
strip valuation, 170
subdivision development method; *see* development
    method
substitute facilities
  *as form of compensation*, 199-201
  *rejection as measure of compensation*, 199-201
summary of appraisal problem, 9, 77, 83-84
summary of salient facts and conclusions, 59-60
summation approach (summation appraisal), 16, 44,
    68, 97
taking + damages valuation (state rule), 39, 112-13,
    166-68; *see also* partial acquisition
takings; *see* eminent domain; inverse takings

temporary acquisitions
  *leaseholds*, 39-41, 72-73, 160-61, 174-78
  *temporary construction easements*, 4
  *temporary inverse takings*, 43
  *temporary takings*, 175, 177-78
tenant (lessee), 16, 21, 35-36, 40-41, 63, 97, 160-61,
    175-76
test of reasonableness, 132
timber, 16, 20, 43-45, 48-49, 54, 62, 97-98, 115-16,
    153, 178, 183
title, 113-15
title evidence report, 72
trends; *see* market trends
Tucker Act, 184
undivided fee, 97, 173
uneconomic remnant; *see under* partial acquisition:
    *allocation*
Uniform Act; *see* Uniform Relocation Assistance and
    Real Property Acquisition Policies Act of 1970
Uniform Relocation Assistance and Real Property
    Acquisition Policies Act of 1970 (Uniform Act), 3-4,
    15, 71, 98-99
Uniform Standards of Professional Appraisal Practice
    (USPAP), 6, 10, 13-15, 56, 58-59
unit rule
  *and cost approach*, 35, 136
  *and existing government improvements*, 98
  *and less-than-fee acquisitions*, 97
  *and mineral properties*, 16, 44, 97, 178-79, 202-03
  *and natural resource properties*, 16, 44, 97, 178-79, 202-03
  *and ownership interests*, 16, 97,
  *and physical components*, 16, 97-98, 202-203
  *and Uniform Act requirements*, 98-99
  *exceptions*, 99
  *generally*, 16, 97
  *undivided fee rule*, 97, 173
unitary holding, 153
unity of ownership, 23-24, 110, 113-15
unity of use, 111-13, 115-16
URA; *see* Uniform Relocation Assistance and Real
    Property Acquisition Policies Act of 1970
use
  *current use*, 21, 63
  *existing use*, 21, 23, 63, 103, 186
  *government's planned use of part acquired,* 151, 156, 171

*highest and best use*, 22-25, 30-31, 44-45, 64, 70, 72-74, 77
   *potential use*, 103
   *prospective use*, 104
   *speculative use*, 138
use history, 20, 62
USPAP; *see* Uniform Standards of Professional
   Appraisal Practice

vacant land, unimproved land, 134
vacant, land as if, 64-65, 134
valuation date, 10-11, 16, 25, 33, 35, 60, 65, 93-95,
   98, 107, 118, 123-24, 139, 143, 150, 174, 186, 204
valuation methods
   *before and after (federal rule)*, 17-18, 31, 37-39, 73, 152
   *taking + damages (state rule)*, 39, 112-13, 166-68
value
   *contributory value*, 34, 38, 39, 68, 98, 193-94
   *interchangeable terms*, 100n260
   *market value, cash value, fair market value*, 10, 20, 68, 70, 90,
      92-101, 104-05, 118-19
   *multiple meanings*, 105
   *noneconomic values*, 23, 105-106
   *use value*, 174

*value to government*, 23, 100
   *value to owner*, 93, 100
   *see also* market value
verification of sales, 26-27; *see also* extraordinary
   verification
voluntary acquisitions, 10, 50, 94, 185-87

water
   *consideration of uses dependent on access to or utilization of*
      *navigable waters*, 193-94
   *hybrid system*, 184
   *navigable waters*, 117, 187-94
   *navigational servitude*, 101, 187-94
   *prior appropriation system*, 183-84
   *riparian rights doctrine*, 183-84, 189-90
   *water rights*, 49, 183-84
wetlands, 20, 109
willing buyer, 95-96, 104-05
willing seller, 95-96, 104-05
witness, appraiser as, 54, 57, 204-05
zoning; *see* land use regulations



**Figure 1. Overview of mining area**

United States Department of Agriculture

# **FINAL** Environmental Impact Statement
## Resolution Copper Project and Land Exchange





## Volume 4

| Additional ground disturbance: |
| No additional ground disturbance anticipated. |

| **PF-WR-02: Divert existing flows across the subsidence area to preserve downstream flows** |
| Other names: M-W26 |
| **Description/overview:** |
| Public comments suggested that existing flows (surface runoff during storm events) be diverted across the subsidence area in order to preserve downstream flows, if possible. This concept was also raised by Forest Service specialists during the Groundwater Modeling Workgroup prior to publication of the DEIS. |

Rationale for including as a potential future measure: Resolution Copper indicated in their responses to the Forest Service on mitigation suggestions raised in public comments, that to the extent practicable and before subsidence starts, Resolution Copper will evaluate the practicability of implementing diversion around the subsidence area. The majority of upgradient surface runoff that would flow towards the subsidence area would have to pass over the Resolution Copper East Plant Site infrastructure complex which sits between the source and the subsidence area. Minimizing that flow across infrastructure would be accomplished by diverting water around the facility and into Queen Creek and Devil's Canyon. This would also minimize the amount of flow lost to the subsidence area.

| **Source of measure:** |
| Resolution Copper; public comments |
| **Resource affected/impacts being mitigated:** |
| Socioeconomic resources; water quality and water supply |
| **Applicable alternatives:** |
| All |
| **Authority to require:** |
| As an applicant-proposed mitigation measure, implementation is not assured; however, if included as a stipulation or requirement in a permit it may become required. |
| **Additional ground disturbance:** |
| None. |

| **PF-WR-03: Mitigation of effects of water level declines** |
| Other names: M-W32 |
| **Description/overview:** |
| Arizona Water Company submitted comments on the DEIS requesting that appropriate funding or bonding be in place to ensure the project will not cause any significant water level declines or water quality impacts. While such mitigation is in place for water level declines caused by dewatering near the mine site (see measure FS-WR-01), no such protections are in place for the area near the Desert Wellfield in the East Salt River valley. |

Case: 25-5185, 08/16/2025, DktEntry: 12.1, Page 2133 of 2158
Case 2:21-cv-00122-DWL    Document 87-19    Filed 07/14/25    Page 4 of 4

Appendix J

| Rationale for including as a potential future measure: The EIS analysis discloses that water quality impacts and significant water level declines are not anticipated in any areas associated with Arizona Water Company water supply systems. However, Resolution Copper notes: "If there are unique situations where water users will be impacted because of well siting requirements, for example, Resolution will work with these impacted stakeholders to mitigate effects of a water level decline caused by the project." This mitigation measure is being included in the event remedies in the future could be warranted. |
|---|
| **Source of measure:** |
| Resolution Copper; public comments |
| **Resource affected/impacts being mitigated:** |
| Socioeconomic resources; water quality and water supply |
| **Applicable alternatives:** |
| All |
| **Authority to require:** |
| As an applicant-proposed mitigation measure, implementation is not assured; however, if included as a stipulation or requirement in a permit it may become required. |
| **Additional ground disturbance:** |
| None. |

