No. 25-5185

# In The United States Court of Appeals for the Ninth Circuit

ARIZONA MINING REFORM COALITION, et al.,

*Plaintiffs-Appellants,*

v.

UNITED STATES FOREST SERVICE, et al.,

*Defendants-Appellees,*

*and*

RESOLUTION COPPER MINING LLC,

*Defendant-Intervenor-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
Case No. 2:21-cv-00122-PHX-DWL
Hon. Dominic W. Lanza

### RESOLUTION COPPER MINING LLC'S OPPOSITION TO EMERGENCY MOTION FOR INJUNCTION

| | |
|---|---|
| Christopher D. Thomas | Michael R. Huston |
| Andrea J. Driggs | *Counsel of Record* |
| Janet M. Howe | Diane M. Johnsen |
| Benjamin A. Longbottom | Nicholas S. Crown |
| HOLLAND & HART LLP | Samantha J. Burke |
| 2398 E. Camelback Road, Suite 650 | Addison W. Bennett |
| Phoenix, Arizona 85016 | PERKINS COIE LLP |
| (602) 316-9334 | 2525 E. Camelback Road, Suite 500 |
| CDThomas@hollandhart.com | Phoenix, Arizona 85016 |
| | (602) 351-8000 |
| | MHuston@perkinscoie.com |

*Counsel for Defendant-Intervenor-Appellee Resolution Copper Mining LLC*

## CORPORATE DISCLOSURE STATEMENT

Resolution Copper Mining LLC is a Delaware limited liability company that is 55% owned by Resolution Copper Company, an indirect, wholly owned subsidiary of Rio Tinto plc, and 45% owned by BHP Copper Inc., an indirect, wholly owned subsidiary of BHP Group Limited. Rio Tinto plc and BHP Group Limited are publicly traded companies. Upon information and belief, no publicly held company owns 10% or more of either company's stock. No other publicly traded company owns 10% or more of the stock in Resolution Copper Mining LLC.

TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................ ii

Introduction ................................................................................................ 1

Background ................................................................................................. 4

      A.     The Exchange Act, 16 U.S.C. § 539p. ........................... 4

      B.     Procedural Background. ................................................ 7

Legal Standard ........................................................................................... 7

Argument .................................................................................................... 9

    I.     AMRC has no likelihood of success on its appraisal
         claim. ........................................................................................ 9

      A.     The MCZ appraisal fully complies with the law. .......... 9

      B.     AMRC's appraisal claim fails for additional
            reasons ....................................................................... 15

    II.    AMRC will not prevail on its NEPA-based claims. .............. 18

      A.     AMRC misunderstands the environmental review
            process for this unique statute. ................................... 19

      B.     None of AMRC's three NEPA objections has
            merit. ......................................................................... 20

    III.   The equities do not favor extraordinary relief. .................... 22

      A.     AMRC will not suffer irreparable harm pending
            appeal. ....................................................................... 23

      B.     The equities weigh decisively against an
            injunction. ................................................................. 25

Conclusion ............................................................................................... 29

Statement of Related Cases ................................................................... 30

Certificate of Compliance ...................................................................... 31

Certificate of Service .............................................................................. 32

## INTRODUCTION

Appellants Arizona Mining Reform Coalition et al. ("AMRC") ask this Court for a truly extraordinary order. AMRC seeks to enjoin execution of an *Act of Congress*—the Southeast Arizona Land Exchange and Conservation Act, 16 U.S.C. § 539p—enacted over a decade ago. But the district court correctly determined, in a 94-page order following hundreds of pages of briefing and a 6+ hour hearing, that AMRC has not shown a likelihood of success—or even raised serious questions—on *any* legal claim. ER-6 (Order) at 92.

In the Exchange Act, Congress exercised its constitutional authority to manage federal land, U.S. Const., art. IV, § 3, cl. 2, by directing the Forest Service to convey 2,422 acres in Arizona's historic "copper triangle" to Resolution Copper Mining LLC. Congress wanted Resolution to build a mine, in an area that has been mined for a century, that will produce enormous supplies of copper—a mineral indispensable to American life and national security. In exchange, the United States will receive from Resolution significantly larger acreage of valuable conservation and historical properties—including one of the most culturally important sites for Western Apache people—to be preserved in perpetuity.

– 1 –

AMRC now seeks to enjoin the land transfer by challenging the appraisal for the lands to be exchanged. But the district court's opinion demonstrates why AMRC's appraisal argument is "absurd": AMRC attempts to force Resolution to pay for mineral-mining rights that Resolution *already owns* since before the Exchange Act. Order 23. The appraisal faithfully implemented federal regulations and Uniform Appraisal Standards by taking account of mineral rights encumbering the government's ownership of the property.

AMRC further argues that the Forest Service's final environmental impact statement (FEIS) for the project did not satisfy the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370m. But the district court's thorough opinion explains in detail why the Forest Service's FEIS is more than sufficient to satisfy the highly deferential review required by *Seven County Infrastructure Coalition* v. *Eagle County*, 145 S.Ct. 1497 (2025). The agency studied this project for *years*, provided multiple (and extended) opportunities for public comment, and produced an FEIS exceeding 6,000 pages and addressing every AMRC complaint.[1]

---

[1] The six volumes of the FEIS are available at https://www.resolutionmineeis.us/documents/final-eis.

– 2 –

AMRC's emergency motion asks this Court to do what the Supreme Court recently reiterated it may not: override an expert agency's judgment about the extent of the environmental review sufficient to reasonably inform the public about this project. *Id.* AMRC is also unlikely to succeed on the merits for additional reasons beyond those grounds embraced by the district court.

The district court further correctly determined that the balance of equities does not weigh in AMRC's favor. AMRC's members claim to want to use the federal parcel to be transferred for recreational and certain religious purposes. But Congress concluded, after extensive hearings and consideration of competing interests, that this project should go forward for the benefit of all the American people. As the court held: "Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute." Order 7 (quoting *United States* v. *Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001)). AMRC's asserted "emergency" is refuted by the record. Resolution's President provided a declaration, under penalty of perjury, swearing that AMRC members and the public will not lose access to the currently federal land for *years* following the exchange. AMRC's policy disagreement with Congress's and the Execu-

tive's judgment about the best use for this public land is no basis for this Court to enjoin a federal statute—especially on such a rushed timetable.

AMRC's motion—which does not comply with this Court's rules—should be denied.[2]

## BACKGROUND

### A.    The Exchange Act, 16 U.S.C. § 539p.

Congress's purpose for the 2014 Exchange Act was to "authorize, direct, facilitate, and expedite" the land exchange with Resolution for development of a copper mine. 16 U.S.C. § 539p(a); *id.* § 539p(c)(8) (the land "shall be available" available to Resolution "for mining and related activities subject to and in accordance with applicable Federal, State, and local laws"). The mine will be constructed using infrastructure from the historic Magma Mine.

