No. 25-5185

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION OF ARIZONA, INC.; CENTER FOR BIOLOGICAL DIVERSITY; EARTHWORKS; THE ACCESS FUND; and SIERRA CLUB.

*Plaintiffs-Appellants*,

v.

BROOKE L. ROLLINS, U.S. SECRETARY OF AGRICULTURE; UNITED STATES FOREST SERVICE; and NEIL BOSWORTH, SUPERVISOR OF THE TONTO NATIONAL FOREST.

*Defendants-Appellees*,

and

RESOLUTION COPPER MINING, LLC.

*Intervenor-Defendant-Appellee.*

---

On Appeal from the United States District Court for the District of Arizona

Honorable District Judge Dominic W. Lanza
(2:21-CV-00122-DWL)

---

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**

---

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to F.R.A.P. 26.1, Plaintiffs-Appellants Arizona Mining Reform Coalition, Inter Tribal Association of Arizona, Inc., Center for Biological Diversity, Earthworks, the Access Fund, and the Sierra Club have no parent companies, no subsidiaries or subordinate companies, and no affiliate companies that have issued shares to the public.

i

## PLAINTIFFS' OPENING BRIEF

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES.................................................................v

TABLE OF ACRONYMS ................................................................x

INTRODUCTION ........................................................................1

STATEMENT OF JURISDICTION ....................................................2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ........................3

STATEMENT OF THE CASE AND PROCEEDINGS BELOW ..................5

STATEMENT OF FACTS.................................................................8

STATUTORY AND REGULATORY BACKGROUND ..........................11

REVIEWABILITY AND STANDARDS OF REVIEW.............................15

SUMMARY OF ARGUMENT ........................................................17

ARGUMENT ..............................................................................19

I.     **The Privatization of Public Lands Will Result in
       Irreparable Harm**..........................................................19

II.    **Plaintiffs Are Likely to Succeed on the Merits** ..................21

A.     **The Appraisal Determinations and Approvals
       Violate the NDAA** .........................................................21

1.     The Secretary of Agriculture's Approval of the Federal Appraisals
       Violates Section 3003 of the NDAA, the Forest Service's
       Appraisal Regulations, and Federal Appraisal Standards .........................23

a.   *The appraisal for the Mining Claim Zone parcel wrongly
      based the valuation of "highest and best use" on the current,
      pre-Exchange situation instead of the future open market
      value after the lands are private* .................................................24

b.   *The appraisal for the Mining Claim Zone parcel arbitrarily
      determined that the parcel's "highest and best use" is not
      for mining, but rather for "surface land use."* ...........................28

c.   *The appraisal for the Mining Claim Zone parcel failed to include
      its mineral values, as the federal rules and standards require* ..................31

d.   *Resolution's current mining claims do not eliminate the need
      to value the minerals* ....................................................................35

2.   Plaintiffs Have Standing to Challenge the Illegal Appraisals .................39

**B.   The FEIS Violates NEPA and the NDAA** .................................42

1.   This Court Has Authority to Judge the FEIS' Sufficiency ...........43

a.   *The FEIS is a "Final Agency Action"* .........................................43

b.   *A valid FEIS would redress Plaintiffs' injuries* ...........................44

2.   The FEIS Violates NEPA .........................................................46

a.   *The FEIS failed to properly analyze the project's impacts on water* ...........46

b.   *The FEIS failed to meaningfully consider comments from
      other agencies on water and socioeconomic impacts* ..................52

c.   *The agency failed to consider, and require, sufficient mitigation
      measures* ...................................................................................55

**III.   Balance of Hardships and Public Interest Tip Sharply in
         AMRC's Favor** ..........................................................................57

**CONCLUSION** ...........................................................................60

**STATEMENT OF RELATED CASES** .......................................................61

**CERTIFICATE OF SERVICE** ...............................................................62

**CERTIFICATE OF COMPLIANCE** ......................................................62

**ADDENDUM** ......................................................................................A-1

# TABLE OF AUTHORITIES

### *Federal Caselaw*

*Apache Stronghold v. United States,*
101 F.4th 1036 (9th Cir. 2023) ................................................1, 2, 6, 10, 11, 17, 43, 46

*Apache Stronghold v. United States,*
CV-21-0050-PHX-SPL, 2025 WL 1360694
(D. Az. May 9, 2025) ......................................................................2, 19, 20, 57, 58, 59

*Apache Stronghold v. United States,*
No. 21-15295, 2021 WL 12295173
(9th Cir. Mar. 5, 2021) ............................................................................20, 57, 58

*Apache Stronghold v. United States,*
145 S.Ct. 1480 (2025) ...........................................................................................20

*Bennett v. Spear,*
520 U.S. 154 (1997) .......................................................................................41, 43, 44

*Bohmker v. Oregon,*
903 F.3d 1029 (9th Cir. 2018) .....................................................................................38

*Clarke v. Sec. Indus. Assoc.,*
479 U.S. 388 (1987) ...........................................................................................41

*Ctr. for Biol. Div. v. U.S. FWS,*
33 F.4th 1202 (9th Cir. 2022) .....................................................................................37

*Cole v. Ralph,*
252 U.S. 286 (1920) ...........................................................................................37

*Desert Citizens Against Pollution v. Bisson,*
231 F.3d 1172 (9th Cir. 2000) ........................................................................30, 39, 40

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.,*
36 F.4th 850 (9th Cir. 2022) .....................................................................................44

*Envtl. Prot. Info. Ctr. v. Carlson,*
968 F.3d 985 (9th Cir. 2020) .....................................................................................16

v

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) ....................................................................16

*Flathead-Lolo-Bitterroot Citizen Task Force v. Mont.*,
98 F.4th 1180 (9th Cir. 2024) ..................................................................16

*Great Basin Mine Watch v. Hankins*,
456 F.3d 955 (9th Cir. 2006) ....................................................................52

*Great Basin Resource Watch v. BLM*,
844 F.3d 592 (9th Cir. 2016) ........................................................49, 52, 56

*Idaho v. Coeur D'Alene Tribe*,
794 F.3d 1039 (9th Cir. 2015) ..................................................................58

*Kettle Range Consv. Group v. BLM*,
150 F.3d 1083 (9th Cir. 1998) ..................................................................60

*League of Wilderness Defs. V. Connaughton*,
752 F.3d 755 (9th Cir. 2014) ....................................................................57

*Lexmark Int'l v. Static Control Components*,
572 U.S. 118 (2014) ..................................................................................41

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) ..................................................................................14

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ..................................................................................41

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983) ..............................................................................29, 54

*Nat'l Fam. Farm Coal v. U.S. EPA*,
966 F.3d 893 (9th Cir. 2010) ....................................................................44

*Nat'l Forest Preservation Group v. Butz*,
485 F.2d 408 (9th Cir. 1973) ....................................................................40

*Nat'l Parks & Cons. Ass'n v. BLM*,
606 F.3d 1058 (9th Cir. 2010) ..................................................................30

*Nat'l Wildlife Fed. v. Burford,*
871 F.2d 849 (9th Cir. 1989) ....................................................41

*Nken v. Holder,*
556 U.S. 418 (2009) ...............................................................57

*NRDC v. U.S. Forest Serv.,*
421 F.3d 797 (9th Cir. 2005) .................................................55

*Or. Natural Res. Council v. Lowe,*
109 F.3d 521 (9th Cir. 1997) .................................................51

*Or. Natural Res. Council Fund v. Brong,*
492 F.3d 1120 (9th Cir. 2007) ...............................................16

*Or. Natural Res. Council Fund v. Goodman,*
505 F.3d 884 (9th Cir. 2007) .................................................17

*Pit River Tribe v. BLM,*
793 F.3d 1147 (9th Cir. 2015) ...............................................42

*Restore the North Woods v. U.S. Dept. of Agric.,*
968 F.Supp. 168 (D. Vt. 1997) .........................................31, 46

*Ritidian v. U.S. Dept. of the Air Force*,
128 F.4th 1089 (9th Cir. 2025) ...............................................43

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989) ..........................................................14, 15

*Seven County Infrastructure Coalition v. Eagle County,*
145 S. Ct. 1497 (2025) .......................................................43, 50

*Shapiro v. U.S.,*
335 U.S. 1 (1948) ...................................................................35

*Shoshone-Bannock Tribes v. United States Dept. of the Interior,*
Nos. 23-35543, 23-35544, 25 WL 2424422
(9th Cir. Aug. 22, 2025) ...........................................25, 26, 27

*Sw. Voter Registration Educ. Project v. Shelley,*
344 F.3d 914 (9th Cir. 2003) .................................................16

vii

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior,*
608 F.3d 592 (9th Cir. 2010) ............................................................49

*U.S. v. Coleman,*
390 U.S. 599 (1968) .........................................................................37

*U.S. v. Locke,*
471 U.S. 84 (1985) ...........................................................................36

*U.S. v. Oakland Cannabis Buyers' Co-op.,*
532 U.S. 487 (2001) .........................................................................59

*W. Land Exch. Project v. U.S. BLM,*
315 F.Supp. 2d 1068 (D. Nev. 2004) ............................................39, 46

*W. Watersheds Project v. Grimm,*
921 F.3d 1141 (9th Cir. 2019) .........................................................44

*WildEarth Guardians v. USDA,*
795 F.3d 1148 (9th Cir. 2015) .........................................................44

*Winter v. Natural Resources Defense Council,*
555 U.S. 7 (2008) ............................................................................15

### *Federal Statutes*

Administrative Procedure Act,
5 U.S.C. §§ 702–706 ..........................................................................3

National Historic Preservation Act
16 U.S.C. §470, *et seq.* .......................................................................8

Section 3003 of the National Defense Authorization Act for Fiscal Year 2015,
16 U.S.C. §539p ...................................................................... *passim*

28 U.S.C. §1292(a)(1) ........................................................................3

28 U.S.C. §1331 .................................................................................2

The 1872 Mining Law,
30 U.S.C. §§ 20–54 ..........................................................................36

American Indian Religious Freedom Act
42 U.S.C. §1996, *et seq.* ..................................................................9

National Environmental Policy Act,
42 U.S.C. §4321, *et seq.* ........................................................ *passim*

### *Federal Regulations*

36 C.F.R. Part 254 ................................................ 3, 13, 17, 24, 26, 31, 32, 34

61 Fed. Reg. 26771 (May 24, 1996)...............................................9

81 Fed. Reg. 14829 (March 18, 2016).........................................14

## TABLE OF ACRONYMS

| | |
|---|---|
| AF | Acre-foot (325,851 gallons of water) |
| AMRC | Arizona Mining Reform Coalition |
| ASLD | Arizona State Lands Department |
| BLM | Bureau of Land Management |
| FEIS | Final Environmental Impact Statement |
| ITAA | Inter Tribal Association of Arizona, Inc. |
| MCZ | Mining Claim Zone (appraised) |
| MWA | Mineral Withdrawal Area (appraised) |
| NDAA | Section 3003 of the National Defense Authorization Act for Fiscal Year 2015, 16 U.S.C. §539p |
| NEPA | National Environmental Policy Act, 42 U.S.C. §§4321 et seq. |
| UAS | Uniform Standards of Professional Appraisal Practice |
| UASFLA | Uniform Appraisal Standards for Federal Land Acquisitions |

## **INTRODUCTION**

Plaintiffs-Appellants Arizona Mining Reform Coalition, Inter Tribal Association of Arizona, Inc., Center for Biological Diversity, Earthworks, the Access Fund, and the Sierra Club (collectively, "AMRC") seek preliminary relief to enjoin the title transfer and land exchange that would hand over 2,422 acres of irreplaceable federal public lands, known as "Oak Flat," to Resolution Copper Mining ("Resolution") (a joint venture of two foreign mining companies), pursuant to §3003 of the National Defense Authorization Act for Fiscal Year 2015 ("NDAA") (the "Exchange"). 16 U.S.C. §539p.

Oak Flat "is a site of great spiritual value" to Tribes in the region. *Apache Stronghold v. United States*, 101 F. 4th 1036, 1044 (9th Cir. 2024) (en banc). These national forest lands also contain important water, wildlife, and recreational values. The Exchange would privatize Oak Flat and adjacent public lands and remove all federal protections for the public resources at the site, causing immediate and irreparable harm to AMRC.

Congress made the Exchange contingent on legally-compliant appraisals and "equal value" between the federal and non-federal lands. The appraisal for the 1,655-acre "Mining Claim Zone" parcel, however, made three critical errors, by: (1) basing the appraisal on the **current** situation of the federal lands, instead of the **future** "highest and best use" of the lands once privatized; (2) determining that the "highest and best use" for these highly sought after lands is not mining, but rather mere

1

"surface land use"; and (3) valuing the estimated 35 billion pounds of copper underlying these lands as **zero**.

Congress also made the Exchange contingent on a Final Environmental Impact Statement ("FEIS") that complies with the National Environmental Policy Act ("NEPA"). The Exchange would facilitate Resolution's proposed Mine, which would pump and dewater massive amounts of groundwater, deplete surface waters, and completely obliterate sacred land at and around Oak Flat. *See generally Apache Stronghold*, 101 F. 4th at 1047–48. The FEIS violates NEPA by failing to consider the reasonably foreseeable impacts of nearby development on water resources, and failing to adequately respond to the highly critical comments of cooperating agencies.

In contrast to the immediate, irreparable harm to AMRC, a preliminary injunction would cause no harm to the Government, and at most only temporary economic harm to Resolution. A preliminary injunction would "not stop Resolution from mining a single ounce of copper should the transfer ultimately be upheld." *Apache Stronghold v. United States*, No. 21-CV-50-PHX-SPL, 2025 WL 1360694, at *8 (D. Ariz., May 9, 2025). The balance of equities and public interest thus tip sharply in AMRC's favor. *Id.*

## STATEMENT OF JURISDICTION

### Jurisdiction of the District Court

The district court had subject matter jurisdiction under 28 U.S.C. §1331 because the action arose under federal laws including: the Administrative Procedure

2

Act ("APA"), 5 U.S.C. §§702-706; the NDAA, 16 U.S.C. §539p; NEPA, 42 U.S.C. §§4321 *et seq.*; and Forest Service Appraisal Regulations, 36 C.F.R. Part 254.

**Jurisdiction of the Court of Appeals**

This Court has jurisdiction under 28 U.S.C. §1292(a)(1) because this is an appeal from an interlocutory order denying a preliminary injunction.

**Finality of Judgment and Timeliness of Appeal**

The district court denied AMRC's motion for a preliminary injunction on August 15, 2025. 1-ER-7-100. AMRC immediately appealed and filed its Rule 27-3 emergency motion for an injunction pending appeal the next day.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

**Federal Appraisals of the Public Properties to be Exchanged**

The NDAA requires that, as a pre-condition of the Exchange, the federal lands and minerals to be transferred must be appraised under federal appraisal regulations and standards. 16 U.S.C. §§539p(c)(4)(5), (e).

1.    When calculating market value for a federal land exchange, federal law requires the appraiser to determine the value of the property's future "highest and best use," which means the privatized lands' probable use after the Exchange. Did the Mining Claim Zone appraisal violate federal appraisal standards and regulations when it based the "highest and best use" valuation on the **current** status of the federal lands, instead of the **future** open market value after the lands are private?

3

2.     The value of the future "highest and best use" of the property is defined as "the most probable and legal use of a property."  Did the appraisal violate federal appraisal standards and regulations when it assumed that the highest and best future use for the Mining Claim Zone parcel is not for mining, when that is the market and proposed use, but rather "surface land use"?

3.     When appraising future market value for a federal land exchange, federal regulations and standards require the appraiser to consider the contributory value of all interests in the land, including minerals.  Resolution estimates there are over 35 billion pounds of copper beneath the Mining Claim Zone parcel, yet the appraisal does not account, at all, for this mineral value.  Did the appraiser comply with federal appraisal standards and regulations when it valued the copper as zero?

**Final Environmental Impact Statement and NEPA**

"Prior to conveying Federal land under this section, the Secretary [of Agriculture] shall prepare a single environmental impact statement under [NEPA]." 16 U.S.C. §539(c)(9)(B).

4.     NEPA requires an EIS to analyze the "reasonably foreseeable" environmental effects of the proposed action.  Resolution's proposed mine would require "tremendous quantities of water" that "may result in alarming long-term consequences," including to the area's socioeconomic resources.  Was it reasonable for the agency to not analyze and disclose the cumulative impacts from Resolution's

4

groundwater demands alongside the immense groundwater demands for an already underway mega-development in the same area?

5.    NEPA requires lead agencies to consult with and consider the comments of other agencies.  The Bureau of Land Management ("BLM") and Arizona State Land Department ("ASLD") are designated "cooperating agencies" and both submitted detailed comments critical of the agency's analysis.  Did the agency adequately address these comments, where the comments are not identified and only some concerns are mentioned?

**Injunction Standards**

6.    The Exchange would result in immediate, irreparable harm to the users of the Oak Flat area, including AMRC and its members.  Temporarily delaying the Exchange while the case proceeds would not result in harm to the Government and only temporary economic harm to Resolution, because mining would not begin for many years, if at all.  Do the public interest and balance of harms tip in favor of preserving Oak Flat's public ownership and access status quo where privatization would result in immediate, irreparable harm and any potential mining is years away?

