**No. 25-5197**

# In the United States Court of Appeals for the Ninth Circuit

GOUYEN BROWN LOPEZ, ET AL.,
*Plaintiffs-Appellants*,

v.

UNITED STATES OF AMERICA, ET AL.,
*Defendants-Appellees*,

and

RESOLUTION COPPER MINING, LLC,
*Intervenor-Defendant-Appellee*.

On Appeal from the United States District Court
for the District of Arizona
No. 2:25-cv-02758-DWL
Hon. Dominic W. Lanza

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTIONS TO DISSOLVE ADMINISTRATIVE STAY**

Miles E. Coleman
NELSON MULLINS RILEY & SCARBOROUGH LLP
2 W. Washington St., Suite 400
Greenville, SC 29601
(864) 373-2352
miles.coleman@nelsonmullins.com

Jeffrey A. Wald
NELSON MULLINS RILEY & SCARBOROUGH LLP
380 Knollwood Street, Suite 530
Winston-Salem, NC 27103
(336) 774-3335
jeffrey.wald@nelsonmullins.com

Madeline C. Bergstrom*
NELSON MULLINS RILEY & SCARBOROUGH LLP
101 Constitution Ave. NW, Suite 900
Washington, DC 20001
(202) 689-2807
madeline.bergstrom@nelsonmullins.com

*application for admission forthcoming

*Counsel for Plaintiffs-Appellants*

ii

## OPPOSITION

No amount of Defendants' foot-stamping or Court-scolding can mask a simple fact: The government is trying to rush ahead with the irreversible destruction of a longstanding Apache sacred site—and deprive this Court of adequate time for review—even though the government itself delayed this project for over a decade without Resolution ever objecting, much less claiming it was suffering "irreparable harm." That's because it wasn't—and still isn't.

Indeed, this is now the third time a federal court has enjoined the land transfer to preserve the status quo and give federal courts adequate time to consider the serious legal questions in these cases. These decisions have rightly rejected Defendant's attempts to force a decision on a "compressed timetable," *San Carlos Apache Tribe v. U.S. Forest Serv.*, No. 21-cv-68, 2025 WL 1618410, at *10–11 (D. Ariz. June 9, 2025), because "[t]here is no close question in this matter. It is abundantly clear that the balance of equities 'tips sharply' in Plaintiff[s'] favor." *Apache Stronghold v. United States*, 782 F. Supp. 3d 756, 770 (D. Ariz. 2025). If the Court pauses the transfer now but reverses course later, Defendants lose little or nothing: they can still proceed with the project and recover every ounce of copper. But if the land is transferred now and the Court reverses later, Plaintiffs stand to lose everything: as the district court observed, "the government's plan will effectively end Apache religious existence as we know it." 1-ER-25.

That's why this Court's "administrative injunction to preserve the status quo" is proper. Order at 2, *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, No. 25-5185 (9th Cir. Aug. 18, 2025), ECF No. 19. Defendants haven't come close to showing otherwise—much less demonstrating "sufficient exigency to justify changing the status quo, particularly during the few weeks before oral argument" and the Court's resolution of "the merits of the emergency motion." *Doe #1 v. Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019).

This Court should take the time needed to evaluate the injunction-pending-appeal motions in this "important case of an unusual magnitude." 1-ER-22. And Defendants' repeated efforts to cut the Court's deliberations short only confirm the need for the Court to engage in them, so Defendants aren't able to accomplish their unlawful ends before this Court has had an adequate opportunity for review. *See* Dkt.20.1 at 1 (government's previous "status report" complaining that the injunction-pending-appeal motions had been pending for "over two weeks"). Defendants' motions should be denied.

## ARGUMENT

**1.** Defendants' motions boil down to their own *ipse dixit* about a question they're in no position to assess: how long may this Court—the busiest circuit in the country—take to resolve three complex emergency motions in high-stakes litigation over the permanent destruction of the core sacred site of Western Apache religion?

Defendants' claim is that the administrative injunction has lasted too long "as a matter of law." Res.10. But as they recognize, the only "law" governing the duration of administrative injunctions says they should last as long as it takes for "the substantive motion" to be "considered on the merits." *Nat'l Urban League v. Ross*, 977 F.3d 698, 701–02 (9th Cir. 2020); *see* Res.2; Gov't.4. So Defendants' argument hinges on the notion that the time spent here is *by definition* longer than this Court needs to adequately consider Plaintiffs' motions. Of course, no precedent holds as much, and Defendants cite none.

Defendants rely mainly on Justice Barrett's concurrence in *United States v. Texas*, 144 S. Ct. 797 (2024). *See* Res.10; Gov't.4–6. But that concurrence acknowledged that administrative stays derive from courts' inherent power to manage their own dockets—a power that entails considerable discretion and that courts themselves are in the best position to assess how to employ. 144 S. Ct. at 798 (Barrett, J., concurring) (entry of administrative stay is "an exercise of" a court's "docket-management authority"). That's why Justice Barrett explained that courts should rule promptly when possible, but that she "would not get into the business" of "review[ing] the decision of a court of appeals to enter—or not enter—an administrative stay." *Id.* at 799.

