Nos. 25-5185, 25-5189, 25-5197

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ARIZONA MINING REFORM COALITION, et al.,
*Plaintiffs–Appellants*,
v.
UNITED STATES FOREST SERVICE, et al.
*Defendants–Appellees*.
and
RESOLUTION COPPER MINING, LLC,
*Intervenor-Defendant–Appellee*

(caption continued on following page)

Appeal from the United States District Court for the
District of Arizona
Nos. 2:21-cv-68, 2:21-cv-122, 2:25-cv-2758 (Hon. Dominic W. Lanza)

**REPLY IN SUPPORT OF FEDERAL APPELLEES' EXPEDITED
MOTION TO DISSOLVE THE ADMINISTRATIVE INJUNCTION**

EZEKIEL A. PETERSON
U.S. Department of Justice
999 18th St., North Terrace,
Suite 600
Denver, CO 80202
(202) 598-6399

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*

THEKLA HANSEN-YOUNG
ERIKA NORMAN
ANGELA ELLIS
*Attorneys*
Environment & Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044

(caption continued from previous page)

————————————————

SAN CARLOS APACHE TRIBE, et al.,
*Plaintiffs–Appellants*,

v.

UNITED STATES FOREST SERVICE, et al.
*Defendants–Appellees.*

and

RESOLUTION COPPER MINING, LLC,
*Intervenor-Defendant–Appellee*

————————————————

GOUYEN BROWN LOPEZ, et al.,
*Plaintiffs–Appellants*,

v.

UNITED STATES OF AMERICA, et al.
*Defendants–Appellees.*

and

RESOLUTION COPPER MINING, LLC,
*Intervenor-Defendant–Appellee*

————————————————

# TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................i

TABLE OF AUTHORITIES ......................................................... ii

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..............................1

ARGUMENT ......................................................................3

    A.    It is "manifestly unlawful" to permit an administrative injunction to remain in effect throughout an appeal ............................3

    B.    Plaintiffs bear the burden to establish that any injunction is warranted. ........................................................7

    C.    The administrative injunction is inflicting harm on the national security interests of the United States. ...................................10

CONCLUSION ................................................................11

CERTIFICATE OF COMPLIANCE ................................................13

# TABLE OF AUTHORITIES

## Cases

*Doe #1 v. Trump*,
    944 F.3d 1222 (9th Cir. 2019) ........................................................... 4, 8

*Hobby Lobby Stores, Inc. v. Sebelius*,
    568 U.S. 1401 (2012) .................................................................... 2, 6, 8

*Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012) ............................................................. 7

*Lopez v. United States*,
    2025 WL 2380475 (D. Ariz. August 17, 2025) ...................................... 7

*National Urban League v. Ross*,
    977 F.3d 698 (9th Cir. 2020) .......................................................... 4, 8, 9

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................ 5, 6

*Respect Maine PAC v. McKee*,
    562 U.S. 996 (2010) ........................................................................ 2, 6

*Rojas-Espinoza v. Bondi*,
    No. 24-7536, 2025 WL 2993230 (9th Cir. Oct. 24, 2025) ............. *passim*

*United States v.Texas*,
    144 S. Ct. 797 (2024) ...................................................................... 4, 9

*Winter v. Natural Resources Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................... 1, 2, 6, 7, 9

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Under this Court's recent precedent, the "temporary injunction" issued by the motions panel seventy-eight days ago is "manifestly unlawful." *Rojas-Espinoza v. Bondi*, __F.4th __, 2025 WL 2993230, at *9 (9th Cir. Oct. 24, 2025). *Rojas-Espinoza* holds that an administrative stay cannot lawfully function as a *de facto* stay pending appeal. Such a stay "flagrantly violates" this Court's precedent because, once the emergency motion is fully briefed, "'the court [is] equipped to rule," and its "obligation" to rule on the motion "[is] triggered." *Id.* at *8 (citation omitted).

Here, that obligation was triggered more than two months ago when briefing on Plaintiffs' emergency motions for injunction pending appeal was complete. This Court's ongoing "temporary" injunction—which Plaintiffs now ask to extend indefinitely—squarely violates Rojas-*Espinoza*.

Plaintiffs have thus unlawfully obtained extraordinary relief to which they are not entitled. An injunction pending appeal requires a clear showing that all four *Winter* factors are met. *Winter v. Natural Resources Def. Council, Inc.* 555 U.S. 7 (2008). Not only has no judge made such a finding, but the only judge to review the merits and equities in these consolidated cases concluded that Plaintiffs were not entitled to *any* injunctive relief because their claims "did not 'present close or serious questions.'" 1-ER-0095.

