# Nos. 25-5185, 25-5189, 25-5197

# In The United States Court of Appeals for the Ninth Circuit

ARIZONA MINING REFORM COALITION, et al.,

*Plaintiffs-Appellants,*

v.

BROOKE L. ROLLINS, U.S. Secretary of Agriculture, et al.,

*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:21-cv-00122-PHX-DWL
Hon. Dominic W. Lanza

### CONSOLIDATED OPPOSITION OF RESOLUTION COPPER MINING LLC TO PETITIONS FOR REHEARING

Christopher D. Thomas
Andrea J. Driggs
Janet M. Howe
Benjamin A. Longbottom
HOLLAND & HART LLP
2398 E. Camelback Rd, Suite 650
Phoenix, AZ 85016
(602) 316-9334
CDThomas@hollandhart.com

Jeffrey Capelouto
PERKINS COIE LLP
1301 Second Avenue, Suite 4200
Seattle, WA 98101

Michael R. Huston
 *Counsel of Record*
Diane M. Johnsen
Addison W. Bennett
PERKINS COIE LLP
2525 E. Camelback Rd, Suite 500
Phoenix, AZ 85016
(602) 351-8000
MHuston@perkinscoie.com

Nicholas S. Crown
PERKINS COIE LLP
700 Thirteenth Street N.W., Suite 800
Washington, DC 20005

*Counsel for Resolution Copper Mining LLC*

SAN CARLOS APACHE TRIBE, a federally recognized Tribe,

*Plaintiff-Appellant,*

v.

UNITED STATES FOREST SERVICE,
an agency of the U.S. Department of Agriculture, et al.,

*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:21-cv-0068-PHX-DWL
Hon. Dominic W. Lanza

GOUYEN BROWN LOPEZ, et al.,

*Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA, et al.,

*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:25-cv-2758-PHX-DWL
Hon. Dominic W. Lanza

TABLE OF CONTENTS

**Page**

Introduction .................................................................................. 1

Background ................................................................................... 5

    A.    Statutory background ............................................. 5

    B.    Factual background ................................................ 7

    C.    Procedural background .......................................... 8

    D.    The panel decision and subsequent developments ................ 9

Argument ..................................................................................... 10

I.    These preliminary-injunction appeals are moot, and there is no sound basis to vacate the panel's well-reasoned opinion .......... 10

    A.    Plaintiffs' only requested equitable remedy cannot issue .................................................................... 10

    B.    The Tribe's contrary arguments regarding mootness lack merit ............................................................. 11

    C.    This interlocutory appeal is not an "extraordinary" or "exceptional" case warranting *Munsingwear* vacatur .......... 13

II.    AMRC's appraisal argument does not warrant *en banc* rehearing ................................................................... 15

    A.    AMRC's challenge does not meet the *en banc* standard ...... 16

    B.    The panel decision correctly applied straightforward property law and 150 years of precedent ........................... 17

    C.    Amici's valuation theory is forfeited, fact-bound, and wrong ................................................................. 24

III.    Lopez's arguments have *already* been rejected *en banc* ................. 26

    A.    Lopez's attempt to relitigate recent binding *en banc* precedent does not warrant further review ......................... 27

    B.    Lopez does not identify any other reason to disturb this Court's recent *en banc* precedent ............................. 33

IV. The Tribe seeks to countermand Supreme Court precedent based on fact-bound and meritless procedural gripes ..................... 38

    A. The Tribe's one-case-only procedural arguments do not merit *en banc* attention ................................................... 39

    B. The Forest Service complied with its obligation under NEPA to reasonably address significant effects of the project ............................................................. 40

    C. The Forest Service complied with its consultation obligations under the Exchange Act .................................... 42

Conclusion .................................................................................... 44

Certificate of Compliance ................................................................ 45

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Akina* v. *Hawaii,*
  835 F.3d 1003 (9th Cir. 2016) ............................................................ 11

*Alaska Miners* v. *Andrus,*
  662 F.2d 577 (9th Cir. 1981) ............................................................. 22

*Apache Stronghold* v. *United States,*
  101 F.4th 1036 (9th Cir. 2024) (en banc),
  *cert. denied,* 145 S.Ct. 1480 (2025),
  *reh'g denied,* 146 S.Ct. 285 (2025) ......................... 4, 6-9, 26-28, 32-37

*Arizona Mining Reform Coalition* v. *USFS,*
  172 F.4th 641 (9th Cir. 2026) ........................... 9, 15-16, 18-19, 21-23,
                                                     34-35, 38, 40-43

*Arizonans for Off. Eng.* v. *Arizona,*
  520 U.S. 43 (1997) ............................................................................. 14

*Assiniboine & Sioux Tribes* v. *Nordwick,*
  378 F.2d 426 (9th Cir. 1967) ............................................................. 22

*Azar* v. *Garza,*
  584 U.S. 726 (2018) ........................................................................... 14

*Best* v. *Humboldt Placer Mining Co.,*
  371 U.S. 334 (1963) ........................................................................... 20

*Bostock* v. *Clayton County,*
  590 U.S. 644 (2020) ........................................................................... 30

*Boston Chamber of Com.* v. *Boston,*
  217 U.S. 189 (1910) ........................................................................... 17

*Bowen* v. *Roy,*
  476 U.S. 693 (1986) ........................................................................ 34-35

*Burwell* v. *Hobby Lobby Stores, Inc.,*
  573 U.S. 682 (2014) ........................................................................... 31

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*Cameron* v. *United States*,
252 U.S. 450 (1920).................................................................19-20

*Crowell* v. *Mader*,
444 U.S. 505 (1980).................................................................13-14

*Del Webb Conservation Holding Corp.* v. *Tolman*,
44 F. Supp. 2d 1105 (D. Nev. 1999)......................................21

*Desert Citizens Against Pollution* v. *Bisson*,
231 F.3d 1172 (9th Cir. 2000)....................................... 12, 23

*Dickens* v. *Ryan*,
744 F.3d 1147 (9th Cir. 2014).........................................14

*Dorsey* v. *United States*,
567 U.S. 260 (2012).................................................29

*Duncan* v. *Bonta*,
131 F.4th 1019 (9th Cir. 2025) (en banc) ...........................37

*Employment Division* v. *Smith*,
494 U.S. 872 (1990)............................................... 28, 32

*Epic Sys. Corp.* v. *Lewis*,
584 U.S. 497 (2018).................................................24

*Farmer* v. *McDaniel*,
692 F.3d 1052 (9th Cir. 2012)........................................14

*Fields* v. *Palmdale Sch. Dist.*,
447 F.3d 1187 (9th Cir. 2006)........................................24

*Forbes* v. *Gracey*,
94 U.S. 762 (1876)..................................................18

*George* v. *McDonough*,
596 U.S. 740 (2022)..................................................31

*Gonzales* v. *O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006)..................................................30

# TABLE OF AUTHORITIES
## (CONTINUED)

Page(s)

*Haight* v. *Thompson*,
763 F.3d 554 (6th Cir. 2014) ................................................................ 33

*Haskell* v. *Harris*,
745 F.3d 1269 (9th Cir. 2014) (en banc) ...................................... 13, 25

*Holt* v. *Hobbs*,
574 U.S. 352 (2015) ............................................................................. 31

*Idaho Conservation League* v. *Bonneville Power Admin.*,
826 F.3d 1173 (9th Cir. 2016) ............................................................. 12

*In Defense of Animals* v. *Department of the Interior*,
648 F.3d 1012 (9th Cir. 2011) ...................................................... 11, 13

*In re Young*,
82 F.3d 1407 (8th Cir. 1996) .............................................................. 33

*International Bhd. of Teamsters* v. *ICC*,
818 F.2d 87 (D.C. Cir. 1987) .............................................................. 14

*Kettle Range Conservation Grp.* v. *BLM*,
150 F.3d 1083 (9th Cir. 1998) ............................................................ 11

*Kipp* v. *Davis*,
986 F.3d 1281 (9th Cir. 2021) ............................................................ 16

*Lockhart* v. *United States*,
546 U.S. 142 (2005) ....................................................................... 29, 30

*Lopez* v. *United States*,
No. 25A1008, 2026 WL 782718 (U.S. Mar. 19, 2026) ................. 8-9, 26

*Lyng* v. *Northwest Indian Cemetery Protective Association*,
485 U.S. 439 (1988) ............................................... 8, 27-29, 32, 34-36

*Mahmoud* v. *Taylor*,
606 U.S. 522 (2025) ............................................................. 8, 26, 34-36

*Marsh* v. *Oregon Nat. Res. Council*,
490 U.S. 360 (1989) ............................................................................. 6

# TABLE OF AUTHORITIES
### (CONTINUED)

Page(s)

*Mirabelli* v. *Bonta,*
607 U.S. 492 (2026)......................................................................35-36

*National Ass'n of Home Builders* v. *Defenders of Wildlife,*
551 U.S. 644 (2007)............................................................................29

*Noyes* v. *Mantle,*
127 U.S. 348 (1888)............................................................................21

*Respect Maine PAC* v. *McKee,*
562 U.S. 996 (2010)............................................................................15

*Save the Peaks Coal.* v. *USFS,*
669 F.3d 1025 (9th Cir. 2012)...........................................................37

*Seven County Infrastructure Coal.* v. *Eagle County,*
605 U.S. 168 (2025)........................................................... 6, 38-39, 41

*South Cent. Bell Tel. Co.* v. *Alabama,*
526 U.S. 160 (1999)............................................................................26

*Tanzin* v. *Tanvir,*
592 U.S. 43 (2020)..............................................................................31

*Te-Moak Tribe of W. Shoshone of Nev.* v. *Department of the Interior,*
608 F.3d 592 (9th Cir. 2010)..............................................................43

