No. 25-5185, 25-5189, 25-5197

# United States Court of Appeals for the Ninth Circuit

———————

ARIZONA MINING REFORM COALITION, et al.,
*Plaintiffs-Appellants*,

v.

BROOK L. ROLLINS, U.S. SECRETARY OF AGRICULTURE, et al.,
*Defendants-Appellees*,

and RESOLUTION COPPER MINING LLC,
*Intervenor-Defendant-Appellee*.

———————

On Appeal from the United States District Court for the District of Arizona
No. 2:21-cv-00122-PHX-DWL
Hon. Dominic W. Lanza

———————

**BRIEF OF *AMICI CURIAE* WILLIAM P. BARR AND MICHAEL B. MUKASEY IN OPPOSITION TO REHEARING EN BANC**

———————

Cody L. Reaves
Chase T. Harrington
Nicolas H. Wilson
TORRIDON LAW PLLC
801 17th Street, NW
Suite 1100
Washington, DC 20006
(202) 249-6900
creaves@torridonlaw.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

INTERESTS OF *AMICI CURIAE* ........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................1

ARGUMENT ........................................................................................................4

I. THE PANEL CORRECTLY HELD THAT THE LAND TRANSFER DOES NOT IMPOSE A "SUBSTANTIAL BURDEN" ON RELIGION BECAUSE IT NEITHER COERCES NOR DISCRIMINATES AGAINST PETITIONERS..........................4

II. PETITIONERS' CLAIMS LACK A LIMITING PRINCIPLE AND WOULD THREATEN TO PARALYZE GOVERNMENTAL FUNCTIONS. ..................................................................................10

    A. The Free Exercise Clause and RFRA Provide No Right To Control Public Lands .............................................................. 10

    B. Lopez's Proposed Standard Leads To Untenable Results And Is Judicially Unworkable.................................................. 12

    C. Nothing in *Mahmoud* or *Mirabelli* Undermines *Apache Stronghold* or Provides Any Basis for En Banc Rehearing....... 17

CONCLUSION....................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apache Stronghold v. United States,*
101 F.4th 1036 (9th Cir. 2024) ..............................................2, 8, 11, 12, 14, 15

*Bowen v. Roy,*
476 U.S. 693 (1986)...........................................................................................11, 15

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014)..............................................................................................6, 15

*Cantwell v. Connecticut,*
310 U.S. 296 (1940).....................................................................................................4

*Carson v. Makin,*
596 U.S. 767 (2022).....................................................................................................5

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993).....................................................................................................5

*Employment Division v. Smith,*
494 U.S. 872 (1990).....................................................................................................6

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021).....................................................................................................5

*Gonzales v. O Centro Espirita Beneficenta Uniao do Vegetal,*
546 U.S. 418 (2006).....................................................................................................6

*Hosanna-Tabor Evangelical Lutheran Church and School v.
EEOC,*
565 U.S. 171 (2012).....................................................................................................5

*Kennedy v. Bremerton Sch. Dist.,*
597 U.S. 507 (2022).....................................................................................................5

*Lyng v. Northwest Indian Cemetery Protective Association,*
485 U.S. 439 (1988)..............................................................................2, 9, 10, 11, 12

iii

*Mahmoud v. Taylor,*
   606 U.S. 522 (2025)..................................................................2, 5, 16, 17, 18

*Mirabelli v. Bonta,*
   607 U.S. 492 (2026)..................................................................................2, 17

*Sherbert v. Verner,*
   374 U.S. 398 (1963)..................................................................................5, 10

*Snoqualmie Indian Tribe v. FERC,*
   545 F.3d 1207 (9th Cir. 2008)......................................................................14

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   239 F. Supp. 3d 77 (D.D.C. 2017) ...............................................................14

*West Virginia State Board of Education v. Barnette,*
   319 U.S. 62 (1943)......................................................................................4, 5

*Wisconsin v. Yoder,*
   406 U.S. 205 (1972)..........................................................................................5

*Yellowbear v. Lampert,*
   741 F.3d 48 (10th Cir. 2014).........................................................................17

**Statutes**

42 U.S.C. § 2000bb-1......................................................................5, 6, 7, 11

Pub. L. No. 113-291, 128 Stat. 3292 (2014).........................................................7

