**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION OF ARIZONA, INC.; EARTHWORKS; CENTER FOR BIOLOGICAL DIVERSITY; ACCESS FUND; GRAND CANYON CHAPTER OF THE SIERRA CLUB,

*Plaintiffs - Appellants*,

v.

UNITED STATES FOREST SERVICE, an agency in the U.S. Department of Agriculture; NEIL BOSWORTH, Supervisor of the Tonto National Forest; BROOKE ROLLINS, US Secretary of Agriculture,

*Defendants - Appellees*,

RESOLUTION COPPER MINING, LLC,

No. 25-5185

D.C. No.
2:21-cv-00122-DWL
District of Arizona,
Phoenix

ORDER

*Intervenor-Defendant - Appellee.*

| | |
|---|---|
| SAN CARLOS APACHE TRIBE, a federally recognized Tribe,<br><br>*Plaintiff - Appellant*,<br><br>v.<br><br>UNITED STATES FOREST SERVICE, an agency in the U.S. Department of Agriculture; NEIL BOSWORTH, Supervisor of the Tonto National Forest; BROOKE ROLLINS,<br><br>*Defendants - Appellees*,<br><br>RESOLUTION COPPER MINING, LLC,<br><br>*Intervenor-Defendant - Appellee.* | No. 25-5189<br><br>D.C. No. 2:21-cv-00068-DWL<br>District of Arizona, Phoenix |
| GOUYEN BROWN LOPEZ; SINETTA LOPEZ, on behalf of herself and her minor child L.B.; NOMIE BROWN; ANGELA KINSEY, on behalf of herself and her minor children V.K. and M.K., | No. 25-5197<br><br>D.C. No. 2:25-cv-02758-DWL<br>District of |

*Plaintiffs - Appellants*,

v.

UNITED STATES OF AMERICA; UNITED STATES FOREST SERVICE; BROOKE ROLLINS; UNITED STATES DEPARTMENT OF AGRICULTURE; TOM SCHULTZ,

*Defendants - Appellees*,

RESOLUTION COPPER MINING, LLC,

*Intervenor-Defendant - Appellee*.

Arizona, Phoenix

Filed September 29, 2026

Before: Johnnie B. Rawlinson, Milan D. Smith, Jr., and Daniel A. Bress, Circuit Judges.

Order;
Dissent by Chief Judge Murguia;
Statement by Judge Graber;
Dissent by Judge Bumatay

## SUMMARY*

### Southeast Arizona Land Exchange and Conservation Act

The panel denied petitions for panel rehearing and/or rehearing en banc in a case in which the panel affirmed the district court's denial of plaintiffs' request for a preliminary injunction seeking to block a land exchange, mandated by the Southeast Arizona Land Exchange and Conservation Act, that targets a large copper deposit in Southeast Arizona located in the Tonto National Forest.

Dissenting from the denial of rehearing en banc, Chief Judge Murguia wrote that, unconstrained by this court's prior precedent narrowly and incorrectly interpreting "substantial burden," the complete obliteration of Oak Flat, a site sacred to the Western Apache, is obviously a "substantial burden" on the Western Apache's religious exercise. The three-judge panel in this case denied relief, bound by prior precedent. This case presented an exceptional circumstance that would justify revisiting this court's prior precedent in *Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024) (en banc).

Respecting the denial of rehearing en banc, Judge Graber, joined by Chief Judge Murguia and Judges McKeown, W. Fletcher, Paez, Berzon, Hurwitz, Wardlaw, Christen, and Koh, wrote that the en banc court in *Apache Stronghold* was wrong when it allowed the proposed mining project at issue here, which will substantially burden the

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Western Apache's exercise of religion. First, the holding indisputably contradicted the plain meaning of the statutory text. Second, the holding grossly misapplied the doctrine described in *Williams v. Taylor*, 529 U.S. U.S. 362 (2000). Third, even if applying the doctrine in *Williams* were appropriate, the analysis was badly bungled.

Judge Bumatay, joined by Chief Judge Murguia and Judges Wardlaw, Christen, and Koh, dissented from the denial of rehearing en banc because even if 1993 RFRA incorporated pre-*Smith* limitations on "substantial burden," those limitations no longer dictate what acts "substantially burden a person's exercise of religion" after Congress's 2000 RFRA amendment. The amendment untethered RFRA from the Supreme Court's First Amendment jurisprudence and expressly included assaults on religious exercise based on the use of real property. Given the change in statutory text, *Apache Stronghold* was wrongly decided.