## *Potential Future Measures for Wildlife (1 measure)*

| **PF-WI-01: Voluntary achievement of "no net loss" of habitat** |
|---|
| Other names: M-WL47 |
| **Description/overview:** |
| Continue collaboration on a voluntary compensatory plan, beyond what is legally mandated, to achieve no net loss of habitat. |
| Rationale for including as a potential future measure: Many aspects of the project design and mitigation will already replace habitat impacted by the mine or will prevent impacts from occurring. This includes preventing riparian and aquatic impacts associated with springs and perennial streams through water replacement if needed, reestablishment of habitat through reclamation, new riparian habitat brought forward as part of the compensatory mitigation under the Section 404 permit, as well as the offered lands coming into Federal ownership that contain desirable habitat. Although there is no legal mandate or regulatory requirement, the goal expressed in the mitigation measure—no net loss of habitat—is an aspirational goal that would have long-term benefits to wildlife in the region. Future mitigations could be considered to bring the project closer to this goal. |
| **Source of measure:** |
| Public comments |
| **Resource affected/impacts being mitigated:** |
| Wildlife habitat |
| **Applicable alternatives:** |
| All |

**United States Department of Agriculture**
Office of the Under Secretary, Natural Resources and Environment
Washington, D.C. 20250

**TO**:          Victoria Christiansen, Chief, USDA Forest Service

**FROM:**      Chris French, Acting Deputy Under Secretary

CHRISTOPHER FRENCH
2021.03.01 14:04:10 -05'00'

**DATE:**      March 1, 2021

**SUBJECT:**   Withdrawal of Notice of Availability; Rescind Final Environmental Impact
              Statement and Draft Record of Decision for Resolution Copper

With this memorandum I am instructing the Forest Service to withdraw the Notice of
Availability, and rescind the Final Environmental Impact Statement and draft Record of
Decision released on January 15, 2021, for Resolution Copper project on the Tonto
National Forest in Arizona and re-initiate tribal consultation.

The withdraw will terminate the pre-decisional objection period. The Resolution Copper
project is proposed on Oak Flat, a site sacred to numerous Federally Recognized Tribes
in the Southwest. The Department is taking this step to provide an opportunity for the
agency to conduct a thorough review based on significant input received from
collaborators, partners, and the public since these documents were released.

The recent Presidential Memorandum on tribal consultation and strengthening nation to
nation relationships, counsels in favor of ensuring the Forest Service has complied with
the environmental, cultural, and archaeological analyses required. USDA has concluded
that additional time is necessary to fully understand concerns raised by Tribes and the
public and the project's impacts to these important resources and ensures the agency's
compliance with federal law. The agency should take appropriate steps to re-initiate
consultation and undertake this review and keep USDA informed of progress.

Roger Flynn (CO Bar # 21078) (*pro hac vice*)
Jeffrey C. Parsons (CO Bar #30210) (*pro hac vice*)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738; wmap@igc.org

Marc D. Fink (MN Bar #343407) (*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
(218) 464-0539; mfink@biologicaldiversity.org

Allison N. Henderson (CO Bar #45088) (*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008; ahenderson@biologicaldiversity.org
*Counsel for Plaintiffs*

Susan B. Montgomery (AZ Bar # 020595)
Robyn L. Interpreter (AZ Bar # 020864)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825; smontgomery@milawaz.com
*Counsel for Inter Tribal Association of Arizona, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| Arizona Mining Reform Coalition, *et al.*, | Case No. 2:21-CV-00122-DWL |
| Plaintiffs | |
| vs. | **PLAINTIFFS' NOTICE OF APPEAL** |
| United States Forest Service, *et al.*, | |
| Defendants, | **PRELIMINARY INJUNCTION APPEAL** |
| and | |
| Resolution Copper Mining, | |
| Defendant-Intervenor. | |

1     Notice is hereby given that Plaintiffs Arizona Mining Reform Coalition; Inter Tribal

2  Association of Arizona, Inc.; Earthworks; Center for Biological Diversity; Access Fund;

3  and Grand Canyon Chapter of the Sierra Club hereby appeal to the United States Court of

4  Appeals for the Ninth Circuit the U.S. District Court's denial of Plaintiffs' motion for a

5

6  preliminary injunction, which was issued on August 15, 2025. Doc. 99.

7     Pursuant to Ninth Circuit Rule 3-2, a Representation Statement is included below.

8                                    Respectfully submitted August 15, 2025.

9
                                       */s/ Marc D. Fink*
10                                     Marc D. Fink (Pro Hac Vice)
                                       CENTER FOR BIOLOGICAL DIVERSITY
11                                     209 East 7th Street
12                                     Duluth, MN 55805
                                       218-464-0539
13                                     mfink@biologicaldiversity.org

14
                                       Roger Flynn (Pro Hac Vice)
15                                     Jeffrey C. Parsons (Pro Hac Vice)
                                       WESTERN MINING ACTION PROJECT
16                                     P.O. Box 349; 440 Main St., #2
17                                     Lyons, CO 80540
                                       303-823-5738
18                                     wmap@igc.org

19
                                       Allison N. Henderson (Pro Hac Vice)
20                                     CENTER FOR BIOLOGICAL DIVERSITY
                                       P.O. Box 3024
21                                     Crested Butte, CO 81224
22                                     970-309-2008
                                       ahenderson@biologicaldiversity.org
23
                                       *Attorneys for All Plaintiffs*
24
25                                     Susan B. Montgomery (AZ Bar # 020595)
                                       Robyn L. Interpreter (AZ Bar # 020864)
26                                     MONTGOMERY & INTERPRETER, PLC
27                                     3301 E. Thunderbird Rd.
                                       Phoenix, AZ 85032
28                                     (480) 513-6825

smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorneys for the ITAA*

# REPRESENTATION STATEMENT

**Appellants:**

Names of Parties:
Arizona Mining Reform Coalition; Inter Tribal Association of Arizona, Inc.; Earthworks; Center for Biological Diversity; Access Fund; and Grand Canyon Chapter of the Sierra Club

Names of Counsel:
Roger Flynn (CO Bar # 21078), *pro hac vice* (registered for Electronic Filing in 9th Cir.)
Jeffrey C. Parsons (CO Bar # 30210), *pro hac vice* (registered for Electronic Filing in 9th Cir.)
Western Mining Action Project
P.O. Box 349; 440 Main St., #2
Lyons, CO 80540
303-823-5738
wmap@igc.org

Marc D. Fink (MN Bar # 343407), *pro hac vice* (registered for Electronic Filing in 9th Cir.)
Center for Biological Diversity
209 East 7th Street
Duluth, MN 55805
218-464-0539
mfink@biologicaldiversity.org

Allison N. Henderson (CO Bar # 45088), *pro hac vice* (registered for Electronic Filing in 9th Cir.)
Center for Biological Diversity
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs*

Susan B. Montgomery (AZ Bar # 020595) (registered for Electronic Filing in 9th Cir.)
Montgomery & Interpreter, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorney for the ITAA*

**Appellees:**

Name of Parties:
Brooke L. Rollins, United States Secretary of Agriculture; United States Forest Service, an agency in the U.S. Department of Agriculture; and Neil Bosworth, Supervisor of the Tonto National Forest.