---

[2] AMRC's motion exceeds the word limit in Circuit Rule 27-1(1)(d) by about 1,000 words—almost 18%. It does not comply with the alternative 20-page limit for motions because it is not double spaced, contrary to Rule 27-1(1)(c). Undersigned counsel notified AMRC's counsel about these problems about one hour after the motion was filed. AMRC's counsel did not respond until 4:20pm on Sunday, denying any violations. The motion does not include a certificate of compliance. AMRC's attempted evasion of the limits justifies denying its motion. *Cf. Kano* v. *Nat'l Consumer Co-op. Bank*, 22 F.3d 899, 899 (9th Cir. 1994).

The Act reflects a decade of debate, including six hearings and twelve draft bills. After weighing tribal and environmental concerns, Congress made many changes—including significantly reducing the amount of federal land that Resolution would receive, requiring that culturally significant land known as Apache Leap be permanently preserved, and providing that access to the Oak Flat Campground be maintained for as long as safely possible. Congress ultimately determined that the exchange is vital to the national interest because it will facilitate domestic production of one of the world's largest remaining deposits of copper, a critical resource for American life and an essential national-security priority. Order 91.

This Court previously determined en banc that the Exchange Act does not violate the First Amendment or Religious Freedom Restoration Act. *Apache Stronghold* v. *United States*, 101 F.4th 1036 (2024), *cert. denied*, 145 S.Ct. 1480 (2025).

**Appraisals.** The Act requires the value of the federal and non-federal lands exchanged to "be equal or … be equalized." 16 U.S.C. § 539p(c)(5)(A). The properties are to be appraised according to Forest Service regulations and uniform appraisal standards. *Id.* § 539p(c)(4)(A).

If the value of the federal land exceeds that of Resolution's land, then Resolution must convey additional property to the United States, "make a cash payment," or both. *Id.* § 539p(c)(5)(B)(i).

**Environmental review.** The Exchange Act instructs the Forest Service to "carry out the land exchange in accordance with the requirements of [NEPA]," "[e]xcept as otherwise provided in this section." 16 U.S.C. § 539p(c)(9)(A). The Forest Service shall "prepare a single environmental impact statement" (the FEIS). *Id.* § 539p(c)(9)(B). Importantly, unlike how NEPA typically operates, the FEIS's purpose is expressly *not* to decide whether to approve the land exchange. Order 27-29. Congress made that decision itself; it did not give the agency any discretion about it. *See Apache Stronghold*, 101 F.4th at 1047. Instead, the Act provides that the FEIS will serve "as the basis for all decisions under Federal law related to" development and operation of the mine "and any related major Federal actions significantly affecting the quality of the human environment." *Id.* § 539p(c)(9)(B). Federal decisions based on the FEIS may include "the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." *Id.*

– 6 –

Issuing the FEIS triggers the prompt, non-discretionary transfer of title: The Secretary "shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper" "[n]ot later than 60 days after the date of publication." 16 U.S.C. § 539p(c)(10).

## B.    Procedural Background.

The Forest Service republished the FEIS on June 20, 2025. 90 Fed. Reg. 26,287. Congress has thus required the land exchange to be completed no later than August 19. On August 15, the district court denied AMRC's motion to enjoin the Act. The court found that AMRC had not "shown a likelihood of success on the merits of [its] claims or even serious questions going to the merits." Order 26-27, 50. Independently, the court found that AMRC failed to show that the balance of harms and public interest supported enjoying the land exchange. Order 90-93.

## LEGAL STANDARD

"An injunction pending appeal barring the enforcement of an Act of Congress would be an extraordinary remedy" to be employed "sparingly and only in the most critical and exigent circumstances." *Wisconsin Right to Life, Inc.* v. *FEC*, 542 U.S. 1305, 1305-1306 (2004) (cleaned up).

"To determine whether to grant an injunction pending appeal, this court applies the test for preliminary injunctions." *Doe* v. *San Diego Uni-*

– 7 –

*fied Sch. Dist.*, 19 F.4th 1173, 1176-1177 (9th Cir. 2021). The movant must make a "clear showing" "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter* v. *NRDC, Inc.*, 555 U.S. 7, 20 (2008).[3] "An injunction is a matter of equitable discretion" not to be awarded "as a matter of course." *Id.* at 32.

The movants must further prove that the alleged harm will occur "during the pendency of th[e] appeal," *Doe #1* v. *Trump*, 957 F.3d 1050, 1070 (9th Cir. 2020), and that the requested injunction is "narrowly tailored to remedy the specific harm shown," *East Bay Sanctuary Covenant* v. *Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (cleaned up). An injunction pending appeal "demands a significantly higher justification than a request for a stay because … an injunction … grants judicial intervention that has been withheld by lower courts." *Respect Maine PAC* v. *McKee*, 562 U.S. 996 (2010) (cleaned up).

---

[3] AMRC invokes a "sliding scale" standard, asserting it need raise only "'serious questions' on the merits" if "the balance of equities tips sharply in" its favor. Motion 3 (citation omitted). That contradicts the Supreme Court's holding that a plaintiff "*must* establish that he is *likely* to succeed on the merits." *Winter*, 555 U.S. at 20 (emphases added).

– 8 –

## ARGUMENT

"'[L]ikelihood of success on the merits is the most important factor'" for an injunction. *Assurance Wireless USA, L.P.* v. *Reynolds*, 100 F.4th 1024, 1038 (9th Cir. 2004) (citation omitted). To prevail on appeal, AMRC must overcome two levels of substantial deference: First, this court reviews orders denying preliminary injunctions "for abuse of discretion," asking "'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *International Franchise Ass'n, Inc.* v. *City of Seattle*, 803 F.3d 389, 398-399 (9th Cir. 2015) (citation omitted). Second, AMRC's claims must overcome the Administrative Procedure Act's "arbitrary-and-capricious standard." *FCC* v. *Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

## I. AMRC has no likelihood of success on its appraisal claim.

AMRC first contests the appraisal of a portion of the federal lands (the Mining Claim Zone, or MCZ) that is encumbered by unpatented mining claims. The district court correctly concluded that AMRC has not even raised a serious question on this claim. Order 26-27.

### A. The MCZ appraisal fully complies with the law.

AMRC argues (Motion 6) that the appraisal "arbitrarily failed to include any value for the" copper beneath the portion of the federal land

– 9 –

covered by unpatented mining claims already owned by Resolution. That is incorrect.