<u>**STATEMENT OF THE CASE AND PROCEEDINGS BELOW**</u>

AMRC challenges the federal government's proposed title transfer of 2,422 acres of public national forest land to international mining conglomerate Resolution. This transfer would immediately prevent access to the site as public lands and cause irreparable harm to AMRC and its members.

5

The case has been ongoing for years.  On January 15, 2021, the Forest Service issued its FEIS governing its review of the "Resolution Copper Project and Land Exchange."  AMRC moved for a preliminary injunction in February 2021.  On March 1, 2021, the agency rescinded the FEIS "in order to reinitiate consultation with the Tribes and ensure impacts have been fully analyzed." 5-ER-1057.

On June 20, 2025, the Forest Service published the new FEIS, with minor changes, along with a new Draft Record of Decision for the proposed operations that would occur on national forest lands and state lands not included in the Exchange. The agency did not provide any public review or comment opportunities during the four-year period it was reconsidering the 2021 FEIS.

The Exchange and related Forest Service approvals would facilitate the proposed Mine, which would pump and dewater regional groundwater and completely obliterate Oak Flat by creating a roughly two-mile-wide, 1,000 foot-deep crater from the "block cave" Mine.  *See Apache Stronghold*, 101 F.4th at 1047.  This mining method would involve excavating ore 4,500 to 7,000 feet underground within the exchanged parcels and then collapsing the void areas created by the excavation. The Mine would transform Oak Flat, which has since time immemorial been a place of profound religious, cultural, and historical significance, sacred to indigenous people, including tribal members of Plaintiff-Appellant Inter Tribal Association of Arizona, Inc.'s Member Tribes, into a massive crater, whose steep slopes would forever remain unsafe for human use.  This is in addition to the other "devastating

6

environmental effects." 1-ER-9.

AMRC, along with San Carlos Apache Tribe in the related appeal (25-5189), filed preliminary injunction motions to block the Exchange. On June 9, 2025, the district court enjoined the Forest Service from conveying the federal lands until August 19, 2025. The district court required plaintiffs to renew their motions after the FEIS was issued on June 20, 2025. After briefing and oral argument on August 6, 2025, the district court denied the motions on August 15, 2025. 1-ER-7-100.

The district court did, importantly, keep in place its previous injunction blocking the Exchange, lasting until the August 19 deadline, so that "Plaintiffs will have a period of time following issuance of this order to attempt emergency relief from the Ninth Circuit." 1-ER-99, n. 30.

AMRC and the Tribe each immediately appealed and on August 16, 2025, filed emergency motions under Rule 27-3 to stay the Exchange pending resolution of the appeals. This Court issued its Order enjoining the Exchange "to preserve the status quo while the motions are pending." Order at 2, Dkt. 19. The Order referred the motions to the merits panel and ordered expedited briefing.

7

## STATEMENT OF FACTS

The Oak Flat area is a place of profound religious, cultural, and historic significance to the San Carlos Apache Tribe and other Indian tribes, nations, and communities in Arizona. The lands to be privatized also contain important water, wildlife, and recreational values that would be immediately lost upon the Exchange, as well as the exclusion of public access and use.



*Oak Flat, shown above, is located within the Tonto National Forest.*

Because of its critical importance to Tribes, Oak Flat is included on the National Register of Historic Places as a Traditional Cultural Property under the National Historic Preservation Act, 16 U.S.C. §470 *et seq.*, and it meets the criteria

8

to be identified as a "sacred site" within the meaning of Executive Order 13007, Indian Sacred Sites, May 24, 1996, 61 Fed. Reg. 26771, the American Indian Religious Freedom Act, 42 U.S.C. §1996, *et. seq.*, and related laws.

The religious and cultural importance of the Oak Flat area does not reside in isolated spots, but rather in the area as a whole. For the Apache People, the area of "Oak Flat" is bounded to the west by (and including) the large escarpment known as "*Dibecho Nadil*" or "Apache Leap" and on the east by (and including) *Gan Bikoh*, which means "Crowndancers Canyon," though it is often referred to by Apache People as "Ga'an Canyon," and by non-Indians as "Devil's Canyon." Oak Flat is bounded to the north by (and including) *Gan Daszin* or "Crowndancer Standing," which is delineated on most maps as "Queen Creek Canyon."



*Ga'an Canyon bounds Oak Flat to the east and would suffer long term loss of water, seeps, and springs as a result of Resolution's groundwater pumping. The Forest Service proposes to approve a large mine waste pipeline spanning the Canyon, resulting in years of construction and loss of the historical and cultural uses.*

9

Oak Flat is also recognized for its beauty and importance to outdoor enthusiasts, including members of AMRC who value it for recreation and a place of unique biological diversity. Oak Flat is also a world-recognized rock-climbing destination. 2-ER-212. Ancient oak trees provide shade for hikers and campers, and give sanctuary to over 170 bird species. At an elevation of 4,200 to 4,600 feet, Oak Flat is a cool respite for the many visitors from Phoenix and beyond.

Wildlife cameras have documented a wide variety of wildlife at Oak Flat, including mountain lion, bear, and coatimundi. 3-ER-395. These lands provide important habitat for endangered and threatened species such as the southwestern willow flycatcher, yellow billed-cuckoo, Gila chub, Arizona hedgehog cactus, and ocelot. 2-ER-330.

Oak Flat's significance has been long recognized. In 1955, 760-acres of national forest lands included in the Exchange were withdrawn from mining by the Eisenhower Administration. *Apache Stronghold*, 101 F.4th at 1130. The withdrawal, which remains in place, prohibited mining-related activities in this Withdrawal Area.

After a decade of unsuccessful lobbying by Resolution to acquire these sacred lands, a rider was added to a must-pass appropriations bill leading to Congressional authorization of the Exchange in 2014 in the NDAA. *Id*. at 1131.

The Exchange parcels to be conveyed to Resolution include (1) the 766-acre Oak Flat "Mineral Withdrawal Area;" and (2) the 1,655-acre "Mining Claim Zone," which sits above the vast majority of the copper deposit. This collective 2,422-acre

10

tract of land is defined as the "Federal Land" to be exchanged in the NDAA. 16
U.S.C. §539p(b)(2).

**STATUTORY AND REGULATORY BACKGROUND**

Importantly, within the NDAA, Congress placed significant restrictions and
conditions on the Forest Service's approval of the Exchange, including (1)
compliance with federal appraisal standards and regulations, and (2) that a single
FEIS that is fully compliant with all federal laws, including NEPA, be the basis for
all decisions related to the Exchange and Mine. *Id*. §§539p(c)(1) (the exchange is
"Subject to the provisions of this section."), (c)(4), (c)(5), (c)(9) (including
requirements for tribal consultation and consideration). The Act requires that "[t]he
federal and non-federal land must be independently appraised, *id*. §539p(c)(4), and
the value of the exchanged land equalized as set forth in the statute, *id*. §
539p(c)(5)." *Apache Stronghold*, 101 F.4th at 1046. "Congress expressly stated that
the land exchange would generally be governed by [NEPA]." *Id. See* 16 U.S.C.
§539p(c)(9) ("the Secretary shall carry out the land exchange in accordance with the
requirements of [NEPA]"), §539p(c)(9)).

**Appraisal Requirements**

A critical limiting factor for the Exchange is Congress' express requirement
that the Forest Service cannot approve the Exchange until the lands Resolution
would obtain (the "Federal Land") and the lands the federal government would
obtain (the "Non-Federal Land") are subject to properly approved appraisals.

The "final appraised values of the Federal land and non-Federal land" must be "determined and approved by the Secretary." 16 U.S.C. §539p(c)(4)(B)(ii). Among other mandates, "[t]he value of the Federal land and non-Federal land to be exchanged under this section shall be equal or shall be equalized in accordance with this paragraph." *Id*. §539p(c)(5)(A). *See also id*. §539p(c)(5)(B)(i) (requiring conveyance of additional lands or money "[i]f the final appraised value of the Federal land exceeds the value of the non-Federal land").

The federal and non-federal lands must be independently appraised, in accordance with nationally recognized appraisal standards including the Uniform Appraisal Standards for Federal Land Acquisitions and the Uniform Standards of Professional Appraisal Practice. *Id*. §539p(c)(4)(B). "The appraisal prepared under this paragraph shall include a detailed income capitalization approach analysis of the market value of the Federal land which may be utilized, as appropriate, to determine the value of the Federal land, and shall be the basis for calculation of any payment under subsection (e)." *Id*. §539p(c)(4)(C).

The "appraisals of the Federal land and non-Federal land" must also be "in compliance with the requirements of section 254.9 of title 36, Code of Federal Regulations." *Id*. §539p(c)(4)(A). These rules require that all values of the exchanged lands be calculated, including minerals, as private fee in the future. "The federal land is appraised as if in private ownership, to its highest and best use." 36

12

C.F.R. §254.9(b). An appraisal must provide "the market value of Federal and non-Federal properties involved in an exchange." *Id.* §254.9(a)(1).

Market value "means the most probable price in cash, or terms equivalent to cash, which lands or interest in lands should bring in a competitive and open market under all conditions requisite to a fair sale, where the buyer and seller each acts prudently and knowledgeably, and the price is not affected by undue influence." *Id.* §254.2.

> In estimating market value, the appraiser shall: (i) Determine the highest and best use of the property to be appraised; (ii) Estimate the value of the lands and interests as if in private ownership and available for sale in the open market; (iii) Include historic, wildlife, recreation, wilderness, scenic, cultural, or other resource values or amenities as reflected in prices paid for similar properties in the competitive market; (iv) Consider the contributory value of any interest in land such as water rights, minerals, or timber, to the extent they are consistent with the highest and best use of the property.

*Id.* §254.9(b).

Thus, under these mandated Forest Service appraisal rules, the land and minerals must be valued as if in fee simple, after the Exchange, as it would in a private, market-based transaction. In determining the future "market value" of the federal parcels to be exchanged-away, the appraiser must calculate the value of "the highest and best use" of the property, which is defined as "the most probable and legal use of a property." *Id.* §254.9(b)(1)(i); §254.2 (definitions).

**NEPA and NDAA Requirements for the FEIS**

As another pre-requisite for the Exchange, Congress required the agency to prepare "a single" FEIS analyzing the Exchange and the proposed Mine. 16 U.S.C.

13

§539p(c)(9)(B). The agency understood that the Exchange was contingent on a NEPA-compliant FEIS. *See* 81 Fed. Reg. 14829-32 (Mar. 18, 2016) (public notice detailing NEPA requirements). "The EIS therefore considered the environmental impacts not only of the mining proposal and all connected actions, but also of the land exchange itself." DROD at v, 2-ER-284. The NDAA further required that the FEIS:

> (i)     assess the effects of the mining and related activities on the Federal land conveyed to Resolution Copper under this section on the cultural and archeological resources that may be located on the Federal land; and
> (ii)    identify measures that may be taken, to the extent practicable, to minimize potential adverse impacts on those resources, if any.

16 U.S.C. §539p(c)(9)(C).

"NEPA declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). "NEPA promotes its sweeping commitment to 'prevent or eliminate[s] damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989), quoting 42 U.S.C. §4321.

For major federal actions, agencies must prepare a "detailed statement" that considers (1) the "reasonably foreseeable environmental effects of the proposed agency action," (2) "any reasonably foreseeable adverse environmental effects which cannot be avoided," (3) "alternatives to the proposed agency action," (4) "the relationship between local short-term uses . . . and the maintenance and enhancement

14

of long-term productivity," and (5) "any irreversible and irretrievable commitments of Federal resources." 42 U.S.C. §4332(2)(C). In preparing the environmental analysis, the lead agency must consult with and obtain the comments of other agencies with special expertise. *Id*. The agency must further ensure the scientific integrity of the environmental analysis. *Id*. §4332(2)(D).

NEPA ensures that the agency will have available, and carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to a larger audience to ensure the public can play a role in the decision-making process. *Robertson*, 490 U.S. at 349. NEPA "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Id*.

## REVIEWABILITY AND STANDARDS OF REVIEW

The issues presented regarding AMRC's irreparable harm, AMRC's likelihood of success on its claims regarding the appraisals and the FEIS, and the balance of harms and public interest, were all fully briefed before the district court, and ruled on in the court's decision. 1-ER-15 (appraisal claims); 1-ER-33 (NEPA claims); 1-ER-94 (irreparable harm); 1-ER-96 (balance of equities and public interest).

To obtain preliminary relief, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Defense Council*, 555 U.S. 7, 20 (2008).

15

A court evaluates these factors on a sliding scale, as a stronger showing of one element may offset a weaker showing of another. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (en banc). When the balance of equities tips sharply in the plaintiff's favor, a plaintiff must raise only "serious questions" on the merits, which is a lesser showing than likelihood of success. *Id.* "Serious questions" are ones that cannot be resolved at this stage because they require a more deliberative review. *Flathead-Lolo-Bitterroot Citizen Task Force v. Mont.*, 98 F.4th 1180, 1192 (9th Cir. 2024).

This Court reviews a denial of a preliminary injunction for abuse of discretion. *Envtl. Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). "The district court's interpretation of the underlying legal principles, however, is subject to de novo review and a district court abuses its discretion when it makes an error of law." *Id.*, quoting *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc).

AMRC's underlying legal claims are governed by the APA, which directs the reviewing court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or not in accordance with law." 5 U.S.C. § 706(2)(A). Under the APA, the court must "engage in a substantial inquiry" and a "thorough, probing, in-depth review." *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007) (internal citations and quotations omitted). The agency must present a "rational connection between the facts found and the

16

conclusions made." *Id.* If the agency fails to consider an important aspect of the problem, or offers an explanation that is contrary to the evidence, the agency's action is arbitrary and capricious and shall be set aside. *Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007).

## SUMMARY OF ARGUMENT

The Exchange would immediately and irreparably harm AMRC. The Exchange would privatize 2,422 acres of national forest lands that have long been used, enjoyed and valued by AMRC's members. Oak Flat "is a site of great spiritual value" to Tribes in the region. *Apache Stronghold*, 101 F. 4th at 1044. These public lands to be given to Resolution, to use (and exclude the public from) as it sees fit, contain significant and prized water, wildlife, and recreational values.

AMRC is likely to prevail on the merits as the Forest Service did not comply with the NDAA's requirements. First, the appraisal for the Mining Claim Zone parcel failed to correctly apply the Uniform Appraisal Standards for Federal Land Acquisitions and applicable Forest Service appraisal regulations, as mandated by §3003. These standards and regulations require a determination of the future "highest and best use" based on the market **after** the Exchange, which is defined as "the most probable and legal use of a property." 36 C.F.R. §254.9(b)(1)(i); §254.2.

But the appraisal for the Mining Claim Zone parcel was erroneously based on the **current** situation, with Resolution having filed mining claims on the federal parcel, which the appraiser wrongly assumed meant that Resolution actually owns

17

the mineral estate—not the United States, who indisputably owns the mineral estate. Regardless, the appraisal standards and regulations specifically require that the determinations of value and "highest and best use" be based on the **future**, post-Exchange situation, at which time Resolution would own the lands and minerals in fee simple and its current federal-land mining claims would not exist.

Additionally, even though the Mining Claim Zone parcel overlies the large copper deposit that Resolution desires to acquire free from federal oversight, the appraiser arbitrarily and incongruously valued the minerals as worthless and determined that the "highest and best use" of this parcel is somehow **not** to develop the mineral deposit, but only for simple "surface land use," at a paltry $1,200/acre, severely undervaluing the parcel. 4-ER-569. This was based on the appraisal's erroneous assumption that the minerals had no appraised value.

AMRC is also likely to prevail on its NEPA claims. Despite the massive amount of water required by the Mine, the Forest Service ignored the serious adverse effects that the pumping and mine dewatering will have on already stressed aquifers and surface waters and failed to consider the cumulative impacts of this pumping along with other projects within the same area, affecting the same aquifers, including the "Superstition Vistas" mega development. In doing so, the agency also failed to adequately respond to the substantial criticisms leveled at its FEIS by federal and state "cooperating agencies." Last, the agency failed to properly consider mitigation needed to reduce the devastating impacts caused by the Exchange and Mine.

Regarding the balance of harms and public interest, Resolution asserts that the copper is immediately needed to support the nation's economic and security needs. But, even if the Mine would occur soon, which is not the case, Resolution has not shown that it will process—or sell—the copper in the United States, and thus any rhetoric about America's mineral needs rings hollow. And, according to the FEIS, the Exchange is not even needed for Resolution to mine the copper.

The harm to AMRC and others from the privatization is permanent, with irreparable impacts occurring on the first day. In contrast, any harm to Resolution is temporary, as any short-term injunction will not hinder or affect the ability to mine copper in the future—even if the company eventually determines that the Mine is financially viable, which remains outstanding, due in large part to the enormous costs in conducting novel and complex operations over a mile below the surface.