**2.** Worse, while Defendants' motions purport to be about the propriety of the administrative injunction, they fail even to mention the standard governing administrative injunctions under this Court's precedent—

3

where the "touchstone is the need to preserve the status quo." *Ross*, 977 F.3d at 702. Instead, Defendants repeatedly invoke the separate standard for stays pending appeal under *Nken v. Holder*, 556 U.S. 418 (2009), and for injunctions under *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008). *See* Gov't.5–6 (*Nken*), 7 (*Winter*); Res.10–11 & n.1 (same; relying on dissents in *Ross* and *Doe #1*). But this Court has already rejected this maneuver, holding that it "erroneously collapses the distinct legal analyses for an administrative stay and a motion for stay pending appeal." *Ross*, 977 F.3d at 702. Rather, "[w]hen considering the request for an administrative stay, our touchstone is the need to preserve the status quo," and this Court "defer[s] weighing the *Nken* factors until the motion for stay pending appeal is considered." *Id.* (citing *Doe #1*, 944 F.3d at 1223). Further, the party seeking to change the status quo bears the burden of demonstrating "sufficient exigency to justify changing the status quo, particularly during the few weeks before" the court resolves "the merits of the emergency motion." *Doe #1*, 944 F.3d at 1223.

This is the "definitive[]" standard for evaluating "administrative stay motions" in this Circuit, and the Court is "not free to depart from" it. *Ross*, 977 F.3d at 702. Applying it here requires denying Defendants' motion.

**3.** First, there is no doubt here about "the need to preserve the status quo." *Id.* As the district court correctly found, Plaintiffs will suffer immediate, irreparable harm upon transfer of Oak Flat and commencement of

4

mining activities. 1-ER-111–13. This includes restrictions on Plaintiffs' ability to access Oak Flat, irreversible harm to Oak Flat's surface, and interference with Plaintiffs' ongoing religious practices. *Id.* Indeed, the government's own EIS admits that the impact on tribal resources will be "immediate, permanent, and large in scale," 3-EIS-892, and that Plaintiffs will suffer "permanent[]," "irreversible," and "irretrievable" harm. 2-EIS-837.

Nor is there any serious dispute about "the relative consequences" of maintaining versus dissolving the administrative stay. *Texas*, 144 S. Ct. at 798 (Barrett, J., concurring). If this Court keeps the stay in place now but reverses course later, Defendants lose little or nothing: they can still proceed with the project, which the government itself has voluntarily delayed for over a decade, and still recover every ounce of copper. But if this Court dissolves the stay now and reverses course later, Plaintiffs suffer devastating harm: loss of their religious practices and physical destruction of Oak Flat. That is why another district court previously concluded "[t]here is no close question in this matter. It is abundantly clear that the balance of equities 'tips sharply' in Plaintiff[s'] favor." *Apache Stronghold*, 782 F. Supp. 3d at 770.

**4.** Defendants have not even come close to demonstrating "sufficient exigency to justify changing the status quo." *Doe #1*, 944 F.3d at 1223. Resolution claims it faces "irreparable harm" due to various monetary "costs" it incurs while it "waits for" the land transfer. Res.12–20. But it's

5

blackletter law that "monetary injury is not normally considered irreparable." *Doe #1 v. Trump*, 957 F.3d 1050, 1060 (9th Cir. 2020); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 676 (9th Cir. 1988) ("no showing that the threat to the owners' revenues constituted an irreparable injury."). And while Resolution also threatens to inflict "significant consequences on the entire local and regional economy" by withholding spending unless it immediately gets its way, Res.18, that argument is precluded, too: Indeed, "monetary injury to third parties … or to the economy in general provides an even weaker justification for a finding of 'irreparable harm,'" *Trump*, 957 F.3d at 1060.

In any event, Resolution fails to explain how these alleged monetary harms have suddenly become "exigen[t]." *Doe #1*, 944 F.3d at 1223. Resolution claims financial consequences are accruing "while [it] waits for the government to implement" the land-transfer rider. Res.13. But the government delayed implementing the land-transfer rider for more than a decade before this lawsuit was even filed. After the rider was slipped into a must-pass defense spending bill in 2014, the government took eleven years to begin moving forward with it—waiting seven years to publish the first EIS, only to withdraw it voluntarily and wait another four years to publish it again. Dkt.25.1 at 20–21. Yet in all that decade-plus, neither the government nor Resolution ever claimed that this self-imposed delay flouted an "express statutory mandate" or caused "irrepa-

6

rable harm." Res.15–16, 20. And neither Defendant even attempts to explain why giving this Court a few days to adequately consider Plaintiffs' injunction-pending-appeal motions will somehow be the straw that breaks the camel's back.