1

Plaintiffs' oppositions underscore their strategy: to enjoy the benefit of an injunction they failed to win by converting a temporary administrative order into a *de facto* reversal of the district court. To do this, they attempt to turn the *Winter* standard on its head. They argue that this "temporary" injunction is now the "status quo" and that the *government* bears the burden of proving an "exigency" to dissolve it.

This is wrong. As the Supreme Court has recognized, a "request for an injunction pending appeal 'does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by lower courts.'" *Hobby Lobby Stores, Inc. v. Sebelius*, 568 U.S. 1401, 1403 (2012) (Sotomayor, J., in chambers) (quoting *Respect Maine PAC v. McKee*, 562 U.S. 996, 996 (2010)). The district court's *denial* of an injunction is the status quo. Plaintiffs bear the heavy burden of justifying judicial intervention, and this unlawful administrative stay cannot relieve them of that responsibility.

The Court should dissolve this unlawful injunction immediately. Plaintiffs' arguments fail for three primary reasons.

*First*, the lengthy administrative injunction is "manifestly unlawful" under *Rojas-Espinoza*. Its sole purpose—to give the Court time to consider the *Winter* motions—was fulfilled when briefing on those motions closed more than two months ago. Its continuation as a *de facto* injunction pending appeal without any *Winter* analysis is a clear violation of controlling precedent.

2

*Second*, Plaintiffs bear the burden to justify an injunction. Their attempt to shift this burden to Defendants by mischaracterizing the "status quo" is contrary to law.

*Finally*, the injunction is not only unlawful; it is also inflicting unwarranted harm to the interests of the United States. The district court already found Plaintiffs have no likelihood of success. Meanwhile, each day the injunction persists, it prevents a congressionally mandated land exchange, impeding the United States' national security priority of increasing domestic copper production. *See* Declaration of Michael P. Cadenazzi ¶ 10.

## ARGUMENT

### A. It is "manifestly unlawful" to permit an administrative injunction to remain in effect throughout an appeal.

This Court's precedent makes clear that an administrative injunction cannot lawfully function as an injunction pending appeal. *Rojas-Espinoza*, 2025 WL 2993230, at *8 n.3 (rejecting practice of "combin[ing] rulings on stay motions with rulings on the merits"). On October 24, 2025, a panel of this Court denounced as "manifestly unlawful" administrative stays that persist for months after briefing on the underlying emergency motion is complete. *Id.* at *8-9. The Court recognized that, where a "'temporary' stay remain[s] in effect all the way through disposition of the appeal," the stay is, "for all practical purposes,

3

*granted in full.*" *Id.* at 7 n.2 (emphasis in original). And it is unlawful, the Court held, to grant such an extended stay without ruling on the merits of the motion.

In *Rojas-Espinoza*, the petitioners moved for a stay pending the Court's disposition of their petition for review of an Immigration Judge's decision ordering their removal. 2025 WL 2993230, at *1. Under this court's General Order 6.4(c)(1), the filing of the stay motion triggered an automatic "temporary administrative stay pending resolution of that motion." *Id.* at *2 (citing Ninth Cir. Gen. Order 6.4(c)(1)). The government opposed the stay. *Id.* at 2. Consistent with "the widespread, if not standard, practice of this court's internal operations," *id.* at *7, the clerk's office then held the fully briefed stay motion until merits briefing was closed, and argument calendared, seven months later, *id.* at *2. As a result, "the supposedly 'temporary' stay" that issued automatically when petitioners filed their stay motion "remained in place for a full seven months over the Government's objection." *Id.* at *7.

Citing this Circuit's decisions in *Doe #1 v. Trump*, 944 F.3d 1222 (9th Cir. 2019), and *National Urban League v. Ross*, 977 F.3d 698 (9th Cir. 2020), and the Supreme Court's decision in *United States v. Texas*, 144 S. Ct. 797 (2024), this Court reiterated that administrative stays are "*only* intended to preserve the status quo *until* the substantive motion for a stay pending appeal can be decided on the merits." *Rojas-Espinoza* 2025 WL 2993230, at *8. The court concluded that petitioners' "extended

4

stay" of seven months after briefing on the motion was complete "flagrantly violates these principles." *Id*. That was so, because "[o]nce the stay motion in [that] case was fully briefed in February 2025, 'the court was equipped to rule,'" and its "obligation" to rule on the motion "was triggered." *Id.* (cleaned up).