*Textile Mills Sec. Corp.* v. *Commissioner,*
314 U.S. 326 (1941)............................................................................37

*U.S. Bancorp Mortg. Co.* v. *Bonner Mall P'ship,*
513 U.S. 18 (1994)..............................................................................14

*United States* v. *Coleman,*
390 U.S. 599 (1968)............................................................................25

*United States* v. *Locke,*
471 U.S. 84 (1985).................................................................. 18, 20, 23

*United States* v. *Munsingwear, Inc.,*
340 U.S. 36 (1950)................................................................... 3, 13-14

## TABLE OF AUTHORITIES
### (CONTINUED)

**Page(s)**

*United States* v. *Shumway*,
199 F.3d 1093 (9th Cir. 1999) ....................................................... 19, 21

*University of Texas* v. *Camenisch*,
451 U.S. 390 (1981) .......................................................................... 11

*Vegas Diamond Props., LLC* v. *FDIC*,
669 F.3d 933 (9th Cir. 2012) ............................................................ 10

## U.S. CONSTITUTION

Art. IV, § 3, cl. 2 ................................................................................. 1

## STATUTES

Southeast Arizona Land Exchange and Conservation Act,
16 U.S.C. § 539p ................................................................................. 1
  16 U.S.C. § 539p(a) ................................................................ 1, 5, 23
  16 U.S.C. § 539p(b)(2) ................................................................. 1, 5
  16 U.S.C. § 539p(c)(1) .............................................................. 1, 29
  16 U.S.C. § 539p(c)(3) .......................................... 4, 6, 29, 40, 42-43
  16 U.S.C. § 539p(c)(4) ................................................................ 6, 17
  16 U.S.C. § 539p(c)(5) ................................................................ 6, 17
  16 U.S.C. § 539p(c)(8) ................................................................ 5, 38
  16 U.S.C. § 539p(c)(9) ..................................................................... 4
  16 U.S.C. § 539p(c)(9)(A) ........................................................... 5, 39
  16 U.S.C. § 539p(c)(9)(B) ................................................................. 5
  16 U.S.C. § 539p(c)(10) ............................................ 5, 7, 15, 30, 38
  16 U.S.C. § 539p(d)(1) ................................................................. 1, 5
  16 U.S.C. § 539p(f) ............................................................................ 5
  16 U.S.C. § 539p(g) ........................................................................... 5
  16 U.S.C. § 539p(g)(2)(B) ............................................................... 29
  16 U.S.C. § 539p(i)(1)(C) ................................... 3, 16-17, 19, 22-23

28 U.S.C. § 1292(a) ...................................................................... 10, 12

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

Religious Freedom Restoration Act (RFRA),
42 U.S.C. § 2000bb *et seq.* .................................................................6
    42 U.S.C. § 2000bb-1(a) ...............................................................30
    42 U.S.C. § 2000bb-1(b) ...............................................................28
    42 U.S.C. § 2000bb-3(b) ...............................................................29
    42 U.S.C. § 2000bb(a)(2) ...............................................................31
    42 U.S.C. § 2000bb(a)(4) ...............................................................28
    42 U.S.C. § 2000bb(a)(5) ...............................................................28
    42 U.S.C. § 2000bb(b)(1) ...............................................................28

Religious Land Use and Institutionalized Persons Act (RLUIPA),
42 U.S.C. § 2000cc *et seq.* ...............................................................33
    42 U.S.C. § 2000cc(a)(1) ...............................................................33
    42 U.S.C. § 2000cc-1(a) ...............................................................33
    42 U.S.C. § 2000cc-5(7)(B) ...........................................................31

Federal Land Policy and Management Act (FLPMA),
43 U.S.C. § 1701 *et seq.* .................................................................17

General Mining Law of 1872, 30 U.S.C. § 26 ................................. 15, 18

## REGULATIONS

36 C.F.R. § 254.2 ...............................................................................23

36 C.F.R. § 254.9(b) ...........................................................................17

36 C.F.R. § 254.9(b)(1)(i) ...................................................................23

36 C.F.R. § 254.9(c)(4) ................................................................. 17, 23

36 C.F.R. § 800.6(b) ...........................................................................43

## OTHER AUTHORITIES

139 Cong. Rec. 26,193 (1993) ...........................................................29

Antonin Scalia & Bryan Garner, *Reading Law* (2012) ........................30

H.R. Rep. No. 103-88 (1993) ...............................................................28

TABLE OF AUTHORITIES
(CONTINUED)

**Page(s)**

18 *Moore's Federal Practice* § 134.02 ...................................................... 37

S. Rep. No. 103-111 (1993) ........................................................................ 28

Uniform Appraisal Standards for Federal Land Acquisitions
§ 4.6.5.2 ............................................................................................... 23

U.S. Patent #02-2026-0002 ...................................................................... 22

## INTRODUCTION

After nearly a decade of debate spanning twelve bills and six hearings, a bipartisan Congress enacted the Southeast Arizona Land Exchange and Conservation Act of 2014, 16 U.S.C. § 539p. Congress exercised its constitutionally assigned power to manage federal lands for the benefit of the Nation, U.S. Const., art. IV, § 3, cl. 2, by "authoriz[ing], direct[ing], facilitat[ing], and expedit[ing]" the exchange of approximately 2,422 acres of Tonto National Forest land—known as Oak Flat—for more than 5,000 acres of ecologically and culturally significant land owned by Resolution Copper Mining LLC. 16 U.S.C. § 539p(a), (b)(2), (d)(1). The exchange will enable Resolution to develop one of the world's largest known deposits of copper—a resource vital to America's national interest. Congress left no question or discretion whether this land would be transferred or whether this mine would be built: once the Forest Service published a final environmental impact statement (FEIS), the Secretary of Agriculture was "directed" to convey the federal land to Resolution, and the transferred land "shall be available" to Resolution "for mining and related activities." *Id.* § 539p(c)(1), (8).

Three sets of Plaintiffs sought preliminary injunctions to block that conveyance: the Arizona Mining Reform Coalition (AMRC), which contends that the government's appraisal of the federal land was wrong to account for pre-existing encumbrances; certain Western Apache individuals (led by Plaintiff Lopez) who contend that the government's disposi-

- 1 -

tion of its own property violates their religious-exercise rights; and the San Carlos Apache Tribe, which challenges the agency's environmental review and more than 20 years of tribal consultations on this project. The District of Arizona denied preliminary relief, finding that none of Plaintiffs' arguments presented even a serious question on the merits, and furthermore that the equities weighed against enjoining a land exchange that Congress sought to "expedite." The merits panel of this Court affirmed. On all but AMRC's appraisal argument, the panel was unanimous: Plaintiffs raise no serious questions on the merits, much less show a likelihood of success. The panel also intentionally allowed the land exchange to close. In accordance with Congress's direction for expedition, the government conveyed title to Oak Flat to Resolution, and the government acquired in exchange more than 5,460 acres now incorporated into the National Forest and National Conservation systems.

Plaintiffs now ask the full Court to wade into interlocutory appeals on requests for particular equitable relief that have become moot. And they recycle fact-bound and legally unavailing arguments that the panel, the *en banc* Court, and the Supreme Court have repeatedly rejected.

Start with mootness. The only relief Plaintiffs sought was a preliminary injunction *blocking* the conveyance. Now that the exchange is complete, that remedy is no longer available. Plaintiffs would need to make a fundamentally different showing, which they have not attempted, to obtain the extraordinary remedy of *undoing* a completed land exchange

explicitly ordered by Congress—especially given the reliance interests that have solidified for contractors, employees, and the community. The *en banc* Court should not be the first to undertake that complex, fact-intensive inquiry. The Tribe's late-breaking attempt to recharacterize its motion as seeking to enjoin the "destruction of Oak Flat" contradicts the Tribe's own filings. Nor does the Tribe's request for *Munsingwear* vacatur have any merit. That doctrine addresses unreviewable *judgments*—not dissipation of interlocutory appellate jurisdiction. The Tribe will have the opportunity to pursue its claims to final judgment and through the ordinary appellate process.

Even if not moot, none of the petitions identifies any issue worthy of *en banc* rehearing. AMRC's appraisal challenge turns on statutory text applicable only to this land exchange, and it implicates no disagreement among circuit courts. AMRC actually flouts precedent by insisting that the appraisal of the federal land should have required Resolution to pay for the value of copper that Resolution *already owned* the exclusive right to mine. The Exchange Act itself refutes AMRC's argument: It prohibits "interfer[ing] with, limit[ing], or otherwise impair[ing]" Resolution's mining claims. 16 U.S.C. § 539p(i)(1)(C). AMRC's view also makes no sense as a matter of basic property law: an appraisal determines the fair-market value of what the property owner holds. Here, the government indisputably did not own—and thus had no power to convey—the right to extract the relevant copper. So no hypothetical third-party buyer would

- 3 -

pay the government for those mining rights. AMRC's contrary contention ignores 150 years of case law establishing that Resolution's mining claims are property rights encumbering the appraised land.

Lopez's religion claims are squarely foreclosed by this Court's *en banc* decision in *Apache Stronghold* v. *United States*, 101 F.4th 1036 (2024), which rejected materially identical challenges brought by Lopez's apparent blood relative. The Supreme Court recently declined to disturb those holdings—twice. And a few days after the panel's decision, Justice Kagan denied Lopez's emergency application presenting the very legal theories repackaged here. Lopez identifies no intervening conflict; she asks this Court to rewrite an *en banc* decision whose ink is still drying.