**Other Authorities**

Proclamation No. 10,962, 90 Fed. Reg. 37,727 (July 30, 2025)..........................16

Exec. Order No. 14,220, 90 Fed. Reg. 11,001 (Feb. 25, 2025)..........................16

Fed. R. App. P. 29 ..............................................................................................1

## INTERESTS OF *AMICI CURIAE*[1]

*Amici* are two former Attorneys General of the United States. William P. Barr served as the 77th Attorney General of the United States from 1991 to 1993 and the 85th Attorney General from 2019 to 2020. Michael B. Mukasey served as the 81st Attorney General from 2007 to 2009. *Amici* have a profound and enduring interest in ensuring that the First Amendment and the Religious Freedom Restoration Act are interpreted in a manner that provides robust protection for religious exercise without creating an unworkable standard that could paralyze essential government functions. Their experience provides a unique, practical perspective on the widespread governmental and judicial burdens that would result from abandoning the established, objective standard for what constitutes a "substantial burden" on an individual's exercise of religion.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici* yield to no one in their vigorous defense of the religious liberties protected by the Constitution and federal statutes. The free exercise of religion

---

[1] No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money to fund its preparation or submission, and no person other than the amici curiae or their counsel contributed money to fund its preparation or submission. Fed. R. App. P. 29(a)(4), (b)(4).

is a cornerstone right in the American legal system, having inspired the birth of our country and enabled its flourishing as a pluralistic society. A principled defense of religious liberty, however, requires a clear understanding of the rights the law protects. As developed through decades of Supreme Court jurisprudence, the Free Exercise Clause of the First Amendment applies when the government coerces, punishes, or discriminates against religious adherents. The enhanced protections of the Religious Freedom Restoration Act (RFRA) are triggered by the same kinds of burdens. But neither provision applies to claims of the kind advanced here, where Congress has simply decided to dispose of government resources in a way that a religious entity opposes.

The panel faithfully applied these settled principles. In *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988), the Supreme Court held that the government's disposition of its own land does not violate the Free Exercise Clause when it neither coerces nor discriminates against religious exercise. This Court, sitting en banc, recently applied that rule to the very land transfer at issue here in *Apache Stronghold v. United States*. 101 F.4th 1036 (9th Cir. 2024) (en banc). Contrary to the Lopez petitioners' assertion, nothing in *Mahmoud v. Taylor*, 606 U.S. 522 (2025) or *Mirabelli v. Bonta*, 607 U.S. 492 (2026), has since changed the controlling

2

framework applied in *Lyng* and *Apache Stronghold*. There is no basis to re-hear *en banc* the panel's correct application of controlling Supreme Court precedent and this Court's recent *en banc* decision.

Lopez petitioners would have *any* government action deemed an infringement and subject to strict scrutiny whenever it has a significant impact on religious activity, even if it is non-discriminatory and non-coercive. This is untenable and would expose a sweeping range of government action to protracted legal challenge and judicial second-guessing whenever an individual asserts that it adversely impacts his religious beliefs. Nor is it feasible for courts to gauge the propriety of government action by measuring its effects on religious belief—which is highly subjective and requires delving into religious matters.

The government has no obligation to provide public property—either land or funds—to support or enable particular religious activities. As long as the government is not acting discriminatorily, the government may refrain from providing public support to religious exercises and, in doing so, the government is not "substantially burdening" religious exercise.

When the government decides not to provide particular resources to the public generally—as it has here—it is not required to continue providing those

3

benefits to any individual who believes they are necessary for the exercise of his spiritual beliefs.

All citizens have a stake in public property, and the government must manage that property in the interests of the public at large, not confer unique privileges on a particular group, especially when that special treatment is based on the group's religion. When it comes to access to public resources, free exercise protections guarantee religious adherents equal rights, not greater rights.

Accordingly, there is no reason for this Court to revisit the panel's decision in this case.

## ARGUMENT

I. **The Panel Correctly Held That the Land Transfer Does Not Impose A "Substantial Burden" on Religion Because it Neither Coerces Nor Discriminates Against Petitioners.**

The Supreme Court has rightly invoked the Free Exercise Clause to protect religious exercise from two forms of government-imposed burdens: discrimination and coercion. The Clause has shielded religious ministers from criminal convictions for proclaiming their faith, *Cantwell v. Connecticut*, 310 U.S. 296 (1940); protected students from expulsion for refusing to salute the American flag, *West Virginia State Board of Education v. Barnette*, 319 U.S.