---

## ORDER

Judges M. SMITH and BRESS voted to deny the Plaintiffs-Appellants' petitions for panel rehearing and/or rehearing en banc. Judge RAWLINSON voted to grant the Plaintiffs-Appellants' petitions for rehearing en banc. The full court was advised of the petitions for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the non-recused active judges in favor of en banc consideration. *See* Fed. R. App. P. 40. The petitions for panel rehearing and/or rehearing en banc are **DENIED**. Judges GOULD, MILLER, FORREST, and JOHNSTONE

did not participate in the deliberations or vote in this case. The motions for leave to file amicus briefs (Dkt. Nos. 234, 235, 237, 241, 244) are **GRANTED**.

---

MURGUIA, Chief Judge, dissenting from the denial of rehearing en banc.

Four years ago, a three-judge panel of our court—of which I was a member—was first asked whether the destruction of *Chí'chil Biłdagoteel*, or Oak Flat, a site sacred to the Western Apaches for millennia, would "substantially burden" the Apaches' exercise of religion under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb to bb-4. *See Apache Stronghold v. United States*, 38 F.4th 742 (9th Cir. 2022), *reh'g en banc granted, opinion vacated,* 56 F.4th 636 (9th Cir. 2022), *and on reh'g en banc,* 95 F.4th 608 (9th Cir. 2024), *amended and superseded by*, 101 F.4th 1036 (9th Cir. 2024). Constrained by our prior precedent narrowly and incorrectly interpreting "substantial burden," *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2008) (en banc), we held that it would not. *Apache Stronghold*, 38 F.4th at 766. At the time, as Judge Graber's statement explains, the practical consequences of our decision were not certain. *See id.* at 773 (acknowledging legislative efforts to block the land transfer).

Two years later, on rehearing en banc, our court was presented with the same question. Unconstrained by *Navajo Nation*, the answer should have been clear: the complete obliteration of Oak Flat is obviously a "substantial burden" on the Apaches' religious exercise. *See Apache Stronghold*, 101 F.4th at 1128–58 (Murguia, C.J., joined by Gould,

Berzon, Lee, and Mendoza, JJ., dissenting); *see id.* at 1158 (Lee, J., dissenting); *see also Apache Stronghold v. United States*, No. 21-15295, 2021 WL 12295173 (9th Cir. Mar. 5, 2021), at *2 (Bumatay, J., dissenting).

We overruled *Navajo Nation*'s definition of "substantial burden" under RFRA. *Apache Stronghold v. United States*, 101 F.4th at 1043 (*per curiam*). But in its place, instead of clarifying our law, we created confusion with seven separate opinions. *See id.* at 1154–55 (Murguia, C.J., dissenting). One six-judge majority held that "preventing access to religious exercise is an example of substantial burden." *Id.* at 1043 (*per curiam*). A different six-judge majority, through a tortured set of analytical moves, made an exception to that rule: "a disposition of government real property" generally "does not impose a substantial burden on religious exercise." *Id.* at 1044 (*per curiam*), 1055 (majority opinion by Collins, J.); *see also Apache Stronghold v. United States*, 145 S. Ct. 1480, 1485 (2025) (Gorsuch, J., joined by Thomas, J., dissenting from the denial of certiorari) ("How the en banc court arrived at its conclusion is a story of its own.").

For the reasons Judge Graber and Judge Bumatay lay out, and the reasons I stated in my dissent, we were wrong. *See Apache Stronghold*, 101 F.4th at 1128–58 (Murguia, C.J., dissenting). As in 2022, though, the consequences were not yet certain. *See Apache Stronghold*, 101 F.4th at 1049 (explaining that the government withdrew its environmental impact statement in March 2021 with a promise to evaluate the Tribes' concerns); *id.* at 1132 n.5 (Murguia, C.J., dissenting) (describing other then-pending legal challenges to the transfer).

In 2025, the government issued a new environmental impact statement, restarting the Land Exchange Act's 60-day clock for conveyance of the land. New plaintiffs filed this action. The panel in this case once again denied relief, bound by our en banc court's unprecedented exception to the definition of "substantial burden" in *Apache Stronghold*. *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, 172 F.4th 641, 665 (9th Cir. 2026). Presented with a petition for rehearing en banc, our court had a second opportunity to fix our tragic error. We should have taken it.

This was our final chance. The uncertainties and contingencies that were present in 2022 and 2024 no longer exist. This case presented a truly exceptional circumstance that would have justified revisiting our prior precedent. Unless the Supreme Court steps in, a mining project will obliterate Oak Flat and destroy "the very foundation of the Apache religion." *Apache Stronghold*, 101 F.4th at 1157 (Murguia, C.J., dissenting). I respectfully but strongly dissent from the denial of rehearing en banc.