Names of Counsel:

Adam R.F. Gustafson
Acting Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

Erika Norman (CA Bar 268425)
Angela Ellis (DC Bar 1670713)
Natural Resources Section
150 M St. NE, Third Floor
Washington, D.C. 20002
(202) 305-0475 (Norman)
Erika.Norman@usdoj.gov;
Angela.Ellis@usdoj.gov

Ezekiel Peterson
Attorney, Appellate Section
U.S. Department of Justice,
Environment & Natural Resources Division
999 18th St, North Terrace, Suite 600
Denver, CO 80212
(303) 844-1348
ezekiel.a.peterson@usdoj.gov

**Defendant-Intervenors:**

Name of Parties:
Resolution Copper Mining

Names of Counsel:
Christopher D. Thomas (#010482)
Andrea J. Driggs (#023633)
Janet M. Howe (#034615)
Benjamin A. Longbottom (#038602)
Holland & Hart LLP
3110 North Central Ave., Suite D-160
Phoenix, Arizona 85012
Telephone: +1.602.316.9334
CDThomas@hollandhart.com

Michael R. Huston (#038763)
Diane M. Johnsen (#007634)
Samantha J. Burke (#036064)
Addison W. Bennett (#039801)
Perkins Coie LLP
2525 East Camelback Road, Suite 500
Phoenix, Arizona 85016
Telephone: +1.602.351.8000
MHuston@perkinscoie.com
DJohnsen@perkinscoie.com
SBurke@perkinscoie.com
ABennett@perkinscoie.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2025, I filed the foregoing document

electronically through the CM/ECF system, which caused all parties through counsel of

record to be served by electronic means, as reflected on the Notice of Electronic Filing.

*/s/ Marc D. Fink*
Marc D. Fink, *pro hac vice*
Center for Biological Diversity

APPEAL,STD

# U.S. District Court
## DISTRICT OF ARIZONA (Phoenix Division)
## CIVIL DOCKET FOR CASE #: 2:21-cv-00122-DWL

Arizona Mining Reform Coalition et al v. United States Forest
Service et al
Assigned to: Judge Dominic W Lanza
Related Case: 2:25-cv-02758-DWL
Cause: 42:4321 Review of Agency Action-Environment

Date Filed: 01/22/2021
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Arizona Mining Reform Coalition**    represented by    **Allison N Henderson**
Center for Biological Diversity - Crested
Butte, CO
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
Email: ahenderson@biologicaldiversity.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey C Parsons**
Western Mining Action Project
PO Box 349
P.O. Box 349
Lyons, CO 80540
303-823-5738
Email: jeff@wmaplaw.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marc D Fink**
Center for Biological Diversity
209 East 7th St
209 E 7th St
Duluth, MN 55805
218-464-0539
Email: mfink@biologicaldiversity.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Roger Flynn**
Western Mining Action Project
P.O. Box 349
Lyons, CO 80540
303-823-5738

Fax: 303-823-5732
Email: wmap@igc.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Susan B Montgomery**
Montgomery & Interpreter PLC
3301 E Thunderbird Rd.
Phoenix, AZ 85032
480-513-6825
Fax: 480-513-6948
Email: smontgomery@milawaz.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Inter Tribal Association of Arizona Incorporated**

represented by **Allison N Henderson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey C Parsons**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marc D Fink**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robyn Loretta Interpreter**
Montgomery & Interpreter PLC
3301 E Thunderbird Rd.
Phoenix, AZ 85032
480-513-6825
Fax: 480-513-6948
Email: rinterpreter@milawaz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roger Flynn**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Susan B Montgomery**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Earthworks**                                  represented by   **Allison N Henderson**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Jeffrey C Parsons**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Marc D Fink**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Roger Flynn**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Susan B Montgomery**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Center for Biological Diversity**             represented by   **Allison N Henderson**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Jeffrey C Parsons**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Marc D Fink**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Roger Flynn**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*

**Susan B Montgomery**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Access Fund**                          represented by   **Allison N Henderson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey C Parsons**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marc D Fink**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Roger Flynn**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Susan B Montgomery**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Grand Canyon Chapter of the Sierra Club**    represented by   **Allison N Henderson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey C Parsons**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marc D Fink**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Roger Flynn**

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Susan B Montgomery**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**United States Forest Service**
*an agency in the U.S. Department of Agriculture*

represented by **Angela Ellis**
US Dept of Justice - ENRD M Street
150 M St. NE
Washington, DC 20002
202-305-0466
Email: angela.ellis@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erika Danielle Norman**
US Dept of Justice - ENRD
4 Constitution Sq.
Washington, DC 20002
202-305-0475
Email: erika.norman@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tyler McVeigh Alexander**
US Dept of Justice
4 Constitution Sq,
150 M St. NE
Washington, DC 20002
202-305-0238
Fax: 202-305-0506
Email: talexander@bicklawllp.com
*TERMINATED: 04/03/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Neil Bosworth**
*Supervisor of the Tonto National Forest*

represented by **Angela Ellis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erika Danielle Norman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tyler McVeigh Alexander**
(See above for address)
*TERMINATED: 04/03/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tom Torres**                                          represented by **Angela Ellis**
*Acting Supervisor, Tonto National Forest*                            (See above for address)
*TERMINATED: 07/14/2025*                                             *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

**Erika Danielle Norman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tyler McVeigh Alexander**
(See above for address)
*TERMINATED: 04/03/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Brooke L Rollins**                                    represented by **Angela Ellis**
*US Secretary of Agriculture*                                        (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**Resolution Copper Mining LLC**                        represented by **Addison W Bennett**
                                                                     Perkins Coie LLP - Phoenix, AZ
                                                                     2525 E Camelback Rd., Ste. 500
                                                                     Phoenix, AZ 85016
                                                                     202-654-6278
                                                                     Email: abennett@perkinscoie.com
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

**Andrea J Driggs**
Holland & Hart LLP - Phoenix
3110 N Central Ave., Ste. D-160
Phoenix, AZ 85012
602-884-2003
Email: ajdriggs@hollandhart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Longbottom**
Holland & Hart LLP - Phoenix
3110 N Central Ave., Ste. D-160
Phoenix, AZ 85012

602-884-2003
Email: balongbottom@hollandhart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher David Thomas**
Holland & Hart LLP - Phoenix
3110 N Central Ave., Ste. D-160
Phoenix, AZ 85012
602-884-2003
Email: cdthomas@hollandhart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Diane M Johnsen**
Perkins Coie LLP - Phoenix, AZ
2525 E Camelback Rd., Ste. 500
Phoenix, AZ 85016
602-351-8000
Email: djohnsen@perkinscoie.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Luis Rojas**
Perkins Coie LLP - Phoenix, AZ
2525 E Camelback Rd., Ste. 500
Phoenix, AZ 85016
602-351-8000
Fax: 602-648-7000
Email: mlrojas@perkinscoie.com
*TERMINATED: 05/04/2023*
*LEAD ATTORNEY*

**Michael R Huston**
Perkins Coie LLP - Phoenix, AZ
2525 E Camelback Rd., Ste. 500
Phoenix, AZ 85016
602-351-8062
Email: mhuston@perkinscoie.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Janet Marie Howe**
Holland & Hart LLP - Phoenix
3110 N Central Ave., Ste. D-160
Phoenix, AZ 85012
602-351-8187
Email: jmhowe@hollandhart.com
*ATTORNEY TO BE NOTICED*