The appraisal did what any appraiser would do to properly value a piece of property: it accounted for encumbrances (easements, etc.). *See* 36 C.F.R. § 254.9(c)(4) (an appraisal must account for "all encumbrances"); Uniform Appraisal Standards for Federal Land Acquisition (UASFLA) at § 4.6.5.2 ("it is improper to disregard preexisting encumbrances and their impact on the property"); *see id.* §§ 1.4.4, 4.11.3.1.[4] For the MCZ, the appraiser correctly observed that the government's title is encumbered by Resolution's pre-existing unpatented mining claims held under the General Mining Law of 1872, 30 U.S.C. §§ 21-54. Order 20. Because of those mining claims, the United States will not transfer the right to mine the copper and other minerals below the surface of the MCZ in the land exchange. Resolution *already owns* that exclusive property right. Order 22.

The General Mining Law provides that "the finder of valuable minerals on government land is entitled to exclusive possession of the land

---

[4] https://www.justice.gov/d9/enrd/legacy/2015/04/13/uniform-appraisal-standards.pdf.

– 10 –

for purposes of mining and to all the minerals he extracts." Order 21 (quoting *United States* v. *Shumway*, 199 F.3d 1093, 1098-1099 (9th Cir. 1999)); *see United States* v. *Locke*, 471 U.S. 84, 86 (1985) (a mining-claim owner may "extract and sell minerals from the claim without paying any royalty" to the government). An unpatented mining claim is thus "'property in the fullest sense of that term.' It is alienable, inheritable, and taxable." *Ickes* v. *Virginia-Colorado Dev. Corp.*, 295 U.S. 639, 644 (1935) (citation omitted).

As the district court explained (Order 21, 23), AMRC misreads the General Mining Law. A mining claim "'is not a claim in the ordinary sense of the word—a mere assertion of a right—but rather is a property interest, which is itself real property in every sense, and not merely an assertion of a right to property.'" Order 21 (quoting *Shumway*, 199 F.3d at 1100). Accordingly, "'the government cannot reserve its own land from an unpatented mining claim without paying the owner the value of the claim.'" *Id.* Under ARMC's "absurd" view, "Resolution should pay the United States for rights it already owns," a result that "would nullify the 1872 Law and 150 years of Supreme Court precedent" and cause a taking of Resolution's property. Order 23.

– 11 –

AMRC doesn't really attempt to refute those precedents. Instead, it argues that Resolution's mining claims are invalid absent discovery of "a valuable mineral deposit" that can be profitably mined. Motion 7 (citing *Center for Biological Diversity* v. *U.S. Fish & Wildlife Service*, 33 F.4th 1202, 1209 (9th Cir. 2022)). The district court explained why AMRC's argument was "not properly raised" below, Order 23 n.8, and in any event is meritless: It is "logical—and certainly not arbitrary and capricious" "that the copper deposits underlying the MCZ parcel are valuable enough to validate Resolution Copper's mining claims." *Id.* AMRC itself has asserted "that the MCZ parcel includes 'tens of billions of dollars worth of copper.'" *Id.* This Court's decision in *Center for Biological Diversity*, which concerned waste-rock disposal on land subject to *invalid* mining claims, is totally irrelevant here. *See* Order 23 n.8.

AMRC next argues (Motion 8-9) that the MCZ appraisal did not comply with regulations requiring inclusion of "all values of the exchanged lands … including minerals." But as the district court observed, the regulations "do not explain how to perform the valuation when, as here, the minerals are subject to unpatented mining claims." Order 23. The regulations do require accounting for encumbrances, *supra* p. 10, and

a mining claim constitutes an "encumbrance on public lands," *Kunkes* v. *United States*, 78 F.3d 1549, 1556 (Fed. Cir. 1996). The appraisal thus complied with the regulations by explaining that Resolution—not the United States—owns the right to extract the minerals in the MCZ, so that property right will not be conveyed and the appraisal must account for that encumbrance in assessing the property's value.

AMRC falls back to legislative history of a draft bill regarding the land exchange, arguing that the MCZ "*must* include the value of the minerals." Motion 9. But "once [Congress] enacts a statute we do not inquire what the legislature meant; we ask only what the statute means." *Epic Sys. Corp.* v. *Lewis*, 584 U.S. 497, 523 (2018)) (cleaned up). Regardless, the federal lands to be exchanged include other parcels—not subject to Resolution's mining claims—and the appraisals of those properties "included the value of those copper deposits." Order 25.

The statutory text in fact powerfully reinforces that Congress intended to *preserve* Resolution's mining claims:

> Nothing in this section shall interfere with, limit, or otherwise impair, the unpatented mining claims … currently held by Resolution Copper on the Federal land, nor in any way change, diminish, qualify, or otherwise impact Resolution Copper's rights and ability to conduct activities on the Federal

– 13 –

> land under such unpatented mining claims and the general mining laws of the United States.

16 U.S.C. § 539p(i)(C); *see* Order 25. By contrast, when Congress wanted to force a change in the status of Resolution's mineral rights, it did so. *Id.* § 539p(g)(3) (requiring surrender of "all rights [in Apache Leap] held under the mining laws").

AMRC invokes (Motion 10) the Act's provision for a "value adjustment" if mineral production exceeds the estimates in the appraisal. 16 U.S.C. § 539(p)(e)(2). But that provision accounts for mineral production from parcels *outside the MCZ*, where Resolution does not already own the mineral rights. And as the district court noted, AMRC's arguments (Motion 10-11) about "highest and best use" and "private lands" again "rely on the false premise that," in performing those valuation scenarios, "Resolution Copper's exclusive right to mine the minerals would somehow cease to exist." Order 23.

In sum, as the court observed (Order 23-26), AMRC's arguments disregard both law and fact. AMRC cites no legal precedent for its argument that federal land encumbered by a mining claim must or could be appraised as if that claim did not exist. It is therefore impossible "to see how the challenged appraisal decision—which followed the recommenda-

– 14 –

tions of an expert whose credentials AMRC has not challenged—could be deemed not just wrong, but so wrong as to qualify as arbitrary and capricious." *Id.*

## B. AMRC's appraisal claim fails for additional reasons.

AMRC's requested injunction based on its appraisal claim also fails for additional reasons.

### 1. The Exchange Act does not condition the land exchange on the completion of judicial review of the appraisal.

Congress "directed" the Forest Service "to convey to" Resolution the United States' "right, title, and interest" in the federal land, 16 U.S.C. § 539p(c)(1), and mandated that the agency "shall convey" the parcel "[n]ot later than 60 days after the [FEIS's] date of publication." *Id.* § 539p(c)(10). "Nowhere" did Congress "confer on the Government discretion to halt the transfer," *Apache Stronghold*, 101 F.4th at 1047. That unambiguous statutory deadline is irreconcilable with AMRC's assertion that the land exchange must await litigation of its claims.