## ARGUMENT

## I.     The Privatization of Public Lands Will Result in Irreparable Harm.

The Secretary of Agriculture will transfer the 2,422 acres of public land to Resolution, resulting in immediate, irreparable harm to AMRC if the current temporary injunction is not continued. 1-ER-95-96. Judge Lanza found—as did Judge Logan, Judge Bumatay, and Justices Gorsuch and Thomas—that users of these lands "have sufficiently established the second preliminary-injunction factor (a likelihood of irreparably injury in the absence of injunctive relief)." 1-ER-12; *Apache Stronghold*, 2025 WL 1360694, at *6; *Apache Stronghold v. United States*,

19

No. 21-15295, 2021 WL 12295173, at *5 (9th Cir. Mar. 5, 2021) (Bumatay, J., dissenting); *Apache Stronghold v. United States*, 145 S. Ct. 1480, 1480–82 (2025).

"[O]nce the transfer is complete, Oak Flat will become private property no longer subject to federal law or Forest Service management, which 'gives Resolution power to exclude Apache Stronghold's members from Oak Flat and to restrict the timing and location of religious ceremonies that regularly take place at Oak Flat ....'" *Apache Stronghold*, 2025 WL 1360694, at *6.  "[E]very day that Oak Flat remains intact is another day that members of the Tribe can use the land in its current, unspoiled form for religious purposes and ceremonies.  Thus, even a temporary delay may, for example, allow another Sunrise Ceremony to take place." 1-ER-37 (citing 145 S. Ct. at 1480–82).

In addition to the profound immediate loss of access for cultural and spiritual purposes for the member Tribes of Plaintiff-Appellant Inter Tribal Association of Arizona, Inc. ("ITAA"), the Exchange will also immediately and permanently eliminate the legal ability of other Plaintiff-Appellant groups' members to continue accessing and using these lands for hiking, rock climbing, appreciating and viewing wildlife, plants, and waters on these lands, camping, and other recreational and aesthetic purposes. 1-ER-94; 3-ER-376–411 (Declarations of Dadgar, Featherstone, McSpadden, Murdock, and Bahr).

## II.     Plaintiffs Are Likely to Succeed on the Merits.

### A.     The Appraisal Determinations and Approvals Violate the NDAA.

The Exchange cannot occur without the agency's compliance with the strict appraisal, "highest and best use," "equal value," and other standards regarding the value of the lands and minerals to be traded-away. 16 U.S.C. §§539p(c)(4), (5).  The appraisals for the Federal and Non-Federal lands were completed between November 2022 and January 2023 and noticed to AMRC on April 22, 2025.  The Forest Service prepared separate appraisals for the two federal parcels.  The 766-acre "Mineral Withdrawal Area" was valued at a total of $22,000,000, with the estimated 5.68 billion pounds of minerals valued at $21,000,000. 4-ER-572-599.  The future "highest and best use" of the parcel was determined to be "exploration and development of […]the mineral resource as a portion of the Resolution Copper deposit." 4-ER-580.

The 1,655-acre "Mining Claim Zone," however, was valued at only $2,610,000, with the estimated 35 billion pounds of minerals valued at **zero**. 4-ER-557-571.  The "highest and best use" of the parcel was determined not to be for mining, but only for "surface land use in support of a mining operation," 4-ER-566, which was valued at a minimal level of only $1,200/acre. 4-ER-569.  This is despite the undisputed fact that the future market and use of the parcel is to mine the underlying copper, as this parcel includes the vast majority of the deposit.  The

21

following shows the location of the two Federal land parcels and the asserted

location of the copper ore.





*(Top): Map of the MWA and MCZ Areas (Excerpt from 4-ER-576)*
*(Bottom): Map of ore body relative to MWA (Excerpt from 5-ER-1015)*

22

1. <u>The Secretary of Agriculture's Approval of the Federal Appraisals Violates Section 3003 of the NDAA, the Forest Service's Appraisal Regulations, and Federal Appraisal Standards</u>.

The Secretary of Agriculture and Forest Service failed to comply with the mandatory appraisal and equal value requirements in three fundamental ways. First, the appraisal for the Mining Claim Zone parcel based its "highest and best use" valuation on the **current** status of the federal lands, instead of its value on the **future** open market after the lands are private. Second, that appraisal erroneously determined that the future "highest and best use" of those lands was merely for "surface land use in support of a mining operation." This is despite the fact that the clear market and intended use of this parcel is for copper mining.

Third, and related, the appraisal for the Mining Claim Zone parcel, which covers the vast majority of the copper ore body, erroneously assumed that the value of the copper is zero, simply because Resolution has filed mining claims on these federal lands—misunderstanding federal mining, appraisal, and public land law. This contradicts the Forest Service's appraisal regulations, which require that in calculating market value for the future uses on private land, all values of the exchanged lands must be factored in, including minerals. In fact, that was exactly what the agency told Congress it must do.

23

a)      *The appraisal for the Mining Claim Zone parcel wrongly based the valuation of "highest and best use" on the current, pre-Exchange situation instead of the future open market value after the lands are private.*

Fundamental to the appraisal regulations and standards is that the appraisal of the federal parcel to be exchanged-away must be based on the future "highest and best use" of the parcel as private lands, post-Exchange.  This is defined as "the most probable and legal use of a property." 36 C.F.R. §254.9(b)(1)(i); *id*. at §254.2.  "The federal land is appraised as if in private ownership, to its highest and best use." *Id.* at §254.9(b).

The appraisal for the Mining Claim Zone parcel, however, arbitrarily ignored the obvious future "highest and best use" of this parcel, in contradiction of the agency appraisal regulations at 36 C.F.R. §254.9 and "the Uniform Appraisal Standards for Federal Land Acquisitions ["UASFLA"]" as mandated by 16 U.S.C. §539p(c)(4)(B).  These rules require that the appraisals treat the lands and minerals as a future, private-lands transaction on the open market, **not** as if the lands were still federal or influenced by mining claims.

"When appraising the federal land portion of the exchange, the regulations require that the appraiser 'estimate the value of the lands and interests as if in private ownership and available for sale in the open market.'" UASFLA at 53 (citations omitted), 5-ER-815.  "That highest and best use becomes the basis to estimate the value of the lands ... as if ... available for sale in the open market." *Shoshone-*

24

*Bannock Tribes v. United States Dept. of the Interior*, Nos. 23-35543, 23-35544, 2025 WL 2424422, *25 (9th Cir., Aug. 22, 2025) (Bumatay, J., dissenting).

But the Mining Claim Zone parcel appraisal was based on the pre-Exchange situation in which the lands remain federal, ignoring the mineral values based on the mere fact that Resolution had filed mining claims. Yet after the Exchange, Resolution will own the lands and minerals in fee simple, and its previous federal land mining claims will be irrelevant. The appraisal's focus on the pre-Exchange status violated the federal standards, where "the appraiser must avoid estimating a property-specific investment value to a particular owner instead of developing an opinion of the market value of the property if it were placed for sale on the open market." UASFLA at 47, 5-ER-809.

But that is what the Mining Claim Zone appraisal did—ignoring the fact that, if this was a private transaction between Resolution and another buyer, it would certainly include the mineral values. Although the appraisal said that "the estate appraised is the fee simple interest," it then erroneously relied on Resolution's mining claims on the current federal land to zero-out the mineral values. 4-ER-564-65.

The agency's appraisal for the adjacent Mineral Withdrawal Area parcel in fact recognized that appraisals of the currently-federal land must be calculated as if in private ownership, without consideration of its current status as federal land. "[F]or the purpose of this Report, the Subject [parcel] is considered fee simple

25

ownership, *as though it is in private ownership, is freely alienable, and zoned consistently with other similarly situated non-Federal properties*." 4-ER-601.

For the Mining Claim Zone parcel, by contrast, the appraiser wrongly assumed that Resolution's unpatented mining claims somehow overrode the requirement to consider the probable future use and market value of the parcel as private land after the exchange. 4-ER-560. This fundamental flaw renders the Mining Claim Zone appraisal arbitrary and contrary to the agency's standards and regulations.

This court recently considered the validity of a land exchange between the federal government and a mining company (J.R. Simplot Co.), including the issue of how to value the future "highest and best use" of the federal lands to be exchanged-away. *Shoshone-Bannock*, 2025 WL 2424422. While the majority held that the land exchange was prohibited by a 1900 statute recognizing Tribal Treaty Rights, Judge Bumatay considered the details of the appraisals for the land exchange in his dissenting opinion.

Relying on the Uniform Appraisal Standards for Federal Land Acquisitions (the same as mandated by §3003), as well as the Interior Department's appraisal regulations (which are essentially the same as the Forest Service's 36 C.F.R. Part 254 regulations also mandated by §3003), he explained that the appraiser should not consider the unique interests of the private party that wishes to obtain the currently-federal lands in the exchange (like Resolution here) but, instead, must determine the

26

future "highest and best use" as if the lands were private and available for sale in the open market after the Exchange. *Shoshone-Bannock*, 2025 WL 2424422, *25.

During briefing in *Shoshone-Bannock*, both the federal government and Simplot agreed that the appraiser must consider the future "highest and best use," which should not be based on the circumstances of the party desiring to obtain the federal land or upon the current federal-land situation. The government asserted that the appraiser must consider "what multiple buyers would pay for the property based on its objective value, not the unique value that one buyer assigns to the land based on idiosyncratic incentives that no one else shares." Federal Appellees' Reply, 2024 WL 2806962, *18 (May 24, 2024).

Similarly, Simplot noted that the "governing regulations require an appraisal of market value in a competitive and open market, considering the land's highest and best use based on market evidence." Simplot's Reply, 2024 WL 2806963, *26 (May 24, 2024) (internal quotations omitted). The company further noted that the appraisal should not be based on the "unique, idiosyncratic value to one individual buyer." *Id.* * 27.

In *Shoshone-Bannock*, the issue was the nature of the future market for the lands to be exchanged-away by the government. Critically, under *either* interpretation of how the future open market should be viewed for the "highest and best use," both before the district court and Judge Bumatay, there was no debate

27

about which market and values must be ascertained—the **future**, post-Exchange lands valued on the open market.

But, here, the appraiser improperly focused on the idiosyncratic **present** interests of Resolution in these lands (MCZ appraisal at 7-8, ER 4-564-65), rather than the likely future uses of these lands and minerals by a prospective private purchaser in fee simple on the open market.

The appraiser's fundamental error in focusing on the current status of the federal lands rather than the future use as private lands pervades the appraisal for the Mining Claim Zone parcel, resulting in the wholly arbitrary and illogical determination that the most probable use of these lands following the Exchange is not for mining, and that the billions of pounds of copper are worthless.

      b)   *The appraisal for the Mining Claim Zone parcel arbitrarily determined that the parcel's "highest and best use" is not for mining, but rather for "surface land use."*

Determining the "highest and best use" is elemental to a proper appraisal, as it dictates the selection of comparable sales and the ultimate estimated value of the parcel. Both of the federal parcels that are subject to the Exchange overlie the mineral deposit, with an estimated five billion pounds within the Mining Withdrawal Area parcel, and an estimated 35 billion pounds within the Mining Claim Zone parcel. Resolution seeks to mine the entire deposit, which is why it has long sought to own these lands in fee simple. The appraiser properly determined that the highest

28

and best use of the Mineral Withdrawal Area is for "exploration and development of a mineral resource as a portion of the Resolution Copper deposit."  4-ER-577.

Yet for the Mining Claim Zone parcel, the appraiser arbitrarily determined that the future "highest and best use" of, and market for, this parcel is **not** to develop the mineral deposit, but rather for "surface land use in support of a mining operation." 4-ER-566.  "Surface land use" in support of mining means that Resolution would use these lands not for mining, but rather for such things as its tailings waste facility. But those types of surface uses have never been proposed on these lands, as their intended use has always been to mine the mineral deposit.

No one, neither Resolution nor a future mining company on the open market, would credibly value these lands for mere "surface use," when the market value lies in the underlying copper.  The agency cannot "offer[] an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

The significance of the distinction that the appraiser made between the Mineral Withdrawal Area and Mining Claim Zone is demonstrated in the consideration of comparable sales.  In the Mineral Withdrawal Area appraisal, because the appraiser properly determined that mining is the highest and best use, he considered numerous copper projects from around the world, and compared them using criteria such as mineral deposit setting, type, and content, and mining methods.

29

4-ER-581.  "Since the MWA copper deposit consisted of approximately 94% copper, comparable sales with similar metal content were selected." *Id.*, 4-ER-582.

In stark contrast, in considering comparable sales for the Mining Claim Zone parcel, the appraiser considered general rural lands that could be used for "tailings management, treatment, and storage." 4-ER-568.  The mineral rights of these lands were "not considered important or necessary." *Id.*, 4-ER-567.  The end result was that the 766-acre Mineral Withdrawal Area, which includes a small portion of the mineral deposit, was valued at $22 million; while the 1,655-acre Mining Claim Zone, which includes the vast majority of the mineral deposit, was valued at less than $2 million (a paltry $1,200/acre). 4-ER-569.

This Circuit has invalidated land exchanges that low-ball, as here, the appraised value by ignoring the likely future market use.  That was the case in *Desert Citizens*, where the appraisal had concluded that the highest and best use of the federal lands was "either open space or wildlife habitat, or mine support," even though the lands "were expected to be used for landfill purposes" based on the likely open market. *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1180–84 (9th Cir. 2000); s*ee also Nat'l Parks & Cons. Ass'n v. BLM*, 606 F.3d 1058, 1069 (9th Cir. 2010) (agency failed to properly consider the future market demand for the exchanged land's "highest and best use").  Similarly, here, the appraiser ignored that the market for the Mining Claim Zone parcel, post-Exchange, is for its copper, and

not general surface use (which could not be used anyway, as it would be swallowed by the 2-mile-wide mine crater).

    c)    *The appraisal for the Mining Claim Zone parcel failed to include its mineral values, as the federal rules and standards require.*

The Mining Claim Zone parcel's market value is based on the competitive and open market post-Exchange, and thus the property valuation was required to include the value of the estimated mineral deposit. Forest Service appraisal regulations require that in estimating market value, all values of the exchanged lands must be factored in, including minerals. 36 C.F.R. §254.9(b). Market value "means the most probable price in cash, or terms equivalent to cash, which lands or interest in lands should bring in a competitive and open market under all conditions requisite to a fair sale." 36 C.F.R. §254.2.

The appraiser must "consider the contributory value of any interest in land such as water rights, **minerals**, or timber, to the extent they are consistent with the highest and best use of the property." 36 C.F.R. §254.9(b)(1)(iv) (emph. added). The current status of the federal lands (whether covered by mining claims or not) is not determinative, because the appraiser must calculate the value of the lands and interests "as if in private ownership and available for sale in the open market." 36 C.F.R. §254.9(b)(1)(ii). All interests and values must be ascertained. *Restore the North Woods v. U.S. Dept. of Agric.*, 968 F. Supp. 168, 174, n. 4 (D. Vt. 1997) ("appraisal must include 'historic, wildlife, recreation, wilderness, scenic, cultural, or

31

other resource values or amenities as reflected in prices paid for similar properties in the competitive market.' 36 C.F.R. §254.9(b)(1)(iii).").

Indeed, §3003 of the NDAA links the future payments in subsection (e) to the mineral values in the initial appraisals: "The appraisal prepared under this paragraph … shall be the basis for calculation of any payment under subsection (e)." 16 U.S.C. §539p(c)(4)(C). This mandate also helps implement subsection (e), which requires that if the mine produces more mineral value than originally calculated in the appraisals "prepared under subsection (c)(4)(C), Resolution Copper shall pay to the United States … a value adjustment payment for the quantity of excess production at the same rate assumed for the income capitalization approach analysis prepared under subsection (c)(4)(C)." *Id.* at §539p(e)(2).

In other words, for the public to be adequately compensated for future mineral production (if it ever occurs), the mineral values must be appraised/calculated in the first place, in order to gauge whether there was a difference in values after the mine began operations. But under the district court's (and government/Resolution's) view, the mineral values in the Mining Claim Zone parcel need not be appraised at all—rendering congressional mandates in subsection (e) meaningless.

In fact, in the congressional debate over what became §3003, the Forest Service testified that the appraisals of both the Mineral Withdrawal Area and the Mining Claim Zone parcels, collectively defined as the "Federal Land," 16 U.S.C. §539p(B)(2), must include the value of the minerals.

32

> The Bill calls for an equal value exchange in section 4(e). If the value of Federal land (including the ore body) to be conveyed exceeds the value of the parcels to be acquired, the Bill would allow for a cash equalization payment by Resolution….

4-ER-664 (Statement of Assoc. Chief U.S. Forest Serv. Wagner).

The agency stated that the "appraisal would be done by somebody who has expertise in appraising properties that have mineral value." 4-ER-676. This was because, as detailed above, the mineral values of the federal parcels to be exchanged-away must be calculated so that they can be matched with future production. 16 U.S.C. §539p(c)(5)(B)(i) ("If the final appraised value of the Federal lands exceeds the value of the non-federal land, Resolution Copper shall – (I) convey additional non-Federal land in the State to the Secretary"). The agency further highlighted the importance of valuing the minerals.

> [S]hould the estimate of mineral value or quantity differ from what was assumed in the appraisal process, if the company actually produced more than what was estimated, there is a provision in this bill for an income capitalization approach to the taxpayers receiving [additional lands].