That's because these alleged harms, if they exist at all, are temporary, sharply contrasting with the permanent and irreparable harm faced by Plaintiffs. In the unlikely scenario that courts uphold the transfer and mine as lawful, the copper will still be there, and the "procurement spending" Resolution has "frozen" can be "releas[ed]." Res.18, 20. And in the more likely scenario in which this Court enters a lasting injunction, that simply reflects the unlawfulness of the government's actions and the risks Resolution knowingly took lobbying for a project aimed at destroying a vital religious site.

And indeed, Resolution's own arguments highlight the mismatch between its alleged harms and the administrative stay it claims is causing them. For example, while Resolution complains of "$545 million in holding costs" it has incurred since "2021," Res.16, those costs can't possibly be attributed to the administrative injunction. Again, the government *voluntarily* withdrew the first EIS in 2021, and it didn't face the administrative injunction until a few weeks ago. 1-EIS-ES-3. Further, Resolution's witness admitted under cross examination that Resolution began incurring these very "holding costs" "in 2004"—"a full decade before Congress" even passed the land-transfer rider at all, and thus "long before it

7

had any real expectancy interest in the … land it now hopes to mine." *Apache Stronghold*, 782 F. Supp. 3d at 768. Resolution's choice "to expend its money in anticipation of a transfer it hopes will … occur … is just that—Resolution Copper's voluntary choice." *Id.* It is no basis for this Court to let the government inflict irreparable harm on Plaintiffs by completing the transfer before the Court has sufficient time to resolve the complex legal issues pending before it.

**5.** Because Defendants wrongly invoke the *Nken* factors, their recapitulation of their arguments on the underlying motions for injunction pending appeal is misplaced. Resolution in particular spends pages repeating its arguments on those motions with citations to its own briefing. Res.7–9. This Court, however, "need not wade into the underlying merits of the issues on appeal" to evaluate an administrative injunction, *Ross*, 977 F.3d at 703—so Plaintiffs will not repeat the arguments in their injunction-pending-appeal and merits briefing. Dkts.3.1, 12.1, 25.1. In any event, Defendants' presentation of their substantive arguments here only underscores that those arguments are meritless.

For example, the overriding theme of Defendants' motions is that Plaintiffs seek an "injunction *against an Act of Congress*," Res.1; *see also* Res.2, 6–7; Gov't.7; that "Congress has already balanced" the interests at issue here, Res.1; and that "Congress has expressly directed [the transfer] to occur by a date certain," Gov't.6, creating a "mandatory congres-

8

sional deadline" that Plaintiffs supposedly seek to prevent the government from meeting, Res.11.

But none of this is true. Plaintiffs don't seek to *enjoin* an Act of Congress; they seek to *enforce* it. In particular, they seek to enforce its express requirement that the Forest Service "carry out the land exchange in accordance with the requirements of [NEPA]." 16 U.S.C. § 539p(c)(9)(A)–(B). Nor has Congress definitively "balanced" the relevant interests. Rather, by enacting the land-transfer rider while declining to exempt it from the operation of the Religious Freedom Restoration Act, Congress called on "Federal court[s]" to "strik[e] sensible balances between religious liberty and competing prior governmental interests." 42 U.S.C. § 2000bb(a)(5). And Congress didn't direct the transfer "by a date certain"; it directed it to occur "60 days after" the issuance of a NEPA-compliant EIS. 16 U.S.C. § 539p(c)(10). Whether the EIS here complies with NEPA is, of course, one of the central issues in this litigation.

In short, Defendants' claim that the administrative injunction should be dissolved because it constitutes an improper "injunction against a federal statute" (Res.2) presumes their reading of the statute is correct—which is exactly what the parties are fighting about in the underlying injunction-pending-appeal and merits briefing. That circular reasoning provides no basis for the Court to disturb the administrative injunction or cut short its deliberation on the motions for injunction pending appeal.

9

# CONCLUSION

This Court should deny Defendants' motions to dissolve the administrative stay.

Respectfully submitted,

/s/ *Miles E. Coleman*
Miles E. Coleman
NELSON MULLINS RILEY & SCARBOROUGH LLP
2 W. Washington St., Suite 400
Greenville, SC 29601
(864) 373-2352
miles.coleman@nelsonmullins.com

Jeffrey A. Wald
NELSON MULLINS RILEY & SCARBOROUGH LLP
380 Knollwood Street, Suite 530
Winston-Salem, NC 27103
(336) 774-3335
jeffrey.wald@nelsonmullins.com

Madeline C. Bergstrom*
NELSON MULLINS RILEY & SCARBOROUGH LLP
101 Constitution Ave. NW, Suite 900
Washington, DC 20001
(202) 689-2807
madeline.bergstrom@nelsonmullins.com

*application for admission forthcoming*

## CERTIFICATE OF COMPLIANCE

This motion complies with the requirements of Fed. R. App. P. 27(d) and Circuit Rules 27-1(1)(d) and 32-3(2) because it has 2,166 words.

This motion also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ *Miles E. Coleman*
Miles E. Coleman

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 10, 2025. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Miles E. Coleman*
Miles E. Coleman

*Counsel for Plaintiffs-Appellants*