As the court recognized, by delaying a decision on the stay motion until it could be considered by a merits panel along with the completed merits briefing, "the ostensible administrative stay ha[d] effectively become a stay pending appeal, but without any consideration of the *Nken* factors." *Id.* at *8 (citing *Nken v. Holder*, 556 U.S. 418 (2009)). The court emphatically condemned that result, observing that "it is manifestly unlawful to allow a temporary stay to be continued" for several months "after an opposed stay motion has been fully briefed." *Id.* at *9. It was also unequivocal, explaining that "holding stay motions until they can be presented to the merits panel together with the completed merits briefing squarely violates *Nken*[]." *Id.*

Under this precedent, the continued administrative injunction here is plainly unlawful. Just as the stay in *Rojas-Espinoza* was issued over the government's objection, Plaintiffs' emergency motions here were vigorously contested. As in *Rojas-Espinoza*, those motions have been fully briefed for months without any decision. And, just as the petitioners in *Rojas-Espinoza* received an extensive stay without carrying their burden under *Nken*, Plaintiffs here are for all practical purposes benefitting from

an injunction pending appeal to which no court has found them entitled under *Winter*.[1]

In fact, the administrative injunction here requires a "significantly higher justification" than the stay in *Rojas-Espinoza*, because here the motions panel did not merely issue a stay; instead, it granted the very injunction that the district court—having thoroughly reviewed the merits and equities—denied. *See Respect Maine*, 562 U.S. at 996 (injunction against enforcement of presumptively valid statute "demands a significantly higher justification than a request for a stay, because unlike a stay, an injunction does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by lower courts") (cleaned up); *see also Hobby Lobby*, 568 U.S. at 1403 .

By the time the merits panel hears argument in January, the fully briefed motions will have been pending for nearly five months. AMRC's request that the Court delay deciding the motions until after it hears full merits argument thus directly conflicts with *Rojas-Espinoza*'s holding that such an extended injunction "flagrantly violates" the law. *Rojas-Espinoza,* 2025 WL 2993230, at *8.

---

[1] Because Plaintiffs seek an injunction pending appeal rather than a stay, *Winter* provides the applicable standard here, while *Rojas-Espinoza* addressed the factors for a stay pending appeal under *Nken*. But the factors that courts consider in evaluating motions for preliminary injunction under *Winter* are the same as the factors set out in *Nken* for stays pending appeal. *See Nken*, 556 U.S. at 434.

As *Rojas-Espinoza* confirms, once the motions for injunction pending appeal were fully briefed on August 19, 2025, "the court was equipped to rule," and its "obligation" to do so "was triggered." *Id.* (cleaned up). Under these circumstances, the continued administrative injunction lacks a lawful basis and should be immediately dissolved. The Court is obligated, under binding precedent, to rule on the motions. And, on the merits, the motions undeniably fail.

### B. Plaintiffs bear the burden to establish that any injunction is warranted.

It is undisputed that Plaintiffs—as the parties seeking the drastic remedy of an injunction pending appeal—bear the burden to establish "by a clear showing" that each of the four *Winter* factors are satisfied. *See Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (citation omitted). And no judge has found that Plaintiffs carried that burden here.[2]

The motions panel made clear that the injunction here was intended merely to "preserve the status quo while the motions [for injunctions pending appeal] are pending." Dkt. No. 19. The order expressly "t[ook] no position on the merits of the motions." *Id.*

---

[2] Indeed, the district court concluded in its thorough decision that the Plaintiffs were not entitled to any injunctive relief. 1-ER-0095. In fact, Plaintiffs' claims did not even "present close or serious questions." *Id.*; *Lopez v. United States*, 2025 WL 2380475 at *11 (D. Ariz. August 17, 2025) (denying injunction pending appeal "for the same reasons" as in *San Carlos* and *AMRC*). As noted in our Answering Brief, the government maintains and preserves for review by the en banc Court or the Supreme Court the argument that "serious questions" would not satisfy *Winter*. Appellees' Answering Br. at 29 n.3, Dkt. No. 76.1.

7

Seizing on the idea that administrative injunctions do not weigh the merits, Plaintiffs attempt to shift their burden to Defendants. Lopez contends that Defendants, as "the party seeking to change the status quo[,] bear[] the burden of demonstrating 'sufficient exigency to justify changing the status quo.'" Lopez Opp. at 2, 4 (quoting *Doe #1*, 944 F.3d at 1223).