The Tribe's *en banc* petition is the weakest of all. It merely raises two intensely fact-bound, meritless procedural claims concerning a single-project-specific FEIS, 16 U.S.C. § 539p(c)(9), and a one-of-a-kind tribal-consultation provision, *id.* § 539p(c)(3). The Tribe's NEPA challenge mischaracterizes the panel decision and the record. The panel did not "blindly" defer to the Forest Service, and the agency did not fail to "directly respond[] to" the Tribe's submissions on highly technical questions; the record shows the agency addressed every point the Tribe raises. And the consultation argument asks this Court to disregard *more than 400* documented tribal consultations over a quarter century.

The petitions should be denied.

- 4 -

## BACKGROUND

### A.     Statutory background

**The Exchange Act.** A bipartisan Congress passed, and President Obama signed, the Exchange Act to "authorize, direct, facilitate, and expedite" the transfer of 2,422 acres of Tonto National Forest land—Oak Flat—which "shall be available" to Resolution "for mining and related activities." 16 U.S.C. § 539p(a), (b)(2), (c)(8). In exchange, the United States acquired 5,460 acres of conservation lands and Apache Leap, a site sacred to Western Apache people. *Id.* § 539p(d)(1), (f)-(g); 12-RCMSER-3227-3231. Congress "weighed considerable tradeoffs" and determined that the exchange would yield "significant economic benefits" and promote "America's national security interests." 1-AMRCER-3.

The Forest Service had to "carry out the land exchange in accordance with the requirements of [NEPA]," "[e]xcept as otherwise provided" by the Act. 16 U.S.C. § 539p(c)(9)(A). Congress instructed it to "prepare a single [FEIS]." *Id.* § 539p(c)(9)(B). And "[n]ot later than 60 days after" the FEIS's "publication," the government was required to "convey all right, title, and interest of the United States in and to the Federal land to Resolution." *Id.* § 539p(c)(10). The FEIS's purpose was not to authorize the exchange—Congress mandated that—but instead to provide "the basis for all decisions under Federal law" concerning the mine "and any related major Federal actions significantly affecting the quality of the human environment." *Id.* § 539p(c)(9)(B).

The Exchange Act required Resolution to convey additional land or money if Oak Flat's appraised value exceeded that of Resolution's land. 16 U.S.C. § 539p(c)(4)-(5). It further directed the government to "consult[] with affected Indian tribes" and "Resolution Copper" to "seek to find mutually acceptable measures" addressing tribal concerns. *Id.* § 539p(c)(3).

**NEPA.** NEPA is "purely procedural" and "does not mandate particular results" or "require the agency to weigh environmental consequences in any particular way." *Seven County Infrastructure Coal.* v. *Eagle County*, 605 U.S. 168, 173, 177 (2025). All NEPA requires is "an environmental impact statement … identifying significant environmental effects." *Id.* at 177. Because some lower courts had previously disregarded Supreme Court precedent by "assum[ing] an aggressive role in policing agency compliance with NEPA," and thereby "slowed down or blocked many projects," the Court in *Seven County* ordered a "course correction." *Id.* at 179, 183-184. "The ultimate question is not whether an EIS … itself is inadequate, but whether the agency's final decision was reasonable and reasonably explained." *Id.* at 184-185; *see Marsh* v. *Oregon Nat. Res. Council*, 490 U.S. 360, 377 (1989) (courts must "defer to" agency's "informed discretion").

**RFRA.** The Religious Freedom Restoration Act "establishes the general rule that '[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability.'" *Apache Stronghold*, 101 F.4th at 1058 (quoting 42 U.S.C.

§ 2000bb-1(a)). But Supreme Court precedent holds that the "disposition of government real property" is not a substantial burden "subject to strict scrutiny." *Id.* at 1055.

### B. Factual background

The government began consulting with the Tribe about mining at Oak Flat about 23 years ago. 12-RCMSER-3052-3157. After continued engagement with the Tribe (and many others), and extensive environmental analyses, the Forest Service published a six-volume EIS in January 2021.[1] In March 2021, the agency withdrew that EIS for additional "review based on significant input received from collaborators, partners, and the public," "to fully understand concerns raised by Tribes," and to "ensure … compliance with federal law." 6-AMRCER-1027.

Between September 2021 and April 2025, the government conducted over 150 additional consultations and updated the FEIS. 1-RCM-SER-544, 12-RCMSER-3135-3157. It published the FEIS on June 20, 2025, 1-AMRCER-6, triggering an August 19 statutory deadline to complete the land exchange. 16 U.S.C. § 539p(c)(10). The FEIS exceeds 2,500 pages, contains 19 appendices, and documents 434 consultations with the Tribe (plus hundreds more with 14 other tribes that have not challenged the exchange). 1-AMRCER-6 n.1, 68.

---

[1] http://web.archive.org/web/20250530231518/https://www.resolution mineeis.us/documents/final-eis.

## C.     Procedural background

*Apache Stronghold.* After the 2021 EIS, a group named Apache Stronghold sued, claiming (as relevant here) that the land exchange would violate the Free Exercise Clause and RFRA. *Apache Stronghold*, 101 F.4th at 1049, 1056, 1063. An *en banc* panel of this Court explained why *Lyng* v. *Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988), foreclosed those claims. The Supreme Court denied certiorari. 145 S.Ct. 1480 (2025). The Supreme Court likewise denied a request for rehearing contending that Apache Stronghold's claims were bolstered by *Mahmoud* v. *Taylor*, 606 U.S. 522 (2025). 146 S.Ct. 285 (2025).

*San Carlos* **and** *AMRC.* After the FEIS's publication in June 2025, the Tribe and AMRC moved to preliminarily enjoin the land exchange. 1-AMRCER-2-95. The district court denied relief because Plaintiffs had not shown likely success—or even a serious question—on any claim. 1-AMRCER-22-27 (appraisal); 1-AMRCER-41-56 (NEPA); 1-AMRCER-68-83 (consultation). The court also held that the equities did not support an injunction, as Congress had deliberately weighed the competing considerations and determined that this mine should be built for the benefit of the entire Nation. 1-AMRCER-91-93.

*Lopez.* In July 2025, a fourth set of challengers filed an eleventh-hour action in the District of Columbia, admittedly attempting to avoid *Apache Stronghold*'s holding. Lopez-ER-9. Following transfer, the District of Arizona denied a preliminary injunction. Lopez-ER-10-23.

- 8 -

### D. The panel decision and subsequent developments

The panel affirmed. 172 F.4th 641. It unanimously held that Plaintiffs were unlikely to succeed on their NEPA claims, *id.* at 658-662; that the Tribe was not likely to succeed on its challenge to the government's extensive consultation efforts, *id.* at 663-664; and that *Apache Stronghold* forecloses Lopez's religion claims, *id.* at 664-666. A majority also held that AMRC's appraisal claim was unlikely to succeed because the appraisal applied nationally recognized standards and established mining law. *Id.* at 656-658. Judge Rawlinson dissented on the appraisal issue. *Id.* at 666-673.

The panel also dissolved an administrative injunction blocking the land exchange. *Id.* at 666. While that temporary injunction was in place, Resolution was required to spend $11 million a month to hold the mine in a ready-state. Dkt. 84.2 ¶ 22. It also faced significant risk of having to lay off up to 20 percent of its workers, dozens of whom are enrolled San Carlos Apache tribal members. *Id.*

After the panel lifted the administrative injunction, the government and Resolution closed the conveyance as the Exchange Act directed. Justice Kagan denied Lopez's ensuing application for emergency relief. *Lopez* v. *United States*, No. 25A1008, 2026 WL 782718 (Mar. 19, 2026). Since then, Resolution has funded a tribal endowment exceeding $50 million and launched a significant ramp-up in local hiring and procurement.

- 9 -

## ARGUMENT

**I.    These preliminary-injunction appeals are moot, and there is no sound basis to vacate the panel's well-reasoned opinion.**

Appellate jurisdiction here rested on 28 U.S.C. § 1292(a). But Plaintiffs sought only one form of relief: a preliminary injunction barring the *conveyance* of Oak Flat. Because that conveyance has been completed, Plaintiffs' motions to stop it (and these appeals) are moot.

The Tribe has no legitimate ground for seeking vacatur of the panel decision unanimously rejecting its claims. Although these interlocutory *appeals* are moot, the underlying cases remain live. Following remand, Plaintiffs may pursue their claims to final judgment and on appeal in the ordinary course.

### A.    Plaintiffs' only requested equitable remedy cannot issue.

All that Plaintiffs sought on interlocutory appeal was to reverse the denial of *preliminary* relief *blocking* the land exchange. AMRC asked this Court (Opening.Br.1) to "enjoin the title transfer and land exchange." Lopez sought (Opening.Br.51, 57, 62-65) to stop the "transfer." The Tribe requested (Opening.Br.4) that this Court "direct" the district court "to enjoin Oak Flat's transfer."

Because no order of this Court now can prevent an exchange that has already happened, the Court cannot grant the only relief that Plaintiffs requested and thus no longer has interlocutory appellate jurisdiction. *Vegas Diamond Props., LLC* v. *FDIC*, 669 F.3d 933, 936 (9th Cir.

2012). The completed exchange is a "changed circumstance[]," *Akina* v. *Hawaii*, 835 F.3d 1003, 1010 (9th Cir. 2016), because "the action that the plaintiff sought to preliminarily enjoin ha[s] already occurred," *In Defense of Animals* v. *Department of the Interior*, 648 F.3d 1012, 1013 (9th Cir. 2011) (per curiam). And "[b]ecause the only issue … before" the Court was "the correctness of the decision" denying preliminary relief, these interlocutory appeals are "moot" and "the case must be remanded" for further proceedings on the merits. *University of Texas* v. *Camenisch*, 451 U.S. 390, 394 (1981).