62 (1943); prohibited states from conditioning receipt of public benefits on abandoning religious convictions, *Sherbert v. Verner*, 374 U.S. 398 (1963); prevented states from compelling parents to send their children to public school when doing so violated their sincere religious beliefs, *Wisconsin v. Yoder*, 406 U.S. 205 (1972); vacated laws targeting religious minorities for performing ritual sacrifices, *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993); and safeguarded religious organizations from state interference in the selection of their ministers, *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012).

More recently, the Supreme Court has emphasized that the Free Exercise Clause does not permit government officials to treat religious entities differently than secular ones. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 542 (2021) (city could not refuse to accommodate religious foster agency's beliefs about marriage while offering accommodations to others); *Carson v. Makin*, 596 U.S. 767, 780 (2022) (state cannot deny tuition assistance payment to schools solely because they are religious); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543–44 (2022) (school district could not prevent personal prayer while allowing comparable secular activities). And it has affirmed that the govern-

ment cannot burden religious exercise as a condition of receiving public benefits. *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (schools could not force parents to allow significant interference with religious instruction of their child as a condition of receiving a public education).

RFRA operates in a similar way. *See* 42 U.S.C. § 2000bb-1(b). Enacted after the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), RFRA prohibits the federal government from "substantially burden[ing] a person's exercise of religion" unless the burden furthers "a compelling governmental interest" and "is the least restrictive means" of doing so. 42 U.S.C. § 2000bb-1. The Supreme Court has held that RFRA protects sacramental uses of certain drugs against criminal prosecution, *Gonzales v. O Centro Espirita Beneficenta Uniao do Vegetal*, 546 U.S. 418 (2006), and that it requires exemptions for closely held religious corporations from providing coverage for certain contraceptives, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

While both RFRA and the Free Exercise Clause provide broad protection, that protection is not unlimited. As noted above, both provisions require

that the government impose a substantial burden—to discriminate against individuals on account of their religion or to coerce them to act inconsistent with their faith—before they apply.

In this case, Congress's decision to transfer federally owned property to a third party does not impose such a burden. In 2014, Congress approved the sale of over 2,000 acres of federal land to a private mining company—an action consistently defended by the Trump, Obama, and Biden administrations. *See* Pub. L. No. 113-291, § 3003, 128 Stat. 3292, 3732 (2014). Underneath the land is the second largest untapped copper deposit in the world, and Congress authorized the transfer to allow "mining and related activities" to secure this critical mineral. *Id.* § 3003(c)(8). If used to extract copper, the transfer will likely prevent the Lopez Appellants ("Lopez")[2] from using the land for religious ceremonies. But the transfer does not discriminate against Lopez: it does not single Lopez out for adverse treatment or penalize on account of faith. Nor does the transfer coerce Lopez: the government is not forcing Lopez—through promised benefits or threats of penalties—to act in a way contrary to Lopez's beliefs. Congress simply authorized a transfer of its own property to

---

[2] In the consolidated appeal decided by the panel, only the Lopez Petitioners brought Free Exercise and RFRA claims.

a third party to use for development of a critical mineral. That decision does not wield the state's power to "prohibit" religious exercise; it just fails to allocate the state's resources to promote it. As a result, the Lopez's First Amendment and RFRA claims cannot succeed, and the panel was correct to reject them.

This Court already considered these issues *en banc*, and it correctly resolved them. Under this Court's *en banc* decision, "a disposition of government real property does not impose a substantial burden on religious exercise when it has no tendency to coerce individuals into acting contrary to their religious beliefs, does not discriminate against religious adherents, does not penalize them, and does not deny them an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Apache Stronghold v. United States*, 101 F.4th 1036, 1044 (9th Cir. 2024) (en banc) (per curiam). While the members of the *en banc* court did not agree on every detail, there was wide agreement on this basic point. *See id.*; *id.* at 1051–52 (majority opinion of Collins, J.); *id.* at 1090–91 (Bea, J., concurring in part and dissenting in part); *id.* at 1109–10 (Nelson, J., concurring); *id.* at 1114, 1119 (Van Dyke, J., concurring).