---

GRABER, Senior Circuit Judge, joined by MURGUIA, Chief Judge; McKEOWN, W. FLETCHER, PAEZ, BERZON, and HURWITZ, Senior Circuit Judges; and WARDLAW, CHRISTEN, and KOH, Circuit Judges, respecting the denial of rehearing en banc:

Indispensable to the Western Apache's religion is a place called Chí'chil Biłdagoteel, or Oak Flat, where they have worshipped and practiced their religion for at least a millennium. The proposed mining project at issue here—which will convert the sacred site into a crater approximately 2 miles across and 1,000 feet deep—plainly will

"substantially burden a person's exercise of religion." 42 U.S.C. § 2000bb-1. In Apache Stronghold v. United States, 101 F.4th 1036 (9th Cir. 2024) (en banc) (per curiam), a bare majority of the en banc court held to the contrary.

We were wrong. See Apache Stronghold v. United States, 145 S. Ct. 1480 (2025) (Gorsuch, J., joined by Thomas, J., dissenting from the denial of certiorari); Apache Stronghold, 101 F.4th at 1128 (Murguia, C.J., dissenting, joined by Judges Gould, Berzon, Lee, and Mendoza); see also id. at 1158 (Lee, J., dissenting) ("Simply put, the complete obliteration of the land—which the Western Apache consider sacred and where they have worshipped and conducted ceremonies for at least a millennium—obviously imposes a substantial burden on the Apache's religious exercise."); Apache Stronghold v. United States, No. 21-15295, 2021 WL 12295173, at *3 (9th Cir. Mar. 5, 2021) (unpublished) (Bumatay, J., dissenting) ("[T]his is not a difficult case."). Our decision was triply flawed:

- Our interpretation in Apache Stronghold indisputably contradicts the plain meaning of the statutory text. The complete destruction of the sacred site here clearly qualifies as a "substantial[] burden" on the exercise of religion, under any dictionary or ordinary meaning of the phrase. See Apache Stronghold, 145 S. Ct. at 1486 (Gorsuch, J., dissenting from the denial of certiorari). Because the meaning of the text is clear, our analysis should have ended there. See, e.g., Nat'l Ass'n of Mfrs. v. Dep't of Def., 583 U.S. 109, 127 (2018).

- Even if applying other tools of statutory interpretation were permissible, we grossly misapplied the doctrine described in Williams v. Taylor (Terry Williams), 529 U.S. 362 (2000). Incredibly, the Terry Williams doctrine was our

sole justification for carving out an exception to the plain meaning of the statutory text. Apache Stronghold, 101 F.4th at 1058–61 (majority opinion by Collins, J.). But the Supreme Court has used that doctrine for one purpose only: to "confirm what [the statutory] language already makes clear." Terry Williams, 529 U.S. at 412. We erred by applying the Terry Williams doctrine in an unprecedented and impermissibly expansive manner: not to confirm a statute's plain meaning but to contradict its plain meaning. See Apache Stronghold, 101 F.4th at 1152–54 (Murguia, C.J., dissenting).

- Even if applying the Terry Williams doctrine in this fashion were appropriate, we badly bungled the analysis. We used the doctrine to import the meaning of "substantially burden" that the Supreme Court purportedly adopted in Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439 (1988). Apache Stronghold, 101 F.4th at 1060–61 (majority opinion by Collins, J.). But Lyng pre-dated the enactment of the statute; applied only to challenges under the Free Exercise Clause; never used the term "substantially burden"; has plainly distinguishable facts; and expressly stated that "a law prohibiting the Indian respondents from visiting [a sacred] area would raise a different set of constitutional questions." Lyng, 485 U.S. at 453 (emphasis added). Whatever teachings Lyng offers, reliance on Lyng here—to contradict and constrict the plain meaning of a statute that was intentionally worded broadly to reach beyond the extent of the Free Exercise Clause—is wholly unjustified. See Apache Stronghold, 145 S. Ct. at 1487 (Gorsuch, J., dissenting from the denial of certiorari); Apache Stronghold, 101 F.4th at 1146–52 (Murguia, C.J., dissenting).

This case is "vitally important." Apache Stronghold, 145 S. Ct. at 1480 (Gorsuch, J., dissenting from the denial of certiorari). If allowed to proceed, the mining project "will effectively 'end Apache religious existence as we know it.'" Id. at 1488 (quoting the petition for certiorari). The Apache's religious practices, like those of many other Native Americans, require access to particular sacred land. So the complete destruction of the Apache's sacred space is the rough equivalent of forever banning communion, for Catholics; or forbidding the study of the Torah, for Jews; or criminalizing all prayer, for Protestants; or outlawing fasting during Ramadan, for Muslims. No one would question that those hypothetical laws would impose a substantial burden on religious exercise, and there equally should be no question here. The constitutional and statutory protections for religious freedom apply to all religions; the laws do not favor some religions and disfavor others.

When we decided Apache Stronghold, the government had withdrawn the environmental impact statement and pledged to issue a new one after gaining a better understanding of the concerns of affected Tribes. Apache Stronghold, 101 F.4th at 1049 (majority opinion by Collins, J.). Other legal challenges to the project were pending. Id. at 1132 n.5 (Murguia, C.J., dissenting). The scope and legality of the project thus were uncertain at that time: Congress could have prevented the land transfer; the precise scope or methodology of the mining project could have been altered; or other court decisions could have stopped the project. And even if the proposal ultimately remained identical (which it did), everyone knew that this second round of litigation was inevitable.