**Samantha Jones Burke**
Perkins Coie LLP - Phoenix, AZ
2525 E Camelback Rd., Ste. 500
Phoenix, AZ 85016

602-351-8204
Fax: 602-648-7000
Email: sburke@perkinscoie.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/22/2021 | 1 | COMPLAINT. Filing fee received: $ 402.00, receipt number 0970-19087782 filed by Grand Canyon Chapter of the Sierra Club, Center for Biological Diversity, Arizona Mining Reform Coalition, Earthworks, Inter Tribal Association of Arizona Incorporated, Access Fund. (Flynn, Roger) (Attachments: # 1 Civil Cover Sheet)(JAM) (Entered: 01/25/2021) |
| 01/22/2021 | 2 | Corporate Disclosure Statement by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (JAM) (Entered: 01/25/2021) |
| 01/22/2021 | 3 | SUMMONS Submitted by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Flynn, Roger) (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons)(JAM) (Entered: 01/25/2021) |
| 01/22/2021 | 4 | Filing fee paid, receipt number 0970-19087782. This case has been assigned to the Honorable Douglas L Rayes. All future pleadings or documents should bear the correct case number: CV-21-122-PHX-DLR. Notice of Availability of Magistrate Judge to Exercise Jurisdiction form attached. (Flynn, Roger) (JAM) (Entered: 01/25/2021) |
| 01/25/2021 | 5 | Summons Issued as to All Defendants. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons)(JAM). *** IMPORTANT: When printing the summons, select "Document and stamps" or "Document and comments" for the seal to appear on the document. (Entered: 01/25/2021) |
| 01/25/2021 | 6 | NOTICE TO FILER OF DEFICIENCY re: 1 Complaint filed by Arizona Mining Reform Coalition, Access Fund, Inter Tribal Association of Arizona Incorporated, Center for Biological Diversity, Grand Canyon Chapter of the Sierra Club, Earthworks. Document not in compliance with LRCiv 7.1(a)(3) - Party names must be capitalized using proper upper and lower case type. *No further action is required*. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (JAM) (Entered: 01/25/2021) |
| 01/25/2021 | 7 | ORDER - The parties are advised, pursuant to LRCiv 12.1(c), that motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) and motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) are discouraged if the defect(s) in the complaint can be cured by a permissible amendment. Plaintiff shall serve a copy of this Order upon Defendant and file notice of service with the Court. See document for complete details. Signed by Judge Douglas L Rayes on 1/25/2021. (WLP) (Entered: 01/25/2021) |
| 01/25/2021 |  | Remark: Pro hac vice motion(s) granted for Marc D Fink on behalf of Plaintiffs Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 01/25/2021) |
| 01/25/2021 |  | Remark: Pro hac vice motion(s) granted for Allison N Melton on behalf of Plaintiffs Access Fund, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated, Defendant Neil Bosworth. |

5-ER-1028

| | | |
|---|---|---|
| | | This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 01/25/2021) |
| 01/29/2021 | | Remark: Pro hac vice motion(s) granted for Roger Flynn on behalf of Plaintiffs Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 01/29/2021) |
| 01/29/2021 | | Remark: Pro hac vice motion(s) granted for Jeffrey C Parsons on behalf of Plaintiffs Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 01/29/2021) |
| 02/18/2021 | 8 | MOTION to Consolidate Cases by Neil Bosworth, Tom Torres, United States Forest Service, Neil Bosworth, Tom Torres, Neil Bosworth, Vicki Christensen, Sonny Perdue, Tom Torres, United States of America. (Associated Cases: CV-21-00050-PHX-SPL, CV-21-00068-PHX-DWL, CV-00122-PHX-DLR) (Alexander, Tyler) (Entered: 02/18/2021) |
| 02/19/2021 | 9 | MOTION for Preliminary Injunction by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10)(Montgomery, Susan) (Entered: 02/19/2021) |
| 02/19/2021 | 10 | Additional Attachments to Main Document re: 9 MOTION for Preliminary Injunction by Plaintiffs Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Attachments: # 1 Exhibit 12, # 2 Exhibit 13, # 3 Exhibit 14, # 4 Exhibit 15, # 5 Exhibit 16, # 6 Exhibit 17, # 7 Exhibit 18, # 8 Exhibit 19)(Montgomery, Susan) (Entered: 02/19/2021) |
| 02/19/2021 | 11 | Additional Attachments to Main Document re: 9 MOTION for Preliminary Injunction by Plaintiffs Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Attachments: # 1 Exhibit 21, # 2 Text of Proposed Order) (Montgomery, Susan) (Entered: 02/19/2021) |
| 02/19/2021 | 12 | MOTION for Leave to File Excess Pages for Motion for Preliminary Injunction by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Attachments: # 1 Text of Proposed Order)(Montgomery, Susan) (Entered: 02/19/2021) |
| 02/19/2021 | 13 | MINUTE ORDER: Scheduling Conference re: 9 Plaintiff's Motion for Preliminary Injunction set for 2/23/2021 at 10:00 AM before Judge Douglas L Rayes. The parties are advised oral argument on the motion will not be heard at this hearing, only a briefing schedule on the motion will be established. The parties will be provided with call-in information via separate email. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MMO) (Entered: 02/19/2021) |
| 02/20/2021 | 14 | Additional Attachments to Main Document re: 9 MOTION for Preliminary Injunction by Plaintiffs Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Attachments: # 1 Exhibit 6)(Montgomery, Susan) (Entered: 02/20/2021) |

| 02/22/2021 | 15 | NOTICE OF ATTORNEY APPEARANCE: Erika Norman appearing for Neil Bosworth, Tom Torres, United States Forest Service. . (Norman, Erika) (Entered: 02/22/2021) |
|---|---|---|
| 02/22/2021 | 16 | ORDER: IT IS ORDERED granting 12 Unopposed Motion for Additional Pages for Motion for Preliminary Injunction. The Court accepts Plaintiffs' Motion for Preliminary Injunction (and included Memorandum in Support) up to 27 pages. Federal Defendants' response to the Motion for Preliminary Injunction shall be limited to 27 pages. Plaintiffs' reply brief shall be limited to 16 pages. Ordered by Judge Douglas L Rayes on 2/22/2021. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MMO) (Entered: 02/22/2021) |
| 02/22/2021 | 17 | Joinder re: (60 in 2:21-cv-00050-SPL) MOTION to Consolidate Cases . filed by Resolution Copper Mining LLC. (Associated Cases: 2:21-cv-00068-DWL, 2:21-cv-00050-SPL, 2:21-cv-00122-DLR) (Thomas, Christopher) (Entered: 02/22/2021) |
| 02/22/2021 | 18 | NOTICE of Appearance by Christopher David Thomas on behalf of Resolution Copper Mining LLC. (Thomas, Christopher) (Entered: 02/22/2021) |
| 02/22/2021 | 19 | Corporate Disclosure Statement by Resolution Copper Mining LLC identifying Corporate Parent Resolution Copper Company, Corporate Parent BHP Copper Incorporated for Resolution Copper Mining LLC. (Thomas, Christopher) (Entered: 02/22/2021) |
| 02/22/2021 | 20 | MOTION to Intervene *(Unopposed)* by Resolution Copper Mining LLC. (Attachments: # 1 Exhibit A Declaration of Andrew Lye, # 2 Exhibit B (Proposed) Answer, # 3 Text of Proposed Order)(Thomas, Christopher) (Entered: 02/22/2021) |
| 02/23/2021 | 21 | MINUTE ENTRY for proceedings held before Judge Douglas L Rayes: Telephonic Scheduling Conference held on 2/23/2021. Upon discussion with the parties, IT IS ORDERED setting the following schedule as to the 9 Motion for Preliminary Injunction: Response due by 3/2/2021. Reply due by noon on 3/4/2021. Telephonic Oral Argument set for 3/5/2021 at 01:30 PM.