Congress deliberately and sparingly used explicit language when it meant to impose conditions on the land exchange. 16 U.S.C. §§ 539p(c)(2) ("Conditions on acceptance"); 539p(c)(7), (g)(3) ("condition of the land exchange"); 539p(i)(3) ("condition of conveyance"). Relevant here, Congress

– 15 –

directed that the appraisals were to be conducted in "accordance with nationally recognized appraisal standards." 16 U.S.C. § 539p(c)(4)(A), (B)(i).[5] But Congress did *not* condition the land exchange on completed judicial review of the appraisals. *See Jones* v. *Hendrix*, 599 U.S. 465, 478 (2023) ("The expression of one thing implies the exclusion of others." (cleaned up)).

To be clear (and to correct the district court's misperception, Order 14), Resolution does not contend that the Exchange Act "bar[s] judicial review" of a final agency action. Our point is more modest and responsive to AMRC's present motion: the statute does not permit conveyance of title to be suspended pending judicial review. AMRC identifies nothing in the statutory text to the contrary.

### 2. AMRC lacks standing.

AMRC also lacks Article III standing to enjoin the land exchange based on the MCZ appraisal.

---

[5] The Act also required the Forest Service to "make the appraisals of the land to be exchanged (or a summary thereof) available for public review." *Id.* § 539p(c)(4)(B)(iv). AMRC does not contend that the agency failed to meet this requirement.

– 16 –

Standing requires showing that the plaintiff's injury is "'fairly traceable *to the challenged action.*'" *Murthy* v. *Missouri*, 603 U.S. 43, 44 (2024) (emphasis added). But AMRC's claimed injuries—alleged denial (eventually) of access to federal land—were the product of Congress's decision to transfer the property, not the appraiser's assessment of the land's value.

Moreover, standing for a procedural-injury claim requires the plaintiff to show "some possibility that the requested relief will prompt" the agency to "reconsider the decision that allegedly harmed" the plaintiff. *Massachusetts* v. *EPA*, 549 U.S. 497, 518 (2007). But the Act does not give the Forest Service any power to "decide" whether to complete the land exchange. Even if a court ordered the Forest Service to revise the appraisal, the agency would have no discretion to cancel or delay the land exchange. *See National Family Farm Coal.* v. *EPA*, 966 F.3d 893, 910 (9th Cir. 2020) (plaintiff must show "'that the relief requested … may influence the agency's ultimate decision of whether to take or refrain from taking a certain action'").

The district court reasoned (Order 12) that, if it ordered the MCZ to be reappraised, the result might "derail" the land exchange because

Resolution might decide not to proceed. But the proper inquiry is not so attenuated, nor does it focus on what a third party might choose to do; it is whether relief could change "agency's ultimate decision." *National Family*, 966 F.3d at 910. And the Forest Service lacks the power to do anything but convey the land.

## II. AMRC will not prevail on its NEPA-based claims.

"[T]he central principle of judicial review in NEPA cases is deference." Order 40 (quoting *Seven County*, 145 S.Ct. at 1511). An agency necessarily makes "a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS." *Seven County*, 145 S.Ct. at 1513. "So long as the EIS addresses environmental effects from the project at issue, courts should defer to agencies' decisions about where to draw the line" and not "micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 1513-1514. A court will not "substitute its judgment for that of the agency," *California* v. *Block*, 690 F.2d 753, 761 (9th Cir. 1982), nor will it "'flyspeck'" the agency's analysis like "'a type of omnipotent scientist,'" *Audubon Society of Portland* v. *Haaland*, 40 F.4th 967, 984 (9th Cir. 2022).

– 18 –

As the district court recognized, none of AMRC's claims is likely meritorious or presents a serious question. Order 40-60. Those claims are "factually inaccurate" and improperly "'fly-speck' the agency's analysis." Order 44, 47, 55. They also face significant threshold obstacles.

## A. AMRC misunderstands the environmental review process for this unique statute.

AMRC's NEPA claims rest on a fundamental misunderstanding about how the Exchange Act operates. While the Act states that, "[e]xcept as otherwise provided in this section, the Secretary shall carry out the land exchange in accordance with the requirements of [NEPA]," 16 U.S.C. § 539p(c)(9)(A), the FEIS's purpose is *not* to determine whether to convey the property to Resolution. Rather, it "shall be used" to make "decisions under Federal law related to the proposed mine and the Resolution mine plan of operations"—things like "permits, rights-of-way, or approvals for … construction." *Id*. § 539p(c)(9)(B); *see id*. § 539p(c)(9)(C) (requiring FEIS to "assess the effects of the mining and related activities").

The agency has not yet made those decisions. So far it has issued only a *draft* Record of Decision (ROD)[6]—and thus has not resolved,

―――――――――――

[6] https://www.resolutionmineeis.us/documents/draft-rod.

among other things, Resolution's pending applications for special-use permits for certain pipelines and power-line crossings. Order 42-43. The agency is currently reviewing objections (including AMRC's) to that draft. The FEIS accordingly is not a "final action" reviewable under the APA, 5 U.S.C. § 702—the only cause of action AMRC can arguably invoke (Order 25). It does not "mark the consummation of the agency's decisionmaking process." *Bennett* v. *Spear*, 520 U.S. 154, 177-178 (1997); *see* Order 37.

AMRC also has yet-another problem: Even if AMRC could demonstrate any narrow flaw with the FEIS, the Supreme Court recently reiterated in *Seven County* that the remedy would be a remand for further analysis *without vacatur* of the FEIS—not an injunction against the land exchange. 145 S.Ct. at 1514. That would be the only proper remedy because a remand could not cause the agency to make a different decision regarding the land exchange.

## B. None of AMRC's three NEPA objections has merit.

1. AMRC argues (Motion 13) that the Forest Service "refused to analyze" how the mine's groundwater pumping will affect the Superstition Vistas subdivision. But as the district court observed, the Forest Service *did* evaluate groundwater impacts to that subdivision. Order 44-46

(recounting the FEIS and rejecting some AMRC arguments as "factually inaccurate"). Because the actual future water usage for a planned but unbuilt development could not be accurately modeled in the quantitative analysis of cumulative effects, the Forest Service provided an additional qualitative discussion about how the entire subdivision may impact regional groundwater supplies. FEIS Vol. 3 at 987. While AMRC says (Motion 13) the court should not have deferred to the agency because its "predictive judgments were not supported in the record," this is precisely the sort of issue where "a reviewing court must be at its most deferential." *Seven County*, 145 S.Ct. at 1512.