4-ER-676. The agency acknowledged it would take time to prepare the appraisals "[g]iven the requirement of mineral reports" to value the minerals. 4-ER-666.

Thus, it is incongruous for the agency to change horses and now say that the appraisal for the Mining Claim Zone parcel did not have to include "the estimate of mineral value," or prepare a report on the mineral values of the federal parcels, when that was exactly what the agency told Congress it would do.

33

The Congressional Budget Office, tasked with analyzing the financial aspects of the Exchange, agreed. "Those appraisals would determine the relative values of the properties affected by the exchange, **including the value of mineral deposits that underlie the federal land**." 4-ER-720-21 (emph. added). The House Report on the bill that would become §3003, further stressed the need for the appraisals of the two federal parcels to calculate the mineral values.

> The bill's effect on offsetting receipts would depend on the outcome of formal appraisals of the federal and private properties that would be conducted after enactment. Those appraisals would determine the relative values of the properties affected by the exchange, **including the value of mineral deposits that underlie the federal land**.

H.R. Rep No. 113-167 (2013), at 22 (emph. added), 4-ER-743.

The district court brushed-aside these numerous statements from high-ranking agency officials and Congressional findings, that the minerals on both federal parcels must be accounted for. 1-ER-30-35. Yet the court presented no evidence, nor could it, that Congress intended that the mineral value for the vast majority of the deposit should be completely ignored. Indeed, the opposite is true, for as detailed above, §3003 specifically required compliance with the federal standards and 36 C.F.R. §254.9, which on their face require valuation of all interests, including minerals, in the calculation of the future, private-lands "highest and best use."

Although legislative findings and testimony do not establish controlling law, they are highly relevant when the eventual agency action directly contradicts what it told Congress. Written statements the agency presented to the congressional

34

committee interpreting and implementing the statute are "highly relevant and material evidence of the probable general understanding of the times and of the opinions of men who probably were active in the drafting of the statute. As such they are entitled to serious consideration." *Shapiro v. U.S.*, 335 U.S. 1, 12, n. 13 (1948).

      d)     *Resolution's current mining claims do not eliminate the need to value the minerals.*

Although the appraisal standards and regulations require the calculation of all values (including minerals) based on the future market of the privatized land, in preparing the appraisal for the Mining Claim Zone parcel, the appraiser believed that Resolution's current mining claims on these federal lands eliminated any consideration of these mineral values. 1-ER-26-32.

But the focus on the company's current mining claims, and any rights that might attach to them if the lands remained federal, is a red herring. As detailed above, Resolution's **current** mining claims do not render the federal minerals valueless for the purposes of evaluating what the property would bring on the **future** open market, after the lands are privatized.

Thus, again, the entire premise of the Mining Claim Zone appraisal is based on a fundamental legal error—that the "highest and best use" valuation is based on the current, federal lands situation—when under the standards and regulations it must instead be based on the future, private lands situation on the open market.

35

Even if Resolution's current mining claims were relevant, the district court's belief that Resolution's current claims override any consideration of mineral values is based on an erroneous view of federal mining and public land law. Under the 1872 Mining Law (30 U.S.C. §§21-54), Resolution's claims allow it the ability to propose mining, subject to government regulation. That is undisputed. But the district court went further, assuming that Resolution has discovered a "valuable mineral deposit" of copper on its claims, which if proven, creates rights to develop the deposit. 1-ER-30. But no evidence is provided to support that assertion of "rights" under the Mining Law, based simply on the filing of claims and Resolution's assertions of value.

Significantly, the appraiser went even further, erroneously believing that the government did not own its own mineral estate for the Mining Claim Zone parcel as it "was not part of the estate owned by the United States." 4-ER-560. But that assumption contradicts longstanding Supreme Court precedent. While owners of unpatented mining claims hold possessory interests in their claims, these interests are a "unique form of property." *U.S. v. Locke*, 471 U.S. 84, 104 (1985). "The United States, *as owner of the underlying fee title to the public domain*, maintains broad powers over the terms and conditions upon which the public lands can be used, leased, and acquired." *Id* (emphasis added).

Ignoring the appraiser's flatly wrong determination that Resolution owns the mineral estate of the entire Mining Claim Zone parcel, the district court instead relied

36

on the appraiser's "premise that the copper deposits underlying the MCZ parcel are valuable enough to validate Resolution Copper's mining claims." 1-ER-30, n. 8. The court also surmised that §3003 "can be reasonably interpreted as reflecting a congressional determination that Resolution Copper's mining claims are valid and that the contemplated mine will be financially viable." *Id.*

But the court cannot manufacture evidence that does not exist. Outside of the company's self-serving estimates of mineral reserves, there is no evidence that each claim within the Mining Claim Zone parcel meets the claim validity test.

Verified evidence that each claim satisfies the strict economic test for validity—not mere filing of mining claims—provides the right to mine the minerals. To prove "discovery of a valuable mineral deposit," the claimant must show that the mineral can be "extracted, removed and marketed at a profit." *U.S. v. Coleman*, 390 U.S. 599, 600 (1968). "[L]ocation [of claims] is the act or series of acts whereby the boundaries of the claim are marked, etc., but it confers no right in the absence of discovery, both being essential to a valid claim." *Cole v. Ralph*, 252 U.S. 286, 296 (1920). "In the absence of a discovery of a valuable mineral deposit, Section 22 [the central provision of the Mining Law] gives a miner no right to occupy the claim beyond the temporary occupancy necessary for exploration." *Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 33 F.4th 1202, 1209 (9th Cir. 2022) (citations omitted) ("*Rosemont*" mine decision).

37

Thus, the amount of the minerals—even the large quantities Resolution asserts—is only one part of the validity/profitability equation. Here, there has never been any analysis of the costs—or whether the company could make the required substantial profit required for any "rights to mine" to accrue.

Importantly, Resolution could have chosen to move forward with its mine plan on the still-federal Mining Claim Zone parcel, and upon proving that its mining claims were valid, as it must under *Rosemont*, rely on its rights under the Mining Law. As the FEIS stated:

> the land exchange remains a discretionary decision on the part of Resolution Copper, which may or may not choose to undertake the exchange after receipt of the appraised value. It is possible that mining under the proposed action or action alternatives could also take place without the land exchange occurring.

2-ER-218.

Yet the company chose not to do that. Instead, it opted for the land exchange route, which eliminates federal ownership and authority. This choice was advantageous to Resolution, as it eliminates federal public land and environmental laws—which place significant controls on mining proposals. *See Bohmker v. Oregon*, 903 F.3d 1029, 1037-38 (9th Cir. 2018) (summarizing federal public land and environmental laws governing mining).

**But Resolution cannot have it both ways**—relying on its current federal lands mining claims to assert a "right to mine," yet also take advantage of its future ownership of the parcels as private fee simple, free from federal authority. Under the mandated federal appraisal standards and regulations, the Mining Claim Zone parcel

38

is no longer treated as being on federal land (and subject to the mining claims), but rather as a private parcel, whose future "highest and best use" is what is appraised—not the current pre-Exchange situation. Contrary to the district court, it is not "absurd" that the minerals on this future private land must be valued, 1-ER-29, for that is what the open market would require.

Thus, even if Resolution could show that all of its mining claims are valid, that does not mean that the Mining Claim Zone appraisal can simply ignore the mineral values, for those claims would not exist after the parcel is privatized.

### 2. Plaintiffs Have Standing to Challenge the Illegal Appraisals.

The Government and Resolution asserted below that AMRC's members, who regularly use the lands to be privatized, have no standing to challenge the erroneous Mining Claim Zone appraisal. Judge Lanza rejected these arguments, 1-ER-16-20, following on-point Ninth Circuit precedent:

> If, by exchange, public lands are lost to those who use and enjoy the land, they are certainly entitled under the APA to file suit to assure that no exchange takes place unless the governing federal statutes and regulations are followed, including the requirement that the land exchange is properly valued by the agency.

*Desert Citizens*, 231 F.3d at 1177. This applies even when Congress has ordered the exchange, the case here. *See W. Land Exch. Project v. U.S. BLM*, 315 F. Supp. 2d 1068, 1099 (D. Nev. 2004).

In *Desert Citizens*, the plaintiffs had standing to argue that the agency relied on an appraisal that undervalued the federal lands and failed the "highest and best use"

39

and "equal value" requirements. 231 F.3d at 1174. As here, the plaintiffs alleged that their members used the federal lands subject to the exchange, and that the exchange would prevent them from using and enjoying these lands. *Id*. at 1176. The challenge to the statute's "equal-value requirement is not merely a generalized allegation of federal revenue loss at taxpayers' expense. Rather, it is an effort by land users to ensure appropriate federal guardianship of the public lands which they frequent." *Id*. at 1177 (relying on *Nat'l Forest Preservation Group v. Butz*, 485 F.2d 408, 410 (9th Cir. 1973), which affirmed standing for recreational users' challenge to the mis-application of the "equal-value requirements" of the exchange statute).

Thus, challenging the "equal value" and appraisal requirements "is not merely a generalized allegation of federal revenue loss at taxpayers' expense." *Desert Citizens* at 1177. Rather, AMRC/ITAA members include tribal, recreational, and other users of these specific public lands that would be lost, and they are entitled to enforce the NDAA's "equal value" and appraisal requirements. *Id*. It is hard to see a greater benefit to AMRC/ITAA members than the prevention of the Exchange and continuation of public access.

As in *Desert Citizens*, this Court's setting aside an illegal exchange that injures AMRC's members establishes redressability. *Id*. at 1178. As Judge Lanza noted, "if the Forest Service were to conclude following the reappraisal that the MCZ parcel is actually worth billions of dollars (as AMRC contends it should be valued), these developments might very well derail the land exchange." 1-ER-18. The proper

40

valuation of the Mining Claim Zone parcel at least would have significantly increased the amount of public land that Resolution would have been required to provide as part of the Exchange, for even if Resolution chose to make an additional cash payment, the NDAA mandates that these funds would be used to acquire additional national forest lands within the region. 16 U.S.C. §539p(c)(5)(B).

Similarly, the Government and Resolution below argued the court cannot adjudge the legality of the appraisals because AMRC/ITAA are not within §3003's "zone of interests." But this test "is not meant to be especially demanding," as the APA meant "to make agency action presumptively reviewable." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). *See, e.g., Clarke v. Sec. Indus. Assoc.*, 479 U.S. 388, 399–400 (1987) ("there need be no indication of congressional purpose to benefit the would-be plaintiff."). The Court takes a "lenient approach" and "often conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff…" *Lexmark Int'l v. Static Control Components*, 572 U.S. 118, 130 (2014) (quotation omitted).

This Circuit supports a broad reading of standing for those with interests that may be affected by the agency's public lands decision. In *Nat'l Wildlife Fed. v. Burford*, conservation group plaintiffs were within zone of interests of the Coal Leasing Act to challenge agency's leases made at fair market value, even though the fair-market-value determination was purely economic. 871 F.2d 849, 852–55 (9th Cir. 1989). *See also Bennett v. Spear*, 520 U.S. 154, 176–177 (1997) (economic

41

interests within zone of interests of the Endangered Species Act, even though the ESA is meant to preserve species); *Pit River Tribe v. BLM*, 793 F.3d 1147, 1155–1158 (9th Cir. 2015) (same, for public land users affected by leases under the Geothermal Steam Act).

Here, the ITAA readily falls within the zone of interests of §3003, as it explicitly includes provisions to protect the interests of affected Tribes and their members. 16 U.S.C. §539p(c)(3), (c)(9)(C). AMRC and the other Plaintiffs also fall within the zone, as they are conservation and recreational groups whose missions include protecting the federal public lands to be exchanged, and whose members regularly use and enjoy these lands.

As the Forest Service testified before Congress, the equal-value and other appraisal requirements were included in §3003 to protect the public's interest in a fair exchange: "My understanding is that it is the vehicle to protect the interests of the public if the appraisal estimate of material removed from the mine didn't match up with the actual production of the mine." Wagner testimony, 4-ER-676; 539p(c)(5)(B) (requiring agency to acquire more land in same region to equalize value as needed).

**B.    The FEIS Violates NEPA and the NDAA.**

Congress conditioned the Exchange on the Forest Service's compliance with NEPA for both the review and approval of the Exchange, as well as for the Mine. "Except as otherwise provided in this section, the Secretary shall carry out the land exchange in accordance with the requirements of the National Environmental Policy

42

Act of 1969 (42 U.S.C. 4321 *et seq*.).” 16 U.S.C. §539p(c)(9); *see also Apache Stronghold*, 101 F. 4th at 1131.  “[I]nherent in NEPA … is a ‘rule of reason.’” *Seven County Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497, 1513 (2025) (citations omitted).  The FEIS fails this “reasonableness” test on numerous grounds.

    1.    <u>This Court Has Authority to Judge the FEIS’ Sufficiency.</u>

        a)    *The FEIS is a “Final Agency Action.”*

The Government argued below that the FEIS is completely unreviewable, as it is not a “final agency action” under the APA.  Under the unique structure of §3003, however, the FEIS is an APA-governed final agency action, as it is the key, and last, triggering event under the statute for the Exchange. 16 U.S.C. §539p(c)(9)(B).

Two conditions must be satisfied for agency action to be “final” under the APA. *Bennett v. Spear*, 520 U.S. 154 (1997).  “First, the action must mark the consummation of the agency’s decisionmaking process,” and “it must not be of a merely tentative or interlocutory nature.” *Id*. at 177-78.  “[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.” *Id*. at 178.  “The finality requirement must be interpreted in a pragmatic and flexible manner,” with a “focus on the practical and legal effects of the agency action.” *Ritidian v. U.S. Dep’t of the Air Force*, 128 F.4th 1089, 1108 (9th Cir. 2025).

The FEIS here is final as it concluded the agency’s responsibilities under NEPA.  Like the “Environmental Assessment” at issue in *Envtl. Def. Ctr. v. Bureau*

43

*of Ocean Energy Mgmt.*, 36 F.4th 850, 868 (9th Cir. 2022), "[t]here is nothing preliminary or tentative" about the FEIS. *Id.* at 868.  Under §3003, the FEIS is the agency's final word before the Exchange is executed and title conveyed.  The FEIS meets *Bennett*'s second part of the test as well, as the FEIS "alter[ed] the legal regime to which the action agency is subject." *Bennett*, 520 U.S. at 178.

> b)   *A valid FEIS would redress plaintiffs' injuries.*

Similarly, a court order requiring a legally-compliant FEIS would redress AMRC's injuries.  When "as here, a plaintiff asserts a procedural injury under NEPA … the Ninth Circuit applies a 'relaxed' redressability requirement" for standing. *WildEarth Guardians v. USDA*, 795 F.3d 1148, 1154 (9th Cir. 2015).  AMRC has standing as long as "the relief requested—that the agency follow the correct procedures—may influence the agency's ultimate decision of whether to take or refrain from taking a certain action." *Nat'l Fam. Farm Coal. v. U.S. EPA*, 966 F.3d 893, 910 (9th Cir. 2010).  As Judge Lanza noted, "if the land exchange were enjoined 'temporarily' and 'in the short term,' that would redress at least some of Plaintiffs' injuries." 1-ER-37, quoting *W. Watersheds Project v. Grimm*, 921 F.3d 1141, 1148 (9th Cir. 2019).

Moreover, the FEIS identifies the Exchange pre-conditions subject to NEPA review, and acknowledges the agency's discretion, as it has "discretion to (1) address concerns of affected Indian Tribes; (2) ensure that title to the non-Federal lands offered in the exchange is acceptable; (3) accept additional non-Federal land or a

44

cash payment from Resolution Copper to the United States in the event that the final appraised value of the Federal land exceeds the value of the non-Federal land; or (4) address other matters related to the land exchange that are consistent with Section 3003 of PL 113-291." 2-ER-194. *See also* 16 U.S.C. §539(c)(5)(B) (authorizing the government to obtain "additional non-Federal land" based on "the requirements of this section" (i.e., the FEIS and appraisals)).

Indeed, the Forest Service testified to Congress that the FEIS was needed to inform its discretionary decision-making on the Exchange. One of the agency's primary objections to the earlier congressional bill proposing §3003 was that it allowed the FEIS to be done **after** the Exchange. "The Bill should be amended to require the preparation of an environmental analysis *before* the land exchange is completed." 4-ER-665 (Statement of Assoc. Chief U.S. Forest Serv. Wagner). The agency specifically linked the FEIS with the discretionary considerations it must perform **before** approving the Exchange:

> The purpose of preparing an environmental analysis before consummating the land exchange would be to analyze the effects of the transfer of the Federal land to Resolution Copper …. The agency would use the environmental analysis to make a decision on whether and how to proceed with the exchange and what mitigation conditions would be required to mitigate the identified impacts.

4-ER-665-666. As a result, Congress amended the bill to require that the FEIS be completed before the Exchange. The agency cannot now disavow its congressional testimony in support of its post hoc and new-found "no discretion" argument.

45

The Government's "no discretion" argument also disregards the Forest Service's prior actions in this case that recognized its discretion over the FEIS and the Exchange. Following AMRC's initial motion for preliminary injunction in 2021, the agency rescinded the FEIS to "ensure impacts have been fully analyzed," thereby stopping the Exchange. 6-ER-1057.