That is wrong. To start, the administrative injunction here did not preserve the status quo; it upended it. Before the motions panel's intervention, the Land Exchange Act was in effect and the government was required to proceed with title transfer on the timeline required by that Act. A "request for an injunction pending appeal does not simply suspend judicial alteration of the status quo but *grants judicial intervention that has been withheld by lower courts.*" *Hobby Lobby,* 568 U.S. at 1403 (Sotomayor, J., in chambers) (emphasis added) (citation omitted)). Thus, Plaintiffs are not seeking merely a stay but instead seek judicial intervention to upend the status quo based on claims that do not even "present close or serious questions," 1-ER-0095, let alone any likelihood of success on the merits. *See also* Reply Br. of Resolution Copper at 1-2, 4, Dkt. No. 130.1.

In addition, Lopez relies on language from *Doe #1*, which merely found that the party seeking the stay failed show it was warranted. 944 F.3d at 1223. But nothing in *Doe #1* (nor this Court's subsequent decisions in *Ross* and *Rojas-Espinoza*) suggests that a party is

presumptively entitled to an indefinite injunction. And even if Plaintiffs were correct about the status quo (they are not), nothing in this Court's precedent supports the idea that analysis of the status quo alone can supplant Plaintiffs' mandatory burden under *Winter*.

Instead, this Court's precedent makes clear that the sole purpose of an administrative stay, and even more so an administrative injunction, is to afford the Court the time to decide whether the party seeking the injunction pending appeal has carried its burden. *See, e.g., Ross*, 977 F.3d at 700-01 ("[A]n administrative stay is *only* intended to preserve the status quo until the substantive motion for stay pending appeal can be decided on the merits.") (citation omitted). Thus, by definition, such an injunction "should last no longer than necessary to make an intelligent decision on the motion." *Texas*, 144 S. Ct. at 799 (Barrett, J., concurring); *Rojas-Espinoza*, 2025 WL 2993230 at *8 ("[A]n administrative stay is supposed to be *a short-lived prelude* to the main event: a ruling on the motion for a stay pending appeal."(citation omitted)).

The question posed by this motion is not, as Lopez proposes, whether Defendants can demonstrate "sufficient exigency" to justify dissolving the injunction. Lopez Opp. at 2, 4. Nor is it, in AMRC's formulation, what would be "the safest and least disruptive path." AMRC Opp. 3. While Defendants vigorously contest Plaintiffs' conception of the status quo and their description of what is "safest and least disruptive," those are not the factors now before this Court. The question here is

whether the ostensibly temporary injunction that has now been in place for two and a half months is lawful under this Court's controlling precedent. As discussed above, it is not.

### C. The administrative injunction is inflicting harm on the national security interests of the United States.

An injunction pending appeal is improper for the reasons provided in the government's opposition to Plaintiffs' motions for injunction pending appeal and motion to dissolve the administrative injunction. *See* Dkt. Nos. 13, 83.1. Plaintiffs assert in their opposition that an injunction pending appeal would not cause substantial harm to the United States. AMRC Opp. at 13-14; Tribe Opp. at 18; Lopez Opp. at 1, 5. They are wrong. Each day that the United States is enjoined from proceeding with the congressionally mandated land exchange delays the United States' ability to increase its domestic copper production.

When unlawful delay extends days, weeks, and then months, it unacceptably impedes the ability of the United States to reduce its dependence on foreign copper. Cadenazzi Decl. ¶ 14. "Copper is indispensable to a wide range of defense systems," and the U.S. Department of War "has identified reliable access to copper and its co-products as essential to maintaining U.S. military readiness." *Id.* ¶¶ 7, 10. According to the Department, "[t]he United States must urgently increase both copper mining and copper refining capabilities to ensure

sufficient domestic supply of this critical mineral and its critical co-products to keep pace with, and reduce reliance on, foreign competitors and adversaries." *Id.* ¶ 10.

The Department has also identified the Resolution Copper mining project as "uniquely positioned to help the United States address these critical national security risks." *Id.* ¶ 12. As "one of the largest undeveloped copper deposits in the world," its anticipated annual production could "meet approximately 25% of current U.S. copper demand for forty years." *Id.* And refining the copper ore domestically at the smelter operated by Rio Tinto plc "would directly support a vertically integrated U.S. copper supply chain." *Id.* ¶ 13.