That procedural posture makes *en banc* review of Plaintiffs' preliminary-injunction motions unusually complex and inappropriate. To *undo* the land exchange, Plaintiffs would need to make a fundamentally different showing accounting for *post-conveyance* reliance interests, jobs, contracts, and tribal endowments. *See Kettle Range Conservation Grp.* v. *BLM*, 150 F.3d 1083, 1087 (9th Cir. 1998); p.9, *supra.* No court has considered those issues, which would require developing facts not in this record.

**B.     The Tribe's contrary arguments regarding mootness lack merit.**

Only the Tribe addresses the fatal mootness problem. It contends (Pet.17) that these appeals are not moot because it purportedly sought to enjoin the "destruction of Oak Flat," not just the land exchange. That's an audacious reversal of the Tribe's own prior insistence that closing the exchange "certainly" would "moot the Tribe's motion for preliminary injunction" and "depriv[e] the Court of jurisdiction." Dkt. 129.1 at 3-4,

10-11. In reality, the Tribe sought an order "enjoining Oak Flat's transfer," in a filing styled "Motion for Preliminary Injunction *to Enjoin Conveyance* of Oak Flat." 6 SCATER-1313, 1337 (emphasis added). The district court confirmed that the Tribe's *exclusive* request was "to block [the] land exchange." 1-AMRCER-2; Lopez-ER-22. The Tribe's appellate briefing similarly did not request any other remedy. Opening.Br.59 (seeking "injunction prohibiting Federal Defendants from transferring Oak Flat"); Reply.40 (same).

The Tribe cites *Desert Citizens Against Pollution* v. *Bisson*, 231 F.3d 1172, 1187 (9th Cir. 2000), and contends (Pet.17) that this Court could "declar[e] void the executed portion of the land exchange." But *Desert Citizens* involved a *discretionary* (not statutorily compelled) exchange. And the Tribe quotes language in a final-judgment appeal addressing whether a complaint adequately alleged standing—not mootness. 231 F.3d at 1176. *Desert Citizens*, moreover, did not suggest that appellate courts may grant relief never requested below. If Plaintiffs wish to pursue a different equitable remedy (unwinding the land exchange), they must first make that request in the district court.

The Tribe's effort to dodge mootness raises yet another vehicle defect for *en banc* review. The Tribe asks an 11-judge panel to grant a vague remedy—enjoining Oak Flat's destruction—that was not "'specifically and distinctly argued'" on appeal. *Idaho Conservation League* v. *Bonneville Power Admin.*, 826 F.3d 1173, 1178 (9th Cir. 2016). The *en*

*banc* Court is one of "review, not first view," and is "limited to deciding whether the district court abused its discretion in denying the injunction plaintiffs sought." *Haskell* v. *Harris*, 745 F.3d 1269, 1271 (9th Cir. 2014) (en banc) (per curiam). It should not be the first to address this complex, fact-intensive remedial question.

Review is especially unwarranted because the Tribe still may pursue its claims below. Were the Tribe to "prevail on the merits of [its] claims, the district court should consider what relief is appropriate." *In Defense of Animals*, 648 F.3d at 1013. This Court may then "review" such a judgment "if and when it is presented." *Haskell*, 745 F.3d at 1271.

### C. This interlocutory appeal is not an "extraordinary" or "exceptional" case warranting *Munsingwear* vacatur.

Similarly meritless are the Tribe's requests (Pet.17) to "vacate the panel opinion" and even "direct the district court to consider vacating its opinion" under *United States* v. *Munsingwear, Inc.*, 340 U.S. 36 (1950).

First, *Munsingwear* does not apply in this circumstance. It is an equitable doctrine for mitigating the harm arising from entry of an unreviewable *merits judgment*, which closes a "case" and binds the losing party through res judicata or stare decisis. 340 U.S. at 39-40. That happens when the "entire case" becomes moot—not (as here) when interlocutory appellate jurisdiction dissipates and the case continues. *Crowell* v. *Mader*, 444 U.S. 505, 506 (1980). Where, as here, "only the issues raised on appeal have been resolved," *Munsingwear* vacatur "is inappropriate."

*Id.*[2] Vacatur is improper because a "controversy between the parties" remains for remand. *International Bhd. of Teamsters* v. *ICC*, 818 F.2d 87, 90 & n.4 (D.C. Cir. 1987).

Even if *Munsingwear* did apply in this interlocutory posture, the Tribe could not satisfy the doctrine's requirements. On occasion, the Supreme Court has vacated interlocutory appellate decisions when an intervening legal development—like new legislation—displaced an appellate ruling. *See Crowell*, 444 U.S. at 506. But *Munsingwear* vacatur is an equitable remedy limited to "exceptional" cases. *U.S. Bancorp Mortg. Co.* v. *Bonner Mall P'ship*, 513 U.S. 18, 26 (1994). The Tribe must "demonstrate … equitable entitlement to" this "extraordinary remedy." *Id.*; *see Dickens* v. *Ryan*, 744 F.3d 1147, 1148 (9th Cir. 2014). Indeed, "[j]udicial precedents are presumptively correct and valuable to the legal community as a whole," and "should stand unless a court concludes that the public interest would be served by a vacatur." *Bonner*, 513 U.S. at 26-27 (cleaned up).

The Tribe does not come close to satisfying that standard. It seeks to vacate the panel and district-court opinions simply because it would prefer to litigate without adverse precedent. *See* pp.38-44, *infra.* Moot-

---

[2] Each of the Tribe's citations involved a *case*-mooting development, not an *appeal*-mooting one. *See Farmer* v. *McDaniel*, 692 F.3d 1052, 1052 (9th Cir. 2012) (habeas petitioner "died in prison"); *Azar* v. *Garza*, 584 U.S. 726, 729 (2018) ("'civil case'" "became moot"); *Arizonans for Off. Eng.* v. *Arizona*, 520 U.S. 43, 72 (1997) ("mooted the case").

ness arose here not because of a new legal development, but because every court to consider the Tribe's claims unanimously found they raised no "serious questions" and provided no basis to enjoin the land exchange. 172 F.4th at 658-664; *see Respect Maine PAC* v. *McKee*, 562 U.S. 996, 996 (2010). The panel properly dissolved the temporary administrative injunction so that the land exchange could close "expedit[iously]" in accordance with Congress's directive, 16 U.S.C. § 539p(c)(10), precisely because the Tribe's claims had been thoroughly reviewed and held legally meritless, 172 F.4th at 666. Far from serving any public interest, vacatur would disrespect the substantial effort of the multiple judges on two courts who thoughtfully considered the Tribe's claims and explained in detail why they fail.

## II.   AMRC′s appraisal argument does not warrant *en banc* rehearing.

AMRC identifies no genuine conflict in authority and no question of exceptional importance. Instead, it would have the *en banc* Court convene to act as appraiser-in-chief over a single project.

As the panel majority observed, AMRC's challenge reflects a fundamental "'misunderstanding of how unpatented mining claims work.'" 172 F.4th at 657-658. Under the General Mining Law of 1872, Resolution held unpatented claims that encumbered the federal land by giving Resolution the exclusive "right to mine" the copper beneath the surface and to keep it "once mined." *Id.* at 657. It was not arbitrary and capricious to account

for that pre-existing encumbrance in appraising the federal land; doing so was required by law.

### A.     AMRC's challenge does not meet the *en banc* standard.

AMRC's petition should be denied because the panel decision does not conflict with any holding of this Court, another circuit, or the Supreme Court. AMRC simply quarrels with mining law in place since the 19th century and the Exchange Act's express text. 172 F.4th at 658. Congress recognized and preserved Resolution's mining claims by directing that "[n]othing in this section shall interfere with, limit, or otherwise impair, the unpatented mining claims or rights currently held by Resolution Copper … nor in any way change, diminish, qualify, or otherwise impact Resolution Copper's rights and ability to conduct activities on the Federal land under such unpatented mining claims and the general mining laws of the United States." 16 U.S.C. § 539p(i)(1)(C). The appraisal honored that command.

Nor was the panel's ruling on the appraisal a decision of exceptional importance. The panel decision "appli[ed] settled legal standards to a set of facts." *Kipp* v. *Davis,* 986 F.3d 1281, 1285 (9th Cir. 2021) (Paez, J., concurring in the denial of reh'g en banc). The panel broke no new ground when it held that adding the value of the copper beneath the federal land to the appraisal would "[e]ffectively wip[e] out the value of Resolution Copper's mining claims and forc[e] it to pay twice for its existing rights." 172 F.4th at 657.

Similarly mistaken is AMRC's suggestion (Pet.16-18) that this case implicates the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 *et seq.* The panel's holding rests on two features unique to this case: Resolution's undisputed, pre-existing mining claims, and the Exchange Act's bespoke command that "[n]othing in" the Act "shall interfere with, limit, or otherwise impair" them. 16 U.S.C. § 539p(i)(1)(C). FLPMA contains no analogous provision, and the panel neither held nor suggested that the United States cannot own a mineral estate.

**B.  The panel decision correctly applied straightforward property law and 150 years of precedent.**

On the merits, AMRC's arbitrary-and-capricious challenge presents no serious question.

**1.**  Basic property principles—and a century-plus of precedent—defeat AMRC's claim.

Congress directed this land to be appraised under "nationally recognized" standards. 16 U.S.C. § 539p(c)(4), (5). Those standards required the appraisal to value the government's property at the price it would command in a hypothetical open-market sale, 36 C.F.R. § 254.9(b), accounting for "all encumbrances," *id.* § 254.9(c)(4). By definition, encumbrances affect property value and—as first-year property law teaches—run with the land in any open-market sale. *Boston Chamber of Com.* v. *Boston*, 217 U.S. 189, 195 (1910) (rejecting view that a "parcel of land [is]

- 17 -

to be valued as an unencumbered whole when it is not held as an unencumbered whole").