8

As a matter of precedent and practical operation of the government, the result could hardly be otherwise. In *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988), the Supreme Court considered the U.S. Forest Service's decision to build a six-mile road through a portion of federal land that had "historically been used for religious purposes" by various Native American tribes. *Id.* at 442. According to a draft environmental report, construction of the road "would cause serious and irreparable damage to the sacred areas." *Id.* Despite recognizing the "severe adverse effects on the practice of [the tribes'] religion," the Court held that road development did not substantially burden the appellants' religious exercise. *Id.* at 447, 450–51. While the road development "may make it more difficult to practice certain religions," it had "no tendency to coerce individuals into acting contrary to their religious beliefs," *id.* at 450, nor did it "penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens," *id.* at 449. And absent those coercive or discriminatory effects, the government maintained "its right to use what is, after all, *its* land." *Id.* at 453.

Lopez's claims require the same conclusion, and the panel rightly found that the land transfer does not impose a substantial burden on religious exercise

within the meaning of the First Amendment or RFRA, and that Lopez's claims cannot succeed.

## II. Petitioners' Claims Lack a Limiting Principle and Would Threaten To Paralyze Governmental Functions.

### A. The Free Exercise Clause and RFRA Provide No Right To Control Public Lands

Neither the Free Exercise Clause nor RFRA grant religious believers the power to require the government to expend federal resources purely to benefit their religious exercise. And they do not impute onto public lands private religious easements. *See Lyng*, 485 U.S. at 452.

"The crucial word in the constitutional text is 'prohibit.'" *Id.* at 451. The government may not interfere with the rights of citizens to exercise their religion, absent compelling justifications. And while the Free Exercise Clause can require exemptions from laws that impose a substantial burden on religious exercise, it does not require the government to subsidize religious worship because it is religious. "For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government." *Id.* (quoting *Sherbert*, 374 U.S. at 412 (Douglas, J., concurring)).

RFRA's text imposes a similar requirement. It restricts the federal government from "substantially burden[ing] a person's exercise of religion." 42 U.S.C. § 2000bb-1(a). It does not, by contrast, impose affirmative obligations on the government to *subsidize* or fund a person's religious exercise. *See Apache Stronghold*, 101 F.4th at 1051–52.

When it comes to federal property, the government has authority to maintain, use, or dispose of it to promote the public interest. To be sure, the government cannot use that land to discriminate—*e.g.*, by allowing hikers to access Oak Flat but not Western Apache seeking to worship and perform sacred rituals. And the government cannot threaten to convey that land to force Lopez or anyone else to change their religious beliefs or practices. *See Lyng*, 485 U.S. at 453; *Apache Stronghold*, 101 F.4th at 1112–13 (VanDyke, J., concurring). But the government is not required to open public lands—or hold onto them—to *benefit* a religious exercise. Otherwise, the First Amendment would mandate "religious servitude[s]" on public lands. *Lyng*, 485 U.S. at 452. "The Free Exercise Clause simply cannot be understood to *require* the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Bowen v. Roy*, 476 U.S. 693, 699 (1986) (emphasis added).

Congress has decided to transfer its own land for mining because it believes that will further the public interest. And "there is no textual, historical, or precedential support for the notion that a government's refusal to use its own property to enable or subsidize religious practice is a cognizable burden under either the Free Exercise Clause or RFRA." *Apache Stronghold*, 101 F.4th at 1110 (VanDyke, J., concurring). Neither the Free Exercise Clause nor RFRA require the government to maintain the land for one specific use as opposed to all others. Lopez's arguments otherwise are not sustainable.

**B.     Lopez's Proposed Standard Leads To Untenable Results And Is Judicially Unworkable.**

*Lyng* held that "incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs," do not "require government to bring forward a compelling justification for its otherwise lawful actions." 485 U.S. at 450–51. Lopez asks this Court to reconsider whether to abandon *Lyng* for its RFRA claim and to adopt the minority reasoning from the *en banc* dissent in *Apache Stronghold*, which would have held that anytime "the government prevents a person from engaging in religious exercise, the government has substantially burdened the exercise of religion." 101 F.4th at 1145 (Murguia, C.J., dissenting).