Those uncertainties and contingencies no longer exist. Unless the judiciary acts now, the project will go forward.

This is the last chance to prevent the irreversible desecration of a place, of a religion, and of a people.

---

BUMATAY, Circuit Judge, joined by MURGUIA, Chief Judge, and WARDLAW, CHRISTEN, and KOH, Circuit Judges, dissenting from denial of rehearing en banc:

Would turning a holy site into a giant crater "substantially burden" the exercise of religion? "To ask the question is to answer it." *In re Debs*, 158 U.S. 564, 581 (1895). Yet for the second time, a panel of this court says no.

It's not the panel's fault. Its hands were bound by our badly fractured decision in *Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024) (en banc). There, an en banc majority said that the Religious Freedom Restoration Act of 1993 ("RFRA") categorically doesn't apply to the "disposition of government real property" absent some minor exceptions. *Id.* at 1044 (per curiam). Thus, the utter destruction of Oak Flat—land used by the Western Apache to commune with their Creator—isn't subject to RFRA's protection simply because it's federal land. But even if RFRA could be read as carving out the government's property when it was enacted in 1993, that interpretation simply cannot survive Congress's 2000 update to RFRA. Congress has now expressly decoupled RFRA from the Supreme Court's Free Exercise caselaw and added protection for the religious use of "real property." Thus, the land transfer of Oak Flat must meet RFRA's demanding requirements.

* * *

The importance of Oak Flat to the Western Apache cannot be overstated:

> For hundreds of years, they have worshipped at a location in Arizona's Tonto National Forest believed to be the most sacred of grounds—Oak Flat. According to their religious tradition, Oak Flat serves as the dwelling place of the Creator's messengers to the earth and generates a direct connection between the Creator's spirit and the Western Apache peoples. Given the deep bond between the Creator and the natural resources of the land, the Western Apaches regard Oak Flat as the holiest land—the perennial home of their sacred religious ceremonies and a historic place of worship. For them, the grounds, plants, and waters of Oak Flat are imbued with unique spiritual significance. It is no overestimation to say that Oak Flat is the spiritual lifeblood of the Western Apache peoples, connecting them to the Creator since before the founding of the Nation.

*Apache Stronghold v. United States*, 2021 WL 12295173, at *1 (9th Cir. 2021) (Bumatay, J., dissenting).

Oak Flat is also federal land—and it sits atop a huge deposit of copper. *Apache Stronghold v. United States*, 145 S. Ct. 1480, 1482 (2025) (Gorsuch, J., dissenting from denial of certiorari). A mining company spent twenty years seeking permission to dig up the site; it finally succeeded by convincing Congress to "attach a last-minute rider" to a

"must-pass" defense-appropriations bill. *Id.* at 1483 (simplified). Under the resulting law, the Department of Agriculture found that "the planned destruction of Oak Flat would cause indescribable hardship to tribal members," but insisted that any alternative would "substantially reduce the amount of ore that could be profitably mined." *Id.* at 1483–84 (simplified).

Apache Stronghold, a nonprofit group, sued to stop the destruction of the Western Apaches' high place. It argued that RFRA, Pub. L. No. 103-141, 107 Stat. 1488 (codified as amended at 42 U.S.C. § 2000bb *et seq.*), barred the government from handing over the land to the mining company. A divided panel of this court rejected that challenge, after which we took the case en banc. *See Apache Stronghold*, 101 F.4th at 1043–44 (per curiam). We produced a kaleidoscope of a decision—two en banc majorities, three concurrences, and two dissents.

The first majority rightly held that RFRA—which bars government from "substantially burden[ing] a person's exercise of religion" if the burden can't survive strict scrutiny, 42 U.S.C. § 2000bb-1(b)—carries a broader definition of "substantially burden" than our precedent had said. RFRA doesn't define "substantially burden," but the Ninth Circuit adopted an artificially narrow definition of the term. *See Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058 (9th Cir. 2008) (en banc). In *Navajo Nation*, we surmised that "a substantial burden is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit . . . or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Id.* at 1069–70 (simplified). The first en banc majority correctly overruled this part of *Navajo Nation*. *Apache Stronghold*, 101 F.4th at 1043 (per curiam).

If we had stopped there, *Apache Stronghold* would have been great news for religious freedom. But we didn't.