APPEARANCES: Telephonic appearance by Roger Flynn, Marc Fink, and Susan Montgomery for Plaintiffs. Telephonic appearance by Erica Norman for Defendants. Telephonic appearance by Chris Thomas for Defendant-Intervenor Resolution Copper Mining LLC. (Court Reporter Jennifer Pancratz.) Hearing held 9:58 am to 10:12 am. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (RMV) (Entered: 02/23/2021) |
| 02/24/2021 | 22 | ORDER granting 20 Motion to Intervene. The Clerk shall file Resolution's proposed form of Answer, which was lodged with the Court, as Exhibit B of the Motion. Signed by Judge Douglas L Rayes on 2/23/21. (DXD) (Entered: 02/24/2021) |
| 02/24/2021 | 23 | ANSWER to 1 Complaint by Resolution Copper Mining LLC.(DXD) (Entered: 02/24/2021) |
| 02/26/2021 | 24 | SERVICE EXECUTED filed by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated: Proof of Service re: Complaint, Summons, Civil Cover Sheet, Corporate Disclosure Statement, Order, etc. upon Tonto National Forest Supervisor Neil Bosworth on 1/28/21; Tonto National Forest Acting Supervisor Tom Torres on 1/27/21; U.S. Attorney's Office District of Arizona on 1/28/21; Acting U.S. Attorney General Robert M. Wilkinson on 2/1/21; United States Department of Agriculture on 2/1/21; United States Forest Service on 2/1/21. (Montgomery, Susan) *Modified text on 3/1/2021 (DXD). (Entered: 02/26/2021) |
| 03/02/2021 | 25 | RESPONSE in Opposition re: 9 MOTION for Preliminary Injunction filed by Resolution Copper Mining LLC. (Attachments: # 1 Exhibit A - Order by Judge Logan, # 2 Exhibit B |

| | | - Declaration of Andrew Lye, # 3 Exhibit C - Declaration of Victoria Peacey, # 4 Exhibit D - Declaration of Sterling Hundley)(Thomas, Christopher) (Entered: 03/02/2021) |
|---|---|---|
| 03/02/2021 | 26 | RESPONSE in Opposition re: 9 MOTION for Preliminary Injunction *and Notice of Superseding Agency Action* filed by Neil Bosworth, Tom Torres, United States Forest Service. (Attachments: # 1 Exhibit Declaration of Tracy Parker, # 2 Exhibit Mem. from USDA to USFS, # 3 Exhibit USFS Ltr. to EPA)(Norman, Erika) (Entered: 03/02/2021) |
| 03/02/2021 | 27 | ORDER: In light of the 3/1/2021 USDA directive to rescind the FEIS and draft Record of Decision for the Resolution Copper Project, the Court believes that the 3/5/2021 oral argument should be vacated. However, the Court will provide the parties an opportunity to object. If the Court receives no objection by 3/3/2021 at 5:00 PM, the 3/5/2021 hearing will be vacated. Should neither side object to the vacating of the hearing, the parties shall file a joint status report no later than 3/10/2021 that explains the status of the case moving forward and that includes a proposed schedule. Ordered by Judge Douglas L Rayes on 3/2/2021. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MMO) (Entered: 03/02/2021) |
| 03/03/2021 | 28 | STIPULATION re: 9 MOTION for Preliminary Injunction , 27 Order, Set Deadlines *Joint Stipulation* by Arizona Mining Reform Coalition. (Flynn, Roger) (Entered: 03/03/2021) |
| 03/03/2021 | 29 | *WITHDRAWAL OF DOCUMENT re: 9 MOTION for Preliminary Injunction by Arizona Mining Reform Coalition. (Flynn, Roger) *Modified to correct event on 3/4/2021 (DXD). (Entered: 03/03/2021) |
| 03/03/2021 | 30 | MINUTE ORDER: Pursuant to 29 Plaintiff's Notice of Withdrawal of Plaintiff's Motion for Preliminary Injunction, oral argument set for 3/5/2021 at 1:30 PM is VACATED. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MMO) (Entered: 03/03/2021) |
| 03/04/2021 | 31 | **REFILED at Doc. 32 ** RESPONSE in Opposition re: 8 MOTION to Consolidate Cases filed by Arizona Mining Reform Coalition. (Flynn, Roger) *Modified to correct event. Redocketed by Clerk using correct event on 3/5/2021 (DXD). (Entered: 03/04/2021) |
| 03/04/2021 | 32 | RESPONSE to Motion re: (60 in 2:21-cv-00050-SPL) MOTION to Consolidate Cases *in Opposition* filed by Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Associated Cases: 2:21-cv-00050-SPL, 2:21-cv-00068-DWL, 2:21-cv-00122-DLR) (DXD) (Entered: 03/05/2021) |
| 03/10/2021 | 33 | STATUS REPORT *Joint Status Report* by Arizona Mining Reform Coalition. (Attachments: # 1 Text of Proposed Order)(Flynn, Roger) (Entered: 03/10/2021) |
| 03/11/2021 | 34 | REPLY to Response to Motion re: (60 in 2:21-cv-00050-SPL) MOTION to Consolidate Cases filed by Neil Bosworth, Tom Torres, United States Forest Service, Neil Bosworth, Vicki Christensen, Sonny Perdue, Tom Torres, United States of America, Neil Bosworth, Tom Torres. (Associated Cases: 2:21-cv-00122-DLR, 2:21-cv-00050-SPL, 2:21-cv-00068-DWL) (Norman, Erika) (Entered: 03/11/2021) |
| 03/16/2021 | 35 | ORDER - Pursuant to the parties' joint Status Report (Doc. 33 ), this case is stayed pending the Forest Service's publication of a future Final Environmental Impact Statement and Draft Record of Decision for the Resolution Copper Project and Land Exchange. The parties shall submit a status report to this Court 90 days after the date of this Order. See Order for further details. Signed by Judge Douglas L Rayes on 3/15/21. (DXD) (Entered: 03/16/2021) |