2.      AMRC complains that the Forest Service "failed to consider" criticisms raised by the United States Bureau of Land Management (BLM) and the Arizona State Land Department (ASLD). Motion 15-16. But the district court explained that the FEIS "directly acknowledge[d] and addresse[d]" many of the BLM's concerns, "even if it [did] not specifically identify the BLM report as the source." Order 47 (quoting the FEIS). As the court noted, "in a project of this magnitude, it will always be possible to identify some argument, raised by some stakeholder, that could have been analyzed in more detail in the FEIS." Order 48. And

– 21 –

"even if the Forest Service could have done more to specifically address ASLD's criticisms," the judiciary must defer to "Forest Service's determination as to just how detailed the FEIS needed to be." Order 50.

3.   AMRC argues (Motion 16-17) that the Forest Service "failed to fully analyze potential mitigation measures" regarding groundwater pumping and transport. But as the district court concluded, "[t]he FEIS includes hundreds of pages of detailed analysis regarding water usage, including analysis regarding mitigation measures." Order 50.

## III.   The equities do not favor extraordinary relief.

Because AMRC "ha[s] not established a likelihood of success or even serious questions going to the merits of any of [its] claims, [its] request[] for a preliminary injunction must be denied," and "the court need not consider" the remaining injunction factors. Order 92-93 (citation omitted); *see Assurance*, 100 F.4th at 1039. Indeed, much of AMRC's motion challenges the district court's weighing of the equities. But that simply confirms that AMRC is unlikely to prevail in this preliminary injunction appeal: "'The assignment of weight to particular harms is a matter for district courts to decide'" subject to "'limited and deferential' review." *Western Watersheds Project* v. *Salazar*, 692 F.3d 921, 923 (9th Cir. 2012).

– 22 –

AMRC has not shown any abuse of discretion in the district court's careful balancing analysis.

Regardless, AMRC's renewed arguments cannot carry its burden on the equities. It has not shown that it will suffer "irreparable harm" *during the pendency of this appeal* if the Court does not enjoin the land exchange immediately. *Winter*, 555 U.S. at 20. And even if AMRC established irreparable harm, an injunction would "not follow" as "a matter of course." *Id.* at 32. As the district court recognized, "there are also weighty equities and public-interest considerations on the other side of the ledger" that independently foreclose relief. Order 91.

### A. AMRC will not suffer irreparable harm pending appeal.

AMRC asserts (Motion 3-4, 17-18) that it will suffer irreparable injury if it loses access to the federal land. That argument simply attacks the Exchange Act itself. Again, vacatur is not appropriate here given the statutory mandate to "expedite" the exchange, and an injunction would countermand Congress's express judgment. *See supra* pp. 4, 20. The fundamental "mismatch between" AMRC's procedural "claim" and "the dangers [it] hopes to remedy through an injunction" bars relief; AMRC's alleged "harms are too attenuated from the purpose" of the statutory pro-

– 23 –

cedures they invoke. *Garcia* v. *Google, Inc.*, 786 F.3d 733, 744, 746 (9th Cir. 2015).

Nor can AMRC rely on religious interests here; AMRC does not assert any religion claims, and this Court has already held that the land exchange "does not impose a substantial burden on religious exercise." *Apache Stronghold*, 101 F.4th at 1044. For that reason, AMRC's reliance (Motion 3-4, 18) on dissenting opinions in *Apache Stronghold* is misplaced. AMRC also overstates its alleged harm by contending that the religious ceremonies they seek to undertake "'regularly take place at Oak Flat.'" Motion 3. This Court has already observed that religious ceremonies cited by AMRC routinely occur "elsewhere in Arizona," and that in 2014, the Apache Sunrise Ceremony (on which AMRC principally relies) occurred "on Oak Flat for just the second time in 'more than a hundred years.'" *Apache Stronghold*, 38 F.4th 742, 749 (2022), *aff'd in relevant part*, 101 F.4th 1036 (2024).

Regardless, none of AMRC's asserted injuries is imminent because public access to the land will not change for the foreseeable future. The Exchange Act requires Resolution to preserve access to Oak Flat Campground for as long as safely possible, 16 U.S.C. § 539p(i)(3), which

– 24 –

will preserve access for decades—if not longer. SER13 ¶ 18. And Resolution has committed under oath to maintaining current access to *all* of the federal land to be exchanged for the next ten years. SER 11, 13 ¶¶ 14, 18. The district court "accept[ed] and ha[d] no reason to question the sincerity" of Resolution's commitment. Order 89. The court's finding also defeats AMRC's contention that it needs emergency relief, because it cannot show any reason to doubt that Resolution will stand by its word.

Even if AMRC could establish irreparable harm (it cannot), it still would not be entitled to the sweeping injunction it seeks. AMRC makes no effort to show that enjoining the *conveyance* of land would be "'narrowly tailored to remedy the specific harm shown'"—the allegedly restricted *access* to that land. *East Bay*, 934 F.3d at 1029. Nor does AMRC attempt to satisfy its burden to show a "significantly higher justification" for an injunction of a duly enacted statute, especially after "judicial intervention … has been withheld" below. *Respect Maine*, 562 U.S. at 996 (citations omitted).

## B.    The equities weigh decisively against an injunction.

AMRC's requested injunction would irreparably harm the critical national security and economic interests that prompted Congress to

enact the Exchange Act. *See* Order 91-92. As the district court recognized, courts sitting in equity cannot "second-guess the political branches' wisdom in deciding how to balance those considerations." Order 91 (citing *Cannabis Buyers*, 532 U.S. at 497).

The Act "represents a considered choice by the political branches to prioritize the significant potential benefits that Resolution Copper's mining activity is expected to generate," including the "promoting [of] critical national security interests." Order 91. The proposed mine is "expected to promote America's national security interests[] by ensuring domestic access to a mineral that is essential to energy distribution, generation, and storage." Order 2; *see* Order 91-92. Multiple administrations have recognized the urgent need for domestic investment in copper. *Addressing the Threat to National Security From Imports of Copper*, 90 Fed. Reg. 11,001 (Feb. 25, 2025) (domestic copper supplies are "essential to the national security, economic strength, and industrial resilience"); *Presidential Determination Pursuant to Section 303 of the Defense Production Act of 1950, as Amended*, 87 Fed. Reg. 19,775 (Mar. 31, 2022). And Resolution is among ten "critical mineral production projects" necessary "to facilitate domestic production of America's vast mineral resources to create jobs,

fuel prosperity, and significantly reduce our reliance on foreign nations." White House, *Trump Administration Advances First Wave of Critical Mineral Production Projects* (Apr. 18, 2025), https://tinyurl.com/35vru2fy.