The "no discretion" argument also contradicts directly-relevant caselaw. For congressionally-mandated land exchanges, federal courts have found discretion based on the prerequisites imposed on the exchange—such as the various provisions in §3003. *See W. Land Exch. Project*, 315 F. Supp. 2d 1068 (although that statute limited BLM's authority to withhold the land from disposal, it did not exempt BLM from complying with NEPA). "BLM has no more discretion to ignore the requirements of NEPA than it does to withhold the land from disposal." *Id.* at 1082; *see also Restore the N. Woods*, 968 F. Supp. at 173 (because the exchange was subject to conditions, the agency's "actions are not purely ministerial, nor will compliance with NEPA be an empty formality."). Here, the Exchange likewise "is subject to certain conditions," including NEPA compliance. *Apache Stronghold*, 101 F.4th at 1046.

### 2. The FEIS Violates NEPA.

#### a) *The FEIS failed to properly analyze the project's impacts on water.*

"[T]he contemplated mining activity will require tremendous quantities of water, which is of particular concern in drought-stricken Arizona." 1-ER-9.

46

The Mine will develop and consume water in various ways, including from a process called "mine dewatering," where an underlying aquifer is drained to keep mine shafts and tunnels dry, and from a series of at least 30 groundwater wells, known as the Desert Wellfield, that will pump groundwater from beneath the East Salt River Valley just outside metro Phoenix.

The Desert Wellfield will pump at least 544,858 acre-feet of water over the life of the Mine. 2-ER-232. An acre-foot of water is 325,851 gallons, or roughly enough water to serve up to four residences for a single year.

> "The [Desert] [W]ellfield pumping would incrementally contribute to the lowering of groundwater levels and cumulatively reduce overall groundwater availability in the area. This water use may result in alarming long-term consequences. Ultimately, long-term use of groundwater may become unsustainable . . . .".

1-ER-9. Significantly, the Desert Wellfield pumping sits at the heart of the massive 275-square mile Superstition Vistas development, a "master planned community" located just east of the Phoenix metropolitan area. This can be seen in the illustration below, with the Superstition development shown in green.

47



*Map From The Treasure of the Superstitions – Scenarios for the Future of Superstition Vistas, Morrison Institute 2006*

However, the Forest Service refused to analyze the Mine's cumulative pumping impacts on the aquifer or existing wells alongside the groundwater impacts of the 275-square mile "Superstition Vistas" mega development that is being constructed on Arizona State Trust Lands in the same proximity as the Desert Wellfield, and which will rely on the same limited groundwater resources as the Mine. 2-ER-225. Instead, the agency unreasonably limited its substantive analysis to only a **small portion** of the development (the DH Horton subdivision, 2-ER-229-230), which had met the technical requirements for an assured water supply under

48

Arizona law.  All other water demands calculated for Superstition Vistas were screened out by the agency as "speculative." 2-ER-230 ("[T]he portion of Superstition Vistas that has a demonstrated source of water has been quantified and included in the regional cumulative effects groundwater model.  Other portions of Superstition Vistas without demonstrated water supplies are speculative and not explicitly modeled.").

But under NEPA, the Forest Service was required to analyze in the FEIS the "(i) the reasonably foreseeable environmental effects of the proposed agency action [and] (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. §4332(2)(C).  This includes considering the impacts of other activities in the area that will cumulatively add to the impacts from the Exchange and Mine. *See Te–Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010); *Great Basin Resource Watch v. BLM*, 844 F.3d 1095, 1104 (9th Cir. 2016).

Judge Lanza held that the agency could brush-off its obligation to analyze or model the extensive water demands for the Superstition Vistas development, concluding that it was sufficient under NEPA for the FEIS to merely discuss the growth in the Superstition Vistas development in a "conceptual" manner. 1-ER-51. According to the district court, the agency should be given deference as to its "analysis regarding water-use issues" including, in the court's view, "water modeling related to the anticipated water use associated with Desert Wellfield and Superstition

49

Vistas." *Id.* But the court afforded the agency unwarranted deference, 1-ER-51-52

(citing *Seven County Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497,

1512-13 (2025)), in violation of NEPA.

While the Forest Service "conceptually" considered water use issues in the

FEIS related to the proposed Superstition Vista's mega development, *see, e.g.,* 2-ER-

225-230, it **did not** make any effort to analyze or model the known water demands

associated with Superstition Vistas, even though it admitted the development would

likely have a population of 900,000 people. 2-ER-227. To the agency, a "lack of

detailed water use plans prevents specific analysis of most of the Superstition Vista's

development..." 2-ER-225. It therefore rejected these water demands in its initial

screening as "speculative" and "not reasonably foreseeable." *Id.* But this is

incorrect.

Although deference to an agency may be appropriate when an agency makes

various "scientific judgments," *Seven County*, 145 S. Ct. at 1512, deference is not

appropriate when the agency avoids the plain facts before it. Here, the Forest

Service wasn't making a "scientific judgement" when it refused to consider the

foreseeable impacts to regional groundwater resources from both the Desert

Wellfield and the Superstition Vista's development. Rather, the agency simply

chose to ignore existing and readily available technical information about the

development's full water demands that it had in hand.

50

As a factual matter, Superstition Vistas is in no way "conceptual" since plans for the development have long been known, (3-ER-412-550, 6-ER-1025-56) and homes have already been built and sold in portions of the development.[1]  Moreover, as noted above, the technical water demands for the Superstition Vistas development have already been calculated in great detail. 3-ER-412-550.  For example, Superstition's residential development is planned to use 185 gallons per capita [person] per day, for roughly 27,370 single-family residential units, and water demands are also calculated for the 2,394 acres of non-residential uses (*e.g.*, commercial, other). 3-ER-451.

The agency therefore could have easily used these calculations—which are quantitative and specific—to ascertain and model the water demands of the full Superstition Vistas development in the FEIS.  Instead, the agency chose to simply ignore these water demands, even though enough information was readily available to permit meaningful consideration.  The agency undoubtedly knew that the total water demands of both the mine and the full Superstition development would show alarming consequences for this already stressed aquifer, but it nevertheless made a calculated decision to ignore these cumulative effects, in violation of NEPA. *See Oregon Natural Resources Council v. Lowe*, 109 F.3d 521, 526-27 (9th Cir. 1997) (an EIS may not sweep stubborn problems or serious criticism under the rug).

---

[1]  https://www.apachejunctionaz.gov/1044/Superstition-Vistas (last visited Sept. 5, 2025).

51

This Circuit has rejected EISs for mining projects that relied on a "qualified" review of cumulative impacts and failed to provide a "quantified assessment of their [other projects] combined environmental impacts," and "objective quantification of the impacts" from other existing and proposed operations in the region—as it did here. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 972 (9th Cir. 2006); *see also Great Basin Resource Watch*, 844 F.3d at 1105 (FEIS failed to "quantify or discuss in any detail the effects of other activities").

The impacts from the Desert Wellfield pumping needed for Resolution's mine are directly connected to and cumulative of the groundwater pumping needed for the Superstition Vistas development. *Seven County* did not eliminate the agency's duty to analyze "any reasonably foreseeable adverse environmental effect which cannot be avoided should the proposal be implemented." 42 U.S.C. §4332(2)(C)(ii).

        b)    *The FEIS failed to meaningfully consider comments from other agencies on water and socioeconomic impacts.*

Judge Lanza also erroneously rejected AMRC's contention that the Forest Service failed to consider the full scope of criticisms raised by the Bureau of Land Management ("BLM") and the Arizona State Land Department ("ASLD") about the FEIS, 1-ER-52-55, both of which are formal "cooperating agencies" in the preparation of the FEIS. 2-ER-190.

After the Forest Service rescinded the 2021 FEIS, it asked the BLM to analyze the Mine's water-related issues. In response, BLM provided a 26-page "targeted technical review" of the FEIS (BLM Review of Hydrology Aspects of the Resolution

52

Copper Project) ("BLM Report"), 2-ER-157-182. These extensive comments were prepared by a "team of [BLM] hydrology specialists" who reviewed a wide range of topics related to "the hydrology and water resources aspects of the project and assessed whether the FEIS adequately addressed comments received during the FEIS development." 2-ER-157.

BLM concluded it did not. BLM's detailed hydrology analysis of the 2021 FEIS go to the heart of AMRC's NEPA claims and support the water related concerns that AMRC and the public raised throughout the NEPA process. Indeed, BLM detailed "serious concern(s)" with the water aspects of the FEIS that it "believed may be deficient, underdeveloped, or improperly analyzed," 2-ER-157, observing that significant topics areas in the FEIS "did not meet the analysis standards of NEPA or suffered for insufficient evaluation or unsupported conclusions." 2-ER-157-58.

For example, BLM found that "the FEIS treats other water uses [like Superstition Vistas] as 'speculative', even though there is a high probability that some of these actions will either affect the amount of water available to [Resolution], or the amount of withdrawn by [Resolution] will affect other planned developments," concluding "[t]here are many assumptions in the FEIS regarding water availability to [Resolution], but few assumptions on the availability of water due to the extended drought or other planned projects." 2-ER-171. The district court nevertheless deferred to the Forest Service regarding its complete lack of

53

acknowledgment of the BLM Report in the FEIS and its failure to meaningfully address the specific and technical water analyses contained in the Report. 1-ER-54. But the agency violated NEPA when it "failed to consider an important aspect of the problem" and "offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs.*, 463 U.S. at 43.

The Forest Service also ignored the critical and specific concerns raised by the ASLD. The ASLD was created to administer lands that were reserved by the United States upon Arizona's statehood and today are held in trust for the benefit of Arizona's schools and public institutions. The ASLD functions as the trustee of the State Land Trust ("Trust") and it has a fiduciary responsibility to responsibly manage the assets of the Trust to maximize financial revenues for its beneficiaries.

ASLD filed extensive comments with the Forest Service enumerating multiple adverse economic impacts to its State Trust lands (and the assets of the Trust) due to the Mine. While the FEIS generally discussed certain of the water-related concerns raised by the ASLD, the ASLD's actual and specific concerns related to the Mine's direct, indirect, and cumulative socioeconomic impacts on the Trust were ignored.

In particular, ASLD notified the Forest Service about the impacts from Resolution's Desert Wellfield pumping and its dewatering effects on State Trust Land at Superstition Vistas and correspondingly, on the financial resources of the Trust itself: "[T]he extraction and transportation of groundwater out of the SVPA [Superstition Vistas Planning Area] greatly compromises the ability to develop these

54

lands to their full planned potential, and as a result, reduces the income and value of the Trust." 2-ER-236.

ASLD also warned that these water impacts would limit the amount of total developable lands at Superstition Vistas: "the loss of 3,440 acres of developable State Trust land represents a minimum potential loss to the Trust of at least $536,640,000 in revenue." 2-ER-235. Yet, none of these socioeconomic impacts were analyzed in any detail in the FEIS, because the agency erroneously determined that Superstition Vistas was "speculative."

The FEIS' failure to consider the socioeconomic concerns about the Mine's impact on the State Trust Lands and the Trust itself violated NEPA. An EIS that relies on misleading economic information or fails to include all relevant costs in its economic analysis cannot fulfill NEPA's purpose of providing decisionmakers and the public a valid foundation on which to judge proposed projects. *See NRDC v. U.S. Forest Serv.*, 421 F.3d 797, 811 (9th Cir. 2005) (inaccurate economic information may defeat the purpose of an EIS by "impairing the agency's consideration of the adverse environmental effects" and by "skewing the public's evaluation" of the proposed agency action).

          c)    *The agency failed to consider, and require, sufficient mitigation measures.*

The FEIS also failed to fully analyze potential mitigation measures, especially regarding the groundwater pumping and transport of water via the proposed pipelines. Judge Lanza erroneously deferred to the agency's failure to disclose or

55

analyze important mitigation measures in the FEIS related to Mine. 1-ER-56. But an FEIS must fully analyze mitigation measures as part of the NEPA process. *See, e.g., Great Basin Resource Watch*, 844 F.3d at 1107.

Here, for example, the agency acknowledges that Desert Wellfield pumping will cause regional groundwater declines that will adversely impact individual wells throughout the region, meaning "infrastructure costs would increase as wells and pumps need to be lowered or replaced." 2-ER-229. Further, "there likely would be certain areas that experience lack of well capacity and groundwater shortages, particularly around the edges of the basin." *Id.* Yet, the FEIS failed to analyze or require **any** mitigation measures to compensate for these impacts, including wells that would need to be deepened or would go dry as a result of the pumping. The FEIS deferred this analysis to future state permitting. 2-ER-233, 2-ER-237. But under NEPA, the Forest Service cannot defer the analysis of impacts and mitigation measures to the future. *Great Basin Resource Watch*, 844 F.3d at 1103–04 (EIS could not rely on future state permitting as substitute for the environmental review requirements). This is especially true here, as a "single" EIS must analyze all impacts. 16 U.S.C. §539p(c)(9)(B). These failures in the FEIS are therefore not entitled to deference under *Seven County*, and the district court erred in concluding otherwise.

56

### III. **Balance of Hardships and Public Interest Tip Sharply in AMRC's Favor**.

The "balance of equities" and "public interest" factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Exchange will result in immediate, irreparable harm to AMRC, as Judge Lanza recognized. 1-ER-95-96. Regarding the other factors, throughout the litigation over the Exchange, three separate judges have now considered the balance of harms and public interest, with two finding that the balance tips sharply in the AMRC's/Tribe's favor, and Judge Lanza the first finding that the balance tips toward Defendants.

In addressing Apache Stronghold's similar emergency motion for an injunction pending appeal in 2021, Judge Bumatay considered these factors, finding that "[t]he balance of the equities and the public interest 'tip sharply' in Apache Stronghold's favor." *Apache Stronghold*, 2021 WL 12295173, *18 (Bumatay, J., dissenting) (citations omitted). Similarly, in addressing a subsequent motion for an injunction pending appeal in the district court, Judge Logan held that "[t]he obvious conclusion" was "that the balance of equities indeed 'tips sharply' in Plaintiff's favor." *Apache Stronghold*, 2025 WL 1360694, *8.

This is unsurprising, as courts generally conclude that immediate, irreparable harm, such as what AMRC will face, far outweighs the sort of temporary, economic harm an injunction pending appeal would cause to Resolution. *See e.g., League of Wilderness Defenders v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) ("the

57

balance of equities tips toward the . . . plaintiffs, because the harms they face are permanent, while the intervenors face temporary delay.").

As explained above, the privatization of the 2,422 acres of currently federal public land at Oak Flat will immediately and irreparably harm AMRC and their members. "There is no doubt that an array of equities and public-interest considerations favor Plaintiffs." 1-ER-97.

By contrast, the Government will suffer little hardship if a stay is issued. *Apache Stronghold*, 2021 WL 12295173, *19 (Bumatay, J., dissenting). While the Government will likely emphasize the nation's need for copper, this interest would "not be lost because of an injunction, but merely delayed." *Apache Stronghold*, 2025 WL 1360694, *8. Indeed, with or without the requested injunction, the Mine remains years away—if it occurs at all.

Resolution, for its part, will focus on alleged temporary economic harm, which is generally not considered irreparable. *Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015). As Judge Logan recognized, "while an injunction will likely prevent Resolution Copper from beginning its work for a limited time, as Plaintiff points out, it will ultimately "not stop Resolution from mining a single ounce of copper should the transfer ultimately be upheld." *Apache Stronghold*, 2025 WL 1360694, *8 (citations omitted).

Although Judge Lanza focused on the "national security" implications of fostering copper production, any mine at this site, if it occurs, is years away with or

58

without a temporary injunction. 1-ER-97. Moreover, Resolution has no stated plans or commitments to actually process or sell the copper in this country, and has simply stated that smelting/processing would occur "off-site." 2-ER-192 (FEIS at ES-7).

Indeed, according to the FEIS, the Exchange is not needed to produce the copper. "It is possible that mining under the proposed action or action alternatives could also take place without the land exchange occurring." 2-ER-218.

In finding that the balance does not tip sharply towards Plaintiffs, Judge Lanza weighed heavily that Congress directed this Exchange in 2014. 1-ER-97–98, citing *U.S. v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 487, 497 (2001). But Congress did not simply order the Exchange in the NDAA. In consideration of the public interest, Congress imposed significant conditions that must occur prior to the Exchange, including Tribal consultation, detailed appraisals subject to strict standards, fair-market value of the lands to be exchanged, preparation of an FEIS in compliance with NEPA, and extra consideration of the impacts on cultural and archaeological resources. 16 U.S.C. §539p(c). Thus, not only did Congress require these pre-requisites, which form the heart of AMRC's claims, it explicitly required them as part of its balancing of interests.

As Judge Logan noted in *Apache Stronghold*, the court should consider the potential "error costs on each side" in balancing the interests and public interest. *Apache Stronghold*, 2025 WL 1360694, *8. "In the most harmful scenario to Plaintiff, if this Court denies the injunction, . . . and Plaintiff ultimately wins on the

59

merits, Plaintiff will have already suffered some or all of its enumerated immediate harms, even despite winning the day in this litigation." *Id.* "Yet in the riskiest scenario for Defendants, . . . the only harm will have been a delay of the land transfer for a number of months or (at most) a couple years." *Id.*

Relatedly, if AMRC's motion is denied, but AMRC ultimately prevails, it will become difficult to later reverse the Exchange, as once the lands are transferred, and undergo modifications, "it might be[come] impracticable to attempt to unscramble the eggs." *Kettle Range Consv. Group v. BLM*, 150 F.3d 1083, 1087 (9th Cir. 1998).