Plaintiffs emphasize that, even once the land exchange occurs, "production of copper is many years away." AMRC Opp. 13; *see also* Tribe Opp. at 22. But that only increases the urgency to proceed with the land exchange expeditiously. This Court should not allow Plaintiffs to compound the challenges the government already faces in securing this critical mineral, much less based on an injunction issued without any assessment of the merits.

## CONCLUSION

For these reasons, this Court should grant this motion and dissolve the temporary administrative injunction.

11

Respectfully submitted,

/s/ *Robert N. Stander*

EZEKIEL A. PETERSON
U.S. Department of Justice
999 18th St., North Terrace,
Suite 600
Denver, CO 80202
(202) 598-6399

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*

THEKLA HANSEN-YOUNG
ERIKA NORMAN
ANGELA ELLIS
*Attorneys*
Environment & Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-2701

November 4, 2025
90-1-4-16263
90-2-4-16252
90-1-4-16516

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 2,594 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

*/s/ Robert N. Stander*
ROBERT N. STANDER

Counsel for Federal Respondents

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| ARIZONA MINING REFORM COALITION, et al., ) ) ) ) *Plaintiffs*; ) ) v. ) ) UNITED STATES FOREST SERVICE, et al., ) ) *Defendants*. ) ) ) ) ) | No. 25-5185 |

## DECLARATION OF MICHAEL P. CADENAZZI

Pursuant to 28 U.S.C. § 1746, I, Michael P. Cadenazzi, declare as follows:

1.  I am the Assistant Secretary of War for Industrial Base Policy. I have served in this position since September 23, 2025.

2.  In my current role, I am the principal advisor to the Under Secretary of War for Acquisition and Sustainment on industrial base policies, and I lead the Department of War's efforts to develop and maintain the U.S. defense industrial base. In this capacity, I am responsible for ensuring a secure supply of materials critical to national security, including copper and other critical minerals, and anticipating and closing gaps in the defense industrial base's ability to manufacture defense systems for the U.S. military.

3.  As part of my responsibilities, I am familiar with the domestic and global copper industry and with the Resolution Copper mining project in Arizona. I make this declaration based

1

on personal knowledge and information provided to me in the course of my official

duties.

4.  Currently, the United States does not mine enough copper to meet the nation's needs.
    According to the U.S. Geological Survey, U.S. consumption of refined copper was 1.6
    million tons in 2024, but the United States mined only 1.1 million tons that year
    (measured by copper content of ore).  The gap in U.S. copper refining is also stark: the
    United States produced only 890,000 tons of refined copper in 2024, enough to meet
    about half of U.S. needs. The United States had to import foreign-refined copper to meet
    much of the rest of its demand. As a result, the United States must urgently increase
    domestic mine production and copper refining to reduce U.S. reliance on foreign sources.

5.  Reliance on foreign sources for copper and its byproduct critical minerals poses a
    significant risk to U.S. national security. According to the U.S. Geological Survey, the
    United States ranked fifth in mined copper ore production in 2024 at 1.1 million tons,
    significantly behind the Democratic Republic of the Congo in third at 2.5 million tons
    and China in fourth at 1.7 million tons, with Russia closely behind in seventh at 0.93
    million tons.

6.  Even more concerning, China now controls over 50% of global refined copper
    production, according to the International Copper Study Group. China's copper refinery
    production was 13 times higher than U.S. copper refinery production in 2024. In this
    context, the United States was reliant on imports to meet 45% of domestic copper
    demand in 2024 because the United States lacks both sufficient mining and refining
    operations to produce and convert U.S.-mined copper ore into the refined copper products
    the nation needs, including for critical defense systems.

7. Copper is indispensable to a wide range of defense systems because of the essential role it plays in electrical systems, electronics and computing, and structural applications. The conductive capabilities of copper wire enable the flow of electricity necessary to nearly every powered defense system, from commercial-off-the-shelf items to the most advanced defense systems, such as aircraft, ground vehicles, warships, submarines, missiles, and many munitions. These include, for example, F-35 fighters, SM-3 surface-to-air missiles, M1 Abrams tanks, Arleigh Burke destroyers, Virginia and Ohio class submarines, and satellites.

8. The copper industry also supports the production of other important minerals, including defense-critical metals that are largely produced as co-products of copper mining and refining, such as tellurium, selenium, molybdenum, rhenium, indium, bismuth, and arsenic. These minerals are essential for high-strength alloys, sensors, microelectronics, and other advanced defense technologies. Because these critical minerals are largely co-products of copper, China also controls a significant share of global production for many of these minerals. Reliance on foreign sources for these co-products of copper mining likewise poses risks to U.S. national security.