Resolution indisputably has held unpatented mining claims encumbering this federal land since long before the Exchange Act. Those claims arise under federal law, 30 U.S.C. § 26, are "property in the fullest sense of the word," *Forbes* v. *Gracey*, 94 U.S. 762, 767 (1876), and granted Resolution "exclusive possession of the land for mining purposes" and rights to "extract and sell minerals from the claim without paying any royalty," *United States* v. *Locke*, 471 U.S. 84, 86 (1985).

When the appraisal valued this land in a hypothetical open-market sale, it correctly accounted for Resolution's existing property rights. Because a hypothetical buyer of the land from the government could not acquire the rights to extract the copper beneath it—only Resolution owned those rights—the appraisal properly excluded the value of those extraction rights. 172 F.4th at 657. And because a buyer also could not develop the land given Resolution's rights to enter and mine it, the appraisal correctly found the property's highest and best use to be surface support for mining. 1-AMRCER-21.

The Exchange Act itself made clear that the federal land should be appraised *subject to* Resolution's mining claims. As explained above, Congress expressly recognized and preserved Resolution's mining claims by directing that "[n]othing in" the Act—including the appraisal requirement—would "interfere with," "limit," "impair," "in any way change," "di-

minish," "qualify," "or otherwise impact" Resolution's "rights and ability to conduct activities on the Federal land under such unpatented mining claims and the general mining laws of the United States." 16 U.S.C. § 539p(i)(1)(C). The appraisal's accounting for Resolution's property rights thus was not arbitrary and capricious; it was the only result federal law allows.

    **2.**    AMRC's contrary arguments parrot errors that this Court and the Supreme Court have repeatedly corrected.

AMRC wrongly dismisses (Pet.10) Resolution's rights as "paper mining claims." An unpatented mining claim is "emphatically" not an "unsupported assertion or demand from which no legal rights can be inferred"; it "is a property interest, which is itself real property in every sense, and not merely an assertion of a right to property." *United States* v. *Shumway*, 199 F.3d 1093, 1099-1100 (9th Cir. 1999).

AMRC next asserts (Pet.5-7) that the majority equated Resolution's mining claims with ownership of the minerals themselves, thereby treating the relevant parcel as a "split estate." Not so. The panel correctly recognized that Resolution's unpatented claims granted the company "exclusive possession of the land for purposes of mining and to all the minerals [it] extracts." 172 F.4th at 656-657 (quoting *Shumway*, 199 F.3d at 1098-1099). Because Resolution alone held the rights to extract that copper, those property rights were not the government's to convey. And *Cameron* v. *United States*, 252 U.S. 450, 460 (1920), does not aid AMRC. It

- 19 -

held only that, while the government holds title to land "in trust" for a miner, courts may resolve an unpatented mining claim's validity. *Id.* at 461, 464. That is inapposite here: no one seriously disputes that Resolution's claims are valid, and AMRC itself concedes (Pet.4) that "billions of pounds of copper" lie beneath the relevant land. *Cameron* does not disturb the foundational rule that "an unpatented mining claim remains a fully recognized possessory interest." *Locke*, 471 U.S. at 86.

AMRC further argues (Pet.10-11) that the appraisal should have assumed that Resolution's mining claims would vanish in a third-party sale, so that a hypothetical buyer could extract copper free and clear of Resolution's claims. That is deeply mistaken.

AMRC cites no case *ever* holding that conveying federal land extinguishes unpatented mining claims encumbering that land. Instead, AMRC invokes the panel dissent and *Best* v. *Humboldt Placer Mining Co.*, 371 U.S. 334 (1963), for the proposition that a mining claim is "*only* [sic] 'valid against the United States.'" Pet.10 (emphasis added). But AMRC rewrites *Best* by inserting the word "only" into *dictum* about mining rights. *See Best*, 371 U.S. at 336. *Best* did not overturn a century of precedent (discussed below) holding that mining claims survive conveyance of the encumbered land. Nor did *Best* hold that mining claims are valid "only" against the government. Of course, a miner can initially file an unpatented claim only against government land. But when a private party buys federal land encumbered by unpatented mining claims, it

- 20 -

takes the land *subject to* those claims; to clear title, the buyer must sue to invalidate them (or purchase them from the miner). *See*, *e.g.*, *Del Webb Conservation Holding Corp.* v. *Tolman*, 44 F. Supp. 2d 1105 (D. Nev. 1999) (lawsuit to clear title of unpatented mining claims encumbering land obtained in a BLM exchange). That is basic property law; encumbrances of all kinds run with the land, because a seller/grantor cannot transfer rights it does not own.[3]

AMRC's contrary view would flout 150 years of precedent. In 1888, the Supreme Court held that the government's grant of a patent for a placer mining claim (which conveyed the surface estate) did not extinguish a preexisting unpatented *subsurface* claim: "A patent of the government cannot, any more than a deed of an individual, transfer what the grantor does not possess." *Noyes* v. *Mantle*, 127 U.S. 348, 351 (1888); *accord Shumway,* 199 F.3d at 1100 ("the government cannot reserve its own land from an unpatented mining claim without paying the owner the value of the claim, because an unpatented mining claim is property"). The panel here applied that settled rule. *See* 172 F.4th at 658 n.3 ("'[T]he government may withdraw or convey the title to land *subject to* valid, unpatented claims.'").

---

[3] AMRC faults (Pet.11) the patent conveyed to Resolution for "no mention of any mining claim encumbrances on the property." But the patent conveyed "the right, title, and interest of the United States"—and the government had no mining rights in the relevant parcel. U.S. Patent #02-2026-0002.

AMRC does not advance its position by invoking (Pet.10) the panel dissent's reading of *Alaska Miners* v. *Andrus*, 662 F.2d 577 (9th Cir. 1981), and *Assiniboine & Sioux Tribes* v. *Nordwick*, 378 F.2d 426 (9th Cir. 1967), for the proposition that a conveyance leaves land "not encumbered by unpatented mining claims." 172 F.4th at 668 (dissenting op.). Those decisions actually hold that "unpatented mining claims survive transfer absent congressional direction to the contrary." *Id.* at 658 n.3 (majority op.). *Alaska Miners* proves the point: the Court reaffirmed that any conveyance of title to land must be made "*subject to* valid, unpatented claims," and "[a] miner need never acquire a title in order to work his claim and protect his rights against third persons." 662 F.2d at 579-580 (emphasis added; citations omitted).

This case is clearer still because Congress supplied the relevant "congressional direction" *not* by extinguishing Resolution's mining claims but by *expressly reserving* them. 16 U.S.C. § 539p(i)(1)(C). Forcing Resolution "to pay twice for its existing rights would undeniably 'interfere with' and 'impair' those claims" in violation of the Exchange Act. 172 F.4th at 657. AMRC retorts (Pet.12) that "Resolution never paid the government in the first place." But Resolution has expended hundreds of millions of dollars in drilling and exploration of the minerals, and has paid fees to the government for these claims for more than 20 years. Federal law provides that, so long as a finder of valuable minerals pays the required fees and makes the required investment, it enjoys the right to

- 22 -

extract and keep those minerals without royalty. *Locke*, 471 U.S. at 86. AMRC's dispute is thus with a 154-year-old law. That is why even the panel dissent recognized that AMRC's theory would constitute a "taking of [Resolution's] property." 172 F.4th at 668. And AMRC is wrong (Pet.11) that the Exchange Act's rights-preservation clause addressed only the remote scenario where Resolution "decided not to accept the exchange." The Act's "purpose" was to compel the exchange while preserving Resolution's pre-existing rights. 16 U.S.C. § 539p(a), (i)(1)(C).

AMRC likewise errs in contending (Pet.12-16) that the panel decision conflicts with *Desert Citizens*, 231 F.3d 1172. That case set aside an exchange of land that the buyer intended to use as a landfill—its actual highest and best use—because the appraisal valued the land as mere "open space" or "mine support." AMRC misreads that decision (Pet.12) to require that appraisals be "based on the value of the 'reasonably probable' *future* uses, not on the pre-exchange land status." The correct test is the property's "highest and best use … as if in private ownership"—*i.e.*, its "most probable and *legal* use" by a third party. 172 F.4th at 656 (emphasis added); *see* 36 C.F.R. §§ 254.2, 254.9(b)(1)(i). A hypothetical buyer of this property could not lawfully extract the copper that was excluded from the appraisal because those rights belong exclusively to Resolution and would continue to encumber the land after conveyance. 36 C.F.R. § 254.9(c)(4) (appraisals must account for "all encumbrances"); Uniform Appraisal Standards for Federal Land Acquisitions § 4.6.5.2 ("improper

- 23 -

to disregard preexisting encumbrances and their impact on the property"). Nor could a private buyer feasibly develop the land, because Resolution would remain entitled to enter and mine it. So the highest and best use of the property would be surface support for mining activity—just as the appraisal determined.

AMRC retreats (Pet.8-9) to irrelevant legislative history, arguing that comments on a previous draft bill suggested this federal land should be appraised as if it included mineral rights. But the text of the bill that was enacted is unambiguous. "[L]egislative history is not the law," particularly where it pertains to a different bill from the one that passed. *Epic Sys. Corp.* v. *Lewis*, 584 U.S. 497, 523 (2018). Once Congress "enacts a statute," courts "ask only what the statute means." *Id.* Regardless, the appraisal did "include[] the value of those copper deposits" when appropriate—that is, for a separate portion of the exchanged federal land that was not encumbered by mining claims. 1-AMRCER-26.

### C.   Amici's valuation theory is forfeited, fact-bound, and wrong.

Amici Legal Scholars erroneously contend (Br.12-21) that the appraisal "overvalued" Resolution's mining claims. That is no basis for *en banc* review for multiple reasons.