12

That theory would put religious liberty law on an untenable course. It would dramatically expand the universe of claims subject to strict scrutiny, empowering any individual with an asserted spiritual connection to land to challenge government action disposing of that land in a manner inconsistent with the person's religious beliefs. This expansion would force courts to abandon the clear, objective standard of coercion and discrimination for a subjective test that requires judges to perform an impossible task: weighing the personal, spiritual value of a religious practice against public benefits of government projects and land use decisions.

Lopez's proposed standard would trigger strict scrutiny for a vast range of government actions, fundamentally alter challenges to federal land usage, and lead to untenable results. It would mean that any person claiming a spiritual connection to a particular threatened parcel, anyone who venerates a cross placed on a bluff set to be used for wind power generation, or anyone who meditates or prays at a site that will be mined for critical minerals could force the government to justify its actions under the most demanding legal standard. It would trigger strict scrutiny over government actions that courts have correctly concluded do not substantially burden religious exercise within the meaning of the relevant protections, such as the grant of an easement for

13

a pipeline to "run under the lakebed but not through the water itself" that was subject to objections by religious adherents who "believe that the mere existence of a crude oil pipeline under the waters of [the lake] will desecrate those waters and render them unsuitable for use in their religious sacraments." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 81, 82, 91 (D.D.C. 2017); *see Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1213 (9th Cir. 2008) (declining to apply strict scrutiny to FERC's approval of a hydroelectric project at a waterfall when a religious group claimed that the project "alters the ancient sacred cycle of water flowing over the Falls").

Further, Lopez's proposed test is unworkable. The current standard provides an objective and administrable framework by focusing on the government's conduct—a burden is substantial if it coerces or discriminates against religious exercise. In contrast, Lopez's test for a substantial burden would require that courts determine substantiality by measuring the effects of the government's action and the degree of their impact on an individual's religious belief. Weighing religious impact also introduces risks of preference, favor, or discrimination. Long-established religious practices could receive more deference than newer traditions. *See Apache Stronghold*, 101 F.4th at 1120 (Van-Dyke, J., concurring). Animistic beliefs systems that venerate sacred physical

14

or environmental features may be given outsized privilege compared to other more abstract religions. *See id.* at 1121–22. Moreover, Lopez's standard lacks any limiting principle that would confine it to property or land use. Under Lopez's theory, individuals could claim a substantial burden from any government policy they find religiously objectionable and wish to challenge—such as military action, the death penalty, or social security numbers. *See, e.g.*, *Bowen*, 476 U.S. at 695. The proposed test offers courts no principled way to avoid subjecting the government to strict scrutiny over virtually any government function.

That unworkability would be compounded under the subsequent strict scrutiny analysis. Even under RFRA, an individual's personal religious interest in public land does not operate as a veto over all other competing uses. Rather, a finding of a substantial burden subjects the government action to strict scrutiny: a values-based comparison of the government interest and the liberty interest. *See, e.g.*, *Burwell*, 573 U.S. at 726–27. If a substantial burden could be defined based on subjective measures of spiritual harm, the approach would require comparison of competing values without any administrable standard. Here, it creates an impossible choice between subjective spiritual beliefs and

15

the expressed will of the democratic branches on matters of national importance. On one side of the scale, the Court is asked to measure the spiritual gravity of, *inter alia*, a ceremony performed near a particular rock overhang with ancient writing, called *Tséyaa Gogeschin*. Pet. for Reh'g En Banc for Lopez Appellants at 3, ECF No. 177 (hereinafter, "Pet."). On the other side, the Court must weigh the expressed democratic will and considered judgment of both Congress and the President to develop the copper mine to limit our nation's dependency on foreign copper, a critical national security vulnerability that weakens our industrial base, risks economic instability, and jeopardizes our defense. *See, e.g.*, Proclamation No. 10,962, § 6, 90 Fed. Reg. 37,727 (July 30, 2025) ("[D]ependency on foreign sources of copper is a national security vulnerability" that "weakens [the Nation's] industrial resilience, exposes the American people to supply chain disruptions, economic instability, and strategic vulnerabilities, and jeopardizes the United States defense industrial base."); Exec. Order No. 14,220, § 1, 90 Fed. Reg. 11,001 (Feb. 25, 2025) ("Copper is a critical material essential to the national security, economic strength, and industrial resilience of the United States."). Courts are readily positioned to step in to prevent coercion of or discrimination against a person's individual

16

religious beliefs, but they are not adequate arbiters of competing land use values. *See, e.g.*, *Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014) (Gorsuch, J.) ("[W]e also lack any license to decide the relative value of a particular exercise to a religion.").