Instead, a *different* en banc majority cabined our ruling and ensured that it rang hollow for the Western Apache. This second majority immediately limited the meaning of "substantially burden" by drawing on a pre-RFRA case, *Lyng*. *Apache Stronghold*, 101 F.4th at 1043–44 (per curiam) (citing *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988)). In *Lyng*, the Supreme Court crafted a 640-million-acre carveout from the Free Exercise Clause: when "[t]he Government's rights to use of its own land" are implicated, the Free Exercise Clause largely bows to the government's whims. *Lyng*, 485 U.S. at 454. *Apache Stronghold*'s second majority asserted that RFRA "subsumes, rather than overrides," *Lyng*'s holding when it comes to what counts as a "substantial burden" on religious exercise. *Apache Stronghold*, 101 F.4th at 1043–44 (per curiam). And this majority claimed that the "disposition of government real property does not impose a substantial burden on religious exercise" unless it coerces religious belief, discriminates against religious belief, penalizes religious belief, or denies the religious rights, benefits, and privileges enjoyed by others. *Id.* In this majority's telling, so long as the government isn't outright discriminating against or coercing worshippers, even the most egregious burdens on religious practice simply don't count when they involve government land.

That's the law of the circuit. But, in my view, if this implied *Lyng* carveout "were ever possible, it is not so now." *Indus. Accident Comm'n v. Payne*, 259 U.S. 182, 188 (1922). That's because Congress amended—and expanded—RFRA in 2000, adding the "use . . . of real property for the purpose of religious exercise" to RFRA's exercise-of-religion

guarantee. 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(b). Whatever technical or contextual meaning the en banc majority might have found to limit "substantial burdens" on free exercise, that interpretation cannot survive Congress's later amendment to the statute. Today, any substantial burdens on the exercise of religion—including burdens based on the use of government-owned real property—trigger strict scrutiny.

Because the Western Apache deserve the protection of RFRA, I respectfully dissent from the denial of rehearing en banc.

## I.

Perhaps the *Apache Stronghold* en banc majority made plausible arguments that RFRA's use of "substantially burden" had a contextual meaning—at least when RFRA was enacted. After all, it is true that "Congress may . . . define a word or phrase in a specialized way." *Feliciano v. Dep't of Transp.*, 605 U.S. 38, 45 (2025). Under this view, Congress could've meant RFRA to "subsume[]" *Lyng*. *Apache Stronghold*, 101 F.4th at 1043–44 (per curiam). But the en banc majority's error was stopping with the 1993 RFRA. The RFRA of 1993 is not the RFRA of today. The 2000 amendment further untethered RFRA from the Supreme Court's First Amendment jurisprudence and expressly included assaults on religious exercise based on the use of real property. Given all this, RFRA cannot be said to "subsume" *Lyng* today. A substantial burden on the exercise of religion on federal lands is just that—a substantial burden.

### A.

Start with some background.

As RFRA itself tells us, Congress passed the law to champion the free exercise of religion after the Supreme Court's controversial decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), which "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion." 42 U.S.C. § 2000bb(a)(4); *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022) (noting that *Smith* has earned "some criticism"); *Apache Stronghold*, 101 F.4th at 1110 (VanDyke, J., concurring) (calling *Smith* "one of the most criticized Supreme Court decisions in history").

How does RFRA work? It "restore[d] the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)." 42 U.S.C. § 2000bb(b)(1). Its guarantee is clear: "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," *id.* § 2000bb-1(a), unless the government can prove that "application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest," *id.* § 2000bb-1(b). As originally enacted, RFRA defined "exercise of religion" as the "exercise of religion under the First Amendment to the Constitution." *See* Pub. L. No. 103-141, § 5, 107 Stat. 1488.

But there was a hiccup. Congress gave RFRA a sweeping scope: it extended to state and federal government alike. When a Texas church challenged a local zoning decision, the Supreme Court determined that RFRA's application to the States exceeded Congress's powers under Section 5 of the Fourteenth Amendment. *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997).

To patch the *City of Boerne*-sized hole in free-exercise law, Congress passed the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), Pub. L. No. 106-274, 114 Stat. 803 (codified at 42 U.S.C. § 2000cc *et seq.*). RLUIPA was enacted under Congress's Commerce and Spending Clause powers, which means it applies to "a more limited category of governmental actions." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 695 (2014). It prohibits state and local government from substantially burdening religious exercise through land-use regulations, as well as substantially burdening worship behind bars. 42 U.S.C. §§ 2000cc, 2000cc-1.

With RLUIPA, Congress made several amendments to RFRA. First was the *City of Boerne* fix. Congress originally defined "government" as agencies and officials of "the United States, a State, or a subdivision of a State." *See* Pub. L. No. 103-141, § 5, 107 Stat 1488. When Congress pushed RFRA's RLUIPA update, it limited "government" only to "the United States, or . . . a covered entity" and excluded States from its definition. 42 U.S.C. § 2000bb-2(1)–(2). Thus, Congress corrected RFRA's *City of Boerne* problem by editing out the States.