5-ER-1031

| 04/16/2021 | 36 | ORDER that Defendants' Motion to Consolidate (Doc. 60 ) is denied. Signed by Judge Steven P Logan on 4/15/2021. (Associated Cases: 2:21-cv-00050-SPL, 2:21-cv-00068-DWL, 2:21-cv-00122-DLR) (REK) (Entered: 04/16/2021) |
|---|---|---|
| 06/14/2021 | 37 | STATUS REPORT *(JOINT)* by Neil Bosworth, Tom Torres, United States Forest Service. (Norman, Erika) (Entered: 06/14/2021) |
| 09/13/2021 | 38 | STATUS REPORT *(Joint)* by Neil Bosworth, Tom Torres, United States Forest Service. (Norman, Erika) (Entered: 09/13/2021) |
| 12/10/2021 | 39 | STATUS REPORT *(Joint)* by Neil Bosworth, Tom Torres, United States Forest Service. (Norman, Erika) (Entered: 12/10/2021) |
| 03/10/2022 | 40 | STATUS REPORT *(Joint)* by Neil Bosworth, Tom Torres, United States Forest Service. (Norman, Erika) (Entered: 03/10/2022) |
| 06/10/2022 | 41 | STATUS REPORT by Neil Bosworth, Tom Torres, United States Forest Service. (Alexander, Tyler) (Entered: 06/10/2022) |
| 09/09/2022 | 42 | STATUS REPORT *Joint Status Report* by Neil Bosworth, Tom Torres, United States Forest Service. (Alexander, Tyler) (Entered: 09/09/2022) |
| 12/08/2022 | 43 | STATUS REPORT *(Joint)* by Neil Bosworth, Tom Torres, United States Forest Service. (Norman, Erika) (Entered: 12/08/2022) |
| 12/28/2022 | 44 | NOTICE re: Notice of Last Name and Email Address Change by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated . (Henderson, Allison) (Entered: 12/28/2022) |
| 03/08/2023 | 45 | STATUS REPORT *(Joint)* by Neil Bosworth, Tom Torres, United States Forest Service. (Norman, Erika) (Entered: 03/08/2023) |
| 05/04/2023 | 46 | NOTICE of Attorney Withdrawal *of Counsel Matthew Rojas Only* filed by Christopher David Thomas. (Thomas, Christopher) (Entered: 05/04/2023) |
| 06/06/2023 | 47 | STATUS REPORT *(Joint)* by Neil Bosworth, Tom Torres, United States Forest Service. (Norman, Erika) (Entered: 06/06/2023) |
| 09/05/2023 | 48 | STATUS REPORT *(Joint)* by Neil Bosworth, Tom Torres, United States Forest Service. (Norman, Erika) (Entered: 09/05/2023) |
| 12/04/2023 | 49 | STATUS REPORT *Joint* by Neil Bosworth, Tom Torres, United States Forest Service. (Alexander, Tyler) (Entered: 12/04/2023) |
| 03/04/2024 | 50 | STATUS REPORT *Joint* by Neil Bosworth, Tom Torres, United States Forest Service. (Alexander, Tyler) (Entered: 03/04/2024) |
| 03/18/2024 | 51 | NOTICE OF ATTORNEY'S CHANGE OF ADDRESS/FIRM NAME by Christopher David Thomas. (Thomas, Christopher) (Entered: 03/18/2024) |
| 06/05/2024 | 52 | STATUS REPORT *Joint* by Neil Bosworth, Tom Torres, United States Forest Service. (Alexander, Tyler) (Entered: 06/05/2024) |
| 09/06/2024 | 53 | STATUS REPORT *Joint* by Neil Bosworth, Tom Torres, United States Forest Service. (Alexander, Tyler) (Entered: 09/06/2024) |
| 11/27/2024 | 54 | JOINT STATUS REPORT by United States Forest Service, Neil Bosworth, Tom Torres. (Norman, Erika) (Entered: 11/27/2024) |

5-ER-1032

| | | |
|---|---|---|
| 02/27/2025 | 55 | JOINT STATUS REPORT by United States Forest Service, Neil Bosworth, Tom Torres. (Norman, Erika) (Entered: 02/27/2025) |
| 03/17/2025 | 56 | NOTICE OF ATTORNEY'S CHANGE OF ADDRESS/EMAIL/FIRM NAME by Andrea J Driggs. (Driggs, Andrea) (Entered: 03/17/2025) |
| 04/03/2025 | 57 | NOTICE of Attorney Termination/Withdrawal *Tyler McVeigh Alexander* filed by Tyler McVeigh Alexander. (Alexander, Tyler) (Entered: 04/03/2025) |
| 04/17/2025 | 58 | NOTICE of Appearance by Angela Ellis on behalf of Neil Bosworth, Tom Torres, United States Forest Service. (Ellis, Angela) (Entered: 04/17/2025) |
| 04/17/2025 | 59 | NOTICE re: 60-Day Notice of Publication of Final Environmental Impact Statement by Neil Bosworth, Tom Torres, United States Forest Service . (Ellis, Angela) (Entered: 04/17/2025) |
| 04/18/2025 | 60 | NOTICE of Appearance by Janet Marie Howe on behalf of Resolution Copper Mining LLC. (Howe, Janet) (Entered: 04/18/2025) |
| 04/28/2025 | 61 | JOINT STATUS REPORT by Neil Bosworth, Tom Torres, United States Forest Service. (Norman, Erika) (Entered: 04/28/2025) |
| 05/01/2025 | 62 | ORDER REASSIGNING CASE - Case reassigned to Judge Dominic W Lanza for all further proceedings. All future pleadings and papers submitted for filing shall bear the following complete case number: CV-21-00122-PHX-DWL. The Clerk shall provide a copy of this order to the District of Arizona Chief Judge. Signed by Senior Judge Douglas L Rayes on 5/1/25. (DXD) (Entered: 05/01/2025) |
| 05/01/2025 | 63 | ORDER - Pursuant to the Joint Status Report (Doc. 61 ), IT IS ORDERED setting Status Conference for **5/5/2025 at 01:00 PM** in Courtroom 601, 401 West Washington Street, Phoenix, AZ 85003 before Judge Dominic W Lanza. The hearing will be conducted in person and/or via Zoom. Counsel shall advise the Court via e-mail (lanza_chambers@azd.uscourts.gov) no later than 5/2/2025 at 3:00 PM as to whether they will appear via Zoom or in person. The Court's staff will provide counsel with the Zoom link for the hearing. Ordered by Judge Dominic W Lanza on 5/1/25. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (SLQ) *Modified text on 5/1/2025 (SLQ). (Entered: 05/01/2025) |
| 05/05/2025 | 64 | MINUTE ENTRY for proceedings held before Judge Dominic W Lanza: Status Conference held on 5/5/2025. Discussion held as to the Joint Status Report (Doc. 61 ). For the reasons stated on the record, the Court adopts, with modifications, the briefing schedule proposed in CV-21-00068-PHX-DWL. The motion for preliminary injunction is due 5/14/2025, the response is due 5/27/2025, and the reply is due 6/2/2025. Oral Argument is set for **6/6/2025 at 10:00 AM** in Courtroom 601, 401 West Washington Street, Phoenix, AZ 85003 before Judge Dominic W Lanza. The hearing will be conducted in person and/or via Zoom. Counsel shall advise the Court via e-mail (lanza_chambers@azd.uscourts.gov) no later than 6/3/2025 at 12:00 PM as to whether they will appear via Zoom or in person. Counsel shall utilize the same Zoom link used for today's proceeding. IT IS FURTHER ORDERED that the stay (Doc. 35 ) is lifted.<br><br>APPEARANCES: Marc Fink and Allison Henderson (via Zoom) and Susan Montgomery (in person) for Plaintiffs. Angela Ellis and Erika Norman (via Zoom) for Defendants. Christopher Thomas and Andrea Driggs (in person) for Intervenor Defendant. (Court Reporter Jennifer Pancratz.) Hearing held 1:05 PM to 1:45 PM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (SLQ) (Entered: 05/05/2025) |