The proposed mine will also have significant immediate and long-term benefits for Arizona and its communities. The project will "boost[] Arizona's economy to the tune of over $1 billion per year." Order 91. And the land exchange will add valuable conservation lands to the public trust. 16 U.S.C. § 539p(d).

By contrast, an injunction would undercut those profound goals. It would exacerbate America's shortage of domestic copper. Order 92. It would postpone job creation and tax revenue. *Id.* And it would impose substantial and unrecoverable economic harm—not just "temporary" injury—on Resolution. *Contra* Motion 19. Resolution has already incurred hundreds of millions of dollars of unrecoverable costs, including $545 million between January 2021 and June 2025 in an operation-ready holding pattern due to litigation delays in completing the land exchange. SER 14 ¶ 20.

– 27 –

AMRC's counterarguments (Motion 18-20) largely repeat their erroneous *merits* challenges to the FEIS. Equally unavailing is their contention that the "delay" they seek would not cause much harm. As the district court recognized, that argument countermands Congress's judgment, whose explicit purpose was "to authorize, direct, facilitate, and *expedite* the exchange." 16 U.S.C. § 539p(a) (emphasis added). That provision reflects the strong "public interest in allowing the land exchange to proceed on the expedited timetable Congress contemplated." Order 92.

Finally, AMRC repeats (Motion 18-19) its conjecture that Resolution might not process or sell all of the copper in the United States. There is no basis for that assertion. AMRC also overlooks that Resolution's manager owns one of the few copper-smelting facilities in the nation (in Utah), and that it is more economic to transport unprocessed copper shorter distances. https://www.riotinto.com/en/operations/us/kennecott. In any event, the district court properly rejected AMRC's speculative "attempts to downplay the national security" interests militating against an injunction. Order 91 n.29. "Regardless of the location of the smelting facilities, the political branches have determined that it is 'imperative for our national security that the United States take immediate action to

– 28 –

facilitate domestic mineral production to the maximum possible extent.'"

*Id.* The equities and public interest weigh conclusively against enjoining Congress's directive.

## CONCLUSION

The Court should deny AMRC's motion.

August 17, 2025                    Respectfully Submitted,

<u>*s/ Michael R. Huston*</u>

Christopher D. Thomas          Michael R. Huston
Andrea J. Driggs                    *Counsel of Record*
Janet M. Howe                      Diane M. Johnsen
Benjamin A. Longbottom        Nicholas S. Crown
HOLLAND & HART LLP            Samantha J. Burke
2398 E. Camelback Road, Suite 650 Addison W. Bennett
Phoenix, Arizona 85016          PERKINS COIE LLP
(602) 316-9334                      2525 E. Camelback Road
CDThomas@hollandhart.com      Suite 500
                                         Phoenix, Arizona 85016
                                         (602) 351-8000
                                         MHuston@perkinscoie.com

*Counsel for Resolution Copper Mining LLC*

– 29 –

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Resolution states that it knows of three cases related to the above-captioned appeal:

(1) *San Carlos Apache Tribe* v. *United States Forest Service, et al.*, No. 25-5189 (9th Cir.).

- *San Carlos Apache Tribe* involves an appeal from the same district court order denying a preliminary injunction at issue in the above-captioned appeal. The plaintiff in *San Carlos Apache Tribe* seeks to enjoin the same land exchange required by 16 U.S.C. § 539p.

(2) *Apache Stronghold* v. *United States*, No. 21-15295 (9th Cir.).

- *Apache Stronghold* involves a challenge to the same land exchange required by 16 U.S.C. § 539p. An en banc panel of this Court affirmed the denial of a preliminary injunction on claims under the Free Exercise Clause and Religious Freedom Restoration Act. 101 F.4th 1036 (9th Cir. 2024), *cert. denied*, 145 S.Ct. 1480 (2025).

(3) *Lopez et al.* v. *United States et al.*, No. 2:25-cv-02758-DWL (D. Ariz.).

- *Lopez* challenges the same land exchange at issue in this appeal and the other related cases. The plaintiffs in *Lopez* raise substantially similar religion claims to those rejected by this Court in *Apache Stronghold*, and substantially similar procedural claims to those rejected by the order denying a preliminary injunction in the proceedings below. The same district court (Lanza, J.) that issued the order at issue in this appeal is presiding over *Lopez*.

August 17, 2025

*/s/ Michael R. Huston*
Michael R. Huston

## CERTIFICATE OF COMPLIANCE

1.   This response complies with the type-volume limitation of Ninth Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 5,592, excluding the parts exempted by those rules. Consistent with Rule 32-3, 5,592 words "divided by 280" is 19.97 which "does not exceed the designated page limit" of 20 pages set by Rule 27-1(1)(d).

2.   This response also complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

August 17, 2025

*/s/ Michael R. Huston*
Michael R. Huston

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2025, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate ACMS system. I certify that all participants in this case are registered ACMS users and that service will be accomplished by the ACMS system.

August 17, 2025

*/s/ Michael R. Huston*
Michael R. Huston

**No. 25-5185**

# In The United States Court of Appeals for the Ninth Circuit

ARIZONA MINING REFORM COALITION, et al.,

*Plaintiffs-Appellants,*

v.

UNITED STATES FOREST SERVICE, et al.,

*Defendants-Appellees,*

*and*

RESOLUTION COPPER MINING, LLC,

*Defendant-Intervenor-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
Case No. 2:21-cv-00122-PHX-DWL
Hon. Dominic W. Lanza

## RESOLUTION COPPER MINING, LLC'S SUPPLEMENTAL EXCERPTS OF RECORD

Christopher D. Thomas
Andrea J. Driggs
Janet M. Howe
Benjamin A. Longbottom
HOLLAND & HART LLP
2398 E. Camelback Road, Suite 650
Phoenix, Arizona 85016
(602) 316-9334
CDThomas@hollandhart.com

Michael R. Huston
*Counsel of Record*
Diane M. Johnsen
Nicholas S. Crown
Samantha J. Burke
Addison W. Bennett
PERKINS COIE LLP
2525 E. Camelback Road, Suite 500
Phoenix, Arizona 85016
(602) 351-8000
MHuston@perkinscoie.com

*Counsel for Defendant-Intervenor-Appellee Resolution Copper Mining, LLC*

## INDEX

| Document | File Date | USDC Dkt. No. | SER Nos. |
|---|---|---|---|
| Declaration of Victoria Peacey in support of Defendant-Intervenor's Brief in Opposition to Motions for Preliminary Injunction | 07/28/2025 | 94-9 | 3-15 |