## CONCLUSION

AMRC satisfies the *Winter* test for a preliminary injunction, and the Exchange should be enjoined pending a final decision on the merits.

Respectfully submitted September 8, 2025.

*/s/ Roger Flynn*
Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

*/s/ Marc D. Fink*
Marc D. Fink
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
mfink@biologicaldiversity.org

60

Allison N. Henderson
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs-Appellants*

*/s/ Susan Montgomery*
Susan B. Montgomery
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com

*Attorneys for Plaintiff-Appellant ITAA*

## STATEMENT OF RELATED CASES

The San Carlos Apache Tribe has filed a related case challenging the government's actions here, the FEIS and proposed Exchange, and has similarly filed an appeal of the district court's denial of the motion for preliminary injunction. No. 25-5189. A third appeal seeking to enjoin the Exchange, *Lopez, et al. v. United States*, is also pending. No. 25-5197.

Further, the case brought by Apache Stronghold, challenging the Exchange, has a petition for reconsideration pending before the United States Supreme Court. No. 21-15295.

Date: September 8, 2025          */s/ Marc D. Fink*

61

## CERTIFICATE OF SERVICE

I, Marc D. Fink, attest that I filed the foregoing and all exhibits with this Court's ECF system on this 8th day of September, 2025.

*/s/ Marc D. Fink*

## CERTIFICATE OF COMPLIANCE

I, Marc D. Fink, certify that: The foregoing complies with the word limitation of Ninth Circuit Rule 32 because it contains less than 14,000 words, and has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font. The pertinent statutory, regulatory, and other provisions are set forth in an addendum attached to this brief as Attachment A.

September 8, 2025        */s/ Marc D. Fink*

# ADDENDUM

Pertinent Statutes, Regulations, and Rules

## Table of Contents

**Relevant Sections of the Administrative Procedure Act.................................. A-3**

    5 U.S.C. § 702 ................................................................................... A-3

    5 U.S.C. § 703 ................................................................................... A-3

    5 U.S.C. § 704 ................................................................................... A-3

    5 U.S.C. § 705 ................................................................................... A-4

    5 U.S.C. § 706 ................................................................................... A-4

**Section 3003 of the National Defense Authorization Act for Fiscal Year 2015, 16 U.S.C. § 539p ....................................................................................... A-6**

**Relevant Sections of the 1872 Mining Law, 30 U.S.C. §§ 21–29................... A-22**

**Relevant Sections of the National Environmental Policy Act...................... A-34**

    42 U.S.C. § 4331 ............................................................................. A-34

    42 U.S.C. § 4332 ............................................................................. A-35

**Relevant Sections of the U.S. Forest Service Appraisal Regulations ........... A-39**

    36 C.F.R. § 254.2 ............................................................................ A-39

    36 C.F.R. § 254.9 ............................................................................ A-41

## Relevant Sections of the Administrative Procedure Act

### 5 U.S.C. § 702 - Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

### 5 U.S.C. § 703 - Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

### 5 U.S.C. § 704 - Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary,

A-3
Addendum

procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

**5 U.S.C. § 705 - Relief pending review**

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

**5 U.S.C. § 706 - Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be—

> **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

> **(B)** contrary to constitutional right, power, privilege, or immunity;

> **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

> **(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## Section 3003 of the National Defense Authorization Act for Fiscal Year 2015, 16 U.S.C. § 539p

**16 U.S.C. § 539p. Southeast Arizona land exchange and conservation**

**(a) Purpose.** The purpose of this section is to authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States.

**(b) Definitions.** In this section:

> **(1)** Apache Leap. The term "Apache Leap" means the approximately 807 acres of land depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Apache Leap" and dated March 2011.

> **(2)** Federal land. The term "Federal land" means the approximately 2,422 acres of land located in Pinal County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Federal Parcel-Oak Flat" and dated March 2011.

> **(3)** Indian tribe. The term "Indian tribe" has the meaning given the term in section 4 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450b).

> **(4)** Non-Federal land. The term "non-Federal land" means the parcels of land owned by Resolution Copper that are described in subsection (d)(1) and, if necessary to equalize the land exchange under subsection (c), subsection (c)(5)(B)(i)(I).

> **(5)** Oak Flat Campground. The term "Oak Flat Campground" means the approximately 50 acres of land comprising approximately 16 developed campsites depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Oak Flat Campground" and dated March 2011.

> **(6)** Oak Flat Withdrawal Area. The term "Oak Flat Withdrawal Area" means the approximately 760 acres of land depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Oak Flat Withdrawal Area" and dated March 2011.

**(7)** Resolution Copper. The term "Resolution Copper" means Resolution Copper Mining, LLC, a Delaware limited liability company, including any successor, assign, affiliate, member, or joint venturer of Resolution Copper Mining, LLC.

**(8)** Secretary. The term "Secretary" means the Secretary of Agriculture.

**(9)** State. The term "State" means the State of Arizona.

**(10)** Town. The term "Town" means the incorporated town of Superior, Arizona.

**(11)** Resolution mine plan of operations. The term "Resolution mine plan of operations" means the mine plan of operations submitted to the Secretary by Resolution Copper in November, 2013, including any amendments or supplements.

**(c) Land exchange.**

**(1)** In general. Subject to the provisions of this section, if Resolution Copper offers to convey to the United States all right, title, and interest of Resolution Copper in and to the non-Federal land, the Secretary is authorized and directed to convey to Resolution Copper, all right, title, and interest of the United States in and to the Federal land.

**(2)** Conditions on acceptance. Title to any non-Federal land conveyed by Resolution Copper to the United States under this section shall be in a form that—

**(A)** is acceptable to the Secretary, for land to be administered by the Forest Service and the Secretary of the Interior, for land to be administered by the Bureau of Land Management; and

**(B)** conforms to the title approval standards of the Attorney General of the United States applicable to land acquisitions by the Federal Government.

**(3)** Consultation with Indian tribes.

**(A)** In general. The Secretary shall engage in government-to-government consultation with affected Indian tribes concerning issues of concern to the affected Indian tribes related to the land exchange.

**(B)** Implementation. Following the consultations under paragraph (A), the Secretary shall consult with Resolution Copper and seek to find mutually acceptable measures to—

**(i)** address the concerns of the affected Indian tribes; and

**(ii)** minimize the adverse effects on the affected Indian tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper under this section.

**(4)** Appraisals.

**(A)** In general. As soon as practicable after the date of enactment of this Act [enacted Dec. 19, 2014], the Secretary and Resolution Copper shall select an appraiser to conduct appraisals of the Federal land and non-Federal land in compliance with the requirements of section 254.9 of title 36, Code of Federal Regulations.

**(B)** Requirements.

**(i)** In general. Except as provided in clause (ii), an appraisal prepared under this paragraph shall be conducted in accordance with nationally recognized appraisal standards, including—

**(I)** the Uniform Appraisal Standards for Federal Land Acquisitions; and

**(II)** the Uniform Standards of Professional Appraisal Practice.

**(ii)** Final appraised value. After the final appraised values of the Federal land and non-Federal land are determined and approved by the Secretary, the Secretary shall not be required to reappraise or update the final appraised value—

**(I)** for a period of 3 years beginning on the date of the approval by the Secretary of the final appraised value; or

(II) at all, in accordance with section 254.14 of title 36, Code of Federal Regulations (or a successor regulation), after an exchange agreement is entered into by Resolution Copper and the Secretary.

(iii) Improvements. Any improvements made by Resolution Copper prior to entering into an exchange agreement shall not be included in the appraised value of the Federal land.

(iv) Public review. Before consummating the land exchange under this section, the Secretary shall make the appraisals of the land to be exchanged (or a summary thereof) available for public review.

(C) Appraisal information. The appraisal prepared under this paragraph shall include a detailed income capitalization approach analysis of the market value of the Federal land which may be utilized, as appropriate, to determine the value of the Federal land, and shall be the basis for calculation of any payment under subsection (e).

(5) Equal value land exchange.

(A) In general. The value of the Federal land and non-Federal land to be exchanged under this section shall be equal or shall be equalized in accordance with this paragraph.

(B) Surplus of Federal land value.

(i) In general. If the final appraised value of the Federal land exceeds the value of the non-Federal land, Resolution Copper shall—

(I) convey additional non-Federal land in the State to the Secretary or the Secretary of the Interior, consistent with the requirements of this section and subject to the approval of the applicable Secretary;

(II) make a cash payment to the United States; or

**(III)** use a combination of the methods described in subclauses (I) and (II), as agreed to by Resolution Copper, the Secretary, and the Secretary of the Interior.

**(ii)** Amount of payment. The Secretary may accept a payment in excess of 25 percent of the total value of the land or interests conveyed, notwithstanding section 206(b) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1716(b)).

**(iii)** Disposition and use of proceeds. Any amounts received by the United States under this subparagraph shall be deposited in the fund established under Public Law 90-171 (commonly known as the "Sisk Act"; 16 U.S.C. 484a) and shall be made available to the Secretary for the acquisition of land or interests in land in Region 3 of the Forest Service.

**(C)** Surplus of non-federal land. If the final appraised value of the non-Federal land exceeds the value of the Federal land—

**(i)** the United States shall not make a payment to Resolution Copper to equalize the value; and

**(ii)** except as provided in subsection (h), the surplus value of the non-Federal land shall be considered to be a donation by Resolution Copper to the United States.

**(6)** Oak Flat Withdrawal Area.

**(A)** Permits. Subject to the provisions of this paragraph and notwithstanding any withdrawal of the Oak Flat Withdrawal Area from the mining, mineral leasing, or public land laws, the Secretary, upon enactment of this Act, shall issue to Resolution Copper—

**(i)** if so requested by Resolution Copper, within 30 days of such request, a special use permit to carry out mineral exploration activities under the Oak Flat Withdrawal Area from existing drill pads located outside the Area, if the activities would not disturb the surface of the Area; and

(ii) if so requested by Resolution Copper, within 90 days of such request, a special use permit to carry out mineral exploration activities within the Oak Flat Withdrawal Area (but not within the Oak Flat Campground), if the activities are conducted from a single exploratory drill pad which is located to reasonably minimize visual and noise impacts on the Campground.

(B) Conditions. Any activities undertaken in accordance with this paragraph shall be subject to such reasonable terms and conditions as the Secretary may require.

(C) Termination. The authorization for Resolution Copper to undertake mineral exploration activities under this paragraph shall remain in effect until the Oak Flat Withdrawal Area land is conveyed to Resolution Copper in accordance with this section.

(7) Costs. As a condition of the land exchange under this section, Resolution Copper shall agree to pay, without compensation, all costs that are—

(A) associated with the land exchange and any environmental review document under paragraph (9); and

(B) agreed to by the Secretary.

(8) Use of Federal land. The Federal land to be conveyed to Resolution Copper under this section shall be available to Resolution Copper for mining and related activities subject to and in accordance with applicable Federal, State, and local laws pertaining to mining and related activities on land in private ownership.

(9) Environmental compliance.

(A) In general. Except as otherwise provided in this section, the Secretary shall carry out the land exchange in accordance with the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(B) Environmental analysis. Prior to conveying Federal land under this section, the Secretary shall prepare a single environmental impact

statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities.

**(C)** Impacts on cultural and archeological resources. The environmental impact statement prepared under subparagraph (B) shall—

**(i)** assess the effects of the mining and related activities on the Federal land conveyed to Resolution Copper under this section on the cultural and archeological resources that may be located on the Federal land; and

**(ii)** identify measures that may be taken, to the extent practicable, to minimize potential adverse impacts on those resources, if any.

**(D)** Effect. Nothing in this paragraph precludes the Secretary from using separate environmental review documents prepared in accordance with the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) or other applicable laws for exploration or other activities not involving—

**(i)** the land exchange; or

**(ii)** the extraction of minerals in commercial quantities by Resolution Copper on or under the Federal land.

**(10)** Title Transfer. Not later than 60 days after the date of publication of the final environmental impact statement, the Secretary shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper.

**(d) Conveyance and management of non-Federal land.**

**(1)** Conveyance. On receipt of title to the Federal land, Resolution Copper shall simultaneously convey—

**(A)** to the Secretary, all right, title, and interest that the Secretary determines to be acceptable in and to—

**(i)** the approximately 147 acres of land located in Gila County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel-Turkey Creek" and dated March 2011;

**(ii)** the approximately 148 acres of land located in Yavapai County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel-Tangle Creek" and dated March 2011;

**(iii)** the approximately 149 acres of land located in Maricopa County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel-Cave Creek" and dated March 2011;

**(iv)** the approximately 640 acres of land located in Coconino County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel-East Clear Creek" and dated March 2011; and

**(v)** the approximately 110 acres of land located in Pinal County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel-Apache Leap South End" and dated March 2011; and

**(B)** to the Secretary of the Interior, all right, title, and interest that the Secretary of the Interior determines to be acceptable in and to—

**(i)** the approximately 3,050 acres of land located in Pinal County, Arizona, identified as "Lands to DOI" as generally depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel-Lower San Pedro River" and dated July 6, 2011;

**(ii)** the approximately 160 acres of land located in Gila and Pinal Counties, Arizona, identified as "Lands to DOI" as generally depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel-Dripping Springs" and dated July 6, 2011; and

**(iii)** the approximately 940 acres of land located in Santa Cruz County, Arizona, identified as "Lands to DOI" as generally depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel-Appleton Ranch" and dated July 6, 2011.

**(2)** Management of acquired land.

**(A)** Land Acquired by the Secretary.

**(i)** In general. Land acquired by the Secretary under this section shall—

**(I)** become part of the national forest in which the land is located; and

**(II)** be administered in accordance with the laws applicable to the National Forest System.

**(ii)** Boundary revision. On the acquisition of land by the Secretary under this section, the boundaries of the national forest shall be modified to reflect the inclusion of the acquired land.

**(iii)** Land and Water Conservation Fund. For purposes of section 7 of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 4601-9), the boundaries of a national forest in which land acquired by the Secretary is located shall be deemed to be the boundaries of that forest as in existence on January 1, 1965.

**(B)** Land acquired by the Secretary of the Interior.

**(i)** San Pedro National Conservation Area.

(I) In general. The land acquired by the Secretary of the Interior under paragraph (1)(B)(i) shall be added to, and administered as part of, the San Pedro National Conservation Area in accordance with the laws (including regulations) applicable to the Conservation Area.

(II) Management plan. Not later than 2 years after the date on which the land is acquired, the Secretary of the Interior shall update the management plan for the San Pedro National Conservation Area to reflect the management requirements of the acquired land.

(ii) Dripping Springs. Land acquired by the Secretary of the Interior under paragraph (1)(B)(ii) shall be managed in accordance with the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.) and applicable land use plans.

(iii) Las Cienegas National Conservation Area. Land acquired by the Secretary of the Interior under paragraph (1)(B)(iii) shall be added to, and administered as part of, the Las Cienegas National Conservation Area in accordance with the laws (including regulations) applicable to the Conservation Area.

**(e) Value adjustment payment to United States.**

**(1)** Annual production reporting.

(A) Report required. As a condition of the land exchange under this section, Resolution Copper shall submit to the Secretary of the Interior an annual report indicating the quantity of locatable minerals produced during the preceding calendar year in commercial quantities from the Federal land conveyed to Resolution Copper under subsection (c). The first report is required to be submitted not later than February 15 of the first calendar year beginning after the date of commencement of production of valuable locatable minerals in commercial quantities from such Federal land. The reports shall be submitted February 15 of each calendar year thereafter.

**(B)** Sharing reports with State. The Secretary shall make each report received under subparagraph (A) available to the State.

**(C)** Report contents. The reports under subparagraph (A) shall comply with any recordkeeping and reporting requirements prescribed by the Secretary or required by applicable Federal laws in effect at the time of production.

**(2)** Payment on production. If the cumulative production of valuable locatable minerals produced in commercial quantities from the Federal land conveyed to Resolution Copper under subsection (c) exceeds the quantity of production of locatable minerals from the Federal land used in the income capitalization approach analysis prepared under subsection (c)(4)(C), Resolution Copper shall pay to the United States, by not later than March 15 of each applicable calendar year, a value adjustment payment for the quantity of excess production at the same rate assumed for the income capitalization approach analysis prepared under subsection (c)(4)(C).

**(3)** State law unaffected. Nothing in this subsection modifies, expands, diminishes, amends, or otherwise affects any State law relating to the imposition, application, timing, or collection of a State excise or severance tax.

**(4)** Use of funds.

**(A)** Separate fund. All funds paid to the United States under this subsection shall be deposited in a special fund established in the Treasury and shall be available, in such amounts as are provided in advance in appropriation Acts, to the Secretary and the Secretary of the Interior only for the purposes authorized by subparagraph (B).