9. A strengthened domestic copper industry will also sustain and further develop the nation's mining and metals workforce. This, in turn, is necessary to support re-shoring production—i.e., returning production operations from foreign countries to the United States—of additional critical minerals.

10. The Department of War has identified reliable access to copper and its co-products as essential to maintaining U.S. military readiness and the technological superiority needed to best position our warfighters to deter, and when needed, defeat adversaries. Secure,

domestic sourcing and refining of copper and its co-products is a national security priority for the Department of War and the nation. The United States must urgently increase both copper mining and copper refining capabilities to ensure sufficient domestic supply of this critical mineral and its critical co-products to keep pace with, and reduce reliance on, foreign competitors and adversaries.

11. This is a critical juncture for the global copper refining industry. In recent years, China has rapidly expanded its copper refining (also called "smelting") capacity, but global copper mining has not increased at the same pace. This structural imbalance has intensified competition between global copper smelters for the limited supply of copper ore they need to remain operational. This crisis is evidenced by the collapse in refining charges, a key source of copper smelters' revenue, which fell to $0 and even negative values in spot markets in 2024. The result is that many global copper smelters are struggling to stay in operation, with copper smelters in partner nations such as Japan and Australia announcing reduced operations or receiving government assistance. While commodity market dynamics are temporary, China's enduring dominance in copper smelting gives China the ability to influence the copper market over the long-term at the expense of U.S. and partner nation smelters and national security.

12. The Resolution Copper mining project in Arizona ("Resolution") is uniquely positioned to help the United States address these critical national security risks. Because of its large scale, Resolution can play a critical role in reducing China's ability to influence the copper market by producing a secure source of high-grade ore for U.S. copper smelters. Resolution is one of the largest undeveloped copper deposits in the world, and its reported copper ore grade is five times higher than the average ore grade of the five

4

largest U.S. copper mines. Resolution's anticipated annual production of 0.5 million tons would meet approximately 25% of current U.S. copper demand for forty years. Resolution can also produce essential copper co-products needed for defense systems and strategic economic sectors, including molybdenum, silver, rhenium, tellurium, indium, and bismuth.

13. Resolution would also increase the availability of U.S. copper ore for domestic copper smelters, thereby increasing production of refined copper to meet a greater share of U.S. demand and better withstand future market shocks and supply chain risks, including those caused by Chinese oversupply. Rio Tinto Plc, the majority owner of Resolution, owns a copper smelter in Utah that operated well below its capacity in 2025. Refining copper ore from Resolution in Utah would directly support a vertically integrated U.S. copper supply chain and mitigate key supply chain bottlenecks and risks. Secure, high-grade ore supply from Resolution could also attract investment for expanding or constructing new U.S. smelters, which could further decrease U.S. reliance on foreign sources and the related national security risks.

14. The sooner that Resolution can begin construction, the sooner the United States can significantly reduce its vulnerability to copper market shocks and reliance on foreign copper sources. This is important to ensuring that the United States and its partners are not reliant on imports from adversaries of a critical input to the manufacturing of defense systems. Copper ore is urgently needed now, including because of the ongoing ore shortage threatening non-Chinese copper smelters and to meet expected long-term growth in U.S. and global copper demand. It will be decades too late to begin the process of

constructing a new mine to meet that demand. For this reason, any delay in expediting

mining at Resolution is causing harm to the United States' national security interests.

15. The urgency of moving forward with Resolution has increased in the past three years.

China has leveraged its dominance in a range of critical minerals, including gallium,

germanium, antimony, and rare earths, in an attempt to cut off supply to the United States

and coerce foreign partners by announcing export restrictions and bans in 2023, 2024,

and 2025. Given China's recent actions to oversupply the refined copper market and

curtail supply of other critical minerals, the United States must be prepared to withstand

these shocks as soon as possible, and Resolution is an important component of U.S.

preparedness and U.S. national security in this area. While each day the project is delayed

might seem individually insignificant, cumulatively such delays compound and create a

significant cascading effect on the ability of the United States to reduce its foreign

reliance and vulnerabilities.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

correct to the best of my knowledge.


Dated: November 3, 2025

CADENAZZI.MICH   Digitally signed by
AEL.P.JR.10129267   CADENAZZI.MICHAEL.P.JR.101
38   29267 38
   Date: 2025.11.03 13:14:01 -05'00'

HON Michael P. Cadenazzi
Assistant Secretary of War
   for Industrial Base Policy

6