First, amici's argument is not properly before the Court. It appears nowhere in AMRC's complaint, preliminary-injunction motion, panel briefing, or rehearing petition. This Court "do[es] not consider on rehearing new issues previously not raised, briefed or argued," *Fields* v.

- 24 -

*Palmdale Sch. Dist.*, 447 F.3d 1187, 1190 (9th Cir. 2006)—particularly eleventh-hour arguments from an amicus, *Haskell*, 745 F.3d at 1271 ("We are limited to deciding whether the district court abused its discretion in denying the [preliminary] injunction plaintiffs sought.").

Even if preserved, amici's argument would not be *en banc*-worthy. Amici demand a claim-by-claim discounting of 148 mining claims for defeasibility, validity risk, compliance costs, and mineral coverage. No *en banc* court would be the first to take on that fact-bound exercise.

Amici further err in suggesting that the validity of Resolution's mining claims could be challenged for lack of mineable deposits. *See United States* v. *Coleman*, 390 U.S. 599, 602-603 (1968). The Exchange Act codifies Congress's opposite finding: "billions of pounds of copper" lie beneath the land. AMRC.Pet.4. It was certainly "logical" for the agency to treat the deposits as "valuable enough to validate Resolution Copper's mining claims." 1-AMRCER-24-25 & n.8.

Finally, amici's own methodology refutes their contention. Amici concede (Br.6) that the proper valuation is the full fee value of the federal land *minus* the value of Resolution's mining claims. But as the appraisal found, when the value of the copper subject to claims is omitted, only the surface value of the property remains. Amici never explain why their pre-ferred "delta" would yield a materially different number and render the appraisal arbitrary and capricious. They simply assume away the Ex-change Act's rights-preservation clause and a century of law, insisting

that mining claims covering 35 billion pounds of copper ore are nearly worthless. The appraisal rightly rejected that nonsensical position.

## III.    Lopez's arguments have *already* been rejected *en banc*.

This Court should reject Lopez's invitation to relitigate settled *en banc* law. Two years ago in *Apache Stronghold*, this Court *en banc* held that Supreme Court precedent and statutory text foreclose materially identical religious-exercise challenges to the Exchange Act. 101 F.4th 1036, 1065. That plaintiff asked the full Court to rehear the case, but it declined. The Supreme Court also declined to disturb that decision—twice—when it denied certiorari, 145 S.Ct. 1480, and then denied a rehearing petition grounded on *Mahmoud*, 146 S.Ct. 285, which is the very decision Lopez now invokes. After the panel decision, Justice Kagan summarily denied Lopez's emergency application reprising the same theories recycled now. *Lopez*, 2026 WL 782718.

Nothing has changed since this Court determined that Lopez's legal arguments misstate both the Constitution and RFRA. Lopez "does not provide a convincing reason why" the Court "should revisit that relatively recent precedent," so it should "not do so." *South Cent. Bell Tel. Co.* v. *Alabama*, 526 U.S. 160, 166 (1999). This Court's 11-judge *en banc* procedures play a vital role in responsibly managing rehearing requests. The Court should not countenance Lopez's transparent ask for another *en banc* panel to convene just two years later to undo the work of an 11-judge panel whose opinion Lopez dislikes.

### A. Lopez's attempt to relitigate recent binding *en banc* precedent does not warrant further review.

Lopez does not identify any intra-circuit conflict, genuine Supreme Court conflict, or question of exceptional importance in the panel's unanimous decision. Lopez instead merely repackages the arguments this Court rejected in *Apache Stronghold*. That decision was correct, and Lopez offers no grounds for another 11-judge panel to re-review their colleagues' recent work.

**1.** *Apache Stronghold* recognized that the same free-exercise theories asserted by Lopez here fail under *Lyng*, 485 U.S. 439. The *en banc* Court held that "the Free Exercise Clause" is not "implicate[d]" by the government's disposition of its own land, even when "the resulting effects on the religious practices of the Indian plaintiffs would 'virtually destroy' their 'ability to practice their religion.'" *Apache Stronghold*, 101 F.4th at 1051 (quoting *Lyng*, 485 U.S. at 450-451).

That rule makes eminent sense. Religious believers cannot demand that the government keep federal property in perpetuity, undeveloped, to preserve their religious access to it—subject only to satisfying strict scrutiny. Granting such unprecedented rights "would 'divest the Government of its right to use what is, after all, *its* land.'" *Id.* (quoting *Lyng*, 485 U.S. at 453). And as *Apache Stronghold* held, the Exchange Act does not "'discriminate' against [Plaintiffs], 'penalize' them, or deny them 'an equal

- 27 -

share of the rights, benefits, and privileges enjoyed by other citizens.'" *Id.* at 1051-1052 (quoting *Lyng*, 485 U.S. at 449, 453).

**2.** Lopez's RFRA claims also fail because that statute "subsumes" *Lyng*'s holding. *Apache Stronghold*, 101 F.4th at 1043-1044, 1056-1063. RFRA forbids the federal government to "substantially burden a person's exercise of religion" unless doing so is "the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(b). Congress enacted RFRA to "restore" "the compelling interest test as set forth in prior Federal court rulings," and overrule *Employment Division* v. *Smith*, 494 U.S. 872 (1990). 42 U.S.C. § 2000bb(a)(4)-(5), (b)(1). RFRA's "substantial[] burden" language derives directly from pre-*Smith* case law—including *Lyng*. *See Smith*, 494 U.S. at 883 (Scalia, J., for the Court); *id.* at 894 (O'Connor, J.); *id.* at 907 n.1 (Blackmun, J.). By adopting that vocabulary, RFRA incorporated *Lyng*.

If doubt remained, legislative history dispels it. Congress instructed courts to "look to free exercise cases decided prior to *Smith*"—and cited *Lyng* for the rule that "strict scrutiny does not apply to … the use of the Government's own property." S. Rep. No. 103-111, at 8-9 & n.19 (1993); *accord* H.R. Rep. No. 103-88, at 6-7 (1993). Thus, "*nobody* would have understood the government's decision about what to do with its own land to be a cognizable burden under RFRA." *Apache Stronghold*, 101 F.4th at 1116 n.6 (VanDyke, J., concurring). Senator Hatch agreed: "RFRA does

not affect *Lyng*." 139 Cong. Rec. 26,193 (1993); *see id.* at 26,415-26,416 (Sen. Grassley) (same); *id.* (Sen. Inouye) (similar).

Lopez's RFRA claim independently fails because the Exchange Act's text, enacted under Congress's constitutional land-management power, unambiguously mandates the land exchange. Once the statutory conditions were met, the Secretary was "*directed* to convey" Oak Flat. 16 U.S.C. § 539p(c)(1) (emphasis added). RFRA—a general-application statute enacted two decades earlier—cannot countermand Congress's express instruction in the Exchange Act. "[S]tatutes enacted by one Congress cannot bind a later Congress." *Dorsey* v. *United States*, 567 U.S. 260, 274 (2012); *see National Ass'n of Home Builders* v. *Defenders of Wildlife*, 551 U.S. 644, 662-663 (2007). Although RFRA states that it applies to later-enacted statutes "unless [they] explicitly exclude[] such application," 42 U.S.C. § 2000bb-3(b), such express-statement requirements are "ineffective," *Lockhart* v. *United States*, 546 U.S. 142, 147-150 (2005) (Scalia, J., concurring) (citing RFRA). Congress may exempt later statutes from RFRA "by implication." *Dorsey*, 567 U.S. at 274.

The Exchange Act is a paradigmatic implied exemption. Congress knew that the Act would affect Native American religious practices and codified accommodations. It required "consultation with affected Indian tribes" to "minimize the adverse effects," 16 U.S.C. § 539p(c)(3), and mandated that Resolution transfer Apache Leap to protect it "for traditional uses … by Native American people," *id.* § 539p(g)(2)(B). Congress then

commanded that the exchange "shall" proceed. 16 U.S.C. § 539p(c)(10). Yet Lopez reads RFRA to command that the exchange *shall not* proceed unless the government can overcome strict scrutiny. Because the two statutes "simply and clearly contradict[]" on Lopez's reading, the Exchange Act—both more specific and later in time—prevails. *Lockhart*, 546 U.S. at 148 (Scalia, J., concurring); Antonin Scalia & Bryan Garner, *Reading Law* 185-186 (2012).

Those separation-of-powers and statutory-interpretation principles defeat Lopez's reliance (Pet.9) on *dictum* describing RFRA as "a kind of super statute, displacing the normal operation of other federal laws." *Bostock* v. *Clayton County*, 590 U.S. 644, 682 (2020) (declining to apply RFRA in Title VII discrimination case). Most ordinary RFRA cases create no irreconcilable conflict because the government can exempt one person while still enforcing the later-enacted statute against others—that's generally "how [RFRA] works." *Gonzales* v. *O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 434 (2006) (exemption from drug laws for religious use of controlled substance); *see* 42 U.S.C. § 2000bb-1(a) (religious exemptions "from a rule of general applicability"). Here, by contrast, Lopez seeks to nullify a land transfer that Congress expressly mandated. So this is the unusual case where exemption and statutory command cannot coexist, and thus where the specific, later statute controls.

**3.** Lopez's remaining assertions lack merit. Lopez contends (Pet.10-11) that the land exchange is, in "ordinary meaning," a substan-

- 30 -

tial burden. But no ordinary English speaker would sensibly call it a "substantial burden" if a person were denied access to perform a ceremony inside a government building or another person's home. And "substantial burden" is a term of art that incorporates the Supreme Court's pre-*Smith* precedent, which Congress is presumed to have adopted. *See George* v. *McDonough*, 596 U.S. 740, 746 (2022).