This Court should decline to reconsider once again whether to follow Lopez's transparently unworkable standard. The established coercion and discrimination-based test provides a clear and administrable framework that protects religious liberty without paralyzing essential government functions.

### C. Nothing in *Mahmoud* or *Mirabelli* Undermines *Apache Stronghold* or Provides Any Basis for En Banc Rehearing.

The Lopez petitioners seek a second *en banc* review by this Court to consider the same "free exercise" question resolved in its prior *en banc* decision in *Apache Stronghold*. To justify this, petitioners assert that the Supreme Court's recent decisions in *Mahmoud v. Taylor*, 606 U.S. 522 (2025) and *Mirabelli v. Bonta*, 607 U.S. 492 (2026), have changed the rule applied in *Lyng* and *Apache Stronghold* by jettisoning any requirement that, to pose a substantial burden on religion, government action, if not discriminatory, must involve coercion. But *Mahmoud* and *Mirabelli* do no such thing, and nothing in those cases undermines the force of *Lyng* or *Apache Stronghold* as the controlling precedents in this case.

17

*Mahmoud* held that parents' free exercise rights were violated where school officials imposed on elementary school students a curriculum antithetical to the parents' religious beliefs and refused to allow parents to opt out. Far from eliminating a coercion requirement, the *Mahmoud* Court explicitly based its ruling on the coercive nature of the school board's actions. After noting its longstanding recognition of the risk of coercive pressure inherent in elementary and secondary school classrooms, *Mahmoud*, 606 U.S. 554–55, the Court rejected the school boards' claim that its curriculum decisions were like the government's land management decisions in *Lyng* and merely involved the government's "internal affairs." The Court stated that "operation of the public schools is not a matter of 'internal affairs'" but "implicates direct, coercive interactions between the State and its young [students]." *Id.* at 557.

The *Mahmoud* Court does not suggest that coercion is no longer required. Rather, it addresses the *level of coercion* that can pose an impermissible burden when the government is instructing young students in public schools, and the rights at stake are those of the parents' to direct the religious upbringing of their children. In that context, the Court explains, impermissible coercion arises not just when the government directly pressures students to renounce their parents' religious beliefs. It also can arise through more subtle

18

coercive pressures, as where a curriculum undermines the parents' religious guidance by promoting moral ideas that contradict those offered by the parents.

Petitioners' reliance on *Mirabelli* (Pet. at 16–18) fares no better. Like *Mahmoud*, *Mirabelli* involved governmental pressure exerted through the public-school system, where the state burdened parents' religious exercise by withholding information about their child's gender transition while facilitating that transition at school. 607 U.S. at 492–93. As in *Mahmoud*, the state used its coercive power over public school operations to interfere with the rights of parents to guide their child's religious development. The state's actions in requiring school personnel to facilitate student transitions, while at the same time ordering that information about a student's transitioning be withheld from parents, were clearly designed to prevent parents from providing guidance to their children. Those actions are nothing if not coercive. Nothing in *Mirabelli* addressed government ownership or disposition of public lands, questioned *Lyng*, or suggested that the Free Exercise Clause limits the government's authority to use or dispose of public lands.

19

## CONCLUSION

The Court should deny *en banc* review and affirm the panel's decision.

July 10, 2026

Respectfully submitted,

/s/ *Cody L. Reaves*
Cody L. Reaves
Chase T. Harrington
Nicolas H. Wilson
TORRIDON LAW PLLC
801 17th Street, NW
Suite 1100
Washington, D.C. 20006
 (202) 249-6900
creaves@torridonlaw.com

*Counsel for Amici Curiae*

20

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)** Nos. 25-5185, 25-5189, 25-5197

I am the attorney or self-represented party.

**This brief contains <u>3931</u> words,** including <u>0</u> words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief 's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[   ] complies with the word limit of Cir. R. 32-1.
[   ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
[✓] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
[   ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
[   ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.
[   ] complies with the length limit designated by court order dated _____.
[   ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

/s/ *Cody L. Reaves*
Cody L. Reaves

*Counsel for Amici Curiae*

21

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on July 10, 2026.  I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

*/s/ Cody L. Reaves*
Cody L. Reaves

*Counsel for Amici Curiae*