**B.**

But Congress did more than just respond to *City of Boerne* when it amended RFRA in 2000. Congress also replaced RFRA's definition of "exercise of religion." While RFRA's original definition was based on "the First Amendment," Congress unlinked the two and gave "exercise of religion" a broader definition straight from RLUIPA.

That's critical here: it means any *Lyng* carveout from RFRA no longer survives. After all,

> A statute which is amended is thereafter, and as to all acts subsequently done, to be construed as if the amendment had always been there, and the amendment itself so thoroughly becomes a part of the original statute that it must be construed in view of the original statute as it stands after the amendments are introduced and the matters superseded by the amendments eliminated.

*Blair v. City of Chicago*, 201 U.S. 400, 475 (1906) (simplified).

In 1993, Congress had originally defined "exercise of religion" as "the exercise of religion under the First Amendment to the Constitution." Pub. L. No. 103-141, § 5, 107 Stat 1488. But in 2000, Congress expanded the definition of "exercise of religion" to "religious exercise, as defined in section 2000cc-5"—thus incorporating part of RLUIPA. 42 U.S.C. § 2000bb-2(4). That change is significant. "When a statute includes an explicit definition of a term, we must follow that definition, even if it varies from a term's ordinary meaning." *Van Buren v. United States*, 593 U.S. 374, 387 (2021) (simplified). And this rule applies even if an earlier Congress had a different definition. So if the 1993 Congress thought RFRA meant one thing, it doesn't matter because the 2000 Congress changed its meaning. The upshot is that RLUIPA—not judicial interpretations of the First Amendment—now governs the contours of religious exercise.

So how does RLUIPA define "religious exercise"? Very expansively. RLUIPA's definition consists of two parts. It first explains what the term means "[i]n general": "'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). It then provides a "Rule" for interpreting the term: "The use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." *Id.* § 2000cc-5(7)(B). And finally, "Congress mandated that this concept 'be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'" *Hobby Lobby*, 573 U.S. at 696 (quoting 42 U.S.C. § 2000cc-3(g)). This means that "the 'exercise of religion' under RFRA must be given the same broad meaning that applies under RLUIPA." *Id.* at 696 n.5.

None of this was accidental. "[W]hen Congress fine-tunes its statutory definitions, it tends to do so with a purpose in mind." *S.D. Warren Co. v. Me. Bd. of Env't Prot.*, 547 U.S. 370, 384 (2006).

So whatever the merit of the *Apache Stronghold* majority's position on *Lyng*, that position makes little sense after RFRA's 2000 amendment. Suppose the majority is right that RFRA as originally passed came with a *Lyng*-sized carveout. The majority justified this by claiming that the phrase "substantially burden a person's exercise of religion" must be read "against the backdrop of existing law," particularly "the body of law discussed in the separate opinions in *Smith*, which concerned the very issue addressed" by RFRA. *Apache Stronghold*, 101 F.4th at 1058–59 (Collins, J.) (simplified). So according to the

second en banc majority, "substantial burden" must be read in the context of First Amendment decisions. Further, the majority tied *Lyng* directly to the precise phrasing of the First Amendment: "As a decision about the scope of the term 'prohibiting,' *Lyng* defines the outer bounds of what counts as a cognizable substantial burden imposed by the government." *Id.* at 1061 (emphasis omitted).

The majority's logic stops working as soon as RFRA incorporates RLUIPA's broader definition of "religious exercise."

First, "Congress deleted the reference to the First Amendment." *Hobby Lobby*, 573 U.S. at 696. This was "an obvious effort to effect a complete separation from First Amendment case law." *Id.* The majority can't "explain why Congress did this if it wanted to tie RFRA coverage tightly to the specific holdings of [the Supreme Court's] pre-*Smith* free-exercise cases." *Id.* at 714. Thus, even if 1993 RFRA incorporated pre-*Smith* limitations on "substantial burden," those precedents, including *Lyng*, no longer dictate what acts "substantially burden a person's exercise of religion." 42 U.S.C. § 2000bb-1(a). Now, "substantial burden" must be read in light of the new definition of "religious exercise," which has no *Lyng*-style carveouts and more closely follows the plain meaning of the term. *Id.* § 2000bb-2(4).

Second, after RLUIPA, there is no reason to import the term "prohibiting" from the Free Exercise Clause. *See* U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."). The precise phrasing of the Free Exercise Clause was the linchpin of *Lyng*'s constitutional holding. *See* 485 U.S. at 453, 456. Congress expressly decoupled RFRA from these limitations when it subbed in RLUIPA's

definition of "religious exercise." *See* 42 U.S.C. § 2000bb-2(4). The First Amendment's phrasing is out; the new RLUIPA definition of "religious exercise" is in. *Compare* § 5(4), 107 Stat. at 1489 ("[T]he term 'exercise of religion' means the exercise of religion under the First Amendment to the Constitution."), *with* 42 U.S.C. § 2000bb-2(4) ("[T]he term 'exercise of religion' means religious exercise, as defined in section 2000cc-5 of this title."). And so past interpretations of whether the government has "prohibited" free exercise are not the standard by which we should read RFRA.