| 05/13/2025 | 65 | TRANSCRIPT REQUEST by Resolution Copper Mining LLC for proceedings held on 05/05/2025, Judge Dominic W Lanza hearing judge(s). (Thomas, Christopher) (Entered: 05/13/2025) |
| 05/13/2025 | 66 | NOTICE TO FILER OF DEFICIENCY re: AO435 65 Transcript Request filed by Resolution Copper Mining LLC. Item 16 ORDER FOR - Applicable Box(es) Not Checked: NON-APPEAL. Item 17 - TRANSCRIPT REQUESTED: The left side is meant for a trial. No need to duplicate date. *FOLLOW-UP ACTION REQUIRED:* 1) Please refile with each box in Item 16 checked that applies. 2) Please refile with duplicated dates of proceedings on left side in Item 17 removed. Deficiency must be corrected within one business day of this notice. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (RAP) (Entered: 05/13/2025) |
| 05/14/2025 | 67 | AMENDED TRANSCRIPT REQUEST pursuant to 66 Notice of Deficiency by Resolution Copper Mining LLC for proceedings held on 05/05/2025, Judge Dominic W Lanza hearing judge(s). (Thomas, Christopher) (Entered: 05/14/2025) |
| 05/14/2025 | 68 | MOTION for Preliminary Injunction by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Attachments: # 1 Exhibit 1-2, # 2 Exhibit 3-7, # 3 Exhibit 8, # 4 Exhibit 8, # 5 Exhibit 10-13, # 6 Exhibit 14, # 7 Exhibit 15, # 8 Proposed Order)(Montgomery, Susan) (Entered: 05/14/2025) |
| 05/14/2025 | 69 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of STATUS CONFERENCE proceedings held on 05/05/2025 before Judge DOMINIC W. LANZA. [Court Reporter: Jennifer A. Pancratz, RMR, CRR, FCRR, CRC, Telephone number (602) 322-7198]. The ordering party receives the transcript directly from the Court Reporter. Therefore, transcripts may not be viewed through Pacer. A non-ordering party may view a transcript at the court's public terminal or purchased through the Court Reporter/Transcriber by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through Pacer. Redaction Request due 6/4/2025. Redacted Transcript Deadline set for 6/16/2025. Release of Transcript Restriction set for 8/12/2025. (RAP) (Entered: 05/15/2025) |
| 05/27/2025 | 70 | NOTICE of Appearance by Samantha Jones Burke on behalf of Resolution Copper Mining LLC. (Burke, Samantha) (Entered: 05/27/2025) |
| 05/27/2025 | 71 | RESPONSE in Opposition re: 68 MOTION for Preliminary Injunction filed by Neil Bosworth, Tom Torres, United States Forest Service. (Attachments: # 1 Exhibit 1 (Appraisal Report Summary))(Norman, Erika) (Entered: 05/27/2025) |
| 05/27/2025 | 72 | RESPONSE in Opposition re: 68 MOTION for Preliminary Injunction filed by Resolution Copper Mining LLC. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2)(Burke, Samantha) (Entered: 05/27/2025) |
| 05/30/2025 | 73 | NOTICE re: Supplemental Authority by Resolution Copper Mining LLC . (Attachments: # 1 Exhibit Slip Opinion)(Huston, Michael) (Entered: 05/30/2025) |
| 06/02/2025 | 74 | REPLY to Response to Motion re: 68 MOTION for Preliminary Injunction filed by Inter Tribal Association of Arizona Incorporated. (Attachments: # 1 Exhibit 16, # 2 Exhibit 17, # 3 Exhibit 18, # 4 Exhibit 19)(Montgomery, Susan) (Entered: 06/02/2025) |
| 06/02/2025 | 75 | RESPONSE re: 73 Notice (Other) *Response to RCM's Notice of Supplemental Authority* by Plaintiff Arizona Mining Reform Coalition. (Montgomery, Susan) (Entered: 06/02/2025) |
| 06/05/2025 | 76 | NOTICE OF TENTATIVE RULING - In advance of the motion hearing on June 6, 2025, the Court wishes to provide the parties with its tentative ruling. The point of providing it |

| | | |
|---|---|---|
| | | beforehand is to streamline oral argument and enhance the parties' ability to address any perceived errors in the Court's tentative analysis. This is not an invitation to submit additional evidence or briefing. Signed by Judge Dominic W Lanza on 6/5/2025. (SLQ) (Entered: 06/05/2025) |
| 06/06/2025 | 77 | MINUTE ENTRY for proceedings held before Judge Dominic W. Lanza: Preliminary Injunction Hearing held on 6/6/2025. Oral argument held regarding Plaintiffs' 68 Motion for Preliminary Injunction. Defendants' exhibits 100, 101 and 101A are admitted. The motion is taken under advisement. |
| | | APPEARANCES: Roger Flynn, Susan Montgomery, Marc Fink and Allison Henderson for Plaintiffs. Angela Ellis and Erika Norman for Defendants Michael Huston, Christopher Thomas, Addison Bennett and Samantha Burke for Intervenor Defendant. (Court Reporter Andrea Bluedorn) Hearing held 10:05 AM to 11:49 AM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (ESG) (Entered: 06/06/2025) |
| 06/06/2025 | 78 | Exhibit List re: Preliminary Injunction Hearing by Neil Bosworth, Tom Torres, United States Forest Service. (ESG) (Entered: 06/06/2025) |
| 06/06/2025 | 79 | MINUTE ORDER regarding exhibits: that the exhibits marked and/or admitted in the above-entitled case at the time of the trial/hearing are returned to respective counsel. Counsel/agents are directed to retain custody of the exhibits until the case has been completely terminated, including all appeals, pursuant to LRCiv 79.1. (ESG) (Entered: 06/06/2025) |
| 06/06/2025 | 80 | TRANSCRIPT REQUEST by Resolution Copper Mining LLC for proceedings held on 06/06/2025, Judge Dominic W Lanza hearing judge(s). (Thomas, Christopher) (Entered: 06/06/2025) |
| 06/09/2025 | 81 | ORDER - IT IS ORDERED that: 1. The motions for preliminary injunction (San Carlos Apache Tribe, Doc. 82; Arizona Mining Reform Coalition, Doc. 68 ) are denied. 2. The federal defendants are enjoined from conveying the federal land described in § 3003 of NDAA until August 19, 2025 (i.e., 60 days after the publication of the FEIS on June 20, 2025). 3. By July 14, 2025, the plaintiff in San Carlos Apache Tribe may file a Second Amended Complaint and the plaintiffs in Arizona Mining Reform Coalition may file a First Amended Complaint. Plaintiffs shall, consistent with LRCiv 15.1(b), attach a redlined version of the pleading as an exhibit. 4. By July 14, 2025, the plaintiff in San Carlos Apache Tribe and the plaintiffs in Arizona Mining Reform Coalition may each file a renewed motion for preliminary injunction. Each motion may not exceed 30 pages. 5. By July 28, 2025, the federal defendants and Resolution Copper shall each file a response to any such renewed motion for preliminary injunction. Each response may not exceed 30 pages. 6. By August 4, 2025, the plaintiff in San Carlos Apache Tribe and the plaintiffs in Arizona Mining Reform Coalition may each file a consolidated reply in support of their renewed motion for preliminary injunction. Each reply may not exceed 20 pages. 7. The Court will endeavor to hold a hearing on the motions and issue a decision before August 19, 2025. (See document for complete details). Signed by Judge Dominic W Lanza on 6/9/2025. (SLQ) (Entered: 06/09/2025) |
| 06/09/2025 | 82 | TRANSCRIPT REQUEST by Neil Bosworth, Tom Torres, United States Forest Service for proceedings held on 6/6/2025, Judge Dominic W Lanza hearing judge(s). (Norman, Erika) (Entered: 06/09/2025) |
| 06/10/2025 | 83 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of PRELIMINARY INJUNCTION Proceeding held on 6/06/2025 before Judge Dominic W. Lanza. Court Reporter: Andrea K. Bluedorn, RMR, CRR, Telephone number: (602)322-7245. The ordering party receives the transcript directly from the Court Reporter. Therefore, transcripts should not be |