# Exhibit 9

Christopher D. Thomas (#010482)
Andrea J. Driggs (#023633)
Janet M. Howe (#034615)
Benjamin A. Longbottom (#038602)
HOLLAND & HART LLP
3110 North Central Ave., Suite D-160
Phoenix, Arizona 85012
Telephone: +1.602.316.9334
CDThomas@hollandhart.com
AJDriggs@hollandhart.com
JMHowe@hollandhart.com
BALongbottom@hollandhart.com

Michael R. Huston (#038763)
Diane M. Johnsen (#007634)
Samantha J. Burke (#036064)
Addison W. Bennett (#039801)
PERKINS COIE LLP
2525 East Camelback Road, Suite 500
Phoenix, Arizona 85016
Telephone: +1.602.351.8000
MHuston@perkinscoie.com
DJohnsen@perkinscoie.com
SBurke@perkinscoie.com
ABennett@perkinscoie.com

*Attorneys for Defendant-Intervenor Resolution Copper Mining LLC*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| San Carlos Apache Tribe,<br><br>              Plaintiff,<br><br>v.<br><br>United States Forest Service, et al.,<br><br>           Defendants. | No. CV-21-00068-PHX-DWL<br>No. CV-21-00122-PHX-DWL<br><br>**DECLARATION OF VICTORIA PEACEY IN SUPPORT OF DEFENDANT-INTERVENOR'S BRIEF IN OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION** |

SER 004

Arizona Mining Reform Coalition, et al.,

Plaintiffs,

v.

United States Forest Service, et al.,

Defendants.

I, Victoria Peacey, declare as follows:

I am over the age of 18 and am competent to make this declaration. If called as a witness, I could and would testify to the following facts, which are within my personal knowledge and based on my review of relevant documents.

**My Background**

1. I have worked for Resolution Copper Mining LLC ("Resolution) or its ultimate parent Rio Tinto for approximately 20 years. Since March 14, 2023, I have been the President and General Manager of Resolution, a Delaware corporation with its principal place of business in Arizona.  A subsidiary of Rio Tinto is the lead joint venture partner of Resolution.

2.  My professional experience and educational background are set forth more fully in my earlier declarations, filed on May 23, 2025 as Exhibit A to Resolution's opposition to the San Carlos Apache Tribe's motion for preliminary injunction (Doc. 86 in No. 2:21-cv-00068) and as Exhibit 1 to the motion for preliminary injunction filed by the Arizona Mining Reform Coalition (Doc. 72 in No. 2:21-cv-00068).  I believe those declarations to be accurate.

**The 2025 Environmental Impact Statement and Draft Record of Decision**

3.  Subsequent to the filing of my previous declarations, the U.S. Forest Service republished on June 16, 2025, on the Forest Service project website the Final Environmental Impact Statement ("FEIS") for the Resolution Copper Project and Land Exchange (the "Project") and its draft Record of Decision ("Draft ROD").  Those

documents, and hundreds of other technical documents pertaining to the Project, were published on the agency's website, https://www.resolutionmineeis.us/.

4. The FEIS and the Draft ROD describe in detail the environmental impact assessment conducted by the Forest Service with the assistance of twelve cooperating and consulting federal, state and county agencies. The Draft ROD also describes the Forest Service's public involvement efforts (Part 5), Project alternatives considered (Part 6), and mitigation measures required of Resolution (Part 4).

5. As more fully described in the FEIS, the Draft ROD, and my prior declarations, the Forest Service conducted substantial public outreach and tribal consultation, which generated significant modifications to Resolution's proposed mine plan of operations. My prior declarations and the FEIS describe Resolution-funded multi-year tribal monitoring programs, a 3-year ethnographic/ethnohistoric study, the Resolution-owned conservation lands to be exchanged, and many other relevant issues.

**Resolution's Investment and the Project's Benefits.**

6. In 2004, Resolution acquired property and infrastructure associated with the historic Magma Copper Mine near Superior, Arizona, in an area that forms part of Arizona's Copper Triangle. Mining in the Superior area reportedly began in the late 1880s. Resolution holds approximately 185 unpatented federal mining claims within the area commonly known as Oak Flat. Resolution or a predecessor in interest located the Claims between 1903 and 2011 on lands the surface of which is administered by the Tonto National Forest.

7. Since Resolution began work on the Project in 2004, the company has invested approximately $ 2.7 billion in the Project. My prior declaration and the FEIS describe in further detail the Project's anticipated economic benefits, which include the creation of approximately 1,500 direct jobs paying around $134 million per year in total compensation; generation of approximately 2,200 indirect jobs; and payment of annual state and local tax revenues from $88 to $113 million. The Project is anticipated to produce an economic impact in excess of $61 billion over its decades-long life.

**Apache Leap Special Management Area**

8. In 2017, the Forest Service established the Apache Leap Special Management Area ("ALSMA"), as required by the Act. Pursuant to the Act, Resolution set aside 697 acres of mining claims and provided approximately 140 acres of privately-held land to permanently protect Apache Leap as part of the ALSMA. *See* 16 U.S.C. § 539p (f), (g). Specific measures were taken within the ALSMA to accommodate tribal concerns regarding public access, grazing, and other protections for locations of cultural importance. Including Apache Leap in this special management area will (A) preserve the natural character of Apache Leap; (B) allow for traditional uses of the area by Native American people; and (C) protect and conserve the cultural and archeological resources of the area. Resolution will monitor Apache Leap to ensure that future mining-related activity does not impact it, and this monitoring will continue throughout construction, operation, closure, and reclamation of the mine.

**Tribal Concerns Prompted Changes to the Project.**

9. In 2015, the Forest Service completed, and Resolution funded, a multi-year ethnographic and ethnohistoric study in partnership with consulting Native American Tribes to identify places, areas, artifacts, and natural features of importance.

10. In 2018, Resolution funded a new Tribal Monitor program, hosted by the Forest Service. This innovative program ensures tribal members are a part of the informed decision-making process to identify areas, resources, and sites of importance. More than 30 members from seven Native American Tribes were trained and employed to work alongside archaeologists and biologists to gather baseline information and tribal perspectives within the footprint of the Resolution Copper Project to inform the alternatives analysis. In June 2020, the Arizona Preservation Foundation and State Historic Preservation Office recognized the program at the Governor's Heritage Preservation Honor Awards. To date, Tribal Monitor crews have performed approximately 61,000 acres of pedestrian surveys.

11. Resolution made significant changes to the Project in response to tribal consultation, including:

• moving the proposed tailing facility from National Forest lands to Arizona state and private lands to avoid disturbance of National Forest resources, including seeps and springs identified as having cultural significance by Native American Tribes;

• developing the Oak Flat Access and Management Plan to ensure that current management continues and assuring Native American Tribes' access for traditional, cultural, and ceremonial purposes;

• rerouting power and pipeline infrastructure to avoid physical impacts to Devil's Canyon and Queen Creek to avoid resources identified as culturally important during tribal consultation;

• developing the subsidence monitoring plan to avoid impacts to cultural resources, including Devil's Canyon and the Apache Leap Special Management Area, and to manage continued access to Oak Flat and Oak Flat Campground;

• developing a monitoring and mitigation plan that will mitigate potential impacts to groundwater-dependent ecosystems; and

• allowing Native American Tribes to harvest select natural resources with cultural significance from the land exchange area, tailings pipeline corridor, and tailings storage facility.

**Post-Exchange Activities.**

12. There appears to be some confusion about how quickly circumstances will change at the 2,422-acre Oak Flat parcel following completion of the land exchange directed by the Southeast Arizona and Land Exchange Act.

**Subsidence at Oak Flat is more than a decade away.**

13. Resolution's mine plan calls for use of the block cave mining method. As the FEIS describes, block caving will eventually produce subsidence of Oak Flat. But there will be no perceptible subsidence at Oak Flat for approximately 16 years. That is because no block caving will begin until after the construction of initial data-gathering tunnels through the resource and beneath Oak Flat. This will be followed by full construction of the underground mine, and taken together is predicted to take 10 years. Only after that

will block-cave mining begin; subsidence of the ground surface is anticipated to occur beginning approximately 6 years after initiation of mining – or approximately 16 years.

**Access to Oak Flat will remain largely unchanged for this period of 16 years.**

14. Until that time, existing access to the entire Oak Flat Parcel will remain largely unchanged. The Oak Flat campground will remain open to the public and available for tribal events and ceremonies. Emory Oak harvesting will continue, as will climbing and off-road vehicle use. The Oak Flat Parcel is frequently utilized by off-highway vehicles (OHV) and Resolution will continue to allow this use after it takes ownership. Existing approved roads for OHV users include FRs 315, 469, 2432, 2435, 2438, 2439 and 3153. Cattle grazing will carry on.  A San Carlos Apache Tribal member-owned business, 4 Winds Contracting, LLC, will manage and maintain existing access to and throughout the campground.

**Surface disturbance at Oak Flat will not happen for months after the land exchange and will be negligible.**

15. After the land exchange, Resolution's exploration and characterization work on the surface will largely take place on private land in the footprint of the historic Magma Mine. It will be months – that is, not until 2026 -- before Resolution creates new surface disturbance of the Oak Flat parcel. At Oak Flat, Resolution plans to disturb approximately 3.76 acres of land (0.15% of the 2,422-acre Oak Flat parcel) is in an area that currently has no road access.  This will be for the purpose of creation of  four new drill pads (soil clearings), two access roads (soil/gravel), equipment storage (soil clearing), and a medical evacuation area (soil clearing).  But this will not occur before 2026.   To my knowledge, after review of the cultural resource studies conducted as part of the FEIS, none of these

drill pads would be placed in an area where tribal ceremonies take place. Drill pads are not constructed structures, but essentially a small clearing in the desert. New drill pads would look like this one, an existing pad known as drill pad RES-9 and noted as Site #2 in the drilling plan of operations approved by the Tonto National Forest in 2010.



16. Other new buildings will be constructed on land Resolution already owns, in the footprint of the historic Magma Copper mine and miles away from the Oak Flat campground. The new buildings on Resolution's private land may include a water treatment plant, administration building, cooling facilities and electrical substations.

17. As the Draft ROD details, Resolution has requested a special use permit to allow pipelines and transmission lines to traverse lands that will remain within the Tonto National Forest following the exchange. That special use permit is contingent on the Draft

ROD becoming final; the Draft ROD is currently subject to a pre-decisional objection period.

**Oak Flat Campground to Remain Open for Decades.**

18. Even Resolution proceeds to develop the Project, the Oak Flat Campground is expected to remain open for at least the next few decades. Resolution will provide access to the surface of the Oak Flat Campground to members of the public and Native American Tribes, to the maximum extent practicable and consistent with health and safety requirements, until the operation of the mine precludes public access for safety reasons. Resolution has developed an Oak Flat Campground Management Plan consistent with the current Forest Service management of the campground and will incorporate additional measures to accommodate requests to periodically close the campground to the public for traditional and ceremonial purposes.

**Potential Impacts of an Injunction**

19. In addition to jeopardizing the long-term benefits described above, enjoining the land exchange would create additional harm to America's efforts to increase its domestic copper supply. At full production, Resolution could meet 25% of America's copper needs and produce a host of other critical mineral and material co-products like indium, tellurium, bismuth, rhenium and many more. An injunction against the land exchange would delay the mine and likely have a chilling effect on all efforts to develop critical minerals and materials projects in the United States. This would be especially true of hard rock mines in the West, where the prevalence of federal land commonly triggers

-8-

the need for environmental review under the National Environmental Policy Act and National Historic Preservation Act.

20. An injunction would also impose substantial economic harm on Resolution. The company incurs $11 million every month to keep the mine in operational state while awaiting the land exchange. That expense includes the cost of maintaining thousands of feet of underground mining infrastructure and employing some 400 workers who keep the mine in an operational state. This is the cost Resolution incurs to maintain the status quo as it waits to begin tunneling and data collection of the copper resource thousands of feet below the Oak Flat parcel. Among other significant expenses necessary during any delay in completing the exchange is the cost of collecting, pumping and treating groundwater to keep the mine works – some of which are 7,000 feet below ground surface – dry. These costs add up. Between January 2021 and June 2025, Resolution spent $545 million in an operation-ready holding pattern due to withdrawal of the FEIS and litigation delays.

21. Another injunction resulting in further delay would also make it difficult for Resolution to justify maintaining the current workforce of approximately 400 people and its social investment in the surrounding Copper Triangle communities. My other declaration explained that among Resolution's Project-related commitments is the establishment of a $53.5 million trust to benefit all 11 consulting tribes (San Carlos and ten others). The trust agreement has been executed and is enforceable by the Trustee. Under the agreement, Resolution must pay the first $12 million into the trust within 60 days after the land exchange. The company must pay another $41.5 million into the trust within six months after issuance of the final record of decision. An injunction

would disrupt the funding of the trust. An injunction would also disrupt or require cancelation of numerous contracts with local businesses. Resolution will incur additional costs if it is required to cancel contracts that depend on the timely, mandated occurrence of the land exchange. Cancelling contracts and agreements and imposing further delay does more than impose economic and reputational harm to Resolution. It will impact people, their jobs, and their families.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct to the best of my knowledge.

EXECUTED at Phoenix, Arizona, this 28th day of July, 2025 in Phoenix, Arizona.

Signed by:

Victoria Peacey
073386A86138416...

Victoria Peacey

35489177