**(B)** Authorized use. Amounts in the special fund established pursuant to subparagraph (A) shall be used for maintenance, repair, and rehabilitation projects for Forest Service and Bureau of Land Management assets.

**(f) Withdrawal.** Subject to valid existing rights, Apache Leap and any land acquired by the United States under this section are withdrawn from all forms of—

**(1)** entry, appropriation, or disposal under the public land laws;

**(2)** location, entry, and patent under the mining laws; and

**(3)** disposition under the mineral leasing, mineral materials, and geothermal leasing laws.

**(g) Apache Leap Special Management Area.**

**(1)** Designation. To further the purpose of this section, the Secretary shall establish a special management area consisting of Apache Leap, which shall be known as the "Apache Leap Special Management Area" (referred to in this subsection as the "special management area").

**(2)** Purpose. The purposes of the special management area are—

**(A)** to preserve the natural character of Apache Leap;

**(B)** to allow for traditional uses of the area by Native American people; and

**(C)** to protect and conserve the cultural and archeological resources of the area.

**(3)** Surrender of mining and extraction rights. As a condition of the land exchange under subsection (c), Resolution Copper shall surrender to the United States, without compensation, all rights held under the mining laws and any other law to commercially extract minerals under Apache Leap.

**(4)** Management.

**(A)** In general. The Secretary shall manage the special management area in a manner that furthers the purposes described in paragraph (2).

**(B)** Authorized activities. The activities that are authorized in the special management area are—

**(i)** installation of seismic monitoring equipment on the surface and subsurface to protect the resources located within the special management area;

A-17
Addendum

(ii) installation of fences, signs, or other measures necessary to protect the health and safety of the public; and

(iii) operation of an underground tunnel and associated workings, as described in the Resolution mine plan of operations, subject to any terms and conditions the Secretary may reasonably require.

(5) Plan.

(A) In general. Not later than 3 years after the date of enactment of this Act [enacted Dec. 19, 2014], the Secretary, in consultation with affected Indian tribes, the Town, Resolution Copper, and other interested members of the public, shall prepare a management plan for the Apache Leap Special Management Area.

(B) Considerations. In preparing the plan under subparagraph (A), the Secretary shall consider whether additional measures are necessary to—

(i) protect the cultural, archaeological, or historical resources of Apache Leap, including permanent or seasonal closures of all or a portion of Apache Leap; and

(ii) provide access for recreation.

(6) Mining activities. The provisions of this subsection shall not impose additional restrictions on mining activities carried out by Resolution Copper adjacent to, or outside of, the Apache Leap area beyond those otherwise applicable to mining activities on privately owned land under Federal, State, and local laws, rules and regulations.

(h) Conveyances to Town of Superior, Arizona.

(1) Conveyances. On request from the Town and subject to the provisions of this subsection, the Secretary shall convey to the Town the following:

(A) Approximately 30 acres of land as depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011- Federal Parcel-Fairview Cemetery" and dated March 2011.

**(B)** The reversionary interest and any reserved mineral interest of the United States in the approximately 265 acres of land located in Pinal County, Arizona, as depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Federal Reversionary Interest-Superior Airport" and dated March 2011.

**(C)** The approximately 250 acres of land located in Pinal County, Arizona, as depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Federal Parcel-Superior Airport Contiguous Parcels" and dated March 2011.

**(2)** Payment. The Town shall pay to the Secretary the market value for each parcel of land or interest in land acquired under this subsection, as determined by appraisals conducted in accordance with subsection (c)(4).

**(3)** Sisk Act. Any payment received by the Secretary from the Town under this subsection shall be deposited in the fund established under Public Law 90-171 (commonly known as the "Sisk Act") (16 U.S.C. 484a) and shall be made available to the Secretary for the acquisition of land or interests in land in Region 3 of the Forest Service.

**(4)** Terms and conditions. The conveyances under this subsection shall be subject to such terms and conditions as the Secretary may require.

**(i) Miscellaneous provisions.**

**(1)** Revocation of orders; withdrawal.

**(A)** Revocation of orders. Any public land order that withdraws the Federal land from appropriation or disposal under a public land law shall be revoked to the extent necessary to permit disposal of the land.

**(B)** Withdrawal. On the date of enactment of this Act [enacted Dec. 19, 2014], if the Federal land or any Federal interest in the non-Federal land to be exchanged under subsection (c) is not withdrawn or segregated from entry and appropriation under a public land law (including mining and mineral leasing laws and the Geothermal Steam Act of 1970 (30 U.S.C. 1001 et seq.)), the land or interest shall be withdrawn, without further action required by the Secretary

concerned, from entry and appropriation. The withdrawal shall be terminated—

> **(i)** on the date of consummation of the land exchange; or

> **(ii)** if Resolution Copper notifies the Secretary in writing that it has elected to withdraw from the land exchange pursuant to section 206(d) of the Federal Land Policy and Management Act of 1976, as amended (43 U.S.C. 1716(d)).

**(C)** Rights of Resolution Copper. Nothing in this section shall interfere with, limit, or otherwise impair, the unpatented mining claims or rights currently held by Resolution Copper on the Federal land, nor in any way change, diminish, qualify, or otherwise impact Resolution Copper's rights and ability to conduct activities on the Federal land under such unpatented mining claims and the general mining laws of the United States, including the permitting or authorization of such activities.

**(2)** Maps, estimates, and descriptions.

**(A)** Minor errors. The Secretary concerned and Resolution Copper may correct, by mutual agreement, any minor errors in any map, acreage estimate, or description of any land conveyed or exchanged under this section.

**(B)** Conflict. If there is a conflict between a map, an acreage estimate, or a description of land in this section, the map shall control unless the Secretary concerned and Resolution Copper mutually agree otherwise.

**(C)** Availability. On the date of enactment of this Act [enacted Dec. 19, 2014], the Secretary shall file and make available for public inspection in the Office of the Supervisor, Tonto National Forest, each map referred to in this section.

**(3)** Public access in and around Oak Flat Campground. As a condition of conveyance of the Federal land, Resolution Copper shall agree to provide access to the surface of the Oak Flat Campground to members of the public, including Indian tribes, to the maximum extent practicable, consistent with

health and safety requirements, until such time as the operation of the mine precludes continued public access for safety reasons, as determined by Resolution Copper.

## The 1872 Mining Law, 30 U.S.C. §§ 21–29

### 30 U.S.C. § 21 - Mineral lands reserved

In all cases lands valuable for minerals shall be reserved from sale, except as otherwise expressly directed by law.

### 30 U.S.C. § 21a - National mining and minerals policy; "minerals" defined; execution of policy under other authorized programs

The Congress declares that it is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in (1) the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries, (2) the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and environmental needs, (3) mining, mineral, and metallurgical research, including the use and recycling of scrap to promote the wise and efficient use of our natural and reclaimable mineral resources, and (4) the study and development of methods for the disposal, control, and reclamation of mineral waste products, and the reclamation of mined land, so as to lessen any adverse impact of mineral extraction and processing upon the physical environment that may result from mining or mineral activities.

For the purpose of this section "minerals" shall include all minerals and mineral fuels including oil, gas, coal, oil shale and uranium.

It shall be the responsibility of the Secretary of the Interior to carry out this policy when exercising his authority under such programs as may be authorized by law other than this section.

### 30 U.S.C. § 22 - Lands open to purchase by citizens

Except as otherwise provided, all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States and those who have declared their intention to become such, under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States.

**30 U.S.C. § 23 - Length of claims on veins or lodes**

Mining claims upon veins or lodes of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper, or other valuable deposits, located prior to May 10, 1872, shall be governed as to length along the vein or lode by the customs, regulations, and laws in force at the date of their location. A mining claim located after the 10th day of May 1872, whether located by one or more persons, may equal, but shall not exceed, one thousand five hundred feet in length along the vein or lode; but no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located. No claim shall extend more than three hundred feet on each side of the middle of the vein at the surface, nor shall any claim be limited by any mining regulation to less than twenty-five feet on each side of the middle of the vein at the surface, except where adverse rights existing on the 10th day of May 1872 render such limitation necessary. The end lines of each claim shall be parallel to each other.

**30 U.S.C. § 24 - Proof of citizenship**

Proof of citizenship, under sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, may consist, in the case of an individual, of his own affidavit thereof; in the case of an association of persons unincorporated, of the affidavit of their authorized agent, made on his own knowledge, or upon information and belief; and in the case of a corporation organized under the laws of the United States, or of any State or Territory thereof, by the filing of a certified copy of their charter or certificate of incorporation.

**30 U.S.C. § 25 - Affidavit of citizenship**

Applicants for mineral patents, if residing beyond the limits of the district wherein the claim is situated, may make any oath or affidavit required for proof of citizenship before the clerk of any court of record or before any notary public of any State or Territory.

**30 U.S.C. § 26 - Locators' rights of possession and enjoyment**

The locators of all mining locations made on any mineral vein, lode, or ledge, situated on the public domain, their heirs and assigns, where no adverse claim existed on the 10th day of May 1872 so long as they comply with the laws of the

United States, and with State, territorial, and local regulations not in conflict with the laws of the United States governing their possessory title, shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations. But their right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as above described, through the end lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges. Nothing in this section shall authorize the locator or possessor of a vein or lode which extends in its downward course beyond the vertical lines of his claim to enter upon the surface of a claim owned or possessed by another.

### 30 U.S.C. § 27 - Mining tunnels; right to possession of veins on line with; abandonment of right

Where a tunnel is run for the development of a vein or lode, or for the discovery of mines, the owners of such tunnel shall have the right of possession of all veins or lodes within three thousand feet from the face of such tunnel on the line thereof, not previously known to exist, discovered in such tunnel, to the same extent as if discovered from the surface; and locations on the line of such tunnel of veins or lodes not appearing on the surface, made by other parties after the commencement of the tunnel, and while the same is being prosecuted with reasonable diligence, shall be invalid; but failure to prosecute the work on the tunnel for six months shall be considered as an abandonment of the right to all undiscovered veins on the line of such tunnel.

### 30 U.S.C. § 28 - Mining district regulations by miners: location, recordation, and amount of work; marking of location on ground; records; annual labor or improvements on claims pending issue of patent; co-owner's succession in interest upon delinquency in contributing proportion of expenditures; tunnel as lode expenditure

The miners of each mining district may make regulations not in conflict with the laws of the United States, or with the laws of the State or Territory in which the district is situated, governing the location, manner of recording, amount of work necessary to hold possession of a mining claim, subject to the following requirements: The location must be distinctly marked on the ground so that its boundaries can be readily traced. All records of mining claims made after May 10, 1872, shall contain the name or names of the locators, the date of the location, and such a description of the claim or claims located by reference to some natural object or permanent monument as will identify the claim. On each claim located after the 10th day of May 1872, that is granted a waiver under section 28f of this title, and until a patent has been issued therefor, not less than $100 worth of labor shall be performed or improvements made during each year. On all claims located prior to the 10th day of May 1872, $10 worth of labor shall be performed or improvements made each year, for each one hundred feet in length along the vein until a patent has been issued therefor; but where such claims are held in common, such expenditure may be made upon any one claim; and upon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made, provided that the original locators, their heirs, assigns, or legal representatives, have not resumed work upon the claim after failure and before such location. Upon the failure of any one of several coowners to contribute his proportion of the expenditures required hereby, the coowners who have performed the labor or made the improvements may, at the expiration of the year, give such delinquent co-owner personal notice in writing or notice by publication in the newspaper published nearest the claim, for at least once a week for ninety days, and if at the expiration of ninety days after such notice in writing or by publication such delinquent should fail or refuse to contribute his proportion of the expenditure required by this section, his interest in the claim shall become the property of his co-owners who have made the required expenditures. The period within which the work required to be done annually on all unpatented mineral claims located since May 10, 1872, including such claims in the Territory of Alaska, shall commence at 12:01 ante meridian on the first day of September succeeding the date of location of such claim.

Where a person or company has or may run a tunnel for the purposes of developing a lode or lodes, owned by said person or company, the money so expended in said tunnel shall be taken and considered as expended on said lode or lodes, whether located prior to or since May 10, 1872; and such person or company shall not be required to perform work on the surface of said lode or lodes in order to hold the same as required by this section. On all such valid claims the annual period ending December 31, 1921, shall continue to 12 o'clock meridian July 1, 1922.

**30 U.S.C. § 28-1 - Inclusion of certain surveys in labor requirements of mining claims; conditions and restrictions**

The term "labor", as used in the third sentence of section 28 of this title, shall include, without being limited to, geological, geochemical and geophysical surveys conducted by qualified experts and verified by a detailed report filed in the county office in which the claim is located which sets forth fully (a) the location of the work performed in relation to the point of discovery and boundaries of the claim, (b) the nature, extent, and cost thereof, (c) the basic findings therefrom, and (d) the name, address, and professional background of the person or persons conducting the work. Such surveys, however, may not be applied as labor for more than two consecutive years or for more than a total of five years on any one mining claim, and each such survey shall be nonrepetitive of any previous survey on the same claim.

**30 U.S.C. § 28-2 - Definitions**

As used in section 28–1 of this title,

**(a)** The term "geological surveys" means surveys on the ground for mineral deposits by the proper application of the principles and techniques of the science of geology as they relate to the search for and discovery of mineral deposits;

**(b)** The term "geochemical surveys" means surveys on the ground for mineral deposits by the proper application of the principles and techniques of the science of chemistry as they relate to the search for and discovery of mineral deposits;

**(c)** The term "geophysical surveys" means surveys on the ground for mineral deposits through the employment of generally recognized equipment and methods

for measuring physical differences between rock types or discontinuities in geological formations;

**(d)** The term "qualified expert" means an individual qualified by education or experience to conduct geological, geochemical or geophysical surveys, as the case may be.

### 30 U.S.C. § 28a - Omitted

### 30 U.S.C. § 28b - Annual assessment work on mining claims; temporary deferment; conditions

The performance of not less than $100 worth of labor or the making of improvements aggregating such amount, which labor or improvements are required under the provisions of section 28 of this title to be made during each year, may be deferred by the Secretary of the Interior as to any mining claim or group of claims in the United States upon the submission by the claimant of evidence satisfactory to the Secretary that such mining claim or group of claims is surrounded by lands over which a right-of-way for the performance of such assessment work has been denied or is in litigation or is in the process of acquisition under State law or that other legal impediments exist which affect the right of the claimant to enter upon the surface of such claim or group of claims or to gain access to the boundaries thereof.

### 30 U.S.C. § 28c - Length and termination of deferment

The period for which said deferment may be granted shall end when the conditions justifying deferment have been removed: Provided, That the initial period shall not exceed one year but may be renewed for a further period of one year if justifiable conditions exist: Provided further, That the relief available under sections 28b to 28e of this title is in addition to any relief available under any other Act of Congress with respect to mining claims.

### 30 U.S.C. § 28d - Performance of deferred work

All deferred assessment work shall be performed not later than the end of the assessment year next subsequent to the removal or cessation of the causes for deferment or the expiration of any deferments granted under sections 28b to 28e of

A-27
Addendum

this title and shall be in addition to the annual assessment work required by law in such year.

**30 U.S.C. § 28e - Recordation of deferment**

Claimant shall file or record or cause to be filed or recorded in the office where the notice or certificate of location of such claim or group of claims is filed or recorded, a notice to the public of claimant's petition to the Secretary of the Interior for deferment under sections 28b to 28e of this title, and of the order or decision disposing of such petition.

**30 U.S.C. § 28f - Fee**

**(a) Claim maintenance fee**

**(1) Lode mining claims, mill sites, and tunnel sites**

The holder of each unpatented lode mining claim, mill site, or tunnel site, located pursuant to the mining laws of the United States before, on, or after August 10, 1993, shall pay to the Secretary of the Interior, on or before September 1 of each year, to the extent provided in advance in appropriations Acts, a claim maintenance fee of $100 per claim or site, respectively. Such claim maintenance fee shall be in lieu of the assessment work requirement contained in the Mining Law of 1872 (30 U.S.C. 28–28e) and the related filing requirements contained in section 1744(a) and (c) of title 43.

**(2) Placer mining claims**

The holder of each unpatented placer mining claim located pursuant to the mining laws of the United States before, on, or after August 10, 1993, shall pay to the Secretary of the Interior, on or before September 1 of each year, the claim maintenance fee described in subsection (a)(1), for each 20 acres of the placer claim or portion thereof. Such claim maintenance fee shall be in lieu of the assessment work requirement contained in the Mining Law of 1872 (30 U.S.C. 28 to 28e)[1] and the related filing requirements contained in section 1744(a) and (c) of title 43.

**(b) Time of payment**

The claim main tenance fee under subsection (a) shall be paid for the year in which the location is made, at the time the location notice is recorded with the Bureau of Land Management. The location fee imposed under section 28g of this title shall be payable not later than 90 days after the date of location.

**(c) Oil shale claims subject to claim maintenance fees under Energy Policy Act of 1992**

This section shall not apply to any oil shale claims for which a fee is required to be paid under section 2511(e)(2) of the Energy Policy Act of 1992 (Public Law 102–486; 106 Stat. 3111; 30 U.S.C. 242).

**(d) Waiver**

(1) The claim maintenance fee required under this section may be waived for a claimant who certifies in writing to the Secretary that on the date the payment was due, the claimant and all related parties—

(A) held not more than 10 mining claims, mill sites, or tunnel sites, or any combination thereof, on public lands; and

(B) have performed assessment work required under the Mining Law of 1872 (30 U.S.C. 28–28e)[1] to maintain the mining claims held by the claimant and such related parties for the assessment year ending on noon of September 1 of the calendar year in which payment of the claim maintenance fee was due.

(2) For purposes of paragraph (1), with respect to any claimant, the term "related party" means—

(A) the spouse and dependent children (as defined in section 152 of title 26), of the claimant; and

(B) a person who controls, is controlled by, or is under common control with the claimant.

For purposes of this section, the term control includes actual control, legal control, and the power to exercise control, through or by common directors, officers,

stockholders, a voting trust, or a holding company or investment company, or any other means.

**(3)** If a small miner waiver application is determined to be defective for any reason, the claimant shall have a period of 60 days after receipt of written notification of the defect or defects by the Bureau of Land Management to: (A) cure such defect or defects, or (B) pay the $100 claim maintenance fee due for such period.

## 30 U.S.C. § 28g - Location fee

Notwithstanding any other provision of law, for every unpatented mining claim, mill or tunnel site located after August 10, 1993, to the extent provided in advance in Appropriations Acts, pursuant to the Mining Laws of the United States, the locator shall, at the time the location notice is recorded with the Bureau of Land Management, pay to the Secretary of the Interior a location fee, in addition to the claim maintenance fee required by section 28f of this title, of $25.00 per claim.

## 30 U.S.C. § 28h - Co-ownership

The co-ownership provisions of the Mining Law of 1872 (30 U.S.C. 28) shall remain in effect, except that in applying such provisions, the annual claim maintenance fee required under this Act shall, where applicable, replace applicable assessment requirements and expenditures.

## 30 U.S.C. § 28i - Failure to pay

Failure to pay the claim maintenance fee or the location fee as required by sections 28f to 28l of this title shall conclusively constitute a forfeiture of the unpatented mining claim, mill or tunnel site by the claimant and the claim shall be deemed null and void by operation of law.

## 30 U.S.C. § 28j - Other requirements

### (a) Federal Land Policy and Management Act requirements

Nothing in sections 28f to 28k of this title shall change or modify the requirements of section 314(b) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1744(b)), or the requirements of section 314(c) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1744(c)) related to filings required by

section 314(b), and such requirements shall remain in effect with respect to claims, and mill or tunnel sites for which fees are required to be paid under this section.

**(b) Omitted**

**(c) Fee adjustments**

> **(1)** The Secretary of the Interior shall adjust the fees required by sections 28f to 28k of this title to reflect changes in the Consumer Price Index published by the Bureau of Labor Statistics of the Department of Labor every 5 years after August 10, 1993, or more frequently if the Secretary determines an adjustment to be reasonable.

> **(2)** The Secretary shall provide claimants notice of any adjustment made under this subsection not later than July 1 of any year in which the adjustment is made.

> **(3)** A fee adjustment under this subsection shall begin to apply the first assessment year which begins after adjustment is made.

**30 U.S.C. § 28k – Regulations**

The Secretary of the Interior shall promulgate rules and regulations to carry out the terms and conditions of sections 28f to 28k of this title as soon as practicable after August 10, 1993.

**30 U.S.C. § 28l - Collection of mining law administration fees**

In fiscal year 2009 and each fiscal year thereafter, the Bureau of Land Management shall collect from mining claim holders the mining claim maintenance fees and location fees; such fees shall be collected in the same manner as authorized by sections 28f and 28g of this title only to the extent provided in advance in appropriations Acts.

**30 U.S.C. § 29 - Patents; procurement procedure; filing: application under oath, plat and field notes, notices, and affidavits; posting plat and notice on claim; publication and posting notice in office; certificate; adverse claims; payment per acre; objections; nonresident claimant's agent for execution of application and affidavits**

A patent for any land claimed and located for valuable deposits may be obtained in the following manner: Any person, association, or corporation authorized to locate a claim under sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, having claimed and located a piece of land for such purposes, who has, or have, complied with the terms of sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title, and section 661 of title 43, may file in the proper land office an application for a patent, under oath, showing such compliance, together with a plat and field notes of the claim or claims in common, made by or under the direction of the Director of the Bureau of Land Management, showing accurately the boundaries of the claim or claims, which shall be distinctly marked by monuments on the ground, and shall post a copy of such plat, together with a notice of such application for a patent, in a conspicuous place on the land embraced in such plat previous to the filing of the application for a patent, and shall file an affidavit of at least two persons that such notice has been duly posted, and shall file a copy of the notice in such land office, and shall thereupon be entitled to a patent for the land, in the manner following: The register of the land office, upon the filing of such application, plat, field notes, notices, and affidavits, shall publish a notice that such application has been made, for the period of sixty days, in a newspaper to be by him designated as published nearest to such claim; and he shall also post such notice in his office for the same period. The claimant at the time of filing this application, or at any time thereafter, within the sixty days of publication, shall file with the register a certificate of the Director of the Bureau of Land Management that $500 worth of labor has been expended or improvements made upon the claim by himself or grantors; that the plat is correct, with such further description by such reference to natural objects or permanent monuments as shall identify the claim, and furnish an accurate description, to be incorporated in the patent. At the expiration of the sixty days of publication the claimant shall file his affidavit, showing that the plat and notice have been posted in a conspicuous place on the claim during such period of publication. If no adverse claim shall have been filed with the register of the proper land office at the expiration of the sixty days of publication, it shall be assumed that the applicant is entitled to a patent, upon the payment to the proper officer of $5 per acre, and that no adverse claim exists; and thereafter no objection from third parties to the issuance of a patent shall be heard, except it be shown that the applicant has failed

A-32
Addendum

to comply with the terms of sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43. Where the claimant for a patent is not a resident of or within the land district wherein the vein, lode, ledge, or deposit sought to be patented is located, the application for patent and the affidavits required to be made in this section by the claimant for such patent may be made by his, her, or its authorized agent, where said agent is conversant with the facts sought to be established by said affidavits.

## Relevant Sections of the National Environmental Policy Act

**42 U.S.C. § 4331 - Congressional declaration of national environmental policy**

**(a)** The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

**(b)** In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

> **(1)** fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
>
> **(2)** assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;
>
> **(3)** attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;
>
> **(4)** preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;
>
> **(5)** achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

A-34
Addendum

**(6)** enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

**(c)** The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

### 42 U.S.C. § 4332 - Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

**(A)** utilize a systematic, interdisciplinary approach which will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

**(B)** identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

**(C)** consistent with the provisions of this chapter and except where compliance would be inconsistent with other statutory requirements, include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

**(i)** reasonably foreseeable environmental effects of the proposed agency action;

**(ii)** any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;

**(iii)** a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not

A-35
Addendum

implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;

**(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

**(v)** any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

> Prior to making any detailed statement, the head of the lead agency shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

**(D)** ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document;

**(E)** make use of reliable data and resources in carrying out this chapter;

**(F)** consistent with the provisions of this chapter, study, develop, and describe technically and economically feasible alternatives;

**(G)** any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

**(i)** the State agency or official has statewide jurisdiction and has the responsibility for such action,

**(ii)** the responsible Federal official furnishes guidance and participates in such preparation,

**(iii)** the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

**(iv)** after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

> The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.

**(H)** study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

**(I)** consistent with the provisions of this chapter, recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

**(J)** make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

**(K)** initiate and utilize ecological information in the planning and development of resource-oriented projects; and

**(L)** assist the Council on Environmental Quality established by subchapter II of this chapter.

## Relevant Sections of the U.S. Forest Service Appraisal Regulations

**36 C.F.R. § 254.2 Definitions.**

For the purposes of this subpart, the following terms have the meanings set forth in this section.

*Acquisition* means the attainment of lands or interests in lands by the Secretary, acting on behalf of the United States, by exchange, purchase, donation, or eminent domain.

*Adjustment to relative values* means compensation for exchange-related costs, or other responsibilities or requirements assumed by one party, which ordinarily would be borne by the other party. These adjustments do not alter the agreed upon value of the lands involved in an exchange.

*Agreement to initiate* means a written, nonbinding statement of present intent to initiate and pursue an exchange, which is signed by the parties and which may be amended by consent of the parties or terminated at any time upon written notice by any party.

*Appraisal or appraisal report* means a written statement independently and impartially prepared by a qualified appraiser setting forth an opinion as to the market value of the lands or interests in lands as of a specific date(s), supported by the presentation and analysis of relevant market information.

*Approximately equal value* means a comparative estimate of value of the lands involved in an exchange which have readily apparent and substantially similar elements of value, such as location, size, use, physical characteristics, and other amenities.

*Arbitration* is a process to resolve a disagreement among the parties as to appraised value, performed by an arbitrator appointed by the Secretary from a list recommended by the American Arbitration Association.

*Assembled land exchange* means an exchange of Federal land for a package of multiple ownership parcels of non-Federal land consolidated for purposes of one land exchange transaction.

*Authorized officer* means a Forest Service line or staff officer who has been delegated the authority and responsibility to make decisions and perform the duties described in this subpart.

*Bargaining* is a process other than arbitration, by which parties attempt to resolve a dispute concerning the appraised value of the lands involved in an exchange.

*Federal lands* means any lands or interests in lands, such as mineral and timber interests, that are owned by the United States and administered by the Secretary of Agriculture through the Chief of the Forest Service, without regard to how the United States acquired ownership.

*Hazardous substances* are those substances designated under Environmental Protection Agency regulations at 40 CFR part 302.

*Highest and best use* means an appraiser's supported opinion of the most probable and legal use of a property, based on market evidence, as of the date of valuation.

*Lands* means any land and/or interests in land.

*Market value* means the most probable price in cash, or terms equivalent to cash, which lands or interest in lands should bring in a competitive and open market under all conditions requisite to a fair sale, where the buyer and seller each acts prudently and knowledgeably, and the price is not affected by undue influence.

*Mineral laws* means the mining and mineral leasing laws applicable to Federally owned lands and minerals reserved from the public domain for national forest purposes and the Geothermal Steam Act of 1970 (30 U.S.C. 1001 *et seq.*), but not the Materials Act of 1947 (30 U.S.C. 601 *et seq.*).

*Outstanding interests* are rights or interests in property held by an entity other than a party to an exchange.

*Party* means the United States or any person, State, or local government who enters into an agreement to initiate an exchange.

*Person* means any individual, corporation, or other legal entity legally capable to hold title to and convey land. An individual must be a citizen of the United States and a corporation must be subject to the laws of the United States or of the State where the land is located or the corporation is incorporated. No Member

A-40
Addendum

of Congress may participate in a land exchange with an agency of the United States, as set forth in 18 U.S.C. 431-433.

*Public land laws* means that body of non-mineral land laws dealing with the disposal of National Forest System lands administered by the Secretary of Agriculture.

*Reserved interest* means an interest in real property retained by a party from a conveyance of the title to that property.

*Resource values* means any of the various commodity values or non-commodity values, such as wildlife habitat and aesthetics, contained within land interests, surface and subsurface.

*Secretary* means the Secretary of Agriculture or the individual to whom responsibility has been delegated.

*Segregation* means the removal for a limited period, subject to valid existing rights, of a specified area of the Federal lands from appropriation under the public land laws and mineral laws, pursuant to the authority of the Secretary of the Interior to allow for the orderly administration of the Federal lands.

*Statement of value* means a written report prepared by a qualified appraiser in conformance with the minimum standards of the Uniform Standards of Professional Appraisal Practice that states the appraiser's conclusion(s) of value.

*** 

## 36 C.F.R. § 254.9 Appraisals.

The Federal and non-Federal parties to an exchange shall comply with the appraisal standards as set forth in paragraphs (a) through (d) of this section, and, to the extent appropriate, with the Uniform Appraisal Standards for Federal Land Acquisitions: Interagency Land Acquisition Conference 1992 (Washington, DC, 1992), ISBN 0-16-038050-2 when appraising the values of the Federal and non-Federal lands involved in an exchange.

**(a) *Appraiser qualifications.***

    **(1)** A qualified appraiser(s) shall provide to the authorized officer appraisals estimating the market value of Federal and non-Federal properties involved

in an exchange. A qualified appraiser may be an employee or a contractor to the Federal or non-Federal exchange parties. At a minimum, a qualified appraiser shall be an individual agreeable to all parties and approved by the authorized officer, who is competent, reputable, impartial, and has training and experience in appraising property similar to the property involved in the appraisal assignment.

**(2)** Qualified appraisers shall possess qualifications consistent with State regulatory requirements that meet the intent of Title XI, Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) (12 U.S.C. 3331). In the event a State or Territory does not have approved policies, practices, and procedures regulating the activities of appraisers, the Forest Service may establish appraiser qualification standards commensurate with those generally adopted by other States or Territories meeting the requirements of FIRREA.

**(b)** *Market value.*

**(1)** In estimating market value, the appraiser shall:

**(i)** Determine the highest and best use of the property to be appraised;

**(ii)** Estimate the value of the lands and interests as if in private ownership and available for sale in the open market;

**(iii)** Include historic, wildlife, recreation, wilderness, scenic, cultural, or other resource values or amenities as reflected in prices paid for similar properties in the competitive market;

**(iv)** Consider the contributory value of any interest in land such as water rights, minerals, or timber, to the extent they are consistent with the highest and best use of the property; and

**(v)** If stipulated in the agreement to initiate in accordance with § 254.4 of this subpart, estimate separately the value of each property optioned or acquired from multiple ownerships by the non-Federal party for purposes of exchange, pursuant to § 254.5 of this subpart. In this case, the appraiser also must estimate the value of the Federal and non-Federal properties in a similar manner.

**(2)** In estimating market value, the appraiser may not independently add the separate values of the fractional interests to be conveyed, unless market evidence indicates the following:

> **(i)** The various interests contribute their full value (pro rata) to the value of the whole; and

> **(ii)** The valuation is compatible with the highest and best use of the property.

**(3)** In the absence of current market information reliably supporting value, the authorized officer may use other acceptable and commonly recognized methods to determine market value.

**(c)** *Appraisal report standards.* Appraisals prepared for exchange purposes must contain the following minimum information:

**(1)** A summary of facts and conclusions;

**(2)** The purpose and/or the function of the appraisal, a definition of the estate being appraised, and a statement of the assumptions and limiting conditions affecting the appraisal assignment, if any;

**(3)** An explanation of the extent of the appraiser's research and actions taken to collect and confirm information relied upon in estimating value;

**(4)** An adequate description of the physical characteristics of the land being appraised; a statement of all encumbrances; title information; location, zoning, and present use; an analysis of highest and best use; and at least a 5-year sales history of the property;

**(5)** A disclosure of any condition that is observed during the inspection of the property or becomes known to the appraiser through the normal research which would lead the appraiser to believe that hazardous substances may be present on the property being appraised;

**(6)** A comparative market analysis and, if more than one method of valuation is used, an analysis and reconciliation of the methods used to support the appraiser's estimate of value;

**(7)** A description of comparable sales, including a description of all relevant physical, legal, and economic factors such as parties to the transaction, source and method of financing, effect of any favorable financing on sale price, and verification by a party involved in the transaction;

**(8)** An estimate of market value;

**(9)** The effective date of valuation, date of appraisal, signature, and certification of the appraiser;

**(10)** A certification by the appraiser to the following:

> **(i)** The appraiser has personally contacted the property owner or designated representative and offered the owner an opportunity to be present during inspection of the property;

> **(ii)** The appraiser has personally examined the subject property and all comparable sale properties relied upon in the report;

> **(iii)** The appraiser has no present or prospective interest in the appraised property; and

> **(iv)** The appraiser has not received compensation that was contingent on the analysis, opinions, or conclusions contained in the appraisal report; and

**(11)** Copies of relevant written reports, studies, or summary conclusions prepared by others in association with the appraisal assignment which were relied upon by the appraiser to estimate value, which may include, but is not limited to, current title reports, mineral reports, or timber cruises prepared by qualified specialists.

**(d)** *Appraisal review.*

**(1)** Appraisal reports shall be reviewed by a qualified review appraiser meeting the qualifications set forth in paragraph (a) of this section. Statements of value prepared by agency appraisers are not subject to this review.

**(2)** The review appraiser shall determine whether the appraisal report:

**(i)** Is complete, logical, consistent, and supported by market analysis;

**(ii)** Complies with the standards prescribed in paragraph (c) of this section; and

**(iii)** Reasonably estimates the probable market value of the lands appraised.

**(3)** The review appraiser shall prepare a written review report, containing at a minimum:

**(i)** A description of the review process used;

**(ii)** An explanation of the adequacy, relevance, and reasonableness of the data and methods used by the appraiser to estimate value;

**(iii)** The review appraiser's conclusions regarding the appraiser's estimate of market value; and

**(iv)** A certification by the review appraiser to the following:

**(A)** The review appraiser has no present or prospective interest in the property which is the subject of the review report; and

**(B)** The review appraiser has not received compensation that was contingent upon approval of the appraisal report.