Lopez next invokes (Pet.11-12) the Supreme Court's rejection of the view that RFRA "merely restored … pre-[RFRA] decisions in ossified form." *Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U.S. 682, 715 (2014). But *Hobby Lobby* held only that a RFRA claimant need not match a pre-*Smith* "category of plaintiffs." *Id.* at 715-716. It did not erase the bedrock principle that Congress legislates against the "backdrop" of existing law. *Tanzin* v. *Tanvir*, 592 U.S. 43, 48 (2020).

Lopez also observes (Pet.11) that RFRA defines "religious exercise" to include "use" of "real property." 42 U.S.C. §§ 2000bb(a)(2), 2000cc-5(7)(B). Private real property, sure. But that does not inform whether this congressionally mandated exchange of *federal* land is a cognizable "substantial burden." Lopez likewise misreads (Pet.12) *Holt* v. *Hobbs*, 574 U.S. 352 (2015). That case addressed RLUIPA—not RFRA—and rejected a prisoner-specific reasonableness test in favor of RLUIPA's compelling-interest standard. 574 U.S. at 361. Nothing in *Holt* displaces pre-*Smith* cases outside the prison context.

Lopez insists (Pet.13-14) that RFRA abrogated *Lyng* because *Lyng* supposedly turned on the same "neutrality" and "general applicability" test as *Smith*. That is incorrect, as *Apache Stronghold* recognized, 101 F.4th at 1054-1055. *Lyng* actually rejected the contention that "the burden" on plaintiffs' "religious practices [was] heavy enough" to trigger strict scrutiny. 485 U.S. at 447. And contrary to Lopez's rhetoric (Pet.1-2), that holding does not uniquely disadvantage Native Americans. *Lyng*'s rule is neutral as to religion and claimant: it governs *any* person's demand to dictate how the government uses its own land. 485 U.S. at 452-453; *accord Apache Stronghold*, 101 F.4th at 1052.

Finally, Lopez contends (Pet.14) that *Lyng* is "factually distinct" from this case because *Lyng* did not involve destruction of a religious site and rested only on "subjective spiritual harm." *Lyng* itself refutes both points. The Supreme Court recognized that the proposed construction in *Lyng* would "physically destroy the environmental conditions" needed for religious practices, but nevertheless rejected any test based on "the effects of a governmental action on a religious objector's spiritual development." 485 U.S. at 449, 451. Distinguishing spiritual from "physical" harm would "perver[t]" RFRA by "arbitrarily giv[ing] greater protection to burdens on religious exercise that are more physical in nature." *Apache Stronghold*, 101 F.4th at 1122 (VanDyke, J., concurring).

**B.      Lopez does not identify any other reason to disturb this Court's recent *en banc* precedent.**

In applying *Apache Stronghold* to the parallel facts here, the panel decision broke no new ground. Lopez trains her focus primarily on *Apache Stronghold* itself, not the panel opinion, and reprises the very circuit-split theory that the Supreme Court has repeatedly declined to review.

1.      Lopez maintains (Pet.14-15) that *Apache Stronghold* conflicts with circuit decisions holding that a substantial burden under RFRA arises when the government "'prevent[s] a religious exercise.'" But this Court adopted that standard in *Apache Stronghold*, 101 F.4th at 1043. And the only RFRA decision Lopez cites is *In re Young*, 82 F.3d 1407 (8th Cir. 1996)—a vacated bankruptcy ruling protecting pre-petition tithes, *id.* at 1417; *see* 521 U.S. 1114 (1997). Lopez does not explain how *Young* conflicts with this Court's holdings about federal-land disposition.

Lopez's other citations (Pet.15) address not RFRA but RLUIPA, which is confined to prisoners and local land-use regulation. 42 U.S.C. §§ 2000cc(a)(1), 2000cc-1(a). As *Apache Stronghold* explained, in those "two specific contexts," the "crucial element" of coercion is "already baked in." 101 F.4th at 1061-1062. As one example, refusing to provide buffalo meat *to a prisoner* for religious ceremonies might substantially burden that prisoner's religious exercise. *See Haight* v. *Thompson*, 763 F.3d 554, 565 (6th Cir. 2014) (cited at Pet.15). But RFRA does not entitle a *non-*

- 33 -

prisoner to demand buffalo meat from the federal government—let alone to veto a congressional decision about how to use federally owned land.

**2.** *Mahmoud*, 606 U.S. 522, does not undermine *Lyng* or *Apache Stronghold*. As the panel unanimously observed, Lopez's "view of *Mahmoud* does not survive scrutiny": not only did "the Supreme Court itself decline[] to rehear its denial of certiorari in *Apache Stronghold* in light of *Mahmoud*," but Lopez "misrepresent[s] the thrust of *Mahmoud* by selectively quoting from it." 172 F.4th at 665.

*Mahmoud*'s facts bear no resemblance to this land exchange. It involved a "mandatory" public-school curriculum with no "opt outs." 606 U.S. at 528-530. That compulsory policy "burden[ed] the religious exercise of parents" by "requir[ing] them to submit their children to instruction that poses 'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill"—and because "a government cannot condition the benefit of free public education on parents' acceptance of such instruction." *Id.* at 530.

Notably, *Mahmoud* reaffirmed that "[t]he Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens"—"even when" the government "interfere[s] with an individual's spiritual activities." 606 U.S. at 557 (quoting *Bowen* v. *Roy*, 476 U.S. 693, 699 (1986); *Lyng*, 485 U.S. at 450). The Court identified

"construction" on "federal land" as a paradigmatic "internal affair[]" imposing no actionable burden. *Id.*

Lopez "misrepresent[s] the thrust of *Mahmoud*," 172 F.4th at 665, by arguing (Pet.16-18) that it (1) created a permanent right of access to federal land whenever its disposition makes it more difficult for parents to instill religious beliefs in their children, and (2) recognized a substantial burden whenever an "objective" or "very real" "danger" threatens religious practice. *Mahmoud* actually turned on a completely different issue: the "character of the burden" in the "'compulsory education'" setting, which produces "direct, coercive interactions between the State and its young residents" and thus requires courts to "proceed differently." 606 U.S. at 557, 564. It was that "compulsory" feature—not parents' desire to teach religion or an "objective" "threat"—that triggered strict scrutiny. *Id.* at 553-554. Lopez's reading would silently overrule *Lyng* in the very passage that reaffirms it—an interpretation the Supreme Court did not adopt and *Apache Stronghold* rightly rejected. 101 F.4th at 1056-1063; *accord Roy*, 476 U.S. at 696, 699-700.

Even where the mandatory-education exception applies, the remedy is far narrower than what Lopez demands. *Mahmoud* "emphasized" that the plaintiffs sought to "opt out" from "particular educational requirement[s]," not to "micromanage the public school curriculum." 606 U.S. at 568; *see Mirabelli* v. *Bonta*, 607 U.S. 492, 496 (2026) (individual

"religious exemptions").[4] Lopez, by contrast, seeks a "religious servitude" over the federal government's disposition of its property. *Contra Lyng*, 485 U.S. at 452.

Lopez's unprecedented theory also lacks any limiting principle. On her view, strict scrutiny applies to *any* federal decision preventing religious access. That would cast constitutional doubt on the Treaty of Guadalupe Hidalgo and establishment of the Tonto National Forest (both of which limited Apache access to Oak Flat), and would let any believer use RFRA to "exclude all human activity but their own" on public lands. *Contra Lyng*, 485 U.S. at 452-453. Anyone could prohibit camping, climbing, hiking, hunting, fishing, or mining wherever she deemed land sacred. The same theory could block new nature preserves, highways, military bases, veterans' hospitals, and other essential federal projects. Our government "simply could not operate" if individuals could claim such "de facto beneficial ownership of" federal land. *Id.* at 452-453.

**3.** Lopez offers no recognized basis for further review. She echoes (Pet.18-20) the dissents from *Apache Stronghold* and the denial of certiorari, and tallies judicial votes across different postures. That exercise just confirms her disagreement with binding precedent. It supplies no warrant to revisit the policy, economic, and national-security interests that this Court—and the Supreme Court—already weighed.

---

[4] Lopez's reliance (Pet.17) on *Mirabelli* is equally misplaced: like *Mahmoud*, it concerned public-school policy, not federal-land disposition.

- 36 -

Far from identifying any development warranting an *en banc* do-over, Lopez merely expresses hope (Pet.1) that a new *en banc* panel will impugn its colleagues' work as "embarrassing[]." But "one en banc panel of the Ninth Circuit should be bound by a prior decision of another en banc panel" absent intervening changes in law or a "full Ninth Circuit sitting." 18 *Moore's Federal Practice* § 134.02. Lopez's panel-shopping is improper because it would "sow inconsistency in appellate decision-making" and "thwart the purpose of rehearing en banc." *Duncan* v. *Bonta*, 131 F.4th 1019, 1045 (9th Cir. 2025) (en banc) (S.R. Thomas, J., concurring). The *en banc* Court took up and decided *Apache Stronghold* to "promote[]" the "[f]inality of decision" on the same issues Lopez reprises here. *Textile Mills Sec. Corp.* v. *Commissioner*, 314 U.S. 326, 335 (1941).

Lopez's unclean hands and untimely lawsuit further confirm that equitable relief is not warranted and further complicate the prospect of *en banc* review. Lopez—an apparent blood relative of Apache Stronghold's leader—brought her case beyond RFRA's statute of limitations and only after the plaintiff in *Apache Stronghold* failed to obtain full Ninth Circuit or Supreme Court review. And Lopez admitted filing her suit in Washington, D.C.—far from the relevant site—to avoid Ninth Circuit law. *See* p.8, *supra.* This Court has decried as "egregious" such "strategic gamesmanship." *Save the Peaks Coal.* v. *USFS*, 669 F.3d 1025, 1032 (9th Cir. 2012). It should reject Lopez's cynical affront to its *en banc* precedent and process.

**IV.    The Tribe seeks to countermand Supreme Court precedent based on fact-bound and meritless procedural gripes.**

The Tribe does not attempt to raise any legal question that might plausibly arise in a future case. Worse yet, it asks this Court to defy the Supreme Court's barely-year-old admonitions in *Seven County*. The Tribe's two procedural claims are fact-bound arbitrary-and-capricious challenges that flunk every *en banc* criterion. The Tribe asks this Court to second-guess an agency's scientific NEPA judgments, and it nitpicks the adequacy of *decades* of documented consultations. Those one-off claims do not raise any "serious" merits question—a point on which the panel was unanimous. 172 F.4th at 660-664.

This petition also suffers from a more fundamental flaw: it is untethered from the Tribe's asserted harms and claimed grounds for *en banc* review. The Tribe insists (Pet.14-17) that the destruction of Oak Flat makes this dispute exceptionally important. Yet it seeks only more NEPA analysis and consultation—processes that by law *cannot* halt or undo the conveyance. Congress compelled this exchange, 16 U.S.C. § 539p(c)(10), and mandated that the land "shall be available" to Resolution "for mining and related activities," *id.* § 539p(c)(8). No amount of additional NEPA analysis or consultation could prevent the exchange or construction of the mine. The exchange is therefore not a legally cognizable injury that the Tribe's process claims could redress. That mismatch confirms these claims do not warrant *en banc* review.

- 38 -

### A. The Tribe's one-case-only procedural arguments do not merit *en banc* attention.

*Seven County* could hardly have been clearer: "The bedrock principle of judicial review in NEPA can be stated in a word: Deference." 605 U.S. at 185. Bound by that command, the Tribe concedes (Pet.8) that "courts must defer to agencies' factfinding and discretionary determinations." So it is left to argue that the panel erred by supposedly treating itself as "powerless to disagree" with the agency's conclusions and bound to "blindly accept" the government's assertion that it considered opponents' concerns.

The panel did no such thing. *See* pp.40-42, *infra.* But even if the panel's unanimous decision resembled the Tribe's description, this case would be an extremely poor vehicle to take up *Seven County* deference. Unlike other NEPA cases, the FEIS here *did not* determine whether to transfer the federal land or allow the project to proceed. Instead, the Exchange Act only *partially* incorporated NEPA—"[e]xcept as otherwise provided" in the Act—to inform *post-exchange* discretionary decisions such as permitting and rights-of-way for this particular mine. 16 U.S.C. § 539p(c)(9)(A). For that reason, whatever the *en banc* Court might say about *Seven County* in this bespoke statutory context would have limited application in ordinary NEPA cases.

The same is true of the Tribe's consultation claim. The Tribe seeks further review of a unique consultation provision and record applicable

to this mining project alone. 16 U.S.C. § 539p(c)(3). Whether more than 400 consultations across nearly a quarter century satisfied that requirement is an idiosyncratic question unlikely to recur.

### B. The Forest Service complied with its obligation under NEPA to reasonably address significant effects of the project.

Constrained by the Supreme Court's mandate that courts must defer to "*how* an agency considers the relevant factors," the Tribe purports to argue (Pet.8) only that the panel here failed to ascertain "*whether* the agency*" actually considered those factors. According to the Tribe (Pet.8-9), the panel did not "confirm that the agency … addressed [the] environmental consequences" of the project, but instead simply took the "agency's word" that it had done so.

That is not a fair description of the panel's opinion. The panel gave the Tribe the benefit of reviewing its extra-record evidence, and then explained in detail how the agency considered and resolved each of the issues the Tribe cited. The FEIS "directly responded to" the Tribe's experts and "addressed each of the topics the Tribe highlights from the declarations, including tailings and pipeline safety, acid rock drainage, and hydrological concerns." 172 F.4th at 661.[5] Only after that careful

---

[5] The district court likewise found that the FEIS "specifically considered and addressed" the Tribe's concerns, "provided extensive, reasoned analysis to justify its conclusions," and devoted "an entire 51-page section" to the issues the Tribe raised. 1-AMRCER-55-56.

review did the panel conclude that "[t]he Tribe's arguments amount to a disagreement with the FEIS's scientific conclusions." *Id.*

The panel's analysis broke no new ground. In announcing a correction of lower-court decisions that had used NEPA to improperly scrutinize agency decisionmaking, the Supreme Court held that judicial review is most deferential "when an agency makes … predictive or scientific judgments." *Seven County*, 605 U.S. at 182. The panel decision is a straightforward application of that settled law.

At bottom, the Tribe's argument is not really that the agency failed to consider its environmental concerns (both the panel and the district court confirmed that it did). The Tribe's real objection is that the agency "failed to reasonably address" those concerns. Pet.10. But that runs straight into the "course correction" that *Seven County* imposed. As the Tribe acknowledges (Pet.8), how the agency considered the factors and the reasonableness of its resulting findings are matters about which the Supreme Court requires judicial deference. 605 U.S. at 182.

All that remains are the Tribe's quibbles with how the Forest Service resolved technical questions—*e.g.*, whether the agency adequately weighed specific causes of pipeline failure or the role of oxygen in groundwater modeling. That is just the sort of "predictive or scientific judgment[]" to which courts must defer. *Seven County*, 605 U.S. at 182. The Tribe's relabeling (Pet.9 n.1) of those methodological disputes as concerning "direct" rather than "indirect" effects changes nothing: *Seven*

- 41 -

*County*'s deference turns on the scientific character of the judgment, not taxonomy.

## C. The Forest Service complied with its consultation obligations under the Exchange Act.

Last of all, the Tribe's objections to the decades-long consultation process fare no better. The Exchange Act required the government to "engage in government-to-government consultation with affected Indian tribes" and "consult with Resolution Copper" to "seek to find" mutually acceptable measures to address tribal concerns and minimize adverse impacts. 16 U.S.C. § 539p(c)(3). This is a "procedural statute[]" that "do[es] not mandate any particular substantive outcome" and cannot be used "to attack the ultimate outcome of the consultation process." 172 F.4th at 663-664. The procedure here was more than adequate. The government engaged the San Carlos Apache Tribe far more than any other tribe—over 400 times across nearly a quarter century. 1-SCATER-67-80; 12-RCMSER-3049-3160. Based on those consultations, the Forest Service identified, and Resolution agreed to, a host of measures addressing tribal concerns. 8-RCMSER-2195-2246; *see* 1-RCMSER-8-9 (outlining changes resulting from consultation).

The Tribe wants a veto, not a consultation. Lacking a congressional grant of that power, it recycles two arguments that the district court and the panel rejected.

- 42 -

First, the Tribe claims (Pet.12) that the government admitted that "as of 2021, it had not yet satisfied its consultation obligations." That is false. The government withdrew the 2021 FEIS to "review" and "fully understand" concerns raised in prior consultations. 6-AMRCER-1027. That decision to continue consulting is not a confession that prior consultations fell below the statutory floor, *see* 172 F.4th at 664, much less that the process had to restart from scratch, *see Te-Moak Tribe of W. Shoshone of Nev.* v. *Department of the Interior*, 608 F.3d 592, 609-610 (9th Cir. 2010) (court appropriately considered "historic background," including consultation "efforts" predating project).

Second, the Tribe protests (Pet.12-13) publication of the FEIS before it had completed a Memorandum of Understanding with the government. But the statute requires consultation, not an MOU. 16 U.S.C. § 539p(c)(3); *cf.* 36 C.F.R. § 800.6(b) (formal "memorandum of agreement" required only if parties "agree on how … adverse effects will be resolved"). And it was the Tribe, not the government, that refused to engage; after 2021, the Forest Service repeatedly sought to resume consultation, but the Tribe declined unless the government first agreed to undo the Exchange Act. 6-SCATER-1118-1119. The Tribe cannot stonewall consultation and then complain that none occurred. As the district court held: "'Consultation is a two-way street,'" and the Tribe cannot "'block any undertaking by refusing to cooperate.'" 1-AMRCER-69. The Tribe's "re-

- 43 -

fus[al] to engage in good faith" forfeits its complaint that the government did too little. 1-AMRCER-73.

The panel thus correctly held that the government satisfied the Exchange Act's consultation requirement, and that fact-bound, statute-specific holding would not merit *en banc* review in any event.

## CONCLUSION

Each rehearing petition should be denied.

Respectfully submitted,

*/s/ Michael R. Huston*

| | |
|---|---|
| Christopher D. Thomas | Michael R. Huston |
| Andrea J. Driggs | *Counsel of Record* |
| Janet M. Howe | Diane M. Johnsen |
| Benjamin A. Longbottom | Addison W. Bennett |
| HOLLAND & HART LLP | PERKINS COIE LLP |
| 2398 E. Camelback Road, Suite 650 | 2525 E. Camelback Rd, Suite 500 |
| Phoenix, Arizona 85016 | Phoenix, AZ 85016 |
| (602) 316-9334 | Telephone: (602) 351-8000 |
| CDThomas@hollandhart.com | MHuston@perkinscoie.com |
| | |
| Jeffrey Capelouto | Nicholas S. Crown |
| PERKINS COIE LLP | PERKINS COIE LLP |
| 1301 Second Avenue Suite 4200 | 700 Thirteenth Street N.W., Suite 800 |
| Seattle, WA 98101 | Washington, DC 20005 |

*Counsel for Intervenor-Defendant-Appellee*
*Resolution Copper Mining LLC*

July 3, 2026

- 44 -

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume requirement of Circuit Rule 40-1(b) and this Court's May 26, 2026 Order because it contains 9,995 words as determined by the word count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type styles requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Michael R. Huston*

PERKINS COIE LLP

*Counsel for Intervenor-Defendant-Appellee Resolution Copper Mining LLC*