Third, the majority's carveout for federal lands now flouts RFRA's plain text. Under RFRA's amended text, a substantial burden on the "use of real property" for a religious purpose now expressly triggers strict scrutiny. *See* 42 U.S.C. § 2000cc-5(7)(B). There's no carveout for "real property" owned and managed by the United States. It's easy to see why. Begin with the statute's rule: the "Government shall not substantially burden a person's exercise of religion." *Id.* § 2000bb-1(a). In turn, "exercise of religion" "means religious exercise" as defined by RLUIPA. *Id.* § 2000bb-2(4). And RLUIPA defines "religious exercise" to mean "*any* exercise of religion," *id.* § 2000cc-5(7)(A) (emphasis added), including "[t]he use, building, or conversion of real property for the purpose of religious exercise," *id.* § 2000cc-5(7)(B). And this rule focuses on the claimants' "use" of the land—it doesn't require that they own it. *Id.* Taking these definitions together, RFRA now prohibits the federal government from substantially burdening a person's use of real property for the purpose of religious exercise—no matter who owns the land.

Finally, RLUIPA's amendment to RFRA gives "exercise of religion" an extra gloss. RLUIPA provides that religious exercise "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g). This rule of construction applies with equal force to RFRA. *Hobby Lobby*, 573 U.S. at 696 n.5. And it's "simply not possible to read these provisions as restricting the concept of the 'exercise of religion' to those practices specifically addressed in [the Supreme Court's] pre-*Smith* decisions." *Id.* at 714. Thus, what substantially burdens the exercise of religion must be read broadly.

Post-2000, there is no *Lyng* carveout to RFRA. "[I]f the original text of RFRA was not clear enough on this point . . . the amendment of RFRA through RLUIPA surely dispels any doubt." *Hobby Lobby*, 573 U.S. at 714. RLUIPA's amendment shows that the majority's "real property" exclusion can't be squared with the text. The majority based its implied RFRA carveout on a First Amendment precedent (*Lyng*), *see Apache Stronghold*, 101 F.4th at 1044 (per curiam), but Congress expressly took the First Amendment out of RFRA's definitional scope, *see* 42 U.S.C. § 2000bb-2(4). And the majority centered that carveout on land, *see Apache Stronghold*, 101 F.4th at 1044 (per curiam), but Congress put "real property" directly within RFRA's ambit, *see* 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(B).

**C.**

The majority largely ignored the import of the 2000 RFRA update. The majority downplayed Congress taking the First Amendment out of RFRA's definition section as merely "decoupling . . . what *activities* count as the 'exercise

of religion' from the Free Exercise Clause." *Apache Stronghold*, 101 F.4th at 1063 (Collins, J.). In the majority's mind, it could stick to its guns on a narrow interpretation of RFRA because (1) "Congress did not alter the phrase 'substantial burden,'" and (2) the phrase should not be "decoupled from any notion of what counts as 'prohibiting' the free exercise of religion under pre-*Smith* caselaw." *Id.* So, for the majority, the *Lyng* carveout survived.

The majority's argument fails for several reasons. First, "we do not . . . construe statutory phrases in isolation; we read statutes as a whole." *Samantar v. Yousuf*, 560 U.S. 305, 319 (2010) (simplified). Applying that lesson to RFRA as amended, it makes little sense to read a single phrase ("substantially burden") in isolation and ignore that it is part of a larger provision ("Government shall not substantially burden a person's exercise of religion."). *See* 42 U.S.C. § 2000bb-1(a). But that's what the majority would have us believe. It says we can presume that "substantially burden" contains pre-*Smith* Free Exercise Clause jurisprudence, even though Congress expressly said that "exercise of religion" does not. The majority would then have us believe that Congress altering "exercise of religion" would have no impact on what counts as a "substantial burden" even though they are interrelated concepts—part of one statutory command. We should be "disinclined to say that what Congress imposed with one hand . . . it withdrew with the other." *Abbott v. United States*, 562 U.S. 8, 21 (2010) (simplified).

Second, it doesn't make sense to assert that the 2000 amendment only "decoupl[ed]" the First Amendment from certain "*activities*." *Apache Stronghold*, 101 F.4th at 1063 (Collins, J.). Nothing in RFRA's amended text supports this artificial narrowing of its meaning. Simply, when Congress

amended RFRA, it changed the entire definitional scope of "exercise of religion." Congress replaced an old definition premised on the Free Exercise Clause with a customized definition imported from RLUIPA that—as the majority itself admits—gives "'exercise of religion' . . . a broader meaning for purposes of RFRA." *Id.* at 1062; *see Holt v. Hobbs*, 574 U.S. 352, 358 (2015) (noting that the new definition "underscore[s RLUIPA's] expansive protection for religious liberty"). The majority overlooks that when Congress amended RFRA, it didn't just say what the law protects—many "activities," to be sure—but that it's no longer limited to protecting the constitutional concept of free exercise that's central to the majority's position. And limiting RFRA in this way violates Congress's command to construe "religious exercise" in "favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." *Hobby Lobby*, 573 U.S. at 696 (quoting 42 U.S.C. § 2000cc-3(g)).

Finally, the majority has no answer to Congress clarifying that the "use . . . of real property for the purpose of religious exercise shall be considered to be religious exercise." *See* 42 U.S.C. § 2000cc-5(7)(B). So even though Congress explicitly recognized the use of "real property" for religious purposes as "religious exercise," the majority somehow says that's not good enough to make it a *cognizable* burden under its narrow definition of "substantial burden." By keeping *Lyng* in place, the majority effectively overruled Congress and maintained that the "use . . . of real property" is unprotected by RFRA if it involves federal government property.

## II.

Given the change in statutory text, arguments that RFRA doesn't reach the government's land transfer at Oak Flat "are reasonable so far as they go, but they do not go very far." *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 296 (2010). Because the Western Apache "use" the government's "real property for the purpose of religious exercise," 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(B), RFRA applies and the government must prove that the land exchange here is the least restrictive means of furthering a compelling governmental interest, *see id.* § 2000bb-1(b)(1)–(2).

The term "real property" as used in § 2000cc-5(7)(B) of RLUIPA (and so in RFRA) must reach Oak Flat. Congress didn't define "real property," and nothing indicates a specialized meaning—so common meaning governs. *See Havana Docks Corp. v. Royal Caribbean Cruises, Ltd.*, 608 U.S. 235, 246 (2026) (giving "property" in 1996 federal statute its "[o]rdinary meaning," as found in contemporary *Black's Law Dictionary*). Any alternative interpretation runs headlong into the rule that "without strong proof of" a departure from ordinary meaning, "commonly used terms should be given their common meaning." *Mullin v. Doe*, 146 S. Ct. 2121, 2135 (2026).

In 2000, "real property" meant "[l]and and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land. Real property can be either corporeal (soil and buildings) or incorporeal (easements)." *Property*, *Black's Law Dictionary* (7th ed. 1999). That describes Oak Flat perfectly, with its "old-growth oak groves, sacred springs, burial locations, and . . . singular concentration of archaeological sites."

*Apache Stronghold*, 145 S. Ct. at 1480 (Gorsuch, J., dissenting from denial of certiorari).

This definition of real property isn't limited by provisions of RLUIPA that Congress didn't put in RFRA. RLUIPA defines a "land use regulation" as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest." 42 U.S.C. § 2000cc-5(5). If Congress wanted to import § 2000cc-5(5) into RFRA, it could have done so. But Congress only imported one definition—"'exercise of religion' means religious exercise, as defined in section 2000cc-5"—and that definition is at § 2000cc-5(7). 42 U.S.C. § 2000bb-2(4). It matters not that an implied "limit comes from a related provision rather than thin air": "snipping words from one subsection and grafting them onto another violates our normal interpretive principles." *Fischer v. United States*, 603 U.S. 480, 508 (2024) (Barrett, J., dissenting).

RFRA and RLUIPA also do different things. RFRA applies only to the federal government and its "covered entities," but it restricts them from doing a lot—the law "provide[s] very broad protection for religious liberty," "far beyond what th[e Supreme] Court has held is constitutionally required." *Hobby Lobby*, 573 U.S. at 706. RLUIPA, "[l]ess sweeping than RFRA[] and invoking federal authority under the Spending and Commerce Clauses," applies to state and local action, but only in "two areas" of particular concern to Congress: abuse of land-use regulations and worship behind bars. *Cutter v. Wilkinson*,

544 U.S. 709, 715 (2005). So there's no reason to impose RLUIPA's land-use provision on RFRA.

In other words, limiting RFRA's scope in "real property" cases to RLUIPA's "land use regulation" cases wouldn't just be textually unfounded. It would erode RFRA's "very broad protection," *Hobby Lobby*, 573 U.S. at 706, while ignoring that Congress passed RLUIPA and only RLUIPA under its "limited and enumerated powers" to govern States, *Landor v. La. Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1939 (2026). All the more reason to "stick with the ordinary meaning of the text that actually applies[.]" *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 816 (2024).

## III.

## Conclusion

The Western Apache use Oak Flat to speak to their Creator. That is enough to receive RFRA's protection. The *Apache Stronghold* majority's analysis might've been right at some point, but not today. Rather than keep *Apache Stronghold* in place to exclude worshippers on government land, we should've swept it out of the Ninth Circuit.

I respectfully dissent.