| | | |
|---|---|---|
| | | viewed through Pacer. A non-ordering party may view a transcript at the court's public terminal or purchased through the Court Reporter/Transcriber by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through Pacer. Redaction Request due 7/1/2025. Redacted Transcript Deadline set for 7/11/2025. Release of Transcript Restriction set for 9/8/2025. (SCH) (Entered: 06/10/2025) |
| 07/14/2025 | 84 | Joint MOTION for Extension of Time to File Answer re: 81 Order *(Unopposed)* by Neil Bosworth, Tom Torres, United States Forest Service. (Attachments: # 1 Proposed Order) (Norman, Erika) *Modified text on 7/15/2025 (DXD). (Entered: 07/14/2025) |
| 07/14/2025 | 85 | ORDER - IT IS ORDERED that the parties' joint motion (Doc. 84 ) is granted. Defendants' deadline to file an answer to the Second Amended Complaint in the San Carlos Apache Tribe Case and to the First Amended Complaint in the Arizona Mining Reform Coalition Case is extended to 30 days from the date on which the Court resolves the renewed preliminary injunction motions. Ordered by Judge Dominic W Lanza on 7/14/2025. (SLQ)(This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Entered: 07/14/2025) |
| 07/14/2025 | 86 | First AMENDED COMPLAINT *FOR VACATUR, DECLARATORY AND INJUNCTIVE RELIEF* against All Defendants filed by Grand Canyon Chapter of the Sierra Club, Earthworks, Inter Tribal Association of Arizona Incorporated, Arizona Mining Reform Coalition, Center for Biological Diversity, Access Fund. (Attachments: # 1 Redline to Plaintiffs' Original Complaint)(Montgomery, Susan) (Entered: 07/14/2025) |
| 07/14/2025 | 87 | MOTION for Preliminary Injunction by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Proposed Order on Plaintiffs' Motion for Preliminary Injunction) (Montgomery, Susan) (Entered: 07/14/2025) |
| 07/17/2025 | 88 | ORDER - IT IS ORDERED that a hearing on the renewed preliminary injunction motions is set for **8/6/2025 at 01:00 PM** in Courtroom 601, 401 West Washington Street, Phoenix, AZ 85003 before Judge Dominic W Lanza. The hearing will be conducted in person and/or via Zoom. Counsel shall advise the Court via e-mail (lanza_chambers@azd.uscourts.gov) no later than 7/31/2025 at 12:00 PM as to whether they will appear via Zoom or in person. The Court's staff will provide counsel with the Zoom link for the hearing. IT IS FURTHER ORDERED that the deadline for the exchange of witness and exhibit lists is **8/4/2025**. All exhibit lists, witness lists, and exhibits shall be provided to the Courtroom Deputy no later than **12:00 PM on 8/5/2025**. Ordered by Judge Dominic W Lanza on 7/17/25. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (SLQ) (Entered: 07/17/2025) |
| 07/17/2025 | 89 | Joint MOTION to Shorten and Consolidate Opposition Briefs re: 81 Order by Neil Bosworth, Brooke L Rollins, Tom Torres, United States Forest Service. (Attachments: # 1 Proposed Order)(Ellis, Angela) (Entered: 07/17/2025) |
| 07/18/2025 | 90 | RESPONSE in Opposition re: 89 Joint MOTION to Shorten and Consolidate Opposition Briefs re: 81 Order filed by Arizona Mining Reform Coalition. (Flynn, Roger) (Entered: 07/18/2025) |
| 07/21/2025 | 91 | ORDER - IT IS ORDERED that a telephonic status conference is set for **July 22, 2025 at 10:00 a.m.** The parties should be prepared to address issues related to the hearing schedule as well as Defendants' motion to modify the briefing schedule. Counsel shall |

| | | connect to the hearing by dialing 855-244-8681 and using access code 2313-785-5764. **All parties must connect no later than five minutes prior to the hearing**. Ordered by Judge Dominic W Lanza on 7/21/25. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (SLQ) (Entered: 07/21/2025) |
|---|---|---|
| 07/22/2025 | 92 | MINUTE ENTRY for proceedings held before Judge Dominic W Lanza: Telephonic Status Conference held on 7/22/2025. Scheduling is discussed. The Court finds that no live testimony will be permitted at the Preliminary Injunction Hearing. The Court further finds good cause to reset the Preliminary Injunction Hearing in time only. The Preliminary Injunction Hearing is reset from 1:00 PM to 10:45 AM on 8/6/2025 in Courtroom 601. Counsel may utilize the same Zoom link previously provided. Argument is presented regarding Defendants' and Intervenor's Joint Motion to Shorten and Consolidate Opposition Briefs (Doc. 89 ). For the reasons stated on the record, IT IS ORDERED granting the motion in part. The Court will allow Defendants and Intervenor to submit 50-page consolidated briefs. Defendants' and Intervenor's consolidated briefs should make very clear which of their arguments apply to Plaintiffs' arguments. <br><br> TELEPHONIC APPEARANCES: Marc Fink, Roger Flynn, Allison Henderson, and Susan Montgomery for Plaintiffs. Angela Ellis and Erika Norman for Defendants. Christopher Thomas for Intervenor. Senior Corporate Counsel Karlene Martorana for Intervenor also present. (Court Reporter Jennifer Pancratz.) Hearing held 10:02 AM to 10:29 AM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (SLQ) (Entered: 07/22/2025) |
| 07/28/2025 | 93 | RESPONSE in Opposition re: 87 MOTION for Preliminary Injunction filed by Neil Bosworth, Brooke L Rollins, Tom Torres, United States Forest Service. (Attachments: # 1 Exhibit 1 (FEIS - Excerpt), # 2 Exhibit 2 (Draft ROD - Excerpt), # 3 Exhibit 3 (Appraisal Summary - MCZ Parcel))(Norman, Erika) (Entered: 07/28/2025) |
| 07/28/2025 | 94 | RESPONSE in Opposition re: 87 MOTION for Preliminary Injunction filed by Resolution Copper Mining LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Huston, Michael) (Entered: 07/28/2025) |
| 08/01/2025 | 95 | NOTICE re: Related Case by Neil Bosworth, Brooke L Rollins, Tom Torres, United States Forest Service . (Ellis, Angela) (Entered: 08/01/2025) |
| 08/01/2025 | 96 | *MOTION Status Conference by Defendants Neil Bosworth, Brooke L Rollins, Tom Torres, United States Forest Service. (Ellis, Angela) *Modified to correct event on 8/4/2025 (SLQ). (Entered: 08/01/2025) |
| 08/04/2025 | 97 | REPLY to Response to Motion re: 87 MOTION for Preliminary Injunction filed by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Attachments: # 1 Exhibit 20)(Montgomery, Susan) (Entered: 08/04/2025) |
| 08/06/2025 | 98 | MINUTE ENTRY for proceedings held before Judge Dominic W Lanza: Preliminary Injunction Hearing (Doc. 87 ) held on 8/6/2025. Argument is presented. IT IS ORDERED taking this matter under advisement. (Court Reporter Cathy Taylor.) Hearing held 10:50 AM to 4:55 PM.(SLQ) (Entered: 08/08/2025) |
| 08/15/2025 | 99 | ORDER - IT IS ORDERED that: 1. San Carlos's motion for preliminary injunction (San Carlos, Doc. 105 ) is denied. 2. AMRC's motion for preliminary injunction (AMRC, Doc. 87 ) is denied. 3. Federal Defendants' motion to strike (San Carlos, Doc. 115 ) is denied. (See document for complete details). Signed by Judge Dominic W Lanza on 8/15/25. (SLQ) (Entered: 08/15/2025) |

| 08/15/2025 | 100 | NOTICE OF INTERLOCUTORY APPEAL to 9th Circuit Court of Appeals re: 99 Order on Motion for Preliminary Injunction, by Access Fund, Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. Filing fee received: $ 605.00, receipt number AAZDC-24625812. (Fink, Marc) (Entered: 08/15/2025) |
|---|---|---|

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/15/2025 15:09:25 | | |
| **PACER Login:** | montinter123 | **Client Code:** | 0000 |
| **Description:** | Docket Report | **Search Criteria:** | 2:21-cv-00122-DWL |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |